Objectives were developed considering the historic and anticipated budget allocations for the Forest, as well as professional experience in implementing various resource programs and activities. Objectives can exceed or not meet an accomplishment based on numerous factors, including budget and staffing increases or decreases, changes in planning efficiencies, and unanticipated resource constraints.

### Standards

The 2012 Planning Rule defines standards as "a mandatory constraint on project and activity decision-making, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements" (36 CFR 219.7(3)(1)(iii)). Standards can be applied forestwide, or specific to a particular management area.

### Guidelines

Guidelines are described in the 2012 Planning Rule as "a constraint on project and activity decision-making that allows for departure from its terms, so long as the purpose of the guidelines is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements" (36 CFR 219.7(3)(1)(iv)). A guideline can be forestwide or specific to a management area.

**Figure 2. Regenerating aspen in an area burned in the 2013 Papoose Fire**

### Suitability of Lands

Suitability determinations are required by the 2012 Planning Rule. The rule states, "Specific lands within a plan area will be identified as suitable for various multiple uses or activities based on the desired conditions applicable to those lands. The plan will also identify lands within the plan area as not suitable for uses that are not compatible with desired conditions for those lands. The suitability of lands need not be identified for every use and activity. Suitability identifications may be made after consideration of historic uses and of issues that have arisen in the planning process. Every plan must identify those lands that are not suitable for timber production." (36 CFR 219.7(e)(1)(v))

The identification of suitability of lands for a particular use in the forest plan indicates that the use may be appropriate but does authorize a specific commitment. Uses or activities may not occur in areas that are identified as not suitable for that use or activity. Subsequent site-specific analysis compliant with the National Environmental Policy Act must be done to prohibit an existing use or authorize a new use. Generally, Forest lands are suitable for uses and management activities appropriate for national forests, such as outdoor recreation or timber, unless identified as not suitable.

### Goals

Goals can be included as optional plan components. Goals are broad statements of intent, other than desired conditions, typically related to process or interaction with the public. Goals are expressed in broad general terms, but do not include completion dates. (36 CFR 219.7(e)(2))

## Other Required Plan Content

The 2012 Planning Rule also requires that plans include "other required content" (36 CFR 219.7(f)(1)) addressing the distinctive roles and contributions of the plan area (see below), a monitoring program (Chapter 4), priority watersheds (appendix G), and proposed and possible actions (appendix I).

## Optional Plan Content

A plan may include additional content, such as potential management approaches or strategies and partnership opportunities or coordination activities 36 CFR 219.7(f)(2). Optional plan content can be changed through administrative changes.

### Management Approaches

Management approaches are optional plan content (FSH 1909.12 22.4) that describes the principal strategies and program priorities the responsible official intends to use to carry out projects and activities developed under the plan. Management approaches can convey a sense of priority and focus among objectives and the likely management emphasis. They relate to desired conditions and may indicate the future course or direction of change while recognizing budget trends, program demands, and accomplishments.

## Strategic Planning Framework

The forest plan was developed based on a strategic framework that includes vision, strategy, tactical, monitoring, and adaptive management levels. Each level provides information to help resource managers determine how to maintain or appropriately adapt forest plan direction while continuing to maintain or move toward desired conditions.

Forestwide goals present broad statements of intent, or vision, other than desired condition. These often look more like vision statements that all other direction tiers to. To incorporate the many uses on the Forest and manage the resources in a sustainable manner, three goals have been established to convey the intent of plan direction. The goals address sustainable ecosystems, watersheds and watershed health, social and economic contributions of the Forest to the surrounding communities, and connecting citizens to the land. The goal statements are numbered to allow for reference, not to indicate priority.

### Goal 1

#### *Maintain and restore sustainable, resilient terrestrial ecosystems*

Ecosystems are a barometer of the quality of land management practices. A natural variety of species, genetic composition, and ecological processes are key to providing the diversity needed for resiliency in the face of environmental disturbances and changes.

Where appropriate in the next planning horizon, diversifying age classes and structure, seral stages, and habitat classes while providing for and maintaining habitat connectivity would provide multiple ecosystem benefits. Increased resilience to insect and disease outbreaks, responsiveness to warmer, drier weather patterns, and increased ecosystem services are just a few of the many benefits provided by sustainable, resilient ecosystems. Ecosystems are managed for connectivity across jurisdictional boundaries. Forest management to maintain and restore sustainable, resilient terrestrial ecosystems will also provide for connectivity of habitat across the landscape. Connectivity of habitats is an important component of ecological integrity and is conducive to making ecosystems more sustainable and resilient to natural disturbances and stressors. The Forest will continue to collaborate and cooperate with other agencies, units, partners, groups, state and local agencies, and individuals.

Forest ecosystems vary by elevation and range from alpine tundra at the highest elevations to pinyon-juniper woodland and sagebrush ecosystems at the lowest elevations. Between the extremes are spruce-fir ecosystems, mixed conifer, and a small amount of Rocky Mountain Gambel oak.

These ecosystems provide habitat for many species of mammals, birds, and reptiles. Amphibians and fish are found in the various wetland ecosystems that occur across the Forest.

Commercial and noncommercial forest and wood products are provided to meet the needs of the public in a sustainable manner to provide for the needs of future generations.

## Goal 2

### *Protect and restore watershed health, water resources, aquatic ecosystems, and the systems that rely on them*

National forests that exist today were initially created under the guidance of the National Forest Reserve Act of 1891, which allowed the President of the United States to set aside forest reserves from land in the public domain. This Act provided for wise use of the lands that provide protection of timber at the headwaters of streams, reduce downstream flooding, and provide a summer-long water supply for irrigation in the arid West (Muhn 1992). Protecting and restoring watershed health reaffirms the Act that created today's national forests.

Water from National Forest System lands, including the Rio Grande National Forest, supports outdoor recreation, biological diversity, wildlife species and habitats, agricultural irrigation, and flood control. National forests provide clean, abundant water for municipal water supplies, and for local and regional aquifer systems.

Opportunities for collaborative stewardship of watersheds emphasize the interrelated biological, economic, and social factors that affect these areas. Healthy and functioning watersheds contribute to overall resource health.

**Figure 3. Rio Grande headwaters near Stony Pass**

## Goal 3

### *Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land*

National Forest System lands contribute forest products and tourism opportunities that are important to national and local economies. They provide ecosystem services for current and future generations. These lands have been influenced by humans while protecting areas of tribal

importance and traditional uses and other areas of religious or cultural importance. Opportunities are available for individuals, partners, and organizations to be active participants in managing, monitoring, and implementing projects that achieve integrated resource management goals.

National Forest System lands provide landscapes with scenic diversity that appear natural, recreational opportunities, and outdoor experiences that range from primitive to developed, with campgrounds and restrooms. Interpretive opportunities increase public knowledge, provide historical background, and promote connection of the current people to the past and their land. Designated areas, such as wilderness and wild, scenic, and recreational rivers, are maintained to protect resource integrity and avoid impacts associated with public use levels.

Cultural resources, including areas acknowledged as traditional cultural properties and other significant areas identified in consultation with tribes and local communities, provide tangible links to historically rooted beliefs, customs, and practices. Cultural resources are managed in compliance with applicable laws, regulations, and policies. Heritage resource sites are managed and interpreted in compliance with all applicable laws and regulations. Historic resources are preserved and protected, and when eligible, nominated to the National Register of Historic Places.

The 2012 Planning Rule defined ecosystem services to include provisioning services such as air, energy, fiber, minerals, and water; regulating services such as soil stabilization; and cultural services that include cultural heritage values and recreational experiences. The Forest strives to meet the demand for these services.

National Forest System lands are used by private industry and other government organizations under special use authorization to provide services for the public that live or recreate around or on these lands. These uses include power generation and transmission, roads for access to the Forest and private inholdings, communication, water storage and transmission, as well as other uses.

## Distinctive Roles, and Contributions

The Rio Grande National Forest is administered by the U.S. Forest Service and is one of 154 national forests nationwide. The Forest is within the Rocky Mountain Region, which oversees national forests and grasslands in Colorado, Kansas, Nebraska, South Dakota, and Wyoming. There are 11 national forests and 4 national grasslands in the Rocky Mountain Region.

The Rio Grande National Forest consists of approximately 1.83 million acres in south-central Colorado (Figure 4) and forms the backdrop for the San Luis Valley, one of the largest mountain basins in the world. The Forest is named for the Rio Grande, as the river's headwaters originate within the Forest boundary. National Forest System lands provide water for municipal, industrial, and agricultural purposes, and the Forest was established in large part for the protection of these watersheds.

**Figure 4. Location of the Rio Grande National Forest in Colorado**

The Forest Service, administered by the U.S. Department of Agriculture, is one of several public land management agencies in the area. Local Department of Interior agencies include the Bureau of Land Management, National Park Service, and U.S. Fish and Wildlife Service. All of the agencies work collaboratively across boundaries.

State agencies also manage lands and resources in close proximity. Forest staff regularly collaborate with Colorado Parks and Wildlife in managing wildlife species and habitat, including elk and bighorn sheep. State agencies have the responsibility of enforcing hunting regulations and in determining big game population objectives and strategies to meet those objectives. Colorado Parks and Wildlife directs herd location and management related to the habitat management responsibilities of the Forest. Big game hunting is an important part of Colorado's economy, which the national forests support.



**Figure 5. Bighorn sheep ewe**

The San Juan Mountains form the western boundary of the Forest. Elevation ranges from about 7,800 feet in the foothills to more than 13,000 feet along the Continental Divide. The eastern boundary follows the Sangre de Cristo mountain range, where elevations exceed 14,000 feet.

The San Luis Valley lies between the two mountain ranges. The valley contains very little National Forest System land. Most National Forest System lands are located in the Sangre de Cristo and San Juan mountain ranges on either side of the San Luis Valley.

The range of ecosystems that occurs on the Forest is generally determined by elevation. At the highest elevations is alpine tundra, which transitions into spruce-fir forests, which is generally inhabited by Engelmann spruce and subalpine fir mixed with aspen. Vegetation in these ecosystems has been substantially altered by the recent spruce bark beetle infestation.

Below the spruce-fir ecosystem are the mixed-conifer ecosystems, which occur in the transition zone between the higher elevation spruce-fir and the lower elevation pinyon-juniper. These ecosystems range from wet to drier ecosystem sites. They include a mix of conifer species, such as ponderosa pine, Douglas fir, white fir, Colorado blue spruce, and smaller amounts of aspen. Depending on site conditions, limber pine, bristlecone pine, and some pinyon pine or juniper can also be present.

At lower elevations is the pinyon-juniper woodland ecosystem, which includes pinyon pine, Rocky Mountain juniper, and Utah juniper. These woodlands generally occur on warm, dry sites

on mountain slopes, mesas, plateaus, and ridges. Understory species include sparse perennial grasses, annual and perennial forbs, and sparse shrubs.

Small amounts of Rocky Mountain Gambel oak shrubland ecosystems are present at the north end of the San Luis Valley near Poncha Pass. The Southern Rocky Mountain montane-subalpine grassland ecosystem includes Arizona fescue, Thurber fescue, and several other grasses, forbs, and sedges.

The Forest occupies the headwaters of the Rio Grande, which flows nearly 2,000 miles from the Continental Divide in southwestern Colorado to the Gulf of Mexico. All public water supplies in the San Luis Valley use water that either wholly or partially originates on Forest lands.

The Rocky Mountain riparian ecosystem includes numerous riparian types in the upper montane and subalpine zones. These systems are highly varied and generally consist of cottonwoods, willows, sedges, and other herbaceous vegetation, aspen, and conifers such as blue spruce, Engelmann spruce, and subalpine fir.

The Forest provides habitat for many species of mammals, birds, reptiles, amphibians, and fish. Eight species are federally recognized as threatened or endangered animal species, including black-footed ferret, Canada lynx, Gunnison sage grouse, Mexican spotted owl, New Mexico meadow jumping mouse, southwestern willow flycatcher, Uncompahgre fritillary butterfly, and yellow-billed cuckoo.

The Forest represents a large part of the core use area for Canada lynx within Colorado. Canada lynx were reintroduced into the state from 1999 to 2006. The vast majority of Canada lynx in Colorado remain and reproduce in the high-elevation spruce-fir zone in the southwestern part of the state.

The various ecosystems provide clean air and water, recreation opportunities, and wood products for Forest visitors.

Counties containing National Forest System lands include Alamosa, Archuleta, Conejos, Hinsdale, Mineral, Rio Grande, Saguache, and San Juan. Many counties are characterized by low population densities, high unemployment, and low per capita income.

Colorado communities within these eight counties as well as Chaffee, Costilla, Fremont, Gunnison, Huerfano, La Plata, Montrose, and Park Counties, and New Mexico communities in Rio Arriba and Taos Counties, have strong socioeconomic ties to the Forest. Residents from local and surrounding communities rely on the Forest for gathering forest products such as firewood, and for recreational activities including hiking, camping, hunting, and more.

Outdoor adventure in southwestern Colorado has a reputation for diversity and excellence. The Forest has diverse recreational opportunities from nonmotorized activities such as backpacking, hiking, fishing, snowshoeing, and skiing to motorized activities such as dirt biking, four-wheeling, and snowmobiling. Forest lands include a variety of developed recreation sites, many areas for dispersed recreation, recreation rentals, seven of the state’s 14,000-foot mountain peaks (fourteeners), and several other unit recreation areas.

Because of the proximity to open spaces, natural settings, and easy access to year-round opportunities, communities surrounding the Forest have become increasingly attractive to new residents. Population projections indicate that this area of Colorado will continue to grow, increasing demands on Forest resources.

The jagged peaks of the Sangre de Cristo and San Juan Mountains surround the San Luis Valley. Whether viewing mountain scenery from roads or finding challenge on trails or rushing rivers, visitors discover solitude and self-reliance through uncrowded year-round recreation opportunities. The Forest's recreation niche addresses solitude in every season. As recreation pressures increase in other parts of Colorado, the public lands surrounding the San Luis Valley maintain their remote spirit and traditional culture.

More than 1,350 miles of trails traverse the Forest including the Colorado Trail, West Lost Trail, and the congressionally designated Continental Divide National Scenic Trail and Old Spanish National Historic Trail. An estimated 170 miles of the Continental Divide National Scenic Trail traverse the Forest, starting at the Forest boundary with the Gunnison National Forest and stretching to the New Mexico state line. Sections of the Old Spanish National Historic Trail, designated in 2002, follow trade routes used to transport supplies and slaves from Santa Fe to the California territory in the 1820s. The West Lost Trail on the Divide Ranger District is a designated national recreation trail.

Colorado has the sixth-highest amount of National Forest System lands nationwide, with about 14,471,800 acres of national forest and grasslands that provide places for recreation activities for residents and visitors. The Forest makes up 13 percent of National Forest System lands in the State of Colorado. For Colorado and most of the Rocky Mountains, tourism is a main source of income. The beautiful scenery provided by the Forest directly ties to local economic benefits.

The Silver Thread and Los Caminos Antiguos Scenic Byways traverse the Forest along with a well-developed system of roads and trails. Many outfitter and guide services provide visitor opportunities to experience the Forest.

The Rio Grande National Forest offers unique scenic experiences. Southwestern flora combine with the spectacular scenery of the central Rocky Mountains. To the east, the open floor of the San Luis Valley is surrounded by the rugged mountain peaks of the Sangre de Cristo range. To the north, high mountain peaks give way to gentler rolling hills covered in lodgepole pine that extend to the valley bottom. Looking west, the scattered mountain peaks are mixed with rolling hills, canyons, and open meadows. To the south, the valley is fairly flat, with several dominant, rounded mountains rising above the horizon.

These characteristics offer visitors some of Colorado's most beautiful scenery. The Sangre de Cristo range is home to several of Colorado's 14,000-foot peaks, including Crestone Peak, Crestone Needles, Kit Carson, and Blanca Peak. The National Park Service manages Great Sand Dunes National Park and Preserve, which borders the Forest in the Sangre de Cristo range. The park is home to the tallest sand dunes in North America.

Rio Grande Pyramid, North Clear Creek Falls, Bristol Head Mountain, the headwaters of the Rio Grande, and the La Garita, South San Juan, and Weminuche Wilderness areas are all in the western part of the Forest. Parks and open meadows contain a variety of plant and animal life and are home to a wide range of wildflowers.

Historic scenic areas include the Bachelor Loop, near Creede, Colorado; the Bonanza Loop, near Villa Grove, Colorado; and the Cumbres and Toltec Scenic Railroad, near Antonito, Colorado. These areas provide a glimpse into the past and allow visitors to connect with local history.

## Relationship to Other Guidance

Management of National Forest System lands is directed from several levels. National and regional direction includes laws, executive orders, regulations, and Forest Service policies. Forest plans provide direction for managing resources at a project or site-specific level. The Forest contributes to national strategic guidance in the context of its unique combination of social, economic, and ecological conditions. This plan helps define the role of the Forest in advancing the agency's national strategy and reflects the national goals. The plan is reflective of the mission of the Forest Service, which is "to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations." The plan also considers direction from other applicable tribal, federal, state, and county plans and strives to incorporate these organizational goals through an "all lands" integrated approach that considers the broader landscape in which the plan operates.

The goals and objectives outlined in the Forest Service's 2015–2020 Strategic Plan were taken into account during revision of the forest plan. The additional laws, policies, regulations, and agency direction tiered to by this plan are listed in appendix H.

Consultation with adjacent federal, state, and county land managers occurred during development of the plan, and collaborative efforts will continue as the plan is implemented.

## Rights and Interests

The forest plan provides a strategic framework that guides future management decisions and actions. As such, forest plans do not create, authorize, or execute any ground-disturbing activity. The forest plan will not subject anyone to civil or criminal liability and will not create legal rights. Forest plans do not change existing permits or authorized uses. To change existing uses, for example, a subsequent decision would be needed.

# Chapter 2. Forestwide Direction

This chapter contains management direction that applies forestwide unless more restrictive direction is specified in Chapter 3. Forestwide direction include desired conditions, objectives, standards, guidelines, and land suitability determinations. Laws, regulations, policies, executive orders, and Forest Service directives (in Forest Service manuals and handbooks) are generally not contained in forest plan components.

This chapter is organized with associated resource direction listed in alphabetical order under the most applicable goal. Most resource areas could be placed under multiple goals. Because the need for plan components and direction varies by resource, not every resource includes every plan component. Some resource sections may have only guidelines, while others have the full complement of desired conditions, objectives, standards, and guidelines.

## Goal 1

***Maintain and restore sustainable, resilient terrestrial ecosystems***

### Aquatic and Terrestrial Nonnative Invasive Species and Noxious Weeds (NNIS)

Nonnative invasive species and noxious weeds include plant and animal species that disrupt ecosystem integrity and displace habitat for native plants and animals. Integrated pest management approaches are applied when treating invasive plant species. These include effective prevention and education programs that combine mechanical, biological, cultural, and chemical methods of control.

Nonnative invasive species and noxious weeds for both aquatic and terrestrial ecosystems are treated under the same program at the Forest level. The direction is combined and contained here; however, it is also applicable to water resources identified in Goal 2.

#### *Management Approaches*

*Principal strategies and program priorities to reduce or control existing and new aquatic and terrestrial invasive species*

The risk of introducing and spreading nonnative plant and animal species and noxious weeds is minimized for all activities, as appropriate. The spread of nonnative invasive species and noxious weeds is mitigated in places where these species are already present. Special designated areas, including roadless and wilderness areas, will generally be prioritized for treatment.

Information from partners, including the Colorado Department of Agriculture, is incorporated into the Invasive Species Action Plan, which identifies priority species, inventory and monitoring, and tools and techniques to address nonnative invasive species.

Continued coordination and cooperation with Colorado Parks and Wildlife helps reduce the potential to introduce, and to control the spread of, aquatic invasive species. Effective prevention and control methods for aquatic nuisance species are shared with fishermen, rafters, and other water recreational users.

Project implementation minimizes the extent of areas affected by existing populations and reduces the chance of introducing new species. Timely and effective revegetation of disturbed sites provides protection of soil and water resources that cannot be restored naturally.

All biological, cultural, and chemical tools are available to reduce or control nonnative invasive species and noxious weeds. Technological advances are incorporated into management practices when shown to be equivalent to, or more effective than, existing treatments.

#### *Desired Conditions*

**DC-NNIS-1:** Populations of aquatic and terrestrial nonnative invasive species do not occur or are low in abundance. Those that do occur do not disrupt ecosystem function. (Forestwide)

**DC–NNIS-2:** Native ecosystems are resilient to invasion by nonnative invasive species. (Forestwide)

#### *Objectives*

**OBJ-NNIS-1:** Reduce terrestrial or aquatic nonnative invasive species on 5,000 acres over the next 15 years. (Forestwide)

### Fire Management (FIRE)

This section provides guidance on the management of both wildfires and prescribed fires, as well as fuels treatment activities to meet various desired conditions and resource objectives. This guidance carries forward into the Forest spatial fire management plan that provides the strategic objectives and management requirements for managing wildfires. The spatial fire plan resides in the Wildland Fire Decision Support System, but as technology advances this may change over time.

Wildland fire management is balanced between wildfire suppression and use of wildland fire, including both prescribed and natural ignitions, to regulate hazardous fuels and move or maintain forest ecosystems toward desired conditions. Wildland fire management assists in achieving ecosystem sustainability including the interrelated ecological, economic, and social components.

#### *Management Approaches*

*Principal strategies and program priorities for wildfire, prescribed fire, and fuels management*

Fire suppression actions are taken to mitigate effects of wildfire to public safety, communities, and unique resource values, while allowing unplanned ignitions to play a natural role in fire-dependent ecosystems.

Wildfire is recognized as a tool to accomplish multiple objectives. Wildfires caused by natural ignitions are managed for multiple resource objectives, including resource benefit when conditions are favorable.

The use of appropriate and authorized hazardous fuels reduction tools, including but not limited to grazing, mechanical treatments, prescribed fire, or naturally ignited wildfires, to meet ecosystem needs and reduce vegetation build-up is intended to lower the risk to communities and other values from damage or loss from wildfire.

Prescribed fire is an appropriate tool to dispose of slash and return nutrients and woody debris to soils while reducing hazardous fuels. This can be integrated into wildlife habitat and forage improvement, and seedbed preparation for natural regeneration.

## Fire Management Zones

Two strategic fire management zones were developed that closely correspond to management area boundaries. Additional direction may be needed depending on the site-specific conditions. Assigning strategic fire management zones supports decision-making prior to ignition by pre-assessing areas for wildland fire risks and benefits, for both prescribed fire and wildfire. Fire management zones include:

- Wildland fire management zone: resource restoration (WFMZ-R) and
- Wildland fire management zone: resource protection and benefit (WFMZ-PB).

### *Wildland Fire Management Zone: Resource Restoration (WFMZ-R)*

This zone applies to Designated Wilderness, Recommended Wilderness, and Roadless Management Areas (MAs 1, 1.1, and 3). These areas represent a lower risk to resource values from wildfire. Conditions allow natural resources to benefit from wildland fire. Management of wildfire to meet resource objectives in this zone is the least constrained. Ecological restoration is accomplished by managing wildland fire under a wide range of weather, fuel moisture, and other environmental conditions that allow fire to play a natural role in the ecosystem. The use of prescribed fire to meet specific resource objectives is appropriate in this zone. All naturally occurring wildfires in these areas are managed primarily to restore and maintain the natural role of fire in the ecosystem with a minimal emphasis on suppression. However, if a wildfire ignites in an area of this zone where a community or infrastructure value is threatened, suppression action will be taken to mitigate the effects. Human-caused wildfires are managed using a full suppression strategy commensurate with the values at risk.

### *Wildland Fire Management Zone: Resource Protection and Benefit (WFMZ-PB)*

This zone applies to all other areas of the Forest, including the General Forest and Rangeland and all Special Designation Management Areas (MAs 5, 4.1, 4.2, 4.21, 4.34, and 4.8). Current conditions may put some natural resource values at varying degrees of risk of damage from wildfire. Mechanical treatments and prescribed burning may be used to protect natural resource values before using wildfire under a wider range of weather, fuel moisture, and other environmental conditions. Wildfires that burn in this zone may benefit natural resources under certain conditions. All lightning-caused wildfires in these areas will be assessed on an individual basis for the most appropriate response based on values at risk and potential benefits to natural resources from wildfire. All human-caused unplanned wildfires are managed using a full suppression strategy commensurate with the values at risk.

**Figure 6. West Fork Fire, June 2013**

### *Desired Conditions*

**DC-FIRE-1:** Wildland fire and fuels reduction treatments are used to create vegetation conditions that reduce threats to real property and infrastructure from wildfire. Fuel loads on lands adjacent to developed areas and communities are reduced. Lands adjacent to private property and infrastructure have defensible space and dispersed patterns of fuel conditions that would favorably modify wildfire behavior and reduce the rate of spread in and around communities at risk. (Forestwide)

**DC-FIRE-2:** Natural ignitions play a natural role in ecosystem dynamics when and where there is no threat to human life or property. (Forestwide)

### *Objectives*

Refer to *Vegetation Management* section.

### *Standards*

**S-FIRE-1:** Unplanned human-caused ignitions will not be managed for resource benefit. (Forestwide)

**S-FIRE-2:** Fire control lines will be rehabilitated to prevent use as trails and/or roads. (Forestwide)

## Insects and Disease (INDS)

Insects and disease can cause major disturbances to the ecological processes that shape the condition of forests. Insects and diseases play an important role in the natural cycles of forest growth and decline. Without the influence of change agents such as fire, insects, and disease, the forest would stagnate and eventually become homogeneous, with a resultant negative impact on biodiversity and resilience to disturbance. These change agents are an integral part of forest ecosystem processes, but still pose a challenge to forest management. The scale of the recent bark beetle outbreak has created significant management challenges that are addressed throughout this forest plan.

Many plan components, including standards and guidelines associated with insects and disease management, are contained in other sections of this forest plan, including but not limited to *Vegetation*, *Pollinators*, and *Wildlife*, along with specific direction for management areas: *Wilderness, Research Natural Areas, Colorado Roadless Areas, Dispersed and Developed Recreation*, and *Ski-based Resorts*.

### *Management Approaches*

*Principal strategies and program priorities to address insects and disease that are not covered in other areas of the forest plan*

Vegetation in high-use recreation areas is managed to ensure public safety and improve forest health in alignment with the desired recreational setting.

Integrated pest management techniques are employed to meet resource objectives. Treatment activities consider the values present and risks to adjacent lands, both public and private. Priority is given to areas where value to be protected exceeds the costs of protection. An example is recreation sites or areas of concentrated public use that are adjacent to subdivisions.

Project activities are designed to minimize the risk of spreading existing infestations, while still providing habitat conditions for wildlife and plant species dependent on the presence of insects and disease.

## Range Management (RNG)

Rangelands are all lands producing, or capable of producing, native forage for grazing and browsing animals, and lands that have been revegetated naturally or artificially to provide a forage cover that is managed like native vegetation. They include all grasslands, forb lands, and shrublands, and those forested lands that can, continually or periodically, naturally or through management, support an understory of herbaceous or shrubby vegetation that is forage for grazing or browsing animals. Rangelands on the Forest are naturally fragmented because of highly dissected mountain slopes and changes in vegetation as elevation changes.

A forest plan identifies areas capable and suitable for livestock, and assigns standards and guidelines specific to range management for those areas.

Rangeland capability is the potential of an area of land to produce resources, supply goods and services, and allow resource uses under an assumed set of management practices and at a given level of management intensity. Capability depends upon current resource condition and site conditions such as climate, slope, landform, soils and geology, as well as the application of management practices such as silviculture or protection from fire, insects, and disease.

Capability is the initial step in the determination of suitability. It is portrayed as a separate step for both reasons of clarity and because the actual product of "capability" often has utility in planning beyond its role in the determination of suitability.

Rangeland suitability is a determination of the appropriateness of grazing on capable lands based on economic and environmental consequences and consideration of the alternative uses forgone if grazing is allowed.

The 2002 amendment to the 1996 forest plan serves as this basis and projects a capacity for livestock grazing at 143,000 head months, including cattle and sheep. An estimated 581,556 acres of land are considered capable and suitable for domestic livestock grazing on the Forest.

Livestock-based agriculture is historically and culturally important in the San Luis Valley and southwestern Colorado. Agriculture, particularly farming and ranching, continues to be an important industry. Domestic livestock grazing contributes to the stability of the surrounding ranching community and its values are recognized as a part of the heritage, for contributions to food and fiber, and for maintenance of open space. While the range allotments on the Forest are not the exclusive source of feed for the permitted stock, they provide important high-elevation forage during the summer months. This forage supplements private and leased pasture, and allows the permittees to maintain current livestock numbers.

### Management Approaches

*Principal strategies and program priorities to address continued and sustained range management*

When allowable-use criteria, allotment management plan guidance, or annual operating instructions have been exceeded, all other solutions are extensively considered before removing livestock from the grazing unit or allotment. Damage from allowable use can result from many other factors including but not limited to flooding, recreation, and wildlife. None of these other factors should push use beyond what is allowed.

Rangelands are managed to provide a wide variety of benefits, including forage for livestock and wildlife, a diversity of plant and animal communities, and high-quality water.

Grazing administration will discourage livestock use in openings created by fire or timber harvest that would delay successful regeneration of the shrubs and trees, and in sensitive riparian, wetland, and spring ecosystems.

Allotments may be vacated but are generally not closed except in extreme circumstances and conditions.

Work is coordinated with cooperators, partners, and permittees to prioritize and restore upland ecosystems and rebuild important structural improvements.

### Desired Conditions

**DC-RNG-1:** Domestic livestock grazing is managed to promote landscape diversity (composition, structure, and function) with both a spatial context (what species, what kind of structure, and what landscape patterns are natural for each ecosystem) and a diversity context (which seral stages and how many are natural for each ecosystem). (Forestwide)

**DC-RNG-2:** Forage, browse, and cover needs for wildlife and authorized livestock are in balance with available forage. (Forestwide)

**DC-RNG-3:** Temporary forage is available for grazing within existing, permitted allotments in coordination with other resource needs, e.g., reforestation. (Forestwide)

**DC-RNG-4:** Range improvements support ecologically sustainable grazing and benefits for wildlife when opportunities exist. New and replacement improvements are designed to benefit aquatic and terrestrial species. (Forestwide)

### *Objectives*

**OBJ-RNG-1:** Restore 150 acres of upland ecosystems over the next 15 years. Restoration objectives will vary based on the ecosystem and condition of the areas. (Forestwide)

### *Guidelines*

**G-RNG-1:** Develop site- and species-specific vegetation use and residue guidelines during rangeland planning, and document them in allotment management plans. In the absence of updated planning or an approved allotment management plan, the utilization and residue guidelines in Table 1 and Table 2 will apply. (Forestwide)

**Table 1. Utilization guidelines for rangeland condition**

| Type of Management | Satisfactory (percent) | Unsatisfactory (percent) |
|---|---|---|
| Season-long | 35 | 20 |
| Fall and winter | 55 | 35 |
| Deferred rotation | 45 | 25 |
| Rest rotation | 50 | 35 |

**Table 2. Clary and Webster residue allowances for rangeland**

| Season of Pasture Use | Satisfactory (inches) | Unsatisfactory (inches) |
|---|---|---|
| Spring | 3 | 4 |
| Summer and fall | 4 | 6 |

**G-RNG-2:** Authorized grazing should not occur on an individual unit for the entire vegetative-growth period. This would be acceptable when the grazing system involves complete rest for that unit for two or more years after a full growing season treatment. (Forestwide)

**G-RNG-3:** Authorized grazing in riparian management zones and groundwater-dependent ecosystems should be in compliance with residual stubble heights identified in Forest Service Technical Report INT-263, *Managing Grazing of Riparian Areas in the Intermountain Region* (Clary and Webster 1989). (Forestwide)

**G-RNG-4:** Authorized grazing in aspen stands should ensure sprouting and sprout survival to perpetuate the long-term persistence of the clones, unless elimination of the clone is planned. (Forestwide)

### Land Suitability

**SUIT-RNG-1:** Grazing in national forest wilderness areas is authorized by the Congressional Grazing Guidelines (108, P.L. 96-560, H.R. Report 96-617 dated 11/14/79). Grazing authorizations would be included as part of any legislation on Management Area 1.1a, Recommended Wilderness. Portions of the acres of recommended wilderness are included in grazing allotments.

## Soils (SOIL)

Soils are a foundational and integral part of ecosystems and the services they provide. Soils provide ecosystem goods and services such as clean drinking water and forest products such as timber and firewood, and provide areas for cattle grazing and recreational opportunities. Healthy, sustainable soils will continue to provide these important ecosystem goods and services into the future. Effects of changes in temperature, and frequency and timing of weather events, can be mitigated in the short term if healthy soils are present. Soils have generally improved over time. Areas with needs for improvement still exist, but soils are mostly in acceptable or good condition in areas of high use and in excellent condition in designated roadless and wilderness areas.

### Management Approaches

*Principal strategies and program priorities to protect soil resources*

Forest programs use genetically appropriate, weed-free seed mixes for revegetation to avoid potential for increasing nonnative invasive species or noxious weeds. Nonnative annuals or sterile perennial species can also be used while native perennials become established.

Forest programs identify and mitigate impacts to soil types that support edaphic plant species of conservation concern during project implementation. These soils include volcanic substrates such as ash-tuffs, latitic lava flows, rhyolite, and andesitic substrates. Sedimentary substrates supportive of edaphic species include calcareous substrates such as limestone and shale.

Soil resources are best protected with site-specific, project-level design and analysis.

### Desired Conditions

**DC-SOIL-1:** Occasional, intermittent, small-scale soil disturbance occurs, allowing propagation of plant species including some species of conservation concern. (Forestwide)

### Standards

**S-SOIL-1:** Manage land treatments to limit severely burned, compacted, eroded, and displaced soil to no more than 15 percent of an activity area, as described in the Watershed Condition Handbook (2509.25, Region 2 Supplement). (Forestwide)

### Guidelines

**G-SOIL-1:** Maintain soil and slope stability where ground-disturbing activities on soils with high erosion rates or mass movement potential are authorized. Where practical, do not authorize activities on soils with high mass movement potential. (Forestwide)

## Species of Conservation Concern (SCC)

Species of conservation concern (appendix D) are animals or plants known to occur in the planning area that the regional forester has determined that the best available scientific information indicates a substantial concern regarding the species' ability to persist over the long-term (36 CFR 219.9). Many of the plan components that contribute to the maintenance or restoration of ecological conditions to contribute to maintaining a viable population of the species of conservation concern are also addressed in other sections including, but not limited to, *Riparian Management Zones, Range Management, Native Animals and Plants*, and *Species of Conservation Concern*. The full list of species of conservation concern, species considered but not carried forward, and necessary ecological conditions for the species are contained in appendix D.

### *Management Approaches*

*Principal strategies and program priorities assist in conservation of species of conservation concern*

Forest programs mitigate impacts to insect species that are listed as species of conservation concern and their habitat, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. To inform project-level planning on avoiding impacts to these species, the range and distribution of at-risk insect species (threatened, endangered, proposed, or candidate species and species of conservation concern) are assessed.

Forest programs mitigate impacts to plant species that are listed as species of conservation concern and their habitat, or that are necessary for those species as food (including grazing, forage, and nectar for pollinators) or cover, from herbicide or other pesticides.

Forest programs mitigate impacts to fish and aquatic species that are listed as species of conservation concern and their habitat, or that are necessary for those species to maintain aquatic organism passage and minimize fragmentation of habitat, except when needed to protect populations from undesired nonnative fish.

Forest programs provide education and awareness information regarding potential disease transmission between recreational pack goats and bighorn sheep at entry points to areas of known bighorn sheep use. Documented areas of overlapping pack goat and bighorn sheep are monitored over time.

Education and outreach materials about boreal toads provide information regarding chytrid fungus. Where the fungus has been detected, the Forest will determine the need to implement decontamination procedures to protect boreal toads and other amphibians.

### *Desired Conditions*

**DC-SCC-1:** Structure, composition, and function of sagebrush ecosystems meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-2:** Structure, composition, and function of coniferous forests, including late seral forests, meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-3:** Structure, composition, and function of riparian areas, including streams, willow thickets, and cottonwood galleries, meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-4:** Structure, composition, and function of aspen-dominated forests meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-5:** Structure, composition, and function of alpine ecosystems, including cushion plant communities, snow willow, alpine fell fields, and talus slopes, meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-6:** Snags and decaying wood processes meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-7:** Structure, composition, and function of montane grasslands meet the needs of associated species, including species of conservation concern. (Forestwide)

**DC-SCC-8:** Improve or maintain habitat for bighorn sheep. (Forestwide)

**DC-SCC-9:** Maintain effective separation to reduce the likelihood of interaction and risk of disease transmission between domestic sheep and bighorn sheep on active grazing allotments. (Forestwide)

### *Standards*

**S-SCC-1:** Maintain effective separation of domestic sheep and bighorn sheep on active grazing allotments to reduce the likelihood and risk of disease transmission. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide)

**S-SCC-2:** Do not authorize projects that will result in displacement of bighorn sheep during their reproductive period (generally April 15 to July 1). (Forestwide)

**S-SCC-3:** Prohibit the use of recreational pack goats in the Sangre de Cristo Wilderness Area to eliminate potential interactions between pack goats and bighorn sheep. (Forestwide)

**S-SCC-4:** Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to reduce the likelihood of contact between animal groups. (Forestwide)



**Figure 7. Ptarmigan reside in the high mountains, generally above timber line**

### *Guidelines*

**G-SCC-1:** To maintain or restore ecological conditions to contribute to maintaining a viable population of insects and plant species of conservation concern, minimize negative impacts to pollinators when applying pesticides. (Forestwide)

**G-SCC-2:** To maintain or restore ecological conditions to contribute to maintaining a viable population of species of conservation concern, roads and other permanent ground-disturbing structures and other authorized activities should not degrade vegetation within 100 feet of where plants listed as species of conservation concern are known to occur, or within occupied habitat for the plains pocket mouse. Typical habitat includes barren or rocky areas but is not limited to alpine fell fields, alpine cushion plant communities, talus slopes at any elevation, rock fields, boulder gardens, cliff faces, recently disturbed soils, exposed shale, gypsum, volcanic, or adobe soils, and other sparsely vegetated areas within other ecosystems. (Forestwide)

**G-SCC-3:** To maintain or restore ecological conditions to contribute to maintaining a viable population of species of conservation concern, reduce habitat fragmentation, and maintain structural conditions of sagebrush ecosystems through design of management activities, patch sizes should not be less than 5 acres. (Forestwide)

**G-SCC-4:** To maintain or restore ecological conditions to contribute to maintaining a viable population of alpine-related species of conservation concern, avoid road construction and other permanent ground-disturbing activities within 100 feet of alpine fell and talus rock fields, and alpine bogs. (Forestwide)

**G-SCC-5:** To maintain or restore ecological conditions to contribute to maintaining a viable population for bat species of conservation concern, retain adequate access for bats and reduce disturbance to resident populations when considering mine or cave closures. (Forestwide).

**G-SCC-6:** To maintain or restore ecological conditions to contribute to maintaining a viable population of northern pocket gophers, management activities in wetlands and riparian corridors should not cause a long-term decrease in the availability of forbs within 100 feet of occupied habitat. (Forestwide)

### Threatened, Endangered, Proposed, and Candidate Species (TEPC)

Plan direction is designed to protect and recover animal and plant species that are listed as threatened or endangered under the Endangered Species Act, or those species that have been proposed or are candidates for listing. Threatened, endangered, proposed, and candidate species can occur anywhere on the Forest. These species can be influenced by direction that occurs throughout the forest plan, including but not limited to direction for wildlife, range management, and vegetation management.

Eight of approximately 300 total species that are potentially affected by plan activities on the Forest are federally recognized as threatened or endangered species. These include black-footed ferret (endangered), Canada lynx (threatened), Gunnison sage grouse (threatened), Mexican spotted owl (threatened), New Mexico meadow jumping mouse (endangered), southwestern willow flycatcher (endangered), Uncompahgre fritillary butterfly (endangered), and yellow-billed cuckoo (threatened). None of these species currently have listed or proposed critical habitat on the Forest.

Of the eight listed species, the Uncompahgre fritillary butterfly, Canada lynx, Gunnison sage grouse, and southwestern willow flycatcher are known to occur in the planning unit.

#### *Canada Lynx*

The 2008 Southern Rockies Lynx Amendment Record of Decision amended eight forest plans, including the Rio Grande's forest plan. The direction prescribed in the 2008 Southern Rockies Lynx Amendment (appendix E) is incorporated, as modified below, into the current direction and would apply forestwide. Additional direction and modifications of the 2008 direction is needed to sufficiently address the continued recovery of Canada lynx due to the current habitat conditions associated with the spruce beetle outbreak in the spruce-fir ecosystem. This direction amends and modifies management direction related to salvage in the Southern Rockies Lynx Amendment, specifically VEG S1 and VEG S2.

Even with higher levels of mortality due to spruce beetle infestation, high-quality lynx and snowshoe hare habitat persists, and vegetation management activities have the potential to benefit and adversely affect lynx and snowshoe hare habitat and populations (ILBT 2013, p. 71). Most vegetation management activities reduce canopy cover and horizontal cover in the understory, which could reduce snowshoe hare densities and habitat values for Canada lynx.

The direction below is intended to encourage vegetation management in areas where habitat quality for lynx and snowshoe hare can be improved while retaining existing high-quality habitat. The overall goal is to maintain areas that support high densities of snowshoe hare while promoting vegetation management that restores habitat and landscape connectivity for lynx movement.

The Southern Rockies Lynx Amendment direction was developed prior to the 2012 Planning Rule. Standard VEG S7 is formatted to be consistent with the forest plan and similar to the Southern Rockies Lynx direction. The direction in the Southern Rockies Lynx Amendment is formatted differently than direction contained in this forest plan. Superscript numbers in the text refer to definitions contained in the Southern Rockies Lynx Amendment in appendix E.

Standard VEG S7 (below) applies to salvage harvest activities conducted in conifer forests that have lynx habitat attributes, but no longer meet the definition for standard VEG S6 due to tree mortality and associated forest structural changes. These stands still provide high-quality lynx habitat and are characterized by dense horizontal cover, and include forest structure that provides cover and food for snowshoe hares, and foraging habitat, traveling, and hiding cover for Canada lynx. According to a recent study completed on the Forest (Squires et al. 2018), stands with Engelmann spruce and subalpine fir in the canopy, and subalpine fir in the subcanopy are disproportionality selected by lynx. Stands where standard VEG S7 would apply continue to support snowshoe hare and secondary prey species, such as red squirrels, particularly when live vegetation and horizontal structure is present.

Salvage harvest in lynx habitat is prioritized as follows:

1. Choose areas with good habitat restoration potential that currently exhibit poor-quality lynx habitat condition, (i.e., horizontal cover density less than 25 percent, subalpine fir is a minor component of the subcanopy, favorable site conditions, and best available science suggests that conditions could be improved through vegetation management);
2. Choose areas that provide poor-quality lynx habitat and poor habitat restoration potential;
3. All other areas based on overall project considerations and needs.

Stands that are subject to VEG S7 represent high-quality habitat for lynx and are confined to the high probability lynx use area (95 percent areas) delineated in the Resource Selection Function model for the Forest (Squires et al. 2018). The High Probability Lynx Use Area Map is contained on the external drive of maps located in the back of the document. These areas are identified as having:

- Overstories that are predominantly live or dead Engelmann spruce and subalpine fir, or either species, with subcanopy layers dominated by subalpine fir, or a combination of either Engelmann spruce or aspen, or both; and
- Total live overstory canopy cover less than or equal to 40 percent; and
- Understory horizontal cover density from ground level to 3 meters above ground level is greater than or equal to 45 percent during winter foraging conditions for snowshoe hares.

Openings in lynx habitat are areas with less than 25 percent total canopy closure. Areas with less than 25 percent horizontal cover are not considered suitable habitat.

During salvage project design, late-successional forest patches that are expected to remain green or mostly green in the next 15 years are identified for retention during project implementation. Foresters and wildlife biologists determine the optimal landscape heterogeneity objectives that include retention, opening patch size, and configuration. Project objectives should be considered at a watershed or sub-watershed scale, using the best available science.

Forest stands that meet the VEG S7 definition represent a disproportionately high value subset of the overall suitable habitat in a lynx analysis unit. Management prioritization provides limited

entry allowances into VEG S7 stands. A 7 percent allowance into VEG S7 stands is available for use within 15 years of the decision date for this forest plan. Suitable lynx habitat is defined as stands with understory horizontal cover density greater than 25 percent. Timber stands subject to VEG S7 in locations that are documented as occupied by lynx and may support reproduction (Ivan 2018) should be avoided where possible. If entry does occur, minimize further reduction in key habitat values.

The VEG S7 standard is associated with a management prioritization focus that supports limited entry into VEG S7 stands while promoting forest restoration in stands that may be improved by understory regeneration. The prioritization focus for vegetation management activities for non-VEG S7 stand and non-hazard trees in the 95 percent lynx use area is as follows:

1. Activities in stands with 0 to 24 percent horizontal cover density (unsuitable habitat) and high site potential for active habitat improvement;
2. Activities in areas of 0 to 24 percent horizontal cover density (unsuitable habitat) with poor potential for further improvements in habitat values;
3. Activities in areas of 25 to 44 percent horizontal cover density (suitable but not high quality).

Hazard tree removal along open and administrative use roads, trails, and campgrounds is exempt from this direction. Removing hazard trees from these locations is done to maintain safety for the public and employees. This treatment may occur up to 250 feet from open and administrative use roads, trails, and campground boundaries.

Dr. John Squires and colleagues with the Rocky Mountain Research Station focused their habitat modeling and mapping of Canada lynx use in spruce beetle-impacted forests on the Rio Grande National Forest to the areas known to consistently support lynx. Dr. Squires consulted State and Forest-level biologists before initiating the field study to ensure that the designated study area captured all primary lynx use areas on the Forest. The northern area of the Forest was deemed to support minimal consistent lynx use, both currently and historically following the reintroduction. Therefore, Dr. Squires and colleagues concluded that the northern portion of the Forest supported too few Canada lynx to capture enough individuals to inform reliable modeling and mapping products. Instead, they focused on the southern portion of the national forest for the field study, resource selection function modeling, and eventual delineation of the high probability lynx use area (95 percent area). Although the northern portion of the Forest was not included in the field study and modeling exercise, it is noteworthy that the Southern Rockies Lynx Amendment management direction, except for VEG S1 and S2, still applies to mapped habitat and linkages across the remainder of the Forest, including the northern area. The U.S. Fish and Wildlife Service's lead consultation biologist and author of the Biological Opinion for the forest plan was routinely engaged in discussions throughout the modeling exercise, the delineation of the 95 percent probability use area, and development or adoption of appropriate lynx management direction in and outside the 95 percent area.

#### *Desired Conditions*

**DC-TEPC-1:** Maintain or improve habitat conditions that contribute to either stability or recovery, or both, for threatened, endangered, proposed, and candidate species. (Forestwide)

Desired conditions related to habitat for Canada lynx are specified in the Southern Rockies Lynx Amendment.

### *Standards*

**S-TEPC-1:** The Southern Rockies Lynx Amendment direction (appendix E), as amended and modified by the forest plan record of decision, shall be applied. (Forestwide)

**S-TEPC-2 (VEG S7):** Salvage activities in stands that represent high-quality lynx habitat may occur in up to 7 percent of the high-probability lynx use area (95 percent lynx use areas shown on the High Probability Lynx Use Area Map) that overlaps the suitable timber base 15 years from the date on the forest plan decision. Salvage activities in VEG S7 stands in combination with all vegetation management activities, including incidental damage resulting in either Stand Initiation Structural Stage conditions, a reduction of horizontal cover, or both, are tracked for 15 years from the decision date for this forest plan decision.

**S-TEPC-3:** Southern Rockies Lynx Amendment standards VEG S1 and VEG S2 do not apply on lynx analysis units that have no overlap, either wholly or partially, with the high probability lynx use areas shown on the High Probability Lynx Use Area Map. All other management direction (excluding VEG S1 and VEG S2) in the Southern Rockies Lynx Amendment applies to areas outside of the high probability lynx use areas (95 percent use area).

### *Guidelines*

**G-TEPC-1:** To avoid or minimize adverse effects to listed species and their habitat, management actions should be designed with attention to threatened, endangered, proposed, or candidate species and their habitats. (Forestwide)

## Vegetation Management (VEG)

The Forest provides a diverse landscape with a wide variety of vegetation communities. The majority of the Forest is in the spruce-fir ecosystem. Other vegetation types that dominate include the Southern Rocky Mountain montane-subalpine grassland and Rocky Mountain alpine turf, followed by mixed-conifer, dry, and pinyon-juniper woodland.

Plan components contained in the section below cover the broad area of forest vegetation and management of forest vegetation. The direction includes plan components related to terrestrial ecosystem integrity, as well as the required timber harvest-related plan components, as described within Chapter 60 of Forest Service Handbook 1909.12. Most plan components in this section were designed using the natural range of variation described in the 1996 forest plan (appendix A), which was used to define the key ecosystem characteristics in the Terrestrial Ecosystem Assessment.

Plan components that affect vegetation are also contained in other sections of this forest plan including, but not limited to, *Fire*, *Insects and Disease*, *Minerals*, *Nonnative Invasive Species and Noxious Weeds*, *Range Management*, *Riparian Management Zones*, *Soils*, *Species of Conservation Concern*, *Visual Quality*, *Watersheds*, and *Wildlife*. Specific direction is also contained for management areas: *Wilderness*, *Dispersed and Developed Recreation*, *General Forest and Intermingled Rangelands*, *Roadless Areas*, *Scenic Byways and Scenic Railroads*, and *Special Interest Areas*.

Project-level timber harvest objectives are formulated during site-specific analysis and are in compliance with forest plan direction presented here. In areas that are suitable for timber production, dead or dying trees are salvaged to recover the economic value of the wood while providing for ecosystem function. Management of ecosystem function includes, among other activities, retention of snags and downed woody material, and habitat management. In addition, snags are managed for public safety.

Key ecosystem characteristics are defined in the 2012 Planning Rule as the dominant ecological components that describe the ecosystems and are relevant and meaningful for addressing ecological condition and integrity, as well as important land management concerns. Ecosystem integrity as related to vegetation is typically assessed by considering dominant ecosystem functions, composition, structure, and connectivity. Key ecosystem characteristics are measurable, qualitatively or quantitatively, and there is some type of data or means to distinguish and describe them. Key ecosystem characteristics have been identified and are listed below:

- Diversity of vegetation
- Late-successional and old-forest habitats
- Snags and downed woody material
- Landscape disturbance and patterns
- Rare communities and special habitats
- Connectivity.

The forest and non-forested ecosystems as described in the assessment reports prepared during the forest plan revision process are listed in Table 3. Corporate vegetation databases classify forest areas by local cover types. A crosswalk between the ecosystems defined in Table 3 and the current distribution of local cover types is presented in Table 4.

**Table 3. Forest and non-forested ecosystems, as described in the assessment reports**

| Ecosystem | National Forest System Acres | Percentage |
|---|---|---|
| Spruce-fir forest mix | 929,645 | 54 |
| Mixed conifer – wet | 42,718 | 2 |
| Mixed conifer – dry | 94,925 | 5 |
| Rocky Mountain alpine turf | 191,800 | 11 |
| Pinyon-juniper woodland (includes low elevation grasslands) | 100,700 | 6 |
| Rocky Mountain Gambel oak – mixed montane shrubland | 1,224 | Less than 1 |
| Southern Rocky Mountain montane – subalpine grassland | 304,136 | 18 |
| Rocky Mountain montane riparian | 61932 | 4 |
| Sagebrush shrubland | 5014 | Less than 1 |
| Intermountain basins greasewood flat | 128 | Less than 1 |

**Table 4. Crosswalk between ecosystems and FSVEG spatial local cover types**

| Ecosystem | Local Cover Type in FSVEG Spatial |
|---|---|
| Spruce-fir forest mix | Spruce-fir forest (TSF)<br>Aspen forest (TAA)<br>Aspen forest with softwoods present (TAA-SW)<br>Lodgepole pine forest (TLP) |
| Mixed conifer – wet | Mixed conifer forest – cool-moist (TMC-CM)<br>Aspen forest (TAA)<br>Aspen forest with softwoods present (TAA-SW) |
| Mixed conifer – dry | Mixed conifer forest – warm-dry (TMX-WD)<br>Ponderosa pine forest (TPP-PP)<br>Mixed conifer forest – cool-dry (TMC-CD)<br>Bristlecone pine/limber pine forest (TBC_LI) |
| Rocky Mountain alpine turf | Alpine vegetation (ALP) |
| Pinyon-juniper woodland (include low elevation grasslands) | Pinyon-juniper woodland (TPJ) |
| Rocky Mountain Gambel oak – mixed montane shrubland | Mountain shrubland (MT_SHR)<br>Semi-desert shrubland (DS_SHR)<br>Non-riparian willow (UP_SWI) |
| Southern Rocky Mountain montane – subalpine grassland | Mountain grassland (MT_GRA)<br>Semi-desert grassland (DS_GRA) |
| Rocky Mountain montane riparian | Riparian vegetation (RIP) |
| Sagebrush shrubland | Sagebrush shrubland (SSA) |
| Intermountain Basins greasewood flat | Not applicable |

### *Management Approaches*

*Principal strategies and program priorities for timber and vegetation management*

Special forest products include materials that are not traditional timber and fiber products, such as sawtimber or house logs. Special forest products are permitted (or contracted) for removal from public lands for commercial, personal, Native American tribal, educational, or scientific purposes. Plan components in this section cover a variety of special forest products including but not limited to building rock, craft products, firewood, floral and greenery products, herb and vegetable products, landscaping products, medicinal and pharmaceutical products, wild berries and fruit, and wild edible mushrooms.

The Forest continues to identify and map populations of *Ligusticum porteri*. Following mapping, the Forest will consider setting aside collection areas for tribal use and rotating the use of these areas over time.

Vegetation treatments generally avoid alteration of the edge of natural openings.

Competition for water, nutrients, and light among the trees is considered when choosing thinning methods, with the goal of restoring or maintaining genetic diversity. Frequency of thinning is dependent on species, financial efficiency, and growing conditions of the site, commonly measured by site index.

Project-level planning uses criteria in appendix A to determine the presence of old forest. The habitat is assessed for quality and distribution and retained as necessary for vegetative diversity.

Management-created openings are no longer considered openings when the trees reach a height and density that meet management objectives. The default criteria are when the minimum

stocking standards for the forest vegetation type on suitable lands are met and average height is 6 feet or greater with at least a 70-percent distribution for conifer species, and 10 feet or greater with at least a 70-percent distribution for aspen. The criteria are validated and may be modified in accordance with local conditions.

Forest vegetation management that results in meeting the needs or demand for forest product offerings for commercial, personal, or other use is done in a manner that supports one or more of the following:

- Maintains or improves ecosystem function, resilience, and sustainability,
- Supports a sustainable level of economic activity in the local timber industry,
- Provides economic or social support to local communities,
- Ensures current and future needs for American Indian tribal use, including that associated with special forest products (e.g., teepee poles),
- Uses, to the fullest extent practicable, potential products including saw timber, poles, top wood, or slash,
- Supports innovation in utilization, including conversion of cut tree mass into biofuels, pellets, biochar, or other useful products,
- Efficiently balances or reduces costs of implementation of treatment activities, and
- Anticipates climate-related change in plant succession, such as favoring heat- or drought-resistant tree species as leave trees.

In areas suitable for timber production, dead or dying trees due to fire, insects, or disease are salvaged to recover the economic value of the wood while providing for ecosystem function. This will be the primary focus of the timber program for the first three years of the planning period.

The scientifically defined silvicultural systems shown by forest cover type in Table 5 meet the management objectives for the landscape or individual stands of trees within a landscape setting. Both even-aged and uneven-aged management systems can be used and applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are to be applied in a manner that will create conditions favorable for natural regeneration. Artificial regeneration will be considered when necessary to meet minimum stocking standards. The silvicultural systems identified in Table 5 can be used to convert uneven-aged stands to even-aged management and even-aged stands to uneven-aged management.

**Table 5. Appropriate silvicultural system by cover type**

| Forest Cover Type | Even Aged | Two Aged | Uneven Aged |
|---|---|---|---|
| Ponderosa pine | Shelterwood, clearcut, overstory removal, seed tree | Irregular shelterwood, shelterwood with reserves | Group selection, single-tree selection |
| Mixed conifer | Shelterwood, clearcut, overstory removal, seed tree | Irregular shelterwood, shelterwood with reserves | Group selection, single-tree selection |
| Aspen | Coppice[1] | Coppice with standards[2] | Group selection[3] |
| Lodgepole pine | Shelterwood, clearcut, overstory removal, seed tree | Irregular shelterwood | Group selection |
| Engelmann spruce and subalpine fir | Shelterwood, clearcut, overstory removal | Irregular shelterwood | Group selection, single-tree selection |

[1] Coppice is a vegetation reproduction method with clearfelling or clearcutting. Clearfelling (clearcutting) stimulates sprouting from the residual roots.

[2] "Standards" are selected overstory trees reserved for a longer rotation at the time each crop of coppice material is cut.

[3] Use of group selection as an appropriate silvicultural system in aspen is currently under study to determine regeneration success, but is authorized on a test basis.

Aspen is encouraged and promoted on the landscape. When regenerating aspen, treatments within seral aspen clones are prioritized with the following criteria:

- Identify stands with large standing and down dead basal area (about 20 percent dead) that are single-storied and showing signs of animal barking (gnawing and bark stripping) or disease. Multistoried stands that have several hundred sapling-size suckers per acre under them, or that show little sign of canker disease or animal barking, are lower priority for any management intervention.
- Identify conifer stands with a small minority of live aspen basal area (less than 20 percent live basal area). (Aspen is likely to disappear from these stands within several decades without intervention).
- Identify isolated clones and stands in areas frequented by animals and in riparian areas, and those at low elevations. Any stands in these situations that meet the criteria above should be given the highest priority for regeneration. (These stands will be at greatest risk of disappearing and will be the most difficult to regenerate successfully. Protection of treatment areas from browsing animals may be needed to achieve successful regeneration.)
- Identify stands that are more cost efficient and not impacted by frequent animal use to treat and contribute positively to the distribution of aspen.

The size of uncut forest areas between openings is based on project-level management objectives for the landscape being analyzed.

Carbon storage and sequestration potential are sustained through maintenance or enhancement of ecosystem biodiversity and function and managing for resilient forest adapted to a natural disturbance process and changing climates.

### Desired Conditions

**DC-VEG-1:** Commercial timber harvest occurs on lands identified as not suitable for timber to meet multiple use objectives and for safety and health. These harvests are not part of the regularly scheduled harvest program. These activities meet management direction and desired conditions and may provide other services and benefits. (Forestwide)

**DC-VEG-2:** Habitat structure in Gambel oak communities provides for the needs of associated species. (Forestwide)

**DC-VEG-3:** All development stages of the forested terrestrial ecosystems are well represented at the landscape scale and occur forestwide within the ranges identified in Table 6. (Forestwide)

**Table 6. Current status and desired conditions of development and structural stages of the forested terrestrial ecosystems**

[Structural stage: 1T/2T, grass/shrub previously trees; 3A, sapling-pole 10 to 40 percent cover; 3B, sapling-pole 40 to 70 percent cover; 3C, sapling-pole greater than 70 percent cover; 4A, mature 10 to 40 percent cover; 4B, mature 40 to 70 percent cover; 4C, mature greater than 70 percent cover.]

| Terrestrial Ecosystem | Development Stage | Structural Stage | Current Condition (percentage) | Desired Condition (percentage) | Desired Condition in Old Forest (percentage) |
|---|---|---|---|---|---|
| Ponderosa pine | Young | 1T/2T | 8 | 5–10 | 10–15 |
| | Mid-open | 3A | 19 | 5–10 | |
| | Mid-closed | 3B, C | 5 | 5–10 | |
| | Mature open | 4A | 49 | 40–50 | |
| | Mature closed | 4B, C | 19 | 15–25 | |
| Warm-dry mixed conifer | Young | 1T/2T | <1 | 5–10 | 15–20 |
| | Mid-open | 3A | 6 | 10–15 | |
| | Mid-closed | 3B, C | 8 | 10–15 | |
| | Mature open | 4A | 34 | 25–30 | |
| | Mature closed | 4B, C | 52 | 25–35 | |
| Cool-moist mixed conifer | Young | 1T/2T | 8 | 5–10 | 20–30 |
| | Mid-open | 3A | 10 | 5–10 | |
| | Mid-closed | 3B, C | 22 | 15–20 | |
| | Mature open | 4A | 17 | 15–20 | |
| | Mature closed | 4B, C | 43 | 30–40 | |
| Cool-dry mixed conifer | Young | 1T/2T | 0 | 5–10 | 15–20 |
| | Mid-open | 3A | 12 | 5–10 | |
| | Mid-closed | 3B, C | 24 | 15–20 | |
| | Mature open | 4A | 25 | 30–40 | |
| | Mature closed | 4B, C | 39 | 15–20 | |
| Spruce-fir | Young | 1T/2T | 30 | 5–10 | 25–35 |
| | Mid-open | 3A | 13 | 5–10 | |
| | Mid-closed | 3B, C | 7 | 10–15 | |
| | Mature open | 4A | 27 | 20–25 | |
| | Mature closed | 4B, C | 22 | 30–40 | |
| Aspen | Young | 1T/2T | 6 | | |
| | Mid-open | 3A | 16 | | |
| | Mid-closed | 3B, C | 58 | | |
| | Mature open | 4A | 2 | | |
| | Mature closed | 4B, C | 19 | | |
| Pinyon-juniper woodland | Young | 1T/2T | 1 | 5–10 | 20–30 |
| | Mid-open | 3A | 47 | 10–15 | |
| | Mid-closed | 3B, C | 38 | 10–15 | |
| | Mature open | 4A | 5 | 20–30 | |
| | Mature closed | 4B, C | 9 | 30–40 | |

### Objectives

**OBJ-VEG-1:** Diversify the structure class distribution for various forest types by managing 800 acres annually in years 4 and 5 of the planning period and 1,200 acres in years 6 through 20 of the planning period, to work toward or maintain the desired conditions in Table 6. (Forestwide)

**OBJ-VEG-2:** Annually restore 150 to 300 acres of dry mixed conifer and ponderosa pine areas to move these forest types toward a species composition and landscape pattern where fire can function in its natural role. (Forestwide)

**OBJ-VEG-3:** Salvage harvest approximately 62,800 CCF (hundred cubic feet) of spruce-fir annually for the first 3 years of the planning period. (Forestwide)

**OBJ-VEG-4:** Salvage harvest an estimated 20,000 CCF of spruce-fir annually during years 4 and 5 of the planning period. (Forestwide)

**OBJ-VEG-5:** Offer timber for sale at an average timber sale quantity of 8,000 CCF per year for years 4 and 5 of the planning period. Offer timber for sale at an average timber sale quantity of 12,000 CCF per year for years 6 through 20. (Forestwide)

**OBJ-VEG-6:** Identify and map a minimum of five select populations of ethnobotanically important plants for tribes in concert with the heritage, botany, and timber programs over the next 15 years. (Forestwide)

**OBJ-VEG-7:** Average 100 acres of hazardous fuels reduction per year in areas adjacent to private development, critical infrastructure, or both over the next 15 years. (Forestwide)

**OBJ-VEG-8:** Average 2,000 acres of fuels reduction per year using fire managed for resource benefit or prescribed fire on Forest lands over the next 15 years. (Forestwide)

*Specific to Objectives **OBJ-VEG-3, OBJ-VEG-4, and OBJ-VEG-5**: Estimates of timber outputs may be larger or smaller on an annual basis, or over the life of the plan, if legal authorities, management efficiencies, or unanticipated constraints change in the future.*

### Standards

**S-VEG-1:** Timber may not be harvested for the purpose of timber production on lands not suited for timber production. Timber harvest may occur on these lands for the following purposes: protecting other multiple-use values, protecting or enhancing biodiversity or wildlife habitat, scenic-resource management, research, or administrative studies consistent with geographic or management area direction, and salvage, sanitation, public health, or safety. (Forestwide)

**S-VEG-2:** Timber shall not be harvested on lands where soil, slope, or other watershed conditions may be irreversibly damaged, as identified in project-specific findings. (Forestwide)

**S-VEG-3:** Timber harvest shall be conducted to assure that the technology and knowledge exist to restock these areas adequately with trees within five years after final harvest. (Forestwide)

Minimum restocking levels for suitable timber lands are defined in Table 7. Exceptions to these levels are allowed if supported by a project-specific determination of adequate restocking.

Restocking levels for unsuitable timber lands must be specified with the silvicultural prescription. Project-specific determination of adequate stocking must be based on the plan's

desired conditions and objectives applicable to the area and project and be consistent with all other applicable plan components. (Forestwide)

**Table 7. Minimum restocking level for suitable timber lands, by species**

| | Spruce-Fir | Aspen | Douglas Fir | Lodgepole Pine | Ponderosa Pine | Other Softwoods | Other Hardwoods |
|---|---|---|---|---|---|---|---|
| Trees per acre | 150 | 300 | 100 | 150 | 75 | 150 | 150 |

**S-VEG-4:** Select harvest systems to achieve desired conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output.

**S-VEG-5:** Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. (Forestwide)

**S-VEG-6:** Openings larger than 40 acres may only be created under one of the following conditions:

- Proposals for larger openings have been approved by the regional forester, following a 60-day public review,
- Areas harvested as a result of natural catastrophic conditions (including those resulting from fire, insects, diseases, and windstorms), or
- When the area that is cut does not meet the definition of openings. (Forestwide)

**S-VEG-7:** The quantity of timber that may be sold per decade will be less than or equal to the sustained yield limit of 737,490 CCF per decade with the following exceptions: salvage or sanitation harvesting of timber stands that are substantially damaged by fire, windthrow, or other catastrophe or that are in imminent danger from insect or disease attack. Salvage harvest of trees substantially damaged by fire, windthrow, or other catastrophe or in imminent danger from insect or disease attack may be harvested over and above the sustained yield limit, consistent with desired conditions for terrestrial and aquatic ecosystems. (Forestwide)

**S-VEG-8:** When there is a shortage of any special forest products for tribal use, commercial permits are issued only to the extent that tribal use can be accommodated. (Forestwide)

### *Guidelines*

**G-VEG-1:** Snag densities (Table 8) are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre. (Forestwide)

### Table 8. Recommended snags and downed wood for wildlife habitat and ecosystem processes

[All quantities are based on an average per acre basis across the planning unit (the area planned for treatment as identified in a project-level decision document).]

| Forest Type | Snags | | | Downed Wood[1] |
|---|---|---|---|---|
| | Minimum diameter at breast height | Minimum/Acre in planning unit | Minimum height (feet) | Tons/Acre |
| Spruce-fir | [2]12 | 6 | 25 | 10 to 15 |
| Mixed conifer | [2]12 | 3 to 4 | 25 | 4 to 10 |
| Aspen | 10 | 5 | 25 | 3 to 5 |
| Ponderosa pine | [2]12 | 3 | 25 | 2 to 3 |
| Lodgepole pine | 10 | 3 | 15 | 5 to 10 |

[1] Project implementation should focus on leaving larger and longer logs onsite in accordance with site capacity.

[2] At least 50 percent of the required snag numbers should represent the largest size classes available.

**G-VEG-2**: Even-aged stands shall generally have reached or surpassed culmination of mean annual increment (achieving 95 percent of culmination of mean annual increment, as measured by cubic volume) prior to regeneration harvest, unless the following conditions have been identified during project development:

- When such harvesting would modify fire behavior to protect identified resource, social, or economic values
- When harvesting of stands will trend landscapes toward desired conditions
- When harvest uses uneven-aged silvicultural systems, thinning, or other intermediate stand treatments that do not regenerate even-aged or two-aged stands
- When harvest is for sanitation or salvage of timber stands that have been substantially damaged by fire, windthrow, or other catastrophe, or that are in imminent danger from insect or disease attack
- When harvest is on lands not suited for timber production and the type and frequency of harvest is due to the need to protect or restore multiple use values other than timber production. (Forestwide)

**G-VEG-3**: To maintain scenic resources, even-aged harvest openings should be irregularly shaped and blend with the natural terrain to the extent practicable. (Forestwide)

**G-VEG-4:** To maintain ecosystem conditions for continued persistence, permit the collection of species of conservation concern plants only for scientific, educational, or conservation purposes and only to the level that persistence of the species is maintained. (Forestwide)

**G-VEG-5:** Old forest, or late-successional stage forest, is often deferred from harvest to maintain biotic diversity across the landscape. To maintain old forest components across the landscape and move toward desired conditions (defined in Table 6) prioritize retention of old forest stands as follows:

- Older stands that have not been manipulated are more desirable than younger ones.

- Stands with limited use and access are better suited to maintain old forest conditions.
- Stands that provide habitat for threatened, endangered, or proposed species, species of conservation concern.
- Stands exhibiting a variety of attributes such as diverse canopy layers, decadence in live trees, standing or downed dead, or both, and patchiness.

#### Land Suitability

**SUIT-VEG-1:** Lands are identified as suitable for timber production in management area direction contained in Chapter 3. Even though lands may be identified as suitable for timber production, those lands may not be feasible for harvest. Feasibility is determined at the site-specific, project level. An estimated 499,936 acres of lands on the Forest have been determined as may be suitable for timber harvest.

### Wildlife and Plants (WLDF)

Most of the wildlife species that inhabit the Forest are outside of the protections provided by the Endangered Species Act, as amended, and are not considered a species of conservation concern as defined in the 2012 Planning Rule. Plan components pertaining to these species are contained in this section. This direction maintains ecosystem integrity on a broad range of terrestrial habitats throughout the Forest, including all vegetation types. This includes all native species as well as any desirable nonnative species. Nearly all plan components have the potential to affect wildlife in some way.

Habitat connectivity can be viewed as the degree to which landscapes facilitate or impede the movement of species and ecological processes among suitable habitat patches (Taylor et al. 1993). Measurements for habitat connectivity involve both the physical attributes that might provide barriers to movement, such as roads and trails, and the vegetation or habitat structural changes and patterns that influence the ability of species to move across the landscape. Potential impacts from impaired connectivity can vary by species. Much of the Forest is bordered by public lands, and the landscape patterns contribute to the continuous nature of the landscape. For some species, such as Rocky Mountain elk, mule deer, and other game species, these landscape conditions will continue to facilitate historic game movement patterns within and among national forest lands and other public and private lands, including across state lines. Much of the land is designated wilderness or roadless, which will contribute to habitat connectivity and movement patterns for many species, particularly those that are sensitive to human disturbances. Additional protected areas occur on adjacent National Forest System lands as well as across state and administrative boundaries.

Sections below include direction for wildlife and plant species on the Rio Grande National Forest. Also included in this section is direction for *species of conservation concern* and direction *for threatened, endangered, proposed, and candidate species*.

#### Management Approaches

*Principal strategies and program priorities to protect wildlife resources in addition to strategies and approaches under species of conservation concern; and threatened, endangered, proposed, and candidate species; and fisheries*

Within fiscal capacity, the Forest continues to participate in and support recovery and conservation efforts including but not limited to conservation agreements for Rio Grande cutthroat trout (RGCTCT 2013), Rio Grande chub and Rio Grande sucker (RGCSCT 2018), fens, pollinators, Uncompahgre fritillary butterfly, bats, watershed condition priorities, prairie dogs, avian monitoring and conservation, bighorn sheep, snow willow and alpine conservation, boreal toad, and unique and rare plant communities.

The Forest maintains an early detection program for white-nose syndrome in bats, follows guidance from the Forest Service Rocky Mountain Regional Office, and continues to coordinate with partners and other agencies to protect bats from white-nose syndrome.

Bat habitat needs are addressed through the Abandoned Mine Lands program. The Forest maintains existing partnerships and seeks additional partners for adequate underground assessments, as possible, prior to closure. When closing caves and mines, access for bats is retained and disturbance to resident bat populations is minimized. When maintaining or removing facilities or bridges, the potential for bat roost activity is assessed. Work is scheduled to reduce impacts to roosting bats.

When raptors are known to occur in a project area, the Forest consults raptor guidance provided by Colorado Parks and Wildlife.

During project analysis, address impacts to pollinators through project design, analysis, and implementation.

Pollinator-friendly best management practices for Federal lands are implemented to improve pollinator habitat and protect these species when implementing management actions. Actions are not limited to the following:

- Design projects to maintain or improve pollinator habitat while meeting resource objectives,
- Include plants that are desirable to pollinator species in project seed mixtures,
- Mitigate impacts to pollinator insects when applying insecticide,
- Include creation and maintenance of pollinator habitat in project design, and
- Implement best management practices for pollinator habitat when managing roads.

The Forest provides a focus on bird conservation by increasing the number of Naturewatch viewing sites and by participating in International Migratory Bird Day activities. Management activities consider habitats and species described in the Colorado Bird Conservation Plan.

The Forest considers the impacts of actions on unique or rare plant community types, particularly those with a biodiversity significance ranking of B1 (outstanding) or B2 (very high) according to the Colorado Natural Heritage Program. In riparian areas and wetland ecosystems containing plants with G1, G2, S1, or S2 NatureServe plant community conservation ranks, impacts are considered with a focus on maintaining ecological integrity.

Existing landscape patterns and local species concerns are used to identify and assess habitat connectivity at various spatial scales during design and analysis of forest management activities. A nest of hydrologic unit codes is used at various scales to assess connectivity patterns. Stream zones and topographic features are identified and used to facilitate movement across the

landscape. These areas serve multiple purposes, including providing aquatic and terrestrial habitat connectivity and areas for species movement in most landscape conditions.

**Figure 8. Great horned owl**

***Desired Conditions***

**DC-WLDF-1:** Habitat conditions are suitable for resident and migratory birds and accommodate key life history requirements. (Forestwide)

**DC-WLDF-2:** Habitat conditions for bats are suitable for reproduction and roosting. (Forestwide)

**DC-WLDF-3:** Habitat connectivity is provided to facilitate species movement within and between daily home ranges, for seasonal movements, for genetic interchange, and for long-distance movements across boundaries. (Forestwide)

**DC-WLDF-4:** Winter range habitat conditions provide the quantity, quality, and spatial arrangement of forage, cover, and security needed to support population objectives for mule deer, pronghorn, Rocky Mountain bighorn sheep, and Rocky Mountain elk. (Forestwide)

**DC-WLDF-5:** Motorized and nonmotorized route travel, on and off existing roads, does not negatively affect ecological conditions necessary to maintain population objectives for big game species. (Forestwide)

**DC-WLDF-6:** Suitable nesting habitat for ground-nesting or low-level shrub-nesting birds is provided by dense, interior riparian willow habitat. (Forestwide)

#### Objectives

**OBJ-WLDF-1**: Develop and interpret at least one location identified in the Colorado Birding Trail over the next 15 years. (Forestwide)

**OBJ-WLDF-2**: Maintain or improve an average of 500 acres of big game winter habitat annually over the next 15 years. (Forestwide)

#### Standards

**S-WLDF-1:** Do not allow rock climbing within one-half mile of active peregrine and prairie falcon nest sites generally from April 15 to July 31 and active golden eagle nest sites generally from December 15 to July 31. (Forestwide)

#### Guidelines

**G-WLDF-1:** To reduce stress at a critical point in the lifecycle of big game, restrict activities on winter range from approximately December 1 to April 15, as needed. (Forestwide)

**G-WLDF-2:** To maintain habitat function, connectivity, and security for big game species, there should be no net gain in motorized and nonmotorized system routes where the system route density currently exceeds one linear mile per square mile or where the net gain would cause system route density to exceed one linear mile per square mile in areas mapped by Colorado Parks and Wildlife as important big game production areas, migration corridors, severe winter range, and winter concentration areas. Exception: This does not apply to administrative routes. (Forestwide)

## Goal 2

### *Protect and restore watershed health, water resources, aquatic ecosystems, and the systems that rely on them*

### Fisheries (FISH)

Management direction is provided for individual resource areas. This direction has been integrated across resource areas. Plan components contained in this section cover the broad area of aquatic habitats that are present throughout the Forest and support all fisheries. Species of conservation concern (Rio Grande cutthroat trout, Rio Grande chub, and Rio Grande sucker), all other native species, and desired nonnative recreational species are included.

Aquatic species include vertebrate and invertebrate animals that live in the water for most or all of their life cycle. Fisheries management focuses on fish species and the habitat components that are vital to their survival. Persistence of these species over time is dependent on an array of well-connected habitat conditions. Management activities can contribute to fragmentation and degradation of habitat for fish and other riparian-dependent species. Dam construction, introduction of nonnative invasive species, livestock grazing, road and facility construction, and vegetation management activities can change habitat conditions.

Many of the plan components that affect fisheries are also addressed in other sections including but not limited to *Minerals*, *Aquatic and Terrestrial Nonnative Invasive Species and Noxious Weeds*, *Recreation*, *Riparian Management Zones*, *Soils*, *Watersheds*, *Wildlife*, and *Species of Conservation Concern*. Specific direction for designated wilderness and designated and eligible wild, scenic, and recreational rivers is also provided.

### Management Approaches

*Principal strategies and program priorities to protect fish and aquatic resources*

Annually, the Forest works with signatories of the Conservation Agreements for Rio Grande Cutthroat Trout (RGCTCT 2013) and the Rio Grande Chub and Rio Grande Sucker (RGCSCT 2018). Shared data are used to maintain and update species occurrences, and the fisheries activity period maps that are contained on the external drive of maps located in the back of this document facilitate consistent and effective implementation of the agreements for use during project-level analysis and in guidance specific to recreational dredging.

The Forest coordinates with staff from Colorado Parks and Wildlife on fish stocking programs. This ensures benefits and reduces degrading effects on native and desired nonnative fish and aquatic species. The Forest provides Colorado Parks and Wildlife recreational fish stocking reports annually by June 15 or as they become available to Forest media outlets, including all district offices.

### Desired Conditions

**DC-FISH-1:** Connectivity of habitat for native and desired nonnative fish and aquatic species is maintained or enhanced by the design and implementation of management actions. Populations are expanding into previously occupied habitat, and interconnectivity is maintained within metapopulations. To maintain sustainable populations, critical life stages are distributed and abundant. Habitat conditions are not a primary factor in species being proposed or listed under the Endangered Species Act or for adding species as a species of conservation concern.

**DC-FISH-2:** Habitat and water quality in lakes and streams allow fish populations to thrive, and habitat is not fragmented by management activities.

### Objectives

**OBJ-FISH-1**: Complete 10 fish connectivity projects (combination of removing barriers or constructing aquatic organism passage structures) over the next 15 years.

**OBJ-FISH-2:** Maintain or restore structure, composition, or function of habitat for fisheries and other aquatic species along 30 miles of stream, with a focus on larger individual stream segments when possible over the next 15 years. (Forestwide)

### Standards

**S-FISH-1:** When authorizing new surface diversions in fish-bearing waters, provide upstream and downstream passage designed for all fish species that are threatened, endangered, proposed or candidate species, and for species of conservation concern except when barriers are needed to protect from undesired nonnative fish. (Forestwide)

**Figure 9. A pond above Pole Creek**

### Guidelines

**G-FISH-1:** New surface diversions should provide passage for native and desired nonnative aquatic species to maintain connectivity except when barriers are needed to protect from undesired nonnative fish. (Forestwide)

**G-FISH-2:** Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish and other wildlife. (Forestwide)

**G-FISH-3:** Fisheries activity period maps (contained on the external drive of maps located in the back of this document) should be consulted during project development and design, including recreational dredging. Date ranges associated with stream classes identified on the map are listed in Table 9.

**Table 9. Dates and species of fish by class of water body**

| Water Body Class | Species | Restricted Activity Period |
|---|---|---|
| A | Core and conservation Rio Grande cutthroat trout | Dates provided by Fisheries Biologist |
| B | Recreational Rio Grande cutthroat trout | May 15 to June 30 |
| C | Brown and brook trout | October 1 to December 31 |
| | Rainbow trout | April 1 to August 31 |
| D | No fish or any other species | None |

Fisheries activity period maps designate the class of a mapped waterbody (A, B, C, or D). They correspond with the restricted activity period in Table 9 and describe the locations of Class A water bodies and may specify special conditions. Except for uncoded water bodies, which do not appear on the maps, class is designated on the maps (contained on the external drive at the back of this document). Uncoded water bodies are Class D unless otherwise specified. When uncoded water bodies enter mapped Class A, B, or C water bodies, the portion of the uncoded water body 1 mile upstream from the mouth is the same class as the mapped water body it enters. This is applied even if the unmapped water body is dry or frozen to the bottom at the time of implementation.

Where unmapped water bodies enter a mapped Class A water body, the unmapped water body is Class A for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class B for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class B water body, the unmapped water body is Class B for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class C for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class C or D water body, the unmapped water body is Class C or D for all portions of the unmapped water body, respectively. Where an unmapped water body enters a fish-bearing lake, the unmapped water body is Class C, whether or not the fish-bearing lake appears on the activity period map(s).

## Groundwater-Dependent Ecosystems (GDE)

Groundwater-dependent ecosystems are a vital component for the natural environment and can include fens, wetlands, seeps, springs, riparian areas, groundwater-fed streams and lakes, and aquifers. These are present throughout the Forest and vary in size and timing. These areas provide an important ecosystem component and provide later-season flows with cold water temperatures, help sustain the function of surface and subsurface aquatic ecosystems, and provide habitat important to the persistence of plant species of conservation concern.

Areas that retain moisture and associated vegetation types have long been recognized as important for both ecosystem function and human benefits. Riparian areas and groundwater-dependent ecosystems such as wetlands, springs, aquifers, and fens provide ecosystem services that are necessary for the long-term health and well-being of both aquatic and upland areas.

Services provided by these areas are vital to the water supplies of downstream users. Services include stabilizing streambanks and reducing erosion, mitigating the impacts of floods, improving water quality by trapping sediment and other pollutants, and sustaining late season base flows. These areas are also vital to a wide variety of plants and animals. Aquatic and terrestrial species depend on the forage and cover provided in these habitat types, and many rare plants occur only in these ecosystems.

#### Management Approaches

*Principal strategies and program priorities to protect groundwater-dependent resources*

Fens and watershed conditions that support healthy fens provide irreplaceable ecological functions. The Forest continues to inventory and evaluate fens, thereby enabling managers to maintain healthy watersheds and aquatic resources.

The Forest continues to work with other agencies and adjacent landowners in the conservation of groundwater-dependent ecosystems.

#### Desired Conditions

**DC-GDE-1:** Identified groundwater-dependent ecosystems provide habitat for species of conservation concern and other native species. Fens continue to accumulate peat. (Forestwide)

#### Standards

**S-GDE-1**: Do not authorize management actions that alter the hydrology of groundwater-dependent habitat features. (Forestwide)

#### Guidelines

**G-GDE-1:** To maintain ecosystem diversity and function, design projects to avoid or mitigate negative impacts to the ecological services that groundwater-dependent ecosystems provide. (Forestwide)

### Riparian Management Zones (RMZ)

Naiman et al. (2000) identifies that discoveries about the structure and dynamics of riparian zones have important implications for stream and watershed management. Forest plans must establish width(s) for riparian management zones around all lakes, perennial and intermittent streams, and open-water wetlands (USDA Forest Service 2015). The following guidance has been developed to help interdisciplinary teams become familiar with, and consistently apply, criteria to appropriately delineate riparian management zones, and analyze important considerations in developing appropriate management actions within, or that affect, riparian management zones. The intent is to ensure that interdisciplinary teams adequately consider riparian functions and ecological processes in both the delineation of riparian management zones and the determination of appropriate management actions within, or that affect, riparian management zones.

Riparian areas represent the area where aquatic and terrestrial ecosystems interface. These important areas occur along streams, rivers, lakes, wetlands, and other waterbodies. These areas can be restored using passive and active management.

Delineation and further definition of riparian management zones are contained in appendix F.

#### *Desired Conditions*

**DC-RMZ-1:** Riparian areas and wetlands are healthy, fully functioning ecosystems that are resilient and able to withstand natural and human disturbances that include flood, fire, drought, changes in frequency and timing of weather events, recreation, and herbivory. Aquatic ecosystems, riparian ecosystems, and watersheds exhibit high ecological integrity. The vegetation consists of desirable native species and age classes and meets the needs of resident amphibians, fish, and migratory birds. Populations of riparian vegetation are diverse, vigorous, and self-perpetuating. Invasive species, including plants and animals, in riparian and wetland ecosystems are rare. There is sufficient vegetative cover to provide bank stability, trap and retain sediment, regulate temperature, and contribute to floodplain function. Riparian ecosystem composition, structure, and function can generally be restored and enhanced by beaver habitat. (Forestwide)

**DC-RMZ-2:** Hydrologic regimes of riparian and wetland ecosystems contribute to appropriate channel and floodplain development, maintenance, and function. (Forestwide)

#### *Objectives*

**OBJ-RMZ-1**: Restore at least 300 acres of riparian or wetland areas over the next 15 years. (Forestwide)

#### *Standards*

**S-RMZ-1**: Management activities may have short-term impacts (generally less than 5 years) to composition, function, and structure of riparian areas and fish habitat. Over the long term (generally greater than 20 years), projects shall not impair connectivity, composition, function, and structure. (Forestwide)

#### *Guidelines*

**G-RMZ-1:** To maintain ecological integrity and connectivity, new system roads and infrastructure should not be constructed in the riparian management zone. (Forestwide)

**G-RMZ-2:** To provide for the structural nesting habitat requirements for riparian-associated birds, design management activities to avoid healthy willow carrs. (Forestwide)

### Watershed (WA)

Healthy, properly functioning watersheds are essential to forest health, water quality, water quantity, and a host of other functions and services. Watershed-specific direction contains both national and regional guidance as required by the 2012 Planning Rule (36 CFR 2190). Additional higher-level guidance is incorporated and followed to protect watersheds and their associated functions and services.

Watersheds occur at multiple scales and range from the largest river basins that cover thousands of acres, such as the Rio Grande, to small streams with only a few acres of contributing area. Watersheds that are functioning properly have terrestrial, riparian, and aquatic ecosystems that capture, store, and release water, sediment, wood, and nutrients within their range of natural variability for these processes.

Many attributes define the condition, or health, of a watershed. These include, but are not limited to, physical and biological characteristics such as the timing and quantity of water flows, water quality, the amount of erosion and sedimentation, the stability of streambanks, stream channel dimensions such as width and depth, the condition of riparian vegetation, and the presence of native or desired nonnative aquatic species. The attributes that reflect the state of a watershed condition are continually changing because of natural disturbances (e.g., disease, floods, insect landslides, and wildfire), natural variability of ecological processes (e.g., flows and cycles of energy, nutrients, and water), climate variability, and human modifications.

The watershed condition policy goal of the Forest Service is "to protect National Forest System watersheds by implementing practices designed to maintain or improve watershed condition, which is the foundation for sustaining ecosystems and the production of renewable natural resources, values, and benefits" (FSM 2520). The forest plan components listed below are designed to assist land managers in maintaining or improving watershed condition by focusing on the key physical and biological attributes and processes of watershed condition that will allow watersheds to be resilient in the face of both natural and human disturbances.

### Desired Conditions

**DC-WA-1:** Physical channel characteristics are in dynamic equilibrium and are commensurate with the natural ranges of discharge and sediment load provided to a stream. Streams have the most probable form and the expected native riparian vegetation composition within the valley landforms that they occupy; they function correctly without management intervention. Historically disturbed and degraded stream channels recover through floodplain development and establishment of riparian vegetation, and demonstrate stable channel geomorphic characteristics. Beaver reintroduction, and the persistence of beaver habitat, can contribute to channel recovery and floodplain function. Upland areas function properly and do not contribute to stream-channel degradation. Roads, trails, and impervious surfaces minimally affect hydrologic processes within watersheds. The sediment regime within water bodies is within the natural range of variation. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport. (Forestwide)

**DC-WA-2:** Within the constraints of existing water rights decrees, the timing and magnitude of flood events is within the natural range of variation. Floodplains are accessible to water flow and sediment deposits. Overbank floods allow floodplain development and support healthy riparian and aquatic habitats. Floods also allow the propagation of flood-associated riparian plant and animal species. (Forestwide)

**DC-WA-3:** State water quality standards are met, and State-classified water uses are supported for all federal water bodies. Water quality for those water bodies listed as impaired on the State of Colorado 303(d) list move toward fully supporting State-classified uses. (Forestwide)

**DC-WA-4:** Aquifers maintain natural conditions of recharge, discharge, and groundwater quality, especially where they are important to surface features dependent on groundwater for their existence (including but not limited to caves, springs, seeps, lakes, riparian areas, wetland ecosystems, fens, and intermittent and perennial streams). (Forestwide)

**DC-WA-5:** Watersheds provide clean, safe water suitable for public consumption after adequate and appropriate water treatment. (Forestwide)

#### *Objectives*

**OBJ-WA-1:** Improve condition class on at least one identified priority watershed, as defined by the national Watershed Condition Framework within 5 years of the date on the forest plan decision. (Forestwide)

**OBJ-WA-2:** Quantify minimum instream flows at new quantification points for stream reaches impacted by federal land acquisitions over the next 5 years. (Forestwide)

#### *Standards*

**S-WA-1:** Incorporate direction included in the National Core Best Management Practices (FS 990A) and Watershed Conservation Practices Handbook (FSH 2509.25), to develop project-specific best management practice prescriptions in project plans. (Forestwide)

#### *Guidelines*

**G-WA-1:** Maintain or restore water quality by assuring that activities meet State of Colorado water quality standards. Management activities in watersheds where State of Colorado 303(d) listed impaired water bodies exist should assist in achieving State water quality standards. (Forestwide)

**G-WA-2:** Management actions should not cause long-term degradation to water resources, including lakes, streams, wetlands, and groundwater. Particular attention should be paid to public water supplies, sole source aquifers, and source water protection areas. (Forestwide)

# Goal 3

### *Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land*

### Air Quality (AIR)

The Clean Air Act and subsequent amendments require Federal land managers to protect air quality related values in Class 1 areas and to protect human health and basic resource values in all areas. The La Garita, Weminuche, and nearby Great Sand Dunes Wilderness areas are classified as Class 1 areas where very little deterioration of air quality is allowed. Virtually all land management activities on the Forest occur outside the non-attainment boundaries. The greatest potential to affect air quality would be from smoke (wildfires, prescribed fires) and road dust.

#### *Desired Conditions*

**DC-AIR-1:** Air quality related values over Class 1 and Class II wilderness areas meet or exceed state standards. (Forestwide)

#### *Guidelines*

**G-AIR-1:** To protect water quality, oils and solvents should not be used for dust abatement measures. (Forestwide)

## Areas of Tribal Importance (ATI)

The San Luis Valley and the surrounding mountains are the ancestral homelands of several American Indian clans, bands, and tribes. Despite their removal by the U.S. Government in the late 1800s, several tribes maintain strong cultural and spiritual connections to the area. These include the Jicarilla Apache, Navajo, Southern Ute, and Ute Mountain Ute Tribes, as well as several Upper Rio Grande and Western Pueblos. Ceremonial and culturally important sites and traditional gathering areas exist on the Forest. Tribes affiliated with the area exhibit a continuing interest in the homeland-related traditions of their people and look to the Forest to aid in the maintenance and re-establishment of cultural connections to ancestral landscapes.

Policy development and methods of consulting with tribes has evolved since the last forest plan was completed 20 years ago. Though not repeated here, the legal framework of Federal policy, case law, and Executive orders provides guidance and establishes standards for tribal authorities and uses of national forests as well as creates pathways to greater collaboration and connection between the Forest and the tribes at all management levels of the Forest Service.

### *Management Approaches*

*Principal strategies and program priorities to protect areas of tribal importance and spiritual connections to the area*

The Forest develops interpretive and educational exhibits and other media focusing on the history of forest lands in collaboration with tribes. This provides a greater understanding and appreciation of shared history, culture, and traditions.

The Forest maintains meaningful relationships with tribes that are built on trust and works with tribes in developing interpretive and educational materials to aid in protecting areas of tribal importance.

The Forest partners with interested tribes in determining the eligibility of Mount Blanca as a traditional cultural property for the National Register of Historic Places.

The Forest develops a management plan to assist in maintaining cultural values, involving staff from the Bureau of Land Management San Luis Valley Field Office, Pike-San Isabel National Forest, interested tribes, U.S. Fish and Wildlife Service Sangre de Cristo Conservation Area, and other non-Federal partners.

The Forest accommodates and facilitates traditional use of areas acknowledged as traditional cultural properties and other culturally important places that are essential to maintaining the continuing cultural identity of associated communities.

In coordination with tribes, the Forest develops collaborative proposals and partnerships to implement projects of mutual benefit and economic development, or both, using federally authorized or advocated programs where available.

The Forest consults with tribes at initial planning stages and during project design. Appropriate tribal perspectives, needs, and concerns, as well as traditional knowledge, are incorporated into project design and decisions, such as areas acknowledged as traditional cultural properties.

Confidential and sensitive information, or both, regarding sacred sites is held in the strictest confidence.

#### *Desired Conditions*

**DC-ATI-1:** Acknowledged traditional cultural properties are present for their cultural importance and are generally free of impacts from other uses. (Forestwide)

**DC-ATI-2:** Access for tribal members is provided for the exercise of treaty rights and to allow opportunities to practice traditional, cultural, educational, and religious activities. (Forestwide)

**DC-ATI-3:** Traditionally used resources are managed sustainably and are available for future generations. (Forestwide)

#### *Guidelines*

**G-ATI-1:** To protect areas of tribal importance, such as areas acknowledged as traditional cultural properties, minimize restoration and recreation activities and uses, as well as the development of new facilities and infrastructure, near these areas. (Forestwide)

**G-ATI-2:** Purposeful excavation, photography, and destructive analysis of human remains, or any one of these, for educational purposes will be considered only by consulting tribes.

### Congressionally Designated Trails (CDT)

Direction included in this section applies to the management of two congressionally designated trails on the Forest: the Continental Divide National Scenic Trail and the Old Spanish National Historic Trail, which were designated by Congress in 1978 and 2002, respectively.

The National Trails System Act of 1968 authorized creation of a national trail system consisting of national scenic, historic, and recreation trails. National scenic and national historic trails may be designated only by an act of Congress, while national recreation trails are administratively designated by the Secretary of the Interior and the Secretary of Agriculture. Both congressionally designated trails that traverse the Forest are managed with a one-half-mile-wide corridor on either side of the trail, which is displayed on maps. Both trails overlie multiple management areas as they traverse the Forest. Forestwide trail guidance applies to the trails as well as the direction associated with the underlying management area. The most restrictive direction (either management area or trail direction) is applied in cases of conflict.

Both trails are depicted to include a 1-mile-wide trail corridor (one-half mile on either side). The trail corridor and associated direction ensures the conservation of the nationally significant scenic, historic, natural, and cultural resources of the congressionally designed trails. The delineation and direction maximize the intended recreation opportunities along the entire lengths of the trails and provide land area on both sides of the designated trails to safeguard the character and protect the trails across different land designations.

The trail corridor encompasses the resources, qualities, values, associated settings, and many uses of the trails. The one-mile-wide corridor addresses the foreground views from the trails. While this area may have been removed from the suitable timber base, the corridor is not to be viewed as an area free from active management. Trees may be cut and removed, and trail work and other resource management activities may be accomplished. The work completed in the trail corridor will be compliant not only with the forestwide trail direction provided below, but also with the management area direction that applies to each trail segment. Particularly in areas where trail segments occur in areas of more active management, this provides a greater opportunity to

increase connection of citizens to the land through interpretation of management actions along the route.

### *Continental Divide National Scenic Trail*

The 3,100-mile-long Continental Divide National Scenic Trail follows the backbone of the Rocky Mountains from Canada to Mexico. The trail traverses portions of 20 national forests, 4 national parks, and 13 Bureau of Land Management districts, as well as various private lands in Colorado, Idaho, Montana, New Mexico, and Wyoming. About 170 miles of the trail is routed through the Rio Grande National Forest, from its northern boundary with the Gunnison National Forest, to the New Mexico state line.

The Forest Service is the lead agency responsible for management of the Continental Divide National Scenic Trail. Management of the trail is consistent with the nature and purposes of the trail as described in the 2009 Continental Divide National Scenic Trail Comprehensive Plan, and any revisions.

#### *Management Approach*

*Principal strategies and program priorities to manage the Continental Divide National Scenic Trail*

The Forest encourages trail partners and volunteers to assist in the planning, development, maintenance, and management of the trail, consistent with the Continental Divide National Scenic Trail Comprehensive Plan.

The Forest evaluates proposed relocations or new segment locations using defined optimal location criteria.

Opportunities to acquire lands or rights-of-way in or adjacent to the Continental Divide National Scenic Trail corridor will be identified and pursued as feasible.

Consistent signage is provided along the Continental Divide National Scenic Trail at road and trail crossings to identify the trail. Interpretive signs are provided at key entry points and at historic and cultural sites to orient visitors and enhance their experience.

During emergencies, incident management teams are made aware of the Continental Divide National Scenic Trail as a resource to be protected. Fire suppression rehabilitation and long-term recovery of the Continental Divide National Scenic Trail corridor are identified as high priorities for incident management teams, burned area emergency recovery teams, and post-fire rehabilitation interdisciplinary teams.



**Figure 10. The Continental Divide National Scenic Trail at Stony Pass**

Over time, appropriate carrying capacities will be established for specific segments of the Continental Divide National Scenic Trail by monitoring use and conditions. Appropriate management actions are taken to maintain or restore the nature and purposes of the trail if the results of monitoring or other information indicate a trend away from the desired conditions.

To provide for user safety and health, adequate trail facilities are provided that accommodate the amount and types of use anticipated on any given trail segment. Minimal facilities are provided to preserve or promote a setting that appears natural.

#### *Old Spanish National Historic Trail*

The Old Spanish National Historic Trail was designated in 2002. Pioneered by Antonio Armijo in 1829, the Old Spanish Trail was a trade network with several routes that carried woolens and slaves between Santa Fe and Los Angeles in trade for horses in Mexico's California territory. The congressionally designated East Fork of the North Branch of the Old Spanish National Historic Trail runs through the Forest, generally following the west flanks of the Sangre de Cristo Mountains before winding up Saguache Creek and into the Gunnison Basin. Inventory and research have identified the Bunker Site as an archaeological site along the trail within the Forest.

The Old Spanish National Historic Trail Comprehensive Administrative Strategy (December 2017) guides management of the trail across six states and a variety of ownerships. Trail management and activities will be coordinated across and adjacent to unit and jurisdictional boundaries.

### Management Approach

*Principal strategies and program priorities to manage the Old Spanish National Historic Trail*

The Forest develops appropriate measures to protect high-potential sites and segments from deterioration due to natural forces, visitor use, vandalism, and other impacts.

The Forest coordinates with trail administrators, recreation staff, volunteers, and trail organizers to plan for, develop, maintain, and manage high-potential sites, segments, and segments under study for the Old Spanish National Historic Trail.

Prominent access points along the Old Spanish National Historic Trail are signed to enhance user experience and safety.

Federally recognized tribes, appropriate Federal, State, and local agencies, and trail administrators are consulted regarding planning and development activities for the Old Spanish National Historic Trail.

### Desired Conditions

**DC-CDT-1:** Viewsheds from the Continental Divide National Scenic Trail have high scenic values. The foreground of the trail appears natural. (Forestwide)

**DC-CDT-2:** The Continental Divide National Scenic Trail is a well-defined trail that provides for high-quality primitive hiking and horseback riding opportunities and other compatible nonmotorized trail activities, as well as motorized vehicle use expressly allowed by administrative regulations at the time of trail designation [16 USC 1246(c)], in a highly scenic setting along the Continental Divide. The significant scenic, natural, historic, and cultural resources along the trail corridor are conserved. Where possible, the trail provides visitors with expansive views of the natural landscapes along the Continental Divide. (Forestwide)

**DC-CDT-3:** The Continental Divide National Scenic Trail can be accessed from multiple locations, allowing visitors to select the type of terrain, scenery, and trail length (e.g., ranging from long distance to day use) that best accommodates their desired outdoor recreation experience(s). Wild and remote backcountry segments provide opportunities for solitude, immersion in natural landscapes, and primitive outdoor recreation. Easily accessible trail segments complement local community interests and needs and help contribute to a sense of place. (Forestwide)

**DC-CDT-4:** The Continental Divide National Scenic Trail is well maintained, signed, and passable. Alternative routes are made available in the case of temporary closures resulting from natural events, such as fire or flood, or land management activities. (Forestwide)

**DC-CDT-5:** The landscape of the North Branch of the Old Spanish National Historic Trail is managed to maintain its nature and purpose while providing educational opportunities, promoting stewardship, providing opportunities for heritage tourism, and protecting traditional cultural properties. (Forestwide)

### Objectives

**OBJ-CDT-1:** Restore or relocate one segment of the Continental Divide National Scenic Trail to improve scenic viewing opportunities and/or to provide for a nonmotorized experience over the next 15 years. (Forestwide)

### *Standards*

**S-CDT-1:** Do not authorize development of oil and gas, geothermal energy, or other leasable mineral resources within the Continental Divide National Scenic and the Old Spanish National Historic Trail corridor. (Forestwide)

**S-CDT-2:** Do not authorize common variety mineral extraction (e.g., limestone, gravel, pumice, etc.) or disposal within the congressionally designated trail corridors. (Forestwide)

### *Guidelines*

**G-CDT-1:** Forest health projects that result in short-term impacts to the scenic integrity of the Continental Divide National Scenic Trail and its corridor should apply mitigation measures, including but not limited to screening. (Forestwide)

**G-CDT-2:** To promote a naturally appearing setting along the Continental Divide National Scenic Trail, the development of any new roads and trails within or across the trail corridor should minimize impacts to the scenic, natural, and experiential values of the trail. Exceptions are allowed on a limited basis if new routes are (a) required by law to provide access to private lands, (b) necessary for emergency protection of life and property, (c) reconnecting routes that were disconnected through a reroute of the Continental Divide National Scenic Trail to a more desirable location that meets the congressional intent, such as moving the trail off of a road system to a route near or on the actual Continental Divide, or (d) determined to be the only prudent and feasible option as indicated in the project-level purpose and need.

### *Suitability*

**SUIT-CDT-1:** The Continental Divide National Scenic Trail and corridor is not suitable for oil and gas or geothermal energy development or other leasable mineral activity.

**SUIT-CDT-2:** The Continental Divide National Scenic Trail and corridor is not suitable for common variety mineral extraction, including but not limited to limestone, gravel, and pumice.

## Cultural Resources (CR)

The Forest contains cultural resources that demonstrate human occupation and use for at least the last 12,000 years. American Indian, Hispanic, and Euro-American communities continue to use the Forest for economic, social, recreational, and religious purposes. These include long-term, rural, land-based communities that use the Forest for subsistence purposes. An understanding of cultural resources and historic uses is important to understanding shared heritage and the social, economic, and ecological sustainability of the planning area, the State of Colorado, the Rocky Mountain region, and the Nation as a whole.

Currently, about 2,099 cultural resources have been documented, including prehistoric and historic remains. About 18 percent of the Forest has been inventoried for cultural resources to some degree. Resources within the Forest represent processes and events important to the identity and history of both tribal groups and long-term, land-based communities. Cultural resources can contain a wealth of information for potential scientific research regarding social and ecological conditions and changes through time, including human successes and failures in coping with these transformations over the past 12,000 years. This information is valuable to managers making decisions regarding contemporary and future ecological management and for educating the public about the complex ecological sustainability of the Forest.

### Management Approaches

*Principal strategies and program priorities to manage cultural resources*

Sites are protected from activities including, but not limited to, vegetation treatment and prescribed fire. Protection can require attention to avoid "islanding" of sites, which can occur from simply avoiding areas to reduce impacts from erosion, severe fire effects, and livestock grazing.

The Forest develops and maintains partnerships to assist in meeting targets, maintaining facilities and infrastructure, completing monitoring, developing resource specific plans, mapping habitat and use, and more. Partnerships are encouraged with traditional communities, surrounding communities and governments, nonprofit groups, volunteers, professional organizations, schools, and any other interested individuals and groups.

In compliance with Section 110 of the National Historic Preservation Act, the Forest completes a non-project inventory annually. The following prioritization is applied:

- Areas where eligible cultural resources are threatened or where ongoing impacts are unknown and need to be assessed.
- Areas indicated to have high cultural value or high density of cultural resources.
- Areas of importance to traditional communities.
- Areas where additional survey will contribute to a greater regional understanding of a specific management unit or special interest area.

The Forest develops and maintains collaborative partnerships and volunteer efforts to assist the agency in researching and managing cultural resources. Partnerships focus on traditional communities, nonprofits, volunteers, professional organizations, and schools.

The Forest develops management and preservation plans for administrative facilities and infrastructure that are significant cultural resources with special significance, or are sites that receive frequent visitor use.

Areas that are acknowledged as traditional cultural properties or cultural landscapes, and other culturally significant areas identified by local communities, provide tangible links to historically rooted beliefs, customs, and practices. These resources are protected through consultation, traditional cultural practices, consulting parties, and project design.

Cultural resources are integrated into all resource management decisions and align with the affirmative management, including protection, of significant cultural resources.

The Forest develops a database of fire-sensitive sites, structures, and other resources to facilitate resource protection during fire management.

The Forest provides opportunities for responsible officials and employees in the agency to receive training to gain a broader understanding of the unique legal relationship between the Federal Government and Indian tribes, and to learn about American Indian law, customs, traditions, and values.

The Forest continues to identify and map populations of *Ligusticum porteri*. Following mapping, the Forest will consider setting aside collection areas for tribal use and rotating the use of these

areas over time. Consultation will assist in identifying other plants that are important to tribes. See also *Vegetation Management* section.

The Forest continues to work with tribes to understand community needs and build respectful, collaborative relationships to achieve mutually desired conditions.

Operation and maintenance plans for special use permits, including recreation residences eligible for inclusion on the National Register of Historic Places, include stipulations to ensure preservation of the historic characteristics of the site.

#### Desired Conditions

**DC-CR-1:** Interpretation and management of cultural resources connects the public to the past, to the land and its history. The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings. Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved and maintained. Long-standing, land-based rural communities that have depended on the Forest are recognized and valued. Cultural resources are protected from natural forces, excessive visitor use, vandalism, and other impacts.

#### Standards

**S-CR-1:** Include applicable provisions in contracts, agreements, and special use permits as needed to protect cultural resources. (Forestwide)

#### Guidelines

**G-CR-1:** Preserve cultural artifacts in place, or curate when necessary. (Forestwide)

### Infrastructure (INFR)

Access is necessary to provide a variety of uses and experiences. Structures are also necessary for the operation and management of the Forest as well as for public safety. The developed infrastructure within the Forest includes bridges, roads, trails, utility corridors, dams, and buildings for administrative, recreational, or special use purposes. An existing road system provides access to the recreating public as well as purchasers of forest products, owners of private land, contractors, and researchers, among others. Utility corridors (transmission lines) provide power and telecommunications access, as well as public safety. Maintained facilities include rental cabins, developed recreation sites, historic sites, and administrative sites.

#### Management Approaches

*Principal strategies and program priorities to manage infrastructure*

Manage the Forest transportation system to reduce resource damage and address public safety.

Facilities acquired through land donation, exchange, or purchase are not retained unless they serve a definitive purpose and funding is available for maintenance, or they are historically significant.

Facilities are managed in compliance with the facilities master plan.

Closed or restricted use roads are available for administrative purposes upon approval by the responsible official. These roads are not displayed on the Forest Motor Vehicle Use Map.

Designated roads, as displayed on the Forest Motor Vehicle Use Map, and newly constructed roads, are open to motorized vehicle use unless a document decision shows that:

- Motorized use conflicts with forest plan objectives,
- Motorized use is incompatible with the recreation opportunity spectrum class,
- Roads and trails will not be managed as open to public motorized use,
- Motorized use creates use conflicts that result in unsafe conditions unrelated to weather conditions,
- Physical characteristics of roads and trails are hazardous for motorized use,
- Roads and trails do not serve an existing or identified public need, or
- Financing is not available for maintenance necessary to protect resources.

Motorized use is restricted on all areas that are not designated for motorized use on the Forest Motor Vehicle Use Map. Forest orders may also be used to close areas for various reasons.

Over-the-snow motorized vehicle use is allowed unless specifically restricted.

The impact of potential alterations in timing, magnitude, and duration of seasonal runoff is considered on infrastructure design and construction. Considerations include evaluations of climate change vulnerability assessment for infrastructure, including recreational infrastructure.

Road use is managed with seasonal closures if:

- Use is causing unacceptable damage to soil and water resources due to weather or seasonal conditions,
- Use is causing unacceptable wildlife conflicts or habitat degradation,
- Use is resulting in unsafe conditions due to weather conditions,
- The road(s) serve a seasonal public or administrative need, or
- The area accessed has a seasonal need for protection.

New trails are developed to expand recreation opportunities, ensure user safety, and disperse existing use. Trail construction is consistent with other resource objectives.

The travel management process is followed during project-level design and analysis to move toward a sustainable Forest road system.

### *Desired Conditions*

**DC-INFR-1:** The transportation system is commensurate with resource management needs, public safety, emergency access, and public access to use and enjoy the Forest. Road restrictions occur for resource management activities that protect, maintain, and enhance habitat, soil, and water objectives, among other values. (Forestwide)

#### *Guidelines*

**G-INFR-1:** To blend with natural surroundings, construct or restore structures to blend with the natural surroundings wherever feasible and practicable. (Forestwide)

### Lands (LAND)

The three primary functions of the Forest lands program are land survey and boundary management, land adjustments, and special uses, for both recreation and non-recreation. Boundary management ensures that the Forest secures and protects the rights, title, values, and interests of the American public on National Forest System lands. This includes the management of boundary lines within the Forest that border state, private, and other Federal agency lands, as well as secured rights-of-way for access to the Forest.

#### *Management Approaches*

*Principal strategies and program priorities to manage the Forest lands program*

Land adjustments consolidate and improve management efficiency through real estate transactions including sales, purchases, exchanges, conveyances, and rights-of-way within and outside the proclaimed Forest boundary. Lands can be transferred to the Forest Service through purchase, exchange, or gifting to the agency. Regardless of the transfer method, the Forest Service can only acquire land from willing parties that meet the criteria. The types of land the agency prefers to acquire include:

- Lands within congressionally designated areas,
- Lands with water frontage, wetlands, and associated riparian ecosystems,
- Lands with habitat for endangered or threatened species,
- Lands with unique historical or cultural resources,
- Lands primarily of value for outdoor recreation purposes and lands needed for aesthetic protection,
- Key tracts that promote effective resource management,
- Lands that consolidate ownership and reduce miles of property lines and corners to be maintained, and
- Lands that maintain or stabilize economies of local governments.

Manage special uses in a manner that protects natural resources, public health, and safety, and is consistent with management plans for National Forest System lands. Special uses are administered on the basis of sound resource management objectives and business principles.

Existing and designated rights-of-way in the 1996 Land and Resource Management Plan are managed to maintain them for future construction and occupancy.

Communication sites and utility lines are fully developed prior to authorization of new sites. New sites may be necessary to fill coverage gaps or meet public needs.

Management activities in linear corridors should be consistent with direction for the management area the corridor passes through.

Land ownership patterns support land and resource goals and objectives, reduce future management costs, respond to community needs, protect critical resource areas, increase recreation opportunities, and improve legal access.

The authorization and administration of special uses by individuals, companies, groups, and government entities protect natural resource values and public health and safety.

#### *Standards*

**S-LAND-1:** Bury electrical utility lines of 33 kilovolts or less, and telephone lines, unless scenic integrity objectives of the area can be met using an overhead line or burial is not technically feasible. (Forestwide)

**S-LAND-2:** Do not authorize conflicting uses of activities in transportation and utility corridors. (Forestwide)

### Minerals (MIN)

National Forest System lands are important storehouses of domestic minerals and energy resources. The search for and production of minerals and energy resources are authorized uses of National Forest System lands, except those lands formally withdrawn from mineral activities by acts of Congress or by executive authority. Mineral activities on National Forest System lands are facilitated in compliance with the national Mining and Mineral Policy Act and are consistent with the agency mission.

Reference the Oil and Gas Stipulations Map contained on the external drive located at the back of this document.

#### *Management Approaches*

*Principal strategies and program priorities to manage the minerals program*

The Forest administers minerals activities through a plan of operations, which includes permits as well as the reclamation and mitigation measures necessary to protect resources.

The Abandoned Mine Lands Program addresses past mines that are no longer active. These lands can pose a hazard to the public, wildlife, and the environment. The program evaluates abandoned mines across the unit and the impacts of these. Mine closure decisions consider and assess needs related to other resources as well, such as wildlife. The program uses partners to evaluate and complete the process.

Procedures assure protection of water quality and fish habitat. The list below addresses management of recreational dredging that occurs on the Forest.

1. Limit use of the practice to outside of critical life-stage periods in streams that have Rio Grande cutthroat trout core conservation populations.
2. The Forest geologist (or designated authority) will review the notice of intent prior to the commencement of activities.
3. Where possible, retain existing instream and riparian vegetation and other features including but not limited to trees, bushes, shrubs, weeds, or tall grasses along streambanks, natural, large woody debris, and large boulders.

4. Operations should not change the stream channel to direct water flow into a streambank or cause bank erosion or destruction of the natural form or the stream channel.
5. Whenever practical, prevent the release of silt, sediment, sediment-laden water, or any other deleterious substances into the watercourse.
6. Keep equipment and machinery in good operating condition, power washed, and free of leaks, excess oil, and grease.
7. Locate the point of discharge to the creek immediately downstream of the worksite to minimize disturbance to downstream populations and habitats.

#### *Guidelines*

**G-MIN-1:** Mining activities can be acknowledged when the activity does not cause substantial surface disturbance or unacceptable impacts to water quality or fish habitat. Aspects of operation will be contained in the notice of intent. A plan of operations will be required for any activities above the scope of a notice of intent. (Forestwide)

### Recreation Management (REC)

Direction below applies to the recreation management program. The natural environment of the Forest offers settings for a wide range of high-quality recreation opportunities, including motorized and nonmotorized opportunities. The Forest provides a variety of summer and winter recreation opportunities that allow visitors to escape from urban environments and enjoy a range of experiences in a variety of rural to primitive settings. Outdoor recreation opportunities include hiking, biking, fishing, hunting, wildlife viewing, driving for pleasure, and the pursuit of spiritual values provided by the natural environment.

#### *Management Approaches*

*Principal strategies and program priorities to manage recreation*

Relationships with partners, cooperators, and permittees are vital to the success of the recreation program, as are building, sustaining, and leveraging strategic relationships to sustain high-quality recreation settings and opportunities.

Recreation development and travel routes are managed to be consistent with the recreation opportunity spectrum class designations.

Available resources (e.g., time, budget, expertise) are strategically invested to support long-term recreation program goals. Developed recreation assets are aligned with projected facility budgets, partnership capabilities, and other re-investment strategies.

Cooperators are encouraged to be involved in stewardship activities.

**Figure 11. Backcountry skiers near Wolf Creek Pass**

Recreation special use permits are leveraged to accomplish recreation program goals and serve the public.

Readily available off-site and on-site information about Forest recreation opportunities is available at fee campgrounds.

When campground occupancy is less than 20 percent for at least one season, managers determine whether to close the campground, convert it to a dispersed site, or take other action.

Trail development is coordinated with systems developed by municipalities, counties, states, other agencies, and partners to promote integration and connectivity. Loop trails are considered where feasible, particularly at low elevations.

The Forest intends to consider using concessionaire operations when fees are charged at developed sites.

When use exceeds the capacity of an area for a recreation opportunity spectrum class, the following actions will address the impacts or effects on the recreation setting: provide information to the public and restore the site, regulate use at the site, restrict the number of users, and close the site if necessary.

### *Desired Conditions*

**DC-REC-1:** A variety of enduring recreation opportunities are available across a variety of settings that foster high-quality, year-round developed and dispersed experiences. Development of facilities and travel routes is consistent with the recreation opportunity spectrum class designations. Recreation facilities and programs incorporate universal design concepts and meet

current Federal accessibility guidelines unless doing so fundamentally alters the setting or character of the program. (Forestwide)

**DC-REC-2:** Sites and facilities are designed to be long-lasting, require low maintenance, and incorporate "green" operations. The sites and facilities should also complement the natural setting. (Forestwide)

#### *Objectives*

**OBJ-REC-1:** Develop three trail connections between strategic community areas and National Forest System trails within 15 years. (Forestwide)

#### *Standards*

**S-REC-1:** Manage, rehabilitate, or close dispersed recreational use areas when:

- Use area condition reaches Frissell-Cole Class 4 or 5 (compromised natural environment), or
- Use conflicts substantially disrupt user experience, safety, or both, and closure is the only alternative (compromised human environment)

**S-REC-2:** Dispersed camping is limited to 14 continuous days in any one location in any 30-day period. (Forestwide)

#### *Guidelines*

**G-REC-1:** To reduce use conflicts and resource damage, activities and projects should not be approved if they exceed the developed, appropriate threshold for the recreation opportunity spectrum capacity levels listed in Table 10. (Forestwide)

**G-REC-2:** On lands that are snow-free, prohibit motorized and mechanized travel outside of designated travelways. Exemptions are only allowed by an order or permit signed by the Forest Supervisor or Regional Forester for administrative, emergency, law enforcement, or land management needs. (Forestwide)

### Table 10. Recreation opportunity spectrum capacity levels

[Capacity range is defined as follows: **Very Low** and **Low** apply to rock, mountain grass, and clearcuts 1 to 20 years old. **Moderate** applies to mountain grass, mature and pole-sized ponderosa pine, mature aspen, and shelterwood cuts 90 to 120 years old. Selection cut 1 to 20 years old and clearcuts 80 to 120 years old. **High** applies to mature and pole-sized spruce, pole-sized aspen, and clearcuts 20 to 80 years old; **ROS**, recreation opportunity spectrum; **PAOT**, persons at one time; **M acres**, 1,000 acres.]

| ROS Class/Capacity Range | Very Low | Low | Moderate | High |
|---|---|---|---|---|
| ***Primitive*** | | | | |
| Trail (PAOT/mile) | 0.5 | 1 | 2 | 3 |
| Area-wide (PAOT/M acres) | 1 | 2 | 7 | 25 |
| ***Semi-primitive Nonmotorized*** | | | | |
| Trail (PAOT/mile) | 2 | 3 | 9 | 11 |
| Area-wide (PAOT/M acres) | 4 | 8 | 50 | 80 |
| ***Semi-primitive Motorized*** | | | | |
| Trail (PAOT/mile) | 2 | 3 | 9 | 11 |
| Area-wide (PAOT/M acres) | 4 | 8 | 10 | 40 |
| ***Roaded Natural*** | | | | |
| Trail (PAOT/mile) | 2 | 3 | 9 | 11 |
| Area-wide (PAOT/M acres) | 40 | 80 | 1,200 | 2,500 |
| ***Rural*** | | | | |
| Trail (PAOT/mile) | 2 | 3 | 9 | 11 |
| Area-wide (PAOT/M acres) | 500 | 800 | 5,000 | 7,500 |

## Scenery (SCNY)

The Rio Grande National Forest provides a scenic backdrop and contributes to the identities of communities in and around the San Luis Valley. Managing scenic resources ensures quality sightseeing and recreation opportunities. Colorado tourism thrives on outdoor recreation and the beautiful scenery of the Rocky Mountains. The Scenic Integrity Objectives Map is contained on the external drive of maps located in the back of this document.

### *Management Approaches*

*Principal strategies and program priorities to manage scenery on the Forest*

The scenery management system provides a systematic approach for determining the relative value and importance of scenery on the Forest. Scenery management involves identifying scenic components, mapping these components, and assigning a value for aesthetics. Forest plan direction helps incorporate scenery as a part of ecosystems to determine trade-offs at the project level.

Areas with low scenic integrity are rehabilitated to gain compliance with mapped scenic integrity levels.

Forest Service constructs and maintains structures and building features consistent with the principles in the Built Environment Image Guide to complement the scenic character of the natural surroundings.

Management practices are designed to produce forest composition, structure, and patterns similar to those that would have occurred under natural disturbance regimes, where feasible.

### Desired Conditions

**DC-SCNY-1:** Areas of high scenic quality are provided, especially in areas seen from roads and trails, developed recreation sites, administrative sites, and towns and cities near the Forest. (Forestwide)

**DC-SCNY-2:** Vegetation treatments visually blend with existing scenic character. (Forestwide)

**DC-SCNY-3:** The transition from Forest lands to adjacent lands with similar desired conditions does not exhibit abrupt changes in scenic quality. (Forestwide)

### Standards

**S-SCNY-1:** Management activities are consistent with identified scenic integrity objectives. Short-term impacts, less than 5 years, that are inconsistent with the scenic integrity objectives may occur. Restoration activities designed to meet or exceed identified scenic integrity objectives should begin within 2 years of project completion (see the Scenic Integrity Objectives Map on the external drive of maps in the back of this document). (Forestwide)

### Guidelines

**G-SCNY-1:** Design management activities to minimize impacts to valued scenic attributes and scenic character. Line, form, color, texture, size, shape, edge effect, and patterns of natural vegetation openings complement surrounding scenic character. (Forestwide)

# Chapter 3. Management Area Specific Direction

This chapter summarizes the physical, biological, social, and economic environments of the planning area and the effects of implementing each alternative on that environment.

## Management Areas (MA)

Forest management provides direction for a mix of environments across the landscape. A forest plan divides National Forest System lands into areas with similar management emphasis and settings in much the same way that city zoning zones municipalities to permit or prohibit certain land uses.

National Forest System lands within the Forest boundary have been divided into nine management areas, each with a different emphasis that is intended to direct management activities on that particular piece of land. Management area allocations are specific to the areas across the Forest with similar management needs and desired conditions.

Management area categories are listed in Table 11 and the corresponding maps are contained on the external drive of maps located in the back of the document.

**Table 11. Management areas**

| Management Area Number | Management Area Emphasis | Estimated Acres |
|---|---|---|
| 1 | Designated Wilderness | 392,138 |
| 1.1a | Recommended Wilderness | 40,052 |
| 3 | Roadless Areas | 519,798 |
| 4.1 | Special Designation: Special Interest Areas | 26,939 |
| 4.2 | Special Designation: Research Natural Areas | 23,861 |
| 4.21 | Special Designation: Scenic Byways and Railroads | 27,501 |
| 4.34 | Special Designation: Eligible and Suitable Wild, Scenic, and Recreational Rivers | 35,869 |
| 4.8 | Special Designation: Ski-based Resorts | 1,632 |
| 5 | General Forest and Rangeland | 837,269 |

### Overlapping Management Area Direction

Overlapping management direction occurs when a special feature occurs within another management area; for example, when a research natural area occurs within a wilderness boundary. The direction related to wilderness is the most restrictive and is established by Congress. A research natural area that occurs within a wilderness area boundary is bound by all of the laws, regulations, policies, and forest plan direction that apply to wilderness as well as by direction related to the management of that individual research natural area.

For Management Area 1.1 – Designated Wilderness, any management proposed in areas where other management areas overlap would be done in compliance with wilderness direction. Overlapping management areas are described below.

Approximately 11,482 acres of Management Area 4.2 – Special Designation: Research Natural Areas occur within the boundaries of designated wilderness. Regional foresters and station directors establish new research natural areas. These areas are used as a baseline for measuring ecological changes and as control areas for evaluation and monitoring. Research natural areas that overlap with designated wilderness include three areas in the Sangre de Cristo Mountains: the Mill Creek, Deadman Creek, and North Zapata Research Natural Areas. A portion of the Mill Creek Research Natural Area overlaps with recommended wilderness as well.

An estimated 15,575 acres of designated wilderness is also managed as Management Area 4.34 – Special Designation: Eligible and Suitable Wild, Scenic, and Recreational Rivers. These areas would be managed to enhance or maintain the outstandingly remarkable features responsible for river designation while complying with wilderness practices and restrictions. Approximately 161 acres of Management Area 4.34 overlap with Management Area 1.1a – Recommended Wilderness. Additionally, an estimated 483 acres of research natural area (Management Area 4.34) overlap with special interest area (Management Area 4.1) and wilderness (Management Area 1). Management proposed on these acres would have to be in compliance with wilderness requirements if that area is carried forward in the analysis of wild, scenic, and recreational river direction and any direction for that specific special interest area.

Approximately 7,313 acres of overlapping management area occurs with research natural areas (Management Area 4.2) and designated eligible and suitable wild, scenic, and recreational rivers (Management Area 4.34). Management activities that might occur in these areas would need to be in compliance with all management areas.

Approximately 856 acres of recommended wilderness (Management Area 1.1a) overlap with Management Area 4.34 – Special Designation: Eligible and Suitable Wild, Scenic, and Recreational Rivers and Management Area 4.1 – Special Designation: Special Interest Areas.

An estimated 2,947 acres of recommended wilderness (Management Area 1.1a) overlap with existing special interest areas (Management Area 4.1). Any activities or management proposed in this area would have to be done in compliance with wilderness practices and meet direction for that specific special interest area.

Overlapping management areas also occur in Management Area 4.2 for research natural areas. As stated previously, the most restrictive management direction would apply when working in areas with overlapping direction. When this occurs, the most restrictive level of management would be the most constraining.

Research natural areas also overlap with the acres designated as Colorado roadless areas. The 5,018 acres overlap with roadless areas in the Finger Mesa Research Natural Area on the Divide Ranger District. If management were to occur on these acres, it would have to be compliant with both the direction for the research natural area and the roadless designation. Estimated acreage of management areas is listed in Table 11.

**Figure 12. Rio Grande Pyramid in fall**

## Management Area 1 – Wilderness

### *Desired Conditions*

Wilderness is designated by Congress and managed in accordance with the Wilderness Act of 1964. Management in these areas protects and perpetuates natural ecological processes and conditions. Natural ecological conditions in designated wilderness are not measurably affected by human use. Management of these area protects the overall wilderness character as described in the Wilderness Act. Approximately 23 percent of the Forest, 430,000 acres, is designated as wilderness. The La Garita, Sangre de Cristo, South San Juan, and Weminuche Wilderness areas all occur on the Rio Grande National Forest. All of these areas are jointly managed, and a lead forest is identified for each wilderness area. Each of the four wilderness areas has a specific wilderness plan to direct and guide management.

Natural succession, influenced by natural processes and disturbances, occurs in all vegetation types. Structure, composition, function, and spatial distribution of vegetative types are the result of natural succession. Where no natural disturbance has occurred, vegetation is mostly in late-successional stages.

Age and structure classes may vary where natural disturbance agents, such as fire or insects, have influenced the succession process. Plant species are native and indigenous to the immediate area. Populations of nonnative invasive plant species are limited, and ongoing management activities control existing populations and eradicate new species before they can become

established. Forage for wildlife, permitted livestock, and packstock is available in meadows and natural openings. Forage availability may be limited due to topography and short growing seasons. Human influences on vegetation is minimal. Timber harvest is prohibited, and this area is not included in the suitable timber base.

Wildlife species are buffered from human influences. No nonnative animal species are introduced. Human influence on aquatic life and riparian areas and processes is minimal in most areas. The composition, structure, and function of aquatic ecosystems are minimally disturbed by human influence. Stocking is used as a tool to enhance threatened, endangered, and candidate species and to enhance recreational opportunities where stocking occurred prior to designation. Water impoundments, ditches, and diversions may be present in designated wilderness areas.

Designated wilderness areas favor solitude; users are expected to be familiar with and use primitive skills in an environment that offers a high degree of risk and challenge. Success or failure is directly dependent on the ability, knowledge, and initiative of the visitor. Contact with other users or Forest Service personnel decreases with increasing distance from the entry portals. Near the entry portals, users may have contact with larger groups. Commercial permitting for day-use activities is allowed in high-use areas. Evidence of established campsites and base camps may be present. An element of discovery is maintained. The presence of interpretive signs, markers, and posts decreases with increasing distance from the entry portals, though cairns may be present. Near the entry portals, trails are marked at intersections to indicate routes. Evidence of cultural and historic sites may be present, and these sites may be signed and interpreted near entry points. Structures or facilities may be present but only as necessary for resource protection when less obtrusive measures were not successful in the past. Human influence on physical features, such as soil and geologic materials, is minimal. Outfitter-guides provide special use recreation services that fulfill identified public needs and support the recreational or wilderness purpose.

Trails provide access for the primary mode of travel from entry portals. Trail systems favor user safety and comfort. Bridges may be present when needed for resource protection or user safety. The presence of constructed trails decreases with increasing distance from entry portals, and travel deep within wilderness is primarily cross-country with no established trails. User-created trails may exist but are not maintained or designated on maps or trail guides. Trails support wilderness experiences and preserve wilderness characteristics.

Evidence of past mining activity may be present but is rare. Designated wilderness areas are withdrawn from locatable mineral entry and are legally unavailable for oil and gas leasing.

Visibility is generally unimpaired. Smoke from wildfires may be visible. The scenic integrity ranges from very high to high, and the recreation opportunity spectrum class ranges from primitive to semi-primitive nonmotorized.

Forestwide desired conditions applicable to wilderness are also contained in Chapter 2.

### *Management Area Specific Management Approaches*

Existing trails are primitive and maintained to minimize resource damage. The following actions will be taken as needed:

- Reduce evidence of trails
- Eliminate duplicate routes

- Remove trails from maps where repeated travel over the same route is to be discouraged.

Signs are restricted to trail intersections. Bridges and other reminders of management control are generally limited to those needed for resource protection and user safety, and generally use native materials.

Bridges are built for resource protection and user safety, not for user convenience, using native materials.

Signage and other infrastructure is minimal and constructed of rustic, native, or natural-appearing materials.

Eligible and listed historic structures are managed to be compatible with the wilderness setting.

Campsites are maintained in Frissell-Cole Class 2 or 3.

Fish stocking emphasizes a wild fishery, where species perpetuate themselves over time and are affected primarily by the forces of nature. Some high mountain lakes may be stocked to support indigenous threatened, endangered, and proposed species as well as species of conservation concern. Species of fish that are not indigenous to the area or that are exotic will not be stocked.

Rockhounding activity must not exceed 50 pounds per person per day or interfere with existing rights, and specimens may only be collected for personal, noncommercial uses.

Voice control or physical restraints are acceptable to prohibit pets from harassing wildlife or people.

The Forest will consider the following to minimize human impacts in wilderness:

- Limit the number of private outfitter-guide camps
- Encourage the use of self-contained stoves or prohibit campfires
- Implement a permit system
- Implement party-size and pack-animal limitations
- Prohibit dogs or implement an on-leash requirement.

Where appropriate, printed wilderness information is posted at trailheads outside of the wilderness boundary.

Restoration activities (e.g., prescribed fire, active weed management) may be used in recommended wilderness areas to protect or enhance the wilderness characteristics.

Significant historic structures can be considered as having cultural values and, when present, may be eligible for protection or restoration.

### *Management Area Specific Standards*

**S-MA 1-1:** Protect and preserve wilderness values and character in congressionally designated wilderness, as well as in areas recommended for wilderness designation.

**S-MA 1-2:** Activities permitted by special use permit within wilderness:

- Will involve minimal physical, visual, and noise disturbance
- Will not result in permanent structures, except for replacements or mandatory repairs to existing facilities previously authorized or allowed by statute

- May exceed the group size limitation when the activity:
  - Will benefit the wilderness character
  - Is necessary for public health and human safety.

**S-MA 1-3:** Group size may not exceed more than 15 people per group, with a maximum combination of people and stock not to exceed 25.

**S-MA 1-4:** Unless justified by terrain, prohibit recreational livestock within 100 feet of lakes and streams.

### *Management Area Specific Guidelines*

**G-MA 1-1:** Pristine management areas of a wilderness should not be changed to a lesser standard of naturalness in order to disperse recreation use from other parts of the wilderness.

### *Management Area Specific Land Suitability*

**SUIT-MA 1-1:** Designated wilderness areas are not suitable for removal of salable mineral material including but not limited to sand, stone, and gravel.

**SUIT-MA 1-2:** Wilderness areas are not included in the suitable timber base.

**SUIT-MA 1-3:** Wilderness areas are not suitable for commercial use of non-timber forest products, including but not limited to firewood, posts, and boughs.

**SUIT-MA 1-4:** Grazing is permitted.



**Figure 13. Crestone Peak**

## Management Area 1.1a – Recommended Wilderness

These are areas that are recommended future inclusion in the National Wilderness Preservation System. The Forest Service only recommends these lands. Decisions to designate these lands as wilderness is made by the U.S. Congress. Congress, and ultimately the President, must establish legislation, through a wilderness bill, to officially designate a wilderness area.

The specific areas being recommended include an estimated 40,052 acres located in the Sangre de Cristo range.

### *Management Area Specific Desired Conditions*

Recommended wilderness areas preserve opportunities for inclusion in the National Wilderness Preservation System. The Forest maintains and protects the ecological and social characteristics that provide the basis for wilderness recommendations.

These areas are characterized by a natural environment where ecological process such as natural succession, wildfire, avalanches, insects, and disease function with limited human interaction.

#### *Management Area Specific Guidelines*

**G-MA 1.1a-1:** To maintain and protect wilderness characteristics, communications sites for public safety should be located outside of recommended wilderness areas unless no other alternative is available. Communications sites that need to be located in recommended wilderness should blend with the environment and be located away from system trails and developed use sites.

**G-MA 1.1a-2:** To maintain and protect wilderness characteristics, new developed recreation facilities with provisions for user comfort, such as picnic tables, fire grills, and vault toilets, should not be installed.

#### *Management Area Specific Land Suitability Determinations*

**SUIT-MA 1.1a-1:** Recommended wilderness areas are not suitable for timber harvest.

**SUIT-MA 1.1a-2:** Recommended wilderness areas are suitable for restoration activities where the outcomes will protect the wilderness characteristics of the area, as long as the ecological and social characteristics that provide the basis for wilderness recommendation are maintained and protected.

**SUIT-MA 1.1a-3:** Recommended wilderness is not suitable for road construction or reconstruction.

**SUIT-MA 1.1a-4:** Recommended wilderness areas are not suitable for removal of salable mineral materials, including but not limited to sand, gravel, and stone.

**SUIT-MA 1.1a-5:** Mechanized transport and motorized use are not suitable in recommended wilderness.

### Management Area 3 – Colorado Roadless Areas

Roadless areas emphasize protection of roadless area values and characteristics. The Colorado Roadless Rule was enacted on July 3, 2012. The Colorado Roadless Rule provided management direction to conserve 4.2 million acres of National Forest System lands statewide for roadless values, including approximately 519,798 acres in 53 areas of the Forest.

The Colorado Roadless Rule is being wholly incorporated into forest plan direction. The areas designated in the Colorado Roadless Rule are contained in Table 12.

**Table 12. Roadless areas in the Forest established by the 2012 Colorado Roadless Rule**

| Roadless Area Name | Includes Upper Tier Acres | Roadless Area Name | Includes Upper Tier Acres |
|---|---|---|---|
| Alamosa River | Yes | Lake Fork | Yes |
| Antora Meadows–Bear Creek | Yes | Lower East Bellows | Yes |
| Beartown | Yes | Middle Alder | Yes |
| Beaver Mountain | Yes | Miller Creek | No |
| Bennett Mountain–Blowout–Willow Creek–Lion Point–Greenie Mountain | Yes | Pole Creek | No |
| Big Buck–Kitty–Ruby | Yes | Pole Mountain–Finger Mesa | Yes |
| Box-Road Canyon | Yes | Red Mountain | Yes |
| Bristol Head | Yes | Ruby Lake | Yes |
| Butterfly | No | Sawlog | Yes |
| Chama Basin | Yes | Sheep Mountain | Yes |
| Conejos River–Lake Fork | No | Silver Lakes–Stunner | Yes |
| Copper Mountain–Sulphur | Yes | Snowshoe Mountain | Yes |
| Cotton Creek | No | Spectacle Lake | No |
| Crestone | No | Spruce Hole–Sheep Creek | Yes |
| Cumbres | Yes | Stunner Pass–Dolores Canyon | Yes |
| Deep Creek–Boot Mountain | Yes | Sulphur Tunnel | No |
| Dorsey Creek | Yes | Summit Peak–Elwood Pass | Yes |
| Elkhorn Peak | Yes | Taylor Canyon | Yes |
| Fourmile Creek | Yes | Tewksberry | Yes |
| Fox Creek | Yes | Tobacco Lakes | Yes |
| Fox Mountain | Yes | Trout Mountain–Elk Mountain | Yes |
| Gibbs Creek | No | Ute Pass | Yes |
| Gold Creek–Cascade Creek | Yes | Wason Park | Yes |
| Hot Springs | No | Wightman Fork–Upper Burro | Yes |
| Indiana Ridge | Yes | Wightman Fork–Lookout | Yes |
| Kitty Creek | No | Willow Mountain | Yes |
| La Garita | Yes | | |

The intent stated in the Colorado Roadless Rule "is to protect roadless values by restricting tree cutting, sale, and removal; road construction and reconstruction; and linear construction zones within Colorado Roadless Areas, with narrowly focused exceptions." (Federal Register, vol. 77, no. 128, Tuesday July 3, 2012, pp. 39602-39612). Colorado roadless areas are included in Management Area 3 – Roadless. A detailed description of this management area and the accompanying direction is available in the 2012 Colorado Roadless Rule (36 CFR Part 294). Motorized and mechanized use can occur in these areas.

### *Desired Conditions*

Colorado roadless areas are generally undeveloped parts of the Forest that provide a variety of settings at different elevations. They are managed to protect roadless characteristics and to

maintain plant and animal habitats that are shaped primarily through natural processes. These areas provide backcountry recreational experiences to the public in areas with less evidence of human activities.

Landscapes in these areas are predominantly natural appearing and relatively undisturbed by humans. Natural processes within the context of the range of natural variability (insects, disease, and fire) are generally allowed to occur with minimal human intervention.

The probability of experiencing solitude in these areas is high. Frequent opportunities for challenge and risk require a degree of self-reliance. Facilities are minimal and exist primarily for site protection. Recreational improvements, such as signs, may be present. Trailheads offer information and directional signage.

Trails provide access for a wide range of challenging recreational opportunities including horseback riding, mountain bike riding, and motorized travel on designated routes. Hunting and fishing opportunities are available for those seeking a more remote experience.

The number of miles of motorized and nonmotorized trails will not substantially change over the planning period. Activities meet the assigned recreation opportunity spectrum class and scenic integrity objectives.

#### *Management Area Specific Standards*

**S-MA3-1:** The Colorado Roadless Rule direction at 36 CFR 294 Subpart D will be followed.

#### *Management Area Specific Land Suitability Determinations*

**SUIT-MA3-1:** Areas designated as Colorado roadless upper tier are available for oil and gas leasing with no surface occupancy.

### Management Area 4 – Special Designations

Management Area 4 emphasizes recreation and scenery. The five divisions represent areas that are designated for specific reasons that can include research; unique special areas; scenery; wild, scenic, and recreational rivers; and ski resorts.

Features in these areas are often interpreted to increase public knowledge of the areas and the features that are present there as well as to connect people with the land and the natural environment.

Some areas are included in the suitable timber base and are available for commercial timber harvest.

### Management Area 4.1 – Special Designation – Special Interest Areas

#### *Desired Conditions*

Special interest areas (Table 13) favor the protection or enhancement of unique characteristics that occur across the Forest. Special interest areas typically contain unique botanical, geologic, historical, scenic, or cultural areas and values. Education and interpretation of the characteristics for which the area was designated are encouraged and are accomplished in consultation with partners, private citizens, tribes, and other agencies.

### *Management Area Specific Management Approaches*

Facilities are designed to meet management objectives.

Vegetation treatment may be used to maintain or enhance special or unique values of the area.

Special use permits are appropriate for scientific or educational activities that are compatible with the values for which the area was created.

Management plans explain and protect the values for which the area was created.

Over-snow motorized travel is suitable in only three special interest areas, specifically the Bachelor Loop, Elephant Rocks, and Wagon Wheel Gap Experimental Station, and may be subject to timing restrictions to protect deer and elk winter range.

**Table 13. Special interest areas in Management Area 4.1**

| Area Name | Special Character and Features | Estimated Acres |
|---|---|---|
| Blowout Pass Special Interest Area | This special interest area was designated because of geologic and scenic values This is an area of hydrothermally altered volcanic rock displays, with vivid red, orange, and yellow soils in a rugged, highly eroded setting. Elevation ranges from 10,000 to 12,124 feet, slopes are generally steep (30 to 80 percent). Forested areas are Engelmann spruce, sub-alpine fir, and bristlecone pine. This special interest area forms the headwaters of Jasper Creek and Burnt Creek, which are naturally polluted by sulfates and free sulfuric acid present in great abundance in the altered rock. Grasses and forbs are limited on open slopes because of soil composition and erosion. | 1,260 |
| Liberty/Duncan | The historic town sites of Duncan and Liberty and the associated mining development represent one of the most intact historical sites within Colorado and the Nation. Intermixed with these historic sites are prehistoric sites, which are advancing the understanding of prehistoric use and habitation in the area. This special interest area emphasizes the management and protection of the historic and cultural values of this area over other uses. | 3,910 |
| Chama Basin Landslide Geologic Area | | 270 |
| Fremont Historic Area | The area includes several identified sites where members John Charles Fremont's fourth expedition camped and traveled while snowbound in the La Garita Mountains in 1848 and 1849. The area is generally above timberline. The area has high recreational value due to the historic nature of the sites. Books and guides about the expedition have been published, and a guide to orienteering has been written for public use. Vehicle access is via Forest Road 620, while Forest Trail 787 provides access to a well. | 8,422 |
| Wagon Wheel Gap Experiment Station | This historic area presents evidence of the first watershed experiment conducted in the United States, which dates from 1909 to 1926. Historic features include the remains the experiment station headquarters, stream houses where scientific measurements were taken, weirs, dumps, roads, and a grave. Two watersheds were included. | 1,585 |
| Elephant Rock Botanical Area | This area was designated for botanic and geologic values. Volcanic formations occur here from the Summer Coon volcano. It is habitat for the rock-loving species *Neoparrya lithophilia.* Adjacent Bureau of Management lands are designated as an Area of Critical Environmental Concern based on unique geologic, scenic, and visual resources, and plants with special status. | 7,017 |

| Area Name | Special Character and Features | Estimated Acres |
|---|---|---|
| Bachelor Loop Historic Area | This area surrounds the Bachelor Loop, an interpretive auto tour, immediately north of Creede, Colorado. The landscape includes historic structures, townsites, and views of the historic town of Creede. This special interest area is on the steep slopes above Willow and Eat Willow Creek. The area near lower Windy Gulch, which is not as steep, consists of open grass and forbs. | 4,475 |

#### *Management Area Specific Guidelines*

**G-MA4.1-1:** Activities should meet the assigned recreation opportunity spectrum class and scenic integrity objectives.

#### *Management Area Specific Land Suitability*

**SUIT-MA4.1-1:** Grazing is permitted unless it is in conflict with the values for which that area was created.

**SUIT-MA4.1-2:** These areas may be suitable for timber production.

**SUIT-MA4.1-3:** These areas are available for oil and gas leasing with no surface occupancy.

### Management Area 4.2 – Special Designation – Research Natural Areas

#### *Desired Conditions*

Research natural areas (Table 14) preserve representative areas with important forest, shrubland, grassland, alpine, aquatic, geologic, or other natural environments. They may have special or unique characteristics, or scientific importance. The management emphasis of these areas focuses on protecting or enhancing unique or exemplary ecosystems designated for non-manipulative research, monitoring, and education.

Research natural areas contribute to the preservation and maintenance of key elements of biological diversity at the genetic, species, population, community, and landscape levels. These areas are intended as baseline areas for measuring ecological changes, and as control areas for evaluation and monitoring.

#### *Management Area Specific Management Approaches*

Low impact uses such as camping, fishing, horseback riding, and hunting can occur unless otherwise restricted. Increases in recreation use that would threaten or interfere with the objectives or purposes for which a research natural area was established should be restricted.

Trails created prior to establishing the area can continue to be used for recreation and scientific research or educational access, unless values for establishment of the area are threatened. No new trail construction should occur unless needed to correct resource damage from existing trails.

Outbreaks of native insects and diseases should proceed without intervention unless they are a substantial threat to important resources outside of the research natural areas. Control methods for insect and disease outbreaks that minimize disturbance are used.

Habitat manipulation may occur for the protection of threatened, endangered, and proposed species, or in locations where it is necessary to perpetuate or restore natural conditions.

Special uses that do not conflict with the values for which the research natural area was established may continue. Proposals for non-manipulative research should be approved by the station director and the district ranger before implementation.

Comprehensive management plans should be developed in coordination with Forest Service Research personnel.

Where feasible, undesirable nonnative plant and animal species should be managed.

**Table 14: Research natural areas in Management Area 4.2**

| Area Name | Acres | Vegetation Zone | Mountain Range |
|---|---|---|---|
| Mill Creek | 2,555 | Foothills, Montane, and Subalpine | Sangre de Cristo |
| North Zapata | 6,114 | Montane, Subalpine, and Alpine | Sangre de Cristo |
| Deadman Creek | 4,777 | Montane, Subalpine, and Alpine | Sangre de Cristo |
| Spring Branch | 4,053 | Foothills and Montane | San Juan |
| Hot Creek | 1,773 | Montane | San Juan |
| Finger Mesa | 3,406 | Alpine and Subalpine | San Juan |
| **Total acres** | 22,678 | | |

### Management Area Specific Standards

**S-MA4.2-1:** Prohibit motorized and mechanized use, except when necessary for research or educational access.

### Management Area Specific Guidelines

**G-MA4.2-1:** Activities should meet the assigned recreation opportunity spectrum class and scenic integrity objectives.

### Management Area Specific Land Suitability

**SUIT-MA4.2-1:** Livestock grazing is permitted when it is not in direct conflict with the resource values that prompted establishment of the area. Permitted livestock grazing is allowed in the Hot Creek Research Natural Area. This area is part of the Hot Creek Allotment, which is under a valid grazing permit. The current permittees have agreed to avoid grazing the area inside of the boundary of the Hot Creek Research Natural Area.

**SUIT-MA4.2-2:** Recreational livestock grazing is permitted unless it threatens the values for which the area was established.

**SUIT-MA4.2-3:** These areas are not suitable for timber production.

**SUIT-MA4.2-4:** These areas are available for oil and gas leasing with no surface occupancy.



**Figure 14. All-terrain vehicle riders near Lookout Mountain on the Conejos Peak Ranger District**

## Management Area 4.21 – Special Designation – Scenic Byways and Scenic Railroads

### *Desired Conditions*

These areas are managed to protect or preserve the scenic and recreation values and uses in designated scenic byways and scenic railroad corridors while concurrently managing the multiple-use values of the landscape. This management prescription applies to the Silver Thread and Los Caminos Antiguos Scenic Byways, and the Cumbres and Toltec Scenic Railroad and National Historic Landmark.

Multiple-use management activities such as commercial timber harvest, wildlife management, recreation activities, and mineral extraction are present but not dominant on the landscape. Features may be interpreted for the public. Facilities may be developed to enhance opportunities for viewing scenery and wildlife. Activities and interactions are managed to maintain the scenic beauty for which the area is designated.

Opportunities for solitude are limited. Visitors can expect frequent contact with other visitors. Roads, recreation facilities, range improvements, and other developments are evident but are managed to be in harmony with the natural environment. Recreation facilities could include scenic overlooks, interpretive signs, and rest areas as appropriate. Developed campgrounds are situated off the main travelway. Trailheads are easily accessible, but also are situated off the main travelway.

Road systems are well signed, and roads are generally passable by passenger car. Motorized and nonmotorized activities, such as biking and horseback riding, are focused on the available trails and roads.

Activities meet the assigned recreation opportunity spectrum classes and scenic integrity objectives.

#### Management Area Specific Management Approaches

Vegetation management maintains or enhances viewing opportunities.

#### Management Area Specific Land Suitability

**SUIT-MA4.21-1:** These areas are suitable for timber production.

**SUIT-MA4.21-2:** Grazing is permitted unless otherwise restricted.

**SUIT-MA4.21-3:** These areas are available for oil and gas leasing with controlled surface use stipulations.

### Management Area 4.34 – Special Designation – Eligible and Suitable Wild, Scenic, and Recreational Rivers

#### Desired Conditions

Congress created the National Wild and Scenic Rivers System in 1968 (Public Law 90-542) to preserve selected rivers that have outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The Wild and Scenic Rivers Act seeks to protect these rivers while at the same time acknowledging the benefits and necessity of appropriate developments within the river corridor. A detailed description of the application of the Wild and Scenic Rivers Act to the Forest is contained in appendix B.

No river segments have been designated under the Wild and Scenic Rivers Act. The eligible and suitable river segments listed in Table 15, with the exception of Deadman Creek, were in the 1996 forest plan. The outstandingly remarkable values identified in the 1996 forest plan remain applicable today. Segments of Medano and Little Medano Creeks have been removed from the inventory of eligible streams because they are now administered by the National Park Service (Great Sand Dunes National Park and Preserve Act of 2000).

Management areas for eligible and suitable wild, scenic, and recreational river segments extend a minimum of one-quarter mile on either side of the mean high-water mark but may be larger to protect identified outstandingly remarkable values.

Activities meet the assigned recreation opportunity spectrum class and scenic integrity objectives.

Maps of all the rivers found to be eligible for recommendation are included on the external drive at the back of this document.

Forest Service Handbook 1909.12, 2015-1, Chapter 80 prescribed the following desired conditions for all eligible or suitable river segments:

- The outstandingly remarkable values that were identified for each eligible or suitable river segment are preserved or enhanced until the river segment is designated or released from consideration.
- The current free-flowing nature of all eligible or suitable river segments is preserved or enhanced until the river segment is designated or released from consideration.
- The water quality of all eligible or suitable river segments is preserved or enhanced until the river segment is designated or released from consideration.
- On all eligible or suitable river segments, the conditions that lead to classification as wild, scenic, or recreational are preserved or enhanced such that no segments are changed from wild to scenic or recreational, or from scenic to recreational.

#### *Management Area Specific Management Approaches*

A suitability analysis should be initiated when a proposed action threatens the free-flowing nature, outstandingly remarkable values, water quality, or scenic classification of an eligible or suitable river segment.

The Forest will engage the local community on the status of eligible or suitable wild, scenic, and recreational river segments and include information on currently decreed federal reserved water rights in Colorado Water Division 3 (81CW183).

#### *Management Area Specific Standards*

**S-MA4.34-1:** Management actions preserve the classification, outstandingly remarkable values, and water quality of eligible and suitable river segments.

**S-MA4.34-2:** Consistent with existing water rights decrees in Colorado Water Division 3 (81CW183), the free-flowing nature of eligible and suitable river segments shall be preserved.

**S-MA4.34-3:** For eligible and suitable river segments, the width of the management area may vary to protect outstanding values but will extend at least one-quarter mile on either side of the river segment.

#### *Management Area Specific Guidelines*

**G-MA4.34-1:** Management actions within the river corridors of eligible and suitable river segments shall be consistent with management direction contained in FSH 1909.12, Chapter 80, Section 84, or current direction.

**G-MA4.34-2:** For eligible or suitable wild river segments:

- The recreation opportunity spectrum class is primitive
- The scenic integrity objective is very high.

**G-MA4.34-3:** For eligible or suitable scenic river segments:

- The recreation opportunity spectrum class is semi-primitive motorized
- Activities will meet the adopted scenic integrity objective.

**G-MA4.34-4:** For eligible or suitable recreational river segments:

- The recreation opportunity spectrum class is semi-primitive motorized

- Activities will meet the adopted scenic integrity objective.

**Table 15. Eligible and suitable river segments for inclusion in the National Wild and Scenic Rivers System**

| Stream or River Name | Length (miles)[1] | Acres | Status | Outstandingly Remarkable Values | Classification |
|---|---|---|---|---|---|
| Archuleta Creek | 5.69 | 1,889 | Eligible | Scenic, Recreational | Scenic |
| Deadman Creek | 3.26 | 1,087 | Eligible | Scenic, Recreational, Historic, Biological | Scenic |
| East Fork Rio Chama | 3.18 | 1,078 | Eligible | Scenic, Recreational | Scenic |
| Hansen Creek | 6.72 | 2,067 | Eligible | Scenic, Recreational | Wild |
| Lower Rio de los Pinos | 4.50 | 1,364 | Eligible | Scenic, Recreational, Historic | Scenic |
| Lower Rio Grande | 4.42 | 1,081 | Eligible | Scenic, Recreational, Historic | Recreational |
| Rio Grande (Box Canyon) | 8.73 | 2,720 | Eligible | Scenic, Recreational, Historic | Scenic |
| Saguache Creek | 8.40 | 2,478 | Eligible | Scenic, Historic, Cultural | Wild |
| Toltec Creek | 2.88 | 525 | Eligible | Scenic, Recreational, Historic | Wild |
| West Bellows Creek | 6.31 | 2,065 | Eligible | Scenic, Recreational, Geologic | Scenic |
| West Fork Rio Chama | 4.81 | 1,239 | Eligible | Scenic, Recreational | Scenic |
| ***South Fork Rio Grande*** | | | | | |
| South Fork Rio Grande (above Big Meadows Reservoir) | 5.19 | 1,633 | Eligible | Scenic, Recreational, Historic | Scenic |
| South Fork Rio Grande (below Big Meadows Reservoir) | 11.98 | 3,016 | Eligible | Scenic, Recreational, Historic | Recreational |
| **South Fork Rio Grande Total** | **17.17** | **4,649** | NA | NA | NA |
| ***Conejos River*** | | | | | |
| El Rito Azul | 3.80 | 1,168 | Suitable | Scenic, Recreational, Wildlife | Wild |
| North Fork Conejos River | 3.93 | 1,208 | Suitable | Scenic, Recreational, Wildlife | Wild |
| Middle Fork Conejos River | 4.59 | 1,411 | Suitable | Scenic, Recreational, Wildlife | Wild |
| Conejos River (Three Forks to Platoro Reservoir) | 3.33 | 1,023 | Suitable | Scenic, Recreational, Wildlife | Wild |
| South Fork of the Conejos River | 12.76 | 3,985 | Suitable | Scenic, Recreational, Wildlife | Wild |
| Conejos River below Platoro Reservoir | 12.54 | 3,539 | Suitable | Scenic, Recreational, Wildlife | Recreational |
| **Conejos River Total** | **40.95** | **12,334** | NA | NA | NA |
| **Wild Rivers Subtotal** | **46.41** | **13,865** | NA | NA | NA |
| **Scenic Rivers Subtotal** | **41.67** | **13,075** | NA | NA | NA |
| **Recreational River Subtotal** | **28.94** | **7,636** | NA | NA | NA |
| **Rio Grande National Forest Total** | **117.02** | **34,576** | NA | NA | NA |

[1] Length, in miles, of the reaches has been updated from the 1996 forest plan to reflect the best available information; changes do not reflect alterations to the eligible or suitable river segments.

### *Management Area Specific Land Suitability*

**SUIT-MA4.34-1:** Rivers or segments that are eligible and suitable and are designated as wild or scenic are not suitable for timber production.

**SUIT-MA4.34-2:** Rivers or segments that are eligible for recreational status are suitable for timber production.

**SUIT-MA4.34-3:** In designated wilderness, eligible and suitable wild rivers or segments are either legally withdrawn or administratively unavailable from mineral entry.

**SUIT-MA4.34-4:** Eligible and suitable scenic rivers or segments are authorized for oil and gas leasing with a controlled surface use stipulation.

## Management Area 4.8 – Ski-based Resorts

### *Desired Conditions*

These areas are managed for their existing or potential use as ski-based resort sites. Wolf Creek Ski Area is the only resort permitted on the Forest. This is an area of concentrated use where visitors can expect a high degree of interaction and many facilities associated with the ski resort industry.

Protection of recreation resources and public safety, including management of insects and disease, is the primary focus. Project implementation in this area maintains the possibility of winter sports recreation. Resource management activities are designed and implemented to maintain or enhance existing resources.

Development in the area will be consistent with the terms and conditions of the special use permit, including submission of a master development plan. These lands are withdrawn from locatable mineral entry.

Facilities are designed and constructed to blend with the natural area. Line and form, indicating past activities, and geometric shapes associated with ski-trail and lift development should be "softened" as opportunities becomes available.

Activities should meet the assigned recreation opportunity spectrum classes and scenic integrity objectives.

### *Management Area Specific Management Approaches*

Vegetation management is included in resort management plans.

### *Management Area Specific Land Suitability*

**SUIT-MA4.8-1:** Grazing is permitted on a limited basis with the agreement and cooperation of the permit holder.

**SUIT-MA4.8-2:** These areas are not suitable for timber production.

**SUIT-MA4.8-3:** These areas are available for oil and gas leasing with no surface occupancy.

## Management Area 5 – General Forest and Rangelands

This management area combines several management areas that were designated in the 1996 forest plan into one large area. A variety of management activities occur, including livestock grazing, management of wildlife habitat, developed and dispersed recreation, exploration and development of minerals and energy resources, and timber harvest. Characterized by forest and grassland communities, this area is managed with a multiple-use emphasis to achieve a variety of goals.

### *Desired Conditions*

Vegetation management goals are met using a full range of silvicultural options. Harvest rotation periods vary depending on species, site, conditions, and management objectives. Timber management activities focus on a variety of management objectives, including but not limited to timber production, habitat management, restoration and maintenance, and management to meet stated recreation objectives, maintain vegetation cover for wildlife, and protect soil stability. All successional stages are represented.

A full range of activities is present with an emphasis on the production of commercial wood products. These areas have a high potential for timber growth, and operations focus on wood production. Suitable forested areas are maintained with commercially valuable species at ages, densities, and sizes that allow growth rates and stand conditions that are conducive to providing a sustained yield of forest products.

Landscape diversity is similar to natural conditions (composition, structure, and function) and includes consideration within a spatial context—for example: what species, what kind of stand structure, and what kind of landscape patterns are natural, by ecosystem. All succession stages are represented, including old forest. Mature stands are identified for old-forest characteristics (appendix A).

Rangelands are composed of grassland ecosystems that maintain and improve desired vegetation conditions for livestock, wildlife, and recreational stock. These areas are characterized by a mix of grassland and forested ecosystems that features open meadows and other grasslands, intermixed with stands of aspens and conifers.

Forested cover is interspersed with grassland areas and managed so that quality forage is readily available, depending upon site-specific conditions. Cover types on winter range areas frequently consist of lower-elevation pinyon-juniper communities, ponderosa pine, and warm-dry ecosystem types that may include Douglas fir, white fir, and aspen. Various shrub species such as mountain mahogany, sagebrush, rabbitbrush, gooseberry, and bitterbrush are interspersed with low-elevation grasses including fescues, squirrel tail, oat-grass, and needle and thread grass. Water sources provide water for both wildlife and livestock where it is a limiting factor on the landscape.

Plant communities occur in a variety of successional stages to provide biological diversity of both plant and animal species. A variety of tools and methods is applied, including but not limited to timber harvest, prescribed burning, and planting.

Watersheds, scenic resources, and wildlife habitat are restored in locations where past management actions have reduced resource effectiveness.

This area has a well-developed transportation system that provides access for recreation opportunities and management. The area has numerous designated roads that offer commercial access and roaded recreation opportunities, while roads with restricted access offer nonmotorized recreation opportunities.

Access may be limited in some areas during the winter to reduce disturbance to wildlife. Vegetation management that occurs during the winter will have authorized access as needed. Access during other seasons is based on travel management objectives.

Where feasible, mutual population objectives are established with Colorado Parks and Wildlife to provide maximum recreation opportunities while minimizing habitat and resource conflicts. Existing and potential partnerships strive to improve or enhance habitat and species numbers.

Recreation opportunities and human disturbance are balanced to allow game species to effectively use resources while conserving energy reserves. Disturbance from motorized and mechanized activities is limited to areas mapped by Colorado Parks and Wildlife during the primary winter use period, generally from December 1 through April 15, or as needed. Winter weather conditions naturally increase secure habitat by limiting access; however, seasonal road restrictions or area restrictions are also used to attain the desired conditions.

Viewing areas provide interpretation of the resources and management.

Quality habitat provides for wildlife dispersion between undeveloped areas of the Forest.

Livestock grazing is present. Grazing systems are managed to provide quality forage for use by big game species as well as livestock.

Appropriate settings are offered that are suitable for a broad range of recreation opportunities. Dispersed and developed recreation areas are designated mostly along road corridors where opportunities for developed and undeveloped recreation can be managed as an integrated resource. These popular areas generally have access to water features or other natural attractions and offer a more social recreation experience with frequent visitor contacts.

Insects and disease are managed to maintain the recreation resource.

Summer homes, resorts, and organizational camps are present and managed to provide unique recreation opportunities. Developed recreation sites and facilities, such as campgrounds and picnic sites, are maintained and updated to meet customer needs. Management actions in dispersed sites maintain the natural characteristics that make the area popular.

Forest visitors to these areas can expect to experience active forest management including timber harvest, livestock grazing, established infrastructure, and improvements. In timber harvest areas, stumps, logging slash, skid trails, and soil disturbance will be evident.

Activities meet the assigned recreation opportunity spectrum classes and scenic integrity objectives.

Opportunities exist for exploration and development of mineral and energy resources.

Recreation facilities are improved on the basis of user demand. Users can expect to have a more social experience.

### Management Area Specific Management Approaches

Domestic livestock grazing is coordinated with vegetation management activities to ensure adequate regeneration of vegetation and prevent impacts on range improvements and natural barriers.

Retrieval of game using off-road vehicles is authorized daily from 12 p.m. to 5 p.m. when conditions would not result in damage to resources, including soils and vegetation.

Fire hazard is reduced by treating fuels consistently with other resource uses and needs.

The operating and reclamation plan for locatable minerals contains strategies to avoid or mitigate impacts to winter range. New roads should not be constructed in locations with important forage and cover.

Forage and cover is managed across the landscape to sustain ungulate populations and support population objectives.

Livestock grazing strategies are designed and managed to provide the forage quantity and quality needed to sustain desired ungulate populations during the winter period.

Motorized and mechanized travel is suitable only on designated routes.

Communication sites and renewable energy development are also subject to project-specific environmental review.

Vegetation treatments in developed recreation areas maintain or enhance recreation opportunities or contribute to visitor safety.

Use conflicts are considered when scheduling vegetation manipulation projects.

Fuels resulting from vegetation manipulation projects are treated commensurate with the risk of human-caused ignition.

Additional restrictions on high-use dispersed-recreation sites are developed to protect sensitive natural resources.

### Management Area Specific Standards

**S-MA5-1:** Off-road travel, including over-the-snow travel, is not allowed on big game winter range areas during the primary use seasons for big game (December 1 – April 15). Exceptions may be allowed under contract or special use authorizations.

### Management Area Specific Land Suitability

**SUIT-MA5-1:** Big game winter range is not suitable for off-road travel during big game primary use seasons. Exceptions made be made for permittees or contractual obligations.

**SUIT-MA5-2:** This area is part of the suitable timber base.

**SUIT-MA5-3:** This area is suitable for grazing.

**SUIT-MA5-4:** These areas are suitable for oil and gas leasing with a no surface occupancy stipulation.



**Figure 15. Bristlecone pinecone**

# Chapter 4. Monitoring

## Introduction

Forest plan monitoring provides feedback for the Forest's planning cycle by testing assumptions, tracking relevant conditions, and evaluating management implementation and effects of management practices. The monitoring program that is developed as part of the forest plan should be strategic, effective, and useful. Forest plan monitoring is an important part of the continuous improvement of the plan through the adaptive management process. Direction for monitoring and evaluation of forest plans is contained in 36 CFR 219.12, and in planning directives at 1909.12, Chapter 30.

## The Role of Monitoring under the 2012 Planning Rule

The National Forest Management Act requires "continuous monitoring and assessment in the field" to evaluate "the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land" (16 USC 1604(g)(3)(C)). The 2012 Planning Rule emphasizes a three-part iterative cycle of assessment, planning, and monitoring in a continuous feedback loop. Monitoring is intended to support the assessment process and evaluate plan implementation over time. This framework is designed to "inform integrated resource management and allows the Forest Service to adapt to changing conditions, including climate change, and improve management based on new information and monitoring" (219.5 (a)).

## Specific Requirements for Monitoring under the 2012 Planning Rule

A monitoring plan consists of monitoring questions and indicators that are designed to inform the management of resources on the Forest by testing relevant assumptions, tracking relevant changes, and measuring management effectiveness and progress toward achieving or maintaining the plan's desired conditions or objectives. The monitoring program must also be coordinated with the Regional Forester and Forest Service State and Private Forestry and Research and Development (219.12 (a)(1)), and it should consider a broader-scale monitoring strategy to address monitoring questions at a geographic scale broader than one single national forest (219.12 (b)). Furthermore, in developing the monitoring plan, the responsible official should also provide opportunities for public participation, "taking into account the skills and interests of affected parties," as well as the scope, methods, forum, and timing of those opportunities (219.4 (a)). This monitoring plan was informed by public input received throughout the development of the forest plan.

Monitoring may involve evaluating if standards and guidelines are implemented (implementation monitoring), if management actions, standards, and guidelines are effective in achieving goals and objectives (effectiveness monitoring), the long-term trend, and condition of key resources (condition or surveillance monitoring). At a minimum, the plan monitoring program must contain one or more monitoring questions and associated indicators that address the following eight items (219.12[a][5][i-viii]):

i. The status of select watershed conditions,

ii. The status of select ecological conditions including key characteristics of terrestrial and aquatic ecosystems,
iii. The status of focal species to assess the ecological conditions required under 219.9,
iv. The status of a select set of the ecological conditions required under 219.9 to contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern,
v. The status of visitor use, visitor satisfaction, and progress toward meeting recreation objectives,
vi. Measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area,
vii. Progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities, and
viii. The effects of each management system to determine that they do not substantially and permanently impair the productivity of the land (16 U.S.C. 1604(g)(3)(C)).

A monitoring evaluation report will be produced and published every two years (219.12 (d)). It "must indicate whether or not a change to the plan, management activities, or the monitoring program, or a new assessment, may be warranted based on the new information… [and] must be used to inform adaptive management of the plan area" (219.12 (d)(2)). The monitoring program and evaluation report are part of the administrative record (219.14 (b)), and the forest supervisor must document "how the best available scientific information was used to inform planning, the plan components, and other plan content, including the plan monitoring program" (219.13 (a)(4)).

## Best Available Scientific Information and Fiscal Constraints

Evaluating ecosystem integrity and sustainability requires the synthesis and interpretation of high-quality data and information from multiple scales of social and ecological organization. While the 2012 Planning Rule directs national forests to use the best available scientific information for plan monitoring, it also recognizes the need to remain within the financial capabilities of the unit. To meet these goals, the proposed forest plan monitoring strategy supplements data and information collected by Forest staff using the best available scientific information available from Forest Service Research and partners, within existing staffing and budgetary limitations. The monitoring questions and indicators contained here rely heavily on federal, state, and other public partners. The protocols, data standards, and metadata from partner organizations were also considered in determining the best available scientific information. For example, reliance on the Forest Service Research's Forest Inventory and Analysis program allows the Forest to use the longest continuous forest census and evaluate management in long-term trends observed in forest conditions. Datasets generated and maintained by partners that have been evaluated for applicability (Table 17) will inform future management, with minimal additional investment needed by the Forest.

To evaluate trends and changes in terrestrial ecological conditions, the Forest will use data and spatial products from Forest Service Research's Forest Inventory and Analysis program, the Remote Sensing Application Center's Monitoring Trends in Burn Severity program, LANDFIRE

(Landscape Fire and Resource Management Planning Tools project), Forest Health Monitoring program, and Bird Conservancy of the Rockies. Forest Inventory and Analysis program data represent the most robust source of information available on the status and trends associated with forest conditions at landscape scales. While the Forest Inventory and Analysis program can be used to monitor broadscale trends in forest cover and composition across regions, it can also be used to track changes in fine-grain characteristics at the landscape scale, including measures of crown cover, stand density, snags, and downed woody material that are relevant for the conservation of threatened and endangered species, and species of conservation concern (Chojnacky 2000, Witt 2015). At the same time, "coarse-grain" changes in ecological conditions at landscape scales, such as structural connectivity and patch size and distribution, may be evaluated using new and existing spatial datasets and remote sensing products from the Remote Sensing Application Center, Forest Health Monitoring program, U.S. Geological Survey, and Forest Inventory and Analysis program. Monitoring trends and changes in Gunnison prairie dog distribution in montane ecosystems, for instance, can be efficiently accomplished by using National Agriculture Imagery Program aerial photography datasets (Sidle et al. 2002). Data collected by the Bird Conservancy of the Rockies also represents an important and scientifically robust source of information. Data on breeding bird occupancy and density is important for understanding trends associated with individual species. In consultation with Bird Conservancy of the Rockies, the Forest identified a suite of bird species for monitoring that can be used to infer changes in the structure, function, and composition of forest ecosystems.

The Forest is also proposing to monitor ecological conditions in aquatic, riparian and wetland, and alpine systems using a variety of approaches. To monitor trends and changes in riparian vegetation and condition at the forest plan level, the Forest is proposing to use new products developed by the Washington Office of the Forest Service that were piloted during the assessment phase of the forest plan revision (Abood 2016). Information on key aquatic ecological conditions, such as streamflow and temperature, may also be acquired from the U.S. Geological Survey and generated through a broadscale strategy implemented in collaboration with Rocky Mountain Research Station's NORWEST stream temperature monitoring program. Beavers are proposed as focal species for aquatic and riparian systems. After consulting with beaver and riparian systems experts at Utah State University, the Forest is proposing to monitor the number of subwatersheds (6th level or 12-digit Hydrologic Unit Code) with beaver activity over time. This is a cost-effective strategy that allows the Forest to track beaver presence and range expansion, identify potential areas where beaver introduction may be appropriate, and provide opportunities for citizen science and outreach. These approaches are complementary. For instance, information on trends in sedimentation, streamflow, riparian cover, and stream temperature are all particularly relevant for the management and conservation of many aquatic and riparian species of conservation concern, such as the Rio Grande cutthroat trout, Rio Grande chub, and Rio Grande sucker.

The Forest is also proposing to use data from partners to track trends and conditions in climatic variability and ecological conditions in alpine ecosystems. For instance, monitoring data and products from the National Oceanic and Atmospheric Administration, Oregon State's PRISM program, Natural Resources Conservation Service SNOTEL, National Phenology Network, and National Park Service Inventory and Monitoring Program can be used to monitor drought, long-term climatic change, atmospheric deposition, vegetative phenology, and alpine vegetation and conditions across the broader plan area.

## Forest Monitoring Framework

The proposed monitoring framework addresses each of the eight monitoring requirements, uses the best available scientific information, and is feasible to implement with existing resources. It is designed to promote iterative evaluation of plan components associated with social and ecological desired conditions, and to facilitate effective and efficient biennial reporting.

The proposed monitoring framework is composed of the following elements.

**Goals** are broad themes associated with core aspects of the Forest Service mission, including goals for social and ecological sustainability and resilience. Monitoring questions, plan components, and indicators are organized under these broad goals.

**Monitoring Requirement** identifies which of the eight monitoring requirements a specific question and set of indicators addresses. In many cases, questions meet the requirements of two or more monitoring requirements.

**Monitoring Question** is the plan-level monitoring question. Monitoring questions are priority questions of high relevance for forest planning and decision-making that can be used to test relevant assumptions, track relevant changes, and measure progress toward achieving desired conditions.

**Desired Conditions** are select desired conditions that represent priority goals and approaches for maintaining or improving the resilience of social and ecological conditions within and across the broader landscape context of the forest plan area.

**Indicators** are measurable attributes of social and ecological conditions that are used to answer monitoring questions and evaluate progress toward maintaining or achieving desired conditions.

**Data Source** represents the data repositories or sources of information from which measures of indicators are derived at the time the plan was developed. New data sources will likely become available as technology evolves. Similarly, data sources that exist during development of the plan may become obsolete. The Forest recognizes the need for adaptive management of the monitoring plan itself, and will incorporate changes over time as appropriate.

The data sources field also includes notes on forest responsibility, partner engagement, and broader scale monitoring. Where "forest responsibility" is noted, the Forest is the primary party responsible for collecting and interpreting this information. Where "partner engagement" is identified, the monitoring information is highly dependent on key partners and their ability to collect and interpret monitoring information. "Broader scale monitoring" indicates that this information may be better collected and evaluated at a scale larger than the Rio Grande National Forest. In most cases, broader-scale data sources are contingent on partnership information, including other federal, state, and non-governmental agencies.

**Frequency** describes the timing and frequency of monitoring evaluation and reporting. Evaluation and reporting frequencies are determined by the frequency of data collection and/or the spatial and temporal variability of resources (i.e., it takes several years of data collection to establish a trend for many resources).

**Adaptive Management Questions:** The Forest's monitoring plan also includes adaptive management questions that are paired with most monitoring questions. These questions are intended to serve two primary functions. First, they highlight the relevancy of the monitoring

questions and data to land management decision-making. Without this lens it can be difficult to sift through volumes of data and analyses and identify salient, possibly actionable information and decision-points. Second, they offer some specific examples of ways that monitoring data may be used to identify needs to adapt our land management decisions. These needs may spring from information on changing conditions, stagnant conditions where the goal is to achieve some improvement, or new information about the status of natural resources on the Forest.

These questions are not an exhaustive list of potential management applications. Instead, they highlight some realistic ways in which monitoring data might be interpreted, evaluated, and used by line officers and land managers to inform decision-making. They are also intended to stimulate the development of additional questions among Forest staff, and they may evolve over time.

Finally, it is important to note that these questions are not intended to trigger, or require, decisions or management actions. Monitoring information is one piece of a larger puzzle that must be put together during land management decision-making processes; line officers will need to couple insights from monitoring data with other information, including resource availability, staffing capacity, multiple use priorities, and public opinion.

## Goal 1

### *Maintain and restore sustainable, resilient terrestrial ecosystems*

Monitoring questions and indicators of measure for Goal 1 are contained in Table 16.

**Table 16. Forest plan-level monitoring questions and indicators of measure for Goal 1**

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 4, 7 | **MQ1:** What is the status and trend of populations of Rocky Mountain elk, Rocky Mountain bighorn sheep, and pronghorn primary use areas? | **Populations of:**<br>• Elk<br>• Pronghorn<br>• Mule deer<br>• Rocky Mountain bighorn sheep | • Colorado Parks and Wildlife<br>• Partnership Engagement | 2 years | • Are there changes in ungulate populations that are outside of expected levels of fluctuation?<br>• If so, do they correlate with changes in habitat conditions that might be addressed through management activities? | DC-VEG-3<br>DC-WLDF-3<br>DC-WLDF-4<br>DC-WLDF-5<br>OBJ-WLDF-2<br>DC-SCC-7 through 9 |
| 4, 7 | **MQ2:** What is the status and trend of forage and cover for big game species? | • Trends in forage availability<br>• Acres of big game habitat maintained or improved | • Forest Service Natural Resource Information System (NRIS) (data from allotments in winter range)<br>• Forest Responsibility | 4 years | • Are there declines in forage availability and amount of canopy cover that could impact key wildlife species?<br>• If so, where are opportunities to address these through management activities? | DC-RNG2<br>DC-RNG-4<br>DC-WLDF-3<br>DC-WLDF-4<br>OBJ-WLDF-2 |
| | | • Acres of cover and security habitat in mapped winter range affected by disturbance/mortality | • Forest Health Monitoring program<br>• Fire data | Analysis and reporting only when significant disturbance/ mortality is observed in mapped winter range | | |
| | | • Changes in crown cover in mapped winter range | • National Agriculture Imagery Program<br>• Partner Engagement | | | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 4 | **MQ3:** What is the status and trend of key ecosystem characteristics associated with species of conservation concern, threatened and endangered species, and resident and migratory bird species? | **Landscape-level indicators**<br>• Acres/location impacted by disturbance and management actions (i.e., in Lynx Analysis Units/lynx habitat)<br>• Distribution of old-forest/late-successional conditions | • Forest Service Activity Tracking System (FACTS) spatial / FSVeg<br>• Forest Inventory and Analysis program.<br>• Forest Health Monitoring program – aerial surveys<br>• Monitoring Trends in Burn Severity program, or fire layers<br>• Partnership Engagement | Analysis and reporting every 2 years (or as appropriate) | • Are there changes to the status of at-risk species that warrant additional plan direction?<br>• Do changes to lynx habitat warrant additional plan direction?<br>• Do changes to key ecosystem characteristics for species of conservation concern warrant additional plan direction? | DC-WLDF-1<br>DC-WLDF34<br>DC-SCC-7<br>DC-SCC-8<br>DC-SCC-6<br>Southern Rockies Lynx Amendment<br>DC-TEPC-1 |
| | | • Acres and extent of Gunnison prairie dog colonies | • National Agriculture Imagery Program<br>• Colorado Parks and Wildlife Health Program<br>• Partnership Engagement | 2 years | • Are there opportunities to improve habitat or to reduce uses that may be negatively impacting Gunnison prairie dog colonies? | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 4 | **MQ 4:** What is the status and trend of ecosystem characteristics associated with species of conservation concern, threatened and endangered species, and resident and migratory bird species? | • Fine-scale indicators:<br>• Number of live trees per acre 15-20, >20 in DBH (for all indicators, forestwide and in major types: aspen, spruce-fir, mixed conifer)<br>• Number of live and dead trees per acre >15 inches DBH<br>• Percentage with <40, 40–70, >70 percent live crown cover<br>• Number of snags per acre 10–15, 15–20, >20-inch DBH<br>• Number of pieces of coarse woody debris (CWD) per acre 5–10, >15 inches DBH, and >15 feet long; volume of CWD per acre<br>• Mortality – net volume and percentage of dead vs. live | • Forest Inventory and Analysis<br>• Partnership Engagement | • 2 years | | DC-WLDF-1<br>DC-WLDF-4<br>DC-VEG-3<br>DC-SCC-7<br>DC-SCC-8<br>DC-SCC-6<br>Southern Rockies Lynx Amendment<br>DC-TEPC-1 |
| | | • Number of abandoned mines gated, and maintained for bats | • Abandoned Mine Lands program<br>• CNHP<br>• Partnership Engagement | • 2 years | • Are abandoned mines being inventoried for bat use and gated prior to mine closure?<br>• What is the trend in white-nose syndrome? | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 8 | **MQ5:** What are the status and trends of soil productivity and function? | • Type, degree, and extent of soil disturbance and risk rating to determine the effect of soil disturbance on soil productivity and hydrologic function | • Soil Disturbance Field Guide<br>• National Soils Information System (NASIS) database<br>• Soil Best Management Practices monitoring<br>• Forest Responsibility | 4 years | • Are management prescriptions, standards, guidelines, and management approaches effectively maintaining or improving soil productivity by reducing or minimizing impacts to soil resources? If not, do they need to be changed? | DC-SOIl-1 |
| 2, 6 | **MQ6:** What are the trends in climate including drought and long-term climate change, and how are they affecting vegetative phenology, snowpack, streamflow, and alpine vegetation? | • Length, spatial extent, severity of drought (Palmer Drought index, Evaporative Demand Drought Index) | • DRI/University of Idaho Climate Engine<br>• Evaporative Demand Drought Index (WWA)<br>• Partnership Engagement<br>• Broader scale monitoring | 2 years | • Do drought trends fall within expected ranges, or if outlier events are occurring, are there management activities that should be considered (e.g., reduction in animal unit months)? Do outlier events warrant additional or plan direction? | |
| | | • Long-term trends in temperature and precipitation | • National Oceanic and Atmospheric Administration – National Centers for Environmental Information (NCEI)<br>• DRI/University of Idaho Climate Engine<br>• Partner Engagement<br>• Broader scale monitoring | 10 years | • Are longer-term climatic trends consistent with those expected and underpinning current plan content?<br>• If not, is there a need for additional or forest plan direction? | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| | | • Snowpack/snow water equivalent | • USDA Natural Resources Conservation Service – SNOTEL<br>• Partner Engagement | | | |
| | | • Trends in streamflow | • U.S. Geological Survey | 10 years | | |
| | | • National Phenology Network [first bloom index] Extended spring indices | • National Phenology Network<br>• Partner Engagement<br>• Broader scale monitoring | 2 years | • Do Extended Spring Indices reflect conditions that fall within ranges expected during plan development?<br>• If not, are there needs to reconsider vegetation management or other management strategies? | |
| | | • Occupancy and trend of Uncompahgre fritillary butterfly colonies | • Uncompahgre fritillary butterfly monitoring partnership<br>• Partner Engagement | 6 and 10 years | • How is climate change or other factors influencing vulnerable alpine systems such as snow willow, the phenology of flowering nectar plants, and occupancy of Uncompahgre fritillary butterfly colony sites? | |
| | | • Alpine vegetation | • National Park Service / Alpine Vegetation and Soils (GLORIA)<br>• Partner Engagement | 4 years | | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 2, 6 | **MQ7**: How are key characteristics of forest ecosystems (structure, composition, function, and disturbance regimes) changing over time, and are they within the natural range of variation? | • Percentage cover of different forest ecosystems<br>• Percent of different structural classes in major forest ecosystems<br>• **Mortality**: Number of snags per acre; net volume live vs dead<br>• **Regeneration**: Number of saplings per acre; species composition of saplings in all ecosystem<br>• **CWD**: (Same as for MQ) | • Forest Inventory and Analysis program<br>• Partnership Engagement | Acquisition every 5, reporting 6 and 10 years | • Do key characteristics of vegetation structure and composition fall within the desired conditions, or are changes trending in this direction?<br>• If not, what is the role of climatic variability, management actions, and disturbance frequencies and intensities in driving these patterns?<br>• Where are management actions most likely to be effective for reducing the potential severity of disturbances and improving vegetative conditions? | DC-SCC-1<br>DC-SCC-2<br>DC-SCC-3<br>DC-SCC-4<br>DC-SCC-5<br>DC-SCC-6<br>DC-VEG-1<br>DC-VEG-4 |
| | | • Changes in fire regime condition class | • Landscape Fire and Resource Management Planning Tools project (LANDFIRE) | | | |
| | | • Size and severity of fires >1,000 acres (net change in volume / Number of live vs dead trees)<br>• Number and acres of all fires | • Monitoring Trends in Burn Severity program<br>• Forest Service Activity Tracking System (FACTS) Spatial<br>• FSVeg<br>• Partnership Engagement | Reporting cycle after years with fires larger than 1,000 acres | | |

*Rio Grande National Forest*
*Land Management Plan*

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| | | • Acres / location of vegetation management in different forest types | • Forest Service Activity Tracking System (FACTS) Spatial<br>• FSVeg<br>• Forest Responsibility | 2 years | | OBJ-VEG-1 |
| | | • Extent of insect mortality | • Forest Health Monitoring program<br>• Partnership Engagement | | | |
| 3 | **MQ 8**: What is the status and trend of upland species? | • Bird guilds | • Bird Conservancy of the Rockies<br>• Partnership engagement | 2 years | | DC-WLDF-1<br>OBJ-WLDF-1 |

99

Rvsd Plan - 00000929

## Goal 2

### *Protect and restore watershed health, water resources, aquatic ecosystems, and the systems that rely on them*

Monitoring questions and indicators of measure for Goal 2 are contained in Table 17.

**Table 17. Forest plan-level monitoring questions and indicators of measure for Goal 2**

| Monitoring Requirement | Monitoring Question | Indicator | Data Source and Responsibility | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 7 | **MQ9:** What is the status of progress toward meeting objectives identified in this plan? | • Objectives identified in this plan, and progress status toward those objectives. | • Projects implemented on the Forest<br>• Forest responsibility | 2 years | | |
| 2, 4, 6 | **MQ10:** What is the status and trend of aquatic ecosystem conditions | • Stream temperature | • Rocky Mountain Research Station – NORWEST<br>• Partner Engagement<br>• Broader scale monitoring | 4 years | • Do stream temperatures and future projections point to areas where cold-water fish habitat may be maintained?<br>• Coupling this with other riparian vegetation condition data, are there restoration opportunities in these places that might be priorities? | DC-SCC-3<br>DC-FISH-1<br>DC-FISH-2<br>DC-GDE-1<br>DC-WA-1<br>DC-WA-3<br>DC-NNIS-1<br>DC-RNG-4<br>DC-RNG-3<br>DC-RMZ-4<br>DC-RMZ-2 |
| | | • Number of fish barriers removed/improved | • Forest Service Activity Tracking System (FACTS) / fisheries reports<br>• Forest Responsibility | 2 years | • Is the Forest achieving goals for improving fish habitat connectivity, or is there a need to increase this effort? | |
| | | • Macrobenthic invertebrates | • Forest staff macro-monitoring | 2–4 years | • Do trends in macrobenthic invertebrate communities point to the need for adjusting management practices or implementing restoration activities? | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source and Responsibility | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| | | • Beaver presence/absence | • HUC-12 watersheds or stream reaches with beaver activity<br>• Forest Responsibility | 2 years | • Where other aquatic ecosystem indicators suggest potential restoration needs, are beavers absent, and if so, would beaver relocation be beneficial? | |
| | | • Presence/distribution of nonnative aquatic invasive species and pathogens<br>• Acres/miles treated | • Colorado Parks and Wildlife / U.S. Geological Survey-Nonindigenous Aquatic Species (NAS)<br>• Partnership Engagement<br>• Broader scale monitoring | 2 years | • Are nonnative aquatic invasive species and pathogens such as chytrid fungus spreading, and if so, are there control efforts that could be considered? | |
| | | • Trends in streamflow | • U.S. Geological Survey<br>• Colorado Division of Water Resources<br>• Partnership Engagement | 4 years | • Is there an increase in the number of impaired streams, and if so, are there measures that can be adopted to curb this increase?<br>• Are there measures that could be considered to remedy this impairment? Has progress been made in removing streams from the impaired list?<br>• Do trends in sedimentation/water quality, stream temperature, or flow warrant management actions to conserve and protect Rio Grande cutthroat, Rio Grande chub, and Rio Grande sucker? | |
| | | • Number of impaired streams (303d) | • Colorado Department of Public Health and Environment<br>• Partnership Engagement | 2 years | | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source and Responsibility | Frequency | Adaptive Management Questions | Associated Plan Component |
|---|---|---|---|---|---|---|
| 2, 4, 6 | **MQ11:** What is the status of populations of fishes that are species of conservation concern? | • Status of Rio Grande cutthroat trout, Rio Grande sucker, and Rio Grande chub conservation populations | • Rio Grande cutthroat trout, Rio Grande sucker, and Rio Grande chub conservation team<br>• Partnership Engagement | All populations monitored every 5 years | • Is the overall goal of the RGCT, RGS, and RGC Conservation Strategy (to provide for the long-term persistence of the species) being met? | DC-SCC-3 |
| 1 | **MQ12:** Is the unit improving condition in priority watersheds? | • Number of projects completed in priority watersheds<br>• Best management practices monitoring | • Forest Service Watershed Improvement Tracking (WIT)<br>• Monitoring protocols rating system<br>• Forest Service Watershed Condition Framework Classification and Assessment Tracking Tool (WCF-WCATT) | 2 years | Are watershed conditions improving in priority watersheds, or do additional management measures need to be considered to facilitate improvement? | DC-WA-1<br>OBJ-WA-1 |
| 2, 4 | **MQ13:** What actions have been taken to restore riparian and wetland ecosystems? | • Acres restored | • Partnership Engagement | 2 years | • If multi-year declines in riparian/wetland vegetation are observed at the Forest level, what is causing them, and are planning or management decisions needed to address them? | DC-RMZ-1<br>OBJ-RMZ-1 |
| 3 | **MQ14:** What is the status and trend of aquatic and riparian focal species | • Beaver | • Forest Responsibility<br>• Number of HUC-12 watersheds with beaver activity | 2–4 years | Where other riparian and wetland ecosystem indicators suggest potential restoration needs, are beavers absent, and if so, would beaver relocation be beneficial? | DC-RMZ-1<br>DC-WA-1 |

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 99 of 422

## Goal 3

### ***Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land***

Monitoring questions and indicators of measure for Goal 3 are contained in Table 18.

**Table 18. Forest plan-level monitoring questions and indicators of measure for Goal 3**

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Sample Adaptive Management Questions | Associated Plan Components |
|---|---|---|---|---|---|---|
| 7 | **MQ15:** What are the economic contributions of the range, timber, recreation, and minerals programs, and how are they changing over time? | • Employment, income, and contribution to gross domestic product<br>• Board feet of timber sold or harvested<br>• Acres treated | • Forest Service IMPLAN model<br>• Forest Service Timber Information Manager (TIM)<br>• Forest Service Activity Tracking System (FACTS)<br>• Forest responsibility | 2 years | • Does the Forest continue to provide sufficient economic benefits to different communities through various program areas? If not, are there programmatic changes that could be considered? | OBJ-VEG-3<br>OBJ-VEG-4<br>OBJ-VEG-5 |
| 2, 7 | **MQ16:** What are the economic contributions of the wildlife and fisheries program to the local economy and how are they changing over time? | • Number of recreational user/activity days related to hunting, fishing, and wildlife viewing, and economic contribution to local counties | • Colorado Parks and Wildlife annual data | 2 years | • How do fish and wildlife values contribute to the recreational pursuits of various communities in the San Luis Valley and what are the benefits of these programs to agency goals such as Kids in the Woods, and helping to get people outside? | DC-FISH-1<br>DC-REC-1 |
| | | • Number of special events hosted such as Free Fishing Day, Migratory Bird Day, etc. | • Internal Forest Service staff data | | | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Sample Adaptive Management Questions | Associated Plan Components |
|---|---|---|---|---|---|---|
| | | • Number of viewing sites developed or maintained | | | | |
| 2, 7 | **MQ17:** What is the status and trend of rangeland health? | • Range condition<br>• Changes in number of allotments with active grazing<br>• Number of surveyed allotments not meeting, moving toward, or meeting desired conditions<br>• Acres of upland restored | • NRIS/ Forest Service Activity Tracking System (FACTS)<br>• Forest responsibility | 4-6 years | | DC-RNG-1<br>DC-RNG-2<br>DC-RNG-3<br>DC-RNG-4<br>DC-NNIS-1<br>DC-NNIS2 |
| | | • Presence and extent of nonnative invasive species and noxious weeds<br>• Acres noxious weeds treated | • Forest Service Nonnative Invasive Species (NNIS)<br>• Forest responsibility | 2 years | | |
| 5 | **MQ18:** What is the status and trend of roads and trails? | • Miles of roads and trails open year-round or open seasonally<br>• Miles of roads and trails built and decommissioned<br>• Miles of roads and trails maintained by maintenance level<br>• Miles of roads and trails maintained or improved to standard | • Forest Service Infrastructure database (INFRA)<br>• Forest responsibility | 2 years | | DC-REC-1 |
| | | • Use of roads and trails | • National Visitor Use Monitoring<br>• Forest responsibility | 5 years | | |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Sample Adaptive Management Questions | Associated Plan Components |
|---|---|---|---|---|---|---|
| 5 | **MQ19:** What recreational activities are the public participating in, and what is their current satisfaction level? | • Visitation on the Forest<br>• Changes in demand/participation in new activities<br>• Percent satisfaction for:<br>1. Very satisfied<br>2. Somewhat satisfied<br>3. Total satisfaction | • National Visitor Use Monitoring<br>• Forest responsibility | 5 years | • If and where trends in recreational satisfaction and use are increasing or decreasing?<br>• What factors or trends are leading to this change?<br>• What changes could be made to improve current and future visitor satisfaction?<br>• How is the public contributing to the local community?<br>• Where are people coming from to use the Forest? | DC-REC-1<br>DC-INFR-1 |
| 7 | **MQ20:** Is the Forest preserving, protecting, and/or restoring cultural resources, including traditional cultural properties and landscapes? | • Number of areas of tribal importance, cultural resources and properties identified, preserved, protected, or restored | • Heritage Program Managed to Standard (HPMtS)<br>• Forest responsibility | Monitoring of 25 percent of Priority Heritage Assets (PHA) each year. All PHAs monitored at least once every 5 years | | DC-DR-1<br>DC-ATI-1 |
| 7 | **MQ21:** How is the Forest engaging visitors, local communities, tribes, and partners to achieve desired conditions, goals, and objectives (i.e., through outreach, | • Number and type of outreach, education, consultation, collaboration, and volunteer activities | • Heritage Program Managed to Standard (HPMtS) particularly Indicator 2, 3 and 5.<br>• Forest responsibility | Annually | | DC-CR-1<br>DC-ATI-1<br>DC-ATI-2<br>DC-ATI-3 |

| Monitoring Requirement | Monitoring Question | Indicator | Data Source | Frequency | Sample Adaptive Management Questions | Associated Plan Components |
|---|---|---|---|---|---|---|
| | education, consultation, and collaboration)? | | • Forest Service NatureWatch, Interpretation and Conservation Education (NICE) reports<br>• Partner engagement | | | |
| 2, 7 | **MQ22:** What management activities are being implemented to reduce the threat of wildland fire to real property and infrastructure and restore forest ecosystems? | • Acres and location of fuel management and restoration treatments (mechanical and prescribed fire) | • Forest Service Activity Tracking System (FACTS)<br>• Forest responsibility | 2 years | | DC-FIRE-1<br>OBJ-VEG-1<br>OBJ-VEG-2<br>OBJ-VEG-7 |
| | **MQ23:** What are the conditions and trends of visibility and air quality/ deposition in selected Class II areas on the unit? | • Visibility<br>• Nitrates and sulfate deposition | • IMPROVE (Interagency Monitoring of Protective Visual Environments)<br>• U.S. Geological Survey<br>• National Atmospheric Deposition Program (NADP)<br>• Partnership Engagement | 2 years | | DC-AIR-1 |

## Adaptive Management

The adaptive management process implements plan direction, analyzes the impacts, monitors, and then evaluates adjustments that may be necessary in a timely manner. Changes will be incorporated through interdisciplinary analysis and will include public involvement.

To be more responsive to necessary changes in forest plan content, Forest staff will annually post proposed changes and the rationale for the changes, which could include monitoring results, on the Forest website. In conjunction with release of the changes, a stakeholder meeting would be held to discuss the changes proposed in detail followed by a comment period. Upon receiving and reviewing all comments, the responsible official would determine the proper authority to be used in making necessary changes to the forest plan content.

Changes to plan components require a forest plan amendment that could use any of the approved authorities available at the time. Changes to optional plan content, corrections in clerical errors to any content (including plan components), changes needed to conform to new statutory or regulatory requirements for which there is no discretion, and other changes to plan content, excluding changes to the substance of plan components or to the application of plan components to specific areas, may be adjusted through an administrative change. This would be done in compliance with the 2012 Planning Rule (36 CFR 219.7(f)) and Forest Service direction from Forest Service Handbook 1909.12 21.5.

# References Cited

Abood, Sinan. 2016. Rio Grande National Forest riparian inventory. Appendix 3 of Assessments 1 and 3. Riparian model assessment report prepared for the Forest by USDA Forest Service, Washington Office – Watershed, Fish, Wildlife, Air and Rare Plants program staff, 15 pp. Accessed August 8, 2017, at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd493832.pdf

Chojnacky, D.C., 2000. FIA forest inventory data for wildlife habitat assessment. Pages 272–275 *in:* Hansen, M., and Burk, T. (Eds.). Integrated Tools for Natural Resources Inventories in the 21st Century. General Technical Report NC-212. St. Paul, Minnesota: USDA Forest Service, North Central Forest Experiment Station.

Clary, W., and Webster, B. 1996. Managing grazing of riparian areas in the Intermountain Region. U.S. Forest Service Intermountain Research Station General Technical Report INT-263, 11 pp. Accessed March 21, 2017, at https://www.fs.fed.us/rm/pubs_int/int_gtr263.pdf

Interagency Lynx Biology Team (ILBT). 2013. Canada lynx conservation assessment and strategy, 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp.

Muhn, J. 1992. Early administration of the Forest Reserve Act: Interior Department and General Land Office policies, 1891–1897. *In:* The Origins of the National Forests: A Centennial Symposium. The Forest History Society, Durham, North Carolina. Accessed April 16, 2017, at http://www.foresthistory.org/Publications/Books/Origins_National_Forests/sec17.htm

NatureServe. 2017. Conservation status assessment: Identifying threatened species and ecosystems. Accessed March 22, 2017, at http://www.natureserve.org/conservation-tools/conservation-status-assessment

RGC and RGS Conservation Team (RGCSCT). 2018. Conservation agreement for Rio Grande chub and Rio Grande sucker. New Mexico Department of Game and Fish, Santa Fe, NM. 33p.

Rio Grande Cutthroat Trout Conservation Team (RGCTCT). 2013. Rio Grande cutthroat trout (*Oncorhynchus clarkii virginalis*) conservation strategy. 64 pp. Accessed May 16, 2017, at: https://cpw.state.co.us/Documents/Research/Aquatic/CutthroatTrout/2013RGCTConservationStrategy.pdf

Sidle, J.G., Johnson, D.H., Euliss, B.R., and Tooze, M. 2002. Monitoring black-tailed prairie dog colonies with high-resolution satellite imagery. Wildlife Society Bulletin 30, 405–411. Accessed August 8, 2017, at: http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1115&context=usgsnpwrc

Squires, J.R., J. Ivan, J. Holbrook, R. Lawrence, S. Savage, and R. Ghormley. 2018. Habitat relationships of Canada lynx in spruce bark beetle impacted forests – Analysis summary 19, March 2018. USDA Forest Service internal report for the Rio Grande National Forest. Rocky Mountain Research Station, Missoula. MT. 34 pp. including tables and figures. Accessed October 22, 2018, at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd592954.pdf

Taylor, P.D., Fahrig, L., Henein, K., and Merriam, G. 1993. Connectivity is a vital element of landscape structure. Oikos 68:571–573.

USDA Forest Service. 2015. Forest Service Handbook 1909.12, Land Management Planning Handbook. Chapter 20 – Land Management Plan. Amendment 1909.12-2015-1. Effective January 30, 2015.

Witt, Chris. 2015. Using adjunct forest inventory methodology to quantify pinyon jay habitat in the Great Basin. Page 302 *in:* Stanton, S.M., and Christensen, G. (compilers). Pushing Boundaries: New Directions in Inventory Techniques and Applications. 2015 Forest Inventory and Analysis (FIA) Symposium, December 8–10, 2015, Portland, Oregon. General Technical Report PNW-GTR-931. Portland, Oregon: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station.

# Glossary

## A

### Access

Road or trail route over which a public agency claims a right-of-way for public use; a way of approach.

### Adaptive management

An approach to natural resource management where actions are designed and executed and effects are monitored for the purpose of learning and adjusting future management actions, which improves the efficiency and responsiveness of management.

### Age class

Age class is one of the intervals, commonly 10 years, into which the age range of trees is divided for classification or use. Age class distribution refers to the location and/or proportionate representation of different age classes in a forest.

### Air quality: Class I, II, and III areas

The area classification scheme established by Congress to facilitate implementation of the prevention of significant deterioration of the air quality provisions of the Clean Air Act.

**Class I** areas receive the highest degree of protection, with only a small amount of certain kinds of additional air pollution allowed.

**Mandatory Class I** areas were designated by Congress and include international parks, national wilderness areas or national memorial parks larger than 5,000 acres, or national parks larger than 6,000 acres, that were in existence (or authorized) on August 7, 1977. The 1990 amendments to the Clean Air Act specified that acreage added to these areas after 1977 must also receive Class I designation. Mandatory Class I areas may not be redesignated to any other classification.

Congress initially designated all other attainment areas as **Class II** and allowed a moderate increase in certain air pollutants.

No **Class III areas**, where a large amount of new air pollution would be allowed, were designated by Congress, but a process was established for redesignating Class II areas to the more protective Class I or the less protective Class III status. Only states or Native American governing bodies have authority to redesignate these areas, except as noted above.

### Air quality related values

Resource that may be adversely affected by a change in air quality. The resource may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource. Values are specific for each designated wilderness area.

### Assessment

For the purposes of land management planning at 36 CFR 219, an assessment is the identification and evaluation of existing information to support land management planning. Assessments are not decision-making documents, but provide current information on select topics relevant to the plan area in the context of their borders.

**At-risk species**

A term used to collectively refer to the federally recognized threatened, endangered, proposed, and candidate species and species of conservation concern within the planning area.

**Aquatic ecosystem**

The stream channel, lake or estuary bed, water, biotic communities, and the habitat features that occur therein.

# B

**Basal area**

The cross-sectional area, in square feet, of a tree measured at breast height (4.5 feet). Basal area of an area is generally estimated in terms of square feet per acre.

**Best management practices**

Methods or techniques that have been determined to be the most effective and practical means of achieving an objective while making the optimum use of resources.

**Big game**

Those species of large mammals normally managed for sport hunting, generally including antelope, bighorn sheep, deer, elk, moose, and mountain goat.

**Big game winter range**

Big game winter range is where a population or portion of a population of animals uses the documented suitable habitat within this range annually, in substantial numbers only during the winter. Crucial winter range describes any portion of the range which has been documented as the determining factor in a population's ability to maintain itself at a certain level over the long term.

**Biological diversity, or biodiversity**

The full variety of life in an area, including the ecosystem, plant, and animal communities, species and genes, and the processes through which individual organisms interact with one another and with their environment.

**Biotic**

Typically refers to living organisms in their ecological rather than their physiological relations.

**Browse**

The buds, shoots, and leaves of woody plants eaten by livestock or wild animals.

# C

**Canada lynx**

The Canada lynx (*Lynx canadensis*) is a North American mammal of the cat family, Felidae, which ranges across Canada and into Alaska as well as some parts of the northern United States, including Colorado.

**Candidate species**

For species under the purview of the U.S. Fish and Wildlife Service (Service), a species for which the Service possesses sufficient information on vulnerability and threat to support a proposal to list as endangered or threatened, but for which no proposed rule has yet been published.

**Canopy**

The uppermost spreading, branchy layer of a forest.

**Canopy cover**

The proportion or percentage of the forest floor covered by the vertical projection of tree crowns.

**Capability (Rangeland)**

Rangeland capability is the potential of an area of land to produce resources, supply goods and services, and allow resource uses under an assumed set of management practices and at a given level of management intensity. Capability depends upon current resource and site conditions such as climate, slope, landform, soils, and geology, as well as the application of management practices, such as silviculture or protection from fire, insects, and disease.

Capability is the initial step in the determination of suitability. It is portrayed as a separate step both for reasons of clarity and because the actual product of “capability” often has utility in planning beyond its role in the determination of suitability.

**Channel**

A passage, either naturally or artificially created, that periodically or continuously contains moving water, or that forms a connecting link between two bodies of water. River, creek, run, branch, and tributary are some of the terms used to describe natural channels, which may be single or braided. Canal and floodway are some of the terms used to describe artificial channels.

**Clearcut**

1. A stand in which essentially all trees have been removed in one operation to produce an even-aged stand. Depending on management objectives, a clearcut may or may not have reserve trees left to attain goals other than regeneration (see regeneration method two-aged methods).
2. A regeneration or harvest method that removes essentially all trees in a stand. A minor live component of the stand may be retained for purposes other than regeneration. The retained trees, referred to as leave trees, should generally comprise less than 10 percent of the growing space of the stand.

**Climax**

The culminating stage in plant succession for a given site where the vegetation has reached a highly stable condition.

**Clone**

A group of plants (for example, aspen) growing in close association, derived by asexual reproduction from a single parent plant.

**Coarse woody debris**

Provides living spaces for a host of organisms and serves as long-term storage sites for moisture, nutrients, and energy. Coarse woody debris consists of any woody material greater than 3 inches in diameter and is derived from tree limbs, boles, roots, and large wood fragments and fallen trees in various stages of decay.

**Code of Federal Regulations**

The listing of various regulations pertaining to management and administration of national forests and other Federal lands.

**Collaboration**

Working with someone to produce or create something.

**Commercial thinning**

An intermediate harvest of commercial-sized trees to meet a variety of management objectives including reducing stand density to improve tree growth, improving forest health, or to meet other stand structural or composition objectives.

**Confluence**

The point where two streams meet.

**Connectivity**

Ecological conditions that exist at several spatial and temporal scales that provide landscape linkages that permit the exchange of flow, sediments, and nutrients; the daily and seasonal movements of animals within home ranges; the dispersal and genetic interchange between populations; and the long distance range shifts of species, such as in response to fluctuations in climate.

**Conservation strategy**

A conservation strategy is a management scheme or plan to conserve or sustain particular ecosystem elements such as rare species or habitats. An example of a conservation strategy is to survey for potential habitats during project planning in order to protect known populations of a rare species through project-specific measures.

**Constraint**

A qualification of the minimum or maximum amount of an output or cost that could be produced or incurred in a given time period.

**Construction**

The displacement of vegetation, soil, rock, and the installation of human-made structures involved in the process of building a complete, permanent road facility. The activities occur at a location or corridor that is not currently occupied by a road.

**Coppice (Coppice with standards)**

Coppice is a vegetation reproduction method with clear felling or clearcutting. Clear felling stimulates sprouting from the residual roots. Standards are selected overstory trees reserved for a longer rotation at the time each crop of coppice material is cut.

**Corridor (utility or right-of-way)**

A linear strip of land defined for the present or future location of transportation or utility right-of-way within its boundaries.

For the Continental Divide National Scenic Trail, the corridor includes one-half mile on either side of the trail.

**Council on Environmental Quality**

An advisory council to the President established by the National Environmental Policy Act of 1969. It reviews Federal programs for their effects on the environment, conducts environmental studies, and advises the President on environmental matters.

**Cover type**

The dominant vegetation in an area—for example, aspen, ponderosa pine, or sedges.

**Critical habitat**

For a threatened or endangered species, (1) the specific areas within the geographical area occupied by the species, at the time it is listed under the Endangered Species Act, on which are found those physical or biological features (a) essential to the conservation of the species, and (b) which may require species management considerations or protection; and (2) specific areas outside of the geographical area occupied by the species at the time it is listed, upon a determination by the Secretary that such area are essential for the conservation of the species. Critical habitat is designated through rule making by the Secretary of the Interior or Commerce.

**Crown**

The upper part of a tree or other woody plant carrying the main branch system and foliage.

**Culmination of mean annual increment**

Mean annual increment of growth and culmination of mean annual increment of growth. Mean annual increment of growth is the total increment of increase of volume of a stand (standing crop plus thinnings) up to a given age divided by that age. Culmination of mean annual increment of growth is the age in the growth cycle of an even-aged stand at which the average annual rate of increase of volume is at a maximum. In land management plans, mean annual increment is expressed in cubic measure and is based on the expected growth of stands, according to intensities and utilization guidelines in the plan.

**Cultural landscapes**

Cultural resources that represent the combined works of nature and humans.

**Cultural resources**

An object or definite location of human activity, occupation, or use identifiable through field survey, historical documentation, or oral evidence. Cultural resources are prehistoric, historic, archaeological, or architectural sites, structures, places, or objects and traditional cultural properties. Cultural resources include the entire spectrum of resources for which the Heritage Program is responsible, from artifacts to cultural landscapes, without regard to eligibility for listing on the National Register of Historic Places.

# D

**Decadence**

A process, condition, or period of deterioration or decline.

**Deciduous**

A deciduous tree or shrub sheds its leaves annually.

**Decommission**

Demolition, dismantling, removal, obliteration, and/or disposal of a deteriorated or otherwise unneeded asset or component, including necessary cleanup work. This action eliminates the deferred maintenance needs for the fixed asset. Decommissioning roads includes activities that result in the stabilization and restoration of unneeded roads to a more natural state.

**Designated road, trail, or area**

A National Forest System road or trail, or an area of National Forest System lands, that is designated for motor vehicle use pursuant to 36 CFR 212.51 on a motor vehicle use map (36 CFR 212.1).

**Designated wilderness**

Designated wilderness refers to any area of land designated by Congress as part of the National Wilderness Preservation System that was established by the Wilderness Act of 1964.

**Desired condition**

A description of specific social, economic, and/or ecological characteristics of the plan area, or a portion of the plan area, toward which management of the land and resources should be directed. (36 CFR 219.7(e)(1)(i))

**Developed recreation**

Recreation that occurs at man-made developments such as campgrounds, picnic grounds, resorts, ski areas, trailheads, etc. Facilities might include roads, parking lots, picnic tables, toilets, drinking water, ski lifts, and buildings. Campgrounds and picnic areas are examples of developed recreation sites.

**Developed site**

Developed recreation sites are relatively small, distinctly defined areas where facilities are provided for concentrated public use, such as campgrounds and picnic areas.

**Diameter at breast height (dbh)**

The diameter of a standing tree measured at a point 4 feet 6 inches from ground level on the uphill side.

**Dispersed recreation**

Outdoor recreation that is spread out over the land and in conjunction with roads, trails, and undeveloped waterways. Activities are typically day-use oriented and include hunting, fishing, boating, hiking, off-road vehicle use, cross-country skiing, motorbiking, and mountain climbing.

**Disturbance**

Any relatively discrete event in time that disrupts ecosystem, watershed, community, or species population structure and/or function and changes resources, substrate availability, or the physical environment.

**Diversity**

The distribution and abundance of different plant and animal communities and species within an area. This term is not synonymous with "biological diversity."

**Down or downed**

A tree or portion of a tree that is dead and lying on the ground.

### Downed woody material or debris

Woody material, from any source, that is dead and lying on the forest floor.

## E

### Easement

A right afforded a person or agency to make limited use of another's real property for access or other purposes.

### Ecological conditions

The biological and physical environment that can affect the diversity of plant and animal communities, the persistence of native species, and the productive capacity of ecological systems. Ecological conditions include habitat and other influences on species and the environment. Examples of ecological conditions include the abundance and distribution of aquatic and terrestrial habitats, connectivity, roads, and other structural developments, human uses, and invasive species.

### Ecological integrity

The quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influences.

### Ecological process

The actions or events that link organisms (including humans) and their environment, such as disturbance, successional development, nutrient cycling, carbon sequestration, productivity, and decay.

### Ecological sustainability

The capability of ecosystems to maintain ecological integrity.

### Economic sustainability

The capability of society to produce and consume or otherwise benefit from goods and services, including contributions to jobs and market and nonmarket benefits.

### Ecosystem

A spatially explicit, relatively homogenous unit of the Earth that includes all interacting organisms and elements of the abiotic environment within its boundaries. Usually described in terms of its composition, structure, function, and connectivity.

### Ecosystem services

The direct and indirect contributions of ecosystems to human well-being. They directly or indirectly support survival and quality of life. Ecosystem services can be categorized into types:

**Provisioning services** – products obtained from ecosystems such as food, fresh water, wood, fiber, genetic resources, and medicines.

**Regulating services** – benefits obtained from the regulation of ecosystem processes such as climate and natural hazards, water purification, waste management, pollination, and pest control.

**Cultural services** – nonmaterial benefits that people obtain from ecosystems such as spiritual enrichment, intellectual development, recreation, and aesthetic values.

**Supporting services** – ecosystem services that are necessary for the production of all other ecosystem services. Examples include biomass production, production of atmospheric oxygen, soil formation and retention, nutrient cycling, water cycling, and provisioning of habitat.

### Edaphic

Of, produced by, or influenced by the soil; related or caused by particular soil conditions, as of texture or drainage, rather than by physiographic or climatic factors.

### Edge

The place where plant communities meet or where successional stages or vegetative conditions within plant communities come together.

### Endangered species

Any species that the Secretary of Interior or the Secretary of Commerce has determined is in danger of extinction throughout all or a significant portion of its range.

### Endangered Species Act

Public Law 93-205, approved in 1973 and since amended, the Endangered Species Act provides for the conservation of ecosystems upon which threatened and endangered species of fish, wildlife, and plants depend.

### Environmental Impact Statement

A formal public document prepared to analyze the impacts on the environment of a proposed project or action and released for comment and review. It is prepared first in draft or review form and later in final form. An EIS must meet the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ) guidelines, and directives of the agency responsible for the proposed project. An impact statement includes the following points: 1) the environmental impact of the proposed action, 2) any adverse impacts that cannot be avoided by the action, 3) the alternative courses of actions, 4) the relationships between local short-term use of the human environment and the maintenance and enhancement of long-term productivity, and 5) a description of the irreversible and irretrievable commitment of resources, which would occur if the action were accomplished.

### Erosion

Detachment or movement of the land surface by water, wind, ice, gravity, or other geological activity. Accelerated erosion is much more rapid than normal, natural, geologic erosion, primarily as a result of the influence of activities of man, animals, or natural catastrophes.

### Even-aged management

The application of a combination of actions that results in the creation of stands in which trees of essentially the same age grow together. Managed even-aged forests are characterized by a distribution of stands of varying ages (and therefore, tree sizes throughout the forested area). The difference in age between trees forming the main canopy level of a stand generally does not exceed 20 percent of the age of the stand at harvest rotation age. Regeneration in a particular stand is obtained during a short period at or near the time that a stand has reached the desired age or size for regeneration and is harvested. Clearcut, shelterwood, or seed-tree cutting methods produce even-aged stands (36 CFR 219.3).

**Executive order**

An order of regulation issued by the President or some administrative authority under his or her direction.

# F

**Facility**

Structures needed to support the management, protection, and use of the national forests, including buildings, utility systems, dams, and other construction features. There are three types of facilities: recreation, administrative, and permittee.

**Fen**

An ancient wetland ecosystem dependent on nutrient-rich local or regional groundwater flow systems maintaining perennial soil saturation and supporting continuous organic soil (i.e., peat) accumulation. (FS-990A)

**Fire management plan**

A plan that identifies and integrates all wildland fire management and related activities within the context of approved land and resource management plans. It defines a program to manage wildland fires (wildfire and prescribed fire). The plan is supplemented by operational plans, including but not limited to preparedness plans, preplanned dispatch plans, prescribed fire burn plans, and prevention plans. Fire management plans assure that wildland fire management goals and components are coordinated.

**Fire regime**

Description of the patterns of fire occurrences, frequency, size, severity, and sometimes vegetation and fire effects as well, in a given area or ecosystem. A fire regime is a generalization based on fire histories at individual sites. Fire regimes typically are described as cycles because some parts of the histories are repeated, and the repetitions can be counted and measured, such as fire return interval.

**Fire regime condition class**

Fire regime condition class is an expression of the departure of the current condition from the historical fire regime. It is derived from the historical fire regime and the current fire severity. It is used as a proxy for the probability of severe fire effects, e.g., the loss of key ecosystem components—soil, vegetation, structure—or alteration of key ecosystem processes—nutrient cycles, hydrologic regimes. The fire regime condition class is an index of ecosystem risks attributable to wildland fire.

**Fire suppression**

All the work and activities connected with fire-extinguishing operations, beginning with discovery and continuing until the fire is completely extinguished. The four fire suppression strategies are:

**Monitor** – the systematic process of observing, collecting, and recording fire-related data, particularly with regard to fuels, topography, weather, fire behavior, fire effects, smoke, and fire location. This may be done onsite, from a nearby or distant vantage point in person or using a sensor, or through remote sensing (aircraft or satellite).

**Confine** – to restrict a wildfire to a defined area by using a combination of natural and constructed barriers that will stop the spread of the fire under the prevailing and

forecasted weather conditions until out. This means that "some action is or has been taken" (line construction, bucket drops, etc.) to suppress portions of the fire perimeter.

**Point zone protection** – Point or zone protection involves protecting specific points from the fire while not actively trying to line the entire fire edge. Points being protected may be communities, individual homes, communication sites, areas of high resource value, etc.

**Full suppression** – a strategy to put the fire out as efficiently and effectively as possible, while providing for firefighter and public safety. To complete a fireline around a fire to halt fire spread, and cool down all hot spots that are an immediate threat to the control line or outside the perimeter, until the lines can reasonably be expected to hold under foreseeable conditions. Synonymous with "full perimeter containment" and "control."

**Floodplain**

The flat area of land adjacent to a river channel that is composed of unconsolidated sediments (alluvium) deposited when the river overflows its banks at flood stages.

**Focal species**

A small subset of species whose status infers the integrity of the large ecological system to which it belongs and provides meaningful information regarding the effectiveness of the plan in maintaining or restoring the ecological conditions to maintain the diversity of plant and animal communities in the plan area.

**Forage**

All browse and herbaceous foods that are available to grazing animals.

**Forb**

Any herbaceous flowering plant other than grasses.

**Forest highway**

A designated forest road under the jurisdiction of, and maintained by, a public authority that is subject to the Highway Safety Act.

**Foreground**

A term used in scenery management to describe the portions of a view between the observer and as far as one-quarter to one-half mile distant.

**Forested land**

Land at least 10 percent occupied by forest trees of any size, or formed having had such tree cover and not currently developed for non-forest use. Lands developed for non-forest use include areas for crops, improved pasture, residential or administrative areas, improved roads of any width, and adjoining road clearing and power line clearing of any width.

**Forest health**

The perceived condition of a forest derived from concerns about such factors as its age, structure, composition, function, and vigor, presence of unusual levels of insects and diseases, and resilience to disturbance.

**Forest plan**

Source of management direction for an individual national forest that specifies activity and output levels for a period of time. Management direction in the plan is based on the issues identified at the time of the plan's development.

**Forest plan revision**

The process for revising a forest plan includes preliminary identification of the need to change the plan based on the assessment, development of a proposed plan, consideration of the environmental effects of the proposal and preparation of a draft environmental impact statement, providing an opportunity for the public to comment on the proposed plan, providing an opportunity for the public to object before the proposal is approved, and finally, approval of the plan and preparation of the final environmental impact statement.

**Fragmentation**

A process that occurs wherever a large, contiguous habitat is transformed into smaller patches that are isolated from each other by a landscape matrix unlike the original. This matrix can differ from the original habitat in either composition or structure. The crucial point is that it functions as either a partial or total barrier to dispersal for species associated with the original habitat. A clear threat to population persistence occurs when fragmentation isolates pairs and populations, as opposed to fragmentation within the home range of individual pairs.

**Fuel**

Organic material that will support the start and spread of a fire: duff, litter, grass, weeds, forbs, brush, trees, and dead wood materials.

**Fuel load**

The amount of fuel present expressed quantitatively in terms of weight of fuel per unit area. This may be available (consumable) fuel or total fuel and is typically dry weight.

**Fuels management**

The manipulation of vegetation for the purpose of changing the characteristics of a fire as it burns.

**Fuels reduction treatment**

Manipulation or removal of fuels to lessen potential damage and resistance to control (includes mechanical and prescribed fire treatments). Fuels reduction treatments result in a change in the amount, configuration, and spacing of live and dead vegetation, with the purpose of creating conditions that result in more manageable fire behavior and reduced severity during wildfires.

**Fuelwood**

Round, split, or sawed wood of general refuse material, which is cut into short lengths for burning as fuel.

**Functioning watershed**

A watershed that is functioning properly has five important characteristics (Williams et al. 1997):

1. They provide for high biotic integrity, which includes habitats that support adaptive animal and plant communities that reflect natural processes.
2. They are resilient and recover rapidly from natural and human disturbances.
3. They exhibit a high degree of connectivity longitudinally along the stream, laterally across the floodplain and valley bottom, and vertically between surface and subsurface flows.
4. They provide important ecosystem services, such as high-quality water, the recharge of streams and aquifers, the maintenance of riparian communities, and the moderation of climate variability and change.

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 117 of 422

5. They maintain long-term soil productivity.

(From FS 977, Watershed Condition Framework, May 2011)

# G

**Game species**

Any species of wildlife or fish for which hunting seasons and bag limits have been established, and are normally harvested by hunters and fishermen.

**Geographic information system**

An information processing technology to input, store, manipulate, analyze, and display spatial resource data to support the decision-making processes of an organization. Generally, an electronic medium for processing map information.

**Goal**

A concise statement that describes a desired condition to be achieved sometime in the future. It is normally expressed in broad, general terms, and is timeless in that it has no specific date by which it is to be completed. Goal statements form the principal basis from which objectives are developed. (36 CFR 219.3)

**Grass/forb**

An early forest successional stage during which grasses and forbs are the dominant vegetation.

**Groundwater**

Water within the earth that supplies wells and springs. Specifically, water in the zone of saturation where all openings in soil and rock are filled. The upper surface level forms the water table.

**Group selection**

A method of regenerating uneven-aged stands in which trees are cut, in small groups, and new age classes are established. The width of groups is commonly approximately twice the height of the mature trees, with small openings providing suitable microclimates for shade-tolerant tree species to regenerate, and the larger openings providing suitable microclimates for more shade-intolerant tree species to regenerate.

**Guideline**

A constraint on project or activity decision-making that allows for departure from its terms, so long as the purpose of the guideline is met. Guidelines are intended to help achieve or maintain a desired condition or conditions, avoid or mitigate undesirable effects, or meet applicable legal requirements.

# H

**Habitat**

The natural environment of a plant or animal. In wildlife management, the major components of habitat are considered to be food, water, cover, and living space.

Rvsd Plan - 00000951

**Herbaceous**

Of, denoting, or relating to herbs.

**Heritage resources**

Buildings, sites, areas, architecture, memorials, and objects having scientific, prehistoric, historic, or social values.

**Hibernacula**

Habitat niches where certain animals, e.g., bats, over-winter, such as caves, mines, tree hollows, or loose bark.

**Hydrologic unit code**

A sequence of numbers that identifies a hydrologic unit (such as rivers, river reaches, lakes, or drainage basins) which are nested drainage basins or watersheds.

## I

**Ignition**

The initiation of combustion.

**IMPLAN**

Acronym for the computer model used as an analysis tool to display social effects of various alternatives developed during the land management planning effort.

**INFRA**

INFRA is a collection of web-based data entry forms, reporting tools, and GIS tools that enable the Forest Service to manage and report accurate information about the inventory of constructed features and land units as well as the permits sold to the public and to partners.

**Infrastructure**

The facilities, utilities, and transportation system needed to meet public and administrative needs for operation, e.g., buildings, roads, and power supplies.

**Inholding**

Land within the proclaimed boundaries of a national forest that is owned by a private citizen, an organization, or an agency.

**Instream flow**

The volume of surface water in a stream system passing a given point at a given time.

**Interdisciplinary team**

A group of individuals with different training assembled to solve a problem or perform a task. The team is assembled out of recognition that no one scientific discipline is sufficiently broad enough to adequately solve the problem.

**Intermittent stream**

A stream or reach of stream channel that flows, in its natural condition, only during certain times of the year or in several years. Characterized by interspersed, permanent surface water areas

containing aquatic flora and fauna adapted to the relatively harsh environmental conditions found in these types of environments (Briggs 1996).

**Interpretation**

Explaining the meaning or significance of something.

**Invasive species**

**Native** species are those that have occurred, now occur, or may occur in a given area as a result of natural processes.

**Exotic** (a.k.a. nonnative, foreign, or alien) species are those that live outside their native range and arrived there by human activity, either deliberate or accidental.

**Invasive** species have the ability to thrive and spread aggressively outside their natural range. They affect both aquatic and terrestrial areas and can be plants, vertebrates, invertebrates, and pathogens.

**Invertebrate**

An animal lacking a spinal column.

## L

**Land exchange**

The conveyance of non-Federal land or interests to the United States in exchange for National Forest System land or interests in land.

**Landscape**

A defined area irrespective of ownership or other artificial boundaries, such as a spatial mosaic of terrestrial and aquatic ecosystems, landforms, and plant communities, repeated in similar form throughout such a defined area.

**Landscape scale**

A heterogeneous land area composed of a cluster of interacting ecosystems that are repeated in similar form throughout. Landscapes vary in size, from many thousands of acres to only a few kilometers in diameter.

**Landslide**

The moderately rapid to rapid downslope movement of soil and rock that may or may not be water saturated.

**Late-successional forest**

A stage of forest succession where the majority of trees are mature or overmature.

**Large woody debris**

Large pieces of relatively stable woody material located within the bankfull channel and appearing to influence bankfull flows.

**Single** – A single piece that has a length equal to or greater than 3 meters or two-thirds of the wetted stream width and 10 centimeters in diameter one-third of the way from the base.

**Aggregate** – Two or more clumped pieces, each of which qualifies as a single piece.

**Rootwad** – Rootmass or boles attached to a log less than 3 meters in length.

**Leasable minerals**

Those minerals or materials designated as leasable under the Minerals Leasing Act of 1920. They include coal, phosphate, asphalt, sulfur, potassium, sodium minerals, and oil and gas. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lease**

A legal contract that provides for the right to develop and produce oil and gas resources for a specific period of time under certain agreed-upon terms and conditions.

**Leave tree**

A tree marked to be left standing in an area where it would otherwise be felled.

**Litter**

A surface layer of loose organic debris, consisting of freshly fallen or slightly decomposed organic materials.

**Locatable minerals**

Minerals or materials subject to claim and development under the Mining Law of 1872, as amended. Generally includes metallic minerals such as gold and silver, and other materials not subject to lease or sale, like some bentonites, limestone, talc, some zeolites, etc.

**Lynx analysis unit**

An area of at least the size used by an individual lynx, from about 25 to 50 square miles.

# M

**M**

1,000 units (thousands)

**Maintenance**

The upkeep of the entire Forest Development Transportation Facility, including surfaces and shoulders, parking and side areas, structures, and such traffic control devices as are necessary for its safe and efficient use (36 CFR 212.1). Maintenance is not for the purpose of upgrading a facility, but to bring it to the originally constructed or subsequently reconstructed conditions.

**Maintenance level**

The level of service provided by, and maintenance required for, a specific road. For more information, see the entry for **road maintenance level**.

**Management action or activity**

An action or activity humans impose on a landscape for the purpose of managing natural resources.

**Management approach**

Management approaches describe the principal strategies and program priorities the responsible official intends to employ to carry out projects and activities developed under the plan. They can

convey a sense of priority and focus among objectives and likely management emphasis. They are optional plan content.

**Management area**

A land area identified within the planning are that has the same set of applicable plan components. A management area does not have to spatially contiguous.

**Management concern**

An issue, problem, or a condition that constrains the range of management practices identified by the Forest Service in the planning process. (36 CFR 219.3)

**Management direction**

A statement of multiple-use and other goals and objectives, the associated management prescriptions, and standards and guidelines for attaining them. (36 CFR 219.3)

**Management prescription**

Management practices and intensity selected and scheduled for application on a specific area to attain multiple use and other goals and objectives. (36 CFR 219.3)

**Mass movement**

Downslope unit movement of a portion of the land surface. A single landslide of the gradual, simultaneous downhill movement of the entire mass of loose earth material on a slope face.

**MBF**

One thousand board feet of timber.

**Mechanical treatment**

Mechanical vegetation treatment is any activity undertaken to modify the existing condition of the vegetation accomplished with mechanical equipment.

**Mechanized**

Provided with mechanical power.

**Mechanized transport**

Includes wheeled forms of transportation such as nonmotorized carts, wheelbarrows, bicycles, and any other nonmotorized, wheeled vehicles.

**Memorandum of understanding**

A legal agreement between the Forest Service and other agencies resulting from consultation between agencies that states specific measures the agencies will follow to accomplish a large or complex project. A memorandum of understanding is not a fund-obligating document.

**Metapopulation**

A group of populations separated by space but that consist of the same species. These spatially separated populations interact as individual members move from one population to another.

**Mineral**

**Locatable** – Hard rock minerals that are mined and processed for the recovery of metals. They may include certain nonmetallic minerals and uncommon varieties of mineral materials such as valuable and distinctive deposits of limestone or silica.

**Leasable** – Coal, oil, gas, phosphate, sodium, potassium, oil shale, sulfur, and geothermal resources.

**Salable (or mineral materials)** – A collective term to describe common varieties of sand, gravel, stone, pumice, cinders, clay, and other similar materials. Common varieties do not include deposits of those materials that may be locatable. In general, these minerals are widely spread and are relatively low in unit value. They are generally used for construction materials and for road building purposes.

**Mineral entry**

Claiming public lands administered by the Forest Service under the Mining Law of 1872 for the purpose of exploiting minerals. May also refer to mineral exploration and development under the mineral leasing laws and Material Sale Act of 1947.

**Mineral withdrawal**

The exclusion of locatable mineral deposits from mineral entry on areas required for administrative sites by the Forest Service, and other areas highly valued by the public. Public lands withdrawn from entry under the General Mining Laws and/or the Mineral Leasing Laws.

**Minimum stocking standard**

The stocking that must be present on regenerated areas before a new stand can be considered established. Minimum stocking is generally stated in terms of number of trees per acre and tree-stem heights by species.

**Mining**

Extraction of valuable minerals or other geological materials from the earth.

**Mitigate, or mitigation**

To avoid, minimize, rectify, reduce, or compensate the adverse environmental impacts associated with an action.

**Modification**

A description in scenic quality objectives when activities may dominate, but must use naturally established form, color, and texture. These areas should appear natural when viewed in the background.

**Monitoring**

A systematic process of collecting information to evaluate effects of actions or changes in conditions or relationships.

**Montane**

Of or inhabiting mountainous country.

**Mosaic**

The intermingling of plant communities and their successional stages in such a manner as to give the impression of an interwoven design.

**Motorized vehicle**

Any vehicle which is self-propelled, other than: a) a vehicle operated on trails; and b) any wheelchair or mobility device, including one that is battery-powered, that is designed solely for use by a mobility-impaired person for locomotion and that is suitable for an indoor pedestrian areas (36 CFR 212.1).

**Motorized equipment**

A machine that uses a motor, engine, or other nonliving power source. This includes, but is not limited to, machines such as chain saws, aircraft, snowmobiles, generators, motorboats, and motor vehicles. It does not include small battery- or gas-powered, hand-carried devices such as shavers, wristwatches, flashlights, cameras, stoves, or other similar small equipment.

**Motorized route**

A National Forest System road or trail that is designated for motorized use on a motor vehicle use map pursuant to 36 CFR 212.51.

**Motorized use**

The designation of roads, trails, and areas that are open to motor vehicle use as specified in the Federal Register / Vol. 70, No. 216 / Wednesday, November 9, 2005 / 36 CFR Parts 212, 251, 261, Travel Management; Designated Routes and Areas for Motor Vehicle Use; Final Rule.

**Motor vehicle use map**

A map reflecting designated roads, trails, and areas open to motorized public use on an administrative unit or a ranger district of the National Forest System.

**Multiple use**

The management of all the various renewable surface resources of the national forests so that they are used in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in the use to conform to changing needs and conditions; that some lands will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output. (36 CFR 219.19)

# N

**National Environmental Policy Act (NEPA)**

A 1969 act declaring a national policy that encourages productive and enjoyable harmony between humankind and the environment, to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of humanity, to enrich the understanding of the ecological systems and natural resources important to the nation, and to establish a Council on Environmental Quality. (The Principal Laws Relating to Forest Service Activities, Agriculture Handbook No. 453, USDA, Forest Service, 359 pp.) The NEPA process is an interdisciplinary process that concentrates decision-making around issues, concerns, alternatives, and the effects of alternatives on the environment. NEPA regulations are set out in Forest Service Handbook 1909.15.

**National Forest Management Act**

A law passed in 1976 as an amendment to the Forest and Rangeland Renewable Resources Planning Act, requiring the preparation of regional guides and forest plans, and the preparation of regulations to guide that development.

**National Forest System lands**

All national forest lands reserved or withdrawn from the public domain of the United States, all national forest lands acquired through purchase, exchange, donation, or other means, the national grasslands and land utilization projects administered under title III of the Bankhead-Jones Farm Tenant Act (50 Stat. 525, 7 USC 1010-1012), and other lands, waters, or interests therein which are administered by the Forest Service or are designated for administration through the Forest Service as a part of the system. 16 USC 1609(a).

**National Historic Preservation Act**

Extends the policy in the Historic Sites Act to State and local historical sites as well as those of national significance, expands the National Register of Historic Places, establishes the Advisory Council on Historic Preservation and the State Historic Preservation Officers, and requires agencies to designate Federal Preservation Officers. Section 106 directs all Federal agencies to take into account the effects of their undertakings (actions, financial support, and authorizations) on historic properties included in or eligible for the National Register. Section 110 establishes inventory, nomination, protection, and preservation responsibilities for federally owned historic properties.

**National Register of Historic Places**

The Nation's official list of cultural resources worthy of preservation. Authorized under the National Historic Preservation Act of 1966, the National Register is part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect our historic and archaeological resources. Properties listed in the Register include districts, sites, buildings, structures, and objects that are significant in American history, architecture, archaeology, engineering, and culture. The National Register is administered by the National Park Service.

**Native American Graves Protection and Repatriation Act (NAGPRA)**

Provides a process for museums and Federal agencies to return certain Native American cultural items—human remains, funerary objects, sacred objects, or objects of cultural patrimony—to lineal descendants, and culturally affiliated Indian tribes and Native Hawaiian organizations. NAGPRA includes provisions for unclaimed and culturally unidentifiable Native American cultural items, intentional excavation, and unanticipated discovery of Native American cultural items on Federal and Tribal lands, and penalties for noncompliance and illegal trafficking. The Act requires agencies and museums to identify holdings of such remains and objects and to work with appropriate Native American groups toward their repatriation. Permits for the excavation and/or removal of "cultural items" protected by the Act require Tribal consultation, as do discoveries of "cultural items" made during activities on Federal or Tribal lands.

**Natural range of variation**

The variation of ecological characteristics and processes over scales of time and space that are appropriate for a given management application. In contrast to the generality of historical ecology, the natural range of variation concept focuses on a distilled subset of past ecological knowledge developed for use by resource managers; it represents an elicit effort to incorporate a past perspective into management and conservation decisions. The pre-European influenced reference period considered should be sufficiently long, often several centuries long, to include the full range of variation produced by dominant natural disturbance regimes such as fire and flooding and should also include short-term variation and cycles in climate. The natural range of variation is a tool for assessing the ecological integrity and does not necessarily constitute a management target or desired condition. The natural range of variation can help identify key structural, functional, compositional, and connectivity characteristics, for which plan components may be important for either maintenance or restoration of such ecological conditions.

**Nonmotorized activities**

Activities that do not incorporate the use of a motor, engine, or other nonliving power source. This includes such machines as aircraft, hovercraft, motorboats, automobiles, motor bikes, snowmobiles, bulldozers, chainsaws, rock drills, and generators.

**Notice of intent**

Written notice to announce the Forest Service's intent to begin forest plan revision and prepare an environmental impact statement.

# O

**Objective**

A concise, measurable, and time-specific statement of a desired rate of progress toward a desired condition or conditions. Objectives should be based on reasonably foreseeable budgets.

**Old forest**

The overstory is dominated by late seral or climax species of a certain age and size, and has other characteristics such as snags, canopy layers, downed woody material, and trees with rotten, dead, or broken tops.

**Openings**

Meadows, clearcuts, and other areas of vegetation that do not provide cover.

**Oshá**

Oshá, also known as osha (*Ligusticum porteri*), is a perennial herb found in parts of the Rocky Mountains and northern Mexico, especially in the southwestern United States. Oshá is strictly a mountain plant that requires partial shade. It is most commonly found in deep, moist soils rich in organic material.

**Outputs**

The goods, end products, or services that are purchased, consumed, or used directly by people. Goods, services, products, and concerns produced by activities that are measurable and capable of being used to determine the effectiveness of programs and activities in meeting objectives.

**Overstory**

That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

**Over-the-snow vehicle**

Vehicles that are designed for use over snow and that run on a track or tracks and/or a ski or skis, while in use over snow.

# P

**Party**

A group of people readily recognized as traveling together.

**Perennial stream**

A stream or reach of a channel that flows continuously or nearly so throughout the year and whose upper surface is generally lower than the top of the zone of saturation in areas adjacent to the stream.

**Persons at one time (PAOT)**

A recreational capacity measurement term indicating the number of people who can use a facility or area at one time. Equal to five persons per family unit for camp and picnic grounds.

**Planned ignition**

The intentional initiation of a wildland fire by a hand-held, mechanical, or aerial device where the distance and timing between ignition lines or points and the sequence of igniting them is determined by environmental conditions (weather, fuel, topography), firing technique, and other factors that influence fire behavior and fire effects (see prescribed fire).

**Planning period**

The lifetime of the plan. The time interval within the planning horizon that is used to show incremental changes in yields, costs, effects, and benefits.

**Planning Rule**

The 2012 Planning Rule provides the overarching framework for individual forests and grasslands in the National Forest System to use in developing, amending, and revising land management plans, which are also known as forest plans. The planning rule identifies a framework for revising land management plans that consists of three phases: assessment, plan revision, and monitoring.

The Forest Service is required by statute to have a national planning rule: the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976, requires the Secretary of Agriculture to issue regulations under the principles of the Multiple-Use Sustained-Yield Act of 1960 for the development and revision of land management plans.

**Planning unit**

The area planned for treatment as identified in a project-level decision document. The overall area being analyzed.

**Plant community**

Any assemblage of plants that occur in the same area and form a distinct ecological unit.

**Pole or pole timber**

Smaller diameter trees larger than saplings that do not meet the specifications for sawtimber.

**Pre-commercial thinning**

Cutting non-sawtimber trees to meet a variety of management objectives including improving tree vigor, stand species composition, wildlife habitat, or reducing fuels.

**Prescribed fire**

Any fire ignited by management actions under certain, predetermined conditions to meet specific objectives related to hazardous fuels or habitat improvement. A written, approved prescribed fire plan must exist, and National Environmental Policy Act requirements must be met, prior to ignition (see planned ignition).

**Prescription**

Management practices selected and scheduled for application on a specific area to attain goals and objectives.

**Preservation**

A scenic condition objective in which only ecological changes are allowed. Management activities, except for low impact recreation facilities, are prohibited. This objective applies mainly to wilderness, primitive areas, and areas with special classifications.

Also, a technique of conservation that maintains the resource in or on the ground into perpetuity.

**Priority heritage asset**

A historic property that meets the criteria for a priority heritage asset with a current documented condition assessment and a recommended management use that realizes its agency and public benefit(s).

**Productive**

The ability of an area to provide goods and services and sustain ecological values.

**Project record**

The documents and materials considered in the making of a forest plan, plan revision, or plan amendment. Also known as the planning record.

**Proposed action**

In terms of the National Environmental Policy Act (NEPA), the project, activity, or decision that a Federal agency intends to implement or undertake, which is the subject of an environmental impact statement or environmental assessment.

**Public access**

Generally refers to a road or trail route over which a public agency claims right-of-way for public use.

**Public participation**

Meetings, conferences, seminars, workshops, tours, written comments, responses to survey questionnaires, and similar activities designed and held to obtain comments from the public about Forest Service planning.

**Proposed species**

Any species that is proposed by the U.S. Fish and Wildlife Service or National Marine Fisheries Service to be listed as threatened or endangered under the Endangered Species Act.

# R

**Range allotment**

Rangelands are managed as allotments and pastures. An allotment is a designated area of land available for permitted livestock grazing. Grazing is authorized for a specified number and kind of livestock. It is the basic land unit used to facilitate management of the range resource on National Forest System lands administered by the Forest Service.

**Range condition**

The state of the plant community on a range site in relation to the potential natural community or the desired plant community for that site. It is typically rated in the general category of satisfactory or unsatisfactory.

**Ranger district**

Administrative subdivision of a national forest that is supervised by a district ranger who reports to the forest supervisor.

**Reclamation**

Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Recreation opportunity spectrum (ROS)**

Allocations that identify a variety of recreation experience opportunities categorized into six classes on a scale from primitive to urban. Each class is defined in terms of the degree to which it satisfies certain recreation experience needs, based on the extent to which the natural environment has been modified, the type of facilities provided, the degree of outdoor skills needed to enjoy the area, and the relative density of recreation use. The six classes are:

**Primitive** – Very high probability of experiencing solitude, self-reliance, and challenge; natural landscape with natural processes allowed to function; very low interaction between users; restrictions and controls not evident; access limited; generally cross-country travel.

**Semi-primitive nonmotorized** – Good probability of experiencing solitude, self-reliance, and challenges; natural primitive landscapes; some evidence of users; minimum subtle controls; access by low standard trails and cross-country travel; natural processes allowed to function with subtle vegetative alterations. Managed for nonmotorized use.

**Semi-primitive motorized** – Moderate probability for self-reliance and experiencing solitude away from roads and trails); risk associated with motorized equipment; predominantly natural landscapes; low concentration of users and interaction by users along roads and trails; minimum but subtle restrictions; vegetative alterations visually blend with the landscape. Existing routes are designated for off highway vehicles and other high clearance vehicles. Mountain bikes and other mechanized equipment are present.

**Roaded natural** – Low opportunity to avoid other users; little opportunity for risk or challenge; substantial modified landscapes; moderate evidence and interaction of users; controls and restrictions present; variety of motorized users and access; various shapes and sizes of vegetative alterations that blend with the landscape. The road system is well defined and can accommodate sedan travel.

**Rural** – Good opportunity to affiliate with others; facilities important; self-reliance of little importance; altered landscapes but attractive; high interaction among users; obvious and prevalent controls; extensive motorized use; vegetation maintained. Rural settings represent most developed recreation sites.

**Urban** – Opportunity to affiliate with others important; outdoor skills associated with competitive events; landscapes extensively changed with dominant structures; large numbers of user interactions; intensive controls are numerous; motorized use prevalent, including mass transit; vegetation planted and maintained. Highly developed ski areas and resorts are examples of a typical urban setting on National Forest lands.

**Recreation setting**

The social, managerial, and physical attributes of a place that, when combined, provide a distinct set of recreation opportunities. The Forest Service uses the recreation opportunity spectrum to define recreation settings and categorize them into six distinct classes: primitive, semi-primitive nonmotorized, semi-primitive motorized, roaded natural, rural, and urban.

**Recreation site**

A defined, public recreation area. The Forest Service uses two categories for recreation sites: dispersed and developed. Both types may have improvements needed to protect resources such as signs, road closure devices, bear resistant food storage devices, and/or sanitation facilities. Some recreation sites are designed and managed for overnight use and some are designed and managed for day-use only (e.g., interpretive signs at roadside pull-outs, trailheads at roadside pull-outs or at road restrictions, picnic areas or boat launches that are closed at night, ski areas that do not have overnight lodging).

**Developed sites** have agency improvements made out of manmade materials that are intended to provide for public recreation and user comfort/convenience. Examples on National Forest Service lands include, but are not limited to, ski areas, campgrounds, sites with cabins, huts, lodges, recreation residences, visitor centers, and trailheads.

**Dispersed sites** have minimal to no agency improvements made out of manmade materials. Dispersed sites may include outfitter camps or other primitive camping spots along a road, trail, or water body, or at a road closure.

**Reforestation**

Management activities used to increase or accelerate the establishment of forest cover to meet resource objectives.

**Regeneration**

**Natural** – A group or stand of young trees created from germination of seeds from trees on the site or sprouting from trees on the site.

**Artificial** – A group or stand of young trees created by direct seeding or by planting seedlings or cuttings.

**Regeneration harvest**

Timber harvest system intended to create a new age class (see regeneration method).

**Regeneration method**

A cutting procedure by which a new age class is created. The major methods are clearcutting, seed-tree, shelterwood, selection, and coppice. Regeneration methods are grouped into four categories: coppice, even aged, two aged, and uneven aged.

**Rehabilitation**

1) Actions taken to protect or enhance site productivity, water quality, or other values for a short period of time.
2) A short-term scenic condition objective used to restore landscapes containing undesirable visual or other resource impacts to the desired scenic or other acceptable quality level.

**Research natural area (RNA)**

Designated areas of land established by the Chief of the Forest Service under 36 CFR 251.23 for research and educational purposes and to typify important forest and range types of the Forest,

as well as other plant communities that have special or unique characteristics of scientific interest and importance.

**Resilience**

The ability of a system to recover from disturbance in the event that the disturbance exceeds the capacity of the system to resist changing. The concepts of resistance and resilience are jointly referred to as resilience.

**Resistance**

The capacity of ecosystems to tolerate disturbances without exhibiting significant change in structure and composition. The concepts of resistance and resilience are jointly referred to as resilience.

**Responsible official**

The Forest Service employee who has the delegated authority to make a specific decision. For example, the regional forester will select the preferred alternative for the forest plan.

**Restore/restoration**

Assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. It is an intentional activity that initiates or accelerates the recovery of an ecosystem with respect to its health, integrity, and sustainability.

**Revegetation**

The reestablishment and development of a plant cover. This may take place naturally through the reproductive processes of the existing flora or artificially through the direct action of reforestation or reseeding.

**Right-of-way**

Land authorized to be used or occupied for the construction, operation, maintenance, and termination of a project or facility passing over, upon, under, or through such land (36 CFR 251.51). The privilege that one person or persons particularly described may have of passing over the land of another in some particular line (FSH 2709.12 05 10).

**Riparian area**

A riparian ecosystem is a transition area between the aquatic ecosystem and the adjacent terrestrial ecosystem, identified by soil characteristics or distinctive vegetation communities that require free or unbound water (FS-990A). Riparian areas may be associated with lakes, reservoirs, estuaries, hot springs, marshes, streams, bogs, wet meadows, and intermittent or permanent streams where free and unbound water is available. This habitat is transitional between true bottomland wetlands and upland terrestrial habitats, and while associated with watercourses, may extend inland or upland for considerable distances.

**Road**

A motor vehicle route more than 50 inches wide, unless identified and managed as a trail.

**Road construction, reconstruction**

Supervising, inspecting, and actual building and incurrence of all costs incidental to the construction or reconstruction of a road.

**Road corridor**

A strip of land between two points used by a road, or some future road whose exact location remains to be determined, generally with an indefinite width.

### Road density

The number of road miles per square mile of land (i.e., 1 mile/square mile is 1 mile of road within a given square mile). This includes the total density all roads.

### Road maintenance level

Defines the level of service provided by, and maintenance required for, a specific road, consistent with road management objectives and maintenance criteria (FSH 7709.58, section 12.3). The maintenance levels are:

**Maintenance level 1** – Intermittent service roads during the time they are closed to vehicular traffic. The closure period is 1 year or longer. Basic custodial maintenance is performed.

**Maintenance level 2** – Roads open for use by high-clearance vehicles, minor traffic, no warning signs. Passenger car traffic is not a consideration.

**Maintenance level 3** – Roads open and maintained for a prudent driver in a standard passenger car, low speed travel, warning signs provided. User comfort and convenience are not considered priorities.

**Maintenance level 4** – Roads that provide a moderate degree of user comfort and convenience at moderate travel speeds, single or double lane, aggregate or paved surface.

**Maintenance level 5** – Roads that provide a high degree of user comfort and convenience, single or double lane, generally paved surface, or aggregate-surfaced with dust abatement.

### Rocky Mountain Region

The Forest Service organizational unit consisting of Colorado, Wyoming, South Dakota, Nebraska, and Kansas. Also called Region 2.

## S

### Sacred site

Per Executive Order 13007 – any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the Indian tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

### Salvage harvest

Removal of trees that are damaged, dead, or dying or being damaged by injurious agents other than competition between trees, such as insect and disease epidemics, wildfire, or storms, to recover timber before it loses its commercial value.

### Sanitation harvest

Intermediate harvest to remove trees to improve stand health by stopping or reducing the actual or anticipated spread of insects and diseases.

**Sawtimber**

Larger diameter trees of sufficient size and quality to be manufactured into dimensional lumber products. Species and minimum diameters of sawtimber trees are established by regional timber markets.

**Scale**

The degree of resolution at which ecological processes, structures, and changes across space and time are observed and measured.

**Scenic character**

A combination of the physical, biological, and cultural images that gives an area its scenic identity and contributes to its sense of place; scenic character provides a frame of reference from which to determine scenic attractiveness and to measure scenic integrity.

**Scenic condition**

Measurable standard for scenic resource management based on the acceptable degree of alteration of the characteristic landscape. The acceptable degree of alternation for a given landscape is dictated by the area's scenic integrity objective.

**Scenic integrity objective**

Scenic integrity objectives serve as the desired conditions for the scenic resources and represent the degree of intactness of positive landscape attributes. Scenic integrity objectives are categorized into five levels. The highest ratings are given to those landscapes where valued landscape attributes will appear complete with little or no visible deviations. Lower ratings are given to those landscapes where modifications will be more evident.

**Very high** – Landscape is intact with changes resulting primarily through natural processes and disturbance regimes.

**High** – Management activities are unnoticed, and the landscape character appears unaltered.

**Moderate** – Management activities are noticeable but are subordinate to the landscape character. The landscape appears slightly altered.

**Low** – Management activities are evident and sometimes dominate the landscape but are designed to blend with surroundings by repeating line, form, color, and texture of valued landscape character attributes. The landscape appears altered.

**Very low** – Human activities of vegetation and landform alterations may dominate the original, natural landscape character but should appear as natural occurrences when viewed at background distances.

**Scenic resource**

The composite of basic physiographic features, patterns, and land-use effects that typify a land unit and influence the scenic appeal the unit may have for visitors.

**Scoping**

Determination of the significant issues to be addressed in an environmental impact statement.

**Secure habitat**

An area where wildlife retreat for safety when disturbance in their usual range is intensified, such as by logging activities or during hunting seasons.

**Sedge**

A grass-like plant with triangular stems and inconspicuous flowers, typically growing in wet ground.

**Sediment**

Material suspended in water or that has been deposited in streams and lakes.

**Seedling/sapling**

A forest successional stage in which trees are less than 5 inches in diameter.

**Seral**

The gradual supplanting of one community of plants by another, the sequence of communities being termed a sere and each stage seral (successional).

**Seral stage**

A phase in the sequential development of a climax community.

**Shrub/seedling**

A forest successional stage in which shrubs and seedling trees are the dominant vegetation.

**Silvicultural treatment**

A forest management activity such as thinning, harvesting, planting, pruning, prescribed burning, and site preparation that is designed to alter the establishment, growth, composition, health, and quality of forests and woodlands to meet the diverse needs and values of landowners and society on a sustainable basis.

**Silviculture**

The art and science of controlling the establishment, growth, composition, health, and quality of forests and woodlands to meet the diverse needs and values of landowners and society on a sustainable basis.

**Single-tree selection**

An uneven-aged method where individual trees of all size classes are removed more or less uniformly throughout the stand to promote growth of remaining trees and to provide space for regeneration.

**Slash**

Woody material left after logging, pruning, thinning, brush cutting, or other management activities and/or accumulating there as a result of storm, fire, or other damage.

**Slope**

The amount or degree of deviation from the horizontal or vertical.

**Slope stability**

The resistance of any inclined surface, as the wall of an open pit or cut, to failure by sliding or collapsing.

**Snag**

A standing, dead tree.

**Social sustainability**

The capability of society to support the network of relationships, traditions, culture, and activities that connects people to the land and to one another and supports vibrant communities.

**Softwood**

A conventional term for timber and trees belonging to the evergreen group, such as pine, spruce, and fir.

**Soil productivity**

The capacity of a soil to support the growth of specified plants, plant communities, or a sequence of plant communities. Soil productivity may be expressed in terms of volume or weight/unit, area/year, percentage of plant cover, or other measures of biomass accumulation.

**Soil survey**

The systematic examination, description, classification, and mapping of soils in an area.

**Spatial**

Referring to the distance, interval, or area between or within things.

**Special area**

Area designated by law (by Congress) or statute or through administrative process (by the Secretary of Agriculture or a Forest Service official).

**Special interest area**

A type of management area designated by the forest supervisor for scenic, geologic, botanic, zoologic, paleontological, archaeological, historic, scenic, or recreational values, or combinations of these values. A special interest area is a type of special area designated through administrative process. Special interest areas are addressed in Forest Service Manuals 2360 and 2372.

**Special use authorization or permit**

A permit, term permit, lease, or easement that allows occupancy, use, rights, or privileges of National Forest System land.

**Species**

Organisms that successfully reproduce among themselves and cannot reproduce successfully with other organisms.

**Stand**

A community of trees or other vegetation sufficiently uniform in composition, constitution, age, spatial arrangement, or condition to be distinguishable from adjacent communities that form a silvicultural or management entity.

**Standards and guidelines**

Principles specifying conditions or levels of environmental quality to be achieved.

**Standard** – a mandatory constraint on project and activity decision-making, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements. (36 CFR 219.7(e)(1)(iii))

Standards are required criteria for the design of projects and activities. Design criteria are the technical design details to ensure that projects and activities maintain or move toward

the desired conditions, or at least to ensure that projects and activities do not preclude their maintenance or attainment. Design criteria provide the sideboards (i.e., define the limits) for projects and activities. Examples of other sources of constraints on the design of projects and activities include congressional direction, oil and gas leasing stipulations, regulations, timber sale contract clauses, and special use authorization standard clauses. In addition, the responsible official may develop project-specific design criteria to constrain a project. A standard differs from a guideline in that a standard is strict design criterion, allowing no variation, whereas a guideline allows variation if the result would be equally effective.

**Guideline** – a constraint on project and activity decision-making that allows for departure from its terms, so long as the purpose of the guideline is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements. (36 CFR 219.7(e)(1)(iv))

Guidelines are similar to standards in that they are design criteria for projects and activities to help achieve the desired conditions and objectives, or at least to ensure that projects or activities do not foreclose their maintenance or attainment. Guidelines differ from standards in that they provide flexibility for compliance, while standards are concrete limitations.

**Stewardship**

Caring for the land and associated resources and passing healthy ecosystems to future generations.

**Stipulation**

A provision that modifies standard lease rights and is attached to and made a part of the lease.

**Stocking**

Live trees per acre needed to meet resource objectives as identified in the forest plan or through other management decisions.

**Structural stage**

Any of several developmental stages of tree stands described in terms of tree age or size and density. In general, the habitat structural stages developed by the Forest Service Rocky Mountain Region staff are used. This classification has different structural stages based on tree size (diameter at breast height) and tree canopy cover percent.

**Structure**

The horizontal and vertical physical elements of forests and grasslands and the spatial interrelationships of ecosystems.

**Stubble**

The basal portion of plants remaining after the top portion has been harvested. Also, the portion of the plants, principally grasses, remaining after grazing is completed.

**Substrate**

The rock material varying in size from boulders to silt that is found in the bed of rivers and streams.

**Succession**

The sequential process of long-term plant community change and development that occurs following a disturbance.

**Successional stage (seral stage)**

The relatively transitory communities that replace one another during development to potential natural community.

**Suitability (Rangeland)**

Rangeland suitability is a determination of the appropriateness of grazing on capable lands based on economic and environmental consequences and consideration of the alternative uses forgone if grazing is allowed.

**Suitability for timber production**

*Lands that may be suited for timber production* is a preliminary classification in the process of determining lands that are suited for timber production. This preliminary classification excludes National Forest System lands that are not suitable for timber production based on legal or technical reasons, such as lands where State, Executive order, or regulation prohibits timber production; lands that have been withdrawn from timber production; lands where timber harvest cannot be done without causing irreversible damage to soil, slope, or other watershed conditions; lands where there is no reasonable assurance of adequate restocking; and land that is not forest land.

**Suitable timber base**

Lands within the National Forest System that are capable, available, and suitable for timber production.

**Suppression**

The work of extinguishing a fire or confining fire spread.

**Surface water**

Water on the surface of the earth.

**Sustainability**

The capability to meet the needs of the present generation without compromising the ability of future generations to meet their needs.

**Sustained yield**

The amount of renewable resources that can be produced continuously at a given intensity of management.

"Sustained yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land. (36 CFR 219.3)

**Sustained yield limit**

The amount of timber, meeting applicable utilization standards that can be removed from a forest annually in perpetuity on a sustained yield basis. It is the volume that could be produced in perpetuity on lands that may be suitable for timber production. Calculation of the limit includes volume from lands that may be deemed not suitable for timber production after further analysis during the planning process. The calculation of sustained yield limit is not limited by land management plan desired condition, other plan components, or the planning unit's fiscal capability and organizational capacity. The sustained yield limit is not a target but is a limitation on harvest, except when the plan allows for a departure.

# T

**Talus**

The loose accumulation of fragmented rock material on slopes, especially at the base of a cliff.

**Temporary road**

A road necessary for emergency operations or authorized by contract, permit, lease, or other written authorization. Temporary roads are not included in a national forest's transportation atlas.

**Terrestrial ecosystem**

A plant community that is not dependent on a perpetual source of water to grow.

**Thinning**

Intermediate treatment to reduce stand density or stocking levels to meet a variety of management objectives including increasing tree growth or vigor, improving stand health or species composition, reducing fuels, or improving wildlife habitat.

**Threatened and endangered species**

An endangered species is a plant or animal species listed under the Endangered Species Act that is in danger of extinction throughout all or a significant portion of its range. A threatened species is any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

**Threshold**

The point or level of activity beyond which an undesirable set of responses begins to take place within a given resource system.

**Timber classification**

Forested land is classified under each of the land management alternatives according to how it relates to the management of the timber resource. The following are definitions of timber classifications:

**Non-forested** – Land that has never supported forests and land formerly forested where use for timber production is precluded by development or other uses.

**Forested** – Land at least 10-percent stocked (based on crown cover) by forest trees of any size, or formerly having had such tree cover and not currently developed for non-forest use.

**Suitable** – Land to be managed for timber production on a regulated basis.

**Unsuitable** – Forest land withdrawn from timber use by statute or administrative regulation (for example, wilderness), or identified as inappropriate for timber production in the forest planning process.

**Timber harvest**

The removal of trees for wood fiber utilization and other multiple-use purposes.

**Timber production**

The purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use.

Managing land to provide commercial timber products on a regulated basis with planned, scheduled entries.

**Timber sale**

Selling of forest products with monetary value to meet forest plan objectives, including providing raw material for both commercial manufacturing and personal use.

**Trail**

A route 50 inches or less in width, or a route greater than 50 inches wide that is identified and managed as a trail.

**Traditional cultural property**

A property affiliated with traditional religious and cultural importance to a distinct cultural group, such as an American Indian tribe or Native Hawaiian group, that is eligible for the National Register of Historic Places because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community. Traditional cultural properties include built or natural locations, areas, or features considered sacred or culturally significant by a group or people. While traditional cultural properties are closely associated with Native American cultures, a site need not be associated with a Native American cultural group to qualify as a traditional cultural property for the purposes of the National Register of Historic Places.

**Travel management**

Providing for safe, environmentally responsible, and customer-responsive movement of vehicles and people to and through public lands.

# U

**Understory**

That portion of a plant community growing underneath the taller plants on the site.

**Uneven-aged management**

The application of a combination of actions needed to simultaneously maintain continuous high-forest cover, recurring regeneration of desirable species, and orderly growth and development of trees through a range of diameter or age classes to provide a sustained yield of forest products. Cutting is typically regulated by specifying the number or proportion of trees of particular sizes to retain within each area, thereby maintaining a planned distribution of size classes. Cutting methods that develop and maintain uneven-aged stands are single-tree and group selection. (36 CFR 219.3)

**Ungulate**

A hoofed animal.

**Unplanned ignition**

Fires caused by natural ignition (lightning) or human caused fires that are not prescribed fires (see wildfire).

# V

### Vegetation management

Activities designed primarily to promote the health of forest vegetation in order to achieve desired results. When vegetation is actively managed, it is manipulated or changed by humans to produce desired results. Where active management of vegetation is required, techniques are based on the latest scientific research and mimic natural processes as closely as possible. Vegetation management is the practice of manipulating the species mix, age, fuel load, and/or distribution of wildland plant communities within a prescribed or designated management area in order to achieve desired results.

### Viable population

A population of plants or animals large enough and distributed in such a way as to ensure its continued existence, despite all the hazards to survival such as illness, predators, old age, etc. throughout its existing range within the planning area.

### Viewshed

The visible portion of the landscape seen from viewpoints. Viewpoints can include residences, recreational facilities, and roads and trails.

# W

### Water right

A property right granted by a State for the use of a portion of the public's surface water resource obtained under applicable legal procedures.

### Watershed

An area of land with a characteristic drainage network that contributes surface or groundwater to the flow at that point; a drainage basin or a major subdivision of a drainage basin.

### Wetlands

Those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support and that, under normal circumstances, do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." (40 CFR 122. 2)

### Wild, Scenic, and Recreational Rivers

A river or section of a river designated under the 1968 Wild and Scenic Rivers Act as wild, scenic, or recreational. Rivers may be designated by Congress or, if certain requirements are met, the Secretaries of Interior or Agriculture, as appropriate. Once designated under the Act, rivers receive special management direction that ensures the maintenance of the free-flowing nature and the outstanding natural, cultural, and recreational values of the river segment. Under the Act, river segments are required to be classified as wild, scenic, or recreational:

**Wild Rivers** – Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

**Scenic Rivers** – Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

**Recreational Rivers** – Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

**Wilderness**

All lands included in the National Wilderness Preservation System by public law; generally defined as undeveloped Federal land retaining its primeval character and influence without permanent improvements or human habitation.

**Wildfire**

Unplanned ignitions or prescribed fires that have been declared wildfires. All wildfires will receive appropriate suppression action.

**Wildland fire**

A general term describing any nonstructural fire that occurs in the wildland. Wildland fires are categorized into two distinct types:

**Wildfires** – Unplanned ignitions or prescribed fires that are declared wildfires

**Prescribed fires** – Planned ignitions.

**Wildland-urban interface**

The line, area, or zone where structures and other human developments meet or intermingle with undeveloped wildland or vegetation fuels.

**Windthrow**

The act of trees being uprooted by the wind.

**Winter range**

An area used by deer and elk during the winter months, generally at lower elevations and/or south and west exposures.

**Withdrawal**

An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other Federal agencies.

*Rio Grande National Forest*
*Land Management Plan*

# Appendices

| | |
|---|---|
| **Appendix A** | Old Forest Criteria |
| **Appendix B** | Wild, Scenic, and Recreational River Eligibility Determination Process |
| **Appendix C** | Timber Suitability and Analysis |
| **Appendix D** | Species of Conservation Concern Presence and Concern for Persistence |
| **Appendix E** | Southern Rockies Lynx Amendment Direction |
| **Appendix F** | Riparian Management Zones |
| **Appendix G** | Priority Watersheds |
| **Appendix H** | Relevant Federal Statutes, Regulations, Policies, and Agreements |
| **Appendix I** | Proposed and Possible Actions |
| **Appendix J** | Mineral Leasing Stipulations and Lease Forms |

145

Rvsd Plan - 00000975

# Appendix A. Old Forest Criteria

The criteria used for determining old forests (Table 19) on the Rio Grande are based on the Regional Guidelines (with slight modifications), which are documented in a publication called "Old-Growth Forests in the Southwest and Rocky Mountain Regions Proceedings of a Workshop," March 9-13, 1992, Portal, Arizona, General Technical Report RM-213.

The old-forest characteristics for each cover type are as follows. To be identified as old forest, most of the characteristics need to be present.

### Ponderosa Pine

- Age greater than or equal to 175
- Large trees per acre (greater than or equal to 16" DBH) greater than or equal 10
- Rot + dead/broken tops per acre greater than or equal 1
- Snags (10" min DBH) greater than or equal 2

### Mixed Conifer

- Age greater than or equal 175
- Large trees per acre (greater than or equal 16" DBH) greater than or equal 10
- Rot + dead/broken tops per acre greater than or equal 1
- Snags (10" min DBH) greater than or equal 2
- Layers greater than or equal 2
- Downed Woody Material greater than or equal 5 tons per acre

### Spruce-Fir

- Age greater than or equal 200
- Large trees per acre (greater than or equal 16" DBH) greater than or equal 10
- Rot + dead/broken tops per acre greater than or equal 1
- Snags (10" min DBH) greater than or equal 2
- Layers greater than or equal 2
- Downed Woody Material greater than or equal 10 tons/acre

### Aspen

- Age greater than or equal 100
- Large trees per acre (greater than or equal 14" DBH) greater than or equal 10
- Rot plus dead/broken tops per acre greater than or equal 1

### Pinyon-Juniper

- Age greater than or equal 200

- Large trees per acre (greater than or equal to 12-inch diameter at root collar (DRC)) greater than or equal to 30
- Rot + dead/broken tops per acre greater than or equal 1
- Snags (10" min DRC) greater than or equal 1

**Table 19. Criteria used to determine old forest**

| Minimum Attributes | Ponderosa Pine | Spruce-Fir | Mixed Conifer | Aspen | Pinyon-Juniper |
|---|---|---|---|---|---|
| Age | 175 | 200 | 175 | 100 | 200 |
| DBH/DRC (inches) | 16 | 16 | 16 | 14 | 12 (DRC) |
| Large trees/ac >= DBH/DRC | 10 | 10 | 10 | 10 | 30 |
| Rot + dead/broken tops per acre | 1 | 1 | 1 | 1 | 1 |
| Snags per acre | 2 | 2 | 2 | n/a | 1 |
| Layers (number) | n/a | 2 | 2 | n/a | n/a |
| Downed Woody Material (tons/acre) | n/a | 10 | 5 | n/a | n/a |

# Appendix B: Wild, Scenic, and Recreational River Eligibility Determination Process

## Background

The National Wild and Scenic Rivers System was created by Congress in 1968 (Public Law 90-542) to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The Wild and Scenic Rivers Act is notable in that it seeks to protect these rivers while at the same time acknowledging the benefits and necessity of appropriate developments within the river corridor. To be designated under the Act, a river segment must meet two fundamental requirements: the river segment must be "free-flowing" as defined by Section 16(b) of the Act, and the river segment must have one or more outstandingly remarkable values (Section 1(b)).

Rivers may be designated by Congress or, if certain requirements are met, the Secretaries of Interior or Agriculture, as appropriate. Once designated under the Act, rivers receive special management direction that ensures the maintenance of the free-flowing nature and the outstanding natural, cultural, and recreational values of the river segment. Under the Act, river segments are required to be classified as wild, scenic, or recreational:

- Wild Rivers – Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.
- Scenic Rivers – Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.
- Recreational Rivers – Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

Section 5(d)(1) of the Wild and Scenic Rivers Act requires that "*consideration shall be given by all Federal agencies involved to potential national wild, scenic, and recreational river areas*" during land management planning. To meet this requirement, Forest Service units conduct a systematic inventory of all river segments to determine if they meet the requirements for designation under the Act. In addition to studies initiated by land management agencies, Congress can direct the study of specific rivers (Section 5(a)). Rivers that have been inventoried and determined to meet the requirements of the Act, but that have not yet been designated, are considered to be either eligible or suitable (those that have been recommended to Congress and the President). These eligible and suitable segments are managed to maintain their free-flowing nature and outstandingly remarkable values until such time as they are designated under the Act or released from consideration.

## Wild and Scenic Rivers Act and the Rio Grande National Forest

In 1975, Public Law 93-621 amended the original Wild and Scenic Rivers Act (PL 90-542) and directed that the three tributary forks of the Conejos River, as well as the main stem of the Conejos (excluding Platoro Reservoir) to its crossing of Highway 17 be studied for potential inclusion in the National Wild and Scenic Rivers System. In 1979, following substantial efforts,

recommendations regarding the Conejos River were made to the Secretary of Agriculture from the State of Colorado and the Forest Service. The recommended wild river segments were: El Rito Azul; the North, Middle, and South forks of the Conejos; as well as the main stem of the Conejos from Three Forks to Platoro Reservoir. Additionally, the main stem of the Conejos from the town of Platoro to the confluence with South Fork of the Conejos was recommended as a recreational river segment. No legislative action has yet been taken on these recommendations (USDA Forest Service 1982).

During the 1996 revision of the forest plan, the Forest engaged in a systematic inventory and eligibility evaluation for all labeled rivers on U.S. Geological Survey 7.5-minute quadrangle maps. The eligibility evaluations from this process were combined with the results of the congressionally mandated Conejos River Study to develop a list of river segments that were potentially eligible for designation under the Wild and Scenic Rivers Act. These potentially eligible segments were included in the alternatives of the 1996 forest plan. The selected alternative, G, found that the river segments listed in Table 20 were eligible for inclusion in the National Wild and Scenic Rivers System. Further language within the 1996 forest plan directed that suitability determinations would be held in abeyance pending the proposal of significant actions that would impact the identified outstandingly remarkable values or the free-flowing nature of the river segments. Management areas and direction were developed for all eligible river segments that included the river and the lands within one-quarter mile on both sides of the mean high-water mark. The length, outstanding remarkable values, and designation of each of the rivers and streams are listed in Table 20.

### *Narratives from the 1996 Wild and Scenic Rivers Act Evaluation*

The primary sources for these narratives are the original evaluation sheets, and in the case of the Conejos River recommended sections, the environmental impact statement (1982) with clarification in parentheses where needed. If additional comments are added, that is noted, and they would come from other material contained within the project record. The date of submission for each evaluation sheet is Conejos Peak Ranger District (December 21, 1992); Del Norte (Divide Ranger District (1992), Creede (Divide) Ranger District (February 12, 1993); and Saguache Ranger District (1992).

#### *Archuleta Creek*

Lower Terminus Location: 32N, 4E, S7; Upper Terminus Location: 33N, 3E, S34. This is a tributary of the Rio Chama and is 5.35 miles in length. This stretch includes the following features (outstandingly remarkable values): scenic and recreational. The probable classification is: Wild.

#### *East Fork Rio Chama*

Lower Terminus Location: 33N, 4E, S17; Upper Terminus Location: 33N, 4E, S5. This stream is a tributary to the Rio Chama and is 2.05 miles in length. This stretch is very scenic and includes the following features (outstandingly remarkable values): scenic and recreational. The probable classification is: Wild.

### Hansen Creek

Lower Terminus Location: 35N, 4E, S36; Upper Terminus Location: 35N, 4E, S8. This stream is a tributary to the South Fork Conejos River and is 6.35 miles in length. This is a very scenic and wild creek, untrammeled by man, and includes the following features (outstandingly remarkable values): scenic and recreational. The probable classification is: Wild.

### Little Medano Creek

Lower Terminus Location: 26S, 73W, S1; Upper Terminus Location: 25S, 72W, S30. This segment is 2.95 miles in length. This stretch includes the following features (outstandingly remarkable values): geologic and fish (Rio Grande cutthroat trout present). The probable classification is: Scenic. Per the Grande Sand Dunes National Park and Preserve Act of 2000, this stream is now part of the Great Sand Dunes National Preserve, managed by the National Park Service.

### Rio de los Pinos (Lower)

Lower Terminus Location: 32N, 6E, S20; Upper Terminus Location: 32N, 6E, S14. The total river stretch is 13.95 miles in length. Special features (outstandingly remarkable values) should be considered on the lower 7-mile stream stretch. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, and fish (Rio Grande cutthroat trout). The probable classification is: Scenic.

### Rio Grande (Lower)

Lower Terminus Location: 40N, 2E, S11 (Coller State Wildlife Area); Upper Terminus Location: 40N, 2E, S30 (Blue Creek). The total river stretch is 5 miles. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, geologic, and historic. The probable classification is: Recreational.

### Rio Grande (Box Canyon)

Lower Terminus Location: 41N, 2W, S32 (Spring Creek); Upper Terminus Location: 40N, 4W, S13. The total river stretch is 11 miles in length and is within a box canyon. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, fish, and historic. Five miles is within the Weminuche Wilderness. The probable classification is: Scenic.

### Saguache Creek

Lower Terminus Location: 44N, 4E, S17; Upper Terminus Location: 43N, 3E, S4. The total river stretch is 7.8 miles in length. The stream runs from the confluence of the North, Middle, and South Forks of Saguache Creek to the Forest boundary. Outstanding features include a large amount of native fish habitat that is undisturbed as well as numerous remnants of Indian encampments. Also, the remains of a soldier were discovered where he had been buried in the bank. The area is relatively inaccessible. This stream includes the following features (outstandingly remarkable values): scenic, fish, historic, and cultural. The probable classification is: Wild.

#### *Toltec Creek*

Lower Terminus Location: 32N, 6E, S22; Upper Terminus Location: 33N, 4E, S14. The creek goes through private land near Osier and the lower terminus is the New Mexico border on Carson National Forest. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, and historic (due to train). The probable classification is: Wild.

#### *West Bellows Creek*

Lower Terminus Location: 41N, 1E, S13; Upper Terminus Location: 42N, 1E, S10. This stream is 10.75 miles in length, and the lower one-half mile is located on private land. From the Wheeler Geologic Area to the boundary with private land, highly scenic cliffs line this drainage. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, geologic, and historic. The probable classification is: Scenic.

#### *West Fork Rio Chama*

Lower Terminus Location: 33N, 4E, S17; Upper Terminus Location: 33N, 3E, S1. This stream is a tributary to the Rio Chama and is 3.5 miles in length. This stretch includes the following features (outstandingly remarkable values): scenic and recreational. The probable classification is: Wild.

#### *Medano Creek (Upper)*

Lower Terminus Location: Sangre de Cristo Wilderness Boundary; Upper Terminus Location: 25S, 72W, S19. This segment is 3.15 miles in length. This stretch includes the following features (outstandingly remarkable values): recreational, fish (Rio Grande cutthroat trout present), and historic. The probable classification is: Scenic. Per the Grande Sand Dunes National Park and Preserve Act of 2000, this stream is now part of the Great Sand Dunes National Preserve, managed by the National Park Service.

#### *Medano Creek (Lower)*

Lower Terminus Location: 26S, 73W, S12; Upper Terminus Location: Sangre de Cristo Wilderness Boundary. This segment of stream is 5.30 miles in length. This stretch includes the following features (outstandingly remarkable values): recreational, fish (Rio Grande cutthroat trout present), and historic. Due to the presence of the Medano Pass road, the probable classification is: Recreational. Per the Grande Sand Dunes National Park and Preserve Act of 2000, this stream is now part of the Great Sand Dunes National Preserve, managed by the National Park Service.

#### *South Fork Rio Grande (Above Big Meadows Reservoir)*

Lower Terminus Location: Big Meadows Reservoir inflow at Weminuche Wilderness boundary; Upper Terminus Location: 38N, 1E, S21. This stream is a tributary of the Rio Grande and is 4.75 miles in length. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, and fish. The probable classification is: Scenic.

#### *South Fork Rio Grande (Below Big Meadows Reservoir)*

Lower Terminus Location: 40N, 3E, S34; Big Meadows Reservoir outflow. This stream is a tributary of the Rio Grande and is 13.9 miles in length, with 5.76 miles within private property

surrounded by National Forest System lands. This stretch includes the following features (outstandingly remarkable values): scenic, recreational, and fish. The probable classification is: Scenic.

#### El Rito Azul

El Rito Azul is the smallest of the three forks. Beginning at Blue Lake (11,643 feet in elevation) in the southwest corner of the drainage, El Rito Azul flows 3.5 miles to its confluence with the North and Middle Forks. At the confluence, the width of the channel averages 6 to 8 feet, and depth is rather shallow. The headwaters pass through an alpine area that is flatter and more open than the headwaters of the North and Middle Fork, but upon entering the subalpine zone, begin a steep descent to Three Forks (the junction of El Rito Azul with the North Fork and the Middle Fork of the Conejos River). El Rito Azul receives about 500 fisherman-days of use per year. The trout population consists of rainbow, brook, and cutthroat. Forest Trail 718 lies parallel to El Rito Azul and is used extensively by hikers and fishermen. Blue Lake covers about 40 surface acres and offers good fishing.

#### North Fork Conejos River

The North Fork originates in a glaciated alpine basin and flows 3.5 miles through a narrow U-shaped valley interspersed with grassy open parks and spruce-fir stands to Three Forks. Unobscured vistas of the peaks of the Continental Divide are common from the open parks along the trail that ascends the North Fork basin. During the spring, many ephemeral and perennial streams tumble off the steep southern slope to the North Fork below. Almost duplicating the size of the Middle Fork, the North Fork's channel width at its mouth is about 16 to 18 feet. The consistently steep gradient allows few opportunities for the diversity of stream features found along the Middle Fork. The North Fork contains brook, cutthroat, and an occasional migrating brown trout. The gradient and stream characteristics inhibit high fish populations, although the stream depth allows natural fish reproduction. This section is free flowing, and adjacent land areas possess outstandingly remarkable values including scenic, recreational, fish, and wildlife. This section was recommended as Wild.

#### Middle Fork Conejos River

The Middle Fork, originating from Lake Ann (11,910 feet in elevation), contains a small population of Rio Grande cutthroat trout. Largest of the three forks, the Middle Fork is 4 miles long and the channel is about 18 feet wide at its mouth. The Middle Fork offers the most diverse streamflow characteristics of the three forks with an abundance of pools, riffles, and beaver ponds. The stream passes through alternating spruce-fir stands and extensive parks where elk and deer are occasionally seen. This section is free flowing, and adjacent land areas possess outstandingly remarkable values including scenic, recreational, fish, and wildlife. This section was recommended as Wild.

#### Conejos River (Three Forks to Platoro Reservoir)

From the confluence at Three Forks, the land becomes a broad, U-shaped glacial valley. The 2.6-mile streambed flattens as the river makes a straight run to Platoro Reservoir. The walls of the canyon are thick with spruce, fir, and occasional stands of aspen, dwindling as they approach the crest. Lesser tributaries drop hundreds of feet from the rock faces of the southern slopes to the glaciated valley below. Within this formation are examples of the Treasure Mountain tuff, a

densely welded quartz-latite ash flow. The bottom of this valley is open and park-like with vegetative cover consisting primarily of mountain bunchgrass, bluegrass, and some willow.

### *South Fork of the Conejos River*

The headwaters of the South Fork start at Glacier Lake and tumble 12 miles to the confluence with the Conejos River. Glacier Lake (11,950 feet in elevation) releases the waters of the south Fork into an alpine glade rimmed on the west by Krummholz and on the east by a small, sturdy spruce-fir stand. In its alpine reaches, the South Fork jostles through random mounds of volcanic debris on a gentle gradient. Forced into pockets, the streamlets of the South Fork have created a number of small lakes, many so small one could cast a stone across. The trail (Forest Trail 724) winds its way up from the main Conejos and branches off to many lakes such as Twin Lakes, Green Lake, and Timber Lake.

Time and the fertility of volcanic soils, snowmelt, and spring rains have given the South Fork a steep, narrow, rocky, timbered appearance. As the South Fork is enhanced by flows from its several tributaries, it becomes an erosional force slashing a canyon to the river. The canyon is narrow and at times hundreds of feet deep. Aspen and spruce avail themselves of the meager footing afforded by infrequent ledges. The V shape of the canyon prohibits traffic along the stream. The trail switches back up a neighboring slope amid Douglas fir, ponderosa pine, and eventually spruce and fir. Sloughing and mass soil movement affect the lower South Fork. The trees in spruce-fir stands have shallow, individual root systems; thus, neither species binds nor survives on the these rapidly moving slumping soils. The aspen, however, have relatively deep roots and reproduce by suckering. The tangle of radiating suckers retards soil motion and aids the stability of the individual trees.

Stocking of rainbow trout in 1968, cutthroat trout in 1969, and brook trout in 1975 has resulted in a self-reproducing fishery. Brown trout already existing in the lower South Fork are residents of a previous stocking. The Division of Wildlife (Colorado Parks and Wildlife), through an agreement with the Forest Service, reintroduced bighorn sheep to the South Fork area in February 1978. This segment has 132 acres of commercial forest land in the Special Component (needs specially designed treatment of timber resources) and 886 acres of commercial forest land in the Deferred Component (withdrawn from timber utilization), with a potential harvest yield of 10,000 board feet. There are no known endangered or threatened species.

This section is free flowing, and adjacent land areas possess values including scenic, recreational, fish, and wildlife. The South Fork of the Conejos qualifies for a Wild classification by virtue of its limited accessibility and pristine nature.

### *Conejos River below Platoro Reservoir*

The character of the Conejos River undergoes a dramatic transition below the reservoir. The river almost triples in size and supports a substantial tourist industry. The area along this segment of river received 42,500 visitor days of use in 1977. This segment supports brown, brook, cutthroat, and rainbow trout, western white and bluehead suckers (unknown what species this is referring to, likely incorrect). In this section, due to heavy stocking, is rainbow trout. In 1975, 22,500 pounds of catchable rainbow trout were stocked between Platoro Reservoir and Mogote. The prevailing game fish species in this study area is the self-sustaining population of brown trout. In number, brown trout dominate the river.

The surrounding lands are primarily National Forest System lands that total 5,188 acres, with 706 acres of private land located along the mainstem of the river between Platoro Reservoir and the mouth of the South Fork, and 1,616 acres located between the mouth of the South Fork and Highway 17. Access is provided from State Highway 17 to Platoro Reservoir by Forest Roads 250 and 271. These roads provide access from Chama, New Mexico; and La Jara, Antonito, and Alamosa, Colorado. The potential harvest of 63,000 board feet of timber annually from 3,515 acres of commercial forest land, classified as Special Component, is possible in this segment. This segment of the river flows southeasterly through a variety of landscapes before passing under Highway 17.

In the upper 1.9 miles, the river leaves the restraints of Platoro Reservoir and flows into a narrow canyon, a dominant geologic feature. Diminutive grasses and occasional woody shrubs in the canyon derive what little nourishment is available from the cracks in the rock face or that portion of the canyon floor not inundated by the river. The vegetative types are characteristic of the subalpine/upper montane zones and can be described as hardy pioneer species of the mountain muhly-fescue type. The river flows swiftly, providing poor habitat for the trout population. Mix Lake Campground is located adjacent to the reservoir.

For the next 2.9 miles, just above the community of Platoro, the canyon opens into a broad, glaciated valley about one mile across at the widest point. The valley walls rise sharply on both sides with a dense growth of Engelmann spruce and subalpine fir to the south, and aspen clones interspersed with conifer stands to the north. The vegetative variety adds visual texture to the valley walls. Bearing testimony to the relentless scouring of glaciers, the flat valley floor is dotted with drumlins, bare rounded rocks protruding from the alluvium rubble. Surrounding these masses are sedges and grasses that give this area a rolling park-like appearance. The river flows swiftly through many deep meanders; some are only a few feet from folding back on one another. The banks are lined with willow and low woody shrubs that provide niches for a variety of songbirds. Located at the head of the valley, primarily on the south bank of the river, is the community of Platoro. The community provides goods and services to a seasonal tourist trade between May 31 and November 1.

> Note: The Conejos Wild and Scenic River Study – final environmental impact statement initially determined 13.2 miles to be eligible, including most of the section described above; however, the 1982 Recommendation from the Secretary of Agriculture to the President of the United States (1982) eliminated 2 miles from the recommendation to avoid potential conflicts with private lands immediately below Platoro Reservoir.

For the next 2.1 miles below the town of Platoro, the U-shaped valley constricts and turns abruptly south at the mouth through a narrow, vegetated canyon. The steep gradient enables fast-moving water to chisel through the rock strata, which impedes its descent to a lower meadow. Willow and a variety of grasses line the streambanks. The riparian vegetation is nearly continuous. The weathering of millennia has broken the harsh face of the Conejos Formation, providing ample organic material for spruce-fir and aspen stands.

For the next 3.4 miles, the canyon opens into a rolling, glaciated plain about 1.5 miles wide. The river rambles at a quick, even pace through meanders near the center of the valley. Near the head of the valley, the Lake Fork tributary enters the main channel. Lake Fork Campground, located just above the confluence, provides fishing to recreationists adjacent to campsites. Grasses are abundant on the rolling meadows of the valley floor. Vegetation on the steeper, better drained

valley wall are spruce-fir and aspen overstory with millet, woodrush, sedge, tufted hairgrass, bluegrass, bluejoint reedgrass, yarrow, paintbrush, and junegrass understory. A bridge at the Lake Fork confluence provides access to Forest Service Roads 105 and 100, which lead to the headwaters of Saddle Creek and Lake Fork. Saddle Creek enters the Conejos from the west just below the bridge. During the summer under Forest Service permit, cattle are driven upriver by ranchers to feed in the upland meadows. Mule deer, elk, black bear, and bighorn sheep graze the lower meadows during the winter months but forage and rest in the high dense timber and forest openings during summer months. Marmots, chipmunks, coyotes, and rabbits also inhabit the lower meadows.

For the lowest 2.9 miles, the river below Trail Creek flows through a steep-walled canyon cut into the Conejos Formation. Following a narrow, winding route, Forest Road 250 traverses the canyon rim to the Pinnacle. These pointed rock spires at the eastern lip of the canyon are an intrusive dike of harder rhyolite rock from which the softer, more easily weathered Conejos Formation broke away. Vegetation is restricted to lichen and various grasses. Occasional clumps of spruce and fir grow in areas where sufficient organic material exists. The western walls of the canyon provide adequate organic material for a spruce-fir stand interwoven with aspen glades. Although good fishing is available along the entire length of the river, fishing in this area is reputed to be the best. It has lighter fishing pressure than other parts of the lower river because of limited access from the road.

## Wild and Scenic Rivers Act and the Forest Plan Revision

The Forest engaged in the revision of the 1996 forest plan under the final directives of the 2012 Planning Rule. These directives state that when developing a plan or plan revision, the responsible official shall:

> *Identify the eligibility of rivers for inclusion in the National Wild and Scenic Rivers System, unless a systematic inventory has been previously completed and documented, and there are no changed circumstances that warrant additional review. (36 CFR sec. 219.7(c)(2)(vi))*

Given that a systematic inventory of rivers was completed and documented concurrent with the 1996 forest plan revision, the responsible official determined that no changed conditions existed and chose to limit the extent of the study process during the current revision to those river segments that were not previously inventoried.

### *Segments Determined to be Eligible in the 1996 Forest Plan*

The river segments listed in Table 20 and elaborated on above as eligible for inclusion in the National Wild and Scenic Rivers System will be carried forward in the forest plan revision. These river segments will retain the same classification, outstandingly remarkable values, river segment termini, and management direction. The only exceptions will be those segments of Medano Creek and Little Medano Creek that are on lands now managed by the National Park Service, which will administer these river segments through the National Park Service land management planning process. Maps of all the rivers found to be eligible for recommendation are included on the external drive at the back of this document.

**Table 20. Eligible rivers for inclusion in the National Wild and Scenic Rivers System from the 1996 Rio Grande forest plan**

| River or Stream Name | Length (miles) | DS (UTM, Zone 13N) | US (UTM, Zone 13N) | Outstandingly Remarkable Values (Specific Value) | Designation |
|---|---|---|---|---|---|
| Archuleta Creek | 5.35 | 356016, 4106182 | 359841, 4100089 | Scenic, Recreational | Scenic |
| East Fork Rio Chama | 2.05 | 362163, 4106170 | 362351, 4110553 | Scenic, Recreational | Scenic |
| Hansen Creek | 6.35 | 366267, 4121079 | 360459, 4127444 | Scenic, Recreational | Wild |
| Little Medano Creek[1,2] | 2.95 | See note [1,2] | See note [1,2] | Scenic, Geologic, Fish (Rio Grande cutthroat trout) | Scenic |
| Rio de los Pinos (Lower) | 7.50 | 381879, 4095041 | 376508, 4096178 | Scenic, Recreational, Fish (Rio Grande cutthroat trout) | Scenic |
| Rio Grande (Lower) | 5.00 | 347066, 4177909 | 341649, 4181683 | Scenic, Recreational, Geologic, Historic | Recreational |
| Rio Grande (Box Canyon) | 8.00 | 312013, 4183163 | 300751, 4177556 | Scenic, Recreational, Fish, Historic (Within Box Canyon and Weminuche Wilderness) | Scenic |
| Saguache Creek | 7.80 | 363847, 4213427 | 354709, 4208158 | Scenic, Fish, Historic, Cultural (Large amounts of undisturbed native fish habitat and numerous cultural sites) | Wild |
| Toltec Creek | 2.70 | 384913, 4095006 | 383112, 4098089 | Scenic, Recreational, Historic (Cumbres and Toltec Scenic Railroad) | Wild |
| West Bellows Creek | 10.75 | 339637, 4187358 | 342950, 4195670 | Scenic, Recreational, Geologic, Historic (Cliffs below Wheeler Geologic Area) | Scenic |
| West Fork Rio Chama | 3.50 | 362163, 4106170 | 359182, 4109807 | Scenic, Recreational | Scenic |
| **Medano Creek[1,2]** | | | | | |
| Medano Creek (Upper Reach) | 3.15 | See note [1,2] | See note [1,2] | Recreational, Fish (Rio Grande cutthroat trout) | Scenic |
| Medano Creek (Lower Reach) | 5.30 | See note [1,2] | See note [1,2] | Recreational, Fish (Rio Grande cutthroat trout) | Recreational |
| Medano Creek Total | 8.45 | See note [1,2] | See note [1,2] | | |
| **South Fork Rio Grande** | | | | | |
| South Fork Rio Grande (Above Big Meadows Res.) | 4.75 | 340081, 4155307 | 334268, 4152579 | Scenic, Recreational, Historic (Within Weminuche Wilderness) | Scenic |
| South Fork Rio Grande (Below Big Meadows Res.) | 13.90 | 353377, 4167424 | 340855, 4156351 | Scenic, Recreational, Historic | Recreational |
| South Fork Rio Grande Total | 18.65 | - | - | | |
| **Conejos River** | | | | | |

| River or Stream Name | Length (miles) | DS (UTM, Zone 13N) | US (UTM, Zone 13N) | Outstandingly Remarkable Values (Specific Value) | Designation |
|---|---|---|---|---|---|
| El Rito Azul | 3.50 | 356317, 4126928 | 355621, 4122627 | Scenic, Recreational, Wildlife (Alpine ecosystem, recreational fishing and hiking) | Wild |
| North Fork Conejos River | 3.50 | 356010, 4126739 | 351006, 4128551 | Scenic, Recreational, Wildlife (Glaciated alpine basin with grassy open parks) | Wild |
| Middle Fork Conejos River | 4.00 | 356010, 4126739 | 350472, 4126691 | Scenic, Recreational, Wildlife (Diverse streamflow characteristics, beaver ponds, elk and deer habitat) | Wild |
| Conejos River (Three Forks to Platoro Reservoir) | 2.60 | 358768, 4130580 | 356327, 4126919 | Scenic, Recreational, Wildlife (Glacial valley, Treasure Mountain tuff) | Wild |
| South Fork of the Conejos River | 12.00 | 369412, 4120628 | 359190, 4124829 | Scenic, Recreational, Wildlife (Alpine ecosystem, narrow and deep canyon, natural sloughing and mass soil movement, recreational fishery) | Wild |
| Conejos River below Platoro Reservoir[3] | 11.20 | 369777, 4120896 | 365820, 4134732 | Scenic, Recreational, Wildlife (Recreational fishing, camping, glacial valley, few irrigation diversions) | Recreational |
| Conejos River Total | 36.80 | - | - | | |
| Wild Rivers Sub-total | 42.45 | - | - | | |
| Scenic Rivers Sub-total | 48.00 | - | - | | |
| Recreational River Sub-total | 35.40 | - | - | | |
| Rio Grande National Forest Total | 125.85 | - | - | | |

[1] Per the Great Sand Dunes National Park and Preserve Act of 2000, these streams are now part of the Great Sand Dunes National Preserve, managed by the National Park Service.

[2] The mileage division between the Scenic and Recreational Reaches is estimated based on the location of the Medano Pass Road; original documentation could not be found.

[3] The Conejos Wild and Scenic River Study – Final Environmental Impact Statement initially determined 13.2 miles to be eligible; however, the 1982 recommendation from the Secretary of Agriculture to the President of the United States (Block 1982) eliminated 2 miles from the recommendation to avoid potential conflicts with private lands immediately below Platoro Reservoir.

### *Inventory of River Segments Not Evaluated as Part of the 1996 Forest Plan*

A review of the inventory from the 1996 forest plan revision was conducted to determine those river segments that had been missed, or those that lacked sufficient documentation to determine the exact extent of the river segment that was evaluated. Initially, 34 stream segments were identified for review; however, four of these segments were not in the U.S. Geological Survey National Hydrography Dataset and were eliminated from consideration. One additional river segment, Osier Creek, which flows south to north and is tributary to the Rio de los Pinos (approximately 0.8 mile downstream from a separate Osier Creek that enters the Rio de los Pinos near Osier, Colorado), was identified during a review of the Carson National Forest Wild and Scenic River inventory. The 31 river segments that required inventory are listed in Table 21 and can be divided into 2 categories: 24 segments on National Forest System lands that were missed in the 1996 inventory, and 7 segments located on the Baca Mountain Tract, which were acquired as part of the Great Sand Dunes National Park and Preserve Act of 2000. These new segments on the Baca Tract were described in detail in the Baca Tract Environmental Assessment (USDA Forest Service and USDI National Park Service 2009).

The 31 river segments listed in Table 21 were evaluated in accordance with the direction provided in section 82.7 of FSH 1909.12-2015-1. The evaluation of the river segments was conducted by a sub-group of those individuals participating as members of the forest plan revision.

The process applied to the river segments listed in Table 21:

1. Determination of the free-flowing condition for each river segment (82.71 - FSH 1909.12-2015-1)
2. Evaluation of outstandingly remarkable values (82.73 - FSH 1909.12-2015-1)
   - The State of Colorado was selected as the region of comparison for all outstandingly remarkable values.
3. Preliminary classification of eligible river segments (82.8 - FSH 1909.12-2015-1)
   - This step determines if the eligible river segment should be wild, scenic, or recreational.
4. Engagement with ranger district staff
   - The process and results of the newly evaluated segments were presented to ranger district staff members. This step was designed to solicit more local expertise on the river segments in question, and to give local resource professionals the opportunity to concur with, or modify, all parts of the eligibility evaluation.
5. Delivery of the results of the preliminary evaluation to the responsible official
   - Under this evaluation, the responsible official has discretion over whether or not a river segment is eligible for inclusion in the National Wild and Scenic Rivers System.

## Recommendations to the Responsible Official

The preliminary evaluation conducted by the interdisciplinary team resulted in a portion of Deadman Creek being recommended to the responsible official as eligible, with a scenic classification, for inclusion in the National Wild and Scenic Rivers System. The recommended reach is 3.3 miles long and is located on lands that were obtained as part of the Baca Mountain

Tract. The evaluated reach was determined to be free-flowing and contain the following outstandingly remarkable values:

- Scenery: An exceptional mature cottonwood and juniper gallery exists on the lower reaches.
- Fisheries: This is a Rio Grande cutthroat trout stream with exceptional habitat.
- Historic and Cultural: Unique features of the Old Spanish Trail exist within the river corridor.
- Other – Botanic: The mature cottonwood and juniper gallery represents a unique feature within the region of comparison. Additionally, there are occurrences of the plant species *Draba smithii* and *Draba grayana;* both are species of conservation concern and NatureServe Global Rank of G2 (Globally Imperiled), N2 (Nationally Imperiled) and S2 (Imperiled) in the State of Colorado.

### Updated Data for Eligible River Segments

As part of the forest plan revision process, background data for the eligible river segments was updated to reflect the best available scientific information. Specifically, river segment lengths were updated to reflect the most recent National Hydrography Dataset issued by the U.S. Geological Survey. These updates do not reflect changes to the river segments determined to be eligible; rather, they reflect the improvement in data quality since 1996.

Table 21 identifies river segments that were not included in the 1996 forest plan. The evaluation process identified segments that have outstandingly remarkable values (values). Four of the rivers are identified as having identified values and free-flowing conditions, which meets the criteria for determining eligibility of the river or segment. The values identified were then considered if the values were unique, rare, or exemplary features that, when compared with similar values at a regional or national scale, were significant.

The values identified were not found to be significant when compared statewide, which was determined to be the scale for the region of comparison. The values identified for Cottonwood and Cat Creeks included fish, specifically Rio Grande cutthroat trout, a species included on the Regional Foresters' species of conservation concern list. Many creeks and rivers on the Forest provide habitat for the species; therefore, this does not raise to the level of unique or rare. Likewise, historic and cultural values identified were tied to historic mining, which again does not raise to the unique or rare level for the Forest, nor the State of Colorado, which was the identified region of comparison.

None of the segments were therefore carried forward as eligible for designation as wild, scenic, or recreational in the draft record of decision.

**Table 21. Preliminary evaluation for inclusion in the National Wild and Scenic Rivers System, river segments missed in the 1996 forest plan**

| Characteristic | | | | Presence of Outstandingly Remarkable Values | | | | | | | Preliminary Evaluation: Is the river segment eligible for WSR inclusion? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Segment Name | District | Length (miles) | Free-Flowing Condition? | Scenery | Recreation | Geology | Fish | Wildlife | Historic and Cultural Values | Other Similar River-related Values | |
| **Baca Mountain Tract Acquisition** | | | | | | | | | | | |
| Alpine Creek | Saguache | 2.9 | Yes | No | No | No | No | No | Yes | No | No |
| Cottonwood Creek | Saguache | 2.8 | Yes | No | No | No | Yes | No | No | No | No |
| **Deadman Creek** | **Saguache** | **3.3** | **Yes** | **No** | **No** | **No** | **Yes** | **No** | **Yes** | **Yes** | **Yes, Scenic** |
| Pole Creek | Saguache | 4.4 | Yes | No | No | No | No | No | Yes | No | No |
| Short Creek | Saguache | 2.4 | Yes | No | No | No | No | No | No | No | No |
| South Spanish Creek | Saguache | 2.4 | Yes | No | No | No | No | No | No | No | No |
| Spanish Creek | Saguache | 5.4 | Yes | No | No | No | No | No | No | No | No |
| **Missed or not documented in the 1996 Eligibility Evaluation** | | | | | | | | | | | |
| Asiatic Creek | Conejos Peak | 2.1 | Yes | No | No | No | No | No | No | No | No |
| Bird Creek | Divide | 1.9 | Yes | No | No | No | No | No | No | No | No |
| Cat Creek | Conejos Peak | 3.9 | Yes | No | No | No | Yes | No | No | No | No |
| Coal Creek | Conejos Peak | 1.2 | Yes | No | No | No | No | No | No | No | No |
| Cropsy Creek | Conejos Peak | 1.7 | Yes | No | No | No | No | No | No | No | No |
| East Fork Navajo River | Conejos Peak | 0.9 | Yes | No | No | No | No | No | No | No | No |

| Characteristic | | | | Presence of Outstandingly Remarkable Values | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Segment Name** | **District** | **Length (miles)** | **Free-Flowing Condition?** | **Scenery** | **Recreation** | **Geology** | **Fish** | **Wildlife** | **Historic and Cultural Values** | **Other Similar River-related Values** | **Preliminary Evaluation: Is the river segment eligible for WSR inclusion?** |
| Flagstaff Creek | Saguache | 2.2 | Yes | No | No | No | No | No | No | No | No |
| Jarosa | Conejos Peak | 0.6 | Yes | No | No | No | No | No | No | No | No |
| La Jara (north sections) | Conejos Peak | 1.1 total | Yes | No | No | No | No | No | No | No | No |
| La Jara (south sections) | Conejos Peak | above | Yes | No | No | No | No | No | No | No | No |
| Little Red Creek | Saguache | 1.3 | Yes | No | No | No | No | No | No | No | No |
| Merkt Creek | Saguache | 2.2 | Yes | No | No | No | No | No | No | No | No |
| Middle Fork Cotton Creek | Saguache | 1.5 | Yes | No | No | No | No | No | No | No | No |
| Middle Fork North Crestone Creek | Saguache | 2.1 | Yes | No | No | No | No | No | No | No | No |
| Middle Fork Pole Creek | Divide | 2 | Yes | No | No | No | No | No | No | No | No |
| Middle Zapata Creek | Conejos Peak | 3.1 | Yes | No | No | No | No | No | No | No | No |
| North Fork Cedar Creek | Saguache | 1.3 | Yes | No | No | No | No | No | No | No | No |
| North Fork Pole Creek | Divide | 3.4 | Yes | No | No | No | No | No | No | No | No |
| North Fork South Zapata Creek | Conejos Peak | 2.1 | Yes | No | No | No | No | No | No | No | No |
| Osier Creek | Conejos Peak | 0.8 | Yes | No | No | No | No | No | No | No | No |

| Characteristic | | | | Presence of Outstandingly Remarkable Values | | | | | | | Preliminary Evaluation: Is the river segment eligible for WSR inclusion? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Segment Name** | **District** | **Length (miles)** | **Free-Flowing Condition?** | **Scenery** | **Recreation** | **Geology** | **Fish** | **Wildlife** | **Historic and Cultural Values** | **Other Similar River-related Values** | |
| Peterson Creek | Saguache | 3.1 | Yes | No | No | No | No | No | No | No | No |
| Rock Creek | Saguache | 0.1 | Yes | No | No | No | No | No | No | No | No |
| San Luis Creek | Saguache | 2.1 | Yes | No | No | No | No | No | No | No | No |
| South Fork Cedar Creek | Saguache | 0.9 | Yes | No | No | No | No | No | No | No | No |

## References Cited

Block, J.R. 1982. Letter from Secretary of Agriculture John R. Block to President of the United States Ronald W. Reagan, dated June 11, 1982, regarding the segment of the Conejos River downstream from Platoro Reservoir for 2 miles. Available in the project record at the Rio Grande National Forest Supervisor's Office in Monte Vista, Colorado.

USDA Forest Service. 1982. Rio Grande National Forest: Conejos Wild and Scenic River Study – Final Environmental Impact Statement. Available in the project record at the Rio Grande National Forest Supervisor's Office in Monte Vista, Colorado.

USDA Forest Service. 1994. Rio Grande National Forest: Analysis of the Management Situation, July 1994. Available at the Rio Grande National Forest Supervisor's Office in Monte Vista, Colorado.

USDA Forest Service. 1996. Rio Grande National Forest: Revised Land and Resource Management Plan, 1996. Available at the Rio Grande National Forest Supervisor's Office in Monte Vista, Colorado.

USDA Forest Service and USDI National Park Service. 2009. Environmental Assessment, Baca Mountain Tract and Camino Chamisa Project. Prepared by Rio Grande National Forest and Great Sand Dunes National Park and Preserve. Accessed April 17, 2017, at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd508050.pdf

# Appendix C. Timber Suitability and Analysis

## Lands that May be Suited for Timber Production

Lands that may be suited for timber production were determined using the criteria in the Land Management Planning Handbook FSH 1909.12 Chapter 60. These areas and associated acreage were determined by starting with the total area of the Rio Grande National Forest and removing areas that are not suited for timber production, listed below:

- In-holdings
- Level 2 through 5 roads
- Lands not suited for timber production because timber production is prohibited, or the lands are withdrawn from timber production:
  - Wilderness areas
  - Eligible wild rivers
  - Colorado roadless areas
  - Research natural areas
- Lands on which technology to harvest timber is not currently available without causing irreversible damage:
  - Certain soil map units having “high mass movement potential” were removed due to this criteria. The criteria differed based on geographic area.
    - In the Sangre de Cristo range, the following Soil Resource Inventory codes were removed: 410S, 605Y, 625S, 670S, 704S, 835X.
    - On the west side (everywhere except the Sangre de Cristo range), soils were removed using a field called mass movement potential, with the exception of those polygons in the Cumbres area that have a Soil Resource Inventory of 139 or 151.
    - Note: In the 2000 amendment, Soil Types 460 and 750M were removed in only particular locations. This was not done because the 460 code is no longer used and because the locations where 750M was unsuitable had already been removed in prior steps.
- Lands on which there is no reasonable assurance that lands can be adequately restocked within 5 years of final regeneration harvest:
  - Elevations above 11,000 feet with south and southwest aspects
  - Elevations below 9,500 feet with south and southwest aspects
  - Areas with greater than 33 percent rock
- Land that is not Forest land
  - Areas with less than 10 percent canopy cover of trees were removed in this step. Areas that were formerly occupied by trees but with low canopy cover due to recent disturbance were not removed if tree species were regenerating.
- Areas with nonindustrial species, such as limber pine, bristlecone pine, pinyon, and juniper.

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 161 of 422

- True riparian areas (defined as an FSVeg spatial local type of RIP (riparian) and cover type of grass, forb, or cottonwood).

The final area considered *may be suitable* for timber production is 499,936 acres.

### Sustained Yield Limit Calculations

The sustained yield limit (SYL) is the amount of timber that can be produced on all lands that *may be suitable* for timber production, assuming all of these lands were managed to produce timber without considering other multiple uses or fiscal or organizational capability. The sustained yield limit was calculated using the Forest Vegetation Simulator (FVS, July 19, 2016, version), the Forest Service's national forest growth and yield model. Site information from the stand exams collected over the last 20 years was used for this analysis. Sustained yield limit was calculated by the following strata, with the number of stands used in parentheses:

- Spruce-fir (405 stands)
- Aspen (103 stands)
- Lodgepole pine (59 stands)
- Ponderosa pine (64 stands)
- Mixed conifer (243 stands)

Additional areas were also included separate from these main strata. This includes 1) 1M and 2S areas with low canopy cover (10 to 25 percent) that key out as grasslands or other non-timber types and which are not previously treed and 2) areas with low canopy cover (less than 25 percent) that have had recent disturbance but were previously treed.

Results from each stand were averaged together to get strata averages.

The management system, rotation age/entry interval, and associated harvest volume (cubic feet per acre) that were used to determine the sustained yield limit are listed in Table 22.

**Table 22. Assumptions used for the sustained yield limit calculation**

| Strata | Management System | Rotation Age / Entry Interval (years) | Acres of May Be Suitable Lands | Harvest Volume (cubic feet/acre) |
|---|---|---|---|---|
| Spruce-fir | Uneven aged – Group Selection | 160 | 165,756 | 2,932 |
| Lodgepole pine | Even aged – Clearcut | 120 | 22,198 | 2,697 |
| Aspen | Even aged – Clearcut | 120 | 114,979 | 2,178 |
| Mixed conifer | Even aged – Shelterwood | 140 | 106,807 | 1,569 |
| Ponderosa pine | Uneven aged – Individual Tree Selection | 30 | 18,542 | 400 |
| Other - 1M and 2S | | 200 | 20,211 | 500 |
| Other – timber | | 200 | 51,388 | 1,000 |

| Strata | Management System | Rotation Age / Entry Interval (years) | Acres of May Be Suitable Lands | Harvest Volume (cubic feet/acre) |
|---|---|---|---|---|
| Other – Rock – Bare Soil | -- | -- | 55 | 0 |

Numerous adjustments were made in Forest vegetation simulations to determine the appropriate harvest volume. These adjustments included factoring in defect, using local merchantability specifications, adjusting the stand density maximum values, calibrating tree growth based on collected tree growth data, and capping tree size based on observed tree sizes. Mortality due to insects and disease, such as spruce beetle, spruce budworm, Douglas-fir beetle, mountain pine beetle and/or engraver beetles, and tent caterpillar, aspen disease, and wood borers was included. Additional details on Forest vegetation simulation assumptions are available on request.

The estimated sustained yield limit is 7,374,937 cubic feet per year or 73,749 CCF per year.

### Lands that Are Suited for Timber Production

The land suited for timber production under each alternative was defined using the criteria below. Starting with the *may be suitable* timber areas, the following areas were removed because timber production is not compatible with the desired conditions and objectives for these areas:

- Recommended wilderness, research natural areas, and wild rivers for the specific alternative
- National Scenic and Historic Trails – Continental Divide National Scenic Trail and Old Spanish Trail, including a one-half-mile corridor on each side of the trail
- National Recreation Trails – Lost Fork and West Lost Fork, including a one-half-mile corridor on each side of the trail
- Scenic rivers
- Current and proposed special interest areas
- Ski-based resorts
- Backcountry areas in any alternatives that have this.

Two main timber suitability changes from the 1996 Rio Grande Revised Land and Resource Management Plan pertain to the Grassland Resource Production areas (Management Area 6.6) and Bighorn Sheep management areas. The Grassland Resource Production areas are being considered suitable for timber production, a change from the 1996 plan, where they were not suitable. In addition, most, but not all, of the Bighorn Sheep management areas in the 1996 plan were merged into the Big Game Winter Range management area (Management Area 5.41) and are now considered suitable for timber production as a result. The suitable timber base is approximately 471,896 acres.

All areas of the suitable timber base were included because timber production is allowed and is consistent with the desired conditions and objectives for the area. However, some inclusions in the suitable timber base may not be currently feasible for timber production. This includes areas that are very difficult to reach (either because of distance or because they lack an appropriate

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 163 of 422

transportation system), areas that would require helicopter logging, cable yarding, and areas that are extremely isolated.

Maps of the areas that are suitable for timber production under each alternative are contained on the external drive of maps located in the back of the document.

Rvsd Plan - 00000997

# Appendix D. Species of Conservation Concern Presence and Concern for Persistence

## Background

The 2012 Planning Rule and Forest Service Handbook 1909.12, Chapter 20, requires that species of conservation concern are identified for the planning area. More detailed analysis of these species is contained in Chapter 3 of the draft environmental impact statement for the forest plan. The 2012 Planning Rule requires the Forest Service to consider species that are known to occur in the planning area and that are established or are becoming established. We recognize that in practice, data on rare and declining species is often variable and incomplete, which complicates making confident presence/absence conclusions and introduces some potential risk for species not further considered for species of conservation concern status (or removing a species from the list).

For the purposes of "known to occur," we have elected to require a record for a species on the planning unit to qualify for species of conservation concern status. Species that exist close to the planning area but that have not been recorded on the planning area are not considered to be known to occur on the planning unit. Species that are thought to be present in the plan area but that have not been documented there are also not considered as known to occur. The species must be documented on National Forest System lands within the boundary of the Forest. Species identified as Forest species of conservation concern and rationale for inclusion are contained in Table 23. All information pertains to the planning area.

The 2012 Planning Rule does not require the agency to consider those that are only transient or accidental, or that are well outside the existing range of the species. Only species that are considered established or are becoming established can be species of conservation concern.

An overview for each species has been prepared and is available on the Forest's website. For each species, the overview considers:

- Status
- Taxonomy
- Distribution, abundance, and trend in the planning area
- A brief description of the natural history and key ecosystem functions
- Overview of ecological conditions necessary for the recovery of federally listed threatened and endangered species, conservation of proposed and candidate species, and maintenance of viable populations of species of conservation concern
- Threats and other risk factors.

Several criteria can be used to determine if a species is established. For plants, "established" means that it has roots in the ground or is otherwise attached to a substrate in the planning area, or has viable seeds in the seed bank produced by a plant that grew in the planning area in the last 20 years or so. Seeds do not remain viable forever, at least not in a naturalistic outdoor setting; the presence of viable seeds is generally an indication that the plants that produced the seeds were alive no more than a few decades ago.

For wildlife species, the determination of what is "established" is less clear. Reproduction by animals on the planning unit would certainly be considered a sign of that species being established. Frequent presence on the Forest, even if the animal breeds elsewhere, would also be considered a sign of being established. A single record for a species in the planning area may or may not qualify it for species of conservation concern status, depending on the overall context of the available information for that species when considering the record.

Occurrence data have been collected from multiple sources, including the Colorado Natural Heritage Program database (continually updated, the Forest Service acquires an updated copy once a year), herbarium records, mist-netting, sight and songbird surveys, and specialist reports.

Information from more detailed assessments and other sources used in determining eligibility for status as a species of conservation concern is summarized in Table 23 and Table 24. Links are provided in digital versions of the tables to take readers to overview assessments that are available on the Forest website. Information contained below applies to the Forest unless stated otherwise.

References for this content are contained in the *References Cited* section of the *Final Environmental Impact Statement* or in the species overviews that are linked below.

Plan components associated with the identified species of conservation concern (Table 25) are listed as a plan component crosswalk.

**Table 23. Current species of conservation concern and evaluation criteria**

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Invertebrates | Western bumblebee *Bombus occidentalis* | Located in 2016 by Rio Grande NF and USFS Rocky Mountain Region staff members during botany surveys. | This species has undergone a severe, range-wide population decline over the past decade, estimated at 40-90 percent. (Cameron et al. 2011) The population on the Forest appears to have mirrored this decline, which is on-going. The U.S. Fish and Wildlife Service currently has this species under review for possible listing under Endangered Species Act. The subspecies *occidentalis* found in the Rocky Mountain Region has declined about 70-99 percent since the late 1990s. The main cause of declines is thought to be the effects of a microsporidian *Nosema bombi* and an imported protozoan parasite from Europe. Other causes of decline include land use changes and habitat loss, changes in nectar flora, grazing, poorly timed fire in suitable nesting habitat, changes to temperature and precipitation regimes, competition with honeybees, and effects of pesticides especially persistent neonicotinoids. All of these threats occur. |
| Invertebrates | White-veined arctic butterfly *Oeneis bore* | Two records on the Forest from 2004, one in Hinsdale County and one in Saguache County. Records verified by USGS Northern Prairie Wildlife Research Center. One record from 1996. | As with many tundra relict species, changes in temperature and precipitation regimes could be a threat, as temperatures warm, species can move north or uphill to cooler refuges. In the case of species that exist on tundra in the southern Rockies, moving uphill is not an option as local populations already only survive on mountain tops. It is possible that warmer temperatures could lead to a loss of nectar plants to the butterfly, or the timing of the nectar bloom is changed relative to the life history needs of *O. bore.* Climate change vulnerability assessments in the vicinity of the Forest note that the white-veined arctic could be lost. |
| Amphibians | Boreal toad *Anaxyrus boreas* | Boreal toads have been reported at 10 sites in the past 20 years with the most recent observations occurring in 2014. | Primary localized threats on the Forest involve chytrid fungus with four of five known sites testing positive. Other local concerns involve water and air quality factors, nonnative species, recreation management and perhaps fire and timber management in localized areas. Climate change vulnerability assessments for areas surrounding the Forest have determined that this species is "highly vulnerable" to negative impacts from changes in temperature are precipitation regimes. |
| Fish | Rio Grande chub *Gila pandora* | Present in three stream segments; surveys by Colorado State University | The primary threats to this species include reduction of stream flows, increased sediment loads, and competition with and predation by nonnative fish. The limited remaining habitat for this species also renders the species at risk from stochastic events. NatureServe ranks this species as "Critically Imperiled" and Colorado Parks and Wildlife lists the species as "Tier 1, Species of Greatest Conservation Need". Currently under review by the U.S. Fish and Wildlife Service for listing under the Endangered Species Act. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Fish | Rio Grande cutthroat trout *Oncorhynchus clarkii virginalis* | Present in 27 stream segments and 2 lakes. | Some recorded presence contradicts dramatic decline over its historic range that is now limited to small, isolated populations in the upper Rio Grande drainage in Colorado. Many of these populations are not self-sustaining and very vulnerable to habitat degradation from a variety of causes, competition and hybridization with nonnatives, over-utilization, and stochastic events. The Climate Change Vulnerability Assessment for the Colorado Bureau of Land Management described this species as having greatly increased vulnerability in its physiological, thermal, and hydrological niches due to potential changes in temperature and precipitation patterns. This species is wholly dependent upon human management to survive. Under current conditions, if management activities were to cease, the subspecies would be expected to resume a declining trend as a result of invasion of populations by nonnative salmonids, stochastic environmental events, whirling disease, and the demographic and genetic factors associated with small, isolated populations (Pritchard and Cowley 2006). Species is ranked by Colorado Parks and Wildlife as Species of Greatest Conservation Need Tier 1. |
| Fish | Rio Grande sucker *Catostomus plebeius* | Currently known from nine stream segments. | Competition with and predation by nonnative species are extensive threats to the health and persistence of Rio Grande sucker populations. Nonnative predators include northern pike and brown trout. The introduced white sucker tends to be well adapted to a variety of degraded environmental conditions, allowing it a competitive advantage on a spatial or temporal scale over the Rio Grande sucker. The larger white sucker competes with Rio Grande sucker for available food sources (periphyton and macroinvertebrates), and also has the ability to hybridize with Rio Grande sucker (Rees and Miller 2005). |
| Birds | Boreal owl *Aegolius funereus* | Eleven records in the past 20 years. | Boreal owls are threatened by loss of nesting habitat and changes in prey base resulting from substantially beetle killed spruce-fir habitat. Resulting in a reduction of closed canopy habitat available. Dramatic change (90 percent) in spruce-fir landscape conditions suggest potential declining habitat trend and species persistence.<br>Other risk factors that may affect species density and distribution are likely to include large-scale stand replacement fire, and large-scale insect outbreaks.<br>The Gunnison Basin Climate Change Vulnerability Assessment indicates that this species is "Highly Vulnerable" to changes resulting from changes in temperature and precipitation regimes. Colorado Natural Heritage Program S2 (Imperiled), Colorado Parks and Wildlife Species of Greatest Conservation Need Tier 2. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Birds | Brewer's sparrow *Spizella breweri* | Ten records in the past 10 years, most recently in 2014. | Rangewide concerns for substantial declines in sagebrush and mountain shrub habitats. The primary concern regarding the persistence of Brewer's sparrow is the continued decline of the species numbers in the area surrounding the Forest as well as pinyon juniper encroachment in the limited suitable sagebrush habitat. Trend estimates show significant decreases in relative abundance from 1966 to 2002. Detection frequencies during this period on routes in southern and eastern Colorado declined. Sauer et al. (2011) report significant declining trends of this species in the Southern Rockies/Colorado Plateau for the period 1966-2010. In addition, the Climate Change Vulnerability Assessment for the Colorado Bureau of Land Management shows that the species may experience a "Greatly Increased" vulnerability" due to the impacts that changes in temperature and precipitation regimes may have on the species that influence the habitat features required by Brewer's sparrow. |
| Birds | Flammulated owl *Otus flammeolus* | Sixty-five records in the past 20 years, the most recent observations in 2014. | Flammulated owls are threatened by loss of suitable nesting habitat. Replacement of open, old-growth ponderosa pine and mixed conifer forest with younger, high-density vegetation is considered detrimental to this species. Immediate threats include the loss of remaining areas of open, mature forest habitat due to departure from historic fire regimes and landscape scale disturbances such as stand replacement fire and bug infestations. |
| Birds | Northern goshawk *Accipiter gentiles* | As of 2015, at least 15 known active nesting territories, 3 historic territories, and 2 other potential territories. | Approximately 90 percent of the species habitat in the Southern Rockies is found on National Forest System lands. This species has experienced a decline in active nests over time. The loss of large nest trees in spruce-fir habitat is correlated with the impacts of beetles. A recent landscape study conducted in the San Juan Mountains of Colorado suggests substantial changes in landscape structure and fragmentation of mature forest have occurred in this area between 1950 and 1993. Many factors contribute to the changed condition including fire exclusion and maturing stand conditions in ponderosa pine. If this trend is representative of regional trends, goshawk habitat is probably declining in Region 2 (Kennedy 2003). Increase in younger tree age classes and loss of older trees associated with beetle kill are also a concern. Extensive habitat changes due to impacts of the bark beetle raises questions about long-term persistence on the forest and surrounding area. Detections and nest territory occupancy has declined in recent years based on project work and monitoring. |
| Bird | Olive-sided flycatcher *Contopus cooperi* | 30 records | The concern for persistence of this species is based on a decline rangewide and forestwide. This species has experienced at least a 50 percent decline based on Rocky Mountain Bird Observatory/Bird Conservancy of the Rockies data. Similar patterns of decline are evident on the Forest based on results of local Breeding Bird Survey results over the past decade. Primary species habitat on the Forest (spruce-fir) has experienced a 90 percent decline. |
| Birds | Peregrine falcon *Falco peregrinus anatum* | Twenty-two records with at least 12 eyries identified, of which 6 are active eyries, 5 are recent or historic eyries, and 1 is potential. | Local eyrie occupancy is declining. Delisted population is still monitored by the USFWS. Recovery of this species in other areas does not appear to be mirrored on the Forest. Stochastic impacts from recreational climbing have potential to cause nesting failure. Due to the small numbers of this species forestwide, even a small number of failed nests could result in the extirpation of the species. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Birds | Southern White-tailed ptarmigan *Lagopus leucurus altipetens* | 26 records | In the Rocky Mountains, approximately 95 percent of occupied ptarmigan habitats are on federal lands, 85 percent of which are National Forest System lands in Colorado and Wyoming. Region 2 populations are isolated from nearest northerly populations by long distances. As with many tundra relict species, changes in temperature and precipitation regimes could be a threat, as temperatures warm, species can move north or uphill to cooler refuges. In the case of species that exist on tundra in the southern Rockies, moving uphill is not an option as local populations already only survive on mountain tops. Warmer temperatures could lead to a loss of alpine tundra on the Forest. In this case, the Southern white-tailed ptarmigan could be lost from the Forest. Climate change vulnerability assessments for areas surrounding the Forest have determined that this species is "Highly Vulnerable" to negative impacts from changes in temperature are precipitation regimes. The species is under a 12-month review for possible Endangered Species Act listing by the U.S. Fish and Wildlife Service due to concerns for the present or threatened destruction, modification, or curtailment of the species' habitat or range due to changes to temperature and precipitation regimes. (Review is still ongoing as of May 16, 2017); State Tier 1 Species of Greatest Conservation Need. |
| Mammals | American marten *Martes americana* | Nine records | Marten is a closed canopy species therefore the 90 percent mortality in spruce-fir, due to beetle kill, creates a concern. This change in suitable habitat, including related declines in associated prey species such as the red squirrel as documented by Colorado Parks and Wildlife (Ivan 2017), creates a persistence concern for the species. |
| Mammals | Fringed myotis *Myotis thysanodes* | Roost site records include an underground mine occurring at 8,941 feet elevation. Acoustic surveys have positively identified the species at a low-elevation ponderosa pine stand in the Hot Creek RNA in 2013. | Concern for long-term persistence of this species stems from white-nose syndrome. Although not yet detected within Colorado, the disease continues to spread west. The agency has measures in place to protect bat roosts and maternity sites from white-nose syndrome, but it remains possible for the disease to infect colonies despite these measures. Based on patterns occurring elsewhere a loss of 80 to 90 percent of the affected bat species could be realized which includes the potential loss of entire colonies. Protection and maintenance of roost sites is also a potential issue. Since only one colony occurs on the Forest, extirpation remains possible. In addition, the Climate Change Vulnerability Assessment for the Colorado Bureau of Land Management suggests that fringed myotis may experience a "slight Increase" in vulnerability due to changes in its' hydrological niche and physical habitat due to changes in temperature regimes and precipitation patterns. |
| Mammals | Gunnison's prairie dog *Cynomys gunnisoni* | Eight known records in two general areas. | The persistence concern for this species is sylvatic plague, which often wipes out most if not all of infected colonies and often involving much larger populations than found on the Forest. |
| Mammals | Northern pocket gopher *Thomomys talpoides agrestis* | Confirmed presence of the vulnerable *agrestis* subspecies (CNHP 2006) | Stochastic human or natural events could extirpate this species due to the very small size of the area occupied by this subspecies. The subspecies is also very rare across its range, which is limited to the San Luis Valley (endemic). |
| Mammals | Plains pocket mouse *Perognathus flavescens* | Two recent records (CNHP) | The concern for persistence is due to the limited habitat and very small area occupied by the species. Due to this small size, stochastic natural or human caused events could extirpate this species. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Mammals | River otter<br>*Lontra canadensis* | Records from 2004 and 2010 | Otters are threatened with extirpation mostly because they are already uncommon, and as such they are susceptible to stochastic events and human harassment. Relatively recent records indicate otters may be recolonizing the valley after an extended absence, perhaps stimulated by state recovery efforts. Opportunities exist to support that re-establishment through ongoing special habitat management attention. |

| | | | |
|---|---|---|---|
| Mammals | Rocky mountain bighorn sheep *Ovis canadensis canadensis* | Known to occur | Bighorn sheep populations have declined in Western North America from an estimated 500,000 at the onset of European settlement to an estimated 15,000 to 20,000 by 1960. Numbers have increased since 1960 due to population translocations and augmentations and other conservation efforts. The distribution of bighorn sheep is naturally fragmented due to the patchy nature of preferred habitats, and bighorn sheep typically make seasonal movements to alpine habitats in summer and lower elevation habitats or south-facing slopes during the winter period.<br>The primary risk to persistence on the Forest is pathogen transmission between domestic sheep and bighorn sheep, and subsequent disease outbreaks and population impacts. Current and expected future domestic sheep grazing includes some risk of contact between domestic sheep and bighorn sheep which can result in respiratory disease outbreaks in bighorn sheep. Respiratory disease in bighorn sheep can result in all age die-offs which can have lasting impacts on populations through suppressed lamb recruitment following disease outbreaks. In-breeding, loss of alpine habitat due to changing temperature and precipitation patterns, and unintentional human harassment can also represent added stressors further impacting persistence of local herds and populations.<br>Despite the risks to bighorn sheep from domestic sheep, Forest bighorn sheep populations have persisted for the past several decades. Colorado Parks and Wildlife has identified 12 Game Management Units that occur entirely or partially on the Forest. Several herds cross administrative boundaries and occur on adjacent public or private lands during part of their life cycles. Overall population estimates for the 12 herds total approximately 1,100 individuals. The total population estimates have fluctuated from approximately 1,000 to 1,500 animals during the past 30 years. Population die-offs due to disease have been observed or suspected in several herds during this time, and some herds have been augmented via population translocations. Currently, several bighorn sheep herds are still recovering from die-off events in the 1990's. The presence of some type of respiratory pathogen has been confirmed in 8 herds. Most herds are currently hunted with regulations and population objectives established by Colorado Parks and Wildlife.<br>Among the herds whose Game Management Unit boundaries overlap the Forest, three occur in areas where domestic sheep grazing is not currently permitted and is not anticipated in the foreseeable future. These herds (S08, S09, and S68, though S68) occur in the Sangre de Cristo mountains on the eastern Forest boundary and account for an estimated 40 percent of the forestwide bighorn sheep population. While long-distance movements from other herds could potentially move pathogens into these herds, this is a relatively low likelihood concern and these herds are considered secure based on management actions under Forest authority.<br>Other Forest herds are at some risk of contact with domestic sheep and transmission of pathogens is possible. Despite the risk to herds outside the Sangre de Cristo Mountains, bighorn sheep are likely to persist due to the strongholds in the Sangre de Cristo mountains and the absence of the domestic sheep grazing, the main threat to persistence.<br>Population management by Colorado Parks and Wildlife will contribute to the persistence of bighorn sheep on the planning unit through establishing population objectives, managing hunting opportunities and potentially through population augmentation via translocations. Lastly, through collaborative monitoring with Colorado Parks and Wildlife and other partners |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| | | | will help provide information on the effectiveness of management actions and help identify potential changes in management needed to support the persistence of bighorn sheep. |
| Mammals | Townsend's big-eared bat *Corynorhinus townsendii townsendii* | Eleven records in the past 20 years. | Concern for the persistence stems from white-nose syndrome. Although not yet detected within Colorado, the disease continues to spread west. The agency has measures in place to protect bat roost and maternity sites from white-nose syndrome, but it remains possible for the disease to infect colonies despite these measures. An 80 to 90 percent loss of the species could be realized, including the loss of entire colonies. In addition, Climate change vulnerability assessments for the state indicate that this species may experience a slight increase in vulnerability due to changes in its physiological hydrological niche and physical habitat due to changes in temperature regimes and precipitation patterns. |
| Plants | *Black Canyon gilia Aliciella penstemonoides* | Known from six occurrences. Last observed in 1998. | This species is found in rocky areas with a spruce-fir overstory, the approximately 90 percent mortality of spruce is a threat to this species because of the resulting loss or alteration of this species' habitat from the loss of that canopy cover. Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is moderately vulnerable to negative impacts from changes in temperature and precipitation regimes, particularly because there are limits to dispersal. Forest occurrences are small and isolated populations which are susceptible to genetic drift and stochastic events. |
| Plants | *Stonecrop gilia Aliciella sedifolia* | This G1 species is known from two locations. Last observed in 2016. Of the entire global distribution of this species, two of the three occurrences are on the Forest. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes because of the loss of alpine habitat. Of the entire global distribution of this species, two of the three occurrences are on the Forest. |
| Plants | *Brandegee milkvetch Astragalus brandegeei* | Known from two occurrences. Both observed in 1986, aerial imagery indicates no evidence that the bristlecone habitat at these two locations has changed, thus there is no evidence to assume that the species is no longer present. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the bristlecone pine habitat of this species is highly vulnerable to negative impacts from changes in temperature and precipitation regimes across Colorado. Isolated and small Forest populations are susceptible to threats from genetic drift and stochastic events. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | Ripley's milkvetch *Astragalus ripleyi* | There are 22 known occurrences of this species last observed in 2016. The entire global distribution of this species is on or near the Forest. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes. This vulnerability is due to likely reductions in suitable habitat as well as alterations in the disturbance regime and its restriction to an uncommon geology. |
| Plants | Northern moonwort *Botrychium pinnatum* | Known from three occurrences, most recent observation in 2003. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is moderately vulnerable to negative impacts from changes in temperature and precipitation regimes that would result in the loss of the alpine portion of this species' habitat. Documented threats to this species include disturbance from vegetation management as well as sedimentation from roads. This species also occurs in spruce-fir and is threatened by the loss or alteration of that habitat from over story mortality. Aerial imagery from 2016 indicates that the canopy cover of spruce at all 3 of the occurrences of this species have been lost. One of the occurrences consists of a single individual while the largest is only 75. Small and Isolated populations are susceptible to genetic drift and stochastic events. |
| Plants | Least moonwort *Botrychium simplex* | Known from a single occurrence. Last observation in 1995. Aerial imagery shows that the habitat at this occurrence is unchanged since 1995 and thus there is no evidence to assume the species is no longer present. | This species is found in spruce-fir habitat which has undergone a 90 percent mortality event resulting in a loss or alteration of this species' habitat. Aerial imagery from 2016 indicates that the canopy cover of spruce at this species' single occurrence has been lost. Climate change vulnerability assessments for areas surrounding the Forest indicate that the spruce-fir, fen, and montane riparian habitats are moderately threatened by changes in temperature and precipitation regimes. The single Forest occurrence consists of only 17 individuals. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Downy Indian paintbrush *Castilleja puberula* | This G2 species is known from three locations, the most recent observation is 2006. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes, has a limited dispersal ability, is dependent on snow and ice, and has migration barriers. Additionally, climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. One of the observations on the Forest is a few individuals scattered over a hundred acres. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | Dwarf alpine hawksbeard *Crepis nana* | Known from three locations, the most recent observation in 1998. | This species is documented to be negatively impacted by domestic livestock grazing. |
| Plants | James' cryptantha *Cryptantha cinerea var. pustulosa* | This species observed at two locations in2017. | Threats to the species that substantiate concern for persistence include managed and unmanaged off-highway vehicle use. |
| Plants | Weber's catseye *Cryptantha weberi* | This species is known from a single observation in 2005. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. Small and Isolated populations are susceptible to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Slender rock-brake *Cryptogramma stelleri* | Known from a single occurrence. Last observation in 1988. | This species is found in spruce-fir habitat which has undergone a 90 percent mortality event resulting in a loss or alteration of this species' habitat. Aerial imagery from 2016 indicates that the canopy cover of spruce at the single occurrence of this species has been lost. Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes that may alter the cool moist dripping spring cliff habitat of this species. There are dispersal and migratory barriers for this species. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Mountain bladder fern *Cystopteris montana* | Known from a single occurrence. Last observation in 1986. | This species is found in spruce-fir habitat which has undergone a 90 percent mortality event resulting in a loss or alteration of this species' habitat. Aerial imagery from 2016 indicates that the canopy cover of spruce at the single occurrence of this species has been lost. Climate change vulnerability assessments for areas surrounding the Forest indicate that the spruce-fir habitat of this species is moderately threatened by changes in temperature and precipitation regimes. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Colorado larkspur *Delphinium alpestre* | There are three known occurrences of this G2 species, the most recent being in 1998. | Vulnerability Assessments for areas surrounding the Forest assessed the alpine habitat of this species and determined that it is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is threatened by the loss of its alpine habitat. Small and Isolated populations are susceptible to threats from genetic drift and stochastic events. Because small and isolated populations only occur in a certain area and have a smaller population, they are more susceptible to loss. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | San Juan draba *Draba graminea* | This G2 species is known from three locations and the most recent observation is from 2013. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes that may alter the alpine habitat of this species. The assessments indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is threatened by the loss of its alpine habitat. The species is reliant on ice and snow. There are dispersal and migratory barriers for this species. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. |
| Plants | Gray's draba *Draba grayana* | This G2 species is known from two locations and the most recent observation is from 1985. Aerial imagery indicates that the alpine scree slope where this species was observed is unaltered and thus there is no evidence to assume the species is no longer present. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is threatened by the loss of its alpine habitat. Additional threats to this species include recreation. The occurrences are small and isolated and are thus susceptible to threats from genetic drift and stochastic events. |
| Plants | Smith's draba *Draba smithii* | G2 Species. There are 12 occurrences the most recent observation was in 2002. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. These assessments indicate that this species is extremely vulnerable to negative impacts from changes in seasonal precipitation as well as threats from energy development, its restriction to specific geologic substrates, dispersal barriers, and migration barriers. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. |
| Plants | Colorado Divide whitlow-grass *Draba streptobrachia* | Species is known from four occurrences; the most recent observation is from 2002. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. The species is reliant on ice and snow. There are dispersal and migratory barriers for this species. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | Philadelphia fleabane *Erigeron philadelphicus* | Known from a single observation in 1990. Aerial imagery indicates that the wet meadow habitat where this species was observed is unaltered and thus there is no evidence to assume the species is no longer present. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the low elevation riparian and wetland habitat of this species is highly susceptible to changes in temperature and precipitation regimes. Small and isolated populations are susceptible to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Many-flowered gilia *Ipomopsis multiflora* | Known from a single occurrence in 1986. Analysis of aerial imagery indicates that the open woodland habitat of this occurrence is unaltered and thus there is no evidence to assume the species is no longer present. | The single occurrence of this species is threatened by invasive plant species and impacts from the management of those invaders. Small and isolated populations are susceptible to threats from stochastic events and genetic drift. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Spiny-spored quillwort *Isoetes tenella* | Known from four occurrences. The most recent was from 2000. | This species and its aquatic and fen habitat are threatened by alterations in flow from development and diversion. Similarly, climate change vulnerability assessments for areas surrounding the Forest indicate that the aquatic and fen habitat of this species is moderately vulnerable to changes in temperature and precipitation regimes. The occurrences of this species on the Forest are small and isolated which are susceptible to threats from genetic drift and stochastic events. |
| Plants | Colorado woodrush *Luzula subcapitata* | Known from three occurrences, the most recent in 2004. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species and its fen habitat are extremely vulnerable to negative impacts from changes in temperature and precipitation. This species lives on the margins of fens and riparian habitats which are susceptible to negative impacts from small changes in hydrology. The occurrences are small and isolated which are susceptible to threats from genetic drift and stochastic events |
| Plants | Colorado tansy aster *Machaeranthera coloradoensis* | Known from four occurrences. The most recent was from 1997. | Threats include recreation and road construction/maintenance, pipeline construction, and construction of radio towers. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | House's sandwort *Minuartia macrantha* | Species was collected in 2003. The single occurrence was from alpine habitat just east of Stony Pass. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes. These assessments indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and thus this species is threatened by the loss of its alpine habitat. Small and isolated populations are susceptible to genetic drift and loss from stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Parry's crazy-weed *Oxytropis parryi* | Species was collected in 1998 and 1999, on rocky slopes north of Saguache and at the head of Raspberry Canyon. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. Small and isolated populations are susceptible to negative impacts from genetic drift and stochastic events. |
| Plants | West silver bladderpod *Physaria scrotiformis* | Single known occurred, documented summer 2017. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. |
| Plants | Southern Rocky Mountain cinquefoil *Potentilla ambigens* | There are three occurrences of this species, the most recent observation is from 1998. | Threats to the species include recreation and trail use. Occurrences are less than 100 individuals. Small populations are susceptible to negative impacts from stochastic events, particularly species like this one that live close to rivers, streams, trails, and roads where these events are more likely. |
| Plants | Arizona willow *Salix arizonica* | G2 species found in a single location. Species was observed to be extant in 2016. | The single occurrence is documented to be threatened by livestock grazing, wildlife damage, and recreation. Climate change vulnerability assessments for areas surrounding the Forest indicate that the high elevation fen habitat of this species is also threatened by changes in temperature and precipitation resulting in changes in the hydrology. The single occurrence of Arizona willow is isolated from other occurrences of the species. Isolated populations are subject to negative impacts from genetic drift. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Tundra saxifrage *Saxifraga caespitosa ssp. monticola* | Known from a single occurrence. Documented in 1998. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. The occurrence is isolated from other populations of this species. Isolated populations are susceptible to negative impacts from genetic drift. Species with single occurrences have particular persistence concerns because a single event can remove the species. |

| Category | Species | Evidence of Occurrence | Substantial Concern About the Species Capability to Persist over the Long Term |
|---|---|---|---|
| Plants | King's campion *Silene kingii* | G2 species known from a single occurrence, documented in 2005. | Climate change vulnerability assessments for areas surrounding the Forest indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and thus this species is threatened by the loss of its alpine habitat. The occurrence is isolated from other populations of this species. Isolated populations are susceptible to negative impacts from genetic drift. Species with single occurrences have particular persistence concerns because a single event can remove the species entirely. |
| Plants | Fine bog-moss *Sphagnum angustifolium* | There is a single occurrence along Iron Creek in 2016. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species and its high elevation fen habitat are threatened by changes in temperature and precipitation regimes. The population is small and isolated, and small and isolated populations are subject to threats from genetic drift and stochastic events. Species with single occurrences have particular persistence concerns because a single event can remove the species. |
| Plants | Rothrock Townsend daisy *Townsendia rothrockii* | G2 species known from three occurrences. The species was known to be extant in 2016. | Climate change vulnerability assessments for areas surrounding the Forest indicate that this species is extremely vulnerable to negative impacts from changes in temperature and precipitation regimes, particularly because it is dependent on ice and snow. These assessments indicate that the alpine habitat of this species is considered to be highly vulnerable to negative impacts from changes in temperature and precipitation regimes in southwest Colorado and this species is thus threatened by the loss of its alpine habitat. Additionally, the occurrences are small and isolated. Small and isolated populations are subject to threats from genetic drift and stochastic events. |

**Table 24. Species considered early but after further review were not identified as species of conservation concern**

| Category | Species | Evidence of Occurrence | Rationale for Not Including the Species as Draft SCC |
|---|---|---|---|
| Amphibian | Leopard frog *Rana pipiens* | Not known to occur | Locally this is primarily a lower-elevation species. Limited, but historical occurrence on Forest. No known existing populations or occurrences. |
| Bird | Grasshopper sparrow *Ammodramus savannarum* | Not known to occur | Very limited occurrence in select locations in the San Luis Valley. Very limited, if any, potential habitat on Forest. |
| Bird | Sage sparrow *Amphispiza belli* | Known to occur | Limited suitable habitat on the Forest and most occurrence records are peripheral, with only one documented occurrence in 2004. Very limited ability to influence species through management actions. |
| Bird | Golden eagle *Aquila chrysaetos* | Known to occur | Associated with primarily low-elevation open grasslands with rocky outcrops. Appears to be secure, occupying these habitats where expected, and, in some cases, at relatively high densities (up to 7 nesting eagles at locations). Also continues to enjoy protections under the Bald and Golden Eagle Protection Act. |
| Bird | Burrowing owl *Athene cunicularia* | Not known to occur | No occurrence on Forest documented through continuous survey efforts, including high-use areas such as prairie dog colonies. |
| Bird | Juniper titmouse *Baeolophus griseus* | Known to occur | Global and state rankings suggest species is secure globally and locally. No known substantial conservation concern. |
| Bird | Ferruginous hawk *Buteo regalis* | Not known to occur | Limited nesting occurrences are restricted to the valley floor. Very little if any potential habitat. |
| Bird | Cassin's finch *Carpodacus cassinii* | Known to occur | Global and state rankings suggest species is secure globally and locally. No known substantial conservation concern. |
| Bird | Veery *Catharus fuscescens* | Known to occur | No reported occurrences under existing databases. Potential evidence of recent breeding at one location. Presence is considered peripheral. |
| Bird | Mountain plover *Charadrius montanus* | Not known to occur | No occurrence documented through continuous survey efforts, including high-use areas such as prairie dog colonies. |
| Bird | Northern harrier *Circus cyaneus* | Not known to occur | Nesting habitat and occurrences primarily restricted to the valley floor. The Forest has little potential habitat. |
| Bird | Black swift *Cypseloides niger* | Known to occur | Survey efforts suggest the population is stable and secure statewide and locally. No documented connection or concerns about effects of Forest uses and management as primary risk factors. Unique species that may warrant other occasional monitoring efforts. |
| Bird | Prairie falcon *Falco mexicanus* | Known to occur | No known substantial conservation concern. Distribution is widespread and rangewide populations are thought to be stable. Cliff and outcrop breeding habitat is unchanged and secure. |

| Category | Species | Evidence of Occurrence | Rationale for Not Including the Species as Draft SCC |
|---|---|---|---|
| Bird | Pinyon jay *Gymnorhinus cyanocephalus* | Known to occur | No known substantial conservation concern. Limited management activity in available habitat. Global and state rankings suggest the species is secure. |
| Bird | Bald eagle Haliaeetus leucocephalus | Known to occur | No breeding or wintering confirmed and no clear evidence of concern for persistence. Species continues to enjoy important protections under the Bald and Golden Eagle Protection Act. |
| Bird | Loggerhead shrike *Lanius ludovicianus* | Known to occur | Occurrence is peripheral. Very few documented occurrences. Very little suitable habitat. |
| Bird | Virginia's warbler *Leiothlypis virginiae* | Known to occur | Fairly common to abundant nesting inhabitant in western Colorado, limited occurrences. Global and state ranking suggest the species is secure. High dispersal capability. Shrubland habitats are limited in availability and stable on the Forest, no known substantial conservation concern. |
| Bird | Brown-capped rosy finch *Leucosticte australis* | Known to occur | Breeding habitat consists of cliffs, caves, and rock crevices in alpine and tundra habitats that is stable and secure. Some uncertainty about sensitivity of alpine habitat to changes to precipitation and temperature regimes. The species is fairly common. No known substantial conservation concern. |
| Bird | Lewis's woodpecker *Melanerpes lewis* | Known to occur | Occurrence is peripheral and primarily associated with lower elevation cottonwood systems such as those along the Alamosa and Conejos River drainages. There are very few documented observations over the past 20 years. Very little suitable habitat is available. |
| Bird | Band-tailed pigeon *Patagioenas fasciata* | Known to occur | Migratory species. Occurrence is sporadic and seasonal with no known nesting occurrence. |
| Invertebrate | Monarch butterfly *Danaus plexippus* | Not known to occur | Limited available habitat. |
| Invertebrate | Theano alpine *Erebia pawloskii* | Not known to occur | Globally secure, moderate concern statewide. Not known to occur. |
| Invertebrate | Colorado blue (butterfly) *Euphilotes rita coloradensis* | Not known to occur | Lower elevation, prairie species. Very limited habitat. |
| Invertebrate | Alberta Arctic *Oeneis alberta* | Known to occur | There are no records of this species occurrence. Bunchgrass habitat forestwide is not at risk. |
| Invertebrate | Gold-edge gem moth *Schinia avemensis* | Not known to occur | Lower elevation species, limited habitat. |
| Invertebrate | Great Basin silverspot *Speyeria nokomis nokomis* | Not known to occur | Lower elevation species, limited habitat. |

| Category | Species | Evidence of Occurrence | Rationale for Not Including the Species as Draft SCC |
|---|---|---|---|
| Mammal | Hoary bat *Lasiurus cinereus* | Known to occur | Individuals detected locally during acoustic bat surveys. Forest occupancy is limited with a 5 occurrences reported over the past 20 years. Potential habitat loss a concern due to the loss of spruce habitat due to the impacts of spruce beetle. Abundant aspen forest remains unaffected and available. Windfarms are a primary threat, but none occur or are planned. |
| Mammal | Southern red-backed vole *Myodes gapperi* | Known to occur | Global and state rankings suggest species is secure in Colorado and locally. No known substantial conservation concern. |
| Mammal | Little brown bat *Myotis lucifugus* | Known to occur | Has experienced substantial population declines in Eastern and Midwestern states affected by white-nose syndrome. White nose syndrome has not yet occurred in Colorado; therefore, there is currently no known substantial conservation concern. Plan components address regarding abandoned mine features for bat species prior to closure. |
| Mammal | Big free-tailed bat *Nyctinomops macrotis* | Known to occur | Occurrence is peripheral. Very few documented occurrences, no known breeding or roosting areas on. Very little suitable habitat. |
| Mammal | American pika *Ochotona princeps* | Known to occur | In Colorado, species remains common in available talus habitat. Quantity of talus habitats remains stable. May be some concerns for effects of changes in temperature and precipitation regimes to alpine habitats but uncertain at this time. No known substantial conservation concern locally although occasional monitoring may be warranted. |
| Mammal | Abert's squirrel *Sciurus aberti* | Known to occur | Widespread through the ponderosa pine zone. No known substantial conservation concern. |
| Mammal | Dwarf shrew *Sorex nanus* | Not known to occur | No occurrences or known habitat. |
| Mammal | Botta's pocket gopher *Thomomys bottae pervagus* | Not known to occur | Species considered secure locally. Limited available habitat. |
| Plant | Rydberg's golden columbine *Aquilegia chrysantha var. rydbergii* | Not known to occur | |
| Plant | Vierhapper's/Alpine aster *Aster alpinus var. vierhapperi* | Known to occur | Too long a time has passed since observation for species to be known to occur. |
| Plant | Violet milkvetch *Astragalus iodopetalus* | Not known to occur | |

| Category | Species | Evidence of Occurrence | Rationale for Not Including the Species as Draft SCC |
|---|---|---|---|
| Plant | Missouri milkvetch *Astragalus missouriensis var. humistratus* | Not known to occur | |
| Plant | Aztec milkvetch *Astragalus proximus* | Not known to occur | |
| Plant | Crandall's rockcress *Boechera crandallii* | Not known to occur | |
| Plant | Narrowleaf grapefern *Botrychium lineare* | Not known to occur | |
| Plant | Winding mariposa lily *Calochortus flexuosus* | Not known to occur | |
| Plant | Lesser tussock sedge *Carex diandra* | Not known to occur | |
| Plant | Mud sedge *Carex limosa* | Known to occur | Too long a time has passed since observation for species to be known to occur. |
| Plant | Slender spiderflower *Cleome multicaulis* | Not known to occur | |
| | | | |
| Plant | Lesser yellow lady's – slipper *Cypripedium parviflorum* | Not known to occur | |
| Plant | Wahatoya larkspur *Delphinium robustum* | Not known to occur | |
| Plant | Heil's tansy mustard *Descurainia kenheilii* | Not known to occur | |
| Plant | Stream orchid, giant helleborine *Epipactis gigantea* | Not known to occur | |
| Plant | Brandegee's buckwheat *Eriogonum brandegeei* | Not known to occur | |
| Plant | Colorado wild buckwheat *Eriogonum coloradense* | Not known to occur | |
| Plant | Whitebristle cottongrass *Eriophorum altaicum var. neogaeum* | Known to occur | No concern for persistence. |

| Category | Species | Evidence of Occurrence | Rationale for Not Including the Species as Draft SCC |
|---|---|---|---|
| Plant | Chamisso's cottongrass *Eriophorum chamissonis* | Not known to occur | |
| Plant | Slender cottongrass *Eriophorum gracile* | Not known to occur | |
| Plant | Bill's neoparrya *Neoparrya lithophila* | Known to occur | Present, no conservation concern due to stable populations that are largely free of threats. |
| Plant | Kotzebue's grass of Parnassus *Parnassia kotzebuei* | Not known to occur | |
| Plant | Degener's beardtongue *Penstemon degeneri* | Not known to occur | |
| Plant | Ice cold buttercup *Ranunculus karelinii* | Known to occur | Taxonomy issues make it difficult to judge the rarity of the species, as taxonomists are uncertain if this is a distinct species or part of a large, more common species. No state ranking because of taxonomic dispute. |
| Plant | Sageleaf willow *Salix candida* | Not known to occur | |
| Plant | Autumn willow *Salix serissima* | Not known to occur | |
| Plant | Weber's saw-wort *Saussurea weberi* | Not known to occur | |
| Plant | Pale blue-eyed grass *Sisyrinchium pallidum* | Not known to occur | |
| Plant | Baltic sphagnum *Sphagnum balticum* | Not known to occur | |
| Plant | Smooth Easter daisy *Townsendia glabella* | Not known to occur | |
| Plant | Lesser bladderwort *Utricularia minor* | Not known to occur | |
| Plant | New Mexico cliff fern *Woodsia neomexicana* | Known to occur | Occurrences are small and isolated and small and isolated populations are susceptible to negative impacts from genetic drift and stochastic events. However, this is not enough to substantiate a local concern for continued persistence. |
| Plant | Plummer's cliff fern *Woodsia plummerae* | Known to occur | Occurrences are small and isolated and small and isolated populations are susceptible to negative impacts from genetic drift and stochastic events. However, this is not enough to substantiate a local concern for continued persistence. |

**Table 25. Crosswalk of species of conservation concern plan components**

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| Invertebrates | Western bumblebee *Bombus occidentalis* | Western bumblebee requires maintenance of habitat at known and potential sites by protection from pesticide use, detrimental livestock grazing, and conifer encroachment. Habitat requirements for this species include the availability of nectar and pollen throughout the colony season (April – August) and a viability of underground nest sites and hibernacula. In addition, western bumblebee populations require habitats that are free from commercially raised pollinators to protect them from nonnative parasites. | G-SCC-1: To maintain ecological conditions to support a viable population of species of conservation concern insects and plants, minimize negative impacts to pollinators when applying pesticides. |
| Invertebrates | White-veined arctic butterfly *Oeneis bore* | This species is dependent on monocot grasses, sedges, and rushes growing on or near wet tundra bogs. It requires access to stable temperatures or refuge uphill; although in many cases locally, moving uphill is not an option as populations already only survive on mountain tops. | G-SCC-1: To maintain ecological conditions to support a viable population of species of conservation concern insects and plants, minimize negative impacts to pollinators when applying pesticides.<br>G-SCC-4: To maintain ecological conditions to support alpine-related species of conservation concern, avoid road construction and other permanent ground-disturbing activities within 100 feet of alpine fell and talus rock fields, and alpine bogs. |
| Amphibians | Boreal toad *Anaxyrus boreas* | Boreal toads require three main habitat components, all free from chytrid fungus: 1) shallow wetlands for breeding, 2) terrestrial habitats with vegetative cover for foraging, and 3) burrows for winter hibernation. Wetland habitats constitute primary and breeding habitats; however, boreal toads may be found in terrestrial habitats during dispersal to and from breeding sites. In Colorado, they are known to occur from 7,500 to 12,000 feet in elevation. | S-GDE-1: Do not authorize management actions that alter the hydrology of groundwater-dependent habitat features.<br>G-GDE-1: To maintain ecosystem diversity and function, design projects to avoid or mitigate negative impacts to the ecological services that groundwater-dependent ecosystems provide.<br>S-RMZ-1: Management activities may have short-term impacts (generally less than 5 years) to composition, function, and structure of riparian areas and fish habitat. Over the long term (generally greater than 20 years), projects shall not impair connectivity, composition, function, and structure.<br>G-RMZ-1: To maintain ecological integrity and connectivity, new system roads and infrastructure should not be constructed in the riparian management zone.<br>S-WA-1: Incorporate direction included in the National Core Best Management Practices and Watershed Conservation Practices Handbook, to develop project-specific best management practice prescriptions in project plans.<br>G-WA-1: Maintain or restore water quality by assuring that activities meet State of Colorado water quality standards. Management activities in watersheds where State of Colorado 303(d) listed impaired water bodies exist should |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | assist in achieving State water quality standards.<br>G-WA-2: Management actions should not cause long-term degradation to water resources, including lakes, streams, wetlands, and groundwater. Particular attention should be paid to public water supplies, sole source aquifers, and source water protection areas.<br>G-FISH-1: New surface diversions should provide passage for native and desired nonnative aquatic species to maintain connectivity except when barriers are needed to protect from undesired nonnative fish.<br>G-FISH-2: Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish and other wildlife.<br>G-MIN-1: Mining activities can be acknowledged when the activity does not cause substantial surface disturbance or unacceptable impacts to water quality or fish habitat. Aspects of operation will be contained in the notice of intent. A plan of operations will be required for any activities above the scope of a notice of intent. |
| Fish | Rio Grande chub<br>*Gila pandora* | Rio Grande Chub require pools of small to moderate size in perennial streams with a mix of cobble, gravel, and sand substrate. Habitat connectivity, a lack of nonnative piscivorous fish, habitat resiliency from drought and negative impacts from fire, stable water temperatures below 20 degrees Celsius, and streamflow are all critical elements that are needed to maintain viable populations of Rio Grande chub. | S-GDE-1: Do not alter the hydrology of groundwater-dependent habitat features.<br>G-GDE-1:Do not negatively impact the ecological services that groundwater-dependent ecosystems provide.<br>S-RMZ-1: Activities should limit impacts to composition, function, and structure of riparian and fish habitat to 5 years and no longer than 20 years.<br>G-RMZ-1: No new roads or infrastructure within the riparian management zones.<br>S-WA-1: Follow watershed Best Management Practices and Watershed Conservation Practices Handbook direction.<br>G-WA-1: Follow State of Colorado water quality standards; if waterbody is a 3030(d) waterbody, activities should assist in achieving State standards.<br>G-WA-2: Actions should not cause long-term damage to any water bodies.<br>G-MIN-1: Mining activities should not cause unacceptable impacts to water quality or fish habitat.<br>G-FISH-1: New surface diversions should provide passage to maintain connectivity except when barriers are needed to protect from undesired nonnative fish.<br>G-FISH-2: Newly constructed perennial stream crossings |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish.<br>G-FISH-3: Fisheries activity period maps should be consulted during project development and design, including recreational dredging. Date ranges associated with stream classes are identified. |
| Fish | Rio Grande cutthroat trout *Oncorhynchus clarkii virginalis* | Populations of Rio Grande cutthroat trout require protection from nonnative trout, introduced diseases, and habitat degradation of riparian areas and roads. Protection of Rio Grande cutthroat trout from both nonnative trout and disease can be achieved by isolating populations using migration barriers. In some cases, a sufficient natural or artificial barrier is present; otherwise, a barrier can be constructed. Aspects of habitat shown to be important for cutthroat trout include availability of cover and number of deep pools, availability of sediment-free spawning gravels and fry rearing habitat, and relatively warm summer water temperatures (13 degrees Celsius up to a 22-degree Celsius maximum). To ensure viability, expansion of existing Rio Grande cutthroat trout populations and establishment of new populations can be achieved by translocating wild or hatchery-produced fish into suitable habitat or by creating conditions that allow natural re-colonization. | S-GDE-1: Do not alter the hydrology of groundwater-dependent habitat features.<br>G-GDE-1: Do not negatively impact the ecological services that groundwater-dependent ecosystems provide.<br>S-RMZ-1: Activities should limit impacts to composition, function, and structure of riparian and fish habitat to 5 years and no longer than 20 years.<br>G-RMZ-1: No new roads or infrastructure within the riparian management zones.<br>S-WA-1: Follow watershed Best Management Practices and Watershed Conservation Practices Handbook direction.<br>G-WA-1: Follow State of Colorado water quality standards; if waterbody is a 3030(d) waterbody, activities should assist in achieving State standards.<br>G-WA-2: Actions should not cause long-term damage to any water bodies.<br>G-MIN-1: Mining activities should not cause unacceptable impacts to water quality or fish habitat.<br>G-FISH-1: New surface diversions should provide passage to maintain connectivity except where barriers are needed to protect from undesired nonnative fish.<br>G-FISH-2: Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish.<br>G-FISH-3: Fisheries activity period maps should be consulted during project development and design, including recreational dredging. Date ranges associated with stream classes are identified. |
| Fish | Rio Grande sucker *Catostomus plebeius* | Rio Grande sucker requires pools of small to moderate size in perennial streams with a mix of cobble, gravel, and sand substrate. Habitat connectivity, lack of nonnative fish, drought and fire protection, stable water temperatures below 25 degrees Celsius, and streamflow are all critical for preservation of Rio Grande sucker populations. | S-GDE-1: Do not alter the hydrology of groundwater-dependent habitat features.<br>G-GDE-1:Do not negatively impact the ecological services that groundwater-dependent ecosystems provide.<br>S-RMZ-1: Activities should limit impacts to composition, function, and structure of riparian and fish habitat to 5 years and no longer than 20 years.<br>G-RMZ-1: No new roads or infrastructure within the riparian |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | management zones.<br>S-WA-1: Follow watershed Best Management Practices and Watershed Conservation Practices Handbook direction.<br>G-WA-1: Follow State of Colorado water quality standards; if waterbody is a 3030(d) waterbody, activities should assist in achieving State standards<br>G-WA-2: Actions should not cause long-term damage to any water bodies<br>G-MIN-1: Mining activities should not cause unacceptable impacts to water quality or fish habitat.<br>G-FISH-1: New surface diversions should provide passage to maintain connectivity except when barriers are needed to protect from undesired nonnative fish.<br>G-FISH-2: Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish.<br>G-FISH-3: Fisheries activity period maps should be consulted during project development and design, including recreational dredging. Date ranges associated with stream classes are identified. |
| Birds | Boreal owl<br>*Aegolius funereus* | Boreal owls require access to nesting cavities in snags and primary prey populations such as small mammals (voles, mice, squirrels) and those habitats that support these species. | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre.<br>S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output.<br>S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | the desired conditions for vegetation, wildlife habitat, scenery, and other resources. |
| Birds | Brewer's sparrow *Spizella breweri* | Brewer's sparrow requires sagebrush and mountain shrub habitats free of pinyon juniper encroachment. This species habitat must be resilient to changes in temperature and precipitation regimes. Brewer's sparrow relies on sagebrush habitat almost exclusively for breeding.<br>Brewer's sparrow habitat can also include to a lesser extent mountain mahogany, rabbitbrush, bunchgrass grasslands with shrubs, bitterbrush, ceanothus, manzanita, and large openings in pinyon-juniper and black greasewood habitats. Brewer's sparrows eat mostly small insects during the breeding season, including caterpillars, leaf beetles, weevils, grasshoppers, ants, and other insects and spiders. | G-SCC-3: Reduce habitat fragmentation and maintain structural conditions of sagebrush ecosystems through design of management activities. Patch sizes should not be less than 5 acres. |
| Birds | Flammulated owl *Otus flammeolus* | Flammulated owls require suitable nesting habitat in open, old-growth ponderosa pine and mixed conifer forest with younger, high-density vegetation with large snags to provide nesting opportunities. Suitable habitat must also include access to abundant insect prey. | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre.<br>G-VEG-5: Old forest, or late-successional stage forest, is often deferred from harvest to maintain biotic diversity across the landscape. To maintain old forest components across the landscape and move toward desired conditions, prioritize retention of old forest stands as follows:<br>- Older stands that have not been manipulated are more desirable than younger ones.<br>- Stands with limited use and access are better suited to maintain old forest conditions.<br>- Stands that provide habitat for threatened, endangered, or proposed species, species of conservation concern.<br>- Stands exhibiting a variety of attributes such as diverse canopy layers, decadence in live trees, standing or downed dead, or both, and patchiness.<br>S-VEG-4: Select harvest systems to achieve desired |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output. S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. |
| Birds | Northern goshawk *Accipiter gentiles* | Goshawks nest in a variety of habitat types throughout their range but seem to prefer unfragmented mature forests with large trees on moderate slopes with open understories. They nest in either coniferous, deciduous, or mixed-pine forests, depending on availability. Nest trees are typically one of the largest trees in the nest area; most territories contain several alternative nest trees. On the Forest, aspen is the most commonly selected nest tree, followed by ponderosa pine, Engelmann spruce, and lodgepole pine. Forest types selected for nesting were aspen, mixed conifer, ponderosa pine, and spruce-fir. | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre.<br>G-VEG-5: Old forest, or late-successional stage forest, is often deferred from harvest to maintain biotic diversity across the landscape. To maintain old forest components across the landscape and move toward desired conditions, prioritize retention of old forest stands as follows:<br>- Older stands that have not been manipulated are more desirable than younger ones.<br>- Stands with limited use and access are better suited to maintain old forest conditions.<br>- Stands that provide habitat for threatened, endangered, or proposed species, species of conservation concern.<br>- Stands exhibiting a variety of attributes such as diverse canopy layers, decadence in live trees, standing or downed dead, or both, and patchiness.<br>S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output.<br>S-VEG-5: Clearcutting may be used where it has been |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. |
| Bird | Olive-sided flycatcher *Contopus cooperi* | Locally, olive-sided flycatchers are more commonly found at higher elevations in spruce-fir forests, but they are less frequently observed in aspen/mixed coniferous, ponderosa pine, riparian, and occasionally pinyon-juniper forests. Olive-sided flycatchers frequently nest in early successional post-fire forests in all montane and subalpine forest types. Nests are most commonly found in live coniferous trees. Olive-sided flycatchers are primarily aerial insectivores, foraging in forest openings, along edges, and over forest canopies utilizing prominent perches, especially snags and dead-topped trees. | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre.<br>S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output.<br>S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. |
| Birds | Peregrine falcon *Falco peregrinus anatum* | Peregrine falcons utilize a wide variety of landscapes for foraging, but require prominent cliffs overlooking surrounding lowlands, often with water, for nesting free of human harassment and environmental toxins from pesticides containing organochlorines. Prey items consist nearly exclusively of living birds including white-throated swift, mourning dove, common nighthawk, rock dove, American robin, and a variety of other passerine species. | S-WLDF-1: Do not allow rock climbing within one-half mile of active peregrine and prairie falcon nest sites generally from April 15 to July 31 and active golden eagle nest sites generally from December 15 to July 31. |
| Birds | Southern white-tailed ptarmigan *Lagopus leucurus altipetens* | The white-tailed ptarmigan is an alpine obligate, meaning they require these habitats for all life stages including breeding and brood-rearing during summer, fall, and winter. Breeding habitats consist of snow-free areas on gentle to moderate slopes where willow is a major component. Elevations vary by latitude, slope, and aspect, | G-SCC-4: To maintain ecological conditions to support alpine-related species of conservation concern, avoid road construction and other permanent ground-disturbing activities within 100 feet of alpine fell and talus rock fields, and alpine bogs. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | ranging from 11,000 – 14,000 feet. Most territories are situated near treeline early in the breeding season and encompass stands of willows more than 1.6 feet tall that protrude above the snow. As the snow melts and vegetation green-up occurs, territories extend upslope to include areas with more rocks, increased herbaceous vegetation, and less willow with rock cover exceeding 25 percent and including rocks larger than 12 inches. | |
| Mammals | American marten *Martes americana* | Habitat includes conifer-dominated forests and vegetation types associated with late-successional stands of mesic coniferous forest, especially those with complex physical structure near the ground. Martens are generalized carnivores. Prey items including voles, shrews, red squirrels, snowshoe hare, and other small mammals make up the bulk of marten winter diets in Colorado. | G-VEG-5: Old forest, or late-successional stage forest, is often deferred from harvest to maintain biotic diversity across the landscape. To maintain old forest components across the landscape and move toward desired conditions, prioritize retention of old forest stands as follows:<br>- Older stands that have not been manipulated are more desirable than younger ones.<br>- Stands with limited use and access are better suited to maintain old forest conditions.<br>- Stands that provide habitat for threatened, endangered, or proposed species, species of conservation concern.<br>- Stands exhibiting a variety of attributes such as diverse canopy layers, decadence in live trees, standing or downed dead, or both, and patchiness.<br>S-TEPC-2 (VEG S7): Salvage activities in stands that represent high-quality lynx habitat may occur in up to 7 percent of the high-probability lynx use area that overlaps the suitable timber base. Salvage activities in VEG S7 stands in combination with all vegetation management activities, including incidental damage resulting in either Stand Initiation Structural Stage conditions, a reduction of horizontal cover, or both, are tracked for 15 years from the decision date for the forest plan decision. |
| Mammals | Fringed myotis *Myotis thysanodes* | Habitat requirements for fringed myotis include dry habitats where open areas (e.g., grasslands and deserts) are interspersed with mature forests (typically ponderosa pine, pinyon-juniper, or oak), creating complex mosaics with ample edges and abundant snags. Caves, underground mines, and buildings are used for maternity, nocturnal, and diurnal roosts, as well as hibernacula, while solitary day and night roost sites may include bridges, rock crevices, and tree cavities in lower elevations. Hibernacula must be free of the fungus that causes white-nose syndrome, *Pseudogymnoascus destructans*. | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest, contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | maintained on every acre. S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site-specific project needs, not primarily for the greatest dollar return or timber output. S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. G-SCC-5: To maintain habitat for bat SCC, retain adequate access for bats and reduce disturbance to resident populations when considering mine or cave closures. |
| Mammals | Gunnison's prairie dog *Cynomys gunnisoni* | Habitat requirements for Gunnison's prairie dog include grasslands, semi-desert, and montane shrublands. The species is associated with intermountain valleys, benches, and plateaus that offer prairie-like topography and vegetation. Gunnison prairie dogs can occupy mesic plateaus and higher mountain valleys, as well as arid lowlands. Colonies must be free of sylvatic plague. | G-SCC-2: Roads and other ground-disturbing structures and other authorized activities should not occur within 100 feet of known occurrences. G-SCC-3: To maintain viability of SCC, reduce habitat fragmentation and maintain structural conditions of sagebrush ecosystems through design of management activities. Patch sizes should not be less than 5 acres. |
| Mammals | Northern pocket gopher *Thomomys talpoides agrestis* | Northern pocket gopher habitats include alpine, cropland/hedgerow, grassland/herbaceous, savanna, shrubland/chaparral, woodland/conifer, and mixed woodlands. It prefers deep soils along streams and in meadows and cultivated fields, but is also found in rocky soils and clay. They do not hibernate but may be inactive in winter and midsummer for brief periods. Most burrowing activity occurs in spring and fall when soil is loose. They must have access to a variety of food items including roots of forbs, cacti, grasses, stems, bulbs, tubers, and leaves. | G-SCC-6: To maintain or restore ecological conditions to contribute to maintaining a viable population of northern pocket gophers, management activities in wetlands and riparian corridors should not cause a long-term decrease in the availability of forbs within 100 feet of occupied habitat. |
| Mammals | Plains pocket mouse *Perognathus flavescens* | Habitat types include sandy soils, tallgrasses, rabbitbrush, and likely pinyon-juniper with sandy soils. This species requires protection during vulnerable periods including nighttime as it is entirely nocturnal, and the species is inactive above ground from late autumn to early spring, and evidently hibernates through much of the winter. It is generally confined to areas of sandy or sandy-loam soil, generally limited to loose, sandy soils and dunes with sparse vegetation cover. The species may occasionally occupy non-sandy atypical habitats such as rocky soils in pinyon-juniper. Plains pocket mouse must also have access to food items consisting primarily of grass, forb, and sedge seeds. | G-SCC-2: Roads and other permanent ground-disturbing structures and other authorized activities should not degrade vegetation within 100 feet of where plants listed as species of conservation concern are known to occur, or within occupied habitat for the plains pocket mouse. Typical habitat includes barren or rocky areas but is not limited to alpine fell fields, alpine cushion plant communities, talus slopes at any elevation, rock fields, boulder gardens, cliff faces, recently disturbed soils, exposed shale, gypsum, volcanic, or adobe soils, and other sparsely vegetated areas within other ecosystems. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| Mammals | River otter<br>*Lontra canadensis* | River otters require stream-associated habitats with good water quality free of pollution, but lakes, reservoirs, beaver ponds, and floodplain wetlands may occur within seasonal home ranges. Valley streams are preferred to mountain streams due to lower gradients and higher productivity. An important physical habitat attribute other than water is riparian vegetation, which provides security cover when they are feeding, denning, or moving on land. Riparian vegetation also enhances otter habitat by stabilizing banks (which reduces soil erosion and protects water quality), contributing nutrients and invertebrates to aquatic systems, providing shading for fish habitat, and encouraging beaver activity. | S-GDE-1: Do not authorize management actions that alter the hydrology of groundwater-dependent habitat features.<br>G-GDE-1: To maintain ecosystem diversity and function, design projects to avoid or mitigate negative impacts to the ecological services that groundwater-dependent ecosystems provide.<br>S-RMZ-1: Management activities may have short-term impacts (generally less than 5 years) to composition, function, and structure of riparian areas and fish habitat. Over the long term (generally greater than 20 years), projects shall not impair connectivity, composition, function, and structure.<br>G-RMZ-1: To maintain ecological integrity and connectivity, new system roads and infrastructure should not be constructed in the riparian management zone.<br>G-RMZ-2: To provide for the structural nesting habitat requirements for riparian-associated birds, design management activities to avoid healthy willow carrs.<br>S-WA-1: Incorporate direction included in the National Core Best Management Practices and Watershed Conservation Practices Handbook, to develop project-specific best management practice prescriptions in project plans.<br>G-WA-1: Maintain or restore water quality by assuring that activities meet State of Colorado water quality standards. Management activities in watersheds where State of Colorado 303(d) listed impaired water bodies exist should assist in achieving State water quality standards.<br>G-WA-2: Management actions should not cause long-term degradation to water resources, including lakes, streams, wetlands, and groundwater. Particular attention should be paid to public water supplies, sole source aquifers, and source water protection areas.<br>G-FISH-1: New surface diversions should provide passage for native aquatic species to maintain connectivity.<br>G-FISH-2: Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of wildlife.<br>G-MIN-1: Mining activities can be acknowledged when the activity does not cause substantial surface disturbance or unacceptable impacts to water quality or fish habitat. Aspects of operation will be contained in the notice of intent. A plan of |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | | operations will be required for any activities above the scope of a notice of intent. |
| Mammals | Rocky mountain bighorn sheep *Ovis canadensis canadensis* | Most local bighorn sheep populations occur in steep, mountainous terrain in the alpine and subalpine zones. However, several local herds are also located in lower elevations within mixed-conifer and pinyon-juniper life zones. Common habitat themes for all bighorn sheep include areas of high topographic relief, which provide and serve as escape terrain, water in close proximity to foraging areas, and forage consisting of grasses, forbs, and shrubs. Bighorn sheep must have effective separation from domestic sheep to protect from respiratory illness. Effective separation is defined by science-based estimates of bighorn sheep core herd range and movements across the landscape in relationship to domestic sheep grazing allotments. Managing potential contact rates to an acceptable level ensures a minimal risk of disease transmission. | S-SCC-1: Maintain effective separation of domestic sheep and bighorn sheep on active grazing allotments to reduce the likelihood and risk of disease transmission. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups.<br>S-SCC-2: Do not authorize projects that will result in displacement of bighorn sheep during their reproductive period (generally April 15 to July 1).<br>S-SCC-3: Prohibit the use of recreational pack goats in the Sangre de Cristo Mountains to eliminate potential interactions between pack goats and bighorn sheep.<br>S-SCC-4: Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to reduce the likelihood of contact between animal groups.<br>G-WLDF-1: To reduce stress at a critical point in the lifecycle of big game, restrict activities on winter range from approximately December 1 to March 31, as needed. |
| Mammals | Townsend's big-eared bat *Corynorhinus townsendii townsendii* | This species forages in edge habitats along streams, adjacent to and within a variety of forested and non-forested habitats including semi-desert scrub, pinyon-juniper woodland, and ponderosa pine woodland. Roost sites at elevations of 10,000 feet indicates the species may also occur in lodgepole pine and spruce-fir communities. More than 90% of its diet is composed of moths. Roost sites must be free of the fungus that causes white-nose syndrome, *Pseudogymnoascus destructans*, and typically include caves and mines, but the species has also been reported to utilize buildings, bridges, rock crevices, and hollow trees as roost sites. | G-SCC-5: To maintain habitat for bat species of conservation concern, retain adequate access for bats and reduce disturbance to resident populations when considering mine or cave closures. |
| Plants | Black Canyon gilia *Aliciella penstemonoides* | *Aliciella penstemonoides* grows in crevices, on narrow ledges, and on rimrock of vertical or near-vertical canyon walls in areas surrounded by spruce-fir forests. The records for the occurrences within the planning area describe the habitat as rhyolitic cliffs, in small cracks on south-facing igneous rock cliffs, and *Ribes cereum/Brickellia grandiflora* habitat type on the southeast/east slope of igneous rock walls. This species requires freedom from physical damage from salvage operations or anything else from management dealing with spruce die-off. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| Plants | Stonecrop gilia *Aliciella sedifolia* | Barren shallow slopes of light-colored ("grayish white") rhyolite pea-gravel (¼- to 1-inch diameter) in San Juan Mountains. Freedom from artificial physical damage from alpine recreation (off-road vehicle use and off-trail hiking), sheep grazing, mining, nonnative species invasion, and pollution. Refugia from climate change. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Brandegee milkvetch *Astragalus brandegeei* | Reported growing with bristlecone pine and fringed sage at 8,800 feet reported in a meadow at 9,000 feet. However, notations on collections outside of the planning area note that it's been found on arid, sandy, or gravelly clay banks, flats and stony meadows, mostly in pinyon-juniper woodland, sometimes in oak brush, rarely in yucca-grassland, most commonly on sandstone, occasionally on granitic or basaltic bedrock. Freedom from artificial disturbance. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Ripley's milkvetch *Astragalus ripleyi* | Has high habitat specificity to open areas in ponderosa pine forests and Arizona fescue meadows on volcanic substrates. Requires appropriate disturbance following ponderosa forest natural range of variation, and freedom from artificial disturbance. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. OBJ-VEG-2 indicates 150-300 acres of restoration annually in ponderosa forest including appropriate fire pattern. |
| Plants | Northern moonwort *Botrychium pinnatum* | Closed canopy forests, moist grassy sites in open forests and meadows. This species typically occurs near streams and other sites where soil moisture is constant. Freedom from sedimentation from roads and vegetation management, especially with salvage following spruce die-off. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Least moonwort *Botrychium simplex* | *Botrychium simplex* is primarily a plant of open habitat, occurring in pastures, meadows, orchards, prairies, wetlands, fens, sand dunes, and in lake and stream edge vegetation. Most of these habitats are at least temporarily wet and some (fens) are permanently saturated. The single known occurrence in the planning area was found in the Engelmann spruce. | G-SCC-2 prevents artificial disturbance within 100 feet no matter the habitat in which least moonwort is found. S-GDE-1 and G-GDE-1 both provide the ecological conditions for groundwater-dependent ecosystems and S-RMZ-1, as well as G-RMZ-1, provide structure composition and function of riparian areas. |
| Plants | Downy Indian paintbrush *Castilleja puberula* | Downy Indian paintbrush has been found on variable slopes (flat to >30%) between 10,700 and 13,100 feet in elevation in cold and dry alpine tundra, fall fields, alpine meadows and grasslands, and at treeline with Krummholz bristlecone pines. Freedom from permanent ground disturbance associated with recreation, wildlife, and domestic livestock concentration. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Dwarf alpine hawksbeard *Crepis nana* | Dwarf alpine hawksbeard is an alpine species that is found in Colorado from 10,000-14,000 feet, typically on steep alpine scree and talus slopes. Freedom from disturbance from domestic livestock grazing. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| Plants | James' cryptantha *Cryptantha cinerea var. pustulosa* | Surveys in 2017 found this species in sandy areas, including sand dunes in pinyon-juniper woodlands on the Forest. Requires freedom from managed and unmanaged off-highway vehicles. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Weber's catseye *Cryptantha weberi* | Sparsely vegetated rocky areas, ash beds, cracks in rocks, and steep slopes, sparsely vegetated andesite and agglomerate and volcanic ash deposits. Rocky soil often with sagebrush. 7,700-9,500 feet. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Slender rock-brake *Cryptogramma stelleri* | Restricted to small microsites with thin mossy soils in shady limestone cliffs near water in the shade of moist coniferous forests. A single occurrence known in the planning area is described as a moist ravine with a southwest exposure. Freedom from disturbance of any kind. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Mountain bladder fern *Cystopteris montana* | The habitat for *Cystopteris montana* is described as moist, rich soil in shady spruce-fir forests, at elevations ranging from 9,000 to 11,000 feet, north-facing, wet, rich Engelmann spruce forests. The habitat for the single occurrence known in the planning area is described as "among rocks" at 9,020 feet. Freedom from disturbance of any kind. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Colorado larkspur *Delphinium alpestre* | This species grows in alpine meadows and talus slopes from 10,800 to 14,300 feet in elevation. Known occurrences have low vegetative cover, and Colorado larkspur is typically the only plant species present on steep and active talus slopes. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | San Juan draba *Draba graminea* | The species is most often associated with the alpine tundra dry meadow, the alpine tundra fellfield community, and the alpine dwarf shrubland. *Draba graminea* appears to prefer volcanic substrates such as ash tuffs and andesitic and latitic lavas. It is not restricted to those substrates and is found in gneiss and shale substrates as well. Overall, the species appears to most commonly occur on north-facing slopes, tucked in protected, cool, more-or-less moist crevices located along rocky benches, ledges, and outcrops. Freedom from disturbance. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Gray's draba *Draba grayana* | Gravelly alpine slopes and fellfields. Elevation 11,500 to 14,000 feet. Collections on the Forest are mostly from various alpine crevices on barren rock face, fellfield talus crevices, but also bristlecone pine and Engelmann spruce. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Smith's draba *Draba smithii* | Talus slopes, in crevices and between rocks in shaded protected sites with xeric and forested habitats. Elevation 8,000 to11,000 feet. Typically the rocks are covered by abundant lichen and, in some cases, mosses. *Draba smithii* occurs on quartz porphyry and volcanic-derived soils. Although directly part of the sparse vegetation | G-SCC-2 provides protection from physical disturbance, S-RMZ-1, G-RMZ-1 both protect the sites that may be influenced by groundwater by providing structure composition and function of riparian areas. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | of rock-dwelling communities, *Draba smithii* grows in various Douglas-fir, blue spruce, bristlecone pine, and aspen communities – and has even been found in association with alder and willow. Requires freedom from disturbance and the presence of volcanically derived soils and rocks within other habitat types. | |
| Plants | Colorado Divide whitlow-grass *Draba streptobrachia* | Grows in the alpine zone, typically in rock outcrops, at elevations from 10,800 to 13,500 feet, on weathered rock and loose soil in the alpine tundra, on scree margins, ridges, slopes, and fellfields. Requires freedom from disturbance. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Philadelphia fleabane *Erigeron philadelphicus* | *Erigeron philadelphicus* prefers moist to very wet conditions. It grows in wet meadows and grassy openings, flood plains, lowland woodlands, thickets, fields, stream banks, low pastures, wet roadsides, and seepage areas. It is found on a variety of soils but requires soils that are moist and moderately well drained. | |
| Plants | Many-flowered gilia *Ipomopsis multiflora* | The habitat descriptions for the species are very general. The element occurrence report states only that the occurrence was found in sandy soils with a southwestern exposure. Specimen labels for collections outside the planning area indicate that the species has been found in open woodlands (pine, oak, juniper, pinyon-juniper), disturbed areas (roadsides, barrow pits, disturbed area around mine, parking lot), canyon bottoms, and sagebrush flats. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Spiny-spored quillwort *Isoetes tenella* | *Isoetes tenella* is an **aquatic** species that grows in shallow, cool, oligotrophic water of slightly acidic lakes, ponds, and streams. It is generally completely submersed in the water. The element occurrence reports for the taxon within the planning area note that it has been found growing in the bottom of a shallow pond, submersed from shoreline to about 1.5 meters, and lake bottom. | G-SCC-2 prevents artificial disturbance within 100 feet no matter the habitat in which spiny-spored quillwort is found. S-GDE-1 and G-GDE-1 both provide the ecological conditions for groundwater-dependent ecosystems including fens, and S-RMZ-1, as well as G-RMZ-1, provide structure composition and function of riparian areas. |
| Plants | Colorado woodrush *Luzula subcapitata* | *Luzula subcapitata* is found in subalpine and alpine willow carrs, subalpine and alpine bogs, banks of alpine streams and adjacent grassy flats; mesic meadows and lakeshores; lacustrine wetlands; alpine tundra; wet meadows; and upper subalpine lakeshores. Reported elevation ranges from 10,500 feet to 13,810 feet. Freedom from disturbance and persistence/preservation of habitat. | G-SCC-2 prevents artificial disturbance within 100 feet no matter the habitat in which Colorado woodrush is found. S-GDE-1 and G-GDE-1 both provide the ecological conditions for groundwater-dependent ecosystems including fens and S-RMZ-1, as well as G-RMZ-1, provide structure composition and function of riparian areas. |
| Plants | Colorado tansy aster *Machaeranthera coloradoensis* | Predominantly found within a grassland cover type, but this species occurs over a very broad elevation range (7,675 to 12,940 feet). It is generally found on rocky, exposed soils of sedimentary or volcanic origin. Macrohabitats range from plains/park grassland to dry grassland communities within life zones of pinyon-juniper woodlands up to alpine fellfields and meadows. Freedom from physical disturbance from roads, construction, and pipelines. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| Plants | House's sandwort *Minuartia macrantha* | *Minuartia macrantha* is found in alpine tundra cushion plant communities and rocky areas both above and below timberline, at elevations from 10,000 to 13,500 feet. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Parry's crazy-weed *Oxytropis parryi* | *Oxytropis parryi* is a montane to alpine species that occupies rocky slopes and saddles above timberline and open places in high-montane parkland. The element occurrence report for the single occurrence in the planning area describes the habitat as grassy slopes, coniferous covered tops, 9,400 to 9,800 feet elevation. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | West silver bladderpod *Physaria scrotiformis* | Alpine tundra on the Rio Grande south of Stony Pass along the Continental Divide. On San Juan National Forest, this species grows on windswept, nearly barren exposures of Leadville limestone in a matrix of Engelmann spruce islands and tundra at from 11,500 to 12,800 feet in elevation. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Southern Rocky Mountain cinquefoil *Potentilla ambigens* | The habitat for this species is described as moist meadows along creeks, meadows of the yellow pine belt, and woods, slopes, and meadows. Most Colorado occurrences are on grassy or colluvial slopes, but it may also occur in montane woods. Elevation range is 6,000 to 8,600 feet. Freedom from physical disturbance from trails and roads. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Arizona willow *Salix arizonica* | *Salix arizonica* is a subalpine species of high-elevation wet meadows, streamsides, and cienegas. Habitat often occurs as a narrow, linear strip associated with perennial water in seeps, springs, streamsides, and wet meadows. Plants are also sometimes found in drier sites adjacent to forest edges or within the riparian zone where subsurface channels provide moisture. Although it is not believed to be a strict substrate specialist, *Salix arizonica* is frequently associated with substrates of volcanic origin, and it appears to favor coarse-textured and well-watered soils, including those associated with alluvial deposits. Requires appropriate habitat and freedom from physical disturbance, including wildlife browsing. | G-SCC-2 provides protection from physical disturbance. S-RMZ-1 and G-RMZ-1 both protect the sites that may be influenced by groundwater by providing structure composition and function of riparian areas. G-RMZ-2 specifically protects willow habitat. |
| Plants | Tundra saxifrage *Saxifraga caespitosa ssp. monticola* | Habitat for tundra saxifrage is described as alpine tundra. The occurrence record for the planning unit describes the habitat as alpine, 12,000 to 12,800 feet in elevation. Other reports within Colorado list the habitat as alpine or alpine tundra, with elevation ranging from 11,000 to 14,064 feet. Requires freedom from physical disturbance. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | King's campion *Silene kingii* | King's campion is most commonly found in the alpine curly sedge cushion plant communities in areas with coarse soils. It generally grows mixed in with other plants rather than growing isolated on | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological |

| Category | Species | Ecological Conditions Necessary to Maintain a Viable Population | Plan Components that Provide Ecological Conditions to Maintain a Viable Population |
|---|---|---|---|
| | | otherwise bare soil, even if that soil seems suitable. The plant may grow preferentially on limestone outcrops or limestone derived soils. Elevation range 11,500 to 12,200 feet. | conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |
| Plants | Fine bog-moss *Sphagnum angustifolium* | The habitat is a moss-dominated wetland type. It is typically restricted to iron fens (high concentrations of Fe [iron] and other ions) and highly acidic (pH below 5.8 and typically below 4.8). This habitat occurs in the San Juan Mountain portion of the Forest. Requires freedom from disturbance and the presence of iron fens. | S-GDE-1 and G-GDE-2 provide protections and the presence of fen habitat. G-SCC-2 protects individuals of this species from physical disturbance. |
| Plants | Rothrock Townsend daisy *Townsendia rothrockii* | The habitat for this species would be considered an alpine sparse forb cover type. Although this species apparently has a wide ecological amplitude and occurs elsewhere at lower elevations, the known records on the Forest are all above 12,400 feet. | G-SCC-2 prohibits permanent ground disturbance within 100 feet of this species. This guideline provides the ecological conditions this species needs by preventing artificial disturbances and thus maintains a viable population. |

# Appendix E. Southern Rockies Lynx Amendment Direction

## Background

The Southern Rockies Lynx Amendment was completed in 2008 and when signed it effectively amended forest plan direction for the Canada Lynx (*Lynx canadensis*) on eight existing forest plans in the Rocky Mountain Region of the U.S. Forest Service, including the Rio Grande. That direction and the implementing guidance are not proposed to be changed at this time. Supplemental guidance is included in the proposed forest plan that addresses the current conditions in the spruce-fir lynx habitat on the Forest.

The direction is incorporated here and would apply to implementation of the proposed forest plan.

## Southern Rockies Lynx Amendment – Management Direction

The management direction applies to lynx habitat on the following National Forests in the Southern Rockies Lynx Amendment area:

Medicine Bow Routt National Forests (two separate Plans), Arapaho-Roosevelt National Forests,

Grand Mesa, Uncompahgre and Gunnison National Forests, Pike-San Isabel National Forests,

Rio Grande National Forest, San Juan National Forest, and White River National Forest.

GOAL[14]

Conserve the Canada lynx.

**ALL MANAGEMENT PRACTICES AND ACTIVITIES (ALL). The following** objectives, standards, and guidelines apply to all management projects in lynx habitat in lynx analysis units (LAUs) in occupied habitat and in linkage areas, subject to valid existing rights. They do not apply to wildfire suppression, or to wildland fire use.

Objective[30] ALL O1

Maintain[26] or restore[40] lynx habitat[23] connectivity[16] in and between LAUs[21], and in linkage areas[22].

Standard[44] ALL S1

New or expanded permanent developments[33] and vegetation management[50] projects[36] must maintain[26] habitat connectivity[16] in an LAU[21] and/or linkage area[22].

Guideline[15] ALL G1

Methods to avoid or reduce effects on lynx should be used when constructing or reconstructing highways[18] or forest highways[12] across federal land. Methods could include fencing, underpasses or overpasses.

Standard[44] LAU S1

Changes in LAU[21] boundaries shall be based on site-specific habitat information and after review by the Forest Service Regional Office.

VEGETATION MANAGEMENT ACTIVITIES AND PRACTICES (VEG). The following objectives, standards, and guidelines apply to vegetation management projects[36] in lynx habitat within lynx analysis units (LAUs) in occupied habitat. With the exception of Objective VEG O3 that specifically concerns wildland fire use, the objectives, standards, and guidelines do not apply to wildfire suppression, wildland fire use, or removal of vegetation for permanent developments such as mineral operations, ski runs, roads, and the like. None of the objectives, standards, or guidelines apply to linkage areas.

Objective[30] VEG O1

Manage vegetation to mimic or approximate natural succession and disturbance processes while maintaining habitat components necessary for the conservation of lynx.

Objective VEG O2

Provide a mosaic of habitat conditions through time that support dense horizontal cover[19], and high densities of snowshoe hare. Provide winter snowshoe hare habitat[51] in both the stand initiation structural stage and in mature, multi-story conifer vegetation.

Objective VEG O3

Conduct fire use[11] activities to restore[40] ecological processes and maintain or improve lynx habitat.

Objective VEG O4

Focus vegetation management[50] in areas that have potential to improve winter snowshoe hare habitat[52] but presently have poorly developed understories that lack dense horizontal cover.

Standard[44] VEG S1

**Where and to what this applies:** Standard VEG S1 applies to all vegetation management[50] projects[36] that regenerate[38] forested stands, except for fuel treatment[13] projects[36] within the wildland urban interface[51] (WUI) as defined by HFRA[17], subject to the following limitation:

> Fuel treatment projects[36] within the WUI[51] that do not meet Standards VEG S1, VEG S2, VEG S5, or VEG S6 shall occur on no more than 3 percent (cumulatively) of lynx habitat on each administrative unit (a National Forest or administratively combined National Forests). In addition, fuel treatment projects may not result in more than three adjacent LAUs exceeding the standard.

For fuel treatment projects[36] within the WUI[51] see guideline VEG G10.

**The standard:** Unless a broad scale assessment has been completed that substantiates different historic levels of stand initiation structural stages[45] limit disturbance in each LAU as follows:

If more than 30 percent of the lynx habitat in an LAU is currently in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects[36].

Standard VEG S2

**Where and to what this applies:** Standard VEG S2 applies to all timber management[47] projects[36] that regenerate[38] forests, except for fuel treatment[13] projects[36] within the wildland urban interface[51] (WUI) as defined by HFRA[17], subject to the following limitation:

> Fuel treatment projects[36] within the WUI[51] that do not meet Standards VEG S1, VEG S2, VEG S5, or VEG S6 shall occur on no more than 3 percent (cumulatively) of lynx habitat on each administrative unit (a National Forest or administratively combined National Forests).

For fuel treatment projects[36] within the WUI[51] see guideline VEG G10.

**The standard:** Timber management[47] projects[36] shall not regenerate[38] more than 15 percent of lynx habitat on NFS lands within an LAU in a ten-year period. This 15 percent includes the entire stand within an even-age regeneration area, and only the patch opening areas within group selections. Salvage harvest within stands killed by insect epidemics, wildfire, etc. does not add to the 15 percent, unless the harvest treatment would cause the lynx habitat to change to an unsuitable condition[24].

Standard VEG S5

**Where and to what this applies:** Standard VEG S5 applies to all precommercial thinning[35] projects, except for fuel treatment[13] projects that use precommercial thinning as a tool within the wildland urban interface (WUI) as defined by HFRA, subject to the following limitation:

> Fuel treatment projects within the WUI that do not meet Standards VEG S1, VEG S2, VEG S5, or VEG S6 may occur on no more than three percent (cumulatively) of lynx habitat on each administrative unit (a National Forest or administratively combined National Forests) for the life of this amendment.

For fuel treatment projects within the WUI see guideline VEG G10.

**The Standard:** Precommercial thinning practices and similar activities intended to reduce seedling/sapling density are subject to the following limitations from the stand initiation structural stage[45] until the stands no longer provide winter snowshoe hare habitat.

Precommercial thinning[35] may occur only:

1. Within 200 feet of administrative sites, dwellings, or outbuildings; or
2. For research studies[39] or genetic tree tests evaluating genetically improved reforestation stock; or
3. For conifer removal in aspen, or daylight thinning[5] around individual aspen trees, where aspen is in decline; or
4. Based on new information that is peer reviewed and accepted by the regional/state levels of the Forest Service and FWS, where a written determination states:
    a) That a project is not likely to adversely affect lynx; or

b) That a project is likely to have short term adverse effects on lynx or its habitat, but would result in long-term benefits to lynx and its habitat.

5. In addition to the above exceptions (and above and beyond the three percent limitation for fuels projects within the WUI[51]), precommercial thinning may occur provided that:

   a) The additional precommercial thinning does not exceed one percent of the lynx habitat in any LAU for the life of this amendment, and the amount and distribution of winter snowshoe hare habitat within the LAU must be provided through appropriate site-specific analysis and consultation; and

   b) Precommercial thinning in LAUs with more than 30 percent of the lynx habitat currently in the stand initiation structural stage[45] is limited to areas that do not yet provide winter snowshoe hare habitat [52]; and

   c) Projects are designed to maintain lynx habitat connectivity[16] and provide snowshoe hare habitat over the long term; and

   d) Monitoring is used to determine snowshoe hare response.

Exceptions 2 and 3 may not occur in any LAU in which VEG S1 is exceeded (i.e., more than 30 percent of LAU in stand initiation structural stage).

Note: This standard is intended to provide snowshoe hare habitat while permitting some thinning, to explore methods to sustain snowshoe hare habitat over time, reduce hazardous fuels, improve forest health, and increase timber production. Project design must ensure any precommercial thinning provides an appropriate amount and distribution of snowshoe hare habitat with each LAU over time, and maintains lynx habitat connectivity within and between LAUs.

Project design should focus on creating irregular shapes for the thinning units, creating mosaics of thinned and unthinned areas, and using variable density thinning, etc.

Standard VEG S6

**Where and to what this applies:** Standard VEG S6 applies to all vegetation management[50] practices within multi-story mature or late successional conifer forests[29], except for fuel treatment[13] projects within the wildland urban interface (WUI) as defined by HFRA[17], subject to the following limitation:

> Fuel treatment projects[36] within the WUI[51] that do not meet Standards VEG S1, VEG S2, VEG S5, or VEG S6 shall occur on no more than 3 percent (cumulatively) of lynx habitat on each administrative unit (a National Forest or administratively combined National Forests).

For fuel treatment projects[36] within the WUI[51] see guideline VEG G10.

**The Standard:** Vegetation management projects[36] that reduce winter snowshoe hare habitat[52] in multi-story mature or late successional conifer forests[29] may occur only:

1. Within 200 feet of administrative sites, dwellings, outbuildings, recreation sites, and special use permit improvements, including infrastructure within permitted ski area boundaries; or

2. For research studies[38] or genetic tree tests evaluating genetically improved reforestation stock; or
3. For incidental removal during salvage harvest[41] (e.g., removal due to location of skid trails); or
4. Where uneven-aged management (single tree and small group selection) practices are employed to maintain and encourage multi-story attributes as part of gap dynamics. Project design must be consistent with VEG O1, O2 and O4, except where impacts to areas of dense horizontal cover are incidental to activities under this exception (e.g., construction of skid trails).

Exceptions 2 and 4 may not occur in any LAU in which VEG S1 is exceeded.

Guideline VEG G1

Vegetation management[50] projects[36] should be planned to recruit a high density of conifers, hardwoods, and shrubs where such habitat is scarce or not available.

Priority for treatment should be given to stem-exclusion, closed-canopy structural stage[46] stands to enhance habitat conditions for lynx or their prey (e.g. mesic, monotypic lodgepole stands). Winter snowshoe hare habitat[52] should be near denning habitat[6].

Guideline VEG G4

Prescribed fire[34] activities should not create permanent travel routes that facilitate snow compaction. Constructing permanent firebreaks on ridges or saddles should be avoided.

Guideline VEG G5

Habitat for alternate prey species, primarily red squirrel[37], should be provided in each LAU.

Guideline VEG G10

Fuel treatment projects[36] within the WUI[51] as defined by HFRA[17] should be designed considering Standards VEG S1, S2, S5, and S6 to promote lynx conservation.

Guideline VEG G11

Denning habitat[6] should be distributed in each LAU in the form of pockets of large amounts of large woody debris, either down logs or root wads, or large piles of small wind thrown trees ("jack-strawed" piles). If denning habitat appears to be lacking in the LAU, then projects[36] should be designed to retain some coarse woody debris[4], piles, or residual trees to provide denning habitat[6] in the future.

LIVESTOCK MANAGEMENT (GRAZ): The following objectives and guidelines apply to grazing projects in lynx habitat in lynx analysis units (LAUs) in occupied habitat. They do not apply to linkage areas.

Objective[30] GRAZ O1

Manage livestock grazing to be compatible with improving or maintaining[26] lynx habitat[23].

Guideline[15] GRAZ G1

In fire- and harvest-created openings, livestock grazing should be managed so impacts do not prevent shrubs and trees from regenerating.

Guideline GRAZ G2

In aspen stands, livestock grazing should be managed to contribute to the long-term health and sustainability of aspen.

Guideline GRAZ G3

In riparian areas[41] and willow carrs[3], livestock grazing should be managed to contribute to maintaining or achieving a preponderance of mid- or late-seral stages[28], similar to conditions that would have occurred under historic disturbance regimes.

Guideline GRAZ G4

In shrub-steppe habitats[43], livestock grazing should be managed in the elevation ranges of forested lynx habitat in LAUs[21], to contribute to maintaining or achieving a preponderance of mid- or late-seral stages, similar to conditions that would have occurred under historic disturbance regimes.

HUMAN USE PROJECTS (HU): The following objectives and guidelines apply to human use projects, such as special uses (other than grazing), recreation management, roads, highways, and mineral and energy development, in lynx habitat in lynx analysis units (LAUs) in occupied habitat, subject to valid existing rights. They do not apply to vegetation management projects or grazing projects directly. They do not apply to linkage areas.

Objective[30] HU O1

Maintain[26] the lynx's natural competitive advantage over other predators in deep snow, by discouraging the expansion of snow-compacting activities in lynx habitat[23].

Objective HU O2

Manage recreational activities to maintain lynx habitat and connectivity[16].

Objective HU O3

Concentrate activities in existing developed areas, rather than developing new areas in lynx habitat.

Objective HU O4

Provide for lynx habitat needs and connectivity when developing new or expanding existing developed recreation[9] sites or ski areas.

Objective HU O5

Manage human activities, such as special uses, mineral and oil and gas exploration and development, and placement of utility transmission corridors, to reduce impacts on lynx and lynx habitat.

Objective HU O6

Reduce adverse highway[18] effects on lynx by working cooperatively with other agencies to provide for lynx movement and habitat connectivity[16], and to reduce the potential for lynx mortality.

Guideline[15] HU G1

When developing or expanding ski areas, provisions should be made for adequately sized inter-trail islands that include coarse woody debris[4], so winter snowshoe hare habitat[51] is maintained.

Guideline HU G2

When developing or expanding ski areas, lynx foraging habitat should be provided consistent with the ski area's operational needs, especially where lynx habitat occurs as narrow bands of coniferous forest across mountain slopes.

Guideline HU G3

Recreation development and recreational operational uses should be planned to provide for lynx movement and to maintain the effectiveness of lynx habitat[23].

Guideline HU G4

Remote monitoring of mineral and energy development sites and facilities should be encouraged to reduce snow compaction.

Guideline HU G5

A reclamation plan should be developed (e.g., road reclamation and vegetation rehabilitation) for closed mineral and energy development sites and facilities that promote the restoration of lynx habitat.

Guideline HU G6

Methods to avoid or reduce effects to lynx habitat connectivity[16] should be used when upgrading unpaved roads to maintenance levels 4 or 5[27], where the result would be increased traffic speeds and volumes, or contribute to development or increases in human activity.

Guideline HU G7

New permanent roads should not be built on ridge-tops and saddles, or in areas identified as important for lynx habitat connectivity[16]. New permanent roads and trails should be situated away from forested stringers.

Guideline HU G8

Cutting brush along low-speed, low-traffic-volume roads[25] should be done to the minimum level necessary to provide for public safety.

Guideline HU G9

If project level analysis determines that new roads adversely affect lynx, then public motorized use should be restricted. Upon project[36] completion, these roads should be reclaimed or decommissioned, if not needed for other management objectives.

Guideline HU G10

Designated over-the-snow routes or designated play areas should not expand outside baseline areas of consistent snow compaction[1], unless designation serves to consolidate use and improve lynx habitat. This may be calculated on an LAU basis, or on a combination of immediately adjacent LAUs.

This does not apply inside permitted ski area boundaries, to winter logging, to rerouting trails for public safety, to accessing private inholdings, or to access regulated by Guideline HU G12.

Use the same analysis boundaries for all actions subject to this guideline.

Guideline HU G11

When developing or expanding ski areas and trails, consider locating access roads and lift termini to maintain and provide lynx security habitat[10].

Guideline HU G12

Winter access for non-recreation special uses and mineral and energy exploration and development should be limited to designated routes[8] or designated over-the- snow routes[7].

LINKAGE AREAS (LINK): The following objective, standard, and guidelines apply to all projects within linkage areas in occupied habitat, subject to valid existing rights.

Objective[30] LINK O1

In areas of intermingled land ownership, work with landowners to pursue conservation easements, habitat conservation plans, land exchanges, or other solutions to reduce the potential of adverse impacts on lynx and lynx habitat.

Standard[44] LINK S1

When highway[18] or forest highway[12] construction or reconstruction is proposed in linkage areas[22], identify potential highway crossings.

Guideline[15] LINK G1

National Forest System lands should be retained in public ownership.

Guideline LINK G2

Livestock grazing in shrub-steppe habitats[43] should be managed to contribute to maintaining or achieving a preponderance of mid- or late-seral stages[28], similar to conditions that would have occurred under historic disturbance regimes.

**Required Monitoring**

1. Maps of the location and intensity of snow compacting activities and designated and groomed routes that occurred inside LAUs during the period of 1998 to 2000 constitute baseline snow compaction. Changes in activities and routes are to be monitored every five years after the decision.
2. When fuels treatment and vegetation management project decisions are signed, report the following:

a) Acres of fuel treatment in lynx habitat by Forest and LAU, and whether the treatment is within or outside the WUI as defined by HFRA.

b) Whether or not the fuel treatment met the vegetation standards or guidelines. If standard(s) were not met, report which standard(s) was not met, why it could not be met, and how many acres were affected.

c) Application of exceptions in Standard VEG S5:

For areas where any of the exceptions 1 through 5 listed in Standard VEG S5 were applied, report the type of activity, the number of acres, and the location (by unit, and LAU) and whether or not Standard VEG S1 was within the allowance.

d) Application of exceptions in Standard VEG S6:

For areas where any of the exceptions 1 through 4 listed in Standard VEG S6 were applied, report the type of activity, the number of acres, and the location (by unit, and LAU) and whether or not Standard VEG S1 was within the allowance.

e) Total acres of lynx habitat treated under exemptions and exceptions to vegetation standards, to assure the 4.5 percent limit is not exceeded on any Forest over the life of the amendment (15 years).

3. Application of guidelines:

a) Summarize what guideline(s) was not followed and why.

b) Document the rationale for deviations to guidelines.

### Lynx Amendment Glossary

[1] *Area cf consistent snow compaction* – An area of consistent snow compaction is an area of land or water that during winter is generally covered with snow and gets enough human use that individual tracks are indistinguishable. In such places, compacted snow is evident most of the time, except immediately after (within 48 hours) snowfall.

These can be areas or linear routes, and are generally found in or near snowmobile or cross-country ski routes, in adjacent openings, parks and meadows, near ski huts or plowed roads, or in winter parking areas. Areas of consistent snow compaction will be determined based on the acreage or miles used during the period 1998 to 2000.

[2] *Broad scale assessment* – A broad scale assessment is a synthesis of current scientific knowledge, including a description of uncertainties and assumptions, to provide an understanding of past and present conditions and future trends, and a characterization of the ecological, social, and economic components of an area. (LCAS)

[3] *Carr* – Deciduous woodland or shrub land occurring on permanently wet, organic soil. (LCAS)

[4] *Coarse woody debris* – Any piece(s) of dead woody material, e.g., dead boles, limbs, and large root masses on the ground or in streams. (LCAS)

[5] *Daylight thinning* – Daylight thinning is a form of precommercial thinning that removes the trees and brush inside a given radius around a tree.

[6] *Denning habitat (lynx)* – Denning habitat is the environment lynx use when giving birth and rearing kittens until they are mobile. The most common component is large amounts of coarse woody debris to provide escape and thermal cover for kittens.

Denning habitat must be within daily travel distance of winter snowshoe hare habitat – the typical maximum daily distance for females is about three to six miles. Denning habitat includes mature and old growth forests with plenty of coarse woody debris. It can also include young regenerating forests with piles of coarse woody debris, or areas where down trees are jack-strawed.

[7] *Designated over-the-snow routes* – Designated over-the-snow routes are routes managed under permit or agreement or by the agency, where use is encouraged, either by on-the- ground marking or by publication in brochures, recreation opportunity guides or maps (other than travel maps), or in electronic media produced or approved by the agency.

The routes identified in outfitter and guide permits are designated by definition; groomed routes also are designated by definition. The determination of baseline snow compaction will be based on the miles of designated over-the-snow routes authorized, promoted or encouraged during the period 1998 to 2000.

[8] *Designated route* – A designated route is a road or trail that has been identified as open for specified travel use.

[9] *Developed recreation* – Developed recreation requires facilities that result in concentrated use. For example, skiing requires lifts, parking lots, buildings, and roads; campgrounds require roads, picnic tables, and toilet facilities.

[10] *Diurnal security habitat (lynx)* – Places in lynx habitat that provide secure winter bedding sites in highly disturbed landscapes such as ski areas. Security habitat gives lynx the ability to retreat from human disturbance. Site characteristics and stand conditions make human access difficult and discourage human activity. Security habitats are sufficiently large to provide effective visual and acoustic insulation and to let lynx easily move away from any intrusion. Lynx security habitat must be in proximity to winter snowshoe hare habitat. (LCAS)

[11] *Fire use* – Fire use is the combination of wildland fire use and using prescribed fire to meet resource objectives. (NIFC) Wildland fire use is the management of naturally ignited wildland fires to accomplish resource management objectives in areas that have a fire management plan. The use of the term wildland fire use replaces the term prescribed natural fire. (Wildland and Prescribed Fire Management Policy, August 1998)

[12] *Forest highway* – A forest highway is a forest road under the jurisdiction of, and maintained by, a public authority and open to public travel (USC: Title 23, Section 101(a)), designated by an agreement with the FS, state transportation agency, and Federal Highway Administration.

[13] *Fuel treatment* – A fuel treatment is a type of vegetation management action that reduces the threat of ignition, fire intensity, or rate of spread, or is used to restore fire- adapted ecosystems.

[14] *Goal* – A goal is a broad description of what an agency is trying to achieve, found in a land management plan. (LCAS)

15 *Guideline* – A guideline is a particular management action that should be used to meet an objective found in a land management plan. The rationale for deviations may be documented, but amending the plan is not required. (LCAS modified)

16 *Habitat connectivity (lynx)* – Cover (vegetation) in sufficient quantity and arrangement to allow for the movement of lynx. Narrow forested mountain ridges or shrub-steppe plateaus may serve as a link between more extensive areas of lynx habitat; wooded riparian communities may provide cover across open valley floors. (LCAS)

17 *HFRA (Healthy Forests Restoration Act)* - Public Law 108-148, passed in December 2003. The HFRA provides statutory processes for hazardous fuel reduction projects on certain types of at-risk National Forest System and Bureau of Land Management lands. It also provides other authorities and direction to help reduce hazardous fuel and restore healthy forest and rangeland conditions on lands of all ownerships. (Modified from Forest Service HFRA web site.)

18 *Highway* – The word highway includes all roads that are part of the National Highway System. (23 CFR 470.107(b))

19 *Horizontal cover* – The visual obscurity provided by vegetation that extends to the ground or snow surface, primarily provided by tree stems and tree boughs, but may also be provided by shrubs, herbaceous vegetation, and landscape topography.

21 *LAU (Lynx Analysis Unit)* – An LAU is an area of at least the size used by an individual lynx, from about 25 to 50 square miles (LCAS). An LAU is a unit for which the effects of a project would be analyzed; its boundaries should remain constant.

22 *Linkage area* – A linkage area provides landscape connectivity between blocks of lynx habitat. Linkage areas occur both within and between geographic areas, where blocks of lynx habitat are separated by intervening areas of non-lynx habitat such as basins, valleys, or agricultural lands, or where lynx habitat naturally narrows between blocks. (LCAS updated definition approved by the Steering Committee 10/23/01)

23 *Lynx habitat* – Lynx habitat occurs in mesic coniferous forest that experience cold, snowy winters and provide a prey base of snowshoe hare. In the southern Rocky Mountains, lynx habitat generally occurs between 8,000 and 12,000 feet in elevation. Primary vegetation consists of Engelmann spruce, subalpine fir, aspen-conifer mix and lodgepole pine on spruce-fir habitat types. On cool moist sites, Douglas-fir and aspen, when interspersed with subalpine forests, may also contribute to lynx habitat. Dry forest types (e.g., ponderosa pine, climax lodgepole pine) do not provide lynx habitat. (LCAS)

24 *Lynx habitat in an unsuitable condition* –Lynx habitat in an unsuitable condition consists of lynx habitat in the stand initiation structural stage where the trees are generally less than ten to 30 years old and have not grown tall enough to protrude above the snow during winter. Stand replacing fire, insect epidemics or certain vegetation management projects can create unsuitable conditions. Vegetation management projects that can result in unsuitable habitat include clearcuts and seed tree harvest, and sometimes shelterwood cuts and commercial thinning depending on the resulting stand composition and structure. (LCAS)

25 *Low-speed, low-traffic-volume road* – Low speed is less than 20 miles per hour; low volume is a seasonal average daily traffic load of less than 100 vehicles per day.

[26] *Maintain* – In the context of this decision, maintain means to provide enough lynx habitat to conserve lynx. It does not mean to keep the status quo.

[27] *Maintenance level* – Maintenance levels define the level of service provided by and maintenance required for a road. (FSH 7709.58, Sec 12.3) Maintenance level 4 is assigned to roads that provide a moderate degree of user comfort and convenience at moderate travel speeds. Most level 4 roads have double lanes and an aggregate surface. Some may be single lane; some may be paved or have dust abated. Maintenance level 5 is assigned to roads that provide a high degree of user comfort and convenience.

Normally, level 5 roads have double lanes and are paved, but some may be aggregate surfaced with the dust abated.

[28] *Mid-seral or later* – Mid-seral is the successional stage in a plant community that is the midpoint as it moves from bare ground to climax. For riparian areas, it means willows or other shrubs have become established. For shrub-steppe areas, it means shrubs associated with climax are present and increasing in density.

[29] *Multi-story mature or late successional forest* – This stage is similar to the *old multistory structural* stage (see below). However, trees are generally not as old, and decaying trees may be somewhat less abundant.

[30] *Objective* – An objective is a statement in a land management plan describing desired resource conditions and intended to promote achieving programmatic goals. (LCAS)

[31] *Old multistory structural stage* – Many age classes and vegetation layers mark the old forest, multistoried stage. It usually contains large old trees. Decaying fallen trees may be present that leave a discontinuous overstory canopy. On cold or moist sites without frequent fires or other disturbance, multi-layer stands with large trees in the uppermost layer develop. (Oliver and Larson, 1996)

[32] *Old growth* – Old growth forests generally contain trees that are large for their species and the site, and are sometimes decadent with broken tops. Old growth often contains a variety of tree sizes, large snags, and logs, and a developed and often patchy understory.

[33] *Permanent development* – Any development that results in a loss of lynx habitat for at least the duration of a forest plan, approximately 15 years. Ski trails, parking lots, new permanent roads, structures, campgrounds, and many special use developments would be considered permanent developments.

[34] *Prescribed fire* – A prescribed fire is any fire ignited as a management action to meet specific objectives. A written, approved prescribed fire plan must exist, and NEPA requirements met, before ignition. The term prescribed fire replaces the term management ignited prescribed fire. (NWCG)

[35] *Precommercial thinning* – Precommercial thinning is mechanically removing trees to reduce stocking and concentrate growth on the remaining trees, and not resulting in immediate financial return. (Dictionary of Forestry)

[36] *Project* - All, or any part or number of the various activities analyzed in an Environmental Impact Statement, Environmental Analysis, or Decision Memo. For example, the vegetation management in some units or stands analyzed in an EIS could be for fuel reduction, and therefore

those units or stands would fall within the term *fuel treatment project* even if the remainder of the activities in the EIS are being conducted for other purposes, and the remainder of those units or stands have other activities prescribed in them. All units in an analysis do not necessarily need to be for fuel reduction purposes for certain units to be considered a *fuel reduction project*.

[37] *Red squirrel habitat* – Red squirrel habitat consists of coniferous forests of seed and cone-producing age that usually contain snags and downed woody debris, generally associated with mature or older forests.

[38] *Regeneration harvest* – The cutting of trees and creating an entire new age class; an even-age harvest. The major methods are clearcutting, seed tree, shelterwood, and group selective cuts. (Helms, 1998)

[39] *Research* – Research consists of studies conducted to increase scientific knowledge or technology. For the purposes of Standards VEG S5 and VEG S6, research applies to studies financed from the forest research budget (FSM 4040) and administrative studies financed from the NF budget.

[40] *Restore, restoration* – To restore is to return or re-establish ecosystems or habitats to their original structure and species composition. (Dictionary of Forestry)

[41] *Riparian area* – An area with distinctive soil and vegetation between a stream or other body of water and the adjacent upland; includes wetlands and those portions of floodplains and valley bottoms that support riparian vegetation. (LCAS)

[42] *Salvage harvest* – Salvage harvest is a commercial timber sale of dead, damaged, or dying trees. It recovers economic value that would otherwise be lost. Collecting firewood for personal use is not considered salvage harvest.

[43] *Shrub steppe habitat* – Shrub steppe habitat consists of dry sites with shrubs and grasslands intermingled.

[44] *Standard* – A standard is a required action in a land management plan specifying how to achieve an objective or under what circumstances to refrain from taking action. A plan must be amended to deviate from a standard.

[45] *Stand initiation structural stage* – The stand initiation stage generally develops after a stand-replacing disturbance by fire, insects or regeneration timber harvest. A new single-story layer of shrubs, tree seedlings, and saplings establish and develop, reoccupying the site. Trees that need full sun are likely to dominate these even-aged stands. (Oliver and Larson, 1996)

[46] *Stem exclusion structural stage (Closed canopy structural stage)* – In the stem exclusion stage, trees initially grow fast and quickly occupy all of the growing space, creating a closed canopy. Because the trees are tall, little light reaches the forest floor so understory plants (including smaller trees) are shaded and grow more slowly. Species that need full sunlight usually die; shrubs and herbs may become dormant. New trees are precluded by a lack of sunlight or moisture. (Oliver and Larson, 1996)

[47] *Timber management* – Timber management consists of growing, tending, commercially harvesting, and regenerating crops of trees.

[48] *Uneven-aged timber management* - Uneven-aged management develops a stand with trees of three or more distinct age classes, either intimately mixed or in small groups of 2 acres or less (based on *The Dictionary of Forestry* Helms, 1998). Group openings do not exceed 20 percent of the stand in a single entry, but individual tree selection can occur throughout an entire stand or between the groups.

[49] *Understory re-initiation structural stage* – In the understory re-initiation stage, a new age class of trees gets established after overstory trees begin to die, are removed, or no longer fully occupy their growing space after tall trees abrade each other in the wind. Understory seedlings then re-grow and the trees begin to stratify into vertical layers. A low to moderately dense uneven-aged overstory develops, with some small shade- tolerant trees in the understory. (Oliver and Larson, 1996)

[50] *Vegetation management* – Vegetation management changes the composition and structure of vegetation to meet specific objectives, using such means as prescribed fire or timber harvest. For the purposes of this decision, the term does not include removing vegetation for permanent developments like mineral operations, ski runs, roads and the like, and does not apply to fire suppression or to wildland fire use.

[51] *Wildland urban interface (WUI)* – Use the definition of WUI found in the Healthy Forests Restoration Act. The full text can be found at HFRA § 101. Basically, the wildland urban interface is the area adjacent to an at-risk community that is identified in the community wildfire protection plan. If there is no community wildfire protection plan in place, the WUI is the area 0.5 mile from the boundary of an at-risk community; or within 1.5 miles of the boundary of an at-risk community if the terrain is steep, or there is a nearby road or ridgetop that could be incorporated into a fuel break, or the land is in condition class 3, or the area contains an emergency exit route needed for safe evacuations. (Condensed from HFRA. For full text see HFRA § 101.)

[52] *Winter snowshoe hare habitat* – Winter snowshoe hare habitat consists of places where young trees or shrubs grow densely – thousands of woody stems per acre – and tall enough to protrude above the snow during winter, so snowshoe hare can browse on the bark and small twigs (LCAS). Winter snowshoe hare habitat develops primarily in the stand initiation, understory reinitiation and old forest multistoried structural stages.

# Appendix F. Riparian Management Zones

## Background

Naiman et al. (2000) identifies that discoveries about the structure and dynamics of riparian zones have extended the scope of understanding about this portion of the landscape and have important implications for stream and watershed management. Forest plans must establish width(s) for riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands (USDA Forest Service 2015). The following guidance has been developed to assist interdisciplinary teams in becoming familiar with and consistently applying criteria to: (1) appropriately delineate riparian management zones; and (2) analyze important considerations in developing appropriate management actions within or affecting riparian management zones. The objective is to ensure that interdisciplinary teams adequately consider riparian functions and ecological processes in both the delineation of riparian management zones and determination of appropriate management actions within or affecting riparian management zones.

### Overview of the Riparian Management Zone Delineation Guidance

Aquatic and riparian systems are easily affected by land management activities on the surrounding hillslopes. Riparian management zones provide both a linkage and transitional habitat between hillslopes and upland terrestrial habitats and the aquatic habitats within stream channels.

In general, there is little controversy over the need to define riparian management zones in order to maintain riparian functions and ecological processes. The controversy is over the width of the riparian management zone, the extent and type of management activities that can occur within them, and the purposes for those activities. Management activities that occur within, or adjacent to, a riparian management zone are subject to specific goals, objectives, standards and guidelines. Forest plans and the associated management direction regulate two major features of riparian management zones: (1) their width; and (2) the kind and amount of activity that can take place within or influence them (Spence et al. 1996, Quigley and Arbelbide 1997, USDA 2015).

Riparian zones are among the most complex ecological systems and also among the most important for maintaining the vitality of the landscape and its rivers (Naiman et al. 2000). Evaluating the effectiveness of riparian management zones to manage for riparian functions and ecological processes is difficult because of the complexities of such areas, the extended time over which impacts can occur; and the resiliency and rate of recovery. The riparian management zone should be designed to maintain riparian functions and ecological processes with consideration of multiple scales (stream reach, sub-watershed, and watershed scale).

### Riparian Management Zone Delineation Criteria for the Rio Grande National Forest

#### *General Criteria*

The following are criteria to be used to delineate riparian management zones for perennial and intermittent streams, ponds, lakes, reservoirs, and wetlands on the Forest.

I. Forested Fish Bearing Streams*

Perennial streams (and intermittent streams providing seasonal rearing and spawning habitat) – In the absence of local field data, 300-foot slope distance from the ordinary high water mark, OR flood-prone width, OR two site-potential tree heights, OR to the outer edges of riparian vegetation, whichever is greatest, OR defined based on a site-specific analysis by a qualified specialist with expertise in the field of riparian function and ecological processes.

II. Forested Non-Fish Bearing Streams*

In the absence of local field data, 150-foot slope distance from the ordinary high water mark, OR flood-prone width, OR one site-potential tree height, OR to the outer edge of riparian vegetation, whichever is greatest, OR defined based on a site-specific analysis by a qualified specialist with expertise in the field of riparian function and ecological processes.

III. Ponds, Lakes, Reservoirs, and Wetlands*

In the absence of local field data, 150-foot slope distance from the ordinary high water mark, OR outer edge of seasonally saturated soils, OR outer edge of riparian vegetation, OR one site-potential tree height, whichever is greatest, OR defined based on a site-specific analysis by a qualified specialist with expertise in the field of riparian function and ecological processes.

IV. Intermittent and Non-Forested Streams*

In the absence of local field data, the outer edge of the riparian vegetation, OR 100-foot slope distance, OR one site-potential tree height whichever is greatest, OR defined based on a site-specific analysis by a qualified specialist with expertise in the field of riparian function and ecological processes.

*Note: Sediment delivery distances vary based upon the combination of proposed management actions and the inherent site characteristics. Because sediment delivery distances may exceed the selected option, riparian management zones may need to be adjusted to avoid or minimize delivery to the associated water body under any option.

### Step-Down Process for Riparian Management Zone Delineation

Effective use of the riparian management zone delineation requires a full understanding of the selection criteria options within each of the four categories.

Delineating a riparian management zone requires two decisions to be made. First, the area needs to be correlated with one of the four Categories (I, II, III, or IV). The second decision is identifying which option, or criteria, within that category to use.

The decision as to which option or criteria should be chosen should occur through discussions with the interdisciplinary team, resource specialists, and/or the line officer. In general, determining the level of analysis that best suits the needs of the project will be driven by the potential effects of the project, baseline conditions, management direction, and issues associated with the project/area of interest that were identified through scoping, the work of the interdisciplinary team, or the line officer.

Written documentation of the chosen riparian management zone delineation option within a category, and the rationale behind the choice, should be included in record documentation for the project.

The options within a given category have varying levels of associated analysis that are involved with delineating the riparian management zone. Category IV, Non-forested Streams, differs from the other Categories in that it does not designate a set distance and therefore has two options rather than three.

### *Option 1*

In lieu of field data, selection of the first option provides a conservative boundary—generally in excess of two site-potential tree heights in the case of the 300-foot slope distance, and greater than one site-potential tree height in the case of the 150-foot slope distance—that would be expected to account for most riparian processes including stream shading, large woody debris recruitment, fine organic litter input, bank stabilization, sediment filtration, windthrow, riparian microclimate and productivity, and wildlife habitat. Again, selection of this option is expected to provide land managers with the option of delineating a riparian management zone in the absence of field confirmation, with the expectation that the distances would account for most riparian functions and ecological processes in a system.

### *Option 2*

The second criteria option, which is used similarly in Categories I-IV, requires field verification of certain site characteristics and provides a more site-based delineation of a riparian management zone boundary for a specific location. Depending on which category (I, II, III, or IV) is involved, options include use of site-potential tree height or riparian vegetation, whichever is greatest given the category.

Site-potential tree height is spoken to in the literature and correlated with the protection of riparian functions and ecological processes such as stream shading, LWD recruitment, fine organic litter input, bank stabilization, sediment filtration, windthrow, riparian microclimate and productivity, and wildlife habitat (Spence et al. 1996, Quigley and Arbelbide 1997).

Riparian vegetation is defined through classification of the vegetation associated with the aquatic habitat and its outer extent (see glossary), and it generally influences riparian processes such as fine organic litter input, bank stabilization, sediment filtration, stream shading, and wildlife habitat.

Option 2 requires the use of certain field data to be collected from the project area and analyzed to determine the boundary of the riparian management zone. It is considered an option requiring potentially less than a site-specific analysis (Option 3), but it is more appropriately tied to the landscape than a default distance might be (Option 1).

### *Option 3*

The third option, which is used in Categories I-IV, is the use of a site-specific analysis to define the riparian management zone. This option requires potentially the most analysis of the three options. When defining the riparian management zone, the specialist conducts an on-site analysis of the riparian functions and ecological processes associated with the stream, pond, lake, reservoir or wetland, and defines the riparian management zone based on the distance that best encompasses the extent of those functions and processes. The value gained from this effort is a site-specific riparian management zone delineation appropriate to the functions and processes between upland terrestrial habitats and adjacent aquatic habitats for that area. This information

potentially provides more opportunities for project design because the existing condition is better known, and therefore effects of actions can be better assessed, and projects can be more responsive to needs of the aquatic ecosystem.

In summary, riparian management zone delineation is set up in a manner that provides flexibility for different levels of analysis that, regardless of the option chosen, will provide for riparian functions and ecological processes. The decision on which option to use must involve considerations of the project in regard to potential effects, baseline conditions, and issues and their relationship to riparian functions and ecological process.

The effectiveness of delineating an accurate riparian management zone provides decision-makers with the information necessary for sound decisions regarding management activities within a watershed. With an understanding of the riparian functions and ecological processes of a system, and the means by which actions may affect them, decision makers are provided an opportunity to design activities to maintain or restore listed fish species, their habitats, and other SWRA resources.

### *Site-Potential Tree Heights for Use in Identifying Riparian Management Zones*

When planning and implementing vegetation management projects, distances equivalent to one or two site-potential tree heights may be used to determine riparian management zone boundaries, provided a site visit has been completed. Current conditions and dominant potential vegetation group (PVG) for the site/project area must be verified in the field.

Once the dominant PVG has been field-verified, the site-potential tree height criteria in Table 26 will be used to determine riparian management zone widths in the management units. See the glossary in this appendix for definitions of site-potential tree height, site tree, and seral tree species. For more information about forested vegetation and PVGs, refer to appendix C of this forest plan.

**Table 26. Site potential tree height by potential vegetation group**

[Rounded average calculated from all available 1,044 stand exams from the Forest during 1995–2015.]

| Potential Vegetation Group | Age | 1 Site Tree Height (feet) | 2 Site Tree Height (feet) |
|---|---|---|---|
| 1 – Aspen forest, with and without softwoods | 100 | 60 | 120 |
| 2 – Bristlecone pine / Limber pine | 100 | 50 | 100 |
| 3 – Lodgepole pine | 100 | 60 | 120 |
| 4 – Mixed conifer (cool-dry) | 100 | 60 | 120 |
| 5 – Mixed conifer (cool-moist) | 100 | 65 | 130 |
| 6 – Mixed conifer (warm-dry) | 100 | 60 | 120 |
| 7 – Pinyon-juniper | 100 | 20 | 45 |
| 8 – Ponderosa pine | 100 | 60 | 120 |
| 9 – Spruce-fir | 100 | 85 | 170 |

## References Cited

Megahan, W.F., and J. Hornbeck. 2000. Lessons learned in watershed management: A retrospective view. Proceedings, USDA Forest Service Rocky Mountain Research Station – P – 13.

Naiman, R.J., R.E. Bilby, and P.A. Bisson. 2000. Riparian ecology and management in the Pacific coastal rain forest. Bioscience. November 2000 vol. 50, no. 11, pp. 996-1011.

Quigley, T.M., and S.J. Arbelbide (eds.) 1997. An assessment of ecosystem components in the interior Columbia Basin and portions of the Klamath and Great Basins, Volume III (PNW-GTR-405, 1997): An Ecosystem Approach to Salmonid Conservation (NMFS TR-4501-96-6057, 1996).

Spence, B.C., and R.M. Hughes. 1996. An ecosystem approach to salmonid conservation. December 1996. TR-4501- 96-6057.

USDA Forest Service. 1997. Riparian reserve evaluation techniques and synthesis, supplement to section II of Ecosystem Analysis at the Watershed Scale: Federal Guide for Watershed Analysis. Version 2.2.

USDA Forest Service. 2015. Forest Service Handbook 1909.12, Land Management Planning Handbook. Chapter 20 – Land Management Plan. Amendment 1909.12-2015-1. Effective January 30, 2015.

# Appendix G. Priority Watersheds

## Background

The Forest Service uses the Watershed Condition Framework to asses and characterize the health and condition of subwatersheds (6th level or 12-digit hydrologic unit code). The Watershed Condition Framework employs a nationally consistent reconnaissance-level approach for classifying watershed condition, using a comprehensive set of 12 indicators that are surrogate variables representing the underlying ecological, hydrologic, and geomorphic functions and processes that affect watershed condition. Primary emphasis is on aquatic and terrestrial processes and conditions that Forest Service management activities can influence (USDA Forest Service 2011).

Watershed condition classification is the process of describing watershed condition in terms of discrete categories (or classes) that reflect the level of watershed health or integrity. The outcome of the classification process is to place each 6th level watershed into one of the classes described below:

- **Class 1:** Watersheds that are functioning properly exhibit high geomorphic, hydrologic, and biotic integrity relative to their natural potential condition.
- **Class 2**: Watersheds that are functioning at-risk exhibit moderate geomorphic, hydrologic, and biotic integrity relative to their natural potential condition.
- **Class 3**: Watersheds that have impaired function exhibit low geomorphic, hydrologic, and biotic integrity relative to their natural potential condition.

A discussion of watershed conditions and trends specific to the Rio Grande National Forest is contained in the *Watershed Resources* section of the environmental impact statement associated with this forest plan revision. Following classification, priority watersheds are selected, and watershed restoration action plans are developed to focus efforts that treat whole watersheds with an integrated set of watershed-scale restoration activities.

Further information on the Watershed Condition Framework is contained in Forest Service publication FS-977 (USDA Forest Service 2011). Additional information, maps, and documentation are available at the Forest Service watershed webpage.

## Priority Watersheds

The 2012 Planning Rule requires land management plans to:

(i) Identify watershed(s) that are a priority for maintenance or restoration; (36 CFR 219.7(f)(1)).

Identification of priority watersheds is done to focus effort on the integrated restoration of watershed conditions in these areas. Priority watersheds are those watersheds where plan objectives for restoration would concentrate on maintaining or improving watershed condition. However, selection of priority watersheds does not preclude watershed restoration efforts in other areas. The identification of priority watersheds is intended to be helpful to Forest Service managers as they schedule work after plan approval, especially in circumstances of limited budgets and resources. Changes as to which watersheds in the plan are "priority" are made by administrative change (sec. 21.5 of FSH 1909.12) (USDA Forest Service 2012).

The Rio Grande National Forest has identified the following priority watersheds:

- Archuleta Creek (130201020202)
- Headwaters Rio Chama (130201020201)21
- Middle Fork Carnero Creek (130100040401).

## References Cited

USDA Forest Service. 2011. Watershed condition framework: A framework for assessing and tracking changes to watershed condition. FS-977. 34 pp. Accessed August 8, 2017, at https://www.fs.fed.us/sites/default/files/Watershed_Condition_Framework.pdf

USDA Forest Service. 2012. Forest Service Handbook 1909.12: Land Management Planning Handbook, chapter 20. 134 pp.

# Appendix H. Relevant Federal Statutes, Regulations, Policies, and Agreements

Management direction in the Forest Service Directive System, including the Forest Service manuals and handbooks, is part of the forest plan management direction and is not repeated in the forest plan directions. Management direction also includes applicable laws, regulations, and policies, although they are not restated in this forest plan.

Direction for managing National Forest System land comes from a variety of levels. National and regional direction includes laws, Executive orders, regulations, and Forest Service policies. The hierarchy of management direction from national and regional direction to the site-specific, project-level direction used in implementing the forest plan is illustrated in Figure 16.

**Figure 16. Hierarchy of national forest management direction**

## Federal Statutes

Applicable Federal statutes that forest management must be in compliance with are listed in Table 27.

**Table 27. Federal Statutes applicable to forest management**

| Title | Initiation/Expiration |
|---|---|
| Agriculture Appropriations Act | May 23, 1908 |
| Alaska National Interest Lands Conservation Act | December 2, 1980 |
| American Indian Religious Freedom Act | August 11, 1978 |
| American with Disabilities Act | 1990 |
| Anderson-Mansfield Reforestation and Revegetation Act | October 11, 1949 |
| Antiquities Act | June 8, 1906 |
| Architectural Barriers Act | 1968 |
| Bankhead-Jones Farm Tenant Act | July 22, 1937 |
| Bald and Golden Eagle Protection Act | June 8, 1940, amended 1962 |
| Cabin Fee Act | December 22, 2014 |
| Carson-Foley Act of 1968 (PL 92-516) | |
| Clarke McNary Act | June 7, 1924 |
| Clean Air Act | July 14, 1955 |
| Clean Air Act | August 7, 1977; Amendments of 1977 and 1990 |
| Clean Water Act as amended | 1948; amended in 1972, 1977, 1981, and 1987 |
| Color of Title Act | December 22, 1928 |
| Cooperative Forestry Assistance Act | July 1, 1978 |
| Department of Agriculture Organic Act | August 3, 1956 |
| Disaster Relief Act | May 22, 1974 |
| Emergency Flood Prevention Act (Agricultural Credit Act) | August 4, 1978 |
| Endangered Species Act as amended | December 28, 1973 |
| Energy Policy Act | August 8, 2005 |
| Energy Security Act | June 30, 1980 |
| Executive Order 13112 | 1999 |
| Executive Order 13195 | January 18, 2001 |
| Federal Advisory Committee Act | October 6, 1972 |
| Federal Aid Highway Act | |
| Federal Cave Resources Protection Act | November 18, 1988 |
| Federal Insecticide Rodenticide, and Fungicide Act | October 21, 1972 |
| Federal Land Exchange Facilitation Act | August 20, 1988 |
| Federal Land Policy and Management Act | October 21, 1976 |
| Federal Lands Recreation Enhancement Act | 2004 |
| Federal Noxious Weed Act | January 3, 1975 |
| Federal Power Act | June 10, 1920 |
| Federal Records Act | September 5, 1950 |
| Federal-State Cooperation for Soil Conservation Act | December 22, 1944 |

| Title | Initiation/Expiration |
|---|---|
| Federal Water Pollution Control Act | July 9, 1956, as amended (Water Quality Act of 1965, Clean Water Restoration Act of 1966) |
| Federal Water Project Recreation Act | July 9, 1965 |
| Fish and Wildlife Conservation Act | September 15, 1960 |
| Fish and Wildlife Coordination Act | March 10, 1934 |
| Forest and Rangeland Renewable Resources Planning Act | August 17, 1974 |
| Freedom of Information Act | November 21, 1974 |
| General Exchange Act | March 20,2922 |
| Granger-Thye Act | April 24, 1950 |
| Healthy Forest Restoration Act | April 7, 1989 |
| Highway Safety Act | September 9, 1966 |
| Historic and Archaeological Data Preservation Act | May 24, 1974 |
| Historical Sites Act | August 21, 1935 |
| Knutson-Vandenberg Act | June 9, 1930 |
| Land Acquisition Act | March 3, 1925 |
| Land Acquisition-Declaration of Taking Act | February 26, 1931 |
| Land and Water Conservation Fund Act | September 3, 1964 |
| Law Enforcement Authority Act | March 3, 1905 |
| Migratory Bird Treaty Act | 1918 |
| Mineral Leasing Act | February 25, 1920, as amended |
| Mineral Leasing for Acquired Lands Act | August 11, 1955 |
| Mineral Materials Act | July 31, 1947 |
| Multiple-Use Sustained Yield Act | June 12, 1960 |
| National Environmental Policy Act | January 1, 1970 |
| National Energy Conservation Policy Act | 1978 |
| National Forest Management Act | October 22, 1976 |
| National Forest Roads and Trails Act | October 13, 1964 |
| National Forest Ski Area Permit Act | 1986 |
| National Historic Preservation Act | October 15, 1966, as amended |
| National Trails System Act | October 2, 1968 |
| National American Graves Protection and Repatriation Act | January 23, 1990 |
| Occupancy Permits Act | March 4, 1915 |
| Organic Administration Act | June 4, 1897 |
| Pipelines Act | February 25, 1920 |
| Public Lands Surveys Act | August 30, 1899 |
| PL 102-575 | October 30 1992 |
| Real Property Quiet Title Action Act | October 25, 1992 |
| Rehabilitation Act | 1973, as amended |
| Renewable Resources Improvement Act | June 30, 1978 |
| Research Grants Act | September 6 ,1958 |
| Right of Eminent Domain Act | August 1, 1888 |
| Rural Development Act | August 30, 1972 |

| Title | Initiation/Expiration |
|---|---|
| Safe Drinking Water Act | November 16, 1977, and Amendments |
| Secure Rural Schools and Community Self-Development Act | 2000 |
| Sikes Act | September 16, 1960 |
| Sisk Act | December 4, 1967 |
| Small Tracts Act | January 12, 1983 |
| Soil and Water Resources Conservation Act | November 18, 1977 |
| Solid Waste Disposal (Resources Conservation and Recovery Act) Act | October 21, 1976 |
| Supplemental National Forest Reforestation Fund Act | September 19, 1972 |
| Surface Mining Control and Reclamation Act | August 3, 1977 |
| Surface Transportation Assistance Act | 1978 |
| The Act | November 16,1973 |
| The Act | May 26, 2000 |
| The Wilderness Act | 1964 |
| Timber Export Act | March 4, 1917 |
| Timber Exportation Act | April 12, 1926 |
| Title Adjustment Act | April 28, 1930 |
| Toxic Substances Control Act | October 11, 1976 |
| Transfer Act | February 1, 1905 |
| Uniform Federal Accessibility Standards | 1968 |
| Uniform Relocation Assistance and Land Acquisition Policies Act | January 2, 1971 |
| U.S. Criminal Code (Title 18 USC Chapter 91- Public Lands) | June 25, 1948 |
| Volunteers in the National Forests Act | May 18, 1972 |
| Water Quality Improvement Act | April 3, 1965 |
| Water Resources Planning Act | July 22, 1965 |
| Watershed Protection and Flood Prevention Act | August 4, 1954 |
| Wild and Scenic Rivers Act | October 2, 1968 |
| Wildfire Suppression Assistance Act | 2003 |
| Wilderness Act | September 3, 1964 |
| Wood Residue Utilization Act | December 19, 1980 |
| Youth Conservation Corps Act | August 13, 1970 |

## Regulations

The Forest also abides by regulations listed in Table 28 as they pertain to the Forest Service.

**Table 28. Regulations applicable to forest management**

| CFR | Title |
|---|---|
| 36 CFR 60 | National Register of Historic Places |
| 36 CFR 63 | Determinations of Eligibility for Inclusion in the National Register of Historic Places |
| 36 CFR 68 | Secretary of the Interior's Standards for the Treatment of Historic Places |
| 36 CFR 79 | Curation of Federally Owned and Administered Archeological Collections |
| 36 CFR 212 | Forest Development Transportation System |
| 36 CFR 213 | Administration Under Bankhead-Jones Act |
| 36 CFR 219 | Planning Rule |
| 36 CFR 220 | National Environmental Policy Act |
| 36 CFR 221 | Timber Management Planning |
| 36 CFR 223 | Sale and Disposal of National Forest System Timber |
| 36 CFR 228 | Minerals |
| 36 CFR 241 | Fish and Wildlife |
| 36 CFR 251 | Land Uses |
| 36 CFR 254 | Landownership Adjustments |
| 36 CFR 261 | Prohibitions |
| 16 U.S.C. 470ii | Protection of Archeological Resources |
| P.L. 114-35 | Cave Resources Protection Act |
| 36 CFR 291 | Occupancy and Use of Developed Sites and Area of Concentrated Public Use |
| 36 CFR 293 | Wilderness Primitive Areas |
| 36 CFR 294 | Special Areas |
| 36 CFR 295 | Use of Motor Vehicles off Forest Development Roads |
| 36 CFR 296 | Archeological Resources Protection Act Uniform Regulations |
| 36 CFR 297 | Wild and Scenic Rivers |
| 36 CFR 800 | Advisory Council on Historic Preservation |
| 36 CFR 1222-1238 | Federal Records Act Uniform Regulations |
| 40 CFR 121-135 | Watersheds Programs |
| 40 CFR 1500-1508 | Council on Environmental Quality |
| | Guidance for Implementation of Federal Wildland Fire Management Policy (2009) |
| P.L. 108-148 | The Healthy Forest Restoration Act |
| | Interagency Prescribed Fire Planning and Implementation Procedures Guide (2014) |
| NFES 2724 | Interagency Standards for Fire and Fire Aviation Operations |
| PMS 484 | National Cohesive Wildland Fire Management Strategy (2014) |
| 43 CFR Part 10 | Native American Graves Protection and Repatriation Act |
| 43 CFR 8340 | Off-road Vehicles |
| 42 U.S.C. 7401 | National Ambient Air Quality Standards |
| NFPA 70 | National Electrical Code |
| NFPN70B | National Fire Code |

| CFR | Title |
|---|---|
| | USDA Forest Service National Fire Plan (2000) |
| 2000 | Uniform Building Code |
| 7 CFR 15e | Enforcement of Nondiscrimination |
| 28 CFR 36 | Nondiscrimination on the Basis of disability by Public Accommodation and in Commercial Facilities |

## Executive Orders

Executive orders applicable to forest management are recorded in Table 29.

**Table 29. Applicable Executive orders**

| Executive Order Number | Title |
|---|---|
| 11593 | Protection and Enhancement of the Cultural Environment |
| 11990 | Protection of Wetlands |
| 11644/11989 | Use of Off-Road Vehicles |
| 11988 | Floodplain Management |
| 12088 | Federal Compliance with Pollution Control Standards |
| 12898 | Environmental Justice |
| 12962 | Recreational Fisheries |
| 13007 | Indian Sacred Sites |
| 13112 | Invasive Species, as amended |
| 13195 | Trails for America in the 21st Century |
| 13287 | Preserve America |

## Policies and Guidelines

The forest plan will follow all applicable policies and guidelines, including:

- Forest Service Heritage Strategy
- All Forest Service Manuals
- All Forest Service Handbook
- Secretary of the Interior's Standards Guidelines for Archeology and Historic Preservation
- USDA Forest Service Strategic Plan: FY2015-2020 or most current version.

## State and Local Direction

State and local direction applicable to forest management:

- Colorado Air Quality Protection Act
- Water Division 3, Water Decrees forestwide

- Memorandum of Understanding 14-MU-11132400-004 between the Forest Service and the Natural Resource Conservation Service for permitting and operating SNOTEL, SCAN, and manual snow survey sites
- Memorandum of Understanding 14-MU-11020000-053 between the Forest Service and the State of Colorado Department of Public Health and Environment for management of water quality in State of Colorado define Source Water Assessment Areas on National Forest Systems lands in Colorado
- Memorandum of Understanding 15-MU-11020000-072 between the Forest Service and the State of Colorado Department of Natural Resources and the Colorado Water Conservation Board to establish a framework for the parties to work together in a cooperative manner on issues regarding the management of water and water uses on National Forest System lands in Colorado.

# Appendix I. Proposed and Possible Actions

## Introduction

In compliance with 36 CFR 219.12, this appendix describes proposed and probable actions that may take place on the Rio Grande National Forest at the project level over the next 3 to 5 years. These projects implement the forest plan and work to maintain exiting conditions or achieve desired conditions described in the forest plan. Included are items such as program strategies; inventories, assessment, resource analysis and other planning needs; and ongoing work with partners and cooperating agencies anticipated during the next 3 to 5 years.

The listed proposed and probable management practices are not intended to be all-inclusive, nor are they intended to be decisions or commitments, but simply projections of what actions may take place in the future. A plan amendment is not required to change or modify any proposed or possible actions. The list of the actions can be updated at any time through an administrative change to the plan. More information may be found under plan objectives and management approaches.

## Goal 1

### *Maintain and restore sustainable, resilient terrestrial ecosystems*

#### *Terrestrial Ecosystems*

- Maintain and restore habitat connectivity where appropriate to improve adaptive capacity of native plants and animals. Collaborate with partners to establish priority locations for maintaining and restoring habitat connectivity.
- Restore fire to the landscape where conditions are appropriate.
- Monitor insect and disease infestations and treat epidemic outbreaks.
- Thin and use wildfire to restore or maintain habitat when appropriate.
- Focus invasive species treatments on high priority invasive species and infestations as identified in the most recent version of the invasive species action plan. Prioritize areas such as wilderness, research natural areas, botanical areas, wild, scenic and recreational areas, and aquatic and riparian areas to maintain the integrity of native species and ecosystems. Promote early detection and rapid response as an effective approach to minimize spread.

#### *Range*

- Review active allotment management plans on a regular basis.
- Maintain and replace fencing, water, and other range improvements.

#### *Species of Conservation Concern*

- Map populations of insect species that are species of conservation concern or threatened, endangered, proposed, or candidate species so that interdisciplinary teams can use the information to design projects to avoid impacts to these species.

### Threatened, Endangered, Proposed, and Candidate Species

- Evaluate and update current lynx linkage areas with partners to provide the desired habitat connectivity functions, as practical and needed based on available resources.

### Wildlife

- Increase the number of Naturewatch viewing sites that focus on bird conservation; participate in events for International Migratory Bird Day.
- Establish a maintenance program for existing bat gates.

### Soils

- Map soil types that support edaphic plant species of conservation concern. Include volcanic substrates such as ash-tuffs, latitic lava flows, rhyolite, and andesitic substrates. Sedimentary substrates supportive of edaphic species include calcareous substrates such as limestone and shale.

### Fire

- Assess burned areas to determine suitable and effective emergency stabilization and rehabilitation needs to meet current and anticipated environmental conditions.
- Implement fuels management activities to protect unique features, reduce fire behavior to an acceptable level, or replicate natural disturbance regimes within the constraints of the management area for the proposal.

### Timber Management

- In areas suitable for timber production, salvage dead or dying trees (due to fire, insects, disease) to recover the economic value of the wood while providing for ecosystem function. This will be the primary focus of the timber program for the first 3 years of the planning period.
- The majority of the timber harvest in the next 3 to 5 years is anticipated to be salvaged to recover the economic value of the beetle-killed trees (Table 30).
- Planned management activity under alternative B Modified is shown in Table 31.

**Table 30. Planned timber sale program (annual average volume output)**

[Based on average base funding and an estimated sustained yield limit of 73.7 MCCF]

| | 1st Decade – Years 1 – 3 | | 1st Decade - Years 4 and 5 | | 1st Decade – Years 6 – 10 | | 2nd Decade | |
|---|---|---|---|---|---|---|---|---|
| **Alternative B Modified** | **CCF** | **MBF** | **CCF** | **MBF** | **CCF** | **MBF** | **CCF** | **MBF** |
| Timber Products | Does not include salvage or sanitation volumes | | | | | | | |
| | Lands suitable for timber production | | | | | | | |
| A1. Sawtimber | 0 | 0 | 5,600 | 2,464 | 8,400 | 3,696 | 8,400 | 3,696 |
| A2. Other products | 0 | | 2,400 | | 3,600 | | 3,600 | |
| C. Projected Timber Sale Quantity (A1 + A2) | 0 | 0 | 8,000 | 2,464 | 12,000 | 3,696 | 12,000 | 3,696 |
| Other Estimated Wood Products | Does not meet timber product utilization standards | | | | | | | |
| | **CCF** | **Tons** | **CCF** | **Tons** | **CCF** | **Tons** | **CCF** | **Tons** |
| D. Fuelwood | 7,200 | 8,600 | 7,200 | 8,600 | 7,200 | 8,600 | 7,200 | 8,600 |
| E. Projected Wood Sale Quantity (C + D) | 7,200 | | 15,200 | | 19,200 | | 19,200 | |
| | **CCF** | **MBF** | **CCF** | **MBF** | **CCF** | **MBF** | **CCF** | **MBF** |
| F. Estimated Salvage Volume | 62,800 | 31,400 | 20,000 | 10,000 | 0 | 0 | 0 | 0 |
| G. Total Volume including Salvage (E + F) | 70,000 | | 35,200 | | 19,200 | | 19,200 | |

**Table 31. Planned management activity under alternative B Modified – annual average per decade**

| Forest Cover Type/ Management Practice | 1st Decade (years 1 – 3) (acres) | 1st Decade (years 4 – 5) (acres) | 1st Decade (years 6 – 10) (acres) | 2nd Decade (acres) |
|---|---|---|---|---|
| Spruce-Fir – Salvage Sales | 6,280 | 2000 | 0 | 0 |
| Ponderosa Pine and Mixed Conifer (thinning, uneven-aged management, and shelterwood treatments) and Aspen (regeneration harvests) | 0 | 800 | 1,200 | 1,200 |
| Ponderosa Pine and Mixed Conifer Prescribed Burns | 700 | | 800 | 800 |
| Spruce-Fir Prescribed Burns (piles) | 190 | | 0 | 0 |
| Grasslands Prescribed Burns | 100 | | 100 | 100 |
| Pinyon-Juniper Prescribed Burns | 50 | | 50 | 50 |

## Goal 2

### *Protect and restore watershed health, water resources, aquatic ecosystems, and the systems that rely on them*

#### *Aquatic and Riparian Ecosystems*

- Use vegetation treatments to restore the structure, function, and composition of riparian areas and meadows where encroachment is impacting meadow function.
- Restore nonfunctioning or functioning at-risk riparian areas so they are in, or are moving toward, proper functioning condition.
- Maintain and restore habitat connectivity where appropriate to improve adaptive capacity of plants and animals. Collaborate with partners to establish priority locations for maintaining and restoring habitat connectivity.
- Restore degraded spring sites back to functional habitat for spring-dependent species.
- Reconstruct or restore riparian function to springs identified as not in proper functioning condition.

#### *Water, Soils, and Watersheds*

- Plan and implement improvement activities in priority watersheds that are functionally at risk or impaired.
- Update the priority watershed list to reflect actual needs on the ground.
- Maintain and restore the connections of floodplains, channels, and water tables to distribute flood flows and sustain diverse habitats.
- Implement resource improvement projects that are beneficial for maintaining and improving soil conditions and productivity, and water quantity and quality.
- Complete on-site investigations and refinement of maps for soil-disturbing projects that require site-specific, precise, and highly detailed soil information that is beyond the scale of the current soil surveys.

## Goal 3

### *Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land*

#### *Local Communities*

- Work to maintain and expand contracting and partnering opportunities with local governments, businesses, and organizations. Develop partnerships that leverage different sources of funding to support opportunities to contribute to economic and social sustainability of local communities.

#### *Recreation*

- Engage cooperators in stewardship activities and framework design.

- Furnish readily available offsite and onsite information about recreation opportunities at fee campgrounds.
- Coordinate trail development with trail systems developed by municipalities, counties, states, other Federal agencies, and partners to allow for integration and connectivity.

### Scenery

- In all vegetation treatment and fuel reduction projects, consider improving scenery resources, especially in area that do not meet established scenery objectives.

### Cultural Resources

- Protect fire-sensitive sites from activities that may include vegetation treatment, including prescribed fire and thinning, in and adjacent to site boundaries provided that appropriate protective measures are in place. Erosion, severe fire effects, and livestock congregation can result from "islanding" if sites are only avoided and not treated.
- Synthesize, interpret, and share cultural resource findings with the scientific community and public through prehistoric and historic contexts, formal presentations, publications, and educational venues.
- Annually complete non-project inventory to uphold the Section 110 mandate of the National Historic Preservation Act by prioritizing the following:
  - Areas where eligible cultural resources are threatened, or ongoing impacts are unknown
  - Areas indicated to have high cultural value or high density of cultural resources
  - Areas of importance to traditional communities
  - Areas where additional survey will contribute to a greater regional understanding of a specific management unit or special interest area.
- Develop and maintain collaborative partnerships and volunteer efforts to assist the Forest Service in researching and managing its cultural resources. Develop partnerships with traditional communities, nonprofits, volunteers, professional organizations, and schools.
- Develop management and preservation plans for administrative facilities and infrastructure that are significant cultural resources with special significance, or are sites that receive heavy visitor use.
- Encourage volunteer participation in cultural resource conservation activities such as research, site stabilization, conservation, and interpretation.
- Engage local communities in cultivating economic development opportunities for heritage tourism.
- Develop a database of fire-sensitive sites, structures, and other resources to facilitate resource protection during fire management.
- Provide opportunities for line officers and Forest Service employees to receive training to gain a broader understanding of the unique legal relationship between the Federal Government and Indian tribes, and to learn about American Indian law, customs, traditions, and values.
- Through consultation, identify other plants that may be important to tribes.

- Identify oshá populations.
- Work to understand the community needs of tribes and build respectful, collaborative relationships to achieve mutually desired conditions.
- Maintain the current heritage database.
- Properly preserve historic documents, such as photographs and maps, and make them available for research and interpretation.
- Cultivate economic development opportunities for heritage tourism in coordination with local communities.

### *Areas of Tribal Importance*

- Develop interpretive and educational exhibits or other media that focus on the history of Forest lands in collaboration with tribes to provide the public with a greater understanding and appreciation of our shared history, culture, and traditions.
- Develop an interpretive and educational site to help prevent vandalism at the Natural Arch.
- Develop interpretive and educational site materials in concert with tribes that can aid in protecting areas of tribal importance.
- Develop a management plan to assist in maintaining cultural values associate with Mount Blanca, involving staff from the San Luis Valley, Bureau of Land Management, Pike-San Isabel National Forest, interested tribes, the U.S. Fish and Wildlife Service Sangre de Cristo Conservation Area, and other non-Federal partners.
- Identify, evaluate, and protect areas acknowledged as traditional cultural properties and work with associated communities to collaboratively manage areas acknowledged as traditional cultural properties by developing programmatic agreements, management plans, memoranda of understanding, or other management tools.

### *Congressionally Designated Trails (CDT)*

- Provide appropriate signage at prominent access points along the Old Spanish National Historic Trail to enhance trail user experience and safety.
- Identify and pursue opportunities to acquire lands or rights-of-way in or adjacent to the Continental Divide National Scenic Trail corridor.
- Provide consistent signage along the trail corridor at road and trail crossings to adequately identify the trail and provide interpretive signs at key trail entry points and limited historic and/or cultural sites to orient visitors and enhance the visitor experience.
- Establish appropriate carrying capacities for specific segments of the Continental Divide National Scenic Trail, monitoring use and conditions, while taking appropriate management actions to maintain or restore the nature and purposes of the trail if the results of the monitoring or other information indicate a trend away from the desired condition.

### *Infrastructure*

- Manage all facilities according to the current Facilities Master Plan.

- When necessary, develop new trails to expand the range of recreation opportunities, ensure user safety, and disperse existing use into different areas to be consistent with other resource objectives.
- Manage road use by seasonal closure if:
  - Use is causing unacceptable damage to soil and water resources due to weather or seasonal conditions
  - Use is causing unacceptable wildlife conflicts or habitat degradation
  - Use is resulting in unsafe conditions due to weather conditions
  - The road(s) serves a seasonal public or administration need
  - The area accessed has a seasonal need for protection or non-use.
- Inspect dams on National Forest System lands to ensure public safety and comply with all appropriate laws and regulations. Assure that high- and moderate-hazard dams have current Emergency Preparedness Plans.
- Inspect facilities with potable water use to ensure public safety and comply with all appropriate laws and regulations.

# Appendix J. Mineral Leasing Stipulations and Lease Forms

This appendix contains the resource-protection stipulations that would be attached to the standard lease form R2-FS-2820-13 (92), which is included below. These protections are visually depicted on the Oil and Gas Stipulations Map found on the external drive at the back of the forest plan document.

The standard lease form (R2-FS-2820-13 (92)) is included. The "Notice for Land of the National Forest System Under Jurisdiction of the Department of Agriculture" is attached to every lease issued through the Bureau of Land Management. Immediately following the notice are the stipulations that would be applied on the ground.

## NOTICE FOR LANDS OF THE NATIONAL FOREST SYSTEM UNDER JURISDICTION OF DEPARTMENT OF AGRICULTURE

The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit. The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by an exploration plan approved by the Secretary of the Interior.

All matters related to this stipulation are to be addressed to:

**District Ranger**, (Unit)
(Street Address)
(City, State Zip)
(Phone number)

who is the authorized representative of the Secretary of Agriculture.

## NOTICE

CULTURAL AND PALEONTOLOGICAL RESOURCES - The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall:

1. Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required, then:
2. Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.
3. Implementation mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.

The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest discovered as a result of surface operations under this lease and shall leave such discoveries intact until directed to proceed by FS and BLM.

*R2-FS-2820-13 (92)*

*Lease Number:* ____________________

*FS Parcel No.:* ____________________

ENDANGERED OR THREATENED SPECIES - The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.

The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the Forest Service. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats.

### No Surface Occupancy Stipulation

#### *Bighorn Sheep Habitat*

**No surface occupancy or use is allowed on the lands described below.** The maps were developed based on management areas described in the 1996 Land and Resource Management Plan and may vary based on current mapping. The most current maps from Colorado Parks and Wildlife should be used in determining where this stipulation applies on the ground.

**For the purpose of:** Protecting habitat important to bighorn sheep.

Bighorn sheep exhibit high fidelity to certain locations used for lambing, feeding, and watering. The Colorado Department of Park and Wildlife regularly updates maps for these locations. The no surface occupancy stipulation would not allow disturbances on these sites important for wildlife.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why this Stipulation is Necessary for Resource Protection:** Oil and gas activities, including field development, could impact herd calving, movements, and feeds causing the sheep to relocate to less favorable sites. For these reasons, no surface occupancy will be allowed so as to protect these habitats.

This stipulation is consistent with the forest plan because it protects an important aspect of biodiversity and achieves the goals of wildlife management.

This stipulation is appropriate because standard lease terms alone allow occupancy. Timing limitations would only protect the animals during birthing season, but a field development could still occur and temporarily or permanently displace bighorn sheep from these areas.

### *Watersheds of Concern and High Concern*

**No surface occupancy or use is allowed on the lands described below** (legal subdivision or other description)

- All of portions of Section _____, Township ____, Range ____ as shown on the attached map which becomes a part hereof.

**For the purpose of:**

Protection and restoration of the ____________________ watershed (Number __________) that has been damaged through past surface disturbance.

Conditions under which a waiver of this stipulation would be considered:

1. A site-specific watershed analysis determines that the watershed is actually not a watershed of concern, the no surface occupancy could be waived. Other resource stipulations may still apply.
2. Total surface disturbance in the watershed has been reduced and restoration has occurred to bring the watershed within acceptable limits.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

### *Special Interest Areas and the Continental Divide National Scenic Trail*

**No surface occupancy or use is allowed on the lands described below.**

**For the purpose of:** Protecting unique and special areas of botanic, geologic, historic, scenic or cultural values. This stipulation would be applied to the following areas:

- Management Area 4.1
- The Continental Divide National Scenic Trail and corridor.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

Exceptions may be allowed if the lessee can demonstrate that the integrity of the special area would not be impaired by development.

**Why This Stipulation is Needed to Protect Resource Values:** This stipulation is consistent with the management areas direction for Management Area 4.1, Special Designation – Special Interest Areas. This stipulation is necessary so that unique and special resources may be protected from ground-disturbing activities associated with development.

### *Soils having Mass Movement Potential*

**No surface occupancy or use is allowed on the lands described below:**

- Soils with mass movement potential.

**For the purpose of:** Protecting long-term soil productivity ad ecosystem sustainability. Areas with high mass movement potential have been mapped and are identified within the soil resource inventories for the Rio Grande National Forest.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

This stipulation may be waived if an on-site investigation by an interdisciplinary team concludes that operations may be carried out without undue risk to soil and water resources.

**Why This Stipulation is Needed to Protect Resource Values:** This stipulation is necessary to protect sensitive soils and ecosystem from a mass failure (landslides). This stipulation prohibits ground-disturbing activity. Standard lease terms are inadequate because they would allow occupancy and associated ground-disturbing activities. Any physical disturbances to the surface soils from roads, earthmoving, or pad construction might result in a mass movement, a reduction of soil productivity, and increased sedimentation. The no surface occupancy stipulation would not allow occupancy and would maintain productivity while allowing leases.

This stipulation is consistent with the land management plan which must manage the land so that long-term soil productivity is not damaged or impaired. It is consistent with other management activities such as timber activities. These soils were excluded from the suitable timber base.

### Research Natural Areas

**No surface occupancy or use is allowed on the lands described below:**

- Management Area 4.2 – Special Designation – Research Natural Areas.

**For the purpose of:** Protection of important biotic and abiotic components of ecosystems.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why This Stipulation is Needed to Protect Resource Values:** This stipulation is consistent with Management Area 4.2 direction. These areas emphasize protection of important natural areas for research and scientific study. Activities other than research and study are limited to those that are non-destructive of the natural vegetation and do not allow roads or facilities. No surface occupancy is appropriate because it will not allow occupancy in these natural areas, thereby protecting areas for study. Standard lease terms or other stipulations would be inadequate because occupancy would be allowed, disturbing and impacting natural functions of the ecosystem. Under no surface occupancy, leasing would be allowed while protecting other resources.

### *Alpine Areas*

**No surface occupancy or use is allowed on the lands described below:**

**For the purpose of:** To protect fragile ecosystems that are not reclaimable and highly visible.

Areas on Alpine Slope Landtype Association shall not have occupancy so that these fragile ecosystems may be protected from disturbances. Reclamation of alpine areas has proven very difficult, if not impossible, on these ecosystems.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why This Stipulation is Needed to Protect Resource Values:** Alpine areas are defined by landtype associations. The "Kobresia on Alpine Summits" ecological land unit association are high-elevation tundra areas having sedges, forbs, and shrub vegetation on shallow soils. Soils are strongly acidic, and have poor revegetation potential due to shallow rooting depth. This ecological unit is in a harsh climatic regime characterized by high winds, cold temperatures, 30 to 50 inches of precipitation per year, and a very short growing season.

The no surface occupancy stipulation is the most appropriate stipulation to protect these fragile ecosystems. Surface disturbances of any kind would be difficult, if not impossible, to reclaim. No surface occupancy is consistent with the overall concept of ecosystem management to protect sensitive resources and assure long-term productivity and sustainability of the land.

Standard lease terms, controlled surface use or timing limitations would allow occupancy, but would disturb these ecosystems. No surface occupancy allows these lands to be leased, while protecting and sustaining these fragile ecosystems.

### *Ski Resorts*

**No surface occupancy or use is allowed on the lands described below.**

**For the purpose of:** To protect existing or potential winter sports sites. This stipulation would be applied to the following areas:

- Management Area 4.8 – Ski-based Resorts.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why This Stipulation is Needed to Protect Resource Values:** This stipulation is consistent with the management area direction for Management Area 4.8 – Ski-based resorts. No surface occupancy is the appropriate stipulation because the mineral estate is available to be leased, while the integrity of the ski area as a recreational place is maintained throughout four seasons. Timing limitations, controlled surface use, and standard lease terms would allow occupancy, and may create conflicts with four-season use or summer maintenance activities.

This stipulation is consistent with other activities allowed or restricted in such areas. For example, these lands are to be recommended for withdrawal from locatable mineral entry with every new master development plan. Alpine ski area lands are included as suited for timber production, which is a change from the 1996 forest plan. Tree removal can occur on these areas, specifically for ski area expansion, safety, aesthetics, and vistas.

### *Slopes of 40 Percent or More*

**No surface occupancy or use is allowed on the lands described below:**

- Any area within the leasehold what has slope of 40 percent of more falls under the jurisdiction of this stipulation.

**For the purpose of:** To protect soil resources from excessive soil erosion, to reduce potential impacts to fisheries, to minimize sedimentation, and to reduce visual impacts from roads on steep slopes.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

The lease may use existing roads on such slopes to access gentler terrain. If new roads are needed through an area of 40 percent slopes or greater, than an on-site investigation will be conducted by various Forest resource specialists such as a hydrologist, soil scientist, engineer, landscape architect, and others. Approval may or may not be given depending on the potential resource impacts estimated by the resource specialists.

**Why This Stipulation is Needed to Protect Resource Values:** This stipulation is consistent with the forest plan which has direction from maintaining soil productivity and protection water quality. This stipulation is not defined by a management area as steep slopes may occur anywhere. Visual impacts are also reduced by this stipulation since many of the steep slopes on the Forest would require full bench road construction which would be highly visible.

This stipulation is consistent with other activities allowed or restricted on steep slopes.

## Timing Limitation Stipulation

### *Deer and Elk Winter Range*

No surface occupancy is allowed during the following time periods. This stipulation does not apply to operation and maintenance of production facilities: From December 1 through April 15.

**No surface occupancy or use is allowed on the lands described below: (legal subdivision or other description).**

This stipulation is applied to all lands defined on maps provided by Colorado Parks and Wildlife.

**For the purpose of:** Keep disturbance to acceptable levels, limit activities to periods of time when animals are not concentrated on these critical winter ranges.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

This stipulation may be waived after environmental analysis reveals that big-game animals are not in the area. This determination depends highly on the type of winter, snowfall amounts, and big-game herd movements and patterns.

**Why this Stipulation is Necessary for Resource Protection:** This stipulation is consistent with management direction for big game winter range, which emphasizes habitat management for deer, elk, pronghorn, and bighorn sheep. The Timing Limitation Stipulation is appropriate because it will minimize impacts during the critical winter period from December 1 through April 15. Standard lease terms alone would not allow adequate time periods for protection of the elk winter range. Occupancy would be allowed in these areas during between April 16 through November 30.

## Controlled Surface Use Stipulation

### *For Soils Having Moderate Mass Movement Potential*

**On the lands described below:** Legal description.

**Surface occupancy or use is subject to the following special operating restraints:** Areas mapped with this stipulation have a moderate mass movement potential, which means they may be subject to landslides, earthflows, debris avalanches, and block slippage. Because of this possibility, occupancy (drill pads and access roads) will only be allowed after an on-site review by soil, water, and engineering specialists of the proposed well location. The specialists may approve the proposed location or require a new location.

**For the purpose of:** To protect soil, water, and fisheries resources from mass failure (landslides).

Soil units having moderate mass movement potential have been identified. Soil resource inventories identify these areas and can be used to identify areas having moderate mass movement potential.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why this Stipulation is Necessary for Resource Protection:** Areas mapped with this stipulation have a moderate mass movement potential, which means they may be subject to landslides, earthflows, debris avalanches, and block slippage. Because of this possibility, occupancy (drill pads and access roads) will only be allowed after an on-site review of the proposed location. The specialists that conduct the review may approve the proposed location or suggest a new acceptable location. The review team may consist of resource specialists such as hydrologists, soil scientists, geotechnical engineers, and landscape architects.

This stipulation is necessary because proposed well locations may need to be moved more than 200 meters in order to keep mass movement risks minimized.

The controlled surface use stipulation is consistent with the intent of the land management plan, which has goals of maintaining soil productivity, ecosystems sustainability, and protecting water quality. No surface occupancy would be overly restrictive since many areas within the stipulated area can have occupancy. Standard lease terms would be inappropriate because they would not describe the specific restrictions and limitations to development.

### *For Scenic Resource Areas*

**On the lands described below:**

**Surface occupancy or use is subject to the following special operating restraints:** These areas have high scenic and recreational values that may require screening or buffering, or site relocation to meet landscape character through the use of line, form, color, and texture. Relocation of proposed well sites may require distances greater than 200 meters.

A computer-generated perspective may be required by the authorized officer as part of the visual impact assessment. In addition, an on-site investigation will be required by a qualified landscape architect as part of the site-specific environmental analysis.

This stipulation is applied to the following areas, unless a more restrictive stipulation applies:

- Management Area 4.21 – Special Designation – Scenic Byways and Scenic Railroads
- Management Area 4.34 – Special Designation – Eligible and Suitable Wild, Scenic, and Recreational Rivers.

**For the purpose of:** Protecting visual resources.

**Any changes:** Waivers, exceptions, or modifications (WEMs) to this stipulation will be considered

- only at the time operations are proposed,
- will be subject to the land management plan in effect at the time of consideration, and
- will be subject to applicable regulations and environmental compliance requirements.

Granting of a WEM is a discretionary action that the operator should not routinely expect. The Forest Service reserves the right to impose other stipulations in the same area of this leasehold if a WEM is granted.

**Why this Stipulation is Necessary for Resource Protection:** This stipulation is necessary because proposed well locations may need to be moved more than 200 meters in order to protect scenic resources.

The controlled surface use stipulation is consistent with management area prescriptions 4.21 and 4.34 of the land management plan. No surface occupancy would be overly restrictive since many areas within the stipulated area can have occupancy. Standard lease terms would be inadequate because they would generally allow relocations of approximately 200 meters, and this limited distance may not protect the scenic resources.

Rvsd Plan - 00001083



**United States Department of Agriculture**
**Forest Service**

Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144
www.fs.usda.gov/main/riogrande/



USDA
Rio Grande National Forest
Land Management Plan
Alternative B - Modified
Management Area Acres
1.1a - 40,052
1 - 392,138
3 - 519,798
4.1 - 26,939
4.2 - 23,861
4.21 - 27,501
4.34 - 35,869
4.8 - 1,632
5 - 837,269
Town
Adjacent Wilderness
Congressionally Designated Trail Corridor
Management Area
1.1a Recommended Wilderness
1 Primitive Wilderness
3 Colorado Roadless
4.1 Special Interest Area
4.2 Research Natural Area
4.21 Scenic Byway or Railroad
4.34 Eligible Wild and Scenic River
4.8 Ski-Based Resort
5 General Forest
National Forest Boundary
Non-FS Land
Uncompahgre National Forest
Uncompahgre Wilderness
Powderhorn Wilderness
Gunnison National Forest
La Garita Wilderness
Weminuche Wilderness
San Juan National Forest
South San Juan Wilderness
San Isabel National Forest
Sangre de Cristo Wilderness
Creede
South Fork
Del Norte
La Garita
Saguache
Villa Grove
Moffat
Crestone
Center
Hooper
Mosca
Monte Vista
Alamosa
Blanca
Jasper
Platoro
114
285
149
112
374
160
17
150
15
Wyoming
Colorado
Nebraska
Fort Collins
Denver
Grand Junction
Utah
Kansas
New Mexico
Oklahoma
25
70
107°0'0"W
106°0'0"W
38°0'0"N
37°0'0"N

Rvsd Plan - 00001085

# Rio Grande National Forest Land Management Plan Fisheries Activity Period Map -West

USDA

Class A - SCC Conservation

Class B - RGCT Recreational Stream and Lake

Class C - Non-native Stream and Lake Recreational

Class D Stream - None

For the purposes of this definition, the Activity Period Map(s) designate the class of a mapped water body as Class A, B, C, or D, and specifies the restricted activity period for classes of water bodies, describes the location of Class A water bodies, and may specify special conditions for some water bodies. The class of a mapped water body, except for an uncoded water body, is the class that is designated by a class symbol on a map.

An uncoded water body means a mapped water body that does not have a class symbol specified on an Activity Period Map. The class of an uncoded water body is as follows:

Class D, unless otherwise specified; or is defined as where an uncoded water body enters a mapped water body that is a Class A, B or C water body, the portion of the uncoded water body for a distance of 1 mile upstream from the mouth of the uncoded water body is the same class as the mapped water body that is entered.

An unmapped water body means a water body that does not appear on an Activity Period Map. The class of an unmapped water body is as follows:

Where an unmapped water body enters a mapped Class A water body, the unmapped water body is Class A for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class B for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class B water body, the unmapped water body is Class B for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class C for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class C or D water body, the unmapped water body is Class C or D for all portions of the unmapped water body, respectively. Where an unmapped water body enters a fish bearing lake, the unmapped water body is Class C, whether or not the fish bearing lake appears on the Activity Period Map(s).

## Locations and Details of Water Bodies

Any person who carries out an activity within the Rio Grande National Forest must use all of the following information to determine the Class of water body applicable to the activity location: the provisions and the applicable RGNF Map, including the associated map legend and its tables. The table below describes each of the types of water bodies with specific details on each Class A water bodies. Where water body Classes appear to overlap on the map or when the water body Class indicated by the map differs from the map legend and its tables, the water body Class indicated in the map legend and tables will apply.

| Water Body | Water Body Class | Location | Restricted Activity Period |
|---|---|---|---|
| West Alder Creek | A | Divide RD | recommended by Fisheries Biologist |
| Whale Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Class B | B | all | Rio Grande Cutthroat Trout (May 15 - June 30) |
| Class C | C | all | Brown Trout and Brook Trout (Oct 1 - Dec 31); Rainbow Trout (April 1 - Aug 31) |
| Class D | D | all | none |

Created by:
USFS R2 Rio Grande National Forest
Revision Team
Fish Biologist

Coordinate System:
GCS North American 1983

N

ATTENTION
This product is reproduced from geospatial information prepared by the U.S. Department of Agriculture, Forest Service. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify or replace GIS products based on new inventories, new or revised information, and if necessary in conjunction with other federal, state or local public agencies or the public in general as required by policy or regulation. Previous recipients of the products may not be notified unless required by policy or regulation.

0 10 20 40 Miles



USDA
Rio Grande National Forest
Land Management Plan
Fisheries Activity Period Map - North
Class A - SCC Conservation
Class B - RGCT Recreational Stream and Lake
Class C - Non-native Stream and Lake Recreational
Class D Stream - None
0
15
30
60
Miles

Locations and Details of Water Bodies

Any person who carries out an activity within the Rio Grande National Forest must use all of the following information to determine the Class of water body applicable to the activity location: the provisions and the applicable RGNF Map, including the associated map legend and its tables. The table below describes each of the types of water bodies with specific details on each Class A water bodies. Where water body Classes appear to overlap on the map or when the water body Class indicated by the map differs from the map legend and its tables, the water body Class indicated in the map legend and tables will apply.

| Water Body | Water Body Class | Location | Restricted Activity Period |
|---|---|---|---|
| Big Springs Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Cave Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Cross Creek | A | Saguache RD | recommended by Fisheries Biologist |
| East Middle Creek | A | Saguache RD | recommended by Fisheries Biologist |
| East Pass Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Jack's Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Middle Fork Carnero Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Miner's Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Prong Creek | A | Saguache RD | recommended by Fisheries Biologist |
| South Fork Carnero Creek | A | Saguache RD | recommended by Fisheries Biologist |
| West Alder Creek | A | Divide RD | recommended by Fisheries Biologist |
| Whale Creek | A | Saguache RD | recommended by Fisheries Biologist |
| Class B | B | all | Rio Grande Cutthroat Trout (May 15 - June 30) |
| Class C | C | all | Brown Trout and Brook Trout (Oct 1 - Dec 31); Rainbow Trout (April 1 - Aug 31) |
| Class D | D | all | none |

For the purposes of this definition the Activity Period Map(s) designate the class of a mapped water body as Class A, B, C, or D, and specifies the restricted activity period for classes of water bodies, describes the location of Class A water bodies, and may specify special conditions for some water bodies. The class of a mapped water body, except for an uncoded water body, is the class that is designated by a class symbol on a map.

An uncoded water body means a mapped water body that does not have a class symbol specified on an Activity Period Map. The class of an uncoded waterbody is as follows:

Class D, unless otherwise specified, or is defined as where an uncoded water body enters a mapped water body that is a Class A, B or C water body, the portion of the uncoded water body for a distance of 1 mile.

An unmapped water body means a water body that does not appear on an Activity Period Map. The class of an unmapped water body is as follows:

Where an unmapped water body enters a mapped Class A water body, the unmapped water body is Class A for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class B for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class B water body, the unmapped water body is Class B for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class C for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class C or D water body, the unmapped water body is Class C or D for all portions of the unmapped water body, respectively. Where an unmapped water body enters a fish bearing lake, the unmapped water body is Class C, whether or not the fish bearing lake appears on the Activity Period Map(s).

USDA

Rio Grande National Forest
Land Management Plan
Fisheries Activity Period Map - East

For the purposes of this definition, the Activity Period Map(s) designate the class of a mapped water body as Class A, B, C, or D, and specifies the restricted activity period for classes of water bodies describes the location of Class A water bodies, and may specify special conditions for some water bodies. The class of a mapped water body, except for an uncoded water body, is the class that is designated by a class symbol on a map.

An uncoded water body means a mapped water body that does not have a class symbol specified on an Activity Period Map. The class of an uncoded water body is as follows:

Class D, unless otherwise specified, or is defined as where an uncoded water body enters a mapped water body that is a Class A, B or C water body, the portion of the uncoded water body for a distance of 1 mile upstream from the mouth of the uncoded water body is the same class as the mapped water body that is entered.

An unmapped water body means a water body that does not appear on an Activity Period Map. The class of an unmapped water body is as follows:

Where an unmapped water body enters a mapped Class A water body, the unmapped water body is Class A for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class B for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class B water body, the unmapped water body is Class B for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class C for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class C or D water body, the unmapped water body is Class C or D for all portions of the unmapped water body, respectively. Where an unmapped water body enters a fish bearing lake, the unmapped water body is Class C, whether or not the fish bearing lake appears on the Activity Period Map(s).

## Locations and Details of Water Bodies

Any person who carries out an activity within the Rio Grande National Forest must use all of the following information to determine the Class of water body applicable to the activity location: the provisions and the applicable RGNF Map, including the associated map legend and its tables. The table below describes each of the types of water bodies with specific details on each Class A water bodies. Where water body Classes appear to overlap on the map or when the water body Class indicated by the map differs from the map legend and its tables, the water body Class indicated in the map legend and tables will apply.

| Water Body | Water Body Class | Location | Restricted Activity Period |
|---|---|---|---|
| Class B | B | all | Rio Grande Cutthroat Trout (May 15 - June 30) |
| Class C | C | all | Brown Trout and Brook Trout (Oct 1 - Dec 31); Rainbow Trout (April 1 - Aug 31) |
| Class D | D | all | none |

Class B - RGCT Recreational Stream and Lake
Class C - Non-native Stream and Lake Recreational
Class D Stream - None

Created by: USFS R2 Rio Grande National Forest Revision Team Fish Biologist
Coordinate System: GCS North American 1983

ATTENTION
This product is reproduced from geospatial information prepared by the U.S. Department of Agriculture, Forest Service. GIS data and product accuracy may vary. They may be developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products based on new inventories, new or revised information, and if necessary in conjunction with other federal, state or local public agencies or the public in general as required by policy or regulation. Previous recipients of the products may not be notified unless required by policy or regulation.

0 12.5 25 50 Miles



USDA
Rio Grande National Forest
Land Management Plan
Fisheries Activity Period Map - South
Class A - SCC Conservation
Class B - RGCT Recreational Stream and Lake
Class C - Non-native Stream and Lake Recreational
Class D Stream - None
0
10
20
40
Miles

For the purposes of this definition, the Activity Period Map(s) designate the class of a mapped water body as Class A, B, C, or D, and specifies the restricted activity period for classes of water bodies, describes the location of Class A water bodies, and may specify special conditions for some water bodies. The class of a mapped water body, except for an uncoded water body, is the class that is designated by a class symbol on a map.

An uncoded water body means a mapped water body that does not have a class symbol specified on an Activity Period Map. The class of an uncoded water body is as follows:

Class D, unless otherwise specified: or is defined as where an uncoded water body enters a mapped water body that is a Class A, B or C water body, the portion of the uncoded water body for a distance of 1 mile upstream from the mouth of the uncoded water body is the same class as the mapped water body that is entered.

An unmapped water body means a water body that does not appear on an Activity Period Map. The class of an unmapped water body is as follows:

Where an unmapped water body enters a mapped Class A water body, the unmapped water body is Class A for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class B for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class B water body, the unmapped water body is Class B for the portion of the unmapped water body for a distance of 1 mile upstream from the mouth of the unmapped water body, including where the unmapped water body is dry or frozen to the bottom at the time of the project, and Class C for any other portion of the unmapped water body. Where an unmapped water body enters a mapped Class C or D water body, the unmapped water body is Class C or D for all portions of the unmapped water body, respectively. Where an unmapped water body enters a fish bearing lake, the unmapped water body is Class C, whether or not the fish bearing lake appears on the Activity Period Map(s).

Locations and Details of Water Bodies

Any person who carries out an activity within the Rio Grande National Forest must use all of the following information to determine the Class of water body applicable to the activity location: the provisions and the applicable RGNF Map, including the associated map legend and its tables. The table below describes each of the types of water bodies with specific details on each Class A water bodies. Where water body Classes appear to overlap on the map or when the water body Class indicated by the map differs from the map legend and its tables, the water body Class indicated in the map legend and tables will apply.

| Water Body | Water Body Class | Location | Restricted Activity Period |
|---|---|---|---|
| Cascade Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Jim Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Middle Fork San Francisco Creek | A | Divide RD | recommended by Fisheries Biologist |
| Lake Fork Conejos River | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Osier Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Rhodes Gulch | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Rio de Los Pinos | A | Conejos Peak RD | recommended by Fisheries Biologist |
| South Fork Cat Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Torsido Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Wolf Creek | A | Conejos Peak RD | recommended by Fisheries Biologist |
| Class B | B | all | Rio Grande Cutthroat Trout (May 15 - June 30) |
| Class C | C | all | Brown Trout and Brook Trout (Oct 1 - Dec 31); Rainbow Trout (April 1 - Aug 31) |
| Class D | D | all | none |

Rvsd Plan - 00001089

# Rio Grande National Forest Forest Plan Revision Western Sangre de Cristo Recommended Wilderness Areas

North Section

106°0'0"W
945
948
980
982
875
985
992
993
994
996
970
Rio Grande National Forest
San Isabel National Forest
Sangre de Cristo Wilderness
Gunnison National Forest
Uncompahgre National Forest
Rio Grande National Forest
San Juan National Forest
San Isabel National Forest
Carson National Forest
Recommended Wilderness
Lvl 2 Open Road
Lvls 3-5 Open Road
National Forest Boundary
Non-FS Land
Sangre de Cristo Wilderness
0 0.5 1 2 3 4 Miles
N

Created by: USFS R2 Plan Revision Support Team GIS Specialist
3/16/2020
Coordinate System: GCS North American 1983

ATTENTION

This product is reproduced from geospatial information prepared by the U.S. Department of Agriculture, Forest Service. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace, GIS products based on new inventories, new or revised information, and if necessary in conjunction with other federal, state or local public agencies or the public in general as requiredby policy or regulation. Previous recipients of the products may not be notified unless required by policy or regulation.

Rvsd Plan - 00001090





Rio Grande National Forest
Forest Plan Revision
Western Sangre de Cristo
Recommended Wilderness Areas

Rvsd Plan - 00001091



Rio Grande National Forest
Forest Plan Revision
Western Sangre de Cristo
Recommended Wilderness Areas
South Section
150
975
Rio Grande National Forest
San Isabel National Forest
Sangre de Cristo Wilderness
Gunnison National Forest
Uncompahgre National Forest
San Juan National Forest
Rio Grande National Forest
Carson National Forest
San Isabel National Forest
Recommended Wilderness
Lvl 2 Open Road
Lvls 3-5 Open Road
National Forest Boundary
Non-FS Land
Sangre de Cristo Wilderness
Created by: USFS R2 Plan Revision Support Team GIS Specialist
3/16/2020
Coordinate System NAD 1983 UTM Zone 13N
0 0.5 1 2 3 4 Miles
N
ATTENTION
This product is reproduced from geospatial information prepared by the U.S. Department of Agriculture, Forest Service. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. Using GIS products for purposes other than those for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products based on new inventories, new or revised information, and if necessary in conjunction with other federal, state or local public agencies or the public in general as requiredby policy or regulation. Previous recipients of the products may not be notified unless required by policy or regulation.





Rio Grande National Forest
Land Management Plan
Desired Scenic Integrity Objective
USDA
N
Town
Recommended Wilderness
Existing Wilderness
Adjacent Wilderness
Non-FS Land
National Forest Boundary
Scenic Integrity Objective
Very High
High
Moderate
Low
Uncompahgre National Forest
Uncompahgre Wilderness
Powderhorn Wilderness
Gunnison National Forest
La Garita Wilderness
San Isabel National Forest
Sangre de Cristo Wilderness
Weminuche Wilderness
San Juan National Forest
South San Juan Wilderness
Creede
South Fork
Del Norte
La Garita
Saguache
Villa Grove
Moffat
Monte
Jasper
Platoro
Crestone
Hooper
Mosca
107°0'0"W
106°0'0"W
38°0'0"N
37°0'0"N

Rvsd Plan - 00001093

# Rio Grande National Forest Land Management Plan Oil and Gas Stipulations

USDA

Uncompahgre National Forest
Uncompahgre Wilderness
Powderhorn Wilderness
La Garita Wilderness
Gunnison National Forest
San Isabel National Forest
Sangre de Cristo Wilderness
Weminuche Wilderness
San Juan National Forest
South San Juan Wilderness

Villa Grove
Saguache
Moffat
Crestone
La Garita
Creede
Center
Hooper
Del Norte
South Fork
Mosca
Monte Vista
Alamosa
Blanca
Jasper
Platoro

107°0'0"W
106°0'0"W
37°0'0"N

**Management Area Acres**

1.1a - 40,052
1 - 392,138
3 - 519,798
4.1 - 26,939
4.2 - 23,861
4.21 - 27,501
4.34 - 35,869
4.8 - 1,632
5 - 837,269

Wyoming / Colorado
Nebraska / Colorado
Fort Collins
Denver
Grand Junction
Utah / Colorado
Colorado / Kansas
Colorado / New Mexico
Colorado / Oklahoma

- Town
- Adjacent Wilderness
- Congressionally Designated Trail Corridor
- Administratively Unavailable lands
- Controlled Surface Use
- Legally Unavailable lands
- No Surface Occupancey
- Private Land
- Standard Lease Terms
- Timing Limitations

**Alt B Modified Management Area**

- 1.1a Recommended Wilderness
- 1 Primitive Wilderness
- 3 Colorado Roadless
- 4.1 Special Interest Area
- 4.2 Research Natural Area
- 4.21 Scenic Byway or Railroad
- 4.34 Eligible Wild and Scenic River
- 4.8 Ski-Based Resort
- 5 General Forest
- National Forest Boundary
- Non-FS Land



NORTH FORK CONEJOS RIVER
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended
Eligible Wild and
Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
National Forest
Boundary
Non-FS Land
Existing Rio Grande
Wilderness
Adjacent Wilderness
WILDERNESS
NORTH FORK CONEJOS RIVER
North Fork Conejos River
Middle Fork Conejos River
MIDDLE FORK CONEJOS RIVER
EL RITO AZUL
El Rito Azul
Conejos River
ARCHULETA CO
CONEJOS CO
DIVIDE
Gunsight
Pass
0
0.45
0.9
1.8
Miles
N

Rvsd Plan - 00001095



MIDDLE FORK CONEJOS RIVER
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended
Eligible Wild and
Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
National Forest
Boundary
Non-FS Land
Existing Rio Grande
Wilderness
Adjacent Wilderness
N
0
0.5
1
2
Miles
NORTH FORK CONEJOS RIVER
North Fork Conejos River
Middle Fork Conejos River
MIDDLE FORK CONEJOS RIVER
Conejos River
El Rito Azul
EL RITO AZUL
CONTINENTAL
DIVIDE
ARCHULETA CO
CONEJOS CO
Gunsight
Pass
RIO GRANDE

Rvsd Plan - 00001096



USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended
Eligible Wild and
Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
EL RITO AZUL
NORTH FORK CONEJOS RIVER
Conejos River
MIDDLE FORK CONEJOS RIVER
Middle Fork Conejos River
SOUTH FORK CONEJOS RIVER
South Fork Conejos River
EL RITO AZUL
El Rito Azul
RIO GRANDE
N
0
0.45
0.9
1.8
Miles

Rvsd Plan - 00001097



SOUTH FORK CONEJOS RIVER
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
EL RITO AZUL
El Rito Azul
Conejos River
Saddle Creek
Hansen Creek
HANSEN CREEK
SOUTH FORK CONEJOS RIVER
South Fork Conejos River
LAKE FORK CONEJOS RIVER
Trail Creek
Valdez Creek
North Fork Rough Creek
Rough Creek
100
105
250
0
1
2
4
Miles
N

Rvsd Plan - 00001098



RIO GRANDE RIVER CREEDE
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
USDA
DIVIDE
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
Highway
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
RIO GRANDE RIVER CREEDE
Rio Grande
Blue Creek
BLUE
GRANDE
COLLER STATE WILDLIFE AREA
RIO
Mc Clelland Mountain
Ute Peak
Prospect
149
601
603
609
432
N
0
0.5
1
2
Miles

Rvsd Plan - 00001099



USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
DIVIDE
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
Highway
FS Lvls 3-5 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
SOUTH FORK RIO GRANDE
Archuleta Creek
South Fork Rio Grande
Gibbs Creek
WEMINUCHE WILDERNESS
CONTINENTAL
DIVIDE
RIO GRANDE NATIONAL FOREST
N
0
0.5
1
2
Miles
160

Rvsd Plan - 00001100



SOUTH FORK RIO GRANDE
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
USDA
DIVIDE
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
Highway
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
0
1
2
4
Miles
N
SOUTH FORK RIO GRANDE
South Fork Rio Grande
Trout Creek
Goodrich Creek
Decker Creek
Mill Creek
Tewksberry Creek
Columbine Creek
Kitty Creek
Lake Fork
Cross Creek
Park Creek
Hope Creek
Black Creek
Spruce Creek
Pass Creek
Paint Creek
Kelly Creek
Beaver Creek
Little Beaver Creek
435
433
355
355.1C
360
430
376
375
359
361
381
410
380
160

Rvsd Plan - 00001101



WEST BELLOWS CREEK
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
DIVIDE District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Special Interest Management Area
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
WEST BELLOWS CREEK
West Bellows Creek
East Bellows Creek
Farmers Creek
South Fork Saguache Creek
RIO GRANDE
600
0
0.75
1.5
3
Miles
N



WEST FORK RIO CHAMA
WEST FORK RIO CHAMA
West Fork Rio Chama
EAST FORK RIO CHAMA
East Fork Rio Chama
Rio Chama
CONEJOS CO
ARCHULETA CO
R3E
R4E
11
12
13
18
17
7
6
8
5
N
0
0.35
0.7
1.4
Miles
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness



SAGUACHE CREEK
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
SAGUACHE
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
SAGUACHE CREEK
Saguache Creek
South Fork Saguache Creek
Duckfoot Creek
Grouse Creek
Allen Creek
Trough Creek
Moon Creek
Johns Creek
740
736
737.1A
787.3F
761
760.2B
760.2C
760
730
675.3P
675
787
FOREST
0
0.75
1.5
3
Miles
N

Rvsd Plan - 00001104



LAKE FORK CONEJOS RIVER
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
LAKE FORK CONEJOS RIVER
SOUTH FORK CONEJOS RIVER
HANSEN CREEK
South Fork Conejos River
Hansen Creek
Conejos River
Lake Fork
Rito Gato
Coal Creek
Gold Creek
Saddle Creek
Trail Creek
Valdez Creek
Beaver Lake Creek
Jim Creek
South Fork Jim Creek
Torsido Creek
French Creek
245
247
250
250.6B
250.6K
260
100
100.2A
105
105.3A
249
248
240
N
0 1.25 2.5 5 Miles

Rvsd Plan - 00001105

RIO DE LOS PINOS
Long Creek
Cascade Creek
Osier Creek
RIO DE LOS PINOS
Rio de los Pinos
103
107
N
CONEJOS CO
RIO ARRIBA CO
Mesa
0
0.475
0.95
1.9
Miles

USDA

Rio Grande National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers

COENJOS PEAK District

**Recommended Eligible Wild and Scenic River**

- WILD
- SCENIC
- RECREATIONAL
- WSR Corridor
- Named River
- FS Lvls 3-5 Open Road
- FS Lvl 2 Open Road
- National Forest Boundary
- Non-FS Land
- Existing Rio Grande Wilderness
- Adjacent Wilderness

Rvsd Plan - 00001106



TOLTEC CREEK
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
Toltec Creek
TOLTEC CREEK
RIO GRANDE NATIONAL FOREST
COLORADO
NEW MEXICO
MP 180
106.1A
103
107
10746
10338
10217
15
21
22
23
0
0.3
0.6
1.2
Miles
N

Rvsd Plan - 00001107



HANSEN CREEK
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
SOUTH SAN JUAN WILDERNESS
HANSEN CREEK
Hansen Creek
SOUTH FORK CONEJOS RIVER
South Fork Conejos River
105
N
0
0.5
1
2
Miles



EAST FORK RIO CHAMA
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
EAST FORK RIO CHAMA
WEST FORK RIO CHAMA
West Fork Rio Chama
East Fork Rio Chama
Rio Chama
CONEJOS CO
ARCHULETA CO
SOUTH SAN J
WILDERNE
R3E
R4E
N
0
0.45
0.9
1.8
Miles

Rvsd Plan - 00001109



RIO GRANDE BOX CANYON
Mason Creek
543
South Clear Creek
Grouse Creek
515
521
Crooked Creek
533
520
520.2D
RIO GRANDE BOX CANYON
Papoose Creek
Squaw Creek
Little Squaw Creek
Texas Creek
Quartz Creek
Fern Creek
Rio Grande
Spring Creek
520.21
149
556
N
RIO GRANDE
NATIONAL FOREST
0
1
2
4
Miles
USDA
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
DIVIDE
District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
Highway
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness



DEADMAN CREEK
Rio Grande
National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
SAGUACHE District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvl 2 Open Road
National Forest Boundary
Special Interest Management Area
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness
0
0.375
0.75
1.5
Miles
N
952
952.1A
953
DEADMAN CREEK
Deadman Creek
Alpine Creek
Alpine
Pole Creek
Cedar
Canyon
Prospects
Mines
Mine
GREAT SAND DUNES NATIONAL PARK
L U I S
M A
R 12 E
R 73 W
4WD



ARCHULETA CREEK
ARCHULETA CREEK
Archuleta Creek
CONTINENTAL DIVIDE
RIO GRANDE NATIONAL FOREST
TIERRA AMARILLA GRANT
AMARILLA
Rio Chama
122
121
N
0
0.5
1
2
Miles
USDA
Rio Grande National Forest
Land Management Plan Revision
Recommended Eligible Wild and Scenic Rivers
CONEJOS PEAK District
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
WSR Corridor
Named River
FS Lvls 3-5 Open Road
FS Lvl 2 Open Road
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness

Rvsd Plan - 00001112



Rvsd Plan - 00001113



USDA
Rio Grande National Forest Land Management Plan Wild and Scenic River Study
Uncompahgre National Forest
Uncompahgre Wilderness
Powderhorn Wilderness
La Garita Wilderness
Gunnison National Forest
San Isabel National Forest
Sangre de Cristo Wilderness
Weminuche Wilderness
San Juan National Forest
South San Juan Wilderness
SAGUACHE CREEK
WEST BELLOWS CREEK
RIO GRANDE RIVER CREEDE
RIO GRANDE BOX CANYON
SOUTH FORK RIO GRANDE
DEADMAN CREEK
CONEJOS RIVER TO PLATORO RESERVOIR
NORTH FORK CONEJOS RIVER
MIDDLE FORK CONEJOS RIVER
EL RITO AZUL
HANSEN CREEK
LAKE FORK CONEJOS RIVER
SOUTH FORK CONEJOS RIVER
EAST FORK RIO CHAMA
WEST FORK RIO CHAMA
ARCHULETA CREEK
TOLTEC CREEK
RIO DE LOS PINOS
114
285
149
17
112
374
160
150
15
142
159
107°0'0"W
106°0'0"W
38°0'0"N
37°0'0"N
0 5 10 20 30 Miles
1996 WSR Study River
Current Plan Revision Study River
Recommended Eligible Wild and Scenic River
WILD
SCENIC
RECREATIONAL
National Forest Boundary
Non-FS Land
Existing Rio Grande Wilderness
Adjacent Wilderness

Rvsd Plan - 00001114

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-SCNY-1: Areas of high scenic quality are provided, especially in areas seen from roads and trails, developed recreation sites, administrative sites, and towns and cities near the Forest. (Forestwide) | | DC-SCNY-1: Areas of high scenic quality are provided, especially in areas seen from roads and trails, developed recreation sites, administrative sites, and towns and cities near the Forest. (Forestwide) | | No change. |
| DC-SCNY-2: Views reflect naturally appearing forested stands consistent with the area's natural range of variability. Recent vegetation treatments visually blend with existing scenic character. (Forestwide) | | DC-SCNY-2: Vegetation treatments visually blend with existing scenic character. (Forestwide) | | Revised to only include the second half of the draft DC. |
| DC-SCNY-3: The transition from Forest lands to adjacent lands with similar desired conditions is seamless and does not exhibit abrupt changes in visual or ecological integrity. (Forestwide) | | DC-SCNY-3: The transition from Forest lands to adjacent lands with similar desired conditions does not exhibit abrupt changes in scenic quality. (Forestwide) | | Revised, with "is seamless" deleted and "visual or ecological integrity" changed to "scenic quality". |
| OBJ-SCNY-1: Over the planning period, meet or improve scenic integrity and stability through vegetation management within two watersheds (hydrologic unit code level 6). (Forestwide) | | | | Objective deleted. |
| OBJ-SCNY-2: Over the planning period, improve five facilities or built features into compliance with the principles in the Built Environment Image Guide. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | Objective deleted. |
| S-SCNY-1: Facility and infrastructure projects that require exterior lighting for safety must employ "dark sky preservation" techniques to reduce excess light pollution and preserve valued views of night skies. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | Standard deleted. |
| S-SCNY-2: Management activities will achieve identified scenic integrity objectives, or improve existing scenic integrity in support of achieving the mapped scenic integrity objective. Short term impacts inconsistent with the scenic integrity objectives may occur for a duration of 3 to 5 years. (Forestwide) | | S-SCNY-1: Management activities are consistent with identified scenic integrity objectives. Short-term impacts, less than 5 years, that are inconsistent with the scenic integrity objectives may occur. Restoration activities designed to meet or exceed identified scenic integrity objectives should begin within 2 years of project completion. (Forestwide) | | Standard re-worded so that management activities need only be consistent with the identified scenic integrity objectives. Duration of acceptable short term impacts clarified/adjusted from "3 to 5 years" to "less than 5 years". New language added regarding restoration activities. |
| G-SCNY-1: Limit management activities that impact valued scenic attributes and mitigate effects on visual characteristics of the surrounding landscape, including line, form, color, texture, size, shape, edge effect, and patterns of natural vegetation openings. (Forestwide) | | G-SCNY-1: Design management activities to minimize impacts to valued scenic attributes and scenic character. Line, form, color, texture, size, shape, edge effect, and patterns of natural vegetation openings complement surrounding scenic character. (Forestwide) | | Guideline re-worded. |
| G-SCNY-2: Rehabilitate areas with low scenic integrity to support achievement of the mapped scenic integrity objectives and long-term management and stewardship of valued scenic character. (Forestwide) | | Rehabilitate areas with low scenic integrity to gain compliance with mapped scenic integrity levels. | | Guideline deleted, but similar language in a new management approach. |
| G-SCNY-3: Design utility and transmission line corridors to visually blend with the existing character consistent with the mapped scenic integrity objective. (Forestwide) | | | | Guideline deleted. |
| MA-SCNY-1: Reinforce the Forest Service identity by constructing, restoring, and maintaining structures and built features consistent with the principles of the Built Environment Image Guide to complement the scenic character of the natural surroundings. (Forestwide) | | Retain the Forest Service identity by constructing, reinforcing, and maintaining structures and building features consistent with the principles in the Built Environment Image Guide to complement the scenic character of the natural surroundings. | | Slightly re-worded. |
| MA-SCNY-2: Design management practices to produce forest composition, structure, and patterns similar to those that would have occurred under natural disturbance regimes. (General Forest Geographic Area) | | Design management practices to produce forest composition, structure, and patterns similar to those that would have occurred under natural disturbance regimes, where feasible. | | Slightly re-worded. |
| | | The scenery management system provides a systematic approach for determining the relative value and importance of scenery on the Forest. Scenery management involves identifying scenic components, mapping these components, and assigning a value for aesthetics. Forest plan direction helps incorporate scenery as a part of ecosystems to determine trade-offs at the project level. | | MA added. |

| | | | | |
|---|---|---|---|---|
| | | The Rio Grande National Forest provides a scenic backdrop and contributes to the identities of communities in and around the San Luis Valley. Managing scenic resources ensures quality sightseeing and recreation opportunities. Colorado tourism thrives on outdoor recreation and the beautiful scenery of the Rocky Mountains. | | MA added. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-REC-1: A variety of enduring recreation opportunities (i.e., trails, campgrounds, and day-use areas) are available across a variety of resilient settings that foster high-quality, year-round developed and dispersed experiences. (Forestwide) | | DC-REC-1: A variety of enduring recreation opportunities are available across a variety of settings that foster high-quality, year-round developed and dispersed experiences. Development of facilities and travel routes is consistent with the recreation opportunity spectrum class designations. Recreation facilities and programs incorporate universal design concepts and meet current Federal accessibility guidelines unless doing so fundamentally alters the setting or character of the program. (Forestwide) | | Re-worded. New language added - "Development of facilities and travel routes is consistent with the recreation opportunity spectrum class designations. Recreation facilities and programs incorporate universal design concepts and meet current Federal accessibility guidelines unless doing so fundamentally alters the setting or character of the program." This language was originally in S-REC-1 and S-REC-2. |
| DC-REC-2: Sustainable, persistent and changing needs of the Forest are addressed. (Forestwide) | | | | DC deleted. |
| DC-REC-3: Relationships with cooperators are long lasting and sustainable and are leveraged to accomplish Forest goals. (Forestwide) | | | | DC deleted. |
| DC-REC-4: Use conflicts among users are infrequent. (Forestwide) | | | | DC deleted. |
| DC-REC-5: Sites and facilities are designed to be long-lasting, require low maintenance, and incorporate "green" operations. The sites and facilities should also complement the natural setting. (Forestwide) | | DC-REC-2: Sites and facilities are designed to be long-lasting, require low maintenance, and incorporate "green" operations. The sites and facilities should also complement the natural setting. (Forestwide) | | No change. |
| OBJ-REC-1: Over the planning period, develop two to three trail connections between strategic community areas and National Forest System trails. (Forestwide) | | OBJ-REC-1: Develop three trail connections between strategic community areas and National Forest System trails within 15 years. (Forestwide) | | Objective changed from "two to three" to "three" trail connections. Time frame changed from "over the planning period" to "within 15 years". |
| S-REC-1: Recreation development and travel routes shall be consistent with the recreation opportunity spectrum class designations. (Forestwide) | | | | Standard deleted, but similar language added to DC-REC-1 and management approaches. |
| S-REC-2: Provide for universal accessibility at recreation sites and trails unless doing so fundamentally alters the setting or character of the program. (Forestwide) | | | | Standard deleted, but language added to DC-REC-1. |
| S-REC-3: Close, rehabilitate, or otherwise mitigate dispersed sites when:<br>• Campsite condition reaches Frissell-Cole Class 4 or 5<br>• Site occupancy does not meet the adopted scenic integrity objective<br>• User conflicts substantially disrupt user experience and/or safety and closure is the only alternative<br>• Unacceptable environmental damage is occurring. (Forestwide) | | S-REC-1: Manage, rehabilitate, or close dispersed recreational use areas when:<br>• Use area condition reaches Frissell-Cole Class 4 or 5 (compromised natural environment), or<br>• User conflicts substantially disrupt user experience, safety, or both, and closure is the only alternative (compromised human environment) | | Revised and re-worded standard. Bullets related to site occupancy/scenic integrity objective and unacceptable environmental damage deleted. Revised standard to use the term "dispersed recreational use areas". |
| S-REC-4: Camping will be limited to 14 continuous days in any one location within a 30 day period. (Forestwide) | | S-REC-2: Do not allow campsites to be established for more than 14 consecutive days in any 30-day period. (Forestwide) | | Re-worded standard. |
| G-REC-1: Manage winter recreation activities within lynx analysis units such that lynx habitat connectivity is maintained or improved where needed. (Forestwide) | | | | Guideline deleted. |
| G-REC-2: Manage recreation within the capacity for the recreation opportunity spectrum objective, as shown in Table 9. This table assists in developing appropriate thresholds for considering recreational permitted uses and wilderness use. (Forestwide) | | G-REC-1: To reduce user conflicts and resource damage, activities and projects should not be approved if they exceed the developed, appropriate threshold for the recreation opportunity spectrum capacity levels listed in Table 10. | | Guideline re-worded and purpose added. |
| MA-REC-1: Strategically invest available resources (e.g., time, budget, expertise) to support long-term recreation program goals. Developed recreation assets are aligned with projected facility budgets, partnership capabilities, and other re-investment strategies. (Forestwide) | | Available resources (e.g., time, budget, expertise) are strategically invested to support long-term recreation program goals. Developed recreation assets are aligned with projected facility budgets, partnership capabilities, and other re-investment strategies. | | Slight re-wording. |
| MA-REC-2: Engage cooperators in stewardship activities and framework design. (Forestwide) | | The Forest intends to encourage cooperators to be involved in stewardship activities. | | Re-worded management approach and deleted reference to framework design. |
| MA-REC-3: Leverage recreation special use permits to accomplish recreation program goals and best serve the public. (Forestwide) | | Recreation special use permits are leveraged to accomplish recreation program goals and serve the public. | | Slight re-wording, with "best" deleted. |
| MA-REC-4: At fee campgrounds, furnish readily available offsite and onsite information about recreation opportunities. (Forestwide) | | Readily available off-site and on-site information about Forest recreation opportunities is available at fee campgrounds. | | Slight re-wording. |

| | | | | |
|---|---|---|---|---|
| MA-REC-5: When campground occupancy is less than 20 percent for at least one season, the site should be examined to decide whether to close the campground, convert it to a concentrated dispersed site, or take other action. (Forestwide) | | When campground occupancy is less than 20 percent for at least one season, a decision will be made to close the campground, convert it to a dispersed site, or take other action. | | Slight re-wording. |
| MA-REC-6: Trail development shall be coordinated with trail systems developed by municipalities, counties, states, other Federal agencies, and partners to allow for integration and connectivity. (Forestwide) | | Trail development is coordinated with systems developed by municipalities, counties, states, other agencies, and partners to promote integration and connectivity. Loop trails are considered where feasible, particularly at low elevations. | | Re-worded. Additional loop trail direction from MA-REC-7 added to this management approach. |
| MA-REC-7: Loop trails should be considered for trail networks, especially those at low elevations, for year-round use, and should be associated with campgrounds or other attractions. (Forestwide) | | | | Management approach deleted, but some of the language added to management approach above. |
| MA-REC-8: Base the availability of outfitter-guide special use permits on a capacity study. Prohibit new permits when capacity has been met for a certain special use authority. (Forestwide) | | | | Management approach deleted. |
| MA-REC-9: Consider the use of concessionaire operations when attempting to charge a fee at a developed site. (Forestwide) | | The Forest intends to consider using concessionaire operations when fees are charged at developed sites. | | Slight re-wording. |
| MA-REC-10: If use exceeds the area capacity for a given recreation opportunity spectrum class, the following management actions should be employed to address the impacts or effects on the recreation setting:<br>1. Inform the public and restore the site<br>2. Regulate use<br>3. Restrict the number of users<br>4. Close the area or site. (Forestwide) | | When use exceeds the capacity of an area for a recreation opportunity spectrum class, the following actions will address the impacts or effects on the recreation setting: Provide information to the public and restore the site, regulate use at the site, restrict the number of users, and finally close the site. | | Slight re-wording. |
| | | Relationships with partners, cooperators, and permittees are vital to the success of the recreation program, as are building, sustaining, and leveraging strategic relationships to sustain high-quality recreation settings and opportunities. | | New management approach. |
| | | Recreation development and travel routes are managed to be consistent with the recreation opportunity spectrum class designations. | | New management approach, but language similar to deleted standard and also present in DC-REC-1. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| G-MIN-1: Recreational dredging does not cause substantial surface disturbance. Activities in or near streams are conducted to maintain water quality and avoid impacts to fish habitat. (Forestwide) | | G-MIN-1: Mining activities can be acknowledged when the activity does not cause substantial surface disturbance or unacceptable impacts to water quality or fish habitat. Aspects of operation will be contained in the notice of intent. A plan of operations will be required for any activities above the scope of a notice of intent. (Forestwide) | | Guideline re-written. More broadly covers mining activities and not just recreational dredging. Revised version is has additional focus on unacceptable impacts to water quality or fish habitat. New language added - "Aspects of operation will be contained in the notice of intent. A plan of operations will be required for any activities above the scope of a notice of intent." |
| G-MIN-2: To protect water quality and fish habitat in recreational dredging:<br>1. Limit the use of the practice to outside of critical life-stage periods in streams that have Rio Grande cutthroat trout core conservation populations.<br>2. The Forest geologist (or designated authority) will review the notice of intent prior to the commencement of activities.<br>3. Where possible, retain existing instream and riparian vegetation and other features, including but not limited to trees, bushes, shrubs, weeds, or tall grasses along streambanks, natural, large wood debris, and large boulders.<br>4. Operations should not change the stream channel to direct water flow into a streambank or cause bank erosion or destruction of the natural form or the stream channel.<br>5. Whenever practical, prevent the release of silt, sediment, sediment-laden water, or any other deleterious substances into the watercourse.<br>6. Keep equipment and machinery in good operating condition, power washed, and free of leaks, excess oil, and grease.<br>7. Locate the point of discharge to the creek immediately downstream of the worksite to minimize disturbance to downstream populations and habitats. (Forestwide) | | Management Approach:<br>Procedures assure protection of water quality and fish habitat. The list below addresses management of recreational dredging that occurs on the Forest.<br>1. Limit use of the practice to outside of critical life-stage periods in streams that have Rio Grande cutthroat trout core conservation populations.<br>2. The Forest geologist (or designated authority) will review the notice of intent prior to the commencement of activities.<br>3. Where possible, retain existing instream and riparian vegetation and other features including but not limited to trees, bushes, shrubs, weeds, or tall grasses along streambanks, natural, large woody debris, and large boulders.<br>4. Operations should not change the stream channel to direct water flow into a streambank or cause bank erosion or destruction of the natural form or the stream channel.<br>5. Whenever practical, prevent the release of silt, sediment, sediment-laden water, or any other deleterious substances into the watercourse.<br>6. Keep equipment and machinery in good operating condition, power washed, and free of leaks, excess oil, and grease.<br>7. Locate the point of discharge to the creek immediately downstream of the worksite to minimize disturbance to downstream populations and habitats. | | Guideline changed to a management approach. Slight re-wording at beginning. |
| G-MIN-3: Follow instream activity maps (Appendix H). Carry out activities during conditions of low flow, when trout redds (spawning sites with potential eggs and larval fish present in the gravel) are not present, and when there is the least risk to fish and wildlife populations and habitat. (Forestwide) | | | | Guideline deleted. |
| G-MIN-4: All motorized vehicles (cars, trucks, jeeps, off-road vehicles) are restricted to motorized trails or legally open roads. This reduces impacts to vegetation and minimizes erosion, stream turbidity, and sedimentation. (Forestwide) | | | | Guideline deleted. |
| G-MIN-5: Contain all fuel-operated tools (generators, etc.) in a spill tray during operation, maintenance, and refueling. Do not refuel or service equipment within 100 feet of a stream. (Forestwide) | | | | Guideline deleted. |
| G-MIN-6: Operate machinery and tools from the bank of the stream to minimize impacts and to better enable mitigation of sedimentation. (Forestwide) | | | | Guideline deleted. |

| | | | | |
|---|---|---|---|---|
| G-MIN-7: Upon completion of the operations:<br>1. Restore all disturbed in-channel or active floodplain habitats upon completion of operations to a condition that is enhanced from their original state.<br>2. Remove all equipment, supplies, and nonbiodegradable materials from the site.<br>3. Remove all plants, animals, or mud and drain all water from equipment prior to leaving the site. (Forestwide) | | | | Guideline deleted. |
| | | Administer minerals activities through a plan of operations, which includes permits as well as the reclamation and mitigation measures necessary to protect resources. | | MA added, though this language was in the introductory section of the minerals section in the draft plan. |
| | | The Abandoned Mine Lands Program addresses past mines that are no longer active. These lands can pose a hazard to the public, wildlife, and the environment. The program evaluates abandoned mines across the unit and the impacts of these. Mine closure decisions consider and assess needs related to other resources as well, such as wildlife. The program uses partners to evaluate and complete the process. | | MA added. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-LAND-1: Utility corridors and transmission lines are designed to blend with the existing character of the landscape. (Forestwide) | | | | DC deleted. |
| DC-LAND-2: Occupancy of electronic sites is consolidated wherever possible and compatible.<br>• Blend with the existing character of the landscape<br>• Consolidate occupancy with electronic sites wherever possible and compatible. (Forestwide) | | | | DC deleted. |
| OBJ-LAND-1: Over the planning period, acquire a minimum of 100 acres through land acquisitions from willing sellers within the Forest. (Forestwide) | | | | Objective deleted. |
| OBJ-LAND-2: Over the planning period, resolve six trespass or encroachment cases. (Forestwide) | | | | Objective deleted. |
| S-LAND-1: Bury electrical utility lines of 33 kilovolts or less, and telephone lines, unless one or more of the following applies:<br>• Scenic integrity objectives of the area can be met using an overhead line<br>• Burial is not feasible due to geologic hazards or unfavorable geologic conditions<br>• Burial would result in greater long-term site disturbance<br>• Burial is not technically feasible. (Forestwide) | | S-LAND-1: Bury electrical utility lines of 33 kilovolts or less, and telephone lines, unless scenic integrity objectives of the area can be met using an overhead line or burial is not technically feasible. (Forestwide) | | Bullet points/exceptions were simplified. |
| S-LAND-2: Do not authorize conflicting uses of activities in transportation and utility corridors. (Forestwide) | | S-LAND-2: Do not authorize conflicting uses of activities in transportation and utility corridors. (Forestwide) | | No change. |
| MA-LAND-1: Conserve existing and designated inventoried rights-of-way that are identified in the 1996 forest plan to protect them for future construction and occupancy. (Forestwide) | | Existing and designated rights-of-way in the 1996 Land and Resource Management Plan are managed to maintain them for future construction and occupancy. | | Slight rewording. |
| MA-LAND-2: Design utility corridors and transmission lines to be fully developed prior to authorizing new sites, unless new sites are determined to be necessary to fill coverage gaps (i.e., cell towers) or to meet public needs (Forestwide). | | Design communication sites and utility lines to be fully developed prior to authorizing new sites. New sites may be necessary to fill coverage gaps or meet public needs. | | Slight rewording. "Utility corridors and transmission lines" changed to "Communication sites and utility lines". |
| MA-LAND-3: To the extent possible, management activities in linear corridors should be compatible with the desired condition for the individual management areas through which corridors pass. (Forestwide) | | Management activities in linear corridors should be consistent with direction for the management area the corridor passes through. | | Clarified that management activities in linear corridors should be consistent with all direction for a management area it passes through, not just the desired condition. |
| MA-LAND-4: The land ownership pattern supports land and resource goals and objectives, reduces future management costs, responds to urban and community needs, protects critical resource areas, increases recreation opportunities, and improves legal public access. (Forestwide) | | Land ownership patterns support land and resource goals and objectives, reduce future management costs, respond to community needs, protect critical resource areas, increase recreation opportunities, and improve legal access. | | Slight re-wording with "urban" and "public" deleted. |
| MA-LAND-5: The survey program and land status records facilitate the resolution of land ownership cases related to title claims, trespass, and unauthorized uses and to protect public access and achieve effective management. (Forestwide) | | | | MA deleted. |
| MA-LAND-6: The authorization and administration of special uses by individuals, companies, groups, and government entities protects natural resource values and public health and safety. (Forestwide) | | The authorization and administration of special uses by individuals, companies, groups, and government entities protect natural resource values and public health and safety. | | No change. |
| MA-LAND-7: Adhere to specific management area stipulations related to suitability. (Forestwide) | | | | MA deleted. |

| | | | | |
|---|---|---|---|---|
| | | Manage special uses in a manner that protects natural resources, public health, and safety, and are consistent with management plans for National Forest System lands. Special uses are administered on the basis of sound resource management objectives and business principles. | | MA added. |
| | | Land adjustments consolidate and improve management efficiency through real estate transactions including sales, purchases, exchanges, conveyances, and rights-of-way within and outside the proclaimed Forest boundary. Lands can be transferred to the Forest Service through purchase, exchange, or gifting to the agency. Regardless of the transfer method, the Forest Service can only acquire land from willing parties that meet the criteria. The types of land the agency prefers to acquire include:<br>• Lands within congressionally designated areas,<br>• Lands with water frontage, wetlands, and associated riparian ecosystems,<br>• Lands with habitat for endangered or threatened species,<br>• Lands with unique historical or cultural resources,<br>• Lands primarily of value for outdoor-recreation purposes and lands needed for aesthetic protection,<br>• Key tracts that promote effective resource management,<br>• Lands that consolidate ownership and reduce miles of property lines and corners to be maintained, and<br>• Lands that maintain or stabilize economies of local governments. | | MA added. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-INFR-1: Safe, accessible, functionally efficient, aesthetically pleasing, energy-efficient, and cost-effective buildings and related facilities (owned, operated, occupied, or authorized by the Forest Service) needed to achieve resource management objectives are maintained or constructed. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted. |
| DC-INFR-2: Discharges from all wastewater disposal facilities owned and operated by the Forest Service, or that are under special-use permit from the Forest Service, comply with applicable Federal or State water quality and effluent discharge standards. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted. |
| DC-INFR-3: The road system provides access for the public to use and enjoy the Forest. Road construction is limited, and the amount of reconstruction is commensurate to the needs of resource management. Road closure may occur in areas to enhance wildlife and fisheries habitat, soil, and watershed resources, among other values. (General Forest Geographic Area, Specially Designated Geographic Area) | | DC-INFR-1: The transportation system is commensurate with resource management needs, public safety, emergency access, and public access to use and enjoy the Forest. Road restrictions occur for resource management activities that protect, maintain, and enhance habitat, soil, and water objectives, among other values. (Forestwide) | | DC reworded. Changed to apply Forestwide. "Road construction is limited" was removed. "Road closure" changed to "Road restrictions". New references to public safety and emergency access added. |
| DC-INFR-4: Trail systems will offer a wide range of recreation opportunities, both motorized and nonmotorized. Consider a wide range of barrier-free opportunities for all new construction and rehabilitation proposals. (Forestwide) | | | | DC deleted. |
| OBJ-INFR-1: Over the planning period, improve five facilities or built features to be visually consistent with principles of the Built Environment Image Guide. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | Objective deleted. There is a management approach in Scenery that reads: *The Forest Service identity is retained by constructing, reinforcing, and maintaining structures and building features consistent with the principles in the Built Environment Image Guide to complement the scenic character of the natural surroundings* |
| G-INFR-1: Wherever feasible and practicable, construct or restore structures to blend with the natural surroundings. (Forestwide) | | G-INFR-1: To blend with natural surroundings, construct or restore structures to blend with the natural surroundings wherever feasible and practicable. (Forestwide) | | Slight rewording. |
| MA-INFR-1: Do not retain facilities acquired by land donation, exchange, or purchase unless they serve a definite future purpose and funding is available for their maintenance, or they are determined to be historically significant. (Forestwide) | | Facilities acquired through land donation, exchange, or purchase are not retained unless they serve a definitive purpose and funding is available for maintenance, or they are historically significant. | | Slight rewording. |
| MA-INFR-2: Manage all facilities according to the current Facilities Master Plan. (Forestwide) | | The Forest intends to manage all current facilities in compliance with the facilities master plan. | | Slight rewording. |
| MA-INFR-3: Closed or restricted roads may be used for administrative purposes if the use is approved by the responsible official. (Forestwide) | | Closed or restricted use roads are available for administrative purposes upon approval by the responsible official. These roads are not displayed on the Forest motor vehicle use map. | | Reworded and added language regarding these roads not being displayed on the Forest motor vehicle use map. |
| MA-INFR-4: Designated travelways, as displayed on the Forest motor vehicle use map, and newly constructed travelways are open to motorized vehicle use unless a documented decision shows that:<br>• Motorized use conflicts with forest plan objectives,<br>• Motorized use is incompatible with the recreation opportunity spectrum class,<br>• Travelways are in areas closed to motorized use and are not designated routes,<br>• Motorized use creates user conflicts that result in unsafe conditions unrelated to weather conditions,<br>• Physical characteristics of travelways are hazardous for motorized use,<br>• Travelways do not serve an existing or identified future public need, or<br>• Financing is not available for maintenance necessary to protect resources. (Forestwide) | | Designated roads, as displayed on the Forest motor vehicle use map, and newly constructed roads are open to motorized vehicle use unless a document decision shows that:<br>• Motorized use conflicts with forest plan objectives,<br>• Motorized use is incompatible with the recreation opportunity spectrum class,<br>• Roads and trails will not be managed as open to public motorized use,<br>• Motorized use creates user conflicts that result in unsafe conditions unrelated to weather conditions,<br>• Physical characteristics of roads and trails are hazardous for motorized use,<br>• Roads and trails do not serve an existing or identified public need, or<br>• Financing is not available for maintenance necessary to protect resources. | | Changed "travelways" to "roads". In bullets, "travelways" changed to "roads and trails". 3rd bullet clarified. |
| MA-INFR-5: On all lands except designated travelways, motorized use is restricted unless the motor vehicle use map or a forest order indicates that such use is specifically allowed. Over-the-snow motorized vehicle use on snow is allowed unless specifically restricted. (General Forest Geographic Area, Specially Designated Geographic Area) | | Motorized use is restricted on all areas not designated for motorized use on the Forest motor vehicle use map. Forest orders may also be used to close areas for various reasons. Over-the-snow motorized vehicle use is allowed unless specifically restricted. | | Reworded. |

| | | | | |
|---|---|---|---|---|
| MA-INFR-6: To protect resource values and provide for public education, allowable modes of travel should be clearly signed at trailheads and/or identified on the motor vehicle use map. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | MA deleted. |
| MA-INFR-7: When necessary, new trails are developed to expand the range of recreation opportunities, ensure user safety, and disperse existing use into different areas to be consistent with other resource objectives. (Forestwide) | | New trails are developed to expand recreation opportunities, ensure user safety, and disperse existing use. Trail construction is consistent with other resource objectives. | | Slight rewording. |
| MA-INFR-8: Manage road use by seasonal closure if:<br>• Use is causing unacceptable damage to soil and water resources due to weather or seasonal conditions<br>• Use is causing unacceptable wildlife conflicts or habitat degradation<br>• Use is resulting in unsafe conditions due to weather conditions<br>• The road(s) serve a seasonal public or administration need<br>• The area accessed has seasonal need for protection or non-use. (General Forest Geographic Area, Specially Designated Geographic Area) | | Manage road use with seasonal closures if:<br>• Use is causing unacceptable damage to soil and water resources due to weather or seasonal conditions,<br>• Use is causing unacceptable wildlife conflicts or habitat degradation,<br>• Use is resulting in unsafe conditions due to weather conditions,<br>• The road(s) serve a seasonal public or administrative need, or<br>• The area accessed has a seasonal need for protection. | | Slight rewording to last bullet. |
| MA-INFR-9: Consider the impact of potential alterations in timing, magnitude, and duration of peak flows on infrastructure design and construction. (Forestwide) | | Consider the impact of potential alterations in timing, magnitude, and duration of seasonal runoff on infrastructure design and construction. Considerations include evaluations of climate change vulnerability assessment for infrastructure, including recreational infrastructure. | | Re-worded with "peak flows" changed to "seasonal runoff". Added language regarding climate change vulnerability assessment. |
| MA-INFR-10: All dams on National Forest System land are inspected to ensure public safety and comply with all appropriate laws and regulations. High- and moderate-hazard dams have current Emergency Preparedness Plans. (Forestwide) | | | | MA deleted. |
| MA-INFR-11: Facilities with potable water use are inspected to ensure public safety and comply with all appropriate laws and regulations. (Forestwide) | | | | MA deleted. |
| MA-INFR-12: The transportation system is designed to minimize resource damage. (General Forest Geographic Area, Specially Designated Geographic Area) | | The Forest transportation system is managed to reduce resource damage and address public safety. | | Re-worded. Revised management approach speaks to how the transportation system is managed (vs designed), speaks to reducing resource damage, rather than minimizing resource damage, and adds in lanuage regarding public safety. |
| MA-INFR-13: Consider the travel analysis process during project-level analysis to move toward a sustainable road system. (General Forest Geographic Area, Specially Designated Geographic Area) | | The travel management process is followed during project-level design and analysis to move toward a sustainable Forest road system. | | Re-worded with the travel management process followed (vs considered) during both project-level design and analysis. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| OBJ-FP-1: Over the planning period, identify and map a minimum of five select populations of oshá and other ethnobotanically important plants for tribes in concert with the heritage, botany, and timber programs. (Forestwide) | | OBJ-VEG-6: Identify and map a minimum of five select populations of ethnobotanically important plants for tribes in concert with the heritage, botany, and timber programs over the next 15 years. (Forestwide) | | Forest Products section was eliminated. This objective was moved to the VEG section. Time frame changed from the planning period to 15 years and specific reference to oshá removed. |
| S-FP-1: When there is a shortage of any special forest products for tribal use, commercial permits are issued only to the extent that the tribal use can be accommodated. (Forestwide) | | S-VEG-8: When there is a shortage of any special forest products for tribal use, commercial permits are issued only to the extent that tribal use can be accommodated. (Forestwide) | | Forest Products section was eliminated. This standard was moved to the VEG section |
| G-FP-1: Special forest products, including but not limited to firewood, building rock, herb and vegetable products, medicinal and pharmaceutical products, wild edible mushrooms, wild berries and fruit, landscaping products, craft products, and floral and greenery products, are available. Plants include trees, shrubs, water plants, forbs, grasses, mosses, lichens, and fungi. Plant parts include leaves, boughs, bark, bulbs, corms, seeds, nuts, and fruits. (Forestwide) | | Management Approaches<br>Special forest products include materials that are not traditional timber and fiber products, such as sawtimber or house logs. Special forest products are permitted (or contracted) for removal from public lands for commercial, personal, Native American tribal, educational, or scientific purposes. Plan components in this section cover a variety of special forest products, including but not limited to firewood, building rock, herb and vegetable products, medicinal and pharmaceutical products, wild edible mushrooms, wild berries and fruit, landscaping products, craft products, and floral and greenery products. | | Forest Products section was eliminated. This guideline was re-worded, moved to the VEG section, and changed to a management approach. |
| MA-FP-1: When identifying and mapping for select populations of oshá, it is expected that private and rotating collection areas would be set aside for tribal use behind closed gates for privacy during ceremony. Areas would change through time. (Forestwide) | | Management approach in cultural resources:<br>Populations of Ligusticum porteri will be mapped (see also Vegetation Management section). When identifying and mapping Ligusticum porteri, consider setting aside collection areas for traditional use. Use of these areas should be rotated over time. Consultation will assist in identifying other plants that are important to tribes.<br><br>Management approach in the VEG section:<br>Continues to identify and map populations of Ligusticum porteri. Following mapping, consider setting aside collection areas for tribal use and rotate use of the areas over time. | | Forest Products section was eliminated but this management approach is covered by a management approach in cultural resources and a management approach in the VEG section. Reference to "behind closed gates for privacy during ceremony" deleted. |
| MA-FP-2: The gathering of forest products meets sustainable limits of the resource. These uses may require a permit. (Forestwide) | | | | MA deleted. |
| MA-FP-3: The needs of people from the San Luis Valley and surrounding areas are recognized, and the Forest Service strives to meet their needs for forest and wood products while protecting those resources for future generations. (Forestwide) | | | | MA deleted. |
| MA-FP-4: Provide tribes with trees, parts of trees, or forest products for traditional and cultural purposes free of charge without requiring a permit. Uses must be noncommercial. (Forestwide) | | | | MA deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-FIRE-1: Major vegetation types reflect little or no departure from historic natural range of variation of fire frequency and intensity (e.g., reflects Fire Regime Condition Class 1). (Forestwide) | | | | DC deleted. |
| DC-FIRE-2: Fuels on lands adjacent to developed areas and communities are maintained at levels where wildfires would not result in damage to property, thereby providing a safer environment for firefighters and the public. (Forestwide) | | DC-FIRE-1: Wildland fire and fuels reduction treatments are used to create vegetation conditions that reduce threats to real property and infrastructure from wildfire. Fuel loads on lands adjacent to developed areas and communities are reduced. Lands adjacent to private property and infrastructure have defensible space and dispersed patterns of fuel conditions that would favorably modify wildfire behavior and reduce the rate of spread in and around communities at risk. (Forestwide) | | DC-FIRE-2, DC-FIRE-3, and DC-FIRE-4 combined with wording changes into the revised DC-FIRE-1. |
| DC-FIRE-3: Wildland fire and fuels reduction treatments create vegetation conditions that reduce the threat to real property and infrastructure from wildfire. (General Forest Geographic Area, Specially Designated Geographic Area) | | DC-FIRE-1: Wildland fire and fuels reduction treatments are used to create vegetation conditions that reduce threats to real property and infrastructure from wildfire. Fuel loads on lands adjacent to developed areas and communities are reduced. Lands adjacent to private property and infrastructure have defensible space and dispersed patterns of fuel conditions that would favorably modify wildfire behavior and reduce the rate of spread in and around communities at risk. (Forestwide) | | DC-FIRE-2, DC-FIRE-3, and DC-FIRE-4 combined with wording changes into the revised DC-FIRE-1. |
| DC-FIRE-4: Lands adjacent to private property and infrastructure have defensible space and dispersed patterns of fuel conditions that favorably modify wildfire behavior and reduce the rate of wildfire spread in and around communities at risk. (Forestwide) | | DC-FIRE-1: Wildland fire and fuels reduction treatments are used to create vegetation conditions that reduce threats to real property and infrastructure from wildfire. Fuel loads on lands adjacent to developed areas and communities are reduced. Lands adjacent to private property and infrastructure have defensible space and dispersed patterns of fuel conditions that would favorably modify wildfire behavior and reduce the rate of spread in and around communities at risk. (Forestwide) | | DC-FIRE-2, DC-FIRE-3, and DC-FIRE-4 combined with wording changes into the revised DC-FIRE-1. |
| DC-FIRE-5: Unplanned natural ignitions play their natural role in ecosystem dynamics when and where they do not threaten human life and property. (Forestwide) | | DC-FIRE-2: Natural ignitions play a natural role in ecosystem dynamics when and where there is no threat to human life or property. (Forestwide) | | Slight re-wording. "Unplanned" deleted. |
| OBJ-FIRE-1: Over the life of the plan, complete an average of 100 acres of hazardous fuels reduction per year in areas adjacent to private development and/or critical infrastructure. (Forestwide) | | OBJ-VEG-7: Average 100 acres of hazardous fuels reduction per year in areas adjacent to private development, critical infrastructure, or both over the next 15 years. (Forestwide) | | Objective moved to VEG section. Timeframe changed from "over the life of the plan" to 15 years. |
| OBJ-FIRE-2: Over the life of the plan, complete an average of 2,000 acres of fuels reduction and resource enhancement per year using fire managed for resource benefit and/or prescribed fire on Forest lands. (Forestwide) | | OBJ-VEG-8: Average 2,000 acres of fuels reduction per year using fire managed for resource benefit or prescribed fire on Forest lands over the next 15 years. (Forestwide) | | Objective moved to VEG section. Timeframe changed from "over the life of the plan" to 15 years. Revised objective is focused on fuels reduction and does not include "resource enhancement". |
| S-FIRE-1: All unplanned human-caused ignitions will be suppressed in the safest and most effective manner possible. (General Forest Geographic Area, Specially Designated Geographic Area) | | S-FIRE-1: Unplanned human-caused ignitions will not be managed for resource benefit. (Forestwide) | | Standard re-worded and changed to apply Forestwide. |
| S-FIRE-2: Fire control lines will be rehabilitated to prevent their use as trails and/or roads. (Forestwide) | | S-FIRE-2: Fire control lines will be rehabilitated to prevent use as trails and/or roads. (Forestwide) | | No change. |
| G-FIRE-1: The construction of fire control lines with heavy equipment should be authorized only when necessary for the protection of life, property, and sensitive resources. (General Forest Geographic Area, Roadless Geographic Area, Specially Designated Geographic Area) | | | | Guideline deleted. |
| MA-FIRE-1: Where unplanned natural ignitions are allowed to play their natural role in the ecosystem, those wildfires are managed to accomplish resource objectives without unnecessarily risking or jeopardizing the ability of the site to sustain ecosystems. (Forestwide) | | | | MA deleted. |

| | | | | |
|---|---|---|---|---|
| MA-FIRE-2: Wildland fire management is balanced between fire suppression and use of wildland fire (including both prescribed fire and natural ignitions) to regulate fuels and maintain forest ecosystems in desired conditions, and help achieve ecosystem sustainability, including its interrelated ecological, economic, and social components. (Forestwide) | | | | MA deleted. |
| MA-FIRE-3: Use appropriate and authorized tools, including but not limited to grazing, mechanical treatment, prescribed fire, or naturally occurring unplanned wildfires to meet ecosystem needs, and reduce vegetation build-up to lower the risk to communities and other values from damage or loss from wildfires. (Forestwide) | | The use of appropriate and authorized hazardous fuels reduction tools, including but not limited to grazing, mechanical treatments, prescribed fire, or naturally ignited wildfires, to meet ecosystem needs and reduce vegetation build-up is intended to lower the risk to communities and other values from damage or loss from wildfire. | | Slight re-wording. |
| MA-FIRE-4: Use prescribed fire to dispose of slash, return inorganic and organic chemicals in the foliage and small woody debris to the soils, reduce hazardous fuel loadings, and create seedbeds for natural regeneration where feasible and appropriate. (Forestwide) | | Prescribed fire is an appropriate tool to dispose of slash and return nutrients and woody debris to soils while reducing hazardous fuels. This can be integrated into wildlife habitat and forage improvement, and seedbed preparation for natural regeneration. | | Re-worded. |
| MA-FIRE-5: Manage unplanned natural ignitions for multiple objectives (including resource benefit) in fire-adapted ecosystems when conditions are favorable to achieve desired resource benefits and protect values at risk. (Forestwide) | | Wildfire is recognized as a tool to accomplish multiple objectives. Wildfires caused by natural ignitions are managed for multiple resource objectives, including resource benefit when conditions are favorable. | | Re-worded. |
| MA-FIRE-6: Take suppression actions to mitigate the threats from unplanned natural ignitions to public safety, communities, and unique resource values while allowing the wildfire to play its natural role in fire-dependent ecosystems. (Forestwide) | | Fire suppression actions are taken to mitigate effects of wildfire to public safety, communities, and unique resource values, while allowing unplanned ignitions to play a natural role in fire-dependent ecosystems. | | Slight re-wording. |
| MA-FIRE-7: Implement fire management activities to minimize impacts to important and/or unique values within the management area(s) where they occur. (Forestwide) | | | | MA deleted. |
| MA-FIRE-8: Fuels management activities may be implemented to protect unique features, reduce fire behavior to an acceptable level, or replicate natural disturbance regimes within the constraints of the management area where the management activity is proposed. (Forestwide) | | | | *MA deleted, though this is listed in Appendix I - Proposed and Possible Actions:*<br>*• Implement fuels management activities to protect unique features, reduce fire behavior to an acceptable level, or replicate natural disturbance regimes within the constraints of the management area for the proposal.* |
| MA-FIRE-9: Include evaluations for immediate suppression, management for resource benefit, or a combination of both actions for wildland fire response on fires occurring on the Forest, in communication with resource advisors. (Forestwide) | | | | MA deleted. |
| MA-FIRE-10: Burned areas will be assessed to determine suitable and effective emergency stabilization and rehabilitation needs to meet current and anticipated environmental conditions. (Forestwide) | | | | MA deleted, though this is listed in Appendix I - Proposed and Possible Actions:<br>*• Assess burned areas to determine suitable and effective emergency stabilization and rehabilitation needs to meet current and anticipated environmental conditions.* |
| MA-FIRE-11: Rehabilitation and restoration activities will be evaluated to assess effectiveness of treatments. (Forestwide) | | | | MA deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-CRT-1: Significant cultural resources (e.g., buildings, sites, districts, structures, and objects), including areas acknowledged as traditional cultural properties, having scientific, cultural, or social values, are identified, preserved, protected, and/or restored for their cultural importance. (Forestwide) | | DC-CR-1: Interpretation and management of cultural resources connects the public to the past, to the land and its history. The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings. Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved and maintained. Long-standing, land-based rural communities that have depended on the Forest are recognized and valued. Cultural resources are protected from natural forces, excessive visitor use, vandalism, and other impacts. | | One of several draft DCs re-worded and combined into 1 revised DC. |
| DC-CRT-2: Cultural resources provide educational opportunities that connect people, past and present, to the land and its history. Through positive heritage experiences provided by interpretive sites, historic standing structures, and other materials, the public has an appreciation for the history of the region and develops an awareness of preservation efforts. (Forestwide) | | | | First part of draft DC was re-worded and combined into the 1 revised DC. Second part of draft DC was deleted. |
| DC-CRT-3: Historic Agency administrative buildings reflect agency history, identity, and function, and where appropriate are available for public use. Restored historic buildings placed on the Agency facility rental program add to Forest recreation program capacity and diversity and generate revenue. (Forestwide) | | | | This DC was deleted. Revised DC-CR-1 states "The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings." |
| DC-CRT-4: Heritage-based recreation opportunities are connected with other recreation opportunities, such as trails. (Forestwide) | | | | DC deleted. |
| DC-CRT-5: Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved. The uniqueness of long-standing, land-based rural communities that have depended on the Forest for generations is recognized and valued. (Forestwide) | | DC-CR-1: Interpretation and management of cultural resources connects the public to the past, to the land and its history. The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings. Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved and maintained. Long-standing, land-based rural communities that have depended on the Forest are recognized and valued. Cultural resources are protected from natural forces, excessive visitor use, vandalism, and other impacts. | | One of several draft DCs re-worded and combined into 1 revised DC. |
| DC-CRT-6: Cultural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved. (Forestwide) | | DC-CR-1: Interpretation and management of cultural resources connects the public to the past, to the land and its history. The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings. Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved and maintained. Long-standing, land-based rural communities that have depended on the Forest are recognized and valued. Cultural resources are protected from natural forces, excessive visitor use, vandalism, and other impacts. | | One of several draft DCs re-worded and combined into 1 revised DC. |

| | | | | |
|---|---|---|---|---|
| DC-CRT-7: Significant cultural resources have no deterioration from natural forces, visitor use, vandalism, and other impacts. (Forestwide) | | DC-CR-1: Interpretation and management of cultural resources connects the public to the past, to the land and its history. The Forest strives to identify, preserve, and protect cultural resources that have scientific, cultural, or social values, including areas acknowledged as traditional cultural properties and historic agency administrative buildings. Cultural and natural resources and historic uses that help sustain cultural communities and contribute to social and economic sustainability are preserved and maintained. Long-standing, land-based rural communities that have depended on the Forest are recognized and valued. Cultural resources are protected from natural forces, excessive visitor use, vandalism, and other impacts. | | One of several draft DCs re-worded and combined into 1 revised DC. |
| S-CRT-1: Include provisions in applicable contracts, agreements, and special use permits for National Register-listed or eligible properties to protect cultural resources. (Forestwide) | | S-CR-1: Include applicable provisions in contracts, agreements, and special use permits as needed to protect cultural resources. (Forestwide) | | Standard re-worded and expanded to apply "as needed" instead of only for National Register-listed or eligible properties. |
| G-CRT-1: Preserve cultural artifacts in place, or curated when necessary, following current standards. (Forestwide) | | G-CR-1: Preserve cultural artifacts in place, or curate when necessary. (Forestwide) | | "Following current standards" deleted. |
| MA-CRT-1: Protect fire-sensitive sites from activities that may include vegetation treatment, including prescribed fire and thinning, in and adjacent to site boundaries provided that appropriate protective measures are in place. Erosion, severe fire effects, and livestock congregation can result from "islanding" if sites are only avoided and not treated. (Forestwide) | | Protect sites from activities including, but not limited to, vegetation treatment and prescribed fire. Protection can require attention to avoid "islanding" of sites, which can occur from simply avoiding areas to reduce impacts from erosion, severe fire effects, and livestock grazing. | | MA reworded. Expanded to include more than just fire-sensitive sites. |
| MA-CRT-2: Cultural resource findings are synthesized, interpreted, and shared with the scientific community and public through prehistoric and historic contexts, formal presentations, publications, and educational venues. (Forestwide) | | | | MA deleted, but language included in Appendix I - Proposed and Possible Actions:<br>• *Synthesize, interpret, and share cultural resource findings with the scientific community and public through prehistoric and historic contexts, formal presentations, publications, and educational venues.* |
| MA-CRT-3: Complete non-project inventory annually to uphold the Section 110 mandate of the National Historic Preservation Act by prioritizing the following:<br>• Areas where eligible cultural resources are threatened or ongoing impacts are unknown and need to be assessed<br>• Areas indicated to have high cultural value or high density of cultural resources<br>• Areas of importance to traditional communities<br>• Areas where additional survey will contribute to a greater regional understanding of a specific management unit or special interest area. (Forestwide) | | In compliance with Section 110 of the National Historic Preservation Act, the Forest intends to complete non-project inventory annually. The following prioritization will be applied:<br>• Areas where eligible cultural resources are threatened or ongoing impacts are unknown and need to be assessed.<br>• Areas indicated to have high cultural value or high density of cultural resources.<br>• Areas of importance to traditional communities.<br>• Areas where additional survey will contribute to a greater regional understanding of a specific management unit or special interest area. | | Slight re-wording. |
| MA-CRT-4: Collaborative partnerships and volunteer efforts are developed and maintained to assist the Forest Service in researching and managing its cultural resources. Develop partnerships with traditional communities, nonprofits, volunteers, professional organizations, and schools. (Forestwide) | | Partnerships are developed and maintained to assist in meeting targets, maintaining facilities and infrastructure, completing monitoring, developing resource specific plans, mapping habitat and use, and more. Partnerships are encouraged with traditional communities, surrounding communities and governments, nonprofit groups, volunteers, professional organizations, schools, and any other interested individuals and groups. Collaborative partnerships and volunteer efforts will continue to be maintained and developed to assist the agency in researching and managing cultural resources. Partnerships will focus on traditional communities, nonprofits, volunteers, professional organizations, and schools. | | MA slightly re-worded. New language added at beginning:<br>*Partnerships are developed and maintained to assist in meeting targets, maintaining facilities and infrastructure, completing monitoring, developing resource specific plans, mapping habitat and use, and more. Partnerships are encouraged with traditional communities, surrounding communities and governments, nonprofit groups, volunteers, professional organizations, schools, and any other interested individuals and groups.* |

| | | | | |
|---|---|---|---|---|
| MA-CRT-5: Develop research questions in concert with those put forth in Colorado Prehistory: A Context for the Rio Grande Basin (Martorano et al. 1999) and Colorado History: A Context for Historical Archaeology (Church et al. 2007), or more current content. (Forestwide) | | | | MA deleted. |
| MA-CRT-6: Develop management and preservation plans for administrative facilities and infrastructure that are significant cultural resources with special significance, or are sites that receive heavy visitor use. (Forestwide) | | The Forest intends to develop management and preservation plans for administrative facilities and infrastructure that are significant cultural resources with special significance, or are sites that receive frequent visitor use. | | Slight re-wording. |
| MA-CRT-7: Areas acknowledged as traditional cultural properties, cultural landscapes, and other culturally significant areas identified by local communities provide tangible links to historically rooted beliefs, customs, and practices. These resources are protected through consultation, traditional cultural practitioners, consulting parties, and project design. (Forestwide) | | Areas that are acknowledged as traditional cultural properties or cultural landscapes, and other culturally significant areas identified by local communities, provide tangible links to historically rooted beliefs, customs, and practices. These resources are protected through consultation, traditional cultural practices, consulting parties, and project design. | | Slight re-wording. |
| MA-CRT-8: Volunteers participate in cultural resource conservation activities such as research, site stabilization, conservation, and interpretation. Cultural resource programs, interpretive presentations, or publications provide the public with opportunities to learn about, understand, and experience the history of the Forest. (Forestwide) | | | | MA deleted, but some of the language is included in Appendix I - Proposed and Possible Actions:<br>• *Encourage volunteer participation in cultural resource conservation activities such as research, site stabilization, conservation, and interpretation.* |
| MA-CRT-9: Local communities are engaged in cultivating economic development opportunities for heritage tourism. (Forestwide) | | | | MA deleted, but similar language is included in Appendix I - Proposed and Possible Actions:<br>• *Cultivate economic development opportunities for heritage tourism in coordination with local communities.* |
| MA-CRT-10: The Heritage Program is integrated into all resource management decisions and aligns with the affirmative management (including protection) of significant cultural resources. (Forestwide) | | Cultural resources are integrated into all resource management decisions and align with the affirmative management, including protection, of significant cultural resources. | | Slightly re-worded. |
| MA-CRT-11: Develop a database of fire-sensitive sites, structures, and other resources to facilitate resource protection during fire management. (Forestwide) | | A database of fire-sensitive sites, structures, and other resources will be developed to facilitate resource protection during fire management. | | Slightly re-worded. |
| MA-CRT-12: Provide opportunities for line officers and Forest Service employees to receive training to gain a broader understanding of the unique legal relationship between the Federal Government and Indian tribes, and to learn about American Indian law, customs, traditions, and values. (Forestwide) | | Opportunities will be provided for responsible officials and employees in the agency to receive training to gain a broader understanding of the unique legal relationship between the Federal Government and Indian tribes, and to learn about American Indian law, customs, traditions, and values. | | Slightly re-worded. |
| MA-CRT-13: Through consultation, identify other plants that may be important to tribes. (Forestwide) | | Consultation will assist in identifying other plants that are important to tribes. | | Slightly re-worded. |
| MA-CRT-14: Map oshá populations. (Forestwide) | | Populations of Ligusticum porteri will be mapped (see also Vegetation Management section). When identifying and mapping Ligusticum porteri, consider setting aside collection areas for traditional use. Use of these areas should be rotated over time. | | MA re-worded and changed to use the scientific name of oshá. Additional language regarding collection areas and rotating these areas was originally in the draft plan in the ATI and FP management approaches. There is also language in the revised plan in the *VEG management approaches:*<br>*Identify and map populations of Ligusticum porteri. Following mapping, consider setting aside collection areas for tribal use and rotate use of the areas over time.* |
| MA-CRT-15: Work with tribes to understand community needs and build respectful, collaborative relationships to achieve mutually desired conditions. (Forestwide) | | The Forest intends to work with tribes to understand community needs and build respectful, collaborative relationships to achieve mutually desired conditions. | | Slightly re-worded. |
| MA-CRT-16: Maintain the current heritage database. (Forestwide) | | | | MA deleted, but similar language is included in Appendix I - Proposed and Possible Actions:<br>• *Maintain the current heritage database.* |

| | | | | |
|---|---|---|---|---|
| MA-CRT-17: Properly preserve historic documents, such as photographs and maps, and make them available for research and interpretation. (Forestwide). | | | | MA deleted, but similar language is included in Appendix I - Proposed and Possible Actions: • *Properly preserve historic documents, such as photographs and maps, and make them available for research and interpretation.* |
| MA-CRT-18: Cultivate economic development opportunities for heritage tourism in coordination with local communities. (Forestwide) | | | | MA deleted, but similar language is included in Appendix I - Proposed and Possible Actions: • *Cultivate economic development opportunities for heritage tourism in coordination with local communities.* |
| MA-CRT-19: For activities that are authorized by special use permits and use sites that are eligible for inclusion in the National Register of Historic Places, the Operation and Maintenance Plan for the permitted activities will stipulate that the maintenance and upkeep must maintain the historic characteristics of the site. (Forestwide) | | Operation and maintenance plans for special use permits, including recreation residences, eligible for inclusion on the National Register of Historic Places include stipulations to ensure preservation of the historic characteristics of the site. | | Re-worded and combined with MA-CRT-21 into one management approach. |
| MA-CRT-20: Prescribed burn projects will follow the Culturally Modified Tree Guidelines developed by fuels specialists and the Forest archaeologist. (Forestwide) | | | | MA deleted. |
| MA-CRT-21: For recreation residences that are eligible for listing on the National Register of Historic Places, the operation and maintenance plan for the special use authorization should stipulate that the maintenance and upkeep must maintain the historic characteristics of the residence. (Forestwide). | | Operation and maintenance plans for special use permits, including recreation residences, eligible for inclusion on the National Register of Historic Places include stipulations to ensure preservation of the historic characteristics of the site. | | Re-worded and combined with MA-CRT-19 into one management approach. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-CDT-1: Viewsheds from the Continental Divide National Scenic Trail have high scenic values. The foreground of the trail is naturally appearing, and generally appears unaltered by human activities. The potential to view wildlife is high and evidence of ecological processes such as fire, insects, and diseases exists. (Forestwide) | | DC-CDT-1: Viewsheds from the Continental Divide National Scenic Trail have high scenic values. The foreground of the trail appears natural. (Forestwide) | | DC simplified and excludes parts of the draft DC related to appearing unaltered by human activities, the potential to view wildlife, and evidence of ecological processes. |
| DC-CDT-2: The landscape of the North Branch of the Old Spanish National Historic Trail is managed to:<br>• Maintain its nature and purpose,<br>• Sustain its historic, rugged, spacious character, and<br>• Preserve the viewshed, cultural landscapes, landmarks, and traditional cultural properties along the trail. (Forestwide) | | DC-CDT-5: The landscape of the North Branch of the Old Spanish National Historic Trail is managed to maintain its nature and purpose while providing educational opportunities, promoting stewardship, providing opportunities for heritage tourism, and protecting traditional cultural properties. (Forestwide) | | DC re-worded, with language added regarding educational opportunties, promoting stewardship, and heritage tourism, and language originally in the second and third bullets deleted or changed. |
| DC-CDT-3: Travelers along the Old Spanish National Historic Trail have opportunities to learn about the history and significance of the trail, and to experience and appreciate the cultural and natural environment that traders experienced in their travels. (Forestwide) | | | | DC deleted. |
| DC-CDT-4: Trailside interpretation and related visitor information services enhance visitor appreciation of the outdoors, natural resources, history, and scenic values along the Old Spanish National Historic Trail, while also promoting stewardship and protection of the trail. (Forestwide) | | | | DC deleted. |
| DC-CDT-5: The management of the Old Spanish National Historic Trail cultivates economic development opportunities for heritage tourism in coordination with local communities. (Forestwide) | | | | DC deleted. |
| DC-CDT-6: The Old Spanish National Historic Trail is well signed, passable, and safely accessible to the public where feasible. (Forestwide) | | | | DC deleted. In Appendix I - Proposed and Possible Actions, it lists:<br>*• Provide appropriate signage at prominent access points along the Old Spanish National Historic Trail to enhance trail user experience and safety.* |
| DC-CDT-7: The Continental Divide National Scenic Trail is a well-defined trail that provides for high-quality primitive hiking and horseback riding opportunities, and other compatible nonmotorized trail activities, in a highly scenic setting along the Continental Divide. The significant scenic, natural, historic, and cultural resources along the trail corridor are conserved. Where possible, the trail provides visitors with expansive views of the natural landscapes along the Continental Divide. (Forestwide) | | DC-CDT-2: The Continental Divide National Scenic Trail is a well-defined trail that provides for high-quality primitive hiking and horseback riding opportunities, and other compatible nonmotorized trail activities, in a highly scenic setting along the Continental Divide. The significant scenic, natural, historic, and cultural resources along the trail corridor are conserved. Where possible, the trail provides visitors with expansive views of the natural landscapes along the Continental Divide. (Forestwide) | | No change. |
| DC-CDT-8: The setting of the Continental Divide National Scenic Trail corridor is consistent with or complements a primitive or semiprimitive nonmotorized setting. The Continental Divide National Scenic Trail may intermittently pass through more-developed settings to provide for a continuous route. (Forestwide) | | | | DC deleted. |
| DC-CDT-9: The Continental Divide National Scenic Trail is accessible from access points that provide opportunities to select the type of terrain, scenery, and trail length, ranging from long distance to day use, that best provide for the compatible outdoor recreation experiences being sought. Wild and remote backcountry segments of the route provide opportunities for solitude, immersion in natural landscapes, and primitive outdoor recreation. Front-country and more easily accessible trail segments complement local community interests and needs and help contribute to a sense of place. (Forestwide) | | DC-CDT-3: The Continental Divide National Scenic Trail can be accessed from multiple locations, allowing visitors to select the type of terrain, scenery, and trail length (e.g., ranging from long distance to day use) that best accommodates their desired outdoor recreation experience(s). Wild and remote backcountry segments provide opportunities for solitude, immersion in natural landscapes, and primitive outdoor recreation. Easily accessible trail segments complement local community interests and needs and help contribute to a sense of place. (Forestwide) | | Small wording changes. |
| DC-CDT-10: Use conflicts among Continental Divide National Scenic Trail users are infrequent. (Forestwide) | | | | DC deleted. |

| | | | | |
|---|---|---|---|---|
| DC-CDT-11: The Continental Divide National Scenic Trail is well maintained, signed, and passable. Alternative routes are made available in the case of temporary closures resulting from natural events, such as fire, flood or land management activities. (Forestwide) | | DC-CDT-4: The Continental Divide National Scenic Trail is well maintained, signed, and passable. Alternative routes are made available in the case of temporary closures resulting from natural events, such as fire or flood, or land management activities. (Forestwide) | | Slight wording correction. |
| OBJ-CDT-1: Restore or relocate two segments of the Continental Divide National Scenic Trail to improve scenic viewing opportunities and/or to provide for a nonmotorized experience. (Forestwide) | | OBJ-CDT-1: Restore or relocate one segment of the Continental Divide National Scenic Trail to improve scenic viewing opportunities and/or to provide for a nonmotorized experience over the next 15 years. (Forestwide) | | Objective reduced from two segments to one. Time frame of 15 years added. |
| S-CDT-1: The congressionally designated trail corridors are not suitable for oil and gas or geothermal energy development, or other leasable mineral activities. (Forestwide) | | S-CDT-1: Do not authorize development of oil and gas, geothermal energy, or other leasable mineral resources within the Continental Divide National Scenic and the Old Spanish National Historic Trail corridor. (Forestwide) | | Standard re-worded. |
| S-CDT-2: No common variety mineral extraction (e.g., limestone, gravel, pumice, etc.) shall occur on or within the congressionally designated trail corridors. (Forestwide) | | S-CDT-2: Do not authorize common variety mineral extraction (e.g., limestone, gravel, pumice, etc.) within the congressionally designated trail corridors. (Forestwide) | | Slight wording change. |
| S-CDT-3: Motorized events and motorized special use permits shall not be permitted on nonmotorized segments of the Continental Divide National Scenic Trail. Motorized events and special use permits could be authorized along existing motorized trail segments not yet converted to nonmotorized use. (Forestwide) | | | | Standard deleted. |
| S-CDT-4: Management activities in the congressionally designated trail corridors shall be consistent with, or make progress toward achieving, high or very high scenic integrity objectives to protect or enhance scenic qualities. (Forestwide) | | | | Standard deleted. |
| G-CDT-1: To retain or promote the character for which the trail was designated, new or relocated trail segments should be located primarily within settings consistent with or complementing primitive or semiprimitive nonmotorized recreation opportunity spectrum classes. To the extent possible, avoid road and motorized trail crossings and other signs of modern development. (Forestwide) | | | | Guideline deleted. |
| G-CDT-2: To protect or enhance the scenic qualities of the Continental Divide National Scenic Trail, management activities should be consistent with, or make progress toward achieving scenic integrity objectives of high or very high within the foreground of the trail (up to 0.5 mile on either side). (Forestwide) | | | | Guideline deleted. Also see S-SCNY-1. |
| G-CDT-3: If forest-health projects result in short-term impacts to the scenic integrity of the trail, mitigation measures should be included, such as screening to reduce short term impacts to the scenic integrity from management activities adjacent to the trail. (Forestwide) | | G-CDT-1: Forest health projects that result in short-term impacts the scenic integrity of the Continental Divide National Scenic Trail should apply mitigation measures, including but not limited to screening. (Forestwide) | | Guideline wording simplified. |
| G-CDT-4: In order to promote a nonmotorized setting, the Continental Divide National Scenic Trail should not be permanently relocated onto routes open to motor vehicle use. (Forestwide) | | | | Guideline deleted. |
| G-CDT-5: Provide adequate trail facilities to accommodate the amount and types of use anticipated on any given segment to provide for visitor health and safety. Facilities provided should be minimal in order to preserve or promote a setting that appears natural. (Forestwide) | | Management approach: To provide for user safety and health, adequate trail facilities are provided that accommodate the amount and types of use anticipated on any given trail segment. Minimal facilities are provided to preserve or promote a setting that appears natural. | | Guideline re-worded and changed to management approach. |
| G-CDT-6: New communication sites, utility corridors, and renewable energy sites should not be allowed within the visible foreground (up to one-half mile) and middle-ground viewshed (up to 4 miles) to protect the scenic values of the trail. (Forestwide) | | | | Guideline deleted. |
| G-CDT-7: Limit linear utilities and rights-of-way to a single trail crossing unless additional crossings are documented as the only prudent and feasible alternative. (Forestwide) | | | | Guideline deleted. |

| | | | | |
|---|---|---|---|---|
| G-CDT-8: New temporary or permanent roads or motorized trail construction across or adjacent to the Continental Divide National Scenic Trail should be avoided unless needed for resource protection, private lands access, or to protect public health and safety. This provides for a naturally appearing setting while avoiding visual, aural, and resource impacts from motorized use. (Forestwide) | | G-CDT-2: To provide for a naturally appearing setting while avoiding impacts from motorized use, no new temporary or permanent roads, or motorized trails, should be constructed across or adjacent to the Continental Divide National Scenic Trail, unless needed for resource protection, private land access, or protection of public health and safety. (Forestwide) | | Guideline simplified and re-worded. |
| G-CDT-9: The use of the Continental Divide National Scenic Trail for landings or as a temporary road for any purpose should not be allowed to provide for a naturally appearing setting while avoiding visual, aural, and resource impacts. (Forestwide) | | | | Guideline deleted. |
| G-CDT-10: Allow hauling or skidding along the trail only when the trail is colocated with an open road and no other options are available. Apply design criteria to minimize impacts to trail infrastructure. (Forestwide) | | | | Guideline deleted. |
| G-CDT-11: Manage unplanned fires in the foreground (up to one-half mile) of the trail using minimum impact suppression tactics, or other appropriate tactics, for the protection of the congressionally designated trail values. Allow heavy equipment line construction within the corridor only when necessary for emergency protection of life and property. (Forestwide) | | | | Guideline deleted. |
| G-CDT-12: Manage wildfires and prescribed fires within 0.5 mile of trails using strategies and tactics that will minimize impacts and emphasis protection of the congressionally designated trail. (Forestwide) | | | | Guideline deleted. |
| G-CDT-13: Management of the Continental Divide Trail shall comply with the most recent version of the Continental Divide Comprehensive Plan or other current direction. (Forestwide) | | | | Guideline deleted. There is a reference to the Continental Divide National Scenic Trail Comprehensive Plan in the introduction to the CDT section. |
| | | SUIT-CDT-1: The Continental Divide National Scenic Trail and corridor is not suitable for oil and gas or geothermal energy development or other leasable mineral activity. | | New suitability statement added, similar to S-CDT-1. |
| | | SUIT-CDT-2: The Continental Divide National Scenic Trail and corridor is not suitable for common variety mineral extraction, including but not limited to limestone, gravel, and pumice. | | New suitability statement added, similar to S-CDT-2. |
| MA-CDT-1: Develop appropriate measures to protect high-potential sites and segments from deterioration due to natural forces, visitor use, vandalism, and other impacts. (Forestwide) | | Appropriate measures are developed to protect high potential sites and segments from deterioration due to natural forces, visitor use, vandalism, and other impacts. | | Slight re-wording. |
| MA-CDT-2: Work to:<br>• Comprehensively document at least 3 miles of the congressionally designated Old Spanish National Historic Trail<br>• Study one paraje (camp)<br>• Study one new segment that was part of the original feasibility study. (Forestwide) | | | | MA deleted. |
| MA-CDT-3: Provide appropriate signage at prominent access points along the Old Spanish National Historic Trail to enhance trail user experience and safety. (Forestwide) | | Prominent access points along the Old Spanish National Historic trail will be signed to enhance user experience and safety. | | Slight re-wording. |
| MA-CDT-4: Where applicable, follow the Old Spanish National Historic Trail Comprehensive Management Plan in consultation with trail administrators and across partner Federal agencies. (Forestwide) | | | | MA deleted, but some language included in the introduction of this section: *The Old Spanish National Historic Trail Comprehensive Administrative Strategy (December 2017) guides management of the trail across six states and a variety cf ownerships. Trail management and activities will be coordinated across and aajacent to unit and jurisdictional boundaries.* |

| | | | | |
|---|---|---|---|---|
| MA-CDT-5: Plan for, develop, maintain, and manage high potential segments, sites, and segments under study for the Old Spanish National Historic Trail with trail administrators, the recreation program, volunteers, and trail organizations. (Forestwide) | | The Forest will work with trail administrators, recreation staff, volunteers, and trail organizers to plan for, develop, maintain, and manage high potential segments, sites, and segments under study for the Old Spanish National Historic Trail. | | Slight re-wording. |
| MA-CDT-6: Coordinate trail management and activities for consistency across and adjacent to unit and jurisdictional boundaries. (Forestwide) | | | | MA deleted, but some language included in the introduction of this section: *The Old Spanish National Historic Trail Comprehensive Administrative Strategy (December 2017) guides management of the trail across six states and a variety cf ownerships. Trail management and activities will be coordinated across and aadjacent to unit and jurisdictional boundaries.* |
| MA-CDT-7: Consult with federally recognized tribal governments, appropriate Federal, state, and local agencies, and trail administrators regarding planning and development activities for the Old Spanish National Historic Trail. (Forestwide) | | Federally recognized tribes, appropriate Federal, State, and local agencies, and trail administrators will be consulted regarding planning and development activities for the Old Spanish National Historic Trail. | | Slight re-wording. |
| MA-CDT-8: Encourage trail partners and volunteers to assist in the planning, development, maintenance, and management of the Continental Divide National Scenic Trail, where appropriate and consistent with the Continental Divide National Scenic Trail Comprehensive Plan. (Forestwide) | | Consistent with the Continental Divide National Scenic Trail Comprehensive Plan, trail partners and volunteers will be encouraged to assist in the planning, development, maintenance, and management of the trail. | | Slight re-wording. |
| MA-CDT-9: Evaluate proposed relocations or new segment locations for the Continental Divide National Scenic Trail by using defined optimal location criteria. (Forestwide) | | Proposed relocations or new segment locations will be evaluated using defined optimal location criteria. | | Slight re-wording. |
| MA-CDT-10: Identify and pursue opportunities to acquire lands or rights-of-way in or adjacent to the Continental Divide National Scenic Trail corridor. (Forestwide) | | Opportunities to acquire lands or rights-of-way in or adjacent to the Continental Divide National Scenic Trail corridor will be identified and pursued as feasible. | | Slight re-wording. Clarified this will be done "as feasible". |
| MA-CDT-11: Consider how activities outside the visible foreground may affect viewsheds and user experiences and mitigate potential impacts to the extent possible. (Forestwide) | | | | MA deleted. |
| MA-CDT-12: Provide consistent signage along the trail corridor at road and trail crossings to adequately identify the trail and provide interpretive signs at key trail entry points and limited historic and/or cultural sites to orient visitors and enhance the visitor experience. (Forestwide) | | Consistent signage is provided along the Continental Divide National Scenic Trail at road and trail crossings to identify the trail. Interpretive signs are provided at key entry points and at historic and cultural sites to orient visitors and enhance their experience. | | Slight re-wording. |
| MA-CDT-13: Ensure that incident commanders are aware of the Continental Divide National Scenic Trail as a resource to be protected during wildfire suppression activities and clearly identify fire suppression rehabilitation and long-term recovery of the trail corridor as high priorities for incident commanders, Burned Area Emergency Rehabilitation team leaders, and post-fire rehabilitation efforts. (Forestwide) | | During emergencies, incident management teams are made aware of the Continental Divide National Scenic Trail as a resource to be protected. Fire suppression rehabilitation and long-term recovery of the Continental Divide National Scenic Trail corridor are identified as high priorities for incident management teams, burned area emergency recovery teams, and post-fire rehabilitation interdisciplinary teams. | | Re-worded and expanded to cover emergencies instead of only wildfire suppression activities. Expanded to apply to teams, rather than individual commanders/team leaders. |
| MA-CDT-14: Establish appropriate carrying capacities for specific segments of the Continental Divide National Scenic Trail, monitoring use and conditions, while taking appropriate management actions to maintain or restore the nature and purposes of the trail if the results of the monitoring or other information indicate a trend away from the desired condition. (Forestwide) | | Over time, appropriate carrying capacities will be established for specific segments of the Continental Divide National Scenic Trail by monitoring use and conditions. Appropriate management actions are taken to maintain or restore the nature and purposes of the trail if the results of monitoring or other information indicate a trend away from the desired conditions. | | Slight re-wording. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-ATI-1: Areas of tribal importance that include acknowledged Traditional Cultural Properties are present for their cultural importance and are generally free of impacts from other uses. (Forestwide) | | DC-ATI-1: Acknowledged traditional cultural properties are present for their cultural importance and are generally free of impacts from other uses. (Forestwide) | | DC wording simplified. |
| DC-ATI-2: Access for tribal members is provided for the exercise of treaty rights and to provide opportunities to practice traditional, cultural, and religious activities, such as plant gathering and ceremonial activities, that are essential to sustaining their way of life, cultural integrity, social cohesion, and economic well-being. (Forestwide) | | DC-ATI-2: Access for tribal members is provided for the exercise of treaty rights and to allow opportunities to practice traditional, cultural, educational, and religious activities. (Forestwide) | | DC wording simplified, with examples deleted and "provide opportunities" changed to "allow opportunities". |
| DC-ATI-3: The significant visual qualities of eligible areas acknowledged as traditional cultural properties are preserved. (Forestwide) | | | | DC deleted. |
| DC-ATI-4: The Forest provides a setting for educating tribal youth in culture, history, and land stewardship, and for exchanging information between tribal elders and youth. (Forestwide) | | | | DC deleted. |
| DC-ATI-5: Traditionally used resources, such as oshá, are not depleted and are available for future generations. (Forestwide) | | DC-ATI-3: Traditionally used resources are managed sustainably and are available for future generations. (Forestwide) | | Specific reference to oshá deleted. "Not depleted" changed to "managed sustainably". |
| G-ATI-1: Minimize restoration and recreation activities and uses, as well as the development of new facilities and infrastructure, near areas of tribal importance, such as areas acknowledged as traditional cultural properties. (Forestwide) | | G-ATI-1: To protect areas of tribal importance, such as areas acknowledged as traditional cultural properties, minimize restoration and recreation activities and uses, as well as the development of new facilities and infrastructure, near these areas. (Forestwide) | | Re-worded to provide clarification on purpose of guideline. |
| G-ATI-2: The scenic and physical integrity of sacred sites, areas acknowledged as Traditional Cultural Properties, or as part of an important cultural landscape, should be retained when approving, locating, and maintaining activities, including, but not limited to communication sites and powerlines. (Forestwide) | | | | Guideline deleted. |
| MA-ATI-9: The purposeful excavation, photography, and/or destructive analysis of human remains for educational purposes, such as research or field schools, is not permitted. (Forestwide) | | G-ATI-2: Purposeful excavation, photography, and destructive analysis of human remains, or any one of these, for educational purposes will be considered only by consulting tribes. | | MA changed to guideline. Wording changed to provide for exception given consideration only by consulting tribes. |
| G-ATI-3: Adhere to and maintain the Intertribal and Interagency San Luis Valley Native American Graves Protection and Repatriation Act Memorandum of Understanding, first enacted in 2009. (Forestwide) | | | | Guideline deleted. |
| G-ATI-4: Adhere to and maintain the Brunot Agreement(s) between the State of Colorado, Ute Mountain, Ute, and Southern Ute Tribes. (Primitive Wilderness Geographic Area) | | | | Guideline deleted. |
| MA-ATI-1: Cooperatively develop interpretive and educational exhibits or other media that focus on the history of Forest lands in collaboration with tribes to provide the public with a greater understanding and appreciation of our shared history, culture, and traditions. (Forestwide) | | Management Approaches<br>Interpretive and educational exhibits and other media focusing on the history of forest lands is developed in collaboration with tribes to provide the public with a greater understanding and appreciation of shared history, culture, and traditions. | | |

| | | | | |
|---|---|---|---|---|
| MA-ATI-2: When identifying and mapping for select populations of oshá, consider setting aside collection areas for tribal use that would rotate through time. (Forestwide) | | Management approach in cultural resources:<br>Populations of Ligusticum porteri will be mapped (see also Vegetation Management section). When identifying and mapping Ligusticum porteri, consider setting aside collection areas for traditional use. Use of these areas should be rotated over time. Consultation will assist in identifying other plants that are important to tribes.<br><br>Management approach in the VEG section:<br>Identify and map populations of Ligusticum porteri. Following mapping, consider setting aside collection areas for tribal use and rotate use of the areas over time. | | MA deleted in ATI section, but covered by the management approaches in the cultural resources and VEG sections. |
| MA-ATI-3: Relationships with tribes are meaningful, built on trust, and maintained. (Forestwide) | | The Forest maintains relationships with tribes that are meaningful and built on trust. | | Slight re-wording. |
| MA-ATI-4: Develop an interpretive and educational site to help prevent vandalism at the Natural Arch. (Specially Designated Geographic Area) | | | | MA deleted, but it is included in Appendix I - Proposed and Possible Actions.<br>• *Develop an interpretive and educational site to help prevent vandalism at the Natural Arch.* |
| MA-ATI-5: Develop interpretive and educational site materials in concert with tribes that can aid in protecting areas of tribal importance. (Forestwide) | | The Forest intends to work with tribes in developing interpretive and educational materials to aid in protecting areas of tribal importance. | | Slight re-wording. |
| MA-ATI-6: Determine eligibility of Mount Blanca as a traditional cultural property to the National Register of Historic Places in partnership with interested tribes. (Forestwide) | | The Forest will partner with interested tribes in determining the eligibility of Mount Blanca as a traditional cultural property to the National Register of Historic Places. | | Slight re-wording. |
| MA-ATI-7: Work with staff from the San Luis Valley, Bureau of Land Management, Pike-San Isabel National Forest, interested tribes, the U.S. Fish and Wildlife Service Sangre de Cristo Conservation Area, and other non-Federal partners to develop a management plan to assist in maintaining cultural values. (Forestwide) | | A management plan will be developed to assist in maintaining cultural values, involving staff from the Bureau of Land Management San Luis Valley Field Office, Pike-San Isabel National Forest, interested tribes, U.S. Fish and Wildlife Service Sangre de Cristo Conservation Area, and other non-Federal partners. | | Slight re-wording. |
| MA-ATI-8: Confidential and/or sensitive information regarding sacred sites is held in the strictest confidence. (Forestwide) | | Confidential and sensitive information, or both, regarding sacred sites is held in the strictest confidence. | | Slight re-wording. |
| MA-ATI-10: Accommodate and facilitate traditional use of areas acknowledged as traditional cultural properties and other culturally important places that are essential to maintaining the continuing cultural identity of associated communities. (Forestwide) | | The Forest intends to accommodate and facilitate traditional use of areas acknowledged as traditional cultural properties and other culturally important places that are essential to maintaining the continuing cultural identity of associated communities. | | Slight re-wording. |
| MA-ATI-11: Coordinate with tribes to develop collaborative proposals and partnerships to implement projects of mutual benefit and/or economic development, using federally authorized or advocated programs where available. (Forestwide) | | In coordination with tribes, develop collaborative proposals and partnerships to implement projects of mutual benefit and economic development, or both, using federally authorized or advocated programs where available. | | Slight re-wording. |
| MA-ATI-12: Identify, evaluate, and protect areas acknowledged as traditional cultural properties and work with associated communities to collaboratively manage areas acknowledged as traditional cultural properties by developing programmatic agreements, management plans, memoranda of understanding, or other management tools. (Forestwide) | | | | MA deleted, but it is included in Appendix I - Proposed and Possible Actions:<br>• *Identify, evaluate, and protect areas acknowledged as traditional cultural properties and work with associated communities to collaboratively manage areas acknowledged as traditional cultural properties by developing programmatic agreements, management plans, memoranda of understanding, or other management tools.* |

| | | | | |
|---|---|---|---|---|
| MA-ATI-13: Consult with tribes at initial planning stages and project design. As appropriate, tribal perspectives, needs, and concerns, as well as traditional knowledge, should be incorporated into project design and decisions, such as areas acknowledged as Traditional Cultural Properties. (Forestwide) | | Consultation with tribes occurs at initial planning stages and during project design. As appropriate, tribal perspectives, needs, and concerns, as well as traditional knowledge, should be incorporated into project design and decisions, such as areas acknowledged as traditional cultural properties. | | Slight re-wording. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-AIR-1: Air quality related values over Class I wilderness areas (La Garita and Weminuche) include but are not limited to visibility, water and snow chemistry, precipitation and atmospheric chemistry, soil chemistry, and aquatic and terrestrial biota. Air quality values meet or exceed state standards. (Primitive Wilderness Geographic Area) | | DC-AIR-1: Air quality related values over Class 1 and Class II wilderness areas meet or exceed state standards. (Forestwide) | | DC-AIR-1 and DC-AIR-2 simplified and combined into one DC. |
| DC-AIR-2: Air quality over Class II wilderness areas (Sangre de Cristo and South San Juan) meets or exceeds state standards with respect to pollutant concentrations to protect human health and the integrity of associated aquatic and terrestrial ecosystem components. (Primitive Wilderness Geographic Area) | | DC-AIR-1: Air quality related values over Class 1 and Class II wilderness areas meet or exceed state standards. (Forestwide) | | DC-AIR-1 and DC-AIR-2 simplified and combined into one DC. |
| DC-AIR-3: Natural air quality conditions in nearby Class I areas, including the Great Sand Dunes Wilderness, will be based on information provided by the Federal land managers about the potentially impacted Class I areas. (Primitive Wilderness Geographic Area) | | | | DC deleted. |
| DC-AIR-4: Dust from projects is limited to reduce impacts of dust-on-snow events. (Forestwide) | | | | DC deleted. |
| DC-AIR-5: The ecological footprint is minimized to promote sustainable natural resource management and emit the lowest practicable greenhouse gas emissions. (Forestwide) | | | | DC deleted. |
| DC-AIR-6: Within agency control, atmospheric deposition of nitrogen and sulfur for lakes with an acid neutralizing capacity of at least 25 μeq/L allows for no more than a 10-percent change from established baseline, and for lakes with an acid neutralizing capacity of less than 25 μeq/L allows for no more than 1 μeq/L decrease in acid neutralizing capacity. (Forestwide) | | | | DC deleted. |
| G-AIR-1: Use approved dust abatement measures (oils and solvents are not acceptable). (Forestwide) | | G-AIR-1: To protect water quality, oils and solvents should not be used for dust abatement measures. (Forestwide) | | Wording improved, with clear purpose added to the guideline. |
| G-AIR-2: Prevent or reduce airborne nutrient and mercury deposition impacts to sensitive high-elevation lakes in Class I wilderness areas over the life of the forest plan; allow no detectable mercury, no more than 2 μeq/L of ammonium, and no late summer nitrate. (Primitive Wilderness Geographic Area) | | | | Guideline deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-SOIL-1: Soil condition is satisfactory, soil functions are sustained, and soil is functioning properly. The ability of soil to maintain resource values and sustain outputs is high. (Forestwide) | | | | DC deleted. |
| DC-SOIL-2: Vegetation contributes to soil conditions, nutrient cycling, and hydrologic regimes at natural levels. (Forestwide) | | | | DC deleted. |
| DC-SOIL-3: Downed woody debris occurs at levels (amount, decay, and size) sufficient to support soil productivity. (Forestwide) | | | | DC deleted. |
| DC-SOIL-4: Biological soil crusts are present at sustainable levels where expected (desert, desert grasslands, piñon-juniper, and sagebrush). (Forestwide) | | | | DC deleted. |
| DC-SOIL-5: Soils are free of pollutants that could alter ecosystem integrity or affect public health. (Forestwide) | | | | DC deleted. |
| DC-SOIL-6: Occasional, intermittent, small-scale soil disturbance occurs, allowing propagation of plant species of conservation concern, including but not limited to Ripley's milkvetch, silky leaf cinquefoil, Rothrock's Townsend daisy (Forestwide) | | DC-SOIL-1: Occasional, intermittent, small-scale soil disturbance occurs, allowing propagation of plant species including some species of conservation concern. (Forestwide) | | Slight re-wording with specific species references deleted. |
| S-SOIL-1: Management activities do not create detrimental soil conditions on more than 15 percent of an activity area. In activity areas where less than 15 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects of the current activity following project implementation and restoration must not exceed 15 percent. In areas where more than 15 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects from project implementation and restoration should not exceed the conditions prior to the planned activity and should move toward a net improvement in soil quality. (Forestwide) | | S-SOIL-1:.Manage land treatments to limit severely burned, compacted, eroded, and displaced soil to no more than 15 percent of an activity area, as described in the Watershed Condition Handbook (2509.25, Region 2 Supplement). (Forestwide) | | Standard re-worded to align with handbook direction. |
| G-SOIL-1: On sensitive soils (high erosion or mass movement potential), ground-disturbing activities should be planned to maintain soil and slope stability and, where practicable, should be avoided on soils with high mass movement potential. (Forestwide) | | G-SOIL-2: Maintain soil and slope stability where ground-disturbing activities on soils with high erosion rates or mass movement potential are authorized. Where practical, do not authorize activities on soils with high mass movement potential. (Forestwide) | | Guideline re-worded. |
| MA-SOIL-1: Use genetically appropriate, weed-free seed populations of native plant species for revegetation efforts where technically and economically feasible. Nonnative annuals or sterile perennial species may be used while native perennials are becoming established. (Forestwide) | | Forest programs use genetically appropriate, weed-free seed mixes for revegetation to avoid potential for increasing nonnative invasive species or noxious weeds. Nonnative annuals or sterile perennial species can also be used while native perennials become established. | | Re-worded. Revised MA makes purpose clear and deletes "where technically and economically feasible." |
| MA-SOIL-2: All soil types supportive of edaphic plant species of conservation concern should be mapped. This includes volcanic substrates such as ash-tuffs, latitic lava flows, rhyolite, and andesitic substrates; sedimentary substrates supportive of edaphic species include calcareous substrates such as limestone and shale. (Forestwide) | | Forest programs identify and mitigate impacts to soil types that support edaphic plant species of conservation concern during project implementation. These soils include volcanic substrates such as ash-tuffs, latitic lava flows, rhyolite, and andesitic substrates. Sedimentary substrates supportive of edaphic species include calcareous substrates such as limestone and shale. | | Re-worded. Revised MA is focused on identifying and mitigating impacts to particular soil types rather than mapping them. In Appendix I - Proposed and Possible Actions, it states: *Map soil types that support edaphic plant species of conservation concern. Include volcanic substrates such as ash-tuJfs, latitic lava flows, rhyolite, and andesitic substrates. Sedimentary substrates supportive of edaphic species include calcareous substrates such as limestone and shale.* |
| MA-SOIL-3: Project-specific best management practices and project design features should be incorporated into land management activities as a principle mechanism for protecting soil resources. (Forestwide) | | Soil resources are best protected with site-specific, project-level design and analysis. | | Re-worded. |
| MA-SOIL-4: Following ground-disturbing activities, soil function should be restored to the extent practicable. (Forestwide) | | | | MA deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-RNG-1: Management of domestic livestock grazing allows for the perpetuation of natural landscape diversity (composition, structure, and function). This includes consideration in a spatial context (what species, what kind of structure, and what landscape patterns are natural by ecosystem) and a temporal context (which seral stages and how may are natural by ecosystem). (Forestwide) | | DC-RNG-1: Domestic livestock grazing is managed to promote landscape diversity (composition, structure, and function) with both a spatial context (what species, what kind of structure, and what landscape patterns are natural for each ecosystem) and a temporal context (which seral stages and how many are natural for each ecosystem). (Forestwide) | | Wording simplified/clarified. |
| DC-RNG-2: Forage, browse, and cover needs for wildlife and authorized livestock are in balance with the available forage. (Forestwide) | | DC-RNG-2: Forage, browse, and cover needs for wildlife and authorized livestock are in balance with available forage. (Forestwide) | | "the" deleted. |
| DC-RNG-3: Rangelands sustain biological diversity and ecological processes. (Forestwide) | | | | DC deleted. Some overlap with DC-RNG-1. |
| DC-RNG-4: Grazed areas trend toward slight to no departure for soil and site stability, hydrologic function, and biotic integrity. (Forestwide) | | | | DC deleted. |
| DC-RNG-5: Transitory forage on Forest lands is available for grazing within existing, permitted allotments in coordination with other resource needs, e.g., reforestation. (Forestwide) | | DC-RNG-3: Temporary forage is available for grazing within existing, permitted allotments in coordination with other resource needs, e.g., reforestation. (Forestwide) | | Small wording changes. |
| DC-RNG-6: Range improvements on grazing allotments should support ecologically sustainable grazing and benefits for wildlife when opportunities exist. New and replacement improvements are designed to benefit and allow for passage of aquatic and terrestrial species. (Forestwide) | | DC-RNG-4: Range improvements support ecologically sustainable grazing and benefits for wildlife when opportunities exist. New and replacement improvements are designed to benefit aquatic and terrestrial species. (Forestwide) | | Wording clarified. "On grazing allotments" and "And allow for passage" removed. |
| OBJ-RNG-1: Over the planning period, prioritize and restore at least 150 acres of upland ecosystems. (Forestwide) | | OBJ-RNG-1: Restore 150 acres of upland ecosystems over the next 15 years. (Forestwide) | | Time frame changed from the planning period to 15 years. Final objective is about restoring acres, not prioritizing and restoring acres. |
| G-RNG-1: Develop site- and species-specific vegetation use and residue guidelines during rangeland planning, and document them in allotment management plans. In the absence of updated planning or an approved allotment management plan, the utilization and residue guidelines in Table 3 and Table 4 will apply. (Forestwide) | | G-RNG-1: Develop site- and species-specific vegetation use and residue guidelines during rangeland planning, and document them in allotment management plans. In the absence of updated planning or an approved allotment management plan, the utilization and residue guidelines in Table 1 and Table 2 will apply. (Forestwide) | | Numbering of tables referenced updated. |
| G-RNG-2: Phase out grazing systems that allow for livestock use in an individual unit during the entire vegetative-growth period, except where determined to achieve or maintain the desired plant community. (Forestwide) | | G-RNG-2: Authorized grazing should not occur on an individual unit for the entire vegetative-growth period. This would be acceptable when the grazing system involves complete rest for that unit for two or more years after a full growing season treatment. (Forestwide) | | Re-worded and exception to guideline changed. |
| G-RNG-3: Allow livestock use of riparian management zones as long as use is in compliance with residual stubble heights identified in Forest Service Technical Report INT 263 Managing Grazing of Riparian Areas in the Intermountain Region (Clary and Webster 1996), or more recent research. (Forestwide) | | G-RNG-3: Authorized grazing in riparian management zones and groundwater dependent ecosystems should be in compliance with residual stubble heights identified in Forest Service Technical Report INT-263, Managing Grazing of Riparian Areas in the Intermountain Region (Clary and Webster 1996). (Forestwide) | | Wording changes with edits to include groundwater dependent ecosystems and deletion of the reference to more recent research. |
| G-RNG-4: Grazing in aspen stands should ensure sprouting and sprout survival sufficient to perpetuate the long-term persistence of the clones. (Forestwide) | | G-RNG-4: Authorized grazing in aspen stands should ensure sprouting and sprout survival to perpetuate the long-term persistence of the clones, unless elimination of the clone is planned. (Forestwide) | | Small wording changes and exception for when elimination of the clone is planned added. |
| G-RNG-5: Minimize controlled driving of permitted livestock in designated wilderness. (Primitive Wilderness Geographic Area) | | | | Guideline deleted. |
| | | SUIT-RNG-1: Grazing in national forest wilderness areas is authorized by the Congressional Grazing Guidelines (§108, P.L. 96-560, H.R. Report 96-617 dated 11/14/79). Grazing authorizations would be included as part of any legislation on Management Area 1.1a, Recommended Wilderness. However, the acres of recommended wilderness are not currently grazed. | | Suitability statement added. |

| | | | | |
|---|---|---|---|---|
| MA-RNG-1: After all other solutions have been extensively considered, remove livestock from the grazing unit or allotment when further utilization on key areas will exceed allowable-use criteria, allotment management plan guidance, or annual operating instructions. Damage from use can result from many things including but not limited to wildlife, recreation, flooding, and livestock grazing, none of which should push the use beyond what is allowed. (Forestwide) | | Management Approaches<br>When allowable-use criteria, allotment management plan guidance, or annual operating instructions have been exceeded, all other solutions are extensively considered before removing livestock from the grazing unit or allotment. Damage from allowable use can result from many other factors including but not limited to flooding, recreation, and wildlife. None of these other factors should push use beyond what is allowed. | | Small wording changes. |
| MA-RNG-2: Rangelands are managed to provide a wide variety of benefits, including forage for livestock and wildlife, a diversity of plant and animal communities, and high yield of high-quality water. (Forestwide) | | Rangelands are managed to provide a wide variety of benefits, including forage for livestock and wildlife, a diversity of plant and animal communities, and high-quality water. | | Slight re-wording. |
| MA-RNG-3: Discourage livestock use in openings created by fire or timber harvest that would delay successful regeneration of the shrub and tree components. (Forestwide) | | Grazing administration will discourage livestock use in openings created by fire or timber harvest that would delay successful regeneration of the shrubs and trees, and in sensitive riparian, wetland, and spring ecosystems. | | Revised MA has additional language surrounding livestock use in sensitive riparian, wetland, and spring ecosystems. |
| MA-RNG-4: Rangelands are managed to provide a variety of benefits, including forage for livestock and wildlife, a diversity of plant and animal communities, and high yields of high quality water. (Forestwide) | | Rangelands are managed to provide a wide variety of benefits, including forage for livestock and wildlife, a diversity of plant and animal communities, and high-quality water. | | Slight re-wording. |
| MA-RNG-5: Work with cooperators, partners, and permittees to prioritize and restore upland ecosystems and rebuild important structural improvements. (Forestwide) | | Work is coordinated with cooperators, partners, and permittees to prioritize and restore upland ecosystems and rebuild important structural improvements. | | "is coordinated" added. |
| | | Allotments may be vacated but are generally not closed except in extreme circumstances and conditions. | | Management approach added. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| MA-INDS-1: Consider potential insect and disease outbreaks so that management activities can be designed to meet or enhance resource objectives. (Forestwide) | | | | Exact management approach was deleted, but covered by other management approach - "Integrated pest management techniques are employed to meet resource objectives." |
| MA-INDS-2: Manage vegetation in high-use recreation areas to ensure public safety and to improve forest health, as needed to maintain or improve the desired recreational setting(s). (General Forest Geographic Area, Roadless Geographic Area, Specially Designated Geographic Area) | | Vegetation in high-use recreation areas is managed to ensure public safety and improve forest health in alignment with the desired recreational setting. | | Small wording changes. Revised language refers to being in alignment with the desired recreational setting, rather than maintaining or improving it. |
| MA-INDS-3: Use integrated pest management techniques, including silvicultural treatments, to meet resource objectives. Treatment activities will be based on values of, and risks to, adjacent private lands, as well as public land. Priority should be given to areas in which values to be protected exceed the cost of protection. (For example, adjacent to subdivisions, recreation sites, or areas of concentrated public use.) (General Forest Geographic Area, Specially Designated Geographic Area) | | Integrated pest management techniques are employed to meet resource objectives. Treatment activities consider the values present and risks to adjacent lands, both public and private. Priority is given to areas where value to be protected exceeds the costs of protection. An example is recreation sites or areas of concentrated public use that are adjacent to subdivisions. | | Small wording changes. |
| MA-INDS-4: Design project activities to minimize the risks of spreading existing infestation, while still providing habitat for those wildlife species dependent on the presence of insects and disease. (General Forest Geographic Area, Specially Designated Geographic Area) | | Project activities are designed to minimize the risk of spreading existing infestations, while still providing habitat conditions for wildlife and plant species dependent on the presence of insects and disease. | | Slightly re-worded. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-NNIS-1: Populations of aquatic and terrestrial nonnative invasive species do not occur or are low in abundance. Those that do occur do not disrupt ecosystem function. (Forestwide) | | DC-NNIS-1: Populations of aquatic and terrestrial nonnative invasive species do not occur or are low in abundance. Those that do occur do not disrupt ecosystem function. (Forestwide) | | No change. |
| DC-NNIS-2: Native ecosystems are self-sustaining and resistant to invasion by nonnative invasive species and/or provide habitat for a broad range of species. (Forestwide) | | DC–NNIS-2: Native ecosystems are resilient to invasion by nonnative invasive species. (Forestwide) | | DC changed - removed "self-sustaining", changed "resistant" to "resilient", and deleted " and/or provide habitat for a broad range of species". |
| OBJ-NNIS-1: Within 10 years of plan approval, reduce terrestrial or aquatic nonnative invasive species on 300 acres. (Forestwide) | | OBJ-NNIS-1: Reduce terrestrial or aquatic nonnative invasive species on 5,000 acres over the next 15 years. (Forestwide) | | Timeframe on objective changed from 10 years to 15 years, changed amount from 300 acres to 5,000 acres. |
| G-NNIS-1: To reduce and control aquatic nuisance species during wildland fire operations, as practicable, follow guidelines and best management practices put forward in Guide to Preventing Aquatic Invasive Species Transport by Wildland Fire Operations (National Wildfire Coordinating Group 2017). (Forestwide) | | | | Guideline deleted. |
| MA-NNIS-1: Reduce and control nonnative and noxious plants Forestwide, with priority given to research natural areas and designated wilderness. Determine the risk of nonnative/noxious weed introduction and spread to all proposed projects and activities and implement appropriate mitigation measures. (Forestwide) | | Management Approaches<br>The risk of introducing and spreading nonnative plant and animal species and noxious weeds is minimized for all activities, as appropriate. The spread of nonnative invasive species and noxious weeds is mitigated in places where these species are already present. Special designated areas, including roadless and wilderness areas, will generally be prioritized for treatment. | | Wording clarified and improved. Priority given to special designated area, not just research natural areas and designed wilderness. |
| | | Information from key partners, including the Colorado Department of Agriculture, will be incorporated into the Invasive Species Action Plan, which identifies priority species, inventory and monitoring, and tools and techniques to address nonnative invasive species. | | MA added. |
| MA-NNIS-2: Coordinate with Colorado Parks and Wildlife staff to reduce the potential for introduction and/or control the spread of aquatic invasive species by recreational users of Forest waters by promoting effective prevention and control measures for aquatic nuisance species. (Forestwide) | | Continued coordination and cooperation with Colorado Parks and Wildlife helps reduce the potential to introduce, and to control the spread of, aquatic invasive species. Effective prevention and control methods for aquatic nuisance species are shared with fishermen, rafters, and other water recreational users. | | MA Re-worded. |
| MA-NNIS-3: Prioritize treatment of cheatgrass among, in, or near sage-grouse habitat. (Forestwide) | | | | MA deleted. |
| MA-NNIS-4: Mitigate conduits for introductions of nonnative invasive species. (Forestwide) | | | | MA deleted. |
| MA-NNIS-5: Areas affected by existing populations, and new introductions, of nonnative invasive species are minimized through project implementation. (Forestwide) | | Project implementation minimizes the extent of areas affected by existing populations and reduces the chance of introducing new species. Timely and effective revegetation of disturbed sites provides protection of soil and water resources that cannot be restored naturally. | | MA-NNIS-5 and MA-NNIS-6 combined into one management approach. MA re-worded. |
| MA-NNIS-6: Timely and effective revegetation of disturbed sites provides protection to soil and water resources that cannot be restored naturally. (Forestwide) | | Project implementation minimizes the extent of areas affected by existing populations and reduces the chance of introducing new species. Timely and effective revegetation of disturbed sites provides protection of soil and water resources that cannot be restored naturally. | | MA-NNIS-5 and MA-NNIS-6 combined into one management approach. Small grammatical correction. |
| MA-NNIS-7: All available biological, cultural, and chemical tools are available to reduce and control nonnative invasive species. | | All biological, cultural, and chemical tools are available to reduce or control nonnative invasive species and noxious weeds. Technological advances are incorporated into management practices when shown to be equivalent to, or more effective than, existing treatments. | | Added reference to noxious weeds. Added second sentence regarding technological advances. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-WLDF-1: Habitat conditions are suitable for all resident and migratory birds and accommodate key life history requirements, such as resting in stop-over habitats, and nesting. (Forestwide) | | DC-WLDF-1: Habitat conditions are suitable for resident and migratory birds and accommodate key life history requirements. (Forestwide) | | DC simplified, with "all" and "such as resting in stop-over habitats, and nesting." deleted. |
| DC-WLDF-2: Habitat conditions for bats, including species of conservation concern, are suitable for reproduction and roosting. (Forestwide) | | DC-WLDF-2: Habitat conditions for bats are suitable for reproduction and roosting. (Forestwide) | | DC simplified, with "including species of conservation concern" deleted. |
| DC-WLDF-3: Sufficient habitat connectivity is present in each vegetation type to facilitate species movement within and between daily home ranges, for seasonal movements, for genetic interchange among species (including Canada lynx and others), and for long-distance movements across boundaries. (Forestwide) | | DC-WLDF-3: Habitat connectivity is provided for to facilitate species movement within and between daily home ranges, for seasonal movements, for genetic interchange, and for long distance movements across boundaries. (Forestwide) | | DC re-worded and simplified. |
| DC-WLDF-4: Habitat conditions provide the quantity, quality, and spatial arrangement of forage, cover, and security needed to support mutually desired population objectives for mule deer, Rocky Mountain elk, pronghorn, and Rocky Mountain bighorn sheep on mapped winter range. (Forestwide) | | DC-WLDF-4: Winter range habitat conditions provide the quantity, quality, and spatial arrangement of forage, cover, and security needed to support population objectives for mule deer, pronghorn, Rocky Mountain bighorn sheep, and Rocky Mountain elk. (Forestwide) | | DC re-worded, with "mutually desired" deleted. |
| DC-WLDF-5: Security habitat for big game species in winter range is provided. Motorized and nonmotorized route travel, on and off existing roads, does not negatively affect ecological conditions necessary to maintain viable populations of species. (Forestwide) | | DC-WLDF-5: Motorized and nonmotorized route travel, on and off existing roads, does not negatively affect ecological conditions necessary to maintain population objectives for big game species. (Forestwide) | | First part of DC regarding security habitat deleted. In second part, "viable populations of species" changed to "population objectives for big game species." |
| DC-WLDF-6: Habitat conditions promote the prevention and control of wildlife-related pathogens and diseases, such as chronic wasting disease. (Forestwide) | | | | DC deleted. |
| DC-WLDF-7: Wood legacies, including snag components, occur in adequate numbers, distribution, and patterns to contribute to landscape connectivity, particularly in spruce-fir forests highly influenced by spruce beetle outside of developed recreation sites. (Forestwide) | | | | DC deleted. |
| DC-WLDF-8: Manage northern goshawk nesting territories on the basis of nest site, post-fledging, and foraging area needs. Nest site buffers should encompass 25–30 acres and post-fledging areas 420 acres, with considerations for surrounding foraging habitat. Refer to Table 24 in Appendix G. (Forestwide) | | | | DC deleted. |
| DC-WLDF-9: Maintain road density of 1.5 miles/per square mile or less in winter concentration areas, winter range, calving areas, and transition habitat. (Forestwide) | | DC for MA 5 - General Forest and Rangelands - Prescribed road densities of 1 mile per square mile provide for critical wildlife needs, in areas used for winter concentration, critical winter range, calving areas, and transition habitat. | | DC deleted but similar direction found in the desired conditions for management area 5 - General Forest and Rangelands. |
| DC-WLDF-10: Where possible, retain public ownership of wildlife travelways adjacent to public highways, or where public lands are identified as a key component in maintaining the integrity of seasonal movements by wildlife. (Forestwide) | | | | DC deleted. |
| DC-WLDF-11: Maintain habitat components of size, quality, and spatial extent necessary on the landscape to provide for connectivity of movement between seasonal habitats (i.e., wildlife travelways) as identified and mapped by Colorado Parks and Wildlife or other science-based partners (e.g., Colorado Natural Heritage Program). (Forestwide) | | | | DC deleted. |
| DC-WLDF-12: Maintain dense, interior riparian willow habitat where needed for maintenance of suitable nesting habitat conditions for veery and other ground or low-level shrub-nesting riparian species. Avoid or limit activities that increase edge habitat and contribute to impacts from cowbird nest parasitism. (Forestwide) | | DC-WLDF-6: Suitable nesting habitat for ground-nesting or low-level shrub-nesting birds is provided by dense, interior riparian willow habitat. (Forestwide) | | DC re-worded and simplified. Last sentence of DC - "Avoid or limit activities that increase edge habitat and contribute to impacts from cowbird nest parasitism" - was deleted. |

| | | | | |
|---|---|---|---|---|
| DC-WLDF-13: Implement management to restore and improve habitat quality on important bighorn sheep lambing areas, winter concentration areas, migratory routes, and movement areas to reduce the potential for disease transmission from domestic sheep. (Forestwide) | | | | DC deleted. |
| OBJ-WLDF-1: Over the planning period, develop and interpret at least one location identified in the Colorado Birding Trail. (Forestwide) | | OBJ-WLDF-1: Develop and interpret at least one location identified in the Colorado Birding Trail over the next 15 years. (Forestwide) | | Time frame changed from "over the planning period" to "over the next 15 years". |
| OBJ-WLDF-2: Evaluate the abandoned mine lands program annually to consider at least one project. Maintain existing partnerships and seek additional partners for adequate underground assessments, as possible, prior to closure. (Forestwide) | | Management approach - Bat habitat needs are addressed through the Abandoned Mine Lands program. Maintain existing partnerships and seek additional partners for adequate underground assessments, as possible, prior to closure. Ensure access for bats and reduce disturbance to resident populations when closing caves and mines. When maintaining or removing facilities or bridges, assess for potential bat roost activity. Schedule work to reduce impacts to roosting bats. | | Objective deleted, but language is included in a wildlife management approach. |
| OBJ-WLDF-3: Use vegetation management and habitat improvements, including prescribed fire, to help achieve and maintain big game winter habitat objectives on about 500 acres per year. (Forestwide) | | OBJ-WLDF-2: Maintain or improve an average of 500 acres of big game winter habitat annually over the next 15 years. (Forestwide) | | Objective re-worded and simplified. |
| S-WLDF-1: Avoid or minimize disturbances as much as possible during the local nesting season (April 15 – July 1 for most passerine birds). Evaluate the effects of projects and activities on migratory and resident birds, with a focus on species of management concern (species of conservation concern, and birds of conservation concern identified by the U.S. Department of Interior Fish and Wildlife Service). Consider important life history needs such as nesting requirements, post-fledging areas, and stop-over habitats. Incorporate conservation measures and principles, as applicable and needed, from local bird conservation plans (e.g., Colorado Bird Conservation Plan, Rio Grande National Forest Avian Monitoring Analysis documents) and/or other references into project design to eliminate or minimize potential adverse effects. (Forestwide) | | | | Standard deleted. |
| S-WLDF-2: Mitigate disturbance to bat habitat and reduce the potential for the introduction of pathogens, such as the fungus that causes white-nose syndrome, by adhering to current regional guidance regarding disease prevention, pathogen management, human access management, and protocols for decontamination requirements, monitoring, etc. (Forestwide) | | | | Standard deleted. |
| S-WLDF-3: Provide security habitat in winter range, winter concentration areas, severe winter range, and lambing areas during big game primary use seasons from December 1 to March 31. Employ access restrictions and seasonal closures as necessary. Dates may vary depending upon variations in winter use. (Forestwide) | | | | Standard deleted. |
| S-WLDF-4: Activities, including alteration of vegetation, that may alter the suitability of the cave or mine should not occur within 500 feet of the entrance of bat swarming sites, hibernacula, and maternity sites, unless to rehabilitate or maintain the suitability of the site or install mine safety closures. (Forestwide) | | | | Standard deleted. |
| S-WLDF-5: Do not allow management activities to impact selected sites occupied by bats during the following periods:<br>• Maternity sites (April 1 to October 1)<br>• Swarming sites (August 15 through October 15, 30 minutes before sunset to 30 minutes after sunrise)<br>• Winter hibernaculum (November 1 to April 1). (Forestwide) | | | | Standard deleted. |

| | | | | |
|---|---|---|---|---|
| S-WLDF-6: Retain residual grass cover from the previous growing season where tall, dense cover is desired for ground-nesting birds. (Forestwide) | | | | Standard deleted. |
| S-WLDF-7: Manage livestock grazing from April 15 to July 1 provide cover for ground nesting bird species that prefer undisturbed cover. (Forestwide) | | | | Standard deleted. |
| S-WLDF-8: Limit disturbance, including but not limited to rock climbing and use of unmanned aerial systems, within one-half mile of:<br>• Active peregrine and prairie falcon nest sites from April 15 to July 31, to maintain nest site integrity.<br>• Active golden eagle nest sites from December 15 to July 31. (Forestwide) | | S-WLDF-1: Do not allow rock climbing within one-half mile of active peregrine and prairie falcon nest sites generally from April 15 to July 31 and active golden eagle nest sites generally from December 15 to July 31. (Forestwide) | | Standard re-worded and changed to only limit rock climbing, and not other disturbances such as unmanned aerial systems. |
| S-WLDF-9: Maintain screening cover to minimize disturbance and harassment of deer and elk along open roads and around openings on the basis of site conditions. Design screening cover design consistent with the disturbance regime characteristics of the forest cover type it is occurring in. (Forestwide) | | | | Standard deleted. |
| S- WLDF-10: Maintain effective separation to minimize the risk of disease transmission between domestic sheep and bighorn sheep on active grazing allotments. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide) | | S-SCC-1: Maintain effective separation of domestic sheep and bighorn sheep on active grazing allotments to reduce the likelihood and risk of disease transmission. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide) | | Standard moved from wildlife section to SCC section. Small wording changes. "minimize the risk of disease transmission" changed to "reduce the likelihood and risk of disease transmission". |
| S-WLDF-11: Mitigate adverse impacts from projects, activities, and uses to bighorn sheep production areas that may result in disturbance or displacement of bighorn sheep during the critical reproductive period (generally April 15 to July 1). (Forestwide) | | S-SCC-2: Do not authorize projects that will result in displacement of bighorn sheep during their reproductive period (generally April 15 to July 1). (Forestwide) | | Standard moved from wildlife section to SCC section. Re-worded to focus on not authorizing projects instead of mitigating adverse impacts from projects, activities, and uses. |
| S-WLDF-12: Do not authorize actions that reduce the effective use of habitat on severe winter range and winter concentration areas between approximately November 1 and April 15. (Forestwide) | | G-WLDF-1: To reduce stress at a critical point in the lifecycle of big game, restrict activities on winter range from approximately December 1 to March 31, as needed. (Forestwide) | | Standard changed to guideline. Purpose clarified. Areas of application changed from "severe winter range and winter concentration areas" to "winter range". Date range changed from Nov 1 thru April 15 to Dec 1 thru March 31. |
| S-WLDF-13: Prohibit the use of recreational pack goats in the Sangre de Cristo Mountains to eliminate potential interactions between pack goats and bighorn sheep. (Forestwide) | | S-SCC-3: Prohibit the use of recreational pack goats in the Sangre de Cristo Mountains to eliminate potential interactions between pack goats and bighorn sheep. (Forestwide) | | Standard moved from wildlife section to SCC section. |
| S-WLDF-14: Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to minimize risk of contact between animal groups. (Forestwide) | | S-SCC-4: Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to reduce the likelihood of contact between animal groups. (Forestwide) | | Standard moved from wildlife section to SCC section. Small wording change from "to minimize risk of contact" to "to reduce the likelihood of contact". |
| G-WLDF-1: Inventory and protect known active raptor nests and nest areas from disturbance, including owl species. Protect inactive nests as needed depending upon nest condition, time since last use, and species potential for nest reuse. Refer to Appendix G for timing considerations and other factors for local raptor species. (Forestwide) | | When raptors are known to occur in a project area, consult the Colorado Parks and Wildlife raptor guidance. | | Guideline and Appendix B/Design Features for Raptors deleted and replaced with a new management approach. |
| G-WLDF-2: In alpine and subalpine willow-dominated riparian areas that provide winter habitat for white-tailed ptarmigan and snowshoe hare:<br>• Ensure that heavy metals that enter the food chain do not bioaccumulate above historically occurring background levels.<br>• Ensure that areas of contamination do not become limiting factors for wildlife population.<br>• Discourage winter recreation and summer vegetation management activities near timberline that would impact winter habitat. (Forestwide) | | | | Guideline deleted. |

| | | | | |
|---|---|---|---|---|
| MA-WLDF-1: Human safety and bat habitat needs are addressed through implementation of the abandoned mine lands program. (Forestwide) | | Bat habitat needs are addressed through the Abandoned Mine Lands program. Maintain existing partnerships and seek additional partners for adequate underground assessments, as possible, prior to closure. Ensure access for bats and reduce disturbance to resident populations when closing caves and mines. When maintaining or removing facilities or bridges, assess for potential bat roost activity. Schedule work to reduce impacts to roosting bats. | | Management approach expanded/combined with other MAs, though with "human safety" deleted. |
| MA-WLDF-2: Pathogens that could cause mortality to bats are detected early and management is coordinated with Colorado Parks and Wildlife and other partners. (Forestwide) | | Maintain an early detection program for white-nose syndrome in bats. Follow guidance from the Forest Service Rocky Mountain Regional Office, and continue to coordinate with partners and other agencies to protect bats from white-nose syndrome. | | Draft MA re-worded. |
| MA-WLDF-3: Habitat management for bats is consistent with recommendations from the Colorado Bat Working Group and the Colorado Bat Conservation Plan. (Forestwide) | | | | Management approach deleted. |
| MA-WLDF-4: Annual collaboration with staff from Colorado Parks and Wildlife and other partners ensures that all desired prairie dog colonies receive dusting and/or vaccinations for plague as needed for maintenance of the colonies. (Forestwide) | | | | Management approach deleted. |
| MA-WLDF-5: Priority habitats and priority species, as described in the Colorado Bird Conservation Plan, are integrated into management activities on the Forest, as applicable to site-specific conservation needs. (Forestwide) | | Provide a focus on bird conservation by increasing the number of Naturewatch viewing sites, and participate in International Migratory Bird Day activities. Consider habitats and species described in the Colorado Bird Conservation Plan into management activities. | | Management approach reworded and combined with another MA. |
| MA-WLDF-6: Continue to provide support for existing avian monitoring activities through the Integrated Monitoring in Bird Conservation Regions Program with the Bird Conservancy of the Rockies with a goal of providing valid trend data for applicable threatened, endangered, proposed, candidate, and species of conservation concern and priority bird species. (Forestwide) | | | | MA deleted, but reference to continuing to support avian monitoring mentioned in the following MA: *Continue to participate and support, within the fiscal capacity, recovery and conservation eJforts including but not limited to: conservation agreements for Rio Grande cutthroat trout (RGCTCT 2013), Rio Grande chub and Rio Grande sucker (RGCSCT 2018), fens, pollinators, Uncompahgre fritillary butterfly, bats, watershed condition priorities, prairie dogs, avian monitoring and conservation, bighorn sheep, snow willow and alpine conservation, boreal toad, and unique and rare plant communities.* |
| MA-WLDF-7: Increase the number of Naturewatch viewing sites that focus on bird conservation; participate in events for International Migratory Bird Day. (Forestwide) | | Provide a focus on bird conservation by increasing the number of Naturewatch viewing sites, and participate in International Migratory Bird Day activities. Consider habitats and species described in the Colorado Bird Conservation Plan into management activities. | | Management approach reworded and combined with another MA. |
| MA-WLDF-8: Establish a maintenance program for existing bat gates. (Forestwide) | | | | Not a MA, but listed in Appendix I - Proposed and Possible Actions. |
| MA-WLDF-9: Use vegetation management and habitat improvement strategies, including but not limited to prescribed fire, thinning, building stock ponds, and guzzler placement, to help achieve and maintain desired conditions for big game winter habitat (Management Area 5.41). (Forestwide) | | | | MA deleted. |
| MA-WLDF-10: The Forest intends to increase education and awareness of potential disease transmission between recreation pack goats and bighorn sheep at entry points into areas known or suspected to be used by bighorn sheep. (Forestwide) | | | | MA re-worded and moved to SCC section. |
| MA-WLDF-11: In coordination with Colorado Parks and Wildlife and other partners, continue to asses Forest bighorn sheep populations to understand overall population status and inform effectiveness of management actions to support the persistence of bighorn sheep on the Forest. (Forestwide) | | | | MA deleted. Assessing the status and trend of populations of bighorn sheep populations are a part of monitoring question 1 (MQ1), with data sources listed as Colorado Parks and Wildlife and Partnership Engagement. |

| | | | | |
|---|---|---|---|---|
| MA-WLDF-12: Discourage recreational activities that disturb bighorn sheep, particularly around primary use or reproduction areas. (Forestwide) | | | | MA deleted. |
| MA-WLDF-13: Separation response plans should be developed for grazing allotments determined to have high or moderate risk of contact between domestic sheep and bighorn sheep. Plans should include a process, protocols, and timelines for communication and subsequent management action when intervention is needed to respond to observed or reported interaction between bighorn sheep and domestic sheep. Plans should be developed cooperatively with the permittees/lessees, Colorado Parks and Wildlife, tribes, and other affected Federal agencies or units. Plans should be developed as part of an adaptive management framework that integrates monitoring information, management activities, and the best available scientific information. (Forestwide) | | | | MA deleted. |
| MA-WLDF-14: The Forest intends to observe and report recreational pack goat use where it might overlap known bighorn sheep range. (Forestwide) | | | | MA deleted. |
| MA-WLDF-15: Continued cooperation with partners, support for investigative research of alpine habitats on the Forest, including snow willow communities, in regards to potential influences of fluctuations of temperature, frequency, and timing of weather events. (Forestwide) | | | | MA deleted. |
| MA-WLDF-16: Provide educational materials and outreach regarding chytrid fungus to the public and internally. Explore the need to implement decontamination procedures for all activities within or near sites known to be positive for chytrid fungus to protect boreal toads and other amphibians. (Forestwide) | | | | MA moved to SCC section. |
| MA-WLDF-17: Agency actions should avoid or otherwise mitigate adverse impacts in unique or rare plant community types that have a biodiversity significance ranking of B1 (outstanding) or B2 (very high) (Colorado Natural Heritage Program), or in riparian area and wetland ecosystems that have plant communities with G1, G2, S1, or S2 NatureServe plant community conservation status ranks, to maintain the ecological integrity of those rare plant communities. (Forestwide) | | Agency actions consider impacts to unique or rare plant community types, particularly those with a biodiversity significance ranking of B1 (outstanding) or B2 (very high) according to the Colorado Natural Heritage Program. In riparian areas and wetland ecosystems containing plants with G1, G2, S1, or S2 NatureServe plant community conservation ranks, consider impacts to maintain the ecological integrity. | | MA re-worded. |
| MA-WLDF-18: Ensure access for bats and reduce disturbance to resident populations when considering mine or cave closures. Exclude bats from the site prior to closure when closing mines. (Forestwide) | | G-SCC-5: To maintain habitat for bat species of conservation concern, retain adequate access for bats and reduce disturbance to resident populations when considering mine or cave closures. (Forestwide). | | MA changed to a guideline - see G-SCC-5. |
| MA-WLDF-19: When feasible, pursue formal mineral withdrawal of abandoned mine sites necessary for conservation of bat species on the species of conservation concern list. (Forestwide) | | | | MA deleted. |
| MA-WLDF-20: Assess for potential bat roost activity when maintaining or removing facilities or bridges. Schedule work to reduce impacts to roosting bats and incorporate features specific to this use as necessary or as separate wildlife habitat improvement projects. (Forestwide) | | Bat habitat needs are addressed through the Abandoned Mine Lands program. Maintain existing partnerships and seek additional partners for adequate underground assessments, as possible, prior to closure. Ensure access for bats and reduce disturbance to resident populations when closing caves and mines. When maintaining or removing facilities or bridges, assess for potential bat roost activity. Schedule work to reduce impacts to roosting bats. | | MA re-worded/combined with similar MAs. |
| MA-WLDF-21: Locate and design wind energy structures to minimize or prevent wildlife mortality. (Forestwide) | | | | MA deleted. |
| MA-WLDF-22: Manage off-road travel on big game winter range areas, including over-the-snow track machines, during the primary use seasons for big game. Exceptions may be authorized under special use permit. (Forestwide) | | S-MA5-1: Off-road travel, including over-the-snow travel, is not allowed on big game winter range areas during the primary use seasons for big game (December 1 – April 15). Exceptions may be allowed under contract or special use authorizations. | | MA deleted, but there is a standard for MA 5 - General Forest and Rangelands. |
| MA-WLDF-23: Design management activities to provide forage and cover across the landscape to sustain ungulate populations and to support state population objectives. (Forestwide) | | Management approach in management area 5 - Manage forage and cover across the landscape to sustain ungulate populations and support population objectives. | | Forestwide MA deleted, but there is a management approach for MA 5 - General Forest and Rangelands. |

| | | | | |
|---|---|---|---|---|
| MA-WLDF-24: Maintain habitat components necessary to provide for connectivity of seasonal habitats as mapped by Colorado Parks and Wildlife. (Forestwide) | | | | MA deleted. |
| MA-WLDF-25: Retain large, unique, legacy trees where feasible. (Forestwide) | | | | MA deleted. |
| MA-WLDF-26: Review direction for consistency when new recovery plans, conservation agreements, conservation strategies, critical habitat designations, or regional management directions for threatened, endangered, or sensitive species are prepared. Use the appropriate authorities to incorporate new direction. (Forestwide) | | | | MA deleted. |
| MA-WLDF-27: Identify and assess habitat connectivity needs at various spatial scales when conducting forest management activities at the project level, as necessary, on the basis of existing landscape patterns and local species concerns. Use a nesting of hydrologic unit codes at the scale(s) necessary to assess connectivity patterns (e.g., 8th-level hydrologic unit codes or smaller). Identify and use key stream zones and topographic features to help facilitate movement across broader landscapes. Movement zones of 400 to 600 feet in width may be sufficient to facilitate movement for most local species of conservation concern, including large predators, in most landscape conditions. (Forestwide) | | Existing landscape patterns and local species concerns are used to identify and assess habitat connectivity at various spatial scales during design and analysis of forest management activities. A nest of hydrologic unit codes is used at various scales to assess connectivity patterns. Stream zones and topographic features are identified and used to facilitate movement across the landscape. These areas serve multiple purposes, including providing aquatic and terrestrial habitat connectivity and areas for species movement in most landscape conditions. | | MA-reworded. |
| | | Continue to participate and support, within the fiscal capacity, recovery and conservation efforts including but not limited to: conservation agreements for Rio Grande cutthroat trout (RGCTCT 2013), Rio Grande chub and Rio Grande sucker (RGCSCT 2018), fens, pollinators, Uncompahgre fritillary butterfly, bats, watershed condition priorities, prairie dogs, avian monitoring and conservation, bighorn sheep, snow willow and alpine conservation, boreal toad, and unique and rare plant communities. | | MA added. |
| MA-PLTR-1: Impacts (positive, negative, or neutral) to pollinators are addressed when undertaking project design, analysis, and implementation. (Forestwide) | | The Forest intends to address impacts to pollinators during project analysis through project design, analysis, and implementation. | | MA slightly re-worded and moved from the Pollinators section to the Wildlife section. |
| MA-PLTR-2: Implement pollinator-friendly best management practices for Federal lands to improve pollinator habitat and protect pollinators when taking management actions. Actions can include the following:<br>• Design projects to maintain or improve pollinator habitat while still meeting resource objectives<br>• Include local pollinator species in project seed mixtures<br>• When using insecticide, consider and mitigate impacts to pollinating insects to the greatest extent possible<br>• Include creation or maintenance of pollinator habitat in project rationale<br>• Implement best management practices when managing roads. (Forestwide) | | Pollinator-friendly best management practices for Federal lands are implemented to improve pollinator habitat and protect these species when implementing management actions. Actions are not limited to the following:<br>• Design projects to maintain or improve pollinator habitat while meeting resource objectives;<br>• Include plants that are desirable to pollinator species in project seed mixtures;<br>• Mitigate impacts to pollinator insects when applying insecticide;<br>• Include creation and maintenance of pollinator habitat in project design; and<br>• Implement best management practices for pollinator habitat when managing roads. | | MA reworded and moved from the Pollinators section to wildlife section. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-SCC-1: A healthy sagebrush steppe ecosystem meets the needs of sagebrush obligate species including, but not limited to, Brewer's sparrow. (Forestwide) | | DC-SCC-1: Structure, composition, and function of sagebrush ecosystems meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC re-worded and made more general, with reference to Brewer's sparrow deleted. |
| DC-SCC-2: Habitat diversity along reaches or sections of perennial stream includes tall, undisturbed grass cover and large, woody riparian complexes. Livestock access is limited in these areas to protect habitat for small, at-risk mammal species, such as the New Mexico meadow jumping mouse. Habitat refugia is available for small mammals that are sensitive to management activities. (Forestwide) | | | | DC deleted. |
| DC-SCC-3: Talus slopes provide habitat for many plants listed as species of conservation concern, including:<br>• Gray's draba<br>• Rocky mountain draba<br>• Rothrock's Townsend daisy<br>• Colorado tansy aster<br>• Colorado larkspur<br>• Stonecrop gilia<br>• Smith's draba (Forestwide) | | DC-SCC-5: Structure, composition, and function of alpine ecosystems, including cushion plant communities, snow willow, alpine fell fields, and talus slopes, meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC re-written to more generally apply to alpine ecosystems and with specific reference to particular SCC species deleted. |
| DC-SCC-4: Plant species that are necessary for species of conservation concern as food (including grazing, forage, and nectar for pollinators) or structure are identified and occur in numbers viable enough to fulfill that function. This includes snow willow (necessary for the Uncompahgre fritillary butterfly), flowering plants (nectar producing species for the Western bumblebee) and many other species. (Forestwide) | | | | DC deleted. |
| DC-SCC-5: Large log (generally greater than 18" diameter) components contribute to the downed woody material remaining in the post-treatment environment. Log decks and slash piles provide supplementary habitat features for marten and other forest species. (General Forest Geographic Area) | | DC-SCC-6: Snags and decaying wood processes meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC re-worded and made more general, with reference to marten deleted. Revised DC applies Forestwide. |
| DC-SCC-6: Gunnison's prairie dog colonies continue to expand and occupy historic habitat areas as an integral component of montane grasslands. (Forestwide) | | DC-SCC-7: Structure, composition, and function of montane grasslands meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC re-worded and made more general, with reference to Gunnison's prairie dog colonies deleted. |
| DC-SCC-7: Natural openings and grasslands provide habitat beneficial to small mammal species that depend on grassland cover and diversity. (Forestwide) | | DC-SCC-7: Structure, composition, and function of montane grasslands meet the needs of associated species, including species of conservation concern. (Forestwide) | | Draft DC deleted. Revised DC-SCC-7 is more general and applies to the structure, composition, and function of montane grasslands. |
| DC-SCC-8: Manage soils to maintain soil health and productivity, while taking into consideration plant species of conservation concern that grow in association with specific soil and geologic characteristics or edaphic plant communities (Table 2). (Forestwide) | | | | DC deleted. |
| DC-SCC-9: Maintain ecological conditions necessary to contribute to ensuring viable populations of both plant and animal species of conservation concern during forest management activities in fens, patches of snow willow, alpine cushion plant communities, talus slopes, alpine fellfields, and floating vegetation mats. (Forestwide) | | DC-SCC-5: Structure, composition, and function of alpine ecosystems, including cushion plant communities, snow willow, alpine fell fields, and talus slopes, meet the needs of associated species, including species of conservation concern. (Forestwide) | | Draft DC deleted. Revised DC-SCC-5 is similar, but does not include references to fens or floating vegetation mats. |
| | | DC-SCC-2: Structure, composition, and function of coniferous forests, including late seral forests, meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC added. |

| | | | | |
|---|---|---|---|---|
| | | DC-SCC-3: Structure, composition, and function of riparian areas, including streams, willow thickets, and cottonwood galleries, meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC added. |
| | | DC-SCC-4: Structure, composition, and function of aspen-dominated forests meet the needs of associated species, including species of conservation concern. (Forestwide) | | DC added. |
| | | DC-SCC-8: Improve or maintain habitat for bighorn sheep. (Forestwide) | | DC added to SCC section. Similar language was in draft plan in wildlife section: *DC-WLDF-13: Implement management to restore and improve habitat quality on important bighorn sheep lambing areas, winter concentration areas, migratory routes, and movement areas to reduce the potential for disease transmission from domestic sheep. (Forestwide)* |
| | | DC-SCC-9: Maintain effective separation to reduce the likelihood of interaction and risk of disease transmission between domestic sheep and bighorn sheep on active grazing allotments. (Forestwide) | | DC added. Similar language was in draft plan in wildlife section: *DC-WLDF-13: Implement management to restore and improve habitat quality on important bighorn sheep lambing areas, winter concentration areas, migratory routes, and movement areas to reduce the potential for disease transmission from domestic sheep. (Forestwide)* *S- WLDF-10: Maintain effective separation to minimize the risk of disease transmission between domestic sheep and bighorn sheep on active grazing allotments. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide)* |
| OBJ-SCC-1: Mitigate impacts to insect species that are listed as species of conservation concern, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. (Forestwide) | | Management approach - Forest programs mitigate impacts to insect species that are listed as species of conservation concern and their habitat, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. To inform project-level planning on avoiding impacts to these species, the range and distribution of at-risk insect species (threatened, endangered, proposed, or candidate species and species of conservation concern) is assessed. | | Objective and management approach (see below) combined into one management approach. "And their habitat" added. |
| OBJ-SCC-2: Mitigate impacts to plant species that are listed as species of conservation concern, or that are necessary for those species as food (including grazing, forage, and nectar for pollinators) or cover, from herbicide or other pesticides. (Forestwide) | | Management approach - Forest programs mitigate impacts to plant species that are listed as species of conservation concern and their habitat, or that are necessary for those species as food (including grazing, forage, and nectar for pollinators) or cover, from herbicide or other pesticides). | | Objective changed to a management approach. "And their habitat" added. |
| S-SCC-1: Avoid disturbance to species of conservation concern that would affect ecological conditions necessary to maintain viable populations of species of conservation concern. The protection may vary depending on the species, disturbance type and potential, topography, and other pertinent factors. Special attention will be given during breeding, young rearing, and other times that are important to survival. (Forestwide) | | | | Standard deleted. |
| S-SCC-2: Avoid or mitigate impacts to boreal toad breeding sites and winter hibernacula within 100 feet from May 15 to September 30. • Consider management actions related to the protection and maintenance of potential summer movements of adult boreal toads away from the sites. • Ensure that sites are identified in the wildland fire decision support system to avoid exposure from retardant. (Forestwide) | | | | Standard deleted. |

| | | | | |
|---|---|---|---|---|
| S- WLDF-10: Maintain effective separation to minimize the risk of disease transmission between domestic sheep and bighorn sheep on active grazing allotments. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide) | | S-SCC-1: Maintain effective separation of domestic sheep and bighorn sheep on active grazing allotments to reduce the likelihood and risk of disease transmission. Effective separation is defined as spatial or temporal separation between bighorn sheep and domestic sheep, resulting in minimal risk of contact and subsequent transmission of respiratory pathogens between animal groups. (Forestwide) | | Standard moved from wildlife section to SCC section. Small wording changes. "minimize the risk of disease transmission" changed to "reduce the likelihood and risk of disease transmission". |
| S-WLDF-11: Mitigate adverse impacts from projects, activities, and uses to bighorn sheep production areas that may result in disturbance or displacement of bighorn sheep during the critical reproductive period (generally April 15 to July 1). (Forestwide) | | S-SCC-2: Do not authorize projects that will result in displacement of bighorn sheep during their reproductive period (generally April 15 to July 1). (Forestwide) | | Standard moved from wildlife section to SCC section. Re-worded to focus on not authorizing projects instead of mitigating adverse impacts from projects, activities, and uses. |
| S-WLDF-13: Prohibit the use of recreational pack goats in the Sangre de Cristo Mountains to eliminate potential interactions between pack goats and bighorn sheep. (Forestwide) | | S-SCC-3: Prohibit the use of recreational pack goats in the Sangre de Cristo Mountains to eliminate potential interactions between pack goats and bighorn sheep. (Forestwide) | | Standard moved from wildlife section to SCC section. |
| S-WLDF-14: Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to minimize risk of contact between animal groups. (Forestwide) | | S-SCC-4: Maintain effective separation between domestic goats used for vegetation management and bighorn sheep to reduce the likelihood of contact between animal groups. (Forestwide) | | Standard moved from wildlife section to SCC section. Small wording change from "to minimize risk of contact" to "to reduce the likelihood of contact". |
| | | G-SCC-1: To maintain ecological conditions to support a viable population of species of conservation concern insects and plants, minimize negative impacts to pollinators when applying pesticides. (Forestwide) | | Guideline added. Draft plan had a standard: *S-PLTR1-1: Mitigate impacts to insect species that are listed as species of conservation concern, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. (Forestwide)* |
| G-SCC-1: Avoid road construction and other permanent ground-disturbing activities in and around the perimeter of alpine fell fields and talus rock fields, or activities that would degrade the vegetation within 100 feet of these features. (Forestwide) | | G-SCC-2: To maintain ecological conditions to support a viability of species of conservation concern, roads and other permanent ground-disturbing structures and other authorized activities should not degrade vegetation within 100 feet of where plants that are listed as species of conservation concern are known to occur. Such barren or rocky areas include, but are not limited to, alpine fell fields, alpine cushion plant communities, talus slopes at any elevation, rock fields, boulder gardens, cliff faces, recently disturbed soils, exposed shale, gypsum, volcanic, or adobe soils, and other sparsely vegetated areas within other ecosystems. (Forestwide) | | Guideline re-worded and expanded. |
| G-SCC-2: Avoid impacts to shale and gypsum soils where plant species of conservation concern occur to ensure ecological conditions necessary to maintain viable populations of these species of conservation concern. (Forestwide) | | | | Guideline deleted. Specific protections for shale and gypsum soils added to the revised G-SCC-2. |
| G-SCC-3: Reduce project-related impacts to known or potential flammulated owl nesting territories by:<br>• Retaining large-diameter snags at or near reference conditions for the primary forest cover type<br>• Retaining large-diameter snags within 300 feet of nesting locations<br>• Maintaining adjacent upland areas in open stand conditions within the context of the natural range of variation. (Forestwide) | | | | Guideline deleted. |
| G-SCC-4: Avoid impacts to Brewer's sparrow habitat by:<br>• Mitigating fragmentation of sagebrush by motorized and mechanized activities<br>• Use grazing systems that discourage fragmentation and promote and maintain late seral understory plant composition<br>• Maintaining large patches of sagebrush that provide suitable habitat and display a variety of structural conditions. (Forestwide) | | G-SCC-3: To maintain viability of species of conservation concern, reduce habitat fragmentation and maintain structural conditions of sagebrush ecosystems through design of management activities. Patch sizes should not be less than 5 acres. (Forestwide) | | Guideline re-worded and simplified, with specific reference to Brewer's sparrow deleted. |

| | | | | |
|---|---|---|---|---|
| G-SCC-5: Maintain and restore Gunnison's prairie dog habitat in montane grasslands by:<br>• Discouraging recreational shooting<br>• Livestock grazing<br>• Improving public understanding of prairie dog roles<br>• Avoiding the use of poison to control of eliminate prairie dogs<br>• Working with partners to translocate prairie dogs. (Forestwide) | | | | Guideline deleted. |
| | | G-SCC-4: To maintain ecological conditions to support alpine-related species of conservation concern, avoid road construction and other permanent ground-disturbing activities within 100 feet of alpine fell and talus rock fields, and alpine bogs. (Forestwide) | | Guideline added. |
| | | G-SCC-5: To maintain habitat for bat species of conservation concern, retain adequate access for bats and reduce disturbance to resident populations when considering mine or cave closures. (Forestwide). | | Guideline added. |
| MA-SCC-1: The Forest intends to map populations of insect species that are species of conservation concern, threatened, endangered, proposed, or candidate species so that interdisciplinary teams can use the information to design projects to avoid impacts to these species. (Forestwide) | | Forest programs mitigate impacts to insect species that are listed as species of conservation concern and their habitat, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. To inform project-level planning on avoiding impacts to these species, the range and distribution of at-risk insect species (threatened, endangered, proposed, or candidate species and species of conservation concern) is assessed. | | Objective (see above) and management approach combined into one management approach. "And their habitat" added. |
| MA-SCC-2: Continue to support the Interagency Recovery Team efforts for the Uncompahgre fritillary butterfly, as necessary, to provide for the recovery of the species and the protection of the alpine habitat components that support it and other high-elevation alpine pollinators. (Forestwide) | | | | MA deleted. |
| MA-SCC-3: Resource advisors should assist wildland fire and other emergency incident commanders, allowing them to accomplish their tasks with minimal harm to species of conservation concern or threatened, endangered, proposed, and candidate species. (Forestwide) | | | | MA deleted. |
| | | Forest programs mitigate impacts to fish and aquatic species that are listed as species of conservation concern and their habitat, or that are necessary for those species to maintain aquatic organism passage and minimize fragmentation of habitat except when needed to protect populations from undesired nonnative fish. | | MA added. |
| | | Provide education and awareness information regarding potential disease transmission between recreational pack goats and bighorn sheep at entry points to areas of known bighorn sheep use. Areas of overlapping pack goat and bighorn sheep use is observed over time. | | MA re-worded and moved from Wildlife section. |
| | | Boreal toad education and outreach materials is provided regarding chytrid fungus. Where the fungus has been detected, determine the need to implement decontamination procedures to protect boreal toads and other amphibians. | | MA re-worded, simplified, and moved from Wildlife section. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-TEPC-1: Occupied or potential Gunnison sage-grouse habitat is maintained for habitat integrity and diversity using information provided by the local interagency working group and/or Range-wide Conservation Plan. (Forestwide) | | | | DC deleted. |
| DC-TEPC-2: Occupied or potential Gunnison sage-grouse habitat provides for habitat integrity and diversity using information provided by the local interagency working group and/or Range wide Conservation Plan. (Forestwide) | | | | DC deleted. |
| | | DC-TEPC-1: Maintain or improve habitat conditions that contribute to either stability or recovery, or both, for threatened, endangered, proposed, and candidate species. (Forestwide)<br>Desired conditions related to habitat for Canada lynx are specified in the Southern Rockies Lynx Amendment. | | DC added. |
| S-TEPC-1: Management actions shall maintain or improve habitat conditions for all at-risk species, contributing to the stability and/or recovery of these species. (Forestwide) | | | | Standard deleted. |
| | | S-TEPC-1: The Southern Rockies Lynx Amendment direction (Appendix E), as amended and modified by the forest plan record of decision, shall be applied. (Forestwide) | | New standard. |
| Standard VEG S7 (S-LYNX-7):<br>Where and to what this standard applies: Standard VEG S7 applies to all vegetation management practices within lynx habitat in conifer forests that no longer meet the definition for Standard VEG S6 (multi-story mature or late successional conifer forests) due to the extensive bark beetle outbreaks. These stands may no longer contain at least two layers of live vegetative structure and do not have a live mature overstory that provides at least 40 percent canopy closure. However, these stands may still represent quality habitat important to the persistence of Canada lynx in these vastly changed landscapes and are characterized by understory vegetation that provides dense horizontal cover for snowshoe hares. Conifer stands that meet the Standard VEG S7 definition may also continue to support secondary prey species, particularly when live green vegetative structure is present.<br>Standard VEG S7 stands are identified by:<br>1. Total live canopy cover of less than 40 percent.<br>2. Understory densities that contain at least 35 percent dense horizontal cover in winter foraging habitat condition for snowshoe hares (i.e., about 1 to 3 meters above average snow depth).<br>The standard does not apply to fuel treatment projects within the wildland-urban interface as defined by the Healthy Forest Restoration Act, subject to the following limitation:<br>(Wildland-urban interface fuels exemption): Fuel treatment projects within the wildland urban interface that do not meet Standards VEG S1, VEG S2, VEG S5, VEG S6, or VEG S7 shall occur on no more than 3 percent (cumulatively) of lynx habitat on each administrative unit (a national forest, or administratively combined national forests).<br>For fuel treatment projects within the wildland-urban interface see Guideline VEG G10.<br>The Standard:<br>Vegetation management activities that occur in conifer stands that qualify as VEG S7 with potential to reduce high-quality winter snowshoe hare habitat shall occur only:<br>1. Within 200 feet of administrative sites, dwellings, outbuildings, recreation sites, and special use permit improvements, including infrastructure within permitted ski area boundaries; or<br>2. For salvage harvest activities when incidental damage to understory and standing green trees is minimized. Pre-project projections of incidental damage will be validated by implementation monitoring and will be documented in administrative records. (Forestwide) | | S-TEPC-2 (VEG S7): Salvage activities in stands that represent high quality lynx habitat may occur in up to 7 percent of the high-probability lynx use area (95 percent lynx use areas shown on the High Probability Lynx Use Area Map) that overlaps the suitable timber base 15 years from the date on the forest plan decision. Salvage activities in VEG S7 stands in combination with all vegetation management activities, including incidental damage resulting in either Stand Initiation Structural Stage conditions, a reduction of horizontal cover, or both, are tracked for 15 years from the decision date for this forest plan decision. | | Revised direction is focused on the High Probability Lynx Use Areas/95 percent lynx use areas and where these areas overlap the suitable timber base and limit salvage activities in stands that represent high quality lynx habitat to 7% of the area and are tracked for 15 years. |
| MA-LYNX-1: The Forest intends to use existing lynx habitat baseline conditions or other existing information, new science, data, and/or analysis tools to assess whether a lynx analysis unit meets Southern Rockies Lynx Amendment standards S1 (30 percent total unsuitable limit) and S2 (15 percent management induced unsuitable limit over 10-year period). If the limit for either standard is attained, further conversion to unsuitable (stand initiation) cannot occur unless a site-specific plan amendment is developed. (Forestwide) | | S-TEPC-3: Southern Rockies Lynx Amendment standards VEG S1 and VEG S2 do not apply on lynx analysis units that have no overlap, either wholly or partially, with the high probability lynx use areas shown on the High Probability Lynx Use Area Map. All other management direction (excluding VEG S1 and VEG S2) in the Southern Rockies Lynx Amendment applies to areas outside of the high probability lynx use areas (95 percent use area). | | MA deleted. Direction for VEG S1 and VEG S2 has changed. New standard says that VEG S1 and VEG S2 do not apply on LAUs outside the high probability lynx use areas. |
| G-TEPC-1: Reduce impacts to the abundance and distribution of willows to maintain or improve the ecological integrity of riparian area and wetland ecosystems for southwestern willow flycatchers and other sensitive woody-riparian associated birds. (Forestwide) | | G-TEPC-1: To avoid or minimize adverse effects to listed species and their habitat, management actions should be designed with attention to threatened, endangered, proposed, or candidate species and their habitats. (Forestwide) | | 1 of 4 guidelines specific to individual TEPC species deleted and replaced with a single, more general guideline. |
| G-TEPC-3: To limit impacts to Gunnison sage-grouse habitat:<br>• Design projects or activities to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population.<br>• Manage riparian areas and wet meadows to meet proper functioning condition while striving to attain reference state vegetation relative to the ecological site description.<br>• Ensure livestock grazing is compatible with nesting and brood-rearing objectives in sage habitats and riparian areas.<br>• Design fuels treatment objectives to protect existing sagebrush ecosystems, modify fire behavior, restore native plants, and create landscape patterns that benefit habitat. (Forestwide) | | G-TEPC-1: To avoid or minimize adverse effects to listed species and their habitat, management actions should be designed with attention to threatened, endangered, proposed, or candidate species and their habitats. (Forestwide) | | 1 of 4 guidelines specific to individual TEPC species deleted and replaced with a single, more general guideline. |

| | | | | |
|---|---|---|---|---|
| G-TEPC-4: Management approaches to recreation and ground-disturbing activities in snow willow habitats occupied by the Uncompahgre fritillary butterfly:<br>• Be consistent with recovery plan objectives, as necessary and in accordance with site-specific needs<br>• Avoid new trail development within occupied colony sites, and manage existing trails and access as necessary to discourage off-trail use. (Forestwide) | | G-TEPC-1: To avoid or minimize adverse effects to listed species and their habitat, management actions should be designed with attention to threatened, endangered, proposed, or candidate species and their habitats. (Forestwide) | | 1 of 4 guidelines specific to individual TEPC species deleted and replaced with a single, more general guideline. |
| G-TEPC-5: Avoid impacts to the southwestern willow flycatcher in riparian willow stream reaches and reference sites where browse-related issues suggest a management concern. (Forestwide) | | G-TEPC-1: To avoid or minimize adverse effects to listed species and their habitat, management actions should be designed with attention to threatened, endangered, proposed, or candidate species and their habitats. (Forestwide) | | 1 of 4 guidelines specific to individual TEPC species deleted and replaced with a single, more general guideline. |
| G-TEPC-2: Maintain habitat availability and quality for threatened, endangered, proposed, and candidate species by incorporating conservation strategies and species habitat needs. Follow higher level direction when species are listed, delisted, or proposed in compliance with U.S. Department of Interior Fish and Wildlife Service direction. (Forestwide) | | | | Guideline deleted. |
| OBJ-LYNX-1: Over the planning period, reduce adverse highway effects on Canada lynx by working with other agencies to provide for movement and habitat connectivity, and to reduce the potential for mortality. (Forestwide) | | From Appendix E - Southern Rockies Lynx Amendment Direction:<br>Objective HU O6<br>Reduce adverse highway18 effects on lynx by working cooperatively with other agencies to provide for lynx movement and habitat connectivity16, and to reduce the potential for lynx mortality. | | Objective deleted, but similar objective is part of the SRLA direction. |
| MA-LYNX-2: Definitions used to determine suitable versus unsuitable lynx habitat due to the conditions associated with the spruce beetle outbreak are:<br>• Unsuitable habitat: stands with less than 25 percent live (green) canopy without understory that provides at least 20 percent horizontal density (e.g., 1 to 3 meters above average snow depth or snowshoe hare winter foraging habitat condition).<br>• Suitable habitat: stands that have greater than 25 percent live canopy with or without understory, or stands that contain 0 to 25 percent live canopy and understory trees that provide at least 20 percent horizontal density in winter snowshoe hare foraging habitat condition. (Forestwide) | | | | MA deleted. |
| MA-LYNX-3: Prioritize the placement of snag clumps and/or other leave areas around good or high quality winter foraging habitat to meet multiple wildlife habitat objectives. (Forestwide) | | | | MA deleted. |
| MA-LYNX-4: Under the landscape conditions associated with the spruce beetle outbreak, additional considerations may be needed to provide for habitat connectivity within and between lynx analysis units. These considerations include:<br>• Assessing habitat connectivity at multiple scales at the project level. Recommended foundation for assessment is an established sub-basin (e.g. 8th-level hydrologic unit code).<br>• Use remaining and recently changed late successional stands as foundations for connectivity patches. Recognize that both stand and landscape-level patches may be influential.<br>• Consider using some stream corridors for movement within and between the planning area and lynx analysis units. Stream corridors that are intended to provide functional habitat connectivity for lynx and other meso-carnivores should be at least 400 to 600 feet wide in total, and designed to promote movement within and between suitable habitat patches, sub watersheds, and lynx analysis units, where desired based on existing landscape conditions.<br>• Recognize contiguous understory patches of 0.5 acre or larger as particularly valuable to snowshoe hare densities. (Forestwide) | | | | MA deleted. Some overlap with a management approach in the wildlife section:<br>*Existing landscape patterns and local species concerns are used to identify and assess habitat connectivity at various spatial scales during design and analysis of forest management activities. A nest of hydrologic unit codes is used at various scales to assess connectivity patterns. Stream zones and topographic features are identified and used to facilitate movement across the landscape. These areas serve multiple purposes, including providing aquatic and terrestrial habitat connectivity and areas for species movement in most landscape conditions.* |
| MA-LYNX-5: Evaluate and update current lynx linkage areas with agency partners to provide the desired habitat connectivity functions, as practical and needed based on available resources. (Forestwide) | | In Appendix I - Proposed and Possible Actions:<br>• Evaluate and update current lynx linkage areas with partners to provide the desired habitat connectivity functions, as practical and needed based on available resources. | | MA deleted, but similar language included in Appendix I - Proposed and Possible Actions |
| MA-LYNX-6: Where desired, based on use information or other local conservation criteria, provide additional considerations for lynx denning habitat and/or known current or past denning areas. These considerations include:<br>• Use existing den site layer to inform historic and potential denning activity during management activities, as needed.<br>• Use local denning model to inform presence and extent of potential denning habitat. Combine with local knowledge and field review to define potential high-quality denning habitat.<br>• Protect known or potential high quality denning habitat through considerations for habitat connectivity, snag patch leave areas, or through suitable lynx habitat retention needs.<br>• Recognize that lynx may use several maternal den sites in the vicinity of a natal den until the post-denning period (August).<br>• Provide for continuing availability of lynx foraging habitat in proximity to denning habitat where applicable. | | | | MA deleted. |

| | | | | |
|---|---|---|---|---|
| Addition of Supplement to Standard S1:<br>1. To maintain the amount and distribution of lynx foraging habitat over time, manage so that no more than 30 percent of the lynx habitat in a lynx analysis unit is in an early stand initiation structural stage or has been silviculturally treated to remove horizontal cover (i.e., does not provide winter snowshoe hare habitat). Emphasize sustaining snowshoe hare habitat in a lynx analysis unit. If more than 30 percent of the lynx habitat in a lynx analysis unit is in early stand initiation structural stage or has been silviculturally treated to remove horizontal cover (e.g., clearcuts, seed tree harvest, pre-commercial thinning, or understory removal), no further increase as a result of vegetation management projects should occur on Federal lands. (Forestwide) | | | | Supplement to Standard S1 has been deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-RMZ-1: Riparian areas and wetlands are healthy, fully functioning ecosystems. Vegetation consists of desirable native species and age classes. Populations of riparian vegetation are diverse, vigorous, and self-perpetuating. Invasive species, including plants and animals, in riparian and wetland ecosystems are rare. There is sufficient vegetative cover to provide bank stability, trap and retain sediment, regulate temperature, and contribute to floodplain function. Riparian ecosystem composition, structure, and function can generally be restored and enhanced by beaver habitat. (Forestwide) | | DC-RMZ-1: Riparian areas and wetlands are healthy, fully functioning ecosystems that are resilient and able to withstand natural and human disturbances that include flood, fire, drought, changes in frequency and timing of weather events, recreation, and herbivory. Aquatic ecosystems, riparian ecosystems, and watersheds exhibit high ecological integrity. The vegetation consists of desirable native species and age classes and meets the needs of resident amphibians, fish, and migratory birds. Populations of riparian vegetation are diverse, vigorous, and self-perpetuating. Invasive species, including plants and animals, in riparian and wetland ecosystems are rare. There is sufficient vegetative cover to provide bank stability, trap and retain sediment, regulate temperature, and contribute to floodplain function. Riparian ecosystem composition, structure, and function can generally be restored and enhanced by beaver habitat. (Forestwide) | | 4 DCs (DC-RMZ-1, DC-RMZ-2, DC-RMZ-4, and DC-RMZ-5) were combined and slightly re-worded into one DC (revised DC-RMZ-1). |
| DC-RMZ-2: Aquatic ecosystems, riparian ecosystems, and watersheds exhibit high ecological integrity. (Forestwide) | | See DC-RMZ-1. | | 4 DCs (DC-RMZ-1, DC-RMZ-2, DC-RMZ-4, and DC-RMZ-5) were combined and slightly re-worded into one DC (revised DC-RMZ-1). |
| DC-RMZ-3: Hydrologic regimes of riparian and wetland ecosystems contribute to appropriate channel and floodplain development, maintenance, and function. (Forestwide) | | DC-RMZ-2: Hydrologic regimes of riparian and wetland ecosystems contribute to appropriate channel and floodplain development, maintenance, and function. (Forestwide) | | No change. |
| DC-RMZ-4: Riparian and wetland ecosystems are resilient and withstand disturbance from natural and management activities, including flood, fire, drought, changes in timing and frequency of weather events, recreation, and herbivory. (Forestwide) | | See DC-RMZ-1. | | 4 DCs (DC-RMZ-1, DC-RMZ-2, DC-RMZ-4, and DC-RMZ-5) were combined and slightly re-worded into one DC (revised DC-RMZ-1). |
| DC-RMZ-5: Habitats sensitive to management activities, such as riparian management zone vegetation, meet the needs of resident amphibians, fish, and migratory birds. (Forestwide) | | See DC-RMZ-1. | | 4 DCs (DC-RMZ-1, DC-RMZ-2, DC-RMZ-4, and DC-RMZ-5) were combined and slightly re-worded into one DC (revised DC-RMZ-1). |
| OBJ-RMZ-1: Over the planning period, work with cooperators to prioritize and restore at least 300 acres of riparian and/or wetland areas. (Forestwide) | | OBJ-RMZ-1: Restore at least 300 acres of riparian or wetland areas over the next 15 years. (Forestwide) | | Time frame changed from "over the planning period" to "over the next 15 years". Revised language removed "work with cooperators to prioritize". |
| S-RMZ-1: Management activities within the riparian management zones must maintain or restore the connectivity, composition, function, and structure of riparian and wetland areas over the long term. (Forestwide) | | S-RMZ-1: Management activities may have short-term impacts (generally less than 5 years) to composition, function, and structure of riparian areas and fish habitat. Over the long term (generally greater than 20 years), projects shall not impair connectivity, composition, function, and structure. (Forestwide) | | Standard re-worded and clarified with regard to short-term vs long-term impacts. |
| G-RMZ-1: To maintain ecological integrity and connectivity, limit the construction of roads and infrastructure in the riparian management zone. (Forestwide) | | G-RMZ-1: To maintain ecological integrity and connectivity, new system roads and infrastructure should not be constructed in the riparian management zone. (Forestwide) | | Guideline re-worded and clarified. |
| G-RMZ-2: Grazing and other management activities in the riparian management zone should provide healthy willow carrs, which can provide the structural nesting habitat requirements for riparian-associated birds. (Forestwide) | | G-RMZ-2: To provide for the structural nesting habitat requirements for riparian-associated birds, design management activities to avoid healthy willow carrs. (Forestwide) | | Guideline re-worded and clarified. |
| G-RMZ-3: Grazing, grazing infrastructure, and other activities in the riparian management zone should prevent or minimize the introduction and spread of cowbirds in riparian willow systems. (Forestwide) | | | | Guideline deleted. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-WA-1: Physical channel characteristics are in dynamic equilibrium and are commensurate with the natural ranges of discharge and sediment load provided to a stream. Streams have the most probable form and the expected native riparian vegetation composition within the valley landforms that they occupy; they function correctly without management intervention. Historically disturbed and degraded stream channels recover through floodplain development and establishment of riparian vegetation, and demonstrate stable channel geomorphic characteristics. Beaver reintroduction, and the persistence of beaver habitat, can contribute to channel recovery and floodplain function. Roads, trails, and impervious surfaces minimally affect hydrologic processes within watersheds. (Forestwide) | | DC-WA-1: Physical channel characteristics are in dynamic equilibrium and are commensurate with the natural ranges of discharge and sediment load provided to a stream. Streams have the most probable form and the expected native riparian vegetation composition within the valley landforms that they occupy; they function correctly without management intervention. Historically disturbed and degraded stream channels recover through floodplain development and establishment of riparian vegetation, and demonstrate stable channel geomorphic characteristics. Beaver reintroduction, and the persistence of beaver habitat, can contribute to channel recovery and floodplain function. Upland areas function properly and do not contribute to stream-channel degradation. Roads, trails, and impervious surfaces minimally affect hydrologic processes within watersheds. The sediment regime within water bodies is within the natural range of variation. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport. (Forestwide) | | Language from 3 DCs (DC-WA-1, DC-WA-2, DC-WA-3) combined into 1 DC (DC-WA-1). |
| DC-WA-2: Aquatic systems and riparian habitats express physical integrity, including physical integrity of shorelines, banks, and bottom configurations, within their natural range of variation. Upland areas function properly and do not contribute to stream-channel degradation. (Forestwide) | | See DC-WA-1. | | Language from 3 DCs (DC-WA-1, DC-WA-2, DC-WA-3) combined into 1 DC (DC-WA-1). Specifically the first part of this DC ("Aquatic systems and riparian habitats express physical integrity, including physical integrity of shorelines, banks, and bottom configurations, within their natural range of variation.") was deleted and the second part ("Upland areas function properly and do not contribute to stream-channel degradation.") was left in. |
| DC-WA-3: The sediment regime within water bodies is within the natural range of variation. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport. (Forestwide) | | See DC-WA-1. | | Language from 3 DCs (DC-WA-1, DC-WA-2, DC-WA-3) combined into 1 DC (DC-WA-1). |
| DC-WA-4: Within the constraints of existing water rights decrees, the timing and magnitude of flood events is within the natural range of variation. Floodplains are accessible to water flow and sediment deposits. Overbank floods allow floodplain development and support healthy riparian and aquatic habitats. Floods also allow the propagation of flood-associated riparian plant and animal species. (Forestwide) | | DC-WA-2: Within the constraints of existing water rights decrees, the timing and magnitude of flood events is within the natural range of variation. Floodplains are accessible to water flow and sediment deposits. Overbank floods allow floodplain development and support healthy riparian and aquatic habitats. Floods also allow the propagation of flood-associated riparian plant and animal species. (Forestwide) | | No change. |
| DC-WA-5: State water quality standards are met and State-classified water uses are supported for all water bodies. Water quality for those water bodies listed as impaired on the State of Colorado 303(d) list move toward fully supporting State-classified uses. (Forestwide) | | DC-WA-3: State water quality standards are met and State-classified water uses are supported for all federal water bodies. Water quality for those water bodies listed as impaired on the State of Colorado 303(d) list move toward fully supporting State-classified uses. (Forestwide) | | Clarified to apply to "federal" water bodies. |
| DC-WA-6: Aquifers maintain natural conditions of recharge, discharge, and groundwater quality, especially where they are important to surface features dependent on groundwater for their existence (including but not limited to caves, springs, seeps, lakes, riparian areas, wetland ecosystems, fens, and intermittent and perennial streams). (Forestwide) | | DC-WA-4: Aquifers maintain natural conditions of recharge, discharge, and groundwater quality, especially where they are important to surface features dependent on groundwater for their existence (including but not limited to caves, springs, seeps, lakes, riparian areas, wetland ecosystems, fens, and intermittent and perennial streams). (Forestwide) | | No change. |
| DC-WA-7: Watersheds provide clean, safe water suitable for public consumption after adequate and appropriate water treatment. (Forestwide) | | DC-WA-5: Watersheds provide clean, safe water suitable for public consumption after adequate and appropriate water treatment. (Forestwide) | | No change. |
| OBJ-WA-1: Improve condition class on at least one identified priority watershed, as defined by the national Watershed Condition Framework, within 10 years of plan approval. (Forestwide) | | OBJ-WA-1: Improve condition class on at least one identified priority watershed, as defined by the national Watershed Condition Framework within 5 years of the date on the forest plan decision. (Forestwide) | | Time frame changed from "within 10 years of plan approval" to "within 5 years of the date on the forest plan decision." |
| OBJ-WA-2: Over the planning period, conduct the necessary data collection to evaluate the need to move instream flow quantification points to the current Forest boundary. (Forestwide) | | | | Objective deleted. |

| | | | | |
|---|---|---|---|---|
| OBJ-WA-3: Over the next 5 years, quantify minimum instream flows at new quantification points for stream reaches impacted by federal land acquisitions such as the Baca Tract. (Forestwide) | | OBJ-WA-2: Quantify minimum instream flows at new quantification points for stream reaches impacted by federal land acquisitions for the Baca Tract over the next 5 years. (Forestwide) | | Slight re-wording, with clarification that this is to be done specifically for stream reaches impacted by acquisitions for the Baca Tract. |
| S-WA-1: Incorporate project-specific best management practices described in FS 990A or as updated in land-use and project plans as a principle mechanism to maintain or restore water quality and meet desired watershed conditions. (Forestwide) | | S-WA-1: Incorporate direction included in the National Core Best Management Practices (FS 990A) and Watershed Conservation Practices Handbook (FSH 2509.25), to develop project-specific best management practice prescriptions in project plans. (Forestwide) | | Standard re-worded. Reference to the Watershed Conservation Practices Handbook (FSH 2509.25) added. |
| G-WA-1: Management activities should maintain or restore water quality to meet State of Colorado water quality standards. In watersheds where State of Colorado 303(d) listed impaired water bodies exist, management activities should assist in achieving State water quality standards. (Forestwide) | | G-WA-1: Maintain or restore water quality by assuring that activities meet State of Colorado water quality standards. Management activities in watersheds where State of Colorado 303(d) listed impaired water bodies exist should assist in achieving State water quality standards. (Forestwide) | | Re-worded. |
| G-WA-2: Management actions should not cause long-term degradation to water resources, including lakes, streams, wetlands, and groundwater. Particular attention should be paid to public water supplies, sole source aquifers, and source water protection areas. (Forestwide) | | G-WA-2: Management actions should not cause long-term degradation to water resources, including lakes, streams, wetlands, and groundwater. Particular attention should be paid to public water supplies, sole source aquifers, and source water protection areas. (Forestwide) | | No change. |

| Draft Plan | | Final Plan | | Comparison |
| --- | --- | --- | --- | --- |
| OBJ-PLTR-1: Restore or enhance 65,000 acres of pollinator habitat over the planning period. (Forestwide) | | | | Objective deleted. Pollinator guidance has been moved to management approaches in wildlife section. There is no longer a pollinator section. MA in wildlife section:<br>*Pollinator-friendly best management practices for Federal lands are implemented to improve pollinator habitat and protect these species when implementing management actions. Actions are not limited to the following:*<br>*• Design projects to maintain or improve pollinator habitat while meeting resource objectives;*<br>*• Include plants that are desirable to pollinator species in project seed mixtures;*<br>*• Mitigate impacts to pollinator insects when applying insecticide;*<br>*• Include creation and maintenance of pollinator habitat in project design; and*<br>*• Implement best management practices for pollinator habitat when managing roads.* |
| S-PLTR1-1: Mitigate impacts to insect species that are listed as species of conservation concern, or that are necessary to those species as pollinators or as food, from applications of insecticide or other pesticides. (Forestwide) | | | | Draft Standard deleted. New guideline in SCC section:<br>*G-SCC-1: To maintain ecological conditions to support a viable population of species of conservation concern insects and plants, minimize negative impacts to pollinators when applying pesticides. (Forestwide)* |
| MA-PLTR-1: Impacts (positive, negative, or neutral) to pollinators are addressed when undertaking project design, analysis, and implementation. (Forestwide) | | Impacts to pollinators are addressed during project analysis through project design, analysis, and implementation. | | Final plan does not have a pollinator section - pollinator guidance has been moved to the wildlife section. MA slightly re-worded. |
| MA-PLTR-2: Implement pollinator-friendly best management practices for Federal lands to improve pollinator habitat and protect pollinators when taking management actions. Actions can include the following:<br>• Design projects to maintain or improve pollinator habitat while still meeting resource objectives<br>• Include local pollinator species in project seed mixtures<br>• When using insecticide, consider and mitigate impacts to pollinating insects to the greatest extent possible<br>• Include creation or maintenance of pollinator habitat in project rationale<br>• Implement best management practices when managing roads. (Forestwide) | | Management Approach in wildlife section:<br>Pollinator-friendly best management practices for Federal lands are implemented to improve pollinator habitat and protect these species when implementing management actions. Actions are not limited to the following:<br>• Design projects to maintain or improve pollinator habitat while meeting resource objectives;<br>• Include plants that are desirable to pollinator species in project seed mixtures;<br>• Mitigate impacts to pollinator insects when applying insecticide;<br>• Include creation and maintenance of pollinator habitat in project design; and<br>• Implement best management practices for pollinator habitat when managing roads. | | Management approach moved to the wildlife section. Wording clarified/corrected in spots. For example, "include creation or maintenance of pollinator habitat in project rationale" was changed to "include creation and maintenance of pollinator habitat in project design." |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-FISH-1: Populations of native and desired nonnative fish and other aquatic species are distributed, or are expanding into previously occupied habitat, with interconnectivity among and within metapopulations. The amount, distribution, and characteristics of life-stage habitats are suitable to maintain or reach viable populations of native and desired nonnative species. Habitat conditions are not a primary factor in listing of species under the Endangered Species Act or adding species to the species of conservation concern list. (Forestwide) | | DC-FISH-1: Connectivity of habitat for native and desired nonnative fish and aquatic species is maintained or enhanced by the design and implementation of management actions. Populations are expanding into previously occupied habitat, and interconnectivity is maintained within metapopulations. To maintain sustainable populations, critical life stages are distributed and abundant. Habitat conditions are not a primary factor in species being proposed or listed under the Endangered Species Act or for adding species as a species of conservation concern. | | 5 draft DCs were simplified and combined into 2 DCs. |
| DC-FISH-2: Aquatic populations during critical life stages are distributed and abundant. (Forestwide) | | See DC-FISH-1. | | 5 draft DCs were simplified and combined into 2 DCs. |
| DC-FISH-3: Healthy aquatic habitat provides for sustainable fish populations for recreational and cultural significance. (Forestwide) | | See DC-FISH-1 and DC-FISH-2. | | 5 draft DCs were simplified and combined into 2 DCs. |
| DC-FISH-4: Fish populations have adequate habitat and water quality to thrive in lakes and streams on the Forest. Natural fish habitat is preferred and promoted over human-made habitat. (Forestwide) | | DC-FISH-2: Habitat and water quality in lakes and streams allow fish populations to thrive, and habitat is not fragmented by management activities. | | 5 draft DCs were simplified and combined into 2 DCs. Some aspects of draft DCs were eliminated, such as "Natural fish habitat is preferred and promoted over human-made habitat." |
| DC-FISH-5: Habitat for native and desired nonnative fish species is not fragmented by the design and implementation of management actions. (Forestwide) | | See DC-FISH-2. | | 5 draft DCs were simplified and combined into 2 DCs. |
| OBJ-FISH-1: Restore connectivity in currently fragmented habitat where the risk of genetic contamination, predation, or competition from undesired nonnative fish species is not a concern by completing 10 fish connectivity projects (combination of removing 10 barriers and/or replacing 10 aquatic organism passage structures) over the life of this plan. Prioritize improvements to existing culverts, bridges, and stream crossings identified for fish passage based on the Rio Grande cutthroat trout conservation strategy and Rio Grande chub and | | OBJ-FISH-1: Complete 10 fish connectivity projects (combination of removing barriers or constructing aquatic organism passage structures) over the next 15 years. | | Objective simplified, with implementation timeframe changed from "over the life of the plan" to "over the next 15 years", and eliminating prioritization strategy for improvements to existing culverts, bridges, and stream crossings. |
| OBJ-FISH-2: Take action to maintain or restore structure, composition, or function of habitat for fisheries and other aquatic species along 30 to 50 miles of stream total over a 10-year period, with a focus on larger individual stream segments when possible (i.e., 3 to 5 miles annually). (Forestwide) | | OBJ-FISH-2: Maintain or restore structure, composition, or function of habitat for fisheries and other aquatic species along 30 miles of stream, with a focus on larger individual stream segments when possible over the next 15 years. (Forestwide) | | Objective adjusted to lower restorative amount to 30 miles of stream over 15 years, rather than 30-50 miles of stream over a 10 year period. |
| S-FISH-1: When authorizing new surface diversions in fish-bearing waters, provide upstream and downstream passage designed for all fish species that are threatened, endangered, or sensitive, and for species of conservation concern, and if needed, include either fish screens or other means to prevent fish entrapment/entrainment. (Forestwide) | | S-FISH-1: When authorizing new surface diversions in fish-bearing waters, provide upstream and downstream passage designed for all fish species that are threatened, endangered, proposed or candidate species, and for species of conservation concern except when barriers are needed to protect from undesired nonnative fish. (Forestwide) | | Wording changed to clarify that the standard applies to proposed and candidate species, but not to sensitive species. New version provides clear exception for when barriers are needed as a result of undesired nonnative fish. New wording eliminated need for fish screens/prevention of fish entrapment. |
| G-FISH-1: New surface diversions in intermittent and perennial streams should provide passage and habitat for native and desired nonnative aquatic species. Flows in intermittent and perennial non-fish-bearing waters that are adequate for fish to pass would also be sufficient for other aquatic species to pass. (Forestwide) | | G-FISH-1: New surface diversions should provide passage for native and desired nonnative aquatic species to maintain connectivity except when barriers are needed to protect from undesired nonnative fish. (Forestwide) | | Guideline simplified and adjusted to focus on passage, rather than passage and habitat. New language provides clear exception for when barriers are needed to protect from undesired nonnative fish. |
| G-FISH-2: Habitat should be determined for aquatic threatened, endangered, and sensitive species, and for species of conservation concern, within or near the planning area. Surveys to determine presence should be conducted for those species with suitable habitat. (Forestwide) | | | | Guideline deleted. |
| G-FISH-3: Construct perennial stream crossings and aquatic organism passages to allow natural streamflow, and bidirectional movement of adult and juvenile fish and other aquatic species. (Forestwide) | | G-FISH-2: Newly constructed perennial stream crossings and aquatic organism passages allow natural streamflow, and bidirectional movement of adult and juvenile fish and other wildlife. (Forestwide) | | Guideline expanded to include "other wildlife" rather than just "other aquatic species". |
| | | G-FISH-3: Fisheries activity period maps (Appendix XX) should be consulted during project development and design, including recreational dredging. Date ranges associated with stream classes identified on the map are listed in Table 9....see also Table 9 and 2 paragraphs that follow it. | | New guideline regarding use of fisheries activity period maps. |
| MA-FISH-1: The Forest intends to continue to cooperate, coordinate, meet objectives, and share data among the signatories with management responsibility for Rio Grande cutthroat trout, Rio Grande chub, and Rio Grande sucker and their habitat and related community assemblages. Fisheries activity period maps (contained on the DVD located at the back of this document) facilitate a consistent and effective implementation of conservation strategies and agreements. (Forestwide) | | Management Approaches<br>Annually, the Forest works with signatories of the Conservation Agreements for Rio Grande cutthroat trout (RGCTCT 2013) and the Rio Grande chub and Rio Grande sucker (RGCSCT 2018). Shared data maintains and updates species occurrences, and the fisheries activity period maps facilitate consistent and effective implementation of the agreements for use during project-level analysis and in guidance specific to recreational dredging. | | Clarified that this is done annually and added specific reference to use of fisheries activity period maps in guidance specific to recreational dredging. |
| MA-FISH-2: Coordinate with staff from the Colorado Parks and Wildlife on fish stocking programs to ensure benefits and reduce degrading effects on native and desired nonnative fish and aquatic species. Provide Colorado Parks and Wildlife recreational fish stocking reports annually by June 15 or as they become available to Forest media outlets, including all district offices. (Forestwide) | | The Forest coordinates with staff from Colorado Parks and Wildlife on fish stocking programs. This ensures benefits and reduces degrading effects on native and desired nonnative fish and aquatic species. Recreational fish stocking reports are provided to Colorado Parks and Wildlife by June 15, or as they become available. | | Slight re-wording. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-GDE-1: Fens are identified and continue to accumulate peat and provide habitat for species of conservation concern, including:<br>• Little grapefern,<br>• Mud sedge,<br>• Colorado woodrush, and<br>• Spiny-spore quillwort. (Forestwide) | | DC-GDE-1: Identified groundwater-dependent ecosystems provide habitat for species of conservation concern and other native species. Fens continue to accumulate peat. (Forestwide) | | Revised DC was expanded to cover SCC and other native species, with references to specific species eliminated. DC broadened to cover GDEs and not just fens. Eliminated requirement to identify fens. |
| G-GDE-1: Protect the functions and services of groundwater-dependent ecosystems, including fens. Provide special emphasis to large-size fens, unusual kinds of fens (such as iron fens and calcareous fens), and fens in especially pristine condition—along with the hydrologic features influencing them. (Forestwide) | | S-GDE-1: Do not authorize management actions that alter the hydrology of groundwater-dependent habitat features. (Forestwide) | | Two draft guidelines replaced with one standard and one guideline. Standard provides stronger protection of the hydrology of groundwater-dependent habitat features. Removed special emphasis on large, unusual, or pristine fens. |
| G-GDE-2: Design projects to avoid impacting the function or ecological services of fens. Rehabilitate and restore damaged fen resources and the ecological conditions that sustain them. (Forestwide) | | G-GDE-1: To maintain ecosystem diversity and function, design projects to avoid or mitigate negative impacts to the ecological services that groundwater-dependent ecosystems provide. (Forestwide) | | Broadened to cover GDEs rather than simply fens. Expanded language to include mitigating negative impacts, rather than just avoiding impacts. Eliminated requirement to rehabilitate and restore damaged fen resources and the ecological conditions that sustain them. |
| MA-GDE-1: The conservation of fens is promoted through cooperative work with other state and Federal agencies and adjoining private landowners. The effects of use and management on fens is researched to improve approaches to conservation. (Forestwide) | | Management Approaches<br><br>The Forest collaboratively works with other agencies and adjacent landowners in the conservation of groundwater-dependent ecosystems. Fens will continue to be inventoried and evaluated as feasible. | | Expanded to cover all groundwater-dependent ecosystems. Eliminated statement regarding addition research on the effects of use and management on fens. New language clarifies that inventory and evaluation of fens will depend on feasibility. |
| MA-GDE-2: Fens and watershed conditions that support healthy fens present an irreplaceable ecological feature on the landscape. These areas are inventoried and evaluated as a management objective for maintaining healthy watersheds and aquatic resources. (Forestwide) | | Fens and watershed conditions that support healthy fens provide irreplaceable ecological functions. As Forest capacity allows, these areas are inventoried and evaluated, thereby enabling managers to maintain healthy watersheds and aquatic resources. | | Re-worded. New language clarifies that inventory and evaluation of fens will depend on capacity. |

| Draft Plan | | Final Plan | | Comparison |
|---|---|---|---|---|
| DC-VEG-1: Timber harvest prescriptions should identify distribution of coarse woody debris and snags, as well as live green replacement trees for future snags. The minimum requirements for adequate wildlife habitat and ecosystem function are shown in Table 5.<br>In each forest type, maintain late-successional and old forest conditions (see Appendix A) that provide key ecological components for wildlife. Snags are important for cavity-nesting birds and other wildlife, including species of conservation concern. These legacy components are an important key ecosystem characteristic for many species.<br>Snags are also an important component in the maintenance of habitat connectivity. Particularly in spruce-fir forest types, a focus on habitat components including snags, down wood, and understory patches of regeneration would maintain and restore habitat connectivity. Snag retention strategies provide a variety of snag heights for species such as bats and the olive-sided flycatcher. Snag height ranges from less than 25 feet to taller than the surrounding habitat.<br>Available hollow trees, snags, and longs are retained to provide unique habitat components that supplement the snag and downed wood recommendations. Downed wood retention provides whole logs in the largest size class. Unless they pose a safety risk, soft snags are retained during management. Downed wood, i.e., woody materials greater than 3 inches in diameter, is important for retaining moisture, trapping soil movement, providing microsites for plant establishment, and cycling soil nutrients in ecosystems. A wide variety of downed wood size classes is preferred.<br>Recommended snag and downed wood criteria for wildlife habitat and ecosystem processes are shown in Table 5. At least the minimum number of snags and amount of downed wood in the planning unit should be maintained. At least 50 percent of the snags retained should represent the largest size classes available. If larger snags are not present, a greater number in the smaller size classes should be retained. Snags do not need to be retained on every acre. (General Forest Geographic Area) | | G-VEG-1: Snag densities are related to disturbance regimes of various forest systems. Snags suitable for nesting and denning (typically larger sizes) are present across the Forest contributing to the diversity of forest structure and maintenance of habitat components important to the persistence of snag-associated wildlife species. Snags provide an important habitat component in the maintenance of habitat connectivity. Snag-retention should represent a variety of snag heights. At least 50 percent of the retained snags should represent the larger size classes available. Where larger snags are not available, trend toward a greater number of smaller snags. Snags are not required to be maintained on every acre. (Forestwide) | | DC changed to a guideline and simplified. Eliminated language surrounding live green replacement trees, late-successional and old forest conditions, retention of soft snags, and some background information. Change from General Forest GA to Forestwide. Table of snag and down wood retention values had changes including collapsing the 3 mixed-conifer types into one row. |
| DC-VEG-2: Vegetation management strategies are consistent with historical succession and disturbance regimes where possible and consistent with other land management objectives. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted, but there is a similar management approach in scenery: Management practices are designed to produce forest composition, structure, and patterns similar to those that would have occurred under natural disturbance regimes, where feasible. |
| DC-VEG-3: Vegetation management occurs on lands identified as not suitable for timber production, for other multiple-use purposes, and these areas have an irregular, unscheduled timber harvest program. These harvests meet management direction and desired conditions for these areas and may provide services and benefits to people. (General Forest Geographic Area, Roadless Geographic Area, Specially Designated Geographic Area) | | DC-VEG-1: Commercial timber harvest occurs on lands identified as not suitable for timber to meet multiple use objectives and for safety and health. These harvests are not part of the regularly scheduled harvest program. These activities meet management direction and desired conditions and may provide other services and benefits. (Forestwide) | | Small wording changes. |
| DC-VEG-4: In spruce-fir forests where the mature forest canopy has reached 60 percent or more mortality from bark beetles, remaining mature and late-successional forest patches that are expected to remain green or mostly green during the life of the plan are retained where they are considered integral to ecosystem or species habitat-related goals. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted. However, this language is in the lynx management approaches: *During salvage project design, late-successional forest patches that are expected to remain green or mostly green in the next 15 years are identified for retention during project implementation. Foresters and wildlife biologists determine the optimal landscape heterogeneity objectives that include retention, opening patch size, and configuration. Project objectives should be considered at a watershed or sub-watershed scale, using the best available science.* |
| DC-VEG-5: Late-successional/old-forest conditions (see Appendix A) are maintained or enhanced to provide ecological conditions necessary to maintain viable populations of at-risk species. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted. |
| DC-VEG-6: Cottonwood riparian areas and wetland ecosystem communities display moderate to high canopy cover (greater than 20 percent) of young, middle-aged, and old cottonwood trees. (General Forest Geographic Area, Specially Designated Geographic Area) | | | | DC deleted. |

| | | | | |
|---|---|---|---|---|
| DC-VEG-7: Habitat structure in Gambel oak communities provides for species assemblage associated with this habitat. (General Forest Geographic Area, Specially Designated Geographic Area) | | DC-VEG-2: Habitat structure in Gambel oak communities provides for the needs of associated species. (Forestwide) | | Small wording change/clarification. |
| DC-VEG-8: All development stages of the forested terrestrial ecosystems are well represented at the landscape scale and occur Forestwide within the ranges identified in Table 6. (Forestwide) | | DC-VEG-3: All development stages of the forested terrestrial ecosystems are well represented at the landscape scale and occur Forestwide within the ranges identified in Table 6. (Forestwide) | | No change. |
| DC-VEG-9: When salvaging timber following wildfire, retain tall snags for snag-associated species and snag location in the riparian management zone. (Forestwide) | | | | DC deleted. |
| OBJ-VEG-1: Diversify the structure class distribution for various forest types via management on 100 acres annually in the first decade and 1,200 acres in the second decade, to work toward or maintain the desired conditions in Table 6, above. (General Forest Geographic Area, Specially Designated Geographic Area) | | OBJ-VEG-1: Diversify the structure class distribution for various forest types by managing 800 acres annually in years 4 and 5 of the planning period and 1,200 acres in years 6 through 20 of the planning period, to work toward or maintain the desired conditions in Table 6. (Forestwide) | | Objective updated to match revised timber program under Alt B Modified. |
| OBJ-VEG-2: Annually restore 150–300 acres of dry mixed-conifer and ponderosa pine areas to move these forest types toward a species composition and landscape pattern where fire can function in its natural role. (General Forest Geographic Area) | | OBJ-VEG-2: Annually restore 150 to 300 acres of dry mixed-conifer and ponderosa pine areas to move these forest types toward a species composition and landscape pattern where fire can function in its natural role. (Forestwide) | | Change form General Forest GA to Forestwide. |
| OBJ-VEG-3: Annually, for the first decade, salvage harvest about 3,000 acres per year of spruce fir to provide for economic sustainability within the region. (General Forest Geographic Area) | | OBJ-VEG-3: Salvage harvest approximately 62,800 CCF (hundred cubic feet) of spruce-fir annually for the first 3 years of the planning period. (Forestwide)<br>OBJ-VEG-4: Salvage harvest an estimated 20,000 CCF of spruce-fir annually during years 4 and 5 of the planning period. (Forestwide) | | Objective updated to match revised timber program under Alt B Modified. |
| OBJ-VEG-4: Annually, for the second decade, offer timber for sale at an average potential timber sale quantity of 8,400 CCF (hundred cubic feet). (General Forest Geographic Area) | | OBJ-VEG-5: Offer timber for sale at an average timber sale quantity of 8,000 CCF per year for years 4 and 5 of the planning period. Offer timber for sale at an average timber sale quantity of 12,000 CCF per year for years 6 through 20. (Forestwide)<br>Additional note added: Specific to Objectives OBJ-VEG-3, OBJ-VEG-4, and OBJ-VEG-5: Estimates of timber outputs may be larger or smaller on an annual basis, or over the life of the plan, if legal authorities, management efficiencies, or unanticipated constraints change in the future. | | Objective updated to match revised timber program under Alt B Modified.<br>Additional note provides clarification. |
| OBJ-VEG-5: Annually, for the second decade of the plan, offer commercial timber and other products for sale at an average annual potential wood sale quantity of 15,600 CCF. (General Forest Geographic Area) | | | | Objective deleted. |
| | | OBJ-VEG-6: Identify and map a minimum of five select populations of ethnobotanically important plants for tribes in concert with the heritage, botany, and timber programs over the next 15 years. (Forestwide) | | In the draft plan, this plan component was in the Forest Products section: OBJ-FP-1: Over the planning period, identify and map a minimum of five select populations of oshá and other ethnobotanically important plants for tribes in concert with the heritage, botany, and timber programs. (Forestwide). There are small changes from that plan component, including using a time frame of 15 years rather than the planning period and not calling out oshá in particular. |
| | | OBJ-VEG-7: Average 100 acres of hazardous fuels reduction per year in areas adjacent to private development, critical infrastructure, or both over the next 15 years. (Forestwide) | | In the draft plan, this plan component was in the Fire section:<br>OBJ-FIRE-1: Over the life of the plan, complete an average of 100 acres of hazardous fuels reduction per year in areas adjacent to private development and/or critical infrastructure. (Forestwide). Time frame changed to 15 years rather than over the life of the plan. |
| | | OBJ-VEG-8: Average 2,000 acres of fuels reduction per year using fire managed for resource benefit or prescribed fire on Forest lands over the next 15 years. (Forestwide) | | In the draft plan, this plan component was in the FIRE section:<br>OBJ-FIRE-2: Over the life of the plan, complete an average of 2,000 acres of fuels reduction and resource enhancement per year using fire managed for resource benefit and/or prescribed fire on Forest lands. (Forestwide) Time frame changed to 15 years rather than over the life of the plan. Final objective eliminated "and resource enhancement". |
| S-VEG-1: Timber may not be harvested for the purpose of timber production on lands not suited for timber production. Timber harvest may occur on these lands for the following purposes: protecting other multiple-use values, protecting or enhancing biodiversity or wildlife habitat, scenic-resource management, research or administrative studies consistent with geographic or management area direction, and salvage, sanitation, public health, or safety. (General Forest Geographic Area) | | S-VEG-1: Timber may not be harvested for the purpose of timber production on lands not suited for timber production. Timber harvest may occur on these lands for the following purposes: protecting other multiple-use values, protecting or enhancing biodiversity or wildlife habitat, scenic-resource management, research, or administrative studies consistent with geographic or management area direction, and salvage, sanitation, public health, or safety. (Forestwide) | | Changed to Forestwide |

| | | | | |
|---|---|---|---|---|
| S-VEG-2: Timber shall not be harvested on lands where soil, slope, or other watershed conditions may be irreversibly damaged, as identified in project-specific findings. (General Forest Geographic Area, Roadless Geographic Area, Specially Designated Geographic Area) | | S-VEG-2: Timber shall not be harvested on lands where soil, slope, or other watershed conditions may be irreversibly damaged, as identified in project-specific findings. (Forestwide) | | Changed to Forestwide |
| S-VEG-3: Conduct harvest to assure that the technology and knowledge exist to restock these areas adequately with trees within 5 years after final harvest.<br>Minimum restocking levels for suitable timber lands are defined in Table 7. Exceptions to these levels are allowed if supported by a project-specific determination of adequate restocking.<br>Restocking levels for nonsuitable timber lands must be specified with the silvicultural prescription.<br>Project-specific determination of adequate stocking must be based on the plan's desired conditions and objectives applicable to the area and project and be consistent with all other applicable plan components. (General Forest Geographic Area, Roadless Geographic Area, Specially Designated Geographic Area)<br>Minimum seedling height requirements are not specified. Seedlings must have survived a minimum of one growing season and be expected (on the basis of research and experience) to be able to produce the desired stand condition specified for this area in the forest plan. The numbers of seedlings in Table 7 represent the minimum number of seedlings needed to meet resource objectives. To assure that adequate restocking of openings created as a result of final harvest is accomplished, as a minimum, stocking surveys are conducted at the end of the first and third growing seasons following regeneration treatment. Adequate stocking cannot be certified until after the third-year growing-season survey. | | S-VEG-3: Timber harvest shall be conducted to assure that the technology and knowledge exist to restock these areas adequately with trees within 5 years after final harvest. (Forestwide)<br>Minimum restocking levels for suitable timber lands are defined in Table 7. Exceptions to these levels are allowed if supported by a project-specific determination of adequate restocking.<br>Restocking levels for unsuitable timber lands must be specified with the silvicultural prescription. Project-specific determination of adequate stocking must be based on the plan's desired conditions and objectives applicable to the area and project and be consistent with all other applicable plan components. (Forestwide) | | Slight re-wording of first half of the standard with a change to Forestwide. Second half of the standard ("Minimum seedling height…") has been deleted. |
| S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site specific project needs, not primarily for the greatest dollar return or timber output. (General Forest Geographic Area) | | S-VEG-4: Select harvest systems to achieve desired conditions and objectives or to meet site specific project needs, not primarily for the greatest dollar return or timber output. | | |
| S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. (General Forest Geographic Area) | | S-VEG-5: Clearcutting may be used where it has been determined to be the optimum method, and other types of even-aged harvest shall be used only where determined to be appropriate following interdisciplinary review. Determinations shall be based on site-specific conditions and the desired conditions for vegetation, wildlife habitat, scenery, and other resources. (Forestwide) | | Changed to Forestwide. Added "following interdisciplinary review." |
| S-VEG-6: Openings will not be created larger than 40 acres, regardless of forest type. Openings larger than 40 acres may be created when one of the following is true:<br>• Proposals for larger openings have been approved by the regional forester, following a 60 day public review,<br>• Larger openings are the result of natural catastrophic conditions (including those resulting from fire, insect or disease attack, or windstorm), or<br>• When the area that is cut does not meet the definition of created openings. (General Forest Geographic Area) | | S-VEG-6: Openings larger than 40 acres may only be created under one of the following conditions:<br>• Proposals for larger openings have been approved by the regional forester, following a 60 day public review,<br>• Areas harvested as a result of natural catastrophic conditions (including those resulting from fire, insects, diseases, and windstorms, or<br>• When the area that is cut does not meet the definition of openings. (Forestwide) | | Slight re-wording. Changed to Forestwide. |
| S-VEG-7: The quantity of timber that may be sold per decade will be less than or equal to the sustained yield limit of 73,749 CCF per year or 737,490 CCF per decade with the following exceptions: salvage or sanitation harvesting of timber stands that are substantially damaged by fire, windthrow, or other catastrophe or that are in imminent danger from insect or disease attack. Salvage harvest of trees substantially damaged by fire, windthrow, or other catastrophe or in imminent danger from insect or disease attack may be harvested over and above the sustained yield limit, consistent with desired conditions for terrestrial and aquatic ecosystems. (General Forest) | | S-VEG-7: The quantity of timber that may be sold per decade will be less than or equal to the sustained yield limit of 737,490 CCF per decade with the following exceptions: salvage or sanitation harvesting of timber stands that are substantially damaged by fire, windthrow, or other catastrophe or that are in imminent danger from insect or disease attack. Salvage harvest of trees substantially damaged by fire, windthrow, or other catastrophe or in imminent danger from insect or disease attack may be harvested over and above the sustained yield limit, consistent with desired conditions for terrestrial and aquatic ecosystems. (Forestwide) | | Clarified that SYL is a decadal limit, and not an annual limit. Changed to Forestwide. |
| S-FP-1: When there is a shortage of any special forest products for tribal use, commercial permits are issued only to the extent that the tribal use can be accommodated. (Forestwide) | | S-VEG-8: When there is a shortage of any special forest products for tribal use, commercial permits are issued only to the extent that tribal use can be accommodated. (Forestwide) | | This standard was moved from the Forest Products section to the VEG section. |

| | | | | |
|---|---|---|---|---|
| G-VEG-1: Even-aged stands shall generally have reached or surpassed culmination of mean annual increment (achieving 95 percent of culmination of mean annual increment, as measured by cubic volume) prior to regeneration harvest, unless the following conditions have been identified during project development:<br>a) When such harvesting would modify fire behavior to protect identified resource, social or economic values<br>b) When harvesting of stands will trend landscapes toward desired conditions<br>c) When harvest uses uneven-aged silvicultural systems, thinning, or other intermediate stand treatments that do not regenerate even-aged or two-aged stands<br>d) When harvest is for sanitation or salvage of timber stands that have been substantially damaged by fire, wind-throw, or other catastrophe or that are in imminent danger from insect or disease attack<br>e) When harvest is on lands not suited for timber production and the type and frequency of harvest is due to the need to protect or restore multiple use values other than timber production. (General Forest Geographic Area) | | G-VEG-2: Even-aged stands shall generally have reached or surpassed culmination of mean annual increment (achieving 95 percent of culmination of mean annual increment, as measured by cubic volume) prior to regeneration harvest, unless the following conditions have been identified during project development:<br>• When such harvesting would modify fire behavior to protect identified resource, social, or economic values<br>• When harvesting of stands will trend landscapes toward desired conditions<br>• When harvest uses uneven-aged silvicultural systems, thinning, or other intermediate stand treatments that do not regenerate even-aged or two-aged stands<br>• When harvest is for sanitation or salvage of timber stands that have been substantially damaged by fire, windthrow, or other catastrophe, or that are in imminent danger from insect or disease attack<br>• When harvest is on lands not suited for timber production and the type and frequency of harvest is due to the need to protect or restore multiple use values other than timber production. (Forestwide) | | Changed to Forestwide. Edited to use bullet points. |
| G-VEG-2: Even-aged harvest openings should be irregularly shaped and blend with the natural terrain. (General Forest Geographic Area) | | G-VEG-3: To maintain scenic resources, even-aged harvest openings should be irregularly shaped and blend with the natural terrain to the extent practicable. (Forestwide) | | Purpose of guideline added. "to the extent practicable" added. Changed to Forestwide. |
| | | G-VEG-4: To maintain ecosystem conditions for continued persistence, permit the collection of species of conservation concern plants only for scientific, educational, or conservation purposes and only to the level that persistence of the species is maintained. (Forestwide) | | Guideline added. |
| | | G-VEG-5: Old forest, or late-successional stage forest, is often deferred from harvest to maintain biotic diversity across the landscape. To maintain old forest components across the landscape and move toward desired conditions (defined in Table 6) prioritize retention of old forest stands as follows:<br>• Older stands that have not been manipulated are more desirable than younger ones.<br>• Stands with limited use and access are better suited to maintain old forest conditions.<br>• Stands that provide habitat for threatened, endangered, or proposed species, species of conservation concern.<br>• Stands exhibiting a variety of attributes such as diverse canopy layers, decadence in live trees, standing or downed dead, or both, and patchiness. | | Guideline added - changed from a management approach. |
| | | SUIT-VEG-1: Lands are identified as suitable for timber production in management area direction contained in Chapter 3. Even though lands may be identified as suitable for timber production, those lands may not be feasible for harvest. Feasibility is determined at the site specific, project level. An estimated 499,936 acres of lands on the Forest have been determined as may be suitable for timber harvest. | | Suitability statement added. |
| MA-VEG-1: The scientifically defined silvicultural systems shown by forest cover type in Table 8, which meet the management objectives for the landscape or individual stands of trees within a landscape setting, are acceptable. Both even-aged and uneven-aged management systems can be used and applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are to be applied in a manner that will create conditions favorable for natural regeneration. Artificial regeneration will be considered when necessary to meet minimum stocking standards. The silvicultural systems identified in Table 8 can be used to convert uneven-aged stands to even-aged management and even-aged stands to uneven-aged management. (General Forest Geographic Area, Specially Designated Geographic Area) | | The scientifically defined silvicultural systems shown by forest cover type in Table 5 meet the management objectives for the landscape or individual stands of trees within a landscape setting. Both even-aged and uneven-aged management systems can be used and applied at scales ranging from a few acres to many hundreds of acres. These silvicultural systems are to be applied in a manner that will create conditions favorable for natural regeneration. Artificial regeneration will be considered when necessary to meet minimum stocking standards. The silvicultural systems identified in Table 5 can be used to convert uneven-aged stands to even-aged management and even-aged stands to uneven-aged management. | | Slight re-wording. |

| | | | | |
|---|---|---|---|---|
| MA-VEG-2: Maintain aspen on the landscape. When regenerating aspen, prioritize treatment within seral aspen clones using the following criteria:<br>• Identify stands with large standing and down dead basal area (about 20 percent dead) that are single-storied and showing signs of animal barking (gnawing and bark stripping) or disease. Multistoried stands that have several hundred sapling-size suckers per acre under them, or that show little sign of canker disease or animal barking, are lower priority for any management intervention.<br>• Identify conifer stands with a small minority of live aspen basal area (less than 20 percent live basal area). (Aspen is likely to disappear from these stands within several decades without intervention).<br>• Identify isolated clones and stands in heavy animal-use area and riparian area, and those at low elevations. Any stands in these situations that meet the criteria above should be given the highest priority for regeneration. (These stands will be at greatest risk of disappearing and will be the toughest to regenerate successfully. Protection of treatment areas from browsing animals may be needed to achieve successful regeneration.)<br>• Identify stands that are more cost efficient and not impacted by heavy animal use to treat and contribute positively to the distribution of aspen. (General Forest Geographic Area) | | Encourage and promote aspen on the landscape. When regenerating aspen, prioritize treatment within seral aspen clones using the following criteria:<br>• Identify stands with large standing and down dead basal area (about 20 percent dead) that are single-storied and showing signs of animal barking (gnawing and bark stripping) or disease. Multistoried stands that have several hundred sapling-size suckers per acre under them, or that show little sign of canker disease or animal barking, are lower priority for any management intervention.<br>• Identify conifer stands with a small minority of live aspen basal area (less than 20 percent live basal area). (Aspen is likely to disappear from these stands within several decades without intervention).<br>• Identify isolated clones and stands in areas frequented by animals and in riparian areas, and those at low elevations. Any stands in these situations that meet the criteria above should be given the highest priority for regeneration. (These stands will be at greatest risk of disappearing and will be the toughest to regenerate successfully. Protection of treatment areas from browsing animals may be needed to achieve successful regeneration.)<br>• Identify stands that are more cost efficient and not impacted by frequent animal use to treat and contribute positively to the distribution of aspen. | | "Maintain aspen on the landscape" changed to "encourage and promote aspen on the landscape." Slight re-wording of third and fourth bullet points. |
| MA-VEG-3: Base the size of the uncut forest areas between openings on project-level objectives for the landscape unit being analyzed. If objectives include creating a mix of vegetation types to benefit wildlife associated with early successional stages and edges, the uncut units can be small. If project-level objectives include provisions for late-successional dependent wildlife species, the uncut units could be large enough to function as an ecological system not overly influenced by edge. (General Forest Geographic Area, Specially Designated Geographic Area) | | The size of uncut forest areas between openings is based on project-level management objectives for the landscape being analyzed. | | MA simplified and slightly re-worded, with second and third sentences of draft MA deleted. |
| MA-VEG-4: Except for treatments designed to enhance, maintain, and restore meadows, avoid alteration of the edge of a natural opening, dependent on the surrounding forest type and assessed on site-specific conditions and habitat needs. (Forestwide) | | Treatments generally avoid alteration of the edge of natural openings. | | MA simplified and re-worded. |
| MA-VEG-5: To restore or maintain genetic diversity when thinning, use practices that consider genetic diversity and competition for water, nutrients, and light among the trees. The frequency of thinning should depend upon species, financial efficiency, and growing conditions of the site (as commonly measured by site index). (General Forest Geographic Area) | | When thinning, restore or maintain genetic diversity by using practices that consider genetic diversity and competition for water, nutrients, and light among the trees. The frequency of thinning is dependent on species, financial efficiency, and growing conditions of the site, commonly measured by site index. | | Slight re-wording. |
| MA-VEG-6: Determine if old forest is present (see Appendix A for criteria) during planning, and make assessments of quality and distribution. (Forestwide) | | Presence of old forest is determined during project-level planning based on criteria in Appendix A. The habitat is assessed for quality and distribution and retained as necessary for vegetative diversity. | | MA re-worded. Revised MA has additional language regarding old forest being "retained as necessary for vegetative diversity." |
| MA-VEG-7: Preserve or defer from harvest some old-forest/late-successional stands to maintain biotic diversity within the landscape/watershed. Assess size, distribution, abundance and the degree of habitat variation among old-forest stands. Consider the following in selecting old forest stands that to be retained:<br>• Older stands that have not been manipulated are more desirable than younger ones.<br>• Stands with limited use and access are better to maintain old-growth characteristics.<br>• Stands that are habitat for threatened, endangered, or proposed species, species of conservation concern, or Colorado Natural Heritage Program Species of Special Concern.<br>• Stands exhibiting a great variety of attributes, such as diverse canopy layers, decadence in live trees, standing and/or downed dead, patchiness, etc. (Forestwide) | | | | MA re-worded and changed to a guideline - see G-VEG-5 |

| | | | | |
|---|---|---|---|---|
| MA-VEG-8: Openings created by management are no longer considered openings when the trees reach a height and density that meet management objectives. The default criteria are when the minimum stocking standards for the forest vegetation type are met and average height is 6 feet or greater with at least a 70-percent distribution for conifer species and 10 feet or greater with at least a 70-percent distribution for aspen. The criteria will be validated and may be modified in accordance with local conditions encountered during implementation. Criteria to consider in determining when an opening is no longer an opening include:<br>• Visual sensitivity of the area<br>• The character of the landscape<br>• The abundance, quality, and need for cover for big game; other vegetation that may be present (i.e., tall shrubs)<br>• Forest health<br>• The need for seed sources<br>• The need for interior forest area<br>• The production of wood fiber<br>• Watershed and riparian area protections. (General Forest Geographic Area) | | Management-created openings are no longer considered openings when the trees reach a height and density that meet management objectives. The default criteria are when the minimum stocking standards for the forest vegetation type on suitable lands are met and average height is 6 feet or greater with at least a 70 percent distribution for conifer species, and 10 feet or greater with at least a 70 percent distribution for aspen. The criteria is validated and may be modified in accordance with local conditions. | | MA re-worded and simplified. Bulleted criteria to consider were deleted. |
| MA-VEG-9: Forest vegetation management that results in, among other objectives, meeting needs or demands for forest product offerings (commercial, personal, or other use) is done in a manner that supports one or more of the following:<br>• Maintains or improves ecosystem function, resilience, and sustainability,<br>• Supports a sustainable level of economic activity in the local timber industry,<br>• Provides economic or social support to local communities,<br>• Ensures current and future needs for American Indian tribal use, including that associated with special forest products (e.g., teepee poles),<br>• Uses, to the fullest extent practicable, potential products including sawtimber, poles, topwood, or slash (e.g., limbs, foliage),<br>• Supports innovation in utilization, including conversion of cut-tree mass into biofuels, pellets, biochar, or other useful products,<br>• Efficiently balances or reduces costs of implementation of treatment activities, and<br>• Anticipates climate-related plant succession changes (such as favoring heat- or drought-resistant tree species as leave trees). (General Forest Geographic Area) | | Forest vegetation management that results in meeting the needs or demand for forest product offerings, for commercial, personal, or other use, is done in a manner that supports one or more of the following:<br>• Maintains or improves ecosystem function, resilience, and sustainability,<br>• Supports a sustainable level of economic activity in the local timber industry,<br>• Provides economic or social support to local communities,<br>• Ensures current and future needs for American Indian tribal use, including that associated with special forest products (e.g., teepee poles),<br>• Uses, to the fullest extent practicable, potential products including saw timber, poles, top wood, or slash,<br>• Supports innovation in utilization, including conversion of cut tree mass into biofuels, pellets, biochar, or other useful products,<br>• Efficiently balances or reduces costs of implementation of treatment activities, and<br>• Anticipates climate-related change in plant succession, such as favoring heat- or drought-resistant tree species as leave trees. | | Slight re-wording. "Among other objectives" deleted from first sentence. |
| MA-VEG-10: In areas suitable for timber production, dead or dying trees (due to fire, insects, disease) are salvaged to recover the economic value of the wood while providing for ecosystem function, including but not limited to retention of downed woody material, habitat, and snags as well as public safety. (General Forest Geographic Area) | | In areas suitable for timber production, dead or dying trees due to fire, insects, or disease are salvaged to recover the economic value of the wood while providing for ecosystem function. This will be the primary focus of the timber program for the first 3 years of the planning period. | | MA simplified, with references to downed woody material, habitat, snags, and public safety removed. Language added to clarified that salvaging dead or dying trees will be the primary focus of the timber program for the first 3 years of the planning period. |
| | | Special forest products include materials that are not traditional timber and fiber products, such as sawtimber or house logs. Special forest products are permitted (or contracted) for removal from public lands for commercial, personal, Native American tribal, educational, or scientific purposes. Plan components in this section cover a variety of special forest products, including but not limited to firewood, building rock, herb and vegetable products, medicinal and pharmaceutical products, wild edible mushrooms, wild berries and fruit, landscaping products, craft products, and floral and greenery products. | | MA added, although this language was in the draft plan in the introduction of the Forest Products section. |

| | | | | |
|---|---|---|---|---|
| MA-FP-1: When identifying and mapping for select populations of oshá, it is expected that private and rotating collection areas would be set aside for tribal use behind closed gates for privacy during ceremony. Areas would change through time. (Forestwide)<br><br>MA-ATI-2: When identifying and mapping for select populations of oshá, consider setting aside collection areas for tribal use that would rotate through time. (Forestwide) | | Continues to identify and map populations of Ligusticum porteri. Following mapping, consider setting aside collection areas for tribal use and rotate use of the areas over time. | | MA added to the VEG section. Draft plan had similar management approaches in the Forest Products and Areas of Tribal Importance sections.<br><br>See also management approach in cultural resources section of the final plan: *Populations of Ligusticum porteri will be mapped (see also Vegetation Management section). When identıfying and mapping Ligusticum porteri, consider setting aside collection areas for traditional use. Use of these areas should be rotated over time. Consultation will assist in identıfying other plants that are important to tribes.* |

# National Forest Management Act Of 1976

***Sec. 1. Title**
***Sec. 2. Findings**
***Sec. 3. Reports on Fiber Potential, Wood Utilization by Mills, Wood Wastes and Wood Product Recycling**
***Sec. 4. Reforestation**
***Sec. 5. Renewable Resource Program**
***Sec. 6. National Forest System Resource Planning**
***Sec. 7. National Participation**
***Sec. 8 Transportation System**
***Sec. 9. National Forest System**
***Sec. 10. Renewable Resources**
***Sec. 11, 13. Limitations on Timber Removal**
***Sec. 14. Public Participation and Advisory Boards**
***Sec. 15, 16. Regulations and Severability**
***Sec. 12. Conforming Amendments to the Forest and Rangeland Renewable Resources Planning Act of 1974**
***Sec. 13. Amendment to the Organic Act.**
***Sec. 14. Timber Sales on National Forest System Lands**
***Sec. 15. Validation of Timber Sales Contracts**
***Sec. 16. Payments to States for Schools and Roads**
***Sec. 17. Acquisition of National Forest System Lands**
***Sec. 18. Amendment to the Knutson-Vandenberg Act**
***Sec. 19. Amendment to the Act of June 12, 1960**
***Sec. 20. Plan for Control of Dutch Elm Disease**
***Sec. 21. Severability**

---

* Act of October 22, 1976 (P.O. 94-588, 90 Stat. 2949, as amended; 16 U.S.C.
* 472A, 476, 500, 513-516, 518, 521b, 528(note), 576B, 594-2(note), 1600(note), 1601(note), 1600-1602, 1604, 1606, 1608-1614)

**Title**

Sec. 1. This Act may be cited as the "National Forest Management Act of 1976". (16 U.S.C. 1600(note))

**Findings**

Sec. 2. The Forest and Rangeland Renewable Resources Planning Act of 1974 (88 Stat. 476; 16 U.S.C. 1601-1610) is amended by redesignating sections 2 through 11 as sections 3 through 12, respectively; and by adding a new section 2 as follows:

Sec. 2. Findings.-The Congress finds that-

"(1) the management of the Nation's renewable resources is highly complex and the uses, demand for, and supply of the various resources are subject to change over time;

"(2) the public interest is served by the Forest Service, Department of Agriculture, in cooperation with other agencies, assessing the Nation's renewable resources, and developing and preparing a national renewable resource and program, which is periodically reviewed and updated;

"(3) to serve the national interest, the renewable resource program must be based on a comprehensive assessment of present and anticipated uses, demand for, and supply of renewable resources from the

Nation's public and private forests and rangelands, through analysis of environmental and economic impacts, coordination of multiple use and sustained yield opportunities as provided in the Multiple-Use, Sustained-Yield Act of 1960 (74 Stat. 215; 16 U.S.C. 528-531), and public participation in the development of the program;

"(4) the new knowledge derived from coordinated public and private research programs will promote a sound technical and ecological base for effective management, use, and protection of the Nation's renewable resources;

"(5) inasmuch as the majority of the Nation's forests and rangeland is under private, State, and local governmental management and the Nation's major capacity to produce goods and services is based on these nonfederally managed renewable resources, the Federal Government should be a catalyst to encourage and assist these owners in the efficient long-term use and improvement of these lands and their renewable resources consistent with the principles of sustained yield and multiple use;

"(6) the Forest Service, by virtue of its statutory authority for management of the National Forest System, research and cooperative programs, and its role as an agency in the Department of Agriculture, has both a responsibility and an opportunity to be a leader in assuring that the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity; and

"(7) recycled timber product materials are as much a part of our renewable forest resources as are the trees from which they originally came, and in order to extend our timber and timber fiber resources and reduce pressures for timber production from Federal lands, the Forest Service should expand its research in the use of recycled and waste timber product materials, develop techniques for the substitution of these secondary materials for primary materials, and promote and encourage the use of recycled timber product materials." (16 U.S.C. 1600)

**Reports On Fiber Potential, Wood Utilization By Mills, Wood Wastes And Wood Product Recycling**

Sec. 3. Section 3 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesigned by section 2 of this Act, is amended by adding at the end thereof a new subsection (c) as follows:

(c) The Secretary shall report in the 1979 and subsequent Assessments on:

"(1) the additional fiber potential in the National Forest System including, but not restricted to, forest mortality, growth, salvage potential, potential increased forest products sales, economic constraints, alternate markets, contract considerations, and other multiple use considerations;

"(2) the potential for increased utilization of forest and wood product wastes in the National Forest Systems and on other lands, and of urban wood wastes and wood product recycling, including recommendations to the Congress for actions which would lead to increased utilization of material now being wasted both in the forests and in manufactured products; and

"(3) the milling and other wood fiber product fabrication facilities and their location in the United States, noting the public and private forested areas that supply such facilities, assessing the degree of utilization into product form of harvested trees by such facilities, and setting forth the technology appropriate to the facilities to improve utilization either individually or in aggregate units of harvest trees and to reduce wasted wood fibers. The Secretary shall set forth a program to encourage the adoption by these facilities of these technologies for improving wood fiber utilization.

"(d) In developing the reports required under subsection (c) of this section, the Secretary shall provide opportunity for public involvement and consult with other interested governmental departments and agencies." (16 U.S.C. 1601)

**Reforestation**

Sec. 4. Section 3 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by adding at the end thereof of new subsections (d) and (e) as follows:

"(d)(1) It is the policy of the Congress that all forested lands in the National Forest System shall be maintained in appropriate forest cover with species of trees, degree of stocking, rate of growth, and conditions of stand designed to secure the maximum benefits of multiple use sustained yield management in accordance with land management plans. Accordingly, the Secretary is directed to identify and report to the Congress annually at the time of submission of the President's budget together with the annual report provided for under section 8 (c) of this Act, beginning with submission of the President's budget for fiscal year 1978, the amount and location by forests and States and by productivity class, where practicable, of all lands in the National Forest System where objectives of land management plans indicate the need to reforest areas that have been cut-over or otherwise denuded or deforested, and best potential rate of growth. All national forest lands treated from year to year shall be examined after the first and third growing seasons and certified by the Secretary in the report provided for under this subsection as to stocking rate, growth rate in relation to potential and other pertinent measures. Any lands not certified as satisfactory shall be returned to the backlog and scheduled for prompt treatment. The level and types of treatment shall be those which secure the most effective mix of multiple use benefits.

"(2) Notwithstanding the provisions of section 9 of this Act, the Secretary shall annually for eight years following the enactment of this subsection, transmit to the Congress in the manner provided in this subsection an estimate of the sums necessary to be appropriate, in addition to the funds available from other sources, to replant and otherwise treat an acreage equal to the acreage to be cut over that year, plus a sufficient portion of the backlog within the eight-year period. After such eight-year period, the Secretary shall transmit annually to the Congress an estimate of the sums necessary to replant and otherwise treat all lands being cut over and maintain planned timber production on all other forested lands in the National Forest System so as to prevent the development of a backlog of needed work larger than the needed work at the beginning of the fiscal year. The Secretary's estimate of sums necessary, in addition to the sums available under other authorities, for accomplishment of the reforestation and other treatment of National Forest System lands under this section shall be provided annually for inclusion in the President's budget and shall also be transmitted to the Speaker of the House and the President of the Senate together with the annual report provided for under section 8(c) of this Act at the time of submission of the President's budget to the Congress beginning with the budget for fiscal year 1978. The sums estimated as necessary for reforestation and other treatment shall include moneys needed to secure seed, grow seedlings, prepare sites, plant trees, thin, remove deleterious growth and underbrush, build fence to exclude livestock and adverse wildlife from regeneration areas and otherwise establish and improve growing forests to secure planned production of trees and other multiple values.

"(3) Effective for the fiscal year beginning October 1, 1977, and each fiscal year thereafter, there is hereby authorized to be appropriated for the purpose of reforesting and treating lands in the National Forest System $200,000,000 annually to meet requirements of this subsection (d). All sums appropriated for the purposes of this subsection shall be available until expended.

"(e) The Secretary shall submit an annual report to the Congress on the amounts, types, and uses of herbicides and pesticides used in the National Forest System, including the beneficial or adverse effects of such uses (16 U.S.C. 1601)

**Renewable Resource Program**

Sect. 5. Section 4 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by striking out the word "and" at the end of paragraph (3); striking out the word "satisfy" and inserting in lieu thereof "implement and monitor" in paragraph (4); striking out the period at the end of paragraph (4) and inserting in lieu thereof a semicolon and the word "and"; and by adding a new paragraph (5) as follows:

"(5) Program recommendations which-

"(A) evaluated objectives for the major Forest Service programs in order that multiple-use and sustained-yield can be determined;

"(B) explain the opportunities for owners of forests and rangeland to participate in programs to improve and enhance the condition of the land and the renewable resource products therefrom;

"(C) recognize the fundamental need to protect and where appropriate, improve the quality of soil, water, and air resources;

"(D) state national goals that recognize the interrelationships between and interdependence within the renewable resources; and

"(E) evaluate the impact of the export and import of raw logs upon domestic timber supplies and prices". (16 U.S.C. 1602)

**National Forest System Resource Planning**

Sec. 6. Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by adding at the end thereof new subsections (c) through (m) as follows: "(c) The Secretary shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest System as soon as practicable after enactment of this subsection and shall attempt to complete such incorporation for all such units by no later than September 30, 1985. The Secretary shall report to the Congress on the progress of such incorporation in the annual report required by section 8(c) of this Act. Until such time as a unit of the National Forest System is managed under plans developed in accordance with this Act, the management of such unit may continue under existing land and resource management plans.

"(d) The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

"(e) In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans-

"(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use, Sustained-Yield Act of 1960, and in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and timber, watershed, wildlife and fish, and wilderness; and

"(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1), the definition of the terms 'multiple use' and 'sustained yield' as provided in the Multiple-Use, Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

"(f) Plans developed in accordance with this section shall-

"(1) form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section;

"(2) be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan;

"(3) be prepared by an interdisciplinary team. Each team shall prepare its plan based on inventories of the applicable resources of the forest;

"(4) be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and

"(5) be revised (A) from time to time when the secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

"(g) As soon as practicable, but not later than two years after enactment of this subsection, the Secretary shall in accordance with the procedures set forth in section 553 of title 5, United States Code, promulgate regulations, under the principles of the Multiple-Use, Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to-

"(1) specifying procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act of 1969, including, but not limited to, direction on when and for what plans an environmental impact statement required under section 102(2) (c) of that Act shall be prepared;

"(2) specifying guidelines which-

"(A) require the identification of the suitability of lands for resource management

"(B) provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids; and

"(C) provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternate activities;

"(3) specifying guidelines for land management plans developed to achieve the goals of the Program which-

"(A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

"(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

"(C) insure research on and (based on continuous monitoring and assessment in the field evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

"(D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvests in accordance with the Multiple-Use, Sustained-Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning period if such practices cannot be successfully implemented or funds are not received to permit such practices to continue substantially as planned;

"(E) insure that timber will be harvested from National Forest System lands only where-

"(i) soil, slope, or other watershed conditions will not not be irreversibly damaged;

"(ii) there is assurance that such lands can be adequately restocked within five years after harvest;

"(iii) protection is provided for streams, stream-banks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat;

and

"(iv) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber; and

"(F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate and even-aged stand of timber will be used as a cutting method on National Forest System lands only where-

"(i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;

"(ii) the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area;

"(iii) cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain;

"(iv) there are established according to geographic areas, forest types, or other suitable classifications the maximum size limits for areas to be cut in one harvest operation, including provision to exceed the established limits after appropriate public notice and review by the responsible Forest Service officer one level above the Forest Service officer who normally would approve the harvest proposal: Provided, That such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm; and

"(v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

"(h)(1) In carrying out the purposes of subsection (g) of this section, the Secretary of Agriculture shall appoint a committee of scientists who are not officers or employees of the Forest Service. The committee shall provide scientific and technical advice and counsel on proposed guidelines and procedures to assure that an effective interdisciplinary approach is proposed and adopted. The committee shall terminate upon promulgation of the regulations. The views of the committees shall be included in the public information supplied when the regulations are proposed for adoption.

"(2) Clerical and technical assistance, as may be necessary to discharge the duties of the committee, shall be provided from the personnel of the Department of Agriculture.

"(3) While attending meetings of the committee, the members shall be entitled to receive compensation at a rate of $100 per diem, including travel time, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons in the Government service employed intermittently.

"(i) Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

"(j) Land management plans and revisions shall become effective thirty days after completion of public participation and publication of notification by the Secretary as required under section 6(d) of this Act.

"(k) In developing land management plans pursuant to this Act, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for salvage sales or sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years. Lands once identified as unsuitable for timber production shall continue to be treated for reforestation purposes, particularly with regard to the protection of other multiple-use values. The Secretary shall review his decision to classify these lands as not suited for timber production at least every 10 years and shall return these lands to timber production whenever he determines that conditions have changed so that they have become suitable for timber production.

"(l) The Secretary shall-

"(1) formulate and implement, as soon as practicable, a process for estimating long-term costs and benefits to support the program evaluation requirements of this Act. This process shall include requirements to provide information on a representative sample basis of estimated expenditures associated with the reforestation, timber stand improvement, and sale of timber from the National Forest System, and shall provide a comparison of these expenditures to the return to the Government resulting from the sale of timber; and

"(2) include a summary of data and findings resulting from these estimates as a part of the annual report required pursuant to section 8(c) of this Act, including an identification on a representative sample basis of those advertised timber sales made below the estimated expenditures for such timber as determined by the above cost process; and

the Secretary shall establish-

"(1) standards to insure that, prior to harvest, stands of trees throughout the National Forest System shall generally have reached the culmination of mean annual increment of growth (calculated on the basis of cubic measurement or other methods of calculation at the discretion of the Secretary): Provided, That these standards shall not preclude the use of sound silvicultural practices, such as thinning or other stand improvement measures: Provided further, That these standards shall not preclude the Secretary from salvage or sanitation harvesting of timber stands which are substantially damaged by fire, windthrow or other catastrophe, or which are in imminent danger from insect or disease attack; and

"(2) exceptions to these standards for the harvest of particular species of trees in management units after consideration has been given to the multiple uses of the forest including, but not limited to, recreation, wildlife habitat, and range and after completion of public participation processes utilizing the procedures of subsection (d) of this section." (16 U.S.C. 1604)

**National Participation**

Sec. 7. Section 8 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended-

* (a) by striking out "sixty" in the second sentence of subsection (a) and inserting in lieu thereof the word "ninety"; and by striking out "sixty-day period" in the third sentence of subsection (a) and inserting in lieu thereof of "ninety-day period"; and

* (b) by adding a new sentence at the end of subsection (c) as follows:

"With regard to the research component of the program, the report shall include, but not be limited to, a description of the status of major research programs, significant findings, and how these findings will be applied in National Forest System management." (16 U.S.C. 1606)

**Transportation System**

Sec. 8. Section 10 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by inserting "(a)" immediately before the words "The Congress" and inserting at the end thereof new subsections (b) and (c) as follows:

"(b) Unless the necessity for a permanent road is set forth in the forest development road system plan, any road construction on land of the National Forest System in connection with a timber contract or other permit or lease shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where vegetative cover has been disturbed by the construction of the road, within ten years after the termination of the contract, permit, or lease either through artificial or natural means. Such action shall be taken unless it is later determined that the road is needed for use as a part of the National Forest Transportation System."

"(c) Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources." (16 U.S.C. 1608)

**National Forest System**

Sec. 9. Section 11(a) of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by adding at the end thereof the following new sentence: "Notwithstanding the provisions of the Act of June 4, 1897 (30 Stat. 34; 16 U.S.C. 473), no land now or hereafter reserved or withdrawn from the public domain as national forests pursuant to the Act of March 3, 1891 (26 Stat. 1103; 16 U.S.C. 471), or any act supplementary to and amendatory thereof, shall be returned to the public domain except by an act of Congress." (16 U.S.C. 1609)

**Renewable Resources**

Sec. 10. Section 12 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as redesignated by section 2 of this Act, is amended by striking out the period at the end of that section and inserting in lieu thereof the following: "and on the date of enactment of any legislation amendatory or supplementary thereto." (16 U.S.C. 1610)

**Limitations On Timber Removal; Public Participation And Advisory Boards; Regulations; Severability**

Sec. 11. The Forest and Rangeland Renewable Resources Planning Act of 1974 is amended by adding at the end thereof new sections 13 through 16 as follows:

"Sec. 13. Limitations on Timber Removal.--(a) The Secretary of Agriculture shall limit the sale of timber from each national forest to a quantity equal to or less than a quantity which can be removed from such forest annually in perpetuity on a sustained-yield basis: Provided, That, in order to meet overall multiple-use objectives, the Secretary may establish an allowable sale quantity for any decade which departs from the projected long-term average sale quantity that would otherwise be established: Provided further, That any such planned departure must be consistent with the multiple-use management objectives of the land management plan. Plans for variations in the allowable sale quantity must be made with public participation as required by section 6(d) of this Act. In addition, within any decade, the Secretary may sell a quantity in excess of the annual allowable sale quantity established pursuant to this section in the case of any national forest so long as the average sale quantity of timber from such national forest over the decade covered by the plan do not exceed such quantity limitation. In those cases where a forest has less than two hundred thousand thousand acres of commercial forest land, the Secretary may use two or more forests for purposes of determining the sustained yield.

"(b) Nothing in subsection (a) of this section shall prohibit the Secretary from salvage or sanitation harvesting of timber stands which are substantially damaged by fire, windthrow, or other catastrophe, or which are in imminent danger from insect or disease attack. The Secretary may either substitute such timber

for timber that would otherwise be sold under the plan or, if not feasible, sell such timber over and above the plan volume. (16 U.S.C. 1611)

**Public Participation And Advisory Boards**

"Sec. 14. Public Participation and Advisory Boards.--(a) In exercising his authorities under this Act and other laws applicable to the Forest Service, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest SErvice programs.

"(b) In providing for public participation in the planning for and management of the National Forest System, the Secretary, pursuant to the Federal advisory Committee Act (86 Stat. 770) and other applicable law, shall establish and consult such advisory boards as he deems necessary to secure full information and advice on the execution of his responsibilities. The membership of such boards shall be representative of a cross section of groups interested in the planning for and management of the National Forest System and the various types of use and enjoyment of the lands thereof." (16 U.S.C. 1612)

"Sec. 15. Regulations.-The Secretary of Agriculture shall prescribe such regulations as he determines necessary and desirable to carry out the provisions of this Act. (16 U.S.C. 1613)

"Sec. 16. Severability.-If any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby." (16 U.S.C. 1614)

**Conforming Amendments To The Forest And Rangeland Renewable Resources Planning Act of 1974**

Sec. 12. The Forest and Rangeland Renewable Resources Planning Act of 1974 is amended as follows:

 (a) Section 6(a), as redesignated by section 2 of this Act, is amended by striking out "section 3" and inserting in lieu thereof "section 4".  (16 U.S.C. 1604)

(b) Section 8, as redesignated by section 2 of this Act, is amended-

(1) by striking out "section 2" and "section 3" in the first sentence of subsection (a) and inserting in lieu thereof "section 3" and "section 4", respectively;

(2) by striking out "section 3" in subsection (c) and inserting in lieu thereof "section 4"; and

(3) by striking out "section 3" in the first sentence of subsection (d) and inserting in lieu thereof "section 4". (16 U.S.C. 1606)

**Amendment To The Organic Act**

Sec. 13. The twelfth undesignated paragraph under the heading "SURVEYING THE PUBLIC LANDS" in the Act of June 4, 1897 (30 Stat. 35, as amended; 16 U.S.C. 476), is hereby repealed. (16 U.S.C. 476)

**Timber Sales On National Forest System Lands**

Sec. 14. (a) For the purpose of achieving the policies set forth in the Multiple-Use, Sustained-Yield Act of 1960 (74 Stat. 215; 16 U.S.C. 528-531) and the Forest and Rangeland Renewable Resources Planning Act of 1974 (88 Stat. 476; 16 U.S.C. 1601-1610), the Secretary of Agriculture, under such rules and regulations as he may prescribe, may sell, at not less than appraised value, trees, portions of trees, or forest products located on National Forest System lands.

(b) All advertised timber sales shall be designated on maps, and a prospectus shall be available to the public and interested potential bidders.

(c) The length and other terms of the contract shall be designed to promote orderly harvesting consistent with the principles set out in section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended. Unless there is a finding by the Secretary of Agriculture that better utilization of the various forest resources (consistent with the provisions of the Multiple-Use, Sustained-Yield Act of 1960) will result, sales contracts shall be for a period not to exceed ten years: Provided, That such period may be adjusted at the discretion of the Secretary to provide additional time due to time delays caused by an act of an agent of the United States or by other circumstances beyond the control of the purchaser. The Secretary shall require the purchaser to file as soon as practicable after execution of a contract for any advertised sale with a term of two years or more, a plan of operation, which shall be subject to concurrence by the Secretary. The Secretary shall not extend any contract period with an original term of two years or more unless he finds (A) that the purchaser has diligently performed in accordance with an approved plan of operation or (B) that the substantial overriding public interest justifies the extension.

(d) The Secretary of Agriculture shall advertise all sales unless he determines that extraordinary conditions exist, as defined by regulation, or that the appraised value of the sale is less than $10,000. If, upon proper offering, no satisfactory bid is received for a sale, or the bidder fails to complete the purchase, the sale may be offered and sold without further advertisement.

(e)(1) In the sale of trees, portions of trees, or forest products from National Forest System lands (hereinafter referred to in this subsection as "national forest materials"), the Secretary of Agriculture shall select the bidding method or methods which-

(A) insure open and fair competition;

(B) insure that the Federal Government receive not less than the appraised value as required by subsection (a) of this section;

(C) consider the economic stability of communities whose economies are dependent on such national forest materials, or achieve such other objectives as the Secretary deems necessary; and

(D) are consistent with the objectives of this Act and other Federal statutes.

The Secretary shall select or alter the bidding method or methods as he determines necessary to achieve the objectives stated in clauses (A), (B), (C) and (D) of this paragraph.

(2) In those instances when the Secretary selects oral auction as the bidding method for the sale of any national forest materials, he shall require that all prospective purchasers submit written sealed qualifying bids. Only prospective purchasers whose written sealed qualifying bids are equal to or in excess of the appraised value of such national forest materials may participate in the oral bidding process.

(3) The Secretary shall monitor bidding patterns involved in the sale of national forest materials. If the Secretary has a reasonable belief that collusive bidding practices may be occurring, then-

(A) he shall report any such instances of possible collusive bidding or suspected collusive bidding practices to the Attorney General of the United States with any and all supporting data;

(B) he may alter the bidding methods used within the affected area; and

(C) he shall take such other action as he deems necessary to eliminate such practices with the affected area.

(f) The Secretary of Agriculture, under such rules and regulations as he may prescribe, is authorized to dispose of, by sale or otherwise, trees, portions of trees, or other forest products related to research and demonstration projects.

(g) Designation, marking when necessary, and supervision of harvesting of trees, portions of trees, or forest products shall be conducted by persons employed by the Secretary of Agriculture. Such persons shall have no personal interest in the purchase or harvest of such products and shall not be directly or indirectly in the employment of the purchaser thereof.

(h) The Secretary of Agriculture shall develop utilization standards, methods of measurement, and harvesting practices for the removal of trees, portions of trees, or forest products to provide for the optimum practical use of the wood material. Such standards, methods, and practices shall reflect consideration of opportunities to promote more effective wood utilization, regional conditions, and species characteristics and shall be compatible with multiple use resource management objectives in the affected area. To accomplish the purpose of this subsection in situations involving salvage of insect-infested, dead, damaged, or down timber, and to remove associated trees for stand improvement, the Secretary is authorized to require the purchaser of such timber to make monetary deposits, as a part of the payment for the timber, to be deposited in a designated fund from which sums are to be used, to cover the cost to the United States for design, engineering, and supervision of the construction of needed roads and the cost for Forest Service sale preparation and supervision of the harvesting of such timber. Deposits of money pursuant to this subsection are to be available until expended to cover the cost to the United States of accomplishing the purposes for which deposited:  Provided, That such deposits shall not be considered as moneys received from the national forests within the meaning of sections 500 and 501 of title 16, United States Code: And provided further, That sums found to be in excess of the cost of accomplishing the purposes for which deposited on any national forest shall be transferred to miscellaneous receipts in the Treasury of the United States.

(1) For sales of timber which include a provision for purchaser credit for construction of permanent roads with an estimated cost in excess of $20,000, the Secretary of Agriculture shall promulgate regulations requiring that the notice of sale afford timber purchasers qualifying as "small business concerns" under the Small Business Act, as amended, and the regulations issued thereunder, an estimate of the cost and right, when submitting a bid, to elect that the Secretary build the proposed road: Provided, That the provision of this subsection shall not apply to sales of timber on National Forest System lands in the State of Alaska.

If the purchaser makes such an election, the price subsequently paid for the timber shall include all of the estimated cost of the road. In the notice of sale, the Secretary of Agriculture shall set a date when such road shall be completed which shall be applicable to either construction by the purchaser or the Secretary, depending on the election. To accomplish requested work, the Secretary is authorized to use from any receipts from the sale of timber a sum equal to the estimate for timber purchaser credits, and such additional sums as may be appropriated for the construction of roads, such funds to be available until expended, to construct a road that meets the standards specified in the notice of sale. The provisions of this subsection shall become effective on October 1, 1976. (16 U.S.C. 472a)

**Validation Of Timber Sales Contracts**

Sec. 15. (a) Timber sales made pursuant to the Act of June 4, 1897 (30 Stat. 35, as amended; 16 U.S.C. 476), prior to the date of enactment of this section shall not be invalid if the timber was sold in accord with Forest Service silvicultural practices and sales procedures in effect at the time of the sale, subject to the provisions of subsection (b) of this section. (16 U.S.C. 476(note))

(b) The Secretary of Agriculture is directed, in developing five-year operating plans under the provisions of existing fifty-year timber sales contracts in Alaska, to revise such contracts to make them consistent with the guidelines and standards provided for in the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended, and to reflect such revisions in the contract price of timber. Any such action shall not be inconsistent with valid contract rights approved by the final judgment of a court of competent jurisdiction. (16 U.S.C. 1601(note))

**Payments To States For Schools And Roads**

Sec. 16. The sixth paragraph under the heading "FOREST SERVICE" in the Act of May 23, 1908, as amended, and section 13 of the Act of March 1, 1911, as amended (35 Stat. 260, 36 Stat. 963, as amended; 16 U.S.C. 500), are each amended by adding at the end thereof, respectively, the following new sentence:

"Beginning October 1, 1976, the term 'moneys received' shall include all collections under the Act of June 9, 1930, and all amounts earned or allowed any purchaser of national forest timber and other forest products within such State as purchaser credits, for the construction of roads on the National Forest Transportation System within such national forests or parts thereof in connection with any Forest Service timber sales contract. The Secretary of Agriculture shall, from time to time as he goes through his process of developing the budget revenue estimates, make available to the States his current projections of revenues and payments estimated to be made under the Act of May 23, 1908, as amended, or any other special Acts making payments in lieu of taxes, for their use for local budget planning purposes." (16 U.S.C. 500)

**Acquisition Of National Forest System Lands**

Sec. 17. (a) The Act of March 1, 1911 (36 Stat. 961), as amended (16 U.S.C. 480, 500, 513-517, 517a, 518, 519, 521, 552, 563), is amended as follows:

(1) Section 4, as amended, is repealed, and all function of the National Forest Reservation Commission are transferred to the Secretary of Agriculture. (16 U.S.C. 513)

(2) Section 5 is repealed. (16 U.S.C. 513)

(3) Section 6 is amended to read as follows: "The Secretary of Agriculture is hereby authorized and directed to examine, locate, and purchase such forested, cut-over, or denuded lands within the watersheds of navigable streams as in his judgment may be necessary to the regulation of the flow of navigable streams or the production of timber. No deed or other instrument of conveyance of lands referred to herein shall be accepted or approved by the Secretary of Agriculture under this Act until the legislature of the State in which the land lies shall have consented to the acquisition of such land by the United States for the purpose of preserving the navigability of navigable streams." (16 U.S.C. 515)

(4) Section 7, as amended, is amended to read as follows: "When the public interests will be benefited thereby, the Secretary of Agriculture is hereby authorized, in his discretion, to accept on behalf of the United States title to any lands within the exterior boundaries of national forests which, in his opinion, are chiefly valuable for the purposes of this Act, and in exchange therefore to convey by deed not to exceed an equal value of such national forest land in the same State, or he may authorize the grantor to cut and remove an equal value of timber within such national forest in the same State, the values in each case to be determined by him: Provided, That before any such exchange is effected notice of the contemplated exchange reciting the lands involved shall be published once each week for four successive weeks in some newspaper of general circulation in the county or counties in which may be situated the lands to be accepted, and in some like newspaper published in any county in which may be situated any lands or timber to be given in such exchange. Timber laws and regulations relating to such national forests, and under the direction and supervision and in accordance with the requirements of the Secretary of Agriculture shall, upon acceptance, become parts of the national forests within whose exterior boundaries they are located, and be subjected to all provisions of this Act." (16 U.S.C. 516)

(5) Section 9, as amended, is amended by striking out the following language in the first sentence: "the National Forest Reservation Commission and". (16 U.S.C. 518)

(6) Section 14, as amended, is repealed. (16 U.S.C. 514)

(b) For purposes of providing information that will aid the Congress in its oversight responsibilities and improve the accountability of expenditures for the acquisition of forest land, the Secretary of Agriculture may not hereafter enter into any land purchase or exchange relating to the National Forest System of $25,000 or more for the types of lands which have been heretofore approved by the National Forest Reservation Commission until after 30 days from the date upon which a detailed report of the facts concerning such proposed purchase or transfer is submitted to the Committee on Agriculture and Forestry of the Senate or such earlier time as may be approved by both such committees. Such report shall contain at least the following:

(1) guidelines utilized by the Secretary in determining that the land should be acquired;

(2) the location and size of the land;

(3) the purchase price of the land and the criteria used by the Secretary in determining such price; and

(4) the person from whom the land is being acquired. (16 U.S.C. 521b)

**Amendment To The Knutson-Vandenberg Act**

Sec. 18. Section 3 of the Act of June 9, 1930 (46 Stat. 527; 16 U.S.C. 576b), is amended-

(a) by striking out the word "or" immediately before "(3)" in the first sentence thereof; and

(b) by striking out in the first sentence thereof the colon preceding the proviso and all that follows down through "three years" and inserting in lieu thereof the following: ", or (4) protecting and improving the future productivity of the renewable resources of the forest land on such sale area, including sale area improvement operations, maintenance and construction, reforestation and wildlife habitat management". (16 U.S.C. 576b)

**Amendment To The Act Of June 12, 1960**

Sec. 19. The Act of June 12, 1960 (74 Stat. 215; 16 U.S.C. 528-531), is amended by adding at the end thereof the following new section:

"Sec. 5. This Act may be cited as the 'Multiple-Use Sustained-Yield Act of 1960'." (16 U.S.C. 528(note))

**Plan For Control Of Dutch Elm Disease**

Sec. 20. The Secretary of Agriculture, in consultation with officials of both the State and political subdivisions thereof, shall conduct a study of the incidence of Dutch elm disease and evaluate methods of controlling the spread of such disease. The Secretary shall prepare and submit to the President and both Houses of the Congress on or before March 1, 1977, a report which includes-

(1) the results of such study;

(2) plans for further research into the control of Dutch elm disease; and

(3) an action plan which includes a program of outreach and public information about the disease, and recommendations for controlling the spread of the disease (16 U.S.C. 594-2(note))

**Severability**

Sec. 21. If any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby. (16 U.S.C. 1600(note))



# FOREST SERVICE MANUAL
# ROCKY MOUNTAIN REGION (REGION 2)
# DENVER, CO

## FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT

## CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

**Supplement No.:** 2600-2011-1

**Effective Date:** **May 25, 2011**

**Duration:** This supplement is effective until superseded or removed.

**Approved:** MICHAEL J. HOLIFIELD
Acting Regional Forester, Resources

**Date Approved:** 06/10/2011

**Posting Instructions:** Supplements are numbered consecutively by Title and calendar year. Post by document; remove entire document and replace it with this supplement. Retain this transmittal as the first page(s) of this document. The last supplement to this title was 2600-2009-1 to FSM 2670.

| **New Document(s):** | 2670 | 23 Pages |
|---|---|---|
| **Superseded Document(s) by Issuance Number and Effective Date** | 2670 (Supplement 2600-2009-1, 06/09/2009) | 23 Pages |

**Digest:**
2672.11 Exhibit 01 – Updates the list of species designated by the Regional Forester. New additions to the list include one mammal, hoary bat (*Lasiurus cinereus*), and one plant, *Draba weberi* (Weber's draba). Species removed from the previous (2009) list are one bird, American three-toed woodpecker (*Picoides dorsalis*), and four plants, *Astragalus wetherelli, Botrychium furcatum, Cirsium perplexans,* and *Oenothera harringtonii.* One mammal, the grizzly bear (*Ursus arctos horribilis*), is removed due to its Court-ordered re-listing as a Threatened species. Two plants, *Ipomposis polyanthus* and *Phacelia sccpulina var. submutica* are removed because they are now proposed for listing under the Endangered Species Act.

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 2 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

## 2670.2 – OBJECTIVES

### 2670.22 - Sensitive Species

3. Develop and implement conservation strategies for sensitive species and their habitats, in coordination with other Forest Service units, managing agencies, and landowners.

4. Coordinate management objectives to conserve sensitive species with state and federal agencies, tribes and other cooperators as appropriate. Approaches may include collaboratively developing individual species or multi-species conservation strategies, formalizing interagency conservation agreements, and incorporating recommendations into management direction set forth in Land and Resource Management Plans.

## 2670.3 – POLICY

### 2670.32 - Sensitive Species

6. Integrate available scientific information, including Regional species evaluations, species and ecosystem assessments, and conservation strategies, into Forest Service planning and implementation.

7. Conduct appropriate inventories and monitoring of sensitive species to improve knowledge of distribution, status, and responses to management activities, coordinating efforts within the Region and with other agencies and partners where feasible.

8. Analyze and manage for sensitive species in groups and habitat complexes, when feasible, to realize efficiencies and ecological soundness of multi-species and ecosystem management approaches.

### 2670.45 – Forest Supervisors

7. In accordance with guidance in FSM 2672.42, designate journey level biologists and botanists who are qualified to review biological evaluations, specifying the type(s) of organisms (fish and aquatic invertebrates, wildlife, terrestrial invertebrates, and plants) for which the individual is qualified. Qualifications include: meeting the Office of Personnel Management Qualification Standards for General Schedule Positions for the appropriate job series (0482, 0486, 0430) at the GS-9 level or above; sufficient training in procedural and substantive requirements for biological evaluations, including knowledge of the Endangered Species Act and Forest Service policy in this FSM; and one year or more of experience in conducting biological evaluations that meet professional standards (FSM 2672.42 and 2672.43). Use expert level staffing to assess adequacy of training and experience (FSM 2604.21 paragraph 5). Provide a list of personnel qualified to review biological evaluations to the Regional Office annually or as updates are completed.

Rvsd Plan - 00001185

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 3 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

## 2670.5 - Definitions

Action. All activities or programs authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas (50 CFR 402.02). Both programmatic and project level proposals are considered to be actions subject to the Endangered Species Act.

Biological Assessment. Information prepared to comply with Section 7 of the Endangered Species Act for major construction activities to determine whether listed and proposed species and designated and proposed critical habitat may be present in the action area, and the evaluation of potential effects of the action on such species and habitat. A "major construction activity" is a major Federal action significantly affecting the quality of the human environment, that is, for which an Environmental Impact Statement is prepared (50 CFR 402.02). A Biological Assessment may be prepared for any project for which formal consultation is required.

Biological Evaluation. A documented Forest Service review of Forest Service actions in sufficient detail to: 1) comply with the requirements of the Endangered Species Act; 2) ensure that actions do not contribute to loss of viability of native or desired non-native plant or animal species, or cause a trend towards listing under the ESA; and 3) provide a standard by which to ensure that endangered, threatened, proposed, and sensitive species and critical habitats receive full consideration in Forest Service decision-making. A biological evaluation may be used to satisfy consultation requirements for a biological assessment (FSM 2672.4).

Conserve. The use of all methods and procedures necessary to bring an endangered species or threatened species to the point at which the protections pursuant to the ESA are no longer necessary, or to avoid causing a species to become threatened or endangered, or to maintain viable populations in the planning area.

Conservation Strategy. A document that establishes conservation objectives and identifies the management actions necessary to conserve a species, species group or ecosystem. The strategy can be incorporated into Forest Service plans through the NEPA process with appropriate line officer approval.

Conservation Agreement. A formal agreement with cooperating or regulatory agencies that identifies how a conservation strategy will be implemented.

Programmatic Consultation. A generic term encompassing several different types of ESA Section 7 consultations: 1) evaluation of strategic management plans that may establish objectives, standards, guidelines, or design criteria to which future actions must adhere; 2) evaluation of an overall Federal "program"; or 3) evaluation of a group of similar proposed actions, or different types of actions proposed within a specific geographic area. Three commonly used approaches for documenting programmatic consultations are tiered, appended, and batched Biological Opinions.

Rvsd Plan - 00001186

## 2671 – COOPERATION

### 2671.44 – Determination of Effects on Listed or Proposed Species

Seek to improve the efficiency and effectiveness of consultations and conferences under Section 7 of the Endangered Species Act and to enhance the conservation of imperiled species by using a streamlining process as appropriate. Streamlining is accomplished by emphasizing coordination and communication during informal consultation. Streamlining actions may include: development of criteria or screens to improve consistency in effects analysis and determinations; identification of design criteria intended to benefit particular species; standardizing the format used to present information and analysis; recommending alternative approaches, such as programmatic consultations, to handle consultation workloads; and establishing procedures to expedite dispute resolution.

## 2672 – PLANNING FOR MANAGEMENT AND RECOVERY

### 2672.11 - Identification of Sensitive Species

1. Species identified as Candidates by the U.S. Fish and Wildlife Service will automatically be placed on the sensitive species list in Region 2.

4. To be eligible for designation by the Regional Forester as sensitive, the species (or subspecies, variety or stock) must be recognized by taxonomic experts, and must be known or likely to occur on National Forest System lands within the Rocky Mountain Region. Sensitive species status applies throughout the range of the species on National Forest System lands within the Rocky Mountain Region. The Regional Forester's sensitive species list for the Rocky Mountain Region is shown in exhibit 01.

5. The evaluation criteria used to determine whether a species warrants sensitive status (FSM 2670.5) are shown in exhibit 02.

6. The list of sensitive species is reviewed and updated periodically. Forest Supervisors may recommend additions or deletions to the list based on the criteria in exhibit 02. Recommendations from other interested agencies, groups, and individuals with information pertinent to sensitive species are considered in the revision process. A species will be removed from the sensitive list when sensitive status is superseded by listing or proposed listing under the Endangered Species Act. A species that is removed from listing under the ESA because recovery criteria have been met is automatically added to the sensitive species list for a period of at least 5 years to ensure that its recovery is maintained and monitored.

7. For newly designated sensitive species, current or planned Forest Service actions that are well underway (or are completed) at the time an updated sensitive species list goes into effect are exempt from requirements to conduct a biological evaluation for that species. This exemption is intended to enable actions that have been planned using the previous sensitive

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.
2670
Page 5 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

species list to go forward. Exemption in these instances does not relieve the responsible official from compliance with other statutory and regulatory mandates, including: 1) National Environmental Policy Act requirements to evaluate significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9, FSH 1909.15 sec. 18), and 2) National Forest Management Act requirements specify guidelines when developing, maintaining and revising plans to provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives (16 USC 1600).

## 2672.4 – Biological Evaluations

## 2672.41 – Objectives of the Biological Evaluation

1. To ensure that Forest Service actions do not contribute to loss of viability of threatened, endangered, proposed, or sensitive plant and animal species, or contribute to a trend towards Federal listing under the Endangered Species Act of any species.

4. To incorporate concerns for sensitive species throughout the planning process, identifying opportunities for enhancement and reducing any potential negative impacts.

## 2672.42 – Standards for Biological Evaluations

1. A list of endangered, threatened, and proposed species and critical habitat known or likely to occur in the action area may be requested from the U.S. Fish and Wildlife Service (FWS), or a list may be submitted to FWS for concurrence.

2. Coordinate mapping of habitat with the FWS and other management agencies as appropriate.

3. An analysis of the direct, indirect, and cumulative effects of the actions under all alternatives considered through the NEPA process on federally listed, proposed, or sensitive species, or habitat required for recovery or to meet Forest Service objectives.

5. A determination of the effects or impacts on each species, and summary of the rationale for each determination.

a. For federally listed species, or species proposed for such listing, and for critical habitat or proposed critical habitat, use the determination statements specified in ESA Section 7 regulations (50 CFR 402) and in accordance with FSM 2671.43 through 2671.45).

b. For Region 2 sensitive species make a determination of:

(1) "No impact";

Rvsd Plan - 00001188

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 6 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

(2) "Beneficial impact";

(3) "May adversely impact individuals, but not likely to result in a loss of viability in the Planning Area, nor cause a trend toward federal listing"; or

(4) "Likely to result in a loss of viability in the Planning Area, or in a trend toward federal listing."

## 2672.43 – Procedure for Conducting Biological Evaluations

The intensity and detail of the biological evaluation may vary and should be commensurate with the risk associated with the action and the vulnerability of the species involved. Document the biological evaluation in accordance with the standards established in FSM 2672.42. When a recovery plan or conservation strategy exists for a species and is applicable to the actions being analyzed, evaluate and document consistency of the action with the recovery plan or conservation strategy.

Step 1. Prefield Review.

Follow current direction in FSM 2672.42 to identify all federally listed or proposed species. Review records and contact knowledgeable Forest Service employees and other experts for known occurrences, distribution maps, and habitat information. As appropriate, contact state and federal wildlife, fish, and plant management agencies, Natural Heritage Programs, research stations, universities, or other organizations about species occurrence and habitat requirements. Document all sensitive species and their habitats that are known or likely to be present in the analysis area, or that the proposed action potentially affects.

Briefly summarize the habitat needs and ecological requirements of the species. Identify seasonal patterns and recommend when field surveys can be conducted to evaluate species and/or habitat presence, if needed. Describe management direction applicable to habitat that may be affected, such as Forest Plan standards and guidelines. FSM 2672.43 Exhibit 01 outlines the procedure to use during the Prefield Review (Step 1) to determine whether Field Reconnaissance (Step 2) is needed to complete the biological evaluation.

Step 2. Field Reconnaissance.

The purpose of this step is to gain a more specific understanding of which habitats and species exist in the action area, and to gather information that will help to evaluate the significance of the area to the species. The need for and extent of field reconnaissance should be commensurate with the risk associated with the proposal, the degree of certainty desired, and the level of knowledge already at hand.

Identify and describe all habitats known to be important for the species in the analysis area. As needed, design and conduct field surveys to confirm species' presence and habitat suitability assess accuracy of remote sensing data, and collect any other data deemed necessary. Assess and

Rvsd Plan - 00001189

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.
2670
Page 7 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

refine knowledge of how habitats exist on the landscape and how species occupy and use their habitats.

Step 3. Analysis of Effects and Determination.

The purpose of this analysis for federally listed or proposed species is to determine whether the action may affect the species or critical habitat. The purpose of this analysis for sensitive species is to determine whether the action will contribute toward federal listing or loss of viability in the Planning Area. As part of the interdisciplinary process of designing alternatives under NEPA, develop design criteria to meet objectives for threatened, endangered, proposed, and sensitive species, and identify any necessary mitigation measures. The analysis must consider direct, indirect, and cumulative effects of the proposed action and any alternatives on the species and its habitat.

Factors that may be considered in the analysis of effects include: the proportion of the species' total population and range that is in the analysis area or is affected by the action; whether the habitat affected by the action is necessary for critical life functions (for example, feeding, breeding, nesting); timing, frequency and duration of human activity, especially as it relates to significant behavioral modification; any anticipated reductions in numbers or distribution of the species; and the potential of the species to recover from short-term impacts.

Based on the analysis, make a determination of the effects of each of the alternatives on federally listed or proposed species and critical habitat, and on Region 2 sensitive species. Use the appropriate language for each federally listed species, critical habitat, proposed species, proposed critical habitat (FSM 2671.43 through 2671.45), and sensitive species, and summarize the rationale for each.

Step 4. Documentation.

The purpose of this step is to check the documentation record that has been compiled. Documentation is essential to the biological evaluation process and is to be conducted as the biological evaluation proceeds, rather than after the fact.

Documentation may be referenced or included as part of the appropriate NEPA document, contained in the biological evaluation itself, or held in district or forest files. Ensure that all requirements and mitigation measures are included in the decision document and implementation plans or contracts.

Documentation should include contacts with agencies, especially the FWS, individuals, and organizations, (dates, names of people and organizations, summary of information), and sources of data used in developing the biological evaluation. The list of species considered must be documented. Indicate species, for which surveys were conducted, describe the survey methods used, provide maps showing which areas were surveyed, record the date(s) of survey(s) and the people who conducted the survey(s), and provide the results. Enter new data into appropriate corporate databases, and notify Natural Heritage Programs and other cooperating agencies as

Rvsd Plan - 00001190

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 8 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

appropriate. Use literature citations to support conclusions on effects, habitat relationships, species ecology, and recommendations for removing or avoiding adverse effects.

Rvsd Plan - 00001191

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 9 of 22

**FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS**

2672.11 – Exhibit 01
R2 Regional Forester's Sensitive Species

## ANIMALS

### MAMMALS

| | |
|---|---|
| *Conepatus leuconotus* | American hog-nosed skunk |
| *Corynorhinus townsendii* | Townsend's big-eared bat |
| *Cynomys gunnisoni* | Gunnison's prairie dog |
| *Cynomys leucurus* | white-tailed prairie dog |
| *Cynomys ludovicianus* | black-tailed prairie dog |
| *Euderma maculatum* | spotted bat |
| *Gulo gulo* | wolverine |
| *Lasiurus cinereus* | hoary bat |
| *Lontra canadensis* | river otter |
| *Martes americana* | American marten |
| *Microtus richardsoni* | water vole |
| *Myotis thysanodes* | fringed myotis |
| *Ovis canadensis canadensis* | Rocky Mountain bighorn sheep |
| *Ovis canadensis nelsoni* | desert bighorn sheep |
| *Sorex hoyi* | pygmy shrew |
| *Thomomys clusius* | Wyoming pocket gopher |
| *Vulpes macrotis* | kit fox |
| *Vulpes velox* | swift fox |
| *Zapus hudsonius luteus* | New Mexican meadow jumping mouse |
| *Zapus hudsonius preblei* (Wyoming SPR) | Preble's meadow jumping mouse |

### BIRDS

| | |
|---|---|
| *Accipiter gentilis* | northern goshawk |
| *Aegolius funereus* | boreal owl |
| *Aimophila cassinii* | Cassin's sparrow |
| *Ammodramus savannarum* | grasshopper sparrow |
| *Amphispiza belli* | sage sparrow |
| *Asio flammeus* | short-eared owl |
| *Athene cunicularia* | burrowing owl |
| *Botaurus lentiginosus* | American bittern |
| *Buteo regalis* | ferruginous hawk |
| *Calcarius mccownii* | McCown's longspur |
| *Calcarius ornatus* | chestnut-collared longspur |
| *Centrocercus minimus* | Gunnison sage-grouse |
| *Centrocercus urophasianus* | greater sage-grouse |
| *Charadrius montanus* | mountain plover |
| *Chlidonias niger* | black tern |

Rvsd Plan - 00001192

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.
2670
Page 10 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Circus cyaneus* | northern harrier |
| *Coccyzus americanus* | yellow-billed cuckoo |
| *Contopus cooperi* | olive-sided flycatcher |
| *Cygnus buccinator* | trumpeter swan |
| *Cypseloides niger* | black swift |
| *Falco peregrinus anatum* | American peregrine falcon |
| *Haliaeetus leucocephalus* | bald eagle |
| *Histrionicus histrionicus* | harlequin duck |
| *Lagopus leucura* | white-tailed ptarmigan |
| *Lanius ludovicianus* | loggerhead shrike |
| *Melanerpes lewis* | Lewis's woodpecker |
| *Numenius americanus* | long-billed curlew |
| *Otus flammeolus* | flammulated owl |
| *Picoides arcticus* | black-backed woodpecker |
| *Progne subis* | purple martin |
| *Spizella breweri* | Brewer's sparrow |
| *Tympanuchus cupido* | greater prairie-chicken |
| *Tympanuchus pallidicinctus* | lesser prairie-chicken |
| *Tympanuchus phasianellus columbianus* | Columbian sharp-tailed grouse |

**AMPHIBIANS**

| | |
|---|---|
| *Anaxyrus boreas boreas* | boreal toad |
| *Lithobates blairi* | plains leopard frog |
| *Lithobates luteiventris* | Columbia spotted frog pop. 4 (Bighorn Mountain spotted frog) |
| *Lithobates pipiens* | northern leopard frog |
| *Lithobates sylvatica* | wood frog |

**REPTILES**

| | |
|---|---|
| *Sistrurus catenatus edwardii* | desert massasauga rattlesnake |
| *Storeria occipitomaculata pahasapae* | Black Hills red-bellied snake |

**FISHES**

| | |
|---|---|
| *Catostomus discobolus* | bluehead sucker |
| *Catostomus latipinnis* | flannelmouth sucker |
| *Catostomus platyrhynchus* | mountain sucker |
| *Catostomus plebeius* | Rio Grande sucker |
| *Couesius plumbeus* | lake chub |

Rvsd Plan - 00001193

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 11 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 01—Continued

| | |
|---|---|
| *Gila pandora* | Rio Grande chub |
| *Gila robusta* | roundtail chub |
| *Hybognathus placitus* | plains minnow |
| *Macrhybopsis gelida* | sturgeon chub |
| *Margariscus margarita* | pearl dace |
| *Nocomis biguttatus* | hornyhead chub |
| *Oncorhynchus clarkii bouvieri* | Yellowstone cutthroat trout |
| *Oncorhynchus clarkii pleuriticus* | Colorado River cutthroat trout |
| *Oncorhynchus clarkii virginalis* | Rio Grande cutthroat trout |
| *Phoxinus eos* | northern redbelly dace |
| *Phoxinus erythrogaster* | southern redbelly dace |
| *Phoxinus neogaeus* | finescale dace |
| *Platygobio gracilis* | flathead chub |

**INSECTS**

| | |
|---|---|
| *Hesperia ottoe* | Ottoe skipper |
| *Ochrotrichia susanae* | Susan's purse-making caddisfly |
| *Somatochlora hudsonica* | Hudsonian emerald |
| *Speyeria idalia* | regal fritillary |
| *Speyeria nokomis nokomis* | Nokomis fritillary or Great Basin silverspot |

**MOLLUSCS**

| | |
|---|---|
| *Acroloxus coloradensis* | Rocky Mountain capshell |
| *Oreohelix pygmaea* | pygmy mountainsnail |
| *Oreohelix strigosa cooperi* | Cooper's Rocky Mountainsnail |

**PLANTS**

**NONVASCULAR PLANTS**

*Sphagnum angustifolium*
*Sphagnum balticum*

**FERNS & ALLIES**

*Botrychium ascendens*
*Botrychium campestre*
*Botrychium lineare*
*Botrychium paradoxum*
*Lycopodium complanatum*
*Selaginella selaginoides*

Rvsd Plan - 00001194

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 12 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 01—Continued

**MONOCOTS**

*Amerorchis rotundifolia*
*Calochortus flexuosus*
*Carex alopecoidea*
*Carex diandra*
*Carex livida*
*Cypripedium montanum*
*Cypripedium parviflorum*
*Eleocharis elliptica*
*Epipactis gigantea*
*Eriophorum altaicum* var. *neogaeum*
*Eriophorum chamissonis*
*Eriophorum gracile*
*Festuca hallii*
*Kobresia simpliciuscula*
*Liparis loeselii*
*Malaxis brachypoda*
*Platanthera orbiculata*
*Ptilagrostis porteri*
*Schoenoplectus hallii*
*Triteleia grandiflora*

**DICOTS**

*Aliciella sedifolia*
*Aquilegia chrysantha* var. *rydbergii*
*Aquilegia laramiensis*
*Armeria maritima* ssp. *sibirica*
*Asclepias uncialis*
*Astragalus barrii*
*Astragalus leptaleus*
*Astragalus missouriensis* var. *humistratus*
*Astragalus proximus*
*Astragalus ripleyi*
*Braya glabella*
*Chenopodium cycloides*
*Cuscuta plattensis*
*Descurainia torulosa*
*Draba exunguiculata*
*Draba grayana*
*Draba smithii*
*Draba weberi*

Rvsd Plan - 00001195

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 13 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 01—Continued

*Drosera anglica*
*Drosera rotundifolia*
*Eriogonum brandegeei*
*Eriogonum exilifolium*
*Eriogonum visheri*
*Gutierrezia elegans*
*Ipomopsis aggregata* ssp. *weberi*
*Lesquerella fremontii*
*Lesquerella pruinosa*
*Machaeranthera coloradoensis*
*Mimulus gemmiparus*
*Neoparrya lithophila*
*Oreoxis humilis*
*Parnassia kotzebuei*
*Penstemon absarokensis*
*Penstemon caryi*
*Penstemon degeneri*
*Penstemon harringtonii*
*Physaria didymocarpa* var. *lanata*
*Physaria pulvinata*
*Physaria scrotiformis*
*Potentilla rupincola*
*Primula egaliksensis*
*Pyrrocoma carthamoides* var. *subsquarrosa*
*Pyrrocoma clementis* var. *villosa*
*Pyrrocoma integrifolia*
*Ranunculus karelinii*
*Rubus arcticus* ssp. *acaulis*
*Salix arizonica*
*Salix barrattiana*
*Salix candida*
*Salix myrtillifolia*
*Salix serissima*
*Sanguinaria canadensis*
*Shoshonea pulvinata*
*Thalictrum heliophilum*
*Townsendia condensata* var. *anomala*
*Utricularia minor*
*Viburnum opulus* var. *americanum*
*Viola selkirkii*

Rvsd Plan - 00001196

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 14 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 02

R2 Sensitive Species Evaluation Criteria

Eight criteria (below) are considered in evaluating whether a species merits sensitive status. The combination of all eight factors, including uncertainty rankings, should be considered and synthesized in formulating the recommendation for sensitive status. Although information may not be complete for all 8 criteria, the available information must provide a compelling argument that population viability is of concern as evidenced by known or predicted downward trends. A species merits inclusion on the Regional list if it is at risk over a substantial part of its range.

**1. Geographic distribution within the Rocky Mountain Region.** All else being equal, species that are present in only a few locations within the Rocky Mountain Region have a higher risk of extirpation, than those that have a broad distribution. Generally, species with the widest breeding distributions are the least vulnerable to deleterious environmental changes and catastrophic events. Species with restricted distribution and limited interchange of individuals between subpopulations and subpopulations are more vulnerable to local events (for example disease, storms) that may cause extirpation. Similarly, species associated with geographically limited habitats may be more extinction prone. Finally, if the current distribution pattern differs significantly from historical distribution, this change should be considered in evaluating the influence of geographic distribution on species persistence.

**Rankings for geographic distribution within the Rocky Mountain Region:**

A = Scarce OR isolated. If a population or habitat meets any of the following conditions:

1. Habitat is very scarce throughout the Region, indicating strong potential for extirpations, and little likelihood of recolonization. Or,
2. Habitat or population connectivity is very limited due to factors such as environmental gradients, introduced species, disease, and habitat loss or degradation. Dispersal among patches is limited or not possible. Or,
3. Habitat is naturally distributed as isolated patches, with limited opportunity for dispersal among patches. Some local populations may be extirpated and rates of recolonization will likely be slow. Or, pictorially if populations or habitat look like any of the following:

= Occupied
= Unoccupied

Rvsd Plan - 00001197

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 15 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 02—Continued

B = Patchy OR gaps. If a population or habitat meets any of the following conditions:

1. Habitat exists primarily as patches, some of which are small or isolated to the degree that species interactions are limited by movements between patches. Local sub-populations in most of the species' range interact as a metapopulation[1] or patchy population, but some patches are so disjunct that sub-populations in those patches are essentially isolated from other populations. Or,
2. Habitat is broadly distributed across the planning area but gaps exist within this distribution. Disjunct patches of habitat are typically large enough and close enough together to other patches to permit dispersal among patches and to allow species to interact as a metapopulation. Or, pictorially if populations or habitat look like any of the following:

C = Contiguous. If a population or habitat meets the following conditions:

1. Habitat is broadly distributed across the Region with opportunity for continuous or nearly continuous occupation by species, little or no limitation on interaction among populations. Or, pictorially if populations or habitat look like either of the following:

D = Insufficient information to draw inferences about criterion

**2. Geographic distribution outside of the Rocky Mountain Region.** Species (or subspecies/ varieties) that occur only in the Rocky Mountain Region warrant a higher level of concern. A species (or subspecies/variety) that is mostly restricted to the Rocky Mountain Region with a limited distribution outside of the Rocky Mountain Region would have a moderate level of concern. The risk of extinction associated with activities in the Rocky Mountain Region can be moderated by the potential for recolonization from populations existing elsewhere, although low recruitment from outside populations would reduce effectiveness of the rescue effect. A species with wide distribution outside the Rocky Mountain Region would generally have a substantially reduced risk as a result of activities in the Rocky Mountain Region.

---

[1] Many spatially structured populations will not function as metapopulations. (The degree to which a particular species occurs as a metapopulation, or several, in the Region will be unknown for most taxa).

Rvsd Plan - 00001198

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 16 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 02—Continued

**Rankings for geographic distribution outside the Rocky Mountain Region:**

A = Only within the boundaries of the Rocky Mountain Region (meaning local or regional endemics)
B = Limited distribution outside the Rocky Mountain Region, or widely disjunct taxa for which the main distribution is at a significant distance from the Rocky Mountain Region
C = Wide distribution outside the Rocky Mountain Region
D = Insufficient information to draw inferences about criterion

**3. Capability of the species to disperse.** Dispersal of individuals from a population may be limited because a species has low vagility or because barriers to dispersal exist. All else being equal, species that do not disperse readily across large areas of unsuitable habitat are at greater risk of extinction, than species that disperse readily across a variety of habitats. Movements of aquatic species may be limited by barriers such as culverts, impoundments, or discontinuous stream networks. The ability of plant species to disperse can depend on seed dispersal agents and reproductive strategy. Species that are mobile and for which dispersal is not limited will be assigned a value of no concern. Species that are able to disperse only within suitable habitat will be assigned a moderate level of concern. Species for which dispersal is limited by behavioral patterns or physical capability will be assigned a high level of concern.

In evaluating this criterion, the importance of dispersal to the life history of the species will be considered. For instance, dispersal is a critical characteristic of the life history of species that occupy ephemeral habitats or that occur early in succession after disturbance. In contrast, dispersal plays a less significant role in the population dynamics of some species that occupy stable habitats (such as cave dwelling insects).

**Rankings for capability to disperse:**

A = Very limited dispersal ability (restricted dispersal capability coupled with ephemeral habitats)
B = Disperses only through suitable habitat (dispersal areas may or may not be corridors)
C = Readily disperses across landscapes with few habitat-related limitations
D = Insufficient information to draw inferences about criterion

**4. Abundance of the species in the Rocky Mountain Region.** Population density or abundance is a primary factor in determining whether a species will persist following habitat loss. All other things being equal, the lower the abundance or density, the greater the risk of extinction. Rankings will be based on categorical estimates of abundance relative to the expected abundance of that species in good habitat. This approach avoids problems associated with using population estimates or abundance estimates for widely diverse species. Base ranking on overall condition, but rationale should draw any contrasts between abundance on NFS lands vs. other ownerships.

Rvsd Plan - 00001199

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 17 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 02—Continued

**Rankings for abundance in the Rocky Mountain Region:**

A = Rare - current abundance (estimated number of individuals or populations) is low enough that stochastic and other factors lead to potential imperilment

B = Uncommon - current abundance (estimated number of individuals or populations) is large enough that demographic stochasticity is not likely to lead to rapid extinction, but, in combination with highly variable environmental factors, could pose a threat

C = Common – current abundance (estimated number of individuals or populations) is large enough that species persistence is not threatened by demographic stochasticity, in combination with environmental variation

D = Insufficient information to draw inferences about criterion

**5. Population trend in the Rocky Mountain Region.** Another primary factor indicating that viability may be at risk is a persistent downward trend in population size. Consistently declining populations are an indication of concern even if current population size is large. All species can be expected to have smaller population numbers at times. In fact, variability is the rule in populations and therefore, short-term declines should be interpreted cautiously. Alternatively, what could appear to be a downward trend may be part of a cyclic population and would not be considered a consistent downward trend. An example may be snowshoe hares, which have population highs and lows over about a 10 - 15 year period. For this species, the pattern of population abundance may need to be considered over 3-4 cycles, before a population trend could be established. Results of local and national monitoring programs may be used to assign values for this criterion.

**Rankings for population trend in the Rocky Mountain Region:**

A = Significant downward or suspected downward population trend

B = Stable population

C = Upward population trend

D = Insufficient information to draw inferences about criterion

**6. Habitat trend in the Rocky Mountain Region.** Another primary factor indicating that viability may be at risk is a persistent downward trend in habitat quality or quantity. Trends in quantity and/or quality of the species' habitat can often be indicative of population trends, if actual species trend data are unavailable. Base ranking on overall condition, but rationale should draw any contrasts between abundance on NFS lands vs. other ownerships. Terrestrial, aquatic, wetland, and riparian ecosystem assessments may provide insights into habitat trends.

**Rankings for habitat trend in the Rocky Mountain Region:**

A = Decline in habitat quality or quantity

B = Stable amounts of suitable or potential habitat, relatively unchanged habitat quality

C = Improving habitat quality or increasing amounts of suitable or potential habitat

D = Insufficient information to draw inferences about criterion

Rvsd Plan - 00001200

2672.11 – Exhibit 02—Continued

**7. Vulnerability of habitats in the Rocky Mountain Region.** Anthropogenic modifications of habitat in the Rocky Mountain Region include urban and rural development, vegetation management, mining, water diversions, and road construction. Ecosystem assessments may be useful in providing insights into natural patterns and dynamics of ecosystems, the processes that influence current habitat conditions, and the degree to which management actions mimic natural disturbances and fall within the historical range of variation. This criterion will evaluate recent and potential effects of habitat modification on wildlife and plant species. Base ranking on overall extent of habitat modifications and resiliency to modification.

**Rankings for vulnerability of habitats in the Rocky Mountain Region:**
A = Substantial modification of habitat has occurred or is anticipated with conditions departing from HRV, and/or habitat is impacted by modern stressors such as herbicides, nonnative invasive species, water diversions and dams, and so forth
B = Habitat modification is likely to fall within the range of historical conditions, but is being impacted by modern stressors
C = Habitat resilient, changes are within HRV, and modern stressors not significant
D = Insufficient information to draw inferences about criterion

**8. Life history and demographic characteristics of the species.** Life history factors such as reproductive rate, relationship with disease organisms, interaction with mutualists or symbionts, food web dynamics, relationship with predators, or relationship with competitors, can affect population size and ability to rebound from stochastic or anthropogenic population reductions. For vertebrates, examples of characteristics that viability risk include: number of reproductive cycles/year, average number of young produced/breeding cycle, minimum age of first reproduction, age specific survival rates, and social organization. Life history characteristics that affect viability in plants include lifespan and variation in life span of individuals (for example annual vs. perennial), seed dispersal strategy, variation in germination rates, relationship with pollination agents, and susceptibility to herbivory. Annual variation in vital rates can also be important.

Species with strong mutualistic relationships, with low reproductive rates and which are highly susceptible to negative effects of disease, predation or competition may have less ability to recover from population declines. Those species will be assigned a high level of concern. Species with higher reproductive rates have a greater ability to recover from losses caused by predation, disease, or competition. Viability risk is also higher for populations depressed by introduced diseases or competitors, or that are susceptible to genetic introgression or inbreeding.

**Rankings for life history and demographic characteristics:**
A = Low reproductive rate **and** high mortality (for example, susceptible to disease, predation, or competition); OR life history characteristics suggest populations may not recover rapidly from disturbance events or other demographic risk factors are of concern

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 19 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

2672.11 – Exhibit 02—Continued

B = Low reproductive rate **or** high mortality (for example, susceptible to disease, predation, or competition), but not both; OR life history characteristics suggest populations have an intermediate ability to recover from disturbance events and no other demographic risk factors are known

C = High reproductive rate **and** not especially susceptible to disease, predation, or competition; OR species has life history characteristics that suggest populations will have a high ability to recover from disturbance events and no other demographic risk factors are known

D = Insufficient information to draw inferences about criterion.

Rvsd Plan - 00001202

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 20 of 22

**FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS**

2672.43 - Exhibit 01

| Question | Answer | Outcome |
|---|---|---|
| Does the species have potential to occur in the area affected by the project, based on species range and habitat associations? | No ➔ | Site-specific inventory is not needed. Document rationale and sources of information. |
| ↓ Yes or Unsure | | |
| Has an adequate site-specific inventory of the area affected by the project already been conducted, using accepted (if available) protocols? | Yes ➔ | Additional inventory is not needed. Use existing inventory information to analyze effects. |
| ↓ No or Unsure | | |
| Is the project expected to have no effects or wholly beneficial effects regardless of the number or location of individuals in the area affected? | Yes ➔ | Assume species is present, then analyze and document expected effects. |
| ↓ No or Unsure | | |
| Would information on presence or relative abundance of the species improve design and/or application of mitigation to reduce adverse effects, or allow better assessment of effects? | No ➔ | Assume species is present, then analyze and document expected effects. |
| ↓ Yes or Unsure | | |
| Are inventory methods feasible and effective for providing information on presence/absence or number and location of individuals? | No ➔ | Assume species is present, and analyze expected effects. Document why inventory is not feasible. |
| ↓ Yes | | |
| Conduct site-specific inventory to inform analysis of effects. | | |

Rvsd Plan - 00001203

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 21 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

## 2676.1 – Grizzly Bear

In the Greater Yellowstone recovery zone, as a result of sustained and coordinated management across agencies and land ownerships, all grizzly bear recovery criteria have been met since 1998. The Final conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area was signed by the Regional Foresters in 2003.

## 2676.11 – Authority

4. Conservation Strategy for Grizzly Bear in the Greater Yellowstone Area. The Conservation Strategy identifies a Primary Conservation Area (PCA) where occupancy by grizzly bears is anticipated and acceptable, and provides guidance for coordinated management and monitoring within and outside the PCA upon de-listing of the grizzly bear. The Memorandum of Understanding Detailing Agency Agreement to Implement the Conservation Strategy, included as pages 12-13 of the Conservation Strategy, was signed by the affected Regional Foresters in 2003. The Conservation Strategy is available at: http://www.fs.fed.us/r1/wildlife/igbc/ConservationStrategy/replacement_cs.pdf.

## 2676.12 – Objectives

1. To maintain or enhance grizzly bear habitat conditions on National Forest System lands as compared to the 1998 baseline, in accordance with the goals established in the Conservation Strategy and the goals, standards and guidelines in National Forest Resource Management Plans.

## 2676.14 – Responsibility

## 2676.14a – Regional Forester

11. Ensure that the grizzly bear is added to the Regional Forester's list of sensitive species immediately upon de-listing under the Endangered Species Act.

## 2676.14b – Forest Supervisor

1. As assigned, the Forest Supervisor of the Shoshone NF shall serve as a member of the IGBC ecosystem management subcommittee. Upon de-listing, the Forest Supervisor shall serve as a member of the Yellowstone Grizzly Coordinating Committee, which has the responsibility for implementing the Conservation Strategy.

2. Work cooperatively with State wildlife agencies to meet population and habitat goals established in the Conservation Strategy.

3. Ensure interagency coordination at appropriate levels and maintain contact with interested publics.

Rvsd Plan - 00001204

R2 SUPPLEMENT 2600-2009-1
EFFECTIVE DATE: June 9, 2009
DURATION: This supplement is effective until superseded or removed.

2670
Page 22 of 22

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED AND SENSITIVE PLANTS AND ANIMALS

4. Work together with State agencies to explore options to address impacts from private land development on conservation of the grizzly bear on National Forest System lands, while recognizing that State and Federal agencies do not have authority over private lands.

## 2676.15 – Planning

## 2676.15a – Habitat Analysis

1. Complete a biological evaluation for all projects potentially affecting the grizzly bear, inside and outside the PCA, to determine if habitat standards in the Conservation Strategy will be met. Modify projects as necessary to meet the habitat standards in the Conservation Strategy.

2. Evaluate grizzly bear habitat connectivity within and between ecosystems through the NEPA process for new road construction or reconstruction.

## 2676.15f – Monitoring

5. Cooperate in interagency monitoring and evaluation of the effectiveness of the Conservation Strategy.

## 2676.16 – Management and Other Resources

Where habitat use by grizzly bears is likely, all contracts, special use permits, easements, annual operating plans and allotment management plans, and other authorizations shall include, as terms and conditions, feasible and effective measures to meet goals and objectives for grizzly bear conservation, including specifications for food storage and garbage disposal to comply with food storage orders. Full cooperation by permittees is a condition for receiving and holding permits.

## 2676.16d – Livestock Grazing

2. Where habitat use by grizzly bears is likely, allotment management plans or annual operating instructions must specify feasible measures for the timely removal, destruction, or treatment of livestock carcasses to provide for public safety or to prevent positive conditioning of grizzly bears to livestock carrion as food.

Rvsd Plan - 00001205

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**36 CFR Part 219**

**RIN 0596–AD02**

## National Forest System Land Management Planning

**AGENCY:** Forest Service, USDA.

**ACTION:** Final rule and record of decision.

**SUMMARY:** The U.S. Department of Agriculture is adopting a new National Forest System land management planning rule (planning rule). The new planning rule guides the development, amendment, and revision of land management plans for all units of the National Forest System (NFS), consisting of 155 national forests, 20 grasslands, and 1 prairie.

This planning rule sets forth process and content requirements to guide the development, amendment, and revision of land management plans to maintain and restore NFS land and water ecosystems while providing for ecosystem services and multiple uses. The planning rule is designed to ensure that plans provide for the sustainability of ecosystems and resources; meet the need for forest restoration and conservation, watershed protection, and species diversity and conservation; and assist the Agency in providing a sustainable flow of benefits, services, and uses of NFS lands that provide jobs and contribute to the economic and social sustainability of communities.

**DATES:** *Effective Date:* This rule is effective May 9, 2012.

**ADDRESSES:** For more information, including a copy of the final PEIS, refer to the World Wide Web/Internet at: *http://www.fs.usda.gov/planningrule*. More information may be obtained on written request from the Director, Ecosystem Management Coordination Staff, Forest Service, USDA Mail Stop 1104, 1400 Independence Avenue SW., Washington, DC 20250–1104.

**FOR FURTHER INFORMATION CONTACT:** Ecosystem Management Coordination staff's Assistant Director for Planning Ric Rine at (202) 205–1022 or Planning Specialist Regis Terney at (202) 205–0895.

**SUPPLEMENTARY INFORMATION:**

### Decision

This document records the decision that the U.S. Department of Agriculture (USDA) reached in determining the alternative that best meets the purpose and need for a new planning rule. The USDA based this decision on the analyses presented in the *Final Programmatic Environmental Impact Statement, National Forest System Land Management Planning* (USDA, Forest Service, 2011) (PEIS). The PEIS was prepared in accordance with the National Environmental Policy Act of 1969 (NEPA).

For the reasons set out in the discussion that follows, the Department hereby promulgates a regulation establishing a National Forest System land management planning rule as described in Modified Alternative A of the *National Forest System Land Management Planning Rule Final Programmatic Environmental Impact Statement* (USDA Forest Service, 2011) with clarifications, and the supporting record. The planning rule describes the process the Forest Service will use for development, amendment, and revision of national forest and grassland plans. It also sets out requirements for the structure of those plans and includes requirements for their content.

This planning rule replaces the final 2000 land management planning rule (2000 rule) as reinstated in the Code of Federal Regulations on December 18, 2009 (74 FR 67062).

### Outline

The following outline shows the contents of the preamble which states the basis and purpose of the rule, includes responses to comments received on the proposed rule, and serves as the record of decision for this rulemaking.

Introduction and Background
Purpose and Need for the New Rule
Public Involvement
Summary of Alternatives Considered by the Agency
The Environmentally Preferred Alternative
Decision and Rationale
Compliance with the Endangered Species Act of 1973, as Amended
Response to Comments
Regulatory Certifications
- Regulatory Planning and Review
- Agency Cost Impacts
- Efficiency and Cost-Effectiveness Impacts
- Distributional Impacts
- Proper Consideration of Small Entities
- Energy Effects
- Environmental Impacts
- Controlling Paperwork Burdens on the Public
- Federalism
- Consultation with Indian Tribal Governments
- Takings of Private Property
- Civil Justice Reform
- Unfunded Mandates
- Environmental Justice

### Introduction and Background

The mission of the Forest Service is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations. Responsible officials for each national forest, grassland, and prairie will follow the direction of the planning rule to develop, amend, or revise their land management plans.

The new planning rule provides a process for planning that is adaptive and science-based, engages the public, and is designed to be efficient, effective, and within the Agency's ability to implement. It meets the requirements under the National Forest Management Act (NFMA), the Multiple-Use Sustained-Yield Act (MUSYA), and the Endangered Species Act, as well as all other legal requirements. It was also developed to ensure that plans are consistent with and complement existing, related Agency policies that guide management of resources on the National Forest System (NFS), such as the Climate Change Scorecard, the Watershed Condition Framework, and the Sustainable Recreation Framework.

The planning rule framework includes three phases: Assessment, plan development/amendment/revision, and monitoring. The framework supports an integrated approach to the management of resources and uses, incorporates the landscape-scale context for management, and will help the Agency to adapt to changing conditions and improve management based on new information and monitoring. It is intended to provide the flexibility to respond to the various social, economic, and ecologic needs across a very diverse system, while including a consistent set of process and content requirements for NFS land management plans. The Department anticipates that the Agency will use the framework to keep plans current and respond to changing conditions and new information over time.

The planning rule requires the use of best available scientific information to inform planning and plan decisions. It also emphasizes providing meaningful opportunities for public participation early and throughout the planning process, increases the transparency of decision-making, and provides a platform for the Agency to work with the public and across boundaries with other land managers to identify and share information and inform planning.

The final planning rule reflects key themes expressed by members of the public, as well as experience gained through the Agency's 30-year history

with land management planning. It is intended to create a more efficient and effective planning process and provide an adaptive framework for planning.

This final planning rule requires that land management plans provide for ecological sustainability and contribute to social and economic sustainability, using public input and the best available scientific information to inform plan decisions. The rule contains a strong emphasis on protecting and enhancing water resources, restoring land and water ecosystems, and providing ecological conditions to support the diversity of plant and animal communities, while providing for ecosystem services and multiple uses.

The 1982 planning rule procedures have guided the development, amendment, and revision of all existing Forest Service land management plans. However, since 1982 much has changed in our understanding of land management planning. The body of science that informs land management planning in areas such as conservation biology and ecology has advanced considerably, along with our understanding of the values and benefits of NFS lands, and the challenges and stressors that may impact them.

Because planning under the procedures of the 1982 rule is often time consuming and cumbersome, it has been a challenge for responsible officials to keep plans current. Instead of amending plans as conditions on the ground change, responsible officials often wait and make changes all at once during the required revision process. The result can be a drawn-out, difficult, and costly revision process. Much of the planning under the 1982 rule procedures focused on writing plans that would mitigate negative environmental impacts. The protective measures in the 1982 rule were important, but the focus of land management has changed since then and the Agency needs plans that do more than mitigate harm. The Agency needs a planning process that leads to plans that contribute to ecological, social, and economic sustainability to protect resources on the unit and maintain the flow of goods and services from NFS lands on the unit over time.

The NFMA requires the Agency to develop a planning rule "under the principles of the Multiple-Use Sustained-Yield Act of 1960, that set[s] out the process for the development and revision of the land management plans, and the guidelines and standards" (16 U.S.C. 1604(g)). The Forest Service fulfills this requirement by codifying a planning rule at Title 36, Code of Federal Regulations, part 219 (36 CFR part 219), which sets requirements for land management planning and content of plans.

In 1979, the Department issued the first regulations to comply with this statutory requirement. The 1979 regulations were superseded by the 1982 planning rule, which has formed the basis for all existing Forest Service land management plans.

In 1989, the Agency initiated a comprehensive Critique of Land Management Planning, which identified a number of adjustments that were needed to the 1982 planning rule. The Critique found that the 1982 planning rule process was complex, costly, lengthy, and cumbersome for the public to provide input. The recommendations in the Critique and the Agency's own experiences with planning led to the Agency issuing an advance notice of proposed rulemaking for a new planning rule in 1991 and proposing a new, revised rule initially in 1995 and again in 1999.

The Department worked with a committee of scientists to develop a final rule, which was issued in 2000. The 2000 revision of the planning rule described a new agenda for NFS planning; made sustainability the foundation for NFS planning and management; required the consideration of the best available scientific information during the planning and implementation process; and set forth requirements for implementation, monitoring, evaluation, amendment, and revision of land management plans. However, a review in the spring of 2001 found that the 2000 rule was costly, complex, and procedurally burdensome. The results of the review led the Department to issue a new planning rule in 2005 and a revised version again in 2008; however, the U.S. District Court for Northern District of California invalidated each of those rules on procedural grounds (*Citizens for Better Forestry* v. *USDA,* 481 F. Supp.2d 1059 (N.D. Cal. 2007) (2005 rule); *Citizens for Better Forestry* v. *USDA,* 632 F. Supp.2d 968 (N.D. Cal. 2009) (2008 rule)).

This final rule replaces the 2000 rule. Because the 2000 rule was the last promulgated planning rule to take effect and not be set aside by a court, the 2000 rule is the rule currently in effect. While the 2000 planning rule replaced the 1982 rule in the Code of Federal Regulations, the transition section of the 2000 rule allowed units to use the 1982 planning rule procedures for plan amendments and revisions until a new planning rule was issued. After the 2008 rule was invalidated, on December 18, 2009, the Department reinstated the 2000 rule in the Code of Federal Regulations and made technical amendments to update transition provisions as an interim measure to be in effect until a new planning rule was issued (74 FR 67062).

The instability created by these past planning rule efforts has caused delays in planning and confused the public. At the same time, the vastly different context for management and improved understanding of science and sustainability that have evolved over the past three decades have created a need for an updated planning rule that will help the Agency respond to new challenges in meeting management objectives for NFS lands.

This final rule is intended to ensure that plans respond to the requirements of land management that the Agency faces today, including the need to provide sustainable benefits, services, and uses, including recreation; the need for forest restoration and conservation, watershed protection, and wildlife conservation; and the need for sound resource management under changing conditions. The new rule sets forth a process that is adaptive, science-based, collaborative, and within the Agency's capability to carry out on all NFS units. Finally, the new rule is designed to make planning more efficient and effective.

### Purpose and Need for the New Rule

The NFMA requires regulations consistent with the principles of the Multiple-Use Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans and the guidelines and standards the Act prescribes (16 U.S.C. 1604(g)). The Forest Service's experience, evolving scientific understanding of approaches to land management, changing social demands, and new challenges such as changing climate have made clear the need for a revised rule to more effectively fulfill NFMA's mandate.

On August 14, 2009, Agriculture Secretary Tom Vilsack outlined his vision for the future of our nation's forests, setting forth a direction for conservation, management, and restoration of NFS lands. Secretary Vilsack stated that: "It is time for a change in the way we view and manage America's forestlands with an eye towards the future. This will require a new approach that engages the American people and stakeholders in conserving and restoring both our National Forests and our privately-owned forests." The Secretary emphasized that the Forest Service planning process provides an important means for integrating forest restoration,

climate resilience, watershed protection, wildlife conservation, opportunities to contribute to vibrant local economies, and the collaboration necessary to manage our national forests. "Our best opportunity to accomplish this is in the developing of a new forest planning rule for our national forests."

The NFS currently consists of 127 land management plans, 68 of which are past due for revision. Most plans were developed between 1983 and 1993 and should have been revised between 1998 and 2008, based on NFMA direction to revise plans at least once every 15 years. The efforts to produce a new planning rule over the past decade have contributed to the delay in plan revisions. With clarity and stability in planning regulations, land management planning can regain momentum and units will be able to complete revisions more efficiently.

As explained in the Introduction and Background section of this document, the present planning rule is the 2000 planning rule. Under the transition provisions of that rule, the Agency can choose to use either the procedures of the 2000 rule or the planning procedures of the 1982 rule to develop, amend, or revise land management plans. Based on the concerns about implementing the 2000 rule procedures, the Forest Service has been relying upon the 2000 rule's transition provision to develop, amend, and revise land management plans under the 1982 procedures until a new planning rule is in place.

The Forest Service and the Department conclude that the procedures of neither the 2000 rule nor the 1982 rule meet the needs of the Agency today or fulfill the Secretary's vision. Moreover, the Department and the Forest Service have determined that the 2000 rule is beyond the Agency's capability to implement. Even though the Agency has had the option to use the procedures in the 2000 rule, no line officer has chosen to use the 2000 rule to revise or amend a land management plan because the 2000 rule is too costly, complex, and procedurally burdensome. At the same time, the 1982 rule procedures are not current with regard to science, knowledge of the environment, practices for planning and adaptive management, or social values, and are also too complex, costly, lengthy, and cumbersome.

The purpose of, and the need for, a new planning rule is to provide the direction for National Forests and Grasslands to develop, amend, and revise land management plans that will enable land managers to consistently and efficiently respond to social, economic, and ecological conditions.

The Secretary of Agriculture is vested with broad authority to make rules "to regulate occupancy and use and to preserve [the forests] from destruction" (16 U.S.C. 551). The MUSYA authorizes and directs that the national forests be managed under the principles of multiple use and to produce sustained yield of products and services. NFMA directs the Secretary to promulgate regulations for the development and revision of land management plans and prescribes a number of provisions that the regulations shall include, but not be limited to (16 U.S.C. 1600(g)). Based on the principles of the MUSYA, the requirements of NFMA, the Secretary's direction and nearly three decades of land management planning experience, the Department and the Forest Service find that a planning rule must address the following eight purposes and needs:

1. Emphasize restoration of natural resources to make our NFS lands more resilient to climate change, protect water resources, and improve forest health.

2. Contribute to ecological, social, and economic sustainability by ensuring that all plans will be responsive and can adapt to issues such as the challenges of climate change; the need for forest restoration and conservation, watershed protection, and species conservation; and the sustainable use of public lands to support vibrant communities.

3. Be consistent with NFMA and MUSYA.

4. Be consistent with Federal policy on the use of scientific information and the Agency's expertise and experience gained in over thirty years of land management planning.

5. Provide for a transparent, collaborative process that allows effective public participation.

6. Ensure planning takes place in the context of the larger landscape by taking an "all-lands approach."

7. Be within the Agency's capability to implement on all NFS units; be clear; provide an efficient framework for planning; and be able to be implemented within the financial capacity of the Agency.

8. Be effective by requiring a consistent approach to ensure that all plans address the issues outlined by the Secretary and yet allow for land management plans to be developed and implemented to address social, economic, and ecological needs across the diverse and highly variable systems of the National Forest System.

## Public Involvement

### *Public Involvement in the Development of the Proposed Rule and Draft Environmental Impact Statement (DEIS)*

The Department and the Agency engaged in an extensive public outreach and participation process unprecedented for the development of a planning rule. A Notice of Intent (NOI) to prepare a new planning rule and an accompanying draft environmental impact statement (DEIS) was published in the **Federal Register** on December 18, 2009 (74 FR 67165). The NOI solicited public comments on the proposal until February 16, 2010. The notice presented a series of substantive and procedural principles to guide development of a new planning rule. Under each principle, the notice posed several questions to stimulate thoughts and encourage responses. The Forest Service received over 26,000 comments in response to the notice.

The Agency held a science forum on March 29 and 30, 2010, in Washington, DC to ground development of a new planning rule in science and to foster a collaborative dialogue with the scientific community. Panels made up of 21 scientists drawn from academia, research organizations, non-government organizations, industry, and the Federal Government presented the latest science on topics relevant to the development of a new rule for developing land management plans. The format was designed to encourage scientists and practitioners to share the current state of knowledge in key areas and to encourage open dialogue with interested stakeholders.

The Forest Service convened a series of four national roundtables held in Washington, DC during the course of developing the proposed planning rule. The intent was to have a national-level dialogue around the concepts for development of the Forest Service proposed planning rule, to get public input prior to developing the proposed rule. The Forest Service also held 33 regional roundtables during April and May 2010 in the following States: Alaska, Arizona, California, Colorado, Georgia, Idaho, Illinois, Montana, Nevada, New Mexico, Oregon, South Dakota, Utah, and Wyoming.

Additionally, the Forest Service Webcast many of the national and regional roundtables, posted materials and summaries of the roundtables online, and hosted a blog to further encourage participation. In all, more than 3,000 members of the public participated in these opportunities to provide their input.

*Public Involvement in the Development of the Final Rule and Final Programmatic Environmental Impact Statement (PEIS)*

The Department and the Agency used the input provided by the public in response to the NOI and during the roundtables to inform the development of the proposed rule and DEIS. The proposed planning rule and draft programmatic environmental impact statement (PEIS) were published for comment on February 14, 2011 (76 FR 8480). The comment period ran for 90 days through May 16, 2011. The Department received nearly 300,000 comments during the comment period.

Early in the comment period, the Agency held a series of public meetings that provided opportunities for interested persons to ask questions about the proposed rule. The intent of the meetings was to explain the proposed rule and provide information to the public as they developed their comments on the proposed rule. Between March 10, 2011, and April 7, 2001, the Agency held 1 national and 28 regional forums, which reached 72 satellite locations across the country. The national meeting was held in Washington, DC. Regional and satellite meetings were held in the following States: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming.

*Tribal Involvement*

To ensure Tribes and Alaska Native Corporations were heard in a way that gave recognition to their special and unique relationship with the Federal Government, the Agency provided opportunities for participation and consultation throughout the process.

To get input early in the process, the Agency hosted two national Tribal roundtables conducted via conference call in May and August, 2010. Additionally, six Tribal roundtables were held in California, Arizona, and New Mexico. Tribes and Alaska Native Corporations also participated in many of the national and regional roundtables prior to development of the proposed rule.

On September 23, 2010, the Deputy Chief for the National Forest System sent a letter inviting 564 federally recognized Tribes and 29 Alaska Native Corporations to begin government-to-government consultation on the proposed planning rule. The Agency held 16 consultation meetings across the country with designated Tribal officials in November and December, 2010, prior to the publication of the proposed rule in February, 2011. Tribal consultation continued following the release of the proposed rule, with additional opportunities for Tribal consultation provided in 2011.

During the public comment period on the proposed rule the Forest Service held a Tribal teleconference to discuss with Tribes how their previous comments were addressed in the proposed rule. Sixteen Tribes participated in the discussion and had the opportunity to have their questions answered by members of the rule writing team, the Ecosystem Management Coordination Director, and the Associate Chief of the Forest Service. Additionally consultation with Tribes continued at the local level.

Summaries of public involvement may be viewed at *http://www.fs.usda.gov/planningrule.*

*Issues Identified in the Programmatic Environmental Impact Statement (PEIS)*

Based on public comments, an interdisciplinary team identified a list of issues to analyze:

- Ecosystem Restoration.
- Watershed Protection.
- Diversity of Plant and Animal Communities.
- Climate Change.
- Multiple Uses.
- Efficiency and Effectiveness.
- Transparency and Collaboration.
- Coordination and Cooperation beyond NFS Boundaries.

The PEIS analyzes six fully developed alternatives (A, Modified A, and B through E), and considered nine additional alternatives that were eliminated from detailed study (40 CFR 1502.14(a)). The six fully developed alternatives, with the exception of Alternative B (No Action), meet all aspects of the purpose and need to varying degrees and are described below. The additional alternatives (Alternatives F through N) were considered but eliminated from detailed study because they did not meet some of the aspects of the purpose and need. Chapter 2 of the PEIS provides a more complete discussion of the disposition of these alternatives.

**Summary of Alternatives Considered by the Agency**

The following summaries describe each alternative. A comparison of the alternatives is available in Chapter 2 of the PEIS.

*Alternative A (Proposed Action and Proposed Planning Rule)*

Alternative A uses an adaptive framework. The framework consists of a three-part learning and planning framework to assess conditions and stressors; develop, amend, or revise land management plans based on the need for change; and monitor to test assumptions, detect changes, and evaluate whether progress is being made toward desired outcomes.

Alternative A would make the supervisor of the national forest, grassland, prairie, or other comparable administrative unit the responsible official for approving new plans, plan amendments, and plan revisions.

This alternative would require the responsible official to take science into account in the planning process and would require documentation as to how science was considered.

This alternative would require the responsible official to provide opportunities for public participation throughout all stages of the planning process, and includes requirements for outreach, Tribal consultation, and coordination with other planning efforts. This alternative would require responsible officials to provide formal public notification at various points in the process and to post all notifications online. This alternative requires the responsible official to encourage participation by youth, low-income, and minority populations. Alternative A would explicitly require the responsible official to provide the opportunity to undertake consultation with federally recognized Indian Tribes and Alaska Native Corporations and require the responsible official to encourage participation by interested or affected federally recognized Indian Tribes and Alaska Native Corporations. As part of Tribal participation and consultation, the responsible official would invite Tribes to share native knowledge during the planning process. Alternative A would require that the responsible official coordinate planning with the equivalent and related planning efforts of other Federal agencies, State and local governments, and Indian Tribes.

Alternative A would require assessments to identify and evaluate information needed to understand and assess existing and potential future conditions on NFS lands in the context of the broader landscape. These assessments would include a review of relevant information from other governmental or non-governmental assessments, plans, reports, and studies.

Alternative A would require plans to include five plan components—desired conditions, objectives, standards, guidelines, and suitability of areas for resource management. Plans could also include goals as option plan components. Alternative A includes direction for other content required in the plan, including the monitoring program.

Alternative A would require plan components to provide for the maintenance or restoration of the structure, function, composition, and connectivity of healthy and resilient aquatic ecosystems and watersheds in the plan area. In addition, Alternative A would include plan components to guide the unit's contribution to social and economic sustainability.

Under Alternative A, plan components for ecological sustainability would be required to take into account air quality, landscape-scale integration of ecosystems, system drivers and stressors including climate change, and opportunities to restore fire adapted ecosystems. Plan components would also be designed to maintain, protect and restore various ecosystem elements including soil, water, and riparian areas.

Alternative A would require plan components for the conservation of all native aquatic and terrestrial species with the aim of providing the ecological conditions to contribute to the recovery of federally listed threatened and endangered species, conserve candidate species, and maintain viable populations of species of conservation concern. Alternative A would also require monitoring of select ecological and watershed conditions and focal species to assess progress towards meeting diversity and ecological sustainability requirements.

Alternative A would require that plans provide for multiple uses and ecosystem services, considering a full range of resources, uses, and benefits relevant to the unit, as well as stressors, and other important factors.

Alternative A would require plan components for sustainable recreation, considering opportunities and access for a range of uses. Recreational opportunities could include non-motorized, motorized, developed, and dispersed recreation on land, water, and air. In addition, plans should identify recreational settings and desired conditions for scenic landscape character.

Alternative A includes requirements for plan components for timber, consistent with the requirements of NFMA.

Alternative A provides an efficient process for amendments, required for any substantive change to plan components, and for administrative changes to make corrections or changes to parts of the plan other than the plan components.

Alternative A requires plan-level and broader-scale monitoring, to inform adaptive management.

Alternative A would require an environmental impact statement for new plans and plan revisions. Plan amendments would require either an environmental impact statement or an environmental assessment, or could be categorically excluded from documentation, based on the significance of effects pursuant to Agency NEPA procedures.

Alternative A would require that the decision document for the plan include the rationale for approval, an explanation of how the plan components meet the requirements for sustainability and diversity, best available scientific information documentation, and direction for project application.

Alternative A requires that projects and activities must be consistent with the plan components, and provides direction for determining consistency. It also requires that other resource plans that apply to the plan area be consistent with the plan components.

The responsible official initiating a plan revision or development of a new plan before Alternative A went into effect would have the option to complete the plan revision or development of the new plan under the prior rule or conform to the requirements of the final rule after providing notice to the public. All plan revisions or new plans initiated after the effective date of the final rule would have to conform to the new planning requirements.

Alternative A includes a severability provision, stating if parts of Alternative A are separately found invalid in litigation, individual provisions of the rule could be severed and the other parts of the rule could continue to be implemented.

Alternative A provides a pre-decisional administrative review (objection) process for proposed plans, plan amendments, and plan revisions. The objection process is based on the objection regulations for certain proposed hazardous fuel reduction projects, found at 36 CFR part 218, and is intended to foster continued collaboration in the administrative review process.

The complete text of Alternative A is provided in Appendix A of the PEIS.

*Reason for non-selection:* Alternative A meets the purpose and need and responds to the significant issues displayed in the PEIS in a manner very similar to Modified Alternative A. The Department received a large number of public comments on Alternative A including suggestions about how to change Alternative A, improve clarity, and better align the text of the alternative with the Department's intent as described in the preamble for the proposed rule. The Department developed Modified Alternative A after considering public comments. Modified Alternative A is described below. Alternative A was not selected because the Agency developed Modified Alternative A in response to public comment. For this reason, Alternative A was not selected as the final rule.

*Modified Alternative A (Final Rule)*

Modified Alternative A, with clarifications, was selected as the final rule, (see the Decision and Rationale section of this document).

Modified Alternative A includes the same concepts and underlying principles as Alternative A, and retains much of the same content. However, a number of changes to the rule text and organization have been made, based on public comment on the proposed rule (Alternative A) and the DEIS. The Forest Service considered the available option of replacing the text of Alternative A with the text of Modified Alternative A in the PEIS. However, because Modified Alternative A looks different than Alternative A, the Agency included it as a new alternative for transparency and for the ease of the reviewer in comparing the proposed rule with the final preferred alternative.

Modified Alternative A uses an adaptive framework for planning. The framework consists of a three-part learning and planning framework to assess information relevant to the plan area, develop, amend, or revise land management plans based on the need for change, and monitor to test assumptions, detect changes, and evaluate whether progress is being made toward desired outcomes.

Modified Alternative A would make the supervisor of the national forest, grassland, prairie, or other comparable administrative unit the responsible official for approving new plans, plan amendments, and plan revisions. The Chief would be required to establish a national oversight process for consistency and accountability.

Modified Alternative A would require the responsible official to use the best available scientific information to inform the planning process, plan components, and other plan content including the monitoring program, and

includes requirements for documentation of how the best available scientific information was used to inform the plan decision.

Modified Alternative A would require the responsible official to provide opportunities for public participation throughout all stages of the planning process, and includes requirements for outreach, Tribal consultation, and coordination with other planning efforts. Modified Alternative A requires the responsible official to encourage participation by youth, low-income, and minority populations. Modified Alternative A would explicitly require the responsible official to provide the opportunity to undertake consultation with federally recognized Indian Tribes and Alaska Native Corporations and require the responsible official to encourage participation by interested or affected federally recognized Indian Tribes and Alaska Native Corporations. As part of Tribal participation and consultation, the responsible official would invite Tribes to share native knowledge during the planning process. Modified Alternative A would require that the responsible official coordinate planning with the equivalent and related planning efforts of other Federal agencies, State and local governments, and Indian Tribes.

Modified Alternative A would require assessments to rapidly identify and evaluate existing information relevant to the plan area to understand and assess existing and potential future conditions on NFS lands in the context of the broader landscape, focused on a set of topics that relate to the requirements for plan components and other plan content. These assessments would include a review of relevant information from other governmental or non-governmental assessments, plans, reports, and studies.

Modified Alternative A would require plans to include five plan components—desired conditions, objectives, standards, guidelines, and suitability of areas for resource management. Plans could also include goals as option plan components. Modified Alternative A includes direction for other content required in the plan, including the monitoring program.

Modified Alternative A would require plan components to provide for the maintenance or restoration of the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area. In addition, Modified Alternative A would include plan components to guide the unit's contribution to social and economic sustainability.

Under Modified Alternative A, plan components for ecological integrity would be required to take into account the interdependence of ecosystems, impacts from and to the broader landscape, system drivers and stressors including climate change, and opportunities to restore fire adapted ecosystems and for landscape scale restoration. Plan components would be also be required to maintain or restore air, soil and water resources, and to maintain or restore the ecological integrity of riparian areas.

Modified Alternative A would require that plans use a complementary ecosystem and species-specific approach to provide for the diversity of plant and animal communities and maintain the persistence of native species in the plan area. Ecosystem plan components would be required for ecosystem integrity and diversity, along with additional, species-specific plan components where necessary to provide the ecological conditions to contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain viable populations of species of conservation concern. Modified Alternative A would also require monitoring of select ecological and watershed conditions and focal species to assess progress towards meeting diversity and ecological sustainability requirements.

Modified Alternative A would require that plans provide for ecosystem services and multiple uses, considering a full range of resources, uses, and benefits relevant to the unit, as well as stressors and other important factors.

Modified Alternative A would require plan components for sustainable recreation, including recreation settings, opportunities, access; and scenic character. Recreational opportunities could include non-motorized, motorized, developed, and dispersed recreation on land, water, and air.

Modified Alternative A includes requirements for plan components for timber management, consistent with the requirements of NFMA.

Modified Alternative A provides an efficient process for amendments, required for any substantive change to plan components, and for administrative changes to make corrections or changes to parts of the plan other than the plan components.

Modified Alternative A requires plan-level and broader-scale monitoring to inform adaptive management.

Modified Alternative A would require an environmental impact statement for new plans and plan revisions. Plan amendments would require either an environmental impact statement or an environmental assessment, or could be categorically excluded from documentation, based on the significance of effects pursuant to Agency NEPA procedures.

Modified Alternative A would require that the decision document for the plan include the rationale for approval; an explanation of how the plan components meet the requirements for sustainability, diversity, multiple use and timber; best available scientific information documentation; and direction for project application.

Modified Alternative A requires that projects and activities must be consistent with the plan components, and provides direction for determining consistency. It also requires that other resource plans that apply to the plan area be consistent with the plan components.

Modified Alternative A would require responsible officials to provide formal public notification at various points in the process and to post all notifications online.

The responsible official initiating a plan revision or development of a new plan before Modified Alternative A went into effect would have the option to complete the plan revision or development of the new plan under the prior rule or conform to the requirements of the final rule after providing notice to the public. All plan revisions or new plans initiated after the effective date of the final rule would have to conform to the new planning requirements.

Modified Alternative A includes a severability provision, stating if parts of Alternative A are separately found invalid in litigation, individual provisions of the rule could be severed and the other parts of the rule could continue to be implemented.

Modified Alternative A provides a pre-decisional administrative review (objection) process for proposed plans, plan amendments, and plan revisions. The objection process is based on the objection regulations for certain proposed hazardous fuel reduction projects, found at 36 CFR part 218, and is intended to foster continued collaboration in the administrative review process.

As is clear from this summary, Modified Alternative A includes the same concepts and underlying principles as Alternative A, and retains much of the same content. However, a number of changes to the rule text and organization were made based on public comment on the proposed rule (Alternative A) and the DEIS.

Many people commented that the proposed rule lacked clarity and was ambiguous in places. Others felt that the intent stated in the preamble of the proposed rule was at times not reflected in the actual text of the proposed rule itself. They were concerned that this ambiguity would lead to inconsistent implementation of the rule and that the intent as expressed in the preamble would not be realized. Modified Alternative A rewords the text in a number of places to improve clarity and better reflect the Department's intent as stated in the preamble to the proposed rule.

There are also a number of changes to the process and content requirements of Alternative A, to address certain concerns raised by the public, reduce process, and make other modifications in response to public comments. A complete description of these changes is provided in the Response to Comments section of this document.

A detailed analysis was conducted to determine if there were any difference in programmatic effects between Alternative A and Modified Alternative A. Because Modified Alternative A was developed to reflect the intent of Alternative A, there were very few differences in programmatic effects between the two alternatives. The few differences in programmatic effects between Alternative A and Modified Alternative A were to plan content and the planning process (requirements for assessments, documentation, notification, plan components) or to the costs of implementation. Any differences in effects to resources cannot be determined at this programmatic level. However, the Department concludes the added clarity in Modified Alternative A will lead to more consistent implementation of the rule.

The full text of Modified Alternative A can be found in Appendix I of the PEIS and is set out as the final rule below. A detailed description of changes to Alternative A that led to Modified Alternative A can be found in the Response to Comments section of this document and in Appendix O of the PEIS. An analysis of the effects of Modified Alternative A has been included in Chapter 3 of the PEIS.

*Alternative B (No Action)*

The "No Action" alternative, as stated by the Council on Environmental Quality, "may be thought of in terms of continuing with the present course of action until that action is changed" (Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026, 18027 (March 23, 1981)). The "No Action" alternative is the 2000 planning rule, which, since the 2008 rule was set aside by court order, is the current rule (see 74 FR 67059 (December 18, 2009)). If the Department chooses to take no action, the 2000 rule would remain in effect. However, the "present course of action" under the 2000 rule is not to use the 2000 rule in its entirety but to use its transition provisions at 36 CFR 219.35, which allow use of the 1982 rule procedures to develop, amend, and revise land management plans until a new planning rule is in place. Since identifying a set of issues with the 2000 rule provisions, as explained in the PEIS at Chapter 1 and in the discussion section of Alternative F, the Forest Service has been relying upon the 2000 rule's transition wording at § 219.35 to use the 1982 rule procedures to develop, amend, and revise land management plans.

The 1982 rule, as amended, is in Appendix B of the PEIS. However, only the provisions of that rule applicable to the development, amendment, and revision of land management plans are available for use pursuant to 36 CFR 219.35 of the current (2000) rule. The 1982 rule procedures require integration of natural resource planning for national forests and grasslands, by including requirements for integrated management of timber, range, fish and wildlife, water, wilderness, and recreation resources, with resource protection activities such as fire management, and the use of other resources such as minerals.

An appeal process has been used throughout the life of the 1982 planning rule. Under § 219.35 of the current (2000) rule, responsible officials have the option of using either a post-decisional appeal process or a pre-decisional objection process for challenging plan approval decisions.

The 1982 rule procedures require regional foresters to be the responsible official for approval of new plans and plan revisions.

Alternative B would continue to require an environmental impact statement for new plans and plan revisions. Documentation for plan amendments would continue to be determined by the significance of effects pursuant to Agency NEPA procedures and could, therefore, range from categorical exclusions to environmental impact statements.

Rule text for this alternative is provided in Appendices B, C, and D of the PEIS, which contain planning provisions, transition provisions, and administrative review provisions respectively.

*Reason for non-selection:* Alternative B is the no action alternative. The 1982 rule procedures are not current with regard to science, knowledge of the environment, practices for planning and adaptive management, or social values, and are unduly complex, costly, lengthy, and cumbersome. For those reasons, the Agency has actively been trying to promulgate a new planning rule to replace the 1982 planning procedures for over a decade (see Introduction and Background section above).

Many plans recently revised under the 1982 planning procedures reflect elements of the purpose and need such as emphasizing restoration, addressing climate change, using a coarse-filter/fine-filter approach for maintaining species diversity, and using a collaborative approach to planning. However, the 1982 planning procedures do not require consideration of these and other important elements in planning that reflect current science, Agency expertise, and best practices in planning. This has resulted in inconsistent incorporation of the elements of the purpose and need in plans.

Alternative B reflects an approach to land management planning that focused on producing outputs (for example, board feet of timber, recreation visitor days, and animal months of grazing) and mitigating the effects of management activities on other resources. The Agency recognizes and supports the importance, value, and legal responsibility of providing for multiple use purposes. Timber, grazing, recreation, and other multiple uses supported on NFS lands provide jobs and income to local communities, and products used by all Americans. However, land management planning today focuses on managing toward desired conditions, or outcomes, rather than focusing simply on outputs.

Outcome-based planning shifts the focus from how to get something done to why it is done. In contemporary planning, outputs are services that are generated as projects and activities are carried out that lead to desired outcomes on the ground. Outcome based planning is well supported by the Agency's experience in land management planning. This approach to planning is also well supported by other land and urban planning agencies at all scales—from urban planning for small cities to international level planning efforts. It is also extensively used in the fields of education, health care, economics, and others. Outcome based planning can and does occur under

Alternative B. However, this approach is not required under this alternative.

Alternative B does not meet several elements of the purpose and need. Alternative B does not:

• Emphasize restoration of natural resources to make our NFS lands more resilient to climate change, protect water resources, and improve forest health.

• Ensure all plans will be responsive to issues such as the challenges of climate change; the need for forest restoration and conservation, and watershed protection.

• Be consistent with Federal policy on the use of scientific information and the Agency's expertise and experience gained in more than 30 years of land management planning.

• Ensure planning takes place in the context of the larger landscape by taking an "all-lands approach."

Alternative B has also proven costly to implement. The 1982 planning procedures require complex analysis processes, such as benchmark analysis, resulting in plan revisions that have, on average, taken 5 to 7 years to complete. In 1989, the Forest Service, with the assistance of the Conservation Foundation, conducted a comprehensive review of the planning process and published the results in a summary report, "Synthesis of the Critique of Land Management Planning" (*http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5127602.pdf*). The Critique found that the planning process of the 1982 rule was very complex, had significant costs, took too long, and was too cumbersome.

Finally, Alternative B includes planning procedures that do not reflect current science or result in unrealistic or unattainable expectations because of circumstances outside of the Agency's control, particularly for maintaining the diversity of plant and animal species. The 1982 rule at 36 CFR 219.19 requires that fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area. These requirements do not recognize that there are limitations on the Agency's authority and the inherent capability of the land. In addition, these requirements do not reflect the most current science. For example:

(1) At times, circumstances that are not within the *authority* of the Agency limit the Agency's ability to manage fish and wildlife habitat to insure the maintenance of a viable population of a species within the plan area, such as:

• Forest clearing in South America—South American forests provide important wintering areas for many Neotropical birds that nest in North America. The clearing of these forests for agricultural purposes poses a serious threat to the long-term viability of the Cerulean warbler and the ability of national forests in the southern Appalachian Mountains to maintain populations of this species.

• Hydropower facilities in the Pacific Northwest and off-shore fishing harvest practices—These facilities and practices are primary downstream threats to Chinook salmon populations whose spawning beds may occur on stream reaches within national forests in the Intermountain West, thus affecting the ability of national forests within this salmon's range to maintain viable populations of this species on their respective units.

• Land use patterns on private lands within and adjacent to NFS units, such as the continuing agricultural uses and urbanization that is occurring east of the Rocky Mountains—habitat fragmentation as a result of these changes reduces available habitat and further isolates existing swift fox populations. This affects the ability of national grasslands in eastern Colorado to maintain viable populations of this species.

(2) At times, it may be beyond the Agency's authority to manage habitat to insure the maintenance of a viable population of a species within the plan area, given that the Agency must comply with all applicable laws and regulations. An example would be when efforts to maintain the habitat conditions necessary for a viable population of one species would jeopardize an endangered or threatened species, in violation of the Agency's statutory obligations under the ESA. Another example would be when maintaining the habitat conditions necessary for a viable population of one species would consume the resources available to a unit to the point of precluding other activities from occurring on the unit that are necessary to comply with independent statutory or regulatory requirements.

(3) Examples of circumstances that are not consistent with the *inherent capability* of the plan area that limit the Agency's ability to manage fish and wildlife habitat to insure the maintenance of a viable population of a species within the plan area include:

• Where a species is inherently rare because its members occur at low numbers and are wide ranging individuals. For such a species the number of breeding individuals that may occur on an individual national forest may be too small to be considered a viable population. The wolverine of the northern Rocky Mountains is such a species.

• Plan areas that lack sufficient land area with the ecological capacity to produce enough habitat to maintain a viable population within the plan area. An example is the Kisatchie National Forest's inability to maintain a viable population of swallow-tailed kite on the Forest due to very limited amounts of land area ecologically capable of producing broad bottomland hardwood and cypress swamp habitats.

• Water quality conditions in Appalachian Mountain streams that provide habitat for eastern brook trout have been altered through acid deposition, due to past and current acid rain, rendering many of them unsuitable for brook trout and compromising the ability of some Appalachian national forests to maintain viable populations of this species.

(4) Sometimes a combination of a lack of authority and the inherent capability of the land limit the Agency's ability to manage fish and wildlife habitat to "*insure* [a vertebrate species'] continued existence is well distributed in the planning area," for example, a federally listed threatened or endangered species may face a combination of stressors such that a population may no longer be viable and whose recovery, in most cases, cannot be achieved within the boundaries of a single unit.

(5) An example of an approach included in the 1982 requirements that is no longer supported by the best available scientific information is the concept of management indicator species (MIS). The 1982 rule is largely reliant on the ability of selected MIS and their associated habitat conditions to adequately represent all other vertebrates in the plan area for assessing vertebrate species viability. Even though the process of assessing and selecting MIS has evolved, the ability of a species or species group, on its own, to adequately represent all associated species that rely on similar habitat conditions is now largely unsupported in the scientific literature.

For these reasons Alternative B was not selected as the final rule.

*Alternative C*

Alternative C was developed to meet the minimum requirements of NFMA, with additional provisions narrowly designed to meet the purpose and need for this rule-making effort.

Provisions to meet the purpose and need, but not otherwise required by NFMA, were included in this alternative to ensure that plans would be responsive to the challenges of climate change, the need for forest restoration, and to ensure the sustainable use of NFS lands to support vibrant communities. The full text of Alternative C is displayed in Appendix E of the PEIS. Specifically, the multiple uses provision in this alternative at § 219.10 requires plan components to include guidance to identify and consider climate change, forest restoration and conservation, and social and economic elements of sustainability to support vibrant rural communities. Provisions were also added to ensure that plans would be developed in a collaborative manner. The public participation provision in this alternative at § 219.4 requires the responsible official to use a collaborative and participatory approach to land management planning. The same provisions for pre-decisional objections found in Alternative A are also included in this alternative.

Unlike the other alternatives considered in detail, this alternative would not explicitly require preparation of an environmental impact statement for development of a new plan or for a plan revision. Instead, this alternative would rely on Agency NEPA implementing procedures at 36 CFR part 220 to determine the level of environmental analysis and documentation. Similar to other alternatives considered in detail, documentation for plan amendments would be determined by the significance of effects pursuant to Agency NEPA procedures and could, therefore, range from categorical exclusions to environmental impact statements.

*Reason for non-selection:* Alternative C imposes the fewest specific requirements for the planning process and plan content of all alternatives analyzed in detail. This alternative reflects the opposite end of the spectrum from Alternative E (the most prescriptive of the alternatives). Under Alternative C the process of plan development, amendment, and revision would be largely guided by the Forest Service Directives System. The result of having few requirements in a rule is greater uncertainty as to what the effects on plan content and the planning process would be and as a result, greater uncertainty as to potential effects to resources over time.

Under Alternative C, the Agency would expect a range of results: The range might vary from an expedited planning process producing very streamlined plans on some units to a planning process and plans that are similar to those plans that have been recently revised using the 1982 planning procedures on other units. There would be no certainty with regard to the inclusion of any plan components beyond the minimum required by this Alternative, and a potential lack of consistency across the National Forest System.

A similar approach of developing a streamlined planning rule and relying on the Forest Service directives for details of implementation was used for the 2008 planning rule. The uncertainty of this approach generated a great deal of distrust by many members of the public who felt the full intent of management direction related to planning should be reflected in the rule.

Alternative C does not expressly include an adaptive management framework. The Department concludes that the adaptive management framework of assessing, revising, amending, and monitoring provides a scientifically supported foundation for addressing uncertainty, understanding changes in conditions that are either the result of management actions or others factors, and keeping plans current and relevant.

This is the least costly of all of the alternatives and that is an important consideration. However, there are other alternatives that would reduce the current costs of planning, have broader based public support, and that, in the Department's view, provide for a more appropriate balance between prescriptive and non-prescriptive approaches to planning.

Even though Agency costs are lower under Alternative C compared to other alternatives, the Department is uncertain whether plans will be developed, amended, or revised to the high standards of excellence the Department expects. All units would comply with the requirements of this alternative. However, there is higher uncertainty associated with selecting an alternative with few requirements as the final rule. The level of uncertainty results in a higher risk that the level of compliance with such important elements as monitoring, public participation, species conservation, or watershed protection may not lead to plans that meet the Department's full objectives.

For these reasons, Alternative C was not selected as the final rule.

*Alternative D*

The full text of Alternative D is displayed in Appendix F of the PEIS. This alternative consists of Alternative A with additional and substitute direction focused on coordination requirements at § 219.4, assessment requirements at § 219.6, sustainability requirements at § 219.8, species requirements at § 219.9, monitoring requirements at § 219.12, and some additional and alternative definitions at § 219.19.

This alternative was designed to evaluate additional protections for watersheds and an alternative approach to addressing the diversity of plant and animal communities. These approaches were addressed together because they both involve requirements for substantive plan content for resource protection, as opposed to other issues that are concerned with procedural requirements.

Unlike Alternative A, this alternative requires establishment of riparian conservation areas and key watersheds, prescribes a 100-foot width for riparian conservation areas, and places the highest restoration priority on road removal in watersheds. Watershed assessments would be required to provide information for defining riparian conservation area boundaries and developing watershed monitoring programs. The alternative would require the identification of key watersheds to serve as anchor points for the protection, maintenance, and restoration of habitat for species dependent on aquatic habitat. It would also require plans to provide spatial connectivity among aquatic and upland habitats.

This alternative would take a somewhat different approach than Alternative A for maintaining viable populations within the plan area. It would require an assessment prior to plan development or revision that identifies: current and historic ecological conditions and trends, including the effects of global climate change; ecological conditions required to support viable populations of native species and desired non-native species within the planning area; and current expected future viability of focal species within the planning area. It would also require that the unit monitoring program establish critical values for ecological conditions and focal species that trigger reviews of planning and management decisions to achieve compliance with the provision for

maintaining viable populations within the plan area.

See Appendix F of the PEIS for Alternative D text in a side-by-side comparison with Alternative A.

*Reason for non-selection:* Alternative D meets the purpose and need in a manner similar to Alternative A. Alternative D includes additional requirements for watershed and species protection and collaboration that provide among the highest levels of watershed and species conservation of all alternatives. However, Alternative D has the second highest planning and monitoring costs of all alternatives, and there are several requirements of Alternative D that would be difficult to implement or not appropriate across all NFS units.

This alternative capitalizes on approaches for watershed management that have been demonstrated to be effective in some areas of the country—largely the Pacific Northwest. However, a single, prescriptive approach may not be effective for improving watershed conditions across the highly diverse watersheds of the NFS.

For example, it is unlikely that the requirements of this Alternative that all plans establish watershed networks that can serve as anchor points for the protection, maintenance, and restoration of broad-scale processes and recovery of broadly distributed species and to maintain spatial connectivity within or between watersheds would be an effective management strategy for improving watershed conditions on certain units, for example, where the percentage of NFS land ownership in a given watershed is very low. Such requirements also may not be the most effective means of maintaining or restoring watershed health on these or other units, and attempting to meet this requirement may preclude other more effective management options.

Alternative D includes a national standard for a minimum 100 foot default width for riparian conservation areas. Based on the analysis in the PEIS, a national standard setting a minimum default width applicable to all types of waterbodies and in all geomorphic settings is not consistent with the preponderance of scientific literature which largely argues for scalable widths, widths tailored to geomorphic settings or an adaptable approach matched to resource characteristics. The national standard does provide certainty or assurance that all riparian areas of 100 feet or less would be fully incorporated within the riparian conservation area, even where narrower widths would be more appropriate based on geomorphic features, conditions, or type of water bodies. However, to expand the default width beyond 100 feet will require a ''burden of proof'' during the planning process that some units may not be willing or able to accomplish, which could lead to the width being under inclusive for riparian areas in the plan area.

Alternative D requires standards to restore sediment regimes to within a natural range of variability. While an understanding of the natural range of variability in sediment regime could provide important context for sediment reduction activities, standards to restore sediment regimes to a natural range of variability might be impractical as they require information on historical flow regimes that might not be applicable to future conditions. Historical ranges of variation as standards or guidelines for restoration may be inappropriate in the face of changing hydrologic conditions brought about by climate change. The added requirements are likely not appropriate for all NFS units, will be data intensive, and might constrain or delay other management actions that could address known sediment problems.

This alternative requires that road removal or remediation in riparian conservation areas and key watersheds be considered a top restoration priority. Setting one primary national restoration priority for all units does not take into account the high variability of conditions and stressors across NFS lands. Also, it does not take into account changing conditions. While road remediation in riparian areas will likely be the highest priority in some places or at some times, it might not be for all units and across the entire life of a plan. For example, it might be more important to shift restoration focus to control a new occurrence of invasive species before it becomes pervasive in a watershed, or to reduce hazardous fuels to reduce the risk of negative effects to soil and water of uncharacteristic or extreme wildfire events.

Finally, Alternative D requires that, with limited exceptions, only management activities for restoration would be allowed in riparian areas. The Department understands the importance and supports the protection of healthy functioning riparian areas for water quality, water quantity, and aquatic and terrestrial habitat. The Department also understands the potential negative effects that management activities or uses such as dispersed or developed recreation, grazing, and water level management can have on riparian areas. However, the Department concludes that decisions regarding management activities in riparian areas are better made at the individual plan and project levels where the effects to the resources, to the users, and to communities can be better determined within the context of overall watershed restoration and the maintenance and restoration of the ecological integrity of riparian areas in the plan area.

None of the individual elements of Alternative D is inconsistent with the final planning rule and they could be incorporated at the plan level into plan direction where they are determined to be applicable and effective for those units. In fact, many current plans already incorporate elements of this alternative. However, requiring incorporation of all elements of Alternative D does not provide enough flexibility for effective and efficient resource management on all units of the NFS.

For these reasons Alternative D was not selected as the final rule.

*Alternative E*

The full text of Alternative E is displayed in Appendix G of the PEIS. This alternative consists of the proposed rule (Alternative A) with additional and substitute direction focused on prescriptive requirements for public notification at § 219.4, assessment requirements at § 219.6, and monitoring requirements at § 219.12.

This alternative prescribes an extensive list of monitoring and assessment questions and requires plan monitoring programs to identify signals for action for each question and its associated indicator.

This alternative specifies performance accountability for line officers' management of unit monitoring and adds responsibility for the Chief to conduct periodic evaluations of unit monitoring programs and the regional monitoring strategies.

Alternative E adds more prescriptive requirements for public participation in the planning process. To help connect people to the outdoors, this alternative also includes requirements for plans to provide for conservation education and volunteer programs.

See Appendix G of the PEIS for Alternative E text in a side-by-side comparison with Alternative A.

*Reason for non-selection:* Alternative E requires more evaluation of ecological conditions and possible scenarios during assessment for plan revisions and more monitoring of specific conditions and responses to restoration. The use of signal points could potentially make land managers more aware and responsive when monitoring results are outside of expected levels. However, the difficulty of establishing

statistically and temporally significant signal points related to restoration, especially where there is insufficient data and where conditions are changing, will increase the complexity of planning. The prescriptive nature of the monitoring requirements could increase the ability to aggregate and compare data between units or at higher scales but could also result in the costly collection of data that is not necessarily relevant to the management of particular individual units or ecological conditions.

Requirements to identify possible scenarios in assessments would have short-term cost increases with possible long-term gains in efficiency. Additional requirements regarding coordination in the assessment and monitoring process would increase initial costs, but consistent coordination might also result in more cost-effective long-term planning efforts to meet viability objectives. However, while additional requirements for standardized collaboration methods might work well for some units, other units might find that some required steps are not relevant to their local public involvement needs. Based on the analysis in the PEIS, collaboration strategies tailored to a unit's particular needs are often more effective than very prescriptive approaches to collaboration.

The PEIS points out potential benefits of more prescriptive requirements for assessment, monitoring, and collaboration. But, the PEIS also points out the drawbacks, particularly in trying to efficiently apply a ''one-size-fits-all'' approach to such things as monitoring or collaboration across highly diverse resources conditions and communities associated with NFS Units. This Alternative also has the highest implementation costs of all alternatives. The Department does not believe that the potential gains in effectiveness warrant the increased costs.

None of the individual elements of Alternative E are inconsistent with the final planning rule and any of them can be incorporated into plan direction where they are determined to be applicable and effective for those units. However, requiring incorporation of all elements of Alternative E does not provide enough flexibility for effective and efficient resource management on all units of the NFS. For these reasons Alternative E was not selected as the final rule.

**The Environmentally Preferred Alternative**

Under the Council on Environmental Quality's (CEQ) NEPA regulation, the Department is required to identify the environmentally preferred alternative (40 CFR 1505.2(b)). This is interpreted to mean the alternative that will promote the national environmental policy as expressed in NEPA's section 101 and that would cause the least damage to the biological and physical components of the environment. The environmentally preferred alternative best protects, preserves, and enhances historic, cultural, and natural resources (Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations (46 FR 18026, 18028 (March 23, 1981)).

The two alternatives that best meet these criteria are Alternative D (if it could be fully implemented) and Modified Alternative A. Alternative D provides the highest level of resource protection, particularly for water and riparian resources. Some requirements of this alternative would be difficult to implement across the entire NFS, add increased cost and complexity to the planning process for little benefit, and may not always represent the best approach for the resource. The additional funds spent on the planning process would not be available for other management activities including restoration and habitat improvement.

Modified Alternative A also provides high levels of resource protection and can be effectively implemented across all units. It does not preclude incorporation of elements of Alternative D into plans where they are most suited to meet resource conditions.

The approval of a planning rule to guide development, revision, and amendment of land management plans is a broad policy decision. Accordingly, impacts described in the PEIS reflect issues concerning effects over a broad geographic and time horizon. The depth and detail of impact analysis is necessarily broad and general because a planning rule is two steps removed from site-specific projects and activities. Quantitative, site-specific effects can only be predicted with any certainty when site-specific actions are proposed.

**Decision and Rationale**

*Decision*

Modified Alternative A, with clarifications, is selected as the final planning rule. A few clarifications were made to better represent the Department's intent, and do not substantively change Modified Alternative A. They include:

(1) Changes made to § 219.7(e)(1)(iv) and § 219.15(d)(3) to clarify that compliance with both standards and guidelines is mandatory, with standards requiring strict adherence to their terms, while guidelines allow for flexibility so long as the purpose for the guideline is achieved.

(2) Changes made to § 219.9(b)(1) to clarify that the responsible official must determine whether the plan components of paragraph (a) provide the necessary ecological conditions, or whether additional, species-specific plan components must be included in the plan.

(3) Changes made to the definition of designated areas in § 219.19 to clarify that the examples of designated areas included in Modified Alternative A were not intended to be exclusive.

(4) Changes throughout Subpart B to clarify that organizations, States and Tribes are among the entities that may object, pursuant to the other requirements in Subpart B.

This decision is based on the *Programmatic Environmental Impact Statement—National Forest System Land Management Planning,* USDA Forest Service, 2011, and its supporting record. This decision is not subject to Forest Service appeal regulations.

Nearly 300,000 comments were received on the DEIS and the proposed rule. The Agency also consulted with Indian Tribes, the US Fish and Wildlife Service and the National Marine Fisheries Service. The Department has reviewed and considered these comments, the results of the consultations, and worked with Agency managers in concluding that the proposed rule would be improved by clarifying the proposed wording and incorporating the changes reflected in Modified Alternative A into the final rule.

This decision does not authorize any projects or activities. The planning rule describes the process the Forest Service will use for development, amendment, and revision of land management plans for national forests and grasslands, and includes requirements for the structure and content of those plans. Any commitment of resources takes place only after (1) a land management plan is approved under the provisions of the final rule (including the completion of the appropriate NEPA process), and (2) the Forest Service proposes projects or activities, analyzes their effects in the appropriate NEPA process, determines consistency with the applicable land management plan, and authorizes the final projects or activities.

Sometimes projects or activities may be authorized at the same time and in the same decision document when approving a plan, plan amendment, or plan revision. One example might be opening or closing trails to the use of

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 383 of 422

off-highway vehicles. In these cases, the part of the decision associated with the project or activity would represent a commitment of resources.

*Rationale for the Decision*

The following paragraphs outline the rationale for the decision, including how Modified Alternative A meets the purpose and need and addresses the significant issues described in the final PEIS.

The Department determined Modified Alternative A best meets the purpose and need for a new planning rule. Modified Alternative A provides a process for planning that is adaptive and science-based, engages the public, and is designed to be efficient, effective, and within the Agency's ability to implement. It is designed to ensure that plans provide for the sustainability of ecosystems and resources; meet the need for forest restoration and conservation, watershed protection, and species diversity and conservation; and assist the Agency in providing a sustainable flow of benefits, services, and uses of NFS lands that contribute to the economic and social sustainability of communities.

The paragraphs below describe how Modified Alternative A meets the purpose and need for a new planning rule. Many of the requirements described for each element can be found in one or more of the alternatives analyzed in the PEIS. However, the Department concludes that the combination of requirements provided in Modified Alternative A provide the best approach for developing, amending, and revising plans. Modified Alternative A is clearer than Alternative A, better reflects the Department's intent as described in the preamble for the proposed rule, and reflects public comments and suggestions for improving the proposed rule. Unlike Alternative B, it meets the purpose and need for a new planning rule. It is also more implementable and less costly than Alternatives D and E, and allows greater flexibility to develop plans that best meet the ecological, social, and economic needs of units across the very diverse National Forest System. The Department concludes that the combination of provisions in Modified Alternative A best meets the purpose and need for a new planning rule and provides assurance that the Department's objectives will be met.

For those reasons, Modified Alternative A provides the best balance among the alternatives to meet the purpose and need for a new planning rule.

*Response to Purpose and Need*

All of the alternatives analyzed in detail, with the exception of Alternative B, meet the purpose and need to varying degrees. No single alternative can maximize all of the elements of the purpose and need. The Department finds that Modified Alternative A provides the best planning framework for meeting the various elements of the purpose and need by creating a rule that:

1. Emphasizes restoration of natural resources to make NFS lands more resilient to climate change, protect water resources, and improve forest health. The Department concludes that Modified Alternative A will result in plans that are adaptive and therefore more likely to remain relevant and implementable, including by providing an adaptive framework that will help responsible officials to respond to changing conditions and new information.

2. Contributes to ecological, social, and economic sustainability by ensuring that all plans will be responsive to issues such as the challenges of climate change; the need for forest restoration and conservation, watershed protection, and species conservation; and the sustainable use of public lands to support vibrant communities.

3. Is consistent with NFMA and MUSYA. The Department intends that the requirements of Modified Alternative A will be integrated into the development or revision of a plan in a manner that provides for the long-term ecological sustainability of the plan area while sustaining ecosystem services and providing for multiple uses.

4. Is consistent with Federal policy on the use of scientific information and the Agency's expertise and experience gained in more than 30 years of land management planning. Responsible officials will use the best available scientific information to inform the plan components and the monitoring program. The Department concludes that Modified Alternative A requires a planning process that is science-based and additionally recognizes the value of local knowledge, the Agency experience, knowledge, and information of other land managers, and indigenous knowledge.

5. Provides for a transparent, collaborative process that allows effective public participation. Modified Alternative A includes requirements to engage the public, Tribes, other government agencies, and groups and communities that have been at times under-represented in planning, such as youth and minorities, throughout the planning process. The Department concludes that the collaborative approach required by Modified Alternative A will result in improved relationships and plans that better meet the needs of diverse communities, which in turn will translate into more successful projects and activities developed under the plans.

6. Ensures planning takes place in the context of the larger landscape by taking an "all-lands approach." Modified Alternative A uses an "all-lands approach" to consider conditions beyond the plan area and how they might influences resources within the plan area as well as how actions on the NFS might affect resources and communities outside of the plan area. It also requires that responsible officials coordinate with entities with equivalent and related planning efforts.

7. Is within the Agency's capability to implement on all NFS units. It is clear and provides an efficient framework for planning, and is able to be implemented within the financial capacity of the Agency.

The Department concludes that Modified Alternative A provides an appropriate balance between the flexibility needed to address issues unique to the plan area and the need for consistent requirements and a consistent approach. Modified Alternative A reduces planning costs and the time needed for a plan revision from current levels.

*Response to the Issue of Ecosystem Restoration*

As many respondents correctly noted, not all NFS lands are in need of restoration and, in fact, NFS lands often provide among the highest quality habitat and the cleanest water of all lands in the country. The final rule provides for the maintenance of those lands. There is also widespread consensus that some NFS lands are degraded or are at risk of becoming degraded. From large scale pine beetle outbreaks in the Intermountain West to watersheds across NFS lands with poorly sited or maintained roads that cause sedimentation or block the movement of fish and aquatic organisms, there are many restoration needs on NFS lands. Modified Alternative A addresses the need for ecosystem maintenance and restoration.

Modified Alternative A incorporates the concept of ecological integrity. This concept is defined in the scientific literature as a means of evaluating ecological conditions in terms of their sustainability. The concept of ecological integrity is also used by the U.S. Department of the Interior's National

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 384 of 422

Park Service and Bureau of Land Management. Aligning approaches across the broader landscape will facilitate an all-lands approach to ecological sustainability.

Under Modified Alternative A, information relevant for ecosystem maintenance and restoration will be identified and evaluated during the assessment phase. Plan components are required for the maintenance and restoration of the ecological integrity of riparian areas and air, soil, and water resources. Responsible officials will consider opportunities to restore fire adapted ecosystems and for landscape scale restoration. The monitoring program will track ecological and watershed conditions and measure progress towards meeting desired conditions and objectives.

Modified Alternative A captures many of the concepts of "best practices" in restoration that are already occurring on NFS lands. Examples of such best practice efforts include the Collaborative Forest Landscape Restoration Program established under section 4003(a) of Title IV of the Omnibus Public Land Management Act of 2009, (*http://www.fs.fed.us/restoration/CFLR/index.shtml*), which promotes healthier, safer, and more productive public lands through partnership efforts, and the Four Forest Restoration Initiative to accomplish landscape scale restoration of ponderosa pine ecosystems in the Southwest. These restoration efforts bring people together to work across ownerships, restore ecosystems, increase organizational capacity, and in the process create jobs and economic opportunities that contribute to sustainable economies. Modified Alternative A provides a platform for working with the public and other land managers to identify restoration needs across the landscape and manage NFS lands to support meeting shared restoration objectives.

*Response to the Issue of Watershed Protection*

Watersheds and water resources on NFS lands are important for many reasons: For example, they are the source of drinking water for one in five Americans, provide important species habitat for terrestrial and aquatic species, and support recreation opportunities in the plan area.

Modified Alternative A includes a strong set of requirements associated with maintaining and restoring watersheds and aquatic ecosystems, water resources, and riparian areas in the plan area. It incorporates the protection or mitigation requirements of the 1982 rule, but goes beyond the 1982 rule in requiring a proactive approach for maintaining or restoring terrestrial and aquatic ecosystems and watersheds in the plan area.

Under Modified Alternative A, information relevant to watersheds, aquatic ecosystems, and water resources will be identified and evaluated during the assessment phase. Plans will be required to identify priority watersheds for maintenance or restoration. Plan components are required for the maintenance and restoration of the ecological integrity of aquatic ecosystems and watersheds, water quality, and water resources in the plan area, including lakes, streams, wetlands, and sources of drinking water.

Plan components are also required for the maintenance and restoration of the ecological integrity of riparian areas, including structure, function, composition, and connectivity; taking into account a number of factors; and plan components must establish widths for riparian management zones. Because riparian resources across NFS units are very diverse, Modified Alternative A retains the 1982 rule requirements to give special attention to land and vegetation within approximately 100 feet of all perennial streams and lakes and prevent management practices that have serious or adverse impacts, but does not require a single national width for riparian management zones. Riparian areas may be forested or open, they are connected with all types of streams, lakes and wetlands, and they vary widely in existing condition and types of use. Modified Alternative A allows for the requirements to be tailored to specific conditions on the plan area. The set of requirements included in Modified Alternative A for riparian areas is more implementable and less costly than the requirements in Alternative D, and will lead to a more effective and appropriate set of plan components across a diverse system.

Under Modified Alternative A, responsible officials must ensure that projects and activities in riparian areas are consistent with plan requirements for maintaining or restoring riparian areas, do not seriously or adversely affect water resources, are suitable uses, and are compatible with desired conditions for those lands. The consistency requirement places the decision about what types of projects or activities may or may not be allowed and what management direction will guide these activities at the plan level. The Department concludes that this is the appropriate level at which to make these decisions.

NFS lands provide some of the highest quality water in the country and are important sources of drinking water, but there are streams that do not meet State water quality standards. Modified Alternative A requires that the Chief of the Forest Service establish requirements for best management practices for water quality, and that plans ensure implementation of those practices.

The Department concludes that Modified Alternative A appropriately elevates the emphasis on the conservation of water and riparian resources, can be implemented on all NFS units, and is soundly supported by recent advances in conservation biology and ecology.

*Response to the Issue of Diversity of Plant and Animal Communities*

Perhaps no other aspect of the proposed planning rule has sparked as much interest or generated as much debate as the requirement to provide for plant and animal diversity. In particular, there is disagreement between those who believe that without strong, specific requirements in the rule for maintaining species diversity and viability, the persistence of many species will be at increased risk, and those who believe that putting specific requirements in the rule will result in endless litigation that will keep the Agency from moving forward with planning and with projects and activities.

The Department's intent is to provide for the diversity of plant and animal communities, and keep common native species common, contribute to the recovery of threatened and endangered species, conserve proposed and candidate species, and maintain species of conservation concern within the plan area, within Agency authority and the inherent capability of the land.

Modified Alternative A requires that future plans be based on a complementary ecosystem and species-specific approach to provide for the diversity of plant and animal communities in the plan area and the long-term persistence of native species in the plan area. This approach is often referred to as the coarse-filter/fine-filter approach.

The ecosystem integrity and diversity requirements in Modified Alternative A are meant to provide a coarse-filter designed to maintain biological diversity. By working toward diverse, connected ecosystems with ecological integrity, the Agency expects that over time, management will create ecological conditions which support the abundance, distribution, and long-term

persistence of most native species within a plan area, as well as provide for diversity of plant and animal communities. The fine-filter provisions are intended to provide a safety net for those species whose specific habitat needs or other influences on their life requirements may not be fully met under the coarse-filter provisions.

The coarse-filter/fine-filter approach is a well-developed concept in the scientific literature and has broad support from the scientific community and many stakeholders. It incorporates the considerable advances of the past three decades in understanding of biological and conservation science. The coarse-filter/fine-filter approach is already incorporated into many recently revised plans and is yielding positive results. For example, restoration of longleaf pine in the South is resulting in increases in red-cockaded woodpecker populations, and restoration of watersheds and instream habitat in the Pacific Northwest is yielding benefits for salmon.

The provisions in Modified Alternative A recognize the importance of maintaining biological diversity of native species on each national forest and grassland, and the compositional, structural, and functional components that comprise the biological diversity on each NFS unit, and recognize the importance of native species and their contributions to maintaining the ecological integrity of ecosystems.

Considering habitat needs for non-vertebrates is not new to the Forest Service. Non-vertebrate species can be federally recognized as threatened or endangered. In addition, the Agency has developed and maintained a list of regional forester sensitive species (RFSS) for over two decades. An RFSS list can include any native plant or animal species. RFSS are those plant and animal species identified by a regional forester for which population viability is a concern, as evidenced by: significant current or predicted downward trends in population numbers or density or significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution. RFSS are thus similar to species of conservation concern. The conservation and management of many RFSS has been a part of many land management plans and projects and activities for decades.

The Department intends to provide for the persistence of all native species by the use of the coarse-filter/fine-filter approach, within Forest Service authority and the inherent capability of the plan area. Modified Alternative A provides a three-fold treatment of all native species.

First, Modified Alternative A requires coarse-filter plan components for the maintenance and restoration of the ecological integrity and diversity of ecosystems in the plan area. Plan components will support the long-term persistence of most native species in the plan area, including providing for species that are common or secure.

Second, species that are federally recognized species under ESA (threatened, endangered, proposed, and candidate species) may not have viable populations on NFS lands and whose recovery, in most cases, cannot be achieved on a single NFS plan area. Modified Alternative A requires the responsible official to develop coarse-filter plan components, and fine-filter plan components where necessary, to contribute to the recovery of listed species and conserve proposed and candidate species.

Third, Modified Alternative A requires the responsible official to develop coarse-filter plan components, and fine-filter plan components where necessary, to provide the desired ecological conditions necessary to maintain viable populations of species of conservation concern within the plan area, or to contribute to maintaining a viable population of a species of conservation concern across its range where it is not within the Agency's authority or is beyond the inherent capability of the plan area to provide the ecological conditions to maintain a viable population of that species within the plan area.

Species of conservation concern are those plant and animal species whose long-term persistence within the plan area is of known conservation concern. The rule requires that species of conservation concern must be ''known to occur in the plan area'' and that the regional forester identify the species of conservation concern for which ''the best available scientific information indicates substantial concern about the species' capability to persist over the long term in the plan area.''

The Department has considered the concerns raised by many that the requirement for maintaining viable populations of species of conservation concern on the plan area is an impossible task and that attempting to meet this requirement will come at the cost of all other management of the NFS lands. The Department concludes that Modified Alternative A provides a more holistic, consistent, realistic, and effective approach to maintaining native fish, wildlife, and plant species on national forests and grasslands than provided under the 1982 rule, while meeting restoration goals and the mandate of multiple use.

Modified Alternative A recognizes that there are limits to the Agency's authority and the inherent capability of the land, whereas the 1982 rule required management prescriptions to ''[p]rovide for adequate fish and wildlife habitat to maintain viable populations of [all] existing native vertebrate species,'' (See 1982 rule at § 219.27 (a)(6)) regardless of whether there are circumstances outside of the authority or the control of the Agency. Examples of circumstances that may be outside of the Agency's authority or the inherent capability of the plan area are provided above in the rationale for non-selection of Alternative B.

The Department concludes the management emphasis on species of conservation concern is more focused than the viability provisions under the 1982 rule, which included all vertebrate species whether there was concern about their persistence in the plan area or not. Since these species may be wide ranging or may occur on multiple units, the regional forester, in coordination with the responsible official, will identify species of conservation concern. Requiring that the regional forester identify species of conservation concern will increase consistency across units and build efficiency into the Agency's collective efforts to maintain the diversity of plant and animal communities.

The Department also considered the challenges the Forest Service has faced in monitoring management indicator species (MIS) under the 1982 rule. MIS monitoring has been the subject of much of the legal debate around the species provisions of the 1982 rule. Modified Alternative A does not include requirements to designate MIS or monitor their population trends. The concept of MIS as a surrogate for the status of other species is not supported by current science, and population trends are difficult and sometimes impossible to determine within the lifespan of a plan.

In the final rule, MIS monitoring has been replaced with monitoring of focal species. The concept of focal species is well supported in the scientific literature and community. Focal species are not surrogates for the status of other species. Focal species monitoring provides information regarding the effectiveness of the plan in providing the ecological conditions necessary to maintain the diversity of plant and animal communities and the persistence of native species in the plan area. Modified Alternative A does not require

or prohibit monitoring of population trends of focal species. Instead, it allows the use of any existing or emerging approaches for monitoring the status of focal species that are supported by current science. Monitoring methods for evaluating the status of focal species may include measures of abundance, distribution, reproduction, presence/absence, area occupied, survival rates, or others.

The Department expects that monitoring key ecosystem and watershed conditions along with monitoring the status of a set of well-chosen focal species will provide timely information regarding the effectiveness of plan components related to plant and animal diversity.

The requirements in Modified Alternative A regarding sustainability and diversity of plant and animal communities are part of the planning framework cycle that requires public participation, assessments, and monitoring. Additionally, provisions in these sections require the responsible official to coordinate with other land owners. These requirements support cooperation and an all-lands approach to ecosystem and species diversity and conservation.

Under plans developed under Modified Alternative A, the Department expects NFS lands to more consistently provide the ecological conditions necessary to maintain the diversity of plant and animal communities and the persistence of native species. Over time, the Department expects habitat quantity to increase and habitat quality to improve for most native species across the NFS including aquatic and riparian species. The Department also expects ecological conditions for many federally listed species, species proposed, and candidates for listing and species of conservation concern to improve within and among plan areas because Modified Alternative A gives emphasis to maintaining and restoring ecological conditions needed by these species. The final rule provides for collaborative approaches to addressing the range-wide concerns of species whose range and long term viability is associated with lands beyond the plan area.

The Department concludes that the combination of requirements in Modified Alternative A reflects a strong, implementable approach to providing for the diversity of plant and animal communities and the persistence of native species in the plan area, and is supported by the scientific literature and community. This approach meets the requirements of NFMA and MUSYA, and provides a holistic, consistent, realistic, and effective approach to providing for diversity of plant and animal communities on national forests and grasslands, while meeting restoration goals and the mandate of multiple use and sustained yield.

*Response to the Issue of Climate Change*

Consideration of changing conditions including climate in planning is not new to the Forest Service. The Climate Change Resource Center has been developed as a reference for Forest Service resource managers and decision makers who need information and tools to address climate change in planning and project implementation on NFS lands. For more than 20 years, Forest Service scientists have been studying and assessing climate change effects on forests and rangelands. Forest Service Research and Development provides long term research, scientific information, and tools that can be used by managers and policymakers to address climate change impacts to forests and rangelands. Climate change-related activities are carried out within research stations covering the whole country. In 2009, the Agency issued guidance for climate change considerations to provide the Agency with the support needed to incorporate climate change into land management planning and project-level NEPA documentation. Recent plan revisions include consideration of climate change.

Modified Alternative A incorporates a strategic framework for adaptive management: assess conditions on the ground using readily available information, build plan components recognizing that conditions may be changing, and monitor to determine if there are measurable changes related to climate change and other stressors on the plan area.

Under Modified Alternative A, responsible officials will identify and evaluate information relevant to understanding ecological conditions and trends and to forming a baseline assessment of carbon stocks. Plans will include plan components to maintain or restore ecological integrity, so that ecosystems can resist change, are resilient under changing conditions, and are able to recover from disturbance. Modified Alternative A also requires monitoring measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area. Taken together, the planning framework and these requirements will ensure that information related to climate change will be addressed in a consistent and strategic fashion.

Modified Alternative A is consistent with and complements the Agency's climate change National Roadmap and Performance Scorecard, the Watershed Condition Framework and ecological restoration and sustainability policies. The climate change roadmap directs national forests and grasslands to develop climate change vulnerability assessments and identifies monitoring strategies. Elements in the scorecard will help the Agency to determine whether assessments and monitoring are being developed in a way that will help inform decisionmaking at the unit level. The scorecard includes requirements that complement or are complemented by requirements in Modified Alternative A. The climate change roadmap and scorecard are available online at *http://www.fs.fed.us/climatechange/advisor/.*

The national watershed condition framework (WCF) approach uses an annual outcome-based performance system to measure progress toward improving watershed condition on NFS lands. The WCF improves the way the Forest Service approaches watershed restoration by targeting the implementation of integrated suites of activities in those watersheds that have been identified as priorities for restoration. A short description of the framework is discussed in Chapter 3 of the final PEIS under watershed protection and a Forest Service publication is available at *http://www.fs.fed.us/publications/watershed/Watershed_Condition_Framework.pdf.*

Modified Alternative A capitalizes on existing Agency work such as the baseline carbon assessments conducted under the Climate Change Scorecard, the assessment and monitoring conducted under the Watershed Condition Framework, and the monitoring of climate change indicators occurring in the Forest Inventory and Analysis program, by ensuring integration of these activities into the land management planning process.

In selecting Modified Alternative A, the Department considered the present capability of the Agency to address climate change in planning. The Department also considered existing Agency policy on climate change and the ways in which the different alternatives could be integrated effectively with those policies. The Department concludes that the requirements for addressing climate change in the final rule can be carried out on all NFS units.

*Response to the Issue of Multiple Uses*

Modified Alternative A embraces the multiple use mandate of the Multiple-Use Sustained-Yield Act and recognizes the importance of multiple uses in many

sections of the alternative. Recreation, timber, grazing, and other multiple uses provide jobs and income to local communities, help to maintain social cultures and long standing traditions, connect people to the land, and contribute to the quality of life for many Americans.

The Agency has reported that spending by recreation visitors in areas within 50 miles of national forests and grasslands amounts to nearly $13 billion each year. Those dollars sustain more than 224,000 full and part-time jobs. Recreation accounts for more than half of all job and income effects attributable to Forest Service programs. Harvest of timber and other forest products from NFS lands contributed to more than 44,000 full- and part-time jobs with labor income totaling more than $2 billion in 2009. Livestock grazing on NFS lands contributes to an estimated 3,695 jobs and labor income totaling $91.9 million per year.

Timber harvest on NFS lands has declined from over 12 billion board feet in 1985 to approximately 2 billion board feet in 2009. In 1985, there were over 8 million cattle, sheep, and other domestic animals grazing on NFS lands. In 2009, this number dropped to approximately 6 million. In contrast, recreation visits to NFS lands have increased over this same period. There are many factors that influence the levels of timber harvest, grazing, and recreation, as well as other individual multiple uses of the NFS. These factors include increasing population, changing cultural and social values, greater access to NFS lands, changing rural and global economies, NFS budgets, and competing resource concerns. It is difficult to predict at this programmatic level the extent to which a new planning rule is likely to affect specific multiple uses in the future. As a result, the Department considered how each of the alternatives in the PEIS provides a framework for supporting the continued delivery of ecosystem services and multiple uses from the NFS.

Modified Alternative A considers ecological, economic, and social sustainability as equal and interdependent factors. Modified Alternative A emphasizes restoration of ecosystems so that they are capable of sustaining multiple uses over time. Restoration activities will produce jobs and income; at the same time; restored, functioning ecosystems can support species diversity while allowing multiple uses to continue. Under Modified Alternative A, timber production and grazing will continue to provide jobs, income, and ways of life for many Americans. Modified

Alternative A emphasizes the importance of the continued delivery of sustainable recreation. Providing high quality recreation opportunities and a range of access to NFS lands creates jobs and income and connects people to the land.

Under Modified Alternative A, plans must contribute to economic and social sustainability and must provide for ecosystem services and multiple uses in the plan area. Responsible officials will use an integrated resource management approach to provide for multiple uses and ecosystem services in the plan area, considering a full range of resources, uses, and benefits relevant to the unit, as well as stressors and other important factors. As part of the multiple use requirements, Modified Alternative A will require plan components for sustainable recreation, including recreation settings, opportunities, access, and scenic character. Modified Alternative A also includes requirements for plan components for timber management, consistent with the requirements of NFMA.

Information relevant to multiple uses and their contributions to local, regional, and national economies, along with information about the benefits (ecosystem services) people obtain from the plan area, will be identified and evaluated in the assessment phase.

Monitoring will track progress towards meeting desired conditions and objectives for recreation and other multiple uses. Broad and unit scale monitoring may provide information on resource and social concerns and conflicts before they result in insurmountable challenges. Most importantly, the Department concludes that the requirements in Modified Alternative A for encouraging public participation, working across boundaries, and engaging other Federal agencies, State, local, and Tribal governments, will help identify multiple uses in the plan area, resolve conflicts, and facilitate the forward movement of effective land management activities.

The Department concludes that Modified Alternative A meets the Agency's multiple-use and sustained-yield obligations under MUSYA and provides an effective framework for sustaining the flow of goods and services from NFS lands over time.

*Response to the Issue of Efficiency and Effectiveness*

Under Modified Alternative A, the Department expects that individual plan revisions will cost less money and consume less time than they do under the 1982 rule procedures. The 1982 rule

procedures are considered the baseline for comparing changes in cost and time for plan revisions because, until a new planning rule is in place, the 1982 rule procedures are being used as permitted by the transition provision of the 2000 rule to develop, revise, and amend all plans.

According to the Agency's regulatory impact analysis and cost-benefit analysis under Modified Alternative A, the Agency estimates that land management planning will cost an estimated $97.7 million per year, which is $6.3 million per year less than it currently costs to conduct planning under the 1982 procedures. More significantly, under Modified Alternative A, the Agency estimates that plan revisions will take, on average, 3 to 4 years as compared to 5 to 7 years under Alternative B, and will cost, on average, $3 to $4 million as compared to $5 to $7 million. As a result of these savings and efficiencies, the Forest Service will be able to revise significantly more plans during the 15-year revision cycle, than under the current planning structure.

Beyond cost and time savings, there are important ancillary benefits to increasing the efficiency of the planning revision process. Under shorter time frames it will be easier for the public to remain engaged throughout the revision process. One of the common concerns expressed by members of the public is that there is a significant amount of turnover in key Agency staff during the long timeframes required for plan revision under the current planning process. This can cause disruption and confusion as established relationships are severed and time and effort is needed to develop new relationships.

The new rule's requirements for increased collaboration and monitoring will lead to higher costs than are projected under Alternative B, but are expected to increase the effectiveness and relevance of land management plans. Increased collaboration provides benefits throughout the planning process and well into implementation. Analysis time may be shortened, administrative objections and the time needed to resolve them may be reduced, and projects developed under the resulting plans may be better understood and supported. Monitoring is important for adaptive management, and can help the Agency to test assumptions, track changing conditions, and measure management effectiveness over time. However, the Agency has long recognized that monitoring efforts when viewed across the Agency as a whole have often lacked consistency and, at times, credibility. The

monitoring requirements of Modified Alternative A complement broader Agency efforts to increase the efficiency and effectiveness of its inventory, monitoring and assessment programs, and make better use of the money currently spent on monitoring.

While the cost of each requirement is included in the total cost estimate of Modified Alternative A, many of the requirements involve work that is already occurring and that will continue to occur regardless of whether this, or another alternative is selected as the final rule. Modified Alternative A was developed as part of an integrated Agency framework to manage the NFS lands more efficiently. Other initiatives and Agency priorities that will complement and support the implementation of the new land management planning process and address critical NFS resource issues include the Watershed Condition Framework, Climate Change Scorecard, landscape scale restoration, an all lands approach, and a new system for inventory, monitoring, and assessment work that addresses core resource information and data needs at all levels of the Agency.

Modified Alternative A is neither the least nor the most costly of the alternatives the Department considered. Modified Alternative A reduces the costs and time required for plan development, amendment, and revision. However, the Department does not believe that selecting the least costly alternative should be the overriding criterion. Planning is an important investment. The requirements in Modified Alternative A are designed to lead to more effective plans, to yield greater efficiencies over time by ensuring a consistent approach to planning, to build on existing information, to facilitate adaptive management, and to allow the use of amendments and administrative changes to keep plans current so that future revisions are less costly.

The Department recognizes that some of the definitions, concepts, and terms used in Modified Alternative A are new or broadly worded. This Alternative sets forth process and content requirements to guide the development, amendment, and revision of land management plans across very diverse national forests and grasslands and over a long period of time. By setting out substantive and procedural requirements, the rule establishes the decision space within which the planning process is to be carried out and within which plan content must fit. The Forest Service will develop directives (the Forest Service Manual and Handbook) that will provide additional guidance and more detailed interpretation to ensure consistent and effective implementation of the rule. These directives will be available for public review and comment before they are finalized. Plans developed, revised and amended under the rule will be consistent with the rule and the directives.

*Response to the Issue of Transparency and Collaboration*

Modified Alternative A supports a transparent and collaborative approach to planning. As described in the PEIS, best practices in public involvement and collaboration emphasize the importance of engaging a broad spectrum of participants. Participants might live close to a plan area or not. What matters is they care about that area for some reason, can contribute to an understanding of relevant issues, can help get planning or project work done, and can help increase organizational and community capacity. A plan revision or amendment process that offers a broad spectrum of participation opportunities is much more likely to produce a meaningful, shared understanding of the social, economic, or ecological factors of importance in the plan area. Forests and grasslands that already engage a broad spectrum of public interests early and often report that their proposed projects and plans more accurately incorporate public vision and interests. They further report that upfront public involvement builds more understanding of proposed actions, and that people typically respond more positively to these proposals.

Under Modified Alternative A, responsible official will be required to provide meaningful opportunities for public participation in each phase of the planning framework. Modified Alternative A includes requirements for outreach, Tribal consultation, and coordination with other planning efforts. Responsible officials will continue to engage State and local governments, Tribes, private landowners, other Federal agencies, and the public at large, but additionally will encourage participation by youth, low-income and minority populations, who have traditionally been underrepresented in the planning process. Having the forest or grassland supervisor as the responsible official provides greater opportunity for people to interact directly with the decision maker than under current rule procedures. Use of a pre-decisional review (objection) process is also consistent with a more collaborative approach.

Modified Alternative A allows flexibility at the local level to determine the most appropriate method and scale of the public involvement. Much of the literature on building effective collaboration discusses the need for flexibility to select public involvement methods appropriate for the unique needs of specific situations and participants.

Modified Alternative A is consistent with current practice on effective public engagement and incorporates approaches that have proven successful and implementable on NFS units.

The requirements for public participation, notification, and documentation required in Modified Alternative A support transparency in planning. This alternative's requirements to consider the accessibility of the process and of information, to use contemporary tools to engage the public and to post all notifications online further increase transparency.

*Response to the Issue of Coordination and Cooperation Beyond NFS Boundaries*

Ecological and social systems are not confined within NFS unit boundaries. Ecosystem services produced by national forests and grasslands affect and are affected by land management activities on adjacent private, State, local, and other Federal Government lands.

Under Modified Alternative A, the responsible official will consider the landscape-scale context for management and will look across boundaries throughout the assessment, plan development/revision, and monitoring phases of the planning process. The assessment phase will provide information about conditions and trends relevant to management of the plan area in the context of the broader landscape. Responsible officials will take an all-lands approach into account when developing plan components for ecological sustainability and multiple uses and ecosystem services. Plan and broader-scale monitoring, along with direction to engage the public and other land managers in each phase, will also support an all-lands approach. Responsible officials will leverage their resources and knowledge with those of other agencies to increase effectiveness and gain efficiency in planning and future implementation of their plans.

The PEIS includes several examples of landscape scale planning, projects, and assessments that are currently using an all-lands approach in planning, assessment and monitoring. They have resulted from an increased recognition

that NFS land management must be considered in the broader landscape and that only this kind of approach can address problems such as maintaining watershed conditions, conserving wide-ranging species, and providing for effective transportation and infrastructure on and off NFS lands. The Department concludes that Modified Alternative A incorporates these best practices and provides a framework for continuing and expanding them.

**Compliance With the Endangered Species Act of 1973, as Amended**

Beginning in September, 2010 and continuing through the development of the final rule and its accompanying final programmatic environmental impact statement (PEIS), representatives from the U.S. Fish and Wildlife Service (USFWS) and the National Oceanic and Atmospheric Administration (NOAA) Fisheries (the reviewing agencies) met regularly with members of the Forest Service to discuss Endangered Species Act of 1973 issues related to the final rule. During that time, the three agencies worked closely together to identify the relevant issues and appropriate level of analysis associated with this rule and the environmental analysis for it. They collaborated on a consultation process and on the biological assessment (BA). The Agency requested consultation under section 7(a)(1) and 7(a)(2) of the Endangered Species Act of 1973 with the reviewing agencies in July, 2011. Additionally, the Agency requested conferencing on the potential effects of the rule on all species that are proposed for Federal listing and currently occur on NFS lands, and those that are candidates for Federal listing that occur on or are suspected to occur on NFS lands. A summary of the consultation meetings between the Forest Service, NOAA Fisheries, and the USFWS can be found in Appendix E of the final PEIS.

NOAA Fisheries and USFWS have each prepared a biological opinion pursuant to section 7(a)(2) of the Endangered Species Act including a conservation review pursuant to section 7(a)(l) Act (16 U.S.C. 1536(a)(1) and (2)). Each agency issued a biological opinion that adoption of the final planning rule is not likely to jeopardize the continued existence of the endangered or threatened species under its jurisdiction and is not likely to destroy or adversely modify any of those species' critical habitat. Each agency's biological opinion also concluded that the planning rule would set forth a system for land use plans that would further the conservation purposes of the Endangered Species Act under section 7(a)(1).

Copies of the biological assessment, its addendum, and the biological opinions are in the project record and can be viewed online at: *http://www.fs.usda.gov/planningrule.*

**Response to Comments**

The following is a description of specific comments received on the proposed rule, responses to comments, and changes made in response to comments. Each comment received consideration in the development of the final rule. In addition, following the publication of the PEIS, the Department received comments on the PEIS and the preferred alternative. These comments were also considered by the Department in the development of the final rule, and any changes made in response to those comments are described below. A response to comments on the draft EIS and the proposed rule may be found in the response to comments appendix of the EIS located online (see **ADDRESSES**).

*General Comments*

The Department received the following comments not specifically tied to a particular section of the 2011 proposed rule.

General Comments on Rulemaking Effort

*Comment: Use of public forums for rule development and meeting locations.* A respondent was critical of the public forums, as the forum they attended was full of private sector representatives and not members of the public. Another respondent felt there were not enough public meetings held on the East Coast. A respondent felt after scoping, the proposed rule was developed "behind closed doors." The respondent felt the meetings on the proposed rule were not opportunities to discuss specific rule wording.

*Response:* The public engagement effort prior to development of the proposed rule was the most extensive, transparent and participatory process ever used to develop a proposed planning rule. The Department began by using the Notice of Intent (NOI) to solicit initial public input, rather than going out with an already developed proposal. This decision was made in recognition of the level of public interest in this rule-making effort, and in a desire to build a proposed rule based on public input. The Department received 26,000 comments on the NOI. Following the NOI, the Department hosted a science forum, 4 national roundtables, and 9 regional roundtables which reached 35 locations around the country, using an independent facilitator to run the roundtables and capture public feedback.

The purpose of the public forums before publication of the proposed rule was to openly and transparently discuss possible content of the proposed rule. Participants in the meetings were invited to suggest specific topics and specific wording during the sessions. Materials and summaries from the roundtables were posted online. Many roundtables used video teleconferencing or Webcasts to provide for participation by members of the public unable to attend in person. This use of technology also provided opportunities for the public to participate from their local Forest Service office. The Agency also hosted a blog site for people to engage in dialogue and provide feedback, as well as participate remotely in the national roundtables. More than 3,000 members of the public participated in these sessions and provided important feedback that the Agency used in developing the proposed rule.

After the proposed rule was published, the Agency hosted 28 regional public forums and one national public forum to answer questions and help the public understand what was in the proposed rule. These sessions were attended by more than 1,350 people and reached 72 satellite locations across the country. These forums were intended to help the public submit informed comments during the comment period for the proposed rule, but the Agency did not accept public comments directly at the forums because of the need to have a consistent way of accepting and recording comments.

After the public comment period closed, the Agency used the more than 300,000 comments received to inform development of this final rule.

*Comment: Proposed rule commenting process.* A respondent felt there was no convenient way for the everyday person to provide comments on the proposed rule.

*Response:* Multiple avenues for the public to submit comments on the proposed rule were provided, including submitting comments electronically via the respondent's choice of two Web sites, or submitting comments using mail or fax. Information on how to submit comments was posted on the Forest Service Web site, distributed at public meetings, and published in the **Federal Register** notice. Additionally, interested parties could sign up for a listserv that provided updates via email.

*Comment: Lack of responses.* A respondent felt the 26,000 comments received during the comment period for the notice of intent (NOI) to develop a

new planning rule meant the Department must undertake further efforts to ensure the public is sufficiently involved in the planning process and further ensure that actions taken as a result of the rule are supported and understood by the public.

*Response:* In addition to the 26,000 comments received in response to the NOI, the Department engaged more than 3,000 people around the country in public forums to receive input between the NOI and the proposed rule, and received more than 300,000 public comments during the 90-day comment period for the proposed rule. After publication of the final rule, public participation in planning at the unit level is mandated by § 219.4, which requires the responsible official to offer meaningful opportunities for public involvement and participation early and throughout the development of a land management plan or plan revision. The Agency is also exploring ways to engage more broadly with the public to implement this final rule.

*Comment: Cooperating status for rulemaking.* Some respondents expressed concern that their requests for cooperating agency status were not granted by the Department.

*Response:* The National Environmental Policy Act (NEPA) allows for cooperating agency status for States, local governments, and Tribes with jurisdiction or special expertise for the development of an environmental document. Several States or local governments requested cooperating agency status. However, a national rule requires a broader look beyond an individual State's or local government's expertise. The Agency also took a unique and unprecedented collaborative and open approach in reaching out to the public, governments, and Tribal entities in developing the rule. Therefore, requests for cooperating agency status during development of the planning rule were not granted. The Department recognizes the valuable role of local and State governments and Tribes in the planning process and provided multiple opportunities for their involvement throughout the country during the collaboration efforts for the planning rule, in addition to the formal public comment periods.

*Comment: Oral comments.* Several respondents felt oral comments during the public forums on the proposed rule should have been allowed.

*Response:* When applicable, the Administrative Procedures Act directs that agencies provide an opportunity for written comment, but allows agencies the discretion whether or not to allow oral presentation of data or views. The Forest Service hosted open public forums in Washington, DC, and across the country to answer questions about the proposed rule during the public comment period. The Forest Service held these forums to help the public understand the content of the proposed rule. The Forest Service did not, however, accept written formal public comments at the forums or provide an opportunity to record oral comments, due to the anticipated volume of public comments, to ensure proper documentation and consideration of all comments, and in the interest of efficiency and accuracy in accepting and reviewing comments. All comments on the proposed rule and DEIS had to be submitted in writing during the 90-day comment period by postal system, fax, or one of two Web sites.

*Comment: Personal comments.* A respondent expressed concern that their scoping comments were not incorporated into the proposed rule.

*Response:* No rule can satisfy the entire spectrum of opinion. The final rule seeks to balance different, and often competing, public needs and perspectives on planning into a process that is practical, workable, based on science, and reflective of overall public and Agency values and input.

*Comment: Incorrect or missing address for submission of comments, phone contact, and Web site utility.* Some respondents expressed confusion on why the Department did not provide an email address for comments to be sent to. Others expressed frustration that the contact phone number was published incorrectly in the DEIS, and expressed a desire to submit comments or ask questions by phone. Some wanted a better sitemap on the Forest Service planning Web site to help navigation through the site.

*Response:* Instead of an email address, the Department provided the addresses of two Web sites the public could choose from to submit comments, in addition to mail or fax options. Because of the volume of anticipated comments, the Department concluded that comments submitted via a Web site would be more efficient to manage than an electronic mail in-box, and would reduce costs and the risk of human error. In addition, comments are more efficiently and rapidly placed in the record and made available for public inspection when submitted via a Web site rather than email.

After being made aware of the incorrect phone number published in the DEIS, the Department corrected the contact information immediately. The Administrative Procedure Act requires agencies to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation" (5 U.S.C. 553(c)). Due to the anticipated volume of public comments, and in the interest of efficiency and accuracy in accepting and reviewing comments, the Department did not accept comments over the telephone. It is not standard practice to accept telephone comments. Opportunities to provide comment were amply provided through the respondent's choice of two Web sites, mail or fax.

The planning rule Web site does contain a site map link on the left-hand menu on the main page. The Department appreciates feedback on our Web design and seeks to continuously improve our Web presence.

*Comment: Verification comments received.* Some respondents wanted to verify that their comments on the planning rule were received.

*Response:* Respondents are able to verify that their comments were received by reviewing the public reading room for the planning rule at *http://contentanalysisgroup.com/fsrd/.* To ensure transparency, comments submitted during the comment period were posted to the reading room for public review.

*Comment: List serv.* A respondent felt the Department should use a listserv to keep the public apprised of the status of the planning rule.

*Response:* A planning rule listserv was announced in June 2010, and has been used since then to communicate with the public. Members of the public may request to be added to the planning rule listserv on the planning rule Web site, or directly at *http://www.fs.fed.us/news/pr-listserv-subscribe.html.*

*Comment: Requests for extension of the comment period.* Some respondents requested an extension of the comment period because some members of the public were not able to participate in Agency meetings addressing the proposed rule. Other respondents requested an extension of the comment deadline because of the late release of a scientific review. Some respondents said that the public did not have enough time to comment on the science review before the comment period closed.

*Response:* The Department went through extraordinary lengths to facilitate the ability of the public to understand and comment on the proposed rule and proposed environmental impact statement. In fact, the Administration identified this rule as a flagship for open government

within the U.S. Department of Agriculture. The Department published in the **Federal Register** a notice of intent to propose a new rule and prepare its accompanying environmental impact statement on December 18, 2009, and took public comment on that notice for 60 days. The proposed rule was informed by approximately 26,000 comments to the notice of intent, a science forum, regional and national roundtables held in 35 locations with over 3,000 people in attendance, national and regional Tribal roundtables, 16 Tribal consultation meetings, Forest Service employee feedback, and over 300 comments posted to the planning rule blog. Throughout that process, the Agency shared a clear timeline with the public, including our intent to publish the final rule by the end of 2011.

The Department considered all the public input, science, and the Agency's expertise to develop the proposed rule and draft environmental impact statement (DEIS). The proposed rule and notice of availability for the DEIS were published in the **Federal Register** and included a 90-day comment period ending on May 16, 2011. A 90-day comment period was used because of the importance of the proposed planning rule. This was 30 days more than the Agency's customary comment period for rulemaking and is 45 days more than the review and comment period for draft environmental impact statements required by National Environmental Policy Act regulations.

The Department reached well beyond its normal practices to provide the public with information to assist in the public comment phase of this rulemaking. During March and April, 2011, after the notices were published in the **Federal Register**, the Forest Service hosted 29 national and regional public forums to provide stakeholders with information about the proposed rule and respond to questions. The forums were attended by almost 1,350 members of the public and reached 74 locations across the country through video and teleconferencing. The National Forum was held within 3 weeks of the opening of the comment period and a video of the forum and forum materials were posted on the planning rule Web site. The regional forums were also held early in the comment period. While the forums were designed to assist the public in understanding the proposed rule and foster informed comments, it was not necessary for any member of the public to attend a forum to develop and submit comments. The Forest Service ensured that the planning rule Web site

contained background information on the proposed rule as well as summaries of the various collaboration and public involvement activities held during the preparation of the proposed rule. Also, the DEIS was posted on that Web site, as published in the **Federal Register** notification. In order to proactively facilitate commenting, the Forest Service provided multiple options for members of the public to submit comments: two Web sites, by hard copy mail, and by facsimile.

In addition, the Department contracted with a neutral third party to arrange an independent review of the DEIS by respected and well known scientists outside of the Forest Service to ensure that the science behind the proposed rule and environmental analysis is current, relevant, accurate, and appropriately applied. In order to ensure the integrity and independence of the review process, the identity of the reviewers and the content of their individual analysis were kept confidential by the third party, until the review was completed. In keeping with our open and transparent process, the Agency committed to make the reviews in their entirety public and did so within 3 business days of receiving them. The Agency posted the reviews on the Internet on April 26, 2011. The summary of the reviews and each independent review can be found on the Internet at *http://www.fs.usda.gov/planningrule*. Neither requesting the review nor sharing the result of the review was legally required. The Forest Service considered the science reviews, along with public comments, in preparing the final programmatic environmental impact statement (PEIS) and final rule.

The Department believes the public had sufficient time to review these materials and consider them when commenting on the proposed planning rule. The Department decided not to extend the 90-day comment period because extra time had been provided for comments beyond the customary practices and an unprecedented amount of information and access to the Agency employees to assist the public in understanding that information was provided to the public via Web site and public meetings.

*Comment: External science review and Federal Advisory Committee Act.* Some respondents were concerned that the external science review of the DEIS violated the Federal Advisory Committee Act (FACA) because they believed the Agency set up an advisory committee but did not follow the FACA requirements. Some respondents were concerned that the Agency did not

follow the National Forest Management Act (NFMA) requirements in setting up a committee of scientists.

*Response:* The external science review of the DEIS did not violate FACA. FACA applies when a Federal agency establishes, controls, or manages a group that provides the Agency with consensus advice or recommendations. The external science review of the DEIS was conducted by seven non-Federal scientists, each of whom separately conducted an independent evaluation of whether appropriate scientific information, content, and rigor had been considered, analyzed, and synthesized in the DEIS. These scientists did not operate as a group; they were not established, controlled or managed as a group by the Agency; and they did not provide the Agency with consensus advice or recommendations. Accordingly, the external science review was not subject to FACA's requirements.

A committee of scientists was not required for this rulemaking effort under the NFMA: a committee of scientists was required only for the 1979 planning rule, and that committee terminated upon promulgation of that regulation. The NFMA states that the Secretary may, from time to time, appoint similar committees when considering revisions of the regulations, but the Secretary need not do so (16 U.S.C. 1604(h)(1)).

*Comment: External science review and public comment.* Some respondents were concerned that science review meetings of the external reviewers were not open to the public, and that the documents considered and produced were not available to the public. Some respondents were concerned that the Agency did not make the reviews public when the proposed rule was published for comment on February 14, 2011.

*Response:* There were no "science review" meetings held by the external reviewers. The Agency did not provide the external reviewers with any documents that were not available to the public. Neither the public nor the Department knew the identities of the reviewers, nor was there interaction between Department personnel and the reviewers during the review phase. It was only after the reviews were completed, during the public comment phase, that the Department learned the identities of the reviewers and the substance of their reviews. Within 3 business days of the Department's receipt of that information, each of the reviews (unedited), the contractor's summary of the reviews, and the identities of the reviewers were made public. The reviews were not available in February because the reviewers

received the DEIS for review at the same time as the rest of the public.

*Comment: External science review and the rule.* Some respondents were concerned that the scientists reviewed the rule and not the DEIS, as appeared evident from their reviews.

*Response:* The basic charge to the science reviewers was to evaluate how well the proposed planning rule's draft environmental impact statement (DEIS) considered the best available science. The contractor gave each science reviewer three key questions to address, regarding scientific caliber, treatment of uncertainty, and comprehensiveness of the DEIS. The reviewers were not asked to review the proposed planning rule or to comment on the alternatives. However, the text of the proposed planning rule and alternatives was included in the appendices of the DEIS that was posted online and made available to the public as well as the science reviewers. Some of the reviewers chose to provide feedback on the proposed rule and alternatives, although they were not asked to comment on those parts.

*Comment: External science reviewers.* Some respondents were concerned that the background of the reviewers did not include expertise that they felt was important to include, including mining, timber, or recreation. Some suggested that the reviewers were biased in their reviews.

*Response:* The Department contracted with RESOLVE to administer the science reviews to ensure the independence of the reviews. RESOLVE is a non-partisan organization that serves as a neutral, third-party in policy decisionmaking. One of RESOLVE's specialties is helping to incorporate technical and scientific expertise into policy decisions. The Agency provided the contractor with a draft of the DEIS and required it to select the reviewers and provide their responses to the Agency.

*Comment: External science review and CEQ documents.* Some respondents commented that the CEQ report from 1982 should not be used because it is too old. Also, some respondents suggested that other references used in the DEIS were too old to use.

*Response:* The references to which the comment referred were the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," which was published in the **Federal Register** in 1981 (46 FR 18026 (March 23, 1981)) and the April 30, 1981 memorandum from the Executive Office of the President on scoping. Both are current and still relevant; see the CEQ Web site on NEPA guidance at *http://ceq.hss.doe.gov/nepa/regs/guidance.html.* Furthermore, scientific literature from decades ago may still be relevant and even considered the best science that is available on some topics. Some classic literature from well known scientists still is used frequently (for example, Pickett et al. 1978) and was used in the DEIS.

*Comment:* Some respondents commented that a concerted effort be made to address the issues raised by the science reviewers.

*Response:* The planning rule team considered and responded to the comments made by the science reviewers, along with other comments submitted by the public. The issues raised in the reviews informed the final PEIS, along with the other feedback received during the public comment period.

*Comment:* Some respondents were concerned that only the Science Review summary was posted online.

*Response:* The Science Review report included a summary of the science review and the full and unedited reviews of each of the science reviewers. The report was prepared by RESOLVE and was posted on the Forest Service Web site without any changes or omissions.

General Proposed Rule Comments

*Comment: Degree of compliance or restriction.* Some respondents said the rule should provide more discretion and flexibility to develop a forest plan by reducing the use of "shalls" and "musts." Other respondents felt phases "take into account" and "consider" should be removed and replaced with more prescriptive terminology as these terms left implementation largely to the discretion of the responsible official.

*Response:* The wording in the final rule was chosen to reflect the degree of structure the Department decided as appropriate for various aspects of the rule. The Department's goal in creating the final rule was to create an implementable framework for planning along with a structure and set of requirements for plan components and other plan content that would support the purpose of the final rule. In addition, the Department allows flexibility for plans to reflect the different unique circumstances across the National Forest System (NFS), including in response to best available scientific information, public input, and information about changing conditions at the unit level. The Department believes that the final rule strikes a good balance.

The Department recognizes that there may be significant differences in circumstances across the NFS that make specific national standards unworkable or not reflective of the best available scientific information for a given plan area. The final rule balances the need for national consistency with the need for local flexibility to reflect conditions and information on each unit. Additional direction will be included in the Forest Service Directives System, and a new requirement was added to § 219.2 that requires the Chief to establish a national oversight process for accountability and consistency of planning under this part.

*Comment: Advocacy for a particular outcome or regulatory wording.* Some respondents expressed general support for or opposition to the proposed rule. Among the items respondents supporting the proposed rule listed are the following: the use of larger ecological regions to provide context for forest, grassland and prairie units; cooperation between the Agency and adjacent governmental entities in planning and plan revision processes; public participation opportunities in the decision making process; the approach on ecological sustainability, watershed restoration and protection, and recognition of ecosystem services. Supportive respondents also were in favor of the emphasis on recreational uses and users; the streamlining and simplifying of the planning process the use of active management techniques; the continued emphasis on multiple use purposes including economic impacts and benefits; the use of best available science; and the appropriate use of regulations and management strategies to mitigate climate change effects. Those respondents expressing a general opposition to the proposed rule felt the way it was written and the requirements it contained were vague, complex, unrealistic, and needed clarification. They felt it would invite litigation; would not provide adequate protection for wildlife and resources; or would limit public access, use, rights, and participation. Some felt the proposed rule was inappropriate because they felt it allowed for continued timber, livestock, mining, and special interest groups' use; wasted tax dollars; would harm economic benefits for rural communities; failed to incorporate the multiple use mandate; failed to include sound science in planning and measurable tools for management; failed to incorporate and analyze Tribal interests and activities; allowed too much discretion to the responsible official; failed to give recreational uses

a greater priority; or failed to address cumulative effects these regulations would cause. Additionally, they expressed concerns over inclusion of climate change requirements. Some respondents expressed endorsement of comments submitted by other organizations or individuals, or referred to attachments submitted in support of their comments.

*Response:* The Department has reviewed all of these comments and enclosures, and appreciates the degree of public interest in the proposed rule. Where changes have been made in the final rule, these discussions can be found in the following section-by-section discussions. Responses to these comments and their relationship with the supporting final programmatic environmental impact statement (PEIS) can be found in Appendix M of the final PEIS.

*Comment: Preservation of the national forests for future generations.* Some respondents stated a desire for the rule to mandate stronger standards to ensure wildlife and wildlife habitats are healthy and resilient; for greater forests protections, and better integration of environmental, economic, and/or social sustainability into future plans and future generations. Some wanted inclusion of guidelines for responsible/sustainable recreation, more restrictions on mining and logging activities, and provisions to limit access to preserve land.

*Response:* The Department agrees that the preservation of our national forests and grasslands is vital to meet the needs of present and future generations. These comments were reviewed and changes are discussed in the section-by-section responses below. The final rule sets the stage for a planning process that can be responsive to the desires and needs of present and future generations of Americans for the multiple uses of NFS lands. The final rule does not make choices between the multiple uses of a plan area. The unit plans developed under the final rule will provide guidance for future projects and activities.

*Comment: General action to protect national forests and grasslands.* Some respondents expressed the need for the Forest Service to protect and not destroy the national forests. They expressed the importance of protection for wildlife, diverse ecosystems, riparian areas, priority watersheds, aquatic resources, clean drinking water, endangered species, climate change and air pollution, access for socioeconomic purposes, cultural and traditional resource use, and the natural beauty of the land. They suggested strengthening the wording of the proposed rule for forest protection, compliance, and consistency; inclusion of protection of access to land for recreation; and allowing natural processes to occur. They felt an effective planning rule will reflect the aspirations of diverse communities.

*Response:* The Department has revised the proposed wording on sustainability, diversity of plant and animal communities, multiple uses, and timber requirements as well as wording in other sections of the final rule to reflect public comments and better ensure the needs of present and future generations. See discussions under the section-by-section response to comments.

*Comment: References to individual forests, projects, and individuals.* Some respondents commented on issues important to them, but not related to this rulemaking effort. Examples of such concerns include the use of DDT, Millennium Ecosystem Assessment, issues with rental housing, sustainable living, a tornado in southeast Tennessee, a vital wildlife crossing in Montana, Willamette National Forest timber harvest levels, and a suggested wolf/gorilla/elephant/chimpanzee/lion/giraffe sanctuary.

*Response:* These and other similar comments have been determined to be outside the scope of the development of a planning rule, because they discuss aspects unique to specific forests, grasslands, or municipalities. Many of the concerns raised would be more properly addressed in specific forest and grassland plans themselves, or in the subsequent decisions regarding projects and activities on a particular national forest, grassland, prairie, or other administrative unit, or may be outside the scope of NFS planning.

*Comment: Wilderness evaluation procedures.* Several respondents felt "sights and sound" should be removed Forest Service directives as a criterion for wilderness inventories.

*Response:* Criteria for the evaluation of areas for wilderness recommendations are in Forest Service directives, which are in the process of being revised. There will be an opportunity for public comment on the directives before they are finalized. The Department encourages members of the public to provide comment on issues specific to the directives during their revision.

*Comment: Changes to other Forest Service regulations.* Some respondents commented about which resource uses or activities should be supported or not supported by the Department on NFS lands. They requested requiring, changing, or eliminating regulations for specific activities. These activities included, but are not limited to, NEPA implementation, grazing, mining, logging, road construction and maintenance, special use permits, hunting, certain recreational activities, trail use conflicts, wildland fire suppression, fuels management, educational opportunities, cultural and historic resources, as well as protections for wild horses and burros.

*Response:* The Department agrees the issues raised are important. However, these comments have been determined to be outside the scope of development of a planning rule. The final rule is intended to provide overall direction for how plans are developed, revised, and amended and for required plan components and other plan content. The final rule and alternatives found in the supporting final PEIS do not provide regulatory direction for the management of any specific resource, except for the NFMA timber requirements. Agency regulations for specific uses can be found in other sections of 36 CFR parts 200–299, which govern management of the national forests, grasslands, and prairie. For example, part 212 regulates administration of the forest transportations system (roads and trails), part 222 regulates range management, including wild horses and burros, and part 223 regulates the sale and disposal of NFS timber. Additional direction may be found in individual plans or in project or activity decision documents. Those communities, groups, or persons interested in these important issues can influence plan components, plan monitoring programs, or subsequent projects or activities by becoming involved in unit planning efforts throughout the process, and by submitting comments on the Forest Service Directives System during opportunities for public comment.

*Comment: Funding and staffing levels.* Some respondents suggested increased funding and staffing for the enforcement of protection and mitigation standards; the collection of fees from and licensing requirements for users; bonding to ensure restoration activities; sustainable funding for fuel reduction activities; and the retention or creation of specific Agency positions.

*Response:* These comments have been determined to be outside the scope of the development of a planning rule. The U. S. Congress determines Agency funding levels under its budgetary process. Staffing issues are more properly addressed by specific forest and grasslands, or regional and national offices.

*Comment: Transparency and collaboration.* Some respondents wanted the public process of land management planning to be kept clear and transparent. Others commented that in addition to transparency, the specific science being used should be shared. Some respondents were concerned that collaboration would result in too much input from local interests and groups. A respondent stated there is no clear definition of collaboration in the DEIS. Another respondent felt the public participation requirements will not result in collaboration and the Forest Service staff would still be doing all of the planning work.

*Response:* The Department agrees the public process for land management planning must be clear and transparent. Section 219.3 of the final rule requires the responsible official to document how the best available scientific information was used to inform the assessment, plan decision, and design of the monitoring program. Such documentation must: identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered. This requirement will provide transparency and an explanation to the public as to how the best available scientific information was used to inform how the responsible official arrived at important decisions. Section 219.14 includes additional requirements for the plan decision document to increase transparency and explain the rationale for decisionmaking.

Section 219.4 of the final rule lists the minimum specific points during the planning process when opportunities for public participation will be provided, and includes direction to provide meaningful opportunities for public engagement and share information with the public in an open way. To meet these requirements, the responsible official must be proactive in considering who may be interested in the plan, those who might be affected by a plan or a change to a plan, and how to encourage various constituents and entities to engage, including those interested at the local, regional, and national levels. All members of the public will be provided opportunities to participate in the planning process. Section 219.16 provides requirements for public notification to ensure that information about the planning process reaches the public in a timely and accessible manner.

Section 219.19 of the final rule includes definitions for participation and collaboration. Because the make-up

and dynamics of the communities surrounding each planning area differ, and because the level of interest in decisionmaking may vary, the final rule provides the responsible official with the flexibility to select the public participation methods that best fit specific planning needs.

Land management planning for NFS lands falls under Forest Service authority and is a responsibility of the Agency. As such, Agency employees are responsible for the preparation of the actual planning documents. Section 219.5(b) states that interdisciplinary teams will be established to prepare assessments; new plans, plan amendments, plan revisions, and unit monitoring programs. However, under § 219.4, the public will have numerous opportunities to participate in the process and contribute to the content of those documents.

*Comment: Tribal activities.* Some respondents felt the rule should support Tribal activities on NFS land because of important Tribal historical, cultural, sacred areas located there; should facilitate the Tribes' exercise of treaty hunting, fishing and gathering rights; and should require partnering with Tribal entities in the planning process.

*Response:* The final rule recognizes and does not change the unique government-to-government relationship between the United States and Indian Tribes. The final rule recognizes and does not modify prior existing Tribal rights, including those involving hunting, fishing, gathering, and protecting cultural and spiritual sites. The rule requires the Agency to work with federally recognized Indian Tribes, government-to-government, as provided in treaties and laws, and consistent with Executive orders when developing, amending, or revising plans. The final rule encourages Tribal participation in NFS planning. Further, the rule recognizes the responsibility of Forest Service officials to consult early with Tribal governments and to work cooperatively with them where planning issues affect Tribal interests. Nothing in the final rule should be construed as eliminating public input or Tribal consultation requirements for future projects. The final rule requires consideration of cultural and historic resources, ecosystem services including cultural services, areas of Tribal importance, and habitat conditions needed for public uses such as hunting, fishing and subsistence, in addition to input from Tribes and Alaska Native Corporations.

*Comment: Compliance with Federal laws and regulations.* Some respondents raised concerns over compliance with

Federal laws governing the management of the national forests. Some examples cited include the National Heritage Preservation Act, the Organic Act, the General Mining Act of 1872, the Wilderness Act, the Endangered Species Act of 1973 (ESA), the Alaska National Interest Lands Conservation Act (ANILCA), and the Tongass Timber Reform Act (TTRA). Some were concerned with the influence of court decisions on the scope of the rule.

*Response:* All alternatives in the final PEIS are faithful to and require compliance with all laws governing the Forest Service, including ANILCA, TTRA, and the other laws identified by respondents. This is reaffirmed in the final rule, § 219.1(f), which states that plans must comply with all applicable laws and regulations—some, but not all, of which are mentioned as examples.

The Secretary has clear authority to promulgate the final rule, and the final rule does not conflict with existing law and policy. The foundation for any exercise of power by the Federal Government is the U.S. Constitution. The Constitutional provision that provides authority for management of public lands is the Property Clause (Article IV, Section 3). The Property Clause states that Congress has the power to dispose of and make all needful rules and regulations respecting land or other property belonging to the United States. Using this authority, Congress entrusted the Secretary of Agriculture with broad powers to protect and administer the National Forest System by passing laws, such as the Organic Administration Act of 1897 (the Organic Act), the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), and the National Forest Management Act of 1976 (NFMA).

The duties that Congress assigned to the Secretary include regulating the occupancy and use of National Forest System lands and preserving the forests from destruction (16 U.S.C. 551). Through the MUSYA, Congress directed the Secretary to administer the National Forest System for multiple use and sustained yield of renewable resources without impairment of the productivity of the land (16 U.S.C. 528–531), thus establishing multiple-use as the foundation for management of national forests and grasslands. The statute defines "multiple use" broadly, calling for management of the various uses in the combination that will best meet the needs of the American people (16 U.S.C. 531). Under this framework, courts have recognized that the MUSYA does not envision that every acre of National Forest System land be managed for every multiple use, and does envision

some lands being used for less than all of the resources. As a consequence, the Agency has wide discretion to weigh and decide the proper uses within any area. (*Wyoming* v. *USDA*, 661 F.3d, 1209, 1267–1268 (10th Cir. 2011); *Perkins* v. *Bergland*, 608 F.2d 803, 806–807 (9th Cir. 1979); and *City & Cnty. of Denver* v. *Bergland*, 695 F.2d 465, 476 (10th Cir. 1982)). In passing the MUSYA, which directs the Forest Service to administer the national forests for ''sustained yield of the several products and services obtained therefrom.'' Congress also affirmed the application of sustainability to the broad range of resources the Forest Service manages, and did so without limiting the Agency's broad discretion in determining the appropriate resource emphasis and mix of uses.

The NFMA reaffirmed multiple use and sustained yield as the guiding principles for land management planning of National Forest System lands (16 U.S.C. 1600, 1604). Together with other applicable laws, the NFMA authorizes the Secretary of Agriculture to promulgate regulations governing the administration and management of the National Forest Transportation System (16 U.S.C. 1608) and other such regulations as the Secretary determines necessary and desirable to carry out the provisions of the NFMA (16 U.S.C. 1613). These laws complement the longstanding authority of the Secretary to regulate the occupancy and use of the National Forest System (16 U.S.C. 551). Forest Service regulations governing subsistence management regulations for public lands in Alaska under the ANILCA are found at 36 CFR part 242, and changes to those regulations are outside the scope of the development of a planning rule.

Some of the Agency's past decisions have been challenged in court, leading to judicial decisions interpreting the extent of Forest Service discretion, or judgment, in managing National Forest System lands. Courts have routinely held that the Forest Service has wide discretion in deciding the proper mix of uses within any area of National Forest System lands. In the words of the Ninth Circuit Court of Appeals, the Agency's authority pursuant to the MUSYA ''breathes discretion at every pore.'' (*Perkins* v. *Bergland*, 608 F.2d 803, 806 (9th Cir. 1979)).

*Comment: Regulatory Flexibility Act (RFA) compliance.* A respondent questioned whether this rulemaking is in compliance with the RFA and the rule's capacity to respond to the needs of small governments.

*Response:* The rule has been considered in light of the RFA, as amended by the Small Business Regulatory Enforcement Fairness Act of 1986 (5 U.S.C. 601 et seq.), as documented in the ''Forest Service Planning—Proposed Rule: Opportunities for Small Entities Report'' (09/22/2010). The Department has determined that the rule will not have a significant economic impact on a substantial number of small business entities as defined by the RFA. Therefore, a full regulatory flexibility analysis is not required. The Department recognizes a large number of small businesses use, extract, or otherwise benefit from access to forest resources. The background information provided in the ''affected environment'' in the ''Efficiency and Effectiveness'' section of Chapter 3 in the PEIS describes contributions of NFS lands to small rural and wildland dependent communities, including contributions to jobs and income.

The rule imposes no requirements on small or large entities, nor does it impose requirements or costs on specific types of industries or communities. Rather, the proposed rule sets out a planning process that is designed to provide more opportunities for all affected parties to collaborate in all phases of planning. These opportunities will increase capacity to consider the needs and desires of small entities and reduce the potential for adverse economic impacts. For example, under the final rule, requirements for considering ecosystem sustainability and contributing to social and economic sustainability should facilitate restoration activities and help sustain economic opportunities linked to local or rural communities. Further discussion of compliance with RFA is found in this document under the heading *Proper consideration of small entities.*

*Comment: Cooperation beyond NFS boundaries.* Some respondents were concerned that the ''all lands'' approach is not within the Forest Service's authority.

*Response:* The final rule provides the framework for the development, amendment, or revision of land management plans for national forests, grasslands, prairies, or other administrative units of the NFS. It does not provide the Forest Service with authority to make management decisions for lands that are not NFS lands or activities that are not occurring on NFS units. The Department recognizes that conditions, resources and the management of NFS lands can influence, or be influenced by, the ecological, social and economic conditions and management of non-NFS lands. In recognition of this interaction, the final rule requires the responsible official to look beyond the unit boundary and develop an understanding of management issues on the plan area within the context of the broader landscape, and coordinate with and encourage participation of other relevant land or resource managers. These requirements are found in § 219.4 (public participation), § 219.6 (assessment), § 219.8 (sustainability), § 219.9 (diversity), and § 219.10 (multiple use) of the final rule.

Specific requirements that were brought up by respondents, such as consultation or coordination with the U.S. Fish and Wildlife Service for species listed under the Endangered Species Act of 1973 or with State Air Quality Boards for air quality management under the Air Quality Act, are addressed elsewhere in Agency regulation and policy. The final rule does not include or reiterate existing direction provided elsewhere.

*Comment: Public input on subsequent planning directives.* Some respondents felt the development of the planning directives should be open to public comment.

*Response:* It is the intent of the Department that the Agency continue to move forward with the open and collaborative approach taken to developing the proposed and final rules. The Agency will provide a public comment period for the planning directives.

*Efficiency and Effectiveness Comments on the Proposed Rule*

*Comment: Process.* A respondent said there are too many mandates in the rule for the responsible official to follow, thus making the proposed rule burdensome and difficult to implement. Another respondent felt the amount of process requirements and paperwork in the proposed rule would slow down the planning process.

*Response:* The final rule uses an adaptive management framework that will facilitate an efficient and implementable planning process. Overall, there are fewer procedural requirements in this final rule than were required by the 1982 planning procedures, and the Agency expects that individual plans will take less time and cost less money to complete. There are a number of analysis and procedural requirements under the 1982 Planning Rule that will no longer be required under the final rule, which will save considerable time, effort, and money. The 1982 planning rule places a great deal of emphasis on using economic analyses to find the solution to planning

problems and challenges. However, the final rule emphasizes public participation and science. Examples of requirements from the 1982 rule not included in the final are: planning criteria, required benchmark alternatives as part of the analysis of the management situation, the projections of demand using both price and non-price information, alternative criteria including Resources Planning Act Program alternative, present net value analysis, comparison of final plan to maximizing present net value alternative, identification of the management intensity for timber production for each category of land which results in the largest excess of discounted benefits less discounted costs, vegetation management practices chosen for each vegetation type and circumstances, and projections of changes in practices for at least four decades.

The framework will facilitate more collaboration with the public and an efficient amendment process. The rule allows administrative changes to plan content other than plan components to help the responsible official adapt to changing conditions, while requiring the responsible official to notify the public.

*Comment: Significance of the rule.* Some respondents felt that the Forest Service fails to address the rule as "significant" under E.O. 12866;

*Response:* The proposed rule was designated as significant by the Office of Management and Budget and, therefore subject to the Office of Management and Budget review. The Agency reviewed this proposed rule under the Department procedures and Executive Order (E.O.) 12866 issued September 30, 1993, as amended by E.O. 13563 on Regulatory Planning and Review (76 FR 3821 (Jan. 21, 2011)). The Agency prepared two Cost Benefit Analysis reports (Jan. 25, 2011 for the proposed rule, Nov. 17, 2011 for the final rule). The reports discuss the regulatory impact analysis requirements associated with E.O. 12866 and 13563 and OMB circulars. In comparison to the "no action" alternative, which would continue to use the 1982 procedures currently allowed under the transition provisions of the 2000 rule, the final rule is not considered an economically significant rule.

*Comment: Cost-benefit analysis.* Some respondents felt that the Forest Service did not account for a sufficient range of costs and benefits, including the costs, benefits, and economic impacts resulting from implementation of revised or new plans.

*Response:* The analysis in the "Efficiency and Effectiveness" section of the DEIS and final PEIS focused primarily on evaluations of programmatic planning efficiency. Additional details about the potential for specific planning costs and cost effectiveness to change under the final rule is provided in the final PEIS and Appendix A of the Cost Benefit Analysis Report (Nov. 17, 2011) for the final rule. Although overall planning costs for the Agency under the new rule are not projected to be substantially different from the 1982 rule, the projected cost per plan is expected to be lower than under the 1982 rule, the time it takes to revise a plan is projected to be shorter, and it is expected that more plans will be revised in a 15-year period. In addition, it is anticipated that units will have greater capacity to maintain the currency and reliability of plans to meet the objectives of the MUSYA, the NFMA, and the planning rule (§ 219.1(b)/(c)), thereby improving the quality of plans and therefore the efficiency of the planning process.

*Comment: Economic impacts such as minerals.* Some respondents felt that the Forest Service failed to assess economic impacts that reflect renewable and non-renewable resource sectors (for example, minerals) as well as other sector-specific impacts.

*Response:* Economic impacts in terms of numbers of jobs and labor income supported by NFS lands, by program, are provided for 2009 in Appendix M of the final PEIS, accounting for direct, indirect, and induced effects. Though economic impacts are not estimated, Appendix C in the Cost Benefit Analysis report for the final rule (2011) provides a limited qualitative discussion of potential indirect effects related to timber, rangeland, and recreation opportunities under baseline conditions. Jobs and income for minerals activity have been included in baseline impact analysis, recognizing that minerals management is administered jointly between the Department of the Interior and the Forest Service. Impacts of the final rule to jobs within specific industry sectors as compared to the other alternatives in the PEIS have not been evaluated as these impacts cannot be determined in the absence of on-the-ground project activity at the unit level.

*Comment: Economic benefits of monitoring and ecosystem services.* Some respondents felt that the Forest Service should identify benefits from comprehensive monitoring and provision of ecosystem services.

*Response:* The programmatic benefits of planning tasks or requirements such as comprehensive monitoring (§ 219.12(b)), development of plans to sustain multiple uses (§§ 219.1(b) and 219.10), and accounting for ecosystem services when guiding unit contributions to sustainability (§ 219.8(b)) are accounted for in the discussion of contributions to overall planning efficiency in the "Efficiency" section of Chapter 3 of the final PEIS as well as the "Cost Benefit Analysis" for the final rule (2011).

As identified by the definition of ecosystem services in § 219.19 of the final rule, benefits from provision of ecosystem services are from provisioning services (for example, timber, forage, clean water, and so forth), regulating services (for example, water filtration, soil stabilization, carbon storage, and so forth), supporting services (for example, nutrient cycling, pollination and so forth), and cultural services (for example, spiritual, heritage, recreational experience, and so forth).

As noted in the Cost Benefit Analysis for the final rule in the "Efficiency and Effectiveness Impacts" section, the programmatic benefits of comprehensive monitoring include improved capacity to gather information and reduce uncertainty for a number of integrated and broader-scale conditions, trends, drivers, and stressors—including capacity to detect effects of management within unit boundaries as well as stressors beyond unit boundaries that affect (or are affected by) unit conditions and action. Emphasis on coordination between unit and broader-scale monitoring is expected to help reduce redundancy and ensure information is complementary and consistent.

*Comment: Collaboration costs.* Some respondents felt that the Forest Service did not properly identify that collaboration is not always efficient or cost-effective, may not result in planning efficiency, and that its use should be based on risk assessments.

*Response:* Collaboration and public participation costs are projected to increase from approximately $1 million annually under the 1982 rule provisions, to $11 million annually under this final rule. This increase reflects the requirements in the final rule for public participation opportunities at various stages of planning. The final rule also states that outreach and collaborative processes should be used where feasible and appropriate (§ 219.4(a)). The Department recognizes that gains in effectiveness and planning efficiency from collaboration may vary across units and be reflective of existing collaborative capacity. The Agency realizes collaboration cannot guarantee a

successful planning process; however, the Department and the Agency believe that the increased investment in public participation will likely result in a more effective and ultimately more efficient planning process, by building support early in the process. Details on assumptions relevant to the consideration of the costs of collaboration can be found in the final PEIS section on Efficiency in Chapter 3.

*Comment: Cost of collaboration, diversity, and litigation.* Some respondents felt that the Forest Service omitted costs associated with amendments, litigation, involvement by non-Federal participants, and requirements related to viability and diversity so that these are not accurately reflected or underestimated. Some respondents also felt that the Forest Service projections about planning efficiency and cost effectiveness gains are incorrect, particularly when considering viability requirements, litigation, and use of collaborative processes.

*Response:* As noted in § 219.13 of the final rule, the requirements for amendments are simpler than requirements for plan development or revision. The final rule allows amendments to be proposed without completing an assessment. As a consequence, the amount of resources associated with amendments is expected to be substantially less than that required for plan development or revision in many cases. Amendments allow for plans to be changed more quickly to respond to changing conditions on the ground than plan revisions.

The Department expects that the adoption of new approaches under the final rule for addressing species viability and diversity within plan components, while recognizing local land and unit capabilities and limits, will increase the feasibility as well as the effectiveness of responding to species and ecosystem diversity, sustainability and recovery needs. Further it is expected the final rule will increase overall planning efficiency for both plan management planning and project-level analysis.

Estimates of the Agency's costs do not account for litigation costs. The costs of litigation are not included in the estimates of annual average Agency costs in the "Efficiency and Effectiveness" section in Chapter 3 of the final PEIS. The sources of information used to estimate planning costs, including past cost benefit analyses completed for previous planning rules, did not include litigation costs. Much of the litigation related to planning occurs at the project level, and it is difficult to separate out litigation costs for land management planning from other Agency expenses. Though litigation costs are not included in the efficiency analysis, it is expected that the pre-decisional objection process contained in subpart B of the final rule and the investments in public participation will lower litigation costs compared to the former post-decisional appeal process and fewer opportunities for public input under the 1982 rule procedures.

*Comment: Efficiency analysis during plan revision.* Some respondents felt it important that shifts in resources in the planning process should not adversely affect or preclude analysis of impacts and effects. They further emphasized that analysis of effects including efficiency analysis are still needed to evaluate plan alternatives. Some respondents felt the rule should outline a planning process that reduces costs of planning and should require that plan alternatives be economically efficient. A respondent suggested that the Agency keep the goal of "maximizing net public benefits" from the 1982 planning procedures because the respondent believes that goal is necessary to insure consideration of economic and environmental aspects of renewable resource management. The respondent suggested the planning rule require evaluation of economic efficiency by a full accounting of all costs and benefits (especially non-market) using dollars and present net value.

*Response:* The Department believes that the framework for adaptive management provided in the final rule is efficient, effective, and will reduce the cost and time needed for development, revision, and amendment of individual plans. The final rule provides direction that the planning process and plan components and other plan content should be within the Agency's authority and the fiscal capability of the unit (§ 219.1(g)).

Analyses will focus on outcomes and analysis of impacts and effects. Analyses will in no way be eliminated or discouraged during the planning process under this new rule. Under the NEPA process during plan revisions and plan amendments, responsible officials will evaluate potential tradeoffs among alternatives as they relate to ecological, social, and economic sustainability and environmental effects.

The Department has chosen to emphasize a rule that supports ecological, social, and economic sustainability as the primary goal for management of NFS lands. The final rule does not include requirements to demonstrate that plans will maximize net public benefits or require valuation of economic efficiency or require present net value analysis as the 1982 rule did. The Department believes the focus should be on collaboration, science, and sustainability, rather than the extensive analysis that was done under the 1982 rule procedures. The Department decided the purpose and applicability of the final rule (§ 219.1) is to produce plans under which the Forest Service will manage NFS lands to sustain multiple uses in perpetuity while maintaining long-term health and productivity of the land. Plans are intended to guide management of NFS lands so they are ecologically sustainable and contribute to social and economic sustainability while providing people and communities with a range of benefits, consistent with MUSYA and NFMA. Under the final rule, responsible officials have the discretion to decide what analysis is useful to inform the public about the effects of plans, plan amendments, and plan revisions.

*Comment: Diverting of funds from projects.* Some respondents felt that the rule must weigh the resources devoted to planning against the need to provide a foundation for management. In other words, excessive planning costs divert funds away from land management and projects.

*Response:* Overall, the cost and time of completing an individual plan, revision, or amendment is expected to be less than that needed using the 1982 rule procedures. Under the final rule the Department: (1) Applies flexibility within a clearly defined national-level framework, and (2) requires plans to be developed in a more cooperative context with both community and scientific involvement, thereby building stakeholder trust. In addition, as compared to the 1982 rule, the final rule changes the planning process and reallocates resources to improve the currency, reliability, and legitimacy of plans. This attention to building support early and throughout the process is intended to improve the effectiveness of plans and the Agency's ability to implement projects developed under plans.

*Comment: Non-market values.* Some respondents felt that the rule should require the need to determine non-market values to comply with NFMA requirements to consider economic aspects of various systems of renewable resources.

*Response:* The NFMA requires a planning rule to insure consideration of the economic and environmental aspects of the various systems of renewable resource management (16

U.S.C. 1604(g)(3)A). The rule requires consideration of economic aspects in the requirements for an assessment and when developing plan components. However, the NFMA does not require the responsible official to determine non-market values or to quantify non-market benefits. Because of the difficult nature of quantifying and valuing non-market goods and services, the Department has decided not to require those calculations as a part of planning under the final rule. The rule requires plan components to contribute to economic sustainability, which includes consideration of market and non-market benefits. Additionally, in a number of sections, the rule requires consideration of ecosystem services and multiple uses, including provisioning, regulating, and cultural services, all of which involve numerous non-market goods and services (for example, Assessment—§ 219.6(b); Social and economical sustainability—§ 219.8(b); and Multiple use—§ 219.10(a)). These requirements, in combination with public participation early and throughout the planning process (§ 219.4), are expected to improve Agency capacity to acknowledge the relative values of both market and non-market goods and services. Under NEPA requirements, the responsible official will carry out effects analyses for significant issues and the environmental documents will discuss the comparative benefits and tradeoffs associated with non-market ecosystem services.

*Comment: Pilot testing.* One respondent noted that the rule should be pilot tested on a sample of units.

*Response:* The Agency intends on phasing in the implementation of the new rule by starting several plan revisions in 2012. This initial phase of implementation will provide opportunities for the Agency to adapt to and refine directives and technical advice for planning under the new rule. Units selected for the initial phase of implementation of the final rule represent a broad spectrum of conditions and are geographically representative. The final rule is intended to provide a flexible planning framework that allows for continuous learning and improvement in implementation.

*Comment: Budget shortfalls.* Some respondents felt that the rule should contain guidance for planning in the event of budget shortfalls.

*Response:* Uncertainties at all levels of decisionmaking, due to changing conditions outside the Agency's control as well as budget allocations, will affect implementation. These uncertainties also influence anticipated outcomes of

the rule (see Chapter 3 of the final PEIS, "Staged Decisionmaking and Environmental Analysis"). It is not appropriate to give guidance about what planning activities may be reduced in the event of budget shortfalls in the national planning rule, since budgets, staffing, program emphasis, and planning needs differ among the units. However, the final rule does provide direction that the planning process and plan components and other plan content should be within the Agency's authority and the fiscal capability of the unit (§ 219.1(g)).

*Comment: Budget expectations.* Some respondents felt that the rule should require estimates of budget expectations in analysis of efficiency and effectiveness, and plan alternatives.

*Response:* The final rule recognizes potential financial constraints by requiring the responsible official to ensure that the planning process, plan components, and other plan content be within the fiscal capability of the unit (§ 219.1(g)). In the context of developing alternative plan components, § 219.7(e)(1)(ii) of the rule states that "Objectives should be based on reasonably foreseeable budgets." Also the final rule sets out the requirements for developing plan monitoring program within the financial and technical capabilities of the Agency (§ 219.12(a)(4)(ii)). The effects of plan alternatives such as budgetary effects will be disclosed when preparing an environmental impact statement for each new plan or plan revision.

*Comment: Secured appropriations.* Some respondents felt that a lack of secured appropriations for planning rendered the rule ineffective. Some respondents felt that future budgets are unlikely to provide full funding for planning.

*Response:* If severe reductions or elimination of funding for land management planning were to occur, it would delay or reduce the Agency's ability to amend and revise plans. It is important to note that the estimated costs for the new rule (Table 6 in the final PEIS) are within the historic range of aggregate planning, inventory, and monitoring annual budgets (1995–2010).

*Comment: Economic analysis for plan revisions.* Some respondents felt that the rule should require the NEPA analysis for the plan to include a fiscal analysis of each alternative's implementation and mitigation costs and require that the cost of inspections, enforcement, and monitoring be included in the plan NEPA analysis. Several respondents felt that the planning rule should include a requirement for explicit disclosure of a variety of costs and benefits of Agency

actions to more accurately compare plan alternatives and plan components. Some respondents felt that the planning rule must require the estimates of present net value (PNV) for plan alternatives and projects and include all costs and benefits. Some respondents felt that the planning rule must require that the dollar cost of impacts on non-timber industries be estimated and included in estimates of PNV.

*Response:* Section 219.5(a)(2)(i) of the final rule states that a new plan or plan revision requires preparation of an environmental impact statement. The NFMA gives considerable discretion to the Agency when considering physical, economic, and other pertinent factors. The Department does not want the planning rule to prescribe specific processes for assessing and evaluating economic efficiency. Cost-benefit analyses, or net present value estimation, are not required when evaluating plan alternatives; however, such an analysis (quantitative and/or qualitative) may be useful in some cases to satisfy the NEPA objectives (42 U.S.C. Sec 4331, 101 and 102(2)) and to demonstrate fulfillment of MUSYA goals (for example, "management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people;" (16 U.S.C. 531(a))). The Forest Service handbook for NEPA (FSH 1909.15, chapter 20, section 22.32) states that if a cost benefit analysis is being considered for a proposed action (for example, proposed plan revision), it must be incorporated by reference or appended to the environmental impact statement as an aid in evaluating the environmental consequences. The Forest Service Handbook (FSH 1909.15.section 22.32) as well as NEPA regulations (40 CFR 1502.23) state that for purposes of complying with the [NEPA], the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. The Handbook and NEPA regulations also state that an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision. Those considerations and factors may include a variety of quantified or qualitative descriptions of costs and benefits that are linked to significant issue determinations for a particular forest plan. The Department requires that land management plans will be

within the fiscal capability of the unit (§ 219.1(g)). The rule requires that objectives be based on reasonably foreseeable budgets (§ 219.7(e)(1)(ii)) and that the monitoring program be within the financial and technical capabilities of the Agency (§ 219.12(a)(4)(ii)). Clarifications about disclosure of costs and benefits, as well as use of cost-benefit (or PNV) analysis are more appropriately included in the Agency directives.

*Comments: Collaboration costs.* Many respondents supported public participation opportunities in the decisionmaking process. Some respondents felt collaboration will not be cost effective. Some felt that coordination, as mandated by law, is effective and will save time and expense in planning, implementation, and management. They said increased costs for collaboration are foreseeable. Some respondents felt the assumptions that collaboration will reduce monitoring costs and bring broader support and resolution of issues with their critics were faulty. They felt the final PEIS should explain how collaboration will lead to cost savings and document savings expected from each alternative.

*Response:* The Department believes that involving the public early on through a participatory, open, and meaningful process is the best way to approach planning. The final rule sets out a planning process that is designed to provide more opportunities for the public to collaborate with the Agency and to become more involved in all phases of planning, including monitoring, assessment, and development of alternatives for land management plan revisions or amendments. Section 219.4 of the final rule requires the responsible official to engage the public in early and meaningful opportunities for participation during the planning process and to coordinate with other public planning efforts, including State and local governments. However, the final rule gives the responsible official discretion to tailor the scope, scale, and types of participation opportunities to be congruent with the need and level of interest, subject to the requirements of section 219.4. Collaborative processes would be used where feasible and appropriate.

The final PEIS does not demonstrate that collaboration will lead to Forest Service cost savings in planning. Because of the public participation and collaboration throughout the planning process, the Department expects that the cost for collaboration and engaging the public during the planning process would be higher than that under the 1982 procedures. However, it is anticipated that overall planning efficiency will be improved as other planning activities such as analyzing and revising plan components are anticipated to be streamlined. It is also expected that increased participation and collaboration throughout the planning process will increase support for eventual plan implementation.

*Comment: Jobs and income.* Some respondents felt that the proposed rule could have a significant effect on jobs, labor income, production, and competition of a particular resource during plan revision and plan amendment.

*Response:* The Department recognizes that plans developed, revised, or amended under the final rule will guide projects that could in turn affect distribution of employment, income, and payments to local governments. Impacts to jobs within specific industry sectors due to the final rule compared to the other alternatives have not been evaluated in detail as these impacts cannot be determined in the absence of on-the-ground project activity at the unit level. Direct effects on the levels of goods, services, and uses to which NFS lands contribute are the end-results of on-the-ground projects or activities.

The effects of plan proposals as well as proposed projects will continue to be evaluated in accordance with NEPA; impacts to employment, income, and payments will likewise continue to be evaluated as appropriate to the need to address plan or project-specific significant issues. The Department does not want the planning rule to prescribe specific processes for assessing and evaluating economic effects. Such direction, guidance, advice, or approaches for effects analysis in general are found in the Agency directives (for example FSM 1970 and FSH1909.17).

*Comment: Site-specific project costs.* Some respondents felt that the Agency incorrectly assumes that the site-specific project costs are not affected by the proposed rule.

*Response:* The Agency did not assume that the site-specific project costs are not affected by the proposed rule. However, the proposed rule cost and benefit analysis did not estimate the effects of the rule on site-specific projects developed under land management plans, because site-specific project costs are a function of unknown future site-specific plan or project proposals occurring under new, revised, or amended plans under the final rule; it is, therefore, not possible to estimate or characterize changes in project-specific costs.

*Comment: Least burden to society.* Some respondents felt the Forest Service should develop the rule in a way that imposes the least burden on society, businesses, and communities.

*Response:* The Department believes that the final rule supports management of the NFS to contribute to social and economic sustainability. The rule does not directly regulate individuals, individual businesses, or other entities such as local or State governments. Impacts to small entities are addressed in the Regulatory Flexibility Analysis (as summarized in the Regulatory Certifications section of the preamble for the final rule).

*Comment: Costs of cumulative regulations.* Some respondents felt the Forest Service should consider the costs of cumulative regulations.

*Response:* The potential effects of the rule in combination with other broad Agency actions and strategies (for example, roadless rules, strategic plans and other Agency goals, NEPA procedures, transition to implementing the final rule, management planning direction by other agencies, and collaboration) are presented in the "Cumulative Effects" section of the final PEIS.

*Comment: Costs to States (Federalism).* Some respondents felt the Forest Service incorrectly concludes that the rule will not impose direct or compliance costs on States (that is, Federalism).

*Response:* Executive Order 13132 (that is, Federalism) establishes requirements the Federal Government must follow as it develops and carries out policy actions that affect State or local governments. The Department concludes that the rule would not impose compliance costs on the States (or local governments) and would not have substantial direct effects on the States.

### *Section-By-Section Explanation of the Final Rule*

The following section-by-section descriptions are provided to explain the approach taken in the final rule to NFS land management planning.

### Subpart A—National Forest System Land Management Planning

### Section 219.1—Purpose and Applicability

This section of the final rule describes the purpose of the rule and its applicability to units of the NFS. This section affirms the multiple-use, sustained-yield mandate of the Forest Service, and states that the purpose of this part is to guide the collaborative

and science-based development, amendment, and revision of land management plans that promote the ecological integrity of national forests and grasslands and other administrative units of the NFS. The NFMA requires the Agency to have a planning rule developed under the principles of the Multiple-Use Sustained-Yield Act of 1960 (MUSYA). The planning rule sets requirements for land management planning and content of plans and applies to all units in the NFS.

The requirements in the final rule should increase Agency and plan area capacity for adapting management plans to new and evolving information about stressors, changing conditions, and management effectiveness. The Department's intent is for responsible officials to use the planning framework to keep plans and management activity current, relevant, and effective.

Section 219.1—Response to Comments

Many comments on this section focused on consistency with MUSYA, compliance with or applicability of valid existing rights, treaties, and applicable laws, and the cost of the process for implementing the rule. The Department modified the wording of the proposed rule to move a reference to "ecosystem services" from paragraph (a) of this section to paragraph (c); add at paragraph (c) "clean air" as a benefit provided by ecosystem services and replace the term "healthy and resilient" with "ecological integrity;" move direction about the Forest Service Directives System previously in paragraph (d) of this section in the proposed rule to § 219.2(b)(5); and make other clarifications for readability. These changes are not changes in requirements; they are just clarifications and reorganizations.

The Department added direction at paragraph (g) of this section to ensure that the planning process, plan components and other plan content are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit. In the proposed rule we had similar wording in §§ 219.8 through 219.11. Adding this requirement in paragraph (g) is a change because the requirement now applies more broadly to the process and content requirements of the final rule.

*Comment: Ecosystem services.* Some respondents objected to the use of "ecosystem services" in § 219.1(b) and throughout the rule. One respondent felt the term diluted the congressionally honored and sanctioned "multiple use" mission of the national forests.

*Response:* The use of the term "ecosystem services" has been removed from § 219.1(b), added to § 219.1(c), and revised throughout the final rule; however, the final rule retains reference to "ecosystem services." The final rule states that plans must "provide for ecosystem services and multiple uses" instead of "provide for multiple uses, including ecosystem services" as it was stated in the proposed rule. The Department believes this revised wording is consistent with the MUSYA, which recognizes both resources and services. The MUSYA requires the Forest Service is to "administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." (16 U.S.C. 529). The Act defines "multiple use" as "the management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services" (16 U.S.C. 531(a)). The Department believes MUSYA anticipated changing conditions and needs, and the meaning of "several products and services obtained" from the national forests and grasslands incorporates all values, benefits, products, and services Americans know and expect the NFS to provide. Resources like clean air and water are among the many ecosystem services these lands provide.

*Comment: Objective of planning.* Some respondents felt the MUSYA refers expressly to five tangible objectives for forest management (recreation, range, timber, watershed, wildlife and fish, and wilderness), and does not include intangibles such as "spiritual sustenance." They felt intangibles should be removed from objectives.

*Response:* The Department believes the mandate under the NFMA and MUSYA is not exclusive to a single resource or use, and that sustained yield applies to all multiple use purposes, including outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. Development of balanced plans for national forests and grasslands is a complex undertaking, and often there are diverse opinions on the desired conditions and objectives set in these plans. The rule sets up a process so individual forests and grasslands are managed with a balanced approach to best meet the needs of present and future generations of Americans. The Department recognizes Americans expect a range of benefits and services from the National Forest System, which can include both tangible objectives and intangible benefits. Under § 219.4, the final rule sets forth an open process for public collaboration, participation, and coordination to inform desired conditions and objectives for NFS lands. The words "spiritual sustenance" in § 219.1(c) of the proposed rule have been changed to "spiritual...benefits" in this final rule because the word "sustenance" was confusing.

*Comment: Valid existing rights.* A respondent felt the rule should require plans to expressly state that their provisions cannot affect valid existing rights established by statute or legal instrument.

*Response:* Whether the plan expressly states it or not, a land management plan cannot affect treaty rights or valid existing rights established by statute or legal instruments. For clarity, the final rule acknowledges this fact in § 219.1(d).

*Comments: Inclusion of other laws.* Some respondents requested that the list of laws at § 219.1 include the ANILCA, the Alaska Native Claims Settlement Act, the FLPMA of 1976, the General Mining Law of 1872, the National Heritage Preservation Act, the Tongass Timber Reform Act, amongst others.

*Response:* The list of laws in § 219.1 is not intended to be a complete list of laws and regulations requiring Agency compliance. The Department did not choose to include an exhaustive list of applicable laws and regulations, as the Agency is obligated to comply with all applicable laws and regulations regardless of whether it is referenced in the text of the final rule. All plans and planning decisions must comply with applicable laws and regulations.

*Comment: Use of fiscal capability.* Some respondents felt the MUSYA does not allow the fiscal capability or economic analysis to limit management as discussed in §§ 219.10 and 219.11 of the proposed rule, while others felt these concepts should be applied to all requirements.

*Response:* Congress determines the annual fiscal allocation to the Agency. The Department concludes that responsible officials must constrain the development of management direction within the plan and planning process within a unit's expected fiscal capability. The Department came to this conclusion because if a responsible official develops a plan beyond a unit's fiscal capability, then management towards the plan objectives and thus plan desired conditions will not be realistic or possible. The Department removed the phrase "and the fiscal capability of the unit" from § 219.10 and § 219.11, and added at § 219.1(g) that

the responsible official shall ensure that the planning process, plan components and other plan content are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit. This requirement at § 219.1(g) applies to all sections of the rule, including sections 219.8, 219.9, 219.10, and 219.11.

Section 219.2—Levels of Planning and Responsible Official

Planning occurs at three levels—national strategic planning, NFS unit planning, and project or activity planning. Section 219.2 of the final rule describes these levels of Agency planning, identifies the responsible official, and describes specific attributes and requirements for unit-level planning. This section also provides the basic authorities and direction for developing, amending, or revising a plan. In addition, it identifies the responsibilities of the Chief for oversight, leadership, and direction.

Some people wanted to see very detailed requirements in the rule, such as monitoring methods and protocols, while others emphasized the need to keep the rule simple, so it would endure and could be implemented across different landscapes within the NFS. This section ensures that the Agency will establish additional needed details in the Directives for effective implementation of the planning rule, while allowing rule wording to remain relevant even as conditions change.

Section 219.2—Response to Comments

Many comments on this section focused on the level of the responsible official, the appropriate scale for planning, and consistency of plans across the NFS. The Department modified the wording from the proposed rule to address concerns raised by the public and other regulatory agencies that more specific requirements were needed to ensure consistent implementation of the rule. The Department moved wording formally in section 219.1 of the proposed rule to this section and added paragraph (b)(5) that requires the Chief:
(i) To establish direction for NFS land management planning under this part in the Forest Service Directives System (what was formerly § 219.1(d) in the proposed rule);
(ii) To establish and administer a national performance oversight and accountability process to review NFS land management planning under this part; and
(iii) To establish procedures in the Forest Service Directives System (Directives) to guide how data on

various renewable resources, as well as soil and water will be obtained to respond to 16 U.S.C. 1604(g)(2)(B).

The addition of the oversight requirement in (ii) is a minor change in requirements in response to the comments received. The other changes are not changes in requirements, they are just clarifications.

*Comment: Level of responsible official and consistency with regional or national programs.* Some respondents felt the proposed change from regional forester to forest supervisor for the level of responsible official would make the plan more responsive to local situations. Others felt this change would result in inconsistencies across unit boundaries, limit collaborators, and reduce the accountability provided by a higher level responsible official. Several respondents felt the discretion given to local responsible officials in the proposed rule could lead to individual forest and grassland level plans that are inconsistent with neighboring unit plans and with regional or national programs.

*Response:* The responsible official will usually be the forest or grassland supervisor, who is most familiar with the resources, issues, and the people relevant to and interested in the unit. However, § 219.2(b)(3) provides the option for higher-level officials to act as the responsible official for a plan, plan amendment, or plan revision across a number of plan areas. Regardless of what level they are, the responsible official must develop, amend, or revise plans within the framework set out by this final rule and is accountable for compliance with the rule and the multitude of relevant laws and policies. To ensure compliance, the final rule wording identifies in § 219.2(b) the Chief as responsible for leadership in carrying out the NFS land management planning program, establishment of planning direction, and administration of a national oversight process for accountability and consistency.

There are also a number of places in the final rule that call for coordination with other staff in the Agency, including the appropriate research station director. The Department anticipates that the regional forester and regional office planning and resource specialists will continue to be involved and provide an additional level of oversight, including reviewing draft and final products developed during the planning process and participating in the development of those products. Regional office engagement will help to provide consistency in interpretation and implementation of the planning

rule and other Agency planning requirements on units within the region.

The final rule includes other requirements at § 219.4 for public participation and coordination with other planning efforts. The final rule also requires in § 219.15 that other resource plans be consistent with the plan components. The Department anticipates that the final rule will be implemented in the context of a mosaic of other Agency programs, for example, the Climate Change Roadmap and Scorecard, the Watershed Condition Framework, and the Sustainable Recreation Framework. The Department expects that these programs and requirements will be mutually supportive and will contribute to good land management.

*Comment: Scale of planning.* Some respondents expressed different opinions about the scale of planning. Some suggested larger or smaller scales than the proposed administrative unit level. One respondent felt the rule should consider a level of planning by resource. Some respondents felt the rule should require use of the U.S. Geologic Survey 5th field hydrologic unit as the minimum size needed to conduct ecological coarse-filter assessments.

*Response:* The final rule allows planning at the most appropriate scale to address issues and resource concerns specific to that unit. The final rule does set forth requirements to consider other scales while developing plans. Section 219.7(f)(1)(ii) requires the responsible official to describe the distinctive roles and contributions of the plan area within the context of a broader landscape. Section 219.7(f)(1)(i), specifically discusses priority watersheds. Section 219.7(d) requires the use of management or geographic areas for a smaller scale geographic context and identification of management requirements that may be needed at the smaller scale. The final rule also provides that two or more responsible officials may undertake joint planning for their units.

Planning at the resource level would not comply with the NFMA requirements for interdisciplinary approach to achieve integration of all resources to achieve integrated consideration of physical, biological, economic, and other sciences to develop one integrated plan.

Requirements for broader-scale assessments and assessments for each individual watershed are not included in the final rule. Adding these requirements would add more preliminary steps to planning that may further delay completion of plan revisions or amendments and may not

be necessary for the planning process. The assessments envisioned in the planning rule are focused on gathering and evaluating existing information relevant to the plan or the specific plan area.

The 1982 rule required the preparation of a regional guide and a planning process for the development of that guide. The final rule does not include a requirement for regional planning. After several years of developing and using regional guides, the Agency found that they added an additional and time-consuming layer of planning that often delayed progress of unit planning. Regional plans also tended to remain static and did not change as new information or science became available.

*Comment: Relationship of plan decisions to project-level plans and decisions.* Several respondents felt the relationship between plan decisions and subsequent project-level decisions was unclear. A respondent felt the rule should explicitly state a programmatic decision is being made for the planning unit.

*Response:* The final rule sets the framework for the development, amendment, and revision of unit plans: The requirements set forth in the final rule are for plans, not for projects or activities that are developed under the plan. Section 219.15 requires projects and activities carried out under the plans developed under the final rule to be consistent with the plans. Unit plans may establish constraints on projects and identify possible activities; however, plans do not authorize activities or projects. Forest Service NEPA procedures must be followed when developing, revising, or amending plans. In addition, the Forest Service NEPA procedures must be followed for proposed site-specific projects or activities developed under the requirements of the unit plan. Section 219.15(d) of the final rule identifies how project and activities must be consistent with plan components.

*Comment: Repeating of laws and regulations.* Several respondents felt proposed § 219.2(b)(2) should clearly state plans "may reference, but should not repeat" laws, regulations, and so forth.

*Response:* The final rule does not prohibit referencing laws, regulations, or Forest Service directives if the responsible official feels that doing so will add clarity.

Section 219.3—Role of Science in Planning

This section requires that the responsible official use the best available scientific information to inform the planning process and plan decisions, and provides requirements for documenting the use of the best available scientific information (BASI). The intent of this requirement is to ensure that the responsible official uses BASI to inform planning, plan components, and other plan content, that decisions are based on an understanding of the BASI and that the rationale for decisions is transparent to the public. The Department also expects that this requirement will increase the responsible official's understanding of risks and uncertainties and improve assumptions made in the course of decisionmaking.

Section 219.3—Response to Comments

Many people provided comments on this section of the proposed rule. Most comments focused on whether or not to include a requirement for use of the BASI, discretion about how science should be used, and the potential procedural burdens created by this requirement. The Department modified the wording of the proposed rule as follows: (1) To clarify how scientific information is to be used in the planning process; (2) to clarify the level of discretion the responsible official has in using scientific information; and (3) to manage the potentially burdensome requirements for documentation.

The Department clarified how BASI will be used in the planning process; changing the wording from "the responsible official shall take into account the best available scientific information," to "the responsible official shall use the best available scientific information to inform the planning process." This clarification is consistent with the Department's intent as described in the preamble to the proposed rule. This clarification is in response to public comments expressing concern that the proposed rule wording would allow the responsible official to ignore best available scientific information. This wording makes clear that the responsible official must use the BASI to inform the process and decisions made during the planning process.

The Department also modified the requirement that the responsible official "determine what information is the most accurate, reliable, and relevant to a particular decision or action" to a requirement that the responsible official "determine what information is the most accurate, reliable, and relevant to the issues being considered." This change focuses the requirement on the issues being considered, because the underlying issues form the basis for decisionmaking, and are the appropriate focus for the requirement to ensure that the responsible official uses scientific information to inform plan-related decisions.

The Department eliminated paragraphs (a), (b), and (c) of § 219.3 of the proposed rule. The remaining paragraph was modified to require the responsible official to document how the best available scientific information was used to inform the assessment, the plan decision, and the monitoring program. Changing these requirements is responsive to public comments about the process associated with meeting the requirements of this section.

*Comment: Best available scientific information.* A respondent felt the term "best available scientific information" used in the proposed rule is value laden and implies judgment that cited scientific information is potentially superior to other scientific information on the topic. This respondent felt using the term would put responsible officials in the position of choosing one scientist over another. Additionally, the concern was expressed that the lack of a clear definition of "best available scientific information" in the rule could allow a responsible official to use poorly constructed or subjective information to inform planning decisions. Still other respondents felt the proposed rule was unclear on who should determine what the best available scientific information is.

*Response:* The Department decided to retain the term "best available scientific information" (BASI) from the proposed rule, and to require that such information be used to inform the assessment, the planning process, and plan components and other plan content, including the monitoring program. The responsible official must determine what information is the most accurate, reliable, and relevant with regard to the issues being considered. In some circumstances, the BASI would be that which is developed using the scientific method, which includes clearly stated questions, well designed investigations, and logically analyzed results, documented clearly and subjected to peer review. However, in other circumstances the BASI for the matter under consideration may be information from analyses of data obtained from a local area, or studies to address a specific question in one area. In other circumstances, the BASI could be the result of expert opinion, panel consensus, or observations, as long as the responsible official has a reasonable basis for relying on that information.

The Department recognizes often there is uncertainty in science, and

there may be differing or inconclusive scientific information. Different disciplines, including the social and economic sciences as well as ecologic science, may provide scientific information that is the best available for the issues being considered. Gathering a range of scientific information and acknowledging potential uncertainties is critical to adequately inform the responsible official as well as the public during the planning process.

The Agency already has a fundamental legal requirement to consider relevant factors, including the relevant scientific information, and explain the basis for its decisions. The Department included this section in the rule, with its explicit requirements for determining and documenting the use of the best available scientific information, to inform the planning process and to help to ensure a consistent approach across the National Forest System.

To respond to comments about the level of documentation for individual units, the requirements for documentation were changed from the proposed rule. The Department eliminated paragraphs (a), (b), and (c) of § 219.3 of the proposed rule, and replaced them with the requirement that the responsible official document how the best available scientific information was used to inform the assessment, the plan decision, and the monitoring program. Section 219.14(a)(4) requires that the plan decision document must document how the best available scientific information was used to inform planning, plan components, and other plan content, including the monitoring program. The remaining paragraph was modified to require the responsible official to document how the best available scientific information was used to inform the design of the monitoring program, rather than in every monitoring report, because the monitoring results are scientific information. In addition, the new documentation requirements call for the responsible official to explain the basis for the determination, and explain how the information was applied to the issues considered.

The Forest Service Directives System will contain further detail on how to document the use of the best available scientific information, including identifying the sources of data such as peer reviewed articles, scientific assessments, or other scientific information. In addition, the Forest Service Directives System will contain further detail on the Forest Services' information quality guidelines. Direction about science reviews may be found in Forest Service Handbook 1909.12—Land Management Planning, Chapter 40—Science and Sustainability.

The final rule is consistent with USDA policy that requires agencies to meet science quality standards when developing and reviewing scientific research information and disseminating it to the public. Also, the final rule is consistent with the recent Executive Order 13563 (2011) that states "when scientific or technological information is considered in policy decisions, the information should be subject to well-established scientific processes, including peer review where appropriate." Responsible officials will rely upon the USDA Office of the Chief Information Officer guidance to determine when the Office of Management and Budget (OMB) Information Quality Bulletin on Peer Review applies. USDA guidelines are found at *http://www.ocio.usda.gov/qi_guide/index.html.*

*Comment: Weight of scientific information.* Some respondents felt the proposed rule allowed science to be weighed more heavily than other relevant information. Some respondents felt the proposed rule allows decisions to be made based on politics or special interests rather than science. Some respondents felt the proposed rule requirement for the best available science to be taken into account was not strong enough, and suggested the rule require decisions to conform to the best science. Other respondents felt the proposed rule made use of science mandatory rather than discretionary.

*Response:* The Department never intended that the responsible official could have the discretion to disregard best available scientific information (BASI) in making a decision. To clarify the Department's intent, the final rule requires the responsible official to use the BASI to inform the planning process rather than take BASI into account. While the BASI must inform the planning process and plan components, it does not dictate what the decision must be: BASI may lead a responsible official to a range of possible options. There also may be competing scientific perspectives and uncertainty in the science. Furthermore, scientific information is one of the factors relevant to decisionmaking. Other factors include budget, legal authority, local and indigenous knowledge, Agency policies, public input, and the experience of land managers.

*Comment: Funding for BASI.* Some respondents felt the requirements to use the best available scientific information were going to be too financially burdensome. Other respondents suggest the term should be removed from the rule as it would only create delays and legal challenges.

*Response:* The Agency is already required to take relevant scientific information into account in decisionmaking. The Agency already has a fundamental legal requirement to consider relevant factors, including relevant scientific information, and explain the basis for its decisions.

This section is not intended to impose a higher standard for judicial review than the existing "arbitrary and capricious" standard. The requirements of this final rule section are also separate from those of the Council on Environmental Quality's NEPA regulations, (40 CFR 1502.22(b)), which in some circumstances require the responsible official to seek out missing or incomplete scientific information needed for an environmental impact statement, unless the costs of doing so are prohibitive. This final rule section does not change that requirement. The requirements in section 219.3 are focused on ensuring the responsible official uses the BASI that is already available to inform the planning process. Thus, while an assessment report or monitoring evaluation report may identify gaps or inconsistencies in data or scientific knowledge, the final rule does not impose the affirmative duty that the CEQ regulation applies to EISs—that is, to engage in new studies or develop new information, or to document that the costs of seeking new information are prohibitive.

Including this section in the rule, with its explicit requirements, for determining and documenting the use of the BASI to inform planning the planning process, will help to ensure a consistent approach across the National Forest System that will lead to more credible and supportable plan decisions.

*Comment: Transparency of science used.* Some respondents felt an addition of a requirement for the disclosure of what science was being used would enhance transparency.

*Response:* Section 219.3 of the final rule requires the responsible official to document how the BASI was used to inform the assessment, plan decision, and design of the monitoring program. Such documentation must: identify what information was determined to be the BASI, explain the basis for that determination, and explain how the information was applied to the issues considered. This requirement will provide both transparency and an explanation to the public as to how BASI was used by responsible officials to arrive at their decisions.

*Comment: Risk, uncertainty, and the precautionary principle.* A respondent

stated the words "risk" and "uncertainty" found throughout the preamble and DEIS are missing from the rule itself. The respondent felt the rule should include wording about risks and uncertainties and require techniques for assisting responsible officials in evaluating risks and uncertainties. Some respondents felt the rule should adopt the "precautionary principle" in planning on the NFS to account for uncertainty. One respondent also felt the wording "lack of full scientific certainty shall not be used as a reason for postponing a cost-effective measure to prevent environmental degradation" should be added.

*Response:* The Department concludes that the adaptive management framework of assessment, revision or amendment, and monitoring in this final rule provides a scientifically supported process for decisionmaking in the face of uncertainty and particularly under changing conditions. The intent of this framework is to create a responsive planning process and allows the Forest Service to adapt to changing conditions and improve management based on new information. Monitoring provides the feedback for the planning cycle by testing assumptions, tracking relevant conditions over time, and measuring management effectiveness.

The assessment report will document information needs relevant to the topics of the assessment and the best available scientific information that will be used to inform the planning process.

The science of risk management is rapidly evolving. To require specific techniques or methodologies would risk codifying approaches that may soon be outdated. The responsible official will inform the public about the risks and uncertainties in the environmental impact statements and environmental assessments for plans, plan revisions, and plan amendments.

*Comment: Climate change and climate science.* Some respondents felt the rule should require use of climate change science in decisionmaking. Others felt the rule should address and implement regulations for mitigation of climate change while others felt the rule should not address climate change.

*Response:* The rule sets forth an adaptive land management planning process informed by both a comprehensive assessment and the best available scientific information. Section 219.6(b)(3)–(4) requires responsible officials to identify and evaluate information on climate change and other stressors relevant to the plan area, along with a baseline assessment of carbon stocks, as a part of the assessment phase. Section 219.8(a)(1)(iv) requires climate change be taken into account when the responsible official is developing plan components for ecological sustainability. When providing for ecosystem services and multiple uses, the responsible official is required by § 219.10(a)(8) to consider climate change. Measureable changes to the plan area related to climate change and other stressors affecting the plan area are to be monitored under § 219.12(a)(5)(vi). Combined with the requirements of the Forest Service Climate Change Roadmap and Scorecard, these requirements will ensure that Forest Service land management planning addresses climate change and supports adaptive management to respond to new information and changing conditions.

Section 219.4—Requirements for Public Participation

This section of the final rule requires the responsible official to provide meaningful opportunities for public participation throughout the planning process. It gives direction for providing such opportunities, including for outreach, Tribal consultation, and coordination with other public planning efforts. The intent of this section is to emphasize the importance of active public engagement in planning and to provide direction for the responsible official to take an active, modern approach to getting public input, including recognition of the need for accessibility of the process and engagement of all publics, the responsibility for Tribal consultation, and engagement with other land managers as part of an all lands approach. The outcomes of public participation can include a greater understanding of interests underlying the issues, a shared understanding of the conditions on the plan area and in the broader landscape that provide the context for planning, the development of alternatives that can accommodate a wide range of interests, and the potential development of a shared vision for the plan area, as well as an understanding of how and why planning decisions are made. Engaging the public early and throughout the process is expected to lead to better decisionmaking and plans that have broader support and relevance.

Section 219.4—Response to Comments

Many comments on this section focused on the requirements for the kinds and level of participation opportunities and outreach, coordination with local and State governments and planning efforts, and Tribal consultation. This section was reorganized and new paragraph headings were assigned to increase clarity. Wording affirming that the Forest Service retains decisionmaking authority and responsibility for all decisions was moved from the definition of collaboration of the proposed rule to paragraph (a) of this section. The Department also listed State fish and wildlife agencies, and State foresters in paragraph § 219.4(a)(1)(iv) as illustrative examples of relevant State agencies.

The Department modified the wording about trust responsibilities in § 219.4(a)(2) that was designated at § 219.4(a)(5) of the proposed rule. The proposed rule said: the Department recognizes the Federal Government's trust responsibility for federally recognized Indian Tribes. The final rule says: the Department recognizes the Federal Government has certain trust responsibilities and a unique legal relationship with federally recognized Indian Tribes. This change was made to ensure accurate recognition of the relationship between the Federal Government and federally recognized Tribes.

The Department deleted the phrase, "to the extent practicable and appropriate," from the end of paragraph § 219.4(b) for coordination with other public planning efforts, in response to public comment. The change is intended to make clear that the requirements for coordination with other public planning efforts have not been reduced from previous rules. However, this change is not intended to require the Agency's planning efforts to tier to, or match the timing of other public planning efforts. These changes are not changes in requirements, they are clarifications.

*Comment: Specific requirements for public engagement.* Some respondents felt that the rule should allow responsible officials to have the discretion to determine public outreach methods, while others felt the rule should contain specific method and process requirements for public engagement because vague requirements could result in courts second-guessing whether the public participation was sufficient. Others felt the public participation opportunities held during planning need to be flexible and accommodate the people living and working in the area. Others requested specific recreation clubs and organizations be added to proposed § 219.4(a)(2). A respondent felt the responsible official should be required to identify other non-traditional means

of engagement and to identify in advance the participation of specific populations in each area with historical and traditional connections to the land, including forestry workers, their associations, and specific communities who retain or wish to retain historic connections to the land. Some respondents felt individuals and organizations engaged in forest planning should be limited to either economic stakeholders or those with an existing interest in forest management as the Forest Service cannot make individuals or groups with no interest or economic stake in national forests participate in forest planning, regardless of the effort the Agency puts into targeted scoping.

*Response:* The rule requires the responsible official to engage and encourage participation by a diverse array of people and communities throughout the planning process. This includes those interested at the local, regional, and national levels and covers all groups and organizations that are interested in the land management planning process. The Department recognizes the need to engage a full range of interests and individuals in the planning process. The national forests and grasslands belong to all Americans and not just those who have economic or previously expressed interest. The Department concluded it was important for the final rule to recognize that opportunities for public participation in the planning process must be fair and accessible, while recognizing and taking into account the diverse interests, responsibilities, and jurisdictions of interested and affected parties. The final rule does not require participation from any specific group. The rule also allows flexibility in the methods of offering opportunities for engagement, recognizing that the best way to engage will vary at different times and in different places. The responsible official has the discretion to determine the scope, timing, and methods for participation opportunities necessary to address local, regional, and national needs, while meeting the requirements of § 219.4.

The planning procedures established for land management planning in the Forest Service Directives System will also provide further direction to ensure consistent implementation of the requirements of the final rule.

*Comment: Clarification on collaborative process.* Some respondents felt the rule should clarify when a collaborative process would or would not be "feasible and appropriate." A respondent felt the rule should ensure public participation occurs when forest plans are revised and amended. Some respondents felt their local Forest Service office is already collaborating with the public and that the proposed rule would discourage the unit from continuing with methods already working locally.

*Response:* This final rule contains a balanced approach that requires the responsible official to engage a diverse array of people and communities throughout the planning process. Participation opportunities must be provided throughout all stages of the land management planning process, including during plan revision and amendment.

The CEQ publication *Collaboration in NEPA—A Handbook for NEPA Practitioners* at: *http://ceq.hss.doe.gov/ntf/Collaboration_in_NEPA_Oct_2007.pdf,* describes a spectrum of engagement, including the categories of inform, consult, involve, and collaborate. Each of these categories is associated with a set of tools, from traditional activities such as notice and comment on the inform end of the spectrum, to consensus building, or a Federal advisory committee on the collaborative end of the spectrum. Because the term "collaboration" is often associated with only those activities on one end of the public engagement spectrum, the Department chose to retain the term "public participation" in the final rule to make clear that the full spectrum of tools for public engagement can be used in the planning process. Every planning process will involve traditional scoping and public comment; in addition, the responsible official will determine the combination of additional public participation strategies that would best engage a diverse set of people and communities in the planning process.

The final rule absolutely provides the flexibility to support the use of already working processes, including existing collaborative processes. Because the make-up and dynamics of the communities surrounding each planning area differ, and because the level of interest in decisionmaking may vary, based on the scope and potential impact of the decision being contemplated, the responsible official needs the flexibility to select the public participation methods that would best meet the needs of interested people and communities. The wording "feasible and appropriate" provides the responsible official the flexibility needed to develop effective participation opportunities, including using existing opportunities for collaboration.

Planning procedures established in the Forest Service Directives System will provide further guidance and clarification for how the public participation requirements of the final rule will be implemented.

*Comment: Time and cost of public involvement.* Some respondents felt the proposed public participation requirements are cumbersome and unrealistic in regards to time and cost and the ability for individuals to fully participate. Others felt the public participation requirements would not result in a more efficient planning process.

*Response:* The final rule directs the responsible official to take the accessibility of the process, opportunities, and information into account when designing opportunities for public participation, precisely because individuals may vary in their ability to engage, including in how much time and money they have to spend on participating in the process. Likewise, the final rule directs the responsible official to consider the cost, time, and available staffing when developing opportunities for public participation that meet needs and constraints specific to the plan area. This is to ensure that the process is feasible and efficient. In addition, § 219.1(g) requires that the planning process be within the authority of the Forest Service and the fiscal capability of the unit.

However, the rule does place a strong emphasis on developing opportunities early and throughout the planning process, with costs of planning projected to be redirected toward collaboration, assessment, and monitoring activities and away from development and analysis of alternatives, as compared to the 1982 procedures. The public participation requirements are expected to improve plans and increase planning efficiency in a variety of ways. Collaborative efforts during the early phases of planning are expected to result in improved analysis and decisionmaking efficiency during the latter stages of planning; lead to improved capacity to reduce uncertainty by gathering, verifying, and integrating information from a variety of sources; reduce the need for large numbers of plan alternatives and time needed for plan revisions; potentially offset or reduce monitoring costs as a result of collaboration during monitoring; improve perceptions regarding legitimacy of plans and the planning process; increase trust in the Agency, and potentially reduce the costs of litigation as a result of receiving public input before developing and finalizing decisions. Overall, it is the Department's

view that investment in providing opportunities for public engagement will lead to stronger and more effective and relevant plans.

*Comment: Undocumented knowledge.* A respondent felt the planning process should take into account other forms of knowledge besides written documentation, and this knowledge should be shared with all interests and individuals throughout the planning process.

*Response:* The Department recognizes that other forms of information besides written documentation, such as local and indigenous knowledge and public experiences, should also be taken into account. Opportunities for the public to provide information during the assessment phase will help the responsible official to capture other forms of knowledge, and to reflect that information in the assessment report that will be available to the public. This section of the final rule requires the responsible official to encourage public participation, thus sharing knowledge, ideas, and resources. In addition, paragraph (a)(3) of this section requires the responsible official to request information about native knowledge, land ethics, cultural issues, and sacred and culturally significant sites.

*Comment: Participation requirements accountability.* Some respondents felt the rule should contain measures ensuring the responsible officials meet the public participation requirements.

*Response:* To ensure accountability in implementation for all of the requirements in the final rule, the Department added § 219.2(b)(5) requiring the Chief to administer a national oversight process for accountability and consistency of NFS land management planning. In addition, the planning procedures established in the Forest Service Directives System will provide further guidance and clarification for how the public participation requirements of the final rule will be implemented.

*Comment: Decisionmaking authority.* Some respondents felt the rule must disclose the Forest Service retains full decisionmaking authority.

*Response:* While § 219.4 of the rule commits the Agency to public participation requirements and encourages collaboration, by law the Forest Service must retain final decisionmaking authority and responsibility throughout the planning process. Paragraph (a) of this section has been modified to include the sentence "The Forest Service retains decisionmaking authority and responsibility for all decisions throughout the process," which was previously in the definition for collaboration in the proposed rule.

*Comment: Specific requirements for youth, low-income, and minority populations.* Some respondents supported requirements to engage youth, low-income and minority populations, and advocated including additional requirements. One respondent felt that references to youth, low-income, and minority populations should be removed. A respondent felt the rule should integrate elements related to equitable recreation access for youth, low-income, and minority populations into the assessment, planning, and monitoring elements of the rule.

*Response:* Many people discussed the need for the Forest Service to make a stronger effort to engage groups and communities that traditionally have been underrepresented in land management planning. This is reflected in the requirement that responsible officials encourage the participation of youth, low-income populations, and minority populations in the planning process and in the requirements to be proactive and use contemporary tools to reach out to the public and consider the accessibility of the process to interested groups and individuals. The Department recognizes the need to engage a full range of interests and individuals in the planning process and the responsibility to promote environmental justice. To encourage wide-ranging participation, the final rule retains the requirement for the responsible official to seek participation opportunities for traditionally underrepresented groups like youth, low-income populations, and minority populations.

The Department added requirements in §§ 219.8 and 10 to take into account opportunities to connect people with nature when developing plan components to contribute to social and economic sustainability and for multiple uses, including recreation, in addition to the requirements for outreach to youth, low-income, and minority populations included in this section. Specific issues regarding recreation access on a unit will be addressed at the local level during the planning process.

*Comment: Predominance of local or national input.* Some respondents felt the proposed § 219.4 did not place enough emphasis on input from the local community, while others felt the proposed collaboration process would result in too much input from local interests and groups. Other respondents felt the public participation process needs to be all-inclusive, including at the local, State, and national levels and should be directed at the general public and not focus on participation from specific segments of the population. Other respondents felt the proposed rule only provides participation opportunities for State and local governments. A respondent felt comments or recommendations by a local Board of Supervisors should be given equal consideration as to those comments received from State and Federal agencies.

*Response:* Section 219.4(a)(1)(iv) of the final rule clarifies the responsible official's duty for outreach to other government agencies to participate in planning for NFS lands, including State fish and wildlife agencies, State foresters, and other relevant State agencies, local governments including counties, and other Federal agencies. However, a successful planning process must be inclusive in order to adequately reflect the range of values, needs, and preferences of society. All members of the public would be provided opportunities to participate in the planning process. Section 219.4(a) of the final rule lists specific points during the planning process when opportunities for public participation would be provided. To meet these requirements, the responsible official must be proactive in considering who may be interested in the plan, those who might be affected by the plan or a change to the plan, and how to encourage various constituents and entities to engage. Responsible officials will encourage participation by interested individuals and entities, including those interested at the local, regional, and national levels.

*Comment: Coordination with State and local governments.* Some respondents felt the proposed rule downplayed requirements to coordinate with State and local governments and that public participation is elevated over coordination. Other respondents felt State wildlife agencies should specifically be coordinated with when designing and implementing plans, on-the-ground management activities, monitoring, and survey design. Some respondents felt the rule should use the wording from § 219.7 of the 1982 planning rule regarding coordination with State and local governments. Others felt wording from Alternative D of the DEIS should be included. Some respondents felt forest plans should be written in partnership with the States in which the national forest or grassland is located. A respondent supported the review of county planning and land use policies and documentation of the review in the draft EIS as stated in proposed § 219.4(b)(3). Several

respondents noted the 1982 planning rule at § 219.7(b) requires county governments to be given direct notice of forest plan revisions and oppose the proposed elimination of the requirement in the proposed rule. A respondent stated input from local governments is required by NFMA's mandate for coordination with local agencies that acknowledges the contributions and responsibilities unique to local agencies, including planning responsibilities for the private lands that fall under the "all lands" umbrella.

*Response:* Many of the coordination requirements of the 1982 planning rule have been carried forward into § 219.4(b)(1) and (2) of the final rule. Section 219.4(b)(3) clarifies requirements for coordination efforts.

Under § 219.4(a), the final rule requires the responsible official to encourage participation by other Federal agencies, Tribes, States, counties, and local governments, including State fish and wildlife agencies, State foresters and other relevant State agencies. The final rule also requires the responsible official to encourage federally recognized Tribes, States, counties, and other local governments to seek cooperating agency status in the NEPA process for planning, where appropriate, and makes clear that the responsible official may participate in their planning efforts.

Under § 219.4(b) of the final rule, the responsible official must coordinate planning efforts with the equivalent and related planning efforts of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments. The Department deleted the phrase, "to the extent practicable and appropriate," from the end of paragraph § 219.4(b), in response to public comment. This change is not intended to require the Agency's planning efforts to tier to, or match the timing of other public planning efforts. It was made to make clear that the requirements for coordination with other public planning efforts have not been reduced from previous rules.

The requirement for coordination from the 1982 rule to identify and consider other information is found in § 219.6(a) of the final rule. Section 219.6(a) of the final rule requires consideration of relevant information in assessments of other governmental or non-governmental assessments, plans, monitoring evaluation reports, and studies. The final rule does not adopt the coordination requirements of Alternative D of the DEIS because the coordination requirements are part of the species viability requirements of Alternative D. The final rule does require the responsible official to coordinate to the extent practicable with other Federal, State, Tribal, and private land managers having management authority over lands relevant to a population of species of conservation concern (§ 219.9(b)(2)(ii)). To discuss the role of the Forest Service unit in the broader landscape, final rule §§ 219.4(a)(1), 219.6(a), 219.7(c)(1), and 219.12(a) require coordination with other levels and deputy areas within the Agency as well as the public, appropriate Federal agencies, States, local governments, and other entities throughout the planning process. The final rule recognizes that participants have different roles, responsibilities, and jurisdictions, which the responsible official will take into account in designing opportunities for participation. The final rule does not adopt the requirement of the 1982 rule to meet with a designated State official and representatives of Federal agencies and local governments because people can often collaborate together without a face-to-face conference. The Department expects responsible officials to effectively engage States, Tribes, and local officials and other representatives in collaborative planning processes.

*Comment: Commitments to and consistency with local plans.* Some respondents felt the rule needs a stronger commitment to local government plans, including statewide forest assessments and resource strategies. Some respondents felt proposed § 219.4(b)(3) wording "nor will the responsible official conform management to meet non-Forest Service objectives or policies" should be removed because it may contradict with the purpose of coordinating with local government. Others felt the primary goal of coordination should be achieving consistency between Federal and local plans within the legal mandates applicable to all entities. Some respondents felt the analysis must document there is no superior alternative to a proposed plan or action as required by NEPA.

*Response:* When revising plans or developing new plans, under § 219.4(b) the responsible official must review the existing planning and land use policies of State and local governments, other Federal agencies, and federally recognized Tribes and Alaska Native Corporations, where relevant to the plan area, and document the results of the review in the draft EIS. Section 219.4(b) requires that review to consider a number of things, including opportunities for the unit plan to contribute to joint objectives and opportunities to resolve or reduce conflicts where they exist. The review would consider the objectives of federally recognized Indian Tribes, and other Federal, State, and local governments, as expressed in their plans and policies, and would assess the compatibility and interrelated impacts of these plans and policies. In addition, responsible officials in the assessment phase are required to identify and consider relevant existing information, which may include relevant neighboring land management plans and local knowledge. This information may include State forest assessments and strategies, ecoregional assessments, nongovernmental reports, State comprehensive outdoor recreation plans, community wildfire protection plans, public transportation plans, and State wildlife action plans, among others.

However, plans are not required to be consistent with State forest assessments or strategies or plans of State and local governments under the final rule. The Forest Service must develop its own assessment and plans related to the conditions of the specific planning unit and make decisions based on Federal laws and considerations that may be broader than the State or local plans. Requiring land management plans to be consistent with local government plans would not allow the flexibility needed to address the diverse management needs on NFS lands and could hamper the Agency's ability to address regional and national interests on Federal lands. In the event of conflict with Agency planning objectives, consideration of alternatives for resolution within the context of achieving NFS goals or objectives for the unit would be explored. The final rule does not repeat legal requirements found in public law, such as NEPA and NFMA, but § 219.1(f) would require plans to comply with all applicable laws and regulations.

*Comment: Cooperating agencies for unit plan development.* A respondent felt the rule should identify State, Tribal, and local governments as cooperating agencies. Other respondents asked why a Tribe would request cooperating agency status and what the benefit would be. Another respondent felt the role of State and local governments is compromised, because the propose rule allows a responsible official to decide when cooperating agency status would be allowed. A respondent noted the Forest Service should be willing to share information and not impose cost-prohibitive barriers to such information, and the proposed rule does not allow cooperating agency status for State and local governments,

because the process folds them into the public at large. Several organizations commented on the preferred alternative that the final rule should require responsible officials to grant cooperating agency status under NEPA to entities if federally recognized Tribes, States, counties, or local governments appropriately apply for such status.

*Response:* The responsible official will encourage federally recognized Tribes, States, counties, and other local governments to seek cooperating agency status where appropriate. The final rule does not preclude any eligible party from seeking cooperating agency status; rather, it provides direction to Forest Service responsible officials to encourage such engagement where appropriate. Cooperating agency status under NEPA is determined under the Council of Environmental Quality (CEQ) requirements for cooperating status (40 CFR 1501.6). Further guidance may be found at *http://www.fs.fed.us/emc/nepa/index.htm*. The final rule does not affect that process. For federally recognized Tribes, cooperating agency status does not replace or supersede the trust responsibilities and requirements for consultation also recognized and included in the final rule. Any request for cooperating agency status will be considered pursuant to the CEQ requirements and Agency policy.

*Comment: Tribal consultation.* Some respondents felt that Alaska Native Corporations should not be given the same status as federally recognized Indian Tribes, while another respondent felt that the final rule should recognize and provide for consultation with affected Alaska Native Corporations and Tribal organizations. Several Tribes and Alaska Native Corporations are concerned about keeping information confidential to protect sites from vandalism.

*Response:* The final rule acknowledges the Federal Government's unique obligations and responsibilities to Indian Tribes and Alaska Native Corporations in the planning process. The statute, 25 U.S.C. 450 note, requires that Federal agencies consult with Alaska Native Corporations on the same basis as Indian Tribes under Executive Order 13175. While the final rule requires consultation and participation opportunities for Alaska Native Corporations, the Department engages in a government-to-government relationship only with federally recognized Indian Tribes, consistent with Executive Order 13175. Responsible officials will protect confidentiality regarding information given by Tribes in the planning process and may enter into agreements to do so.

*Comment: Coordination with Tribal land management programs.* Some respondents felt the responsible official should actively engage in coordination with Tribal land management programs and that the proposed rule weakens requirements to coordinate planning with Tribes. One respondent requested that the Tribal coordination provisions from the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1712(b)) be included in the final rule.

*Response:* The final rule provides participation, consultation, and coordination opportunities for Tribes during the land management planning process, under § 219.4. This section also states at § 219.4(b) that the responsible official shall coordinate land management planning with the equivalent and related planning efforts of federally recognized Indian Tribes and Alaska Native Corporations. A citation for 43 U.S.C. 1712(b) has been added to the final rule at § 219.4(b)(2). Participation in a collaborative process would be voluntary and would supplement, not replace consultation.

*Comment: Government-to-government relationship.* One respondent felt the proposed rule does not go far enough in identifying the unique government-to-government relationship between Tribes and the Forest Service.

*Response:* The Department recognizes the unique government-to-government relationship that the Federal Government has with Tribes, and has engaged Tribes throughout the rulemaking process. The final rule includes requirements for engaging Tribes during the land management planning process. At § 219.4(a)(2) the final rule states that the responsible official shall honor the government-to-government relationship between federally recognized Indian Tribes and the Federal Government, in accordance with Executive Order 13175. Additionally, § 219.4 requires that the responsible official provide opportunities for participation and consultation for federally recognized Indian Tribes and Alaska Native Corporations.

Section 219.5—Planning Framework

This section provides an overview of the framework for land management planning, and identifies what occurs during each phase. It also includes the requirement for the establishment of an interdisciplinary team for planning. This framework reflects key themes heard from the public, as well as experience gained through the Agency's 30-year history with land management planning.

The framework requires a three-part learning and planning cycle: (1) Assessment; (2) plan development, plan revision, or plan amendment; and (3) monitoring. This framework is science-based (§ 219.3), and provides a blueprint for an open and participatory land management process (§§ 219.4 and 219.16). It is intended to create a better understanding of the landscape-scale context for management and support an integrated and holistic approach to management that recognizes the interdependence of ecological resources and processes, and of social, ecological, and economic systems. The framework creates a structure within which land managers and partners will work together to understand what is happening on the land. It is intended to establish a responsive process that would allow the Agency to adapt management to changing conditions and improve management based on new information and monitoring, using narrower, more frequent amendments to keep plans current between revisions.

Section 219.5—Response to Comments

Many comments on this section focused on the need for more clarity in the framework. The Department made changes to § 219.5(a)(1) to describe the assessment and emphasize that the assessment process is intended to be rapid, and use existing information related to the land management plan within the context of the broader landscape. The Department removed the discussion about the preliminary need to change the plan from paragraph (a)(1) because the discussion has been removed from the assessment (§ 219.6) and discussed in paragraph (a)(2) of this section and in § 219.7. The Department removed the introductory text of paragraph (a)(2) of this section because it was redundant to paragraph (a)(2)(i) of this section and to § 219.7(b). Section 219.5(a)(2)(ii) was slightly modified to clarify that the first step to amend a plan is to identify a preliminary need to change the plan. Additional edits were made for clarity. The changes to this section are not changes in requirements, they are just clarifications.

*Comment: Planning framework.* Some respondents felt more clarity was needed on the three phases of the framework (assessment, development, and monitoring). Further clarity was sought on how the phases are interrelated.

*Response:* This section was included to provide clarity with regard to each phase of the framework and how they are interrelated. Detailed requirements and relationships for each phase are provided in other sections of the rule. In

addition to the descriptions of what occurs during each phase provided in this section, changes were made to §§ 219.6, 219.7 and 219.12 to make clear that information from each phase should be used to inform each of the other phases. In § 219.6, assessments are required for new plan development and plan revision, and a new list of topics for the assessment was included to more closely link the assessment requirements to the requirements for plan components and other plan content. The responsible official must identify and consider relevant information contained in monitoring reports during the assessment phase. These monitoring evaluation reports are developed in the monitoring phase as required in § 219.12(d), which requires that they be used to inform adaptive management. Section 219.7 requires the responsible official to review relevant information from the assessment and monitoring to identify a preliminary need for change and to inform the development of plan components and other plan content, including the monitoring program. In this way, the framework builds on information gathered and developed during each phase of the planning process and supports adaptive management for informed and efficient planning.

*Comment: Resource exclusion.* Some respondents felt the proposed rule allows too much discretion to the responsible official to exclude resources or uses of interest under the three phases of the planning framework.

*Response:* There are numerous opportunities throughout the process for the public to identify resources and uses that are of interest to them, along with information about those resources or uses relevant to the plan area. If a resource or use is identified as of interest, it will be considered during of the planning process. The responsible official must meet all the requirements contained in the final rule, including the requirement to identify resources present in the plan area and consider them when developing plan components for §§ 219.8 through 219.11, including for ecological sustainability, diversity, and multiple use.

*Comment: Composition of planning interdisciplinary teams.* Several respondents felt the rule should specify the composition of the interdisciplinary teams required under proposed § 219.5(b).

*Response:* The Department concluded that the responsible official should have the discretion to determine the disciplines, or areas of expertise, to be represented on the Agency interdisciplinary team for preparation of assessments; new plans, plan amendments, or plan revisions; and plan monitoring programs. Because planning efforts are based on an identified need for change, it would not be appropriate to require the same disciplines to be represented on every interdisciplinary team. Also, individual team members often have broad areas of expertise and may represent multiple disciplines.

Section 219.6—Assessments

This section sets out both process and content requirements for assessments. In the assessment phase, responsible officials will rapidly identify and evaluate relevant and existing information to provide a solid base of information and context for plan decisionmaking, within the context of the broader landscape. The final rule identifies and provides examples of sources of information to which the responsible official should refer, requires coordination and participation opportunities, and requires documentation of the assessment in a report to be made available to the public. This phase is intended to be rapid, and changes were made to the final rule to improve the efficiency of the assessment process. The Department expects the assessment required by the final rule will take about 6 months to complete.

The content of assessments will be used to inform the development of plan components and other plan content, including the monitoring questions, and to provide a feedback loop. The final rule narrows and clarifies the requirements for the content of plan assessments, to increase efficiency and provide a clearer link to the requirements for plan components and other plan content in the other sections of the final rule. During the assessment phase, the public will have the opportunity to bring forward relevant information. Gathering and evaluating existing, relevant information will help both the responsible official and the public form a clear base of information related to management issues and decisions that will be made later in the planning process.

Section 219.6—Response to Comments

Many comments on this section focused on concerns about the assessment phase in the proposed rule being too open ended, lengthy and costly, and/or not closely enough linked to the requirements for plan components and monitoring in the other phases of the framework. The Department determined that these concerns were valid, and made a number of changes to this section in response. The Department reorganized the section to clarify the process and direction for assessments.

In the introductory paragraph, the Department removed the description of what an assessment is, and provided a cross-reference to description of the assessment in § 219.5(a)(1). This change was made to avoid redundancy, and is not a change in requirements. Changes to the description of the assessment in § 219.5(a)(1) were made to focus on the use of existing information in a rapid process. This change reflects the intent for this phase as stated in the preamble to the proposed rule, and makes that intent clear in the final rule. Additional changes to reflect this focus were made throughout this section. These changes reflect the preamble discussion of the proposed rule about rapid assessments; therefore, these changes are clarifications based on public comments to make the assessment more efficient.

In paragraph (a) of the final rule the Department made several changes, including:

(1) Removed specific requirements for formal notification and encouragement of various parties to participate in the assessment (designated at § 219.6(a)(1) and (a)(2) of the proposed rule); these specific requirements were removed in response to public comments. Requirements for public participation and notification during this phase are still present in §§ 219.4 and 219.16. This is a change in requirements that is based on public comments to make the assessment more efficient.

(2) Moved the type of information to identify and consider from paragraph (b)(2) of this section of the proposed rule to paragraph (a)(1) in this section. The Department added public transportation plans and State wildlife data to the list of example documents to consider contained in paragraph (a)(1). The Department further clarified in this paragraph that relevant local knowledge will be considered if publicly available or voluntarily provided. These additions are not changes in requirements as they clarify the Department's intent.

(3) Changed the description of the report at paragraph (a)(3) from a set of reports to a single assessment report; changed discussion of additional information needs to clarify that they should be noted in the assessment report, but that new information need not be developed during the assessment phase; and changed the requirement from documenting how science was "taken into account" to how the best available scientific information was "used to inform" the assessment for

consistency with § 219.3. These changes reflect public comments on making the assessment phase more efficient, as well as public comments on § 219.3.

(4) Removed the requirement for the assessment to identify the need to change the plan from this section and added that requirement as an early step in the planning process in § 219.7. The Department moved the requirement to § 219.7 because after reading the public comments it was decided that identifying a need to change the plan in the assessment phase may cause confusion with the NEPA process. The planning rule continues to emphasize a "need for change" approach to planning but this now begins with a preliminary identification of the need to change the plan identified in the beginning of plan development (§ 219.7) within the formal NEPA process.

Paragraph (b) describes the content of assessments for plan development or plan revision. The Department added a specific listing of 15 topics that would be identified and evaluated relevant to the plan area, and removed the requirement in the proposed rule that the assessment report identify and evaluate information related to the substantive sections of the plan (§§ 219.7, 219.8, 219.9, 219.10, and 219.11). This change was made in response to comments that the assessment phase needed to be both more efficient and more narrowly and specifically focused on the information needed to form a basis for developing plan components and other plan content. These changes represent a change in requirements. Changes made to § 219.7 provide additional clarity to link the two phases.

One term in the list of 15 items may be unfamiliar to the reader: baseline assessment of carbon stocks. The final rule requires that the responsible official use existing information to do a baseline assessment of carbon stocks. Carbon stocks are the amount of carbon stored in the ecosystem, in living biomass, soil, dead wood, and litter. This requirement was included in response to public comments to ensure that information about baseline carbon stocks is identified and evaluated before plan revision or development, and to link this phase to the requirements of the Forest Service Climate Change Roadmap and Scorecard. The Department's expectation is that this information would be generated via implementation of the Roadmap and Scorecard prior to planning efforts on a unit, and that the assessment phase would use that information to meet the direction in § 219.6(b)(4). The Forest Service has developed a National Roadmap and Performance Scorecard for measuring progress to achieve USDA strategic goals (USDA Forest Service 2010d, 2010j). The roadmap describes the Agency's strategy to address climate change and the scorecard is an annual reporting mechanism to check the progress of each NFS unit.

The requirements for the assessment to identify distinctive roles and contributions and potential monitoring questions previously included in paragraph (b) were removed from this section of the rule because they implied there would be decisions in the assessment phase that should be made as part of the plan decision. Both requirements are still present in other sections of the final rule; therefore, the removal of these requirements from this section of the rule is a minor change.

At § 219.6(c) the Department removed requirements for plan amendments that were consolidated with requirements for plan amendments in § 219.13(b)(1) for clarity and to avoid duplication. In addition, the Department changed the word "issue" to "topic" to avoid confusion with the term "issues" as used in the NEPA process. These changes are not changes in requirements, they are just clarifications.

*Comment: Assessment process.* Some respondents felt the proposed assessment process should be removed from the rule as it is an added and potentially costly step to the planning process. They felt it would be more efficient and effective if assessments used to justify an amendment or plan revision were combined into one document for the proposed amendment or revision. They also felt the rule should provide more guidance and parameters for the decisionmaking occurring along with assessment reports. Other respondents felt the proposed rule requirements were vague on the nature of assessments and more standards or guidelines for determining proper time frames, content, and need for assessment is necessary. Others were concerned that the assessments should be more comprehensive, that too much discretion was given to the responsible official to determine what to include in the assessment, and the responsible official should be required to use, not just consider, the information.

*Response:* Section 219.6 of the final rule changes the requirements for assessments. A single document identifying and evaluating key information for a plan revision or amendment will serve as an important source to set the stage for planning in both the development of the plan and in the evaluation of environmental effects through an environmental impact statement.

The final rule stresses the assessment as an information gathering and evaluation process specifically linked to the development of plan components and other plan content, in the context of the broader landscape. The final rule requires information about the list of topics in § 219.6(b) to be identified and evaluated in the assessment. The inclusion of this list as opposed to the broader direction included in the proposed rule is intended to make the process both more efficient, and more clearly focused on the specific information needed to inform the development of plan components and other plan content as required by other sections of the final rule.

The requirement of the proposed rule to find a "need to change" during the assessment phase of planning has been removed to clarify that the assessment is not a decisionmaking process and does not require a NEPA document to be prepared. Changes to § 219.7 clarify that the responsible official must review material gathered during the assessment to identify a preliminary need to change the existing plan and to inform the development of the plan components and other plan content. The information may be used and referenced in the planning process, including environmental documentation under NEPA. However, the assessment report is not a decision document.

The responsible official is required to provide public participation opportunities to all interested parties during the assessment process, and must provide notice of such opportunities, as well as the availability of the assessment report. The public will have a formal opportunity to comment on information derived from the assessment later in the NEPA process of the plan development, amendment, or revision.

The Department decided to retain the flexibility provided in the proposed rule for the responsible official to determine when an assessment prior to plan amendment is needed, along with the scope, scale, process, and content for plan amendments, in order to keep the amendment process flexible. Amendments can be broad or they can be narrow and focused only on a subset, or even on a single one, of the topics identified in the list of 15 in the final rule, or on something not on the list. Or the amendment could take place while the information in the assessment done for the plan revision or initial development is still up-to-date, such that a new assessment would not be needed. The circumstances and

considerations for when a plan amendment assessment should occur are too variable to specify in the final rule.

*Comment: Use of existing information.* Some respondents felt the rule should clarify that the responsible official need only consider existing information during the assessment phase. The concern raised was that if a responsible official had to develop new information such as new scientific studies to fill gaps in the existing science, the planning process would be further delayed. Others expressed that limiting the assessment to rapid evaluation of existing information may result in lack of input from the public or actually be of little use when the Forest Service has very little information.

*Response:* The Department agrees the assessment phase needs to be efficient and effective. The Department focused the final rule on rapidly gathering and evaluating existing information on the topics identified in paragraph (b) of the final rule. The intent is for the responsible official to develop in the assessment phase a clear understanding of what is known about the plan area, in the context of the broader landscape, in order to provide a solid context for decision-making required during the planning phase. The Forest Service will use relevant existing information from a variety of sources, both internal to the Agency and from external sources. The responsible official is required to provide public participation opportunities to all interested parties during the assessment process. The Department concludes that engaging the public to inform the assessment report will help the responsible official and the interested public to develop a common base of information to use in the planning phase, increasing the legitimacy and integrity of future decisions.

*Comment: Additional assessment considerations.* Some respondents noted reasonably foreseeable conditions, stressors, and opportunities (for example forecasts for continued urbanization and ecological changes resulting from climate change) need to be considered when measuring present conditions, stressors, and opportunities. The respondents implied this information should be calculated and considered during the assessment phase of land management planning. Still others indicated there should be requirements for water quality, minerals, historic, social, economic, and other resources. Others mentioned the responsible official should be required to accept material submitted by

universities, and should consider best available science.

*Response:* The list in § 219.6(b) includes the topics identified in these comments. The Department accepts that the list included in the final rule represents a focused set of topics relevant to the development of plan components and other plan content required in other sections of the final rule. The final rule requires that the best available scientific information be used to inform all phases of the planning process. Documents submitted by universities would be accepted by the Agency and considered as part of the assessment.

*Comment: Annual regional evaluations.* Some respondents indicated the proposed assessment process needs to provide for regular over-arching investigations of potential need to change issues above the individual forest level. Some suggested the final rule should provide for annual evaluations by each Forest Service region for developing information affecting broader-scale factors and how the information may indicate a need to initiate forest plan revisions or amendments.

*Response:* The final rule does not require annual evaluations of monitoring results by each region or for the broader-scale monitoring strategy. The three-part planning cycle of assessments, planning, and monitoring will provide a framework to identify changing conditions and respond with adaptive management. Broader-scale monitoring will help to identify and track changing conditions beyond the individual forest level. The final rule requires consideration of information from both the broader and plan scales of monitoring. This information would be described in the biennial plan monitoring report for each unit if applicable to plan area. Annual investigations and review, in addition to what is provided for in the rule, would be procedurally difficult and was deemed not necessary.

*Comment: Assessments versus monitoring.* Some respondents remarked that the rule needs to state the Agency cannot rely on one-time assessments in lieu of monitoring data.

*Response:* The Department does not intend for assessments to replace monitoring. The final rule requires monitoring and biennial monitoring reports. Results from monitoring will be considered when developing an assessment and during the planning phase, just as the information gathered during the assessment phase will inform the planning phase, including development of the monitoring program.

*Comment: Assessments and performance.* Some respondents pointed out that the rule should link the assessment process with the Agency's integrated management reviews to assess performance in implementation of plan priorities.

*Response:* While management reviews can be a tool to assess plan progress toward meeting the intended results, the final rule does not require management review be linked with the assessment process. Management reviews are part of the management process for all mission areas, and are broader in scope, looking at many issues. The final rule is limited in scope to the planning process to develop, amend, or revise plans.

*Comment: Notification of scientists.* Some respondents stated the proposed rule's requirement to encourage and notify scientists to participate in the process was unwieldy.

*Response:* The detailed notification requirements previously included in this section have been removed in order to make the process more efficient and clearer. However, the final rule still requires that the responsible official coordinate with Forest Service Research and Development, identify and evaluate information from relevant scientific studies and reports, provide participation opportunities to the public, and use best available scientific information to inform the planning process.

*Comment: Public comment and participation on assessment reports.* Some respondents felt the rule should provide the public with the opportunity to review, comment, and provide additional information during the assessment phase. Other respondents felt the proposed rule was not clear as to what role the public would play in determining the scope of the assessment. The desire was also expressed for the opportunity to appeal the development or use of the assessment report.

*Response:* The rule requires the responsible official to provide opportunities for the public to participate in and provide information for the assessment process. For a new plan or plan revision, the final rule specifies the minimum scope of the assessment. For a plan amendment assessment, the need for and scope of the assessment will be determined by the responsible official based on the circumstances. The assessment is an informational document, not a decision document; therefore, a formal comment period is not required. As such, an opportunity to appeal or object to an assessment report is not required by the final rule. Other opportunities for

formal comment and objection are provided in the rule for plan decisions.

*Comment: Distinctive roles and contributions.* Some respondents felt the requirement for assessments to identify "distinctive roles and contributions of the unit within the broader landscape" should be retained; while others felt it should be removed.

*Response:* The final removes this requirement from the assessment as it implies a decision that should be made when approving the distinctive roles and contributions of the unit as part of the other plan content (§ 219.7(f)). It is retained in the requirement for other plan content in § 219.7 of the final rule.

*Comment: Assessments and plan components.* A respondent suggested assessments should include development of plan components to meet the substantive requirements of other rule provisions such as water quality standards.

*Response:* Assessments do not develop plan components, but only gather and evaluate existing information that can be used later in the development of plan components.

*Comment: Information gaps or uncertainties.* Some respondents declared the rule should require a component in the assessment identifying information gaps or uncertainties.

*Response:* Section 219.6(a)(3) of the final rule requires the assessment to document in the report information needs related to the list of topics in paragraph (b) as part of the assessment report. Adding a requirement for the responsible official to document all information gaps or uncertainties could become burdensome and was inconsistent with the rapid evaluation of existing information.

*Comment: Cumulative effects disclosure.* Some respondents stated proposed § 219.6(b)(3) should specifically address the need to document cumulative effects to the condition of lands, water, and watersheds.

*Response:* The final rule does not add a cumulative effects requirement to the assessment. The assessment identifies and evaluates information on conditions and trends related to the land management plan. This will include influences beyond the plan area and influences created by the conditions and trends in the plan area. Cumulative effects analysis is part of the NEPA process and disclosed in the environmental documentation for planning or project decisionmaking.

Section 219.7—Plan Development or Plan Revision

This section sets out requirements for how to develop a new plan or revise an existing plan. This section has two primary topics: (1) The process for developing or revising plans and (2) direction to include plan components and other content in the plan. The intent of this section is to set forth a process for planning that reflects public input and Forest Service experience. The process set forth in the final rule requires the use of the best available scientific information to inform planning (§ 219.3), and requires public participation early and throughout the process (§ 219.4). By conducting an assessment using a collaborative approach before starting a new plan or plan revision, and by working with the public to develop a proposal for a new plan or plan revision, the Department expects that the actual preparation of a plan would be much less time consuming then under the 1982 rule procedures, and that plans will be better supported. These requirements incorporate the best practices learned from the past 30 years of planning, and the Department concludes these practices can be carried out in an efficient and effective manner.

This section also sets out requirements for plan components. These plan components are based on techniques widely accepted and practiced by planners, both inside and outside of government. The set of plan components must meet the substantive requirements for sustainability (§ 219.8), plant and animal diversity (§ 219.9), multiple use (§ 219.10), and timber requirements based on the NFMA (§ 219.11) as well as other requirements laid out in the plan. Except to correct clerical errors, plan components can only be changed through plan amendment or revision. Plan components themselves cannot compel Agency action or guarantee specific results. Instead, they provide the vision, strategy, objectives, and constraints needed to move the unit toward ecological, social, and economic sustainability

In addition to the plan components, this section includes requirements for other plan content. Other required plan content differs from plan components in that an amendment or revision is not required for changes to be made that reflect new information or changed conditions.

Section 219.7—Response to Comments

Many comments on this section focused on aspects of the plan component and NEPA requirements. The Department retains the 2011 proposed rule wording in the final rule except for minor changes and the following:

(1) At paragraph (c)(2)(i) of this section, the Department consolidated the requirement to identify a preliminary need to change the plan from § 219.6(a) and § 219.7(a). This change is not a change in requirement for the planning process, but moves this requirement from the assessment phase to the start of the planning phase. Also, in this paragraph, the Department modified the wording to make the link between the assessment and monitoring phases with the plan phase clearer: the final rule requires that the responsible official review relevant information from the assessment and monitoring to identify a preliminary need to change the plan and to inform the development of plan components and other plan content. This change reflects the intent of the Department as stated in the preamble to the proposed rule and responds to public comment. It is a change in requirement.

(2) At paragraph (c)(2)(ii) of this section, the Department added a requirement to consider the goals and objectives of the Forest Service strategic plan. The Department added this requirement to respond to public comments and to address the requirement of 16 U.S.C. 1604(g)(3) to specify guidelines for land management plans developed to achieve the goals of the "Program." Today the "Program" is equivalent to the Forest Service strategic plan. This is an additional requirement to implement the NFMA.

(3) At, paragraph (c)(2)(v) of this section, the Department edited the wording regarding whether to recommend any additional area for wilderness to remove the confusing term "potential wilderness areas." The paragraph was also edited to clarify that lands that may be suitable, as well as lands that are recommended for wilderness designation, must be identified. These changes clarify the proposed rule and respond to public comment.

(4) At paragraph (c)(2)(vii), the Department added a new requirement to identify existing designated areas other than wilderness or wild and scenic rivers, and determine whether to recommend any additional areas for designation. The changes make clear that if the responsible official has the delegated authority to designate a new area or modify an existing area, then the responsible official may designate such lands when approving the plan, plan revision, or plan amendment. Based on

public comment, the Department added this requirement to clarify the requirement of § 219.10(b)(1)(vi) of the proposed rule.

(5) At paragraph (c)(3) the Department added the requirement for the regional forester to identify species of conservation concern for the plan area in coordination with the responsible official in paragraph (c)(2) of this section. The Department added this requirement in response to public comment to provide more consistency and accountability in selecting the species of conservation concern. This is a new requirement.

(6) At paragraph (d) of this section, the Department clarified that management areas or geographic areas are required in every plan. This is a clarification of paragraph (d) of the proposed rule and reflects the Department's intent for the proposed rule. Under the proposed rule, inclusion of management and/or geographic areas was implied by paragraph (d); the change to the final rule makes clear that every plan must include management areas or geographic areas or both, to which plan components would apply as described in paragraph (e) of the final rule. The Department removed the provision of the proposed rule that stated every project and activity must be consistent with the applicable plan components, because § 219.15(b) and (d) also state this, and this statement would be redundant. These changes are not changes in requirements; they are clarifications.

(7) At paragraph (e)(1)(iv), the Department clarified the wording in the description of a guideline to respond to comments on the preferred alternative. The Department changed the word "intent" to "purpose." The final wording is: "a guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the *purpose* of the guideline is met." In addition, in the second sentence of paragraph (e)(1)(iv), Department added the words "or maintain" because guidelines, like standards, may be established to help achieve or maintain a desired conditions or conditions.

(8) At paragraph (e)(1)(v), the Department clarified that plans will include identification of specific lands as suitable or not suitable for various multiple uses and activities, in response to public comment on this section. It retains the wording that makes clear that the suitability of an area need not be identified for every use or activity, and adds clarifying wording stating that suitability identifications may be made after consideration of historic uses and

of issues that have arisen in the planning process. This is a clarification of the proposed rule paragraph (d)(1)(v) to carry out the intent of the proposed rule.

*Comment: Alternate plans.* A respondent said wording contained in the 1982 rule at § 219.12(f)(5) requiring the Agency to develop alternatives to address public concerns should be restored.

*Response:* The rule requires preparation of an EIS as part of the plan revision process. The NEPA requires development of a range of reasonable alternatives in the EIS. Therefore, a duplicative requirement in the rule is not necessary.

*Comment: Requests for revision.* A respondent said there should be a process for others to request plan revisions. The responsible official would retain the option of determining whether such a request would warrant starting the assessment process.

*Response:* The public may request a plan revision at any time. The public does not need special process to make this request.

*Comment: Combining multiple national forests under one plan.* Some respondents felt a multi-forest plan would need separate tailored requirements for the different ecosystems, landscapes, landforms, forest types, habitats, and stream types that exist in each of the national forests affected.

*Response:* The final rule allows the responsible official the discretion to determine the appropriateness of developing a multi-forest plan, or a separate plan for each designated unit. Plan components would be designed as appropriate for those units to meet the requirements of the final rule, whether for a single or a multi-forest plan.

*Comment: Environmental Policy Act compliance and plan development, amendment, or revision (NEPA).* Some respondents felt plans should be as simple and programmatic as possible and that the preparation of an EIS for a new plan or plan revision is not appropriate. NEPA compliance should occur only at the project level. One respondent wanted a clear commitment for preparation of an EIS for forest plan revisions. Another respondent said categorical exclusions should be used for minor amendments, environmental assessments for more significant amendments, and EISs should be reserved for major scheduled plan revisions. A respondent said responsible officials should not be allowed to combine NEPA and planning associated public notifications (§ 219.16). A respondent said to please consider and

discuss an efficient amendment process in the proposed rule. Another respondent proposed § 219.7(e)(1)(iv) be rewritten to clarify any aspect of any planning document are proposals subject to NEPA.

*Response:* The final rule requires the preparation of an EIS for plan revisions and new plans. Plan amendments must be consistent with Forest Service NEPA procedures, which require an EIS, an EA, or a CE, depending on the scope and scale of the amendment. Projects and activities will continue to be conducted under Forest Service NEPA procedures. The Department believes the NEPA analysis requirements are appropriate to inform the public and help responsible officials make decisions based on the environmental consequences. The requirements for public participation are described in § 219.4 and notifications in § 219.16. The Department retained the wording on combining notifications where appropriate to allow for an efficient amendment process while continuing requiring public notice.

The NEPA regulations at 40 CFR 1508.23 provides that a proposal "exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." Not all aspects of planning and planning documentation fall under this definition, and the Department considers classifying every aspect of every planning document as a "proposal" subject to NEPA would be an unnecessary and burdensome requirement on the Agency.

*Comment: Additional coordination requirements.* Some respondents suggested additional coordination requirements for noxious weed management, reduction of the threat of wildland fire, assessment of existing aircraft landing sites, and guidelines to ensure project coordination across forest and grassland boundaries where discrepancies between individual unit plans may occur.

*Response:* The Department agrees the issues raised are important. The final rule does emphasize an all lands approach precisely to address issues like these. This emphasis is in each phase of planning: in the assessment phase, responsible officials are directed to identify and evaluate relevant information in the context of the broader landscape; in § 219.8, the final rule requires that the responsible official consider management and resources across the landscape; and in § 219.4 the responsible official is directed to

Case 1:21-cv-02994-REB Document 24-5 Filed 06/21/22 USDC Colorado Page 414 of 422

consider opportunities for the plan to address the impacts identified or contribute to joint objectives across jurisdictions. Section 219.12 provides a framework for coordination and broader-scale monitoring. However, the rule provides overall direction for plan components and other plan content, and for how plans are developed, revised, and amended. More specific guidance with regard to particular resources is properly found in the plans themselves, or in the subsequent decisions regarding projects and activities on a particular national forest, grassland, prairie, or other comparable administrative unit. Those communities, groups, or persons interested in these important issues can influence plan components and plan monitoring programs by becoming involved in planning efforts throughout the process, including the development and monitoring of the plan, as well as the development of proposed projects and activities under the plan.

*Comment: Scope of the responsible official's discretion.* Some respondents raised concerns over the responsible official's discretion to determine conditions on a unit have changed significantly so a plan must be revised, because the proposed rule fails to define significant and does not include an opportunity for public involvement in this determination. Other respondents felt use of the terms "consider" and "appropriate," as in proposed § 219.7(c)(2)(ii) are vague, too discretionary, and could mean the official would look at conditions and trends, but then fail to address them, leading to a poor assessment and planning.

*Response:* A primary goal of the new rule is to create a framework in which new information is identified and used to support adaptive management. The Department expects the new rule to facilitate, over time, the increased use of the amendment process to react more quickly to changing conditions. Placing overly prescriptive requirements in this section could inhibit the responsible official's ability to adaptively manage within the planning rule framework. Section 219.7(c)(2)(ii) in the proposed rule, now (c)(2)(iii) in the final rule, is simply intended as a process step to identify the relevant resources present in plan area for the purpose of developing plan components. This is not intended to be a new assessment, but is linked to the requirements for the assessment in section 219.6(b) of the final rule. Sections 219.8–219.11 contain the requirements for developing plan components to address those resources.

Plan Components

*Comment: Plan component wording, standards, and guidelines.* A respondent remarked that it was unclear if plans could meet the requirements in this section for plan components by including only one of each of the different kinds of plan components, or whether the Agency is making a binding commitment to include more than one standard, which the respondent believed to be more binding than desired conditions or guidelines.

*Response:* This section of the rule identifies what plan components are, and requires that every plan contain desired conditions, objectives, standards, guidelines, and suitability. The intent of the Department in the proposed rule was that the responsible official would determine the best mix of plan components to address the rule's substantive requirements. However, some respondents were concerned that the rule could be interpreted to require only one of each kind of plan component for every plan. Therefore, the final rule includes changes to the wording in sections 219.8–11 to require that plans include "plan components, including standards or guidelines."

*Comment: Desired Future Condition plan component.* A respondent felt desired future condition should be included as a plan component, as it is more than the sum total of the individual desired conditions for each of the important ecological, social, and economic resources on the forest and causes individual desired conditions to occur somewhat in sync.

*Response:* Plans under the rule will identify the forest or grassland's distinctive roles and contributions within the broader landscape and the desired conditions for specific social, economic, and ecological characteristics of the plan area. The Department believes those requirements, combined with the requirements for public participation and integrated resource management, will result in plans that reflect an overall vision for the future desired condition of the plan area as a whole.

*Comment: Desired conditions.* Some respondents stated defining a desired condition as specific social, economic, and/or ecological conditions may continue ecologically unsustainable social and economic practices leading to unsustainable outcomes. A respondent commented that States are responsible for setting fish and wildlife population objectives and the wording must be changed to prevent the Agency from taking on the role of the States. Other respondents wanted more direction on how the responsible official determines desired conditions.

*Response:* Desired conditions are a way to identify a shared vision for a plan area. In some instances, desired conditions may only be achievable in the long-term. At times, the desired conditions may be the same as existing conditions. Desired conditions may be stated in terms of a range of conditions. Other plan components would provide the strategy and guidance needed to achieve that vision. Plans must meet the requirements of §§ 219.8 through 219.11, including to provide for ecological sustainability. Projects and activities must be consistent with desired conditions as described in § 219.15. The Forest Service Directives System will describe how desired conditions should be written and developed.

States do have responsibilities for managing fish and wildlife, but the rule requires plans to include plan components for ecological conditions (habitat and other conditions) to maintain diversity of fish and wildlife species, as required by NFMA. Responsible officials will continue to coordinate with Federal, State, and local governments and agencies on other public planning efforts.

*Comment: Procedures for analysis.* Some respondents suggested that the final rule should include specific procedures for analysis. These include specific economic indicators for the economic analysis part of the planning process, the model paradigm for social and economic resources important to rural communities, and means of weighing relative values of multiple uses.

*Response:* Such guidance is not included in this final rule. Analysis methods and technical procedures are constantly changing; the planning rule would quickly be outdated if specific methods were mandated. Additional guidance with regard to social and economic resource analysis is more appropriate in the Forest Service Directives System, and revisions to the Forest Service directives will be available for public comment.

*Comment: Objectives.* Several respondents supported clear, measurable, and specific objectives to enhance transparency and accountability. Several respondents felt basing objectives on reasonable foreseeable budgets unduly constrains planning analysis. Another respondent thought a desired condition without objectives is completely meaningless.

*Response:* The rule uses objectives to support measureable progress toward a desired condition. Objectives will lead

to the development of a proactive program of work to achieve the desired condition by describing the focus of management in the plan area. Objectives will be based on achieving and monitoring progress toward desired conditions, and will be stated in measurable terms with specific time frames. Objectives based on budgets and other assumptions help set realistic expectations for achievement of plan objectives over the life of the plan and assist in building public trust in the Agency being able to make progress towards achieving desired conditions and objectives.

*Comment: Goals.* Several respondents felt goals should be mandatory because broad general goal statements describe how the desired future conditions will be achieved and create the overall framework for the other plan components. Others felt they should be optional. Another respondent suggested inclusion of a goal to connect youth, minority, and urban populations to the national forest or grassland to better assure required plan components incorporate and reflect the needs of diverse populations.

*Response:* The proposed wording for goals is unchanged in the final rule because the proposed optional use of goals allows responsible officials to determine whether or not they are a useful plan component in addressing the local situation. Inclusion of a goal for youth, minority, and urban populations is not required in the final rule because the final rule requires the responsible official to encourage participation of youth, low-income populations, and minority populations throughout the planning process, and to consider opportunities to connect people with nature as well as to contribute to social and economic sustainability when developing plan components. See §§ 219.4, 219.8(b), and 219.10(a).

*Comment: Suitability for uses other than timber.* Some respondents felt the rule should require suitability determinations for multiple uses. In addition to suitability for timber use as required under NFMA, a respondent felt suitability of lands for livestock grazing, fire suppression, energy developments, mineral leasing, and off highway vehicles should be required to meet the Act. Another respondent felt economics should be a part of the analysis and land suitability determinations. A respondent felt identification of lands where specific uses are not allowed is de facto regulation of those uses, and proposed § 219.2(b)(2) wording "a plan does not regulate uses by the public" appears inconsistent with NFMA direction regarding the identification of lands as suitable for resource management activities, such as timber harvest. In addition, the respondent stated this wording may be inconsistent with proposed § 219.7(d)(1)(v) wording that a "plan may also identify lands within the plan area as not suitable for uses that are not compatible with desired conditions for those lands."

*Response:* Determining the suitability of a specific land area for a particular use or activity is usually based upon the desired condition for that area and the inherent capability of the land to support the use or activity. NFMA does not impose a requirement to make suitability determinations for all multiple uses. The NFMA requires that plans "determine * * * the availability of lands and their suitability for resource management" (16 U.S.C. 1604(e)(2).

The Department clarified the wording of paragraph (e)(1)(v) to make clear that plans will include identification of specific lands as suitable or not suitable for various multiple uses and activities, in response to public comment on this section; however, the Department decided not to require determinations in every plan for specific uses other than timber. The final rule retains the wording that makes clear that the suitability of an area need not be identified for every use or activity, and adds clarifying wording stating that suitability identifications may be made after consideration of historic uses and of issues that have arisen in the planning process. The responsible official will determine when to identify suitability for various uses and activities as part of the set of plan components needed to meet the requirements of §§ 219.8–219.11.

The identification of suitability is not de facto regulation of those uses. However, responsible officials may, and often do, develop closure orders to help achieve desired conditions. If a responsible official were to develop a closure order, that closure order is a regulation of uses and would prohibit or constrain public use and occupancy. Such prohibitions are made under Title 36, Code of Federal Regulations, Part 261—Prohibitions, Subpart B—Prohibitions in Areas Designated by Order. Issuance of a closure order may be made contemporaneously with the approval of a plan, plan amendment, or plan revision.

*Comment: Suitability for mineral materials.* Several respondents felt the determination of the suitability of lands for energy developments, leasing and extraction, mineral exploration, or mineral leasing must be required. Other respondents felt the rule should not imply the Agency has regulatory or administrative authority to determine which portions of NFS lands are suitable for mineral exploration and development as such a determination would be a de facto withdrawal not in accordance with existing laws.

*Response:* Responsible officials should not make suitability determinations for any resource such as minerals where another entity has authority over the disposal or leasing. Congress has given the Secretary of the Interior authorities over the disposal of locatable minerals (gold, silver, lead, and so forth) and leasable minerals (oil, gas, coal, geothermal, among others). The Secretary of Agriculture has authority over saleable minerals (sand, gravel, pumice, among others). The final rule or a plan developed under the final rule cannot make a de facto withdrawal. Withdrawals occur only by act of Congress or by the Secretary of the Interior through a process under 43 CFR 2300. The Forest Service minerals regulation at 36 CFR 228.4(d) govern how the Agency makes decisions about the availability of lands for oil and gas leasing, and those decisions are not suitability determinations. Decisions about availability of lands for oil and gas leasing under 36 CFR 228.4(d), have been made for most national forests and grasslands. Decisions about the availability of lands for oil and gas leasing under 36 CFR 228.4(d) are not plan components; however, availability decisions may be made at the same time as plan development, plan amendment, or plan revision; but that is not required.

*Comment: Guidelines.* One respondent noted the preamble for the proposed rule stated that guidelines are requirements, but felt guidelines should be optional. Another respondent felt the proposed rule eliminates the distinction between plan guidelines and standards, making guidelines legally enforceable standards with which all projects must comply. The respondent felt that making guidelines enforceable in the same way as standards eliminates what the respondent believed to be the Department's that guidelines are discretionary to provide management flexibility. One respondent policy advocated making guidelines binding, because if they are discretionary, why include them. Several respondents commented on the preferred alternative that the Department should remove the discretion to meet the rule's substantive mandates through either standards "or" guidelines by requiring "standards *and* guidelines."

*Response:* The final rule retains the proposed rule's distinction between

standards and guidelines. Under the final rule, standards and guidelines are both mandatory—projects and activities must be consistent with the applicable standards and guidelines. Consistency with a standard is determined by strict adherence to the specific terms of the standard, while consistency with a guideline allows for either strict adherence to the terms of the guideline, or deviation from the specific terms of the guideline, so long as the purpose for which the guideline was included in the plan is met (§ 219.15). This approach to guidelines allows for flexibility as circumstances warrant, for example, when there is more than one way to achieve the intended purpose, or new information provides a better way to meet the purpose, without lessening protections. Guidelines included in plans pursuant to this final rule must be written clearly and without ambiguity, so the purpose is apparent and project or activity consistency with guidelines can be easily determined.

The final rule retains the preferred alternative's wording of "standards or guidelines" throughout sections 219.8–219.11. While every set of plan components developed to meet a substantive requirement of the rule must include standards or guidelines, including both may not be appropriate in every circumstance.

*Comment: Use of standards and guidelines to promote action.* A respondent suggested standards and guidelines should be used to promote or mandate certain management actions, like managing suitable timberlands towards the desired future condition or reducing fuels around wildland-urban interface areas.

*Response:* The Department expects that the set of plan components developed in response to one or more requirements in the rule will facilitate management to move the unit towards one or more desired conditions. Standards and guidelines set out design criteria which are applied to projects and activities, but do not by themselves result in specific management actions taking place.

*Comment: Mandatory standards.* Some respondents stated the final rule must include measurable standards for specific resources such as climate change, species viability, sustainable recreation, valid existing rights, or watershed management, in order to implement the intent of the rule and to ensure consistency. Others were opposed to the use of standards and guidelines.

*Response:* The rule includes specific requirements for plan components in §§ 219.8 through 219.11. The final rule has been modified to clarify that "standards or guidelines" must be part of the set of plan components required by each of those sections. However, the Department does not agree there should be specific national standards for each of the resources or uses mentioned in the comment, because significant differences in circumstances across the National Forest System could make specific national standards unworkable or not reflective of the best available scientific information for a given plan area. The final rule balances the need for national consistency with the need for local flexibility to reflect conditions and information on each unit. Additional direction will be included in the Forest Service Directives System, and a new requirement was added to § 219.2 that require the Chief to establish a national oversight process for accountability and consistency of planning under this part.

*Comment: Management areas and special areas.* Some respondents indicated management areas and prescriptions should be required plan components and identification of areas with remarkable qualities for special designation should be required as part of the planning process.

*Response:* The final rule requires each plan to include management areas or geographic areas, allows for the plan to identify designated or recommended areas as management areas or geographic areas, allows the responsible official to identify or recommend new designated areas, and clarifies the term "designated area" under § 219.19, in response to public comment.

*Comment: Potential wilderness area evaluation and management.* Some respondents found the term "potential wilderness area" confusing or inadequate, and the wilderness evaluation process unclear or in conflict with congressional action.

*Response:* The final rule wording removes the term "potential wilderness areas" from the final rule in response to public comments. The wording in § 219.7 clarifies that the Agency will identify and evaluate lands that may be suitable for inclusion in the National Wilderness Preservation System and determine whether to recommend them for wilderness designation. Section 219.10(b)(iv) wording has also been changed to clarify that areas recommended for wilderness designation will be managed to protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation. Direction for the evaluation process and inventory criteria is listed in Forest Service Handbook 1909.12—Land Management Planning Handbook, Chapter 70—Wilderness Evaluation. Chapter 70 is part of the Forest Service Directives System being revised following the final rule and the public is encouraged to participate in the upcoming public comment period for those directives. The wilderness evaluation requirement in the rule is not in conflict with the law. In addition, many State wilderness acts require the Forest Service to review the wilderness option when the plans are revised. The Utah Wilderness Act of 1984 is one example, Public Law 98–428. § 201(b)(2); 98 Stat. 1659.

*Comment: Roadless area management and inventory.* Some respondents noted that direction should be added to identify, evaluate, and protect inventoried roadless areas, and a requirement to remove these areas from lands suitable for timber production. Some respondents suggested inclusion of "unroaded areas," as defined in § 219.36 of the 2000 planning rule, in evaluation of lands that may be suitable for potential wilderness and protocols for such evaluation be included in the rule. An organization commented on the preferred alternative that the Department should clarify that the intended starting point for the wilderness evaluation is a full inventory of all unroaded lands.

*Response:* Agency management direction for inventoried roadless areas is found at 36 CFR part 294—Special Areas, and plans developed pursuant to the final rule must comply with all applicable laws and regulations (§ 219.1(f)).

The wording of § 219.7(c)(2)(v) was changed in the final rule to clarify that areas that may be suitable for inclusion in the National Wilderness System must be identified as part of the planning process, along with recommendations for wilderness designation. This change makes clear that each unit will identify an inventory of lands that may be suitable as a starting point for evaluating which lands to recommend. Inventories of lands that may be suitable for inclusion in the National Wilderness Preservation System will be conducted following direction in Forest Service Handbook 1909.12—Land Management Planning Handbook, Chapter 70 Wilderness evaluation, which also includes criteria for evaluation. Chapter 70 is part of the Forest Service Directives System which will be revised following the promulgation of this rule. The public is encouraged to participate in the upcoming public comment period for those directives. It is currently Agency policy that unless otherwise provided by law, all roadless,

undeveloped areas that satisfy the definition of wilderness found in section 2(c) of the Wilderness Act of 1964 be evaluated and considered for recommendation as potential wilderness areas during plan development or revision (FSM 1923).

*Comment: Time limit on Congressional action.* A respondent suggested the rule should include a 10-year time limit for Wild and Scenic River or Wilderness recommendations to be acted upon by Congress or the Agency's recommendation is withdrawn.

*Response:* The Constitution does not grant the U.S. Department of Agriculture authority to set time limits on Congressional action. The Department decided it is not going to require responsible officials to withdraw any such recommendations.

Other Plan Content

*Comment: Forest vegetation management practices.* Some respondents requested clarification of proposed § 219.7(f)(1)(iv) phrase ''proportion of probable methods of forest vegetation management practices expected'' as it is unclear what type of management practices must be undertaken to successfully satisfy this requirement.

*Response:* Section 16 U.S.C. 1604(f)(2) of the NFMA requires plans to ''be embodied in appropriate written material * * * reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan.'' Therefore, under the final rule and Forest Service Directives System, the Department expects plans to display the expected acres of timber harvest by the categories, such as: regeneration cutting (even- or two-aged), uneven-aged management, intermediate harvest, commercial thinning, salvage/ sanitation, other harvest cutting, reforestation, and timber stand improvement in an appendix. Examples of such exhibits are displayed in Forest Service Handbook 1909.12, Land Management Planning, Chapter 60, Forest Vegetation Resource Planning is available at *http://www.fs.fed.us/im/directives/fsh/1909.12/1909.12_60.doc.* The list of proposed and possible actions may also include recreation and wildlife projects. The final rule allows the list to be updated through an administrative change (§ 219.13(c)).

*Comment: Distinctive roles and contributions.* Some respondents said there is no legal requirement for identification of a forest or grassland's distinctive roles and contributions, and the requirement will bias and polarize the planning process in favor of some uses, products, and services and against others. Other respondents felt the unit's distinctive roles should be plan components requiring a plan amendment to change, or the wording strengthened to require assessment of underrepresented ecosystems and successional classes across the broader landscape.

*Response:* Under the public participation process, the Department believes the development of the distinctive roles and contributions, while not required by NFMA, will be a unifying concept helping define the vision for the plan area within the broader landscape. The preferred vision is expected to assist the responsible official in developing plan components for the multiple uses. However, projects and activities would not be required to be consistent with the plan area's distinctive roles and contributions, so the Department decided to keep this description as other plan content.

*Comment: Additional plan components and content.* Some respondents suggested additional required plan components like partnership opportunities, coordination activities, monitoring program, or specific maps.

*Response:* Plan components are the core elements of plans. Projects and activities must be consistent with plan components (§ 219.15), and an amendment or revision is required to change plan components. Plan components in the rule are usually reserved for ecological, social, or economic aspects of the environment, but the responsible official has discretion in developing plan components to meet the requirements of the final rule.

Some items like a monitoring program are included as other required content in the plan, but not as a required plan component. The final rule allows the responsible official to add other plan content for unit issues and conditions. Other plan content can be other information that may be useful to Forest Service employees when designing projects and activities under the plan components. The other content in the plan (§ 219.7(f)) differs from plan components in that an amendment or revision would not be required for changes to be made to reflect new information or changed conditions. Monitoring is not included as a plan component, so the monitoring program can be refined and updated without a plan amendment in response to new information or changing conditions. Listing of specific methods for partnership opportunities or coordination activities as part of the plan is optional content for a plan. The Department did not require specific maps as part of the final rule.

*Comment: Priority Watersheds.* Some respondents asked what process is used to identify priority watersheds and why priority watersheds are not a plan component. Some respondents noted the proposed rule requirement to identify priority watersheds for maintenance and restoration did not include specific criteria for selecting watersheds and did not prescribe what activities or prohibitions would occur in priority watersheds.

*Response:* Section 219.7(f)(1)(i) requires identification of priority watersheds for restoration. This will focus integrated restoration of watershed conditions. Setting priorities can help ensure that investments provide the greatest possible benefits. The Department realizes that priority areas for potential restoration activities could change quickly due to events such as wildfire, hurricanes, drought, or the presence of invasive species. Therefore, this requirement is included as ''other required content'' in § 219.7(f)(1)(i) rather than as a required plan component, allowing an administrative change (§ 219.13) to be used when necessary to quickly respond to changes in priority. Any changes would require notification.

The Department intends to use the Watershed Condition Framework (WCF), *http://www.fs.fed.us/publications/watershed/Watershed_Condition_Framework.pdf,* for identifying priority watersheds, developing watershed action plans and implementing projects to maintain or restore conditions in priority watersheds. However, the WCF is a relatively new tool that will be adapted as lessons are learned from its use, as new information becomes available, or as conditions change on the ground. Therefore, because the criteria for selecting watersheds may change in the future, it is not appropriate to codify such criteria in a rule. The adaptive management approach incorporated in the WCF provides the best opportunity and most efficient way to prioritize watersheds for restoration or maintenance. The Department expects that implementation of the final rule and the WCF will be mutually supportive.

Section 219.8—Sustainability

The requirements of this section of the final rule are linked to the requirements in the assessment (§ 219.6) and monitoring (§ 219.12). In addition,

this section provides a foundation for the next three sections regarding diversity of plant and animal communities (§ 219.9), multiple use (§ 219.10), and timber requirements based on the NFMA (§ 219.11). Together these sections of the final rule require plans to include plan components designed to maintain or restore ecological conditions to provide for ecological sustainability and to contribute to social and economic sustainability.

The requirements of this section, and all sections of the rule, are limited by the Agency's authority and the inherent capability of the plan area. This limitation arises from the fact that some influences on sustainability are outside the Agency's control, for example, climate change, national or global economic or market conditions, and urbanization on lands outside of or adjacent to NFS lands. Given those constraints, the Department realizes it cannot guarantee ecological, economic, or social sustainability. It is also important to note that plan components themselves do not compel agency action or guarantee specific results. Instead, they provide the vision, strategy, guidance, and constraints needed to move the plan area toward sustainability. The final rule should be read with these constraints in mind.

Additional requirements for contributing to social and economic sustainability are found in § 219.10 and § 219.11.

Section 219.8—Response to Comments

Many comments on this section focused on the concepts of ecological health, resilience and integrity, requirements for riparian area management, the relationship between social, ecological, and economic sustainability, and the requirements for social and economic sustainability. The Department reorganized this section to improve clarity, and made the following changes in response to public comment.

1. The Department changed the order of the wording of the introductory paragraph.

2. At paragraph (a)(1) of this section, the Department changed the caption ''Ecosystem plan components'' to ''Ecosystem Integrity.'' In addition, the Department replaced the phrase ''healthy and resilient'' to ''ecological integrity'' in this paragraph and throughout this subpart. The Department also modified additional wording of this section to reflect this change. This change responds to public concern about how to define and measure ''health'' and ''resilience.'' Ecosystem integrity is a more scientifically supported term, has established metrics for measurement, and is used by both the National Park Service and the Bureau of Land Management. Requirements included in this section, as well as in § 219.9 require plans to include plan components designed to ''maintain or restore ecological integrity.''

3. The Department modified the list of factors the responsible official must take into account when developing plan components at paragraph (a)(1)(i)–(v). The Department removed the term ''landscape scale integration'' and replaced it with a requirement for the responsible official to take into account the interdependence of terrestrial and aquatic ecosystems, the contributions of the plan area to the broader landscape, and the conditions of the broader landscape that influence the plan area. The Department also added a requirement to take into account opportunities for landscape scale restoration. The additional wording clarifies the Department's intent that the planning framework be designed to ensure that managers understand the landscape-scale context for management, and the interdependence of ecosystems and resources across the broader landscape.

The Department removed air quality from paragraph (a)(1) and added air quality to paragraph (a)(2). This change is in response to public comment that requested that air resources be treated in a similar manner to soil and water resources. Additionally, the paragraph was modified to add the term ''standards or guidelines'' to clarify here and in similar sentences throughout §§ 219.8 through 219.11 that standards or guidelines must be part of the set of plan components developed to comply with requirements throughout the rule. Except for the change for air quality, these changes to paragraph (a)(1) are not changes in requirements, because they reflect the Department's intent as stated in the preamble for the proposed rule, and provide additional clarity.

4. At paragraph (a)(2) of this section, the Department changed the caption ''Ecosystem elements'' to ''Air, soil, and water.'' This reorganized paragraph requires the plan to have plan components, including standards or guidelines, to maintain or restore the elements of air, soil, and water resources. The Department also changed the phrase ''maintain, protect, or restore'' of the proposed rule to ''maintain or restore'' here and throughout the final rule. This change is in response to public comment, and to make the rule consistent throughout the sections, and recognizes that the concept of protection is incorporated as part of how a responsible official accomplishes the direction to maintain or restore individual resources. These changes are not changes in requirements, they are clarifications.

5. At paragraph (a)(2) the Department reorganized the elements that plan components are designed to maintain or restore. The Department removed the provisions about terrestrial elements and rare plant communities from paragraph (a)(2); these items are now discussed in § 219.9(a) of the rule. At paragraph (a)(2)(iv) the Department combined the wording about aquatic elements and public water supplies of paragraphs (a)(2)(i) and (a)(2)(iv) of the proposed rule. The wording about water temperatures changes, blockages of water courses, and deposits was removed from this paragraph and is now more appropriately discussed with riparian areas at paragraph (a)(3)(i) of this section.

6. Paragraph (a)(3) adds specific requirements to the proposed rule to maintain or restore riparian areas. It provides that plan components must maintain or restore the ecological integrity of riparian areas, including ''structure, function, composition and connectivity,'' to make clear that the plan must provide direction for proactive management of riparian areas. Paragraph (a)(3) also sets out a list of elements relevant to riparian areas that must be considered when developing plan components to maintain or restore ecological integrity, and it changes the proposed rule's requirement for a ''default width'' for riparian areas to a requirement for a riparian management zone. These changes respond to public comment to provide more clear and specific direction for riparian areas. In addition, at paragraph (a)(3), the Department added a requirement to give special attention to the area 100 feet from the edges of perennial streams and lakes; and a requirement that plan components must ensure that no management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment that seriously and adversely affect water conditions or fish habitat shall be permitted within the zones or the site-specific delineated riparian areas. These requirements are carried forward from the 1982 rule. These additional requirements were added because public comments suggested the proposed rule was too vague or too open to interpretation with regard to minimum requirements.

7. At paragraph (a)(4), the Department added a requirement for the Chief to

establish requirements for national best management practices for water quality in the Forest Service directives and for plan components to ensure implementation of these practices. The public will have an opportunity to comment on these Forest Service directives. The Department added this requirement to respond to comments that the rule needed provisions to protect water quality and other comments about the use of best management practices.

8. At paragraph (b) of this section, the Department requires plan components to guide the unit's contribution to social and economic sustainability. The Department modified this paragraph to:

(i) Add reference to "standards or guidelines," consistent with changes in other sections.

(ii) Remove wording about distinctive roles and contributions contained in the proposed rule, because the requirement is in § 219.7. This is not a change in requirements.

(iii) Add scenic character, recreation settings, and access in response to public comment about recreation. This change reflects the intent of the Department as stated in the preamble to the proposed rule.

(iv) Add a new requirement to take into account opportunities to connect people with nature to respond to public comments about the need to connect Americans, especially young people and underserved communities, with the NFS. This additional requirement adds specificity to the proposed rule direction to contribute to social sustainability and provide for ecosystem services as defined in the proposed rule.

(v) Make additional edits for clarity.

*Comment: Maintain, protect, or restore.* Some respondents did not understand why in some sections of the rule (such as § 219.9) the phrase "maintain or restore" was used and in other sections (such as § 219.8) the phrase "maintain, protect, or restore" was used. They questioned whether the two phrases were intended to mean different things or provide different levels of protection.

*Response:* The use of the two different phrases in the proposed rule was unintended. There was no intent to impart differing levels of protection or different requirements by the use of the two phrases. After review of the proposed rule and the preamble, it is apparent that the two phrases are used interchangeably and often inconsistently. To avoid future confusion, the phrase "maintain and restore" has been used consistently throughout §§ 219.8 and 219.9. The Department believes that "protection" is inherent in maintaining resources that are in good condition and restoring those that are degraded, damaged, or destroyed. The Department did not intend to imply that plan components would not "protect" resources where the word "protect" was not part of the phrase. Maintenance and restoration may include active or passive management and will require different levels of investment based on the difference between the desired and existing conditions of the system.

*Comment: Best management practices and specificity for water sustainability.* Some respondents felt the requirements for maintaining and restoring watersheds, sources of drinking water, and riparian areas of the proposed rule lacked the specificity necessary to consistently implement the rule. A respondent said the rule should reemphasize a commitment to maintaining water quality standards—through the limitation of uses incompatible with clean water, management for restoration of water quality, and the mandatory use of best management practices. One respondent suggested that plans may list best management practices that a project is required to adopt. Other respondents said the final planning rule should also require monitoring for water quality standard compliance and implementation and effectiveness of best management practices.

*Response:* Wording was added to § 219.8 of the final rule to clarify and add detail to the requirements for plan components for watersheds, aquatic ecosystems, water quality, water resources including drinking water resources, and riparian areas, in response to public comment.

Wording was also added to require that the Chief establish requirements for national best management practices (BMPs) for water quality in the Forest Service Directives System, and that plan components ensure implementation of those practices. The relevant directives (FSM 2532 and FSH 2509.22) are currently under development and will be published for public comment. At this time, the Department anticipates that the proposed directives will require the use of the national core BMPs (*National Core BMP Technical Guide,* FS–990a, in press).

The final rule does not require monitoring of implementation and effectiveness of best management practices, but does require monitoring of select watershed and ecosystem conditions, as well as progress toward meeting the plan's desired conditions and objectives.

These changes and the requirements in this and other sections reflect the intent as stated in the preamble of the proposed rule to place a strong emphasis on water resources and develop a framework that will support watersheds, aquatic ecosystems, and water resources throughout the National Forest System.

*Comment: Riparian area management zone size.* Some respondents felt the rule should include a minimum default width for riparian areas ranging from 100 feet to 300 feet or to the width of the 100 or 200-year flood plain. Without specific requirements, respondents felt there would be inconsistent implementation of the rule. Others preferred the riparian area default width vary depending on ecological or geomorphic characteristics approach used in the proposed rule.

*Response:* The Department added wording at § 219.8(a)(3) to require special attention to land and vegetation for approximately 100 feet from the edges of all perennial streams and lakes. The Department decided to make this change to respond to public comment and retain the special attention provided in the 1982 rule, but decided not to require a minimum default width because the scientific literature states riparian area widths are highly variable and may range from a few feet to hundreds of feet. The final rule requires the responsible official to use the best available scientific information (§ 219.3) to inform the establishment of the width of riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands. Plan components to maintain or restore the ecological integrity of riparian areas will apply within that zone, or within a site-specific delineation of the riparian area.

*Comment: Management activities in riparian areas.* Some respondents felt the riparian area guidance in the proposed rule represented a weakening of protection from the 1982 rule and wanted to see stronger national standards. They felt some management activities, like grazing and off-highway vehicle (OHV) use, should be prohibited or limited in riparian areas as they can be harmful to riparian area health. Others felt management activities in riparian areas should be left to only restoration efforts. Some respondents felt the riparian management requirements in the proposed rule were vague or too open to interpretation. Others felt the proposed rule may preclude active management within riparian areas.

*Response:* Section 219.8 has been revised in the final rule to address these concerns. The final rule requires the

responsible official to give special attention to land and vegetation for approximately 100 feet from the edges of all perennial streams and lakes and further requires that plan components must ensure that no management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment that seriously and adversely affect water conditions or fish habitat shall be permitted within the riparian management zones or the site-specific delineated riparian areas. The Department expects projects and activities, including restoration projects, will occur in riparian areas. Plans may allow for projects and activities in riparian areas that may have short term or localized adverse impacts in order to achieve or contribute to a plan's desired conditions or objectives, so long as they do not seriously and adversely affect water conditions or fish habitat.

These requirements are similar to the requirements of the 1982 rule. They are in addition to the final rule requirements in § 219.8(a)(3) that plans must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of riparian areas in the plan area, including plan components to maintain or restore structure, function, and composition. The changes to the proposed rule make clear that plans must provide for the ecological integrity of riparian areas in the plan area, and must include a set of plan components, including standards or guidelines, to do so. The responsible official must also take into account water temperature and chemical composition, blockages of water courses, deposits of sediment, aquatic and terrestrial habitats, ecological connectivity, restoration needs, and floodplain values and risk of flood loss when developing these plan components. These requirements are in addition to the requirements in § 219.8(a)(2) to include plan components to maintain or restore water quality and water resources, and the requirement in § 219.7(f) to identify priority watersheds for restoration or maintenance.

The Department believes that these requirements provide strong direction for proactive management (active and passive) of water resources beyond what was required in the 1982 rule, while allowing the responsible official to use the best available scientific information, public input, and information about local conditions to inform development of plan components in response to these requirements.

*Comment: Sustainability and multiple use.* Some respondents felt the proposed rule did not adequately recognize the importance of the multiple use mandate because the proposed rule at § 219.8 omitted any reference to multiple use.

*Response:* The proposed rule and the final rule both explicitly recognize multiple uses in § 219.8(b), with additional direction provided in § 219.10 with regard to management for multiple uses.

*Comment: Maintain ecological conditions.* Some respondents felt the proposed requirements to maintain or restore ecological conditions in §§ 219.8 and 219.9 would allow for the Agency to develop plan components maintaining current degraded ecological conditions.

*Response:* The intent of the rule is for plan components to maintain desired conditions, and restore conditions where they are degraded. However, the Department recognizes in some instances it may be impracticable or impossible to restore all degraded, damaged or destroyed systems that may be present in a plan area because of cost, unacceptable tradeoffs between other resource and restoration needs, or where restoration is outside the capability of the land or Forest Service authority. There are also degraded areas on NFS lands where the tools or methods are not currently available to effectively restore them to desired conditions. The Department recognizes that at times, management activities maintaining existing, less than desirable conditions in the short-term may be critical to preventing further degradation and for successful restoration towards desired conditions over the long-term. For example, the primary management emphasis in some areas may be controlling the spread of invasive species when eradication is not currently feasible.

Ecological Integrity

*Comment: Integration of terrestrial and aquatic ecosystems.* Some respondents felt the proposed rule was unclear in the requirement that the responsible official take into account the integration of terrestrial and aquatic ecosystems in the plan area when creating plan components to maintain or restore the health and resilience of terrestrial and aquatic ecosystems and watersheds in the plan area.

*Response:* The final rule adds clarifying wording to § 219.8. The word ''integration'' was changed to ''interdependence'' to better reflect the Department's intent, and new wording was added requiring the responsible official to consider contributions of the unit to ecological conditions within the broader landscape influenced by the plan area and conditions in the broader landscape that may influence the sustainability of resources and ecosystems, as well as opportunities for landscape scale restoration. These changes clarify the former requirement in the proposed rule and strengthen the planning framework by ensuring responsible officials understand the interdependence of ecosystems in the plan area, as well as the role and contribution of their units and the context for management within the broader landscape.

*Comment: Invasive species.* Some respondents felt the rule should have more explicit requirements on how invasive species management would be included in plans.

*Response:* It is clear that the introduction of invasive species to national forest and grassland ecosystems has had, and is continuing to have, profound effects on the ecological integrity of these ecosystems. The final rule explicitly addresses invasive species in § 219.6, which requires information about stressors such as invasive species to be identified and evaluated, and in corresponding requirements in §§ 219.8 and 219.10. Plan components are required to maintain or restore ecological integrity under §§ 219.8, taking into account stressors including invasive species, and the ability of the ecosystems on the unit to adapt. Plan components for multiple uses must also consider stressors, including invasive species, and the ability of the ecosystems on the unit to adapt.

Social and Economic Sustainability

*Comment: Relationship between ecological, social and economic sustainability.* Some respondents felt ecological sustainability should be prioritized over social and economic sustainability, whereas other felt that economic sustainability should be prioritized. Others felt NFS lands should be managed primarily for multiple uses that contribute to economic and social sustainability. Some respondents felt the proposed rule incorrectly prioritizes plan components by use of ''maintain or restore'' elements of ecological sustainability over the use of the term ''to contribute'' for social and economic sustainability. Some respondents expressed differing opinions about the relative importance of ecological, social, and economic sustainability in relation to multiple uses. A respondent felt social and economic sustainability should not be included in the rule, while another felt

ecological sustainability should not be included. Some respondents felt social, environmental, and economic considerations are not competing values but interdependent and all play a role in management. Some respondents disagreed with the concept that the Agency has more control over ecological sustainability than social and economic sustainability. Some respondents felt the proposed rule definition of sustainability was not clear.

*Response:* The MUSYA requires "harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or greatest unit output" (16 U.S.C. 531). Under this final rule, ecological, social, and economic systems are recognized as interdependent, without one being a priority over another. The rule requires the consideration of ecological, social, and economic factors in all phases of the planning process. However, the final rule recognizes that the Agency generally has greater influence over ecological sustainability on NFS lands than over broader social or economic sustainability, although it cannot guarantee sustainability for any of three. The Department recognizes that management of NFS lands can influence social and economic conditions relevant to a planning area, but cannot ensure social and economic sustainability because many factors are outside of the control and authority of the responsible official. For that reason, the final rule requires that the plan components contribute to social and economic sustainability, and provide for ecological sustainability, within Forest Service authority and the inherent capability of the plan area.

Ecological sustainability will help provide people and communities with a range of social, economic, and ecological benefits now and in the future. In addition, plan components will provide directly for a range of multiple uses to contribute to social and economic sustainability. The final rule includes a modified definition of sustainability by defining the terms ecological sustainability, economic sustainability, and social sustainability as part of the definition of sustainability.

*Comment: Connecting people to nature.* Some respondents felt the rule should contain wording to encourage a sense of value for public lands necessary in maintaining these lands for

enjoyment by future generations. In an increasingly urbanized society, they felt access to NFS lands is necessary for people to visit, learn, recreate, and generate their livelihood.

*Response:* Section 219.8(b)(6) of the final rule requires the responsible official take into account opportunities to connect people with nature.

*Comment: Cultural sustainability.* Some respondents felt the rule should include management of cultural resources as a separate aspect of sustainability. A respondent felt proposed § 219.8(b)(4) should be expanded to include "cultural landscapes."

*Response:* The final rule does not create a separate aspect of sustainability for management of cultural resources, but does address cultural resources and uses. The definition in the final rule of "social sustainability" recognizes the "relationships, traditions, culture, and activities that connect people to the land and to one another, and support vibrant communities." In addition: Section 219.1(c) recognizes that NFS lands provide people and communities with a wide array of benefits, including "cultural benefits." Section 219.4 requires opportunities for public and Tribal participation and coordination throughout the planning process. Section 219.4(a)(3) requires that the responsible official request "information about native knowledge, land ethics, cultural issues, and sacred and culturally significant sites" during consultation and opportunities for Tribal participation. Section 219.6(b) requires the assessment to include identification and evaluation of information about cultural conditions and cultural and historic resources and uses. Section 219.8 in the final rule recognizes cultural aspects of sustainability by requiring "cultural and historic resources and uses" be taken into account when designing plan components to guide contributions to social and economic sustainability. Section 219.10(b)(1)(ii) of the rule requires "plan components * * * for a new plan or plan revision must provide for protection of cultural and historic resources," and "management of areas of Tribal importance." The final rule also includes recognition of and requirements for "ecosystem services," which include "cultural heritage values." These requirements, in combination with the requirement that plan content include descriptions of a unit's roles and contributions within the broader landscape under § 219.7(e), ensure the cultural aspects of sustainability will be taken into account when developing plan components that

guide unit contributions to social sustainability.

*Comment: Local economies, communities, and groups.* Some respondents felt the rule should require coordination with or participation of local communities. Some respondents felt the rule should recognize that how units are managed can greatly influence local communities and economies. Some respondents felt the rule should include maintaining "vibrant communities." Some respondents felt the proposed rule preamble discussion about the Agency's relative influence over ecological as compared with social and economic sustainability was incorrect, as the Agency has more influence or impact on local communities than the preamble implied. A respondent felt the rule should consider all communities, not just local. A respondent felt the proposed rule inappropriately allows the Agency to dictate social and economic sustainability of local communities.

*Response:* Nothing in the final rule would dictate the social or economic sustainability of local communities—to the contrary, the rule recognizes that plans cannot dictate social or economic sustainability. However, the Department recognizes that management of NFS lands can influence local communities as well as persons and groups outside of these communities, and that some local economies may be more dependent on the management of the plan area and NFS resources than others. Section 219.4 requires the responsible official to engage local communities, as well as those interested at the regional and national levels, as well as to coordinate with other public planning efforts, including State and local governments, and Tribes. Section 219.6(b) requires in the assessment phase that responsible officials identify and evaluate existing relevant information about social, cultural, and economic conditions, benefits people obtain from the NFS planning area, and multiple uses and their contribution to the local, regional, and national economies. Section 219.8 requires that plans provide plan components to contribute to economic and social sustainability, and section 219.10 requires plans to provide for ecosystem services and multiple uses. Section 219.12 requires monitoring progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities. These requirements will help plans contribute to vibrant communities.

*Comment: Specific processes for assessing social and economic*

*sustainability.* Some respondents felt the final rule should include specific processes for assessing social and economic sustainability, such as analyzing the role of forest receipts (Federal revenues that are shared with states and counties) on local economies. A respondent felt the proposed rule required less involvement by social and economic experts than by other types of experts or scientists.

*Response:* The final rule provides a framework for plan development, amendment, and revision with sufficient flexibility to accommodate the continuously evolving range of social and economic conditions across the Forest Service administrative units. The final rule does not prescribe a specific process for assessing and evaluating social and economic sustainability, nor does it include descriptions of area boundaries for social and economic impact analysis. Such direction, guidance, or advice, is more appropriate in the Forest Service directives. The public will be given an opportunity to review and comment on any Forest Service Manual or Forest Service Handbook revision associated with land management planning. Social, economic, and ecologic experts are all welcome to participate in the planning process: This final rule does not discriminate or give more weight to one group or kind of expert over another.

Section 219.9—Diversity of Plant and Animal Communities

This section of the final rule fulfills the diversity requirement of the NFMA, which directs the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section [of this Act], provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan" (16 U.S.C. 1604(g)(3)(B)).

The final rule adopts a complementary ecosystem and species-specific approach to provide for the diversity of plant and animal communities and the long-term persistence of native species in the plan area. Known as a coarse-filter/fine-filter approach, this is a well-developed concept in the scientific literature and has broad support from the scientific community and many members of the public. This requirement retains the strong species conservation intent of the 1982 rule but with a strategic focus on those species that are vulnerable paired with a focus on overall ecosystem integrity and diversity. The final rule requires the use of the best available scientific information to inform the development of the plan components including the plan components for diversity. It also recognizes limits to agency authority and the inherent capability of the plan area.

The Department's intent in providing the requirements in this section is to provide for diversity of plant and animal communities, and provide ecological conditions to keep common native species common, contribute to the recovery of threatened and endangered species, conserve candidate and proposed species, and maintain viable populations of species of conservation concern within the plan area.

The premise behind the coarse-filter approach is that native species evolved and adapted within the limits established by natural landforms, vegetation, and disturbance patterns prior to extensive human alteration. Maintaining or restoring ecological conditions similar to those under which native species have evolved therefore offers the best assurance against losses of biological diversity and maintains habitats for the vast majority of species in an area, subject to factors outside of the Agency's control, such as climate change. The final rule recognizes the importance of maintaining the biological diversity of each national forest and grassland, and the integrity of the compositional, structural, and functional components comprising the ecosystems on each NFS unit.

The coarse-filter requirements of the rule are set out as requirements to develop plan components designed to maintain or restore ecological conditions for ecosystem integrity and ecosystem diversity in the plan area. Based upon the current science of conservation biology, by working toward the goals of ecosystem integrity and ecosystem diversity with connected habitats that can absorb disturbance, the Department expects that over time, management would maintain and restore ecological conditions which provide for diversity of plant and animal communities and support the abundance, distribution, and long-term persistence of native species. These ecological conditions should be sufficient to sustain viable populations of native plant and animal species considered to be common or secure within the plan area. These coarse-filter requirements are also expected to support the persistence of many species currently considered imperiled or vulnerable across their ranges or within the plan area.

For example, by maintaining or restoring the composition, structure, processes, and ecological connectivity of longleaf pine forests, national forests in the Southeast provide ecological conditions that contribute to the recovery of the red-cockaded woodpecker (an endangered species) and conservation of the gopher tortoise (a threatened species), in addition to supporting common species that depend on the longleaf pine ecosystem.

Similarly, maintaining or restoring shortgrass prairies on national grasslands in the Great Plains contributes to the conservation of black-tailed prairie dogs (regional forester sensitive species (RFSS) of the Rocky Mountain Region), mountain plovers (proposed threatened), and burrowing owls (RFSS), in addition to supporting common species that depend on the shortgrass prairie ecosystem. Maintaining or restoring watershed, riparian, and aquatic conditions in the national forests in the Northeast contributes to the conservation of the eastern brook trout (RFSS), in addition to supporting common species that depend on functioning riparian areas and aquatic ecosystems in the area.

The final rule would further require additional, species-specific plan components, as a "fine-filter," to provide for additional specific habitat needs or other ecological conditions of certain categories of species, when the responsible official determines those needs are not met through the coarse-filter. The species for which the rule requires fine-filter plan components, when necessary, are federally listed threatened and endangered (T&E) species, proposed and candidate species, and species of conservation concern. If the responsible official determines that compliance with the coarse-filter approach is insufficient to provide the ecological conditions necessary to contribute to the recovery of federally listed threatened and endangered species, conserve species that are proposed or candidates to Federal listing, or maintain within the plan area a viable population of a species of conservation concern, then additional species-specific plan components that would do so are required, within Agency authority and the inherent capability of the land.

Species-specific plan components provide the fine-filter complement to the coarse-filter approach. For example, while coarse-filter requirements to restore longleaf pine ecosystems may provide most of the necessary ecological conditions for the endangered red-