cockaded woodpecker, additional fine-filter species-specific plan components may also be needed, for example, a plan standard to protect all known red-cockaded woodpecker cavity trees during prescribed burning activities. Examples for other species might include requiring proper size and placement of culverts to allow for aquatic organism passage on all streams capable of supporting eastern brook trout, or requiring closure devices on all cave and mine entrances to prevent the spread of white-nose syndrome to bat populations in the plan area.

Unlike the 1982 rule, the final rule explicitly acknowledges that there are limits to Agency authority and the inherent capability of the land. With respect to species of conservation concern (SCC), the responsible official may determine that those limits prevent maintenance or restoration of the ecological conditions necessary to maintain a viable population of a species of conservation concern within the boundaries of the plan area. The responsible official must then include plan components to maintain or restore ecological conditions within the plan area to contribute to maintaining a viable population of that species within its range. In doing so, the responsible official would be required to coordinate to the extent practicable with other land managers.

Examples of factors outside the control of the Agency could include: A species needing an area larger than the unit to maintain a viable population; non-NFS land management impacts to species that spend significant parts of their lifecycle off NFS lands; activities outside the plan area (for example, increasing fragmentation of habitat or non- and point source pollution often impact species and their habitats, both on and off NFS lands); failure of a species to occupy suitable habitat; and climate change and related stressors, which could impact many species and may make it impossible to maintain current ecological conditions. Other stressors, such as invasive species, insects, disease, catastrophic wildfire, floods, droughts, and changes in precipitation, among others, may also affect species and habitat in ways that the Agency cannot completely control or mitigate for.

In section 219.19, the Department defines native species as "an organism that was historically or is present in a particular ecosystem as a result of natural migratory or evolutionary processes; and not as a result of an accidental or deliberate introduction into that ecosystem. An organism's presence and evolution (adaptation) in an area are determined by climate, soil and other biotic and abiotic factors." By defining species as "was historically or is present in a particular ecosystem," the Department is not suggesting that historically native species that are no longer present must be reintroduced. The Department is recognizing that if such species were to return or to be reintroduced to the area, they would still be considered native.

In addition to developing, amending, and revising plans under the diversity requirements of this section, the final rule includes requirements for ecological sustainability in § 219.8, and in § 219.10 for providing for multiple uses including wildlife and fish, considering ecosystem services, fish and wildlife species, habitat and habitat connectivity, and habitat conditions for wildlife, fish, and plants commonly enjoyed and used by the public when developing plan components for integrated resource management. Requirements in the assessment and monitoring phases are also linked to and support the requirements of this section.

### Section 219.9—Response to Comments

The Department received many comments on this section. People suggested a broad range of approaches, including reinstating the 1982 viability requirements; protecting and maintaining healthy habitats with no species specific provisions; increasing viability requirements; and mirroring the NFMA wording for diversity without including reference to viability. In addition, some people emphasized that there is a need to coordinate and cooperate beyond NFS unit boundaries for purposes of identifying and protecting critical habitat, migration corridors, and other habitat elements.

The Department also received many comments expressing concern or confusion over the relationship between the ecosystem diversity requirement in paragraph (a) and the species conservation requirement in paragraph (b) in this section of the proposed rule. In particular, there was concern over whether the complementary coarse-filter and fine-filter strategy described in the preamble and DEIS for the proposed rule was clearly expressed in the proposed rule wording itself. Additionally, there was a lack of understanding of how these two requirements would maintain both the diversity of plant and animal communities and the persistence of native species within the plan area as expressed in the preamble.

In response to public comments, the Department modified the proposed rule wording and made additions to it. The result is a final § 219.9 that has the same intent as the proposed rule but is clearer and will better effectuate the Department's approach to providing for diversity.

The Department added wording to the introduction to explain, as expressed in the preamble for the proposed rule, that plans adopt a complementary ecosystem (coarse-filter) and species-specific (fine-filter) approach to maintaining the diversity of plant and animal communities and the persistence of native species in the plan area. This combined approach for maintaining biological diversity over large landscapes is a well-developed concept in the scientific literature, and is generally supported by the science community for application on Federal lands.

Paragraph (a) was modified with the new heading of "Ecosystem plan components," and subdivided into 2 parts. The new paragraph (a)(1) has a heading of "Ecosystem integrity" and includes the requirements of paragraph (a) of the proposed rule, consistent with the equivalent requirement in § 219.8(a). As in § 219.8 the "health and resilience" of the proposed rule was replaced with "ecological integrity" as described in the discussion of 219.8. The concept of ecological integrity is also being advanced by the U.S. Department of the Interior for National Park System lands. Having similar approaches to assessing and evaluating ecological conditions across the broader landscape will facilitate an all-lands approach to ecological sustainability.

The Department added a new paragraph ((a)(2)), which retains the proposed rule heading of "ecosystem diversity." This paragraph includes new wording to make clear that the plan must include plan components to maintain the diversity of ecosystems and habitat types in the plan area. This change was made to explain, as described in the preamble to the proposed rule that plans provide for ecosystem diversity. As part of providing for this requirement, paragraph (a)(2) includes direction to provide plan components to maintain and restore key characteristics of ecosystem types (similar to requirements of proposed rule § 219.8(2)(i) and (ii)), rare native plant and animal communities (moved from proposed rule § 219.8(a)(2)(iii)), and diversity of native tree species (moved from paragraph (c) of proposed § 219.9). Both subsections of paragraph (a) direct that the responsible official include "standards or guidelines" in the set of plan components developed to meet these requirements.

The heading of paragraph (b) was changed from "Species Conservation" to "Additional, species-specific plan components" to clarify the fact that both the ecosystem plan components (coarse-filter) and the additional species-specific plan components (fine-filter) contribute to species conservation. Paragraph (b)(1) adds proposed species to candidate species as species to be conserved. The substance of paragraph (b) was modified in the final rule to make it clear that the plan components required by this paragraph are intended to complement and supplement the coarse-filter requirements, where necessary.

In response to comments on the preferred alternative, a change was made to the wording in § 219.9(b)(1) to clarify the Department's intent that the responsible official must make a determination as to whether additional, species-specific plan components are required. The final rule states that "the responsible official shall determine whether or not the plan components required by paragraph (a) provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area."

The "if then" statement in paragraph (b)(1) conveys the Department's expectation that for most native species, including threatened, endangered, proposed, candidate, and species of conservation concern, the ecosystem integrity and ecosystem diversity requirements (coarse-filter) would be expected to provide most or all of the ecological conditions necessary for those species' persistence within the plan area. However, for threatened, endangered, proposed, candidate, and species of conservation concern, the responsible official must review the coarse-filter plan components, and if necessary, include additional, species-specific (fine-filter) plan components to provide the ecological conditions to contribute to recovery of threatened and endangered species, to conserve proposed and candidate species, and to maintain viable populations of species of conservation concern in the plan area. As in many places in the final rule, paragraph (b) clarifies that the responsible official will include "standards or guidelines" in the set of plan components developed to meet these requirements. The word "developed" in this paragraph was changed to the word "included" to be consistent with similar construction in this and other sections that the plan will include plan components to meet various requirements.

Within paragraph (b)(1), the Department changed the requirement for ecological conditions to maintain "viable populations of species of conservation concern" (§ 219.9 (b)(3) of the proposed rule) to "*a viable population of each* species of conservation concern" (emphasis added). The change reflects the Department's intent from the proposed rule, but provides clarity in response to confusion about whether the proposed rule wording referred to populations of different species or multiple populations of the same species in the plan area, as well as concern that the proposed rule wording could be interpreted to mean that plans did not have to address every species of conservation concern. This clarification is consistent with the preamble of the proposed rule which discusses the agency's obligation in terms of maintaining "a viable population of a species of conservation concern * * * to maintain the long-term persistence of that species." 76 FR 8493 (February 14, 2011).

As in the proposed rule, the ecosystem and species-specific requirements in the final rule are both limited by Forest Service authority and the inherent capability of the plan area. As in the proposed rule, the final rule provides an alternative standard for species of conservation concern if it is beyond the Forest Service's authority or the inherent capability of the plan area to provide ecological conditions to maintain a viable population of a species of conservation concern within the plan area. In such cases, the final rule requires that the responsible official document that determination (new requirement in the final rule) and include plan components, including standards or guidelines, to maintain or restore ecological conditions within the plan area to contribute to maintaining a viable population of the species within its range. The words "to the extent practicable" following the word "contribute" were removed from the final rule because they caused confusion and were unnecessary given other provisions of the rule, including Section 219.1(g). The final rule retains a modified requirement that in providing such plan components, the responsible official shall coordinate to the extent practicable with other Federal, State, Tribal, and private land managers having management authority over lands "relevant to that population," to reflect the need for a cross boundary approach to species conservation.

The Department added paragraph (c) to the final rule to modify and clarify the definition of species of conservation concern, formerly in section 219.19. The new wording clarifies that the species of conservation concern must be "known to occur in the plan area," that the regional forester is the line officer who identifies the species of conservation concern, and the standard for that is "the best available scientific information indicates substantial concern about the species' capability to persist over the long term in the plan area."

The Department believes these revisions more clearly describe the application of the coarse-filter/fine-filter strategy for maintaining biological diversity as discussed in scientific literature and the PEIS. As plan components designed to meet these requirements are created and complied with, the broad spectrum of habitat and other ecological conditions necessary to support the diversity of plant and animal communities and the persistence of native plant and animal species would be expected through this complementary strategy.

*Comment: Relationship between ecosystem diversity and species conservation.* Some respondents felt the proposed rule was confusing in its description of the relationship between the ecosystem diversity requirement in proposed § 219.9(a) and the species conservation requirement in § 219.9(b). They felt the complementary coarse-filter/fine-filter strategy described in the preamble and DEIS was not clearly expressed in the proposed rule wording. Additionally, they felt it was unclear on how these two requirements would maintain the diversity of plant and animal communities and the persistence of native species within the plan area.

*Response:* In response to public comments, the Department clarified the proposed rule wording and made additions to the final rule. The coarse-filter/fine-filter approach used in the final rule and the modifications made to the proposed rule are explained in the introductory paragraphs of the response to comments on section 219.9.

*Comment: Threatened, and endangered species.* Some respondents felt the Department should consult with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service on potential effects to threatened and endangered species as a result of the proposed planning rule. Others felt recovery plans are not legally enforceable documents; therefore, they are not mandatory for Federal agency adoption.

*Response:* Beginning in 2009 and continuing through the development of this planning rule and its accompanying PEIS, representatives from the U.S. Fish and Wildlife Service and the National Marine Fisheries Service met regularly with the Forest Service to discuss ESA issues related to the rule. The three agencies worked together to identify the relevant issues and appropriate level of analysis associated with the final rule and environmental analysis, and have collaborated on a consultation process and on the biological assessment. The Agency requested consultation with these regulatory agencies in July 2011. Additionally, the Agency requested conferencing on the potential effects of the rule on all species proposed for Federal listing that currently occur on NFS lands and those that are candidates for Federal listing occurring on or are suspected to occur on NFS lands. The Agency completed consultation, as discussed in this preamble in the section with the caption of: *Compliance with the Endangered Species Act of 1973, as Amended.*

NFS lands are a major contributor to threatened and endangered species recovery plans and actions, maintaining habitat for such species as red-cockaded woodpecker, Canada lynx, bull trout, steelhead, and many other listed species. As part of the Forest Service mission, the actions needed to recover T&E species and maintain or restore critical habitats are a high priority. These species are at risk of extinction and are protected under the ESA. Under the ESA, the Forest Service is to carry out "programs and activities for the conservation of endangered species and threatened species" (16 U.S.C. 1536(a)(1)) and "insure that any action authorized, funded or carried out by [it] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical habitat]" (16 U.S.C. 1635(a)(2)).

As did the proposed rule, the final rule requires that the plan include plan components to provide ecological conditions in the plan area necessary to contribute to the recovery of T&E species, using coarse-filter plan components and adding species-specific plan components where necessary. While the 1982 rule at section 219.19(a)(7) did have specific requirements for protection of T&E critical habitat, and required objectives to remove T&E species from listing, where possible, through appropriate conservation measures, the requirement in the final rule that requires plan components to provide ecological

conditions to "contribute to the recovery of" T&E species is more comprehensive. The final rule recognizes that these species may not be viable or have a viable population at this time, and in many cases may rely on lands and conditions outside NFS boundaries and beyond Agency control. Thus an individual NFS unit rarely can fully meet the recovery needs of a listed species. Under this final rule, the Department anticipates that plan components, including standards or guidelines, for the plan area would address conservation measures and actions identified in recovery plans relevant to T&E species. When implemented over time, these requirements would be expected to result in plans that will be proactive in the recovery and conservation of the threatened, endangered, proposed, and candidate species in the plan areas. These requirements will further the purposes of § 7(a)(1) of the ESA, by actively contributing to threatened and endangered species recovery and maintaining or restoring the ecosystems upon which they depend.

The Forest Service frequently collaborates with the U.S. Fish and Wildlife Service (USFWS) and the National Oceanic and Atmospheric Administration (NOAA) in the development and implementation of recovery plans for many species. The Forest Service will continue to work with USFWS, NOAA, States, and other partners to conserve and recover federally listed plant and animal species. The responsible official may also contribute to other recovery actions, such as species reintroductions to increase species distribution and threatened and endangered species monitoring programs. In addition, the Agency will continue to evaluate effects of proposed management actions to T&E species or designated critical habitat. Consultation with the appropriate regulatory agency(s) will also occur at the plan development, amendment, or revision stage and again at the project stage, if they may affect any federally listed species or designated critical habitat. Additional guidance will be forthcoming on procedures for conducting ESA section 7(a)(1) conservation reviews of plans in the Forest Service directives.

Complementary sections of the final rule, §§ 219.3, 219.4, and 219.6, in combination emphasize: the role of science in preparing, revising, or amending a plan; collaboration, including coordination with other planning efforts; consideration of objectives of other agencies and entities; the encouragement of appropriate

agencies and entities to participate in determining assessment needs and identify contributions of relevant broad-scale assessments and plans of other agencies and governments; and the incorporation of broad-scale monitoring to address questions that are more appropriately answered at scales beyond NFS boundaries. These processes, programs, and activities would be incorporated into future unit planning processes and plans, and as these plans are implemented, they will actively contribute to ESA goals.

*Comment: Candidate and proposed species.* Many respondents supported the proposed rule requirement to conserve species that are candidates for Federal listing. Other respondents questioned why the proposed rule requires candidate species conservation as these species have not received Federal protection under ESA, and this may lead to more petitions for species listings being filed in the future and further limit the management options of the Agency.

*Response:* The Department added definitions for "candidate species," and "proposed species," and "conserve" to § 219.19 of the final rule to clarify the definitions of these terms and to avoid misunderstanding. Under the ESA, candidate and proposed species do not receive the special legal protections afforded to threatened and endangered species. However, the Department believes it is important to develop plan components for those plant and animal species that are proposed or candidates for Federal listing that occur on NFS lands, in order to assist in their recovery such that a Federal listing is no longer required. Similar to T&E species, candidate and proposed species may not have a viable population that can be maintained in the plan area at this time. In the final rule, the Agency would provide coarse-filter, and where necessary, additional fine-filter plan components for ecological conditions that would conserve candidate and proposed species, reducing risks to those species and providing for the maintenance or restoration of needed ecological conditions.

*Comment: Authority for viability.* Some respondents felt the proposed rule's concept of species viability may be outside the Agency's authority to implement; they take the position that managing for species diversity and viability is the responsibility of State agencies, the National Marine Fisheries Service, and the U.S. Fish and Wildlife Service.

*Response:* The requirement, to "provide for diversity of plant and animal communities" as set forth under

§ 1604(g)(3)(B) of the NFMA, does not specifically reference the diversity or viability of particular species. It is a statutory requirement that there be a planning rule that provides for diversity. However, it is within the Department's authority to require that plans provide ecological conditions to maintain viable populations of species of conservation concern. The Department's ability to maintain the diversity of plant and animal communities is dependent on protecting the plant and animal species and the interactions and processes the species perform. The Department developed the final rule in recognition that many Agency plans, programs, and activities are important influences on providing the desired ecological conditions for plant and animal communities and native species on NFS lands. In accordance with the MUSYA, plans must also provide for multiple uses including wildlife and fish.

The provisions in this final rule are focused on providing the ecological conditions necessary to support the diversity and persistence of native plant and animal species. The final rule maintains and provides additional direction to work with State fish and wildlife agencies, other Federal agencies, as well as others, to conserve fish, wildlife, and plant habitats and populations on NFS lands and to contribute to shared goals, such as those provided in state wildlife action plans or in threatened or endangered species recovery plans. Requirements in §§ 219.4, 219.6, 219.10, and 219.12 of this final rule complement and support interagency collaboration on habitat and species conservation.

*Comment: Species of Conservation Concern (SCC) and Viability.* Some respondents felt the rule should include the following wording from § 219.19 of the 1982 rule: "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." Some felt this standard should be extended to plants and invertebrates as well as vertebrates, and not only to SCC. Some respondents felt the proposed rule weakens current protections for plant and animal species therefore, the rule needs inclusion of clear, strong requirements focused on protecting and maintaining all native species within a plan area. On the other hand several respondents felt the proposed requirement to maintain viability of SCC is too expensive and cumbersome to implement. They felt this requirement is unattainable and procedurally impossible to demonstrate. Some respondents were opposed to

providing protections for species other than vertebrates as it could lead to the possibility of maintaining viable populations of invertebrates, fungi, microorganisms, and other life forms, which these respondents suggest is inappropriate and beyond the Agency's authority.

*Response:* The Department concludes that managing ecological conditions for species protection is well within the authority of the Forest Service to manage the NFS for multiple use, and that the requirements of this section are more strategic and implementable than the 1982 rule while providing strong requirements focused on maintaining diversity and the persistence of native species within the plan area. The 1982 rule required that "habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." There may be hundreds of vertebrate species on a particular plan area. For some vertebrate species there may be little scientific information about their life requirements and habitat relationships, even though they may be considered common and secure within habitats provided on a NFS unit. For other vertebrate species, the requirement to maintain viable populations in the planning area may be unattainable, for reasons outside of the Agency's control.

The final rule instead relies on current scientific literature to adopt the complementary ecosystem and species-specific approach described above in the introduction to this section, and to focus species-specific management attention on those species that are vulnerable. Ecosystem (coarse-filter) plan components are expected to provide the necessary ecological conditions for species that are common, with viable populations in the plan area and no reason for concern about their ability to persist in the plan area over the long term. For species that are known to be imperiled (threatened, endangered, proposed and candidate species), the final rule requires coarse-filter, and where necessary, fine-filter plan components to provide ecological conditions that contribute to recovery or conservation of the species, recognizing that there is likely not a viable population of such species in the plan area at the time of plan approval.

The final rule provides direction for a third category of species: species that are vulnerable within the plan area, but not federally recognized for purposes of the ESA. These are species known to occur in the plan area, for which the best available scientific information indicates a substantial concern about

the species' capability to persist in the plan area over the long term. The Department called this category "species of conservation concern."

For this category of species, the final rule requires coarse-filter, and where necessary, fine-filter plan components to provide ecological conditions to maintain a viable population of such species within the plan area, where it is within Forest Service authority and the inherent capability of the land to do so. If providing the ecological conditions to maintain a viable population within the plan area is beyond Forest Service authority or the inherent capability of the land, then the final rule requires coarse-filter, and where necessary, fine-filter plan components to provide ecological conditions to contribute to maintaining a viable population of the species within its range. For example, if a unit is incapable of providing a sufficient amount of the ecological conditions necessary to maintain a viable population of a species of conservation concern within the plan area, then the responsible official must include plan components that provide the ecological conditions in the plan area necessary to contribute to a viable population of that species in the broader landscape. The rule requires the responsible official to work in coordination with other relevant land managers when developing such plan components.

Species of conservation concern, like the categories of common species and imperiled species, is not limited to native and desired non-native vertebrates (as in the 1982 rule); it may include any native plant or animal species that meets the definition. The Department has the authority to include requirements for species other than vertebrate species under the NFMA and the MUSYA. Non-vertebrate species can be federally recognized as threatened or endangered. In addition, in each NFS region, the regional forester has developed and maintained a list of regional forester sensitive species (RFSS) for over two decades. The RFSS list can include any native plant or animal species. RFSS are those plant and animal species identified by a regional forester for which population viability is a concern, as evidenced by: significant current or predicted downward trends in population numbers or density; or significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution. RFSS are similar to SCC. The conservation and management of many RFSS has been a part of many land management

plans and projects and activities for decades.

The projected costs of carrying out the rule are found in the Regulatory Planning and Review section of the preamble and in the final PEIS supporting this final rule. These costs are not expected to be too expensive or cumbersome to be carried out by the Agency. Because these requirements adopt a scientifically supported approach, acknowledge that there are limits to Agency control, and focus management attention more strategically on ecosystem plan components that will provide for most species and where necessary on additional species-specific plan components for species that are vulnerable, the Department believes that the requirements of this section, combined with the requirements in other sections of the rule for public participation, assessment and monitoring, will result in a strong, more effective, efficient, and implementable framework for providing for species diversity and persistence.

*Comment: Distribution of species or habitat.* Some respondents raised concerns that the definition of a viable population and the requirements for species of conservation concern do not include the requirement that these species or habitats be "well-distributed" as is required in the 1982 rule and they feel that this omission results in a lessening of protection for species between the 1982 rule and this final planning rule.

*Response:* NFMA does not require that species or habitats be well-distributed within the plan area. The 1982 rule stated at § 219.19 that: "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area."

This final rule includes requirements to restore or maintain ecological conditions to support viable populations of species of conservation concern. It requires that the responsible official determine whether or not the plan components required by paragraph (a) "provide the ecological conditions necessary to * * * maintain a viable

population of each species of conservation concern within the plan area. If the responsible official determines that the plan components required in paragraph (a) are insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area" (§ 219.9(b)(1)). The rule defines a viable population as: "A population of a species that continues to persist over the long term with *sufficient distribution to be resilient and adaptable* to stressors and likely future environments" (§ 219.19) (emphasis added).

The intent behind both the 1982 provisions and the final rule provisions is the same: To provide habitat to maintain viable populations. However, there are a number of reasons for the Department's decision not to include the term "well-distributed" in the final rule and instead used the phrase "with sufficient distribution to be resilient and adaptable." The term is not defined in the 1982 rule, has been inconsistently interpreted in plans, and has been applied in many different ways.

Importantly, the term "well-distributed" on its own is not clearly biological: Many people have interpreted the term in a geographical context as opposed to a biological context. This geographic interpretation has proven problematic at times, because the plan area is not an ecological boundary; it is an administrative boundary that may overlap completely or only partially with a species' natural ecological range. In addition, for some species, those areas of overlap may be changing in response to changing conditions.

Since 1982, we have learned more about what is important for a species to persist on the landscape, with an evolving understanding of important ecological concepts like resilience, connectivity, and adaptability, and of stressors such as climate change. For these reasons, instead of relying on the term "well-distributed," the Department chose instead to include a more ecologically-based definition of a viable population, "with sufficient distribution to be resilient and adaptable to stressors and likely future environments" such that the population "continues to persist over the long term."

Combined with the requirement in section 219.3 to use the best available scientific information to inform the plan, this definition is intended to focus the development of plan components on providing ecological conditions where they will be most useful and important

to the species, which may or may not lead to habitat that is evenly or "well" distributed across the plan area for every species. For some species, that may mean having the appropriate ecological conditions throughout the plan area. For others, it may mean focusing on a small portion of the plan area. For others, it may mean working to restore or provide ecological conditions for a species whose range is migrating in response to changing conditions. For still others, it may mean providing a corridor or corridors to connect habitat.

The change from "well distributed" to "sufficient distribution to be resilient and adaptable" is intended to clarify that we are using "distribution" in an ecological context to support species' long term persistence and to help increase consistency in implementation. The Department recognizes that the long-term security of species improves as distribution increases and habitat and other ecological conditions are maintained or improved. Whether distribution is "sufficient" will be evaluated in the context of what a population needs for resilience and adaptability such that it can continue to persist over the long term, considering the species' natural history, the ability of individuals to interact, historical distribution and potential future distribution, and recognizing that habitat and species distribution will be dynamic over time. The responsible official will use the best available scientific information to inform this evaluation. In making this evaluation, it is the Department's expectation that for the purposes of this subpart, the individuals of a species of conservation concern that exist in the plan area will be considered to be members of one population of that species. The responsible official would consider the distribution of individuals or groups that would support a viable population of that species in the plan area. Additional guidance will be included in the directives, which will be available for public notice and comment.

It is important to recognize that the requirements of § 219.9(b)(1) and the definition of viable population support and are part of a broader set of requirements in the final rule that are important for species conservation, including the requirements in §§ 219.8 and 219.9 to maintain or restore ecological integrity, including connectivity of ecosystems in the plan area; and the requirement in § 219.9(a) to provide a diversity of ecosystem types throughout the plan area.

Combined, the requirements in the final rule are expected to provide the

conditions that support the persistence of native species in the plan area and maintain the diversity of plant and animal communities. For these reasons, the Department believes that the set of requirements in the final rule is not a lessening of protection from the 1982 rule, and represents a science-based approach to species conservation.

*Comment: Identification and definition of species of conservation concern.* Some respondents felt the proposed rule was unclear on who the responsible official for identifying SCC was, what criteria would be used to identify SCC; and whether or not that criteria should be established in the planning rule. Some respondents offered suggested criteria for identifying SCC. Several respondents expressed concern the proposed rule provides too much discretion to the responsible official in deciding which species will receive protection.

*Response:* In response to these comments, the definition of species of conservation concern was moved from § 219.19 to a new paragraph (c) in this section and was modified. The Department changed the line officer who identifies the SCC for the plan area from the responsible official (normally the forest supervisor) to the regional forester in the final rule. The change was made to provide additional consistency and promote efficiency in identifying species of conservation on and among national forests and grasslands within a region. The broader-scale monitoring strategy will also be developed by the regional forester.

The final rule's definition of SCC makes the criterion for identifying such species narrower and more scientific than the definition in the proposed rule. The species must be "known to occur in the plan area," and "the best available scientific information" must indicate "substantial concern" about the species' capability to persist over the long-term in the plan area.

Additional guidance for the identification of species of conservation concern will be included in the Forest Service Directives System, with an opportunity for public comment. The Department expects that State or Tribal lists of endangered, threatened, rare, endemic, or other classifications of species, such as those listed as threatened under State law; and other sources such as the NatureServe conservation status system may be used to inform the identification of SCC.

*Comment: Circumstances not within Forest Service authority, consistent with the inherent capability of the plan area.* Some respondents felt the rule needs to clarify what is meant by "within Forest

Service authority, and consistent with the inherent capability of the plan area," to provide consistency in their application and intent. Others felt use of these terms allowed the Agency to avoid responsibilities for maintaining the diversity of plant and animal communities and the persistence of native species within the plan area. Still others felt the rule should describe the types of circumstances that make the Agency's ability to meet the requirement for maintaining viable populations of species of conservation concern infeasible or impractical. Some respondents said the rule should provide more discretion and flexibility.

*Response:* The acknowledgment of limits to Agency authority and the inherent capability of the land do not "allow" the Agency to avoid responsibility for maintaining the diversity of plant and animal communities and the persistence of native species within the plan area. These limits exist whether they are acknowledged in the rule or not. The Department believes it is more transparent and effective to require a robust and scientifically supported approach to providing for the diversity of plant and animal communities and the persistence of native species within the plan area and openly acknowledge that there are some circumstances outside of Agency control, allowing responsible officials to adjust, adapt, and work more collaboratively with other land managers to protect species in the context of the broader landscape.

The "inherent capability of the land" is defined in § 219.19 of the final rule as: "The ecological capacity or ecological potential of an area characterized by the interrelationship of its physical elements, its climatic regime, and natural disturbances" Examples of circumstances where the plan area may lack the inherent capability to maintain a viable population of a species include where a plan area is not large enough to produce sufficient habitat on the unit or where, due to current or projected changes in climate, it would be impossible for the plan area to produce or maintain the required amount or quality of habitat conditions necessary to sustain a viable population of the species within the plan area. Additional examples of circumstances outside the Agency's control, including those that may be outside the Agency's authority or the inherent capability of the land, are discussed earlier in this document as part of the rational for non-selection of Alternative B (No Action).

There may also be circumstances where the plan area has the inherent

capability over time to provide for certain ecological conditions, but cannot produce such ecological conditions within the lifetime of the plan: for example, where a species needs old growth or late successional habitat where there is none (for example, where bark beetle has killed all of the late successional stands in a plan area). The plan would include plan components to move the plan area towards providing that habitat in the future, but would not have the capability to produce it instantly.

Examples of circumstances not within the authority of the Agency include land use patterns on private lands within or adjacent to NFS units that fragment and reduce habitat for a species whose range extends well beyond the plan area, habitat loss or degradation along important migration routes or wintering grounds for a species who spends some of its life history on other lands or in other countries, or the influence of disease or invasive species.

Section 219.3 requires the use of the best available scientific information to inform the plan components required by this section, and § 219.14 requires the responsible official to document how the requirements of this section were met. Section 219.2 requires that the Chief establish a national oversight process for accountability and consistency. The Forest Service Directives System will include additional direction for implementing the requirements of this section, and will be available for public comment.

*Comment: Diversity of tree and other plant species.* Some respondents felt the rule is not protective enough of the diversity of tree and other plant species. Others felt the rule should have specific requirements for old growth and large, intact blocks of forest; leaving more snags and dead wood; reforestation guidelines that include diverse tree mixtures; and use of herbicides.

*Response:* The Department based the requirements of § 219.9(a)(2)(iii) on the NFMA.

The final rule requires in paragraph (a)(2)(i) and (ii) plan components to provide for key characteristics associated with terrestrial and aquatic ecosystem types and rare aquatic and terrestrial plant and animal communities, which may include old growth stands, meadows, snags, or other characteristics. These characteristics are similar to what was required in the proposed rule at § 219.8(a)(2)(i) and (ii) and (iii)). More specific requirements were not included in the final rule, because these issues are best identified and determined at the forest or grassland level, reflecting ecosystems

and plant and animal communities on the unit. Further direction will be provided in the Forest Service Directives System and in individual plans.

*Comment: Additional species comments.* Some respondents felt the rule should include direction on species assessments, developing the coarse-filter, and disclosing specific environmental effects.

*Response:* The Department agrees the issues raised are important. The final rule is intended to provide overall planning direction applicable throughout the entire National Forest System. The type of guidance requested by these respondents is more appropriately found in the Forest Service Directives System and/or in the plans themselves or in the subsequent decisions regarding projects and activities on a particular national forest, grassland, prairie, or other comparable administrative unit. Some of the requested guidance, such as how to do assessments for particular species, would not apply to planning throughout the entire System. Other types of guidance, instructing the Agency on how to carry out the rule's requirements, may be so detailed that if, included in the rule, may make it unmanageably long and complicated. Also, including instructions in the rule on how to carry out various planning tasks may tie the Agency to procedures even when it learns better ways to carrying out those tasks. The Department concludes that placing such direction in Forest Service directives, which can change more readily than a rule, or allowing the Agency to try out various ways to carry out the rule, is likely to result in more effective and efficient planning than including such detail in the final rule itself.

*Comment: "survey and manage."* Several respondents requested the planning rule require "survey and manage" procedures currently employed in the Pacific Northwest under the Northwest Forest Plan. Several respondents said one foreseeable outcome could be court ordered service-wide requirements for "survey and manage" as they believe is currently mandated in the Northwest Forest Plan. One respondent believes by expanding the requirements for viability beyond vertebrates the Forest Service will be forced to use "survey and manage" procedures of the Northwest Forest Plan on a nationwide basis.

*Response:* The final rule does not require "survey and manage" procedures similar to those in the Northwest Forest Plan. "Survey and manage" is a Northwest Forest Plan

program where, before ground disturbing projects can be approved, the Forest Service must inventory late successional and old structure stands for nearly 400 species including fungi, lichens, bryophytes, mollusks, and several vascular plants, arthropods and vertebrates. None of the species are listed under ESA, but little is known about them. The final rule requires an assessment of existing, relevant information, and the use of best available scientific information to inform plan components to meet the species and diversity requirements of the rule. The final rule clarifies that species of conservation concern must be known to occur in the plan area and that the best available scientific information must indicate substantial concern about the species' capability to persist over the long term in the plan area.

Section 219.10—Multiple Use

This section requires that plans provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area, through integrated resource management. The responsible official must consider a range of uses, resources, services, and opportunities relevant to the plan area when developing plan components to provide ecosystem services and multiple uses, along with reasonably foreseeable risks to ecological, social, and economic sustainability. In addition, this section includes specific requirements for plan components for a new plan or plan revision. This section builds on the requirements in § 219.8 for plans to provide for ecological sustainability and contribute to social and economic sustainability.

Section 219.10—Response to Comments

Many comments on this section focused on multiple use requirements, requirements for ecosystem services, recreation, cultural and historic resources, wilderness and wild and scenic rivers, and designated areas. In response to public comment, the Department made a number of changes to this section to clarify intent.

The Department rearranged the wording of the introductory paragraph of this section to clarify the intent of the Agency that plans must provide for ecosystem services and multiple uses. The Department removed the term "fiscal capability" from the introductory paragraph because direction about fiscal capability is now included in § 219.1(g), and to be consistent with §§ 219.8 and 219.9.

The Department modified the requirements of paragraph (a) to clarify the wording, make these requirements parallel to other sections of the rule, and to respond to public comments. The Department added a requirement to have plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area. This change is in response to public comment to clarify that plan components for integrated resource management are to provide for ecosystem services and multiple uses, and to require standards or guidelines as part of the set of plan components developed to comply with the requirements of paragraph (a). As in earlier sections, the Department also changed the phrase "multiple uses, including ecosystem services" to "ecosystem services and multiple uses," consistent with the MUSYA (see response to comments for § 219.1). The Department added a definition of integrated resource management in § 219.19, reflecting the interdependence of ecological resources as well as economic, ecological, and social systems.

Paragraph (a)(1) to (a)(10) includes a list of elements the responsible official shall consider when developing plan components for integrated resource management to provide for ecosystem services and multiple uses in the plan area. The Department modified this list in response to public comments; some of these modifications are additional requirements. The Department modified the list as follows: In paragraph (a)(1), changed the term recreational values to recreation opportunities to make the wording consistent with other sections and with paragraph (b)(1), and added "and uses" to the end of the list in paragraph (a)(1) to recognize that the list includes both resources and uses and that there may be other resources and uses relevant to the plan area; in paragraph (a)(3), added the words "appropriate placement of infrastructure" to recognize that there may be new infrastructure needs or proposals in addition to the need for sustainable management of already existing infrastructure; in paragraph (a)(5), modified wording to emphasize that responsible officials, in addition to meeting the requirements in § 219.9 for diversity and species and providing for wildlife and fish as part of the earlier direction in § 219.10 and paragraph (a)(1), should specifically consider habitat conditions for species that are used or enjoyed by the public for recreational opportunities such as

hunting and fishing, or for subsistence, and added a requirement that the responsible official collaborate with other land managers in doing so; in paragraph (a)(6), dropped the wording in the proposed rule to consider "the landscape context for management as identified in the assessment" because it was redundant with modifications made to the requirements in § 219.7, and moved the text at proposed paragraph (a)(7) to the final paragraph (a)(6); moved the text from proposed rule paragraphs (a)(7), (8) and (9), with some modifications, to the final rule paragraphs (a)(6),(7), and (8); in paragraph (a)(9) in the final rule added a new requirement, to consider "public water supplies and associated water quality," in recognition of the role that national forests and grasslands play in providing drinking water to nearly one in five Americans; and added a requirement at (a)(10), to require consideration of opportunities to connect people to nature, recognizing that plans should consider both the resources on the plan area and people's connection to them.

Paragraph (b)(1)(i) to (b)(1)(vi) sets forth a list of requirements for plan components for new plans or plan revisions, adding the requirement that the set of plan components developed to meet these requirements include standards or guidelines, consistent with similar changes in other sections. The Department modified the requirements of paragraph (b) to clarify the wording, make these requirements parallel to other sections of the rule, and to respond to public comments. In paragraph (b)(1)(i), the Department slightly modified the requirement to require that plans must provide for sustainable recreation, including recreation settings, opportunities, and access; and scenic character; and to make clear in this section that recreation opportunities may include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air.

In addition, the Department modified paragraph (b) by: Changing the wording for protection of wilderness and management of areas recommended for wilderness to be clearer; adding a requirement for management of rivers "determined suitable" for inclusion in the Wild and Scenic River System; changed paragraph (b)(1)(vi) to be consistent with changes made to § 219.7(c)(2)(vii) that clarify that the responsible official may establish new designated areas as part of the plan; and made additional edits for clarity. Some of these are additional requirements to respond to public comment.

*Comment: Inclusion of MUSYA, multiple use.* Some respondents felt proposed § 219.10 does not specifically reference MUSYA. Other respondents felt that administering the NFS lands for multiple uses should not be included in the final rule. Some respondents requested the rule include specific uses.

*Response:* The Department made changes to this section to clarify that plans must include plan components to provide for multiple uses. The MUSYA has guided NFS management since it was enacted in 1960, and will continue to do so, regardless of whether it is specifically referenced in this section, or any other section, of the rule. The MUSYA expanded upon the original purposes for which national forests may be established and administered, which were identified in the Organic Administration Act: "to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." (Act of June 4, 1897 (16 U.S.C. 475)).

The MUSYA states that the Forest Service is to "administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." (16 U.S.C. 529). The Act defines "multiple use" as "The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services * * *." (16 U.S.C. 531(a)).

The Department acknowledges and applies the MUSYA throughout the final rule. In the very first section of the final rule, § 219.1(b) states that the Forest Service manages the NFS to sustain the multiple use of its renewable resources in perpetuity while maintaining the long term health and productivity of the land, consistent with MUSYA. The rest of the sections in subpart A give additional direction on how to do that. The assessment phase and public participation will help the responsible official determine the range of ecosystem services and multiple uses provided by the unit. Section 219.10 requires plan components to provide for ecosystem services and multiple uses, using an integrated approach to resource management. These plan components will be informed by the assessment, public input, and the best available scientific information, as well as monitoring.

*Comment: Ecosystem services and methods for assessing multiple use.* Some respondents felt the proposed rule improperly expands the MUSYA's specified multiple use purposes to include ecosystem services, which the proposed rule defines as educational, aesthetic, spiritual, and cultural heritage values. Some respondents felt ecosystem services should be determined by research.

*Response:* The phrase "multiple uses, including ecosystem services" has been changed throughout the rule to "ecosystem services and multiple uses." The Department believes this revised wording is consistent with the MUSYA, which directs the Agency to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom" (16 U.S.C. 529). MUSYA anticipated and provided for "periodic adjustments in use to conform to changing needs and conditions." (16 U.S.C 531). "Ecosystem services" may be a relatively new term, but it is entirely within the scope of the Act to acknowledge that the "several products and services obtained" from national forests and grasslands incorporates the full range of values, resources, uses and benefits that these lands provide.

Research has provided insights into the ecosystem services to be obtained from the NFS. During the planning process, the assessment phase, public input, monitoring, and the best available scientific information will help the responsible official identify and develop plan components to provide for the ecosystem services to be obtained from each NFS unit.

*Comment: Relationship of ecosystem services to other multiple uses.* Some respondents felt proposed § 219.10 gave ecosystem services higher priority than other multiple uses.

*Response:* The final rule does not give ecosystem services higher priority than multiple uses. It provides an integrated resource management approach, where interdependent elements of sustainability are considered as a whole, instead of as separate resources or uses. The mix of plan components included in each plan will reflect local conditions in the broader landscape, the best available scientific information, and public input.

*Comment: Procedures for economic analysis.* Some respondents felt the rule should include specific economic indicators for the economic analysis, the model paradigm for social and economic resources, and means of weighing relative values of multiple uses. Some respondents suggested the

Rvsd Plan - 00001264

rule should include specific procedures for analysis of ecosystem services. Several respondents suggested the rule include specific methods for assessing multiple uses.

*Response:* The final rule does not include this type of guidance as it is more appropriate in the Agency's directives, because methods, models, and indicators will alter over time. Forest Service directives will be developed for the final rule, and members of the public will have the opportunity to comment on them. In addition, economic information and models represent one kind of best available scientific information that the responsible official must use to inform the planning process and plan components.

*Comment: Identification of those providing multiple use information.* Some respondents felt the rule should specify who should be included to provide information about multiple uses.

*Response:* Section 219.4 of the final rule requires the responsible official to provide opportunities for public participation in all phases of the planning framework. Section 219.3 requires the identification and use of the best available scientific information to inform the planning process. Section 219.6 requires identifying and evaluating existing information relevant to the plan area, including with regard to multiple uses. Monitoring will also provide information about multiple uses. Communities, groups, or individuals interested in these issues can provide input on plan components for multiple uses by becoming engaged in the public participation process required under this section.

*Comment: Specific objectives, prohibitions, and inclusion of specific multiple uses and ecosystem services.* Several respondents felt the final rule should establish specific objectives for resources and prohibitions of uses. Several respondents requested that the rule include specific uses. Some respondents were for and others against a rule requirement for specific ecosystem services. Some respondents felt the rule provides the responsible official with too much discretion over multiple uses and instead should prioritize multiple uses or require inclusion of specific multiple uses. Some respondents felt it was unclear if multiple uses listed in proposed § 219.10 would have priority over those not listed.

*Response:* The final rule recognizes that conditions on each plan area will vary. The final rule therefore focuses on providing a framework for sustainability

and integrated resource management and requiring associated plan components, including standards and guidelines. Objectives for resources and constraints on uses will be established by the responsible official in the plans themselves, or in the subsequent decisions regarding projects and activities. Agency regulations at 36 CFR part 261 establish certain national prohibitions. The final rule provides a planning framework to be used on all units in the NFS. As part of the planning process, the final rule includes direction for the responsible official to identify, evaluate, and consider all relevant resources when developing plan components for ecosystem services and multiple uses. Section 219.6 includes general direction to identify and evaluate existing relevant information for ecosystem services and multiple uses, in addition to direction to identify and evaluate information about specific resources and uses such as air, soil, water, and recreation. Section 219.7 includes direction to develop a list of relevant resources as part of the plan revision or development process, building on the assessment and any additional information developed in the planning process. Sections 219.8–219.11 include requirements for some specific resources, in addition to the requirement in § 219.10(a) to consider all relevant resources and uses in developing plan components. Throughout, the responsible official will use the best available scientific information, and will be informed by public participation.

The final rule does not prioritize multiple uses; rather, it requires the responsible official to provide plan components for integrated resource management, based on the resources and uses relevant to the plan area. Specific direction or guidance for specific uses will be included in the Forest Service Directives System, the plans themselves, and/or in the subsequent decisions regarding projects and activities.

*Comment: Mineral exploration and development.* Some respondents felt that the Forest Service should establish specific, detailed requirements to address mining of mineral resources on NFS lands while some respondents felt the Forest Service fails to address delays and impediments to mineral exploration and development caused by the failure of the rule to address minerals consistent with applicable statutes.

*Response:* The planning rule does not impose requirements that would create inconsistencies with existing laws or regulations governing mineral exploration and development on

Federal lands. Plans developed under the final rule must comply with all applicable laws and regulations (§ 219.1(f)). It is not expected that the rule will cause delays or impede mineral exploration and development on NFS units. Section 219.10(a) specifically recognizes mineral resources and directs the responsible official to consider mineral resources when developing plan components for integrated resource management for multiple use and sustained yield under the MUSYA. In addition, § 219.8 requires the responsible official take into account multiple uses that contribute to the local, regional or national economies.

*Comment: Relationship of livestock grazing with ecological sustainability and other uses.* Some respondents felt range resource activities should not be supported in the rule, while others felt it should be supported. Some respondents felt the rule should include more specific direction for livestock grazing.

*Response:* The final rule sets the stage for a planning process that is responsive to the multiple use desires and needs of present and future generations of Americans. Rangeland ecosystems are part of many units, and the MUSYA specifically provides that range is one of the multiple uses for which the national forests are managed. The appropriate level of grazing on a unit or other direction regarding range use in the plan area is best determined in individual plans and at the site-specific level, so that direction is appropriate to the conditions in the plan area.

*Comment: Game species.* Some respondents felt the rule should include requirements for species that are hunted, fished, or trapped, including recognition of their social and economic importance to sportsman, photographers, and other enthusiasts who enjoy viewing all wildlife. Several Indian Tribes and State game and fish departments said that certain species play a special role in contributing to social, cultural, and economic sustainability, and that plans should consider habitat for those species beyond what is required to provide diversity.

*Response:* The Agency recognizes the important role of NFS lands in providing the habitat for these species. Plan components designed to meet the ecosystem integrity and ecosystem diversity requirements of § 219.9, along with additional components where needed if the species is in the categories listed in § 219.9(b), will provide the habitat and other ecological conditions necessary to support these species.

Sections 219.6, 219.8 and 219.12 also recognize the importance of outdoor recreation opportunities and uses, including hunting and fishing. In addition, section 219.10 of the final rule retains the provision of the proposed rule that specifically requires consideration of habitat conditions for wildlife, fish, and plants commonly enjoyed and used by the public for hunting, fishing, trapping, gathering, observing, and subsistence. The final rule adds a provision that such consideration is to be done in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments. This addition, combined with the requirements of §§ 219.4 and 219.6, should ensure appropriate consideration is given to species of importance to these groups and entities. The final rule is not intended to require that units maintain ecological conditions that meet all population goals of State agencies.

*Comment: Recreational priority and opportunities.* Several respondents felt recreation and its relationship with ecological sustainability deserves greater importance in the rule, including discussion of specific recreational opportunities under a separate section. Other respondents felt more specific requirements for recreational activities and opportunities should be included in the rule. Some respondents felt it was inappropriate to include recreational facilities with transportation and utility corridors as examples of infrastructure.

*Response:* The final rule recognizes the importance of recreation, both for its contributions to economic and social sustainability, and as an important use connecting people to the land. The high value placed on recreation has been a common theme throughout the public participation process leading to this final rule. Americans make over 170 million visits to national forests and grasslands each year. These visits provide an important contribution to the economic vitality of rural communities as spending by recreation visitors in areas surrounding national forests amounts to nearly 13 billion dollars annually. Recreation is also a critical part of social sustainability, connecting people to nature, providing for outdoor activities that promote long-term physical and mental health, enhancing the American public's understanding of their natural and cultural environments, and catalyzing their participation and stewardship of the natural world. Providing for sustainable recreation is one of the biggest challenges and opportunities facing the Forest Service,

and land management planning is a critical process in meeting this need.

The final rule provides direction for sustainable recreation throughout the planning process. The final rule retains the term "sustainable recreation" to recognize that planning should identify, evaluate, and provide a set of recreational settings, opportunities and access for a range of uses, recognizing the need for that set to be sustainable over time. Ecosystem services include "cultural services" such as recreational experiences, and social sustainability recognizes the activities and traditions that connect people to the land. The rule recognizes and states in § 219.10 and the definition section in § 219.19 that recreational opportunities include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air. Examples include activities such as hiking, biking, hunting, fishing, horseback riding, skiing, off-highway vehicle use, camping, picnicking, bird and other wildlife watching, canoeing, kayaking, geocaching, recreational aviation, hang gliding, and many more. A detailed list was not included in § 219.10 so as not to inadvertently leave a recreation use out, and also in recognition that new recreational uses are always being developed.

In the assessment phase (§ 219.6), the responsible official must identify and evaluate existing information relevant to recreation settings, opportunities, and access, in addition to recreational infrastructure, benefits people obtain from the plan area and the contribution of multiple uses to the local, regional, and national economies. Section 219.8 requires the responsible official to take sustainable recreation and scenic character into account when developing plan components to contribute to social and economic sustainability.

Section 219.10 requires plan components to provide for multiple uses including outdoor recreation. In paragraph (a), responsible officials must consider aesthetic values, ecosystem services, recreation settings and opportunities, and habitat conditions specifically for species used and enjoyed by the public for recreational opportunities such as hunting, fishing, and wildlife observation. Responsible officials must also consider placement and management of infrastructure, including recreational facilities. It is appropriate to refer to such facilities as infrastructure because recreational facilities are fixed capital installations that enhance recreational experiences. These facilities include: campgrounds, roads, trails, backcountry airstrips, and drinking water and wastewater

infrastructure. In paragraph (b), the final rule requires that plan revisions and new plans include plan components to provide for sustainable recreation; including recreation settings, opportunities, access; and scenic character. Section 219.12 requires monitoring for visitor use and progress toward meeting recreational objectives.

These requirements are in response to public comment and in recognition of the importance of recreation.

*Comment: Objectives, standards and guidelines for sustainable recreation.* Several respondents felt the rule should require the plan to identify objectives, standards and guidelines for sustainable recreation. A respondent felt the rule should use the term "must" instead of "should" with respect to identifying recreational settings, and desired conditions for scenic landscape character. Some respondents felt the proposed rule provision that the plan should identify desired conditions for "scenic landscape character" was too narrow; others felt it expanded Agency authorities beyond legal mandates.

*Response:* The requirement in § 219.10(b)(1)(i) is changed in the final rule; where the proposed rule provided that the plan "should identify recreational settings and desired conditions for scenic landscape character," the final rule requires that a new plan or plan revision must include plan components, including standards or guidelines, to provide for sustainable recreation; including recreation settings, opportunities, and access; and scenic character. The term "landscape character" in proposed § 219.19 has been replaced in the final rule with "scenic character" to clarify what resource is being considered. The scenic resource falls under the Agency's multiple use and sustained yield mandate. "Landscape character" in the proposed rule was defined in terms of visual and cultural identity; "scenic character" is defined in the final rule in terms of scenic identity.

*Comment: Use of land allocations.* Some respondents felt the rule should require land allocations to allow the Agency to establish a recreation zoning system.

*Response:* Section 219.7(d) of the final rule requires management areas or geographic areas in every plan. A plan could include management areas based on recreation settings and opportunities.

*Comment: Preservation easement.* A respondent expressed concern the Agency is considering putting grazing allotments under a "preservation easement."

*Response:* "Preservation easements" were not proposed for inclusion in the

Rvsd Plan - 00001266

**21223**

planning rule and are not included in the final rule.

*Comment: Protection of cultural and historic resources.* Several respondents felt the proposed rule would allow responsible officials to damage or destroy cultural and historic resources if done for the purpose of achieving other resources objectives. Some respondents felt specific direction for management of cultural and historic resources and uses should be added to the rule. Some respondents suggested that § 219.10(b)(1)(ii) include protection of the "uses" and "cultural landscapes." Other respondents felt the rule should establish priorities between cultural and historic resources and other resource objectives.

*Response:* The Department considers cultural and historic resources to be very important for social sustainability as well as important economic contributors. Benefits of cultural and historic sites include: expanded knowledge and understanding of history; cultural and spiritual connections to our heritage; scientific data about past cultures or historical conditions and similar matters; and tourism that benefits rural economies. The final rule provides direction for cultural and historic resources throughout the planning process. The assessment phase requires identifying and evaluating information about cultural and historic resources and uses and areas of Tribal importance, in addition to ecosystem services, which include "cultural services." Section 219.8 also requires the responsible official to take cultural and historic resources on the plan area into account when developing plan components to contribute to economic sustainability and social sustainability, which includes the traditions and culture that connect people to the land.

In § 219.10, paragraph (a) requires that the responsible official consider cultural and heritage resources, habitat conditions for species used and enjoyed by the public, and opportunities to connect people with nature, when developing plan components for integrated resource management to provide for ecosystem services and multiple uses, which include cultural and historic resources and uses. Paragraph (b) retains the requirement of the proposed rule that plan components must provide for the protection of cultural and historic resources. The use of the word "protect" is to ensure that the responsible official takes into account the effect a plan may have on cultural and historic values and provide for these resources, within the context of managing for multiple use purposes.

It does not create a preservation mandate, but where actions might impair the resources or use, the Department expects that the responsible official would seek to avoid or minimize potential harm by following established procedures for cultural and historic resource management. The rule does not remove or change Agency obligations to meet the National Historic Preservation Act and other laws and Executive orders for the protection of these resources.

The final rule does not include more specific direction for cultural and historic uses or activities and does not establish priorities among the multiple uses. Additional process requirements and guidance are more appropriately located in Agency directives, land management plans, and projects or activities.

*Comment: Non-Tribal indigenous rights.* Several respondents stated the final rule should address the management of areas of importance for non-Tribal indigenous entities with pre-existing cultural and natural resources access, maintenance and use rights based on historical and documented claims to lands now managed by the Forest Service.

*Response:* Section 219.1(d) of the final rule states that the planning rule "does not affect treaty rights or valid existing rights established by statute or legal instruments." Section 219.4(a) of the final rule requires the responsible official to provide opportunities for public participation, during which non-Tribal indigenous entities can inform the responsible official of areas of importance to them. Section 219.6(a)(1) requires the responsible official to identify and consider, "relevant information, including local knowledge," and to identify areas of Tribal importance, as well as cultural and historic resources and uses. Section 219.10 requires plan components to provide for management of areas of Tribal importance. Specific issues of access and use will be addressed at the levels of unit planning or project or activity planning.

*Comment: Spiritual sustenance.* Some respondents felt the rule should not provide for spiritual sustenance, because there is no legal mandate for doing it. A respondent stated that the First Amendment prohibits "making of any law respecting an establishment of religion."

*Response:* Plans are not required to provide for spiritual sustenance. The final rule recognizes in § 219.1(c) and in the definition of "ecosystem services" that spiritual values is one of the benefits people derive from the NFS. To contribute to social and economic

sustainability, plans must provide for ecosystem services and multiple uses as provided in this section. Managing NFS lands and resources such that they provide opportunities for spiritual benefits does not establish a religion, and no preference is given to one religion over another.

*Comment: Management of wilderness areas and areas recommended for wilderness designation.* Some respondents felt the rule should ensure wilderness protection is not extended to recommended wilderness areas so de facto wilderness areas are not created by the Agency. Some respondents felt the rule should address activities affecting designated wilderness areas or with the potential to degrade areas recommended for wilderness and reduce their potential for designation. One respondent states the rule should include wilderness management direction parallel to the Wilderness Act wording. Another respondent felt the rule should provide wilderness management flexibility to respond to changing conditions.

*Response:* Wilderness areas provide important places for recreation, solitude, and renewal; are refuges for species; and can attract tourism that benefits rural economies. Section 219.1 of the final rule states plans must comply with all applicable laws and regulations, including the Wilderness Act. The Department changed the wording of § 219.10(b)(iv) of the final rule from "protection of wilderness areas as well as the protection of recommended wilderness areas to protect the ecologic and social values and character for which they might be added to the National Wilderness System," in the proposed rule to "protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation to protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation." The changes were made to increase clarity and better reflect the Department's intent from the proposed rule. This requirement, in addition to related requirements in §§ 219.6, 219.7, and 219.10(a)(1), reflect the Agency's responsibilities under the Wilderness Act and are consistent with the recognition in the MUSYA that wilderness is consistent with its purposes and provisions.

The protection of designated wilderness areas is a requirement of law. Management of areas recommended for wilderness designation to protect and maintain the characteristics that provide the basis for

Rvsd Plan - 00001267

**21224**    **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

their suitability for designation is lawful and within the Agency's authority. In fact, many State wilderness acts require that any areas recommended for wilderness designation are to be managed for the purpose of protecting the area's suitability for wilderness. The Utah Wilderness Act of 1984 is one example (Pub. L. 98–428. § 201(b)(4); 98 Stat 1660).

The Department believes the requirement in the final rule meets the Agency's intent to ensure that the types and levels of use allowed would maintain wilderness character and would not preclude future designation as wilderness. Specific direction regarding incompatible uses in recommended wilderness areas will be found in the Forest Service Directives System and in plans themselves.

*Comment: Responsible official discretion to recommend areas for wilderness designation.* Some respondents felt the proposed rule provides the responsible official with too much discretion about evaluations for, determinations of, and management of areas recommended for wilderness designation.

*Response:* Section 219.7 of the final rule was modified to require the identification and evaluation of areas that may be suitable for inclusion in the National Wilderness Preservation System. Public input during the opportunities for public participation will help the responsible official determine whether to recommend any such areas for wilderness designation. State wilderness acts, typically require the Forest Service to review the wilderness option of areas during plan revision. The Utah Wilderness Act of 1984 is one example (Pub. L. 98–428. § 201(b)(2); 98 Stat. 1659). The responsible official's recommendation in a plan is not the President's recommendation to Congress. So, the recommendation is not necessarily what is recommended to Congress. The Agency's process for identifying and evaluating areas for recommendation is established in the Forest Service Directives System in the Forest Service Handbook 1909.12, which will be revised and made available for public comment. Specific direction and requirements for management of wilderness areas are also included in the Forest Service Directives System, and are in the process of being revised and put out for public comment.

*Comment: Wilderness designation.* Several respondents felt that the Agency should increase wilderness areas, while others felt that the Agency should reduce wilderness areas.

*Response:* Only Congress has the authority to designate wilderness areas or change the boundaries of designated wilderness areas, under the Wilderness Act of 1964. Wilderness areas provide a number of benefits, and the MUSYA recognizes wilderness as consistent with its multiple use purposes and provisions. The responsible official will determine whether or not to recommend any new areas for designation as part of the planning process.

*Comment: Wild and scenic river protection.* Some respondents supported protection of rivers not designated as a wild and scenic river, while others did not. One respondent commented that proposed § 219.10(b)(1)(v) provides protection for only eligible rivers.

*Response:* The final rule has been changed to include suitable rivers in § 219.10(b)(1)(v). The Wild and Scenic Rivers Act requires "every wild, scenic, or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic river system." To be eligible for inclusion, a river must be free-flowing and, with its adjacent land area, possess one or more "outstandingly remarkable" values. The determination of eligibility is an assessment that does not require a decision or approval document, although the results of this inventory need to be documented as a part of the plan document or plan set of documents.

Once a river is determined to be eligible, a suitability study gives the basis for determining which rivers to recommend to Congress as potential additions to the National Wild and Scenic Rivers System (National System). Therefore, the Department decided it is appropriate and consistent with the Act for the Agency to protect rivers determined to be suitable until Congress decides on designation and those eligible until the Agency determines if the rivers are suitable for the values for which they may be included in the national wild and scenic river system.

*Comment: Special designations.* Some respondents felt the rule should provide for special designations including a comprehensive list of designated or recommended special areas. Several respondents felt the rule should include specific procedures for identifying areas for special designation. A respondent felt the rule should provide the responsible official the opportunity to designate special areas.

*Response:* The Agency manages many kinds of designated areas in addition to wilderness areas and wild and scenic rivers, including experimental forests, national heritage areas, national

monuments, national recreational areas, national scenic trails, research natural areas, and scenic byways. These areas can contribute in important ways to social and economic sustainability as well as ecologic sustainability.

The definition of designated areas in § 219.19 has been modified so that it is clear that designated areas may be established in the land management planning process or by a separate process by statute or by an administrative process in accord with NEPA requirements and other applicable laws. Section 219.7(c)(2) has been modified to make clear that responsible officials may designate an area if they have the delegated authority to do so. Section 219.10(b)(1)(vi) of the final rule requires plan components to provide for the "appropriate management of other designated or recommended special areas in the plan area, including research natural areas." Specific guidance on designation procedures is more appropriate for the Agency's directives, and is not found in the rule.

## Section 219.11—Timber Requirements Based on the NFMA

This section of the final rule includes provisions for identifying lands as not suitable for timber production and for limitations on timber harvest. This section meets the statutory requirements of the NFMA related to management of the timber resource. The NFMA, along with the requirements of this section, would provide for mitigation of the effects of timber harvest on other resources and multiple uses. Other sections of the final rule contain provisions that supplement the requirements of this section.

Timber is one of the multiple use purposes of the NFS, as recognized by the MUSYA and the Act of 1897, also known as the Organic Administration Act. Timber is also recognized by § 219.10 of this subpart. The National Forest Management Act of 1976 signaled a new direction for the planning and management of NFS lands, especially with regard to management of the timber resource and impacts to other resources. Management and use of timber harvest on NFS lands continues to evolve. Today, harvest of timber on NFS lands occurs for many different reasons, including ecological restoration, community protection in wildland urban interfaces, habitat restoration, and protection of municipal water supplies. Timber harvest also supports economic sustainability through the production of timber, pulp for paper, specialty woods for furniture, and fuel for small-scale renewable

energy projects. Timber harvesting, whether for restoration or wood production objectives, also supports employment and provides payments in lieu of taxes in many counties throughout the country.

This final rule provides the guidance for developing plans, not guidance for individual projects, and it is important to recognize that any individual timber project or activity could not provide for all aspects of social, economic, or ecological sustainability. However, all projects and activities must be consistent with the plan components in the plan, including those developed to meet the requirements of sustainability, diversity, multiple use, and timber (§§ 219.8 through 219.11), as required by § 219.15.

Section 219.11—Response to Comments

Many concerns were raised over direction for timber harvest for purposes other than timber production, responsible official discretion in determining timber harvest on lands not suited for timber production, and suitability of lands for timber production. For clarity, the Department modified this section from the wording of the proposed rule.

In the opening paragraph of this section, the Department removed the phrase "the plan must provide for multiple uses and ecosystem services including timber" because that requirement is found in § 219.10 and replaced that phrase with the words "the plan must include plan components, including standards or guidelines, and other plan content regarding timber management" to more accurately reflect the requirements of this section. The Department changed the term "capability" to "inherent capability" to be consistent with other sections of this subpart. The Department defines the term inherent capability in § 219.19. The Department removed the term "fiscal capability" from this section. Fiscal capability is now discussed in § 219.1 and is an overarching consideration throughout the planning process, rather than being pointed out for only selected portions of the planning process. Other minor wording changes were made for clarity.

Paragraph (a) has a new caption of "Lands not suited for timber production." In paragraph (a)(1) of this section, in the discussion of identifying lands not suitable for timber production, the Department removed the sentence "The responsible official may determine, considering physical, economic, and other pertinent factors, that lands are not suitable for timber production." The Department removed

this sentence about factors because the criteria at paragraphs (a)(1)(i) through (a)(1)(vi) are the physical, economic, and other pertinent factors to deal with the requirements of the statute (16 U.S.C. 1604(k)), and include the consideration of other desired conditions and objectives in the plan. In particular, paragraph (a)(1)(iii) of this section deals with the economic factors as the responsible official develops desired conditions to provide for social, economic, and ecological sustainability (§§ 219.8–219.11).

The provision discussing the 10-year review of lands not suitable for timber production that was in paragraph (a) of the proposed rule has been removed from paragraph (a)(1) and moved to modified paragraph (a)(2) of this section.

The specific factors in paragraph (a) for identifying lands not suitable for timber production are based on the NFMA requirements limiting timber harvest (16 U.S.C. 1604(g)(3)(E)) and the Agency policy. Paragraph (a)(1)(iv) of this section contains a specific criterion that would not allow lands to be identified as suitable for timber production unless technology is currently available for conducting timber harvest without causing irreversible damage to soil, slope, or other watershed conditions. Available technology may vary from place to place, and could be, for example: horse logging, ground based skidding, aerial systems, or cable logging systems. This provision has been in place since the 1979 rule, to meet the NFMA obligation to consider physical factors to determine the suitability of lands for timber production. The factor has been effective in protecting watershed conditions. However, the Department removed the words "or substantial and permanent impairment of the productivity of the land" from paragraph (a)(1)(iv) in the final rule because it caused confusion and the Department's intent was captured by the remaining text "irreversible damage to soil, slope, or watershed conditions."

Paragraph (a)(2) of this section now discusses the requirements of the 10-year review of lands not suitable for timber production. This paragraph combines and modifies discussions from paragraph (a)(1) and paragraph (a)(3) of the proposed rule for clarity.

Paragraph (a)(2) of the proposed rule has been modified and redesignated as paragraph (b) with a new caption of "Timber harvest for the purposes of timber production." The Department removed the wording of the proposed rule about lands which are not identified in the plan as "not suitable"

for timber production are suited for timber production because some respondents believed this required the designation of these lands as suitable for timber production, which was not the Department's intent. In addition, the Department added a requirement in paragraph (b) of this section to clarify that where a plan identifies lands as suitable for timber production the plan must include plan components to guide timber harvest for timber production or for other multiple purposes on such lands.

Modified paragraph (c) of this section combined provisions from paragraph (b)(2) and paragraph (c) of the proposed rule. Paragraph (c) has a new caption of "timber harvest for purposes other than timber production."

Paragraph (c) of this section sets forth that the plan may include plan components to allow for timber harvest for purposes other than timber production as a tool to assist in achieving or maintaining one or more applicable desired condition(s) or objective(s) of the plan in order to protect other multiple-use values, and for salvage, sanitation, or public health or safety. The wording "in order to protect other multiple-use values" was added for consistency with the intent of the NFMA, which allows for timber harvest "necessitated to protect * * * multiple use values" other than timber production on lands not suited for timber production (16 U.S.C. 1604(k)). The wording of this paragraph also reflects longstanding Agency practices of using timber harvest to protect other multiple use values and public health and safety in areas not suited for timber production.

In modified paragraph (d) of this section, the rule discusses the limitations on timber harvest based on statutory requirements, incorporating and modifying wording from the paragraphs (b)(1) and (d) of this section of the proposed rule. Paragraph (d)(1) of this section in the final rule states the same requirement as paragraph (b)(1) of the proposed rule.

At paragraph (d)(2) in this section, the rule includes the provision that plan components shall ensure timber harvest would occur only where soil, slope, or other watershed conditions would not cause irreversible damage, which is a requirement of NFMA (16 U.S.C. 1604(g)(3)(E)(i)); the proposed rule (at paragraph (d)(1)) included a citation to this part of NFMA, therefore this change does not add a new requirement.

Paragraph (d)(3) of this section includes the same requirement as paragraph (d)(2) of the proposed rule.

Rvsd Plan - 00001269

In paragraphs (d)(4)(i) through (d)(4)(iii) of this section, the rule directs that plan components must ensure that plans include size limits for regeneration of even-aged stand of trees in one harvest operation. The rule retains wording of paragraphs (d)(3), (d)(3)(i), (d)(3)(ii), and (d)(3)(iii) of the proposed rule, with minor changes for clarity. The changes include: (1) Clarifying what the plan may or may not provide, rather than set out a prohibition on projects; (2) the term "areas to be cut in one harvest operation" has been replaced with "openings that may be cut in one harvest operation;" and (3) the discretion for plans to exceed the default maximum size of paragraph (d)(3)(i) of the proposed rule has been changed from "Cut openings larger than those specified may be permitted where larger units will produce a more desirable combination of benefits" to "Plan standards may allow for openings larger than those specified in paragraph (d)(4) of this section to be cut in one harvest operation where the responsible official determines that larger harvest openings are necessary to help achieve desired ecological conditions in the plan area." These changes in wording from the proposed to the final rule are not changes in requirements, but simply clarify the Department's intent.

In paragraph (d)(5) of this section, the rule directs that plan components must ensure that timber will be harvested only where the harvest complies with resource protection requirements of the NFMA. Paragraph (d)(5) is a modification of paragraph (d)(1) of the proposed rule and this modification is not a change in requirements. These requirements reference the provisions of NFMA to limit harvest to situations where the productivity of the land could be sustained and harvesting prescriptions are appropriately applied. For example, by referencing NFMA paragraph (d)(5) requires plan components for even-aged timber harvest that: (1) Limit clearcutting to locations where it is determined to be the optimum method for regenerating the site; (2) require interdisciplinary review of the harvest proposal; and (3) require cutting to be blended with the natural terrain. These requirements are referenced but not repeated in the final rule because the Department believes they are incorporated and enhanced by the requirements for resource protection in other sections of the rule and plan consistency requirements of § 219.15. In addition, some requirements are not repeated because they are addressed by other regulations; for example, the

NEPA regulations direct environmental analysis and the use of interdisciplinary teams.

In paragraph (d)(6) of this section, the rule directs that plan components must set forth the limit on the quantity of timber that may be sold in the national forest. The Department modified the wording of paragraph (d)(4) of the proposed rule, and moved the provision to paragraph (d)(6) of the final rule as follows:

(1) The proposed rule required plan components to limit the quantity of timber that can be removed annually in perpetuity on a sustained-yield basis. The final rule says plan components must ensure the quantity of timber that may be sold from the national forest is limited to an amount equal to or less than that which can be removed from such forest annually in perpetuity on a sustained-yield basis. This change was made to agree with the NFMA wording.

(2) The Department added a sentence that this limit may be measured on a decadal basis to reflect the Agency practice, and 16 U.S.C. 1611. Note that under this paragraph the quantity sold in any given year may exceed the annual average for the decade, but the total quantity sold over a 10-year period may not exceed the decadal limit.

(3) The Department changed the provision that required the plan to "provide for departure from the limit, as provided by NFMA" to "The plan may provide for departures from this limit as provided by the NFMA where departure would be consistent with the plan's desired conditions and objectives."

(4) The Department added that exceptions for departure from this limit on the quantity sold must be made with a public review and comment period of at least 90 days, to be consistent with the NFMA.

The Department concludes that these changes in wording at revised paragraphs (d)(6) of this section clarify the Department's intent and reflect the requirements of the NFMA.

In paragraph (d)(7) of this section, the rule directs that plan components must ensure that the regeneration harvest of even-aged stands of trees is limited to stands that generally have reached the culmination of mean annual increment of growth (CMAI). The Department retains the wording of paragraphs (d)(5) of the proposed rule, with minor changes for clarity. The changes include: Changing the provision that "Exceptions, set out in 16 U.S.C. 1604(m), are permitted only if consistent with the land management plan" to "Plan components may allow for exceptions, set out in 16 U.S.C. 1604(m), only if such harvest is

consistent with other plan components of the land management plan." The Department removed the provision of the proposed rule at paragraph (d)(5) that stated: "If such exceptions are anticipated, the responsible official should include those exceptions in the land management plan as standards or guidelines" because it is now redundant with the sentence "Plan components may allow for exceptions * * *." The Department removed the provision about directives and CMAI, because that sentence is redundant with the provision at § 219.2(b)(5)(i) requiring Forest Service directives. These modifications at revised paragraphs (d)(7) of this section are not changes in requirements but clarify the Department's intent and reduce redundancy.

*Comment: Timber harvest for other purposes.* Some respondents felt the proposed rule at § 219.11(b)(2) was either too discretionary or too restrictive in meeting NFMA's allowance for salvage sales and other limited timber harvest on lands not suited for timber production. Some respondents felt the proposed rule should prohibit timber harvesting on unsuitable lands or specify that timber salvage on those lands be solely for non-commercial purposes.

*Response:* Today, timber harvest is often used to achieve ecological conditions and other multiple use benefits for purposes other than timber production. Therefore, the Department clarified at § 219.11(c) that a plan may include plan components to allow for timber harvest for purposes other than timber production as a tool to assist in achieving or maintaining one or more applicable desired conditions or objectives of the plan to protect other multiple-use values. Consistent with Section 1604(k) of NFMA, § 219.11(c) of the proposed rule also allows timber harvest for salvage, sanitation or public health or safety in areas not suitable for timber production. The Department believes that the provisions of this section provide a balanced approach recognizing that timber harvest will be necessary in many places to assist the Agency in accomplishing restoration and other multiple use objectives.

Section 219.11(d)(1) of the final rule restates the prohibition that had been in the proposed rule at 219.11(b)(1), that no harvest for the purpose of timber production may occur on lands not suitable for timber production. The final rule at § 219.11(d) also requires plan components to ensure no timber harvest may occur on lands where timber harvest would cause irreversible damage to soil, slope, or other watershed

conditions. Timber harvest must be consistent with the desired conditions set out in the plan (§ 219.15).

*Comment: Responsible official discretion in determining timber harvest on lands not suited for timber production.* Some respondents felt the proposed rule allows the responsible official too much discretion in allowing or permitting timber harvesting on lands not suited for timber production.

*Response:* This section, as well as other sections of the rule, provides sideboards to the responsible official's discretion. The rule identifies factors to be considered by the responsible official in paragraph (c) of this section consistent with the NFMA, specific limitations that require standards or guidelines for timber harvest, and consistency with other applicable plan components.

Section 219.3 of the rule requires the responsible official to use the best available scientific information. The rule also allows those interested communities, groups, or persons to engage in the public participation process for the development of plan components and monitoring programs and for the subsequent development of proposed projects and activities under the plan. Individual proposed projects for timber harvesting will still undergo additional opportunities for public involvement during the project's NEPA process. The Department believes that these requirements provide an appropriate balance of requirements and discretion.

*Comment: Suitability of lands with a primary conservation focus.* A respondent felt the rule should state that timber production is not suitable on lands managed with a primary conservation or restoration focus, including inventoried roadless areas, old-growth forests, priority and municipal watersheds, and riparian areas.

*Response:* The proposed rule provides overall direction for how plans are developed, revised, and amended. Section 219.11(a)(1)(iii) requires that where timber production would not be compatible with desired conditions and objectives established by the plan, including those established in accordance with the requirements for suitability (§ 219.8), diversity (§ 219.9), and multiple use (§ 219.10), the responsible official shall identify such lands as not suitable for timber production. Additional guidance regarding suitability of lands will be found in the plans themselves, or in the subsequent decisions regarding projects and activities on a particular national forest, grassland, prairie, or other

comparable administrative unit. The rule also allows those interested communities, groups, or persons to engage in the public participation process for the development of plans. Public participation will also be used during the subsequent development of proposed projects and activities under the plan, during which concerns regarding suitability of lands may be raised.

*Comment: Cost and revenues of timber harvesting.* Some respondents felt the rule should require full and explicit disclosure of costs and benefits of timber harvesting in order for the public to more accurately compare plan alternatives and plan components. They felt timber harvesting should only be allowed where direct revenues will exceed all direct costs, and lands not cost-efficient should be designated unsuitable. Some felt the Government should not subsidize the logging industry or compete against private timber forest owners.

*Response:* The costs and benefits of each alternative for a plan developed under the final rule is required to be disclosed under the NEPA process at the time of plan development, revision, or (if relevant) amendment. The Department recognizes that the cost of timber harvest is a major concern. The real measure of the worth of the timber program; however, is not net cost versus revenues, but costs versus public benefits. The final rule requires plan components for restoration which will likely result in projects to achieve multiple benefits. Some of these benefits can be measured as receipts; others are public benefits for which revenues are not received, such as restored watersheds; improved wildlife habitat; and improved bird watching, fishing, and hunting opportunities. The emphasis of the final rule is sustainability; and managing vegetation can help attain sustainability. Selling timber and managing vegetation is a key tool for restoration and providing wildlife habitat (cover types and age classes), creating diversity in the visual appearance of the landscape, improving the overall ecological integrity, producing timber products, providing jobs, and providing additional recreational opportunities by increasing forest access. Increasingly, the Agency uses stewardship contracts to offer projects to achieve multiple objectives including harvesting timber for restoration purposes.

For lands to be identified in the plan as suitable for timber production, timber production on those lands must be compatible with the achievement of the desired conditions and objectives

established by the plan. The desired conditions include those to meet requirements for plan development or revision (§ 219.7); social, economic, and ecological sustainability (§ 219.8); plant and animal diversity (§ 219.9); multiple use (§ 219.10); and timber (§ 219.11). The responsible official will establish management areas with different desired conditions based on providing social, economic, and ecological sustainability. This suitability determination is complex and will be based on analysis of costs, benefits, and values.

Additional rule requirements for a detailed analysis of costs and benefits other than the final rule requirement for an EIS for plan development and plan revision and that plans be amended to be consistent with Forest Service NEPA procedures are not necessary.

*Comment: Review of lands suitable for timber production.* A respondent felt lands suitable and not suitable for timber production should be reviewed every 10 years to ensure these designations are still appropriate. A respondent said the proposed rule has incorrectly expanded and interpreted the base requirements of the NFMA by: (1) falsely stating that the NFMA requires the identification of lands suitable for timber production (the respondent declared that the NFMA only requires identification of land not suited for timber production); and (2) stating that all lands not identified as not suitable are therefore suitable.

*Response:* The NFMA requires a review of lands designated not suitable every 10 years, and the rule follows this mandate. The rule requires identification of land not suited for timber production and imposes specific factors to be considered. The purpose of identifying lands not suitable for timber production is to identify the land base upon which timber production harvest levels are subsequently calculated (lands suitable for timber production). To avoid confusion, the provision saying that ''all lands not identified in the plan as not suitable for timber production are suited for timber production'' has been removed from the final rule. The Department believes the respondent's assumption behind this comment is that all lands except those determined to be not suitable will be harvested. That is not the Agency's expectation. The identification of lands suitable for timber production is not a final decision compelling or approving projects and activities. A final determination of suitability is made through project and activity decisionmaking.

**21228**   **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

*Comment: Aesthetic resources.* A respondent felt "aesthetic resources" should be removed from proposed § 219.11(d)(2) wording because timber harvesting can create less appealing aesthetics but can be an integral part of sustaining high quality wildlife habitat.

*Response:* The final rule retains the wording of the proposed rule at § 219.11(d) ensuring timber harvesting is consistent with protection of aesthetic resources, because the wording matches the NFMA at 16 U.S.C. 1604(g)(3)(F)(v). However, the Department recognizes that selling timber and managing vegetation are important tools for providing wildlife habitat (cover types and age classes), creating diversity in the visual appearance of the landscape, and improving the overall forest health.

*Comment: Allowable sale quantity.* A respondent felt the planning rule should include a requirement for allowable sale quantity as in the 1982 rule.

*Response:* Section 219.11 includes timber requirements based on the NFMA. The term "allowable sale quantity" (ASQ) is a term of art of the 1982 rule. The term ASQ is used in the NFMA in discussions about departures that exceed the quantity of timber that may be sold from the national forest (16 U.S.C. 1611). However, the NFMA does not require that the term be used in the implementing regulations (16 U.S.C. 1604). The term has caused confusion about whether ASQ is a target or an upper limit under the 1982 rule procedures, the Agency wants to avoid this confusion under this final rule. Plans will have an upper limit for timber harvest for the quantity of timber sold as required in § 219.11(d)(6). The requirements in § 219.7(f) that plan content must include information about the planned timber sale program and timber harvesting levels, and in § 219.11(d)(6) that the plan must limit the quantity of timber that may be sold from the national forest to that which can be removed annually in perpetuity on a sustained-yield basis, provide a more practicable way to give direction than using the term "ASQ." Additional requirements will be found in the Forest Service Directive System.

*Comment: Changing plan harvest levels relationship with plan amendments.* A respondent felt changing the timber harvesting level specified in the unit plan should be done through a revision or amendment of the unit plan because timber harvesting is an important objective.

*Response:* Any change to plan components related to timber harvesting level requires a plan amendment under this final rule. Such plan components may include objectives for annual

timber harvest or standards limiting the amount of timber harvested in the first decade. However, changing the tables or graphs of associated timber information in other plan content (§ 219.7(f)) may be done with an administrative change.

*Comment: Levels of timber harvest.* A respondent felt the rule should require forest plans to identify three timber production levels. Those three levels were: (1) The long-term sustained-yield capacity, which is the theoretical maximum sustainable level in perpetuity; (2) the timber harvest level associated with achieving the desired future conditions contemplated in the plan; and (3) the probable timber harvest level given anticipated budgets and other priorities.

*Response:* Final rule §§ 219.7(f) and 219.11(d)(6) require determination of the long-term sustained-yield capacity (the quantity of timber that may be sold from the national forest) and require determination of the planned timber sale program. A requirement for the timber harvest level associated with achieving the desired future conditions is not included because the NFMA does not require such a calculation and it would be a highly speculative harvest level that would not likely be realistic. Harvest levels must be within the fiscal capability of the unit.

*Comment: Timber harvest unit size limits.* Some respondent felt the proposed rule standards for maximum size limits for areas to be cut in one regeneration harvest operation should be determined by local conditions, individual forest plans objectives, based on science, and mimic historic forest disturbance regimes.

*Response:* These limits on the maximum opening sizes were established in the 1979 planning rule and have been in use under the 1982 rule. In 1979, the committee of scientists recommended the maximum size for openings created by timber cutting be set by regional plans or regional silvicultural guides, not be set as a national standard. However, the Department decided in 1979 to set maximum size of harvest cut openings (40-, 60-, or 100-acre maximums depending on geographic location) with exceptions provided for through regional plans where larger openings will produce more desirable combinations of benefits. In the final rule, the Department continues these standards with the exceptions provided through the responsible official, who is normally the forest or grassland supervisor. The procedure for varying these limits is an established process that has worked effectively, providing a limit on opening size and public

involvement with higher level approval for exceeding the limits. The Department believes that the procedure for varying from these limits may be particularly justifiable in the future for ecological restoration, species recovery, improvement of vegetation diversity, mitigation of wildland fire risk, or other reasons. For example, some rare species are adapted to large patch sizes with similar habitat attributes for critical parts of their life cycle.

*Comment: Limiting the quantity of timber removed annually.* Some respondents felt the proposed rule was unclear on direction for limiting the quantity of timber removed annually in perpetuity on a sustained-yield basis as it simply repeats NFMA wording.

*Response:* The Department changed the wording in paragraph (d)(6) of this section of the final rule to add clarity. In addition, the Department requires the Chief to set forth procedures for planning in the Forest Service Directives System to further explain the methods for determining the limit of the quantity of timber removed annually in perpetuity on a sustained-yield basis for an individual unit plan (§ 219.11(d)(6)).

*Comment: Use of culmination of mean annual increment.* A respondent felt the proposed use of culmination of mean annual increment (CMAI) of growth to limit regeneration harvests of even-aged stands will not address issues of poor forest health, and the likelihood of uncharacteristic insect, disease, and fire. Another respondent felt CMAI should also be used where timber is cut in non-even-aged stands.

*Response:* The Department does not agree that the national policy of CMAI as required by 16 U.S.C. 1604(m) has caused problems with issues of forest heath and the likelihood of uncharacteristic insect, disease, and fire. The national policy gives the Agency authority for exceptions from this standard for recreation, wildlife habitat, and other purposes. The NFMA requires that standards shall not preclude the use of sound silvicultural practices, such as thinning or other stand improvement measures. CMAI does not apply to uneven-aged stands as these stands are multi-aged; therefore, the final rule continues to limit the use of CMAI to regeneration harvests of even-aged stands.

Section 219.12—Response to Comments

Many comments on this section focused on requirements for the plan monitoring program, broad-scale monitoring strategies, and use of the monitoring information and the monitoring report. Throughout this section of the final rule, the Department

made minor edits for clarity and changed the name from "unit monitoring program" in the proposed rule to the "plan monitoring program" In the final rule. This change to the name clarifies that monitoring is intended to focus on the plan components and is not geographically defined or applicable to other resource program monitoring on the unit. Additionally, the Department added a sentence to paragraph (a) to draw a clearer link between the monitoring program and the use of monitoring information for adaptive management of the plan area.

The Department removed the requirements for science in paragraph (a)(4)(ii) because the requirements of § 219.3 apply to the entire subpart and therefore do not need to be repeated here. The Department is committed to using science to inform monitoring and the decisions based on monitoring information.

At paragraph (a)(5) of this section, the Department corrected the phrase monitoring "questions or indicators" to "questions and associated indicators" to better reflect the way questions and indicators are used for monitoring. In response to public comment the Department made several changes to the list of required monitoring questions and associated indicators of paragraph (a)(5) as follows:

(1) At paragraph (a)(5)(ii) of this section, the Department added direction that the monitoring for the status of select ecological conditions include questions and indicators for key characteristics of terrestrial and aquatic ecosystems, to link this monitoring requirement to the ecological requirements in §§ 219.8 and 219.9.

(2) At paragraph (a)(5)(iii) of this section, the Department clarified that questions and indicators for the status of focal species are to assess the ecological conditions required under § 219.9, to link this monitoring requirement more clearly to the coarse-filter requirements.

(3) At paragraph (a)(5)(iv) the Department added a new requirement for questions and indicators for the status of a select set of ecological conditions required under § 219.9 to contribute to the recovery of federally listed threatened and endangered species; conserve proposed and candidate species; and maintain a viable population of each species of conservation concern. This change was made in response to comments to more closely link monitoring with the need to assess progress towards meeting plan components for the species requirements in § 219.9. Additional discussion of this addition is discussed

in the comment on *monitoring of at risk species*.

(4) At paragraph (a)(5)(v), the Department added the status of visitor satisfaction to the requirement for questions and indicators for the status of visitor use designated at paragraph (a)(5)(iv) of the proposed rule, in response to public comment.

(5) At paragraph (a)(5)(vi), the Department retained the requirement for questions and indicators related to climate change designated at paragraph (a)(5)(v) of the proposed rule, and changed the words "and other stressors on the unit" to "and other stressors that may be affecting the plan area."

(6) The Department removed the requirement for questions and indicators for the carbon stored in above ground vegetation previously designated at paragraph (a)(5)(vi) of the proposed rule. This change is accompanied by a change to § 219.6(b)(4) that requires responsible officials to identify and evaluate existing information for a baseline assessment of carbon stocks as part of the assessment. This change in requirements will lead to a more comprehensive assessment of carbon stocks (as opposed to carbon stored in above ground vegetation) earlier in the planning process. The Department retains the requirement to monitor changes related to climate change and other stressors (§ 219.12(a)(5)(vi).

(7) At paragraph (a)(5)(vii), the Department removed the requirement for questions and indicators for the progress toward fulfilling the unit's distinctive roles and contributions and added a requirement for questions and indicators addressing the progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities. This change more accurately reflects what the Department intended to accomplish with the previous requirement at paragraph (a)(5)(vii) and the other requirements of (a)(5), and will help inform management effectiveness.

(8) At paragraph (a)(5)(viii), the Department changed the term "management system" to "each management system" to use words of the NFMA at 16 U.S.C. 1604(g)(3)(C) and respond to public comments.

The Department added wording to paragraph (a)(7) to clarify that project and activity monitoring may be used to gather information for the plan monitoring program, and that plan monitoring may inform the development of specific projects and activities; but that the plan monitoring requirements of this section are not a prerequisite for making a decision to carry out a project or activity.

At paragraph (c) of this section on timing and process, the Department removed the requirement at paragraph (c)(1) where the proposed rule required the responsible official to work with the public to identify potential monitoring needs during the assessment. The Department removed this requirement from the assessment phase in response to public comments to make the assessment phase more efficient and focused. As required in § 219.7, the assessment information will inform the development of monitoring questions and indicators during the plan development or revision phase.

The Department removed paragraph § 219.12(c)(4) of the proposed rule, the requirement that responsible officials ensure that scientists are involved in the design and evaluation of unit and broad-scale monitoring, because wording of the requirement was confusing and the substance of the requirement was redundant with the coordination requirements at §§ 219.12(a)(1) and (b)(2) of the rule.

The Department reorganized paragraph (d) for clarity. The Department removed the second sentence of paragraph (d)(1) of the proposed rule and moved to paragraph (d)(2) the requirement the monitoring evaluation report indicate whether a change to plan components or other plan content may be warranted. In addition, at paragraph (d)(2) the Department added the requirement that the report must be used to inform adaptive management of the unit.

At paragraph (d)(1)(iii) of the proposed rule the Department removed the requirement that the monitoring evaluation report must describe how best available science was taken into account, because the report is intended to be an evaluation of data and information gathered by the plan monitoring program, which must be informed by best available scientific information. A new requirement was added to section 219.14(a)(4) to make clear that the plan decision document must document how the responsible official used best available scientific information to inform the plan monitoring program.

In addition, paragraph (d)(3) of the proposed rule is now paragraph (d)(1)(iii) of the final rule, paragraph (d)(2) of the proposed rule is now (d)(3) of the final rule, but no changes to these requirements were made.

*Comment: Scope of monitoring.* Some respondents felt the proposed rule was unclear as to the extent of topics, including ones for desired conditions, responsible officials could consider when choosing the scope and scale of

**21230**   **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

plan monitoring. A respondent felt the rule should require the scope of the monitoring question be as complete as possible even if the scope of the final monitoring program cannot address all the questions.

*Response:* Because the information needs most critical for informed and adaptive management will vary by unit, the rule allows the responsible official the discretion to set the scope and scale of the plan monitoring program, subject to the minimum requirements in paragraph (a)(5) of this section. Paragraph (a)(2) directs that questions and indicators should be based on one or more desired conditions, objectives, or other plan component(s), but makes clear that not every plan component needs to have a corresponding monitoring question. Furthermore, the questions and indicators must be designed to inform the management of resources on the plan area, including by testing assumptions, tracking changes, and measuring management effectiveness and progress towards achieving or maintaining the plan's desired conditions or objectives. This direction allows the responsible official to develop the most strategic, effective and useful program for the plan area, based on the plan components in the plan and informed by best available scientific information and public input. This direction also recognizes practical limits to the technical or financial capabilities of the Agency: not all parts of a plan, or every acre, can be monitored each year—and it may not be a strategic investment to do so.

However, section 219.12(a)(5) of the final rule provides direction for a set of monitoring questions and associated indicators that must be part of every plan monitoring program. The list reflects substantive requirements of the final rule and links to the assessment phase. The responsible official can always consider additional factors and add questions and indicators.

Every plan monitoring program would contain one or more questions and associated indicators that address each of the following: (1) The status of select watershed conditions; (2) the status of select ecological conditions including key characteristics of terrestrial and aquatic ecosystems; (3) the status of focal species to assess the ecological conditions required under § 219.9; (4) the status of a select set of ecological conditions required under § 219.9 to contribute to the recovery of federally listed threatened and endangered species; conserve proposed and candidate species; and maintain a viable population of each species of

conservation concern within the plan area; (5) the status of visitor use, visitor satisfaction, and progress toward meeting recreation objectives; (6) measurable changes on the plan area related to climate change and other stressors affecting the plan area; (7) progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities; and (8) the effects of each management system to determine that they do not substantially and permanently impair the productivity of the land.

*Comment: Accountability and public oversight for monitoring:* Some respondents felt the rule should provide sufficient opportunity for public enforcement of monitoring quality and for public input on the Agency's use of monitoring information affecting project decisions. Several respondents felt the proposed rule did not establish accountability for monitoring and suggested the rule either require review by the Chief or specify the consequences of not conducting monitoring. Another suggested that the monitoring effort be periodically reviewed objectively by disinterested parties. Some respondents felt to improve accountability findings from monitoring program reports, the reports should be decisions subject to review.

*Response:* The rule cannot grant enforcement authorities to the public. Those authorities can only be granted by Congress. However, the rule's public participation and reporting requirements allow for a more transparent Government and holds officials accountable for sharing monitoring information and data with the public. This data will be open to public scrutiny, criticism, and objective review. The public will be able to evaluate and provide input on the Agency's use of the monitoring information to inform future decisions during opportunities for public participation and comment for those decisions, including future plan amendments, plan revisions, projects, and activities.

Accountability is achieved through the rule by requiring officials to develop monitoring, plan monitoring programs with questions and indicators and broader-scale monitoring strategies, and to prepare biennial monitoring reports. All these requirements allow for public involvement and review. Section 219.2(b)(5) of the rule further requires the Chief of the Forest Service to administer a national oversight and accountability process to review NFS land management planning which includes monitoring programs. The

Agency already follows Departmental standards for the objectivity of information used to inform significant decisions under the Information Quality Act (Section 515 of Public Law 106–554). In addition, the responsible official is subject to performance review and accountability for fulfilling requirements of the rule and policies of the Agency. The Forest Service is required to report monitoring information consistent with the USDA Strategic Plan. (*http://www.ocfo.usda. gov/usdasp/sp2010/sp2010.pdf*).

Monitoring reports (like assessment reports) will include information that will be used to inform decisions, but are not decision documents because they do not compel an action or make a decision on an action; therefore, subjecting monitoring specifications to objection or appeal procedures is not necessary.

*Comment: Monitoring requirements.* A respondent felt the rule should include monitoring requirements for scientific grounding, thoughtful design, and sufficient funding, regularly scheduled, and analysis of cumulative impacts.

*Response:* The final rule requires the use of the best available scientific information to inform the monitoring program, requires the responsible official to identify the fundamental questions and indicators that will inform the design of monitoring programs, and will lead to a robust monitoring program that will be used to inform management. The public will have opportunities to provide input into the design of the monitoring program and to review the monitoring data. The monitoring information can be used in a number of ways, including analyzing cumulative effects. The final rule includes direction to take financial and technical capabilities of the Agency into account in designing the monitoring program, and requires in § 219.1(g) that the plan be within the fiscal capability of the unit.

*Comment: Monitoring and consistency of methods.* Some respondents felt the rule should include national monitoring standards to enable consistency across units so each national forest and grassland could be compared to others. Some respondents felt units could not develop monitoring programs efficiently in the absence of regional or national standards or guidance. Some respondents felt units will need additional guidance to enable them to design and conduct monitoring because the necessary resources and expertise is not often available on each unit. A respondent felt clarification was needed for how broader-scale monitoring could be associated with

assessments by the plan unit in the absence of regional guidelines. A respondent felt specific terminology should be used regarding monitoring types: range and distribution monitoring, status and change monitoring, and cause and effect monitoring. Some respondents felt the rule should require technical details like methods for data collection, sampling methods, specific measurements to sample, statistically sound set of monitoring guidelines, reference conditions or baseline data, cause-effect designs for monitoring, or possible contaminants to water quality, or that schedules of work be required in monitoring programs and documented in plans.

*Response:* The Department and Agency recognize the importance of having a system of monitoring that allows for information to be collected, used and compared across planning units. For that reason the final rule directs that the plan monitoring program must be coordinated and integrated with broader scale monitoring strategies to ensure that monitoring is complementary and efficient, and gathered at the appropriate scales, along with direction to coordinate with Research and Development, State and Private Forestry, and others. To support implementation of these requirements, the Agency is currently reviewing its inventory and monitoring system. However, the final rule does not include national monitoring standards for consistency across units because there is no fully tested national approach available at this time. The kinds of things to be monitored are varied, monitoring techniques and protocols evolve and improve over time, and different techniques may be more or less appropriate depending on what is being monitored and the information needs most critical to inform adaptive management on the unit. In addition, monitoring techniques may vary by partner, impacting opportunities to coordinate monitoring across landscapes and among neighboring land managers.

For these reasons the Department concluded it would be more appropriate to include additional direction and guidance, including for the kinds of technical specifications identified by the respondents, in the Forest Service Directives and in the unit plans. The final rule makes clear in paragraph (a)(6) of this section that a range of monitoring techniques may be used to carry out the monitoring required by this section: different questions and indicators will require the use of different, and

evolving, techniques or methodologies. The responsible officials will use the best available scientific information to inform those choices. Monitoring protocols and methods would be coordinated with the national forester and Forest Service State and Private Forestry and Research and Development.

*Comment: Monitoring triggers.* Some respondents thought that the monitoring program should include triggers or thresholds for action.

*Response:* The rule did not include triggers or thresholds because not all monitoring elements and indicators are suited to triggers. Establishing triggers can be complex and time consuming. The rule does not preclude the inclusion of triggers where they can be developed and where they are informed by the best available scientific information. The Department does intend the three phases of planning to be connected, and for each phase to inform the others. The information gathered and evaluated in the assessment phase will help the responsible official to develop a strategic monitoring program, and the information from monitoring will be used to indicate whether a new assessment is warranted, and to inform future assessments and plan components and other plan content. Wording was added to § 219.7 to make clear that the assessment and monitoring reports should be used to inform the plan development or revision, and to § 219.12 to make clear that the monitoring report should be used to inform adaptive management.

*Comment: Use of non-agency data.* Some respondents felt the Agency is reluctant to accept monitoring data about environmental conditions from a third party, like livestock permittees, and that the proposed rule funding requirements would further reduce funding available for monitoring. These conditions would cause the Agency to unfairly restrict some special uses, like grazing. Other respondents felt the rule should clearly provide opportunities for the responsible official to use information and assistance from non-agency organizations and individuals to contribute to monitoring programs. Other respondents felt non-agency data must meet Agency data standards. Still others felt the rule should allow the public opportunity to assist in gathering and submitting data.

*Response:* The rule provides more encouragement to use secondary data including sources external to the Agency than previous planning rules. Section 219.4 requires opportunities for public participation throughout the

planning process, including developing the monitoring program. Section 219.12(c)(3)(i and ii) specifically directs the responsible official to take into account existing NFS and non-NFS inventory, monitoring and research programs, and to take into account opportunities to design and carry out multi-party monitoring. Many current monitoring programs and assessments rely on secondary data from a variety of sources, governmental and non-governmental sources. Monitoring data will be used to inform adaptive management. The requirements in this rule are intended to result in a more strategic use of monitoring dollars, and to leverage those investments where it is feasible and appropriate to do so.

*Comment: Collection of data beyond unit boundaries.* Some respondents felt the proposed rule inappropriately makes the responsible officials undertake broader-scale monitoring analyses, monitoring of significant areas not federally owned, and to collect data beyond unit boundaries.

*Response:* The final rule does not impose a requirement for responsible officials or regional foresters to monitor non-NFS lands. The monitoring requirements do not give responsible officials license to monitor where they lack authority.

It is appropriate and efficient to recognize that some monitoring questions are best evaluated at scales broader than one unit, to best inform management of a 193 million acre National Forest System that spans the country. The final rule directs the regional forester to develop a broader-scale monitoring strategy, in coordination with others, and encourages identifying opportunities for multi-party monitoring. The rule encourages responsible officials to coordinate monitoring across NFS units. The rule allows the Agency to continue efforts to use data from other agencies and sources because monitoring cooperation is in the best interest of Americans and the land, informing effective management and facilitating the strategic use of monitoring dollars.

*Comment: Use of the Forest Inventory and Analysis system (FIA).* A respondent suggests the rule should use the FIA system to monitor the health of forests and changes related to climate change.

*Response:* Many Agency units actively use FIA information as an integral part of their monitoring programs. The final rule directs the responsible official to take into account existing national and regional inventory, monitoring, and research programs, including from Forest Service State and

Private Forestry and Research and Development which includes FIA data.

*Comment: Scientist involvement in plan and broader-scale monitoring design.* A respondent felt the proposed rule sets too high a standard of ensuring scientists are involved in plan and broader-scale monitoring design. Another respondent felt the proposed rule did not specify in detail how the external scientific community would be involved.

*Response:* The requirement under § 219.12(c)(4) of the proposed rule for scientists to be involved in the design and evaluation of unit and broader-scale monitoring has been removed in response to public comment because the requirement was confusing and can be met through the coordination requirements at §§ 219.12(a)(1), (b)(2) and (c)(3)(ii) of the final rule. The final rule requires the use of best available scientific information to inform the design and content of the monitoring program, opportunities for public participation, and coordination in development of the monitoring program with Forest Service Research and Development, along with other partners and the public. The external science community may be involved in variety of ways, for example, through public participation opportunities or the use of external scientific reports.

*Comment: Changes to specific subjects to be addressed in monitoring programs.* A respondent suggested the responsible official discretion would be improved by deleting proposed wording "related to climate change and other stressors" and "carbon stored in vegetation." Others felt requirements to monitor accomplishment of plan objectives and progress towards achieving plan "desired conditions" should be added. Some respondents felt the proposed rule's monitoring requirements for specific resource areas unduly limited responsible official discretion in determining what questions and indicators to include in the unit monitoring program. Some respondents felt specific subjects should be required in all plan monitoring programs including: grazing impacts, off-road vehicle use, species populations, vegetation, ecological conditions, social and economic sustainability, effects of long-term uses, noise pollution, water quality, recreational use satisfaction, and public safety, among others. Some respondents felt the proposed rule would limit monitoring programs to consider only one monitoring question or indicator.

*Response:* Section 219.12(a)(5) of the rule requires the responsible official to develop a plan monitoring program that describes, at a minimum, one or more questions and associated indicators on eight specific topics. The number of monitoring questions and indictors may vary by topic. The Department believes that the set of minimum requirements for the plan monitoring program included in paragraph (a)(5) of the final rule is appropriate, reflects the substantive requirements of the final rule, builds on the information gathered during the assessment phase, and is focused on informing adaptive management of the plan area.

Paragraph (a)(5) does not limit the questions and indicators in any given plan. The responsible official has the authority to determine whether additional monitoring elements are warranted or necessary to inform management decisions if they are within the fiscal capability of the unit to implement. The Department's intent is for the responsible official to determine what information needs are most critical for informed and adaptive management of the plan area. Because most resource management concerns vary by forests or grasslands, the rule allows the responsible official discretion to set priorities for monitoring where it is most needed. This discretion is also important for fostering opportunities to coordinate monitoring with other government agencies and non-government entities. Therefore, an extensive list of other possible monitoring requirements in addition to the set in paragraph (a)(5) is not included in the final rule.

The requirements to include questions and associated indicators to monitor measurable changes on the plan area related to climate change and other stressors was retained in the final rule, because it is important to track changing conditions. The final rule removes the monitoring requirement for carbon stored in above ground vegetation because the Department added a requirement in the assessment phase (§ 219.6(b)) to identify and evaluate existing information for a baseline assessment of carbon stocks. This change reflected comments to this section and the assessment section, and is consistent with the Agency's Climate Change Scorecard which also requires a baseline assessment of carbon stocks. The Department added a requirement for the plan monitoring program to monitor progress toward meeting the plan's desired conditions and objectives and a requirement to monitor visitor satisfaction in § 219.12(a)(5) of the final rule.

*Comment: Ecological Conditions and Focal Species (§ 219.9).* Some respondents felt the required monitoring questions and indicators of § 219.12(a) of the proposed rule did not adequately address fish and wildlife populations or gauge progress towards meeting the requirements of § 219.9 of the proposed rule.

*Response:* In response to these comments, the Department added wording to the required questions and indicators of § 219.12 to link them to the ecological conditions required by §§ 219.8 and 219.9, added the requirement in paragraph (a)(5)(iv) to monitor ecological conditions associated with the species requirements in § 219.9, and modified two definitions. The changes to the requirements for questions and indicators are explained in the introduction to the response to comments of this section. The Department modified the definition of "ecosystem" to explain these interrelated ecosystem elements so the relationship between monitoring questions and indicators are clearly related to the ecological conditions of §§ 219.8 and 219.9. The Department modified the definition of focal species to clarify the intended role of focal species in assessing the effectiveness of the plan in maintaining the diversity of plant and animal communities in the plan area.

*Comment: Questions about focal species.* Respondents asked questions about focal species. (1) What are they? (2) What do they represent? (3) What criteria will be used to select them? (4) How many will there be for a particular plan area? (5) How will they be monitored?

*Response:* (1) The inclusion of the focal species (§ 219.19) in the monitoring section is based on concepts from the March 15, 1999, Committee of Scientists report, which recommended focal species as an approach to monitor and assess species viability. The term "focal species" is defined in the rule as: A small subset of species whose status permits inference to the integrity of the larger ecological system to which it belongs and provides meaningful information regarding the effectiveness of the plan in maintaining or restoring the ecological conditions to maintain the diversity of plant and animal communities in the plan area. Focal species would typically be selected on the basis of their functional role in ecosystems.

(2) The requirement for monitoring questions that address the status of focal species is linked to the requirement of § 219.9 of the final rule to provide for ecosystem integrity and diversity, which describes the coarse-filter approach for providing diversity of plant and animal

communities and the persistence of native species in the plan area. The rule requires plan components designed to maintain or restore a range of ecological conditions at a variety of spatial and temporal scales (§§ 219.8 and 219.9). Appropriate monitoring of focal species will provide information about the integrity of the ecosystem and the effectiveness of the plan components in maintaining diversity of plant and animal communities in the plan area. In other words, focal species monitoring is used as means of understanding whether a specific ecological condition or set of conditions is present and functioning in the plan area. Focal species monitoring is not intended to provide information about the persistence of any individual species. The rule does not require managing habitat conditions for focal species, nor does it confer a separate conservation requirement for these species simply based on them being selected as focal species.

(3) The Committee of Scientists report said focal species may be indicator species, keystone species, ecological engineers, umbrella species, link species, or species of concern. Agency directives will provide guidance for considering the selection of a focal species from these or other categories. Criteria for selection may include: the number and extent of relevant ecosystems in the plan area; the primary threats or stressors to those ecosystems, especially those related to predominant management activities on the plan area; the sensitivity of the species to changing conditions or their utility in confirming the existence of desired ecological conditions; the broad monitoring questions to be answered; factors that may limit viability of species; and others. This does not preclude the use of an invasive species as a focal species, whose presence is a major stressor to an ecosystem.

(4) The final planning rule does not require a specific number or numeric range of focal species to be selected. The number will vary from unit to unit. The definition of focal species requires a small subset of species. The responsible official has discretion to choose the number of focal species that he or she determines will be useful and reasonable in providing the information necessary to make informed management decisions. It is not expected that a focal species be selected for every element of ecological conditions.

(5) The rule does not specify how to monitor the status of focal species. Monitoring methods may include measures of abundance, distribution,

reproduction, presence/absence, area occupied, survival rates, or others. The objective is not to choose the monitoring technique(s) that will provide the most information about the focal species, but to choose a monitoring technique(s) for the focal species that will provide useful information with regard to the purpose for which the species is being monitored.

The final rule does not require monitoring species population trends. Species population trend monitoring is costly, time intensive, and may not provide conclusive or relevant information. In addition, traditional monitoring of species population size and trend is not reliable for many species because of wide variations in population size. For certain species, for example, a more reliable method may be presence-absence data obtained through non-invasive genetic sampling. Presence-absence modeling could be used to map and predict species distribution, help model habitat requirements and use occurrence data to help estimate the probability of a species being present in sustainable numbers within a geographic area. Genetic sampling, which is drawing DNA from physical species evidence collected at sites under evaluation, can be used to acquire data for this approach. Other monitoring techniques in addition to these examples may be more appropriate in a given circumstance. Therefore, although population trend monitoring may be used where feasible and appropriate, the final rule explicitly provides discretion to the responsible official to choose the most appropriate methods for monitoring, using the best available scientific information to inform the monitoring program.

Specific guidance on focal species selection and monitoring methodology is expected to be further described in the Agency's planning directives. Some focal species may be monitored at scales beyond the plan area boundary, while others may be more appropriately monitored and assessed at the plan area scale.

*Comment: Focal species vs. management indicator species.* Many respondents expressed concern or confusion over the role of focal species monitoring in meeting the requirements of § 219.9; and how focal species would be used differently from management indicator species (MIS) as required under the 1982 planning rule.

*Response:* The Department's decision to require monitoring of focal species as well as select ecological and watershed conditions is a shift from the 1982 rule's requirement to specifically monitor

population trends of "management indicator species," or MIS. The theory of MIS has been discredited since the 1982 rule. Essentially, monitoring the population trend of one species should not be extrapolated to form conclusions regarding the status and trends of other species. The requirement for monitoring questions that address the status of focal species is linked to the requirement of § 219.9 of the final rule to provide for ecosystem integrity and diversity, which describes the coarse-filter approach for providing diversity of plant and animal communities and the persistence of native species in the plan area. Focal species are not intended to provide information about the persistence of any individual species.

In addition, population trends for most species are extremely difficult to determine within the 15-year life of a plan, as it may take decades to establish accurate trend data, and data may be needed for a broader area than an individual national forest or grassland. Nor is this data the most useful to inform management for the purposes of meeting the diversity requirements of the rule. Instead, the Agency expects to take advantage of recent technological advancements in monitoring the status of focal species, such as genetic sampling to estimate area occupied by species.

The provisions under § 219.9 of the final planning rule are focused on maintaining or restoring the ecological conditions necessary to maintain the diversity of plant and animal communities and support the persistence of native species in the plan area. Because of the problems with MIS as stated above, and because the concept of monitoring focal species, as described by the Committee of Scientists report of March 15, 1999, is used to assess the integrity of ecological systems, the final planning rule incorporates the concept of focal species for monitoring the ecological conditions required in § 219.9. Focal species are not intended to be a proxy for other species. Instead, they are species whose presence, numbers, or status are useful indicators that are intended to provide insight into the integrity of the larger ecological system, the effects of management on those ecological conditions, and the effectiveness of the § 219.9 provisions. The monitoring questions and associated indicators required in § 219.12(a)(5)(i–iv) as discussed above are expected to assess progress towards meeting the desired ecological conditions required under §§ 219.8 and 219.9, and the effectiveness of those conditions in maintaining the diversity of plant and animal communities and

supporting the persistence of native species in the plan area.

*Comment: Selection and monitoring of focal species.* Respondents felt the rule should require 3 items for selection and monitoring of focal species: (1) The best available scientific information; (2) the engagement of research, state fish and wildlife agencies, and others; and (3) a broader spatial scale then one plan area.

*Response:* The rule requires (1) all aspects of planning to use the best available scientific information to inform the planning process, plan components, and other plan content, including the monitoring program (§§ 219.3 and 219.14); (2) coordination with research, and consideration of opportunities to design and carry out monitoring with a variety of partners including state agencies (§§ 219.12(a)(1), (b)(2), and (c)(3)(ii)); and (3) broader-scale monitoring strategies be developed in addition to the plan monitoring program, to address questions that are best answered at a broader scale than one plan area (§ 219.12(b)), which may include monitoring for one or more focal species.

*Comment: Monitoring of at risk species.* Some respondents felt the rule should require monitoring of populations of federally listed threatened and endangered species, species that are candidates for Federal listing, and species of conservation concern.

*Response:* In response to public comments, the Department added a requirement to the rule for monitoring questions and associated indicators to monitor the status of a select set of the ecological conditions required under § 219.9 to contribute to the recovery of federally listed threatened and endangered species; conserve proposed and candidate species; and maintain a viable population of each species of conservation concern within the plan area (§ 219.12(a)(5)(iv). It is expected that monitoring a select set of the ecological conditions required by these species will give the responsible official information about the effectiveness of the coarse and fine-filter plan components included to meet the requirements of at risk species. The intent of the term ''a select set'' is to focus the monitoring on a few important ecological conditions that may be monitored in an efficient way. Monitoring for watershed conditions, other ecological conditions, and focal species will also provide information about the effectiveness of plan components for at risk species.

In some circumstances, a threatened, endangered, proposed, or candidate

species, or a species of conservation concern may be the most appropriate focal species for assessing the ecological conditions required by § 219.9. However, as explained in earlier responses in this section, population trend monitoring is not required by the final rule.

*Comment: Monitoring of habitat conditions.* Respondents felt that monitoring habitat conditions only, specifically related to vegetation composition and structure, will not adequately address the reasons why species may or may not occupy those habitats; and that there may be other stressors unrelated to habitat that make suitable habitat conditions unsuitable for occupation by a particular species.

*Response:* The final rule requires monitoring the status of select ecological conditions. The concept of ecological conditions as defined in the proposed rule and the final rule includes more than vegetation composition and structure: it is designed to encompass those factors as well as others, including stressors that are relevant to species and ecological integrity.

Examples of ecological conditions include the abundance and distribution of aquatic and terrestrial habitats, connectivity, roads and other structural developments, human uses, and invasive species.

*Comment: Distinctive roles and contributions.* A respondent felt ''distinctive roles and contributions'' wording in proposed § 219.12(a)(5)(vii) is inappropriate and should be stricken from the monitoring section.

*Response:* The final rule removes ''distinctive roles and contributions'' from § 219.12 in response to public comment because the Department has decided that the new requirement at paragraph (a)(5)(vii) for questions and indicators addressing the progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities, more accurately reflects what the Department intended to accomplish with the previous requirement at paragraph (a)(5)(vii) in the proposed rule and the other proposed requirements of (a)(5).

*Comment: Management systems in NFMA.* Some respondents felt the proposed rule misinterprets the NFMA reference to management systems by not repeating the word ''each'' and by overly restricting the types of management systems.

*Response:* The final rule adds the word ''each'' to the monitoring requirement for management systems. As clarification, § 219.19 of the final

rule also includes a definition of management system as a timber management system such as even-aged management or uneven-aged management. Management system is a term of art of the NFMA (16 U.S.C. 1604(g)(3)(C)). The term management system must be understood in the context of the NFMA which was developed to give guidance to the Agency in how to manage timber. The Department understands the intent of Congress was that research and evaluation would be done on a sample basis. The Forest Service Research and Development staff began the long-term soil productivity program in 1989 to examine the long term consequences of soil disturbance on fundamental forest productivity through a network of designed experiments. (Powers, R.F. 2006. Long-Term Soil Productivity: genesis of the concept and principles behind the program. Can. J. For. Res. 36:519–528.)

*Comment: Monitoring effects of management procedures.* A respondent felt the 1982 provisions for requiring documentation of the measured prescriptions and effects of management procedures (practices) are superior to the monitoring requirements of the proposed rule. The respondent felt the proposed provisions would fail to ensure that actions do not jeopardize biodiversity.

*Response:* The Department requires monitoring questions and indicators to monitor eight topics including the status of ecological conditions. Ecological conditions include vegetation composition and structure, abundance and distribution of aquatic and terrestrial habitats, connectivity, roads and other structural developments, human uses, and invasive species. Questions and indicators associated with the required topics in § 219.12(a)(5) of the final rule can be used to evaluate effects of management procedures (practices) based on the outcomes observed in ecological conditions. The Department concludes that these monitoring requirements support the substantive requirements for ecological integrity and ecosystem and species diversity in the final rule.

*Comment: Conservation education:* A respondent felt monitoring should include conservation education.

*Response:* Conservation education can be a valuable outcome from collaborative planning and reaching out to engage others in design of monitoring programs. The rule gives discretion to the responsible officials to consider the extent and methods chosen to address conservation education. Other sections direct the responsible official to

consider opportunities to connect people to nature. However, a specific requirement for monitoring conservation education was not added to the final rule.

*Comment: Financial feasibility of monitoring.* Some respondents felt the proposed rule was obligating the Agency to undertake unaffordable or unachievable monitoring work, in particular broad-scale monitoring extending beyond the boundaries of NFS lands. Some felt the monitoring requirements may cause the Agency to increase fees to cover costs or that broad-scale monitoring would become a precondition before issuing special use permits.

*Response:* The proposed rule does not obligate the Agency to monitor beyond its fiscal means. Final rule §§ 219.1(g), 219.12(a)(4)(ii) and 219.12(b)(3) ensures that responsible officials must exercise discretion to develop technically and financially feasible monitoring programs. Although monitoring information will be used by responsible officials to inform the need to change plan components, including standards or guidelines, the rule specifically makes clear in § 219.12(a)(7) that monitoring is not a prerequisite for carrying out a project or activity such as the renewal of special use permits.

*Comment: Financial feasibility of monitoring economic and social structures of communities.* A respondent felt the financial feasibility of monitoring under the proposed rule was unattainable and additional discussion was needed on how economic and social structures of local communities will be monitored.

*Response:* The rule requires certain subjects be addressed with one or more questions and associated indicators as the basis for plan monitoring. The NEPA compliance in support of proposed plans and projects will disclose the economic and social effects to local communities, and paragraph (a)(5)(vii) of this section requires monitoring progress towards meeting desired conditions and objectives in the plan, which will include plan components developed to contribute to social and economic sustainability. However, there is no requirement to monitor the economic and social structures of local communities. The Department believes that the monitoring requirements of the final rule will be achievable.

*Comment: Feasibility of climate change monitoring.* Some respondents felt the requirement for plan monitoring programs to include one question and indictor associated with measurable changes on the unit related to climate

change and other stressors would be neither affordable nor achievable.

*Response:* The Department believes that including monitoring questions and indicators associated with measureable changes on the unit related to climate change and other stressors is achievable. The Agency is already conducting monitoring for climate change and other stressors such as insects, diseases, invasive species, wildfire, and more. In addition, the Agency is implementing the Climate Change Roadmap and Scorecard, which includes monitoring for climate change. This section allows the responsible official to use and build on other data and programs, encourages coordination with others and multi-party monitoring, and recognizes that some monitoring questions may best be answered at a scale broader than on plan area. The flexibility provided in this section will allow the responsible official to develop a strategic, effective, and financially achievable monitoring program, while meeting the requirements of paragraph (a)(5).

*Comment: Project monitoring.* Some respondents felt project monitoring requirements should be included in the rule. Citing Department of Army regulations, a respondent felt the rule should require project monitoring funding be allocated before project implementation. Some respondents felt proposed § 219.12(a)(7) meant project monitoring would not occur.

*Response:* The Department agrees project monitoring is important and is a valuable means of understanding the effects of projects and can provide information useful to adapt future project plans to improve resource protection and restoration. The Department added wording to paragraph (a)(7) to clarify that project and activity monitoring may be used to gather information for the plan monitoring program, and that plan monitoring may inform the development of specific projects and activities. The Department anticipates that project and activity monitoring will be used as part of the plan monitoring program, but the responsible official has the discretion to strategically select which projects to monitor and the monitoring questions related to those projects that will best inform the monitoring program and test assumptions, track changing conditions, or evaluate management effectiveness. However, the final rule makes clear the monitoring requirements of this section are not a prerequisite for making a decision to carry out a project or activity. Each project carried out under the plan will not automatically include the monitoring requirements for the plan.

Project monitoring may also occur for purposes other than supporting the plan monitoring program, and the final rule does not preclude project-specific monitoring requirements developed as part of project or activity decisions. The planning rule does not discuss requirements for project monitoring; therefore, funding of project monitoring is an issue outside the scope of the planning rule.

*Comment: Risks from lack of monitoring or monitoring information.* Some respondents felt the lack of monitoring, or information not available through monitoring, could delay management actions or foreclose activities and projects because of uncertainties. A respondent felt the rule should clearly state monitoring goals are not preconditions to approve, continue, or renew special use permits or provide for public uses, or State fish and wildlife management activities.

*Response:* Although monitoring information may be used by responsible officials to inform the need to change the plan, monitoring is not a precondition of conducting projects or carrying out management actions. The rule establishes those elements of monitoring necessary to inform adaptive management of the resources on the unit. None of the requirements of monitoring for the plan monitoring program apply to individual projects or activities. These monitoring requirements do not delay or foreclose management activities.

*Comment: Monitoring and extractive actions.* A respondent felt the rule should require all extractive actions to cease on a unit until timely monitoring has been completed.

*Response:* The planning rule does not apply to any ongoing projects or activities except as provided by § 219.15.

*Comment: Monitoring and assessment data.* A respondent felt the rule should specifically state new and accurate data is important to the success of monitoring and assessment, and use of new and accurate data is required.

*Response:* The final rule requires the use of best available scientific information to inform the development of the monitoring program. However, the final rule does not add the requirement suggested by the respondent as some monitoring questions or indicators may be adequately addressed with existing data. Accuracy in data is met through data protocols and quality control standards covered in other Agency guidance outside the planning regulations.

*Comment: Feedback needed from monitoring to planning and*

Rvsd Plan - 00001279

**21236** **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

*management actions.* Some respondents felt the proposed rule lacks feedback between monitoring and changes to plan components. Some respondents felt the rule should include accountability measures and explicitly include "adaptive management" requirements rather than just describing a framework for planning consistent with principles of "adaptive management."

*Response:* The Department made changes in response to public comments to make clear the focus on adaptive management. The monitoring program is required to be designed to inform management (§ 219.12(a)). The final rule requires that the monitoring evaluation report be used to inform adaptive management of the plan area (§ 219.12(d)(2)), in addition to the requirement that the report indicate whether new information indicates that changes are warranted. The final rule requires that the responsible official review relevant information from both the assessment and monitoring to inform the development of plan components and other plan content (§ 219.7(c)(2)(i)). Section 219.5(a) sets forth a responsive planning process that informs integrated resource management and allows the Agency to adapt to changing conditions, including climate change, and improve management based on new information and monitoring. The final rule also requires the Chief to administer a national oversight process for accountability and consistency to review NFS land management planning in the context of this framework (§ 219.2(b)(5)).

*Comment: Biennial evaluations.* Some respondents felt the proposed biennial evaluations requirement would be too costly, time consuming and complex. Others felt the rule should require an annual evaluation. Others thought the biennial evaluation time is too short because of long-term aspects, such as climate change, require long periods of time before meaningful evaluations can be conducted. Still others felt the rule should require a public comment period on the biennial evaluation. One respondent felt the rule should not allow the responsible official to publish monitoring evaluation reports without approval at a higher level. Some respondents felt the proposed requirement for biennial reporting would not meet NFMA's requirement for continuous monitoring.

*Response:* The Department decided to retain the requirement that the responsible official conduct a biennial evaluation of the monitoring information and issue a written report of the evaluation and make it available to the public. The biennial evaluation of monitoring is intended to collect, evaluate, and report on new data or results that provide information for adaptive management: for example, information about management effectiveness, progress towards meeting desired conditions or objectives, changing conditions, or validation (or invalidation) of assumptions. The biennial monitoring evaluation does not need to evaluate all questions or indicators on a biennial basis but must focus on new data and results that provide new information for adaptive management. The responsible official may postpone the monitoring evaluation for 1 year after providing notice to the public in the case of exigencies such as a natural disaster or catastrophic fire. The Department believes that this requirement is implementable and important to inform adaptive management.

The Agency's experience is that an annual evaluation is too frequent to determine trends or to accumulate meaningful information and the 5-year time frame (§ 219.10(g) of the 1982 rule) is too long to wait in order to respond to changing conditions or new information. Therefore, the Department determined the monitoring evaluation would occur at a 2-year interval. The Department recognizes some kinds of monitoring indicators require longer time frames for thorough evaluation of results, but a biennial review of what information has been collected will ensure evaluation of available information is timely and can be used to inform planning and adaptive management of the unit.

The Department also retained the requirement that the responsible official publish the monitoring evaluation report, so that it is available to the public. Section 219.4(a) of the final rule requires the responsible official to provide opportunities for the public to participate in reviewing the results of monitoring information. The responsible official may elect various methods for this participation, but the rule does not direct any specific form for this participation such as requiring formal comment on the biennial evaluation. Public notice of the availability of the monitoring evaluation report is required, and must be posted online. Additional notice may be made in any way the responsible official deems appropriate. Any changes to the monitoring program require consideration of public comment.

Section 219.5(a)(3) of the final rule states that under the planning framework "monitoring is continuous." The biennial monitoring evaluation report would not halt monitoring; it would simply report new information obtained from that monitoring.

*Comment: Evaluation reports and changes to plan components based on information from petition(s).* A respondent suggested the biennial evaluation report incorporate science contained in environmental analyses and the plan be updated to incorporate information from petition(s).

*Response:* The requirement in this section for a biennial evaluation report is focused on providing systematic and transparent reporting and evaluation of information obtained pursuant to the monitoring program established consistent with this section. The report will be used to inform adaptive management on the unit. As part of the planning process, the responsible official may also consider any additional relevant information contained in other sources, such as petitions or new environmental analyses.

*Comment: Required actions in response to monitoring.* Some respondents felt monitoring results might be of no consequence if there are no requirements in the rule to take specific actions to respond to monitoring results. These changes should not wait for another planning cycle. Others felt the rule should include criteria as to when a need to change the plan is indicated by monitoring. A respondent suggested unit monitoring incorporate efforts to focus on non-native invasive species not present but can reasonably be foreseen as posing a risk to eventually enter the plan area. Another respondent felt proposed § 219.12(a)(7) would result in monitoring programs not dealing with watershed degradation associated with projects or activities, such as grazing, and the rule should focus on watersheds in poor condition, degraded riparian and upland habitats, substantial and permanent losses in soil productivity, and streams. A respondent felt the requirement to monitor "the status of select watershed conditions" was vague and could lead to the collection of disparate types of information across planning units and could create local conflicts over the requirement's interpretation. A respondent felt more explanation was necessary in the rule on why topics were not included in requirements under § 219.12(a)(5). A respondent felt the rule should require the monitoring program to substantiate why certain portions of the plan do not warrant monitoring. A respondent suggested the rule specify a framework for reporting on forest conditions such as the Montreal Protocol.

Rvsd Plan - 00001280

**21237**

*Response:* The final rule requires that the monitoring evaluation report indicate whether a change to the plan, management activities, the monitoring program, or a new assessment may be warranted based on the new information. It also requires that the monitoring evaluation report be used to inform adaptive management of the plan area to ensure that the plan remains effective and relevant. The responsible official will need to evaluate when the information warrants a change to the plan. The public will have the opportunity to review the biennial monitoring report, and is welcome to provide input to the responsible official. The Department modified the requirements of paragraph (a)(5) in response to public comments and to more closely link the monitoring requirements to the assessment topics and to the substantive requirements in §§ 219.7 through 219.11. The responsible official is not limited to the monitoring requirements identified in paragraph (a)(5) of this section. The responsible official may add questions and indicators to reflect the monitoring needs most appropriate to inform effective management for that unit. In addition, the broader-scale monitoring strategies will identify questions and indicators best monitored at a broader geographic scale than the plan area.

The Department concluded that the set of monitoring requirements in the final rule provides an appropriate balance between requiring core monitoring on each unit and recognizing that there will be a wide and diverse array of monitoring needs across each system, including with regard to what specific questions and indicators may be most relevant for the topics in paragraph (a)(5) of this section. The responsible official will need to document the rationale for decisionmaking, as well as how best available scientific information was used to inform the monitoring program. Additional direction will be included in the Forest Service Directive System, and may be provided as a result of the Agency's ongoing review of its monitoring system.

The final rule requires monitoring of watershed conditions, as well as ecological conditions associated with aquatic ecosystems, and progress towards meeting desired conditions and objectives. The Department believes that these monitoring requirements will support the substantive requirements in the final rule for plan components for watersheds, water quality, water resources, and riparian areas, including those considerations with regard to water identified in the comment, and

will inform management effectiveness and adaptive management.

The Department expects monitoring will be informed by FIA data. The FIA program inventories and reports on changing conditions across all forested lands and provides information that reflects many Montreal Process indicators.

*Comment: Adjusting plans without adequate monitoring information.* A respondent felt the proposed rule's emphasis on making rapid changes may cause the responsible official to make changes to plan components without the benefit of monitoring over an appropriate period of time, as some monitoring questions and indicators cannot be adequately evaluated annually. A respondent felt the proposed rule's support of rapid adjustment of management through monitoring could lead to mistakes when causal factors are not understood. Another respondent felt the adaptive management approach was too vague and the rule needed wording to endorse a precautionary approach when the responsible official has only limited data available for a decision about a significant change in resource management.

*Response:* The Department agrees numerous monitoring questions and indicators could take many years of monitoring data collection before the information can be credibly evaluated. The use of the monitoring information is one factor in deciding when and how to change a plan. Any amendment or revision conducted as a result of new information from monitoring would be carefully done in accordance with the NEPA and the requirements of this final rule. Rapid, narrow amendments can help plans stay current and relevant, while recognizing that more information will be available over time. Since responsible officials already have discretion to consider precautionary measures when risks to resources are uncertain during NEPA analysis, the Department decided it is not necessary to add precautionary wording to the final rule. Any significant change in resource management would need to be consistent with the sustainability and other requirements in the final rule.

*Comment: Administrative change applied to monitoring program.* A respondent felt modifying monitoring programs with an administrative change would pose a risk of not conducting good monitoring because changes could be done too easily.

*Response:* Section 219.2 requires national oversight and process for accountability for planning. In addition, a substantive change to a monitoring

program via an administrative change can only be made after public notice and consideration of public comment. Monitoring design and specification of details about measurement quality objectives, techniques, and frequency are subject to changing scientific knowledge. The final rule allows monitoring programs to be changed in a timely way to respond to evolving science and to maintain scientific credibility. Additionally, monitoring programs do not rely exclusively on protocols authored by the Agency. For example, other agencies such as Environmental Protection Agency, US Geological Survey, and National Park Service possess expertise and have already incurred substantial expense developing, reviewing, and testing protocols. It will be important, especially for multi-party monitoring, to be able to evaluate and incorporate these protocols when appropriate in the plan monitoring program as new partnerships are formed.

### Section 219.13—Plan Amendment and Administrative Changes

This section of the rule sets out the process for changing plans through plan amendments or administrative changes. The section would allow the responsible official to use new information obtained from the monitoring program or other sources and react to changing conditions to amend or change the plan. The Department's intent is that plans will be kept more current, effective, and relevant by the use of more frequent and efficient amendments, and administrative changes over the life of the plan, also reducing the amount of work needed for a full revision.

### Plan Amendments

Plan amendments incrementally change the plan as need arises. Plan amendments could range from project specific amendments or amendments of one plan component, to the amendment of multiple plan components. For example, a monitoring evaluation report may show that a plan standard is not sufficiently protecting streambeds, indicating that a change to that standard may be needed to achieve an objective or desired condition in the plan for riparian areas. In that case, the responsible official could choose to act quickly to propose an amendment to change that particular standard.

The process requirements for plan amendments and administrative changes are simpler than those for new plan development or plan revisions in order to allow responsible officials to keep plans current and adapt to new information or changed conditions.

Rvsd Plan - 00001281

As discussed in § 219.6, the final rule does not require an assessment prior to initiating a plan amendment, because a new assessment will not always be necessary or useful. However, the responsible official can always choose to conduct an assessment and take additional time to develop a proposal when the potential amendment is broader or more complex or requires an updated understanding of the landscape-scale context for management. For example, a monitoring evaluation report may indicate that a new invasive species is affecting forest health in the plan area. The responsible official may want to conduct a new, focused assessment to synthesize new information about the spread of that species, how other plan areas or land management agencies are dealing with the threat, what stressors make a resource more vulnerable to the species, how the species may be impacting social or economic values, or how neighboring landowners are approaching removal of the species. The responsible official, consistent with the requirements for public participation in § 219.4, would then collaboratively develop a proposal to amend several plan components to deal with the invasive species.

All plan amendments must comply with Forest Service NEPA procedures. This final rule provides that appropriate NEPA documentation for an amendment could be an EIS, an environmental assessment (EA), or a categorical exclusion (CE) depending upon the scope and scale of the amendment and its likely effects. A proposed amendment that may create a significant environmental effect and thus require preparation of an EIS is considered a significant change in the plan for the purposes of the NFMA.

Administrative Changes

Administrative changes allow for rapid correction of errors in the plan components. In addition, other content in the plan, as identified in § 219.7(f), could be altered with an administrative change, including the monitoring plan, the identification of watersheds that are a priority for maintenance or restoration, the plan area's distinctive roles and contributions, and information about proposed or possible actions that may occur on the plan area during the life of the plan. This final rule requires the responsible official to provide public notice before issuing any administrative change. If the change would be a substantive change to the monitoring program, the responsible official must also provide an opportunity for the public to comment

on the intended change and consider public concerns and suggestions before making a change. The Department believes that allowing administrative changes to other content, other than plan components, would help the responsible official rapidly adapt that content to changing conditions and respond to new information, while requiring the responsible official to keep the public informed. For example, a major fire event may make a particular watershed a new priority, or a new collaborative monitoring effort may require the addition of one or more monitoring questions.

Section 219.13—Response to Comments

The Department made minor modifications to the wording of this section from the 2011 proposed rule for clarity.

At the end of paragraph (a), the words ''(including management areas or geographic areas)'' were added to reflect the modifications of § 219.7, and to clarify that an amendment is required for any change in how or whether plan components apply to those areas.

The Department merged provisions about plan amendments found in two sections of the proposed rule (§§ 219.6(c) and 219.13(b)(1)) into one paragraph (paragraph (b)(1) of this section) of the final rule, for clarity. The provisions were removed from § 219.6(c) of the final rule.

The Department added a sentence to the end of paragraph (b)(3) of this section to make clear that a proposed amendment that may have a significant environmental effect and thus require preparation of an EIS is considered a ''significant change in the plan'' for purposes of the NFMA. The NFMA at 16 U.S.C. 1604(f)(4) states that plans shall be amended in any matter whatsoever after public notice, and, if such amendment would result in a significant change in a plan, the plan must be amended in accordance to the requirements of 16 U.S.C. 1604(e) and (f) and public involvement required by 16 U.S.C. 1604(d). Likewise, as part of the NEPA process, the responsible official must determine whether the significance of the proposed amendment's impact on the environment would require an environmental impact statement. This addition to the final rule makes the NEPA and NFMA findings of ''significance'' one finding. If under NEPA a proposed amendment may have a significant effect on the environment and an EIS must be prepared, the amendment would automatically be considered a significant change to a plan.

The Department finds that the process requirements for an EIS, the 90-day public comment period required by this final rule, and the additional requirements for amendments under this final rule meet the requirements for a amendment that results in a significant change to the plan under 16 U.S.C. 1604(f)(4). Thus, the responsible official must make only one determination of significance, under the well-known standards of NEPA.

For other plan amendments, less detailed levels of NEPA compliance such as the preparation of environmental assessment or a decision memo using a categorical exclusion may be appropriate. There is the same opportunity for persons to file objections to all proposed amendments as there is for proposed revisions (subpart B of the final rule).

Paragraph (c)(1) of both the proposed and the final rule provide that changes to ''other plan content,'' may be made via an administrative change (unlike the plan components, which require an amendment to make substantive changes). Because of the importance of the monitoring program to the public, the proposed rule provided and the final rule retained a requirement that substantive changes to the monitoring program made via an administrative change can be made only after notice and consideration of public comment. In the final rule, the Department added the word ''substantive'' to convey the Department's intent that minor changes or corrections to the monitoring program can be made via an administrative change without providing an opportunity for public comment.

*Comment: Appropriate NEPA for plan amendments.* Some respondents felt plans should be as simple and programmatic as possible and NEPA compliance should occur only at the project level. Another respondent said categorical exclusions should be used for minor amendments, environmental assessments for more significant amendments. Some respondents felt any action requiring an amendment should be considered a significant action, therefore requiring development of an EIS to disclose the anticipated effects of the amendment. A respondent felt it was unclear as to when an EIS was done for an amendment and when it was done for a plan revision. Other respondents felt use of categorical exclusions was inappropriate for a plan amendment as any changes to the plan should be subject to careful environmental review, scrutiny, and analysis.

Rvsd Plan - 00001282

*Response:* Requiring an EIS for all amendments would be burdensome, and unduly expensive for amendments with no significant environmental effect. It would also inhibit the more frequent use of amendments as a tool for adaptive management to keep plans relevant, current and effective between plan revisions based on changing conditions and new information. The Department requires the responsible official to follow NEPA procedures and choose the appropriate level of analysis: EIS, EA, or CE, based on the scale and scope of the amendment. As clarification, § 219.13 of the final rule clarifies that any plan amendment that may create a significant environmental effect and therefore require preparation of an EIS will be considered "a significant change in the plan" for the purposes of the NFMA; requiring a 90-day comment period under § 219.16. An EIS is always required for a plan revision or for development of a new plan.

*Comment: Amendment verses administrative change.* Some respondents felt the proposed rule was confusing regarding when an amendment and when an administrative change was to be used.

*Response:* Plan components are the plan's desired conditions, objectives, standards, guidelines, suitability of areas, or goals described in § 219.7. An amendment is required if a change, other than correction of a clerical error or a change needed to conform to new statutory or regulatory requirements, needs to be applied to any of these plan components.

Administrative changes are made to correct clerical errors to plan components, to alter content in the plan other than the plan components, or to achieve conformance of the plan to new statutory or regulatory requirements. A clerical error is an error of the presentation of material in the plan such as phrasing, grammar, typographic errors, or minor errors in data or mapping that were appropriately evaluated in the development of the plan, plan revision, or plan amendment. An administrative change could not otherwise be used to change plan components or the location in the plan area where plan components apply, except to conform the plan to new statutory or regulatory requirements. Changes that could be made through an administrative change may also be made as part of a plan amendment or revision instead.

*Comment: Thirty-day comment period on environmental assessments (EAs).* Some respondents felt more than 30 days was needed for public review of a large and complicated plan amendment supported by an EA. They proposed a three tiered public response period: 90 days for proposals requiring an EIS, 60 days for those requiring an EA, and 30 days for all others.

*Response:* The final rule retains the 30-day minimum comment period for a plan amendment (§ 219.16(a)). Agency practice shows 30 days can be reasonable when an EA is prepared.

*Comment: Project specific plan amendments.* Some respondents expressed concern with the use of project specific plan amendments because they felt that they do not get sufficient analysis, review, public input, and may not use the best available science. A respondent felt these amendments should only be allowed for unforeseen events or special circumstances. Another respondent felt the supporting NEPA documentation should include a 'no amendment' alternative which accomplishes the proposed action without amending the plan.

*Response:* No change was made to this provision in the final rule. Project-specific amendments are short-lived with the project, and localized to the project area. The point of a project-specific amendment is to allow a project that would otherwise not be consistent with the plan to be authorized and carried out in a manner appropriate to the particular time and place of the project, without changing how the plan applies in other respects. Project specific amendments give a way to deal with exceptions. An exception is similar to a variance to a county zoning ordinance. If the amendment changed plan components that would apply to future projects, the exception would not be applicable. Section 219.16(b) requires use of the Agency's notification requirements used for project planning at 36 CFR parts 215 or 218 for project-specific of amendment.

*Comment: Amending plans under existing regulations.* A respondent felt the rule should allow for the option of amending existing plans under the existing planning regulations.

*Response:* Final rule § 219.17(b)(2) allows amendments to existing plans to be initiated for a period of 3 years under the provisions of the prior planning regulation. This provision is unchanged from the proposed rule.

*Comment: Administrative changes.* Some respondents felt allowing wilderness area boundaries to be changed with administrative changes was inappropriate. Some respondents felt changes to monitoring programs should not be done administratively as these changes should be transparent and have public accountability.

*Response:* Wilderness area boundaries may only be changed by an act of Congress, therefore a change to the wilderness area boundaries identified in the plan would only be made to conform the plan to the congressionally mandated change, with no discretion available to the responsible official or to the public. When there is no agency discretion, an administrative change to the plan is appropriate.

The rule requirements for administrative changes will facilitate more rapid adjustment of plans. The technical aspects of monitoring may need adjustment due to new information or advances in scientific methods, or a change may be needed to reflect a new monitoring partnership or for other reasons. The responsible official must involve the public in the development of the plan monitoring program and post notice of changes to the monitoring program online. If the change to the monitoring program is substantive, the public must be given an opportunity to comment. These requirements are intended to keep the public engaged and informed of the monitoring program, while allowing the program to build on new information and stay current.

**Section 219.14—Decision Documents and Planning Records**

This section of the rule requires the responsible official to record approval of a new plan, plan revision, or amendment in a decision document prepared according to Forest Service's NEPA procedures and this section. This section describes requirements for decision documents and associated records for approval of plans, plan amendments, or plan revisions. These requirements will increase the transparency of the decision and the rationale for approval, and require the responsible official to document how the plan complies with the requirements in this final rule.

This section also sets forth basic requirements for the responsible official to maintain public documents related to the plan and monitoring program. It requires the responsible official to ensure that certain key documents are readily accessible to the public online and through other means, and that the planning record be available to the public.

**Section 219.14—Response to Comments**

Comments on this section focused on the availability of documents. The Department largely retained the wording from the 2011 proposed rule; however,

the Department did make changes for consistency in this section to reflect changes made in other sections of the rule.

At paragraph (a)(2) the proposed rule wording of "An explanation of how the plan components meet the sustainability requirements of § 219.8 and the diversity requirements of § 219.9, taking into account the limits of Forest Service authority and the capability of the plan area" was modified to "An explanation of how the plan components meet the sustainability requirements of § 219.8, the diversity requirements of § 219.9, the multiple use requirements of § 219.10, and the timber requirements of § 219.11." The Department added the requirements to explain how plan components meet the requirements of §§ 219.10 and 219.11 to cover all the substantive requirements for plan components. The Department removed the words taking into account the limits of Forest Service authority and the capability of the plan area, because they are part of §§ 219.8–11 and § 219.1(g).

At paragraph (a)(4), the Department changed the wording from the proposed rule wording of "taken into account and applied in the planning process," to "how the best scientific information was used to inform planning, the plan components, and other plan content, including the plan monitoring program" to be consistent with the final rule wording of § 219.3. This change was made to make clear that § 219.3 applies to every aspect of planning, and the public must be able to see and understand how it has been applied. Additional minor edits were made for clarity.

*Comment: Content of decision document.* Some respondents felt these proposed requirements should be reduced to what is required by the NEPA. Others felt a discussion on multiple use and timber requirements per the NFMA, and use of best available scientific information should be included.

*Response:* The Council on Environmental Quality NEPA regulations at 40 CFR 1505.5 requires a record of decision to identify and discuss all factors and essential considerations of national policy which were balanced by the Agency in making its decision and state how those considerations entered into its decision. The plan only provides the management direction approved by the decision, while the decision document provides the rationale for the decision; therefore, the factors used in decisionmaking are most appropriate for the discussion in the decision document. The requirements of this section will help

increase transparency and public understanding of the responsible official's decisions. Based on public comment, the Department added the multiple use requirements of § 219.10 and the timber requirements of § 219.11 to the list of items (§ 219.14(a)(2)) that the responsible official address in explaining how plan components meet the requirements of the rule. Section 219.14(a)(4) of the final rule also requires the decision document to document how the best available scientific information was used to inform the planning process, the plan components, and other plan content.

*Comment: Availability of planning documents on the Internet.* Some respondents supported the proposed requirement to make available online assessment reports; plan decision documents; proposed plans, plan revisions, or plan amendments; public notices and environmental documents associated with a plan; the monitoring program and monitoring evaluation reports. Some respondents felt the plan should also include all documents supporting analytical conclusions made and alternatives considered throughout the planning process source data, including GIS data, the monitoring program, and any plan revision. Some respondents made specific requests about when and how documents are made available online.

*Response:* Section 219.14(b)(1) of the final rule requires online availability of documents including assessments, the monitoring evaluation report, the current plan and proposed plan changes or decision documents, and any public notices or environmental documents associated with the plan. The final rule keeps the wording of the proposed rule that these documents must be "readily accessible" online; the expectation is that the documents would be posted as soon as they are finished and formatted for public viewing. Documents that require formal notifications will be posted when formal notice is made, if not before. In addition, the final rule requires that documents identified in § 219.52(c)(1) must be available online at the time of notification of the start of the objection period.

Making all data and information used in the planning process available online would be very time-consuming and expensive. However, to ensure that units continue to make all planning records available for those who may be interested, the final rule requires the responsible official to make all documents available at the office where the plan, plan revision, or amendment was developed. The final rule does not prohibit the responsible official from

using other means of making documents available.

*Comment: Availability of NEPA documents.* Some respondents stated the final EIS supporting a plan should be made available no later than the start of objection process.

*Response:* The Department requires the objection process to begin after the NEPA documents are final and made available. Section 219.52(c) lists the required items that the public notice must contain in notifying the public of the beginning of the objection process including a draft plan decision document. In addition, the final rule requires that documents identified in § 219.52(c)(1) must be available online at the time of notification of the start of the objection period.

Section 219.15—Project and Activity Consistency With the Plan

This section of the final rule provides that projects and activities authorized after approval of a plan, plan revision, or plan amendment developed pursuant to the final rule must be consistent with plan components as set forth in this section. The NFMA requires that "resource plans and permits, contracts and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans" (16 U.S.C. 1604(i)). However, no previous planning rule provided specific criteria to evaluate consistency of projects or activities with the plan.

This section provides that every project and activity authorized after approval of a plan, plan amendment, or plan revision developed pursuant to the final rule must be consistent with the plan and the applicable plan components as set forth in this section. Project decision documents must describe how the project or activity is consistent with the plan. This final rule specifies criteria to use to evaluate consistency with the plan components.

The Agency has experienced difficulty in the past in determining how new plan components and content in a plan apply to projects and activities approved prior to the effective date of a plan amendment or revision. With respect to such projects and activities, the rule requires that: 1) the plan decision document must expressly allow such projects to go forward or continue, and thus deem them consistent, or 2) in the absence of such express provision, the authorizing instrument (permit, contract, and so forth) approving the use, occupancy, project, or activity must be adjusted as soon as practicable to be consistent with

the plan, plan amendment, or plan revision, subject to valid existing rights.

Other types of plans may be developed for the lands or resources of the planning area. These resource plans, such as travel management plans, wild and scenic river plans, and other resource plans, may be developed for the lands or resources of the planning area. This section requires that other resource plans be consistent with the land management plan and applicable plan components. If such plans are not consistent, modifications of the resource plan must be made or amendments to the land management plan must be made to resolve any inconsistencies.

Section 219.15—Response to Comments

The Department retained the wording of the proposed rule, except for three modifications. The Department clarified the first sentence of paragraph (a)(1) to say every decision document approving a plan, plan amendment, or plan revision must state whether authorizations of occupancy and use made before the decision document may proceed unchanged.

At paragraph (d), the Department added that every project and activity must be consistent with the applicable plan components and removed those words from § 219.7(d) of the proposed rule, because this provision is more appropriate in this section of the final rule.

At paragraph (d)(3), in response to comments received on the preferred alternative, the Department modified the direction for determining consistency with guidelines to make the Department's intent more clear. Paragraph (d)(3)(i) was modified to reflect the structure of the requirement for standards in paragraph (d)(2), and now reads: "Complies with applicable guidelines as set out in the plan." In paragraph (d)(3)(ii), the Department replaced "carrying out the intent" to "achieving the purpose" of the applicable guidelines.

The Department removed the wording at § 219.15(d)(3)(ii) of the proposed rule that repeated text from § 219.7(e)(1)(iv), to avoid duplication and because the reference to § 219.7(e)(1)(iv) is adequate.

*Comment: Consistency requirement.* Some respondents felt the proposed rule was too vague and unclear about project or activity consistency with the plan. They felt the rule needs specific criteria for determining if a project or activity is consistent with the plan, and achieving consistency may not be feasible unless guidelines are made mandatory.

*Response:* No previous planning rule provided specific criteria to evaluate consistency of projects or activities with

the plan. The Forest Service policy was that consistency could only be determined with respect to standards and guidelines, or just standards, because an individual project alone could almost never achieve objectives and desired conditions. See the 1991 Advanced Notice of Proposed Rulemaking 56 FR 6508, 6519–6520 (Feb 15, 1991) and the 1995 Proposed Rule, at 60 FR 18886, 18902, 18909 (April 13, 1995).

The Department continues to believe that the consistency requirement cannot be interpreted to require achievement of the desired conditions or objectives of a plan by any single project or activity, but we believe that we can provide direction for consistency to move the plan area toward desired conditions and objectives, or to not preclude the eventual achievement of desired conditions or objectives, as well as direction for consistency with the other plan components.

This section requires that every project and activity authorized after the approval of a plan, plan revision or plan amendment must be consistent with the plan as provided in paragraph (d) of this section. Paragraph (d) specifies criteria to evaluate consistency, and requires that project approval documents describe how the project or activity is consistent. Given the very large number of project and activities, and the wide variety of those projects and activities, it is not feasible to provide any direction more specific than that set out in paragraph (d).

Section 219.16—Public Notifications

In this section, the final rule sets forth requirements for public notification designed to ensure that information about the planning process reaches the public in a timely and accessible manner. This section describes when public notification is required, how it must be provided, and what must be included in each notice. This section of the final rule is meant to be read with § 219.4 of the rule in mind, which sets forth direction for responsible officials to engage the public and provide opportunities for interested individuals, entities, and governments to participate in the planning process.

This final rule represents a significant new investment in public engagement designed to involve the public early and throughout the planning process. The Department is making this investment in the belief that public participation throughout the planning process will result in a more informed public, better plans, and plans that are more broadly accepted by the public than in the past. The requirements in this section

respond to the consensus that people want to be informed about the various stages of the planning process, with clear parameters for when and how they can get involved.

Public input at several points during the development of the rule emphasized the importance of updating the way we provide notice to the public to ensure that we successfully reach a diverse array of people and communities and inform them about the process and how they could participate. Many people said that using only one outreach method would not reach all needed communities. In response, this section directs responsible officials to use contemporary tools to provide notice to the public, and, at a minimum, to post all notices on the relevant Forest Service Web site.

This section of the final rule provides that "notifications may be combined where appropriate." This provision would allow flexibility for plan amendments to have a more streamlined, efficient process than new plans or plan revisions, where appropriate. This approach is in keeping with the public's desire and the Agency's need for a process that allows plan areas to quickly and efficiently adapt to new information and changing conditions. (see § 219.13 for further discussion.)

Section 219.16—Response to Comments

The Department made the following changes to this section of the final rule:

In the introduction to paragraph (a) the Department changed the term "formal notifications" to "notifications." This change is a clarification.

The Department removed the requirement at paragraph (a)(1) for a formal notice for the preparation of an assessment, in response to public comments on the efficiency of the assessment process. A requirement for notice of opportunities to provide information for assessments is now in paragraph (c)(6) of this section: notice must be posted online, and additional notice may be provided in any way the responsible official deems appropriate.

The wording of paragraph (a)(1) in the final rule, formerly paragraph (a)(2) in the proposed rule, was modified to remove the words "when appropriate" before plan amendment. The change reflects the Department's intent in the proposed rule and responds to public comments about confusion over whether notice to initiate the development of plan amendments is required (it is). This change is not a change in requirement, this is a clarification.

At paragraph (c)(3) the Department added a new paragraph that requires that when the notice is for the purpose of inviting comments on a proposed plan, plan revision, or plan amendment, and a draft EIS is prepared, the Environmental Protection Agency (EPA) **Federal Register** notice of availability of an EIS shall serve as the required **Federal Register** notice. This change makes the procedure similar to the prior rule procedures and eliminates an additional **Federal Register** notice at the time of a DEIS.

At paragraph (c)(6), the Department modified "plan amendment assessments" to "assessment reports" in the list of public notices that may be made in any way the responsible official deems appropriate that was in paragraph (c)(5) of the proposed rule. This change clarifies how the public will receive notice of a completed assessment report. The word "additional" was added to the beginning of paragraph (c)(6) to make clear that, at a minimum, notice for the items in the paragraph must be posted online. This change is a clarification.

At paragraph (d), the Department added an exception for the content for public notices when the notice is for the purpose of inviting comments on a proposed plan, plan amendment, or plan revision for which a draft EIS is prepared. This change is necessary because of the change at paragraph (c)(3), stating that the **Federal Register** notice of availability for the draft EIS will serve as the required public notice. The EPA has a standard format for notices that does not include the requirements of paragraph (d). The public will be able to find the additional information online.

*Comment: When appropriate.* Some respondents felt proposed rule § 219.16(a)(2) wording "when appropriate" should be removed in reference to public notification of plan amendments.

*Response:* The final rule removes the wording "when appropriate" in relation to plan amendments in what is now § 219.16(a)(1) in the final rule, in response to public comment and to clarify the Department's intent from the proposed rule.

*Comment: Notification.* Some respondents felt the words "deems appropriate" in paragraph (c)(5) of the proposed rule should be removed, and requested clarification of what contemporary tools would be used. Some respondents requested direct notification, or notification of changes to a specific use. A respondent felt **Federal Register** notice should be mandatory for all plan amendments and

any other notification such as administrative changes. Some respondents suggested changes to the proposed notification process to better inform those individuals and groups who would be most affected and interested in these activities. Some respondents felt that use of a newspaper of record is not effective since newspaper subscriptions are declining across the country.

*Response:* Section 219.16 of the final rule requires, at a minimum, that all public notifications must be posted online and the responsible official should use contemporary tools to provide notice to the public. These could include an array of methods, such as meetings, town halls, email, or Facebook posts. The best forms of notice will vary by plan area and over time, therefore the rule does not seek to predetermine what those tools might be. The wording "deems appropriate" in paragraph (c)(6) for the notices not listed in paragraph (a) allows the responsible official the flexibility to determine the notification method that best meets the needs of interested individuals, groups, and communities; therefore, it has been retained in the final rule.

Additionally, there are requirements outlined in (c)(1)–(5) for posting notices in the **Federal Register** and applicable newspaper(s) of record for the notices required in paragraph (a). The use of the **Federal Register** to give notice for all amendments and administrative changes would be inefficient for the Agency; therefore the requirements in paragraph (c) vary.

Persons desiring notification of changes to a specific use on a national forest or grassland should contact that office. A requirement for direct notification has not been added. The Department concludes that such a requirement would be unworkable, and that the forms of public notice required by this section, including the requirement that all notices be posted online, will enable informed and active public engagement.

Section 219.17—Effective Dates and Transition

This section of the final rule describes when approval of plans, plan revisions, or plan amendments would take effect and when units must begin to use the new planning regulations.

Section 219.17—Response to Comments

Many comments on this section focused on the efficiency of the process, clarity, and potential additional requirements. The Department retained

the wording from the proposed rule except for the following changes:

The Department changed the wording of paragraph (a) of the proposed rule about effective dates of the proposed rule in response to public comments about the efficiency of the planning process. The final rule retains the requirement that a plan or plan revision, is effective 30 days after publication of notice of approval, and also retains that requirement for a plan amendment for which an EIS is prepared. The final rule removes the 30 day delay for amendments that do not require an EIS; such amendments are effective immediately upon publication of the notice of approval. This change in requirements improves the efficiency of amendments.

Paragraphs (b)(1)–(3) were modified slightly to reflect that the effective date of the final rule will be 30 days after the date of publication of the final rule in the **Federal Register**.

In paragraph (b)(2) of this section, the Department modified the wording and added a new first sentence to clarify that all new plan amendments initiated after the effective date of this rule must use the objections process of subpart B, even if the amendment is developed using the planning procedures of the prior planning regulation. This is a change made to require that subpart B apply to all plans, plan revisions and plan amendments initiated after the effective date of the final rule. In the rest of paragraph (b)(2) the Department: Revised the sentences to improve the ease, flow, and clarity of this paragraph, and clarified that when initiating plan amendments the optional appeal procedures are not available.

In paragraph (b)(3) of this section, the Department clarified that the objection process of subpart B of this part applies if the responsible official completing a plan process initiated prior to this part chooses objections instead of optional appeal procedures. This change was made to avoid confusion about which objection procedures would apply in that case (prior rule of December 18, 2009, or subpart B of this final rule). In addition, the Department clarified that the objection process of subpart B may be chosen only if the public is provided the opportunity to comment on a proposed plan, plan amendment, or plan revision, and associated environmental analysis. These clarifications are not a change in requirements.

In paragraph (c) the Department added wording in response to public comments to clarify that existing plans will remain in effect until revised, and that the final rule does not compel a

change to any existing plan, except as required in § 219.12(c)(1). In addition the Department added wording that none of the requirements of this part apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part, except that projects and activities must be consistent with plan amendments developed under this final rule. These changes are not changes in requirements; the changes clarify the intent of the Department in the proposed rule. This paragraph in the final rule is needed for clarity so that all NFS units understand they are subject to the new planning rule for plan development, plan amendment, and plan revision, while still requiring NFS units to follow the plan provisions of their current plans.

*Comment: Timing of compliance.* Some respondents felt the rule should establish a time limit beyond which any action which is being performed under a previous regulation must be brought into compliance with this part, and the responsible official should not have discretion to apply prior planning regulation in completing a plan development, plan amendment, and plan revisions initiated before the effective date of this part. A respondent felt newly started plan amendments should follow the new planning direction without exception. Another respondent felt the rule should allow the option of amending existing plans under either the existing planning regulations or the new planning rule requirements until the current plan is revised under the new rule. Some respondents felt the rule's transition provisions should state the Agency will operate under existing plans until all legal challenges to a new plan or plan revision are resolved to avoid disruption of existing contracts.

*Response:* There is no transition period for new plans or plan revisions initiated after the effective date of the final rule: all new plans and plan revisions must conform to the new planning requirements in subpart A. Plan revisions that are currently ongoing or initiated prior to the effective date of the final rule may be completed using either the previous rule or the final rule. Many of the ongoing plan revision efforts have taken many years, and it could be expensive in terms of both time and costs to require them to follow the new procedures, in addition to delaying needed improvements to outdated plans. It could also be unfair to the public who have invested time in these efforts. The responsible official does have the discretion to conform an

ongoing revision effort to the requirements of the new rule after providing notice to the public, if doing so would be feasible and appropriate for that effort.

For amendments, there would be a 3-year transition window during which amendments may be initiated and completed using the 2000 rule, including the 1982 procedures via the 2000 rule's transition provisions, or may conform to the new rule. After 3 years, all new plan amendments must conform to the new rule. This transition period for new amendments would give the responsible official the option to facilitate amendments for plans developed under previous rules for a limited time, using a familiar process, until full familiarity with the new rule develops.

Plan decisions will not be approved until the Agency has resolved any objections filed under subpart B. This delay of the effective date until after the objections are resolved should adequately avoid disruptions. Many legal challenges to plans go on for years, however, and it would not be workable to wait to implement a plan until after all legal challenges are resolved.

*Comment: Climate change requirements for 1982 revisions.* A respondent felt the rule's transition provisions should require forests currently planning revisions under the 1982 planning rule to consider climate change impacts and actions to address climate change and to reduce stressors to provide for greater habitat resiliency.

*Response:* The Department decided not to include this requirement in the transition provisions of the final rule. However, all NFS units are working to implement the climate change roadmap released in 2009, and are using the climate change scorecard, which requires consideration of climate change impacts, vulnerability, and adaptability, as well as monitoring and other requirements. The Department decided that the Roadmap and Scorecard implementation is the most appropriate method for working to address climate change in plan revisions currently being conducted under the 1982 rule.

*Comment: Conflicts between rules.* A respondent felt the proposed rule's transition section is confusing because there will be situations where the old rule can be in conflict with the new rule and the final rule should therefore include guidance to handle those conflicting situations. Another respondent also felt the entire section needs more clarity.

*Response:* The transition provision is important to provide a smooth change to the new rule, and is workable. Changes

were made as described above to improve clarity.

*Comment: Planning schedule for revisions.* A respondent felt the rule should establish some schedule by which overdue plans, or ones due within the next year or two, will be revised as currently 68 plans of 127 plans are past due for revision.

*Response:* The Agency does not have the resources to revise all 68 plans that need revision within the next few years. The Agency posts the Chief's schedule for plan revision online at *http://www.fs.fed.us/emc/nfma/index.htm.*

*Comment: Compliance with regulatory scheme.* A respondent felt the Forest Service should eliminate the proposed rule § 219.2(c) (none of the requirements of the final rule applies to projects) and § 219.17(c) (projects completed under existing forest plans need only be consistent with the plan and not the 1982 rule). They believe the provisions are inconsistent with case law. They cite several judicial decisions. Another respondent felt § 219.17(c) of the proposed rule allows plans to be revised free of any obligation to demonstrate compliance with the regulatory scheme under which it was developed.

*Response:* The Ninth Circuit and Tenth Circuits Court of Appeals have confirmed the Agency's position that the 1982 rule was superseded by the 2000 Rule, and no longer applies. See, *Land Council* v. *McNair,* 537 F. 3d 981, 989 n. 5 (9th Cir. 2008); *Forest Guardians* v. *U.S. Forest Service,* 641 F. 3d. 423 (10th Cir. 2011). This provision is needed for clarity so that all NFS units understand they are subject to the new planning rule for plan development, plan amendment, and plan revision, but otherwise are governed by the plan provisions of their current plans. Responsible officials, who continue plan development, revisions or amendments initiated prior to the effective date of the final rule using the procedures of the 1982 rule, must comply with the 1982 rule procedures in developing those plans, plan revisions or amendments. Plan amendments initiated after the effective date of this rule, may for three years follow the 1982 rule procedures or the requirements of this rule for amendments.

*Comment: Delay of project-specific plan amendments.* Some respondents felt the rule should require a 30-day delay for the effective date of all project-specific plan amendments, as plan amendments are significant actions and no amendment may apply only to a single concurrent project.

**21244** **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

*Response:* Not all plan amendments are significant actions. The final rule does not require a 30 day-delay for project-specific plan amendments, and provides for site-specific project amendments, in keeping with the Department's intent that the amendment process be efficient and used more frequently.

Section 219.18—Severability

If any part of this final rule is held invalid by a court, this section provides that the invalid part would be severed from the other parts of the rule, which would remain valid.

Section 219.18—Response to Comments

This section explains that it is the Department's intent that the individual provisions of the final rule be severable from each other. The Department retains the 2011 proposed rule wording in the final rule.

*Comment: Invalidation of entire rule.* A respondent felt if any part of the proposed rule is judged invalid by a court the rule should state the entire rule is invalid.

*Response:* The Department retained the provision in the final rule, because rulemaking is an extensive Departmental and public undertaking, and the entire rule should not be dismissed if a court finds only a portion of the rule is inappropriate.

Section 219.19—Definitions

This section sets out and defines the special terms used in the final subpart A. Changes to this section were made in response to public comments.

The Department added definitions for: best management practices, candidate species, conserve, disturbance regime, ecological integrity, inherent capability of the plan area, integrated resource management, maintain, management system, native species, persistence, proposed species, recreation opportunity, restore, recovery, riparian management zone, scenic character, and stressors for clarity and to define new terms.

The Department removed definitions for: Health(y), landscape character, potential wilderness areas, and resilience, because the terms are not used in the final rule. The Department moved a modified definition of species of conservation concern from § 219.19 to § 219.9. The Department removed the definition of system drivers, because the term is defined in the rule in § 219.6 as disturbance regimes, dominant ecological processes, and stressors—including wildland fire, invasive species, and climate change.

The Department modified the definitions for: assessment, collaboration, connectivity, conservation, designated areas, ecological conditions, ecosystem, focal species, landscape, multiple use, recreation setting, restoration, riparian areas, sole source aquifer, sustainability, and sustainable recreation to improve clarity.

The Department modified the definition of "ecosystem" to further explain and describe the key characteristics related to ecosystem composition, structure, function, and connectivity so the relationship between monitoring questions and indicators are clearly related to the ecological conditions of §§ 219.8 and 219.9.

Section 219.19—Response to Comments

*Comment: Definitions for various terms.* Some respondents felt more detailed definitions or explanations about specific terms should be included in the rule, including: access, aesthetic value, air quality, capability, clerical error, concurrence, coordination, cultural images, cultural sustenance, decision document, documented need, ecological integrity, educational, evaluation, extent practicable, feedbacks, fiscal capability of the unit, grasslands, identify, Indian, interested parties, irreversible damage, landscape character, no reasonable assurance, opportunity, partners, reasonably foreseeable budgets, renewable energy projects, renewable resources, scenic attractiveness, scenic integrity, small-scale reasonably foreseeable risks, spatial mosaic, spiritual, substantial and permanent impairment, sustainable management of infrastructure, transportation and utility corridors, valid existing rights, and watershed conditions.

*Response:* Some of the requested definitions were included in the final rule, where including a definition provides additional meaning or clarity, or where the term is uncommon terms or used with a specific meaning. Other requested definitions were not included, either because the term was not included in the final rule, or the Department used the terms in their ordinary meaning.

*Comment: Requests for inclusion of definitions.* Some respondents felt additional definitions should be included in the rule, including: airstrip, alternate disputes resolution methods, animal welfare, appropriately interpreted and applied, biodiversity, biological integration, completeness or wholeness, cost effectiveness, cost efficiency, default width, ecological unit, ecologically sustainable, economic

efficiency, efficiency, environmental justice, healthy and resilient ecosystem, incidental recreation, Indian land, internal trailheads, materially altered, measureable progress, national historic trails, net public benefits, non-Tribal indigenous entity, primitive road, reasonable basis, recreational values, roadless area, scenic landscape character, science-based understanding, silviculture, soundscape, substantive way, sustainable multiple uses, and timely manner.

*Response:* The final rule either does not use the term; therefore, a definition is not provided or the final rule uses the commonly understood meaning, making definition unnecessary.

*Comment: Definition of assessment.* A respondent felt the definition of assessment should be revised to allow for the development of new information if and when it is necessary for a successful assessment.

*Response:* The Department has modified the definition to be clear that an assessment is to focus on and rapidly evaluate existing information to provide an informed basis and context for initiating a change to a plan or plan development. The need for new information may be identified in the assessment report, but development of new information is not required or intended during the assessment process.

*Comment: Definition of collaboration processes.* A respondent felt the Agency should define collaborative process. A respondent requested the Agency add the concept of feedback to collaboration definition.

*Response:* The proposed rule defined collaboration; the final rule defines both collaboration and collaborative process using the proposed rule's definition of collaboration. The definition is unchanged except that the last sentence of the proposed rule's definition was moved to § 219.4. The concept of feedback is indirectly included in the proposed rule definition. The concept of feedback is an important part of why the Department supports an adaptive framework that provides meaningful opportunities for public participation early and throughout the process. The moved sentence clarifies that under collaboration the Forest Service retains decisionmaking authority and responsibility for all decisions throughout the process.

*Comment: Definitions for congressionally designated areas and administratively designated areas.* A respondent felt separating of congressionally designated and administratively designated areas through the definition would help in clarifying their differences, including a

definition for national scenic and historic trail. A comment was received on the preferred alternative, asking if the lists in the definition of designated areas were exhaustive.

*Response:* The Department clarified the definition of designated areas in the final rule. The definition encompasses both congressionally and administratively designated areas, and provides examples of areas that are designated by each process. National scenic trails are referenced as one of the examples of a designated area, but a separate definition was not added to the final rule. The final rule provides direction for wilderness and wild and scenic rivers in § 219.10(b) separately from other designated or recommended areas because their associated legislation contains specific requirements for the Secretary of Agriculture. The final rule in § 219.10(b)(vi) provides for appropriate management of other designated or recommended areas, which would include areas such as congressionally designated national historic trails. To respond to the comment on the preferred alternative, the Department clarified the definition of designated areas to explicitly show that the list of examples is not exhaustive by removing the word "include" and added the words: Examples of * * * designated areas are.

*Comment: Definition of connectivity.* Some respondents felt the definition should remove the word "separate" so that it includes connectivity both within and between national forests at multiple scales, reflecting the disparate needs of different species with different capacities for mobility. A respondent said the term is not appropriate because it might trigger counterproductive litigation.

*Response:* Connectivity is an important part of the concept of ecological integrity. The Department therefore retained the term in the final rule, and modified it in response to public comments. The Department modified the definition of connectivity, removing the words that would limit the concept to "separate national forest or grassland areas." The final rule definition is worded to apply to several scales and to identify the types of the biophysical aspects of ecological functions that the term encompasses.

*Comment: Definition of conservation.* Respondents felt the proposed rule definition fails to include elements of resource use and wise use, or should not include preservation or should not include management.

*Response:* The Department retains the definition of conservation because the

definition is consistent with the use of the term in the rule. However, the Department added species to the list of resources included in the definition so that conservation is defined as the protection, preservation, management, or restoration of natural environments, ecological communities, and species.

*Comment: Definition of disturbance.* A respondent felt the definition of disturbance should go beyond biological resources and extend to cultural, historic, recreational, and aesthetic resources as well.

*Response:* In the final rule, the concept of disturbance is limited to any disruption of an ecosystem, watershed, plant and animal community, or species population: therefore the Department retained the proposed rule definition. Such disturbance may result in impacts to cultural, historic, recreation, aesthetic, or other resources or uses.

*Comment: Definition of diversity.* A respondent felt the rule needs a definition of "diversity." One respondent requested a definition of biodiversity.

*Response:* When the term diversity is used alone in the rule, its meaning is the commonly understood use of the term and therefore no rule definition of the term is necessary. The final rule retains a definition of the term ecosystem diversity. The term biodiversity is not in the rule, and therefore no definition of that term is needed.

*Comment: Definition of ecosystem services.* Some respondents felt specific aspects of services should be included in the definition. Other respondents felt the proposed definition is too limiting to "direct human utility." A respondent felt the proposed rule definition mixes services with uses and resources, making the term "ecosystem services" confusing.

*Response:* The final rule retains the proposed definition, which focuses on the "benefits people obtain from ecosystems." The definition is consistent with the MUSYA mandate to "administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom" (16 U.S.C. 529), and allows for changing conditions and needs.

*Comment: Definition of focal species.* A respondent felt the definition of focal species is too narrow: it should not be limited to a small number because of fiscal capability.

*Response:* The Department changed the definition of focal species based on public comment to clarify the intended role of focal species in assessing the effectiveness of the plan in maintaining the diversity of plant and animal

communities in the plan area, as required in § 219.9. The Department retained the concept of a small number in the final rule because the responsible official has discretion to choose the small subset of focal species that he or she determines will be useful and reasonable in providing the information necessary to make informed management decisions. The Department does not expect a focal species to be selected for every element of ecological conditions.

*Comment: Definition of integrated resource management.* Several respondents felt the phrase "integrated resource management" needed to be defined.

*Response:* In the final rule the term has been defined as multiple-use management that recognizes the interdependence of ecological resources and is based on the need for integrated consideration of ecological, social, and economic factors. The approach of integrated resource management considers all relevant interdependent elements of sustainability as a whole, instead of as separate resources or uses. "Integrated resource management" is not the same as the "all-lands approach." "Integrated resource management" refers to the way in which the resources are to be considered, as a whole instead of by individual resource. The "all-lands approach" refers to the area of analysis for the planning phases, which can extend beyond the national forest and grassland boundary.

*Comment: Definition of landscape.* A respondent felt landscapes should not be defined as being irrespective of ownership.

*Response:* The Department recognizes and respects ownership boundaries. The definition applies to a perspective for assessment purposes for resources and influences that may extend beyond the NFS boundary. The Department retained the landscape term in the final rule because conditions and trends across the broader area may influence, or be influenced by projects or activities on NFS lands. Plan components would apply only the NFS lands, but the responsible official should be informed by an understanding of the broader landscape when developing plan components.

*Comment: Definition of local and indigenous knowledge.* Some respondents felt the rule should provide a definition for local and indigenous knowledge, and this knowledge should not be considered on the same level as scientifically- or historically-based information.

*Response:* Section 219.19 of the final rule retains the proposed rule's

definition for native knowledge. The final rule requires the use of the best available scientific information to inform decisions. The final rule strikes a balance for using science as an integral and foundational, but not the sole, influence on planning, allowing for other sources of information or input, including native knowledge, to be considered during the planning process.

*Comment: Definition of monitoring.* A respondent felt the definition of monitoring should be revised to capture the concept of measuring the response of resources to land management over time. Another respondent felt the definition should include the concepts of inventory, continuity, desired conditions, public participation, and open and transparent process.

*Response:* The final rule revised the proposed rule definition to remove the words "over time and space" to ensure that the definition is broad enough to incorporate the concept of measuring the response of resources to land management over time, or at a single instant, at a broad geographic scale, or at a specific location, depending on the objective for an individual monitoring question or indicator. The rule framework itself is based on the concept that the set of monitoring questions and indicators that make up the monitoring program will be used to inform adaptive management on the unit over time. The terms that the commenter wishes added to the definition are key concepts and terms in the rule, but adding them to the definition of monitoring is unnecessary.

*Comment: Multiple use definition.* Some respondents requested specific inclusions and exclusions from the definition of "multiple use." Other respondents requested more detailed definitions or explanations about specific terms associated with § 219.10 Multiple use, such as access, aesthetic value, small-scale renewable energy projects and transportation and utility corridors.

*Response:* The definition does not reference specific uses or services. The definition was established by Congress at 16 U.S.C. 531. The type of direction requested by the respondents is more appropriate as part of the specific requirements of the final rule, as part of plans, or as part of projects or activities carried out under the plans.

Other terms used in § 219.10 are defined where necessary; see the first response to comments in this section for additional discussion.

*Comment: Definition of participation.* A respondent felt that the definition of participation be defined as engagement in activities.

*Response:* The Department retained the proposed rule definition for participation because the Department cannot require engagement; but it can offer participation opportunities.

*Comment: Definition of productivity.* A respondent felt the current definition of "productivity" should be amended to include economic productivity.

*Response:* The Department's use of the term productivity in the rule does not include economic productivity; therefore, the proposed rule definition is retained in the final rule.

*Comment: Definition of restoration.* Several respondents felt the definition should not include the concept of going back to ecosystem conditions that once existed, especially under changing climatic conditions. Still others felt that the definition should be clearer and more in line with definitions found in the scientific literature.

*Response:* The final planning rule adopts the definition advanced by the Society for Ecological Restoration International, but retains from the proposed rule (with minor word changes) the additional explanation that ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions. Chapter 3 of the Final PEIS discusses the relevance of evaluating the range of natural variation in the "Historical Range of Variability (HRV) as a Way of Understanding the Historical Nature of Ecosystems and Their Variation" under the "Dynamic Nature of Ecosystems" portion of the Affected Environment discussion.

*Comment: Definition of riparian area vs. riparian management zones.* Some respondents felt the use of the terms "riparian areas" and "riparian management zones" between the preamble and the proposed rule were inconsistent. Some felt the proposed definition of riparian areas was outdated and did not reflect current science and understanding of riparian areas function and management.

*Response:* The final rule rewords the proposed rule's definition for "riparian areas" and adds a definition for "riparian management zone." Riparian areas are ecologically defined areas of transition between terrestrial and aquatic systems and have unique characteristics, values, and functions within the landscape. Riparian management zones are portions of watersheds areas where riparian-dependent resources receive primary emphasis. "Riparian areas" are defined

in physical and biological terms; riparian management zones are defined in administrative terms. A riparian area and a riparian management zone would overlap, but one may be wider or narrower than the other.

*Comment: Definition of risk.* A respondent felt the definition of "risk" should refer to "probability" and "magnitude."

*Response:* The Department retains the definition of the proposed rule for risk because "probability and magnitude" are equivalent to "likelihood and severity" in the proposed rule definition, which is "a combination of the likelihood that a negative outcome will occur and the severity of the subsequent negative consequences."

*Comment: Definition of social science.* A respondent felt the final rule should define social science.

*Response:* The term "social science" was not in the proposed rule and is not in the final rule, and therefore need not be defined. The final rule includes reference to social sustainability in the definition for sustainability.

*Comment: Definition of stressor.* A respondent felt the Agency should define the term stressor.

*Response:* The Department defines the term stressor in the final rule as a factor that may directly or indirectly degrade or impair ecosystem composition, structure, or ecological process in a manner that may impair its ecological integrity, such as invasive species, loss of connectivity, or the disruption of a natural disturbance regime.

*Comment: Definition of sustainable recreation.* A respondent felt the term was defined vaguely and should be deleted from the rule. A respondent felt ecosystem services and sustainable recreation are equivalent concepts but defined differently so that it is confusing. A respondent felt the definition should include the predictability of opportunities, programs, and facilities over time. A respondent said the definition should include ecologically sustainable, economically sustainable, fiscally sustainable, socially sustainable, and be focused on outcomes. A respondent objected to the inclusion of the undefined term "social sustainability" in the definition of sustainable recreation, because social sustainability might be an opportunity to remove hunting and fishing from the NFS.

*Response:* The Department decided to keep the term but modify the definition for clarity. The definition in the rule is: "the set of recreation settings and opportunities on the National Forest System that is ecologically, economically, and socially sustainable

Rvsd Plan - 00001290

for present and future generations." In addition, the Department defined the terms economic sustainability and social sustainability as part of the definition of sustainability. The socially sustainable part of sustainable recreation (when considered within the boundaries of the NFS, which is how we have now defined it) deals largely with addressing conflicts between uses.

The Department's use of the term socially sustainable is intended to give the opposite direction as the respondent's concern, leading to support for hunting and fishing opportunities because hunting and fishing are important to sustain traditions and connect people to the land and to one another.

*Comment: Definition of viable population.* Some respondents felt the rule should replace "sufficient distribution to be resilient and adaptable" in the proposed definition and incorporate the phrase "well-distributed in habitats throughout the plan area" and "high likelihood" over a specified time period (50 years) into the definition of viable population.

*Response:* See the response to comments to section 219.9 for a discussion of the term well-distributed.

The final planning rule does not specifically incorporate "high likelihood" or a specified time period into the definition of viable population because it is difficult to interpret and measure consistently and because estimating the probabilities of maintaining a viable population of a particular species of conservation concern over a certain period time will vary from species to species and from unit to unit, depending on existing conditions and potential existing and future threats and stressors, especially those related to climate change, that may affect species differently on different NFS units.

Subpart B—Pre-Decisional Administrative Review Process

Introduction to This Subpart

Subpart B sets forth the requirements for the objection process in this final rule.

Prior to the 2000 rule, the administrative review process for plan decisions provided an opportunity for a post-decisional appeal. With this process, a plan was generally put into effect before the appeal was resolved. This scenario has often been problematic because when reviewing appeals, if a reviewing officer finds fault with a plan already in effect, the remedy can be costly to both the Forest Service and the public in terms of time and

money. Such a situation can also damage public trust in the planning process. Interim direction is often put into place while the responsible official prepares further analysis and other appropriate corrections.

After receiving initial public input, reviewing public comments, and taking into account agency history and experience regarding pre- or post-decision administrative appeal processes, the Department decided to include a pre-decisional administrative review process, called an objection process, in the final rule. An objection prompts an independent administrative review by an official at a level above the deciding official and a process for resolution of issues. This process allows interested individuals to voice objections and point out potential errors or violations of law, regulations, or agency policy prior to approval and implementation of a decision. The Forest Service has successfully used a similar process since 2004 for administrative review of hazardous fuel reduction projects developed pursuant to the Healthy Forests Restoration Act.

Section 219.50—Purpose and Scope

This section states that the purpose of the subpart is to establish a process for pre-decisional administrative review of plans, plan amendments, and plan revisions.

Section 219.50—Response to Comments

This subpart describes a pre-decisional administrative review (objection) process for plans, plan amendments, or plan revisions. The Department retains the 2011 proposed rule wording in the final rule of § 219.50. To respond to comments on the preferred alternative, the Department changed the wording in § 219.50 and throughout subpart B to clarify that the parties that may object include States and Tribes as well as organizations and individuals. The preferred alternative and the proposed rule used the terms "individual" and "organization" for those who may file an objection. States and Tribes are not organizations; therefore, the Department changed the term "organization" to "entity" in sections 219.50, 219.53, 219.55 and 219.61. These modifications to subpart B are clarifications, not changes in requirements,

*Comment: Objection process over appeals process.* Some respondents expressed support for the objection process while some respondents want the objection process removed and replaced with the appeals process, or want to see both processes used.

*Response:* The Department's choice of this approach is based on two primary considerations. First, a pre-decisional objection is more consistent with the collaborative nature of this final rule and encourages interested parties to bring specific concerns forward earlier in the planning process, allowing the Forest Service a chance to consider and respond to potential problems in a plan or decision before it is approved and implemented. Second, pre-decisional objections lead to a more timely and efficient planning process, reducing waste of taxpayer and agency time and dollars spent implementing projects under plans subsequently found to be flawed.

With a pre-decisional objection process, the responsible official, the reviewing official, interested parties, and the objector have the opportunity to seek reasonable solutions to conflicting views of plan components before a responsible official approves a plan, plan amendment, or plan revision. This approach fits well with a collaborative approach to planning, and encourages resolution before a plan, plan amendment, or plan revision is approved.

The Department believes that having both a pre-decisional objection process and a post decision appeals process would be redundant and inefficient.

Section 219.51—Plans, Plan Amendments, or Plan Revisions Not Subject To Objection

This section identifies those plans, plan amendments, or plan revisions that would not be subject to the pre-decisional objection process under the final rule.

Section 219.51—Response to Comments

The Department retains the 2011 proposed rule wording in the final rule except to change the term formal comments to substantive formal comments. This change was made throughout this subpart.

*Comment: Secretary decisions subject to administrative review.* Some respondents felt decisions made by the Secretary or the Under Secretary for Natural Resources and Environment affecting the Forest Service should be subject to administrative review.

*Response:* Land management plan decisions made by the Secretary or Under Secretary for Natural Resources and Environment have never been subject to appeal or objection. The Department chooses not to change this approach. The Agency anticipates that approvals of plans, plan amendments, or plan revisions by the Secretary or

Under Secretary will continue to be rare occurrences.

## Section 219.52—Giving Notice of a Plan, Plan Amendment, or Plan Revision Subject To Objection Before Approval

Section 219.52 provides additional information for providing the public notice, required by § 219.16 subpart A, that would begin the objection filing period. This notice serves three particular purposes: (1) To notify parties eligible to file objections that the objection filing period is commencing; (2) to notify parties eligible to file objections and others of the availability of planning documents and how to obtain those documents; and, (3) to establish a publicly and legally verifiable start date for the objection filing period.

Section 219.52 would require the Forest Service to make a special effort to ensure the public understands how the objection process in this subpart would be used for each plan, plan amendment, and plan revision. Specifically, the responsible official would be required to disclose the objection procedures by stating that this process will be used during scoping under the NEPA process and in the appropriate NEPA documents. Early disclosure will help ensure that those parties who may want to file objections are aware of the necessary steps to be eligible.

The final rule also requires the responsible official to make the public notice for beginning the objection filing period available to those who have requested the environmental documents or who are eligible to file an objection. This requirement is intended to ensure that the necessary information reaches those who have specifically requested it and those who could have a particular interest in the start of the objection filing period by virtue of their eligibility to file an objection.

Paragraph (c) outlines the format and content of the public notice to ensure potential objectors have necessary procedural information, can find underlying documents, and understand the process, timing, and requirements for filing an objection.

## Section 219.52—Response to Comments

Changes were made to wording in this section to be consistent with changes made in response to public comments on other sections in this subpart, including changing the term "formal comments" to "substantive formal comments" and the objection periods from 30 days in the proposed rule to 45 days, or 60 days if an EIS was prepared.

The Department added a sentence to paragraph (a) of this section to allow the responsible official to choose to use the objection process for a plan, plan amendment, or plan revision initiated before the effective date of the rule even when the scoping notice had not indicated that an objection process would be used. To ensure meaningful notice is given, however, the notice that the objection process will be used must be given prior to an opportunity to provide substantive formal comment on a proposed plan, plan amendment, or revision and associated environmental analysis.

A requirement to make the documents identified in paragraph (c)(1) of this section available online at the time of public notice was added for clarity, to reflect the Department's intent.

*Comment: Notice of a plan, plan amendment, or plan revision subject to objection.* Some respondents felt "making available" the public notice for the beginning of the objection period for a plan, plan amendment, or plan revision was not adequate notification.

*Response:* Section 219.16(a)(3) of subpart A requires formal notification of the beginning of the objection period by posting the information online, and via the **Federal Register** and/or the newspaper of record as set forth in § 219.16(c). The term "making available" is used in this section to allow the responsible official the flexibility to use other tools at his or her disposal for notification, for example, sending an email to a list of interested parties or issuing a news release, in addition to the formal notifications identified in § 219.16.

*Comment: Specific date for the start of the objection process.* Some respondents felt there is a need for a specific publication date for the beginning of the objection period.

*Response:* The Department believes the matter is best addressed by having the objection filing deadline begin the day after publication of the public notice as outlined in § 219.56(b)(2). Although the Agency can request newspapers publish notices on a certain date, a publication date is not guaranteed. When publication occurs on a different date than estimated, the result could lead to confusion. By not publishing a (potentially different) starting date, the Department believes the potential for confusion is reduced or eliminated and leaves all parties with the same information.

*Comment: Need to guess and predict decision.* Some respondents said the objection process forces the public to guess and predict what the actual decision will be.

*Response* A draft plan decision document is one of the items § 219.52 (c) requires to be made available to the public when public notice of the beginning of the objection process is given. If no objections are filed, the draft, once signed would become the decision. If an objection is filed, there may be changes made for the final decision. The objection process allows objectors and interested parties to meet with the reviewing officer to try to resolve issues raised in an objection before a final plan decision. This process is more efficient and more consistent with the participatory approach used in the final rule.

## Section 219.53—Who May File an Objection

This section of the rule identifies eligibility requirements for filing an objection under this subpart. This section is written in the context of § 219.4 in subpart A, which expresses the Agency's intent to involve the public early and throughout the planning process in keeping with the collaborative nature of this final rule.

## Section 219.53—Response to Comments

Except for minor corrections of editorial errors, the Department retains the proposed rule wording. The Department changed the term "formal comments" to "substantive formal comments." In the proposed rule, we used both terms; in the final rule, we used the term "substantive formal comments" consistently throughout. The Department clarified in paragraph (a) that objections must be based on previously submitted substantive formal comments "attributed to the objector" to be consistent with § 219.54(c)(7). As discussed in response to comments for § 219.50, the Department changed the term "organizations" to "entities" in this section. These changes are not changes in requirements, but are clarifications.

*Comment: Substantive formal comment.* Some respondents requested the rule define "substantive formal comment."

*Response:* The proposed rule included a definition for "formal comments." The final rule includes instead a definition of "substantive formal comments," the term used throughout this subpart in the final rule, at § 219.62 of the final rule, in response to this comment. The definition is consistent with the definition used in Agency appeal regulations 36 CFR part 215 for "substantive comment."

*Comment: Who may file an objection?* Some respondents felt limiting the opportunity for filing an objection to

those who have participated in providing substantive formal comments was the correct approach. Other respondents felt anyone should be able to file an objection.

*Response:* The rule requires the responsible official to engage the public early and throughout the planning process in an open and transparent way, providing opportunities for meaningful public participation to inform all stages of planning. The requirement for limiting the opportunity for filing an objection to those who have provided substantive formal comments during at least one public participation opportunity is intended to encourage public engagement throughout the planning process and help ensure that the Agency has the opportunity to hear and respond to potential problems as early as possible in the process. Without this requirement some substantive problems might not be identified until the end of the planning process.

This requirement will increase the efficiency of the planning process and the effectiveness of plans by encouraging early and meaningful public participation. Engaging the public early and often results in better identification of issues and concerns and allows the Agency to respond earlier in the process and in a way that is transparent to all members of the public.

*Comment: Substantive comment submittal requirement.* Some respondents felt the proposed rule requirement for participation by a formal comment submittal in order to file an objection is an undue burden on the public because organizations and individuals with limited resources cannot be expected to participate in all public involvement opportunities. Others felt it places an unreasonable limitation on the ability of citizens to participate in the objection process. Still others disagree with the basic concept of not submitting formal comments equates to not having an opportunity to object.

*Response:* Because the final rule requires significant investment in providing opportunities for public participation, the Department believes it is important to honor that process and ensure that issues arise as early in the process as possible, when then can best be addressed. The Department does not believe it is too high a burden for a potential objector to first engage in and provide formal substantive comments during at least one of the numerous opportunities for public participation during the planning process for a plan, plan amendment, or plan revision. Subpart B does not require participation

in every one of those opportunities. This requirement should assist in the timely involvement of the public. The objection process is expected to resolve many potential conflicts by encouraging resolution before a plan, plan amendment, or plan revision is approved.

*Comment: Objection eligibility.* Some respondents felt the objection process forces the public to submit comments on everything in order to preserve their right to object based on submitted comments. A number of respondents stated objections should be permitted on issues raised by any party at any time.

*Response:* The planning process is intended to engage interested individuals and entities in an ongoing dialogue in which all substantive issues and concerns are identified. The Department decided to retain the requirements in this section to make sure that issues are identified as early as possible, by the parties interested in those issues. At the same time, this subpart recognizes that there may be issues that arise after the opportunities for public comment, and allows parties who have participated earlier to object on those issues.

*Comment: Objections by other Federal agencies and Federal employees.* A respondent stated that objections from other Federal agencies should be allowed. Another respondent stated that a Federal employee should be allowed to file an objection and should be allowed to include and discuss non-public information in their objection.

*Response:* The objection process is an administrative review opportunity for individuals and entities, other than Federal agencies. Federal agencies have other avenues for working together to resolve concerns, including consultations required by various environmental protection laws. It is expected that Federal agencies will work cooperatively during the planning process.

Federal employees who meet eligibility requirements of § 219.53(a) and choose to file an objection may do so, but not in an official capacity. They must not be on official duty or use Government property or equipment in the preparation or filing of an objection, nor may they include information only available to them in their official capacity as Federal employees.

Section 219.54—Filing an Objection

This section of the final rule sets out how to file an objection, and the minimum content that must be included.

Section 219.54—Response to Comments

Minor changes were made to this section in response to public comment. Paragraph (a) was changed to clarify that all objections must be submitted to the reviewing officer for the plan. The Department added "other published Forest Service documents" to (b)(2) of this section to indicate that, along with Forest Service Directives System documents and land management plans, published Forest Service documents may be referenced rather than included in an objection. The Department also clarified in Paragraph (b) that any documents not listed in (b)(1)–(4) that are referenced in an objection must be included with the objection or a web link must be provided. These minor changes and clarifications reflect public comments.

*Comment: Proposed prohibition on incorporation by reference.* Some respondents felt the proposed prohibition on incorporation by reference is unduly burdensome. Some felt the wording on what references are required to be included in an objection were unclear.

*Response:* Section 219.54(b) of the final rule retains the proposed rule wording. The Department believes the requirements are clear, and will help the reviewing officer understand the objection and review it in a timely way. The documents that can be included by reference include: Federal laws and regulations, Forest Service Directives System documents, land management plans, and other published documents, documents referenced by the Forest Service in the planning documentation related to the proposal subject to objection, and formal comments previously provided to the Forest Service by the objector during a proposed plan, plan amendment, or plan revision comment period. The final rule was modified to allow for published Forest Service documents to be included by reference as well. All documents not identified in the list in § 219.54(b), or Web links to those documents, must be included with the objection, if referenced in the objection.

*Comment: Internet submission of objections.* Some respondents felt the rule should allow filing of objections via Internet communication.

*Response:* An email submittal to the appropriate email address is an acceptable form of filing an objection.

*Comment: Remedy inclusion requirement.* Some respondents felt requiring inclusion of a potential remedy presents an obstacle for participation in the objection process.

Rvsd Plan - 00001293

**21250**   **Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations

*Response:* The objection process sets the stage for meaningful dialogue on how a proposed plan, plan amendment, or plan revision could be improved. The objection, including suggesting about how the proposed plan may be improved, can be concise, but should provide a basis for dialogue to resolve concerns. The reviewing officer should be able to use the objection to engage with the objector and other interested parties during the objection period to determine an appropriate course of action.

Section 219.55—Objections Set Aside From Review

This section describes the various circumstances that would require a reviewing officer to set aside an objection from review and the notification requirements related to setting an objection aside.

Section 219.55—Response to Comments

The Department made minor changes for clarity and consistency. Comments on this section were answered in response to comments regarding § 219.53. As discussed in response to comments for § 219.50, the Department changed the term "organization" to "entity" in this section.

Section 219.56—Objection Time Periods and Process

This section details the time in which objections can be filed, how time periods are calculated, the evidence required to demonstrate a timely filing, the role and responsibilities of the reviewing officer, publication of notifications, and the reviewing officer's response requirements.

Section 219.56—Response to Comments

Two changes were made to this section. The Department lengthened the amount of time from 30 days to 60 days to file an objection if an EIS has been prepared and the Department lengthened the time from 30 to 45 days if an EIS is not prepared. This change in procedural requirements was made to give more time to the public in response to public comment on the proposed rule. Changes to other sections in this subpart were made to be consistent with this change.

In addition, in paragraph (e) of this section, the Department added the requirement that for an objection or part of an objection related to the selection of species of conservation concern, the reviewing officer may not be the regional forester who identified those species, but must be a different line officer. The Chief may be the reviewing officer or may delegate the reviewing

officer authority and responsibility to a line officer at the same administrative level as the regional forester. In addition, the Department added a requirement for the reviewing officer for the plan to convey any such objections to the appropriate line officer. These changes in requirements are needed because of the change in § 219.9(c) subpart A requiring that the regional forester, rather than the responsible official for the plan, identify the species of conservation concern.

*Comment: Thirty-day comment period.* Some respondents felt the 30-day time limit for filing an objection is too short.

*Response:* Section 219.56 was changed to modify the objection filing period to 60 days for a new plan, plan revision, or a plan amendment for which an EIS is prepared, and 45 days for amendments for which an EIS is not prepared in response to this comment.

*Comment: Interested person's timeframe.* Some respondents felt the proposed interested person's timeframe of 10 days is insufficient and would limit interested parties ability to fully participate in the objection process.

*Response:* The final rule retains the 10-day requirement. Persons who have been participating throughout the process should already be familiar with those issues, and should be able to file a request to participate within this timeframe. Granting a longer timeframe for filing a request to participate in an objection would affect the reviewing officer's ability to schedule meetings in a timely manner to discuss issues raised in the objection with the objector and interested parties, thereby delaying resolution of an objection and impacting the reviewing officer's ability to respond to all objections within the timeframe provided by § 219.57.

Section 219.57—Resolution of Objections

This section explains the Department's requirements for the process and responsibilities related to the resolution of objectives. The intent of this process is to have a meaningful dialogue with objectors and interested parties in order to resolve as many concerns as possible prior to approval of a plan, plan amendment, or plan revision.

Section 219.57—Response to Comments

The Department retains the proposed rule wording in the final rule.

*Comment:* Some respondents felt that not requiring a point by point written response to objections is contrary to the objective of resolving issues before decisions are made.

*Response:* It is the intent of the Agency that all issues raised through objection will be responded to, although the responses may not necessarily address each issue individually. Consolidating objection issues and answering with a single response may be appropriate for objection issues of a similar or related nature. Consolidated responses allow similar issues to be examined and responded to consistently and efficiently.

Section 219.58—Timing of a Plan, Plan Amendment, or Plan Revision Decision

This section describes when a responsible official could approve a plan, plan amendment, or plan revision.

Section 219.58—Response to Comments

Other than a minor correction to paragraph (c) to change "30-day time period" to "allotted filing period" to be consistent with the option of either the 60-day or 45-day time period for filing of an objection under § 219.56, the Department retains the proposed rule wording in the final rule.

*Comment:* A respondent felt that the 5-day business period following the objection period should be increased to 10 days.

*Response:* The Department determined that 5 business days are an adequate time period for an objection that was timely filed to be received by the reviewing officer, under any delivery option.

Section 219.59—Use of Other Administrative Review Processes

This section would allow for the use of other administrative review processes in lieu of the objection process in certain circumstances when the Forest Service is participating in a multi-Federal agency planning process or when a plan amendment is approved in a decision document approving a project or activity.

Section 219.59—Response to Comments

The proposed rule authorized the reviewing officer to choose whether to adopt the administrative review procedure of another Federal agency. The final rule instead gives the responsible official this authority, to better reflect the Department's intent, and consistent with the requirement for the responsible official to notify the public early in the planning process that a review process other than the objection process of this subpart would be used.

*Comment: Public burden.* Some respondents expressed concern about the unreasonable and unfair burden placed on the public for site-specific

plan amendments by having to respond to two processes, the NEPA appeal of project level activity and the planning NFMA objection process for planning decision.

*Response:* The Department recognizes there may be limited circumstances when a plan amendment decision applicable to a project and all future projects in the plan area is made at the same time as that project or activity decision. In such circumstances, the objection process applies to the plan amendment decision, and the review process of 36 CFR part 215 or 218 would apply to the project or activity decision (§ 219.59(b)). In these circumstances, while the NEPA analysis for amendment and project may be combined, the responsible official is making two separate decisions: A project or activity decision and a plan amendment that applies to all future projects or activities. Each action, project, and amendment, should be reviewed under its appropriate review procedures. A person or entity may seek review of either or both, depending upon the person's or entity's concerns.

The Department requires the public be notified during the NEPA process that the objection process will be used (unless the option provided by paragraph (a) of this section to use another process is available and chosen). The Agency's NEPA requirements serve to assure ample opportunities for notification of the public of the use of the objection process as well as the beginning of the objection process.

Section 219.60—Secretary's Authority

This section clarifies that nothing in this subpart restricts the statutory authority of the Secretary of Agriculture regarding the protection, management, or administration of NFS lands.

Section 219.60—Response to Comments

The section of the final rule is unchanged from the proposed rule. No comments were submitted by the public on this section.

Section 219.61—Information Collection Requirements

This section explains that this subpart's requirements regarding information that an objector must provide are "information collection requirements" as defined by 5 CFR part 1320 and that these requirements have been approved by the Office of Management and Budget.

Section 219.61—Response to Comments

This section of the final rule is unchanged from the proposed rule. No comments were submitted by the public on this section.

Section 219.62—Definitions

This section defines some of the terms and phrases used in subpart B of the proposed rule.

Section 219.62—Response to Comments

The Department has made a few minor changes throughout this section.

The final rule dropped the definition of "formal comments" and added a definition of "substantive formal comments." This definition includes the definition of the proposed rule's term, "formal comments," and added wording to clarify when comments are considered substantive. The final rule also modified the definition of "objection period" by replacing the proposed rule's "30 calendar day period" with "allotted filing period." As discussed in response to comments for § 219.50, the Department changed the term "organization" to "entity" in this section.

*Comment: Substantive formal comment:* Some respondents requested the rule define "substantive formal comment."

*Response:* In response to this comment, and because the term "substantive formal comment" is now used consistently throughout this subpart, the final rule defines "substantive formal comments." The definition is consistent with the definition used in Agency appeal regulations 36 CFR 215 for "substantive comment."

**Regulatory Certifications**

*Regulatory Planning and Review*

The Agency reviewed this final rule under U.S. Department of Agriculture (Department) procedures and Executive Order (E.O.) 13563 issued January 18, 2011, and E.O. 12866 issued September 30, 1993. Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The final rule will not have an annual effect of $100 million or more on the economy or adversely affect productivity, competition, jobs, the environment, public health or safety, or State or local governments. This final rule will not interfere with an action taken or planned by another Agency. Finally, this final rule will not alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients of such programs. However, because of the extensive interest in National Forest System (NFS) planning and decisionmaking, this rule has been designated a significant regulatory action, although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

A cost benefit analysis, including the regulatory impact analysis requirements associated with Executive Orders 13563 and 12866 and OMB circulars, has been developed. The analysis evaluates the costs and benefits of implementing the final rule to the baseline, which assumes planning pursuant to the 1982 rule procedures, as allowed by the transition provisions of the 2000 planning rule (36 CFR 219.35(b), 74 FR 67073 (December 18, 2009)). This analysis is posted on the World Wide Web at: *http://www.fs.usda/planningrule,* along with other documents associated with this final rule.

The scope of this analysis is limited to programmatic or agency procedural activities related to plan development, plan revision, and plan amendment of land management plans for management units (for example, national forests, grasslands, prairies) within the NFS. No costs or benefits associated with on-the-ground projects or activities are characterized or projected. Potential procedural effects evaluated in the analysis include potential changes in agency costs for planning and changes in overall planning efficiency. In this analysis, costs refer to planning costs to the Agency. Benefits refer to the benefits of the alternatives in terms of planning efficiency and capacity for land management plans to maintain long-term health and productivity of the land for the benefits of human communities and natural resources. This analysis identifies and compares the costs and benefits associated with developing, maintaining, revising, and amending NFS land management plans under six alternatives: Alternative A the proposed NFS planning rule (proposed rule); Modified Alternative A modification of the proposed rule (final rule); Alternative B the implementation of 1982 rule procedures under the 2000 rule (No Action); Alternative C the minimum to meet the National Forest

Management Act (NFMA) and purpose and need; Alternative D a modified version of the proposed rule with an alternative approach to species diversity and an emphasis on watershed health; Alternative E a modified version of the proposed rule with emphasis on monitoring performance and collaboration. Alternative B is the no action alternative and therefore the baseline for this analysis.

The final rule includes the same concepts and underlying principles as the proposed rule. However, there are a number of changes to the rule text and to the document structure. The changes are based on public comment received during the comment period on the DEIS and the proposed rule (Alternative A).

The cost and benefits of the final rule are evaluated within the context of a planning framework consisting of the three-part learning and planning cycle: Assessment, development/revision/amendment, and monitoring. The cost-benefit analysis focuses on key activities related to this three-part planning cycle for which agency costs can be estimated with the 1982 rule procedures as a baseline. Differences in costs across alternatives are estimated when possible, but benefits are discussed qualitatively as potential changes in procedural or programmatic efficiency. The key activities for which costs were analyzed include: (1) Assessments (for example, identification and evaluation of existing information relevant to the plan area to establish a basis of information and the landscape-scale context for management prior to changing the plan); (2) public participation (for example, collaboration and public participation activities not including those required by the NFMA and NEPA); (3) development and analysis of plan revision and amendment decisions (developing of alternatives to address the need to change the plan, analyzing and comparing the effects of alternatives, notification and comment solicitation requirements under NEPA, and finalizing and documenting plan revision and plan amendment decisions); (4) science support (activities for assuring identification and use of the best available scientific information); (5) resolution of issues regarding plan revisions or plan amendments through the administrative processes of appeals or objections; (6) monitoring (limited to those monitoring activities that support planning); and (7) minimum plan maintenance (minimum expenses to maintain a plan during non-revision years, excluding assessment, collaboration, and analysis/decision

costs associated specifically with plan amendments).

Primary sources of data used to estimate agency costs include recent cost-benefit analyses, business evaluations, and budget justifications for planning rules issued between 2000 and 2008 and recent historical data (1996–2009) regarding regional and unit-level budget allocations and paid expenditures for planning and monitoring activities related to planning. The 1982 rule procedures are considered the baseline for this analysis. Until a new planning rule is in place, the 1982 rule procedures are being used, as permitted by the transition provision of the 2000 rule, to develop, revise, and amend all plans. Agency costs are initially estimated for the 1982 rule procedures and then used as a baseline from which adjustments are made, based on explicit differences in planning procedures, to estimate the incremental impact of the final rule. However, it should be noted that cost projections of the final rule are speculative because there are challenges anticipating the process costs of revising and amending plans at this programmatic level of analysis. Annual costs are estimated separately for years during which units (with regional support) are engaged in plan revision and the years units are engaged in plan maintenance/amendment. The estimated costs are then aggregated to estimate total planning costs. Based on past studies and analyses of plan revisions under the 1982 rule procedures, the agency determines that plan revisions under the 1982 rule procedures will take approximately 5 years. These studies and analyses indicate that plan revisions for some units may take 7 years or longer. For estimation of average agency costs for planning over a 15-year planning cycle, it is assumed that management units will be engaged in plan revision for 3 to 4 years under the final rule and 5 years under the 1982 rule procedures, assuming annual plan maintenance or more frequent but shorter amendments than the 1982 rule procedures will be occurring for the remaining years between revision cycles.

Monitoring is assumed to occur every year, but monitoring differs slightly for plan revision years compared to maintenance years. Shorter revision periods reflect the expectation that the process for revising plans will be more efficient under the final rule because of procedural changes described below (see "Efficiency and Cost Effectiveness Impacts"). It is also assumed that approximately 120 management units will initiate plan revision over the next

15 years (2012 through 2026). Total costs are assumed to cover activities directly related to planning (and monitoring for planning purposes) at the unit and regional office levels, as well as indirect or overhead (cost pools) activity for supporting planning activities, but do not include project-level costs. Costs associated with planning at the national office and research stations are assumed to remain relatively constant across alternatives; these costs are unknown but not expected to be substantial compared to other costs evaluated. Total costs (2009 dollars ($)) are estimated for a 15-year planning cycle and then annualized assuming a 3 percent and 7 percent discount rate. Annualized costs accrued over the 15-year period reflect the annual flow of costs that have been adjusted to acknowledge society's time value of money.

Due to the programmatic nature of the final action, the benefits derived from land management plans developed, revised, or amended under the different alternatives are not quantified. Instead, the benefits of the alternatives are assessed qualitatively for procedural or programmatic efficiency. Efficiency is a function of (1) the time and resources used (costs) to complete and maintain plans, and (2) the degree to which those plans are capable of providing direction for resource monitoring, management, and use/access that sustains multiple uses (including ecosystem services) in perpetuity and maintains long-term health and productivity of the land for the benefit of human communities and natural resources, giving due consideration to relative values of resources (that is, meets the objectives of the NFMA and other key guiding legislation).

Agency Cost Impacts

Results of the cost analysis indicate agency costs increase for some key activities and decrease for others under the final rule and alternatives. However, total annual planning costs are not projected to be substantially different between the final rule and the 1982 rule procedures. Estimates of potential differences in planning costs are complicated by the unknown effects of any future Forest Service directives that might be developed to support the final rule.

As shown in Table 1, the annual average undiscounted cost to the Agency for all planning-related activities under the final rule ($97.7 million per year) are estimated to be $4.8 million per year lower compared to the proposed rule ($102.5 million per year), and $6.3 million per year lower

compared to the 1982 rule procedures ($104 million per year).

### TABLE 1—SUMMARY OF ESTIMATED ANNUAL AVERAGE COSTS OF ALTERNATIVE RULES

[In million $ per year *]

| | Estimated annual average costs | | | Net savings/(cost) comparisons | |
| --- | --- | --- | --- | --- | --- |
| | Final rule | Proposed rule | 1982 rule procedures | Final rule to proposed rule | Final rule to 1982 rule procedures |
| Annual average undiscounted costs ........................ | 97.7 | 102.5 | 104 | 4.8 | 6.3 |
| Annualized discounted costs at 3% .......................... | 97 | 102 | 103 | 5 | 6 |
| Annualized discounted costs at 7% .......................... | 96.3 | 101.2 | 102.2 | 4.9 | 5.9 |

* Estimates are in 2009 dollars.

Assuming a 3 percent discount rate, the projected annualized cost for the final rule is estimated to be $97 million, while the projected annualized cost for the proposed rule is $102 million, implying an annualized cost difference between the final rule and the proposed rule of $5 million, while the projected annualized cost for the 1982 rule procedures is $103 million, implying a projected annualized cost difference of $6 million. Assuming a 7 percent discount rate for the same timeframe, the projected annual cost estimate for the final rule is $96.3 million compared to $102.2 million under the 1982 rule procedures.

Given the relatively small change in estimated costs, combined with the uncertainty associated with costing assumptions, estimated annual planning costs for the final rule are not projected to be substantially different from the proposed rule and the 1982 procedures. However, over a 15-year period more plan revisions and amendments are expected to be completed under the final rule as compared to the 1982 rule procedures for about the same amount of cost estimated. It is anticipated that units will have greater capacity to maintain the currency, reliability, and legitimacy of plans to meet the objectives of the MUSYA, the NFMA, and the planning rule (§ 219.1(b) and (c)): Thereby improving the quality of plans and therefore the efficiency of the planning process.

Based on the above quantitative comparison, annual average planning costs to the Agency are projected to be similar for the final rule, the proposed rule, and the 1982 procedures. A learning curve is expected under the final rule. During the initial efforts by management units to develop, revise, or amend plans under the new rule, costs are expected to reflect additional time and resources needed to adjust to a new planning framework, including training. It is likely the cost of training will

decrease gradually over time. Therefore, during the first 15-year period, planning costs will be slightly elevated and not significantly different from the no-action alternative as units adjust to the new planning process and build collaborative capacity. In subsequent 15-year periods, planning costs are likely to decrease as the new process becomes more established. Planning costs in subsequent planning cycles are expected to decrease, recognizing there will still be efficiency gains during the initial planning efforts.

The cost and benefit analysis assumed eight management units will start plan revision annually. Therefore, approximately 120 management units will at least initiate plan revision over the next 15 years (2012 through 2026). This analysis also assumed each management unit would take 3 to 4 years to revise a plan under the final rule and 5 years under the 1982 rule procedures. Given these assumptions, over a 15 year period, there would be approximately 104 plan revisions completed under the final rule in contrast to an estimated 88 plans revised under the 1982 rule procedures, a net increase of 16 plans revised under the final rule.

Efficiency and Cost-Effectiveness Impacts

The numerous public meetings, forums, and roundtable discussions revealed growing concern about a variety of risks, stressors, and challenges to planning (for example, climate change; insects and disease; recreation, timber, and other shifts in demands; population growth, and other demographic shifts; water supply protection and other ecosystem support services). Addressing these types of risks and contingencies requires a larger landscape perspective, information from a broad spectrum of sources, and a framework that can facilitate adaptation to new information. The new procedural

requirements under the rule are designed to recognize these needs. The requirements are intended to increase agency capacity to adapt management plans in response to new and evolving information about risks, stressors, contingencies, and management constraints as described in the section above. It is anticipated under the final rule that the Agency will be able to establish plans that are efficient and legitimate frameworks for managing resources that meet public demand in a sustainable fashion and satisfy the goals of the MUSYA and the NFMA, and that management units will be better able to keep plans updated and current with evolving science and public concerns without substantial changes in planning costs over a 15-year period.

Under the final rule, costs are projected to be redirected toward collaboration, assessment, and monitoring activities and away from development and analysis of alternatives compared to the 1982 rule procedures. Costs are also expected to be redirected more toward maintenance or plan amendments under the final rule, due in part to expectations that less time will be needed to complete plan revisions. These effects are projected to occur, in part, because of broader support and resolution of issues at earlier stages of plan revision, achieved through collaboration as well as other procedural changes.

The reallocation of efforts and costs across different phases of planning, and across key planning activities under the final rule is expected to improve overall planning efficiency. Shifts in emphasis and resources under the final rule are projected to improve the currency, reliability, and legitimacy of plans to serve as a guide for: (1) Reducing uncertainty by identifying and gathering existing and new information about conditions, trends, risks, stressors, contingencies, vulnerabilities, values/needs, contributions, and management

constraints; (2) integrating and assessing ecological, social, and economic information to determine if outputs and outcomes related to unit contributions to ecological, social, and economic conditions indicate a need to change the plan; and (3) responding to the need for change in management activities, projects, or revisions and amendments to plan components. Potential increases and/or reallocation of costs associated with assessment, analysis, and monitoring requirements for elements such as diversity and sustainability are expected to provide clearer direction for subsequent project planning. Project-level costs are not included in the analysis of land management planning costs.

Agency planning costs under the final rule are estimated to be slightly lower compared to the proposed rule and the 1982 rule procedures, however, due to relatively small differences in estimated costs, combined with uncertainty associated with costing assumptions, the estimated agency costs are not projected to be substantially different between the proposed rule, the final rule, and the 1982 rule procedures. Changes in rule requirements under the final rule will enhance planning efficiency, and more plan revisions and amendments, as well as more effective plans, are expected as a result of the final rule. Details about the potential effects of specific procedural changes on agency costs and planning efficiency are described below, by activity category.

*Assessment:* Slight increases in assessment costs (compared to the cost of doing an analysis of the management situation under the 1982 rule procedures) are anticipated under the final rule. This is due to an increased emphasis on characterizing factors such as assessing conditions, trends, and sustainability within a broader ecological and geographic context (landscapes), ecosystem and species diversity, climate change, as well as other system drivers, risks, threats, and vulnerabilities. Gains in cost effectiveness are achieved through other elements such as direction to rely on existing information and the removal of required prescriptive benchmark analysis. Changes in the assessment requirements and guidance are expected to increase planning efficiency and effectiveness by improving capacity to assimilate and integrate existing and new information to inform changes to the plan.

Assessments would identify and evaluate information at landscape levels and at a geographic scale based on ecological, economic, or social factors relevant to the plan area, rather than

reliance on administrative boundaries. This broader approach would enhance capacity to incorporate information about conditions outside of NFS boundaries relevant to management of the plan area.

Risks and vulnerabilities to ecosystem elements and functions would be considered in assessments thereby encouraging consideration of the effects of long-term environmental or social/economic variability, events, and trends on future outputs, ecosystem services, and outcomes.

For the final rule, the level of effort, or reallocation of effort (and cost) to the assessment phase is reduced as compared with the proposed rule, due to a narrower focus on rapid review and evaluation of existing information (for example, assessments completed by States and other entities, and so forth), as well as the inclusion of a specific set of topics to focus on for the assessment, as opposed to the broader direction in the proposed rule. Requirements to discuss roles and contributions, "need-to-change," as well as monitoring questions have been removed under the final rule. The 'benefits people obtain from NFS planning areas' (ecosystem services) have been highlighted under the final rule. Direction to gather and evaluate information about potential species of conservation concern is more explicit (and transparent) under the final rule. The changes in assessment requirements under the final rule are expected to improve the cost effectiveness of assessments. These changes are also designed to increase the likelihood of improving capacity to respond to changes in conditions and trends, as originally intended under the proposed rule.

*Public Participation:* Requirements for public participation (including collaboration) have not changed between the proposed and final rules. Costs associated with public participation are projected to increase under the final rule as compared to the 1982 rule procedures due primarily to requirements that opportunities for participation, including collaboration where feasible and appropriate, be provided throughout the planning process. Gains in cost effectiveness may occur, in part, by providing responsible officials with discretion to design collaborative strategies that meet unit-specific needs and constraints and recognize local collaborative capacity. Costs for some units may be higher where potential barriers to collaboration are present (for example, pre-existing relationships may exacerbate perceived inequities; absence of pre-existing social networks or capacity; or false

commitments). Recognizing these challenges, the final rule provides responsible officials with discretion to determine the scope, methods, and timing of opportunities for public participation that are appropriate to the circumstances specific to the action being taken, and the final rule states that opportunities for collaboration be offered when feasible and appropriate. However, changes in guidance and requirements for public participation under the final rule are expected to increase planning efficiency, especially as related to the relevance and effectiveness of plans, because of the following:

(1) Improved analysis and decisionmaking efficiency during latter stages of planning due to increases in public input during early phases;

(2) Improved capacity to reduce uncertainty by gathering, verifying, and integrating information from a variety of sources, including Tribal or other forms of knowledge, within and beyond unit boundaries;

(3) Potential to offset or reduce agency monitoring costs as a result of collaboration during monitoring plan development and monitoring itself;

(4) Improved capacity to consider values and concerns for all economic sectors and social segments, including amenity-driven demographic shifts associated with local or rural communities in wildland dependent counties;

(5) Reduced need for large numbers of plan alternatives as well as time needed to complete plan revisions as a consequence of broader support and resolution of issues achieved through public participation and collaboration during early phases of final plan development;

(6) Improved perceptions regarding the legitimacy of plans and the planning process and improved ability to address issues and concerns prior to the need for litigation by increasing transparency, developing awareness of the values and expected behavior of others, and seeking greater understanding about values, needs, tradeoffs, and outcomes during earlier stages of planning; and,

(7) Building unit (and regional) capacity to overcome existing barriers to collaboration (for example, absence of social networks or capacity; perceptions about pre-existing power relationships) through training and facilitation.

*Analysis and decisions (plan development, plan revision or amendment):* Costs associated with analysis and decisions are estimated to decrease overall under the final rule due primarily to the effect of fewer prescriptive requirements (relative to

Rvsd Plan - 00001298

1982 rule procedures) regarding probable (management) actions, timber program elements, number and types of alternatives, evaluation of alternatives, and minimum management requirements. The forces affecting the cost include (1) increased emphasis on consideration of resource attributes and conditions such as sustainability, watershed health, and water supply, and (2) adaptation to new approaches for addressing species viability and diversity in the short-term (with long-term potential for gains in cost-effectiveness).

The following elements associated with the final rule are expected to increase planning efficiency by facilitating plan revisions and amendments, expanding capacity for adaptive management, and improving guidance for responding to diverse determinations of a need to change the plan:

The adoption of a coarse-filter/fine-filter approach for addressing species viability and diversity within plan components, combined with the recognition of land management and resource limits which constrain the Agency, is expected to make management units better able to develop plans that provide feasible or realistic direction for responding to species and ecosystem sustainability and recovery needs and meeting requirements for plant and animal diversity.

A greater emphasis on sustainability and ecosystem integrity in plan components is expected to facilitate restoration responses triggered by new information regarding environmental, social, and economic risks and stressors, including climate change and changes in demand for goods and services. Expected results include reduced effects from anthropogenic stressors, thereby helping to restore healthy ecosystems and compatible uses (especially in areas sensitive to disturbance and changing conditions) as well as increased protection of riparian area function.

Refocusing the use of the term "restoration" to focus on recovery of resiliency and ecosystem functions (instead of historical reference points) provides greater flexibility to respond to need-for-change regarding damaged ecosystems.

Greater emphasis placed on identifying each unit's role in providing ecosystem services within a broader landscape or region should facilitate the design of management responses that recognize the marginal effects or contributions of ecological, social, or economic conditions originating from outside of the traditional unit study area boundaries.

More frequent amendments expected under the final rule could potentially lead to fewer need-for-change determinations when plans are revised. Assessments and proposal steps may not be needed for some amendments.

Under the final rule, slightly more effort is re-directed to activities associated with development and analysis of plan revisions (or amendments) compared to the proposed rule. Examples of changes under the final rule that can enhance overall planning efficiency include:

• Moving "Need-to-change" determinations from assessments to the plan revision phase to clarify the separation between the assessment and NEPA phases;

• Clarifying how plan area ecosystems are integrated into landscape-level ecological, social, and economic sustainability;

• Refining and clarifying requirements for riparian zones; and

• Clarifying unit responsibilities for the diversity of plant and animal communities.

These changes are expected to contribute to planning efficiency by improving the capacity of plans to provide for sustainability and diversity.

*Science support:* Slight cost increases for science support may occur under the final rule due in part to more prescriptive wording to use the best available scientific information during the planning process to inform the planning process, plan components, and other plan content, including the monitoring program. On the other hand, requirements under the final rule for using the best available scientific information to inform decisions contribute to planning efficiency by maximizing coverage of scientific input from diverse sources, integrating science throughout all stages of planning, and taking advantage of scientific knowledge from external partners and agency research stations, thereby strengthening the decisionmaking process. Also the final rule has fewer documentation requirements, concentrating the burden of documentation on the most relevant and appropriate points in the planning process. Additional changes are made to clarify the responsible official's use of best available scientific information in informing the planning process.

*Resolutions:* The cost effect of a shift from a post-decisional appeals process (under the 1982 rule procedures) to a pre-decisional objection period under the final rule is difficult to project. Ongoing litigation under the current planning rule is costly and time consuming and may continue under the new rule. However, the new planning framework (i) places greater emphasis on public participation and collaboration early and throughout the planning process, (ii) adopts a pre-decisional objection process, and (iii) changes the regional office responsible official from regional forester to forest supervisor. These changes are expected to improve legitimacy and trust in the planning process and contribute to more efficient resolution of issues early in the process, prior to the plan development, plan revision or plan amendment approval. Making a decision on an objection before plan approval can be less disruptive than an appeal decision which can come months after plan implementation begins. The more frequent use of amendments expected under the final rule will keep plans more current and is expected to narrow the focus of changes over time. In addition, the assessment and monitoring phases of the planning framework are expected to build public support and improve the legitimacy and relevance of plans by providing and continually updating a transparent base of information to inform management decisions. There is no expectation of unanimous support for any given proposed plan development, plan revision or plan amendment under any of the alternatives, however early resolution of issues is expected to occur and contribute to overall planning efficiency under the final rule. Efficiency gains under the final rule are expected to be similar to the proposed rule for resolution of issues, recognizing that the objection period for actions involving environmental impact statements is extended to 60 days under the final rule and to 45 days when there is no environmental impact statement.

*Monitoring:* Relative increases in monitoring costs as compared to the 1982 rule procedures are anticipated as a consequence of a greater emphasis on broader input and participation in the design and implementation of monitoring, new approaches for characterizing diversity and resiliency, and two-level (plan and broad-scale) monitoring. However, over time, the two-level approach to monitoring is expected to increase monitoring efficiencies and decrease the cost of other planning related activities. Under the final rule, the two-level approach to monitoring is intended to inform the plan area management and make progress toward desired outcomes. By testing assumptions, tracking changing conditions, and assessing management effectiveness, monitoring information will inform adaptive management and lead to more effective and relevant

Rvsd Plan - 00001299

plans. Plan monitoring and broader-scale monitoring levels are related. The monitoring framework would require monitoring to be more consistent across units of the NFS. The final rule would mobilize multi-party monitoring resources by working across all Forest Service branches and engage partners and other Government agencies in its monitoring efforts to help reduce the cost of added monitoring requirements and provide for monitoring efforts that are complementary. There is also potential that collaboration would result in more cooperative monitoring programs with other agencies and the public. This could help leverage resources to accomplish additional monitoring.

Changes in guidance and requirements for monitoring under the final rule as compared to the 1982 rule procedures are expected to increase planning effectiveness by improving capacity to gather information and reduce uncertainty for a number of integrated ecological, social, and economic conditions, trends, risks, stressors, constraints, and values within and beyond unit boundaries.

Monitoring under the final rule focuses to a greater extent on ecosystems, habitat diversity, and smaller numbers of species to monitor (relative to MIS under Alternative B), with the intent that tracking of species diversity and habitat sustainability will be more cost-effective and reflective of unit-specific capabilities. Two-level monitoring is intended to create a more systematic and unified monitoring approach to detect effects of management within unit boundaries as well as track risks, stressors, and conditions beyond unit boundaries that affect, or are affected by, unit conditions and actions.

Emphasis on coordination between plan area monitoring and broader-scale monitoring helps ensure information is complementary, is gathered at scales appropriate to monitoring questions, reduces redundancy, and improves cost-effectiveness.

Efficiency gains under the final rule are expected to be similar to the proposed rule. Changes to monitoring requirements under the final rule should enhance those gains by: (1) Clarifying that monitoring information should inform need-to-change, (2) modifying requirements for engaging various partners in developing the monitoring program, and (3) clarifying the connection between the monitoring requirements and the requirements for diversity in § 219.9.

Distributional Impacts

Due to the programmatic nature of this rule, it is not feasible to assess distributional impacts (for example, changes in jobs, income, or other measures for social and economic conditions across demographics or economic sectors) in detail. Under the final rule, units would continue to use their timber sale program and other forest management activities to enhance timber and other forest resource values and benefits over time (similar to the 1982 procedures). Continued monitoring of recreation use is expected under the final rule as a result of continuation of the national visitor use monitoring system. Collaboration under the final rule would help assure consideration of a broad spectrum of recreational values and an integrated mix of sustainable recreation opportunities relevant to each NFS unit.

Grazing allotments are parcels or designated areas of rangeland leased or permitted to a livestock grazer. Their use is planned and monitored to maintain sustainable production and rangeland health. Plans would include plan components to maintain or restore ecological integrity of lands, including rangelands, and grazing allotment management plans would continue to be modified to be consistent with plans developed under the final rule, as they are for plans developed using the 1982 rule procedures.

In general, the final rule is designed to facilitate engagement and involvement throughout all phases of planning, thereby improving capacity to consider and incorporate values and concerns for all economic sectors and social segments affected by any given plan, plan revision, or plan amendment. The final rule is also intended to facilitate assimilation of existing or new information about local or rural, as well as national, concerns and values throughout the planning process. Increased opportunities for considering and addressing social and economic concerns through participation and collaboration under the final rule therefore apply evenly across all sectors and populations.

The final rule requires plans to have plan components that "guide the plan area's contributions to social and economic sustainability." The final rule also requires that plans include a statement of the roles and contributions of the unit within a broader landscape and that assessments, plan component development, and monitoring consider social and economic conditions, including a broad spectrum of goods and services. These requirements

provide a flexible means for acknowledging the varying and relative importance of plan area contributions to social and economic sustainability as it relates to a range of economic sectors and populations across units and regions.

The final rule is more prescriptive about considering and facilitating restoration of damaged resources as well as improving resource capacity to withstand environmental risks and stressors (that is, resiliency), thereby providing greater capacity for sustaining local or rural economic opportunities to benefit from forest resources and ecosystem services, including recreation/tourism and water supply/watershed health as well as restoration based activities.

Proper Consideration of Small Entities

The final rule has also been considered in light of Executive Order 13272 regarding proper consideration of small entities and the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), which amended the Regulatory Flexibility Act (5 U.S.C. 601 et. seq.). The Department has determined this action will not have a significant economic impact on a substantial number of small entities as defined by the E.O. 13272 and SBREFA, because the final rule imposes no requirements or costs on small entities, nor does it impose requirements or costs on specific types of industries or communities. In addition, the final rule provides more opportunities for small entities to engage with the Department and become more involved in all phases of planning, thereby expanding capacity to identify and consider the needs and preferences of small entities. Timelier planning and management decisions under the final rule should increase opportunities for small entities to benefit from implementation of updated land management plans. Additional emphasis on ecosystem resiliency to facilitate restoration activities and on sustainable recreation opportunities should help sustain economic opportunities linked to local or rural communities, many of which are host to small entities. Therefore, a regulatory flexibility analysis is not required for this final rule.

*Energy Effects*

This final rule has been reviewed under Executive Order (E.O.) 13211 issued May 18, 2001), "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use." It has been determined that this final rule does not constitute a significant energy action as

defined in E.O. 13211. While the Agency does not manage subsurface minerals, mineral exploration and development does occur on NFS lands. Similarly, the Agency recognizes the growing demand for geothermal, wind, and solar energy development on NFS lands. Agency management of the renewable resources mandated by MUSYA recognizes ongoing and potential exploration and development while protecting and conserving these renewable resources. The final rule set out administrative procedural requirements whereby NFS land management plans are developed, revised, and amended. The final rule recognizes in § 219.10 that development of renewable and non-renewable energy resources are among the potential uses in a plan area. However, the final rule does not dictate the activities that may occur or not occur on administrative units of the NFS. Accordingly, the final rule does not have energy requirements or energy conservation potential.

Plans developed under the final rule will provide the guidance for making future project or activity resource management decisions. The final rule recognizes in § 219.10 that the placement and maintenance of infrastructure such as transmission lines are among the potential uses in a plan area. Land management plans may identify major rights-of-way corridors for utility transmission lines, pipelines, and water canals. The effects of the construction of utility transmission lines, pipelines, and canals are, of necessity, considered on a case-by-case basis as specific construction proposals. While these plans may consider the need for such facilities and may include standards and guidelines that may constrain energy exploration and development, they would not authorize construction of them; therefore, the final rule does not constitute a significant energy action within the meaning of E.O. 13211. Consistent with E.O. 13211, direction to incorporate consideration of energy supply, distribution, and use in the planning process will be included in the Agency's administrative directives for carrying out the final rule.

*Environmental Impacts*

This final rule establishes the administrative procedures to guide development, amendment, and revision of NFS land management plans. The Agency has prepared a final programmatic environmental impact statement to analyze possible environmental effects of the final rule, present several alternatives to the final rule, and disclose the potential environmental impacts of those

alternatives. The final programmatic environmental impact statement is available on the Web at *http:// www.fs.usda.gov/planningrule.*

The final rule requires plan development, amendment, or revision to follow NEPA procedures. The rule requires an EIS for plan development and plan revisions. The rule also requires that plan amendments comply with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an EIS, an EA, or a CE, depending upon the scope and scale of the amendment and its likely effects.

*Controlling Paperwork Burdens on the Public*

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), the information collection or reporting requirements for the objection process were previously approved by the Office of Management and Budget (OMB) and assigned control number 0596–0172 for the objection process included in the Title 36, Code of Federal Regulations, Part 218—Predecisional Administrative Review Processes, Subpart. A—Predecisional Administrative Review Process for Hazardous Fuel Reduction Projects Authorized by the Healthy Forests Restoration Act of 2003.

The information required by subpart B of this rule is needed for an objector to explain the nature of the objection being made to a land management plan, plan amendment, or plan revision. This final rule retains the objection process established in the CFR 218 objection regulation and does not require additional information be provided from the public. This rule does instead give direction that is more detailed to both the public and Forest Service personnel on the timelines, requirements, and procedures of the objection process.

*Federalism*

The Agency has considered this final rule under the requirements of Executive Order (E.O.) 13132 issued August 4, 1999, "Federalism." The Agency has made an assessment that the final rule conforms with the Federalism principles set out in this Executive Order; would not impose any compliance costs on the States; and would not have substantial direct effects on the States, on the relationship between the national Government and the States, nor on the distribution of power and responsibilities among the various levels of government. Therefore, the Agency concludes that this final rule does not have Federalism implications. Moreover, § 219.4(a) of this final rule

shows sensitivity to Federalism concerns by requiring the responsible official to encourage participation of State and local governments and Indian Tribes in the planning process. In addition, § 219.4(b) requires the responsible official to coordinate planning with State and local governments and Indian Tribes.

In the spirit of E.O. 13132, the Agency provided many opportunities for State and local officials, including their national representatives, to share their ideas and concerns in developing the final regulation. Respondents to the February 14, 2011, proposed rule included the following: 113 county government agencies or elected officials, 62 State government agencies, elected officials, or associations, and 18 American Indian government agency, or elected officials. Many Tribal, State, and local government agencies submitted comments requesting that collaboration and coordination be mandatory before beginning plan revisions. Some respondents suggested that forest plans be made locally and adapted to "local management," "local control," and "local collaboration." Intergovernmental planning coordination was supported by many respondents as well. Many respondents cited Federal, Tribal, State, local, and other types of planning they felt the Agency should be careful to consider and integrate into forest plans. Respondents often agreed that the Agency's planning efforts are strengthened when achieved in careful collaboration with local governments and other local interests. Comments of this nature were sometimes followed up with considerations for "cooperating agency" provisions to solidify the process and outcomes to be achieved through the participation of cooperating agencies. The Department carefully considered these comments when making changes to the rule.

*Consultation With Indian Tribal Governments*

On September 23, 2010, the Deputy Chief for the National Forest System sent letters inviting more than 540 federally recognized Tribes and Alaska Native Corporations to begin consultation on the proposed planning rule. The Forest Service continued to conduct government-to-government consultation on the planning rule while developing the final rule. The Forest Service considers Tribal consultation as an ongoing, iterative process through the issuance of the final rule.

The Agency held 16 consultation meetings across the country in November and December 2010. During these meetings, Forest Service leaders

met with Tribal and Alaska Native Corporation leaders, or their designees, to discuss a Tribal consultation paper, which described how the draft proposed rule discussed concerns Tribes had raised during the collaborative sessions held earlier in the year. Forest Service leaders also met one-on-one with Tribal leaders that requested consultation in this manner. In July 2011, the Deputy Chief for the National Forest System sent letters encouraging federally recognized Tribes and Alaska Native Corporations to continue consult prior to release of the final rule. Tribes have continued to consult one-on-one with Forest Service leaders, as well as through regional or sub-regional consultation meetings. All of the consultation meetings that have occurred throughout development of the proposed and final rule have strengthened the government-to-government relationship with the Tribes as well as improved the final rule. Consultation is an ongoing process and can occur at any time, including following publication of the final rule.

The Agency incorporated the input received through consultation before December 13, 2010, into the proposed rule. Those concerns heard during Tribal consultation after December 13 and which were given to the Agency by October 21, 2011, were considered for incorporation in the final rule.

The Agency also held two national Tribal roundtable conference calls to provide additional opportunities for Tribes and Tribal associations to comment prior to the development of the proposed planning rule. More than 45 Tribes and Tribal associations participated in the First National Tribal Roundtable on May 3, 2010, and more than 35 Tribes and Tribal associations participated in the Second National Tribal Roundtable on August 5, 2010. Transcripts and summaries of these meetings are available on the planning rule Web site. Additionally, six Tribal roundtables were held in California, Arizona, and New Mexico.

On March 11, 2011, after publication of the proposed rule, the Forest Service held a Tribal teleconference to provide information on the proposed rule and answer questions. Sixteen Tribes participated in the discussion and had the opportunity to have their questions answered by the Ecosystem Management Coordination Director and the Associate Chief of the Forest Service. A number of Tribes submitted comments on the proposed rule during the public comment period and the content of these letters has been carefully considered in developing the final rule.

The Agency heard from Tribal leaders that the rule should clearly state how the special rights and interests of Tribes would be provided for in the planning process and show how Tribes will be engaged early throughout the planning process. They emphasized the obligation the Forest Service has to Tribes to fulfill treaty obligations and trust responsibilities, protect and honor reserved rights, and fully recognize the unique government-to-government relationship that exists between the Federal Government and Tribes. Tribal leaders also stated that the role of science in the planning process must account for traditional Tribal knowledge. In response to these concerns, the final rule recognizes and does not modify the unique government-to-government relationship between the United States and Indian Tribes. The final rule recognizes and does not modify prior existing Tribal rights, including those involving hunting, fishing, gathering, and protecting cultural and spiritual sites. The rule requires the agency to work with federally recognized Indian Tribes, government-to-government, as providing in treaties and laws and consistent with Executive orders when developing, amending, or revising plans. The final rule encourages Tribal participation in NFS planning. Further, the rule recognizes the responsibility of Forest Service officials to consult early with Tribal governments and to work cooperatively with them where planning issues affect Tribal interests. Nothing in the final rule should be construed as eliminating public input or Tribal consultation requirements for future projects conducted in accordance with the final rule. The responsible official shall request information from Tribes about native knowledge, including information about land ethics, cultural issues, and sacred and culturally significant sites, during the planning process.

At § 219.4(b)(2), for plan development or revision, the responsible official shall review the planning and land use policies of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments. The results of the review would be displayed in the environmental impact statement for the plan. The final rule at § 219.4(a)(1)(v) requires, where appropriate, the responsible official to encourage federally recognized Tribes to seek cooperating agency status. This provides an additional opportunity for Tribes to be engaged in the planning process and provides further avenues for Tribes to

provide input during the planning process. Additionally, the responsible official may participate in planning efforts of federally recognized Indian Tribes and Alaska Native Corporations, where practicable and appropriate. For federally recognized Tribes, cooperating agency status does not replace or superseded the trust responsibilities and requirements for consultation also recognized and included in the final rule.

Tribal leaders stated that they want to see non-federally recognized Tribes and groups included in the consultation or planning process, as well as the involvement of youth. Non-federally recognized groups and Tribes would be able to participate in the planning process under the public requirements in § 219.4. Section 219.4(a)(1)(ii) requires the responsible officials to encourage participation by youth, as well as low-income and minority populations.

Tribes place great emphasis on protection of water resources and want to see the planning rule include stipulations for water protection. Water resources are discussed throughout this final rule, including specifically in § 219.7 (New plan development or plan revision), § 219.8 (Sustainability), § 219.9 (Diversity of Plant and Animal Communities), and § 219.10 (Multiple Use). Tribes support a management approach that moves away from monoculture management and promotes sustainable and diverse populations of plants and animals. Section 219.9 of the final rule requires land management plans to contain components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area.

The definition of native knowledge in § 219.19 has been retained based on the feedback that we received during consultation. The definition acknowledges that native knowledge is a way of knowing or understanding the world derived from multiple generations of indigenous peoples' interactions, observations, and experiences with their ecological systems, and that it is also place-based and culture-based knowledge in which people learn to live in and adapt to their own environment through interactions, observations, and experiences with their ecological system.

Many Tribes had a variety of concerns regarding social, economic, and ecological sustainability, and suggested that the Agency specifically discuss cultural sustainability within the final rule and protect cultural resources. The definition in the final rule of

**Federal Register** / Vol. 77, No. 68 / Monday, April 9, 2012 / Rules and Regulations **21259**

"sustainability" notes that "social sustainability refers to the capability of society to support the network of relationships, traditions, culture, and activities that connect people to the land and to one another, and support vibrant communities." In addition, § 219.1(c) recognizes that NFS lands provide people and communities with a wide array of benefits, including "cultural benefits." Section 219.4 requires opportunities for public and Tribal participation and coordination throughout the planning process. Section 219.4(a)(3) requires that the responsible official request "information about native knowledge, land ethics, cultural issues, and sacred and culturally significant sites" during consultation and opportunities for Tribal participation. Section 219.6(b) requires assessment content to include cultural conditions and cultural and historic resources and uses. Section 219.8 in the final rule recognizes cultural aspects of sustainability by requiring "cultural and historic resources and uses "be taken into account when designing plan components to guide contributions to social and economic sustainability." Section 219.10(b)(1)(ii) of the rule requires "plan components * * * for a new plan or plan revision must provide for protection of cultural and historic resources," and "management of areas of Tribal importance." The final rule also includes recognition of and requirements for "ecosystem services," which include "cultural heritage values." These requirements, in combination with the requirement that plan content include descriptions of a unit's roles and contributions within the broader landscape under § 219.7(e), ensure the cultural aspects of sustainability will be taken into account when developing plan components that guide unit contributions to social sustainability.

During the consultation meetings, the Agency heard from Tribal leaders that confidentiality is a big concern. To explicitly discuss confidentiality, § 219.1(e) states that the responsible official shall comply with Section 8106 of the Food, Conservation, and Energy Act of 2008, Executive Order 13007 of May 24, 1996, Executive Order 13175 of November 6, 2000, laws and other requirements with respect to disclosing or withholding under the Freedom of Information Act certain information regarding reburial sites or other information that is culturally sensitive to Indian Tribe or Tribes.

The Agency has heard from Tribal leaders that they want to see sacred sites protected. The final rule requires that

responsible officials request information from Tribes about sacred sites, and provides for protection of cultural and historic resources and management of areas of Tribal importance. In addition, a separate initiative by the USDA Office of Tribal Relations and the Forest Service is conducting a policy review concerning sacred sites and is consulting with Tribes during their effort. The Agency has informed Tribes of this separate initiative and how they can participate during the consultation meetings. Information that the Agency received during the planning rule consultation process regarding sacred sites has been shared with the USDA Office of Tribal Relations and the Forest Service initiative.

The Forest Service received many other comments during the Tribal consultation meetings. A number of these comments were regarding concerns that are outside of the scope of the national planning rule or that will be discussed at the local level during the development of land management plans. Tribes received responses to these comments in separate documents, which were mailed to those Tribes and Alaska Native Corporations that participated in the October and November 2010 consultation meetings following the publication of the proposed rule. Additionally, a document summarizing the comments and responses from these meetings was made available to federally recognized Tribes and Alaska Native Corporations as part of the consultation documents provided in August 2011.

Many of the public participation and other requirements in the final rule have significant potential to involve Tribes and tribal members in NFS planning and management, and to incorporate information into the process that will be relevant with regard to local effects of management on individual units, including to Tribal communities. However, pursuant to Executive Order 13175 of November 6, 2000, "Consultation and Coordination with Indian Tribal Governments," the final rule itself does not have "substantial direct effects." Effects, both positive and adverse, may occur at the local planning level, which is one of the many reasons the final rule includes requirements for tribal consultation as well as outreach to Tribes during public participation opportunities. Effects may also occur at the project or activity level, which have additional opportunities for public engagement.

The Agency has also determined that this final rule does not impose substantial direct compliance costs on Indian Tribal governments. This final

rule does not mandate Tribal participation in NFS planning. Rather, the final rule imposes an obligation on Forest Service officials to provide Tribes an opportunity to consult and to reach out early to engage them throughout the planning process.

*Takings of Private Property*

The Agency analyzed this rule in accordance with the principles and criteria contained in Executive Order 12630 issued March 15, 1988, and the Agency determined that the rule does not pose the risk of a taking of private property.

*Civil Justice Reform*

The Agency reviewed the rule under Executive Order 12988, "Civil Justice Reform." The Agency has not identified any State or local laws or regulations that are in conflict with this regulation or that would impede full implementation of this rule. Nevertheless, in the event that such conflicts were to be identified, the final rule, if implemented, would preempt the State or local laws or regulations found to be in conflict. However, in that case, (1) no retroactive effect would be given to this final rule; and (2) the Department would not require the use of administrative proceedings before parties could file suit in court challenging its provisions.

*Unfunded Mandates*

Pursuant to Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538), the Agency has assessed the effects of this final rule on State, local, and Tribal governments and the private sector. This final rule does not compel the expenditure of $100 million or more by any State, local, or Tribal governments or anyone in the private sector. Therefore, a statement under § 202 of the Act is not required.

*Environmental Justice*

The Department considered impacts of the final rule to civil rights and environmental justice (pursuant to Executive Order 12898 (59 FR 7629, February 16, 1994)). If implemented, with outreach, public engagement and using NEPA procedures to document effects, this analysis concludes that no adverse civil rights or environmental justice impacts from the planning rule are anticipated to the delivery of benefits or other program outcomes on a national level for any under-represented population or to other U.S. populations or communities from the adoption of the final planning rule.

While national level impacts are not expected to be disproportionate, yet-to-

be-identified adverse impacts may be possible on a regional or local scale at the unit planning level. Differences in national level effects and regional/local level effects are the result of uneven distribution of minorities, low-income populations, and variations in regional, cultural, or traditional use, and differences in local access to resources. Impacts on the national forest level will be further examined at the unit level, including NEPA analysis for plan development, plan revision, or plan amendment and site-specific projects.

The participation efforts required by the final rule have significant potential to reach and involve diverse segments of the population that historically have not played a large role in NFS planning and management. Section 219.4(a) requires that when developing opportunities for public participation, the responsible official shall take into account the discrete and diverse roles, jurisdictions, responsibilities, and skills of interested and affected parties as well as the accessibility of the process, opportunities, and information. The responsible official is required to be proactive and use contemporary tools, such as the Internet, to engage the public, and share information in an open way with interested parties. Requirements of § 219.4 to consider accessibility and requirements to encourage participation by youth, low-income populations, and minority populations may improve environmental justice outcomes.

The final rule includes provisions for filing an objection before the final decision if the objector has filed a substantive formal comment related to a new plan, plan revision, or plan amendment. In the past, substantive formal comments were required to be in writing and submitted during the formal comment period when developing land management plans. The final rule expands the definition of a substantive formal comment to include written or oral comments submitted or recorded during an opportunity for public participation provided during the local unit's planning process (§§ 219.4 and 219.16).

If implemented, there are no anticipated adverse or disproportionate impacts to underserved, protected groups, low income, or socially disadvantaged communities. The final rule requirements, including outreach and collaboration, and the requirement for NEPA analysis are designed to avoid adverse or disproportionate effects; therefore, mitigating measures are not necessary or appropriate for adopting or implementing the planning rule. Local site-specific mitigation may occur as

NFS projects and activities are planned and executed consistent with Department policy.

## List of Subjects in 36 CFR Part 219

Administrative practice and procedure, Environmental impact statements, Indians, Intergovernmental relations, National forests, Reporting and recordkeeping requirements, Science and technology.

Therefore, for the reasons set forth in the preamble, the Forest Service revises part 219 of Title 36 of the Code of Federal Regulations to read as follows:

## PART 219—PLANNING

### Subpart A—National Forest System Land Management Planning

Sec.
219.1   Purpose and applicability.
219.2   Levels of planning and responsible officials.
219.3   Role of science in planning.
219.4   Requirements for public participation.
219.5   Planning framework.
219.6   Assessment.
219.7   New plan development or plan revision.
219.8   Sustainability.
219.9   Diversity of plant and animal communities.
219.10   Multiple use.
219.11   Timber requirements based on the NFMA.
219.12   Monitoring.
219.13   Plan amendment and administrative changes.
219.14   Decision document and planning records.
219.15   Project and activity consistency with the plan.
219.16   Public notifications.
219.17   Effective dates and transition.
219.18   Severability.
219.19   Definitions.

### Subpart B—Pre-Decisional Administrative Review Process

219.50   Purpose and scope.
219.51   Plans, plan amendments, or plan revisions not subject to objection.
219.52   Giving notice of a plan, plan amendment, or plan revision subject to objection before approval.
219.53   Who may file an objection.
219.54   Filing an objection.
219.55   Objections set aside from review.
219.56   Objection time periods and process.
219.57   Resolution of objections.
219.58   Timing of a plan, plan amendment, or plan revision decision.
219.59   Use of other administrative review processes.
219.60   Secretary's authority.
219.61   Information collection requirements.
219.62   Definitions.

**Authority:** 5 U.S.C. 301; 16 U.S.C. 1604, 1613.

## Subpart A—National Forest System Land Management Planning

### § 219.1   Purpose and applicability.

(a) This subpart sets out the planning requirements for developing, amending, and revising land management plans (also referred to as plans) for units of the National Forest System (NFS), as required by the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (16 U.S.C. 1600 *et seq.*) (NFMA). This subpart also sets out the requirements for plan components and other content in land management plans. This part is applicable to all units of the NFS as defined by 16 U.S.C. 1609 or subsequent statute.

(b) Consistent with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528–531) (MUSYA), the Forest Service manages the NFS to sustain the multiple use of its renewable resources in perpetuity while maintaining the long-term health and productivity of the land. Resources are managed through a combination of approaches and concepts for the benefit of human communities and natural resources. Land management plans guide sustainable, integrated resource management of the resources within the plan area in the context of the broader landscape, giving due consideration to the relative values of the various resources in particular areas.

(c) The purpose of this part is to guide the collaborative and science-based development, amendment, and revision of land management plans that promote the ecological integrity of national forests and grasslands and other administrative units of the NFS. Plans will guide management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future. These benefits include clean air and water; habitat for fish, wildlife, and plant communities; and opportunities for recreational, spiritual, educational, and cultural benefits.

(d) This part does not affect treaty rights or valid existing rights established by statute or legal instruments.

(e) During the planning process, the responsible official shall comply with Section 8106 of the Food, Conservation, and Energy Act of 2008 (25 U.S.C. 3056), Executive Order 13007 of May

Rvsd Plan - 00001304

24, 1996, Executive Order 13175 of November 6, 2000, laws, and other requirements with respect to disclosing or withholding under the Freedom of Information Act (5 U.S.C. 552) certain information regarding reburial sites or other information that is culturally sensitive to an Indian Tribe or Tribes.

(f) Plans must comply with all applicable laws and regulations, including NFMA, MUSYA, the Clean Air Act, the Clean Water Act, the Wilderness Act, and the Endangered Species Act.

(g) The responsible official shall ensure that the planning process, plan components, and other plan content are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit.

### § 219.2   Levels of planning and responsible officials.

Forest Service planning occurs at different organizational levels and geographic scales. Planning occurs at three levels—national strategic planning, NFS unit planning, and project or activity planning.

(a) *National strategic planning.* The Chief of the Forest Service is responsible for national planning, such as preparation of the Forest Service strategic plan required under the Government Performance and Results Modernization Act of 2010 (5 U.S.C. 306; 31 U.S.C. 1115–1125; 31 U.S.C. 9703–9704), which is integrated with the requirements of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the NFMA. The strategic plan establishes goals, objectives, performance measures, and strategies for management of the NFS, as well as the other Forest Service mission areas: Research and Development, State and Private Forestry, and International Programs.

(b) *National Forest System unit planning.* (1) NFS unit planning results in the development, amendment, or revision of a land management plan. A land management plan provides a framework for integrated resource management and for guiding project and activity decisionmaking on a national forest, grassland, prairie, or other administrative unit. A plan reflects the unit's expected distinctive roles and contributions to the local area, region, and Nation, and the roles for which the plan area is best suited, considering the Agency's mission, the unit's unique capabilities, and the resources and management of other lands in the vicinity. Through the adaptive planning cycle set forth in this subpart, a plan can

be changed to reflect new information and changing conditions.

(2) A plan does not authorize projects or activities or commit the Forest Service to take action. A plan may constrain the Agency from authorizing or carrying out projects and activities, or the manner in which they may occur. Projects and activities must be consistent with the plan (§ 219.15). A plan does not regulate uses by the public, but a project or activity decision that regulates a use by the public under 36 CFR Part 261, Subpart B, may be made contemporaneously with the approval of a plan, plan amendment, or plan revision. Plans should not repeat laws, regulations, or program management policies, practices, and procedures that are in the Forest Service Directive System.

(3) The supervisor of the national forest, grassland, prairie, or other comparable administrative unit is the responsible official for development and approval of a plan, plan amendment, or plan revision for lands under the responsibility of the supervisor, unless a regional forester; the Chief; the Under Secretary, Natural Resources and Environment; or the Secretary acts as the responsible official. Two or more responsible officials may undertake joint planning over lands under their respective jurisdictions.

(4) A plan for a unit that contains an experimental area may not be approved without the concurrence of the appropriate research station director with respect to the direction applicable to that area, and a plan amendment applicable to an experimental area may not be approved without the concurrence of the appropriate research station director.

(5) The Chief is responsible for leadership and direction for carrying out the NFS land management planning program under this part. The Chief shall:

(i) Establish planning procedures for this part in the Forest Service Directive System in Forest Service Manual 1920—Land Management Planning and in Forest Service Handbook 1909.12—Land Management Planning Handbook.

(ii) Establish and administer a national oversight process for accountability and consistency of NFS land management planning under this part.

(iii) Establish procedures in the Forest Service Directive System for obtaining inventory data on the various renewable resources, and soil and water.

(c) *Project and activity planning.* The supervisor or district ranger is the responsible official for project and activity decisions, unless a higher-level

official acts as the responsible official. Requirements for project or activity planning are established in the Forest Service Directive System. Except as provided in the plan consistency requirements in § 219.15, none of the requirements of this part apply to projects or activities.

### § 219.3   Role of science in planning.

The responsible official shall use the best available scientific information to inform the planning process required by this subpart. In doing so, the responsible official shall determine what information is the most accurate, reliable, and relevant to the issues being considered. The responsible official shall document how the best available scientific information was used to inform the assessment, the plan decision, and the monitoring program as required in §§ 219.6(a)(3) and 219.14(a)(4). Such documentation must: Identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered.

### § 219.4   Requirements for public participation.

(a) *Providing opportunities for participation.* The responsible official shall provide opportunities to the public for participating in the assessment process; developing a plan proposal, including the monitoring program; commenting on the proposal and the disclosure of its environmental impacts in accompanying NEPA documents; and reviewing the results of monitoring information. When developing opportunities for public participation, the responsible official shall take into account the discrete and diverse roles, jurisdictions, responsibilities, and skills of interested and affected parties; the accessibility of the process, opportunities, and information; and the cost, time, and available staffing. The responsible official should be proactive and use contemporary tools, such as the Internet, to engage the public, and should share information in an open way with interested parties. Subject to the notification requirements in § 219.16, the responsible official has the discretion to determine the scope, methods, forum, and timing of those opportunities. The Forest Service retains decisionmaking authority and responsibility for all decisions throughout the process.

(1) *Outreach.* The responsible official shall engage the public—including Tribes and Alaska Native Corporations, other Federal agencies, State and local

Rvsd Plan - 00001305

governments, individuals, and public and private organizations or entities—early and throughout the planning process as required by this part, using collaborative processes where feasible and appropriate. In providing opportunities for engagement, the responsible official shall encourage participation by:

(i) Interested individuals and entities, including those interested at the local, regional, and national levels.

(ii) Youth, low-income populations, and minority populations.

(iii) Private landowners whose lands are in, adjacent to, or otherwise affected by, or whose actions may impact, future management actions in the plan area.

(iv) Federal agencies, States, counties, and local governments, including State fish and wildlife agencies, State foresters and other relevant State agencies. Where appropriate, the responsible official shall encourage States, counties, and other local governments to seek cooperating agency status in the NEPA process for development, amendment, or revision of a plan. The responsible official may participate in planning efforts of States, counties, local governments, and other Federal agencies, where practicable and appropriate.

(v) Interested or affected federally recognized Indian Tribes or Alaska Native Corporations. Where appropriate, the responsible official shall encourage federally recognized Tribes to seek cooperating agency status in the NEPA process for development, amendment, or revision of a plan. The responsible official may participate in planning efforts of federally recognized Indian Tribes and Alaska Native Corporations, where practicable and appropriate.

(2) *Consultation with federally recognized Indian Tribes and Alaska Native Corporations.* The Department recognizes the Federal Government has certain trust responsibilities and a unique legal relationship with federally recognized Indian Tribes. The responsible official shall honor the government-to-government relationship between federally recognized Indian Tribes and the Federal government. The responsible official shall provide to federally recognized Indian Tribes and Alaska Native Corporations the opportunity to undertake consultation consistent with Executive Order 13175 of November 6, 2000, and 25 U.S.C. 450 note.

(3) *Native knowledge, indigenous ecological knowledge, and land ethics.* As part of tribal participation and consultation as set forth in paragraphs (a)(1)(v) and (a)(2) of this section, the responsible official shall request

information about native knowledge, land ethics, cultural issues, and sacred and culturally significant sites.

(b) *Coordination with other public planning efforts.* (1) The responsible official shall coordinate land management planning with the equivalent and related planning efforts of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments.

(2) For plan development or revision, the responsible official shall review the planning and land use policies of federally recognized Indian Tribes (43 U.S.C. 1712(b)), Alaska Native Corporations, other Federal agencies, and State and local governments, where relevant to the plan area. The results of this review shall be displayed in the environmental impact statement (EIS) for the plan (40 CFR 1502.16(c), 1506.2). The review shall include consideration of:

(i) The objectives of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments, as expressed in their plans and policies;

(ii) The compatibility and interrelated impacts of these plans and policies;

(iii) Opportunities for the plan to address the impacts identified or contribute to joint objectives; and

(iv) Opportunities to resolve or reduce conflicts, within the context of developing the plan's desired conditions or objectives.

(3) Nothing in this section should be read to indicate that the responsible official will seek to direct or control management of lands outside of the plan area, nor will the responsible official conform management to meet non-Forest Service objectives or policies.

### § 219.5  Planning framework.

(a) Planning for a national forest, grassland, prairie, or other comparable administrative unit of the NFS is an iterative process that includes assessment (§ 219.6); developing, amending, or revising a plan (§§ 219.7 and 219.13); and monitoring (§ 219.12). These three phases of the framework are complementary and may overlap. The intent of this framework is to create a responsive planning process that informs integrated resource management and allows the Forest Service to adapt to changing conditions, including climate change, and improve management based on new information and monitoring.

(1) *Assessment.* Assessments rapidly evaluate existing information about relevant ecological, economic, and social conditions, trends, and

sustainability and their relationship to the land management plan within the context of the broader landscape. The responsible official shall consider and evaluate existing and possible future conditions and trends of the plan area, and assess the sustainability of social, economic, and ecological systems within the plan area, in the context of the broader landscape (§ 219.6).

(2) *Plan development, plan amendment, or plan revision.*

(i) The process for developing or revising a plan includes: Assessment, preliminary identification of the need to change the plan based on the assessment, development of a proposed plan, consideration of the environmental effects of the proposal, providing an opportunity to comment on the proposed plan, providing an opportunity to object before the proposal is approved, and, finally, approval of the plan or plan revision. A new plan or plan revision requires preparation of an environmental impact statement.

(ii) The process for amending a plan includes: Preliminary identification of the need to change the plan, development of a proposed amendment, consideration of the environmental effects of the proposal, providing an opportunity to comment on the proposed amendment, providing an opportunity to object before the proposal is approved, and, finally, approval of the plan amendment. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects.

(3) *Monitoring.* Monitoring is continuous and provides feedback for the planning cycle by testing relevant assumptions, tracking relevant conditions over time, and measuring management effectiveness (§ 219.12). The monitoring program includes plan-level and broader-scale monitoring. The plan-level monitoring program is informed by the assessment phase; developed during plan development, plan amendment, or plan revision; and implemented after plan decision. The regional forester develops broader-scale monitoring strategies. Biennial monitoring evaluation reports document whether a change to the plan or change to the monitoring program is warranted based on new information, whether a new assessment may be needed, or whether there is no need for change at that time.

(b) *Interdisciplinary team(s).* The responsible official shall establish an interdisciplinary team or teams to

Rvsd Plan - 00001306

prepare assessments; new plans, plan amendments, and plan revisions; and plan monitoring programs.

### § 219.6   Assessment.

The responsible official has the discretion to determine the scope, scale, and timing of an assessment described in § 219.5(a)(1), subject to the requirements of this section.

(a) *Process for plan development or revision assessments.* An assessment must be completed for the development of a new plan or for a plan revision. The responsible official shall:

(1) Identify and consider relevant existing information contained in governmental or non-governmental assessments, plans, monitoring reports, studies, and other sources of relevant information. Such sources of information may include State forest assessments and strategies, the Resources Planning Act assessment, ecoregional assessments, non-governmental reports, State comprehensive outdoor recreation plans, community wildfire protection plans, public transportation plans, State wildlife data and action plans, and relevant Agency or interagency reports, resource plans or assessments. Relevant private information, including relevant land management plans and local knowledge, will be considered if publicly available or voluntarily provided.

(2) Coordinate with or provide opportunities for the regional forester, agency staff from State and Private Forestry and Research and Development, federally recognized Indian Tribes and Alaska Native Corporations, other governmental and non-governmental parties, and the public to provide existing information for the assessment.

(3) Document the assessment in a report available to the public. The report should document information needs relevant to the topics of paragraph (b) of this section. Document in the report how the best available scientific information was used to inform the assessment (§ 219.3). Include the report in the planning record (§ 219.14).

(b) *Content of the assessment for plan development or revision.* In the assessment for plan development or revision, the responsible official shall identify and evaluate existing information relevant to the plan area for the following:

(1) Terrestrial ecosystems, aquatic ecosystems, and watersheds;

(2) Air, soil, and water resources and quality;

(3) System drivers, including dominant ecological processes,

disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of terrestrial and aquatic ecosystems on the plan area to adapt to change;

(4) Baseline assessment of carbon stocks;

(5) Threatened, endangered, proposed and candidate species, and potential species of conservation concern present in the plan area;

(6) Social, cultural, and economic conditions;

(7) Benefits people obtain from the NFS planning area (ecosystem services);

(8) Multiple uses and their contributions to local, regional, and national economies;

(9) Recreation settings, opportunities and access, and scenic character;

(10) Renewable and nonrenewable energy and mineral resources;

(11) Infrastructure, such as recreational facilities and transportation and utility corridors;

(12) Areas of tribal importance;

(13) Cultural and historic resources and uses;

(14) Land status and ownership, use, and access patterns; and

(15) Existing designated areas located in the plan area including wilderness and wild and scenic rivers and potential need and opportunity for additional designated areas.

(c) *Plan amendment assessments.* Where the responsible official determines that a new assessment is needed to inform an amendment, the responsible official has the discretion to determine the scope, scale, process, and content for the assessment depending on the topic or topics to be addressed.

### § 219.7   New plan development or plan revision.

(a) *Plan revisions.* A plan revision creates a new plan for the entire plan area, whether the plan revision differs from the prior plan to a small or large extent. A plan must be revised at least every 15 years. But, the responsible official has the discretion to determine at any time that conditions on a plan area have changed significantly such that a plan must be revised (16 U.S.C. 1604(f)(5)).

(b) *New plan development.* New plan development is required for new NFS units. The process for developing a new plan is the same as the process for plan revision.

(c) *Process for plan development or revision.* (1) The process for developing or revising a plan includes: Public notification and participation (§§ 219.4 and 219.16), assessment (§§ 219.5 and 219.6), developing a proposed plan,

considering the environmental effects of the proposal, providing an opportunity to comment on the proposed plan, providing an opportunity to object before the proposal is approved (subpart B), and, finally, approving the plan or plan revision. A new plan or plan revision requires preparation of an environmental impact statement.

(2) In developing a proposed new plan or proposed plan revision, the responsible official shall:

(i) Review relevant information from the assessment and monitoring to identify a preliminary need to change the existing plan and to inform the development of plan components and other plan content.

(ii) Consider the goals and objectives of the Forest Service strategic plan (§ 219.2(a)).

(iii) Identify the presence and consider the importance of various physical, biological, social, cultural, and historic resources on the plan area (§ 219.6), with respect to the requirements for plan components of §§ 219.8 through 219.11.

(iv) Consider conditions, trends, and stressors (§ 219.6), with respect to the requirements for plan components of §§ 219.8 through 219.11.

(v) Identify and evaluate lands that may be suitable for inclusion in the National Wilderness Preservation System and determine whether to recommend any such lands for wilderness designation.

(vi) Identify the eligibility of rivers for inclusion in the National Wild and Scenic Rivers System, unless a systematic inventory has been previously completed and documented and there are no changed circumstances that warrant additional review.

(vii) Identify existing designated areas other than the areas identified in paragraphs (c)(2)(v) and (c)(2)(vi) of this section, and determine whether to recommend any additional areas for designation. If the responsible official has the delegated authority to designate a new area or modify an existing area, then the responsible official may designate such area when approving the plan, plan amendment, or plan revision.

(viii) Identify the suitability of areas for the appropriate integration of resource management and uses, with respect to the requirements for plan components of §§ 219.8 through 219.11, including identifying lands which are not suitable for timber production (§ 219.11).

(ix) Identify the maximum quantity of timber that may be removed from the plan area (§ 219.11(d)(6)).

(x) Identify questions and indicators for the plan monitoring program (§ 219.12).

(xi) Identify potential other content in the plan (paragraph (f) of this section).

(3) The regional forester shall identify the species of conservation concern for the plan area in coordination with the responsible official.

(d) *Management areas or geographic areas.* Every plan must have management areas or geographic areas or both. The plan may identify designated or recommended designated areas as management areas or geographic areas.

(e) *Plan components.* Plan components guide future project and activity decisionmaking. The plan must indicate whether specific plan components apply to the entire plan area, to specific management areas or geographic areas, or to other areas as identified in the plan.

(1) *Required plan components.* Every plan must include the following plan components:

(i) *Desired conditions.* A desired condition is a description of specific social, economic, and/or ecological characteristics of the plan area, or a portion of the plan area, toward which management of the land and resources should be directed. Desired conditions must be described in terms that are specific enough to allow progress toward their achievement to be determined, but do not include completion dates.

(ii) *Objectives.* An objective is a concise, measurable, and time-specific statement of a desired rate of progress toward a desired condition or conditions. Objectives should be based on reasonably foreseeable budgets.

(iii) *Standards.* A standard is a mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

(iv) *Guidelines.* A guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. (§ 219.15(d)(3)). Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

(v) *Suitability of lands.* Specific lands within a plan area will be identified as suitable for various multiple uses or activities based on the desired conditions applicable to those lands. The plan will also identify lands within the plan area as not suitable for uses that are not compatible with desired conditions for those lands. The suitability of lands need not be identified for every use or activity. Suitability identifications may be made after consideration of historic uses and of issues that have arisen in the planning process. Every plan must identify those lands that are not suitable for timber production (§ 219.11).

(2) *Optional plan component: goals.* A plan may include goals as plan components. Goals are broad statements of intent, other than desired conditions, usually related to process or interaction with the public. Goals are expressed in broad, general terms, but do not include completion dates.

(3) *Requirements for the set of plan components.* The set of plan components must meet the requirements set forth in this part for sustainability (§ 219.8), plant and animal diversity (§ 219.9), multiple use (§ 219.10), and timber (§ 219.11).

(f) *Other content in the plan.* (1) *Other required content in the plan.* Every plan must:

(i) Identify watershed(s) that are a priority for maintenance or restoration;

(ii) Describe the plan area's distinctive roles and contributions within the broader landscape;

(iii) Include the monitoring program required by § 219.12; and

(iv) Contain information reflecting proposed and possible actions that may occur on the plan area during the life of the plan, including: the planned timber sale program; timber harvesting levels; and the proportion of probable methods of forest vegetation management practices expected to be used (16 U.S.C. 1604(e)(2) and (f)(2)). Such information is not a commitment to take any action and is not a "proposal" as defined by the Council on Environmental Quality regulations for implementing NEPA (40 CFR 1508.23, 42 U.S.C. 4322(2)(C)).

(2) *Optional content in the plan.* A plan may include additional content, such as potential management approaches or strategies and partnership opportunities or coordination activities.

## § 219.8  Sustainability.

The plan must provide for social, economic, and ecological sustainability within Forest Service authority and consistent with the inherent capability of the plan area, as follows:

(a) *Ecological sustainability.* (1) *Ecosystem Integrity.* The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity, taking into account:

(i) Interdependence of terrestrial and aquatic ecosystems in the plan area.

(ii) Contributions of the plan area to ecological conditions within the broader landscape influenced by the plan area.

(iii) Conditions in the broader landscape that may influence the sustainability of resources and ecosystems within the plan area.

(iv) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of terrestrial and aquatic ecosystems on the plan area to adapt to change.

(v) Wildland fire and opportunities to restore fire adapted ecosystems.

(vi) Opportunities for landscape scale restoration.

(2) *Air, soil, and water.* The plan must include plan components, including standards or guidelines, to maintain or restore:

(i) Air quality.

(ii) Soils and soil productivity, including guidance to reduce soil erosion and sedimentation.

(iii) Water quality.

(iv) Water resources in the plan area, including lakes, streams, and wetlands; ground water; public water supplies; sole source aquifers; source water protection areas; and other sources of drinking water (including guidance to prevent or mitigate detrimental changes in quantity, quality, and availability).

(3) *Riparian areas.* (i) The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of riparian areas in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity, taking into account:

(A) Water temperature and chemical composition;

(B) Blockages (uncharacteristic and characteristic) of water courses;

(C) Deposits of sediment;

(D) Aquatic and terrestrial habitats;

(E) Ecological connectivity;

(F) Restoration needs; and

(G) Floodplain values and risk of flood loss.

(ii) Plans must establish width(s) for riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands, within which the plan components required by paragraph (a)(3)(i) of this section will apply, giving special attention to land and vegetation for approximately 100 feet from the edges of all perennial streams and lakes.

Rvsd Plan - 00001308

(A) Riparian management zone width(s) may vary based on ecological or geomorphic factors or type of water body; and will apply unless replaced by a site-specific delineation of the riparian area.

(B) Plan components must ensure that no management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment that seriously and adversely affect water conditions or fish habitat shall be permitted within the riparian management zones or the site-specific delineated riparian areas.

(4) *Best management practices for water quality.* The Chief shall establish requirements for national best management practices for water quality in the Forest Service Directive System. Plan components must ensure implementation of these practices.

(b) *Social and economic sustainability.* The plan must include plan components, including standards or guidelines, to guide the plan area's contribution to social and economic sustainability, taking into account:

(1) Social, cultural, and economic conditions relevant to the area influenced by the plan;

(2) Sustainable recreation; including recreation settings, opportunities, and access; and scenic character;

(3) Multiple uses that contribute to local, regional, and national economies in a sustainable manner;

(4) Ecosystem services;

(5) Cultural and historic resources and uses; and

(6) Opportunities to connect people with nature.

### § 219.9  Diversity of plant and animal communities.

This section adopts a complementary ecosystem and species-specific approach to maintaining the diversity of plant and animal communities and the persistence of native species in the plan area. Compliance with the ecosystem requirements of paragraph (a) is intended to provide the ecological conditions to both maintain the diversity of plant and animal communities and support the persistence of most native species in the plan area. Compliance with the requirements of paragraph (b) is intended to provide for additional ecological conditions not otherwise provided by compliance with paragraph (a) for individual species as set forth in paragraph (b). The plan must provide for the diversity of plant and animal communities, within Forest Service authority and consistent with the

inherent capability of the plan area, as follows:

(a) *Ecosystem plan components.* (1) *Ecosystem integrity.* As required by § 219.8(a), the plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore their structure, function, composition, and connectivity.

(2) *Ecosystem diversity.* The plan must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area. In doing so, the plan must include plan components to maintain or restore:

(i) Key characteristics associated with terrestrial and aquatic ecosystem types;

(ii) Rare aquatic and terrestrial plant and animal communities; and

(iii) The diversity of native tree species similar to that existing in the plan area.

(b) *Additional, species-specific plan components.* (1) The responsible official shall determine whether or not the plan components required by paragraph (a) of this section provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area. If the responsible official determines that the plan components required in paragraph (a) are insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area.

(2) If the responsible official determines that it is beyond the authority of the Forest Service or not within the inherent capability of the plan area to maintain or restore the ecological conditions to maintain a viable population of a species of conservation concern in the plan area, then the responsible official shall:

(i) Document the basis for that determination (§ 219.14(a)); and

(ii) Include plan components, including standards or guidelines, to maintain or restore ecological conditions within the plan area to contribute to maintaining a viable population of the species within its range. In providing such plan components, the responsible official shall coordinate to the extent

practicable with other Federal, State, Tribal, and private land managers having management authority over lands relevant to that population.

(c) *Species of conservation concern.* For purposes of this subpart, a species of conservation concern is a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area.

### § 219.10  Multiple use.

While meeting the requirements of §§ 219.8 and 219.9, the plan must provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area as follows:

(a) *Integrated resource management for multiple use.* The plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area. When developing plan components for integrated resource management, to the extent relevant to the plan area and the public participation process and the requirements of §§ 219.7, 219.8, 219.9, and 219.11, the responsible official shall consider:

(1) Aesthetic values, air quality, cultural and heritage resources, ecosystem services, fish and wildlife species, forage, geologic features, grazing and rangelands, habitat and habitat connectivity, recreation settings and opportunities, riparian areas, scenery, soil, surface and subsurface water quality, timber, trails, vegetation, viewsheds, wilderness, and other relevant resources and uses.

(2) Renewable and nonrenewable energy and mineral resources.

(3) Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors.

(4) Opportunities to coordinate with neighboring landowners to link open spaces and take into account joint management objectives where feasible and appropriate.

(5) Habitat conditions, subject to the requirements of § 219.9, for wildlife, fish, and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence, and other activities (in

collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments).

(6) Land status and ownership, use, and access patterns relevant to the plan area.

(7) Reasonably foreseeable risks to ecological, social, and economic sustainability.

(8) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of the terrestrial and aquatic ecosystems on the plan area to adapt to change (§ 219.8);

(9) Public water supplies and associated water quality.

(10) Opportunities to connect people with nature.

(b) *Requirements for plan components for a new plan or plan revision.* (1) The plan must include plan components, including standards or guidelines, to provide for:

(i) Sustainable recreation: including recreation settings, opportunities, and access; and scenic character. Recreation opportunities may include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air.

(ii) Protection of cultural and historic resources.

(iii) Management of areas of tribal importance.

(iv) Protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation to protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation.

(v) Protection of designated wild and scenic rivers as well as management of rivers found eligible or determined suitable for the National Wild and Scenic River system to protect the values that provide the basis for their suitability for inclusion in the system.

(vi) Appropriate management of other designated areas or recommended designated areas in the plan area, including research natural areas.

(2) Other plan components for integrated resource management to provide for multiple use as necessary.

**§ 219.11   Timber requirements based on the NFMA.**

While meeting the requirements of §§ 219.8 through 219.10, the plan must include plan components, including standards or guidelines, and other plan content regarding timber management within Forest Service authority and the inherent capability of the plan area, as follows:

(a) *Lands not suited for timber production.* (1) The responsible official shall identify lands within the plan area as not suited for timber production if any one of the following factors applies:

(i) Statute, Executive order, or regulation prohibits timber production on the land;

(ii) The Secretary of Agriculture or the Chief has withdrawn the land from timber production;

(iii) Timber production would not be compatible with the achievement of desired conditions and objectives established by the plan for those lands;

(iv) The technology is not currently available for conducting timber harvest without causing irreversible damage to soil, slope, or other watershed conditions;

(v) There is no reasonable assurance that such lands can be adequately restocked within 5 years after final regeneration harvest; or

(vi) The land is not forest land.

(2) The responsible official shall review lands identified in the plan as not suited for timber production at least once every 10 years, or as otherwise prescribed by law, to determine whether conditions have changed so that they have become suitable for timber production. As a result of this 10-year review, the plan may be amended to identify any such lands as suitable for timber production, if warranted by changed conditions.

(b) *Timber harvest for purposes of timber production.* A plan that identifies lands as suitable for timber production must include plan components, including standards or guidelines, to guide timber harvest for timber production or for other multiple use purposes on such lands.

(c) *Timber harvest for purposes other than timber production.* Except as provided in paragraph (d) of this section, the plan may include plan components to allow for timber harvest for purposes other than timber production throughout the plan area, or portions of the plan area, as a tool to assist in achieving or maintaining one or more applicable desired conditions or objectives of the plan in order to protect other multiple-use values, and for salvage, sanitation, or public health or safety. Examples of using timber harvest to protect other multiple use values may include improving wildlife or fish habitat, thinning to reduce fire risk, or restoring meadow or savanna ecosystems where trees have invaded.

(d) *Limitations on timber harvest.* Whether timber harvest would be for the purposes of timber production or other purposes, plan components, including standards or guidelines, must ensure the following:

(1) No timber harvest for the purposes of timber production may occur on lands not suited for timber production.

(2) Timber harvest would occur only where soil, slope, or other watershed conditions would not be irreversibly damaged;

(3) Timber harvest would be carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and aesthetic resources.

(4) Where plan components will allow clearcutting, seed tree cutting, shelterwood cutting, or other cuts designed to regenerate an even-aged stand of timber, the plan must include standards limiting the maximize size for openings that may be cut in one harvest operation, according to geographic areas, forest types, or other suitable classifications. Except as provided in paragraphs (d)(4)(i) through (iii) of this section, this limit may not exceed 60 acres for the Douglas-fir forest type of California, Oregon, and Washington; 80 acres for the southern yellow pine types of Alabama, Arkansas, Georgia, Florida, Louisiana, Mississippi, North Carolina, South Carolina, Oklahoma, and Texas; 100 acres for the hemlock-Sitka spruce forest type of coastal Alaska; and 40 acres for all other forest types.

(i) Plan standards may allow for openings larger than those specified in paragraph (d)(4) of this section to be cut in one harvest operation where the responsible official determines that larger harvest openings are necessary to help achieve desired ecological conditions in the plan area. If so, standards for exceptions shall include the particular conditions under which the larger size is permitted and must set a maximum size permitted under those conditions.

(ii) Plan components may allow for size limits exceeding those established in paragraphs (d)(4) and (d)(4)(i) of this section on an individual timber sale basis after 60 days public notice and review by the regional forester.

(iii) The plan maximum size for openings to be cut in one harvest operation shall not apply to the size of openings harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm (16 U.S.C. 1604(g)(3)(F)(iv)).

(5) Timber will be harvested from NFS lands only where such harvest would comply with the resource protections set out in sections 6(g)(3)(E) and (F) of the NFMA (16 U.S.C. 1604(g)(3)(E) and (F)). Some of these

Rvsd Plan - 00001310

requirements are listed in paragraphs (d)(2) to (d)(4) of this section.

(6) The quantity of timber that may be sold from the national forest is limited to an amount equal to or less than that which can be removed from such forest annually in perpetuity on a sustained-yield basis. This limit may be measured on a decadal basis. The plan may provide for departures from this limit as provided by the NFMA when departure would be consistent with the plan's desired conditions and objectives. Exceptions for departure from this limit on the quantity sold may be made only after a public review and comment period of at least 90 days. The Chief must include in the Forest Service Directive System procedures for estimating the quantity of timber that can be removed annually in perpetuity on a sustained-yield basis, and exceptions, consistent with 16 U.S.C. 1611.

(7) The regeneration harvest of even-aged stands of trees is limited to stands that generally have reached the culmination of mean annual increment of growth. This requirement would apply only to regeneration harvest of even-aged stands on lands identified as suitable for timber production and where timber production is the primary purpose for the harvest. Plan components may allow for exceptions, set out in 16 U.S.C. 1604(m), only if such harvest is consistent with the other plan components of the land management plan.

### § 219.12   Monitoring.

(a) *Plan monitoring program.* (1) The responsible official shall develop a monitoring program for the plan area and include it in the plan. Monitoring information should enable the responsible official to determine if a change in plan components or other plan content that guide management of resources on the plan area may be needed. The development of the plan monitoring program must be coordinated with the regional forester and Forest Service State and Private Forestry and Research and Development. Responsible officials for two or more administrative units may jointly develop their plan monitoring programs.

(2) The plan monitoring program sets out the plan monitoring questions and associated indicators. Monitoring questions and associated indicators must be designed to inform the management of resources on the plan area, including by testing relevant assumptions, tracking relevant changes, and measuring management effectiveness and progress toward

achieving or maintaining the plan's desired conditions or objectives. Questions and indicators should be based on one or more desired conditions, objectives, or other plan components in the plan, but not every plan component needs to have a corresponding monitoring question.

(3) The plan monitoring program should be coordinated and integrated with relevant broader-scale monitoring strategies (paragraph (b) of this section) to ensure that monitoring is complementary and efficient, and that information is gathered at scales appropriate to the monitoring questions.

(4) Subject to the requirements of paragraph (a)(5) of this section, the responsible official has the discretion to set the scope and scale of the plan monitoring program, after considering:

(i) Information needs identified through the planning process as most critical for informed management of resources on the plan area; and

(ii) The financial and technical capabilities of the Agency.

(5) Each plan monitoring program must contain one or more monitoring questions and associated indicators addressing each of the following:

(i) The status of select watershed conditions.

(ii) The status of select ecological conditions including key characteristics of terrestrial and aquatic ecosystems.

(iii) The status of focal species to assess the ecological conditions required under § 219.9.

(iv) The status of a select set of the ecological conditions required under § 219.9 to contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern.

(v) The status of visitor use, visitor satisfaction, and progress toward meeting recreation objectives.

(vi) Measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area.

(vii) Progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities.

(viii) The effects of each management system to determine that they do not substantially and permanently impair the productivity of the land (16 U.S.C. 1604(g)(3)(C)).

(6) A range of monitoring techniques may be used to carry out the monitoring requirements in paragraph (a)(5) of this section.

(7) This section does not apply to projects or activities. Project and

activity monitoring may be used to gather information for the plan monitoring program, and information gathered through plan monitoring may be used to inform development of projects or activities. But, the monitoring requirements of this section are not a prerequisite for making a decision to carry out a project or activity.

(b) *Broader-scale monitoring strategies.* (1) The regional forester shall develop a broader-scale monitoring strategy for plan monitoring questions that can best be answered at a geographic scale broader than one plan area.

(2) When developing a monitoring strategy, the regional forester shall coordinate with the relevant responsible officials, Forest Service State and Private Forestry and Research and Development, partners, and the public. Two or more regional foresters may jointly develop broader-scale monitoring strategies.

(3) Each regional forester shall ensure that the broader-scale monitoring strategy is within the financial and technical capabilities of the region and complements other ongoing monitoring efforts.

(4) Projects and activities may be carried out under plans developed, amended, or revised under this part before the regional forester has developed a broader-scale monitoring strategy.

(c) *Timing and process for developing the plan monitoring program and broader-scale strategies.* (1) The responsible official shall develop the plan monitoring program as part of the planning process for a new plan development or plan revision. Where a plan's monitoring program has been developed under the provisions of a prior planning regulation and the unit has not initiated plan revision under this part, the responsible official shall modify the plan monitoring program within 4 years of the effective date of this part, or as soon as practicable, to meet the requirements of this section.

(2) The regional forester shall develop a broader-scale monitoring strategy as soon as practicable.

(3) To the extent practicable, appropriate, and relevant to the monitoring questions in the plan monitoring program, plan monitoring programs and broader-scale strategies must be designed to take into account:

(i) Existing national and regional inventory, monitoring, and research programs of the Agency, including from the NFS, State and Private Forestry, and Research and Development, and of other

governmental and non-governmental entities;

(ii) Opportunities to design and carry out multi-party monitoring with other Forest Service units, Federal, State or local government agencies, scientists, partners, and members of the public; and

(iii) Opportunities to design and carry out monitoring with federally recognized Indian Tribes and Alaska Native Corporations.

(d) *Biennial evaluation of the monitoring information.* (1) The responsible official shall conduct a biennial evaluation of new information gathered through the plan monitoring program and relevant information from the broader-scale strategy, and shall issue a written report of the evaluation and make it available to the public.

(i) The first monitoring evaluation for a plan or plan revision developed in accordance with this subpart must be completed no later than 2 years from the effective date of plan decision.

(ii) Where the monitoring program developed under the provisions of a prior planning regulation has been modified to meet the requirements of paragraph (c)(1) of this section, the first monitoring evaluation must be completed no later than 2 years from the date the change takes effect.

(iii) The monitoring evaluation report may be postponed for 1 year in case of exigencies, but notice of the postponement must be provided to the public prior to the date the report is due for that year (§ 219.16(c)(6)).

(2) The monitoring evaluation report must indicate whether or not a change to the plan, management activities, or the monitoring program, or a new assessment, may be warranted based on the new information. The monitoring evaluation report must be used to inform adaptive management of the plan area.

(3) The monitoring evaluation report may be incorporated into other planning documents if the responsible official has initiated a plan revision or relevant amendment.

(4) The monitoring evaluation report is not a decision document representing final Agency action, and is not subject to the objection provisions of subpart B.

### § 219.13 Plan amendment and administrative changes.

(a) *Plan amendment.* A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas).

(b) *Amendment process.* The responsible official shall:

(1) Base an amendment on a preliminary identification of the need to change the plan. The preliminary identification of the need to change the plan may be based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances. When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the project or activity may serve as the documentation for the preliminary identification of the need to change the plan;

(2) Provide opportunities for public participation as required in § 219.4 and public notification as required in § 219.16. The responsible official may combine processes and associated public notifications where appropriate, considering the scope and scale of the need to change the plan; and

(3) Amend the plan consistent with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects. A proposed amendment that may create a significant environmental effect and thus require preparation of an environmental impact statement is considered a significant change in the plan for the purposes of the NFMA.

(c) *Administrative changes.* An administrative change is any change to a plan that is not a plan amendment or plan revision. Administrative changes include corrections of clerical errors to any part of the plan, conformance of the plan to new statutory or regulatory requirements, or changes to other content in the plan (§ 219.7(f)).

(1) A substantive change to the monitoring program made outside of the process for plan revision or amendment may be made only after notice to the public of the intended change and consideration of public comment (§ 219.16(c)(6)).

(2) All other administrative changes may be made following public notice (§ 219.16(c)(6)).

### § 219.14 Decision document and planning records.

(a) *Decision document.* The responsible official shall record approval of a new plan, plan amendment, or revision in a decision document prepared according to Forest Service NEPA procedures (36 CFR 220). The decision document must include:

(1) The rationale for approval;

(2) An explanation of how the plan components meet the sustainability requirements of § 219.8, the diversity requirements of § 219.9, the multiple use requirements of § 219.10, and the timber requirements of § 219.11;

(3) A statement of how the plan, plan amendment, or plan revision applies to approved projects and activities (§ 219.15);

(4) The documentation of how the best available scientific information was used to inform planning, the plan components, and other plan content, including the plan monitoring program (§ 219.3);

(5) The concurrence by the appropriate research station director with any part of the plan applicable to any experimental forests or experimental ranges (§ 219.2(b)(4)); and

(6) The effective date of the plan, amendment, or revision.

(b) *Planning records.* (1) The responsible official shall keep the following documents readily accessible to the public by posting them online and through other means: assessment reports (§ 219.6); the plan, including the monitoring program; the proposed plan, plan amendment, or plan revision; public notices and environmental documents associated with a plan; plan decision documents; and monitoring evaluation reports (§ 219.12).

(2) The planning record includes documents that support analytical conclusions made and alternatives considered throughout the planning process. The responsible official shall make the planning record available at the office where the plan, plan amendment, or plan revision was developed.

### § 219.15 Project and activity consistency with the plan.

(a) *Application to existing authorizations and approved projects or activities.* Every decision document approving a plan, plan amendment, or plan revision must state whether authorizations of occupancy and use made before the decision document may proceed unchanged. If a plan decision document does not expressly allow such occupancy and use, the permit, contract, and other authorizing instrument for the use and occupancy must be made

consistent with the plan, plan amendment, or plan revision as soon as practicable, as provided in paragraph (d) of this section, subject to valid existing rights.

(b) *Application to projects or activities authorized after plan decision.* Projects and activities authorized after approval of a plan, plan amendment, or plan revision must be consistent with the plan as provided in paragraph (d) of this section.

(c) *Resolving inconsistency.* When a proposed project or activity would not be consistent with the applicable plan components, the responsible official shall take one of the following steps, subject to valid existing rights:

(1) Modify the proposed project or activity to make it consistent with the applicable plan components;

(2) Reject the proposal or terminate the project or activity;

(3) Amend the plan so that the project or activity will be consistent with the plan as amended; or

(4) Amend the plan contemporaneously with the approval of the project or activity so that the project or activity will be consistent with the plan as amended. This amendment may be limited to apply only to the project or activity.

(d) *Determining consistency.* Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components developed or revised in conformance with this part by meeting the following criteria:

(1) *Goals, desired conditions, and objectives.* The project or activity contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives, or does not foreclose the opportunity to maintain or achieve any goals, desired conditions, or objectives, over the long term.

(2) *Standards.* The project or activity complies with applicable standards.

(3) *Guidelines.* The project or activity:

(i) Complies with applicable guidelines as set out in the plan; or

(ii) Is designed in a way that is as effective in achieving the purpose of the applicable guidelines (§ 219.7(e)(1)(iv)).

(4) *Suitability.* A project or activity would occur in an area:

(i) That the plan identifies as suitable for that type of project or activity; or

(ii) For which the plan is silent with respect to its suitability for that type of project or activity.

(e) *Consistency of resource plans within the planning area with the land management plan.* Any resource plans (for example, travel management plans)

developed by the Forest Service that apply to the resources or land areas within the planning area must be consistent with the plan components. Resource plans developed prior to plan decision must be evaluated for consistency with the plan and amended if necessary.

## § 219.16  Public notifications.

The following public notification requirements apply to plan development, amendment, or revision. Notifications may be combined where appropriate.

(a) *When formal public notification is required.* Public notification must be provided as follows:

(1) To initiate the development of a proposed plan, plan amendment, or plan revision;

(2) To invite comments on a proposed plan, plan amendment, or plan revision, and associated environmental analysis. For a new plan, plan amendment, or a plan revision for which a draft environmental impact statement (EIS) is prepared, the comment period is at least 90 days. For an amendment for which a draft EIS is not prepared, the comment period is at least 30 days;

(3) To begin the objection period for a plan, plan amendment, or plan revision before approval (§ 219.52);

(4) To approve a final plan, plan amendment, or plan revision; or

(5) To announce whenever a plan, plan amendment, or plan revision process initiated under the provisions of a previous planning regulation will be conformed to meet the provisions of this part (§ 219.17(b)(3)).

(b) *Project or activity plan amendments.* When a plan amendment is approved in a decision document approving a project or activity and the amendment applies only to the project or activity, the notification requirements of 36 CFR part 215 or part 218, subpart A, applies instead of this section.

(c) *How public notice is provided.* The responsible official should use contemporary tools to provide notice to the public. At a minimum, all public notifications required by this part must be posted online, and:

(1) When the Chief, the Under Secretary, or the Secretary is the responsible official, notice must be published in the **Federal Register**.

(2) For a new plan or plan revision, when an official other than the Chief, the Under Secretary, or the Secretary is the responsible official, notice must be published in the **Federal Register** and the applicable newspaper(s) of record.

(3) When the notice is for the purpose of inviting comments on a proposed plan, plan amendment, or plan revision

for which a draft EIS is prepared, the Environmental Protection Agency (EPA) **Federal Register** notice of availability of a draft EIS shall serve as the required **Federal Register** notice.

(4) For a plan amendment when an official other than the Chief, the Under Secretary, or the Secretary is the responsible official, and for which a draft EIS is not prepared, notices must be published in the newspaper(s) of record.

(5) If a plan, plan amendment, or plan revision applies to two or more units, notices must be published in the **Federal Register** and the newspaper(s) of record for the applicable units.

(6) Additional public notice of administrative changes, changes to the monitoring program, opportunities to provide information for assessments, assessment reports, monitoring evaluation reports, or other notices not listed in paragraph (a) of this section may be made in any way the responsible official deems appropriate.

(d) *Content of public notices.* Public notices required by this section except for notices applicable to paragraph (c)(3) of this section, must clearly describe the action subject to notice and the nature and scope of the decisions to be made; identify the responsible official; describe when, where, and how the responsible official will provide opportunities for the public to participate in the planning process; and explain how to obtain additional information.

## § 219.17  Effective dates and transition.

(a) *Effective dates.* (1) A plan or plan revision is effective 30 days after publication of notice of its approval.

(2) Except as provided in paragraph (a)(3) of this section, a plan amendment for which an environmental impact statement (EIS) has been prepared is effective 30 days after publication of notice of its approval; a plan amendment for which an EIS has not been prepared is effective immediately.

(3) A plan amendment that applies to only one specific project or activity is effective on the date the project may be implemented in accordance with administrative review regulations at 36 CFR parts 215 and 218.

(b) *Plan amendment and plan revision transition.* For the purposes of this section, initiation means that the Agency has issued a notice of intent or other notice announcing the beginning of the process to develop a proposed plan, plan amendment, or plan revision.

(1) *Initiating plan development and plan revisions.* Plan development and plan revisions initiated after May 9,

2012 must conform to the requirements of this part.

(2) *Initiating plan amendments.* All plan amendments initiated after May 9, 2012 are subject to the objection process in subpart B of this part. With respect to plans approved or revised under a prior planning regulation, including the transition provisions of the reinstated 2000 rule (36 CFR part 209, published at 36 CFR parts 200 to 209, revised as of July 1, 2010), plan amendments may be initiated under the provisions of the prior planning regulation for 3 years after May 9, 2012, and may be completed and approved under those provisions (except for the optional appeal procedures of the prior planning regulation); or may be initiated, completed, and approved under the requirements of this part. After the 3-year transition period, all plan amendments must be initiated, completed, and approved under the requirements of this part.

(3) *Plan development, plan amendments, or plan revisions initiated before this part.* For plan development, plan amendments, or plan revisions that were initiated before May 9, 2012, the responsible official may complete and approve the plan, plan amendment, or plan revision in conformance with the provisions of the prior planning regulation, including its transition provisions (36 CFR part 209, published at 36 CFR parts 200 to 209, revised as of July 1, 2010), or may conform the plan, plan amendment, or plan revision to the requirements of this part. If the responsible official chooses to complete an ongoing planning process under the provisions of the prior planning regulation, but chooses to allow for an objection rather than an administrative appeal, the objection process in subpart B of this part shall apply. When the responsible official chooses to conform an ongoing planning process to this part, public notice must be made (§ 219.16(a)(5)). An objection process may be chosen only if the public is provided the opportunity to comment on a proposed plan, plan amendment, or plan revision, and associated environmental analysis.

(c) *Plans developed, amended, or revised under a prior planning regulation.* This part supersedes any prior planning regulation. No obligations remain from any prior planning regulation, except those that are specifically included in a unit's existing plan. Existing plans will remain in effect until revised. This part does not compel a change to any existing plan, except as required in § 219.12(c)(1). None of the requirements of this part apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part, except that projects or activities on such units must comply with the consistency requirement of § 219.15 with respect to any amendments that are developed and approved pursuant to this part.

**§ 219.18   Severability.**

In the event that any specific provision of this part is deemed by a court to be invalid, the remaining provisions shall remain in effect.

**§ 219.19   Definitions.**

Definitions of the special terms used in this subpart are set out as follows.

*Alaska Native Corporation.* One of the regional, urban, and village native corporations formed under the Alaska Native Claims Settlement Act of 1971.

*Assessment.* For the purposes of this subpart, an assessment is the identification and evaluation of existing information to support land management planning. Assessments are not decisionmaking documents, but provide current information on select topics relevant to the plan area, in the context of the broader landscape.

*Best management practices for water quality (BMPs).* Methods, measures, or practices selected by an agency to meet its nonpoint source control needs. BMPs include but are not limited to structural and nonstructural controls and operation and maintenance procedures. BMPs can be applied before, during, and after pollution-producing activities to reduce or eliminate the introduction of pollutants into receiving waters.

*Candidate species.* (1) For U.S. Fish and Wildlife Service candidate species, a species for which the U.S. Fish and Wildlife Service possesses sufficient information on vulnerability and threats to support a proposal to list as endangered or threatened, but for which no proposed rule has yet been published by the U.S. Fish and Wildlife Service.

(2) For National Marine Fisheries Service candidate species, a species that is:

(i) The subject of a petition to list and for which the National Marine Fisheries Service has determined that listing may be warranted, pursuant to section 4(b)(3)(A) of the Endangered Species Act (16 U.S.C. 1533(b)(3)(A)), or

(ii) Not the subject of a petition but for which the National Marine Fisheries Service has announced in the **Federal Register** the initiation of a status review.

*Collaboration or collaborative process.* A structured manner in which a collection of people with diverse interests share knowledge, ideas, and resources while working together in an inclusive and cooperative manner toward a common purpose. Collaboration, in the context of this part, falls within the full spectrum of public engagement described in the Council on Environmental Quality's publication of October, 2007: Collaboration in NEPA—A Handbook for NEPA Practitioners.

*Connectivity.* Ecological conditions that exist at several spatial and temporal scales that provide landscape linkages that permit the exchange of flow, sediments, and nutrients; the daily and seasonal movements of animals within home ranges; the dispersal and genetic interchange between populations; and the long distance range shifts of species, such as in response to climate change.

*Conservation.* The protection, preservation, management, or restoration of natural environments, ecological communities, and species.

*Conserve.* For purposes of § 219.9, to protect, preserve, manage, or restore natural environments and ecological communities to potentially avoid federally listing of proposed and candidate species.

*Culmination of mean annual increment of growth.* See mean annual increment of growth.

*Designated area.* An area or feature identified and managed to maintain its unique special character or purpose. Some categories of designated areas may be designated only by statute and some categories can be established administratively in the land management planning process or by other administrative processes of the Federal executive branch. Examples of statutorily designated areas are national heritage areas, national recreational areas, national scenic trails, wild and scenic rivers, wilderness areas, and wilderness study areas. Examples of administratively designated areas are experimental forests, research natural areas, scenic byways, botanical areas, and significant caves.

*Disturbance.* Any relatively discrete event in time that disrupts ecosystem, watershed, community, or species population structure and/or function and changes resources, substrate availability, or the physical environment.

*Disturbance regime.* A description of the characteristic types of disturbance on a given landscape; the frequency, severity, and size distribution of these characteristic disturbance types; and their interactions.

*Ecological conditions.* The biological and physical environment that can affect the diversity of plant and animal communities, the persistence of native species, and the productive capacity of ecological systems. Ecological

conditions include habitat and other influences on species and the environment. Examples of ecological conditions include the abundance and distribution of aquatic and terrestrial habitats, connectivity, roads and other structural developments, human uses, and invasive species.

*Ecological integrity.* The quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence.

*Ecological sustainability.* See sustainability.

*Ecological system.* See ecosystem.

*Economic sustainability.* See sustainability.

*Ecosystem.* A spatially explicit, relatively homogeneous unit of the Earth that includes all interacting organisms and elements of the abiotic environment within its boundaries. An ecosystem is commonly described in terms of its:

(1) Composition. The biological elements within the different levels of biological organization, from genes and species to communities and ecosystems.

(2) Structure. The organization and physical arrangement of biological elements such as, snags and down woody debris, vertical and horizontal distribution of vegetation, stream habitat complexity, landscape pattern, and connectivity.

(3) Function. Ecological processes that sustain composition and structure, such as energy flow, nutrient cycling and retention, soil development and retention, predation and herbivory, and natural disturbances such as wind, fire, and floods.

(4) Connectivity. (see connectivity above).

*Ecosystem diversity.* The variety and relative extent of ecosystems.

*Ecosystem services.* Benefits people obtain from ecosystems, including:

(1) *Provisioning services,* such as clean air and fresh water, energy, fuel, forage, fiber, and minerals;

(2) *Regulating services,* such as long term storage of carbon; climate regulation; water filtration, purification, and storage; soil stabilization; flood control; and disease regulation;

(3) *Supporting services,* such as pollination, seed dispersal, soil formation, and nutrient cycling; and

(4) *Cultural services,* such as educational, aesthetic, spiritual and

cultural heritage values, recreational experiences and tourism opportunities.

*Environmental assessment (EA).* See definition in § 219.62.

*Environmental document.* For the purposes of this part: an environmental assessment, environmental impact statement, finding of no significant impact, categorical exclusion, and notice of intent to prepare an environmental impact statement.

*Environmental impact statement (EIS).* See definition in § 219.62.

*Even-aged stand.* A stand of trees composed of a single age class.

*Federally recognized Indian Tribe.* An Indian or Alaska Native Tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe under the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a.

*Focal species.* A small subset of species whose status permits inference to the integrity of the larger ecological system to which it belongs and provides meaningful information regarding the effectiveness of the plan in maintaining or restoring the ecological conditions to maintain the diversity of plant and animal communities in the plan area. Focal species would be commonly selected on the basis of their functional role in ecosystems.

*Forest land.* Land at least 10 percent occupied by forest trees of any size or formerly having had such tree cover and not currently developed for non-forest uses. Lands developed for non-forest use include areas for crops, improved pasture, residential or administrative areas, improved roads of any width and adjoining road clearing, and power line clearings of any width.

*Geographic area.* A spatially contiguous land area identified within the planning area. A geographic area may overlap with a management area.

*Inherent capability of the plan area.* The ecological capacity or ecological potential of an area characterized by the interrelationship of its physical elements, its climatic regime, and natural disturbances.

*Integrated resource management.* Multiple use management that recognizes the interdependence of ecological resources and is based on the need for integrated consideration of ecological, social, and economic factors.

*Landscape.* A defined area irrespective of ownership or other artificial boundaries, such as a spatial mosaic of terrestrial and aquatic ecosystems, landforms, and plant communities, repeated in similar form throughout such a defined area.

*Maintain.* In reference to an ecological condition: To keep in existence or

continuance of the desired ecological condition in terms of its desired composition, structure, and processes. Depending upon the circumstance, ecological conditions may be maintained by active or passive management or both.

*Management area.* A land area identified within the planning area that has the same set of applicable plan components. A management area does not have to be spatially contiguous.

*Management system.* For purposes of this subpart, a timber management system including even-aged management and uneven-aged management.

*Mean annual increment of growth and culmination of mean annual increment of growth.* Mean annual increment of growth is the total increment of increase of volume of a stand (standing crop plus thinnings) up to a given age divided by that age. Culmination of mean annual increment of growth is the age in the growth cycle of an even-aged stand at which the average annual rate of increase of volume is at a maximum. In land management plans, mean annual increment is expressed in cubic measure and is based on the expected growth of stands, according to intensities and utilization guidelines in the plan.

*Monitoring.* A systematic process of collecting information to evaluate effects of actions or changes in conditions or relationships.

*Multiple use.* The management of all the various renewable surface resources of the NFS so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output, consistent with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528–531).

*National Forest System.* See definition in § 219.62.

*Native knowledge.* A way of knowing or understanding the world, including traditional ecological and social knowledge of the environment derived from multiple generations of indigenous peoples' interactions, observations, and

experiences with their ecological systems. Native knowledge is place-based and culture-based knowledge in which people learn to live in and adapt to their own environment through interactions, observations, and experiences with their ecological system. This knowledge is generally not solely gained, developed by, or retained by individuals, but is rather accumulated over successive generations and is expressed through oral traditions, ceremonies, stories, dances, songs, art, and other means within a cultural context.

*Native species.* An organism that was historically or is present in a particular ecosystem as a result of natural migratory or evolutionary processes; and not as a result of an accidental or deliberate introduction into that ecosystem. An organism's presence and evolution (adaptation) in an area are determined by climate, soil, and other biotic and abiotic factors.

*Newspaper(s) of record.* See definition in § 219.62.

*Objection.* See definition in § 219.62.

*Online.* See definition in § 219.62.

*Participation.* Activities that include a wide range of public involvement tools and processes, such as collaboration, public meetings, open houses, workshops, and comment periods.

*Persistence.* Continued existence.

*Plan area.* The NFS lands covered by a plan.

*Plan or land management plan.* A document or set of documents that provide management direction for an administrative unit of the NFS developed under the requirements of this part or a prior planning rule.

*Plant and animal community.* A naturally occurring assemblage of plant and animal species living within a defined area or habitat.

*Productivity.* The capacity of NFS lands and their ecological systems to provide the various renewable resources in certain amounts in perpetuity. For the purposes of this subpart, productivity is an ecological term, not an economic term.

*Project.* An organized effort to achieve an outcome on NFS lands identified by location, tasks, outputs, effects, times, and responsibilities for execution.

*Proposed Species.* Any species of fish, wildlife, or plant that is proposed by the U.S. Fish and Wildlife Service or the National Marine Fisheries Service in the **Federal Register** to be listed under Section 4 of the Endangered Species Act.

*Recovery.* For the purposes of this subpart, and with respect to threatened or endangered species: The improvement in the status of a listed species to the point at which listing as federally endangered or threatened is no longer appropriate.

*Recreation.* See Sustainable recreation.

*Recreation opportunity.* An opportunity to participate in a specific recreation activity in a particular recreation setting to enjoy desired recreation experiences and other benefits that accrue. Recreation opportunities include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air.

*Recreation setting.* The social, managerial, and physical attributes of a place that, when combined, provide a distinct set of recreation opportunities. The Forest Service uses the recreation opportunity spectrum to define recreation settings and categorize them into six distinct classes: primitive, semi-primitive non-motorized, semi-primitive motorized, roaded natural, rural, and urban.

*Responsible official.* See definition in § 219.62.

*Restoration.* The process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystems sustainability, resilience, and health under current and future conditions.

*Restore.* To renew by the process of restoration (see restoration).

*Riparian Areas.* Three-dimensional ecotones of interaction that include terrestrial and aquatic ecosystems that extend down into the groundwater, up above the canopy, outward across the floodplain, up the near-slopes that drain to the water, laterally into the terrestrial ecosystem, and along the water course at variable widths.

*Riparian management zone.* Portions of a watershed where riparian-dependent resources receive primary emphasis, and for which plans include plan components to maintain or restore riparian functions and ecological functions.

*Risk.* A combination of the likelihood that a negative outcome will occur and the severity of the subsequent negative consequences.

*Scenic character.* A combination of the physical, biological, and cultural images that gives an area its scenic identity and contributes to its sense of place. Scenic character provides a frame of reference from which to determine scenic attractiveness and to measure scenic integrity.

*Social sustainability.* See sustainability.

*Sole source aquifer.* Underground water supply designated by the Environmental Protection Agency (EPA) as the "sole or principle" source of drinking water for an area as established under section 1424(e) of the Safe Drinking Water Act (42 U.S.C. 300h–3(e)).

*Source water protection areas.* The area delineated by a State or Tribe for a public water system (PWS) or including numerous PWSs, whether the source is ground water or surface water or both, as part of a State or tribal source water assessment and protection program (SWAP) approved by Environmental Protection Agency under section 1453 of the Safe Drinking Water Act (42 U.S.C. 300h–3(e)).

*Stressors.* For the purposes of this subpart: Factors that may directly or indirectly degrade or impair ecosystem composition, structure or ecological process in a manner that may impair its ecological integrity, such as an invasive species, loss of connectivity, or the disruption of a natural disturbance regime.

*Sustainability.* The capability to meet the needs of the present generation without compromising the ability of future generations to meet their needs. For purposes of this part, "ecological sustainability" refers to the capability of ecosystems to maintain ecological integrity; "economic sustainability" refers to the capability of society to produce and consume or otherwise benefit from goods and services including contributions to jobs and market and nonmarket benefits; and "social sustainability" refers to the capability of society to support the network of relationships, traditions, culture, and activities that connect people to the land and to one another, and support vibrant communities.

*Sustainable recreation.* The set of recreation settings and opportunities on the National Forest System that is ecologically, economically, and socially sustainable for present and future generations.

*Timber harvest.* The removal of trees for wood fiber use and other multiple-use purposes.

*Timber production.* The purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use.

*Viable population.* A population of a species that continues to persist over the long term with sufficient distribution to be resilient and adaptable to stressors and likely future environments.

*Watershed.* A region or land area drained by a single stream, river, or drainage network; a drainage basin.

*Watershed condition.* The state of a watershed based on physical and biogeochemical characteristics and processes.

*Wild and scenic river.* A river designated by Congress as part of the National Wild and Scenic Rivers System that was established in the Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1271 (note), 1271–1287).

*Wilderness.* Any area of land designated by Congress as part of the National Wilderness Preservation System that was established in the Wilderness Act of 1964 (16 U.S.C. 1131–1136).

## Subpart B—Pre-Decisional Administrative Review Process

### § 219.50   Purpose and scope.

This subpart establishes a pre-decisional administrative review (hereinafter referred to as objection) process for plans, plan amendments, or plan revisions. This process gives an individual or entity an opportunity for an independent Forest Service review and resolution of issues before the approval of a plan, plan amendment, or plan revision. This subpart identifies who may file objections to a plan, plan amendment, or plan revision; the responsibilities of the participants in an objection; and the procedures that apply to the review of the objection.

### § 219.51   Plans, plan amendments, or plan revisions not subject to objection.

(a) A plan, plan amendment, or plan revision is not subject to objection when the responsible official receives no substantive formal comments (§ 219.62) on that proposal during the opportunities for public comment (§ 219.53(a)).

(b) Plans, plan amendments, or plan revisions proposed by the Secretary of Agriculture or the Under Secretary for Natural Resources and Environment are not subject to the procedures set forth in this section. A decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture.

(c) A plan, plan amendment, or plan revision is not subject to objection under this subpart if another administrative review process is used consistent with § 219.59.

(d) When a plan, plan amendment, or plan revision is not subject to objection under this subpart, the responsible official shall include an explanation with the signed decision document.

### § 219.52   Giving notice of a plan, plan amendment, or plan revision subject to objection before approval.

(a) The responsible official shall disclose during the NEPA scoping process and in the appropriate NEPA documents that the proposed plan, plan amendment, or plan revision is subject to the objection procedures in this subpart. This disclosure is in addition to the public notice that begins the objection filing period, as required at § 219.16. When a responsible official chooses to use the objection process of this subpart for a plan, plan amendment, or plan revision process initiated before the effective date of this rule, notice that the objection process will be used must be given prior to an opportunity to provide substantive formal comment on a proposed plan, plan amendment, or revision and associated environmental analysis.

(b) The responsible official shall make available the public notice for the beginning of the objection period for a plan, plan amendment, or plan revision (§ 219.16(a)(3)) to those who have requested the environmental documents or are eligible to file an objection consistent with § 219.53.

(c) The content of the public notice for the beginning of the objection period for a plan, plan amendment, or plan revision before approval (§ 219.16(a)(3)) must:

(1) Inform the public of the availability of the plan, plan amendment, or plan revision, the appropriate final environmental documents, the draft plan decision document, and any relevant assessment or monitoring evaluation report; the commencement of the objection filing period under 36 CFR part 219 Subpart B; and the process for objecting. The documents in this paragraph will be made available online at the time of public notice.

(2) Include the name of the plan, plan amendment, or plan revision, the name and title of the responsible official, and instructions on how to obtain a copy of the appropriate final environmental documents; the draft plan decision document; and the plan, plan amendment, or plan revision.

(3) Include the name and address of the reviewing officer with whom an objection is to be filed. The notice must specify a street, postal, fax, and email address; the acceptable format(s) for objections filed electronically; and the reviewing officer's office business hours for those filing hand-delivered objections.

(4) Include a statement that objections will be accepted only from those who have previously submitted substantive formal comments specific to the proposed plan, plan amendment, or plan revision during any opportunity for public comment as provided in subpart A.

(5) Include a statement that the publication date of the public notice in the applicable newspaper of record (or the **Federal Register**, if the responsible official is the Chief) is the exclusive means for calculating the time to file an objection (§ 219.56).

(6) Include a statement that an objection, including attachments, must be filed with the appropriate reviewing officer (§ 219.62) within 60 days, if an environmental impact statement has been prepared, otherwise within 45 days of the date of publication of the public notice for the objection process.

(7) Include a statement describing the minimum content requirements of an objection (§ 219.54(c)).

### § 219.53   Who may file an objection.

(a) Individuals and entities who have submitted substantive formal comments related to a plan, plan amendment, or plan revision during the opportunities for public comment as provided in subpart A during the planning process for that decision may file an objection. Objections must be based on previously submitted substantive formal comments attributed to the objector unless the objection concerns an issue that arose after the opportunities for formal comment. The burden is on the objector to demonstrate compliance with requirements for objection. Objections that do not meet the requirements of this paragraph may not be accepted; however, objections not accepted must be documented in the planning record.

(b) Formal comments received from an authorized representative(s) of an entity are considered those of the entity only. Individual members of that entity do not meet objection eligibility requirements solely based on membership in an entity. A member or an individual must submit substantive formal comments independently to be eligible to file an objection in an individual capacity.

(c) When an objection lists multiple individuals or entities, each individual or entity must meet the requirements of paragraph (a) of this section. Individuals or entities listed on an objection that do not meet eligibility requirements may not be considered objectors, although an objection must be accepted (if not otherwise set aside for review under § 219.55) if at least one listed individual or entity meets the eligibility requirements.

(d) Federal agencies may not file objections.

Rvsd Plan - 00001317

(e) Federal employees who otherwise meet the requirements of this subpart for filing objections in a non-official capacity must comply with Federal conflict of interest statutes at 18 U.S.C. 202–209 and with employee ethics requirements at 5 CFR part 2635. Specifically, employees may not be on official duty nor use government property or equipment in the preparation or filing of an objection. Further, employees may not include information unavailable to the public, such as Federal agency documents that are exempt from disclosure under the Freedom of Information Act (5 U.S.C. 552(b)).

### § 219.54   Filing an objection.

(a) All objections must be filed, in writing, with the reviewing officer for the plan. All objections must be open to public inspection during the objection process.

(b) Including documents by reference is not allowed, except for the following list of items that may be referenced by including the name, date, page number (where applicable), and relevant section of the cited document. All other documents or Web links to those documents, or both must be included with the objection, if referenced in the objection.

(1) All or any part of a Federal law or regulation.

(2) Forest Service Directive System documents and land management plans or other published Forest Service documents.

(3) Documents referenced by the Forest Service in the planning documentation related to the proposal subject to objection.

(4) Formal comments previously provided to the Forest Service by the objector during the proposed plan, plan amendment, or plan revision comment period.

(c) At a minimum, an objection must include the following:

(1) The objector's name and address (§ 219.62), along with a telephone number or email address if available;

(2) Signature or other verification of authorship upon request (a scanned signature for electronic mail may be filed with the objection);

(3) Identification of the lead objector, when multiple names are listed on an objection (§ 219.62). Verification of the identity of the lead objector if requested;

(4) The name of the plan, plan amendment, or plan revision being objected to, and the name and title of the responsible official;

(5) A statement of the issues and/or the parts of the plan, plan amendment,

or plan revision to which the objection applies;

(6) A concise statement explaining the objection and suggesting how the proposed plan decision may be improved. If applicable, the objector should identify how the objector believes that the plan, plan amendment, or plan revision is inconsistent with law, regulation, or policy; and

(7) A statement that demonstrates the link between prior substantive formal comments attributed to the objector and the content of the objection, unless the objection concerns an issue that arose after the opportunities for formal comment (§ 219.53(a)).

### § 219.55   Objections set aside from review.

(a) The reviewing officer shall set aside and not review an objection when one or more of the following applies:

(1) Objections are not filed in a timely manner (§ 219.56);

(2) The proposed plan, plan amendment, or plan revision is not subject to the objection procedures of this subpart pursuant to §§ 219.51 and 219.59;

(3) The individual or entity did not submit substantive formal comments (§ 219.53) during opportunities for public comment on the proposed decision (§ 219.16(a)(1) and (a)(2));

(4) None of the issues included in the objection is based on previously submitted substantive formal comments unless one or more of those issues arose after the opportunities for formal comment;

(5) The objection does not provide sufficient information as required by § 219.54(c);

(6) The objector withdraws the objection in writing;

(7) The objector's identity is not provided or cannot be determined from the signature (written or electronically scanned), and a reasonable means of contact is not provided (§ 219.54(c)); or

(8) The objection is illegible for any reason and a legible copy cannot easily be obtained.

(b) When an objection includes an issue that is not based on previously submitted substantive formal comments and did not arise after the opportunities for formal comment, that issue will be set aside and not reviewed. Other issues raised in the objection that meet the requirements of this subpart will be reviewed.

(c) The reviewing officer shall give written notice to the objector and the responsible official when an objection or part of an objection is set aside from review and shall state the reasons for not reviewing the objection in whole or part. If the objection is set aside from

review for reasons of illegibility or lack of a means of contact, the reasons must be documented in the planning record.

### § 219.56   Objection time periods and process.

(a) *Time to file an objection.* For a new plan, plan amendment, or plan revision for which an environmental impact statement (EIS) is prepared, written objections, including any attachments, must be filed within 60 days following the publication date of the public notice for a plan, plan amendment, or plan revision before approval (§§ 219.16 and 219.52). For an amendment for which an EIS is not prepared, the time to file an objection is within 45 days. It is the responsibility of the objector to ensure that the reviewing officer receives the objection in a timely manner.

(b) *Computation of time periods.* (1) All time periods are computed using calendar days, including Saturdays, Sundays, and Federal holidays in the time zone of the reviewing officer. However, when the time period expires on a Saturday, Sunday, or Federal holiday, the time is extended to the end of the next Federal working day (11:59 p.m. for objections filed by electronic means such as email or facsimile machine).

(2) The day after publication of the public notice for a plan, plan amendment, or plan revision before approval (§§ 219.16 and 219.52), is the first day of the objection filing period.

(3) The publication date of the public notice for a plan, plan amendment, or plan revision before approval (§§ 219.16 and 219.52), is the exclusive means for calculating the time to file an objection. Objectors may not rely on dates or timeframe information provided by any other source.

(c) *Evidence of timely filing.* The objector is responsible for filing the objection in a timely manner. Timeliness must be determined by one of the following indicators:

(1) The date of the U.S. Postal Service postmark for an objection received before the close of the fifth business day after the objection filing date;

(2) The electronically generated posted date and time for email and facsimiles;

(3) The shipping date for delivery by private carrier for an objection received before the close of the fifth business day after the objection filing date; or

(4) The official agency date stamp showing receipt of hand delivery.

(d) *Extensions.* Time extensions for filing are not permitted except as provided at paragraph (b)(1) of this section.

Rvsd Plan - 00001318

(e) *Reviewing officer role and responsibilities.* The reviewing officer is the U.S. Department of Agriculture (USDA) or Forest Service official having the delegated authority and responsibility to review an objection filed under this subpart. The reviewing officer is a line officer at the next higher administrative level above the responsible official; except that:

(1) For a plan amendment, that next higher-level line officer may delegate the reviewing officer authority and responsibility to a line officer at the same administrative level as the responsible official. Any plan amendment delegation of reviewing officer responsibilities must be made prior to the public notification of an objection filing period (§ 219.52).

(2) For an objection or part of an objection specific to the identification of species of conservation concern, the regional forester who identified the species of conservation concern for the plan area may not be the reviewing officer. The Chief may choose to act as the reviewing officer or may delegate the reviewing officer authority to a line officer at the same administrative level as the regional forester. The reviewing officer for the plan will convey any such objections or parts thereof to the appropriate line officer.

(f) *Notice of objections filed.* Within 10 days after the close of the objection period, the responsible official shall publish a notice of all objections in the applicable newspaper of record and post the notice online.

(g) *Response to objections.* The reviewing officer must issue a written response to the objector(s) concerning their objection(s) within 90 days of the end of the objection-filing period. The reviewing officer has the discretion to extend the time when it is determined to be necessary to provide adequate response to objections or to participate in discussions with the parties. The reviewing officer must notify all parties (lead objectors and interested persons) in writing of any extensions.

### § 219.57  Resolution of objections.

(a) *Meetings.* Prior to the issuance of the reviewing officer's written response, either the reviewing officer or the objector may request to meet to discuss issues raised in the objection and potential resolution. The reviewing officer must allow other interested persons to participate in such meetings. An interested person must file a request to participate in an objection within 10 days after publication of the notice of objection by the responsible official (§ 219.56(f)). The responsible official shall be a participant in all meetings

involving the reviewing officer, objectors, and interested persons. During meetings with objectors and interested persons, the reviewing officer may choose to use alternative dispute resolution methods to resolve objections. All meetings are open to observation by the public.

(b) *Response to objections.* (1) The reviewing officer must render a written response to the objection(s) within 90 days of the close of the objection-filing period, unless the allowable time is extended as provided at § 219.56(g). A written response must set forth the reasons for the response but need not be a point-by-point response, and may contain instructions to the responsible official. In cases involving more than one objection to a plan, plan amendment, or plan revision, the reviewing officer may consolidate objections and issue one or more responses. The response must be sent to the objecting party(ies) by certified mail, return receipt requested, and posted online.

(2) The reviewing officer's review of and response to the objection(s) is limited to only those issues and concerns submitted in the objection(s).

(3) The response of the reviewing officer will be the final decision of the U.S. Department of Agriculture on the objection.

### § 219.58  Timing of a plan, plan amendment, or plan revision decision.

(a) The responsible official may not issue a decision document concerning a plan, plan amendment, or plan revision subject to the provisions of this subpart until the reviewing officer has responded in writing to all objections.

(b) A decision by the responsible official approving a plan, plan amendment, or plan revision must be consistent with the reviewing officer's response to objections.

(c) When no objection is filed within the allotted filing period, the reviewing officer must notify the responsible official. The responsible official's approval of the plan, plan amendment, or plan revision in a plan decision document consistent with § 219.14, may occur on, but not before, the fifth business day following the end of the objection-filing period.

### § 219.59  Use of other administrative review processes.

(a) Where the Forest Service is a participant in a multi-federal agency effort that would otherwise be subject to objection under this subpart, the responsible official may waive the objection procedures of this subpart and instead adopt the administrative review

procedure of another participating Federal agency. As a condition of such a waiver, the responsible official for the Forest Service must have agreement with the responsible official of the other agency or agencies that a joint agency response will be provided to those who file for administrative review of the multi-agency effort. When such an agreement is reached, the responsible official for the Forest Service shall ensure public notice required in § 219.52 sets forth which administrative review procedure is to be used.

(b) When a plan amendment is approved in a decision document approving a project or activity and the amendment applies only to the project or activity, the administrative review process of 36 CFR part 215 or part 218, subpart A, applies instead of the objection process established in this subpart. When a plan amendment applies to all future projects or activities, the objection process established in this subpart applies only to the plan amendment decision; the review process of 36 CFR part 215 or part 218 would apply to the project or activity part of the decision.

### § 219.60  Secretary's authority.

Nothing in this subpart restricts the Secretary of Agriculture from exercising any statutory authority regarding the protection, management, or administration of NFS lands.

### § 219.61  Information collection requirements.

This subpart specifies the information that objectors must give in an objection to a plan, plan amendment, or plan revision (§ 219.54(c)). As such, this subpart contains information collection requirements as defined in 5 CFR part 1320 and have been approved by the Office of Management and Budget and assigned control number 0596–0158.

### § 219.62  Definitions.

Definitions of the special terms used in this subpart are set out as follows.

*Address.* An individual's or entity's current mailing address used for postal service or other delivery services. An email address is not sufficient.

*Decision memo.* A concise written record of the responsible official's decision to implement an action that is categorically excluded from further analysis and documentation in an environmental impact statement (EIS) or environmental assessment (EA), where the action is one of a category of actions which do not individually or cumulatively have a significant effect on the human environment, and does not give rise to extraordinary circumstances

Rvsd Plan - 00001319

in which a normally excluded action may have a significant environmental effect.

*Environmental assessment (EA).* A public document that provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact, aids an agency's compliance with the National Environmental Policy Act (NEPA) when no EIS is necessary, and facilitates preparation of a statement when one is necessary (40 CFR 1508.9; FSH 1909.15, Chapter 40).

*Environmental impact statement (EIS).* A detailed written statement as required by section 102(2)(C) of the National Environmental Policy Act (NEPA) of 1969 (40 CFR 1508.11; 36 CFR 220).

*Formal comments.* See substantive formal comments.

*Lead objector.* For an objection submitted with multiple individuals, multiple entities, or combination of individuals and entities listed, the individual or entity identified to represent all other objectors for the purposes of communication, written or otherwise, regarding the objection.

*Line officer.* A Forest Service official who serves in a direct line of command from the Chief.

*Name.* The first and last name of an individual or the name of an entity. An electronic username is insufficient for identification of an individual or entity.

*National Forest System.* The National Forest System includes national forests, national grasslands, and the National Tallgrass Prairie.

*Newspaper(s) of record.* The newspaper(s) of record is (are) the principal newspaper(s) of general circulation annually identified and published in the **Federal Register** by each regional forester to be used for publishing notices as required by 36 CFR 215.5. The newspaper(s) of record for projects in a plan area is (are) the newspaper(s) of record for notices related to planning.

*Objection.* The written document filed with a reviewing officer by an individual or entity seeking pre-decisional administrative review of a plan, plan amendment, or plan revision.

*Objection period.* The allotted filing period following publication of a public notice in the applicable newspaper of record (or the **Federal Register**, if the responsible official is the Chief) of the availability of the appropriate environmental documents and draft decision document, including a plan, plan amendment, or plan revision during which an objection may be filed with the reviewing officer.

*Objection process.* Those procedures established for pre-decisional administrative review of a plan, plan amendment, or plan revision.

*Objector.* An individual or entity who meets the requirements of § 219.53, and files an objection that meets the requirements of §§ 219.54 and 219.56.

*Online.* Refers to the appropriate Forest Service Web site or future electronic equivalent.

*Responsible official.* The official with the authority and responsibility to oversee the planning process and to approve a plan, plan amendment, and plan revision.

*Reviewing officer.* The USDA or Forest Service official having the delegated authority and responsibility to review an objection filed under this subpart.

*Substantive formal comments.* Written comments submitted to, or oral comments recorded by, the responsible official or his designee during an opportunity for public participation provided during the planning process (§§ 219.4 and 219.16), and attributed to the individual or entity providing them. Comments are considered substantive when they are within the scope of the proposal, are specific to the proposal, have a direct relationship to the proposal, and include supporting reasons for the responsible official to consider.

Dated: March 23, 2012.

**Harris D. Sherman,**

*Under Secretary, Natural Resources and Environment.*

[FR Doc. 2012–7502 Filed 4–6–12; 8:45 am]

**BILLING CODE P**



# FOREST SERVICE MANUAL
## NATIONAL HEADQUARTERS (WO)
## WASHINGTON, DC

## FSM 1900 - PLANNING

## CHAPTER 1920 – LAND MANAGEMENT PLANNING

**Amendment No.:** 1900-2015-1

**Effective Date:** January 30, 2015.

**Duration:** This amendment is effective until superseded or removed.

**Approved:** LESLIE WELDON
Deputy Chief

**Date Approved:** 01/30/2015

**Posting Instructions:** Amendments are numbered consecutively by title and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this title was 1900-2013-1 to FSM 1930.

| New Document | 1920 | 42 Pages |
|---|---|---|
| **Superseded Document(s) by Issuance Number and Effective Date** | 1920 (Amendment 1900-2006-2, 01/31/2006) | 68 Pages |

**Digest:**

<u>1920</u> – Revises chapter in its entirety.

Rvsd Plan - 00001321

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 2 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## Table of Contents

1920.1 – Authority ............................................................................................................. 4
    1920.11 – Statutory Authorities ..................................................................................... 4
    1920.12 – Regulations ................................................................................................... 4
1920.2 – Objectives ........................................................................................................... 5
1920.3 – Policy ................................................................................................................. 5
    1920.31 – Compliance with Legal Requirements for Civil Rights and Environmental Justice
        ..................................................................................................................................... 6
    1920.32 – Compliance with Legal Requirements for Tribal Consultation ............................ 7
1920.4 – Responsibility ..................................................................................................... 7
    1920.41 – Chief, Forest Service ....................................................................................... 7
    1920.42 – Washington Office, Director, Ecosystem Management Coordination ................. 7
1920.5 – Definitions ........................................................................................................... 8
**1921 – LAND MANAGEMENT PLANNING UNDER THE 2012 PLANNING RULE ...... 8**
    1921.02 – Objectives ..................................................................................................... 9
    1921.03 – Policy ............................................................................................................. 9
    1921.04 – Responsibility ............................................................................................... 10
    1921.04a – Regional Forester ....................................................................................... 10
    1921.04b – Research Station Director ........................................................................... 11
    1921.04c – Director, Northeastern Area State and Private Forestry .............................. 11
    1921.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor
        ................................................................................................................................... 11
    1921.1 – Oversight of Land Management Planning ........................................................ 13
    1921.11 – Regional Oversight ....................................................................................... 13
    1921.12 – Criteria for Land Management Plans ............................................................. 13
    1921.13 – Oversight Process ......................................................................................... 13
    1921.14 – National Reviews for Planning ...................................................................... 14
**1922 – TRANSITION OF PRIOR RULE PLANS TO 2012 RULE COMPLIANCE ........ 15**
**1923 – WILDERNESS EVALUATION ............................................................................ 15**
    1923.01 – Authority ...................................................................................................... 15
    1923.03 – Policy ........................................................................................................... 15
    1923.04 – Responsibility ............................................................................................... 16
    1923.04a – Chief, Forest Service ................................................................................... 16
    1923.04b – Regional Forester ....................................................................................... 18
    1923.04c – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor
        ................................................................................................................................... 19
    1923.1 – Review and Approval ..................................................................................... 20
    1923.11 – Proposals Resulting from Wilderness Recommendations Incorporated in Land
        Management Plans, Including Legislatively Mandated Studies ................................... 20
    1923.12 – Proposals Resulting from Wilderness Recommendations Not Incorporated in
        Land Management Plans, Including Legislatively Mandated Studies ........................... 21
**1924 – WILD AND SCENIC RIVER EVALUATION ....................................................... 21**
    1924.01 – Authority ...................................................................................................... 21

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 3 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

1924.03 – Policy ............................................................................................................. 22
1924.04 – Responsibility ............................................................................................... 22
1924.04b – Washington Office, Deputy Chief, National Forest System.............................. 24
1924.04c – Regional Forester ........................................................................................ 24
1924.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor
    ............................................................................................................................... 26
1924.1 – Review and Approval ...................................................................................... 28
1924.11 – Proposals Resulting from River Studies Incorporated in Land Management Plans,
    Including Legislatively Mandated Studies................................................................. 28
1924.12 – Proposals Resulting from River Studies Not Incorporated in Land Management
    Plans, Including Legislatively Mandated Studies...................................................... 29
**1925 – MANAGEMENT OF INVENTORIED ROADLESS AREAS [RESERVED].........29**
**1926 – LAND MANAGEMENT PLANNING USING PLANNING REGULATIONS IN**
    **EFFECT BEFORE NOVEMBER 9, 2000.................................................................29**
1926.03 – Policy ........................................................................................................... 30
1926.04 – Responsibility ............................................................................................... 30
1926.04a – Regional Forester ........................................................................................ 30
1926.04b – Forest, Grassland, Prairie, or Other Administrative Unit Supervisor ............... 31
1926.1 – Land Management Planning Process ................................................................ 31
1926.11 – Land Management Planning Results ............................................................... 31
1926.12 – Benchmark Analysis ...................................................................................... 32
1926.13 – Formulation of Alternatives ........................................................................... 32
1926.14 – Estimated Effects of Alternatives ................................................................... 32
1926.15 – Resource Integration Requirements When Using Planning Regulations In Effect
    Before November 9, 2000......................................................................................... 32
1926.2 – Land Management Plan Content........................................................................ 35
1926.21 – Standards for Land Management Plans ........................................................... 35
1926.3 – Review and Approval of Land Management Plans ............................................. 35
1926.31 – Internal Review ............................................................................................. 35
1926.31a – Standards for Regional Review..................................................................... 35
1926.31b – Internal Review Process............................................................................... 36
1926.32 – External Review ............................................................................................. 37
1926.4 – Land Management Plan Implementation ............................................................ 37
1926.41 – Analysis and Evaluation ................................................................................ 37
1926.5 – Amendment..................................................................................................... 38
1926.51 – Changes to the Land Management Plan That are Not Significant....................... 39
1926.52 – Changes to the Land Management Plan That are Significant.............................. 40
1926.6 – Revision ......................................................................................................... 40
1926.7 – Monitoring and Evaluation ............................................................................... 41
1926.71 – Monitoring Requirements ............................................................................... 41

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 4 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

This chapter provides a process for developing, revising, amending, and making administrative changes to land management plans (plans) for the National Forest System (NFS). This chapter should be used in conjunction with Forest Service Handbook 1909.12, which provides additional policy direction for the process of developing, revising, amending, and making administrative changes to plans.

## 1920.1 – Authority

## 1920.11 – Statutory Authorities

See FSM 1901 for a summary of the relevant acts and FSH 1909.12, zero code, section 08.1, for text of the Forest and Rangeland Renewable Resource Planning Act, the Wilderness Act of 1964, the Eastern Wilderness Act, the Wild and Scenic Rivers Act, and the regulations for National Forest System Land Management Planning. Other applicable authorities are discussed at FSM 1011.

## 1920.12 – Regulations

Under the authority of Title 36, Code of Federal Regulations, part 219 -- Planning, Subpart A -- National Forest System Land Management Planning, published April 9, 2012 (77 FR 21162) plans may be developed, revised, amended, or administratively changed. Plan development and plan revisions initiated after May 9, 2012, must conform to the requirements of the 2012 Planning Rule.

Under the 2012 Planning Rule, for plan amendments or plan revisions initiated prior to May 9, 2012, the Forest Service may continue use provisions of the prior planning rule, which was the 2000 Planning Rule, including transition provisions that permit use of the planning procedures of the 1982 Planning Rule. The provisions of the prior planning regulation can be used in certain circumstances and as follows (see 36 CFR 219.17):

> 1. Plan development, plan amendments, or plan revisions initiated before May 9, 2012, may be completed using the provisions of the prior planning regulation or conform to the requirements of the 2012 Planning Rule. The Responsible Official shall give public notice (see 36 CFR 219.16(a)(5)) if the ongoing planning process is changed to the 2012 planning process.

> 2. For plans approved or revised under a prior planning regulation, plan amendments initiated during the transition period (until May 9, 2015) (36 CFR 219.17 (b)(2)) may be initiated and completed under the provisions of the prior planning regulations or they may conform to the 2012 Planning Rule provisions. Any plan amendments initiated after May 9, 2015, must conform to the applicable provisions of the 2012 Planning Rule.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 5 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

3. For units with plans developed, revised, or amended using the provisions of a prior planning regulation, no obligations remain from any prior planning regulations, except those that are specifically included in the plan.

## 1920.2 – Objectives

General objectives of land management planning are to:

1. Develop a fully integrated plan to guide the management of the land and resources of the plan area.

2. Display short- and long-term management intent for the plan area to the public, Federal, State, Tribal, and local governments.

## 1920.3 – Policy

See FSM 1903 for general policy for planning. It is the Agency's policy to:

1. Prepare and maintain a work plan to guide and manage the planning process.

2. Organize the planning record and make it available for public review when the Responsible Official files the draft environmental impact statement.

3. Write using plain language so documents are clear, concise, and well organized.

4. Amend the plan with sufficient frequency to keep plans current throughout the 15-year plan period.

5. Use the current land management plan as a starting point for revision, and make changes based on a need to do so.

6. Provide all Service-wide direction necessary for planning assessments, plan development, plan revision, plan amendment, and plan monitoring is contained or referenced in this chapter, and supplements, or handbooks thereto.

7. Encourage participation by Federal, State, and local agencies, and Tribes, as well as the public, and consider their public input in the planning process.

8. Establish clear expectations with the public of the timeline and the need for a timely and efficient planning process to be completed within the fiscal capability of the unit.

9. Ensure changes in Service-wide planning direction (FSM 1920 and FSH 1909.12) are carried out as follows:

a. For new plans, plan revisions, and plan amendments. Upon issuance of an amended directive, Responsible Officials shall comply with the amended directive for

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 6 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

all new plans, plan revisions and plan amendments developed pursuant to the 2012 Planning Rule that are initiated after the amended directive. Note that plan amendments may be initiated under the procedures of the prior planning rule for 3 years after May 9, 2012, and may be completed and approved under those procedures (See transition provisions of the 2012 Planning Rule, 36 CFR 219.17(b)).

b. For plan amendments and revisions initiated prior to the issuance of an amended directive. If a plan amendment or a revision has been initiated prior to issuance of the amended directive, the Responsible Official should use the amended directive in any new step or phase of the planning process, but is not required to revise past steps or phases within the process: for example, a completed assessment would not need to be revised to comply with the amended directives. For a phase or step that is ongoing at the time of the issuance of the amended directive, the Responsible Official should incorporate the amended directive to the extent practicable, but may choose to complete that phase or step as planned to avoid significant disruptions to ongoing public engagement and planning schedules: for example, it may be practicable to incorporate more elements of the amended directive into development of an assessment that is 20 percent complete, while an assessment that is 90 percent complete may simply incorporate the guidance in the amended directive on how to document the assessment report. As another example, if a unit is in the process of developing a draft plan and has identified segments of rivers to study for eligibility for Wild and Scenic River designation, the Responsible Official would not be required to re-inventory segments based on the amended directives. The Responsible Official shall document in the project file the circumstance and rationale for staging compliance with the amended directive.

10. If approval of a plan, plan revision, or amendment may affect listed species or critical habitat, the Responsible Official shall consult with National Marine Fisheries Service (NMFS) or the U.S. Fish and Wildlife Service (USFWS) in accordance with the Endangered Species Act (ESA) section 7(a)(1), U.S.C 1636(a)(1). The Agency may also consult on the plan as a "conservation program" in accordance with the ESA section 7(a)(2). Additional guidance on procedures for conducting such consultations can be found in FSM 2670.

11. If approval of a plan, plan revision, or amendment may jeopardize the continued existence of species proposed for listing under the ESA or may adversely modify proposed critical habitat, the Responsible Official shall confer with NMFS or USFWS in accordance with Endangered Species Act section 7(a)(2) (FSM 2670).

## 1920.31 – Compliance with Legal Requirements for Civil Rights and Environmental Justice

The Responsible Official shall ensure that civil rights impacts are considered during the land management planning process in accordance with Departmental Regulation (DM) 4300-4 and FSM 1730.4. Consider any civil rights impacts and any disproportionate negative impacts of

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 7 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

plan approval to minority or low-income populations early in the planning process and, if warranted, throughout the process and the land management plan itself. Further direction on civil rights impact analyses is found at FSH 1709.11, chapter 30.

Environmental justice issues that arise during the development, revision, or amendment of a plan should be examined as directed by Departmental Regulation 5600-2 and Council on Environmental Quality publication titled "Environmental Justice - Guidance under the National Environmental Policy Act," located at *http://ceq.eh.doe.gov/nepa/regs/ej.justice.pcf*.

### 1920.32 – Compliance with Legal Requirements for Tribal Consultation

The Responsible Official shall provide to federally recognized Indian Tribes and Alaska Native Corporations the opportunity to undertake consultation consistent with Executive Order 13175 of November 6, 2000, and 25 U.S.C. 450 note (36 CFR 219.4(a)). Consultation for plans should be in accord with FSH 1509.13 - American Indian and Alaska Native Relations Handbook, Chapter 10 - Consultation with Tribes.

### 1920.4 – Responsibility

General responsibilities for planning are found in Title 36, Code of Federal Regulations, sections 219.1 and 219.2 (36 CFR 219.1 and 219.2) and FSM 1904. Additional, specific responsibilities for unit-level land management planning are found in FSM 1921.04 and FSM 1926.04. Additional, specific responsibilities for wilderness recommendations and wild and scenic river system additions are found in FSM 1923.04 and 1924.04 respectively.

### 1920.41 – Chief, Forest Service

1. The Chief of the Forest Service is responsible for national planning, such as the preparation of the Forest Service Strategic Plan required under the Government Performance and Results Modernization Act of 2010 (5 U.S.C. 306; 31 U.S.C. 1115-1125; 31 U.S.C. 9703-9704).

2. The Chief reserves the authority to approve the schedule for revising individual land management plans.

3. The Chief administers a national performance oversight process for NFS land management planning (FSM 1921.1).

4. The Chief may choose to serve as the Responsible Official for any plan development, revision, or amendment.

### 1920.42 – Washington Office, Director, Ecosystem Management Coordination

The Washington Office, Director, Ecosystem Management Coordination, is responsible for:

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 8 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

1. Assisting the Chief, through the Deputy Chief for the NFS, in all land management planning matters, including oversight of compliance with the NFMA.

2. Coordinating NFS input into the national strategic plan.

3. Strengthening the relationship between land management plans and strategic plan goals, objectives, strategies, and related performance measures that apply to management of the NFS.

4. Providing planning and coordination assistance to the Regions about land management plans, monitoring plans and strategies, and the National Environmental Policy Act (NEPA).

5. Coordinating national performance oversight and accountability for consistency of National Forest System land management planning.

### 1920.5 – Definitions

See 36 CFR 219 and FSH 1909.12, zero code, for definitions that apply to land management planning.

### 1921 – LAND MANAGEMENT PLANNING UNDER THE 2012 PLANNING RULE

The following sections of FSM 1921 set forth Forest Service management objectives, policy, and responsibilities for meeting the requirements of Title 36, Code of Federal Regulations, part 219 -- National Forest System Land Management Planning, as published April 9, 2012 (77 FR 21162).

FSM 1921 must be used in conjunction with FSH 1909.12, which sets forth additional Forest Service management objectives, policy, and responsibilities for meeting the requirements of Title 36, Code of Federal Regulations, part 219 -- National Forest System Land Management Planning, as published April 9, 2012 (77 FR 21162). Title 36, Code of Federal Regulations, part 219 (36 CFR 219), FSM 1921, and FSH 1909.12 together present an integrated set of guidance and direction for land management planning. Line Officers and relevant staff shall meet the requirements in 36 CFR 219, FSM 1921, and FSH 1909.12 when developing, revising, or amending plans.

See FSM 1926 for guidance for any plan amendments or plan revisions that will continue to use the provisions of the planning regulations in effect before November 9, 2000, under 36 CFR 219, published at 36 CFR parts 200 to 299, revised as of July 1, 2010. See FSH 1909.12, zero code, section 08.1 for text of the regulations for National Forest System Land Management Planning.

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 73 of 251

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 9 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

### 1921.02 – Objectives

1. Sustain multiple use of NFS land's renewable resources in perpetuity while maintaining the long-term health and productivity of the land and contribute to the social, cultural, and economic vitality of affected communities for current and future generations, consistent with the Multiple-Use Sustained-Yield Act of 1960 (36 CFR 219.1(b)).

2. Promote the ecological integrity of National Forests and Grasslands through the collaborative, science-informed development, revision, or amendment of land management plans (36 CFR 219.1(c)).

3. Broaden and deepen the engagement of the American people in National Forest and Grasslands planning.

4. Improve the resilience of National Forests and Grasslands to climate change and other stressors.

5. Improve the efficiency, relevance, and effectiveness of land management planning.

### 1921.03 – Policy

See FSM 1903 and FSM 1920.03 for general policy for planning activities.

1. Responsible Officials shall follow policy direction stated in FSH 1909.12 for all phases of land management planning: assessments, plan development, plan revisions, plan amendments, and monitoring.

2. Responsible Officials shall ensure that new or revised plans provide for ecological sustainability and contribute to social and economic sustainability, and must:

a. Use available information pertaining to ecosystem composition, structure, function, and connectivity when developing plan components to contribute to ecological sustainability (36 CFR 219.8 (a), FSM 1921.5, and FSH 1909.12, ch.10 and 20).

b. Use available information pertaining to social and economic systems when developing plan components to contribute to social and economic sustainability (36 CFR 219.8 (b), and FSH 1909.12, ch. 10 and 20).

c. Use the Scenery Management System (SMS) in all plan revisions to address scenic character and develop scenery-related plan direction unless the Responsible Official provides written justification and obtains concurrence from the Regional Forester.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 10 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

3. Responsible Officials shall conduct all aspects of land management planning (assessment; development, amendment or revision; monitoring) in a timely and efficient manner.

4. The Forest Service's goal is to complete plan revisions within 4 years from initiation of assessment to plan approval.

5. Responsible Officials shall use a continual assessment, planning, and monitoring process that provides a feedback loop that allows the Forest Service to adapt to changing conditions and to improve plans based on new information and monitoring (36 CFR 219.5(a)).

### 1921.04 – Responsibility

### 1921.04a – Regional Forester

The Regional Forester may choose to be the Responsible Official for a plan, plan amendment, or plan revision (36 CFR 219.2(b)(3)). Following approval of the plan, plan amendment, or plan revision, the National Forest, Grassland, Prairie or other comparable administrative unit Supervisor will be the Responsible Official for future amendment or revision unless indicated otherwise by the Regional Forester.

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the Regional Forester to:

1. Coordinate planning efforts among adjoining units and Regions.

2. Coordinate monitoring among multiple units to address broader geographic scale questions and to maintain a broader-scale monitoring strategy that supports these needs.

3. Maintain quality control throughout the planning process.

4. Identify, in coordination with the Responsible Official, the species of conservation concern (36 CFR 219.7(c)(3)) to be used by Responsible Officials for meeting the requirements of diversity of plant and animal communities (36 CFR 219.9(c)).

5. Coordinate between the Responsible Official and the Chief on planning-related matters, when appropriate.

6. Coordinate on broader-scale monitoring strategies with other Regional Foresters, Research Station Directors, and the Northeastern Area State and Private Forestry Director, as appropriate.

7. Serve as the Reviewing Officer for an objection (36 CFR part 219, subpart B) when the Responsible Official is a Line Officer at the first administrative level below a Regional Forester.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 11 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

8. Follow policy direction stated in FSH 1909.12 for land management planning.

9. Direct State and Private Forestry and other staffs to assist Responsible Officials with assessment information and data, plan monitoring programs, and broader-scale monitoring strategies, and provide planning support as appropriate.

## 1921.04b – Research Station Director

It is the responsibility of the Research Station Directors to provide:

1. Assistance to Responsible Officials for science reviews, as appropriate.

2. Assistance with assessment information and data, where appropriate.

3. Assistance with plan monitoring programs and broader-scale monitoring strategies.

4. Review of the proposed plan components applicable to experimental areas and, upon determining that those plan components are adequate and appropriate, concur in the plan approval with respect to those plan components.

## 1921.04c – Director, Northeastern Area State and Private Forestry

It is the responsibility of the Director for the Northeastern Area State and Private Forestry to provide within the Area:

1. Assistance with plan monitoring programs and broader-scale monitoring strategies, where appropriate.

2. Assistance with assessment information and data, and support during planning, where appropriate.

## 1921.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

Rvsd Plan - 00001331

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 76 of 251

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 12 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

1. The Supervisor of the National Forest, Grassland, Prairie, or other comparable administrative unit is the Responsible Official for preparing assessment, developing, and approving a plan or plan revision, plan amendments, and developing and implementing a plan monitoring program for lands under the responsibility of the Supervisor, unless the Regional Forester, the Chief, the Under Secretary, or the Secretary chooses to act as the Responsible Official (36 CFR 219.2(b)(3)).

2. The authority for approving project-specific plan amendments cannot be delegated to District Rangers.

3. The Supervisor of the National Forest, Grassland, or Prairie or other comparable administrative unit is responsible for:

    a. Adapting the plan to changing situations through amendments and administrative changes.

    b. Ensuring required assessments, monitoring reports, plan, plan amendments, and plan revisions are prepared by an Interdisciplinary Team (36 CFR 219.5(b)).

    c. Coordinating with Research Station Directors when experimental or research natural areas are located on the unit.

    d. Determining the best available scientific information for the issues being considered and using it to inform the planning process.

    e. Providing meaningful public participation opportunities early and throughout the planning process.

    f. Guiding the planning process with a goal of completion of plan revisions within 4 years.

    g. Conducting all aspects of land management planning (assessment; development, amendment, or revision; monitoring) in a timely and efficient manner and within the fiscal capability of the unit.

    h. Ensuring the integration of assessment, planning, implementation, and monitoring into an adaptive management framework that facilitates continued management and planning improvements and changes as suggested by monitoring results.

4. The Supervisor of the National Forest, Grassland, or Prairie or other comparable administrative unit is responsible for following policy direction stated in FSH 1909.12 for land management planning.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 13 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1921.1 – Oversight of Land Management Planning

This section describes general requirements for oversight of land management planning.

See 36 CFR 219.2(b)(5)(ii) for additional direction.

## 1921.11 – Regional Oversight

The Regional Office staff works with the Supervisor's staff by assisting in the planning process and providing oversight throughout the planning process to support consistency and accountability among planning efforts. FSM 1921.12 lists the criteria for land management plans.

## 1921.12 – Criteria for Land Management Plans

Regional Foresters and Supervisors shall ensure that:

1. Each land management plan or amendment complies with laws, regulations, and policy, including 36 CFR part 219, FSM 1920, and FSH 1909.12, and including requirements for threatened and endangered species.

2. Each land management plan is aligned with the goals and objectives of the Forest Service Strategic Plan.

3. The analysis in the applicable NEPA document for each plan is adequate to permit an informed selection of a preferred alternative.

4. Each final land management plan or amendment and applicable NEPA document has received an appropriate interdisciplinary review.

5. Oversight supports the identification and use of best practices, and facilitates consistent approaches and outcomes among comparable planning efforts.

## 1921.13 – Oversight Process

The Regional Office staff and the Responsible Official's staff work together to develop an action plan to share resources, coordinate with the Washington Office, and prepare the assessment, plan, and plan monitoring program.

The Regional Office staff provides oversight throughout the planning process and should agree on the plan development processes and environmental document methodologies and analysis before the Forest Supervisor formally invites comments on a proposed plan or plan revision (36 CFR 219.16(a)(2).

After the proposed plan is published in the Federal Register and the 90-day comment period closes, the Regional Office staff continues to provide oversight regarding processes,

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 14 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

methodologies, and analysis used to develop a summary of the public comments received on the proposed plan, the responses to the public comment (which are made available to the public in accordance with 36 CFR 219.216), and the plan and applicable NEPA documents before the Forest Supervisor begins the objection period for a plan or plan revision (36 CFR 219.52).

For a plan or plan revision, the Regional staff shall forward the appropriate briefing papers about the plan prepared by the Supervisor's staff to the Director of Ecosystem Management Coordination. Based on the briefing papers, the Ecosystem Management Coordination staff confirms that the criteria (FSM 1921.12) have been met. The Director of Ecosystem Management coordinates appropriate briefings in the Washington Office.

Upon briefing the Washington Office and review of the final land management plan by the Regional staff, the Forest Supervisor may print and release the final documents, except as provided in FSM 1921.14.

The Regional Office staff is also responsible before, during, and after the planning process, for coordinating among Supervisors across the Region and with other Regions and Deputy Areas to: ensure compliance with requirements, support consistency among efforts, identify and share lessons-learned and best practices, and facilitate sharing data and information across Forests, Regions, and Deputy Areas.

## 1921.14 – National Reviews for Planning

1. The Chief may require Washington Office review of a draft proposed plan or revision before Responsible Officials formally invite comments on it, (36 CFR 219.16(a)(2) and before the Responsible Official begins the objection period for a plan or plan revision (36 CFR 219.52), for example, if:

a. The plan makes recommendations for Congressional action. Examples of congressional action are additions to or deletions from the National Wilderness Preservation System, national trails, national recreation areas, studies, or changes to the National Wild and Scenic River System, and adjustments in NFS boundaries.

b. The Region has specifically requested Washington Office review.

c. The plan is the first plan prepared within the Region under the 2012 Planning Rule, the degree or intensity of controversy, the extent of changes in the preferred or any other alternative, or if other circumstances warrant.

2. The Director of Ecosystem Management Coordination (EMC) shall conduct reviews of the Regional oversight for NFS land management planning including for consistency and compliance within and across Regions with 36 CFR 219, FSM 1920 and FSH 1909.12. The Director of EMC should conduct at least one Regional review annually. The purpose of a review is to evaluate internal and administrative controls and

Case 1:21-cv-02994-REB  Document 24-6  Filed 06/21/22  USDC Colorado  Page 79 of 251

WO AMENDMENT 1900-2015-1                                          1920
EFFECTIVE DATE: 01/30/2015                                       Page 15 of 42
DURATION: This amendment is effective until superseded or removed.

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

to identify successful management, management weaknesses, and needed corrective actions. Direction for conducting reviews is found in FSM 1410.

## 1922 – TRANSITION OF PRIOR RULE PLANS TO 2012 RULE COMPLIANCE

See 36 CFR 219.12(c)(1), 36 CFR 219.17 for additional direction.

Plan development and plan revision initiated on or after May 9, 2012, must conform to the new planning requirements of the 2012 Planning Rule. Plan amendments initiated on or after May 9, 2015, must conform to the 2012 Rule; amendments initiated prior to May 9, 2015, may be developed and completed under the prior planning rule.

Monitoring programs for all NFS units must comply with the requirements of the 2012 Planning Rule by May 9, 2016, or as soon as practicable, based on the scope of needed changes, timing of planned revisions, and availability of funding.

## 1923 – WILDERNESS EVALUATION

Consideration of areas for wilderness recommendation is inherent in the land management planning process and required by the Planning Rule. Although the President and the Secretary may recommend that certain areas be designated as wilderness, Congress reserves the authority to designate wilderness areas. In addition, the Congress may direct the study of specific areas and provide other guidance on wilderness evaluations through specific wilderness legislation.

### 1923.01 – Authority

Specific authority for the study and designation of wilderness is contained in the Wilderness Act of September 3, 1964 (16 U.S.C. 1131, Pub. L. 88-577) and the Eastern Wilderness Act of January 3, 1975 (16 U.S.C. 1132, Pub. L. 93-622). The land management planning rule requires identification and evaluation of lands that may be suitable for inclusion in the National Wilderness Preservation System and a determination of whether to recommend lands for wilderness designation (36 CFR 219.7(c)(5)). The Planning Rule also requires that management of areas recommended for wilderness designation protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation (36 CFR 219.10(b)(iv)). For wilderness study, see FSH 1909.15 to determine the applicable NEPA documentation.

### 1923.03 – Policy

1. Unless otherwise provided by law, all areas that may be suitable for inclusion in the National Wilderness Preservation System must be inventoried and evaluated for recommendation as designated wilderness areas during plan development or revision. Responsible Officials shall follow policy direction stated in FSH 1909.12, chapter 70, for this inventory and evaluation process.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 16 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

2. The results of the inventory and evaluation of areas recommended for designated wilderness conducted during plan revision or plan development must be included in the planning record.

3. Any area recommended for wilderness or wilderness study designation is not available for any use or activity that may reduce the wilderness potential of an area.

## 1923.04 – Responsibility

## 1923.04a – Chief, Forest Service

Exhibit 01 displays responsibilities of the Forest Service Chief when an area is recommended for wilderness or Congress authorizes a wilderness study.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 17 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

### 1923.04a – Exhibit 01

### Chief's Responsibilities

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if the draft plan decision would make preliminary administrative recommendations (FSH 1909.12, sec. 24.41)<br><br>2. Prepare and submit to Congress, a notification letter documenting the preliminary administrative recommendation for wilderness designation<br><br>3. Provide the final study report or legislative environmental impact statement or both from the FEIS and record of decision to Congress for further consideration.<br><br>4. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if record of decision would make preliminary administrative recommendations (FSM 1926.31b).<br><br>2. Transmit the final study report or legislative environmental impact statement or both that are extracted from FEIS and record of decision to Secretary of Agriculture for further consideration.<br><br>3. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 1. Review before printing the preliminary and final study report and/or applicable NEPA document.<br><br>2. Transmit final study report and/or applicable NEPA document to Secretary of Agriculture for approval.<br><br>3. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. |

[1] 2012 Planning Rule - 36 CFR part 219.

[2] 1982 Planning Rule - The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 18 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1923.04b – Regional Forester

Exhibit 01 displays Regional Forester responsibilities for an area recommended for wilderness or Congress authorizes a wilderness study.

### 1923.04b – Exhibit 01

### Regional Forester Responsibilities

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Upon request of the Chief, review and forward the study report or applicable NEPA document or both that support the preliminary administrative recommendations of the plan, plan amendment, or plan revision.<br><br>3. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 70). | 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Make preliminary administrative recommendations in record of decision.<br><br>3. Approve plan, including the management direction for recommended wilderness or recommended wilderness study areas.<br><br>4. Upon request of the Chief, preparing a legislative proposal (FSH 1909.12, ch. 70). | 1. Review and forward the preliminary and final wilderness study report and/or applicable NEPA document to the Chief for approval to print.<br><br>2. Prepare summary material for submission to the Secretary.<br><br>3. Prepare a draft transmittal letter. |

[1] 2012 Planning Rule -- 36 CFR 219.

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 19 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

### 1923.04c – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

Exhibit 01 displays responsibilities of the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor for the preparation of wilderness recommendations.

#### 1923.04c – Exhibit 01

#### Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor Responsibilities

| Forest Service Recommended Wilderness Using 2012 Planning Rule[1] | Forest Service Recommended Wilderness Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Conduct the wilderness inventory and evaluations during plan development, plan amendment, or plan revision (see FSH 1909.12 ch. 10 and 70).<br><br>2. Maintain documentation for the areas inventoried and evaluated for wilderness in the planning record.<br><br>3. Make preliminary administrative recommendations in plan decision document.<br><br>4. Approve plan, including the plan components for recommended wilderness or recommended wilderness study areas (see 36 CFR 219.10 and FSH 1909.12, ch. 20). | 1. Conduct necessary wilderness evaluations during plan development, plan amendment, or plan revision.<br><br>2. Document the process of inventory and evaluation in an appendix of an EIS.<br><br>3. Develop management direction for recommended wilderness or recommended wilderness study areas. | 1. Prepare study report and/or applicable NEPA document (FSH 1909.15).<br><br>2. Print and distribute the approved study report or applicable NEPA document or both for comment (FSH 1909.12, sec. 72.2).<br><br>3. Print and distribute the approved study report and/or applicable NEPA document to the public (FSH 1909.12, sec. 74) |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 20 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1923.1 – Review and Approval

### 1923.11 – Proposals Resulting from Wilderness Recommendations Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Recommended Wilderness Using 2012 Planning Rule. Before publishing the public notice commencing the 60-day objection period (36 CFR 219.16(a)(3)) for a plan, plan amendment, or plan revision, the Responsible Official, through the Regional Forester, shall notify the Chief of tentative preliminary administrative recommendations for wilderness designation of areas evaluated during the land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for wilderness must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, the Secretary of Agriculture, and the President of the United States. The Congress has reserved the authority to make final decisions on wilderness designation. Plan implementation is not dependent upon subsequent action related recommendations for wilderness designation.**

2. Forest Service Recommended Wilderness Using 1982 Planning Rule. Before printing the applicable NEPA document for a plan, plan amendment, or plan revision, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations for wilderness designation of areas evaluated during the land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for wilderness must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, the Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on wilderness designation.**

When the Chief decides to forward preliminary administrative wilderness recommendations to the Secretary, the study report and information from the applicable NEPA document and plan approval document must accompany these recommendations.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 21 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

3. Legislatively Mandated Study. The Chief shall coordinate an intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report and/or applicable NEPA document.

## 1923.12 – Proposals Resulting from Wilderness Recommendations Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies

For wilderness recommendations based on evaluations or studies conducted separately from the land management planning process, follow Agency policy and procedures for implementing the NEPA (FSH 1909.15) to determine the applicable NEPA documentation. The study document may be combined with any applicable NEPA document. The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall transmit the study documents for legislatively mandated studies to the Chief, through the Regional Forester. Wilderness recommendations or studies conducted outside of the land management planning process require the same level of detail as for recommendations made as part of the land management planning process.

## 1924 – WILD AND SCENIC RIVER EVALUATION

Consideration of potential wild and scenic rivers is an inherent part of the land management planning process. A river study assesses the eligibility of a river for inclusion in the National Wild and Scenic Rivers System (National System) and evaluates the potential physical, biological, economic, and social effects of adding the river to the National System. River segments in the National System may be classified as Wild, Scenic, or Recreational. See FSH 1909.12, chapter 80, for the river study process. The study forms the basis for recommendations to the Secretary and Congress and for legislative action.

## 1924.01 – Authority

The authority for study and designation of wild and scenic rivers is the Wild and Scenic Rivers Act of October 2, 1968 (Act), as amended (16 U.S.C. 1271 *et seq.*). The act has two provisions for identification of rivers for study: (1) by act of Congress under Section 5(a) or (2) through Federal agency planning processes under Section 5(d)(1). The U.S. Department of Agriculture and U.S. Department of the Interior Guidelines for Eligibility, Classification, and Management of River Areas, 47 FR 39454-39461 (Sept. 7, 1982), (USDA-USDI Guidelines provide uniform guidelines for carrying out studies and for managing rivers that are part of the System .

The land management Planning Rule specifically requires that during plan development or revision, the eligibility of rivers must be identified unless an inventory has been completed and no changed circumstances warrant further review (219.7(vi). The Planning Rule also requires that management of eligible and suitable rivers protect the values that provide the basis for their

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 22 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

inclusion in the system of Wild and Scenic rivers (36 CFR 219.10(b)(v)). The Act and USDA-USDI Guidelines are referenced in FSH 1909.12, zero code, section 08.1. For river study, see FSH 1909.15 to determine the applicable NEPA documentation.

### 1924.03 – Policy

1. Complete legislatively mandated study or studies within the specified study period.

2. If a systematic inventory of Forest Service identified eligible rivers or a comprehensive Forest, Grassland, Prairie, or other comparable administrative unit suitability study has been previously completed and documented, conduct additional assessment and study at the time of a proposed plan, plan amendment, or plan revision only if changed circumstances warrants additional review of eligibility or if the Responsible Official considers the river suitability study an issue. Document the process in an appendix to the Environmental Impact Statement for the plan.

3. Conduct studies in close cooperation with affected Federal, State, and local agencies, Tribal governments, landowners, and national and local publics. Include a determination of possible State participation in the preservation and administration of the river if it is added to the National System.

4. For rivers identified eligible for study, manage until suitability is determined to protect the values for which they might be added to the National System (free-flow, water quality, and outstandingly remarkable values) by statute for legislatively mandated study, or by existing Forest Service authorities for Forest Service identified study. Refer to FSH 1909.12, section 84 for specific management guidance for each of the river classifications.

5. A river determined through a suitability study to not be suitable will no longer be considered eligible and interim protection measures no longer need to be applied to those rivers. Consideration of potential wild and scenic rivers is an inherent part of the ongoing land management planning process. A river study assesses the eligibility of a river for inclusion in the National Wild and Scenic Rivers System (National System) and evaluates the potential physical, biological, economic, and social effects of adding the river to the National System. See FSH 1909.12, chapter 80, for the river study process. The study forms the basis for recommendations to the Secretary and Congress and for legislative action.

### 1924.04 – Responsibility

The Secretary of Agriculture has designated the Forest Service as the lead coordinating Agency for the U.S. Department of Agriculture in the studies of rivers that involve NFS lands.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 23 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1924.04a – Chief

Exhibit 01 displays responsibilities of the Chief when a river is recommended as a Wild and Scenic River or Congress authorizes a river for study.

### 1924.04a – Exhibit 01

### Chief's Responsibilities for River Studies on National Forest System Lands

| Forest Service Identified Study Using 2012 Planning Rule[1] | Forest Service Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if the draft plan decision would make preliminary administrative recommendations (FSH 1909.12, sec 85.2). | 1. May review before printing the final EIS for a plan, plan amendment, or plan revision if record of decision would make preliminary administrative recommendations (FSM 1926.31b). | 1. Must review before printing the preliminary and final study report and/or applicable NEPA document. |
| 2. Prepare a notification letter documenting the preliminary administrative recommendation for river designation | 2. Transmit the final study report or legislative environmental impact statement or both that are extracted from EIS and record of decision to Secretary of Agriculture for further consideration. | 2. Transmit the preliminary study report/applicable NEPA document for intergovernmental review as required by Section 4(b) of the Act. Provide comments to the Region. |
| 3. Transmit the final study report or legislative environmental impact statement or both that are extracted from EIS and record of decision to Secretary of Agriculture for further consideration | | 3. Transmit the final study report/applicable NEPA document to Secretary of Agriculture for approval. |
| 4. Provide support, review, and coordination of the legislative proposal with the Secretary and Office of Management and Budget. | 3. Provide support and review of legislative proposal and coordinate review of the legislative proposal with the Secretary and Office of Management and Budget. | 4. Provide support and review of legislative proposal and coordinate review of the legislative proposal with the Secretary and Office of Management and Budget. |

[1] 2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 24 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

### 1924.04b – Washington Office, Deputy Chief, National Forest System

The Washington Office, Deputy Chief, National Forest System, is responsible for:

1. Designating the lead Region when a legislatively mandated study river involves more than one Region.

2. Coordinating the Departmental review of other agency and State Wild and Scenic River designation proposals submitted pursuant to sections 5(a) and 2(a)(ii) of the Act.

### 1924.04c – Regional Forester

The Regional Forester is responsible for designating the lead unit when a legislatively mandated or Forest Service identified study river involves more than one Forest, Grassland, Prairie, or other comparable administrative unit or more than one Region.

Exhibit 01 displays the responsibilities of the Regional Forester when a river is recommended as a wild and scenic river or Congress authorizes a river for study.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 25 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1924.04c – Exhibit 01

### Regional Forester's Responsibilities for River Studies on National Forest System Lands

| Forest Service Identified Study Using 2012 Planning Rule[1] | Forest Service Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>2. Upon request of the Chief, review and forward the study report or applicable NEPA document, or both, that support preliminary administrative recommendations of the plan, plan amendment, or plan revision.<br><br>3. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 80). | 1. Decide whether to use the land management planning process to evaluate suitability for one or more eligible rivers.<br><br>2. Forward the tentative preliminary administrative recommendations to the Chief.<br><br>3. Make preliminary administrative recommendations in record of decision.<br><br>4. Approve management direction for eligible or suitable rivers.<br><br>5. Upon request of the Chief, prepare a legislative proposal (FSH 1909.12, ch. 80). | 1. Provide two copies of the preliminary and final study report and/or applicable NEPA document to Chief for approval to print. Submit 10 copies of approved and printed preliminary to Chief for intergovernmental review.<br><br>2. Prepare summary information document and draft transmittal letter from the President to the Congress (FSH 1909.12, ch. 80). |

[1]  2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

Rvsd Plan - 00001345

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 26 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

### 1924.04d – Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor

The unit Supervisor is responsible for:

1. Inviting concerned State(s) to participate jointly in a legislatively mandated study where the U.S. Department of Agriculture is the lead agency (section 5(c) of the Act).

2. Where a Forest Service identified study river touch only a small part of National Forest System lands, inviting the participation of the agency(ies) with jurisdiction over the largest proportion of the lands involved (refer to FSH 1909.12, sec. 83.12).

Exhibit 01 displays responsibility of the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor related to wild and scenic river studies.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 27 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1924.04d – Exhibit 01

### Forest, Grassland, Prairie, or Other Comparable Administrative Unit Supervisor Responsibilities for River Studies on National Forest System Lands

| Forest Service-Identified Study Using 2012 Planning Rule[1] | Forest Service-Identified Study Using 1982 Planning Rule[2] | Legislatively Mandated Study |
|---|---|---|
| 1. Identify eligible rivers within the plan area (36 CFR 219.7(c)(2)(vi) following guidance in FSH 1909.12, chapter 80.<br><br>2. Decide whether to use the land management planning process to evaluate suitability for one or more eligible rivers..<br><br>3. Conduct wild and scenic studies during plan development, plan amendment, or plan revision, as appropriate.<br><br>4. Make preliminary administrative recommendations in plan decision document.<br><br>5. Develop and approve plan components for eligible or suitable rivers (36 CFR 219.10). | 1. Identify eligible rivers within the plan area<br><br>2. Conduct any wild and scenic studies during plan development, plan amendment, or plan revision.<br><br>3. Develop management direction for eligible or suitable rivers. | 1. Prepare the study report and applicable NEPA document or both (FSH 1909.15).<br><br>2. Print and distribute the approved study report or applicable NEPA document or both for comment (FSH 1909.12, sec. 85.1).<br><br>3. Respond to intergovernmental and public comments in the final study report and/or applicable NEPA document.<br><br>4. Print and distribute the approved final study report or applicable NEPA document or both to the public (FSH 1909.12, sec. 85.1). |

[1]  2012 Planning Rule -- 36 CFR 219

[2] 1982 Planning Rule -- The 2012 Planning Rule allows plan revisions or amendments initiated prior to the Rule's effective date (May 9, 2012), and plan amendments initiated within 3 years of the effective date, to continue to use the planning process of a prior rule (i.e., the 1982 Planning Rule process) 36 CFR 219.17. The 1982 Planning Rule was last published in the Code of Federal Regulations, 36 CFR part 219 (2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 28 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1924.1 – Review and Approval

Internal review and approval of a Forest Service recommendation for wild and scenic river designation shall meet the same requirements as those for land management plans (FSH 1909.12, ch. 20, sec. 21.4 and, when in relation to plans completed using planning regulations in effect before November 9, 2000, FSM 1926.3).

## 1924.11 – Proposals Resulting from River Studies Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Identified Study Using 2012 Planning Rule. Before publishing the public notice commencing the 60-day objection period (36 CFR 219.16(a)(3)) for a plan, plan amendment, or plan revision, the Responsible Official, through the Regional Forester, shall notify the Chief by letter of tentative preliminary administrative recommendations on rivers evaluated during land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for rivers must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

2. Forest Service Identified Study Using 1982 Planning Rule. Before printing the applicable NEPA document for a plan, plan amendment, or plan revision, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations on rivers evaluated during land management planning process.

The land management plan decision document that makes preliminary administrative recommendations for rivers must contain the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

When the Chief decides to forward preliminary administrative river recommendations to the Secretary, the study report and information from the applicable NEPA document and plan approval document will accompany these recommendations.

Rvsd Plan - 00001348

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 29 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

3. Legislatively Mandated Study. The Chief shall coordinate intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report/applicable NEPA document (FSH 1909.12, sec. 85.1).

## 1924.12 – Proposals Resulting from River Studies Not Incorporated in Land Management Plans, Including Legislatively Mandated Studies

1. Forest Service Identified Study. For river studies conducted separately from the land management planning process, follow the Agency policy and procedures for implementing the National Environmental Policy Act (NEPA) (FSH 1909.15) to determine the applicable NEPA document. To meet the requirements of NEPA, the Council on Environmental Quality (CEQ) regulations (40 CFR 1506.4), FSM 1950, and FSH 1909.15, the study document may be combined with any applicable NEPA document and meet the standard found in FSH 1909.12, section 85.21b.

Before printing the final combined study report and/or applicable NEPA document, the Regional Forester shall notify the Chief by letter of the tentative preliminary administrative recommendations.

The applicable NEPA document should include the following statement:

> **This recommendation is a preliminary administrative recommendation that will receive further review and possible modification by the Chief of the Forest Service, Secretary of Agriculture, and the President of the United States. Congress has reserved the authority to make final decisions on designation of rivers as part of the National Wild and Scenic Rivers System.**

2. Legislatively Mandated Study. The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall transmit through the Regional Forester the combined study report and applicable NEPA documents to the Chief. The Chief shall coordinate intergovernmental review, prepare any legislation proposal, and coordinate review with the Secretary and Office of Management and Budget before release of the final study report and/or applicable NEPA document (FSH 1909.12, sec. 85.1).

## 1925 – MANAGEMENT OF INVENTORIED ROADLESS AREAS [RESERVED]

## 1926 – LAND MANAGEMENT PLANNING USING PLANNING REGULATIONS IN EFFECT BEFORE NOVEMBER 9, 2000

This section provides guidance to carry out plan development, plan amendment, or plan revision using the planning regulations in effect before November 9, 2000. See FSH 1909.15 to determine the applicable NEPA documentation.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 30 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

In two situations, under 36 CFR 219.17, Responsible Officials may continue to use the provisions of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000).

1. Plan development, plan amendments, or plan revisions initiated before May 9, 2012.

2. Plan amendments initiated before May 9, 2015.

## 1926.03 – Policy

In addition to complying with the general policies and principles set forth in FSM 1920.3, the land management planning process must:

1. Integrate all resource programs and supporting activities.

2. Base resource inventories on sound sampling designs using common definitions and standards.

3. Estimate the goods and services, activities, and investments to be implemented or produced by decade and display these outputs for the identified Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1600 *et seq.)* time periods.

4. Prepare a monitoring program that is responsive to identified issues and sufficient to meet legal requirements for monitoring soil, water, air, wildlife and fish, vegetation, and other resources.

## 1926.04 – Responsibility

When Responsible Officials continue to use the provisions of the planning regulations in effect before November 9, 2000, the following responsibilities are applicable.

## 1926.04a – Regional Forester

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the Regional Forester to:

1. Coordinate planning efforts between Forests, Grasslands, Prairie, or other comparable administrative unit within and between adjacent units and Regions.

2. Maintain quality control of land management plans by ensuring that required standards of FSM 1926.21 are met

3. Ensure land management plan monitoring requirements are consistent among adjoining units.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 31 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

4. Review, and approve as appropriate, any amendment that results in a significant change to a land management plan.

## 1926.04b – Forest, Grassland, Prairie, or Other Administrative Unit Supervisor

In addition to the responsibilities specified in FSM 1904, it is the responsibility of the administrative unit Supervisor to:

1. Prepare the draft and final land management plan and applicable environmental analysis to meet the standards in FSM 1926.21 and 1926.31a.

2. Ensure that the Interdisciplinary Team integrates knowledge of the physical, biological, economic, and social sciences, and environmental design in the planning process.

3. Conduct planning activities in a manner fully consistent with the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ) implementing regulations, the Forest Service's environmental policies and procedures described in FSM 1950 and FSH 1909.15.

4. Develop and approve amendments that result in a non-significant change to the land management plan.

5. Prepare amendments that result in a significant change to the land management plan and recommend them to the Regional Forester for approval.

## 1926.1 – Land Management Planning Process

## 1926.11 – Land Management Planning Results

Minimum results required of land management planning are:

1. Identification of major public issues, management concerns, and management opportunities.

2. Development of a set of criteria to guide the formulation and evaluation of alternatives.

3. Analysis of the management situation that determines both the need for and the opportunity to establish or change management direction.

4. Formulation of a set of alternatives that responds to the significant issues.

5. Evaluation of alternatives and identification of a preferred alternative to the extent required by NEPA, CEQ regulations, and Forest Service environmental policies and procedures (FSM 1950 and FSH 1909.15).

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 96 of 251

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 32 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

6. A land management plan that achieves the 14 principles described in section 219.1 of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000).

7. A monitoring program to evaluate progress toward achieving the goals, objectives, and desired future conditions of the plan.

## 1926.12 – Benchmark Analysis

The development of benchmarks is not limited by Forest Service policy or budget, discretionary constraints, or program and staffing requirements. Benchmark analysis will be conducted in accordance with section 219.12(e)(1) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

## 1926.13 – Formulation of Alternatives

Formulate alternatives to meet the requirements of sections 219.12(f) and 219.16 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

## 1926.14 – Estimated Effects of Alternatives

The analysis and comparison must be sufficient to permit an informed selection of the preferred alternative as described above.

## 1926.15 – Resource Integration Requirements When Using Planning Regulations In Effect Before November 9, 2000

Requirements for integrating individual resources including designated wilderness and other special areas into the land management planning process are found in sections 219.14 through 219.27 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000). The land management planning process must:

1. Provide land management plan direction for designated wilderness, wild and scenic rivers, national recreation areas, national trails, national monuments, national scenic areas, research natural areas, national management emphasis areas, and other identified special interest areas.

2. Use the recreation opportunity spectrum system to determine management of recreation settings, opportunities, and to provide a broad spectrum of experiences in response to user preference.

3. Estimate the silvicultural systems and practices to be applied to lands suitable for timber production.

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 33 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

4. Provide for management of land suitable for timber production for saw timber-size crop trees unless exceptions, such as pulpwood crop trees, are provided for in the land management plan. Also, provide for management of suitable forest land to provide multiple products including, but not limited to, saw logs, pulpwood, poles, posts, and fuel wood through appropriate silvicultural practices to utilize site productivity.

5. Estimate output levels for fuel wood and other nonindustrial wood products that do not require secondary processing where sustained demand is anticipated.

6. Permit a departure sale schedule to temporarily drop below the base timber sale schedule at or beyond the end of the first decade.

7. Meet the intent of the culmination of mean annual increment (CMAI) requirement by ensuring the total yield from stands at harvest age is equal to or greater than 95 percent of the volume production corresponding to CMAI. Base CMAI on cubic measure and on the yield from regeneration harvests and any additional yields resulting from intermediate harvests.

8. Estimate the annual net growth on lands suitable for timber production for the fifth decade of the land management plan for at least the preferred alternative.

9. Use cubic foot volume and harvest acres, by harvest method, as a dual control in regulating the amount of timber to be offered and sold as specified by the allowable timber sale quantity. Base the control for treatment practices such as site preparation, reforestation, and pre-commercial thinning on acreage measurements.

10. Ensure that the set of management indicator species meets the requirements of 36 CFR 219.14(f) and the applicable provisions of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

11. Ensure that management prescriptions will provide for habitat capability to meet demand for management indicator species and provide access for recreational and commercial uses with minimal disturbance to species use of suitable habitats.

12. Ensure that, consistent with other resource management needs, management prescriptions will provide for pest prevention activities to lessen host susceptibility to pest damage, increase host vigor, or otherwise minimize pest impact before an outbreak occurs.

13. Ensure the plan provides for the kinds, amounts, and distribution of habitat needed for recovery of threatened or endangered species and needed to maintain viable, well-distributed populations of all existing native and desired nonnative species.

14. Provide plan direction for wildfire protection and prescribed fire use appropriate to efficient attainment of land management goals and objectives. Except for planning units with low historic large fire occurrence or low potential for significant wildland fires, the

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

Responsible Official should consider plan guidance for cost containment of fire suppression costs (FSH 1909.12, sec. 13).

15. Identify the desired landownership pattern and develop guidance for landownership adjustments to include purchase, donations, exchange, right-of-way acquisition, transfers, interchanges, sales, and boundary adjustments. Guidance for landownership adjustments should emphasize the following objectives:

a. Acquisition to meet identified resource management needs.

b. Acquisition contributing to consolidation that reduces administrative problems and costs and further enhances public use.

c. Conveyance of land better suited for non-Federal ownership.

16. Provide access to energy and mineral resources in the most efficient manner and encourage industry proposals for resource development on NFS lands, consistent with the rights that individuals or companies have acquired under the mineral leasing acts and mining laws and consistent with the objective of the alternatives.

17. Identify the specific access guidance and travel management options available to meet the objectives for each management prescription. Describe how access will be provided and how travel will be managed. Include the forest transportation system and air and water access. Integrate considerations of biological, physical, social, and economic factors, and environmental design criteria. Link access and travel requirements and opportunities to the full spectrum of resource objectives for each management area and alternative.

18. Develop guidance for the development and maintenance of other physical support facilities required to carry out management objectives.

19. Provide for consideration of transportation and utility corridor designation and utilization. Energy right-of-way corridors on Federal land must be designated and incorporated into the land management plan in accordance with the Energy Policy Act of 2005 (Public Law 109-58, section 368). Coordinate activities between Regions and with other Federal and State agencies to designate location, alignment, and associated use and occupancy standards for rights-of-way.

20. Determine watershed condition class and include objectives or prescriptions for improving watershed conditions when necessary.

21. Ensure municipal watershed requirements (36 CFR 251.9) are incorporated in land management plan standards and guidelines.

22. Develop guidance to maintain surface resources associated with groundwater resources.

Rvsd Plan - 00001354

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 35 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

23. Establish plan guidance that will be used to protect water quality.

24. Provide management direction to protect air quality related values, including visibility, in Class I Federal areas as required by the Clean Air Act Amendments of 1977 and FSM 2120.

25. Plan for pest prevention and protection appropriate to attainment of land management goals and objectives.

26. Provide guidance for geothermal leasing and development for areas with high geothermal resource potential in accordance with Title 30 United States Code, section 4 as amended by Energy Policy Act of 2005 (Public Law 109-58, section 222).

## 1926.2 – Land Management Plan Content

Section 219.11 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000) establishes minimum requirements for content of the land management plan.

## 1926.21 – Standards for Land Management Plans

In addition to the other requirements of this chapter, land management plans must meet the following standards:

1. Resource information and other data are factual and accurate.

2. Guidance is adequate to guide formulation of individual resource programs and schedules needed to implement the plan.

3. Assumptions, analytical approaches, and data are consistently applied within the plan.

4. Interdisciplinary planning and resource coordination are evident.

5. A map delineating management areas and displaying future corridors is included.

## 1926.3 – Review and Approval of Land Management Plans

Section 219.10 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000) establishes general requirements for review and approval of land management plans.

## 1926.31 – Internal Review

The Regional Forester reviews land management plans against the standards in section 1926.21.

## 1926.31a – Standards for Regional Review

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 36 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

Regional reviews must ensure that:

1. Each land management plan complies with laws, regulations, policy, and Chief's direction.

2. Each land management plan is reviewed against Resources Planning Act targets and related costs for the unit and the Region as a whole.

3. The analysis and comparative evaluation, documented in the applicable NEPA document, is adequate to permit an informed selection of the preferred alternative.

4. The completed land management plan and applicable NEPA document have received an interdisciplinary review.

## 1926.31b – Internal Review Process

1. Following approval by the Regional Forester, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor prints the draft plan and accompanying applicable NEPA document and makes them available for public review (see the Forest Service "National Environmental Policy Act Handbook," FSH 1909.15, ch 20, sec. 24 for direction on making draft material available to the public).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 37 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

2. The Regional Forester reviews a summary of the public comment received on the draft, the response to the public comment, and the proposed final plan and applicable NEPA document (see the Forest Service "National Environmental Policy Act Handbook," FSH 1909.15, ch 20, sec. 25 for direction on making final material available to the public).

3. The Chief may require Washington Office review before printing of all final plans and their accompanying applicable NEPA documents, if the plan makes recommendations that will ultimately require congressional action. Examples of congressional action include additions to or deletions from the National Wilderness Preservation System, National Trails, National Recreation Areas, studies or changes to the National Wild and Scenic River System, and proposed adjustments in NFS boundaries. Otherwise, upon approval of final land management plan by the Regional Forester, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor may print and release the final documents unless:

a. The Region has specifically requested Washington Office review.

b. The Chief has specified Washington Office review because of the degree or intensity of controversy, the extent of changes in the preferred or any other alternative, or if other circumstances warrant.

### 1926.32 – External Review

External reviews during the land management planning process require public participation and coordination with other public planning efforts. Provide public participation at the earliest stages of the process. Use public participation to identify public issues during the formal scoping process and during review of draft documents. Prepare a public participation plan and make this plan a part of the planning records along with documented results of participation activities. Document results of coordination with other Federal agencies, Tribal, State, and local governments.

### 1926.4 – Land Management Plan Implementation

### 1926.41 – Analysis and Evaluation

Conduct analysis and evaluation to establish a rational basis for making decisions on proposed projects or activities. The analysis must provide the Responsible Official with relevant information necessary to make a decision to select or reject proposed projects or activities. The

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 38 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

analysis and evaluation must be sufficient to establish a determination of consistency, comply with National Environmental Policy Act (NEPA) requirements, document findings, and provide a basis for selecting actions to implement. The following provides specific requirements for analysis and evaluation:

1. Confirm and document that the proposed project or activity is consistent with the management direction in the land management plan. If an action cannot be changed to be consistent, the action must be rejected or the land management plan must be amended as directed in FSM 1926.5. Consistency determinations, including specific required findings, are described in FSH 1909.12, section 29.

2. Normally, economic evaluations of proposed projects or activities that yield or affect priced outputs should be based on cost-efficiency analysis (FSM 1970). Land management plan information may be used if the underlying analysis was sufficiently site specific and if costs and output values have not changed. Select projects or activities that are most efficient in following land management plan direction.

3. Complete environmental analysis before approving projects and activities (FSM 1950 and FSH 1909.15).

### 1926.5 – Amendment

The need to amend a land management plan may arise from several sources, including the following:

1. Recommendations of the Forest, Grassland, Prairie, or other comparable administrative unit Interdisciplinary Team that are based on findings that result from monitoring and evaluating implementation of the land management plan (FSM 1926.7).

2. Findings that existing or proposed permits, contracts, cooperative agreements, and other instruments authorizing occupancy and use are not consistent with the land management plan, but should be approved.

3. Changes necessitated by resolution of administrative appeals.

4. Changes in plan guidance needed to correct planning errors.

5. Changes in plan guidance necessitated by changed physical, social, or economic conditions.

6. Desired implementation of projects or activities outside the scope of the land management plan.

Upon receiving advice from the Interdisciplinary Team that the plan requires change, the Responsible Official shall:

Rvsd Plan - 00001358

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 39 of 42

**FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING**

1. Determine whether proposed changes to a land management plan are significant or not significant in accordance with the requirements of sections 1926.51 and 1926.52.

2. Document the determination of whether the change is significant or not significant in a decision document.

3. Provide appropriate public notification of the decision before implementing the changes as follows.

(a) The Responsible Official shall notify those who, in writing, have requested it, and to those who are known to have participated in the decision-making process.

(b) When the Chief, the Under Secretary, or the Secretary is the Responsible Official, notices must be published in the Federal Register.

(c) For a plan amendment when an official other than the Chief, the Under Secretary, or the Secretary is the Responsible Official, and for which a draft EIS is not prepared, notices must be published in the newspaper(s) of record.

(d) If plan amendment, applies to two or more units, or if a draft EIS has been prepared, notices must be published in the Federal Register and the newspaper(s) of record for the applicable units.

Findings of the Responsible Official regarding the consistency of projects or activities and actions with the land management plan and the determination of the significance of an amendment are an integral part of decisions. As such, they are subject to administrative review under 36 CFR 219.14.

## 1926.51 – Changes to the Land Management Plan That are Not Significant

Changes to the land management plan that are not significant can result from:

1. Actions that do not significantly alter the multiple-use goals and objectives for long-term land and resource management.

2. Adjustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management.

3. Minor changes in standards and guidelines.

4. Opportunities for additional projects or activities that will contribute to achievement of the management prescription.

The Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall prepare an amendment to the land management plan to accommodate a change determined not to be

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 40 of 42

FSM 1900 - PLANNING
CHAPTER 1920 – LAND MANAGEMENT PLANNING

significant. Appropriate public notification is required before implementation of the amendment as described in FSM 1926.5.

## 1926.52 – Changes to the Land Management Plan That are Significant

The following examples indicate circumstances that may cause a significant change to a land management plan:

> 1. Changes that would significantly alter the long-term relationship between levels of multiple-use goods and services originally projected (see section 219.10(e) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000)).

> 2. Changes that may have an important effect on the entire land management plan or affect land and resources throughout a large portion of the planning area during the planning period.

When a significant change needs to be made to the land management plan, the Forest, Grassland, Prairie, or other comparable administrative unit Supervisor shall prepare an amendment. Documentation of a significant change, including the necessary analysis and evaluation should focus on the issues that have triggered the need for the change. In developing and obtaining approval of the amendment for significant change to the land management plan, follow the same procedures as are required for developing and approving the land management plan (see secs. 219.10(f) and 219.12 of the planning regulations in effect before November 9, 2000 (36 CFR parts 200 to 299, revised as of July 1, 2000)).

## 1926.6 – Revision

The National Forest Management Act (NFMA) requires revision of land management plans at least every 15 years; however, a plan may be revised sooner if physical conditions or demands on the land and resources have changed sufficiently to affect overall goals or uses for the entire unit. To revise a land management plan, plan revisions initiated after May 9, 2012, must conform to 36 CFR 219, after obtaining approval of the Chief to schedule a revision. Plan revisions previously initiated before May 9, 2012, may continue to follow procedures set forth in section 219.12 of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 41 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

## 1926.7 – Monitoring and Evaluation

Conduct monitoring of the land management plan and of the individual projects or activities to determine how well objectives have been met and how closely management standards and guidelines have been applied. Monitoring and evaluation requirements for the land management plan are found at section 219.12(k) of the planning regulations in effect before November 9, 2000 (see 36 CFR parts 200 to 299, revised as of July 1, 2000).

Monitoring of the land management plan is conducted at three levels:

1. Implementation Monitoring. Implementation monitoring is designed to determine if plans, prescriptions, projects, and activities are implemented as designed and in compliance with land management plan objectives, requirements, and standards and guidelines. Evaluation of implementation monitoring may require adjustment of prescriptions and targets or changes in plan or project administration.

2. Effectiveness Monitoring. Effectiveness monitoring is designed to determine if plans, prescriptions, projects, and activities are effective in meeting management direction, objectives, and the standards and guidelines. Evaluation of the results of effectiveness monitoring is used to adjust land management plan objectives, targets, prescriptions, standards and guidelines, conservation practices, mitigation measures, and other best management practices and could result in change to or amendment of the land management plan.

3. Validation Monitoring. Validation monitoring is designed to ascertain whether the initial assumptions and coefficients used to develop the land management plan are correct or if there is a better way to meet land management planning regulations, policies, goals, and objectives. Evaluation of this type of monitoring can result in amendment of land management plans and may be used to recommend changes in laws, regulations, and policies that affect both the plan and project implementation.

## 1926.71 – Monitoring Requirements

1. Focus monitoring on those activities that:

   a. Affect significant management systems such as total silvicultural systems and other monitoring requirements.

   b. Are responsive to stated issues, concerns, and management opportunities.

   c. Affect major components of the environment.

2. Coordinate monitoring efforts with resource inventory needs to reduce duplication.

3. Monitor to ensure that:

WO AMENDMENT 1900-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1920
Page 42 of 42

**FSM 1900 - PLANNING**
**CHAPTER 1920 – LAND MANAGEMENT PLANNING**

a. The land management plan complies with applicable laws and regulations.

b. Cumulative effects of project implementation do not exceed standards or thresholds stated in the land management plan.

c. Planned mitigation actions are implemented and maintained as designed.

Accordingly, the Saint Lawrence Seaway Development Corporation is amending 33 CFR part 401, Regulations and Rules, as follows:

## PART 401—SEAWAY REGULATIONS AND RULES

### Subpart A—Regulations

■ 1. The authority citation for subpart A of part 401 continues to read as follows:

**Authority:** 33 U.S.C. 983(a) and 984(a)(4), as amended; 49 CFR 1.52, unless otherwise noted.

■ 2. In § 401.29, remove footnote 1 and revise paragraph (a) to read as follows:

### § 401.29 Maximum draft.

(a) Notwithstanding any provision herein, the loading of cargo, draft and speed of a vessel in transit shall be controlled by the master, who shall take into account the vessel's individual characteristics and its tendency to list or squat, so as to avoid striking bottom.

*   *   *   *   *

■ 3. Revise § 401.61 to read as follows:

### § 401.61 Assigned frequencies.

The Seaway stations operate on the following assigned VHF frequencies:

156.8 MHz—(channel 16)—Distress and Calling.

156.7 MHz—(channel 14)—Working (Canadian stations in Sector 1 and the Welland Canal).

156.65 MHz—(channel 13)—Working (U.S. station in Lake Ontario).

156.6 MHz—(channel12)—Working (U.S. station in Lake Ontario).

156.6 MHz—(channel 12)—Working (U.S. stations in Sector 2 of the River); and

156.55 MHz—(channel 11)—Working (Canadian stations in Sector 3, Lake Ontario and Lake Erie).

Issued at Washington, DC, on January 23, 2015.

Saint Lawrence Seaway Development Corporation.

**Carrie Lavigne,**

*Chief Counsel.*

[FR Doc. 2015–01554 Filed 1–27–15; 8:45 am]

**BILLING CODE 4910–61–P**

## DEPARTMENT OF AGRICULTURE

### Forest Service

**36 CFR Parts 212 and 261**

**RIN 0596–AD17**

### Use By Over-Snow Vehicles (Travel Management Rule)

**AGENCY:** Forest Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** The Forest Service manages winter uses to protect National Forest System (NFS) resources and to provide a range of opportunities for motorized and non-motorized recreation. In 2005, the agency regulated winter motorized use as a discretionary activity under its regulations for Use by Over-Snow Vehicles. Consistent with a court order dated March 29, 2013, the United States Department of Agriculture (the Department) amends the Department's travel management rule (TMR) to require designation of roads, trails, and areas on NFS lands to provide for over-snow vehicle (OSV) use. An over-snow vehicle is defined as "a motor vehicle that is designed for use over snow and that runs on a track and/or a ski or skis, while in use over snow". The Responsible Official will establish a system of routes and areas to provide for over-snow vehicle use. The regulations will continue to exempt over-snow vehicle use from the travel management rule, which provides for designation of a system of routes and areas for other types of motor vehicle use.

**DATES:** This rule is effective February 27, 2015.

**ADDRESSES:** The record for this final rule contains all the documents pertinent to this rulemaking. These documents are available for inspection and copying at the Office of the Director, Recreation, Heritage, and Volunteer Resources Staff, 5th Floor, Sidney R. Yates Federal Building, 1400 Independence Avenue SW., Washington, DC, on business days between 8:30 a.m. and 4:00 p.m. Those wishing to inspect or copy these documents are encouraged to call Jamie Schwartz, Recreation, Heritage, and Volunteer Resources Staff, at 202–205–1589 beforehand to facilitate access into the building.

**FOR FURTHER INFORMATION CONTACT:** Jamie Schwartz, 202–205–1589, Recreation, Heritage, and Volunteer Resources Staff.

**SUPPLEMENTARY INFORMATION:**

### 1. Background and Need for the Rule

Between 1982 and 2009, the number of people who operated motor vehicles off road increased by more than 153 percent in the United States ("Outdoor Recreation Trends and Futures, a Technical Document Supporting the Forest Service 2010 RPA [Forest and Rangeland Renewable Resources Planning Act of 1974] Assessment," p. 135 (H. Cordell, 2012)). While both motor vehicle use and OSV use are increasing in the National Forests and Grasslands, so are many other types of

recreational activities. From 1982 to 2009, the number of people in the United States participating in viewing or photographing birds increased 304.2 percent, the number of people participating in day hiking increased 228.2 percent, the number of people participating in backpacking increased 167 percent, the number of people participating in fishing increased 36 percent, and the number of people participating in hunting increased 34 percent (*id.* at 135–36). Providing for the long-term sustainable use of NFS lands and resources is essential to maintaining the quality of the recreation experience in the National Forests and Grasslands.

In 2005, the Forest Service (Agency) promulgated the TMR to provide more effective management of public motor vehicle use. The 2005 TMR includes subpart B, which requires designation of those NFS roads, NFS trails, and areas on NFS lands where public motor vehicle use is allowed (36 CFR 212.51(a)), and subpart C, under which the Responsible Official has the discretion to determine whether to regulate OSV use and to establish a system of routes and areas where OSV use is allowed unless prohibited or a system of routes and areas where OSV use is prohibited unless allowed. Subpart C of the 2005 TMR authorizes but does not require the Responsible Official to allow, restrict, or prohibit OSV use on NFS roads, on NFS trails, and in areas on NFS lands.

On March 29, 2013, the U.S. District Court for the District of Idaho ruled that subpart C of the TMR violated Executive Order (E.O.) 11644, as amended by E.O. 11989. *Winter Wildlands Alliance* v. *U.S. Forest Serv.,* 2013 WL 1319598, No. 1:11–CV–586–REB (D. Idaho Mar. 29, 2013). The court did not rule that the Agency lacks the discretion to determine how to regulate OSV use. To the contrary, the court held that the Forest Service has the discretion to determine where and when OSV use can occur on NFS lands. The ruling requires the Agency to designate routes and areas where OSV use is permitted and routes and areas where OSV use is not permitted on NFS lands, consistent with E.O. 11644, as amended by E.O. 11989, sec. 3(a), but does not dictate where and when OSV use can occur on those lands. The court ordered the Forest Service to issue a new rule consistent with the E.O.s.

The Department is amending subpart C of the TMR to provide for management of OSVs on NFS lands consistent with the EOs, the court's order, and subpart B of the TMR. Specifically, the Department is amending subpart C of the TMR to

require the Responsible Official to designate NFS roads, NFS trails, and areas on NFS lands where OSV use is allowed in administrative units or Ranger Districts, or parts of administrative units or Ranger Districts, where snowfall is adequate for OSV use to occur. The Department is not removing the exemption for OSVs from subpart B.

## 2. Unique Qualities of OSV Use and Management

The Department believes that a separate subpart for regulation of OSV use is appropriate because of the difference in management and impacts of OSV use and other types of motor vehicle use on NFS lands.

The difference between management of OSV use and management of other types of motor vehicle use on NFS lands stems from differences in their associated settings, activities, environmental impacts, and public preferences. National Forests and Grasslands change when snow blankets the landscape. Vegetation camouflages, animals burrow, and water transforms into ice. Recreationists and others accessing snow-covered National Forests and Grasslands typically trade hiking boots for skis and snowshoes and motor vehicles with tires for those with tracks and sleds.

Because of snowfall patterns, National Forests and Grasslands vary significantly in their need to address OSV use. National Visitor Use Monitoring (NVUM) data from 2008 to 2012 show that approximately 30 percent of NFS lands do not offer OSV recreation opportunities. OSV use occurs only when sufficient snow is present, in contrast to other types of motor vehicle use, which can occur at any time of the year. Other types of motor vehicles operating over snow are regulated under subpart B of the TMR.

When properly operated and managed, OSVs do not make direct contact with soil, water, and vegetation; whereas most other types of motor vehicles operate directly on the ground. Unlike other types of motor vehicles traveling cross-country, OSVs generally do not create a permanent trail or have a direct impact on soil and ground vegetation. In some areas of the country, OSV use is therefore not always confined to roads and trails.

The public's OSV preferences and practices on NFS lands vary nationwide due to different terrain, snow typology and amount, recreational activities, and transportation needs. OSV use on NFS lands in the Northeast and Midwest is largely trail-based, while the larger, wide-open, powder-filled bowls in

western mountains can support cross-country OSV use.

Subpart B of the TMR recognizes that cross-country travel by other types of motor vehicles is generally unacceptable. Subpart C of the TMR as originally promulgated and in the final rule recognizes that cross-country travel by OSVs may be acceptable in appropriate circumstances.

Recreational preferences are another factor accounting for the difference in management of OSV use and other types of motor vehicle use. The public's desire for recreational opportunities is different in the summer and the winter. The public enjoys the National Forests for a variety of winter activities including snowmobiling, cross country skiing, snowshoeing, and winter snow play. NVUM data from 2008 to 2012 indicate that 21 percent of public use of the National Forests (152 million visits) occurs during the snow season. Most of this winter use (69 percent) occurs at alpine ski areas. Nearly 4 million people enjoy snowmobiling on the National Forests.

In summary, OSV route and area designations will sustain natural resource values, enhance user experiences, and be consistent with other types of motor vehicle use designations on NFS lands.

## 3. Impact on Existing Decisions

Consistent with § 212.50(b) of subpart B of the 2005 TMR, existing decisions that allow, restrict, or prohibit OSV use on NFS roads, on NFS trails, or in areas on NFS lands that were made under prior authorities (part 295 or subpart C) will remain in effect under the final rule and will not have to be revisited.

Analogous to § 212.52(a) of subpart B of the 2005 TMR, the final rule provides that public notice with no further public involvement is sufficient for previous administrative decisions, made under other authorities and including public involvement, that regulate OSV use on NFS roads, on NFS trails, and in areas on NFS lands over the entire administrative unit or Ranger District, or parts of the administrative unit or Ranger District, where snowfall is adequate for OSV use to occur, and no change is required to these previous decisions. In short, units or Districts that have completed OSV use designations under other authorities and including public involvement do not have to revisit them.

For clarity, the final rule adds a provision in subpart C regarding the requirement for an OSV use map to display designations for OSV use, separate from the requirement in subpart B for a motor vehicle use map

displaying designations for other types of motor vehicle use.

## 4. Public Comments and Response to Comments

### Overview

On June 18, 2014, the Forest Service published a document in the **Federal Register** (79 FR 34678) seeking public comment on the proposed amendments to subpart C of the TMR. The proposed rule was posted electronically on the **Federal Register** site at *www.gpoaccess.gov* and at the Federal e-rulemaking site at *www.regulations.gov*. During the 45-day comment period that ended on August 4, 2014, the Agency received no requests for an extension of the comment period. The Forest Service received 20,210 comments on the proposed rule.

The respondents represented 37 States and the District of Columbia. The following lists the categories of respondents:

• Recreation interests, including permit holders;
• Government agencies;
• Environmental or conservation groups; and
• Individuals who did not identify an affiliation.

Comments came from organizations and individuals concerned about the impacts of OSV use on the environment and on non-motorized uses. Comments also came from organizations and individuals concerned about potential restrictions on OSV use.

Respondents offered general comments either supporting or not supporting the proposed rule or supporting or opposing OSV use in general on NFS lands. Respondents also offered specific comments about sections of the proposed rule that they would like to see revised. Many respondents offered suggestions for implementation, funding, and enforcement of the proposed rule at the local level and comments on other rulemaking efforts or existing Forest Service policy, all of which are beyond the scope of this rulemaking.

### General Comments

*Comment:* Some respondents believed that the Forest Service has successfully used current subpart C of the TMR for managing OSV use and that there is no reason to implement the proposed rule.

*Response:* The March 29, 2013, order requires the Agency to revise subpart C to require, rather than provide for, designation of routes and areas where OSV use is permitted and routes and areas where OSV use is not permitted on NFS lands, consistent with EO 11644, as amended by EO 11989.

*Comment:* Some respondents stated that the Forest Service should have addressed OSV use in the TMR; that failure to do so has resulted in use conflicts and resource damage; and that the TMR should be reviewed and used as a starting point for developing an over-snow rule.

*Response:* Current subpart C of the TMR addresses OSV use by providing for but not requiring designation of routes and areas for OSV use. The Department disagrees that the approach to management of OSV use in current subpart C has resulted in use conflicts and resource damage. As stated in the preamble to the proposed and final rules, the Forest Service is amending subpart C in response to a court order to require designation of those NFS roads, NFS trails, and areas on NFS lands that are open to OSV use and to prohibit OSV use that is inconsistent with those designations.

*Comment:* Some respondents stated that the Forest Service should have more vigorously defended subpart C of the TMR and the Agency's management of OSV use.

*Response:* The Federal Government vigorously defended subpart C of the TMR in the litigation that resulted in the March 29, 2013, order. This order requires the Agency to revise subpart C to require, rather than provide for, designation of routes and areas where OSV use is permitted and routes and areas where OSV use is not permitted on NFS lands, consistent with EO 11644, as amended by EO 11989.

*Comment:* Some respondents stated that the proposed rule should not have been published in the summer, when OSV users are not focused on winter recreation.

*Response:* This rulemaking is court-ordered and is subject to a court deadline. The Agency had to proceed as quickly as possible to comply with the court order. Moreover, no publication time is ideal for everyone. For example, in the winter time, OSV users could be recreating and not focused on rulemaking.

*Comment:* Some respondents stated that since OSV use is not adequately regulated, and since few current restrictions on OSV use are enforced, OSV use should not be expanded. Other respondents noted that enforcement of restrictions and prohibitions on OSV use is an issue in the backcountry and that OSVs are encroaching on non-motorized areas in search of fresh powder and are disregarding signage in the area. Other respondents stated that the registration fee for OSVs should be raised to pay for increased enforcement and signage for OSV use designations.

*Response:* Enforcement of the TMR, including subpart C, is beyond the scope of this rulemaking. Forest Service law enforcement personnel play a critical role in ensuring compliance with applicable laws and regulations, protecting public safety, and protecting NFS resources. The Forest Service also maintains cooperative relationships with many State and local law enforcement agencies that provide mutual support across jurisdictional boundaries. Education and cooperative relationships with users support enforcement efforts by promoting voluntary compliance. The final rule will not increase the Agency's budget or the number of law enforcement officers. However, the final rule will enhance consistency and clarity in management of OSV use on NFS lands.

OSV use maps will be available at local Forest Service offices and, as soon as practicable, on Forest Service Web sites. Once an administrative unit or a Ranger District issues an OSV use map, OSV use in that unit or District that is inconsistent with the designations reflected on the map will be prohibited. The Forest Service plans to issue additional travel management guidance in its sign handbook to enhance consistency in content and use of standard interagency symbols in signs.

*Comment:* Some respondents stated that the Forest Service should not establish an artificial, predetermined date by which local units are required to complete winter travel planning across the NFS. Other respondents requested that the Forest Service establish a timeline for issuance of OSV use maps.

*Response:* The Department shares an interest in completing route and area designations for OSV use as quickly as possible. The Forest Service will make every effort, within its available resources, to complete route and area designations for OSV use as quickly as possible. However, the Department disagrees with establishing an enforceable deadline for completion of the process. Imposing an enforceable deadline for completing OSV use designations would subject the Forest Service to a legal challenge if, despite its best efforts (perhaps due to the controversy involved in the process), the Agency is unable to meet the deadline. The Department believes that appropriate public input and coordination between the Responsible Official and Federal, State, Tribal, county, and municipal governments offers the best hope for long-term resolution of issues involving designations for motor vehicle use, including OSV use. An inflexible

deadline can make collaborative solutions more difficult.

*Comment:* Some respondents stated that how the Agency will fund management of OSV use and enforce restrictions on OSV use should be considered in OSV designation decisions, and requested that the Agency consider pursuing alternative management practices in coordination with the States and organizations like the Interagency Off-Highway Vehicle (OHV) Working Group established by the State of Montana's Department of Fish, Wildlife, and Parks.

*Response:* Recreation management in general and recreation funding are beyond the scope of this rulemaking, which addresses designation of routes and areas on NFS lands for OSV use. Forest Service appropriations are authorized by Congress. The Forest Service is committed to using whatever funds it has available to accomplish the purposes of this final rule in a targeted, efficient manner. The Agency makes appropriate use of all other sources of available funding and has a number of successful cooperative relationships with State governments. Volunteer agreements with user groups and others have proven successful in extending Agency resources for trail construction, maintenance, monitoring, and mitigation. Regardless of the level of funding available, the Department believes that the final rule provides an appropriate procedural framework for management of OSV use on NFS lands that is consistent with EO 11644, as amended by EO 11989, the District Court's March 29, 2013, order, and regulation of other types of motor vehicle use on NFS lands. While availability of resources for maintenance and administration must be considered in designating routes for OSV use (§§ 212.55(a) and 212.81(d) of the final rule), cooperative relationships and volunteer agreements may be included in this consideration.

*Comment:* Some respondents supported the Forest Service policy for managing nonconforming uses in recommended wilderness and wilderness study areas and encouraged the Forest Service to codify this policy nationally in the final rule. Some respondents believed that inventoried roadless areas, areas recommended for wilderness in land management plans, and wilderness study areas should be more protected under the final rule. Other respondents suggested that the Forest Service amend 36 CFR 212.55(e) to state that "National Forest System roads, National Forest System trails, and areas on National Forest System lands in wilderness areas, or primitive areas,

inventoried roadless areas, areas recommended for wilderness in land and resource management plans, or wilderness study areas shall not be designated for motor vehicle use pursuant to this section, unless, in the case of wilderness areas, motor vehicle use is authorized by the applicable enabling legislation for those areas.''

*Response:* The issue regarding nonconforming uses in recommended wilderness and wilderness study areas is beyond the scope of this final rule. The Department believes that the National Forests and Grasslands should provide access for both motorized and non-motorized uses in a manner that is environmentally sustainable over the long term. Designations for motor vehicle use, including OSV use, are best made at the local level, in coordination with Federal, State, Tribal, and local governments and appropriate public involvement, as provided for in this final rule.

Protection of roadless areas is adequately addressed by the national and State-specific roadless rules and need not be addressed in this rulemaking.

*Comment:* Many respondents commented on the backcountry hut system in Colorado. Some of these respondents were in favor of allowing OSV use in the area surrounding these huts, while other respondents were opposed to OSV use in this area.

*Response:* Whether OSV use should be allowed in certain areas on NFS lands is beyond the scope of this final rule. This final rule addresses the procedural framework for making OSV use designations rather than OSV use designations themselves. The Department encourages public participation in local OSV use designations.

*Comment:* Some respondents stated that fat tire bicycles should be regulated under the proposed rule. Some respondents stated that the Forest Service should explicitly incorporate a definition of bicycles that unambiguously distinguishes them from motor vehicles, including OSVs, and should provide guidance to ensure that bicycles are managed as a non-motorized use. Some respondents commented that bicycles should be managed on their own merits and not as an afterthought to motorized travel management.

*Response:* Regulation of non-motorized use, including bicycles without motors, is beyond the scope of this final rule, which addresses motorized use, specifically, OSV use. The Forest Service has clearly defined the term ''bicycle'', which includes new

fat tire bicycles, in Forest Service Handbook 2309.18 as ''a pedal-driven, human-powered device with two wheels attached to a frame, one behind the other.'' Management of bicycles, including fat tire bicycles in winter, would be addressed as part of trail management planning for non-motorized uses. New technologies that merge bicycles and motors, such as e-bikes, are considered motor vehicles under § 212.1 of the TMR.

*Comment:* Some respondents stated that the proposed rule should require Forest Service employees to spend half their time in the field improving conditions and reducing fuels for fire.

*Response:* Allocation of employees' time with regard to conditions on the ground and reducing fuel loads is beyond the scope of this final rule, which addresses regulation of OSV use.

*Comment:* Some respondents stated that the term ''Responsible Agency Official'' should be clearly defined, and that identifying who this official is might help with potential inconsistency in implementing the rule.

*Response:* The Forest Service did not propose any changes pertaining to identification of the Responsible Official in the current TMR. Therefore, the request to define the term ''Responsible Official'' is beyond the scope of this final rule. The Department believes the meaning of this term is clear from the context of the TMR. The Responsible Official in the context of the TMR is the person who has responsibility for managing an administrative unit or a Ranger District and who has delegated authority to make designation decisions under the TMR for that unit or District.

*Comment:* Some respondents commented that education regarding outdoor ethics is paramount for backcountry activities such as OSV use and should be required in the final rule. These respondents believed that inexperienced users cause much of the environmental damage and use conflicts associated with OSV use and that better outdoor ethics training could prevent a lot of these problems.

*Response:* Outdoor ethics training is outside the scope of this rulemaking, which addresses designation of routes and areas for OSV use. The Department appreciates the valuable and long-standing contributions of nongovernmental organizations, including user groups, to promote environmental ethics and responsible behavior on Federal lands.

*Comment:* Some respondents commented that implementation of the proposed rule would have a direct impact on grooming programs and cooperative agreements for grooming

among private organizations, counties, and the Forest Service.

*Response:* The Department disagrees. The final rule revises the procedural framework for designating routes and areas for OSV use consistent with E.O. 11644, as amended, and the March 29, 2013, court order and will not have any direct effect on grooming programs or cooperative agreements for grooming among private organizations, counties, and the Forest Service.

OSV Exemption in Subpart B

*Comment:* Some respondents stated that the Forest Service should remove the OSV exemption in subpart B to provide consistency between winter and summer travel management. Other respondents stated that OSVs are motor vehicles and therefore should be subject to the same regulation as other types of motor vehicles, such as OHVs. Some respondents stated that the OSV exemption in subpart B is appropriate given the differences between OSVs and other types of motor vehicles, including OHVs.

*Response:* The Department believes that there are enough differences between OSV use and other types of motor vehicle use to justify regulation of OSV use in a separate subpart. As stated above, the difference between management of OSV use and management of other types of motor vehicle use on NFS lands stems from differences in their associated settings, activities, environmental impacts, and public preferences. For example, impacts from wheeled motor vehicles traveling directly on the soil differ from impacts from motor vehicles with tracks or skis traveling over snow. Therefore, the Department is retaining the OSV exemption in subpart B of the TMR.

Biological Resource Management

*Comment:* Some respondents stated that the Forest Service should limit OSV use off established trails to minimize damage to habitat for species like bear, ermine, dusky grouse, lynx, mountain goat, bighorn sheep, and snowshoe hare and that OSV use on trails should be limited to areas with no ecological value to ensure these species have adequate habitat. Other respondents stated that there is no credible evidence that OSVs cause resource damage or have an impact on wildlife and that the proposed rule should be rewritten to reflect that fact.

*Response:* The National Forests and Grasslands are managed by law for multiple uses, including wildlife, timber, grazing, mining, and outdoor recreation. These uses must be balanced, rather than given preference.

**4504**     **Federal Register** / Vol. 80, No. 18 / Wednesday, January 28, 2015 / Rules and Regulations

OSV use may have an impact on NFS resources and wildlife. Managers must apply the so-called "minimization criteria" in § 212.55 when determining which roads, trails and areas to authorize for OSV use in order to minimize effects on National Forest resources including wildlife. These criteria do not change with this rule. The Department believes that National Forests and Grasslands should provide access for both motorized and non-motorized uses in a manner that is environmentally sustainable over the long term. The Department believes that the analysis of effects to wildlife and other NFS resources for designations for motor vehicle use, including OSV use, are best made at the local level, in coordination with Federal, State, Tribal, and local governments and with appropriate public involvement, as provided for in this final rule.

*Comment:* Some respondents stated that allowing OSV use everywhere hurts dedicated lynx and wolverine habitat. Some respondents stated that a large portion of wolverine habitat in North America is under Federal ownership and should be protected. These respondents requested that the final rule fully evaluate and disclose the effects of dispersed recreation on wolverines and their habitat and, where necessary, minimize the harm from those activities. These respondents also stated that the final rule should require the Forest Service to consult with the U.S. Fish and Wildlife Service to determine best mitigation practices regarding wolverines. Some respondents stated that OSV use compact snow, which gives larger predators like the coyote easier access to areas previously available to only smaller predators like the lynx and results in increased competition during sensitive lifecycles. Other respondents stated that there are fewer species in the winter season than in the summer, but that their protection is still important. Some respondents stated that Responsible Officials should be required to use the best available technology (BAT), as determined by the U.S. Environmental Protection Agency, in assessing impacts of OSV use in areas with sensitive species or special features. Some respondents stated that wildlife impacts from OSV use would be minimal because OSV users tend to favor higher elevations and because wildlife has typically migrated to lower elevations where conditions are more favorable.

*Response:* The impact of OSV use on specific species, including threatened and endangered species, in specific locations is beyond the scope of this final rule. This final rule addresses the procedural framework for making OSV use designations, rather than OSV use designations themselves. OSV use designations are made at the local level, with appropriate public input and coordination with Federal, State, Tribal, and local governments based on the criteria in the final rule (§§ 212.55 and 212.81(d)). The final rule does not provide for designating routes and areas for OSV use everywhere it may occur. Rather, the final rule provides for designation of a system of routes and areas where OSV use is allowed and for prohibition of OSV use that is inconsistent with the designations.

The final rule will not have any effect on the ground until designation of roads, trails, and areas for OSV use is complete for a particular administrative unit or Ranger District, with appropriate public involvement and coordination with Federal, State, Tribal, and local governments. Designation decisions at the local level will be accompanied by appropriate consideration of potential impacts on threatened and endangered species. In making designations for OSV use, the Forest Service will consult with the U.S. Fish and Wildlife Service, as appropriate, under Section 7 of the Endangered Species Act. BAT is not required for assessing impacts from motor vehicle use. The Forest Service encourages public participation in local OSV decision making.

Other Environmental Impacts and Use Conflicts

*Comment:* Some respondents noted that OSVs are heavy and compact the snow, leaving deep tracks that make slopes unusable and dangerous for cross-country skiing. These respondents stated that this impact could be avoided by separating motorized and non-motorized uses. Some respondents commented that motorized and non-motorized uses should be located in separate staging areas, where possible, to limit use conflicts. Some respondents believed that snow pack from track compaction decreases snow melt. Other respondents stated that OSVs come in direct contact with the soil when OSV users search for adequate snow and that OSVs come in contact with the top of vegetation, which has an impact on the soil and vegetation. Some respondents stated that motorized and non-motorized recreational activities are legitimate uses of Federal land, but they should be separated to ensure safe enjoyment for all involved. Other respondents believed that OSV use is incompatible with non-motorized uses and should be excluded from all NFS lands or should be restricted to trails and subject to a licensing requirement.

Some respondents commented that the Responsible Official should have to address OSV use in the same manner as other motorized recreational uses on NFS lands. These respondents reasoned that the issue of use conflicts between motorized and non-motorized recreation is the same regardless of the level of snowfall or the season.

Other respondents stated that OSVs are loud and that their noise carries, in some cases for several miles, which disturbs the quiet recreational experience of non-motorized users. Some respondents believed that OSVs compromise air and water quality, the landscape, and the quiet of the natural forest setting. Some respondents believed that OSV users leave behind trash and litter that adversely affects other users. Other respondents stated that the Forest Service should endorse the minimization of OSV use in the backcountry and that mechanized travel spoils the wilderness experience.

Some respondents stated that the proposed rule should protect the quiet use of NFS lands, as this use predates any motorized use. Some respondents stated that the Forest Service failed to address non-motorized winter recreational uses like skiing and snowshoeing, which predate OSV use, and that these non-motorized uses are most likely to be heavily impacted by OSV use and should be addressed. Some respondents commented that it is difficult for non-motorized winter users to reach the backcountry, but when they do and find it overrun with OSVs, it can detract from their experience. These respondents believed that motorized winter uses should be limited to certain areas so that non-motorized winter users can seek solitude and quiet elsewhere. Other respondents stated that advances in technology have allowed OSVs to go places they never have before, further decreasing the areas available for quiet recreation. Some respondents believed that non-motorized uses should be given priority over motorized uses when undertaking winter travel management planning.

Some respondents believed that OSVs with two-cycle motors are obsolete and environmentally wasteful and should be banned in favor of modern four-cycle motors. These respondents noted that the exhaust from an OSV not only smells but lingers in the area for several hours.

Other respondents stated that OSVs do not come in direct contact with the ground and often ride on a cushion of snow several feet thick, and that when the snow melts, the tracks are washed away. Some respondents believed that OSVs on NFS roads do little to no harm

compared to other motor vehicles and therefore should not be restricted. Other respondents believed that motorized winter use is an appropriate use of NFS lands and should not be limited in favor of non-motorized winter uses. Some respondents suggested that winter travel planning be based on an equitable process that eliminates the perceived bias that the OSV community has dealt with for many years. These respondents stated that non-motorized users like cross-country and backcountry skiers, snowshoe enthusiasts, split boarders, and dog-sledders have unlimited access to the backcountry, including areas that they could not realistically reach without the aid of an OSV, while OSVs are limited to small fractions of the National Forests and Grasslands. These respondents believed that limiting OSVs to small areas would result in more use conflicts and greater environmental impacts.

*Response:* The site specific potential effects of OSV use on non-motorized winter recreational use and natural resources and the designation of certain types of OSVs in specific locations are beyond the scope of this final rule. This final rule addresses the procedural framework for making OSV use designations, rather than OSV use designations themselves. OSV use designations are made at the local level, with appropriate public input and coordination with Federal, State, Tribal, and local governments based on the criteria in the final rule (§§ 212.55 and 212.81(d)). The same criteria are applied to designations for OSV use and designations for other types of motor vehicle use. Potential effects of OSV use on non-motorized winter recreational use and natural resources are addressed in the procedural framework for OSV use designations in the final rule. The criteria for designation of roads, trails, and areas for OSV use in the final rule require the Responsible Official to consider, with the objective of minimizing, effects of OSV use on natural resources and conflicts between OSV use and existing or proposed recreational uses of NFS lands, including non-motorized winter recreational uses. In addition, the criteria for designation of routes and areas for OSV use require the Responsible Official to consider the compatibility of OSV use with existing conditions in populated areas, taking into account sound, emissions, and other factors (§§ 212.55(b) and 212.81(d) of the final rule).

The Department believes that National Forests and Grasslands should provide access for both motorized and non-motorized uses in a manner that is environmentally sustainable over the long term. The NFS is not reserved for the exclusive use of any one group, nor must every use be accommodated on every acre. It is entirely appropriate for different areas of the NFS to provide different opportunities for recreation. The Department believes that designations for motor vehicle use, including OSV use, are best made at the local level, in coordination with Federal, State, Tribal, and local governments and with appropriate public input, as provided for in this final rule. The Forest Service encourages public involvement in local OSV decisions.

The Department agrees that OSVs have different impacts from other types of motor vehicles that run on the ground. However, per EO 11644, as amended, and the court order, the Forest Service must designate those routes and areas where OSV use is allowed and those routes and areas where OSV use is prohibited.

Economic Impacts

*Comment:* Some respondents believe that increased regulation of OSV use will have a negative impact on small-town economies that depend on OSV users for income.

*Response:* The final rule revises the procedural framework for local decision-making regarding OSV use and will not have any effect until designation of roads, trails, and areas for OSV use is complete for a particular administrative unit or Ranger District, with appropriate public involvement and coordination with Federal, State, Tribal, and local governments. Even after OSV designations are complete, the final rule will have no direct impact on small business entities because designations merely will regulate where OSV use will occur on NFS roads, on NFS trails, and in areas on NFS lands. The Department has determined that the final rule will not have a significant economic impact on a substantial number of small entities because the final rule will not impose recordkeeping requirements on them, nor will it affect their competitive position in relation to large entities or their cash flow, liquidity, or ability to remain in the market.

*Comment:* Some respondents stated that non-motorized winter users of NFS lands use staging areas and trails that in many cases have been plowed or groomed with revenue from OSV users; that non-motorized users do not pay for plowed trailhead parking or groomed trails but want increased access to these areas; and that non-motorized users should be required to share the cost of plowing trailhead parking and grooming trails by paying for a trail pass or parking pass or paying a use fee. Some respondents stated that if non-motorized users want a separate system of trails, they should have to pay a separate fee to fund maintenance of those trails. Other respondents stated that the motorized recreation community has many partnerships in place to maintain and improve existing trails that are used by both motorized and non-motorized users.

*Response:* The extent to which the costs of plowing trailhead parking and grooming trails are borne by users is beyond the scope of this rulemaking. The Forest Service does not typically plow trailhead parking or groom trails and does not run programs that generate revenue to pay for these services. States or private organizations typically plow trailhead parking and groom trails using revenue derived from the States' sales tax or the sale of stickers issued by the States. The final rule revises the procedural framework for local decision-making regarding OSV use and will not have any effect until designation for a particular administrative unit or Ranger District, with appropriate public involvement and in coordination with Federal, State, Tribal, and local governments. The Forest Service's authority to charge and retain fees for use of recreational facilities and services is contained in the Federal Lands Recreation Enhancement Act (16 U.S.C. 6801–6814), which is beyond the scope of this rulemaking. The Department agrees that cooperators make valuable contributions to maintenance and improvement of NFS trails for both motorized and non-motorized users.

Demographics of OSV Use

*Comment:* The demographics used in the proposed rule are outdated and should be updated to reflect current OSV use.

*Response:* The demographics for OSV use used in the proposed rule are provided for background purposes and date from a 2012 Resource Planning Assessment. These figures are current, as figures in Resource Planning Assessments conducted under the Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA) (16 U.S.C. 1600 note, 1600–1614) are normally updated every 5 to 10 years. The increase in cross-country skiing between 1992–93 and 1999–2000 is 2.6 million visits, while the increase in OSV use for those periods is 6.1 million visits.

*Comment:* The percentages used in the proposed rule to demonstrate an

**4506** **Federal Register** / Vol. 80, No. 18 / Wednesday, January 28, 2015 / Rules and Regulations

increase in recreational activities like bird-watching and fishing can be misleading; the Forest Service should replace them with actual numbers.

*Response:* This information was provided for background purposes and came from research data in "Outdoor Recreation Trends and Futures, a Technical Document Supporting the Forest Service 2010 RPA Assessment," p. 135 (H. Cordell, 2012) at *http://www.srs.fs.usda.gov/pubs/gtr/gtr_srs150.pdf.*

Recreational Preferences

*Comment:* Some respondents stated that wilderness areas have increased steadily over the last 40 years, which has limited all forms of motorized recreation and given more access to non-motorized uses. These respondents stated that Federal lands should be open to all members of the public.

*Response:* This final rule does not encourage or discourage motor vehicle use, but rather requires designation of roads, trails, and areas for OSV use. The Department believes that a well-designed system of routes and areas designated for OSV use can reduce maintenance needs and environmental damage while enhancing the recreational experience for all users, both motorized and non-motorized.

*Comment:* Some respondents commented that motor vehicle access for the elderly and persons with disabilities should not be limited.

*Response:* Under section 504 of the Rehabilitation Act of 1973, no person with a disability can be denied participation in a Federal program that is available to all other people solely because of his or her disability. In conformance with section 504, wheelchairs are welcome on all NFS lands that are open to foot travel and are specifically exempted from the definition of a motor vehicle in § 212.1 of the TMR, even if they are battery-powered. However, there is no legal requirement to allow people with disabilities to use OSVs on NFS roads, on NFS trails, and in areas on NFS lands where OSV use is prohibited because such an exemption could fundamentally alter the nature of the Forest Service's travel management program (7 CFR 15e.103). Reasonable restrictions on OSV use, applied consistently to everyone, are not discriminatory.

*Comment:* Some respondents believed that the Forest Service should remove references to "play areas" from the final rule because all types of terrain are conducive to OSV travel and recreation.

*Response:* Like the proposed rule, the final rule does not include a reference to "play areas."

*Comments Related to Specific Sections of the Proposed Rule*

Part 212—Travel Management

Subpart A—Administration of the Forest Transportation System

212.1—Definitions

*Comment:* Some respondents commented that designation of areas as big as a Ranger District would not comply with the language or intent of EO 11644, as amended. Some respondents commented that the proposed definition for an area would not resolve use conflicts and would only exacerbate them. One respondent suggested that designated areas should be limited to watersheds no larger than those assigned hydrologic unit code 6 by the U.S. Geological Survey. Other respondents supported the proposed definition of an area.

*Response:* E.O. 11644, as amended, does not define the term "area." The amended definition for "area" in the proposed and final rules is based on the characteristics of OSV use, which presents a distinct suite of issues. An OSV traveling over snow has different impacts on natural resource values than motor vehicles traveling over the ground. Unlike other motor vehicles traveling cross-country, OSVs traveling cross-country generally do not create a permanent trail or have a direct impact on soil and ground vegetation. However, OSV use may have an impact on NFS resources and wildlife. The Department anticipates that it may be appropriate to designate areas for cross-country OSV use and that it may be appropriate to designate larger areas for cross-country OSV use than for cross-country use by other types of motor vehicles. Accordingly, the definition for an area in the proposed and final rules exempts OSVs from the statement that in most cases an area will be much smaller than a Ranger District. The definition of "area" in the proposed and final rules does not provide that areas designated for OSV use will necessarily be as large as a Ranger District, but rather that they do not have to be much smaller than a Ranger District. As with evaluation of areas proposed for other types of motor vehicle use, proposed OSV areas will be subject to the minimization criteria in § 212.55(b)(1)–(4), pursuant to § 212.81(d) of the final rule.

*Comment:* Some respondents commented that the definition of the term "over-snow vehicle" needs to be expanded to allow for modified vehicles, such as snowcats and fat tire bicycles, to be used on the trail system if permitted by State law.

*Response:* Regulation of non-motorized uses such as bicycle use is beyond the scope of this rulemaking. The definition of "over-snow vehicle" is also beyond the scope of this rulemaking, as it was not proposed for revision. The Department does not believe it is necessary or appropriate to revise the definition of "over-snow vehicle" at this time.

Subpart C—Over-Snow Vehicle Use

212.81(a)—Over-Snow Vehicle Use, General

*Comment:* Some respondents believed that local officials should be given the discretion to designate a system of routes and areas where OSV use is allowed unless prohibited or a system of routes and areas where OSV use is prohibited unless allowed.

Some respondents believed that the Responsible Official should not have the discretion to designate a system of routes and areas where OSV use is allowed unless prohibited or a system of routes and areas where OSV use is prohibited unless allowed. These respondents stated that winter travel management planning should be more consistent with travel management planning in other seasons by producing a system of routes and areas where OSV use is prohibited unless allowed. These respondents noted that this approach is easily understood by the public and is more enforceable. Other respondents stated that where appropriate (for example, where no natural resource issues are identified), the Forest Service should be consistent regarding designations for OSV use across District, Forest, and Regional boundaries. These respondents believed that District, Forest, and Regional boundaries can be confusing to the public and that consistent designations for OSV use would improve public understanding as well as provide consistent opportunities for OSV use.

Other respondents commented that the proposed rule violates E.O. 11644, as amended, and the March 29, 2013, court decision by continuing to allow designation of a system that is open unless closed to OSV use, which circumvents analysis of impacts from OSV use. Other respondents commented that, to be consistent with the E.O. 11644, as amended, the Agency must designate trails and areas where OSV use is allowed and trails and areas where OSV use is not allowed.

*Response:* In its March 29, 2013, ruling, the Federal District Court held that under E.O. 11644, as amended, the Forest Service has the discretion to determine how to regulate OSV use, but

that the Agency does not have the discretion to determine whether it will regulate OSV use. The proposed rule is consistent with the court's ruling in that it requires the Agency to designate routes and areas for OSV use, but gives the Responsible Official the discretion to determine whether to designate a system of routes and areas that is open unless designated closed to OSV use or a system of routes and areas that is closed unless designated open for OSV use. In either case, the decision would be based on an analysis of the impacts from the proposed designations and anticipated uses in accordance with subpart B, as modified in subpart C to provide for consistency in terminology.

The Department agrees that it would be clearer for the public and would enhance consistency in travel management planning and decision-making if the Responsible Official were required to designate a system of routes and areas where OSV use is prohibited unless allowed. Accordingly, the Department has revised § 212.81(a) in the final rule to state that, subject to specified exemptions, OSV use on NFS roads, on NFS trails, and in areas on NFS lands must be designated by the Responsible Official on administrative units or Ranger Districts, or parts of administrative units or Ranger Districts, where snowfall is adequate for that use to occur and, as appropriate, must be designated by class of vehicle and time of year. Under § 261.14 of the final rule, OSV use that is not in accordance with the designations reflected on an OSV use map is prohibited.

The Department has removed the definition of "designated road, trail, or area" from § 212.1, as with promulgation of this final rule it is no longer accurate to define designated routes and areas as those that are designated for motor vehicle use pursuant to § 212.51 on a motor vehicle use map. Under this final rule, routes and areas will also be designated for OSV use pursuant to § 212.81 on an OSV use map.

*Comment:* Most respondents commented that OSV designation decisions should be made at the local level, not at the national level. Some respondents commented that the local Forest Service official should retain the discretion to manage OSV use to address local conditions.

Many respondents stated that whether there is adequate snowfall for OSV use should be determined at the local level and should not be based on specific starting and ending dates because of the unpredictability of snowfall. Some respondents suggested that adequate snowfall be determined by a minimum depth, rather than a specific timeframe. Other respondents suggested that OSV use be zoned by timeframe as well as by location.

*Response:* The Department agrees that OSV designation decisions, including adequacy of snowfall for OSV use, should be made at the local level, as reflected in the final rule. Designation of OSV use in specific locations, including determination of where snowfall is adequate for OSV use to occur, is beyond the scope of this rule. The final rule revises the procedural framework for local decision-making regarding OSV use, utilizing the criteria for designation of roads, trails, and areas (§§ 212.55 and 212.81(d) of the final rule).

Section 212.81(a) of the proposed rule provides, subject to certain exceptions, that OSV use on NFS roads, on NFS trails, and in areas on NFS lands must be designated on administrative units and Ranger Districts, or parts of those units and Districts, where snowfall is adequate for that use to occur. The Forest Service intended the phrase, "where snowfall is adequate for that use to occur," to have two applications. First, the Agency intended the phrase to exempt units like the National Forests of Florida that never have enough snowfall for OSV use to occur from the designation requirement in § 212.81(a). Second, where snowfall may occur, but is not consistently adequate for OSV use to occur, the Agency intended the phrase to provide for the Responsible Official to determine when snowfall is adequate in designating OSV use. To clarify these intentions, the Department has added the phrase, "and if appropriate, shall be designated by class of vehicle and time of year," after the phrase, "where snowfall is adequate for that use to occur." The Department has included the phrase, "class of vehicle," to enhance consistency with subpart B, in accordance with the preceding comment and response, and to allow Responsible Officials to take into account changing technology in OSVs. The Department has included the qualifier, "as appropriate," because it may not always be appropriate or necessary to designate OSV use by class of vehicle or time of year. The Department believes that determinations of when snowfall is adequate for OSV to occur should be based on local conditions, including, as appropriate, variability in the weather.

*Comment:* Many respondents commented that the proposed rule recognizes the difference between OSV use in the East and OSV use in the Midwest and West. These respondents stated that cross-country travel is the preferred method of OSV use in the Midwest and West and should be allowed to continue under the final rule. Other respondents believed that OSV use in the West should not be limited to designated trails and that experienced riders would not ride off route in an area that is not conducive to OSV use because they are aware that riding in this type of area would damage the expensive tracks on OSVs. Some respondents stated that OSVs should be given the same opportunity to travel cross-country as skiers and snowshoers. Some respondents suggested that the ability to travel cross-country on an OSV is what brings people to snow-covered areas and that by limiting OSV use to routes, the Forest Service would decrease the number of people who will visit these areas. Some respondents believed that the proposed rule recognizes that OSV use is a legitimate use on NFS lands and that OSV use should not be limited to designated trails and roads, but should also be allowed to occur in open areas. These respondents stated that the proposed rule should be implemented as written.

Other respondents believed that cross-country OSV use should not be allowed because OSV users can quickly become lost and end up in a non-motorized area. Some respondents suggested that areas 3 to 5 square miles beyond trailheads and parking lots should be closed to cross-country use during the snow months. These respondents believed that this approach would allow OSVs to access the backcountry while leaving the more accessible areas to snowshoers and cross-country skiers.

*Response:* The Department agrees that OSV use presents a distinct suite of issues. An OSV traveling over snow has different impacts on natural resource values than motor vehicles traveling over the ground. Unlike other motor vehicles traveling cross-country, OSVs traveling cross-country generally do not create a permanent trail or have a direct impact on soil and ground vegetation. Therefore, the Department anticipates that it may be appropriate to designate areas for cross-country OSV use and that it may be appropriate to designate larger areas for cross-country OSV use than for cross-country use by other types of motor vehicles. Accordingly, the definition for an area in the proposed and final rules exempts OSVs from the statement that in most cases an area will be much smaller than a Ranger District. Whether specific areas should be designated for OSV use is beyond the scope of this final rule. This final rule addresses the procedural framework for making OSV use designations, rather than OSV use designations themselves. OSV use designations are made at the

local level, with appropriate public input and coordination with Federal, State, Tribal, and local governments, based on the criteria in the final rule (§§ 212.55 and 212.81(d)).

*Comment:* Some respondents commented that the proposed rule should restrict OSV use to designated routes and prohibit cross-country OSV use near wilderness and that the routes should be designated so as to minimize impacts on wilderness and wildlife and to avoid impairment of the visitor experience in wilderness.

*Response:* The Department does not believe it would be appropriate for this rule to restrict OSV use to designated routes and prohibit cross-country OSV use near wilderness. Responsible officials will consider impacts of OSV use on nearby wilderness and wildlife during the designation process by applying the minimization criteria of 212.55 to minimize effects to National Forest resources and to other users.

*Comment:* Some respondents commented that Forest Service units will need to conduct site-specific analysis for all resources within an area to be designated for OSV use, which would require a "hard look" under the National Environmental Policy Act (NEPA). These respondents believed that the NEPA process for designating an area for OSV use could be onerous. Other respondents commented that NEPA documentation for winter travel management decisions does not adequately reflect how the Forest Service applied the minimization criteria in the TMR in those decisions and is inconsistent with the TMR.

*Response:* Regulations implementing NEPA are issued by the Council on Environmental Quality and are found at 40 CFR part 1500. Agency direction on NEPA compliance is found in 36 CFR part 220 and FSH 1909.15. The Department believes that the scope, content, and documentation of NEPA analysis associated with designating routes and areas for OSV use will ultimately depend on site-specific factors, including the local history of travel planning, public input, and environmental impacts at the local level. Therefore, the Department is not addressing NEPA compliance in this final rule. The Responsible Official will address application of the minimization criteria pursuant to §§ 212.55(b)(1)–(4) and 212.81(d) of the final rule in documentation for OSV designation decisions.

*Comment:* Some respondents stated that the Forest Service should clarify in the final rule the need to apply the minimization criteria in the TMR to trails within areas that are proposed for

designation for OSV use. Other respondents commented that by failing to provide for analysis of trails within areas, the proposed rule does not address the requirement to show that OSV use on those routes will not have a negative impact on the environment or other uses.

*Response:* The Department believes that if an area is analyzed appropriately under NEPA for OSV use utilizing the criteria established in the final rule (§§ 212.55 and 212.81(d)), there is no need for additional analysis to evaluate effects of OSV use on specific trails in that area, which are typically covered by snow. As units analyze an area, impacts on the environment and other users will be minimized within that area as specified in § 212.55(b)(1)–(4). Consistent with the EOs, the proposed and final rules do not require the Forest Service to show the absence of any adverse impacts from OSV use on the environment or other uses. Rather, the proposed and final rules require the Agency to consider, with the objective of minimizing, certain environmental impacts and use conflicts (§ 212.55(b)(1)–(4)).

*Comment:* Some respondents commented that there is a master memorandum of understanding between the Forest Service's Alaska Region and the Alaska Department of Fish and Game (ADF&G) and that ADF&G has authority to regulate fish and wildlife populations on NFS lands, except to the extent that authority is superseded by Federal law. These respondents also noted that, with regard to designated wilderness in Alaska, administrative use of OSVs by governmental agencies is allowed pursuant to the Alaska National Interest Lands Conservation Act (ANILCA) and Forest Service Manual Supplement no. R–10 2300–2003–2, 2326.1, Conditions Under Which Use May Be Approved. These respondents suggested amending the exemption from OSV designations in proposed § 212.81(a)(1) for limited administrative use by the Forest Service to add administrative use by State fish and wildlife management agencies. These respondents believed that an exemption should be granted for all administrative use because the qualifier "limited" is not defined and is redundant, since Agency administrative field work and travel are presumably necessary rather than superfluous.

*Response:* The Department disagrees that the exemption from OSV designations in § 212.81(a)(1) of the proposed rule and from the prohibition in § 261.14(a) of the TMR for limited administrative use by the Forest Service should be revised to add limited

administrative use by State fish and wildlife management agencies. The Department has retained the qualifier "limited administrative use" in the exemption. A broad exemption from OSV designations could undercut the purposes of the final rule. The Department is not making the requested revision so as to stay consistent with the corresponding exemption in §§ 212.51(a)(4) and 261.13(d) of the TMR. The Forest Service has the ability to authorize OSV use by State fish and wildlife management agencies on a case-by-case basis.

*Comment:* Some respondents stated that there should be a process for administrative review of OSV designation decisions prior to their enforcement.

*Response:* OSV designation decisions that are documented with a decision notice or record of decision associated with an environmental assessment or environmental impact statement are subject to the predecisional objection process in 36 CFR part 218.

212.81(b)—Previous Comprehensive Over-Snow Vehicle Decisions

*Comment:* Some respondents believed that all areas on NFS lands that are open to OSV use should remain that way.

Other respondents stated that the final rule should allow areas and routes to be designated for OSV use only after comprehensive analysis has been made available for public review and comment.

*Response:* The final rule's prohibition on OSV use off the designated system (§ 261.14) goes into effect on an administrative unit or a Ranger District once that unit or District has designated those NFS roads, NFS trails, and areas on NFS lands that are open to OSV use and published an OSV use map identifying those roads, trails, and areas (§ 212.81(c) of the final rule). Until designations for a unit or District are complete and an OSV use map identifying those designations is published, existing OSV travel management policies, restrictions, and orders remain in effect. Use of NFS roads, NFS trails, and areas on NFS lands consistent with current OSV travel management decisions and management objectives may continue. Forest Supervisors may continue to issue travel management orders pursuant to part 261, subpart B, and impose temporary, emergency closures based on a determination of considerable adverse effects pursuant to §§ 212.52(b)(2) and 212.81(d) of the final rule. Under §§ 212.80(b) and 212.81(b) of the final rule, previous administrative decisions that allow, restrict, or prohibit

OSV use on NFS roads and NFS trails or in areas on NFS lands that were made under other authorities may remain in effect.

As stated above, units or Districts that have completed OSV use designations under other authorities and including public involvement do not have to revisit them and may, with public notice but no further analysis or decision-making, establish those decisions as the designation pursuant to this final rule for the unit or District, effective upon publication of an OSV use map.

In that situation, the only substantive change effected by this final rule will be enforcement of the restrictions pursuant to the prohibition in § 261.14, rather than pursuant to an order issued under part 261, subpart B. Section 212.81(b) of the final rule provides that no further public involvement is required in this special case. Alternatively, Responsible Officials may revise OSV designations under §§ 212.54 and 212.81(d) of the final rule.

New OSV designation decisions will be subject to the procedural requirements in the final rule, including appropriate public involvement (§§ 212.52(a) and 212.81(d) of the final rule). Nothing in this final rule requires reconsideration of any previous administrative decisions that allow, restrict, or prohibit OSV use on NFS roads and NFS trails or in areas on NFS lands and that were made under other authorities, including decisions made in land management plans and travel plans. Section 212.80(b) of the final rule provides that these decisions may be incorporated into OSV designations made pursuant to this final rule.

*Comment:* Some respondents suggested that the Forest Service establish an expiration date for all previous OSV use decisions to ensure that an administrative unit or a Ranger District is not relying on OSV use decisions or winter travel plans that are woefully out of date. Other respondents stated that previous OSV use decisions should not be given undue weight, and that just because they were made under previous authorities does not mean that they should not be reviewed. Some respondents suggested that all existing OSV use decisions be reviewed for compliance with the minimization criteria in the TMR and E.O. 11644, as amended. Other respondents believed that if previous OSV use decisions addressed the minimization criteria in E.O. 11644, as amended, and were made with public involvement, they should not have to be reviewed, but that previous OSV use decisions that do not meet these criteria should have to be

reviewed under the proposed rule. Some respondents suggested that the Forest Service retain only previous OSV use decisions that were based on application of the minimization criteria, as required by E.O. 11644, and that all other previous OSV use decisions are deemed invalid.

Some respondents believed that previous OSV use decisions should not have to be reviewed, as they were made in accordance with the legal authorities in effect at that time, and as the Forest Service does not have the budget or personnel to review all previous OSV use decisions while making new OSV use decisions. These respondents believed that requiring review of all previous OSV use decisions would result in a backlog that would negatively affect all winter recreationists.

*Response:* The Department does not believe that previous OSV use decisions made under other authorities should be subject to an expiration date or a requirement for review. As with prior administrative decisions governing other types of motor vehicle use, nothing in this final rule requires reconsideration of any previous administrative decisions that allow, restrict, or prohibit OSV use on NFS roads and NFS trails or in areas on NFS lands and that were made under other authorities, including decisions made in land management plans and travel plans. To the contrary, §§ 212.80(b) and 212.81(b) of the final rule provide for these decisions to be given effect. The Department believes that previous OSV use decisions made under other authorities are valid and that requiring review of previous OSV use decisions would be inefficient and disrespectful of public involvement in past OSV use decision-making. The final rule recognizes that designations of roads, trails, and areas for OSV use are not permanent. Unforeseen environmental impacts, changes in public demand, route construction, and monitoring conducted under §§ 212.57 and 212.81(d) of the final rule may lead Responsible Officials to consider revising OSV designations under §§ 212.54 and 212.81(d) of the final rule.

212.81(c)—Decision-Making Process

*Comment:* Some respondents stated that the specific requirements for management of OSV use in E.O. 11644, as amended, as reinforced by the March 29, 2013, court ruling, should be incorporated into the proposed rule.

*Response:* The Department agrees and believes that the final rule is consistent with E.O. 11644, as amended, and the March 29, 2013, court ruling in requiring the Responsible Official to

designate those routes and areas where OSV use is allowed and in prohibiting OSV use off the designated system.

*Comment:* Some respondents suggested expanding the criterion to consider conflicts between motorized and non-motorized uses under § 212.55(b)(3) in making OSV designations to state that (1) remote lands that are not readily reachable by non-motorized winter recreationists but are readily reachable by OSV users should not be counted against OSV users; (2) OSV users should be credited for maintaining restrooms, parking facilities, and trails that benefit non-motorized recreationists; and (3) lands that are open to OSV use generally remain open to non-motorized winter recreation and so provide value to non-motorized recreationists.

*Response:* The Department does not believe that it would be appropriate to make this revision. Section 212.55(b)(3) of the TMR applies to all types of motor vehicle use, including OSV use, and tracks the corresponding wording in Section 3(a)(3) of E.O. 11644, as amended. Decisions regarding where OSV use may occur are best made at the local level based on site-specific conditions and with appropriate public involvement, including input from motorized and non-motorized users and other interested parties.

*Comment:* Some respondents commented that the final rule should require the Responsible Official to coordinate with State and local officials before making any preliminary or final OSV designation decision.

*Response:* The Department agrees that travel management decisions should be coordinated with appropriate Federal, State, Tribal, county, and other local governments, as provided for in §§ 212.53 and 212.81(d) of the final rule.

*Comment:* Some respondents commented that the proposed rule appropriately requires the Responsible Official to recognize Sections 811(b) and 1110(a) of ANILCA when implementing the rule in Alaska and that the proposed rule should reference OSV use authorized under other applicable provisions of ANILCA.

*Response:* The Department declines to make this change, as sections 811(b) and 1110(a) are the only provisions in ANILCA that directly address OSV use.

*Comment:* Some respondents stated that the OSV use map, a requirement under the proposed rule, must have sufficient detail in order to be useful, and that the final rule should identify more clearly what should be included on an OSV use map.

*Response:* The Forest Service plans to develop a standard national format for

OSV use maps issued under this final rule. The Forest Service also plans to issue additional travel management guidance in its sign handbook to enhance consistency in content and use of standard interagency symbols in signs. In addition, the Department has added a definition for "over-snow vehicle use map" to 36 CFR 212.1 and has moved the requirement for an OSV use map in subpart C to a separate section, § 212.81(c) of the final rule, to underscore that this requirement is separate from the requirement for a motor vehicle use map under subpart B. Consistent with § 212.81(a) of the final rule, § 212.81(c) of the final rule provides for an OSV use map to display the classes of vehicles and the time of year designated for OSV use, if applicable.

*Comment:* Some respondents stated that NFS roads, NFS trails, and areas on NFS lands designated for OSV use should be clearly marked. Other respondents believed that restrictions on OSV use should be more clearly relayed to the public so incidents of OSV use off the designated system could be reported to the proper authorities. These respondents recommended increasing signage around areas designated for OSV use to increase awareness of these designations by both motorized and non-motorized users.

*Response:* The Department declines to adopt this suggestion. The Forest Service has found that posting routes as open or closed to particular use has not always been effective in controlling use, partly because new unauthorized routes continue to appear even in areas that are closed to motor vehicle use. Requiring each undesignated route and area to be posted as closed would be an unreasonable and unnecessary burden on Agency resources and would tend to defeat the purpose of the final rule. Signs have also proven to be difficult to maintain and subject to vandalism. The final rule places more responsibility on users to get OSV use maps from Forest Service offices or Web sites and to remain on routes and in areas designated for OSV use. This approach is consistent with subpart B of the TMR.

Part 261—Prohibitions

Subpart A—General Prohibitions

261.14—Over-Snow Vehicle Use

*Comment:* Some respondents suggested that the Forest Service require a special use permit for or prohibit activities and events involving OSV use on NFS lands. Other respondents commented that day use permits should be required for OSV use to limit impacts on natural resources and non-motorized users.

*Response:* Regulation of activities and events involving OSV use on NFS lands is beyond the scope of this rulemaking, which involves designation of routes and areas for OSV use. OSV use designations are made at the local level, with appropriate public input and coordination with Federal, State, Tribal, and local governments based on the criteria in the final rule (§§ 212.55 and 212.81(d)). The Department does not believe it would be appropriate to establish a prohibition on activities and events involving OSV use, which is a legitimate use of NFS lands. Permit requirements for OSV use are governed by the Federal Lands Recreation Enhancement Act (16 U.S.C. 6802(h)).

**5. Regulatory Certifications for the Final Rule**

*Regulatory Impact*

This final rule has been reviewed under USDA procedures and E.O. 12866 on regulatory planning and review. The Office of Management and Budget (OMB) has determined that this final rule is nonsignificant and is therefore not subject to OMB review under E.O. 12866.

*Environmental Impact*

This final rule requires designation at the field level, with appropriate public input, of those NFS roads, NFS trails, and areas on NFS lands that are open to OSV use. This final rule will have no effect on users or on the environment until designation of NFS roads, NFS trails, and areas on NFS lands for OSV use is complete for a particular administrative unit or Ranger District, with appropriate public involvement. Forest Service regulations at 36 CFR 220.6(d)(2) exclude from documentation in an environmental assessment or environmental impact statement "rules, regulations, or policies to establish service-wide administrative procedures, program processes, or instructions." The Department has concluded that this final rule falls within this category of actions and that no extraordinary circumstances exist which would require preparation of an environmental assessment or environmental impact statement.

*Regulatory Flexibility Act Analysis*

The Department has considered this final rule in light of the Regulatory Flexibility Act (5 U.S.C. 602 *et seq.*). This final rule will not directly affect small businesses, small organizations, and small governmental entities. The Department has determined that this final rule will not have a significant economic impact on a substantial number of small entities pursuant to the Regulatory Flexibility Act because it will not impose recordkeeping requirements on them; it will not affect their competitive position in relation to large entities; and it will not affect their cash flow, liquidity, or ability to remain in the market.

*Federalism and Consultation and Coordination With Indian Tribal Governments*

The Department has considered this final rule under the requirements of E.O. 13132 on federalism and has determined that the final rule conforms with the federalism principles set out in this E.O. The final rule will not impose any compliance costs on the States and will not have substantial direct effects on the States, the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government. Therefore, the Department has determined that no further assessment of federalism implications is necessary at this time.

Moreover, this final rule does not have Tribal implications as defined by E.O. 13175, entitled "Consultation and Coordination with Indian Tribal Governments," and therefore advance consultation with Tribes is not required.

*No Takings Implications*

The Department has analyzed this final rule in accordance with the principles and criteria contained in E.O. 12630. The Department has determined that this final rule will not pose the risk of a taking of private property.

*Controlling Paperwork Burdens on the Public*

This final rule does not contain any recordkeeping or reporting requirements or other information collection requirements as defined in 5 U.S.C. 1320 that are not already required by law or not already approved for use. Accordingly, the review provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR part 1320 do not apply.

*Energy Effects*

The Department has reviewed this final rule under E.O. 13211, entitled "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use." The Department has determined that this final rule does not constitute a significant energy action as defined in the E.O.

*Civil Justice Reform*

The Department has reviewed this final rule under E.O. 12988 on civil justice reform. After adaptation of this final rule, (1) all State and local laws and regulations that conflict with this final rule or that impede its full implementation will be preempted; (2) no retroactive effect will be given to this final rule; and (3) it will not require administrative proceedings before parties may file suit in court challenging its provisions.

*Unfunded Mandates*

Pursuant to Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538), which the President signed into law on March 22, 1995, the Department has assessed the effects of this final rule on State, Tribal, and local governments and the private sector. This final rule will not compel the expenditure of $100 million or more by any State, Tribal, or local government or anyone in the private sector. Therefore, a statement under section 202 of the act is not required.

**List of Subjects**

*36 CFR Part 212*

Highways and roads, National Forests, Public lands—rights-of-way, and Transportation.

*36 CFR Part 261*

Law enforcement, National forests.

Therefore, for the reasons set out in the preamble, the Forest Service amends parts 212 and 261 of title 36 of the Code of Federal Regulations as follows:

**PART 212—TRAVEL MANAGEMENT**

**Subpart A—Administration of the Forest Transportation System**

■ 1. The authority citation for subpart A continues to read as follows:

**Authority:** 16 U.S.C. 551, 23 U.S.C. 205.

■ 2. Amend § 212.1 by revising the definition for "area," adding definitions for "designation of over-snow vehicle use" and "over-snow vehicle use map" in alphabetical order, and removing the definition for "designated road, trail, or area" to read as follows:

**§ 212.1  Definitions.**

\* \* \* \* \*

*Area.* A discrete, specifically delineated space that is smaller, and, except for over-snow vehicle use, in most cases much smaller, than a Ranger District.

\* \* \* \* \*

*Designation of over-snow vehicle use.* Designation of a National Forest System

road, a National Forest System trail, or an area on National Forest System lands where over-snow vehicle use is allowed pursuant to § 212.81.

\* \* \* \* \*

*Over-snow vehicle use map.* A map reflecting roads, trails, and areas designated for over-snow vehicle use on an administrative unit or a Ranger District of the National Forest System.

\* \* \* \* \*

**Subpart C—Over-Snow Vehicle Use**

■ 3. Revise the heading of subpart C to read as set forth above.

■ 4. The authority citation for subpart C continues to read as follows:

**Authority:** 7 U.S.C. 1011(f), 16 U.S.C. 551, E.O. 11644, 11989 (42 FR 26959).

■ 5. Revise § 212.80 to read as follows:

**§ 212.80  Purpose, scope, and definitions.**

(a) *Purpose.* This subpart provides for a system of National Forest System roads, National Forest System trails, and areas on National Forest System lands that are designated for over-snow vehicle use. After these roads, trails, and areas are designated, over-snow vehicle use not in accordance with these designations is prohibited by 36 CFR 261.14. Over-snow vehicle use off designated roads and trails and outside designated areas is prohibited by 36 CFR 261.14.

(b) *Scope.* The Responsible Official may incorporate previous administrative decisions regarding over-snow vehicle use made under other authorities in designating National Forest System roads, National Forest System trails, and areas on National Forest System lands for over-snow vehicle use under this subpart.

(c) *Definitions.* For definitions of terms used in this subpart, refer to § 212.1.

■ 6. Revise § 212.81 to read as follows:

**§ 212.81  Over-snow vehicle use.**

(a) *General.* Over-snow vehicle use on National Forest System roads, on National Forest System trails, and in areas on National Forest System lands shall be designated by the Responsible Official on administrative units or Ranger Districts, or parts of administrative units or Ranger Districts, of the National Forest System where snowfall is adequate for that use to occur, and, if appropriate, shall be designated by class of vehicle and time of year, provided that the following uses are exempted from these designations:

(1) Limited administrative use by the Forest Service;

(2) Use of any fire, military, emergency, or law enforcement vehicle for emergency purposes;

(3) Authorized use of any combat or combat support vehicle for national defense purposes;

(4) Law enforcement response to violations of law, including pursuit; and

(5) Over-snow vehicle use that is specifically authorized under a written authorization issued under Federal law or regulations.

(b) *Previous over-snow vehicle decisions.* Public notice with no further public involvement is sufficient if an administrative unit or a Ranger District has made previous administrative decisions, under other authorities and including public involvement, which restrict over-snow vehicle use to designated routes and areas over the entire administrative unit or Ranger District, or parts of the administrative unit or Ranger District, where snowfall is adequate for OSV use to occur, and no change is proposed to these previous decisions.

(c) *Identification of roads, trails, and areas for over-snow vehicle use.* Designation of National Forest System roads, National Forest System trails, and areas on National Forest System lands for over-snow vehicle use shall be reflected on an over-snow vehicle use map. Over-snow vehicle use maps shall be made available to the public at headquarters of corresponding administrative units and Ranger Districts of the National Forest System and, as soon as practicable, on the Web site of the corresponding administrative units and Ranger Districts. Over-snow vehicle use maps shall specify the classes of vehicles and the time of year for which use is designated, if applicable.

(d) *Decision-making process.* Except as modified in paragraph (b) of this section, the requirements governing designation of National Forest System roads, National Forest System trails, and areas on National Forest System lands in §§ 212.52 (public involvement), 212.53 (coordination), 212.54 (revision), 212.55 (designation criteria (including minimization)), and 212.57 (monitoring), shall apply to decisions made under this subpart. In making decisions under this subpart, the Responsible Official shall recognize the provisions concerning rights of access in sections 811(b) and 1110(a) of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3121(b) and 3170(a), respectively).

## PART 261—PROHIBITIONS

■ 7. The authority citation for part 261 continues to read as follows:

**Authority:** 7 U.S.C. 1011(f); 16 U.S.C. 472, 551, 620(f), 1133(c), (d)(1), 1246(i).

### Subpart A—General Prohibitions

■ 8. Revise the definition for "area" in § 261.2 to read as follows:

#### § 261.2 Definitions.

\* \* \* \* \*

*Area.* A discrete, specifically delineated space that is smaller, and, except for over-snow vehicle use, in most cases much smaller, than a Ranger District.

\* \* \* \* \*

■ 9. Revise § 261.14 to read as follows:

#### § 261.14 Over-snow vehicle use.

After National Forest System roads, National Forest System trails, and areas on National Forest System lands have been designated for over-snow vehicle use pursuant to 36 CFR 212.81 on an administrative unit or a Ranger District of the National Forest System, and these designations have been identified on an over-snow vehicle use map, it is prohibited to possess or operate an over-snow vehicle on National Forest System lands in that administrative unit or Ranger District other than in accordance with those designations, provided that the following vehicles and uses are exempted from this prohibition:

(a) Limited administrative use by the Forest Service;

(b) Use of any fire, military, emergency, or law enforcement vehicle for emergency purposes;

(c) Authorized use of any combat or combat support vehicle for national defense purposes;

(d) Law enforcement response to violations of law, including pursuit;

(e) Over-snow vehicle use that is specifically authorized under a written authorization issued under Federal law or regulations; and

(f) Use of a road or trail that is authorized by a legally documented right-of-way held by a State, county, or other local public road authority.

Dated: January 20, 2015.

**Robert Bonnie,**

*Under Secretary, NRE.*

[FR Doc. 2015–01573 Filed 1–27–15; 8:45 am]

**BILLING CODE 3411–15–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

**[EPA–HQ–OPP–2014–0643; FRL–9920–45]**

### Sulfoxaflor; Pesticide Tolerances for Emergency Exemptions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes time-limited tolerances for residues of sulfoxaflor, N-[methyloxido[1-[6-(trifluoromethyl)-3-pyridinyl]ethyl]-$\lambda^4$-sulfanylidene]cyanamide, including its metabolites and degradates in or on sorghum, grain; sorghum, forage; and sorghum, stover. This action is in response to EPA's granting of an emergency exemption under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) authorizing use of the pesticide on sorghum. This regulation establishes a maximum permissible level for residues of sulfoxaflor in or on these commodities. The time-limited tolerances expire on December 31, 2017.

**DATES:** This regulation is effective January 28, 2015. Objections and requests for hearings must be received on or before March 30, 2015, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2014–0643, is available at *http://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket) in the Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW., Washington, DC 20460–0001. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPP Docket is (703) 305–5805. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Susan Lewis, Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001; main telephone number: (703) 305–7090; email address: *RDFRNotices@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. General Information

*A. Does this action apply to me?*

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

• Crop production (NAICS code 111).

• Animal production (NAICS code 112).

• Food manufacturing (NAICS code 311).

• Pesticide manufacturing (NAICS code 32532).

*B. How can I get electronic access to other related information?*

You may access a frequently updated electronic version of 40 CFR part 180 through the Government Printing Office's e-CFR site at *http://www.ecfr.gov/cgi-bin/text-idx?&c=ecfr&tpl=/ecfrbrowse/Title40/40tab_02.tpl.*

*C. How can I file an objection or hearing request?*

Under section 408(g) of the Federal Food, Drug, and Cosmetic Act (FFDCA), 21 U.S.C. 346a, any person may file an objection to any aspect of this regulation and may also request a hearing on those objections. You must file your objection or request a hearing on this regulation in accordance with the instructions provided in 40 CFR part 178. To ensure proper receipt by EPA, you must identify docket ID number EPA–HQ–OPP–2014–0643 in the subject line on the first page of your submission. All objections and requests for a hearing must be in writing, and must be received by the Hearing Clerk on or before March 30, 2015. Addresses for mail and hand delivery of objections and hearing requests are provided in 40 CFR 178.25(b).

In addition to filing an objection or hearing request with the Hearing Clerk as described in 40 CFR part 178, please submit a copy of the filing (excluding any Confidential Business Information (CBI)) for inclusion in the public docket. Information not marked confidential pursuant to 40 CFR part 2 may be disclosed publicly by EPA without prior notice. Submit the non-CBI copy of your objection or hearing request, identified by docket ID number EPA–HQ–OPP–2014–0643, by one of the following methods:

Rvsd Plan - 00001375

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 1 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## Table of Contents

20.5 – Definitions..................................................................................................................4
20.6 – Cited References...........................................................................................................4
**21 – DEVELOPING, REVISING, AMENDING, OR ADMINISTRATIVELY CHANGING A PLAN................................................................................................................. 5**
21.1 – Developing or Revising Plans.......................................................................................5
   21.11 – General Steps for Developing or Revising Plans ......................................................5
   21.12 – Considerations when Preparing New or Revised Plans .............................................6
   21.13 – Opportunities for Coordinating Planning and NEPA Activities ...............................9
   21.14 – Coordination of Public Outreach and Scoping Activities for Plan Revision ...........10
21.2 – Information Basis for Plan Development, Plan Amendment, and Plan Revision..........13
   21.21 – Need to Change the Plan .......................................................................................13
   21.22 – Species of Conservation Concern...........................................................................14
   21.22a – Identifying Species of Conservation Concern ......................................................14
   21.22b – Evaluating New Information on Species of Conservation Concern ......................15
   21.23 – Outreach during Development or Revision of Plans ...............................................17
   21.24 – Consultation with Federally Recognized Indian Tribes and Alaska Native Corporations ...............................................................................................................17
21.3 – Amending a Plan .........................................................................................................18
   21.31 – Project-specific Plan Amendments and Administrative Review..............................19
   21.32 – Plan Amendment Outreach and Consultation .........................................................20
   21.33 – Project consistency with Prior Plans amended using the 2012 Planning Rule.........20
21.4 – Concluding the Plan Development, Revision, or Amendment Process.........................22
   21.41 – Decision Document................................................................................................22
   21.42 – Documentation of Plan Revision and the Planning Record ....................................24
   21.43 – Documenting Public Involvement .........................................................................25
21.5 – Administrative Changes...............................................................................................26
   21.51 – Making Administrative Changes to the Monitoring Program..................................27
21.6 – Plan Development, Revision, or Amendments Started Under Previous Planning Rule.27
21.7 – Project or Activity Decisions Concurrent with Plan Decisions ...................................28
21.8 – Public Use Prohibitions ..............................................................................................29
**22 – REQUIREMENTS FOR INTEGRATED PLAN CONTENT.................................... 31**
22.1 – Plan Components..........................................................................................................33
   22.11 – Desired Conditions.................................................................................................36
   22.12 – Land Management Plan Objectives ........................................................................37
   22.13 – Standards ...............................................................................................................38
   22.14 – Guidelines.............................................................................................................40
   22.15 – Suitability of Lands................................................................................................41
   22.16 – Goals .....................................................................................................................43
22.2 – Where Plan Components Apply....................................................................................43
   22.21 – Identification of Management Areas and Geographic Areas....................................44
22.3 – Other Required Content in the Plan.............................................................................46

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 2 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

22.31 – Priority Watersheds............................................................................................46
22.32 – Distinctive Roles and Contributions of the Plan Area ............................................47
22.33 – Plan Monitoring Program...................................................................................50
22.34 – Proposed and Possible Actions.............................................................................50
22.4 – Optional Content in the Plan................................................................................51
**23 –RESOURCE REQUIREMENTS FOR INTEGRATED PLAN COMPONENTS ....... 52**
23.1 – Ecological Sustainability and Diversity of Plant and Animal Communities................56
    23.11 – Plan Components for Ecosystem Integrity and Diversity.......................................58
    23.11a – Natural Range of Variation.............................................................................59
    23.11b – Ecosystem Integrity......................................................................................60
    23.11c – Opportunities to Restore Fire-adapted Ecosystems ...........................................65
    23.11d – Ecosystem Diversity ....................................................................................65
    23.11e – Riparian Areas ...........................................................................................67
    23.12 – Plan Components for Air, Soil, and Water..........................................................70
    23.12a – Air Quality.................................................................................................71
    23.12b – Soils and Soil Productivity............................................................................72
    23.12c – Water Quality and Water Resources ...............................................................73
    23.13 –Species-specific Plan Components for At-risk Species ...........................................74
    23.13a – Threatened and Endangered Species................................................................77
    23.13b – Proposed and Candidate Species ...................................................................78
    23.13c – Species of Conservation Concern ...................................................................78
23.2 – Social and Economic Sustainability and Multiple Use..............................................84
    23.21 –Contributions of the Plan Area to Social and Economic Sustainability ...................84
    23.21a – Multiple Uses.............................................................................................87
    23.21b – Ecosystem Services......................................................................................88
    23.22 – Social, Cultural, and Economic Conditions Influenced by the Plan.........................89
    23.23 – Considerations for Multiple Uses, Ecosystem Services, and Infrastructure ............91
    23.23a – Sustainable Recreation Resources and Opportunities to Connect People with
        Nature..................................................................................................................91
    23.23b – Fish, Wildlife, and Plants .............................................................................98
    23.23c – Watersheds and Water Resources...................................................................99
    23.23d – Rangelands, Forage, and Grazing.................................................................100
    23.23e – Timber and Vegetation...............................................................................102
    23.23f – Scenery, Aesthetic Values, Viewsheds, and Geologic Features ..........................103
    23.23g – Cultural and Historic Resources ..................................................................106
    23.23h – Areas of Tribal Importance .........................................................................108
    23.23i – Mineral and Nonrenewable Energy Resources ................................................109
    23.23j – Geologic Hazards.......................................................................................112
    23.23k – Renewable Energy .....................................................................................113
    23.23l – Infrastructure, Roads and Trails ...................................................................114
    23.23m – Land Status, Ownership, Use, Access and Linkage of Open Space with Other
        Ownerships..........................................................................................................117
    23.23n – Other Considerations for Multiple Uses.........................................................119

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 3 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

**24 – DESIGNATED AREAS** ..................................................................................... **120**

24.1 – Identifying Existing and Recommending New Designated Areas in the Plan ............124

24.2 – Plan Components for Designated Areas and Areas Recommended for Designation...125

24.3 – Designated Area Plans .................................................................................................127

24.4 – Specific Types of Designated Areas in Land Management Plans................................127

    24.41 – Wilderness .............................................................................................................127

    24.42 – Wild and Scenic Rivers.........................................................................................130

    24.43 – National Scenic and Historic Trails ......................................................................132

    24.44 – Inventoried Roadless Areas ..................................................................................134

Rvsd Plan - 00001378

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 4 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

This chapter describes the planning requirements of 36 CFR 219 ("2012 Planning Rule") and the procedures for developing, amending, and revising land management plans during the planning phase. FSH 1909.12, chapter 10 describes the requirements for the assessment phase for developing, amending, and revising land management plans.

## 20.5 – Definitions

See the Zero Code chapter of this Handbook for definitions.

## 20.6 – Cited References

U.S. Department of Agriculture, Forest Service. 2011a. Watershed Condition Classification Technical Guide. FS-978. Washington, DC: U.S. Department of Agriculture, Forest Service. 49 p. Available at *http://www.fs.fed.us/publications/watershed/watershed_classification_guide.pdf* .

U.S. Department of Agriculture, Forest Service. 2011b. Watershed Condition Framework. FS-977. Washington, DC: U.S. Department of Agriculture, Forest Service. 34 p. Available at *http://www.fs.fed.us/publications/watershed/*.

U.S. Department of Agriculture. Forest Service. 2012a. National Best Management Practices for Water Quality Management on National Forest System Lands. Volume 1: National Core BMP Technical Guide. FS-990a. Washington, DC: U.S. Department of Agriculture, Forest Service. 177 p. Available online at *http://www.fs.fed.us/biology/resources/pubs/watershed/index.html*.

U.S. Department of Agriculture. Forest Service. [In prep]. National Best Management Practices for Water Quality Management on National Forest System Lands. Volume 2: National BMP Monitoring Protocols Technical Guide. FS-990b. Washington, DC: U.S. Department of Agriculture. Forest Service. [n.d.].

U.S. Department of Agriculture. Forest Service 2014. National Riparian Vegetation Monitoring Technical Guide: Conterminous United States. General Technical Report. Rocky Mountain Research Station-GTR-XXX. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. (Draft). Available at *http://www.fs.fed.us/biology/watershed/riparian/USFS_National_Riparian_Protocol.pdf.*

Weins, J.A., G.D. Hayward, H.D. Safford, and C.M. Giffen. 2012. Historical Environmental Variation in Conservation and Natural Resource Management. Wiley-Blackwell. Chichester, West Sussex, UK. 337 p.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 5 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21 – DEVELOPING, REVISING, AMENDING, OR ADMINISTRATIVELY CHANGING A PLAN

This section gives guidance on the planning phase of how to develop, amend, revise, or administratively change a plan. FSH 1909.12, chapter 10 describes the requirements for the assessment phase for developing, amending, and revising land management plans. Plans provide vision, strategy, guidance, and constraints. Plans themselves do not compel Agency action or guarantee specific results.

### 21.1 – Developing or Revising Plans

### 21.11 – General Steps for Developing or Revising Plans

The Responsible Official should complete the plan development or plan revision, from the public notice of the assessment to final plan approval, within 4 years.

The plan development or revision process may be conducted in many different ways depending on the circumstances. The Interdisciplinary Team shall design the process to be transparent and efficient, to reflect principles of adaptive management, and to engage the public through meaningful opportunities for participation early and throughout the process.

The Responsible Official has the discretion to determine the scope, methods, forum, and timing of the process, subject to public notification requirements listed in 36 CFR 219.16 (see FSH 1909.12, ch. 40, sec. 42).

The Responsible Official shall establish an Interdisciplinary Team to carry out the planning process (36 CFR 219.5(b)) and provide the Team direction regarding the scope and nature of the new plan or plan revision. FSH 1909.15, chapter 10, section 12.2 gives guidance on Interdisciplinary Team selection. After the assessment phase and during planning phase, the Interdisciplinary Team develops potential plan components, and constantly reviews, evaluates, and adjusts them throughout planning phase to assure that they make a coherent whole.

Outreach to the public continues at all steps of the plan development or revision process (FSH 1909.12, ch. 40). While the Agency does not specify a sequence of steps for developing or revising plans, general steps for conducting the planning process include:

1. Identifying the need to change the plan (36 CFR 219.7(c)(2)(i), sec. 21.21 of this Handbook).

2. Describing the plan area's distinctive roles and contributions in the broader landscape (36 CFR 219.7(f)(1)(ii), sec. 22.32 of this Handbook).

3. Identifying the species of conservation concern (36 CFR 219.9(c)); FSH 1909.12, ch. 10, sec. 12.52 and sec. 21.22 of this Handbook).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 6 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

4. Developing a proposed new plan or revised plan with public participation (36 CFR 219.4 and 219.16 (FSH 1909.12, ch. 40).

5. Analyzing and documenting the environmental and social effects of the proposed plan components and alternatives in an environmental impact statement following the appropriate National Environmental Policy Act (NEPA) Procedures (36 CFR 220, FSM 1950, and FSH 1909.15).

6. Reviewing the land use policies of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments required by 36 CFR 219.4(b)(2) and document the review in the environmental impact statement.

7. Providing an opportunity for the public to comment on the proposed new plan or revised plan and the draft environmental impact statement (36 CFR 219.16(a)(2)). The required comment period is at least 90 days for a new plan or plan revision.

8. Considering public comments and preparing a predecisional new plan or revised plan.

9. Consulting with National Oceanic and Atmospheric Administration's National Marine Fisheries Service (NMFS), a division of the Department of Commerce, or the U.S. Fish and Wildlife Service, a bureau of the Department of the Interior (USFWS), or both; if the approval of a plan, or plan revision, or plan amendment may affect listed species or critical habitat or may adversely affect essential fish habitat of managed fisheries.

10. Providing an opportunity to object to a plan, before approval (36 CFR 219.52; FSH 1909.12, ch. 50).

11. Approving the final plan or plan revision with in a decision document that also serves as a record of decision, and notifying the public (36 CFR 219.14(a) and 219.16(a)(4)).

## 21.12 – Considerations when Preparing New or Revised Plans

In addition to identifying a need to change the plan and reviewing the assessment, the Responsible Official shall identify and consider a number of resources and issues during the planning process as listed by the 2012 Planning Rule (36 CFR 219.7(c)(2)). The Responsible Official should consider this list of resources and issues before developing a proposed new plan or revised plan or as part of the process of developing the proposed plan. The following list sets forth requirements, along with references for guidance and information. Note that each consideration also may be supported by information generated during public participation or derived from some other source.

1. The Responsible Official shall base the plan components on likely budgets and other assumptions that are realistic as required by 36 CFR 219.1(g):

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 7 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

**(g) The responsible official shall ensure that the planning process, plan components, and other plan content are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit.**

2. Before or as part of the process of developing plan components for a new plan or plan revision, the following items should be completed:

a. Identification of the species of conservation concern (§ 219.7(c)(3), § 219.9(c), sec. 21.22a of this Handbook).

b. Descriptions of the plan area's distinctive roles and contributions within the broader landscape (§ 219.7(f)(1)(ii), sec. 22.32 of this Handbook).

c. Identification of the need to change the existing plan (§ 219.7(c)(2)(i)), sec. 21.21 of this Handbook).

d. Identification of priority watersheds (§ 219.7(f)(1)(i), sec. 22.31 of this Handbook).

e. Consideration of the goals and objectives of the Forest Service strategic plan, available at *http://www.fs.fed.us*, as they relate to the plan area (§ 219.2(a)).

f. Identification of the presence and consider the importance of various physical, biological, social, cultural, and historic resources on the plan area (§ 219.6)based on the assessment and the need to change the plan components (sec. 23 of this Handbook).

g. Consideration of conditions, trends, and stressors identified in the assessment related to the need to change the plan components. (§ 219.6).

h. Inventory and evaluation of lands that may be suitable for inclusion in the National Wilderness Preservation System (§ 219.7(c)(2)(v), FSH 1909.12, ch. 70, and sec. 24.41 of this Handbook).

i. Identification of the eligibility of rivers for inclusion in the National Wild and Scenic Rivers System, unless a systematic inventory has been previously completed and documented and there are no changed circumstances that warrant additional review (§ 219.7(c)(2)(vi), FSH 1909.12, ch. 80, and sec. 24.42 of this Handbook).

j. Identification of existing designated areas other than wilderness areas and wild and scenic rivers (§ 219.7(c)(2)(iii), sec. 24 of this Handbook).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 8 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

k. Identification of the lands that may be suitable for timber production and identify the maximum quantity of timber that may be removed from the plan area (FSH 1909.12, ch. 60).

l. Identification of questions and indicators for the plan monitoring program (§ 219.12, FSH 1909.12, chapter 30).

m. Identification of other content in the plan (§ 219.7(f), sec. 22.3 and 22.4 of this Handbook).

n. Review of land use policies of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments required by 36 CFR 219.4(b)(2).

3. The recommended layout for plan components and other plan content is illustrated by the plan model, described in the technical guide "Foundations of Forest Planning" available on the Ecosystem Management Coordination website at *http://www.fs.fed.us/emc/r.fma/index.htm*.

4. The Responsible Official shall ensure an integrated set of plan components that:

a. Together provide for sustainability, ecological integrity, diversity of plant and animal communities, ecosystem services, and multiple use;

b. Contribute to social and economic sustainability;

c. Provide a strategic and practical framework for managing the plan area;

d. Are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit; and

e. On balance, best meet the needs of the American people (16 U.S.C. 531).

5. The Responsible Official should understand:

a. Local customs and culture;

b. Different and possibly conflicting public interests, needs, perspectives, and wants, including regional and national points of view; and

c. The broad range of public values and the input from the public, governmental entities, and the Agency.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 9 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.13 – Opportunities for Coordinating Planning and NEPA Activities

The NEPA and Forest planning processes must be integrated. The Responsible Official should provide direction to the Interdisciplinary team in a project initiation letter to ensure that the Interdisciplinary Team develops a strategic approach for coordinating planning and NEPA procedures. The Forest Service NEPA directives are found in FSM 1950 – Environmental Policy and Procedures and in FSH 1909.15 – National Environmental Policy Act Handbook. See *http://www.fs.fed.us/emc/nepa/nepa_procedures/index.htm*.

Careful coordination of planning and NEPA procedures, particularly public participation, allows the Interdisciplinary Team to be more efficient by aligning planning tasks with the requirements of NEPA. Important opportunities to integrate planning and NEPA requirements include the following:

1. Using the results of the assessment to describe the affected environment in the environmental impact statement. If information gaps were identified during or subsequent to the assessment, additional information might be needed to effectively describe the affected environment, consistent with NEPA requirements.

2. Using the need to change the plan identified during the planning process to write the purpose and need statement for the environmental impact statement. Early in the planning phase, a preliminary need to change the plan is identified and public comment is sought to help develop the need to change the plan, which in turn helps focus plan development or revision.

3. Including both planning and NEPA requirements in the public participation strategy (FSH 1909.12, ch. 40, sec. 42).

4. Integrating NEPA scoping, where appropriate, into public engagement activities used to support development of plan components and other plan content. Scoping includes refining the proposed action, determining cooperating agencies, identifying preliminary issues, and identifying interested and affected persons (FSH 1909.15, ch. 10, sec. 11.) Early public engagement during the planning process can help to identify goals and concerns for the plan area. This phase provides the opportunity for the Interdisciplinary Team to meet NEPA scoping requirements and, therefore, gain an understanding of the following elements that will be important during the NEPA analysis:

   a. Significant issues that will frame alternatives for considerations,

   b. Potential alternatives for analysis, and

   c. Potential effects of alternatives.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 10 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.14 – Coordination of Public Outreach and Scoping Activities for Plan Revision

The Responsible Official has discretion to determine when to begin the NEPA scoping phase; for example, during the assessment, as soon as the assessment is complete, before developing plan components, or early in the development of plan components. The Responsible Official may adjust steps and content of the scoping process, depending upon when scoping begins.

The Responsible Official should ensure that the Interdisciplinary Team has planned appropriately to meet and integrate NEPA and planning public outreach requirements and to meet notice and maintenance of meeting records (see FSH 1909.15, ch. 10, sec. 11, "Conduct Scoping," and sec. 12.1, "Project Initiation").

There are considerations when coordinating public outreach and scoping activities. Here are two examples:

1. Engage the public to develop the proposal and later begin NEPA scoping. Once the Responsible Official starts the planning process with notice to start development of a new plan revision (36 CFR 219.5(a)(1)), the Interdisciplinary Team would conduct public engagement activities needed to ensure strong public input into developing a proposal. The proposal might consist of a detailed need to change the plan, proposed management areas, plan components, or a combination of these items. At a reasonable time in advance of preparation of the draft environmental impact statement (EIS), the Responsible Official has the option to start NEPA scoping by publishing a notice of intent (NOI) in the Federal Register. Under this consideration, the Agency gives the public a more specific proposal, developed with public input, in the NOI to bring about specific comments that are useful to identify specific issues related to the proposal. Responsible Officials shall set the expectation that they will consider and use all public comments arising through the NEPA process to refine or alter the proposal.

2. Engage the public to develop the proposal and at the same time begin NEPA scoping. NEPA scoping may begin simultaneously with the planning process. The notice of intent to prepare an EIS can be combined with the notice to start development of a new plan revision (36 CFR 219.5(a)(1). In this approach, the proposal in the NOI would be less specific than paragraph 1. In this approach, public engagement efforts intended to identify issues and potential alternatives, and to design plan components are done together. Under this consideration, additional public engagement may be needed once a proposal is refined to identify specific issues related to the proposal. If there are major changes to the NOI proposal, a corrected notice of intent should be published in the Federal Register.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 11 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Exhibit 01 displays a model on how planning, NEPA, and opportunities to participate are related over time in the plan revision process. There is a row for each topic. The beginning of the assessment is on the left. The end of the planning process is on the right. It should take 3 to 4 years to cross the page. The activities that occur about the same time are arranged on top of one another. The duration of any given activity will vary depending on specific circumstances.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 12 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.12 - Exhibit 01

### Relationship of Planning, NEPA, and Opportunities to Participate in Plan Revision

| Planning Timeline | | | | | | | |
|---|---|---|---|---|---|---|---|
| Planning Process | | | | | | | |
| Assessment | Preliminary identification of need to change the plan | Development of plan components and other plan content for proposed plan | | Seek public comment on proposed plan | Develop plan | Objection Process | Plan approval |
| National Environmental Policy Act (NEPA) Process | | | | | | | |
| | Scoping (flexibility to begin scoping at any point in the assessment and planning process) Review results of scoping. Identify purpose and need based on need to change the plan | Identify alternatives Describe affected environment Estimate effects of each alternative Develop environmental impact statement | | Seek public comment on draft environmental impact analysis (EIS) and preferred alternative | Consider comments and respond to comments. Develop final EIS and draft plan decision | Issue errata sheet or supplemental EIS if needed | Record of decision approving the plan |
| Opportunities for Public Participation | | | | | | | |
| Formal notice starting assessment * | Formal notice of starting plan revision* | | Inform public of results of scoping | Formal notice of availability of DEIS and proposed plan* | | Formal notice to begin objection period (availability of FEIS, final plan, and draft plan decision document* Notice of objections filed in the newspaper of record | Formal notice of plan approval* |
| Public engagement in assessment. | Formal notice of intent to develop EIS (when scoping starts)* Public engagement in planning process and scoping process. | | Public engagement | Public engagement | Public engagement | | Public engagement about plan approval |

* Formal notice means notice in the Federal Register and the newspaper of record

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 13

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.2 – Information Basis for Plan Development, Plan Amendment, and Plan Revision

New plans, plan amendments, and plan revisions are based on a need to change the plan. Usually the Responsible Official begins a plan revision because it is time to do so; that is, NFMA requires plan revision "at least every 15 years." 16 USC 1604 (f)(5). In that case, how much of the content of the plan must change in the revision process is the "need to change the plan" inquiry.

Otherwise, if a need to change the plan is identified that cannot be made through administrative changes (36 CFR 219.13) or by changing management practices rather than plan components, an amendment or revision should be started, as appropriate. A well-supported and effective rationale determining a need to change the plan must be based on a good source of information. Assessments (ch. 10), along with the planning record, are an important source of information for a new plan or plan revision.

For plan amendments, an assessment is not required (see FSH 1909.12, ch. 10, sec. 15). The Responsible Official may rely on a monitoring report or other documentation of new information, changed conditions, or changed circumstances to identify a need to change the plan (36 CFR 219.13(b)).

The Responsible Official shall focus on evaluating available, relevant information. The terms "available" and "relevant" are defined in FSH 1909.12, chapter 10, section 11.

## 21.21 – Need to Change the Plan

The Responsible Official for plan development, plan amendment, and plan revisions shall identify a need to change the plan to give focus to the planning process. If a need to change the plan is identified that cannot be made through administrative changes (36 CFR 219.13), an amendment or revision should be started, as appropriate.

The need to change the plan helps define the proposed action, purpose and need, and decision framework for the environmental analysis related to the planning process (See FSH 1909.12, ch. 40 and FSH 1909.15, ch. 10, sec. 11.2). The Responsible Official should involve the public in the development of the need to change the plan by giving the public the opportunity to comment on a preliminary need to change before documenting the need to change the plan as part of the purpose and need in the environmental analysis documents for the plan development, plan revision, or plan amendment.

1. The need to change the plan should be written so that it is clear to the public which plan components are proposed to be changed and which are not.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 14 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

2.  Numerous sources of information are available to the Responsible Official to help determine a need to change the plan including:

a.  Biennial evaluations of monitoring information (36 CFR 219.12(d); FSH 1909.12, ch. 30, sec. 34)

b.  An assessment for plan development or plan revision (36 CFR 219.6(a) and (b); FSH 1909.12, ch. 10, secs. 12, 13 and 14)

c.  A focused assessment for plan amendments, if needed (36 CFR 219.6; FSH 1909.12, ch. 10, sec. 15)

d.  Other documentation of new information, changed conditions, or changed circumstances on the plan area, from any source, that supports a need for a revision, amendment or administrative change to the plan (36 CFR 219.6(c)).

e.  Changes in laws, regulations, or policy.

3.  When developing or revising a plan, the Responsible Official should invite public input on a preliminary need to change the plan (36 CFR 219.7(c)(2)(i)) so that:

a.  Public comments are used to improve the need to change the plan.

b.  The topics and concerns considered can be broadened or reduced as needed.

c.  The need to change the plan may support retaining existing plan direction as plan components as well as developing new plan components as appropriate.

4.  For documentation, the Responsible Official should document the need to change as part of the purpose and need in the environmental analysis documents for the plan development, plan revision, or plan amendment.

## 21.22 – Species of Conservation Concern

## 21.22a – Identifying Species of Conservation Concern

The Regional Forester is the Responsible Official for identifying any species of conservation concern in a plan area. Identifying the SCCs usually occurs during the planning phase, but may occur at any time.

1.  The Regional Forester has the authority and responsibility to:

a.  Review the rationale and documentation for potential species of conservation concern provided by the Responsible Official (FSH 1909.12, ch. 10, sec. 12.52), and determining whether the best available scientific information indicates:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 15 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(1)  That the species is native and known to occur in the plan area, and

(2)  There is a substantial concern about the species' capability to persist over the long term in the plan area based on the guidance of FSH 1909.12, chapter 10, section 12.52c.

b.  Based on the review of the potential species of conservation concern, identify the species of conservation concern in coordination with the Responsible Official for the plan area.  This authority to identify species of conservation concern may not be delegated.

c.  Identify species of conservation concern early enough to expedite the planning process.

d.  Leverage expertise of the public and local, State, Tribal, and other Federal natural resource agencies, for identifying species of conservation concern.

e.  Engage the public and invite public input when identifying species of conservation concern, as part of the public participation strategy (FSH 1909.12, ch. 40, sec. 42).

f.  Document the rationale for the selection of species of conservation concern.

g.  Inform the Responsible Official and the public of the identified species of conservation concern.

h.  Identify any species of conservation concern at times outside the planning process as appropriate.

2.  The Responsible Official has the authority to:

a.  Leverage expertise of the public and local, State, Tribal, and other Federal natural resource agencies in determining whether plan components need to be added, removed, or changed based on any new species of conservation concern being identified by the Regional Forester.

b.  Recommend additional changes to the list of species of conservation concern to the Regional Forester, if appropriate.  See section 21.22b of this Handbook for guidance on new information and species of conservation concern.

## 21.22b – Evaluating New Information on Species of Conservation Concern

After the Regional Forester has identified the species of conservation concern, new scientific information may indicate some species should be added or removed from the list.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 16 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

If any employee receives such new scientific information before or after a new plan or plan revision is approved, the employee should send the information to the Forest Supervisor for the plan area.

1. When there is new scientific information indicating a potential change to the list of species of conservation concern, the Forest Supervisor should:

   a. Evaluate the new information using the guidance of FSH 1909.12, chapter 10, section 12.52 to develop a recommendation whether to change the list of species of conservation concern.

   b. Leverage expertise of the public and local, State, Tribal, and other Federal natural resource agencies.

   c. Document the rationale for including or not including the species as a species of conservation concern for the plan area using the guidance of FSH 1909.12, chapter 10, section 12.52.

   d. Send documentation and recommendation to the Regional Forester.

2. When the Regional Forester receives a recommendation from a Forest Supervisor to change the species of conservation concern for a plan area, the Regional Forester should:

   a. Consider the recommendation using the guidance of FSH 1909.12, chapter 10, section 12.52.

   b. Leverage expertise of the public, including local, State, Tribal, and other Federal natural resource agencies, for identifying species of conservation concern.

   c. Document a response and rationale.

   d. Notify the public and the Responsible Official of any changes to the list of species of conservation concern for the plan area.

3. If the Regional Forester identifies an additional species of conservation concern, the Forest Supervisor should:

   a. Review the information relevant to the threats, stressors, and other risks to the species persistence within the plan area using the guidance of FSH 1909.12, chapter 10, section 12.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 17 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

b. Evaluate whether existing plan components would provide the ecological conditions necessary to maintain the long-term persistence of the species within the planning area using the guidance of section 23.13 of this Handbook.

c. Determine if the plan must include additional species-specific plan components to maintain the species' long-term persistence.

d. Document the determination, and amend the plan accordingly, if appropriate.

4. If the Regional Forester removes a species from the list of species of conservation concern, the Forest Supervisor should review the plan and amend the plan, if appropriate (sec. 21.3 of this Handbook).

## 21.23 – Outreach during Development or Revision of Plans

Guidance on a public and governmental outreach strategy, including tribal consultation, and on methods for giving notice is provided in FSH 1909.12, chapter 40. The 2012 Planning Rule requirements include 36 CFR 219.4, "Requirements for Public Participation," and 36 CFR 291.16, "Public Notifications."

If the approval of a plan, or plan revision, or plan amendment may affect listed species or critical habitat, or may adversely affect essential fish habitat of managed fisheries, the Responsible Official shall follow procedures in FSM 2670 for working with the NMFS or the USFWS or both (FSM 1920.3). See FSM 2670 for requirements for consultation on land management plans.

For plan development or plan revision that may adversely affect historic properties or sites of religious or cultural importance to Indian Tribes, the Responsible Official shall follow procedures in FSM 2360 for consulting with State Historic Preservation Offices (SHPOs), Indian Tribes, and the Advisory Council for Historic Preservation (Title 16, United States Code 470 et seq.; 36 CFR 800; Executive Order 13007 – Indian Sacred Sites).

## 21.24 – Consultation with Federally Recognized Indian Tribes and Alaska Native Corporations

Under the Federal Land Policy and Management Act of 1976, the Responsible Official shall coordinate with planning programs of Indian Tribes and for Indian Tribes (such as those developed by the Bureau of Indian Affairs):

In the development and revision of land use plans, the Secretary of Agriculture shall coordinate land use plans for lands in the National Forest System with the land use planning and management programs of and for Indian tribes by, among other things, considering the policies of approved tribal land resource management programs. (43 U.S.C. 1712(b)).

Rvsd Plan - 00001392

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 18 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The Responsible Official shall engage in formal, meaningful consultation and collaboration with Tribal Officials on new plans or plan revisions as part of the Federal government-to-government relationship and Executive Order 13175, Consultation and Coordination with Indian Tribal Governments. See FSH 1509.13, chapter 10, and FSH 1909.12 and Chapter 40 – Public Participation, for guidance regarding consultation and coordination with Indian Tribes and Alaska Native Corporations. (See 36 CFR 219.4(a)(2); FSH 1909.12, ch. 40, sec. 44.3; FSH 1509.13, ch. 10)

## 21.3 – Amending a Plan

Plan amendments started after May 9, 2015, must conform to the 2012 Planning Rule requirements. Before that date, plan amendments may be made following the 1982 Rule process or following the 2012 Planning Rule. (36 CFR 219.17(b)(2)).

For plans developed, revised, or amended under a previous Planning Rule, changes to plan content that correspond to plan components defined in the 2012 Planning Rule (desired conditions, goals, guidelines, objectives, standards, or suitability of lands for uses) must be made by plan amendment or plan revision. All additions or modifications to the text of plan direction that are made by plan amendments using the 2012 rule must be written in the form of plan components as defined at 36 CFR 219.7(c).

Amendment of a plan developed and approved using the 1982 Rule process requires application of the 2012 Planning Rule requirements only to those changes to the plan made by the amendment. For example, the 2012 Rule's requirements to establish a riparian management zone (36 CFR 219.8(a)(3)) would apply only if the plan amendment focuses on riparian area guidance.

Plan amendments are intended to be an adaptive management tool to keep plans current, effective, and relevant between required plan revisions (every 15 years). Amendments help Responsible Officials adapt an existing plan to new information and changed conditions. Maintaining plans through amendment also may reduce the workload for subsequent plan revisions.

Amendments may be broad or narrow in scope, depending on the need to change the plan. An assessment for a plan amendment is not required, but may be developed at the discretion of the Responsible Official (see ch. 10, sec. 15).

Whether an amendment is proposed in response to changing conditions or in relation to a specific project, the Responsible Official should keep the scope and scale of the process, including public participation, commensurate with the scope of the plan amendment (CFR 219.13(b)(2)).

A plan amendment process relies on the Responsible Official's identification of the need to change a plan.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 19 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

> **Amendment process. The responsible official shall…[b]ase an amendment on a preliminary identification of the need to change the plan. The preliminary identification of the need to change the plan may be based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances.** (36 CFR 219.13(b)).

In general, the steps for conducting a plan amendment process are as follows:

> 1. The Responsible Official identifies a need to change the plan by means of a plan amendment.
>
> 2. Invite input from public and governmental entities on the need to change the plan identified at step 1. (See 36 CFR 219.4 and FSH 1909.12, ch. 40).
>
> 3. Consider public comments, complete documentation regarding the need to change the plan, and determine whether an amendment is appropriate. If an administrative change is appropriate, follow procedures in section 21.5 of this Handbook.
>
> 4. Document the need to change the plan in the appropriate NEPA analysis document as part of the purpose and need (see 21.21 of this Handbook and see FSH 1909.15, ch. 10).
>
> 5. Provide opportunity for the public and governmental entities to comment on the proposed amendment and the environmental document. The comment period is at least 90 days when an EIS is prepared and at least 30 days otherwise (36 CFR 219.16(a)(2)).
>
> 6. Provide an opportunity to object to the plan amendment before approval (36 CFR 219.52; see ch. 50).
>
> 7. Respond to objections, if any (36 CFR 219.57(b); FSH 1909.12, ch. 50, sec. 51.66).
>
> 8. Approve the final plan amendment and notify the public (36 CFR 219.14(a) and 36 CFR 219.16(a)(4)).

Correction of clerical errors to any plan component is not an amendment but administrative changes. Requirements for administrative changes are found at 36 CFR 219.13 (c); see also section 21.5 of this Handbook.

## 21.31 – Project-specific Plan Amendments and Administrative Review

Amendments may be project-specific. If a proposed project is not consistent with the plan, the Responsible Official has the option to start a plan amendment that, if approved, would accommodate the project.

Rvsd Plan - 00001394

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 20 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The administrative review process for plan amendments varies based on whether the amendment applies to one project or to future projects as well. If the plan amendment applies only to a single project, the amendment would be subject to the project review process. If the plan amendment would apply to future projects as well, the objections process of the 2012 Planning Rule (36 CFR 219, Subpart B) would apply. The project itself will always be subject to the applicable project review process of 36 CFR 215 or 218 (see 36 CFR 219.59(b) as described in FSH 1909.12, ch. 50, sec. 51.1).

When a plan amendment is approved in the same decision document with a project, the Responsible Official for both decisions must be a Forest Supervisor or higher-level official, regardless of whether the District Ranger could have authorized the project in the absence of a plan amendment. The decision document for the project and amendment must include the rationale for amending the plan.

Multiple or frequent project-specific plan amendments of the same type may suggest a need to change a plan component. The Responsible Official should recognize when there are multiple project-specific plan amendments and evaluate the presence of any systemic need to change the plan that should be addressed by a plan amendment.

## 21.32 – Plan Amendment Outreach and Consultation

Outreach and consultation during a plan amendment is similar to outreach and consultation for a plan outreach (sec. 21.1 of this Handbook). See FSH 1909.12, chapter 40 for additional guidance on outreach.

## 21.33 – Project consistency with Prior Plans amended using the 2012 Planning Rule

The 2012 Planning Rule sets forth how to determine whether a project is consistent with the plan amendments at 36 CFR 219.17(c) and 36 CFR 219.15(d). The applicable provisions are quoted below with the relevant wording underlined.

> **§ 219.15 Project and activity consistency with the plan.**
>
> \*\*\*
>
> **(d) *Determining consistency.* Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components developed or revised in conformance with this part by meeting the following criteria:**
>
> **§ 219.17 Effective dates and transition**
>
> \*\*\*

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 21 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(c) *Plans developed, amended, or revised under a prior planning regulation.* **This part supersedes any prior planning regulation. No obligations remain from any prior planning regulation, except those that are specifically included in a unit's existing plan. Existing plans will remain in effect until revised. This part does not compel a change to any existing plan, except as required in § 219.12(c)(1). None of the requirements of this part apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part, except that projects or activities on such units must comply with the consistency requirement of § 219.15 with respect to any amendments that are developed and approved pursuant to this part.**

For a plan developed or revised under a prior planning regulation that is amended pursuant to the 2012 Planning Rule, the consistency requirement is as follows:

1. The 2012 Planning Rule consistency provisions at 36 CFR 219.15(d ) apply only to plan component(s) added or modified in conformance with, and as defined by, the 2012 Planning Rule; with respect to other plan provisions, the Forest Service's prior interpretation of consistency, that projects need only be consistent with plan standards and guidelines, applies.

2. The Forest Service's prior interpretation of consistency, that projects need only be consistent with plan standards and guidelines, and not the 2012 Planning Rule consistency provisions at 36 CFR 219.15(d), also applies when an amendment developed and approved under the 2012 Planning Rule does not change the text of the plan direction but simply applies existing plan direction to a different, or additional, area or areas within the plan area.

The reason that the manner of compliance with consistency requirements depends upon the origin of the plan direction applicable to a project is that, before the 2012 Planning Rule, the Forest Service interpretation was that the consistency requirement applied to standards and guidelines but not to other parts of the plan. Plan direction was written with this interpretation in mind, so there was no expectation that projects must be consistent with any direction other than standards and guidelines. The 2012 Planning Rule applies a new interpretation, so that projects and activities must be consistent with all applicable plan components (desired conditions, objectives, suitability of lands, as well as standards and guidelines), see 36 CFR 219.15(d).

The 2012 Planning Rule also includes new direction for designing and drafting plan components (see 36 CFR 219.7(c) ) through (e).The application of the project consistency requirements of the 2012 Planning Rule to plan direction that does not conform to these new drafting requirements could trigger an expansion of the amendment process that would be inconsistent with the need to change the plan. Such a result would impede the intent of the 2012 Rule to make it easier to

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 22 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

keep plans current by amending them frequently and by providing for amendments with a narrow scope. Therefore, when an amendment developed and approved pursuant to the 2012 Planning Rule retains the text of plan direction that had been developed when the Forest Service had the narrower interpretation of consistency, it is appropriate also to retain the application of that interpretation.

Applying the consistency requirements at 36 CFR 219.15(d) for such plan direction would also make project-level planning considerably more difficult, when the base plan was developed under a previous planning rule. Thus, it is important to continue to apply the prior interpretation of consistency to plan direction developed under that interpretation, for project consistency to be determined with respect to standards and guidelines. See the preamble to the Proposed Planning Rule for further explanation, 76 FR 8480, 8501 (February 14, 2011).

## 21.4 – Concluding the Plan Development, Revision, or Amendment Process

## 21.41 – Decision Document

The Responsible Official approves plans, plan amendments, and revised plans with a decision document developed according to NEPA procedures (FSH 1909.15). For a new plan or plan revision, the decision document is a Record of Decision (sec. 21.1 of this Handbook). For a plan amendment, the decision document would be a Decision Memo, Decision Notice, or Record of Decision, depending upon what type of NEPA analysis was prepared (sec. 21.3 of this Handbook). In addition to complying with Forest Service NEPA procedures, a decision document for a plan, revised plan, or amendment must meet the requirements of the Rule at 36 CFR 219.14(a) and 219.15(a), which are set out in exhibit 01.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 23 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.4 - Exhibit 01

### Planning Rule Requirements for Decision Documents

| Decision Document Requirements (36 CFR 219.14(a), 219.15(a)) and 219.51(d) | New or Revised Plan | Plan Amendment |
|---|---|---|
| The rationale for approval | Yes | Yes |
| An explanation of how the plan components meet the sustainability requirements of § 219.8, the diversity requirements of § 219.9, the multiple use requirements of § 219.10, and the timber requirements of § 219.11 | Yes | If Applicable |
| Every decision document approving a plan, plan amendment, or plan revision must state whether authorizations of occupancy and use made before the decision document may proceed unchanged. If a plan decision document does not expressly allow such occupancy and use, the permit, contract, and other authorizing instrument for the use and occupancy must be made consistent with the plan, plan amendment, or plan revision as soon as practicable, subject to valid existing rights.  36 CFR 219.15(a) | Yes | Yes |
| The documentation of how the best available scientific information was used to inform planning, the plan components, and other plan content, including the plan monitoring program (§ 219.3) | Yes | Yes |
| The concurrence by the appropriate research station director with any part of the plan applicable to any experimental forests or experimental ranges (§ 219.2(b)(4)); | If Applicable | If Applicable |
| The effective date of the plan, plan amendment, or plan revision | Yes | Yes |
| When a plan, plan revision, or plan amendment is not subject to objection, the Responsible Official shall include an explanation in the decision document of why it is not subject to objection (36 CFR 219.51(d)). | Yes | Yes |

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 24 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The decision document should also include a summary (with cross-references to the planning record; see sec. 21.42 of this Handbook) of how the plan and the planning process meets all the applicable requirements of the Planning Rule including those not specifically required by 36 CFR 219.14 This summary should provide a description of how the plan decision is responsive to public and governmental participation including the success in reaching low-income and minority communities and young people in the planning process. The scope of the summary should be commensurate with the complexity of the decision made.

For plan amendments, the decision document must discuss only those requirements of 36 CFR 219.8 through 219.11 that are applicable to the plan components that are being modified or added. For example, if a plan amendment does not add or modify plan components applicable to an experimental forest or range, there would be no need to document the Research Station Director's concurrence with the amendment

Plans serve as an umbrella for projects, activities, and resource plans. If ongoing projects, activities, and resource plans would not be consistent with the plan, plan revision, or the plan as amended, they must be made consistent with the plan, unless the decision document allows them to proceed unchanged (36 CFR 219.15(a)). The decision document should identify projects, activities, and resource plans that must be changed to be consistent with the plan and set forth a schedule for modifying the ongoing projects to be consistent with the plan (subject to prior existing rights).

### 21.42 – Documentation of Plan Revision and the Planning Record

**(b)** *Planning records.* **(1) The responsible official shall keep the following documents readily accessible to the public by posting them online and through other means: assessment reports (§ 219.6); the plan, including the monitoring program; the proposed plan, plan amendment, or plan revision; public notices and environmental documents associated with a plan; plan decision documents; and monitoring evaluation reports.** (36 CFR 219.12).

**(2) The planning record includes documents that support analytical conclusions made and alternatives considered throughout the planning process. The responsible official shall make the planning record available at the office where the plan, plan amendment, or plan revision was developed.** (36 CFR 219.14).

Analytical conclusions should be written using plain language that discusses any important risks and uncertainties in the assumptions. The Interdisciplinary Team may support conclusions using the "Issue-Rule-Analysis/Application-Conclusion" model (IRAC). The model follows the following formula:

1. The *issue* statement poses a key question to be answered or issue to be addressed.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 25 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

2. The *rule* statement presents the criterion necessary to address the *issue*.

3. The *analysis/application* section applies the relevant assumptions, data, facts, or results of a Resource Specialist's analysis to the *rule*.

4. The *conclusion* directly answers the question posed in the *issue* statement based on the material presented in the *rule and analysis/application* sections.

See exhibit 01 for an example.

### 21.42 - Exhibit 01

### Example of Issue-Rule-Analysis/Application-Conclusion model

*Issue*: Whether the plan components should require a specific canopy cover to provide the ecological conditions necessary to maintain a viable population of XX species within the plan area (a species of conservation concern).

*Rule*: Planning regulations require plan components provide the ecological conditions necessary to maintain a viable population of each species of conservation concern within the plan area unless the responsible official determines that it is beyond the authority of the Forest Service or not within the inherent capability of the plan area.

*Analysis*: The best available scientific information shows that a viable population of XX species will be maintained through managing its habitat to meet ecological conditions of 1, 2, and 3. Specific canopy cover percentage is not one of those ecological conditions.

*Conclusion*: Plan components need not require a specific amount of canopy cover because the best available scientific information demonstrates that specific canopy cover is not necessary to maintain a viable population of XX species within the plan area.

(Note: analysis for an actual plan issue would likely be more detailed).

### 21.43 – Documenting Public Involvement

The Interdisciplinary Team should document how the public involvement contributed to the development of the proposed plan in a "participation process" document. The Team should document the "who, what, where, when, and how" of public and governmental participation. The Team should document the steps of the public and governmental participation process related to the need to change the plan and the development of any alternatives (sec. 21.21 of this Handbook; and FSH 1909.12, ch. 40). Comments and other input received during scoping

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 26 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

should be managed and documented. Documentation should include contact information like electronic and postal mailing information (FSH 1909.15, ch. 10, sec. 12.6). This documentation may be in an appendix to the appropriate environmental document.

## 21.5 – Administrative Changes

*Administrative changes.* **An administrative change is any change to a plan that is not a plan amendment or plan revision. Administrative changes include corrections of clerical errors to any part of the plan, conformance of the plan to new statutory or regulatory requirements, or changes to other content in the plan (§ 219.7(f)).**

**(1) A substantive change to the monitoring program made outside of the process for plan revision or amendment may be made only after notice to the public of the intended change and consideration of public comment (§ 219.16(c)(6)).**
**(2) All other administrative changes may be made following public notice (§ 219.16(c)(6)).** (36 CFR 219.13(c)).

Administrative changes are:

1. Corrections of clerical errors to any plan content, including plan components;

2. Any changes to plan content, including plan components, when necessary to conform the plan to new statutory or regulatory requirements, for which there is no discretion.

3. Any other changes to plan content except for changes to the substance of plan components, or to the application of plan components to specific areas within the planning area.

Administrative changes to the monitoring program must have at least 30 days for public comment, and section 21.51 of this Handbook describes the process.

The Responsible Official shall give public notice before issuing an administrative change (36 CFR 219.13(c)(2)). The public notice may be made in any way the Responsible Official deems appropriate, except for, at a minimum; the notice must be posted online on the administrative unit's planning website.

After reviewing comments on the proposed change, if any, the Responsible Official may make the change effective by posting the change online. Administrative changes are not subject to the objection process (36 CFR 219.50).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 27 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The Responsible Official should be transparent with the public and governmental entities when making administrative changes to "other plan content" by reaching out to the public early. When considering public and governmental participation, the Responsible Official should consider the importance of the need to change the plan and conduct appropriate outreach that is commensurate with the change to be made and the level of public and governmental interest. Public involvement may be minimal for correction of clerical errors.

## 21.51 – Making Administrative Changes to the Monitoring Program

Changes to existing plan monitoring programs are made by administrative change, unless the change is made as a part of a plan revision or a plan amendment.

The Responsible Official shall provide opportunities for public and governmental participation when considering changes to the monitoring program.

1. Any change to the monitoring program may be made only after notice to the public of the intended change and consideration of public comment (36 CFR 219.16(c)(6)).

2. The public comment period for a proposed change to the monitoring program should be at least 30 days.

## 21.6 – Plan Development, Revision, or Amendments Started Under Previous Planning Rule

*Plan development, plan amendments, or plan revisions initiated before this part.* **For plan development, plan amendments, or plan revisions that were initiated before May 9, 2012, the responsible official may complete and approve the plan, plan amendment, or plan revision in conformance with the provisions of the prior planning regulation, including its transition provisions (36 CFR part 219, published at 36 CFR parts 200 to 299, revised as of July 1, 2010), or may conform the plan, plan amendment, or plan revision to the requirements of this part. If the responsible official chooses to complete an ongoing planning process under the provisions of the prior planning regulation, but chooses to allow for an objection rather than an administrative appeal, the objection process in subpart B of this part shall apply. When the responsible official chooses to conform an ongoing planning process to this part, public notice must be made (§ 219.16(a)(5)). An objection process may be chosen only if the public is provided the opportunity to comment on a proposed plan, plan amendment, or plan revision, and associated environmental analysis.** (36 CFR 219.17((b)(3)).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 28 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The Responsible Official may choose to conform an ongoing planning process (started before May 9, 2012) to the 2012 Planning Rule, if it is feasible and appropriate to do so (see 36 CFR 219.17(b)(3)).

To conform to the 2012 Planning Rule, the Responsible Official should evaluate the ongoing planning process to determine the extent to which it meets the requirements of the new rule and adjust the ongoing process to meet any requirements if necessary. If the Responsible Official decides to adjust the planning process, the Responsible Official then shall issue a formal public notification in the Federal Register and newspaper of record to announce and describe how the plan revision or plan amendment process will be conformed to meet the provisions of the 2012 Planning Rule. For ongoing plan revisions that conform to the 2012 Planning Rule the Responsible Official may change from the Regional Forester to the Forest Supervisor upon formal public notification.

## 21.7 – Project or Activity Decisions Concurrent with Plan Decisions

The Responsible Official may find that the NEPA process for a project or activity may be more efficiently conducted together with a plan revision or plan amendment process. The relationship of the project NEPA process and the planning process is as follows:

1. Project or activity decisions may be made at the same time as the decision to approve a land management plan or amendment, but such project and activity decisions do not, thereby, become plan components, or any other part of a plan.

2. A project or activity decision must be supported by NEPA analysis appropriate for that project and distinct from the NEPA analysis for a plan or plan amendment.

3. Environmental analysis for projects and activities may be included in the same document as the plan development environmental analysis. If the analysis for the project or activity is contained in the same documentation as the plan environmental analysis, the distinction between the two separate analyses must be clear, with the project analysis set out in a separate section.

4. The project or activity decision may be included in the plan decision document or in a separate decision document. If the project or activity decision is included in the same document as the plan decision, the distinction between the two decisions must be clear, with the project decision set out in a separate section of the decision document.

5. The administrative review for the project or activity must be the appropriate procedure for the project or activity decision (36 CFR part 218), not the objection process of 36 CFR 219 Subpart B.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 29 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

a. If a plan amendment is approved to apply to a specific project only, the administrative review opportunity for the amendment must be that which is provided for the project decision (36 CFR 219.15 or part 218).

b. If a plan amendment is to be issued at the same time as the project decision, and the amendment applies to future projects as well, the objection process of 36 CFR 219 Subpart B applies to the amendment (that is, there are two separate administrative review opportunities, one to challenge the project and another to challenge the amendment). See FSH 1909.12, chapter 50, section 51.1 for additional guidance.

6. Examples of project decisions are the following:

a. Authorization of a specific land management project or activity.

b. Designation of roads, trails, and areas for motor vehicle use under 36 CFR 212.50.

c. An Order issued following 36 CFR part 261 prohibiting or constraining the public's use of an area. See section 21.8 of this Handbook for guidance regarding plans and prohibitions of public uses.

## 21.8 – Public Use Prohibitions

Any constraint on the public's use of National Forest System lands, not otherwise imposed by law or regulation, requires the Responsible Official to issue an order under 36 CFR part 261, Subpart B. An order may close an area or restrict the type or timing of a use or uses in an area. An example of such an order is "The following act is prohibited on [name] National Forest: possessing or using a bicycle except on forest roads open to highway legal vehicles, trails designated for bicycle use, developed recreation areas, and trailheads (36 CFR 261.55(c))."

A plan is direction for the Forest Service, not the public; therefore, the plan alone cannot prohibit public uses such as biking, boating, camping, fishing, hiking, horseback riding, hunting, or picnicking. See exhibit 01 for a demonstration of how designation of land not suitable for a public use affects land management.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 30 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.8 - Exhibit 01

### Example of how suitability of lands for a particular use affects on-the-ground management

- A plan may identify an area as not suitable for equestrian riding.

- The plan has no immediate effect on the public. People may still ride horses in this area.

- Because of the plan, the Forest Service may not issue authorizations for equestrian events, or approve equestrian trail construction or maintenance.

- An appropriate Responsible Official may issue a closure order (following appropriate NEPA analysis) to prohibit the activity for which the area is not suited, but is not required to do so. A closure order can be issued concurrent with the plan decision document, or separately, at the discretion of the Responsible Official.

- A closure order does govern the public's conduct, and therefore an Agency law enforcement official may issue a citation to people who ride in the area, for violating the order.

Nothing precludes an authorized officer from issuing an order at any time it is necessary to do so. In the context of planning, there are two options for dealing with public uses that are preventing attainment of the desired conditions for the plan area or portion of the plan area:

1. Consecutive plan and project decision making. The Responsible Official may identify lands in which the use is occurring as not suitable for such use and establish an objective in the plan to have such uses controlled in a specified time. After plan approval, the Responsible Official may propose a closure, analyze the effects of the proposal and issue a project decision to issue an order prohibiting the use. The Responsible Official is not required to propose and issue a closure order, and public uses may continue despite their occurring on lands not suitable for them, so long as a closure order is not in effect. The plan components would, however, bar the Forest Service from authorizing such uses, for example, when they would be conducted as an event requiring a special use authorization.

2. Concurrent plan and project decision making. During the plan development process, the Responsible Official may identify lands in which the use is occurring as not suitable for such use, and establish an objective in the plan to have such uses controlled in a specified time. At the same time, the Responsible Official may also propose the closure of an area and analyze the proposal separately from the Plan environmental impact statement. The Responsible Official would include in the plan decision document or a separate decision a site-specific decision authorizing closure of the area, and the

Rvsd Plan - 00001405

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 31 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

Responsible Official would issue a closure order at the same time. See section 21.7 of this Handbook for further guidance regarding concurrent decisions, and FSH 1909.12, chapter 50, section 51.1 for additional guidance regarding the application of plan and project objection process.

## 22 – REQUIREMENTS FOR INTEGRATED PLAN CONTENT

The land management plan must include plan components and other plan content (36 CFR 219.7; see FSH 1909.12, zero code for definitions). Plan components should provide a strategic and practical framework for managing the plan area. Plan components should be applicable to the resources and issues of the plan area, and should reflect the unit's distinctive roles and contributions (36 CFR 219.7(f)(1)(ii)). The Responsible Official shall integrate plan components so the plan is internally consistent for the plan area. As a whole, the set of plan components must provide for social, economic, and ecological sustainability and multiple uses. The Planning Rule requires plan components for integrated resource management as follows:

> **§ 219.1 Purpose and Applicability. . . .**
>
> \*\*\*
>
> **(b) ... and management plans guide sustainable, integrated resource management of the resources with the plan area . . . .**
>
> **§ 219.2 Levels of planning and responsible officials. . . .**
>
> \*\*\*
>
> **(b) National Forest System unit planning. (1) . . . . A land management plan provides a framework for integrated resource management and for guiding project and activity decisionmaking on a national forest, grassland, prairie, or other administrative unit.**
>
> **§ 219.5 Planning framework.**
> **(a) ...The intent of this framework is to create a responsive planning process that informs integrated resource management . . . .**
>
> **§ 219.10 Multiple Use. . . .**
>
> **\*\*\*(a) Integrated resource management for multiple use. The plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area.** (36 CFR 219.10(a)).

The Planning Rule defines "integrated resource management" as "[m]ultiple use management that recognizes the interdependence of ecological resources and is based on the need for integrated consideration of ecological, social, and economic factors" (36 CFR 219.19).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 32 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The rule sets out requirements for plan components in four sections: 219.8 (Sustainability), 219.9 (Diversity of Plant and Animal Communities), 219.10 (Multiple Use) and 219.11 (Timber Requirements Based on the NFMA). While the Rule sets out these requirements in separate sections, the plan should not be organized with a similar structure. Rather, plan components must meet these requirements in an integrated manner.

The set of plan components should integrate social, economic, cultural, and ecological considerations. For example, the desired condition for a sustainable landscape must be developed in the context of the desired multiple uses for the landscape. When providing for desired multiple uses for an area, the plan must at the same time ensure that the uses will be managed sustainably, while providing for ecological sustainability.

A plan is not an assemblage of program plans that have unique plan components for every resource. While the set of plan components must fulfill all the requirements of 36 CFR 219.8 through 219.11, there need not be a one-to-one correlation of one plan component to each requirement listed in those sections. What is essential is that as a whole, the combined plan components meet the requirements of the Rule for ecological integrity, diversity of plant and animal communities, multiple-use management, ecologically sustainable production of goods and services, and they contribute to economic and social sustainability. All of these requirements go hand in hand.

The term "integration" means that the plan components work together, but does not mean that all uses must be provided for on all lands. From place to place within a plan, a plan will often provide for some uses but not others. The Multiple-Use Sustained-Yield Act makes that principle clear by explaining that "multiple use" means management to make "judicious use of the land for some or all" of the renewable resources thereon, with some land "used for less than all of the resources" (16 USC 531).

The integration of plan components means that all plan components work together toward achieving or maintaining desired conditions. The plan components are internally consistent. One plan component must not directly conflict with another plan component or prevent its accomplishment. Not only must unit-wide plan components fit together, but also unit-wide and area-specific plan components must fit together. Fitting unit-wide and area-specific plan components together may require qualification to eliminate conflicts in direction. For example, a standard for a wildland-urban interface area requires that vegetation management projects leave no standing dead trees or downed woody debris; the Forestwide standard requires all vegetation management projects leave a certain minimum level of dead trees or down woody debris, but also states the qualification, "except within the wildland-urban interface area."

For more information, examples, lessons learned, and technical guidance for monitoring and evaluating contributions to ecological, social, and economic sustainability visit the Technical Information for Planning Site (TIPS) at *http://www.fs.fed.us/TIPS*.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 33 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.1 – Plan Components

(e) *Plan components.* **Plan components guide future project and activity decisionmaking. The plan must indicate whether specific plan components apply to the entire plan area, to specific management areas or geographic areas, or to other areas as identified in the plan.** (36 CFR 219.7(e)).

This section and sections 22.11 through 22.16 of this Handbook give guidance for developing the required plan components for every plan. The following plan components are required (36 CFR 219.7): desired conditions, objectives, standards, guidelines, and suitability of lands. Goals may be included as an optional plan component.

1. Objectives, desired conditions, standards, and guidelines must be written clearly and concisely in a way that allows for monitoring to test their effectiveness and verify assumptions on which they are based.

2. Plan components:

a. Must be written so that they are in accord with Agency authorities, and the inherent capability of the plan area.

b. Are written clearly and with clarity of purpose and without ambiguity so that a project's consistency with applicable plan components can be easily determined. (For definition of consistency, see 36 CFR 219.15).

c. Must have clear geographic applicability (that is, the entire plan area, a specific management or geographic area, or land of specific character; see sec. 22.2 of this Handbook).

d. Guide the development of future projects and activities, and are not commitments to act or final decisions approving projects and activities.

e. Must be informed by the assessment, monitoring, public and governmental participation, and the best available scientific information. (For more information on best available science, see FSH 1909.12, zero code, sec. 07).

f. May be used to carry out laws, regulations, or policies, but should not merely repeat existing direction from laws, regulations, or directives. (References to other sources are preferred.)

g. Guide and constrain Forest Service personnel; not the public.

h. May not interfere with statutory or valid existing rights.

Rvsd Plan - 00001408

Case 1:21-cv-02994-REB   Document 24-6   Filed 06/21/22   USDC Colorado   Page 153 of 251

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 34 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

i. Should not simply repeat Agency policies applicable to all National Forest System units.

j. Can be stated to apply only at certain seasons or only at specific ecological conditions. See exhibit 01 for simple examples of desired conditions, objectives, standards, and guidelines.

See the Plain Language website at *http://www.plainlanguage.gov* for guidance on how to write clearly and concisely.

Plan components should not include explanatory narrative; see section 22.4 of this Handbook for direction on how to include explanatory narrative as "other plan content."

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 35 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.1 - Exhibit 01

## Example of Plan Components for a Management Area (Oak-grasslands example)

**Desired Condition for Management Area XX:**

Generally, natural environments characterize this management area and users have the opportunity to experience a moderate degree of independence, closeness to nature, solitude, and remoteness, but with motorized opportunities on forest roads and some trails. Satisfactory recreational experience is provided for forest visitors. This area contributes to economic sustainability by providing areas for birders who frequently use quality outfitter guides for birding tours.

Oak-grasslands dominate watersheds in this management area (see Appendix maps). On upper slopes and ridges across this area, grasslands (less than 10 percent tree canopy closure) and open oak woodlands (10-60 percent tree canopy closure) are interspersed in variable mixtures. In general, tree density increases as one moves down slope, but densities are variable and transitions gradual. Snag and den tree density averages three stems per acre on a watershed basis (10-digit hydrologic unit code (HUC)). Native grasses and forbs dominate understories.

Most mid and lower slopes have open oak forests (60-80 percent tree canopy closure), with understories containing oak regeneration in sufficient numbers to provide for sustaining oak on these sites over time. Multi-layered mixed hardwood mesophytic and riparian forests occur on lower slopes, where, because of topography and moisture, understory fires burn at low intensities. In riparian areas, vegetative filter strips have at least 80 percent total ground cover comprised of grasses, or forbs. In riparian areas, flooding is the primary disturbance factor.

In grasslands and open oak woodlands of this management area, diverse grass and grass-forb understories provide diverse and abundant herbage, seeds, and insects. Open canopies and a periodic fire frequency of x-y years create this understory condition. This understory condition also supports a diverse assemblage of wildlife. Rare species that are adapted to open forests and grasslands are present and distributed in numbers that will provide for self-sustaining populations. These include Henslow's sparrow, whip-poor-will, southern prairie aster, barbed rattlesnake-root, buffalo clover, and prairie parsley. Small mammals, such as deer mice (*Peromyscus* species), voles *(Microtus* species*)*, and rabbits *(Sylvilagus* species*)* are abundant, supporting increased populations of predators, such as raptors, foxes, and bobcats.

**Objectives for Management Area XX:**

- To have an average of X snags per acre within Y years of plan revision approval.

- To add 5 thousand acres of Henslow's sparrow habitat to the current XX acres by 2020.

- To have X rehabilitated high-impact dispersed camping areas within Y years of plan revision approval.

- To have by 2025 at least 80 percent of forest visitors who respond to Forestwide annual visitor satisfaction survey report their recreational experiences rated as "satisfactory."

**Standards for Management Area XX:**

- Timber harvest must not occur in riparian buffers except to maintain or restore the riparian ecosystem. Riparian buffers are at least 100 feet on either side of the tops of perennial stream banks. Riparian buffers along intermittent streams must be 50 to 75 feet or more, measured from bankfull stage.

**Guidelines for Management Area XX:**

-On sustained slopes greater than 35 percent, heavy equipment should not be used for mechanical site preparation treatments to reduce erosion from soil disturbance.

-Artificial regeneration should use native plant material (FSM 2070, glossary) in restoration activities to provide suitable habitat for native species of butterflies, birds, and other wildlife.

-Trail construction should not occur in riparian buffers, except for designated stream crossings, to prevent soil erosion and sediment deposition in waterways.

**Suitability of lands:** This management area is suitable for motorized recreation on designated roads and trails.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 36 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.11 – Desired Conditions

> ***Desired conditions.*** **A desired condition is a description of specific
> social, economic, and/or ecological characteristics of the plan area, or
> a portion of the plan area, toward which management of the land and
> resources should be directed. Desired conditions must be described in
> terms that are specific enough to allow progress toward their
> achievement to be determined, but do not include completion dates.**
> (36 CFR 219.7(e)(1)(i)).

Desired conditions describe the aspirations or visions of what the plan area (or portions thereof)
should look like in the future and drive the development of the other plan components. Desired
conditions essentially set forth the desired landscape of the future and the other plan components
give guidance on how to get there. Desired conditions should be developed with the context of
the plan area's distinctive roles and contributions within the broader landscape in mind (sec.
22.32 of this Handbook). A plan's set of desired conditions must be internally consistent so they
are feasible and attainable, and they must be written clearly so that they can be understood by the
public as well as the Agency. The set of desired conditions must reflect the capability of the plan
area and the fiscal capability of the Agency. The set of desired conditions for plan revision must
cover ALL the requirements for a plan set out at 36 CFR 219.8 through 219.11—to provide for
sustainable ecosystems with ecological integrity, in the context of multiple-use management.
The set of desired conditions should integrate the ecological, economic, social, and cultural
desired conditions. The format function of desired conditions is addressed in this section.
Sections 23 through 24.44 of this Handbook set forth guidance for the resource requirements for
plan components.

Desired conditions, as key plan components, are fundamental to determining monitoring
strategies and requirements. Desired conditions should define the geographic scale, where
applicable, used to measure change associated with them. Responsible Officials should include
sufficiently detailed descriptions of desired conditions so they are useful to determine the
purpose and need for many projects such as restoration projects and activities. Other plan
content may identify, if applicable, how desired conditions may differ from existing conditions.

When designing desired conditions, the Responsible Official should take into account the
condition of the land adjacent to the plan area and the larger surrounding landscape. Consider
the desires by adjacent agencies, landowners, interested and affected individuals, or communities
for the plan area. Because desired conditions affect current and future generations, they should
be developed as part of the public outreach and collaborative process of planning.

Desired conditions have essential characteristics:

1. Desired conditions have cultural, ecological, economic, and social characteristics.
The set of desired conditions are sustainable and:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 37 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

a. Describe what is desired for ecosystem integrity; air, soil, and water quality; riparian areas; social and economic sustainability; ecosystem diversity; additional species-specific plan components if needed; and multiple uses (required topics are listed in section 23, exhibit 01 of this Handbook);

b. Are attainable through integrated resource management for multiple uses (§ 219.10(a)); and

c. Contribute to social and economic sustainability (§ 219.8(b)); including:

(1) Social relationships, traditions, culture, and activities that connect people to the plan area where they recreate, hunt, visit, or work for their livelihood.

(2) The capability of society to produce and consume goods and services, including jobs, market benefits, and nonmarket benefits derived from the plan area.

2. Desired conditions have functional characteristics; they:

a. Must be written with enough detail so the condition of on-the-ground achievement is clear and progress toward their achievement can be measured or evaluated;

b. May be the same as an existing condition, so efforts to manage for the desired condition would focus on maintaining that condition;

c. Must be achievable even if the time for success exceeds the plan period;

d. Must not direct taking action or prohibit taking action, or indicate specific tools (for example, prescribed fire and thinning) to be used for its attainment or maintenance;

e. Should be expressed in a way that helps managers determine the uses that are suitable and the types of management actions that may be proposed during the planning period to move toward or maintain those conditions;

f. May be stated in comparative terms such as "more," or "less," or "increased," or "decreased," but only if the baseline is clearly stated;

g. May be stated in terms of a range of clearly defined conditions; and

h. May be supplemented by a photograph or illustration.

## 22.12 – Land Management Plan Objectives

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 38 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

> ***Objectives.* An objective is a concise, measurable, and time-specific statement of a desired rate of progress toward a desired condition or conditions. Objectives should be based on reasonably foreseeable budgets.** (36 CFR 219.9(e)(1)(ii)).

Plan objectives:

1. Must be outcomes designed to make progress toward attaining desired conditions;

2. Help set the basis for priority areas or activities, with a timing expectation that near-term objectives would be completed first, depending on funding;

3. Must be clearly stated in measurable terms with specific and reasonable timeframes; (Timeframe can be identified by either an end date ("by 2020") or by a period of time from an identified start point (within 5 years of plan approval."));

4. Should be expressed in terms of outcomes, not actions; and

5. Must be attainable within the fiscal capability of the unit, determined through a trend analysis of the recent past budget obligations for the unit (3 to 5 years); (Other plan content (such as potential management approaches, sec. 22.4 of this Handbook) may identify how the Responsible Official would respond to enhanced resources or other efficiencies that would facilitate attaining desired conditions (36 CFR 219.1(g)).

## 22.13 – Standards

> ***Standards.* A standard is a mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.**
> (36 CFR 219.7(e)(1) (iii)).

There are several ways to constraint projects and activities: standards, guidelines, and other sources of constraints. A standard differs from a guideline in that a standard is a strict constraint, allowing no variation, whereas a guideline allows variation if the result would be equally effective. Examples of other sources of constraints on the design of projects and activities include congressional direction, oil and gas leasing stipulations, regulations, timber sale contract clauses, and special use authorization standard clauses. In addition, the Responsible Official may develop project-specific constraints for a project.

Standards are used when the requirement is absolute such as to ensure projects will not prevent achievement of a desired condition, or to ensure compliance with laws such as the timber requirements of sections 6(g)(3)(E) and (F) of the NFMA to protect aesthetics, fish, recreation, soil, watershed, and wildlife (16 U.S.C. 1604(g)(3)(E) and (F)), or to protect threatened or

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 39 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

endangered species under the Endangered Species Act of 1973 as amended (16 U.S.C. 1531-1544). For some species, standards are used to maintain habitat connectivity. For example, standards are used as part of the aquatic conservation strategies for the Northwest Forest Plan amendments and the Sierra Nevada Framework amendments. Standards can be used to limit disturbances from projects and activities to animal dens, perennial streams, and wildlife habitat. Standards can also be used to protect resources by restricting authorization of specific uses in appropriate circumstances. Such uses might include firewood gathering, grazing, motor vehicle use, road construction, timber harvest, removal of sand and gravel, sanitary waste facilities, storage of fuel, and surface occupancy in riparian areas.

Standards:

1. Place design or operational constraints on projects and activities, or prohibit the Forest Service from authorizing certain types of projects or activities to help achieve or maintain desired conditions, to avoid undesirable effects, or to meet applicable legal requirements (see required topics for standards or guidelines in sec. 23, ex. 01 of this Handbook).

2. Are stated in a precise manner, and with mandatory or prohibitive wording, such as "must," "shall," "must not," "may not," "shall not," or XX is not allowed to be authorized."

3. Are written clearly and without ambiguity so that consistency of a project or activity with a standard can be easily determined. (For definition of consistency, see 36 CFR 219.15).

4. Should not direct or compel processes such as analysis, assessment, consultation, planning, inventory, or monitoring. (Such processes that could be used can be part of other plan content such as management approaches, see sec. 22.4 of this Handbook)

5. Must not restate other plan components.

6. May be used to provide limitations or direction on whether or how a specific tool is appropriate.

7. Must not mandate conditions beyond those affected by a project. Any guidance meant to apply more broadly, such as to maintain a certain level of snag density throughout a watershed should be written in the form of desired conditions or objectives.

8. May impose alternative constraints, when appropriate. An alternative constraint may be particularly useful in situations where conditions do not currently exist in some project areas. For example, "Vegetation management activities must retain an average of four snags per acre on forested acres of the project area, unless this average does not exist. In such case, make up the difference from the largest live trees in the project area."

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 40 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.14 – Guidelines

**Guidelines. A guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. (§ 219.15(d)(3)). Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.** (36 CFR 219.7(e)(1)(iv)).

Guidelines serve the same purpose as standards but they differ from standards in that they provide flexibility in defining compliance, while standards are absolute constraints.

Guidelines:

1. Place design or operational constraints on projects and activities to help achieve or maintain desired conditions, to avoid undesirable effects, or to meet applicable legal requirements (see required topics for standards or guidelines in sec. 23, ex. 01 of this Handbook).

2. Are not absolute, but allow for departure from their terms so long as the underlying purposes are met. They use the words "should" and "should not."

3. Should clearly describe the circumstances and manner in which the guidelines apply so that other options may be carried out if they meet the purposes of the guidelines.

4. Should not direct or compel processes such as analysis, assessment, consultation, inventory, planning, or monitoring.

5. Must not restate other plan components.

6. May be used to provide limitations or direction on whether or how a specific tool is appropriate.

7. May not impose conditions beyond those affected by a project. Any guidance meant to apply more broadly should be written in the form of desired conditions or objectives.

8. May impose alternative guidance, when appropriate. An alternative guideline may be particularly useful in situations where conditions do not currently exist in some project areas. For example, "Pipelines, gas lines, or electric lines (transmitting less than 34.5 kV) should be buried at a minimum depth of 3 feet to protect from damage and freezing. Exceptions may be made if site conditions warrant, such as bedrock requiring blasting."

Rvsd Plan - 00001415

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 41 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.15 – Suitability of Lands

> (v) *Suitability of lands.* Specific lands within a plan area will be
> identified as suitable for various multiple uses or activities based on
> the desired conditions applicable to those lands. The plan will also
> identify lands within the plan area as not suitable for uses that are not
> compatible with desired conditions for those lands. The suitability of
> lands need not be identified for every use or activity. Suitability
> identifications may be made after consideration of historic uses and of
> issues that have arisen in the planning process. Every plan must
> identify those lands that are not suitable for timber production
> (§ 219.11). (36 CFR 219.7(e)(1)(v)).

National Forest System lands are generally suitable for a variety of uses consistent with the
purposes for which they are administered (outdoor recreation, grazing, timber, watershed, and
wildlife and fisheries). As discussed in the beginning of section 22 of this Handbook, the set of
plan components including the suitability of lands in the plan area should integrate social,
economic, cultural, and ecological considerations. The identification of suitability of lands is not
required for every resource or activity. If suitability of lands is identified for a resource or
activity, such identification does not need to be made for every acre of the plan area. For some
resources, identifying the suitability of use or activity in a particular area may be more
appropriately made at the project or activity level with site-specific analysis, stakeholder
participation, and proposed design criteria.

Identifying suitability helps determine if future projects and activities are consistent with desired
conditions. The identification of suitability or nonsuitability of lands is based on the desired
condition for those lands and the inherent capability of the land to support the use.

Identifying which uses to focus on when identifying lands as "suitable " or not for the uses may
arise from issues raised in public participation. When beginning to identify specific lands as
suitable for various uses, the Interdisciplinary Team should consider what they learned from
existing uses, monitoring, project planning, and resource plans including fire management plans,
travel management plans, watershed plans, and other resource plans.

The Responsible Official should document and make available to the public the rationale for
identifying the suitability of lands and the information sources, tools, standards, technical
guidance documents, and databases used in the identification.

Responsible officials should not identify suitability of lands for any resource, such as certain
minerals, if an entity other than the U.S. Department of Agriculture (USDA) has sole authority
over the resource. Section 23.22i of this Handbook gives guidance for plan components and
mineral resources.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 42 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The effect of identifying lands as *suitable* for a use is notably different from identifying lands as *not suitable* for a use. The difference is as follows:

1. Lands identified as suitable for certain uses or activities. A plan's identification of certain lands as suitable for a use is not a commitment to allow such use but only an indication that the use might be appropriate. A specific use or activity may be approved or may be disapproved in an area identified as suitable for such types of use. For instance, a plan may identify a management area as suitable for utility corridors; however, that suitability determination does not imply that specific application for pipeline construction would be approved.

2. Lands specified as not suitable for uses or activities. If a plan identifies certain lands as not suitable for a use, then that use or activity may not be authorized. Public uses for which a special use authorization is not required, such as biking, boating, camping, hiking, or hunting, will not be affected by such a designation in the plan; such uses can only be restricted by an action such as a closure order (sec. 21.8 of this Handbook). See chapter 60 of this Handbook for identification of lands not suitable for timber production.

A plan may not identify a use or activity as being suitable in the plan area or relevant part of the plan area, and should identify the area as not suitable for that use or activity, if any of the following conditions apply:

a. A law, regulation, Executive Order, or Forest Service directive prohibits the use;

b. The use would result in substantial and permanent impairment of the productivity of the land or renewable resources; or

c. The use is not compatible with the desired conditions and objectives for the plan area, or relevant portion thereof.

Plans may include suitability or nonsuitability statements for uses such as: administrative or commercial communication sites, commercial harvest of nontimber forest products, cross-country over-snow vehicle use, helicopter skiing, mechanized travel, motorized travel, nonmechanized travel, nonmotorized travel, range structures, recreational trails, research activities, tethering and grazing of recreational stock, utility corridors, and others.

Plans should not include any suitability or nonsuitability statements for the use of management tools such as prescribed fire, clearcutting, or use of chemicals. A guideline or standard may be used to provide limitations or direction on whether or how use of a specific tool is appropriate.

There are many approaches for identifying suitable or not suitable lands for uses, including: geographical (variety of mapping techniques); narrative descriptions of types of physical, ecological, or economic conditions; photos showing types of conditions; and tying specific uses to suitability tables of management areas. An example of a narrative description of identifying

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 43 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

not suitable lands is "Timber production is not suitable on soil types B-2 and C-5 as defined in the Forest Soils Handbook." If maps are used to show where plan components apply, substantive changes to such maps require a plan amendment.

## 22.16 – Goals

> ***Optional plan component: goals.*  A plan may include goals as plan components.  Goals are broad statements of intent, other than desired conditions, usually related to process or interaction with the public.  Goals are expressed in broad, general terms, but do not include completion dates.** (36 CFR 219.7(e)(2)).

The Responsible Official may choose to include goals as optional plan components.  Goals may be used to organize plan components similar to the Forest Service Strategic Plan.  Goals may be appropriate to describe a state between current conditions and desired conditions but without specific amounts of indicators (acres, percentages, frequencies).  Goals may also be appropriate to describe overall desired conditions of the plan area that are also dependent on conditions beyond the plan area or Forest Service authority.  Goals for resource conditions may be appropriate if scientific information is not adequate to provide sufficient specificity to establish desired condition.  However, using goals in lieu of desired conditions should be avoided.

Goals instead of objectives may be appropriate if the Responsible Official is not sure a concise, measurable, and time-specific statement of a desired rate of progress is within the control of the unit; however, using goals in lieu of objectives should be avoided.  Examples are:

1. If the outcome is the result of a partnership between the Forest Service and other land owners within the broader landscape.

2. If the outcome is uncertain, because it could be beyond the fiscal capability of the unit.

## 22.2 – Where Plan Components Apply

The public, governmental entities and Forest Service employees need to know where plan components apply.  The plan must indicate which plan components apply unit-wide, which apply to specific parcels of land, and which apply to land of specific character).  Plans use management areas or geographic areas to apply plan components to specific mapped parcels of land.  Some plan components apply to land of specific character (for example riparian areas, roads, springs, streams, and wetlands) and this is explained in the wording of the plan component itself.

A plan can have complicated land allocation schemes.  Some plans may include static areas (for example, old forest emphasis areas), overlapping areas (for example, wildland-urban interface may overlap with old forest emphasis areas), and dynamic areas that may change over time (for example, spotted owl protected activity centers).  If a plan has overlapping areas and direction that overlaps, the plan must clearly explain which direction has priority.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 44 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

A plan applies only to National Forest System land and, therefore, no longer applies after land has been conveyed to others. With respect to land that is acquired through land exchange or other means, the forest-wide plan components apply to that land automatically. Additionally, the plan components for the management or geographic area within which the land lies in whole or in large part will apply, unless the plan is amended to add plan components specific to that land.

## 22.21 – Identification of Management Areas and Geographic Areas

> **(d)** *Management areas or geographic areas.* **Every plan must have management areas or geographic areas or both. The plan may identify designated or recommended designated areas as management areas or geographic areas.** (36 CFR 219.7(d)).

The terms "management area" and "geographic area" may be used to describe how plan components apply to specific parcels of National Forest System land, with locations shown on maps. The definitions of geographic area and management area are defined at 36 CFR 219.19. Geographic areas are based on place, while management areas are based on purpose.

1. <u>Management areas</u>. The typical management area (MA) map represents the management emphasis on landscape basis. Management area maps often show lands with integrated packages of compatible resource direction. For example, a map of a plan area's management areas might be labeled as follows: MA 1, for all the lands in the plan area emphasizing developed recreational use; MA 2, for all the lands in the plan area that are suitable for timber production; MA 3, for all the lands in the plan area providing for off-highway vehicle trails; MA 4, for all the lands in the unit that are Wilderness; MA 5, for all the lands in the unit areas emphasizing primitive backcountry recreational experiences.

2. <u>Geographic areas</u>. The typical geographic area map represents large areas that have desired conditions with a range of possible resource management emphases. Rather than a management emphasis map, a geographic area map tends to focus on a place (Red Rock Canyon, Mount Whitney, or perhaps a specific watershed).

A geographic approach is based on the idea that the plan serves as a long-range vision for an area. However, the boundaries for different suitable uses within a geographic area may be identified by using multiple overlays of maps. For example, overlays of maps could identify how suitability for nonmotorized use, winter motorized use, and timber production differs across one geographic area.

A combination of geographic area and management area approaches may be useful. Above all, the approach must fit the plan area, be clear about the use of geographic areas, management areas, and where plan components apply.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 45 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Management areas and geographic areas may overlap. Management areas may overlap with other management areas if specified plan components are not conflicting. Not every acre of the plan area needs to be assigned to a management area or geographic area. Management areas or geographic areas may be established for designated areas, including designated roadless areas.

Plan guidance in a management area or geographic area (MA or GA) could differ from the forest-wide guidance in the following ways:

> 1. The MA or GA guidance can constrain an activity where the unit-wide guidance does not (for example unit-wide direction may say nothing about leaving snags, but MA-GA direction requires leaving X snags per acre);

> 2. The MA or GA guidance can constrain an activity to a greater degree than the unit-wide direction does (for example, unit-wide guidance is to leave an average of X snags per acre, but in MA 1 the average of X + 3 snags per acre is to be retained); or

> 3. The MA or GA would be in conflict with the unit-wide direction *except* that the unit-wide direction allows for the discrepancy (for example, forestwide guidance is for a minimum of X snags per acre, *"except where a MA or GA plan component provides otherwise,"* and the MA or GA plan component for a wildland-urban interface area is that NO snags are to be retained).

The names of designated areas (see sec. 24, ex. 01 of this Handbook) should not be used as a "management area" or "geographic area" name unless the area has been specifically designated.

The following names are reserved for Forest Service designated areas when using the process of FSM 2372-Areas Designated Administratively, or unless the Responsible Official is designating or recommending the area as an administratively designated area using the process of FSM 2372 as part of the plan decision:

> 1. Botanical Area.
>
> 2. Geological Area.
>
> 3. Historical Area.
>
> 4. Paleontological Area.
>
> 5. Recreational Area.
>
> 6. Scenic Area.
>
> 7. Zoological Area.

Designated areas are discussed in section 24 of this Handbook.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 46 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.3 – Other Required Content in the Plan

In addition to requiring that a plan have components, the Planning Rule requires that a plan have "other required content" (36 CFR 219.7(f)(1)). Sections 22.31 through 22.34 of this Handbook discuss priority watersheds, distinctive roles and contributions of the plan area, plan monitoring program, and proposed and possible actions in that order.

## 22.31 – Priority Watersheds

The Planning Rule requires land management plans to:

> **(i) Identify watershed(s) that are a priority for maintenance or restoration;** (36 CFR 219.7(f)(1)).

Identification of priority watersheds is done to focus effort on the integrated restoration of watershed conditions in these areas.

The Responsible Official should identify an appropriate number of watersheds in the plan for maintenance or improvement that corresponds to reasonable and achievable plan objectives for a 5-year period and within current budget levels. Priority watersheds in the plan are the watersheds where plan objectives for restoration would concentrate on maintaining or improving watershed condition.

The Forest Service national Watershed Condition Framework (WCF) must be used in all plan revisions for identifying priority watersheds unless the Responsible Official coordinates with the Washington Office, Director, Watershed, Fish, Wildlife, Air & Rare Plants staff, provides written justification, and obtains concurrence from the Regional Forester for using an alternate approach.

Under the Watershed Condition Framework, the task of identifying priority watersheds is left to the discretion of Responsible Officials within the broad framework of national direction, regional emphasis, land management plan direction, resource values, restoration costs, local issues and needs, and opportunities for watershed maintenance and restoration.

The identification of priority watersheds for the plan will use an Interdisciplinary Team process, where the Responsible Official approves the priority watersheds. The Responsible Official should reach out to local, State, Tribal, other Federal agencies, and interest groups when identifying priority watersheds. The identification of priority watersheds is also based on the following:

1. Agency watershed restoration policies and priorities that have been established at other scales, including national and regional scale restoration strategies.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 47 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

2. The importance of water and watershed resources (ecological, social, and economic resource value), the urgency of management action to address conditions and threats, and the ability of management actions to maintain or improve conditions or address threats.

3. Alignment of watershed objectives with other Forest Service strategic objectives and priorities.

4. Alignment of watershed objectives with the strategies and priorities of other Federal and State agencies, Tribes, community and collaborative efforts, nongovernmental conservation organizations, and public desires.

5. Considering watersheds that have important ecological values, such as those with designations of Outstanding Natural Resource waters, Class A/Blue Ribbon fisheries, Class I Air sheds, or biodiversity hotspots.

6. Considering impaired ecosystems, such as those with Clean Water Act 303(d) listed waters, threatened or endangered species, poor air quality, invasive species, or degraded vegetation conditions, and those where improvement or restoration activities are necessary to meet regulatory requirements or meet desired condition objectives.

The identification of priority watersheds is intended to be helpful to Forest Service managers as they schedule work after plan approval, especially in circumstances of limited budgets and resources.

The Interdisciplinary Team should develop plan components to address conditions in priority watersheds.

Changes as to which watersheds in the plan are "priority" are made by administrative change (sec. 21.5 of this Handbook).

The Watershed Condition Framework publication is available at *http://www.fs.fed.us/publications/watershed/*. Watershed Condition Framework priority watersheds are mapped online at the USDA Forest Service Watershed Condition and Prioritization Interactive map at *http://apps.fs.usda.gov/WCFmapviewer/*.

## 22.32 – Distinctive Roles and Contributions of the Plan Area

The Planning Rule requires land management plans to:

> **(ii) Describe the plan area's distinctive roles and contributions within the broader landscape;** (36 CFR 219.7(f)(1)).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 48 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The Planning Rule (36 CFR 219.2(b)) explains the types of things the Interdisciplinary Team may consider when describing the plan area's distinctive roles and contributions within the broader landscape:

> **. . . A plan reflects the unit's expected distinctive roles and
> contributions to the local area, region, and Nation, and the roles for
> which the plan area is best suited, considering the Agency's mission,
> the unit's unique capabilities, and the resources and management of
> other lands in the vicinity. . . .**

The plan area's distinctive roles and contributions within the broader landscape can provide focus or context and can aid in developing plan components. Well-described distinctive roles and contributions can also help provide an all-lands perspective and a framework for potential collaborative restoration efforts.

A plan area may have multiple roles and contributions within the broader landscape. In describing the plan area's distinctive roles and contributions within the broader landscape, the Responsible Official should consider the many potential roles of the plan area.

Some roles may not be distinctive but could still be important. For example, all forested land in an area may be part of the upstream supply of water to a downstream community, making a unit's contribution to the quality and availability of that water important but not distinctive. The Responsible Official should note those roles and contributions that are most relevant to the unit's land and resource management. This description is important because it provides a foundation for desired conditions and objectives. Desired conditions and objectives should address all-important roles.

The Interdisciplinary Team should describe the distinctive roles and contribution of the plan area within the broader landscape early in the planning phase. The team should consider information evaluated during the assessment phase as a starting point for describing the distinctive roles and contributions. The Interdisciplinary Team should develop an understanding of the ecological, social, and economic context that surrounds the plan area. For example, does the plan area represent a large or a small percentage of the land ownership in a county or other jurisdiction; what is the level of diversity of the local economy; and what habitat conditions can be provided on surrounding or intermingled private or State land? The roles and contributions of the plan area should then be placed within this context, to provide a gauge of the relative importance of each potential role.

When writing the description of the plan area's distinctive roles and contribution within the broader landscape, the Interdisciplinary Team should consider the following:

    1. Whether the plan area's distinctive roles and contributions within the broader landscape:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 49 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

a. Are distinctive attributes of the plan area, or distinctive benefits (uses, values, products, and services) provided by the plan area to the broader landscape;

b. Are important and relevant at the local, regional, and/or national level; and

c. Contribute toward social, economic, and ecological sustainability.

2. Descriptions of a plan area's distinctive roles and contributions may reflect the:

a. Ecological role of the plan area in the broader landscape;

b. Economic benefits of uses, products, and services provided by the plan area;

c. Resources and management of other lands in the broader landscape in terms of social, cultural, economic, and ecological conditions; and

d. The role of the plan area in providing the renewable resources of the Multiple-use Sustained-Yield Act of 1960 (MUSYA) of outdoor recreation, range, timber, watershed, and wildlife and fish; and

e. The role of the plan area of providing sustained yield of the several products and services obtained therefrom (MUSYA) including ecosystem services.

f. The role of the plan area as related to other planning efforts such as Community Wildfire Protection Plans and regional or national plans and strategies.

3. Examples of distinctive roles and contributions of a plan area within the broader landscape could include:

a. A downhill skiing designation.

b. Recharge areas for water supplies for large communities.

c. A major source of supply for local timber industry.

d. A primary conservation area for grizzly bear.

e. A designated area with extraordinary scenic views for high volume backpacking.

f. An outstanding opportunity for hiking on a national scenic trail.

g. Extraordinary scenery contributing to quality of life and opportunities to improve physical and mental health.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 50 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

h.  The location of a specific river, protected under the Wild and Scenic Rivers Act, nationally known for white water rafting.

4.  Comments from the public and governmental entities may be received from various perspectives including:

a.  Engagement of communities, individuals, Indian Tribes, and others early in the participation process, to define existing and desired roles and contributions of the plan area;

b.  Outreach to engage youth, minority, and low-income populations (FSH 1909.12, ch. 40, sec. 43.3);

c.  Collaborative processes to achieve understanding lifestyles, values, attitudes, beliefs, and other conditions, relevant to the plan area;

d.  Consideration of the areas and populations to which plan area contributions apply at a local, regional, and national scale, as appropriate;

e.  Consideration of the context of local, Tribal, regional, and national perspectives;

f.  Consideration of the context to the Agency's mission and strategic plan goals; and

g.  Consideration of current and projected program outputs and ecosystem services.

## 22.33 – Plan Monitoring Program

A land management plan must contain a plan monitoring program (36 CFR 219.12).  See FSH 1909.12, chapter 30 for guidance for developing a plan monitoring program.

## 22.34 – Proposed and Possible Actions

The Planning Rule requires land management plans to:

> **(iv) Contain information reflecting proposed and possible actions that may occur on the plan area during the life of the plan, including: the planned timber sale program; timber harvesting levels; and the proportion of probable methods of forest vegetation management practices expected to be used (16 U.S.C. 1604(e)(2) and (f)(2)). Such information is not a commitment to take any action and is not a "proposal" as defined by the Council on Environmental Quality regulations for implementing NEPA (40 CFR 1508.23, 42 U.S.C. 4322(2)(C)).** (36 CFR 219.7(f)(1)).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 51 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The land management plan must include a list of types of possible projects for the next 3 to 5 years to move toward the desired conditions and objectives.  The possible actions may be displayed in an appendix as a brief summary of the types of possible projects expected.

The plan's discussion of possible actions must be explicit that the types of actions described do not commit the Agency to perform or permit those actions, but that they are provided as possible actions that would likely be consistent with plan components, particularly the desired conditions and objectives.

The possible actions listed should include exhibits of the possible timber sale program, timber-harvesting levels, and the proportion of probable methods of forest vegetation management practices expected to be used, if applicable; see examples of such exhibits in FSH 1909.12, chapter 60.  The identification of possible actions should include an estimate of timber harvesting level, but should not include speculation about the specific amount, frequency, location, magnitude, or numbers of actions during the plan period.

Do not place a "to do" list of projects and expected dates in the plan.  If management approaches are included as optional content in the plan (sec. 22.4 of this Handbook); they may be used to inform future proposed and possible actions.

## 22.4 – Optional Content in the Plan

Optional content in the plan is discussed at 36 CFR 219.7(f)(2):

> **(2)** *Optional content in the plan*. **A plan may include additional content, such as potential management approaches or strategies and partnership opportunities or coordination activities.**

Plans may include optional content, such as existing conditions, explanatory narrative, general management principles, management approaches, management challenges, performance history, performance risks, or referenced material.  This optional content must not be labeled or worded in a way that suggests it is a plan component.  In addition, optional content must not include, or appear to include, a "to do" list of tasks or actions.

For example, a plan could include optional explanatory narrative on performance history to show the public how planned outcomes are related to recent trends, while also reflecting movement toward the desired condition.  A discussion of performance risks could give the public a realistic expectation regarding the plan area's ability to achieve the objectives.  Optional content in the plan could facilitate transparency and give the public and governmental entities a clear understanding of the plan and how outcomes would likely be delivered.  Optional content in the plan may also describe partnership opportunities that support the achievement of desired conditions and objectives.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 52 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

If used, management approaches would describe the principal strategies and program priorities the Responsible Official intends to employ to carry out projects and activities developed under the plan. The management approaches can convey a sense of priority and focus among objectives and the likely management emphasis. Management approaches should relate to desired conditions and may indicate the future course or direction of change, recognizing budget trends, program demands and accomplishments. Management approaches may discuss potential processes such as analysis, assessment, inventory, project planning, or monitoring. Use care not to create unrealistic expectations regarding the delivery of programs.

Land management plans are not the only vehicle for providing information for subsequent projects and activities to help achieve the desired conditions. Land management plans may reference other sources of information in "other plan content" such as standard road and trail construction clauses, special use authorization clauses, memoranda of understanding between the Forest Service and other agencies, Congressional direction, or best management practice guidebooks.

Optional plan content can be changed through administrative changes.

## 23 –RESOURCE REQUIREMENTS FOR INTEGRATED PLAN COMPONENTS

A plan provides vision, strategy, and constraints to guide integrated resource management of the plan area. This section provides a framework for developing the plan components that together provide for ecological sustainability and contribute to social and economic sustainability in the plan area as well as the broader landscape. Plan components must be within the inherent capability of the plan area, Forest Service authority, and the fiscal capability of the unit (36 CFR 219.1(g)).

> **§ 219.8 Sustainability.**
>
> **a) Ecological sustainability. (1) Ecosystem Integrity. The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity, taking into account: . . . .**
>
> * * *
>
> **The plan must provide for social, economic, and ecological sustainability within Forest Service authority and consistent with the inherent capability of the plan area, as follows: . . . .**
>
> * * *

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 172 of 251

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 53 of 134

FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN

**(b) Social and economic sustainability. The plan must include plan components, including standards or guidelines, to guide the plan area's contribution to social and economic sustainability, . . .**

**\* \* \* § 219.9 Diversity of plant and animal communities. This section adopts a complementary ecosystem and species-specific approach to maintaining the diversity of plant and animal communities and the persistence of native species in the plan area. Compliance with the ecosystem requirements of paragraph (a) is intended to provide the ecological conditions to both maintain the diversity of plant and animal communities and support the persistence of most native species in the plan area. Compliance with the requirements of paragraph (b) is intended to provide for additional ecological conditions not otherwise provided by compliance with paragraph (a) for individual species as set forth in paragraph (b). The plan must provide for the diversity of plant and animal communities, within Forest Service authority and consistent with the inherent capability of the plan area.**

**\* \* \* § 219.10 Multiple use.**

**While meeting the requirements of §§ 219.8 and 219.9, the plan must provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area . . . .**

While the guidance in the sections that follow is stated in terms of "plan components for diversity" and for "ecological integrity" and for "multiple use," individual plan components need not be so narrow. The set of desired conditions for a plan area, or portion of the area, in particular provides an integrated description of an area managed sustainably for ecological integrity, multiple use, and for the production of goods and services. (See sec. 22 of this Handbook—introductory text—for additional discussion of integrated plan components.)

The requirements for plan components are set out in this section, topic by topic. While this directive sets out each requirement separately, the set of plan components should integrate them. For new plans or plan revision, the Rule requires the plan to include plan components, including standards or guidelines for many topics at 36 CFR 219.8 through 219.1l. The topics include air quality; contribution to social and economic sustainability; diversity of ecosystems; ecological integrity; integrated resource management; soils and soil productivity; timber harvest; water quality; and water resources.

A separate plan section, or even a unique plan component, is not required for each topic. Rather, the plan components should be integrated in any manner that ensures that the plan, as a whole, meets each of the Rule's requirements. One plan component can address more than one requirement; for example, a standard that limits soil disturbance during timber harvesting

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 54 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

operations would respond to the Rule's requirements that timber harvest not irreversibly damage soil and be carried out consistent with the protection of soil, as well as the Rule requirements regarding the maintenance or restoration of ecological integrity, riparian areas and water quality.

See exhibit 01 for a list of all the Rule requirements for plan components, including standards or guidelines.  Note the set of desired conditions should cover all topics listed in exhibit 01, except for where the topic or resource does not occur within the plan area.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 55 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23 - Exhibit 01

### The topics for which plan components, including standards or guidelines, are required

- Ecological integrity of terrestrial and aquatic ecosystems, and watersheds in the plan area (36 CFR 219.8(a) and 219.9(a))
- Air quality; soils and soil productivity, including guidance to reduce soil erosion and sedimentation; and water quality (36 CFR 219.8(a)(2))
- Ecological integrity of riparian areas (36 CFR 219.8(a)(3))
- Contribution to social and economic sustainability (36 CFR 219.8(b))
- Diversity of ecosystems and habitat types (36 CFR 219.9(a)(2))
- [species-specific] ecological conditions in the plan area [for species at risk, when coarse filter does not required protections for such species] (36 CFR 219.9(b)(1)) and 219.9(b)(2)(ii))
- Integrated resource management to provide for ecosystem services and multiple uses (36 CFR 219.10(a)))
- Sustainable recreation; including recreation settings, opportunities, and access; and scenic character (36 CFR 219.10(b)(i))
- Protection of cultural and historic resources (36 CFR 219.10(b)(ii))
- Management of areas of tribal importance (36 CFR 219.10(b)(iii))
- Protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation . . . . (36 CFR 219.10(b)(iv))
- Protection of designated wild and scenic rivers as well as management of rivers found eligible or determined suitable. . . . (36 CFR 219.10(b)(v))
- Appropriate management of other designated areas or recommended designated areas . . . (36 CFR 219. 219.10(b)(vi))
- No timber harvest for the purposes of timber production on lands not suited (36 CFR 219. 219.11(d)(1))
- Soil, slope, or other watershed conditions would not be irreversibly damaged (36 CFR 219.11(d)(2))
- Protection of soil, watershed, fish, wildlife, recreation, and aesthetic resources (36 CFR 219.11(d)(3))
- Limit[s on] the maximize size for openings (must be standards; cannot be guidelines) (36 CFR 219.11(d)(4))
- Timber harvest only when in compliance with the resource protections (36 CFR 219.11(d)(5))
- [Timber removal] on a sustained yield basis (36 CFR 219.11(d)(6))
- [Regeneration only of] stands that generally have reached the culmination of mean annual increment of growth (36 CFR 219.11(d)(7))

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 56 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Section 23.1 of this Handbook, "Ecological Sustainability and Diversity of Plant and Animal Communities," provides guidance for developing plan components related to ecological sustainability, ecosystem integrity and conditions that meet the needs of at-risk species within the plan area.

Section 23.2 of this Handbook, "Social and Economic Sustainability and Multiple Uses," provides guidance for developing plan components to guide the plan area's contribution to social and economic sustainability (such as employment, income, community wellbeing, and culture).

Developing plan components is an iterative process.  For example, emerging plan components may be adjusted to ensure that management for multiple use will do so in a way that provides for sustainable ecological conditions, and vice-versa.

While a plan cannot guarantee sustainability, plan components are more likely provide for sustainability if they reflect the broader social, economic, and ecological context in which the plan applies.  In addition, plan components must be within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit (36 CFR 219.1(g)).

## 23.1 – Ecological Sustainability and Diversity of Plant and Animal Communities

To develop the land management plan consistent with maintaining ecological sustainability, the plan must include plan components, including standards or guidelines, designed to maintain, restore, or promote the ecological integrity of terrestrial, riparian, and aquatic ecosystems; maintain the diversity of plant and animal communities; and support the persistence of native species within the plan area, subject to the extent of Forest Service authority and the inherent capability of the plan area.

This section (sec. 23.1 of this Handbook) gives direction for developing plan components for ecological sustainability and diversity of plant and animal communities.  It consists of three subsections.

The first two subsections, "Plan Components for Ecosystem Integrity and Ecosystem Diversity" (sec. 23.11-23.11d of this Handbook) and "Plan Components for Air, Soil, and Water" (sec. 23.12-23.12c of this Handbook), provide direction for design of plan components for the ecosystem and watershed level within the plan area.

The third subsection, "Additional Species-Specific Plan Components" (sec. 23.13-23.13c of this Handbook), gives direction for the design of plan components when those developed for the ecosystem and watershed level under sections 23.11 and 23.12 of this Handbook would not provide for the ecological conditions necessary to meet the requirements of 36 CFR 219.9(b).

The plan development process for ecological sustainability and diversity of plant and animal communities should primarily focus on the ecosystem and watershed level plan components, especially those that support ecological conditions for at-risk species.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 57 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

When developing integrated plan components the Interdisciplinary Team should consider the following:

1. Major vegetation types and their successional stages, patch sizes, spatial arrangement, and connectivity;

2. Dominant ecological processes and disturbance regimes for the plan area;

3. Ecosystems and unique habitat types including those that are rare or at risk;

4. Stressors, such as changes in human impacts within the plan area, disruptors of a key ecosystem characteristic by catastrophic fire, effects of a changing climate, invasive species, or water obstructions;

5. Soil resources and soil productivity;

6. Geologic resources and hazards;

7. Air resources;

8. Water quality and quantity, stream and other natural water flows, stream and lake morphology, wetlands, riparian areas, floodplains, and other groundwater-dependent ecosystems;

9. Management strategies that mitigate the effects of stressors, restores ecological integrity, or adaptation strategies to reduce vulnerability; and

10. Access, recreational settings, and scenic character.

11. Maintenance or restoration of key ecosystem characteristics identified in the assessment including those that are rare or at risk (FSH 1909.12, ch. 10, secs. 12.14c and 12.55) in the plan area.

12. Range of ecological conditions established within the limits of natural landforms, vegetation, and disturbance processes that existed before extensive human alteration (FSH 1909.12, ch. 10, sec. 12.14a).

13. Variation in physical and biological conditions exhibited by ecosystems because of system drivers, stressors, climatic fluctuations, and disturbance regimes, including those that are beyond the control of the Agency (FSH 1909.12, ch. 10, sec. 12.3).

14. The concept that the environmental conditions that sustained species and other ecosystem components in the past are likely to sustain them (at least over the short term) in the future (Weins et al. 2012; and sec. 23.11a of this Handbook).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 58 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.11 – Plan Components for Ecosystem Integrity and Diversity

The Agency's vision is for ecosystems in the plan area to have ecological integrity and adaptive capacity. (See FSH 1909.12, zero code, sec. 05 for definition of ecological integrity and adaptive capacity). Ecosystems have integrity when their composition, structure, function, and connectivity are operating normally over multiple spatial and temporal scales. However, not every desired condition or acre has to meet the definition of ecological integrity, because some specific areas may not have the capability or because another concern such as public safety is more important in a specific area.

In light of possible changes in species composition under the effects of climate change and with a focus on restoration, the Agency designs plan components to provide ecological conditions to sustain functional ecosystems based on a future viewpoint. Functional ecosystems are those that sustain critical ecological functions over time to provide ecosystem services.

Functional restoration may be necessary to restore the abiotic and biotic processes in degraded ecosystems. Functional restoration focuses on the underlying processes that may be degraded, regardless of the structural condition of the ecosystem. As such, a functionally restored ecosystem may have different structure and composition than the past reference condition.

1. The Responsible Official should coordinate with Research and Development to develop plan components to adapt to the effects of climate change.

2. The Responsible Official should direct the Interdisciplinary Team to design plan components that are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit (36 CFR 219.1(g)):

a. Provide ecological conditions to restore, establish, and maintain functioning ecosystems on National Forest System lands that can sustainably support multiple uses and provide a broad range of goods and services.

b. Restore, establish, and maintain functioning ecosystems that will have greater adaptive capacity to withstand stressors and recover from disturbances, especially changing and uncertain environmental conditions and extreme weather events.

c. Provide ecological conditions to sustain ecosystems that maintain the diversity of plant and animal communities and the persistence of native species in the plan area (36 CFR 219.9).

d. Take into account the effects of a changing climate (36 CFR 219.8(a)(1)(iv)).

e. Provide for ecological integrity, ecosystem services, and multiple uses within the plan area in an integrated manner (36 CFR 219.10).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 59 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.11a – Natural Range of Variation

An understanding of the natural range of variation related to key ecosystem characteristics provides context and insights to the design of plan components. Agency intent is to promote ecosystem integrity in the plan area. However, it may not be possible or appropriate to strive for returning key characteristics to past conditions throughout the plan area.

Understanding the natural range of variation is fundamental in strategic thinking and planning, even if restoration to historical conditions is not the management goal or possible on parts of the plan area. Understanding the natural range of variation of an ecosystem provides an understanding of how ecosystems are dynamic and change over time. The natural range of variation is useful for understanding each specific ecosystem, for understanding its existing ecological conditions, and for understanding its likely future character, based on projections of climate regimes. The natural range of variation is a guide to understanding how to restore a resilient ecosystem with structural and functional properties that will enable it to persist into the future.

The goal of understanding natural range of variation is to help design plan components to maintain or restore the integrity of the diversity of terrestrial, riparian, and aquatic ecosystems and habitat types throughout the plan area provide an ecosystem (coarse-filter) approach to maintaining the persistence of native species.

When developing plan components, the Interdisciplinary Team shall consider the role of the natural range of variation as follows:

1. In general, where appropriate, the Interdisciplinary Team should design plan components aimed at maintaining or restoring the natural range of variation of specific key ecosystem characteristics needed to promote ecosystem integrity in the plan area.

2. For specific areas within an ecosystem, the Responsible Official may determine that it is not appropriate, practical, possible, or desirable to contribute to restoring conditions to the natural range of variation. Natural range of variation includes a wide range of characteristics, some more common than other characteristics. To achieve social, economic, cultural, or ecological objectives it may be desirable to manage for uncommon conditions in specific areas in the plan area. For an ecosystem to withstand or recover from disturbance events caused under unique circumstances, it may be necessary to manage for characteristics that were rare or never occurred in the past. The following are examples of situations where it is NOT appropriate, practical, possible, or desirable to design plan components to restore past conditions for specific areas within an ecosystem:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 60 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

a. The system is so degraded that restoration is not possible.

b. The ability to restore the desired ecological conditions or key ecosystem characteristics is beyond the authority of the Forest Service, the fiscal capability of the unit, or the inherent capability of the plan area.

c. The system is no longer capable of sustaining key ecosystem characteristics identified as common in the past based upon likely future environmental conditions.

d. Conditions that rarely or never occurred in the past, but that can be managed for in the future, will better contribute to long-term ecosystem sustainability and adaption to the effects of a changing climate.

e. Conditions that rarely or never occurred in the past, but that can be managed for in the future, will better address public health and safety concerns.

f. Conditions common in the past are directly opposed to integrated desired conditions (desired conditions that represents a balance of social, economic, cultural and ecological needs).

3. If past conditions relative to the natural range of variation are not appropriate, practical, possible, or desirable approaches:

a. The Interdisciplinary Team should design plan components based on a general scientific and ecological understanding of the conditions that would sustain key ecosystem characteristics and sustain at-risk species using factors such as: representativeness, redundancy, habitat associations of particular species, disturbance dynamics, or observed conditions in reference areas. (FSH 1909.12, ch. 10, sec. 12.14b); and

b. The Responsible Official should briefly explain in the plan decision document the rationale for NOT basing the design of the plan components on those conditions that were common in the past relative to the natural range of variation.

## 23.11b – Ecosystem Integrity

Plans must contain plan components, including standards or guidelines, that maintain or restore the composition, structure, ecological processes, and connectivity of plan area ecosystems in a manner that promotes their ecological integrity (36 CFR 219.8(a) and 219.9(a)(1)). Ecological integrity is defined in the Rule at 36 CFR 219.19 and at FSH 1909.12, zero code, section 05.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 61 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

**219.8 Sustainability**

**(a) Ecological sustainability. (1) Ecosystem Integrity. The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity, taking into account:**

**(i) Interdependence of terrestrial and aquatic ecosystems in the plan area.**

**(ii) Contributions of the plan area to ecological conditions within the broader landscape influenced by the plan area.**

**(iii) Conditions in the broader landscape that may influence the sustainability of resources and ecosystems within the plan area.**

**(iv) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of terrestrial and aquatic ecosystems on the plan area to adapt to change.)**

**(v) Wildland fire and opportunities to restore fire adapted ecosystems.**

**(vi) Opportunities for landscape scale restoration.**

**\*\*\***

**§ 219.9 Diversity of plant and animal communities.**

**. . . (a) Ecosystem plan components. (1) Ecosystem integrity. As required by § 219.8(a), the plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area, including plan components to maintain or restore their structure, function, composition, and connectivity.**

The Interdisciplinary Team shall take into account the following items, set out in the Rule at 36 CFR 219.8(a)(1)(i) –(iv) and (vi) when developing plan components:

1. Interdependence of terrestrial and aquatic ecosystems in the plan area. The Interdisciplinary Team should develop plan components in an integrated manner reflecting the interaction and interdependence of terrestrial, aquatic, and riparian ecosystems in the plan area.

Rvsd Plan - 00001436

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 62 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

2. Contributions of the plan area to ecological conditions within the broader landscape influenced by the plan area. When developing plan components the Interdisciplinary Team should consider:

a. Ecological conditions within the broader landscape and how those conditions may be influenced by resources or management within the plan area (FSH 1909.12, ch. 10, sec. 12.14c, paragraph 3).

b. Ecological connectivity at multiple temporal and spatial scales that would provide landscape linkages facilitating the exchange of resources and the movements of species across the broader landscape (FSH 1909.12, ch. 10, sec. 12.14c, paragraph 1).

c. Ecological conditions, habitats, or key ecosystem characteristics in the plan area that are unique, under-represented, or rare across the broader landscape (FSH 1909.12, ch. 10, sec. 12.14c, paragraph 3).

d. Opportunities to maintain or restore ecological conditions for pollinators and improve pollinator health.

3. Conditions in the broader landscape that may influence the sustainability of resources and ecosystems within the plan area. When developing plan components the Interdisciplinary Team should consider the ecological conditions in the broader landscape that may influence the sustainability of the plan area and should consider the following:

a. Existing conditions of the broader landscape outside National Forest System boundaries that may influence the plan area's ability to maintain or restore ecological integrity of plan area ecosystems. Such conditions may include habitat fragmentation, land use patterns, resource management, or urbanization (FSH 1909.12, ch. 10, sec. 12.14c, paragraph 3).

b. Facilitating or mimicking dominant ecological processes and system drivers of the broader landscape, especially those related to fire-adapted ecosystems (FSH 1909.12, ch. 10, sec. 12.3).

c. Collaborating with other land managers across the broader landscape when developing an all-lands approach to planning for ecological resources in a manner that promotes the ecological integrity of terrestrial, riparian, and aquatic ecosystems in the plan area (FSH 1909.12, ch. 40).

4. System drivers, including dominant ecological processes, disturbance regimes, and stressors. When developing plan components, the Interdisciplinary Team should consider dominant ecological processes, disturbance regimes, and stressors (FSH 1909.12, ch. 10, sec. 12.3), and should:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 63 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

a. Consider plan components designed to facilitate ecosystem adaptation to the effects of stressors.

b. Consider developing plan components designed to limit the ability of stressors to impact ecosystem integrity. In doing so, consider:

(1) Providing protection from stressors for areas of high ecosystem integrity, or areas of social, cultural, or economic importance.

(2) Mitigating stressors associated with forest and rangeland management, such as equipment impacts on soils and water, or movement of invasive species via vehicles and foot travel.

(3) Mitigating, if feasible, the effects of widespread environmental stressors such as air pollution and influence of changing climate.

(4) Coordinating with Agency staff from Research and Development to develop plan components to adapt to the effects of climate change.

5. Opportunities for landscape scale restoration. When developing plan components regarding opportunities for landscape-scale restoration of ecological integrity the ID team should consider the following:

a. Multiple spatial and temporal scales. The arrangement of ecological conditions, key ecosystem characteristics, and management goals at multiple spatial and temporal scales are important.

(1) The ecological role of the plan area within the broader landscape, including capability and condition of terrestrial, aquatic, and riparian systems.

(2) Complementary restoration goals of other land managers adjacent to or within the relevant ecosystems of the plan area, if available.

(3) Opportunities to compensate for degraded conditions in the broader landscape.

(4) The broad-scale context of scarcity and abundance, and Agency ability to restore and maintain desired features or conditions that are scarce in the broader landscape (FSH 1909.12, ch. 10, sec. 12.14c, paragraph 3).

(5) Opportunities to align desired ecological conditions with landscape-scale ecological units (such as the land-type association level of the National Hierarchical Framework of Ecological Units (FSM 2060.3)), if feasible, to simplify analysis and management by reducing the variability of ecological classifications across units of the National Forest System.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 64 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(6) Opportunities for partnerships to support restoring ecological conditions at the appropriate geographic scale.

b. <u>At-risk species</u>. The Interdisciplinary Team should consider the key ecosystem characteristics, ecosystems, and ecological conditions necessary to sustain the at-risk species.

c. <u>Landscape patterns that promote long-term ecological integrity and ecosystem diversity</u>. The ID team should consider plan components for landscape patterns that promote long-term ecological integrity and ecosystem diversity. Landscape pattern is defined as the arrangement, connectivity, composition, size, and relative abundance of ecosystem patches that occur within an area of land at a given time. Patches can be characterized by vegetation type, seral stage, habitat type, or other features relevant to a forest or rangeland management question. Examples of ways to provide plan components for such patterns include:

(1) Designing ecosystem (coarse-filter) connectivity based on landscape patterns of forests, grasslands, rangelands, streams, and wetlands that were created under ecological processes and landscape disturbance regimes that occurred before extensive human alteration.

(2) Designing spatial configuration of desired ecological conditions relative to the natural range of variation conditions, including the scale, frequency, and intensity of system drivers of ecosystem change over time (or other ecological reference model if the natural range of variation is not an appropriate approach) (FSH 1909.12, ch. 10, sec. 12.14a; Weins et al. 2012).

(3) Maintaining a representative range of successional states for all ecosystems and in patch configurations similar to those that occurred under historical conditions, at a scale resilient to natural disturbances.

(4) Designing for ecosystem integrity based on a general scientific and ecological understanding of the conditions that would sustain key ecosystem characteristics and at-risk species using factors such as representativeness, redundancy, habitat associations of particular species, or other factors (FSH 1909.12, ch. 10, sec. 12.14b; and sec. 23 of this Handbook).

(5) Maintaining the integrity of scarce or unique smaller areas through plan components for desired conditions and standards or guidelines to constrain the levels of disturbance for areas around them.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 65 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.11c – Opportunities to Restore Fire-adapted Ecosystems

When developing plan components for ecological integrity, the Interdisciplinary Team should consider and integrate together plan components related to wildland fire, fuels management, and restoration of fire-adapted ecosystems (36 CFR 219.8(a)(1)(v)). The development of such plan components should be based on the need to change the plan, using information such as the National Cohesive Wildland Fire Management Strategy, community assessment and mitigation plans, fire's historic role in the plan area, local community wildfire protection plans, local risk assessments, trends in fire behavior, and wildland-urban interface (WUI) areas identified in the assessment phase (FSH 1909.12, ch. 10, sec. 12.3), or from information brought forward during the public and governmental participation process. Plan components for fire or fuels management should include the following:

1. Desired Conditions. Desired conditions should define and identify fire's role in the ecosystem. It may also be appropriate to identify desired conditions for fuel conditions, fire severity, fire frequency, and so on. These desired conditions should be integrated with the other desired conditions for air, soil, threatened and endangered species, vegetation, water, and so on. In addition, the following topics should be considered when developing desired conditions—current management strategies, hazardous fuels, prevention, public and firefighter safety, smoke management, values to be protected from or enhanced by wildland fire, and wildland-urban interface.

2. Objectives. If fuels conditions are an issue in wildland-urban interface areas, the plan should include a plan objective that sets forth a projection of the number of fuel treatment acres meeting an integrated desired vegetative and fuel condition in a specific time to move toward (or maintain) the desired condition.

3. Standards or guidelines. The plan may include standards or guidelines related to basic smoke management practices, non-fire fuels treatments, post-fire rehabilitation, prescribed fire treatments, and wildland fire responses. A guideline or standard may provide guidance on when or how a specific tool is appropriate.

## 23.11d – Ecosystem Diversity

The Planning Rule requirements for ecosystem diversity from 36 CFR 219.9(a)(2) are:

**The plan must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area. In doing so, the plan must include plan components to maintain or restore:**

**(i) Key characteristics associated with terrestrial and aquatic ecosystem types;**

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 185 of 251

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 66 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

### (ii) Rare aquatic and terrestrial plant and animal communities; and

### (iii) The diversity of native tree species similar to that existing in the plan area.

To develop the land management plan consistent with maintaining ecosystem diversity, the plan must include plan components, including standards or guidelines, designed to maintain, restore, or promote ecosystem diversity and habitat types.

The diversity of terrestrial, riparian, and aquatic ecosystems and habitats is fundamental to providing ecological conditions that support the abundance, distribution, and long-term persistence of native species and diversity of plant and animal communities. In addition, diversity of ecosystems and habitat types within the unit is an important aspect of the coarse-filter approach. The terms ecosystem diversity and habitat type are defined in FSH 1909.12, zero code, section 05. Terrestrial, riparian, and aquatic ecosystems to be addressed in the planning process are identified in the need to change the plan based on the assessment phase or identified based on information brought forward during the public and governmental participation process. See sections 23.1–23.12c of this Handbook for direction about plan components related to maintaining or restoring terrestrial, riparian, and aquatic ecosystems.

When developing plan components for maintaining and restoring the diversity of ecosystems and habitat types, the Interdisciplinary Team should consider the following:

1. The spatial extent and distribution of ecosystems and habitat types and spatial relationships to the natural range of variation (or other reference conditions if the use of natural range of variation is inappropriate).

2. The importance of ecosystems and habitats type to providing ecological conditions that contribute to the recovery of threatened and endangered species, conserve proposed and candidate species, and maintain viable populations of species of conservation concern (sec. 23.13 of this Handbook).

3. How plan components under consideration for large-scale ecosystems (like longleaf pine forests) would maintain or restore rare or unique embedded communities (like hillside bogs and longleaf savannahs) (FSH 1909.12, ch. 10, sec. 12.14c).

4. How plan components under consideration for ecosystems would contribute to maintaining the persistence of native tree species within the plan area.

5. How plan components for key characteristics of the ecosystem and habitat types contribute to the broader biodiversity of ecosystems across the plan area.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 67 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.11e – Riparian Areas

The rule requirements for riparian areas from 36 CFR 219.8(a)(3) are:

> **(i) The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of riparian areas in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity, taking into account:**
>
> **(A) Water temperature and chemical composition;**
>
> **(B) Blockages (uncharacteristic and characteristic) of water courses;**
>
> **(C) Deposits of sediment;**
>
> **(D) Aquatic and terrestrial habitats;**
>
> **(E) Ecological connectivity;**
>
> **(F) Restoration needs; and**
>
> **(G) Floodplain values and risk of flood loss.**
>
> **(ii) Plans must establish width(s) for riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands, within which the plan components required by paragraph (a)(3)(i) of this section will apply, giving special attention to land and vegetation for approximately 100 feet from the edges of all perennial streams and lakes.**
>
> **(A) Riparian management zone width(s) may vary based on ecological or geomorphic factors or type of water body; and will apply unless replaced by a site-specific delineation of the riparian area.**
>
> **(B) Plan components must ensure that no management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment that seriously and adversely affect water conditions or fish habitat shall be permitted within the riparian management zones or the site-specific delineated riparian areas.**

To maintain the ecological integrity of riparian areas, the plan must include plan components, including standards or guidelines, designed to maintain, restore, or promote riparian areas. This provision does not prohibit projects that may have short-term adverse effects to water conditions and fish habitat, but that will maintain or restore structure, function, composition, and connectivity of riparian areas over the long term.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 68 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

Riparian areas are important elements of watersheds that provide critical transition zones linking terrestrial and aquatic ecosystems. Restoration of riparian areas may be accomplished through passive management or may require active management particularly in areas where natural disturbances such as fire or flooding have been prevented from occurring.

The terms ephemeral stream, intermittent stream, perennial stream, riparian area, and riparian management zone are defined in FSH 1909.12, zero code, section 05.

The National Core Best Management Practices (BMP) Technical Guide (USDA Forest Service 2012a) refers to riparian management zones as aquatic management zones. The technical guide discusses designation of the riparian management zone under the national core best management practice "Plan-3 Aquatic Management Zone Planning." The Agency uses the technical guide to carry out the requirements for the national best management practices for water quality (FSM 2526). As discussed in section 23.12c of this Handbook, plan components must ensure implementation of the best management practices.

Sections 23.1–23.12c of this Handbook give direction on plan components related to maintaining or restoring the ecological integrity of all ecosystems including riparian ecosystems (riparian areas).

The plan must establish widths for riparian management zones for all lakes, perennial and intermittent streams, and open water wetlands (36 CFR 219.8(a)(3)(ii)) so employees know where the plan components for ecological integrity of riparian areas apply.

Riparian management zones must include the riparian area.

1. When establishing riparian management zones, the Interdisciplinary Team should consider:

a. Available information on the location and extent of surface waterbodies, springs, wetlands, vegetation, soils, geomorphology, topography, and other relevant information.

b. Soil and vegetation indicators of riparian areas that include regionally distinctive riparian soils and vegetation, or the soil potential to support regionally distinctive vegetation.

c. Fluvial geomorphic indicators of riparian areas such as break in slope or evidence of fluvial deposition.

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 188 of 251

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 69 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

d. The 100-year recurrence interval flood stage. The water surface elevation corresponding to the 100-year recurrence interval flood may be preferable to some standard distance from the stream channel (for example, a 100-foot buffer) because a set distance may overestimate actual riparian widths along small streams and underestimate the extent of riparian vegetation along larger rivers.

e. Existing site-specific riparian area delineations, if available (FSH 1909.12, ch. 10, section 12.14d).

f. The effects of climate change on stream flows that may affect the size of riparian management zones.

2. When establishing widths for riparian management zones as require by the Rule, and in areas where available information on the distribution of riparian dependent resources within the plan area is too limited to determine appropriate riparian management zone dimensions, the Interdisciplinary Team should consider the following when establishing widths:

a. Establishing a default distance from the edge of all lakes, perennial streams, intermittent streams, and open water wetlands, such as the ordinary high water mark or bankfull flow, for the riparian management zone.

b. Giving special attention to the first 100 feet from the edges of all perennial streams, lakes, and other bodies of permanent surface water containing aquatic flora and fauna or supporting substantial riparian vegetation. In other words, plan components for riparian management zones should be developed to maintain, improve, or restore the condition of the land around and next to waterbodies in the context of the environment in which they are located, recognizing their unique values and importance to watersheds while providing for multiple uses on National Forest System lands.

c. Giving attention to dry washes or channels with minimal or no riparian vegetation that support riparian vegetation downstream due to subsurface flow through the stream channel or adjacent alluvial sediments.

3. When developing plan components for ecological integrity of riparian areas, the Interdisciplinary Team should:

a. Design plan components that constrain projects and activities to comply with requirements of the Planning Rule not to cause detrimental changes to water resources that "seriously and adversely affect water conditions or fish habitat"

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 70 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(36 CFR 219.8(a)(3)(ii)(B)). This provision does not prohibit projects that may have short-term adverse effects to water conditions and fish habitat, but that will maintain or restore structure, function, composition, and connectivity of riparian areas over the long term.

b. Consider designing plan components for restoring processes that support desirable riparian integrity including allowing roots of plants access to groundwater.

c. Consider designing plan components that provide for passive management or active management. An example of passive management is restoring elements of flow regimes, such as environmental flows and levels, by restricting a destructive activity. Examples of active management include recontouring roads or mechanically removing structures or vegetation. Active management may be appropriate in areas if past management has prevented natural disturbances (such as fire or flooding), or if past projects and activities have altered riparian functions (such as where roads are located within riparian areas).

For guidance on delineating site-specific riparian areas associated with streams and rivers, see the guidelines in the National Riparian Vegetation Monitoring Technical Guide (Forest Service 2012b) or other Agency supported guidance. For guidance on delineating site-specific riparian areas for non-fluvial or palustrine areas (associated with wetlands, lakes and other standing bodies of water), see the U.S. Army Corps of Engineers wetland delineation manuals for the region of interest, available at *http://el.erdc.usace.army.mil/wetlands/wlpubs.html*.

## 23.12 – Plan Components for Air, Soil, and Water

The rule requirements for air, soil and water from 36 CFR 219.8(a)(2) are:

> **The plan must include plan components, including standards or guidelines, to maintain or restore:**
>
> **(i) Air quality.**
>
> **(ii) Soils and soil productivity, including guidance to reduce soil erosion and sedimentation.**
>
> **(iii) Water quality.**
>
> **(iv) Water resources in the plan area, including lakes, streams, and wetlands; ground water; public water supplies; sole source aquifers; source water protection areas; and other sources of drinking water (including guidance to prevent or mitigate detrimental changes in quantity, quality, and availability).**

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 71 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Plan components, including standards or guidelines, designed to maintain or restore these ecosystem elements provide the basis for maintaining or restoring the ecological integrity of the plan area. In addition to the resources listed in 36 CFR 219.8(a)(2), clean air, clean and abundant water supplies, geologic resources, and riparian areas should be considered when developing plan components.

When developing plan components for maintaining air quality, soil productivity, water quality, and water resources within the plan area, the Interdisciplinary Team should consider:

1. The range of ecological conditions established within the limits of the natural landforms, vegetation, and disturbance processes that existed before extensive human alteration.

2. The variation in physical and biological conditions exhibited by ecosystems because of climatic fluctuations and disturbance regimes.

3. The concept that the environmental conditions that sustained ecosystem components in the past are likely to sustain them, at least over the short term, in the future.

4. The potential influences of threats and stressors that are within and beyond the influence of management actions on the plan area that are likely to affect ecological conditions on the plan area during the life of the proposed plan (15 years).

### 23.12a – Air Quality

The rule requirements for air quality are listed in 36 CFR 219.8(a)(2)(i). The development of plan components, including standards or guidelines, for air quality should be based on a need to change the plan identified from the assessment (FSH 1909.12, ch. 10, sec. 12.21) or from information brought forward during the public and governmental participation process.

To address air quality issues when developing, amending, or revising a plan, the Interdisciplinary Team should consider:

1. Visibility. As appropriate, consider develop plan components for visibility in class I areas commensurate with goals from relevant State, Federal, and Tribal implementation plans.

2. Emissions. As appropriate, develop plan components for emissions from management activities such as permitted mining or oil and gas operations.

3. Air Pollution Deposition and Exposure of Biophysical Resources. Where critical loads of air pollution to water, soils, flora, or fauna have been exceeded (see assessment, FSH 1909.12, ch. 10, sec. 12.21), develop plan components to help protect or restore key ecosystem characteristics of relevant resources within the plan area. The key

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 72 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

characteristics may include aquatic chemistry, soil chemistry, soil productivity, and biogeochemical cycling. The plan components may include desired conditions and objectives for target loads of air pollution deposition and target levels of air pollution exposure.

4. <u>Smoke Management</u>. If objectives for prescribed fire are set forth in the plan, consider developing plan components for smoke management. Consider relevant State, Federal, or Tribal smoke management program requirements when developing plan components for smoke management. For additional information on smoke management, see Basic Smoke Management Practices. USDA Natural Resources Conservation Service and Forest Service Technical Note (2011) at
*http://www.airquality.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1046311.pcf.*

## 23.12b – Soils and Soil Productivity

The rule requirements for soils and soil productivity are listed in 36 CFR 219.8(a)(2)(ii). The development of plan components for soils and soil productivity, including standards or guidelines, should be based on the need to change the plan identified from the assessment (FSH 1909.12, ch. 10, sec. 12.22) or information brought forward during the public and governmental participation process.

1. In addition to considering information identified in the assessment, the Interdisciplinary Team may consider existing recommendations in Forest Service national best management practices guidance documents (USDA Forest Service 2012a). Additional information is found in FSM 2551.3.

2. When designing plan components for soils and soil productivity to sustain the productive capability of the land, its ecological resources, and watershed functions, the Interdisciplinary Team should consider whether it would be appropriate for plan components to give direction regarding :

a. Restoring degraded areas.

b. Maintaining the ecological integrity and functions of soils by managing vegetation communities and the type, degree, and amount of disturbance to soils. (See FSM 2550.5 and FSM 2551.5 for definition of soil function).

c. Maintaining biological properties of soils, such as an appropriate level of organic matter to sustain biological cycling.

d. Maintaining organic matter inputs and avoiding losses, to help maintain or increase net soil carbon storage.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 73 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

e. Mitigating impacts for those soils that have been identified as vulnerable to stressors.

f. Mitigating potential impacts of changing climate, such as changes in occurrence of extreme storm events (in other words, do potential impacts affect appropriate uses of soils?).

g. Limiting potential impacts on soil physical properties, for example, compaction, rutting, puddling, displacement of the soil surface, and erosion.

h. Limiting potential effects on soil chemical properties, such as potential for nutrient depletion, acidification or both.

## 23.12c – Water Quality and Water Resources

The Planning Rule requires the plan to have plan components, including standards or guidelines, to maintain or restore:

**(iii) Water quality.**

**(iv) Water resources in the plan area, including lakes, streams, and wetlands; ground water; public water supplies; sole source aquifers; source water protection areas; and other sources of drinking water (including guidance to prevent or mitigate detrimental changes in quantity, quality, and availability).** (36 CFR 219.8(a)(2)(iii) and (iv)).

The rule requires the establishment of BMPs in the Forest Service Directive System 36 CFR 219.8(a)(4).

**(4) *Best management practices for water quality*. The Chief shall establish requirements for national best management practices for water quality in the Forest Service Directive System. Plan components must ensure implementation of these practices.**

The development of plan components, including standards or guidelines, designed to maintain or restore water resources in the plan area, including lakes, streams, wetlands, and groundwater, should be based on a need to change the plan identified from the assessment (FSH 1909.12, ch. 10, secs. 12.23 and 13.34) or on information brought forward during the public and governmental participation process.

The Interdisciplinary Team should consider surface and subsurface water quality and public water supplies associated with the plan area watersheds. The Team should also coordinate with State, local and tribal water managers, water users, and others about appropriate resource protection, consistent with applicable law.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 74 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The Interdisciplinary Team should develop desired conditions for water quality and quantity in the plan area and consider developing plan components to:

1. Maintain or restore the water quality, quantity, timing, and distribution necessary to sustain ecosystems and downstream ecosystem services into the future by:

a. Including guidance designed to prevent or mitigate detrimental changes in quantity, quality, and availability, including temperature changes and inputs of sediment and other pollutants.

b. Ensuring implementation of the national best management practices (BMPs) program for water quality (FSM 2532; USDA Forest Service 2012).

c. Quantifying the water necessary to maintain and restore terrestrial, riparian, and aquatic ecosystems and associated dependent species, including aquatic species and groundwater-dependent ecosystems in the plan area, when appropriate and practical.

d. Specifying the appropriate environmental flows and water levels, when appropriate and practical.

2. Support the restoration of designated impaired waters within or adjacent to National Forest System lands with primary or secondary impairments that have the potential to be influenced by Forest Service forest and rangeland management activities in the plan area.

3. Maintain or restore the integrity of public water supplies, sole source aquifers, source water protection areas, and other sources of drinking water in the plan area.

4. Maintain or restore the integrity of lakes, streams, wetlands, and groundwater in the plan area.

5. Address the concerns identified for priority watersheds (sec. 22.31 of this Handbook).

### 23.13 –Species-specific Plan Components for At-risk Species

Plan components developed for ecosystem integrity and ecosystem diversity (sec. 23.11 of this Handbook) are expected to provide for ecological conditions necessary to maintain the persistence or contribute to the recovery of native species within the plan area, including at-risk species identified in assessment.

At-risk species for planning are federally recognized threatened, endangered, proposed, and candidate species; and species of conservation concern. The term "ecological conditions" is defined in FSH 1909.12, zero code, section 05. Ecological conditions include habitat and the effects of human uses (for example, recreation, grazing, and mining).

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 75 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The Planning Rule, at 36 CFR 219.9(b)(1), requires the Responsible Official to determine whether plan components, including standards or guidelines, to maintain or restore ecosystem integrity and ecosystem diversity provide sufficient ecological conditions for at-risk species, or if plan components specifically directed toward providing specific conditions required by such species must be developed:

> **(b) Additional, species-specific plan components. (1) The responsible official shall determine whether or not the plan components required by paragraph (a) of this section provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area. If the responsible official determines that the plan components required in paragraph (a) are insufficient to provide such ecological conditions, then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area.**

To make the determination required by 36 CFR 219.9(b)(1), the Responsible Official should evaluate if emerging plan components that would provide for ecosystem integrity and ecosystem diversity (coarse-filter approach) would also provide the ecological conditions necessary to meet the Rule's requirements for all the at-risk species in the plan area. If the evaluation indicates such plan components would not provide sufficient conditions required by the Rule for one or more at-risk species, the Responsible Official shall develop additional, species-specific plan components, including standards or guidelines, for each of those species (fine-filter approach).

Examples of such plan components include a standard for protecting red-cockaded woodpecker nest cavity trees during prescribed burning activities, an objective to establish a food storage order designed to minimize grizzly bear/human conflicts occupied grizzly bear habitat, or a standard for size and placement of culverts on cutthroat trout streams.

The Responsible Official should design an evaluation process for the emerging set of plan components for each at-risk species to determine the degree to which the set of emerging plan components meet the requirements of the Planning Rule for at-risk species. The Responsible Official should take into account the need to change the plan based on the status for each at-risk species (as outlined in FSH 1909.12, ch.10, sec. 12.55).

Plan components that provide for ecological conditions for ecosystem integrity and ecosystem diversity (sec. 23.11 of this Handbook) are the primary context for the evaluation of at-risk species. For most species, the only practical quantitative evaluation of their required ecological conditions is an assessment of habitat conditions (ecological conditions). Plan components developed for multiple uses may contribute to, or detract from, ecological conditions needed for

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 76 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

at-risk species. For example, on some forests or grasslands, a portion of the plan area may have a desired condition for undeveloped remote recreation. Such a desired condition should be taken into account when evaluating the ecological conditions for at-risk species, because it may mitigate some stressors, contribute to ecological conditions, or provide refugia.

1. Process for evaluating emerging plan components. Evaluating the emerging plan components and their likely contribution to meeting requirements for at-risk species is an iterative process as the plan is being developed, amended, or revised. The process includes:

a. Developing emerging plan components that provide for ecosystem integrity and ecosystem diversity.

b. Evaluating whether those emerging plan components would sustain the ecological conditions that the Rule requires for at-risk species.

c. Refining emerging plan components that do not adequately handle species risk factors from the evaluation of status of at-risk species (FSH 1909.12, ch. 10, sec. 12.55) or do not sustain the ecological conditions that support at-risk species by:

(1) Making adjustments to the emerging plan components for ecosystem integrity and ecosystem diversity necessary to sustain the ecological conditions that support at-risk species;

(2) Adding additional species-specific plan components necessary to sustain the ecological conditions required by the Rule for at-risk species; or

(3) Combining paragraphs (1) and (2).

d. Repeating the steps of paragraphs 1b and 1c if other social, economic, or ecological considerations are added that alter plan components in a way that would affect an at-risk species.

2. Considerations when evaluating the potential emerging plan components. When evaluating whether emerging plan components that provide for ecosystem integrity and diversity would adequately provide conditions for at-risk species, the Interdisciplinary Team should consider the following:

a. Relevant information derived from the status of at-risk species (FSH 1909.12, ch. 10, sec. 12.55), as well as limiting factors, threats, and stressors to each at-risk species.

b. The key habitat relationships of the species, by:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 77 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(1) Evaluating the connection between habitat conditions and population consequences.

(2) Using general ecological principles when there is a lack of knowledge of relationships between species, populations, and habitats.

(3) Using existing spatially explicit habitat models, demographic models, or other relevant models.

(4) Using qualitative methods such as expert opinion or simple habitat assessments in the absence of adequate information or models.

(5) Framing the evaluation in the context of risk and uncertainty, no matter what evaluation method is used.

c. Conducting the evaluations of the emerging plan components at the scale in which biological populations of the species operate. Analysis at the scale of distinct population segments or evolutionary significant units may be appropriate.

d. Effects, influences, and contributions from other land ownerships and actions outside of the plan area in addition to those within the plan area.

## 23.13a – Threatened and Endangered Species

The development of or changes to plan components to provide for ecological conditions for threatened and endangered species should be based on a need to change the plan identified from the assessment of the ecological conditions necessary to contribute to their recovery and maintaining or restoring critical habitats (FSH 1909.12, ch. 10, sec. 12.55), or from information brought forward during the public and governmental participation process.

When designing plan components (ecosystem and species-specific) to provide for ecological conditions that contribute to the recovery of threatened and endangered species that occur within the plan area, the Interdisciplinary Team should:

1. Consider conservation measures and actions identified in the recovery plan for each threatened and endangered species.

2. Consider limiting factors (for example, naturally small and isolated populations, climate change) and key threats to each threatened and endangered species.

3. Engage with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (NMFS), as appropriate, in the evaluation of existing conditions for threatened and endangered species and in the development of plan components that contribute to their recovery.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 78 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

4. Work beyond the plan area boundary to collaborate and cooperate with U.S. Fish and Wildlife Service, National Marine Fisheries Service, States, Tribes, other partners, landowners, and land managers to support an all-lands approach to species recovery.

5. Support the reintroduction of listed species into historical habitat on National Forest System lands where appropriate, consistent with recovery plan objectives.

6. Engage with the U.S. Fish and Wildlife Service or National Marine Fisheries Service, as appropriate, in the evaluation of any effects to aquatic threatened and endangered species downstream of the plan area that could be affected by actions within the plan area.

## 23.13b – Proposed and Candidate Species

Development of plan components for proposed and candidate species should be based on the ecological conditions necessary to conserve proposed and candidate species that were identified in the assessment phase or information brought forward during the public and governmental participation process and maintain or restore their habitats in the plan area to contribute to preventing them from being federally listed (FSH 1909.12, ch. 10, sec. 12.55).

When developing plan components (ecosystem and species-specific) to conserve proposed and candidate species, the Interdisciplinary Team should:

1. Consider conservation measures identified in existing conservation strategies and agreements relevant to proposed and candidate species in the plan area.

2. Consider limiting factors and key threats to species identified in proposed rules from U.S. Fish and Wildlife Service or National Marine Fisheries Service for listing or candidate species assessments.

3. Engage with U.S. Fish and Wildlife Service and National Marine Fisheries Service in the evaluation of existing conditions for proposed and candidate species and in the development of plan components designed to conserve these species.

4. Work beyond the plan area boundary to collaborate and cooperate with U.S. Fish and Wildlife Service, National Marine Fisheries Service, States, Tribes, other partners, landowners, and land managers to support an all-lands approach to conserve proposed and candidate species.

## 23.13c – Species of Conservation Concern

Species of conservation concern are defined in the Planning Rule (36 CFR 219.9(c)) and in FSH 1909.12, zero code, section 05. The rule requirements for species-specific plan components for species of conservation concern are:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 79 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

**(2) If the responsible official determines that it is beyond the authority of the Forest Service or not within the inherent capability of the plan area to maintain or restore the ecological conditions to maintain a viable population of a species of conservation concern in the plan area, then the responsible official shall:**

**(i) Document the basis for that determination (§ 219.14(a)); and**

**(ii) Include plan components, including standards or guidelines, to maintain or restore ecological conditions within the plan area to contribute to maintaining a viable population of the species within its range. In providing such plan components, the responsible official shall coordinate to the extent practicable with other Federal, State, Tribal, and private land managers having management authority over lands relevant to that population.** (36 CFR 219.9(b)(2)).

See section 21.22a of this Handbook for guidance on selecting species of conservation concern.

The Rule requires, as a general matter, that the plan have plan components to provide ecological conditions necessary to maintain a viable population of each species of conservation concern in the plan area. The ecological conditions may be those provided for through a coarse filter approach or through a fine filter (species-specific) approach. The Rule also provides that when the Forest Service's authority or the inherent capability of the plan area is insufficient to provide ecological conditions to maintain a viable population of species of conservation concern in the plan area, the Agency's obligation becomes one of contributing to maintaining a viable population of the species of conservation concern in its range.

When evaluating whether plan components (ecosystem and species-specific) would provide for the ecological conditions to maintain a viable population of each species of conservation concern in the plan area, the Interdisciplinary Team shall determine whether the plan components would provide the ecological conditions necessary to maintain or restore a viable population of a species of conservation concern in the planning area (36 CFR 219.9(b)(1)).

Five aspects of the evaluation process are explained in the following paragraphs: (1) viable population, (2) three possible outcomes of evaluating plan components, (3) examples of circumstances not within the authority of the Forest Service, (4) examples of circumstances not within the inherent capability of the plan area, and (5) duties of the Responsible Official when maintenance of a viable population of species of conservation concern within the plan area is beyond the authority of the Forest Service or not within the inherent capability of the plan area.

1. Viable population. The Planning Rule defines viable population as follows:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 80 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

**Viable population. A population of a species that continues to persist over the long term with sufficient distribution to be resilient and adaptable to stressors and likely future environments.**
(36 CFR 219.19)

The following principles must be kept in mind when developing plan components to provide for ecological conditions necessary to maintain a viable population of species of conservation concern in the plan area:

a. The rule only requires ecological conditions to maintain a viable population.

b. The meaning of the word "population" for planning purposes is explained in the preamble to the proposed rule: "it is the Department's expectation that for the purposes of this subpart, the individuals of a species of conservation concern that exist in the plan area will be considered to be members of one population of that species." (77 FR 21217, April 9, 2012). In some situations, individuals or groups of individuals in the plan area may be known to be or highly suspected to be reproductively isolated and separate from the rest of the individuals. These individuals or groups may need to be considered when considering "sufficient distribution" as described in paragraph 1d of this section.

c. The words "persist over the long-term" means the species continues to exist in the plan area over a sufficiently long period that encompasses multiple generations of the species, the time interval between major disturbance events, the time interval to develop all successional stages of major habitat types, or the time interval needed for the overall ecosystem to respond to management. Understand that confidence in the evaluations of persistence decreases rapidly as the timeframe of projections increases and that the Responsible Official will change plan components using plan amendments and plan revisions when the Responsible Official decides plan components need to be changed because of changed conditions.

d. Whether there is "sufficient distribution" of a species should be considered in the context of the species' natural history and historical distribution and on the potential distribution of the habitat within the plan area. Recognize that habitat and population distribution are dynamic over time. Sufficient distribution also implies a distribution that permits individuals to interact within the plan area within the constraints of the species' natural history. Sufficient distribution implies that ecological conditions are provided to support redundancy in numbers such that losing one or some without replacement will still support a viable population. It should not be expected that management of National Forest System lands would provide broadly or evenly

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 81 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

distributed habitat throughout a plan area for all species.  Furthermore, as long as there is enough habitat in the plan area to maintain a viable population, there is no requirement that habitat to maintain all known individuals or the maximum possible number of individuals of a species must be available in the plan area.

e.  The word "resilient" suggests that when disturbance events or stressors result in the local disappearance of individuals or extirpation from an area, recolonization of suitable habitat may occur in the future to facilitate long-term persistence in the plan area.

f.  The word "adaptable" means that the species is able to adjust to new conditions.  Ecological conditions to support the species are distributed in a way that the species may be represented in a variety of locally adapted ecotypes for increased likelihood of persistence in unknown future environments.

g.  Species distribution should also be provided for by the requirement that plan components must maintain or restore the diversity of ecosystems and habitat types throughout the plan area (36 CFR 219.9(a)(2), and by the requirement to maintain or restore connectivity (36 CFR 219.9(a)(1)).

2.  Three possible outcomes of evaluating plan components.  There are a variety of methods for conducting this evaluation, such as expert opinion, expert panels, Bayesian-belief models, habitat suitability models, and so on.  The evaluation of the ecosystem and species-specific plan components may result in three outcomes:

a.  The emerging plan components, when carried out, would provide the necessary ecological conditions to maintain a viable population of the species of conservation concern in the plan area.

b.  Adjustments to emerging ecosystem plan components, additional species-specific plan components, or both, when carried out, would provide the necessary ecological conditions to maintain a viable population of the species of conservation concern in the plan area.

c.  Due to circumstances that are neither within the authority of the Forest Service nor consistent within the inherent capability of the land, the plan area is unable to provide the ecological conditions necessary to maintain a viable population of a particular species of conservation concern within the plan area.  When this occurs, the Responsible Official shall document the basis for this determination in the planning record.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 82 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

3. Examples of circumstances not within the authority of the Forest Service. The following are species-specific examples of when ecological conditions necessary for the long-term persistence of a species are outside the National Forest System lands and, therefore, outside Forest Service control for providing ecological conditions to maintain viable populations of each species of conservation concern within a plan area:

a. Forest clearing in South America. These South American forests provide important wintering areas for many Neotropical birds that nest in North America. The clearing of these forests for agricultural purposes adversely affects the wintering habitat and ecological conditions necessary for the continued survival of viable populations of the Cerulean warbler. Thus, impacts to habitat outside the National Forest System may adversely affect populations of species that migrate to and from a National Forest.

b. Hydropower and flood control facilities in the Pacific Northwest and recreational and commercial fish harvest practices. These facilities and practices are primary downstream threats to anadromous fish populations whose spawning beds may occur on stream reaches within National Forests. These facilities and practices occur outside of National Forest System lands and are outside of Forest Service control, but nonetheless may adversely affect anadromous fish populations found on National Forest System lands.

c. Land use patterns on private lands intermixed with or adjacent to National Forest System lands. The continuing agricultural uses and urbanization that is occurring east of the Rocky Mountains is causing habitat fragmentation, which reduces available habitat and ecological conditions necessary for the viability of swift fox populations. Therefore, a reduction in viable populations of this species can occur as a result of land use development and patterns outside of National Forest System lands.

d. Domestic sheep grazing on private lands intermixed with or adjacent to National Forest System lands in the west. The contact of bighorn sheep with domestic sheep can transmit diseases to bighorn sheep and can cause die-offs of the affected bighorn sheep herds. Therefore, a reduction in viable populations of bighorn sheep can occur because of land use outside National Forest System lands.

4. Examples of circumstances not within the inherent capability of the plan area. The inherent capability of the land is defined in FSH 1909.12, zero code, section 05. Examples of circumstances that are not within the inherent capability of the plan area to provide the ecological conditions needed to maintain or restore a viable population of a species within the plan area include:

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 83 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

a. A species that is inherently rare because its individuals naturally occur at low numbers and are wide-ranging. For example, the wolverine occurs at relatively low densities in the northern Rocky Mountains and the number of breeding individuals in a single National Forest may be presumably too small to be considered a viable population.

b. A plan area that lacks sufficient ecological capacity to produce the habitat or ecological conditions necessary to maintain a viable population. An example is the Kisatchie National Forest, which has very limited amounts of land capable of producing the broad bottomland hardwood and cypress swamp habitat necessary to maintain a viable population of swallow-tailed kite. This National Forest is only capable of providing habitat for some individuals of this species.

c. Current and projected changes in climate that may affect a National Forest or grassland's ability to maintain or even contribute to the ecological conditions necessary to maintain viable populations of some species. An example is the warming trends at higher elevations in the West, which are altering the capability of some National Forests in California and other areas of the West to provide ecological conditions needed to maintain viable populations of American pika.

d. Where water quality conditions in Appalachian Mountain streams that provide habitat for eastern brook trout have been altered through acid deposition. The acid deposition is due to past and current acid rain, rendering many streams unsuitable for brook trout and compromising the ability of some Appalachian National Forests to provide the ecological conditions needed to maintain viable populations of this species.

5. Duties of the Responsible Official. If the Responsible Official determines it is beyond the authority of the Forest Service or not within the inherent capability of the plan area to maintain or restore the ecological conditions to maintain a viable population of a species of conservation concern in the plan area, then the Responsible Official shall:

a. Document the basis for the determination.

b. Include plan components, including standards or guidelines, to maintain or restore ecological conditions within the plan area to contribute to maintaining a viable population of the species within its range. For additional guidance see the principles about viable populations at paragraph 1 of this section.

c. Coordinate, to the extent practicable, with Federal, State, Tribal, and private land managers relevant to the species population. In doing so, consider:

(1) The range of the species beyond the plan area, and the ecological role of the plan area to contribute to a viable population across the broader landscape.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 84 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

(2) Working towards an all-lands approach to species conservation with other land managers across the range of the species, including efforts to mitigate threats or stressors and to provide ecological conditions that would support the species.

## 23.2 – Social and Economic Sustainability and Multiple Use

In the definition of sustainability, the Planning Rule defines social and economic sustainability as follows:

**. . . "social sustainability" refers to the capability of society to support the network of relationships, traditions, culture, and activities that connect people to the land and to one another and support vibrant communities.**

**. . . "economic sustainability" refers to the capability of society to produce and consume or otherwise benefit from goods and services including contributions to jobs and market and nonmarket benefits. . .** (36 CFR 219.19).

Plans are required to have plan components to guide the plan area's contribution to social and economic sustainability (36 CFR 219.8(b)) and for integrated resource management to provide for ecosystem services and multiple uses in the plan area (36 CFR 219.10(a). Plan components must be integrated to meet these requirements as well as requirements for ecological sustainability and species diversity as described in sections 22 and 23 of this Handbook. Under the Planning Rule, ecological, social, and economic systems are recognized as interdependent, without one being a priority over the other. These plan components apply to the plan area and are within the authority of the Forest Service, the inherent capability of the land, and the fiscal capability of the planning unit.

## 23.21 –Contributions of the Plan Area to Social and Economic Sustainability

Plans must include plan components that guide the plan area's contribution to social and economic sustainability to provide people and communities with a range of social, cultural, and economic benefits for present and future generations. Desired conditions should include a description of the plan area's contribution to social, economic, and cultural conditions. The general Planning Rule requirements for social and economic sustainability are as follows:

**§ 219.8 Sustainability.**

**The plan must provide for social, economic, and ecological sustainability within Forest Service authority and consistent with the inherent capability of the plan area, as follows:**

\*\*\*

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 85 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

**(b)** *Social and economic sustainability.* **The plan must include plan components, including standards or guidelines, to guide the plan area's contribution to social and economic sustainability, taking into account:**

**(1) Social, cultural, and economic conditions relevant to the area influenced by the plan;**

**(2) Sustainable recreation; including recreation settings, opportunities, and access; and scenic character;**

**(3) Multiple uses that contribute to local, regional, and national economies in a sustainable manner;**

**(4) Ecosystem services;**

**(5) Cultural and historic resources and uses; and**

**(6) Opportunities to connect people with nature.** (36 CFR 219.8)

In addition, the 36 CFR 219.10, Multiple Use, requires that when developing plan components, the Responsible Official shall consider the following:

**(7) Reasonably foreseeable risks to ecological, social, and economic sustainability.** (36 CFR 219.10 (a)).

The Planning Rule sections on social and economic sustainability (36 CFR 219.8(b) and multiple uses (36 CFR 219.10) cover some of the same topics. Sections within section 23.2 of this Handbook present each of these topics once—covering the pertinent requirements from both §219.8(b) and §219.10 of the Planning Rule. The entirety of section 23.2 of this Handbook describes how plans contribute to social and economic sustainability.

FSH 1909.12, chapter 20, sections 13.0, 13.1 and 13.2 describe the framework of how management of the plan area contributes to social, economic, and cultural conditions in the plan area, in the area(s) of influence and the broader landscape. The provision of multiple uses, ecosystem services, infrastructure, and Forest Service presence in the community are the types of contributions most likely to affect these social, economic, and cultural conditions. The assessment identifies these contributions of the plan area and the risks that may affect the ability of the plan to sustain the contributions.

Sections 23.21a and 23.21b of this Handbook give further general guidance on multiple uses and ecosystem services.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 86 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Specific guidance on developing plan components for infrastructure is contained in section 23.23 of this Handbook in the sections on sustainable recreation, scenery, renewable energy and infrastructure, roads, and transportation.

Agency operations are normally developed to support the plan and contribute directly and indirectly to the Forest Service presence in the community. The plan should not contain plan components that direct how Agency operations are conducted. The operations of the Forest Service administrative unit support the achievement of the desired conditions, goals, and objectives of the plan consistent with standards, guidelines, and suitability plan components. The Interdisciplinary Team evaluates the social, cultural, and economic impact of Agency operations and the Forest Service presence as part of the environmental analysis and briefly described in section 23.22 of this Handbook.

The plan components should be designed to guide sustainable contributions to social, cultural, and economic conditions while recognizing the reasonably foreseeable risks and uncertainties affecting the plan area.

The desired conditions of the plan should describe the desired social, economic, and cultural conditions in the plan area and the major contributions the plan area makes to social, cultural, and economic conditions outside of the plan area. Plan objectives can describe intended outcomes related to these contributions intended for accomplishment by a certain time. Suitability, standards, and guidelines should clarify how and where certain kinds of uses, projects and activities may or may not occur for reasons such as maintaining or restoring ecological sustainability and species diversity, or avoiding conflicts among uses. The distinctive roles and contributions of the plan area can highlight major unique contributions of the plan area to social and economic sustainability.

The Interdisciplinary Team should consider the following kinds of questions in developing plan components related to social and economic sustainability:

1. What is needed or desired for contributions from the plan area to contribute to social, cultural, and economic conditions?

2. Will the plan area (under the management of the plan) be able to sustain these contributions?

3. How will the plan components influence the contributions of the plan area to social and economic sustainability?

4. How will the plan affect social, economic, and cultural conditions in the plan area and area(s) of influence and the broader landscape? Will the plan adversely affect or benefit minority or low income populations?

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 87 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

5. Will the plan be able to sustain the plan area's contributions to social, cultural, and economic conditions under the reasonably foreseeable risks and uncertainties affecting the plan area, the area of influence and the broader landscape?

6. Are the plan components related to social and economic sustainability well integrated with the plan components that provide for ecological sustainability, including those that provide for ecosystem integrity and species diversity?

## 23.21a – Multiple Uses

Plan components that provide for multiple uses are one of the primary contributions to social and economic sustainability of the plan in the broader landscape. The Rule's general requirements for integrated resource management of multiple uses area at 36 CFR 219.10:

> **§ 219.10 Multiple use.**
>
> **While meeting the requirements of §§ 219.8 and 219.9, the plan must provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area as follows:**
>
> **(a) *Integrated resource management for multiple use*. The plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area. When developing plan components for integrated resource management, to the extent relevant to the plan area and the public participation process and the requirements of §§ 219.7, 219.8, 219.9, and 219.11, the responsible official shall consider**
>
> **(1) Aesthetic values, air quality, cultural and heritage resources, ecosystem services, fish and wildlife species, forage, geologic features, grazing and rangelands, habitat and habitat connectivity, recreation settings and opportunities, riparian areas, scenery, soil, surface and subsurface water quality, timber, trails, vegetation, viewsheds, wilderness, and other relevant resources and uses.** *[Specific topics are detailed at 36 CFR 219.10(a)(2)-(16) and described in subsequent sections].*

\*\*\*\*\*

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 88 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

> **(b) Requirements for plan components for a new plan or plan
> revision. (1) The plan must include plan components, including
> standards or guidelines, to provide for** [*Specific topics are detailed at
> 36 CFR 219.10(b)(1)(i)-(vi) and described in subsequent sections*].

This section of the Rule first requires, at paragraph (a), that a plan *must* include plan
components, including standards or guidelines, for integrated resource management to provide
for ecosystem services and multiple use. The rule does not specify how a plan shall do this, but
it lists specific topics that that the Responsible Official *shall consider* in developing plan
components (36 CFR 219.10 (a)(1)-(10).

The Planning Rule at 36 CFR 219.10(b) requires, that a plan *must include* plan components to
provide for specific resources and uses (36 CFR 219.10(b)(1)(i)-(vi)). Plan components to meet
these requirements are expected to be integrated and a unique plan component is not required for
each topic in 36 CFR 219.10(b) as described in sections 22 and 23 of this chapter. The following
sections of this Handbook give direction to meet these specific requirements: sections 23.21a,
23.23a, 23.23g, 23.23h, 24.2, 24.41, and section 24.42.

## 23.21b – Ecosystem Services

The Planning Rule (§ 219.10, § 219.10(a)(1), § 219.8(b)(3) requires that a plan include plan
components including standards or guidelines, for integrated resource management to provide for
ecosystem services and multiple use.

The Interdisciplinary Team should review the assessment for key ecosystem services provided
by the plan area along with information about the ability of the plan area to provide these key
ecosystem services FSH 1909.12, ch. 10, sec. 13.12). This information provides a framework to
evaluate how potential plan components are likely to provide for and affect key ecosystem
services.

Key ecosystem services may include services that are described elsewhere in section 23.2 of this
Handbook. These include provisioning services such as air, water, energy, fiber, and minerals;
regulating services such as soil stabilization; and cultural services such as cultural heritage
values, and recreational experiences.

A plan may identify key ecosystem services that are provided by the plan area but that are not
covered in this chapter: for example, provisioning services such as food, and regulating services
such as flood control. In such a case the plan should have plan components that provide for
those services. When developing plan components to provide for key ecosystem services, the
Interdisciplinary Team should consider how those services contribute to social, cultural, and
economic conditions.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 89 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

The plan should describe the desired conditions for the key ecosystem services in the plan area. Within the plan area, desired conditions may describe different desired sets of ecosystem services from different management or geographic areas. When developing plan objectives, the Interdisciplinary Team should consider the linkage between the key ecosystem services and how plan objectives would contribute to the intended achievement of the level, quality, or delivery of the key ecosystem services. A plan does not need to have a specific plan component for each key ecosystem service, but there should be a linkage between each of the key ecosystem services and the plan components.

## 23.22 – Social, Cultural, and Economic Conditions Influenced by the Plan

When developing plan components, including standards or guidelines, the Interdisciplinary Team shall take into account the social, cultural, and economic conditions relevant to the plan's area(s) of influence and the broader landscape (36 CFR 219.8(b)(1)).

1. When developing plan components, the Interdisciplinary Team should:

   a. Review the assessment, along with information from public and governmental participation, for information about social, cultural, and economic conditions and their relationship to the contributions of the plan area. (FSH 1909.12, ch. 10, sec.13.23). These social and economic considerations, along with ecological considerations, are often interrelated.

   b. Consider the following when developing plan components for social, cultural, and economic conditions:

   (1) Opportunities for the plan area to contribute to social conditions including the health, safety, education, social wellbeing, and quality of life of people and communities affected by the plan area. Opportunities can provide for service or civic engagement, and other activities that connect people to the land and to one another.

   (2) Opportunities for the plan area to contribute to cultural conditions such as traditions, history, art, and traditional resource uses. These can include traditional uses such as gathering of plants, fish, or wildlife for subsistence; sacred sites; ranching; or means of accessing the plan area such as on horseback, motor vehicles, or airstrips.

   (3) Opportunities for the plan area to contribute to economic conditions such individual employment, small businesses, personal income, Federal receipts shared with local governments, and the provision of economically significant benefits, products, and services, including those with both market and nonmarket value.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 90 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(4) Ways to reduce or eliminate adverse impacts to any environmental justice communities identified during the assessment or public participation process.

2. The plan should include a description of the desired social, cultural, and economic conditions in the plan area. The description could include:

a. How people use the plan area and the type of social environment that the plan area can provide.

b. Cultural aspects of the plan area including its relationship to specific communities, role in sustaining cultures and use of particular places for cultural events.

c. Economic conditions in terms of the types of work opportunities and resource use desired in the plan area.

3. The plan desired conditions should also contain a description of the contributions of the plan area to the social, cultural, and economic conditions in the area(s) of influence and beyond in the broader landscape. This can include contributions such as the following examples:

a. Recreational and educational opportunities that are designed to provide a wide range of recreational and learning opportunities for communities of interest, schools, and individuals.

b. Management of cultural resources or interpretation of these resources to foster certain educational or cultural activities.

c. Use of resources or infrastructure such as recreation, grazing, timber, or water and energy transmission corridors or roads that help to sustain businesses and employment opportunities.

Note that desired conditions should not describe desired social, economic, or cultural conditions outside the plan area because these are not within Forest Service authority, but they should describe contributions the plan area can make to these conditions.

4. The Interdisciplinary Team should analyze the potential impact of the plan components on social, cultural, and economic conditions as part of the environmental analysis for any plan revision or any plan amendment. The environmental analysis document also analyzes environmental effects on minority populations, low-income populations, or Indian tribes, including human health, social, and economic effects. This analysis should include an evaluation of the sustainability of the contributions of the plan area. Agency guidance for performing such social and economic evaluations in an environmental analysis is contained in FSH 1909.17.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 91 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.23 – Considerations for Multiple Uses, Ecosystem Services, and Infrastructure

Sections 23.23a through 23.23n of this Handbook give additional guidance related to contributions of the plan area covered in the multiple use section (36 CFR 219.10), and the sustainability section (36 CFR 219.8(b)).

## 23.23a – Sustainable Recreation Resources and Opportunities to Connect People with Nature

The Planning Rule (§ 219.10(a)) requires that a plan include plan components including standards or guidelines for integrated resource management to provide for ecosystem services and multiple use [including outdoor recreation]; and plan components including standards or guidelines to provide for:

> **Sustainable recreation; including recreation settings, opportunities, and access; and scenic character. Recreation opportunities may include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air.** (36 CFR 219.10 (b)(1)(i)).

The Planning Rule also requires that the development of plan components must take into account outdoor recreation that contributes to local, regional, and national economies in a sustainable manner (§ 219.8(b)(3)) and sustainable recreation; including recreation settings, opportunities and access; and scenic character (§ 219.8(b)(2)). In the development of plan components the Responsible Official shall consider recreation settings and opportunities, trails (§ 219.10(a)(1)) and appropriate placement and sustainable management of recreational facilities (§ 219.10(a)(3)). Introductions to sections 22 and 23 of this Handbook give guidance on how to integrate plan components to meet these requirements.

The Planning Rule provides definitions for sustainable recreation, recreation setting, and recreation opportunity (see 36 CFR 219.19 or FSH 1909.12, zero code, section 05). Guidance pertaining to scenic character is described in section 23.23f of this Handbook.

1. When developing plan components:

   a. The Interdisciplinary Team should review information from the assessment, the need for change, and distinctive roles and contributions related to recreational settings, opportunities, and access in the plan area. Also, consider information about public preferences or demand for recreational opportunities in the broader landscape and the plan area and the compatibility of recreational uses. The review should include consideration of information provided by the public regarding recreation opportunities and activities that may be outside the Recreation Opportunity Spectrum or the National Visitor Use Monitoring system. The information provides a starting point for integrating recreation settings, opportunities, and access with other resource values, multiple uses, ecosystems services, and designated areas.

Rvsd Plan - 00001466

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 92 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

b.  The Interdisciplinary Team should consider how sustainable recreation is related to achievement of the plan area's ecological sustainability and contribution to social and economic sustainability.  The Interdisciplinary Team should consider the compatibility of different recreational uses in specific areas within the plan area.  In addition, the Interdisciplinary Team should consider how the recreational uses will influence ecological conditions.

c.  The Interdisciplinary team should develop plan components that are within the authority of the Forest Service, inherent capability of the land and the fiscal capability of the unit (36 CFR 219.1(g)).  Consideration of fiscal capability should recognize contributions of partnerships.

Exhibit 01 describes how sustainable recreation contributes and is related to achieving each aspect of sustainability, and provides examples of how plan components could be developed to address this.  For additional information, see FSM 2310.

Rvsd Plan - 00001467

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 93 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.23a - Exhibit 01

### Recreation's Contribution to Sustainability

| Type of Sustainability | Role of Sustainable Recreation | Examples of Plan Component Development |
|---|---|---|
| Ecological sustainability refers to the capability of ecosystems to maintain ecological integrity (36 CFR 219.19). | The health and resiliency of a unit's natural resources are critical to the sustained delivery of nature-based recreation settings and opportunities. As such, the delineation of desired recreation settings and opportunities must be compatible with the landscape's ability to support the associated types of activities, use levels, access, and infrastructure. | Desired motorized recreation opportunity spectrum (ROS) classes are located on landscapes where the topography, geology, soils, can support motorized use and the associated roads and motorized trails.  Although the designation of specific travel routes is not a land management plan decision, ROS provides the framework where specific recreational opportunities, activities and expected experiences are integrated to ensure compatibility with the landscape's natural and cultural resource values. |
| | | In addition to identifying desired ROS classes, plan components may limit the authorization of recreation activities that have been identified as a stressor to the ecological system. Plan components can also be designed that will lead to subsequent actions to limit or place constraints on recreation activities identified as a stressor.  Examples of recreation as a stressor include dispersed camping in riparian areas, snowmobiling elk winter range, or recreation in bear country. See section 21.8, exhibit 01 of this Handbook for a discussion of public use prohibitions. |

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 94 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.23a - Exhibit 01--Continued

| Type of Sustainability | Relationship to Sustainable Recreation | Example of Plan Component Development |
|---|---|---|
| Social sustainability refers to the capability of society to support the network of relationships, traditions, culture, and activities that connect people to the land and to one another, and support vibrant communities. (36 CFR291.19) | Recreation is an important means for people to connect with nature; pursue adventure; socialize; and/or realize personal goals of self-discovery, stress relief, or self-reliance. Social benefits include improving the quality of life for individuals and communities and the many health benefits associated with engaging in outdoor activities | Plan components can provide for a range of recreation settings, opportunities, and places, or to accomplish management goals such as visitor safety or minimizing conflicts between various uses. Other plan content specific to sustainable recreation may describe management approaches for: social engagement through the integration of community and regional recreation programs; greater connection of the plan area to local communities, youth and underserved populations; responding to the needs of visitors; creating connections between people and nature; promoting long-term physical and mental health; and instilling a culture of stewardship and appreciation. |

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 95 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.23a - Exhibit 01--Continued

| Type of Sustainability | Relationship to Sustainable Recreation | Example of Plan Component Development |
|---|---|---|
| Economic sustainability refers to the capability of society to produce and consume or otherwise benefit from goods and services including contributions to jobs and market and nonmarket benefits (36 CFR 219.19). | Recreation and tourism is often an important component of local and regional economies.  Outfitter-guides, ski areas, or other recreation special uses contribute to both creating jobs and providing a stream of revenue to regional and/or local markets. | Plan components may identify certain types of recreation opportunities for specific areas within the plan area.  This can include management areas for winter sports complexes, equestrian use, or interpretative sites and campgrounds.  It can also include identifying areas as suitable for certain types of dispersed recreation activities such as equestrian use, mountain biking or river rafting.  Plan components may identify general changes to the desired recreation infrastructure such as campgrounds and trails (see sec. 23.23l of this Handbook) that bridge gaps between desired recreational outcomes and available resources.  Other plan components and other plan content can be developed to highlight, maintain, or enhance certain recreation settings or opportunities that support economic contributions from recreation in the plan area, the area of influence and the broader landscape. |

Rvsd Plan - 00001470

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 96 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

d. The Interdisciplinary Team uses the recreation opportunity spectrum to define recreation settings and categorize them into the six distinct classes as the structure to describe recreational settings. At the forest scale, sustainable recreation is derived through the integrated planning process and emerges as the resultant set of desired recreation opportunity spectrum classes. Each setting provides opportunities to engage in activities (motorized, nonmotorized, developed, or dispersed on land, water, and in the air) that result in different experiences and outcomes.

(1) The Interdisciplinary Team may create desired recreation opportunity spectrum subclasses. For example, the subclass "roaded modified" was first defined in the Pacific Northwest to distinguish those settings significantly altered by past timber harvest from other roaded natural settings. The Interdisciplinary Team may also create desired recreation opportunity spectrum classes to reflect seasonal variations. Desired winter recreation opportunity spectrum classes can be developed to depict changes in the location, mix and distribution of setting attributes, access, and associated opportunities (both motorized and nonmotorized). In doing so, distinct seasonal changes in the recreation settings and opportunities can be integrated with other seasonally relevant multiple uses, resource values and management objectives, such as protecting crucial winter range, providing access to key winter destinations, or limiting access to avalanche prone areas.

(2) The interdisciplinary team is encouraged to use new approaches for managing recreation within the plan area. The interdisciplinary team should be proactive in developing a coherent system of sustainable and socially compatible recreation opportunities.

2. The plan must include plan components, including standards or guidelines, to provide for sustainable recreation integrated with other plan components as described in 23.21a. To meet this requirement the plan:

a. Must include desired conditions for sustainable recreation using mapped desired recreation opportunity spectrum classes. This mapping may be based on management areas, geographic areas, designated areas, independent overlay mapping, or any combination of these approaches. Desired recreation opportunity spectrum classes may be different from existing classes. The set of desired recreation opportunity spectrum classes is the result of an integrated planning process in which recreation contributes to social, economic, and ecological sustainability. Desired recreation settings and opportunities may complement surrounding land uses and may vary by season.

b. May include additional plan components to supplement and complement achieving desired recreation opportunity spectrum classes. Consider desired conditions and related plan components associated with other multiple uses, ecosystem services, and

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 97 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

ecological sustainability. These plan components should be designed within the overall structure of the land management plan to ensure full integration of sustainable recreation.

c. May include objectives where existing recreation opportunity spectrum settings for an area differ from the desired recreation opportunity spectrum for that area. Examples of such objectives are: an objective that roads be obliterated within a certain time period on lands with a desired condition of nonmotorized recreation opportunity spectrum classes; or an objective to create motorized connections between communities and adjacent forest settings within a certain time period on lands on which the desired condition includes a motorized use recreation opportunity spectrum class. Objectives may also be designed for activities to alter the condition of recreation areas, dispersed sites, infrastructure including trails, or services to achieve sustainable desired conditions for recreation in the plan area.

d. Should include suitability determinations for motorized recreation including over the snow vehicles consistent with the desired recreation opportunity spectrum class. This suitability of areas may change by season. Travel management decisions are separate, project-level decisions that determine the specific areas and routes for motorized recreation consistent with areas identified in the plan as suitable for motorized recreation use. The specific areas and routes open to motorized recreation are the result of this staged planning process (sec. 23.23l of this Handbook). Resulting opportunities for motorized recreation including over-the-snow vehicles must be consistent with Executive Order 11644. Suitability or other plan components cannot prohibit public recreational use without additional process (sec. 21.8 of this Handbook).

e. May include suitability of lands for various types of mechanized, and nonmotorized recreation opportunities that are appropriate within each of the desired recreation opportunity spectrum settings.

f. May include suitability determinations for types of recreational facilities, access, infrastructure, and special uses that are appropriate within each of the desired recreation opportunity spectrum settings.

g. Should include specific standards or guidelines where restrictions are needed to ensure the achievement or movement toward the desired recreation opportunity spectrum classes. Standards or guidelines can also apply to specific desired recreation opportunity spectrum settings, specific recreation opportunities, trails, developed recreation, interpretive and educational opportunities, dispersed recreation, special uses, or other recreation activities.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 98 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

h. May also include discrete plan components for specific recreation opportunity spectrum classes, identified management areas, geographic areas, designated areas, or other identified places within the plan area. Examples of specific areas that may need additional plan components can include landscapes that exhibit unique geological formations, water features, or scenic qualities; contain cultural features or landscapes that are significant to an area's heritage and identity; or possess unique recreation destinations, activities, or services that are important to the area's tourism industry.

The Planning Rule requires that the development of plan components must take into account opportunities to connect people with nature (§ 219.8(b)(6) and (§219.10(a)(10)).

The Interdisciplinary Team should evaluate information from the assessment, the need for change, and distinctive roles and contributions as a starting point to determine how the plan can provide opportunities to connect people with nature. Plan components such as those that provide recreational opportunities are one important way to accomplish connecting people with nature.

The plan could include management approaches or other plan content that describe ways to better connect youth or underserved populations to recreation opportunities, to provide quality information to a diverse set of visitors to understand where to go for the recreation experience they are seeking, to address visitor safety through education and management actions, to enhance visitors' understanding of their natural and cultural environments, and to provide opportunities for people to develop a sense of stewardship and appreciation of the plan area. Environmental study areas or visitor centers may be identified specifically to provide educational opportunities for local schools or the public.

### 23.23b – Fish, Wildlife, and Plants

The Planning Rule (§ 219.10(a)) requires that a plan include plan components including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple use [including wildlife and fish].

When developing plan components, the Responsible Official shall take into account plants, wildlife and fish, and related uses, that contribute to local, regional, and national economies in a sustainable manner (§ 219.8(b)(3)) and consider fish and wildlife species and habitat and habitat connectivity (§ 219.10 (a)(1)). Other required considerations in the development of plan components include:

> **Habitat conditions, subject to the requirements of §219.9, for wildlife, fish and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence and other activities (in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies and State and local governments).** (§ 219.10(a)(5)).

Rvsd Plan - 00001473

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 99 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

When developing plan components:

    1. The Interdisciplinary Team should identify the contribution of fish, wildlife, plant species, and related uses, to economic and social sustainability. The assessment provides information on the species of fish, wildlife, and plants that are commonly used or enjoyed by the public, the conditions and trends associated with these species, and the contribution of the use and enjoyment of these species to social and economic sustainability (see FSH 1909.12, ch. 10, sec. 13.35). Plan components related to ecological sustainability (section 23.1 of this Handbook) and species diversity (section 23.13 of this Handbook) also contribute to social and economic sustainability. In addition to this contribution, the Interdisciplinary Team should examine if other plan components can further improve the conditions of fish, wildlife, and plants that are commonly used or enjoyed by the public.

    2. The Responsible Official should work with relevant governmental entities, including federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments and the public to design plan components for habitat conditions and sustainable recreation opportunities that provide for the use and enjoyment of fish, wildlife, and plants. Plan components for ecological sustainability, habitat connectivity, species diversity (see sec 23.1 and 23.13 of this Handbook on species at risk), and recreation may also contribute to the use and enjoyment of fish, wildlife, and plants.

The Responsible Official may provide for public use and enjoyment of fish, wildlife, and plant species with desired conditions that describe the ecological conditions for the species desired by the public and how the public can enjoy these species. Desired conditions may highlight different species or different ways to enjoy the species for specific land areas of the plan area. Other plan components would be designed to support achieving this desired condition.

### 23.23c – Watersheds and Water Resources

The Planning Rule (§ 219.10(a)) requires that a plan include plan components including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple use [including watershed].

When developing plan components, the Responsible Official shall take into account watersheds that contribute to local, regional, and national economies in a sustainable manner (§ 219.8(b)(3)) and consider surface and subsurface water quality (§ 219.10(a)(1)). Other required considerations in the development of plan components include public water supplies and associated water quality (§219.10(a)(9)).

Water and watershed management may also play a role in providing for other uses, such as water-based recreation or energy. The assessment provides available information about the contributions of watersheds and water resources to the public, the conditions and trends related

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 100 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

to water use, and the contribution of water use to social and economic sustainability (FSH 1909.12, ch.10, secs.12.23 and 13.34). When developing plan components, the Interdisciplinary Team should consider the contribution of water and watersheds within the plan area to economic and social sustainability.

Guidance associated with ecological sustainability with respect to watershed, surface and subsurface water quality, and public water supplies and associated water quality is contained in 36 CFR 219.8 and section 23.12c of this Handbook. Plan components that support ecological sustainability will likely also support the social and economic sustainability contributions of water and watersheds within the plan area. The Responsible Official should consider whether additional plan components are necessary to support the values of water and watersheds, other multiple uses related to water and watersheds, water quality and public drinking water supplies and the contribution of water and watersheds to social and economic sustainability.

### 23.23d – Rangelands, Forage, and Grazing

The Planning Rule (§ 219.10(a)) requires that a plan include plan components including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple use [including range].

When developing plan components, the Responsible Official shall take into account range that contributes to local, regional, and national economies in a sustainable manner (§ 219.8(b)(3)) and consider forage, grazing, and rangelands ((§ 219.10 (a)(1).

To the extent practicable for a land management plan, the Responsible Official should coordinate with State fish and game agencies to balance State population objectives for game species with plan components related to domestic livestock grazing.

    1. When developing components, the Interdisciplinary Team should:

        a. Review the assessment for information about conditions and trends of rangelands, transitory range, and other grazing lands, sustainability of the ecological conditions that support grazing of livestock, the impacts of grazing on ecological integrity and species diversity, and the contribution of livestock grazing to sustainability (FSH 1909.12, ch. 10, sec. 13.32). The assessment may also have information linking the contributions of grazing in the plan area to social, cultural, and economic conditions of communities in the area of influence and the broader landscape.

        b. Consider the conditions, trends, and stressors, that affect the ability of the plan area to sustain native ungulates, other species, and domestic livestock that depend on the forage produced in the plan area, consistent with meeting requirements for ecological integrity and species diversity described in section 23.1 of this Handbook.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 101 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

c. Recognize important contributions grazing in the plan area may provide to sustain native people and communities dependent on such grazing opportunities. Public engagement strategies should include the participation of native stock raising communities where applicable, in the development of plan components affecting grazing of livestock.

d. Consider current range management (FSM 2200) of existing allotments in the development of plan components that apply to the allotments within the plan area.

e. Recognize potential adverse interactions between domestic livestock and native species and provide appropriate plan components to avoid or mitigate these risks.

f. Consider wild horse-burro territories present in the plan area and management for wild horses and burros in the development of plan components that apply to these territories (sec. 24 of this Handbook).

2. The plan must include plan components, including standards or guidelines, to provide for integrated resource management to provide for ecosystem services and multiple use integrated with other plan components as described in 23.21a. To meet this requirement the plan may include:

a. Desired conditions for rangelands, transitory range, and other grazing lands that describe the type, level, and general location of grazing anticipated in the plan area while considering the sustainability of this contribution to the social, cultural, and economic conditions affecting communities in the area(s) of influence and the broader landscape.

b. Objectives that identify expected progress for indicators of rangeland health or other intended achievements such as acres or number of range improvements and accommodations for native species.

c. Suitability determinations to indicate management areas or other areas where livestock grazing or wild horse and burro management is or is not suitable, depending on physical and ecological considerations and the desired conditions for the areas.

d. Standards or guidelines, such as seasonal closures or restrictions based on forage condition, to maintain the ecological sustainability and the sustainability of forage for grazing.

e. Other plan content to describe the approach to range management to provide for rangeland health, restoration, and grazing opportunities for domestic livestock.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 102 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Design plan components to accommodate the range of site-specific needs of individual areas, species, allotments, and plant communities. Allotment management plans for livestock, and territory management plans for wild horse and burro populations provide specific operational guidance and are the most appropriate planning level to carry out management tools such as minimum stubble height, multiple-year mean utilization, or streambank alteration limitations.

The appropriate management level for wild horse and burro populations is established in the territory management plan. When a plan is developed, amended, or revised, allotment management plans and wild horse and burro territory plans should be evaluated for consistency with the new plan, as required by 36 CFR 219.15(a).

### 23.23e – Timber and Vegetation

The Planning Rule (§ 219.10(a)) requires that a plan include plan components including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple use [including timber].

When developing plan components, the Responsible Official shall take into account timber that contributes to local, regional, and national economies in a sustainable manner (§ 219.8(b)(3)) and consider vegetation (§ 219.10 (a)(1)).

Management of forest vegetation for ecological sustainability, species diversity, and social and economic sustainability is a major focus of planning.

1. When developing plan components, the Interdisciplinary Team should:

   a. Review the assessment for information about the current condition of forests, potential contributions of timber harvest and other wood product activity, to social, economic, and ecological sustainability (FSH 1909.12, ch. 10, sec. 13.33). Timber harvest may also be a stressor to ecosystems and an influence on species diversity that needs to be considered consistent with guidance in section 23.1 of this Handbook.

   b. Evaluate ecological processes and stressors with and without active timber harvest. This step is often a central part of the planning process. This evaluation may be supported with GIS information and analysis models that explore different harvest methods and schedules that lead to different desired mixes of plant communities and seral stages. This evaluation may include timber harvests that result in timber sold that can contribute to mills or other businesses in support of local economies. Different desired conditions for vegetation and different approaches in terms of land area available for harvest, harvest methods, and harvest schedules may be examined in the planning process.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 103 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

c. Identify the role of timber harvest within the plan area to maintain and restore desired vegetation conditions for ecological sustainability and species diversity along with the contribution of timber and other wood products and services to economic and social sustainability. This role can include how timber harvest can contribute to creating the desired fire regime condition class or other vegetative conditions (sec. 23.11c of this Handbook). Specific guidance for complying with the Planning Rule requirements that are based on the NFMA timber provisions are described in FSH 1909.12, ch. 60.

2. The plan must include plan components, including standards or guidelines, integrated with other plan components to provide for integrated resource management to provide for ecosystem services and multiple use integrated with other plan components as described in 23.21a. To meet this requirement the plan may include:

a. Desired conditions that describe the mix of specific vegetation conditions such as plant communities, seral stages or fire regime condition class. Desired conditions can also describe the desired nature of timber management.

b. Objectives that describe intended achievement of certain desired vegetative conditions such as seral stages where timber harvest is a way to achieve the objective. Objectives may also identify planned timber harvest activity by acres of vegetation management projects, projected wood sale quantity, or projected timber sale quantity (see FSH 1909.12, ch. 60, secs. 64.62 and 65.1). Consider including timber management objectives to maintain, improve, or restore wildlife habitat for species that are commonly hunted or otherwise enjoyed by the public. Objectives may also include timber harvest to restore conditions in the near term for lands where continued timber harvest or production is not compatible with desired conditions.

c. Suitability, standards, and guidelines as needed so that timber harvest activities are compatible with desired conditions and objectives for other resources including ecological integrity and species diversity. Chapter 60 includes specific guidance on suitability of lands for timber production and required plan components related to timber.

d. Other plan content that discusses the general management approach intended for timber management or partnership strategies to improve markets for plan area timber. Chapter 60 includes specific guidance on required display of the timber program.

### 23.23f – Scenery, Aesthetic Values, Viewsheds, and Geologic Features

The Planning Rule requires that the plan must include plan components, including standards or guidelines, to provide for scenic character (§ 219.10(b)(1)(i)).

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 223 of 251

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 104 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

When developing plan components, the Responsible Official shall take into account scenic character (§ 219.8(b)(2)) and consider aesthetic values, geologic features, scenery, and viewsheds (§ 219.10 (a)(1)).

The scenery management system (SMS) is the framework for developing plan components related to scenic character, unless an exception is established per FSM 1921.03. This framework for scenery management is described in Landscape Aesthetics - A Handbook for Scenery Management (Agriculture Handbook 701). Note that the term "scenic character" replaces the term "landscape character" as defined in Chapter I of this Handbook. In addition to this Handbook, FSM 2380 contains additional information on the Scenery Management System.

Viewsheds are specific elements to be considered when developing plan components within the scenery management system, because they describe areas seen from certain view locations such as roads, trails, or campgrounds. Constituent information (such as public preferences) is used to identify desired attributes of scenic character, critical viewsheds, and concern levels of the plan area in the context of the surrounding lands. The review of assessment information should include consideration of other information provided by the public regarding scenery that is not covered in the Scenery Management System. The assessment information, along with ecological considerations, should result in scenery-related plan components that compliment a visual transition from local communities, that is compatible with desired recreation settings and opportunities, and reflect healthy, resilient landscapes.

1. When developing plan components, the Interdisciplinary Team should:

   a. Review information from the assessment that includes the evaluation of existing, trending, and potential scenic character of the plan area and relevant stressors affecting scenery. Information identified in the assessment, the need for change, and the unit's distinctive roles and contributions provide a starting point for integrating scenery with ecological integrity, species diversity, multiple uses, ecosystem services, and designated areas. The scenic character of the plan area, or a portion of the plan area, may be identified as unique or distinct when viewed within a broader landscape.

   b. Consider including in the plan components the concepts of scenic integrity, stability, and sustainability at multiple scales (for example, unit-wide, by geographic area, by management area, by recreation opportunity spectrum setting, by corridor, by viewshed, by geologic or historic feature, or by place association).

   c. Consider developing plan components for aesthetics in the design, construction, and maintenance of infrastructure, facilities or other specific projects or activities that may be proposed under the plan. The Built Environment Guide ("The Built Environment Image Guide for the National Forests and Grasslands" United States

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 105 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

Department of Agriculture, Forest Service, FS-210, September 2001) can be used or referenced to develop applicable plan components that create, maintain, or enhance constructed features and infrastructure to blend with the cultural and biophysical setting.

d. Integrate maintaining or restoring scenic character with the plan components of other resources, multiple uses and ecosystem services so that they function collectively in achieving ecological, social and economic sustainability.

2. The plan must include plan components including standards or guidelines to provide for scenic character integrated with other plan components as described in 23.21a. To meet this requirement the plan:

a. Must include a description of desired scenic character based on the scenery management system, unless an exception is established pursuant to FSM 1921.03. Desired scenic character may be different from existing or potential scenic character identified in the assessment. Depending on the biophysical and cultural attributes of the plan area's landscape, there may be multiple desired scenic character descriptions associated with specific areas.

(1) Desired conditions describing scenic character should include scenic integrity objectives that describe the degree to which desired attributes of the scenic character are to remain. Scenic integrity objectives should be assigned throughout the plan area. (Note that scenery integrity objectives are not the same as plan component "objectives" under the Planning Rule).

(2) Desired conditions may also describe scenic stability, sustainability, and other measures used in scenery management system. Desired conditions may include maps, graphics, photographs, or visual simulations that give a visual representation of desired scenic character and associated scenic integrity objectives.

b. Should contain standards or guidelines as needed to avoid or mitigate undesirable effects incompatible with desired scenery conditions. Standards or guidelines can also apply to specific scenic integrity objectives, management areas, geographic areas, designated areas or other identified special areas or places. Standards and guidelines can be applied at multiple scales to specific management activities such as timber harvest, utility corridors, trail construction, facility development, or road construction.

Unique geologic features must also be considered in the planning process. These features are often unique scenic attractions and would likely be recognized in the scenery management system. In some situations, plan components may be developed to either protect or interpret geologic features within a management, geographic or designated area or for a landscape or place.

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 106 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 23.23g – Cultural and Historic Resources

The Planning Rule requires that the plan must include plan components, including standards or guidelines, for protection of cultural and historic resources (§ 219.10(b)(1)(ii)).

When developing plan components, the Responsible Official shall take into account cultural and historic resources and uses (§ 219.8(b)(5)) and consider cultural and heritage resources (§ 219.10 (a)(1)).

1. When developing plan components:

    a. The Interdisciplinary Team should review information from the assessment about the cultural and historical context of the plan area, the cultural and historical resources and uses present in the plan area, the condition and trends affecting these resources, and how these resources help sustain specific cultural communities and contribute to social and economic sustainability (FSH 1909.12, ch. 10, sec. 13.8).  A cultural resource overview or a Heritage Program Plan may also have useful information.  The Forest Service also uses the term "cultural resources and heritage assets" to describe cultural and heritage resources.  See section 21.3 of this Handbook for more detail on priority heritage assets.

    b. The Interdisciplinary Team shall develop appropriate plan components for the protection of cultural and historic resources while considering the following:

    (1)  What plan components are needed to protect currently identified historic properties, identified but unevaluated cultural resources, and the cultural resources that may be discovered and evaluated during project planning.  These plan components may apply unit-wide.  See FSH 2309.12, chapter 30 for more detail on the evaluation of cultural and historic resources and uses.

    (2)  Whether unique plan components are needed for situations where cultural or historical resources and uses may be of specially recognized value.  Priority Heritage Assets are an example of cultural or historic resources that may be of such recognized value.

    (3)  Whether plan components that provide for scenic character is in accord with the requirements of the National Historic Preservation Act (NHPA) (Title 16, United States Code, section 470 et seq.), where historic properties derive their integrity from their setting (scenery and viewshed).  See section 23.23f of this Handbook for information about the Scenery Management System that describes scenic character in the land management plan.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 107 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

c.  The Responsible Official shall consult with appropriate entities according to section 106 of the NHPA (16 U.S.C. 470) or programmatic agreements established under the NHPA.  The consultation may include consultation with State Historic Preservation Officers, Tribal Historic Preservation Officer(s), federally recognized Indian Tribes and Alaska Native Corporations, and the Advisory Council on Historic Preservation.  FSM 2361.2 contains detailed direction for section 106 of the NHPA.

2.  The plan must include plan components including standards or guidelines for protection of cultural and historic resources integrated with other plan components as described in 23.21a.  To meet this requirement the plan may include:

a.  Desired conditions describing the cultural or historic resources in the plan area. For interpretive areas, priority heritage assets, or cultural landscapes, a special set of desired conditions may be appropriate for the protection, management, and use of the resource.

b.  Standards or guidelines appropriate for the protection, management, and use of historic properties and cultural resources, as well as appropriate treatment for known but unevaluated cultural resources, or undiscovered cultural resources.  Standards or guidelines may distinguish between these situations.  Standards or guidelines may be designed specifically for prcjects and activities to avoid unintentional damage or destruction to cultural resources.  Use of federally recognized best management practices may greatly assist with developing plan components for managing cultural resources or heritage assets that overlap with lands managed by other Federal agencies.

c.  Management, geographic, or designated areas (sec. 22.2 and 24 of this Handbook) with unique plan components, depending on the primary value of the resource (cultural, traditional, scientific, interpretative, or continued use).  A geographic area may be used to identify a cultural landscape.  In other situations, especially those of active cultural use, traditional cultural properties or sacred sites (sec 23.23h of this Handbook), the Responsible Official shall not disclose (if restricted by 25 U.S.C. 3056), or may choose to not to disclose, any locational information in the plan to maintain confidentiality of the sites.  Confer with the Office of the General Counsel about disclosure about whether to disclose or withhold information about cultural and historic locations in the planning process.

d.  Other plan content to describe a management approach for evaluating sites for listing on the National Register of Historic Places.  Other plan content may also identify unique cultural and historic resources, cultural landscapes, national heritage areas, national monuments, national historic trails, national historic landmarks or

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 108 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

historical areas, or unique cultural or historic management or geographic areas as part of the plan's distinctive role and contribution. See section 24 of this Handbook for further discussion of national monuments, national historic trails, national historic landmarks, or historical areas that are designated areas.

## 23.23h – Areas of Tribal Importance

The Planning Rule requires that the plan must include plan components, including standards or guidelines, for management of areas of tribal importance (§ 219.10(b)(1)(iii)).

1. When developing plan components:

    a. The Interdisciplinary Team should review the assessment for information about areas of tribal importance, existing tribal rights, and the conditions and trends of these areas of tribal importance (FSH 1909.12, ch. 10, sec. 13.7).

    b. The Responsible Official shall recognize the areas of tribal importance during tribal consultation and develop appropriate plan components for management of these areas. Areas of tribal importance may not always be recognized as cultural resources, as described in section 23.23g of this Handbook. In cases where these tribally important areas are the same as, or may overlap with, cultural resources, guidance in section 23.23g of this Handbook also applies.

    c. The Responsible Official shall consult with federally-recognized Indian Tribes and Alaska Native Corporations on the development of plan components for management of areas of tribal importance (see FSH 1909.12, ch. 40, sec. 44).

    d. The Responsible Official shall develop plan components to manage lands containing Indian sacred sites in accordance with Executive Order 13007 of May 24, 1996. Provisions for the specific protection, management, or use of these areas are developed in consultation and collaboration with Indian Tribes or Alaska Native Corporations and the Responsible Official.

    e. Some Indian Tribes or Alaska Native Corporations may not want areas of tribal importance identified. The Responsible Official shall not disclose (if restricted by 25 U.S.C. 3056) or may choose to not to disclose, any locational information in the plan to maintain confidentiality of the areas of tribal importance. Sacred sites identified by federally recognized Indian Tribes or Alaska Native Corporations during consultation with the Responsible Official can be treated as confidential by the Agency consistent with 25 U.S.C. 3056 and Executive Order 13007.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 109 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

2.  The plan must include plan components including standards or guidelines for management of areas of tribal importance integrated with other plan components as described in 23.21a.  To meet this requirement the plan may include:

a.  Desired conditions that clearly recognize Indian Tribe and Alaska Native Corporations' concerns associated with areas of tribal importance and access to these areas even if the locations of the areas are not identified.  These desired conditions may include providing for traditional uses of the plan area by Indian Tribes and Alaska Native Corporations.

b.  Standards, guidelines, or suitable uses to place limits or conditions on projects or activities that may adversely affect areas of tribal importance.

c.  Other plan content to describe an ongoing collaborative strategy with specific Indian Tribes or Alaska Native Corporations as partners in the accomplishment of the objectives.

### 23.23i – Mineral and Nonrenewable Energy Resources

The Planning Rule requires that in the development of plan components, including standards or guidelines, the Responsible Official shall consider renewable and nonrenewable energy and mineral resources (§ 219.10(a)(2)).  Section 23.23k of this Handbook discusses renewable energy resources.

In consideration of these resources, the Responsible Official must be aware of the various authorities that govern the Agency's mineral and nonrenewable energy management and determine what decisions will be made in the plan, concurrently with the plan, or that may occur subsequent to the plan decision.  Applicable law and Federal regulations that define Agency jurisdiction over mineral and nonrenewable energy management include:

Coal resource management (43 CFR part 3420),

Geothermal resource leasing (43 CFR part 3201),

Solid leasable minerals other than coal and oil shale (43 CFR 3501.17),

Oil shale (43 CFR 3900.5),

Tar sands (43 CFR 3140),

Locatable minerals (36 CFR part 228, subpart A),

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 110 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Disposal of mineral materials (36 CFR part 228, subpart C), and

Oil and gas (36 CFR part 228, subpart E, section 228.102(c) and 43 CFR 3100)

Depending on the specific mineral and applicable laws and regulations, the Forest Service may identify lands in the Federal estate that may or may not be suitable or available for mineral and nonrenewable energy development. The Forest Service manages surface use for the exploration and development of minerals and nonrenewable energy resources on National Forest System lands. In the land management plan, plan components applicable to mineral and nonrenewable energy development must be within Forest Service authority consistent with applicable laws and regulations, including the requirements of the Planning Rule.

Responsible Officials should evaluate the impacts of past, current, and potential mineral development and activity in the plan area and the relationship between the plan components and these impacts in the future; recognizing that current practices can avoid some impacts associated with past development. The plan should identify the existing or potential contributions and impacts of mineral and nonrenewable energy activity expected to occur within the plan area, even if the activity is outside of Agency authority.

In developing an integrated set of plan components, the Responsible Official should include plan components to guide the development of mineral and nonrenewable resources where applicable in the plan area and where the Responsible Official has the authority to do so as part of the land management planning process. The Responsible Official should also consider whether separate decisions regarding the Federal mineral estate would be appropriate or necessary for effective land management. Such decisions include those that can be made concurrently as part of the plan development, revision, or amendment or those recommended for a later time. Include the rationale for such decisions in the plan decision document.

1. When developing plan components for nonrenewable energy and mineral resources: The Interdisciplinary Team should review the assessment (FSH 1909.12, ch. 10 sec. 13.5) for information about the current level, potential, and trends in, mineral and nonrenewable energy activity in the plan area.

2. Plan components related to nonrenewable energy and mineral resources must be in accord with Agency jurisdiction, applicable law, and Federal regulations. The extent of Forest Service authority and responsibility for management of the Federal mineral estate varies depending on the mineral resource involved. Specific authorities applicable to nonrenewable energy or mineral resources that are relevant to the plan area should be reviewed prior to developing any applicable plan components.

3. Plan components must recognize valid existing or statutory rights, such as reserved, outstanding or private mineral rights (sec. 23.23m of this Handbook) or the reasonable right of access to lands open to mineral entry under the general mining laws (30 U.S.C. 22 et seq.).

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 111 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

4.  Plan components related to nonrenewable energy and mineral resources must be consistent with the requirements of the Planning Rule, including those for sustainability (§ 219.8), diversity of plant and animal communities (§ 219.9), and multiple use (§ 219.10).  When developing plan components the Interdisciplinary Team should consider the following:

a.  Whether plan components to guide nonrenewable or mineral resource development are necessary to achieve other desired conditions or objectives related to sustainability, diversity of plant and animal communities, and multiple use.

b.  The Forest Service has sole discretion over the management of mineral materials or saleable minerals as described 36 CFR part 228, subpart C.  The Forest Service also has sole discretion over making lands available for oil and gas leasing, subject to valid existing rights as described in 30 U.S.C. 226(h).

c.  For plan areas where lands were identified in the plan assessment to have coal development potential, the land use planning requirements of 43 CFR 3420.1-4 (b)(1)–(4) must be followed.  The plan must identify areas that are acceptable for further consideration for coal leasing according to procedures at 43 CFR 3420.1-4(e), which include reviewing the identified lands to assess where there are areas unsuitable for all or certain stipulated methods of mining per the criteria contained in 43 CFR 3461.  The plan must also contain an estimate of the amount of coal recoverable by either surface or underground methods or both (43 CFR 3420.1-4(d)).

d.  For plan areas with oil and gas resources, the availability of lands for leasing may be determined in conjunction with the planning process (36 CFR 228, Subpart E, 228.102).

The Forest Service decision regarding which lands are available for oil and gas leasing is supported through preparation of a leasing availability analysis.  A leasing analysis may be for all or portions of a plan area.  The difference in scope, proposed action, and level of detail between a planning effort and a leasing analysis must be made clear should a single NEPA analysis document be used to support both the plan and oil and gas leasing availability decisions.

For National Forest System plan areas for which oil and gas leasing availability decisions have already been made, the Responsible Official shall review those availability decisions to determine if the previous decision is consistent with the plan components of the newly amended or revised land management plan.  If the leasing availability decision is not consistent with the plan, it must be made consistent with the land management plan (36 CFR 219.15) or the plan decision document must expressly allow the availability decision to proceed unchanged (36 CFR 219.15(a); and sec. 21.41 of this Handbook).

Rvsd Plan - 00001486

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 112 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

The Forest Service may not authorize a BLM leasing decision that is inconsistent with the land management plan decision, and the BLM may not issue any lease on National Forest System lands without the authorization of the Forest Service.

e. For plan areas that expect substantial new mineral or nonrenewable energy development, a projection of potential activity or a reasonably foreseeable development scenario in the case of oil and gas development may be needed not only to estimate the contributions of the mineral resource, but also the influence of this development on other resources. Such a projection or development scenario should be done with the BLM and is part of the environmental impact analysis.

4. The plan may include:

a. Desired conditions that identify mineral uses likely to occur in the long term, along with the desired context for their operation. Desired conditions may describe surface resources and, as appropriate, subsurface resources such as groundwater and caves that may be affected by development of mineral resources.

b. Objectives to maintain or restore the condition of surface and subsurface resources.

c. Suitability, standards, or guidelines to identify measures, within appropriate legal authorities of the Forest Service, to minimize or avoid impacts on surface or subsurface resources or to protect purposes for which lands were acquired. Plan components for aspects of mineral development within Forest Service authority must be in accord with other plan components, including those for ecological sustainability.

d. Other plan content to briefly describe the general management principles, management challenges, and management approaches to ongoing mineral operations and likely future development. Development of mineral resources may be a distinctive role and contribution of the plan area within the broader landscape.

The environmental analysis document evaluates the potential impact of the plan decision regarding mineral and nonrenewable energy developments on the social, economic, cultural, and ecological conditions.

### 23.23j – Geologic Hazards

The assessment contains information identifying geologic hazards such as landslides, flooding or snow avalanches that may be a risk to the public or to the resources of the plan area. Based on this information the Responsible Official should consider whether the set of plan components

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 113 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

adequately recognizes these hazards and provides for appropriate mitigations. If not, the Responsible Official should direct the Interdisciplinary Team to add plan components to address these geologic hazards.

The desired conditions of the plan can describe certain geologically hazardous areas to be avoided or mitigated. There may be plan objectives to modify infrastructure or manage certain lands to reduce risks associated with these areas. Suitability, standards, or guidelines may prescribe certain restrictions on uses, projects, or activities in or near these geologically hazardous areas.

### 23.23k – Renewable Energy

The Planning Rule requires that in the development of plan components, including standards or guidelines, the Responsible Official shall consider renewable energy resources (§219.10(a)(2)) and appropriate placement and sustainable management of infrastructure such as utility corridors (§219.10(a)(3)).

National forests and grasslands are capable of producing energy through a variety of methods. Many energy sources such as wind, solar, biomass, and hydroelectric can be considered renewable as these forms are capable of producing energy without depleting the source of the energy. The extraction of fossil fuels (oil, natural gas, and coal) and geothermal energy is described in section 23.23i of this Handbook on leasable minerals. Energy developed on or off National Forest System lands often requires infrastructure to transfer electric power or fossil fuels through transmission corridors between producers and consumers.

1. When developing plan components:

   a. The Interdisciplinary Team should review the assessment for information about the current and future potential energy developments their potential contributions and impacts in and around the plan area (FSH 1909.12, ch. 10, sec. 13.5).

   b. The Interdisciplinary Team should consider existing facilities and potential for generation and transmission of energy from or across National Forest System lands.

   c. The Responsible Official should engage with other Federal agencies, such as the FERC, BLM, USACE, or State or local government agencies that may have jurisdiction of certain types of energy facilities in the plan area. The BLM is the lead Federal agency for permitting interagency pipelines. Additional laws and regulations may apply to these types of energy developments. Appropriate engagement with these agencies and interests and recognition of applicable laws and regulations must be part of the planning process.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 114 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

d. The Interdisciplinary Team should consider how and whether the land management plan may provide for renewable energy, such as solar, wind, biomass and hydroelectric energy sites. The team should evaluate lands that are most suitable for these uses and avoid lands that are sensitive, legally restricted from such development or committed to other uses where such energy development would not be desirable. The evaluation of lands should consider how and whether the plan area can contribute to providing renewable energy while simultaneously providing for other desired conditions and objectives of the plan area. The Interdisciplinary Team should develop appropriate plan components that establish this framework for future renewable energy development, while avoiding or mitigating related adverse impacts.

2. The plan may include:

a. Desired conditions that identify long-term energy developments, uses of resources such as biomass for energy, or transmission corridors and the desired context for their operation.

b. Objectives that identify measureable outcomes or intended achievements related to energy resource management, such as improving the condition of infrastructure developments, providing a supply of material for energy generation such as fuelwood, biomass or mitigation outcomes related to energy developments, such as modification of fish passage at dams.

c. Suitable use areas or areas not suitable for certain types of energy developments or resource use in accordance with the appropriate legal authorities and land capability.

d. Standards or guidelines to identify restrictions on certain practices related to the use, development, or transmission of energy within the plan area, within appropriate legal authorities of the Forest Service.

e. Provision of energy or transmission of energy across the plan area as a distinct role and contribution of the plan area.

The environmental analysis document evaluates the potential impact of the plan's decision regarding energy developments on the social, economic, cultural, and ecological conditions within and near the plan area.

### 23.23l – Infrastructure, Roads and Trails

The Planning Rule requires that the development of plan components must consider trails (§ 219.10 (a)(1)) and appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors (§ 219.10 (a)(3)).

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 115 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Infrastructure includes road systems, trail systems, recreational facilities, administrative facilities, airstrips, and other facilities needed in and near the plan area. The central consideration in land management planning for infrastructure is that the integrated desired conditions and other plan components set a framework for the sustainable management of the plan area's infrastructure and mitigation of adverse impacts.

Most design related to infrastructure occurs at the project or site level with a specificity that is not appropriate for a land management plan. For example, the design and construction, or reconstruction, of an individual trail segment is a project-specific decision, as is the siting and design of a recreational facility. Travel management analysis is a separate process outside of land management planning to determine which roads are to be maintained for public use consistent with the land management plan.

1. When developing plan components, the Interdisciplinary Team should:

    a. Review the assessment for information about the current infrastructure (FSH 1909.12, ch. 10, sec. 13.6). Based on information from the assessment and subsequent public involvement, the Interdisciplinary Team can determine how well the current infrastructure supports or contributes to social, economic, or ecological sustainability and what plan components are needed to deal with infrastructure.

    b. Develop plan components to reflect the extent of infrastructure that is needed to achieve the desired conditions and objectives of the plan. The plan should provide for a realistic desired infrastructure that is sustainable and can be managed in accord with other plan components including those for ecological sustainability.

    c. These plan components must be within the fiscal capability of the planning unit and its partners, consistent with the authority of the Forest Service, and the inherent capability of the plan area.

2. Related to roads, the plan:

    a. Should include desired condition for the road system based on the desired uses for the plan area and management or geographic areas. The desired condition should identify the road system that provides primary access to and within the plan area and describe the general desired use and condition of other roads. This may vary depending on the management area, geographic area, or other areas within the plan area. Desired recreational settings and opportunities (sec. 23.23a of this Handbook) related to the public's recreational use and need for roads are important factors influencing the use and sustainability of roads. Other uses such as grazing, timber

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 116 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

harvest, mineral and energy development, and administrative uses also determine needs for the road system. The plan's desired condition should describe a basic framework for an appropriately sized and sustainable transportation system that can meet these needs. The desired condition may also describe the desired road density for different management areas, geographic areas or other areas in the plan area.

b. May include other plan components for the road system based on the desired conditions:

(1) Objectives such as decommissioning roads in areas where existing roads are no longer desired or improving roads in areas where the road system needs improvement, such as replacing culverts or stabilizing certain types of roads.

(2) Suitability determinations to identify what types of roads are suitable or not suitable for certain management areas and geographic areas.

(3) Standards or guidelines for road management that may restrict road management activities, such as road construction, in certain situations, for example, to protect riparian zones or sensitive scenic areas.

3. Related to recreational trails, the plan:

a. Should include desired conditions for recreational trails. The desired condition of the recreational settings and opportunities should lead to plan components aligned with the desired recreational settings and opportunities of the plan (sec. 23.23a of this Handbook). The desired condition(s) for trails may include an overall design of the trail system that enhances compatible uses and manages user conflicts for the plan area. The desired condition may describe nationally designated trails (sec. 24.43 of this Handbook) and distribution and types of trails for various uses such as hiking, off-road vehicles, mountain bikes, equestrian use, or winter uses such as skiing or snowmobiling.

b. May include objectives to identify intended outcomes or achievements for trail construction or maintenance, such as trail construction or reconstruction to avoid user conflicts on trails or impacts to important environmental areas such as rattlesnake dens.

c. May identify the types of trails and recreational use that are suitable or not suitable in a management or geographic area; these should be aligned with the desired recreational settings and opportunities (sec. 23.23a of this Handbook). While the plan does not determine the use for each specific trail, it does establish desired conditions and other plan components that indicate what types of trails are appropriate within different parts of the plan area.

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 117 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

4.  The plan may include the following related to other types of infrastructure such as trails for nonrecreational use, facilities for recreational visitors, airstrips, and utility corridors.

a.  Desired condition for other infrastructure appropriate for the plan area, or specific management or geographic areas.

b.  Objectives to indicate intended progress toward achieving the desired conditions.

c.  Suitability components to identify the kinds of infrastructure that are suitable in certain areas, and

d.  Standards or guidelines related to infrastructure development or management.

Other resource plans specifically designed for management of infrastructure, such as travel management plans, must be consistent with the plan components of the land management plan (36 CFR 219.15(e)).  The Responsible Official shall review any existing travel management plans to determine if the previous decision is consistent with the plan components of the newly amended or revised land management plan.  If the travel management plan is not consistent with the plan, it must be made consistent with the land management plan (36 CFR 219.15) or the plan decision document must expressly allow the travel management decision to proceed unchanged (sec. 21.41 of this Handbook).

The environmental analysis document evaluates the potential impact of the plan's decision regarding infrastructure on the social, economic, cultural, and ecologic conditions within and near the plan area.

### 23.23m – Land Status, Ownership, Use, Access and Linkage of Open Space with Other Ownerships

The Planning Rule requires that the development of plan components must consider habitat and habitat connectivity (§ 219.10 (a)(1)) and:

> **(4) Opportunities to coordinate with neighboring landowners to link open spaces and take into account joint management objectives where feasible and appropriate.**
> \*\*\*
> **(6) Land status and ownership, use and access patterns, relevant to the plan area. (§ 219.10 (a))**

1.  When developing plan components, the Interdisciplinary Team should:

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 118 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

a. Review the assessment for information about National Forest System land ownership, status, use, and access within and near the plan area (FSH 1909.12, ch. 10, sec. 13.9).

b. Recognize and actively consider the nature of land status, ownership, and access within the plan area and surrounding the plan area. In particular, the resource and management influences related to land status, ownership, and use must be considered in the planning process. For example, consider such issues as: the potential impacts of fragmentation to habitats in areas of mixed ownership, how off forest development pressures may influence the plan area, and access to and through the planning area for public uses and forest management. An additional important concern is the consideration of opportunities to create connectivity of habitat and open space across these ownerships.

c. Review and consider the plans, planning efforts, and land use policies of other jurisdictional neighboring ownerships as described in FSH 1909.12, chapter 40, section 44.1 of this Handbook. Consider also the plans of any private landowners that are relevant to the plan area and that are made available to the Responsible Official.

d. Consider opportunities for collaboration with neighboring ownerships and other Federal agencies, State, local, and tribal governments to support a landscape approach for sustainable management in which the plan area plays a role.

e. Consider the following:

(1) Indian treaty and other reserved rights on the plan area;

(2) Valid existing rights associated with other ownerships within and adjacent to the plan area;

(3) The status and ownership of Federal lands, including where the Federal government owns the surface and another party owns reserved, outstanding, or other private mineral rights within the plan area;

(4) Changing ownership, uses, or fragmentation either underway or planned near the plan area and how these may affect the plan area's resources;

(5) Access points and areas accessed by the public for recreation, trail connectivity, and other uses of the plan area;

(6) Open space commitments of adjacent landowners where connectivity with the plan area connects or could connect open space across boundaries;

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 119 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

(7)  Risks to either the plan area or to adjacent ownerships along plan area boundaries; and

(8)  Coordination with U.S. Border Patrol on issues relating to national security along any international border of the United States.

2.  The plan may include:

a.  The desired nature of the land patterns, uses, and access of the plan area including unique desired conditions for specific areas based on their land status or adjacency to other ownerships.

b.  Objectives to identify intended outcomes for improving land status or multiple land ownership patterns, connecting open space, improving access issues or conditions along the plan area boundary such as treatments in the wildland-urban interface.

c.  Suitability of lands for uses and standards or guidelines to restrict projects or activities in consideration of land ownership, status, and other influences that cross ownership boundaries.

d.  Management or geographic areas where a specific set of plan components may be used to deal with important influences that cross ownership boundaries.  Examples include wildland-urban interface areas or open space connections.

e.  Other plan content to describe management approaches to work with multiple governments and ownerships to accomplish common goals or objectives.  This could include a description of partnerships and coordination designed to achieve more sustainable land management approaches within the broader landscape.  Other plan content could describe how the Responsible Official may work to establish collaborative agreements for joint objectives with other ownerships or jurisdictions.

The environmental analysis document examines the impacts of the plan decision on the lands adjacent and near the plan area.

## 23.23n – Other Considerations for Multiple Uses

The Planning Rule requires that the plan contain other plan components for integrated resource management to provide for multiple use as necessary (§ 219.10(b)) and that the development of plan components consider air quality, riparian areas, soil, and other relevant resources and uses. ((§ 219.10 (a)(1).  It is not necessary to consider issues beyond the current space-time continuum.  Other required considerations in the development of plan components include:

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 120 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

**(7) Reasonably foreseeable risks to ecological, social, and economic sustainability.**

**(8) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species and climate change; and the ability of the terrestrial and aquatic ecosystems on the plan area to adapt to change [§ 219.8]** (§ 219.10 (a)).

Exhibit 01 lists where each of these topics is covered in an earlier section of this chapter as follows:

### 23.22q - Exhibit 01

### Topics covered in an earlier section of this chapter

| Topic | Section |
|---|---|
| Air quality | Section 23.12a |
| Riparian areas | Section 23.11c |
| Soil | Section 23.12b |
| Reasonably foreseeable risks to ecological sustainability | Section 23.1-23.13c |
| System drivers, disturbance regimes and stressors | Section 23.1-23.11d |
| Climate change and the ability of aquatic and terrestrial ecosystems to adapt to change | Section 23.1-23.13c |

## 24 – DESIGNATED AREAS

A designated area is defined at 36 CFR 219.19 as:

**An area or feature identified and managed to maintain its unique special character or purpose. Some categories of designated areas may be designated only by statute and some categories may be established administratively in the land management planning process or by other administrative processes of the Federal executive branch. Examples of statutorily designated areas are national heritage areas, national recreational areas, national scenic trails, wild and scenic rivers, wilderness areas, and wilderness study areas. Examples of administratively designated areas are experimental forests, research natural areas, scenic byways, botanical areas, and significant caves.**

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 121 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

Land management plan decisions may include recommendations to establish additional or modify existing designated areas. Some designated areas may be formally designated or established concurrently with a plan decision, while others may not. The term "designated area" refers to categories of area or feature established by, or pursuant to, statute, regulation, or policy. Once established the designation continues until a subsequent decision by the appropriate authority removes the designation. Changes in actual designations do not occur as part the plan decision.

Exhibit 01 lists some types of designated areas that the Responsible Official may consider recommending for designation, the designating authority for each type of designated area, and the location of existing guidance for their designation.

The list in exhibit 01 is not comprehensive. Some plan areas may have unique designations created by special legislation or other administrative action in addition to the types identified in this section. If a land area does not qualify as a designated area or has not been designated, but needs specific guidance, the Responsible Official may identify the area as a management area or as a geographic area to apply specific plan components in the land management plan.

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 122 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 24 - Exhibit 01

### Designated Areas - Designating Official and Guidance Cross-Reference

| Designated Areas | Designation Authority | Additional Guidance Location |
|---|---|---|
| Statutorily Designated Areas | | |
| National Heritage Area | Congressional act designates. | http://www.nps.gov/history/heritageareas/ |
| National Monument | Presidential Executive order or Congressional act designates. | FSM 2371 |
| National Recreation Area | Congressional act designates. | FSM 2371 |
| National Scenic Area | Congressional act designates. | FSM 2371 |
| National Scenic and Historic Trails | Congressional act designates. | FSM 2353.4 |
| Wild and Scenic River | Congressional act designates. | FSM 1924 & FSM 2354 FSH 1909.12 |
| Wilderness, or Wilderness Study Areas | Congressional act designates. | FSM 1923 & 2320 FSH 1909.12 |
| Highway Systems, Interstate and National | Congressional act established process. Secretary of the Department of Transportation approves. | 23 CFR part 470 |
| Administratively Designated Areas | | |
| Botanical Area, Geological Area, Historical Area, Paleontological Area, Recreational Area, Scenic Area, or Zoological Area | Responsible official recommends. Regional forester may designate areas less than 100,000 acres. Secretary of Agriculture designates areas of 100,000 acres or larger. | 36 CFR 294.1 FSM 2372 |
| Designated Critical Habitat | Director of Fish and Wildlife Service | Endangered Species Act |
| Inventoried Roadless Areas/Roadless Areas | Secretary of Agriculture | 36 CFR Part 294--Special Areas Subpart B, Subpart C, and Subpart D, |
| Experimental Forest or Range | Responsible official recommends with concurrence of station director Chief designates. | FSM 4062 |

Rvsd Plan - 00001497

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 123 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 24 - Exhibit 01--Continued

| National Historic Landmark National Natural Landmark | Responsible official recommends. Secretary of the Interior designates. | FSM 2373 36 CFR 751, FSM 2364.4 |
|---|---|---|
| Research Natural Area | Responsible official recommends. Regional forester designates, with concurrence of station directors. | FSM 4063 |
| Scenic Byway - Forest Service | Responsible official recommends. Chief designates. | None |
| Scenic Byway - National | Responsible official recommends. Federal Highway Administration designates. | 23 CFR part 162 program guides. |
| Significant Caves | | 36 CFR part 290 |
| Wild Horse and Burro Territories | Forest Service Chief | FSM 2260 |

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 124 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

1. The intent behind identifying designated areas in plans and recommending additional areas for designation is to:

a. Assure that plans identify established designated areas and provide plan components appropriate for the designated area; and

b. Recommend areas where doing so would help to carry out the distinctive role and contributions of the plan area in the broader landscape or contribute to achieving desired conditions for the plan area. Recommendations for designated areas are limited to areas that meet the distinctive qualifications for designation that varies by category or types listed in 24, exhibit 01.

## 24.1 – Identifying Existing and Recommending New Designated Areas in the Plan

The 2012 Planning Rule requires the Responsible Official to identify existing designated areas and determine whether to recommend any additional areas:

**(2) In developing a proposed new plan or proposed plan revision, the responsible official shall:**

**\* \* \***

**(vii) Identify existing designated areas other than the areas identified in paragraphs (c)(2)(v) and (c)(2)(vi) of this section, and determine whether to recommend any additional areas for designation. If the responsible official has the delegated authority to designate a new area or modify an existing area, then the responsible official may designate such area when approving the plan, plan amendment, or plan revision.** (36 CFR 219.7(c)).

1. The Responsible Official shall identify the following in the land management plan:

a. Designated areas that have been previously designated by statute or through a separate administrative process.

b. Areas that the Responsible Official is recommending for designation using appropriate procedures for either statutory or administrative designation.

2. All designated areas that have been statutorily designated or recommended to be statutorily designated must be shown on a map in the plan, unless it is necessary not to do so, to protect resources in the designated area. Mapping may show the designated area as a management area, geographic area or as part of a separate overlay specifically to show location of designated areas. Other administratively designated areas must also be identified in the plan on a map or using a narrative.

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 125 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

3. The Responsible Official shall identify any recommendations for additional designated areas and the rationale for the recommended designations in the plan decision document.

4. Regional Foresters may designate areas within their authority using appropriate procedures concurrently with the approval of a plan amendment or plan revision. The Responsible Official should work with the Regional Forester when considering and evaluating areas to recommend for designation that are within the authority of the Regional Forester to designate.

5. If the Responsible Official intents to have an administrative designation of an area approved together with the plan decision under the appropriate authority, the authorizing official shall identify the area to be designated, the rationale for the designation, and any supporting documentation for the designation in the plan decision document. See section 24, exhibit 01 of this Handbook for information on authorities and guidance for documenting the designation of an area. See section 21.7 of this Handbook for guidance on doing a concurrent decision with a plan decision. See section 21.42 of this Handbook for guidance on plan decisions.

6. The Chief shall be notified if the plan development, plan amendment, or plan revision makes preliminary recommendations that ultimately require Congressional action. The Responsible Official, through the Regional Forester, shall notify the Chief by letter of tentative preliminary administrative recommendations. Examples of preliminary recommendations for Congressional action include additions to or deletions from the National Wilderness Preservation System, National Scenic and Historic Trails, National Recreation Areas; and studies or changes to the National Wild and Scenic River System.

## 24.2 – Plan Components for Designated Areas and Areas Recommended for Designation

The Planning Rule requires that the plan must include plan components, including standards or guidelines, for:

> **(vi) Appropriate management of other designated areas or recommended designated areas in the plan area, including research natural areas.** (36 CFR 219.10(b)(1)).

Sections 22 and 23 of this Handbook give guidance on how to integrate plan components to meet this requirement.

1. When developing plan components:

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 126 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

a. The Interdisciplinary Team should review the assessment for information about existing designated areas in the plan area, a general evaluation of the potential need and opportunity for additional designated areas, and the contribution of designated areas to social, economic, and ecological sustainability (FSH 1909.12, ch. 10, sec. 14). Each type of designated area has its own purposes and authorities (sec. 24.1 of this Handbook).

b. The Responsible Official shall include plan components that will provide for appropriate management of designated areas based on the applicable authorities and the specific purposes for which each area was designated or recommended for designation. Uses and management activities are allowed in designated areas to the extent that these uses are in harmony with the purpose for which the area was designated. For recommended designated areas, the uses and activities allowed should be compatible with the basis of the recommendation.

c. The Responsible Official shall provide for plan components for designated areas that do not interfere with the exercise of valid existing rights.

d. The Interdisciplinary Team should consider how designated areas contribute to other desired conditions or objectives for ecological, economic, or social sustainability.

e. The Responsible Official should coordinate with other Responsible Officials to develop plan components that are compatible across multiple plan areas when a designated area is located across multiple land management plan areas.

2. The plan must include plan components including standards or guidelines for management of other designated areas and areas recommended for designation integrated with other plan components as described in 23.21a. To meet this requirement the plan may include:

a. Desired conditions for the designated areas and its contribution to social, economic, or ecological sustainability. Desired conditions may be developed for specific designated areas.

b. Standards, guidelines, or suitability to place limits or conditions on projects or activities that may adversely affect the purposes of designated areas.

c. Recognition of certain designated areas as part of a plan area's distinctive roles and contributions.

To organize plan components applicable to designated areas, the Interdisciplinary Team may identify designated areas with management areas, geographic areas, designated area overlays, or other means. Management areas or geographic areas may include designated areas, but need not

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 127 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

do so, because some designations may not need unique plan components. Other designations may have plan-specific components applied without the concept of a unique management area or geographic area by including the designated area within a management area(s), geographic area(s), or a combination thereof, where the plan components are compatible with the designation. Unit-wide direction may include plan components that apply to the designated area as identified in a mapped overlay or to other locational characteristics associated with the designated area.

Where multiple designated areas (existing or recommended) overlap in same land area, the plan must provide compatible direction to meet the needs of all of the designations. This is often done with wording to state that the designated area with the most restrictive plan components must be followed in the management of the land area.

## 24.3 – Designated Area Plans

Planning for designated areas may be met through the land management plan, unless the authorities for the designation require a separate plan. Specific plans for designated areas must be consistent with the plan components (36 CFR 219.15(e)). The designated area authorities may require specific plans (such as wild and scenic river plans or national scenic and historic trail plans) for a designated area with additional requirements than those of the Planning Rule. Any parts of a designated area plan that meet the requirements for land management plan components must be included in the land management plan. The entire area plan does not need to be included in the land management plan. The land management plans must also be compatible with these designated area plans or either the land management plan or the designated area plan must be amended to achieve this compatibility.

## 24.4 – Specific Types of Designated Areas in Land Management Plans

The following sections provide guidance for recognizing and providing plan components for specific types of designated areas. The general guidance provided in sections 24.1, 24.2, and 24.3 of this Handbook also applies to these designated areas. This general guidance should be consulted for any type of designated area that is not further specifically described in sections 24.4 through 24.44 of this Handbook.

## 24.41 – Wilderness

The Planning Rule requires that the plan must include plan components, including standards or guidelines for:

> **(iv) Protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation to protect and maintain the ecological and social characteristics that provide the basis for their suitability for wilderness designation.**
> (36 CFR 219.10(b)(1).)

WO AMENDMENT
EFFECTIVE DATE:
DURATION:  This amendment is effective until superseded or removed.

1909.12_20
Page 128 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

Sections 22 and 23 of this Handbook give guidance on how to integrate plan components to meet this requirement.

Plans that include designated wilderness areas must have plan components that provide for wilderness management in accordance with the requirements of the Wilderness Act of 1964 (16 U.S.C. 1131–1136, 78 Stat 890), and the law that established the particular wilderness area and any other applicable laws.

When a plan area includes an area or areas for which the Responsible Official makes a preliminary administrative recommendation for wilderness designation, the plan must include plan components that protect the ecological and social characteristics that provide the basis for the suitability of the area for wilderness designation until Congress acts on the recommendation. FSH 1909.12, chapter 70 gives guidance for inventory and evaluation of lands that may be suitable for wilderness and, from those lands, to identify areas, if any, for which the Responsible Official recommends that the land be designated wilderness.

1. The Interdisciplinary Team should review the assessment for information about existing wilderness areas and wilderness study areas in the plan area, a general evaluation of the potential need and opportunity for additional wilderness areas, and the contribution of wilderness to social, economic, and ecological sustainability (FSH 1909.12, ch.10, sec. 14).

2. When developing plan components for designated wilderness areas within the plan area, the Responsible Official should consider:

a. Measures to protect and enhance the wilderness characteristics of the area.

b. Management on adjoining lands that are within the NFS or in other Federal, Tribal or State ownership, especially when the adjoining land s are also designated wilderness areas. If the adjoining lands are part of the same designated wilderness area, the Responsible Officials should coordinate with the Responsible Official(s) of the adjacent administrative unit(s) to ensure compatible management of the wilderness area in both plan areas.

c. Guidance in FSM 2320 regarding management of wilderness areas.

3. When developing plan components for recommended wilderness areas, the Responsible Official shall follow the guidance for developing plan components for recommended wilderness areas as contained in FSH 1909.12, chapter 70, section 74.1. This guidance is repeated here as follows:

**When developing plan components for recommended wilderness areas, the responsible official has discretion to implement a range of management options.  All plan components applicable to a**

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 248 of 251

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 129 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

**recommended area must protect and maintain the social and ecological characteristics that provide the basis for wilderness recommendation. In addition, the plan may include one or more plan components for a recommended wilderness area that:**

**1. Enhance the ecological and social characteristics that provide the basis for wilderness designations;**

**2. Continue existing uses, only if such uses do not prevent the protection and maintenance of the social and ecological characteristics that provide the basis for wilderness designation;**

**3. Alter existing uses, subject to valid existing rights; or**

**4. Eliminate existing uses, except those uses subject to valid existing rights.**

**The responsible official should strive to maintain consistency with the provisions of 16 U.S.C. 1133(d) and the content of FSM 1923.03(3) in developing plan components for the management of recommended wilderness areas.**

4. The plan must clearly identify and map existing wilderness, wilderness study areas, and recommended wilderness areas within the plan area. The plan may identify each area, or type of area, as a management area or geographic area, with plan components applicable to each.

5. The Responsible Official shall identify any recommendations for wilderness in the decision document for the plan as described in FSH 1909.12, chapter 70, section 71.4.

6. The plan must include plan components including standards or guidelines for the protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness integrated with other plan components as described in 23.21a. To meet this requirement, the plan may include the following types of plan components:

a. Desired conditions that describe the desired wilderness character for existing, recommended, or wilderness study areas from an ecological or social perspective.

b. Standards or guidelines appropriate for placing limits or conditions on projects or activities that may adversely affect the wilderness character of existing wilderness, wilderness study, or recommended wilderness areas. Certain uses may be identified as suitable or not suitable for these areas. Existing wilderness areas have been

Case 1:21-cv-02994-REB Document 24-6 Filed 06/21/22 USDC Colorado Page 249 of 251

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 130 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

withdrawn from and are not suitable for timber production (see FSH 1909.12, Chapter 60, sec. 61.11). Recommended wilderness areas, or wilderness study areas are not suitable for timber production as such production is not compatible with the desired condition for these areas (see FSH 1909.12, Chapter 60, sec. 61.2).

c. The contributions of wilderness as part of the plan area's distinctive role and contribution.

Designated wilderness areas may also have management plans for specific wilderness areas. These management plans must be consistent with the land management plan (36 CFR 219.15(e)) or one of the two plans must be amended to achieve this consistency. Only plan components contained in the wilderness plan need to be included in the land management plan. The entire wilderness area plan does not need to be included in the land management plan.

### 24.42 – Wild and Scenic Rivers

The Planning Rule requires that the plan must include plan components, including standards or guidelines for:

> **(v) Protection of designated wild and scenic rivers as well as management of rivers found eligible or determined suitable for the National Wild and Scenic River system to protect the values that provide the basis for their suitability for inclusion in the system.** 36 CFR 219.10(b)(1).

Plans that include designated wild and scenic rivers must have plan components that provide for management in accordance with the requirements of the National Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1281–1287), and the law that established the particular river and any other applicable laws.

FSH 1909.12 chapter 80 details a river-specific study process to be followed to determine eligibility, potential classification (wild, scenic, or recreational), and suitability of river segments for inclusion in the National Wild and Scenic River System. FSH 1909.12, chapter 80 also contains guidance about plan components for rivers identified as eligible or suitable rivers for inclusion in the National Wild and Scenic Rivers system.

Eligible river segments may be evaluated for their suitability for inclusion in the Wild and Scenic River System during the plan revision process. However, suitability evaluation of eligible river segments may be deferred for a separate evaluation outside the plan revision process.

1. When developing plan components for designated, suitable, or eligible wild and scenic rivers:

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 131 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

a. The Interdisciplinary Team should review the assessment for information about existing wild and scenic river segments including their classification into wild, scenic, or recreational segments (FSH 1909.12, ch. 10, sec. 14) and the eligible and suitable rivers identified in the river study process described in FSH 1909.12, chapter 80. The assessment also provides a general evaluation of the potential need and opportunity for additional wild and scenic river segments and the contribution of wild and scenic rivers to social, economic, and ecological sustainability.

b. The Interdisciplinary Team shall develop plan components that provide for management of existing designated wild and scenic rivers in accordance with requirements of the National Wild and Scenic Rivers Act.

c. Plans with river segments found to eligible or suitable for designation must have plan components that protect the outstandingly remarkable values that provide the basis for their inclusion in the National Wild and Scenic River system. FSH 1909.12, chapter 80, section 84.3 describes interim protection measures for protecting eligible and suitable rivers. FSH 1909.12, chapter 80, section 84.4 describes how to provide plan components for these interim measures.

d. The Interdisciplinary Team shall provide plan components for wild and scenic river segments that do not interfere with the exercise of valid existing rights.

e. The Responsible Official should coordinate with the Responsible Officials of adjacent administrative units to ensure compatible management of any wild and scenic river that passes through connected land management plan areas.

f. The Interdisciplinary Team should consider:

(1) Measures to protect and enhance the free flow, water quality, and outstandingly remarkable values of the rivers (see FSM 2354 for more information on wild and scenic river management); and

(2) Management on adjoining lands within the river corridor.

2. The plan must clearly identify designated, suitable, and eligible river segments within the plan area. To organize plan components applicable to existing, suitable, or eligible wild and scenic rivers, the Responsible Official may identify one or more management or geographic areas for wild and scenic rivers or use other means to indicate where plan components apply.

3. The plan must include plan components including standards or guidelines for the protection of designated wild and scenic rivers and management of eligible and suitable rivers integrated with other plan components as described in 23.21a. To meet this requirement, the plan may include:

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 132 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

a. Desired conditions that describe the conditions expected for wild and scenic river segments and their surrounding corridors. These desired conditions should be based on the type of river segment (wild, scenic, or recreational). Desired conditions can vary for different river segments, depending upon each segment's classification and outstandingly remarkable values.

b. Standards, guidelines, or suitability to place limits or conditions on projects or activities to ensure that adverse effects on the outstandingly remarkable values of an eligible or suitable wild and scenic river segment are avoided (See FSH 1909.12, ch. 80, sec. 84.3 d). Standards or guidelines may also protect the intended wild, scenic, or recreational character of a designated river segment. Designated wild river segments have been withdrawn from and are not suitable for timber production (see FSH 1909.12, ch. 60, sec. 61.11). Eligible and suitable wild river segments are not suitable for timber production as such production is not compatible with maintaining the option for future designation as wild river segment (see FSH 1909.12, ch. 60, sec. 61.2).

c. The wild and scenic river segments may be part of the distinctive role and contribution of the plan area. Other plan content may describe the Responsible Official's management approach to completing suitability studies of an eligible river or completing wild and scenic river management plans for designated rivers.

4. The Responsible Official shall describe the status and any recommendations for wild and scenic rivers in the decision document as described in FSH 1909.12, chapter 80.

Designated wild and scenic rivers must also have comprehensive river management plans (CRMPs). The plan must be compatible with the CRMP or the plan or CRMP must be amended to achieve this compatibility. Only plan components contained in a CRMP need to be included in the land management plan. The entire CRMP does not need to be included in the land management plan.

## 24.43 – National Scenic and Historic Trails

1. When developing plan components for national scenic and historic trails:

a. The Interdisciplinary Team should review the assessment for relevant information about existing national scenic and historic trails in the plan area, including established rights-of-way pursuant to 16 U.S.C 1246(a)(2) and direction contained in comprehensive plans (CPs) pursuant to 16 U.S.C. 1244(e) or 1244(f). For existing or study national scenic and historic trails that do not have such information published, assessments identify and evaluate other information pertinent to the location and management of national scenic and historic trails.