WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 133 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

b. The Interdisciplinary Team shall identify Congressionally designated national scenic and historic trails and plan components must provide for the management of rights-of-ways (16 U.S.C 1246(a)(2)) consistent with applicable laws, regulations, and Executive Orders. Plan components must provide for the nature and purposes of existing national scenic and historic trails and for the potential rights-of-way of those trails designated for study (16 U.S.C. 1244(b)).

c. The Interdisciplinary Team shall use the national scenic and historic trails rights-of-way maps required by 16 U.S.C. 1246(a)(2) to map the location of the trails. Where national trail rights-of-way have not yet been selected, the Interdisciplinary Team shall reference the establishing legislation (16 U.S.C. 1244(a)) as the primary source for identifying and mapping the national scenic and historic trails right-of-way. If the right-of-way has not been selected, either through legislation or publication in the Federal Register, the Interdisciplinary Team should use other information to delineate a national scenic and historic trails corridor that protects the resource values for which the trail was designated or is being proposed for designation (16 U.S.C 1244(b)).

d. The Responsible Official shall consult with neighboring Responsible Officials when developing plan components for national scenic and historic trails that cross unit boundaries and shall strive to maintain or establish compatible management approaches while recognizing diverse resource conditions and needs in the different plan areas.

e. Plan components must be compatible with the objectives and practices identified in the comprehensive plan for the management of the national scenic and historic trail. The objectives and practices include the identification of resources to be preserved and the trail's carrying capacity.

f. The Responsible Official shall include plan components that provide for the nature and purposes of national scenic and historic trails in the plan area. In doing so, the Responsible Official should take into consideration other aspects of the plan related to the trail such as access, cultural and historic resources, recreational settings, scenic character, and valid existing rights.

2. The plan must include plan components including standards or guidelines for a designated area as described in section 24.2 of this Handbook. To meet this requirement the plan:

a. Should include desired conditions that describe the national scenic and historic trail and the recreational, scenic, historic, and other resource values for which the trail was designated.

Rvsd Plan - 00001508

WO AMENDMENT
EFFECTIVE DATE:
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 134 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

b. May include objectives for national scenic and historic trails where existing conditions (settings, opportunities, scenic character, cultural and other resources values) are different from desired conditions. These objectives can identify intended activities to improve national scenic and historic trail conditions, mitigate or enhance associated resource values, create or improve connections with communities and visitors, or other desired and measureable outcomes that will improve the national scenic and historic trail experience.

c. May include standards or guidelines to place limits or conditions on projects or activities to protect the trail and associated resource values.

d. May include suitability plan components to limit or prevent incompatible uses and activities.

e. Must identify and map National scenic and historic trails per #1c above.

f. May, to apply plan components unique to the National and Scenic Historic Trail: provide one or more management or geographic areas for a national scenic and historic trail; reference the identified national scenic and historic trail right-of-way, place a corridor around the trail, or use other means to clearly identify where the plan components apply in reference to the trail.

FSM 2350 has more information about national scenic and historic trails.

## 24.44 – Inventoried Roadless Areas

The plan must identify Inventoried Roadless Areas governed by the Roadless Area Conservation Rule (36 CFR 294 Subpart B) or the Idaho Roadless Rule (36 CFR 219 Subpart C) and Colorado Roadless Rule (36 CFR 219 Subpart D), or any other State roadless rule in effect and applicable. The spatial information for the boundaries of such roadless areas is available at the Roadless Area Conservation website (*http://.fs.usda.gov/roadless/*).

The Responsible Official, in the planning process, does not have the authority to modify the boundaries of roadless areas covered by such rules.

Roadless areas designated under a roadless rule may be, but are not required to be, identified as unique management areas or geographic areas in the plan. Regardless, Responsible Officials shall ensure that plan components applicable to such areas are compatible with the applicable roadless rule. The plan can have different plan components in multiple management areas or geographic areas apply to the inventoried roadless areas as long as these plan components are compatible with the restrictions of the applicable roadless rule.

 Rio Grande National Forest

# The 1996 Rio Grande National Forest: What Needs to Change

- This document was circulated to the public following meetings held in March 2016.
- Comments were collected from the general public and from Forest Service employees and were incorporated into this document (Version 2).
- This document is draft and is designed to launch the proposed action development phase of the Rio Grande National Forest plan revision process.

## Introduction

The current Land and Resource Management Plan (forest plan) for the Rio Grande National Forest is nearly 20 years old. Forest staff is currently in the process of developing a new plan that guides how it will be managed over the next 15 to 20 years. Recently completed assessment reports provide information on the current "state of the forest," including conditions, trends, and risks to sustainability. A product of an extensive public process, nearly 20 years of forest monitoring reports, and other available reports and data, these assessment reports are informed by the best available scientific information and provide guidance on what needs to change in the 1996 Forest Plan to ensure the sustainability and resiliency of resources, goods, and services on the Rio Grande National Forest. While we are not in a formal comment period and comments can be submitted at any time during the process, to be more helpful in informing the next phase of the process please submit comments by August 22, 2016. Please send comments to rgnf_forest_plan@fs.fed.us.

## What is a Forest Plan?

A forest plan is the overarching direction for all management decisions and projects on the Rio Grande, constrained by law, regulation, and policy. Written as a snapshot in time and reflecting a philosophy of management from both the agency and the public, a forest plan helps define the management direction for the forest, literally lines drawn on the map, as well as the establishes desired conditions and related standards and guidelines for management priorities of those areas. A forest plan is also a physical, bound, three-volume publication that includes a Record of Decision, Final Environmental Impact Statement, and Appendices, and it is used daily as a reference guide and dog-eared on resource managers' and line officers' desks.

The current forest plan for the Rio Grande National Forest is available in hard copy at the Forest Service offices in La Jara, Monte Vista, Del Norte, and Saguache as well as on the website at http://www.fs.usda.gov/main/riogrande/landmanagement/planning.

## Why a Need for Change Document?

To initiate the proposed action development phase of the revision process, the 2012 Planning Rule requires Forest Service staff to present a document to the public at the end of the assessment phase explaining what needs to be revised from the previous plan. This *Need for Change* document identifies the needs and desires to change the 1996 Forest Plan, as recommended during the assessment phase discussed above. Change criteria are described below, and the specific changes under consideration are identified in Tables A through D, which follow.

Rvsd Plan - 00001510

Rio Grande National Forest

**Table A.** *Requirements in the forest plan revision process*

Many federal laws, regulations, and policies govern the work of forest staff every day. These requirements are *non-discretionary* for the forest supervisor, who is the deciding official in the revision process.

| | Requirement | Basis for Requirement | What we did with what we heard (internal & external) |
|---|---|---|---|
| A1 | Re-evaluate the suitability of forest lands for multiple uses, including areas for timber production, communication sites, over the snow vehicle use, mechanized and or/motorized travel, and utility corridors. | • National Forest Management Act<br>• Multiple Use Sustained Yield Act<br>• 2012 Planning Rule | The analysis will consider the suitability or non-suitability of lands based on the desired conditions and the inherent capability of the land to support the use. Suitability is not determined for every resource or activity; or for every acre of the plan area. Over-the-snow vehicle use was added in response to comments received in April. |
| A2 | Conduct an inventory, evaluation, analysis, and recommended wilderness on the Rio Grande National Forest. | • Wilderness Act (1964)<br>• 2012 Planning Rule, Chapter 70 | Inventory, evaluation, analysis and recommendation process is described in FSH 1909.12, Chapter 70. The process is being implemented with thorough public involvement (Appendix A2) |
| A3 | Conduct an inventory, evaluation, analysis, and recommend for inclusion in the Wild and Scenic Rivers System. | • Wild and Scenic Rivers Act<br>• 2012 Planning Rule, Chapter 80 | Inventory, evaluation, analysis and recommendation process is described in FSH 1909.12, Chapter 80. The process is being implemented on 23 segments not included in the analysis for the 1996 Forest Plan. (Appendix A3) |
| A4 | Update direction to further promote the recovery and conservation of federally recognized threatened, endangered, proposed, and candidate species. | • Endangered Species Act<br>• 2012 Planning Rule | The analysis will address all existing direction related to federally recognized species. |
| A5 | Revise the 1996 Forest Plan to provide management direction to manage habitat to ensure viable populations of species of conservation concern. | • 2012 Planning Rule<br>• Discussion in Assessment 5 | Initial Proposal will include proposed species of conservation concern list from the Regional Forester. The analysis will consider a select set of key ecological conditions, and plan components related to the viability of the species of conservation concern known to occur on the |

Rvsd Plan - 00001511

 Rio Grande National Forest

Need for Change, Version 2

July 2016

| | | | forest. (hyperlink to draft list/letter as appendix A5) |
|---|---|---|---|
| A6 | Revise the 1996 plan to incorporate management direction related to renewable energy. including reasonably foreseeable transmission corridors. | • 2012 Planning Rule<br>• Identification in Assessment 10, Energy and Minerals | The analysis will determine suitability for renewable energy resource development and accompanying plan components. |
| A7 | Revise management direction related to climate change. | • 2012 Planning Rule | The analysis will consider ecosystem characteristics that may be vulnerable to climate change. |
| A8 | Consider goals and objectives of the Forest Service strategic plan. | • 2012 Planning Rule | The Revised Plan will consider the broad goals and objectives of the USDA Forest Service Strategic Plan: FY 2015-2020. |
| A9 | Develop sustainable management direction for current and future recreation uses. | • 2012 Planning Rule<br>• Identified in Assessment 9, Recreation | The Initial Proposal will develop plan components related to sustainable recreation management on the RGNF. (Draft standards in process) |
| A10 | Forest plans must identify priority watersheds for maintenance and restoration. The Forest Service National Watershed Condition Framework must be used in plan revisions. | • 2012 Planning Rule<br>• Identification in Assessments 1 and 2<br>• Internal staff recommendations | Moved from Table C. The revised forest Plan will incorporate the Watershed Condition Framework (Appendix A10). |

Rvsd Plan - 00001512

 Rio Grande National Forest

***Table B.*** *Changes needed throughout the previous plan*

These needs for change are the first level of discretionary needs identified by the deciding official. They represent overarching general needs that were commonly, and in many cases overwhelmingly, identified through a combination of the assessments, public comments, tribal consultation, internal comments, or a combination of all of these means of seeking input for the revised forest plan.

| | Needed Change | Basis for Change | What we did with what we heard (internal and external) |
|---|---|---|---|
| B1 | Revise the accessibility of the previous plan to the public, including incorporating current and changing technology and web-based tools to facilitate the diverse needs of the public | • Identification in public meetings | 1996 Forest Plan, amendments and monitoring reports are now available on forest website. |
| B2 | Re-evaluate the number, arrangement, and boundaries of Management Areas, and plan direction in the current forest plan management areas to minimize complexity and promote ecosystem integrity and connectivity | • Identification by the public and Forest Service staff | The Initial Proposal will include tiered geographic areas, management approaches, management areas, and desired conditions ranging from primitive to active management and related management discretion. (Appendix B2 – Map and Ecosystem Integrity) |
| B3 | Revise the current plan to allow for more adaptive management to better meet and monitor desired conditions related to:<br>• potential climate change effects<br>• fluctuations in forest budgets,<br>• using partnerhips, volunteers, and citizen scientists | • Identification by the public and Forest Service staff | The Initial Proposal includes three overarching Goals centered on:<br>• Protecting and restoring watershed health, water resources, and the systems that rely on them;<br>• Maintaining and restoring sustainable and resilient ecosystems;<br>• Contributing to social and economic sustainability in the broader landscape and connect citizens to the land. (Appendix B4)<br><br>The Revised Plan Monitoring Framework will be designed with partners, volunteers and citizen science in mind. |
| B4 | Revise the current plan to include management approaches that consider local economies, markets, and partnership | • Identification by the public | This is a consideration and approach that will be carried throughout the development of plan components. |

Rvsd Plan - 00001513

 Rio Grande National Forest

| | | | |
|---|---|---|---|
| | opportunities as tools for meeting desired conditions | | |
| B5 | Revise the current plan to include management direction that ensures sustainable infrastructure related to recreation, forest health, and habitat connectivity | • 2012 Planning Rule<br>• Identification by Forest Service staff | Considerations to be included in the analysis. |

Rvsd Plan - 00001514

 Rio Grande National Forest

*Table C. Changes identified through the assessment phase*

These needs for change are the second level of discretionary needs identified by the deciding official. They may be considered due to clear gaps in the previous plan, or represent specific needs that were identified through a combination of the assessments, public comments, tribal consultation, internal comments, or a combination of all of these means of seeking input for the revised forest plan. At this time, the deciding official believes these needs for change are relevant, timely, and appropriate for evaluation as a proposed action in the environmental analysis phase of the revision process under the National Environmental Policy Act (NEPA phase).

| | Identified Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|---|
| C1 | Revise the current forest plan to allow for better integration, clearer direction, and more flexibility with regard to the use of prescribed and naturally occurring fire as a management tool and disturbance agent within the constraints of human health and safety | • Identification in Assessment 1, Ecosystem Integrity<br>• Identification by the public | Plan direction language would be updated to comply with the Wild Fire Decision Support System. Direction should be adaptive in nature but fit with the area prescription and direction. |
| C2 | Update the existing forest-wide air monitoring plan and 1994 Wilderness Air Quality Monitoring Plan reflecting current best management practices | • Identification in Assessment 2, Air, Soils, and Water Resources<br>• Internal staff recommendations | The forest plan must include plan components related to air quality. All aspects of air quality monitoring will be updated in the analysis. |
| C3 | Revise the previous plan and identify long-term priority watersheds to reflect the current best management practices including the Watershed Conservation Practices Handbook, National Best Management Practices program, and Watershed Condition Framework | • Identification in Assessments 1 and 2<br>• Internal staff recommendations<br>• 2012 Planning Rule | Moved to A. |
| C4 | Update the previous plan to incorporate the negotiated settlement language and decree between the Rio Grande National Forest and the State of Colorado (2000) | • Identification in Assessment 2<br>• Internal staff recommendations<br>• Identification by the public | Incorporate the in-stream flow language in the desired condition and standard operating procedure. Incorporate objectives from agreement. |
| C5 | Revise the previous plan to provide management direction for the Old Spanish National Historic Trail, including language from the Old Spanish National Historic Trail Comprehensive Management Plan | • Identification in Assessments 13 and 15<br>• Internal staff recommendations<br>• Identification by the public | Old Spanish National Historic Trail and Cumbres and Toltec National Historic Landmark will be considered for special designations including any related non-FS direction. |

Rvsd Plan - 00001515

 Rio Grande National Forest

| | Identified Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|---|
| | when completed by the National Park Service; for the Continental Divide National Scenic Trail (CDT), including language from the 2009 CDT Comprehensive Plan; for the Sangre de Cristo National Heritage Area, Cumbres and Toltec National Historic Landmark; and for the Rio Grande del Norte National Monument. | | The Sangre de Cristo Heritage Area was congressionally designated in 2009. It includes portions of forest in Conejos and Alamosa counties. Regional direction for the Continental Divide National Scenic Trail is in development. |
| C6 | Evaluate additional areas for special designation, including areas with cultural values, ecosystem types known to be heavily fragmented, and areas important for the protection of plant communities and special habitats vulnerable to climate change. Evaluate additional protection of two critically significant areas, Mt. Blanca Massif and the Natural Arch, while maintaining motorized access. | • Identification in Assessments 12 and 15<br>• Internal staff recommendations<br>• Identification by the public | After consultation with Federally recognized Tribes Mt. Blanca Massif and Natural Arch will be considered for special designation. Agency staff will investigate additional designations related to sensitive areas, key ecosystem characteristics tied to the viability of species of conservation concern and climate change vulnerabilities. Specific sites might include Lower Deadman Creek on the Baca Mountain Tract and snow willow habitat for the Uncompahgre fritillary butterfly. |
| C7 | Revisit the size of the Fremont Special Interest Area | • Identification in Assessment 13<br>• Internal staff recommendations | Field archaeology work in 2015 confirmed the actual location of the Christmas Camp site. The revised forest plan will consider that field work. |
| C8 | Update management direction to maintain separation between bighorn and domestic sheep. Address the need for management direction regarding recreational pack goats. | • Identification by a 2010 internal Conservation Assessment | Moved from D. The analysis will address Big Horn Sheep direction and concerns. |

Rvsd Plan - 00001516

 Rio Grande National Forest

*Table D. Desired changes identified through the assessment phase*

These desires for change are the third level of discretionary needs considered by the deciding official. They represent specific needs that were identified through a combination of the assessments, public comments, tribal consultation, internal comments, or a combination of all of these means of seeking input for the revised forest plan. At this time, the deciding official believes these needs will be relevant, timely, and appropriate for further analysis in the NEPA phase. The deciding official, with public and interdisciplinary team involvement, will make a subsequent decision on whether to change this from a desire to a clear need for change. If it is decided to drop one or more of these desires from consideration after further analysis and subsequent decision, a clear rationale will be provided.

| | Desired Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|---|
| D1 | Update the definition and management direction for late successional/old growth forest and woodland communities | • Identification in Assessment 1<br>• Internal staff recommendations | Old growth is an ecosystem characteristic related to stages of late successional habitat. This will be updated and addressed in the discussion and analysis of ecosystem characteristics |
| D2 | Revisit the oil and gas Leasing Available Analysis completed for the 1996 Forest Plan | • Identification in Assessment 10<br>• Identification by the public | The 1996 Forest Plan anticipated more activity that has been experienced. Suitability and leasing availability may be revisited when the Bureau of Land Management begins a new analysis. *** new technology discussion. Attach Appendix D2 |
| D3 | More efficiently manage wilderness areas across administrative boundaries with adjacent forests, and better incorporate the 1993 Colorado Wilderness Act and language specifically regarding Wheeler Geologic Area. | • Internal staff recommendations | Wilderness is currently administered across boundaries with adjacent units. Wheeler Geologic Area will be considered during the Wilderness Inventory, Evaluation, Analysis and Recommendation process or potentially considered for Special Designation in the forest plan. The 1996 Forest Plan contains management direction for the area. |
| D4 | Contribute to developing and maintaining sustainable enterprises that contribute to the general economic and social vitality of the area. | • Identification in Assessments 6, 7, and 8, Social, Cultural, and Economic Resources and Ecosystem Services<br>• Identification by the public | The role of the Forest Service is to actively contribute to social and economic sustainability in the broader landscape. This should be included in the overall goals for forest management. Management would focus on relationship maintenance and proactive management. |
| D5 | Maintain the quality of visitor experiences while providing forest products and cultural and | • Identification in Assessments 6, 7, and 8<br>• Identification by the public | This will be addressed through analysis. Comments addressed the need to tie population .increases with impacts to the quality of recreational experiences. |

Rvsd Plan - 00001517



Rio Grande National Forest

Need for Change, Version 2

July 2016

| | Desired Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|---|
| | recreational experiences to a greater number of people | | |
| D6 | Revisit how managing for multiple uses on the forest affects cultural resources | • Identification in Assessment 13, Cultural and Historic Resources<br>• Identification by the public | Existing 1996 Forest Plan direction for cultural resource protection should be updated to incorporate more current manual and handbook direction. |
| D7 | Evaluate additional protection of two critically significant areas, Mt. Blanca Massif and the Natural Arch, while maintaining motorized access | • Identification in Assessment 12, Tribal Resources<br>• Tribal consultation | Combine with C6 |
| D8 | Additional management direction for recreational climbing in relation to peregrine falcon nests. | • Internal staff recommendations | Impacts should be addressed in a site specific analysis. Habitat and resource concerns can be mitigated through Forest Order. |
| D9 | Update management direction to maintain separation between bighorn and domestic sheep | • Identification by a 2010 internal Conservation Assessment | Move to C |
| D10 | Additional management direction regarding recreational pack goats on the Rio Grande National Forest | • Internal staff recommendations | Move to C and combined |
| D11 | Revisit the stay limits on the Rio Grande in managed and dispersed campsites | • Internal staff recommendations | **Need IDT discussion- Rec assigned<br><br>DNR input 30 days |
| D12 | Revisit the Capacity Allocation Process related to special use permits | • Internal staff recommendations | **Need IDT discussion- Rec assigned |

Rvsd Plan - 00001518



Rio Grande National Forest

| | Desired Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|---|
| D13 | Revisit the off-road game retrieval policy on the Rio Grande National Forest | • Internal staff recommendations<br>• Identification by the public | ***Need IDT discussion, Wildlife assigned; CPW comments propose changed time, perhaps include in the travel management analysis |
| D14 | Revise the communication sites permitted in the current forest plan (and the approval process), considering internal needs, community use and technology, and future needs of the public | • Identification in Assessment 11, Infrastructure<br>• Internal staff recommendations<br>• Identification by the public | Move to A. |
| D15 | Address new technology, including the use of drones on the forest, as well as alternative energy sites and fiber optic | • Identification in Assessment 11, Infrastructure | ***Need IDT discussion, coordinate with Safety/Fire |
| D16 | Better access and management flexibility to maintain irrigation structures, such as dams and diversions, in wilderness areas | • Identification in Assessments 2 and 6 | The Minimum Resource Design Guide is a tool for applicants to seek a waiver to conduct mechanized maintenance in wilderness areas. Prioritized maintenance schedules through regular consultation with line officers is encouraged. |
| D17 | Update plan direction to protect and ensure legal access for public, private, and tribal needs in cases of fragmentation of forest lands | • Identification in Assessment 14, Land Status, Ownership, Use, and Access<br>• Internal staff recommendations<br>• Identification by the public | ***Need IDT discussion |
| D18 | Prioritize acquisition of inholdings appropriate for the management and continuity of forest land and collaborate more effectively with other private, state, and federal land owners of lands that border the Rio Grande National Forest | • Identification in Assessment 14, Land Status, Ownership, Use, and Access<br>• Internal staff recommendations<br>• Identification by the public | ***Need IDT discussion |

Rvsd Plan - 00001519

 Rio Grande National Forest

| Desired Change | Basis for Change | What we did with what we heard (internal & external) |
|---|---|---|
| D19 Update plan direction for the removal of common mineral materials, such as commercial contracts, personal, ceremonial, and free use permits | • Identification in Assessment 10, Energy and Minerals<br>• Internal staff recommendations<br>• Identification by the public | ***Need IDT discussion |

Rvsd Plan - 00001520

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

Appendices

Rvsd Plan - 00001521

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1:
Inventory

*Appendix A2 – Forest Plan Revision Wilderness Recommendation Process*

 **Rio Grande National Forest Plan Revision** 

# Wilderness Recommendation Process

# Step 1: Inventory of Lands that may be Suitable for Inclusion in the National Wilderness Preservation System

Rvsd Plan - 00001522

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

---

*In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).  Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

iii

Rvsd Plan - 00001523

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1:
Inventory

*To file a program discrimination complaint, complete the USDA Program Discrimination
Complaint Form, AD-3027, found online at
http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a
letter addressed to USDA and provide in the letter all of the information requested in the
form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed
form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant
Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410;
(2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.*

*USDA is an equal opportunity provider, employer, and lender.*

# Table of Contents

Introduction ........................................................................................................................... 1
Step 1: Inventory of Lands that may be Suitable for Inclusion in the NWPS ................................ 1
   Inventory Process and Criteria ............................................................................................... 1
   Public Collaboration ............................................................................................................. 2
   Inventory Results ................................................................................................................. 3
Next Steps................................................................................................................................ 6
   Evaluation .......................................................................................................................... 6
   Analysis and Recommendation.............................................................................................. 6

Appendix A: Substantially Noticeable Definitions ........................................................................ 8
   Assumptions Developed When Applying the Substantially Noticeable Definition Matrix. 8
   Substantially Noticeable Definition Table .......................... **Error! Bookmark not defined.**
Appendix B: Public Comment Summary and Response .............................................................. 11
Appendix C: Team Members ..................................................................................................... 15

## Introduction

The Rio Grande National Forest is in the process of revising the forest plan. The revision process includes identifying and evaluating lands that may be suitable for inclusion in the National Wilderness Preservation System (NWPS) and determining whether to recommend to the Chief of the Forest Service any such lands for wilderness designation. A description of this process can be found in the 2012 Forest Service Planning Rule and Chapter 70 of the Forest Service Land Management Planning Handbook 1909.12.  This process includes the following four steps:

1. Identify and inventory all lands that may be suitable for inclusion in the National Wilderness Preservation System

2. Evaluate the wilderness characteristics of each area based on a given set of criteria

3. The Forest Supervisor will determine which areas to further analyze in the National Environmental Policy Act (NEPA) process

4. The Forest Supervisor will decide which areas, if any, to recommend for inclusion in the National Wilderness Preservation System (NWPS).

Lands evaluated and analyzed through this process and the resulting NEPA analysis are only preliminary administrative recommendations; Congress has reserved the authority to make final decisions on wilderness designation.

This report summarizes Step 1 of this process for the Rio Grande National Forest.

## Step 1: Inventory of Lands that may be Suitable for Inclusion in the NWPS

The Rio Grande National Forest interdisciplinary team (please see Appendix C for a list of members) began identifying and inventorying lands that may be suitable for inclusion in the NWPS using the size, adjacency, and road improvements criteria outlined in the Forest Service Handbook.[1]  The directives used to the complete Phase 1 Inventory were the draft directives, dated December 19, 2013.

### Inventory Process and Criteria

1. Initial screening

- Private and state in-holdings were removed.
- FS Roads Maintenance Level 2 through 5 were buffered and removed.[2] **See FS Road Maintenance Definitions.**
- The 1996 Rio Grande National Forest Plan Utility Corridors were excluded from the inventory areas, as well as other known cleared rights-of-way and pipelines.

---

[1] See FSH 1909.12 Chapter 70, 71.21 and 71.22a

[2] A "snapshot" of the Rio Grande National Forest roads from xxxxx was used for the inventory.

2. Substantially Noticeable Features (See Appendix A for the Substantially Noticeable Definitions)

- Improvements that suggest substantially noticeable human activity in the area as a whole were removed.
- All tree removal activities from any year are considered substantially noticeable unless otherwise determined by specialist knowledge.[3]

**3.** Acreages of areas were then calculated and the following size classes are maintained:

- An area greater than 5,000 acres.
- An area adjacent to existing Wilderness regardless of size.
- A standalone area (not adjacent to existing Wilderness) that is less than 5,000 acres but of sufficient size to make practicable its preservation and use in an unimpaired condition and can be effectively managed as a separate unit of NWPS.

**Lands shown on this preliminary inventory map do not imply designation or necessarily convey or require a particular kind of management, and inclusion or removal of any of these lands are open to discussion.**

All unauthorized/user-created routes were included in the inventory because they are not part of the official road system. Those routes will be considered in the evaluation phase as part of the apparent naturalness and degree to which the area may be managed to preserve its wilderness characteristics.

Lands adjacent to development or activities that impact opportunities for solitude were included in the inventory. The fact that non-wilderness activities or uses can be seen or heard from within any portion of the area, must not, of itself, preclude inclusion in the inventory. It is appropriate to extend boundaries to the edges of development for purposes of inclusion in the inventory.

## Public Collaboration

The Rio Grande National Forest hosted a series of collaborative workshops in June 2016 (see Appendix E). These workshops focused on the initial identification and inventory of lands that may be suitable for inclusion in the NWPS.

The public provided comments on the draft inventory results through an online collaborative mapping tool, hard copy comment forms, e-mail, and postal mail from June 1 – June 17, 2016. The Forest received a total of 10 comments during the comment period. Most comments did not provide specific comments on the draft inventory map. See Appendix B for a summary of the comments and how the inventory map was modified based on the comments.

---

[3] See Table 1 for inventory polygons with "not substantially noticeable" features.

Rvsd Plan - 00001526

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

## Inventory Results

The resulting areas and acres are summarized in Table 1. Some overall results include the following:

- No stand-alone areas less than 5,000 acres were included because they were not of a sufficient size as to make practical its preservation and use in an unimpaired condition (from Criterion #3).
- Areas less than 5,000 acres in size were included because they are adjacent to an existing wilderness or recommended wilderness study area[4] (from Criterion #2).
- Forest-wide, 1,559,196.77 acres are included in the final wilderness inventory map.

**Table 1. Wilderness Inventory Results**

| Inventory Polygon[5] | Ranger District | Size | Acres[6] | "Not substantially noticeable" |
|---|---|---|---|---|
| 1.a | Conejos Peak | Wilderness Adjacent | 6,481.89 | |
| 1.b | Conejos Peak | Wilderness Adjacent | 27.73 | |
| 2 | Saguache | Wilderness Adjacent | 51,387.88 | |
| 3.a | Saguache | Wilderness Adjacent | 1,219.14 | |
| 3.b | Saguache | Wilderness Adjacent | 2,909.54 | |
| 3.c | Saguache | Wilderness Adjacent | 402.01 | |
| 3.d | Saguache | Wilderness Adjacent | 130.26 | |
| 3.e | Saguache | Wilderness Adjacent | 4,021.95 | |
| 3.f | Saguache | Wilderness Adjacent | 738.54 | |
| 3.g | Saguache | Wilderness Adjacent | 383.55 | |
| 3.h | Saguache | Wilderness Adjacent | 1,489.17 | |
| 3.i | Saguache | Wilderness Adjacent | 3,462.08 | |
| 4 | Saguache | Larger than 5K acres | 25,663.84 | 1920s – 1940s shelterwood cuts |
| 5 | Saguache | Larger than 5K acres | 8,223.73 | 1920s – 1940s shelterwood cuts |
| 6 | Saguache | Larger than 5K acres | 53,803.51 | |
| 7 | Saguache | Larger than 5K acres | 9,273.69 | |
| 8 | Saguache | Larger than 5K acres | 9,210.56 | |
| 9 | Saguache | Larger than 5K acres | 16,792.56 | |
| 10 | Saguache | Larger than 5K acres | 19,605.94 | |

---

[4] Wilderness study areas are management areas on Bureau of Land Management federal lands.

[5] Numbering is not sequential due to adjustments during inventory process.

[6] All acres are approximate.

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| Inventory Polygon[5] | Ranger District | Size | Acres[6] | "Not substantially noticeable" |
|---|---|---|---|---|
| 11 | Saguache | Larger than 5K acres | 10,290.71 | |
| 12 | Saguache | Larger than 5K acres | 49,276.00 | |
| 13 | Saguache | Larger than 5K acres | 17,220.38 | |
| 15 | Saguache | Larger than 5K acres | 25,541.44 | |
| 18 | Saguache | Larger than 5K acres | 9,877.84 | |
| 20.a | Saguache | Wilderness Adjacent | 116,546.27 | |
| 20.b | Saguache and Divide | Wilderness Adjacent | 57,220.13 | |
| 21 | Saguache | Wilderness Adjacent | 575.90 | |
| 22 | Divide | Larger than 5K acres | 16,770.88 | |
| 23 | Divide | Larger than 5K acres | 8,189.55 | |
| 24 | Divide | Wilderness Adjacent | 184.49 | |
| 25.a | Divide | Wilderness Adjacent | 46,282.90 | |
| 25.b | Divide | Wilderness Adjacent | 2,428.23 | |
| 26 | Divide | Larger than 5K acres | 112,833.95 | |
| 27 | Divide | Larger than 5K acres | 47,812.07 | |
| 28 | Divide | Larger than 5K acres | 102,716.88 | |
| 29 | Divide | Wilderness Adjacent | 10,198.60 | |
| 30.a | Divide | Wilderness Adjacent | 30.91 | |
| 30.b | Divide | Wilderness Adjacent | 8.06 | |
| 30.c | Divide | Wilderness Adjacent | 27.10 | |
| 31 | Divide | Wilderness Adjacent | 221.18 | |
| 32 | Divide | Wilderness Adjacent | 191.47 | |
| 33 | Divide | Wilderness Adjacent | 1,531.97 | |
| 34 | Divide | Wilderness Adjacent | 417.72 | |
| 35 | Divide | Wilderness Adjacent | 2,895.51 | |
| 36.a | Divide | Wilderness Adjacent | 9,620.32 | |
| 36.b | Divide | Wilderness Adjacent | 4.14 | |
| 37.a | Divide | Larger than 5K acres | 5,878.58 | |
| 37.b | Divide | Wilderness Adjacent | 12,539.72 | |
| 38.a | Divide | Wilderness Adjacent | 58,832.90 | 1925 shelterwood cut |
| 38.b | Divide | Larger than 5K acres | 10,363.64 | |
| 39 | Divide | Larger than 5K acres | 18,685.06 | |
| 40 | Divide | Larger than 5K acres | 17,838.25 | |

4

| Inventory Polygon[5] | Ranger District | Size | Acres[6] | "Not substantially noticeable" |
|---|---|---|---|---|
| 41 | Divide | Larger than 5K acres | 72,587.05 | |
| 42 | Divide | Wilderness Adjacent | 703.02 | |
| 43.a | Divide | Wilderness Adjacent | 10,221.41 | |
| 43.b | Divide | Wilderness Adjacent | 1,029.70 | |
| 44 | Divide | Larger than 5K acres | 19,003.29 | |
| 45.a | Divide | Larger than 5K acres | 12,393.48 | |
| 45.b | Divide | Larger than 5K acres | 21,900.14 | |
| 46 | Divide | Larger than 5K acres | 15,173.13 | |
| 49 | Divide | Larger than 5K acres | 12,089.18 | |
| 50 | Divide | Larger than 5K acres | 25,096.64 | |
| 51 | Divide and Conejos Peak | Larger than 5K acres | 123,836.95 | |
| 52 | Conejos Peak | Larger than 5K acres | 29,785.17 | |
| 53 | Conejos Peak | Wilderness Adjacent | 5,988.71 | |
| 54 | Conejos Peak | Wilderness Adjacent | 23.45 | |
| 55 | Conejos Peak | Wilderness Adjacent | 12,181.52 | |
| 56 | Conejos Peak | Larger than 5K acres | 19,075.14 | |
| 57 | Conejos Peak | Wilderness Adjacent | 8,646.54 | |
| 58.a | Conejos Peak | Wilderness Adjacent | 91.29 | |
| 58.b | Conejos Peak | Wilderness Adjacent | 5.20 | |
| 58.c | Conejos Peak | Wilderness Adjacent | 12.41 | |
| 59 | Conejos Peak | Larger than 5K acres | 58,526.07 | |
| 60 | Conejos Peak | Larger than 5K acres | 8,790.80 | |
| 61 | Conejos Peak | Wilderness Adjacent | 2,457.53 | |
| 62 | Conejos Peak | Larger than 5K acres | 9,344.44 | |
| 63.a | Conejos Peak | Wilderness Adjacent | 53,786.78 | 1970s single-tree selection cuts and precommercial thinning |
| 63.b | Conejos Peak | Wilderness Adjacent | 321.95 | |
| 63.c | Conejos Peak | Wilderness Adjacent | 37.31 | |
| 64 | Conejos Peak | Larger than 5K acres | 40,961.39 | 1970s-1980s single-tree selection cuts |
| 65 | Conejos Peak | Carson Inventory adjacent | 4,463.88 | |

Rvsd Plan - 00001529

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| Inventory Polygon[5] | Ranger District | Size | Acres[6] | "Not substantially noticeable" |
|---|---|---|---|---|
| 66 | Conejos Peak | Carson Inventory adjacent | 2,382.85 | |

## Next Steps

### Evaluation

The next step in wilderness recommendation process is to evaluate each area on the inventory map for wilderness characteristics. Evaluation of wilderness characteristics is done using five criteria set forth in the Wilderness Act of 1964 and required in the Forest Service Handbook final directives FSH 1909.12, Chapter 70, Section 72.1. A summary of these five criteria is as follows:

1. Evaluate the degree to which the area generally appears to be affected primarily by the forces of nature, with the imprints of man's work substantially unnoticeable (apparent naturalness).

2. Evaluate the degree to which the area has outstanding opportunities for solitude or for a primitive and unconfined type of recreation. The word "or" means that an area only has to possess one or the other. The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre.

3. Evaluate how an area of less than 5,000 acres is of sufficient size to make its preservation and use in an unimpaired condition practicable.

4. Evaluate the degree to which an area may contain ecological, geological, or other features of scientific, educational, scenic, or historical value. These values are not required in an area to be present, but their presence should be identified and evaluated where they exist.

5. Evaluate the degree to which the area may be managed to preserve its wilderness characteristics.

Over the next several months, each area of the inventory will be evaluated for these criteria based on direction from the FSH 1909. 12 Chapter 70. Supporting information that is identified during the evaluation phase will be used to evaluate and assess the area as a whole.

### Analysis and Recommendation

Following the evaluation phase, the Forest Supervisor will decide, based on evaluation and public input, which areas, or portions thereof, will be considered in draft forest plan and alternatives. Comments will be used to make adjustments and prepare a draft environmental impact statement. This will tentatively be available for review in summer 2017. A draft record of decision and final environmental impact statement will occur in winter 2017 with the opportunity for objections.

Once the forest plan is finalized, the final environmental impact statement is released, and a record of decision is signed, the Rio Grande National Forest Supervisor may recommend suitable lands for National Wilderness Preservation System designation to the Chief of the U.S. Forest Service. Such recommendation may then be forwarded to the Secretary of Agriculture, and ultimately to Congress, for their consideration and possible designation. Congress has reserved

6

Case 1:21-cv-02994-REB   Document 24-7   Filed 06/21/22   USDC Colorado   Page 24 of 341

the authority to make final decisions on wilderness designation.  Please see Appendix F for a detailed description of the process from evaluation through recommendation in Forest Service Land Management Planning Handbook 1909.12, Chapter 70.

## Appendix A: Substantially Noticeable Definitions

The term "substantially noticeable" is not directly defined in the Forest Service Handbook 1909.12, Chapter 70 for inventory of lands that may be suitable for inclusion in the NWPS[7]. In February 2016, the Rio Grande National Forest interdisciplinary team developed a definition of 'substantially noticeable' for the specific improvements listed in the Forest Service Handbook[8]. The use of the term "improvements" in this context is taken from the Forest Service Handbook, and means the evidence of past human activities in the area as a whole. An interdisciplinary team of resource specialists drafted the definitions of "substantially noticeable."

## Assumptions Developed When Applying the Substantially Noticeable Definition Matrix

### Linear Features

For linear improvements, such as fences or water pipelines, the determination for whether the improvement is substantially noticeable is not based on a person walking parallel to the feature with a continuous view of the improvement. Rather, the determination is based on a person potentially seeing the feature from different vantage points while traveling cross country in the area.

### Structures

Structures, dwellings, and other relics of past occupation, when they are considered part of the historic and cultural landscape of the area, may be included in the inventory of lands that may be suitable for inclusion into the NWPS.[9]

### Improvements Similar to Those Found in Existing Designated Wilderness

Substantially noticeable improvements occurring in existing wilderness on the Rio Grande National Forest do not influence the consideration of whether the same or similar improvement is substantially noticeable or not substantially noticeable using the final directives of FSH 1909.12 Chapter 70. The final FSH 1909.12 Chapter 70 directives and the Substantially Noticeable definitions will be used to determine if improvements are substantially noticeable. The fact that the same type of improvement may occur in designated wilderness will not influence whether an improvement within an inventory area is substantially noticeable or not substantially noticeable.

### Applying Substantially Noticeable Definitions

The interdisciplinary team applied the Substantially Noticeable definitions during interdisciplinary meetings held between December 2015 and February 2016. The team reviewed each inventory area using the Substantially Noticeable definitions, corporate infrastructure data in Forest Service geodatabases, aerial photography. For those improvements for which there is no corporate record, local knowledge was applied if available.

---

[7] FSH 1909.12 Chapter 70, 71.22b
[8] FSH 1909.12 Chapter 70, 71.22b
[9] FSH 1909.12 Chapter 70, 71.22b #11

The following table includes the other improvements listed in FSH 1909.12 Chapter 70 and a matrix of improvements which are substantially noticeable.

**Table 2. Substantially Noticeable Definition Table**

| Improvement Types FSH 1909.12 Chapter 70 71.22b – Other Improvements | Substantially Noticeable Definitions |
|---|---|
| **Airstrips and Heliports** | Not applicable. |
| **Vegetation Treatments** | Most vegetation treatments are substantially noticeable due to slow regrowth at high elevations. Treatments create deviations in form, line, color, texture and pattern in the surrounding natural landscape. Changes in canopy cover and forms introduced by treatment unit shape are evident and contrast with the surrounding natural landscape. Edges of treatment units are linear or abrupt. Concentrations of treatments may create an unnatural pattern across the landscape. |
| **Timber Harvest Areas** | Most timber harvest areas are substantially noticeable due to slow regrowth at high elevations. Treatments create deviations in form, line, color, texture and pattern in the surrounding natural landscape. The natural landscape appears altered by vegetation treatment improvements.  Changes in canopy cover and forms introduced by treatment unit shape are evident and contrast with the surrounding natural landscape. Edges of treatment units are linear or abrupt. Concentrations of treatments may create an unnatural pattern across the landscape. |
| **Vertical Structures** | Vertical structures associated with communications sites that create deviations in form, line, color, texture and pattern in the surrounding natural landscape and are substantially noticeable.\n\nOther vertical structures have minimal impact, including their maintenance and access requirements and are not substantially noticeable. |
| **Areas of Mining Activity** | Areas of mining activity where improvements create deviations in form, line, color, texture and pattern in the surrounding natural landscape.  The natural landscape appears altered by mining activity impacts. Improvements are not partially or completely screened by topography or vegetation from most vantage points. Historic mining activities are part of the cultural landscape and are not substantially noticeable. |
| **Range improvement areas** | Structural and non-structural improvements contrast with the form, line, color and texture of the surrounding landscape and/or structural improvements begin to dominate the setting are substantially noticeable.\n\nRanching is part of the forest's cultural heritage, and range structures have become accepted as necessary parts of characteristic landscapes. Range structures such as fences, corrals and related structures, and water developments are generally not substantially noticeable unless they meet the following criteria: |

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| Improvement Types FSH 1909.12 Chapter 70 71.22b – Other Improvements | Substantially Noticeable Definitions |
|---|---|
| **Recreation Improvements** | Per FSH 1909.12 Chapter 70:  As a general rule, developed sites should not be included. Areas with minor, easily removable recreation developments may be included.<br><br>Other recreation improvements such as dispersed campsites and outfitter-guide hunting camps are not substantially noticeable. |
| **Utility Corridors/Linear Rights-of-way** | Per FSH 1909.12 Chapter 70: Powerlines with cleared rights-of-way, pipelines, and other permanently installed linear right-of-way structures should not be included.<br><br>Utility study corridor areas, underground pipelines and other linear features without cleared rights-of-ways are not substantially noticeable. |
| **Watershed Treatment Areas** | Watershed treatment areas where improvements create deviations in form, line, color, texture and pattern in the surrounding natural landscape are substantially noticeable.<br><br>Examples include:<br>• Improvements made of non-natural materials<br>• Terraced areas<br>• Post-fire treatments (i.e., filter dams) to control flooding, which are permanent and made of non-natural materials. |

Rvsd Plan - 00001534

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

## Appendix B: Public Comment Summary and Response

The following table summarizes comments received from individual and organizations via email, phone, written letter, or web-based map application.

**Table 3. Public Comments and Changes to Inventory Map.**

| Commenter | Summary/Key Points | Changes to Inventory Map |
|---|---|---|
| Bernie Krystyniak | Supports additional wilderness designations in the Hinsdale County area of the forest. No specific comments on the draft inventory map. | N/A |
| Tom Sobel | Request for GIS data layers | N/A |
| Ardell Broadbent | General comments on support for public use of the national forest. No specific comments on the draft inventory map. | N/A |
| Rio Grande Watershed Emergency Action Coordination Team (RWEACT) | The criteria presented at the May 25, 2016, meeting in Del Norte appears to be more than sufficient for identifying land which should be included in the inventory of acreage which could then be considered as possible additions to Designated Wilderness. We have no additional criteria to suggest. In addition, the Rio Grande National Forest's team has done a very thorough job of identifying all of the acreage that fits the criteria and we feel there is nothing we could add to that remarkable effort. The process can move on to evaluation and assessment with confidence. | N/A |
| Trails Preservation Alliance and COHVCO | General comments on recognition that forest must conduct wilderness inventory, but do not support additional wilderness recommendations on the Rio Grande. No specific comments on the draft inventory map. | N/A |
| Mineral County Board of County Commissioners | Presence of man-made improvements (range improvements, motorized trails, historical mining, historical structures) in areas that are part of the wilderness inventory should exclude these areas from consideration as designated wilderness. | N/A |

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| Commenter | Summary/Key Points | Changes to Inventory Map |
|---|---|---|
| | No specific comments on the draft inventory map. | |
| Jim Bazemore | General comments supporting the process as outlined during June 1 public meeting. Specific comments about the conditions and trends of grazing impacts in existing wilderness in the Assessment.<br><br>No specific comments on the draft inventory map. | N/A |
| Intermountain Forest Association | General comments on recognition that forest must conduct wilderness inventory, but do not support additional wilderness recommendations on the Rio Grande.<br><br>No specific comments on the draft inventory map. | N/A |
| Hinsdale County Board of County Commissioners | Do not support additional wilderness recommendations on the Rio Grande.<br><br>No specific comments on the draft inventory map. | N/A |
| The Wilderness Society, Rocky Smith (independent consultant), San Luis Valley Ecosystem Council, Defenders of Wildlife, Quiet Use Coalition, Rocky Mountain Wild | Inventory criteria on web (story map) and criteria on hand out at public meeting are different. | N/A |
| | The roads criterion needs to be refined to better reflect the direction in section 71.22a of the Forest Service Handbook (FSH), and, in particular, the direction in subsections 71.22a(1)(b) and (c) that directs that areas with roads recommended for reclassification to Maintenance Level (ML) 1 or identified as "likely not needed" in the travel analysis should be included in the inventory. | Reviewed 2015 Travel Analysis recommendations and determined ML 2 roads "likely not needed" and ML 2 |

Rvsd Plan - 00001536

| Commenter | Summary/Key Points | Changes to Inventory Map |
|---|---|---|
| | The 2015 Travel Analysis Report identifies: a) 48 ML 2 National Forest System road segments (totaling 56 miles) as "likely not needed"; and b) 272 ML 2 National Forest System road segments (totaling about 431 miles) for reclassification to ML 1. | roads identified for reclassification to ML 1 are already included in the wilderness inventory. |
| | To better reflect the handbook direction, the Forest Service can modify the online direction to say: "the inventory includes: a) blocks of lands 5,000 acres or larger; b) areas adjacent to existing wilderness, primitive areas, administratively recommended wilderness, or wilderness inventory of other Federal ownership regardless of size; and c) "A standalone area (not adjacent to existing Wilderness) that is less than 5,000 acres but of sufficient size to make practicable its preservation and use in an unimpaired condition." | N/A |
| | Regarding "excluded constructed features", we request that you describe what constitutes substantially noticeable vegetation management based on rational considerations and knowledge of field conditions. | N/A |
| | The first bullet under "substantially noticeable features" (on website) disqualifies improvements that "suggest substantially noticeable human activity in the area as a whole." While we agree with the concept that disqualifying improvements are those with impacts that appear substantially noticeable in the area as a whole, we request more detail about the types of features examined and the reasons for disqualification. | N/A |
| | The second bullet under "substantially noticeable features" disqualifies all tree removal activities from any year unless otherwise determined by specialist knowledge. This is a very broad disqualification statement that needs to have a more restrictive application. | The final wilderness inventory documentation will identify definitions for "substantially noticeable" features for all other improvements identified in FSH 1909.12 Ch. 70. |
| | We are concerned that the transportation data that was used to generate the polygons may not align with the data presented in the Travel Analysis Report and Motor Vehicle Use Maps. We ask that you double-check the accuracy of the transportation layer being used in the spatial analysis, and that you are correctly applying the data to the roads criteria described in FSH 1909.12, chapter 70, section 71.22(a). | N/A |
| | We believe that wilderness inventory polygon 15 improperly excludes the western part of the Sawlog Upper Tier Roadless area and adjacent lands in the Storm King Mountain area. The map depicts the eastern portion of NFS road 41G incorrectly. The map shows it located along the North Fork of Carnero Creek, and as such separating | Adjusted polygon 15 on inventory map as described in this comment. |

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| Commenter | Summary/Key Points | Changes to Inventory Map |
|---|---|---|
| | the western area from wilderness polygon 15 to the east. Forest and County Road 41G actually follows the Middle Fork of Carnero Creek to the west, and that segment of road is accurately depicted on the map.<br><br>The route incorrectly depicted on the wilderness inventory map as road 41 G along the North Fork of Carnero Creek is actually Forest Trail 773 (aka the North Carnero Trail, a hiking/horse trail), at least for the length of the 2.66 mile segment between the private land parcels. This trail extends north from Forest Road 680. Forest Road 680 in this corridor is a ML-1 closed road for 3.45 miles on USFS land (not including the .8 mile segment on private land) according to the "Rio Grande RoadsWithCoreAttibut" page on the 'Decommissioned Roads' spreadsheet available on the RGNF TAP page online at http://www.fs.usda.gov/detailfull/riogrande/landmanagement/projects/?cid=fseprd484850&wid th=full Given that ML-1 closed roads and trails are not supposed to exclude lands from the initial Wilderness Inventory, we believe that lands on both the east and west sides of Forest Trail 773 and the closed segment of FR 680 should be included in Wilderness inventory polygon 15. | |

Rvsd Plan - 00001538

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

## Appendix C: Team Members

The following table presents all persons associated with the project during the inventory process. Team members may be part of several teams listed.

**Table 4. Team Members**

| Name | Affiliation & Title |
|---|---|
| Erin Minks | Forest Planner |
| Tom Malecek | Deputy Forest Supervisor |
| Judi Perez | Range, Soils, Water and Invasive Species Program Manager |
| Natalie Heberling | R2 Planning Team, GIS |
| Cheryl O'Brien | GIS |
| Tristram Post | District Ranger, Saguache |
| Lisa McClure | Wilderness Manager |
| Gerard Sandoval | Forestry Technician |
| Mike Blakeman | Public Affairs Officer |
| Andrea Jones | District Ranger – Conejos Peak |
| Martha Williamson | District Ranger - Divide |
| Kelly Garcia | Range Management Specialist |
| Rachel Franchina | Forest Service Enterprise Program, Recreation Planner |

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

## *Appendix A3 – Forest Plan Revision Wild and Scenic Rivers Process Summary*

Below is a table (Table 1) and short summary of the streams that will need to be evaluated during the Forest Plan revision process. Information from the full evaluation completed for the 1996 and updated information provided internally is included. Forest Service Handbook 1909.12, Chapter 80 Sections 82.61 and 82.62 were used to determine what stream segments were evaluated for the 1996 plan revision. An initial internal evaluation has determined that 25 segments may need to be evaluated. These, and an additional 9 segments that occur in the Baca Tract which was acquired after the 1996 evaluation and have not been evaluated entirely.

Table 1. Rio Grande National Forest Wild and Scenic River Evaluation - 2016

| Number | Stream or River Name | District | Length (mi) | Potential miss 1996 / Baca Tract |
|--------|----------------------|----------|-------------|----------------------------------|
| 1 | Asiatic Creek | Conejos Peak | 2.12 | 1996 |
| 2 | Cat Creek | Conejos Peak | 3.89 | 1996 |
| 3 | Coal Creek | Conejos Peak | 1.16 | 1996 |
| 4 | Cropsy Creek | Conejos Peak | 1.67 | 1996 |
| 5 | East Fork Navajo River | Conejos Peak | 0.87 | 1996 |
| 6 | Jarosa Creek | Conejos Peak | 0.60 | 1996 |
| 7 | La Jara Creek | Conejos Peak | 1.08 | 1996 |
| 8 | Middle Zapata Creek | Conejos Peak | 3.11 | 1996 |
| 9 | North Fork South Zapata Creek | Conejos Peak | 2.14 | 1996 |
| 10 | San Luis Creek | Conejos Peak | 2.13 | 1996 |
| 11 | Bird Creek | Divide | 1.94 | 1996 |
| 12 | East Branch Pinos Creek | Divide | 0.11 | 1996 |
| 13 | East Willow Creek | Divide | 8.73 | 1996 |
| 14 | Middle Fork Pole Creek | Divide | 3.37 | 1996 |
| 15 | North Fork Pole Creek | Divide | 1.95 | 1996 |
| 16 | Flagstaff Creek | Saguache | 2.22 | 1996 |
| 17 | Little Red Creek | Saguache | 1.31 | 1996 |
| 18 | Masauernez Creek | Saguache | 1.33 | 1996 |
| 19 | Merkt Creek | Saguache | 2.16 | 1996 |
| 20 | Middle Fork Cotton Creek | Saguache | 1.48 | 1996 |
| 21 | Middle Fork North Crestone Creek | Saguache | 2.11 | 1996 |
| 22 | North Fork Cedar Creek | Saguache | 1.31 | 1996 |
| 23 | Peterson Creek | Saguache | 3.14 | 1996 |
| 24 | Rock Creek | Saguache | 0.11 | 1996 |
| 25 | South Fork Cedar Creek | Saguache | 0.85 | 1996 |
| 26 | Alpine Creek | Saguache | 2.9* | Baca Tract |
| 27 | Cottonwood Creek | Saguache | 2.8* | Baca Tract |
| 28 | Cedar Canyon / Cedar Spring | Saguache | 2.6* | Baca Tract |
| 29 | Deadman Creek | Saguache | 3.3* | Baca Tract |
| 30 | Pole Creek | Saguache | 1.3* | Baca Tract |
| 31 | Short Creek | Saguache | 1.5* | Baca Tract |
| 32 | Spanish Creek | Saguache | 4.5* | Baca Tract |
| 33 | South Spanish Creek | Saguache | 2.4* | Baca Tract |

Rvsd Plan - 00001540

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

| 34 | Willow Creek | Saguache | 0.1* | Baca Tract |
|----|--------------|----------|------|------------|

*initial estimate only, to be determined during analysis

Most of the Baca Tract streams originate in the Rio Grande National Forest that were evaluated originally, but the entire segments should be evaluates through the newly acquired land.  An initial GIS evaluation determined the potential lengths of these nine segments, along with the 25 segments identified through this round's initial analysis. This amount to evaluation of 34 segments or approximately 72 miles of stream segments.

## *Appendix A10 - Implementation of the Watershed Condition Framework in Forest Plan Revision*

In 2010, Forest staff was tasked with assessing all 6th-level watersheds forest-wide. These assessments were done using readily available data, local knowledge, and professional judgement. The assessments were assigned in October 2010 with a completion date of early 2011. The basic process was summarized in a letter to Forest staff in this manner:

### Watershed Condition Framework 6-Step Process



**Step A:** Classify the condition of all of the 6th-level code watersheds on the Rio Grande National Forest using existing data layers, local knowledge, and professional judgment.

**Step B:** Prioritize watersheds for restoration based on ecological, economic, social considerations, partnership opportunities, and potential benefits.

**Step C:** Develop watershed action plans for the priority watersheds that identify the suite of essential project needed to change condition class and estimate costs.

**Step D:** Implement watershed action plans. A watershed is considered to have moved to an improved condition class when all of the essential projects identified in Step C are completed.

**Step E:** Project costs and watershed condition class will be tracked for both annual reporting and 5-year evaluations using the agency financial management and work plan software programs.

**Step F:** Monitor the effectiveness of treatment and assess if condition class was actually improved.

Rvsd Plan - 00001542

Watershed Condition Framework rankings can be adjusted annually as new, more accurate knowledge becomes available or when some event (fire, flood, and /or beetle infestation, etc.) changes the characteristics within a watershed such that the function of the watershed could be changed significantly. Additionally, every 5 years a forest-wide assessment is conducted to determine if any significant changes have occurred within each watershed and to determine a need for reassessment of a given watershed.

From the initial assessment, three watersheds were chosen as priority watersheds for closer analysis and to have Watershed Restoration Action Plans (WRAP) written to address restoration / protection of watershed resources needs. They are included in the following table.

*Table 1. Priority watersheds 6th-level code and name*

| Hydrologic Unit Code | Watershed |
| --- | --- |
| 130100040401 | Middle Fork Carnero Creek |
| 130201020201 | Headwaters of Rio Chama |
| 130201020202 | Archuleta Creek |

Since the completion of the initial analysis some progress has been made to complete essential projects within these watersheds as money is available. A few watersheds were reassessed at the 5-year mark, in the spring of 2016, in response to landscape-level disturbance (beetle and fire) and acquisition of more knowledge about the watersheds conditions. As yet Forest staff has not completed a restoration plan for any of these watersheds.

Priority watershed has a specific meaning in the context of the Watershed Condition Framework. The 2012 planning rule requires the Forest Service to identify and designate priority watersheds.

Rvsd Plan - 00001543

Rio Grande National Forest Plan Revision: Wilderness Recommendation Process Step 1: Inventory

## *Appendix B2 – Geographic Area Map*



## *Appendix B2 – Summary of Terrestrial Ecosystem Integrity*

## Introduction

This report provides a summary of anticipated needs to change in the 1996 Rio Grande Forest Plan to address new requirements in the 2012 Planning Rule to "maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds within the Forest."

Ecological integrity is defined as "the quality or condition of an ecosystem when its dominant ecological characteristics (for example composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence." (36 CFR 219.19)

The Rio Grande Forest Plan Revision Assessment (Assessments 1 and 3 Ecosystem Integrity, Systems Drivers and Stressors for Terrestrial Ecosystems) lists the key characteristics which define ecosystems within the Forest:

- Diversity of vegetation – amount and distribution of vegetation structural stages
- Landscape disturbances and patterns
- Connectivity and fragmentation
- Late successional habitats
- Snags and down woody material
- Rare communities and special habitats

Terrestrial ecosystems within the Rio Grande National Forest include the following (approximate acres):

- Spruce-Fir Forest Mix (930,000 acres or 54 percent of the Forest) – Engelmann spruce, subalpine fir, quaking aspen
- Southern Rocky Mountain Montane-Subalpine Grassland (304,000 acres or 18 percent) – fescue, grasses
- Rocky Mountain Alpine Turf (192,000 acres or 11 percent) – grasses, sedges, sagebrush
- Pinyon-Juniper Woodland and low elevation grasslands (100,000 acres or 6 percent) – two needle pinyon, Rocky Mountain juniper
- Mixed Conifer – dry (95,000 acres or 5 percent) – Ponderosa pine most common
- Rocky Mountain Montane Riparian (62,000 acres or 4 percent) – riparian plants, willows, sedges
- Mixed Conifer – wet (43,000 acres or 2 percent) – Douglas fir most common
- Sagebrush Shrubland (5,000 acres) – bunchgrass, forbs
- Rocky Mountain Gambel Oak – Mixed Montane Shrubland (1,000 acres)
- Inter-Mountain Basins Greasewood Flat (100 acres)

The Rio Grande National Forest currently has 430,000 acres in Wilderness Areas. The forest also has an additional 518,620 acres in 53 different Colorado Roadless Areas. Together, these areas cover about 52% of the 1.83 million acres on the Rio Grande National Forest. There is also an additional 22,678 acres in Research Natural Areas. This half of the forest is highly protected with very little human impacts and a high degree of ecosystem integrity.

On the other half of the forest, there are many standard and guidelines in the amended forest plan that provide for the key ecosystem characteristics identified above. These were examined and led to the recommendations below.

# Recommendations

## Snags and down wood

There are standards in the current plan for retention of snags and down wood. These are sufficient and for the most part, the forest has well above the minimum amount recommended. The only exception is in the ponderosa pine forest type, where the current plan recommends a minimum of 3 14" snags per acre and 4-9 tons/acre of downed logs. Stand exam and Forest Inventory Analysis data suggest that the ponderosa pine forests aren't meeting these minimums. Assessment of the minimum retention amounts, especially for ponderosa pine, is recommended. Adding a minimum retention amount for pinyon-juniper forests should also be considered. Changes may also be needed due to the changed condition in the spruce-fir cover type to ensure future snag levels are sufficient.

## Late-successional habitat

Currently only about 13% of the forest is in late-successional habitats. This is no surprise given the recent large-scale disturbances on the forest. We expect this to increase under current plan direction, but future predicted levels are still less than the historic estimates of late-successional habitat, and may be reduced as disturbances such as large fires and insect outbreaks increase in frequency due to climate change.

Based on monitoring reports, it is recommended that the definition and management strategy of late-successional habitat in the current plan be reviewed and modified to include estimates of current and desired amounts by ecosystem type.

## Diversity of Vegetation

The assessment and published literature suggest that many ecosystems on the Rio Grande National Forest are within the range of natural variation. However, little is known about some of these ecosystems. The 2013 monitoring report echoes this – "Forested lands across the Forest are generally assumed to reflect composition, structure, and pattern with a natural range of variability as described in Appendix A of the Final Environmental Impact Statement for the 1996 Revised Land and Resource Management Plan."

Exceptions include the Dry Mixed-Conifer type. Given the more frequent fire regime of this type, it is generally thought to have been more impacted by fire suppression and thus more departed from historic conditions. Given that past management activities and disturbance events may have shifted species composition by removing the mature ponderosa pine, it is recommended that in this type, restoration efforts are continued to move this type towards a sustainable species composition and landscape pattern where fires can function in a desirable manner.

In the Wet Mixed Conifer type, modelling suggests that currently this ecosystem is highly departed from the natural range of variation. We believe this is due to recent fires and heavy spruce budworm mortality. It is recommended that this type in particular undergo further investigation.

Although there are many standards and guidelines related to the diversity of vegetation, the 1996 plan doesn't specifically describe the desired distribution of vegetation types and structural stages on the forest. One recommendation is to more fully describe the desired condition for each ecosystem type.

## Landscape disturbance and processes

Current standards and guidelines regulate and limit the size of silvicultural openings. They also promote management of stands infected by insects or disease, aim to minimize the risk of spreading infestations, and encourage incorporation of insect and disease potential when planning management activities. Guidelines endorse the use of broadcast burning and suggest development and implementation of a

prescribed-fire program. One standard says to manage land treatments to limit the sum of severely burned and detrimentally compacted, eroded, and displaced land to no more than 15% of any land unit.

Some plan components focus on how management should emulate the pattern, timing, and frequency of natural disturbances. It is recommended these plan components be reviewed and clarified. There is a concern about whether or not this is always desirable and whether this is consistent with other plan components and direction, such as the Southern Rockies Lynx Amendment.

In addition, it is recommended that strategic fire management zones be incorporated into the forest plan to provide guidance on prescribed burning and allowing fires to burn for resource benefit.

## Connectivity and Fragmentation

The current plan has some standards and guidelines related to connectivity and fragmentation. For instance, there is a forestwide objective to use existing roads, instead of constructing new ones and there are standards and guidelines about limiting connected disturbed areas, revegetation of temporary roads and travelways no longer needed, seasonal road closures, and restricting and limiting roads.

As discussed in the assessments, most terrestrial ecosystems are well protected within wilderness areas, roadless areas, and research natural areas and have low fragmentation due to roads, railroads, and private in-holdings. The exceptions to this are the Southern Rocky Mountain Montane-Subalpine Grasslands, Pinyon-Juniper Woodlands and Low Elevation Grasslands, and Rocky Mountain Montane Riparian. These 3 ecosystems were found to have the most fragmentation due to roads, railroads, and private in-holdings and have the least protection in wilderness areas, roadless areas, and research natural areas. It is recommended that extra protection and attention be given to these types as a result. In addition, given the dominance of the spruce-fir cover type on the forest and its changed conditions, connectivity in this type is important and should be investigated further.

It is also recommended that the idea of connectivity be more fully explored and better incorporated into plan components and direction. In essence, connectivity on the Rio Grande National Forest is still a knowledge gap.

## Rare communities and special habitats

Rio Grande National Forest personnel are still considering how best to proceed on the management of rare communities and special habitats. Some recommendations include the consolidation of plan direction on rare communities and special habitats given that it is currently dispersed throughout the plan. It is also recommended that the high diversity potential conservation areas discussed in Assessment 1 be investigated further as possible designated areas.

## Other Recommendations

It is also recommended that current plan components be reviewed and updated individually for clarity. They may need to be updated so that they better fit the definition of a desired condition, objective, standard, or guideline. All plan components should be reviewed to ensure they comply with the criteria in the 2012 planning rule.

In addition, there is a need to change some plan components simply due to difficulty or infeasibility of implementation.

Rvsd Plan - 00001547

# *Appendix B4 – Overarching Forest Plan Goals*

## Protect and restore watershed health, water resources, and the systems that rely on them

National forests that exist today were initially created under the guidance of the National Forest Reserve Act of 1891. The Act allowed the President of the United States to set aside forest reserves from the land in the public domain. This Act provided for wise use of the lands that would provide protection of timber at the headwaters of streams and reduce downstream flooding and provide water for irrigation in the West all summer[10]. Protecting and restoring watershed health reaffirms the Act that initiated the national forests of today.

Opportunities would be provided to emphasize collaborative stewardship of watersheds and interrelated biological, economic, and social factors that affect these areas. Heathy and functioning watersheds contribute to overall resource health.

## Maintain and restore sustainable, resilient ecosystems

Ecosystems are a barometer of the quality of land management practices. A natural variety of species, genetic composition, and ecological processes are key to providing the diversity needed to be resilient in the face of environmental disturbances and changes.

Aggressively diversifying age classes and structure, seral stage, and habitat classes in the next planning horizon would provide many benefits including but not limited to providing connectivity, responsiveness to anticipated changes in climate, ecosystem services, recreation, increased social and economic benefits, and more.

## Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land

The Rio Grande National Forest would continue to contribute forest products and tourism opportunities that are important to local economies and provide ecosystem services for current and future generations.

We would maintain places where human influence is limited as well as protect religious, Tribal, and culturally significant areas.

Opportunities would be available for individuals, partners, and organizations to be active participants in managing, monitoring, and implementing projects that achieve integrated resource management.

---

[10] Early Administration of the Forest Reserve Act: Interior Department and General Land Office Policies, 1891-1897, James Muhn, http://www.foresthistory.org/Publications/Books/Origins_National_Forests/sec17.htm).

# San Luis Valley Air Toxics Analysis | 2012

San Luis Valley Air Toxics Analysis

Executive Summary:

Analysis of the San Luis Valley using the National Air Toxics Assessment (NATA), the locally positioned particulate matter (PM10) monitors, and meteorological data from 2000 to 2011 resulted in no significant cancer or neurological risk findings. The potential for respiratory risks, though not rising above the hazard quotient threshold, indicated the need for a more thorough review of the data. Although onroad and nonroad diesel sources are contributing to the existence of diesel particulate matter, it appears that the focus of the CARE grantee, the San Luis Valley Ecosystem Council, when considering potential sources of toxic air pollution should be centered on the issue of emissions related to local landfills and/or analyzing the contents of local particulate matter through speciation. The first part of this analysis evaluates hazardous air pollutants (HAPS), the second part looks at coarse particulate matter (PM10.)

Prepared 3/16/12

by Kyle Olson

Community Air Toxics Coordinator

US EPA Region 8

303-312-6002 olson.kyle@epa.gov

pg. 1

# San Luis Valley Air Toxics Analysis | **2012**

**Introduction:**

The San Luis Valley, composed of Alamosa, Conejos, Costilla, Mineral, Rio Grande, and Saguache counties for the purpose of this analysis, is the recent recipient of an EPA CARE level 1 grant. The purpose of the grant is to assess the environmental concerns in the valley, and was awarded to the San Luis Valley Ecosystem Council (SLVEC). Although the SLVEC is investigating many alternatives to how the funds should be spent, this particular paper will focus only on the air pollution concerns. The model used to conduct the analysis is the 2005 National Air Toxics Assessment (the most recent data set), monitoring data is from the Colorado Department of Public Health and Environment's two monitors in Alamosa, and meteorological data is from the University of Utah's MesoWest database.



*Figure 1: San Luis Valley as seen from above New Mexico, markers indicate point sources in NATA.*

Rvsd Plan - 00001550

# San Luis Valley Air Toxics Analysis | **2012**

## National Air Toxics Assessment Modeling:

NATA allows for the analysis to begin with EPA's central concern: risks to human health, and to then work backwards from there to pollutants, emissions, and sources. This process was conducted in five steps.

The first step was a risk analysis at the population tract level, reviewing the three risk categories that NATA uses: cancer, respiratory, and neurological. Cancer risk is broken out by pollutant origination sector (point, nonpoint, onroad, nonroad, background, and secondary) and none of these individually rose close to hazardous range. The highest total combined cancer risk was in Alamosa County, but based on the NATA model the EPA can conclude that the risk of developing cancer from toxic air pollutants is very low at this time: where a hazard is indicated at the value of 1 or above, the cancer risk in this particular tract was only 0.0000174, or roughly 15 possible cases of cancer for every 1,000,000 people. For context, the total cancer risk from air pollution in Denver's most polluted tract is 0.000132, or 132 possible cases of cancer for every 1,000,000 people; cancer risk in Alamosa county is approximately 9 times lower than Denver. Therefore we can conclude that cancer risk from inhalation of air pollution is not a concern in the San Luis Valley at this time. The respiratory risk analysis and the neurological analysis didn't result in any significant results that indicated an immediate danger to human health; the highest values were 0.351 and 0.025, respectively. Both of these highest values also were modeled as occurring in Alamosa County. Although the respiratory value is below the hazard index threshold of 1 for all pollutants combined, some individual pollutants contained in the model appeared to have some high readings , warranting further investigation. Cursory analysis indicated the following about the highest hazard index tract, located in the city of Alamosa:

**Alamosa Cty, CO**
FIPS 08003, Tract 981600
**Avg totl respiratory HI = 0.4**
less than 1% point sources
28% nonpoint sources
12% onroad mobile sources
5% nonroad mobile sources
2% background
53% secondary
**Pollutant contributions:**
65% Acrolein
17% Acetaldehyde
13% Formaldehyde

Based on the respiratory concerns, the analysis next considered three specific emissions categories contributing to hazardous air pollutants. These include onroad, nonroad, and nonpoint sources, again at the population tract level. Again, San Luis Valley residents are fortunate in that none of these particular sectors, when analyzed for specific pollutant contributors (for example, modeled gasoline combustion emissions related to potential respiratory risk) yielded any outstanding results. The nonpoint source category included risk data for boilers and process heaters, non-wood heating, wood and wood residue heating, commercial cooking, commercial and non-commercial use of solvents, paint stripping

pg. 3

# San Luis Valley Air Toxics Analysis | **2012**

operations, halogenated solvent cleaners, gasoline distribution and storage, open & prescribed and managed burning, and portable fuel containers. Notably missing from the NATA model for the San Luis Valley are the following categories: stationary reciprocating internal combustion engines, pesticide application, landfills, and agricultural field burning. It is unfortunate that these gaps exist in the "nonpoint emissions categories" portion of the model, as they have a higher probability of being central hazardous air pollution concerns for this area. To find emissions from these sources requires manual analysis of the data within the model.

The third step was to consider individual hazardous air pollutants. Because there are 187 air toxics and diesel PM, it is not possible to query every pollutant and analyze the table resulting from each. Therefore, a total emissions table was downloaded from the database and pollutants ranked by tons per year within the following categories: onroad, nonroad, major point, area point, nonpoint, rail, prescribed burns, and wildfires. Any pollutant that rose above the emissions threshold of 10 tons per year (TPY) was selected for further analysis.

| Row Labels | Sum of 2005 WILDFIRES | Sum of 2005 RAIL | Sum of 2005 PRESCRIBE D_BURNS | Sum of 2005 NONROAD-OTHER | Sum of 2005 ONROAD | Sum of 2002 AREA NONPOINT | Sum of 2005 AREA POINT | Sum of 2005 MAJOR POINT |
|---|---|---|---|---|---|---|---|---|
| 2,2,4-Trimethylpentane | 0.000 | 0.008 | 0.000 | 104.633 | 34.826 | 2.976 | 0.000 | 0.000 |
| Benzene | 13.884 | 0.009 | 0.000 | 28.535 | 29.363 | 23.601 | 4.882 | 0.000 |
| Ethyl Benzene | 0.000 | 0.007 | 0.000 | 21.051 | 14.713 | 0.674 | 1.833 | 2.946 |
| Formaldehyde | 31.778 | 0.147 | 0.000 | 18.933 | 11.433 | 21.233 | 1.011 | 0.000 |
| Hexane | 0.202 | 0.019 | 0.000 | 17.478 | 11.607 | 5.519 | 2.144 | 0.000 |
| Methanol | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 17.925 | 0.000 | 0.000 |
| m-Xylene | 0.000 | 0.000 | 0.000 | 63.614 | 41.605 | 0.000 | 0.000 | 0.000 |
| o-Xylene | 0.000 | 0.000 | 0.000 | 22.608 | 15.014 | 1.699 | 0.000 | 0.000 |
| Toluene | 7.013 | 0.011 | 0.000 | 307.408 | 100.529 | 13.851 | 56.939 | 2.823 |
| ...Only 9 of the 187 HAPs are included in this table, other small readings account for the Grand Total discrepancy... | | | | | | | | |
| Grand Total | 73.823 | 0.340 | 0.000 | 599.549 | 274.595 | 124.290 | 88.412 | 31.317 |

*Table 1: NATA pollutant analysis by category to determine 10 ton per year (TPY) emission threshold. Nonroad, onroad, and area point sources are highlighted in the Grand Total row because of the potential for the CARE grant to address these sectors.*

The following pollutants were captured in this analysis: 2,2,4-Trimethylpentane, Benzene, Ethyl Benzene, Formaldehyde, Hexane, Methanol, Xylenes, & Toluene. Some additional pollutants were added to this list due to their toxicity and common occurrence across the rest of the country, these included: Acetaldehyde, Acrolein, 1,3-Butadiene, and Diesel PM. All four of these pollutants occurred in the San Luis Valley with values of 8.63 TPY (Acetaldehyde), 5.23 TPY (Acrolein), and 4.99 TPY (1,3-Butadiene), with Diesel PM represented on an exposure concentration rather than TPA scale.

The fourth step considers the sources of the identified pollutants. The highest occurring hazardous air pollutant (HAP) was Toluene. Nonroad and onroad sources contribute 307.4 and 100.5 TPY, respectively.

# San Luis Valley Air Toxics Analysis | **2012**

It is also emitted from landfills in the valley at 56.9 TPY, far and away the most common toxic air pollutant from a single, stationary source in the San Luis Valley.

However, pollutants from stationary sources emit approximately 124.29 TPY, while onroad sources emit 275.6 TPY and nonroad an estimated 599.55 TPY. Although it is easy to identify the nonroad sources in an agricultural community, it is much more difficult to address the pollutant problem from this source without spending a lot of money to replace or retrofit high-emission vehicles. The EPA's Diesel Emissions Reduction Act does have an annual grant competition which would be highly beneficial for the San Luis Valley Ecosystem Council to consider applying for, but to be effective will mean partnering with the farmers in the valley and convincing them to volunteer their vehicles for retrofits or replacements. For more information on this grant program please visit: http://www.epa.gov/diesel/grantfund.htm. You can also speak with Kyle Olson in EPA Region 8 about the program.

HAP Emissions from Stationary Sources in the San Luis Valley- NATA 2005

| Row Labels | Sum of EMISSIONS_TPY |
|---|---|
| ⊞ Dry Cleaning Facilities: Perchloroethylene | 1.08945 |
| ⊞ Gasoline Distribution (Stage I) | 1.215685002 |
| ⊞ Industrial/Commercial/ Institutional Boilers & Process Heaters - gas | 0.024156384 |
| ⊟ Municipal Landfills | 84.03790386 |
| 1,1,2,2-Tetrachloroethane | 0.697863799 |
| 1,4-Dichlorobenzene | 0.11562799 |
| Acrylonitrile | 1.25804826 |
| Benzene | 3.247550868 |
| Carbon Disulfide | 0.165390351 |
| Carbon Tetrachloride | 0.002304919 |
| Carbonyl Sulfide | 0.110250371 |
| Chlorobenzene | 0.105402385 |
| Chloroform | 0.013415768 |
| Ethyl Benzene | 1.833108541 |
| Ethyl Chloride | 0.302086083 |
| Ethylene Dibromide | 0.000703731 |
| Ethylene Dichloride | 0.151974208 |
| Ethylidene Dichloride (1,1-Dichloroethane) | 0.870983658 |
| Hexane | 2.120792628 |
| Mercury & Compounds | 0.000219413 |
| Methyl Chloride | 0.228832174 |
| Methyl Chloroform | 0.239876951 |
| Methyl Isobutyl Ketone | 0.701555879 |
| Methylene Chloride | 4.549614924 |
| Propylene Dichloride | 0.076172888 |
| Tetrachloroethylene | 2.316851927 |
| Toluene | 56.93920002 |
| Trichloroethylene | 1.387729152 |
| Vinyl Chloride | 1.718313582 |
| Vinylidene Chloride | 0.07262052 |
| Xylenes (Mixture of o, m, and p isomers) | 4.811412874 |
| ⊞ Not a MACT process | 32.11144334 |
| ⊞ Stationary Combustion Turbines - Natural Gas | 0.124500003 |
| ⊞ Stationary Reciprocating Internal Combustion Engines - Natural Gas | 1.125 |
| ⊞ (blank) | |
| **Grand Total** | **119.7281386** |

*Table 2: Emissions sources displayed, with Municipal Lanafills showing specific pollutants. 100% of the Toluene from area point sources is emitted from lanafills, making toluene at lanafills a less complex emissions problem to consider.*

pg. 5

# San Luis Valley Air Toxics Analysis | **2012**

While mitigating pollution from mobile sources may address more tons of pollution, the concern remains that the sources are mobile, and therefore may not always be in the valley. Certain types of nonroad sources, of course, remain on the farm or site, depending on the industry, but stationary sources can be a better way to ensure that grant funds benefit the valley in the long run. Table 2, above, demonstrates that to total area point emissions of Toluene are emitted from a single source. Given the high toluene NATA modeling results from landfills, it is recommended that a potential air toxics approach may compliment a more comprehensive solid waste project based in the San Luis Valley.

#### Statistical Evaluation of Meteorology & Course Particulate Matter (PM10) Monitoring:

There are two PM monitors in the San Luis Valley, both in Alamosa. One sits at 208 Edgemont Blvd., the other at 425 4th St; both are operated by the Colorado Department of Public Health and Environment (CDPHE.) Data from these monitors was evaluated from 1/1/2000 to 10/27/2011. All days that exceeded the National Ambient Air Quality Standard (NAAQS) for PM10, that is: 150 micrograms per cubic meter (ug/m3) averaged over a 24 hour period, were pulled from the dataset and compared to meteorological data from the MesoWest database.

The purpose of the evaluation is to determine, statistically speaking, whether the days with high dust readings can be explained by high wind situations, or whether there may be another source of PM10 that San Luis Valley citizens should be aware of. The meteorological data was evaluated on all 22 days with measurements that exceeded the threshold, and a correlation coefficient was calculated for the average and the median gust miles per hour (MPH) and the average and median wind MPH. The highest correlation was between median wind MPH and PM10 monitored level, with a value of 0.425 (0 would indicate no correlation, 1 would indicate a high correlation.) This value implies quite a bit of random variability, so a test for significance was performed using the following formula:

$$t = r\sqrt{\frac{n-2}{1-r^2}}$$

Where r=0.425 (correlation), n=22 (sample size), and calculated t=2.0997. In order to be at least 90% sure that these two variables were related the t value would have to exceed 1.725 (student's t critical values table, degrees of freedom as 22-2=20.) Based on the sample size, a 2 tailed test for significance demonstrated that there is moderate evidence to suggest that wind speed can be associated to high PM10 days (rejected null hypothesis.) Lastly, the calculated p value was 0.02397, a low enough value to indicate a good probability of the test statistic being significant (threshold being below 0.05.)

San Luis Valley Air Toxics Analysis | **2012**



*Figure 2: Scatter plot revealing moderate correlation between median wind speed and measured PM10.*

This finding relieves some of the dust creation burden that may have been inappropriately placed on mobile or combustion sources, but still doesn't solve the health problem of local residents inhaling high amounts of particulates on days that exceed air quality thresholds. The PM10, in other words, is not defined by any well-studied source (like combustion), so it is unclear what comprises the dust being blown around the valley.



*Figure 3: PM10 exceeded 150ug/m3 in Feb, Mar, Apr, May, June, Oct, and Dec at least once between 2000 and 2012, the above pie chart shows the distribution of occurrence within those months (e.g. most exceedances occurred in April.)*

pg. 7

## San Luis Valley Air Toxics Analysis | **2012**

The figure above is a summary analysis of the time of year the monitors record values exceeding 150 ug/m3 of PM10, and the percent of the readings that fell into each month. As is evident, 41% of the exceedances occurred in April over the last 11 years. Given the finding above that PM10 can be linked to windy days, it is tempting to assume that April must be an exceptionally windy month. However, of the months with exceedances, April has average wind speeds (19.4 is the average MPH in April, 19.7 MPH is the average over the entire year), and has a median wind gust speed of 32.7 MPH, the lowest measured speed of gusts of the seven months in question (see figure 4, below.) This begs the question of whether there may be some other activity occurring in the valley in April that stirs up the dust, and whether the dust may have herbicides or pesticides comprising it. On the other hand the dust may not be comprised on anything toxic at all, but because the samples taken at the two PM10 monitoring stations are not speciated, the composition of the particulate is unknown. For this reason it may benefit the community to pay for speciation of the samples, especially in April, to determine the content of the course particulate matter being inhaled.



*Figure 4: Although 41% of exceedances of the PM10 150 ug/m3 threshold occur in April, it is the month with only average wind speeds and the lowest measured gust speeds.*

### Conclusion:

Based on the NATA model there is no immediate risk of cancer or neurological health in the San Luis Valley at this time. Respiratory risk, as calculated by the model, also doesn't surpass the hazard quotient threshold, although there does appear to be 2,2,4-Trimethylpentane, Benzene, Ethyl Benzene, Formaldehyde, Hexane, Methanol, Xylenes, & Toluene in the area that could perhaps be addressed by the grantee. Of these pollutants, Toluene was the pollutant that occurred in a significant quantity from a single source, making it an easy target for the grantee to consider. The emissions sources of the other pollutants are either from mobile sources (which can be addressed using the EPA's Diesel Emissions

pg. 8

# San Luis Valley Air Toxics Analysis | **2012**

Reduction Act program- see page 5) or are from multiple sources, making them much more difficult to mitigate in a single project.

If nonroad and onroad sources give the grantee pause for concern, then the EPA has a very successful National Clean Diesel Campaign strategy authorized by the Diesel Emission Reduction Act that is proven to mitigate harmful air pollutants from heavy duty diesel sources. CARE funding can be used to fund these strategies, as well as separate funding that the grantee can compete for when the 2012 Request for Proposals is released April 9th. This strategy will require the SLVEC to partner with local farmers to volunteer their fleets for retrofit, upgrade, or replacement.

Evaluation of PM10 monitoring data from 1/1/2000 through 10/27/2011 demonstrated that the PM10 in the valley has exceeded the NAAQS threshold of 150 ug/m3 22 times. All of these exceedances occurred on high wind days, so they did not trigger a need to categorize the San Luis Valley as a non-attainment area for PM10. Nevertheless, residents are still breathing in the particulates regardless of the regulatory designation, so it is a potential health concern to consider. The data indicated that 41% of these exceedances occurred in the month of April, even though April is not to most windy month, as measured by the daily average wind speed and median gust speed. Additionally, the PM10 samples from the monitors in the area are not subjected to speciation, so it is not clear what the PM10 is composed of. For this reason it may be useful for the San Luis Valley Ecosystem council to consider using future funds to pay for sample speciation, especially in April, to rule out the possibility of toxicity in local PM. If the dust is generated by local agricultural activities it may be useful for the valley to consider establishing a set of Best Management Practices (BMPs) to help the local agriculture sector avoid contributing to PM10 on high wind days or to consider the potential toxicity of pesticides and/or herbicides used on the fields.

**Comments on draft Assessment 13, Cultural and Historic Resources**

*We believe this draft assessment adequately captures existing information regarding Cultural and Historic resources.*

We agree with the statement on page 3, the table on page 9, and the statement on page 18 indicating that the majority of the planning area (~82%) has not been inventoried for cultural and historic resources.  Since many sites or resources have not been discovered or properly documented;  it is  likely they are experiencing unknown damage, destruction and negative influences by both permitted and unauthorized activities and/or other uses occurring on the forest.

•       There are Misspelled words and unedited sentences in several places in this assessment.
•       This section could use a glossary for technical terms like "lithic," "B.P.," and "debitage."
•       The RGNF may harbor some unique high-elevation sites of interest which require greater levels of protection, and efforts to upgrade sites should be made throughout the forest wherever possible.
•       The stories about damages or destruction of historic sites due to the lack of adequate planning for management treatments, lack of monitoring, lack of protective barriers, or other intrusions gave us great concern.  This includes poorly controlled prescribed burns, uncontrolled cattle grazing, vandalism, motorized off-road impacts, and illegal land uses.
**Additional staff is needed for monitoring and enforcement personnel to protect and safeguard sensitive historic sites and areas.**
•        We are aware of efforts made in previous administrations to cut tax support, cut personnel, and force a commercial operation of the forest based on its own cash flow on whatever resources can be found, but we have concern about the efforts being made by the Denver Botanical Gardens and Kansas University to manage osha as a commercial harvested product (page 12) and the potential precedence being set to privatize public assets. This type of partnership has to be managed carefully and with the greatest of oversight. This potential enterprise needs to benefit public interest first.

We strongly believe the following statement in reference to the Fremont Historic Special Interest Area on page 11 must be modified:
•   "The area needs to be surveyed for the undocumented camps so that some of the acreage can return to the timber base."
•   It is presumptuous and pre-decisional to state "so that some of the acreage may "return to the timber base".  A more accurate survey may not modify the boundary of this Special Interest Area, or it might suggest an increase in its size.  Any lands identified for removal from the Special Interest Area could be proposed for a management prescription which is not related to timber, and may not be considered as part of the timber base.

Also, this SIA is near timberline. Logging should not occur in these areas, especially not commercial timber production.

**Table 6.** Conditions and trends influencing the condition of, or the demand for, cultural and historic resources (positively and negatively)
    We recommend the modifications described below be made to Table 6
**"Trends/Conditions and influences" on page 16 and 17.**
Since that information was gleaned from a public meeting, it may only reflect the opinion of those in attendance.   While we agree with most of the information presented and believe it to be factual, we do not agree with all the information and feel that it is incomplete.

*"Grazing and ranching /Can protect important sites if ranchers are informed."*
- This should be modified to state that grazing and livestock needs to be monitored closely because it can also negatively impact sites and resources.
**Page 15 of this assessment provided an example of this.**
Since grazing allotments cover most of the planning area, and most of this land has not been inventoried for cultural and historic resources, it is possible that grazing animals are currently inadvertently negatively impacting unknown or undocumented sites and resources.

**Under USFS Management Page 16**
*"Excessive rules and regulations/ Hamper current lifeways (e.g. grazing, resource gathering)".*
The Influences should be modified to also state:
- "Educates the public; helps preserve and protects resources and permits law enforcement action against violators."  The term "excessive" is subjective and not defined.
- There are individuals who believe most rules and regulations are excessive while others believe there are not enough rules and regulations.  It must be emphasized that most rules and regulations already in place are valuable, and they contribute to the preservation and protection of cultural and historic resources.

*"Roadless designation/road closure/ Impairs access; concentrates use in other areas.*
They can also protect sensitive archaeological values."
- We recommend that the Influences be modified to state "Impairs motorized access on roads".  Roadless areas in and of themselves do not impair general human access. They clearly limit only one specific type of transportation access via roads, but permit most other forms of access.
- We also recommend that the second sentence be modified to state:
  "Can also protect archaeological, cultural and historic sites, resources and values." This change is more inclusive of the protection which roadless areas may offer.

*"Bureaucracy/ Reduces ability to clear archaeological sites in timely manner; requires frustrating NEPA process."*
- The word "frustrating" must be removed from the Influences.  Use of this word is a subjective judgement that is not defined.  Many individuals value the NEPA process,

Rvsd Plan - 00001559

as it helps guarantee that the public is allowed input into the decision making process, and also presents information to the line officer on how best to protect resources.

*"Lack of staff/ Causes inadequate monitoring and water maintenance."*
- This should be modified to state as an Influence:  "Causes inadequate monitoring, enforcement of regulations and water maintenance".

*"Decreased logging allowances /Increases fire risk to historic areas and sites."*
- The Influences should be modified to also include "Reduces risk of known and unknown site damage and destruction."

*"Decreased grazing allotments /Negative impacts to economy and access (via loss of stock trails)."*
- The Influence should be modified to also include: "Reduces risk of known and unknown site damage and destruction from stock use."

*"Bark beetle epidemic /Increases fire danger, increases wood gathering opportunities, opens new rangeland, hampers trail access".*  The evidence as to whether or not the beetle epidemic increases fire danger is inconclusive, and leaning toward an actual decrease in fire danger. **This part of the statement should be removed.**
- We recommend the addition of the following influences:
  "May expose or conceal undiscovered resources, which can result in protections or negative impacts".

   **We suggest the addition of the following in the USFS Management section in Table 6:**

***Condition or Trend - "Allowances for off route travel by motorized vehicles"***
*Influence-* "Can negatively impact, damage or increase vandalism to known and unknown sites".
Dispersed motorized camping, off route game retrieval and firewood collecting all permit legal use of motor vehicles off of designated routes. It can be difficult to see and/or avoid artifacts obscured by vegetation or terrain when driving a vehicle off road.  Unexpected or unanticipated noise from motor vehicle use can negatively impact desired experiences. (See below.)

**Condition or Trend** - "Increased casual or hobby mining"
*Influence-* "Digging, sluicing and excavation can negatively impact, damage or destroy sites."

**Condition or Trend- "Increased anthropogenic noise"**
*Influence-* "Can negatively impact desired historic or cultural experiences"
The acoustic environment has a significant impact on visitor perceptions of a location or area.

Noise that is not wanted or inappropriate can detract from desired experiences at cultural or historic sites.

**Page 18 states** that the Rio Grande National Forest is developing a programmatic agreement for a project on the Forest with the State Historic Preservation Office that "that may become the template for Colorado Forests. The programmatic agreement will allow managers to streamline the NEPA process while addressing specific steps in order to remain in compliance with Section 106 of the NHPA."

Since every project is different, we caution the RGNF about using an agreement for one project as a template on any other projects. Also, "streamlining" NEPA can be a code word for shortcutting, i. e., not taking the time to address issues as required by the statute and its implementing regulations. While we are in favor of making the review process work more efficiently, any programmatic agreement must ensure that all proper steps are taken to fully disclose impacts to cultural and historic resources and provide mitigation for any damage to them.

**Comments Relating to RGNF Draft Assessment 7 – Ecosystem Services**

As you are aware from our attendance at the 20-year plan assessment meetings throughout the valley, we are advocating Forest Service adoption of ecosystems, ecosystem processes, ecosystem integrity, and ecosystem services in all forms as the major instrument for evaluating conditions, formulating compatible priorities and policies, and ensuring that management prescriptions are being carried out to ensure protection of these resources.

Please be assured that we are immensely appreciative of the RGNF's leadership role among peers in addressing its planning responsibilities and conducting a well-performed and inclusive planning process.  We cannot, however, accept the notion that the RGNF is passing up the opportunity to put the ecosystem priorities in place for the next 20 years, and believe there is still time to make the necessary revisions as recommended in the balance of this paper.

**Good Job, But Not Enough Priority**

We believe the RGNF did a great job of describing and differentiating the basic types of ecosystem services, and cross-referencing with other draft sections of the assessment.  But, the ecosystem discussion is treated merely as just another chapter in the plan contents (and "Assessment 7" at that), without any sense of priority and deal-making influence that ecosystem analysis should have in ranking the relative importance of the various ecosystem services which are being promoted and where the majority of attention and resources is being placed.

It seems like all or most of the ingredients for an argument of ecosystem priority are there, *but overly subordinated or disguised* in the narratives and finally included almost as an afterthought.  This also places a burden upon the reader to hunt up all references and understand the full collective impact of the ecosystem connections and activity limitations.

- We do recognize the chapter on Ecosystem Integrity as number one in the draft numbering order, but we think having this follow Ecosystem Services in the number 1 position would make a stronger statement.

We are also wondering why in all of this the 2012 Planning Rule --- the quintessential mandate and command to the Forest Service for incorporating ecosystem consideration in its management decisions in a manner equal in power and force to the time-worn mantra of "multiple use" --- does not even warrant the slightest mention?

**"There is no existing forest plan direction specific to ecosystem services."  Really?**

To us, the forest plan direction based on the 2012 Planning Rule is in itself sufficient direction for the forest systems to design plans specific to and compatible with area differences.

Rvsd Plan - 00001562

- In our paper dated June 29, 2015 and entitled "Report and Findings on Ecosystem Management Priorities:  A Request for Integration in Forest Assessments and Planning," we researched numerous reports and studies on the marvelous scientific pursuit of defining and describing the concept of ecosystems and ecosystem services for thoughtful consideration and practical use in forest management.  Hearing no comment from the RGNF on this gifted effort, we would encourage a possible second look by planning staff.

Briefly, contents of the June paper can be reviewed and include ---
- Provisions in the economic framework of the 2012 Planning Rule are presented as the starting point of the report and reference to the official language contained in the new law with regard to the ecosystem analysis and protection priorities.
- We go beyond the Millennium four categories of ecosystem services and examine extended definitions to create a better understanding of all the nuances and implications for policy.
- We were intrigued by some of the pioneering efforts to quantify the value of ecosystems, and reviewed past attempts to monetize ecosystems in dollar terms.
- Obligations of the RGNF under Environmental Justice provisions which apply to our low-income, high-minority plan area were brought to management attention (which have been addressed in the draft assessments).
- Much can be learned from how other countries are addressing ecosystem science, and included the concept of "natural capital" working in Europe which has already been advanced to policy level.
- We reference the Deschutes NF study which sees the ecosystem requirement as a science-based means of resolving conflict between various multiple users by selecting those which best sustain the forest eco-structure.
- As an attempt to understand the Forest Service approach to ecosystem assessment, and develop an appreciation for the technical expertise incorporated in its guidance, we included whole parts of the Management Handbook in Chapter J. on the evaluation of ecosystem integrity, key ecosystem characteristics, disturbance regimes, and system drivers and stressors.
- To further enhance our understanding of the technical ecosystem processes and standard management approach, we found a Canadian release on the guidelines for ecological restoration in British Columbia very helpful, and included selected portions for our report.
- Not satisfied with the lack of information on how to assess increasing motorized recreational use, we discovered the analysis presented in a paper entitled "Unmanaged Motorized Recreation."
- The need for assessments to include specific reviews on situations and developments which we believe will require additional ecosystem protection strategies is also addressed in one of the chapters.
- We also include a long list of terms and definitions and an addendum on impacts and benefits of the RGNF from a purely economic perspective as contrasted to a focus on ecosystems.

**Should we be satisfied with the RGNF "monetary/non-monetary" dichotomy to describe the values of ecosystem services?**

In the RGNF draft we are led to believe that only key services directly related to monetary value such as recreation, timber, and water can be monetized, and those such as cultural heritage and biodiversity cannot. But our reviews revealed several pioneering efforts being made to estimate values for the benefits we are receiving from the forest where trading markets have not been established, but are essential to the health of the forest and human well-being.

Shortly after submitting our June 29 report, a very remarkable effort along these lines was brought to our attention by *The Wilderness Society* on a study prepared by Key-Log Economics to provide concepts, estimation, and application to national forest planning in North Carolina, and this was also shared with RGNF planning staff. Entitled *Ecosystem Services in the Pisgah-Nantahala National Forest Region*, it covers most of the points mentioned in this response paper, investigates and explains ecosystem service concepts in greater depth than we have seen elsewhere, and provides estimates of the hard-to-get values based on the *benefits transfer method.*

Through a series of data collections and calculations, researchers were able to apply this methodology to establish ecosystem service values on the following elements ---
- Food
- Raw materials
- Water supply
- Biological control
- Carbon sequestration
- Climate stability
- Disturbance prevention
- Gas regulation
- Soil retention
- Waste treatment
- Water regulation
- Aesthetic information
- Recreation
- Soil formation

In our opinion, a ground-breaking contribution of this magnitude cannot be denied, and every effort should be made to incorporate a similar framework for planning by the RGNF.

**Summary Recommendations**

Again, we applaud the RGNF in its efforts to address the complex arena of science and interpretations surrounding the study of ecosystem services and their implications for planning, but would recommend:
- a much greater commitment by the agency to incorporate the mandate for ecosystem analysis into practical management use and as a primary decision-

making tool.  We have been forewarned from our review of the Deschutes NF and other studies that such a transition requires persistence and patience to take hold within the staffing culture, but is greatly appreciated when the concepts become fully absorbed and the advantages of new information and perspectives are put into place to assist management in facing an increasing level of challenges to maintain and improve sustainability of the forest.

To this end, we offer the following recommendations to edit, add to, or revise portions of the Ecosystem Services draft as constructive advisement in order to strengthen its impact in the assessment process and reflect serious commitment on the part of the RGNF to ecosystem analysis as the prime tool for decision making ---

- Advance the Ecosystem Services Draft Assessment order from number 7 to number 1.
- Acknowledge and define Forest Service responsibilities with regard to ecosystem services in the 2012 Planning Rule, and how the intent of this law is being incorporated into the planning and implementation process for the next 20 years.
- Review and acknowledge the Pisgah-Nantahala NF study to estimate monetary values for all forms of ecosystem services and processes, and affirm the intent to keep abreast of research advancements with the ultimate goal to apply a similar approach and methodology to develop estimates for the RGNF.
- Acknowledge and incorporate expanded definitions of ecosystem services and related terminology from the Pisgah-Nantahala NF study as may be useful or feasible.
- Acknowledge conflicts between various forms of recreational use such as motorized vs non-motorized use and variances on the degree of impact to ecosystem integrity and processes needed to maintain or improve forest sustainability.
- Explain how the adaptive management approach can be used in conjunction with ecosystem analysis to produce desirable management outcomes.

We would welcome the opportunity to discuss Ecosystem Services with Planning Staff at your earliest convenience.

### ASSESSMENT 10 – ENERGY, MINERALS, AND GEOLOGIC HAZARDS

*This assessment contains relevant information on the resources listed in its title, but we do not believe the analysis here is complete.*

**Transmission Corridor, Page 7**
   There is no mention of the BLM planned upgrade of transmission capacity over Poncha Pass planned by Xcel Energy, in cooperation with Tri-State Generation and Transmission. Two lines have been approved for upgrade from a 69 kv to a 115kv line. In reaching this decision, the energy companies believe it will increase reliability and redundancy (since the lines are more than 2 miles apart), thus technically creating a transmission loop. This decision to upgrade by the energy companies needs to be reflected in this assessment.

**In the analysis of oil and gas, the assessment states:**

> More than 140,000 acres of mostly National Forest System land were nominated for lease in 2008 and 2009, but were deferred primarily because the BLM needs to conduct a leasing analysis on National Forest System lands.

**Page 8.** It would be beneficial to show where these potential areas are located. Also, what specifically is the status of the "leasing analysis" being done on national forest lands? Is this an analysis of what lands within a specific area will be considered suitable for leasing?
Under the Federal Onshore Oil and Gas Leasing Reform Act (FOOGLRA), 30 U.S.C. 181, it is clearly the responsibility of the Forest Service to do this analysis. See also 36 CFR 228.102.2(c) and (d).

**Will the forest-wide oil and gas leasing suitability analysis done for the previous forest plan be updated?** Assessment 10 doesn't directly state yes or no.
It does say the following:

> *While industry has expressed interest in exploring for oil and gas in the upper Rio Grande, it is unknown whether there are economically recoverable oil and gas deposits below lands managed by the Rio Grande National Forest.*

Pages 3, 8. **A deeper analysis is needed to determine:**
a) if recent advances in technology, such as hydraulic fracturing and horizontal drilling, have made or could make oil and/or gas more economically recoverable?, and
b) what market prices for oil and gas might encourage lease nominations and exploration by industry?

In any case, the previous leasing analysis should be referenced in the assessment and made available to the public.

- The agency must also analyze the possible impacts of leasing and potential subsequent development of oil and gas on national forest land within the planning area. It must not delegate this to another agency.

Finally, there is no mention in this draft of reviewing the **No Surface Occupancy** stipulation and what lands may become available for this designation due to changes in the management prescription or re-designation of Special Interest or other types of areas.

Under **"Noncommercial Mineral Collecting Activities"**, recreational mining is appropriately discussed (p. 9). However, there is no discussion of trends in such use, or whether current regulation and permitting (where applied) is sufficient.

It also implies that casual use is allowed in wilderness:
- We would like to see clarification and direction regarding the possible permitting process allowed for casual collecting within the Rio Grande Forest wilderness, if that activity is currently allowable.
- We strongly recommend against collecting activity within wilderness.

*This Assessment must consider the increase in casual rock and mineral collecting, and the potential impacts this activity can have.*

The popularity of recreational, personal, hobby and/or casual mineral and rock collecting is increasing statewide and nationally.  The price of gold has increased to more than 4 times its value at the time of the previous Forest Plan in 1996, providing extra incentive for gold prospectors.  The demand and value of rocks used for decorative and functional purposes (landscape boulders, flagstone) has also increased.

Since the value of gold and certain rocks and minerals has increased tremendously, the line between commercial and non-commercial collecting is not clear.   Recreational, casual small scale collectors can and do benefit from the materials they collect from forest lands.

**We are not sure if the Recreation Assessment will cover casual rock and mineral collection, so we will discuss it here also.**

Causal rock and mineral collection on the Rio Grande is considered in numerous documents.

Rvsd Plan - 00001567

**The 1996 Forest Plan at III-3 contains the following Standard:**
<u>"Recreational panning, sluicing, and dredging shall be allowed outside Wilderness where such activities do not interfere with the rights of mining claimants protected under the 1872 Mining Law, as amended. These activities shall be evaluated on a case-by-case basis, to determine if an operating plan is needed, by the authorized Forest Service official."</u>

Regulations at 36 CFR 228.4 (a)(1) requires a notice of intent to be filed by any person proposing to conduct operations which might cause significant disturbance of surface resources except when

  **"(ii) Prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and occasionally removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using battery operated dry washers, and collecting of mineral specimens using hand tools".**

 *A file "MINERAL, ROCK COLLECTING AND METAL DETECTING ON THE NATIONAL FORESTS" (available on the Rio Grande Forest website ([http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5261774.pdf](http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5261774.pdf) )*  states "Generally, most of the National Forests are open to recreational mineral and rock collecting, gold panning and prospecting using a metal detector. This low impact, casual activity usually does not require any authorization… "Normally, any gold found can be removed and kept. If the removal of the gold, rocks, or minerals might cause disturbance of surface resources, beyond digging a small shallow hole, a NOI may be required."

Words in the above regulations such as "significant", "reasonable", " small", "shallow" and "may" are ambiguous and open to individual interpretation. The line between casual collecting and collecting which requires a Notice of Intent is not clear.  Regulations regarding these activities on BLM lands are different.

This ambiguity, combined with the increased and ambitious collection of rocks and minerals, has resulted in unregulated collection activity which results in resource damage. Collectors are moving large quantities of material by digging pits and gouging out streambeds or banks to actually removing smaller amounts of valuable rocks or minerals. They are confused about the regulations for casual collecting, including:
a)where casual collection is permitted or prohibited;
b) when a notice of intent is required, and/or
c) how much material they are allowed to move or remove.

Rvsd Plan - 00001568

- We suggest that additional language be added to the Forest Plan to clarify when a notice of intent must be filed, where casual collecting is not allowed, how much material can be moved and removed.

In order to limit confusion and better manage casual collecting, we suggest the following be added to the Standard at III-3:

- " Recreational panning, sluicing, dredging and casual rock and mineral collecting is statute dependent and a notice of intent is required near (¼ mile of) any designated Wilderness Area; Wild and Scenic River or waterway under consideration for this designation; within any Research Natural Area or Special Interest Area; within any area identified as critical habitat for any Threatened or Endangered Species and within any area listed or eligible for the National Register of Historic Places.'

The assessment provides a map of abandoned mines (p. 11, Figure 2).
This map shows a large number of such mines, with concentrations near Creede, Summitville area, and Bonanza. However, there is no further information on whether any of these mines have been reclaimed, nor any prioritization of needed work. (See p. 9.)

- Further information on hazards at abandoned mines should be in the assessment.
- The revised plan should contain some direction for addressing abandoned mines.

The main geologic hazards identified on the RGNF are "avalanches, rock falls, and flash flooding." Page 10.

- The assessment should identify areas where these hazards, especially the first two, have occurred and/or are likely to occur in the future.
- It should also mention any efforts to reduce these hazards or repair damage done by them.

The Forest Service Handbook has the following guidance: **"In particular, the team should identify and evaluate hazardous geologic conditions in proximity to communities, infrastructure, established recreation areas, and other high use areas." FSH 1909.12, section 13.53.**

**Social, Cultural and Economic Conditions, Chapter 6**

*This draft assessment report generally captures all primary sources of information regarding social, cultural and economic conditions.*

On page 1 the number of open miles of roads and trails should accurately reflect the current situation.

- There are over 2000 miles of roads and trails on the Forest open to public use. This is significantly different than the "hundreds" that is stated.

We recommend inserting the underlined words into the following sentence on page 2: "In addition, recreation visitors to the forest come from outside the region and spend dollars both within and outside the core set of counties before they reach the Rio Grande National Forest; for example, in Chaffee, Park and Fremont counties."

This helps clarify that recreation visitors from outside the region spend dollars in many locations.   This is properly stated on page 31:
"On their way to the planning area, and once they arrive, these visitors spend money on goods and services such as gas, food, lodging, and souvenirs."

*We agree with the following statement on page 3-4:*

"In recent years communities surrounding the Rio Grande National Forest have become increasingly attractive to new residents because of their proximity to open spaces, natural settings and easy access to year round recreational opportunities. As a steward of Colorado's public lands, a portion of population growth in this region can be attributed to the scenic beauty and outdoor recreation supported by the Rio Grande National Forest."

*We agree with this statement on page 4:*

"These forecasts show that study area growth is anticipated to remain concentrated in communities which offer residents access to recreation, open space and wildlands provided by the Rio Grande National Forest."  This appears to be a trend nationwide.

*On page 5, the assessment states:*

"In contrast, less densely populated areas provide greater access to open spaces and wildlands, which may offer natural amenity values to residents and visitors."

The definition of the term "wildland" is not provided, which makes the meaning of this statement confusing.  There may be less populated areas where none of the nearby land could be considered "wild."  For example, agriculturally developed land areas in Eastern Colorado, Kansas or Nebraska would not be considered "wildlands," yet these areas are

much less densely populated than other areas of the United States.  The residents of these areas do not have greater access to "wildlands" than someone living in a densely populated place such as Denver.  Population density is not necessarily correlated with access to wildlands.

- *We suggest modifying this sentence (Pg 5) to state:*
  "In contrast, less densely populated areas may provide greater access to open spaces and wildlands, which may offer natural amenity values to residents and visitors."

  We have been waiting for the RGNF to produce some detail on its economic contributions which is contained in this epic work, but unfortunately much of this has been lost in the decision to address these issues on a super-enlarged 18-county geography where the RGNF "planning area" cannot be visualized.

  There is probably a good reason for doing it this way due to lack of data at the RGNF level but available as part of a larger geography.  Or because pre-packaged studies are already available through Headwaters EDT, IMPLAN, or other consulting sources which may not offer breakouts at the RGNF level but are desirable in other respects.  Or to be helpful in making comparisons of RGNF counties to counties in surrounding forests.  Or because the planners genuinely believe this is the right approach.

  To us, this just makes it more confusing, harder to understand, and inconsistent with the other assessments.

- At least they could have grouped the RGNF/SLV counties together in the tables and provided regional subtotals.  We are grateful that this monster landscape approach is confined to just this one assessment section.

   That being said, this assessment provides a very good summary of the primary communities interested in Rio Grande Forest Management.  We are pleased to see that the assessment included the non-use values community of interest in this discussion.

- Page 25 --- "It is not feasible to estimate non-market values during the planning process."  We have tried repeatedly to inform the RGNF about the Pisgah-Nantahala study and other efforts to estimate the non-market values.  Having this kind of information will help to establish a stronger set of management alternatives to the endless pursuit of trying to make the forest resources match whatever the population trends dictate.

•      Page 30 --- A great sense of fealty and reverence is given to the Multiple-Use Sustained-Yield Act of 1960 which is over 50 years old and was addressed to a wholly different set of conditions and level of forest resources than exist today.

•      Page 33 --- What are the dollar units in Table 14 for the average spending profiles?

•      Page 34 --- What is reference date for RGNF employment?

On page 37 we suggest the underlined words be added to the following sentence: "Federal grazing land is particularly valuable to ranchers because of the low grazing fees charged for use of this land."  This statement would not be accurate without this clarification.

•      Page 37 --- Very little comment on the percent increases shown on Table 19 for cattle inventory of 109% in Archuleta County, and 153% for sheep in Costilla County.  We hope none of these impacts have compromised the sustainability of any forest or other public lands.

We find this a very thorough and comprehensive document, more on the order of a research study than part of an action plan for management.  It may be laborious to wade through, but it offers an excellent reference source for county-level data and trends on general demographics, social characteristics, labor force, income and wages, revenues, and spending profiles --- to name a few.

It also does an excellent job of covering relevant historical events, and terms for describing economic and cultural benefits of the forest to dependent communities and various types of human use and experience.

**Concerns:**

•      Consistent with our previous comments on the assessment process, Assessment 6 provides no sense of urgency regarding provisions which must be made to protect the health and sustainability of the forest, and using ecosystem integrity as the main regulator of forest conditions.

•      Often the narrative gets lost in covering past history, and loses any focus on what is needed for the future.

•      We are not advised of any limits on the use of forest resources, and at times it seems like it caters too much to the needs of dependent communities and maximization of economic benefits for profit motives.

- We could not find any mention of the existence of motorized recreation or other highly impactful uses of the forest which should also be treated as one of the "conditions" to be taken into account.

**Comments on draft Report Assessment 12  Areas of Tribal Importance**

We agree with many of the statements made in this assessment.  Although we do not represent Tribal interests, we support many of the suggestions made in this assessment.

We recognize that Mt. Blanca is a significant area of Tribal Importance and agree with the suggestion on page 8 that this area be considered for a special designation in the planning process.

·   We also agree that more coordination between adjacent agencies and land owners must occur in this, and other areas, adjacent to the boundary of the Rio Grande National Forest. We support the concept of a multi-agency management plan for this area to keep the mountain as "pristine" as possible.

The assessment must include factual information that the summit itself of Mt. Blanca is not within the legal boundary of the Sangre de Cristo Wilderness Area, which is located approximately one half mile away.  Thus the Rio Grande National Forest is not managing any lands very near the summit as Wilderness.   Lands with Wilderness protection on the adjacent Pike San Isabel (P-SI) National Forest are approximately 1.2 miles away.

The land just to the north of Blanca is on the P-SI and in a 3A management area, where emphasis is on "semi-primitive non-motorized recreation ", but where "mineral and energy resource activities are compatible with the goals of this management area". P-SI Forest Plan at III-125. Even though the area closest to the peak is in a roadless area, mineral activity could still be permitted here or outside the RA to the north, which would not be far from Mt. Blanca.

The nearest lands to the summit on the Rio Grande Forest are currently in a Backcountry Management Area Prescription (MA 3.3), which is different than Wilderness or Roadless. The Forest Plan states that "[t]hese areas are available for locatable mineral entry. Rio Grande Plan at IV-18. Also, any areas with high potential for oil or gas are available for leasing with a no surface occupancy stipulation. Ibid.

In short, Mt. Blanca is not as well protected as the assessment states. Efforts are needed to ensure that the mountain remains, or becomes, pristine. More coordination among the four land managing entities must occur during this planning process, especially with the adjacent national forest.

·   **A special management area for the Blanca summit and surrounding area should be considered.**

The conditions and trends segment must be updated to include information that the Blanca area is a very popular destination for recreationists, primarily due to the presence of four 14,000 foot summits.  This section should also state that heavy public recreational use may complicate efforts to keep the area on and around Mt. Blanca pristine.

We agree with the assessment that motorists and vehicles on FR 975 are leaving trash and toxic fluids in this area.  It must be mentioned that vehicles pollute the air with emissions, emit unwanted noise, and leave behind solid wastes in the form of brake pad and tire dust. We are concerned about noise and impacts from motorized use on, and unauthorized motorized use beyond,  FR 975 in this area, which are negatively impacting desired experiences and the "pristine" nature of this area. Noise from vehicle use extends well beyond the immediate road surface.

Rvsd Plan - 00001574

There are also concerns about the negative impacts of legally permitted cross country use by ATVs for game retrieval in and beyond an area east of Lake Como.  The 2014/2015 Cornejos Peak District Motor Vehicle Use Map depicts a game retrieval area in this location with a boundary which can not be accessed from any legally open motorized route.  Motorized game retrieval may be occurring even though it is specifically prohibited in MA 3.3. See Forest Plan at IV-18."

There was a Record of Decision on the road's status around 2000 that was upheld by the then Regional Forester, Elizabeth Estill.  The Decision was to close the road at the west end of Como Lake. This would have preserved the best 4 WD experience for those users, and protected sensitive wetlands and unstable slopes on the road on the east side of the lake and going up. About the same time, roughly, the private property around the lake was conveyed into USFS hands.

Unfortunately, the Record of Decision was never implemented and left the road open all the way to the end. The big problem with the Conejos District Ranger's decision at the time not to implement the ROD was that he notified motorized users of his decision, but never notified other stakeholders like the Colorado Mountain Club.

We understand that the road has been adopted by the Jeepers Creepers group from Durango and as of 2012, they were trying to maintain stable conditions. Motorized use has respected the carsonite posts placed by the District on the east side of the lake to keep them out of the wetlands. The road still remains open to the "bitter end," or it's been called, "the road that never ends."

There is a fairly large turn-around place at road's end where most of the grass/tundra is gone due to turning jeeps. The trail continues across a small stream and then climbs the escarpment next to a waterfall; crosses the stream at the top; and continues into the upper basin. We understand that efforts were underway to mitigate damage to that area but we are unclear as to the status at this time.

- **We would like to see the ROD reviewed, implemented and made part of the Forest Plan.**
- We agree with  the suggestion in the draft assessment that the Natural Arch area is significant and deserves additional Special Interest Area protection.

  The Natural Arch is a popular destination and some forms of unmanaged recreation are having negative impacts in this area.   We are concerned that desired experiences and unique wildlife values are being adversely impacted by noise and other negative impacts from motorized use, especially OHV use, on forest roads 659, 670.2a and 670.2B in this area.

Studies indicate that all motorized sources of noise had detrimental impacts on evaluations of landscape quality compared with natural sounds.[i]

---

[i]  Human Responses to Simulated Motorized Noise in National Parks
David Weinzimmer, Peter Newman, Derrick Taff, Jacob Benfield, Emma Lynch and Paul Bell
Journal: Leisure Sciences, 2014, Volume 36, Number 3, Page 251

**Comments on Draft Assessment 2-Air Quality**

**The draft assessment generally does a very adequate job considering the major factors related to air quality on the Rio Grande National Forest.**

On page 6, we agree that Managers must be concerned about air quality. Managers should also be concerned when poor air quality is or may affect additional considerations including human health; wildlife; recreation; and cultural, social and economic resources.

On page 7, the phrase "cars and trucks" must be changed to "motorized vehicles" in the following sentence: **"It includes emissions from industry, including power plants, as well as cars and trucks, wood burning stoves and fireplaces, and ground disturbing activities such as mining and road construction."**

On page 7, the statement **"The pollution typically originates outside of national forest boundaries, but is transported through the atmosphere and deposited inside national forest boundaries"** fails to recognize and include that there are many sources of pollution that also originate inside forest boundaries. While air pollution originating outside the forest must be considered, so must pollution sources originating inside the forest. Air pollution sources originating within the forest include motor vehicle emissions, dust from road and trail use, smoke from fires, chemical spills, etc.

Sources of pollution that originate inside forest boundaries have the potential to have greater impacts than pollution that originates outside of forest boundaries, because of the proximity of the pollution source to the forest. Sources of pollution that originate inside forest boundaries are the sources the Rio Grande National Forest has the greatest potential to recognize, regulate and limit/manage.

Page 7 also includes the following statement: **"The impact on the ecosystem is related to the amount of pollution emitted, the distance from the ecosystem of concern, and meteorology affecting the transport and dispersion of pollutants."**
- We strongly recommend that "the type of pollution emitted" also be included and considered. Different types of pollution have different effects, toxicities, dispersal rates, etc.

- Page 9 and 13 must also mention and include consideration of additional designated areas not on the Forest where high air quality is of greater importance. Although not part of the Rio Grande National Forest, the 33,549 acre Great Sand Dunes Wilderness Area is directly adjacent to forest lands and properly recognized as such on page 14 of the draft assessment.

The Great Sand Dunes National Park and Preserve does real time Air Quality monitoring for the Park. This information is sent to Sandia Labs once a month for analysis. It would be beneficial for the Rio Grande Forest to get a summary of this data on a regular basis, perhaps quarterly, so this information could be integrated as part of Forest Service

baseline inventory. Issues of concern are Mercury (from the Four Corners area), transportation (vehicular) and emissions from the Regional Landfill, specifically, toluene, between Monte Vista and Del Norte.

- ***Please see San Luis Valley Air Toxics analysis Report 2012.***

- The nearby Cruces Basin Wilderness on the Carson National Forest in New Mexico must also be included and considered.  The boundary of this 18,876 acre Wilderness Area is only .90 mile away from Rio Grande Forest lands.
- In addition, air quality in the 62,923 Powderhorn Wilderness Area must also be considered in this assessment.  The boundary of this Gunnison Forest Wilderness is ~6 miles from the boundary of the Rio Grande National Forest.   This is close enough that activity or events on the Rio Grande have the potential to influence air quality in this Class 2 Airshed Wilderness.
- The boundary of the Rio Grande del Norte National Monument on New Mexico BLM lands is located only .94 miles from the Forest boundary.  Air quality in National Monuments must also be considered.

Activities on the Rio Grande National Forest have and may influence air quality in these nearby areas.  As this draft assessment correctly states on page 13 **"air and various air-borne emissions are not constrained by surface area boundaries."**

- On page 23 we recommend changing the word "automobile" to "motorized vehicles" in the following sentence:  **"Area and mobile sources of pollution include, among other things, automobiles, agricultural activities, planes, trains, residential wood burning, lawn mowers, and barbeques."**

Motorized vehicles is a more inclusive term which would include trucks, ATVs, motorcycles, OHVs, snowmobiles and other vehicles.

On page 23 the term "non-road engine" is frequently used in this paragraph. "Primary sources for CO include wood burning, vehicles and non-road engines; for NOx vehicles, non-road engines, oil/gas, and railroads; for SO2 wood burning, combustion, vehicles, oil/gas, and non-road engines; for PM wood burning, road dust, agriculture tilling, and construction; and for VOC pesticides, wood burning, non-road engines, and vehicles."

- The term "non-road engine" is not defined.  Does this include engines used for travel on trails?
- The word "vehicles" in the above sentence must be qualified to state "motorized vehicles", as mechanized and other types vehicles do not contribute to these emissions.
- PM (Particulate Matter) also can result from motorized trail use, so "road dust" should be changed to "road and trail dust".

Road and trail dust needs to be given additional consideration in this assessment. Unpaved roads (presumably road dust created from the use of these roads) was identified

as one of the major sources of pollution on the Forest in 1996, as stated in page 8 of the draft assessment.

Motor vehicle use on unpaved roads and trails can raise significant amounts of dust. This adds both fine and course particulate matter to the air.

National Visitor Use Monitoring data for the Forest from 2010 indicates that over 12% of forest visitors drive for pleasure, ride OHVs and/or use motorized trails as their primary activity. Most forest visitors use motor vehicles to travel to and access destinations on the forest. This indicates that a significant number of visitors potentially drive and ride around on the forest raising dust.

Only 20 miles of the 2000+ miles of roads and trails available for public use on the Forest are paved, so use on just about 100% of these routes can raise dust.

Road dust is a concern for maintaining air quality.  As an example, in 1991 Congress created the Grand Canyon Visibility Transport Commission (GCVTC) to advise the EPA on strategies for protecting visual air quality at national parks and wilderness areas on the Colorado Plateau.
In 1996, the GCVTC published its recommendations to the EPA that included specific actions as well as options for consideration. The Committee identified road dust as deserving of high priority attention, and stated that further study is needed to resolve the uncertainties regarding both near-field and distant effects of road dust on visibility.

Another USFS study, "Effects of All-Terrain Vehicles on Forest Lands and Grasslands" indicated that dust raised from OHV use had the potential to create enough dust to significantly impair rider visibility, impact areas over 50 meters away from routes, and raise enough dust so that reach air particulate concentration levels which would be unhealthful for trail users.

- Use of roads during permitted activities such as timber hauling, road construction and maintenance, and mining/oil/gas development all have the potential to raise dust, but these concerns can and should be identified and mitigated in the permit process.

Of greater concern is the generally unregulated and unlimited dust creation which occurs as a result of travel and recreational use on all transportation routes on forest lands (including use on designated forest roads and trails, permitted and administrative use, use of county and other roads on forest land, legal and unauthorized use off designated routes, etc.).   As human population increases, there will be increasing motorized travel on forest roads and trails for transportation and recreation, and thus there will be an increase in particulate matter levels due to airborne dust resulting from this use.

Rvsd Plan - 00001579



*OHVs raising dust on the adjacent Pike San Isabel National Forest*

- **The assessment must recognize and consider noise as a form of air pollution.**

Anthropogenic noise is increasingly being recognized as a significant environmental stressor with negative impacts on humans and wildlife.(ref)   Noise can impact natural settings and the desired experiences associated with those settings, human health, and animal and human behavior.

- Significant noise sources both within and outside of the forest include gunfire (especially repetitive gunfire from recreational shooting), motor vehicle noise (especially OHV noise) and gas powered engines such as from chainsaw use.   Like other forms of air pollution, noise and the natural soundscape are not constrained by surface area boundaries.

Noise has the potential to travel great distances. For example shooting noise can be heard at great distances from the shooter. The noise produced by an average gun (over 150 dB) can easily be detected by humans at distances exceeding 5 miles.  The noise from gunfire only dissipates to a level that would not be considered annoyingly loud (upper 70 dB) by many people at a distance of one mile.

Forest noise has also been connected with a decrease in property values on adjacent private land (ref).

- The assessment must recognize and consider anthropogenic light as a form of air pollution.

Anthropogenic light has been recognized as having negative impacts on wildlife, plants, and on the perception of natural settings and desired experiences associated with those settings.  Most light pollution and its negative impacts results from artificial light sources illuminating areas at night.

*Light sources can be on or off the forest, and easily cross surface area boundaries.*

Significant light sources on the forest include vehicle lights, lighting associated with extractive industry development, lighting from permitted oil/gas/mineral extraction, and lighting from overnight camping areas.

Increasing use of OHVs and the corresponding increase in emissions and dust, must be considered. OHV use for recreation and transportation has increased dramatically both on and off the forest.  There is a growing attempt statewide to permit OHV use on city and county roads, which could facilitate additional OHV use on the forest.   EPA regulations permit OHV engine emissions to be higher than licensed passenger vehicle emissions.

Groups of people who choose to travel using single passenger OHVs instead of multi passenger licensed vehicles increase the number engines running (which increases emissions) and the number of vehicles and wheels in contact with the ground (which increases dust).
  • For example, a group of 4 people who choose to travel with OHVs instead of in a jeep increase the number of engines running, vehicles used, and tires on the ground all by a factor of 4.

Emissions from potential increases in over snow vehicle use, including snowmobiles, must also be considered.  EPA regulations permit snowmobile engines to emit higher levels of dangerous emissions than licensed passenger cars and trucks.
Since the locations where many forest visitors congregate are more limited and concentrated in winter as opposed to summer *(due to limited plowed roads and trailheads),* visitors are more aware of compromised air quality at these locations.
Noise, odor, and emissions result in conflict between snowmobile users and other recreationists on trails and at trailheads.

The impacts of air pollution on forest visitors outside of Wilderness must also be considered.  Many visitors to the Rio Grande National Forest expect and desire settings and experiences that are less polluted than the urban area they are coming from.
The assessment properly recognizes *(on page 8)* that the 1996 Forest Plan EIS stated that air quality on the Rio Grande National Forest was rated some of the best in the nation.  Although numerous Wilderness visitors on Rio Grande National Forest value clean air, many forest visitors outside of Wilderness value clean air as well.
Site specific sources of air pollution originating from within the forest, such as road and trail dust or smoke from fires, have a high probability of negatively impacting forest visitors.
  • The desires of local, regional, national and international visitors to experience clean air must be considered.  The assessment on page 47 briefly mentions "people recreate on the forest to enjoy clean air and view expansive vistas".  This must be expanded to include desires to experience natural sights, sounds and smells.

There are numerous designated areas on the Forest where the maintenance of higher air quality is particularly important.  Compromised air quality would impact Research Natural Areas.  Scenic areas, such as the Lobo Overlook, Cumbres and Toltec Scenic Railroad should

have higher standards for air quality.   Special Interest Areas may also require higher consideration for air quality standards.

Maintaining high air quality is important at other important locations on the Forest where visitors congregate.  These include designated recreation sites such as campgrounds, picnic areas and trailheads.
The Rio Grande National Forest has numerous fourteen thousand foot peak summits which receive high levels of visitation.  Climbers expect to be rewarded with expansive vistas for their efforts, and poorer air quality compromises visibility from these summits.
Not all of these 14ers are in Wilderness Areas.  Blanca, Little Bear, Kit Carson and Challenger Point are not within designated Wilderness and require additional consideration in order to maintain higher air quality at these summits.

- The identified need for change primarily considers legal requirements to protect the environment.

The impacts of air quality resulting from recreation, traditional and extractive uses need to be accounted for spatially and experientially.  Locations where air quality can impact the quality and desires of recreational users must be identified and considered.   The distance between sources of air pollution and sensitive habitat or desired experiences of visitors must be considered.

The Forest Plan should strive to separate sources of air pollution from desired experiences dependent upon high air quality.
- Examples to ponder might include the impacts of increasing high speed OHV use and fugitive dust from this use on the Pool Table Road #600 on the surrounding La Garita Wilderness.
- Possible loss of visibility resulting from fireplace use at the proposed Village at Wolf Creek on the viewshed from the Lobo Overlook.

***Do Colorado no smoking laws apply to public buildings on Forest lands?***

**Comments on Draft Report Assessment 14 Land Status and Ownership, Use, and Access Patterns**

We generally agree with and support the information provided in this draft assessment report.

We agree with the statement on page 3 that **"Budget declines and a loss (nationally) of expertise and staffing of the special use program is causing a backlog of expired permits, inadequate inspections of existing permitted uses, and delays or incorrectly issued new permits."**

- Another statement must include recognition that inadequate monitoring and enforcement has resulted in unpermitted activities and use on the forest when a permit would normally be required.
- On page 5 we recommend that the Trend "The creation of "illegal non-system routes" across national forest system lands is ongoing and causes resource damage" be modified so it states "The creation and use of "illegal non-system routes" across national forest system lands is ongoing and causes resource damage."

We suggest the following additional "Influence of Trends" be added on page 7.

- "There is an increased potential of illegal and unauthorized use of forest lands from adjacent private property."   It is difficult to monitor and detect activities such as unauthorized motor vehicle use, theft of forest products, drug labs, dumping and occupancy and use on forest land immediately adjacent to private property.

- We fully agree with the statement on p. 7 that the shared boundary with other federal and state lands provides the Forest with opportunities for collaboration on land use and access.  The Forest must take steps to mitigate inconsistent land use and access issues with adjacent lands.

- This assessment must include a statement that often times the boundary between forest land and adjacent lands under other jurisdictions is not accurately or visibly marked on the ground.  This results in confusion about what activities are allowed, and leads to inadvertent actions and use resulting in negative impacts on forest land and resources.

We highly recommend that the following be included in this assessment to elaborate on some of the inconsistent land use and access issues:

- "Inconsistent management of permitted forms of travel between the Rio Grande Forest and adjacent land or routes results in concerns and conflicts.

For example, the Forest currently permits cross country travel by mechanized vehicles such as bicycles, whereas adjacent BLM San Luis Valley Field Office lands and Grand Mesa-Uncompahgre-Gunnison National Forest lands limit mechanized travel to designated

Rvsd Plan - 00001582

routes. Riders legally riding on undesignated routes on Forest lands violate regulations when they  cross onto these adjacent public lands.

Most Forest roads permit unlicensed OHV use, and this results in conflicts and concerns when those roads transition to adjacent county roads.   All adjacent county roads currently prohibit unlicensed OHV use according to Colorado Revised Statute 33-14.5-108.

Allowance of off route travel by snowmobiles on national forest land can lead to inadvertent use on adjacent private land across unmarked boundary lines, which violates Colorado Revised Statute 33-14-113."

- The assessment must also mention how advances in technology will produce mechanized and motorized vehicles which will enable people to more quickly and easily access some areas of the Rio Grande NF and possibly increase the impacts from such use and increase the areas where impacts occur.

- There are inconsistent land management designations along the Rio Grande Forest boundary with adjacent National Forests and BLM lands.

- *Please see the attached list of these management boundary inconsistencies.*

- This assessment must discuss how the use of adjacent land can impact RGNF land, and how use of forest land can influence adjacent lands.  Sounds, sights, odors, water, wildfires and wildlife/animals/people often freely move across the boundary between the Forest and lands under other jurisdictions.  Management or use of forest lands can dramatically influence the use of adjacent lands. Management of adjacent lands influences forest lands.
  For example, one study[i] found that forest noise had an impact on property values of adjacent private land.  Development of adjacent land can increase wildlife dependence on forest lands to meet their habitat needs.   Recreational target shooting noise can influence use and desired experiences across boundary lines.  Vegetation, management and use levels can impact the potential for man-caused wildfires on adjacent lands.

Since this assessment addresses access patterns, it should contain the following information:
- miles of roads and trails open to various types of use (motorized and classes of vehicles) versus non-motorized); trends in types of use (e. g., snowmobiling versus cross-country skiing and snowshoeing); and patterns and trends in the use of developed facilities.

- We recognize that these items could be addressed in assessment chapters 9 and 11. If so, they should at least be referenced here.

The maps at the end of draft assessment 14 are useful, but some are difficult to read.

Rvsd Plan - 00001583

*For example, the legend on Figure 3 is not readable.*

In Figure 5, trails do not show on the map in spite of a designation for them in the legend. Utilities and gas lines do not show on the map designed to show them, Figure 6.

---

[i] Ham, C.; Champ, P.A.; Loomis, J.B. and Reich, R. M. (2012) Accounting for Heterogeneity of Public Lands in Hedonic Property Models, Land Economics, 88 (3): 444–456

## DRAFT ASSESSMENT CHAPTER 2 COMMENTS FOR SOILS

On page 50, we agree with the statement that soils can lose much of their productivity when altered.   The next statement **"Alteration can occur through management actions as well as natural events"** on page 50 *does not fully capture all the means by which soils can be altered and is confusing.*

The term "management actions" implies that the Rio Grande National Forest is actively and visibly supervising, controlling, and responding to all soil altering actions other than natural events.  This is not the case, and there are many unsupervised, unmanaged actions which occur on the forest which have the potential to alter soil productivity.

Dispersed recreational activities, for example, have the potential to alter soil productivity.  While the Forest may indirectly be managing dispersed recreation in that these types of activities are generally allowed by USFS policy to occur on forest lands, many forms of dispersed recreation are not managed, and occur without Forest staff oversight.  In 2004, USFS Chief Bosworth identified unmanaged recreation as one of the four major issues in national forest management, including the health of air, water and soils.

If the Rio Grande National Forest defines a "management action" as also to include passively permitting known activities to occur without intervention, then this sentence does not have to be modified. If *active mismanagement* is also included as part of management actions, no modification is required.

- We **do not** agree with these definitions, and believe a "management action" implies active and visible supervision, regulation and response.
- We thus recommend this sentence be modified to state **"Alteration can occur through managed and unmanaged human actions as well as natural events."**

On page 50 the draft assessment includes ways in which soil can be altered, including erosion, compaction, loss of nutrients, and modification of hydrologic function.

- This discussion must also include soil contamination and pollution via the introduction of unnatural chemicals or elements into the soil.  Toxic chemicals such as oil, gas, cyanide and pesticides; or elements such as heavy metals including lead, can and have been introduced into soils.

A variety of activities and sources result in soil contamination and pollution. Atmospheric deposition is specifically mentioned on page 59 of draft assessment 2. Presumably this includes widespread deposition from sources of pollution off the forest (such as wind carrying power plant contamination) and also sources on the forest (such as emissions from vehicles on forest roads and trails.  Hazardous material spills are also mentioned as a source of downstream non-forest water pollution on page 59, and these must also be considered a potential source of forest soil pollution.

- Chemical contamination of water is considered as part of the Watershed Condition Framework beginning on page 58 of this assessment, but chemical contaminations must also be listed as a form of soil alteration.

Soil productivity and health can be compromised due to the presence of contaminants and/or pollutants.   Contaminated soil can limit plant growth and cover.   Toxic chemicals/elements can be absorbed by plants and animals inhabiting that soil or leached out of the soil by rain, streams or other forms of water.  These chemicals and pollutants can

have direct negative impacts on organisms inhabiting contaminated soils. Indirect negative impacts on organisms inhabiting or consuming contaminated water, or ingesting contaminated plants or animals, can also occur.

Heating must also be included in the discussion of ways in which soil can be altered, especially as a result of fire. Scorching is mentioned as way that soil can be damaged on page 54 of this assessment. Page 63 of the water section in the draft assessment states that heating can impair soil quality. Soil heating from fire can kill all soil microbes, volatilize nutrients, and create hydrophobic, or water repellent, soil. This can delay or limit the reestablishment of plant growth and cover, encourage the introduction and spread of noxious weeds, and potentially increase soil erosion. High temperatures due to fire can modify the physical, chemical and biological properties of soil. (see the 2005 USFS publication Wildland Fire in Ecosystems Effects of Fire on Soil and Water at: http://www.fs.fed.us/rm/pubs/rmrs_gtr042_4.pdf

- Soil alteration due to heating can occur naturally in events such as wildfires; as management actions such as a prescribed burn; or as unmanaged actions such as a human caused wildfires or dispersed campfires.
- To a lesser extent, lower levels of soil heating can occur as a result of increased solar radiation due to the loss or modification of vegetative or snow cover, or a decrease in moisture content.

We agree with the statement on page 54 that **"There is a lack of quantitative base and trend data on soil productivity in alpine areas, forested areas and rangeland upland areas, on soil compaction in rangeland bottoms such as riparian areas and swales, and on rates of erosion on system and unauthorized roads and trails."**
We believe there is also a lack of data for soil impacts due to authorized dispersed motorized camping access routes and sites within 300 feet of system roads, especially those that disturb "edge areas." (Defined by Trails Program, Colorado Parks and Wildlife). Also there is a lack of data on the impacts of trails that are not unauthorized, such as those created by use from livestock or non-motorized users.

On page 56 we fully agree with the following statement: **"As with many soils, surface disturbing activities such as timber harvest, grazing, recreation developments, road construction, and off-road motorized use, are the greatest threat to loss of soil integrity, primarily due to erosion and soil compaction."** This is especially true because many of the above activities are authorized and allowed on forest lands. Also, for some of these activities, heavy equipment is used, increasing the likelihood of soil compaction.

We fully agree with the statement on page 60 that states: **"As a general rule soil quality and productivity concerns exist with existing system roads and trails, uncontrolled motorized use on unauthorized roads and trails, and livestock grazing in riparian areas."**
- We are particularly concerned with the unknown extent of soil impacts from unauthorized motorized use off system roads and trails, as this use is not monitored

or managed to the extent that designated routes or livestock grazing are.  Soil quality and productivity concerns also exist due to allowed motorized use for the purpose of dispersed camping and game retrieval off of system roads and trails.  The first paragraph under Local Soil Resource Concerns must be modified regarding the primary concerns with soil quality and productivity to reflect the above.  Repeated on and off road and trail use can also compact soils and modify water infiltration.

We agree with the statement on page 60 that Best Management Practices **"are proven measures that protect the soil resource if properly implemented and monitored."**  We believe such practices can also help protect resources in addition to soil resources.  We also agree with findings that **"the practices are not always being fully and properly implemented at the project level."**   We believe this is due to these practices being suggestions, and not requirements.  We recommend that the Forest Plan include more Best Management Practice concepts as Standards and Guidelines to ensure that more of these practices are actually prioritized and implemented.

- At a minimum the soil quality provisions in the Forest Service's Watershed Conservation Practices Handbook, FSH 2509.25, should be incorporated into the revised Forest Plan, with most of the WCPH's design criteria stated as standards in the revised plan.

If the assessment states that best management practices are not always being fully and properly implemented, this means that Forest Plan direction is not being met.  **Thus we believe that there is a need for change in the Forest Plan related to these concerns.**

- We support the proposed preparation of a Forest-wide soil resource monitoring plan (p. 61).  We believe this plan must be part of the Forest Plan revision process, or specific direction must be included in the plan for its timely development.

Rvsd Plan - 00001587

**Rio Grande National Forest Administrative Disparities at Boundaries with other National Forests**

| Designated Area on Adjacent National Forest | Length of Boundary Disparity | Rio Grande National Forest Current Management at Boundary |
|---|---|---|
| PSINF Porphyry Peak roadless | 2.1 miles | RGNF General forest products and dispersed recreation |
| PSINF Starvation Creek roadless | 3.84 miles | RGNF General forest products and dispersed recreation |
| GMUG Cochetopa Hills roadless | 15 miles | RGNF General forest products |
| GMUG Cochetopa roadless (upper tier 6618 acres) | Approx. 2 miles | RGNF Grassland Resource Production |
| GMUG La Garita Wilderness | Approx. 5 miles | RGNF General Forest and Intermingled Rangelands, Grassland Resource Production and Forest products |
| GMUG La Garita Wilderness | 2.6 miles | RGNF Lake Fork roadless |
| GMUG La Garita Wilderness | 5.6 miles | RGNF Wasson Park roadless |
| GMUG La Garita Wilderness | 5.6 miles | RGNF General Forest and Intermingled Rangelands |
| GMUG La Garita Wilderness | 9 miles | RGNF Bristol Head roadless |
| GMUG Carson roadless | 2.53 E side 0.94 W side | RGNF dispersed recreation on sides of K/BBuck/Ruby Roadless |
| GMUG Cataract roadless .5 miles of upper tier | 2.4 miles | RGNF dispersed recreation on NE side of Pole Mtn/Finger Mesa roadless |
| SJNF Weminuche Wilderness (at Hunchback Pass) | 3.9 miles | RGNF dispersed recreation |
| SJNF Weminuche Wilderness (at Piedra Pass) | 0.36 miles | RGNF Copper Mountain / Sulphur roadless  (upper tier) |
| SJNF Weminuche Wilderness (at Piedra Pass) | 0.5 miles | RGNF backcountry and dispersed recreation |
| SJNF Weminuche Wilderness (at Piedra Pass) | 1 mile | RGNF Red Mountain roadless (upper tier) |
| SJNF Turkey Creek roadless (upper tier) | .28 miles | RGNF Dispersed recreation |
| SJNF Turkey Creek roadless (.33 upper tier) | .53 | RGNF Dispersed recreation |
| SJNF Treasure Mountain roadless (8.4 upper tier) | 11.58 miles | RGNF Forest Products and some dispersed recreation |
| SJNF South San Juan Wilderness (at Elwood Pass) | .76 miles | RGNF Dispersed recreation |
| SJNF South San Juan Wilderness (south of Elwood Pass) | 5.58 miles | RGNF Summit Peak/Elwood Pass roadless (upper tier) |
| Carson NF Cruces Basin Oser Mesa roadless | Approx. 5 miles | RGNF Grassland Resource Protection and Designated/Eligible Scenic Rivers (Rio de los Pinos) |
| PSINF Sangre de Cristo: Blanca Peak to Slide Mountain roadless | ~.4miles | RGNF Backcountry |

**GMUG** - *Grand Mesa-Uncompahgre-Gunnison National Forests*
**PSINF** – *Pike-San Isabel National Forest*
**RGNF** – *Rio Grande National Forest*
**SJNF** – *San Juan National Forest*

Total of approximately 85 miles of RGNF boundary adjacent to inventoried roadless/Wilderness under an adjacent jurisdiction, where the adjacent administrative designation is at a higher level of protection than the RGNF designation.

Rvsd Plan - 00001588

**Rio Grande National Forest Administrative Disparities at Boundaries with BLM lands**

| Designated Area on Adjacent BLM land | Length of Boundary Disparity | Rio Grande National Forest Current Management at Boundary |
|---|---|---|
| Trickle Mountain ACEC | 1.32 miles | RGNF Deer and Elk Winter Range |
| Trickle Mountain ACEC | 3.1 miles | RGNF General forest products & Intermingled Rangeland |
| Trickle Mountain ACEC | .5 | RGNF Dispersed Recreation |
| Trickle Mountain ACEC | 1.59 | RGNF Antora Meadows / Bear Creek roadless upper tier |
| Trickle Mountain ACEC | 1.5 | RGNF Deer and Elk Winter Range |
| Trickle Mountain ACEC | 1.45 miles | RGNF Antora Meadows / Bear Creek roadless |
| Trickle Mountain ACEC | 2.95 | RGNF Deer and Elk Winter Range |
| Trickle Mountain ACEC | 2.9 | RGNF Deer and Elk Winter Range |
| Trickle Mountain ACEC | 4.8 | RGNF Deer and Elk Winter Range |
| Elephant Rocks ACEC | 1.8 | RGNF Elephant Rocks SIA |
| Elephant Rocks ACEC | 1.3 | RGNF Elephant Rocks SIA |
| Los Mogotes ACEC | .47 miles | RGNF Bighorn Sheep Special Wildlife Area |
| Cumbres and Toltec RR Corridor ACEC | .6 miles | RGNF Ripley Milkvetch SIA |
| Black Canyon WSA | .38 miles | RGNF Deer and Elk Winter Range |
| Black Canyon WSA | .74 mile | RGNF Hot Springs roadless |
| Black Canyon WSA | .18 miles | RGNF Deer and Elk Winter Range |
| Black Canyon WSA | .33 | RGNF Cotton Creek roadless |
| Black Canyon WSA | .33 | RGNF Deer and Elk Winter Range |

**RGNF** – *Rio Grande National Forest*
**WSA**- *Wilderness Study Area*
**ACEC**-*Area of Critical Environmental Concern*
**SIA**- *Special Interest Area*



January 20, 2016

Erin Minks, Forest Planner
Mike Blakeman, RGNF Spokesman
1803 W. Highway 160
Monte Vista, CO 81144

Hello Erin and Mike;

Here are our comments on most of the assessment chapters provided so far, with the exception of Water in Chapter 2, we will have that to you shortly. We have also just begun working on Recreation.

We sincerely appreciate the opportunity to evaluate and comment on draft Assessment Reports. We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.

We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.

We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports. We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.

If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.

Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition

Rocky Smith, Policy Analyst

Christine Canaly, Director
San Luis Valley Ecosystem Council, P.O. Box 223, Alamosa, CO 81101, (719) 589-1518 info@slvec.org
www.slvec.org

Rvsd Plan - 00001590



January 20, 2016

Erin Minks, Forest Planner
Mike Blakeman, RGNF Spokesman
1803 W. Highway 160
Monte Vista, CO 81144

Hello Erin and Mike;

Here are our comments on most of the assessment chapters provided so far, with the exception of Water in Chapter 2, we will have that to you shortly. We have also just begun working on Recreation.

We sincerely appreciate the opportunity to evaluate and comment on draft Assessment Reports. We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.

We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.

We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports. We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.

If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.

Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition

Rocky Smith, Policy Analyst

*Christine Canaly*

Christine Canaly, Director
San Luis Valley Ecosystem Council, P.O. Box 223, Alamosa, CO 81101, (719) 589-1518 info@slvec.org
www.slvec.org

Rvsd Plan - 00001591

**Comments on Draft Assessment 2-Air Quality**

 **The draft assessment generally does a very adequate job considering the major factors related to air quality on the Rio Grande National Forest.**

 On page 6, we agree that Managers must be concerned about air quality.  Managers should also be concerned when poor air quality is or may affect additional considerations including human health; wildlife; recreation; and cultural, social and economic resources.

 On page 7, the phrase "cars and trucks" must be changed to "motorized vehicles" in the following sentence:  **"It includes emissions from industry, including power plants, as well as cars and trucks, wood burning stoves and fireplaces, and ground disturbing activities such as mining and road construction."**

 On page 7, the statement **"The pollution typically originates outside of national forest boundaries, but is transported through the atmosphere and deposited inside national forest boundaries"** fails to recognize and include that there are many sources of pollution that also originate inside forest boundaries.  While air pollution originating outside the forest must be considered, so must pollution sources originating inside the forest.  Air pollution sources originating within the forest include motor vehicle emissions, dust from road and trail use, smoke from fires, chemical spills, etc.

 Sources of pollution that originate inside forest boundaries have the potential to have greater impacts than pollution that originates outside of forest boundaries, because of the proximity of the pollution source to the forest.  Sources of pollution that originate inside forest boundaries are the sources the Rio Grande National Forest has the greatest potential to recognize, regulate and limit/manage.

 Page 7 also includes the following statement:  **"The impact on the ecosystem is related to the amount of pollution emitted, the distance from the ecosystem of concern, and meteorology affecting the transport and dispersion of pollutants."**
- We strongly recommend that "the type of pollution emitted" also be included and considered. Different types of pollution have different effects, toxicities, dispersal rates, etc.

- Page 9 and 13 must also mention and include consideration of additional designated areas not on the Forest where high air quality is of greater importance.  Although not part of the Rio Grande National Forest, the 33,549 acre Great Sand Dunes Wilderness Area is directly adjacent to forest lands and properly recognized as such on page 14 of the draft assessment.

 The Great Sand Dunes National Park and Preserve does real time Air Quality monitoring for the Park. This information is sent to Sandia Labs once a month for analysis. It would be beneficial for the Rio Grande Forest to get a summary of this data on a regular basis, perhaps quarterly, so this information could be integrated as part of Forest Service baseline inventory. Issues of concern are Mercury (from the Four Corners area), transportation (vehicular) and emissions from the Regional Landfill, specifically, toluene, between Monte Vista and Del Norte.
- ***Please see San Luis Valley Air Toxics analysis Report 2012.***

- The nearby Cruces Basin Wilderness on the Carson National Forest in New Mexico must also be included and considered.  The boundary of this 18,876 acre Wilderness Area is only .90 mile away from Rio Grande Forest lands.
- In addition, air quality in the 62,923 Powderhorn Wilderness Area must also be considered in this assessment.  The boundary of this Gunnison Forest Wilderness is ~6 miles from the boundary of

the Rio Grande National Forest.   This is close enough that activity or events on the Rio Grande have the potential to influence air quality in this Class 2 Airshed Wilderness.
- The boundary of the Rio Grande del Norte National Monument on New Mexico BLM lands is located only .94 miles from the Forest boundary.  Air quality in National Monuments must also be considered.

   Activities on the Rio Grande National Forest have and may influence air quality in these nearby areas. As this draft assessment correctly states on page 13 **"air and various air-borne emissions are not constrained by surface area boundaries."**

- On page 23 we recommend changing the word "automobile" to "motorized vehicles" in the following sentence:  **"Area and mobile sources of pollution include, among other things, automobiles, agricultural activities, planes, trains, residential wood burning, lawn mowers, and barbeques."**

Motorized vehicles is a more inclusive term which would include trucks, ATVs, motorcycles, OHVs, snowmobiles and other vehicles.

   On page 23 the term "non-road engine" is frequently used in this paragraph.
"Primary sources for CO include wood burning, vehicles and non-road engines; for NOx vehicles, non-road engines, oil/gas, and railroads; for SO2 wood burning, combustion, vehicles, oil/gas, and non-road engines; for PM wood burning, road dust, agriculture tilling, and construction; and for VOC pesticides, wood burning, non-road engines, and vehicles."
- The term "non-road engine" is not defined.  Does this include engines used for travel on trails?
- The word "vehicles" in the above sentence must be qualified to state "motorized vehicles", as mechanized and other types vehicles do not contribute to these emissions.
- PM (Particulate Matter) also can result from motorized trail use, so "road dust" should be changed to "road and trail dust".

   Road and trail dust needs to be given additional consideration in this assessment.  Unpaved roads (presumably road dust created from the use of these roads) was identified as one of the major sources of pollution on the Forest in 1996, as stated in page 8 of the draft assessment.

   Motor vehicle use on unpaved roads and trails can raise significant amounts of dust.  This adds both fine and course particulate matter to the air.

   National Visitor Use Monitoring data for the Forest from 2010 indicates that over 12% of forest visitors drive for pleasure, ride OHVs and/or use motorized trails as their primary activity. Most forest visitors use motor vehicles to travel to and access destinations on the forest. This indicates that a significant number of visitors potentially drive and ride around on the forest raising dust.

   Only 20 miles of the 2000+ miles of roads and trails available for public use on the Forest are paved, so use on just about 100% of these routes can raise dust.

   Road dust is a concern for maintaining air quality.  As an example, in 1991 Congress created the Grand Canyon Visibility Transport Commission (GCVTC) to advise the EPA on strategies for protecting visual air quality at national parks and wilderness areas on the Colorado Plateau.
   In 1996, the GCVTC published its recommendations to the EPA that included specific actions as well as options for consideration. The Committee identified road dust as deserving of high priority attention, and

stated that further study is needed to resolve the uncertainties regarding both near-field and distant effects of road dust on visibility.

Another USFS study, "Effects of All-Terrain Vehicles on Forest Lands and Grasslands" indicated that dust raised from OHV use had the potential to create enough dust to significantly impair rider visibility, impact areas over 50 meters away from routes, and raise enough dust so that reach air particulate concentration levels which would be unhealthful for trail users.

- Use of roads during permitted activities such as timber hauling, road construction and maintenance, and mining/oil/gas development all have the potential to raise dust, but these concerns can and should be identified and mitigated in the permit process.

Of greater concern is the generally unregulated and unlimited dust creation which occurs as a result of travel and recreational use on all transportation routes on forest lands (including use on designated forest roads and trails, permitted and administrative use, use of county and other roads on forest land, legal and unauthorized use off designated routes, etc.). As human population increases, there will be increasing motorized travel on forest roads and trails for transportation and recreation, and thus there will be an increase in particulate matter levels due to airborne dust resulting from this use.



*OHVs raising dust on the adjacent Pike San Isabel National Forest*

- **The assessment must recognize and consider noise as a form of air pollution.**
  Anthropogenic noise is increasingly being recognized as a significant environmental stressor with negative impacts on humans and wildlife.(ref)  Noise can impact natural settings and the desired experiences associated with those settings, human health, and animal and human behavior.
  - Significant noise sources both within and outside of the forest include gunfire (especially repetitive gunfire from recreational shooting), motor vehicle noise (especially OHV noise) and gas powered engines such as from chainsaw use.  Like other forms of air pollution, noise and the natural soundscape are not constrained by surface area boundaries.

Noise has the potential to travel great distances. For example shooting noise can be heard at great distances from the shooter. The noise produced by an average gun (over 150 dB) can easily be detected by humans at distances exceeding 5 miles.  The noise from gunfire only dissipates to a level that would not be considered annoyingly loud (upper 70 dB) by many people at a distance of one mile.
  Forest noise has also been connected with a decrease in property values on adjacent private land (ref).

- The assessment must recognize and consider anthropogenic light as a form of air pollution.

Rvsd Plan - 00001594

Anthropogenic light has been recognized as having negative impacts on wildlife, plants, and on the perception of natural settings and desired experiences associated with those settings. Most light pollution and its negative impacts results from artificial light sources illuminating areas at night.
**Light sources can be on or off the forest, and easily cross surface area boundaries.**

Significant light sources on the forest include vehicle lights, lighting associated with extractive industry development, lighting from permitted oil/gas/mineral extraction, and lighting from overnight camping areas.

Increasing use of OHVs and the corresponding increase in emissions and dust, must be considered. OHV use for recreation and transportation has increased dramatically both on and off the forest. There is a growing attempt statewide to permit OHV use on city and county roads, which could facilitate additional OHV use on the forest. EPA regulations permit OHV engine emissions to be higher than licensed passenger vehicle emissions.

Groups of people who choose to travel using single passenger OHVs instead of multi passenger licensed vehicles increase the number engines running (which increases emissions) and the number of vehicles and wheels in contact with the ground (which increases dust).
- For example, a group of 4 people who choose to travel with OHVs instead of in a jeep increase the number of engines running, vehicles used, and tires on the ground all by a factor of 4.

Emissions from potential increases in over snow vehicle use, including snowmobiles, must also be considered. EPA regulations permit snowmobile engines to emit higher levels of dangerous emissions than licensed passenger cars and trucks.
Since the locations where many forest visitors congregate are more limited and concentrated in winter as opposed to summer *(due to limited plowed roads and trailheads),* visitors are more aware of compromised air quality at these locations.
Noise, odor, and emissions result in conflict between snowmobile users and other recreationists on trails and at trailheads.

The impacts of air pollution on forest visitors outside of Wilderness must also be considered. Many visitors to the Rio Grande National Forest expect and desire settings and experiences that are less polluted than the urban area they are coming from.
The assessment properly recognizes *(on page 6)* that the 1996 Forest Plan EIS stated that air quality on the Rio Grande National Forest was rated some of the best in the nation.        Although numerous Wilderness visitors on Rio Grande National Forest value clean air, many forest visitors outside of Wilderness value clean air as well.
Site specific sources of air pollution originating from within the forest, such as road and trail dust or smoke from fires, have a high probability of negatively impacting forest visitors.
- The desires of local, regional, national and international visitors to experience clean air must be considered. The assessment on page 47 briefly mentions "people recreate on the forest to enjoy clean air and view expansive vistas". This must be expanded to include desires to experience natural sights, sounds and smells.

There are numerous designated areas on the Forest where the maintenance of higher air quality is particularly important. Compromised air quality would impact Research Natural Areas. Scenic areas, such as the Lobo Overlook, Cumbres and Toltec Scenic Railroad should have higher standards for air quality. Special Interest Areas may also require higher consideration for air quality standards.

Maintaining high air quality is important at other important locations on the Forest where visitors congregate. These include designated recreation sites such as campgrounds, picnic areas and trailheads.

Rvsd Plan - 00001595

The Rio Grande National Forest has numerous fourteen thousand foot peak summits which receive high levels of visitation.  Climbers expect to be rewarded with expansive vistas for their efforts, and poorer air quality compromises visibility from these summits.

Not all of these 14ers are in Wilderness Areas.  Blanca, Little Bear, Kit Carson and Challenger Point are not within designated Wilderness and require additional consideration in order to maintain higher air quality at these summits.

- The identified need for change primarily considers legal requirements to protect the environment.

The impacts of air quality resulting from recreation, traditional and extractive uses need to be accounted for spatially and experientially.  Locations where air quality can impact the quality and desires of recreational users must be identified and considered.   The distance between sources of air pollution and sensitive habitat or desired experiences of visitors must be considered.

The Forest Plan should strive to separate sources of air pollution from desired experiences dependent upon high air quality.
- Examples to ponder might include the impacts of increasing high speed OHV use and fugitive dust from this use on the Pool Table Road #600 on the surrounding La Garita Wilderness.
- Possible loss of visibility resulting from fireplace use at the proposed Village at Wolf Creek on the viewshed from the Lobo Overlook.

***Do Colorado no smoking laws apply to public buildings on Forest lands?***

Rvsd Plan - 00001596

### DRAFT ASSESSMENT CHAPTER 2 COMMENTS FOR SOILS

On page 50, we agree with the statement that soils can lose much of their productivity when altered. The next statement **"Alteration can occur through management actions as well as natural events"** on page 50 *does not fully capture all the means by which soils can be altered and is confusing.*

The term "management actions" implies that the Rio Grande National Forest is actively and visibly supervising, controlling, and responding to all soil altering actions other than natural events. This is not the case, and there are many unsupervised, unmanaged actions which occur on the forest which have the potential to alter soil productivity.

Dispersed recreational activities, for example, have the potential to alter soil productivity. While the Forest may indirectly be managing dispersed recreation in that these types of activities are generally allowed by USFS policy to occur on forest lands, many forms of dispersed recreation are not managed, and occur without Forest staff oversight.   In 2004, USFS Chief Bosworth identified unmanaged recreation as one of the four major issues in national forest management, including the health of air, water and soils.

If the Rio Grande National Forest defines a "management action" as also to include passively permitting known activities to occur without intervention, then this sentence does not have to be modified. If *active mismanagement* is also included as part of management actions, no modification is required.

- We **do not** agree with these definitions, and believe a "management action" implies active and visible supervision, regulation and response.
- We thus recommend this sentence be modified to state **"Alteration can occur through managed and unmanaged human actions as well as natural events."**

On page 50 the draft assessment includes ways in which soil can be altered, including erosion, compaction, loss of nutrients, and modification of hydrologic function.

- This discussion must also include soil contamination and pollution via the introduction of unnatural chemicals or elements into the soil. Toxic chemicals such as oil, gas, cyanide and pesticides; or elements such as heavy metals including lead, can and have been introduced into soils.

A variety of activities and sources result in soil contamination and pollution. Atmospheric deposition is specifically mentioned on page 59 of draft assessment 2. Presumably this includes widespread deposition from sources of pollution off the forest (such as wind carrying power plant contamination) and also sources on the forest (such as emissions from vehicles on forest roads and trails. Hazardous material spills are also mentioned as a source of downstream non-forest water pollution on page 59, and these must also be considered a potential source of forest soil pollution.

- Chemical contamination of water is considered as part of the Watershed Condition Framework beginning on page 58 of this assessment, but chemical contaminations must also be listed as a form of soil alteration.

Soil productivity and health can be compromised due to the presence of contaminants and/or pollutants. Contaminated soil can limit plant growth and cover. Toxic chemicals/elements can be absorbed by plants and animals inhabiting that soil or leached out of the soil by rain, streams or other forms of water. These chemicals and pollutants can have direct negative impacts on organisms inhabiting contaminated soils. Indirect negative impacts on organisms inhabiting or consuming contaminated water, or ingesting contaminated plants or animals, can also occur.

Heating must also be included in the discussion of ways in which soil can be altered, especially as a result of fire. Scorching is mentioned as way that soil can be damaged on page 54 of this assessment. Page 63 of the water section in  the draft assessment states that heating can impair soil quality. Soil heating from fire can kill all soil microbes, volatilize nutrients, and create hydrophobic, or water repellent, soil.

Rvsd Plan - 00001597

This can delay or limit the reestablishment of plant growth and cover, encourage the introduction and spread of noxious weeds, and potentially increase soil erosion. High temperatures due to fire can modify the physical, chemical and biological properties of soil. (see the 2005 USFS publication Wildland Fire in Ecosystems Effects of Fire on Soil and Water at: http://www.fs.fed.us/rm/pubs/rmrs_gtr042_4.pdf

- Soil alteration due to heating can occur naturally in events such as wildfires; as management actions such as a prescribed burn; or as unmanaged actions such as a human caused wildfires or dispersed campfires.
- To a lesser extent, lower levels of soil heating can occur as a result of increased solar radiation due to the loss or modification of vegetative or snow cover, or a decrease in moisture content.

We agree with the statement on page 54 that **"There is a lack of quantitative base and trend data on soil productivity in alpine areas, forested areas and rangeland upland areas, on soil compaction in rangeland bottoms such as riparian areas and swales, and on rates of erosion on system and unauthorized roads and trails."**

We believe there is also a lack of data for soil impacts due to authorized dispersed motorized camping access routes and sites within 300 feet of system roads, especially those that disturb "edge areas." (Defined by Trails Program, Colorado Parks and Wildlife). Also there is a lack of data on the impacts of trails that are not unauthorized, such as those created by use from livestock or non-motorized users.

On page 56 we fully agree with the following statement: **"As with many soils, surface disturbing activities such as timber harvest, grazing, recreation developments, road construction, and off-road motorized use, are the greatest threat to loss of soil integrity, primarily due to erosion and soil compaction."** This is especially true because many of the above activities are authorized and allowed on forest lands. Also, for some of these activities, heavy equipment is used, increasing the likelihood of soil compaction.

We fully agree with the statement on page 60 that states: **"As a general rule soil quality and productivity concerns exist with existing system roads and trails, uncontrolled motorized use on unauthorized roads and trails, and livestock grazing in riparian areas."**

- We are particularly concerned with the unknown extent of soil impacts from unauthorized motorized use off system roads and trails, as this use is not monitored or managed to the extent that designated routes or livestock grazing are. Soil quality and productivity concerns also exist due to allowed motorized use for the purpose of dispersed camping and game retrieval off of system roads and trails. The first paragraph under Local Soil Resource Concerns must be modified regarding the primary concerns with soil quality and productivity to reflect the above. Repeated on and off road and trail use can also compact soils and modify water infiltration.

We agree with the statement on page 60 that Best Management Practices **"are proven measures that protect the soil resource if properly implemented and monitored."** We believe such practices can also help protect resources in addition to soil resources. We also agree with findings that **"the practices are not always being fully and properly implemented at the project level."** We believe this is due to these practices being suggestions, and not requirements. We recommend that the Forest Plan include more Best Management Practice concepts as Standards and Guidelines to ensure that more of these practices are actually prioritized and implemented.

- At a minimum the soil quality provisions in the Forest Service's Watershed Conservation Practices Handbook, FSH 2509.25, should be incorporated into the revised Forest Plan, with most of the WCPH's design criteria stated as standards in the revised plan.

If the assessment states that best management practices are not always being fully and properly implemented, this means that Forest Plan direction is not being met. **Thus we believe that there is a need for change in the Forest Plan related to these concerns.**

- We support the proposed preparation of a Forest-wide soil resource monitoring plan (p. 61). We believe this plan must be part of the Forest Plan revision process, or specific direction must be included in the plan for its timely development.

**Social, Cultural and Economic Conditions, Chapter 6**

*This draft assessment report generally captures all primary sources of information regarding social, cultural and economic conditions.*

On page 1 the number of open miles of roads and trails should accurately reflect the current situation.

- There are over 2000 miles of roads and trails on the Forest open to public use.  This is significantly different than the "hundreds" that is stated.

We recommend inserting the underlined words into the following sentence on page 2: <u>"In addition, recreation visitors to the forest come from outside the region and spend dollars both within and outside the core set of counties before they reach the Rio Grande National Forest; for example, in Chaffee, Park and Fremont counties."</u>

This helps clarify that recreation visitors from outside the region spend dollars in many locations.   This is properly stated on page 31:
"On their way to the planning area, and once they arrive, these visitors spend money on goods and services such as gas, food, lodging, and souvenirs."

*We agree with the following statement on page 3-4:*

"In recent years communities surrounding the Rio Grande National Forest have become increasingly attractive to new residents because of their proximity to open spaces, natural settings and easy access to year round recreational opportunities. As a steward of Colorado's public lands, a portion of population growth in this region can be attributed to the scenic beauty and outdoor recreation supported by the Rio Grande National Forest."

*We agree with this statement on page 4:*

"These forecasts show that study area growth is anticipated to remain concentrated in communities which offer residents access to recreation, open space and wildlands provided by the Rio Grande National Forest."  This appears to be a trend nationwide.

*On page 5, the assessment states:*

"In contrast, less densely populated areas provide greater access to open spaces and wildlands, which may offer natural amenity values to residents and visitors."

The definition of the term "wildland" is not provided, which makes the meaning of this statement confusing.  There may be less populated areas where none of the nearby land could be considered "wild." For example, agriculturally developed land areas in Eastern Colorado, Kansas or Nebraska would not be considered "wildlands," yet these areas are much less densely populated than other areas of the United States.  The residents of these areas do not have greater access to "wildlands" than someone living in a densely populated place such as Denver.  Population density is not necessarily correlated with access to wildlands.

Rvsd Plan - 00001600

- *We suggest modifying this sentence (Pg 5) to state:*
  "In contrast, less densely populated areas may provide greater access to open spaces and wildlands, which may offer natural amenity values to residents and visitors."

  We have been waiting for the RGNF to produce some detail on its economic contributions which is contained in this epic work, but unfortunately much of this has been lost in the decision to address these issues on a super-enlarged 18-county geography where the RGNF "planning area" cannot be visualized.

  There is probably a good reason for doing it this way due to lack of data at the RGNF level but available as part of a larger geography.  Or because pre-packaged studies are already available through Headwaters EDT, IMPLAN, or other consulting sources which may not offer breakouts at the RGNF level but are desirable in other respects.  Or to be helpful in making comparisons of RGNF counties to counties in surrounding forests.  Or because the planners genuinely believe this is the right approach.

  To us, this just makes it more confusing, harder to understand, and inconsistent with the other assessments.

- At least they could have grouped the RGNF/SLV counties together in the tables and provided regional subtotals.  We are grateful that this monster landscape approach is confined to just this one assessment section.

   That being said, this assessment provides a very good summary of the primary communities interested in Rio Grande Forest Management.  We are pleased to see that the assessment included the non-use values community of interest in this discussion.

- Page 25 --- "It is not feasible to estimate non-market values during the planning process."  We have tried repeatedly to inform the RGNF about the Pisgah-Nantahala study and other efforts to estimate the non-market values.  Having this kind of information will help to establish a stronger set of management alternatives to the endless pursuit of trying to make the forest resources match whatever the population trends dictate.

- Page 30 --- A great sense of fealty and reverence is given to the Multiple-Use Sustained-Yield Act of 1960 which is over 50 years old and was addressed to a wholly different set of conditions and level of forest resources than exist today.

- Page 33 --- What are the dollar units in Table 14 for the average spending profiles?

- Page 34 --- What is reference date for RGNF employment?

   On page 37 we suggest the underlined words be added to the following sentence: "Federal grazing land is particularly valuable to ranchers because of the low grazing fees charged for use of this land."  This statement would not be accurate without this clarification.

Rvsd Plan - 00001601

• Page 37 --- Very little comment on the percent increases shown on Table 19 for cattle inventory of 109% in Archuleta County, and 153% for sheep in Costilla County.  We hope none of these impacts have compromised the sustainability of any forest or other public lands.

We find this a very thorough and comprehensive document, more on the order of a research study than part of an action plan for management.  It may be laborious to wade through, but it offers an excellent reference source for county-level data and trends on general demographics, social characteristics, labor force, income and wages, revenues, and spending profiles --- to name a few.

It also does an excellent job of covering relevant historical events, and terms for describing economic and cultural benefits of the forest to dependent communities and various types of human use and experience.

**Concerns:**

• Consistent with our previous comments on the assessment process, Assessment 6 provides no sense of urgency regarding provisions which must be made to protect the health and sustainability of the forest, and using ecosystem integrity as the main regulator of forest conditions.

• Often the narrative gets lost in covering past history, and loses any focus on what is needed for the future.

• We are not advised of any limits on the use of forest resources, and at times it seems like it caters too much to the needs of dependent communities and maximization of economic benefits for profit motives.

- We could not find any mention of the existence of motorized recreation or other highly impactful uses of the forest which should also be treated as one of the "conditions" to be taken into account.

Rvsd Plan - 00001602

### Comments Relating to RGNF Draft Assessment 7 – Ecosystem Services

As you are aware from our attendance at the 20-year plan assessment meetings throughout the valley, we are advocating Forest Service adoption of ecosystems, ecosystem processes, ecosystem integrity, and ecosystem services in all forms as the major instrument for evaluating conditions, formulating compatible priorities and policies, and ensuring that management prescriptions are being carried out to ensure protection of these resources.

Please be assured that we are immensely appreciative of the RGNF's leadership role among peers in addressing its planning responsibilities and conducting a well-performed and inclusive planning process. We cannot, however, accept the notion that the RGNF is passing up the opportunity to put the ecosystem priorities in place for the next 20 years, and believe there is still time to make the necessary revisions as recommended in the balance of this paper.

### Good Job, But Not Enough Priority

We believe the RGNF did a great job of describing and differentiating the basic types of ecosystem services, and cross-referencing with other draft sections of the assessment. But, the ecosystem discussion is treated merely as just another chapter in the plan contents (and "Assessment 7" at that), without any sense of priority and deal-making influence that ecosystem analysis should have in ranking the relative importance of the various ecosystem services which are being promoted and where the majority of attention and resources is being placed.

It seems like all or most of the ingredients for an argument of ecosystem priority are there, *but overly subordinated or disguised* in the narratives and finally included almost as an afterthought. This also places a burden upon the reader to hunt up all references and understand the full collective impact of the ecosystem connections and activity limitations.

- We do recognize the chapter on Ecosystem Integrity as number one in the draft numbering order, but we think having this follow Ecosystem Services in the number 1 position would make a stronger statement.

We are also wondering why in all of this the 2012 Planning Rule --- the quintessential mandate and command to the Forest Service for incorporating ecosystem consideration in its management decisions in a manner equal in power and force to the time-worn mantra of "multiple use" --- does not even warrant the slightest mention?

### "There is no existing forest plan direction specific to ecosystem services." Really?

To us, the forest plan direction based on the 2012 Planning Rule is in itself sufficient direction for the forest systems to design plans specific to and compatible with area differences.

- In our paper dated June 29, 2015 and entitled "Report and Findings on Ecosystem Management Priorities: A Request for Integration in Forest Assessments and Planning," we researched numerous reports and studies on the marvelous scientific pursuit of defining and describing the concept of ecosystems and ecosystem services for thoughtful consideration and practical use in forest management. Hearing no comment from the RGNF on this gifted effort, we would encourage a possible second look by planning staff.

Briefly, contents of the June paper can be reviewed and include ---

- Provisions in the economic framework of the 2012 Planning Rule are presented as the starting point of the report and reference to the official language contained in the new law with regard to the ecosystem analysis and protection priorities.
- We go beyond the Millennium four categories of ecosystem services and examine extended definitions to create a better understanding of all the nuances and implications for policy.
- We were intrigued by some of the pioneering efforts to quantify the value of ecosystems, and reviewed past attempts to monetize ecosystems in dollar terms.
- Obligations of the RGNF under Environmental Justice provisions which apply to our low-income, high-minority plan area were brought to management attention (which have been addressed in the draft assessments).
- Much can be learned from how other countries are addressing ecosystem science, and included the concept of "natural capital" working in Europe which has already been advanced to policy level.
- We reference the Deschutes NF study which sees the ecosystem requirement as a science-based means of resolving conflict between various multiple users by selecting those which best sustain the forest eco-structure.
- As an attempt to understand the Forest Service approach to ecosystem assessment, and develop an appreciation for the technical expertise incorporated in its guidance, we included whole parts of the Management Handbook in Chapter J. on the evaluation of ecosystem integrity, key ecosystem characteristics, disturbance regimes, and system drivers and stressors.
- To further enhance our understanding of the technical ecosystem processes and standard management approach, we found a Canadian release on the guidelines for ecological restoration in British Columbia very helpful, and included selected portions for our report.
- Not satisfied with the lack of information on how to assess increasing motorized recreational use, we discovered the analysis presented in a paper entitled "Unmanaged Motorized Recreation."
- The need for assessments to include specific reviews on situations and developments which we believe will require additional ecosystem protection strategies is also addressed in one of the chapters.
- We also include a long list of terms and definitions and an addendum on impacts and benefits of the RGNF from a purely economic perspective as contrasted to a focus on ecosystems.

**Should we be satisfied with the RGNF "monetary/non-monetary" dichotomy to describe the values of ecosystem services?**

In the RGNF draft we are led to believe that only key services directly related to monetary value such as recreation, timber, and water can be monetized, and those such as cultural heritage and biodiversity cannot. But our reviews revealed several pioneering efforts being made to estimate values for the benefits we are receiving from the forest where trading markets have not been established, but are essential to the health of the forest and human well-being.

Shortly after submitting our June 29 report, a very remarkable effort along these lines was brought to our attention by *The Wilderness Society* on a study prepared by Key-Log Economics to provide concepts, estimation, and application to national forest planning in North Carolina, and this was also shared with RGNF planning staff.

Entitled *Ecosystem Services in the Pisgah-Nantahala National Forest Region*, it covers most of the points mentioned in this response paper, investigates and explains ecosystem service concepts in greater depth than we have seen elsewhere, and provides estimates of the hard-to-get values based on the *benefits transfer method.*

Through a series of data collections and calculations, researchers were able to apply this methodology to establish ecosystem service values on the following elements ---

- Food
- Raw materials
- Water supply
- Biological control
- Carbon sequestration
- Climate stability
- Disturbance prevention
- Gas regulation
- Soil retention
- Waste treatment
- Water regulation
- Aesthetic information
- Recreation
- Soil formation

In our opinion, a ground-breaking contribution of this magnitude cannot be denied, and every effort should be made to incorporate a similar framework for planning by the RGNF.

**Summary Recommendations**

Again, we applaud the RGNF in its efforts to address the complex arena of science and interpretations surrounding the study of ecosystem services and their implications for planning, but would recommend:

- a much greater commitment by the agency to incorporate the mandate for ecosystem analysis into practical management use and as a primary decision-making tool. We have been forewarned from our review of the Deschutes NF and other studies that such a transition requires persistence and patience to take hold within the staffing culture, but is greatly appreciated when the concepts become fully absorbed and the advantages of new information and perspectives are put into place to assist management in facing an increasing level of challenges to maintain and improve sustainability of the forest.

To this end, we offer the following recommendations to edit, add to, or revise portions of the Ecosystem Services draft as constructive advisement in order to strengthen its impact in the assessment process and reflect serious commitment on the part of the RGNF to ecosystem analysis as the prime tool for decision making ---

- Advance the Ecosystem Services Draft Assessment order from number 7 to number 1.
- Acknowledge and define Forest Service responsibilities with regard to ecosystem services in the 2012 Planning Rule, and how the intent of this law is being incorporated into the planning and implementation process for the next 20 years.
- Review and acknowledge the Pisgah-Nantahala NF study to estimate monetary values for all forms of ecosystem services and processes, and affirm the intent to keep abreast of research advancements with the ultimate goal to apply a similar approach and methodology to develop estimates for the RGNF.
- Acknowledge and incorporate expanded definitions of ecosystem services and related terminology from the Pisgah-Nantahala NF study as may be useful or feasible.

Rvsd Plan - 00001605

- Acknowledge conflicts between various forms of recreational use such as motorized vs non-motorized use and variances on the degree of impact to ecosystem integrity and processes needed to maintain or improve forest sustainability.
- Explain how the adaptive management approach can be used in conjunction with ecosystem analysis to produce desirable management outcomes.

We would welcome the opportunity to discuss Ecosystem Services with Planning Staff at your earliest convenience.

Rvsd Plan - 00001606

**ASSESSMENT 10 – ENERGY, MINERALS, AND GEOLOGIC HAZARDS**

*This assessment contains relevant information on the resources listed in its title, but we do not believe the analysis here is complete.*

**Transmission Corridor, Page 7**

There is no mention of the BLM planned upgrade of transmission capacity over Poncha Pass planned by Xcel Energy, in cooperation with Tri-State Generation and Transmission. Two lines have been approved for upgrade from a 69 kv to a 115kv line. In reaching this decision, the energy companies believe it will increase reliability and redundancy (since the lines are more than 2 miles apart), thus technically creating a transmission loop. This decision to upgrade by the energy companies needs to be reflected in this assessment.

**In the analysis of oil and gas, the assessment states:**

> More than 140,000 acres of mostly National Forest System land were nominated for lease in 2008 and 2009, but were deferred primarily because the BLM needs to conduct a leasing analysis on National Forest System lands.

**Page 8.** It would be beneficial to show where these potential areas are located. Also, what specifically is the status of the "leasing analysis" being done on national forest lands?
Is this an analysis of what lands within a specific area will be considered suitable for leasing?
Under the Federal Onshore Oil and Gas Leasing Reform Act (FOOGLRA), 30 U.S.C. 181, it is clearly the responsibility of the Forest Service to do this analysis. See also 36 CFR 228.102.2(c) and (d).

**Will the forest-wide oil and gas leasing suitability analysis done for the previous forest plan be updated?** Assessment 10 doesn't directly state yes or no.
It does say the following:

> *While industry has expressed interest in exploring for oil and gas in the upper Rio Grande, it is unknown whether there are economically recoverable oil and gas deposits below lands managed by the Rio Grande National Forest.*

Pages 3, 8. **A deeper analysis is needed to determine:**
a) if recent advances in technology, such as hydraulic fracturing and horizontal drilling, have made or could make oil and/or gas more economically recoverable?, and
b) what market prices for oil and gas might encourage lease nominations and exploration by industry?

In any case, the previous leasing analysis should be referenced in the assessment and made available to the public.

- The agency must also analyze the possible impacts of leasing and potential subsequent development of oil and gas on national forest land within the planning area. It must not delegate this to another agency.

Rvsd Plan - 00001607

Finally, there is no mention in this draft of reviewing the **No Surface Occupancy** stipulation and what lands may become available for this designation due to changes in the management prescription or re-designation of Special Interest or other types of areas.

Under **"Noncommercial Mineral Collecting Activities"**, recreational mining is appropriately discussed (p. 9). However, there is no discussion of trends in such use, or whether current regulation and permitting (where applied) is sufficient.

It also implies that casual use is allowed in wilderness:

- We would like to see clarification and direction regarding the possible permitting process allowed for casual collecting within the Rio Grande Forest wilderness, if that activity is currently allowable.
- We strongly recommend against collecting activity within wilderness.

*This Assessment must consider the increase in casual rock and mineral collecting, and the potential impacts this activity can have.*

The popularity of recreational, personal, hobby and/or casual mineral and rock collecting is increasing statewide and nationally.  The price of gold has increased to more than 4 times its value at the time of the previous Forest Plan in 1996, providing extra incentive for gold prospectors.  The demand and value of rocks used for decorative and functional purposes (landscape boulders, flagstone) has also increased.

Since the value of gold and certain rocks and minerals has increased tremendously, the line between commercial and non-commercial collecting is not clear.   Recreational, casual small scale collectors can and do benefit from the materials they collect from forest lands.

**We are not sure if the Recreation Assessment will cover casual rock and mineral collection, so we will discuss it here also.**

Causal rock and mineral collection on the Rio Grande is considered in numerous documents.

**The 1996 Forest Plan at III-3 contains the following Standard:**
"Recreational panning, sluicing, and dredging shall be allowed outside Wilderness where such activities do not interfere with the rights of mining claimants protected under the 1872 Mining Law, as amended. These activities shall be evaluated on a case-by-case basis, to determine if an operating plan is needed, by the authorized Forest Service official."

Regulations at 36 CFR 228.4 (a)(1) requires a notice of intent to be filed by any person proposing to conduct operations which might cause significant disturbance of surface resources except when
 **"(ii) Prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and occasionally removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using battery operated dry washers, and collecting of mineral specimens using hand tools".**

Rvsd Plan - 00001608

 A file "MINERAL, ROCK COLLECTING AND METAL DETECTING ON THE NATIONAL FORESTS" (available on the Rio Grande Forest website (http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5261774.pdf ) states "Generally, most of the National Forests are open to recreational mineral and rock collecting, gold panning and prospecting using a metal detector. This low impact, casual activity usually does not require any authorization… "Normally, any gold found can be removed and kept. If the removal of the gold, rocks, or minerals might cause disturbance of surface resources, beyond digging a small shallow hole, a NOI may be required."

Words in the above regulations such as "significant", "reasonable", " small", "shallow" and "may" are ambiguous and open to individual interpretation. The line between casual collecting and collecting which requires a Notice of Intent is not clear.  Regulations regarding these activities on BLM lands are different.

This ambiguity, combined with the increased and ambitious collection of rocks and minerals, has resulted in unregulated collection activity which results in resource damage. Collectors are moving large quantities of material by digging pits and gouging out streambeds or banks to actually removing smaller amounts of valuable rocks or minerals.  They are confused about the regulations for casual collecting, including:
a)where casual collection is permitted or prohibited;
b) when a notice of intent is required, and/or
c) how much material they are allowed to move or remove.

- We suggest that additional language be added to the Forest Plan to clarify when a notice of intent must be filed, where casual collecting is not allowed, how much material can be moved and removed.

In order to limit confusion and better manage casual collecting, we suggest the following be added to the Standard at III-3:
- " Recreational panning, sluicing, dredging and casual rock and mineral collecting is  statute dependent and a notice of intent is required near (¼ mile of) any designated Wilderness Area; Wild and Scenic River or waterway under consideration for this designation; within any Research Natural Area  or Special Interest Area; within any area identified as critical habitat for any Threatened or Endangered Species and within any area listed or eligible for the National Register of Historic Places.'

The assessment provides a map of abandoned mines (p. 11, Figure 2).
This map shows a large number of such mines, with concentrations near Creede, Summitville area, and Bonanza. However, there is no further information on whether any of these mines have been reclaimed, nor any prioritization of needed work. (See p. 9.)
- Further information on hazards at abandoned mines should be in the assessment.
- The revised plan should contain some direction for addressing abandoned mines.

The main geologic hazards identified on the RGNF are "avalanches, rock falls, and flash flooding." Page 10.

- The assessment should identify areas where these hazards, especially the first two, have occurred and/or are likely to occur in the future.
- It should also mention any efforts to reduce these hazards or repair damage done by them.

The Forest Service Handbook has the following guidance: **"In particular, the team should identify and evaluate hazardous geologic conditions in proximity to communities, infrastructure, established recreation areas, and other high use areas."**
**FSH 1909.12, section 13.53.**

**Comments on draft Report Assessment 12  Areas of Tribal Importance**

We agree with many of the statements made in this assessment.  Although we do not represent Tribal interests, we support many of the suggestions made in this assessment.

We recognize that Mt. Blanca is a significant area of Tribal Importance and agree with the suggestion on page 8 that this area be considered for a special designation in the planning process.

- We also agree that more coordination between adjacent agencies and land owners must occur in this, and other areas, adjacent to the boundary of the Rio Grande National Forest.  We support the concept of a multi-agency management plan for this area to keep the mountain as "pristine" as possible.

The assessment must include factual information that the summit itself of Mt. Blanca is not within the legal boundary of the Sangre de Cristo Wilderness Area, which is located approximately one half mile away.  Thus the Rio Grande National Forest is not managing any lands very near the summit as Wilderness.   Lands with Wilderness protection on the adjacent Pike San Isabel (P-SI) National Forest are approximately 1.2 miles away.

The land just to the north of Blanca is on the P-SI and in a 3A management area, where emphasis is on "semi-primitive non-motorized recreation ", but where "mineral and energy resource activities are compatible with the goals of this management area". P-SI Forest Plan at III-125. Even though the area closest to the peak is in a roadless area, mineral activity could still be permitted here or outside the RA to the north, which would not be far from Mt. Blanca.

The nearest lands to the summit on the Rio Grande Forest are currently in a Backcountry Management Area Prescription (MA 3.3), which is different than Wilderness or Roadless. The Forest Plan states that "[t]hese areas are available for locatable mineral entry. Rio Grande Plan at IV-18. Also, any areas with high potential for oil or gas are available for leasing with a no surface occupancy stipulation. Ibid.

In short, Mt. Blanca is not as well protected as the assessment states. Efforts are needed to ensure that the mountain remains, or becomes, pristine. More coordination among the four land managing entities must occur during this planning process, especially with the adjacent national forest.

- **A special management area for the Blanca summit and surrounding area should be considered.**

The conditions and trends segment must be updated to include information that the Blanca area is a very popular destination for recreationists, primarily due to the presence of four 14,000 foot summits.  This section should also state that heavy public recreational use may complicate efforts to keep the area on and around Mt. Blanca pristine.

We agree with the assessment that motorists and vehicles on FR 975 are leaving trash and toxic fluids in this area.  It must be mentioned that vehicles pollute the air with emissions, emit unwanted noise, and leave behind solid wastes in the form of brake pad and tire dust. We are concerned about noise and impacts from motorized use on, and unauthorized motorized use beyond,  FR 975 in this area, which are negatively impacting desired experiences and the "pristine" nature of this area.  Noise from vehicle use extends well beyond the immediate road surface.

There are also concerns about the negative impacts of legally permitted cross country use by ATVs for game retrieval in and beyond an area east of Lake Como.  The 2014/2015 Cornejos Peak District Motor Vehicle Use Map depicts a game retrieval area in this location with a boundary which can not be accessed from any legally open motorized route.  Motorized game retrieval may be occurring even though it is specifically prohibited in MA 3.3. See Forest Plan at IV-18."

There was a Record of Decision on the road's status around 2000 that was upheld by the then Regional Forester, Elizabeth Estill.  The Decision was to close the road at the west end of Como Lake. This would have preserved the best 4 WD experience for those users, and protected sensitive wetlands and unstable slopes on the

road on the east side of the lake and going up. About the same time, roughly, the private property around the lake was conveyed into USFS hands.

Unfortunately, the Record of Decision was never implemented and left the road open all the way to the end. The big problem with the Conejos District Ranger's decision at the time not to implement the ROD was that he notified motorized users of his decision, but never notified other stakeholders like the Colorado Mountain Club.

We understand that the road has been adopted by the Jeepers Creepers group from Durango and as of 2012, they were trying to maintain stable conditions. Motorized use has respected the carsonite posts placed by the District on the east side of the lake to keep them out of the wetlands. The road still remains open to the "bitter end," or it's been called, "the road that never ends."

There is a fairly large turn-around place at road's end where most of the grass/tundra is gone due to turning jeeps. The trail continues across a small stream and then climbs the escarpment next to a waterfall; crosses the stream at the top; and continues into the upper basin. We understand that efforts were underway to mitigate damage to that area but we are unclear as to the status at this time.

- **We would like to see the ROD reviewed, implemented and made part of the Forest Plan.**
- We agree with the suggestion in the draft assessment that the Natural Arch area is significant and deserves additional Special Interest Area protection.

The Natural Arch is a popular destination and some forms of unmanaged recreation are having negative impacts in this area. We are concerned that desired experiences and unique wildlife values are being adversely impacted by noise and other negative impacts from motorized use, especially OHV use, on forest roads 659, 670.2a and 670.2B in this area.

Studies indicate that all motorized sources of noise had detrimental impacts on evaluations of landscape quality compared with natural sounds.[i]

---

[i] Human Responses to Simulated Motorized Noise in National Parks
David Weinzimmer, Peter Newman, Derrick Taff, Jacob Benfield, Emma Lynch and Paul Bell
Journal: Leisure Sciences, 2014, Volume 36, Number 3, Page 251

**Comments on draft Assessment 13, Cultural and Historic Resources**

*We believe this draft assessment adequately captures existing information regarding Cultural and Historic resources.*

We agree with the statement on page 3, the table on page 9, and the statement on page 18 indicating that the majority of the planning area (~82%) has not been inventoried for cultural and historic resources.  Since many sites or resources have not been discovered or properly documented;  it is  likely they are experiencing unknown damage, destruction and negative influences by both permitted and unauthorized activities and/or other uses occurring on the forest.

• There are Misspelled words and unedited sentences in several places in this assessment.
• This section could use a glossary for technical terms like "lithic," "B.P.," and "debitage."
• The RGNF may harbor some unique high-elevation sites of interest which require greater levels of protection, and efforts to upgrade sites should be made throughout the forest wherever possible.
• The stories about damages or destruction of historic sites due to the lack of adequate planning for management treatments, lack of monitoring, lack of protective barriers, or other intrusions gave us great concern.  This includes poorly controlled prescribed burns, uncontrolled cattle grazing, vandalism, motorized off-road impacts, and illegal land uses.
**Additional staff is needed for monitoring and enforcement personnel to protect and safeguard sensitive historic sites and areas.**
•  We are aware of efforts made in previous administrations to cut tax support, cut personnel, and force a commercial operation of the forest based on its own cash flow on whatever resources can be found, but we have concern about the efforts being made by the Denver Botanical Gardens and Kansas University to manage osha as a commercial harvested product (page 12) and the potential precedence being set to privatize public assets. This type of partnership has to be managed carefully and with the greatest of oversight. This potential enterprise needs to benefit public interest first.

We strongly believe the following statement in reference to the Fremont Historic Special Interest Area on page 11 must be modified:
• "The area needs to be surveyed for the undocumented camps so that some of the acreage can return to the timber base."
• It is presumptuous and pre-decisional to state "so that some of the acreage may "return to the timber base".  A more accurate survey may not modify the boundary of this Special Interest Area, or it might suggest an increase in its size.  Any lands identified for removal from the Special Interest Area could be proposed for a management prescription which is not related to timber, and may not be considered as part of the timber base.

Also, this SIA is near timberline. Logging should not occur in these areas, especially not commercial timber production.

**Table 6.** Conditions and trends influencing the condition of, or the demand for, cultural and historic resources (positively and negatively)
We recommend the modifications described below be made to Table 6
**"Trends/Conditions and influences" on page 16 and 17.**
Since that information was gleaned from a public meeting, it may only reflect the opinion of those in attendance.   While we agree with most of the information presented and believe it to be factual, we do not agree with all the information and feel that it is incomplete.

*"Grazing and ranching /Can protect important sites if ranchers are informed."*
- This should be modified to state that grazing and livestock needs to be monitored closely because it can also negatively impact sites and resources.

**Page 15 of this assessment provided an example of this.**

Since grazing allotments cover most of the planning area, and most of this land has not been inventoried for cultural and historic resources, it is possible that grazing animals are currently inadvertently negatively impacting unknown or undocumented sites and resources.

**Under USFS Management Page 16**
*"Excessive rules and regulations/ Hamper current lifeways (e.g. grazing, resource gathering)".*
The Influences should be modified to also state:
- "Educates the public; helps preserve and protects resources and permits law enforcement action against violators."  The term "excessive" is subjective and not defined.
- There are individuals who believe most rules and regulations are excessive while others believe there are not enough rules and regulations.  It must be emphasized that most rules and regulations already in place are valuable, and they contribute to the preservation and protection of cultural and historic resources.

*"Roadless designation/road closure/ Impairs access; concentrates use in other areas.*
They can also protect sensitive archaeological values."
- We recommend that the Influences be modified to state "Impairs motorized access on roads".  Roadless areas in and of themselves do not impair general human access.  They clearly limit only one specific type of transportation access via roads, but permit most other forms of access.
- We also recommend that the second sentence be modified to state:
  "Can also protect archaeological, cultural and historic sites, resources and values."
  This change is more inclusive of the protection which roadless areas may offer.

*"Bureaucracy/ Reduces ability to clear archaeological sites in timely manner; requires frustrating NEPA process."*
- The word "frustrating" must be removed from the Influences.  Use of this word is a subjective judgement that is not defined.  Many individuals value the NEPA process, as it helps guarantee that the public is allowed input into the decision making process, and also presents information to the line officer on how best to protect resources.

*"Lack of staff/ Causes inadequate monitoring and water maintenance."*
- This should be modified to state as an Influence:  "Causes inadequate monitoring, enforcement of regulations and water maintenance".

*"Decreased logging allowances /Increases fire risk to historic areas and sites."*
- The Influences should be modified to also include "Reduces risk of known and unknown site damage and destruction."

*"Decreased grazing allotments /Negative impacts to economy and access (via loss of stock trails)."*
- The Influence should be modified to also include: "Reduces risk of known and unknown site damage and destruction from stock use."

*"Bark beetle epidemic /Increases fire danger, increases wood gathering opportunities, opens new rangeland, hampers trail access".*  The evidence as to whether or not the beetle epidemic increases fire danger is

inconclusive, and leaning toward an actual decrease in fire danger. **This part of the statement should be removed.**

- We recommend the addition of the following influences:
  "May expose or conceal undiscovered resources, which can result in protections or negative impacts".

**We suggest the addition of the following in the USFS Management section in Table 6:**

***Condition or Trend - "Allowances for off route travel by motorized vehicles"***
*Influence*- "Can negatively impact, damage or increase vandalism to known and unknown sites". Dispersed motorized camping, off route game retrieval and firewood collecting all permit legal use of motor vehicles off of designated routes. It can be difficult to see and/or avoid artifacts obscured by vegetation or terrain when driving a vehicle off road.  Unexpected or unanticipated noise from motor vehicle use can negatively impact desired experiences. (See below.)

**Condition or Trend** - "Increased casual or hobby mining"
*Influence*- "Digging, sluicing and excavation can negatively impact, damage or destroy sites."

**Condition or Trend- "Increased anthropogenic noise"**
*Influence*- "Can negatively impact desired historic or cultural experiences"
The acoustic environment has a significant impact on visitor perceptions of a location or area. Noise that is not wanted or inappropriate can detract from desired experiences at cultural or historic sites.

**Page 18 states** that the Rio Grande National Forest is developing a programmatic agreement for a project on the Forest with the State Historic Preservation Office that "that may become the template for Colorado Forests. The programmatic agreement will allow managers to streamline the NEPA process while addressing specific steps in order to remain in compliance with Section 106 of the NHPA."

Since every project is different, we caution the RGNF about using an agreement for one project as a template on any other projects. Also, "streamlining" NEPA can be a code word for shortcutting, i. e., not taking the time to address issues as required by the statute and its implementing regulations. While we are in favor of making the review process work more efficiently, any programmatic agreement must ensure that all proper steps are taken to fully disclose impacts to cultural and historic resources and provide mitigation for any damage to them.

**Comments on Draft Report Assessment 14 Land Status and Ownership, Use, and Access Patterns**

We generally agree with and support the information provided in this draft assessment report.

We agree with the statement on page 3 that **"Budget declines and a loss (nationally) of expertise and staffing of the special use program is causing a backlog of expired permits, inadequate inspections of existing permitted uses, and delays or incorrectly issued new permits."**

- Another statement must include recognition that inadequate monitoring and enforcement has resulted in unpermitted activities and use on the forest when a permit would normally be required.
- On page 5 we recommend that the Trend "The creation of "illegal non-system routes" across national forest system lands is ongoing and causes resource damage" be modified so it states "The creation and use of "illegal non-system routes" across national forest system lands is ongoing and causes resource damage."

We suggest the following additional "Influence of Trends" be added on page 7.

- "There is an increased potential of illegal and unauthorized use of forest lands from adjacent private property."   It is difficult to monitor and detect activities such as unauthorized motor vehicle use, theft of forest products, drug labs, dumping and occupancy and use on forest land immediately adjacent to private property.

- We fully agree with the statement on p. 7 that the shared boundary with other federal and state lands provides the Forest with opportunities for collaboration on land use and access.  The Forest must take steps to mitigate inconsistent land use and access issues with adjacent lands.

- This assessment must include a statement that often times the boundary between forest land and adjacent lands under other jurisdictions is not accurately or visibly marked on the ground. This results in confusion about what activities are allowed, and leads to inadvertent actions and use resulting in negative impacts on forest land and resources.

We highly recommend that the following be included in this assessment to elaborate on some of the inconsistent land use and access issues:

- "Inconsistent management of permitted forms of travel between the Rio Grande Forest and adjacent land or routes results in concerns and conflicts.

For example, the Forest currently permits cross country travel by mechanized vehicles such as bicycles, whereas adjacent BLM San Luis Valley Field Office lands and Grand Mesa-Uncompahgre-Gunnison National Forest lands limit mechanized travel to designated routes. Riders legally riding on undesignated routes on Forest lands violate regulations when they  cross onto these adjacent public lands.

Most Forest roads permit unlicensed OHV use, and this results in conflicts and concerns when those roads transition to adjacent county roads.   All adjacent county roads currently prohibit unlicensed OHV use according to Colorado Revised Statute 33-14.5-108.

Rvsd Plan - 00001616

Allowance of off route travel by snowmobiles on national forest land can lead to inadvertent use on adjacent private land across unmarked boundary lines, which violates Colorado Revised Statute 33-14-113."

- The assessment must also mention how advances in technology will produce mechanized and motorized vehicles which will enable people to more quickly and easily access some areas of the Rio Grande NF and possibly increase the impacts from such use and increase the areas where impacts occur.

- There are inconsistent land management designations along the Rio Grande Forest boundary with adjacent National Forests and BLM lands.

- *Please see the attached list of these management boundary inconsistencies.*

- This assessment must discuss how the use of adjacent land can impact RGNF land, and how use of forest land can influence adjacent lands. Sounds, sights, odors, water, wildfires and wildlife/animals/people often freely move across the boundary between the Forest and lands under other jurisdictions. Management or use of forest lands can dramatically influence the use of adjacent lands. Management of adjacent lands influences forest lands.
  For example, one study[i] found that forest noise had an impact on property values of adjacent private land. Development of adjacent land can increase wildlife dependence on forest lands to meet their habitat needs. Recreational target shooting noise can influence use and desired experiences across boundary lines. Vegetation, management and use levels can impact the potential for man-caused wildfires on adjacent lands.

Since this assessment addresses access patterns, it should contain the following information:

- miles of roads and trails open to various types of use (motorized and classes of vehicles) versus non-motorized); trends in types of use (e. g., snowmobiling versus cross-country skiing and snowshoeing); and patterns and trends in the use of developed facilities.

- We recognize that these items could be addressed in assessment chapters 9 and 11. If so, they should at least be referenced here.

The maps at the end of draft assessment 14 are useful, but some are difficult to read.
*For example, the legend on Figure 3 is not readable.*

In Figure 5, trails do not show on the map in spite of a designation for them in the legend.
Utilities and gas lines do not show on the map designed to show them, Figure 6.

[i] Ham, C.; Champ, P.A.; Loomis, J.B. and Reich, R. M. (2012) Accounting for Heterogeneity of Public Lands in Hedonic Property Models, Land Economics, 88 (3): 444–456

**Assessment 9, Recreation draft report comments**

*Here are comments on Recreation Draft Assessment Report 9.*
We sincerely appreciate the opportunity to respond. We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.
We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.
We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports.  We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.
If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.
These draft assessment reports generally do a very adequate job considering the major factors related to Recreation on the Rio Grande National Forest.
Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition
Rocky Smith, Forest Policy Analyst
Roz McClelland, Rocky Mountain Recreation Initiative
Christine Canaly, San Luis Valley Ecosystem Council

- The information sources and gaps on **page 1** also needs to include USFS sources of public education and information regarding recreation on the forest.  Public education regarding recreational opportunities and regulations in the form of maps, signage and web information is a crucial part of recreation.
- The proper implementation of recreation management decisions depends upon the recreating public obtaining and understanding information provided to them regarding those decisions.
- The assessment should recognize and evaluate these sources of public information regarding recreation.  The assessment must recognize that inconsistent public messaging between various sources of USFS recreational materials is confusing the public, making the difficult task of recreation management, more difficult.
- *For example, there are numerous discrepancies regarding the existence of, and allowed uses on, trails depicted using current district Motor Vehicle Use Maps and the 2012-2015 District specific visitor maps.  Signage on the ground is not consistent with, and contradicts, documented decisions.*

We agree with the statement on **page 2:**

Rvsd Plan - 00001618

*"We need more studies to evaluate the interactions between recreation use and the impacts to ecological integrity, especially in terms of the effects of dispersed recreation on species diversity, distribution, and ecological integrity."*

Dispersed recreation accounts for a large percentage of use on the RGNF, and the volume and intensity of this type of recreation is not well tracked or monitored.

- We believe that the RGNF should recognize that recreational use likely impacts species diversity, distribution and ecological integrity. Management of dispersed recreation should not be limited due to the lack of definitive studies. There is ample evidence in the literature that human presence can negatively impact species and ecological integrity.

Dispersed recreation can also have significant impacts on natural resources, including land, vegetation, natural soundscapes, wildlife and waterways.

On **page 2** the draft report states that there is limited documentation "regarding the location, type, and frequency of recreation user conflicts. Although there may be limited documentation on this for the RGNF, conflicts have generally been documented in other areas and forests, and regulations have been developed to mitigate and eliminate those conflicts.

### *Common recreation conflicts on other forests include:*
- Conflicts between motorized and non-motorized recreationists
- Conflicts between recreational target shooters and other forest users (The Arapaho Roosevelt is currently conducting a forest wide recreational shooting analysis. The adjacent Pike San-Isabel National Forest has closed areas to recreational target shooting to reduce conflict).
- Conflicts due to unleashed dogs (harassing/killing wildlife or other forest users)
- Conflicts between trail users in different user groups (see Conflicts on Multiple-Use Trails)
  http://www.fhwa.dot.gov/environment/recreational_trails/publications/conflicts_on_multiple_use_trails/conflicts03.cfm
- Conflicts due to noise
- Conflicts due to mountain bike use off designated routes (Gunnison National Forest, SLV BLM public lands, Salida District Pike San Isabel National Forest have all addressed this in recent planning processes)
- Conflicts due to unmanaged recreational mining and rock/mineral collection.(The BLM Royal Gorge and Grand Junction Field Offices have developed additional management actions for recreational mining and rock/mineral collection).

These types of conflicts occur nationwide on public lands. They are occurring between recreationists on the Rio Grande National Forest.

We encourage the RGNF to be proactive in anticipating and responding to conflicts in this planning process. Recreational use will only increase on the forest and this will result in an increase in conflicts.

Rvsd Plan - 00001619

**Therefore, the RGNF should consider the following:**
-separating user groups where conflict is likely
-Educating the recreationists about avoiding behavior which may lead to conflict and implementing and enforcing regulations in certain locations.  These actions can help maintain quality recreational experiences and reduce conflicts for all users.


**Noise and the protection of Solitude/Quietude**

   Unwanted anthropogenic noise can significantly interfere with desired recreational, historical or cultural experiences in specific areas throughout the forest and lead to conflict.

   Experiencing unwanted noise from other forest users can result in the loss of a perception of solitude, and solitude has been identified as a significant part of the niche of this forest.  Relaxing is consistently one of the top most popular participation activities on the RGNF (according to National Visitor Use Monitoring), and the vast majority of forest visitors find it difficult to relax while listening to loud, unwanted and/or annoying noises.

   Certain forms of dispersed recreation, such as target shooting and OHV use, can generate noise which interferes with these desired experiences.  Noise can travel long distances, is difficult to escape, and the noise generated by a just one user can negatively impact large areas and the experiences of other forest visitors in those areas.

   *The assessment must recognize the negative impacts and conflicts that result from unwanted anthropogenic noise, and recognize that there are sites and locations where such noise is inappropriate.*


**The RGNF should consider the designation of quiet use areas in certain locations throughout the forest.   Examples of these might include the areas within and areas adjacent to:**
•      Designated campgrounds, picnic areas, scenic overlooks, interpretive sites, trailheads, designated parking areas or wildlife viewing areas.
•      Any municipality, town, city or significant residential development or subdivision.
•      Significant seasonal wildlife habitat.  Breeding, calving, birthing and nesting areas, or other locations important to wildlife.  Studies have shown that anthropogenic noise can have significant negative impacts on avian species which depend upon vocalizations in the courtship process.
•      Research Natural Areas, Special Interest Areas, Cultural or Tribal Areas, Historic Areas or certain other similar designated areas.
•      Certain other concentrated dispersed use areas where unwanted noise would interfere with desired experiences.   These might include popular dispersed camping areas, fishing areas or similar places.


**Also on page 2, we agree that:**

Rvsd Plan - 00001620

*"There are limitations to the recreation opportunity spectrum tool in outcome·focused management."* For example, the ROS is applied to broad areas and ignores the fact that different site and area specific recreation opportunities can occur within that broader area assigned to the same ROS class. All trail classes can and do occur in all settings.

- Given that almost half of the RGNF currently is within the specific Roaded Modified ROS subclass setting, *an unusually large percentage*, there may be opportunities to consider different ROS settings for some of those lands. This may help increase the diversity of recreation experiences on the RGNF and better coincide with existing designations and conditions.
- There are opportunities to modify ROS to better align with designations for the Colorado Roadless Rule and the Continental Divide National Scenic Trail.

**The recreation guideline on page 6:**
"Trail development shall be coordinated with trail systems developed by municipalities, counties, states, other federal agencies, and partners" **may need revision or clarification**. Other non-forest entities (including but not limited to, municipalities, counties, states, other federal agencies, and partners may have different desires, goals, standards, restrictions, etc. with regards to trail development.

- This guideline should be revised to include coordination and consideration of any and all land owners or managers under any jurisdiction, including private property.
- Cross boundary coordination must occur, but this should not necessarily require a RGNF response to trails or trail systems on another jurisdiction.

Coordination must involve the joint analysis and approval of an official trail designated by both managing jurisdictions for any trails that lead up to or cross the RGNF boundary. Designated trails generally encourage, facilitate and receive greater amounts of use than undesignated routes.

It is irresponsible and improper for one jurisdiction to designate a trail that will facilitate use on the land across a boundary line unless the other jurisdiction has conducted an analysis and agrees to accept the burden of managing that use.

- The RGNF must also consider full connectivity to designated public routes for trails before approval, when appropriate. Trails that lead from RGNF land to adjacent land under another jurisdiction must also have legally approved and designated connectivity to publicly open routes either on that adjacent route or beyond. *For example, the RGNF should not approve a new trail which connects to a BLM trail, but then transitions to an undesignated route on private land beyond.*
- Recreation event permits issued by the RGNF must also ensure that any travel involved is legally approved and permitted by all land owners or managers.
- We agree with the guideline of prohibiting dispersed camping within 100 feet of any lake or stream. We believe this should be modified to include a broader

Rvsd Plan - 00001621

category of permanent or semi-permanent surface water (pond, fen, wet meadow, river, etc.).

- We also believe that this prohibition should become a standard to help ensure education, public compliance, and implementation. Newer public RGNF District visitor maps indicate that dispersed camping should occur at least 150 feet from water sources.

*The list of non-motorized recreation activities should specifically include hunting.* With a few exceptions, Colorado regulations prohibit the firing of a gun from or across any road and hunters are not permitted to have a loaded firearm in any vehicle or on an OHV. Most hunting on the RGNF occurs during rifle season. Hunting is not an activity which depends upon motor vehicle use, and there are many hunters who use horses and their own two feet for access.

The RGNF does permit game retrieval with ATVs. Use of ATVs for hunting is not required and many hunters use backpacks, game carts, horses/mules/burros and friends to retrieve harvested big game. *ATV game retrieval is a source of conflict among hunters and other forest users and has a high potential to damage natural resources.*

**The statement on page 9: "**Only the highest elevations (8,500 feet and above) receive sufficient snow pack to allow for snowmobile use as well as other winter sport activities (downhill and cross-country skiing, snowboarding, tubing, sledding, snowshoeing) on a regular basis" **must be modified.**

- With climate change snow conditions may and will be different than they are today. We suggest the word "Currently" or "Typically" be inserted at the front of this sentence to account for changing snow pack.
- **On page 10** the draft assessment report states that the forest has seven fourteeners, while on page 15 identifies six fourteeners on the Forest. The correct number is six, and **page 10** needs to be corrected.

**The following statement on page 10 is surely a typographic error and must be corrected:** *"Our motor vehicle use map identifies 378 miles of trails and 681 miles of roads for public motorized use on the Conejos Peak, Divide and Saguache Ranger Districts."*

- The 2015 RGNF Travel Analysis Process Report identifies 301 miles of motorized trails and 2127 miles of maintenance level 2-5 roads on the RGNF. **(page 1)**. Other spreadsheets posted on the RGNF Travel analysis webpage (http://www.fs.usda.gov/detailfull/riogrande/landmanagement/projects/?cid=fseprd484850&width=full ) provide different totals for miles of motorized trail on the RGNF, but all are less than 378 miles.
- While the number and mileage of administrative roads and trails closed to public use is not easily discernable from the Travel Analysis Process Report, there are fewer than 378 miles of motorized trails and much more than 681 miles of roads publicly open to motorized use on the RGNF.

Rvsd Plan - 00001622

**On page 10,** the statement of where motorized recreation is prohibited must be clarified and expanded to properly include regulations as specified **36 CFR 212.51.**   Motorized recreation is restricted to routes and areas depicted on Motor Vehicle Use Maps, unless specific exceptions apply.

- Perhaps the forest was trying to convey the concept of which management prescription areas permit motorized recreation, in which case the assessment should read *"We do not permit motorized recreation in the following management prescription areas…".*

- We also believe the above statement may not be correct, as the forest appears to permit (or does not specifically make attempts to exclude on District visitor maps) motorized snowmobile recreation in certain areas. ***For example, the Eligible Wild River management prescription area for Toltec Creek on the Conejos District Visitor map does not specifically prohibit snowmobile use.***

**Dispersed Recreation vs Recreational sites**

The proximity to dispersed recreation on developed recreation sites must be considered in the assessment so the foundation can be clear for the EIS..  Many forest visitors expect a higher quality and more specific desired recreational experience from a developed recreation site, especially if they are paying a fee.

The visual, auditory and olfactory byproducts of some forms of dispersed recreation can easily intrude upon designated sites.  This can result in compromise of desired recreational experiences for developed site users, and lead to conflict.

- *Dispersed recreation can also minimize the RGNF investment in developed recreation sites.*

 For example, dispersed camping is currently permitted directly adjacent to developed campgrounds and some dispersed campers use developed campground facilities and do not follow developed campground regulations.

Unmanaged recreational target shooting can also negatively impact the desired recreational experiences of many developed site users.

It must be recognized that all forms of dispersed recreation are not appropriate in all areas.  **Dispersed recreation should not conflict or interfere with the operation of developed recreation, scientific study, or special management areas.**

- We suggest using another word instead of "backcountry" in the following sentence on **page 12:**
  "The Rio Grande National Forest is a popular destination for both motorized and non-motorized recreationists seeking backcountry areas for dispersed recreation."   The RGNF has a Backcountry management prescription area, and these management areas are not necessarily the undeveloped recreation areas where dispersed recreation generally occurs. "Backcountry" could be replaced with "undeveloped or less developed".

Rvsd Plan - 00001623

We recommend additional clarification be added on **page 12** regarding dispersed recreation. This page contains a sentence: "Essentially the recreation that happens "everywhere else", dispersed recreation occurs in and outside wilderness areas on roads, trails and general forest and water areas which are not managed as developed sites."

Recreational use occurring <u>on</u> a designated road or trail is not necessarily dispersed recreation, but rather recreational use that is occurring on a designated, developed and improved USFS facility that is specifically managed for public use.  Trails especially are facilities developed and managed to accommodate recreational use.  Driving for pleasure is a popular recreational activity on forest roads.

The recent RGNF Travel Analysis Process evaluated the recreational benefit of roads and certain trails. Roads and trails may not be developed recreation sites, but they do concentrate recreational use in certain locations and corridors.  Studies indicate that most human use occurs within a half mile of a road or trail.

- While the recreational use associated with roads and trails may be dispersed, it must be recognized that roads and trails are facilities which are frequently used for recreation and are often managed for recreational use.

**Page 12** contains the sentence: *"In these dispersed use areas there are sometimes user conflicts during peak seasons (especially hunting season), health and safety concerns (i.e., littering and human waste), and visible resource degradation (i.e., vegetative removal, trampling, soil erosion, wildlife disturbance, etc.)."*

We believe that there are conflicts in areas that occur outside of peak seasons.  We recommend the RGNF consider additional management of dispersed recreation, especially in concentrated use areas.

The discussion of infrastructure maintenance and operating costs on **p. 12** refers to *"the twenty-year life cycle of our next Forest Plan"*. As the Forest Service well knows, the National Forest Management Act requires revision of plans at least once every 15 years.

**On page 14** The following sentence is included in the *"Solitude in Every Season"* section **on page 14**: *"As recreation pressures increase in other parts of Colorado, the public lands of the San Luis Valley maintain their remote spirit and traditional culture."*  While we agree that RGNF lands are generally maintaining their remote spirit, solitude and traditional culture relative to other forests, **this assessment must recognize that this is changing.**

The increased recreational pressure on other forest lands is also requiring increased recreational regulations.  Recreational pressure and increased regulations are combining to push forest users to RGNF lands.  *An increase in dispersed recreational use on RGNF is resulting in a general decrease in the perception of solitude for forest visitors.*

We encourage the RGNF to be proactive in managing the forest in order to maintain solitude.  We recommend that the RGNF recognize recreational trends in other parts and

Rvsd Plan - 00001624

Forests of Colorado, and include components in this Forest Plan to proactively respond to those trends.

We agree with statements made on **page 15** that the Fourteeners are a popular recreation destination which is also resulting in environmental impacts. The assessment report must acknowledge that the area frequented, and resulting impacts, of Fourteeners visitation extend beyond the use of actually climbing the peaks.

Fourteener areas also involve use of vehicles on access roads, vehicle parking, dispersed camping, heavy use of trails and areas approaching the peaks, and human waste disposal.

- We recommend that special management areas be designated for the Willow Creek and Lake Como access areas, in order to responsibly provide appropriate access while preserving resources for Fourteener climbing.
- The discussion of important recreation sites which begins on **page 16** must include RGNF areas mentioned as part of the Colorado Birding Trails.

Colorado Parks and Wildlife and other partners have identified specific watchable wildlife areas and locations where birders can best enjoy their activity as Colorado Birding Trails. (http://coloradobirdingtrail.com/ ) Birding is a popular recreation activity worldwide and is best enjoyed in specific habitats where natural conditions predominate. Effective birding depends upon natural soundscapes for bird song and call identification.

**Specific locations on the RGNF that are part of Colorado Birding Trails include:**
- Poso Campground
- Moon Pass
- Storm King Campground
- North Crestone Creek Campground
- Platoro Reservoir area
- Conejos Canyon area
- Trujillo Meadows area
- Wolf Creek Pass
- Big Meadows Reservoir area
- Park Creek area
- Summitville area
- Pinos Creek
- Embargo Creek
- Groundhog Park area
- Beaver Creek Reservoir area.

Other specifically identified (http://cpw.state.co.us/thingstodo/Pages/Viewing.aspx) Colorado Parks and Wildlife watchable wildlife viewing locations on the RGNF include:

- Natural Arch Watchable Wildlife Route

Rvsd Plan - 00001625

- Bachelor Historic loop area
- Highway 149 area from South Fork to Spring Creek Pass
  Brown Lake area.

We do not agree with the statement on **page 18** that *"Management of the Trail is consistent with the nature and purposes of the Trail and the 2009 Continental Divide National Scenic Trail Comprehensive Plan and any revisions."*

There are concerns that CDNST management may not be consistent with the nature and purposes of the trail.  A decision to designate and permit motorcycle use on the CDNST in the 2010 Gunnison Travel Management Plan was appealed by numerous groups.  This appeal was upheld in 2010 because a determination was made that supporting documentation which indicated that motorcycle use on this trail was not substantially interfering with the purpose and nature of the CDNST was lacking.[i]

This very same CDNST segment in question (trail 813) crosses back and forth between the GMUG Forest and the RGNF.  Thus, there is insufficient evidence that motorized use on the CDNST is not substantially interfering with the nature and purpose of that trail on both the Gunnison and Saguache Districts.

Therefore, trail management may not be consistent with **section 6 b(5)(a) the 2009 CDNST Comprehensive Plan, nor with Forest Service policy. See FSM 2353.42.**

We wish we could agree with verbiage stating *"The Continental Divide National Scenic Trail is a quiet, continuous mountain path"* on **page 18**.  **We would support a forest plan standard or guideline to manage the CDNST as a quiet path.**  When one considers sound level as a measurement of quiet, there are long segments of the CDNST on the RGNF that are frequently not quiet.

For example, dirt motorcycles are allowed on the CDNST/Trail #813 for long segments of RGNF from Lujan Pass to Windy Peak.

The dirt motorcycles that actually adhere to Colorado State Law emit up to 96 dBA in noise.  That amount of noise is the opposite of what is considered quiet by most people.

We thank you for recognizing on **page 18** that the Colorado Trail has no official management designation.  Although the Colorado Trail route deservedly has received its share of attention and use, and citizen efforts have done a good job of promoting the concept of this trail, we find it odd that a Forest Plan Guideline listed on **page 6** of this assessment specifically prioritizes reconstruction, operation, and maintenance on the Colorado Trail over other non-Congressionally designated trails.

We believe that it is unwarranted to make a programmatic commitment of limited RGNF staff time and funding to a trail concept that lacks an official management designation.  This is especially true since the Colorado Trail Foundation exists and has made admirable efforts to organize and mobilize volunteers and funding for this route.

There are other trails on the RGNF which deserve attention for reconstruction, operation and maintenance, but are not receiving it.

Rvsd Plan - 00001626

This draft assessment report states on **page 19** that "The majority of the inventoried roadless area acreage where roads are prohibited on the Rio Grande National Forest has been designated as backcountry areas **(management area 3.3)."**

We thank the RGNF for recognizing that not all roadless area acreage is in a management prescription area that prohibit roads.  The adoption of the roadless rule in 2001 and the Colorado Roadless Rule in 2012 are significant changes that have occurred since the 1996 plan which require attention in this forest plan revision process.

- **There is a "need for change" so that management prescription areas for Colorado Roadless Areas prohibit roads.**

**Page 19,** lists activities occurring or increasing since 1996 that have resulted in increased safety risks.  The following should be added to this list:

- recreational target shooting
- use of OHVs on mixed use trails
- use of mountain bikes on non-motorized trails and on unauthorized trails.
- unauthorized use of OHVs off of designated routes.

We do not fully agree with the statement on **page 19:** *"Conflict happens when a person's expectations for his or her recreational experiences are not met."*  There are numerous instances when expectations for recreational experiences are not met that have nothing to do with conflict and more to do with disappointment.

For example, a recreational user might expect a scenic view to not be obscured by low clouds; fishing at a lake to be better than it is, or there to be more snow for skiing than actually exists.  In all of these instances, expectations for recreational experiences are not met, but this cannot be attributed to conflict.

- We prefer, and recommend the RGNF use, the definition of conflict used by Jacob and Schreyer(2) which is "goal interference attributed to another's behavior".  This definition is much more applicable and appropriate for a recreation assessment and to recreational user conflict.

Since conflict involves a recreationist's response to something, what a recreationist responds to can involve more than direct contact, sounds or the sight of physical evidence.  Perceptions received via all senses can contribute to conflict.  For example, the odor of exhaust from snowmobiles may result in conflict in a cross country skier.

**On page 20**, the sentence *"The Decision was appealed by entities opposing bicycle use on the trail"* must be modified to accurately reflect the positions of the appealing entities.

This sentence should read: *"The Decision was appealed by entities opposing bicycle use on the trail and/or by entities who believe that unmanaged bicycle use on the trail would substantially interfere with the purpose and nature of the trail."*

Rvsd Plan - 00001627

- We encourage the RGNF to address the issue of what uses will be allowed on the CDNST in the Forest Plan revision. **The narrative on p. 20** is less than definitive in this regard.
- The RGNF needs to work with the GMUG NF to ensure that management of the CDNST complies with the Comprehensive Plan and Forest Service Policy, and is consistent across both national forests.

While we agree with the statements **on page 20** that user created trails and campsites are a concern and a source of conflict, *we believe that the word "route" should be used instead of "trails".* The creation and use of road- like routes by full sized motor vehicles is also a concern and source of conflict. The use of the word "route" better captures the full range of user created travel ways.

 **Also on page 20**, it is stated that the RGNF manages user created trails and camping sites in "backcountry areas".

- We believe this statement should be modified to avoid confusion with the 3.3 Backcountry management prescription areas. We also know that the RGNF has made, and should make efforts to manage user created routes and camp sites in all areas of the forest, including frontcountry and other areas.
- We recommend removing "in backcountry areas" from this sentence to more accurately depict current management. Again, "backcountry" could be replaced with "undeveloped or less developed" or other similar term.

The discussion of user created routes should also include additional ways in which they cause conflict, including the trampling of vegetation, wildlife disturbance, spreading noxious weeds and disturbing cattle and livestock.

 We believe the assessment report should devote additional wording to the problem of unauthorized motorized use on the RGNF, by both OHVs and licensed motor vehicles. The draft report lumps unauthorized motorized routes in with all other forest user groups and should provide more discussion regarding this issue in the assessment.

- *We believe unauthorized motorized use is the most significant and widespread recreation related problem and concern on the RGNF, and it causes the greatest amounts of conflict and negative impacts.*

There is a large amount of evidence supporting this belief. The relatively open terrain on many parts of the RGNF helps facilitate this use. Motor vehicle technology has increased considerably since the last forest plan, allowing off route use to more easily occur in new

Rvsd Plan - 00001628

areas.  More people are driving highway licensed SUVs and trucks than ever, with the capability of going off road.

The U.S. Forest Service recognized unmanaged recreation, and specifically unmanaged motorized recreation, as one of the four greatest threats to forests in 2004, which led to the 2005 travel management rule.

Policies which allow off route motorized use for dispersed camping and game retrieval blur the line between illegal and legal use.   A 2015 OHV grant application submitted by the RGNF Divide District estimated 1000 miles of unauthorized motorized routes existed on the RGNF.  This grant sought additional funding for education and enforcement related to unauthorized motorized use.

There is insufficient budget and staffing for proper recreation management and also proper education and enforcement of motor vehicle regulations.

**Table 5 on page 21** is confusing, as the figures do not agree with the 2015 Travel Analysis Process Report. Also, the road miles numbers do not add up.
- The total number is listed in the Table as 2414 miles, but adding the two categories (managed for low clearance use and managed for high clearance use) adds to 2420 miles.

We agree with the **statement on page 21** referring to an existing maintenance backlog for roads, trails and trailheads.  We recommend that the RGNF and this draft assessment recognize and state that it takes more than maintenance to properly manage all aspects of recreation infrastructure.
- We recommend that the RGNF recognize the management shortfall which exists on the RGNF.  Management is a more comprehensive term which includes maintenance but also things such as monitoring, patrolling, education, enforcement, planning, work related to closure and restoration of unauthorized routes, etc. Management responsibilities are also discussed **on page 22**.
- We recommend that "maintenance backlog" be changed to "management backlog" to better portray the existing situation.

The same sentence ends by stating the RGNF has a "need to improve some recreational access."  The word "improve" is subjective, and can mean different things to different user groups. For example, "improve" could mean upgrading existing access by reconstructing a rough road, or it could mean creating new access to an area not currently accessible.

The 2015 RGNF Travel Analysis Process Report recommends some potential actions which would decommission certain roads, partially due to the huge road maintenance shortfall which exists.  Some users may not interpret the implementation of that action as an improvement.

Rvsd Plan - 00001629

We suggest the end of this statement be modified to read **"need to improve recreational management"**, as this would more comprehensively include all actions the RGNF identifies as a need.

We fully agree with the statement **on page 22** that *"Existing levels of allocated funds are inadequate to meet National Quality Standards at all developed sites and trails on the Rio Grande National Forest."*

**On page 22** the discussion of *"Conditions and Trends that Affect the Quality and Sustainability of Recreation Settings and Opportunities"* must include a discussion of the difficulty with properly educating forest recreational visitors regarding regulations, and also the difficulty enforcing those regulations.

For example, despite the production and distribution of Motor Vehicle Use Maps on the RGNF, unauthorized use of motor vehicles off of designated routes remains a major concern.  Limited staffing and time, and increased forest visitation and use, requires law enforcement to increasingly prioritize which regulations to enforce.

Lack of sufficient education and enforcement can result in conflicts and resource damage, which affects the quality and possibly the sustainability of recreation settings and opportunities.

A sentence on **page 24** reads: *"However, we expect concession operations, partnerships, grants, and site prioritization with management options developed through the upcoming recreation facility analysis to buffer the shortfall in our recreation budget."*

While we encourage the RGNF to try to obtain funding and implement these actions, we believe these expectations may fall short.

As one example, the RGNF TAP found that there is an accumulated deferred maintenance budget shortfall of over $2 million dollars for motorized trails alone.   Given that the entire Colorado State OHV grant program only awards ~$4 million per year in funds statewide, it is unlikely enough funding will be available to bring all motorized trails up to standards.

*We suggest the word "help" be added before the word "buffer" in this sentence to bring expectations closer to reality.*

**On page 24** the spruce beetle is improperly included in a discussion of invasive species. Spruce beetles are not an invasive species, as there is no evidence to suggest that they are non-native or alien. They likely have existed as long as spruce trees have been here.

**Page 26** mentions driving for pleasure as one of the top activities on the RGNF.   The assessment must capture the fact that what most people are driving has changed significantly since the 1996 Plan.

Rvsd Plan - 00001630

The 1990's saw a huge increase in the popularity of sport utility vehicles (SUV) in the United States which was likely not recognized in the 1996 Forest Plan. In 1999, approximately 20% of vehicles were SUVs.

The popularity of SUVs has increased since then, such that they are now the most common type of vehicle class in the U.S. (about 33% of vehicles are now SUVs).

The popularity of SUVs is significant because they are high clearance vehicles, many with 4WD or all-wheel drive. They permit the average driver (coming from a place like Denver or points beyond) to more easily access the majority of ML-2 roads on the forest which are not maintained for passenger cars. They also permit and facilitate easy access off designated road, whether this is within 300 feet for dispersed camping or beyond.

This has made the management of motor vehicle use on the RGNF much more challenging. Implementation, education and enforcement of MVUMs and regulations have become increasingly difficult, especially in remote locations, due to the increased access provided by SUVs.

Additional information should be included in the discussion of recreation trends beginning on **page 27.**

A 2013 presentation (online at http://www.fs.fed.us/speeches/outdoor-recreation-national-forest-system ) by Mary Wagner, Associate Chief of the U.S. Forest Service, suggested that USFS studies indicate the following recreation trends:

*"•As our population grows, our nation's outdoor recreation resources will decline on a per-person basis. Growing recreation demand could be constrained by resource limits.*

*•The five outdoor recreation activities likely to have the fastest growth are developed skiing, challenge activities, equestrian activities, motorized water activities, and day hiking. The activities expected to decline the most are motorized cjf-road activities, motorized snow activities, hunting, fishing, and floating activities. But most activities are expected to increase."*

**On page 27,** one paragraph states "Various forms of skiing, including snowboarding, declined during this decade" referring to the years between 2000-2009. The next paragraph states that developed skiing is one of the "top five activities in terms of growth of number of participants." *These two statements seem to contradict each other.*

The discussion of recreation trends must take into account the relative impacts of the various types of recreation. *It must be recognized that some forms cf recreation have greater impacts (on natural resources, wildlfe, other forest users) than other forms.*

A trend common to nearby National Forest, BLM and other public lands is an increased public desire to add large numbers of new recreational trails, especially OHV and mountain bike trails.

Rvsd Plan - 00001631

- We believe that the assessment should recognize this fact, and assess the current ability of the RGNF to provide proper management direction in responding to these demands.

- We recommend that the RGNF conduct and include a suitability analysis, and include maps which determine and depict over-ground travel suitability for OHVs, over snow vehicles, and mountain bikes.  These maps should depict suitable/unsuitable areas where these forms of recreational travel are allowed/not allowed, where they are restricted to designated routes, and where possible opportunity areas for these uses may exist.

   The assessment should recognize the fact that all forms of recreation can have negative impacts on wildlife and other resources.  There is increasing evidence that non-motorized trails and use also can have significant negative impacts on wildlife.
- The assessment should recognize that there may be some areas where no recreation is appropriate, as the **recent 2013 San Juan Forest Plan did at 2.14.4.**

   The assessment should recognize that the addition of any new travel route, for recreational or other use, will result in negative impacts to wildlife.  This was best stated in the **FEIS Gunnison Basin Federal Lands Travel Management Gunnison National Forest in 2010 (page 3-112)** : *"Basically all activities related to roads and trails will have an effect on wildlife species. The widespread, detrimental impacts of human disturbance on wildlife are well documented in the literature. No positive benefits to wildlife have been identified from increases in travel management access."*

   Another trend that is causing concerns on Colorado public lands is the creation of illegal trails by mountain bikers.   Bicycles have some of the most specific travel needs of all trail users.  They benefit greatly by having developed routes to follow due to their limited power output, higher rate of speed than foot or horse travel, use of wheels, and limited turning radius.

   One 2014 survey, conducted by a Salida, CO connected group, indicated that 15% of mountain bike users construct illegal trails and 18% use illegal trails. (6)

*Numerous public land agencies have limited mountain bikes to designated routes in order to better provide safe and responsible bicycle riding opportunities and better manage bicycle use.*

   **On page 30,** we caution the use of the SLV GO Master  Plan as it was developed with limited public participation.  SLVEC was not invited to the original SLV GO meetings and found the survey's that were conducted had responses that came from a very specific mountain bike group not living in the San Luis Valley.  If you compare those results with other  surveys conducted focused on Rio Grande Forest uses, it will become apparent that

Rvsd Plan - 00001632

the SLV GO results look skewed in favor of mountain biking and do not reflect the balance of other uses on the Forest.

SLVEC eventually invited itself to the SLV GO meetings and it was apparent that there had been no discussion regarding impacts to wildlife corridors or connectivity. If you look at the SLV GO Master Plan, 3 pages are devoted to conservation, the third page is about another area of the state. This vision needs a lot more work regarding natural resource baseline gathering. SLVEC's input has been minimal, the same is true of other wildlife agencies.

- The increased use of drones must be mentioned on **page 32** as an additional form of emerging and unique recreation which is causing concerns.

We agree with the statement on **page 35:** *"It is important to realize that we cannot meet all demand for recreation placed on us by a growing population due not only to fiscal capability, but also because of potential impacts of recreational use on other forest resources such as ecological integrity and species diversity."*

It is important to recognize that economic sustainability of new recreation facilities includes more than planning, construction and maintenance. Recreation facilities require long term comprehensive management commitments for things such as monitoring, education, enforcement, event permitting, restoration, hazard mitigation, managing growth, dispersed camping, etc.

While we agree that volunteers and outside sources of funding can assist the RGNF with recreation management, these sources of assistance may not be sustainable in the long run. Funding and volunteer labor can fluctuate and disappear.

Funding and volunteers may be able to contribute to construction and maintenance, but are likely unwilling or unable to contribute to long term management of recreational facilities. For example, the RGNF has learned that it is much easier to obtain Colorado OHV Grant funding for OHV trail maintenance than it is to obtain funding for OHV education and enforcement.

Simply managing volunteers requires a commitment of staff time and funding by the Forest. The RGNF will be ultimately responsible for all aspects of recreation management. The assessment should recognize the limitations of outside sources of assistance.

The **1996 RGNF Plan** stated that *"Outdoor recreation is the primary resource on the RGNF"* **(page P-11).** We believe that is still true today, and this must be emphasized in the recreation assessment.

While outdoor recreation on the RGNF may be its primary resource, it also poses the greatest risk. It is difficult to manage the volume of recreational use; to make an unknown and unlimited number of recreational users fully aware of opportunities and regulations, and there is generally an inadequate amount of funding and staff allocated for proper and comprehensive recreation management.

Rvsd Plan - 00001633

**Comments on page 34** allude to the fact that some local residents combine recreation with subsistence type activities such as firewood gathering. We agree that there may be differences between the way local residents use the forest and the way other visitors use the forest.

It is important for the RGNF to recognize that the overall number of local residents that use the forest for subsistence type activities is limited when compared to the overall potential number of non-local forest visitors.   Attitudes and practices, and an understanding of regulations, may differ between user groups also.

The assessment needs to recognize that what may be subsistence type activities for some locals (firewood gathering, hunting, fishing, cross country ATV use for game retrieval) are recreational activities for the general public.

Special allowances applied forest wide which might aid a limited number of locals (such as cross country motorized use for certain activities) are unmanageable and unsustainable when practiced by unlimited numbers of the general public.

**Page 36** of this draft assessment report cites recent National Visitor Use Monitoring figures which indicate that more non-locals visit the forest than locals.  Although the relative amount overall visitation on the RGNF is relatively low when compared to some other forests, visitation is increasing and expected to continue to increase.

Most RGNF forest visitors are Colorado residents, and Colorado's population is expected to continue to experience one of the highest growth rates of any State, according to US Census data.

There are numerous references in this draft assessment regarding the need to gather additional data or conduct additional studies.  While we support using, and basing decisions upon, the best available science, we caution delaying all decisions or actions because of inadequate data.

This is especially true when it comes to the social sciences, as human behavior is extremely complex and variable. The RGNF should try to avoid "analysis paralysis" when it comes to limiting or restricting recreation due to a lack of data.

- We encourage the RGNF to err on the side of caution favoring wildlife and resource protection when making management decisions regarding recreation.

The RGNF recreation assessment must recognize the problems and concerns associated with its policy of allowing cross country game retrieval in this assessment.  **Game retrieval is primarily an activity associated with recreational hunting.**

The promotion and use of ATVs for hunting has increased significantly since the 1996 Forest Plan.  Since game retrieval is permitted as a guideline for certain forest management area prescriptions throughout the forest, *it is more of a programmatic issue as opposed to a project level issue.*

Rvsd Plan - 00001634

**The following are concerns with the current RGNF game retrieval policy:**

- Regulations, and public messaging, regarding this policy are confusing and inconsistent
- It offers certain recreationists preferential treatment over other recreationists
- Perpetuates the myth that it is acceptable to use a motor vehicle off route, and that this use is not damaging and has no impacts
- It allows hunters to travel an unspecified distance off of designated routes in an ATV (up to 4 miles in some locations) and the limits of the game retrieval area boundaries are very difficult to discern
- Some designated game retrieval areas delineated on the MVUM are not legally accessible to ATV use
- It allows use on closed routes, motorcycle singletrack trails or non-motorized trails, making it more difficult to manage unauthorized motorized use on these routes
- Leads to conflicts with other recreationists, hunters, wildlife and natural resources.
- Soil, water, land or vegetation damage are not defined
- It is difficult to monitor and enforce

**Over snow vehicle recreation should be considered in this assessment.**  Newer technology has made snowmobiles more powerful and lighter than before, and this has allowed them to access additional areas.  Winter recreational use of all types has increased on the forest, resulting in an increase in winter recreation conflicts.

Lynx have populated areas of the forest, and unmanaged snowmobile use has the potential to negatively impact lynx.

The RGNF is required to evaluate its designations and policy regarding over snow vehicle use *as a result of amendments to 36 CFR parts 212 and see the Use By Over-Snow Vehicles (Travel Management Rule), 80 Fed Reg 4500 et seq to., January 28, 2015261.*

- The assessment should thus provide any data available on winter recreation use, including amount of use (number of trips per day), and areas of existing and potential conflict between OSV and non-motorized users.

The identification and specific designation and delineation of areas open and closed to over snow vehicle use should be considered in this planning process.  Forest Visitor maps have long depicted specific areas which are either designated as open or closed to snowmobiles on all parts of the forest.

Over snow vehicle use designations are forest wide, and deal with larger land areas, *suggesting they are more programmatic, not project and site specific, and thus more suited to a forest plan revision process.*  While we are unsure of the source for this decision and designation, these areas must be considered as part of this assessment.

Rvsd Plan - 00001635

[i] **Recreation comment references**

(1)  Appeal /Response and Decision Letter from Deputy Regional Forester   Maribeth Gustafson   9/30/10 Pg. 2Available online at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207761.pdf

(2)  Jabob, G. R. & R. Schreyer 1980. "Conflict in outdoor recreation: A theoretical perspective". Journal of Leisure Research, 12: 368-380.

(3) Frid, A., and Dill, L.M., 2002, "Human-caused Disturbance Stimuli as a Form of Predation Risk" Conservation Ecology Vol. 6 no.1

(4) Knight R. L. and D. N. Cole. 1991. "Effects of recreational activity on wildlife in wildlands ". In: Trans. 56th N. A. Wildl. and Nat. Res. Conf.

(5) Gill J. A., K. Norris, and W. J. Sutherland, 2001, "Why behavioral responses may not reflect the population consequences of human disturbance." Biological Conservation 97:265-268

(6) Singletracks.com infographic. Based on 2014 mountain bike rider survey results, referenced online February 2015 at http://images.singletracks.com/infographics/mtb_trail_infographic.pdf

Rvsd Plan - 00001636

**Comments on Multiple Uses Scenic Character 8.1 Assessment Draft Report**

We sincerely appreciate the opportunity to respond. We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.

We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.

We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports. We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.

If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.

These draft assessment reports generally do a very adequate job considering the major factors related to Recreation on the Rio Grande National Forest.
Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition
Rocky Smith, Forest Policy Analyst
Roz McClelland, Rocky Mountain Recreation Initiative
Christine Canaly, San Luis Valley Ecosystem Council

**On page one** the draft report states that:
*"These landscapes give these communities their identity."*

Surrounding forest lands and landscapes provide important characteristics which help contribute to the identities of communities. Landscapes do not necessarily give communities their entire identities, and they are not the only component contributing to the identity of communities.

We understand that landscapes do provide "A Sense of Place." There are a multitude of social, cultural, economic, and other factors that contribute to the identities of communities.

We recommend that this statement be modified so it reads "These landscapes significantly contribute to the identities of these communities" or simply "These landscapes contribute to the identity of the surrounding communities."

**On page 9** the statement:
*"No records of historical timber activities were kept prior to 1945."*
There is evidence which contradicts this statement.
GIS data, which is available on the USDA Forest Service Geodata Clearinghouse website at
http://data.fs.usda.gov/geodata/edw/datasets.php, contains a wealth of historical timber

Rvsd Plan - 00001637

harvest data for the RGNF.  There are numerous records of planned and accomplished timber cuts before 1945.

As an example, there was a single tree selection cut made in the Ruby Lake area in 1910, which described the method and equipment used as "animal logging."

It is important to recognize that timber activity can and does alter scenic resources, and that there are some historical records of timber activity on the RGNF.  This historic timber activity may or may not be visible today in these locations, and its impact on current scenic integrity may be negligible.

We disagree with the following statement on **page 9:**
*"The landscapes identified as suitable for timber harvesting may be viewed as slightly altered to heavily altered at any time depending on implementation of planned management activities."*

There are locations on the RGNF identified as suitable for timber harvesting that have never had any management activities implemented on them.

Thus, it is not accurate to view those areas as slightly altered when in fact they have never been altered.  Identification of an area as suitable for an action does not automatically imply that the area has or ever will have that action occur within it.

**We suggest this statement be modified to state:**
*"The landscapes identified as suitable for timber harvesting may already be, or later become, slightly altered to heavily altered at any time depending on possible implementation of planned management activities."*

**On page 9,** there is a statement:
*"Typically the events that create the most notable changes in the landscapes are insect and disease infestations, and fires that burn outside the range of historic variability."*

What are the criteria for determining that a fire has burned outside the range of historic variability?  Humans and the USFS have historically suppressed fire on the RGNF in modern history.

**Table 6 on page 25** of the RGNF Assessment Report for Ecosystem Integrity, Systems Drivers and Stressors for Terrestrial Ecosystems indicates that the current estimated yearly acres burned on the RGNF are only about 25% of historic estimated yearly acres burned.

The relatively low amounts of acreage burned per year have provided people with an abnormal attitude toward fire.   Most people do not understand that fire used to be historically more prevalent and common on the RGNF than present conditions.

The assessment includes this **statement on page 12:**
*"The 2005 and 2010 National Visitor Use Monitoring report showed that the majority of people recreating on the forest either live in communities within 50 miles of the forest, or they are from out of state and travel from over 500 miles away to enjoy the forest."*

We agree that a significantly larger percentage of people were viewing natural features in 2010 than in 2005 (according to National Visitor Use Monitoring data).  We are not convinced, however, of the validity of combining viewing natural features with driving for

pleasure.  When you consider historical National Visitor Use Monitoring data, driving for pleasure appears to have declined markedly.

In 2000-2001, 57% of visitors indicated they participated in driving for pleasure but this figure markedly declined to only **17.2% and 25.9% in 2005 and 2010**, respectively.

Also the increase between **2005-2010** in both driving for pleasure and viewing natural features as primary activities was mostly due to an increase in viewing natural features.

Viewing natural features as a primary activity increased **8.8%** while driving for pleasure increased only **1.9%.** Thus viewing natural features does not correlate precisely with driving for pleasure.

We agree with the statement **on page 16** that:
*"The current insect epidemic affecting forests across the Rocky Mountain Region, including the Rio Grande National Forest, is not unusual."*  It must be pointed out that the negative public perceptions toward insect damaged forests mentioned on **page 9** of this draft assessment report are subjective opinions.

Those opinions are likely coming from individuals who likely have not personally experienced insect outbreaks within the recent 100-year period of low insect outbreaks.

Opinions are based upon experiences, and people come to value what they know and experience.  Those who have never experienced insect outbreaks are thus more likely to react negatively to those changes.

Future public attitudes toward insect outbreaks will likely be different due to experiences obtained from exposure to current forest conditions, and increasing knowledge that bark beetles are a natural change agent.

We agree with the statement made on **page 17** implying that there are factors which make proper management of scenic resources more challenging.   While the RGNF has no control over some factors such as population growth, it does have management  over how it responds to the impacts of those factors which impact scenic resources.

For example, the forest can regulate  the method, scope, size and location of any fuel treatments which might occur in the wildland-urban interface on forest lands.  The forest can manage  how it treats non-system user created routes on forest lands with education and enforcement to help prevent the formation of these routes, and on the ground actions to close and restore those routes.

 Road and trails have both been associated with altered scenic resources **(page 1 of the draft assessment)** while at the same time identified as providing access to areas where high scenic quality is to be maintained **(page 3).**

Roads and trails might be viewed as a cultural asset that contributes to scenic character in certain locations, but normally the visual presence of a road or trail detracts from a naturally appearing landscape.

- This assessment must include additional language describing the huge impact roads (and to a lesser extent trails) have on scenic character.  Roads are the largest and most widespread visible human artifact on earth, and this is also true on the RGNF.

- The 2015 RGNF Travel Analysis Process identified over 2819 miles of system roads on the forest (and an additional 1300+ miles of standard trails). Designated system travel routes are the largest and most significant actively maintained feature on the RGNF which negatively impacts scenic character and naturalness.

An estimated 1000 miles of unauthorized motorized routes further degrade natural appearing scenic character by disturbing and removing vegetation. Because these routes were neither designed nor engineered before appearing on the landscape, their impacts, including that on visual character, can exceed the impacts of system roads.

Permitted off route motorized travel for dispersed camping and game retrieval also significantly impact scenic character, especially along travel routes adjacent to areas managed to appear natural.

In September of 2013 the USFS obtained a new tool which made restoring lands impacted by unauthorized or decommissioned roads to more natural conditions much easier. **A Categorical Exclusion at 36 CFR 220.6(e)(20) and FSH 1909.15 32.2 (20)** allows for restoration of non-system unauthorized routes and decommissioned roads to a more natural state. This CE can be used to make the management of scenic resources less challenging.

We agree that there is a need for change for scenic objectives along the Continental Divide National Scenic Trail. The foreground and middleground as viewed from this trail must be considered.

- Direction for scenic management of this trail as a concern level 1 route with a scenic integrity objective of very high and high, can be found at FSM 2353.44b and FSM 2380.

The mapped areas depicted in Figure 18 should be evaluated to determine how they align with the final Colorado Roadless Rule. The roadless areas, supposedly depicted on this map, are not easy to discern.

- As we mentioned in our comments on the Recreation Assessment Draft report, ROS needs to be reevaluated.

Rvsd Plan - 00001640

**Comments on Assessment chapter 8 – multiple uses.**

We sincerely appreciate the opportunity to respond.
We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.
    We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.
    We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports.  We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.
    If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.
    These draft assessment reports generally do a very adequate job considering the major factors related to Recreation on the Rio Grande National Forest.
Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition
Rocky Smith, Forest Policy Analyst
Roz McClelland, Rocky Mountain Recreation Initiative
Christine Canaly, San Luis Valley Ecosystem Council

**RANGE.  On page 1,**

> Rangelands are defined as all lands producing, or capable of producing, native forage for grazing and browsing animals, and lands that have been revegetated naturally or artificially to provide a forage cover that is managed like native vegetation. They include all grasslands, forb lands and shrublands; and those forested lands that can, continually or periodically, naturally or through management, support an understory of herbaceous or shrubby vegetation that is forage for grazing or browsing animals.

**Page 1.** In other words, land with any vegetation that could be eaten by a domestic animal, plus land that could have this vegetation, is considered rangeland. It is not clear if every area that meets the above definition is capable rangeland. **See page 4.**
    Also, there is no information on what if any lands are capable rangeland but not suitable for grazing. **Page 1** identifies 581,000 acres as "capable and suitable for domestic livestock grazing," while **page 4** states that 581,556 acres are "suitable for livestock grazing."
    • The acreage for capable and suitable rangeland should be listed, and broken out by: ranger district, watershed, and class of grazing (i. e., cattle and horse versus sheep and goat).

Rvsd Plan - 00001641

We agree with the proposal suggested on **page 2** that the assessment should consider a larger planning area, including adjacent National Forests, due to the presence of abutting allotments and possible differences in standards, guidelines and management criteria.

BLM land adjacent to the RGNF is also grazed by many permitees, and differing management of grazing on those lands may warrant consideration in this assessment.

Under Historic Conditions of Range Resource, the assessment states on **p. 2** that
*"Today, most of the remaining allotments are carrying sustainable numbers of animals."*
*(Emphasis added)*
But it also says that:

> *"Annual monitoring data and reports on most allotments show that livestock grazing is ecologically sustainable at current levels."*

**Page 3.**

The assessment should clarify whether any allotments are over-grazed, and if so, identify which ones are denuding the allotment area.

The assessment rightfully observes in the same paragraph on **p. 3** that stocking was very high and seasons were very long prior to the establishment of the Rio Grande and San Juan National Forests in the early part of the 20th century, "causing long-lasting environmental effects."

**Pp. 2, 4.**

While most areas have recovered due to lower stocking and better practices, "[t]here are still areas exhibiting remnants of those effects…". Id. at 4.

It is important to work toward the elimination of adverse impacts pursuant to unsustainable grazing. The places where these impacts are still occurring should be identified in the assessment, and prioritized in the plan for remedial action as needed.

The assessment should provide more information on the conflict between domestic and bighorn sheep, such as the locations of the areas mentioned **on p. 3** where domestic sheep range has been reduced in order to ensure separation between domestic and bighorn sheep.

**The risk that grazing poses to various species must be mentioned in this assessment.**
The draft assessment report #5 for at risk species identified grazing as a risk for *six of the eight* Federally recognized species considered by the RGNF. Grazing was also identified as a *risk for 21 of the 82 Species of Conservation Concern.*

**TIMBER.**
**On page 5**, the Total Sale Program Quantity (TSPQ) is stated as:
*79 thousand hundred cubic feet (MCCF) per year.*

---

**Page 2**

Rvsd Plan - 00001642

However, the long-term sustained yield is only **54 MMCF** of conifer plus **16 MCCF** of aspen, each per year. Ibid.

In other words, the RGNF could produce an amount of timber well over what it could ever produce on a sustained yield basis over the long term?

*That of course would be illegal. This apparent violation of the law must be explained.*

Also requiring explanation is the discrepancy between the above-cited TSPQ and that in the 1997 Forest Plan's FEIS. The latter lists the TSPQ for the first decade in selected alternative G under the "experienced" budget as **367.1 MCCF**, which would be **36.71 MCCF** per year. **Id. at 3-174.**

For the full budget, which we assume the RGNF has not come close to receiving, the figure is **76.34 MCCF annually (ibid)**, still below the stated TSPQ.

In another section of the 1997 Forest Plan FEIS **(p. S-9)**, the annual TSPQ under selected alternative G is **39.71 MCCF** for the first decade, budget level unspecified.

**On page 10**, it states that the scale of analysis includes "areas along the Colorado Front Range north of the Rio Grande National Forest."

*Why would this area be part of the analysis area for timber?*

It is unlikely that timber mills along Colorado's Front Range would be interested in timber from the RGNF because the haul distance would be quite long. To our knowledge, there has been no such interest in RGNF timber from this area, historically or currently.

**Page 13** states that timber harvest can increase the diversity of understory plant species. It should also state that timber harvest damages and destroys understories and creates good conditions for the introduction and spread of exotic species.

**Page 14** notes the issue of **"how long the larger dead trees retain their utility as saw or house logs."** This affects how much timber the RGNF can offer for sale, because the standing dead trees lose their value for possible commercial products after a time. We believe that most standing dead trees would lose commercial value for dimension lumber within 3-5 years. They probably would retain value for house logs for some time after that, but there currently is little market for house logs.

- The assessment should have further information on how long standing dead trees retain commercial value for various products, or express a commitment to further develop this info, because commercial utility will be an important factor in determining how much commercial timber the RGNF can offer for sale.

Rvsd Plan - 00001643

**The timber section of Assessment 8 concludes with:**

> *...timber harvest is an essential tool for maintaining ecosystem integrity and ensuring a wide variety of benefits from our forests.*

It is questionable whether timber harvest helps maintain ecological integrity. With the exception of lower-elevation forests dominated by ponderosa pine that have long had fire suppression, forests are better left alone if the goal is to maintain ecological integrity. Thus the above-quoted statement should be removed from the assessment.
**If it is retained, the following should be added:**

> *However, many stands better retain ecological integrity when left to the forces of nature. In any case, timber cutting must be applied carefully because it can cause strong adverse effects, including those on: soils, water quality, wildlife and fish habitat integrity, and introduction and spread of exotic species.*

**It should be noted that Table 17 on page 34 of assessment 6** shows a notable decline in the volume and quantity cut for all forest wood products considered during the recent time period.

   **Under Fish, Wildlife, and Plants on pp. 17-18,** there is a long list of information that is lacking. Much of this is important for composing a revised management plan. Some of the information said to be missing should be available.
- For old growth "definitions" (actually "descriptions"), see Mehl, 1992.
- For information on Rio Grande Cutthroat Trout, see FWS, 2014.
- For modelling concerning key attributes for big game, like open road density **(first bullet point, p.17),** there should be considerable information available, such as the Montana Elk-Logging Studies.
- For information on how the adjacent Gunnison National Forest also has used modelling to consider the relationship between habitat effectiveness and route density, see Gunnison, 2010.

   We note with great concern the lack of information **on big game retrieval**
*"on resource damage and/or big game management objectives."*
**Page 17; see also page 19**, noting the likely impacts from this use.
   This use also impacts individuals of many species directly, by disturbance in unpredictable locations or trampling.
- Given the potential for damage to various resources, including soils, water quality, and wildlife habitat effectiveness, from the use of all-terrain and other vehicles off of designated routes, we recommend that game retrieval off routes be suspended until it can

Rvsd Plan - 00001644

be ascertained that no significant damage to resources is occurring, and existing damage is repaired.

As we have expressed in comments on other assessment chapters, we are concerned about the lack of information on the impacts of human uses on wildlife in general. This includes hunting and fishing camps, noted as an impact on **p. 19**.

**Page 19** states there is a rising demand for hunting and fishing. What is the source for this assertion? Hunting has been decreasing for many years generally.

The discussion on **page 19** should not be limited to consideration of use during hunting seasons. Visitors illegally drive off route for recreation, and legally use vehicles off route for dispersed motorized camping and to snowmobile, at other times of the year.

**Under Trends, Issues, and Concerns (TIC) in Table 9, p. 20,** the following passage occurs for bighorn sheep:

> *Approximately 4 of 11 herds considered secure due to past and current disease events, or continued risk of contact with domestic sheep, stable trend.*

**This passage is not clear.** Are 4 of 11 herds secure, or are they not secure because of disease and contact with domestic sheep?

**In Table 9 on p. 21,** the TIC, the far right column, does not match the species for some of the entries. For example for bear (first line), the TIC discusses small game, which was probably meant for the second line.

**The Summary/Conclusion section for Fish, Wildlife, and Plants** should state at the end of the first paragraph that the high level of recreation use likely has some adverse impacts on various resources, including wildlife.

## REFERENCES

FWS, 2014. Species Status Assessment Report for the Rio Grande Cutthroat Trout. U.S. Fish and Wildlife Service Region 2, Albuquerque, NM, August 2014.

Mehl. Mel S., 1992. Old Growth Descriptions For The Major Cover Types in the Rocky Mountain Region. IN: Old-Growth Forests in the Southwest and Rocky Mountain Regions:

Rvsd Plan - 00001645

Proceedings of a Workshop. Rocky Mountain Forest and Range Experiment Station (now Rocky Mountain Research Station), General Technical Report RM-213.

Gunnison Basin Federal lands Travel Management FEIS, 2010, USDA Forest Service GMUG, pages 3-113 through 119, online at
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5182985.pdf, accessed January 2016

Rvsd Plan - 00001646

March 18, 2016

Dear Forest Service staff;

We sincerely appreciate the opportunity to evaluate and comment on these draft Assessment Reports.  We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.

We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.

We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports.  We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.

If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.

Thanks so much for all the good work.

Sincerely,

Tom Sobal, Quiet Use Coalition

Rocky Smith, Policy Analyst

Roz McClelland, Rocky Mountain Recreation Initiative

Christine Canaly, San Luis Valley Ecosystem Council

Rvsd Plan - 00001647

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

***Assessment 1 & 3 draft Report comments on Ecosystem Integrity, Systems Drivers and Stressors for Terrestrial Ecosystems***

***We believe the scope of this assessment report must be better defined.***

**On page 1** an ecosystem is defined as being
*"composed of living organisms (plants, animals and microbes) and their nonliving environment (climate and soil for terrestrial ecosystems…"*
It would be better emphasized that this specific assessment focuses primarily on vegetation (plants) and that animals and soils are covered in other assessments.

**On page 1** we suggest that the words "grasslands and shrub lands" replace the word "rangelands" in the following sentence:
"Terrestrial ecosystems include forested areas, non-forested (rangelands) and alpine ecosystems."
The word rangeland unnecessarily suggests an emphasis on grazing.

**On page 1,** this assessment states that
*"The modelling we did to look at the natural range of variability and ecosystem integrity did not specifically include climate change."*

**This is a major omission.**

- Climate change may influence many of the noted conditions (growth rate and mortality, species distribution, disturbances) but also other potential drivers and stressors.  A new forest plan must fully consider climate change.
- Note that the Planning Rule specifically states that assessments must consider climate change as a system driver. See 36 CFR 219.6(b)(3). See also id. at 219.8(a)(1)(iv). Climate change is listed as a driver/stressor on p. 3 of the assessment.

**The text at p. 2** even admits that without considering climate change, "some of the simulation results may not hold and there may be other unanticipated conditions due to the effects of climate change".

**Pages 4-5** discuss, in general terms, the possible effects of climate change on the RGNF, and the agency "recommend[s] addressing climate change in our revised Forest Plan."

*In light of all of the above, the absence of climate change in modelling is shocking and must be rectified.*

We agree that habitat connectivity is an indicator of ecosystem integrity. **(p. 30).** Thus we also agree that a comprehensive connectivity analysis on the Rio Grande National Forest would be helpful in assessing current habitat conditions, **as stated on page 2.**

Rvsd Plan - 00001648

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

This analysis must include connectivity not only on RGNF lands, but also include connectivity to surrounding adjacent forests, BLM lands, private lands, etc.   Connectivity is correctly considered to include adjacent lands on **page 31.**

- We recommend the sentence on **page 2** read: *"We do not have a comprehensive connectivity analysis on the Rio Grande National Forest and adjacent lands, which would be helpful in assessing current habitat conditions."* **The RGNF should undertake this comprehensive analysis as part of the plan revision.**

We agree with the proposal **on page 3** to include an additional 10 km buffer around RGNF lands in this analysis, to include a broader landscape.  This recognizes that natural processes do not conform and adhere to human delineated boundaries.

- For example, a connectivity analysis should consider lands up to at least 10 km outside of the RGNF boundary.

We agree with the major system stressors and drivers identified in this assessment. We believe that the discussion on **page 5** of management actions should be expanded and include additional information. Unlike many of the other system stressors and drivers, management actions are and can be controlled and influenced by humans, and thus are of primary consideration in a forest plan.

Management actions on the RGNF, when they are of sufficient duration, intensity, and magnitude, may influence systems as stressors and drivers, or even becomes drivers and/or stressors themselves, and thereby affect ecosystem characteristics. Management actions include any alterations to ecosystems or activities that the Forest Service conducts, authorizes, or restricts on NFS lands.

We believe that various vegetation treatments, livestock grazing, and vehicular access are management activities of sufficient duration, intensity and magnitude to influence system drivers at the national forest scale.

Various vegetation treatments, including timber harvest, thinning, prescribed fire and other activities, have historically occurred on the RGNF.

*We disagree with the statement on **page 5** that these activities are a minor driver and stressor on the forest.*

Although the draft assessment states that only .2 % of the forest receives vegetation treatment each year, it must be recognized that a significant amount of forest lands have experienced some form of vegetation treatment in the past, so there is accumulative impact.

A rough analysis of USFS GIS data for historical timber cutting on the forest indicates that approximately 10% of the forest has undergone some type of vegetation treatment during the past 100 years.

**Seventeen percent** of the forest is considered suitable for timber production. Although vegetation does grow back, the impacts of these activities are of long duration.  We agree

Rvsd Plan - 00001649

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

that additional activities associated with vegetation treatment, such as road construction, have lasting impacts on the forest.

Many roads constructed specifically for timber harvests have been incorporated into the designated transportation system, and many temporary roads have not been properly closed and decommissioned.

Vehicle access, especially motorized use, has significant impacts on the forest.  There are over 2,500 miles of designated motorized routes on the forest.   These routes have lasting effects due to ongoing maintenance (or lack of it) and use.  The impacts of these routes extend well beyond the area disturbed by the route tread itself.

Edge effects, and the facilitation of human presence extend beyond the immediate route tread.  Travel routes also have facilitated the spread of non-native and invasive vegetation such as the pervasive common dandelion (*Taraxacum officinale*).

Permitted cross country travel by snowmobiles, ATVs retrieving game, and vehicles travelling off route for the purpose of dispersed motorized camping magnify the footprint of vehicle use.  Hundreds of miles of unauthorized motorized use off of system routes also contributes to additional ecological impacts.

Grazing is permitted on the majority of the forest, *with 31% of forest lands considered suitable for grazing.*  Grazing has occurred on the forest for over 100 years.  Currently grazing is much more regulated than it once was.

**Draft Assessment 8 on page 4** correctly, in our opinion, states that grazing has resulted in long lasting environmental effects, some of which still remain today.

- Grazing infrastructure, including fences and water developments, and access routes, influences ecosystems even if stock is not present.
- Fire suppression should also be considered as a management activity which has had significant effects on the RGNF ecosystem.

We disagree with wording throughout this draft assessment **(pages 17 and 23)** that state *"Across the entire Rio Grande National Forest, the effects of management are small."*

We believe that when you consider the overall direct and indirect effects of forest management, both individually and cumulatively, the impacts are significant.  Vegetation treatment, vehicle access, grazing and fire suppression and other actions have had, and will continue to have, significant impacts on forest ecosystems.

We agree with the statement **on page 9** that there is little scientific evidence to support claims that fire may be more severe or frequent after beetle mortality events, and that there are studies that contradict those claims.

Rvsd Plan - 00001650

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

We disagree with the following statement on **p. 26:**

> *"Key vegetation habitat types such as late-successional spruce-fir, pinyon pine, and Engelmann spruce forests are also very susceptible to wildland fire and are only sustainable through a strict full suppression strategy."*

Englemann spruce forests, given their high elevation and associated cold, moist climate, burn very rarely. Fire suppression is not needed to maintain them. It is also not needed to maintain pinon pine, as historically, fires burned and pinon survived.

We appreciate the consideration of human caused fragmentation beginning on **page 32. On page 32** the Haddad et. al. study from 2015 was cited as evidence that all forms of human presence can fragment habitats.   Additional studies provide evidence that all forms of human travel routes fragment habitat, including quiet recreational trails.  (2)(3)(4)(5)

While Wilderness, Roadless and Research Natural Areas provide levels of protection, portions of these areas also receive heavy amounts of human use and are thus essentially fragmented.

We do not agree with metrics which use only a 300 meter buffer zone around roads to account for human-caused fragmentation.  The RGNF permits off route motorized travel for dispersed motorized camping to a distance of 300' from any road.

Motorized travel and overnight human occupancy extends this zone well beyond 300 feet in many areas.  The studies cited above suggest that all travel routes result in fragmentation.

In addition, several metrics consider the zone of human fragmentation around travel routes to extend up to ½ mile or more, such as elk largely avoiding use of areas within this distance of roads open to motor vehicles.   Motorized vehicle noise, odors, enhanced human presence and edge effects extend beyond the edge of travel routes.

The adjacent Gunnison National Forest considered a ½ mile fragmentation buffer around all motorized and mechanized routes. (6).   The Haddad study extends this distance to one kilometer.

**Comments on Assessment of Ecosystem Integrity (12.14) draft report:**

**Rare Communities and Special Habitats**

We are pleased that the RGNF is using Colorado Natural Heritage Program (CNHP) Potential Conservation Areas (PCA) data in this assessment.

We recommend that the RGNF use the best available and most recent data in this assessment.  The assessment states on **page 39** that the forest reviewed three reports ranging from 1998-2006 in compiling this assessment.

CNHP constantly updates its data, and we have noted that the latest online data available from CNHP (available as GIS attributes  via

Rvsd Plan - 00001651

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

http://www.cnhp.colostate.edu/download/gis.asp and also as online reports via http://www.cnhp.colostate.edu/download/gis/pca_reports.asp ) conflicts with data contained in this assessment.

   Specifically, the 2015 list of CNHP Potential Conservation Areas (PCAs) on the RGNF with a very high or outstanding biodiversity rank differs from what is reported in the draft assessment.
   According to November 2015 CNHP data, there are two PCAs with outstanding biodiversity significance rankings with lands partially on the RGNF:
**The Half Peak and Great Sand Dunes PCA's.**

____ There are 16 PCAs with a very highbiodiversity significance rankings that exist all or partially on the RGNF:
  • Sheep Mountain in San Juans
  • Deep Creek Uplands West
  • Miners Creek
  • Rat Creek Pond
  • North Creede
  • Bellows Creek
  • Rio Grande Pyramid
  • Groundhog Park
  • Hot Creek
  • Deadman Creek-Western Sangres
  • Cottonwood Creek-Western Sangres
  • Spanish Creek
  • Dimick Gulch
  • Trickle Mountain
  • La Manga Creek
  • Stony Pass

   These CNHP PCAs with outstanding or very high biodiversity rankings must be considered as rare communities and special habitat.
  • CNHP PCAs should be considered for designation as special areas.

   **The Half Peak CNHP PCA** contains populations of Stonecrop gilia (Gilia sedifolia). This species is globally critically imperiled (G1S1) and described as only known from two locations in the world. *It is a USFS Sensitive Species.*

   Another location for this species and habitat which must be considered is **the Sheep Mountain in San Juans CNHP PCA.**

Rvsd Plan - 00001652

Threats to this species include grazing and off route motorized use, and it has been suggested that **Research Natural Area** status be applied to habitat for this species to ensure protection.

(1)  Snowmobile use could impact this plant in both of its locations, and off route ATV use for game retrieval is allowed within the Sheep Mountain habitat location.

**The Rio Grande Pyramid PCA** must be considered.  It is ranked as having very high biodiversity significance due to the presence of the globally imperiled (G5T1t2/S1) Uncompahgre Fritillary Butterfly.

**The Deep Creek Uplands West, Rat Creek Pond, Miner's Creek, North Creede and Bellows Creek CNHP PCAs** must also be considered.  These are all ranked as having very high biodiversity significance due to the presence of Smith whitlow-grass (*Draba smithii*) , which is globally imperiled (G2S2).

This plant is described by CNHP as being only known to occur in four counties in southern Colorado.

- **We recommend specific consideration be given to the Deep Creek Uplands West, Rat Creek Pond, Miner's Creek areas.**

**The Groundhog Park** very high biodiversity ranked PCA must also be considered due to the presence of Subalpine Riparian Willow Carr (G2G3 S2) fens.

**The Hot Creek PCA** boundaries do not align with the existing **Hot Creek Research Natural Area** boundaries. Some consideration should be given to lands adjacent to and north of Hot Creek, in order to extend protection for the globally vulnerable (G3/S1) Rio Grande chub (*Gila pandora*), and the globally vulnerable (G3G4/S1) Rio Grande sucker (*Catostomus plebeius*) which inhabit that Creek.

**The Dimick Gulch PCA** must be considered for protection, as it is ranked as having very high biodiversity significance due to occurrence of the globally imperiled (G2G3/S2S3) Narrowleaf Cottonwood - Rocky Mountain juniper (*Populus angustifolia - Juniperus scopulorum*) riparian plant association.

**The Trickle Mountain** very high biodiversity significance **PCA** contains significant areas of USFS land which should be considered for protection.   This site contains numerous globally rare grasslands, plant communities and associated species, including the globally imperiled (G2/S2) Herbacious vegetation Muhlenbergia filiculmis montane grassland.

**The La Manga Pass PCA** is significant as it contains the best occurrence of the globally imperiled (G2G3/S1) Arizona willow (*Salix arizonica*).

Rvsd Plan - 00001653

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

*There are additional CNHP identified areas which deserve consideration because they provide habitat for significant species.*

**The Decker Creek PCA** contains areas on RGNF lands which are habitat for Gunnison Sage Grouse (*Centrocercus minimus*), which is critically imperiled on a global scale (G1/S1). This species was listed as a Federally Threatened species in November of 2014. ( See 79 Fed Reg 69192 et seq., November 20, 2014).

Colorado Parks and Wildlife GIS data identifies Gunnison Sage Grouse Brood Area and Overall Range habitat on Forest lands in this area.

**The Ojito Creek Uplands and Hicks Canyon PCAs** contains land which is habitat for state imperiled Ripley milkvetch G3S2. Some of the lands in the Hicks Canyon site are contained in an existing Special Interest Area, and we recommend evaluating this area to determine if the boundary should be expanded.

*There are numerous streams which provide special habitats for populations of Rio Grande Cutthroat Trout on the forest.*

Some consideration must be given to these habitats, and to the **Middle Fork of San Francisco Creek, Cascade Creek and Osier Creek.**

Although some of the PCAs in the Table 14 on page 40 of this draft assessment report are no longer ranked as having high biodiversity significance, they deserve consideration.

We agree that there are additional special habitat types that deserve conservation consideration, as described **on page 42.** Emphasis should be placed on any riparian or water based area, as these locations have been heavily impacted by human activity, and are underrepresented in protected management prescriptions on the RGNF, especially at lower elevations outside of Wilderness.

We recommend additional habitats which have not been subjected to much livestock grazing and contain few non-native or invasive plant species, such as segments of the **Kelly Creek roadless area**, *also be added to this list.*

*The RGNF contains examples of ecosystems which show little to no evidence of management actions and human presence, and these should be preserved.*

(1) Anderson, D.G. 2004, August 9. Gilia sedifolia Brandeg. (stonecrop gilia): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/giliasedifolia.pdf accessed February 2016.

(2) Wiedmann, B. P and Bleich, V. C. 2014. Demographic responses of bighorn sheep to recreational activities: A trial of a trail, Wildlife Society Bulletin, 38-4, pages: 773-782.

(3) Snetsinger, S.D. and K. White. 2009. Recreation and Trail Impacts on Wildlife Species of Interest in Mount Spokane State Park. Pacific Biodiversity Institute, Winthrop, Washington. 60 p.

Rvsd Plan - 00001654

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

(4) Jordan, m. 2000.  Ecological Impacts of Recreational Use of Trails:  A Literature Review, The Nature Conservancy, 250 Lawrence Hill Road Cold Spring Harbor, New York.

(5) Thompson, B., 2015. Recreational Trails Reduce the Density of Ground-Dwelling Birds in Protected Areas, Environmental Management, 55-5, 1181.

(6) FEIS Gunnison Basin Federal Lands Travel Management,  2010  pg 124 accessed online via http://www.blm.gov/style/medialib/blm/co/field_offices/gunnison_field_office/travel.Par.53275.File.dat/Final%20EIS%20April%202010.pdf  Accessed February 2016

Rvsd Plan - 00001655

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

**Assessment 4 Carbon draft Comments**

**Page two** states that the RGNF carbon assessment does not include emissions from agency, contractor, or permittee business operations or public recreation uses.

Although a source for internal agency business emissions is provided, emissions from other forest related sources are not considered.   While it may be difficult to obtain data for these sources, the forest should not ignore them.

Management decisions and practices which help limit carbon emissions by contractors, permitees and the public should be encouraged.

**This assessment should include additional material regarding carbon emissions.** Specifically carbon emissions from wildfire. Also how wildfire emissions relate to emissions from the anthropogenic burning of fossil fuel.  *(typical wildfire emissions are <10% of anthropogenic emissions (1)).*

(1) Wiedinmyer, C.; Neff, J.C. 2007. Estimates of $CO_2$ from fires in the United States: Implications for carbon management. Carbon Balance Manage. 2(10)

Rvsd Plan - 00001656

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

***Assessment 5 draft Comments on Identifying and Assessing At-risk species***

We agree with the comment on **page 13** that lynx

*"Connectivity attributes that facilitate movement should be further defined and mapped across the Unit and adjoining unit landscapes."*

- **We recommend this be considered as part of the forest plan revision.**

The Initial US FWS proposal has not identified any critical lynx habitat in Colorado, despite the fact that lynx reintroduction within the state has been deemed successful by Colorado Parks and Wildlife.

The '<u>Risk Factors</u> for this species' column for **Canada lynx on page 57** should not be blank.  **Pages 13 and 14** of this assessment identify numerous potential risks for this species, including climate change; increased over snow vehicle use and other recreation resulting in snow compaction; habitat fragmentation; factors affecting lynx mortality; unmanaged grazing; and factors affecting lynx movement.

Although the US FWS did not determine that critical habitat for **Gunnison sage-grouse** exists on the RGNF, as stated on **page 19**, this does not mean that this species does not and cannot inhabit this area.

It must be noted that not all of the conservation strategy elements listed on **page 20** have been fully implemented in the Poncha Pass area, and others have only been recently implemented.

For example, system roads have only recently been seasonally closed by the BLM in this area, and there is a great deal of unauthorized motorized use which regularly occurs throughout this area.

- We recommend adding risk factors for the **Plains pocket mouse** (*Perognathus flavescens*) on **page 59**.  Possible risk factors include habitat fragmentation and human disturbance due to recreation (1)
- We recommend adding ATV game retrieval as a risk factor for **Stonecrop gilia** (*Aliciella sedifolia*) **on page 60**, as off route use by ATVs for game retrieval is allowed in part of the habitat for this species identified as the Sheep Mountain in San Juans Colorado Natural Heritage Program Potential Conservation Area.

Off road vehicle use, mining, climate change and pollution are also considered risks for this species. (2)  The very limited worldwide habitat for this species must be protected.

There are **numerous species** included in the "<u>At-Risk</u>" list for which nothing was included in the risk factors column, or the risk factor column indicated there was a *"Lack of information regarding species."*

Rvsd Plan - 00001657

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

- We recommend that if a species has been identified as imperiled and present on the RGNF, there should be some identifiable risk factors listed.
- We recommend a number of additions as risk factors as detailed below.  It should be noted that the source of this information predominantly comes from USDA Forest Service Technical Conservation Assessments, as referenced.

Possible risk factors which should be included **on page 60** for **Vierhapper's aster, alpine aster** (*Aster alpinus var. vierhapperi*) include *"loss cf habitat or individuals due to human-related activities such as grazing, mining, and recreational activities such as cjf-road vehicle use, snowmobiles, camping, and hiking."*

Also climate change and cloud seeding are risk factors. (3)

Possible risk factors which should be included on **page 60** for **Aztec milkvetch** (*Astragalus proximus*) include oil and gas development, road building and maintenance, off-road vehicle use, grazing, fire, air pollution, and global climate change. (4)

 Possible risk factors which should be included for **Crandall's rockcress** (*Boechera crandallii)* **on page 60** include loss of plants due to trampling, ground disturbing activities such as off-route recreation, grazing which can facilitate introduction of non-native species, and climate change. (5)

Possible risk factors which should be included on **page 61** for **Northern moonwort** (*Botrychium pinnatum*) include off-road vehicle use, recreation; timber harvest, firewood cutting, fire suppression, grazing and ground disturbing maintenance.(6)

Possible risk factors which should be included on **page 61** for **Little grapefern** (*Botrychium simplex*) include ground disturbing maintenance, timber harvest, recreation, fire, grazing, exotic species invasion, climate change, and pollution. (7)

Possible risk factors which should be included on **page 61** for **Mud sedge** (*Carex limosa*) include logging and climate change. (8)

Possible risk factors which should be included for **Rocky Mountain Draba** (*Draba graminea*) on **page 63** include erosion due to recreational use or grazing, climate change, and competition from invasive species introduced by recreation or grazing. (9)

Possible risk factors which should be included for Smith's **Draba** (*Draba graminea*) on **page 63** include impacts due to habitat modification from recreational use or route construction, and grazing where plants are accessible.

Cross country travel by ATVs for game retrieval, and snow mobile use, is permitted in many areas where this species occurs, and may potentially result in negative impacts to these plants or their habitat. (10)

Possible risk factors which should be included for **Colorado wild buckwheat** (*Eriogonum coloradense*) on **page 64** include "recreation impacts, grazing and its

Rvsd Plan - 00001658

secondary effects, right-of-way management, residential development and human population growth, exotic species invasion, effects of small population size, mining, rust, global climate change, and pollution." (11)

Possible risk factors which should be included on **page 66** for **King's campion** (*Silene kingie*) include grazing, recreation, climate change and invasive species. (12)

### ***Motorized Use***

Motor vehicle use off designated routes is currently allowed in many areas on the RGNF for the purposes of game retrieval and dispersed motorized camping.   This use has the potential to negatively impact sensitive wildlife species due to direct physical or auditory disturbance; habitat modification; mortality and/or pollution of air and water.  (13)

Off route motorized use can pose risks to sensitive plant species via trampling and physical injury; erosion; soil compaction and pollution of air and water sources. (13)

Snowmobile use is currently allowed off designated routes on most lands in the RGNF. This use can disturb sensitive species of wildlife intentionally or unintentionally via direct disturbance or noise resulting in stress, habitat loss and/or displacement; increased stress due to infrequent sub-freezing temperatures; direct mortality and pollution, including increased acidity of surface waters fed by snowmelt (14)

Snowmobile use can result in risks to sensitive plants via direct physical injury; soil erosion; snow compaction, and pollution of air and water sources. (14)

Imperiled plant species with a limited range and a limited number of individuals are generally at risk because of habitat modification and/or direct impacts.

Risk factors for most imperiled plants would include permitted grazing since it is allowed on most forest lands.  Grazing can result in trampling, direct mortality due to ingestion (unless the plant is inedible to livestock) or habitat modification.

Where imperiled plants are not within a designated Wilderness or Backcountry area prescription, the allowance of off-route wheeled motorized use poses risks.

Off route recreation, including dispersed tent camping and hiking/horseback riding can pose risks due to trampling anywhere on the forest.

### ***Mountain Biking***

Off-route use of mountain biking can pose risks in all locations but designated Wilderness.  Steep slopes, rock bands and cliff areas which are habitat for rare plants are at risk due to recreational use such as rock climbing and downhill mountain biking.

Potential risks from snowmobile use may be present in all areas on the RGNF except designated Wilderness.

Anthropogenic noise can be a significant stressor to imperiled wildlife. (15)  Significant sources of this noise include recreational shooting, oil and gas wells, and motor vehicle use

Rvsd Plan - 00001659

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

especially OHV and snowmobile use (which emit over four times as much noise as normal licensed passenger vehicles).

*The current RGNF plan contains few restrictions on recreational activities which have the potential to negatively impact at risk species or their habitat. Unlike project level decisions which can restrict the location and timing of administrative permitted activities, recreation is allowed to occur throughout the forest.*

## References

(1) Birney, E.C. 1999. Status of the plains pocket mouse (*Perognathus flavescens*) at the Twin Cities Army Ammunition Plant, 1999. Final report submitted to the Nongame Wildlife Program, Minnesota Department of Natural Resources. 10+ pp.

(2) Anderson, D.G. (2004, August 9). *Gilia sedifolia* Brandeg. (stonecrop gilia): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/giliasedifolia.pdf (Accessed February 2016).

(3) Moore, L. and S. Friedley. (2006, November 27). *Aster alpinus var. vierhapperi* (Onno) Cronquist (Vierhapper's aster): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/asteralpinusvarvierhapperi.pdf (Accessed February 2016).

(4) Decker, K. (2005, September 7). *Astragalus proximus* (Rydberg) Wooton & Standley (Aztec milkvetch): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http:// www.fs.fed.us/r2/projects/scp/assessments/astragalusproximus.pdf (accessed February 2016).

(5) Ladyman, J.A.R. 2005. *Boechera crandallii* (B.L. Robinson) W.A. Weber (Crandall's rockcress): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. Online. Available: http://www.fs.fed.us/r2/projects/scp/assessments/boecheracrandallii.pdf (accessed March 2016).

(6) Ahlenslager, K. and Potash, L (2007) Conservation Assessment for 13 Species of Moonworts. (online) USDA Forest Service Region 6 and USDI Bureau of Land Management, Oregon and Washington. Available: http://www.blm.gov/or/plans/surveyandmanage/files/ca-va-botrychium-13-species-2007-04-18.pdf (accessed February 2016).

(7) Anderson, D.G. (2006, May 22). *Botrychium simplex* E. Hitchcock (little grapefern): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region.

Rvsd Plan - 00001660

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

Available: http://www.fs.fed.us/r2/projects/scp/assessments/botrychiumsimplex.pdf (accessed February 2016).

(8) Gage, E. and D.J. Cooper. (2006, April 14). *Carex limosa* L. (mud sedge): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/carexlimosa.pdf (accessed February 2016).

(9) Moore, L. and S. Friedley. (2004, September 30). *Draba graminea* Green (Rocky Mountain draba): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://
www.fs.fed.us/r2/projects/scp/assessments/drabagraminea.pdf (accessed March 2016).

(10) Ladyman, J.A.R. (2004, February 3). *Draba smithii* Gilg ex O.E. Schulz (Smith's draba): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/drabasmithii.pdf (accessed March 2016).

(11) Anderson, D.G. (2004, October 14). Eriogonum coloradense Small (Colorado buckwheat): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/eriogonumcoloradense.pdf (accessed March 2016).

(12) Ladyman, J.A.R (2006, September 22). Silene kingii (S. Wats.) Bocquet (King's campion): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/silenekingii.pdf (accessed February 2012).

(13)  Switalski, A.T. and Jones, A. (2012) Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers. Journal of Conservation Planning, 8: 12-24.

(14) Winter Wildlands Alliance, Environmental Impacts from Snowmobile Use. [Online] http://winterwildlands.org/wp-content/uploads/2014/05/Environmental-Impacts-from-Snowmobile-Use.pdf (accessed February 2016).

(15)  Francis, C.D.and Barber, J.R. (2013) A framework for understanding noise impacts on wildlife: an urgent conservation priority. Frontiers in Ecology and the Environment, 11(6): 305–313.

Rvsd Plan - 00001661

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

### Chapter 15, Designated Areas draft assessment Comments

**On page 1,** the draft assessment describes designated areas as permanent. There is nothing in 36 CFR 219.19 which states that a designated area is a permanent management designation. See 219.7(c)(2)(vi). Designations under the control of the Forest Service, for example, can be modified, even completely removed, via a subsequent plan amendment or revision.

The assessment provides a startling example of this lack of permanency **on page 4** when it describes how the Wheeler National Monument had its National Monument status abolished. **The word "permanent" should thus be removed from this sentence.**

**On page 4** the draft assessment again states that the CDNST management is consistent with the 2009 CDNST Comprehensive Plan and that it is a quiet trail.  We believe this to be incorrect.

There are concerns that CDNST management may not be consistent with the nature and purposes of the trail.  A decision to designate and permit motorcycle use on the CDNST in the 2010 Gunnison Travel Management Plan was appealed by numerous groups.

This appeal was upheld in 2010 because a determination was made that supporting documentation which indicated that motorcycle use on this trail was not substantially interfering with the purpose and nature of the CDNST was lacking.[1]

This very same CDNST segment in question **(trail 813)** crosses back and forth between the GMUG Forest and the RGNF.  Thus, there is insufficient evidence that motorized use on the CDNST is not substantially interfering with the nature and purpose of that trail on both the Gunnison and Saguache Districts. *Therefore, trail management may not be consistent with section 6 b(5)(a) the 2009 CDNST Comprehensive Plan.*

When one considers sound level as a measurement of quiet, there are long segments of the CDNST on the RGNF that are frequently not quiet.  For example, dirt motorcycles are allowed on the CDNST/**Trail #813** for long segments of RGNF from Lujan Pass to Windy Peak.

The dirt motorcycles that actually adhere to Colorado State Law emit up to 96 dBA in noise.  That amount of noise is far from what is considered quiet by most people.  Perhaps the sentence should state that the CDNST management is ***intended to be*** consistent with the 2009 CDNST Comprehensive Plan, but currently is not.

The discussion of the CDNST **on page 11** must include the corridor, management area, *and the requirement for a unit plan.*

---

[1] Appeal /Response and Decision Letter from Deputy Regional Forester  Maribeth Gustafson  9/30/10 Pg. 2

Available online at  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5207761.pdf

Rvsd Plan - 00001662

**We agree with the statement on page 16:** *"We also may need an update to the 1994 potential research natural area candidate inventory to determine if, based on changed conditions or new information, we should consider additional areas as potential candidate research natural areas."*

Notably, the RGNF has undertaken *"no analysis and consideration of the most recent Colorado Natural Heritage Program data,"* which includes information on threatened and endangered species and potential conservation areas. **Page 2.**

- We believe there are significant Potential Conservation Areas identified by the Colorado Natural Heritage Program that warrant consideration as research natural areas and/or other designated areas.

**On page 17**, we believe that the currently published Colorado Natural Heritage Program Potential Conservation Area reports identify all of the High, Very high, and Outstanding biodiversity significant areas on the RGNF.

- This data **indicates important needs** and the potential for new designated Research Natural Areas (RNA's) and/or Special Interest Areas. (SIA's).

*The following are Colorado Natural Heritage Program Potential Conservation Areas that especially warrant consideration for special area designation:*

- Half Peak
- Sheep Mountain in San Juans
- Rat Creek Pond
- Rio Grande Pyramid
- Deep Creek Uplands West
- Decker Creek
- Deadman Creek-Western Sangres
- Elephant Rocks
- Ojito Creek Uplands
- Decker Creek
- Dimick Gulch
- Miner's Creek
- Groundhog Park
- Spanish Creek
- Hicks Canyon
- Kelly Creek

We agree with further consideration of designating the **Natural Arch area and the Rio Grande Pyramid** area.  We agree that the lower area of **Deadman Creek** must be considered as a potential addition to the existing Research Natural Area in this location.

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

We also agree that the **Devils Hole Geologic Area, Summer Coon Volcano Geologic Area, West Lost Trail Creek Landslide Geologic Area, and Brewster Stageline Historic Area** warrant consideration as new designated areas or as expanded existing designated areas.

We will make the following comments regarding the 1994 Wilderness needs assessment, as discussed on pages **17-18** of this draft assessment report.

We provide these comments even though the draft assessment states **on page 1** that it will not address Chapter 70 Wilderness evaluation.

*-Given that the Wilderness Assessment is more than 20 years old, a fresh look is needed.*

- The **need for wilderness** may be greater in 2016 than it was in 2014 because of the need to protect species habitat and connectivity, and because of global warming.

For example, the assessment on **p. 20** notes the importance of unroaded areas for conservation of biological diversity and integrity, including maintaining native fish stocks. Some roadless areas have roads and trails open to motorized use, so the protection they provide may not be sufficient.

**-There is especially a need for lower elevation wilderness,** i. e ., below the subalpine zone. The assessment correctly observes that *"[g]enerally, all of the wilderness areas on the Rio Grande National Forest are high elevation".* **Page 17.**

-The assessment makes a good argument for the economic value of wilderness (**pp. 21-22**). Additional wildness acreage could thus contribute to economic sustainability.

- **Wilderness provides levels of protection unavailable via other types of land designations.**

-  It is not clear how the RGNF determined what ecological land type associations are under-represented in the National Wilderness Preservation System.
 **What does under-representation mean?**
  The International Convention on Biological Diversity (ICBD) recommends that at least *17% of the world's terrestrial areas be conserved by 2020 .[2] Given that the ICBD's 17% threshold serves as the floor, we believe 20% is a more reasonable target for biodiversity conservation purposes.*
     On April 13 of 2015 we submitted a letter to the RGNF containing a more detailed analysis of ecosystem representation within protected areas on the forest.

---

[2] Woodley, S., Bertzky, B., Crawhall, N. et al. (2012). Meeting Aichi target 11: What does success look like for protected area systems? Parks, 18, 23-36.

Rvsd Plan - 00001664

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

- **We recommend that the analysis in our letter be given consideration.**

-Land type associations from 1994 have become more sophisticated, detailed and inclusive with newer and more current ecosystem representation analyses.

**For example, the existing RGNF Plan Final Environmental Impact Statement at 3-329 identified 17 ecosystem types that might be desirable for representation as part of Resource Natural Areas.** More specific and additional ecosystems and habitats have been identified in current analyses when compared to those conducted in 1994[3].

Unless the RGNF is actively communicating and coordinating with the BLM and the National Park Service regarding the need to represent ecosystems in Wilderness, the RGNF must take the initiative and not assume that these other agencies are working toward fulfilling this need.

-Wilderness areas provide more than recreation opportunities and habitat. For example, they help provide clean air, clean water and connectivity. **Pages 21 and 22** of this draft assessment provide an excellent synopsis of many of the benefits of Wilderness.

-**Page 14** of the Draft Report for the Recreation Assessment describes the RGNF niche as **"Solitude in Every Season."**

The best places to experience solitude are designated Wilderness Areas, which are in part created because of, and managed for, their ability to provide outstanding opportunities for solitude.

While primitive non-motorized recreation opportunities can be provided outside of wilderness, these are commonly not being provided outside of wilderness.

- We believe that there are no trails outside wilderness in primitive recreation opportunity spectrum settings on which bicycle use is prohibited. Hence, a primitive, non-motorized, non-mechanized ROS outside of wilderness is not provided. This argues for either more wilderness or **for the creation of non-motorized, non-mechanized settings** outside of wilderness areas.

Also, FSH 1909.12 73.21 (2) states that the undeveloped lands which provide opportunities for a primitive type of recreation outside wilderness *"are going to decrease in acreage as the demands on public lands increase."*

We agree with the statement on **page 18** that *"It is reasonable to consider the additional acreage identified in the other current Forest Plan alternatives for potential additions to the existing special interest areas."*

---

[33] Gergely, K.J., and McKerrow, A., (2013), Land cover—National inventory of vegetation and land use: U.S. Geological Survey Fact Sheet 2013–3085, 1 p., http://pubs.usgs.gov/fs/2013/3085/ .

Rvsd Plan - 00001665

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

We suggest the sentence on **page 18** which contains the phrase *"Inventoried roadless areas are essentially unmodified natural environments"* be adjusted to match the current condition.  There are numerous facilities and uses permitted within inventoried roadless areas which significantly modify parts of those areas.

For example, some roadless areas contain popular OHV trails which significantly modify the natural soundscape and the natural environment within a mile-wide corridor.

- We suggest this sentence be changed so it reads **"Many parts of Inventoried roadless areas are essentially unmodified natural environments."**

**On page 19** we do not believe the following statement is correct:

*"The Rio Grande National Forest inventoried roadless areas are also identified as backcountry areas in our current Forest Plan."*   There are numerous Colorado Roadless Rule areas which are not managed in the 3.3 Backcountry management prescription.

- **RGNF Colorado Roadless areas <u>not managed as backcountry below</u>**

*First listed*-Roadless area name---*then*, significant management area prescription other than Backcountry

1. Crestone---*Special Wildlife Areas-Bighorn Sheep, Deer and Elk Winter range*

2. Cotton Creek---*Deer and Elk Winter range*

3. Hot Springs---*Deer and Elk Winter range*

4. Miller Creek---*Deer and Elk Winter range*

5. Butterfly--- *Deer and Elk Winter range*

6. Dorsey Creek---*General Forest and Intermingled Rangelands*

7. Ute Pass--- *Special Wildlife Areas- Bighorn Sheep*

8. Lake Fork---*Forest Products, General Forest and Intermingled Rangelands*

9. Deep Creek/Boot Mountain---*Grassland Resource Production*

10. La Garita--- *Special Wildlife Areas-Bighorn Sheep, Forest Products*

11. Lower East Bellows--- *Deer and Elk Winter range*

12. Bristol Head---*General Forest and Intermingled Rangelands*

13. Kitty Creek---*Forest Products*

Rvsd Plan - 00001666

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

14. Gibbs Creek---*Dispersed Recreation*

15. Sulphur Tunnel---*Forest Products*

16. Pole Mountain/Finger Mesa---*Dispersed Recreation, Forest Products*

17. Beaver Mountain--- *Deer and Elk Winter range*

18. Bennet Mountain / Blowout / Willow Creek / Lion Point / Greenie Mountain--- *Special Wildlife Areas- Bighorn Sheep, Grassland Resource Production*

19. Alamosa River--- *Special Wildlife Areas-Bighorn Sheep*

20. Wightman Fork / Upper Burro---*Forest Products*

21. Willow Mountain--- *Designated and Eligible Recreation Rivers*

22. Conejos River / Lake Fork--- *Designated and Eligible Recreation Rivers*

23. Spectacle Lake---*Dispersed Recreation*

24. Fox Creek--- *Special Wildlife Areas-Bighorn Sheep*

25. Cumbres--- *Special Wildlife Areas-Bighorn Sheep*

26. Chama Basin--- *Designated and Eligible Recreation Rivers*

27. Spruce Hole / Sheep Creek--- *Special Wildlife Areas-Bighorn Sheep*

- If the intent of this statement is to use the word 'backcountry' to describe something other than a 3.3 management prescription area, we suggest the use of another word to avoid confusion.
- **On page 20,** we agree with the statement:  *"We can use other designations, including research natural areas, experimental forest and special interest areas that may be more beneficial to managing terrestrial and aquatic plant and animal species. However, wilderness remains the strongest protection available, and should be recommended for protection of areas containing important resources where management that might be needed outside of wilderness is not necessary."*

Please correct the grammar in this sentence **on page 21**:

*"There a number of designated areas on the Rio Grande National Forest."*

We disagree with the statement on **page 23:** *"The first step in evaluating potential wilderness is identifying and inventorying all areas within National Forest System lands that satisfy the definition of wilderness found in section 2(c) of the 1964 Wilderness Act."*

Rvsd Plan - 00001667

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

According to FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness Evaluation:

### 71 – INVENTORY OF AREAS THAT MAY BE SUITABLE FOR INCLUSION IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

The primary function of the inventory step is to efficiently, effectively, and transparently identify all lands in the plan area that may have wilderness characteristics as defined in the Wilderness Act. (Emphasis added.)

In other words, the RGNF must consider **potential** wilderness. This is even acknowledged in the conclusion to this assessment:  citing Chapter 70, p. 23 states that before soliciting comments on a draft plan, *"we will be required to inventory and evaluate potential wilderness". (Emphasis again added.)*

### 71.2 – Inventory Steps and Criteria

Include an area in the inventory when:

1. The area meets the size criteria defined in section 71.21 and has no improvements; or

2. The area meets the size criteria defined in section 71.21 and is consistent with the improvements criteria defined in sections 71.22a and 71.22b.

Under the size criteria referenced above, areas to be included in the inventory should be at least 5000 acres in size, or if smaller, be *"of sufficient size as to make practicable its preservation and use in an unimpaired condition, including but not limited to areas contiguous to an existing wilderness, primitive areas, administratively recommended wilderness, or wilderness inventory of other Federal ownership."* Lands containing certain *"road improvements"* are to be included in the inventory (71.22a), as are those with any of the *"other improvements"* listed at 71.22b if these features *"are not substantially noticeable in the area as a whole".*

The first step in the Chapter 70 Wilderness Evaluation Process is substantially different from the suggested identification of lands that *"satisfy the definition of Wilderness."* We encourage the RGNF to follow the correct sequential step by step procedure identified in Chapter 70 as part of the Wilderness Evaluation process.

**There are additional designated areas which we believe must be considered as a programmatic part of the Forest Plan revision.**

Rvsd Plan - 00001668

- We recommend the RGNF consider a special designated area for Gunnison Sage Grouse habitat, which was listed as a Federally Threatened species in November of 2014. See 79 Fed Reg 69192 et seq., November 20, 2014.
  Colorado Parks and Wildlife has identified Gunnison Sage Grouse Brood Area and Overall Range habitat on RGNF lands on the Saguache District.

There are a number of species found on the RGNF with an overall conservation rank of critically imperiled or imperiled, and/or sensitive. **The RGNF should take a close look at special area designations for habitats of the following species:**

- Nesting habitat and potential nesting habitat for Peregrine Falcon
- Boreal Toad breeding sites
- Rio Grande Cutthroat Trout
- Canada Lynx
- Uncompahgre Fritillary Butterfly
- Smith whitlow-grass
- Stonecrop gilia
- Boreal Owl
- Ripley milkvetch
- Reflected Moonwart

**For lynx, the RGNF should consider a special area or management prescription for linkages, especially landscape linkages.**

The RGNF Designated Areas assessment must recognize requirements associated with the **Continental Divide National Scenic Trail (CDNST)** as part of the planning process. The CDNST is a congressionally designated area as per 36 CFR 219.19.
*The 2009 CDNST Comprehensive Plan and Forest Service Manual 2353.4 contains information and direction that was not considered in the 1996 RGNF Forest Plan.*

The RGNF must recognize that the CDNST **is not established as simply a narrow trail, but as a corridor.**
We believe this assessment must include statements which acknowledge that the current Forest plan does not adequately:

- Develop a CDNST Unit Plan
- Establish a CDNST corridor
- Protect and conserve scenic, natural, historical, and cultural qualities of the CDNST corridor
- Specifically delineate a CDNST corridor with the creation of a CDNST management area broad enough to protect natural, scenic, historic, and cultural features
- Consider desired CDNST user settings and opportunities

Rvsd Plan - 00001669

March 18, 2016 QUC, SLVEC, RMRI and RS Assessment Comments

- Establish a CDNST monitoring program.

The Rio Grande National Forest is the headwaters of a number of important rivers, including the Rio Grande. In addition, the northern part of the San Luis Valley is an endorheic basin (closed drainage basin). There are numerous important aquatic resources and wetlands which are a critical part of these waterways and the water which originates on the RGNF.

The Colorado Natural Heritage Program has identified and assessed numerous significant wetland areas on the RGNF.

*We recommend that the assessment recognize the importance of these wetlands, and that some of these unique areas be considered for special designations due to their significance and importance.*

- Interest in climbing the 14,000-foot peaks (14ers) has resulted in a marked increase in use of those peaks and areas since 1996. This has presented additional management concerns and opportunities.
- A survey of 14er peak land managers indicated use of the areas associated with these peaks is expected to increase to extreme levels, and that this will result in heavy physical and social impacts.
  Almost 78% of these land managers wanted additional tools in order to better manage use associated with 14ers in order to meet resource objectives.[i]
- We recommend that the peaks and areas accessed from the **Lake Como and Willow Creek areas** be considered for special designations in this planning process.
- Cultural areas associated with the **Natural Arch, Mount Blanca and the Kelly Creek Aspen grove** must be considered for special designation.

---

[i] Existing Conditions on Colorado's Fourteeners Natural Resource Manager Survey Results, presentation by USFS 14er Program Manager Loretta McEllhiney, available online February 2016 via: http://www.fs.fed.us/r2/recreation/wilderness/core_team/forums/national_trends/mcellhiney presentation.pdf

Rvsd Plan - 00001670

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

***Assessment 1 & 3 draft Report comments on Ecosystem Integrity, Systems Drivers and Stressors for Terrestrial Ecosystems***

   We sincerely appreciate the opportunity to evaluate and comment on these draft Assessment Reports.  We hope that you consider and incorporate the comments provided in order to create accurate final Assessment Reports.

   We are delivering this information in what we hope will be format friendly. You have the entire set of comments in PDF. Then, we are also sending separate chapters using word format, which may make it easier to reference specific comments sent to specific individuals.

   We are impressed with the general quality, accuracy and thoroughness of the draft Assessment Reports.  We appreciate the efforts made by the RGNF to separate facts from opinions in compiling these reports.

   If you question the accuracy of any statements made in our comments, we can provide additional supporting documentation.

**Thanks so much for all the good work.**

Sincerely,

Tom Sobal, Quiet Use Coalition

Rocky Smith, Policy Analyst

Roz McClelland, Rocky Mountain Recreation Initiative

Christine Canaly, San Luis Valley Ecosystem Council

   ***We believe the scope of this assessment report must be better defined.***

   **On page 1** an ecosystem is defined as being
*"composed of living organisms (plants, animals and microbes) and their nonliving environment (climate and soil for terrestrial ecosystems..."*
It would be better emphasized that this specific assessment focuses primarily on vegetation (plants) and that animals and soils are covered in other assessments.

   **On page 1** we suggest that the words "grasslands and shrub lands" replace the word "rangelands" in the following sentence:
"Terrestrial ecosystems include forested areas, non-forested (rangelands) and alpine ecosystems."
The word rangeland unnecessarily suggests an emphasis on grazing.

   **On page 1,** this assessment states that

Rvsd Plan - 00001671

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

*"The modelling we did to look at the natural range of variability and ecosystem integrity did not specifically include climate change."*

**This is a major omission.**

- Climate change may influence many of the noted conditions (growth rate and mortality, species distribution, disturbances) but also other potential drivers and stressors.  A new forest plan must fully consider climate change.
- Note that the Planning Rule <u>specifically states that assessments must consider climate change as a system driver</u>. See 36 CFR 219.6(b)(3). See also id. at 219.8(a)(1)(iv). Climate change is listed as a driver/stressor on p. 3 of the assessment.

**The text at p. 2** even admits that without considering climate change, "some of the simulation results may not hold and there may be other unanticipated conditions due to the effects of climate change".

**Pages 4-5** discuss, in general terms, the possible effects of climate change on the RGNF, and the agency "recommend[s] addressing climate change in our revised Forest Plan."

*In light of all of the above, the absence of climate change in modelling is shocking and must be rectified.*

We agree that habitat connectivity is an indicator of ecosystem integrity. **(p. 30).** Thus we also agree that a comprehensive connectivity analysis on the Rio Grande National Forest would be helpful in assessing current habitat conditions, **as stated on page 2.**

This analysis must include connectivity not only on RGNF lands, but also include connectivity to surrounding adjacent forests, BLM lands, private lands, etc.   Connectivity is correctly considered to include adjacent lands on **page 31.**

- We recommend the sentence on **page 2** read: *"We do not have a comprehensive connectivity analysis on the Rio Grande National Forest and adjacent lands, which would be helpful in assessing current habitat conditions."* **The RGNF should undertake this comprehensive analysis as part of the plan revision.**

We agree with the proposal **on page 3** to include an additional 10 km buffer around RGNF lands in this analysis, to include a broader landscape.  This recognizes that natural processes do not conform and adhere to human delineated boundaries.

- For example, a connectivity analysis should consider lands up to at least 10 km outside of the RGNF boundary.

<u>We agree with the major system stressors and drivers identified in this assessment.</u> We believe that the discussion on **page 5** of management actions should be expanded and include additional information.   Unlike many of the other system stressors and drivers,

Rvsd Plan - 00001672

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

management actions are and can be controlled and influenced by humans, and thus are of primary consideration in a forest plan.

Management actions on the RGNF, when they are of sufficient duration, intensity, and magnitude, may influence systems as stressors and drivers, or even becomes drivers and/or stressors themselves, and thereby affect ecosystem characteristics. Management actions include any alterations to ecosystems or activities that the Forest Service conducts, authorizes, or restricts on NFS lands.

We believe that various vegetation treatments, livestock grazing, and vehicular access are management activities of sufficient duration, intensity and magnitude to influence system drivers at the national forest scale.
Various vegetation treatments, including timber harvest, thinning, prescribed fire and other activities, have historically occurred on the RGNF.

*We disagree with the statement on **page 5** that these activities are a minor driver and stressor on the forest.*
Although the draft assessment states that only .2 % of the forest receives vegetation treatment each year, it must be recognized that a significant amount of forest lands have experienced some form of vegetation treatment in the past, so there is accumulative impact.
A rough analysis of USFS GIS data for historical timber cutting on the forest indicates that approximately 10% of the forest has undergone some type of vegetation treatment during the past 100 years.
**Seventeen percent** of the forest is considered suitable for timber production. Although vegetation does grow back, the impacts of these activities are of long duration.  We agree that additional activities associated with vegetation treatment, such as road construction, have lasting impacts on the forest.
Many roads constructed specifically for timber harvests have been incorporated into the designated transportation system, and many temporary roads have not been properly closed and decommissioned.
Vehicle access, especially motorized use, has significant impacts on the forest.  There are over 2,500 miles of designated motorized routes on the forest.   These routes have lasting effects due to ongoing maintenance (or lack of it) and use.  The impacts of these routes extend well beyond the area disturbed by the route tread itself.
Edge effects, and the facilitation of human presence extend beyond the immediate route tread.  Travel routes also have facilitated the spread of non-native and invasive vegetation such as the pervasive common dandelion (*Taraxacum $c_j$ficinale*).
Permitted cross country travel by snowmobiles, ATVs retrieving game, and vehicles travelling off route for the purpose of dispersed motorized camping magnify the footprint of vehicle use.  Hundreds of miles of unauthorized motorized use off of system routes also contributes to additional ecological impacts.

Rvsd Plan - 00001673

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

Grazing is permitted on the majority of the forest, *with 31% of forest lands considered suitable for grazing.* Grazing has occurred on the forest for over 100 years. Currently grazing is much more regulated than it once was.

**Draft Assessment 8 on page 4** correctly, in our opinion, states that grazing has resulted in long lasting environmental effects, some of which still remain today.

- Grazing infrastructure, including fences and water developments, and access routes, influences ecosystems even if stock is not present.
- Fire suppression should also be considered as a management activity which has had significant effects on the RGNF ecosystem.

We disagree with wording throughout this draft assessment **(pages 17 and 23)** that state *"Across the entire Rio Grande National Forest, the effects of management are small."*

We believe that when you consider the overall direct and indirect effects of forest management, both individually and cumulatively, the impacts are significant. Vegetation treatment, vehicle access, grazing and fire suppression and other actions have had, and will continue to have, significant impacts on forest ecosystems.

We agree with the statement **on page 9** that there is little scientific evidence to support claims that fire may be more severe or frequent after beetle mortality events, and that there are studies that contradict those claims.

We disagree with the following statement on **p. 26:**

> *"Key vegetation habitat types such as late-successional spruce-fir, pinyon pine, and Engelmann spruce forests are also very susceptible to wildland fire and are only sustainable through a strict full suppression strategy."*

Englemann spruce forests, given their high elevation and associated cold, moist climate, burn very rarely. Fire suppression is not needed to maintain them. It is also not needed to maintain pinon pine, as historically, fires burned and pinon survived.

We appreciate the consideration of human caused fragmentation beginning on **page 32.** **On page 32** the Haddad et. al. study from 2015 was cited as evidence that all forms of human presence can fragment habitats. Additional studies provide evidence that all forms of human travel routes fragment habitat, including quiet recreational trails. (2)(3)(4)(5)

While Wilderness, Roadless and Research Natural Areas provide levels of protection, portions of these areas also receive heavy amounts of human use and are thus essentially fragmented.

Rvsd Plan - 00001674

We do not agree with metrics which use only a 300 meter buffer zone around roads to account for human-caused fragmentation.  The RGNF permits off route motorized travel for dispersed motorized camping to a distance of 300' from any road.

Motorized travel and overnight human occupancy extends this zone well beyond 300 feet in many areas.  The studies cited above suggest that all travel routes result in fragmentation.

In addition, several metrics consider the zone of human fragmentation around travel routes to extend up to ½ mile or more, such as elk largely avoiding use of areas within this distance of roads open to motor vehicles.  Motorized vehicle noise, odors, enhanced human presence and edge effects extend beyond the edge of travel routes.

The adjacent Gunnison National Forest considered a ½ mile fragmentation buffer around all motorized and mechanized routes. (6).  The Haddad study extends this distance to one kilometer.

## Comments on Assessment of Ecosystem Integrity (12.14) draft report:

### Rare Communities and Special Habitats

We are pleased that the RGNF is using Colorado Natural Heritage Program (CNHP) Potential Conservation Areas (PCA) data in this assessment.

We recommend that the RGNF use the best available and most recent data in this assessment.  The assessment states on **page 39** that the forest reviewed three reports ranging from 1998-2006 in compiling this assessment.

CNHP constantly updates its data, and we have noted that the latest online data available from CNHP (available as GIS attributes  via
http://www.cnhp.colostate.edu/download/gis.asp and also as online reports via
http://www.cnhp.colostate.edu/download/gis/pca_reports.asp ) conflicts with data contained in this assessment.

Specifically, the 2015 list of CNHP Potential Conservation Areas (PCAs) on the RGNF with a very high or outstanding biodiversity rank differs from what is reported in the draft assessment.

According to November 2015 CNHP data, there are two PCAs with outstanding biodiversity significance rankings with lands partially on the RGNF:
**The Half Peak and Great Sand Dunes PCA's.**

There are 16 PCAs with a very highbiodiversity significance rankings that exist all or partially on the RGNF:
- Sheep Mountain in San Juans
- Deep Creek Uplands West
- Miners Creek
- Rat Creek Pond

Rvsd Plan - 00001675

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

- North Creede
- Bellows Creek
- Rio Grande Pyramid
- Groundhog Park
- Hot Creek
- Deadman Creek-Western Sangres
- Cottonwood Creek-Western Sangres
- Spanish Creek
- Dimick Gulch
- Trickle Mountain
- La Manga Creek
- Stony Pass

These CNHP PCAs with outstanding or very high biodiversity rankings must be considered as rare communities and special habitat.
- CNHP PCAs should be considered for designation as special areas.

**The Half Peak CNHP PCA** contains populations of Stonecrop gilia (Gilia sedifolia). This species is globally critically imperiled (G1S1) and described as only known from two locations in the world. *It is a USFS Sensitive Species.*

Another location for this species and habitat which must be considered is **the Sheep Mountain in San Juans CNHP PCA.**

Threats to this species include grazing and off route motorized use, and it has been suggested that **Research Natural Area** status be applied to habitat for this species to ensure protection.
(1) Snowmobile use could impact this plant in both of its locations, and off route ATV use for game retrieval is allowed within the Sheep Mountain habitat location.

**The Rio Grande Pyramid PCA** must be considered.  It is ranked as having very high biodiversity significance due to the presence of the globally imperiled (G5T1t2/S1) Uncompahgre Fritillary Butterfly.

**The Deep Creek Uplands West, Rat Creek Pond, Miner's Creek, North Creede and Bellows Creek CNHP PCAs** must also be considered.  These are all ranked as having very high biodiversity significance due to the presence of Smith whitlow-grass (*Draba smithii*) , which is globally imperiled (G2S2).
This plant is described by CNHP as being only known to occur in four counties in southern Colorado.

Rvsd Plan - 00001676

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

- **We recommend specific consideration be given to the Deep Creek Uplands West, Rat Creek Pond, Miner's Creek areas.**

**The Groundhog Park** very high biodiversity ranked PCA must also be considered due to the presence of Subalpine Riparian Willow Carr (G2G3 S2) fens.

**The Hot Creek PCA** boundaries do not align with the existing **Hot Creek Research Natural Area** boundaries.   Some consideration should be given to lands adjacent to and north of Hot Creek, in order to extend protection for the globally vulnerable (G3/S1) Rio Grande chub (*Gila pandora*), and the globally vulnerable (G3G4/S1) Rio Grande sucker (*Catostomus plebeius*) which inhabit that Creek.

**The Dimick Gulch PCA** must be considered for protection, as it is ranked as having very high biodiversity significance due to occurrence of the globally imperiled (G2G3/S2S3) Narrowleaf Cottonwood - Rocky Mountain juniper (*Populus angustifolia - Juniperus scopulorum*) riparian plant association.

**The Trickle Mountain** very high biodiversity significance **PCA** contains significant areas of USFS land which should be considered for protection.   This site contains numerous globally rare grasslands, plant communities and associated species, including the globally imperiled (G2/S2) Herbacious vegetation Muhlenbergia filiculmis montane grassland.

**The La Manga Pass PCA** is significant as it contains the best occurrence of the globally imperiled (G2G3/S1) Arizona willow (*Salix arizonica*).

*There are additional CNHP identified areas which deserve consideration because they provide habitat for significant species.*

**The Decker Creek PCA** contains areas on RGNF lands which are habitat for Gunnison Sage Grouse (*Centrocercus minimus*), which is critically imperiled on a global scale (G1/S1). This species was listed as a Federally Threatened species in November of 2014.( See 79 Fed Reg 69192 et seq., November 20, 2014).

Colorado Parks and Wildlife GIS data identifies Gunnison Sage Grouse Brood Area and Overall Range habitat on Forest lands in this area.

**The Ojito Creek Uplands and Hicks Canyon PCAs** contains land which is habitat for state imperiled Ripley milkvetch G3S2.  Some of the lands in the Hicks Canyon site are contained in an existing Special Interest Area, and we recommend evaluating this area to determine if the boundary should be expanded.

Rvsd Plan - 00001677

March 18, 2016 QUC, SLVEC, RMRI and RS Comments

*There are numerous streams which provide special habitats for populations of Rio Grande Cutthroat Trout on the forest.*
Some consideration must be given to these habitats, and to the **Middle Fork of San Francisco Creek, Cascade Creek and Osier Creek.**

Although some of the PCAs in the Table 14 on page 40 of this draft assessment report are no longer ranked as having high biodiversity significance, they deserve consideration.

We agree that there are additional special habitat types that deserve conservation consideration, as described **on page 42.** Emphasis should be placed on any riparian or water based area, as these locations have been heavily impacted by human activity, and are underrepresented in protected management prescriptions on the RGNF, especially at lower elevations outside of Wilderness.

We recommend additional habitats which have not been subjected to much livestock grazing and contain few non-native or invasive plant species, such as segments of the **Kelly Creek roadless area**, *also be added to this list.*

*The RGNF contains examples of ecosystems which show little to no evidence of management actions and human presence, and these should be preserved.*

(1) Anderson, D.G. 2004, August 9. Gilia sedifolia Brandeg. (stonecrop gilia): a technical conservation assessment. [Online]. USDA Forest Service, Rocky Mountain Region. Available: http://www.fs.fed.us/r2/projects/scp/assessments/giliasedifolia.pdf accessed February 2016.

(2) Wiedmann, B. P and Bleich, V. C. 2014. Demographic responses of bighorn sheep to recreational activities: A trial of a trail, Wildlife Society Bulletin, 38-4, pages: 773-782.

(3) Snetsinger, S.D. and K. White. 2009. Recreation and Trail Impacts on Wildlife Species of Interest in Mount Spokane State Park. Pacific Biodiversity Institute, Winthrop, Washington. 60 p.

(4) Jordan, m. 2000. Ecological Impacts of Recreational Use of Trails: A Literature Review, The Nature Conservancy, 250 Lawrence Hill Road Cold Spring Harbor, New York.

(5) Thompson, B., 2015. Recreational Trails Reduce the Density of Ground-Dwelling Birds in Protected Areas, Environmental Management, 55-5, 1181.

(6) FEIS Gunnison Basin Federal Lands Travel Management, 2010 pg 124 accessed online via http://www.blm.gov/style/medialib/blm/co/field_offices/gunnison_field_office/travel.Par.53275.File.dat/Final%20EIS%20April%202010.pdf Accessed February 2016

Rvsd Plan - 00001678

Rio Grande National Forest Plan Revision Team
rgnf_forest_plan@fs.fed.us

April 15, 2016

Dear Planning Team,

The following are the comments of the parties listed at the end of this letter on the draft Need For Change (NFC) document. The need to change an existing plan is the first step in developing a revised plan. The 2012 Planning Rule 36 CFR 219.7(a)(2). We appreciate the RGNF making this document available for public comment, and for actively soliciting input from the public on this and other revision topics.

In general, we believe the document captures most of the issues that may need to be addressed in the plan revision, including ones identified by the public during meetings and comments on the draft assessment chapters. We are pleased to see the following items:

  --adaptive management for climate change and fluctuating forest budgets;
  -- develop sustainable management direction for current and future recreation trends;
  --update air quality monitoring forest wide and in wilderness;
  --include management for various areas, including the Continental Divide National Scenic Trail, Old Spanish Trail, and Cumbres and Toltec Historic landmark;
  --evaluate possible new special areas, including those that provide opportunities for connectivity, or that protect plant communities or special habitats vulnerable to climate change;
  --"revisit how managing for multiple uses…affects cultural resources";
  --update oil-gas leasing availability;
  --more efficient wilderness management for those areas with a shared administrative boundary;
  --update management for separation of domestic and bighorn sheep;
  --consider additional management direction for pack goats;
  --address new technology, including renewable energy sting and drones;
  --revisit the off-road game retrieval policy; and
  --prioritize inholdings for acquisition.

As is elaborated below, we hope that all of these issues are addressed in the plan revision.

I. ADDITIONAL REQUIRED ELEMENTS OF PLAN REVISION.  Table A in the NFC document lists "Requirements in the Forest Plan Revision Process". Since the previous revision, new rules mandate that additional requirements be considered in Table A of the Need for Change.

1

Rvsd Plan - 00001679

A. <u>Colorado Roadless Rule</u>. The Colorado Roadless Rule ("CRR"; see 77 Fed Reg 39576 et seq., July 3, 2012) modified policy and management direction for all Colorado national forest roadless areas, including a sizable portion of the RGNF.  Thus the RGNF plan must be modified to comply with the CRR.

Although the Backcountry 3.3 management area prescription includes much of the land within Colorado Roadless areas, there are many Roadless areas which include lands in other management prescription areas.  **Please see Exhibit 1**, which details CRR areas with 1996 RGNF Plan management area designations which are likely inconsistent with the requirements of the CRR.

The revised plan must have standards and guidelines for Colorado Roadless Rule areas that, at a minimum, limit timber harvest and road construction and reconstruction to the narrowly-tailored situations described in the CRR. See 36 CFR 294.42 through 219.46.  Note that the requirements for upper tier roadless areas are more restrictive. Current management area 3.3, Backcountry states, under Desired Conditions:  "No road building occurs within the area", but no standard prohibits road construction. See Plan at IV-17, IV-18.

To fully protect roadless areas, the revised RGNF plan should prohibit logging and road construction altogether in most cases, especially in upper tier areas. The CRR specifically provides, for all Colorado Roadless Areas, that:

> Land management plan components can be more restrictive than this [Rule] …
>
> Nothing in this [Rule] shall prohibit a responsible official from further restricting activities allowed within Colorado Roadless Areas.

36 CFR 294.48(c).

B. <u>Over-snow Vehicle Rule</u>. The Over-snow Vehicle Rule (OSV Rule)[1], which was promulgated in January 2015, changed the management paradigm for over-snow motorized vehicles.  The OSV rule establishes that OSV use is prohibited on national forests except on a designated system of roads, trails, and areas.[2] The rule also requires that the Forest Service locate OSV trails and areas in places with adequate snowfall, and with the objective of minimizing impacts to resources and other existing or potential uses.[3]

---

[1] 80 Fed. Reg. 4500 (Jan. 28, 2015).
[2] 36 CFR 212.1. (OSV areas must be discrete delineated spaces.)
[3] See 36 CFR 212.80, 212.81(a) and (d), 212.55(b), and 261.14. *Also see* Executive Orders 11644 and 11989, and See WildEarth Guardians v. U.S. Forest Serv., 790 F.3d 920, 929-32 (9th Cir. 2015)

2

The current plan is not in compliance with the OSV Rule.  For instance, in the current plan at III-39, Infrastructure-Travelways, Standard 3 states that "[s]now machine use on snow is allowed unless specifically restricted."  Draft Assessment 9, p. 20, confirms that "unrestricted cross country travel by snowmobiles" is allowed everywhere outside designated wilderness.

Public OSV use is prohibited on private land in Colorado, unless the private land owner gives permission to the OSV user in advance, according to Colorado Revised Statute 33-14-113. Snowmobile use on adjacent San Luis Valley Field Office BLM lands is restricted to designated routes in most areas. See BLM, 2008, at 3. Thus restricting OSV use on national forest lands to specifically designated routes and areas, in addition to complying with the OSV Rule, would help ensure consistency with OSV management on adjacent lands.

We recommend a forest wide standard to read "[o]ver snow vehicle use on snow is prohibited unless specifically allowed."

C. Protection of Riparian and Aquatic Resources. The Planning Rule contains new specific direction of protecting riparian areas. See 36 CFR 219.8(a)(3)(i). Some additional plan direction is likely to be needed to fully comply with these requirements Assessments 1 and 3, Ecosystem Integrity, Systems Drivers and Stressors for Aquatic Ecosystems, stated the following:

> there is a need to revise and update the aquatic habitat section of the Forest Plan. …
>
> Examples include the need for additional management direction addressing the importance of stream connectivity and aquatic organism passage programs and their relationship to aquatic habitat resiliency, and incorporating the Aquatic Nuisance Species Plan for the Rio Grande National Forest into plan revision components. Potential mitigation strategies for chytrid fungus and local amphibian species are part of this recommendation. We need additional updates regarding restoration opportunities for native aquatic species and for managing low-elevation riparian systems, seeps and springs; including hummocking and pugging guidelines.

Id. at 32.

Additional objectives, standards, and guidelines should be developed to address these issues. There should also be direction to improve the health and integrity of priority watersheds, as these are watersheds "that are a priority for maintenance or restoration". 36 CFR 219.7(f)(1)(i).

Rvsd Plan - 00001681

D. <u>Presidential Memorandum</u>.  The plan must also apply the direction in a recent Presidential Memorandum on Mitigation.[4] This Memorandum requires that:

> Large-scale plans and analysis inform the identification of areas where development may be most appropriate, where high natural resource values result in the best locations for protection and restoration, or where natural resource values are irreplaceable.

Memorandum, section 1.

It also requires that the Forest Service apply a mitigation framework of *avoid, minimize, and compensate* to all aspects of management and ensure no net loss of important, scarce, or sensitive resources. Id. at sections 2(f), 3, and 4. There is a need for the land management plan to establish a mitigation framework for all development projects that among other things ensures no net loss of important, scarce, or sensitive resources and provides a menu of possible mitigation measures that provide durability and address climate change.[5]

The current plan does include plan components that together meet all of these requirements. While it does zone the forest for various uses, it does not identify irreplaceable natural resources subject to the avoidance requirement, or important, scarce, or sensitive resources that are subject to the no net loss requirement.

II. <u>TRAVEL MANAGEMENT</u>.  We recognize that some of the details of travel management are best done in a separate process after the plan is finalized. For example, analysis of, and decisions for, specific routes need to be done after the forest plan is complete because it would take too long to finish the plan if it included this. However, the revised forest plan must provide some direction on travel management to provide the basis for a travel management plan to be done later. The forest plan will need to prescribe some limitations on human use, including limits on motor vehicle use, in order to ensure sufficient protection of resources.

---

[4] Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, section 1. Issued November 3, 2015. *Available at* https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resources-development-and-encouraging-related

[5] For example, projects requiring temporary or permanent road-building that impact places with important, scarce, or sensitive resources should include the decommissioning of unneeded roads elsewhere, focusing on places where road removal would enhance important, scarce, or sensitive resources (e.g., in roadless areas, critical habitat, wildlife corridors).

4

The current forest plan also needs to be revised to meet new authorities related to travel management, including: 1) the planning rule's requirements to ensure sustainable recreation, including sustainable settings and access[6], ensure ecological integrity of terrestrial and aquatic ecosystems, maintain diversity and provide for connectivity[7]; and 2) the 2005 Travel Management Rule as specified in 36 CFR parts 212, 251 and 261, and the Forest Service Manual 7700. The 2005 Travel Management Rule requires that wheeled off-road vehicles be restricted to a system of designated trails, roads, and areas, and that exceptions for the purposes of retrieving game or dispersed camping are to be used sparingly[8] and limited to driving defined distances off specific road/trail segments.  Moreover, the Rule requires that off-road vehicle trails and areas must be located to minimize impacts to resources and other existing or potential uses.

The current plan direction on travel management is inadequate to ensure compliance with these authorities. For example, in the current plan at III-39, Infrastructure-Travelways, Standards 1, 2 and 3 must be modified to conform to current regulations.

We recommend the following modifications:
- The word "Travelways" should not be used.  36 CFR 212.1 and FSM 7705 contain the correct terms and definitions for routes on the forest.
- Standard 1 should be modified to include exceptions to use of closed routes and areas as defined in 36 CFR 261.13.
- In Standard 2, the phrase 'Designated travelways, as displayed on the Rio Grande National Forest Visitor Map" must be changed to "Designated routes, as displayed on Rio Grande National Forest Motor Vehicle Use Maps" or something similar.
- Standard 2 states that "newly constructed travelways are open to motorized-vehicle use unless a documented decision shows that…".  This must be modified, as newly constructed routes should not necessarily be added to the designated transportation system and/or be open for motorized-vehicle use if they are temporary routes, an approved and designated non-motorized trail, etc.  We recommend modification of the wording in this section to state "newly constructed routes are closed to motor vehicle use unless a documented decision shows that…".  This better matches the general direction of the 2005 Travel Management Rule indicating that routes and areas on forest service lands

[6] 36 CFR 219.10(b)(2) (plan components, including standards and guidelines, must provide for sustainable recreation)
[7] 36 CFR § 219.8(a)(1)-(3); *see also id.* § 219.9(a) and §219.8(a)(1) & (a)(3)(i).
[8] *See* 70 Fed. Reg. **68285** (November 9, 2005) ("The Department expects the Forest Service to apply this provision sparingly, on a local or State-wide basis, to avoid undermining the purposes of the final rule and to promote consistency in implementation. "*See also* Letter from the Chief of the Forest Service dated June 8, 2006 ("[Exceptions] represent site-specific decisions associated with specific roads and trails or road and trail segments, rather than a blanket exception to the rule.  Designations under 36 CFR 212.51(b) will be applied sparingly to avoid undermining the purposes of the rule and to promote consistency in implementation.")

Rvsd Plan - 00001683

are closed unless opened. A decision on whether to open any new roads to motor vehicle use must consider all the factors in 36 CFR 212.55.

At a minimum, there must be some direction in management areas on whether motor vehicle use is allowed, and if so, at what time of year, and by what class of vehicle. The plan must also restrict OSVs to designated routes and areas, as is discussed above.

We recommend that the plan contain language restricting mechanized travel to designated routes. This would ensure consistency with regulations on adjacent San Luis Valley BLM and Gunnison National Forest lands; better align with national trends in management of this use; help the forest in providing better, safer, and more sustainable routes to accommodate this use; assist with the identification and management of lands which may qualify or be recommended for Wilderness; and help the forest better manage this type of use. Note that the White River National Forest restricted mechanized travel to designated routes in their recent plan revisions.[9]


III. <u>WILD RIVER ELIGIBILITY</u>.  Item A3 states:  "Identify and evaluate lands that may be suitable for inclusion in the Wild and Scenic Rivers System". We are concerned about Saguache Creek, which we believe has been improperly managed as a Scenic River when it was evaluated to be a potential Wild River.

Saguache Creek was specifically identified as an eligible wild river in the 1996 Forest Plan. Plan at IV-8, Plan FEIS at 3-363.  Eligible wild rivers are supposed to be managed as area 1.5 (National River System, Wild Rivers Designated and Eligible) in the plan, under which restrictions on management and public uses are stronger than those for scenic and recreational rivers.

Additional eligible wild rivers identified in the plan include:  North Fork Conejos River, Middle Fork Conejos River, El Rito Azul, Toltec and Hansen Creek. Plan, ibid. All of these other 5 river segments appear to be included in the 1.5 management prescription area.

It is likely the plan was referring to the 7 mile stretch of Saguache Creek from FSR 675.3P to the national forest/private land boundary to the northeast.  However, this section is shown on the plan's management area map as having a 3.4 management area prescription, that for scenic rivers, designated and eligible.

---

[9] See White River National Forest Land and Resource Management Plan, Standard 4 *in* Travel System Infrastructure, Page 2-39.  "On lands that are snow-free, prohibit motorized and mechanized travel outside of designated travelways…". Exceptions are allowed for administration, emergency, law enforcement, and special use contract and permits.

Rvsd Plan - 00001684

GIS information identifies this seven mile stretch of Saguache Creek as a Designated and Eligible Scenic River management prescription area (2239 acres, half mile wide corridor, management area 3.4). However, the current plan at IV-19 does not specifically list Saguache Creek as an eligible scenic river.

We believe this erroneously applied management prescription has influenced additional management direction for this area. For example, this management corridor was not considered upper tier roadless in the 2012 CRR, in contrast to the remainder of the Fourmile Creek Roadless area. See CRR FEIS Map 4: Alternative 2 – Colorado Roadless Areas Upper Tier Acres. The Saguache Creek corridor is not being managed consistently with Eligible Wild River direction with regards to ATV game retrieval, oil and gas leasing, ROS, etc.

We do not understand why Saguache Creek is being managed under a 3.4 Eligible Scenic River management prescription area instead of a 1.5 Eligible Wild River management prescription area. This must be corrected in the revised forest plan.


IV. <u>MANAGEMENT AREAS</u>.  We are very concerned with the following item:

B 2: **Re-evaluate the number, arrangement, boundaries, and plan direction related to the current forest plan management areas to minimize complexity and maximize ecosystem integrity and connectivity**.

Re-evaluating these areas and their boundaries is generally appropriate and desirable during a plan revision. However, "re-evaluate" apparently means "reduce", as is emphasized in slide 9 of the Need For Change presentation. The narration on this slide states that Supervisor Dallas

> would like to broaden what is covered in management areas thus significantly reducing the number of different management areas.

Seventeen management areas (MAs) were used in the current plan (See Forest Plan, Chapter IV), not 43, as suggested during the March 30 webinar. This does not seem to us like a large number of MAs for 1,852,000 acres.[10] This is much less than some plans have used – e. g., the 2002 revision of the White River NF plan used 32 MAs. We must remember that forest planning is inherently a complex undertaking because it provides, or is supposed to provide, a foundation for all the projects and activities that could occur on the respective planning unit over the life of the plan, while still protecting the land and resources. To ensure that the respective national forest is properly protected, appropriate uses are allowed with needed limitations, and issues concerning forest management are addressed, a good number of MAs will likely be needed.

---

[10] This is the RGNF acreage stated at p. P-9 of the current plan.

Rvsd Plan - 00001685

The number of MAs should be influenced by requirements to maintain or restore ecosystem integrity of inherently complex natural systems. Minimizing complexity does not equate to or necessarily lead to maximizing ecosystem integrity and connectivity. The RGNF should also consider the designation of management areas holistically, as a spatial design that provides for sustainability and helps recover federally endangered and threatened species, conserves species that are proposed for listing or candidates for listing under the ESA, maintains the viability of species of conservation concern, and supports the persistence of most native species in the plan area.

The current menu of MAs allows application of appropriate desired conditions, standards, and guidelines to fit many different situations, from areas needing strong limits on activities (e. g., proposed and existing wilderness and wild rivers), to areas where more intensive development (ski areas) may occur. For example, the management areas for Bighorn Sheep 5.42 capture important habitat for this species, as identified by Colorado Parks and Wildlife 2014-14 GIS data, almost precisely.

The danger in simplifying management by consolidating the MAs is that more activity would be allowed under each MA, reducing the likelihood that limitations on human uses and protection needed for various resources would be applied. In other words, areas needing a specific focus for proper management might not receive it.

A simplified roster of MAs might not help the public better understand national forest management. If more activities were allowed under the MAs, a member of the public might not be able to get a concrete idea of what activities would occur on any part of the RGNF s/he wished to visit.

We recommend retaining the three separate wilderness management area prescriptions of Pristine 1.11, Primitive 1.12 and Semi-primitive 1.13. These areas are likely the easiest to manage, and include important distinctions regarding commercial outfitter/guide camps, campsite condition classes, trails, and managing human use impacts. Wilderness is a unique designation, and it may need detailed management ensure that recreational and other values are protected.

The three separate wild, scenic and recreational river management areas must be retained as they each have distinct restrictions on human use and associated management, as prescribed in the Wild and Scenic Rivers Act. See 16 U.S.C. 1273(b).

It may be tempting to combine Research Natural Areas, Special Interest Areas and other designations such as National Trails into one Designated Area management category. However,

Rvsd Plan - 00001686

it would be difficult to adequately capture the unique management requirements, including standards and guidelines that are needed for each of these types of areas in one management category.

We could likely support a reevaluation of management areas in order to maximize ecosystem integrity and connectivity. Changes that consider wildlife linkages, ecological processes and relationships, and biological diversity could help ensure resilience and adaptability to climate change and other variables. However, we do not see this as likely leading to a reduction of the number of MAs needed for protection of resources and appropriate management.

In general, we feel strongly that the number of MAs used in the revised plan should be based on what is needed to guide future management and use of the forest by the agency and public, and on what protective measures are needed. The agency should not assume that the number of MAs used in the revised plan can or should be reduced before the need for management is fully assessed. If the available MAs are reduced, the current categories should at least be retained. That would still allow a good range of MAs to be used as needed.

V. <u>WILDLIFE HABITAT CONNECTIVITY</u>.  We are pleased that the RGNF included three need for change statements related to connectivity (B2, B5, and C6). We request that the RGNF add a statement that more affirmatively addresses the need to establish plan direction for restoring and maintaining connectivity to ensure the opportunity for species movement across the landscape. The current plan has an objective to "[m]anage wildlife habitat at the appropriate scale…to maintain the ability of species to disperse over large areas". Plan at II-2.

However, given that much more is known today about wildlife movement and the importance of such in a climate change world[11], there is a need to provide more explicit direction. We request that the RGNF include the need for wildlife corridors in order to provide for connectivity in the forest plan. We believe corridors are a good method for ensuring the plan complies with the planning rule's requirement to maintain and restore connectivity.  (See 36 CFR 219.8(a)(1) and 219.9(a)(1).  To this end, we offer the following the need for change statement:

> There is a need to revise the current plan to include direction for managing towards terrestrial, riparian, and aquatic habitat connectivity for species movement across the landscape, both within and beyond the RGNF. Plan management approaches should include, but not be limited to, establishing and maintaining wildlife corridors in and between areas of intact habitat.

---

[11] See comments submitted by The Wilderness Society, Defenders of Wildlife, and the Center for Large Landscape Conservation on Assessment Chapter 15 dated Feb. 9, 2016.

Rvsd Plan - 00001687

VI. <u>MANY OF THE "DESIRED" CHANGES NEED TO BE ADDRESSED</u>.  We believe that the majority of the identified needs for change should be addressed in the plan revision, as is further detailed below. Since the forest plan guides almost all projects and activities that will occur on the RGNF over the plan's life (by law up to 15 years), all issues that affect more than just a local area should be addressed in the revised plan.

However, it appears that this will not be the case for the RGNF. The fourth category of needs for change, section D of the NFC Document, "Desired Changes Identified Through the Assessment Phase", will not be addressed in the revised plan because the Forest Supervisor "believes they are best analyzed at a different level (e.g., project level, travel management plan, etc.)". RGNF Need For Change Powerpoint, Slide 4.

We believe the following desired changes from Table D need to be addressed in the revision, as described below. Note that the "basis for change" for these items includes identification in various assessments and "identification by the public", as well as "internal staff recommendations". By failing to include any of these items in the revision, the RGNF would ignore input by the public and from its own staff recommendations. It is not acceptable that the RGNF proposes to ignore these issues in the plan revision.

D 2: **Revisit the oil and gas Leasing Available Analysis completed for the 1996 Forest Plan**. The previous analysis for oil and gas leasing availability was done with the current forest plan, which was issued in 1997. Since that time, hydraulic fracturing ("fracking") has become common, as has horizontal drilling, where oil and gas deposits up to about a mile away can be reached. The net result of these and other technological advances is that many places possibly containing oil and/or gas that were previously unreachable can now be drilled, and the oil and gas therein extracted.

Oil and gas operations affect many resources:  wildlife habitat, water quality, air quality, scenery, livestock grazing, etc. The potential impacts of oil and gas operations, under the reasonably foreseeable development scenario[12], need to be disclosed at the same time as impacts from other projects and activities so that mitigation measures can be incorporated into the revised forest plan to minimize impacts from possible oil and gas development and from cumulative impacts. Failing to include oil and gas direction in the plan would reduce the ability of the RGNF to fully address cumulative impacts.

Note that under the CEQ Regulations implementing NEPA:

---

[12] See 36 CFR 228.102(c)(4).

Rvsd Plan - 00001688

Federal agencies shall to the fullest extent possible: …

 (c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

40 CFR 1500.2. Analyzing leasing availability is required by regulation (see 36 CFR 228 Subpart E), just as forest plans are required (36 CFR 219). That is, both are "agency practice[s]".

The fact that oil and gas prices are currently low, meaning there is less likely to be interest in exploration and drilling, should not deter the Forest Service from analyzing leasing availability. The prices could increase, and likely will do so during the life of the revised forest plan. We remind the Forest Service that in March 2008, the Bureau of Land Management, with the approval of the Forest Service, offered for lease sale an unprecedented 140,000 acres on the RGNF. These proposed leases were deferred, but the fact that they were offered at all is an indication of the broad scope of possible oil and gas development on the RGNF.

It is better to do the analysis and determine which lands are available for leasing now, before there is a great deal of interest and pressure to approve leases. That way, industry has a better idea where it will and will not be able to operate.

If the oil-gas leasing analysis will not be done as part of the plan, the plan must say when it will be done.


**D 3: More efficiently manage wilderness areas across administrative boundaries shared with adjacent forests, and better incorporate the 1993 Colorado Wilderness Act and language specifically regarding Wheeler Geologic Area.** The Forest Service should ensure consistent management of wilderness and other areas that span administrative boundaries.  This is important for the Sangre de Cristo wilderness because of the issue of pack goats, as is discussed further below.


**D 6: Revisit how managing for multiple uses on the forest affects cultural resources.**
**D 7: Evaluate additional protection of two critically significant areas, Mt. Blanca Massif and the Natural Arch, while maintaining motorized access.**
**D 8: Consider additional management direction for recreational climbing in relation to sensitive heritage resources and habitat like peregrine falcon nests.**

Rvsd Plan - 00001689

Heavy or abusive recreational use can threaten the integrity of cultural resources. Draft Assessment 13 notes damage to cultural resources from livestock grazing and illegal roads. Id. at 14. It also notes that cultural resources have been discovered inside project boundaries. Ibid. Given that most of the Forest has not been evaluated for cultural resources (id. at 18), permitted activities are likely having a negative impact on those resources.

The Forest Plan is a good place for management direction to prevent, minimize, and mitigate damage to cultural resources. Protecting cultural resources could be addressed through forest-wide standards and guidelines and/or management prescriptions. Direction is needed to ensure a timely management response when new cultural resources are discovered or are being impacted.

Similar measures may be needed to eliminate conflicts between recreational climbing versus peregrine falcon nesting and/or other wildlife needs, if such conflicts now occur or are expected to occur during the life of the plan.

There are numerous permitted dispersed recreational activities which are likely having an adverse impact on cultural resources, sensitive habitat, and other resources. These activities include:  climbing, off road game retrieval, off route OSV use, off route mechanized travel, off route travel using motorized vehicles for the purpose of dispersed camping, firewood collection, recreational shooting, etc.  We recommend that the forest plan include additional direction regarding management of dispersed recreation, including its appropriateness in certain areas. This will be necessary to fulfill Need For Change item A9:  "[d]evelop sustainable management direction for current and future recreation trends". Recreation that persistently causes adverse impacts to resources is <u>not</u> sustainable.


D 9: **Update management direction to maintain separation between bighorn and domestic sheep**.
D 10: **Additional management direction regarding recreational pack goats on the Rio Grande National Forest**.

Interactions between domestic and bighorn sheep are known to transmit disease to the latter. As a result of this and other problems, bighorn sheep populations all over Colorado have declined, and periodic die-offs still occur, primarily due to disease, which "is widely believed to be the most significant threat facing bighorns in Region 2 and elsewhere across their range". Beecham et al, 2007, at 4.  All four bighorn herds on or partially residing on the RGNF have been exposed to domestic sheep. Id. at 49, 53.[13]

---

[13] The RGNF claims to lack information on bighorn sheep movements "particularly in relationship to domestic sheep allotments". Draft Assessment 8 at 18. However, the Beecham et el study, though not up to date, provides some relevant information.

Rvsd Plan - 00001690

Since all four herds have been exposed to diseases from domestic sheep, we believe some forest plan direction is needed to ensure viability of bighorn herds by requiring separation of bighorn and domestic sheep. There may be differences between each area where domestic and bighorn sheep interact, but some objectives, standards, and guidelines should apply to all four areas. The 2012 and 2013 Monitoring and Evaluation Reports both recommended that the plan have "a standard for effective separation" of domestic and bighorn sheep. Pages 38 and 46, respectively. Draft Assessment 8 at p. 3 recognizes the continuing issue of the need for separation.

If the RGNF will rely on existing direction, that direction must be referenced in the plan, and made available to the public during or before the comment period on the DEIS. Its effectiveness in maintaining separation and helping ensure viability of bighorn sheep herds must be analyzed in the EIS.

The 2013 revision of the plan for the San Juan National Forest has the following standards for bighorn sheep protection:

> 2.3.39 Bighorn Sheep (Ovis canadensis): During project-level planning on domestic sheep (O. aries) allotments, management options must be developed to prevent physical contact between domestic sheep and bighorn sheep. Actions may include but are not limited to boundary modification, livestock-type conversion, or allotment closures.

> 2.3.40 Bighorn Sheep: Grazing permit administration in occupied bighorn sheep habitat must utilize measures to prevent physical contact between domestic sheep and bighorn sheep. Permit administration actions may include but are not limited to use of guard dogs, grazing rotation adjustments, or relocation of salting and bed grounds.

> 2.3.41 Bighorn Sheep: Management of recreational pack goats and other domestic goats (Capra aegagrus hircus) must utilize measures to prevent physical contact with bighorn sheep.

> 2.3.42 Bighorn Sheep: Domestic goats used for invasive plant control must be veterinarian certified as free of pathogens transmissible to bighorn sheep, except in areas where there is no risk of contact with bighorn sheep.

San Juan Plan at 39. Since the San Juan NF is adjacent to the RGNF, adopting these measures would ensure consistency of management between the two national forests.

13

Assessment 8 states, at p. 18, that the Forest Service "lack[s] information pertaining to recreational pack goat use". The 2013 Monitoring and Evaluation Report states that use of pack goats in the Sangre de Cristo Wilderness should be discussed with the Pike-San Isabel NF and be addressed in the RGNF plan revision. Id. at 46, 47.

Thus the plan revision would be a good time and place to develop policy and management direction to address the issue of potential disease transmission from goats to bighorn sheep, and any other issues regarding goats. Standard 2.3.41 from the San Juan Plan or a similar measure should be included in the RGNF revised plan.


**D 13: Revisit the off-road game retrieval policy on the Rio Grande National Forest**. The policy allowing off-road use of all-terrain vehicles to retrieve game killed by hunters can be easily abused. It has the effect of ratifying off-route use of motor vehicles at all times, making it harder to enforce prohibitions against such use outside of hunting seasons. Vehicles can be used in attempts to find game as opposed to just retrieving game already killed. Such abuse reduces hunting success and diminishes the experience of hunting. Since most off-road ATV use for hunting occurs during big game rifle season, soils are often wet from snowmelt, and the use of motor vehicles will damage them.

We believe that the consideration of this policy is programmatic and should thus be included in the Forest Plan. Currently, game retrieval is permitted in many locations forest wide.  The specific locations where game retrieval is allowed or prohibited are defined by the boundaries of specific management prescription areas.   Modification of the boundaries of these areas are may impact the appropriateness of off-route game retrieval in those areas.   As stated elsewhere, we believe the management prescription area boundaries on the forest must be modified to coincide with direction for Colorado Roadless Area boundaries and other new rules, and this could impact game retrieval.

The current forest plan contains the following statement regarding game retrieval:  "Game retrieval is authorized using ATVs from noon to 5:00 pm (1200 -1700) each day, unless soil and water damage will occur".  This is included as language associated with some management prescription areas which permit this activity.  See, e. g., management area 5.11, Guideline 6, at Plan p. IV-29, 30. If nothing else, there is a need for change regarding this language. For example, the definition of "damage", and damage to "water" especially, is not defined or clear.

Off road game retrieval has many other concerns and potential negative impacts which need to be considered. They are detailed in the attached Exhibit 2.

14

Rvsd Plan - 00001692

<u>We believe that the entire game retrieval policy must be revisited in the revision</u>. Since the areas where this activity is or is not permitted is linked to the forest plan, the best place to reconsider this policy is as part of the plan revision process. Most national forests, including those in Colorado[14], have eliminated or strictly limited off-road motorized travel for the purposes of game retrieval because it is widely recognized that its allowance has caused resource damage and conflict, and impedes enforcement of the restrictions depicted on Motor Vehicle Use Maps.

If ATV use for game retrieval will still be allowed, the plan must provide sideboards to guide future site-specific management per the requirements in the 2005 planning rule at 36 CFR 212.51(b).[15] While some details might have to later be described in travel management, the plan should contain some direction, e. g., limiting the distance vehicles can travel off road to retrieve game and the types of areas where such use will be allowed and under what conditions. This use must be prohibited altogether in some areas, such as RNAs, areas recommended for wilderness designation, and roadless areas.

If this policy is not revisited as part of the forest plan revision process, we recommend that the plan include specific language stating that it will be revisited and also when this will occur.


**D 14: Revise the communication sites identified in the current forest plan (and the approval policy), considering internal needs, potential changes in technology, and future needs of the public**. Forest plans have long designated sites where communications facilities and other infrastructure can be located, and we do not see why this should not continue. Some areas should not have communication sites, such as roadless areas, bighorn sheep habitat, and areas where major road construction or reconstruction would be needed.


**D 15: Address new technology, including the use of drones on the forest, as well as alternative energy sites and fiber optic**. Given the emphasis on renewable energy, the Forest Service may receive requests for siting wind turbine towers and solar energy facilities. The plan must show where such facilities can be located and where they cannot be located, and/or provide standards and guidelines for determining proper locations.

---

[14] For instance, *see* White River National Forest Land and Resource Management Plan, Standard 5 *in* Travel System Infrastructure, Page 2-39.

[15] "In designating routes, the responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain forest roads or trails where motor vehicle use is allowed, and if appropriate within specified time periods, solely for the purposes of dispersed camping or retrieval of a downed big game animal by an individual who has legally taken that animal."

Rvsd Plan - 00001693

Recreational use of drones has become very popular. The possibility of problems with such use has thus increased. These problems include: disruption of camping; degradation of the recreational experience, especially in wilderness and other primitive areas; and harassment of wildlife.

Even though the Federal Aviation Administration controls use of airspace, the Forest Service should have some jurisdiction over use of drones on national forest lands, e. g., being able to prohibit launch and landing of such vehicles in some areas. In any case, the issue cannot be ignored. The Forest Service should use whatever authority it does have to limit use of drones so that problems with use do not get out of control. At a minimum, recreational drones should be banned entirely from airspace over wilderness areas, as the use of machines like drones is clearly antithetical to the spirit of wilderness, and is detrimental to wildlife and the human experience of wilderness. Drones should also be banned from any RNAs and special areas that are designated to protect wildlife.

**D 18: Prioritize acquisition of inholdings appropriate for the management and continuity of forest land and collaborate more effectively with other private, state, and federal land owners of lands that border the forest**. With forest-wide analyses being conducted for the revised plan and accompanying EIS, needs for land acquisition will be identified. This it makes sense that the plan would prioritize inholdings for acquisition. This cannot be done at the project level, because only one or a small number of parcels would be examined, as opposed to looking a need for acquisition forest-wide.

**D19: Update plan direction for the removal of common mineral materials, such as commercial contracts, personal, ceremonial, and free use permits**. Recreational, or "hobby", mining is becoming quite popular. Local damage to soils and water quality can occur. The revised plan should contain direction for this activity, including: limits on motor vehicle use; limits on how much material can be removed each day, week, or year; limits regarding where this activity may occur so that it does not compromise infrastructure, facilities, public health and safety or sensitive habitats; and permitting requirements. In addition, the plan should guide where and how the Forest Service can remove mineral materials for administrative purposes.

See further discussion of this issue in our comments on Draft Assessment 10.

VII. UNDERLINE COMMENTS ON OTHER NEEDS FOR CHANGE

Rvsd Plan - 00001694

B 3:   We agree with, and support, needed changes that would allow for more adaptive management related to climate change and forest budget fluctuations.  Adaptive management will be needed to respond to climate change. The use of adaptive management as a response to other variables should be used cautiously.

B 4:   Local economies, markets and partnerships should only be considered as tools to meet desired conditions. They should not be the driving force behind the development or modification of desired conditions.

B 5:  We agree there needs to be infrastructure for sustainable recreation, but how would "infrastructure" support connectivity? Ensuring connectivity needs to be a focus of the revision, as is discussed above, but the presence of infrastructure, e. g., roads and any other structures that attracts human use, reduces the effectiveness of connectivity.

C 5:   We agree with the need to provide management direction for trails that have been designated since the previous revision.  These designations require management direction to ensure protection of the values for which they have been designated. They may require special areas or separate management areas, especially for Continental Divide National Scenic Trail corridor.

C 6:   We agree that there is a need to evaluate additional areas for special designation for the resources listed.  We believe there is also an opportunity to evaluate special designations for geologic, historic, and scenic values, and recommend these words be specifically added to this need for change.

The RGNF should consider two prescriptions for SIAs:  1) for areas needing more protection from human use, use 2.1, SIA – Minimal Use and Interpretation;  and 2) for areas where more human use is acceptable and can be managed, use 3.1, SIA, Emphasis on Use and Interpretation.

The current plan at IV-16 states a standard for special interest areas (SIAs) that the recreational opportunity spectrum class is semi-primitive motorized.  If only one MA is used for SIAs, this will need to be changed in order to protect the unique values of some specific SIAs. Clearly, motorized use could make it more difficult to protect important values, such as cultural resources, in some SIAs.

The two areas mentioned in D 7, the Mt. Blanca Massif and the Natural Arch, should be considered for special area designation. The location and type of motorized access to these areas must be evaluated if they are proposed for any designation.  See more detailed discussion in the comments on Draft Assessment 12 submitted by San Luis Valley Ecosystem Council et al.

17

Rvsd Plan - 00001695

C 7:  reducing the size of the Fremont Special Interest Area must be done cautiously, if at all. When this area was created, the Forest Service may have erred on the side of caution by including all land areas which it felt might possibly include some of the historic camps, because the exact locations of all the camps were not known at the time.  If not done already, the forest should conduct research and field work to more accurately determine the camp locations.

From this information, appropriate boundaries for this SIA can be drawn. They should include a buffer around the actual camp sites to better ensure protection of the sites.  Other values within this SIA, such as the Deep Creek/Boot Mountain Roadless area, a Colorado Parks and Wildlife identified elk production area, and modeled lynx denning and other habitat must be considered. Any acreage removed from the SIA must not automatically be added to the timber base, as was suggested in Draft Assessment 13 at p. 11. Areas within 400 vertical feet of timberline should not be available for timber cutting, if it is allowed at all.

Any timber cutting should be restricted to within 0.25 miles of FR 650.

D 4:  While the RGNF should certainly consider the local economy and vitality of the surrounding area, we do not believe that there is a need to specifically include direction to develop and maintain sustainable enterprises as part of the Forest Plan. The development and maintenance of such enterprises should not be a responsibility of the RGNF.

D16:  We agree with your position that this need can be met through application of the existing Minimum Tool process.

Adjust livestock grazing standards and guidelines as needed.  Assessment 1, 3 (terrestrial) states:

> …we have standards and guidelines in the current Forest Plan regarding the timing, amount, and regulation of livestock grazing. We need to evaluate and potentially adjust these standards and guidelines based on monitoring data. This is particularly true for low elevation riparian areas, which are especially vulnerable to climate change impacts.

Id. at 5.

18

Rvsd Plan - 00001696

The 2013 Forest Plan Monitoring and Evaluation Report questions whether the "current range utilization standard provides adequate protection for riparian habitat attributes for wildlife". Id. at 13.

IX. FORMULATE A REASONABLE NUMBER OF ALTERNATIVES FOR THE PLAN REVISION EIS. This is technically not a need for change topic, but we address it here because of the issue raised recently. We are concerned about the statements made during the March 30 webinar that the Forest Service would try to have as few alternatives as possible in the EIS for the Forest Plan revision. The thinking apparently is that upfront public participation will lead to resolution of conflicts on some issues, reducing the need for EIS alternatives.

RGNF personnel referenced the planning rule and directives as supporting this goal. However, we do not find anything in the planning rule or Directives that recommends, or even mentions, reducing the number of EIS alternatives. We also find no mention of having a the lowest number of alternatives in the recently published draft of "A Citizens Guide to Forest Planning", which was assembled by the Planning Rule Implementation FACA Committee, and is available at: http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd494137.pdf

The following provision of the planning rule could be mis-extrapolated and misinterpreted to encourage fewer alternatives. The Forest Service must review the planning and land use policies of Native American tribes, other federal agencies, and state and local governments. Results of the review must be included in the plan revision EIS and shall consider: ...

(iv) Opportunities to resolve or reduce conflicts, within the context of developing the plan's desired conditions or objectives.

219.4(b)(2). This says nothing about reducing the number of alternatives considered, and it only applies to a review of policies of other government agencies, not concerns expressed by the general public.

Note that the Council on Environmental Quality regulations implementing the National Environmental Policy Act state that: "agencies shall – rigorously explore and objectively evaluate all reasonable alternatives". 40 CFR 1502.4(a). This regulation applies to forest plans just as it does to projects and activities proposed for implementation under them.

Alternatives may be even more important for plans than they are for projects because the plans provide the basis for potential approval and implementation of a great many projects over the life of a plan. How many of what type of projects and where they would be located depends on the

19

Rvsd Plan - 00001697

theme and emphasis of a plan. Therefore, it is important to have a variety of possible themes for a plan, in the form of EIS alternatives.

NEPA and its implementing regulations do not prescribe a set number of alternatives. However, CEQ guidance requires that "a reasonable number of [alternatives], covering the <u>full spectrum</u> of alternatives, must be analyzed and compared in the EIS". Questions and Answers About the NEPA Regulations, 46 Fed Reg 18026, March 23, 1981; emphasis original.

The undersigned certainly support "upfront" public participation. Indeed, this continues to occur in the revision process for the Rio Grande plan, and we commend the agency for how it has conducted the process so far. But it remains to be seen if this results in resolution of a significant number of potential conflicts.

History suggests it will not do so. Almost every national forest management plan now in existence has been developed with extensive public participation, but still had strong conflicts, e. g, those between:  logging and conservation interests, livestock grazing versus biodiversity protection advocates, water users and river protection advocates, and motorized and non-motorized recreationists. Since forest plans are inherently complicated and controversial, it is important that the analysis include all points of view on how a respective national forest unit should be managed.

We urge the Forest Service to not prematurely attempt to limit the number of alternatives, especially not before scoping has even begun, but rather to commit itself to developing an adequate range of reasonable alternatives as prescribed by NEPA's implementing regulations. We believe that a reasonable number of action alternatives will be necessary to cover the full range of themes of management for the RGNF.


CONCLUSION.  We appreciate this opportunity to comment on the need for change. Since forest plan revisions occur only once every 15 years or more, it is important that each revision address the full range of issues that are relevant to the respective national forest unit. Regulations enacted since the previous revision must be incorporated into the new revision. The number of management areas used must be commensurate with the need to address management issues and protect the land and its resources.

Alternatives formulated for the EIS accompanying the plan revision must reflect the full spectrum of public opinion on how a national forest should be managed and protected.

As always, we are happy to further discuss our concerns with the planning team.

20

Sincerely,


Rocky Smith, Forest Management Analyst and Consultant
1030 Pearl St. #9
Denver, CO 80203
303 839-5900
2rockwsmith@gmail.com

Christine Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
Info@slvec.org

Tom Sobal, Director
Quiet Use Coalition
POB 1452
Salida, CO  81201
719 539-4112
quietuse@gmail.com

Roz McClellan
1567 Twin Sisters Rd.
Nederland,  CO  80466
303 447-9409
mcclelr@colorado.edu

Alison Gallensky, GIS and IT Director
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver CO 80202
(303) 454-3345
alison@rockymountainwild.org

John R. Mellgren, Staff Attorney
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

21

Miller Creek---Deer and Elk Winter range

Butterfly--- Deer and Elk Winter range

Dorsey Creek---General Forest and Intermingled Rangelands

Ute Pass--- Special Wildlife Areas- Bighorn Sheep

Lake Fork---Forest Products, General Forest and Intermingled Rangelands

Deep Creek/Boot Mountain---Grassland Resource Production

La Garita--- Special Wildlife Areas-Bighorn Sheep, Forest Products

Lower East Bellows--- Deer and Elk Winter range

Bristol Head---General Forest and Intermingled Rangelands

Kitty Creek---Forest Products

Gibbs Creek---Dispersed Recreation

Sulphur Tunnel---Forest Products

Pole Mountain/Finger Mesa---Dispersed Recreation, Forest Products

Beaver Mountain--- Deer and Elk Winter range

Bennet Mountain / Blowout / Willow Creek / Lion Point / Greenie Mountain--- Special Wildlife Areas-Bighorn Sheep, Grassland Resource Production

Alamosa River--- Special Wildlife Areas-Bighorn Sheep

Wightman Fork / Upper Burro---Forest Products

Willow Mountain--- Designated and Eligible Recreation Rivers

Conejos River / Lake Fork--- Designated and Eligible Recreation Rivers

23

Spectacle Lake---Dispersed Recreation

Fox Creek--- Special Wildlife Areas-Bighorn Sheep

Cumbres--- Special Wildlife Areas-Bighorn Sheep

Chama Basin--- Designated and Eligible Recreation Rivers

Spruce Hole / Sheep Creek--- Special Wildlife Areas-Bighorn Sheep

## EXHIBIT 2
### DETAILED CONCERNS WITH THE POLICY OF ALLOWING OFF-ROUTE MOTORIZED USE FOR GAME RETRIEVAL DURING HUNTING SEASONS.

### Why The RGNF Game Retrieval Policy Is Problematic
* = more information below

1. *It is a confusing and misunderstood policy.
   --Only allows low pressure tire all-terrain vehicles (ATVs), but not motorcycles, 4WD vehicles greater than 50" wide (utility task vehicles - UTVs) or licensed vehicles
   --Only allowed noon to 5 (not before or after)
   --Only allowed in certain areas (These areas are depicted on the motor vehicle use map (MVUM), but the boundaries are not marked on the ground and not always associated with terrain features.)
   --Only allowed if no soil or water or vegetation damage allowed (damage is not clearly defined.)
   --*Public messaging is not consistent. (Is it water or vegetation or land damage?)

2. Perpetuates the belief that it is acceptable to use a motor vehicle off route; and that this use is not damaging and has no impacts.

3. Gives big game hunters special preferences when compared to other recreationists, and can thus lead to conflicts.

4. Gives hunters retrieving game on the Rio Grande Nat. Forest special preferences when compared to other hunters in Colorado. (*Are hunters on the Rio Grande different than hunters on adjacent public lands?)

5. *Is not consistent with management of adjacent BLM or other national forest lands.

24

Rvsd Plan - 00001702

6. Soil, water, land or vegetation damage are not defined.  Often times ATV riders do not know if cross-country use results in damage until after it occurs.  ATV riders have to look back behind to actually see damage, which is uncommon because riders look forward.

7. *How is water itself damaged?  Often times the easiest route to follow for cross-country ATV use is up stream beds, especially in the fall when vegetation is high and water levels are low. The potential for invisible damage to the stream bed and aquatic habitats under the water is high. *Game retrieval legally permits ATV use in and along 15 waterways which contain Rio Grande Cutthroat Trout.

8. Allows hunters to travel an unlimited distance off routes within certain area boundaries. There is no specified distance limit for travel off a designated route. There are areas that are over 4 miles away from a designated route that allow game retrieval. (Four or more miles if a **direct** route is taken; the actual distance covered to travel there and back may be more).

9. The game retrieval area boundaries are not marked on the ground and do not always coincide with easily identifiable natural features. The areas where cross-country ATV game retrieval is allowed exist primarily on a map. Hunters would need to navigate with a GPS with accurate overlay information loaded into it to consistently retrieve game legally.  We are not aware that any such easily useable overlay exists for Rio Grande game retrieval.

10. Game retrieval area boundaries coincide with specific management prescription area boundaries from the 1996 Forest Plan.  If management prescription area boundaries are modified in a forest plan revision process, game retrieval may become inconsistent with the new management area prescription boundaries and/or standards and guidelines.  Revision of the Forest Plan management area boundaries could trigger required modifications of Motor Vehicle Use Maps.

11. This policy can easily result in cross-country ATV use on private land or in Wilderness, Research Natural Areas, etc.  These remote boundaries are generally not marked on the ground away from designated routes, as cross country motorized use is not expected.

12. Can spread noxious weeds and weed seeds to remote locations.  Weed seeds are likely prevalent during hunting season, and most noxious weed populations are found along designated routes where cross country ATV use would begin.

13. Allows use on closed routes, motorcycle singletrack trails and non-motorized trails, making it more difficult to keep these routes physically closed to ATV use.

14. Does not prohibit multiple passes by an ATV to go off route to retrieve game.  This additionally contributes to the creation/use of undesignated routes.

15. *Some designated game retrieval areas delineated on the MVUM are not legally accessible to ATV use.

Rvsd Plan - 00001703

16. *Permitted cross country motorized travel has a high potential of damaging sensitive native plants or their habitat.

17. This policy is difficult to enforce and monitor, as the abuse and land damage occurs primarily far from designated motorized routes.

18. *RGNF and BLM staff recognize the game retrieval policy is problematic.

19. *Motorized game retrieval is not required for handicapped hunters.

## Messaging regarding the current game retrieval policy is not consistent.

Game retrieval is authorized using ATVs from noon to 5:00 pm (1200 -1700) each day, unless soil and water damage will occur.

(1996 RGNF Forest Plan language, included as guidelines for management areas where this is allowed)

o      Big game retrieval is allowed only with ATVs (vehicles that do not exceed 50 inches in width with a large tire surface and less than 10 lbs of tire pressure). This does not include dirt bikes or conventional 4-wheel drive vehicles.
o      Big game retrieval is allowed only for the purpose of retrieval of legally taken big game animal.
o      Big game retrieval is allowed only from 12:00 and 17:00 each day during a legal hunting season.
o      Big game retrieval is allowed only if the use does not create soil or water damage or cutting of vegetation.

(From July 31, 2008 Categorical Exclusion for Clarification and Implementation of the 2005 Travel Rule, which led to a new travel order).

Motorized big game retrieval is allowed, but restricted to areas specified on the Rio Grande National Forest Motor Vehicle Use Map. Only all-terrain vehicles (ATVs) may be used to retrieve game between 12:00 p.m. and 5:00 p.m. ATVs must not exceed 50 inches in width and must have large tire surface area and less than 10 lbs of tire pressure. Game retrieval with ATVs must not damage soils and vegetation. (Language from website http://www.fs.usda.gov/detail/riogrande/recreation/ohv/?cid=stelprdb5167720)

The use of All Terrain Vehicles (ATV's) is permitted off Forest Development roads or trails during Big Game hunting seasons in the afternoons, only to retrieve legally harvested game, in open designated areas or on designated trails in closed areas. No weapons are allowed on ATV's traveling on closed roads or off Forest Development roads or trails while retrieving legally

26

Rvsd Plan - 00001704

harvested game.  These open areas are depicted in light gray color on the Rio Grande Travel Map.

Designated Backcountry Areas are closed to motorized game retrieval and motorized travel is restricted to Designated Trails Open to Motorized Use.  These areas are depicted in dark gray on the Rio Grande Travel Map.

All-Terrain Vehicles (ATV's) are vehicles that do not exceed 48 inches in width and have low tire pressure tires (less than 10 lbs of air pressure) with large tire surface on the ground.  This does not include dirt bikes or conventional 4–wheel drive vehicles.

(Travel Order RG-02-05 language)


During the big-game hunting season, off-highway vehicular travel by ATV is permitted in the afternoon for the retrieval of harvested game, provided that damage to the land does not occur.  Off-highway travel by standard highway vehicles is not allowed.  Firearms are not needed to retrieve harvested game so please leave them in camp.

(Rio Grande NF Visitor map language)


Game Retrieval is authorized using ATV's from Noon to 5:00 pm (1200 to 1700) each day, unless soil and water damage will occur.

When a big game animal has been legally taken, the individual who legally took the animal may drive or be driven to the downed animal. Under no circumstances may a second ATV be used to retrieve the animal. The ATV driven to the animal should be of sufficient capacity that only one trip is necessary. The number of individuals who participate in the retrieval is limited only by the ATV's capacity, and the willingness of others to walk to and from the downed animal.

The ATV used to retrieve the game may be operated off of the route within the game retrieval areas defined and specified on the MVUM. If the downed game is further than the allowed distance, the vehicle may be driven only the specified distance from the designated route.

All Terrain Vehicles (ATV's) are vehicles that do not exceed 50 inches in width and have low tire pressure (less than 10 lbs of air pressure) with large tire surface on the ground. This does not include dirt bikes or conventional 4-wheel drive vehicles.

Caution: Trails and portions of trails open to motorized use may be unsuitable and unsafe for 4- and 6- wheel ATV use.

(2014/2015 RGMF MVUM language)


## Adjacent BLM and Forest game retrieval policy

Gunnison NF: motorized game retrieval not allowed beyond standard 300 foot limit.

Pike San Isabel NF:  motorized game retrieval not allowed beyond 300 foot limit.

San Juan NF:  only allowed in the Boggy Glade area, a small area over 80 miles from the RGNF.

Carson NF:   motorized game retrieval not allowed beyond the standard 300 foot limit.

27

San Luis Valley BLM lands:  Motorized game retrieval is not allowed beyond a standard 300 foot limit.

The only other place motorized game retrieval is allowed in CO is on the Routt NF, hundreds of miles away. We could not locate any information on game retrieval there.

## Game retrieval permits ATV use in and adjacent to these waterways containing Rio Grande cutthroat trout:

Upper portion of Middle Fork San Francisco Creek, incl. SF Lakes
Middle Fork Carnero Creek
South Fork Carnero Creek
Cave Creek
Miners Creek
Prong Creek
Cat Creek
Rhodes Gulch
Cross Creek
Jacks Creek
East Pass Creek
Big Springs Creek
Lake Fork Conejos River
Cascade Creek
Osier Creek

## There are game retrieval areas depicted on the MVUM that cannot legally be accessed by an ATV, or members of the public using an ATV.

These areas have no public motorized route leading into them from which an ATV can legally begin to be used for game retrieval, or they are separated from other public roads by private or USFS lands which do not legally allow public cross country use by ATVs.

Depicting these areas as open to ATV game retrieval encourages illegal off route ATV use on BLM or USFS lands, and/or trespassing across private lands.  Some game retrieval areas adjacent to private lands unfairly allow exclusive non-public game retrieval access.

Examples:

   --No motorized access from USFS or BLM designated routes to game retrieval area NW of Ferguson Creek in Sangres on Saguache Ranger District (RD). T.47N R.9E. Sec 12.

   --No access near N. Piney Creek in Sangres on Saguache RD, T. 46N R.10E Sec 3.

28

--No legal public ATV access S. of Kerber Peak T.45N R.8E Sec 1, Saguache RD.

--No legal ATV access across BLM and no legal public ATV access to Soda Spring Coal Creek area. Saguache RD, T.46N R.8E Sec 14, 15, 22, 23.

--No legal ATV access across BLM or USFS to Horse Canyon-Trickle Mountain area. Saguache RD, T.46N R.6E Sec 11.

--No legal ATV access; illegal access is via the Willow Mtn motorcycle trail #737  SW of big lake,  Conejos Peak RD, T.35N R.5E Sec 21, 22.

--No public access through private land south of FR 526/Ivy Creek in Red Mtn Creek drainage. Divide RD, T.39N R.1W Sec 19.

--Isolated land area surrounded by private.  No open public access.  Divide RD, T.41N R.5E Sec 11.

--No public access, only accessible across private land.  West of Wagon Wheel Gap, Divide RD, T.40N R.1E Sec 22.

--No public access, only across private land.  Turret Peak area, Divide RD, T.41N R.1E Sec 27.

--No Public access, small area adjacent to South San Juan Wilderness. Conejos RD, T.34N R.5E Sec 1.

--Area east of Lake Como has no legal public motorized access to it. ATV users would have to illegally ride across USFS land closed to public motorized use.  Conejos RD, T.41N R.5E Sec 11.


It might be possible to legally retrieve game in these areas by placing and removing an ATV in them with a helicopter.


## Motorized game retrieval is legally permitted in areas with imperiled plant populations:

Ripley's Milkvetch   *Astragalus ripleyi*
Northern Moonwort   *Botrychium pinnatum*
Least Moonwort   *Botrychium simplex*
James' Cryptantha   *Cryptantha cinerea*
Colorado Larkspur   *Delphinium ramosum var. alpestre*
Hell's Tansy Mustard   *Descurainia kenheilii*
San Juan Whitlow-Grass   *Draba graminea*
Smith's Whitlow-Grass    *Draba smithii*

29

Philadelphia Fleabane  *Erigeron philadelphicus*
Stonecrop Gilia  *Gilia sedifolia*
Parry's Crazy-Weed  *Oxytropis parryi*
Arizona Willow  *Salix arizonica*
King's Campion  *Silene kingii*
Rothrock Townsend-Daisy  *Townsendia rothrockii*
Plummer's Cliff Fern  *Woodsia plummerae*

## RGNF staff recognizes game retrieval is problematic.

"The RGNF allows ATV use for cross country game retrieval under specific conditions which opens the door for honest misinterpretation as well as abuse. There is a particular need during for increased education and enforcement during hunting season to ensure compliance with the game retrieval rules"

Martha A Williamson, Divide District Ranger, on Page 4 of a 12/1/14 CO State OHV grant application requesting Law Enforcement Support.

## Adjacent SLV BLM Field Office believes unrestricted off route game retrieval results in the creation of unauthorized routes.

In 2007, the adjacent San Luis Valley BLM Field Office stated the following:

"The majority of the user created routes (cross country) have been observed by BLM and FS staff to have been created during the hunting season. A hunter uses an ATV/OHV to retrieve game cross country then another follows those tracks across country believing that there is a good hunting area at the end of the tracks and by the end of the hunting season a new two track route has been created. Few recreationists go on public lands during hunting season due to the risks created by the large number of hunters. Outside of hunting season staff have not seen the numbers of user created routes develop. "

(BLM response to comments, San Luis Resource Area Travel Management Plan EA, Appendix 25.
http://www.blm.gov/style/medialib/blm/co/field_offices/slvplc/travel_management/appendices.P ar.88848.File.dat/Appendix_%2025.pdf )

Rvsd Plan - 00001708

Planning Team
Rio Grande National Forest
Via e-mail: rgnf_forest_plan@fs.fed.us

August 22, 2016

Dear Rio Grande National Forest Planning Team,

The following are the comments of the parties listed at the end of this letter on the Revised Plan
Framework and Need For Change (RPF/NFC), including version 2 of the NFC and the
Framework + Crosswalk. We incorporate by reference our previous comments on the Need For
Change, dated April 15, 2016, as applicable, i. e., where it has not been made moot by
subsequent Forest Service proposals.

We are pleased to see some positive modifications in the need for change, such as a commitment
to evaluate the possibility of 34 river segments not previously analyzed for inclusion in the
National Rivers system and favorable modifications to the Need For Change. However, we are
very concerned about the proposal to move standards and guidelines toward "management
practices". We are also concerned about proposed goals and use of geographic areas.

**MONITORING.** Monitoring is mentioned a few times in the documents being reviewed here,
such as the Crosswalk and slide 17 of the RPF/NFC. It is also prominently featured in Need For
Change item B 3. Without question, monitoring is a critically important part of adaptive
management, which the plan rule mandates. See 36 CFR 219.2(b), 219.5(a)(3), and 219.12(a)(1).
Without it, there would be no way to assess whether desired conditions and objectives were
being met, nor how well standards and guidelines were being applied and how effective they
were. In other words, adaptive management could not be implemented without monitoring.

The planning rule requires development of a monitoring plan that is included in the forest plan.
See 219.12(a)(1). However, we have seen nothing in any of the plan revision documents to date
regarding a monitoring plan. The description of the Forest Plan Revision Process (on the web at:
http://www.fs.usda.gov/detail/riogrande/landmanagement/projects/?cid=fseprd513089), has a
section entitled "Phase 3, Monitoring, May 2018 – Ongoing", but it does not mention a
monitoring plan.

Given the number of components that must be included in a monitoring plan (219.12(a)(2-5), and
the importance of monitoring, the RGNF should begin developing the monitoring plan "early in
the planning process." FSH 1909.12, chapter 30, Section 32.1. See also id. at section 31.2.

Rvsd Plan - 00001709

**WILDERNESS INVENTORY**
We will submit detailed comments on this item separately.


**REVISION FRAMEWORK AND CROSS WALK**

Goals versus desired conditions. The Framework-Crosswalk states that for the existing plan's desired conditions: "Keep '96 policies, shift into Goals, Geographic Areas and Management Areas". Does this mean forest-wide desired conditions, which are in Chapter I of the existing plan? The management areas have their own desired conditions (in Plan Chapter IV). Would those desired conditions also be converted into goals? This isn't clear because the "Tactical How" section of the Framework-Crosswalk states: "Keep '96 Management Areas themes, shift to "Integrated Desired Conditions". (See further discussion below on management areas.)

There may seem to be little difference between desired conditions and goals. However, under the planning rule, goals are optional (see 219. 7(e)(2)), but desired conditions are a required plan component (219.7(e)(1)(i)). They are defined in the rule as follows:

> Goals are broad statements of intent, other than desired conditions, usually related to process or interaction with the public. Goals are expressed in broad, general terms, but do not include completion dates.

219.7(e)(2).

> A desired condition is a description of specific social, economic, and/or ecological characteristics of the plan area, or a portion of the plan area, toward which management of the land and resources should be directed. Desired conditions must be described in terms that are specific enough to allow progress toward their achievement to be determined, but do not include completion dates.

219.7(e)(1)(i).

The RPF/NFC, slide 10, lists only three forest-wide goals. They are much broader and more vague than the forest-wide desired conditions in Chapter 1 of the current plan. See further discussion on the possible implementation of one goal of concern below.

With shifting desired conditions into goals and adhering to the above-quoted definitions, the revised plan might not address the RGNF's intent for "specific social, economic, [or] ecological characteristics" of the RGNF. The goals could be so broad and vague as to be almost meaningless. In any case, the RGNF should use desired conditions, as required in the Planning

2

Rvsd Plan - 00001710

Rule. This includes having forest-wide desired conditions to guide overall management to insure that projects and actions are oriented toward attaining certain conditions, such as habitat for lynx and other TES species, and protection of watersheds.

Fulfillment of the second forest-wide goal, "maintain and restore sustainable, resilient ecosystems", could include the following implementation strategy according to the RPF/NFC Appendix B4:

> Aggressively diversifying age classes and structure, seral stage, and habitat classes in the next planning horizon would provide many benefits including but not limited to providing connectivity, responsiveness to anticipated changes in climate, ecosystem services, recreation, increased social and economic benefits, and more.

This is a very strange proposal given the current condition on the RGNF. The late successional stage covers considerably less area than it did historically, a departure from the historic range of variability. Assessment 1 and 3 Terrestrial at 35. Indeed, with the death of most of the mature and older Englemann spruce due to spruce bark beetle, late successional habitat in the spruce-fir type has decreased considerably. Notably, this timber type covers over 900,000 acres of the RGNF. Id. at 8.

Late successional habitat cannot be created by human actions. Rather, stands must be allowed to develop over time. At this time, with much of the spruce-fir type in the stand initiation stage (perhaps more so than historically), there would be no way to diversify age classes and structures. Assessment 1 and 3 Terrestrial, ibid. predicts that without management, the area in late successional stage would increase in all forest types, but it would still be short of historic levels except for one forest. It is hard to imagine how any human activity could accelerate the development of older age classes.

We strongly recommend that the possible strategy for realizing goal 2 be removed from consideration. It simply cannot be implemented.

Management practices versus Standards and Guidelines.  Standards and guidelines are two other required plan components, as described in the Rule:

> A standard is a mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements. …

3

Rvsd Plan - 00001711

A guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. (§ 219.15(d)(3)). Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

219.7(e)(iii) and (iv), respectively.

In other words, plans are clearly intended to have some limitations on management in order to meet desired conditions, avoid or mitigate adverse impacts, and meet legal requirements.

The Framework-Crosswalk states the following:

### '96 Plan Standards and Guidelines
Keep '96 policy intent, clarify language, shift into "Management Practices".

"Management practices" are not found in the plan rule.[1] They would thus not be an enforceable part of the revised forest plan. By shifting standards and guidelines into management practices, the intent seems to be to avoid any, or most, restrictions on management actions and projects, and to convert required plan components, which can only be changed by plan amendment[2], into something that can be changed by the Forest Supervisor without public involvement.[3]

We understand the need for the RGNF to have flexibility to respond to changing conditions and unexpected occurrences. Indeed, some flexibility is needed to implement adaptive management, as provided in the planning rule (219.5(a)). However, restrictions on management are still needed to ensure compliance with laws and regulations, and that impacts would be manageable.

Moreover, standards and guidelines, along with other plan components, establish certainty, help ensure consistency in decision making, and build and retain trust with the public. It is simply not appropriate to evade the intent of the planning rule by greatly reducing or eliminating the use of required plan components that mandate limitations on management. Minor changes in plan components require only a minor plan amendment. See 219.13(b)(3).[4]

---

[1] Under "Optional content in the plan", 219.7(f)(2) mentions "potential management approach and strategies", with no further elaboration. These terms are not defined in 219.19.
[2] See 219.13(a).
[3] 219.13(c)(2)
[4] "The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects."

4

Without standards and guidelines, the RGNF would not be accountable to the public. Any change to management practices would be considered an "administrative change", which is:

> any change to a plan that is not a plan amendment or plan revision. Administrative changes include corrections of clerical errors to any part of the plan, conformance of the plan to new statutory or regulatory requirements, or changes to other content in the plan (§ 219.7(f)).

219.13(c)(1).

Changes to management practices would probably be considered "other" plan content under 219.7(f), even though "management practices" is not specifically mentioned or described in the planning rule as "other" content. The Framework + Crosswalk hints that administrative changes may be used for "Policies for specific Locations and Resources". The public would have to be notified of such changes (219.16(c)), but comment may not be required and decisions would not be subject to objection.

The <u>revised plan must contain standards and guidelines</u> that place adequate and appropriate restrictions on management as needed to ensure compliance with laws, regulations, and policies, and to avoid or minimize adverse effects of projects and activities.


<u>Use of geographic areas</u>.  The RGNF proposes to use five geographic areas (GAs) in the revised plan. See RPF/NFC, slide 13. The GAs would be designated by management emphasis not area, in contradiction to the planning directives:

> Geographic areas are based on place, while management areas are based on purpose.
> …
>
> Rather than a management emphasis map, a geographic area map tends to focus on a place…".

FSH 1909.12, section 22.21. Management areas, on the other hand, are delineated by management emphasis. Ibid.

Use of GAs in the previous round of national forest planning in Colorado was for specific places, often watersheds or other topographically identifiable areas, not for areas with similar management emphasis. The Routt NF used 29 GAs. The Arapaho-Roosevelt National Forest used 59 GAs. None of the other forests used GAs. The San Juan NF used three GAs, corresponding to the three ranger districts on that unit.

5

Rvsd Plan - 00001713

The RGNF proposes to use only five GAs. That means that management direction for any of these GAs would be broad and not consider site-specific needs for management. That is particularly true of the "active management" GA, which might cover half of the RGNF. If intended management emphasis is similar in each respective GA, then having GAs would not add anything meaningful to the revised plan because any management direction in the GAs would likely be redundant with management areas.  We recommend that the RGNF either drop GAs or delineate them geographically rather than by management emphasis.

The RGNF could be divided into logical geographic areas based on landscape character and physiography (e.g., the Sangres; the Conejos River Valley; Chama Basin, Upper Rio Grande areas), and then nest management areas within these zones.  Both geographic and management areas would have plan components and other associated plan content (e.g., management strategies). Where management/geographic areas overlap, the more restrictive plan components would apply.  This is similar to the approach used by the San Juan National Forest.

Lastly, we support creating separate management areas for Colorado Roadless Areas (CRAs). Those CRAs recommended for wilderness or other protective designation should have a management area with components that ensure retention of the characteristics that make them eligible for the respective designations. Those not recommended for any designation should have plan components that will assure compliance with the Colorado Roadless Rule.


**NEED FOR CHANGE VERSION 2**

Item **A 1** says to re-evaluate suitability for various multiple uses. Five uses are listed, but livestock grazing is conspicuous in its absence. Suitability for livestock grazing by class of animal (cattle/horse, sheep/goat, and other) should be evaluated in the plan revision. Determining suitability for livestock grazing is encouraged by FSH 1909.12 section 23.23d 2(c).

We are glad to see the suitability of lands for over-snow vehicle use will be determined. This is necessary to reduce damage to habitat effectiveness wintering animals like lynx and marten, and to reduce conflicts between motorized and non-motorized recreationists, as required by Executive Orders 11644 and 11989. It will help the RGNF comply with the Over-snow Vehicle (OSV) Rule. See 80 Fed Reg 4500 et seq., January 28, 2015, but additional action will be needed to fully comply with the OSV Rule.

We are also pleased to see that suitability of lands for both mechanized and motorized travel will be determined.  This is necessary and important in order to properly and responsibly consider desired recreational experiences and effects on natural resources from recreational use.

Rvsd Plan - 00001714

**A 3**, inventory, evaluation, analysis, and recommendations for river segments under the Wild and Scenic Rivers Act. We are very pleased to see that additional segments will be considered, ones that were not studied for the previous plan revision, and nine segments on the Baca Tract, which the RGNF acquired since the last revision. Streams for which conditions have changed should also be identified and considered for eligibility. (See FHS 1909.12, section 82.2.)

The Rio de los Pinos must be evaluated, if has not been recently evaluated. Note that the 9-11 miles of this river in New Mexico that are closest to Colorado have been found eligible for scenic designation. See the Environmental Assessment for Amendment 11 to the Carson National Forest Plan, Appendix B at 20[5]. Also, 4-5 miles of tributaries, including the Osier Fork from its boundary with the Tierra Amarilla Grant to the Colorado state line, are eligible for recreational designation. Ibid. The Osier Fork enters the Rio de los Pinos in Colorado.

Note that both segments referenced above have numerous outstandingly remarkable values. Ibid. It is likely that these values also occur along the portions of these rives in Colorado.

Segments found eligible must include a preliminary classification (wild, scenic, or recreational; 16 U. S. C. 1273(b), FSH 1909.12 section 82.8). The analysis of eligibility should be available to the public no later than the draft EIS to ensure ample opportunity for public review.

River segments identified in the 1996 plan as eligible, including the six segments eligible for wild designation[6], must be retained as eligible, unless an analysis demonstrates they are no longer eligible. Such analysis must be subject to public review before segments are removed from eligibility.

All eligible segments must be managed to retain their eligibility. See 219.10(b)(1)(v).

**A 10**, identifying priority watersheds. Since this is required by the Planning Rule at 219.7(f)(1)(i), we are glad to see that it has been moved to Table A.

**B 2**, re-evaluate management areas. Please see our April 15, 2016 comments at pp. 7-9. We still believe that a good number of management areas, similar to that used in the exiting plan, is needed to provide adequate management direction for the RGNF. Note that one possible way to

---

[5] This amendment was approved January 26, 2002.
[6] See 1996 Forest Plan at IV- 8.

Rvsd Plan - 00001715

management areas less complex would be to create overarching geographic areas delineated by physiography and nested management areas within them, as suggested earlier in the comments.

**C 1**: we agree with revising the plan to give managers more flexibility to use prescribed and naturally occurring fire. The planning rule requires consideration of "[w]ildland fire and opportunities to restore fire adapted ecosystems". 219.8(a)(1)(v).

**C 5**:  we agree with adding direction to the plan for the areas listed. For the Continental Divide National Scenic Trail, the RGNF should work with the GMUG NF, as much of the Trail in the planning area straddles the border between these two national forests.

**C 6**: we agree with the need for consideration of additional special areas to protect fragmented eco-types, important cultural artifacts, and plant communities and habitats potentially vulnerable to climate change. We recommend that you add a sentence to this item that says "Examine the possibilities for increasing the Research Natural Area system to better meet the policy objectives set forth in FSM 4063.02."[7]  Forest Service policy directs that land management planning is the appropriate venue for selecting and establishing Research Natural Areas. See FSM 4063.03.[8]

We agree with inclusion of the Mt. Blanca Massif and Natural Arch areas for consideration for special area designation of as part of item C 6.

**C 7**, reducing the size of the Fremont special area. See our previous comment letter at 18.

**C 8** Separating bighorn and domestic sheep. We are pleased to see that this issue has been moved to Table C, indicating an increase in recognition of its importance. Given that diseases transmitted from domestic sheep to bighorns can be devastating to the latter, and the continuing

---

[7] The objectives of establishing Research Natural Areas are to:
1.  Maintain a wide spectrum of high quality representative areas that represent the major forms of variability found in forest, shrubland, grassland, alpine, and natural situations that have scientific interest and importance that, in combination, form a national network of ecological areas for research, education, and maintenance of biological diversity.
2.  Preserve and maintain genetic diversity, including threatened, endangered, and sensitive species.
3.  Protect against human-caused environmental disruptions.
4.  Serve as reference areas for the study of natural ecological processes including disturbance.
5.  Provide onsite and extension educational activities.
6.  Serve as baseline areas for measuring long-term ecological changes.
7.  Serve as control areas for comparing results from manipulative research.
8.  Monitor effects of resource management techniques and practices.

[8] "The selection and establishment of Research Natural Areas within the National Forest System primarily emerges from continuing land and resource management planning and associated environmental analyses (FSM 1920 and FSM 1950).  Forest plans shall include analysis of, and recommendations for, the establishment of proposed Research Natural Areas."

Rvsd Plan - 00001716

decrease in bighorn populations, action is needed to ensure recovery and maintenance of viable populations of bighorns. See our April 15, 2016 comments at 11-13. Controlling the recreational use of pack goats is also needed to prevent disease transmission, so it makes sense to combine these issues as proposed.

Table **D** has measures that "may be relevant, timely, and appropriate" for consideration in the revision. A decision will be made on each measure, and a clear rationale will be provided for those that are dropped from consideration.  NFC at 8. We are pleased to see recognition of the possible importance of addressing these issues in the plan revision, and for agreeing to provide "clear rationale" for dropping any of the items from consideration.

**D 1**, update definition and management direction for late successional and old growth forests. With the death of most of the mature Englemann spruce, old growth will be in short supply for many years to come. The revised plan should contain direction to retain all old growth in other timber types, including subalpine fir, ponderosa pine, and Douglas-fir.

**D 2**, oil and gas leasing availability analysis. See our comments of April 15, 2016 at 10-11. (See also our comments on various draft assessments, dated January 20, 2016, at 17-18.) We still believe that now, when there is not much interest in exploration, is a good time to update oil and gas leasing availability, rather than later, when, with increased market prices, there may be a much stronger interest, which might necessitate a plan amendment. The RGNF would be under strong pressure to make all of the legally available land in its jurisdiction available for leasing.

**D 3** states to better manage wilderness areas across administrative boundaries and "better incorporate the 1993 Colorado Wilderness Act and language specifically regarding Wheeler Geologic Area." We approve of coordinating management with other units when wilderness areas occur on two national forests, as all four of the wilderness areas on the RGNF do.

What language appears in the 1993 Colorado Wilderness Bill regarding the Wheeler area, other than the paragraph (2)(a)(16)), which designates the "Wheeler Addition to the La Garita Wilderness Proposal"?

Item D 3 also states, in the third column:

> Wheeler Geologic Area will be considered during the Wilderness Inventory, Evaluation, Analysis and Recommendation process or potentially considered for Special Designation in the forest plan.

Rvsd Plan - 00001717

The Wheeler area is already in the La Garita Wilderness, so why would it need to be considered during the wilderness inventory, etc. process?

**D 4**, "Contribute to developing and maintaining sustainable enterprises that contribute to the general economic and social vitality of the area." While the RGNF must consider how its management might affect the local economy, it should not develop or maintaining any industry that depends on certain management of the RGNF. That is the role of industry and chambers of commerce, not the Forest Service. The RGNF should consider the needs of industry (just like it should do for all other interests), but there should be no plan direction for the RGNF to create or maintain such industries.

An industry that is or becomes dependent can become a powerful economic force that then dictates management. That is exactly what happened with the timber industry in the 1960s and 1970s, which resulted in overcutting. According to the "Summation of Forestry Studies for Rio Grande Basin" Wood Utilization workshop that took place August 4th 2016 in Alamosa, Molly Pitts mentioned the Four Corners Report and reiterated that the timber harvest industry on public lands in the west has dropped 80% since 1998. Timber suitability and harvesting options have changed drastically since the last Forest Plan.

According to the 2015 State of the Forest Report, only 9% (175,367 acres,) is being recommended as "likely" harvesting consideration for a variety of reasons. In addition, the data produced by the 2015 Spruce Mortality Study contributes further ambiguity regarding harvest management decisions when there appears to be a 3 to 9 year spread in recent Spruce mortality. Determining timeframe of death is difficult when viewing a stand of dead trees. The longer the standing dead deal with the outside elements, the greater increase of "timber defect", decreasing potential economic value to industry.

**D 6**, "[r]evisit how managing for multiple uses on the forest affects cultural resources". This is badly needed, as certain types of recreation and heavy recreational use of any kind can damage cultural resources.

**D 9**, recreational climbing. This item states, in the third column:  "Impacts should be addressed in a site specific analysis. Habitat and resource concerns can be mitigated through Forest Order." Site specific analyses will be needed, but it would be best if there was some forest-wide direction to do these analyses, and where they might be needed. Direction is also needed on what to look for in terms of damage to:  flora, fauna, cultural resources, and soils (from human use, including camping).

10

**D 11**, revise the stay limit for dispersed and developed campsites. The language here hints that the current limit of 14 days may be increased to 30 days. Slide 16 in the RPC/NFC PowerPoint proposes a change to 30 days. We believe this would be inappropriate for camp sites that are often fully occupied. The season of use in some of the campsites is no longer than about four months. Allowing someone to say for a fourth or more of the season limits opportunities for use by others.[9] Also, lengthy use of dispersed sites increases the potential for damage, such as accumulation of human waste and trash. We recommend that the stay limit not be increased to anywhere near 30 days for dispersed sites or popular developed sites, if it is increased at all.

A special use permitting process would better accommodate the few unique situations where an increased stay of greater than 14 days may be desired and appropriate, rather than a blanket extension of the existing limit.

**D 13**, off-road game retrieval policy. As we strongly argued in our April 15, 2016 letter, this is an urgent programmatic issue that must be addressed in the forest plan, even if some of the details may have to be done later during travel management planning. Implementation of the current policy is confusing, it leads to the potential for damage to soil and water, and makes enforcement of travel restrictions more difficult outside of hunting seasons. Existing management area prescription boundaries determine where game retrieval is currently allowed and prohibited, and any modification of those boundaries could impact game retrieval. See April 15 letter at 14-15 and 24-30. This issue needs to be moved to Table B.

**D 15**, address new technology, including drones. As we argued in our April 15 comments at 15-16, drone use needs to be regulated, and for some areas like wilderness and RNAs, prohibited altogether.

This need for change item also addresses "alternative energy sites and fiber optic (sic)". It thus overlaps somewhat with item A 6, which would address "suitability for renewable energy resource development".

D 19, "[u]pdate plan direction for the removal of common mineral materials, such as commercial contracts, personal, ceremonial, and free use permits". See our previous comment letter at 16.

<u>Additional Needs for Change</u>.

---

[9] This is noted in slide 17 in the PowerPoint, which also states, "Persons are using sites as season-long residences".

11

Rvsd Plan - 00001719

The planning rule has a substantial set of requirements around managing for <u>water resources</u> that is not reflected in part A of the need for change document.  In order that these concepts are not lost in the plan revision, we recommend that you add the following items to NFC part A:

- ✓ There is a need to maintain and restore water quality. 219.8(a)(2)(iii)
- ✓ There is a need to maintain and restore lakes, streams, wetlands, ground water, public water supplies, sole source aquifers, source water protection areas.  219.8(a)(2)(iv)
- ✓ There is a need to maintain and restore ecological integrity of riparian areas, and develop plan components to maintain and restore structure, function, composition, and connectivity. 219.8(a)(3)(i)
- ✓ There is a need to establish widths for riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands and establish plan components for these zones. 219.8(a)(3)(ii)
- ✓ There is a need to ensure implementation of BMPs for water quality. 219.8(a)(4)
- ✓ There is a need to maintain or restore rare aquatic plant and animal communities. 219.9(a)(2)(ii)

Section A of the Need for Change should specifically mention <u>the need to ensure habitat connectivity</u>. "Connectivity" is defined in the rule as follows:

> Ecological conditions that exist at several spatial and temporal scales that provide landscape linkages that permit the exchange of flow, sediments, and nutrients; the daily and seasonal movements of animals within home ranges; the dispersal and genetic interchange between populations; and the long distance range shifts of species, such as in response to climate change.

219.19.

Connectivity will be critically important for wide-ranging species such as lynx. The intent to address connectivity may be captured in NFC item A 5, "provide management direction to manage habitat to ensure viable populations of species of conservation concern". However, it would be appropriate to have a specific mention of connectivity to ensure that it receives the emphasis it deserves.

Thank you for this opportunity to comment. We would be happy to discuss any of the items in this letter, if that would help your understanding of our concerns. We look forward to providing you with additional input during the forthcoming scoping period.

Rvsd Plan - 00001720

Sincerely,


Rocky Smith, Forest Management Analysis and Consultant
1030 Pearl St. #9
Denver, CO 80203
303 839-5900
2rockwsmith@gmail.com

Alison Gallensky, GIS and IT Director
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver CO 80031
(303) 619-0509
alison@rockymountainwild.org

Lauren McCain, Federal Lands Policy Analyst
Defenders of Wildlife
535 16th St. Suite #310
Denver, CO 80202
720 943-0453
lmccain@defenders.org

Vera Smith, Director of Forest Planning and Policy
The Wilderness Society
1660 Wynkoop St., #850
Denver, CO 80202
303 650-5942
Vera_smith@tws.org

Chris Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223, 537 Main St.
Alamosa, CO 81101
(719) 589-1518
info@slvec.org

Tom Sobal, Director
Quiet Use Coalition
PO Box 1452

13

Rvsd Plan - 00001721

Salida, CO  81201
(719) 539-4112
quietuse@gmail.com

John R. Mellgren, Staff Attorney
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
mellgren@westernlaw.org
(541) 359-0990

Rvsd Plan - 00001722



Dan Dallas, Supervisor
Erin Minks, Forest Planner
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

July 8, 2016

Dear Supervisor Dallas and Ms. Minks,

Thank you for considering these comments on Assessment Chapters 1, 2 and 3 and related portions of
the Need for Change statement on behalf of The Wilderness Society, San Luis Valley Ecosystem Council,
Rocky Mountain Wild, Defenders of Wildlife, Quite Use Coalition, Western Environmental Law Center,
and Rocky Smith. We are restricting our comments to water resources and watersheds. We want to
thank the Forest Service for putting together a well-researched and scientifically supported report on
aquatics, and, in particular, for working proactively with Colorado Natural Heritage Program and others
to evaluate the wetlands on the forest. We offer the following comments on the assessment and
related need for change statement in the hope that it will inform your thinking as you craft the proposed
action and initiate scoping.

Spatial Data. While the general information about watershed processes and function was very helpful, it
would also be helpful to provide more information – especially spatial information – on the stream
segments and watersheds. For instance, you provide general information that there are watersheds and
segments that are impacted from specific land uses (e.g., road, ORVs, grazing, impoundments) but you
do not specify which segments/watersheds are so affected or display the information on maps.
Similarly, it would be very helpful to see spatially where the most undisturbed stream water features
and watersheds are located.

Predicted location of high quality stream segments. The assessment report discusses in general terms
predicted changes to stream segments from climate change, and recommends that the Forest Service in
the revision give special attention to those segments that will serve as cold water refugia. However, the
report does not specify which segments these are likely to be and why. This information would be very
useful in designing a revised plan that facilitates climate change adaptation and builds resiliency.

Additional scientific literature on the importance of landscape scale aquatic management. We
recommend that you include the information from the following scientific articles in the assessment
report as they are directly relevant to watershed management.

Rvsd Plan - 00001723

*Articles on the importance of redundancy, connectivity, and low disturbance for aquatic habitats.* The following articles conclude that vulnerable aquatic species, in order to be persistent and resilient, require complex, well connected habitats across a mosaic of streams and watersheds, and that restoration and maintenance of these conditions is integral to their survival in the face of large-scale disturbance such as wildfire. Reiman et al (2012) explain this, saying "Conservation or restoration of relatively large networks of habitat and the physical and ecological processes that maintain them, the broad expression and adaptation of life histories, and the potential for connections within, and among, populations are all critical. In essence, resilience will depend on a spatial and temporal structure and diversity in populations and habitats that can absorb or benefit from the effects of fire."

Rieman et al, 1995. "Does Wildfire Threaten Extinction for Salmonids? Responses of Redband Trout and Bull Trout Following Recent Large Fires on the Boise National Forest." *In* Proceedings – Fire Effects on Rare and Endangered Species and Habitats Conference, Nov. 13-16, 1995, Coeur d'Alene, Idaho.

Rieman and Clayton, 1997. "Wildfire and Native Fish: Issues of Forest Health and Conservation of Sensitive Species." *In* Fisheries 22(11):6-15, October 1997.

Reiman et al, 2012. "Fire and Fish: a Synthesis of Observation and Experience." USDA Forest Service RMRS-GTR-290. 2012.

*Importance of headwaters streams to overall aquatic function.* The assessment report does not discuss the importance of headwater streams. The scientific literature is rich with articles that speak to this. Headwater streams represent 60 to 80% of the total stream length within a catchment and drain 70 to 80% of the total catchment area, and therefore are important sources of sediment, water, nutrients, and organic matter for downstream systems (Gomi et al 2002; MacDonald and Coe 2007). Headwater streams also support genetically isolated species and thus are important for maintaining biodiversity in watersheds (Gomi et al 2002); this may argue that headwater streams will be important for refugia as the climate warms and dries as predicted (Isaak et al 2016). Lastly, the small size of headwater streams means that they are particularly responsive to natural and anthropogenic disturbances (MacDonald and Coe 2007). The following articles address the important role of headwater reaches in watersheds.

Lee MacDonald and Drew Coe, 2007. "Influence of Headwater Streams on Downstream Reaches in Forested Areas" *in Forest Science* 53(2). Pages 148-168.

Gomi, T., Sidle, R., and J. Richardson, 2007. "Understanding Processes and Downstream Linkages of Headwater Systems." *In* BioScience (2002) 52 (10): 905-916.

Daniel J. Isaak, Michael K. Young, Charles H. Luce, Steven W. Hostetler, Seth J. Wenger, Erin E. Peterson, Jay M. Ver Hoef, Matthew C. Groce, Dona L. Horan, and David E. Nagel, 2016. "Slow climate velocities of mountain streams portend their role as refugia for cold-water biodiversity" PNAS 2016 113 (16) 4374-4379. Available at
https://www.researchgate.net/publication/299606956_Slow_climate_velocities_of_mountain_s treams_portend_their_role_as_refugia_for_cold-water_biodiversity.

Better understanding of ground and surface water interdependence. The assessment does not adequately address the hydrologic connections between surface water and ground water resources, especially flows of energy and nutrients between the two. Recent studies in the region have shown that

2

ground water is an integral contributor to surface water resources and that in general a better understanding of the interplay in specific basins between the two is needed. For instance, see the June 2016 High Country News Article entitled "Study finds surprising source of Colorado River water supply" (attached). The article reports on a recent US Geological Survey study that found that more than half the flow of rivers in the upper part of the Colorado River Basin is sustained by ground water and concludes that managers must consider ground water and surface water as a joint resource, and better protect a resource threatened by overuse and climate change.

Modification to conclusion. The draft assessment report states that lower elevation streams and those with limited base flow should be management priorities because they are most likely to be influenced by climate change in the future (see pages 4 and 35 in Assessments 1 and 3 for Aquatics). While we certainly would not contest that low elevation streams, especially those that have been subjected to land use stresses such as grazing and recreation, should be restored as appropriate through passive (removal of the stresses) or active means, it is not clear to us that they should be the singular focus of management action in the aquatic realm. As discussed above, headwater streams – which can be regarded as the capillaries to the larger aquatic network – are influential for downstream health and may be important as climate refugia for cold-water species. They are certainly important for perpetuating and reestablishing Rio Grande populations of cutthroat trout and other aquatic species. (See Appendix 1 to Assessments 1 and 3 Aquatic at 17.) In addition, based on the articles provided above by Reiman and others, the appropriate aquatic conservation strategy may be to protect a network of streams to ensure redundancy, resiliency, diversity, complexity, and connectivity in the larger watersheds and landscapes.

Additional wetlands data. As the Assessment Report Chapters 1 and 3, the wetlands report[1], and the fen report[2] make clear, wetlands are an essential habitat and irreplaceable resource, providing ecosystem goods and services as well as habitat for all sorts of biodiversity. We were heartened to see that the Forest Service partnered with Colorado Natural Heritage Program and others to investigate the location and condition of wetlands and fens in the aforementioned report, and that the information will be used to inform the revision of the forest plan. With this letter, we would like to submit to you the results of a wetlands analysis in which Dr. Aaron Hall, aquatic ecologist at Defenders of Wildlife, and Alison Gallensky, GIS Director at Rocky Mountain Wild, identified specific important wetlands and wetland complexes within the Rio Grande National Forest (RGNF) to supplement your recent wetland investigations. Hall and Gallensky are scheduled to present this analysis and their findings at the upcoming GIS in the Rockies conference in Denver, Colorado on September 21-22, 2016.

*Analysis framework.* Hall and Gallensky designed a wetlands analysis that is portable to other landscape scale planning units (e.g. other National Forests, BLM lands, National Parks etc.) by incorporating data that are relatively easy to obtain (e.g. national datasets), or easily substitutable at the planning unit scale (e.g. species occurrences). While this approach represents a tradeoff between local specificity and portability of the analysis, the intent of identifying important wetland/wetland complexes on public lands is met, with the added advantage of providing a framework for additional, similar analyses on other lands.

---

[1] Lemly, Joanna. 2012. Assessment of Wetland Condition on the Rio Grande National Forest, Colorado Natural Heritage Program, Colorado State University, Fort Collins, CO.

[2] Smith, G. J. Lemly, P. Smith, and B. Kuhn. 2016. Fen Mapping for the Rio Grande National Forest. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado.

3

*Methodology.* Hall and Gallensky used a multi-criteria GIS-based approach to rank wetlands within the RGNF. They started with wetlands already identified in the National Wetlands Inventory[3] occurring on RGNF, plus an additional buffer of wetlands within 1km of the region, used for connectivity measurements. For the purposes of the study, they defined an important wetland/wetland complex as having exceptionally high quality abiotic and biotic attributes.

The abiotic focus is on the hydrologic characteristics and landscape setting of individual wetlands. Hall and Gallensky therefore incorporated attributes of wetland size, adjacency, elevation, water source, type, and known human modifications. All data were obtained from public sources, including the National Wetlands Inventory, National Hydrology Database and enhanced Database, Rio Grande National Forest Noxious Weeds Inventory, CNHP Potential Conservation Areas. A summary of these attributes can be found in Table 1.

The biotic focus for this study is on rare, threatened and endangered species, with the goal of identifying wetlands and wetland complexes which are vital in supporting these sensitive species. Hall and Gallensky identified sensitive wetland/riparian species by looking at those listed under the federal Endangered Species Act, Colorado Parks and Wildlife threatened and endangered species list, the US Forest Service Region 2 sensitive species list, and NatureServe rankings. They developed an initial list of focal species known or thought to occur on RGNF, and then attempted to obtain spatial data for species in this list. Data were obtained from the Colorado Natural Heritage Program (CNHP), Colorado Parks and Wildlife (CPW), and Colorado Oil and Gas Conservation Commission (COGCC). Overall, they were able to obtain spatial data for 14 sensitive species within RGNF (Table 2). Available types of data included occurrence locations of individuals; delineated nesting, roosting and foraging habitat (i.e. birds); and occupied stream habitat (i.e. fishes). Ultimately, the dataset included one amphibian, four birds, two fish, one insect, and six plant species. This provides a good view of the less common and possibly at-risk species found in aquatic environments and adjacent terrestrial areas on the RGNF.

## Table 1: Hydrologic/Habitat Criteria utilized

| Abbrev | Criteria | Data Source | Ranking | Note |
|--------|----------|-------------|---------|------|
| WSize | Wetland Size | FWS NWI | 1 point for wetlands size > 10 acres | |
| Adj | Adjacency | FWS NWI | 1 point if there are any other wetlands within 250 meters | |
| Net | Network | FWS NWI | 1 point if there are 5 or more neighboring wetlands within 250 meters | |
| Head | Headwaters Associated | NHD and Enhanced NHD | 1 point if a 1st or 2nd order stream intersects the wetland Or 1 point if NHD stream not in Enhanced NHD (likely also headwaters) | |
| Spr1 | Spring fed | NHD and NHD Plus | 1 point if no streams intersect the wetland | |
| Spr2 | Spring fed | NHD | 1 point if spring intersects the wetland | NHD Type SpringSeep |

[3] National Wetlands Inventory, https://www.fws.gov/wetlands/NWI/index.html, US Fish and Wildlife Service, Falls Church, VA and Madison, WI. Data retrieved 11/2015.

Rvsd Plan - 00001726

| Carbon | Carbon | FWS NWI | 1 point if wetland attributes indicate especially good capture of atmospheric carbon | |
| Weed | Vegetative Integrity | RGNF Noxious Weeds Inventory | 1 point if the wetlands does NOT overlap noxious weeds | |
| PCA | Vegetative Integrity | CNHP PCAs | 1 point if the wetlands overlaps a PCA with Outstanding or Very High biodiversity significance | Some PCAs are defined for animal species but most focus on plants and natural communities |
| NoMod | Hydrologic Integrity | FWS NWI | 1 point if NWI attributes do NOT indicate human modification | Attribute special modifiers (lower case) d, f, m, h, s, x indicate human modification |

## Table 2: Species Criteria Utilized

| Abbrev | Major Group | Common Name | Scientific Name | Data Source | Buffer |
|---|---|---|---|---|---|
| BToad | Amphibian | Boreal Toad | *Bufo boreas boreas* | CNHP 2002 | 500 m |
| BToad | Amphibian | Boreal Toad | *Bufo boreas boreas* | CDOW 2006 | 500 m |
| BEagle | Bird | Bald Eagle | *Haliaeetus leucocephalus* | CPW (Nest/Roost) | 300 m |
| BEagle | Bird | Bald Eagle | *Haliaeetus leucocephalus* | CPW (Forage) | 0 m |
| BEagle | Bird | Bald Eagle | *Haliaeetus leucocephalus* | CNHP 2011 | 300 m |
| GuSG | Bird | Gunnison Sage Grouse | *Centrocercus minimus* | CPW (production) | 0 m |
| Ospry | Bird | Osprey | *Pandion haliaetus* | CPW (Foraging) | 0 m |
| PFalc | Bird | Peregrine Falcon | *Falco peregrinus* | CNHP 2014 | 2 km |
| RGChb | Fish | Rio Grande chub | *Gila pandora* | CNHP 2011 | 50m |
| RGCT | Fish | Rio Grande Cutthroat Trout | *Oncorhynchus clarki virginalis* | COGCC/CPW | 0 |
| PyrX | Insect | Xanthus Skipper | *Pyrgus xanthus* | CNHP 2011 | 500 m |
| EriAN | Plant | Altai Cottongrass | *Eriophorum altaicum var. neogaeum* | CNHP 2011 | 100 m |
| SalA | Plant | Arizona Willow | *Salix arizonica* | CNHP 2011 | 100 m |
| BotP | Plant | Northern Moonwort | *Botrychium pinnatum* | CNHP 2011 | 100 m |
| EriP | Plant | Philadelphia Fleabane | *Erigeron philadelphicus* | CNHP 2011 | 100 m |
| DraS | Plant | Smith's Whitlow-Grass | *Draba smithii* | CNHP 2011 | 100 m |

5

Rvsd Plan - 00001727

| PotA | Plant | Southern Rocky Mountain Cinquefoil | *Potentilla ambigens* | CNHP 2011 | 100 m |
|------|-------|-----------------------------------|-----------------------|-----------|-------|

Hall and Gallensky scored each wetland based on the presence/absence of each of our abiotic and biotic variables. No weighting of variables was performed (i.e. it was a strictly additive ranking system) to remove inconsistencies associated with ranking the relative importance of each variable (Widis 2015), and to maintain the simple portable approach. For biotic scores each species could be given a maximum of one point, even if a wetland intersected multiple datasets for the species (e.g. a wetland within foraging habitat for a bird species, and also with a nest location for the same species). This resulted in each of the wetlands being assigned a single score. Hall and Gallensky then mapped the occurrence of wetlands with high scores, and manually identified complexes of highly ranked wetlands for further consideration (Figure 1).



Figure 1. Wetlands on the Rio Grande National Forest ranked based on an analysis of abiotic and biotic characteristics.

Hall and Gallensky used the spatial distribution of average wetland scores by HUC12 watershed as a course filter that identified high quality watersheds to investigate further (Figure 2). Within these highly ranked watersheds they initially identified 14 complexes of highly ranked wetlands through visual

6

inspection. Wetlands within these complexes scored 5 to 10. After initial wetland complexes were identified, Hall and Gallensky determined the hydrologic drainage area feeding each of those complexes. The area draining into a wetland has the most influence on its abiotic attributes, and therefore its ability to support biotic components. This approach provides a higher degree of protection than just delineating the wetland boundary, and represents a scientifically defensible boundary for possible future wetlands protection areas. They then identified potential conflicts, including grazing rights, water rights, active and inactive mining claims, and private land inholdings within RGNF that intersected the initial set of high value wetland complexes. They removed four of the initial wetland complexes because they were located primarily on private lands or had other conflicts. This left a list of 10 high quality wetland complexes (Figure 3).



Figure 2: Average analysis scores of NWI wetlands by HUC12 watershed. Darker watersheds have higher scores. Black line is the boundary of RGNF.

Rvsd Plan - 00001729



Figure 3. Important wetland complexes on the Rio Grande National Forest based on an analysis of abiotic and biotic characteristics.

*Comparison with other RGNF wetland reports*

The purpose of Lemly (2012) CNHP Wetlands study was to map and assess the condition of wetlands within the Rio Grande Headwaters Basin, of which the Forest is a part. This was done through GIS mapping and supplemented with surveys at 77 wetlands located within the Forest. The results are a detailed description of the wetland types and their distribution within the Forest, as well as wetland condition measures (Multi-metric Ecological Integrity Assessment) for the 77 wetlands which were surveyed. In summary, wetlands were found to cover 2% of the land area of the Forest, of which just over half (55%) are freshwater herbaceous wetlands. Wetlands are much more common in higher elevations than lower elevations. Wetlands which were surveyed were generally found to be in good health (excellent to good condition).

The purpose of Smith et al (2016) CNHP Fen study was to identify potential fens within the Forest, through GIS analysis of aerial photography and topographic maps, and to assign a confidence (low, possible, likely) to each of these potential fens. The results were 6,408 potential fens identified on the Forest, with most fens located in higher elevations between 10,000 and 12,000 feet. Fen distribution was further described by elevation, bedrock geology, ecoregion, and watershed, giving a comprehensive view of potential fen distribution within the Forest. Three watersheds in particular were identified as

having a high number of likely fens. Smith et al (2016) provides information which is extremely helpful in an applied setting, both for the forest revision process, and for project specific actions such as timber sales, livestock grazing operations, and trail maintenance. While only a modeling exercise which identifies potential fens, this is still excellent baseline information which can be used as a starting point for knowing where important fen/wetland resources are located within the forest, and therefore how these irreplaceable resources can be protected.

The 2012 CNHP wetlands study, 2016 CNHP fens study, and the 2016 Hall and Gallensky analysis each provide unique information about the distribution and status of wetland resources within the Forest. The 2012 CNHP study is largely descriptive, without a specific applied focus, especially as it pertains to forest plan revisions. The 2016 CNHP fen study is also descriptive, but does identify some watersheds which harbor high numbers of fens and might be considered for increased protections/designations. The 2016 Hall and Gallensky analysis specifically focuses on identifying wetland resources of high quality that should be considered for protective management in the forest planning process.

Modification to Need for Change Statement. In addition to the comments submitted on the draft Need for Change statement by the undersigned on April 15th, 2016,[4] we offer recommendations for modifying the Need for Change statement based on the information submitted in this letter. These recommendations should also inform the development of the proposed action.

The draft Need for Change document includes one watershed-related item: "C3. Revise the previous plan to identify priority watersheds to reflect the current best management practices including the Watershed Conservation Practices Handbook, National Best Management Practices program, and Watershed Condition Framework." While we agree that the plan should identify priority watersheds for maintenance and restoration and reflect current best management practices, both required elements in the 2012 planning rule[5], we are concerned that doing so will not likely change the status quo.  Adhering to these frameworks is a current responsibility of the forest, yet about ½ of the watersheds are considered to be at risk (see page 13 in Assessments 1 and 3 for Aquatics). Therefore, we believe that additional changes need to be made to the current plan to advance restoration and recovery of watersheds and aquatic resources. We recommend the following:

- There is a need to identify, protect, restore, and monitor a network of streams to maintain and/or enhance aquatic processes, ensure stream connectivity and aquatic organism passage[6], and improve/maintain biodiversity.
- There is a need to protect, restore, and monitor important wetlands and wetland complexes (including upland feeder basins) in order to maintain aquatic biodiversity and integrity, maintain clean and cold water, and provide ecosystem services.

We thank you for considering our comments on this draft assessment chapter, and for all of your hard work on the forest planning process.

---

[4] See page 3 for comments on priority watersheds and aquatics.
[5] See 36 CFR 219.7(f)(1)(i) and 36 CFR 219.8(a)(4).
[6] Appendix 1 to Assessment 1 and 3 Aquatic states: "Stream diversions can seriously reduce instream habitat and migration for aquatic biota, nutrient transport, sediment movement and water quality (including temperature)…". Id. at 4; citations omitted. Appendix 1 further states that habitat for Rio Grande cutthroat trout could be increased by modifying diversion structures to allow passage. Id. at 7.

Rvsd Plan - 00001731

With regards,

*[signature]*

Vera Smith, Director of Forest Planning and Policy
The Wilderness Society
1660 Wynkoop St., #850
Denver, CO 80202
303-650-5942
Vera_smith@tws.org

On behalf of:

Dr. Aaron Hall, Rockies & Plains Representative
Dr. Lauren McCain, Federal Lands Policy Analyst
Defenders of Wildlife
535 16th Street, Suite 310
Denver, Co 80202
720 943-0453
lmccain@defenders.org

Alison Gallensky, GIS and IT Director
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver CO 80202
(303) 454-3345
alison@rockymountainwild.org

Christine Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
Info@slvec.org

John R. Mellgren, Staff Attorney
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
mellgren@westernlaw.org

Rocky Smith
Forest Management Analyst and Consultant
1030 Pearl St. #9
Denver, CO 80203

10

Rvsd Plan - 00001732

303 839-5900
2rockwsmith@gmail.com

Tom Sobal
Quiet Use Coalition
P.O. Box 1452
Salida, CO 81201
(719) 539-4112
info@quietuse.org


Attachments:

- High Country News Article
- Rieman et al, 1995. "Does Wildfire Threaten Extinction for Salmonids? Responses of Redband Trout and Bull Trout Following Recent Large Fires on the Boise National Forest." *In* Proceedings – Fire Effects on Rare and Endangered Species and Habitats Conference, Nov. 13-16, 1995, Coeur d'Alene, Idaho.
- Rieman and Clayton, 1997. "Wildfire and Native Fish: Issues of Forest Health and Conservation of Sensitive Species." *In* Fisheries 22(11):6-15, October 1997.
- Reiman et al, 2012. "Fire and Fish: a Synthesis of Observation and Experience." USDA Forest Service RMRS-GTR-290.
- Lee MacDonald and Drew Coe, 2007. "Influence of Headwater Streams on Downstream Reaches in Forested Areas" *in Forest Science* 53(2). Pages 148-168.
- Gomi, T., Sidle, R., and J. Richardson, 2007. "Understanding Processes and Downstream Linkages of Headwater Systems." *In* BioScience (2002) 52 (10): 905-916.
- Daniel J. Isaak, Michael K. Young, Charles H. Luce, Steven W. Hostetler, Seth J. Wenger, Erin E. Peterson, Jay M. Ver Hoef, Matthew C. Groce, Dona L. Horan, and David E. Nagel, 2016. "Slow climate velocities of mountain streams portend their role as refugia for cold-water biodiversity" PNAS 2016 113 (16) 4374-4379. Available at https://www.researchgate.net/publication/299606956_Slow_climate_velocities_of_mountain_streams_portend_their_role_as_refugia_for_cold-water_biodiversity.

Rvsd Plan - 00001733

## Study finds surprising source of Colorado River water supply

*More than half of the rivers in the Upper Colorado Basin originate as groundwater, USGS says.*

Sarah Tory June 20, 2016 *Web Exclusive*

Every spring, snow begins to melt throughout the Rocky Mountains, flowing down from high peaks and into the streams and rivers that form the mighty Colorado River Basin, sustaining entire cities and ecosystems from Wyoming to Arizona. But as spring becomes summer, the melting snow slows to a trickle and, as summer turns to fall, all but stops.

Scientists have known for a long time that flow in rivers is sustained by contributions from both snowmelt runoff and groundwater.  The groundwater is composed of rivulets of water hidden below ground —some thousands of years old — that are particularly important for sustaining a river's flow after the spring snowmelt has subsided. Less clear, however, was exactly how much of the flow in rivers came from groundwater, a critical source of much of the West's water supply. Now, a new study, released last month by the U.S. Geological Survey (USGS), helps quantify just how much: more than half the flow of rivers in the upper part of the Colorado River Basin is sustained by groundwater. That finding, say experts, highlights the need to better protect a resource threatened by overuse and climate change.

"Because we now have numbers on this connection, we have a better understanding of the importance of groundwater as a contributor to our surface water supply, and anything impacting the groundwater system will also impact flow in rivers." says Matthew Miller, a USGS scientist and the lead author of the study.

Rvsd Plan - 00001734



An aerial shot of Utah's Uinta Mountains shows how the winter snow lingering on high peaks feeds the rivers flowing through the valleys below. Those rivers are also fed by groundwater, which accounts for over half the streamflow in the Upper Colorado River Basin.
NASA/Flickr

To determine how much of the flow in rivers came from groundwater, scientists examined streamflow data at 146 sites in Colorado, Utah, Wyoming, New Mexico, and Arizona, measuring the electrical conductivity of the water. Low conductivity meant the water had not had time to pick up ions from the ground, indicating it came from recent snowmelt. Meanwhile, higher conductivity signified the water had picked up ions as it trickled through soil and rocks below ground. Researchers then used the information to determine the percentage of water originating from snowmelt runoff and the percentage originating from groundwater and created a model that predicts where streamflow originates in the Upper Colorado River basin. On average, Miller and his team found that 56 percent of that flow comes from groundwater.

Though water managers recognized the link between groundwater and surface water back in 1877, for the better part of the last century, state laws allocating water to various users through a system of water rights dealt only with surface water. But when heavy pumping systems were developed after WWII, groundwater levels throughout the West plummeted.

13

Rvsd Plan - 00001735

In some places, over-pumping has caused the water table to drop hundreds of feet, creating giant cracks in the land as it sinks and drying up streams. In 2015, a team of NASA scientists determined that some 13 trillion gallons of groundwater had been lost from the Colorado River Basin since the NASA satellites began collecting data in late 2004 — equivalent to roughly one and a half times the total capacity of Lake Mead and as much water as the state of Arizona uses in six years.

In the past several decades, Western states have passed laws to better regulate groundwater and curb over-pumping. California became the last to do so with the 2014 Sustainable Groundwater Management Act. Still, when it comes to incorporating groundwater into states' byzantine water laws, big challenges remain, says Malcolm Wilson, the head of the Water Resources Group for the Bureau of Reclamation's Upper Colorado Region. How much, for instance, does pumping groundwater affect a user with rights to a nearby river?

The new study, says Wilson, offers a reminder both for the Bureau of Reclamation and for states that managing surface water and groundwater as two interconnected parts of a system is essential, particularly as the climate changes. Thanks to warmer temperatures, in the future, more streamflow in the West will likely come from rainfall instead of from snowmelt. Since rain tends to run quickly off the surface more quickly than melting snow, that means less water will be percolating into the ground to replenish the aquifers that sustain rivers late into the dry months of the year. And the shifting climate also promises to increase events like major forest fires that can turn the soil hydrophobic and prevent water from seeping into the ground.

For Wilson, the study's finding reinforces the idea that we need to take a more holistic approach to resource management. Sustaining the West's groundwater, means not only allocating supplies properly, he says, but protecting the watersheds that produce groundwater.

14

Rvsd Plan - 00001736

# Fire and Fish: a Synthesis of Observation and Experience

## Bruce Rieman[1], Robert Gresswell[2], and John Rinne[3]

[1]USDA Forest Service, Rocky Mountain Research Station (retired), Seeley Lake, MT

[2]U.S. Geological Survey, Northern Rocky Mountain Science Center, Bozeman, MT

[3]USDA Forest Service, Rocky Mountain Research Station (retired), Flagstaff, AZ

## Introduction

The effects of wildfire on aquatic systems and fishes occurring in them has been linked to the *direct* or immediate influence of the fire on water quality and the *indirect* or subsequent effects on watershed characteristics and processes that influence water quality and quantity, stream channels, and aquatic biota (Gresswell 1999). Early research linking fire and aquatic systems focused on effects to soil, erosion, and water yield and quality, with a relatively limited temporal and spatial context (see Gresswell 1999 for a review). Wildfire generally was perceived as a destructive force threatening aquatic resources (e.g., fish populations) and related values (Rieman and Clayton 1997; Kaufman 2004).

Subsequent efforts have integrated physical and ecological processes related to fire, and these concepts have been temporally categorized as short-term (i.e., <1 year), mid-term (1-10 yr), and long-term (10s to 100s of years) (e.g., Minshall and Brock 1991; Minshall and others 1998, 2001; Mihuc and Minshall 2005). Concomitantly, spatial context is critical because heterogeneity in fire severity, stream or watershed characteristics, and ecological communities constrains subsequent events and ecological responses. A broader perception includes the role of wildfire as a fundamental agent of disturbance potentially shaping heterogeneity, diversity, and productivity in aquatic ecosystems (Reeves and others 1995; Gresswell 1999; Bisson and others 2003).

The effects of fire and fire related management have been of particular importance to those interested in, or responsible for, management of native fishes. Fish and associated fisheries often hold particular social and economic importance. The sometimes dramatic short-term effects of fire and postfire disturbance on stream channels, water quality, and mortality of individual organisms can be readily apparent. As a result, attempts to influence fire and its effects on aquatic systems and fish populations before and, particularly, during and after the fire, have consumed considerable resources, time, and energy, and engendered substantial debate (e.g., Dunham and others 2003; Rieman and others 2003; NMFS 2007; Rhodes and Baker 2008; Rieman and others 2010).

It is our intent to summarize the known effects of fire-related processes in forested biomes of the western United States, briefly review existing knowledge regarding direct and indirect effects to fish, and consider the implications for fish populations. We integrate earlier summaries (e.g., Gresswell 1999; Dunham and others 2003; Rieman and others 2003) with more recent information and conclude with a final synthesis, including implications for conserving or restoring the resilience of fish populations to wildfire.

Rvsd Plan - 00001737 159

# Fire Effects

### Direct Effects

Wildfires consume flammable materials, and in the process, shade and cover provided by vegetation and woody debris is altered (Gresswell 1999). If a severe fire burns near or across a stream, water temperature can increase substantially (Hitt and others 2003). Dissolution of smoke, ash, and volatile compounds can alter pH and concentrations of trace metals, nutrients, and other chemical constituents in streams (Cushing and Olsen 1963; Minshall and others 1989; Spencer and Hauer 1991; Earl and Blinn 2003; Spencer and others 2003).

Direct physical effects can produce mortality of aquatic organisms including fishes, amphibians, invertebrates, and periphyton (Rieman and others 1997; Gresswell 1999). The causes of mortality have not been definitively identified, but potential mechanisms include rapid increases in temperature and accumulation of toxic chemicals (e.g., ammonium, trace metals, and cyanide) (Minshall and others 1989, 1997; Spencer and Hauer 1991; Barber and others 2003).

The observed spatial pattern of direct effects seems to depend on the extent and severity of fire and size of the watershed (Gresswell 1999). Minshall and Brock (1991), for example, suggested that fire would not directly influence temperature in third order or larger streams. Furthermore, high variability in postfire distribution of fishes in small streams appears to be associated with the heterogeneity of riparian fire severity (Rieman and others 1997). Mortality or displacement of fishes may be extensive, extending for several kilometers, but effects are often incomplete or patchy within and among stream reaches influenced by fire (Minshall and Brock 1991; Rinne and Neary 1996; Rieman and others 1997).

More recently, Howell (2006) found evidence of high to complete mortality or displacement of steelhead (*Oncorhynchus mykiss*), Chinook salmon (*O. tshawytscha*), and brook trout (*Salvelinus fontinalis*) in several moderate to severely burned reaches of three small (<2.6 m width) streams in eastern Oregon. Fish persisted at normal densities in stream reaches immediately downstream of those experiencing more severe fire. Based on observations from streams in northwestern Montana, Jakober (2001) reported that direct effects of several large fires were observable the following year. For example, the majority of fish in a drainage located in northwestern Montana were killed during a fire in 1996, and bull trout appeared to have been extirpated from headwater reaches of two small streams (Jakober and Dentino 2003). In contrast, fish distribution and density were relatively unaffected 1 year after fires that burned in Lolo National Forest during 2000 (Jakober 2002). In the southwestern United States, direct mortalities of fish appear to be less common than those following subsequent hydrologic events (Rinne and Jacoby 2005).

Direct effects may also result from fire suppression activities and the use of fire retardants (Gresswell 1999). Sodium ferrocyanide, a component of a commonly used fire retardant, is known to be toxic to aquatic organisms (Little and Calfee 2002; Pilliod and others 2003; Angeler and Moreno 2006), but the temporal and spatial extent of these effects have been poorly understood. In fact, Crouch and others (2006) recently found no evidence that retardant increased the levels of any chemical constituents above those from wildfire alone. The authors suggested that ferrocyanide was elevated through pyrogenic sources (Crouch and others 2006). Nonetheless, the Forest Service eliminated use of retardants with sodium ferrocyanide in 2007 because of the potential toxicity to aquatic organisms (USDA 2007). The replacement, known commercially as PhosChek, was less toxic in laboratory

fire-related hydrological changes that can attenuate within 10 years, changes in the recruitment of woody debris can extend for decades (Reeves and others 1995; Gresswell 1999; Scheidt 2006). Postfire accumulation of wood is related to the prefire forest, severity of the fire, and processes associated with wood routing and storage in the channel (May and Gresswell 2003; Scheidt 2006). Woody debris may even decline following fire if a large proportion of the vegetation (including instream debris jams) is burned completely, or if remaining wood is transported out of the system during periods of elevated discharge (Swanson and Lienkaemper 1978). Mid-term accumulation may occur with toppling of fire-killed trees, undermining of riparian trees with increased flow and bank erosion, or the transport of wood from upslope via debris flows or avalanches (Swanson and Lienkaemper 1978; Scheidt 2006). Longer-term recruitment may depend on the rate that mature trees develop. The interaction of processes controlling the supply, accumulation, transport and storage of woody debris can lead to substantial variability within and among individual streams, or across time (e.g., May and Gresswell 1993; Young and others 2006). The capacity of a stream system to store and continually rework stored materials, however, may also lead to relatively stable or uniform conditions in some systems (Scheidt 2006).

*Food Webs.*–A handful of studies before 1989 provided a limited perspective on wildfire and responses in biological communities and food webs in streams (Gresswell 1999). In general, it is clear that fire and subsequent effects can disrupt invertebrate communities in segments of small streams, and that at longer time scales, effects depend on the severity and extent of the fire, subsequent hydrologic disturbance, and the characteristics and recovery of riparian vegetation. There is a substantial body of literature that initially defined the anticipated responses of stream communities and food webs to the extended effects of wildfire (e.g., Minshall and others 1989, 1997, 1998, 2001, 2004; Robinson and Minshall 1996; Minshall 2003; Earl and Blinn 2003; Mihuc and Minshall 2005). The generalized prediction emerging from this work can be summarized as an ecological succession in a temporal frame (Minshall and others1989; Gresswell 1999; Dunham and others 2003; Minshall and others 2004).

The short-term effects of postfire disturbances are related to the biophysical template following the fire, and responses can be dramatic, varying from virtually undetectable to the complete loss of invertebrates and algae. Where disruption is great, invertebrate and algal communities are often recolonized quickly, but abundance and diversity may continue to vary (Earl and Blinn 2003; Minshall and others 2004).

In the mid-term (1-10 yr), diversity in aquatic communities tends to increase and productivity can be high with increased sunlight, stream temperatures, and nutrient flux. Where the riparian canopy is substantially reduced, foodwebs are expected to shift from largely allochthonous to autochthonous sources of carbon, with a concomitant response in trophic guilds of macroinvertebrates (or shifts feeding strategies by individual species; Mihuc 2004) and detrital respiration. Recent research has provided additional evidence that severe wildfire can stimulate primary production and a shift to primary consumers that support a greater biomass of predatory insects, potentially fish, and even consumers in linked riparian communities (Malison 2008; Malison and Baxter2010).

In the longer term (10-300 yr), watershed processes are anticipated to interact with succession in terrestrial and riparian vegetation. Influx of wood generally leads to organic litter accumulation. Trophic pathways are anticipated to shift from autochthonous toward allochthonous carbon sources as riparian vegetation increases and the canopy closes (Minshall and others 1989). Recent research has

generally supported these predictions and extended the perspective (Minshall and others 2004; Robinson and others 2005), but changing climate may constrain future riparian communities leading to unanticipated outcomes.

The long-term effects of wildfire on macroinvertebrate communities and food webs remain speculative, largely because direct evidence from empirical studies of that temporal extent simply does not exist. The results clearly depend, however, on the myriad interactions between disturbance, terrestrial succession, and watershed process that directly and indirectly influence the legacy of materials and linkages within, and between terrestrial and aquatic systems (Dale and others 2005; Milner and others 2007, 2008; Pettit and Naiman 2007).

## Fish Population Responses

Stream environments can change quickly during or following a fire (e.g., a single flood event) and may be catastrophic in ecological terms (including local extirpation of organisms in individual stream reaches). Concomitantly, indirect effects of wildfire often initiate or constrain processes, and responses can extend for decades and even centuries. Wildfire clearly plays an important role in supply of food and materials and the heterogeneity of channel conditions that contribute to the mosaic and productivity of habitats (Reeves and others 1995; May and Gresswell 2003; May and Lee 2004). Although direct and indirect effects of wildfire can induce fish mortality, the long-term consequences for fish populations and assemblages will ultimately depend on the legacies of material, biota, and the associated physical and ecological processes that shape them. Understanding these changes ultimately requires a population-level perspective.

The response of fish populations to the direct and indirect effects of wildfire has been a focus of considerable interest in the last two decades. Because fires are hard to predict, most of the early research was opportunistic. In some cases, wildfires burned in watersheds where pre-existing population data facilitated before-after comparisons (e.g., Novak and White 1990; Rinne and Neary 1996; Rieman and others 1997), but inference was also gained from comparisons among burned and unburned streams, or the temporal trajectory of populations associated with the immediate effects of fire (Minshall and Brock 1991; Rieman and others 1997). Initial research focused principally on description of changes in distribution and abundance of extant populations or segments of populations (Rieman and others 1997; Gresswell 1999), but subsequent syntheses considered a broader context of population and ecological processes (Rieman and Clayton 1997; Dunham and others 2003; Heck 2007).

Although historic information suggested that direct effects of fire could produce substantial fish mortality (Minshall and Brock 1991; Rinne and Neary 1996; Rieman and others 2007), we know of no examples of population extirpation associated with immediate effects of wildfires. In general, population level implications of wildfire appear to depend on longer-term processes.

Reductions in abundance, contraction in distribution, and even local extirpation have been reported with the indirect effects of large fires (Bozek and Young 1994; Rinne and Neary 1996; Gresswell 1999; Rieman and others 1997; Rinne and Carter 2008). Extreme effects, including local extirpations, have most often been observed in the southwestern United States (Rinne and Neary 1996). Negative consequences are related to diminished water quality associated with postfire ash flows, loss of habitat connectivity during periods of drought and intermittent flows, violent postfire flooding, and loss of food base and habitat (Rinne 2003, 2004; Rinne and Carter 2008). Fish populations in the Southwest may be especially

vulnerable because the spring and early summer fire season is followed by monsoon in late summer (Rinne 2004). When heavy rains follow severe fire, and heavy ash or "slurry flows" have been reported (Rinne and Neary 1996).

The potential for a severe disturbance is coupled with the fact that many of remaining native fish populations in the Southwest are limited to small streams isolated from any source of immigration (Brown and others 2001). In fact, many fishes in the region have been formally listed as threatened or endangered under ESA, and therefore, there is substantial concern that wildfires could negatively influence persistence. In some cases, rescue efforts have been initiated to capture surviving fish during, or immediately following, a fire and move them to a secure environment (e.g., hatchery) until habitat conditions in the burned watershed stabilized (Brooks 2006; A. Unthank, USDA Forest Service Regional Office, Albuquerque, NM personal communication).

Despite the potentially deleterious consequences, population collapses have not been ubiquitous in the aftermath of even very large fires. In some cases, fire had little apparent effect (Gresswell 1999; Riggers 2001; Jakober 2002). In others, abundance was seriously depressed, and reach-level extirpation occurred; however, populations rebounded relatively quickly (e.g., 1-6 years; Novak and White 1990; Rieman and others 1997; Jakober and Dentino 2003). The emerging context of disturbance ecology and metapopulation dynamics and documented population resurgence resulted in a hypothesis of recovery strongly mediated by the expression of migratory life histories and by dispersal from refugia not influenced by the fire and subsequent events (Rieman and Clayton 1997; Rieman and Dunham 2000; Dunham and others 2003).

Recent research has sustained this view. In an extensive study of 32 watersheds that burned in large fires on the Boise National Forest between 1986 and 1994, Burton (2005) found that even where reach or broader-scale extirpation of fishes had occurred, recolonization through dispersal was complete. Howell (2006) reported rapid (within 4 years) recovery of rainbow and steelhead populations through immigration from habitats not influenced by postfire disturbances. Debris flows actually provided new habitat for Chinook salmon by destroying a culvert and promoting access to new areas above the former barrier (Howell 2006). Similarly, fire-flood generated debris fans in the Middle Fork Salmon River created new habitat used by spawning Chinook salmon within months of the events (R. Thurow USDA Forest Service, Rocky Mountain Research Station, Boise Idaho, personal communication of unpublished data). Examples of rapid responses now extend beyond the North American continent, and recovery of native fishes within 24-36 months of extirpation following extensive postfire sediment flows has been documented in Australia (Lyon and O'Conner 2008).

In fact, evidence that fishes exhibit resilience to fire is unmatched by recovery from anthropogenic disturbance (Neville and others 2009). Dunham and others (2007) contrasted two levels of postfire disturbance (burn-and-debris-flow and burn-only) with unburned streams in the Boise River basin, but severity of disturbance did not have substantial influence on the distribution of either rainbow trout (*O. mykiss*) and tailed frogs (*Ascaphus truei*) within 10 years following fire. It appeared that even if effects from wildfire (e.g., elevated summer water temperature) continued for a decade or more, human activities that reduce the capacity of organisms to respond to disturbance may be a greater threat to persistence than wildfire (Dunham et al 2007). Similarly, Neville and others (2009) found no evidence of genetic bottlenecks associated with fire related disturbance in 55 streams affected by the Boise fires, but genetic diversity decreased in relation to human caused migration barriers (i.e., impassable road culverts).

The potential spread of nonnative species facilitated by fire-related disturbance is another important issue for some dwindling native fish populations (Dunham and others 2003). Because stream temperature can affect the relative distribution and interaction of native and nonnative species (e.g., McHugh and Budy 2005; Rieman and others 2006; Benjamin and others 2007; McMahon and others 2007), it has been suggested that warming of streams affected by wildfire may lead to expansion of nonnative species (e.g., brook trout or brown trout *Salmo trutta*) and concomitant contraction of native species, like bull trout *S. cor fluentus* and cutthroat trout (Dunham and others 2007; Isaak and others 2010). Results of a recent study in the Bitterroot River watershed where bull trout and westslope cutthroat trout co-occur with nonnative brown trout, brook trout, and rainbow trout suggested that native salmonids were resilient to fire (Sestrich and others 2011). Although nonnative trout invaded 4 of 17 stream sections within the burned area, the invasion rate was similar in sections that did not burn. Habitat conditions declined, but native trout populations actually exceeded pre-disturbance levels 3 years following the fire (Sestrich and others 2011).

To this point, the emphasis has been on dispersal and migration as key mechanisms behind population-level responses of fishes to fire, but research examining sublethal effects of habitat changes provides some evidence that phenotypic plasticity and adaptation to the effects of fire are mechanisms that may contribute to population resilience as well. In one recent study, habitat characteristics and growth of coastal cutthroat trout (*O. clarkii clarkii*) were evaluated in severely and moderately burned watersheds and an unburned control (Heck 2007). Stream temperature increased following the removal of riparian vegetation during the fire, and growth of fish in burned watersheds was greater than in the unburned control. Increased water temperatures and a longer growing season may have triggered a bottom-up response resulting in an increased growth of cutthroat trout, but longevity decreased (Heck 2007). Apparently, survival in these headwater streams was limited by the maximum size of the individual trout, and faster growing individuals reached the critical point at an earlier age. In a study of nine tributaries of the Boise River (i.e., three each of reference, burned, and burned with channel reorganization), there was a direct relationship between growth and maturation rate, and level of disturbance 10 years following fire (A. Rosenberger, University of Alaska, personal communication of unpublished data). Such adaptation could be critical to persistence of some isolated populations (Letcher and others 2007).

## Summary, Implications, and Conclusions

Wildfire can have dramatic effects on streams and on populations of native fishes. Mortalities have been associated with the direct effects of severe fires, but these consequences have been most frequently observed in relatively small streams and over limited extent (1-2 km). Indirect effects linked to the physical and ecological process occurring after a fire can extend over 10s to even 100s of km of stream, however, and effects may last for decades, and potentially even centuries. Wildfire and associated disturbances have been, and likely will continue to be, a proximate cause of extirpation for small populations of native fishes. In general, however, the effects of wildfire are far less dramatic. In some cases, the effects of wildfires have been difficult to measure, and in others, populations that were initially depressed have rebounded dramatically, even increasing in abundance or extent relative to prefire conditions.

**Rvsd Plan - 00001743**

Gresswell (1999) suggested that over much longer time scales (decades to millennia), fish were well adapted to disturbances occurring at the frequency of wildfire. Recent evidence suggests that effects of disturbance in individual habitat patches are greatest on individuals and local populations that are least mobile, and early speculation to that effect (Warren and Liss 1980; Rieman and Clayton 1997; Gresswell 1999) has been supported by recent findings. Because habitat fragmentation is directly linked to the ability of fish to move among disparate portions of a stream network, this factor alone may be much more critical to the persistence of western salmonids than disturbance related to wildfire. There is a growing body of evidence that watershed characteristics including size, complexity (number and arrangement of tributaries), connectivity, and management history play a major role in the population structure and resilience at multiple levels of biological organization across disturbance-prone landscapes (Wofford and others 2005; Neville and others 2006; Guy and others 2008).

Clearly, context shapes the effects of wildfire on populations and communities of native fishes. Fish are most vulnerable to both direct and indirect effects of fire where populations are restricted to relatively small areas of habitat, and risk is greatest in isolated stream segments or small networks in steep, confined drainages where severe fires are likely to burn a large proportion of the headwaters and riparian corridor. Where populations are relatively large, have access to diverse, well-connected habitats and/or the capacity to adapt to changing environments, vulnerability is lessened; in many cases, the capacity and even the productivity of habitat can even be improved following wildfire (e.g. Malison and Baxter 2010).

The differences in context are evident among individual populations and watersheds across the landscape. Some populations within a basin may be highly vulnerable to any form of disturbance, but others are much less so (e.g., Guy and others 2008; Peterson and others 2008; Neville and others 2009). Populations of Chinook salmon, bull trout, and other species that migrate over large expanses of habitat in the Pacific Northwest and northern Rocky Mountains have fared well in response to the major fires of recent decades. Managers in these systems may tend to worry less about wildfire than the more chronic effects of watershed development. They may even see wildfire as beneficial for creating or expanding new habitats (e.g., Howell 2006). In contrast, managers concerned with remnant populations of native fishes isolated by invasive species and dewatered stream channels in the central Rocky Mountains and the Southwest may view the next wildfire as the catalyst for local extirpation, or even species level extinction (e.g., Brown and others 2001; Rinne 2004; Brooks 2006).

Large disturbances will likely continue in all of these regions. The watersheds of the Rocky Mountains and interior west have been shaped by disturbances linked to wildfire, large storms, and the flux, routing, and storage of water (in groundwater, snow and ice), sediment, and wood. On evolutionary time scales, large fires, mass erosion events, floods, and even local extinctions have likely been common (e.g., Bennett 1990; Reeves and others 1995; Meyer and Pierce 2003), and yet many species and populations of fishes have persisted and adapted (Gresswell 1999). Management might alter the frequency and magnitude of particular disturbance processes, but it likely cannot eliminate large and intense watershed events (e.g., Kirchner and others 2001; Istanbullouglu and others 2002). In fact, frequency and/or magnitude of some disturbances may even increase with changing climate (e.g., McKenzie and others 2004; Westerling and others 2006). Furthermore, the extent of thermal habitats for coldwater salmonids and the connectivity among refugia are expected to decline, further increasing the vulnerability of some populations

(Rieman and others 2007; Williams and others 2009; Haak and others 2010; Isaak and others, 2010).

So how can managers respond to the challenges posed by changing fire regimes and the conservation of native fishes and diverse aquatic ecosystems? In general, options can be categorized as management before, during, and after fire (Dale and others 2001; Dunham and others 2003), but a framework for monitoring and adaptation is critical in all cases (Dunham and others 2003). Management before fire includes maintaining or restoring the resistance or resilience to disturbance before the next disturbance occurs. Conditions contributing to resistance and resilience in populations emerge repeatedly in the discussion above and elsewhere (e.g., Gresswell 1999; Dunham and others 2003; Bisson and others 2003; Rieman and Isaak 2010). Conservation or restoration of relatively large networks of habitat and the physical and ecological processes that maintain them, the broad expression and adaptation of life histories, and the potential for connections within, and among populations are all critical. In essence, resilience will depend on a spatial and temporal structure and diversity in populations and habitats that can absorb or benefit from the effects of fire.

In some cases only remnant habitats exist and reconnection or expansion to support resilience and adaptive potential is not possible or desirable (e.g., the potential invasion of nonnative species). The only alternative may lie in attempts to change the character of disturbance. For example, by reducing the extent or grain of severe fire, even small populations may have some chance of persisting. Considerable discussion has focused on the management of fuels through prescribed fire or thinning as a tool for altering the severity of fire, if not its extent (Reinhardt and others 2008; Rieman and others 2010). Continued debate about the potential utility of such efforts is related to the tradeoffs between the potentially damaging effects of management relative to the effects of the fires (Rhodes and Baker 2008; Rieman and others 2010) that may occur with, or without that management (Littell and others 2009).

If the conditions supporting the resilience and adaptation of populations cannot be created before a large fire occurs, managers are left with limited options. They might attempt to suppress or mitigate effects during or after the fire. Although extraordinary measures could make the difference between extinction and persistence (e.g., Brown and others 2001), there is some question whether postfire watershed remediation can even influence the kinds of events that might actually threaten populations (Backer and others 2004). Regardless of their efficacy, these actions can be extraordinarily expensive and necessarily will be limited in the extent or number of populations, streams, or watersheds that might be considered. Concomitantly, there are other activities (e.g., salvage logging) that can be detrimental to particularly vulnerable populations in the postfire environment (Beschta et al 2004; Karr and others 2004; Reeves and others 2006).

Clearly, better information is needed to understand where and how the conditions in forests, watersheds, and native fish populations transition from those that may benefit from and are resilient to the effects of wildfire, to those that are vulnerable to those effects. At what point is a population too small or too isolated to persist? Can we actually influence the character of fire to alter that balance? How do we weigh the threats and benefits of aggressive management? Peterson and others (2008), Dare and others (2009), and Rieman and others (2010) offer some tools that may help refine this discussion and offer some approaches that can begin to answer these questions. Further collaboration between researchers and managers could extend this process. In the interim, the basic concepts of resilience outlined repeatedly throughout this review provide a critical foundation for the future.

**Rvsd Plan - 00001745**

# References

Amaranthus, M. H. Jubas, and D. Arthur. 1989. Stream shading, summer streamflow, and maximum water temperature following intense wildfire in headwater streams. Pages 75-78 *in* N. H. Berg, editor. Proceedings of the symposium on fire and watershed management. USDA Forest Service General Technical Report PSW-109.

Angeler, D.G., and J.M. Moreno. 2007. Zooplankton community resilience after press-type anthropogenic stress in temporary ponds. Ecological Applications 17:1105-1115.

Backer, D.M., S.E. Jensen, and G.R. McPherson. 2004. Impacts of fire-suppression activities on natural communities. Conservation Biology 18:937-946.

Barber, T.R., C.C. Lutes, M.R.J. Doorn, P.C. Fuchsman, H.J. Timmenga, and R.L. Crouch. 2003. Aquatic ecological risks due to cyanide releases from biomass burning. Chemosphere 50:343-348.

Benda, L.,D. Miller, P. Bigelow, and K. Andrus. 2003. Effects of post-fire erosion on channel environments, Boise River, Idaho. Forest Ecology and Management 178:105-119.

Benjamin, J.R., J.B. Dunham, and M.R. Dare. 2007. Invasion by nonnative brook trout in Panther Creek, Idaho: roles of habitat quality, biotic resistance, and connectivity to source habitats. Transactions of the American Fisheries Society 136:875-888.

Bennett, K.D. 1990. Milankovitch cycles and their effects on species in ecological and evolutionary time. Paleobiology 16:11-21.

Beschta, R.L., J.J. Rhodes, J.B. Kauffman, R.E. Gresswell, G.W. Minshall, C.A. Frissell, D.A. Perry, R. Hauer, and J.R. Karr. 2004. Postfire management on forested public lands of the western USA. Conservation Biology 18:957-967.

Bisson, P.A., B.E. Rieman, C. Luce, P.F. Hessburg, D.C. Lee, J.L. Kershner, G.H. Reeves, and R.E. Gresswell. 2003. Fire and aquatic ecosystems of the western USA: current knowledge and key questions. Forest Ecology and Management 178:213-229.

Bozek, M.A., and M.K. Young. 1994. Fish mortality resulting from delayed effects of fire in the Greater Yellowstone Ecosystem. Great Basin Naturalist 54:91-95.

Brooks, J.E 2006. Emergency evacuation procedures for Gila trout. J. E. Brooks, editor. Gila trout recovery team. US Fish and Wildlife Service, Arizona Game and Fish Department, New Mexico Department of Game and Fish, U.S. Forest Service, and University of New Mexico, Albuquerque.

Brown, D.K., A.A. Echell, D.L. Propst, J.E. Brooks, and W.L. Fisher. 2001. Catastrophic wildfire and number of populations as factors influencing risk of extinction for Gila trout (*Oncorhynchus gilae*). Western North American Naturalist 61:139-148.

Burton, T.A. 2005. Fish and stream habitat risks from uncharacteristic wildfire: observations from 17 years of fire-related disturbances on the Boise National Forest, Idaho. Forest Ecology and Management 211:140-149.

Comas, S. 2007. Aerial application of fire retardant environmental assessment: aquatic specialist report and biological evaluation. USDA Forest Service, Washington DC.

Crouch, R.L., H.J. Timmenga, T.R. Barber, and P.C. Fuchsman. 2006. Post-fire surface water quality: comparison of fire retardant versus wildfire-related effects. Chemosphere 62:874-889.

Cushing, J.C.E., and P.A. Olson. 1963. Effects of weed burning on stream conditions. Transactions of the American Fisheries Society 92:303-305.

Dale, V.H., C.M. Crisafulli, and F.J. Swanson. 2005. 25 Years of ecological change at Mount St. Helens. Science 308:961-962.

Dale, V.H., L.A. Joyce, S. McNulty, R.P. Neilson, M.P. Ayres, M.D. Flannigan, P J. Hanson, L.C. Irland, A.E. Lugo, C.J. Peterson, D. Simberloff, F.J. Swanson, B.J. Stocks, and B.M. Wotton. 2001. Climate change and forest disturbances. BioScience 51:723-733.

Dare, M.R., Luce C.L., Hessburg P.F., Rieman B.E., Miller C., and Black A.E. 2009. Integrated analysis for management of fire and fuels, terrestrial and aquatic ecological processes, and conservation of sensitive aquatic species. Final Report Project 05-4-3-15, USDI, USDA Joint Fire Sciences Program, Boise, Idaho.

Dunham, J.B., A.E. Rosenberger, C.H. Luce, and B.E. Rieman. 2007. Influences of wildfire and channel reorganization on spatial and temporal variation in stream temperature and the distribution of fish and amphibians. Ecosystems 10:335-346.

Dunham, J.B., M.K. Young, R.E. Gresswell, and B.E. Rieman. 2003. Effects of fire on fish populations: landscape perspectives on persistence of native fishes and nonnative fish invasions. Forest Ecology and Management 178:183-196.

Earl, S.R., and D.W. Blinn. 2003. Effects of wildfire ash on water chemistry and biota in south-western U.S.A. streams. Freshwater Biology 48:1015-1030.

Gresswell, R.E. 1999. Fire and aquatic ecosystems in forested biomes of North America. Transactions of the American Fisheries Society 128:193-221.

Guy, T.J., R.E. Gresswell, and M.A. Banks. 2008. Landscape-scale evaluation of genetic structure among barrier-isolated populations of coastal cutthroat trout, *Oncorhynchus clarkii clarkii*. Canadian Journal of Fisheries and Aquatic Sciences 65:1749-1762.

Haak, A.L., J.E. Williams, D. Isaak, A. Todd, C.C. Muhlfeld, J.L. Kershner, R.E. Gresswell, S.W. Hostetler, and H.M. Neville. 2010. The potential influence of changing climate on the persistence of salmonids of the inland West. U.S. Geological Survey, Open-File Report 2010-1236.

Heck, M.P. 2007. Effects of wildfire on growth and demographics of coastal cutthroat trout in headwater streams. Master's Thesis. Oregon State University, Corvallis.

Hitt N.P. 2003. Immediate effects of wildfire on stream temperature. Journal of Freshwater Ecology 18:1713.

Howell, P.J. 2006. Effects of wildfire and subsequent hydrologic events on fish distribution and abundance in tributaries of North Fork John Day River. North American Journal of Fisheries Management 26:983-994.

Isaak, D.J., C.H. Luce, B.E. Rieman, D.E. Nagel, E.E. Peterson, D.L. Horan, S. Parkes, and G.L. Chandler. 2010. Effects of climate change and wildfire on stream temperatures and salmonid thermal habitat in a mountain river network. Ecological Applications 20:1350-1371.

Istanbullouglu, E., D.G. Tarboton, R.T. Pack, and C.E. Luce. 2004. Modeling of the interactions between forest vegetation disturbances and sediment yields. Journal of Geophysical Research 109, FO1009, doi: 10.1029/2003JF000041, 2004.

Jakober, M. and C.A. Dentino. 2003. Summary of fish habitat and population changes in the Wilderson Creek drainage, upper Selway subbasin, six years after the 1996 Swet fire, Manuscript Report, April 7, 2003. Bitterroot National Forest, Hamilton, Montana.

Jakober, M.J. 2002. A summary of fish habitat and population changes in Flat Creek, Upper Selway River Drainage, one year after the 2000 Wilderness Complex fires, Manuscript Report March 25, 2002. Bitterroot National Forest, Hamilton, Montana.

Karr, J.A., J.J. Rhodes, G.W. Minshall, F.R. Hauer, R.L. Beschta, C.A. Frissell, and D.A. Perry. 2004. The effects of postfire salvage logging on aquatic ecosystems in the American West. BioScience 54:1029-1033.

Kauffmann, J.B. 2004. Death rides the forest: perceptions of fire, land use, and ecological restoration of western forests. Conservation Biology 18:878-882.

Keller, E.A. and F.J. Swanson. 1979. Effects of large organic material on channel form and fluvial processes. Earth Surface Processes and Landforms 4:361-380.

Kirchner, J.W., R.C. Finkel, C.S. Riebe, D.E. Granger, J.L. Clayton, J.G. King, and W.F. Megahan. 2001. Mountain erosion over 10 yr, 10 ky, and 10 my time scales. Geology 29:591-594.

Legleiter, C.J., R.L. Lawrence, M.A. Fonstad, W.A. Marcus, and R. Aspinall. 2002. Fluvial response a decade after wildfire in the northern Yellowstone ecosystem: a spatially explicit analysis. Geomorphology 1304:1-18.

Letcher, B.H., K. Nislow, J. Coombs, M. O'Donnell, and T. Dubreuil. 2007. Population response to habitat fragmentation in a stream-dwelling brook trout population. PLoS ONE 2:1-11.

Littell, J.S., D. McKenzie, D.L. Peterson, and A.L. Westerling. 2009. Climate and wildfire area burned in western U.S. ecoprovinces, 1916-2003. Ecological Applications 19:1003-1021.

Little, E.E., and R.D. Calfee. 2003. Effects of fire retardant chemical to fathead minnows in experimental streams. Environmental Science and Pollution Research 10:296-300.

Luce, C.H. 2005. Fire effects on runoff generation processes. Pages 1831-1838 in M.G. Anderson, and J.J. McDonnell, editors. Encyclopedia of hydrological sciences. Wiley, Chichester.

Lyon, J.P., and J.P. O'Connor. 2008. Smoke on the water: can riverine fish populations recover following a catastrophic fire-related sediment slug? Austral Ecology 33:794-806.

Malison, R.L., and C.V. Baxter. 2010. The fire pulse: wildfire stimulates flux of aquatic prey to terrestrial habitats driving increases in riparian consumers. Canadian Journal of Fisheries and Aquatic Sciences 67: 570-579.

Malison, R.L. 2008. Effects of wildfire on aquatic insect assemblages, emerging adult insects, and riparian consumers in a wilderness watershed. Master's Thesis. Idaho State University, Pocatello.

May, C.L., and R.E. Gresswell. 2003. Processes and rates of sediment and wood accumulation in headwater streams of the central Oregon Coast Range. Earth Surface Processes and Landforms 28:409-424.

USDA Revised Plan AR 00001748

May, C.L., and D.Lee. 2004. The relationships among in-channel sediment storage, pool depth, and summer survival of juvenile salmonids in Oregon Coast Range streams. North American Journal of Fisheries Management 24:761-774.

McHugh, P., and P. Budy. 2005. An experimental evaluation of competitive and thermal effects on brown trout (*Salmo trutta*) and Bonneville cutthroat trout (*Oncorhynchus clarkii utah*) performance along an altitudinal gradient. Canadian Journal of Fisheries and Aquatic Sciences 62:2784-2795.

McKenzie, D., Z. Gedalof, D.L. Peterson, and P. Mote. 2004. Climate change, wildfire, and conservation. Conservation Biology 18:890-902.

McMahon, T.E., A.V. Zale, F.T. Barrows, J.H. Selong, and R.J. Danehy. 2007. Temperature and competition between bull trout and brook trout: A test of the elevation refuge hypothesis. Transactions of the American Fisheries Society 136:1313-1326.

McNabb, D.H., F. Gaweda, and H.A. Froehlich. 1989. Infiltration, water repellency, and soil moisture content after broadcast burning a forest site in southwest Oregon. Journal of Soil and Water Conservation 44:87-90.

Meyer, G.A., and J.L. Pierce. 2003. Climatic controls on fire-induced sediment pulses in Yellowstone National Park and central Idaho: a long-term perspective. Forest Ecology and Management 178:89-104.

Mihuc, T.B. 2004. Food web dynamics in Yellowstone streams: shifts in the trophic basis of a stream food web after wildfire disturbance. Pages 189-199 *in* L. L. Wallace, editor. After the Fires: The ecology of change in Yellowstone National Park. Yale University Press, New Haven, Connecticut.

Mihuc, T.B., and G.W. Minshall. 2005. The trophic basis of reference and post-fire stream food webs 10 years after wildfire in Yellowstone National Park. Aquatic Sciences - Research Across Boundaries 67: 541-548.

Miller, D., C. Luce, and L. Benda. 2003. Time, space, and episodicity of physical disturbance in streams. Forest Ecology and Management 178:121-140.

Milner, A.M., C.L. Fastie, F.S. Chapin, D.R. Engstrom, and L.C. Sharman. 2007. Interactions and linkages among ecosystems during landscape evolution. BioScience 57: 237-247.

Milner, A.M., A.L. Robertson, K.A. Monaghan, A.J. Veal, and E.A. Flory. 2008. Colonization and development of an Alaskan stream community over 28 years. Frontiers in Ecology and the Environment 6:413-419.

Minshall, G.W. 2003. Responses of stream benthic macroinvertebrates to fire. Forest Ecology and Management 178:155-161.

Minshall, G.W., and J.T. Brock. 1991. Observed and anticipated effects of forest fire on Yellowstone stream ecosystems. Pages 123-135 *in* R.B. Keiter, and M.S. Boyce, editors. The Greater Yellowstone Ecosystem: redefining America's wilderness heritage. Yale University Press, New Haven, Connecticut.

Minshall, G.W., J.T. Brock, and J.D. Varley. 1989. Wildfires and Yellowstone's stream ecosystems. BioScience 39:707-715.

Minshall, G.W., C.T. Robinson, and D.E. Lawrence. 1997. Postfire response of lotic ecosystems in Yellowstone National Park U.S.A. Canadian Journal of Fisheries and Aquatic Sciences 54:2509-2525.

Minshall, G.W., C.T. Robinson, and T.V. Royer. 1998. Stream ecosystem responses to the 1998 wildfires. Yellowstone Science 6 (3):15-22.

**Rvsd Plan - 00001749**

Minshall, G.W., T.V. Royer, and C.T. Robinson. 2001. Response of the Cache Creek macroinvertebrates during the first 10 years following disturbance by the 1988 Yellowstone wildfires. Canadian Journal of Fisheries and Aquatic Sciences 58:1077-1088.

Minshall, G.W., T.V. Royer, and C.T. Robinson. 2004. Stream ecosystem responses to fire: the first ten years. Pages 165-188 *in* L.L. Wallace, editor. After the fires: the ecology of change in Yellowstone National Park. Yale University Press, New Haven, Connecticut.

Moody, J.A., and D.A. Martin. 2009. Synthesis of sediment yields after wildland fire in different rainfall regimes in the western United States. International Journal of Wildland Fire 18:96-115.

Neville, H.M., J.B. Dunham, and M.M. Peacock. 2006. Landscape attributes and life history variability shape genetic structure of trout populations in a stream network. Landscape Ecology 21:901-916.

Neville, H.,J. Dunham, A. Rosenberger, J. Umek, and B. Nelson. 2009. Influences of wildfire, habitat size, and connectivity on trout in headwater streams revealed by patterns of genetic diversity. Transactions of the American Fisheries Society 138:1314-1327.

NMFS (National Marine Fisheries Service). 2007. Endangered Species Act Section 7 consultation biological opinion: the aerial application of eight long-term fire retardants on all Forest Service lands. USDI NOAA, Endangered Species Division of the Office of Protected Resources.

Novak, M.A., and R.G. White. 1990. Impact of fire and flood on the trout population of Beaver Creek, Upper Missouri Basin, Montana. Pages 120-127 *in* F. Richardson, and R. H. Hamre, editors. Wild Trout IV: Proceedings of the symposium. U.S. Government Printing Office, Washington, D.C.

Peterson, D.P., B.E. Rieman, J.B. Dunham, K.D. Fausch, and M.K. Young. 2008. Analysis of trade-offs between threats of invasion by nonnative trout brook trout (*Salvelinus fontinalis*) and intentional isolation for native westslope cutthroat trout (*Oncorhynchus clarkii lewisi*). Canadian Journal of Fisheries and Aquatic Sciences 65:557-573.

Pettit, N., and R.J. Naiman. 2007. Fire in the riparian zone: Characteristics and ecological consequences. Ecosystems 10:637-687.

Pilliod, D.S., R.B. Bury, E.J. Hyde, C.A. Pearl, and P.S. Corn. 2003. Fire and amphibians in North America. Forest Ecology and Management 178:163-181.

Reeves, G., P. Bisson, B. Rieman, and L. Benda. 2006. Post-fire logging in riparian areas. Conservation Biology 20:994-10047.

Reeves, G H., L.E. Benda, K.M. Burnett, P.A. Bisson, and J.R. Sedell. 1995. A disturbance-based ecosystem approach to maintaining and restoring freshwater habitats of evolutionarily significant units of anadromous salmonids in the Pacific Northwest. Pages 334-349 *in* J. L. Nielsen, editor. Evolution and the aquatic ecosystem: defining unique units in population conservation. American Fisheries Society, Special Symposium 17, Bethesda, Maryland.

Reinhardt, E.D., R.E. Keane, D.E. Calkin, and J.D. Cohen. 2008. Objectives and considerations for wildland fuel treatment in forested ecosystems of the interior western United States. Forest Ecology and Management 256:1997-2006.

Rhodes, J.J., and W.L. Baker. 2008. Fire probability, fuel treatment effectiveness, and ecological tradeoffs in western U.S. Public Forests. The Open Forest Science Journal 1:1-7.

Rieman, B., and J. Clayton. 1997. Wildfire and native fish: issues of forest health and conservation of sensitive species. Fisheries (Bethesda) 22:6-15.

Rieman, B.E., and J.B. Dunham. 2000. Metapopulations and salmonids: a synthesis of life history patterns and empirical observations. Ecology of Freshwater Fish 9:51-64.

Rieman, B.E., P.F. Hessburg, C. Luce, and M.R. Dare. 2010 Wildfire and management of forests and native fishes: conflict or opportunity for convergent solutions. BioScience 60:460-468.

Rieman, B.E., D. Isaak, S. Adams, D. Horan, D. Nagel, C. Luce, and D. Myers. 2007. Anticipated climate warming effects on bull trout habitats and populations across the interior Columbia River Basin. Transactions of the American Fisheries Society 136:1552-1565.

Rieman, B., D. Lee, D. Burns, R. Gresswell, M. Young, R. Stowell, J. Rinne, and P. Howell. 2003. Status of native fishes in the western United States and issues for fire and fuels management. Forest Ecology and Management 178:197-211.

Rieman, B.E., D. Lee, G. Chandler, and D. Myers. 1997. Does wildfire threaten extinction for salmonids? Responses of redband trout and bull trout following recent large fires on the Boise National Forest. Pages 47-57 *in* J. Greenlee, editor. Proceedings of the fire effects on rare and endangered species and habitats conference. International Association of Wildland Fire, Fairfield, Washington.

Riggers, B. 2001. Lolo Burned Area Assessment—Fisheries, Manuscript Report. Lolo National Forest, Missoula, Montana.

Rinne, J.N. 2003. Flows, fishes, foreigners, and fires: relative impacts on Southwestern native fishes. Hydrology and Water Resources in the Southwest 33:79-84.

Rinne, J.N. 2004. Forests, fish and fire: Relationships and management implications for fishes in the southwestern USA. Pages 151-156 *in* G. J. Scrimgeour, G. Eisler, B. McCulloch, U. Silins, and M. Monita, editors. Proceedings of the Forest-Land-Fish Conference II, April 26-28, 2004. Edmonton, Alberta.

Rinne, J.N., and C.D. Carter. 2008. Short-term effects of wildfires on fishes in the southwestern United States, 2002: Management implications. Pages 167-173 *in* M.G. Narog, editor. Proceedings of the 2002 fire conference: managing fire and fuels in the remaining wildlands and open spaces of the Southwestern United States. USDA Forest Service General Technical Report PSW-GTR-189, Albany, California.

Rinne J.N., and G. Jacoby. 2005. Aquatic biota, fishes, invertebrates. Pages 135-143 *in* Neary D. G., K. Ryan, J. Landsberg, and L. F. Debano, editors. Wildland fire in ecosystems: effects of on soil and water. USDA Forest Service General Technical Report RM-42, Fort Collins, Colorado.

Rinne, J.N., and D.G. Neary. 1996. Fire effects on aquatic habitats and biota in Madrean-type ecosystems: Southwestern United States. Pages 135-145 *in* R. H. Hamre, editor. Proceedings of the Madrean fire conference, RM-GTR-289. USDA Forest Service Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Robichaud, P.R., J.L. Beyers, and D.G. Neary. 2005. Chapter 10. Watershed rehabilitation. Pages 179-198 *in* D.G. Neary, K.C. Ryan, and L.B. Debano, editors. Wildland fire in ecosystems: effects of fire on soils and water, RMRS-GTR-42-volume 4. USDA Forest Service Rocky Mountain Research Station, Ogden, Utah.

**Rvsd Plan - 00001751**

Robichaud, P.R., L.H. MacDonald, and R.B. Foltz. 2007 (January 19, last update). Chapter 5. Fuel management and erosion. Pages 1-48 *in* W. J. Elliot, and L. J. Audin, editors. DRAFT Cumulative watershed effects of fuels management in the western United States. [Online]. Available: http://forest.moscowfsl.wsu.edu/engr/cwe/ [2009, March 13—access date].

Robichaud, P.R, J.W. Wagenbrenner, R.E. Brown, K.M. Spigel. 2009. Three years of hillslope sediment yields following the Valley Complex fires, western Montana. Research Paper RMRS-RP-77. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado.

Robinson, C.T., and G.W. Minshall. 1996. Physical and chemical responses of streams in Yellowstone National Park following the 1988 wildfires. Pages 217-221 *in* J. Greenlee, editor. Proceedings of the Second Biennial Conference on the Greater Yellowstone Ecosystem: The ecological implications of fire in Greater Yellowstone. International Association of Wildland Fire, Fairfield, Washington.

Robinson, C.T., U. Uehlinger, and G.W. Minshall. 2005. Functional characteristics of wilderness streams twenty years following wildfire. Western North American Naturalist 65:1-10.

Scheidt, N.E. 2006. Stream succession: channel changes after wildfire disturbance. Master's Thesis. University of Idaho, Boise.

Sestrich, C.M., T.E. McMahon, and M.K. Young. 2011. Influence of fire on native and nonnative salmonid populations and habitat in a western Montana basin. Transactions of the American Fisheries Society 140:136-146.

Spencer C.N., K.O. Gabel, and F.R. Hauer. 2003. Wildfire effects on stream food webs and nutrient dynamics in Glacier National Park, USA. Forest Ecology and Management 178:141-154.

Spencer, C.N., and F.R. Hauer. 1991. Phosphorus and nitrogen dynamics in streams during a wildfire. Journal of the North American Benthological Society 10:24-30.

Swanson, F.J. 1981. Fire and geomorphic process. Pages 401-420 *in* H. A. Mooney, T. M. Bonnicksen, N. L. Christensen, J. E. Lotan, and W. A. Refiners, editors. Fire regimes and ecosystem properties. USDA Forest Service, General Technical Report, WO-GTR-26, Washington, D.C.

Swanson, F.J., and G.W. Lienkaemper. 1978. Physical consequences of large organic debris in Pacific Northwest streams. USDA Forest Service General Technical Report PNW-69, Portland, Oregon.

USDA (U.S. Department of Agriculture, Forest Service). 2007. Aerial application of fire retardant: environmental assessment. USDA Forest Service, Fire and Aviation Management, Washington, DC.

Warren, C.E., and W.J. Liss. 1980. Adaptation to aquatic environments. Pages 15-40 *in* R. T. Lackey, and L. Nielsen, editors. Fisheries management. Blackwell Scientific Publications, Oxford.

Westerling, A.L., H.G. Hidalgo, D.R. Cayan, and T.W. Swetnam. 2006. Warming and earlier spring increases western U.S. forest wildfire activity. Science 330:940-943.

Williams, J.E., A.L. Haak, H.M. Neville, and W.T. Colyer. 2009. Potential consequences of climate change to persistence of cutthroat trout populations. North American Journal of Fisheries Management 29:533-548.

Wofford, J.E.B., R.E. Gresswell, and M.A. Banks. 2005. Influence of barriers to movement on within-watershed genetic variation of coastal cutthroat trout. Ecological Applications 15:628-637.

 USDA_sPlan_FMRS_0001752

Wondzell, S.M., and J. G.King. 2003. Post fire erosional processes in the Pacific Northwest and Rocky Mountain Region. Forest Ecology and Management 178:75-88.

Young, M.K., E.A. Mace, E.T. Ziegler, and E.K. Sutherland. 2006. Characterizing and contrasting instream and riparian coarse wood in Montana basins. Forest Ecology and Management 226.

**Rvsd Plan - 00001753** 175

Case 1:21-cv-02994-REB   Document 24-7   Filed 06/21/22   USDC Colorado   Page 247 of 341

*Proceedings — Fire Effects on Rare and Endangered Species and Habitats Conference, Nov. 13-16, 1995. Coeur d' Alene, Idaho.*
© *IAWF, 1997.  Printed in U.S.A.*

# Does Wildfire Threaten Extinction for Salmonids? Responses of Redband Trout and Bull Trout Following Recent Large Fires on the Boise National Forest

## Bruce Rieman, Danny Lee, Gwynne Chandler, and Deborah Myers

*USDA Forest Service, Intermountain Research Station, 316 E. Myrtle, Boise, ID 83702
Tel.(208) 364-4340; Fax (208) 364-4346*

## Introduction

The potential for wildfire to impact aquatic ecosystems and their associated threatened, endangered, or sensitive species is of increasing concern. Recent (since 1988) large-scale fires followed by dramatic hydrologic disturbances spark much of this interest. Broad swaths of western forest lands, where fire suppression and past silvicultural activities have radically altered vegetation structure and fuel loads, are ripe for high-intensity fires. The potential seems greatest in warm/dry habitat types that historically were dominated by frequent, but low intensity burns. Interconnected, fuel-laden stands may now link areas that historically burned less frequently or uniformly into large, homogeneous areas that are vulnerable to high-intensity, stand replacing events (Agee 1988; Henjum et al. 1994). Recent fires in the Pacific Northwest seem to confirm these expectations.

Wildfires influence aquatic ecosystems both directly and indirectly. Direct effects include heating or abrupt changes in water chemistry (Minshall et al. 1989; McMahon and de Calesta 1990). Indirect effects include changes in hydrologic regime, erosion, debris flows, woody debris loading and riparian cover ( Swanson and Lienkaemper 1978; Brown 1989; Megahan 1991; Bozek and Young 1994). Intense fires and related events have killed fish (Bozek and Young 1994) and even caused local extinctions (Propst et al. 1992; Rinne 1996). Conceivably, large and intense fires could threaten populations of sensitive salmonids such as bull trout, chinook salmon, steelhead, and others that are depressed from other causes. Historical fires, however, were a natural and potentially important part of the disturbance regime for terrestrial and aquatic systems (Reeves et al. 1995). Large fires supplied woody debris and triggered hydrologic events and debris flows that transported coarse substrates to stream channels. These processes may well have provided the materials that maintained productive habitats for fish and other organisms (Swanson et al. 1990; Reeves et al. 1995).

The magnitude and intensity of recent fires heighten concerns regarding forest/ecosystem health, the potential loss of valuable wood fiber and private property, and the apparent threat to sensitive species. Such concerns have galvanized new efforts to reduce fuel loads and stand densities through mechanical treatment and the use of prescribed fire. These efforts create a quandary for biologists and managers working with aquatic systems. The long-term negative effects of timber harvest activities on aquatic ecosystems are well documented (see papers in Meehan 1991 and Salo and Cundy 1987; Henjum et al. 1994). The effects of fire on fish are more equivocal. Do large fires really threaten extinction for many existing salmonid populations? What influences the risk?

Large fires in the Boise River basin on the Boise National Forest in 1992 and 1994 provided an opportunity to examine these questions relative to populations of two sensitive salmonids. Bull trout (*Salvelinus confluentus*) is a category-one species under the Endangered Species Act (ESA), and redband or interior rainbow trout (*Oncorhynchus mykiss*) is recognized as a species of special concern by the Idaho Department of Fish and Game. Some isolated redband populations have been petitioned for formal listing under ESA. Both species inhabit streams caught within fires described as among the most destructive ever observed on the Forest. We initiated work on the responses of these fishes to wildfire and related effects in 1992. The work was planned as long term and much is incomplete. Our preliminary results and the body of literature regarding the disturbance and recovery of aquatic communities provide a base, however, to initiate the discussion.

## Study Area and Species Background

The Boise River Basin is contained almost wholly within the southern batholith section of the northern Rocky Mountain physiographic province. The geology is dominated by granitic rock of the Idaho Batholith. Stream flows are dominated by snowmelt, but summer thunderstorms also occur. Mean annual air temperature at 1,600 m is about 5° C. Forest habitat types (Steele et al. 1981) are predominantly Douglas-fir (*Pseudotsuga menziesii*), and

Ponderosa pine (*Pinus ponderosa*) at low and mid elevations and subalpine fir (*Abies asiocarpa*) at higher elevations.

In five days of August, 1992, lightning-ignited fires on the Forest and adjacent lands burned 105,000 hectares within a contiguous area along the South and Middle Forks of the Boise River (Figure 1). High fuel loading and extended drought contributed to high fire intensity. Nearly complete loss of vegetative cover occurred throughout much of the area (Maloney et al. 1995).

We selected two watersheds as primary study sites within the 1992 burn area, Sheep Creek and Rattlesnake Creek. Burn intensities were particularly high in some segments of the riparian corridors. Preliminary surveys in intensely burned reaches found little surviving emergent vegetation, numerous dead fish, no live fish or other vertebrates, and no or very few macro invertebrates. Population estimates were not available prior to the fire, but previous surveys conducted by the Boise National Forest and Idaho Department of Fish and Game showed that bull trout and redband trout were common in both systems. In addition, extensive fish population surveys throughout

the Boise River basin provided a general comparison of fish densities and species compositions expected in similar waters. The two watersheds are similar in landscape characteristics (Table 1). Both drain into the Boise River basin above Arrowrock reservoir, and both are open to movement of fish to and from the larger basin. Both support the same vertebrate communities, which include bull trout, redband trout, sculpin (*Cottus* spp), tailed frogs (*Ascaphus truei*), and transient populations of mountain whitefish (*Prosopium williamsoni*) and several cyprinids.

We also began studies on a redband trout population in a third watershed, Cottonwood Creek, in 1992. The Cottonwood Creek watershed was unaffected by the 1992 fires, but burned extensively under very similar conditions in 1994. Although Cottonwood Creek is smaller than Sheep Creek or Rattlesnake Creek, it is in a similar setting (Table 1). The stream is isolated from the Boise River in most years by an impassable culvert and does not support bull trout. Redband trout were abundant and found throughout the stream in 1992 and 1993.

Redband trout are native to the Boise River basin and may represent remnant populations of the anadromous



Figure 1. Map of study streams and burn intensity for the 1992 and 1994 fires in the Boise River basin, Idaho. Stream reaches and sites designated for sampling are shown by number or letter (EF = East Fork Sheep Creek, DC = Devils Creek, LR = Little Rattlesnake Creek).

**Table 1.** Characteristics of watersheds for study streams influenced by the 1992 and 1994 fires on the Boise National Forest.

| Watershed | Watershed Area (Ha) | Mean Stream Gradient (%) | Max Basin Elevation (m) | Min Basin Elevation (m) |
|---|---|---|---|---|
| Sheep Creek | 11,315 | 6.5 | 2771 | 1048 |
| Rattlesnake Creek | 11,539 | 4.4 | 2482 | 988 |
| Cottonwood Creek | 5,824 | 7.3 | 2216 | 975 |

rainbow trout or steelhead that inhabited the basin prior to isolation by downstream dams. Redband trout are common throughout the basin, inhabiting streams of all sizes (Rieman and McIntyre 1995). Redband trout in the interior sub-basins of the Columbia River basin typically exhibit both resident and migratory life-history patterns. The resident form resides in natal tributaries or watersheds (like Sheep Creek and Rattlesnake Creek) throughout life, while the migratory form may spawn and rear for some period in a tributary system before moving to a larger river or lake to mature. Both forms are thought to exist throughout the Boise River basin but detailed life-history studies have not been done. Watersheds that are isolated from the main river by natural or human made barriers (culverts, dams) support only the resident form.

Bull trout are also found throughout the Boise River basin, and also exhibit migratory and resident life-history patterns (Rieman and McIntyre 1995). Bull trout are less abundant than redband trout, with fish found in less than half of the waters inventoried throughout the basin (Rieman and McIntyre 1995). Individual adult and sub-adult bull trout may range widely, but spawning and juvenile rearing appear to be restricted to the colder headwaters of larger watersheds (Rieman and McIntyre 1995). In the Sheep Creek and Rattlesnake Creek watersheds, for example, juvenile bull trout would be expected in roughly the upper third of the available stream reaches. Resident bull trout may remain within their natal tributaries throughout life. Migratory forms may rear for two or three years in the headwater streams before moving into the larger rivers, lakes, or reservoirs to mature (Rieman and McIntyre 1993). Once mature, the adults may make repeated, annual, spawning migrations. The resident and migratory forms can be distinguished by virtue of size; migratory adults typically are much larger than the resident adults. Both forms can occur in the same populations (Rieman and McIntyre 1993).

## Methods

### Fire and Watershed Effects

The Boise National Forest mapped burn intensity throughout the fire perimeters in the fall immediately following each event. Burn intensity was based on condi-

tion of above ground vegetation. High intensity was defined as areas where the canopy was completely consumed leaving only black needles or needleless trees and leafless hardwoods and brush. Moderate intensity was defined as areas with 50 to 100% scorched canopy. Scorched canopy was recognized as fire killed needles and leaves that remained on the trees and brush.

We surveyed the study streams by foot in the September following the fires. We qualitatively mapped fire intensity within the riparian zone along the main reaches described below. Although virtually the entire lengths of streams within each watershed were influenced by the fires, some areas were more strongly altered than others. We classified each reach as either high or low intensity effect based on the predominant condition of emergent vegetation. We considered high intensity burn reaches as those where most leaves and needles along the length of the reach were consumed in the fire. In many cases whole trees, shrubs, and downed wood were also consumed by the fire. In most cases fire intensity mapped for the adjacent forest was also high.

### Distribution and Abundance of Fish Sheep

**Creek and Rattlesnake Creek.** We initiated sampling to describe the distribution and abundance of fishes in mid September following the 1992 fire. Snorkeling and electrofishing were used in Sheep Creek in 1992, but sampling was limited to electrofishing in Rattlesnake Creek that year. Snorkeling was the primary method used to describe distribution and abundance in subsequent years in both systems. All snorkeling was conducted from the last week of August through the middle of September in each year. All electrofishing was conducted from the middle of September through the first week of October in each year.

Each stream was stratified into reaches representing distinct channel segments of similar gradient, confinement and discharge. Reaches were contiguous and varied in length from 1 to 3.3 km, covering most of the perennial streams in each watershed (Figure 2). The last reach in Sheep Creek was below a bedrock cascade that was a barrier to fish passage. We found no fish in the stream above the cascade and assume that all of the potential fish habitat was below that point. Some suitable habitat existed in the stream above the last reach in Rattlesnake Creek, but the channel was small and we believe that more than 90 % of the habitat available to fish was within our sampled area.

Snorkeling or electrofishing was completed in seven reaches in 1992, but included eight or nine reaches in subsequent years. Our snorkel methods followed those outlined by Thurow (1994). Fish were recorded in three length groups (< 75 mm, 75 to 150 mm and > 150 mm). In the first year one to three sites about 50 m in length were sampled in each reach. In the following years 15 to

50                           Rieman, B., Lee, D., Chandler,G., and Myers, D.



**Figure 2.** Distribution and number of redband trout sampled in Sheep Creek from 1992 to 1995. The shaded bar under the figure for 1992 designates the reaches with high intensity burns in the riparian area. Dark portions of the histograms represent fish less than 75mm which are predominantly young-of-the-year; open portions represent larger fish. The * designates electrofishing data summarized when snorkel data were not available. NS designates no sample available. The dashed horizontal lines represent the 50% and 75% cumulative frequency (i.e. 75% of sites less than) for sampled numbers in similar stream reaches throughout the Boise River Basin.

20 sites ranging from about 3 to 15 m in length were snorkeled in each reach. The sampling after 1992 was designed to provide complete population estimates for each reach. For the purposes of this paper, however, we report only the sampled densities for two size groups to demonstrate trends in the distribution and the abundance of juvenile and older fish.

Single pass electrofishing was conducted with a backpack shocker in both stream systems in all years.

Electrofishing was used initially to survey for presence of fish after the fire in Rattlesnake Creek when high turbidity, low water temperatures, and limited time preempted further snorkel sampling. Electrofishing was continued to provide more detailed size and growth information and as a measure of relative abundance when snorkeling was not possible. A single site of 80 to 150 m was fished in each sampled reach. Electrofishing data were summarized in the same format as the snorkel data and are reported here only when snorkel data were unavailable.

We did not have pre-fire data for Sheep and Rattlesnake creeks for comparison with post-fire fish response. We summarized similar density information for streams sampled throughout the Boise River basin in 1993 and 1994 as outlined by Rieman and McIntyre (1995). We used the cumulative frequency distribution for all of the sampled densities as a base for interpretation of the numbers observed in the burned reaches.

**Cottonwood Creek.** Sampling in Cottonwood Creek was initiated in September 1992, two years before the fire, as part of an independent project. All sampling in this system was conducted by electrofishing in five to 10 sites, each approximately 100 m long, distributed through the length of the stream (Figure 2). Sampling was designed to provide complete population estimates using block nets and multiple pass removal methods. We present only the density estimates from the catch per-area-sampled to describe the trends in distribution and abundance of the redband trout found in this stream.

## Results

### General Observations of Fire and Watershed Effects

The 1992 and 1994 fires burned with moderate or high intensity throughout much of the three study watersheds (Figure 1). Along the stream channels we classified high intensity effects in four of the nine study reaches in Sheep Creek, six of 10 reaches in Rattlesnake Creek, and six of the 10 sites in Cottonwood Creek (Figures 2, 3, and 6 below). Data on channel and habitat responses following the fires have not been summarized, but important effects in the flow, sediment, and temperature regimes of each stream were evident in the first year following each event. Increased surface erosion and large pulses of fine sediments occurred throughout each system. In many cases pools were virtually filled with new material, although pools in higher gradient channels often remained relatively free of sediment. Debris flows producing pulses of both fine and coarse sediments and woody debris occurred in at least one small tributary channel in each watershed. In reaches with high intensity burn effects shading from riparian cover was virtually eliminated. Woody debris in stream channels was often observed as woody **Rvsd Plan - 00001757**

In subsequent years the effects of altered hydrology and delivery of sediments and coarse debris were clearly evident. Channels were highly dynamic. Some habitats for fish were lost or altered by the loss of old wood and filling of pools with sediments, while others were created by the formation of new pools, channels and undercut banks in response to the recruitment of new wood from fire killed trees. Debris flows scoured some small high gradient channels dramatically simplifying habitats within them or in the larger stream immediately below the confluence with those channels. Debris flows also delivered a substantial volume of coarse materials that did or are likely to contribute to complexity of channels downstream.

Riparian vegetation was not killed along the intensely burned reaches. Although cover from emergent vegetation was lost immediately after the fires, resprouting from roots has been pronounced and the canopy from vegetation immediately adjacent to the channel increased substantially in following years in all intensely burned reaches.

### Distribution and Abundance of Fish

Six stream reaches were sampled in Sheep Creek and six reaches in Rattlesnake Creek immediately following the 1992 fires. Eight or nine reaches were sampled in each stream in subsequent years. In 1992 densities of redband trout and bull trout were very low or nonexistent in reaches that were intensely burned (Figures 2, 3, 4, and 5). Dead fish were observed in all four of the intensely burned reaches in Sheep Creek and no live fish could be found in reach eight of Sheep Creek or in reaches six through eight in Rattlesnake Creek. We could not sample reach nine of Rattlesnake Creek in 1992 or 1993. However, because burn intensity appeared to be especially high in this reach, and because similar or less intensely burned reaches downstream were apparently defaunated, we believe it unlikely that many if any fish persisted in that reach immediately after the fire. Redband trout persisted in relatively high numbers in reaches immediately adjacent to the intensely burned reaches in both the Sheep and Rattlesnake watersheds (Figures 2 and 3). Bull trout persisted in modest numbers in the adjacent reaches of Sheep Creek (Figure 4). In Rattlesnake Creek, however, only a few individuals were found in a single downstream reach (Figure 5). Spawning and initial rearing of bull trout is restricted to the higher, colder, reaches of streams throughout the Boise River Basin (Rieman and McIntyre 1995) and was likely limited to the area above reach seven in Rattlesnake Creek. We found juvenile bull trout only in the upper reaches of both streams. For that reason we believe that virtually the entire juvenile and resident adult population of bull trout was eliminated by the fire in this watershed.



**Figure 3.** Distribution and number of redband trout sampled in Rattlesnake Creek from 1992 to 1995. The shaded bar under the figure for 1992 designates the reaches with high intensity burns in the riparian area. Dark portions of the histograms represent fish less than 75mm which are predominantly young-of-the-year; open portions represent larger fish. The * designates electrofishing data summarized when snorkel data were not available. NS designates no sample available. The dashed horizontal lines represent the 50% and 75% cumulative frequency (i.e. 75% of sites less than) for sampled numbers in similar stream reaches throughout the Boise River Basin.

Both bull trout and redband trout were found in the intensely burned reaches of Sheep Creek and Rattlesnake Creek in 1993 and subsequent years. Densities of redband trout fluctuated among years throughout both streams and were strongly influenced by variation in the number of juvenile fish (Figures 2 and 3). Although variation was pronounced, by 1995 the densities in most stream reaches including those strongly influenced by the fires were high in comparison to other streams throughout the Boise River Basin (Figures 2 and 3). Very high numbers of juvenile redband trout in Devil's Creek in 1993 and 1994 and in



**Figure 4.** Distribution and number of bull trout trout sampled in Sheep Creek from 1992 to 1995. The shaded bar under the figure for 1992 designates the reaches with high intensity burns in the riparian area. Dark portions of the histograms represent fish less than 150mm which are considered juveniles (Rieman and McIntyre 1995); open portions represent larger fish. The * designates electrofishing data summarized when snorkel data were not available. NS designates no sample available. The dashed horizontal lines represent the 50% and 75% cumulative frequency (i.e. 75% of sites less than) for sampled numbers in similar stream reaches throughout the Boise River Basin.

many of the lower or mid reaches of both streams in 1994 was particularly striking. The increase in numbers for the higher reaches (7, 8 in Sheep Creek; 7, 8, 9 in Rattlesnake Creek) was driven primarily by movement of older individuals with little recruitment of young fish.

The relatively large numbers of young bull trout observed in reach nine of Rattlesnake Creek (Figure 5) was initially puzzling in light of the believed defaunation of the upper part of this stream. In late August of 1994, however, we observed five large (>400 mm) adult bull trout holding in reach four. The timing and presence of

the large fish indicated that a migratory life-history had persisted in the Rattlesnake Creek population. The extended movement pattern for this life history implies that both sub-adult and adult fish were outside the Rattlesnake Creek watershed during the fire, but had returned to reproduce in the fall.

Five sites were sampled in Cottonwood Creek in 1992 and 12 sites in later years. The numbers of redband trout were relatively high throughout the stream in 1992 and 1993. Immediately following the fire in 1994 densities in the five intensely burned sites were much lower than



**Figure 5.** Distribution and number of bull trout trout sampled in Rattlesnake Creek from 1992 to 1995. The shaded bar under the figure for 1992 designates the reaches with high intensity burns in the riparian area. Dark portions of the histograms represent fish less than 150mm considered juveniles (Rieman and McIntyre 1995); open portions represent larger fish. The * designates electrofishing data summarized when snorkel data were not available. NS designates no sample available. The dashed horizontal lines represent the 50% and 75% cumulative frequency (i.e. 75% of sites less than) for sampled numbers in similar stream reaches throughout the Boise River Basin.

Rvsd Plan - 00001759

in preceding years or the adjacent sites (Figure 6). In 1995 fish were again relatively abundant in all reaches, and in most cases at densities comparable to those prior to the fire. Juvenile fish were less important in 1995 than earlier years, however.

## Discussion

Fires that burned in the Boise River basin in 1992 and 1994 exemplify large and intense events that would have been rare historically, but seem more likely to occur in the future. Both fires profoundly altered fish populations and habitat. We found evidence of extensive direct mortality, as well as increased erosion, debris torrents, and other indications of likely effects on the productivity and stability of available habitat and these populations. Habitat and populations appeared to be very dynamic following the fires, and the effects are likely to persist for years or decades (see Minshall et al. 1989).

Despite the catastrophic appearance of the effects, the short term recovery of bull trout and redband trout populations has been dramatic. Fish were present in the defaunated reaches within 1 year, and numbers approached those in unaffected stream reaches in 1 to 3 years. In some reaches, juvenile densities were very high suggesting that recruitment might even have benefited from the effects of fire. At least in the short term, populations of redband trout and bull trout within the Boise River basin appear to have the ability to adapt to, and recover from, changes in their environments associated with intense wildfire.

Two mechanisms were important in the short-term recovery that we observed: 1) refounding of defaunated reaches through dispersal from local or internal refuges; and 2) refounding through complex life history and overlapping generations.

**Local Refuges.** Despite the broad scale and intensity, the fires in these watersheds left a definite mosaic of intensely burned, lightly burned, and unburned areas. Some tributary streams retained intact riparian vegetation, while some mainstem sections displayed a patchwork of burn intensity in the riparian zone. In Cottonwood Creek, for example, we found depauparate reaches interspersed with areas supporting very high densities of fish. In Sheep and Rattlesnake creeks, we found high densities immediately below long reaches that were devoid of fish. Fish were wholly eliminated from reaches in smaller streams such as Devil's Creek, and from the upper portions of Sheep and Rattlesnake creeks. Although fish were strongly affected, the fires of 1992 and 1994 did not produce a uniform or complete elimination of fish or disruption of habitat.

Recolonization of the affected reaches was influenced by the proximity, and direction of refuges. In Cottonwood



**Figure 6.** Distribution and number of redband trout sampled in Cottonwood Creek from 1992 to 1995. The shaded bar under the figure for 1994 designates the sites with high intensity burns in the riparian area. Dark portions of the histograms represent fish less than 75mm which are predominantly young-of-the-year; open portions represent larger fish. All sites were sampled by electrofishing. NS designates no sample available.

Creek, where redband trout persisted in patches throughout the stream, numbers and age structures approached preburn conditions in the first year. Fish were reestablished in depauparate reaches by dispersal from both upstream and downstream sources over relatively short distances. In Sheep and Rattlesnake creeks, where redband trout were apparently eliminated in the upper reaches, recolonization must have occurred through dispersal from downstream sources over longer distances and a longer time frame. Although fish were present in substantial numbers in the severely affected reaches within the first year, numbers and age structures continued to vary over the period of study. Our observations are consistent with other studies of recolonization in fish populations follow-

ing major disturbance and defaunation. In general, where internal refuges (i.e. sites of persistence within the spatial extent of the population) exist, recolonization occurs rapidly. Recovery often is evident in a few years (Meffe and Sheldon 1990; Niemi et al.1990; Yount and Niemi 1990; Lamberti et al. 1991; Detenbeck et al. 1992; Bayley and Osborne 1993) or even weeks (Sheldon and Meffe 1995).

The mechanism and rate of recolonization is strongly influenced by the local environment (Sheldon and Meffe 1995). Mechanisms that stimulate recovery or compensate for habitat losses might be triggered or enhanced by the disturbance event (Bisson et al. 1996; Minshall et al. 1989). For example, we observed high densities for young-of-the-year redband trout in several reaches influenced by the fires or related hydrologic effects. This is not consistent with a concept of fire as a catastrophic event, causing only negative changes in habitat conditions (i.e. loss of riparian cover, increased water temperatures and fine sediments). In small, cold streams, increased solar exposure may translate to warmer water, increased primary production (Minshall et al. 1989), and ultimately faster growth or higher carrying capacities for juvenile fish (Murphy and Meehan 1991). Similar positive responses in growth and production have been observed for other salmonids following large natural disturbances (Bisson et al. 1988) Although the fires killed fish and may depress production in some life stages for some time, they also may have created the potential for important compensation within these populations.

In summary, broadly distributed habitats suitable for these fishes during and after the fire provided for recolonization. The benefits of spatially redundant and complex habitats to the persistence and resilience of populations at multiple scales is well established in theory (den Boer 1968; Poff and Ward 1990; Sedell et al. 1990) and building empirical evidence (e.g. Pearsons et al. 1992).

**Life History.** We found evidence with both bull trout and redband trout that large-scale movements, other than those associated with the simple diffusion of fish from refuges within the stream, influenced recovery. In Rattlesnake Creek we believe that bull trout were nearly if not completely eliminated from the upper stream. Had the population been limited to a resident life history, the entire population could have been lost. We cannot eliminate the possibility that some fish survived in local refuges that we did not locate, but the observation of large adults moving into the system in September, strongly suggests that an adult or subadult component of the population persisted outside the watershed. A similar, though smaller scale effect, may have occurred with redband trout in Little Rattlesnake and Devil's creeks, where large numbers of juvenile fish were found in streams that had been vacant the year before.

It appears that a complex of life-history patterns also provided a temporal and a spatial hedge against extinc-

tion. Similar results have been reported for salmonid populations influenced by wildfire (Novak and White 1989) and other disturbances (Titus and Mosegaard 1992; Armstrong et al. 1994). Strong support is also found in life-history theory for salmonids (Gross 1991; Thorpe 1994 b) and other species (Poff and Ward 1990).

Theory proposes the persistence of multiple life-history strategies as a mechanism stabilizing populations in variable environments (Gross 1991; Thorpe 1994 b) but also as a mechanism that leads to full exploitation of, and may be dependent on, a complex of available habitats (Healey 1994; Lichatowich and Mobrand 1995). We expect that diverse life-histories are maintained because of an evolutionary history in variable environments (Poff and Ward 1990). Spawning and rearing habitats for bull trout are distributed primarily in higher elevation, colder watersheds. Because high elevation areas throughout the region were more likely to experience mixed or high intensity fires (Arno 1980) many populations have experienced this pattern of disturbance. We should expect that, in an evolutionary sense, bull trout are well acquainted with large, intense fires. The existence of complex life histories such as the mixed migratory behaviors and overlapping generations found in the Boise River basin could be the expression of strategies that have emerged because of the disturbance of fire and associated hydrologic events. We also expect the expression of complex life-histories to be tied to the template of the available habitats (Healey 1994; Thorpe 1994 a; and also see Turner et al. 1995 for discussion of larger scales). If the spatial and temporal complexity of habitats is lost the expression of complex life histories can be lost as well.

The two pathways we have suggested for the short term recovery of salmonids influenced by the Boise fires imply that the nature of the habitats available to the populations strongly influenced the result. The complexity of the landscapes undoubtedly led to the mosaic in burn effects but also a mosaic of pre-fire stream habitat conditions that provided important refuges within the burn perimeter. That same complexity of stream habitats, the size of the basins and the connection of the watersheds to a larger river basin are likely important in the full expression of diverse life histories. In the short term, these bull trout and redband trout populations, seem to have the potential for dramatic recovery from very large intense wildfires. Similar potential in other populations likely depends on the quality and extent of available habitats.

We do not know the long term effects of these fires. Fires often trigger increased surface erosion (Megahan 1991) and, if followed by intense storms, debris torrents and channel scour also may be common (Brown et al. 1989; Swanson et al. 1990). In many cases the short term rate of erosion and sediment delivery following a fire can outweigh the effects of roads and timber harvest activities (Megahan 1991). Changes in vegetation and watersheds influencing hydrologic and temperature regimes and

erosion that influence fish habitat may persist for years and perhaps decades (Minshall et al. 1989; Brown 1989). The long term legacy in many cases, however, can be positive (Swanson and Lienkaemper 1978; Brown 1989; Swanson et al. 1990; Reeves et al. 1995). Increased inputs of large wood and coarse sediments from dispersed sources or storm triggered debris flows are also likely to follow large fires (Brown 1989; Megahan 1991; Reeves et al. 1995) and have been common in our study watersheds. The larger materials often store fine sediments, and provide the hydraulic complexity necessary for sorting of larger materials that represent critical elements of fish habitat. The intensive debris and scour events that generate the materials are often localized (Megahan 1991) and confined to the smaller, high gradient channels (Swanson et al. 1990). The movement of fine sediments may occur in pulses or waves that are not uniform in time or space (Reeves et al. 1995). Although the volumes of fine sediments can be large they may be relatively short lived and patchy in relation to the effects of other more chronic disturbances such as roading and timber harvest activities (Reeves et al. 1995). Others have found that the erosional and hydrologic effects of large fires decline substantially within 10 years (Brown 1989; Beaty 1994). Historically this episodic contribution of coarse debris may have been key to the creation and maintenance of complex, instream habitats (Brown 1989; Swanson and Lienkaemper 1978; Reeves et al. 1995). Emerging theory strongly suggests that natural disturbance regimes may have been critical to the maintenance of such habitats and the productivity of the associated populations (Reeves et al. 1995) as well as the genetic and phenotypic diversity that supports resilience of populations in the short term and adaptation in the long term (Poff and Ward 1990). The suppression of fire in recent history could well have contributed to the overall decline in productivity of fish habitats throughout the region. Arguably the recent fires might be viewed as a badly needed "house cleaning" for overstocked forests as well as an infusion of materials critical for the maintenance of productive habitats.

So are these fires good or bad for existing populations of native salmonids? As generally seems to be the case in ecology the answer depends. Larger and more intensive fires may result in local extinctions of very small and isolated populations. Many species and populations, however, may still have the ecological diversity necessary for dealing with this disturbance. Although fire may create important changes in watershed processes (e.g. surface erosion and mass failure) that are often considered negative for fish, the spatial and temporal nature of the disturbances is important (Reeves et al. 1995). Fire and the associated hydrologic effects can be characterized as pulsed disturbances as opposed to the more chronic "press" effects linked to permanent roads or extended timber harvest activities (see Yount and Niemi 1990). The effects of fire are more likely to be episodic, dispersed

through time and space. Species such as bull trout and redband trout appear to have been well adapted to such pulsed disturbance. The population characteristics that provide for resilience in the face of such events, however, likely depend on large, well connected and spatially complex habitats that can be lost through chronic or press effects of other management. A critical element to resilience and persistence of many populations for these and similar species will be the restoration or maintenance of highly complex, well connected habitats, across a mosaic of streams and watersheds.

Throughout the Pacific Northwest the effects of chronic watershed disturbance, the introduction of exotic species, and barriers such as dams, diversions, and road culverts, have resulted in the fragmentation and isolation of salmonid populations and the elimination or serious depression of historic life-history patterns (Rieman and McIntyre 1993; Frissell et al. 1993; Henjum et al. 1994; Lichatowhich and Mobrand 1995). By expanding our efforts in timber harvest to minimize the risks of large fire, we risk expanding what are well established negative effects on streams and native salmonids. In general, previous attempts to minimize such effects in any single watershed have led to the dispersal of activities across broad areas (Reeves et al. 1995). The chronic and widespread nature of timber harvest and other human related disturbance has led to a loss of spatial complexity of stream environments, that ultimately can be reflected in the loss of complexity and diversity and distribution of populations and life histories (Frissell et al. 1993; Reeves et al. 1995). We do not expect conventional timber harvest activities to produce watershed effects equivalent even to very large wildfires. It also is not clear that attempts to manipulate the structure and processes of whole ecosystems (i.e beneficially manipulate the fire regime) can ever be successful (Baker 1994; Stanley 1995). The perpetuation or expansion of existing road networks, and other activities might well erode the ability of populations to respond to the effects of large scale storms and other disturbances that we clearly cannot change.

There is growing interest for intensive forest management to reestablish more natural landscape patterns and disturbance regimes, but the risks and benefits of that management vary across the landscape. In our haste, forest health treatment projects have been justified from all perspectives including the risk of extinction for sensitive species such as bull trout and redband trout. There is undoubtedly a point where the risk of fire outweighs the risk of our management, but that point needs to be discovered through careful evaluation and scientific study not through the opposing powers of emotional or political rhetoric. Our experience with the effects of the recent fires is incomplete. The picture that emerges both from our experience and the available literature, however, suggests that the consequences of large fires are not as catastrophic as some have anticipated. Managers must weigh that knowledge against other needs.

56                          Rieman, B., Lee, D., Chandler,G., and Myers, D.

**Acknowledgments.** The Boise National Forest provided burn intensity maps and funding or other support for some of this work. Don Corley, Tim Burton, and John Thornton provided logistical help and Don Corley, Steve Kozel, and Chris Reighn conducted some of the sampling in Rattlesnake and Cottonwood Creeks. Lori Leatherbury, Jim Bogesvang, Jack McIntyre, Deborah Hennesey, Mike Radko, Kerry Overton, Robin Armstrong, Dean Paron, Teresa Busby, and Dave Hopkins helped with field work or some aspects of data summary and presentation. Kathy Geier-Hayes and Jack McIntyre provided useful comments on early drafts of the manuscript.

## References

Agee, J. K. 1988. Wildfire in the Pacific west: a brief history and implications for the future. pp 11-16. In N. H. Berg (editor) Proceedings of the symposium on fire and watershed management. October 26-28, Sacramento, CA. USDA Forest Service Pacific Southwest Forest and Range Experiment Station, GTR PSW-109. Berkeley, CA.

Armstrong, J. D., P. E. Shackley and R. Gardiner. 1994. Redistribution of juvenile salmonid fishes after localized catastrophic depletion. Journal of Fish Biology 45: 1027-1039.

Arno, S. F. 1980. Forest fire history in the northern rockies. Journal of Forestry. August, 1980: 460-465.

Baker, W.L. 1994. Restoration of landscape structure altered by fire suppression. Conservation Biology 8: 763-769.

Bayley, P. B. and L. L. Osborne. 1993. Natural rehabilitation of stream fish populations in an Illinois catchment. Freshwater Biology 29: 295-300.

Beaty, K. G. 1994. Sediment transport in a small stream following two successive forest fires. Canadian Journal of Fisheries and Aquatic Sciences 51: 2723-2733.

Bisson, P. A., J. L. Nielsen, and J. W. Ward. 1988. Summer production of coho salmon stocked in Mount St. Helens streams 3-6 years after the 1980 Eruption. Transactions of the American Fisheries Society 117: 322-335.

Bisson, P. A., G. H. Reeves, R. E. Bilby, and R.J. Naiman. 1996. Watershed management and Pacific salmon; desired future conditions? In D. P. Stouder, P. A. Bisson, and R. Naiman (editors). Pacific salmon and their ecosystems. Chapman and Hall, New York.

Bozek, M.A. and M.K. Young. 1994. Fish mortality resulting from delayed effects of fire in the Greater Yellowstone Ecosystem. Great Basin Naturalist 54: 91-95.

Brown, J. K. 1989. Effects of fire on streams. pp 106-110. In F. Richardson, and R. H. Hamre (editors). Wild Trout IV: Proceedings of the symposium. U. S. Government Printing Office, Washington, D. C.

den Boer, P.J. 1968. Spreading of risk and stabilization of animal numbers. Acta Biotheoretica 18: 165-194.

Detenbeck, N. E., P. W. DeVore, G. J. Niemi, and A. Lima. 1992. Recovery of temperate-stream fish communities from disturbance: a review of case studies and synthesis of theory. Environmental Management 16: 33-53.

Frissell, C.A., J. Doskocil, J. Gangemi, J. Stanford. 1995. Identifying priority areas for protection and restoration of aquatic biodiversity: a case study in the Swan River Basin, Montana, USA. Open File Report. University of Montana Flathead Lake Biological Station, Polson, MT.

Frissell, C. A., W. J. Liss, and D. Bales. 1993. An integrated biophysical strategy for ecological restoration of large watersheds. P. 449-456. In D. Potts (editor). Proceedings of the symposium on changing roles in water resources management and policy. American Water Resources Association, Herdon, Virginia.

Gross, M.R. 1991. Salmon breeding behavior and life history evolution in changing environments. Ecology 72: 1180-1186.

Healey, M.C. 1994. Variation in the life history characteristics of chinook salmon and its relevance to conservation of the Sacramento winter run of chinook salmon. Conservation Biology 8: 876-877.

Henjum, M. G. and seven co-authors. 1994. Interim protection for late-successional forests, fisheries, and watersheds: National forests east of the Cascade Crest, Oregon and Washington. The Wildlife Society, Bethesda, MD.

Lamberti, G. A., S. V. Gregory, L. R. Ashkenas, R. C. Wildman, and K. M. S. Moore. 1991. Stream ecosystem recovery following a catastrophic debris flow. Canadian Journal of Fisheries and Aquatic Sciences. 48: 196-208.

Lichatowich, J.A., and L.E. Mobrand. 1995. Analysis of chinook salmon in the Columbia River from an ecosystem perspective. Report prepared for USDE Bonneville Power Administration Contract DE-AM79-92BP25105. Portland OR.

Maloney, P. C., J. L. Thorton, and E. Lesch. 1995. A summary of watershed monitoring within the Foothills Fire salvage logging area 1992-1995. Boise National Forest, Boise, ID.

McMahon, T.E. and D.S. deCalista. 1990. Effects of fire on fish and wildlife. In J.D. Walstad, S.R. Radosvich, and D.V. Sandberg (editors). Natural and prescribed fire in Pacific Northwest Forest. Oregon State University Press.

Meehan, W. R. (editor). 1991. Influences of forest and rangeland management on salmonid fishes and their habitats. American Fisheries Society Special Publication 19, Bethesda, MD.

Meffe, G. K. and A. L. Sheldon. 1990. Post-defaunation recovery of fish assemblages in southeastern blackwater streams. Ecology 71: 657-687.

Megahan, W. F. 1991. Erosion and site productivity in western-montane forest ecosystems. pp 146-150. In Proceedings of the Symposium on Management and Productivity of western montane forest soils, Boise ID April 10-12, 1990.

Minshall, G. W., J. T. Brock, and J. D. Varley. 1989. Wildfires and Yellowstone's stream ecosystems. Bioscience 39: 707-715.

Murphy, M. L. and W. R. Meehan. 1991. Stream Ecosystems. In American Fisheries Society special publication 19, Bethesda, Maryland.

Niemi, G. J. and seven co-authors. 1990. Overview of case studies on recovery of aquatic systems from disturbance. Environmental Management 14: 571-588.

Novak, M. A. and R. G. White. 1989. Impact of a fire and flood on the trout population of Beaver Creek, upper Missouri basin, Montana. P. 120-129. In F. Richardson, and R. H. Hamre (editors). Wild Trout IV: Proceedings of the symposium. U. S. Government Printing Office, Washington, D.C.

Pearsons, T. N., H. W. Li, and G. A. Lamberti. 1992. Influence of habitat complexity on resistance to flooding and resilience of stream fish assemblages. Transactions of the American Fisheries Society 121: 427-436.

Poff , N. L. and J. V. Ward. 1990. Physical habitat template of lotic systems: recovery in the context of historical pattern of spatiotemporal heterogeneity. Environmental Management 14: 629-645.

Propst, D. L., J. A. Stefferud, and P. R. Turner. 1992. Conservation and status of Gila trout, *Oncorhynchus gilae*. Southwestern Naturalist 37: 117-125.

Reeves, G. H., L. E. Benda, K. M. Burnett, P. A. Bisson, and J. R. Sedell. 1995. A disturbance-based ecosystem approach to maintaining and restoring freshwater habitats of evoluntionarily significant units of anadromous salmonids in the Pacific Northwest. American Fisheries Society Symposium 17: 334-349. Bethesda, Maryland.

Rieman, B. E., and J. D. McIntyre. 1993. Demographic and habitat requirements for conservtion of bull trout. USDA Forest Service Intermountain Research Station, GTR INT-302, Ogden, UT.

Rieman, B. E., and J. D. McIntyre. 1995. Occurrence of bull trout in naturally fragmented habitat patches of varied size. Transactions of the American Fisheries Society 124: 285-296.

Rinne, J. N. 1996. Southwestern wildfires: effects on fishes and aquatic macroinvertebrates and management implications. North American Journal of Fisheries Management 16: 653-658.

Salo, E. O., and T. W. Cundy (editors). 1987. Streamside management: forestry and fishery interactions. University of Washington Institute of Forest Resources, Contribution No. 57, Seattle, WA.

Sedell, J. R., G. H. Reeves, F. R. Hauer, J. A. Stanford, and C. P. Hawkins. 1990. Role of refugia in recovery from disturbances: modern fragmented and disconnected river systems. Environmental Management 14: 711-724.

Sheldon, A. and G. K. Meffe. 1995 Short-term recolonization by fishes of experimentally defaunated pools of a coastal plain stream. Copeia 1995: 828-837

Stanley, T. R. Jr. 1995. Ecosystem management and the arrogance of humanism. Conservation Biology 9: 255-262.

Steele, R., R. D. Pfister, R. A. Ryker, and J. A. Kittams. 1981. Forest habitat types of central Idaho. USDA Forest Service Intermountain Forest and Range Experiment Station, GTR INT-114. Ogden, UT.

Swanson, F.J. and G. W. Lienkaemper. 1978. Physical consequences of large organic debris in Pacific Northwest streams. USDA Forest Service, Pacific Northwest Research Station, GTR PNW-69, Portland, OR.

Swanson, F. J., J. F. Franklin, and J. R. Sedell. 1990. Landscape patterns, disturbance, and management in the Pacific Northwest, USA. pp 191-213. In I. S. Zonneveld and R. T. Forman (editors). Changing landscapes: an ecological perspective. Springer-Verlag, New York.

Thorpe, J.E. 1994 (a). Performance thresholds and life-history flexibility in salmonids. Conservation Biology 8: 877-879.

Thorpe, J.E. 1994 (b). Salmonid flexibility: responses to environmental extremes. Transactions of the American Fisheries Society 123: 606-612.

Thurow, R. F. 1994. Underwater methods for study of salmonids in the Intermountain West. USDA Forest Service, GTR INT-307, Ogden, UT.

Titus, R.G. and H. Mosegaard. 1992. Fluctuating recruitment and variable life history of migratory trout, *Salmo trutta* in a small unstable stream. Journal of Fish Biology 41: 239-255.

Turner, M. G., R. H. Gardner, and R. V. O'Neill. 1995. Ecological dynamics at broad scales. BioScience, science and biodiversity policy supplement 1995: S29-S35.

Yount, J. D., and G. J. Niemi. 1990. Recovery of lotic communities and ecosystems from disturbance— a narrative review of case studies. Environmental Management 14: 547-570.

MANAGEMENT

# Wildfire and Native Fish: Issues of Forest Health and Conservation of Sensitive Species

By Bruce Rieman and Jim Clayton

## ABSTRACT

Issues related to forest health and the threat of larger, more destructive wildfires have led to major new initiatives to restructure and recompose forest communities in the western United States. Proposed solutions will depend, in part, on silvicultural treatments and prescribed burning. Large fires can produce dramatic changes in aquatic systems, including altered sediment and flow regimes, fish mortality, and even local extinctions. Responses of salmonid populations to large disturbances such as fire indicate that complexity and spatial diversity of habitats are important to the resilience and persistence of populations. Some populations retain the ecological diversity necessary to persist in the face of large fires, and natural events such as wildfire have been important in creating and maintaining habitat diversity. Although timber harvest and fire can precipitate similar changes in watershed processes, we do not necessarily expect the physical and ecological consequences of large fires and timber harvest to be the same. We agree that healthy forests are fundamental to healthy aquatic ecosystems. In their haste to restore unhealthy forests, however, managers must take care to avoid simplistic solutions that compound problems already present in the management of aquatic ecosystems and native fishes. Management to restore ecological structure, composition, and process is largely experimental and potentially risky. We propose that the mosaic of conditions in both terrestrial and aquatic systems provides an opportunity to learn and adapt new management without placing key remnant aquatic habitats and populations at risk.

Some concerned scientists and managers have suggested that the increasing risk of uncharacteristically large or damaging wildfires in forests across the western United States may threaten the integrity of whole landscapes. In response, major initiatives to correct such problems have been proposed, some of which rely largely on silvicultural activities such as increased timber harvest, thinning, and prescribed fire. Do these and associated activities represent higher or lower risks for native fishes and aquatic environments?

Wildfires and forest health have dominated much of the discussion and interest regarding management of forested lands in the West in recent years. It is increasingly evident that forested landscapes throughout the region have been dramatically altered by past land management activities. Selective and extensive timber harvest, silviculture, fire suppression, and grazing practices have substantially changed the structure and composition of forest communities (Franklin 1992; Lehmkuhl et al. 1994; Hessburg et al. 1997). The general decline in abundance of large, old trees and old forest (Henjum et al. 1994; Hessburg et al. 1997) is a familiar issue. But ecologists are now recognizing that changes

in structure and composition are symptomatic of more fundamental changes in patterns of disturbance and other ecological processes. Forests that were once mosaics of species, ages, and patterns in crown cover have been simplified. Many are now dominated by higher-density, middle-aged stands that are more vulnerable to pest infestations and fire (Huff et al. 1995; Hessburg et al. 1997; Hann et al. 1997). The more homogeneous patterns in vegetation and the increased fuel loadings are thought to increase landscape vulnerability to larger stand-replacement fires (Agee 1988, 1994; Huff et al. 1995). Large fires burning throughout the West in recent years may have been the result of these changes (e.g., Christensen et al. 1989; Barbouletos and Morelan 1995), although climatic patterns may be important as well (e.g., Johnson et al. 1995, 1996).

The possibility of uncharacteristically large, damaging fires and declining forest health holds important implications for land managers. Larger fires mean lost timber values, increased threats to private property on an expanding urban-wild-land interface, and higher costs associated with fire suppression. Uncharacteristic fires may also threaten properties of ecosystems. Direct effects of intense fires and subsequent impacts on hydrologic regimes, erosion, debris flows, woody debris, and riparian cover can strongly influence the structure and function of aquatic systems (Swanson 1981; Megahan 1991; Bozek and Young 1994). Intense fires and the associated environments (e.g., extremely warm temperatures, large sediment pulses, and debris flows) may

*Bruce Rieman is a research fishery scientist with the U.S. Forest Service, Rocky Mountain Research Station, 316 E. Myrtle, Boise, ID 83702; 208/373-4340; FAX 208/373-4391; brieman/int_boise@fs.fed.us. Jim Clayton is a research soil scientist at the same research station: marefim@micron.net.*

Rvsd Plan - 00001765



Alan Barta

result in direct mortality of fish (Minshall and Brock 1991; Bozek and Young 1994; Rinne 1996) and other aquatic organisms (Rinne 1996), and even extinction of local populations (Propst et al. 1992; Rinne 1996).

Concern about such severe possibilities has focused interest on active vegetation management, galvanizing efforts to actively restructure or recompose forest communities (Barbouletos and Morelan 1995; see other papers in Eskew 1995). Managers have justified these initiatives by citing the spectrum of potential social, economic, and ecological costs. For example, some managers have argued that changing fire patterns represent one of the most important threats to the persistence of native, threatened, endangered, or sensitive species such as bull trout (*Salvelinus confluentus*), chinook salmon (*Oncorhynchus tshawytscha*), and redband/rainbow trout (*O. mykiss*). Given the general decline of many native fishes throughout the West (Williams et al. 1989; Nehlsen et al. 1991; Lee et al. 1997) and the seemingly pervasive nature of forest health problems, it may be prudent to proceed quickly with active vegetation management in all "unhealthy" forests. But such management carries costs and risks that also must be considered.

Forest health and ecosystem management initiatives seek to recreate a structure and composition in forest communities that is more consistent with natural disturbance regimes. Although prescribed and natural fires can play an important role (Carlson et al. 1995; Huff et al. 1995), silvicultural activities that include thinning and harvest will be desirable where feasible. Although wildfire and timber harvest both can result in changes to watershed processes that conceptually are similar (e.g., increased surface erosion and water yield), they also may differ fundamentally. Disturbance by fire affects ecosystems in complex ways, but activities that reduce the risk of fire, insect, or pathogen outbreaks by changing vegetation structure and composition, and fuel management also lead to complicated effects. Mimicking natural disturbance may not be as easy as hoped.

We believe that managers often hold overly simplistic views of the forest health problem. In our experience, some believe that forest health can be improved simply by managing vegetation through silvicultural treatments that manipulate structure and composition. While this viewpoint is attractive because it provides some clear direction for managers, key elements of large ecosystems such as soil and watershed processes can be discounted. Land management activities influence many ecosystem components, and clearly more than the forests have changed. In other cases managers recognize that forest attributes are part of a larger ecosystem, but still seem to imply that treating symptoms (terrestrial vegetation) will lead to a cascade of solutions. Put simply, restoring terrestrial vegetation to a more natural condition should lead to improvements in

Wildfires may trigger major debris flows, floods, and erosion that can significantly harm or even destroy small fish populations and other aquatic biota.

overall ecosystem health. Pathways to forest health decline were largely a result of vegetation manipulations. Can't those pathways be retraced?

Perhaps, but ecological function does not follow directly from structure. Rather, both structure and function emerge from the underlying process (Bradshaw 1996). In other words, how we get where we wish to go may be just as important as where we wish to go. Silvicultural and prescribed fire management tools can lead to the goal of restoring stand structure and composition, but such restoration may have mixed implications for restoring other aspects of failing ecosystems such as fishes and their habitats

Rvsd Plan - 00001766

We do not question the need to manage landscapes and forests in ways more consistent with natural patterns of disturbance (*sensu* Attiwill 1994). We suggest the issue is not whether to do something or nothing, but rather to weigh the risks of our actions as objectively as possible. To that end, we believe it is useful to consider some of the physical and biological processes likely to influence streams, fish habitats, and populations after large wildfires or management intended to reduce the probability of such fires.

## Physical Processes

The intensity and distribution of natural disturbance and ecosystem responses to disturbance are strongly influenced by landscape attributes. Swanson et al. (1988) suggest that land form position and slope gradient affect flow of energy and matter (water, solutes, and particulate matter) and, therefore, influence the pattern and intensity of disturbance by flow processes. Thus, natural barriers such as ridges and valley bottoms control the spread of fire, and slope and channel gradients dictate the velocity and travel distance of sediment movement. The result is a somewhat predictable, although dynamic, patchiness of disturbance at the landscape scale, constrained by land form and slope gradients. Disturbance due to management activities likely is less constrained because of human ability to circumvent natural barriers. Swanson et al. (1990) suggest that this has led to creation of new landscape disturbance patterns in the Pacific Northwest with little regard for the ecologic design

of management activities. The implications of the changed disturbance regime at the landscape scale are not easily interpreted. However, a wealth of information exists about natural and management induced disturbances as they affect physical processes on mountain slopes.

*Temperature*—Changes in stream temperature are controlled by the amount of energy (heat) exchange and the mass of water in the stream. While many processes affect energy exchange, including evaporative cooling and conductive transfer with substrate, the controlling factor is solar radiation (Brown 1969). There is anecdotal evidence of dramatic, short-term temperature elevations associated with fire in small streams (Minshall and Brock 1991). In addition to latitude, slope, aspect, frequency of cloudy sky, and time of year, incoming radiation is correlated with shading provided by streamside vegetation and terrain and, therefore, is subject to change from fire (Helvey 1972; Amaranthus et al. 1989) or logging (Brown and Krygier 1970; Meehan 1970; Patton 1973). Loss of shading can cause mean annual maximum temperatures to rise by as much as 15°C (Brown and Krygier 1970). The effects of canopy loss on stream temperature by fire or logging disturbance may be approximately equal if the fire consumes the canopy. However, many fires don't consume canopy foliage, and conifer needles may be retained following crown fires for up to a year. In addition, standing tree boles adjacent to streams provide some shade for many years. Streamside vegetation recovery is usually rapid after

logging or a fire unless soil is compacted during timber harvest and yarding. Recovery of streamside vegetation is generally faster in moist coastal ecosystems than in drier inland systems, and recovery is faster at lower elevations than higher ones (Beschta et al. 1987).

*Erosion*—Disturbance by fire, harvest activities, and road construction invariably results in greater erosion and sediment production; however, the severity and longevity of increase is highly dependent on site properties and the kind of disturbance. At the broad scale, erosional processes differ due to lithology, land form, and local climate. Consequently, landscapes are predisposed to variation in erosional processes and efficiencies of sediment transport during times of relative stability and after disturbance. A thorough discussion that distinguishes these process differences in natural landscapes can be found in Swanston (1991) and Megahan (1991).

Disturbances that change the way a slope handles water are likely to result in more erosion and to persist longer than disturbances that reduce cover. Fire consumption of forest floor or removal of soil cover during log skidding generally increases surface erosion rates. Effects are usually short-lived (a few years), although harsh sites may not reestablish effective ground cover for more than a decade (Megahan et al. 1995). In contrast, fire-induced water repellence (DeBano et al. 1970) increases the risk of surface rilling, "slurry flows" (Rinne 1996), debris flows, and hyperconcentrated flood events by reducing the infiltration capacity of soils. While reduced infiltration due to fire-induced water repellence is brief—usually a few years—channel recovery (reestablishing soil and mature vegetation) after debris flows or floods may take decades (Megahan 1991) or even centuries (Benda 1985). These effects are most common in headwater basins, although structure and habitat in receiving streams may be altered for long periods through deposition and scour (Swanston 1991).

Timber harvest and fire both increase the likelihood of mass erosion on sites. The presence of roots and tree stems imparts a measure of strength to soils, decreasing the likelihood of mass failure (Ziemer and Swanston 1977; Gray and Megahan 1981). This is particularly important in colluvial soils because frequent erosion and deposition in these sites provide little time for soil development and pedogenic processes such as weathering and organic matter accretion to promote soil structure and increase resistance to mass erosion. Soil strength declines as roots decay and typically reaches a minimum in 5–10 years after disturbance, but buttressing by large trees may last for several decades after mortality. Vegetation loss also results in decreased water removal from soil by transpiration. Higher antecedent soil moisture during rainfall or snowmelt increases the probability of flooding and the occurrence of shallow, rapid landslides, and can activate flowing water in ephemeral draws. In cohesionless soils, "sapping" failures (Megahan and Bohn 1989) and channel headcutting may greatly accelerate sediment production from ephemeral draws.

Road construction causes the most severe disturbance to soils on slopes, far overshadowing fire and logging as a cause of accelerated erosion (Swanson and Dyrness 1975; Beschta 1978; Reid and Dunne 1984). Perhaps the major reason is that the excavation required to build a road on a slope results in a disruption of subsurface water transport, bringing water to the surface where flow is concentrated, and velocities are much higher (Megahan 1972). Other reasons include disruption of soil structure and vegetation rooting; sidecasting of loose, unconsolidated roadfill; increased connections between roads and streams by gully formation and slides; and oversteepened cutslopes. Accelerated sediment production from roads depends on how recent construction was and on whether road design features that mitigate erosion such as special drainage features, structures, revegetation, and surfacing treatments were incorporated. Acceleration factors for sediment production range from tens to hundreds of times over natural rates in forested areas, based on various studies in the mountain west (Furniss et al. 1991). Typically, sediment production rates decline by an order of magnitude within three years of construction; however, these accelerated rates remain for the life of the road. Secondary surface erosion on mass failures is often chronic and may be as damaging to stream biota as episodic inputs from mass failures because the sediment particles are finer and are delivered throughout a long time.

> Road construction causes the most severe disturbance to soils on slopes, far overshadowing fire and logging as a cause of accelerated erosion

Surface and mass-erosion risk are increased after fire or logging, and rates and recovery times are generally similar. Fire-induced water repellence may greatly increase the likelihood of flooding, surface soil rilling, and hyperconcentrated flow events in first- and second-order channels. This elevated risk diminishes rapidly with time, but accelerated erosion and channel scour can be dramatic when high-intensity summer rainstorms hit recent burns if soils are water-repellent. Sediment production from logging and fire accelerates at similar rates. Increases may range from 10- to 100-fold and usually decline to natural levels within a decade (Megahan 1980). Rapid erosion from road disturbance is typically greater than accelerated erosion from fire or logging disturbance and persists for the life of the road. Effective road placement and design features can mitigate erosion from roads, but studies clearly identify accelerated sediment production from roads to be larger and more chronic than sediment production from fire or logging.

*Streamflow*—Water yield and timing of peak and low flows also are affected by disturbance. Harvesting and fire may alter the spatial pattern of snow deposition and redistribution, and change interception, evaporation, rate of snowmelt, and storage of water in soil by decreasing transpiration. Changes in water yield after disturbance depend on climatic factors, vegetation changes, and soil properties. Typically, the largest increases in yield occur on sites that received precipitation or snowmelt during the growing season, sites that were fully vegetated and had a large change in transpiration, and on deep soils with a high water-holding capacity. In the West, water yield increases after vegetation disturbance range from not detectable to 40% in the first year

Rvsd Plan - 0000176

(Chamberlin et al. 1991); typical recovery to predisturbance levels take 30–50 years. Peak flows average 20% higher after a forest is cut in small patches in a snowmelt-dominated regime (Troendle and King 1985). Effects of roads on streamflow response are varied. Peak flows and flow duration have either increased, decreased, or remained unchanged in basins after road construction (King and Tennyson 1984; Jones and Grant 1996). Maximum effects on fish habitat (both beneficial and detrimental) probably occur when disturbance alters peak flows or low flows.

*Water Chemistry*—Stream chemistry changes have been documented after disturbance by fire or logging. Short-term (1–3 years) elevated concentrations of dissolved nitrate, cations, and alkalinity have been reported. With the exception of extreme conditions during or immediately following fires across some small streams (Minshall et al. 1989; Rinne 1996), such changes are inconsequential to aquatic biota. Downstream eutrophication, particularly in lakes and reservoirs, may be a concern that we do not consider in this paper.

## Biological Processes and Fishes

The effects of large fires on fishes are direct and indirect. Direct effects may result from changes in water temperature and chemistry (Minshall et al. 1989; McMahon and de Calesta 1990; Minshall and Brock 1991). Direct effects may include mortality and displacement of individuals, but few studies have documented the extent of these responses (McMahon and de Calesta 1990). Clearly, fires can result in immediate mortalities (McMahon and de Calesta 1990; Minshall and Brock 1991; Rieman et al. 1997), but actual mechanisms and interactions are poorly understood (Minshall et al. 1989; Minshall and Brock 1991; Bozek and Young 1994) and may be highly variable. Rieman et al. (1997) noted areas where no live fish and numerous dead fish were found immediately after an intense fire burned through riparian corridors of two streams in Idaho. In a third stream in a similar setting and immediately following a similar fire, fish densities were depressed in intensely burned reaches, but no areas were devoid of fish. Minshall et al. (1989) suggested that changes in water temperature and water chemistry during or immediately after the Yellowstone fires were relatively minor. Minshall and Brock (1991) suggested such effects were more likely to be important in smaller rather than larger streams. Rinne (1996) found no significant reduction in densities of fish as a direct result of a large fire burning across three headwater streams in Arizona.

Indirect effects of large fires are somewhat better understood and can be dramatic. Bozek and Young (1994) noted mortalities of Yellowstone cutthroat trout (*Oncorhynchus clarki bouvieri*) associated with increased suspended sediments in streams two years after large fires in the Greater Yellowstone ecosystem. Floods and debris flows triggered by fires and subsequent storm events have apparently eliminated fish from stream reaches in Montana (Novak and White 1989) and Idaho. Others have documented the local extinction of small populations of salmonids after similar events (Propst et al. 1992; Rinne 1996).

A general conclusion is that large fires can, in the short term, result in substantial mortality and even local extinctions. However, the result may be largely a function of scale. The relative magnitude of an effect is likely to be strongly

influenced by the intensity and severity of the fire, which will, in turn, be influenced by patterns of living vegetation, fuel loads, fire weather, and terrain. Small streams are more likely to be influenced stronger than larger streams. Even when large regions are burned, the mosaic of conditions across streams will produce a patchwork of disturbance effects (e.g., Minshall and Brock 1991). The effects of fires on watershed and ecological processes may be evident for decades (Minshall et al. 1989; Minshall and Brock 1991; Huntington 1995), but they may not necessarily be catastrophic.

Studies of fish populations after large disturbances or experimental defaunation have concluded that population recovery can occur quickly, frequently within a few years (Niemi et al. 1990; Detenbeck et al. 1992), weeks (Sheldon and Meffe 1995), or even days (Peterson and Bayley 1993). To consider risks and tradeoffs associated with large fires and management designed to mitigate those fires, we should consider characteristics of populations and habitats likely to influence biological responses. Two elements seem important: (1) refounding of affected streams or reaches through dispersal from local or internal refugia and (2) stabilizing effects that emerge from complex life histories and overlapping generations in fish populations.



*Refugia*—Rieman et al. (1997) followed responses of three rainbow trout and two bull trout populations in three watersheds after two of the largest, most-intense fires recorded in Boise National Forest, Idaho. Despite the large sizes, the fires in these watersheds left an assortment of intensely burned, lightly burned, and unburned areas that immediately and directly influenced fish distributions. In one stream, depauperate reaches were interspersed with areas supporting high densities of fish. In two streams, moderate or high densities of fish were found immediately below long (2 km–5 km) reaches devoid of fish. Fish may have been completely eliminated from some smaller tributary streams. In years after the fires, debris flows occurred in tributary streams of each watershed. Although populations were depressed, fires in 1992 and 1994 did not produce a uniform or complete elimination of fish or disruption of habitat. Rather, fish numbers increased somewhat dramatically, often exceeding those before the fire or those in streams not influenced by fire (Rieman et al. 1997).

Population responses after the Boise fires were apparently influenced by the presence of refugia (i.e., habitats or stream reaches that supported concentrations of fish during and after the fires). In one system where fish persisted in patches throughout the mainstem, numbers and age structure approached preb... Rvsd Plan - 00001769

Case 1:21-cv-02994-REB   Document 24-7   Filed 06/21/22   USDC Colorado   Page 263 of 341

were reestablished in depauparate reaches by dispersal from both upstream and downstream sources over short distances. In two other streams where fish were apparently eliminated in the upper reaches and some tributaries, recolonization must have occurred through dispersal from downstream sources over longer distances and time.

The mechanism and rate of recolonization are likely to be influenced by the local environment (Sheldon and Meffe 1995). Mechanisms that stimulate recovery or compensate for habitat losses might even be triggered or enhanced by the disturbance (Bisson et al. 1988, 1997; Min-



Streamside vegetation grows below the badly burned trees in Fall Creek, Payette National Forest, after a fire during summer 1994

shall et al. 1989). Although some scientists have reported degradation of juvenile habitats after fire (Minshall et al. 1989), such changes also may result in increased production. Rieman et al. (1997) found high densities for young-of-the-year trout in several reaches one and two years after the Boise fires in all of the watersheds directly influenced by the fires. In small, very cold streams, increased solar exposure may result in warmer water, increased primary and secondary production (Minshall et al. 1989, Minshall and Brock 1991), and faster growth or higher carrying capacities for juvenile fish (Murphy and Meehan 1991). Similar positive responses in growth and production have been observed for other salmonids after large disturbances (Bisson et al. 1988). Although fires may kill fish and depress production in some life stages for some time (Minshall et al. 1989), they also may create the potential for important compensation and subsequent dispersal within or among populations. The importance of spatially redundant and com-

plex or heterogeneous habitats to the persistence of populations is well established in theory (den Boer 1968; Dunning et al. 1992), and there is growing empirical support (e.g., Pearsons et al. 1992). A complex, well-dispersed network of habitats is likely to be an important element in the persistence of fishes during and after large fires.

*Life History*—Many salmonids exhibit a suite of life history forms that include varied patterns of movement, age and timing of maturity, and habitat utilization (Northcote 1992; Thorpe 1994a, 1994b). Multiple forms (i.e., resident and migratory) may occur in proximity to each other, perhaps even in sympatry. The diversity and plasticity of life histories have been viewed as stabilizing mechanisms for populations in variable environments (Gross 1991; Thorpe 1994b). For example, Rieman et al. (1997) and Novak and

White (1990) provide evidence that salmonid populations, severely depressed by the effects of fires, persisted through the presence of a migratory life history form. In essence, although fires caused severe mortality or even eliminated the fish in some streams, populations persisted because some members had migrated outside of the affected area, returning later to spawn. Life history pattern apparently provided both a temporal and spatial hedge against extinction; had these populations been restricted to nonmigratory forms, they might well be extinct. Similar results have been reported for salmonid populations influenced by other disturbances (Titus and Mosegaard 1992; Armstrong et al. 1994).

Complex life histories may be the result of historical patterns of disturbance. For example, spawning and rearing habitats of bull trout are distributed primarily in colder, higher-elevation watersheds (Rieman and McIntyre 1995). Because high-elevation areas throughout the region were more likely to experience mixed or high-intensity fires (Arno 1980), we might expect that, in an evolutionary sense, bull trout and similarly distributed species are well acquainted with large, intense fires. The existence of complex life histories such as the mixed migratory behaviors and overlapping generations found in the Boise River basin could be the expression of strategies that have emerged because of periodic disturbances like fire.

The broad expression of life histories appears dependent on the heterogeneity and connectivity of habitats. Migratory patterns require access to networks of streams that may extend from hundreds of meters to hundreds of kilometers (Bjornn and Mallet 1964; Fausch and Young 1995). Although different forms may occur in the same streams or watersheds, evidence exists that some differences have emerged as adaptations to, or phenotypic expressions against, a template of heterogeneous habitats (Healey 1994; Healey and Prince 1995; Lichatowich and Mobrand 1995). If the spatial and temporal complexity of habitats is lost, the expression of complex life histories may be lost as well.

*The Effects of Management*—If refugia and the expression of life histories are critical to the recovery and persistence of fishes influenced by large fires, the condition of available habitats and effects of past management should be key elements influencing evaluations of risk. The potential effects of management on the ability of populations to respond to large disturbances must be weighed. Throughout the Pacific Northwest, the effects of chronic watershed disturbance by road-building and timber harvest; introduced species, and barriers such as dams, diversions, and road culverts have resulted in fragmented, isolated salmonid populations and the elimination or restriction of life-history patterns (Rieman and McIntyre 1993; Frissell et al 1997). The status of native fishes has been negatively associated with indices of human-related disturbance such as the density of roads (Lee et al. 1997). Although the mechanisms are varied, the risks are clear. Through efforts to intensely manage land and associated activities such as timber harvest, we risk expanding the disruption of watersheds and populations of native fishes. In general, attempts to minimize such effects in any single watershed have led to the dispersal of disruptive activities across broad areas (Reeves et al. 1995). The chronic nature of land

Rvsd Plan - 00001770

management and other human-related disturbances has led to lost spatial complexity of stream environments that ultimately may be reflected in the loss of complexity, diversity, and distribution of populations and life histories (Frissell et al. 1993; Reeves et al. 1995). That loss might well erode the ability of populations to respond to the effects of large fires as well as large storms, floods, and other natural events that we cannot hope to control.

## Conclusions and Future Direction

The tradeoffs between vegetation management and wildfire are not simple. In some cases short-term rates of erosion and sediment delivery after a fire may be larger than the effects of roads and timber harvest. After a fire, changes in vegetation and watersheds influencing hydrologic and temperature regimes and erosion may persist for years, perhaps decades. However, the long-term legacy can be important. Substantial inputs of large wood and coarse sediments also are likely to follow large fires (Brown 1989; Reeves et al. 1995; Young 1994). The larger materials often store fine sediments and provide the hydraulic complexity necessary for sorting substrates important to fish habitat. After fires, intense debris flow and scour events that generate sediment are often localized (Megahan 1991) and prevail primarily in smaller, high-gradient channels (Swanson et al. 1990). Although the volumes of fine sediments can be large, they may be relatively short-lived and patchy in relation to the effects of other more-chronic disturbances associated with roads and timber harvest (Reeves et al. 1995). Historically, the episodic contribution of coarse debris may have been key to the creation and maintenance of complex instream habitats (Swanson and Lienkaemper 1978; Reeves et al. 1995). Emerging theory supports the idea that natural disturbances have been critical to the maintenance of such habitats, the productivity of associated populations (Reeves et al. 1995; Bisson et al. 1997), and the broad expression of life histories. Recent fire suppression could well have contributed to the overall decline in productivity of fish habitats throughout the region.

Large fires can produce local extinctions of small, isolated populations. However, many species and populations may still have the ecological diversity necessary to persist. Although wildfires may create important changes in watershed processes often considered harmful for fish or fish habitats, the spatial and temporal nature of disturbance is important. Fire and the associated hydrologic effects can be characterized as "pulsed" disturbances (sensu Yount and Niemi 1990) as opposed to the more chronic or "press" effects linked to permanent road networks. Species such as bull trout and redband trout appear to have been well adapted to such pulsed disturbance. The population characteristics that provide for resilience in the face of such events, however, likely depend on large, well-connected, and spatially complex habitats that can be lost through chronic effects of other management. Critical elements to resilience and persistence of many populations for these and similar species will be maintaining and restoring complex habitats across a network of streams and watersheds. Intensive land management could make that a difficult job.

Fire and management-related disturbances may cause important, and in some respects similar, changes in physical and biological systems. However, we do not expect conventional timber harvest and road to produce effects equal to fire. Also clear is that attempts to manipulate the structure, composition, and processes of whole ecosystems are largely experimental (Baker 1994; Stanley 1995; Kimmins 1996). In haste, managers have justified actions by citing such concerns as risks to biological communities and sensitive fishes. Undoubtedly, cases exist where the risks of large fires outweigh the risks of intensive management, but those will be clarified only through careful evaluation. Because past management and human disturbance have led to much change in terrestrial and aquatic ecosystems, we suspect that forested landscapes most in need of restoration will often coincide with watersheds and aquatic systems in similar condition (Quigley et al. 1996). That pattern could represent both potential conflicts and opportunities for managers struggling with issues of forest health, wildfire, and sensitive fishes.

Where important, but depressed and small or isolated populations of sensitive fishes persist in landscapes at high risk of uncharacteristic wildfire, populations are threatened both by our management and the lack of it. In these circumstances management should proceed only with the greatest possible care. Silvicultural prescriptions that do not require new or reconstructed road systems and that emphasize prescribed fire or low-impact logging and yarding systems would be clear priorities. Restoring watershed processes through the stabilization and obliteration of roads, hill slope stabilization, and revegetation of riparian areas could be key elements in any plan. Careful watershed and hydrologic analyses are required to weigh any tradeoffs.

Where populations persist in a matrix of healthy watersheds and productive habitats mixed with those in poorer condition, the opportunity for more progressive and adaptive management is greater. Because healthier populations are more likely to persist in the face of even large fires, the need to restructure forests is unlikely to be an immediate priority from an aquatic perspective and, potentially, is a threat. In many cases the extent of the forest health problem is large, and not all lands can be treated in the foreseeable future, even if tradeoffs were clear. We suggest that logical priorities lie in watersheds that are either less or not important in terms of aquatic biological diversity or critical populations, or that have been so strongly altered through past management that further losses are likely to be minor. Prioritizing activities in these areas offers several advantages. First, because management of large systems is largely experimental, new approaches can be tested without placing key aquatic systems at further risk. Second, successfully reestablishing more natural patterns and processes could lead to long-term restoration of more complex, productive aquatic habitats. The long-term restoration of a matrix of whole watersheds could ultimately lead to the wider distribution of habitats necessary to support a broader expression of aquatic biological diversity. The potential for success might be substantially greater if forest restoration projects included the obliteration of particularly damaging roads. Third, working in the matrix would represent progress toward reducing the continuity of fuels, diminishing the risk of uncharacteristically

Rvsd Plan - 00001771

large fires, and restoring biological diversity in terrestrial systems (*sensu* Carey and Curtis 1996)

The approach we suggest will require a broader perspective. As managers attempt to restore more natural patterns in forests (and aquatic ecosystems), both the distribution and intensity of activities should be guided by a landscape perspective of risk and opportunity. A strategic vision of historical condition and variation, current patterns, and long-term potential will be critical. It is unrealistic to hope to return all landscapes to their historical conditions from either an aquatic or forest perspective. Prioritizing efforts that minimize risks to remaining elements while maximizing learning and opportunities to create something more functional will be key to progress. As managers learn to create more natural patterns and restore critical processes through active manipulations of forests and watersheds, landscape management that incorporates planned disturbances could conceivably replace a system of watershed and riparian reserves as the solution for maintaining aquatic diversity and ecological function in forested ecosystems (Reeves et al. 1995; Carey et al. 1996). Ultimately, we believe that healthy forests and healthy aquatic communities should be elements of the same problem (*sensu* Franklin 1992), not competing issues in resource allocation. ➤➤

## Acknowledgments

We thank Dave Burns, Michael Young, Fred Swanson, Bob Gresswell, Wayne Minshall, and John Rinne for providing constructive reviews and materials that improved the manuscript. We are particularly indebted to Paul Hessbug for extended discussions and critical review that contributed directly to many of the ideas expressed in this paper.

## References

Agee, J. K. 1988. Wildfire in the Pacific West: a brief history and implications for the future. Pages 11–16 *in* N. H. Berg, ed. Proceedings of the symposium on fire and watershed management. U.S. Forest Service Pacific Southwest Forest and Range Experiment Station, GTR-PSW-109, Berkeley, CA.
———. 1994. Fire and weather disturbances in terrestrial ecosystems of the eastern Cascades. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-320, Portland, OR.

Amaranthus, M., H. Jubas, and D. Arthur. 1989. Stream shading, summer streamflow, and maximum water temperature following intense wildfire in headwater streams. Pages 75–78 *in* N. H. Berg, ed. Proceedings of a symposium on fire and watershed management. U.S. Forest Service, Pacific Southwest Forest and Range Experiment Station, PSW-GTR-109, Berkeley, CA.

Armstrong, J. D., P. E. Shackley, and R. Gardiner. 1994. Redistribution of juvenile salmonid fishes after localized catastrophic depletion. J. Fish Biol. 45:1,027–1,039.

Arno, S. F. 1980. Forest fire history in the northern Rockies. J. For. 78:460–465.

Attiwill, P. M. 1994. The disturbance of forest ecosystems: the ecological basis for conservative management. For. Ecol. Manage. 63:247–300.

Baker, W. L. 1994. Restoration of landscape structure altered by fire suppression. Conserv. Biol. 8:763–769.

Barbouletos, C., and L. Z. Morelan. 1995. Implementing forest ecosystem health projects on the ground. Pages 227–231 *in* L. G. Eskew, ed. Forest health through silviculture.

Proceedings of the 1995 national silviculture workshop. U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station, RM-GTR-267, Fort Collins, CO.

Benda, L. E. 1985. Delineation of channels susceptible to debris flow and debris floods. Pages 195–201 *in* Proceedings, international symposium on erosion, debris flow, and disaster prevention. Erosion Control Engineering Society, Sabo, Japan.

Beschta, R. L. 1978. Long-term patterns of sediment production following road construction and logging in the Oregon Coast Range. Water Resour. Res. 14(6):1,011–1,016.

Beschta, R. L., R. E. Bilby, G. W. Brown, L. B. Holtby, and T. D. Hofstra. 1987. Stream temperature and aquatic habitat: fisheries and forestry interactions. Pages 191–232 *in* E. O. Salo and T. W. Cundy, eds. Streamside management: forestry and fisheries interactions. University of Washington Institute of Forest Resources, contribution no. 57, Seattle.

Bisson, P. A., G. H. Reeves, R. E. Bilby, and R. Naiman. 1997. Desired future conditions? Pages 447–474 *in* D. P. Stouder, P. A. Bisson, and R. Naiman, eds. Pacific salmon and their ecosystems. Chapman and Hall, New York.

Bisson, P. A., J. L. Nielsen, and J. W. Ward. 1988. Summer production of coho salmon stocked in Mount St. Helens streams 3–6 years after the 1980 eruption. Trans. Am. Fish. Soc. 117:322–335.

Bjornn, T. C., and J. Mallet. 1964. Movements of planted and wild trout in an Idaho river system. Trans. Am. Fish. Soc. 93:70–76.

Bozek, M. A., and M. K. Young. 1994. Fish mortality resulting from delayed effects of fire in the Greater Yellowstone ecosystem. Great Basin Nat. 54:91–95.

Bradshaw, A. D. 1996. Underlying principles of restoration. Can. J. Fish. Aquat. Sci. 53(supplement 1):3–9.

Brown, G. W. 1969. Predicting temperature of small streams. Water Resour. Res. 5:68–75.

Brown, G. W., and J. T. Krygier. 1970. Effects of clearcutting on stream temperature. Water Resour. Res. 6(4):1,131–1,140.

Brown, J. K. 1989. Effects of fire on streams. Pages 106–110 *in* F. Richardson and R. H. Hamre, eds. Wild trout IV: proceedings of the symposium. U.S. Government Printing Office, Washington, DC.

Carey, A. B., and R. O. Curtis. 1996. Conservation of biodiversity: a useful paradigm for forest ecosystem management. Wildl. Soc. Bull. 24:610–620.

Carey, A. B., and seven coauthors. 1996. Washington forest landscape management project—a pragmatic, ecological approach to small-landscape management. Washington State Department of Natural Resources report no. 2, Olympia.

Carlson, C. E., S. F. Arno, J. Chew, and C. A. Stewart. 1995. Forest development leading to disturbance. Pages 26–36 *in* L. G. Eskew, ed. Forest health through silviculture. Proceedings of the 1995 national silviculture workshop. U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station, RM-GTR-267, Fort Collins, CO.

Chamberlin, T. W., R. D. Harr, and F. H. Everest. 1991. Timber harvesting, silviculture, and watershed processes. Am. Fish. Soc. Spec. Publ. 19:181–206.

Christensen, N. L., and 12 coauthors. 1989. Interpreting the Yellowstone fires of 1988—Ecosystem responses and management implications. Bioscience 39(10):678–685.

DeBano, L. F., L. D. Mann, and D. A. Hamilton. 1970. Translocation of hydrophobic substances into soil by burning organic litter. Soil Sci. Soc. Am. Proc. 34:130–133.

den Boer, P. J. 1968. Spreading of risk and stabilization of

Rvsd Plan - 00001772

animal numbers. Acta Biotheoretica 18:165–194.

Detenbeck, N. E., P. W. DeVore, G. J. Niemi, and A. Lima. 1992. Recovery of temperate-stream fish communities from disturbance: a review of case studies and synthesis of theory. Environ. Manage. 16:33–53.

Dunning, J. B., B. J. Danielson, and H. R. Pulliam. 1992. Ecological processes that affect populations in complex landscapes. Oikos 65:169–175

Eskew, L. G., ed. 1995. Forest health through silviculture. Proceedings of the 1995 national silviculture workshop. U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station, RM-GTR-267, Fort Collins, CO.

Fausch, K. D., and M. K. Young. 1995. Evolutionarily significant units and movement of resident stream fishes: a cautionary tale. Am. Fish. Soc. Symp. 17:360–370.

Franklin, J. F. 1992. Scientific basis for new perspectives in forests and streams. Pages 25–72 in R. J. Naiman, ed. Watershed management, balancing sustainability, and environmental change. Springer, New York.

Frissell, C. A., W. J. Liss, and D. Bayles. 1993. An integrated biophysical strategy for ecological restoration of large watersheds. Pages 449–456 in D. Potts, ed. Proceedings of the symposium on changing roles in water resources management and policy. American Water Resources Association, Herndon, VA.

Frissell, C. A., W. J. Liss, R. E. Gresswell, R. K. Nawa, and J. L. Ebersole. 1997. A resource in crisis: changing the measure of salmon management. Pages 411–444 in D. P. Stouder, P. A. Bisson, and R. Naiman, eds. Pacific salmon and their ecosystems. Chapman and Hall, New York.

Furniss, M. J., T. D. Roelofs, and C. S. Yee. 1991. Road construction and maintenance. Am. Fish. Soc. Spec. Publ. 19:297–324.

Gray, D. H., and W. F. Megahan. 1981. Forest vegetation removal and slope stability in the Idaho batholith. U.S. Forest Service research paper, Intermountain Forest and Range Experiment Station, INT-271, Ogden, UT.

Gross, M. R. 1991. Salmon breeding behavior and life history evolution in changing environments. Ecology 72:1,180–1,186.

Hann, W. J., J. Jones, and M. Karl. 1997. Landscape dynamics of the basin. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-405, Vol. 2, Ch. 3, Portland, OR.

Healey, M. C. 1994. Variation in the life history characteristics of chinook salmon and its relevance to conservation of the Sacramento winter run of chinook salmon. Conserv. Biol. 8(3):876–877.

Healey, M. C., and A. Prince. 1995. Scales of variation in life history tactics of Pacific salmon and the conservation of phenotype and genotype. Am. Fish. Soc. Symp. 17:176–184.

Helvey, J. D. 1972. First-year effects of wildfire on water yield and stream temperature in north central Washington. Pages 308–312 in Proceedings of the symposium, watersheds in transition. American Water Resources Association and Colorado State University, Fort Collins, CO.

Henjum, M. G., and seven coauthors. 1994. Interim protection for late-successional forests, fisheries, and watersheds: national forests east of the Cascade Crest, Oregon and Washington. The Wildlife Society, Bethesda, MD.

Hessburg, P. F., B. G. Smith, S. D. Kreiter, C. A. Miller, R. B. Salter, C. H. McNicoll, and W. J. Hann. 1997 (in press). Historical and current forest and range landscapes in the Interior Columbia River basin and portions of the Klamath and Great basins. Part I. Linking vegetation patterns and

landscape vulnerability to potential insect and pathogen disturbances. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-00, Portland, OR.

Huff, M. H., R. D. Ottmar, E. Alvarado, R. E. Vihnanek, J. F. Lehmkuhl, P. F. Hessburg, and R. L. Everett. 1995. Historical and current forest landscapes of eastern Oregon and Washington. Part II. Linking vegetation characteristics to potential fire behavior and related smoke production. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-355, Portland, OR.

Huntington, C. W. 1995. Fish habitat and salmonid abundance within managed and unroaded landscapes on the Clearwater National Forest, Idaho. U.S. Forest Service Eastside Ecosystem Management Project, final report, order no. 43-0E00-4-9106, Walla Walla, WA.

Johnson, E. A., K. M. Miyanishi, and J. M. H. Weir. 1995. Old-growth, disturbance, and ecosystem management. Can. J. Bot. 73:918–926.

———. 1996. Old-growth, disturbance, and ecosystem management: reply. Can. J. Bot. 75:511.

Jones, J. A., and G. E. Grant. 1996. Peak flow responses to clear-cutting and roads in small and large basins, western Cascades, Oregon. Water Resour. Res. 32:959–974.

Kimmins, J. P. 1996. Importance of soil and role of ecosystem disturbance for sustained productivity of cool temperate and boreal forests. Soil Sci. Soc. Am. J. 60:1,643–1,651.

King, J. G., and L. C. Tennyson. 1984. Alteration of streamflow characteristics following road construction in north central Idaho. Water Resour. Res. 20:1,159–1,163.

Lee, D. C., J. Sedell, B. Rieman, R. Thurow, and J. Williams. 1997. Broadscale assessment of aquatic species and habitats. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-405, Vol. 3, Ch. 4. Portland, OR.

Lehmkuhl, J. F., P. F. Hessburg, R. L. Everett, M. H. Huff, and R. D. Ottmar. 1994. Historical and current forest landscapes of eastern Oregon and Washington: Part 1 vegetation pattern and insect and disease hazards. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-328, Portland, OR.

Lichatowich, J. A., and L. E. Mobrand. 1995. Analysis of chinook salmon in the Columbia River from an ecosystem perspective. Report prepared for Bonneville Power Administration, Contract DE-AM79-92BP25105, Portland, OR.

McMahon, T. E., and D. S. deCalista. 1990. Effects of fire on fish and wildlife. Pages 233–250 in J. D. Walstad, S. R. Radosvich, and D. V. Sandberg, eds. Natural and prescribed fire in Pacific Northwest Forest. Oregon State University Press, Corvallis.

Meehan, W. R. 1970. Some effects of shade cover on stream temperature in Southeast Alaska. U.S. Forest Service, Pacific Northwest Forest and Range Experiment Station, research note PNW-113, Portland, OR.

Megahan, W. F. 1980. Nonpoint source pollution from forestry activities in the western United States: results of recent research and research needs. Pages 92–151 in Proceedings of forestry and water quality: What course in the 80s? Water Pollution Control Federation, Washington, DC.

———. 1991. Erosion and site productivity in western-montane forest ecosystems. Pages 146–150 in Proceedings: management and productivity of western-montane forest soils. U.S. Forest Service, Intermountain Research Station, GTR-INT-280, Ogden, UT.

———. 1972. Subsurface flow interception by a logging road in the mountains of central Idaho. Pages 350–356 in

Rvsd Plan - 00001773

Proceedings of the national symposium on watersheds in transition, Fort Collins, Colorado. American Water Resources Association Series 14, Herndon, VA.

Megahan, W. F., and C. C. Bohn. 1989. Progressive, long-term slope failure following road construction and logging on noncohesive, granitic soils of the Idaho batholith. Pages 501–510 in W. W. Woessner and D. F. Potts, eds. Proceedings of the symposium, headwaters hydrology. American Water Resources Association, Bethesda, MD.

Megahan, W. F., J. G. King, and K. A. Seyedbagheri. 1995. Hydrologic and erosional responses of a granitic watershed to helicopter logging and broadcast burning. For. Sci. 41:777–795.

Minshall, G. W., J. T. Brock, and J. D. Varley. 1989. Wildfires and Yellowstone's stream ecosystems. Bioscience 39:707–715.

Minshall, G. W., and J. T. Brock. 1991. Observed and anticipated effects of forest fire on Yellowstone stream ecosystems. Pages 123–135 in R. B. Keiter and M. S. Boyce, eds. The Greater Yellowstone ecosystem: redefining America's wilderness heritage. Yale University Press, New Haven, CT.

Murphy, M. L., and W. R. Meehan. 1991. Stream ecosystems. Am. Fish. Soc. Spec. Publ. 19, Bethesda, MD.

Nehlsen, W., J. E. Williams, and J. A. Lichatowich. 1991. Pacific salmon at the crossroads: Stocks at risk from California, Oregon, Idaho, and Washington. Fisheries 16(2):4–21.

Niemi, G. J., and seven coauthors. 1990. Overview of case studies on recovery of aquatic systems from disturbance. Environ. Manage. 14:571–588.

Novak, M. A., and R. G. White. 1989. Impact of a fire and flood on the trout population of Beaver Creek, upper Missouri basin, Montana. Pages 120–129 in F. Richardson and R. H. Hamre, eds. Wild trout IV: proceedings of the symposium. U.S. Government Printing Office, Washington, DC.

Northcote, T. G. 1992. Migration and residency in stream salmonids: some ecological considerations and evolutionary consequences. Nordic J. Freshwater Res. 67:5–17.

Patton, D. R. 1973. A literature review of timber harvesting effects on stream temperatures: research needs for the Southwest. U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station, research note RM-249, Fort Collins, CO.

Pearsons, T. N., H. W. Li, and G. A. Lamberti. 1992. Influence of habitat complexity on resistance to flooding and resilience of stream fish assemblages. Trans. Am. Fish. Soc. 121:427–436.

Peterson, J. T., and P. B. Bayley. 1993. Colonization rates of fishes in experimentally defaunated warmwater streams. Trans. Am. Fish. Soc. 122:199–207.

Propst, D. L., J. A. Stefferud, and P. R. Turner. 1992. Conservation and status of Gila trout, Oncorhynchus gilae. Southwest. Nat. 37: 117–125.

Quigley, T. M., R. W. Haynes, and R. T. Graham. 1996. Integrated scientific assessment for ecosystem management in the Interior Columbia Basin. U.S. Forest Service, Pacific Northwest Research Station, PNW-GTR-382, Portland, OR.

Reeves, G. H., L. E. Benda, K. M. Burnett, P. A. Bisson, and J. R. Sedell. 1995. A disturbance-based ecosystem approach to maintaining and restoring freshwater habitats of evolutionarily significant units of anadromous salmonids in the Pacific Northwest. Am. Fish. Soc. Symp. 17:334–349.

Reid, L. M., and T. Dunne. 1984. Sediment production from forest road surfaces. Water Resour. Res. 20(12):1,753–1,761.

Rieman, B. E., D. Lee, G. Chandler, and D. Myers. 1997 (in press). Does wildfire threaten extinction for salmonids:

responses of redband trout and bull trout following recent large fires on the Boise National Forest. In J. Greenlee, ed. Proceedings of the symposium on fire effects on threatened and endangered species and habitats. International Association of Wildland Fire, Fairfield, WA.

Rieman, B. E., and J. D. McIntyre. 1993. Demographic and habitat requirements for conservation of bull trout. U.S. Forest Service Intermountain Research Station, GTR-INT-302, Ogden, UT.

———. 1995. Occurrence of bull trout in naturally fragmented habitat patches of varied size. Trans. Am. Fish. Soc. 124:285–296.

Rinne, J. N. 1996. Short-term effects of wildfire on fishes and aquatic macroinvertebrates in the southwestern United States. N. Am. J. Fish. Manage. 16:653–658.

Sheldon, A., and G. K. Meffe. 1995. Short-term recolonization by fishes of experimentally defaunated pools of a coastal plain stream. Copeia 1993(4):828–837.

Stanley, T. R., Jr. 1995. Ecosystem management and the arrogance of humanism. Conserv. Biol. 9:255–262.

Swanson, F. J. 1981. Fire and geomorphic processes. Pages 401–420 in Fire regimes and ecosystem conference. U.S. Forest Service, WO-26, Washington, DC.

Swanson, F. J., and C. T. Dyrness. 1975. Impact of clear-cutting and road construction on soil erosion by landslides in the western Cascade Range, Oregon. Geology 3:393–396.

Swanson, F. J., and G. W. Lienkaemper. 1978. Physical consequences of large organic debris in Pacific Northwest streams. U.S. Forest Service, Pacific Northwest Research Station, GTR-PNW-69, Portland, OR.

Swanson, F. J., J. F. Franklin, and J. R. Sedell. 1990. Landscape patterns, disturbance, and management in the Pacific Northwest, USA. Pages 191–213 in I. S. Zonneveld and R. T. Forman, eds. Changing landscapes: an ecological perspective. Springer-Verlag, New York.

Swanson, F. J., T. K. Katz, N. Caine, and R. G. Woodmansee. 1988. Land form effects on ecological processes and features. Bioscience 38:92–98.

Swanston, D. N. 1991. Natural processes. Am. Fish. Soc. Spec. Publ. 19:139–179.

Thorpe, J. E. 1994a. Performance thresholds and life-history flexibility in salmonids. Conserv. Biol. 8:877–879.

———. 1994b. Salmonid flexibility: responses to environmental extremes. Trans. Am. Fish. Soc. 123:606–612.

Titus, R. G., and H. Mosegaard. 1992. Fluctuating recruitment and variable life history of migratory trout, Salmo trutta, in a small, unstable stream. J. Fish Biol. 41:239–255.

Troendle, C. A., and R. M. King. 1985. The effect of timber harvest on the Fool Creek watershed, 30 years later. Water Resour. Res. 21:1,915–1,922.

Williams, J. E., and seven coauthors. 1989. Fishes of North America endangered, threatened, or of special concern: 1989. Fisheries 14(6):2–20.

Young, M. K. 1994. Movement and characteristics of streamborne, coarse, woody debris in adjacent burned and undisturbed watersheds in Wyoming. Can. J. For. Res. 24:1,933–1,938.

Yount, J. D., and G. J. Niemi. 1990. Recovery of lotic communities and ecosystems from disturbance—a narrative review of case studies. Environ. Manage. 14:547–570.

Ziemer, R. R., and D. N. Swanston. 1977. Root strength changes after logging in southeast Alaska. U.S. Forest Service, Pacific Northwest Forest and Range Experiment Station, research note PNW-306, Portland, OR.

Rvsd Plan - 00001774

(e.g., glaciated U-shaped valleys) set the template for process rates in headwater systems.

The flow of sediment and woody debris from episodic landslides has a direct effect on headwater channels in mountainous regions (Dietrich and Dunne 1978, Benda and Cundy 1990, Whiting and Bradley 1993). The zones of initiation and deposition of these mass movements often both occur within headwater systems (Sidle et al. 1985), and the processes of mass movement affect the accumulation and distribution of woody debris throughout the channel network. Channel reach types (e.g., cascades, steps, and pools) in headwater channels vary because of sediment supply, larger substrate, exposed bedrock, and woody debris (Montgomery and Buffington 1998, Halwas and Church 2002). Furthermore, hydrologic processes in hillslopes and zero-order basins (unchannelized hallows) control stream-flow generation (Tsukamoto et al. 1982, Sidle et al. 2000) and stream chemistry (Likens et al. 1977). The expansion and shrinkage of wetted areas and stream channels in response to changing precipitation conditions significantly modify subsurface flow paths (Hewlett and Hibbert 1967). Such changes affect landslide probability in hillslopes (Sidle et al. 1985), as well as organic matter and nutrient fluxes from terrestrial to aquatic environments (Dieterich and Anderson 1998).

Biological processes in headwater systems also respond to the complex interactions of geomorphic and hydrologic processes at various temporal and spatial scales (Hynes 1975, Meyer and Wallace 2001). Leaf litter and woody debris from riparian zones and hillslopes (allochthonous input, that is, originating from outside the stream channels) are important sources of food and habitat for biota in small streams (Richardson 1992, Wallace et al. 1999). Relatively large substrate and woody debris in headwater channels modify channel hydraulics and provide sediment storage sites (Zimmerman and Church 2001); this in turn alters habitat types and accumulation of organic matter (Webster et al. 1999). Stream- and storm-flow generation processes modify organic matter dynamics (Kiffney et al. 2000), as well as biological community structure and life cycles of aquatic fauna in headwater channels (Dieterich and Anderson 2000).

Because the spatial extent of headwater systems makes up a major portion (70% to 80%) of the total catchment area (Sidle et al. 2000, Meyer and Wallace 2001), headwater systems are important sources of sediment, water, nutrients, and organic matter for downstream systems. Sediment produced in headwater systems moves through channel networks and alters channel morphology (Hogan et al. 1995, Benda and Dunne 1997a, 1997b). Floods induce scour and deposit sediment along channels, thus damaging riparian vegetation (Swanson et al. 1998). Sediment transported from headwater tributaries creates various channel environments (Gregory et al. 1991, Nakamura et al. 2000) and modifies patterns of channel morphology, riparian structure, and hyporheic exchange (exchange of water between saturated sediment surrounding the open channel and the channel itself; Wondzell and Swanson 1999), as well as macroinvertebrate communi-

ties in downstream reaches (Rice et al. 2001). Large amounts of allochthonous organic matter are transported from headwater tributaries (Cummins et al. 1983, Webster et al. 1999, Kiffney et al. 2000). Movement of detrital material and invertebrates from headwater reaches supports the downstream food web; this in turn alters productivity, population density, and community structure of stream biota in downstream reaches (Wipfli and Gregovich 2002).

## Conceptual structures of stream ecosystems

Many conceptual studies have demonstrated the functional relationships of scales and processes in geomorphology, hydrology, and biology that contribute to our understanding of stream ecosystems. Recognition of stream systems as a continuum was a major advance in developing a functional and dynamic perspective from upstream to downstream systems (Hynes 1975, Vannote et al. 1980). Understanding and organization of temporal and spatial scales and their causality have affected paradigms in modern science and land use management. In geomorphology, Schumm and Lichty's comprehensive paper (1965) first demonstrated the dependent and independent processes of landform evolution at various temporal and spatial scales. Church and Mark (1980) discussed proportional characteristics of landforms and their behaviors at different scales.

The functional relationships among geomorphic processes in space and time are recognized as controls on the continuity of material transport in stream ecosystems. The equilibrium concept of geomorphology (Leopold et al. 1964), which demonstrated the relationship between sediment supply and transport, led to the development of the geomorphic perspective of fluvial processes in a continuum from upstream to downstream reaches. For instance, Hey (1979) suggested that a process–response model with functional linkages from upstream to downstream systems is needed to explain and predict channel responses to a set of input conditions. Sediment budgets and routing were used to describe the spatial and temporal linkages of sediment movement along channels (Dietrich and Dunne 1978). Additionally, Wolman and Millar (1960) and Dunne (1991) demonstrated temporal and spatial linkages between hydrologic and geomorphic processes with respect to rainfall–landslide thresholds and channel network development. Benda and Dunne (1997a, 1997b) examined the occurrence of mass movement in hillslopes and related sediment routing processes through a channel network from a stochastic viewpoint; they concluded that continuity and discontinuity of sediment transport occur within watersheds because of changes in valley width and channel gradient.

Continuity and discontinuity of biological processes from upper to lower reaches have been discussed in the context of heterogeneity of habitat, population, and community dynamics. The river continuum concept (Vannote et al. 1980) depicts upstream linkages and downstream adjustment of stream ecosystems, based on changes in channel morphology

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

Rvsd Plan - 00001776

● *Articles*

through streams and rivers (Leopold et al. 1964). Based on the river continuum concept, Ward and Stanford (1983, 1995) developed a serial discontinuity concept, whereby a dam or channel morphology (e.g., confined headwaters, meandering and braided reaches) disconnects the upstream to downstream continuum. In a separate attempt to characterize stream ecosystems, others have shown how surface and subsurface flow interactions along channel corridors are important to nutrient cycling and biotic communities (Newbold et al. 1982, Stanford and Ward 1993). A hierarchical classification of stream ecosystems was proposed to examine continuity and discontinuity of impacts on stream biota at different scales within watersheds (Frissell et al. 1986). Patch dynamics, formed by microtopographic attributes, may indicate the fragmentation of habitat and community structure in stream ecosystems (Pringle et al. 1988). Disturbances (e.g., landslides, debris flows, floods, and droughts) may control the patch distribution of organisms in and around stream systems (Townsend 1989, Gregory et al. 1991). Montgomery (1999) demonstrated that geomorphic processes set the templates of biological processes of disturbance, the river continuum, and patch dynamics in his process domain concept.

Although the importance of channel network structure for material dynamics has gradually been recognized (Johnson et al. 1995, Benda and Dunne 1997b, Meyer and Wallace 2001, Rice et al. 2001), when most of the earlier conceptual and field studies were conducted, watershed processes were assumed to be linear, and thus network structures such as tributary pattern, density, and junction effects were disregarded. The river continuum concept (Vannote et al. 1980) evokes not a network (branching shape), but a linear concept from upper to lower stream reaches. Similarly, the nutrient spiraling concept (Newbold et al. 1982) presents a more complex, but still linear, abstraction of solute dynamics in stream ecosystems within channels and hyporheic zones (Fisher 1997). However, Minshall and colleagues (1985) and Johnson and colleagues (1995) observed that landform attributes, such as tributary junctions in channel networks, affect the river continuum concept. Kirkby (1993) and Robinson and colleagues (1995) demonstrated the importance of channel networks in drainage basins for understanding and forecasting flow regimes, sediment transport processes, and landform evolution. Fisher (1997) noted that a paradigm shift from linear to network (branched shape) systems is necessary to understand the processes and linkages of physical and biological dynamics in stream ecosystems. Benda and colleagues (1997b) and Rice and colleagues (2001) emphasized the importance of channel network structure to understand the longitudinal variations in sediment movement and aquatic environments.

***Headwater and network systems.*** The watershed network can be partitioned into two systems, headwater and network systems, on the basis of process characteristics. Structural differences and the continuous versus discontinuous nature of processes are critical for distinguishing between headwaters and larger watershed systems. Hydrologic, geo-



***Figure 1. Structural differences between headwater and network systems. Arrows show the movement of sediment, water, nutrients, and organic material. Solid and broken lines show perennial and intermittent streams, respectively.***

morphic, and biological processes in headwater systems cascade from hillslopes to streams (figure 1), and because hillslopes and streams are tightly coupled, material transport within headwater systems thus can be predicted as processes from hillslopes to stream channels. In contrast, material routing in larger watersheds is controlled by the channel network structure, because numerous headwaters are nested within it. Therefore, network structure must be considered in predicting material transport in larger watershed systems (figure 1; Fisher 1997). Nevertheless, processes from headwaters to downstream systems are often discontinuous because of changes in valley width, tributary junction angle, substrate size, and channel gradient (Benda and Cundy 1990, Ward and Stanford 1995, Bravard and Gilvear 1996, Rice et al. 2001).

Headwater systems contain four topographic units with distinctive biological and hydrological processes (Hack and Goodlett 1960): (1) hillslopes; (2) zero-order basins; (3) ephemeral or temporal channels emerging from zero-order basins, termed "transitional" channels; and (4) first- and second-order stream channels depending on linkages from hillslopes to channels (figure 2). Hillslopes have either divergent or straight contour lines, typically with no channelized flow. A zero-order basin is defined as an unchannelized hollow with convergent contour lines (Tsukamoto et al. 1982). Colluvial material, that is, debris transported by gravity from adjacent hillslopes, typically fills such hollows. Although saturated overland flow may be observed in zero-order basins and at the foot of hillslopes during storms, biological activity in such hillslopes and zero-order basins is terrestrial (Hack and Goodlett 1960).

Channels with defined banks may emanate from zero-order basins (Tsukamoto et al. 1982); if channels exist at the outlet of these basins, they represent the headmost definable channels with temporary or ephemeral flow. Temporary channels have more or less continuous flow at least 4 to 5

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

*Articles*



*Figure 2. Processes and structures in headwater systems. Four topographic units compose headwater systems (bold type): hillslopes, zero-order basins, transitional channels (temporary or ephemeral channels emerging from zero-order basins), and first- and second-order stream channels. DOC, dissolved organic carbon; CPOM, coarse particulate organic matter; FPOM, fine particulate organic matter.*

***Size of headwater systems.*** In the river continuum concept (Vannote et al. 1980), headwater streams were defined as first- to second-order channels, based on Strahler's (1957) channel classification. However, there are potential problems with such classifications: (1) stream orders depend on scales of maps; (2) stream orders are modified by basin-scale topography (e.g., steep mountains versus plains); and (3) stream orders are not suitable for explaining hydrologic, geomorphic, and biological processes, as well as the importance of headwater streams. Meyer and Wallace (2001) noted that most detailed topographic maps did not include most headwater channels that might be found in field inventories. Thus, "headwaters" defined by Strahler's system and the river continuum concept pose ambiguities related to identification and interpretation of the sizes of headwater systems.

months in an average year, whereas ephemeral channels flow only for several days during wet periods (Dieterich and Anderson 2000). Thus, temporary and ephemeral channels emanating from zero-order basins typically cannot support the complete life cycles of the juvenile stages of aquatic macroinvertebrates, except for those species with a long diapause stage or other strategies for tolerating absence of surface flow (Anderson 1997, Meyer and Wallace 2001). Despite the inability to support macroinvertebrates, such channels are integral parts of channel networks and have distinct roles (e.g., temporary storage of organic matter; Dieterich and Anderson 1998, 2000, Halwas and Church 2002); thus, we call such streams transitional first-order channels, or simply transitional channels (figure 2). Transitional channels may gradually or abruptly begin from zero-order basins, depending on concentration (critical length) of saturated overland flow, infiltration–excess overland flow, and seepage erosion (by means of return flow). Such channels may also contain discontinuous segments prior to entering first-order channels (Montgomery and Dietrich 1989).

First-order streams are the uppermost, unbranched channels with either perennial flow or sustained intermittent flow (more than 4 to 5 months during an average year). First-order channels may directly emanate from the outlet of zero-order basins, depending on flow generation mechanisms (e.g., springs and seeps). Second-order (one branch) or even higher order (multiple branch) streams may be considered headwater streams, depending on degree of coupling between hillslopes and channels (e.g., transport distance of debris flow), which is discussed later in this article. Both first-and second-order channels may have intermittent reaches (dry parts), depending on groundwater level and volume of alluvium (sediment deposited by flowing water).

Processes from hillslopes to streams are important for defining the downstream limits of headwater systems. For instance, the transition from mass movement–dominated to fluvial process–dominated reaches occurs in headwater streams of Oregon for drainage areas up to 1.0 $km^2$ (figure 3a; Benda and Dunne 1987). The major causes for the deposition of debris flows are decreasing channel gradient, abrupt tributary junction, and flow divergence (Benda and Cundy 1990). Swanson and colleagues (1998) also noted that drainage areas from 0.01 to 1 $km^2$ (1 to 100 ha) are appropriate for distinguishing headwater streams based on physical and biological processes. Using digital elevation models (DEMs), Montgomery and Foufoula-Georgiou (1993) demonstrated that a shift from colluvial to alluvial geomorphic processes occurred from 0.1 to 1.0 $km^2$. However, digital elevation models have limitations related to identifying headwater swales. With developments in laser altimetry, DEMs with contour intervals less than or equal to 2 meters can be developed; such precision will facilitate identification of geomorphic hollows and other features.

Variation of discharge in drainages less than 1 $km^2$ was greater than for drainages larger than 1 $km^2$, based on the representative elementary area concept (figure 3B; Woods et al. 1995). Researchers (Wood et al. 1988, Woods et al. 1995) have noted that hydrologic processes within a 1 $km^2$ area are governed by hillslope processes related to soil depth, topography, rainfall intensity, and vegetation. Such site factors create greater variation of unit area discharge. In contrast, hydrological response in basins greater than 1 $km^2$ is more affected by routing processes and the structure and extent of the floodplain.

The findings of such studies indicate that the largest drainage area of headwater systems is likely 1 $km^2$ (figure 3a,

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

Rvsd Plan - 00001778



*Figure 3. Downstream changes of hydrologic, geomorphic, and biological processes. Shaded area indicates ranges of each parameter. (a) Transition from debris flow–dominated to alluvium-dominated processes occurs at drainage areas ranging from 0.1 to 1.0 km² (Benda and Dunne 1987). (b) Variation of unit area discharge is greater within basins less than 1.0 km² (Woods et al. 1995). (c) Number of woody debris dams in headwater streams without mass movement is greater, compared with larger watershed systems, because relatively small woody debris can form dams. (d) Ratio in coarse particulate organic matter (CPOM ≥ 1 mm) and fine particulate organic matter (0.5 μm ≤ FPOM < 1 mm) may rapidly decrease in drainage areas greater than 1.0 km², because CPOM is retained more in headwater streams and greater amounts of FPOM are transported from headwaters.*

3B). Although we suggest a relative upper size limit (1 km²) for headwater systems, depending on the region, process-based criteria are more important for the definition of headwater systems than simply catchment area (Whiting and Bradley 1993, Montgomery 1999). In the following sections, we review hydrologic, geomorphic, and biological processes in headwaters (≤ 1 km² in drainage area) and network systems (> 1 km² in drainage area).

## Hydrogeomorphic and biological processes

Different magnitudes and frequencies of hydrologic processes occur in headwaters and large watershed systems (Woods et

al. 1995). Geomorphic processes in headwaters are largely stochastic, whereas more chronic processes related to routing of sediment, water, and wood are common in channel network systems (Benda and Dunne 1997a, 1997b). Such different hydrogeomorphic processes between headwater and network systems also modify biological community structure and distribution as well as recovery processes of stream biota from disturbances (Rice et al. 2001).

### Hydrogeomorphic processes

**Headwater systems.** Water inputs of headwater systems are unique, compared with larger watershed systems. Because headwaters occupy the highest positions in catchments, precipitation and snow accumulation in headwaters are generally greater than in lower elevation zones (table 1). Rainfall inputs vary greatly among headwater systems; thus, isolated precipitation is typically observed more in headwater systems than in the overall watershed. The relative temporal fluctuation of peak flows in headwaters is greater than in larger watersheds (table 1, figure 3b; Robinson et al. 1995, Woods et al. 1995). Water inputs strongly affect hillslope and channel conditions because of the close coupling of hydrologic and geomorphic processes within confined and steep valleys of headwater systems (figure 2; Sidle et al. 2000). Stream temperature and water chemistry in headwater channels are closely related to soil pore structure and bedrock fractures in hillslopes and zero-order basins. Subsurface discharge from hillslopes contributes base flow and storm flow to headwater channels, initiates certain erosion processes, and is important for the development of headwater topography (Dunne 1991).

Storm flow responds rapidly to intense rainfall in headwaters because of their relatively small storage capacity and shorter flow paths. Storm flow generation in headwater channels is also affected by the responses of hillslopes and zero-order basins to changing antecedent moisture conditions (figure 4; Hewlett and Hibbert 1967, Sidle et al. 2000). Storm flow is primarily generated by direct runoff from saturated riparian areas and channel interception during lower antecedent moisture conditions. Throughflow from the soil matrix at the foot of hillslopes and riparian areas gradually increases with increasing wetness of the basins. During wet conditions, zero-order basins with relatively shallow soils start contributing surface runoff, and preferential flow from hillslopes augments storm flow. Zero-order basins and preferential flow paths are major contributors to storm flow during very wet conditions (Sidle et al. 2000). Transitional channels emerging from zero-order basins typically flow during such storms, when the storms are preceded by very wet conditions (figure 4). During rain and rain-on-snow events, nearly saturated conditions in hydrologically responsive areas (e.g., zero-order basins) may induce slope failure (Sidle et al. 1985). During the dry seasons, however, intermittent (dry) reaches may be found in headwater channels, depending on groundwater level and depth of alluvium.

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

*Articles*

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

*Table 1. Characteristics of hydrologic, geomorphic, and biological processes in headwater and network systems, particularly in forested mountains in the Pacific Northwest.*

| Process | Characteristic | Headwater system | Network system |
|---------|----------------|------------------|----------------|
| Hydrology | Precipitation | Greater precipitation<br>Greater snow accumulation | Lower snow accumulation |
| | Heat dynamics | Canopy closure<br>Dependent on groundwater flow | Canopy open |
| | Flow generation | Subsurface and groundwater flow in zero-order basins and hillslopes | Saturated overland and return flows in flood plain, riparian zones<br>Tributary outflows |
| | Flow regime | Smaller absolute discharge volume<br>Greater variation of unit-area peak discharge | Larger absolute discharge volume<br>Smaller variation of unit-area peak discharge<br>Desynchronized or desynchronized outflows |
| | Hyporheic zone | Smaller volume | Greater lateral and vertical volume |
| | Stream chemistry | Soil pores, bedrock fractures, lithology<br>Flow path in hillslopes and zero-order basin | Tributary outflows, hyporheic exchange |
| Geomorphology | Morphology | Higher mean altitde<br>Steeper gradient and confined valley | Lower mean altitude<br>Lower gradient and wider valley |
| | Dominant sediment movement | Episodic mass movement | Chronic bedload movement |
| | Channel reach type | Colluvial, cascade, step pool, bedrock | Step pool, pool riffle, ripple dune |
| | Roughness element | Woody debris, boulder, bed form (e.g., step) | Woody debris, logjams, bed form (e.g., bar) |
| Biology | Energy input | Allochthonous and lateral (from hillslope) input | Autochthonous and tributary outflows |
| | Organic matter | CPOM > FPOM<br>DOC from groundwater flows and leaching | CPOM < FPOM<br>DOC from tributaries and in-stream processing |
| | Nutrient source | Groundwater, riparian vegetation | Tributary outflows, floodplain |
| | Dominant functional group | Shredder | Gatherer, filterer |
| | Disturbance | Landslides and debris flows<br>Drought | Flood pulses and bedload movement |

DOC, dissolved organic carbon; CPOM, coarse particulate organic matter; FPOM, fine particulate organic matter.

Landslides and debris flows are dominant geomorphic processes in headwater systems (table 1). Such mass movements transport sediment and woody debris from hillslopes to channels and modify stream and riparian conditions. Sediment and woody debris are routed as channelized debris flows and deposited in the downstream reaches of headwater systems (Benda and Cundy 1990). Exposed bedrock and less woody debris typify scour and runout zones (Gomi et al. 2001). In contrast, massive piles of woody debris and sediment are found in deposition zones of debris flows (Hogan et al. 1995). Logjams at the terminal end of debris flows often modify both longitudinal and planimetric profiles of channels (e.g., braiding, forming side channels). Such geomorphic processes also alter riparian forest structure; for instance, alder (*Alnus* spp.) typically invades scour and deposition disturbance zones created by mass movement in the Pacific Northwest of the United States and Canada. Adjustment of channel morphology after landslides and debris flows largely depends on sediment and woody debris inputs. The regeneration of riparian stands in scour and deposition zones of debris flows begins to restore the recruitment of woody debris 20 to 50 years after mass movement in headwater streams (Gomi et al. 2001).

Channel morphology in headwater systems can be characterized by channel obstructions such as large woody debris

and boulders (table 1; Zimmerman and Church 2001). Channel depth in headwaters tends to be shallower relative to the average diameters of such channel bed obstructions. Because substrate materials are not well sorted, interlocking boulders and cobbles modify the stability of channels, forming channel steps and creating sites for sediment storage (Zimmerman and Church 2001). Woody debris pieces also store sediment and modify channel roughness, and owing to the narrow channel width, relatively small woody debris pieces and jams have similar functions in headwater channels (Gomi et al. 2001). Therefore, headwater streams may have more woody debris dams than larger watershed systems because smaller woody debris can form these dams (figure 3c). The accumulation and distribution of woody debris alter the distribution of channel reach types such as cascades, step pools, and bedrock (Montgomery and Buffington 1998, Halwas and Church 2002).

**Network systems.** Observations of single headwater systems cannot be simply extrapolated to network systems where upstream contributions dominate base flow and storm flow generation. Because of the longer routing processes of water and greater storage capacity, peak flows in downstream reaches are often attenuated, lost partly to deep percolation and desynchronized flows that buffer peaks between headwaters and downstream locations. Floodplain and riparian

Rvsd Plan - 00001780

● *Articles*

zones also contribute to storm flow generation in larger watershed systems. Synchronized outflows from headwaters enhance peak flow in downstream reaches, whereas desynchronized outflows from headwaters attenuate flood peaks (table 1, figure 5; Robinson et al. 1995, Ziemer and Lisle 1998). Timing of outflows may be altered by hillslope and channel storage capacity (e.g., soil and substrate depth), amount of deep percolation from headwater systems, routing length, woody debris and other roughness elements in channels, and riparian vegetation characteristics.

More regular sediment transport, such as bedload movement, dominates sediment transport in downstream reaches (table 1). Sediment delivery from headwater to downstream is often interrupted because sediment is temporarily stored in or along the streambed, banks, terraces, and debris fans (Hey 1979, Benda and Dunne 1997a, Nakamura et al. 2000). Sediment transport from tributaries alters patterns in the downstream fining of substrate size (Rice et al. 2001). Sediment movement may appear as sediment waves through channel networks from headwater to downstream systems (figure 6; Benda and Dunne 1997b). Sediment deposits and accumulations induce local aggradation with the fining processes of sediment in the downstream direction. Such processes also modify channel reach types, sinuosity, and formation of side channels. Channels may shift laterally as banks erode and bars form in the unconfined floodplains of downstream reaches. Synchronized and desynchronized landslides and debris flows in headwater systems alter the impacts of sediment movement on geomorphic and biological conditions in downstream reaches (figure 6). Synchronized landslides and debris flow deposits aggregate extensively within confined reaches of downstream channels during relatively short periods. In contrast, desynchronized mass movements gradually aggregate in larger reaches of channels. Sediment transit time from headwaters to the main channel depends on the presence of unconstrained reaches, tributary junction angles, channel gradient, timing of various mass movements, and amount of runoff (Benda and Cundy 1990, Bravard and Gilvear 1996, Nakamura et al. 2000).

However, sediment transport to downstream reaches is not as simple as shown in figure 6. Woody debris often forms jam structures in the transition zone between headwaters and downstream reaches because of deposits from landslides and debris flows, fluvial transport, and recruitment from riparian areas (e.g., by wind throw and natural mortality). Logjams often store sediment for 40 to 50 years until the structures collapse or channel courses change (Hogan et al. 1995). Changing valley configurations, channel gradient, and material types also modify sediment transport from headwater to downstream systems (Whiting and Bradley 1993, Nakamura et al. 2000). Spatial distribution of mass movement occurrence influences sporadic sediment transport throughout network systems (Benda and Dunne 1997b).



*Figure 4. Conceptual view of dynamic, hydrologically active areas in headwaters. For dry conditions, riparian zones and direct precipitation on channels are the only active sites of flow generation. Throughflow from the soil matrix at the foot of hillslopes and riparian areas gradually activates with increasing wetness. Zero-order basins (shaded areas) with relatively shallow soils begin to contribute surface runoff (broad white arrows) during wet conditions, while preferential flow (thin black arrows) from hillslopes contributes less to stream flow. Water begins to flow in transitional channels emerging from zero-order basins. Zero-order basins and preferential flow actively contribute to storm flow during very wet conditions. Figure adapted from Sidle and colleagues (2000).*

## Biological processes

**Terrestrial and aquatic processes in headwater systems.** Because forested headwater streams are typically narrow with closed riparian canopies, biological processes (terrestrial and aquatic) in hillslopes and streams are closely linked (figure 2). Retention and routing of organic materials from allochthonous inputs (that is, riparian and lateral input of leaf litter and woody debris) are important factors affecting biological processes in headwater systems (table 1). Allochthonous energy sources are larger than autochthonous energy sources (e.g., primary production in streams; Bilby and Bisson 1992). Because of relatively small discharges and numerous roughness elements (e.g., boulders and woody debris), coarse particulate organic matter (CPOM ≥ 1 millimeter) tends to be stored behind in-stream obstructions, retained for longer periods in headwater channels, and transformed to smaller particles (Kiffney et al. 2000); such organic matter accumulations thus are important sources of food and habitat for macroinvertebrates (Richardson 1992). The dominant functional group of macroinvertebrates in headwater channels

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

*Articles*



*Figure 5. Synchronization of hydrologic processes in network systems. Volumes of outflows in tributaries of watersheds A and B are similar; however, peak discharges are different at $A^3$ and $B^3$ because of the different arrival time of peak flow. Figure adapted from Ziemer and Lisle (1998).*

is shredders; they break larger particles into smaller sizes (table 1; Cummins et al. 1989). Fungi and bacteria also help to break CPOM into fine particulate organic matter (0.5 μm ≤ FPOM < 1 mm) and dissolved organic carbon (DOC), which can benefit secondary consumers (Heard and Richardson 1995).

Terrestrially derived invertebrates that are associated with riparian vegetation are important for aquatic biota in headwater streams (Wipfli 1997). Riparian canopy closure also modifies heat and solar radiation available to stream channels (table 1). Groundwater and subsurface flows from hillslopes and zero-order basins contribute nutrients (e.g., DOC and nitrate) and influence water temperature (table 1). Availability of nutrients and light as well as water temperature modify algal growth; this in turn alters rates of nutrient leaching and litter decomposition. Headwater hyporheic zones are smaller, and their nutrient exchange is less, than in downstream reaches (Stanford and Ward 1993). Lateral diversity in riparian zones may be low because of the confined valleys of headwater streams, whereas longitudinal variation of habitat may be high because of changes in discharge, channel gradient, and sediment supply. Transitional streams emerging from zero-order basins are also important habitat and sources of organic matter (Meyer and Wallace 2001).

Species composition and life history of vertebrates are also unique in headwaters. In the Pacific Northwest, there are relatively limited numbers and fewer species of fishes (e.g., cutthroat trout [*Oncorhynchus clarki*] and bull trout [*Salvelinus confluentus*]), because of the topographic harshness (steep channel gradients and shallow water). Owing to geographical isolation, populations of such trout may have unique genetic characteristics in headwater systems. Adult coho salmon (*Oncorhynchus kisutch*) spawn and some juvenile coho reside

in refugia within lower headwater reaches during high flows (Bryant 1984). Some amphibians (e.g., tailed frogs [*Ascaphus truei*]) are also found primarily in headwater channels and associated riparian zones.

**Responses to and recovery from disturbances in headwater systems.** The dynamic nature of geomorphic and hydrologic processes affects the biotic community through disturbances. The frequency, intensity, and duration of disturbances are important factors altering responses and recovery time of riparian vegetation, channel morphology, and biological communities (Townsend 1989, Gregory et al. 1991, Swanson et al. 1998). Mass movement is the major disturbance in headwater channels, though forest fires, floods, and droughts also occur with varying frequencies (table 1). The movement of sediment and woody debris during landslides and debris flows drastically alters in-channel habitat (e.g., pool depth and interval) and macroinvertebrate communities (table 1; Lamberti et al. 1991). Because of limited refugia and larger moving particles in relatively confined headwater channels, macroinvertebrates and fish may be killed or washed away during peak flows or find refuge locally and in downstream reaches (Sedell et al. 1990).

Recovery processes in riparian and stream ecosystems differ according to level of disturbance. For instance, exposed bedrock is found in scour and runout zones of landslides and debris flows, and sediment and woody debris accumulations are distributed in deposition zones; this physical template characterizes the resistance and resilience of biotic communities and recovery processes from the disturbances. Either narrow bands of even-aged vegetation (typically alder in the Pacific Northwest) or mixed conifer and deciduous riparian corridors may be established along headwater channels depending on the level of disturbance (e.g., level of soil damage). Such differences in riparian vegetation modify long-term recovery processes of the biological communities in headwater ecosystems because of changes in the recruitment of leaf litter, woody debris, and sediment (Bilby and Bisson 1992, Gomi et al. 2001). Recovery of headwater biotic communities from disturbances may also depend on the continuity of headwater systems. Aerial dispersal from undisturbed downstream to upstream reaches is important for recovery. If undisturbed subreaches exist in otherwise disturbed upper reaches, invertebrates and organic matter that drift to disturbed reaches may induce quicker recovery of biotic communities (Lamberti et al. 1991).

Seasonal drought significantly affects the life cycles and community structure of invertebrates in headwater systems (table 1; Dieterich and Anderson 2000, Muchow and Richardson 2000). Temporary streams with flow duration greater than 4 to 5 months have similar faunal assemblages, whereas life cycles of macroinvertebrates are altered in intermittent streams with less than 3 months of flow. During the dry periods, aquatic insects move to hyporheic zones, remnant wet-

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

Rvsd Plan - 00001782

ted pools, and permanently flowing channels (e.g., downstream reaches and other streams). Aquatic invertebrates also emerge as adults and other desiccation-resistant forms, largely through diapause. During much drier years, first- and second-order channels may be entirely dry and exert greater effects on macroinvertebrates.

**Downstream assemblages in network systems.** Materials from headwater tributaries modify downstream biological assemblages and processes in channel networks (table 1). Spatial and temporal variation of riparian and channel structures, related to mass movement as well as flow characteristics in headwater tributaries, creates different patterns of biological assemblages in channel network systems. Changes in channel morphology from confined headwater systems to braided and meandering channels in downstream systems may affect interaction between riparian and stream ecosystems, as well as habitat types (Ward and Stanford 1995). Sediment transport from tributaries affects the distribution of substrate sizes and thus modifies macroinvertebrate communities (Rice et al. 2001). Supplies of nutrients and organic matter to larger streams depend largely on in-

flows from tributaries. Most of the CPOM generated in headwater streams (70% to 90%) is transported downstream (Webster et al. 1999, Kiffney et al. 2000, Wipfli and Gregovich 2002). FPOM concentrations typically increase along headwater channels because of biological and physical processing (breakdown). Therefore, the CPOM/FPOM ratio may decrease rapidly with increasing drainage area: CPOM decline is due to lower inputs relative to channel size, and FPOM increases are due to breakdown processes (table 1, figure 3D; Webster et al. 1999). Types of vegetation (deciduous and coniferous) related to mass movement and timber harvesting histories in headwater systems may modify the amount and seasonal variation of CPOM and FPOM export to downstream reaches (Kiffney et al. 2000). For instance, leaves from deciduous trees and shrubs typically decompose 2 to 3 months after entering streams, whereas conifer needles take 200 days to 2 years to be processed by bacteria and macroinvertebrates (Gregory et al. 1991). Drifting organic materials and macroinvertebrates from fishless headwater tributaries support both growth rates and density of stream vertebrates in downstream systems (Wipfli and Gregovich 2002). Therefore, the food webs and community structures of network watershed systems may be modified through the drifting of materials (invertebrates and detritus) from headwater tributaries.

Because disturbances have different characteristics and magnitudes, their impacts on biological communities in headwaters and downstream reaches differ. The acute impact of a single debris flow may destroy biotic communities and habitat in headwater systems. In downstream systems, however, collective effects of sediment transport pulses and flood surges from headwater systems affect riparian vegetation and



*Figure 6. Synchronization of sediment movement in network systems. Shaded area shows sedimentation caused by landslides and debris flows. Accumulated sediments from headwater systems may alter the formation of braided and side channels. Figure adapted from Montgomery and Buffington (1998).*

the biotic community (table 1; Nakamura et al. 2000). Basinwide drought may increase the number of intermittent reaches and decrease linkages between headwaters and main channels. However, more refugia such as side channels and undisturbed tributaries are accessible in downstream reaches than in confined headwaters (Reice et al. 1990). The effects of disturbances in headwater systems on the channel network strongly relate to material routing processes from headwaters to downstream reaches.

## Linkages of headwater and network systems

The nature and degree of linkages between headwater and downstream systems are important aspects of the roles of headwater streams and routing processes of organic and inorganic matter. The degree of linkage varies spatially and temporally owing to topographic aspects and mass movement occurrences; such characteristics relate to long-term geomorphic (e.g., glaciation and tectonic) activities and the physical characteristics of rock, or lithology. Debris fans and floodplains are geomorphic attributes that support the linkages from headwaters to main channels. Sediment movement may be modified by channel gradient, tributary junction angle, and reach constraints (Benda and Cundy 1990, Nakamura et al. 2000). Beaver ponds, wetlands, and intermittent channel reaches also alter the connectivity between headwater and downstream systems; intermittent channel reaches also disrupt this connectivity. In addition, temporal variation related to mass movement, wind throw, wildfire, and land use change, as well as their respective recovery processes, affect the degree of connection between headwater and down-

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

stream systems. Biologically, connectivity is important for species migration, habitat, and refugia (Sedell et al. 1990) and for the flux of organic matter and nutrients (Cummins et al. 1983).

Tributary junctions between headwater and larger channels are very important as network nodes for regulating material flows in watersheds, and they have unique hydrologic, geomorphic, and biological attributes. Heterogeneity of water, sediment, and woody debris movement is higher at tributary junctions. Abrupt changes in channel gradient and valley width may cause sediment deposition, including terraces and debris fans. Riparian structure at such tributary junctions is complex, because riparian vegetation is frequently destroyed by floods, sediment deposition, and scour. Plant seeds transported by headwater streams may initiate riparian regeneration. Channel geometry at tributary junctions varies, depending on sediment and flow regimes from headwater systems and their degree of synchronization. Scour pools and gravel bars typically form along tributary flow margins, depending on junction angles (Bristow et al. 1993). Such sediment and woody debris deposits modify channel forms, for example, braiding and side channels. Hydrologic and geomorphic variability at tributary confluences also influences habitat types (pool size and distribution as well as substrate type) and biological processes in the area of the junction. Habitat, and therefore species composition, may be very diverse at confluences, because sediment and woody debris accumulations form pools, steps, and side channels (Rice et al. 2001). Drifting materials from headwater tributaries also mix at junctions. Hyporheic processes may be enhanced at junctions because of the accumulation and exchange of materials, but this subject has not been studied. Both nutrient and gas exchange in the hyporheic zone may be significant when sediment and woody debris accumulate and braided channels form at confluences.

## Conclusions

Headwater systems are important sources of sediments, water, nutrients, and organic matter for downstream reaches. Despite the significant roles of headwater systems within the channel network, the ecological values of headwater systems are underestimated, and their processes have been extensively modified by land use (Meyer and Wallace 2001). Process characteristics differ between headwaters and larger watershed systems, which needs to be considered in establishing management guidelines. Hydrologic, geomorphic, and biological processes in and along hillslopes, zero-order basins, transitional channels, and first- and second-order channels characterize headwater systems in the following ways:

- Processes are tightly linked between hillslopes and channels and from terrestrial to aquatic environments.
- The expansion of hydrologically active areas (e.g., riparian zones, zero-order basins, bogs) during periods of increasing wetness increases the probability of mass movements and alters flow paths between terrestrial and aquatic environments.

- Landslides and debris flows that dominate geomorphic processes alter distributions and accumulations of sediment and woody debris.
- Recovery of invertebrate communities after such disturbances depends on drift, migration, and recolonization of biota from undisturbed upper and lower reaches.
- Succession and conversion from deciduous to coniferous riparian stands (and vice versa) modify availability of nutrients and light, recruitment of wood and organic materials, habitat types, and structure of biotic communities.

The numerous headwater tributaries that flow into downstream reaches affect hydrologic, geomorphic, and biological processes and attributes in downstream reaches of channel networks in the following ways:

- Synchronized or desynchronized inflows of water, sediments, nutrients, and organic matter from headwater tributaries create a variety of channel conditions and biological assemblages in downstream reaches.
- Temporal variations of disturbance regimes and riparian succession in headwater tributaries alter physical and biological conditions of channels, as well as input of materials (sediment, invertebrates, and detritus), which in turn modifies food webs and their productivity in downstream reaches.
- Connectivity of headwater systems to downstream reaches affects both the cumulative and dispersed nature of material transport processes within watershed systems.
- Tributary junctions are unique in their physical and biological processes and are important as network nodes.
- Spatial and temporal variations of processes in headwater systems are critical factors affecting the dynamics of stream ecosystems, as well as the heterogeneity of riparian and riverine landscapes in channel networks.

Because the characteristics of headwaters vary as a result of biogeoclimatic factors (e.g., riparian structure, precipitation, discharge, drainage density) and management and disturbance regimes, both similarities and differences of processes among headwater systems are important for evaluating the role of headwaters within the watershed network. Two general types of studies are needed to understand headwater processes and downstream linkages. Process-related studies within headwater systems are essential. Despite the progress in elucidating hydrogeomorphic (Sidle et al. 2000) and biological (Richardson 1992, Wallace et al. 1999) processes from hillslopes to stream channels, a better understanding of the functional linkages among wood, sediment, nutrients, and water in headwater systems is needed to address the relevant ecosystem process. It is also necessary to evaluate the influence of headwater processes on downstream systems (Benda and Dunne 1997b, Rice et al. 2001, Wipfli and Gregovich 2002). The connectivity of headwaters to downstream reaches must be evaluated in future studies to understand cumulative effects of changes in headwaters.

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

Rvsd Plan - 00001784

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

● *Articles*

Ecology and management of downstream riparian zones have been extensively studied and applied in the context of stream restoration during the past 10 years (Naiman et al. 2000). However, the role of headwater systems has recently attracted more attention with respect to conservation, restoration, and management of downstream reaches. Consequently, management of headwater streams and riparian zones is important, and there are benefits to considering the linkages of headwater and downstream systems. The collection of appropriate information will require collaboration of interdisciplinary teams of hydrologists, geomorphologists, and biologists.

## Acknowledgments
We thank Lee Benda, Mason Bryant, Matthew Greenstone, Dan Moore, Junjiro Negishi, Richard Woodsmith, and an anonymous reviewer for comments that helped improve an earlier manuscript.

## References cited
Anderson NH. 1997. Phenology of Trichoptera in summer-dry headwater streams in western Oregon, U.S.A. Pages 7–13 in Holzenthal RW, Flint OS Jr, eds. Proceedings of the 8th International Symposium on Trichoptera. Columbus (OH): Ohio Biological Survey.
Benda LE, Cundy TW. 1990. Predicting deposition of debris flows in mountain channels. Canadian Geotechnical Journal 27: 409–417.
Benda L, Dunne T. 1987. Sediment routing by debris flows. Pages 213–223 in Beschta RL, Blinn T, Grant GE, Ice GG, Swanson FJ, eds. Erosion and sedimentation in the Pacific Rim. International Association of Hydrological Science publication no. 165.
———. 1997a. Stochastic forcing of sediment supply to the channel network form landsliding and debris flow. Water Resources Research 33: 2849–2863.
———. 1997b. Stochastic forcing of sediment routing and storage in channel networks. Water Resources Research 33: 2865–2880.
Bilby RE, Bisson FA. 1992. Allochthonous versus autochthonous organic matter contributions to the trophic support of fish populations in clear-cut and old-growth forested streams. Canadian Journal of Fisheries and Aquatic Sciences 49: 540–551.
Bravard JP, Gilvear DJ. 1996. Hydrological and geomorphological structure of hydrosystems. Page 89–116 in Petts GE, Amoros C, eds. Fluvial Hydrosystems. London: Chapman and Hall.
Bristow CS, Best JL, Roy AG. 1993. Morphology and facies models of channel confluence. In Marzo M, Puigdefabregas C, eds. Alluvial Sedimentation. Oxford (United Kingdom): Blackwell Scientific. International Association of Sedimentologists publication no. 17.
Bryant MD. 1984. Distribution of salmonids in the Trap Bay basin, Tenekee inlet. Pages 17–31 in Meehan WR, Merrell TR Jr, Hanley TA, eds. Fish and Wildlife Relationships in Old-Growth Forests. Proceedings of the Symposium of the USDA Forest Service; 12–15 April 1982; Juneau, AK.
Church M, Mark DM. 1980. On size and scale in geomorphology. Progress in Physical Geography 4: 342–390.
Cummins KW, Sedell JR, Swanson FJ, Minshall GW, Fisher SG, Cushing CE, Petersen RC, Vannote RL. 1983. Organic matter budgets for stream ecosystems: Problems in their evaluation. Pages 279–298 in Barnes JR, Minshall GW, eds. Stream Ecology: Application and Testing of General Ecological Theory. New York: Plenum Press.
Cummins KW, Wilzbach MA, Gates DM, Perry JB, Taliaferro WB. 1989. Shredders and riparian vegetation. BioScience 39: 24–30.
Dieterich M, Anderson NH. 1998. Dynamics of abiotic parameters, solute removal and sediment retention in summery-dry headwater streams of western Oregon. Hydrobiologia 379: 1–15.
———. 2000. The invertebrate fauna of summer-dry streams in western Oregon. Archive für Hydrobiologie 147: 273–295.
Dietrich WE, Dunne T. 1978. Sediment budget for small catchment in mountainous terrain. Zeitschrift fur Geomorphologie Neue Folge, Supplement band 29: 191–206.
Dunne T. 1991. Stochastic aspect of the relations between climate, hydrology and landform evolution. Transactions of the Japanese Geomorphological Union 12: 1–24.
Fisher SG. 1997. Creativity, idea generation, and the functional morphology of streams. Journal of the North American Benthological Society 16: 305–318.
Frissell CA, Liss WJ, Warren CE, Hurley MD. 1986. A hierarchical framework for stream habitat classification: Viewing streams in a watershed context. Environmental Management 10: 199–214.
Gomi T, Sidle RC, Bryant MD, Woodsmith RD. 2001. The characteristics of woody debris and sediment distribution in headwater streams, southeastern Alaska. Canadian Journal of Forest Research 31: 1386–1399.
Gregory SV, Swanson FJ, McKee WA, Cummins KW. 1991. An ecosystems perspective of riparian zones. BioScience 41: 540–551.
Hack JT, Goodlett JC. 1960. Geomorphology and Forest Ecology of a Mountain Region in the Central Appalachians. Washington (DC): US Geological Survey. Professional paper no. 347.
Halwas KL, Church M. 2002. Channel units in small, high gradient streams on Vancouver Island, British Columbia. Geomorphology 43: 243–256.
Heard SB, Richardson JS. 1995. Shredder-collector facilitation in stream detrital food webs: Is there enough evidence? Oikos 72: 359–366.
Hewlett JD, Hibbert AR. 1967. Factors affecting the response of small watersheds to precipitation in humid areas. Pages 275–290 in Sopper WE, Lull HW, eds. Forest Hydrology. Oxford (NY): Pergamon Press.
Hey RD. 1979. Dynamic process-response model of river channel development. Earth Surface Processes 4: 59–72.
Hogan DL, Bird SA, Hassan MA. 1995. Spatial and temporal evolution of small coastal gravel-bed streams: The influence of forest management on channel morphology and fish habitat. Paper presented at the 4th International Workshop on Gravel Bed Rivers; 20–26 August 1995; Gold Bar, WA.
Hynes HBN. 1975. The stream and its valley. Verhandlungen der Internationale Vereinigung fur Theoretische und Augewandte Limnologie 19: 1–15.
Johnson BL, Richardson WB, Naimo TJ. 1995. Past, present and future concepts in large river ecology. BioScience 45: 134–141.
Kiffney PM, Richardson JS, Feller MC. 2000. Fluvial and epilithic organic matter dynamics in headwater streams of southwestern British Columbia, Canada. Archive für Hydrobiologie 148: 109–129.
Kirkby MJ. 1993. Network hydrology and geomorphology. Pages 1–11 in Beven K, Kirkby MJ, eds. Channel Network Hydrology. New York: John Wiley and Sons.
Lamberti GA, Gregory SV, Ashkenas LR, Wildman RC, Moore KM. 1991. Stream ecosystem recovery following a catastrophic debris flow. Canadian Journal of Fisheries and Aquatic Sciences 48: 196–208.
Leopold LB, Wolman MG, Miller JP. 1964. Fluvial Processes in Geomorphology. New York: Dover.
Likens GE, Bormann, FH, Pierce RS, Eaton JS, Johnson NM. 1977. Biogeochemistry of a Forested Ecosystem. New York: Springer-Verlag.
Meyer JL, Wallace JB. 2001. Lost linkages and lotic ecology: Rediscovering small streams. Pages 295–317 in Press MC, Huntly NJ, Levin S, eds. Ecology: Achievement and Challenge. Oxford (United Kingdom): Blackwell Scientific.
Minshall GW, Cummins KW, Peterson RC, Cushing CE, Bruns DA, Sedell JR, Vannote RL. 1985. Development in stream ecosystem theory. Canadian Journal of Fisheries and Aquatic Sciences 42: 1045–1055.
Montgomery DR. 1999. Process domain and river continuum. Journal of the American Water Resources Association 35: 397–410,
Montgomery DR, Buffington JM. 1998. Channel processes, classification, and response. Pages 13–42 in Naiman RJ, Bilby RE, eds. River Ecology and Management: Lessons from the Pacific Coastal Ecoregion. New York: Springer.

*Articles*

Montgomery DR, Dietrich WE. 1989. Source areas, drainage density, and channel initiation. Water Resources Research 25: 1907–1918.

Montgomery DR, Foufoula-Georgiou E. 1993. Channel network source representation using digital elevation models. Water Resources Research 29: 3925–3934.

Muchow CL, Richardson JS. 2000. Unexplored diversity: Macroinvertebrates in coastal B.C. headwater streams. Pages 15–19 in Darling LM, ed. Proceedings of Biology and Management of Species and Habitat at Risk Conference; February 1999; Kamloops, British Columbia, Canada.

Naiman RJ, Bilby RE, Bisson PA. 2000. Riparian ecology and management in the Pacific coastal rain forest. BioScience 50: 995–1011.

Nakamura F, Swanson FJ, Wondzell SM. 2000. Disturbance regimes of stream and riparian systems: A disturbance-cascade perspective. Hydrological Processes 14: 2847–2860.

Newbold JD, Elwood JW, O'Neill RV, Van Winkle W. 1982. Nutrient spiraling in streams: Implications for nutrient limitation and invertebrate activities. American Naturalist 120: 628–652.

Pringle CM, Naiman RJ, Bretschko G, Karr JR, Oswood MW, Webster JR, Welcomme RL, Winterbourn MJ. 1988. Patch dynamics in lotic systems: The stream as a mosaic. Journal of the North American Bentholological Society 7: 503–524.

Reice SR, Wissmar RC, Naiman RJ. 1990. Disturbance regimes, resilience, and recovery of animal communities and habitat in lotic ecosystems. Environmental Management 14: 647–659.

Rice SP, Greenwood MT, Joyce CB. 2001. Tributaries, sediment sources, and longitudinal organization of macroinvertebrate fauna along river systems. Canadian Journal of Fish and Aquatic Science 58: 824–840.

Richardson JS. 1992. Food, microhabitat, or both? Macroinvertebrate use of leaf accumulations in a montane stream. Freshwater Biology 27: 169–176.

Robinson JS, Sivaplan M, Snell JD. 1995. On the relative roles of hillslope processes, channel routing, and network geomorphology in the hydrologic response of natural catchments. Water Resources Research 31: 3089–3101.

Schumm SA, Lichty RW. 1965. Time, space and causality in geomorphology. American Journal of Science 263: 110–119.

Sedell JR, Reeves GH, Hauer FR, Stanford JA, Hawkins CP. 1990. Role of refugia in recovery from disturbances: Modern fragmented and disconnected river systems. Environmental Management 14: 711–724.

Sidle RC, Pearce AJ, O'Loughin CL. 1985. Hillslope Stability and Land Use. Washington (DC): American Geophysical Union. Water Resources Monograph no. 11.

Sidle RC, Tsuboyama Y, Noguchi S, Hosoda I, Fujieda M, Shimizu T. 2000. Streamflow generation in steep headwaters: A linked hydro-geomorphic paradigm. Hydrological Processes 14: 369–385.

Stanford JA, Ward JV. 1993. An ecosystem perspective of alluvial rivers: Connectivity and the hyporheic corridor. Journal of the North American Bentholological Society 12: 48–60.

Strahler AN. 1957. Quantitative analysis of watershed geomorphology. Transactions, American Geophysical Union 38: 913–920.

Swanson FJ, Johnson SL, Gregory SV, Acker SA. 1998. Flood disturbance in a forested mountain landscape. BioScience 48: 681–689.

Townsend CR. 1989. The patch dynamics concept of stream community ecology. Journal of the North American Benthological Society 8: 36–50.

Tsukamoto Y, Ohta T, Noguchi H. 1982. Hydrological and geomorphological study of debris slides on forested hillslope in Japan. Pages 89–98 in Walling DE, ed. Recent Developments in the Explanation and Prediction of Erosion and Sediment Yield. International Association of Hydrological Sciences publication no. 137.

Vannote RL, Minshall WG, Cummins KW, Sedell JR, Cushing CE. 1980. The river continuum concept. Canadian Journal of Fisheries and Aquatic Sciences 37: 130–137.

Wallace JB, Eggert SL, Meyer JL, Webster JR. 1999. Effects of resource limitation on a detrital-based ecosystem. Ecological Monographs 69: 409–442.

Ward JV, Stanford JA. 1983. The serial discontinuity concept of lotic ecosystems. Page 29–42 in Fontaine TD, Bartell SM, eds. Dynamics of Lotic Ecosystems. Ann Arbor (MI): Ann Arbor Science.

———. 1995. The serial discontinuity concept: Extending the model to floodplain rivers. Regulated Rivers: Research and Management 10: 159–168

Webster JR, Benfield EF, Ehrman TP, Schaeffer MA, Tank JL, Hutchens JJ, D'Angelo DJ. 1999. What happens to allochthonous material that falls into streams? A synthesis of new and published information from Coweeta. Freshwater Biology 41: 687–705.

Whiting PJ, Bradley JB. 1993. A process-based classification system for headwater streams. Earth Surface Processes and Landforms 18: 603–612.

Wipfli MS. 1997. Terrestrial invertebrates as salmonid prey and nitrogen source in streams: Contrasting old-growth and young-growth riparian forests in southeastern Alaska, USA. Canadian Journal of Fisheries and Aquatic Sciences 54: 1259–1269.

Wipfli MS, Gregovich DP. 2002. Invertebrates and detritus export from fishless headwater streams in southeastern Alaska: Implications for downstream salmonid production. Freshwater Biology 47: 957–970.

Wolman MG, Miller JP. 1960. Magnitude and frequency of forces in geomorphic processes. Journal of Geology 68: 54–74.

Wondzell SM, Swanson FJ. 1999. Floods, channel change, and the hyporheic zone. Water Resources Research 35: 555–567.

Wood EF, Sivapalan M, Beven K, Band L. 1988. Effects of spatial variability and scale with implications to hydrologic modeling. Journal of Hydrology 102: 29–47.

Woods R, Sivapalan M, Duncan M. 1995. Investigating the representative elementary area concept: An approach based on field data. Hydrological Processes 9: 291–312.

Ziemer RR, Lisle TE, 1998. Hydrology. Pages 43–62 in Naiman RJ, Bilby RE, eds. River Ecology and Management: Lessons from the Pacific Coastal Ecoregion. New York: Springer.

Zimmerman A, Church M. 2001. Channel morphology, gradient profiles and bed stresses during flood in a step-pool channel. Geomorphology 40: 311–327.

Downloaded from http://bioscience.oxfordjournals.org/ by guest on July 4, 2016

Rvsd Plan - 00001786

# Influence of Headwater Streams on Downstream Reaches in Forested Areas

## Lee H. MacDonald and Drew Coe

**Abstract:** The source areas of headwater streams typically compose 60% to 80% of a catchment. This, plus the typical increase in precipitation with elevation, means that headwater streams generate most of the streamflow in downstream areas. Headwater streams also provide other important constituents to downstream reaches, including coarse and fine sediment, large woody debris, coarse and fine organic matter, and nutrients. The relative importance of headwater streams as a source of these other constituents is highly variable because the amount and quality of each constituent can be modified by in-channel storage, dilution, biological uptake, diminution, and chemical transformations. Headwater sources of water, fine sediment, and fine particulate organic matter are more likely to be delivered to downstream reaches than coarse sediment, woody debris, nutrients, or an increase in water temperatures. The complexity and temporal variability of channel-hillslope interactions, in-channel processes, and downstream conditions makes it difficult to rigorously link upstream inputs and anthropogenic activities to the condition of downstream resources. These issues may preclude the use of adaptive management, particularly in larger basins, as adaptive management implicitly assumes that (1) downstream changes can rapidly be detected, (2) management will change rapidly in response to any adverse change, and (3) a management change will rapidly improve the affected resource. Since these assumptions may be difficult to satisfy—particularly in larger basins—the use of adaptive management must be carefully examined before it can be applied at the watershed scale. FOR. SCI. 53(2):148–168.

**Keywords:** streamflow, sediment, large woody debris, cumulative watershed effects, adaptive management

H EADWATER STREAMS compose the uppermost portions of the stream network. Headwater streams typically represent from 60 to 80% of the total stream length within a catchment (Schumm 1956, Shreve 1969), and they drain 70 to 80% of the total catchment area (Sidle et al. 2000, Meyer and Wallace 2001). The small size of headwater streams means that they are particularly responsive to natural and anthropogenic disturbances such as debris flows, changes in vegetative cover, changes in sediment inputs, and changes in organic matter inputs (Benda et al. 2005, Hassan et al. 2005a, Richardson et al. 2005). The preponderance of headwater streams, when combined with their sensitivity and potential linkages to downstream resources, means that headwater streams are of increasing interest to scientists and resource managers (Whiting and Bradley 1993, Gomi et al. 2002, JAWRA 2005).

By definition, headwater streams begin where surface runoff is sufficiently concentrated to cause scour and distinct banks (Dietrich and Dunne 1993). This surface runoff may occur only during storm events or snowmelt ("ephemeral"), seasonally ("intermittent"), or continuously ("perennial"). Headwater channels can be distinguished from hillslope rills because they are relatively persistent features on the landscape and generally occur in strongly convergent areas. The channel head or the initiation point for headwater channels can migrate in response to large storm events or

severe disturbance (Montgomery and Dietrich 1989, Istanbulluoglu et al. 2004), but such changes do not alter the general location of a stream within a landscape and usually do not alter stream order.

The downstream end of headwater channels is more ambiguous, but in this article the lower boundary is defined as the colluvial-alluvial transition point. When the drainage area is 1 km$^2$ or less, colluvial (hillslope) processes dominate channel form and in-channel fluxes. As the drainage area increases from 1 km$^2$ to 10 km$^2$, alluvial processes become an increasingly dominant control on channel morphology and fluxes (Montgomery and Foufoula-Georgiou 1993, Brummer and Montgomery 2003, Stock and Dietrich 2003). Some authors have suggested that a drainage area of 1 km$^2$ and a channel slope of 20 to 30% defines this colluvial-alluvial transition point (Montgomery and Foufoula-Georgiou 1993, Woods et al. 1995, May and Gresswell 2004), but variations in climate, geology, and other factors means that this transition can occur when the drainage area is as small as 0.1 to 0.3 km$^2$ (Benda and Dunne 1997a) or as large as 10 km$^2$ (Madsen 1994, Brummer and Montgomery 2003). For the purposes of this article headwater channels are defined as any channel with a drainage area of up to 10 km$^2$. In the Pacific Northwest this upper limit corresponds to streams that are up to about 10 m wide (Brummer and Montgomery 2003).

Lee H. MacDonald, Department of Forest, Rangeland, and Watershed Stewardship, Colorado State University, Fort Collins, CO 80523-1472—Fax: (970) 491-6754; leemac@warnercnr.colostate.edu. Drew Coe, Central Valley Regional Water Control Board, Redding, CA 96002—dbrcoe@waterboards.ca.gov.

Acknowledgments: We thank the Oregon Headwaters Research Cooperative for organizing the Conference on the Science and Management of Headwater Streams, inviting the presentation that led to this article, and providing the financial assistance that made it possible to attend. Curt Veldhuisen was a key source of inspiration for this article, and this work is based on the contributions of students and scientists too numerous to list. We thank Pete Bisson, George Ice, John Stednick, three anonymous reviewers, and the associate editor for their helpful comments on an earlier version of this article, and Isaac Larsen for redrafting Figures 9 and 10.

Manuscript received May 9, 2006, accepted December 20, 2006

Copyright © 2007 by the Society of American Foresters

Rvsd Plan - 00001787

Given their location in the landscape, the hydrologic, geomorphic, and biological characteristics of headwater streams result from a dynamic mix of colluvial and alluvial processes. In downstream channels the channel conditions and material fluxes are again a complex integration of the fluxes and processes from both upslope and upstream, but the hillslopes adjacent to higher-order channels generally play a much smaller role in terms of streamflow, sediment yields, nutrient fluxes, aquatic productivity, and aquatic biodiversity.

The management of headwater channels is important because they drain the vast majority of the catchment area, and they are a critical source of water, sediment, fine and coarse organic matter, and nutrients (Gomi et al. 2002). They also are the first source of aquatic life as one makes the transition from hillslopes into the channel network. From a regulatory perspective, headwater streams have been largely ignored despite their potential effect on downstream reaches. Towns and cities generally are located adjacent to larger streams and rivers, and laws such as the Clean Water Act initially focused on regulating point sources, maintaining water quality in these larger streams for domestic use, and sustaining fisheries. It was not until 1972 that the Clean Water Act explicitly addressed nonpoint pollution sources, such as hillslope erosion. Similarly, state-level forest practice regulations focused on perennial, fish-bearing streams until the late 1980s or early 1990s.

The wider recognition of the importance of headwater streams is relatively recent (Jackson et al. 2001, Gomi et al. 2002, Halwas and Church 2002, Jackson and Sturm 2002, Benda et al. 2005, Hunter et al. 2005). Relative to higher-order channels, there have been much fewer studies on the conditions and instream dynamics of headwater streams despite their relative predominance in terms of drainage area and total stream length. Although most paired-watershed studies have been conducted at the scale of headwater streams, these typically have focused on the watershed-scale changes in streamflow and sediment yields and treated the watershed as a black box. Few studies have rigorously examined the extent to which headwater streams control downstream conditions, despite the conceptual recognition of headwater-downstream linkages (e.g., Vannote et al. 1980, Benda et al. 2004b). Hence, the purpose of this article is to review existing knowledge with respect to:

1.  How well are headwater streams connected to downstream areas in terms of the generation and delivery of discharge, coarse and fine sediment, coarse and fine organic matter, temperature, and nutrients?

2.  To what extents do natural disturbances and anthropogenic activities alter the connectivity between hillslopes, headwater streams, and downstream areas?

3.  To what extent are downstream conditions controlled by the inputs from headwater streams as compared to colluvial processes from the adjacent hillslopes and the intervening riparian and fluvial processes?

The answers to these three questions are important because they determine the extent to which downstream conditions are affected by management activities in headwater drainages. The strength of the linkages between headwater catchments and downstream conditions are important for justifying the regulation of headwater streams, and for predicting the magnitude and timing of cumulative watershed effects (CWEs).

Similarly, the magnitude and timing of the connectivity between headwater streams and downstream reaches directly affects the extent to which adaptive management can be applied in larger catchments. Adaptive management is increasingly touted as the most practical approach for resource management given the complexities and uncertainties in predicting management impacts at the watershed scale (Stednick et al. 2004). In larger watersheds the successful use of monitoring and adaptive management depends to a large extent on the strength of the linkages between upstream and downstream resources, and the responsiveness of downstream resources to a specified change in upstream management. Hence, the final objective of this article is to assess the validity of the assumptions implicit in the use of adaptive management at the watershed scale, and the relative detectability of anthropogenic effects on downstream channel conditions.

The following sections discuss the extent to which headwater streams are connected to downstream areas with respect to discharge, coarse and fine sediment, coarse and fine organic matter, temperature, and nutrients. Most of the examples are drawn from forested streams from northern California up through British Columbia, as this is where these issues are particularly controversial and much of the recent research has been conducted. The final section addresses the implicit assumptions and constraints on using adaptive management at the watershed scale.

## *Contribution of Headwater Streams to Downstream Runoff*

The contribution of headwater streams to downstream runoff is critical for water supply as well as the transport of sediment, coarse and fine organic matter, and nutrients (Moore and Wondzell 2005). Approximately 95% of the runoff in a channel is generated on hillslopes (Knighton 1998). Since first-order channels compose the vast majority of the drainage network, it follows that headwater streams are usually the primary source of streamflow.

The delivery of water from hillslopes to channels can occur as surface flow, subsurface stormflow, or groundwater (Dunne and Leopold 1978, Novotny and Olem 1994). In headwater catchments the delivery of water to the channel and hence the magnitude and timing of peak flows are controlled primarily by hillslope processes (Dunne 1976). In a 1 $km^2$ basin the time to peak flow can vary from about 25 min when Horton (infiltration-excess) overland flow is the dominant runoff process, to 1 hour for saturation overland flow, and over 18 hours when subsurface stormflow is the dominant runoff process (Dunne 1976). Horton overland flow is rare in forested areas in the western United States, and water from the hillslopes is delivered to the channel network primarily by subsurface stormflow (McGlynn et al. 2004, McNamara et al. 2005) and secondarily by saturation overland flow.

The amount and timing of hillslope runoff varies as the channel network expands and contracts under different moisture conditions (Hewlett and Nutter 1970, Hunter et al. 2005), and the hillslopes become hydrologically connected or disconnected from the stream network (McNamara et al. 2005). During dry periods, hydrologic connectivity is primarily restricted to wet convergent areas and the riparian zones immediately adjacent to the channel (McGlynn et al. 2004). Subsurface stormflow is only generated under relatively wet conditions, and the delivery of this water to the stream channel is increasingly viewed as threshold-dependent. In humid forested catchments recent studies indicate that subsurface stormflow only occurs when rainfall exceeds about 20 to 55 mm under wet antecedent conditions (Weiler et al. 2005). Hillslopes with shallower soils tend to have lower thresholds (Weiler et al. 2005, Tromp-van Meerveld and McDonnell 2006), and the entire hillslope may not be hydrologically connected to the stream until the deepest soils wet up. This means that even though hillslopes compose most of the drainage area, complete hillslope-stream connectivity may only occur a couple of times per year in drier, rain-dominated forested areas, and only during spring snowmelt in snow-dominated areas (McGlynn and McDonnell 2003, Weiler et al. 2005, McNamara et al. 2005).

The variability and complexity in hillslope-stream connectivity helps explain why headwater streams can have higher peak flows per unit area and greater variability than their downstream counterparts (Figure 1) (Woods et al. 1995, Gomi et al. 2002). The higher peak flows in headwater basins can be attributed to several factors, including the general tendency for precipitation to increase with increasing elevation; the greater potential for an entire basin to be simultaneously affected by an intense rain event; the potential for the entire basin to fall within a narrow elevation band and therefore be subjected to rain or rain-on-snow rather than a mixture of rain and snow; the ability for an entire basin to be simultaneously at or near peak snowmelt rates; and the potential for runoff from different portions of a basin to be synchronized.

As basin size increases, the magnitude and timing of storm runoff are increasingly controlled by the structure and morphology of the drainage network and valley bottoms rather than hillslope-scale runoff processes (Robinson et al. 1995, Gomi et al. 2002, McGlynn et al. 2004). As a hypothetical example, the maximum channel length in a $100 \text{ km}^2$ basin will be on the order of 15 to 20 km. During high flows the mean water velocity should be around $1.5 \text{ m s}^{-1}$, so the average water molecule might spend several hours in the channel before reaching the basin outlet. Depending on the dominant runoff process, the travel time for water in the stream is comparable to the time lag between precipitation (or snowmelt) and the input of water into the stream channel. With increasing basin size the in-channel travel time increases and the hillslope runoff processes become progressively less important in defining the magnitude and timing of stormflow hydrographs.

In larger basins rainfall and snowmelt inputs will exhibit greater spatial variability, and the peak flows from the various sub-basins are more likely to be desynchronized. Larger basins generally will have more potential water storage in and on the banks and floodplains. With increasing basin size there is more potential for transmission losses, but in most mountainous environments these generally are assumed to be negligible (Table 1). Transmission losses can be substantial when a stream flows across a coarse-textured alluvial fan or alluvial plain (Herron and Wilson 1999, Woods et al. 2006), in karst terrane, and in semi-arid environments when the water table is below the deepest portion of the stream channel.



**Figure 1. Unit area peak flows with a recurrence interval of four years versus catchment area for 477 gauging stations in Washington state.**

Rvsd Plan - 00001789

Table 1.  Generalized relative likelihood of the storage, transformation, and delivery of eight different constituents from headwater streams to downstream reaches

| Constituent | Likely magnitude of | | | Means of delivery |
|---|---|---|---|---|
| | Storage | Transformation | Delivery | |
| Discharge | Low | Low | High | All flows, minimal delay |
| Fine sediment ($<2$ mm) | Low to moderate | Low | Moderate to high | All flows, but predominantly high flows |
| Coarse sediment ($>2$ mm) | High | Moderate to high | Low to moderate | High flows and mass wasting events |
| Large woody debris | High | Low to moderate | Low | Mass wasting or extremely high flows |
| Coarse particulate organic matter | Moderate | High | Moderate | Primarily high flows and mass wasting |
| Fine particulate organic matter | Low to moderate | Moderate | Moderate to high | All flows, especially high flows |
| Nutrients | High | High | Low to moderate | All flows |
| Temperature | Low | High | Low to moderate | Low flows |

Because stream channels are relatively efficient conveyers of water, particularly at higher flows, any change in runoff induced by management activities in headwater basins is likely to affect downstream runoff (Table 1). The aggregation of various management-induced changes in flow from different headwater areas can result in a cumulative watershed effect (CWE), and the magnitude of this effect depends primarily on the changes in flow resulting from each management activity, and only secondarily on how these changes in flow are transmitted downstream (MacDonald 2000).

The management-induced changes in flow can be difficult to assess in large forested watersheds for several reasons. First, paired-watershed studies have shown that the combination of forest harvest and roads can increase the size of peak flows, decrease the size of peak flows, or have no significant effect (Harr and McCorison 1979, Austin 1999, Moore and Wondzell 2005). The majority of studies conducted in small (i.e., 10–300 ha), rain-dominated catchments in the Oregon Cascades and along the Pacific Coast have shown that extensive forest harvest increases the size of the average storm peak flow by about 13 to 44% (Moore and Wondzell 2005). In snowmelt-dominated areas forest harvest generally increases the annual maximum peak flows by about 40%, but values can range up to 87% (Troendle and King 1987, King 1989, Moore and Wondzell 2005). Both field (Toman 2004) and modeling (Wigmosta and Perkins 2001) studies indicate that road runoff can increase peak stormflows in small headwater streams by up to 500%, but studies in larger basins generally have not been able to document a road-induced increase in peak stormflows. This variability means that an understanding of the underlying causal processes is needed to predict the hydrologic response of different headwater basins to a given set of management activities.

A second difficulty is whether the results from small watersheds can be extrapolated to larger basins, as most paired-watershed studies have been conducted at the headwater scale. The combined effect of forest harvest and roads on runoff is still controversial in basins larger than about 10 to 20 km$^2$, especially where rain-on-snow events generate the largest floods. A 1996 article, for example, claimed that forest harvest and roads increased peak flows by up to

100% in large catchments (62–559 km$^2$) as compared to a 50% increase in catchments smaller than 1.0 km$^2$ (Jones and Grant 1996). Other researchers used different statistical methods to analyze the same data set and found no significant increases in peak flows in the same large catchments (Thomas and Megahan 1998, Beschta et al. 2000). A decreasing change in the size of peak flows with increasing catchment size could be attributed to increased floodplain storage, greater spatial and temporal variability in rainfall and snowmelt, greater variability in basin characteristics (e.g., geology, soils, vegetation, and drainage network structure), and the tendency for percentage area disturbed to decrease with increasing basin size (Megahan and Hornbeck 2000, Beschta et al. 2000). In the snowmelt-dominated Rocky Mountains, the changes in flow due to harvesting 24% of a nearly 17 km$^2$ basin were similar to the values observed in small headwater basins (Troendle et al. 2001).

A third problem is the decline in measurement accuracy in larger basins because streamflows usually are measured in natural channels rather than with carefully engineered flumes or weirs. A lower accuracy limits our ability to detect significant change (see section on adaptive management). A final limitation is that treatments such as forest harvest do not persist over time due to vegetative regrowth. In larger basins, treatments tend to be spread out over longer time periods and regrowth will reduce both the magnitude of the changes in streamflow and the number of storms or years that can be compared (Austin 1999, Jones 2000).

We conclude that headwater streams are the dominant source of runoff. This water is generally conveyed to downstream areas (Table 1), and in-channel processes become increasingly important with increasing basin size. Management-induced changes in runoff have been repeatedly detected in small experimental watersheds, but it is much more difficult to detect the effects of forest management on runoff in larger basins due to the spatial and temporal variations in precipitation and snowmelt, transmission and storage losses, the uncertainties in quantifying the site-scale changes in runoff, measurement errors, and the difficulty of rapidly imposing a given treatment while maintaining a comparable untreated control.

Rvsd Plan - 00001790

## *Hillslope Sediment Production and Delivery*

While hillslope runoff is usually delivered to headwater channels by subsurface flowpaths, sediment is transported into headwater channels and downstream reaches by surface processes (Benda and Dunne 1997a, b, Istanbulluoglu et al. 2004). The proportion of hillslope erosion that is delivered to channels varies with the transport process, proximity to the stream channel, flowpath characteristics, sediment particle size, level of disturbance, and the magnitude of runoff and erosion events (Dietrich et al. 1982, Wemple et al. 1996, Reid and Dunne 1996, Benda and Dunne 1997a, b, Croke and Mockler 2001, Sidle et al. 2004, Istanbulluoglu et al. 2004). Similarly, the ability of headwater streams to deliver sediment to downstream reaches is a function of channel type, transport process, transport capacity, and sediment particle size (Knighton 1998, Bunte and MacDonald 1999, Hassan et al. 2005a). The delivery of sediment to stream channels generally can be classified as discrete (e.g., debris flows) or relatively chronic (e.g., soil creep or the storm-by-storm delivery of sediment from roads).

Mass wasting accounts for 60% to more than 90% of long-term sediment inputs in many headwater catchments in the Pacific Northwest (Swanson et al. 1982, Benda and Dunne 1987, Raines 1991, Paulson 1997, Brardinoni et al. 2003, Benda et al. 2005). At a larger scale, mass wasting accounted for 86% of the total sediment yield for a 187 km$^2$ catchment in northwestern California (Raines 1991) and 44 to 98% of the total sediment yield for catchments in northwestern Washington with drainage areas of 12 to 140 km$^2$ (Paulson 1997).

In headwater catchments the dominant mass wasting processes are either translational slides or debris flows, and these typically originate in colluvial hollows and inner gorge landforms (Dietrich and Dunne 1978, Benda et al. 2005). The density of colluvial hollows in northern California and the Oregon Coast Range range from 22 to 100 per square kilometer (Dietrich and Dunne 1978, Montgomery and Dietrich 1989, Benda 1990), and the average cycle of infilling and failure has been estimated at 5,000–6,000 years (Dietrich et al. 1982, Benda and Dunne 1987, Reneau and Dietrich 1991). In some geologic terranes (e.g., the Franciscan formation in northwestern California), mass wasting in the form of deep-seated earthflows can be the dominant process for delivering hillslope sediment to the stream network (Kelsey 1978).

The delivery of sediment from a mass wasting event to a headwater channel depends on its location relative to the channel network and the travel distance of the landslide or debris flow. Colluvial hollows often are immediately above the heads of first-order channels, so landslides or debris flows in colluvial hollows typically have to travel only a short distance before entering the channel network, and often connect colluvial hollows to first-order channels (Montgomery and Dietrich 1989, Istanbulluoglu et al. 2004). Inner gorges are steep and parallel to the channel network, so mass failures in this landform also have a high probability for delivering water and sediment to the channel network (Paulson 1997). By combining data from two field studies (Benda and Cundy 1990, Robison et al. 1999), we found that the median travel distance for 473 landslides and debris flows in Oregon and northwestern Washington was just under 250 m, although 5% had a travel distance in excess of 1,300 m (Figure 2).

Mass wasting events deliver both fine and coarse sediment to the channel network (Reid and Dunne 1996). Shallow mass wasting processes, such as translational slides, typically remove the soil profile down to bedrock, so the particle-size distribution of this material is similar to the particle-size distribution of the soil profile (Reid and Dunne 1996). In the Oregon Coast Range, the particle-size distribution of the sediment stored in first- and second-order



Figure 2. Cumulative frequency distribution of landslide and debris flow runout distances ($n = 473$) (Benda and Cundy 1990, Robison et al. 1999).

Rvsd Plan - 00001791

channels was almost identical to the particle-size distribution of the material stored in colluvial hollows (Benda and Dunne 1987). The larger clasts delivered into headwater streams by debris flows and deep-seated mass wasting often exceed the flow competence and remain in the channel as lag deposits (Brummer and Montgomery 2003).

Sediment inputs by shallow mass wasting generally are episodic in nature. The recurrence interval of these events decreases with distance downstream because of the rapid increase in the number of landslide-prone landforms—such as colluvial hollows—with increasing scale (Figure 3). The likelihood of disturbance (e.g., fire or timber harvest) or an exceptionally large storm event also increases with increasing catchment size (Benda and Dunne 1997a). If erosion events were completely random, annual sediment inputs and sediment yields should be progressively less variable with increasing scale. In fact, the large frontal storms that trigger mass wasting events in the Pacific Northwest tend to occur over relatively large areas, and a compilation of sediment yield data from different regions shows little change in the variability of annual sediment yields with increasing basin size (Figure 4).

Land use activities can increase both the frequency and magnitude of mass wasting and surface erosion. In forested areas, timber harvest and roads can increase the amount of sediment being produced from mass wasting by 3 to 16 times (Swanson and Dyrness 1975, Montgomery et al. 2000, Guthrie 2002, May 2002), and the amount of sediment being delivered to the channel network by 0.6 to 138 times (Guthrie 2002, Brardinoni et al. 2003, Hassan et al. 2005a). The management-induced increases in the amount of sediment being delivered to the channel network are due to an increase in travel distance as well as an increase in



Figure 4. Coefficient of variation for annual sediment yields versus basin area (Bunte and MacDonald 1999).

frequency. In the Oregon Coast Range, road-induced mass failures traveled three times as far as the mass failures in a mature forest, and the road-induced mass failures increased the amount of sediment being delivered to the channel network by nearly five times relative to mature forests (May 2002).

The chronic sources of sediment in headwater channels include soil creep, bank erosion, and surface erosion (Roberts and Church 1986, Hassan et al. 2005a). Estimated soil creep rates are 0.001 to 0.01 m $yr^{-1}$ for the Oregon Coast Range, 0.002 m $yr^{-1}$ for the Oregon Cascades, and 0.02 m $yr^{-1}$ for Northern California (Dietrich and Dunne 1978,



Figure 3. Predicted recurrence intervals for landslides and debris flows versus catchment area under undisturbed conditions in the North Fork of Smith Creek, Oregon. The average recurrence interval for a 3 km² catchment was reported as 50–100 years (Benda and Dunne 1997a), so a value of 75 years was used here. The recurrence interval for the sixth-order catchment was reported as less than a decade, and a value of 10 years was used here.

Swanson et al. 1982, Benda et al. 2005). The volume of sediment that is delivered to the stream network from soil creep depends on the creep rate, soil depth, and drainage density (Dietrich and Dunne 1978, Roberts and Church 1986).

The high infiltration rates in most undisturbed forested catchments mean that rainsplash, sheetwash, and rilling typically generate no more than a small fraction of the sediment that is delivered from hillslopes to headwater channels (Roberts and Church 1986, Hassan et al. 2005). Even if overland flow does occur, the dense vegetative cover and high surface roughness minimize overland flow velocities and sediment transport capacity (Dietrich et al. 1982, Libohova 2004).

Overland flow and the associated surface erosion processes are common on unpaved forest roads, and the resultant road surface erosion rates are commonly two or more orders of magnitude higher than the surface erosion rates in undisturbed areas (Megahan and Kidd 1972, Reid and Dunne 1984, Luce and Black 1999, MacDonald et al. 2004). Road erosion rates in the western United States have been estimated at up to 101 kg m$^{-2}$ yr$^{-1}$ for heavily trafficked roads in western Washington (Reid and Dunne 1984), but more typical values are from 0.2 to 2.0 kg m$^{-2}$ yr$^{-1}$ (Mac-Donald and Stednick 2003). In the Oregon Coast Range, sediment production from different road segments followed a log-normal distribution, indicating that most of the road-related sediment is being derived from a relatively few segments. Road sediment is of particular concern because it

generally is fine-grained (sand-sized or smaller) (Megahan and Hornbeck 2000, Ramos-Scharron and MacDonald 2005), and this material is particularly detrimental to many aquatic organisms (Waters 1995).

There are fewer data on the delivery of sediment from roads to the stream network than on road sediment production. Studies in the western United States have reported that from 18% to 75% of the roads are hydrologically connected to the stream network (Coe 2006). A recent analysis of these connectivity data indicates that the percentage of roads connected to the stream network is directly proportional to the mean annual precipitation (Figure 5) (Coe 2006). The presence of engineered drainage structures—such as waterbars, rolling dips, or relief culverts—can decrease the proportion of roads that are connected to the stream network by about 40% (Figure 5). The small size of the particles being eroded from roads means that the hydrologically connected roads also will be delivering sediment to the stream network.

High-severity wildfires in forested basins can increase the production and delivery of sediment by several orders of magnitude (Moody and Martin 2001, Wondzell and King 2003, Benavides-Solorio and MacDonald 2005). This increase is due to the severe reduction in infiltration rates, the high overland flow velocities due to the loss of ground cover and surface roughness, and the large increase in drainage density due to the headward extension of the channel network (DeBano et al. 1998, Robichaud et al. 2000, Wondzell and King 2003, Istanbulluoglu et al. 2004,



Figure 5. Percentage of roads connected to the stream channel network versus mean annual precipitation (Coe 2006).

Rvsd Plan - 00001793

Libohova 2004). In the Colorado Front Range most of the sediment from high-severity fires is due to channel incision (Moody and Martin 2001, Pietraszek 2006), and this is why convergent hillslopes tend to produce several times more sediment per unit area than planar hillslopes (Benavides-Solorio and MacDonald 2005). The increase in drainage density greatly increases the hillslope-stream connectivity (Libohova 2004), and most of the sediment from high-severity fires is available for transport to downstream reaches (Moody and Martin 2001, Pietraszek 2006). In contrast, postfire erosion rates after moderate- and low-severity fires are one or more orders of magnitude lower than for sites burned at high severity because the protective litter layer and soil organic matter is not completely consumed and there is correspondingly less rainsplash, soil water repellency, and overland flow (Robichaud et al. 2000, Neary et al. 2005).

## *Connectivity of Sediment from Headwater Channels to Downstream Reaches*

The delivery of sediment from headwater channels to downstream reaches depends on the transport process, channel type, transport capacity, and sediment particle size. In steep headwater catchments, debris flows can be the dominant process for delivering sediment to first- and second-order channels as well as the predominant source of sediment (Benda and Dunne 1987, Benda 1990, May 2002, Benda et al. 2005). Debris flows typically erode the colluvium and alluvium stored along the axis of a hollow or headwater channel, and in the Oregon Coast Range they can entrain from 2 to 15 m$^3$ of sediment per meter of channel length (Benda 1990, May 2002). Debris flows typically deposit sediment when tributary junction angles exceed 70 degrees (Benda and Cundy 1990) and channel slopes are less than 10% (Benda et al. 2005). However, debris flows

can deposit sediment in channels with gradients of up to 25%, or continue to transport sediment when the channel slope is as low as 3% (Benda et al. 2005). In general, most of the sediment from debris flows is deposited in channels that are third-order or higher (Benda and Dunne 1987, Benda 1990, May 2002, Benda et al. 2005). As noted earlier, the transport process also will affect the size of the sediment being transported from the hillslope to the channel.

The sediment transport capacity of headwater channels, and hence the delivery of sediment to downstream reaches, is limited by the high flow resistance due to large clasts, large woody debris, and vertical bedforms such as channel steps (Montgomery and Buffington 1997, Curran and Wohl 2003, Benda et al. 2005). The high roughness in headwater channels provides flow resistance, which reduces sediment entrainment and makes it more difficult to predict sediment transport rates (Hassan et al. 2005a).

The entrainment and transport of sediment in stream channels can be divided into three phases (Ashworth and Ferguson 1989, Hassan et al. 2005a), and these represent different degrees of upstream-downstream connectivity (Figure 6). In phase I, sand-sized or finer material is transported over a stable bed, and this can deliver fine sediment to downstream reaches at relatively low flows (Ashworth and Ferguson 1989). In phase II the entrainment and transport of the bed material is size-selective, and in phase III the entire bed is mobilized, resulting in a high degree of upstream-downstream connectivity. The coarse nature of the bed material in many headwater streams means that phase II and especially phase III transport are relatively infrequent, particularly in channels with strongly structured bedforms (e.g., step-pool channels) (Grant et al. 1990, Hassan et al. 2005).

These three phases of sediment transport mean that fine



Figure 6. Schematic diagram of the different phases of bedload transport and sediment connectivity versus shear stress (adapted from Hassan et al. 2005).

sediment is more readily delivered to downstream reaches than coarser particles (Table 1). Nevertheless, large amounts of fine sediment can be stored in headwater channels in the lee of large boulders, behind large woody debris, under the surface armor layer, in the channel margins, and on floodplains and terraces (Grant et al. 1990, May and Gresswell 2003b, Benda et al. 2005). In a small ephemeral channel in western Washington, only 35% of the fine (0.063–0.5 mm) and 10% of the coarse (0.5–2.0 mm) sand particles were transported more than 95 to 125 m (Duncan et al. 1987). These low proportions were attributed to the effects of large woody debris on sediment storage and transport rates (Duncan et al. 1987).

Recent studies have documented the important role of large woody debris with respect to the storage and transport of sediment in headwater channels (Keller and Swanson 1979, Megahan 1982, Chesney 2000, May and Gresswell 2003b, Gomi and Sidle 2003). In the Pacific Northwest and Alaska, large woody debris stored an average of 0.5 m$^3$ of alluvial sediment per meter of channel, and the range of values was from 0 to 2.9 m$^3$ m$^{-1}$ (Megahan 1982, Chesney 2000, May and Gresswell 2003b, Gomi and Sidle 2003). There may be very little sediment stored in channels that have been recently scoured by debris flows (May and Gresswell 2003b), but the amount of stored sediment will increase over time as sediment is delivered to the channel by colluvial processes and the sediment storage capacity increases with the recruitment of woody debris (May and Gresswell 2003b).

Sediment transport models developed for larger alluvial channels typically overpredict sediment transport rates in headwater streams by at least an order of magnitude (Hassan et al. 2005a). This overprediction can be attributed to the greater form roughness and sediment storage capacity in

headwater streams. Alternatively, empirical models derived from tracer studies can be used to estimate the downstream travel distance and delivery of sediment. The best model developed from 50 studies explained 43% of the variability in mean annual travel distance as a function of tracer particle size and bankfull channel width:

$$\log_{10} T = 2.30 + 0.819 \log_{10} W - 0.611 \log_{10} D, \quad (1)$$

where $T$ is the mean annual travel distance in m yr$^{-1}$, $W$ is the bankfull channel width in m, and $D$ is the particle size in mm (Bunte and MacDonald 2002). The significance of bankfull width is consistent with other analyses of tracer studies (Beechie 2001) and the cross-correlations between channel width and other variables, such as channel slope and flow depth (Knighton 1998).

Equation 1 indicates that the mean annual travel distance for a 3 m-wide headwater stream will vary from several kilometers for a particle that is only 0.05 mm in diameter to only a few tens of meters for a particle that is 64 mm in diameter (Figure 7). Both Figure 7 and our understanding of sediment transport processes indicate that there is likely to be a long lag in the delivery of larger particles to downstream reaches, and this lag increases as channel size decreases and particle size increases (Table 1). Particle abrasion will decrease travel times by decreasing particle sizes, and for weaker rock types this particle breakdown can greatly increase sediment delivery from headwater streams to downstream reaches (Benda and Dunne 1997b). The sediment derived from unpaved roads also has a relatively high likelihood of being delivered to downstream areas because it is predominantly sand-sized or smaller. Much of the sediment derived from high-severity wildfires is likely to be delivered to downstream reaches because it is largely



Figure 7. Predicted mean annual sediment travel distance for four different particle sizes as a function of bankfull channel width. The model explains 43% of the variability in mean annual sediment travel distance.

Rvsd Plan - 00001795

derived from rill and channel erosion (Moody and Martin 2001, Pietraszek 2006). High-severity wildfires also greatly increase the size of peak flows, and hence the sediment transport capacity (Helvey 1980, Istanbulluoglu et al. 2004).

## Downstream Effects of Sediment Inputs

The delivery of sediment through the channel network can affect water quality, channel morphology, and aquatic organisms in downstream reaches, but the magnitude and type of these effects depend in part on whether the sediment delivery is episodic or chronic (Waters 1995, Gresswell 1999, Trombulak and Frissell 2000). Many of the documented impacts from headwater areas are due to high-magnitude, low-frequency disturbances that transport large slugs of sediment from hillslopes or headwater streams to a downstream reach. Such episodic inputs can induce debris fans, valley terrace formation, channel avulsions, coarse sediment deposits, substrate fining, increased bedload transport, and channel aggradation (Madej and Ozaki 1996, Lisle et al. 2000, Miller and Benda 2000, Sutherland et al. 2002, Benda et al. 2004a, May and Lee 2004). The effects of these episodic inputs tend to be most pronounced at the confluence of headwater streams with larger channels, as these locations are characterized by sharp changes in sediment supply, wood loading, and transport capacity. These confluence effects can include sediment deposition, a change in substrate size, and changes in channel morphology above and below the confluence (Benda et al. 2004a). Because the processes that deliver sediment depend on both the tributary and mainstem drainage area, the likelihood of a confluence effect, such as a debris fan, increases as the ratio of the tributary drainage area to the mainstem drainage area increases (Figure 8) (Benda et al. 2004a). In humid environments, debris flows typically affect the mainstem when the tributary drainage area is less than 1 $km^2$ and the mainstem drainage area is less than 50 $km^2$ (Benda et al. 2004a). The probability of a confluence effect is estimated to be greater than 50% when the ratio of tributary to mainstem drainage area exceeds 0.012 (Figure 8) (Benda et al. 2004a).

Alluvial effects occur when sediment from a tributary is transported to a mainstem channel by high flows (e.g., phase III sediment transport), and these effects can include changes in gradient, sediment deposition, a change in substrate size, and channel instability. The scale domain for alluvial effects is when tributary drainage areas are greater than 10 $km^2$ and mainstem drainage areas are greater than 500 $km^2$ (Figure 8) (Benda et al. 2004a).

Once a slug of sediment is delivered to a higher-order channel, the resulting sediment wave can move downstream via translation, dispersion, or a combination of the two (Lisle et al. 2001). Translation means that the sediment wave moves downstream as a single mass, but this is rare except when the sediment is fine-grained and the flow is tranquil (i.e., subcritical) (Lisle et al. 2001). In a purely dispersive sediment wave the upstream edge and wave apex do not travel downstream (Lisle et al. 2001). Because dispersion is the dominant process, the amplitude of sediment waves tends to decrease rapidly over time, making them difficult to detect unless the wave is relatively young or the sediment input is large relative to the channel dimensions (Lisle et al. 2001). Dispersion may be unimportant if the large clasts delivered by mass wasting or other processes exceed the flow competence of the receiving channel (Brummer and Montgomery 2006). The movement of a sediment wave can initiate a cycle of channel aggradation and degradation (Madej and Ozaki 1996, Miller and Benda 2000, Sutherland et al. 2002), while the selective transport and abrasion of material can induce downstream fining (Sutherland et al. 2002).

There is less evidence in the literature on how the low



Figure 8. Process domains and the probability for confluence effects as a function of the tributary drainage area relative to the mainstem drainage area for humid regions of the Pacific Northwest (Benda et al. 2004a). The bold line represents a probability of 0.50 for a confluence effect.

magnitude, chronic delivery of sediment from hillslope sources can affect downstream reaches, as a change in sediment load often is accompanied by other changes, such as a loss of riparian cover or a change in the amount of large woody debris (Everest et al. 1987). As indicated by Table 1 and Equation 1, fine sediment is more likely to be delivered to downstream areas than coarse sediment. Numerous studies have linked an increase in fine sediment loads to changes in macroinvertebrate populations and, to a lesser extent, changes in fish habitat and fish populations (Everest et al. 1987, Waters 1995, Suttle et al. 2004). The overall trends for macroinvertebrate populations show that a shift in the substrate due to increasing fine sediment loads will tend to decrease taxa richness and abundance; decrease the abundance and richness of sensitive taxa such as Ephemeroptera, Plecoptera, and Tricoptera; and increase the number of oligochaetes and burrowing chironomids (Waters 1995).

These changes in the macroinvertebrate populations are a concern because they can directly affect the amount and type of prey available to high-value fisheries. Large increases in fine sediment loads also are a concern because of their potential adverse effect on spawning and rearing habitat (Everest et al. 1987). At low sediment loads most of the fine sediment in the channel is either on the channel margins or in the matrix of the bed material (Carling and Reader 1982, Lisle and Hilton 1999). As the fine sediment supply exceeds the storage capacity of the bed matrix, the fine particles form surficial patches on the bed surface and in pools (Lisle and Hilton 1999). In northwestern California and in Colorado, both the sediment supply and the lithology were found to affect the filling of pools with fine sediment (Schnackenberg and MacDonald 1998, Lisle and Hilton 1999).

Relatively few studies in forested areas have documented a significant relationship between downstream channel condition and watershed-scale indices of sediment supply, such as percent area harvested, road density, or equivalent roaded (or clearcut) area (McGurk and Fong 1995, MacDonald et al. 1997, Schnackenberg and MacDonald 1998, Faustini and Kaufmann 2003, Cover et al. 2006). These studies can help identify potential problems and possible causes, but they generally do not quantify the various sediment sources or provide the process-based analyses needed to guide regulators and resource managers. At the headwater scale, paired-watershed studies have shown that road construction can increase sediment loads by 100 to 200% (Brown and Krygier 1971, Rice et al. 1979), but many of these studies were done when standards for road design, construction, and maintenance were less stringent than present standards (e.g., more frequent drainage, full bench construction, limitations on wet season use, and outsloping). Recent paired watershed studies in northwestern California have demonstrated that increases in suspended sediment loads were primarily controlled by postharvest increases in the volume of streamflow during storms (Lewis et al. 2001). Although increases in suspended sediment were attributed to the watershed area occupied by roads, there was little field evidence of sediment delivery from newly constructed roads (Lewis et al. 2001).

In summary, there is a need for studies to measure

directly the effects of current management activities on sediment production in headwater areas, explicitly link these sources to the channel network, evaluate sediment routing, and then document whether there is a resulting downstream physical and/or biological response. Efforts to correlate disturbance indices with downstream conditions will need to explicitly consider hillslope-channel connectivity rather than simply using watershed-scale means or totals. The identification of a downstream response may be difficult because of the temporal variability in downstream conditions and the potential effect of infrequent catastrophic erosion events or longer-term processes, such as Pleistocene glaciation or tectonic uplift, relative to contemporary hillslope erosion (Church and Slaymaker 1989, Kirchner et al. 2001, Ferrier et al. 2005).

## Production and Delivery of Large Woody Debris to Headwater Channels

Large woody debris (LWD) can play an important role in modifying channel hydraulics, regulating sediment flux, and controlling channel morphology and aquatic habitat (Montgomery and Buffington 1997, Curran and Wohl 2003, Lancaster et al. 2003, May and Gresswell 2003b, MacFarlane and Wohl 2003, Hassan et al. 2005b). The connectivity of LWD from hillslopes to headwater channels depends primarily on the processes by which wood is recruited and transported.

In headwater catchments LWD is recruited through mass wasting, tree mortality, windthrow, and bank erosion (Keller and Swanson 1979, Martin and Benda 2001, Benda et al. 2002, May and Gresswell 2003a). The relative importance of each process varies with local conditions and stream size. In southeastern Alaska, bank erosion and tree mortality were the primary sources of LWD in catchments of 0.6–1.7 km$^2$, while mass wasting accounted for less than 3% of the total wood recruitment (Martin and Benda 2001). Bank erosion and tree mortality also were the primary sources of LWD in northwestern California (Benda et al. 2002). In contrast, landslides delivered more than half of the wood pieces to second-order streams in the Oregon Coast Range (May and Gresswell 2003a). In third-order streams in the same area, windthrow accounted for 60% of the wood pieces, while mass wasting contributed only 10% (May and Gresswell 2003a). In general, recruitment from mass wasting becomes less important and recruitment from bank erosion becomes more important with increasing drainage area (Keller and Swanson 1979, Martin and Benda 2001).

The dominant recruitment process controls which and how much of the hillslopes are connected to headwater channels and the frequency of hillslope-channel interactions. In the Oregon Coast Range, the median source distance for LWD was 40 m for a variety of mass wasting processes, 20 m for windthrow, 18 m for tree mortality, and 2 m for bank erosion (May and Gresswell 2003a). This indicates that mass wasting has a higher spatial connectivity relative to the other LWD recruitment processes, but the temporal connectivity of individual hillslopes may be much lower because landslides and debris flows are so infrequent. Individual tree mortality has a lower spatial connectivity

Rvsd Plan - 00001797

because transport distances are less, but the temporal connectivity is much higher because the LWD inputs are more frequent and evenly spaced over time.

## *Delivery of LWD from Headwater Channels to Downstream Reaches*

The delivery of LWD from headwater channels to downstream reaches depends on the disturbance regime and high flows in the headwater channel, as well as the number and size of LWD (Table 1) (Hassan et al. 2005b). The transport of LWD from headwater channels typically is associated with debris flows or extreme floods (May 2002, Abbe and Montgomery 2003, Benda et al. 2005, Hassan et al. 2005b), but fluvial transport in headwater channels is relatively rare because the LWD tends to be large relative to the channel dimensions and size of peak flows (Bilby and Bisson 1998, May and Gresswell 2003a). A meta-analysis of 10 studies found that the normalized loading of LWD (i.e., pieces per unit channel length divided by channel width) was greatest in channels less than 5 m wide (Hassan et al. 2005b). These results mean that the residence time of LWD in headwater channels is primarily a function of the decay rate rather than the transport rate (Keller and Swanson 1979, Lancaster et al. 2003, Hassan et al. 2005b).

Debris flows are the most important transport mechanism for LWD in first- through third-order channels (Abbe and Montgomery 2003), but fluvial transport becomes more important as channel size increases (Hassan et al. 2005b). Wood in mid-sized streams (i.e., third-order) tends to move as a congested mass (Braudrick et al. 1997), while in fourth-order and larger channels LWD is more likely to be selectively transported. The travel distance of LWD in these larger streams is a function of the ratio of wood length to both the mean channel width and the mean radius of the channel curvature (Braudrick et al. 1997).

The complex interactions between sediment and LWD affect the likelihood and magnitude of downstream effects. The entrainment of LWD can reduce debris flow velocities, runout lengths, and facilitate sediment deposition (May 2002, Lancaster et al. 2003, Bunn and Montgomery 2004). Higher LWD loadings increase the amount of sediment that can be stored in the channel as well as on floodplains and terraces (Montgomery et al. 2003). A greater sediment storage capacity can help store sediment inputs from hillslopes and release this material as somewhat smoother fluxes of fluvially transported sediment (Massong and Montgomery 2000, Lancaster et al. 2001, Bunn and Montgomery 2004). Hence, the delivery of sediment and LWD to downstream channels by debris flows can be moderated or decreased by higher wood loadings in headwater channels (Lancaster et al. 2001, May and Gresswell 2003b, Bunn and Montgomery 2004). Conversely, a reduction in LWD loading due to forest harvest, fire, or other causes can result in a more direct coupling between the fine sediment inputs into headwater reaches and the delivery of this sediment to downstream areas (Lancaster et al. 2001, May and Gresswell 2003b, Bunn and Montgomery 2004).

## *Inputs and Downstream Delivery of Organic Matter and Nutrients*

The small size of headwater streams means that they are almost completely shaded in forested areas. The large amounts of canopy cover mean that autochthonous (i.e., inputs generated within the stream) production is usually quite low (Gomi et al. 2002, Richardson et al. 2005), and up to 90% of the organic matter inputs are derived from hillslope and riparian sources (Fisher and Likens 1973). In addition to LWD, the primary organic matter inputs include dissolved organic carbon (DOC), coarse (>1 mm) particulate organic matter (CPOM), and to a much lesser extent, fine particulate organic matter (FPOM) (Gomi et al. 2002, Richardson et al. 2005). The coarse particulate organic matter is predominantly leaves and needles, and this material can be rapidly transformed into FPOM by fungi, invertebrates, fragmentation, and abrasion (Richardson et al. 2005). Total organic matter inputs per unit stream area are high relative to downstream reaches (Richardson et al. 2005). Primary production within the stream becomes more important as drainage area and channel size increase (Bilby 1988, Richardson et al. 2005).

The delivery of organic matter from headwater streams to downstream reaches is controlled by many of the same transport processes as water and sediment (Table 1). Much of the DOC exported from headwater streams is derived from leaching of the forest litter, and the transport of DOC is directly coupled with the transport of water. FPOM typically represents the largest component of organic matter exports (Bilby and Likens 1980), as FPOM is generated by the rapid breakdown of CPOM and is more readily transported than CPOM (Table 1). FPOM and CPOM have lower specific gravities than similar-sized sediment particles, so these organic materials are more easily transported downstream.

Although FPOM and CPOM can be readily transported by streamflow, the high roughness and abundant LWD in headwater channels means that much of this organic matter can be stored in the channel, on floodplains, or on terraces (Table 1). The downstream delivery of FPOM and CPOM is primarily a function of whether the stream has access to this material rather than the transport capacity. This means that FPOM and CPOM are exported from headwater streams primarily during high flows (Table 1). Large amounts of organic matter also can be transported downstream on a much more episodic basis by debris flows or other mass wasting processes (Richardson et al. 2005).

Forest management can alter the inputs of organic matter in several ways. In the absence of buffer strips, timber harvest decreased allochthonous inputs of organic matter to small streams in western Washington by 80% (Bilby and Bisson 1992). Algal production increased by 60%, but the total organic matter inputs in the unlogged sites were still more than 50% higher than in the logged sites (Bilby and Bisson 1992). Timber harvest in riparian areas also can shift species composition from conifers to hardwoods (Richardson et al. 2005), although some states—such as Oregon and Washington—allow riparian areas to be converted from

hardwoods to conifers. A change from conifers to nitrogen-fixing species such as red alder can increase in-channel productivity and decrease the total organic matter input from terrestrial sources (Piccolo and Wipfli 2002). Timber harvest also may increase the downstream delivery of organic matter by increasing mass wasting (Montgomery et al. 2000, May 2002, Richardson et al. 2005) and reducing the amount of storage by reducing wood recruitment (Richardson et al. 2005).

Nutrient production and delivery are particularly complex because of the high potential for uptake and transformation (Table 1). Stream water chemistry and nutrient availability are strongly influenced by geologic weathering, particularly in areas with younger soils derived from noncrystalline rocks (Feller 2005). Geologic weathering is an important source of potassium, magnesium, and calcium. Atmospheric deposition is an important source of compounds such as sulfate, nitrogen (N), and mercury (Schuster et al. 2002, Feller 2005). Nutrients can be leached from organic material such as litterfall, but the relative importance of nutrient inputs from hillslope leaching rapidly diminishes in the downstream direction as streamflow increases (Feller 2005). Nitrogen, and especially phosphorus (P), are of primary concern because they typically limit aquatic productivity (Goldman et al. 1990).

Nitrogen and phosphorus fluxes into and from headwater streams are controlled by runoff processes, chemical reactions, and biological uptake and transformations in the soils, groundwater, and channels. Most of the nitrogen transported from forests to streams is in the form of nitrate (Vitousek et al. 1979), but the amounts are relatively small in most undisturbed forest ecosystems (Feller 2005). An increase in nitrogen inputs to headwater streams will not necessarily increase primary productivity because light is often the limiting factor (Bisson 1982).

Phosphorus concentrations in streams are typically very low due to the rapid biological uptake and ease of chemical bonding (Hem 1970, Feller 2005). Most of the phosphorus entering into aquatic ecosystems in forested areas will be in the form of orthophosphates and either sorbed onto soil particles or incorporated into organic compounds (MacDonald et al. 1991). Any processes or management activities that increase the delivery of organic matter and sediment—particularly fine sediment—to the stream channel will increase the input of phosphorus.

Once in the stream, nutrients can be adsorbed by mineral and organic surfaces, oxidized by organisms or light, undergo chemical transformation, used by primary producers such as algae, and microbially transformed by processes such as nitrification (Table 1) (Feller 2005). The concept of nutrient spiraling refers to the uptake, transformation, and transport of nutrients in the downstream direction. In headwater channels the majority of inorganic N is typically removed or transformed in a few minutes or hours, or within tens or hundreds of meters (Peterson et al. 2001). The time and distance necessary for nitrogen uptake or transformation increases in the downstream direction because of the increase in water depth and discharge (Alexander et al. 2000). The rapid uptake of P within streams also results in little downstream transport of dissolved P (Feller 2005).

Most of the downstream delivery of P will occur in particulate forms during high flows (Newbold et al. 1983).

The delivery of N and P is of greatest concern when there are downstream oligotrophic lakes and reservoirs, as the accumulation of these nutrients can lead to water quality degradation and changes to aquatic ecosystems (Dunne and Leopold 1978). The complexities of channel processes, when combined with the diversity of nutrient sources and inputs, makes it very difficult to link specific management activities in forested areas to downstream nutrient fluxes or concentrations (Feller 2005). In most cases the cumulative delivery of nutrients from forested areas is very small relative to the inputs from agricultural and urban areas (Dunne and Leopold 1978, EPA 1997, Carpenter et al. 1998).

## Downstream Trends in Stream Temperature

Stream temperature typically increases in the downstream direction (Moore et al. 2005). The cooler temperatures in headwater reaches are due to the high proportion of canopy cover, the preponderance of cooler subsurface stormflow, and cooler air temperatures at higher elevations (Moore et al. 2005). Localized cooling can occur in downstream reaches due to an increase in shading, groundwater inputs, hyporheic exchange, and thermal stratification in pools (Nielsen et al. 1994, Moore et al. 2005).

Timber harvest, wildfire, grazing, windthrow, tree mortality, agriculture, urbanization, and debris flows can decrease the amount of canopy cover and increase summer water temperatures (Johnson and Jones 2000, Poole and Berman 2004, Moore et al. 2005). The magnitude of the temperature increase is generally proportional to the decrease in riparian shade. Riparian management zones often are designed to limit the decrease in stream shading and resulting temperature increases (Brown and Krygier 1970), but narrow riparian zones may allow the stream to be exposed (Jackson et al. 2001). In forested headwater streams, complete clearing can increase the maximum annual stream temperature by up to 16°C (Brown and Krygier 1970), but most studies in the Pacific Northwest have found that forest harvest increases the maximum stream temperature by no more than 5°C (Moore et al. 2005). In some cases clearcutting to the edge of a stream had no significant effect on water temperatures, and the absence of a significant increase was attributed to the shading provided by large accumulations of logging slash plus cooler post-harvest air temperatures (Jackson et al. 2001). If stream temperatures do increase due to forest harvest, studies show that from 5 to more than 20 years are required for stream temperatures to recover to preharvest levels. Larger streams usually require a longer time to recover (Moore et al. 2005).

An increase in stream temperature induced by forest harvest can be transmitted downstream, or it can quickly diminish once the stream enters a forested reach with extensive shading (Table 1) (Moore et al. 2005). The rate of downstream cooling in a well-shaded reach can be quite rapid due to the combination of groundwater inputs, hyporheic exchange, and heat conduction to the substrate (Story et al. 2003). One study in the interior of British Columbia

Rvsd Plan - 00001799

found more than 4°C of cooling in the first 150 m below a clearcut (Story et al. 2003).

The potential for upstream temperature increases to affect downstream water temperatures is limited by the cooling effects associated with groundwater inflows, inflows from tributaries that have not been subjected to management-induced increases in temperature, hyporheic exchange, heat conduction to the streambed, and evaporative cooling (Table 1) (Moore et al. 2005). One study showed that stream temperature increases at the mouth of a 325 $km^2$ catchment were correlated with a cumulative harvest index (Beschta and Taylor 1988), but this was before the requirements for riparian buffers (Moore et al. 2005). The effects of forest management on water temperatures continues to be an active topic for research, but the increasing requirements for buffer strips and retaining riparian cover mean that increases in maximum water temperatures due to forest harvest generally are becoming less frequent, smaller in magnitude, and more localized.

Downstream water temperatures also can increase due to the indirect effects of timber harvest and other land use activities. For example, aggradation from management-induced mass wasting can lead to a wider, shallower channel that is more susceptible to solar radiation warming (Moore et al. 2005). An increase in fine sediment may clog channel substrate, thereby reducing hyporheic exchange and its associated cooling. Alternatively, extreme aggradation may result in subsurface flow and cooler water temperatures when the flow reemerges further downstream (McSwain 1987).

## *Detecting Headwater Effects on Downstream Reaches and Implications for Adaptive Management*

The reviews in the previous sections highlight the diversity and complexity of headwater-downstream interactions for water, sediment, large wood, particulate organic matter, nutrients, and water temperature. These sections also summarized how management activities in headwater areas might affect each of these constituents, and the extent to which a change in the headwaters might be transmitted downstream and affect some downstream resource of concern. A strong understanding of headwater-downstream interactions is necessary under the National Environmental Protection Act, as this explicitly requires federal agencies to evaluate and consider the environmental impacts of their actions in decisionmaking. More specifically, federal agencies are required to consider the cumulative effect of their actions when added to other past, present, and reasonably foreseeable future actions (CEQ 1997). Many states have laws that require similar environmental assessments for actions taken by state agencies. Similarly, the Clean Water Act regulates both point and nonpoint sources of pollution, and the associated regulations provide an explicit process for controlling pollution on a watershed scale when water quality standards are not being met (MacDonald 2000). A watershed-scale approach also may be necessary when developing habitat conservation plans for aquatic species under the Endangered Species Act.

The difficulty is that in each case there can be a tremendous amount of uncertainty in how a given policy or management activity in an upslope or upstream area will affect aquatic resources. This uncertainty stems from the wide variability of site conditions, the variability in how a given activity is carried out, the uncertainty with respect to future storm events, and the inability to adequately characterize all of the controlling processes and site factors. The uncertainty increases as one attempts to predict the effects of multiple activities over space and time, and how the effects of these activities are accumulated and transmitted downstream (MacDonald 2000). The implication is that it can be very difficult to predict accurately the effects of policies and management activities at the watershed scale.

Given this uncertainty, regulators and land managers are increasingly turning to an adaptive management process (Gray 2000). Adaptive management refers to the iterative process of initiating one or more sets of activities, monitoring the effect of those activities on the resource(s) of concern, and then adjusting management actions in response to any observed change (Walters 1986) (Figure 9).

Adaptive management implicitly assumes that (1) there is a direct linkage between the management actions being implemented and the resource of concern; (2) any adverse change in the resource of concern can be detected within a reasonable time frame; (3) if an adverse change is observed, a change in management can be rapidly implemented; and (4) the management change will rapidly lead to the desired change in the resource of concern. Adaptive management is a very effective process for situations that meet these criteria, and examples can range from managing one's bank balance to weed control in a newly established forest plantation. However, the use of adaptive management at the watershed scale can be much more problematic because these four criteria may not be easily satisfied (Figure 9).



Figure 9. Schematic of the adaptive management cycle (solid arrows). Dashed arrows indicate potential breaks or failures.

The first assumption presumes that there is a direct linkage between the management actions being implemented and the resource of concern. This linkage is often relatively clear at the headwater scale, but as watershed scale increases there is an increase in the number of management activities as well as the number and complexity of the controlling processes. It therefore becomes increasingly difficult to link a given management activity to the condition of a downstream resource (Figure 9). For example, a decline in anadromous fish populations could be due to a degradation of spawning habitat and lower fry emergence rates, a degradation of rearing habitat and a reduction in escapement, competition with introduced species, changes in streamflow, the presence of dams or other migration barriers, an increase in mortality while the fish are in the ocean, overfishing, climate change, disease, or a combination of these and other factors. Even if one can document that an increase in fine sediment is causing a decline in spawning habitat, one must then determine the relative role of each possible sediment source, and identify which management actions need to be altered and where. If the increase in fine sediment can be attributed to an increase in bank erosion, for example, one must then determine whether the increase in bank erosion is due to an increase in the size of peak flows, an exceptionally large storm event, a decrease in bank vegetation, or some combination of factors. In most cases there will not be one obvious cause, and this makes it very difficult to definitively link particular management actions to the condition of a downstream resource. The difficulty of making such linkages increases almost exponentially with increasing spatial scale due to both the increase in the number of processes that must be considered and the increase in the number and type of management activities.

The second implicit assumption is that change can be detected within a reasonable time frame. The first problem with this assumption is that monitoring data usually are very limited because there are so few resources devoted to monitoring. Yet the simple truism is that, "If you aren't monitoring, you aren't managing." (S. Swanson, University Nevada at Reno, personal communication, 1992). In other words, if one isn't qualitatively or quantitatively evaluating the effects of one's actions, it's difficult to claim that one is actually managing a particular resource or activity. It clearly is not possible to monitor everything everywhere all of the time, so monitoring programs have to be carefully designed and focused (MacDonald et al. 1991). The development and implementation of a monitoring program also can be hindered by the lack of rigorous methods and criteria for evaluating key resources, such as the quality of spawning habitat, the quality of rearing habitat, or the amount, location, and size of large woody debris in different environments and channel types. The different stakeholders and resource managers must also agree a priori on what type of magnitude of change is needed to trigger a specified change in management. In the absence of an explicit monitoring program and explicit criteria for decisionmaking, adaptive management is not a viable option (Figure 9).

The second problem is that significant change may be very difficult to detect. In most cases significant change is defined by a $P$ value of 0.05, which means that there is less than a 5% chance that a difference is due to chance. For adaptive management to be an effective strategy, one must be able to detect rapidly an adverse change so that management can be adjusted (Figure 9). One also wants high power, which is the likelihood of detecting change when there really is a change. Conceptually, the minimum detectable change depends on the magnitude of the change due to management activities relative to the temporal variability, measurement uncertainty, specified level of significance, and desired power (Figure 10). It is beyond the scope of this article to discuss quantitatively each of these components, but managers typically underestimate the magnitude of natural variability and overestimate their ability to detect a statistically significant change.

The difficulty of detecting change can be illustrated by calculating how many years of annual sediment data are needed pre and post-treatment to detect a specified percentage change. In undisturbed basins the typical coefficient of variation (CV, where the CV is equal to the standard deviation divided by the mean) for annual sediment yields is 70 to 100% (Bunte and MacDonald 1999). If we ignore the relatively large measurement uncertainty and assume the CV to be 100%, a 0.05 level of significance, and a power of



Figure 10. Schematic of the various factors that control the minimum detectable effect.

Rvsd Plan - 00001801

80%, one needs 17 years of pretreatment data and 17 years of posttreatment data to detect a 100% increase in annual sediment yields (Loftis et al. 2001). With only 5 years of pretreatment and 5 years of posttreatment data, the minimum change that can be detected under these same conditions is a 250% increase. Change can be detected more rapidly if some of the variability in the parameter of interest can be accounted for by another variable, such as annual precipitation or the sediment yields from a comparable control watershed (Loftis et al. 2001).

Because most resources are highly variable over time and space, resource managers can expect to detect only relatively large changes within any reasonable length of time (Loftis et al. 2001). Current environmental regulations and best management practices (BMP) were developed in response to the more obvious declines in resource condition, and as regulations become more stringent we are trying to detect progressively smaller changes. The implication is that it will become increasingly difficult to detect significant changes at the watershed scale, and to link these changes to specific management actions. An important caveat on the adaptive management process is that the inability to detect a significant change does not necessarily mean that no change has occurred, as many monitoring programs have relatively low statistical power.

The third assumption underlying adaptive management is that the resource of concern will respond rapidly to a change in management. The validity of this assumption will vary widely with stream type, the type of change imposed by management actions, and the resource of concern (Montgomery and MacDonald 2002). Some water quality parameters, such as turbidity, change rapidly in response to a storm event, and these changes are rapidly transmitted downstream. However, many decades may be required before a change in riparian management affects the amount of LWD in a stream channel. A long lag in resource response will preclude the use of adaptive management, or result in an extended period of adverse effects before there is a change in management and a positive effect on resource condition (Figure 9).

Watershed scale also can affect the magnitude and timing of a resource response. The overall tendency is for downstream resources to become less responsive to management changes as watershed size increases because of the greater potential for time lags (storage), dilution, and uptake or transformations (Table 1). As one example, the deposition of sediment in a first-order channel due to a road crossing may exhibit little or no time lag between a change in management (e.g., armoring a fillslope or installing waterbars just before the crossing) and a decrease in the amount of sediment being deposited. The initial deposit also may be rapidly removed by high flows. In larger watersheds there is more likely to be a substantial time lag between efforts to decrease sediment inputs in headwater streams and the amount of sediment in a downstream location.

These examples suggest that resource response times depend on at least three potential time lags. The first time lag is the rate at which the causal process recovers. If the causal process is surface erosion from unpaved forest roads, erosion can be rapidly reduced by building new waterbars or

paving. However, if the problem is an increase in stream temperature due to a loss of riparian canopy or a change in the size of peak flows due to forest harvest, the time lag for recovery will probably be quite slow because it depends on the rate of forest regrowth. Bank erosion may recover relatively quickly if it is due to overgrazing, but not if it is caused by an increase in the size of peak flows.

The second time lag is the time needed to transport the constituent of concern to the location of interest. This time lag can be negligible in the case of peak flows or certain parameters such as turbidity, but much longer in the case of coarse-textured sediment. The third lag is the amount of time needed for the resource to recover. Macroinvertebrates can quickly recover from a toxic chemical spill if there is a healthy community upstream, but the recovery of a resident fish population may take several generations. If a possible consequence of management is the extinction of a desired species or population, adaptive management is not a viable option.

Each of these time lags and potential consequences must be evaluated to determine whether adaptive management is a viable approach (Figure 9). In general, all three of these time lags must be relatively short for adaptive management to be effective in minimizing resource damage. However, if society is willing to accept some resource degradation, adaptive management may be a viable option across larger time and space scales. For example, the progressive development and application of forestry-related BMP in the Pacific Northwest has been an adaptive management process. The problem is that each iteration of this adaptive management cycle required a certain amount of resource degradation to trigger another round in the development and imposition of BMPs. The acceptability of this degradation is a political and social issue, but one also has to consider the extent to which this degradation is reversible. Certain management activities are largely irreversible, such as urbanization or the construction of high-value infrastructure projects (e.g., highways, dams, or ski resorts). The listing of numerous salmonid populations in the Pacific Northwest under the Endangered Species Act indicates a failure of at least some of the regulatory systems designed to protect these populations. Both failures and successes must be critically examined to determine the conditions under which adaptive management can be an effective strategy for protecting aquatic resources.

## Conclusions

The hillslopes draining to headwater streams account for most of the catchment area and generate the majority of the streamflow. In most cases the streamflow from headwater channels is efficiently routed to downstream areas. This means that management-induced changes in streamflow will accumulate downstream, but the changes in peak flows at the headwater scale generally will be diminished in the downstream direction because of dispersion, dilution, storage, and desynchronization. Similarly, turbidity, fine sediment, dissolved organic carbon, and particulate organic matter can be readily transported downstream, and for these constituents it may be possible to directly link a change in headwater inputs to downstream conditions.

There is a much weaker link between upstream inputs

and downstream fluxes for coarse sediment, large woody debris, nutrients, and stream temperatures. The poorer connectivity is due to a combination of in-channel storage, biological uptake, chemical and physical transformations, dilution, and physical, chemical, and biological breakdown. The relative importance of these in-channel processes increases with increasing watershed scale, so it becomes increasingly difficult to link a specific change in headwater streams to downstream resource conditions as watershed size increases. The linkage between headwater streams and downstream conditions also is complicated by the high temporal and spatial variability in the delivery of materials from hillslopes into headwater streams, and from headwater streams to downstream reaches.

The connectivity between headwater and downstream reaches directly affects the extent to which adaptive management can be applied at the watershed scale. The viability of adaptive management at the watershed scale depends on the ability to rapidly detect change, a strong linkage between management actions and instream conditions, the time lags between management actions and the condition of a given resource, and the reversibility of adverse change. The complex and variable linkages between headwater streams and downstream areas suggest that these conditions will be rarely satisfied in larger watersheds, and this will limit the usefulness of adaptive management at the watershed scale.

## Literature Cited

ABBE, T.B., AND D.R. MONTGOMERY. 2003. Patterns and processes of wood debris accumulation in the Queets river basin, Washington. *Geomorphology* 51:81–107.

ALEXANDER, R.B., R.A. SMITH, AND G.E. SCHWARZ. 2000. Effect of stream channel size on the delivery of nitrogen to the Gulf of Mexico. *Nature* 403:758–761.

ASHWORTH, P.J., AND R.I. FERGUSON. 1989. Size-selective entrainment of bedload in gravel bed streams. *Water Resour. Res.* 25:627–634.

AUSTIN, S.A. 1999. *Stream flow response to forest management: An analysis using published data and flow duration curves*. MSc thesis, Colorado State University, Fort Collins, CO. 121 p.

BEECHIE, T. 2001. Empirical predictors of annual bed load travel distance, and implications for salmonid habitat restoration and protection. *Earth Surf. Proc. and Landforms* 26(9):1025–1034.

BENAVIDES-SOLORIO, J., AND L.H. MACDONALD. 2005. Measurement and prediction of post-fire erosion at the hillslope scale, Colorado Front Range. *Int. J. Wildland Fire* 14:1–18.

BENDA, L. 1990. The influence of debris flows on channel and valley floors of the Oregon Coast Range, U.S.A. *Earth Surf. Proc. and Landforms* 15:457–466.

BENDA, L.E., K. ANDRAS, D. MILLER, AND P. BIGELOW. 2004a. Confluence effects in rivers: Interactions of basin scale, network geometry, and disturbance regimes. *Water Resour. Res.* 40:W05402, doi:10.1029/2003WR002583.

BENDA, L.E., P. BIGELOW, AND T.M. WORSLEY. 2002. Recruitment of wood to streams in old-growth and second-growth redwood forests, northern California, U.S.A. *Can. J. Fish. Aquat. Sci.* 32:1460–1477.

BENDA, L., AND T. CUNDY. 1990. Predicting deposition of debris flows in mountain channels. *Can. Geotech. J.* 27:409–417.

BENDA, L., AND T. DUNNE. 1987. Sediment routing by debris flows. *Int. Assoc. Hydro. Sci. Pub.* 165:213–223.

BENDA, L., AND T. DUNNE. 1997a. Stochastic forcing of sediment

supply to channel networks from landsliding and debris flows. *Water Resour. Res.* 33(12):2849–2863.

BENDA, L., AND T. DUNNE. 1997b. Stochastic forcing of sediment routing and storage in channel networks. *Water Resour. Res.* 33(12):2865–2880.

BENDA, L., M.A. HASSAN, M. CHURCH, AND C.L. MAY. 2005. Geomorphology of steepland headwaters: The transition from hillslopes to channel. *J. Am. Water Resour. Assoc.* 41(4):835–851.

BENDA, L., N.L. POFF, D. MILLER, T. DUNNE, G. REEVES, G. PESS, AND M. POLLOCK. 2004b. The network dynamics hypothesis: How channel networks structure riverine habitats. *Bioscience* 54(5):413–427.

BESCHTA, R.L., M.R. PYLES, A.E. SKAUGSET, AND C.G. SURFLEET. 2000. Peakflow responses to forest practices in the western Cascades of Oregon, USA. *J. Hydrol.* 233:102–120.

BESCHTA, R.L., AND R.L. TAYLOR. 1988. Stream temperature increases and land use in a forested Oregon watershed. *Water Resour. Bull.* 24(1):19–25.

BILBY, R.E. 1988. Interactions between aquatic and terrestrial systems. P. 13–30 in *Streamside management: Riparian, wildlife, and forestry interactions*, Raedeke, K.J. (ed.). University of Washington, Institute of Forest Resources, Contribution No. 59, Seattle, Washington.

BILBY, R.E., AND P.A. BISSON. 1992. Relative contribution of allochthonous and autochthonous organic matter to the trophic support of fish populations in clear-cut and old-growth forested headwater streams. *Can. J. Fish. Aquat. Sci.* 49:540–551.

BILBY, R.E., AND P.A. BISSON. 1998. Function and distribution of large woody debris. P. 324–346 in *River ecology and management*, Naiman, R.J. and R.E. Bilby (eds.). Springer, New York.

BILBY, R.E., AND G.E. LIKENS. 1980. Importance of organic debris dams in the structure and function of stream ecosystems. *Ecology* 61:1107–1113.

BISSON, P.A. 1982. *Annual fertilization and water quality—Final report*. Weyerhaeuser Company Technology Center, Technical Report 050-5411-02, Centralia, WA. 32 p.

BRARDINONI, F., O. SLAYMAKER, AND M.A. HASSAN. 2003. Landslide inventory in a rugged forested watershed: a comparison between air-photo and field survey data. *Geomorphology* 54:179–196.

BRAUDRICK, C.A., G.E. GRANT, Y. ISHIKAWA, AND H. IKEDA. 1997. Dynamics of wood transport in streams: A flume experiment. *Earth Surf. Proc. Landforms* 22:669–683.

BROWN, G.W., AND J.T. KRYGIER. 1970. Effects of clear-cutting on stream temperature. *Water Resour. Res.* 6(4):1133–1139.

BROWN, G.W., AND J.T. KRYGIER. 1971. Clear-cut logging and sediment production in the Oregon Coast Range. *Water Resour. Res.* 7:1189–1198.

BRUMMER, C.J., AND D.R. MONTGOMERY. 2003. Downstream coarsening in headwater channels. *Water Resour. Res.* 39(10):1294, doi:10.1029/2003WR001981.

BRUMMER, C.J., AND D.R. MONTGOMERY. 2006. Influence of coarse lag formation on the mechanics of sediment pulse dispersion in a mountain stream, Squire Creek, North Cascades, Washington, United States. *Water Resour. Res.* 42:W07412, doi:10.1029/2005WR004776.

BUNN, J.T., AND D.R. MONTGOMERY. 2004. Patterns of wood and sediment storage along debris-flow impacted headwater channels in old-growth and industrial forests of the western Olympic Mountains, Washington. P. 99–112 in *Riparian vegetation and fluvial geomorphology: Hydraulic, hydrologic, and geotechnical interactions*. Bennett, S.J., and A. Simon (eds.). American Geophysical Union, Washington, DC.

BUNTE, K., AND L.H. MACDONALD. 1999. *Scale considerations*

Rvsd Plan - 00001803

and the detectability of cumulative watershed effects. Technical Bulletin No. 776, National Council of Air and Stream Improvement, Research Triangle Park, NC. 327 p.

BUNTE, K., AND L.H. MACDONALD. 2002. *Predicting the mean annual travel distance of streambed particles: A meta-analysis of published data.* EOS Trans. AGU 83(47), Fall Meeting Suppl., Abstract H21G-05.

CARLING, P.A., AND N.A. READER. 1982. Structure, composition, and bulk properties of upland stream gravels. *Earth Surf. Proc. Landforms* 7:349–365.

CARPENTER, S.R., N.F. CARACO, D.L. CORRELL, R.W. HOWARTH, A.N. SHARPLEY, AND V.H. SMITH. 1998. Nonpoint pollution of surface waters with phosphorus and nitrogen. *Ecol. Appl.* 8(3):559–568.

CEQ. 1997. *Considering cumulative environmental impacts under the National Environmental Policy Act.* Council on Environmental Quality, Washington, DC. 64 p.

CHESNEY, C. 2000. *Functions of wood in small, steep streams in eastern Washington: Summary of results for project activity in the Ahtanum, Cowiche, and Tieton basins.* TFW Effectiveness Monitoring Report. TFW-MAG1-00-002. Washington Department of Natural Resources, Olympia, WA.

CHURCH, M., AND O. SLAYMAKER. 1989. Holocene disequilibrium of sediment yield in British Columbia. *Nature* 327:452–454.

COE, D. 2006. *Sediment production and delivery from forest roads in the Sierra Nevada, California.* MSc thesis, Colorado State University, Fort Collins, CO. 110 p.

COVER, M., V. RESH, C. MAY, AND W. DIETRICH. 2006. *Quantitative linkages between sediment supply, streambed fine sediment, and benthic macroinvertebrates in streams of the Klamath National Forest.* Report prepared for the United States Forest Service, Pacific Southwest Region, and Klamath National Forest. 32 p.

CROKE, J., AND S. MOCKLER. 2001. Gully initiation and road-to-stream linkage in a forested catchment, southeastern Australia. *Earth Surf. Proc. Landforms* 26:205–217.

CURRAN, J.H., AND E.E. WOHL. 2003. Large woody debris and flow resistance in step-pool channels, Cascade Range, Washington. *Geomorphology* 51:141–157.

DEBANO, L.F., D.G. NEARY, P.F. FFOLLIOTT. 1998. *Fire's effects on ecosystems.* John Wiley and Sons, New York. 333 p.

DIETRICH, W.E., AND T. DUNNE. 1978. Sediment budget for a small catchment in mountainous terrain. *Zeitsch. Geomorph.* (Suppl. 29):191–206.

DIETRICH, W.E., AND T. DUNNE. 1993. The channel head. P. 175–219 in *Channel network hydrology,* Beven, K., and M.J. Kirkby (eds.). John Wiley and Sons, New York.

DIETRICH, W.E., T. DUNNE, N.F. HUMPHREY, AND L.M. REID. 1982. Construction of sediment budgets for drainage basins. P. 5–23 in *Sediment budgets and routing in forested drainage basins,* F.J. Swanson, R.J. Janda, T. Dunne, and D.N. Swanston (eds.). U.S.D.A. Forest Service General Technical Report PNW-141, Pacific Northwest Forest and Range Experiment Station, Portland, OR.

DUNCAN, S.H., R.E. BILBY, J.V. WARD, AND J.T. HEFFNER. 1987. Transport of road-surface sediment through ephemeral stream channels. *Water Resour. Bull.* 23(1):114–119.

DUNNE, T. 1976. Field studies of hillslope flow processes. P. 227–293 in *Hillslope hydrology,* M.J. Kirkby (ed.). John Wiley & Sons, New York.

DUNNE, T., AND L.B. LEOPOLD. 1978. *Water in environmental planning.* W.H. Freeman and Company, New York. 818 p.

EPA. 1997. *Monitoring guidance for determining the effectiveness of nonpoint source controls.* EPA/841-B-96-004, U.S. Environmental Protection Agency, Washington, DC.

EVEREST, F.H., R.L. BESCHTA, J.C. SCRIVENER, K.V. KOSKI, J.R. SEDELL, AND C.J. CEDERHOLM. 1987. Fine sediment and salmonid production: A paradox. P. 98–142 in *Streamside management: Forestry and fishery interactions,* Salo, E.O., and T.W. Cundy (eds.). Contr. No. 57, Inst. Forest Resources, University of Washington, Seattle, WA.

FAUSTINI, J.M., AND P.R. KAUFMANN. 2003. *Regional, basin, and local factors influencing the use of synoptic survey data to assess anthropogenic changes in streambed stability and fine sediment.* Eos Trans. AGU, 84(46), Fall Meet. Suppl., Abstract H42E-1125.

FELLER, M.C. 2005. Forest harvesting and streamwater inorganic chemistry in western North America: A review. *J. Am. Water Resour. Assoc.* 41(4):785–811.

FERRIER, K.L., J.W. KIRCHNER, AND R.C. FINKEL. 2005. Erosion rates over millennial and decadal timescales at Caspar Creek and Redwood Creek, Northern California Coast Ranges. *Earth Surf. Proc. Landforms* 30:1025–1038.

FISHER, S.G., AND G.E. LIKENS. 1973. Energy flow in Bear Brook, New Hampshire: An integrative approach to stream ecosystem metabolism. *Ecol. Mon.* 43:421–439.

GOLDMAN, C.R., E.R. MARZOLF, AND J.J. ELSER. 1990. Phosphorus and nitrogen limitation of phytoplankton growth in the freshwaters of North America: A review and critique of experimental enrichments. *Can. J. Fish. Aquat. Sci.* 47(4):1468–1477.

GOMI, T., AND R.C. SIDLE. 2003. Bedload transport in managed steep-gradient headwater streams of southeastern Alaska. *Water Resour. Res.* 39(12):1336, doi:10.1029/2003WR002440.

GOMI, T., R.C. SIDLE, AND J.S. RICHARDSON. 2002. Understanding processes and downstream linkages of headwater systems. *Bioscience* 52(10):905–916.

GRANT, G.E., F.J. SWANSON, AND M.G. WOLMAN. 1990. Pattern and origin of stepped-bed morphology in high gradient streams, western Cascades, Oregon. *Geo. Soc. Am. Bull.* 102:340–352.

GRAY, A.N. 2000. Adaptive ecosystem management in the Pacific Northwest: A case study from Coastal Oregon. *Conserv. Ecol.* 4(2):6. Available online at www.consecol.org/vol4/iss2/art6.

GRESSWELL, R.E. 1999. Fire and aquatic ecosystems in forested biomes of North America. *Trans. Am. Fish. Soc.* 128:193–221.

GUTHRIE, R.H. 2002. The effects of logging on frequency and distribution of landslides in three watershed on Vancouver Island, British Columbia. *Geomorphology* 43:273–292.

HALWAS, K.L., AND M. CHURCH. 2002. Channel units in small, high gradient streams on Vancouver Island, British Columbia. *Geomorphology* 43:243–256.

HARR, R.D., AND F.M. MCCORISON. 1979. Initial effects of clearcut logging on size and timing of peak flows in a small watershed in western Oregon. *Water Resour. Res.* 15(1):90–94.

HASSAN, M.A., M. CHURCH, T.E. LISLE, F. BRARDINONI, L. BENDA, AND G.E. GRANT. 2005a. Sediment transport and channel morphology of small, forested streams. *J. Am. Water Resour. Assoc.* 41(4):853–876.

HASSAN, M.A., D.L. HOGAN, S.A. BIRD, C.L. MAY, T. GOMI, AND D. CAMPBELL. 2005b. Spatial and temporal dynamics of wood in small streams. *J. Am. Water Resourc. Assoc.* 41:899–919.

HELVEY, J.D. 1980. Effects of a north-central Washington wildfire on runoff and sediment production. *Water Resour. Bull.* 16:627–634.

HEM, J.D. 1970. *Study and interpretation of the chemical characteristics of natural water.* U.S. Geological Survey Water Supply Paper 1473, Washington, DC. 363 p.

HERRON, N., AND C.J. WILSON. 1999. A water balance approach to assessing the hydrologic buffering potential of an alluvial fan. *Water Resour. Res.* 37(2):341–351.

HEWLETT, J.D., AND W.L. NUTTER. 1970. The varying source area

of streamflow from upland basins. P. 65–83 in *Proceedings of the Symposium on Interdisciplinary Aspects of Watershed Management*. Bozeman, MT, August 3–6, 1970. American Society of Civil Engineers, New York.

HUNTER, M.A., T. QUINN, AND M.P. HAYES. 2005. Low flow spatial characteristics in forested headwater channels of southwest Washington. *J. Am. Water Resour. Assoc.* 41(3):503–516.

ISTANBULLUOGLU, E., D.G. TARBOTON, R.T. PACK, AND C.H. LUCE. 2004. Modeling of the interactions between forest vegetation, disturbance, and sediment yields. *J. Geol. Res.* 109:F01009, doi:10.1029/2003JF000041.

JACKSON, C.R., AND C.A. STURM. 2002. Woody debris and channel morphology in first- and second-order forested channels in Washington's coast ranges. *Water Resour. Res.* 38:1177, doi:10.1029/2001WR001138.

JACKSON, C.R., C.A. STURM, AND J.M. WARD. 2001. Timber harvest impacts on small headwater stream channels in the coast ranges of Washington. *J. Am. Water Resour. Assoc.* 37(6):1533–1550.

JAWRA. 2005. Special issue on headwater streams. *J. Am. Water Resourc. Assoc.* 41(4):753–947.

JOHNSON, S.L., AND J.A. JONES. 2000. Stream temperature responses to forest harvest and debris flows in western Cascades, Oregon. *Can. J. Fish. Aquat. Sci.* 57(2):30–39.

JONES, J.A. 2000. Hydrologic processes and peak discharge response to forest removal, regrowth, and roads in 10 small experimental basins, western Cascades, Oregon. *Water Resour. Res.* 36(9):2621–2642.

JONES, J.A., AND G.E. GRANT. 1996. Peak flow responses to clear-cutting and roads in small and large basins, western Cascades, Oregon. *Water Resour. Res.* 32:959–974.

KELLER, E.A., AND F.J. SWANSON. 1979. Effects of large organic material on channel form and fluvial processes. *Earth Surf. Proc. Landforms* 4:361–380.

KELSEY, H.M. 1978. Earthflows in Franciscan melange, Van Duzen River Basin, California. *Geology* 6:361–364.

KING, J.G. 1989. *Streamflow responses to road building and harvesting: A comparison with the equivalent clearcut area procedure.* USDA Forest Service, Intermountain Forest and Range Experiment Station, Research Paper INT-401.

KIRCHNER, J.W., R.C. FINKEL, C.S. RIEBE, D.E. GRANGER, J.L. CLAYTON, J.G. KING, AND W.F. MEGAHAN. 2001. Mountain erosion over 10 yr, 10 k.y., and 10 m.y. time scales. *Geology* 29(7):591–594.

KNIGHTON, D. 1998. *Fluvial forms and processes.* Arnold, London, United Kingdom. 383 p.

LANCASTER, S.T., S.K. HAYES, AND G.E. GRANT. 2001. Modeling sediment and wood storage and dynamics in small mountainous watersheds. P. 85–102 in *Geomorphic processes and riverine habitat*, Dorava, J.M., D.R. Montgomery, B.B. Palcsak, and F.A. Fitzpatrick (eds.). Water Science and Application Volume 4, American Geophysical Union, Washington, DC.

LANCASTER, S.T., S.K. HAYES, AND G.E. GRANT. 2003. Effects of wood on debris flow runout in small mountain watersheds. *Water Resour. Res.* 39(6), doi:10.1029/2001WR001227.

LEWIS, J.L., S.R. MORI, E.T. KEPPELER, AND R.R. ZIEMER. 2001. Impacts of logging on storm peak flows, flow volumes and suspended sediment loads in Caspar Creek, California. P. 85–125 in *Land use and watersheds: Human influences on hydrology and geomorphology in urban and forest areas*, Wigmosta, M.S., and S.J. Burges (eds.). Water Science and Application Volume 2, American Geophysical Union, Washington, DC.

LIBOHOVA, Z. 2004. *Effects of thinning and a wildfire on sediment production rates, channel morphology, and water quality in the*

*Upper South Platte watershed.* MSc thesis, Colorado State University, Fort Collins, CO. 103 p.

LISLE, T.E., Y. CUI, G. PARKER, J.E. PIZZUTO, AND A.M. DODD. 2001. The dominance of dispersion in the evolution of bed material waves in gravel bed rivers. *Earth Surf. Proc. Landforms* 26:1409–1420.

LISLE, T.E., AND S. HILTON. 1999. Fine bed material in pools of natural gravel bed channels. *Water Resour. Res.* 35(4):1291–1304.

LISLE, T.E., J.M. NELSON, J. PITLICK, M.E. MADEJ, AND B.L. BARKETT. 2000. Variability in bed mobility in natural, gravel-bed channels and adjustments to sediment load at local and reach scales. *Water Resour. Res.* 36(12):3743–3755.

LOFTIS, J.C., L.H. MACDONALD, S. STREETT, H.K. IYER, AND K. BUNTE. 2001. Detecting cumulative watershed effects: The statistical power of pairing. *J. Hydrol.* 251:49–64.

LUCE, C.H., AND T.A. BLACK. 1999. Sediment production from forest roads in western Oregon. *Water Resour. Res.* 35(8):2561–2570.

MACDONALD, L.H. 2000. Evaluating and managing cumulative effects: Process and constraints. *Environ. Manag.* 26(3):299–315.

MACDONALD, L.H., D. COE, AND S. LITSCHERT. 2004. Assessing cumulative watershed effects in the Central Sierra Nevada: Hillslope measurements and catchment-scale modeling. P. 149–157 in *Proc. Sierra Nevada Science Symposium: Science for Management and Conservation.* PSW-GTR-193.

MACDONALD, L.H., A. SMART, AND R.C. WISSMAR. 1991. *Monitoring guidelines to evaluate effects of forestry activities on streams in the Pacific Northwest and Alaska.* EPA/910/9-91-001. U.S. Environmental Protection Agency Region 10, Seattle, WA. 166 p.

MACDONALD, L.H., AND J.D. STEDNICK. 2003. *Forests and water: A state-of-the-art review for Colorado.* Colorado Water Resources Research Institute Report No. 196. 65 p.

MACDONALD, L.H., E.E. WOHL, AND S.W. MADSEN. 1997. Validation of water yield thresholds on the Kootenai National Forest. Report submitted to the Kootenai National Forest by Colorado State University. 197 p.

MACFARLANE, W.A., AND E. WOHL. 2003. Influence of step composition on step geometry and flow resistance in step-pool streams of the Washington Cascades. *Water Resour. Res.* 39(2), doi:10.1029/2001WR001238.

MADEJ, M.A., AND V. OZAKI. 1996. Channel response to sediment wave propagation and movement, Redwood Creek, California, U.S.A. *Earth Surf. Proc. Landforms* 21:911–927.

MADSEN, S.W. 1994. *Channel response associated with predicted water and sediment yield increases in northwest Montana.* MSc thesis, Dept. of Earth Resources, Colorado State University. 203 p.

MARTIN, D., AND L. BENDA. 2001. Patterns of instream wood recruitment and transport at the watershed scale. *Trans. Am. Fish. Soc.* 130:940–958.

MASSONG, T.M., AND D.R. MONTGOMERY. 2000. Influence of sediment supply, lithology, and woody debris on the distribution of bedrock and alluvial channels. *Geol. Soc. Am. Bull.* 112(5):591–599.

MAY, C.L. 2002. Debris flows through different forest age classes in the central Oregon Coast Range. *J. Am. Water Resour. Assoc.* 38(4):1097–1113.

MAY, C.L., AND R.E. GRESSWELL. 2003a. Large wood recruitment and redistribution in headwater streams of the Oregon Coast Range, U.S.A. *Can. J. For. Res.* 33:1352–1362.

MAY, C.L., AND R.E. GRESSWELL. 2003b. Processes and rates of sediment and wood accumulation in headwater streams of the

Rvsd Plan - 00001805

Oregon Coast Range, U.S.A. *Earth Surf. Proc. Landforms.* 28:409–424.

MAY, C.L., AND R.E. GRESSWELL. 2004. Spatial and temporal patterns of debris flow deposition in the Oregon Coast Range, U.S.A. *Geomorphology* 57:135–149.

MAY, C.L., AND D.C. LEE. 2004. The relationships among in-channel sediment storage, pool depth, and summer survival of juvenile salmonids in Oregon Coast Range Streams. *North Am. J. Fish. Manag.* 24:761–774.

McGLYNN, B.L., AND J.J. McDONNELL. 2003. Quantifying the relative contributions of riparian and hillslope zones to catchment runoff and composition. *Water Resour. Res.* doi:10.1029/2003WR002091.

McGLYNN, B.L., J.J. McDONNELL, J. SEIBERT, AND C. KENDALL. 2004. Scale effects on headwater catchment runoff timing, flow sources, and groundwater-streamflow relations. *Water Resour. Res.* doi:10.1029/2003WR002494.

McGURK, B.J., AND D.R. FONG. 1995. Equivalent roaded area as a measure of cumulative effect of logging. *Environ. Manag.* 19(4):609–621.

McNAMARA, J.P., D.G. CHANDLER, M. SEYFRIED, AND S. ACHET. 2005. Soil moisture states, lateral flow, and streamflow generation in a semi-arid, snowmelt-driven catchment. *Hydrol. Process.* 19:4023–4038.

McSWAIN, M.D. 1987. *Summer temperatures and channel characteristics of a Southwestern Oregon coastal stream.* MSc thesis, Oregon State University, Corvallis, OR. 99 p.

MEGAHAN, W.F. 1982. Channel sediment storage behind obstructions in forested drainage basins draining the granitic bedrock of the Idaho Batholith. P. 114–121 in *Sediment budgets and routing in forested draining basins*, Swanson, F.J., F.J. Janda, T. Dunne, and D.N. Swanson (eds.). U.S. Dept. of Agriculture, Forest Service, Gen. Tech. Rep. PNW-141, Portland, OR.

MEGAHAN, W.F., AND J. HORNBECK. 2000. Lessons learned in watershed management: A retrospective view. P. 177–188 in *Land stewardship in the 21st century: The contributions of watershed management.* USDA For. Serv. RMRS-P-13, Fort Collins, CO.

MEGAHAN, W.F., AND W.J. KIDD. 1972. Effects of logging and logging roads on erosion and sediment deposition from steep terrain. *J. For.* 70(3):136–141.

MEYER, J.L., AND J.B. WALLACE. 2001. Lost linkages and lotic ecology: Rediscovering small streams. P. 295–317 in *Ecology: achievement and challenge*, M.C. Huntly and N.J. Levin (eds.). Blackwell Scientific, Oxford, UK.

MILLER, D., AND L. BENDA. 2000. Effects of punctuated sediment supply on valley-floor landforms and sediment transport. *Geol. Soc. Am. Bull.* 112(12):1814–1824.

MONTGOMERY, D.R., AND J.M. BUFFINGTON. 1997. Channel reach morphology in mountain drainage basins. *Geol. Soc. Am. Bull.* 109:596–611.

MONTGOMERY, D.R., AND W.E. DIETRICH. 1989. Source areas, drainage density, and channel initiation. *Water Resour. Res.* 25(8):1907–1918.

MONTGOMERY, D.R., AND E. FOUFOULA-GEORGIOU. 1993. Channel network source representation using digital elevation models. *Water Resour. Res.* 29:3925–3934.

MONTGOMERY, D.A., AND L.H. MACDONALD. 2002. Diagnostic approach to stream channel assessment and monitoring. *J. Am. Water Resour. Assoc.* 38(1):1–16.

MONTGOMERY, D.R., T.M. MASSONG, AND S.C.S. HAWLEY. 2003. Influence of debris flows and log jams on the location of pools and alluvial channel reaches, Oregon Coast Range. *Geol. Soc. Am. Bull.* 115(1):78–88.

MONTGOMERY, D.R., K.M. SCHMIDT, H.M. GREENBERG, AND W.E. DIETRICH. 2000. Forest clearing and landsliding. *Geology* 28(4):311–314.

MOODY, J.A., AND D.A. MARTIN. 2001. Initial hydrologic and geomorphic response following a wildfire in the Colorado Front Range. *Earth Surf. Proc. Landforms.* 26(10):1049–1070.

MOORE, R.D., D.L. SPITTLEHOUSE, AND A. STORY. 2005. Riparian microclimate and stream temperature response to forest harvesting: A review. *J. Am. Water Resour. Assoc.* 41(4):813–834.

MOORE, R.D., AND S.M. WONDZELL. 2005. Physical hydrology in the Pacific Northwest and the effects of forest harvesting—A review. *J. Am. Water Resour. Assoc.* 41:753–784.

NEARY, D.G., K.C. RYAN, AND L.F. DEBANO (eds.). 2005. *Wildland fire in ecosystems: Effects of fire on soil and water.* USDA For. Serv. General Tech. Rep. RMRS-GTR-42, vol. 4, Rocky Mountain Res. Stn., Fort Collins, CO.

NEWBOLD, J.D., J.W. ELWOOD, R.V. O'NEILL, AND A.L. SHELDON. 1983. Phosphorus dynamics in a woodland stream ecosystem: A study of nutrient spiraling. *Ecology* 64:1249–1265.

NIELSEN, J.L., T.E. LISLE, AND V. OZAKI. 1994. Thermally stratified pools and their use by steelhead in northern California streams. *Trans. Am. Fish. Soc.* 123:613–626.

NOVOTNY, V., AND H. OLEM. 1994, *Water quality: Prevention, identification, and management of diffuse pollution.* Van Nostrand Reinhold, New York. 1054 p.

PAULSON, K.M. 1997. *Estimating changes in sediment supply due to forest practices: A sediment budget approach applied to the Skagit River Basin in northwestern Washington.* MSc thesis, University of Washington, Seattle, WA. 156 p.

PETERSON, B.J., W.M. WOLLHEIM, P.J. MULHOLLAND, J.R. WEBSTER, J.L. MEYER, J.L. TANK, E. MARTI, W.B. BOWDEN, H.M. VALETT, A.E. HERSHEY, W.H. MCDOWELL, W.K. DODDS, S.K. HAMILTON, S. GREGORY, AND D.D. MORRALL. 2001. Control of nitrogen export from watersheds by headwater streams. *Science* 292:86–90.

PICCOLO, J.J., AND M.S. WIPFLI. 2002. Does red alder (*Alnus rubra*) in upland riparian forests elevate macroinvertebrate and detritus export from headwater streams to downstream habitats in southeastern Alaska? *Can. J. Fish. Aquat. Sci.* 59:503–513.

PIETRASZEK, J.H. 2006. *Controls on post-fire erosion at the hillslope scale, Colorado Front Range.* MSc thesis, Colorado State University, Fort Collins, CO. 207 p.

POOLE, G.C., AND C.H. BERMAN. 2004. An ecological perspective on in-stream temperature: Natural heat dynamics and mechanisms of human-caused thermal degradation. *Environ. Manag.* 27(6):787–802.

RAINES, M.A. 1991. *Sediment budget for the Grouse Creek basin, Humboldt County, California.* MSc thesis, Western Washington University, Bellingham, WA.

RAMOS-SCHARRON, C.E., AND L.H. MACDONALD. 2005. Measurement and prediction of sediment production from unpaved roads, St. John, U.S. Virgin Islands. *Earth Surf. Proc. Landforms* 30:1283–1304.

REID, L.M., AND T. DUNNE. 1984. Sediment production from forest road surfaces. *Water Resour. Res.* 20(11):1753–1761.

REID, L.M., AND T. DUNNE. 1996. *Rapid evaluation of sediment budgets.* Catena Verlag, Reiskirchen, Germany. 164 p.

RENEAU, S.L., AND W.E. DIETRICH. 1991. Erosion rates in the southern Oregon Coast Range: Evidence for an equilibrium between hillslope erosion and sediment yield. *Earth Surf. Proc. Landforms* 16:307–322.

RICE, R.M., F.B. TILLEY, AND P.A. DATZMAN. 1979. *A watershed's response to logging and roads: South Fork of Caspar Creek, California, 1967–1976.* USDA Forest Service Research Publication PSW-146, Pac. Southwest Forest and Range Exp. Sta., U.S. Dept. of Agric., Berkeley, CA.

RICHARDSON, J.S., R.J. NAIMAN, F.J. SWANSON, AND D.E. HIBBS. 2005. Riparian communities associated with Pacific Northwest headwater streams: Assemblages, processes, and uniqueness. *J. Am. Water Resour. Assoc.* 41:935–947.

ROBERTS, R.G., AND M. CHURCH. 1986. The sediment budget in severely disturbed watersheds, Queen Charlotte Ranges, British Columbia. *Can. J. For. Res.* 16:1092–1106.

ROBICHAUD, P.R., J.L. BEYERS, AND D.G. NEARY. 2000. *Evaluating the effectiveness of post fire rehabilitation treatments.* USDA Forest Service General Technical Report RMRS-GTR-63, Rocky Mountain Research Station, Fort Collins, CO.

ROBINSON, J.S., M. SIVAPALAN, AND J.D. SNELL. 1995. On the relative roles of hillslope processes, channel routing, and network geomorphology in the hydrological response of natural catchments. *Water Resour. Res.* 31(12):3089–3101.

ROBISON, E.G., K.A. MILLS, J. PAUL, L. DENT, AND A. SKAUGSET. 1999. *Oregon Department of Forestry Storm Impacts and Landslides of 1996: Final report.* Oregon Department of Forestry, Forest Practices Technical Report 4. 145 p.

SCHNACKENBERG, E.S., AND L.H. MACDONALD. 1998. Detecting cumulative effects in headwater streams on the Routt National Forest, Colorado. *J. of Am. Water Resour. Assoc.* 34(5):1163–1177.

SCHUMM, S.A. 1956. Evolution of drainage systems and slopes in badlands at Perth Amboy, New Jersey. *Bull. Geol. Soc. Am.* 67:597–646.

SCHUSTER, P.F., D.P. KRABBENHOFT, D.L. NAFTZ, L.D. CECIL, M.L. OLSON, J.F. DEWILD, D.D. SUSONG, J.R. GREEN, AND M.L. ABBOT. 2002. Atmospheric mercury deposition during the last 270 years: A glacial ice core record of natural and anthropogenic sources. *Env. Sci. Tech.* 36:2303–2310.

SHREVE, R.W. 1969. Stream lengths and basin areas in topologically random channel networks. *J. Geology* 77:397–414.

SIDLE, R.C., S. SASAKI, M. OTSUKI, S. NOGUCHI, AND A.R. NIK. 2004. Sediment pathways in a tropical forest: Effects of logging roads and skid trails. *Hydrol. Process.* 18:703–720.

SIDLE, R.C., Y. TSUBOYAMA, S. NOGUCHI, I. HOSODA, M. FUJIEDA, AND T. SHIMIZU. 2000. Streamflow generation in steep headwaters: A linked hydro-geomorphic paradigm. *Hydrol. Process.* 14:369–385.

STEDNICK, J.D., C.A. TROENDLE, AND G.G. ICE. 2004. Lessons for watershed research in the future. P. 277–287 in *A century of forest and wildland watershed lessons,* Ice, G.G., and J.D. Stednick (eds.). Soc. of Am. Foresters, Bethesda, MD.

STOCK, J., AND W.E. DIETRICH. 2003. Valley incision by debris flows: Evidence of a topographic signature. *Water Resour. Res.* 39(4):1089, doi:10.1029/2001WR001057.

STORY, A., R.D. MOORE, AND J.S. MACDONALD. 2003. Stream temperature in two shaded reaches below cutblocks and logging roads: Downstream cooling linked to subsurface hydrology. *Can. J. For. Res.* 33(8):1383–1396.

SUTHERLAND, D.G., M.H. BALL, S.J. HILTON, AND T.E. LISLE. 2002. Evolution of a landslide-induced sediment wave in the Navarro River, California. *Geol. Soc. Am. Bull.* 114(8):1036–1048.

SUTTLE, K.B., M.E. POWER., J.M. LEVINE, AND C. MCNEELY. 2004. How fine sediment in riverbeds impairs growth and survival of juvenile salmonids. *Ecol. Appl.* 14:969–974.

SWANSON, F.J., AND C.T. DYRNESS. 1975. Impact of clear-cutting and road construction on soil erosion by landslides in the western Cascade Range, Oregon. *Geology* 3(7):393–396.

SWANSON, F.J., R.L. FREDRICKSON, AND F.M. MCCORISON. 1982. Material transfer in a western Oregon forested watershed. P. 233–266 in *Analysis of coniferous forest ecosystems in the western United States,* Edmonds, R.L. (ed.). Hutchinson Ross Publishing Co., Stroudsburg, PA.

THOMAS, R.B., AND W.F. MEGAHAN. 1998. Peak flow response to clear-cutting and roads in small and large basin, western Cascades, Oregon: A second opinion. *Water Resour. Res.* 34(12):3393–3403.

TOMAN, E.M. 2004. *Forest road hydrology: The influence of forest roads on stream flow at stream crossings.* MSc thesis, Oregon State University, Corvallis, OR. 78 p.

TROENDLE, C.A., AND R.M. KING. 1987. Effect of partial and clearcutting on streamflow at Deadhorse Creek, Colorado. *J. Hydrol.* 90(1/2):145–157.

TROENDLE, C.A., M.S. WILCOX, G.S. BEVENGER, AND L.S. PORTH. 2001. The Coon Creek water yield implementation project: Implementation of timber harvesting technology to increase streamflow. *For. Ecol. Manag.* 143:179–187.

TROMBULAK, S.C., AND C.A. FRISSELL. 2000. Review of the ecological effects of roads on terrestrial and aquatic communities. *Conserv. Biol.* 14:18–30.

TROMP-VAN MEERVELD, H.J., AND J.J. MCDONNELL. 2006. Threshold relations in subsurface stormflow 2. The fill and spill hypothesis: An explanation for observed threshold behavior in subsurface stormflow. *Water Resour. Res.* doi:10.1029/2004WR003800.

VANNOTE, R.L., G.W. MINSHALL, K.W. CUMMINS, J.R. SEDELL, AND C.E. CUSHINGS. 1980. The river continuum concept. *Can. J. Fish. Aquat. Sci.* 37:130–137.

VITOUSEK, P.M., J.R. GOSZ, C.C. GRIER, J.M. MILILLO, W.A. REINERS, AND R.L. TODD. 1979. Nitrate losses from disturbed ecosystems. *Science* 204:469–474.

WALTERS, C.J. 1986. *Adaptive management of renewable resources.* Macmillan, New York.

WATERS, T.F. 1995. *Sediment in streams: Sources, biological effects, and control.* Monograph 7, American Fisheries Society, Bethesda, MD.

WEILER, M., J.J. MCDONNELL, H.J. TROMP-VAN MEERVELD, AND T. UCHIDA. 2005. Subsurface stormflow. P. 1719–1732 in *Encyclopedia of hydrological sciences,* Anderson, M.G. (ed.). Wiley and Sons, New York.

WEMPLE, B.C., J.A. JONES, AND G.E. GRANT. 1996. Channel network extension by logging roads in two basins, western Cascades, Oregon. *Water Resour. Bull.* 32:1195–1207.

WHITING, P.J., AND J.B. BRADLEY. 1993. A process-based classification system for headwater streams. *Earth Surf. Proc. Landforms* 18:603–612.

WIGMOSTA, M.S., AND W.A. PERKINS. 2001. Simulating the effects of forest roads on watershed hydrology. P. 127–143 in *Land and watersheds: human influence on hydrology and geomorphology in urban and forest areas,* Wigmosta, M.S., and S.J. Burgess (eds.). AGU Water Science and Application, vol. 2. Washington., DC.

WONDZELL, S.M., AND J.G. KING. 2003. Post-fire erosional processes in the Pacific Northwest and Rocky Mountain Regions. *For. Ecol. Manag.* 178:75–87.

WOODS, R., M. SIVAPALAN, AND M. DUNCAN. 1995. Investigating the representative elementary area concept: An approach based on field data. *Hydrol. Process.* 9:291–312.

WOODS, S.W., L.H. MACDONALD, AND C.J. WESTBROOK. 2006. Hydrologic interactions between an alluvial fan and a slope wetland in the Central Rocky Mountains, USA. *Wetlands* 26:230–243.

Rvsd Plan - 00001807

## Ecosystem Representation in the Rio Grande National Forest

These comments address the role of ecosystem representation in the Rio Grande National Forest's land management planning process. As explained below and illustrated by the accompanying maps and data, the Rio Grande hosts numerous ecosystem types that are poorly represented in the National Wilderness Preservation System (NWPS) both regionally and nationally. Given the central importance of ecosystem diversity to conserving biological diversity and satisfying the requirements of the 2012 National Forest System Land Management Planning Rule, 36 C.F.R. part 219, the upcoming plan revision process presents a crucial opportunity for the Rio Grande to increase the diversity of ecosystems that are protected as part of the NWPS or through other special designations. Most immediately, the Forest Service should incorporate ecosystem representation into its assessment of the need and opportunity for additional designated areas.

    I.       Ecological Importance of Ecosystem Representation in Wilderness and Other Protected Areas

Wilderness and other protected conservation areas are the cornerstones of most regional, national, and international efforts to conserve biological diversity and ecological processes of natural ecosystems (Bertzky *et al.* 2012). Research has shown that protected areas reduce the loss, degradation, and fragmentation of natural habitats (Bruner *et al.* 2001; Naughton-Treves *et al.* 2005) and slow the rate of extinction of threatened species that occur therein (Butchart *et al.* 2012). Conversely, federal public lands in the United States that are managed for a variety of uses including mining, logging, and motorized recreation – and not primarily for conservation purposes – do not have the same benefits. Recognizing the central importance of protected areas in conserving biological diversity, the International Convention on Biological Diversity recommends that at least 17% of the world's terrestrial areas be conserved by 2020 (Woodley *et al.* 2012). To that end, the NWPS already serves as the world's largest national system of highly protected conservation areas.[1]

Wilderness and other protected areas, however, can help achieve biodiversity targets only if they are located in the right places – that is, if they are ecologically representative of terrestrial ecosystems. This "representation" approach assumes that for protected areas to conserve genetic, species, and community diversity – as well as the composition, structure, function, and evolutionary potential of natural systems – they must encompass the full variety of ecosystems (Olson & Dinerstein 1998; Margules &

---

[1] The NWPS contains 21 million hectares in 690 units, covering nearly 1/5 of what the International Union for Conservation of Nature (IUCN) classifies as "category 1 areas," or the most natural and highly protected areas worldwide. By contrast, the IUCN classifies general Forest Service matrix lands as "GAP Status 3" – "Area having permanent protection from conversion of natural land cover for the majority of area. Subject to extractive uses of either broad, low-intensity type (eg. Logging) or localized intense type (eg. Mining)." – which is not considered a "protected" category for biodiversity purposes.

Rvsd Plan - 00001808

Pressey 2000). In other words, protection of distinct ecological communities in turn protects the species that rely on them and the natural ecological processes that are characteristic of those ecosystems (Rodrigues *et al.* 2004; Bunce *et al.* 2013). According to the Convention on Biological Diversity, the percentage of terrestrial ecosystems protected by 2020 (with a target of 17%) is one indicator of how well ecosystems are represented throughout the global network of protected conservation areas (Woodley *et al.* 2012).

Despite its importance, our analysis of ecosystem representation in the NWPS (Dietz *et al.* 2014 (*in revision*)) – which is described in detail below – shows that the NWPS suffers from a significant under-representation of many ecosystems. Over 20% (117) of the 553 types of unique ecosystems occurring on federal lands in the contiguous United States are not included in the NWPS. Even more concerning is that less than half of those 553 ecosystems are more than nominally represented: only 244 ecosystem types have at least 5% of their federal land area protected in the NWPS. And at a more reasonable 20% target for biodiversity conservation purposes, that number falls to only 113 ecosystems with at least 20% of their federal land area protected in the NWPS. 95% of that diversity was achieved by 1994, and wilderness designations over the past 15 years have added only 1 new ecosystem type above the 20% threshold. Moreover, there is not a clear correlation between how rare an ecosystem is on federal lands and how well it is represented in the NWPS. We found that there are many ecosystem types that are common on federal lands (covering over 100,000 hectares) but are poorly represented in the NWPS.

As we commemorate the 50th anniversary of the Wilderness Act (signed into law on September 3, 1964), it is important to begin to remedy this under-representation of ecosystems in the NWPS.  Human population growth, climate change, and pressure for development and extraction of natural resources make wilderness and other protected areas increasingly vital to conserve biological diversity. Given those pressures and stressors, we must establish a network of connected wilderness and other protected areas that represent the full expression of ecosystem diversity.

II.    <u>Regulatory Requirements to Evaluate Ecosystem Representation</u>

Given the regional, national, and global importance of ecosystem representation in the NWPS and other protected areas, the 2012 National Forest System Land Management Planning Rule requires the Forest Service to evaluate and incorporate ecosystem representation into its forest assessment and planning processes. Indeed, protecting ecosystem diversity is a central purpose of forest planning under the rule:

> Plans will guide management of [National Forest System] land so that they are ecologically sustainable and contribute to social and economic sustainability; ***consist of ecosystems and watersheds with*** ecological integrity and ***diverse plant and animal communities***; and have the

2

> capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future.

36 C.F.R. § 219.1(c) (emphasis added).

To satisfy the 2012 Planning Rule's ecosystem diversity mandate, forests are first required to identify and evaluate existing designated areas, including wilderness, and the potential need and opportunity for additional designated areas as part of the assessment phase. *Id.* § 219.6(b)(15). In doing so, the assessment "should identify and evaluate available information to answer questions such as: . . . Are there specific land types or ecosystems present in the plan area that are not currently represented or minimally represented?" Forest Service Handbook (FSH) 1909.12, ch. 10, § 14(1)(4)(c).

Next, during the plan development or revision phase, the Forest Service is required to "[i]dentify and evaluate lands that may be suitable for inclusion in the [NWPS] and determine whether to recommend any such lands for wilderness designation." 36 C.F.R. § 219.7(c)(2)(v). In evaluating potential wilderness areas, the agency must, among other things, "[e]valuate the degree to which the area may contain ecological, geological, or other features of scientific, educational, scenic, or historical value." FSH 1909.12, ch. 70, § 72.1(4); *see also* 16 U.S.C. § 1131(c)(4) (wilderness, as defined by the Wilderness Act of 1964, "may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value"). "Such features or values may include[ r]are plant or animal communities or rare ecosystems," with "rare" being "determined locally, regionally, nationally, or within the system of protected designations." FSH 1909.12, ch. 70, § 72.1(4)(a).

In addition to identifying and evaluating areas to recommend for wilderness designation, the 2012 Planning Rule also requires the agency to "[i]dentify existing designated areas other than [wilderness] and determine whether to recommend any additional areas for designation." 36 C.F.R. § 219.7(c)(2)(vii). Those special designations may include, for example, ecological areas, botanical areas, or Research Natural Areas (RNAs), which are designed to "[m]aintain a wide spectrum of high quality representative areas that represent the major forms of variability . . . that, in combination, form a national network of ecological areas for research, education, and maintenance of biological diversity . . . [and s]erve as a baseline area for measuring long-term ecological changes." Forest Service Manual 4063.02; *see also* 36 C.F.R. § 219.19 (Forest Service may designate RNAs as part of planning process).

Complementing the requirement to consider ecosystem representation in determining suitability for wilderness and other special designations, the 2012 Planning Rule directs that plans generally provide for ecological sustainability and integrity and "the diversity of plant and animal communities and the persistence of native species." 36 C.F.R. §§ 219.8-219.9. The Forest Service cannot satisfy those substantive mandates without

Rvsd Plan - 00001810

adequately protecting ecosystem diversity in the plan area. For example, plans "must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types[, including r]are . . . plant and animal communities." *Id.* § 219.9(a)(2). With conflicting management and resource demands and human-caused stressors such as climate change that threaten ecosystem diversity and integrity, plans simply cannot restore or maintain the diversity of plant and animal communities absent a robust network of protected areas that adequately represent that diversity.

Collectively, these various procedural and substantive mandates commit the agency to a meaningful evaluation and consideration of under-represented and rare ecosystems throughout the planning process, starting with the assessment of the need and opportunity for additional designated areas. In doing so, the agency is required to use "the best available scientific information." *Id.* § 219.3. As described in the methodology section below, we believe our analysis of ecosystem representation represents the best available scientific information, and we encourage the Forest Service to incorporate it into its assessment, wilderness evaluation, and the broader planning process.

III.    <u>Methods and Analysis of Ecosystem Representation</u>

To inform the Rio Grande National Forest's assessment of the need and opportunity for additional designated areas, we conducted an analysis of ecosystem representation in wilderness at the national- and forest-level scales to provide the best available scientific information.

According to the U.S. Geological Survey (USGS), the contiguous United States contains 565 terrestrial, non-developed ecosystems. In this study, we analyzed representation of those ecosystems by comparing their areas in the NWPS with their areas on federal land at both the national and forest levels in order to calculate a percent representation:

> Equation 1: *(area of ecosystem in the NWPS/area of ecosystem on federal land)\*100*[2]

> Equation 2: *(area of ecosystem in the NWPS on the* Rio Grande *NF/area of ecosystem on the* Rio Grande *NF)\*100*

We conducted these calculations at the finest scale for which consistent, spatially-explicit vegetative land-cover data is available: the 6th level of the National Vegetation

---

[2] We used federal land, as opposed to all land, within the contiguous United States to better assess where ecosystems are under-represented on lands potentially available for wilderness designation.

Rvsd Plan - 00001811

Classification System (NVCS 2008).[3] That data is from the USGS Gap Analysis Program (GAP) national land-cover data version 2 at 30-meter resolution (USGS 2011).

We obtained spatial data of the NWPS from the University of Montana College of Forestry and Conservation's Wilderness Institute at wilderness.net, which maintains the most up-to-date spatial data on wilderness areas. To map federal land area, we used the U.S. Protected Areas Database (PAD-US) version 1.3 (USGS 2012), which includes geographic boundaries, land ownership, land management, management designation, parcel name, area, and protection category.[4]

We overlaid the NWPS and all federal lands with land-cover data in a Geographic Information System (ArcGIS 10.2) to calculate and compare the total area of each ecosystem within the NWPS and federal land. We then calculated the percent of each ecosystem within the NWPS based on all area occurring on federal land (Equation 1, above).[5] This was part of a national assessment that we conducted (Dietz *et al.* 2014 (*in revision*)).

We did the same calculations at the forest level. We extracted land-cover data and clipped it to the forest boundary, and then calculated the percent of each ecosystem within the Rio Grande National Forest's four existing wilderness areas based on all federal land area occurring on the Forest (Equation 2, above).

Next we classified representation for each scale into four classes (<5%, 5-9.9%, 10-19.9%, ≥20%) and mapped them across the entire national forest. We considered ecosystems with <19.9% of their total area in the NWPS as inadequately represented.

We then brought the Colorado inventoried roadless areas data for the Rio Grande National Forest into Arc and created a new shapefile that included only the inventoried areas. This allowed us to focus our analysis on the areas that are potentially suitable for wilderness designation by tabulating the area of each ecosystem occurring within each roadless area (see attached matrix, Table 2 "Ecosystem Composition of Colorado IRAs.xlsx"). Values within the matrix are the estimated acres of each ecosystem occurring within each roadless area unit.

---

[3] The NVCS classifications are as follows: 1) Class; 2) Subclass; 3) Formation; 4) Division; 5) Macrogroup; **6) Group (a.k.a. ecological system, to which we refer in this study as "ecosystem")**; 7) Alliance; and 8) Association.

[4] The PAD-US is a national inventory of terrestrial and marine protected areas that are managed to preserve biological diversity and other natural, recreation, and cultural uses.

[5] For example, when we say "boreal aspen-birch forest has 19% representation in NWPS," we mean that 19% of all federal land encompassing that ecosystem type is protected as wilderness in the NWPS.

Rvsd Plan - 00001812

We used these data to calculate the proportion (%) of each roadless area that is composed of ecosystems inadequately represented in the NWPS by each of the 3 lower representation classes (<5%, 5-9.9%, 10-19.9%) and for both scales of representation (Table 1).

IV.    <u>Results</u>

Our analysis shows that a significant number of inventoried roadless areas on the Rio Grande National Forest contain high proportions of inadequately represented ecosystem types at both the forest-level and national scales (Tables 1 & 2; Maps 2 & 3). We found that under-represented ecosystems (at both representation levels) cover over 50% of the acreage of 22 of the 53 inventoried roadless areas in the forest, and over 80% of 7 of the 53 areas. The ecosystem under-representation problem is particularly acute at the forest level, where severely under-represented ecosystem types (<5%) cover over 40% – and up to 71% – of the acreage of 10 of the 53 inventoried roadless areas.

More broadly, our analysis shows that inadequately represented ecosystem types cover over 40% of the Rio Grande National Forest at both the national and forest levels of representation. (Table 3, Tabs 2 & 3).

At the forest level, our analysis found that only 11 of the 31 ecosystem types found on the Rio Grande are adequately represented (Table 3, Tabs 1 & 2; Map 3). In total, under-represented ecosystem types span over 43% of the forest area and approximately 788,000 acres. Ecosystem types with less than 5% representation at the forest level comprise over 23% of the entire Rio Grande, while ecosystem types with less than 10% representation at that scale cover 27% of the forest.

The story is similar at the national scale, with a total of 21 inadequately represented ecosystem types covering over 41% and 742,000 acres of the Rio Grande (Table 3, Tab 3; Map 2). Further, only 6% of these under-represented ecosystems are protected in wilderness nationally.

Notably, two of the most prevalent ecosystems on the Rio Grande are under-represented both at the forest and national levels (Table 3, Tabs 2 & 3). The Southern Rocky Mountain Montane-Subalpine Grassland covers over 191,000 acres of the forest, yet only 3.4% of the ecosystem is protected as wilderness. The Rocky Mountain Aspen Forest and Woodland spans 209,000 acres on the Rio Grande, only 28,000 of which are protected in the forest's wilderness.

The attached maps and tables depict these results in detail, showing the following:

Map 1 "Colorado Roadless Areas, Rio Grande National Forest": Depicts each unit (polygon) in the Colorado Roadless Area inventory, with the Upper Tier units outlined in

6

Rvsd Plan - 00001813

black with hash marks, other Colorado Roadless Areas outlined in blue with hash marks, and the forest boundary shaded deep green.

Map 2 "Ecosystem Representation on the Federal Level": Color depiction of the results of Equation 1 (above), showing the level of representation in the NWPS of each ecosystem type at the national scale. For example, areas shown in red depict ecosystems that are represented in the NWPS at less than 5% of all available federal land. [Colorado Upper Tier Roadless Ares outlined in black with cross-hatching; other Colorado Roadless Areas outlined in blue with cross hashing]

Map 3 "Ecosystem Representation on the Forest Level": Color depiction of the results of Equation 2 (above), showing the level of representation in the NWPS of each ecosystem type at the forest level. [Colorado Upper Tier Roadless Ares outlined in black with cross-hatching; other Colorado Roadless Areas outlined in blue with cross hashing]

Table 1 "Rio Grande IRAs Representation Table": Proportion (%) of each inventoried roadless area composed of under-represented ecosystem types on the Rio Grande National Forest based on national- and forest-level representation. Representation of each ecosystem type was quantified based on all available area on federal land and the individual forest. All ecosystems with <20% representation in the NWPS at each scale were broken into 3 levels of representation (<5%, 5-9.9%, and 10-19.9%). This table allows one to prioritize roadless area units by proportion of land area that is composed of under-represented ecosystems, at three levels.

Table 2 "Ecosystem Composition of Colorado IRAs": Values within the matrix are the estimated acres of each ecosystem type occurring within each roadless area unit. This table depicts the specific ecosystem composition of each unit.

Table 3, Tabs 1-3 "Rio Grande National Forest Ecosystems Representation": These tables depict which ecosystems are under-represented at the forest-level and national scales. Tab 1 shows a complete list of ecosystem types found on the Rio Grande National Forest, and the proportion of each type in the NWPS at the forest-level and national scales.  Tabs 2 and 3 show representation breakdowns at the three levels (<5%, 5-9.9%, and 10-19.9%) at the forest-level and national scales.

V.    Recommendations

Sufficient ecosystem representation in the NWPS and other protected areas is crucial to achieving ecological integrity of the diverse plant and animal communities found in the Rio Grande National Forest. As described above and depicted in the attached maps and tables, our analysis shows that under-representation of ecosystems in the NWPS is a significant problem on the Rio Grande. Thus, the planning process presents the Forest Service with a critical opportunity to prioritize protection of ecosystem diversity and begin to remedy the under-representation of numerous ecosystem types in the NWPS.

Rvsd Plan - 00001814

To that end, we urge the Rio Grande National Forest to use the representation information in the attached tables and maps and described above throughout the planning process. Most immediately, the information should be used to assess the need and opportunity for additional designated areas. Following the assessment, the information also should be used to evaluate areas that may be suitable for inclusion in the NWPS,[6] and to determine which areas to carry forward for NEPA analysis and, ultimately, which areas to recommend for wilderness designation. In addition, the forest should use the information more broadly in its planning process and determinations whether to designate or recommend for designation other areas such as RNAs, ecological or botanical areas, etc. As described above, we believe that this information is the best available science on ecosystem representation, which the agency is legally required to use in its planning process.

If you have any questions about the analysis or data, or would like to have the data in another format, please contact Phil Hartger (phil_hartger@tws.org).

---

[6] For example, Region 5 has made exceptional efforts to incorporate our analysis into the wilderness evaluation processes for the Inyo, Sequoia, and Sierra National Forests. The Region's wilderness team prepared a data summary for each inventoried unit, ranked by percent composition of under-represented ecosystems, to assess the relative opportunities in each unit to enhance ecosystem diversity. Those summaries are attached hereto.

Rvsd Plan - 00001815

## Literature Cited

Bertzky, B., Corrigan, C., Kemsey, J. *et al.* (2012). *Protected planet report 2012: tracking progress towards global targets for protected areas.* IUCN, Gland, Switzerland and UNEP-WCMC, Cambridge, UK.

Bruner, A.G., Gullison, R.E., Rice, R.E. & da Fonseca, G.A.B. (2001). Effectiveness of parks in protecting tropical biodiversity. *Science*, **291**, 125-128.

Bunce, R.G.H., Bogers, M.M.B., Evans, D. *et al.* (2013). The significance of habitats as indicators of biodiversity and their links to species. *Ecol. Indic.*, **33**, 19-25.

Butchart, S.H.M., Scharlemann, J.P.W., Evans, M.I. *et al.* (2012). Protecting important sites for biodiversity contributes to meeting global conservation targets. *PLOS ONE*, **7** (3): e32529, 1-8.

Dietz, M.S., R.T. Belote, G.H. Aplet, and J.L. Aycrigg (2014). *In Revision*. The world's largest wilderness preservation system after 50 years: an assessment of ecosystem representation. *Biological Conservation* XX: xxx-xxx.

Margules, C.R. & Pressey, R.L. (2000). Systematic conservation planning. *Nature*, **405**, 243-253.

National Vegetation Classification System, Version 2, Feb. 2008. (2008). Vegetation Subcommittee, Federal Geographic Data Committee. FGDC-STD-005-2008.

Naughton-Treves, L., Holland, M.B. & Brandon, K. (2005). The role of protected areas in conserving biodiversity and sustaining local livelihoods. *Annu. Rev. Env. Res.*, **30**, 219-252.

Olson, D.M. & Dinerstein, E. (1998). The global 200: A representation approach to conserving the Earth's most biologically valuable ecoregions. *Conserv. Biol.*, **12**, 502-515.

Rodrigues, A.S.L., Andelman, S.J., Bakarr, M.I. *et al.* (2004). Effectiveness of the global protected areas network in representing species diversity. *Nature*, **428**, 640-643.

US Geological Survey, Gap Analysis Program (GAP). (2011). *National Land Cover*, version 2, August 2011. Accessed 15 January 2014: http://gapanlysis.usgs.gov.

US Geological Survey, Gap Analysis Program (GAP). (2012). *Protected Areas Database of the United States* (PAD-US), version 1.3, combined feature class, Nov. 2012. Accessed 15 January 2014: http://gapanalysis.usgs.gov/padus.

Rvsd Plan - 00001816

The Wilderness Act. (1964). Public Law 88-577, 16 U.S.C. 1131-1136, 88th Congress, Second Session, September 3, 1964.

Woodley, S., Bertzky, B., Crawhall, N. *et al.* (2012). Meeting Aichi target 11: What does success look like for protected area systems? *Parks*, **18**, 23-36.

Rvsd Plan - 00001817

**MAP 1: COLORADO ROADLESS AREAS, RIO GRANDE NATIONAL FOREST**

Rvsd Plan - 00001818

# MAP 2: ECOSYSTEM REPRESENTATION ON THE FEDERAL LEVEL, RIO GRANDE NATIONAL FOREST



Colorado

New Mexico

N

| | Rio Grande National Forest |
|---|---|
| | Colorado Roadless Areas Upper Tier |
| | Colorado Roadless Areas |

**Federal Representation in NWPS**

| | < 5% |
|---|---|
| | 5 - 9.9% |
| | 10 - 19.9% |
| | > 20% |

0   10   20   30   40
Miles

UT    CO
AZ    NM    OK    TX

Rvsd Plan - 00001819

# MAP 3: ECOSYSTEM REPRESENTATION ON THE FOREST LEVEL, RIO GRANDE NATIONAL FOREST



**Colorado**

**New Mexico**

N

| 0 | 10 | 20 | 30 | 40 |
|---|---|---|---|---|

**Miles**

Rio Grande National Forest

Colorado Roadless Areas
Upper Tier

Colorado Roadless Areas

Rio Grande NF, Representation in NWPS

< 5%

5 - 9.9%

10 - 19.9

> 20%

UT  CO

AZ  NM  OK  TX

Rvsd Plan - 00001820

Rio Grande National Forest, underrepresented Ecological Systems ("Ecosystems")

| Colorado Roadless Unit | Federal Representation | | | | Forest Representation | | | |
|---|---|---|---|---|---|---|---|---|
| | < 5% | 5 - 9.9% | 10 - 19.9% | < 20% | < 5% | 5 - 9.9% | 10 - 19.9% | < 20% |
| Butterfly | 21.7 | 2.7 | 60.8 | 85.1 | 49.4 | 23.9 | 13.9 | 87.2 |
| Spectacle Lake | 1.2 | 32.0 | 50.9 | 84.1 | 64.8 | 16.3 | 4.2 | 85.4 |
| Taylor Canyon | 0.3 | 35.3 | 48.1 | 83.7 | 54.7 | 14.7 | 15.3 | 84.7 |
| Cotton Creek | 8.2 | 16.4 | 58.3 | 82.8 | 40.7 | 29.3 | 14.6 | 84.6 |
| Ute Pass | 7.1 | 22.6 | 51.8 | 81.4 | 71.1 | 8.8 | 3.3 | 83.2 |
| Dorsey Creek | 0.1 | 13.1 | 67.3 | 80.6 | 45.2 | 3.3 | 33.5 | 82.0 |
| Miller Creek | 25.7 | 8.5 | 46.0 | 80.2 | 45.2 | 19.1 | 17.4 | 81.7 |
| Hot Springs | 0.0 | 20.5 | 59.1 | 79.6 | 29.7 | 1.5 | 47.0 | 78.3 |
| Conejos River / Lake Fork | 0.0 | 8.5 | 70.5 | 79.0 | 43.5 | 12.7 | 18.0 | 74.2 |
| Pole Creek | 6.7 | 14.4 | 57.2 | 78.3 | 22.8 | 1.2 | 49.4 | 73.4 |
| Sawlog | 0.2 | 9.8 | 62.2 | 72.2 | 15.1 | 7.0 | 49.8 | 71.9 |
| Crestone | 17.3 | 11.3 | 41.6 | 70.1 | 37.4 | 12.7 | 21.0 | 71.0 |
| Antora Meadows / Bear Creek | 0.3 | 4.4 | 62.1 | 66.8 | 44.7 | 1.5 | 24.2 | 70.4 |
| Elkhorn Peak | 1.9 | 3.8 | 59.9 | 65.5 | 33.0 | 0.6 | 34.4 | 68.0 |
| Tewksberry | 0.2 | 8.9 | 55.3 | 64.4 | 37.2 | 8.2 | 22.3 | 67.7 |
| La Garita | 8.3 | 9.2 | 45.0 | 62.4 | 48.3 | 9.8 | 8.7 | 66.7 |
| Four Mile Creek | 0.1 | 13.6 | 48.3 | 62.0 | 27.9 | 19.0 | 17.5 | 64.4 |
| Middle Alder | 0.8 | 13.4 | 47.6 | 61.8 | 25.7 | 11.2 | 21.6 | 58.5 |
| Spruce Hole / Sheep Creek | 2.5 | 3.5 | 53.9 | 59.9 | 26.5 | 4.2 | 27.6 | 58.3 |
| Trout Mountain / Elk Mountain | 1.1 | 5.7 | 50.8 | 57.7 | 16.7 | 11.2 | 26.6 | 54.5 |
| Beaver Mountain | 0.8 | 6.7 | 49.4 | 56.9 | 14.3 | 7.7 | 32.4 | 54.4 |
| Bennet Mountain / Blowout / Willo | 1.0 | 4.7 | 48.8 | 54.5 | 35.7 | 1.0 | 16.8 | 53.5 |
| Alamosa River | 0.3 | 5.5 | 45.0 | 50.8 | 11.3 | 2.3 | 33.5 | 47.1 |
| Fox Creek | 0.2 | 3.7 | 40.8 | 44.6 | 3.6 | 13.4 | 29.4 | 46.4 |
| Wason Park | 0.3 | 1.7 | 31.9 | 33.9 | 21.9 | 2.3 | 17.8 | 41.9 |
| Wightman Fork / Upper Burro | 0.0 | 0.4 | 32.7 | 33.2 | 12.6 | 2.9 | 21.1 | 36.6 |
| Lower East Bellows | 0.1 | 4.3 | 28.6 | 32.9 | 2.8 | 4.2 | 28.4 | 35.4 |
| Chama Basin | 0.1 | 3.1 | 28.8 | 32.1 | 20.5 | 3.5 | 10.0 | 33.9 |
| Snowshoe Mountain | 0.0 | 2.5 | 29.4 | 32.0 | 0.5 | 0.4 | 32.8 | 33.7 |
| Box / Road Canyon | 0.4 | 2.8 | 22.8 | 25.9 | 9.8 | 0.0 | 22.5 | 32.3 |
| Tobacco Lakes | 0.0 | 22.7 | 2.0 | 24.8 | 1.3 | 1.5 | 23.5 | 26.3 |
| Cumbres | 0.0 | 4.1 | 20.3 | 24.4 | 7.1 | 1.4 | 16.2 | 24.7 |
| Lake Fork | 0.0 | 0.4 | 23.2 | 23.7 | 13.9 | 1.5 | 8.5 | 23.9 |
| Copper Mountain / Sulphur | 0.0 | 3.8 | 18.6 | 22.4 | 4.5 | 1.0 | 16.6 | 22.2 |
| Silver Lakes / Stunner | 0.0 | 1.4 | 18.3 | 19.8 | 4.7 | 0.2 | 16.2 | 21.2 |
| Wightman Fork To Lookout | 0.0 | 0.6 | 19.1 | 19.7 | 1.3 | 0.0 | 19.7 | 21.1 |
| Deep Creek / Boot Mountain | 0.0 | 0.5 | 18.8 | 19.4 | 2.9 | 0.7 | 17.4 | 21.0 |
| Willow Mountain | 0.0 | 0.8 | 17.7 | 18.5 | 0.6 | 0.7 | 18.5 | 19.8 |
| Ruby Lake | 0.0 | 2.0 | 16.4 | 18.4 | 3.5 | 0.5 | 15.7 | 19.7 |
| Bristol Head | 0.0 | 1.1 | 16.3 | 17.4 | 4.2 | 1.8 | 12.5 | 18.5 |
| Sheep Mountain | 0.0 | 0.2 | 14.5 | 14.7 | 6.0 | 3.0 | 6.4 | 15.4 |
| Fox Mountain | 0.0 | 1.1 | 13.4 | 14.5 | 6.8 | 0.0 | 7.0 | 13.8 |
| Big Buck / Kitty / Ruby | 0.0 | 0.2 | 12.4 | 12.6 | 1.9 | 0.0 | 9.2 | 11.2 |
| Pole Mountain / Finger Mesa | 0.0 | 0.5 | 9.8 | 10.3 | 2.2 | 0.0 | 8.9 | 11.1 |
| Kitty Creek | 0.0 | 0.1 | 6.5 | 6.6 | 1.6 | 0.0 | 5.1 | 6.7 |
| Red Mountain | 0.0 | 0.9 | 4.6 | 5.5 | 1.2 | 1.9 | 3.4 | 6.5 |
| Gibbs Creek | 0.0 | 0.7 | 4.4 | 5.0 | 1.9 | 0.1 | 3.8 | 5.8 |
| Sulphur Tunnel | 0.0 | 0.2 | 4.4 | 4.6 | 0.2 | 0.6 | 4.8 | 5.6 |
| Gold Creek / Cascade Creek | 0.0 | 1.0 | 3.1 | 4.1 | 1.6 | 1.6 | 1.4 | 4.6 |
| Stunner Pass / Dolores Canyon | 0.0 | 1.0 | 2.1 | 3.1 | 0.3 | 0.0 | 3.8 | 4.1 |
| Beartown | 0.0 | 0.1 | 1.7 | 1.7 | 0.5 | 0.0 | 1.6 | 2.1 |
| Indian Ridge | 0.0 | 0.0 | 1.3 | 1.3 | 0.1 | 0.0 | 1.8 | 1.8 |
| Summit Peak / Elwood Pass | 0.0 | 1.1 | 0.0 | 1.1 | 0.0 | 0.0 | 1.4 | 1.4 |

Rvsd Plan - 00001821

| Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area | Colorado Roadless Rule Areas | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ecosystem | Chama Basin | Cumbres | Spruce Hole / Sheep Creek | Fox Creek | Conejos River / Lake Fork | Summit Peak / Elwood Pass | Stunner Pass / Dolores Canyon | Wightman Fork To Lookout | Silver Lakes / Stunner | Tobacco Lakes |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 392 | 213 | 158 | 65 | 62 | 0 | 0 | 2 | 14 | 0 |
| Rocky Mountain Aspen Forest and Woodland | 6,010 | 1,840 | 2,540 | 1,558 | 433 | 0 | 53 | 993 | 829 | 16 |
| Rocky Mountain Lodgepole Pine Forest | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 4,866 | 4,133 | 552 | 1,980 | 22 | 459 | 1,068 | 1,405 | 1,244 | 806 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 3,191 | 1,498 | 511 | 1,015 | 30 | 143 | 1,489 | 1,160 | 2,165 | 790 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 0 | 4 | 0 | 158 | 0 | 1 | 0 | 7 | 11 | 0 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 84 | 151 | 95 | 812 | 61 | 0 | 1 | 2 | 27 | 0 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 25 | 39 | 433 | 6 | 27 | 0 | 0 | 0 | 123 | 0 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 0 | 19 | 86 | 111 | 12 | 0 | 0 | 0 | 10 | 0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 0 | 0 | 5 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 0 | 91 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 47 | 82 | 923 | 87 | 92 | 0 | 9 | 75 | 60 | 52 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 0 | 165 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 743 | 474 | 1,182 | 65 | 0 | 7 | 33 | 73 | 48 | 87 |
| Rocky Mountain Alpine-Montane Wet Meadow | 3,191 | 1,191 | 516 | 26 | 44 | 1,472 | 75 | 758 | 245 | 135 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 1,312 | 422 | 244 | 63 | 87 | 608 | 101 | 338 | 329 | 374 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Alpine Fell-Field | 194 | 0 | 0 | 0 | 0 | 82 | 2 | 60 | 71 | 45 |
| Rocky Mountain Alpine Turf | 74 | 1 | 0 | 0 | 0 | 316 | 0 | 88 | 68 | 50 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 266 | 107 | 30 | 46 | 0 | 0 | 83 | 353 | 240 | 106 |
| Rocky Mountain Alpine Bedrock and Scree | 687 | 36 | 0 | 0 | 0 | 105 | 13 | 254 | 137 | 97 |
| Cultivated Cropland | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 30 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Recently Logged Areas | 266 | 129 | 18 | 0 | 0 | 36 | 25 | 29 | 5 | 66 |
| Open Water (Fresh) | 5 | 65 | 3 | 44 | 0 | 0 | 4 | 2 | 52 | 687 |

Rvsd Plan - 00001822

| Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area | Colorado Roadless Rule Areas | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ecosystem | Gold Creek / Cascade Creek | La Garita | Tewksberry | Fox Mountain | Gibbs Creek | Kitty Creek | Wason Park | Snowshoe Mountain | Red Mountain | Copper Mountain / Sulphur |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 0 | 73 | 399 | 45 | 0 | 2 | 15 | 518 | 8 | 167 |
| Rocky Mountain Aspen Forest and Woodland | 8 | 1,733 | 1,400 | 270 | 17 | 51 | 1,945 | 4,553 | 137 | 772 |
| Rocky Mountain Lodgepole Pine Forest | 0 | 23 | 12 | 8 | 7 | 4 | 18 | 173 | 0 | 0 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 224 | 1,527 | 812 | 3,153 | 787 | 910 | 3,140 | 8,125 | 1,667 | 1,176 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 347 | 1,684 | 1,426 | 1,648 | 519 | 273 | 2,140 | 9,886 | 414 | 1,465 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 0 | 520 | 0 | 3 | 0 | 0 | 597 | 1,645 | 10 | 1 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 0 | 867 | 742 | 186 | 23 | 29 | 472 | 909 | 22 | 37 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 0 | 1,033 | 1,175 | 339 | 2 | 8 | 286 | 1,305 | 0 | 73 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 0 | 897 | 169 | 2 | 0 | 0 | 302 | 236 | 2 | 0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 0 | 875 | 6 | 0 | 0 | 0 | 51 | 7 | 0 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 18 | 1,120 | 322 | 19 | 14 | 7 | 3,811 | 2,158 | 6 | 79 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 60 | 21 | 24 | 103 | 0 | 0 | 1,071 | 318 | 12 | 94 |
| Rocky Mountain Alpine-Montane Wet Meadow | 87 | 12 | 5 | 75 | 1 | 65 | 1,242 | 245 | 139 | 168 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 83 | 46 | 72 | 120 | 26 | 39 | 1,471 | 643 | 246 | 632 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 11 | 0 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 |
| Rocky Mountain Alpine Fell-Field | 0 | 0 | 0 | 5 | 5 | 20 | 825 | 47 | 156 | 65 |
| Rocky Mountain Alpine Turf | 0 | 11 | 0 | 0 | 0 | 18 | 1,402 | 13 | 169 | 54 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 6 | 70 | 9 | 108 | 22 | 3 | 471 | 89 | 145 | 203 |
| Rocky Mountain Alpine Bedrock and Scree | 16 | 5 | 0 | 18 | 3 | 102 | 1,172 | 6 | 434 | 136 |
| Cultivated Cropland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Recently Logged Areas | 8 | 0 | 1 | 15 | 4 | 0 | 21 | 12 | 13 | 27 |
| Open Water (Fresh) | 0 | 4 | 15 | 3 | 6 | 0 | 5 | 11 | 10 | 0 |

| Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area | Colorado Roadless Rule Areas | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ecosystem | Ruby Lake | Pole Mountain / Finger Mesa | Big Buck / Kitty / Ruby | Beartown | Box / Road Canyon | Bristol Head | Lower East Bellows | Sawlog | Sheep Mountain | Lake Fork |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 112 | 28 | 0 | 0 | 26 | 58 | 29 | 207 | 0 | 0 |
| Rocky Mountain Aspen Forest and Woodland | 723 | 3,448 | 554 | 39 | 101 | 5,153 | 101 | 1,451 | 296 | 1,430 |
| Rocky Mountain Lodgepole Pine Forest | 6 | 2 | 0 | 0 | 0 | 16 | 0 | 14 | 9 | 12 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 2,090 | 6,900 | 1,986 | 533 | 392 | 8,278 | 301 | 952 | 753 | 2,066 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 2,676 | 4,628 | 1,848 | 536 | 479 | 6,225 | 723 | 1,435 | 1,281 | 2,751 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 46 | 0 | 0 | 0 | 0 | 642 | 6 | 327 | 171 | 270 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 122 | 0 | 0 | 0 | 19 | 481 | 60 | 1,329 | 6 | 4 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 191 | 0 | 0 | 0 | 20 | 245 | 211 | 1,044 | 7 | 10 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 12 | 0 | 0 | 0 | 8 | 205 | 19 | 798 | 0 | 0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 20 | 0 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 77 | 842 | 674 | 2 | 135 | 1,596 | 122 | 2,649 | 125 | 1,017 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 77 | 419 | 122 | 2 | 1 | 1,664 | 49 | 86 | 29 | 646 |
| Rocky Mountain Alpine-Montane Wet Meadow | 98 | 546 | 53 | 53 | 0 | 2,221 | 0 | 12 | 59 | 199 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 316 | 5,410 | 1,408 | 218 | 19 | 3,982 | 26 | 78 | 73 | 1,079 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 4 | 3 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Alpine Fell-Field | 22 | 1,832 | 71 | 2 | 0 | 1,065 | 0 | 0 | 20 | 304 |
| Rocky Mountain Alpine Turf | 31 | 13,676 | 2,866 | 951 | 0 | 9,605 | 2 | 0 | 32 | 212 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 12 | 425 | 102 | 4 | 2 | 1,390 | 50 | 7 | 81 | 270 |
| Rocky Mountain Alpine Bedrock and Scree | 187 | 5,464 | 165 | 55 | 0 | 2,992 | 0 | 0 | 123 | 331 |
| Cultivated Cropland | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Recently Logged Areas | 6 | 174 | 13 | 1 | 0 | 191 | 16 | 13 | 3 | 47 |
| Open Water (Fresh) | 2 | 3 | 2 | 0 | 0 | 33 | 9 | 0 | 0 | 0 |

| *Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area* | Colorado Roadless Rule Areas | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ecosystem | Four Mile Creek | Taylor Canyon | Antora Meadows / Bear Creek | Ute Pass | Elkhorn Peak | Dorsey Creek | Butterfly | Miller Creek | Cotton Creek | Crestone |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 14 | 10 | 44 | 69 | 217 | 120 | 10 | 24 | 129 | 236 |
| Rocky Mountain Aspen Forest and Woodland | 383 | 141 | 4,657 | 63 | 3,113 | 1,545 | 210 | 81 | 175 | 1,160 |
| Rocky Mountain Lodgepole Pine Forest | 77 | 29 | 7,871 | 963 | 2,180 | 552 | 116 | 14 | 11 | 116 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 1,288 | 453 | 3,043 | 389 | 672 | 429 | 176 | 95 | 125 | 1,053 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 1,835 | 394 | 1,780 | 973 | 1,326 | 104 | 8 | 19 | 89 | 586 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 487 | 107 | 396 | 192 | 311 | 28 | 24 | 15 | 77 | 264 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 985 | 983 | 339 | 763 | 67 | 51 | 446 | 304 | 334 | 884 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 1,155 | 481 | 368 | 837 | 86 | 47 | 27 | 10 | 170 | 273 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 1,330 | 2,044 | 583 | 1,770 | 84 | 0 | 30 | 64 | 237 | 542 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 7 | 11 | 50 | 609 | 196 | 0 | 0 | 0 | 162 | 1,199 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 0 | 6 | 129 | 2 | 0 | 11 | 17 | 14 | 1 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 2,275 | 1,263 | 906 | 1,736 | 819 | 76 | 323 | 52 | 620 | 473 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 4 | 5 | 10 | 3 | 0 | 4 | 403 | 267 | 23 | 6 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 9 | 4 | 457 | 35 | 164 | 14 | 25 | 55 | 96 | 35 |
| Rocky Mountain Alpine-Montane Wet Meadow | 12 | 5 | 101 | 0 | 71 | 4 | 31 | 22 | 0 | 32 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 101 | 14 | 858 | 19 | 437 | 61 | 12 | 0 | 3 | 67 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 26 | 69 | 381 | 117 | 86 | 323 | 10 | 0 | 4 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Rocky Mountain Alpine Fell-Field | 0 | 0 | 35 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| Rocky Mountain Alpine Turf | 0 | 0 | 349 | 0 | 279 | 10 | 0 | 0 | 0 | 18 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 107 | 4 | 70 | 6 | 134 | 0 | 0 | 0 | 0 | 8 |
| Rocky Mountain Alpine Bedrock and Scree | 0 | 0 | 461 | 0 | 210 | 5 | 0 | 0 | 0 | 18 |
| Cultivated Cropland | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Recently Logged Areas | 0 | 0 | 1 | 0 | 7 | 0 | 0 | 0 | 0 | 8 |
| Open Water (Fresh) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |

| Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area | Colorado Roadless Rule Areas | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ecosystem | Pole Creek | Hot Springs | Trout Mountain / Elk Mountain | Beaver Mountain | Middle Alder | Wightman Fork / Upper Burro | Bennet Mountain / Blowout / Willow Creek / Lion Point / Greenie Mountain | Deep Creek / Boot Mountain | Spectacle Lake | Willow Mountain |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 17 | 70 | 495 | 292 | 2 | 4 | 636 | 41 | 190 | 26 |
| Rocky Mountain Aspen Forest and Woodland | 105 | 75 | 8,345 | 1,751 | 808 | 1,728 | 16,120 | 2,898 | 105 | 1,646 |
| Rocky Mountain Lodgepole Pine Forest | 0 | 3 | 598 | 12 | 29 | 2 | 5 | 42 | 0 | 0 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 90 | 11 | 5,547 | 1,831 | 1,523 | 1,595 | 6,523 | 5,746 | 0 | 3,930 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 50 | 3 | 6,808 | 872 | 399 | 655 | 9,393 | 4,446 | 3 | 2,600 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 11 | 66 | 100 | 66 | 138 | 46 | 451 | 496 | 0 | 20 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 169 | 16 | 1,379 | 792 | 1,033 | 276 | 3,992 | 391 | 6 | 75 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 46 | 2 | 2,399 | 549 | 400 | 89 | 2,875 | 181 | 161 | 7 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 99 | 25 | 1,347 | 169 | 725 | 15 | 1,643 | 35 | 9 | 11 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 59 | 0 | 355 | 60 | 42 | 2 | 535 | 0 | 0 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 7 | 0 | 0 | 0 | 2 | 0 | 1 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 2 | 3 | 0 | 7 | 0 | 5 | 0 | 0 | 0 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 184 | 178 | 3,999 | 395 | 315 | 81 | 2,361 | 1,685 | 44 | 39 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 0 | 10 | 0 | 0 | 0 | 5 | 0 | 5 | 0 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 37 | 14 | 606 | 54 | 5 | 107 | 123 | 1,026 | 0 | 151 |
| Rocky Mountain Alpine-Montane Wet Meadow | 0 | 0 | 177 | 16 | 1 | 1,249 | 2,784 | 3,403 | 9 | 745 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 1 | 0 | 595 | 43 | 7 | 452 | 1,831 | 3,627 | 87 | 551 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 10 | 0 | 3 | 0 | 0 | 0 | 8 | 7 | 0 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Alpine Fell-Field | 0 | 0 | 2 | 0 | 0 | 35 | 560 | 763 | 0 | 4 |
| Rocky Mountain Alpine Turf | 0 | 0 | 1 | 4 | 0 | 21 | 924 | 1,944 | 0 | 14 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 2 | 0 | 85 | 139 | 7 | 152 | 193 | 291 | 0 | 93 |
| Rocky Mountain Alpine Bedrock and Scree | 0 | 0 | 7 | 20 | 0 | 132 | 874 | 525 | 0 | 21 |
| Cultivated Cropland | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Recently Logged Areas | 0 | 0 | 24 | 10 | 0 | 8 | 132 | 66 | 0 | 30 |
| Open Water (Fresh) | 1 | 0 | 2 | 0 | 0 | 0 | 16 | 2 | 0 | 13 |

Rvsd Plan - 00001826

| Values are the estimated acres of each ecosystem occuring within each Idaho Inventoried Roadless Area | Colorado Roadless Rule Areas | | | | |
|---|---|---|---|---|---|
| Ecosystem | Alamosa River | Sulphur Tunnel | Indian Ridge | Cataract | Cochetopa Hills |
| Inter-Mountain Basins Aspen-Mixed Conifer Forest and Woodland | 230 | 3 | 0 | 0 | 0 |
| Rocky Mountain Aspen Forest and Woodland | 1,560 | 43 | 12 | 0 | 0 |
| Rocky Mountain Lodgepole Pine Forest | 0 | 4 | 0 | 0 | 0 |
| Rocky Mountain Subalpine Dry-Mesic Spruce-Fir Forest and Woodland | 853 | 884 | 502 | 0 | 12 |
| Rocky Mountain Subalpine Mesic Spruce-Fir Forest and Woodland | 1,331 | 565 | 732 | 0 | 1 |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 2 | 5 | 0 | 0 | 0 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 111 | 3 | 0 | 0 | 0 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 459 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 27 | 0 | 0 | 0 | 0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 9 | 0 | 0 | 0 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 4 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 0 | 0 | 0 | 0 | 0 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 50 | 31 | 9 | 0 | 0 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 60 | 21 | 13 | 0 | 0 |
| Rocky Mountain Alpine-Montane Wet Meadow | 5 | 24 | 0 | 0 | 0 |
| Rocky Mountain Subalpine-Montane Riparian Shrubland | 49 | 56 | 137 | 0 | 0 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 0 | 0 | 0 | 0 | 0 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain Alpine Fell-Field | 0 | 3 | 21 | 2 | 0 |
| Rocky Mountain Alpine Turf | 0 | 12 | 26 | 5 | 0 |
| Rocky Mountain Cliff, Canyon and Massive Bedrock | 85 | 171 | 4 | 0 | 0 |
| Rocky Mountain Alpine Bedrock and Scree | 0 | 17 | 161 | 6 | 1 |
| Cultivated Cropland | 0 | 0 | 0 | 0 | 0 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 0 | 0 | 0 | 0 | 0 |
| Recently Logged Areas | 0 | 0 | 0 | 0 | 0 |
| Open Water (Fresh) | 10 | 0 | 0 | 0 | 0 |

| Ecological Group ("Ecosystem") | Rio Grande NF Wilderness (Acres) | Rio Grande NF Non-Wilderness (Acres) | All Rio Grande NF (Acres) | % Rio Grande Wilderness | % Coverage, Rio Grande Forest Area |
|---|---|---|---|---|---|
| **Representation @ < 20%** | | | | | |
| Rocky Mountain Subalpine-Montane Limber-Bristlecone Pine Woodland | 4,044 | 17,524 | 21,569 | 18.8 | 1.2 |
| Rocky Mountain Subalpine-Montane Mesic Meadow | 7,832 | 36,940 | 44,772 | 17.5 | 2.5 |
| Rocky Mountain Aspen Forest and Woodland | 28,744 | 180,349 | 209,094 | 13.7 | 11.6 |
| Recently Logged Areas | 2,809 | 21,751 | 24,560 | 11.4 | 1.4 |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 3,615 | 63,607 | 67,222 | 5.4 | 3.7 |
| Rocky Mountain Lodgepole Pine Forest | 1,801 | 43,089 | 44,890 | 4.0 | 2.5 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 2,069 | 56,698 | 58,767 | 3.5 | 3.3 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 6,478 | 184,796 | 191,274 | 3.4 | 10.6 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 2 | 126 | 128 | 1.6 | 0.0 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 22 | 1,812 | 1,833 | 1.2 | 0.1 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 39 | 3,590 | 3,629 | 1.1 | 0.2 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 634 | 63,099 | 63,733 | 1.0 | 3.5 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 3 | 567 | 571 | 0.6 | 0.0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 244 | 46,843 | 47,087 | 0.5 | 2.6 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 2 | 516 | 518 | 0.4 | 0.0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 180 | 180 | 0.0 | 0.0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 412 | 412 | 0.0 | 0.0 |
| Inter-Mountain Basins Semi-Desert Grassland | 0 | 1,265 | 1,265 | 0.0 | 0.1 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 6,470 | 6,470 | 0.0 | 0.4 |
| Inter-Mountain Basins Active and Stabilized Dune | 0 | 1 | 1 | 0.0 | 0.0 |
| **Total** | **58,339** | **729,636** | **787,975** | **7.4** | **43.7** |
| | | | | | |
| **Representation @ < 10%** | | | | | |
| Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest and Woodland | 3,615 | 63,607 | 67,222 | 5.4 | 3.7 |
| Rocky Mountain Lodgepole Pine Forest | 1,801 | 43,089 | 44,890 | 4.0 | 2.5 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 2,069 | 56,698 | 58,767 | 3.5 | 3.3 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 6,478 | 184,796 | 191,274 | 3.4 | 10.6 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 2 | 126 | 128 | 1.6 | 0.0 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 22 | 1,812 | 1,833 | 1.2 | 0.1 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 39 | 3,590 | 3,629 | 1.1 | 0.2 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 634 | 63,099 | 63,733 | 1.0 | 3.5 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 3 | 567 | 571 | 0.6 | 0.0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 244 | 46,843 | 47,087 | 0.5 | 2.6 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 2 | 516 | 518 | 0.4 | 0.0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 180 | 180 | 0.0 | 0.0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 412 | 412 | 0.0 | 0.0 |
| Inter-Mountain Basins Semi-Desert Grassland | 0 | 1,265 | 1,265 | 0.0 | 0.1 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 6,470 | 6,470 | 0.0 | 0.4 |
| Inter-Mountain Basins Active and Stabilized Dune | 0 | 1 | 1 | 0.0 | 0.0 |
| **Total** | **14,910** | **473,072** | **487,981** | **3.1** | **27.1** |

**Representation @ < 5%**

| | | | | | |
|---|---|---|---|---|---|
| Rocky Mountain Lodgepole Pine Forest | 1,801 | 43,089 | 44,890 | 4.0 | 2.5 |
| Southern Rocky Mountain Mesic Montane Mixed Conifer Forest and Woodland | 2,069 | 56,698 | 58,767 | 3.5 | 3.3 |
| Southern Rocky Mountain Montane-Subalpine Grassland | 6,478 | 184,796 | 191,274 | 3.4 | 10.6 |
| Introduced Upland Vegetation - Perennial Grassland and Forbland | 2 | 126 | 128 | 1.6 | 0.0 |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 22 | 1,812 | 1,833 | 1.2 | 0.1 |
| Inter-Mountain Basins Montane Sagebrush Steppe | 39 | 3,590 | 3,629 | 1.1 | 0.2 |
| Southern Rocky Mountain Ponderosa Pine Woodland | 634 | 63,099 | 63,733 | 1.0 | 3.5 |
| Rocky Mountain Lower Montane-Foothill Shrubland | 3 | 567 | 571 | 0.6 | 0.0 |
| Southern Rocky Mountain Pinyon-Juniper Woodland | 244 | 46,843 | 47,087 | 0.5 | 2.6 |
| Rocky Mountain Subalpine-Montane Riparian Woodland | 2 | 516 | 518 | 0.4 | 0.0 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 180 | 180 | 0.0 | 0.0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 412 | 412 | 0.0 | 0.0 |
| Inter-Mountain Basins Semi-Desert Grassland | 0 | 1,265 | 1,265 | 0.0 | 0.1 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 6,470 | 6,470 | 0.0 | 0.4 |
| Inter-Mountain Basins Active and Stabilized Dune | 0 | 1 | 1 | 0.0 | 0.0 |
| **Total** | **11,295** | **409,465** | **420,759** | **2.7** | **23.3** |

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

**Background**
The Wilderness Society comments indicated the Wilderness Evaluation process should consider the suitability of Wilderness Inventory Areas with under-represented and rare ecosystems. The Wilderness Society utilized several sets of available information at the national scale to identify under-represented ecosystems in the National Wilderness Preservation System (NWPS).

The National Vegetation Classification System Group 6[1] data was used to identify the set of thirty-six ecological groups within the Inyo NF. For each ecological group on the forest, they provided two calculations: the percentage of an ecological group's total area that is within the NWPS; the percentage of an ecological group's area within the Inyo NF that is within designated wilderness. The ecological groups were divided into four classes of representation, which are termed categories A through D below.

**Category A** is ecological groups on the Inyo NF that have less than five percent of their area protected within the NWPS:
1. *Great Basin Xeric Mixed Sagebrush Shrubland- 3% protected in NWPS*
2. *Inter-Mountain Basins Big Sagebrush Shrubland-3% protected in NWPS*
3. *Inter-Mountain Basins Semi-Desert Shrub Steppe-2% protected in NWPS*
4. *Inter-Mountain Basins Mixed Salt Desert Scrub – 2% protected in NWPS*

**Category B** is ecological groups on the Inyo NF that have between five and ten percent of their area protected within the NWPS:
1. *Great Basin Foothill & Lower Montane Riparian Woodland and Shrubland- 9% protected in NWPS*
2. *Inter-Mountain Basins Montane Sagebrush Steppe – 7% protected in NWPS.*

**Category C** is ecological groups on the Inyo NF that have between ten and twenty percent of their area protected within the NWPS. The Wilderness Society indicated it considers ecosystems with less than twenty percent of its total area in the NWPS as inadequately represented[2].
1. *Great Basin Pinyon-Juniper Woodlands – 14% of ecosystem protected in NWPS*
2. *Rocky Mountain Aspen Forest and Woodland – 12% of ecosystem protected in NWPS.*

**Category D** is ecological groups on the Inyo NF that have more than twenty percent of their area protected within the NWPS, and are not discussed further.

**Data Management and processing**
1. Eight of thirty-six ecological types were not considered in this summary because their label indicated they are developed land.
2. Area size information was converted from hectares to acres.
3. Ecosystems in each category were ranked by size, largest to smallest.

---

[1] The National Vegetation Classification System website indicates the ecological context for Group 6 data: regional mesoclimate, geology, substrates, hydrology and disturbance regimes.
[2] The twenty percent representation threshold is based on Society for Conservation Biology and Convention on Biological Diversity targets (personal communication with Matt Dietz).

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001830

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

4. Ecosystems in each category with less than 1,000 total acres on all Inyo NF non-wilderness lands were not included in this summary.
5. For each category, the acres for the ecological groups in that category were summed for each wilderness inventory unit.
6. The percentage of each wilderness inventory unit's total area comprised of "under-represented" ecological groups was calculated for each of the Categories A-C.

The table below summarizes the Wilderness Society representation data for each wilderness inventory area listed in the polygon column:

**General location**: 1988 Forest Plan management area labels describe the general location of the inventory unit, and whether the unit is adjacent to designated wilderness.

**Size**: The area in acres indicated is the "parent polygon".

**Category A:** The summary first displays the percentage of the wilderness inventory unit comprised of Category A ecological groups, and the types of type of ecological groups in Category A within the inventory unit. Any ecological groups with more than 1,000 acres in an inventory unit is highlighted in bold font.

**Category B:** The summary first displays the percentage of the wilderness inventory unit comprised of Category B ecological groups, and the types of type of ecological groups in Category B within the inventory unit. Any ecological groups with more than 1,000 acres in an inventory unit is highlighted in bold font.

**Category C:** Next, the summary displays the percentage of the wilderness inventory unit comprised of Category C ecological groups, and the types of ecological groups in Category C within the inventory unit.  Any ecological groups with more than 1,000 acres in an inventory unit is highlighted in bold font. The difference between Category B and Category C for most inventory units is largely attributed to the addition of *Great Basin Pinyon-Juniper Woodland* in Category C acreage.

**Note:** The percent of the wilderness inventory unit comprised of Category B ecological groups includes the area of Category A ecological groups (the names of the Category A ecosystems, however, are not listed again under Category B).  The percent of the wilderness inventory unit comprised of Category C ecological groups includes the area of both Category A and B ecological groups

**Inyo NF Representation:** The percentage of a unit's area comprised of ecological groups with less than twenty percent total acreage for the ecological group on the Inyo NF in designated wilderness.  The twenty percent representation is the only category displayed for Inyo NF because only six of fifty-five wilderness inventory units have more than 1,000 acres of ecological groups with less than twenty percent of their total acreage on the forest in designated wilderness.  The ecological groups in this category include:

Rvsd Plan - 00001831

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

- *Inter-Mountain Basins Mixed Salt Desert Scrub*
- *Great Basin Xeric Mixed Sagebrush Shrubland*
- *Inter-Mountain Basins Semi-Desert Shrub Steppe*

| Wilderness Inventory Units | National Vegetation Classification System summary |
|---|---|
| 944 | **General location:** Benton-Casa Diablo Management Area<br>**Size:** 7,629 acres<br><br>**Category A:** 40% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>  • *Great Basin Xeric Mixed Sagebrush Shrubland*<br>  • ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>  • *Inter-Mountain Basins Semi-Desert Shrub Steppe*<br>  • *Inter-Mountain Basins Mixed Salt Desert Scrub*<br><br>**Category B:** 61% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>  • ***Inter-Mountain Basins Montane Sagebrush Steppe***<br><br>**Category C:** 100% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>  • ***Great Basin Pinyon-Juniper Woodlands***<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| 995 | **General location:** Benton-Casa Diablo Management Area<br>**Size:** 5,806 acres<br><br>**Category A:** 2% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>  • *Inter-Mountain Basins Big Sagebrush Shrubland*<br>  • *Great Basin Xeric Mixed Sagebrush Shrubland*<br><br>**Category B:** 35% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>  • ***Inter-Mountain Basins Montane Sagebrush Steppe*** |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001832

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

| | |
|---|---|
| | • *Great Basin Foothill & Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 98% percent of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodlands*** |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1012** | **General location:** Glass Mountain and Benton-Casa Diablo Management Areas<br>**Size:** 40,368 acres |
| | **Category A:** 10% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• *Inter-Mountain Basins Mixed Salt Desert Scrub*<br>• *Great Basin Xeric Mixed Sagebrush Shrubland*<br>• *Inter-Mountain Basins Semi-Desert Shrub Steppe* |
| | **Category B:** 32% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 75% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland* |
| | **Inyo NF representation:** Less than one percent of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1039** | **General location:** Glass Mountain Management Area<br>**Size:** 11,026 acres |
| | **Category A:** 3% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>• *Great Basin Xeric Mixed Sagebrush Shrubland* |

**Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/1⸱**

Rvsd Plan - 00001833

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

|  |  |
|---|---|
|  | **Category B:** 20% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 97% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1068** | **General location:** Glass Mountain Management Area<br>**Size:** 12,311 acres<br><br>**Category A:** 20% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• *Inter-Mountain Basins Mixed Salt Desert Scrub*<br>• *Great Basin Xeric Mixed Sagebrush Shrubland*<br>• *Inter-Mountain Basins Semi-Desert Shrub Steppe*<br><br>**Category B:** 63% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 93% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** Less than one percent of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1072** | **General location:** Mono Basin and Glass Mountain Management Areas<br>**Size:** 7,574 acres |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001834

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

| | |
|---|---|
| | **Category A:** 57% percent of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br><br>**Category B:** 57% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 69% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1080** | **General location:** South Sierra Management Area<br>**Size:** 1,137 acres adjacent to South Sierra Wilderness<br><br>**Category A:** 39% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B: none**<br><br>**Category C:** 52% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1081** | **General location:** South Sierra Management Area<br>**Size:** 5,413 acres adjacent to Golden Trout Wilderness<br><br>**Category A:** 8% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland* |

Rvsd Plan - 00001835

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

| | |
|---|---|
| | **Category B: none** |
| | **Category C:** 27% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1092** | **General location:** Golden Trout Management Area<br>**Size:** 4,552 acres adjacent to Golden Trout Wilderness |
| | **Category A:** 1% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland* |
| | **Category B:** 1% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 23% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1098** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 1,476 acres adjacent to John Muir Wilderness |
| | **Category A:** None |
| | **Category B:** Less than one percent of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 5% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001836

**Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1099** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 1,092 acres adjacent to John Muir Wilderness<br><br>**Category A:** None<br><br>**Category B:** Less than one percent of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br><br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 13% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1106** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 1,408 acres adjacent to John Muir Wilderness<br><br>**Category A:** 2% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** 4% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 17% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001837

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1108** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 2,100 acres adjacent to John Muir Wilderness<br><br>**Category A:** Less than one percent of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** Less than one percent of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br><br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 5% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS.  Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1109** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 1,319 acres adjacent to John Muir Wilderness<br><br>**Category A:** 5% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** 5% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** Ten percent of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/1·

Rvsd Plan - 00001838

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

|  |  |
|---|---|
|  | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1110** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 1,650 acres adjacent to John Muir Wilderness |
|  | **Category A:** 2% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>• *Great Basin Xeric Mixed Sagebrush Shrubland* |
|  | **Category B:** 2% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
|  | **Category C:** 6% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS.  Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |
|  | **Inyo NF representation:** 7% of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1112** | **General location:** Owens Valley Escarpment Management Area<br>**Size:** 4,949 acres adjacent to John Muir Wilderness |
|  | **Category A:** 33% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Great Basin Xeric Mixed Sagebrush Shrubland*<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• *Inter-Mountain Basins Semi-Desert Shrub Steppe*<br>• *Inter-Mountain Basins Mixed Salt Desert Scrub* |
|  | **Category B:** 35% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Inter-Mountain Basins Montane Sagebrush Steppe*<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
|  | **Category C:** 46% of the inventory unit is comprised of ecological groups which |

Rvsd Plan - 00001839

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

| | |
|---|---|
| | have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include: <br> • *Great Basin Pinyon-Juniper Woodland* <br> • *Rocky Mountain Aspen Forest and Woodland* <br><br> **Inyo NF representation:** 23% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1115** | **General location:** Owens Valley Escarpment Management Area <br> **Size:** 3,485 acres adjacent to John Muir Wilderness <br><br> **Category A:** 82% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS: <br> • *Great Basin Xeric Mixed Sagebrush Shrubland* <br> • ***Inter-Mountain Basins Big Sagebrush Shrubland*** <br> • *Inter-Mountain Basins Semi-Desert Shrub Steppe* <br> • *Inter-Mountain Basins Mixed Salt Desert Scrub* <br><br> **Category B:** 84% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include: <br> • *Inter-Mountain Basins Montane Sagebrush Steppe* <br> • *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* <br><br> **Category C:** 100% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include: <br> • *Great Basin Pinyon-Juniper Woodland* <br><br> **Inyo NF representation:** 5% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1116** | **General location:** Owens Valley Escarpment Management Area <br> **Size:** 2,437 acres adjacent to John Muir Wilderness <br><br> **Category A:** 55% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS: <br> • *Great Basin Xeric Mixed Sagebrush Shrubland* <br> • ***Inter-Mountain Basins Big Sagebrush Shrubland*** <br> • *Inter-Mountain Basins Semi-Desert Shrub Steppe* <br> • *Inter-Mountain Basins Mixed Salt Desert Scrub* <br><br> **Category B:** 61% of this inventory unit is comprised of ecological groups which |

Rvsd Plan - 00001840

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Inter-Mountain Basins Montane Sagebrush Steppe*<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 98% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br><br>**Inyo NF representation:** 2% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1140** | **General location:** Coyote Management Area<br>**Size:** 75,299 acres adjacent to the John Muir Wilderness<br><br>**Category A:** 13% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Great Basin Xeric Mixed Sagebrush Shrubland***<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• *Inter-Mountain Basins Semi-Desert Shrub Steppe*<br>• ***Inter-Mountain Basins Mixed Salt Desert Scrub***<br><br>**Category B:** 29% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 65% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** 2% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1147** | **General location:** Rock Creek-Pine Creek Management Area<br>**Size:** 1,351 acres adjacent to John Muir Wilderness<br><br>**Category A:** 22% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the |

     **Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14**

Rvsd Plan - 00001841

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>**Category B:** None<br><br>**Category C:** 37% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1148** | **General location:** Rock Creek-Pine Creek Management Area<br>**Size:** 1,756 acres adjacent to John Muir Wilderness<br><br>**Category A:** 7% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** 8% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 19% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1154** | **General location:** Rock Creek-Pine Creek Management Area<br>**Size:** 5,243 acres adjacent to John Muir Wilderness<br><br>**Category A:** 8% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>• *Inter-Mountain Basins Mixed Salt Desert Scrub*<br><br>**Category B:** 10% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological |

**Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14**

Rvsd Plan - 00001842

Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System

|  |  |
|---|---|
|  | groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 54% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1155** | **General location:** Rock Creek-Pine Creek Management Area<br>**Size:** 3,498 acres adjacent to John Muir Wilderness<br><br>**Category A:** 1% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** 3% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland*<br><br>**Category C:** 35% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland*<br><br>**Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1156** | **General location:** Convict-McGee Management Area<br>**Size:** 5,129 acres adjacent to John Muir Wilderness<br><br>**Category A:** 22% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br><br>**Category B:** 24% percent of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include: |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001843

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | • *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 57% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| 1159 | **General location:** Mammoth Escarpment Management Area<br>**Size:** 14,833 acres adjacent to John Muir Wilderness |
| | **Category A:** 11% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland*** |
| | **Category B:** 11% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 27% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland* |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| 1161 | **General location:** Reds Meadow-Fish Creek Management Area<br>**Size:** 1,656 acres adjacent to Ansel Adams Wilderness |
| | **Category A and B:** Almost none of this area is comprised of ecosystems which have less than ten percent of their total area protected in the National Wilderness Preservation System: |
| | **Category C:** 2% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland*<br>• *Rocky Mountain Aspen Forest and Woodland* |

**Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14**

Rvsd Plan - 00001844

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

|  |  |
|---|---|
|  | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1164** | **General location:** Reds Meadow-Fish Creek Management Area<br>**Size:** 1,017 acres adjacent to Ansel Adams Wilderness |
|  | **Categories A, B and C:** Almost none of this area is comprised of ecosystems which have less than ten percent of their total area protected in the National Wilderness Preservation System: |
|  | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1179** | **General location:** Walker-Parker Management Area<br>**Size:** 7,212 acres adjacent to Ansel Adams Wilderness |
|  | **Category A:** 10% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland* |
|  | **Category B:** 10% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
|  | **Category C:** 51% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland***<br>• *Rocky Mountain Aspen Forest and Woodland* |
|  | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1195** | **General location:** Mono Basin Management Area<br>**Size:** 2,008 acres adjacent to Ansel Adams Wilderness |
|  | **Category A:** 21% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>**Category B: none** |
|  | **Category C:** 68% of the inventory unit is comprised of ecological groups which |

Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14

Rvsd Plan - 00001845

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include: <br> • *Great Basin Pinyon-Juniper Woodland* <br> • *Rocky Mountain Aspen Forest and Woodland* <br><br> **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| 1208 | **General location:** Lee Vining Management Area <br> **Size:** 2,516 acres adjacent to Ansel Adams Wilderness <br><br> **Category A:** 1% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS: <br> • *Inter-Mountain Basins Big Sagebrush Shrubland* <br> **Category B: none** <br><br> **Category C:** 2% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include: <br> • *Great Basin Pinyon-Juniper Woodland* <br> • *Rocky Mountain Aspen Forest and Woodland* <br><br> **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| 1211 | **General location:** Lee Vining Management Area <br> **Size:** 1,949 acres adjacent to Ansel Adams Wilderness <br><br> **Category A:** 4% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS: <br> • *Inter-Mountain Basins Big Sagebrush Shrubland* <br><br> **Category B:** 4% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS. Ecological groups in category B include: <br> • *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* <br><br> **Category C:** 34% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include: <br> • *Great Basin Pinyon-Juniper Woodland* <br> • *Rocky Mountain Aspen Forest and Woodland* <br><br> **Inyo NF representation:** This inventory unit does not contain any ecological |

**Revised by Jeff Novak 11/25/2014; Edited by C. Boston on 11/19/14**

Rvsd Plan - 00001846

**Inyo NF Wilderness Inventory Areas
Summary of The Wilderness Society's data on
Under-represented Ecosystems in the National Wilderness Preservation System**

| | |
|---|---|
| | groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1232** | **General location:** Inyo Mountains Management Area<br>**Size:** 3,205 acres adjacent to South Sierra  Wilderness |
| | **Categories A and B**: Almost none of this area is comprised of ecosystems which have less than ten percent of their total area protected in the National Wilderness Preservation System. |
| | **Category C:** 9% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS.  Ecological groups in Category C include:<br>• *Great Basin Pinyon-Juniper Woodland* |
| | **Inyo NF representation:** This inventory unit does not contain any ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1236** | **General location:** Inyo Mountains Management Area<br>**Size:** 73,178 acres; a portion is adjacent to the Inyo Mountains Wilderness |
| | **Category A:** 32% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Great Basin Xeric Mixed Sagebrush Shrubland***<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• ***Inter-Mountain Basins Semi-Desert Shrub Steppe***<br>• *Inter-Mountain Basins Mixed Salt Desert Scrub* |
| | **Category B:** 44% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
| | **Category C:** 80% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS.  Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland*** |
| | **Inyo NF representation:** 7% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1242** | **General location:** White Mountains Management Area<br>**Size:** 10,084 acres |

Rvsd Plan - 00001847

**Inyo NF Wilderness Inventory Areas**
**Summary of The Wilderness Society's data on**
**Under-represented Ecosystems in the National Wilderness Preservation System**

|  |  |
|---|---|
|  | **Category A:** 8% of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• *Inter-Mountain Basins Big Sagebrush Shrubland*<br>• *Inter-Mountain Basins Montane Sagebrush Steppe* |
|  | **Category B:** 14% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• *Inter-Mountain Basins Montane Sagebrush Steppe* |
|  | **Category C:** 25% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland*** |
|  | **Inyo NF representation:** Less than one percent of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |
| **1246** | **General location:** White Mountains Management Area<br>**Size:** 43,230 acres |
|  | **Category A:** 43% percent of the inventory unit is comprised of the following ecological groups, which have less than five percent of their total area protected in the NWPS:<br>• ***Great Basin Xeric Mixed Sagebrush Shrubland***<br>• ***Inter-Mountain Basins Big Sagebrush Shrubland***<br>• *Inter-Mountain Basins Semi-Desert Shrub Steppe*<br>• ***Inter-Mountain Basins Mixed Salt Desert Scrub*** |
|  | **Category B:** 48% of this inventory unit is comprised of ecological groups which have less than ten percent of their total area protected in the NWPS.  Ecological groups in category B include:<br>• ***Inter-Mountain Basins Montane Sagebrush Steppe***<br>• *Great Basin Foothill and Lower Montane Riparian Woodland and Shrubland* |
|  | **Category C:** 96% of the inventory unit is comprised of ecological groups which have less than twenty percent of their total area protected in the NWPS. Ecological groups in Category C include:<br>• ***Great Basin Pinyon-Juniper Woodland*** |
|  | **Inyo NF representation:** 8% of the area of this inventory unit contains ecological groups with less than twenty percent of their area on the Inyo NF in designated wilderness. |

Rvsd Plan - 00001848