need to manage the forest to allow for species migration. Intact ecological zones connected to each other can buffer these changes and allow species to adapt to changing conditions in order to maintain continuous wildlife habitat.

## Overarching Comment

In short, within the above referenced context, we would like to provide scientific reports and maps created by CPLA for integration into the plan revision and assessment, as well as suggest a need for change statement:

**Need for Change:** Facilitate wildlife movement across the forest and onto surrounding private, state, and tribal lands.

A recent study by Tom Watts[1], as well as a map compiling existing wildlife corridors in the CPLA region (please see page 3), displays the cross-jurisdictional nature of wildlife movement, even between national forests. Please incorporate this data into your plan revision. Do not hesitate to contact us with any questions or comments about our thoughts on the plan revision. Thank you for your consideration.

Sincerely,

Monique DiGiorgio, Executive Director
970-335-8174 | chamapeak@gmail.com

---

[1] Watts, Tom. November 2014. A COMPILATION OF MULE DEER AND ELK POPULATION DATA FOR THE SAN JUAN/CHAMA BASIN. Online at http://www.chamapeak.org/pdf/Watts_FINAL%20REPORT-2014.pdf

Rvsd Plan - 00002112

**WILDLIFE MIGRATION OF MULE DEER AND ELK IN THE CPLA REGION**
*GIS data was collected from the Southern Ute Indian Tribe, Jicarilla Apache Nation, and Chama Peak Land Alliance, and is available upon request.*



3

Rvsd Plan - 00002113

| | |
|---|---|
| **From:** | Rick Schnaderbeck |
| **To:** | FS-comments-rocky-mountain-rio-grande |
| **Subject:** | ATV Use |
| **Date:** | Wednesday, July 29, 2015 5:14:59 PM |

Dear Forest Planner,

I wish to comment on ATV use on the RGNF. Allowing ATVs to go anywhere on the forest to retrieve big game has been a disaster. I believe this is the main reason behind the explosion of illegal rogue ATV trails on the Forest. One set of tracks related to big game retrieval quickly becomes tomorrows rogue trail. The expansion of illegal trails on the RGNF over the past 25 years is simply staggering. I believe the RGNF is the only Forest in Colorado to allow the "big game retrieval" use of ATVs at this level and I question the mindset behind it. Horses and friends seem to work well on other forests for packing out harvested animals and question why that cannot work on the RGNF.

I have also noticed ATV abuse by those grazing livestock on the Forest. A hunting friend stated that he confronted a livestock permittee operating an ATV off trail on the RGNF in Rio Grande County and the permittee stated he had special permission to use his ATV off designated trails. I surely hope this is not the Forest's Policy regarding ATV use by livestock permittees. I support the grazing of Forest lands but certainly not giving these folks special permission to use ATV's beyond the scope of the general public. Horses, mules, etc have worked well in the past for livestock permittees and giving these folks special permission to use ATV's is simply not right in these times of dramatically expanding illegal ATV trails.

Thanks for the chance to comment.
Sincerely,
Rick Schnaderbeck
4005 N. Rd 3 West
Monte Vista, CO 81144

## SAN LUIS VALLEY IRRIGATION DISTRICT

*P. O. Box 637     296 Miles Street*
*Center, Colorado 81125-0637*
*719-754-2254*

*August 11, 2015*

Dan Dallas
Forest Supervisor
Rio Grande National Forest
12105 Highway 160
Monte Vista, Colorado 81132

Re: Revised Forest Plan – Forest Service Water Rights

Dan:

I am writing to you on behalf of the San Luis Valley Irrigation District. During a meeting of the Rio Grande Basin Roundtable, the Forest Service discussed consideration of obtaining "additional" reserved water rights for the Rio Grande National Forest as part of the Revised Forest Plan process. After the presentation, members of the Roundtable voted and took the position that there should be no action under the Revised Forest Plan regarding federal reserved water rights. The Irrigation District fully supports that position.

Following the meeting, we reviewed the final decree of the Water Court in *Concerning the Application for Water Rights of the United States of America in Alamosa, Archuleta, Conejos, Hinsdale, Mineral, Rio Grande, Saguache, Costilla, and San Juan Counties, Colorado, Findings of Fact, Conclusions of Land, and Judgment and Decree,* Case No. 81CW183, District Court, Water Division No. 3, Colorado (March 30, 2000) ("Decree"), in which the water rights for the Rio Grande National Forest were finally settled, and a determination of all of the United States' reserved water rights for the Forest were decreed. As you are aware, the Decree was the result of extensive, hard fought, and thorough negotiations; and, it recognizes in several paragraphs that it is a final and complete resolution of all the United States' water right claims.

In light of the specific language in the Decree, the history of the litigation and negotiations, and the vote of the Roundtable, the Irrigation District believes, as stated above, that no additional action is necessary regarding federal reserved water rights in the Rio Grande National Forest.

Thank you for your consideration of the Irrigation District's position on this matter.

Sincerely,

Randall K. Palmgren,
President of the Board of Directors
San Luis Valley Irrigation District

Rvsd Plan - 00002115



P.O. Box 2800
Pagosa Springs, CO 81147

Business Office: (970) 264-5639          Ski Report 800-SKI-WOLF          Fax: (970) 264-2392
Web Site: www.wolfcreekski.com                    Email: wolfcreekski@wolfcreekski.com

Tuesday, August 25, 2015

Rio Grande Forest Plan Comments
13308 US Hwy 160
Del Norte CO 81132
comments-rocky-mountain-rio-grande@fs.fed.us

Dear Mr. Dallas,

Last year, Wolf Creek Ski Area (WCSA) celebrated its seventy fifth consecutive season of operation as a ski area, thirty-eight of which were under the ownership and management of the Pitcher Family. The last Forest Plan was implemented in 1996 and used as a guiding document for the development of WCSA. For the most part, the 1996 Forest Plan was adequate as a planning document. The two largest factors that were unforeseen at the time of publication was the exponential growth of motorized winter backcountry travel and the nearly forest wide infestation and resulting mortality of the Engelmann spruce. These changes, along with the unforeseen revolution in ski manufacturing creating a modern skier that can access more varied terrain than ever regardless of skill level, will have the greatest affect both directly and indirectly on the recreational experience at WCSA. When looking to the next 20 years (the effective lifespan of the Forest Plan), these changing conditions should be taken into consideration. It is entirely possible that there will be unforeseen factors that arise in the next twenty years and WCSA advocates for some flexibility to be built into the Plan in order to accommodate future changes.

In order to clearly articulate WCSA's position and to simplify the canvassing process for the RGNF, we are providing the Forest with the following comments and insights to be considered.

## WINTER RECREATION AT WCSA
WCSA and the Rio Grande National Forest (RGNF) have committed to the general philosophy that highly developed (MA8) winter recreation has a large role in facilitating public use and enjoyment of forest lands and that this is a sound principle to operate under. This is reflected in the continued cooperative efforts to upgrade and improve access to WCSA's existing permit area and to plan for and acknowledge the need for future improvements.

WCSA remains committed to developing a winter recreational experience that continues to be accessible and affordable to the public at large. With the changes in climate and the advancements in ski equipment, WCSA foresees a need to provide greater access to terrain that is not developed in the more traditional method of clear cutting trails with a large dependence on grooming to maintain a skiable product. WCSA asks that the new Forest Plan support this premise by acknowledging that modern ski areas be developed based on an experiential model in which the overall skiing experience is valued and considered when lift infrastructure is proposed.

The groundwork for this has been laid out by the RGNF, while not pre-decisional, by accepting WCSA's Master Development Plan (MDP) signed in 2012. This document acknowledges the proposed expansion into the San Juan National Forest.

1. As part of our accepted MDP on file with the RGNF, WCSA advocates for the expansion of our Special Use Permit (SUP) by designating approximately 85 acres near Alberta Park Reservoir as MA8, and thus facilitate the commencement of the environmental analysis process. This is high quality north facing terrain in a highly accessible area that the public would enjoy with or without lift infrastructure. We believe that this would add to the continued enjoyment of WCSA and that it would tie in well with the planned Meadow lift with the use of a short snowcat shuttle. As the public continues its interest in the pseudo-backcountry skiing experience we believe this would be a well-used area. Wolf Creek Ski Area is prepared to make improvements to this area by removing hazard trees and mitigating undergrowth issues, which will make this terrain more user friendly for the visiting public.

2. The landscape changing event brought on by the spruce beetle and the resulting Engelmann spruce mortality was not contemplated in the 1996 Forest Plan. This has killed over 90% of all spruce trees on Wolf Creek's Special Use Permit and presents a formidable challenge for the management of WCSA. We request that special consideration be given to WCSA in the forthcoming Forest Plan that allows for a cooperative dynamic process of dealing with the safety, recreational, and ascetic needs of WCSA. These considerations should include non-traditional timber sale techniques that allow for the flexibility for the RGNF staff to facilitate timber removal at WCSA.

3. Snowmobile use around Wolf Creek's SUP has grown exponentially in the past 20 years. While we believe that all recreational opportunities should be allowed on public lands, WCSA management also believes that the simple matter of developing and enforcing a meaningful maximum noise standard would allow for continued recreational use of snowmobiles (including commercial use) while taking into account that skiers generally enjoy some level of peace and quiet. WCSA understands that there is noise generated by the highway, our snow removal equipment and standby generators, but we also feel, given the exponential growth in snowmobiling and the high level of

modifications done to these machines, that there is an argument that they create too much noise.

## WATER

WCSA has 2.5 million gallons of water rights, jointly owned by WCSA and the USFS, which have been earmarked for building out our snowmaking system. We currently have storage for 500,000 gallons and have been approved to build a second 500,000 gallon holding tank. We intend to use this water for our scattered snowmaking system, which serves to augment natural snowfall during late season openings and low snow years. We believe that snowmaking is a pertinent use of this resource as part of our commitment to provide the public with an enjoyable ski experience on public lands.

Wolf Creek is committed to water conservation and quality control. Three modern water-free restrooms facilities are currently in use on the mountain. These environmentally friendly restrooms are water-free, composting and certified zero discharge. Low water-usage toilets have been in place in all other restroom facilities at the ski area since 1982 long before it was commonplace to conserve water resources. Also, Wolf Creek Ski Area has conducted bi-annual in depth water sampling since 2002 by an independent water firm of all major streams passing through the Special Use Permit.

## LAND USE

As part of the Forest Plan, we support a winter use survey as the backbone of a land use management plan. Better signage will alleviate multi-use congestion areas and a travel management plan should balance motorized and non-motorized use areas. The Rio Grande National Forest could facilitate private-public partnerships to augment trail maintenance work where the effect of beetle kill overwhelms RGNF recreation staff.

In reviewing relevant documents, WCSA has determined that the report generated by the Winter Wildlands Alliance is both thoughtful and comprehensive. We therefore believe that the USFS should incorporate this data and analysis to create some quality backcountry areas that are not subject to motorized use, but are easily reached in a normal day of skiing.

We believe that there is an opportunity for meaningful change in logging practices over the next 20 years. With the decimation of tree stands by the spruce beetle there is ample timber for the growth of local cottage industry. This should be in conjunction with a plan for the future, which will enhance accessibility by building needed road infrastructure or upgrading existing roads usable for recreation as well. For example, the skiable, steep, north facing terrain on Thunderhead Mountain (the power lines) would greatly benefit from tree removal and glading. Select timber sales such as this would improve backcountry skiing as well as enhance the forest experience for other user groups as well.

WCSA believes that the Pass Creek Yurt would benefit from a non-motorized designation around their yurt, which is currently surrounded by snowmobile use, consequently detracting from the intended recreational use.

**WILDERNESS**
Given the large percentage of designated wilderness in the South San Juan and the Weminuche, we do not think there needs to be additional allocation of wilderness. It is difficult to keep up with trail maintenance due to wilderness restrictions on transportation and tools and therefore travel has become cumbersome in these areas. With the overwhelming amount of standing dead spruce stands on the RGNF, we think these public lands are better managed without additional wilderness designations.

**ENERGY AND MINERALS**
Wind power and solar energy are abundant natural resources and are currently underutilized as an energy source on the RGNF. We recommend that the RGNF designate public land for commercial development of both of these energy sources. The harnessing of wind and solar energy would attract competitive industry to the surrounding communities and will add well paying jobs to the area. On the flip side, until there are more scientific studies about the consequences of hydraulic fracturing, WCSA does not want it to be permitted on the RGNF, and notably, at the headwaters of a major US river system.

**IN CLOSING**
Wolf Creek Ski Area appreciates the opportunity to participate in the Forest Plan revision and we are happy to discuss any of the aforementioned items at length. We look forward to staying involved with this process over the next couple of years and are hopeful that this is part of a meaningful document that will guide forest management in decades to come.

Sincerely,

Davey Pitcher
President & CEO
Wolf Creek Ski Area



710 10th Street • Golden, CO 80401 • 303.279.3080 • www.cmc.org

September 2, 2015

Rio Grande National Forest
Attn: Plan Revision Team
1803 W. Highway 160
Monte Vista, CO 81144
comments-rocky-mountain-rio-grande@fs.fed.us

**RE: Rio Grande Forest Plan Revision, Recreation Assessment**

Dear Forest Planning Team,

On behalf of the Backcountry Snowsports Initiative (BSI) and Winter Wildlands Alliance, we are pleased to submit comments during the assessment phase of the Rio Grande National Forest Plan revision process. We appreciate the opportunity to provide public input early and often as these decisions will impact our constituents – backcountry skiers, split-boarders, cross country skiers, snowshoers and winter mountaineers.

The Backcountry Snowsports Initiative is a program within the Colorado Mountain Club's Conservation department which advocates for human-powered winter recreation across the state. Through our network of 1,200 supporters, grassroots advocacy organizations, local snowsports clubs, corporate partners and national associates we promote access to and protection of winter landscapes that provide pristine recreation opportunities. In the past, we've worked closely with local groups on winter travel planning and land use designations on Rabbit Ears/Buffalo Pass, Wolf Creek Pass, and the White River National Forest in coordination with the Vail Pass Task Force, among others. We also work closely with Winter Wildlands Alliance, a national advocacy group, to amplify our voice on large campaigns like the new Over-Snow Vehicle travel rule released in early 2015. Winter Wildlands Alliance is a national non-profit organization dedicated to promoting and preserving winter wildlands, and a quality human-powered snowsports experience on public lands. WWA has 1,300 direct members and a network of 35 grassroots groups across 11 states. BSI and WWA supporters include both residents of the San Luis Valley and visitors to the Rio Grande National Forest who all have a strong interest in the Forest Plan revision as it pertains to management of winter landscapes and winter recreation in Southern Colorado.

**Social Trends & Economic Impacts of Recreation**

Recreation and human-powered winter recreation in particular, are significant factors in Colorado's culture and local economies. According to the Outdoor Industry Association, outdoor recreation generates $13.2 billion in consumer spending in Colorado, 125,000 direct Colorado jobs, $4.2 billion in salaries, and $994 million in state and local revenue.[1] Skiing has long been present on the forest, though it has seen significant growth since the forest plan was last revised.

---

[1] https://outdoorindustry.org/images/ore_reports/CO-colorado-outdoorrecreationeconomy-oia.pdf

Human-powered snowsports are the fastest growing segments of winter recreation and include backcountry skiing (sometimes referred to as telemarking or telemark skiing), alpine touring, snowshoeing and cross-country skiing. The Outdoor Industry Foundation's *2013 Outdoor Recreation Participation Report*[2] found that over the previous three years national participation in snowshoeing increased by 41% and telemark skiing by 3.2%. Of all forms of active outdoor recreation studied, telemark skiing had the third highest rate of growth in the past 3 years. Furthermore, a 2012 study released by the Physical Activity Council[3] showed single digit annual growth rates in human-powered snowsports, despite a decline in participation in motorized snowsports, and winter recreation in general. According to the Snowsports Industries of America, over six million skiers and snowboarders explored the backcountry during the 2013/2014 season[4] and the sale of backcountry ski equipment rises substantially each year.[5]

At the same time, there has been a significant decrease in the popularity of snowmobiling across the nation. The International Snowmobile Manufacturers Association reports the sale of snowmobiles within the United States has dropped from 91,670 in 2006 to 58,299 in 2015, a 36% decline, while total U.S. snowmobile registrations continues to hover around 1.3 million.[6] In Colorado, snowmobile registrations with Colorado Parks and Wildlife have remained fairly stable, or showed a slight decline, to around 31,000 registrations per year. Internal USDA research predicts a similar trend into the future, with undeveloped skiing (which includes ski touring) projected as one of the top five growth activities in the next several decades while motorized snow activities will see one of the lowest rates of participation growth. The number of participants in undeveloped skiing, according to agency research, is projected to increase by 55 – 106 percent by 2060.[7]

This comparison is useful as part of the assessment is developing a need for change. While both motorized and non-motorized winter recreation are popular on the Rio Grande NF, recent trends and the USFS's own projections indicate that non-motorized use will increase substantially more over the plan period and beyond. Additionally, the population in Colorado is projected to double by 2050[8] meaning even more pressure on public lands for recreation opportunities over the lifetime of the RGNF plan. This industry growth provides a variety of economic development opportunities for communities in the San Luis Valley that are largely underemployed and impoverished. From guiding services and gear sales to hut rentals and dining services, there are a multitude of business opportunities associated with this growth. Winter recreation management guidelines should support this growing demographic and include proactive management strategies to ensure user conflicts are low and user experience remains high.

---

[2] *2013Outdoor Recreation Participation Report* (2013):
https://outdoorindustry.org/images/researchfiles/ParticipationStudy2013.pdf?193
[3] *Physical Activity Council's 2012 Participation Report*
http://www.physicalactivitycouncil.com/PDFs/2012PacReport.pdf
[4] SIA Snow Sports Mid-Season Market Intelligence Report (2014-2015)
[5] SIA Snow Sports Market Intelligence Report (2014-2015)
[6] http://www.snowmobile.org/docs/isma-snowmobiling-fact-book.pdf
[7] Outdoor recreation trends and futures: a technical document supporting the Forest Service 2010 RPA Assessment. Ken Cordell. http://www.srs.fs.usda.gov/pubs/gtr/gtr_srs150.pdf
[8] Colorado Water Conservation Board, *The Municipal & Industrial Water Supply and Demand Gap* http://cwcb.state.co.us/water-management/water-supply-planning/Pages/TheWaterSupplyGap.aspx

**Opportunities for Human Powered Recreation**

The Rio Grande National Forest contains a plethora of winter recreation opportunities for a variety of user types and ability levels. Human-powered winter recreationists seek abundant snow, terrain of varied aspects, elevations, and steepness, and a sense of remoteness and solitude, yet generally travel within a three to five mile buffer of a road during day trips. Longer overnight trips – which often include a stay in a hut or yurt on the forest – allow skiers to move deeper into the backcountry. Both of these experiences are highly valued by backcountry skiers, and the Rio Grande offers both – especially during the spring when days are long, snowpack is generally more stable, and roads offer greater access. Additionally, cross country skiing is gaining popularity through new groups like the Crestone Nordic Club which introduces new users to the sport and helps maintain groomed routes on the forest.

The Rio Grande National Forest is unique in that users can still find solitude in many areas, but as use increases, user conflict and safety becomes an increasing concern. It is important that the forest regulate snowmobile activity so that this use does not lead to conflict in areas that are important for quiet winter recreation or wildlife. Cumbres Pass and Wolf Creek Pass, for example, are popular multi-use areas that require additional agency management to minimize impacts between recreationists. Although winter recreation maps exist for both sites, they have not been through an adequate public process to meet the requirements of the new Over-Snow Vehicle (OSV) rule. During the Forest Plan revision process, we recommend that the forest identify these sites, and others, that will require more in-depth winter travel planning. We understand that route-by-route travel planning will not be conducted during the forest plan but we believe area designations such as "OSV travel restricted to designated routes" and "motorized travel prohibited" are appropriate in certain areas to protect wildlife habitat and opportunities for quiet winter recreation. By the same token, there may be areas appropriate for "open" motorized cross-country travel where OSVs will not have significant impacts on natural resources, wildlife or other user groups.

We've assembled some general guidelines and recommendations for winter recreation planning based on other Forest travel plans and encourage you to keep these in mind throughout the planning process:
- Engage all user groups in stakeholder meetings throughout the process
- Gather data on current winter backcountry use to better inform planning*
- Consider "Snow" as a resource to be managed for a variety of uses (recreation, habitat, view sheds, soundscapes, climate, economic value, etc.) just as you would consider soil or water or timber.
- Create non-motorized buffer zones around huts and yurts – preserves quiet, private experience
- Create non-motorized buffer zones around wilderness areas – reduces accidental boundary crossings by OSVs, preserves quiet experience for recreationists and wildlife
- Set minimum snow depth for OSV use at 18" to protect underlying soils and vegetation
- Use easily-identifiable geographic boundaries (ridges, cliff bands, roads) as borders between open/closed/restricted areas – reduces confusion and unauthorized use
- Implement seasonal OSV closures for critical wildlife habitat including Lynx and large ungulate winter range.

*BSI is in the process of collecting winter recreation data from users across the state in order to help public land management agencies understand where users are traveling, where conflicts are occurring, and which areas are appropriate for OSV closures or restrictions. We will be hosting mapping workshops and will provide data to the Rio Grande National Forest periodically throughout the plan revision process.

## Conclusion

The Rio Grande National Forest offers a variety of winter recreation opportunities and we look forward to working with you to bring balanced management to the backcountry. We also want to emphasize our interest in collaborating with all stakeholder groups to find collaborative and proactive solutions throughout the forest. The Backcountry Snowsports Initiative – and our partner groups and supporters – will continue to provide data, recommendations, policy expertise and outreach to our community throughout the forest plan revision and implementation process. Please keep us informed of the process and feel free to contact me at any time to discuss these comments in more detail.

Sincerely,

Julie Mach
Conservation Director
Colorado Mountain Club
(303)996-2764
juliemach@cmc.org

Hilary Eisen
Recreation Planning Coordinator
Winter Wildlands Alliance
(208) 629-1986
heisen@winterwildlands.org

For more information about the Backcountry Snowsports Initiative visit www.cmc.org/BSI

For more information about Winter Wildlands Alliance visit www.winterwildlands.org



# Intermountain Forest Association

2218 Jackson Blvd, Ste 10, Rapid City, SD  57702
605-341-0875    Fax  605-341-8651

February 3, 2016

Mr. Dan Dallas
Rio Grande NF
1803 W. Highway 160
Monte Vista, CO 81144

Dear Mr. Dallas:

On behalf of the members of the Intermountain Forest Association, I appreciate
this opportunity to offer comments regarding the Southern Rockies Lynx
Amendment (SRLA) direction for your consideration in preparing the
Assessment and Need to Change for the Rio Grande NF forest plan revision.

IFA has carefully followed the listing of Canada lynx and the Forest Service's
response to that listing.  IFA has commented repeatedly on the development and
implementation of the SRLA, including the adverse effects of that direction on
forest management, timber outputs, and forest health in the national forests in
Colorado and southern Wyoming.

Among other things, the U.S. Fish and Wildlife Service's Final Rule listing the
Canada lynx as Threatened stated, in reference to the Northern Rockies/
Cascades and Southern Rockies:

> "However, considering the overall proportions of lynx forest types
> affected, timber harvest and precommercial thinning on Federal lands are
> not currently conducted, nor are they likely in the projected future to be
> conducted, at levels likely to impact lynx at the population level" (March
> 24, 2000 Federal Register, p 16072).

The 2008 SRLA amended the RGNF forest plan to "add consistent management
direction that will conserve the Canada lynx."  The SRLA was designed as short-
term direction until the affected forest plans were revised; at the time, plan
revisions were anticipated to be completed shortly.  In our view, the SRLA was
overly restrictive with regard to forest management, especially considering the

relatively low quality lynx habitat in Colorado national forests. The USFWS has repeatedly discussed the low quality of habitat in the Southern Rockies Geographic Area for lynx, including the following three quotes from the September 12, 2014 Federal Register:

> "… we conclude that habitat in Colorado and other parts of the Southern Rockies is marginal, naturally fragmented, and disjunct; that it has not been historically capable of supporting natural resident lynx populations; that it has not been demonstrated to contain all of the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx populations over the long term (i.e., it does not contain the [Primary Constituent Element]); and that it is not essential to the conservation of the [Distinct Population Segment]" (p 54795).

> -"even the best potential lynx habitat in the Southern Rocky Mountains is marginal and unlikely to support lynx populations over time" (p 59817).

> -"the contribution of the Southern Rockies to the persistence of lynx in the contiguous United States is presumably minimal" (p 59817).

The SRLA Record of Decision requires the Forest Service to review and reconsider the direction in the SRLA when the forest plans for each of the affected national forests is revised. We view the revision of the RGNF forest plan as an opportunity to consider what has been learned since the SRLA was approved, and, using that information, to update the lynx direction in the revised forest plan.

Some of our comments are not as applicable to the RGNF as to other national forests in the Southern Rockies Geographic Area; however, since the RGNF is the first of the affected national forests to revise its forest plan, it's important to raise and address these issues now as the RGNF will establish precedents for subsequent forest plan revisions.

Best Available Scientific Information
We applaud the RGNF's initiative in inviting Dr. John Squires to conduct research into lynx populations on the RGNF, and look forward to working with you to review and incorporate his research findings, as well as other applicable science, into applied forest management through the revised forest plan.

Desired Conditions and Objectives
Implementation of the SRLA has been disproportionately focused on the Standards with virtually no attention paid to Objectives VEG O1 and VEG 02, that state:

-VEG 01 - Manage vegetation to mimic or approximate natural succession and disturbance processes while maintaining habitat components necessary for the conservation of lynx.
-VEG O2 - Provide a mosaic of habitat conditions through time that support dense horizontal cover, and high densities of snowshoe hare. Provide winter snowshoe hare habitat in both the stand initiation structural stage and in mature, multi-story conifer vegetation.

We recommend increasing the emphasis on Objectives and Desired Conditions relative to Standards in the revised forest plan, and recommend that the RGNF take a hard look at long-term desired conditions and objectives for long-term biodiversity, including lynx habitat.

Precommercial Thinning I
One result of the beetle epidemics and large fires is hundreds of thousands of acres of young, high-density stands in the Southern Rockies Geographic Area. We urge you to consider the following questions:
-What are the long-term implications of managing versus not managing those stands for lynx habitat as well as habitat for other wildlife species? We recommend using some of the modeling tools already being used elsewhere by the Forest Service to predict, for example, density, various wildlife habitat values, potential for forest fires, and potential for insect epidemics in 80 year old thinned and unthinned lodgepole pine stands, as well as the habitat diversity and values, fire potential, and insect risk across the broader landscape.
-How can the Forest Service retain hare habitat in the short-term, but promote long-term biodiversity in post-harvest, post-burn, and post-beetle epidemic areas?

Precommercial Thinning II
According to the SRLA FEIS (pages 59-60, and 135), "For non-thinned lodgepole pine stands in management areas where commercial timber production is a goal, an 89% reduction of production of sawlog-sized material would be anticipated over the next 60 years." That statement is consistent with the literature.

However, instead of a detailed analysis and disclosure of effects, the Forest Service misrepresented the effects of essentially prohibiting all precommercial thinning in lynx habitat; following are several examples:
-"The new direction will also not substantially alter timber outputs, even though it may affect the mix of products as well as growth and yield" (SRLA ROD, p 25).
-"Limiting precommercial thinning may reduce growth and yield of some lodgepole stands, and the potential to produce some products [i.e.,

sawtimber] in the future, overall cubic foot volume would not be affected"
(SRLA ROD, p 25-26).
-"In addition, the ASQ would not be affected on any units because the
management direction does not preclude timber harvest" (SRLA ROD, p
26).
-"Therefore, changes in LTSY are unlikely to lead to changes in outputs,
especially as measured in cubic feet" (SRLA ROD, p 26).
-"These potential reductions would occur in future decades and not the
current planning period" (SRLA FEIS, p 136).
-"Limiting precommercial thinning in lodgepole pine forests could affect
growth and yield, and the potential to produce some products in the
future, because these forests tend to stop growing if not thinned; however,
overall cubic foot volume would not be affected" (SRLA FEIS, p 231).
-"Limiting precommercial thinning may reduce tree growth and long-
term sustained yield (LTSY) in these stands. … It is likely there would be
no change in overall timber outputs, but there may be changes in what
material is harvested and where." (October 10, 2008 Rocky Mountain
Region SRLA Communications Plan).

Further, a June 22, 2012 letter from Regional Forester Dan Jiron stated "[The
SRLA and NRLMD] acknowledged that limitations on precommercial thinning
could affect forest growth and yield, but would not reduce overall cubic foot
volume production [emphasis added]." The misplaced belief, which continues to
be pervasive in the Forest Service, that there will be no ill effects from not
precommercial thinning as long as cubic foot volume production is maintained,
is simply not true. Consider for a minute the problems the Rocky Mountain
Region is currently having selling large volumes of POL, and imagine the Forest
Service's management program if all future timber from young regenerated
stands is POL.

We recommend that you thoroughly analyze, and disclose, the effects of
prohibiting precommercial thinning on forest growth and yield, the forest
products industry, and social and economic sustainability.

We also recommend exploring precommercial thinning prescriptions that could
increase hare habitat over "typical" precommercial thinning prescriptions, for
instance, by emphasizing more diversity of leave tree species or by leaving
portions of the stand unthinned as described in Griffin and Mills, 2007.

Risk Factors
According to the Draft Assessment Discussion of Canada lynx (Lynx
Assessment), "The LCAS identified several … "risk factors" for the Southern
Rockies Geographic Area. Risk factors affecting lynx productivity included fire
exclusion, grazing, and winter recreational uses that create compacted snow

conditions."  We would point out that forest management and timber harvest were not included as a "risk factor."  That is consistent with the Canada lynx listing decision (Fed Reg, March 24, 2000, p 16073), in which the USFWS discussed the large proportion of lynx forest types managed in nondevelopmental status and concluded that levels of timber harvest and thinning are not likely threatening the Southern Rockies lynx population. Further, the USFWS noted documented lynx presence and reproduction in a variety of managed landscapes.  Similarly, in the 2013 LCAS, the section titled "Human activities and developments specific to the Southern Rockies" (page 55-56) does not mention timber management activities as a risk factor.

A major reason that forest management and timber harvest were not identified as risk factors is the relatively high proportion of undevelopable acres and the relatively low proportion of timber harvest acres.  For example, the RGNF is 1,837,661 total acres, of which 392,190 acres are designated Wilderness (21%), 518,600 acres are Colorado Roadless Areas (28%), and only 291,325 acres are suited timberlands (16%).  Further, the total FY 14 timber harvest acreage was only 575 acres (.03%).

So, why then, if forest management and timber harvest are not "risk factors", is the direction in the SRLA so heavily biased against timber harvest and forest management?  Further, the number of acres of lynx habitat affected by timber harvest is miniscule compared to the number of acres affected by insect epidemics and fires over the past 20 years.  Again, why are timber harvest and precommercial thinning disproportionately targeted?  We urge the RGNF to take a "deep dive" into those questions as part of the forest plan revision.

Snow Compaction
The Lynx Assessment lists "Uncompacted snow conditions and management of over-the-snow vehicle route densities" as a key ecological condition on the RGNF.

However, the literature doesn't seem to support that premise.  For example, according to the USFWS (Federal Register, September 12, 2014, p 54829) –

> "Snowmobiling occurs throughout the areas designated as lynx critical habitat, and understanding of the potential effects of snowmobiling on lynx continues to evolve. Concerns about potential negative impacts of snowmobiling are based primarily on the hypothesis that compacted over-the-snow trails could result in increased competition between lynx and other snowshoe hare predators, such as coyotes, in areas where deep snow would otherwise preclude or minimize such competition (Buskirk *et al.* 2000a, pp. 86–95). Research on the relationship between coyotes, lynx,

and lynx habitat has provided mixed results regarding this hypothesis, with several studies showing that coyotes use compacted snow trails, but none indicating increased competition or substantial dietary overlap between lynx and coyotes (Interagency Lynx Biology Team 2013, pp. 80–82). In response to this uncertainty, the 2013 revisions to the LCAS provided more flexibility with respect to the management of recreational activities in lynx habitat."

Further, Kolbe et al. 2007 contains the following conclusions:

-"Therefore, we found no evidence that snowmobile trails were associated with coyote foraging sites on our study area."

-"It is unlikely that limiting compacted snowmobile trails on our study area would significantly reduce exploitation competition between coyotes and lynx during winter."

We recommend that you carefully review whether, or not, the premise that snow compaction allows other predators to compete with lynx is true.

Linkage/Connectivity

According to the Lynx Assessment, "Connective habitat between administrative units in the San Juan Mountains and beyond is essential for facilitating movement of Canada lynx across the landscape", and then later discuses "four key linkage areas". However, there is no discussion about how that conclusion was reached, nor is there any supporting documentation.

We are concerned that designation and/or management of "connective habitat" would have further adverse effects on forest management. The SRLA direction is very vague; the definition of "Habitat connectivity" is "Cover (vegetation) in sufficient quantity and arrangement to allow for the movement of lynx." Considering a) that the SRLA contains very little specific direction about managing for connectivity, b) that the USFWS's concern about habitat connectivity appears to be primarily "high volume, high speed highways" and suburban developments (see Fed Reg, March 24, 2000, p 16080), c) that the USFWS has "no information demonstrating that forest roads negatively impact resident lynx populations" (see Fed Reg, March 24, 2000, p 16080), and d) the documented travels of 'Colorado' Canada lynx to Alberta, Kansas, Utah, Wyoming, New Mexico, Montana, Idaho, Arizona, Nebraska, and Nevada across many miles of "unsuitable habitats", we recommend that any identification/designation of "connective habitat" as part of the RGNF forest plan revision include a discussion of the need for that designation, the benefits of that designation, how those would be managed, and how those would affect overall management of, and outputs from, the RGNF, with an opportunity for public review and comment.

Mapping

The SRLA did not designate lynx habitat. Instead, the SRLA established the direction that would be applied to mapped lynx habitat (ROD, p 6). The criteria used for lynx habitat was "vegetation that **could** [emphasis added] contribute to lynx habitat" (SRLA-FEIS App F, NRLA-FEIS App B), regardless of lynx occupancy, use, or probability of long-term persistence. The Forest Service's decision that all national forest lands that "could contribute to lynx habitat", as identified by wildlife biologists, would be managed as lynx habitat is, to my knowledge, unprecedented, and certainly a much higher standard than for other T&E species, for example, grizzly bears, black footed ferrets, or spotted owls.

According to the Lynx Assessment, lynx habitat was most recently mapped for the RGNF in 2011. That mapping included 867,241 acres of primary habitat and 170,847 acres of secondary habitat, for a total of 1,038,088 acres of suitable lynx habitat. That compares to 952,900 acres of suitable lynx habitat in Table 3.1 of the 2008 SRLA FEIS.

Unfortunately, the Forest Service has never allowed public review of or comment on lynx habitat mapping or even the protocols for lynx habitat mapping. We view that as a serious shortcoming considering the significant effects of whether a particular acre is mapped, or not mapped, as lynx habitat, and recommend that you allow public review and comment on lynx habitat mapping as part of the forest plan revision.

We also recommend that you analyze the underlying assumption that all lynx habitat is equally important.

To go a step further, the Lynx Assessment discusses "inability to map suitable [lynx] habitat" and "uncertainties associated with baseline habitat condition changes due to significant natural events such as spruce beetles." We question why the RGNF needs to map lynx habitat. We don't know of any other species in Colorado for which the Forest Service is required to complete comparable habitat mapping. From the outside looking in, lynx habitat mapping is time consuming, arduous, contentious, and expensive. Is the time and money spent on mapping lynx habitat justified by benefits to lynx?

Occupied/Non-occupied

A premise of the SRLA was that national forests are either occupied or not occupied in their entirety. We recommend that the FS consider a process whereby portions of a national forest could be considered occupied, or not occupied.

Bookkeeping

The FS adopted an overly complex, expensive, time-consuming and perhaps not all that meaningful analysis requirements based on LAUs. Similarly, the FS also adopted an overly complex, expensive, time-consuming, and perhaps not very meaningful monitoring process for the SRLA. Both of those are especially true considering the low value of lynx habitat in the SRGA. We recommend that you explore less expensive and time-consuming methods for analysis and monitoring.

Summary/Key Questions

1. The 2013 LCAS revision recommends focusing limited conservation resources on those ''… relatively limited areas that support persistent lynx populations and have evidence of recent reproduction, with less stringent protection and greater flexibility given in areas that only support lynx intermittently'' (Interagency Lynx Biology Team 2013, p. 2). Is the RGNF/SRGA an area where "less stringent protection and greater flexibility" would be appropriate?

2. Why not establish a sliding scale of lynx habitat 'importance', based in part on the presence or absence of lynx, and then develop forest plan direction for 'low value' lynx habitat that is less restrictive than direction for 'high value' lynx habitat? Could that replace the current time consuming, expensive, and contentious mapping process?

3. Revision of the forest plan, including lynx habitat direction, should consider predicted long-term stand structure development, associated wildlife habitat values, and timber outputs (in cubic feet and board feet) at a landscape scale.

4. To what extent, if any, have completion of the Roadless Area Conservation Rule and Colorado Roadless Rule and the consequential change in the proportion of national forest lands in developmental versus nondevelopmental allocations since the decision to list the Canada lynx in March 2000 changed the USFWS's assessment of the adequacy of existing regulatory mechanisms? See attached February 1, 2015 IFA letter.

5. Given the USFWS's conclusion in March 2000 that timber harvest and precommercial thinning on Federal lands were not currently conducted at levels likely to impact lynx at the population level, why not establish a threshold at those levels, below which there would be only minimal analysis or restrictions?

8

6. What are current precommercial thinning needs on suited timberlands in the RGNF/SRGA? Why not incorporate a strategy to accomplish that thinning into forest plans? What about exploring precommercial thinning prescriptions with a heavier emphasis on species diversity and reserves?

7. How will the effects of updated lynx direction on social and economic sustainability be analyzed and considered?

8. What is the best available scientific information regarding connectivity, linkage corridors, and winter snow compaction, and what direction, if any, to address those issues should be included in the revised forest plan?

9. Why not allow portions of national forests to be identified as "occupied or non-occupied"?

10. To what extent can lynx habitat needs be satisfied through the "coarse filter"? What is the "right" combination of Objectives, Desired Conditions, and Standards to achieve lynx habitat needs?

11. The Forest Service has been implementing the recommendations in the Lynx Conservation Assessment and Status since 2000 and has been implementing the SRLA in the SRGA since 2008. What has been learned from effectiveness monitoring and how will those results be considered and incorporated into the revised forest plan?

12. How will lynx direction be integrated into the revised forest plans?

Thank you for your consideration and I would be happy to discuss this letter with you and your staff at your convenience.

Sincerely,

*Thomas A. Troxel*

Thomas A. Troxel
Executive Director

## Minks, Erin - FS

| | |
|---|---|
| **From:** | Dean Swift <deanswiftseedcompany@gmail.com> on behalf of Dean Swift Seed Company <dean@deanswiftseed.com> |
| **Sent:** | Friday, March 25, 2016 4:40 PM |
| **To:** | FS-RGNF forest plan |
| **Cc:** | Minks, Erin - FS; Blakeman, Mike -FS |
| **Subject:** | Comment |
| **Attachments:** | Image (131).jpg |

Dear Rio Grande National Forest,

I attended the public meeting at the Conejos Peak RD office a couple of weeks ago. I thought you did an excellent job with the meeting.

My comment about the upcoming plan is basically a request to keep allowing minimum impact, traditional uses of the forest by the public in this area. These uses include firewood gathering, some Christmas trees, mushroom collection, Piñon nuts in some years, etc., and the use that is of personal interest to me which is the collection of seed cones for the growing of nursery and Christmas trees. Seed cones have been collected in Colorado at least since 1894 (see attached). We gather the cones from squirrel caches during September and October in the years of heavy cone production. I extract the seeds, dewing and clean them and then ship them to nurseries here and abroad. The forest service all over the country is the guardian of much genetic material that is useful, not only for timber, but also for ornamental uses. I would hate to see this genetic material made off limits. The collection of cones has no impact on the forest, and is a great benefit to the nursery business.

I personally have gathered cones from the Rio Grande, and other forests in Colorado, for over forty years, as others have done before me. There are numerous families who literally plan their vacation time for the gathering of seed cones. It's great recreation, and they earn Christmas money while they're at it. In some cases the same families have gathered seed cones for three generations or more.

I hope the collection of seed cones will continue to be an allowed use in the Rio Grande National Forest. Thank you, Dean Swift

Dean Swift Seed Company
P.O. Box 908
Alamosa, CO 81101
719-589-3499 (Tel)
719-589-3299 (Fax)
dean@deanswiftseed.com

 Virus-free. www.avast.com

1

Rvsd Plan - 00002133

Thoughts about Need for Change doc from Donna Shorrock- incoming RO Ecologist, Region 2- 4/16

Overall, this document is very broad in scope and not every item seems to fully capture findings from Assessments 1 & 3. I am concerned that this lack of specificity leaves items open to interpretation of intent of the assessments, objectives for the needed changes, as well as how the change identified translates to a strategy or work needed on the ground. Below are topics that I either feel need further clarification or that were recommendations made in Assessment 1, but have been omitted in the Need for Change document.

Perhaps the Need for Change document intentionally maintains a high level perspective, but is it appropriate in this document to provide additional detail for:

- Revising management direction related to climate change
- Identifying approaches to ensure forest health and habitat connectivity

Curious about little reference to extent of recent change – structure, composition, etc. Will there be an indication of how forest perceives this "clean slate" and intends to approach "recovery"?

Include gaps in knowledge –clearly identify need to address deficits (climate change, role of fire given current status of fuel loads, habitat connectivity – analysis needed); approaches to filling these gaps – maybe these belong in plan?

What I think are important points from assessment: Address drivers and stressors on the riparian and aquatic ecosystems of the Rio Grande National Forest include water use, roads, trails, and other transportation, recreation, biological stressors such as beaver presence and pesticide use, mineral extraction, vegetation management, urbanization, and others. Some of these factors need further assessment and are currently a gap in our knowledge. Examples of some of these current knowledge gaps include the number of stream diversions, reservoirs, and spring developments, miles of roads and trails, number of stream crossings, off-road vehicle use statistics, and recreation use estimates, among others.

…we need to revisit all of the standards and guidelines and other plan components in the 1996 Forest Plan, and we may update them to better reflect the new state of the forest. As an example, much of our current timber harvesting is salvage of dead trees, and we need to make sure that the new forest plan components are clear about this management activity. We also need to ensure that the plan components aren't overly restrictive so that objectives such as encouraging aspen can be met. We need to better incorporate the role of naturally occurring fire, with clearer direction on when and how we can use fire as a tool to meet our ecosystem integrity objectives. We will also need to address climate change and its effects on the ecosystems of the Rio Grande National Forest.

Other questions: should model be re-run to include extreme insect outbreaks?

Is there concern about potential decline in aspen (fire suppression, climate change)?

Are late successional habitat estimates of 13% current?

Philosophy about managing toward an historic range of variability? How prescriptive for management are HRVs?

Should evaluation of grazing levels be addressed here?

Does a reduction in management areas maximize ecosystem integrity? I am unfamiliar with the current breakdown, except that management areas are numerous and therefore minimizing complexity may certainly be warranted. That said, I am a bit concerned that a system with too few management areas may either not improve ecosystem integrity or actually increase complexity by creating areas with multiple management strategies. I would love to know more about the proposed changes and corresponding objectives.

  

April 5, 2016

Rio Grande National Forest
Attn: Dan Dallas, Forest Supervisor
1803 W. Highway 160
Monte Vista Co 81144

RE: Rio Grande National Forest Plan Revision
Initial Comments

Dear Supervisor Dallas:

Please accept these comments on the Rio Grande National Forest Plan Revision Project on behalf of the Trails Preservation Alliance ("TPA"), Colorado Snowmobile Association ("CSA") and the Colorado Off-Highway Vehicle Coalition ("COHVCO"). Prior to addressing the specific concerns that have been raised to date in the development of the new Rio Grande National Forest's Resource Management Plan (RMP), the Organizations would like to thank the Rio Grande National Forest staff for their efforts to date in the planning process. The Organizations are aware that the Rio Grande National Forest is one of the first forests to move forward under the new United States Forest Service (USFS) planning rule and at this time and USFS guidance regarding the application of the new planning rule to local forests or planning units remains under development. This lack of planning rule clarity compounds the inherent conflict that exists between current forest planning timeline and the rate at which species management and research are progressing. This lack of clarity has made any efforts on the Rio Grande difficult at best as there are many new concepts and principals developed under the planning rule that will heavily impact plan development. The Organizations believe that the efforts to date have done a commendable job in satisfying these new requirements and standards and the Organizations remain willing to assist in resolution of any issues that might arise on this front in any way that we can.

The TPA is a volunteer organization created to be a viable partner to public lands managers, working with the USFS and the Bureau of Land Management (BLM) to preserve the sport of trail riding and multi-use recreation. The TPA acts as an advocate for the sport and takes the

1

necessary action to insure that the USFS and BLM allocate a fair and equitable percentage of public lands access to diverse multi-use recreational opportunities. COHVCO is a grassroots advocacy organization representing approximately 150,000 registered off-highway vehicle ("OHV") users in Colorado seeking to represent, assist, educate, and empower all OHV recreationists in the protection and promotion of multi-use and off-highway motorized recreation throughout Colorado. COHVCO is an environmental organization that advocates and promotes the responsible use and conservation of our public lands and natural resources to preserve their aesthetic and recreational qualities for future generations. Colorado Snowmobile Association ("CSA") was founded in 1970 to unite winter motorized recreationists across the state to enjoy their passion. CSA currently has 2,500 members. CSA has become the voice of organized snowmobiling seeking to advance, promote and preserve the sport of snowmobiling by working with Federal and state land management agencies and local, state and federal legislators. TPA, CSA and COHVCO are referred to collectively in this correspondence as "The Organizations."

The Organizations offer the following comments, values and concerns regarding this plan update moving forward.

1. The Organizations believe that continued multi-use access and motorized recreation within the National Forest is vitally important to the preservation and conservation of our public lands and the well-being of our citizens. The Organizations acknowledge that as America becomes more urbanized and populations rise, our younger citizens are becoming less connected to and are less likely to identify with the outdoors in their daily lives. Our Organizations have worked diligently and continuously to help Coloradans and visitors to our State to be able to access and enjoy our public lands in a safe and responsible manner. We recognize that there is a bona fide correlation between an individual's personal health and their participation in outdoor activities. We continually strive to get youth and families excited about visiting, seeing and experiencing all that our public lands have to offer. We have a history of partnering with the USFS to protect our forest resources while reducing and eliminating barriers that are continuing to make it difficult for Americans to get outside and travel on a multi-use trail or share a road as part of their outdoor recreational experience. The Organizations feel that this renewal of the Forest Plan must work diligently to ensure that a balanced spectrum of opportunities are provided in the Rio Grande National Forest to properly serve the diverse cross section of our population and meet their recreational needs. We contend that both "Conservation philosophies" and "Recreation activities" are compatible and can work in harmony for the betterment of the Forest. We request that this revision of

2

the Forest Plan fairly and adequately provide an Environmentally, Economically and Socially sustainable end state.

2. The USFS has been a recognized supporter of the California Children's Outdoor Bill of Rights. Nationwide there are concerns about the youth of our country's lack of exercise, detachment from outdoor activities and limited access to public parks and land. The Rio Grande National Forest along with its associated network of roads and trails provides the necessary access and recreational opportunity for the surrounding region's youth to explore nature, play in safe places, follow a trail, go fishing, camp under the stars, connect with the past and many of the other activities inspired by Richard Louv's book "Last Child Left in the Woods." Loss or closure of the multi-use and motorized system of trails with the Rio Grande National Forest would certainly be a tragedy and lost opportunity for the region's youth to be able to connect to and be exposed to nature.

3. It is well recognized that the average age of our country's population is increasing and the number of persons aged 50 and older is steadily increasing. As the average age grows, so is the number of people still choosing to recreate outdoors but more and more will be less able to use non-motorized methods of travel or participate in high-energy, high-skill sports. As this demographic group grows, so will their needs for access to the Forest by motorized or other assisted methods. If we collectively fail to recognize and plan for this changing demographic, we will be deliberately excluding a significant and growing segment of the population from the opportunities to experience and enjoy the Rio Grande National Forest. Many of us hope to retain our individual mobility into the "Golden Years," but many will not, and they will need to rely upon some sort of motorized assistance to access the places we all enjoy and cherish. The Rio Grande National Forest's Assessment #9, Recreation even states that *"For seniors, inaccessible infrastructure and lack of opportunities that enable senior adults to continue in outdoor recreation constrains recreation participation"*.

4. The economic impacts of multi-use and motorized recreation within the Rio Grande National Forest must not be overlooked or underestimated. Even though the Rio Grande National Forest receives somewhat lower visitation than other national forests in Colorado, there are still significant economic benefits being realized by all of the communities and Counties encompassed by and in proximity to the Forest. As an example, motorized recreational enthusiasts were responsible for $990 million in direct

3

expenditures relating to motorized recreation in Colorado during the 2012-2013 season alone.[1]

5. Our Organizations contend that the previous Forest Plan and subsequent Travel Management Plan (TMP) substantially reduced recreational opportunities, reduced access, eliminated multi-use/motorized recreational opportunities and was too restrictive. This new plan must seek a more balanced and fair allocation of resources to recreation and especially multi-use/motorized recreational opportunities. Similarly, the restrictions of the former plan have contributed to the current poor health of the forest and unnecessarily hampered the efforts of the agency to be able to properly and effectively mitigate fuels and manage the density of the forest biomass.

6. With few if any exceptions, the roads and trails within the Rio Grande National Forest have been in existence and providing public benefits for decades. History has shown that these routes provides a level of tangible recreational, economic and/or forest access value. Continuing to have an adequate network of forest roads and trails will be truly beneficial and necessary in providing sufficient access for future timber management, continuing forest visits, recreation, emergency access/egress and wildland firefighting efforts. This minimal threat is accurately reflected in the aquatic assessments on the Rio Grande National Forest which clearly conclude that these routes pose an exceptionally low level threat to water quality.

7. We feel it is important to spotlight the following general principles regarding multi-use recreation and are important considerations when evaluating any modifications to the Forest Plan[2]:

   a. Generally forest visitors participating in multi-use activities will use routes that exist and adequately satisfy their needs and desires.

   b. Non-system trails and roads should be reviewed during this review process to determine if any of these non-system routes will fulfill a valid multi-use need and can be altered to meet recreation and resource management considerations.

   c. Route networks and multi-use trail systems should meet local needs, provide the desired recreational opportunities and offer a quality experience. We are not asking that this be done at the expense of other important concerns, but a system

---

[1] See, COHVCO- *Economic Contribution of Off-Highway Vehicle use in Colorado*, prepared by the Lewis Burger Group – August 2013. A copy of this report has been enclosed for your convenience.

[2] See, National Off-Highway Vehicle Conservation Council- Management Guidelines for OHV Recreation, 2006.

of routes that does not meet user needs will not be used properly and will not be supported by the users. Occurrences of off-route use, other management issues and enforcement problems will likely increase when the routes and trails do not provide an appropriate and enjoyable opportunity.

d. Recreational enthusiasts look for variety in their various pursuits. For multi-use, to include motorized/OHV users, this means looped routes. An in-and-out route may be satisfactory if the destination is so desirable that it overshadows the fact that forest visitors must use the same route in both directions (e.g., access to dispersed camping sites, overlooks, historic sites, the Wheeler Geologic Area, etc.). However, even in these cases, loop systems will always provide better experiences.

8. "Desired Recreational Experiences" is subjective and will vary from individual to individual. Calls to decommission roads or to return areas to more natural states and enhance recreational experiences is purely subjective and a personal opinion. No one will be able to enjoy the forest and all of the resources the forest has to offer if adequate access is not provided. Multi-use and motorized recreation is indeed a bona fide form of recreation and not one to be reduced, banned or eliminated on public lands.

9. An adequate network of forest roads and trails is necessary to provide access for proper forest management and especially in times of emergency. The USFS is a world renowned expert on wildland firefighting and knows firsthand the importance of good access, redundant routes and routes in key places and the impact of those routes on the safety of the firefighters, the public and successful wildland firefighting. The demands for reduced road inventory, for reduced route density and increased decommissioning of roads is not collectively and universally in the best interest of the forest nor the public. The demand for more and more closure of multi-use and motorized access is often based upon self-serving desires and an unwillingness to share our natural resources with others, intolerance of mixed forest uses and an unwillingness to coexist in our individual pursuits of recreation. Likewise the premise that decommissioning roads will reduce human caused fires is absolutely unfounded and unsubstantiated and should not be utilized as a criteria for any decisions regarding the elimination or closure of any multi-use or motorized route.

10. Not all dead roads are necessarily of low value and in need of closure. Many dead end spurs and "low value" routes provide access to picnic areas, dispersed camping sites,

5

overlooks, etc. Although the values of these roads is less than that of main roads, connectors and loops, (i.e. "higher value" routes) their individual, overall benefit and value must be individually considered. We acknowledge that these roads will likely not generate much positive public interest and comment, however these routes can still have substantial importance to the public. We would encourage the Rio Grande National Forest to listen to your own recreational and field staff when assessing any low value or dead end spur roads.

11. Duplicative roads and trails may on the surface appear redundant and not needed. This is often the cry from those unfamiliar with multi-use and motorized recreation or simply seeking to eliminate or reduce public use of these roads. However, we would challenge that some duplicative routes may in fact offer unique benefits for distributing the use rather than concentrating use to a single route or may offer looping and other recreational opportunities. It is our position that every route has recreational value as each route provides a unique experience to those using the route for recreational activity.

12. The Organizations in general oppose the conversion of routes to "Administrative Roads". This designation in and of itself suggest an elitism attitude that Agency staff or other special designated personnel are the only ones capable of properly using a route. If a route is important for USFS and agency staff to access a location, it is very probable that that same route is equally important or desirable for the public to access the same or similar location. If the route is properly constructed and receives the requisite level of maintenance, there should be few reasons the public should not be allowed similar access and privileges. The designation that only "special" personnel are allowed to use a route does little to foster any sense of community and partnership users and agency staff should have for each other. Discrimination of the public users and the fostering of elitism should not be perpetuated, encouraged or allowed to proliferate. The designation of routes for Administrative Use should only be utilized in the rarest of instances where the exclusion of the public can be justified for very site specific, meaningful and justifiable conditions (e.g. mandated security of critical infrastructure, etc.).

13. In the past there have been unfounded concerns for American elk and mule deer as a reason to close and limit multi-use and motorized recreation on public lands. The premise that "large animals, especially deer and elk, are sensitive to traffic and activity

6

along roads" is not supported by published scientific research. Extensive studies completed as recently as 2005 by the National Park Service (NPS) in Yellowstone Park stated that "Effects of winter disturbances on ungulates from motorized and non-motorized uses more likely accrue at the individual animal level than at the population scale." Even the biologist performing the research stated that the debate regarding effects on human recreation on wildlife is largely a "social issue" as opposed to a wildlife management issue. This NPS research would certainly seem relevant to wildlife in the Rio Grande National Forest and does not support a premise for closures and reductions in multi-use recreational opportunities. Additional research published by Mark Rumble, Lahkdar Benkobi and Scott Gamo in 2005 has also found that hunting invokes a more significant response in elk than other factors in the same habitat area (e.g. roads or trails). Likewise research by Connor, White and Freddy in 2001 has even demonstrated that elk population increases on private land in response to hunting activities. This research again brings into question why multi-use trail recreation (specifically motorized recreation) might be cited and used as the justification for any closures or modification to public access.

14. The Organizations are aware of demands regarding a perceived inadequacy of the USFS to provide enforcement of regulations pertaining to multi-use and motorized recreation in particular. We would challenge that based upon several studies, pilot projects, etc. by the Colorado Parks and Wildlife Division, the USFS and the BLM to analyze if indeed an enforcement issue exists, and without exception, those projects have shown there are no problems due to a lack of enforcement. The State of Colorado's OHV funds have been used to subsidize law enforcement programs and the detailing of law enforcement officers to OHV areas only to come back with consistent results that this cry for the need for enforcement is unfounded, unsubstantiated and just plain inaccurate. In 2011, the Colorado Parks and Wildlife Division initiated an OHV Law Enforcement Pilot program to address the accusations, questions and concerns raised by critics of OHV recreation on public lands in Colorado. The data and observations gathered from this Pilot program in 2011, 2012, and 2103 repeatedly demonstrated excellent compliance with OHV rules and regulations throughout Colorado by OHV users. It was estimated that over 10,000 individual OHV users were stopped and inspected during the Pilot Program

7

and 94% of those users were found to be fully compliant with Colorado OHV laws and regulations.[3]

15. **Sound.** Motorized and non-motorized uses are equally legitimate uses of public lands and especially on USFS roads and multi-use/motorized trails. Sound from motorized use is to be expected in areas open to motorized use. The Organizations would offer that the State of Colorado already has strict standards for any and all sound emanating from OHV's. This very detailed standard has proven to be effective since 2006 and governs vehicles produced as far back as 1971. OHV users themselves have funded efforts to educate, test and "police" themselves for sound level compliance. We feel that complaints of noise and demands for sound reduction are once again unfounded and will often be used as a selfish excuse to try and reduce or eliminate motorized access and use of public lands.

The Organizations would be willing to partner with the USFS to address any site specific sound issues that may be asserted to be present on the Rio Grande National Forest. The Organizations have undertaken sound testing with independent third parties at numerous other areas asserted to have sound issues and have almost uniformly found that site specific sound issues are unrelated to OHV activity and are more commonly related to trains, air travel and high speed arterial roads in the area.

The Organizations further submit that those seeking a quiet recreational experience have a wide range of opportunities available on the Rio Grande National Forest given the high levels of Wilderness already in place. The Organizations submit that these opportunities must be utilized before additional closures are undertaken, as the inability to access a "quiet area" is a different issue than the lack of quiet areas on the Rio Grande National Forest.

16. We acknowledge that the Rio Grande National Forest may have struggled somewhat with the proliferation of non-system trails by ALL users throughout the Forest. However, we feel much of this stems from an increasing need and demand for multi-use recreational opportunities on public lands in general. As the State of Colorado's population has grown, so have the sales of Off Highway Vehicles (OHV's), bicycles, hiking equipment, camping units and other forms of outdoor recreation increasing the

---

[3] *See*, Colorado Parks and Wildlife - *The 2014 Off-Highway Vehicle Law Enforcement & Field Presence Program*, Colorado Parks and Wildlife Division, March 2014

demand for recreation sites within the Rio Grande National Forest. We would offer that much of the increase in illegal user-created routes, braided routes & trails and unauthorized group campsites are a result and reflection of inadequately meeting the needs and demands of the public and the recreational users who choose these areas. An adequate and varied inventory of routes and trails that fulfills the user's spectrum of needs for variety, difficulty, destinations, challenge, terrain and scenic opportunity will lead to improved compliance and less off route travel. Closure and reduction of recreational opportunities and the resulting concentration of the ever increasing number of users, has shown again and again that the desired results are not obtained.

17. As future Proactive and Adaptive Management Plans are considered to try and achieve a particular desired condition or end state, these Plans should include thresholds and triggering mechanisms that allow for the expansion and adding of recreational opportunities, not just curtailment, restrictions and eliminations of opportunities. If desired conditions are not being achieved or monitoring protocols are not rendering the preferred results, consideration should be given that perhaps the needs and demands of the users are not being adequately provided for. One example might be off trail use or use of closed routes. Rather than assuming this is merely caused by a minority of users ignoring the rules, this may indeed be an indicator that the existing network does not adequately meet the user group's spectrum of needs for a route to a particular destination, level or degree of challenge, route length, etc. The Organizations believe the motorized game retrieval standards currently allowed on the Rio Grande National Forest provide a concrete example of the need for flexibility in management to achieve management objectives.

18. The motorized community has proudly partnered with land managers to help offset budget limitations, which has resulted in grant funding exceeding $100k per year now being provided to the Rio Grande National Forest, even in light of the most recent round of budget cuts to the USFS. Lack of fiscal capacity by the USFS should not be a criteria for, or lead to closures and reductions in public recreational opportunities, closure of routes or elimination of public access to the Rio Grande National Forest. We fully realize the stark realities of ever diminishing budgets, but it would be a travesty that the public citizenry should be locked out of any public lands and denied access because of a lack of funding. Maintenance and staffing may suffer, but the public must not be shut out. Public access must be preserved and the ongoing grant funding that has been provided on a project and Good Management Crew basis for the Rio Grande National Forest the

Organizations hope has played an integral part in efforts to maintain access to public lands for all user groups. This grant program has become more important every year as federal budgets continue to decline at a somewhat alarming rate and creates a situation where leaving a trail open to motorized usage significantly expands funding available for the route to be maintained with.

19. The Organizations encourage the individual Ranger Districts within the Rio Grande National Forest to carry on their efforts and continue to make submissions for grants through the Colorado Parks and Wildlife OHV Grant program to support OHV trail related projects on the Forest. OHV project grants can address the full spectrum of OHV recreation support needs. Examples of eligible OHV grant funded activities includes[4]:

- Construction, reconstruction or maintenance of OHV routes or multi-use trails that allow for motorized use
- Crossing structures, bridges, railings, ramps, and fencing
- Bank stabilization and retaining structures
- OHV trail corridor re-vegetation and erosion control
- Trailhead development and/or support facilities related to OHV or multi-use trails including parking areas, restrooms, and related facilities
- Equipment needed to build or maintain OHV trails
- Signs - directional, regulatory, and interpretive signage for OHV routes
- Printing - maps/guides, safety and educational materials programs, publications and videos on safety and OHV recreation
- OHV trail or system planning, engineering, or design
- Land acquisition or easement projects. NEPA review and environmental compliance work required under NEPA or other statutes
- Restoration of closed trails or damaged areas where a nexus exists between OHV misuse and needed repairs
- Salary, compensation and benefits for crew members or project employees
- OHV Education and safety programs
- Wildlife habitat restoration

20. In general, the Organizations do not support the segregation of users and the exclusive use of one user group at the exclusion of others. We feel it is both socially beneficial and desirable for all users to learn to coexist and to show tolerance and respect for

---

[4] http://cpw.state.co.us/aboutus/Pages/TrailsGrantsOHV.aspx

Rvsd Plan - 00002145

other users and groups of users. Just as we all learn to live together in our daily lives away from the forest, we should also extend that willingness to coexist when in the forest. Segregated user groups only fosters arrogance, elitism, intolerance and eventually leads to unjustified stereotyping and discrimination which results in greater user conflict. The Organizations are intimately familiar with the situation where user conflict is used as a strawman for the desire to create exclusive use areas on the Rio Grande. The Organizations are not aware of any major user conflict areas or issues currently existing on the Rio Grande and creating user conflict in an attempt to create exclusive use areas on the forest would be unfortunate.

21. We feel it will be necessary for this revision of the Forest Plan to provide opportunities and future opportunities that will not restrict the changes and development of new technologies such as hybrid bikes, electric bikes/motorcycles, personal mobility devices just to name a few.

22. Together our Organizations do not support or endorse the expansion of Wilderness areas within the Rio Grande National Forest or management that seeks to provide expanded Wilderness like experiences. In Colorado alone, there are approximately 3.7 million acres of Congressionally designated Wilderness in our National Forests or approximately 15% of all USFS lands. Another 210,984 acres of Wilderness are located within Colorado's Bureau of Land Management (BLM) boundaries and 306,081 acres are located in Colorado's National Parks. In total, there are **4.2 million acres** of designated Wilderness already in Colorado. This is an area larger than the states of Rhode Island and Delaware combined. Many of the remaining lands within the State that might be considered for "Wilderness" designation have been specifically "released" by Congress from future consideration as Wilderness, or have been studied by the agency and deemed unsuitable for Wilderness designation.

Finally, visitor use statistics do not suggest that we need additional Wilderness areas. Nationally, only about 5 percent of user visits to the Forest System are in Wilderness areas. The visitation figure for the Rocky Mountain region is even lower, about 4 %, despite over 15% of USFS lands in Colorado being Congressionally designated Wilderness[5]. Congress has amply addressed both the need and demand for Wilderness in Colorado. Wilderness advocates frequently claim new Congressional designations of

---

[5] *See*, USFS National Visitor Use Monitoring Results, USDA Forest Service, National Summary Report, Updated 20 May 2013.

Wilderness areas will drive economic growth, which claims are supported by generalized assertions by the Outdoor Industry Association (OIA) research findings that outdoor recreation is $646 Billion dollar a year industry. The relationship of this research and Congressionally designated Wilderness is unclear at best, as the OIA research specifically includes valuations of activities such as motorized recreation, Bicycling, RV camping, and Snowmobiling. In reality, most Americans, for various reasons, are unable or unwilling to enlist in the physical and rigorous effort required of the adventures in Wilderness areas. The Rio Grande National Forest and other forests face broad-scale ecological threats that require well designed management responses that do not stop at a Wilderness boundary. In Colorado, we only need to look outside to see the devastation tied to catastrophic wildfires and the spruce beetle outbreaks. An ecological imbalance has developed over time because widespread treatments in the Engleman and Blue Spruce stands that would have created age class diversity, enhanced the vigor of remaining trees, and improved stand resiliency to drought or insect attack—such as timber harvest and thinning — lacked public acceptance in the past.

23. Four large Wilderness areas on Rio Grande already provide exceptional recreational opportunity for those seeking to user experience (i.e., La Garita, Sangre de Cristo, Weminuche, and South San Juan). Even with these exceptional resources, these areas only received 4% of visitor days to the Rio Grande.[6] A lot of local frustration with complex fires and impacts that lack of management had with these fires scope and intensity. Requirements for Wilderness management have also greatly increased basic operation costs for land managers as even basic maintenance may only be done without mechanical assistance.

24. **Colorado Roadless Rule.** The Organizations are also concerned that the Roadless Rule is often used as a lever for the expansion of Wilderness areas. This is a misapplication of the Roadless Rule, as Colorado as developed its own rule that specifically identifies motorized trails as a characteristic of a Colorado Roadless area.[7] While Roadless areas have limitations on road construction and heavy maintenance, trails are entirely outside

---

[6] *See*, USFS National Visitor Use Monitoring report for the Rio Grande National Forest- Round 3
[7] *See*, Colorado Roadless Rule § 294.41 Definitions; *see also* 294.46 Other activities (e)

the scope of the Colorado Roadless Rule [8] as trail networks may be constructed and expanded in a Colorado Roadless Area.

In the development of the Colorado Roadless Rule, an extensive inventory of characteristics of each area of a forest proposed to be managed either as a CRA or Upper Tier areas was undertaken. A significant portion of the Rio Grande National Forest was proposed to be managed as upper tier Roadless Areas under Alternative 4 in the NEPA analysis. After the inventory was completed most of these areas were identified to remain Colorado Roadless areas due to existing levels of human activity in the areas. Given the proximity in time of this inventory, the Organizations believe this inventory is highly relevant to discussions seeking the expansion of any wilderness like management as these areas were recently inventoried for these characteristics and found not to be eligible. The Organizations are not aware of any management in these areas where Wilderness characteristics were possibly expanded.

25. **National Monument Designations.** The Organizations would not support the designation of any new or existing historic sites, geologic sites or other areas being designated as National Monuments (with their inherent and corresponding restrictions and limits on public access). We offer that the Rio Grande National Forest has done an adequate job throughout its history in recognizing and preserving the many special and unique sites, locations and landscapes contained within the current Forest boundaries. Any designations as National Monuments are unnecessary and would be detrimental to ensuring unfettered public access. The Organizations support the status quo access to such locations as the town site of Bonanza, the Wheeler Geologic Area, Cumbres and Toltec National Historic Landmark, Mount Blanca, the Natural Arch, the Fremont Special Interest Area, etc.

26. We would ask that any future access easements allow "full public access" and that no "conditional easements" or easements restricting travel to a specified mode or modes of travel be exchanged or conveyed. The Organizations are also aware of extensive efforts in other national forests to create buffers around any non-motorized route or route that might have been provided a specific designation by Congress. Each of these specific designations are managed under the National Trails System Act, which clearly

---

[8] *See,* Proposed Colorado Roadless Rule; 77 Federal Register No. 128 (Tuesday, July 3, 2012) Rules and Regulations at pg 39580.

13

addresses the relationship of any designated routes and adjacent management standards as follows:

"Development and management of each segment of the National Trails System shall be designed to harmonize with and complement any established multiple use plans for that specific area in order to insure continued **maximum** benefits from the land."[9]

Given this clarity of management, the Organizations would find it difficult to establish a fact pattern where the existence of a trail in an area could be used to close multiple use recreation in areas adjacent to the trail.

27. Cultural sites - The Organizations were pleased to note that The Need for Change document[10] states the desire to expand several cultural areas while maintaining motorized access.  Maintaining multiple use access is critical to the public support for these areas in the future, as the public should understand why an area is important and without this type of hands on understanding resentment will grow for closure of these areas. The Organizations also vigorously assert that cultural sites have been specifically identified as a multiple use management concern and when multiple uses of cultural areas are balanced, closures to the areas are difficult to justify.

28. Best available science must be relied on in the development of the RMP for all species. Often identifying best available science can be difficult as this is an issue that is now rapidly evolving for many species, such as the Gunnison Sage Grouse, Mexican Wolf, Wolverine and Canadian Lynx. The rapid evolution of best available science in comparison to RMPs has resulted in conflict between these two issues, and as recently exemplified by the Pike & San Isabel National Forest Plan Challenge can result in lawsuits being brought against land managers when forest plans conflict with best available science. Overreliance on outdated management principals and standards should be avoided in the development of the Rio Grande National Forest RMP as this will be an area which will be ripe for legal challenge in the future.

---

[9] See, 16 USC 1246(a)(2) emphasis added

[10] See, Rio Grande National Forest "Need for Change document" pg. 6 - item D7.  A complete version of this document is available here: http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd493976.pdf

Rvsd Plan - 00002149

The Organizations submit that the new adaptive management and monitoring standards further support the requirement that best available science be relied on both in the development of forest plans and over the life of the forest plan. The Organizations would also note that the on-going requirement to manage to best available science and avoid application of outdated management standards in the development of new forest or resource plans was specifically addressed in the new Lynx Conservation Assessment and Strategy ("LCAS"). While the LCAS is highlighted here similar provisions are found in almost all species specific management documents that have been created. The LCAS specifically provides as follows:

"This edition of the LCAS provides a full revision, incorporating all prior amendments and clarifications, substantial new scientific information that has emerged since 2000...... Guidance provided in the revised LCAS is no longer written in the framework of objectives, standards, and guide-lines as used in land management planning, but rather as conservation measures. This change was made to more clearly distinguish between the management direction that has been established through the public planning and decision-making process, versus conservation measures that are meant to synthesize and interpret evolving scientific information."[11]

LCAS continues by addressing the relationship of best available science and existing forest plans as follows:

"Forest plans are prepared and implemented in accordance with the National Forest Management Act of 1976.....**The updated information and understandings in the revised LCAS may be useful for project planning and implementation, as well as helping to inform future amendments or revisions of forest plans.**"[12]

Many wildlife or quiet use advocates are uncomfortable in reducing the strictness of management standards when best available science moves away from one low risk threat to a species to address newly discovered or understood threats. Given the clarity of these various positions and the legal exposure that could result from failing to implement these

---

[11] *See,* Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp. at pg. 2. (Hereinafter referred to as "LCAS").
[12] *See,* LCAS at pg. 4

15

requirements the Organizations vigorously assert that best available science must be applied in the Rio Grande National Forest RMP moving forward.

29. Motorized game retrieval. The Organizations submit that motorized game retrieval is an important component of the hunting experience on the Rio Grande National Forest. While the Organizations are aware this is a site specific travel management decision, the continuation of these regulations should be provided for as the RMP moves forward.

30. Wildlife habitat connectivity- The Organizations are aware that nationally the concept of management of Wildlife Habitat area connectivity is a new concept but CPW has been at the forefront of this issue and has been critical in application of these types of principals on public lands throughout Colorado. As a result the Organizations submit that wildlife connectivity is an issue that has basically been resolved on the Rio Grande National Forest through the on-going site specific planning on the Forest and as a result do not see the need for significant changes in current management to address these issues.

31. The number of categories in the new Rio Grande RMP must be reduced. The Organizations are aware there has been significant concern voiced over the proposed reduction in the number of management standards that are currently in the Rio Grande National Forest RMP. The Organizations vigorously support a significant reduction in the number of categories simply to comply with the landscape nature of an RMP. Even with the size of the Rio Grande National Forest the number of categories currently in place reflects several local plans being combined rather than a true landscape level plan that is developed to facilitate local planning moving forward.

The Organizations would welcome a discussion of these opportunities and any other challenges that might be facing the Rio Grande National Forest moving forward at your convenience. Please feel free to contact Don Riggle at 725 Palomar Lane, Colorado Springs, 80906, Cell (719) 338-4106 or Scott Jones, Esq. at 508 Ashford Drive, Longmont, CO 80504. His phone is (518)281-5810 and his email is scott.jones46@yahoo.com.

Sincerely,

*Don Riggle*

Scott Jones, Esq.
TPA Authorized Representative
CSA/COHVCO President

D.E. Riggle, Director of Operations
Trail Preservation Alliance

16

Rvsd Plan - 00002151

April 12, 2016

Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

RE: Needs for Change document

To Whom it May Concern,

With this letter I would like to comment on the Rio Grande National Forest's Need
for Change document and the draft assessments for the Forest Plan revision.

As a New Mexico resident, I am interested in the RGNF's Forest Plan revision
because I use the Forest for both recreation and business purposes. I am the
president of the Chama Valley Outdoor Club (around 30-35 members), a member of
the Rotary Club of Chama Valley and the Chama Valley Chamber of Commerce, a
member of the New Mexico Cross Country Ski Club (over 300 members) and am an
owner/operator of the Spruce Hole Yurt (which is located on the RGNF). In
addition, I organize the Chama Chile Ski Classic, which is a yearly cross-country
skiing event that takes place on the Rio Grande National Forest.

New Mexicans and Village of Chama residents and visitors, use the southern RGNF
extensively. It is a popular place for cross-country skiers, snowshoers and
snowmobilers in the winter, used by the Cumbres and Toltec Scenic Railroad in the
summer/fall and is popular with hunters and those who enjoy fishing. The scenic
resources, habitat and wild character of the RGNF are essential to Chama's railroad,
and outdoor recreation economy.

### The Need for Change Document – First Impressions

The Rio Grande National Forest's Need for Change document did not seem very
comprehensive, given the details provided in the assessment documents. In the
Need for Change document, Table A made sense, in that these were the *legal*
requirements of the Forest Service, and Table B identified those changes that
needed to be made throughout the existing forest plan, to update it. These were
very broad, across the board need for change statements.

Table C was very disappointing with only 7 identified changes needed, based on the
Assessment Phase. Table D, apparently, are "desired changes" that may or may not
be included in the final document. While many of these "desired changes" are more
specific, they affect management throughout the Forest and should be included in a
final need for change document. And as I understand from the meeting I attended in
LaJara, if a "need" is not in the Forest Plan, it won't be considered.

I was expecting a Need for Change document similar to the Carson National Forest. The Carson included overarching Need for Change statements which affected the entire Forest and Forest Plan, but then also had more specific statements subdivided under topic areas such as soils, vegetation, energy and minerals, etc. Overall the Carson's draft Need for Change document seemed more comprehensive with 51 need for change statements included versus 21 statements included in the Rio Grande's Need for Change document and 19 statements (Table D) that *may* be included.

**Recreation, Need for Change:**

I focused primarily on the Recreation Assessment and the Need for Change statements that resulted.  The Need for Change does not mention some of the recreation needs identified in the Recreation Assessment, which included:

- Collect more data and more information about recreation trends, user conflicts and winter use, that includes low-income and Hispanic user groups, and incorporate this new information in recreation planning.
- Revise recreation management direction to reflect current and future recreation uses (like drones or fat tire snow bikes)
- Evaluate the interactions between current and future recreation uses and the impacts to ecological integrity, especially in terms of the effects of dispersed recreation on species diversity, distribution, and ecological integrity.
- Conduct recreation opportunity spectrum inventories to assess current and future recreation demand needs.

The Forest Service should revise their Need for Change document to reflect the above needs in the final Need for Change document.

In Colorado and New Mexico, motorized, non-motorized and backcountry outdoor recreation are fast growing uses of national forests, which can potentially have a large impact on the environment.  According to the RGNF's Recreation Assessment, "recreation use has increased significantly on the forest both in numbers of recreational users, and types of recreational activities."  Even though the RGNF is currently more remote and primitive Forest, people seeking outdoor recreation opportunities will continue to increase, especially as climate change pushes more people northward and to the mountains for recreation

1. Recommended Addition:  I recommend that the Forest Service add a need for change statement similar to this:
   - *Conduct comprehensive, data and studies on recreation in order to update plan direction to reflect new and current recreational uses, technology and trends; to minimize both summer and winter recreational conflicts; to reflect the cultures and people using the Forest, and to address new environmental impacts of changing and increasing recreational use.*

**Over-Snow Vehicle Rules and Winter Recreation**

The Forest Service has not considered the requirements of the new Over Snow Vehicle Rules (Use by Over-Snow Vehicles (Travel Management Rule), 80 Fed. Reg. 4500-4512 (Jan. 28, 2015)(amending 36 C.R.R. 212and 261) in it's need for change document. This ruling requires the Forest Service to designate specific routes, trails and delineated areas where over-snow vehicles (OSV) are allowed. Once these specific trails, routes and delineated areas are designated, then all other areas will be closed to OSV travel. The 2005 Travel Management Rule, subpart C, which allowed, but did not require the Forest Service to designate a winter off-road vehicle system, is not longer valid under the new OSV Rules.

There are areas on the RGNF where there are "voluntary winter recreation separation programs" (Wolf Creek Pass, Cumbres/LaManga area) but not all of the areas in these programs are working well to keep quiet winter recreationists (cross-country skiers/snowshoers) separated from motorized users (OSV users).

The Cumbres/LaManga passes area, in particular, is difficult to manage and enforce with the current voluntary separation program, despite the Forest Service's efforts to publish maps and put up signs. As a result, many of the areas designated for quiet winter use are over-run with snowmobiles. Even previously inaccessible areas, are accessible because snowmobile technology has made it easier for the machines to climb steep hills and travel more areas. There has been significant reductions in quiet use areas since the last Forest Plan was completed.

With the new OSV rules, there will no longer be a need for "***Voluntary*** Separation Plans" because the Forest Service will need to clearly define winter motorized areas and routes, but there will be a need for all users to agree upon a plan. There is a need to establish guidelines for managing OSV's on the Forest in order to guide travel management planning n the future.

Recommended Addition: Table A in the Need for Change document lists the "Requirements in the Forest Plan Revision Process". A statement about the OSV Rules needs to be included in this list. I suggest the following statement:

- *Develop guidelines and direction for OSV travel that reduces recreational user conflicts, reduces impacts to natural resources and wildlife, uses best management practices and meets the requirements of the OSV Rules.*

Once these guidelines are developed, the Forest Service will then have a clear direction on how to proceed in winter travel management planning.

**Wildlife Habitat and Connectivity**

While the RGNF's Need for Change document includes wildlife habitat and connectivity as part of several need for change statements (B2, B5 and C6), I feel that it does not adequately address wildlife habitat and connectivity between ecologically intact areas. There is a need in the plan for maintaining and restoring wildlife/habitat corridors to allow species movement. Below, I've included two of the Carson's Need for Change statements that could be used in the Rio Grande NF's Need for Change document (with modifications added):

- *There is a need to provide plan direction for managing towards terrestrial, riparian, and aquatic habitat connectivity (and restoration) for species movement across the landscape (both inside and outside the Rio Grande NF boundries).*
- *There is a need to provide plan direction that allows for (maintaining) improving (and restoring) aquatic passage in streams where it has been compromised. Plan direction should promote the restoration and expansion cf the range cf native aquatic species and connectivity cf fragmented populations.*

**Changing "Desired Changes" to Needs for Change:**

I feel that the Forest Service would severely limit its Need for Change document if it did not include many or all of these "desired changes" in the final Need for Change document. Below, I have made comments on the "desired changes" that I am more familiar with:

D2 *Oil and gas leasing*: I am concerned about oil and gas leasing on the RGNF, especially since just a little south of Chama, NM, we have been dealing with fracking issues and concerns for water quality. The Rio Grande NF needs to take a close look at oil and gas leases in light of new technologies (fracking, side directional drilling) and their impacts (such as causing earthquakes near areas where waste water is reinjected into the earth. An example of this problem is in Oklahoma where fracking is common and earthquakes have increased tremendously.). The RGNF needs to revisit it's oil and gas leases in light of new issues with oil and gas technology.

D3 *Wilderness Boundaries*: This need for change is relevant, especially between the New Mexico and Colorado borders for management of lands added to the wilderness inventory that could potentially add to the Las Cruces Basin Wilderness from the New Mexico side across the border into Colorado and the Rio Grande National Forest.

D4 *Develop and maintain sustainable enterprises that contribute to the general economic and social vitality cf the area*: This need for change has particular relevance to the residents of Chama, NM. Chama is dependent on the RGNF for it's scenic resources and the use of the Forest for the Cumbres and Toltec Scenic Railroad. Local people use the Forest for wood cutting, hunting, fishing, and

recreation. Agreements with the Forest Service, and management and policies, that help promote sustainable activities, help the local economy.

D12 *Revisit the Capacity Allocation Process related to special use permits.* This process has particular relevance to my business, that I operate with my husband on the RGNF. We own the Spruce Hole Yurt and are allowed to operate from October to April (winter months) each year. Most yurts and huts in Colorado are allowed to operate year-round and/or in the summer (see Colorado Hut & Yurt Alliance page under 10th Mtn. Huts: http://www.huts.org/cohutsyurts/index.php)
We hope that the Capacity Allocation Process would allow examination of time of use for permitted yurt operations on the RGNF.

D13 *Revisit the off-road game retrieval policy on the Rio Grande National Forest.* I would be in favor of the RGNF looking at the manageability of this policy and whether or not it is even appropriate in all areas on the Forest (are there environmentally sensitive areas which could be harmed with off-road ATVs?). Many hunters now use ATVs exclusively for their hunting and some hunters have exploited this policy to do their hunting off-road.

On a practical level, I think that the off-road game retrieval policy should be banned entirely because it is too difficult to enforce. In addition, it is incongruent with the rest of the travel management policies on the Forest (vehicles staying on designated motorized routes). With a reduction in the number of staff in law enforcement (from 2 to 1 ½ full time equivalent), there are not enough feet on the ground to enforce the afternoon retrieval policy (and never were), even with the help of state wildlife employees.

I am part of a hunting family, and we are beginning to see our own limits on how far we can walk from a road to hunt and carry out our game, once we have made a kill. We are willing to accept these limitations and recognize that we won't be able to hunt forever.

It does not take much for ATV's to do a lot of damage, especially in sensitive areas and wet soils. There are only a few National Forest's that allow game retrieval, and with limited Forest resources, this might be a good time to end this policy.

## Next Steps – NEPA

At the meeting I attended at the Forest Service office in LaJara on the Need for Change document, there was some discussion on what the Forest Service was planning to do next with the beginning of the NEPA process. One of the statements made that concerned me, was that the Forest Service was planning to "reduce the number of alternatives presented in the Draft EIS".

While the planning rule of 2012 has added a lot to the process of developing a Forest Plan by providing more public input and greater analysis, I believe that it is

important to present to the public a full range of alternatives in the Draft EIS. This is really the culmination of all the work done through the planning process. I don't think compromising the NEPA process is either legal or the right thing to do.

In addition, I think the Forest Service will continue to see additional information and more thought out ideas coming from public input through the scoping process, as more people continue to become involved with the Forest Plan revision.

_____

I want to thank the Rio Grande National Forest and it's staff for all your efforts to make the Forest Plan revision process more inclusive. You have provided so many opportunities for people to be involved through meetings, online comments and webinars, phone calls and meetings with different groups and individuals.

Sincerely,


Mary Ann DeBoer
HC 75 Box 66
Chama, New Mexico  87520
575-756-2294

April 15, 2016

**Preliminary Comments/Suggestions Regarding Forest Plan Revision Need for Change and various Assessments**
**Colorado Parks and Wildlife, Monte Vista Office**

CPW was asked to review and provide preliminary comments regarding the Rio Grande Forest in their efforts so far in the Forest Plan revision process, specifically the Need for Change document and Assessment 5. My staff and I have reviewed those documents to the extent possible given tight timeframes and I will warn that we have not had sufficient time to do a thorough review. We did find several items that we believe could be addressed more thoroughly or provide specific information in relation to various topics.

Need for Change Document

- We believe it would be helpful to more clearly define the categories that have been identified in relation to need for change and levels, manager discretion and change needed vs. desired need. Because the enumeration is sequential it is an easy jump for readers to assume that the ascending letters indicate the relative importance of each issue rather than a specific categorization matrix.
- D9 Update Management Direction to maintain separation between bighorn and domestic sheep. This is a very important topic to CPW. We have worked together in the past to work toward decisions that have helped resolve some of these concerns and look forward to working with the RGNF in future efforts. This is a very high priority topic and should be identified as such in the plan with specific goals, objectives and tools (see suggested Desired Conditions and Standards below).
- D10  Management of pack goats: Define management direction at it relates to D9
- D11 Stay Limits on forest in dispersed campsites. We believe that the limits on the length of stay on the forest are appropriate. We also believe that the current number of days is in conflict with some of our hunting seasons. Providing longer stays in specific legitimate circumstances would be helpful for CPW and our customers.
- D13 Revisit the off-road game retrieval policy on the Rio Grande National Forest. This is another major topic of concern for CPW. Below is a list of our concerns with regard to this topic:
  - With the aging population of hunters, an effective game retrieval policy is incredibly beneficial to CPW. It allows hunters to more confidently penetrate the forest on foot knowing that a mechanism exists for the retrieval of that animal that would otherwise be unmanageable for many. These increases in harvest efficiency help CPW to better manage wildlife populations without having to cause overcrowding and other problems that are created from that particular aspect.
  - We mention in the above paragraph an "effective" game retrieval policy. The current policy is not entirely effective. There are several components that could be improved to make it both more effective and protective of forest resources and other hunter's experiences.
  - The current game retrieval areas need significant re-alignment. There are numerous areas that are open to ATV game retrieval, but the terrain is not in any way accessible by ATV. Yet, other areas that would lend themselves to this sort of use with minimal to no damage are closed. We are confused why this is such.
  - There is an assumption in these documents that resource damage on the forest by ATVs is specifically caused by hunters. That is not a completely accurate statement. It would be unreasonable to say that no hunters have caused resource damage. However, we have witnessed significantly more damage being done by general motorized OHV users throughout the summer and early fall.
  - The lack of a good travel management map has created confusion among users and there is a general lack of management of those uses.

- o In addition, when hunters have caused damage, it has been due to violations of travel management by simply driving off-road with both ATV and full-sized vehicles. There are very few instances of resource damage due to game retrieval activities.
- o Currently, three different game retrieval maps exist. This creates confusion and unnecessary violations for those who have the wrong map.
- We are unclear if this is a Forest Plannning issue vs. a travel management implementation issue

## Assessment 5 Fish, Wildlife, and Plants

- Need to compare this to CPW's SWAP that was recently approved by USFWS.
- Would like "Information Gap" section to be based on the best available science if fact and datasets are not complete.
- Several species are maybe listed as "at risk" in error. Many of these are common and not considered by CPW as at risk (e.g. bobcat, beaver, sport fish, etc.). We would like further discussions on what criteria the FS has used to make these determinations
- Bighorn sheep should be considered a species of management concern.
- Deer are not a risk of extinction, but the FS LMP should help the State meet is population objectives, and review and implement aspects of CPW's Mule Deer Strategy.
- Aquatic Concerns
  - We would like a clearer definition for Aquatic species – does it include fish species other that RG Cutt, RG Chub, RG Sucker; does this include aquatic invertebrates?
  - Very few Rio Grande suckers and RG cutthroat live in the mainstream Rio Grande River
  - Native and non-native fish is forest fisheries should be managed as recreational fisheries; not just native
  - In the executive summary of Assessment 5 there is a statement that FS "Needs to protect genetics of rainbow trout"; should it state cutthroat?
  - RG Cutthroat
    - o Conditions needed: Pool habitat within 35 to 60% of total stream habitat area. Stream bank vegetative cover greater then 25%. Stream bank stability greater than 90%. Stream shading within 50-70% during mid-day. Water temperatures within 8 to 16 C during spawning and incubation periods. Fine sediments (less than 6.3 mm) should fall within 0 to 24% of sediment present
    - o Risk Factors: add climate change, wildfires, drought, habitat loss
  - Rio Grande Sucker
    - o Ecosystem used: can also be lakes although not common
    - o Risk Factor – can hybridize with white suckers and compete
    - o Water Quality – include Rio Grande Cutthroat
  - There are several native cutthroat fisheries and may be more appropriate listed as management concern vs at risk.

### Draft Suggested Desired Conditions

- Wildlife populations are viable on National Forest lands. Wildlife populations are self-sustaining, connected, and genetically diverse across NF lands.
- Big game severe winter range, winter concentration areas, and production areas are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).

- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on USFS lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife special status species.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife special status species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity

### Draft Standards

- Standards for the raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)
- **Bats:** If abandoned mines are closed, surveys will be conducted to determine occupancy. If surveys cannot be completed, occupancy will be assumed and mine closures must allow for bat access. Abandon mines that are determined to be hazardous to bats will be closed to bats.
- **Bats:** Human access at occupied caves or abandoned mines will be restricted as necessary during the following periods to maintain essential life cycle processes:
  - Maternity sites - April 15 through September 1
  - Swarming sites - August 15 through October 15 (30 minutes before sunset to 30 minutes after sunrise)
  - Winter hibernacula - October 15 through May 15
- **Bighorn Sheep (*Ovis canadensis*):** During project-level planning on domestic sheep (*O. aries*) allotments, management options must be developed to prevent physical contact between domestic sheep and bighorn sheep. Actions may include but are not limited to boundary modification, livestock-type conversion, or allotment closures.
- **Bighorn Sheep:** Grazing permit administration in occupied bighorn sheep habitat must utilize measures to prevent physical contact between domestic sheep and bighorn sheep. Permit administration actions may include but are not limited to use of guard dogs, grazing rotation adjustments, or relocation of salting and bed grounds.
- **Bighorn Sheep:** Management of recreational pack goats and other domestic goats (*Capra aegagrus hircus*) must utilize measures to prevent physical contact with bighorn sheep.

Rvsd Plan - 00002160

- **Bighorn Sheep:** Domestic goats used for invasive plant control must be veterinarian certified as free of pathogens transmissible to bighorn sheep, except in areas where there is no risk of contact with bighorn sheep.
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors should be designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.
- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area should be designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.
- **Road and Motorized Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on NF Lands:** The intent of this Standard is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of NF lands, road and motorized trail densities should be addressed when analyzing and approving management actions that affect motorized routes. Where management actions would result in road and motorized trail densities exceeding 1 mile/square mile on SJNF lands in the areas listed below, actions should be designed to maintain habitat effectiveness on SJNF lands throughout each mapped polygon. Habitat effectiveness for this Standard is considered maintained when road densities within the CPW mapped areas on SJNF lands listed below are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas on NF lands listed below, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.
  - • Big game production areas (calving or lambing areas)
  - • Elk and deer severe winter range
  - • Elk and deer winter concentration areas
  - • Deer critical winter range

**Draft Guidelines**

- In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist.
- **Bats:** Human access should be managed at caves and abandoned mines where known bat populations exist to protect bat habitat from disturbance and/or the introduction of pathogens. Management examples include, but are not limited to, seasonal or permanent closures and excluding humans by installing bat gates.
- **Bats:** Where known bat concentrations of significant conservation concern are located outside caves or abandoned mines (such as in bridges structures, rock crevasse, or tree snags), human disturbance should be managed in order to protect those populations and the concentration site's physical features.
- **Bats:** On the SJNF, formal mineral withdrawal of abandoned mines for conservation of special status bat species should be pursued when demonstrated necessary to prevent loss of effective or crucial habitat due to mining activity.
- **Bats:** At swarming sites, hibernacula, and maternity sites, activities that may alter the suitability of the cave or abandoned mine for bat occupation should not occur within 500 feet of the entrance, unless to rehabilitate the suitability of the site or install mine safety closures.
- **Migratory Birds:** Projects or activities should consider and undertake proactive bird conservation actions as practicable particularly during breeding season to maintain or improve habitat needs over the long-term for species identified as priority for conservation action.
- **Bighorn Sheep:** Projects or activities that adversely impact bighorn sheep production areas by reducing habitat effectiveness should be limited or avoided, using access restrictions during the following periods:
  - • Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*): April 15–June 30

Rvsd Plan - 00002161

- **Bighorn Sheep:** Projects or activities that adversely impact bighorn sheep severe winter range and winter concentration areas by reducing habitat effectiveness should be limited or avoided using access restrictions during the following periods:
  - Rocky Mountain bighorn sheep: November 1-April 15

Aquatic Species

### Desired Conditions

- Long-term sustainability of aquatic ecosystems is maintained.
- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.
- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species. Abundant Rio Grande cutthroat trout populations are maintained and other areas are managed for increased abundance. Threats to Rio Grande cutthroat trout and its habitat are eliminated or reduced to the greatest extent possible

Rvsd Plan - 00002162

**BOARD OF COUNTY COMMISSIONERS**

**MINERAL COUNTY**
P.O. BOX 70
CREEDE, COLORADO 81130
(719) 658-2331



April 15, 2016

Dan Dallas
Forest Supervisor
Rio Grande National Forest
1803 US Hwy 160
Monte Vista, CO 81144

Mr. Dallas,

On behalf of the Mineral County Board of County Commissioners I thank you for the opportunity provided to be engaged early and often in the Forest Plan Revision. I remember in so many of the early assessment meetings an overriding issue expressed was the public did not feel that they were being listened to or their concerns addressed. It impresses me that you and your staff have taken that to heart and gone above expectations to engage the public and listen.

I am writing this letter with some bullet points that have come to bear in reading part of the assessments from the point of view of Mineral County. I am hoping that this will act as a place holder for further comments as we finish reviewing all of the assessments. Our overarching concern/feedback on the "need to change" documents can be summed up with this statement: **Mineral County depends on, is impacted by, thrives in, works in/with and plays in the Rio Grande National Forest**. There is very little about Mineral County and Creede that isn't at least indirectly affected by everything in the Forest. This Revision and subsequent implementation will be vitally important to our economy, wellbeing, visitors and residents. The Forest is our life-blood!

The following statements are general in their form and not a complete list of our feedback but, I hope, will help frame future discussions and comments going forward.

- Mineral County has proven its resiliency time and again but recent events on the forest, namely the devastating beetle kill and West Fork Complex Fire, stretched that resilient nature to near breaking. Loss of forest access by recreationists and consumers, loss of production, loss of grazing, loss of aesthetics, loss of wildlife habitat, etc., will create an environment that will be difficult if not impossible to recover from.
- We all count ourselves as "owners" of the Forest and display that stewardship with pride. This local "ownership" should give Mineral County and our neighboring Counties top billing over regional and national input when considering the value, use and benefits of the Forest. Non-users of our resource should only have a secondary place in evaluating the "need to change".
- Mineral County commends the Desired Condition of multi-use sustainability and rural development. The earlier referenced resiliency of our County has pushed the area into some new ventures that will continue to rely on the aesthetic value of the Forest as well as the production and recreation access of the Forest. New industry options like telecommuting will

rely on the "quality of life" that Mineral County offers to attract new families to the area and the Forest is a top player in that quality. New technologies that allow potential use of the dead and burnt forest can possibly thrive in this area and give us all the opportunity to partake in the housecleaning and rejuvenation of this precious resource. We encourage the continued rejuvenation of the timber industry in the area and specifically in this County. We recognize that is a huge avenue to a healthy forest. Thinking outside the box to maintain a vigorous and health economy while preserving this beautiful environment needs to be the driving factor in decision making.

- Recreation and consumer access needs to be thoroughly vetted. New and renewed opportunities need detailed scrutiny to avoid user conflict. Keeping everyone out of the same "sandbox" is key to minimizing if not eliminating those conflicts while still enjoying and using the whole of the Forest.
- Active management is paramount! There needs to be boots on the ground. So many of the desired changes mentioned in the assessments require if not demand there be active, involved engaged management. The current state of the Forest is, in our opinion, what deskside management results in.
- Finally, Mineral County is adamantly opposed to any new Wilderness. Although, we have learned to live and thrive with our existing Wildernesses, anything new is not going to help reach functional development and use in and out of the Forest. Again, active management of what exists becomes more important that creating new.

Thank you again for this opportunity to comment. We will be offering more detailed comments in the immediate future. We look forward to continued dialogue.

Sincerely,

Janelle Kukuk
County Administrator
719-658-2360
mincty@hotmail.com



**Sent via email to: rgnf_forest_plan@fs.fed.us**

April 15, 2016

Erin Minks
Forest Planner
Rio Grande National Forest
Forest Plan Revision
1803 US Hwy 150
Monte Vista, CO 81132

**RE: Comments on Rio Grande National Forest Plan Revision Process: Draft Need for Change document**

Dear Ms. Minks,

Please accept the following comments from Trout Unlimited (TU) on the Rio Grande National Forest's (RGNF) Draft Need for Change document. We appreciate the Forest Service's invitation to participate in the planning process and for working with TU and other stakeholders in the assessment phase under the 2012 Planning Rule.

Trout Unlimited is the nation's oldest and largest coldwater conservation non-profit organization with more than 155,000 members nationwide dedicated to conserving, protecting and restoring North America's trout and salmon fisheries and their watersheds. Since 1959, TU staff and volunteers have worked toward the protection of sensitive ecological systems necessary to support robust native and wild trout populations in their respective ranges. We recognize the high value of public lands and the role public lands play in providing habitat to coldwater fisheries, drinking water, and wildlife habitat. Trout Unlimited believes that the actions taken on public lands are ultimately reflected in the quality of fish and wildlife habitat and their populations.

In Colorado, TU plays a critical role in watershed conservation, restoration, and rehabilitation on public lands, particularly our forests. Twenty-four chapters and 10,000 members statewide actively participate in projects with the National Forest, local communities, and private landowners in order to maintain the larger important forest landscape that is so vital to the social and economic community in this area. The San Luis Valley TU chapter has a long term relationship with the Rio Grande National Forest including recent projects such as restoration on the Hidden Mile of the Conejos, and native Rio Grande Cutthroat Trout reintroduction.

The RGNF is host to the majority of all headwater habitat for a truly unique and native fish – the Rio Grande cutthroat trout (RGCT). Because these fish are only found in specific and limited places, protection of their watersheds and habitats are especially important. Rio Grande cutthroat trout have adapted to this region for eons; they are a part of our culture and angling heritage. Trout Unlimited has

worked on RGCT issues consistently over many years, and we are excited to take advantage of this opportunity in the planning process to ensure even better protections for these fish.

As sportsmen we have considerable stake in the management direction, strategy, and priorities of the RGNF's new planning process. These are the lands on which we fish and hunt, and we feel privileged to participate in the public process that guides the management of those resources. Members of TU believe in multiple uses of the forest but care deeply about the coldwater fisheries, big game habitat, pristine watersheds, and backcountry areas. We look forward to working with the Forest Service throughout the plan revision process.

### General Comments

We understand the revised Forest Plan will supersede the 1996 RGNF Plan and any amendments. As participants during the 2012 Planning Rule process, we support the new Rule's goals for the Forest Plan revision, which include:
- Maintain and restore ecosystem and watershed health and resilience (ecological integrity),
- Protect key resources on the unit, including water, air, and soil,
- Address water quality and riparian area protection and restoration.

In reviewing the Draft *The 1996 Rio Grande National Forest: What Needs to Change*, there are many components identified which we agree with and feel the RGNF is on target for implementing these changes into the plan revision for a stronger management plan. However, several important items identified in the Draft Need for Change document we feel deserve a higher priority for adoption in the Final Need for Change and Proposed Action as well as some concerns which were not identified in the assessment and comment phases. Our comments are detailed below.

### A. Requirements in the Forest Plan Revision Process

Although mandated for inclusion in the Final Need for Change document, Trout Unlimited applauds the Forest Service's efforts to address such large issues as listed in Table A. Each issue listed has implications for the concerned sportsman in that healthy, connected landscapes are what we depend on for recreation. Increasingly important is the need for protected places and rivers as we face accumulating impacts to natural landscapes. On the RGNF we have an opportunity to protect and prioritize some of the last remaining strongholds of wild lands and wild species.

Trout Unlimited believes this can be accomplished through a fresh look at specific areas for additional protections in the form of Special Management Areas, Priority Watersheds, recommended lands with wilderness characteristics, rivers with Wild and Scenic values, roadless area inventories, and critical habitat for species of conservation concern. All these layers looked at through the lens of climate change will surely assist in informing the best possible management for our most special places.

### B. Changes needed throughout the previous plan

*B2 - Re-evaluate the number, arrangement, boundaries, and plan direction related to the current forest plan management areas to minimize complexity and maximize ecosystem integrity and connectivity.*

Trout Unlimited believes that Management and Geographic Areas are extremely important tools for protecting places with outstanding values and resources that are not already protected by designated areas. The RGNF is well guided to relook at these tools. We would like the revised Plan to include areas

Rvsd Plan - 00002166

specifically identified as sportsmen-centric that include enhanced recreation, hunting, and angling opportunities. Trout Unlimited is drafting area suggestions and will provide examples to the RGNF staff. These suggested areas will provide a layering of Geographic and Management Area recommendations and associated recommended goals, objectives, standards, and guidelines that capture the interests of Trout Unlimited and partners. Though focused on coldwater fisheries, big game habitat and other issues will be evaluated and brought forth in the suggestions.

*B3 - Revise the current plan to allow for more adaptive management to better meet and monitor desired conditions related to climate change and fluctuations in forest budgets, through the help of partnerships, volunteers, and citizen scientists.*

Trout Unlimited feels privileged to be partners with the Forest Service through volunteer and citizen science projects. We believe these grassroots collaborations are the heart and soul of our organization and they are in no short supply on the RGNF. Under the plan revision process, we recommend the prioritization of citizen science contributions, but also for an internal monitoring and feedback structure that provides accountability and continuity for understanding the data obtained through the volunteer citizen science program. We want to be sure that the work contributed through the citizen science program is valuable, useable, and provides an opportunity to critique the process of those contributions. This recommendation also compliments the objective from line B1 (Table B), to revise the accessibility of the previous plan to the public and incorporate web-based technology as a public interface.

*B5 - Revise the current plan to include management approaches that ensure for sustainable infrastructure related to recreation, forest health and habitat connectivity*

Angling and hunting are important uses of National Forest lands. These uses are dependent on high quality waters, outstanding habitat conditions, intact watersheds and appropriate access. Typically these uses are lumped in with other recreational uses such as hiking, skiing, sightseeing and camping, and receive no specific management guidance. Frequently there is significant attention to biodiversity, viability and habitat conditions, but rarely is there a direct linkage to sportsmen and their use of these public lands for their traditional activities. Trout Unlimited hopes that new management approaches be utilized as a framework by which we can develop a Sportsmen's "vision" for the RGNF that not only protects intact backcountry lands, but that also address need and opportunity for stream restoration, protecting and improving front country winter range, and travel management, among other objectives.

## C. Changes identified through the Assessment phase

*C3 - Revise the previous plan to identify priority watersheds to reflect the current best management practices including the Watershed Conservation Practices Handbook, National Best Management Practices program, and Watershed Condition Framework*

Since the 1996 Plan there have been significant changes to overall watershed conditions and improvements to best management practices. The referenced Forest Service guiding documents were published after the original plan, as recently as 2011 in the Watershed Condition Frame work, and should be used to guide the direction of the new forest plan. These tools are important assessors and could be applied to new 2012 Planning Rule concepts such as landscape level connectivity and watershed health. Combined with new knowledge of RGCT distribution and habitat requirements[1], reevaluation of priority

---

[1] Rio Grande Cutthroat Trout Conservation Team. 2013. Rio Grande cutthroat trout (*Oncorhynchus clarkii virginalis*) Conservation Strategy. Colorado Parks and Wildlife, Denver, CO
https://www.fws.gov/southwest/es/NewMexico/documents/RGCT_conservation_strategy_final_12-10-13.p

watersheds for this species of conservation concern alone is worth prioritization in the Need for Change. We recommend the draft Plan include updated science and management objectives as recommended in the 2013 RGCT Strategy.

*C4 - Update the previous plan to incorporate the negotiated in-stream flow water rights language and decree between the Rio Grande National Forest and the State of Colorado from 2000.*

Through use of in-stream flow water rights by the RGNF, large amounts of work by TU and other organizations is made possible. The unique nature of the current situation on this Forest has allowed for extensive collaboration between diverse groups of stakeholders to produce a mutually beneficial system for water management. There are native and wild trout populations which would be threatened if these programs were to stop. We support the RGNF integrating the updated water rights language into the revised forest plan.

*C6 - Evaluate additional areas for special designation, including areas with cultural values, opportunities for connectivity, and areas important for the protection of plant communities and special habitats vulnerable to climate change.*

Currently, there is a unique sync in timing of federal lands planning in the Rio Grande valley across Colorado and New Mexico. This is an opportunity for a true landscape scale collaborative approach to management of almost 5 million acres (see attached map). Trout Unlimited is asking for the RGNF to include in the plan these larger ideas in the decision making of area designations (see attached letter). The past plan was not afforded the same opportunity to work across boundaries, and the management of neighboring federal lands should be taken into consideration during this new planning process. In light of this new opportunity, and the flexibility of new geographic and management areas as addressed in line B2, there is sufficient reason to pursue new areas for special designations. Furthermore, climate change has created extreme risks for coldwater fish. The U.S. Geological Survey as recently finalized a survey that finds nearly two-thirds of remaining RGCT populations survive in streams with baseflows of less than 1 cfs. Because 60 percent of RGCT habitat exists on national forests in Colorado and New Mexico, we believe updated definitions of special designations would be appropriate.

## D. Desires identified through the Assessment phase

*D2 - Revisit the oil and gas leasing Available Analysis completed for the 1996 Forest Plan.*

Trout Unlimited supports the new plan containing an updated oil and gas leasing analysis and direction for protecting areas from future oil and gas leasing. We also support a separate NEPA process for defining the management direction which the RGNF plans to take in designating areas available and unavailable for oil and gas leasing and development.

*D13- Revisit the off-road game retrieval policy on the Rio Grande National Forest.*

Trout Unlimited and our members would like to see aspects of the Forest's off–road game retrieval policy updated to reflect current hunting trends and new science about impacts to the landscape and to wildlife. We believe the Forest Plan to be an appropriate place for this conversation, but would also support a subsequent Travel Management Plan if it were to address the game retrieval policy at that time.

*D19 - Update plan direction for the removal of common mineral materials, such as commercial contracts,*

---

Rvsd Plan - 00002168

*personal, ceremonial, and free use permits*

Increasing popularity of recreational suction dredge mining has become an issue among many trout streams in the West. As technology and access increases, TU would like the revised plan to reflect these changes and provide the opportunity for protecting watersheds and the sensitive aquatic habitats where trout live. There have been significant investments in instream river work across the RGNF since the 1996 Plan to which new small scale mining techniques pose a threat.

## Identified Priorities Missing from the Draft Need for Change

*Abandoned Mine Reclamation Sites.*

Missing from the Need for Change document is any mention of abandoned mine cleanup opportunities. We believe the new plan should contain direction and a prioritization mechanism for addressing the remediation and reclamation of abandoned mine sites. The RGNF in particular has been a leader in utilizing partnerships and innovative techniques to have positive impacts on formerly dead zones caused from abandoned mines. Kerber Creek is an example of a waterway which has seen significant regeneration as a trout fishery after a mine reclamation process was initiated. Without strong directives and foresight, a project on the scale of Kerber creek would be impossible. The RGNF Abandoned Mine Land Inventory Project completed by Forest districts from 1993 through 1998 is a baseline from which the Forest Service can expand. This Inventory Project was not included in the 1996 Plan and we recommend reconsideration for the new plan revision. As such we ask the Forest Service to examine and include in their need for change language concerning abandoned and polluting mines on Forest Service property.

## Conclusion

Trout Unlimited is committed to protecting and restoring the unique fish and wildlife and habitat values of the Rio Grande National Forest. We appreciate the opportunity to participate in the forest plan revision process and would like to work cooperatively with the Forest Service on the issues discussed above. A strong plan developed with cooperating partners will help achieve ecologically sustainable, fiscally realistic, and enforceable management options for the forest resources in the future.

Please feel free to contact me with any questions.

Sincerely,

Garrett Hanks
SW Colorado Field Organizer
Trout Unlimited
1309 E. 3rd Ave., Suite 109
Durango, CO 81301
970-430-5540
ghanks@tu.org

Mark Seaton
President
San Luis Valley Chapter, Trout Unlimited
P.O Box 503
Alamosa, CO 81101
719-588-7678
slvtroutunlimited@gmail.com

and on behalf of :

Rvsd Plan - 00002169

    

February 26, 2016

Cal Joiner, Regional Forester
U.S. Forest Service, Southwest Region
333 Broadway Blvd. SE,
Albuquerque, NM 87102

Dan Jirón, Regional Forester
U.S. Forest Service, Rocky Mountain Region
740 Simms St.
Golden, CO 80401

Amy Lueders, New Mexico State Director
Bureau of Land Management
301 Dinosaur Trail
Santa Fe, NM 87508

Sue Masica, Regional Director
National Park Service, Intermountain Region
12795 Alameda Parkway
Denver, CO 80225

Dear Regional Foresters Cal Joiner and Dan Jiron and Directors Amy Lueders and Sue Masica:

We write to bring to your attention an exciting opportunity for the United States Forest Service (USFS), Bureau of Land Management (BLM), and the National Park Service (NPS) to coordinate your respective federal land management planning efforts in the Upper Rio Grande watershed. Our sporting organizations represent thousands of hunters and anglers in Colorado, New Mexico, and throughout the west who enjoy outdoor experiences on USFS, BLM and NPS administered lands. We are currently collaborating with the USFS in the development of the Carson, Santa Fe and Rio Grande National Forests plan revisions, the BLM on the Rio Grande del Norte National Monument plan amendment, and the NPS on the upcoming plan development for the recently established Valles Caldera National Preserve.

These planning efforts will encompass more than five million acres of federal lands within the Upper Rio Grande watershed, a treasured landscape in both Colorado and New Mexico.[1] This landscape is also home to a 90,000 acre conservation easement (the single largest conservation easement ever donated to the U.S. Fish and Wildlife Service), as well as the 579,000-acre Vermejo Ranch that is managed with a conservation and wildlife focus.

Given the immediate adjacency and collective ecological significance of these administrative units within the headwaters of the Rio Grande, simultaneous revisions present a unique opportunity to showcase an "all lands" approach for managing landscape connectivity and large-scale species movement. In the case of the Upper Rio Grande, the daily and seasonal movements of animals within home ranges, dispersal and genetic interchange among populations, and potential range shifts in response to climate change will span borders between states and land jurisdictions. With over five million acres currently in play, we can shape the long-term management of one of the largest blocks of wild public lands in North America -- an area coveted by sportsmen for its hunting and fishing, important fish and wildlife habitat

---

[1] The Carson National Forest National Forest is 1.5 million acres, the Santa Fe National Forest is 1.6 million acres, Rio Grande National Forest is 1.8 million acres, Rio Grande del Norte National Monument is 242,455 acres, and the Valles Caldera National Preserve is 89,000 acres.

and movement corridors. The concept of landscape-level integrated planning is emphasized in the USFS's new planning rule (including requirements that the agency maintain or restore connectivity in forest plans and coordinate planning with other federal agencies), the BLM's Planning 2.0 revision process, and the NPS's management policy for cooperative conservation beyond park boundaries. The Upper Rio Grande could be a model landscape for piloting cooperative and integrated planning for species and landscape connectivity.

To that end, we ask that you capitalize on this opportunity and coordinate the Carson, Santa Fe, and Rio Grande National Forests, Valles Caldera National Preserve, and BLM Rio Grande del Norte National Monument land management planning processes, especially around landscape connectivity and species movement. For such efforts to succeed, each administrative unit must be committed to collaborating and identifying planning alternatives that enhance landscape connectivity and species movement and have the support of their leadership. We respectfully ask that you make the Upper Rio Grande a replicable model for providing connectivity and species movement at a multi-state, multi-jurisdictional scale.

Thank you for your consideration of this request.

Sincerely,

Garret Hanks
Southwest Colorado Field Coordinator
Trout Unlimited
ghanks@tu.org

Toner Mitchell
New Mexico Water and Habitat Program Manager
Trout Unlimited
tmitchell@tu.org

David Lien
Chairmain
Colorado Backcountry Hunters & Anglers
dlien442@gmail.com

Oscar Simpson
State Chair
New Mexico Backcountry Hunters & Anglers
oscarsimpson3@yahoo.com

Suzanne O'Neill
Executive Director
Colorado Wildlife Federation
cwfed@coloradowildlife.org

Garrett VeneKlasen
Executive Director
New Mexico Wildlife Federation
garrett@nmwildlife.org

Brian Kurzel
Regional Executive Director- Rocky Mountain
Regional Center
National Wildlife Federation
KurzelB@nwf.org


cc:

Dan Dallas, Forest Supervsior, Rio Grande National Forest
James Duran, Forest Supervisor, Carson National Forest
Maria Garcia, Forest Supervisor, Santa Fe National Forest
Sarah Schlanger, Field Manger, BLM Taos Field Office
Jorge Silva-Bañuelos, Valles Caldera National Preserve

# Conservation Opportunities in the Upper Rio Grande Landscape



Rio Grande NF

Pueblo

Alamosa

Durango

Colorado

New Mexico

Rio Grande del Norte National Monument

Vermejo Park Ranch

Carson NF

Taos

Sante Fe NF

Valles Caldera NP

Santa Fe

**Legend**

- Units undergoing land management planning
- National Forest
- BLM Land
- Bureau of Indian Affairs Land
- National Wildlife Refuges
- National Parks
- Designated Wilderness
- Wilderness Study Areas
- Area of Critical Environmental Concern
- Conservation Easements
- BLM Lands with Wilderness Characteristics
- National IRAs
- Colorado Roadless Areas, Upper Tier
- Colorado Roadless Areas
- State Parks & Wildlife Areas

0   10   20   30   40 Miles

Rvsd Plan - 00002173



**WOLF CREEK**
THE MOST SNOW IN COLORADO®

P.O. Box 2800
Pagosa Springs, CO 81147

Business Office: (970) 264-5639          Ski Report 800-SKI-WOLF          Fax: (970) 264-2392
Web Site: www.wolfcreekski.com                              Email: wolfcreekski@wolfcreekski.com

Friday, April 15th, 2016

Rio Grande Forest Plan Comments
13308 US Hwy 160
Del Norte, CO 81132
Rgnf_forest_plan@fs.fed.us

Dear Mr. Dallas,

Wolf Creek Ski Area (WCSA) participated in a variety of ways during the assessment phase of the Rio
Grande Forest Plan Revision by attending public meetings, discussing observations and ideas with forest
staff, contributing to the MindMixer website, and submitting written comments. The Forest Plan will
direct forest management for decades to come, and as such, WCSA appreciates the opportunity to
provide comment throughout the process. This letter is in regards to the Needs for Change document
and draft assessments.

**NEEDS FOR CHANGE**

In the Needs for Change document, WCSA offers comment on A1, A6, A9, B4, B5, C1, D5 and D15 below:

- **A1:** WCSA supports the demarcation in forest management directive between salvage sales and
  green timber sales, hereby warranted with the decimation of timber stands on the Rio Grande
  National Forest (RGNF). The former type of sale should be administered with greater expediency
  and flexibility in order to extract timber while it still has value and to improve forest health.
  WCSA would also like the RGNF to consider non-traditional timber sales that enhance forest
  accessibility by building or repairing road infrastructure usable for timber removal as well as
  recreation.
- **A6 & D15:** Wolf Creek supports increased renewable energy production on the RGNF, and
  believes it warrants specific consideration separate from non-renewable energy in the new
  Forest Plan.
- **A9:** As stated throughout the draft assessments, there is conflict between motorized and non-
  motorized forest users. In order to address this debate, WCSA believes that the Forest Service
  needs to quantify forest visitors by user type, assess their impact, and devise a travel
  management plan for current and future recreation trends.
- **B4 & B5 & D5:** As a longtime partner in recreation with the Rio Grande National Forest, WCSA
  will move forward with its plan for sustainable infrastructure improvements. This is a core
  component of the management philosophy, in which development is grounded in improving the
  ski experience for WCSA guests on the RGNF. This experiential ski philosophy is based on
  attracting visitors throughout the season by offering a unique experience, rather than

Rvsd Plan - 00002174

developing the Special Use Permit to allow for ever larger peak days. This business strategy supports local economies that depend upon Wolf Creek Ski Area throughout the entire winter season.

- **C1:** Wolf Creek supports the use of prescribed and naturally occurring fire as a management tool. WCSA advocates for greater autonomy for forest officers at the local level to determine when fire, both naturally occurring and prescribed, is a healthy treatment option for the forest.
- **D15:** As part of the Winter Operating Plan, WCSA prohibits the use of drones on the Special Use Permit.

## DRAFT ASSESSMENTS

WCSA reviewed the executive summaries of all forestwide planning assessments, but the specific document of interest is *Assessment 9- Recreation*. WCSA is pleased to see the proposed area of expansion is being considered, as stated on page 11: "We also emphasize existing and potential ski-based resorts in management area 8.22. This management area encompasses the Wolf Creek Ski Area, including locations where expansion may occur."  The aforementioned expansion area is approximately 85 acres near Alberta Park Reservoir that will tie in well with the proposed Meadow Lift. This additional acreage offers north facing, exciting new ski terrain that will complement the upward trend in recreationalist seeking the pseudo-backcountry ski experience.

As commented upon above and echoed throughout the planning document, voluntary separation of different user types, specifically between motorized and non-motorized users, does not always work. In order to address this conflict, WCSA supports thorough summer and winter use surveys from which the Forest Service can designate specific areas as motorized and non-motorized. While this is sure to be a contentious process, it will in fact alleviate the growing tension between different forest user groups.

When considering additional Special Use Permits on the RGNF, WCSA believes it is imperative that all applicants are held to the same level of scrutiny. Different user groups have different impacts that should thus be analyzed when determining management area allotments and permit applications.

## IN CLOSING

The comments above, along with verbal and written statements previously on record, are part of the continued dialogue between the Rio Grande National Forest and Wolf Creek Ski Area on the future of the forest.  Any and all of these ideas welcome discussion with forest staff throughout the Rio Grande Forest Plan Revision process.

Sincerely,

Davey Pitcher
President & CEO
Wolf Creek Ski Area



# Intermountain Forest Association

2218 Jackson Blvd, Ste 10, Rapid City, SD 57702
605-341-0875    Fax 605-341-8651

April 18, 2016

Mr. Dan Dallas
Rio Grande NF
1803 W. Highway 160
Monte Vista, CO 81144

Dear Mr. Dallas:

On behalf of the members of the Intermountain Forest Association, I appreciate this
opportunity to offer comments on the draft Assessments and the draft Need for Change
documents associated with the Rio Grande NF forest plan revision.

## Recommendation 1, Natural Range of Variation

Natural Range of Variation (the term used in the 2012 Planning Rule) is crucial to the forest
plan revision since Ecosystem Integrity is measured, in part, by whether or not the
dominant characteristics of the ecosystem a) are within the range of what would occur
"naturally" (natural range of variability), and b) can stay within that range as each
ecosystem is influenced by stressors such as climate change, as well as development and
other uses of the forest.

We have two significant concerns regarding the RGNF's estimates of NRV, the first being
the concept of NRV equilibrium and the second being several of the assumptions used to
estimate NRV.

NRV Equilibrium – The title for Figure 3, on page 16 of Assessment 1 and 3, compares
current and projected future habitat structural stage classes to a "natural range of variation
equilibrium" condition. We do not support the "equilibrium" approach. The basic concept
of NRV assumes a "range" of natural conditions against which current conditions and a
range of future conditions can be compared. According to Weins et al (2012), "The notion
that equilibrium or stasis was the norm in the natural landscape prior to major impacts from
European settlement in North America is no longer tenable in the light of several decades of
research on environmental history". Further, use of an "equilibrium condition" would force
the RGNF into comparing forest attributes against a very narrow range of conditions. We
recommend that you discard the "equilibrium condition" approach, and make new RGNF
NRV estimates for a "range" of natural conditions.

1

Assumptions – We question several of the assumptions used in the modeling of NRV, including:

-Overly optimistic projections of spruce-fir forest regeneration – page 18 of Assessments 1 and 3 states that "the current overabundance of grass/shrub conditions largely disappears in the first 20 years of projections and open conifer forests are mostly replaced by mid- and closed- cover forests over the first century of projections".

There is considerable evidence that regeneration to spruce-fir following fires will take considerably longer than 20 years. Romme (2009) estimated 40-50 years after fires where inadequate seed sources remained, and an 80-year delay in abundant spruce regeneration in one stand above 11,000 feet. Further, the attached white paper from Paul Minow describes 1) "large expanses of aspen that are on the forest now can be attributed to past fires", ie, the succession pathway to spruce-fir is likely to include an intermediate aspen stage, 2) "several fires have left the forest treeless and converted to rangelands", including the Osier Mountain Fire which burned a "great stand of spruce forest" in 1879 and "50% of the area is still grass", ie, the succession path to spruce-fir may include a long stage of grasslands. Finally, the Cumbres Vegetation Management FEIS states (on page 70) "If a severe wildfire were to occur in the areas heavily impacted by spruce beetle, a type conversion to grassland similar to the spruce-fir forest burned in the 1870s Osier fire would be a likely outcome." Other recent project NEPA documents on the RGNF contained similar comments.

-The assumption that large spruce beetle epidemics like the one currently affecting the RGNF are not within the NRV – The decision to not include large spruce bark beetle outbreaks as discussed on page 18 of Assessments 1 and 3 misreads the science, including the quote in the 5th paragraph. The discussion on page 68 of Assessment 1 and 3 includes the following -- "The Region 2 and the Rio Grande experts who helped develop the insect transition parameters determined that outbreaks of the severity that have recently occurred are too rare to model, and therefore the spruce beetle outbreaks represented in the model represent moderate, but not extreme, severity events". We disagree. There is considerable evidence that spruce beetle epidemics just like the one currently affecting the RGNF are not unprecedented. Schmid and Frye (1977) discuss historic spruce beetle epidemics on pages 1 and 2, and the effects of those epidemics on succession on pages 20 and 21. Similarly, Romme et al (no date) concluded "There is no evidence to support the idea that current levels of bark beetle or defoliator activity are unnaturally high. Similar outbreaks have occurred in the past." Finally, foresters who have worked extensively on the RGNF observe that the current monoculture of age classes now on the RGNF appear to have been set up by historic extensive spruce bark beetle epidemics or fires.

-Modeled patch sizes may not be appropriate for the RGNF – The modeled patch sizes for spruce fir insects outbreaks were 75% at 25 acres, 10% each at 5 acres and

Rvsd Plan - 00002177

250 acres, about 3% at 2,500 acres, and about 2% at 25,000 acres, all based on patch size distribution from Blue Mountains in Oregon (Figure 11, p 68, Assessment 1 and 3). We question whether those modeled patch sizes are accurate and appropriate for the RGNF, especially considering the size of the current epidemic.

-An assumption that the fire return interval in spruce-fir is 500 years. That is considerably longer than the 300-year spruce-fir fire return interval estimated in Romme 2009.

As acknowledged on page 18, incorporating these assumptions into the RNV modeling yields a result "that is not necessarily in agreement with the published literature". Given the 2012 Planning Rule's emphasis on Best Available Science, use of a result " that is not necessarily in agreement with the published literature" should be done very cautiously and only with a very strong rationale. In our opinion, that rationale does not exist.

We recommend a thorough review of how RNV has been estimated for the RGNF.

## Recommendation 2, Species of Conservation Concern

According to the 2012 Planning Rule, Species of Conservation Concern are: "a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which the regional forester has determined that the best available scientific information indicates substantial concern about the species capability to persist over the long-term in the plan area."

The RGNF is required to compile a list of potential SCCs, and the Regional Forester will then make a decision about which species are on the SCC list for the RGNF.

In general, the draft list of SCCs does not contain adequate rationale for species' inclusion on the list. We are concerned that there are many species included on the Draft SCC list for which there are no known population on the RGNF (for example, Northern Leopard Frog, Veery, Wolverine, Ryberg's golden columbine, Aztec milkvetch, etc.) or for which there is no documented "substantial concern" about the species' capability to persist over the long-term in the plan area (for example, Black swift, Boreal owl, Flammulated owl, Northern goshawk, American marten, etc.). Since those species don't meet the "black and white" requirements for SCCs, they should be removed from the draft list of SCCs. If new information becomes available that documents a known occurrence or substantial concern about long-term persistence, then those species can be added to the list at that time.

Finally, we recommend that the Regional Forester make the decision on the final SCC list early enough in the plan revision process to allow the RGNF and the public to consider that information in the preparation of and comments on the draft plan and DEIS.

## Recommendation 3, Lynx

In general, the Planning Rule requires the forest plan to provide the ecological conditions necessary to contribute to the recovery of federally listed threatened and endangered

Rvsd Plan - 00002178

species. We are particularly concerned about the Canada lynx and the direction in the Southern Rockies Lynx Amendment (SRLA), and include by reference our February 3, 2016 letter to the RGNF.

According to the Assessment:
       a) there were kittens in 2015, the first documented since 2010,
       b) there are a little over 1 million acres of mapped lynx habitat on the RGNF,
       c) 780,000 acres of lynx habitat have been affected by the spruce beetle epidemic,
       d) the spruce beetle epidemic doesn't seem to be affecting lynx distribution or reproduction,
       e) the RGNF has identified connective habitat that "is essential" for lynx movement,
       f) the majority of high-quality lynx habitat is/was late-successional spruce-fir cover types, and
       g) timber harvest is never mentioned as one of the risk factors for lynx.

We request that you address the following questions as part of the RGNF forest plan revision:
       1) Is all of the SRLA direction necessary to "contribute to the recovery of lynx"?
       2) Are LAUs and all the calculations associated with suited/not suited habitat necessary to "contribute to the recovery of lynx"?
       3) What is proposed management prescription for "connective habitat", and is that necessary "to contribute to the recovery of lynx"?
       4) Which acres of the RGNF will be managed for lynx habitat?  What will be the criteria for determining those acres, and will the public have an opportunity to review and comment on the proposed mapping?
       5) If timber harvest is not a risk factor, why have forest plan components to address timber harvest?
       6) If late-successional spruce-fir cover type is most used by lynx, what forest management strategy is proposed to provide adequate late successional spruce-fir habitat over the long-term?
       7)  What are the desired conditions for long-term lynx habitat on the RGNF?
       8) Can lynx habitat needs be adequately provided through the "coarse filter" section of the revised forest plan.
       9) Can lynx habitat needs be adequately provided through SRLA Objectives VEG 01 – 04 (see attached)?

Attached are two pages from the Big Moose FEIS. We are concerned about the time and energy spent by RGNF wildlife biologists tracking the various acreages and percentages in Table 3.8-1 in order to comply with the SRLA, all of which may be of little value to lynx recovery.  We are also concerned about the various acreage "caps" and the potential long-term effects of those caps on vegetation management.

We recommend that you incorporate these considerations into the forest plan revision.

## **Recommendation 4, Timber Harvest/Silviculture**

The forest planning directives require that the Forest Assessment include "standing inventory, age classes, growth, and mortality". Notwithstanding the effects of the spruce bark beetle epidemic on available forest inventory data, we request that you include the most current information available.

As discussed on Page 9 of Assessment 8, one of current forest plan Guidelines is "Our chosen silviculture system should emulate the pattern, timing, and frequency of natural disturbances found in the landscape being treated." Considering the history of natural disturbances on the RGNF and the current widespread spruce bark beetle epidemic, we recommend a different approach for the revised forest plan.

Specifically, we recommend that the revised forest plan maximize salvage of dead spruce in order to reduce forest fuels, hasten establishment of 'the next forest', and utilize dead trees for products and economic benefits. We also recommend that the PTSQ for the first two decades not be limited by "non-declining constraints". Finally, we recommend that the RGNF not limit the PTSQ based on current budget and/or staffing levels; instead, we recommend a two-tiered approach, similar to that proposed by the Francis Marion NF (see FMNF Draft Revised Forest Plan OBJ-F-2(o)).

Page 11 of Assessment 8 explains that of the 1.8 million acres of the RGNF, only a small portion (17%) are considered suitable for timber production. Then, on page 14, the Assessment states "only 9 percent of the total forest is eligible for us to manage to improve watershed health based on the current forest management plan and economic considerations." This statement is based on work completed by Forest Stewardship Concepts in 2014. Because the work completed by FSC had different objectives and priorities, and was not a public process, we recommend deleting that language. By no means do we believe that information should be included in the consideration of NFC items A1 and B2.

### Recommendation 5, Climate Change

Considering that Need for Change A7 states that management direction should be revised to address climate change, we believe Assessments 1 & 3 should be beefed up to include current status of climate change on the RGNF as well as the best available projections for climate change, and the potential to affect wildfire frequency and intensity, insect infestations, invasive species, flooding, erosion, forest composition and health, and sedimentation. In particular, we recommend similar information to that recently published in the GMUG's SBEADMR (Spruce Beetle Epidemic and Aspen Decline Management Response) Final EIS, including:

> *-Furthermore, these disturbances are occurring in the context of a changing climate. Over the past 100 years, Southwestern Colorado temperatures have increased, and modeled climate projections for the region include warmer and longer frost-free summers, snowline moving up in elevation, earlier snowmelt, and consequently, a longer fire season.*

*-Due to predicted warming, spruce beetle outbreaks could be more likely in the future. Higher summer temperatures can foster spruce beetle outbreaks by allowing beetles to reproduce every year rather than every two years (Bentz et al. 2010). Additionally, anticipated more frequent drought conditions place water-stressed stands at greater risk of insect and disease.*

*-Climate changes could lead to larger fires and possibly fire with more high-severity area than in previous decades (Westerling et al. 2006, Agee 2007, Funk 2012). Modeled climate scenarios for the Gunnison Basin by 2035 indicate potential for the fire season to increase by one month; for fire frequency in high-elevation forests to increase from 4 to 12 times as often as experienced between 1971-2000; and for fire extent to increase from 6 to 11 times the extent burned between 1971-2000. These scenarios model severity and frequency irrespective of tree mortality (Rangwala and Rondeau, Southwest Colorado Social-Ecological Climate Resilience (SECR) Project). (Pages 2-3).*

### Recommendation 6, Fire

Page 2 of Assessments 1 and 3 state that the RGNF is unclear how allowing fire on the landscape with current high fuel loadings will impact the desired conditions in specific forests types; however, according to page 9, research suggests it is not an issue.

We recommend further review of research, including:

- Jenkins, MJ, Page, WG, Hebertson, EG, Alexander, ME. 2012. Fuels and fire behavior dynamics in bark beetle attacked forests in western North America and implications for fire management. Forest Ecology and Management. 275:23-34.
- Jorgenson, C.A., and M.J. Jenkins. 2010. Fuel Complex Alterations Associated with Spruce Beetle-Induced Tree Mortality in Intermountain Spruce-Fir Forests, USA. For. Sci. 56:In press.
- Effects of Drought on Forests and Rangelands in the United States: A Comprehensive Science Synthesis.
  http://www.fs.fed.us/sites/default/files/DROUGHT_book-web-1-11-16.pdf

### Recommendation 7, Biological Diversity

A primary contributor to size and intensity of the spruce bark beetle epidemic in the Rio Grande NF over the past 15 years was the lack of age and size class forest diversity. One of the most important outcomes of the Rio Grande NF plan revision should be a Desired Condition for forest Biological Diversity, ie, age class, size class, etc. and a strategy to acheive that desired condition.

We recommend that the revised forest plan include detailed Desired Conditions for forest vegetation, both for suited and nonsuited timberlands. Our experience is different than the following sentence found on page 2 of Assessment 1 and 3: "Standards and guidelines in our current Forest plan were written to move the forest toward these desired conditions." From our experience, standards and guidelines have very little to do with moving a forest

toward desired conditions.  Accordingly, we recommend that the RGNF revised forest plan emphasize Objectives and Desired Conditions over Standards.

## Need for Change Document

Following are several general comments:

-we recommend that you add background and rationale for Need for Change items based on "internal staff recommendations".

-we recommend consistently referring to "the current forest plan", instead of "the previous forest plan".

-we recommend that the term "Revisit", as used in a number of Need for Change items, be supplemented with a more descriptive discussion of the objective.

-we note that many Desired Conditions and Objectives in the current forest plan do not conform to the definitions for those components in 219.7(e), and recommend that Desired Conditions and Objectives in the revised forest plan be written to conform with 219.7(e).

-the current forest plan contains numerous Standards and Guidelines that restate law, regulations, or Forest Service policy.  We recommend that all plan components be written so they do not repeat laws, regulations, Forest Service directives, etc. (219.2(b)(2)).

A2 – We recommend you modify A2 to clarify that potential new wilderness areas will be analyzed and considered, but, there is no requirement to recommend new wilderness areas.

A4 – We recommend that you modify A4 to "Update plan direction to conform to requirements for recovery or conservation of federally recognized threatened, endangered, proposed, and candidate species".

A5 – We recommend that you modify A5 to "Identify potential species of conservation concern.  Provide management direction to manage habitat to ensure viable populations for the species of conservation concern selected by the Regional Forester."

A7 – Among other things, revising management direction related to climate change should include the following as discussed on page 8 of Assessment 4:  1) the fact that forests can covert to being a large carbon source if fire and fuels management are ineffective, and 2) that salvaging standing dead trees and turning them into wood products not only permanently stores carbon, but also reduces the amount of carbon that could be released in a wildfire.

A9 - Because roads are such a critical issue, and important to many different programs, we would like to see more detail in Assessment 11 about how Forest Service roads are maintained.  For example, many roads are maintained annually through timber sale requirements.

B3 – We recommend modifying B3 as follows: "Revise the current plan to allow for more adaptive management to better meet and monitor desired conditions through the help of partnerships, volunteers, State and local governments, and NGOs."

B4 and B5 - We recommend that consideration of local economies and sustainable infrastructure include sawmills and other wood product facilities, which are critical for achieving sustainable forest management objectives. Forest management jobs (non-services type jobs) are well-paying jobs. It is important to have a sustainable supply of timber to ensure that these types of jobs are sustained. In comparison, service related jobs paid 29% less, on average. Forest related jobs have dropped from 1% to .4% since 1998, which is tied to the lack of supply. The timber section of Assessment 7 should also discuss the road maintenance that gets done through timber sales, which is a very important "service" that benefits multiple resources.

C2 – We recommend expanding C2 beyond air quality monitoring to consider revising the plan components related to air quality. Page 47 of Assessment 2 states "wildfire emissions, depending on the year, can be the most significant source of pollution within and around the Forest, **but are not controllable by management except indirectly, through fire suppression."** Given the very large amount of mortality, we feel strongly that salvage, at least on suitable acres, could be a significant smoke management tool by reducing the amount of fuel that could potentially burn during a wildfire, and should be mentioned. We also recommend a serious discussion about air quality, smoke from prescribed burning, smoke from burning piles, smoke from managed wild fires, and "natural" air quality.

C3 – Wildfire is the greatest current and potential threat to watersheds, water quality, and water quantity. As part of this change item, we recommend incorporating the standards and other relevant direction in the Water Conservation Practices Handbook into the forest plan.

New Need for Change Issues

We have two recommendation regarding Canada lynx:

> 1-that review and reconsideration of the Southern Rockies Lynx Amendment direction be added to Section A of the Need for Change, since that is required by the SRLA Record of Decision.
>
> 2-that forest plan lynx direction be included with all other plan components, and not in an appendix.

Thank you for your consideration. We would be happy to discuss these comments and recommendations with you at your convenience.

Sincerely,

*Thomas A. Troxel*

Thomas A. Troxel
Executive Director

8

Rvsd Plan - 00002183



# Intermountain Forest Association

2218 Jackson Blvd, Ste 10, Rapid City, SD 57702
605-341-0875    Fax 605-341-8651

August 22, 2016

Mr. Dan Dallas
Rio Grande NF
1803 W. Highway 160
Monte Vista, CO 81144

Dear Mr. Dallas:

On behalf of the members of the Intermountain Forest Association, I appreciate this opportunity to offer the following comments on Version 2 of the draft Need for Change associated with the Rio Grande NF forest plan revision:

**Item A2**
We recommend rewording to "Identify and evaluate lands that may be suitable for Wilderness designation and determine whether or not to recommend any of those lands for Wilderness designation." That will help to clarify that there is no requirement to make any recommendation for Wilderness designation.

**Item A4**
We recommend rewording to "Update direction to contribute to the recovery of federally…" We, again, recommend that the RGNF specifically review and reconsider the Southern Rockies Lynx Amendment (SRLA) during forest plan revision, as required by the SRLA Record of Decision. As discussed in our February 3, 2016 letter, there are many questions regarding lynx and the SRLA that should be addressed during the forest plan revision process. We especially encourage you to analyze ways to simplify the habitat accounting requirements in the SRLA. We also recommend that forest plan lynx direction be included with all other plan components, and not in an appendix.

**Item A5**
We recommend rewording to "Provide management direction …"

We support including the proposed list of SCCs with the initial proposal. As we discussed in our previous letter, and want to reiterate again, we recommend that the Regional Forester make the decision on the final SCC list early enough to allow the RGNF and the public to consider that information in the preparation of and comments on the draft plan and DEIS.

**Item A6**

We recommend that woody biomass be included in the management direction related to renewable energy.

**Item A10**

We recommend that the Watershed Condition Framework process be open to the public in order to facilitate the goal of achieving integrated resource management.

**Item B3**

We recommend that the goal of "protecting and restoring watershed health, water resources, and the systems that rely on them" be changed to "protect, manage, and restore." Active management will be a critical piece in achieving the listed goals.

**Additions**

We recommend two additions to Section A of the NFC –

-"Provide direction for timber management," as required by 219.11.

-"Develop direction to provide for ecosystem services and multiple uses," as required by 219.10.

Finally, we recommend one more addition to the NFC –

-"Develop desired conditions and other plan components for long-term forest restoration and resilience, forest health, and diversity of forest vegetation."

We appreciate your consideration of these recommendations as you move forward in the plan revision process. I would be happy to discuss these comments if you have any questions.

Sincerely,

*Thomas A. Troxel*

Thomas A. Troxel
Executive Director

**Minks, Erin - FS**

| | |
|---|---|
| **From:** | Blackwolf, Guy E -FS on behalf of FS-RGNF forest plan |
| **Sent:** | Tuesday, May 10, 2016 11:10 AM |
| **To:** | Minks, Erin - FS; Blakeman, Mike -FS |
| **Subject:** | FW: forest plan comments/ Update: forwarding Comment from Jan Crawford |
| | |
| **Expires:** | Sunday, November 06, 2016 12:00 AM |

Good Morning I am forwarding a comment on the Forest Plan Revision/Need for Change document for your review and record from Jan Crawford dated 3/14/2016. No attachments were included with this comment.

Thank you,



**Guy E. Blackwolf**
**NEPA Planner**
**Forest Service**
**Rio Grande National Forest, Supervisor's Office**

p: 719-852-6270
f: 719-852-6250
geblackwolf@fs.fed.us

1803 W Highway 160
Monte Vista, CO 81144
www.fs.fed.us

Caring for the land and serving people

**From:** Jan Crawford [mailto:jdchda@gojade.org]
**Sent:** Monday, March 14, 2016 4:54 PM
**To:** FS-RGNF forest plan <rgnf_forest_plan@fs.fed.us>
**Subject:** forest plan comments

In reading the Need For Change document n the web site, I was unable to find a section that might cover changes needed to reduce existing and future threats to the land and water due to livestock grazing. I am attaching a photo of a creek I have fished for over a decade that has been severely damaged by grazing on the allotment. Given its current and anticipated staffing and budgets, and the lack of easy access to many remote areas, the FS cannot possibly visit every allotment frequently enough to identify and remedy damage like this. In the face of climate change, the risk to the forest may well increase in the future. What can be added to the planning process to potentially enlist more stakeholders in providing better tracking of this and other threats to the forest in the future?

Thanks for your hard work in managing our forest, and for any ideas you might encounter to remedy this problem.

1

Rvsd Plan - 00002186



United States
Department of
Agriculture

**Forest Service**

Rio Grande
National Forest

September 2016



# The Rio Grande National Forest Plan: Proposed Action

In developing a proposed revised plan, the responsible
official *"shall engage the public… early and throughout
the planning process."*
(36 CFR 219.4 (a)).



RIO GRANDE PYRAMID IN THE WEMINUCHE WILDERNESS.

Rvsd Plan - 00002187

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov (link sends e-mail).

USDA is an equal opportunity provider, employer, and lender.

# Rio Grande National Forest
# Proposed Action

**Lead agency:**          USDA Forest Service

**Responsible official:**   Dan Dallas, Forest Supervisor
                          Rio Grande National Forest

**For information,**       Erin Minks, Planning Team Leader
**contact:**              1803 W. Highway 160
                          Monte Vista, CO
                          81144
                          719-852-6215

**Email comments or**      rgnf_forest_plan@fs.fed.us
**questions to:**

**Documents are posted:**   Forest Plan Revision webpage

**Abstract:** The Forest Service has identified the preliminary purpose and need and proposed action to revise the 1996 Rio Grande National Forest Land and Resource Management Plan in accordance with the 2012 National Forest System Land Management Planning Rule adopted by the U.S. Department of Agriculture. Assessments documenting existing information about relevant ecological, economic, and social conditions, trends, and sustainability and their relationship to the land management plan within the context of the broader landscape were published during the spring of 2016. Relevant information from the assessments, applicable laws and policies, and public comment were considered in determining the need to change and proposed action.

i

*USDA Forest Service*



UPPER EAST WILLOW CREEK, PART OF THE WASON PARK CRA.

Rvsd Plan - 00002190

*Proposed Action—Rio Grande National Forest Plan Revision*

# Contents

Introduction ................................................................................................................................. 1
Strategic Framework .................................................................................................................... 2
Forest-wide Vision ....................................................................................................................... 4
    Roles & Contributions ............................................................................................................. 4
    Forest-wide Goals ................................................................................................................... 7
        Goal 1: Protect and restore watershed health, water resources, and the systems that rely on them .. 7
        Goal 2: Maintain and restore sustainable, resilient ecosystems ........................................... 8
        Goal 3: Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land ................................................................................................. 8
Strategic Domain .......................................................................................................................... 9
    Forest-wide Desired Conditions .............................................................................................. 9
    Objectives ............................................................................................................................. 13
    Geographic Areas ................................................................................................................. 13
        Fire Management Zones ...................................................................................................... 15
            Fire for Resource Benefit - Maintenance zone (FRB-M) ................................................ 15
            Fire for Resource Benefit - Restoration and Protection (FRB-RP) zone ......................... 15
            Resource Protection (Wildland Urban Interface) zone (RP) ........................................... 16
        General Forest Geographic Area ......................................................................................... 16
        Primitive Wilderness Geographic Area ................................................................................ 18
        Roadless Geographic Area .................................................................................................. 19
        Specially Designated Geographic Area ............................................................................... 21
Tactical Domain ......................................................................................................................... 23
    Management Areas ............................................................................................................... 23
        Proposed Management Area 1.1 – Designated Wilderness ................................................. 23
        Management Area 1.5 – Eligible Wild Rivers ...................................................................... 24
        Management Area 2.2 – Research Natural Areas ............................................................... 24
        Management Area 3.1 – Special Interest Area—Use and Interpretation Emphasis ............ 25
        Management Area 3.3 – Backcountry .................................................................................. 25
        Management Area 3.4 – Designated and Eligible Scenic Rivers ....................................... 26
        Proposed Management Area 3.5 – Colorado Roadless Area .............................................. 26
        Proposed Management Area 3.6 – Upper Tier Colorado Roadless Area ........................... 28
        Management Area 4.3 – Dispersed and Developed Recreation .......................................... 29
        Management Area 5.11 – General Forest and Intermingled Rangelands ........................... 29
        Management Area 5.13 – Forest Products .......................................................................... 30
        Management Area 5.41 – Deer and Elk Winter Range ....................................................... 31
        Management Area 5.42 – Special Wildlife Areas – Bighorn Sheep .................................... 31
        Management Area 6.6 – Grassland Resource Production ................................................... 32
        Management Area 4.21 – Scenic Byways and Scenic Railroads ....................................... 32
        Management Area 4.4 – Designated and Eligible Recreational Rivers ............................... 33
        Management Area 8.22 – Ski-based Resorts ...................................................................... 33
    Adaptive Management Domain .............................................................................................. 36
    Monitoring Domain ................................................................................................................ 36

Rvsd Plan - 00002191

*USDA Forest Service*



WATERFALL BELOW LAKE ANN, SOUTH SAN JUAN WILDERNESS.

Rvsd Plan - 00002192

## Introduction

This document lays out the strategy that the Rio Grande National Forest (Fig. 1) will use to proceed into the formal Forest Plan Revision process, which will result in an Environmental Impact Statement and Record of Decision as well as a revised Forest Plan. The strategic framework presented below is organized by levels starting with overarching goals. The goals help focus the strategic, tactical, adaptive management, and monitoring domains that provide a strategic vision for how to make the revised Forest Plan more adaptive and responsive to monitoring results, changing direction, changing technologies, and changing resource conditions.

Included in the strategic framework are Geographic Areas and Management Areas. Desired conditions are described for each Management Area while Geographic Area descriptions present more of a management emphasis based on land status and line officer discretion. Existing standards and guidelines will be considered during the analysis and further plan development; however, those are not yet finalized. All aspects of forest plan revision will incorporate the best available science.



Figure 1. Location of Rio Grande National Forest in Colorado.

*USDA Forest Service*

# Strategic Framework

The strategic framework (Fig. 2) uses the 1996 Forest Plan as a starting point. Some changes are needed to incorporate amendments and subsequent direction into the revised Forest Plan. Implementation and monitoring have shown that the overall management direction of the Forest Plan is sound but since its approval in 1996, significant changes in economic, social, and ecological conditions have occurred that need to be addressed. The revised Forest Plan could include Forest-wide Goal statements and newly established Geographic Areas and Forest-wide Fire Management Zones. Management Areas from the 1996 Forest Plan will be adjusted to reflect a reduction in the number of Management Areas, three proposed new Management Areas, and changes to the boundaries of some exiting Management Areas. Two of the newly proposed Management Areas incorporate direction from the 2012 Colorado Roadless Rule, while the other one reduces three separate Wilderness Management Areas into one.



Figure 2. Forest Plan Revision Framework.

The Forest Plan will bring the national mandate for multiple use into the current environment on the Rio Grande National Forest and southern Colorado. To incorporate the many uses on the Forest while maintaining the resources, the Forest Service has established three goals that state the intent of the Plan direction. The Goals address watersheds and watershed health, sustainable ecosystems, and the social and economic contributions of the Forest to surrounding communities, in addition to connecting citizens to their public lands.

The remainder of the Plan is divided into strategic, tactical, adaptive management, and monitoring domains that are interwoven and feed information back to help land managers determine how to adapt Plan direction to continue to move resources toward desired conditions, and how best to incorporate those changes into Forest Plan direction.

The Strategic domain encompasses the Forest-wide policy direction that includes an overall emphasis for Geographic Areas, which are areas with similar management emphasis and land status designations. Forest-wide desired conditions describe the conditions Forest managers are working to achieve while objectives set measures and time frames to help managers determine if resources are trending toward desired conditions. Standards and guidelines may be associated with these areas to establish sideboards to direct activities in these Geographic Areas. Standards and guidelines, both Forest-wide and Management Area specific, will be included in the final Plan but have not yet been finalized.

The Tactical domain divides the Geographic Areas into smaller Management Areas that have specific Integrated Desired Conditions representing most resources. Management Areas show lands with compatible resource direction and fit within the larger Geographic Areas. Management Areas incorporate resource-specific management direction that regulates activities allowed within each specific Management Area. Management Areas are designated by numbers, with the first integer representing the overall emphasis of the area (Table 1.1).

The Adaptive Management domain proposes to create a process designed to increase the responsiveness of current and future forest managers to changing conditions on the landscape, changes in higher level directions, and developing technologies. The process was developed in response to comments from the public to all the Forest Plan to adapt to changing conditions in a more timely way in the future.

Table 1.1. Management Area Designations

| Management Area Integer | Emphasis |
|---|---|
| 1 | Wilderness and Wild and Scenic River designation |
| 2 | Areas set aside for research |
| 3 | Preservation of Roadless characteristics |
| 4 | Areas designated for scenic values or high recreation emphasis |
| 5 | General forest management and wildlife designations |
| 6 | Grassland management |
| 7[1] | Wildland Urban Interface |
| 8 | Ski-based recreation |

[1] The 1996 Forest Plan did not identify any area in Management Area 7.

*USDA Forest Service*

The Monitoring domain reflects the eight topic areas required by the 2012 Planning Rule (36 CFR 219.12) and reflects an ongoing partnership with the Forest Inventory and Analysis program that is managed by the Forest Service State and Private Forestry organization to share information collected on the Forest. Monitoring questions and measurable indicators will be developed and refined during the analysis process.

# Forest-wide Vision

## Roles & Contributions

The Rio Grande National Forest consists of about 1,830,000 acres in south-central Colorado. The Forest forms the backdrop for the San Luis Valley, one of the largest mountain basins in the world. The headwaters of the Rio Grande originate in the Forest, and most Forest watersheds feed into the Rio Grande system. Water for municipal, industrial, and agricultural purposes comes from the Sangre de Cristo mountain range on the Valley's east side, and the San Juan mountain range to the west.

Elevation in the Forest ranges from about 7,800 feet in the foothills to more than 13,000 feet in the San Juan range along the Continental Divide. The Sangre de Cristo range, to the east, as several peaks that exceed 14,000 feet.

The expansive and flat San Luis Valley, which contains very little National Forest System land, is composed of unconsolidated sediments laid down in the late Tertiary period. The Sangre de Cristo and San Juan mountain ranges on either side of the San Luis Valley, where most of the Forest is, are of different origin and geologic age. The San Juan Mountains are composed of volcanic rocks and related shallow, intrusive rocks of the mid-to-late Tertiary period. Although the Sangre de Cristo Mountains are of more recent origin, the bedrock is older. The steep, narrow Sangre de Cristo Mountains were formed by faulting and thrusting along the Rio Grande rift.

Forest ecosystems generally vary by elevation, with the highest elevation being the alpine tundra that occurs at or above 11,500 feet in elevation. Decreasing in elevation is the spruce-fir forest, which is generally inhabited by Engelmann spruce (*Picea englemannii*) and subalpine fir (*Abies lasiocarpa*) mixed with quaking aspen (*Pcpulous tremuloides*). Vegetation in these ecosystems has been significantly impacted by the recent spruce bark beetle infestation.

The mixed conifer-wet ecosystem occurs in the transition zone between the higher elevation spruce-fir and the drier mixed conifer type. It is generally dominated by Douglas fir (*Pseudotsuga menziesii*) and various combinations of white fir (*Abies Concolor*), Colorado blue spruce (*Picea pungens*), Engelmann spruce, or subalpine fir with incidental occurrences of ponderosa pine (*Pinus ponderosa*).

The drier mixed conifer ecosystem sites include a mix of conifer species, including ponderosa pine, Douglas fir, white fir, Colorado blue spruce, and smaller amounts of aspen. Depending on site conditions, limber pine (*Pinus flexilis*), bristlecone pine (*Pinus aristata*), and some pinyon pine (*Pinus edulis*) or juniper (*Juniperus* spp.) can be present.

The Rocky Mountain alpine turf ecosystem is widespread above the upper timberline (11,000 and higher). Dominant species include boreal sagebrush (*Artemisia arctica*), several *Carex* species, tufted hair grass (*Deschampsia caespitosa*), *Festuca* species, Ross' avens (*Geum rosii*),

Bellardi bog sedge (*Kobresia myosuroides*), cushion phlox (*Phlox pulvinata*), and alpine clover (*Tr.folium dasyphyllym*).

Closer to the Valley the pinyon-juniper woodland ecosystem includes pinyon pine, Rocky Mountain juniper (*Juniperus sccpulorum*), and Utah juniper (*Juniperus osteosperma*). These woodlands generally occur on warm, dry sites on mountain slopes, mesas, plateaus, and ridges. Understory species include sparse perennial grasses, annual and perennial forbs, and sparse shrubs.

Rocky Mountain Gambel oak shrubland ecosystems are found at the north end of the San Luis Valley near Poncha Pass. Dominant species include Gambel oak (*Quercus gambleii*), serviceberry (*Amelanchier* spp.), sagebrush (*Artemisia* spp.), and various other shrubs, grasses, and forbs.

The Southern Rocky Mountain montane-subalpine grassland ecosystem includes Thurber fescue (*Festuca thurberi*), Arizona fescue (*Festuca arizonica*), and several other grasses, forbs, and sedges.

The Rocky Mountain riparian ecosystem includes numerous riparian types in the upper montane/subalpine zones. These systems are highly variable and generally consist of cottonwoods, willows, sedges, and other herbaceous vegetation, aspen, and conifers such as blue spruce, Engelmann spruce, and subalpine fir.

The Rio Grande National Forest has habitat for an estimated 300 species of mammals, birds, reptiles, amphibians, and fish. Eight of the 300 species are federally recognized as threatened or endangered animal species and include:

- Black-footed ferret (*Mustela nigripes*)
- Canada lynx (*Lynx canadensis*)
- Gunnison sage grouse (*Centrocercus minimus*)
- Mexican spotted owl (Strix occidentalis lucida)
- New Mexico meadow jumping mouse (*Zapus hudsonius luteus*)
- Southwest willow flycatcher (*Empidonax traillii extimus*)
- Uncompahgre fritillary butterfly (*Boloria acrocnema*)
- Yellow-billed cuckoo (*Coccyzus americanus*).

The Rio Grande National Forest represents a large part of the core area for lynx, which were reintroduced to Colorado from 1999 to 2006. The vast majority of lynx in Colorado remain and reproduce in the high-elevation spruce-fir zone in the southwestern part of the state, including the Rio Grande.

Counties containing National Forest System lands include Archuleta, Alamosa, Conejos, Hinsdale, Mineral, Rio Grande, Saguache, and San Juan. Many counties are characterized by low population densities, high unemployment, and low per capita income. Although there are no Forest lands in Custer and Costilla counties, people there rely on the Forest for gathering forest products such as firewood, and for hiking, camping, and other recreational activities.

The area of influence for the Rio Grande goes beyond the eight counties that make up the Forest. Colorado communities within Alamosa, Archuleta, Chafee, Conejos, Costilla, Fremont, Gunnison, Hinsdale, Huerfano, La Plata, Mineral , Montrose, Park, Rio Grande, Saguache, and San Juan counties and New Mexico communities in Rio Arriba and Taos counties are recognized as having strong socio-economic ties to the Forest.

Communities surrounding the Rio Grande have become increasingly attractive to new residents because of their proximity to open spaces and natural settings, and easy access to year-round recreational opportunities. Population projections indicate that the San Luis Valley and the region surrounding the Rio Grande Forest will continue to grow, increasing demands on forest resources.

Rio Grande National Forest offers diverse recreation opportunities that include backpacking, boating, camping (both developed and dispersed), cross-country skiing, fishing, hiking, hunting, off-road vehicle riding, picnicking, rock climbing, snowshoeing, and snowmobiling.

There are more than 1,350 miles of trails on the Forest including the Continental Divide National Scenic Trail, Colorado Trail, and Old Spanish National Historic Trial. About 170 miles of the Continental Divide National Scenic Trail lie within the Rio Grande, starting at the forest boundary with Gunnison National Forest and stretching to the New Mexico state line. Sections



FISHING AT LOVE LAKE.

of the Old Spanish National Historic Trail, designated in 2002, pass through the Forest, offering a glimpse into past trade routes that moved supplies and slaves from Santa Fe to the California territory in the 1820s.



RIO GRANDE RESERVOIR.

Nationwide, Colorado contains the sixth highest acreage of National Forest System lands. About 14.5 million acres of national forest and grasslands provide recreation opportunities for residents and visitors in Colorado. Tourism is a main source of income for Colorado and most of the Rocky Mountains. Beautiful scenery and local economic benefits are tied together closely.

Rio Grande National Forest makes up 13 percent of the National Forest System land in the state. The Forest has two designated scenic byways—the Silver Thread and Los Caminos Antiguos—and a well-developed system of roads and trails.

Many outfitter and guide services provide visitor opportunities to experience the Forest.

Located in the south-central portion of the Rocky Mountain range, the Forest offers unique scenic experiences. The Forest combines southwestern flora with the spectacular scenery of the central Rocky Mountains. To the east, the open floor of the San Luis Valley is surrounded by the

Rvsd Plan - 00002198

rugged mountain peaks of the Sangre de Cristo range. To the north, high mountain peaks give way to much gentler rolling hills covered in lodgepole pine that extend to the Valley bottom. Looking west, the scattered mountain peaks are mixed with rolling hills of mixed rock canyons and open meadows. To the south, the Valley is fairly flat, with several dominant, rounded mountains that rise above the horizon.

These characteristics offer visitors some of Colorado's most beautiful scenery. The Sangre de Cristo range is home to several of Colorado's 14,000-foot peaks including Crestone Peak, Crestone Needles, Kit Carson, and Blanca Peak. Great Sand Dune National Park and Preserve borders Rio Grande National Forest in the Sangre de Cristo range. Some of the tallest dunes in North America are found in the Park, which is operated by the National Park Service.

The western part of the Forest has a view of the Rio Grande Pyramid, the 100-foot high North Clear Creek Falls, Bristol Head Mountain, the headwaters of the Rio Grande River, and the La Garita, South San Juan, and Weminuche Wilderness areas. Parks and open meadows, such as Saguache Park, contain a variety of plant and animal life and are home to a wide range of wildflowers.

Historic scenic areas include the Bachelor Loop, near Creede; the Bonanza Loop, near Villa Grove; and the Cumbres and Toltec Scenic Railroad, near Antonito. Tucked in the foothills are many unique rock formations, including the Natural Arch and Summer Coon Volcano areas. Adjacent Bureau of Land Management lands have well known canyons such as Penitente, Witches, Sidewinder, and the Rock Garden canyons that draw avid rock climbers to the area.



NATURAL ARCH – POSSIBLE PROPOSED
SPECIAL DESIGNATED AREA.

## *Forest-wide Goals*

Forest-wide Goals provide umbrella statements that all other direction would tier to. The goal statements are numbered to allow for reference; the numbers do not indicate any priority.

### Goal 1: Protect and restore watershed health, water resources, and the systems that rely on them

National forests that exist today were initially created under the guidance of the National Forest Reserve Act of 1891. The Act allowed the President of the United States to set aside forest reserves from the land in the public domain. This Act provided for wise use of the lands that would provide protection of timber at the headwaters of streams, reduce downstream flooding, and provide a summer-long water supply for irrigation in the arid West[1]. Protecting and restoring watershed health reaffirms the Act that created today's national forests.

Opportunities exist to emphasize collaborative stewardship of watersheds and the interrelated biological, economic, and social factors that affect these areas. Healthy and functioning watersheds contribute to overall resource health.

---

[1] Early Administration of the Forest Reserve Act: Interior Department and General Land Office Policies, 1891-1897, James Muhn, http://www.foresthistory.org/Publications/Books/Origins_National_Forests/sec17.htm

*USDA Forest Service*

## Goal 2: Maintain and restore sustainable, resilient ecosystems

Ecosystems are a barometer of the quality of land management practices. A natural variety of species, genetic composition, and ecological processes are key to providing the diversity needed for resiliency in the face of environmental disturbances and changes.

Aggressively diversifying age classes and structure, seral stage, and habitat classes, where appropriate, in the next planning horizon would provide many benefits including but not limited to providing resilience to insect and disease outbreaks, responsiveness to anticipated changes in climate, ecosystem services, recreation, increased social and economic benefits, and more.

## Goal 3: Actively contribute to social and economic sustainability in the broader landscape and connect citizens to the land

Rio Grande National Forest contributes forest products and tourism opportunities that are important to local economies, and provide ecosystem services for current and future generations.

Places with human influence are maintained while protecting religious, tribal, or culturally significant areas.

Opportunities are available for individuals, partners, and organizations to be active participants in managing, monitoring, and implementing projects that achieve integrated resource management.

The Rio Grande provides natural-appearing landscapes with diverse scenery. The Forest Service maintains and provides access to a multitude of recreation opportunities within the expected capacity of the Rio Grande National Forest budget. Designated areas, such as wilderness and wild, scenic, and recreational rivers, are maintained to protect their integrity and avoid damage incurred by overuse of these precious resources. The Forest provides a wide range of outdoor experiences, ranging from primitive to highly developed, that are within the overall capacity of the Forest. Where possible, interpretive opportunities increase public knowledge, provide historical background, and promote a connection of the current people to the past and their land.

Heritage resource sites are managed and integrated with recreation and environmental education in compliance with all applicable laws and regulations. When appropriate, sites are nominated to the National Register of Historic Places and managed to those standards.

Colorado tourism thrives on outdoor recreation and beautiful scenery, and the Forest maintains these values to continue to attract visitors to the area. Market-oriented programs such as minerals, range management, special use permitting, and timber management are managed to continue. Non-marketable programs, including fisheries, heritage resources, recreation, water, Wilderness, and wildlife, are managed to continue to supply goods and services as requested by the public.

Ecosystem services, as defined in the 2012 Planning Rule (36 CFR 291), include provisioning services such as air, water, energy, fiber, and minerals; regulating services such as soil stabilization; and cultural services that include cultural heritage values and recreational experiences. The Rio Grande strives to meet the demand for these services.

Rvsd Plan - 00002200

# Strategic Domain

## *Forest-wide Desired Conditions*

The desired conditions for resource areas contained in the 1996 Forest Plan are listed below. Desired conditions provide a description of the mosaic of land and resource conditions that are managed at both the Forest and Management Area level.

| Desired Conditions for Ecological Resources | |
|---|---|
| Biological Diversity | Habitat composition (including seral stage), structure, pattern (connectivity), and disturbance frequencies similar to those that result from natural disturbances (insects, disease, and fire) are maintained to the extent possible, given legal and policy limitations, and the desired condition for the area. |
| | Provide ecological conditions necessary to contribute to the recovery of Federally listed species, conservation of proposed and candidate species, and maintain viable populations of species of conservation concern in the plan area. |
| | Habitats for federally listed Threatened, Endangered, and Proposed species and Species of Conservation Concern are protected, restored, and enhanced. Habitat on National Forest System lands is managed to help assure that those species whose viability is a concern survive throughout their range, and that habitat conditions improve or stabilize. |
| Air Resources | Air quality remains excellent and exceeds state and federal standards. Visibility is among the best in the country. Forest activities do not affect long-term conditions or contribute to off-Forest concerns. |
| Timber Resources | The vegetative structure on the Rio Grande National Forest is capable of sustaining timber harvest that supplies wood products while providing for the biological diversity of those forested areas. |
| | Some harvest operations are designed to mimic natural disturbance events or processes. |
| Range | Vegetation is managed for a mixture of seral stages, with most of the rangelands in mid to high seral stages. Site-specific desired conditions are fully described in the allotment management plan. |
| Fire | The role of fire in ecosystem dynamics is recognized and sponsored when and where it does not threaten human life and property. |
| | The amount, arrangement, and continuity of live and dead materials that contribute to fire spread (fuel profiles) are consistent with land uses and estimates of historic fire regimes. |
| Noxious Weeds | Noxious weeds are managed using an integrated pest management approach. All control methods, such as physical removal, prescribed fire, mechanical devices, biological treatments, or chemical applications, are evaluated to reduce potential adverse effects on human health and the environment, and are designed to meet Management Objectives. |
| Water and Aquatic Resources | Healthy watersheds operate in a dynamic equilibrium between extreme natural events. Surface-disturbing activities are managed so that floods, droughts, sediment loads, bank erosion, rills, gullies, and landslides are not markedly increased. |

*USDA Forest Service*

| Desired Conditions for Ecological Resources | |
|---|---|
| | Water quality is maintained or improved, with all stream segments having a near-reference-stream appearance. Water is suitable for municipal water supplies after normal treatment, including supplies obtained from shallow alluvial aquifers. Chemical, physical, and biological attributes are improved and maintained in a healthy condition, ensuring future use. |
| | Stream health is maintained through natural processes without artificial controls. Streams have the expected range of habitat features (for example, healthy riparian vegetation, stable banks, overwintering pools, and healthy aquatic organisms). |
| | Riparian areas and floodplains are healthy, fully functioning ecosystems. Vegetation is diverse and is generally in a later-seral condition, to provide site stability. |
| | Fish thrive in Forest lakes and streams in response to adequate habitat and water quality. Natural fish habitat is preferred and promoted over human-made habitat. |
| Soils | Soils are maintained in, or improved to, healthy conditions to allow the ecosystems they support to flourish. Healthy soils and ecosystem sustainability will be assured if soil damages, such as erosion, displacement, compaction, scorching, and nutrient drains, are kept within allowable limits. |
| | Ecosystem management activities are harmonious with soil capabilities, potentials, and limitations. |
| | Soils may be periodically disturbed by management activities, but are restored and reclaimed to original potentials after activities have been completed. |
| | Where fire is used to perpetuate an ecosystem, it is managed to accomplish resource objectives without unnecessarily risking or jeopardizing the ability of the site to sustain ecosystems. |
| | Heathy soils provide certain products such as wood, forage for livestock and wildlife, water, recreation, minerals, and aesthetic benefits. To maintain these benefits for the long term, soil health needs to remain within acceptable limits. |
| Minerals | Mineral development is compatible with ecosystem capabilities and resource values. Balanced use and development of mineral resources are allowed, while protecting other resource values with stipulations, mitigation, and careful monitoring. Problems caused by historic mining are corrected. |
| Special Forest Products | Special forest products, such as firewood, building rock, herb and vegetable products, medicinal and pharmaceutical products, wild edible mushrooms, wild berries and fruit, landscaping products, craft products, and floral and greenery products, continue to be available from the Forest. Plants include trees, shrubs, water plants, forbs, grasses, mosses, lichens, and fungi. Plant parts that are used include leaves, boughs, bark, bulbs, corms, seeds, nuts, and fruits. |
| | The gathering of forest products depends on the sustainable limits of the resource. In addition, permits may be required for some of these products. |
| | The Forest Service recognizes the needs of people from the San Luis Valley and surrounding areas, and strives to meet their needs for forest and wood products while protecting those resources for future generations. |

Rvsd Plan - 00002202

| Desired Conditions for Social Resources | |
|---|---|
| Research Natural Areas | Several Research Natural Areas (RNAs) represent a variety of ecosystems in the Sangre de Cristo and San Juan Mountains. Ecosystems represented are typical plant associations that occur on the Forest, from the lowest elevations up through the alpine zone. |
| Unroaded Areas | Selected unroaded areas are maintained to offer nonmotorized, or limited motorized, recreation opportunities outside Wilderness. Ecological composition, structure, pattern, and natural processes (fire, insects, disease, floods, etc.) are maintained, where feasible, to perpetuate biological diversity. |
| Wild and Scenic Rivers | The "outstandingly remarkable" resources and values of selected rivers and their adjacent corridors are managed to protect their existing conditions for the benefit and enjoyment of present and future generations. |
| Wilderness | Designated wilderness is managed to: <br><br> • retain its pristine character and natural processes with minimal evidence of human influence, <br> • offer opportunities for solitude, and <br> • retain its ecological, educational, scenic, and historical values. |
| Special Interest Areas | Special Interest Areas are managed to protect or enhance their unique botanical, archeological, geologic, or other values. Some areas offer interpretive sites and educational opportunities. |
| Heritage Resources | Heritage resources supply information about the nation's heritage, offer quality recreation opportunities for the public, and contribute information that aids management of other Forest resources. |
| | Proactive consultation with Tribes helps ensure the protection, preservation, and use of areas that are culturally important to them. |
| | Heritage resources are systematically evaluated and nominated for the National Register of Historic Places when they meet eligibility criteria. |
| | Heritage resources are protected from damage by project activities or vandalism through project design, specified protection measures, monitoring, and coordination. |
| Recreation | The Forest Recreation program is managed to: <br><br> • offer opportunities for motorized and nonmotorized recreation within appropriate settings, <br> • be responsive to visitor desires and increase service to the public, <br> • maintain a broad range of quality developed recreation facilities within capacity, <br> • feature traditional and nontraditional dispersed recreation opportunities, <br> • showcase scenic byways and landscapes, <br> • expand interpretive services, and <br> • allow for current areas used as summer homes, resorts, and youth camps to continue to be managed as recreation special-use development areas. |
| Scenery | The outstanding scenery of the Rio Grande National Forest is a major attraction for visitors. Management is focused on maintaining this high scenic quality, especially of areas seen from road and trail corridors, developed recreation sites, administrative sites, and towns and cities near the Forest. |

*USDA Forest Service*

| Desired Conditions for Social Resources |
|---|
| Encourage vegetative diversity and feature scenic attractions. |
| Areas exceeding unacceptably low Scenic Integrity Levels are rehabilitated to a higher Scenic Integrity Objective. |

| Desired Administrative Conditions | |
|---|---|
| General Infrastructure | Reservoirs and Ponds: All dams on National Forest System lands are inspected to ensure public safety and comply with all appropriate laws and regulations. High- and moderate-hazard dams have current Emergency Preparedness Plans in place. |
| | Facilities: Safe, accessible, functionally efficient, aesthetically pleasing, energy-efficient, and cost-effective buildings and related facilities (owned, operated, occupied, or authorized by the Forest Service) needed to achieve resource management objectives are maintained or constructed. |
| | Drinking Water: The Forest Service will test water at facilities under special-use permit to ensure that human health is protected in accordance with the Safe Drinking Water Act. |
| | Waste Water: Discharge or infiltration of pollutants from all wastewater disposal facilities owned and operated by the Forest Service, or that are under special-use permit from the Forest Service, do not create health hazards or nuisance conditions. This discharge does not alter the quality or characteristics of ground water and surface water beyond applicable federal or state water-quality and effluent-discharge standards. |
| | Roads: The road system continues to serve as adequate access for the public to enjoy the Forest. Road construction is limited, and the amount of reconstruction has decreased. Road closure is emphasized in some areas to enhance wildlife habitat, soil, and water resources. |
| Real Estate | Develop a land ownership pattern that improves the ability of the Forest Service to meet Forest needs and public objectives. |
| | Land adjustments through purchases, exchanges, and donations include an array of unique plant and animal habitats, riparian areas, geologic features, heritage resources, and recreation opportunities. |
| Health and Safety | Rio Grande National Forest is responsive to public needs in emergencies, and supports and enters into cooperative agreements with local officials. |
| | Forest work programs are conducted within the guidelines of the National Health and Safety Codes and the Occupational Safety and Health Administration. |
| Rural Development | Recognizing the economic dependency of rural communities on National Forest System lands and resources, Forest managers cooperate with local rural communities to develop sustainable enterprises that contribute to the general economic and social vitality of the area. Forest managers also give sufficient advance notice to rural communities about potential changes that may affect local economies. |
| | Forest managers cooperate with local, county, state, and tribal partners to meet rural community needs. |

Rvsd Plan - 00002204

## Objectives

Objectives listed here are not meant to be an exhaustive list, but present a starting point for beginning a larger conversation. It is expected that objectives will be changed and added throughout the analysis process. Other required plan components will be developed during the analysis process.

Objectives are a required plan component under the 2012 Planning Rule. They should be measurable and time specific and will be used to measure progress toward goals and desired conditions. The 1996 Forest Plan contained objectives that will be evaluated and adjusted to meet the measurable and time-specific aspect of the direction. Examples of potential Objectives are:

- OBJ GF1: Within 10 years of plan approval, take action to eliminate non-native invasive species on 300 acres.

- OBJ GF2: Take action to maintain, enhance, or improve conditions on three to five fen habitats within 10 years of plan approval.

- OBJ GF3: Take action to maintain, enhance, or improve condition on three to five meadows within 10 years of plan approval.

- OBJ GF4: Take action to maintain or restore structure, composition, or function of habitat for fisheries and other aquatic species along 3 to 5 miles of stream over a 10-year period.

- OBJ GF5: Use appropriate and authorized tools including grazing, mechanical treatment, prescribed fire, or naturally occurring fire to meet resource objectives and reduce vegetation build-up to lower the risk to communities and other values.

- OBJ GF6: Improve condition class on at least one identified priority watershed, as defined by the national Watershed Condition Framework, within 10 years of plan approval.

## Geographic Areas

Forest management provides for a mix of environments across the landscape. Much like city zoning, the forest is divided into areas that have similar management emphasis.

In response to comments received during the Assessment phase of the Plan Revision process, the Proposed Action clarifies direction based on land status and reduces overlapping direction. The proposed format maintains much of the previous direction but add place-based desired conditions to better focus overall direction. The Proposed Action incorporates Geographic Areas that combine Management Areas with similar emphases into larger groupings based on land status and line officer discretion. Four Geographic Areas are proposed: General Forest, Primitive Wilderness, Roadless, and Specially Designated. Management Areas designated under the 1996 Forest Plan, with some modifications, would fit into the larger Geographic Area boundaries. How Management Areas from the 1996 Forest Plan integrate into the Geographic Areas is shown in Table 1.2, along with the proposed changes to Management Areas.

Table 1.2. Proposed Geographic Areas that contain 1996 Forest Plan Management Areas in relation to proposed Management Areas

| Geographic Area | 1996 Forest Plan Management Area | Proposed Management Area |
|---|---|---|
| **General Forest** | 4.3 | 4.3 |
| | 5.11 | 5.11 |
| | 5.13 | 5.13 |
| | 5.41 | 5.41 |
| | 5.42 | 5.42 |
| | 6.6 | 6.6 |
| **Roadless** | 1.11 | 2.2 |
| | 1.12 | 3.3 |
| | 1.13 | 3.5 |
| | 1.5 | 3.6 |
| | 2.2 | |
| | 3.1 | |
| | 3.3 | |
| | 3.4 | |
| | 5.41 | |
| | 5.42 | |
| | 6.6 | |
| **Wilderness** | 1.11 | 1.1 |
| | 1.12 | 1.5 |
| | 1.13 | |
| | 1.5 | |
| **Special Designations** | 1.11 | 1.1 |
| | 1.12 | 1.5 |
| | 1.13 | 2.2 |
| | 1.5 | 3.1 |
| | 2.2 | 3.4 |
| | 3.1 | 4.21 |
| | 3.3 | 4.2 |
| | 3.4 | 4.4 |
| | 4.21 | 8.22 |
| | 4.3 | |
| | 4.4 | |
| | 8.22 | |

Rvsd Plan - 00002206

*Proposed Action—Rio Grande National Forest Plan Revision*

## Fire Management Zones

Fire Management Zones are introduced in this section to facilitate the discussion of Geographic Areas that follows.

Rio Grande National Forest is proposing to implement Strategic Fire Management Zones that are most applicable at the Geographic Area level. These zones are not a mapped feature. Assigning strategic wildfire management zones supports decision makers before ignition occurs, by pre-assessing areas for wildland fire (prescribed fire and wildfire) risks and benefits. Three strategic fire management zones are proposed:



OX CART FIRE IN THE SANGRE DE CRISTO WILDERNESS, JUNE 2013.

1. The Fire for Resource Benefit for Maintenance (FRB-M) zone
2. The Fire for Resource Benefit for Restoration and Protection (FRB-RP) zone
3. The Resource Protection (RP) zone, which includes the wildland urban interface (WUI).

### *Fire for Resource Benefit - Maintenance zone (FRB-M)*

This zone applies to the Wilderness and Roadless Geographic Areas. These areas present a lower risk to resource values from a wildfire, there is little threat to communities, and conditions allow natural resources to benefit from wildland fire. Managing wildfire to meet resource objectives in this zone is the least constrained. Ecological maintenance is accomplished by managing wildland fire under a wide range of weather, fuel moistures, and other environmental conditions. The use of prescribed fire to meet specific resource objectives is appropriate in this zone.



FIREWEED IN PAPOOSE FIRE BURNED AREA.

### *Fire for Resource Benefit - Restoration and Protection (FRB-RP) zone*

This zone is applied to the General Forest Geographic Area where current conditions may put some natural resource values at varying degrees of risk for damage from wildfire. Mechanical treatments and prescribed burning may be used to promote ecological restoration before using wildfire under a wider range of weather, fuel moistures, and other environmental conditions. Wildfires that burn in this zone can benefit natural resources under more limited conditions.

Wildfires in this area could be managed for multiple objectives. For example, a portion of a wildfire may threaten resources that may require fire suppression or point protection, but allowing other portions of the same fire to burn may meet resource objectives by providing ecological objectives. Managing wildfires to meet resource objectives in this zone can be constrained in some areas due to fuel conditions and the risk to natural resources from wildfire.

Some acreage within this zone presents a lower risk to natural resource values, and conditions there allow resources to benefit from wildland fire. Ecological maintenance is accomplished by managing wildland fire under a wide range of weather, fuel moistures, and other environmental conditions. Wildfire starts in this zone are carefully assessed to determine suppression needs dependent on values at risk and the area's resilience to fire and potential benefits.

### Resource Protection (Wildland Urban Interface) zone (RF)

This zone contains resources where conditions put natural resources and communities at high risk of damage from wildfire. Managing wildfires to meet resource objectives in this zone is not considered due to potential negative consequences to natural resource values, critical infrastructure, the Wildland Urban Interface, or nearby communities. Targeted ecological restoration and fuels reduction treatments may be needed in some areas to better safeguard communities and resources.

## General Forest Geographic Area

Forest and grassland communities are characteristic of the General Forest Geographic Area, which is managed with a multiple-use emphasis to achieve a variety of goals. Resource use and management across the landscape would be balanced.

Timber is harvested using a full range of silvicultural treatments, methods, and prescriptions. Rotation periods are designated on the basis of species-specific needs. Vegetation is managed for wood production or to benefit other resources.

All vegetation management is sustainable and focused on restoring or maintaining resiliency in the face of changing environmental conditions. Resource management allows for flexibility and the ability to adapt in accordance with resource response. Management follows a plan-act-monitor-evaluate process.

Assessments 1 and 3 identified large-scale changes in the current conditions on the Rio Grande. Large-scale spruce beetle outbreaks have resulted in the Forest-wide infestation of 588,000 acres of mature Engelmann spruce (*Picea englemanii*). This outbreak will have long-lasting effects on all aspects of the forest, including but not limited to carbon storage, recreation access, timber harvest, and wildlife habitat. These effects are highly variable and may be positive or negative. To capture the existing value of the dead trees and begin to restore the habitat, an increase in the volume harvested is anticipated for the near term (next 10 years). After 10 years, the dead spruce likely would no longer be viable as a commercial sawtimber, and harvest values are anticipated to be reduced.

Chapter 60 of Forest Service Handbook 1909.12 provides direction for the evaluation of timber and forest vegetation resources and the development of related plan components. The 2012 Planning Rule requires that when revising a Forest Plan, the Responsible Official must review and determine acreage that is not suitable for timber production as well as acreage that "may be suitable" for timber production. Then, based on Management Area desired conditions, standards, and guidelines, the Forest Plan shall identify the acreage that is actually "suitable for timber production." The proposed and final Forest Plans will include other required elements such as the projected wood sale quantity, projected timber sale quantity, and sustained yield limit. For the purposes of the Proposed Action, at this time, only the acres that "may be suitable for timber production" are being included.

The biggest recent change on the forest is the current spruce beetle outbreak. The spruce beetle (*Dendroctonus rufipennis*) is a native insect that attacks and kills mature Engelmann spruce. Spruce beetles are a key disturbance agent in spruce-fir forests and historically have caused large, intense outbreaks over expansive areas. Since the early to mid-2000s, large spruce beetle outbreaks have occurred on several national forests in Colorado and Wyoming, including the Rio Grande. The 2013 Rio Grande National Forest Monitoring report estimates the cumulative infested area on



SPRUCE TREES KILLED BY SPRUCE BEETLES.

the Forest at 480,000 acres, while 2015 aerial survey estimates increased this to 588,000 acres. Many areas affected by spruce beetle have 80–100% mortality of mature Engelmann spruce. Given that spruce-fir forests cover half the Forest and make up two-thirds of the current suitable timber base, this will have huge impacts on the Rio Grande National Forest's timber harvest program.

The Forest Service vision for the timber sale program now and into the future is one of change and adaptation. For the upcoming decade, salvage harvest in the spruce-fir cover type will dominate the timber harvest program. It is anticipated that during the second decade of the plan, as the dead spruce loses more value, less salvage harvesting will be done and more green timber will be harvested in other forest types, such as mixed-conifer. Long term, the timber harvest program on the Rio Grande National Forest is expected to be smaller, as it will take many years for the spruce-fir forests to reach commercial size again.

Recent annual timber harvest on the Forest has been 40,000–45,000 CCF. The Forest plans to continue to salvage harvest at approximately the same levels. This includes material sold through timber sales as well as permits for other wood products. Since 2015, the Forest has been harvesting approximately 2,000–2,500 acres per year of sawtimber. This is higher than past levels due to the salvage of spruce. The Forest expects to continue at this level while the dead spruce retains its commercial value. After the commercial value is lost, harvest levels will decrease.

The current estimate of what "may be suitable" for timber production is 515,000 acres. The suitable timber base is not expected to change greatly from the base in the 1996 Forest Plan, as amended by the 2000 Timber Suitability Amendment. Currently, as described in that amendment, the "suitable timber" acreage is 315,000 acres. The "suitable timber" base in the new plan will be similar, with small changes due to boundary adjustments in specially designated areas, such as the Fremont Special Interest Area, changes related to other special interest areas, and changes due to the 2010 Colorado Roadless Rule

The area has a well-developed transportation system that allows for easy access and movement of forest products and livestock while providing for visitor and employee safety. Roads are located in the proper locations to avoid excess impacts from sedimentation or erosion.

Ecosystems would be resilient to the impacts of wildfire, and wildland fire has predominantly positive benefits to ecosystems and resources. Lands in this Geographic Area are maintained at a

*USDA Forest Service*

moderate to low risk with high potential benefit conditions relative to fire. Wildfire is managed to meet resource objectives under a wide range of environmental conditions; however, under more extreme burning conditions or where infrastructure or other values are threatened, fires may be suppressed. The landscape is resilient to the impacts of wildfire. Over time, risks to natural resources are reduced to allow more areas to be considered for wildfire maintenance.

Where appropriate, quality forage and cover for bighorn sheep, deer, elk, lynx, and other native wildlife as well as livestock would be available.

Insect and disease populations are managed at endemic levels. Wildfires managed for resource benefit and prescribed fire are used under acceptable conditions to move toward desired conditions.

Visitors should expect to see managed but natural-appearing forested stands. Recent vegetation treatments are visible but blend with the landscape over time.

Visitors could anticipate frequent contact with other forest users along recreation trails and in developed and dispersed recreation sites.

Water quality and quantity are managed to be maintained or restored. Riparian values and habitat are maintained or restored using active management where appropriate.

A variety of Management Areas (from the 1996 Forest Plan) would fit under this Geographic Area, including but not limited to Areas 3.3, 4.3, 5.11, 5.13, 5.41, 5.42, and 6.6. Each Management Area has a more specific management emphasis based on the overall theme of the area.

## Primitive Wilderness Geographic Area

This Primitive Wilderness Geographic Area is managed to protect and perpetuate natural ecological processes and conditions. Natural ecological conditions are not measurably affected by human use. These areas are managed to protect the Wilderness character described in the Wilderness Act of 1964 for which they were established. Currently about 430,000 acres, or 23 percent, of the Rio Grande has been designated as Primitive Wilderness Geographic Area.



WETLAND IN WEMINUCHE WILDERNESS.

Fire is a natural process that influences vegetative type, distribution, and structure. Ecosystems are resilient to the impacts of wildfire, and wildland fire has predominantly positive benefits to ecosystems and resources. Lands within this zone are maintained in a predominantly low risk with high potential benefit condition relative to wildland fire.

The Primitive Wilderness Geographic Area is not included in the suitable timber base.

The Primitive Wilderness Geographic Area encompasses Management Areas 1.11 – Wilderness-Pristine, 1.12 – Wilderness-Primitive, 1.13 – Wilderness-Semi-Primitive, and 1.5 from the 1996

Rvsd Plan - 00002210

Forest Plan. The 1996 Forest Plan divided these areas into three separate management areas designated for the varying levels of solitude, risk, and challenge. The entire area is managed as designated Wilderness. Parts of four designated Wilderness areas are within Rio Grande National Forest. All are administered by more than one Forest Service unit, and each one has a designated lead Forest that directs management. Each of the four Wilderness areas has a specific wilderness plan that directs and guides management within the area. Because site-specific direction is incorporated within other tools, the Forest Service is proposing to combine the three Management Areas, 1.11, 1.12, and 1.13, into Proposed Management Area 1.1.

## Roadless Geographic Area

The Roadless Geographic area emphasizes protection of Roadless area values and characteristics. The Colorado Roadless Rule was enacted on July 3, 2012. The Roadless Rule provided management direction to conserve 4.2 million acres of National Forest System land in Colorado for Roadless area values, including 518,600 acres in 53 areas on the Rio Grande.

The Colorado Roadless rule created an additional layer of management for the Rio Grande and established two designations: Roadless and Upper Tier Roadless, which are addressed below. To better incorporate that direction and simplify decision making in identified roadless areas, that management prescription is incorporated as a Geographic Area with two newly established management areas, Management Areas 3.5 and 3.6.

These acres are not to be included as part of the identified suitable timber base.

The areas designated under the 2012 Colorado Roadless Rule on the Rio Grande National Forest are listed in Table 1.3.

The intent stated in the Rule "is to protect roadless values by restricting tree cutting, sale, and removal; road construction and reconstruction; and linear construction zones within Colorado Roadless Areas, with narrowly focused exceptions."[2] These restrictions are described in the desired condition statements for the newly established Management Areas, which are detailed below.



ELK GRAZING IN POLE CREEK CRA.

---

[2] Federal Register. Volume 77, Number 128. Tuesday, July 3, 2012. Pp 39602–39612.

*USDA Forest Service*

Table 1.3. Rio Grande NF Roadless Areas established by the 2012 Roadless Rule

| Roadless Area Name | Includes Upper Tier Acres | Roadless Area Name | Includes Upper Tier Acres |
|---|---|---|---|
| Alamosa River | X | La Garita | X |
| Antora Meadows-Bear Creek | X | Lake Fork | X |
| Beartown | X | Lower East Bellows | X |
| Beaver Mountain | X | Middle Alder | X |
| Bennett Mountain-Blowout-Willow Creek-Lion Point-Greenie Mountain | X | Miller Creek | |
| Big Buck-Kitty-Ruby | X | Pole Creek | |
| Box-Road Canyon | X | Pole Mountain-Finger Mesa | X |
| Bristol Head | X | Red Mountain | X |
| Butterfly | | Ruby Lake | X |
| Chama Basin | X | Sawlog | X |
| Conejos River-Lake Fork | | Sheep Mountain | X |
| Copper Mountain-Sulphur | X | Silver Lakes-Stunner | X |
| Cotton Creek | | Snowshoe Mountain | X |
| Crestone | | Spectacle Lake | |
| Cumbres | X | Spruce Hole-Sheep Creek | X |
| Deep Creek-Boot Mountain | X | Stunner Pass-Dolores Canyon | X |
| Dorsey Creek | X | Sulphur Tunnel | |
| Elkhorn Peak | X | Summit Peak-Elwood Pass | X |
| Four Mile Creek | X | Taylor Canyon | X |
| Fox Creek | X | Tewksberry | X |
| Fox Mountain | X | Tobacco Lakes | X |
| Gibbs Creek | | Trout Mountain-Elk Mountain | X |
| Gold Creek-Cascade Creek | X | Ute Pass | X |
| Hot Springs | | Wason Park | X |
| Indiana Ridge | X | Wightman Fork-Upper Burro | X |
| Kitty Creek | | Wightman Fork-Lookout | X |
| | | Willow Mountain | X |

20

Roadless areas characteristics defined in the Rule include:

- High quality or undisturbed soil, water, and air
- Sources of public drinking water
- Diversity of plant and animal communities
- Habitat for threatened, endangered, proposed, candidate, and sensitive species, and for those species dependent on large, undisturbed areas of land
- Primitive, semi-primitive, nonmotorized, and semi-primitive motorized classes of dispersed recreation
- Reference landscapes
- Natural-appearing landscapes with high scenic quality
- Traditional cultural properties and sacred sites
- Other locally identified unique characteristics.

Fire is considered a natural process that influences vegetative type, distribution, and structure. Ecosystems are resilient to the impacts of wildfire, and wildland fire has predominantly positive benefits to ecosystems and resources. Lands within this zone are maintained in a predominantly low risk with high potential benefit condition relative to wildland fire.

This Geographic Area incorporates all or parts of the following Management Areas from the 1996 Forest Plan 1.11, 1.12, 1.13, 1.5, 2.2, 3.1, 3.3, 3.4, 5.41, 5.42, and 6.6. Because Colorado Roadless Areas were developed separately from the Forest Plan, many of the 1996 Management Areas were assumed by these new designations. Some of these Management Areas would persist in this Geographic Area designation while the remaining Management Areas would no longer be applicable or appropriate. The Forest Service is proposing to establish two new management areas: Proposed Management Area 3.5 would include designated Roadless areas, and Proposed Management Area 3.6 would include Upper Tier Roadless areas. These proposed Management Areas are described below.

More detailed direction for this Geographic Area is contained in the 2012 Colorado Roadless Rule (36 CFR Part 294).

## Specially Designated Geographic Area

Specially Designated Geographic Area designations include Agency designations such as Research Natural Areas; Wheeler Geologic Area; Wild, Recreational, or Scenic River segments; Scenic Byways; and areas designated for rare or unique botanical, cultural, geologic, historical, or scenic values. Where appropriate, features are interpreted for the public. The Proposed Action includes consideration of several new designated areas as identified in the Need to Change document. The following areas will be considered for designation in the analysis: the Continental Divide Trail, Old Spanish Trail, Natural Arch, Cumbres and Toltec National Historic Landmark, and Mt. Blanca Massif. New information regarding the boundary of the John C. Fremont Winter Camp Special Interest Area will also be considered.

Ecosystems are resilient to the impacts of wildfire, and wildland fire has predominantly positive benefits to ecosystems and resources. Lands in this zone are maintained at a moderate to low risk

*USDA Forest Service*

with high potential benefit conditions relative to fire. Wildfires are managed to meet resource objectives under a wide range of environmental conditions; however, fires may be suppressed under more extreme burning conditions. The landscape is resilient to the impacts of wildfire. Over time, risks to natural resources are reduced to allow more areas to be considered for wildfire maintenance.

The Specially Designated Geographic Area is not included in the suitable timber base.

Ecological values are in balance with human occupancy, and consideration is given to both. Resource management activities may occur where authorized, but natural ecological processes and resulting pattern normally predominate. These areas are generally characterized by natural-appearing landscapes. An array of management tools may be used to restore or maintain relatively natural patterns of ecological process; thus, some evidence of human activities will be noticeable. Uses, including mechanized use, will vary from area to area and may vary by season. The following previously identified Management Areas from the 1996 Forest Plan were included in this Geographic Area: 1.11, 1.12, 1.13, 1.5, 2.2, 3.1, 3.3, 3.4, 4.21, 4.3, 4.4, and 8.22.



CONTINENTAL DIVIDE NATIONAL SCENIC TRAIL NEAR STONY PASS, HEADWATERS OF THE RIO GRANDE.

Rvsd Plan - 00002214

# Tactical Domain

## *Management Areas*

The 1996 Forest Plan had several Management Areas. Amendments to the original decision provided additional layers of direction and management emphasis resulting additional layers of management direction that were challenging to both Forest managers and the public. Proposed changes include creation of two new Management Areas related to the Colorado Roadless Rule, reduction of some Management Areas, and combining some current Management Areas to better facilitate clarity and understanding of the direction. The Proposed Geographic Areas, how the 1996 Forest Plan Management Areas fit within, and the proposed changed Management Areas are shown in Table 1.2. Two maps, one showing the proposed Management Areas and the other showing the proposed Management Areas within the Geographic Areas, are included at the end of this document.

### *Proposed Management Area 1.1 – Designated Wilderness*

Wilderness can be designated only by Congress and is managed in accordance with the Wilderness Act of 1964. Natural succession occurs in all vegetation types and is influenced by natural processes and disturbances. Structure, composition, function, and spatial distribution of vegetative types are the result of natural succession. Where no natural disturbance has occurred, vegetation is mostly in late-successional stages. Age and structure classes may vary where natural disturbance agents, such as fire or insects, have influenced the succession process. Plant species are native and indigenous to the immediate area. Non-native invasive species are limited and increases are controlled. Forage for wildlife, permitted livestock, and packstock is available in meadows and natural openings, although availability may be limited due to topography and short growing seasons. Human influences on vegetation is minimal. Timber harvest is prohibited and this area is not included in the suitable timber base.

Wildlife species are buffered from human influences. No additional non-native plant or animal species are introduced. Human influence on physical features, such as soil and geologic materials, is minimal. Human influence on aquatic life and riparian areas and processes is minimal in most areas. The composition, structure, and function of aquatic ecosystems are minimally disturbed by human influence. Stocking is used as a tool to enhance Threatened, Endangered, and Sensitive Species and enhance recreational opportunities. Water impoundments, ditches, and diversions may be present in Wilderness areas.

Wilderness areas are managed for solitude; users are expected to be familiar with and use primitive skills in an environment that offers a high degree of risk and challenge. Success or failure is directly dependent on the ability, knowledge, and initiative of the visitor. Contact with other users or Forest Service personnel decreases with increasing distance from the entry portals. Near the entry portals, users may have contact with larger groups. Commercial permitting for day-use activities is allowed in high-use areas. Evidence of established campsites and base camps may be present. An element of discovery is maintained. The presence of interpretive signs, markers, and posts decreases with increasing distance from the entry portals, though cairns may be present. Near the entry portals, trails are marked at intersections to indicate routes. Evidence of cultural and historic sites may be present, and these sites may be signed and interpreted near entry points. Structures or facilities may be present but only as necessary for resource protection when less obtrusive measures were not successful in the past.

*USDA Forest Service*

Trails are the primary mode of travel from the entry portals. Trail systems are maintained for user safety and comfort. Bridges may be present when needed for resource protection or user safety. The presence of constructed trails decreases with increasing distance from entry portals, and travel deep within Wilderness is primarily cross-country with no established trails. User-created trails may exist but are not maintained or designated on maps or trail guides.

Livestock grazing is an appropriate and authorized use except where previously delineated.

Evidence of past mining activity may be present but is rare. Wilderness areas are withdrawn from locatable mineral entry and are legally unavailable for oil and gas leasing.

Visibility is generally unimpaired. Smoke from natural fires may be visible. The Scenic integrity is Very High and the Recreation Opportunity Spectrum is Primitive.

Each wilderness area has a prepared wilderness management plan that describes specific levels of management. Management Plans are prepared in cooperation with other managing units or agencies.

### Management Area 1.5 – Eligible Wild Rivers

Eligible Wild River areas are managed to protect and perpetuate eligible Wild River segments and adjacent areas. These areas are eligible for official designation based on the presence of one or more "outstandingly remarkable" feature: scenic, recreation, geologic, wildlife, or fisheries values. The width of the area may vary to protect outstanding values, but at least one-quarter mile on either side of the segment is included.

Existing eligible Wild Rivers include El Rito Azul, Hansen Creek, Middle Fork Conejos River, North Fork Conejos River, Toltec Creek, and Saguache Creek.

The landscape is predominantly natural appearing. Vegetative composition and structure are influenced by biological processes and conditions. Due to the proximity of the streams, there is a greater than average diversity of native plant and animal species.

Livestock grazing is an appropriate and authorized use.

Road construction is not authorized in these areas.

Management activity is dependent on the projected future designation. Outstandingly remarkable features are protected until a suitability study is completed and final recommendation of designation is made.

No motorized travel occurs within one-quarter mile of the stream or river segment.

These areas are not available for oil and gas leasing.

The Scenic Integrity is Very High and the Recreation Opportunity Spectrum Class is Primitive.

### Management Area 2.2 – Research Natural Areas

Research Natural Areas preserve representative areas that typify important forest, shrubland, grassland, alpine, aquatic, geologic, or other natural environments. These areas often may also have special or unique characteristics of scientific importance. The management emphasis of these areas focuses on protecting or enhancing unique or exemplary ecosystems designated for non-manipulative research, monitoring and education.

Rvsd Plan - 00002216

*Proposed Action—Rio Grande National Forest Plan Revision*

Research Natural Areas contribute to the preservation and maintenance of key elements of biological diversity at the genetic, species, population, community, and landscape levels.

Research Natural Areas are intended as baseline areas for measuring ecological changes, and as control areas for evaluation and monitoring.

Develop comprehensive management plans as needed.

Where feasible, manage undesirable non-native plant and animal species.

Livestock grazing is an appropriate or authorized use when it is not in direct conflict with resources values that prompted establishment of the area.

The Recreation Opportunity Spectrum class for these Research Natural Areas is Semi-Primitive Nonmotorized.

### Management Area 3.1 – Special Interest Area—Use and Interpretation Emphasis

Special Interest Areas are managed to protect or enhance unique characteristics that occur across the Forest. Special Interest Areas typically contain unique botanical, geologic, historical, scenic, or cultural areas and values. Management emphasizes developing and interpreting some of these areas for public education and recreation.

Livestock grazing is an appropriate and authorized use.

Proposed activities meet the Adopted Scenic Integrity Objective and the Recreation Opportunity Spectrum class is Semi-Primitive Motorized.

### Management Area 3.3 – Backcountry

The landscape is predominantly natural appearing and relatively undisturbed by humans. Natural processes within the context of the range of natural variability (insects, disease, and fire) are generally allowed to occur with minimal human intervention. Prescribed natural fire plans should be developed and Confine/Contain strategies and minimal-impact suppression techniques emphasized on wildfires. Management-ignited fires may be used to mimic natural disturbance regimes.

There is a high probability of experiencing solitude and opportunity for a high degree of self-reliance, challenge, and risk. Facilities are minimal and exist primarily for site protection. Improvements to enhance recreation use, such as signs, may be present, but are rustic in style. Trailheads providing access to these areas are outside the area and offer information and directional signing. Cross-country motorized travel is limited to snow machines in the winter not otherwise restricted.

Trails provide a full range of challenging recreation opportunities. These include biking, horseback riding, mountain biking, and motorized travel on designated trails. Hunting and fishing opportunities are available for those seeking a more remote experience. No road building occurs within the area, and new trail construction is rare.

The allocation of miles of motorized or non-motorized travel ways is that the classification of trails (motorized or non-motorized) identified in the Forest Plan will not substantially change over the planning period. While individual travel ways might change from non-motorized to motorized or vice versa, the Recreation Opportunity Spectrum will stay Semi-Primitive.

Rvsd Plan - 00002217

*USDA Forest Service*

Generally, non-recreational special uses such as electronic sites and utility corridors are excluded from Backcountry areas.

Livestock grazing is appropriate and authorized within this Management Prescription.

### Management Area 3.4 – Designated and Eligible Scenic Rivers

Scenic river corridors are managed to protect and perpetuate river segments that are either eligible for Scenic River designation or have already designated as such. As of yet no rivers have been designated, but some eligible segments have been identified. Eligibility requires one or more "outstandingly remarkable" feature, which may include scenic, recreational, geologic, wildlife, or fisheries values. The width of the area may vary to protect the outstanding values, but at least one-quarter mile on either side of the segment is included.

Rivers on the Rio Grande identified as eligible Scenic Rivers include Archuleta Creek, West Fork Rio Chama, East Fork Rio Chama, Lower Rio de los Pinos, part of Medano Creek, part of South Fork Rio Grande, Rio Grande (Box Canyon), and West Bellows.

Scenic River landscapes are generally natural appearing. Vegetative composition and structure is influenced by biological processes and condition. The proximity of streams results in a greater than average density of plant and animal species.

Livestock grazing is an appropriate and authorized use. These lands are available and authorized for oil and gas leasing with a Controlled Surface Use Stipulation. These lands are part of the Suitable timber base.

### Proposed Management Area 3.5 – Colorado Roadless Area

Colorado Roadless Areas are generally undeveloped parts of the Forest that provide a variety of settings at different elevations. They are managed to protect roadless characteristics and to maintain plant and animal habitats that are shaped primarily through natural processes. These areas provide backcountry recreational experience to the public in areas with less evidence of human activities.

Landscapes in these areas are predominantly natural appearing and relatively undisturbed by humans. Natural processes within the context of the range of natural variability (insects, disease, and fire) are generally allowed to occur with minimal human intervention.

The probability of experiencing solitude in these areas is high. Frequent opportunities for challenge and risk require a degree of self-reliance. Facilities are minimal and exist primarily for site protection. Recreational improvements, such as signs, may be present. Trailheads offer information and directional signing. Cross-country motorized travel is limited to snow machines in the winter (where other restrictions do not apply).

Trails provide a wide range of challenging recreation opportunities including horseback riding, mountain bike riding, and motorized travel on designated routes. Hunting and fishing opportunities are available for those seeking a more remote experience. No new road construction occurs within the areas.

Miles of motorized and nonmotorized travel will not substantially change over the planning period. Although individual travel ways could change from nonmotorized to motorized or vice-versa, the Recreation Opportunity Spectrum would remain Semi-Primitive.

Rvsd Plan - 00002218

Trees may be cut, sold, and removed if the Responsible Official determines that the activity is consistent with the applicable land management plan. One or more of the roadless area characteristics will be maintained or improved over the long-term, with exceptions and only if one of the following conditions exists:

1. The Regional Forester determines that tree cutting, sale, or removal is needed to reduce hazardous fuels to an at-risk community.

2. The Regional Forester determines that tree cutting, sale, or removal is needed outside of the community protection zone and where wildland fire disturbance is a significant risk that could adversely affect a municipal water supply system or the maintenance of that system.

3. Tree cutting, sale, or removal is needed to maintain or restore the characteristics of ecosystem composition, structure, and processes.

4. Tree cutting, sale, or removal is needed to improve habitat for federally threatened, endangered, proposed, or Agency designated sensitive species; in coordination with the Colorado Department of Natural Resources.

5. Tree cutting, sale, or removal is incidental to the implementation of a management activity not otherwise prohibited.

6. Tree cutting, sale, or removal is needed and appropriate for personal or administrative use as provided for in 36 CFR 223, subpart A.

A road or temporary road could only be constructed and reconstructed if the Responsible Official determines that:

1. A road is needed pursuant to reserved or outstanding rights, or is provided for by statue or treaty.

2. Road realignment is needed to prevent irreparable resource damage that arises from the design, location, use, or deterioration of a forest road that cannot be mitigated by road maintenance.

3. Road reconstruction is needed for road safety improvement.

4. The Regional Forester has determined that a road is needed to allow for construction, reconstruction, or maintenance of an authorized water conveyance structure.

5. A temporary road is needed to protect health and safety in cases of imminent flood, fire, or other catastrophic event.

6. The Regional Forester has determined that a temporary road is needed to facilitate tree cutting or removal within the first half mile of a community protection zone to reduce wildfire hazard to community of water conveyance structure.

7. A temporary road is needed pursuant to the exploration or development of an existing oil and gas lease that does not prohibit road construction or reconstruction.

*USDA Forest Service*

A linear construction zone may not be constructed except when the Regional Forester determines that one is needed:

- Pursuant to reserve or outstanding rights or as provided in a statute or treaty
- For construction, reconstruction, or maintenance of an authorized water conveyance structure.

Additionally, the Regional Forest must approve projects for:

- The construction, reconstruction, or maintenance of power lines or telecommunication lines
- Construction, reconstruction, or maintenance of a pipeline for oil and gas leasing.

Other restriction and prohibitions are described in detail in the Colorado Roadless Rule direction (36 CFR Part 294).

### Proposed Management Area 3.6 – Upper Tier Colorado Roadless Area

Upper Tier Roadless Areas are described in the 2012 Colorado Roadless Rule and are identified in Table 1.3.

These areas are generally undeveloped parts of the Forest that provide a variety of settings at different elevations. They are managed to protect roadless characteristics and to maintain plant and animal habitats that are shaped primarily through natural processes. These areas provide backcountry recreational experiences to the public in areas with less evidence of human activities.

Limited vegetation manipulation may occur in this Management Area. Trees may be cut, sold, and removed only when incidental to implementation of an authorized management activity. For further clarification refer to the 2012 Colorado Roadless Rule (36 CFR 223). Trees may also be cut, sold, and removed when needed for personal or administrative use as provided for in the rule.

Landscapes in these areas are predominantly natural appearing and relatively undisturbed by humans. Natural processes within the context of the range of natural variability (insects, disease, and fire) are generally allowed to occur with minimal human intervention.

The probability of experiencing solitude in these areas is high. Frequent opportunities for challenge and risk require a degree of self-reliance. Facilities are minimal and exist primarily for site protection. Recreational improvements, such as signs, may be present. Trailheads offer information and directional signing. Cross-country motorized travel is limited to snow machines in the winter (where other restrictions do not apply).

Trails provide a range of challenging recreation opportunities including horseback riding, mountain bike riding, and motorized travel on designated routes. Hunting and fishing opportunities are available. Road and trail construction and reconstruction follows the direction outlined in the 2012 Colorado Roadless Rule (36 CFR 223). Generally, roads may only be approved for construction where there are outstanding rights or a previous statute or treaty that prescribes the need. Road construction may be authorized when there is an imminent threat to public health and safety, for example in a flood, fire, or other catastrophic event that requires intervention to reduce the loss of life or property.

Rvsd Plan - 00002220

The amount of motorized and nonmotorized travel ways will not substantially change over the planning period. Although individual travel ways may change from nonmotorized to motorized or vice-versa, the Recreation Opportunity Spectrum is Semi-Primitive.

Trees may be cut, sold, and removed if the Responsible Official determines that the activity is consistent with the Forest Plan and:

- Is incidental to a management activity not otherwise prohibited

- Is needed and appropriate for personal or administrative use as provided in 36 CFR 223, Subpart A.

A road may only be constructed or reconstructed if the Responsible Official determines that:

- A road is needed pursuant to reserved or outstanding rights, or is provided for by statue or treaty

- A road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event, that without intervention would cause the loss of life or property.

### Management Area 4.3 – Dispersed and Developed Recreation

Dispersed and Developed Recreation areas are designated mostly along road corridors where developed and undeveloped recreation opportunities can be managed as an integrated resource. These popular areas generally have access to water features or other natural attractions and offer a more social recreation experience with frequent visitor contacts.

Vegetation composition and structure are managed to meet the recreation objectives for this area, maintain vegetation cover for wildlife, and protect soil stability. Commercial harvest is authorized for reasons other than production of forest products.

Insects and disease are managed to maintain the recreation resource.

Summer homes, resorts, and organizational camps are present and managed to provide unique recreation opportunities. Developed recreation sites and facilities, such as campgrounds and picnic sites, are maintained and updated to meet customer needs. Management actions in dispersed sites maintains the natural characteristics that make the area popular.

Recreation Opportunity Spectrum class is Modified.

### Management Area 5.11 – General Forest and Intermingled Rangelands

This Management Area allows for a variety of management options, including livestock grazing, wildlife habitat, dispersed recreation, exploration, development of minerals and energy resources, and timber harvest. Characterized by forest and grassland communities, this area is managed with a multiple-use emphasis to achieve a variety of goals.

Timber is harvested to meet management goals using a full range of silvicultural options; however, even-aged systems are more likely to occur. Where timber harvest is planned, rotation periods are longer and entries are less frequent than in Area 5.13, which is described below. Timber management activities focus on what is retained in the stand instead of on wood production. All successional stages are represented. Management allows the perpetuation of natural landscape diversity (composition, structure, and function) and includes consideration

*USDA Forest Service*

within a spatial context—for example: what species, what kind of stand structure, and what kind of landscape patterns are natural, by ecosystem.

Management actions ensure that there is sufficient habitat for wildlife dispersion between undeveloped areas of the Forest.

The area has a well-developed transportation system with numerous open roads that offer commercial access and roaded recreational opportunities, while roads with restricted access offer nonmotorized recreation opportunities.

Watersheds, scenic resources, and wildlife habitat are restored in locations where past management actions have reduced resource effectiveness.

Appropriate settings are offered that are suitable for a broad range of recreation opportunities. Recreation facilities are improved on the basis of user demand. Users can expect to have a more social experience.

Livestock grazing is appropriate and authorized in this area.

Recreation Opportunity Spectrum class is Modified Roaded. Activities undertaken meet the prescribed Scenic Integrity Objectives.

### Management Area 5.13 – Forest Products

This area allows for a full range of activities with an emphasis on the production of commercial wood products. These areas have a high potential for timber growth, and operations focus on wood production. Suitable forested areas are maintained with commercially valuable species at ages, densities, and sizes that allow growth rates and stand conditions that are conducive to providing a sustained yield of forest products.

Timber management is accomplished in a manner that allows the perpetuation of natural landscape diversity (composition, structure, and function) and includes consideration within a spatial context—for example: what species, what kind of stand structure, and what kind of landscape patterns are natural, by ecosystem. All succession stages are represented, including old growth. Mature stands are identified for old growth characteristics.

Management actions ensure that sufficient quality habitat for wildlife dispersion exists between undeveloped areas of the forest.

The area has a well-developed transportation system with numerous open roads that offer commercial access and roaded recreational opportunities, while restricted access roads offer nonmotorized recreation opportunities.

Forest visitors can expect to experience managed forest. Managed stands will have evidence of management, including stumps, slash, skid trails, and soil disturbance.

Opportunities exist for exploration and development of mineral and energy resources.

Livestock grazing is appropriate and authorized.

Recreation Opportunity Spectrum class is Modified Roaded. Activities undertaken meet the prescribed Scenic Integrity Objectives.

Rvsd Plan - 00002222

### *Management Area 5.41 – Deer and Elk Winter Range*

These areas are managed to provide quality winter range forage, cover, and solitude for deer, elk, and other wildlife species. Winter Range areas are made up of forested and non-forested habitat generally at lower elevations of the Forest.

Vegetation is managed to sustain healthy plant communities that provide a variety of plants for food and cover.

The transportation system provides access for vegetation treatments and activities but reduce habitat fragmentation across the landscape.

To minimize resource conflicts on and off of National Forest System lands and to offer recreation opportunities, habitat management criteria should be developed in coordination with the Colorado Department of Parks of Wildlife along with adjacent private and Federal land owners.

Human activities are managed during the winter season to allow wildlife to effectively use the area.

Livestock grazing is appropriate and authorized. Grazing systems could be developed in cooperation with state and federal agencies and adjacent landowners so that all lands can be considered in the development of vegetation management objectives for an area.

Recreation Opportunity Spectrum class is Modified Roaded. Activities undertaken meet the prescribed Scenic Integrity Objectives.

Adjustment to this Management Area is anticipated on the basis of remapping of bighorn sheep herds by the Colorado Department of Parks and Wildlife.

### *Management Area 5.42 – Special Wildlife Areas – Bighorn Sheep*

Special Wildlife Areas for bighorn sheep are maintained for established herds and are characterized by rocky slopes, cliffs, and open grasslands with scattered stands of trees. Vegetation management may be used to enhance or maintain bighorn sheep habitat. To assure species viability management emphasizes maintenance and improvement of the habitat characteristics that bighorn sheep depend on.

Herd objectives are established in cooperation



ROCKY MOUNTAIN BIGHORN EWE ON LONG RIDGE NEAR CREEDE.

*USDA Forest Service*

with the Colorado Department of Parks and Wildlife.

Established viewing areas should provide interpretation of the resources and management.

Livestock grazing is appropriate and authorized. Maintain a buffer between domestic sheep and bighorn sheep, to prevent interaction.

Recreation Opportunity Spectrum class is Modified Roaded. Activities undertaken meet the prescribed Scenic Integrity Objectives.

Adjustment to this Management Area is anticipated based on remapping completed by the Colorado Department of Parks and Wildlife mapping of bighorn sheep herds.

### *Management Area 6.6 – Grassland Resource Production*

Grassland Resource Production areas are managed to produce forage. Management in these areas emphasizes vegetation associated with grassland ecosystems to maintain and improve desired vegetation conditions for livestock, wildlife, and recreational stock. The areas are characterized by a mix of grassland and forested ecosystems that features open meadows and other grasslands, intermixed with stands of aspens and conifers.

Plant communities are managed in a variety of successional stages to provide biological diversity of both plant and animal species. A variety of tools and methods are applied, including but not limited to timber harvest, prescribed burning, and planting. Timber harvest is managed for objectives other than forest products.

Visitors to these areas can expect to see livestock and wildlife along with range improvements.

Livestock grazing is appropriate and authorized.

Recreation Opportunity Spectrum class is Modified Roaded. Activities undertaken meet the prescribed Scenic Integrity Objectives.

### *Management Area 4.21 – Scenic Byways and Scenic Railroads*

These areas are managed to protect or preserve the scenic and recreation values and uses in designated Scenic Byways and Scenic Railroad Corridors while concurrently managing the multiple-use values of the landscape. This management prescription applies to the Silver Thread and Los Caminos Antiguos Scenic Byways, and the Cumbres and Toltec Scenic Railroad.

Multiple-use management such as commercial timber harvest, wildlife management, recreation activities, and mineral extraction is allowed in these landscapes, which feature high-quality scenery. Features may be interpreted for the public. Facilities may be developed to enhance opportunities for viewing scenery and wildlife. All activities and interactions are managed to maintain the scenic beauty for which the area is designated.

Opportunities for solitude are limited. Visitors can expect frequent contact with other visitors. Roads, recreation facilities, range improvements, and other developments are evident but are managed to be in harmony with the natural environment. Recreation facilities could include scenic overlooks, interpretive signs, and rest areas as appropriate. Developed campgrounds are situated off of the main travel way. Trailheads are easily accessible, but also are off of the main travel way.

Road systems are well signed and are generally passable by a passenger car but can be gravel or paved. This area has access for motorized recreation activities off of the main travel ways.

Rvsd Plan - 00002224

Nonmotorized activities such as biking and horseback riding are focused on the available trails and roads.

Livestock grazing is an appropriate and authorized use. This area is included in the suitable timber base.

All activities will meet the adopted Scenic Integrity Objective and the Recreation Opportunity Spectrum Class is Modified Roaded.

### *Management Area 4.4 – Designated and Eligible Recreational Rivers*

Recreational Rivers are managed to protect and perpetuate designated or eligible stream segments that have the one or more required "outstandingly remarkable" features that include scenic, recreational, geologic, wildlife, or fisheries values. The actual width of the area may vary to protect the outstanding values, but is at least one-quarter mile on either side of the stream. Existing diversion structures, rip-rap, or flood-control structures must be maintained.

Eligible Recreational Rivers from the 1996 Forest Plan include Medano Creek, South Fork Rio Grande, Lower Rio Grande, and Conejos Rivers.

Landscapes in these area are predominantly natural-appearing. Vegetative composition and structure are influenced by biological processes and conditions. Proximity to the stream results in greater than average diversity of plants and animal species.

Livestock grazing is an appropriate and authorized use. These areas are not included in the suitable timber base.

Activities undertaken will meet the adopted Scenic Integrity Objective, and the Recreation Opportunity Spectrum class is Modified.

### *Management Area 8.22 – Ski-based Resorts*

These areas are managed for their existing or potential use as ski-based resort sites. Wolf Creek Ski Area lands are the only lands currently included in the Management Area. This is an area of concentrated use. Visitors can expect a high degree of interaction and many facilities associated with the ski resort industry.

Resources are managed to protect the recreation resource and ensure public safety, including management of insects and disease. Project implementation in this area maintains the possibility of winter sports recreation. Resource Management activities are designed and implemented to maintain or enhance existing resources.

Development in the area will be consistent with the terms and conditions of the Special Use Permit, including submission of a master development plan. These lands are not part of the suitable timber base. They are also withdrawn from locatable mineral entry, and grazing is not authorized or permitted.

Activities will meet the adopted Scenic Integrity Objective and the Recreation Opportunity Spectrum class is Roaded Natural.

*USDA Forest Service*

Table 1.4. Allowable activities in the proposed Management Areas

| Allowable Activities | 1.1 | 1.5 | 2.2 | 3.1 | 3.4 | 3.5 | 3.6 | 4.21 | 4.3 | 4.4 | 5.11 | 5.13 | 5.41 | 5.42 | 6.6 | 8.22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Timber vegetation management for fiber | | | | | | | | X | X | | X | X | X | X | X | |
| May be suitable for timber harvest | | | | | | | | X | X | X | X | X | X | X | X | X |
| Timber stand improvement | | | | | | | | X | X | | X | X | X | X | X | |
| Salvage/Sanitation Harvest | | | | X | | | | X | X | X | X | X | X | X | X | X |
| Prescribed fire | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Naturally occurring fire | X | X | X | X | X | X | X | | | X | X | X | X | X | X | |
| Trail construction/reconstruction | X | X | | X | X | X | X | X | | X | X | X | X | X | X | X |
| Off road game retrieval | | | | | | | | | | | X | X | X | X | X | X |
| Off road travel for dispersed camping, firewood gathering, etc. | | | | | | | | X | X | X | X | X | X | X | X | |
| Full suppression of wildfires* | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Authorized grazing | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | |

*Full fire suppression is an option for any wildfire and is up to the discretion of the Line Officer.

Rvsd Plan - 00002226

The Forest Plan will present standards and guidelines as prescribed in the 2012 Planning Rule. Standards and guidelines place operational constraints on projects and activities that help achieve or maintain desired conditions. They should not direct processes for additional analysis or planning. Standards and guidelines can be applied at the Forest-wide, Geographic Area, or Management Area scale. As a starting point, Forest Service direction states that Forest Plans will include plan components including standard or guidelines for the following:

- Ecological integrity of terrestrial and aquatic ecosystems, and watersheds in the plan area
- Air quality; soils and soil productivity, including guidance to reduce soil erosion and sedimentation; and water quality
- Ecological integrity of riparian areas
- Contribution to social and economic sustainability
- Diversity of ecosystems and habitat types
- Ecological conditions in the plan area
- Integrated resource management to provide for ecosystem services and multiple uses
- Sustainable recreation including recreation settings, opportunities, and access; and scenic character
- Protection of cultural and historic resources
- Management of areas of tribal importance
- Protection of congressionally designated wilderness areas as well as management of areas recommended for wilderness designation
- Protection of designated Wild and Scenic Rivers as well as management of rivers found eligible or determined suitable
- Appropriate management of other designated areas or recommended designated areas
- Timber harvest not allowable for the purposes of timber production on unsuitable lands
- Soil, slope, or other watershed conditions would not be irreversibly damaged
- Protection of soil, watershed, fish, wildlife, recreation, and aesthetic resources
- Limits on the maximize size for openings (must be standards)
- Timber harvest only when in compliance with the resource protections
- Timber removal on a sustained yield basis
- Regeneration only of stands that generally have reached the culmination of mean annual increment of growth.

## Adaptive Management Domain

The Adaptive Management Domain puts in place a process that implements plan direction, analyzes the impacts, monitors, and then evaluates adjustments that may be needed to be adaptive and responsive in a timely manner. Changes will be incorporated through interdisciplinary analysis and will include public involvement.

To be more responsive to necessary changes in the Forest Plan content, Forest Leadership will annually post proposed changes and the rationale for the changes, which could include annual monitoring results, on the Forest website. In conjunction with release of the changes, a stakeholder meeting would be held to discuss the changes proposed in detail followed by a comment period. Upon receiving and reviewing all comments the Responsible Official would determine the proper authority to be used in making necessary changes to the Plan content. The entire process would be open and transparent.

Changes to Plan Components requires a Forest Plan Amendment that could use any of the approved authorities available at the time. Changes to optional plan content, corrections in clerical errors to any content (including plan components), changes needed to conform to new statutory or regulatory requirements for which there is no discretion, and other changes to plan content except for changes to the substance of plan components or to the application of plan components to a specific areas in the planning area, may be adjusted through an Administrative Change. This would be done in compliance with the 2012 Planning Rule (36 CFR 219.7(f)) and Forest Service direction from Forest Service Handbook 1909.12 § 21.5.

## Monitoring Domain

During the revision process, the existing Monitoring program will be reevaluated in accordance with direction contained in the 2012 Planning Rule and in Forest Service Handbook 1909.12. The monitoring program to be developed as part of the Forest Plan should be strategic, effective, and useful. Monitoring forms the basis for continuous improvement of the plan and the adaptive management process. Plan monitoring is one part of the overall approach. Broader-scale monitoring is driven by the Regional Forester and addresses relevant plan monitoring questions that are best answered at a geographic level.

Monitoring questions and measurable indicators of response will allow Forest personnel to measure management effectiveness and assess progress toward desired conditions. The intent of monitoring is to provide the Responsible Official with sufficient information to inform key management decisions about the success of the plan, not to fulfill other interests or purposes.

The 2012 Planning Rule does not require development of monitoring questions for every desired condition, objective, or other plan components. As with all other parts of Forest Plan development, monitoring questions and indicator measurements will use the best available science and will involve public participation. The Monitoring Program will address a minimum of eight topics, including:

Rvsd Plan - 00002228

1. The status of select watershed conditions

2. The status of select ecological conditions, including key characteristics of terrestrial and aquatic ecosystems

3. The status of focal species to assess ecological conditions under 36 CFR 219.9

4. The status of a select set of the ecological conditions required under 36 CFR 219.9 to contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern

5. The status of visitor use, visitor satisfaction, and progress toward meeting recreation objectives

6. Measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area

7. Progress toward meeting the desired conditions and objectives in the plan, including for providing multiple use opportunities

8. The efforts of each management system to determine that they do not substantially and permanently impair the productivity of the land.

Some aspects of the monitoring program may be fulfilled by monitoring conducted by other entities than the Forest, such as but not limited to the Region's broader-scale monitoring program, other federal or state agencies, university researchers, tribes, and other interest groups working in collaboration with Forest staff.

In addition to the annual stakeholder meeting, a written report evaluating the monitoring program will be produced biennially and will be available to the public.

USDA Forest Service



RIO GRANDE NATIONAL FOREST PROPOSED MANAGEMENT AREAS.

Rvsd Plan - 00002230



RIO GRANDE NATIONAL FOREST PROPOSED MANAGEMENT AREAS AND GEOGRAPHIC AREAS.

 

# 2015 ANNUAL REPORT



# 1   GREETINGS!

On behalf of the Alamosa County Marketing District Board, I am very excited to say that 2015 was a very productive year! It was certainly a whirlwind of many great events that kept our summer jam-packed. From mid-May through the first of November, there were events and activities every single weekend, with many weekends having two to three events to choose from. New events such as the Rio Frio 5k in January and the Chalk-a-Walk were both huge successes. As with all the events in Alamosa County, old or new events could not be possible without the amazing teamwork of so many different organizations.

A huge factor in the success of 2015 was the incredible attendance seen at the Great Sand Dunes National Park and Preserve. Medano Creek had water for an above average number of days which is always a huge draw for visitors. Growing popularity in National Parks, sandboarding, and adventure tourism across the country also contributed to the high numbers.

There was a healthy increase in lodging tax collections in 2015 which coincided with the 7% increase in visitors in the Welcome Center. Interest in visiting Alamosa County skyrocketed, reflecting an 80% increase in visits to the website, and nearly 26,000 Visitor Guides were requested and mailed, a 65% increase over 2014! International interest in traveling to Alamosa County has also grown, the Convention & Visitors Bureau hosted more than 10 FAM Tours and Media Trips from countries such Germany, Canada, and the Netherlands.

The coming year is already promising to be just as exciting. Several unique and interesting groups have planned a trip to Alamosa this summer. And, expect to see another incredible year from the Great Sand Dunes as the National Park Service celebrates it 100th anniversary in 2016.

Sincerely,

Jamie Greeman
Executive Director
Alamosa Convention & Visitors Bureau

### Board Members

David Brolyes, President
Tom Bobicki, Vice-President
(not pictured)
Danielle VanVeghten, Treasurer
Jeff Woodward
Fred Bunch
Rob Oringdulph
Cathy Simpson
Jamie Greeman, Executive Director



### Mission Statement of the Alamosa County Local Marketing District Board

The Local Marketing District Board shall promote small town hospitality with modern amenities to offer enhanced customer and visitor services. In addition, the Local Marketing District Board will assist in increasing lodging room nights, extending the summer season beyond the summer months, as well as enhancing the overall economic development of Alamosa County.

# TAX COLLECTIONS   **2**

Two separate taxes are collected on each hotel/motel room reserved in Alamosa County. Lodging Tax is collected at the rate of 1.9% and the Marketing District Tax is collected at the rate of 4%.

### Marketing District Collections



| Year: 2011 $353,614.13 | Year: 2012 $594,621.40 | Year: 2013 $335,880.85 | Year: 2014 $382,971.16 | Year: 2015 $431,022.65 |

### Lodging Tax Collections



| Year: 2011 $174,138.96 | Year: 2012 $191,149.47 | Year: 2013 $165,133.53 | Year: 2014 $157,485.58 | Year: 2015 $219,165.57 |

### 2015 Expenses



Payroll Tax Expenses $6,139.17 ▶ 2%

Tourism Marketing $105,335.11 ▶ 23%

Museum $34,200.00 ▶ 7%

Gateway Center / Overhead $52,165.43 ▶ 11%

Business Development $8,750.00 ▶ 2%

Colorado Welcome Center $45,876.43 ▶ 10%

Convention & Visitors Bureau $165,999.46 ▶ 36%

Event Grant Program $42,400.00 ▶ 9%

# 3   VISITOR COUNTS & STATISTICS

**"We couldn't do it without the dedication of our amazing Welcome Center volunteers!"**

There are 10 official State Welcome Centers in Colorado including Alamosa. The Welcome Centers are strategically positioned in key entrance points across the state. The centers- staffed by an amazing group of volunteers- serve as a great source of information for visitors coming to Colorado. Research shows that visitors who stop at a Welcome Center are likely to spend more during their vacation. Visitors in the Welcome Center were up 7% in 2015, arriving from all corners of the globe. All 50 states were represented, most of them coming from Colorado, New Mexico, and Texas. International visitors represented 40 different countries!





**Welcome Center Visitation**

Year 2015 — 36,685
Year 2014 — 34,232
Year 2013 — 50,733
Year 2012 — 26,326
Year 2011 — 43,010

**Visitors by State**

Colorado 45%
New Mexico 9%
Arizona 3%
Oklahoma 3%
California 3%
Kansas 2%

| International Visitors | |
|---|---|
| Australia | 28 |
| Austria | |
| Belgium | |
| Brazil | |
| Canada | 114 |
| China | |
| Costa Rica | |
| Czech Republic | |
| Denmark | |
| Ecuador | |
| E Salvador | |
| England | 32 |
| France | 49 |
| Germany | 104 |
| Guatemala | |
| Honduras | |
| Hong Kong | |
| Ireland | |
| Mumbai | |
| Italy | |
| Japan | |
| Mexico | |
| Netherlands | 21 |
| New Zealand | |
| Nicaragua | |
| Poland | |
| Norway | |
| Peru | |
| Poland | |
| Puerto Rico | |
| Russia | |
| Scotland | |
| South Korea | |
| Spain | |
| Sweden | |
| Switzerland | 31 |
| Taiwan | |
| Thailand | |
| Wales | |
| West Indies | |
| **Total** | **490** |

# WEBSITE & VISITOR GUIDE REQUESTS    4



**Website Activity**

|  | VISITS | UNIQUE VISITORS | PAGE VIEWS |
|---|---|---|---|
| 2014 | 73,510 | 58,233 | 267,106 |
| 2015 | 132,577 | 107,948 | 330,790 |

Screenshots of Alamosa.org

2015 Visitor's Guide

**Visitor Guide Requests**

**Visitor Guide Request by Source**

| Source | Count | Percent |
|---|---|---|
| Colorado.com | 17,880 | 62% |
| Rocky Mountain National Park Contest | 3,765 | 13% |
| Official State Vacation Guide | 1,880 | 7% |
| Alamosa.org | 1,880 | 7% |
| MyRockyMountainPark.com | 1,193 | 4% |
| Go-Colorado | 771 | 3% |
| e-Newsletter | 673 | 3% |
| Audubon | 500 | 2% |
| Contact Us | 150 | 2% |

# A Profile of Development and the Wildland-Urban Interface (WUI)

## Rio Grande NF Region

### Alamosa County CO, Conejos County CO, Costilla County CO, Mineral County CO, Rio Grande County CO, Saguache County CO

Produced by
**Economic Profile System-Human Dimensions Toolkit**
**EPS-HDT**
February 26, 2015

# About EPS-HDT

## About the Economic Profile System-Human Dimensions Toolkit (EPS-HDT)

EPS-HDT is a free, easy-to-use software application that produces detailed socioeconomic reports of counties, states, and regions, including custom aggregations.

EPS-HDT uses published statistics from federal data sources, including Bureau of Economic Analysis and Bureau of the Census, U.S. Department of Commerce; and Bureau of Labor Statistics, U.S. Department of Labor.

The Bureau of Land Management and Forest Service have made significant financial and intellectual contributions to the operation and content of EPS-HDT.

See headwaterseconomics.org/eps-hdt for more information about the other tools and capabilities of EPS-HDT.

For technical questions, contact Patty Gude at eps-hdt@headwaterseconomics.org, or 406-599-7425.



**HEADWATERS**
**ECONOMICS**
headwaterseconomics.org

**Headwaters Economics** is an independent, nonprofit research group. Our mission is to improve community development and land management decisions in the West.



www.blm.gov

**The Bureau of Land Management**, an agency within the U.S. Department of the Interior, administers 249.8 million acres of America's public lands, located primarily in 12 Western States. It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.



www.fs.fed.us

**The Forest Service**, an agency of the U.S. Department of Agriculture, administers national forests and grasslands encompassing 193 million acres. The Forest Service's mission is to achieve quality land management under the "sustainable multiple-use management concept" to meet the diverse needs of people while protecting the resource. Significant intellectual, conceptual, and content contributions were provided by the following individuals: Dr. Pat Reed, Dr. Jessica Montag, Doug Smith, M.S., Fred Clark, M.S., Dr. Susan A. Winter, and Dr. Ashley Goldhor-Wilcock.

Rvsd Plan - 00002238

# Table of Contents

Page

**Development in the WUI**
How much of the WUI has been developed, and how much has not yet
been developed?                                                                 1
How many homes are in the WUI, and what proportion are permanently
versus seasonally occupied?                                                      2

**Land Use in the WUI**
How much land is used inside and outside of the WUI?                             3

**Existing and Potential Risk**
What is the wildfire risk to development?                                        4

**Data Sources & Methods**                                                       5

**Links to Additional Resources**                                               6

**Note to Users:**

This report is one of fourteen reports that can be produced with the EPS-HDT software. You may want to run another EPS-HDT report for either a different geography or topic. Topics include land use, demographics, specific industry sectors, the role of non-labor income, the wildland-urban interface, the role of amenities in economic development, and payments to county governments from federal lands. Throughout the reports, references to on-line resources are indicated by superscripts in parentheses. These resources are provided as hyperlinks on each report's final page. The EPS-HDT software also allows the user to "push" the tables, figures, and interpretive text from a report to a Word document. For further information and to download the free software, go to:

headwaterseconomics.org/eps-hdt

Rvsd Plan - 00002239

## Rio Grande NF Region

# Development in the WUI

### How much of the WUI has been developed, and how much has not yet been developed?

This page evaluates the wildland-urban interface (WUI) for the eleven western continental states, showing both square miles and the proportion of the WUI that has been developed and how much remains to be developed.

### Wildland-Urban Interface (Square Miles), 2010

|  | Rio Grande NF Region | West |
|---|---|---|
| Total WUI Area | 92 | 23,596 |
| WUI Area with Homes | 13 | 3,837 |
| WUI Area without Homes | 80 | 19,759 |
| **Percent of Total** | | |
| WUI Area with Homes | 14.0% | 16.3% |
| WUI Area without Homes | 86.0% | 83.7% |

- In 2010, Rio Grande NF Region had the largest total WUI area (92.5 square miles), and Alamosa County, CO had the smallest (4.4 square miles).



- In 2010, Conejos County, CO had the largest percent of the WUI with homes (35.1%), and Costilla County, CO had the smallest (0.7%).



Data Sources: Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205; U.S. Department of Commerce. 2011. TIGER/Line 2010 Census Blocks and 2010 Summary File 1, Washington, D.C.

Rvsd Plan - 00002240

## Rio Grande NF Region

# Development in the WUI

### How many homes are in the WUI, and what proportion are permanently versus seasonally occupied?

This page measures the total number of homes compared to the subset of homes in the WUI and how many of those homes are permanent or second homes.

### Total Homes and Wildland-Urban Interface Homes, 2010

|  | Rio Grande NF Region | West |
| --- | --- | --- |
| Total Number of Homes | 25,127 | 27,766,144 |
| WUI Homes | 1,883 | 1,947,927 |
| Second Homes in WUI | 1,307 | 293,196 |

### Percent of Total

|  | | |
| --- | --- | --- |
| WUI Homes as % of Total Homes | 7.5% | 7.0% |
| Second Homes as % of WUI Homes | 69.4% | 15.1% |

- In 2010, Mineral County, CO had the largest percent of total homes (37.6%) built inside the WUI, and Alamosa County, CO had the smallest (0.4%).



Percent of Total Homes Built in the WUI, 2010

- In 2010, Conejos County, CO has the largest share of second homes in the WUI (90.2%), and the West has the smallest (15.1%).



Percent of Homes in the WUI that are Second Homes, 2010

Data Sources: Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205; U.S. Department of Commerce. 2011. TIGER/Line 2010 Census Blocks and 2010 Summary File 1, Washington, D.C.

Rvsd Plan - 00002241

## Rio Grande NF Region

# Land Use in the WUI

### How much land is used inside and outside of the WUI?

This page provides both the total number of residences (homes) as well as the subsets of homes in and outside the WUI. It also shows the average lot size (in acres) of homes within the WUI compared to homes outside of the WUI.

### Average Lot Sizes (Acres/Home), 2010

| | Rio Grande NF Region | West |
|---|---|---|
| **Average Lot Size** | 2.7 | 0.9 |
| Total Number of Homes | 25,127 | 27,766,144 |
| Total Residential Acres | 69,069 | 24,584,252 |
| **Average Lot Size in WUI** | 4.4 | 1.3 |
| WUI Homes | 1,883 | 1,947,927 |
| WUI Residential Acres | 8,280 | 2,455,779 |
| **Average Lot Size in Non-WUI** | 2.6 | 0.9 |
| Non-WUI Homes | 23,244 | 25,818,217 |
| Non-WUI Residential Acres | 60,789 | 22,128,473 |

- In 2010, the largest difference in lot sizes in and outside the WUI occurred in Conejos County, CO. In the WUI, the average lot size was 6.9 acres and outside the WUI the average lot size was 2.8 acres.



Average Lot Size, 2010

■ Average Lot Size in WUI    ■ Average Lot Size in Non-WUI

Data Sources: Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205; U.S. Department of Commerce. 2011. TIGER/Line 2010 Census Blocks and 2010 Summary File 1, Washington, D.C.

Rvsd Plan - 00002242

## Rio Grande NF Region

# Existing and Potential Risk

### What is the wildfire risk to development?

This page measures the risk of wildfire for lands already developed in the WUI and the potential risk of wildfire should homes be build on undeveloped land in the WUI.  The geographies are ordered within the eleven western states in both absolute and percentile rankings.

### West-Wide and State-Wide County Rankings, 2010

|  | Rio Grande NF Region | West |
|---|---|---|
| West-Wide Rank by Existing Risk | na | na |
| West-Wide Rank by Potential Risk | na | na |
| State-Wide Rank by Existing Risk | na | na |
| State-Wide Rank by Potential Risk | na | na |

#### Percentile

|  | Rio Grande NF Region | West |
|---|---|---|
| West-Wide Rank by Existing Risk | na | na |
| West-Wide Rank by Potential Risk | na | na |
| State-Wide Rank by Existing Risk | na | na |
| State-Wide Rank by Potential Risk | na | na |

- In 2010, Conejos County, CO was in the 69 percentile in the West when ranked by existing risk (the amount of forested land where homes have already been built next to public lands).

- In 2010, Saguache County, CO was in the 64 percentile in the West when ranked by future potential risk (the area of undeveloped, forested private land bordering fire-prone public lands).



- In 2010, Conejos County, CO was in the 70 percentile in the state when ranked by existing risk (the amount of forested land where homes have already been built next to public lands).

- In 2010, Saguache County, CO was in the 69 percentile in the state when ranked by future potential risk (the area of undeveloped, forested private land bordering fire-prone public lands).



Data Sources: Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205; U.S. Department of Commerce. 2011. TIGER/Line 2010 Census Blocks and 2010 Summary File 1, Washington, D.C.

Rvsd Plan - 00002243

# Data Sources & Methods

## Data Sources

The EPS-HDT Development and the Wildland-Urban Interface (WUI) report uses a set of specific West-wide data sources to quantify measures of fire risk related to residential development. In an effort to report more accurate statistics for land ownership, a compilation of state level data was used. All of the spatial data in this report were the result of calculations made in Geographic Information Systems (GIS). The contact information for these databases is:

- **Protected Areas Database 1.3 2012**
  US Geological Survey, Gap Analysis Program (GAP)
  http://gapanalysis.usgs.gov/padus/

- **MODIS Land Cover Type 2006**
  National Aeronautics and Space Administration
  http://modis-land.gsfc.nasa.gov/landcover.htm

- **2010 Decennial Census**
  Census Bureau, U.S. Department of Commerce
  http://wwwcensus.gov
  Tel 303-969-7750

## Methods

In this report, we focus on housing that borders federal public forestlands in the West. Roughly 70 percent of western forests are publicly owned. Since wildfire is a natural disturbance in many of these forests, this creates a potential risk to adjacent private lands. Fire risk is extremely difficult to quantify. Since most western forests burn at some point and residential areas are rarely abandoned, for the purpose of this report, all forested public lands were considered susceptible to wildfire.

A buffer of 500 meters surrounding forested public lands, including federal, state, and locally managed forests, was mapped, and residential areas that fell within this buffer were identified. The forested public lands were identified based on the following classes from satellite classified land cover maps: evergreen needleleaf forest, evergreen broadleaf forest, deciduous needleleaf forest, deciduous broadleaf forest, mixed forests, closed shrublands. Although open shrublands and grasslands are also prone to wildfire, defending homes in these habitats tends to be less dangerous and less expensive. Since guidelines for the amount of defensible space necessary to protect homes range from 40 to 500 meters, the threshold of 500 meters was used to identify where residential development occurs adjacent to fire-prone public lands. This is a conservative estimate of the WUI and the associated risk of fire, since it is unknown how many home owners within this zone have followed defensible space guidelines.

In order to identify where housing has occurred adjacent to forested wildlands in the West, maps of housing density were created at the scale of 2000 Census blocks. Forested areas where residential development (census blocks with mean lot sizes less than 40 acre) occurred within 500 meters (0.31 miles) of public lands were identified. The threshold of 40 acre lot sizes was used to identify residential development because at this home density, areas are generally considered to be more populated than working agricultural lands. The mean lot size per Census block was calculated by dividing the number of housing units by the area of private land (public lands and any water bodies were excluded).

For each western state and for the West as a whole, the area of forested wildland interface containing homes, i.e., the WUI, was compared to the area of undeveloped forested wildland interface. Per state, the number of homes in the wildland interface was calculated, as well as the percent of these homes that are second homes. The number of second homes within the WUI was calculated by adding the number of "seasonally occupied" homes, as specified in by the Census SF1 H005005 field, to the number of "other vacant" homes, as specified in the Census SF1 H005007 field. These counts do not include homes that are vacant because they are for rent or sale.

Two measures were used to identify counties with high existing and high potential risk of wildland fire to homes. Existing risk was measured in terms of the total area of WUI per county, and potential risk was represented by the area of undeveloped forested wildland interface, where home construction could occur in the future.

For additional information about methods used to generate metrics in this report, see: Gude, P.H., Rasker, R., and van den Noort, J. 2008. Potential for Future Development on Fire-Prone Lands. Journal of Forestry 106(4):198-205.

Rvsd Plan - 00002244

# Links to Additional Resources

## For more information about EPS-HDT see:

headwaterseconomics.org/eps-hdt

## Web pages listed under Additional Resources include:

Throughout this report, references to on-line resources are indicated by superscripts in parentheses. These resources are provided as hyperlinks here.

1   www.silvis.forest.wisc.edu/library/WUIDefinitions2.asp
2   headwaterseconomics.org/wildfire.php
3   headwaterseconomics.org/wildfire/HeadwatersFireCosts.pdf
4   www.fs.fed.us/biology/wildecology/HFRA.pdf
5   headwaterseconomics.org/wildfire/PGude_2008_Forestry.pdf
6   www.biologicaldiversity.org/swcbd/programs/fire/wui1.pdf
7   headwaterseconomics.org/wildfire/HeadwatersEconomics_FireCostStudy_TechnicalReport.pdf
8   www.napawash.org/Pubs/WildfireJan04.htm
9   www.napawash.org/Pubs/Wildfire9_30_02.pdf
10  headwaterseconomics.org/wildfire/Gude_Manuscript_4-24-09_Color.pdf
11  www.pnas.org/content/early/2009/06/05/0900991106.abstract

Rvsd Plan - 00002245

# A Profile of Socioeconomic Measures

## Rio Grande NF Region

### Selected Geographies: Alamosa County CO, Conejos County CO, Costilla County CO, Mineral County CO, Rio Grande County CO, Saguache County CO

### Benchmark Geographies: Colorado Non-Metro

Produced by
**Economic Profile System-Human Dimensions Toolkit**
**EPS-HDT**
February 26, 2015



# About EPS-HDT

## About the Economic Profile System-Human Dimensions Toolkit (EPS-HDT)

EPS-HDT is a free, easy-to-use software application that produces detailed socioeconomic reports of counties, states, and regions, including custom aggregations.

EPS-HDT uses published statistics from federal data sources, including Bureau of Economic Analysis and Bureau of the Census, U.S. Department of Commerce; and Bureau of Labor Statistics, U.S. Department of Labor.

The Bureau of Land Management and Forest Service have made significant financial and intellectual contributions to the operation and content of EPS-HDT.

See headwaterseconomics.org/eps-hdt for more information about the other tools and capabilities of EPS-HDT.

For technical questions, contact Patty Gude at eps-hdt@headwaterseconomics.org, or 406-599-7425.



headwaterseconomics.org

**Headwaters Economics** is an independent, nonprofit research group. Our mission is to improve community development and land management decisions in the West.



www.blm.gov

**The Bureau of Land Management**, an agency within the U.S. Department of the Interior, administers 249.8 million acres of America's public lands, located primarily in 12 Western States. It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.



www.fs.fed.us

**The Forest Service**, an agency of the U.S. Department of Agriculture, administers national forests and grasslands encompassing 193 million acres. The Forest Service's mission is to achieve quality land management under the "sustainable multiple-use management concept" to meet the diverse needs of people while protecting the resource. Significant intellectual, conceptual, and content contributions were provided by the following individuals: Dr. Pat Reed, Dr. Jessica Montag, Doug Smith, M.S., Fred Clark, M.S., Dr. Susan A. Winter, and Dr. Ashley Goldhor-Wilcock.

Rvsd Plan - 00002247

# Table of Contents

|  | Page |
|---|---|
| **Trends** | |
| How have population, employment, and personal income changed? | 1 |
| **Components** | |
| How have the components of population changed? | 2 |
| How have the components of employment changed? | 3 |
| How has the mix of wage and salary and proprietors income changed? | 4 |
| How has the mix of labor earnings and non-labor income changed? | 5 |
| **Industry Sectors** | |
| How has employment by industry changed historically? | 6-7 |
| How has employment by industry changed recently? | 8-9 |
| How has personal income by industry changed historically? | 10-11 |
| How has personal income by industry changed recently? | 12-13 |
| **Performance** | |
| How have earnings per job and per capita income changed? | 14 |
| How do wages compare across industries? | 15 |
| How has the unemployment rate changed? | 16 |
| What are the commuting patterns in the region? * | 17 |
| Do national recessions affect local employment? | 18 |
| * This page is unavailable for the selected geographies and has been removed. | |
| **Benchmarks** | |
| How does performance compare to the benchmark? | 19-20 |
| **Data Sources & Methods** | 21 |
| **Links to Additional Resources** | 22 |

**Note to Users:**

This report is one of fourteen reports that can be produced with the EPS-HDT software.  You may want to run another EPS-HDT report for either a different geography or topic.  Topics include land use, demographics, specific industry sectors, the role of non-labor income, the wildland-urban interface, the role of amenities in economic development, and payments to county governments from federal lands.  Throughout the reports, references to on-line resources are indicated by superscripts in parentheses.  These resources are provided as hyperlinks on each report's final page.  The EPS-HDT software also allows the user to "push" the tables, figures, and interpretive text from a report to a Word document.  For further information and to download the free software, go to:

headwaterseconomics.org/eps-hdt

Rvsd Plan - 00002248

## Rio Grande NF Region

### How have population, employment, and personal income changed?

This page describes trends in population, employment, and real personal income. If this report is for an individual county, it also shows the county (metropolitan, micropolitan, or rural) classification.

### Total Population, Employment, & Real Personal Income Trends, 1970-2013

|  | 1970 | 1980 | 1990 | 2000 | 2013 | Change 2000-2013 |
|---|---|---|---|---|---|---|
| Population | 37,506 | 38,055 | 40,214 | 46,246 | 46,780 | 534 |
| Employment (full and part-time jobs) | 13,084 | 17,504 | 19,213 | 24,437 | 26,260 | 1,823 |
| Personal Income (thousands of 2013$s) | 572,241 | 880,933 | 975,930 | 1,316,207 | 1,621,969 | 305,762 |

Population and personal income are reported by place of residence, and employment by *place of work* on this page.

Population Trends, Rio Grande NF Region

* From 1970 to 2013, population grew from 37,506 to 46,780 people, a 25% increase.



Employment Trends, Rio Grande NF Region

* From 1970 to 2013, employment grew from 13,084 to 26,260 jobs, a 101% increase.



Personal Income Trends, Rio Grande NF Region

* From 1970 to 2013, personal income grew from $572.2 million to $1,622.0 million (in real terms), a 183% increase.



Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA30.

Rvsd Plan - 00002249

## Rio Grande NF Region



### How have the components of population changed?

This page describes various components of population change and total population growth (or decline). Total population growth (or decline) is the sum of natural change (births & deaths) and migration (international & domestic).

#### Components of Population Decline, 2000-2013

| | Change 2000-2013 |
|---|---|
| **Population Decline (2000 - 2013)** | 506 |
| **Avg. Annual Population Change (Natural Change & Net Migration)** | 27 |
| **Avg. Annual Natural Change (Births & Deaths)** | 266 |
| Avg. Annual Births | 651 |
| Avg. Annual Deaths | 385 |
| **Avg. Annual Net Migration (International & Domestic)** | -250 |
| Avg. Annual International Migration | 68 |
| Avg. Annual Domestic Migration | -318 |
| **Avg. Annual Residual** | -17 |

#### Percent of Population Decline, 2000-2013

| | |
|---|---|
| **Avg. Annual Natural Change (Births & Deaths)** | 100.0% |
| **Avg. Annual Net Migration (International & Domestic)** | 0.0% |



- From 2000 to 2013, population grew by 506 people, a 1% increase.

- From 2000 to 2013, natural change contributed to 100% of population growth.

- From 2000 to 2013, migration contributed to % of population growth.

Average Annual Components of Population Decline*, Rio Grande NF Region, 2000-2013



\* The Census Bureau makes a minor statistical correction, called a "residual" which is shown in the table above, but omitted from the figure. Because of this correction, natural change plus net migration may not add to total population change in the figure.

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, Population Division, Washington, D.C.

Rvsd Plan - 00002250

## Rio Grande NF Region

# Components

### How have the components of employment changed?

This page describes changes in two components of employment: wage and salary jobs, and proprietor jobs.

Wage and Salary: This is a measure of the average annual number of full-time and part-time jobs by place of work. All jobs for which wages and salaries are paid are counted. Full-time and part-time jobs are counted with equal weight.

Proprietors: This term includes the self-employed in farm and nonfarm sectors by place of work. Nonfarm self-employment consists of the number of sole proprietorships and the number of individual business partners not assumed to be limited partners. Farm self-employment is defined as the number of non-corporate farm operators, consisting of sole proprietors and partners.

### Components of Employment Change, 1970-2013

|  | 1970 | 1980 | 1990 | 2000 | 2013 | Change 2000-2013 |
|---|---|---|---|---|---|---|
| **Total Employment** | 13,084 | 17,504 | 19,213 | 24,437 | 26,260 | 1,823 |
| Wage and salary jobs | 9,352 | 13,049 | 13,965 | 17,248 | 17,506 | 258 |
| Number of proprietors | 3,732 | 4,455 | 5,248 | 7,189 | 8,754 | 1,565 |
| **Percent of Total** |  |  |  |  |  | % Change 2000-2013 |
| **Total Employment** |  |  |  |  |  | 7.5% |
| Wage and salary jobs | 71.5% | 74.5% | 72.7% | 70.6% | 66.7% | 1.5% |
| Number of proprietors | 28.5% | 25.5% | 27.3% | 29.4% | 33.3% | 21.8% |

All employment data in the table above are reported by *place of work*. Includes full-time and part-time workers.

- From 1970 to 2013, wage and salary employment (people who work for someone else) grew from 9,352 to 17,506, a 87% increase.

- From 1970 to 2013, proprietors (the self-employed) grew from 3,732 to 8,754, a 135% increase.



Components of Employment, Rio Grande NF Region

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA30.

Rvsd Plan - 00002251

## Rio Grande NF Region

# Components

### How has the mix of wage and salary and proprietors income changed?

This page describes the components of labor earnings (in real terms): income from wage and salary, and proprietors' employment. It also looks more closely at proprietors, comparing long-term trends in proprietors' employment and personal income.

### Components of Labor Earnings Change, 1970-2013 (Thousands of 2013 $s)

|                                 | 1970    | 1980    | 1990    | 2000    | 2013    | Change 2000-2013 |
|---------------------------------|---------|---------|---------|---------|---------|------------------|
| Earnings by place of work       | 408,716 | 641,376 | 665,374 | 856,315 | 963,777 | 107,462          |
| Wage & salary disbursements     | 254,365 | 371,685 | 365,857 | 514,538 | 583,770 | 69,232           |
| Supplements to wages & salaries | 29,582  | 60,933  | 85,117  | 125,728 | 148,964 | 23,236           |
| Proprietors' income             | 124,769 | 208,757 | 214,400 | 216,050 | 231,043 | 14,993           |
| **Percent of Total**            |         |         |         |         |         | % Change 2000-2013 |
| Earnings by place of work       |         |         |         |         |         | 12.5%            |
| Wage & salary disbursements     | 62.2%   | 58.0%   | 55.0%   | 60.1%   | 60.6%   | 13.5%            |
| Supplements to wages & salaries | 7.2%    | 9.5%    | 12.8%   | 14.7%   | 15.5%   | 18.5%            |
| Proprietors' income             | 30.5%   | 32.5%   | 32.2%   | 25.2%   | 24.0%   | 6.9%             |

All income data in the table above are reported by *place of work*, which is different than earnings by *place of residence* shown on the following page of this report.

- From 1970 to 2013, labor earnings from wage and salary employment grew from $254.4 million to $583.8 million (in real terms), a 130% increase.

- From 1970 to 2013, labor earnings from proprietors' employment grew from $124.8 million to $231.0 million (in real terms), a 85% increase.



Components of Labor Earnings, Rio Grande NF Region

- In 1970, proprietors represented 29% of total employment. By 2013, proprietors represented 33% of total employment.

- In 1970, proprietors represented 31% of total labor earnings. By 2013, proprietors represented 26% of total labor earnings.



Proprietors' Employment Share of Employment & Proprietors' Income Share of Labor Earnings, Rio Grande NF Region

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Tables CA05 & CA05N.

Rvsd Plan - 00002252

## Rio Grande NF Region


**Components**

### How has the mix of labor earnings and non-labor income changed?

This page describes changes in labor earnings and non-labor sources of income.

<u>Labor Earnings</u>: This represents (on this page) net earnings by place of residence, which is earnings by place of work (the sum of wage and salary disbursements, supplements to wages and salaries, and proprietors' income) less contributions for government social insurance, plus an adjustment to convert earnings by place of work to a place of residence basis.

<u>Non-Labor Income</u>: Dividends, interest, and rent (money earned from investments), and transfer payments (includes government retirement and disability insurance benefits, medical payments such as mainly Medicare and Medicaid, income maintenance benefits, unemployment insurance benefits, etc.) make up non-labor income. Non-labor income is reported by place of residence.

### Components of Personal Income Change, 1970-2013 (Thousands of 2013 $s)

| | 1970 | 1980 | 1990 | 2000 | 2013 | Change 2000-2013 |
|---|---|---|---|---|---|---|
| **Total Personal Income** | 572,241 | 880,933 | 975,930 | 1,316,207 | 1,621,969 | 305,762 |
| Labor Earnings | 401,073 | 603,796 | 624,053 | 812,211 | 897,385 | 85,174 |
| Non-Labor Income | 171,168 | 277,136 | 351,877 | 503,995 | 724,584 | 220,589 |
| Dividends, Interest and Rent | 82,195 | 139,518 | 175,949 | 239,212 | 323,355 | 84,143 |
| Transfer Payments | 88,973 | 137,618 | 175,928 | 264,783 | 401,229 | 136,446 |
| **Percent of Total** | | | | | | % Change 2000-2013 |
| **Total Personal Income** | | | | | | 23.2% |
| Labor Earnings | 70.1% | 68.5% | 63.9% | 61.7% | 55.3% | 10.5% |
| Non-Labor Income | 29.9% | 31.5% | 36.1% | 38.3% | 44.7% | 43.8% |
| Dividends, Interest and Rent | 14.4% | 15.8% | 18.0% | 18.2% | 19.9% | 35.2% |
| Transfer Payments | 15.5% | 15.6% | 18.0% | 20.1% | 24.7% | 51.5% |

All income data in the table above are reported by *place of residence*. Labor earnings and non-labor income may not add to total personal income due to adjustments made by the Bureau of Economic Analysis.

- From 1970 to 2013, labor income grew from $401.1 million to $897.4 million (in real terms), a 124% increase.

- From 1970 to 2013, non-labor income grew from $171.2 million to $724.6 million (in real terms), a 323% increase.

- From 1970 to 2013, labor earnings accounted for 47% of growth in total personal income and non-labor income for 53%.

- In 1970, non-labor income represented 30% of total personal income. By 2013 non-labor income represented 45% of total personal income.





Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Tables CA05 & CA05N.

Rvsd Plan - 00002253

## Rio Grande NF Region

# **Industry Sectors**

### How has employment by industry changed historically?

This page describes historical employment change by industry. Industries are organized according to three major categories: non-services related, services related, and government. Employment includes wage and salary jobs and proprietors. The employment data are organized according to the Standard Industrial Classification (SIC) system and reported by place of work.

### Employment by Industry, 1970-2000

| | 1970 | 1980 | 1990 | 2000 | Change 1990-2000 |
|---|---|---|---|---|---|
| **Total Employment (number of jobs)** | 13,084 | 17,504 | 19,213 | 24,437 | 5,224 |
| **Non-services related** | 4,389 | 5,651 | 5,795 | 6,758 | 963 |
| Farm | 3,165 | 3,018 | 2,824 | 2,891 | 67 |
| Agricultural services, forestry, fishing & other | 234 | 1,004 | 1,148 | 1,372 | 224 |
| Mining (including fossil fuels) | 67 | 32 | 334 | 232 | -102 |
| Construction | 384 | 751 | 789 | 1,644 | 855 |
| Manufacturing (including forest products) | 539 | 846 | 700 | 619 | -81 |
| **Services related** | 5,707 | 7,789 | 9,429 | 12,674 | 3,245 |
| Transportation & public utilities | 587 | 682 | 542 | 793 | 251 |
| Wholesale trade | 302 | 523 | 852 | 935 | 83 |
| Retail trade | 2,014 | 2,427 | 2,873 | 3,586 | 713 |
| Finance, insurance & real estate | 591 | 977 | 860 | 1,551 | 691 |
| Services | 2,213 | 3,180 | 4,302 | 5,809 | 1,507 |
| **Government** | 2,601 | 3,325 | 3,981 | 4,851 | 870 |

### Percent of Total

| | 1970 | 1980 | 1990 | 2000 | % Change 1990-2000 |
|---|---|---|---|---|---|
| **Total Employment** | | | | | 27.2% |
| **Non-services related** | 33.5% | 32.3% | 30.2% | 27.7% | 16.6% |
| Farm | 24.2% | 17.2% | 14.7% | 11.8% | 2.4% |
| Agricultural services, forestry, fishing & other | 1.8% | 5.7% | 6.0% | 5.6% | 19.5% |
| Mining (including fossil fuels) | 0.5% | 0.2% | 1.7% | 0.9% | -30.5% |
| Construction | 2.9% | 4.3% | 4.1% | 6.7% | 108.4% |
| Manufacturing (including forest products) | 4.1% | 4.8% | 3.6% | 2.5% | -11.6% |
| **Services related** | 43.6% | 44.5% | 49.1% | 51.9% | 34.4% |
| Transportation & public utilities | 4.5% | 3.9% | 2.8% | 3.2% | 46.3% |
| Wholesale trade | 2.3% | 3.0% | 4.4% | 3.8% | 9.7% |
| Retail trade | 15.4% | 13.9% | 15.0% | 14.7% | 24.8% |
| Finance, insurance & real estate | 4.5% | 5.6% | 4.5% | 6.3% | 80.3% |
| Services | 16.9% | 18.2% | 22.4% | 23.8% | 35.0% |
| **Government** | 19.9% | 19.0% | 20.7% | 19.9% | 21.9% |

All employment data are reported by *place of work*. Estimates for data that were not disclosed are indicated with tildes (~).

The employment data above are organized according to the Standard Industrial Classification (SIC) system. The data end in 2000 because in 2001 the Bureau of Economic Analysis switched to organizing industry-level data according to the newer North American Industrial Classification System (NAICS). More recent employment trends, organized by NAICS, are shown in subsequent sections of this report.

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA25.

Rvsd Plan - 00002254

## Rio Grande NF Region

# **Industry Sectors**

### How has employment by industry changed historically?

This page describes historical employment trends by major industry category (non-services related, services related, and government) and by industry. Employment includes wage and salary jobs and proprietors. The employment data are organized according to the Standard Industrial Classification (SIC) system and reported by place of work.

- From 1970 to 2000, jobs in services related industries grew from 5,707 to 12,674, a 122% increase.

- From 1970 to 2000, jobs in non-services related industries grew from 4,389 to 6,758, a 54% increase.

- From 1970 to 2000, jobs in government jobs grew from 2,601 to 4,851, an 87% increase.



Employment by Major Industry Category, Rio Grande NF Region

- In 2000 the three industry sectors with the largest number of jobs were services (5,809 jobs), government (4,851 jobs), and retail trade (3,586 jobs).

- From 1970 to 2000, the three industry sectors that added the most new jobs were services (3,596 new jobs), government (2,250 new jobs), and retail trade (1,572 new jobs).



Employment by Industry, Rio Grande NF Region

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA25.

Rvsd Plan - 00002255

## Rio Grande NF Region

# **Industry Sectors**

### How has employment by industry changed recently?

This page describes recent employment change by industry. Industries are organized according to three major categories: non-services related; services related; and government. Employment includes wage and salary jobs and proprietors. The employment data are organized according to the North American Industrial Classification System (NAICS) and reported by place of work.

### Employment by Industry, 2001-2013

| | 2001 | 2013 | Change 2001-2013 |
|---|---|---|---|
| **Total Employment (number of jobs)** | 24,813 | 26,260 | 1,447 |
| **Non-services related** | ~6,105 | ~5,949 | -156 |
| Farm | 2,970 | 2,596 | -374 |
| Forestry, fishing, & related activities | ~806 | ~997 | 191 |
| Mining (including fossil fuels) | ~255 | ~388 | 133 |
| Construction | ~1,647 | ~1,473 | -174 |
| Manufacturing | ~427 | ~495 | 68 |
| **Services related** | ~12,669 | ~13,419 | 750 |
| Utilities | ~166 | ~165 | -1 |
| Wholesale trade | ~759 | 730 | -29 |
| Retail trade | 2,825 | ~2,499 | -326 |
| Transportation and warehousing | ~701 | 914 | 213 |
| Information | ~196 | ~186 | -10 |
| Finance and insurance | ~629 | ~743 | 114 |
| Real estate and rental and leasing | ~547 | ~600 | 53 |
| Professional and technical services | ~632 | ~729 | 97 |
| Management of companies and enterprises | 103 | ~162 | 59 |
| Administrative and waste services | ~432 | ~502 | 70 |
| Educational services | ~156 | ~224 | 68 |
| Health care and social assistance | ~2,419 | ~2,527 | 108 |
| Arts, entertainment, and recreation | ~529 | ~582 | 53 |
| Accommodation and food services | ~1,511 | ~1,784 | 273 |
| Other services, except public administration | ~1,064 | ~1,072 | 8 |
| **Government** | 4,862 | 4,963 | 101 |

### Percent of Total

| | 2001 | 2013 | % Change 2001-2013 |
|---|---|---|---|
| **Total Employment** | | | 5.8% |
| **Non-services related** | ~24.6% | ~22.7% | -2.6% |
| Farm | 12.0% | 9.9% | -12.6% |
| Forestry, fishing, & related activities | ~3.2% | ~3.8% | 23.7% |
| Mining (including fossil fuels) | ~1.0% | ~1.5% | 52.2% |
| Construction | ~6.6% | ~5.6% | -10.6% |
| Manufacturing | ~1.7% | ~1.9% | 15.9% |
| **Services related** | ~51.1% | ~51.1% | 5.9% |
| Utilities | ~0.7% | ~0.6% | -0.6% |
| Wholesale trade | ~3.1% | ~2.8% | -3.8% |
| Retail trade | 11.4% | ~9.5% | -11.5% |
| Transportation and warehousing | ~2.8% | 3.5% | 30.4% |
| Information | ~0.8% | ~0.7% | -5.1% |
| Finance and insurance | ~2.5% | ~2.8% | 18.1% |
| Real estate and rental and leasing | ~2.2% | ~2.3% | 9.7% |
| Professional and technical services | ~2.5% | ~2.8% | 15.3% |
| Management of companies and enterprises | 0.4% | ~0.6% | 57.3% |
| Administrative and waste services | ~1.7% | ~1.9% | 16.2% |
| Educational services | ~0.6% | ~0.9% | 43.6% |
| Health care and social assistance | ~9.7% | ~9.6% | 4.5% |
| Arts, entertainment, and recreation | ~2.1% | ~2.2% | 10.0% |
| Accommodation and food services | ~6.1% | ~6.8% | 18.1% |
| Other services, except public administration | ~4.3% | ~4.1% | 0.8% |
| **Government** | 19.6% | 18.9% | 2.1% |

All employment data are reported by *place of work*. Estimates for data that were not disclosed are indicated with tildes (~).

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA25N.

Rvsd Plan - 00002256

## Rio Grande NF Region

# **Industry Sectors**

### How has employment by industry changed recently?

This page describes recent employment trends by major industry category (non-services related, services related, and government) and by industry. Employment includes wage and salary jobs and proprietors. The employment data are organized according to the North American Industrial Classification System (NAICS) and reported by place of work.

• From 2001 to 2013, jobs in services related industries grew from 12,669 to 13,419, a 6% increase.

• From 2001 to 2013, jobs in non-services related industries shrank from 6,105 to 5,949, a -3% decrease.

• From 2001 to 2013, jobs in government jobs grew from 4,862 to 4,963, a 2% increase.



• In 2013 the three industry sectors with the largest number of jobs were government (4,963 jobs), farm (2,596 jobs), and health care, social assistance (2,527 jobs).

• From 2001 to 2013, the three industry sectors that added the most new jobs were accommodation, food services (273 new jobs), transportation, warehousing (213 new jobs), and agric. services, forestry, fishing (191 new jobs).



Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA25N.

Rvsd Plan - 00002257

# Rio Grande NF Region



**Industry Sectors**

## How has personal income by industry changed historically?

This page describes historical personal income change by industry (in real terms). Industries are organized according to three major categories: non-services related, services related, and government. The personal income data are organized according to the Standard Industrial Classification (SIC) system and reported by place of work.

### Personal Income by Industry, 1970-2000 (Thousands of 2013 $s)

| | 1970 | 1980 | 1990 | 2000 | Change 1990-2000 |
|---|---|---|---|---|---|
| **Labor Earnings** | 408,716 | 641,376 | 665,374 | 856,315 | 190,941 |
| **Non-services related** | ¯132,334 | ¯256,714 | ¯262,266 | ¯267,975 | 5,709 |
| Farm | 83,972 | 173,010 | 169,151 | 131,652 | -37,499 |
| Agricultural services, forestry, fishing & other | ¯6,442 | ¯23,408 | ¯27,687 | ¯33,943 | 6,256 |
| Mining (including fossil fuels) | ¯1,573 | ¯2,864 | ¯16,056 | ¯14,351 | -1,705 |
| Construction | ¯20,227 | ¯28,143 | ¯26,796 | ¯65,757 | 38,961 |
| Manufacturing (including forest products) | ¯20,119 | ¯29,291 | 22,576 | ¯22,272 | -304 |
| **Services related** | ¯169,295 | ¯221,397 | ¯247,653 | ¯369,696 | 122,043 |
| Transportation & public utilities | ¯32,302 | ¯33,415 | 31,420 | ¯48,136 | 16,715 |
| Wholesale trade | ¯10,315 | ¯21,256 | ¯37,219 | ¯34,024 | -3,195 |
| Retail trade | 57,416 | 57,009 | 63,580 | 82,231 | 18,651 |
| Finance, insurance & real estate | ¯8,418 | ¯23,139 | ¯16,865 | ¯40,871 | 24,007 |
| Services | 60,845 | 86,577 | 98,570 | 164,434 | 65,865 |
| **Government** | 92,672 | 120,156 | 155,508 | 213,917 | 58,409 |

### Percent of Total

| | | | | | % Change 1990-2000 |
|---|---|---|---|---|---|
| **Labor Earnings** | | | | | 28.7% |
| **Non-services related** | ¯32.4% | ¯40.0% | ¯39.4% | ¯31.3% | 2.2% |
| Farm | 20.5% | 27.0% | 25.4% | 15.4% | -22.2% |
| Agricultural services, forestry, fishing & other | ¯1.6% | ¯3.6% | ¯4.2% | ¯4.0% | 22.6% |
| Mining (including fossil fuels) | ¯0.4% | ¯0.4% | ¯2.4% | ¯1.7% | -10.6% |
| Construction | ¯4.9% | ¯4.4% | ¯4.0% | ¯7.7% | 145.4% |
| Manufacturing (including forest products) | ¯4.9% | ¯4.6% | 3.4% | ¯2.6% | -1.3% |
| **Services related** | ¯41.4% | ¯34.5% | ¯37.2% | ¯43.2% | 49.3% |
| Transportation & public utilities | ¯7.9% | ¯5.2% | 4.7% | ¯5.6% | 53.2% |
| Wholesale trade | ¯2.5% | ¯3.3% | ¯5.6% | ¯4.0% | -8.6% |
| Retail trade | 14.0% | 8.9% | 9.6% | 9.6% | 29.3% |
| Finance, insurance & real estate | ¯2.1% | ¯3.6% | ¯2.5% | ¯4.8% | 142.3% |
| Services | 14.9% | 13.5% | 14.8% | 19.2% | 66.8% |
| **Government** | 22.7% | 18.7% | 23.4% | 25.0% | 37.6% |

All income data are reported by place of work. Industry categories may not add to total because of adjustments made by the Bureau of Economic Analysis. Estimates for data that were not disclosed are indicated with tildes (~).

The personal income data above are organized according to the Standard Industrial Classification (SIC) system. The data end in 2000 because in 2001 the U.S. Department of Commerce switched to organizing industry-level information according to the newer North American Industrial Classification System (NAICS). More recent personal income trends, organized by NAICS, are shown in subsequent pages of this report.

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA05.

Rvsd Plan - 00002258

**Rio Grande NF Region**

# Industry Sectors

## How has personal income by industry changed historically?

This page describes historical personal income trends by industry (in real terms). Industries are organized according to three major categories (non-services related, services related, and government) and using Standard Industry Classification categories. Data are reported by place of work.

- From 1970 to 2000, personal income in services related industries grew from $169.3 million to $369.7 million (in real terms), a 118% increase.

- From 1970 to 2000, personal income in non-services related industries grew from $169.3 million to $268.0 million (in real terms), a 102% increase.

- From 1970 to 2000, personal income in government jobs grew from $92.7 million to $213.9 million (in real terms), a 131% increase.



Personal Income by Major Industry Category, Rio Grande NF Region

- In 2000, the three industry sectors with the largest personal income were government ($213.9 million), services ($164.4 million), and farm ($131.7 million).

- From 1970 to 2000 the three industry sectors that added the most new personal income (in real terms) were government ($121.2 million), services ($103.6 million), and farm ($47.7 million).



Personal Income by Industry, Rio Grande NF Region

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA05.

Rvsd Plan - 00002259

## Rio Grande NF Region

# **Industry Sectors**

### How has personal income by industry changed recently?

This page describes recent personal income change (in real terms). Industries are organized according to three major categories: non-services related, services related, and government. The personal income data are organized according to the North American Industrial Classification System (NAICS) and reported by place of work.

### Personal Income by Industry, 2001-2013 (Thousands of 2013 $s)

| | 2001 | 2013 | Change 2001-2013 |
|---|---|---|---|
| **Labor Earnings** | 869,089 | 963,777 | 94,688 |
| **Non-services related** | ~234,608 | ~272,630 | 38,022 |
| Farm | 111,763 | 153,692 | 41,929 |
| Forestry, fishing, & related activities | ~27,603 | ~32,679 | 5,076 |
| Mining (including fossil fuels) | ~14,049 | ~23,085 | 9,036 |
| Construction | ~67,908 | ~48,245 | -19,663 |
| Manufacturing | ~13,284 | ~14,929 | 1,645 |
| **Services related** | ~393,130 | ~430,277 | 37,147 |
| Utilities | ~19,843 | ~17,769 | -2,074 |
| Wholesale trade | ~33,856 | ~63,021 | 29,165 |
| Retail trade | 73,956 | ~65,948 | -8,008 |
| Transportation and warehousing | ~26,029 | ~27,407 | 1,378 |
| Information | ~12,829 | ~5,993 | -6,836 |
| Finance and insurance | ~22,383 | ~26,355 | 3,972 |
| Real estate and rental and leasing | ~12,583 | ~5,160 | -7,423 |
| Professional and technical services | ~23,391 | ~31,811 | 8,420 |
| Management of companies and enterprises | 6,303 | ~11,601 | 5,298 |
| Administrative and waste services | ~5,986 | ~7,459 | 1,473 |
| Educational services | ~1,967 | ~3,900 | 1,933 |
| Health care and social assistance | ~81,815 | ~91,570 | 9,755 |
| Arts, entertainment, and recreation | ~9,038 | ~8,345 | -693 |
| Accommodation and food services | ~27,126 | ~27,899 | 773 |
| Other services, except public administration | ~36,024 | ~36,039 | 15 |
| **Government** | 219,875 | 221,618 | 1,743 |

### Percent of Total

| | 2001 | 2013 | % Change 2001-2013 |
|---|---|---|---|
| **Labor Earnings** | | | 10.9% |
| **Non-services related** | ~27.0% | ~28.3% | 16.2% |
| Farm | 12.9% | 15.9% | 37.5% |
| Forestry, fishing, & related activities | ~3.2% | ~3.4% | 18.4% |
| Mining (including fossil fuels) | ~1.6% | ~2.4% | 64.3% |
| Construction | ~7.8% | ~5.0% | -29.0% |
| Manufacturing | ~1.5% | ~1.5% | 12.4% |
| **Services related** | ~45.2% | ~44.6% | 9.4% |
| Utilities | ~2.3% | ~1.8% | -10.5% |
| Wholesale trade | ~3.9% | ~6.5% | 86.1% |
| Retail trade | 8.5% | ~6.8% | -10.8% |
| Transportation and warehousing | ~3.0% | ~2.8% | 5.3% |
| Information | ~1.5% | ~0.6% | -53.3% |
| Finance and insurance | ~2.6% | ~2.7% | 17.7% |
| Real estate and rental and leasing | ~1.4% | ~0.5% | -59.0% |
| Professional and technical services | ~2.7% | ~3.3% | 36.0% |
| Management of companies and enterprises | 0.7% | ~1.2% | 84.1% |
| Administrative and waste services | ~0.7% | ~0.8% | 24.6% |
| Educational services | ~0.2% | ~0.4% | 98.2% |
| Health care and social assistance | ~9.4% | ~9.5% | 11.9% |
| Arts, entertainment, and recreation | ~1.0% | ~0.9% | -7.7% |
| Accommodation and food services | ~3.1% | ~2.9% | 2.9% |
| Other services, except public administration | ~4.1% | ~3.7% | 0.0% |
| **Government** | 25.3% | 23.0% | 0.8% |

All employment data are reported by *place of work* . Estimates for data that were not disclosed are indicated with tildes (~).

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA05N.

Rvsd Plan - 00002260

## Rio Grande NF Region

# **Industry Sectors**

### How has personal income by industry changed recently?

This page describes recent personal income trends (in real terms) by major industry category (non-services related, services related, and government) and by industry. The personal income data are organized according to the North American Industrial Classification System (NAICS) and reported by place of work.

- From 2001 to 2013, personal income from services related industries grew from $393 million to $430 million (in real terms), a 9% increase.

- From 2001 to 2013, personal income from non-services related industries grew from $235 million to $273 million (in real terms), a 16% increase.

- From 2001 to 2013, personal income from government jobs grew from $220 million to $222 million (in real terms), a 1% increase.

- In 2013, the three industry sectors with the largest personal income were government ($221.6 million), farm ($153.7 million), and health care, social assistance ($91.6 million).

- From 2001 to 2013, the three industry sectors that added the most new personal income (in real terms) were farm ($41.9 million), wholesale trade ($29.2 million), and health care, social assistance ($9.8 million).





Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA05N.

Rvsd Plan - 00002261

## Rio Grande NF Region

# **Performance**

### How have earnings per job and per capita income changed?

This page describes how average earnings per job and per capita income (in real terms) have changed over time.

Average Earnings Per Job: This is a measure of the compensation of the average job. It is total earnings divided by total employment. Full-time and part-time jobs are counted at equal weight. Employees, sole proprietors, and active partners are included.

Per Capita Income: This is a measure of income per person. It is total personal income (from labor and non-labor sources) divided by total population.

### Average Earnings per Job & Per Capita Income, 1970-2013 (2013 $s)

|  | 1970 | 1980 | 1990 | 2000 | 2013 | Change 2000-2013 |
|---|---|---|---|---|---|---|
| Average Earnings per Job | $31,238 | $36,642 | $34,631 | $35,042 | $36,701 | $1,660 |
| Per Capita Income | $15,257 | $23,149 | $24,268 | $28,461 | $34,672 | $6,211 |
| **Percent Change** |  |  |  |  |  | % Change 2000-2013 |
| Average Earnings per Job |  |  |  |  |  | 4.7% |
| Per Capita Income |  |  |  |  |  | 21.8% |

Average Earnings per Job & Per Capita Income, Rio Grande NF Region

- From 1970 to 2013, average earnings per job grew from $31,238 to $36,701 (in real terms), a 17% increase.

- From 1970 to 2013, per capita income grew from $15,257 to $34,672 (in real terms), a 127% increase.



Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA30.

Rvsd Plan - 00002262

## Rio Grande NF Region

# **Performance**

### How do wages compare across industries?

This page describes employment and average annual wages by industry. Industries are organized according to three major categories: non-services related, services related, and government.

### Employment & Wages by Industry, 2013 (2013 $s)

|  | Employment | % of Total Employment | Avg. Annual Wages | % Above or Below Avg. |
|---|---|---|---|---|
| **Total** | 15,670 | | $31,457 | |
| **Private** | 11,239 | 71.7% | $30,594 | -2.7% |
| **Non-Services Related** | 2,890 | 18.4% | $30,799 | -2.1% |
| Natural Resources and Mining | 1,898 | 12.1% | $29,144 | -7.4% |
| Agriculture, forestry, fishing & hunting | na | na | na | na |
| Mining (incl. fossil fuels) | na | na | na | na |
| Construction | 590 | 3.8% | $36,056 | 14.6% |
| Manufacturing (Incl. forest products) | 360 | 2.3% | $28,455 | -9.5% |
| **Services Related** | 8,349 | 53.3% | $30,524 | -3.0% |
| Trade, Transportation, and Utilities | 2,873 | 18.3% | $32,769 | 4.2% |
| Information | 117 | 0.7% | $28,855 | -8.3% |
| Financial Activities | 584 | 3.7% | $39,728 | 26.3% |
| Professional and Business Services | 558 | 3.6% | $35,357 | 12.4% |
| Education and Health Services | 2,125 | 13.6% | $36,350 | 15.6% |
| Leisure and Hospitality | 1,746 | 11.1% | $15,437 | -50.9% |
| Other Services | 285 | 1.8% | $26,043 | -17.2% |
| Unclassified | 0 | 0.0% | na | na |
| **Government** | 4,429 | 28.3% | $33,660 | 7.0% |
| Federal Government | 370 | 2.4% | $53,883 | 71.3% |
| State Government | 1,130 | 7.2% | $42,646 | 35.6% |
| Local Government | 2,929 | 18.7% | $27,639 | -12.1% |

This table shows wage data from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits and uses slightly different industry categories than those shown on previous pages of this report.

• In 2013, government jobs paid the highest wages ($33,660), and services related jobs paid the lowest ($30,524).

• In 2013, services related jobs employed the largest number of people (8,349) and non-services related employed the smallest (2,890 jobs).



Wages & Employment by Major Industry, Rio Grande NF Region, 2013

Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

Rvsd Plan - 00002263

## Rio Grande NF Region



**Performance**

### How has the unemployment rate changed?

This page describes the average annual unemployment rate and the seasonality of the unemployment rate over time.

Unemployment Rate: The number of people who are jobless, looking for jobs, and available for work divided by the labor force.

### Average Annual Unemployment Rate, 1990-2013

| | 1990 | 2000 | 2013 | Change 2000-2013 |
|---|---|---|---|---|
| Unemployment Rate | 9.5% | 4.6% | 9.1% | 4.5% |

- Since 1990, the annual unemployment rate ranged from a low of 4.6% in 2000 to a high of 10.7% in 1992.



Average Annual Unemployment Rate, Rio Grande NF Region

### Seasonal Unemployment Rate, 2010-2014

| Unemployment Rate (%) | Jan. | Feb. | March | April | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 9.2% | 9.1% | 9.2% | 8.4% | 7.5% | 8.6% | 8.9% | 8.8% | 7.8% | 8.1% | 9.0% | 9.7% |
| 2011 | 10.9% | 10.4% | 10.1% | 9.1% | 8.6% | 9.8% | 9.7% | 9.0% | 8.6% | 8.3% | 8.8% | 9.3% |
| 2012 | 10.9% | 10.6% | 10.3% | 9.5% | 8.6% | 9.8% | 9.9% | 9.4% | 8.2% | 8.1% | 8.4% | 9.4% |
| 2013 | 10.3% | 9.9% | 9.4% | 8.7% | 8.0% | 9.8% | 9.4% | 9.5% | 8.6% | 8.3% | 8.6% | 8.7% |
| 2014 | 9.9% | 9.4% | 9.3% | 8.2% | 7.3% | 7.7% | 7.6% | 6.6% | 5.4% | 4.6% | 5.0% | |

- The lowest seasonal unemployment rate was Oct. of 2014. The highest seasonal unemployment rate was Jan. of 2011.



Seasonal Unemployment Rate, Rio Grande NF Region

Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C.

Rvsd Plan - 00002264

## Rio Grande NF Region



**Performance**

### Do national recessions affect local employment?

This page describes long-term trends in employment during national recession and recovery periods.

#### Employment Change During National Recessions, 1976-2014

|  | Jan '80 - July '80 | July '81 - Nov '82 | July '90 - Mar '91 | Mar '01 - Nov '01 | Dec '07 - June '09 |
|---|---|---|---|---|---|
| Employment Change (Net Jobs) | 2,782 | -1,887 | -1,170 | 2,650 | -51 |
| Employment Change (Monthly % Change) | 18.8% | -10.4% | -6.6% | 13.3% | -0.2% |

#### Employment Change During Recovery from National Recessions, 1976-2014

|  | Aug '80 - June '81 | Dec '82 - June '90 | Apr '91 - Feb '01 | Dec '01 - Nov '07 | July '09 - Nov. '14 |
|---|---|---|---|---|---|
| Employment Change (Net Jobs) | 87 | 1,976 | 2,009 | 1,011 | 181 |
| Employment Change (Monthly % Change) | 0.5% | 12.4% | 11.4% | 4.6% | 0.8% |

- From 1976 to 2014, employment grew from 16,020 to 23,855 jobs, a 49% increase.



- In the recovery period (Dec '82-Jun '90) following the 1981-1982 recession, employment grew by 1,976 jobs, a 0.1% monthly increase.



Blue vertical bars in the figures above represent the last five recession periods: January 1980 to July 1980; July 1981 to November 1982; July 1990 to March 1991; March 2001 to November 2001; and December 2007 to June 2009. The green columns in the figure above represent the intervening recovery periods.

Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C.; National Bureau of Economic Research. 2009. U.S. Business Cycle Expansions and Contractions, Cambridge, MA.

Rvsd Plan - 00002265

## Rio Grande NF Region

# **Benchmarks**

### How does performance compare to the benchmark?

This page describes key performance indicators for the selected geography and compares them to the selected benchmark area. (If no custom benchmark area was selected, EPS-HDT defaults to benchmarking against the U.S.) Performance indicators are organized by groups (trends, prosperity, stress, and structure) that highlight potential competitive strengths and weaknesses.

### Relative Performance, 2013

| | | Rio Grande NF Region | Colorado Non-Metro | Ratio of Rio Grande NF Region to Colorado Non-Metro |
|---|---|---|---|---|
| **Trends** | Population (percent change, 2000-2013) | 1.2% | 9.8% | |
| | Employment (percent change, 2000-2013) | 7.5% | 10.8% | |
| | Personal Income (percent change, 2000-2013) | 23.2% | 24.8% | |
| | Average Earnings per Job (percent change, 2000-2013) | 4.7% | 2.1% | |
| | Per Capita Income (percent change, 2000-2013) | 21.8% | 13.7% | |
| **Prosperity** | Average Earnings per Job | $36,701 | $40,007 | |
| | Per Capita Income | $34,672 | $41,365 | |
| | Average Annual Wages - Services Related | $30,414 | $33,940 | |
| | Average Annual Wages - Non-Services Related | $30,489 | $48,984 | |
| | Average Annual Wages - Government Related | $33,660 | $39,053 | |
| **Stress** | Unemployment Rate (change 2000-2013) | 4.5% | 3.7% | |
| | Unemployment Rate | 9.1% | 6.9% | |
| **Structure** | Percent of Employment in Proprietors | 33.3% | 33.1% | |
| | Percent of Personal Income in Non-Labor | 44.7% | 41.8% | |
| | Percent of Services Related Jobs | 51.1% | 62.4% | |
| | Percent of Non-Services Related Jobs | 22.7% | 20.0% | |
| | Percent of Government Jobs | 18.9% | 14.9% | |
| | Commuting (net residential adjustment share of personal income) | 2.4% | 0.0% | |

Commuting statistics are displayed only when comparing a county to a benchmark county.

(chart axis: 0.0    1.0    2.0    3.0)

- Rio Grande NF Region is most different from the benchmark in average earnings per job (percent change, 2000-2013), per capita income (percent change, 2000-2013), and unemployment rate.

Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C.Tables CA05N, CA25N, CA30, & CA91; U.S. Department of Labor. 2014. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.; U.S. Department of Labor. 2014. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C.

Rvsd Plan - 00002266

## Rio Grande NF Region

# **Benchmarks**

### How does performance compare to the benchmark?

This page describes trends in key performance indicators (change in population, employment, real personal income, and the unemployment rate) for the selected geography and compares them to the selected benchmark area. Blue vertical bars indicate periods of national recession.

- From 1970 to 2013, population in Rio Grande NF Region grew by 25% compared to 86% for the Colorado Non-Metro.



- From 1970 to 2013, employment in Rio Grande NF Region grew by 101% compared to 198% for the Colorado Non-Metro.



- From 1970 to 2013, personal income in Rio Grande NF Region grew by 183% compared to 280% for the Colorado Non-Metro.



- In 2013 the unemployment rate in Rio Grande NF Region was 9.1%, compared to 6.9% for the Colorado Non-Metro.



Data Sources: U.S. Department of Commerce. 2014. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Table CA30; U.S. Department of Labor. 2014. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C..

Rvsd Plan - 00002267

# Data Sources & Methods

## Data Sources

The EPS-HDT Measures report uses published statistics from government sources that are available to the public and cover the entire country. All data used in EPS-HDT can be readily verified by going to the original source. The contact information for databases used in this profile is:

- **Regional Economic Information System**
  Bureau of Economic Analysis, U.S. Department of Commerce
  http://bea.gov/bea/regional/data.htm
  Tel. 202-606-9600
- **Local Area Unemployment Statistics**
  Bureau of Labor Statistics, U.S. Department of Labor
  http://www.bls.gov/lau
  Tel. 202-691-6392
- **National Bureau of Economic Research**
  http://www.nber.org/cycles/recessions.html
  Tel. 617-868-3900

- **Quarterly Census of Employment and Wages**
  Bureau of Labor Statistics, U.S. Department of Labor
  http://www.bls.gov/cew
  Tel. 202-691-6567
- **Population Division**
  Census Bureau, U.S. Department of Commerce.
  http://www.census.gov/population/www/
  Tel. 866-758-1060

## Methods

EPS-HDT core approaches:

EPS-HDT is designed to focus on long-term trends across a range of important measures. Trend analysis provides a more comprehensive view of changes than spot data for select years. We encourage users to focus on major trends rather than absolute numbers. EPS-HDT displays detailed industry-level data to show changes in the composition of the economy over time and the mix of industries at points in time. EPS-HDT employs cross-sectional benchmarking, comparing smaller geographies such as counties to larger regions, states, and the nation, to give a sense of relative performance. EPS-HDT allows users to aggregate data for multiple geographies, such as multi-county regions, to accommodate a flexible range of user-defined areas of interest and to allow for more sophisticated cross-sectional comparisons.

SIC to NAICS:

Starting in the 1930s, the Standard Industrial Classification (SIC) system has served as the structure for the collection, aggregation, presentation, and analysis of the U.S. economy. Under SIC, which employed a four-digit coding structure, an industry consists of a group of establishments primarily engaged in producing or handling the same product or group of products or in rendering the same services. As the U.S. economy shifted from a primary emphasis on manufacturing to a more complex services economy, SIC became less useful as a tool for describing the economy's changing industrial composition.

The North American Industry Classification System (NAICS), developed using a production-oriented conceptual framework, groups establishments into industries based on the activity in which they are primarily engaged. NAICS uses a six-digit hierarchical coding system to classify all economic activity into twenty industry sectors. Five sectors are mainly goods-producing sectors and fifteen are entirely services-producing sectors.

County Business Patterns started organizing their data using NAICS in 1998, Census in 2000, and Bureau of Economic Analysis's Regional Economic Information System in 2001. Because the methods underlying SIC and NAICS are fundamentally different (what was sold vs. how it was produced), NAICS is not backward compatible with SIC. There are a few circumstances where it is acceptable to show uninterrupted trends across the SIC-NAICS discontinuity. Total personal income, total labor income, and non-labor income can all be plotted continuously without a problem. In addition, a few industries can also be plotted without a break, though this is not the case for services.

Adjusting dollar figures for inflation:

Because a dollar in the past was worth more than a dollar today, data reported in current dollar terms should be adjusted for inflation. The U.S. Department of Commerce reports personal income figures in terms of current dollars. All income data in EPS-HDT are adjusted to real (or constant) dollars using the Consumer Price Index. Figures are adjusted to the latest date for which an annual Consumer Price Index is available.

Data gaps and estimation:

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics uses supplemental data from the U.S. Department of Commerce to estimate these data gaps. These are indicated in italics in tables. Documentation explaining methods developed by Headwaters Economics for estimating disclosure gaps is available at headwaterseconomics.org/eps-hdt.

Rvsd Plan - 00002268

# Links to Additional Resources

## For more information about EPS-HDT see:

headwaterseconomics.org/eps-hdt

## Web pages listed under Additional Resources include:

Throughout this report, references to on-line resources are indicated by superscripts in parentheses. These resources are provided as hyperlinks here.

1  www.bea.gov/SCB/PDF/2004/11November/1104Econ-Areas.pdf
2  www.ers.usda.gov/Briefing/Rurality/Typology
3  headwaterseconomics.org/3wests.php
4  www.bea.gov/regional/docs/econlist.cfm
5  www.census.gov/popest/about/terms.html
6  www.census.gov/popest/methodology/index.html
7  www.bea.gov/regional/definitions/nextpage.cfm?key=Proprietors%20employment
8  www.bea.gov/glossary/glossary.cfm
9  www.bea.gov/regional/definitions
10 www.bls.gov/bls/NAICS.htm
11 www.bls.gov/opub/mlr/2009/11
12 www.bls.gov/opub/mlr/2012/01/art1full.pdf
13 www.ers.usda.gov/Amberwaves/Feb03/features/ruralamerica.htm
14 headwaterseconomics.org/eps-hdt
15 www.headwaterseconomics.com/3wests/Rasker_et_al_2009_Three_Wests.pdf
16 www.ers.usda.gov/publications/aer-agricultural-economic-report/aer781.aspx
17 www.census.gov/eos/www/naics
18 www.bls.gov/opub/mlr/indexe.htm#Earnings_and_wages
19 www.livingwage.geog.psu.edu/
20 www.bls.gov/bls/employment.htm
21 www.bls.gov/bls/wages.htm
22 www.bls.gov/oes
23 www.bls.gov/cps/faq.htm#Ques3
24 www.nber.org
25 www.bea.gov/regional/reis
26 www.bea.gov/regional/reis/jtw
27 www.bls.gov/lau/laumthd.htm
28 www.nber.org/cycles/recessions.html
29 www.nber.org/cycles/cyclesmain.html

Rvsd Plan - 00002269

# A Profile of Industries that Include Travel & Tourism

### Rio Grande NF Region

### Alamosa County CO, Conejos County CO, Costilla County CO, Mineral County CO, Rio Grande County CO, Saguache County CO

Produced by
**Economic Profile System-Human Dimensions Toolkit**
**EPS-HDT**
February 26, 2015

Rvsd Plan - 00002270



# About EPS-HDT

## About the Economic Profile System-Human Dimensions Toolkit (EPS-HDT)

EPS-HDT is a free, easy-to-use software application that produces detailed socioeconomic reports of counties, states, and regions, including custom aggregations.

EPS-HDT uses published statistics from federal data sources, including Bureau of Economic Analysis and Bureau of the Census, U.S. Department of Commerce; and Bureau of Labor Statistics, U.S. Department of Labor.

The Bureau of Land Management and Forest Service have made significant financial and intellectual contributions to the operation and content of EPS-HDT.

See headwaterseconomics.org/eps-hdt for more information about the other tools and capabilities of EPS-HDT.

For technical questions, contact Patty Gude at eps-hdt@headwaterseconomics.org, or 406-599-7425.



headwaterseconomics.org

**Headwaters Economics** is an independent, nonprofit research group. Our mission is to improve community development and land management decisions in the West.



www.blm.gov

**The Bureau of Land Management**, an agency within the U.S. Department of the Interior, administers 249.8 million acres of America's public lands, located primarily in 12 Western States. It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.



www.fs.fed.us

**The Forest Service**, an agency of the U.S. Department of Agriculture, administers national forests and grasslands encompassing 193 million acres. The Forest Service's mission is to achieve quality land management under the "sustainable multiple-use management concept" to meet the diverse needs of people while protecting the resource. Significant intellectual, conceptual, and content contributions were provided by the following individuals: Dr. Pat Reed, Dr. Jessica Montag, Doug Smith, M.S., Fred Clark, M.S., Dr. Susan A. Winter, and Dr. Ashley Goldhor-Wilcock.

Rvsd Plan - 00002271

# Table of Contents

Page

**Travel & Tourism Employment**

Which industries include travel & tourism jobs? .......................... 1

How have industries that include travel and tourism changed? .......... 2

Which industries that include travel and tourism are changing the fastest? .......... 3

To what extent is overall employment seasonal or part time? .......... 4-5

**Travel & Tourism Wages**

How do wages in industries that include travel and tourism compare to wages in other sectors? .......... 6

How do jobs and wages in industries that include travel and tourism compare? .......... 7

**Travel & Tourism Benchmarks**

How does regional employment in industries that include travel and tourism and other measures compare to the U.S.? .......... 8

How does employment in industries that include travel and tourism compare across geographies? .......... 9

**Data Sources & Methods** .......... 10

**Links to Additional Resources** .......... 11

**Note to Users:**

This report is one of fourteen reports that can be produced with the EPS-HDT software.  You may want to run another EPS-HDT report for either a different geography or topic.  Topics include land use, demographics, specific industry sectors, the role of non-labor income, the wildland-urban interface, the role of amenities in economic development, and payments to county governments from federal lands.  Throughout the reports, references to on-line resources are indicated by superscripts in parentheses.  These resources are provided as hyperlinks on each report's final page.  The EPS-HDT software also allows the user to "push" the tables, figures, and interpretive text from a report to a Word document.  For further information and to download the free software, go to:

headwaterseconomics.org/eps-hdt

Rvsd Plan - 00002272

## Rio Grande NF Region

# Travel & Tourism Employment

### Which industries include travel & tourism jobs?

This page describes the number of jobs (full and part-time) and the share of total jobs in industries that include travel and tourism.

Travel and Tourism: Consists of sectors that provide goods and services to visitors to the local economy, as well as to the local population. These industries are: retail trade; passenger transportation; arts, entertainment, and recreation; and accommodation and food. It is not known, without additional research such as surveys, what exact proportion of the jobs in these sectors is attributable to expenditures by visitors, including business and pleasure travelers, versus by local residents. Some researchers refer to these sectors as "tourism-sensitive." They could also be called "travel and tourism-potential sectors" because they have the potential of being influenced by expenditures by non-locals. In this report, they are referred to as "industries that include travel and tourism."

### Employment in Travel & Tourism, 2012

| | Rio Grande NF Region | U.S. |
|---|---|---|
| **Total Private Employment** | 9,994 | 115,938,468 |
| **Travel & Tourism Related** | 1,655 | 17,699,082 |
| **Retail Trade** | 356 | 3,205,829 |
| Gasoline Stations | 278 | 862,630 |
| Clothing & Accessory Stores | 54 | 1,630,575 |
| Misc. Store Retailers | 24 | 712,624 |
| **Passenger Transportation** | 7 | 450,689 |
| Air Transportation | 6 | 428,110 |
| Scenic & Sightseeing Transport | 1 | 22,579 |
| **Arts, Entertainment, & Recreation** | 88 | 2,057,290 |
| Performing Arts & Spectator Sports | 9 | 439,903 |
| Museums, Parks, & Historic Sites | 2 | 137,405 |
| Amusement, Gambling, & Rec. | 77 | 1,479,982 |
| **Accommodation & Food** | 1,204 | 11,985,274 |
| Accommodation | 301 | 1,936,610 |
| Food Services & Drinking Places | 903 | 10,048,664 |
| **Non-Travel & Tourism** | 8,339 | 98,239,386 |

### Percent of Total

| | | |
|---|---|---|
| **Travel & Tourism Related** | 16.6% | 15.3% |
| **Retail Trade** | 3.6% | 2.8% |
| Gasoline Stations | 2.8% | 0.7% |
| Clothing & Accessory Stores | 0.5% | 1.4% |
| Misc. Store Retailers | 0.2% | 0.6% |
| **Passenger Transportation** | 0.1% | 0.4% |
| Air Transportation | 0.1% | 0.4% |
| Scenic & Sightseeing Transport | 0.0% | 0.0% |
| **Arts, Entertainment, & Recreation** | 0.9% | 1.8% |
| Performing Arts & Spectator Sports | 0.1% | 0.4% |
| Museums, Parks, & Historic Sites | 0.0% | 0.1% |
| Amusement, Gambling, & Rec. | 0.8% | 1.3% |
| **Accommodation & Food** | 12.0% | 10.3% |
| Accommodation | 3.0% | 1.7% |
| Food Services & Drinking Places | 9.0% | 8.7% |
| **Non-Travel & Tourism** | 83.4% | 84.7% |

The major industry categories (retail trade; passenger transportation; arts, entertainment, and recreation; and accommodation and food) in the table above are the sum of the sub-categories underneath them and as shown here do not represent NAICS codes. The data does not include employment in government, agriculture, railroads, or the self-employed because these are not reported by County Business Patterns. Estimates for data that were not disclosed are indicated with tildes (~).

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, County Business Patterns, Washington, D.C.

Rvsd Plan - 00002273

## Rio Grande NF Region

# Travel & Tourism Employment

### How have industries that include travel and tourism changed?

This page describes trends in industries that include travel and tourism as a percent of all jobs and compares industries containing travel and tourism to the rest of the economy. It also shows jobs in industries that include travel and tourism as a percent of total employment.

- In 1998, travel & tourism represented 18.01% of total employment. By 2012, travel & tourism represented 16.56% of total employment.



Percent of Total Private Employment in Industries that Include Travel & Tourism, Rio Grande NF Region

- From 1998 to 2012, travel & tourism employment shrank from 1,734 to 1,655 jobs, a 4.6% decrease.

- From 1998 to 2012, non-travel & tourism employment grew from 7,894 to 8,339 jobs, a 5.6% increase.



Total Jobs in Industries that Include Travel & Tourism and Non-Travel & Tourism Sectors, Rio Grande NF Region

Travel & Tourism ---- Non-Travel & Tourism

- In, 2012, Mineral County, CO had the largest percent of total travel & tourism employment (41.5%), and Saguache County, CO had the smallest (9.3%).



Percent of Total Private Employment in Industries that Include Travel & Tourism, 2012

■ Accommodation & Food Services
⊠ Arts, Entertainment, & Recreation

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, County Business Patterns, Washington, D.C.

Rvsd Plan - 00002274

## Rio Grande NF Region

# Travel & Tourism Employment

### Which industries that include travel and tourism are changing the fastest?

This page describes the change in employment in sectors that include travel and tourism compared to the change in other sectors, and compares how the various industries that include travel and tourism have changed over time.

- From 1998 to 2012, travel & tourism employment shrank by 79 jobs.

- From 1998 to 2012, non-travel & tourism employment grew by 445 jobs.



New Jobs in Industries that Include Travel & Tourism, Rio Grande NF Region, 1998 to 2012

- From 1998 to 2012, retail trade shrank from 386 to 356 jobs, a 7.8% decrease.

- From 1998 to 2012, passenger transportation shrank from 11 to 7 jobs, a 36.4% decrease.

- From 1998 to 2012, arts, entertainment, & recreation shrank from 97 to 88 jobs, a 9.3% decrease.

- From 1998 to 2012, accommodation & food services shrank from 1,240 to 1,204 jobs, a 2.9% decrease.



Jobs in Industries that Include Travel & Tourism, Rio Grande NF Region

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, County Business Patterns, Washington, D.C.

Rvsd Plan - 00002275

## Rio Grande NF Region

# **Travel & Tourism Benchmarks**

### To what extent is overall employment seasonal or part time?

This page describes differences in the seasonality of employment and part-time work for all industries.



Seasonal Unemployment, Rio Grande NF Region, 2013

Rio Grande NF Region    U.S.

- In 2013, Mineral County, CO had the most change in unemployment (biggest absolute value of difference between min and max), and Alamosa County, CO had the least (smallest absolute value of difference between min and max).

Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Local Area Unemployment Statistics, Washington, D.C.

Rvsd Plan - 00002276

## Rio Grande NF Region

# **Travel & Tourism Benchmarks**

### To what extent is overall employment seasonal or part time?

This page describes differences in the seasonality of employment and part-time work for all industries.

- In 2000, 28.4 percent of workers in Rio Grande NF Region worked less than 40 weeks over the course of the year, compared to 20.9 percent for the nation.



- In 2000, 25 percent of workers in Rio Grande NF Region worked less than 35 hours per week on average, compared to 21 percent for the nation.



Data Sources: U.S. Department of Commerce. 2000. Census Bureau, Systems Support Division, Washington, D.C.

Rvsd Plan - 00002277

## Rio Grande NF Region

# Travel & Tourism Wages

### How do wages in industries that include travel and tourism compare to wages in other sectors?

This page describes wages (in real terms) from employment in industries that include travel and tourism, including sub-sectors, compared to wages from employment in all non-travel and tourism sectors combined. It also describes the percent of jobs in each category. These are shown together to illustrate the relative wage levels in industries that include travel and tourism, including sub-sectors, and how many people are employed in each sub-sector.

### Average Annual Wages, 2013 (2013 $s)

| | Rio Grande NF Region | U.S. |
|---|---|---|
| **All Sectors** | $31,457 | $49,804 |
| **Private** | $30,594 | $49,700 |
| **Travel & Tourism** | $13,798 | $21,793 |
| **Retail Trade** | $17,960 | $20,877 |
| Gasoline Stations | $16,695 | $19,118 |
| Clothing & Accessories | $17,846 | $20,193 |
| Misc. Store Retailers | $22,644 | $23,934 |
| **Passenger Transportation** | na | $68,816 |
| Air Transportation | na | $71,339 |
| Scenic & Sightseeing | na | $30,583 |
| **Arts, Entertainment, & Rec.** | $14,958 | $33,770 |
| Performing Arts & Spectator Sports | na | $79,503 |
| Museums, Parks, & Historic Sites | na | $31,710 |
| Amusement, Gambling, & Rec. | $14,958 | $20,637 |
| **Accommodations & Food** | $12,844 | $18,175 |
| Accommodation | $13,706 | $27,819 |
| Food Services & Drinking Places | $12,474 | $16,446 |
| **Non-Travel & Tourism** | $32,227 | $54,895 |
| **Government** | $33,660 | $50,360 |

This table shows wage data from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits; the major industry categories (retail trade, passenger transportation; arts, entertainment, and recreation; and accommodation and food) are the sum of the sub-categories underneath them and as shown here do not represent NAICS codes.

### Percent of Total Employment, 2013

| | Rio Grande NF Region | U.S. |
|---|---|---|
| **All Sectors** | | |
| **Private** | 71.7% | 84.3% |
| **Travel & Tourism** | 10.4% | 13.2% |
| **Retail Trade** | 1.7% | 2.3% |
| Gasoline Stations | 1.2% | 0.6% |
| Clothing & Accessories | 0.2% | 1.0% |
| Misc. Store Retailers | 0.3% | 0.6% |
| **Passenger Transportation** | na | 0.4% |
| Air Transportation | na | 0.3% |
| Scenic & Sightseeing | na | 0.0% |
| **Arts, Entertainment, & Rec.** | 0.6% | 1.5% |
| Performing Arts & Spectator Sports | na | 0.3% |
| Museums, Parks, & Historic Sites | 0.0% | 0.1% |
| Amusement, Gambling, & Rec. | 0.6% | 1.1% |
| **Accommodations & Food** | 8.1% | 9.1% |
| Accommodation | 2.4% | 1.4% |
| Food Services & Drinking Places | 5.7% | 7.7% |
| **Non-Travel & Tourism** | 40.4% | 71.1% |
| **Government** | 28.3% | 15.7% |

Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

Rvsd Plan - 00002278

## County Region

# Travel & Tourism Wages

### How do jobs and wages in industries that include travel and tourism compare?

This page describes average wages (in real terms) and employment levels in industries that include travel and tourism. It also shows average wage trends (in real terms) for industries that include travel and tourism at the regional level.





Data Sources: U.S. Department of Labor. 2014. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

Rvsd Plan - 00002279

**Rio Grande NF Region**

# Travel & Tourism Benchmarks

## How does regional employment in industries that include travel and tourism and other measures compare to the U.S.?

This page describes the difference in travel-and-tourism specialization between the region and the U.S. by comparing jobs in industry sectors that include travel and tourism as a share of total employment and with location quotients. It also shows other possible indicators of travel and tourism (part-time work and second homes) at the regional level.

### Percent of Total Private Employment in Industry Sectors that Include Travel & Tourism, Rio Grande NF Region vs. U.S., 2012

| Industries Including Travel and Tourism | Employment Share | | Location Quotient | Employment Share | Location Quotient |
|---|---|---|---|---|---|
| | Rio Grande NF Region | U.S. | | Rio Grande NF Region vs. U.S. | Rio Grande NF Region vs. U.S. |
| Retail Trade | 3.6% | 2.8% | 1.3 | | |
| Passenger Transportation | 0.1% | 0.4% | 0.2 | | |
| Arts, Entertainment, & Recreation | 0.9% | 1.8% | 0.5 | | |
| Accommodation & Food | 12.0% | 10.3% | 1.2 | | |

0%    10%    20%        0.0    1.0    2.0

■ Rio Grande NF. ☒ U.S.

• In 2012, retail trade had the highest location quotient score (1.3) and passenger transportation had the lowest (0.2).

### Other Possible Measures of the Presence of Travel and Tourism, Rio Grande NF Region vs. U.S., 2000

| Indicators of Seasonal Work and Housing | Rio Grande NF Region | U.S. | Difference | Rio Grande NF Region vs. U.S. | Difference in Percent, Rio Grande NF Region vs. U.S. |
|---|---|---|---|---|---|
| Part-Time Work (less than 40 weeks per year) | 28.4% | 20.9% | 7.5% | | |
| Part-Time Work (less than 35 hours per week) | 25.0% | 21.0% | 4.0% | | |
| Second Homes | 5.3% | 2.0% | 3.3% | | |

0%    20%    40%        0.0%    5.0%    10.0%

■ Rio Grande NF. ☒ U.S.

• In 2000, the difference between Rio Grande NF Region and the U.S. in the percent of people working less than 40 weeks per year was 7.5%.

• In 2000, the difference between Rio Grande NF Region and the U.S. in the percent of people working less than 35 hours per week was 4%.

• In 2000, the difference between Rio Grande NF Region and the U.S. in the percent of homes which were second homes was 3.3%.

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, County Business Patterns, Washington, D.C.; U.S. Department of

Rvsd Plan - 00002280

Commerce. 2000. Census Bureau, Systems Support Division, Washington, D.C.

Rvsd Plan - 00002281

**Rio Grande NF Region**

# Travel & Tourism Benchmarks

This page describes the change in employment in industries that include travel and tourism for all selected geographies and the U.S. The information is indexed (1998=100) so that data from counties with different size economies can be compared to each other, and to larger geographies.



Employment in Industries that Include Travel & Tourism

- From 1998 to 2012, Mineral County, CO had the fastest rate of change in travel & tourism employment, and Rio Grande County, CO had the slowest.

Data Sources: U.S. Department of Commerce. 2014. Census Bureau, County Business Patterns, Washington, D.C.

Rvsd Plan - 00002282

# Data Sources & Methods

## Data Sources

EPS-HDT uses published statistics from government sources that are available to the public and cover the entire country. All data used in EPS-HDT can be readily verified by going to the original source. The contact information for databases used in this profile is:

- **County Business Patterns**
  Bureau of the Census, U.S. Department of Commerce
  http://www.census.gov/epcd/cbp/view/cbpview.html
  Tel. 301-763-2580

- **2000 Decennial Census**
  Bureau of the Census, U.S. Department of Commerce
  http://www.census.gov
  Tel. 303-969-7750

- **Quarterly Census of Employment and Wages**
  Bureau of Labor Statistics, U.S. Department of Labor
  http://www.bls.gov/cew
  Tel. 202-691-6567

- **Local Area Unemployment Statistics**
  Bureau of Labor Statistics, U.S. Department of Labor
  http://www.bls.gov/lau
  Tel. 202-691-6392

## Methods

EPS-HDT core approaches

EPS-HDT is designed to focus on long-term trends across a range of important measures. Trend analysis provides a more comprehensive view of changes than spot data for select years. We encourage users to focus on major trends rather than absolute numbers.

EPS-HDT displays detailed industry-level data to show changes in the composition of the economy over time and the mix of industries at points in time.

EPS-HDT employs cross-sectional benchmarking, comparing smaller geographies such as counties to larger regions, states, and the nation, to give a sense of relative performance.

EPS-HDT allows users to aggregate data for multiple geographies, such as multi-county regions, to accommodate a flexible range of user-defined areas of interest and to allow for more sophisticated cross-sectional comparisons.

Adjusting dollar figures for inflation

Because a dollar in the past was worth more than a dollar today, data reported in current dollar terms should be adjusted for inflation. The U.S. Department of Commerce reports personal income figures in terms of current dollars. All income data in EPS-HDT are adjusted to real (or constant) dollars using the Consumer Price Index. Figures are adjusted to the latest date for which the annual Consumer Price Index is available.

Data gaps and estimation

Some data are withheld by the federal government to avoid the disclosure of potentially confidential information. Headwaters Economics uses supplemental data from the U.S. Department of Commerce to estimate these data gaps. These are indicated in italics in tables. Documentation explaining methods developed by Headwaters Economics for estimating disclosure gaps is available at headwaterseconomics.org/eps-hdt.

Rvsd Plan - 00002283

# Links to Additional Resources

## For more information about EPS-HDT see:

headwaterseconomics.org/eps-hdt

## Web pages listed under Additional Resources include:

Throughout this report, references to on-line resources are indicated by superscripts in parentheses. These resources are provided as hyperlinks here.

1  www.ingentaconnect.com/content
2  www.kansascityfed.com/publicat/econrev/PDF/3q03wilk.pdf
3  headwaterseconomics.org/eps-hdt
4  http://mgm2impact.com/
5  www.census.gov/econ/census07
6  www.fs.fed.us/recreation/programs/nvum
7  www.bea.gov/industry/iedguide.htm#ttsa
8  www.ers.usda.gov/publications/ruralamerica/ra174/ra174b.pdf
9  www.ers.usda.gov/publications/err7/err7.pdf
10  www.bls.gov/cps/cps_htgm.htm
11  www.bls.gov/bls/employment.htm
12  www.bls.gov/bls/wages.htm
13  www.bls.gov/oes
14  http://data.bls.gov/pdq/VersionInfo.jsp?version=0.0.0
15  www.bls.gov/oco
16  www.census.gov/econ/cbp/index.html
17  www.sussex.ac.uk/Units/spru/publications/imprint/sewps/sewp28/sewp28.pdf
18  www.mailer.fsu.edu/~tchapin/garnet-tchapin/urp5261/topics/econbase/lq.htm

Rvsd Plan - 00002284

Rio Grande National Forest's Supervisor's Office
Attn: Forest Plan Revision
1803 W. Highway 160
Monte Vista, CO 81144

Via e-mail: *rgr.f_forest_plan@fs.fed.us*

October 28, 2016

Dear Rio Grande Planning Team,

The following are the comments of the endorsers listed below on formal scoping for the forest plan revision for the Rio Grande National Forest (RGNF) and accompanying environmental impact statement (EIS). For this submission, we have reviewed the Notice of Intent to Prepare an Environmental Impact Statement (NOI; 81 Fed Reg 62706 et seq., September 12, 2016) and the Proposed Action (PA) document available on the RGNF's revision website.

As part of our comments, we are also submitting a Conservation Alternative (Alternative). We ask that this alternative be considered as a full alternative in the forthcoming environmental impact statement (EIS) for the revised plan. We are happy to work with the planning staff to ensure that the themes and concepts in our Alternative are fully represented in a plan revision EIS alternative. Our proposed Conservation Alternative should be considered part of our scoping comments, and is incorporated here by reference.

Many of the issues and concepts described in our Alternative should also be applied to other alternatives formulated for the plan revision EIS. They are emphasized in this letter.

Sincerely,


Rocky Smith, Forest Management Analyst and Consultant
1030 Pearl St. #9
Denver, CO 80203
303 839-5900
2rockwsmith@gmail.com

Chris Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223
Alamosa, CO 81101

1

(719) 589-1518
info@slvec.org

Alison Gallensky, GIS and IT Director
Rocky Mountain Wild
1536 Wynkoop St Suite 900
Denver CO 80202
(303) 454-3345
Alison@rockymountianwild.org

Alan Apt, Wilderness Chair
Sierra Club Rocky Mountain Chapter
PO Box 620
Nederland CO 80466
970 980 9027
alanrapt@gmail.com

John R. Mellgren, Staff Attorney
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
mellgren@westernlaw.org
(541) 359-0990

Bruce Gordon, Executive Director
EcoFlight
307 L AABC
Aspen, CO 81611
bruce@ecoflight.org
970-429-1110

Jimbo Buickerood, Lands and Forest Protection Program Manager
San Juan Citizens Alliance
1309 East Third Avenue #5
PO Box 2461
Durango, CO 81302
970.259.3583 Ext. 2
Jimbo@sanjuancitizens.org

Matt Reed

Public Lands Director
High Country Conservation Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917
matt@hccacb.org

Scott Braden, Wilderness & Public Lands Advocate
Conservation Colorado
1536 Wynkoop St. 5C
Denver, CO 80203
303.405.6702 (o)
scott@conservationco.org

Quiet Use Coalition
Tom Sobal, Director
POB 1452
Salida, CO 8i201
quietuse@gmail.com
719-539-4112

Greg Dyson, Wild Places Program Director
Wild Earth Guardians
2590 Walnut St.
Denver, CO 80202
gdyson@wildearthguardinas.org
503 730-9242

## TABLE OF CONTENTS

I. A MAJOR FOCUS OF THE PROPOSED ACTION SHOULD BE PROTECTION OF
BIOLOGICAL DIVERSITY AND RECOVERY OF AT-RISK SPECIES. 6

II. THE PROPOSED ACTION SHOULD RECOMMEND SOME QUALIFYING AREAS FOR
WILDERNESS DESIGNATION 9

III. DESIGNATE SPECIAL AREAS 10

Rvsd Plan - 00002287

IV. PROTECT AND RECOVER SPECIES OF CONSERVATION CONCERN AND OTHER AT-RISK SPECIES, INCLUDING LYNX AND WOLVERINE  11

V. WILD, SCENIC, AND RECREATIONAL RIVERS ELIGIBILITY AND MANAGEMENT  12

VI. FORMULATE STRONG STANDARDS AND GUIDELINES, BOTH FOREST-WIDE AND FOR INDIVIDUAL MANAGEMENT AREAS  18

VII. ANALYZE A WIDE RANGE OF ALTERNATIVES IN THE PLAN REVISION EIS  19

VIII. PROPOSED GEOGRAPHIC AREAS AND MANAGEMENT AREAS NEED MODIFICATION   20

IX. ADDRESS TRAVEL MANAGEMENT   24

X. PROTECT WATERSHEDS   26

XI. PROVIDE ECOSYSTEM SERVICES AND ANALYZE IMPACTS ON THEM  27

XII. UPDATE THE AVAILABILITY OF LANDS FOR OIL AND GAS LEASING  3

XIII. TIMBER MANAGEMENT  37

XIV. LIVESTOCK GRAZING  39

XV. CONTROL INVASIVE SPECIES  39

XVI. FIRE  40

XVII. ANALYZE THE SUITABILITY OF LANDS FOR RENEWABLE ENERGY DEVELOPMENT  40

XVIII. MONITORING 42

XIX. ANALYZE IMPACTS OF CLIMATE CHANGE  44

XX. ECONOMICS  50

Rvsd Plan - 00002288

XXI. ESA-LISTED SPECIES RECOVERY PLANS  53

REFERENCES  31

ATTACHMENTS (sent separately)

1. April 15, 2016 comments on Need for Change and Plan Revision Framework

2. August 22, 2016 comments on Need For Change version 2 and the Plan Revision Framework

3. Appendices to September 6 comments on the Preliminary Wilderness Evaluation, which includes Our Wilderness recommendations

Rvsd Plan - 00002289

# RIO GRANDE NATIONAL FOREST PLAN REVISION
## SCOPING COMMENTS

I. A MAJOR FOCUS OF THE PROPOSED ACTION SHOULD BE PROTECTION OF BIOLOGICAL DIVERSITY AND RECOVERY OF AT-RISK SPECIES.

The Planning Rule states:

> The purpose of this part is to guide the collaborative and science-based development, amendment, and revision of land management plans that promote the ecological integrity of national forests and grasslands.

36 CFR 219.1(c). Ecological integrity is defined in the rule as follows:

> The quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence.

219.19.

First and foremost, maintaining all the parts of each ecosystem is necessary to ensure ecological integrity. That means retaining all native species and recovering, to the extent possible, at-risk species[1].

Also important is maintaining ecological processes like fire, predation, natural hydrological cycles, soil formation, etc. Indeed, the Planning Rule requires that plans

> provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area.

219.9(b)(1).

In our alternative, we state:

---

[1] This includes:  threatened, endangered, proposed, and candidate species under the Endangered Species Act, as well as species of conservation concern.

6

Rvsd Plan - 00002290

The theme of this alternative is to maintain, restore, and enhance biological diversity, including: consideration of plants, animals, fish, invertebrates, natural ecological processes, and local and landscape-level habitat connectivity, while still providing opportunities for multiple uses, as required by the Multiple Use Sustained Yield Act and the National Forest Management Act.

Alternative at 4.

This emphasis fits comfortably into Forest-wide goal 2, "Maintain and restore sustainable, resilient ecosystems". PA at 8. However, we do not believe that "[a]ggressively diversifying age classes and structure, seral stage, and habitat classes" (ibid.) would accomplish this goal. In fact, it would likely contradict it. Aggressively diversifying age classes would take a great deal of human manipulation, mostly via logging. Ecosystems that are heavily manipulated by humans, at least with methods other than prescribed natural fire, are not natural and will not contribute to maintaining biological diversity. For example, Canada lynx are known to avoid logged areas, and therefore such logging can significantly degrade Canada lynx habitat for long periods of time. Logging would destroy advanced regeneration and wildlife habitat, and the presence and use of roads would severely diminish habitat effectiveness for many wildlife species and lead to soil erosion and stream sedimentation.

Also, with large areas of Englemann spruce killed by beetles, much of the RGNF is in the non-forested or stand initiation seral stages. No actions by humans would diversify the age-class of stands dominated by dead and dying spruce. Planting spruce may help re-establish individual forest stands, but many acres planted in the near future (assuming that adequate stocking occurs everywhere) would not diversify the age class structure. Salvage logging and the removal of dead and dying trees would also remove important woody material from the landscape, which can cause cascading effects to ecosystems and retard the recovery of ESA-listed species.

We believe that to some degree, the focus of our Alternative stated above should receive emphasis in every alternative considered in the plan revision EIS. Public lands are the only places with enough acreage to provide habitat for wide-ranging species and those with needs for large areas and/or specialized habitat such as lynx, black bear, bighorn sheep, marten, and goshawk. The continued existence of, and recovery to, viable populations of these species depends on national forest management, as land in non-public ownerships is not large enough to provide for these species, nor to protect biological diversity in general. Also, such lands are mostly managed for purposes other than conserving ecological resources and biological diversity.

Rvsd Plan - 00002291

Thus it is critical that national forests be managed to conserve ecological integrity and biological diversity, and to maintain connectivity of wildlife habitat. Landscape linkages and wildlife corridors, as described in the Alternative, should be designated and managed to ensure wildlife passage.

The "strategic framework" for the plan revision must be based on the concepts outlined at 219.1(c), including the use of best-available science to revise plans to promote ecological integrity and sustainability. From the description of the strategic framework on p. 2 of the PA, it is not clear that this will be the intent of the RGNF plan revision.

The revised plan must ensure adequate representation of ecosystem types in protected areas. Our wilderness recommendations would increase representation of ecological types not currently protected in the National Wilderness Preservation System. See further discussion in our wilderness recommendations, which were part of our submission on September 6, 2016 and are in Appendix 5 to our Alternative.

Ecosystems and wildlife habitat must be connected across the landscape to ensure movement of wide-ranging species like lynx. The revised plan must ensure connectivity across borders with the Pike-San Isabel, Grand Mesa-Uncompahgre-Gunnison, San Juan and Carson National Forests, and with adjacent BLM lands in Colorado. See sections IV and V of the Alternative for a more detailed discussion.

Objectives, standards and guidelines must be composed to ensure there is sufficient emphasis on maintaining biological diversity in all alternatives, including the proposed action.

The Forest Service has a duty to conserve species listed under the Endangered Species Act (ESA):

> All other Federal agencies shall, in consultation with and with the assistance of the Secretary [of Interior], utilize their authorities in furtherance of the purposes of th[e Endangered Species] Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act.

16 U.S.C. 1536(a)(1). "Conservation" is defined in ESA as follows:

> The terms ''conserve,'' ''conserving,'' and ''conservation'' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary…

Rvsd Plan - 00002292

Id. at 1532 (3). This means that the Forest Service does not just have an obligation to cause no harm to ESA-listed species, but it has an affirmative obligation to support and work to actively recover ESA-listed species found on the RGNF.

Because implementation of the revised plan could affect any or all of the eight threatened or endangered species that may reside on the RGNF[2] (see PA at 5), formal ESA consultation with the U. S. Fish and Wildlife Service is required before the revised plan is approved.

II. THE PROPOSED ACTION SHOULD RECOMMEND SOME QUALIFYING AREAS FOR WILDERNESS DESIGNATION.  We note that the PA does not have a proposed management area (MA) for areas recommended for wilderness. We assume this means that the RGNF intends not to recommend any acres for wilderness designation in the revised plan. We believe this is shortsighted. The proposed revised plan should recommend some areas for wilderness, especially some areas adjacent to existing wilderness areas.

Many areas on the RGNF score very high on some wilderness qualities, and a number of them have an overall recommendation of high. See Wilderness Recommendation Process, Preliminary Evaluation Results. Some of the less than high rankings in this Evaluation appear to be in error. See our comments on the Preliminary Wilderness Evaluation, September 6, 2016, which are attached to our alternative as Appendix 4. In short, many areas on the RGNF clearly meet the criteria for wilderness.[3]

Recommending qualifying areas for wilderness designation would ensure protection of ecosystem types that are currently under-represented in the National Wilderness Preservation System, both nationally and on the RGNF. See detailed analysis in Appendix 1 to our September 6, 2016 comments, which is attached to our Alternative as Appendix 5. Note also the analysis in Appendix 2b of those comments (begins on p. 93 of the Appendix 5 file) identifying areas with considerable acreage of the five most under-represented ecosystem types on the RGNF. Recommending some of these areas and others for wilderness would help maintain the integrity of these and other under-represented ecosystem types and the diverse plant and animal communities they support.

Assigning roadless areas to either of the roadless MAs, 3.5 and 3.6, would provide some protection for wilderness characteristics, but still allow logging and road construction under some circumstances, especially in MA 3.5.  See PA at 27-28.

---

[2] Plan implementation will almost certainly affect lynx, as is discussed elsewhere in these comments and in section V of our Alternative.
[3] The Preliminary Evaluation used the broad characteristics of wilderness areas listed in the Wilderness Act (see 16 U.S.C. 1131) and then addressed "considerations under each characteristic that help to narrow down each character trait." Preliminary Evaluation at 1.

Rvsd Plan - 00002293

On September 6, 2016, we submitted a list of areas we believe should be recommended for wilderness designation. This includes a description of each area and why it should be recommended for wilderness designation. We excluded from our recommendations all areas that had conflicts with possible wilderness designation, such as motorized trails. See Appendix 3 to our comments of September 6, 2016, beginning on p. 100 of that file, attached to these comments, and also to our Alternative as Appendix 5. We ask that all or nearly all of our wilderness recommendations be included in at least one alternative in the EIS, and that the proposed action contain at least some of our recommendations.

## III. DESIGNATE SPECIAL AREAS

Various areas on the RGNF have special, fragile, and/or unique qualities that deserve protection. We are pleased to see that the following areas will be considered for designation: "the Continental Divide Trail, Old Spanish Trail, Natural Arch, Cumbres and Toltec National Historic Landmark, and Mt. Blanca Massif." PA at 21. However, the recreational opportunity spectrum class should not always be semi-primitive motorized, as proposed on p. 25 of the PA. Motorized use would certainly be inappropriate in the Mt Blanca Massif and the Continental Divide Trail corridor (except for motorized travelways that cross the Trail). The ROS class for these areas should be primitive and semi-primitive non-motorized, respectively. For other special areas, motorized use should not be allowed if it puts at risk any of the qualities for which the area is designated. In that regard, limitations on motorized use in the Natural Arch area will likely be necessary.

See our Alternative, Appendix 7, for a description of special areas that we believe should be designated. [4] At least one alternative should have all or nearly all of these areas and the ones being considered by the Forest Service, and the proposed revised plan should designate at least some of them.

If the Fremont Special Interest Area will be reduced in size, as hinted at PA pp. 17 and 21, the acreage excluded from the SIA should not be suitable for timber production, as it is too close to timberline. Reforestation in such areas would be difficult. See more detailed comments on this at p. 16 of our April 15, 2016 comments on Need For Change. [5]

See also Alternative Appendix 6 for recommendations for research natural areas.

---

[4] This includes a designated area that incorporates the Natural Arch and more.
[5] This comment later was mistakenly dated 2015.

Rvsd Plan - 00002294

## IV. PROTECT AND RECOVER SPECIES OF CONSERVATION CONCERN AND OTHER AT-RISK SPECIES, INCLUDING LYNX AND WOLVERINE

We are pleased to see that the RGNF has made available on its plan revision website a preliminary list of species of conservation concern (PSCC). We agree that the species on the list should be SCC, and we also believe the following should be added to it:

   --American pika (*Ochotona princeps*)
   --silky pocket mouse (*Perognathus flavus*)
   --red squirrel (*Tamiasciurus hudsonicus*)
   -- Brazilian Free-tailed Bat (*Tadarida brasiliensis*)
   -- Pale Moonwort (*Botrychium pallidum*)

American **pikas** live among high-elevation talus fields and are vulnerable to warming temperatures (Beever et al. 2003). American pikas are experiencing declines across most of their range (Wilkening et al. 2015). Calkins et al. (2012) predicted that pika habitat will shrink at even slightly warmer temperatures. The species occurs in the RGNF. For species that are at risk from the effects of climate change such as pika, designation as SCC is vitally important to ensure that stressors within the Forest Service's control, in combination with climate change, do not push these species towards a need for listing under the ESA.

According the NatureServe, the **silky pocket mouse** is imperiled in Colorado (NatureServe 2015). Based on a Forest Service Region 2 evaluations form, the species is known to occur on the RGNF (Forest Service 2001). Additionally, a small mammal survey conducted by Colorado Natural Heritage Program found occurrences on the RGNF (CNHP 2015). See also Rocchio et al. 2000.

Based on a study by Colorado Parks and Wildlife and others (CPW, undated), **red squirrels** may be having a negative response moderate and severe spruce beetle outbreak conditions. The assumption is that the loss of cone crop, a key food resource for the squirrels, is the key factor. They are residents of the RGNF and serve as an important secondary food source for Canada lynx. In Colorado, it represents a greater percentage of lynx diet than elsewhere within the lynx's range.

NatureServe (2015) ranks the **Brazilian free-tailed bat** as critically imperiled in Colorado. The species' range overlaps with the RGNF, and the forest includes several important habitats including caves (or mines), riparian, and mixed conifer forest.

**Pale moonwort** is ranked as imperiled in Colorado by NatureServe 2015. It is a Colorado Rare Plant (CNHP, 1997+) and Forest Service Region 2 Sensitive Species. It has been found in Rio

Rvsd Plan - 00002295

Grande and/or Conejos counties (Kettler et al. 2000). The Draft Environmental Impact Statement for the RGNF 1996 land and resource management plan indicates the plant occurs on the forest (p. 3-94).

The revised plan must protect **wolverine** (*Gulo gulo luscus*). Wolverine conservation status in the lower-48 is currently in some flux. In April 2016, a federal judge rejected the 2014 decision by the U. S. Fish and Wildlife Service (FWS) to not list the distinct population segment of the North American wolverine under the ESA. As the FWS reconsiders protections for wolverines, it is once again a "candidate" species under ESA. This may raise questions over how the Forest Service, including the RGNF, should treat wolverine in ongoing and forthcoming forest plan revisions.

Because the wolverine is a candidate species, the revised plan must ensure that ecological conditions are maintained that will "contribute to the recovery of federally listed threatened and endangered species [and] conserve proposed and candidate species". 219.9(b)(1). Maintaining ecological conditions alone will probably not be sufficient to help ensure wolverine recovery and viability across its range on national forest lands. Therefore, plan components, including standards and guidelines, for wolverine will likely be necessary, as required by 219.9(b)(1). For example, limitations on snowmobile use in some alpine areas where denning could occur may be necessary for protection and recovery of wolverine.

Importantly, the RGNF should review and incorporate the preliminary findings, and expected final report, from the Wolverine Winter Recreation Research Project that recently concluded the field study component of the project. All reports and maps are available at: http://www.roundriver.org/wolverine/wolverine-maps-reports-and-publications/ (last accessed October 20, 2016). Additionally, because of the uncertainty surrounding the wolverine's listing status and the importance of the species, the RGNF revised plan should include a mechanism whereby wolverine is automatically added to the species of conservation concern list in the event that the U.S. Fish and Wildlife Service once again determines that wolverine do not merit listing under the ESA. Given the expected life-span of the revised plan, this is very important to ensure that the plan can anticipate potential actions by other federal agencies in the future, but during the life of the revised plan.

The revised plan must have components, including standards and guidelines, for protecting **lynx** (*Lynx canadensis*), a threatened species under the federal Endangered Species Act. Please see Alternative section V for a detailed set of recommendations for lynx. We recommend a new management area for lynx linkages and a special area for one linkage.

The revised plan and all alternatives must have plan components that ensure adequate protection of lynx habitat. The EIS must demonstrate that each alternative would maintain lynx habitat and

12

Rvsd Plan - 00002296

provide an opportunity for the species to begin recovering to a full, viable population in Colorado. It will be especially important to limit logging, especially salvage logging, and other types of vegetation management in areas of lynx habitat.

Additionally, because of uncertainty regarding the future ESA-listing status of Canada lynx and the results of the currently ongoing status review of Canada lynx, the RGNF revised plan should include a mechanism whereby Canada lynx is automatically added to the species of conservation concern list in the event that the U.S. Fish and Wildlife Service decides to delist Canada lynx and remove its ESA protections as a threatened species.


## V. WILD, SCENIC, AND RECREATIONAL RIVERS ELIGIBILITY AND MANAGEMENT

Under the Wild and Scenic Rivers Act, the Forest Service is required to evaluate potential additions to the National Wild and Scenic Rivers System:

> In all planning for the use and development of water and related land resources, consideration shall be given by all Federal agencies involved to potential national wild, scenic and recreational river areas, and all river basin and project plan reports submitted to the Congress shall consider and discuss any such potentials. The Secretary of the Interior and the Secretary of Agriculture shall make specific studies and investigations to determine which additional wild, scenic and recreational river areas within the United States shall be evaluated in planning reports by all Federal agencies as potential alternative uses of the water and related land resources involved.

16 U.S.C. 1276(d)(1).

A river is eligible to be included in the national wild and scenic rivers system if it is free-flowing and has at least one river-related outstandingly remarkable value (ORV)of national or regional significance. 16 U.S.C 1271(b), 1273(b). Segments found eligible must include a preliminary classification (wild, scenic, or recreational; 16 U. S. C. 1273(b), FSH 1909.12 section 82.8).

Free flowing is defined as follows in the Wild and Scenic Rivers Act:

> "Free-flowing", as applied to any river or section of a river, means existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway. <u>The existence, however, of low dams, diversion works, and other minor structures at the time any river is proposed for inclusion in the national wild and scenic rivers system shall not automatically bar</u>

13

its consideration for such inclusion: Provided, That this shall not be construed to authorize, intend, or encourage future construction of such structures within components of the national wild and scenic rivers system.

16 U. S. C. 1286(b); emphasis added.

"Outstandingly remarkable" values are "scenic, recreation, geologic, fish and wildlife, historic, cultural, or other similar values". 16 U.S.C. 1271.

The Planning Rule requires plans to identify eligible rivers:

> (2) In developing a proposed new plan or proposed plan revision, the responsible official shall….
>
> (vi) Identify the eligibility of rivers for inclusion in the National Wild and Scenic Rivers System, unless a systematic inventory has been previously completed and documented and there are no changed circumstances that warrant additional review.

36 CFR 219.7(c)(2)(vi).

And under the Planning Rule's Directives:

> Unless a systematic inventory of study rivers has been completed and eligible rivers identified, the Interdisciplinary Team shall develop and conduct a comprehensive inventory and evaluation to determine which rivers are eligible for inclusion in the National System.  …
>
> When conducting an eligibility study of Forest Service-identified rivers (sec. 5(d)(1) of the Act) during land management plan development or revision, the Interdisciplinary Team shall include all potential wild, scenic, and recreational rivers flowing wholly or partially on National Forest System lands as identified in the Nationwide Rivers Inventory and by other sources.

FSH 1909.12, section 82.2.

The planning team needs to determine the potential eligibility of every stream on the RGNF for eligibility for designation as a wild, scenic, or recreational river under the Wild and Scenic Rivers Act. Such consideration is required under the Act. See 16 U. S. C. 1276(d)(1). Studies done for the previous RGNF plan may be sufficient where there have been no changes in river conditions. However, streams previously determined to be ineligible should be re-examined, as it

14

is possible that factors that make them ineligible, e g., low-head dams, no longer exist. See 219.7(c)(2)(vi) and FSH 1909.12, sections 82.2 and 82.4. Similarly, the planning team should reconsider river values and river corridor values in the context of the current regional and national array of river-related natural values. Streams of particular interest include Lake Fork Conejos River, South Fork Conejos River, and additional segments of the Rio Grande River, including the one from Stony Pass to Rio Grande Reservoir.

We are pleased to see that the RGNF will evaluate stream segments that were not previously evaluated, including nine segments in the Baca tract, which the Forest Service has acquired since the previous plan revision, and 25 segments elsewhere. See Need For Change, Version 2, item A 3 and Appendix A 3. The RGNG should review wild & scenic assessments and management already undertaken by adjacent federal land-management agencies, especially for any segments of streams shared with the forest.

Also, the forest should review existing streamflow protections provided by the State of Colorado *Stream and Lake Protection Program* (instream flow water rights), and consider for wild & scenic eligibility the streams included in that program. State instream flow water rights also provide new opportunities for federal-state cooperation, complementing and justifying eligibility findings. Specific state-protected streams that should be considered or retained for eligibility include:

- Alamosa River headwaters
- Alder Creek
- Bear Creek
- Beaver Creek
- Cross Creek
- East Fork Pinos Creek
- Elk Creek
- El Rito Azul
- Embargo Creek
- John's Creek
- Lake Fork Conejos River
- Lost Mine Creek
- Middle Fork Conejos River
- Middle Fork Saguache Creek
- North Fork Conejos River
- North Fork Saguache Creek
- Pinos Creek
- Saguache Creek
- South Fork Camero Creek

Rvsd Plan - 00002299

- South Fork Saguache Creek
- Treasure Creek
- Wannamaker Creek
- West Alder Creek
- West Fork Pinos Creek

The Colorado Natural Heritage Program (CNHP) published, in April 2016, a report on fens in the RGNF (Smith et al, 2016). That report defines fens as ground-water fed wetlands that typically support sedges and low stature shrubs, and identifies potential fen areas within the forest, including a total of 2,532 likely fen areas in the forest. The report highlights in particular three watersheds with very high numbers of likely fens: Elk Creek; Headwaters of Alamosa River; Ute Creek.

While these fens rely most directly on groundwater, the interplay between groundwater and surface flows in streams is likely enough that nearby streams should be carefully studied for protection as part of the forest's fen assessment. Specifically, the following streams should be considered or retained for wild & scenic eligibility (or, if currently eligible, should retain that eligibility), focusing on the possible ORVs of fens and related plant communities:

*Elk Creek watershed*
- Elk Creek
- Rio Colorado
- South Elk Creek

*Alamosa River Headwaters*
- Bitter Creek
- Cascade Creek
- Cataract Creek
- Iron Creek
- Gold Creek
- Prospect Creek
- Treasure Creek

*Ute Creek watershed*
- East Ute Creek
- Middle Ute Creek
- West Ute Creek
- Ute Creek

Rvsd Plan - 00002300

The Colorado Natural Heritage Program (CNHP) published a report on the RGNF's wetlands (Lemly, 2012). It found wetlands in generally good condition across the forest, with a majority of wetlands occurring in subalpine and alpine areas. Id at 15. Like CNHP's 2016 report, it also noted the importance of fens in these areas. Id. at 36-37. The RGNF should consider wild-scenic river eligibility as one method of ensuring protection for these valuable resources. The following alpine streams should be studied for eligibility (or retained in current eligibility), focusing on stream-supported wetlands and the plant communities they support in order to recognize and protect those values:

- Benito Creek
- Halfmoon Creek
- Machin Creek
- headwaters Middle Fork Saguache Creek
- headwaters South Fork Saguache Creek
- Spring Creek
- Twin Peaks Creek
- Wannamaker Creek
- Whale Creek
- Adams Fork
- North Fork (Conejos)
- Middle Fork (Conejos)
- Rito Azul
- Mesa Creek
- Rito Hondo
- Spring Creek
- Willow Creek
- Bear Creek
- Pole Creek
- West Fork Pole Creek
- Rio Grande River above Rio Grande Reservoir

When considering streams for wild & scenic eligibility study, the forest should reference CNHP listings of riparian-dependent rare plants in the vicinity. For RGNF, these may include: Barneby's fever-few, blue-eyed grass, Bodin milkvetch, broadfruit, bur-reed, Colorado watercress, marsh-meadow Indian-paintbrush, mud sedge, slender spiderflower, and small-winged sedge.

The forest should also use data and analyses prepared by CNHP for *Potential Conservation Areas* location within the forest, including reports entitled:  Adams Fork of Conejos River, Baca Grande and Reserve, Conejos River at Platoro, Conejos River at Spectacle Lake, Conejos River

17

Springs, El Rito Azul, Elephant Rocks, Great Sand Dunes, Pole Creek, Ra Jadero Canyons, Rito Hondo Creek, Rio Grande at Pole Creek Mountain, Saguache Creek, Sangre de Cristo Creek, Sangres Alluvial Fan, South Fork of the Conejos River and Hansen Creek, Upper Medano Creek, Upper Pole Creek, and Zapata Falls.

The forest should also evaluate for eligibility streams that contain Rio Grande cutthroat trout, or that once contained that fish, or that contain habitat suitable to assisting with that fish's recovery. Additional information for this purpose is available in CPW, 2013 and RGCT Conservation Team, 2013, both prepared in cooperation among the states of Colorado and New Mexico and the U.S. Forest Service.

All river segments found eligible must be managed to maintain their eligibility, both their free-flowing nature and any ORVs. Each alternative must contain plan components to ensure such protection, as required by 219.10(b)(1).

The revised plan should correct the management prescription error applied, in the 1996 plan, to Saguache Creek, which was classified as wild. While other wild-classification eligible streams are currently managed under 1.5 *Eligible Wild River*, seven miles of Saguache Creek are managed under 3.4 *Eligible Scenic River*. This discrepancy in management prescriptions has consequences relative to mineral withdrawal, oil & gas leasing, logging, ROS, and motorized travel. The new plan should affirm the wild classification of eligible Saguache Creek and adjust management area applications accordingly.

See Alternative section VI for additional comments on wild, scenic, and recreational river eligibility.

## VI. FORMULATE STRONG STANDARDS AND GUIDELINES, BOTH FOREST-WIDE AND FOR INDIVIDUAL MANAGEMENT AREAS

Standards and guidelines are two required plan components, as described in the Rule:

A standard is a mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements. …

A guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. (§ 219.15(d)(3)). Guidelines are established to help achieve or maintain a desired

> condition or conditions, to avoid or mitigate undesirable effects, or to meet
> applicable legal requirements.

219.7(e)(iii) and (iv), respectively.

In other words, plans are clearly intended to impose some limitations on management in order to meet desired conditions, avoid or mitigate adverse impacts, and meet legal requirements. Note that the plan decision document must include "[a]n explanation of how the plan components meet the sustainability requirements of § 219.8, the diversity requirements of § 219.9, the multiple use requirements of § 219.10, and the timber requirements of § 219.11" (36 CFR 219.14(a)(2)). Therefore, the EIS for the revision should show how each alternative meets these requirements.

It is important for the revised plan to have strong standards to ensure that impacts from implementation of projects and activities under the plan are minimized. Protections for wildlife and plant species at risk and riparian/wetlands are particularly important. The revised plan need not repeat existing direction, such as the Watershed Conservation Practices Handbook (FSH 2509.25), but the plan must incorporate this direction and state where this direction can be found so that the public has easy access to it. It must also incorporate the Soil Management Handbook, FSH 2509.18, including the R-2 Supplement 2509.18-92-1 .

Standards and guidelines, both forest-wide and in individual management areas, must not be watered down into "management practices". There is no provision in either the Planning Rule or the Planning Directives for use of management practices instead of standards and guidelines. We addressed this issue in our August 22, 2016 comments at 3-5. As we stated there:  "It is simply not appropriate to evade the intent of the planning rule by greatly reducing or eliminating the use of required plan components that mandate limitations on management." Id. at 4. Making plan amendments easier is not a valid reason to use management practices instead of plan components. If a minor change in plan components is desired, only a minor amendment and corresponding NEPA documentation are needed. See 219.13(b)(3).


VII. ANALYZE A WIDE RANGE OF ALTERNATIVES IN THE PLAN REVISION EIS.

We addressed this issue in our April 15, 2016 comments[6], in response to a statement by the Forest Service during a March 30, 2016 webinar that the RGNF would try to have as few alternatives as possible in the plan revision EIS. We believe that full formulation and analysis of several alternatives, in addition to the required proposed action and no action alternatives, will be necessary to incorporate the spectrum of possible ways to manage the RGNF.

---

[6]These comments are incorporated by reference into our scoping comments, and are attached.

Rvsd Plan - 00002303

Alternatives with different emphasis may require management areas not used in the proposed action. For example, alternatives that recommended any acreage for wilderness would need an MA for proposed wilderness.[7] In our Alternative, submitted with these comments, we recommend a new MA for lynx landscape and other linkages.

A wide range of alternatives, as required by 40 CFR 1502.14(a), must be formulated and analyzed to accommodate the wide diversity of possible management options for the RGNF.

VIII. PROPOSED MANAGEMENT AREAS AND GEOGRAPHIC AREAS
NEED MODIFICATION

We discussed our concerns with geographic areas (GAs) in our August 22, 2016 comments[8] at 5-6. We still have difficulty seeing how the use of GAs as proposed would aid in the revision. The PA states:

>...Geographic Area descriptions present more of a management emphasis based on land status and line officer discretion. ...

>In response to comments received during the Assessment phase of the Plan Revision process, the Proposed Action clarifies direction based on land status and reduces overlapping direction. The proposed format maintains much of the previous direction but add (sic) place-based desired conditions to better focus overall direction. The Proposed Action incorporates Geographic Areas that combine Management Areas with similar emphases into larger groupings based on land status and line officer discretion.

PA at 1, 13.

How does the use of GAs "reduce[] overlapping direction"? As described in the quote above, GAs *add* direction that overlaps the direction in management areas. Any direction in GAs is also not "place-based"; rather, it is based on how areas are managed. The NOI states that the proposed action

---

[7] In the last round of forest planning in Region 2, the White River NF recommended some acreage for wilderness and assigned it to MA 1.2. See White River Plan at 3-10.
[8] These comments are also incorporated by reference into our scoping comments and attached.

20

> includes an overarching geographic area layer above the forest's existing
> management area layer, tiered to levels of active management, the forest's discretion
> in said management, and the current legal status of the land.

NOI at 62707.

The management areas would presumably have place-based desired conditions. Having desired conditions at the GA level would add overlapping, and potentially confusing, direction.

As we noted in our August 22, 2016 comments, the proposed use of GAs contradicts the Planning Directives, which state that GAs are "based on place". See FSH 1909.12, section 22.21.

We are not opposed to the use of GAs. However, we see no benefit in using them as proposed. The RGNF should either drop GAs or make them place-based and show how they would aid in providing management direction.


The consolidation of three **MAs for designated wilderness** (formerly 1.1, 1.2, and 1.3) into one new MA (1.1) (see PA at 18-19) is acceptable, provided that this MA contain standards and guidelines that address heavily used areas. These Standards and Guidelines must provide for restoration and for limiting use as necessary to protect and restore natural conditions. MA 1.13 in the current plan addresses this in Standard 2 (Plan at IV-7, -8).

We agree with the proposed management strategy for wilderness areas:

> Wilderness areas are managed for solitude; users are expected to be familiar with and
> use primitive skills in an environment that offers a high degree of risk and challenge.

PA at 23. However, the PA also proposes that in this MA, "[t]rail systems are maintained for user safety and comfort". Id. at 24. These two statements contradict. Some relocation or other management of trails may be needed to address potentially serious safety problems, but trails should generally not be managed for user comfort in wilderness.


We are pleased to see **Saguache Creek** listed as eligible for wild designation under the Wild and Scenic Rivers Act. PA at 24. It was found eligible in the current plan (see Plan at IV-8, Plan FEIS at 3-363), but was assigned to a scenic river-eligible MA on the Plan Management Area Map. Please be sure this river corridor is assigned to the wild-eligible MA (1.5) in the revised plan. The description of this MA should state that areas assigned to it are not suitable for timber production.

21

Why would areas assigned to **MA 3.4**, Designated and Eligible Scenic Rivers, be "part of the Suitable timber base"? Id. at 26. Under this MA,

> Scenic River landscapes are generally natural appearing. Vegetative composition and structure is influenced by biological processes and condition.

Ibid. Any logging, especially for the purpose of timber production, would be inconsistent with this desired condition.

Inclusion of scenic river corridors in the suitable base is especially odd, given that areas assigned to **MA 4.4**, Designated and Eligible Recreational Rivers, would be excluded from the suitable base. PA at 33. We believe strongly that neither scenic- or recreational-eligible rivers should be in the suitable timber base.

For **MA 3.1**, Special Interest Areas, the recreational opportunity spectrum should not always be semi-primitive motorized. These areas "typically contain unique botanical, geologic, historical, scenic, or cultural areas and values." PA at 25. Parts of most of these areas (e. g., those beyond basic access to the area) will need to be off-limits to motorized use to ensure these values are better protected from shooting and other vandalism. Similarly, livestock grazing, said to be an appropriate use (ibid.), may need to be limited or prohibited in some areas or parts of them to protect botanical values.

In **MA 3.4**, stipulations for oil and gas leases would be controlled surface use. PA at 26. But as with logging, oil and gas operations would be inconsistent with maintaining natural conditions, as the MA would require. It would be best to exclude MA 3.4 areas from oil and gas leasing to protect natural values. If leasing is allowed, stipulations must prohibit surface occupancy.

For **MA 3.5**, non-upper tier Colorado Roadless Areas, the PA, quoting from the Colorado Roadless Rule (CRR), lists the conditions under which logging could be approved. However, point 2, addressing cutting outside the community protection zone, omits the CRR's requirement that such "[p]rojects are expected to be infrequent". 36 CFR 292(c)(2)(ii).

**MA 5.13** states:

Rvsd Plan - 00002306

> Management actions ensure that sufficient <u>quality</u> habitat for wildlife dispersion exists between undeveloped areas of the forest.

PA at 30; emphasis added. The same statement is in **MA 5.11**, minus the word "quality". Ibid. 5.13 has a stronger emphasis on timber production than 5.11[9], so if retention of quality habitat is required for 5.13, it should also be required for MA 5.11.

Under **MA 5.42**, Special Wildlife Habitats – Bighorn Sheep, areas would be

> maintained for established herds and are characterized by rocky slopes, cliffs, and open grasslands with scattered stands of trees.

PA at 31. It is well known that domestic sheep can transmit diseases to bighorn sheep. Such diseases are often fatal to bighorn sheep. The threats to bighorns were summarized as follows in a study commissioned by the Forest Service:

> Threats to the long-term viability of bighorn sheep in Region 2 include diseases transmitted by domestic livestock, the lack of connectivity and/or loss of genetic variability (fitness) due to habitat fragmentation, habitat loss, increased human disturbance, competition with domestic livestock, and predation on small, isolated herds. The relative importance of these threats to the persistence of bighorn sheep in Region 2 varies from area to area. However, the risk of disease outbreaks resulting from contact with domestic sheep and goats is widely believed to be the most significant threat facing bighorns in Region 2 and elsewhere across their range. …
>
> Management and conservation efforts for bighorn sheep in Region 2 should focus on:
>
> 1) eliminating the potential for contact between bighorn sheep and domestic sheep and goats…

Beecham et al, 2007, at 4. This publication further notes that "disease is likely the factor that eventually results in the extirpation or extinction of many bighorn herds". Id. at 36. See also Forest Plan Monitoring and Evaluation Report, 2013, at 13, 46.

Of the four bighorn herds on the RGNF at the time Beecham et al's research was published, two of them had "chronic" or "extensive" exposure to domestic sheep, and one other was suspected

---

[9] MA 5.13 places "emphasis on the production of commercial wood products" (PA at 30), while 5.11 emphasizes multiple use "to achieve a variety of goals" (id. at 29).

Rvsd Plan - 00002307

of having such exposure. Id.at 49. The fourth herd known to reside on the RGNF also resides on the GMUG NF, where domestic sheep grazing has historically occurred, leading to a widespread die-off within this herd in 1988. Id at 53.

But even so, "[l]ivestock grazing [would be] appropriate and authorized" under MA 5.42. This is not acceptable. It puts bighorns at too much risk, a risk that is avoidable by not allowing grazing of domestic stock in bighorn sheep habitat. Habitat for bighorns is mainly steep, rocky areas that may not contain much forage for domestic stock, but even where it does, many areas are too rough and isolated for domestic stock to reach them.


IX. ADDRESS TRAVEL MANAGEMENT.  One of the most important and controversial aspects of national forest management is travel management. We recognize that the revised plan will not make decisions about which individual routes will be open to what uses and when. NOI at 62708. However, some forest-wide travel management issues should be addressed in the forest plan because the road system affects other forest resources, such as wildlife habitat effectiveness, watershed integrity, and recreation opportunity. If all decisions concerning the road system are made later, it might trigger the need for a major amendment to the forest plan and a supplemental EIS.

The revised plan must provide direction for achieving an ecologically and fiscally sustainable minimum road system, as required under the 2012 Planning Rule and subpart A of the Forest Service travel rules, 36 C.F.R. part 212. To address its unsustainable and deteriorating road system, the Forest Service promulgated the Roads Rule (referred to as "subpart A") in 2001. 36 C.F.R. §§ 212.1-212.21 (Administration of the Forest Transportation System), 66 Fed. Reg. 3206 (Jan. 12, 2001). This rule was amended by "Travel Management; Designated Routes and Areas for Motor Vehicle Use, Final Rule", 70 Fed Reg 68264 et seq., November 9, 2005.

Under the amended rule at 36 CFR 212.5b, the Forest Service "must identify the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands". At a minimum, Forest Plan designations, such as management area prescriptions and geographic area prescriptions (if used) should establish areas where routes will be generally open, open with specified restrictions, or closed to use by various classes of motor vehicle, including use allowed by season(s) for both on-snow and dry land use, consistent with laws and regulations, as well as desired conditions, and objectives for each respective area.

Detailed designations of areas and individual routes for the non-snow season (for snow season, see below) can be done later in a travel management plan. However, the system of roads with maintenance level 3 or higher should be identified at the Forest Planning stage. This will be necessary to do a proper analysis of wildlife habitat connectivity, as these roads are the ones with

Rvsd Plan - 00002308

the most traffic and the highest vehicle speeds, and thus the most likely to fragment wildlife habitat.

All of the acreage in the plan area should be determined to be suitable or unsuitable for motorized use, by type of motor vehicle(s), and season. The planning directives state that such an analysis should be done, "including [for] over the snow vehicles". See FSH 1909.12 section 23.23a 2d.  Undertaking a suitability analysis will set the stage for later detailed travel planning, where route designations are done, and ensure that motorized travel does not interfere with attaining desired conditions and objectives, especially for retaining ecological sustainability and integrity, and protecting at-risk species.

Over-snow vehicles. Designations for over-snow vehicles (OSVs) may need to be done with the Forest Plan or earlier to meet the mandate of the OSV Rule, issued January 28, 2015 (80 Fed Reg 4500 et seq.). While this rule, which amended the agency's Travel Management Rule (36 CFR 212), did not state a deadline for completion, it clearly requires designation of routes and areas open to OSVs.

Under the OSV Rule, the Forest Service must apply the minimization criteria at 36 CFR 212.81(d), 212.55. Note especially the "[s]pecific criteria for designation of trails and areas" at 212.55(b). This section requires the agency to ensure that the following are minimized:

> (1) Damage to soil, watershed, vegetation, and other forest resources;

> (2) Harassment of wildlife and significant disruption of wildlife habitats;

> (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands; and

> (4) Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands.

Minimum snow depth for operation of OSVs should be at least one foot of packed snow. This depth should be higher for areas with taller vegetation, like willows.

Designation of areas and routes open to OSVs must not result in increased snow compaction, as required by the Southern Rockies Lynx Amendment.[10] Therefore, if any new areas are designated for OSV use, some existing areas would have to be closed to such use.

---

[10] Human Use Guideline HU G 10 states:  "Designated over-the-snow routes or designated play areas should not expand outside baseline areas of consistent snow compaction, unless designation serves to consolidate use and improve lynx habitat." SRLA Record of Decision at Attachment 1-8.

Rvsd Plan - 00002309

Motor vehicle use should generally be prohibited in protected areas, other than for emergency search and rescue, and to maintain existing access to areas that analysis shows can withstand a high level of human use without damage to the values for which the respective area is designated. Failure to prohibit or sufficiently restrict motorized use in designated areas would likely result in damage to the important characteristics of the areas that make them worthy of protection and able ( with some areas) to contribute to the protection and enhancement of biological diversity.

Off-route motorized use for game retrieval. Use of motor vehicle off of designated routes for game retrieval should not be allowed, except vehicles can be allowed to park just off roads open to the type of motor vehicle being used. Use of ATVs off of designated routes during hunting seasons invites damage because, for big game rifle seasons at least, the ground is often wet from melting snow, thus motor vehicle use will create ruts. Use of ATVs in these conditions creates visible routes that are then noticed and used by other vehicle operators in other seasons. Areas damaged by motor vehicles do not recover easily because soils are often thin and growing seasons are short.

The 2013 Monitoring and Evaluation Report noted that impacts from ATV use have been observed but that such impacts could "not be specifically attributed to afternoon big game retrieval". Id. at 24. As long as off-route game retrieval is allowed, a high priority for monitoring recreational impacts needs to be checking on ATV use for game retrieval.

Please see our comments of April 15, 2016 at 14-15 and 24-30 for a detailed explanation of why the off-route motorized game retrieval policy should be rescinded. These comments are attached in an Appendix to these comments.

Bicycles.  The current plan has no direction on where and when bicycles can be used on the RGNF. Direction is needed to make regulation consistent with the GMUG NF and adjacent BLM land. Bikes should be limited to some existing routes. They should not be allowed on very steep or very narrow trails, nor on trails moderately or heavily used for hiking and/or horseback riding. Bikes must not be allowed to go cross-country, i. e, off of designated routes.


X. PROTECT WATERSHEDS

Under the Planning Rule, plans must, "[i]dentify watershed(s) that are a priority for maintenance or restoration". 219.7(f)(1). Furthermore, "[t]he Interdisciplinary Team should develop plan components to address conditions in priority watersheds".  FSH 1909.12, section 22.31.

Rvsd Plan - 00002310

The NOI stated that the PA would identify priority watersheds for maintenance and restoration (81 Fed. Reg. 62707). However, a list or assessment of priority watersheds is absent from the PA. It would have been very helpful to see the watersheds list or analysis at this stage in the planning process.

It is very important to have the plan components necessary to protect riparian areas, as required by the Planning Rule at 219.8(a)(3). The Forest Service's Watershed Conservation Practices Handbook (WCPH), FSH 2509.25, must be incorporated into the revised plan and each EIS alternative. The management practices therein must be forest-wide standards. This should meet at least some of the requirements of the Planning Rule for riparian areas.  (See 219.8(a)(3).) Additional standards and guidelines may be needed to fully protect riparian areas and wetlands, including fens. The latter are irreplaceable, so they deserve a high level of protection.

The Forest Service has federal reserved water rights for many streams on the RGNF. The EIS for the revision should analyze to what extent these rights will help maintain adequate streamflows to support ecological functions, including flushing flows, winter flows, and aquatic life. Given that the rights are likely junior on many streams, they may not provide much protection in an extended drought. In any case, other plan components will be necessary to ensure protection of watersheds.

Any watersheds in Class III, function impaired, should receive priority for treatment. But some watersheds in Class II, functioning at risk, may need action to prevent further deterioration.

See additional discussion in our Alternative, section VIII.


XI. PROVIDE ECOSYSTEM SERVICES AND ANALYZE IMPACTS ON THEM

Under the Planning Rule:

> (b) *Social and economic sustainability.* The plan must include plan components, including standards or guidelines, to guide the plan area's contribution to social and economic sustainability, taking into account: …

> (4) Ecosystem services…

219.8.

Ecosystem services provide many benefits, as summarized in Assessment 7. But also, as this assessment observes, "Because these benefits are often difficult to quantify, impacts on these

services can often be neglected during forest planning." Id. at 4. Therefore, it is important that the plan revision EIS thoroughly describe ecosystem services and evaluate how they could be affected by implementation of each EIS alternative.

Ecosystem services evaluated in the plan revision EIS should include, though obviously not be limited to, carbon sequestration, biological control, and soil formation.

We note that these ecosystem services can and should be assessed through the Forest Service's hard look at impacts and accounted for in the agency's identification and consideration of alternatives. See 40 C.F.R. §§ 1502.14, 1502.16, 1508.7, 1508.8. The 2012 Planning Rule takes an integrated and holistic approach that recognizes the interdependence of ecological processes with social and economic systems.

To properly assess this integrated and holistic approach, we recommend that the RGNF use a Total Economic Valuation framework (Peterson and Sorg 1987) to prepare any benefit-cost analysis for the Forest Plan revision and the various project-level activities and authorizations existing and contemplated on the RGNF.[11]

Use of Total Economic Valuation is consistent with the 2012 Planning Rule's mandates providing for assessment and protection of ecosystem services (see, e.g., 36 C.F.R. §§ 219.1(c), 219.6(b)(7), 219.8(b)(4), 219.10(a), 219.19). Furthermore, the White House Office of Management and Budget, Council on Environmental Quality, and Office of Science and Technology Policy released a memorandum, M-16-01, on October 7, 2015 directing federal agencies to incorporate ecosystem services into their decision-making, including through "monetization" and "ecosystem-services assessment methods" where "an agency's analysis require consideration of costs." M-16-01 at 2.

Total Economic Valuation recognizes that the public goods and services produced by public lands, including the RGNF, have characteristics that are not necessarily profitable if exploited by private enterprise. The aesthetic value of a viewshed, for example, is difficult to divide up and sell to individual consumers. It is also difficult to exclude "free riders" that enjoy the scenic beauty but are unwilling to pay for it. In these situations, private firms have little economic incentive to produce viewsheds and market forces fail to produce an adequate supply, despite the fact that additional, protected viewsheds may be economically rational and socially desirable.

Without adequate protection of public goods and services, society as a whole is less wealthy, and many of us as individuals are worse off (Peterson and Sorg, 1987, Morton 1999).

---

[11] Our comments regarding Total Economic Valuation are liberally appropriated—in certain instances, virtually word-for-word, from the excellent June 2015 comments submitted by the Conservation Economics Institute to the U.S. Bureau of Land Management regarding proposed oil and gas rules. See http://www.conservationecon.org/#!og/kl7ht

Rvsd Plan - 00002312

While the value of rival and excludable commodities, such as fossil fuels, livestock grazing, or other commercial activities, can be measured with market data, there are externalities (negative public goods, or public "bads") that often result from these activities (such as water quality degradation) that are not traded in markets and whose values are not reflected in market prices. Exclusive reliance on measures of value based on the market prices of commodities is thus incomplete. Put simply, the value of non-market public goods and services produced by public lands, including the RGNF, are not reflected in market transactions and therefore lack prices. The fact that non-market goods are not priced does not mean they have no value, only that market indicators of the value do not exist. Economists have developed methods for estimating non-market values when consumers are unable to express their preferences and willingness-to-pay via the marketplace.

Non-market values are estimated by economists using two main methods: (1) stated preference; and (2) and revealed preference. Stated preference relies on surveys that ask respondents to state their maximum willingness to pay for a non-market good or to choose from among a set of nonmarket goods with varying attributes and price levels. Revealed preference methods derive the value of non-market goods through actual behavior, including expenditures on travel and medical care, property values, and wage rates. Stated preference methods are the only way to estimate passive-use benefits (e.g. option, bequest, and existence values). Several choice experiment applications have examined passive use values from the management of public land. Garber-Yonts, et al. studied the preferences of Oregonians regarding the management of Oregon's Coast Range, including large acreage of BLM land. Adomowicz, et al. (1998) and Boxall and Macnab (2000) studied stakeholders' preferences regarding industrial forest management and other use and passive use values. Both studies find evidence of high valuations for passive-use values.

To complete a reasoned and informed benefits-cost analysis, we therefore recommend that the RGNF, using Total Economic Valuation, fully assess the non-market benefits and costs associated with the Forest Plan revision and the various project-level activities and authorizations existing and contemplated on the RGNF. As Field and Field (2009) point out, "[b]enefit-cost analysis is for the public sector what a profit-and-loss analysis is for a business firm" (p. 118). Economic efficiency takes the perspective of all of society, and examines all the costs and benefits associated with development and resource extraction on the RGNF, including non-market values.

The RGNF socio-economic analysis should, as part of using a total economic valuation framework, specifically assess the social cost of carbon to assess the RGNF's existing carbon sequestration value and the predicted or foreseeable net changes to the RGNF's carbon

29

Rvsd Plan - 00002313

sequestration capacity as a result of the cumulative impact of climate change and the specific project-level activities that would flow from the Forest Plan.

Executive Order 12,866 already directs federal agencies to assess and quantify carbon costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others. See Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).[12] Moreover, independent of Executive Order 12866, the Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal cost-benefit analyses:

> [T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.

*Ctr. for Biological Diversity v. Natl. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dep't of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose project's indirect carbon dioxide emissions violates NEPA).

To implement Executive Order 12,866, an Interagency Working Group ("IWG") was formed to develop a consistent and defensible estimate of the Social Cost of Carbon—allowing agencies to "incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions."[13] Using Social Cost of Carbon, put simply, measures the benefit of reducing greenhouse gas emissions now and avoiding costs in the future.[14] The charts below depict, (A) dramatically increasing damages from global warming over time, as well as (B) the social cost of these carbon emissions based on 2013 TDS values.[15]

---

[12] See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).

[13] See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD).

[14] See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011).

[15] See Richard Revesz, et al., Global warming: Improve economic models of climate change, NATURE 508, 173-175 (April 10, 2014).

Rvsd Plan - 00002314



**CARBON'S COSTLY LEGACY**

Economic models of climate change project that resulting damage worldwide (**A**) will increase with future emissions and may cost several per cent of global gross domestic product (GDP) with the warming expected by 2100. Uncertainties in future socio-economics, emission rates and climate impacts result in a range of estimates of the social cost of carbon, which is also affected by the choice of 'discount rate' used to convert future harms into today's money (**B**).

The importance of assessing the Social Cost of Carbon is obvious. Leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions.[16] The interagency process to develop social costs of carbon estimates—originally described in the 2010 interagency Technical Support Document ("TSD"), and updated in 2013—developed four values based on the average SCC from three integrated assessment models (DICE, PAGE, and FUND), at discount rates of 2.5, 3, and 5 percent,[17] as well as a fourth value demonstrating the cost of worst-case impacts.[18] These models are intended to quantify damages, including health impacts, economic dislocation, agricultural changes, and other effects that climate change can impose on humanity. While these values are inherently speculative, a recent GAO report has confirmed the soundness of the methodology in which the IWG's carbon costs estimates were developed, therefore underscoring the importance of integrating this analysis into the agency's decision-making process, even if the authority to do so is grounded in other duties, such as the National Forest Management Act and

---

[16] See Nature 508 at 174.

[17] The choice of which discount rate to apply—translating future costs into current dollars—is critical in calculating the social cost of carbon. The higher the discount rate, the less significant future costs become, which shifts a greater burden to future generations based on the notion that the world will be better able to make climate investments in the future. The underlying assumption of applying a higher discount rate is that the economy is continually growing. The IWG's "central value" of three percent is consistent with this school of thought—that successive generations will be increasingly wealthy and more able to carry the financial burden of climate impacts. "The difficulty with this argument is that, as climate change science becomes increasingly concerning, it becomes a weaker bet that future generations will be better off. If they are not, lower or negative discount rates are justified." WRI Report, at 9. "Three percent values an environmental cost or benefit occurring 25 years in the future at about half as much as the same benefit today." Id.

[18] See 2013 TSD at 2.

31

NEPA.[19] In fact, certain types of damages remain either unaccounted for or poorly quantified in IWG's estimates, suggesting that the social cost of carbon values are conservative and should be viewed as a lower bound, in particular given the RGNF's expansive mandates pursuant to the National Forest Management Act and NEPA.[20]

The updated interagency Social Cost of Carbon estimates for 2020 are $12, $43, $65 and $129 (in 2007 dollars).[21] The IWG does not instruct federal agencies to use a particular discount rate, suggesting the 3 percent discount rate ($43 per ton of CO2) as the "central value," but further emphasizing "the importance and value of including all four [social cost of carbon] values."[22] Use of all four values is, of course, consistent with the RGNF's broad responsibilities, pursuant to, e.g., NEPA, to take a hard look at impacts.

The Council on Environmental Quality has also recognized the social cost of carbon as a "harmonized, interagency metric that can provide decisionmakers and the public with some context for meaningful NEPA review." 79 Fed. Reg. 77802, 77827 (Dec. 24, 2014). The SCC provides an important tool for establishing the dollar value of future climate impacts and its use should catalyze agency action to reduce climate pollution and avoid or mitigate climate costs. The social cost of carbon, properly harnessed to the NEPA process, thus advances the Council on Environmental Quality's admonitions against "boilerplate" by providing an easily understood metric to "to foster excellent action" and to "take actions that protect, restore, and enhance the environment. 40 C.F.R. § 1500.1(c); 77 Fed. Reg. 77802, 77824. Furthermore, by providing a quantitative, monetized estimate of the actual costs—i.e., impacts—of the RGNF Forest Plan revision as implemented through proposed actions and alternatives, social cost of carbon analysis helps puts to rest the notion that agencies need not act to reduce climate pollution or to ameliorate climate change impacts because their actions "represent only a small fraction of global emissions…." (77 Fed. Reg. 77802, 77825).

We recommend the RGNF use the Social Cost of Carbon as follows.

First, the RGNF should ensure that the Social Cost of Carbon is applied to all greenhouse gas (GHG) pollutants, not just carbon dioxide. This can be done, simply, by multiplying the social

---

[19] GAO-14-663, Social Cost of Carbon (July 24, 2014).
[20] See Peter Howard, et al., Omitted Damages: What's Missing From the Social Cost of Carbon, Environmental Defense Fund, Institute For Policy Integrity, Natural Resources Defense Council (March 13, 2014), (providing, for example, that damages such as "increases in forced migration, social and political conflict, and violence; weather variability and extreme weather events; and declining growth rates" are either missing or poorly quantified in carbon cost models)
[21] See 2013 TSD at 3 (including a table of revised SCC estimates from 2010-2050). To put these figures in perspective, in 2009 the British government used a range of $41-$124 per ton of CO2, with a central value of $85 (during the same period, the 2010 TSD used a central value of $21). WRI Report at 4. The UK analysis used very different assumptions on damages, including a much lower discount rate of 1.4%. The central value supports regulation four times a stringent as the U.S. central value. Id.
[22] See 2013 TSD at 12.

Rvsd Plan - 00002316

cost of carbon by the global warming potential of the particular GHG. This analysis should, notably, account for the differing warming potentials of certain GHGs, such as methane, over differing time frames (in particular 100- and 20-year time frames). For example, the Intergovernmental Panel on Climate Change, in its *Fifth Assessment Report*, states that methane is 34 times more potent than CO2 over a 100-year time frame and upwards of 86 times more potent than CO2 over a 20-year time frame (accounting for climate-carbon feedbacks).[23]

Second, the RGNF should explicitly recognize that the social cost of carbon —and, more broadly, Total Economic Valuation—is a tool to quantify the climate impacts of a proposed action and to compare alternatives, and thus has far broader relevance to the NEPA process then just cost-benefit analysis. Indeed, in some instances, the social cost of carbon/total economic valuation analysis may be the best way to take a hard look at climate impacts to comply with 40 C.F.R. § 1502.22, depending on the availability of other tools to understand climate pollution and climate change impacts.[24] We emphasize this point because NEPA analyses often rely heavily on quantification of GHG pollution as a proxy for understanding climate impacts. However, using GHG pollution levels as a proxy for impacts has limited utility value, especially as compared to a social cost of carbon analysis. Unlike GHG pollution levels, the social cost of carbon offers a simple, straightforward, and easily understood metric to understand cumulative impacts and, specifically, the present dollar value of the incremental impact of GHG pollution increases caused cumulatively by a proposed action. 40 C.F.R. § 1508.7. Use of the social cost of carbon—rather than just quantification of climate pollution levels—can therefore help better inform the design, consideration, and selection of alternatives (including the no action alternative) and mitigation measures, "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

Third, the RGNF should recognize that uncertainties pertaining to the social cost of carbon do not cut both ways and certainly do not warrant exclusion of SCC from NEPA analyses. In fact, any uncertainties warrant recognition that the social cost of carbon underestimates—perhaps significantly—the climate impacts of GHG pollution. As the U.S. Environmental Protection Agency has concluded:

> given current modeling and data limitations, [the federal SCC values] do[] not include all important damages. As noted by the IPCC Fourth Assessment Report, it is "very likely that [SCC] underestimates" the damages. The models used to develop SCC estimates, known as integrated assessment models, do not currently include all of the important physical, ecological, and economic impacts of climate change recognized in the climate change literature because of a lack of precise information

---

[23] IPCC Fifth Assessment Report, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (accepted September 26, 2013).

[24] IPCC Fifth Assessment Report, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (accepted September 26, 2013).

Rvsd Plan - 00002317

on the nature of damages and because the science incorporated into these models naturally lags behind the most recent research. [25]

We therefore support the revised draft guidance's statement that social cost of carbon estimates "are intended to be updated as scientific and economic understanding improves" (77 Fed. Reg. 77802, 77827), but ask the RGNF to treat SCC values as a lower bound to a project's impacts of climate change and to account for peer-reviewed scientific and economic literature pointing to far higher SCC values. [26]

Fourth, the RGNF should explain that the express purpose of assessing the Social Cost of Carbon is to provide an apples-to-apples basis for comparing a project's economic benefits with climate pollution impacts (costs). Where the Social Cost of Carbon is not assessed, these impacts (costs) are hidden from the public and, reflecting our comments regarding the broader use of Total Economic Valuation, in fact "paid for" by the broader environment and public in the form of degraded ecological resiliency, public health impacts, and more. Comparing the dollar benefits estimated to be produced by a proposed action to the dollar costs expected to be imposed by the project is a wholly defensible and necessary exercise. A dollar of income or tax revenue in the short term in the project area is no more important than, and could be negated by, the costs imposed by flooding in a coastal area, wildfire consuming a drought-stricken area, or people stricken by tropical diseases elsewhere in the country and experienced in the future—impacts that the current science says are highly likely.

Of course, the RGNF may consider both quantitative and qualitative factors in selecting an alternative. Large, significant industrial operations, for example, should not be authorized simply because their monetized benefit exceeds their monetized cost. For, taken to its logical conclusion, it would mean that the largest operations could, for example, effectively always be justified so long as they reap significant economic benefits that exceed the economic costs to the relatively poor or powerless. See Exec. Or. 12,898 (Feb. 16, 1994). By completing a social cost of carbon analysis, agencies should still consider qualitative factors, like environmental justice, to protect against inequities and to comply with conservation mandates.

Regardless, the social cost of carbon provides a quantitative basis for gauging, in conjunction with qualitative factors, whether a Federal agency—representing the broad public interest rather than the narrow and insular interest of a project proponent—should or should not approve a project or impose conditions to mitigate harm.

---

[25] EPA, The Social Cost of Carbon, http://www.epa.gov/climatechange/EPAactivities/economics/scc.html
[26] Moore, Frances C. and Diaz, Delavane B., Temperature Impacts on Economic Growth Warrant Stringent Mitigation Policy, Nature Climate Change 5, 127–131 (2015)
(http://www.nature.com/nclimate/journal/v5/n2/full/nclimate2481.html)

Rvsd Plan - 00002318

It is notable that the Social Cost of Carbon is already being taken into account (if imperfectly) by federal agencies and that its use has been upheld by the federal courts. In both Idaho and Montana, the BLM has prepared Social Cost of Carbon estimates in conjunction with the leasing of oil and gas.[27] The U.S. District Court for the District of Colorado also found Social Cost of Carbon analysis appropriate, and chided both the U.S. Forest Service and BLM for rejecting its use. See *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp.3d 1174 (2014). With the use of the social cost of carbon becoming a more common practice, the RGNF should prepare a social cost of carbon analysis as a component of its Total Economic Valuation benefits-costs analysis as an appropriate and useful means of analyzing and assessing climate impacts under NEPA.

Fundamentally, use of a Total Economic Valuation framework—inclusive of the social cost of carbon —will help the RGNF internalize non-market benefits and costs,and thereby improve any socio-economic analysis prepared for the RGNF Forest Plan revision. For more information on benefit-cost analysis we recommend a couple of references:  Chapter 6 in Field and Field (2009) lays out the various types of analyses very clearly; EPA, "Guidelines for Preparing Economic Analyses" (U.S. EPA 2000) is also a good reference and serves as a standard reference for the many benefit-costs analyses conducted by EPA and required by the Office of Management and Budget. Fundamentally, Total Economic Valuation of benefits-costs will provide a basis for reasoned, informed, and efficient planning, management, and decision-making to "provide for social, economic, and ecological sustainability." 36 C.F.R. § 219.8.

See section XIX below for further discussion on addressing the impacts of climate change.

XII. UPDATE THE AVAILABILITY OF OIL AND GAS LEASING. The world of oil and gas operations on national forest lands, has changed considerably since the previous plan was approved.   First and foremost is the widespread application of hydraulic fracturing, or "fracking", and horizontal drilling, making it possible to produce oil and natural gas in areas where it is not possible to do so using conventional drilling techniques. Also, protection of roadless areas has been formalized with the Colorado Roadless Rule (CRR), limiting where and how oil and gas-related activity can occur.

As part of the plan revision, the Rio Grande NF must conduct the leasing analysis required by 36 CFR 228.102(c) and (d). This analysis requires a determination of which lands:  are open to

---

[27]  See e.g. BLM, Little Willow Creek Environmental Assessment, DOI-BLM-ID-B010-2014-0036-EA at p. 81-83 (Feb. 10, 2015) (https://www.blm.gov/epl-front-office/projects/nepa/39064/55133/59825/DOI-BLM-ID-B010-2014-0036-EA_UPDATED_02272015.pdf) and BLM, Environmental Assessment for October 21, 2014 Oil and Gas lease Sale, DOI-BLM-MT-0010-2014-0011-EA (May 19, 2014) at 76, http://www.blm.gov/style/medialib/blm/mt/blm_programs/energy/oil_and_gas/leasing/lease_sales/2014/oct__21_2014/july23posting.Par.25990.File.dat/MCFO%20EA%20October%202014%20Sale_Post%20with%20Sale%20(1).pdf.

Rvsd Plan - 00002319

leasing with standard lease terms, open to leasing with additional stipulations, or administratively closed to leasing.

It is important that the leasing analysis and decisions about lands available for leasing be conducted with the forest plan because impacts from oil-gas exploration and development may overlap with, or increase the intensity of, impacts from other management activities. It is highly likely that oil and gas activities on national forest land would affect: air quality, wildlife habitat fragmentation and connectivity, soils, water quality, scenery, and recreation opportunity. Thus disclosure of impacts from implementation of a forest plan would be incomplete without an analysis of impacts from oil and gas operations. Analyzing oil and gas activities separately would be treating them as an activity that operates in isolation from other management.

Lands available for leasing should generally be limited to those areas with at least moderate potential for oil and gas.

If the plan makes decisions about leasing specific lands under 36 CFR 228.102(e), then site-specific NEPA analysis must be done. It would be better to do such analyses and decisions separate from the plan, since the plan is a broad-scale document that sets the stage for specific projects to be later approved after proper consideration of NEPA and any other required documentation.

The analysis of leasing must include description of the reasonably foreseeable development (RFD) scenario, as required by 36 CFR 228.102(c)(3). This RFD becomes the basis for the required analysis of impacts of post-leasing oil-gas activity. Id. at 102(c)(4). Given the now-widespread application of fracking and horizontal drilling, the Forest Service should at a minimum develop a new RFD.

All protected areas must be discretionary no lease (DNL), or if leasing them is allowed, require no surface occupancy (NSO) stipulations for all leases. Note that under the Colorado Roadless Rule (CRR), NSO stipulations are required for leases issued after July 3, 2012 (the effective date of the CRR) in upper tier Colorado Roadless Areas (CRAs). CRR at 36 CFR 294.46(c). Waivers, exceptions, and modifications (WEMs) are not allowed if surface occupancy would result. Ibid. For non-upper tier CRAs, road construction and reconstruction are prohibited for these leases. 294.46(b). WEMs of these lease stipulations for any leases in CRAs (even those issued before July 3, 2012) are prohibited if road construction or reconstruction could result. Ibid. To ensure consistency and protection of valuable ecological resources, we strongly recommend that all roadless areas either be DNL or have NSO stipulations that are not subject to WEMs.

Wild river segments are withdrawn from mineral entry. 16 U. S. C. 1280(a)(iii). Therefore, such segments, and any segments recommended for such designation, cannot be leased. Any segments

36

found eligible for designation under any classification (wild, scenic, recreational) under the Wild and Scenic Rivers Act must be DNL.

All of the following areas should be DNL, or if any are leased, NSO stipulations with no WEMs allowed must be applied: all alpine areas, riparian areas, wetlands, priority watersheds and watersheds where function is impaired[28], campgrounds, picnic grounds, trailheads, big game winter range, deer and elk calving/fawning grounds, bighorn sheep lambing grounds, and areas immediately adjacent to private lands with residences.

All leases must include plans for reclaiming the site(s) used, including not only the well pad, but any access roads and pipelines.

Now is also a good time to do the leasing availability analysis because prices for oil and gas are low, and there is little industry interest. Thus there is no pressure on the RGNF to open large areas of the Forest to leasing. If, on the other hand, the leasing availability analysis is delayed until a time when prices are higher and industry interest increases considerably, there would be pressure on the RGNF to allow leasing in many areas, including some where leasing should not be allowed.

The following areas should not be available for leasing: all roadless areas, especially upper tier ones; alpine areas; designated and proposed special areas, including research natural areas; eligible and designated wild river corridors; wetlands; priority watersheds; developed recreation sites, including trailheads; big game winter range; deer and elk calving/fawning grounds; bighorn sheep lambing grounds; lynx linkage areas; and any designated critical habitat for ESA-listed species (either currently designated critical habitat or any that is designated during the life of the revised plan).

## XIII. TIMBER MANAGEMENT

The RGNF should not encourage development of a large wood products industry. Such an industry could demand too much wood, push for extensive permanent and temporary road construction, and not be sustainable, given the need to retain live and dead trees for wildlife habitat and other ecological purposes. Lynx habitat would especially be at risk with a high-volume timber program. Notably, preliminary results from ongoing studies show that lynx are using areas with considerable amounts of dead and/or dying spruce. See The Wildlife society on-line newsletter, Feb. 2, 2016, available at:

---

[28] The planning Rule requires plans to "[i]dentify watershed(s) that are a priority for maintenance or restoration". 36 CFR 219.7(f)(1)(i). Plans "should [have] plan components to address conditions in priority watersheds". FSH 1909.12, section 22.31.

Rvsd Plan - 00002321

http://wildlife.org/canada-lynx-persist-in-spruce-beetle-impacted-forests-research-shows/
Accessed October 10, 2016.

By the time any Englemann spruce timber is cut under the revised plan, the trees eight inches or so and greater in diameter will have been dead for about 8 to 15 years. Though dead spruce that were sound (i. e., free of rot) when attacked by beetles can remain standing for several decades, the wood will have deteriorated because of weather checking and splitting. Insects may further decay the standing dead trees. Thus it is questionable that any of the dead spruce would be suitable for sawtimber, especially dimension lumber.[29] It may still be useful for biomass and house logs, but the former is not economic (see Alternative section IX), and there is little market for the latter.

All roadless areas, ESA-listed species' designated critical habitat, and designated (special) areas should be unsuitable for timber production. The following areas should also be unsuitable: areas over 35 percent slope, slopes with high ratings for soil erosion or slope failure, forested wetlands, and land within 100 feet of streams and other water bodies.

Stands containing dead or dying Englemann spruce do not necessarily need to be treated. Dead spruce, if free of rot when attacked by beetles, may remain standing for decades. The dead trees provide some hiding cover for various species and "other" habitat for lynx. They will also provide lynx denning habitat after falling to the ground in the future. Fallen trees will as they slowly return to the soil and reduce soil erosion. In other words, the dead spruce provides a considerable ecological benefit. This benefit would be lost with widespread salvage logging. Such treatment would also damage and destroy understories of young spruce and fir, delaying or prohibiting recovery of stands to a forested condition, or require expensive planting, with success uncertain.

While there will not be a shortage of snags and future down dead trees, there needs to be a forest-wide standard to ensure that they remain well-distributed. Salvage logging will remove many snags and possibly some existing down logs from each treatment area, but some of both should be retained in each salvage project. Snags should be left in groups, with some live trees if possible. Soft snags, i. e., those with some signs of internal rot, should receive priority for retention, as such snags will be the best for cavity-nesting species of wildlife to excavate into nests.

Similarly, a forest-wide standard must ensure retention of sufficient down-dead material. The largest sizes available should be retained, and the down dead material must be well distributed. Brown et al, 2003 stated that "10 to 30 tons per acre" of coarse woody debris (three-inch

---

[29] The PA at 16 states that "After 10 years, the dead spruce likely would no longer be viable as a commercial sawtimber…".

diameter and up) was desirable "for cool Douglas-fir and lodgepole pine types and lower subalpine fir types", provided small woody debris (less than three inches in diameter) was no more than 5 tons per acre.

Cutting of dead and dying spruce should be mainly limited to areas where dead trees could pose a hazard to public safety, such as in areas near infrastructure and adjacent to private land where the landowners are creating defensible space on their lands.

Old trees of all species, including subalpine fir, should generally be retained. With the death of almost the entire Englemann spruce overstory across the RGNF, the landscape is short of older trees and late successional habitat compared to historical conditions. See Assessment 1 and 3 Terrestrial at 35. The existing older trees will be needed to replace spruce snags, as the beetle-killed spruce fall to the ground over the next 75 years.

There is no need to cut aspen. There is currently little or no commercial wood product use for this species. Due to a large number of natural and human-caused disturbances in the late 19th century and early 20th century, aspen may have been at an historic high in the early to mid-1900s. See current Forest Plan FEIS at 3-167. The loss of spruce overstory due to bark beetle mortality will create areas for aspen to expand, as noted in Assessment 1 and 2 Terrestrial, p. 9.

Clearcutting should not be done in shade-tolerant species because reforestation is difficult. Clearcuts, if done in stands of any species, should be small (no more than a few acres) to avoid creating large open areas and fragmenting wildlife habitat.

See section IX of our Alternative for additional discussion on timber management.


XIV. LIVESTOCK GRAZING

See section XI of our Alternative for a more detailed discussion. The Forest Service should not restock currently vacant allotments and ones that become vacant. The land in these allotments should be restored to natural ecological conditions.


XV. CONTROL INVASIVE SPECIES

Proliferation of non-native plant species has become a serious issue on public lands in the western United States. The revised plan should have desired conditions, objectives, standards, and guidelines to combat this large and ever-growing threat to ecological integrity. Plan components should address priorities for weed treatment, as well as potential treatment methods.

Rvsd Plan - 00002323

See Alternative section XV for more details.

## XVI. FIRE

Please see section X of Our Alternative. In general, the revised plan should encourage restoration of fire where safe and appropriate, via prescribed fire and fire use (formerly known as prescribed natural fire). It is most important to restore fire in the lower elevation ecosystems, below 9000 feet or so, as these areas have likely seen the most impact from human fire suppression.

The fire management zones proposed in the PA (p. 15) are similar to what we propose in our Alternative. However, the PA states that these zones "are not a mapped feature". Ibid. If so, then how could the zones "support[] decision makers before ignition occurs, by pre-assessing areas for wildland fire (prescribed fire and wildfire) risks and benefits"? If decision makers do not know where the zones are, they cannot make informed decisions about how to manage fire anywhere in the respective zones.

We encourage the RGNF to use fire zones in the revised plan, but they need to be mapped and displayed for each alternative in the revision EIS. That way, both the public and the agency decision makers will be informed about how fires would be managed.

## XVII. ANALYZE THE SUITABILITY OF LANDS FOR RENEWABLE ENERGY DEVELOPMENT

Establishment of renewable energy, such as wind, solar, and geothermal, is becoming quite popular as way of supplying energy without relying on fossil fuels. It is reasonable to expect that there may be some requests for permits to locate renewable energy facilities on the RGNF over the life of the forthcoming revised forest plan. But as noted at p. 4 of Assessment 10, Energy and Minerals, the current plan does not address the issue of determining what portions of the RGNF might be suitable for renewable energy development. Therefore, the revised plan must make this determination.

The installation of solar and wind facilities is a permanent and overriding use of the land, meaning the areas on which these facilities are installed will not be available for most, if any, other uses. Therefore, suitability decisions must be made carefully, and only after consideration of all the potential impacts.

Rvsd Plan - 00002324

**Wind turbines** are known to cause significant mortality of avian and bat species. See e. g., RESOLVE, 2004; Loss et al, 2014; Cryan et al, 2014. Therefore, no land should be determined suitable for wind energy development unless it can be demonstrated that the installation and use of such facilities is not likely to cause more than minor mortality of bird and bats. Stipulations likely to be effective in keeping mortality and injury to a minimum must be required.

Generally, the taller the turbines, the greater the risk of collisions and death. Also, siting in canyons and on ridges where birds and bats are more likely to migrate, increases the risk of mortality.

Before any permits for wind energy are approved, proponents must agree to: monitor use, injuries, and deaths of birds and bats; regularly report all injury and mortality; and make their facilities available for research into bird and bat injuries and deaths and means to reduce such injuries and mortality. These conditions must be non-waivable stipulations on all wind energy development facility permits. Permit conditions may also need to include provisions to deter small mammals like rabbits, pocket gophers, and voles from inhabiting permitted areas, as such species are prey for raptors and can thus attract raptors to sites where they can be injured or killed.

Strict monitoring and mitigation will be necessary to ensure that the RGNF complies with the Migratory Bird Treaty Act (16 U.S.C 703-712), the Bald and Golden Eagle Protection Act (16 U.S.C. 668-668d), and the Endangered Species Act (16 U.S.C. 1531 et seq.).

Similarly, **solar facilities** can be death traps for avian and bat species. They, or the insects they consume, are sometimes attracted by the bright light, or the birds and bats mistake a reflective solar facility for a water body. This is especially true for solar thermal facilities, where solar light is concentrated to heat water and produce steam that turns a turbine to produce electricity. Birds and bats flying into these facilities can be instantly burned to death, as has been repeatedly documented at facilities in California. See: Avian Mortality at Solar Energy Facilities in Southern California: A preliminary analysis, available at: http://www.kcet.org/news/redefine/rewire/Avian-mortality%20Report%20FINALclean.pdf, accessed September 27, 2016.

See also a 2014 report in Scientific American magazine, available at: http://www.scientificamerican.com/article/solar-farms-threaten-birds/, accessed September 27, 2016.

This report cites the following mitigation measures as ways to reduce bird and bat deaths:

clearing vegetation around solar towers to make the area less attractive to birds, retrofitting panels and mirrors with designs that help birds realize the solar arrays are not water, suspending operations at key migration times, and preventing birds and bats from roosting and perching at the facilities.

However, the ultimate effectiveness of these measures is uncertain, and research continues. The unwaivable stipulations listed above for wind energy facilities should also be applied to solar facilities.

**Geothermal facilities** must not disrupt stream functions. Though they usually use groundwater, such facilities could affect the flow of streams if the groundwater is tributary to the stream.

The following areas must not be suitable for renewable energy development: all protected areas and those proposed for any protective designation, big game winter range, calving and fawning grounds, bighorn sheep lambing grounds, wetlands, riparian areas, wetlands campgrounds, trailheads, and alpine areas.

XVIII. MONITORING

Under the 2012 Planning Rule, national forest planning is clearly intended to be adaptive. See 36 CFR 219.2(b). Monitoring is a key component of this adaptive management process, as without it, changing conditions would not be identified and the effectiveness of plan components in mitigating impacts from plan implementation could not be assessed. As a result, changes in any plan to reflect changed conditions or new information would seldom if ever be done, and adaptive management would not be possible.

Specifically, the Planning Rule states:

> Monitoring information should enable the responsible official to determine if a change in plan components or other plan content that guide management of resources on the plan area may be needed.

36 CFR 219.12(a)

Under the Planning Rule, each plan must have a monitoring program that has "plan monitoring questions and associated indicators". 36 CFR 219.12(a)(2). Indicators are the means of "testing relevant assumptions and measuring management effectiveness and progress toward achieving or maintaining the plan's desired conditions or objectives". 219.12(a)(2).

Rvsd Plan - 00002326

As part of the indicator(s) for each monitoring question, there must be **triggers** for what result would identify a need for further evaluation, or in some cases, even an immediate change in management. Without triggers, monitoring might become just a collection of data, with no application toward identifying a possible need to change management. In other words, adaptive management would be thwarted.

<u>Focal species</u>. Each monitoring plan must have questions and indictors that address "[t]he status of focal species to assess the ecological conditions required under § 219.9." 219.12(a)(5)(iii). See our Alternative, section XVI, for a list of recommended focal species.

Whether or not they are officially designated as focal species, some monitoring of at-risk species should be done. This includes threatened, endangered, proposed, and candidate species, and species of conservation concern. Without such monitoring, there is no way to determine whether plan components are effective in meeting the Planning Rule requirement to:

> contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area.

36 CFR 219.9(b).

Given the importance of monitoring to the land management planning process, it is critically important that the Rio Grande have money available for this activity as part of each annual budget, or under a longer-term appropriation. If money is not available for monitoring, major projects should not be implemented. Generally, information from projects should be regularly gathered and used for the forest monitoring program.

Broad scale monitoring. The Planning Rule requires the Regional Forester to develop a broad-scale monitoring program "for plan monitoring questions that can best be answered at a geographic scale broader than one plan area". 219.12(b). We recommend that this be developed concurrently with the monitoring program for the RGNF. Per 219.12(b)(2) and (c)(2), the Regional Office should work with the RGNF and the GMUG, San Juan, Pike-San Isabel, and Carson National Forests; the Colorado Department of Natural Resources; and the BLM's San Luis Valley Field Office to develop a broader-scale monitoring strategy "as soon as practicable".

Items of broader-scale monitoring must include, though not be limited to, the movement of wildlife species such as lynx, deer, elk, moose, and bighorn sheep.

## XIX. ANALYZE IMPACTS OF CLIMATE CHANGE

There is no question that the earth is warming. Given the continued emissions of greenhouse gases (especially methane and carbon dioxide) mainly from human actions, continued warming is likely. The revised plan must reflect this by providing for resiliency, or the ability of ecosystems on the RGNF to maintain their functioning in the face of a warming climate. Consistent with laws, regulations, and protection of resources, the RGNF should be managed to retain carbon stocks and possibly increase carbon storage. However, any efforts to increase future carbon storage should not be done by methods that decrease current carbon storage.

Plan components for addressing and adapting to climate change will be necessary to ensure that the revised plan complies with the following from the Plan Rule:

> *Ecological sustainability.* (1) *Ecosystem Integrity.* The plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area,…

219.8(a).

Without mitigation measures, a national forest that is affected by runaway climate change is not ecologically sustainable. It is likely not socially or economically sustainable, either.

All of the RGNF will be affected by climate change, but lower elevation ecosystems and habitats are the most likely to be adversely affected by a warming climate. They could experience anything from floods to extended droughts at various future times. Generally, lower elevation habitat is likely to decrease in quality for some species due to warmer temperatures. Thus there will be a tendency for some species to move higher in elevation over time.

Therefore, it is very important to ensure connectivity of habitat from lower to higher elevations. This includes providing conditions that encourage connectivity from non-public lands adjacent to the RGNF (which are often at lower elevation) to areas on the Forest. It is also important to protect wildlife habitat with designated areas. These areas should encompass the full elevational range of the RGNF, but most of the currently designated area acreage is in the higher elevations. See Assessment 15. Thus areas with high ecological integrity below 10,000 feet elevation or so must be retained. Commercial activities should be minimized in these areas, with protection provided by special area designation or appropriately restrictive standards and guidelines, both forest-wide and those that are part of management areas.

The planning team should place special emphasis on the protection and restoration of water resources. Rivers, streams, wetlands and other waters originating on the Rio Grande National Forest function as essential ecological elements in the broader landscape. Emphasizing

Rvsd Plan - 00002328

protection and restoration of these water resources can improve resiliency and thereby have significant positive impacts on social, economic, and ecological sustainability across the RGNF.

The revised plan should have provisions to minimize release of greenhouse gases from activities on the RGNF. Any oil and gas leases should have strict, non-waivable stipulations requiring installation of the best available control technology for reducing leaks of gases such as methane in areas where exploration, drilling, or production occur. Other than for personal use firewood, the RGNF should not sell wood that is likely to be burned (e. g., for commercial biomass energy production), and would thus emit carbon directly into the atmosphere.

All alternatives must be evaluated for their effects on climate change, in terms of both current and future emissions and carbon sequestration. The analysis in the plan revision EIS should also analyze how a warming climate would affect management opportunities.

To assess the possible monetary costs to the planning area attributable to global warming, and the possible benefits from reduction of carbon emissions, the Forest Service should use the Social Cost of Carbon methodology. See:
http://www3.epa.gov/climatechange/EPAactivities/economics/scc.html
See also discussion in section XI above concerning the use of social cost of carbon methodology for analyzing economic effects.

This method accounts for only those costs of carbon (and benefits for its reduction) which can be quantified and to which a monetary value can be assigned. The other costs of carbon must separately be analyzed and included in the overall analysis of the effects of climate change.

The RGNF should foster landscape-scale ecological and community resiliency. Resiliency provides a positive, constructive frame to optimize and balance interconnected social, economic, and ecological systems and to thereby satisfy the agency's duty to "provide for social, economic, and ecological sustainability" in light of the challenges and opportunities presented by the reasonably foreseeable impacts of climate change to the RGNF and the broader landscape within which the RGNF rests. See 36 C.F.R. § 219.8.

Resiliency, for us, consists of two parts. First, resiliency is the capacity of an ecological or community system to maintain its function in the face of stress. A system with high resiliency withstands and bounces back from stress better than a system with low resiliency. Second, resiliency is the capacity of an ecological or community system to adapt to changing circumstances and conditions. Accordingly, a system with high adaptive capacity adjusts to changing circumstances and conditions better than a system with low adaptive capacity. These themes, and acknowledgement of the interconnected nature of ecological and community systems, are echoed in Aldo Leopold's 1949 classic, A Sand County Almanac, where the author

45

eloquently states, "[t]hat land is a community is the basic concept of ecology, but that land is to be loved and respected is an extension of ethics. That land yields a cultural harvest is a fact long known, but latterly often forgotten."

Resiliency can help account for the interconnected nature of natural and human-built infrastructure and provide a basis for effectively identifying management challenges and opportunities in world suffering from climate change. The RGNF Forest Plan can help optimize and balance how resources, such as water, are used across this interconnected landscape-scale mosaic of natural and human-built infrastructure, given the impacts of climate change.

Climate change, as we note above, elevates the importance of resiliency and understanding the interconnected nature of ecological and community systems. Indeed, this is at the root of the Forest Service's 2012 Planning Rules, which direct the Forest Service to "provide for social, economic, and ecological sustainability." 36 C.F.R. § 219.8. Climate change exacerbates impacts caused by existing ecological and community stressors, such as poorly managed road systems and livestock grazing. Climate change is also a persistent, intensifying, and non-linear stressor, changing precipitation and snowmelt patterns. Actions adequate to guard against a particular impact in a world that has warmed by 2°C may therefore be completely inadequate in a world that has warmed by 3°C. Thus, in the absence of robust action by the RGNF to build resiliency, climate change may, over time, unravel and catastrophically degrade existing ecological and community systems in the broader landscape.

We emphasize this reality because the Intended Nationally Determined Contributions ("INDCs") provided in advance of the upcoming U.N. Framework Convention on Climate Change Conference of the Parties in Paris in December 2015 are presently insufficient to constrain warming below the internationally agreed upon target to constrain warming to 2°C above pre-industrial levels.[30] The 2°C target is generally viewed as a threshold—if imperfect—to ameliorate the risk of catastrophic climate impacts. Notably, there are intense efforts underway in Paris, this very moment, to lower the threshold to 1.5°C to improve climate security and to protect the most vulnerable—efforts we support.[31] While projections vary, the INDCs, even if implemented successfully (a very big if), would still put the world for warming greater than 2°C.[32] This should provide a sobering reality check to us all and underscore the importance of a meaningful, impactful Forest Plan revision.

---

[30] *See* http://www.wri.org/indc-definition (explaining INDCs).

[31] http://www.thenation.com/article/with-1-5-degrees-celsius-target-climate-justice-movement-poised-to-score-surprise-win/

[32] http://climateactiontracker.org/global.html (last visited Dec. 8, 2015).

Rvsd Plan - 00002330

To foster resilience, the RGNF should take the following four core actions as part of the Forest Plan revision process: (1) Account for climate change through a linked combination of proactive and adaptive management; (2) place special emphasis on the protection and restoration of water resource resilience; (3) better conserve wildlife habitat in the face of climate change; and (4) optimize the RGNF's carbon sequestration capacity.

The RGNF should forthrightly acknowledge and assess the predicted and reasonably foreseeable impacts of climate change and consider alternatives to ameliorate those impacts through the National Environmental Policy Act ("NEPA") review for the plan revision. These alternatives should assess different means of fostering resiliency to satisfy the 2012 Planning Rule's directive to "provide for social, economic, and ecological sustainability" 36 C.F.R. § 219.8. Each alternative should detail the specific plan components, i.e., desired conditions, objectives, standards, guidelines, and determinations regarding the suitability of lands for various multiple uses and how those plan components will or will not foster resiliency in the face of climate change to provide for social, economic, and ecological sustainability. This is particularly critical in the context of wildfire management, where ecological and community resiliency should drive wildlife risk management. Put differently, wildlife risk management should maximize resiliency benefits. Without considering broad-scale resiliency benefits, we are concerned that too much emphasis will be placed on logging to the exclusion of other activities and the broader need to manage for landscape-scale forest resiliency that holistically addresses interconnected ecological and community systems.

Climate change must be directly and consciously infused into all plan components, whether desired conditions, objectives, standards, guidelines, or determinations regarding the suitability of lands for various multiple uses. This is particularly important in terms of plan components that ensure *proactive*, rather than only reactive, adaptive planning, management, and decision-making. Proactive action at the Forest Plan level sets the stage for effective, meaningful project-level action.

With regards to resiliency and wildlife, the RGNF should consider alternatives (as required by NEPA (42 U.S.C. §§ 4332(2)(c)(iii), 4332(2)(E)) and its implementing regulations (40 C.F.R. 1502.14)) to better conserve wildlife by protecting and restoring intact wildlife habitat, improving the connectivity and permeability of wildlife habitat between wildlife habitat core areas, and maximizing the widest possible altitudinal range within protected areas. Each of these three elements works together to maximize the resilience of the RGNF's diverse wildlife species in the face of a warming climate.

In this context, we note that coordination with other National Forests and BLM lands adjacent to the RGNF is necessary, and cross-border wildlife protection measures, especially for species such as Canada lynx, is vital to ensure the resilience of these species in the face of climate

47

change, and consistency across borders for the management and protection of these species. We recommend designation of the Spruce Hole-Osier-Toltec Landscape Connectivity Area to accomplish this. See Alternative Appendix 7.

As to the RGNF's carbon sequestration capacity, the revised Forest Plan should optimize the RGNF's carbon sequestration capacity, ensuring, as much as possible, that the forest functions as a carbon sink. Unexploited federal lands can and should function as a carbon sink to help reduce net greenhouse gas emissions and thereby mitigate climate change. We recommend that the RGNF achieve this objective by limiting activities, like fossil fuels extraction, that release greenhouse gas emissions.

All fossil fuel leases or permits to drill should have strong, non-waivable stipulations to minimize the release of climate pollution (especially methane). This would help retain ecological and community resiliency. Also, incorporate carbon sequestration capacity as a criterion in the design and prioritization of project-level action with the express intent to protect and optimize the forest's ability to store carbon.

To help inform the RGNF's actions to mandate and optimize the RGNF's carbon sequestration capacity, we refer you to and ask you to assess the recommendations crafted by the Federal Forest Carbon Coalition.[33]

We note that while the RGNF's carbon sequestration capacity may appear small relative to the entire world, individual actions, cumulatively, can prove quite positive and, indeed, are essential. As the Supreme Court teaches:

> Agencies, like legislatures, do not generally resolve massive problems in one fell swoop, see *Williamson v. Lee Optical of Okla., Inc*., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563, but instead whittle away over time, refining their approach as circumstances change and they develop a more nuanced understanding of how best to proceed, cf. *SEC v. Chenery Corp*., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995.

*Mass. v. EPA*, 549 U.S. 497, 499 (2007).

We emphasize that the RGNF should also address, regardless of management actions, how each of the plan revision EIS's alternatives impacts the RGNF's carbon flows in terms of both sources and sinks, and in light of both "context" and "intensity," as part of the agency's hard look responsibilities under NEPA. See 40 C.F.R. §§ 1502.15, 1508.7, 1508.8, 1508.25, 1508.27.

---

[33] See http://www.forestcc.org/recs.

Rvsd Plan - 00002332

Resiliency and carbon sequestration are expressly called for by Executive Order 13,653, "Preparing the United States for the Impacts of Climate Change." Section 1 of this order explains that:

> The impacts of climate change—including an increase in prolonged periods of excessively high temperatures, more heavy downpours, an increase in wildfires, more severe droughts, permafrost thawing, ocean acidification, and sea-level rise—are already affecting communities, natural resources, ecosystems, economies, and public health across the Nation. These impacts are often most significant for communities that already face economic or health-related challenges, and for species and habitats that are already facing other pressures. Managing these risks requires deliberate preparation, close cooperation, and coordinated planning by the Federal Government, as well as by stakeholders, to facilitate Federal, State, local, tribal, private-sector, and nonprofit-sector efforts to improve climate preparedness and resilience; help safeguard our economy, infrastructure, environment, and natural resources; and provide for the continuity of executive department and agency (agency) operations, services, and programs.

Section 3 of the Order reinforces this policy direction, mandating that agencies take action to make "watersheds, natural resources, and ecosystems, and the communities and economies that depend on them, more resilient in the face of a changing climate." Section 3 further states that, "recognizing the many benefits the Nation's natural infrastructure provides, agencies shall, where possible, focus on program and policy adjustments that promote the dual goals of greater climate resilience and carbon sequestration."

Executive Order 13,653 should be understood in the context of two new White House memoranda, which the RGNF should review to inform its Forest Plan revision. In October 2015, the White House directed federal agencies to account for ecosystem services in federal planning and decision-making.  In November 2015, the White House strengthened federal ecological resource protection and restoration efforts.  These memoranda complement the Council on Environmental Quality's  guidance for federal agencies as they strive to account for climate change through National Environmental Policy Act ("NEPA") reviews.  While that guidance remains in draft form, it is nonetheless helpful to inform the RGNF Forest Plan revision's NEPA process and how that process can properly account for climate pollution and climate change.

Note that the plan rule requires plans to provide ecosystem services:

> The plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area.

49

Rvsd Plan - 00002333

219.10(a). See further discussion in section__ above.

To assure that the RGNF can continue to provide ecosystem services and ecological, economic, and social sustainability, climate change will have to be addressed and its effects reduced.

Landscape-scale thinking, management, and analysis is crucial to resiliency in the face of climate change risks, impacts, and vulnerabilities. By taking a landscape-scale approach, the RGNF can best identify and prioritize opportunities to take Forest Plan and project level action to ameliorate climate change and to complement non-federal resource protection and restoration efforts.

## XX. ECONOMICS

The 2012 planning rule establishes that land management plans will guide the management of National Forest System lands so that they are "ecologically sustainable and contribute to social and economic sustainability" and have the "capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future." 36 CFR 219.1(c).

In the revision phase, the Forest Service is required to develop plan components, including standards and guidelines, to "guide the plan area's contribution to social and economic sustainability, taking into account:

> • …economic conditions relevant to the area influenced by the plan, …

> • Multiple uses that contribute to local, regional and national economies in a sustainable manner, and

> • Ecosystem services."

36 CFR 219.8(b)(1), (3), (4).

The rule defines Ecosystem services as follows:

> Benefits people obtain from ecosystems, including:

> (1) Provisioning services, such as clean air and fresh water, energy, fuel, forage, fiber, and minerals;

Rvsd Plan - 00002334

(2) Regulating services, such as long term storage of carbon; climate regulation; water filtration, purification, and storage; soil stabilization; flood control; and disease regulation;

(3) Supporting services, such as pollination, seed dispersal, soil formation, and nutrient cycling; and

(4) Cultural services, such as educational, aesthetic, spiritual and cultural heritage values, recreational experiences and tourism opportunities.

219.19.

It defines economic sustainability as "…the capability of society to produce and consume or otherwise benefit from goods and services including contributions to jobs and market and nonmarket benefits…" while "meet[ing] the needs of the present generation without compromising the ability of future generations to meet their needs." 36 CFR 219.19.

We submitted substantive comments on ecosystem services during the assessment phase. We hope our comments provided useful information and guidance for the Rio Grande National Forest and Region 2 as a whole.

According to EPS-HDT, 2015, including Alamosa, Conejos, Costilla, Saguache Rio Grande and Mineral Counties, the population of the area has grown 25% since the 1970s (to 2013). See Appendix 9?

Employment during the same timeframe has doubled (approximately 13,000-26,000 jobs). Personal income has also seen an increase of 186 percent (almost 6 million to 16.22 million), reflecting a steady, healthy growth in population and income, reflecting an overall quality of life increase. Interestingly, self-employment also saw a 135 percent increase, almost 4,000 to 9,000 jobs, over the last 40 years.

Non-labor income (investments etc.,) has increased by 323 percent, meaning that retirees have found the San Luis Valley a desirable place to live. The largest concentration of second homes in the wildland urban interface (WUI) is in Conejos County (almost 70 percent) and Mineral County had the largest percentage of homes built within WUI (almost 38 percent).

Mostly baby boomers have moved to this WUI area because of quality of life issues that the Rio Grande National Forest provides (as part of ecosystem services), if they can handle the altitude. This also means building homes get built near fire prone areas. This highlights the importance of education, fire mitigation, and implementing controlled burns.

Rvsd Plan - 00002335

Non-Service jobs (extractive jobs, agriculture) have decreased by 11 percent, but service related jobs (transportation, utilities, amenities, wholesale/retail, health services) has increased by 35 percent. Government jobs have increased by 22 percent.

Regarding travel and tourism, information developed by the same EPS-HDT group, Mineral County (94 percent public lands) has seen the fastest rate of change in travel and tourism employment (1998-2012), an approximate 20 percent increase.

According to the Alamosa County, 2015, "the Great Sand Dunes National Park and Preserve had attracted an above average number of visitors, due to the growing popularity of National Parks, sandboarding, and adventure tourism across the country."

"Lodging tax collections increased, with a 7% increase of visitation at the Alamosa Welcome Center, from the following year. Interest in visiting Alamosa County has skyrocketed, reflecting an 80% increase in visits to their website, and 26,000 Visitor guides requested and mailed, a 65% increase over 2014."

This information does not include the 100th anniversary of the National Park Service, which is being celebrated this year (2016). Long story short, the Rio Grande headwaters surrounding the San Luis Valley and the quality of life it provides, small towns, and clean air and water, have been discovered by retirees, recreation visitors, cultural/historic buffs, small businesses and a generation of professionals who can use technological innovations to work from home.
What this means for the Rio Grande is vigilance in this planning process to prepare for travel management planning. Recreation on this Forest is going to increase considerably, thus anticipating where this increased use will occur and mitigating accordingly will be essential.

Technology will also play a critical role in terms of recreation access. Mountain bikes for example are only going to become more sophisticated, being able to travel farther distances, in rugged terrain at higher speeds. The Rio Grande must plan for this inevitability.
The Rio Grande does not have to concern itself so much with creating "cottage industry economic opportunities" for the surrounding communities because the economic opportunities are coming to the Rio Grande.

The Rio Grande National Forest already provides the essential elements for a wide range of multiple use and economic opportunities including: grazing, timber, various forms of recreation, small scale mining, hunting, fishing, wood gathering, herb collection, and downhill and backcountry skiing and winter sports. The present challenge is going to be balancing these uses and simultaneously protecting traditional uses, because the increase in recreation is going to interfere with users who are used to having the forest to themselves.

Rvsd Plan - 00002336

The 21st century has made its way into the RGNF, so any clearly defined management areas, wilderness recommendations, research natural areas, other designated areas, priority watersheds, wetlands, and wildlife corridors that can be identified and protected in this planning process will support the previous plan's traditional uses and also help provide ecosystem services for current and future generations.

## XXI. ESA-LISTED SPECIES RECOVERY PLANS

The RGNF revised plan should explicitly require the RGNF to comply with all recovery plans prepared and released by the U.S. Fish and Wildlife Service for any ESA-listed species occurring on the RGNF. As the expert agency, the U.S. Fish and Wildlife Service expends considerable resources preparing recovery plans to help guide species towards recovery and eventual delisting under the ESA. Because the recommendations in recovery plans are very important for species recovery, but sometimes not diligently applied by federal land management agencies, the RGNF should become a leader amongst its peers and commit to mandatory compliance with all ESA-listed species' recovery plans.

## REFERENCES

Alamosa County, 2015. Alamosa County Local Marketing District Board and the Alamosa Convention and Visitors Bureau, 2015 Annual Report.

Beecham, John L., Cameron P. Collins, M.S., and Timothy D. Reynolds, 2007. Rocky Mountain Bighorn Sheep(*Ovis canadensis*): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project. February 12, 2007.

Beever, E.A., P.F. Brussard, and J. Berger. 2003. Patterns of apparent extirpation among isolated populations of pikas (Ochotona princeps) in the Great Basin. Journal of Mammalogy. 84: 37-54. Bureau of Land Management, *Environmental Assessment for October 21, 2014 Oil and Gas lease Sale*, DOI-BLM-MT-0010-2014-0011-EA (May 19, 2014) at 76, http://www.blm.gov/style/medialib/blm/mt/blm_programs/energy/oil_and_gas/leasing/lease_sale s/2014/oct__21_2014/july23posting.Par.25990.File.dat/MCFO%20EA%20October%202014%2 0Sale_Post%20with%20Sale%20(1).pdf

Rvsd Plan - 00002337

Brown, James K., Elizabeth D. Reinhardt, and Kylie A. Kramer, 2003. Coarse Woody Debris: Managing Benefits and Fire Hazard in the Recovering Forest. Rocky Mountain Research Station, General Technical Report RMRS-GTR-105. July, 2003

Bureau of Land Management, *Little Willow Creek Environmental* Assessment, DOI-BLM-ID-B010-2014-0036-EA at p. 81-83 (Feb. 10, 2015) (https://www.blm.gov/epl-front-office/projects/nepa/39064/55133/59825/DOI-BLM-ID-B010-2014-0036-EA_UPDATED_02272015.pdf)

Calkins, M.T., E.A. Beever, K.G. Boykin, J.K. Frey, and M.C. Andersen. 2012. Not-so-splendid isolation: modeling climate-mediated range collapse of a montane mammal Ochotona princeps across numerous ecoregions. Ecography. 35(9): 780-791.

CNHP (Colorado Natural Heritage Program), 1997+. Colorado Rare Plant uide.www.cnhp.colostate.edu. Latest update: June 30, 2014. http://www.cnhp.colostate.edu/download/projects/rareplants/list.asp?list=master

CNHP (Colorado Natural Heritage Program). 2015. Searching for pocket mice in the San Luis Valley. CNHP Blog, Connecting Conservation and Science. http://cnhpblog.blogspot.com/2015/10/searchingforpocketmiceinsanluis.html

CPW (Colorado Parks and Wildlife) et al. Undated. Impact of Bark Beetle Epidemics on Mammals in Colorado. http://sciencegs.weebly.com/uploads/6/0/6/4/60649065/wildlife_effects_spruce_beetle.pdf

CPW, 2013. Rio Grande Cutthroat Trout (*Oncorhynchus clarkii virginalis*) Conservation Strategy. Colorado Division of Parks and Wildlife, October, 2013.

Cryan, Paul M., P. Marcos Gorresen, Cris D. Hein, Michael R. Schirmacher, Robert H. Diehl, Manuela M. Huso, David T. S. Hayman, Paul D. Fricker, Frank J. Bonaccorso, Douglas H. Johnson, Kevin Heist, and David C. Dalton, 2014. Behavoir of Bats at Wind Turbines. Proceedings of the National Academy of Sciences. www.pnas.org/cgi/doi/10.1073/pnas.1406672111.

Environmental Protection Agency, Evaluating Climate Policy Options, Costs and Benefits. Available at: https://www.epa.gov/climatechange/evaluating-climate-policy-options-costs-and-benefits (last accessed October 27, 2016)

EPS-HDT, 2015. A Profile of Socioeconomic Measures Rio Grande NF Region Selected Geographies: Alamosa County CO, Conejos County CO, Costilla County CO, Mineral County

Rvsd Plan - 00002338

CO, Rio Grande County CO, Saguache County CO. Benchmark Geographies: Colorado Non-Metro. Economic Profile System-Human Dimensions Toolkit, EPS-HDT, February 26, 2015

Field, B.C. and M. K. Field. 2009. Environmental Economics: An Introduction (5th edition). McGraw Hill: Boston, MA 448 pp.

Forest Service. 2001. Region 2 Sensitive Species Evaluation Form, Perognathus flavus / Silky Pocket Mouse. USDA Forest Service, Region 2. July 23. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5318202.pdf.

GAO, Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates, GAO 14-663 (August 2014.) (http://www.gao.gov/products/GAO-14-663)

Greenspan, Ruth and Callan, Dianne, *More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English,* World Resources Institute (July 2011).

Howard, Peter et al., *Omitted Damages: What's Missing From the Social Cost of Carbon*, Environmental Defense Fund, Institute for Policy Integrity, Natural Resources Defense Council (March 13, 2014)

Interagency Working Group on the Social Cost of Carbon, United States Government, *Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866* (May 2013)

IPCC Fifth Assessment Report, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (accepted September 26, 2013).

Kettler, S., J. Rocchio, R. Schorr, and J. Burt. 2000. Biological Inventory of Rio Grande and Conejos Counties, Colorado. Colorado Natural Heritage Program. Fort Collins, Colorado. March 31.
http://www.cnhp.colostate.edu/download/documents/2000/rio_grande_and_conejos_counties_vol1.pdf.

Learn, Joshua. Canada lynx persist in spruce beetle impacted forests, research shows. Wildlife Society. February 2, 2016. Available at: http://wildlife.org/canada-lynx-persist-in-spruce-beetle-impacted-forests-research-shows/ (last accessed October 27, 2016)

Loss, Scott R., Tom Will, Peter P. Marra, 2013. Estimates of bird collision mortality at wind facilities in the contiguous United States. Biological Conservation 168 (2013) 201–209. http://dx.doi.org/10.1016/j.biocon.2013.10.007

Rvsd Plan - 00002339

Lemly, Joanna, 2012. Assessment of Wetland Condition on the Rio Grande National Forest. Colorado State University, Colorado Natural Heritage Program.

Moore, Frances C. and Diaz, Delavane B., *Temperature Impacts on Economic Growth Warrant Stringent Mitigation Policy*, *Nature Climate Change* 5, 127–131 (2015) (http://www.nature.com/nclimate/journal/v5/n2/full/nclimate2481.html)

Morton, P. 2001. Testimony before the U.S. Senate, Energy Impacts of the Roadless Area Conservation Rule. Subcommittee on Forests and Public Land Management, Committee on Energy and Natural Resources. Washington, D.C. April 26, 2001

National Academy of Sciences (NAS), 1997. Valuing Groundwater: Economic Concepts and Approaches. Committee On Valuing Groundwater, National Research Council.

NatureServe. 2015. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia. Available http://explorer.natureserve.org.

Peterson, G.L. and C.F. Sorg.1987. Toward the measurement of total economic value. USDA Forest Service. GTR RM-148. Fort Collins, CO.

RESOLVE, 2004. Proceedings of the Wind Energy and Birds/Bats Workshop: Understanding and Resolving Bird and Bat Impacts. Washington, DC. May 18-19, 2004. Prepared by RESOLVE, Inc., Washington, D.C., Susan Savitt Schwartz, ed. September 2004.

Revesz, Richard *et al., Global warming: Improve economic models of climate change,* Nature 508, 173-175 (April 10, 2014).

RGCT Conservation Team, 2013. Conservation Agreement for Rio Grande Cutthroat Trout *(Oncorhynchus clarkii virginalis)* in the states of Colorado and New Mexico. Colorado Division of Parks and Wildlife, Denver, CO. 29 p.

Rocchio, J., D. Culver, S. Kettler, and R. Schorr. 2000. Biological Inventory of Rio Grande and Conejos Counties, Colorado Volume II: A Natural Heritage Inventory and Assessment of Wetlands and Riparian Areas in Rio Grande and Conejos Counties. Colorado Natural Heritage Program. Fort Collins, Colorado. http://www.cnhp.colostate.edu/download/documents/2000/Rio_Grande_and_Conejos%20County_Inventories_2.pdf.

56

Smith et al, 2016.  Smith, Gabrielle, Joanna Lemly, Pam Smith, and Bernadette Kuhn, 2016. Fen Mapping for the Rio Grande National Forest. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado, April, 2016.

U.S. Environmental Protection Agency. 2015 Economic Analysis for Revised Uranium Mill Tailings Standards (EPA 402---R---14---003).

Wilkening, J.L., C. Ray, and J. Varner. 2015 Relating sub-surface ice features to physiological stress in a climate sensitive mammal, the American pika (Ochotona princeps). PloS one. 10(3): e0119327.

Young, R. A., & Loomis, J. B. 2014. Determining the Economic Value of Water: Concepts and Methods. Routledge.

ATTACHMENTS (sent separately)

1 April 15, 2016 comments on Need for Change and Plan Revision Framework

2 August 22, 2016 comments on Need For Change version 2 and the Plan Revision Framework

3 Appendices to September 6 comments on the Preliminary Wilderness Evaluation, which includes Our Wilderness recommendations. The wilderness recommendations begin at p. 100 of the document.

Rvsd Plan - 00002341

| | |
|---|---|
| **From:** | ale1221@hotmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Wednesday, October 26, 2016 10:46:17 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

CA

Mr. Chad Alevras
6738 S Niagara Ct
Centennial CO 801121011
ale1221@hotmail.com

Rvsd Plan - 00002342

| | |
|---|---|
| **From:** | stacia@usa.net |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 9:06:31 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Ms. Stacia Gondusky
PO BOX 775283
Steamboat Springs CO 804775283
stacia@usa.net

Rvsd Plan - 00002343

| | |
|---|---|
| **From:** | yayacarlita@comcast.net |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:45:46 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Carla Behrens
904 Little Leaf Ct
Longmont CO 805036442
yayacarlita@comcast.net

| | |
|---|---|
| **From:** | kcbstudio@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:52:56 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mr. KC Benson
519 Saint Vrain Ln
Estes Park CO 805177489
kcbstudio@gmail.com

Rvsd Plan - 00002345

| | |
|---|---|
| **From:** | kblack.ot@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:22:29 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Karina Black
1023 Forest Ave
Boulder CO 803042556
kblack.ot@gmail.com

Rvsd Plan - 00002346

**From:** pelicanluv@mail.com
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 10:58:18 AM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Maureen Oliver-Borquez
1325 Vance St
Lakewood CO 802144281
pelicanluv@mail.com

| | |
|---|---|
| **From:** | katech@fastmail.us |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 12:29:36 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Kate Chasson
PO BOX 955
Fraser CO 804420955
katech@fastmail.us

Rvsd Plan - 00002348

| | |
|---|---|
| **From:** | raycoffman@comcast.net |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:54:49 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Mr. Ray Coffman
12803 W Roanoke Pl
Morrison CO 804651210
303-948-7085
raycoffman@comcast.net

| | |
|---|---|
| **From:** | crossgm@msn.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:29:28 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Grace Cross
3526 Hearthfire Dr
Fort Collins CO 805243775
crossgm@msn.com

Rvsd Plan - 00002350

| | |
|---|---|
| **From:** | gillespie@gkbaum.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:55:20 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Sheryl Gillespie
50 S Clarkson St
Denver CO 802092120
gillespie@gkbaum.com

Rvsd Plan - 00002351

| From: | ms_seana_o@hotmail.com |
|---|---|
| To: | FS-RGNF forest plan |
| Subject: | Please preserve more of the Rio Grande National Forest |
| Date: | Tuesday, October 25, 2016 11:07:45 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

seana katz

Dr. Seana Katz
1473 Periwinkle Dr
Boulder CO 803041150
ms_seana_o@hotmail.com

Rvsd Plan - 00002352

| | |
|---|---|
| **From:** | skeil@nso.edu |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:23:11 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Stephen L. Keil


Dr. Stephen Keil
118 Luxury Pl
Pagosa Springs CO 811478868
skeil@nso.edu

Rvsd Plan - 00002353

| | |
|---|---|
| **From:** | jkilgore22@hotmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:09:08 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Ms. Jennifer Kilgore
4648 Dapple Ln
Boulder CO 803015381
jkilgore22@hotmail.com

| | |
|---|---|
| **From:** | Nancy.n.kimble@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:54:30 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Nancy Kimble
139 Overlook Dr
Durango CO 813019437
Nancy.n.kimble@gmail.com

Rvsd Plan - 00002355

| | |
|---|---|
| **From:** | edgarbyknight@hotmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 12:22:20 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Ms. Bobbie Knight
5152 Tucson Way
Denver CO 802394036
edgarbyknight@hotmail.com

Rvsd Plan - 00002356

| | |
|---|---|
| **From:** | tckkob@q.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:55:56 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Tricia Kob
1918 Leicester Way
Fort Collins CO 805261205
tckkob@q.com

Rvsd Plan - 00002357

| | |
|---|---|
| **From:** | kklampke@comcast.net |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:07:23 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Ms. Karen Lampke
3307 Kittery Ct
Fort Collins CO 805262358
kklampke@comcast.net

| | |
|---|---|
| **From:** | dradjust@qwestoffice.net |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:43:04 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Dr. Tom Lankering
110 Midland Ave
Basalt CO 816218305
dradjust@qwestoffice.net

| | |
|---|---|
| **From:** | liedike0250@msn.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:34:30 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mr. Robert Liedike
5379 Balsam St Apt 301A
Arvada CO 800023555
liedike0250@msn.com

| | |
|---|---|
| **From:** | katemanzer@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 9:14:44 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am a graduate student at the University of Colorado, Boulder, studying Environmental Policy and Management. I recently wrote a comment to the Flathead National Forest, in Montana. I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

I do, however, want to express concern for the wildland fires that have consumed much of the national forests in Colorado, Montana, and California as climate change has and continues to approach and consume the lands where we live and play.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for downstream communities, and would provide a home for wildlife to live free. If forests aren't managed correctly, however, these headwaters can be damaged just as much by development as they would be damaged by fire.

If designating these lands as wilderness means that management of these forests would be sacrificed, I don't believe it is the best option. But if designating these forests wilderness will bring the natural presence of fire back into these forests in a healthy way, I support the expansion of wilderness. From my analysis of the Forest Service's plan for the Flathead National Forest, I found that greater ability to manage the forests, and not designate them as wilderness, is the best option of all alternatives, given that climate change will increase the intensity and frequency of fires in these landscapes.

I trust that the Forest Service will make the best decision. Keep up the good work!

Thank you for considering my comments.

Kate Manzer

Ms. Kate Manzer
4820 Meredith Way
Boulder CO 803031154
katemanzer@gmail.com

**From:** klnaiman@earthlink.net
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 11:18:01 AM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Sincerely,


Ms. Karen Naiman
1205 S Valentia Ct
Denver CO 802473020
klnaiman@earthlink.net

Rvsd Plan - 00002362

**From:** christallklar@hotmail.com
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 12:15:57 PM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Chris Ocean
12520 W 64th Ave
Arvada CO 800043804
christallklar@hotmail.com

**From:** speirce@prodigy.net
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 12:26:14 PM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Dr. Susan Peirce
143 Eagle Feather Way
Lyons CO 805408450
speirce@prodigy.net

| | |
|---|---|
| **From:** | debphen@me.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:54:10 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Deb Phenicie
21633 N Turkey Creek Rd
Morrison CO 804659055
debphen@me.com

Rvsd Plan - 00002365

| | |
|---|---|
| **From:** | tozirubin@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:57:49 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Tozienka Rubin
135 Country Center Dr
Pagosa Springs CO 811478379
9707313360
tozirubin@gmail.com

Rvsd Plan - 00002366

| | |
|---|---|
| **From:** | curtis.rullestad@hlramerica.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 12:38:53 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Mr. Curt Rullestad
999 E 22nd Ave Apt 5
Denver CO 802055169
curtis.rullestad@hlramerica.com

Rvsd Plan - 00002367

| | |
|---|---|
| **From:** | ernestosagas@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 8:55:28 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Dr. Ernesto Sagas
2342 Cedarwood Dr
Fort Collins CO 805261278
ernestosagas@gmail.com

| | |
|---|---|
| **From:** | fernfalls@me.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 12:24:38 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Mr. Virgil Salzman
1265 Race St Apt 202
Denver CO 802062850
fernfalls@me.com

Rvsd Plan - 00002369

| | |
|---|---|
| **From:** | rayschamel@me.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:46:14 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Dr. Raymond Schamel
11874 County Road 120
Hesperus CO 813269561
(970) 259-9797
rayschamel@me.com

| | |
|---|---|
| **From:** | camarofox24@msn.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 10:58:48 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Nicole Shaffer
4377 Teeter Totter Cir
Colorado Springs CO 809172936
camarofox24@msn.com

Rvsd Plan - 00002371

| | |
|---|---|
| **From:** | roger.singer@sierraclub.org |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:49:32 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Roger Singer

Mr. Roger Singer
1701 Utah St
Golden CO 804012565
roger.singer@sierraclub.org

Rvsd Plan - 00002372

| | |
|---|---|
| **From:** | srsdogfarm@skybeam.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:56:26 AM |

Rio Grande National Forest Supervisor Dan Dallas

As a citizen of these United States, I am writing today to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Mrs. Sheryl Sussbauer
10401 County Road 17
Longmont CO 805049441
srsdogfarm@skybeam.com

Rvsd Plan - 00002373

**From:** stempelman@me.com
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 8:23:30 PM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mr. Steven Tempelman
9612 Aspen Hill Cir
Lone Tree CO 801245493
stempelman@me.com

Rvsd Plan - 00002374

| | |
|---|---|
| **From:** | esjq@msn.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Tuesday, October 25, 2016 11:05:49 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Elisa Townshend
1385 Elizabeth St
Denver CO 802062308
esjq@msn.com

Rvsd Plan - 00002375

**From:** tubersteve@gmail.com
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 11:19:18 AM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Stephen Tuber

Mr. Stephen Tuber
5375 Kewanee Dr
Boulder CO 803034217
tubersteve@gmail.com

Rvsd Plan - 00002376

**From:** deweipert@comcast.net
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 11:19:20 AM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.

Donn weipert


Mr. Donn Weipert
1230 Palmer Park Blvd
Colorado Springs CO 809093739
deweipert@comcast.net

Rvsd Plan - 00002377

| | |
|---|---|
| **From:** | megancatherinefaber@gmail.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Wednesday, October 26, 2016 9:26:08 AM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Megan Faber
1285 S Sherman St
Denver CO 802101512
megancatherinefaber@gmail.com

Rvsd Plan - 00002378

| | |
|---|---|
| **From:** | joyceokc@juno.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please preserve more of the Rio Grande National Forest |
| **Date:** | Thursday, October 27, 2016 5:38:30 PM |

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Mrs. Joyce Wood
179 Lake View Dr
Bayfield CO 811229436
joyceokc@juno.com

Rvsd Plan - 00002379

**From:** mlucero@pueblo.us
**To:** FS-RGNF forest plan
**Subject:** Please preserve more of the Rio Grande National Forest
**Date:** Tuesday, October 25, 2016 11:33:27 AM

Rio Grande National Forest Supervisor Dan Dallas

I am writing to express my support for more recommended wilderness and conservation areas within the Rio Grande National Forests.

With nearly one million acres of roadless and undeveloped land in this forest, we have a great opportunity to protect vulnerable areas from development and preserve the wild condition of the land for clean water, wildlife and non-motorized recreation.

I support recommending the potential wilderness areas and Special Interest Areas proposed by the Wilderness Society. Managing more areas as recommended wilderness will protect the headwaters of the Rio Grande for wildlife and downstream communities, and would provide undeveloped places for wildlife to roam free.

Adding under-protected ecosystem types to the wilderness system would preserve essential habitat for sensitive wildlife species and create connected corridors, so plants and animals can adapt and migrate in response to a changing climate. Expanding wilderness areas would ensure that people today and into the future can experience the remote adventure of the Rio Grande headwaters.

Designating other conservation areas is also very important. I support, for instance, the designation of the Chama Basin as a Watershed Protection Area, and the Spruce Hole-Sheep Creek and Wolf Creek Linkages as zoological areas to enhance wildlife migration. I also support the expansion of the Summer Coon La Ventana Geologic Area to protect the unusual geologic formations and rare plants.

Thank you for considering my comments.


Ms. Mary Lucero
1136 Lake Ave
Pueblo CO 810042858
mlucero@pueblo.us

Rvsd Plan - 00002380

March 8, 2017

Jennifer Cramer, Forest Planner
Santa Fe National Forest
11 Forest Lane
Santa Fe, NM 87508

Erin Minks, Forest Planner
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

Kevin Naranjo, Forest Planner
Carson National Forest
208 Cruz Alta Rd.
Taos, NM 87571

John Baily, Monument Manager
BLM Taos Field Office
226 Cruz Alta Road
Taos, NM  87571

> Re: Proposed Management Direction for Aquatic and Terrestrial Connectivity for Consideration
> in the Forest Service and BLM Land Management Planning Processes in the Upper Rio Grande
> Landscape

Dear Ms. Cramer, Ms. Minks, Mr. Naranjo and Mr. Baily:

We are pleased to submit to the Forest Service and BLM the attached direction for enhancing terrestrial and aquatic wildlife habitat connectivity for consideration in and incorporation into the land management planning processes in the Upper Rio Grande Landscape. The material presented here expands on comments and information presented in earlier comments to the individual planning units by the undersigned.  We request that each planning unit include this direction in alternatives in the environmental analysis document.

We provide three attachments to this letter:

- Attachment 1 - Terrestrial Connectivity Management Direction
- Attachment 2 - Aquatic Connectivity Management Direction
- Attachment 3 – Place-Based Opportunities for Terrestrial Connectivity

The Upper Rio Grande is an expansive, extraordinary landscape in southern Colorado and northern New Mexico comprised of a mosaic of federal, state, tribal, and private lands. Species occurrence and

modeling data indicate that this is a crucial landscape for wildlife movement and genetic dispersal for many species. Four federal units totaling about five million acres of public land are concurrently undertaking land management planning. Given the immediate adjacency and collective ecological significance of these administrative units, simultaneous revisions present a unique opportunity to showcase an "all-lands" approach for providing landscape connectivity and conserving large-scale species movement.

The concept of landscape-level integrated planning is emphasized in the Forest Service's 2012 planning rule and, in terms of the BLM, the Federal Land Policy and Management Act (FLPMA). The Forest Service's planning rule provides an approach for maintaining and restoring connectivity, both within Forest Service planning boundaries as well as broader landscapes, for the purposes of improving ecological integrity at multiple scales, sustaining wildlife populations and species, and facilitating climate change adaptation. FLPMA directs the BLM to balance multiple uses with the protection of, among other things, fish and wildlife when making management decisions. FLPMA also authorizes the agency to designate Areas of Critical Environmental Concern to protect important areas, such as lands that are important for connectivity and wildlife movement, from harmful impacts due to other uses.

The units in the Upper Rio Grande must work together to develop plan direction on connectivity that will create a consistent approach for managing wildlife movement across the landscape. We developed the attached direction with the entire landscape in mind. To help ensure management consistency across borders, it is our desire that each unit include the attached direction in its land management plan. We would be willing to work with your agencies to refine the language.

Our proposed terrestrial connectivity management direction is provided in Attachment 1. This attachment starts by offering a series of desired condition statements to maintain or enhance connectivity. We do not expect units to adopt all of these desired conditions. Instead, we offer several from which units can choose. The attachment then provides our terrestrial connectivity management direction, which takes a two-tiered approach: forest-wide and place-based direction. It is important that units include direction at both scales to effectively provide for landscape connectivity.[1] In Attachment 3, we provide a map of the specific areas for which the place-based direction would apply.

We provide our aquatic connectivity management direction in Attachment 2. This aquatic direction also takes a two-tiered approach. First, the direction proposes a Conservation Watershed Network (CWN). CWN is a watershed based model, analyzed forest-wide, that is comprised of a collection of watersheds where management emphasizes habitat conservation and restoration to support native fish and other aquatic species. Second, the management direction proposes Riparian Management Zones, which are portions of watersheds where riparian-associated resources receive primary emphasis, and management activities are subject to specific standards and guidelines.

While we acknowledge that each unit is well-underway in developing their environmental analysis documentation, much of the proposed direction found in these attachments is not entirely new. We point out that all three national forests received the place-based opportunities (Attachment 3) for

---

[1] Minor ES, Lookingbill TR. A multiscale network analysis of protected-area connectivity for mammals in the United States. Conserv Biol. 2010; 24: 1549–1558.

terrestrial connectivity during their respective scoping periods. The proposed place-based terrestrial connectivity management direction found in Attachment 1 that accompanies the areas shown in Attachment 3 also largely mirrors the information submitted during scoping. The forest-wide terrestrial connectivity direction provided in Attachment 1 is a new submission to all Forest Service units. As for aquatic connectivity, Trout Unlimited submitted what largely resembles the management direction in Attachment 2 to the Rio Grande National Forest during scoping.[2] Admittedly, the proposed aquatic connectivity direction has not previously been submitted to the Carson or Santa Fe National Forests.[3] Trout Unlimited also identified a set of watersheds that should be managed for native fish and watershed health and submitted these places to each national forest during scoping. While these watersheds are not necessarily meant to serve as the CWN, the Forest Service should use these watersheds to inform the identification of the CWN. Meanwhile, both sets of management direction – for aquatic and terrestrial connectivity – are new submissions to the BLM for consideration in the Rio Grande del Norte National Monument planning process. The reason for the belated submission of this management proposal is that the *Wildlife Movement Workshop: Connectivity in the Upper Rio Grande Watershed* – hosted by the New Mexico and Colorado Natural Heritage Programs on December 7-8, 2016 in Taos – spurred fresh thinking and new opportunities for collaboration among several conservation, wildlife, and sportsperson NGOs.

We extend our appreciation to the Forest Service and BLM for the opportunity to provide this management direction for consideration in the development of your land management plans. Our intent in providing this direction is to work cooperatively with the agencies and the larger interested public to ensure that our federal public lands – as a public trust resource – are properly managed for multiple use and the long-term public interest for the benefit of existing and future generations. It is our desire to see the agencies address our proposed terrestrial and aquatic connectivity direction in at least one alternative in the environmental analysis documentation, including the preferred alternative. Please include this letter and all attachment in the administrative record for each land management planning process.

Regards,

Joshua Hicks
Assistant Director, National Forest Action Center
The Wilderness Society
303-650-1148
josh_hicks@tws.org

Lauren McCain, Ph.D.
Federal Lands Policy Analyst
Defenders of Wildlife
720-943-0453
lmccain@defenders.org

---

[2] The Wilderness Society's scoping letter to the Rio Grande National Forest also included information on potential conservation watersheds, and asked that the concept be adopted in the forest plan.

[3] We want to acknowledge the Wetland Jewels proposal submitted by Amigos Bravos and the Western Environmental Law Center to the Carson and Santa Fe National Forests. This wetland proposal could inform the identification of a CWN on these forests.

Rvsd Plan - 00002383

**Attachment 1: Terrestrial Connectivity Management Direction**

***Desired Conditions***

Protected wildlife corridors provide areas for: landscape-scale movement, migration, and dispersal of wide-ranging wildlife species, and they offer security from intensive recreational and other human disturbances. This is an important step in providing for the maintenance of biodiversity across the forest. [adapted from: White River National Forest Plan Revision 2002, Record of Decision Component 3: Establishment of Management Area Direction]

Corridors/linkage areas and associated approach areas provide secure habitat conditions for wildlife movement between large blocks of habitat and/or seasonal habitats at localized and landscape scales, especially across valley bottoms and other fragmented areas. These areas provide cover and often connect key habitat components for those species that use that particular area. NFS lands contribute to linkages between landscapes, unless such landscape isolation is determined to be beneficial. Corridors/linkage areas enable genetic interactions. [adapted from: Kootenai National Forest Wildlife Approach Areas http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsm91_056306.pdf]

Communication and collaboration occurs between federal, tribal, state, and local governments and private landowners to develop, coordinate, improve, and implement common management objectives, including maintaining and enhancing the habitat, habitat connectivity and viability of terrestrial and aquatic wildlife species.

Willing adjacent landowners, planners, and other interested parties work together to improve wildlife connectivity opportunities across multiple jurisdictions (e.g., cooperative agreements, land consolidations, exchanges, acquisitions, easements, etc.). [adapted from: Kootenai National Forest Wildlife Approach Areas]

Core habitat areas (including but not exclusively Wilderness Areas, Wilderness Study Areas, Research Natural Areas, some Inventoried Roadless Areas, and Special Zoological Areas) are not isolated so as to maintain functional connectivity between and among these areas. Such areas, and the connections between them, contain relatively intact ecosystems where natural processes dominate, provide habitat for native biota, and constitute part of a system that helps to preserve the native biological diversity at the planning unit scale and larger landscape scale. [adapted from: San Juan Public Lands Draft Land Management Plan]

Long-term connectivity and integrity of habitat utilized for movement through public lands is restored and maintained to provide for ecological integrity in order to contribute to the recovery of threatened and endangered species, conserve species proposed or candidates for listing under the Endangered Species Act, assure the persistence of Forest Service Species of Conservation Concern, conserve Bureau of Land Management special status species, priority species identified in Colorado and New Mexico State Wildlife Action Plans, and game species. [adapted from: San Juan Public Lands Draft Land Management Plan]

Rvsd Plan - 00002384

Forest infrastructure (e.g., roads, fences) does not impede large landscape species (e.g., big game and large carnivore) movement and seasonal habitat use. Infrastructure is designed and located to facilitate wildlife movement. Secure habitat occurs in big game migration corridors to facilitate big game movement. [adapted from: Shoshone National Forest, Draft Proposed Land Management Plan, August 2008. Available online at: http://www.fs.fed.us/r2/shoshone/projects/planning/revision/revision_documents/february_2009/2008_0820_plan.pdf]

To the maximum extent possible, intact, contiguous, secure habitat is provided to support multidirectional seasonal movements of native ungulates. Human disturbance levels (especially in fall and winter ranges, and on calving/fawning grounds) are limited to provide for effective habitat, as defined by State agency partners. These support critical life cycle functions and seasonal needs, including seasonal migration corridors between ranges, for sustaining herds capable of meeting State population objectives. [adapted from: San Juan Public Lands Draft Land Management Plan]

### *Forest-Wide Management Direction*

- Winter, including over-snow vehicle use, and summer recreation activities should conform to best available scientific knowledge for mitigating impacts to big and small game, federally protected species, Forest Service Species of Conservation Concern, and other special status and sensitive wildlife species.

- Motorized route density standards or guidelines that consider open and closed USFS roads, USFS motorized trails, and non-USFS roads (e.g., county roads and state highways) are based on best available science for maintaining and/or restoring functional habitat conditions for wildlife that occur in the area.

- Standard.  All temporary roads are removed and the lands and waters on which they were located are restored to natural conditions, and moving toward their Natural Range of Variability, within one year of the termination of the purpose for which they were established.

- Standard. Decommission and reclaim unauthorized routes and system roads that the agency determines are no longer needed for public motorized use.

- Guideline. Establish and implement in a timely manner mitigation standards for main FS arterial roads and state highways to facilitate movement of wildlife, including a reduction in mortality of wildlife from vehicle collisions. Coordinate with CDOT and NMDOT on planning and projects.

- Standard. Optimize fencing for livestock to make all fences wildlife friendly (i.e., fences to not create unreasonable or unnecessary movement barriers or hazards for wildlife). Coordinate with

Rvsd Plan - 00002385

permittees to identify fencing that is not critical for livestock operations; fencing that is not critical for livestock operations and that is impeding wildlife movement is removed. Any new livestock fencing that is installed should be constructed in a manner that will minimize disruption to wildlife movement, taking into consideration seasonal migration and water resources.

- Plan direction must include and comply with the Southern Rockies Lynx Amendment regarding lynx linkage areas (Objective LINK O1, Standard LINK S1, Guideline LINK G1, and Guideline LINK G2), and also:
  - Objective ALL O1:  Maintain or restore lynx habitat connectivity in and between LAUs, and in linkage areas.
  - Standard ALL S1: New or expanded permanent developments and vegetation management projects must maintain habitat connectivity in an LAU and/or linkage area.

- Monitoring & Adaptive Management
  - Monitor for trends in landscape integrity and permeability of the forest, and larger landscape, over time. Landscape integrity will be assessed by considering human modification that contributes to fragmentation, including roads, residential development, energy development, transmission corridors, and other development.
  - Work with governments and private partners, including adjacent forests, BLM, state wildlife agencies, universities and non-profits, to monitor wildlife movement within and across the forest.
  - Ensure that the plan is responsive to the information gathered during monitoring by building in triggers that lead to a change in management that improves connectivity and permeability of the forest.
  - Designate elk and pronghorn as focal species and develop monitoring questions that help assess effectiveness of plan direction related to connectivity.

- Identify where large core protected areas currently exist, both within the forest and larger landscape, and the connections that exist between them. Until more data are available that describe these core areas and connections in more detail, it is important to ensure that blocks of habitat maintain a high degree of connectivity between them, and that blocks of habitat do not become fragmented in the short term. Utilize management direction offered above to maintain and/or restore connections between these core protected areas.


***Place-Specific Management Direction***

- Guideline. Management actions will be driven by the primary need to ensure continued or enhanced habitat connectivity and viability for wildlife movement.

Rvsd Plan - 00002386

- Guideline. Activities currently authorized by the agency shall coexist with wildlife movement, migration and dispersal. Changes to current activities and infrastructure may be required if found incompatible with the area's wildlife values.

- Guideline. Where possible, augment wildlife values through purchase from willing sellers, exchange, transfer or donation of additional acreage of crucial wildlife habitat for their migration, movement and dispersal. Acquired lands are to be managed consistent with the corridor's standards and guidelines.

- Guideline. Winter, including over-snow vehicle use, and summer recreation activities should conform to best available scientific knowledge for mitigating impacts to big and small game, federally protected species, Forest Service Species of Conservation Concern, and other special status and sensitive wildlife species.

- Standard. Do not authorize new permanent roads within the corridor in order to maintain unfragmented habitat for wildlife migration and dispersal.

- Standard. Motorized route density standards within the management area to conform to the best scientific recommendations, generally less than one mile per square mile (Lyon 1979; Van Dyke et al. 1986a, b; Fox 1989; Trombulak and Frissell 2000; Strittholt and DellaSala 2001; Davidson et al. 1996). Ensure that there will be no net increases in densities above a scientific credible threshold. If these densities do not exist today, the Forest Service will develop a strategy to achieve them. Motorized route density will consider open and closed USFS roads, USFS motorized trails, and non-USFS roads (e.g., county roads and state highways) and be based on best available science for maintaining and/or restoring functional habitat conditions for wildlife that occur in the area.

- Standard. All temporary roads are removed and the lands and waters on which they were located are restored to natural conditions within one year of the termination of the purpose for which they were established.

- Standard. Decommission and reclaim unauthorized routes and system roads that the agency determines are no longer needed for public motorized use.

- Guideline. Establish and implement in a timely manner mitigation standards for main USFS arterial roads and state highways to facilitate movement of wildlife including a reduction in mortality of wildlife from vehicle collisions (modified from BLM Lower Sonoran and Sonoran National Monument Proposed RMP and Final EIS. June 2012. https://www.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=21457.) Coordinate with CDOT and NMDOT on planning and projects.

4

- Standard. All projects, activities, and infrastructure authorized in wildlife movement corridor shall be designed, timed and located to allow continued successful seasonal movement. [adapted from: Bridger-Teton National Forest Land and Resource Management Plan Amendment: Pronghorn Migration Corridor http://www.wyomingoutdoorcouncil.org/html/what_we_do/wildlife/pdfs/PronghornMigration Corr-ROD.pdf]

- Guideline. Retain some connectivity of existing forested corridors within plan areas and between old-growth sites for future forested corridors where connectivity is potential but absent. [adapted from: Arapaho and Roosevelt National Forests and Pawnee National Grassland 1997 Revision http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsm91_057935.pdf] (Feel free to move this or include in the place-specific direction)

- Guideline. Maintain appropriate amounts and distribution of natural foods and hiding cover in corridors/linkage zones and approach areas to meet the subsistence and movement needs of target wildlife species. [adapted from: Kootenai National Forest Wildlife Approach Areas]

- Standard. Manage disturbance footprint resulting from vegetation management activities within the corridor spatially and temporally. This may include establishing maximum width and acres of any single on-the-ground disturbance, limiting total acreage of ground disturbance at any one time, limiting times of year when treatment activities occur.

- Standard. Optimize fencing for livestock to make all fences wildlife friendly (i.e., fences to not create unreasonable or unnecessary movement barriers or hazards for wildlife). Coordinate with permittees to identify fencing that is not critical for livestock operations; fencing that is not critical for livestock operations and that is impeding wildlife movement is removed. Any new livestock fencing that is installed should be constructed in a manner that will minimize disruption to wildlife movement, taking into consideration seasonal migration and water resources.

- Standard. Preclude the granting of new right-of-ways for energy development that would negatively impact wildlife, their habitat and its connectivity.

- Standard. Withdraw the corridor from location and entry under the Mining Law, subject to valid existing rights.

- Standard. The area must be discretionary no oil and gas leasing.

Rvsd Plan - 00002388

Cited Sources

Davidson, D.W., Newmark, W.D., Sites, J.W. Jr., Shiozawa, D.K., Rickart, E.A., Harper, K.T., Keiter, R.B. 1996. Selecting Wilderness Areas to Conserve Utah's Biological Diversity. *Great Basin Naturalist* 56(2):95-118.

Fox, R.A. 1989. Mule Deer (Odocoileus hemionus) Home Range and Habitat Use in an Energy-Impacted Area of the North Dakota Badlands. Masters Thesis, University of North Dakota. Grand Forks, ND.

Lyon, L. J. 1979. "Habitat Effectiveness for Elk as Influenced by Roads and Cover." *Journal of Forestry*, October, 658-660.Van Dyke et al. 1986a, b;

Stritthold, J.R., and D.A. DellaSala. 2001. Importance of Roadless Areas in Biodiversity Conservation in Forested Ecosystems: A Case Study—Kalmath-Siskiyou Ecoregion, U.S.A. *Conservation Biology* 15(6):1742-1754.

Trumbulak, S.C., and C.A. Frissell.  2000. Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities. *Conservation Biology* 14(1):18-26.

VanDyke, F. G., Brocke, R. H., and Shaw, H. G. (1986a). Use of Road Track Counts as Indices of Mountain Lion Presence. *Journal of wildlife Management*. 50(1):102-109.

VanDyke, F. G., Brocke, R. H., Shaw, H. G., Ackerman, B. B., Hemker, T. P., and Lindzey, F. G. (1986b). Reactions of Mountain Lions to Logging and Human Activity. *Journal of Wildlife Management*. 50(1): 95-102.

Rvsd Plan - 00002389

**Attachment 2: Aquatic Connectivity Management Direction**

**Major Recommendations**

- Use a combination of tools across the region and Rio Grande Basin to ensure riparian and aquatic ecosystem connectivity and watershed health
- Layering of frameworks, management approaches, management or geographic areas, desired conditions, standards, and guidelines to create an Aquatic Conservation Strategy for the Rio Grande Basin spanning the Carson, Santa Fe and Rio Grande National Forests
- Utilize the existing Watershed Condition Framework as base to establish and execute metrics and water quality standards in the context of "geomorphic, hydrologic and biotic integrity" as defined in the Forest Service Manual
- Ensure that a monitoring plan includes useful monitoring questions around aquatic connectivity and ecological integrity
- Create a Conservation Watershed Network for Native Fish at the individual forest level but which is consistent across boundaries
- Create or expand the definition of Riparian Management Zones and apply a set of standards designed to assure riparian protection

***Conservation Watershed Network for Native Fish***

A Conservation Watershed Network for Native Fish (CWN) is a model set forth in the Flathead National Forest's Draft Revised Forest Plan[1] as an approach to managing native fish habitat. This watershed based tool, analyzed forest wide, is defined as "a collection of watersheds where management emphasizes habitat conservation and restoration to support native fish and other aquatic species. The goal of the network is to sustain the integrity of key aquatic habitats to maintain long-term persistence of native aquatic species."

A September 2016 memorandum sent by the Washington Office to Regional Foresters[2] clarified that the Forest Service has the authority under the 2012 planning rule to establish conservation watersheds in land management plans, and that the Forest Service has a long history of doing so.[3] This authority complements the Forest Service's requirement to identify priority watersheds generated through the Watershed Conservation Framework in land management plans.[4] The memorandum also clarifies that the purpose of conservation watersheds is distinct from that of priority watersheds; the former is intended to be long-term designations designed to conserve aquatic species over the duration of a land

---

[1] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf
[2] See Memorandum dated September 30, 2016 entitled *Clarification on Conservation Watersheds in Land Management Plans* signed by Chris French and Rob Harper (Directors of Ecosystem Management Coordination and Watershed, Fish, Wildlife, Air and Rare Plants, respectively) to Regional Foresters.
[3] For example, Northwest Forest Plans identify key watersheds, and Sierra Nevada Framework plans identify critical aquatic refuges.
[4] 36 C.F.R. § 219.7(f).

1

management plan (i.e., decades), typically at a finer scale of watershed, while the former is done more broadly, and can be "thought of as tactical and near-term designations guiding the implementation of agency work priorities in the near-term."[5]

Rio Grande cutthroat trout (RGCT), the legacy fish of the Rio Grande basin, currently occupy only 12% of their native stream habitat. In the larger effort to promote the long-term sustainability of these remarkable fish, connectivity and consistency across large watersheds and across political boundaries must be recognized. The current Forest Plan revisions on the Carson, Santa Fe, and Rio Grande National Forests are an opportunity to assist those efforts and are the best chance to collectively meet the goals of the 2013 Rio Grande Cutthroat Trout Conservation Strategy[6].

Applied to the Carson, Santa Fe, and Rio Grande National Forests, development of a CWN should include:

- Watersheds currently in good condition or which have the potential to be restored to good condition
- Watersheds expected to protect native fish and help maintain healthy watersheds and river systems
- Watersheds resilient to impacts of climate change and thermal barriers
- Watersheds with existing, or potential for, high connectivity in regard to RGCT habitat, genetics, and distinct populations
- Watersheds with high potential for storing water on the landscape in the form of floodplain and wetland connectivity
- Watersheds with existing or potential for connectivity between headwaters of congressionally designated protections with unprotected lower lying elevations
- Watersheds with geographic and hydrologic connectivity between pristine headwaters and lower stream reaches with poorer condition

In the creation of a CWN, many factors must be taken into consideration. The Flathead Forest Draft Forest Plan, Appendix E lays out a detailed description of their multiscale analysis and factors contributing to the creation of the CWN, but there are many examples under the umbrella term of Conservation Watersheds. They are referred to as Key Watersheds in the Northwest Forest Plan, and Critical Aquatic Refuges in Region 5's Sierra Nevada Framework. There are currently no defined Conservation Watersheds in Regions 2 or 3. A locally sensitive CWN and a cohesive, landscape scale, Aquatic Conservation Strategy would be the best management tool for the unique challenges of the regions aquatic and water resources.

Recommendations for considerations in creating a CWN for Native Fish in the Rio Grande Basin include:

---

[5] *Ibid.*
[6] RGCT Conservation Team. 2013. Rio Grande cutthroat trout (Oncorhynchus clarkii virginalis) Conservation Strategy. Colorado Parks and Wildlife, Denver, CO.
https://www.fws.gov/southwest/es/newmexico/documents/RGCT_conservation_strategy_final_12-10-13.pdf

Rvsd Plan - 00002391

- A watershed based analysis of varying scale, specifically for RGCT
  - Greater Rio Grande Watershed
    - Pecos and Rio Grande RGCT populations
      - Larger Sub Basin complexes (Sand Creek, Comanche Creek, etc.)
        - Conservation Populations
          - Core Conservation Populations
- Close consultation of the 2013 Rio Grande Cutthroat Trout Conservation Strategy and of ongoing efforts in conservation biology and science from the strategies' partners
- A compilation, summarization and systematic analysis of available studies and data on existing trout habitat and population conditions, limiting factors, and climate change predictions relevant to the Rio Grande Basin and its sub watersheds
  - Analysis of thermal connectivity, including possible climate change scenarios, applied to coldwater fisheries
- Degree of existing and potential connectivity
  - Ecologically
  - Hydraulically
  - Hydrologically
  - Culturally
  - Politically
- Other Native Fish species
- Watersheds important to other water users

*Considerations for management of CWN watersheds:*

- Removal of unnecessary physical stream and river barriers
- Optimization of existing infrastructure to facilitate natural stream function and fish passage
- Emphasis on green infrastructure instead of artificial constructions
- Prioritization of partner projects for restoration and rehabilitation
  - Use Comanche Creek as example of partnership potential and project design
- Where appropriate recommend designations of recreational populations of RGCT
- Any timber activity need be consistent with the priority purpose of restoration and protection of RGCT
  - Additional analysis process for any timber harvest permits to prioritize projects reducing  risk of post fire flooding and meet strict standards to protect waterways from potential  negative impacts
- Adhere to Forest Service BMPs protecting fish and their habitat
- No new extractive energy and mineral leases in conservation watersheds
- Strict water quality and riparian health standards, focused on health of RGCT, which are measurable incorporated into the forest monitoring plan
- No net increase in roads
- Replacement of road-stream crossing structures that impede channel or floodplain

3

as possible
- Decommissioning of unnecessary roads and stream-road crossings
- Application of BMPs for water including regular effectiveness monitoring
- Avoid stream channel disturbances during spawning season for RGCT, suckers, and chub
- Reevaluation of grazing allotments overlapping known RGCT populations and future project areas to encourage mutually beneficial riparian use for fish and permittee


***Riparian Management Zones***

Complementing the CNW, the Flathead National Forest Draft Revised Forest Plan also recognized additional classification of Riparian Management Zones (RMZ). These Zones would complement the CWN to provide the best possible management direction in aquatic connectivity and the 2012 forest planning rule's direction to maintain and restore ecologic integrity of aquatic ecosystems and watersheds.[7]

From the Flathead National Forest Draft Revised Forest Plan, p 21-23:

"Riparian management zones are portions of watersheds where riparian-associated resources receive primary emphasis, and management activities are subject to specific standards and guidelines. RMZs include traditional riparian corridors, wetlands, intermittent streams, and other areas that help maintain the integrity of aquatic ecosystems by 1) influencing the delivery of coarse sediment, organic matter, and woody debris to streams, 2) providing root strength for channel stability, 3) shading the stream, and 4) protecting water quality. RMZ provide other riparian functions, including delivery of organic matter and woody debris, stream shading, and bank stability. Another critical function of RMZ is to provide for wildlife habitat use and connectivity."

Recommendations for classification of RMZ

- Category 1 – Native Fish Bearing Streams
- Category 2 – Permanently flowing non-fish bearing streams
- Category 3 – Ponds, lakes, reservoirs
- Category 4 – Wetlands
- Category 5 – Seasonally flowing or intermittent streams or lands with exceptional detrimental erosion
- Discretion of management in "Inner" and "Outer" zones within the underlying RMZ

*Considerations for management of RMZ*

- RMZ reflect a natural composition of native flora and fauna and a distribution of physical, chemical, and biological conditions appropriate to natural disturbance regimes

---

[7] 36 C.F.R. §219.8(a)(1).

4

- The species composition and structural diversity of native plant communities in riparian management zones, including wetlands, provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration
- They will supply amounts and distributions of nutrients, coarse woody debris, and fine particulate organic matter sufficient to sustain physical complexity and stability
- RMZ feature key riparian processes and conditions, including slope stability and associated vegetative root strength, wood delivery to streams and within the RMZs, input of leaf and organic matter to aquatic and terrestrial systems, solar shading, microclimate, and water quality, operating consistently with local disturbance regimes
- RMZs should have highly diverse structure and composition to support terrestrial riparian-associated plants and animals.
- Only activities that advance RGCT connectivity and aquatic ecological health allowed
- Prioritization of partner projects for restoration and rehabilitation including replacement of non-native vegetation such as tamarisk with appropriate native plantings
- Preclude surface disturbance from oil and gas development within a buffer from the ordinary high water mark from perennial and intermittent streams and other riparian areas; apply a larger setback from Gold Medal (CO) and Special Trout (NM) waters

5

Rvsd Plan - 00002394

# Place-based Opportunities for Connectivity in the Upper Rio Grande Landscape



Rvsd Plan - 00002395

**From:** Defenders of Wildlife on behalf of Nancy Bowsher
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:56:49 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Nancy Bowsher
14685 County Road 261c
Nathrop, CO 81236-9774
(719) 539-7877
nbowsher@yahoo.com

Rvsd Plan - 00002396

**From:** Defenders of Wildlife on behalf of Lisha Doucet
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:57:11 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Lisha Doucet
8525 Citation Dr
Wellington, CO 80549-3224
(281) 389-5339
lisha_doucet@hotmail.com

**From:** Defenders of Wildlife on behalf of Mary Ferraro
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:56:57 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Mary Ferraro
718 Fulton St
Aurora, CO 80010-3914
(720) 262-4272
ferrarmt@hotmail.com

Rvsd Plan - 00002398

**From:** Defenders of Wildlife on behalf of James Johnson
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 5:26:44 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Mr. James Johnson
1715 Holly Way
Fort Collins, CO 80526-6920
(970) 221-0432
jandajohnson1@comcast.net

Rvsd Plan - 00002399

**From:** Defenders of Wildlife on behalf of Barbara League
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:57:04 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Barbara League
3830 Silver Plume Ln
Boulder, CO 80305-7218
bleague54@me.com

Rvsd Plan - 00002400

**From:** Defenders of Wildlife on behalf of Cindy Miller
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:59:59 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Cindy Miller
8494 US Highway 285
Morrison, CO 80465-8954
(303) 697-0495
mtn.miller@hotmail.com

Rvsd Plan - 00002401

**From:** Defenders of Wildlife on behalf of Desiree Sanchez
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:57:05 PM

Oct 24, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Desiree Sanchez
917 Harrison Dr
Lafayette, CO 80026-1864
desireedsanchez@yahoo.com

Rvsd Plan - 00002402

| | |
|---|---|
| **From:** | Defenders of Wildlife on behalf of Lyrysa Smith |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please! Let"s Protect the Rio Grande National Forest |
| **Date:** | Monday, October 24, 2016 1:26:36 PM |

Oct 24, 2016

Rio Grande National Forest Supervisor  Dan Dallas

Dear Rio Grande National Forest Supervisor  Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to
recommend the highest level of protection for wildlife in the Rio
Grande National Forest. I support more recommended wilderness and
conservation areas within the Rio Grande National Forest in order to
better conserve important habitat for the threatened Canada lynx,
boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat
trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this
forest, the current planning process is a prime opportunity to protect
vulnerable habitat from development, and to preserve wild lands for
wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species
and an array of other wildlife. Protecting these areas will conserve
the headwaters of the Rio Grande for the benefit of fish, wildlife and
downstream communities. Connecting strongholds with corridors will also
help animals move across the landscape and adapt in response to a
changing climate. I support the designation of zoological areas,
including the Wolf Creek Linkage and a corridor that links the Rio
Grande to the Carson National Forest to enhance Canada lynx movement
and wildlife migration.

Thank you for your consideration,

Ms. Lyrysa Smith
1885 S Quebec Way
Apt B22
Denver, CO 80231-5623
lyrysasmith@gmail.com

**From:** Defenders of Wildlife on behalf of Lisa Zales
**To:** FS-RGNF forest plan
**Subject:** Protect the Rio Grande National Forest
**Date:** Monday, October 24, 2016 4:56:49 PM

Oct 24, 2016

Rio Grande National Forest Supervisor  Dan Dallas

Dear Rio Grande National Forest Supervisor  Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to
recommend the highest level of protection for wildlife in the Rio
Grande National Forest. I support more recommended wilderness and
conservation areas within the Rio Grande National Forest in order to
better conserve important habitat for the threatened Canada lynx,
boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat
trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this
forest, the current planning process is a prime opportunity to protect
vulnerable habitat from development, and to preserve wild lands for
wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species
and an array of other wildlife. Protecting these areas will conserve
the headwaters of the Rio Grande for the benefit of fish, wildlife and
downstream communities. Connecting strongholds with corridors will also
help animals move across the landscape and adapt in response to a
changing climate. I support the designation of zoological areas,
including the Wolf Creek Linkage and a corridor that links the Rio
Grande to the Carson National Forest to enhance Canada lynx movement
and wildlife migration.

Thank you for your consideration,

Lisa Zales
7622 S Grape St
Centennial, CO 80122-3857
lisazales@yahoo.com

| | |
|---|---|
| **From:** | Defenders of Wildlife on behalf of Tammy Fiebelkorn |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Please protect the Rio Grande National Forest |
| **Date:** | Wednesday, October 26, 2016 10:04:15 AM |

Oct 26, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

I am writing to recommend the highest level of protection for wildlife in the Rio Grande National Forest. I lived in Colorado for many years, and am still a frequent visitor there - specifically because of the wonderful natural resources like the Rio Grande National Forest.

I support more recommended wilderness and conservation areas within the Rio Grande National Forest in order to better conserve important habitat for the threatened Canada lynx, boreal toads, Rocky Mountain bighorn sheep, the Rio Grande cutthroat trout and the endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this forest, the current planning process is a prime opportunity to protect vulnerable habitat from development, and to preserve wild lands for wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species and an array of other wildlife. Protecting these areas will conserve the headwaters of the Rio Grande for the benefit of fish, wildlife and downstream communities. Connecting strongholds with corridors will also help animals move across the landscape and adapt in response to a changing climate. I support the designation of zoological areas, including the Wolf Creek Linkage and a corridor that links the Rio Grande to the Carson National Forest to enhance Canada lynx movement and wildlife migration.

Thank you for your consideration,

Ms. Tammy Fiebelkorn
1445 Adams St NE
Albuquerque, NM 87110-5046
(505) 410-3884
tammy@e-solved.com

| | |
|---|---|
| **From:** | Defenders of Wildlife on behalf of Jake Hodie |
| **To:** | FS-RGNF forest plan |
| **Subject:** | PLEASE Protect the Rio Grande National Forest!! |
| **Date:** | Thursday, October 27, 2016 9:36:30 AM |

Oct 27, 2016

Rio Grande National Forest Supervisor Dan Dallas

Dear Rio Grande National Forest Supervisor Dallas,

As a Defender of Wildlife and a resident of Colorado, I am writing to
recommend the highest level of protection for wildlife in the Rio
Grande National Forest.

So much of our wilderness has already been ruined by mining, drilling,
development, and man.
Enough is enough!
The wilderness is supposed to be a place of peace and quiet for us, and
the wildlife which live in it!
The animals are running out of places to live and be safe. Our wildlife
are under threat from so many angles. They desperately need to be
protected, mainly from humans.
Life is hard enough for people, let alone the animals.
Can't we please offer them some much needed help?!
PLEASE protect the RIO GRANDE NATIONAL FOREST for all future
generations. Some damage cannot be undone!

I STRONGLY SUPPORT more recommended wilderness and conservation areas
within the Rio Grande National Forest in order to better conserve
important habitat for the threatened Canada lynx, boreal toads, Rocky
Mountain bighorn sheep, the Rio Grande cutthroat trout and the
endangered Uncompahgre fritillary butterfly.

With nearly one million acres of roadless and undeveloped land in this
forest, the current planning process is a prime opportunity to protect
vulnerable habitat from development, and to preserve wild lands for
wildlife, clean water and non-motorized recreation.

I support designating special areas as strongholds for at-risk species
and an array of other wildlife. Protecting these areas will conserve
the headwaters of the Rio Grande for the benefit of fish, wildlife and
downstream communities. Connecting strongholds with corridors will also
help animals move across the landscape and adapt in response to a
changing climate. I support the designation of zoological areas,
including the Wolf Creek Linkage and a corridor that links the Rio
Grande to the Carson National Forest to enhance Canada lynx movement
and wildlife migration.

Thank you for your consideration,

Mr. Jake Hodie
145 Starwood
Aspen, CO 81611

Rvsd Plan - 00002406

skicopmtn@aol.com



535 16th Street, Suite 310 | Denver, Colorado 80202 | tel 303.825.0918
**www.defenders.org**

October 28, 2016

Rio Grande National Forest
Supervisor's Office
1803 W. Highway 160
Monte Vista, Colorado 81144

Via email: *rgr f_forest_plan@fs.fed.us*

Dear Rio Grande National Forest Planning Team:

Please accept the following comments on the on formal scoping for the forest plan revision for the
Rio Grande National Forest (RGNF). We have reviewed the Notice of Intent to Prepare an
Environmental Impact Statement (NOI; 81 Fed Reg 62,706 et seq., September 12, 2016) and the
Proposed Action document available on the RGNF's revision website. Thank you for the
opportunity to review and provide feedback on the Proposed Action. We appreciate the time and
effort required to assemble this document. We request that you consider the issues and information,
outlined below, for consideration as you continue through the planning process and on to develop
the Draft Environmental Impact Assessment.

Defenders of Wildlife (Defenders) is a national non-profit conservation organization founded in
1947 focused on conserving and restoring native species and the habitat upon which they depend.
We submit the following on behalf of our 1,200,000 members and supporters nationwide, including
more than 21,000 in Colorado.

Feel free to contact Lauren McCain at lmccain@defenders.org or 720-943-0453 with any questions.

Sincerely,

Peter Nelson
Senior Policy Advisor, Federal Lands

Lauren McCain
Federal Lands Policy Analyst

Rvsd Plan - 00002408

# Contents

1.  Introduction ........................................................................................................................ 2

2.  General Comments on the Proposed Action ..................................................................... 3

    2.1.  Responsiveness and Flexibility................................................................................. 3

    2.2.  Goals ......................................................................................................................... 4

    2.3.  Forest-wide Desired Conditions ............................................................................... 5

    2.4.  Objectives ................................................................................................................. 8

    2.5.  Geographic Areas ..................................................................................................... 8

    2.6.  General Forest Area .................................................................................................. 8

    2.7.  Fire Management Zones........................................................................................... 10

    2.8.  Standards and Guidelines ....................................................................................... 11

3.  Use of Best Available Scientific Information and the Assessment.................................. 11

4.  Ecological Integrity ....................................................................................................... 12

    4.1.  Terrestrial Ecosystems ........................................................................................... 12

        4.1.1.  Ecosystem Resilience and Aggressive Diversification of Forested Ecosystems ..................... 12

        4.1.2.  Salvage Logging.......................................................................................... 16

    4.2.  Watersheds and Aquatic and Riparian Ecosystems ............................................... 17

    4.3.  Connectivity............................................................................................................ 20

5.  At-risk Species............................................................................................................... 21

    5.1.  Threatened and Endangered Species ...................................................................... 21

    5.2.  Proposed and Candidate Species ........................................................................... 31

    5.3.  Species of Conservation Concern .......................................................................... 32

        5.3.1.  Species of Conservation Concern Selection ............................................... 32

        5.3.1.1.  Response to Additional Recommendations ................................................ 34

        5.3.1.2.  Additional request for consideration.......................................................... 35

        5.3.2.  Species of Conservation Concern Recommendations ................................. 35

6.  Climate Change.............................................................................................................. 45

7.  Monitoring ..................................................................................................................... 48

    7.1.  General Comments .................................................................................................. 48

    7.2.  Recommended Focal Species .................................................................................. 49

8.  Designated Area Recommendations ............................................................................... 51

9.  Literature Cited .............................................................................................................. 51

Rvsd Plan - 00002409

1.  Introduction

The Rio Grande National Forest (RGNF) supports an array of strongholds for vulnerable native flora and fauna. The Forest has an opportunity to contribute to the recovery of eight federally protected species, including the threatened Canada lynx and endangered Uncompahgre fritillary butterfly; conserve the North American wolverine, which is proposed for listing under the U.S. Endangered Species Act (ESA); and maintain the persistence of Species of Conservation Concern (SCC) through its management plan revision process.

Now is the time for bold action in forest planning; robust, science-based forest plan decisions will result in higher degrees of public confidence that the Forest Service is fulfilling its mission and conservation obligations and enabling integrated landscape-level decision making and more efficient project-level implementation. To that end, the purpose of National Forest System (NFS) land management planning is to develop plans that "guide management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future, …includ[ing] clean air and water; habitat for fish, wildlife, and plant communities; and opportunities for recreational, spiritual, educational, and cultural benefits" (36 CFR 219.1(c)). These are the overall, broad-scale desired conditions set forth in the 2012 Planning Rule (36 CFR 219.1-219.19) (Planning Rule or rule).

To achieve these broad goals, a system has been developed to assess current conditions and trends, identify the need to change the forest plan based on the Assessment, develop a plan to meet desired conditions, and monitor conditions to test if the plan is working. Each element of the system is integral to the whole. The planning phase for forest plan revision begins with a "review of the relevant information from the Assessment and monitoring to identify a preliminary need to change the existing plan and to inform the development of plan components and other plan content" (219.7(c)(2)(i)). The planning process must also be driven by review, incorporation, and analysis of best available scientific information (BASI) (219.3).

The Planning Rule is a federal regulation implementing the National Forest Management Act (NFMA) (1600 U.S.C. § 1600 et seq.). NFMA was enacted in 1976 in large part to elevate the value of ecosystems, habitat and wildlife on our national forests to the same level as timber harvest and other uses. NFMA codified an important national priority to ensure forest management plans "provide for the diversity of plant and animal communities based on the suitability and capability of the specific land area" (16 U.S.C. § 1604(g)(3)(B) (2012)). NFMA established a process for integrating the needs of wildlife with other multiple uses in forest plans. Most important, the law set a substantive threshold Forest Service management actions must comply with for sustaining the diversity of ecosystems, habitats, plants and animals on national forests. These comments are primarily on the species diversity and ecological sustainability aspects of management planning.

Management goals and approaches must be detailed, enforceable, and designed to protect and restore wild forest landscapes that are held in trust for all American's, not just those with economic interests in our natural resources. There may be natural desire to postpone difficult analyses and decisions to the project-scale; however, this approach will only delay and reduce the effectiveness of efforts required by the NFMA to conserve and restore our national forests and resident fish,

wildlife, and plants. The Planning Rule requires that *plan components*—not project decisions—provide ecological conditions for at-risk species.

2.   General Comments on the Proposed Action

We appreciate the effort to portray the Proposed Action as a "strategic framework". It is important to have a clear portrayal of the architecture that the Forest is proposing for the revised plan. It is our view that in forest planning, as in other disciplines, form should follow function. The forest plan therefore should be designed to meet the purpose and requirements of the Planning Rule. The purpose of forest plans is articulated in the Planning Rule in Section 219.1(c).[1] These purposes provide a framework for the structure of all forest plans, and can be tailored to meet the unique roles, contributions and contexts of individual national forests. Importantly, forests should not ignore or downplay any of the broad goals and purposes of the Planning Rule. Note that ecological integrity is the first stated purpose thus reinforcing the notion that maintaining and restoring the health of national forest lands and waters is central to the rule's fundamental principle of social, economic and ecological sustainability. Forest plans achieve these purposes by following the direction and fulfilling the requirements of the Planning Rule through the use of plan components and other plan direction. Plan components are the heart of the forest plan in that they enable rule purposes and requirements to be met. While the overall architecture of a plan is important, a plan will be evaluated on the degree that its plan components effectively meet the rule's purposes.

2.1.  Responsiveness and Flexibility

At the outset it is important to appropriately frame the purpose of a forest plan under the Planning Rule. The Proposed Action states that the revised *forest plan* should be "adaptive and responsive to monitoring results, changing direction, changing technologies, and changing resource conditions" (p. 1). Elsewhere the Proposed Action states that "Resource management allows for flexibility and the ability to adapt…" (p. 16). It is true that the Planning Rule framework "creates a responsive *planning process*" that "allows the Forest Service to adapt to changing conditions" (36 CFR 219.6(a)) emphasis added). However, there is nothing in the Planning Rule that provides authority to establish a *flexible forest plan* by building uncertainty into the plan components themselves.

It's helpful to think of the eventual decision document supporting the forest plan at the outset of the process. That decision will require "An explanation of how the plan components meet the sustainability requirements of § 219.8, the diversity requirements of § 219.9, the multiple use requirements of § 219.10, and the timber requirements of § 219.11" (36 CFR 219.14(a)(2)). Every plan component developed at this stage of the planning process should be evaluated through the lens of that requirement:  Does it allow the forest plan to meet the rule's requirements?  There is an allure to postpone plan decisions to another time and place, whether it be under the auspices of "flexibility" "adaptive management" or some other reason. This will not work. A plan that provides

---

[1] The purpose of this part is to guide the collaborative and science-based development, amendment, and revision of land management plans that promote the ecological integrity of national forests and grasslands and other administrative units of the NFS. Plans will guide management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the e present and into the future. These benefits include clean air and water; habitat for fish, wildlife, and plant communities; and opportunities for recreational, spiritual, educational, and cultural benefits.

discretion for future decision-makers to adopt programmatic decisions on a project-by-project basis would provide the Forest with the ability to essentially change or create plan direction in the future without public involvement. This would be counter to the fundamental purpose of NFMA of providing integrated and strategic direction for future projects (NFMA Section 6(f)(1)). It would also bypass the substantive requirements of the Planning Rule, and its requirement for use of BASI, both of which explicitly do not apply to projects (36 CFR 219.2(c)). In the case of at-risk species, it would allow the Forest to avoid its statutory obligation for *forest plans* to provide for diversity of plant and animal communities.

The forest plan cannot simply be a blank check. Plan components must "guide the development of future projects and activities" (FSH 1909.12 Ch. 20, 22.1). It is important that this step of providing a longer-term and landscape-scale context for project decision-making be taken seriously. Where future determinations are necessary, failure to at least provide criteria for making those determinations amounts to including no plan components that would meet species-diversity requirements.

The Proposed Action does not provide meaningful plan components for at-risk species (i.e. providing certainty that necessary ecological conditions for *each* at-risk species will be achieved under the plan). We understand that those plan components are forthcoming, but it is worth noting at this stage that the Planning Rule clearly states that it is *plan components* that must provide the necessary ecological conditions for at-risk species (36 CFR 219.7(d)(3)). Plan components are limited to optional goals, and required desired conditions, objectives, standards, guidelines and suitability of lands. Monitoring programs are required, but are not plan components and cannot be used in lieu of plan components to meet diversity requirements. Information may be included in a plan about "management approaches or strategies (36 CFR 219.7(f)(2))," but these are not plan components and cannot be relied on to meet the diversity requirement.

## 2.2. Goals

The Proposed Action employs goals at the top of the strategic framework. Goals are an optional plan component considered to be "broad statements of intent, other than desired conditions, usually related to process or interaction with the public" (36 CFR 219.7(e)(2)). The Planning Rule does not suggest that goals are to "provide umbrella statements that all other direction would tier to" (p. 7). Plan direction tiers to the requirements of the Planning Rule. In fact, the three goals provided in the Proposed Action appear to be loose interpretations of Planning Rule requirements. For example, the goal to "protect and restore watershed health, water resources, and the systems that rely on them" is found in Section 219.8 of the Planning Rule. Specifically, there must be plan components (including standards or guidelines) for watershed integrity (219.8(a)) and water resources in the plan area (36 CFR 219.8(a)(2)(iv)).

Similarly, the goal to "maintain and restore sustainable, resilient ecosystems" essentially alludes to the Planning Rule's requirement to maintain or restore the ecological integrity of ecosystems (36 CFR 219.8). The restoration of natural fire regimes as drivers of ecological integrity and resiliency should be an overarching goal within the forest plan; this would be in line with the rule's emphasis on developing plan components for "Wildland fire and opportunities to restore fire adapted ecosystems" (36 CFR 219.8(a)(1)(v)). We note that the goal to "aggressively" diversify "age classes and structure, seral stage, and habitat classes" is not appropriate. First, goals should not be used in lieu of desired conditions (FSH 1909.12 Ch. 20, 22.16). Second, there needs to be specific plan

components for the particular ecosystems within the plan area; the proposed action appears to generalize conditions across ecosystems; ecosystems vary in their degree of integrity and each will have unique maintenance and restoration needs. If age class, structure, seral state, and habitat class refer to key ecosystem characteristics, there must be desired conditions for them based on the natural range of variation, as well as standards and guidelines to ensure that desired conditions are actually achieved. "Aggressive" diversification in not an appropriate term; objectives can be used to establish a rate of progress toward desired conditions for ecological integrity and would need to be compatible with other plan components for sustainability and plant and animal community diversity.

The goals do not meet the definition of plan components provided in the directives. For example, they essentially "repeat Agency policies applicable to all National Forest System units" and are not "written clearly and with clarity of purpose and without ambiguity so that a project's consistency" with them can be easily determined (FSM 1909.12 Ch. 20, 22.1). It may be appropriate to use goals to "organize plan components" (FSH 1909.12 Ch. 20, 22.16) and this could be the role the Forest envisioned for them in the Proposed Action. In this case we would recommend goal statements that meet the definition of plan components and that they be provided for all types of plan components, including the duty to provide ecological conditions for at-risk species. We also recommend that the Forest shape the goals using the direction provided in the directives, for example by describing a "state between current conditions and desired conditions" or "overall desired conditions of the plan area that are also dependent on conditions beyond the plan area or Forest Service authority."

### 2.3. Forest-wide Desired Conditions

The Proposed Action lists a number of forest-wide desired conditions (Strategic Domain p. 9). Here is where it may be useful to organize desired conditions with specific goal statements for specific resource requirements consistent with the Planning Rule. As mentioned, the framework should cover all of the Planning Rule's requirements, not just a subset: "The set of desired conditions for plan revision must cover ALL the requirements for a plan set out at 36 CFR 219.8 through 219.11 – to provide for sustainable ecosystems with ecological integrity, in the context of multiple-use management" (FSH 1909.12 Ch. 20, 22.11, emphasis in original).

So for example rather than "biological diversity" there would be a set of desired conditions for "ecological sustainability" (219.8). This would include desired conditions for key characteristics of ecological integrity for each terrestrial and aquatic ecosystem in the plan area, and watersheds. There will also be a set of desired conditions for ecological conditions necessary for at-risk species, which may overlap those provided for ecological integrity. The draft plan should list all desired conditions for integrity and those necessary for at-risk species so that it is clear how Planning Rule requirements are being met. Such a format also allows the reader to understand that the needs of at-risk species will be met through plan components for integrity or through species specific plan components.

As it stands the forest-wide desired conditions presented in the Proposed Action do not meet the Planning Rule's definitions and requirements. For example, there must be plan components for integrity for each of the ecosystems and watersheds in the plan area. It is not clear in the Proposed Action what the target ecosystems are for integrity management. The ecosystems discussed in the "Roles & Contributions" section (p. 4), along with those evaluated within the Assessment, should form the basis for plan components for ecosystem integrity.

Furthermore, the proposed desired conditions are not "described in terms that are specific enough to allow progress toward their achievement to be determined" (36 CFR 219.7(e)(1)(i)). Vague desired conditions provide nothing to judge whether they have been met except for the opinion of the Forest Service. The less specific and ascertainable the desired conditions are, the more mandatory standards and guidelines are needed to provide certainty that the Planning Rule's requirements are being met. For instance, the desired condition for "biological diversity" states that "habitat composition (including seral stage), structure, pattern (connectivity), and disturbance frequencies similar to those that result from natural disturbances (insects, disease, and fire) are maintained to the extent possible…" This is a start in identifying key ecosystem characteristics for integrity. However, it is necessary to actually describe the desired key characteristic (e.g. habitat composition, structure, pattern/connectivity, disturbance) conditions in specific terms for *each* target ecosystem. These characteristics and information on their integrity status should be carried forward from the Assessment, and we discuss this below.

We assume that the desired condition to "provide ecological conditions necessary to contribute to the recovery of Federally listed species, conservation of proposed and candidate species, and maintain viable populations of species of conservation concern in the plan area" is a placeholder because it simply repeats Planning Rule requirements. It would be helpful if the Forest would acknowledge this and make a concerted attempt to solicit comment on what those actual conditions are. We are somewhat surprised that the Forest is using a placeholder approach here given that the conditions necessary to meet the requirements for at-risk species should have been identified and documented during the Assessment (along with relevant information gaps that may be filled through inventories, plan monitoring, or research) (FSH 1909.12 Ch. 10, 12.53).

Similarly, we assume that the desired condition to protect, restore and enhance habitat for federally listed species is not meant to serve as a plan component but to solicit further input on the specification of those species and the definition of desired condition statements for each of those habitat types. Again this is information that is required to be provided in the Assessment so that generic plan components can be avoided for those that actually specify in measurable terms the conditions required by at-risk species.

There are a number of flaws throughout the set of forest-wide desired conditions; to mention a few:

Under "Timber Resources" the desired condition is that "some harvest operations are designed to mimic natural disturbance events or processes." This doesn't seem to be a desired condition. The desired condition is for stands/areas to have a condition that mimics natural disturbance. This is a good plan component for integrity, but it would also need to specify which ecosystem it applied to, and get further into the appropriate ecological scale. "Harvest operations" would then contribute to achieving the desired stand conditions. In that same section there is a desired condition that "vegetation structure…is capable of sustaining timber harvest…" It is appropriate and required to have plan components for timber harvest but the phrasing of the plan component suggests that the desired ecosystem structure is driven by a capability to sustain harvest. It would be more appropriate to define the desired structural conditions for ecosystems, patch areas and stands in the planning area, considering areas in suitable (production) and non-suitable (harvest for other purposes) designations to ensure that plan components for timber harvest are compatible or may assist in achieving desired conditions for integrity.

Under "Range" the desired condition states that "site specific desired conditions are fully described in the allotment management plan." Postponing the development of a desired condition is not a desired condition. The forest plan must define the conditions necessary to govern projects and activities implemented under the plan.

Under "Fire" there is a desired condition that "the role of fire in ecosystem dynamics is recognized and sponsored when and where it does not threaten human life and property." We don't grasp the meaning of the word "sponsored" in this sentence. Furthermore, this is not a desired condition in that it doesn't specify the role of fire in ecosystem dynamics nor discuss under what conditions (or when) it would be recognized. The forest plan is the place to define the role of fire. Effectively planning and managing for wildland fire is a central policy objective of the Planning Rule. The Assessment is to provide information on the role of wildland fire as a system driver (36 CFR 219.6(b)(3)), and plan direction for integrity should also stress desired conditions and other plan components for fire disturbance (36 CFR 219.8(a)(1)(iv)). Specific plan components to "restore fire adapted ecosystems" are expected (36 CFR 219.8(a)(1)(v)). Desired conditions for fire behavior should be developed based on the Assessment and BASI. The desired condition that "the amount, arrangement, and continuity of live and dead materials that contribute to fire spread are consistent with land uses and estimates of historic fire regimes" is problematic. We agree that there should be a desired condition for those structural conditions to meet ecosystem integrity requirements; to accomplish this the desired condition needs to describe the parameters of the historic fire regimes for each of the relevant ecosystems. We also agree that there may be additional plan components addressing other issues such as "land uses" but those must be developed so that they are compatible with the desired condition for the ecosystem. We note that ecological integrity need not be achieved "on every acre" but that the sum of the plan components for any given ecosystem must result in an ecosystem's integrity.

Plan components for "Water and Aquatic Resources" should reflect the requirements in Section 219.8 by actually articulating the desired condition. For example, the "dynamic equilibrium between extreme natural events" needs to be described, as does the meaning of a "near-reference-stream appearance"; "expected ranges", "acceptable limits" and levels of habitat (i.e. "adequate") need to be described so that they can be measured. Any time there is a reference to something not being "increased", or "maintained" or "improved", that baseline value needs to be expressed so that the condition can be measured. Words like "healthy" or "harmonious" should not necessarily be avoided, but be qualified so that they can be consistently evaluated.

The only way to determine if "Mineral development is compatible with ecosystem capabilities and resource values" is to have plan components for ecosystem capabilities and resource values. The forest plan must provide the "stipulations, mitigation, and careful monitoring" that will ensure that ecosystem capabilities and resource values are being maintained (i.e. constraints on project or activity decisionmaking to help achieve the desired conditions for resource values).

More should be said on roads. The desired condition states that the "road system continues to serve as adequate access for the public". Does this mean that the current road system is adequate and will not change in nature? Does it mean that a different road system could be adequate?  More specificity on the "areas" where road closure is emphasized is needed, as well as the desired conditions for these areas for wildlife habitat, soil, and water resources. Objectives will be required to make progress toward these conditions in these areas. Other plan components may be necessary

to avoid expansion of the road system in areas where roads pose a threat to necessary conditions for wildlife, soil and water resources.

### 2.4. Objectives

We appreciate the examples of potential Objectives and provide the following comments. Consider using objectives to prioritize areas. For example, actions to eliminate non-native invasive species may be prioritized in certain priority watersheds or other areas where the invasives pose a particularly acute threat to sustainability. Tier the objectives to specific desired conditions. An objective to "maintain, enhance, or improve conditions on three to five fen habitats" (or meadows, fish habitats, etc.) will not work unless there are specific plan components describing those conditions. The objective to "Use appropriate and authorized tools…to meet resources objectives" does not seem to be an objective. It seems more like a potential management approach. Obviously the "resource objectives" would have to be defined, as would the desired conditions for "vegetation build-up". Priority watersheds play an important role in the Planning Rule and could be the subject of focused restoration planning. We note that the priority watersheds need to be identified in the plan. Desired conditions for specific attributes of "condition class" may be useful in focusing restoration actions that will effectively improve watershed conditions.

### 2.5. Geographic Areas

The Planning Rule defines geographic areas as "spatially contiguous land areas." It is not clear that the proposed geographic areas are contiguous. The directives point out that geographic areas are "large areas" "based on place, while management areas are based on purpose" (FSH 1909.12 Ch. 20, 22.21). "General Forest" "Primitive Wilderness" and "Roadless" areas are not clearly characterized as spatially contiguous places; in fact, they occur throughout the Forest. The areas appear to be defined more by their purpose. Management direction for Wilderness and Roadless lands is fairly well established based on the purposes associated with the designation of these areas. And, for example, the General Forest Geographic Area is defined by its "multiple-use emphasis to achieve a variety of goals." This does not sound like a geographic place (i.e. a canyon, or a mountain area, or a specific watershed, as discussed in the directives); by definition it is a "general" area. It seems the point of the geographic area designation is to direct plan direction to a specific spatial area characterized by some sort of geographic logic; we question whether the Forest is appropriately using the Geographic Area designation tool in this case. The proposed plan direction does not imply a sense of place-based management in this case.

### 2.6. General Forest Area

As for the "desired conditions" for the General Forest area (the statements are not defined as such), they are problematic. For example, there is a statement that the "multiple-use emphasis" is used to "achieve a variety of goals." These goals need to be specified. In order to "balance" "resource use and management", plan components for those values would need to be expressed. Similarly, the "species-specific needs" that will form the basis for "rotation periods" need to be specified in the form of plan components. Clearly there will need to be plan components for "resiliency in the face of changing environmental conditions" so that it can be determined that "all vegetation management is sustainable."

Regarding the spruce-beetle outbreak, and the implications for management within the General Forest area, the Proposed Action states that it's "effects are highly variable and may be positive or negative." The Proposed Action seems to conclude that it is necessary to "restore" conditions following the disturbance, without clarifying its positive or negative effects. To reach a conclusion that conditions require restoration, the Forest must demonstrate that projected future conditions for selected key characteristics do not indicate ecological integrity (i.e. that future conditions will be outside of NRV considering future environmental change). Absent desired conditions for integrity for characteristics of the ecosystem affected by the spruce-beetle outbreak it is not possible to propose a vague "restoration" effort. Social and economic objectives such as to "capture the existing value of the dead trees" and increase the near term harvest volume $may$ have validity, but only after it has been demonstrated that the system requires restoration of ecological integrity due to the outbreak and plan components have been established to guide such restoration. The statement that "For the upcoming decade, salvage harvest in the spruce-fir cover type will dominate the timber harvest program" is totally premature absent plan direction for ecological conditions in that forest type.

Regarding timber suitability, as it is discussed within the General Forest area of the Proposed Action, the lands that "may be suitable for timber production" are equal to the total NFS lands in the plan area minus the lands not suited for timber production due to legal or technical reasons (FSH 1909.12 Ch. 60 61 – Exhibit 01). It is not valid to project the estimate of what may be suitable until the lands not suited have been formally identified; the directives state that they may be identified in the Assessment or prior to the development of alternatives. Furthermore, it is not safe to assume that the "suitable base in the new plan will be similar" to the current plan without having plan components yet.

Regarding the desired condition for roads within the General Forest area, it will be necessary to specify what a "well-developed transportation system" consists of and evaluate the impacts of pursuing that condition on plan components for other resources.

It is interesting to read that ecosystems within the General Forest area "would be resilient to the impacts of wildfire" which implies wildfire behaving as a stressor rather than a driver of ecosystem integrity and resiliency. The thinking here needs to be clear. Uncharacteristic fire may act as a stressor (a threat to resiliency) in that it is behaving outside of its natural range. Therefore, in addition to defining the structural and compositional characteristics of a resilient system, there should be plan components for characteristic (functional) fire (as a driver of integrity). Desired conditions for ecosystem function are all too often overlooked in favor of structural or compositional attributes.

If there are characteristics of wildfire that are detrimental to ecosystem function (i.e. that are operating outside of NRV) it may be necessary to pursue improvements in resiliency conditions; these could be related to desired conditions for key structural, compositional, or functional characteristics. (In other words it may be necessary to change structural conditions to change fire behavior.) Once it has been established which characteristics are not resilient to wildfire, then desired conditions and supporting plan components can be established to guide restoration actions. The restoration of sustainable fire regimes (i.e. within NRV, informed by climate change impacts, and considering social impacts for some portions of some ecosystems) should be an overarching goal of the forest plan.

The statement that "Lands in this Geographic Area are maintained at a moderate to low risk with high potential benefit conditions relative to fire" needs to be more clearly explained. Risk of what? (The same construction is used in the Roadless Geographic Area, where it is necessary to explain the management implication.) "Acceptable conditions" for managing wildfires for resource benefit and prescribed fire need to be defined.

"Quality forage and cover" for wildlife need to be defined and measurable based on the demonstrated ecological needs of those species.

### 2.7. Fire Management Zones

The concept of fire management zoning is valid, given the realities of managing for fire within and adjacent to the Forest. However, the zoning approach must result in ecosystem integrity being achieved for the various Forest ecosystems. As mentioned earlier, integrity need not be achieved on "every acre" but must be met at the ecosystem scale of analysis within the plan area. There needs to be overarching plan direction for the affirmative role of fire in maintaining and restoring ecosystem conditions; management zones for fire can then tier to that framework.

The Proposed Action states that the Fire Management "zones are not a mapped feature" but applies the zones to the Geographic Areas and the Wildland Urban Interface, which are all mapped or mappable. So we are confused by that statement and believe that the zones meet the definition of a management area (i.e. an area "that has the same set of applicable plan components"). It appears that the intent is to provide unique plan components for the three types of fire zones. For example, it appears that "ecological maintenance" is one of the desired conditions in the FRB-M. It is equally if not more important at this stage to stress the desired conditions in the zones in addition to describing *how* that condition will be achieved. As mentioned earlier, the plan should have robust desired conditions and plan components for wildfire conditions as a driver of ecological integrity; those plan components could be forest wide (a goal for example) and tailored to geographic and management areas. It is not clear how the Fire Management Zones relate to the plan's approach to providing for the integrity of the various ecosystems in the plan area; what's missing at this stage is an understanding of the various ecosystems and their desired conditions for integrity.

Pivotal to this entire discussion is a definition and discussion of the "resources values" that are put at risk from wildfire. In Wilderness and Roadless areas there is low risk to resource values from fire, but in the General Forest area the "current conditions may put some natural resource values at varying degree of risk for damage from wildfire." What values are being discussed? Desired conditions and other plan components for these values must be expressed in order to understand the risks of not maintaining or achieving those conditions. The "specific resource objectives" mentioned throughout this section should be understood to be at minimum the ecological integrity of the ecosystems of interest; this is the primary driver of all other terrestrial and aquatic management directions. Only after establishing desired conditions for integrity of key characteristics for the ecosystems within the plan area can one make decisions about how to manage for integrity within those ecosystems. The Fire Management Zone concept implies that this logic is present: that generally backcountry areas will maintain "high integrity" conditions but that integrity may be compromised elsewhere due to other objectives and constraints. In concept this makes sense because an ecosystem can have integrity even if not every portion of that system is managed for that sole purpose. However, the forest plan will have to be crystal clear on how integrity is being provided and determined for each of the relevant ecosystems. The effects analysis will need to reveal

the impacts of all the plan direction on integrity and demonstrate that the rule's requirement is being met at the ecosystem scale of analysis.

### 2.8. Standards and Guidelines

The Proposed Action states that the "Forest Plan will present standards and guidelines prescribed in the 2012 Planning Rule" and recognizes that they are needed to achieve desired conditions (p. 35). It is somewhat difficult to provide comment on the desired conditions as stand-alone plan components, knowing that each will need to be supported by other plan components. However, at this stage it is important to point out that there are perils associated with relying too heavily on desired conditions. For example, the requirement for consistency with desired conditions is inherently much more flexible than for mandatory standards (36 CFR 219.15(d)(1)), and potentially allows no progress whatsoever to be made towards achieving them. Recognizing that such outcome-oriented plan components alone would not provide sufficient certainty, the Planning Rule indicates that mandatory standards and/or guidelines that act as constraints on projects be used where needed "to meet applicable legal requirements." Courts have held that only mandatory terms in forest plans can be considered regulatory mechanisms for the purpose of listing decisions under the Endangered Species Act. The NFMA diversity requirement requires a similar degree of certainty. There should be desired conditions for the ecological conditions needed by the at-risk species, and these need to be accompanied by standards and guidelines to ensure that those ecological conditions are achieved. It may be helpful to list all of the at-risk species, their necessary ecological conditions, and the set of plan components that apply to each, recognizing that plan components can meet the needs of more than one species. Structuring the plan components this way makes it much simpler to evaluate the effectiveness of the draft plan.

### 3. Use of Best Available Scientific Information and the Assessment

Based on our review of the Proposed Action, it is not clear how the Assessment and monitoring are being used in the planning decision process and will be used in the further development of plan components and other plan content in accordance with 36 CFR 219.7(c)(2)(i). We expected that the Proposed Action would demonstrate stronger linkages between assessment findings and various elements of the Proposed Action.

Defenders' comments on the draft assessment, particularly assessments 1, 3, and 5, pointed out some potential problems with assessment analyses and also use and documentation of science that we hoped the Forest Service would address in revisions of the Assessment documents. For example, we recommended that Assessment 1 and 3 (Terrestrial) provide an explanation regarding how inconsistencies between vegetation modeling results and relevant peer reviewed science would be resolved is a way that would guide management direction. We identified some areas where the Assessment indicated that additional changes may be necessary to make in the revised plan. In some places, the Proposed Action infers that there are gaps in the Assessment that need to be filled in order to make scientifically sound decisions. We will not restate all of our Assessment comments and concerns here, but have highlighted some places in the Proposed Action where we believe assessment deficiencies are leading to assumptions and decisions about forest management direction that are not based on the BASI. Additionally, where the Assessment does provide useful information, we believe there are cases where the Proposed Action did not capitalize on this information to develop proposed plan components, particularly desired conditions.

Rvsd Plan - 00002419

4.   Ecological Integrity

We are interested in how the Forest Service is defining "resilience." Variants of the term are used throughout the Proposed Action and assessments 1 and 3. We want to be sure we understand the RGNF's conception of resilience. We encourage the RGNF to focus on "ecological integrity," which encompasses resilience and is defined in the Planning Rule as,

> The quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation *and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence.* (36 C.F.R. 219.19, emphasis added)

4.1.  Terrestrial Ecosystems

4.1.1. Ecosystem Resilience and Aggressive Diversification of Forested Ecosystems

Under Goal 2, "Maintain and restore sustainable, resilient ecosystems," the Forest Service includes the following assertion,

> Aggressively diversifying age classes and structure, seral stage, and habitat classes, where appropriate, in the next planning horizon would provide many benefits including but not limited to providing resilience to insect and disease outbreaks, responsiveness to anticipated changes in climate, ecosystem services, recreation, increased social and economic benefits, and more. (Proposed Action: 8)

We have discussed above our problems with this statement regarding its appropriateness in relation to the Planning Rule and have some additional questions, below, regarding how the Assessment and BASI support the statement.

First, what are the ecological conditions on the Forest that suggest a loss of ecological integrity and a need for "[a]ggressively diversifying age classes and structure, seral stage, and habitat classes" to restore integrity? The belief that aggressive diversification will result in ecological benefits depends, in part, on the assumption that forest conditions are departed from NRV. Vegetation modelling conducted as a part of Assessments 1 and 3 (Terrestrial) suggests that the spruce-fir forest mix and mixed conifer-wet ecosystem types are substantially departed from NRV (Assessments 1 and 3, Terrestrial: 17).

Assessments 1 and 3 acknowledge significant limitations in the modelling and inconsistencies with other research, including published literature. For example, despite clear direction in FSH 1909.12, Ch. 10 12.14c to assume "the influence of climate change…will continue, based on the best available scientific information" when assessing the status of ecosystems, the model did not incorporate climate change effects and projections, and the Assessment stated, "[t]herefore, some of the simulation results may not hold and there may be other unanticipated conditions due to the effects of climate change" (Assessments 1 and 3, Terrestrial: 18). The Assessment stated, "[a] recent mixed-conifer synthesis (Colorado Forest Restoration Institute 2010) suggests that it is unclear how departed from the natural range of variation these cool-moist mixed conifer forests are and that more information is needed" (Assessments 1 and 3, Terrestrial: 19).

Rvsd Plan - 00002420

Model results for the spruce-fir forest ecosystem are also inconsistent with peer-reviewed literature. The Assessment stated,

> The modelling of historic conditions included moderate spruce beetle outbreaks, but did not include the rare, extreme spruce beetle outbreaks like the one the Rio Grande National Forest is currently experiencing. Literature (Eager et al. 2012, Romme et al. 2009) indicates that in these spruce-fir forests, spruce beetles generally persist in low-level, widespread populations that have little effect on forest structure, but that they periodically have very large outbreaks, where the "beetles may kill millions of mature pine or spruce trees over areas of thousands of hectares." Since the modelling did not include these large, explosive outbreaks, the spruce-fir forests may not be nearly as departed from the natural range of variation as the modelling suggests. (Assessments 1 and 3, Terrestrial: 18)

We recognize that uncertainties and disagreements are inherent in scientific research. We agree that the spruce beetle outbreak has changed forest conditions. However, in the case of the Assessment model, the modelers omitted rare—but not necessarily anomalous—extreme beetle epidemic cycles that periodically do occur in this forest type. As the planning handbook states when directing methods for NRV analysis, "Some conditions may have occurred frequently, and others may have occurred rarely", but there is no justification for ignoring infrequent disturbances (FSH 1909.12 Ch. 10, 12.14a). This makes the model suspect. While we appreciate that the Forest Service has recognized conflicts between modelling results and other science, we question whether the modelling results represent the BASI for assessing ecological conditions on the Forest. The Assessment made no explicit determination about which scientific information represents the BASI. Assessments 1 and 3 (terrestrial) concludes with the following statement,

> It is difficult to determine whether the terrestrial ecosystems on the Rio Grande National Forest are within the range of what would occur naturally. Modelling results indicate that the terrestrial ecosystems on the Rio Grande National Forest are, in general, moderately to substantially departed from what would occur naturally. However, some model assumptions and results do not agree with published literature. We know that very large spruce beetle outbreaks happened historically, but we don't really know with any certainty whether this latest spruce beetle outbreak is a completely natural phenomenon or one influenced by climate change. The departure from the natural range of other types, such as mixed conifer, is uncertain as well.

Again, the proposal for aggressively diversifying age classes, etc. and a general indication that the RGNF plans to change forest management direction seems to be based on assumptions that forest conditions are departed from reference conditions and are not resilient to insects, disease, fire, or climate change. The BASI, as presented in the Assessment, does not support this perception.

The Assessment statement quoted above indicates confusion over how to make an integrity status determination. It's not either NRV or climate; the "ecological reference model," as described in the directives (FSH 1909.12 Ch. 10, 12.14c), should incorporate both past and likely future conditions. If these types of disturbance events are going to be more frequent in the future, then they should be considered future (trending) drivers and built into the desired conditions. If certain conservation targets are not likely to persist under those future conditions, and thus are vulnerable, then they require adaptation strategies (i.e. plan components to help them persist in the face of climate change).

Rvsd Plan - 00002421

Second, what is the BASI documented in the Assessment or elsewhere that supports the notion that aggressive diversification will contribute to ecological integrity? The Forest Service is apparently making the leap from the assumption that forest ecosystems, particularly spruce-fir and wet mixed-conifer, are substantially departed from NRV to the assumption that heavy management will more closely align these ecosystems with reference conditions. The key characteristics selected: age classes and, particularly, structure, seral stage, and habitat classes are not well-defined; without further description and explanation, they do not represent "important specific elements of an ecosystem" for evaluating or for sustaining "the long-term integrity of the ecosystems" (FSH 1909.12 Ch. 10, 12.13). They do not appear to be meaningful for developing plan components.

Even if the spruce-fir and wet mixed conifer forests are indeed significantly departed from NRV, it does not necessarily follow that a management program of diversification would lead to integrity and some of the other benefits touted in the Proposed Action. The Assessment does not demonstrate support for the assumption. The Proposed Action does not outline plan components that support the goal. The following desired condition from the Proposed Action does not meet the definition of desired condition under the Planning Rule.

> Habitat composition (including seral stage), structure, pattern (connectivity), and disturbance frequencies similar to those that result from natural disturbances (insects, disease, and fire) are maintained to the extent possible, given legal and policy limitations, and the desired condition for the area.

We are interpreting that the following excerpt from the Assessment means that modelling results should help forecast how management (and a lack of management) will likely shape forest conditions in relation to NRV.

> We also used this modelling to estimate how conditions may change into the future, with and without management. As a result, we can use these modelling results to evaluate the similarity or difference of current conditions to historical conditions (within the natural range of variability), and how that may change in the future as an indicator of ecological integrity. (Assessment 1 and 3, Terrestrial: 5-6)

If the modelling was intended to compare projected forest ecosystem conditions under a management scenario and under an unmanaged scenario, the Assessment failed to present such an analysis in a way that a reader could identify differences between scenarios. The Assessment follows a pattern of describing the extent of departed conditions for vegetation types based on modelled outcomes, comparing the modelled results to published literature, projecting future recovery, and listing various management treatments that have been applied to these ecosystems. It is not apparent that assessment projections are based on how the Forest is being managed under the current management plan. And, the Assessment does not differentiate between management and non-management in its projections or make a connection between management and future recovery. We use the spruce-fir forest ecosystem analysis to exemplify this point. The Assessment stated,

> Future projections for the spruce-fir forest ecosystem generally show a trajectory of recovery toward the natural range of variation conditions over time. The current overabundance of grass/shrub conditions largely disappears in the first 20 years of projections, and open conifer forests are mostly replaced by mid- and closed cover forests over the first century of projections. Aspen stands increased in short-term and mid-term projections. Longer-term

projections, however, show a decline of aspen stands to levels roughly 10 percent lower than under the natural range of variation, mostly due to lower levels of wildfire under contemporary conditions due to fire suppression. (Assessment 1 and 3, Terrestrial: 18)

It is not clear from this paragraph whether the projected spruce-fir recovery is a response to management or not. (The passage does raise the question: how should plan direction regarding fire suppression change to address aspen vulnerability?) The next paragraph merely lists management activities.

Management treatments in the spruce-fir ecosystem include broadcast burning, group selection, planting of trees, salvage harvest, shelterwood harvest, and stand clearcut. In total, these treatments represent roughly 0.1 percent of the area occupied by spruce-fir on the Rio Grande National Forest (1,277 acres per year). (Assessment 1 and 3, Terrestrial: 18-19)

The Assessment did not make the linkages—using BASI—that demonstrate how treatments can achieve ecosystem integrity.

Assessment 1 and 3 (terrestrial) concluded by stating, "[m]any opportunities exist to help us work towards reducing risk and adapting to climate change and the drivers and stressors of the various ecosystems," including, "[t]esting non-traditional restoration treatments that achieve heterogeneous conditions at a variety of scales (Underhill et al. 2014)" (Assessment 1 and 3, Terrestrial: 43). Underhill et al. (2014) presented the results of a fuels reduction program that involved thinning to create forest openings in ponderosa pine and dry mixed-conifer forest, which is not showing departure from NRV in the RGNF based on vegetation modelling. Furthermore, it is not clear from the Assessment that homogeneity is a problem for the major RGNF ecosystem types.

The Proposed Action does not describe what management methods it will use to achieve diversification. Salvage harvest is the only vegetation treatment mentioned, and we are not provided an explanation of how salvage will result in diversification.

Third, how will aggressive diversification contribute to the ecological conditions necessary to promote threatened and endangered species recovery, proposed species conservation, and species of conservation concern persistence? We have found one of the biggest weaknesses in the aggregated chapters of the Assessment and presentation of scientific information is the inadequate linkage made between current forest management, ecosystem conditions, and the ecological conditions necessary for the recovery and persistence of at-risk species. We raised the point in our comments on the Assessment and need for change documents that habitat requirements for at-risk species should be represented by key characteristics used to assess ecological conditions (see FSH 1909.12 Ch. 10, 12.14(4)(b)). The RGNF's draft wildlife Assessment 5 stated that the draft version of the Assessment was a "work in progress" (Assessment 5: 74). Assessment 5 has not been revised.

Fourth, what can the RGNF do to make well-supported, science-based management decisions under this environment of significant uncertainty as the planning process moves ahead? We are looking forward to a more complete explanation in future planning documents of how diversification provides "resilience to insect and disease outbreaks, responsiveness to anticipated changes in climate, ecosystem services, recreation, increased social and economic benefits, and more" (Proposed Action: 8) based on BASI. Additionally, we urge the Forest Service to avail itself of experts who conduct research on forests in the Southern Rocky Mountains. Several locally-based

scientists are co-authors of papers cited in Assessment 1 and 3 (terrestrial). We recommend the RGNF initiate a science review, as explained in the planning directives, to help provide advice on management direction in the face of scientific uncertainty. The implications of the spruce beetle outbreak on ecosystem integrity and management, and the questions surrounding historical and climate-driven disturbances are significant enough to warrant such a review. Making ill-informed management decisions on this issue poses "substantial risk to important resources in the plan area" (FSH 1909.12 Ch. Zero Code, 07.2).

### 4.1.2. Salvage Logging

Post-disturbance logging or salvage harvest is a long practiced yet scientifically unsupported method of forest management. The practice is upheld in the Proposed Action as a necessary management tool for aiding in forest restoration following a wildfire, insect outbreak, or disease. Salvage logging can and often does accomplish the opposite result by increasing the fire hazard, degrading water quality and soils, and impairing the habitat and ecological function of the forest (Beschta et al. 2004; Karr et al. 2004; Donato et al. 2006; Noss et al. 2006; Shatford et al. 2007; Thompson et al. 2007; Lindenmayer et al. 2004, 2008). Natural tree regeneration can be abundant after fire, and postfire logging may actually reduce regeneration by as much as 71 percent (Shatford et al. 2007). Salvage logging diminishes a forests ability to store and sequester carbon; burned forests with no salvage logging stored and sequestered carbon at a significantly higher level than salvage-logged forest areas (Powers et al. 2013).

Salvage logging simplifies stand structure and adversely affects native species abundance and diversity which is inconsistent with ecological integrity. In order to conclude that adequate amounts of complex early seral forest (i.e., unlogged burned forests) are being provided across the landscape and the plan meets the ecosystem diversity requirements outlined in the Planning Rule, the amount of high and moderate severity burn forest that will not be salvaged should be based on the NRV relative to the level of complex early seral forest occurring in the planning area. There must be desired conditions for complex early seral forest conditions and supporting plan components to achieve those ecologically important conditions.

Natural succession is an ecological process that often begins with disturbance, and proceeds through multiple stages of forest development (Franklin et al. 2002). Disruption of this process through salvage logging and planting results in simplified forests and reduced biodiversity (Lindenmayer and Franklin 2008). The rarity of naturally evolving early successional forests due to past management practices is now recognized by leading research scientists, for example, "Young forests growing within a matrix of unsalvaged snags and logs may be the most depleted forest habitat type in regional landscapes, particularly at low elevations" (Lindenmayer and Franklin 2002 in Brown et al. 2004); and "Currently, early-successional forests (naturally disturbed areas with a full array of legacies, i.e., not subject to post-fire logging) and forests experiencing natural regeneration (i.e., not seeded or planted), are among the most scarce habitat conditions in many regions" (Noss et al. 2006).

As such, plan components should be developed that define desired early seral conditions and prohibit salvage logging in areas that experience disturbance events within the NRV because these forests would not require any restoration or fuels treatments. In sum, the body of scientific literature finds that, overall, intensive salvage logging and reforestation produce greater adverse impacts on recovering ecosystems, rather than contributing to recovery (see Lindenmayer et al. 2008). To ensure

that the revised forest plans reached the goals for ecological integrity in the 2012 Planning Rule and Directives, the Proposed Action needs to reject all intensive salvage logging except as needed for public safety, infrastructure protection and science-based restricted fuel zones. Post disturbance management may be valid when needed to achieve desired conditions for ecological integrity.

### 4.2. Watersheds and Aquatic and Riparian Ecosystems

Goal 1 of the Proposed Action (p. 7) is, "Protect and restore watershed health, water resources, and the systems that rely on them." As we discussed above, the goal is a modification of Planning Rule language found in Section 219.8. The desired conditions pertaining to water resources, restated in the Proposed Action from current management plan, must be revised to fit new requirements and definition for "desired conditions" in the rule; they must be written to be measurable in a way that monitoring can discern trends. Assessment 1 and 3 (Aquatic/Riparian) and Assessment 2 provide information about ecological conditions that can help shape desired conditions to comply with the Planning Rule.

It is crucial to have scientifically sound set of plan components to direct the maintenance and restoration of watershed, aquatic, and riparian integrity. Humans depend on them as do a range of at-risk species of the Forest. Assessment 5 describes habitat requirements for federally protected and SCCs under consideration. High water quality (e.g., low sediment load; low pollution from roads, agriculture, pesticide use, fire retardant and foaming agents; and very low salinity) is necessary for the boreal toad, Northern leopard frog, Rio Grande chub, Rio Grande sucker, river otter, Whitebristle cottongrass, slender cottongrass, spiny-spore quillwort, Colorado woodrush, and sphagnum (Assessment 5: 69). The presence of competing and predatory non-native fish and amphibians in waterbodies can be a limiting factor for the boreal toad, Northern leopard frog, Rio Grande cutthroat trout, Rio Grande chub, and Rio Grande sucker (Assessment 5: 69). Several species depend on riparian vegetation for cover and for foraging, for example, as well as for stabilizing streambanks. Species that require willow thickets and cottonwood galleries include Rio Grande sucker, Southwestern willow flycatcher, yellow-billed cuckoo, bald eagle, Canada lynx, western bumblebee, Colorado woodrush, silkyleaf cinquefoil, veery, stream orchid, and Colorado woodrush (Assessment 5: 70). Species that require cover from bank vegetation that overhangs waterways include Northern leopard frog, Rio Grande cutthroat trout, Rio Grande sucker, and river otter (Assessment 5: 70).

The Assessment indicated needs for change to plan direction regarding Forest water resources. Assessment 1 and 3 (Aquatic/Riparian) provided a summary of these needs,

> Based on information in this section of the assessment, there is a need to revise and update the aquatic habitat section of the Forest Plan. For the purposes of forest planning, considerations for aquatic habitats and species are combined with soil and water resources. However, the information in this assessment for riparian and aquatic ecosystem integrity, highlights some specific needs with aquatic habitats and species on the forest, especially in regards to the unique aquatic endemics to the upper Rio Grande Basin. Examples include the need for additional management direction addressing the importance of stream connectivity and aquatic organism passage programs and their relationship to aquatic habitat resiliency, and incorporating the Aquatic Nuisance Species Plan for the Rio Grande National Forest into plan revision components. Potential mitigation strategies for chytrid fungus and local amphibian species are part of this recommendation. We need additional updates

Rvsd Plan - 00002425

regarding restoration opportunities for native aquatic species and for managing low-elevation riparian systems, seeps and springs; including hummocking and pugging guidelines. Updates should also increase awareness regarding the ecological drivers for local aquatic habitats including glaciation, stream gradient, and geological factors associated with aquatic habitat productivity. (Assessment 1 and 3, Aquatic/Riparian: 32)

We need to update the existing Forest Plan with current information related to aquatic habitats and potential vulnerabilities associated with climate change. Central to this update is the need to maintain cold water systems and side channel refugia for aquatic species. We need to acknowledge the connection between current human stressors and a potential increase in vulnerability to aquatic integrity as related to climate change. Thus, while our standards and guidelines for aquatic systems should be adaptable and flexible they should also be well defined, firm and measurable. (Assessment 1 and 3, Aquatic/Riparian: 32)

We should manage keystone species such as beaver, which restore streams to more natural flow rates and water table levels, to maintain stream function and store water naturally on the landscape. (Assessment 1 and 3, Aquatic/Riparian: 42)

These are not reflected in the Proposed Action.

The Assessment, lists 10 key characteristics used to assess riparian and aquatic ecosystem conditions (Assessment 1 and 3, Aquatic/Riparian: 3-4). The Assessment acknowledges,

The reference models or conditions we use for describing the natural range of variation for the various riparian and aquatic ecosystems on the Rio Grande National Forest and elsewhere are not well defined. In our 1996 Forest Plan, we used reference streams to monitor and inform stream health, but did not address many of the other various aquatic systems on the Rio Grande National Forest, nor the ecological components that maintain them. However, the reference stream information we have suggests that most streams and riparian systems on the Rio Grande National Forest are in good to excellent condition. (Assessment 1 and 3, Aquatic/Riparian: 14)

Yet, the Assessment provides some data about current conditions to inform the development of plan components—baselines from which to monitor trends in conditions. (Information gaps (*italicized*) indicate a need for monitoring.) For example:

- … almost one-half of the watersheds on the forest are functioning at-risk due to rangeland vegetation condition concerns and four watersheds have impaired function due to rangeland vegetation condition concerns. (See Assessment 2). (Assessment 1 and 3, Aquatic/Riparian: 14)

- There are 303(d) listed impaired waterbodies within three watersheds on the RGNF (Assessment 2: 78)

- There are approximately 680 miles of rivers and streams on the Rio Grande National Forest that sustain populations of nonnative trout. … Approximately 78 percent of the subwatersheds on the Forest received a poor watershed condition framework ranking in regards to secure presence of native species. (Assessment 1 and 3, Aquatic/Riparian: 12)

- monitoring across the Forest by Forest Service staff suggests historical grazing, and in some allotments, current ungulate grazing is negatively affecting stream physical function. (Assessment 2: 77)

- The multi-metric ecological integrity assessment utilized by the Colorado Natural Heritage Program during the 2012 wetlands assessment provides a sound alternative approach to assessing whether the integrity of an ecosystem is being maintained (Lemly 2012). Using this method, A ranks indicate reference conditions (no or minimal human impact), B ranks indicate slight deviation from reference, C ranks indicate moderate deviation from reference, and D ranks indicate significant or severe deviation from reference. … Of the 77 various wetlands surveyed, 41 were A-ranked, 32 were B-ranked, and 4 were C-ranked. A-ranked systems occurred primarily in the alpine and subalpine zones, with lower elevation sites more likely to receive B-ranks. However, a few wetlands are ranked C due to stressors including grazing, hydrologic modifications, and surrounding land use activities. Riparian shrublands, wet meadows, and fens were most of the A- and B-ranks, with riparian woodlands and marsh slightly lower ranks. *It is also important to note that some riparian ecosystem types, such as those associated with man-made reservoirs or low-elevation riparian woodlands, are not well-represented in the sites sampled for the ecological integrity assessment index.* (Assessment 1 and 3, Aquatic/Riparian: 14)

- Low-elevation seeps and springs frequently used for livestock and/or wildlife troughs were not included in the Colorado Natural Heritage Program assessment. *Although condition data is lacking for these types of systems,* we consider their ecosystem integrity low due to water diversions, trampling, and other impacts. (Assessments 1 and 3, Aquatic/Riparian: 4)

- Pugging in saturated soil areas is readily observable in some montane springs and meadow areas where livestock and native ungulates congregate. Heavy cattle use in palustrine systems can alter the hydrology by damaging soils. Soil compaction and pugging of the peat layer will change surface water flow. Heavy cattle use can also alter the successional processes within the sedge- dominated area of a fen. Cattle hoof action can lead to pugging and hummocking, creating microsites where shrubs can become established, changing the sedge-dominated meadow to carr shrubland. (Assessments 1 and 3, Aquatic/Riparian: 4-5)

- For the most part, current influences of livestock grazing are localized and are limited on a landscape basis. However, certain aquatic, riparian, and wetland areas continue to show impacts. Frequently these are the lower gradient areas both with historical carry-over effects and/or current influences from other human activities (recreation, forest management, road management, big game, invasive species, and so forth). (Assessment 1 and 3, Aquatic/Riparian: 29)

- Existing barriers to ecological connectivity for aquatic organisms do exist and have been noted in other sections of this report. These primarily involve road crossing and culverts, although some natural barriers also exist. Some barriers are desirable to discourage interactions with non-native fish species. In some cases, human impacts are contributing to stream impacts. (Assessment 1 and 3, Aquatic/Riparian: 15)

Plan direction should be developed to address each of these important issues.

4.3. Connectivity

Defenders has published a report on connectivity planning within the forest planning process. We recommend that the Rio Grande planning team take a look at that report; it provides some information on how to effectively consider connectivity in the forest planning process (www.defenders.org/publication/planning-connectivity).

As noted in the ecosystem Assessment 1 and 3 (Terrestrial), "Connectivity of habitat is an indicator of ecosystem integrity" (p. 2) and was selected as a key ecosystem characteristic, along with landscape pattern. Therefore, it will be necessary to have plan components for connectivity/fragmentation and pattern for ecosystems within the plan area. These could be termed plan components for landscape structure in that they are not driven by the needs of individual species (more on that below).

The Proposed Action only makes a vague reference to connectivity in one of the three desired conditions for biological diversity (p. 9), stating that, "Habitat...pattern (connectivity)...similar to those that result from natural disturbances...are maintained to the extent possible..." Note that the statement makes no reference to the *restoration* of connectivity, as directed by the Planning Rule; the statement implies that existing pattern and connectivity are within the NRV and thus only need to be "maintained." There is no backing evidence to support the implication that existing Forest ecosystem connectivity only needs to be maintained (in fact, the Assessment indicates a need to restore connectivity conditions across the Forest).

It does not appear that much information from the Assessment was applied to the Proposed Action for landscape connectivity/pattern. Part of the problem may be that the Assessment did not present clear information on the status of connectivity within the Forest. Specifically (as directed by FSH 1909.12 Ch. 10, 12.14c):

- Whether or not existing connectivity conditions are contributing to the long-term integrity of ecosystems in the plan area and species adaptation to a changing climate (and are expected to do so under existing plan direction or need to be addressed in the revised plan)?
- Whether there are existing and reasonably foreseeable barriers to ecological connectivity for terrestrial and aquatic organisms?
- Whether connectivity conditions are vulnerable to climate change?
- If projects or activities would be necessary to maintain or restore connectivity?
- How the existing role or contribution of the Forest affects connectivity relevant to the broader landscape?
- The influence on connectivity from existing conditions, threats, or stressors (within or beyond the plan area)?

The Assessment suggests a reference condition for landscape structure, but it is difficult to draw out the particulars, and therefore difficult to establish clear plan direction for connectivity. For example, in discussing the role of mixed-severity fire in shaping landscape structural conditions it states: "Historically, highly variable, mixed-severity fires maintained patchy and diverse vegetation structure and composition. This patchiness provides varied and productive habitat for many different plant and animal species" (Assessment 1 and 3, Terrestrial: 25). There should be desired conditions for "patchiness" for specific ecosystems within the plan area based on characteristic disturbance

Rvsd Plan - 00002428

regimes, informed by climate change information. It appears that some information on patch size was presented in Assessment 1 and 3 (Terrestrial) (Figures 10 and 11) but it is not apparent how that information is applicable to desired conditions for landscape connectivity/pattern.

In addition to providing for connectivity within ecosystems for integrity, the plan should provide connectivity where it is a necessary ecological condition for an at-risk species. Therefore, for example the plan will have to provide direction to allow for "connectivity among suitable patches" for Mexican spotted owl; cited as a key habitat variable to fulfill the owl's life history requirements (Assessment 5: 23). Similarly, there will need to be plan direction to provide for contiguous habitat/connectivity for New Mexico meadow jumping mouse, as noted in Assessment 5 (p. 57).

The plan will have to address habitat fragmentation in a meaningful way (the antithesis of connectivity). The Assessment 1 and 3 (Terrestrial) notes that most of the Forest's ecosystems are vulnerable to fragmentation (based on the analysis that shows only four ecosystem types have more than 50% of their acreage in a "protected" status, Table 8). The Assessment implies that this degree of fragmentation "is associated with decreased ecosystem function and biodiversity" and therefore not contributing to ecological integrity. Plan components to address fragmentation (i.e. restore connectivity) will therefore likely be necessary to comply with the Planning Rule. Clear plan direction should be granted to the most vulnerable ecosystems/communities referenced in the Assessment such as pinyon and Arizona and Thurber fescue. Similarly, the forest plan should affirmatively address those ecosystems most heavily impacted by roads and other fragmenting infrastructure (Table 9) including the five land type associations that have more than 15 percent of their area impacted by roads, railroads and private in-holdings. Priority watersheds should be highlighted for restoration of aquatic and terrestrial ecosystem connectivity (due for example to roads and barriers to aquatic organism passage). We would expect "aggressive" objectives to address terrestrial and aquatic ecosystem fragmentation and restoration of functional connectivity for at-risk fish, wildlife and plants.

The forest plan will also have to specifically address the many individual species where fragmentation is documented as a threat to their necessary ecological condition, including boreal toad, Northern leopard frog, Rio Grande chub, Rio Grande sucker, Western bumblebee, Canada lynx and Gunnison sage-grouse, to name several documented in Assessment 5.

5.  At-risk Species

    5.1.  Threatened and Endangered Species

At a meeting between RGNF members of the planning team and members of the public held on October 4, 2016, we were pleased to learn that the Forest has begun engaging with the U.S. Fish and Wildlife Service (USFWS) regarding consultation under Section 7 of the U.S. Endangered Species Act (ESA). We were also happy to hear that the Forest Service would include a Section 7(a)(1) analysis as part of this process with USFWS. Section 7(a)(1) can be a forgotten aspect of the consultation process and is often not given the attention it deserves in conserving listed species.

Federally recognized species (endangered, threatened, proposed, candidate) must be identified through the coordination with ESA consulting agencies, in this case USFWS. We have been

recommending early engagement with the USFWS, which complies with the Planning Rule.[2] Early contributions to a forest plan by the consulting agencies can help streamline the Section 7(a)(2) consultation process for the plan and increase the likelihood of contributing to recovery of listed species and avoiding listing of proposed and candidate species under Section 7(a)(1) of the ESA (16 U.S.C. §§ 1536(a)(1)-(2)). Federally recognized species must be addressed by plan components if they "may be present" in the plan area (50 C.F.R. 402.12(c)(1), (d)) or if they are not present but would be expected to occur there to contribute to recovery. They should be included as target species. The RGNF has recognized eight target threatened and endangered species in its Proposed Action (p. 5).

The ESA requires the Forest Service and other federal agencies to, "in consultation with and with the assistance of the Secretary (listing agencies), utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation[3] of (listed species)" (16 U.S.C. §§ 1536(a)(1)). Therefore the ESA requires that the Forest Service must use its authorities, including NFMA and its planning process and resulting plans, in furtherance of recovery of listed species.[4]

The Planning Rule establishes an affirmative regulatory obligation that forest plans "provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened or endangered species" (36 C.F.R. § 219.9(b)(1)). The provision supports the "diversity requirement" of NFMA (16 U.S.C. § 1604(g)(3)(B)). Moreover, the preamble to the Planning Rule specifically links this requirement to its responsibility under the ESA for recovery of listed species, stating, "[t]hese requirements will further the purposes of Section 7(a)(1) of the ESA, by actively contributing to threatened and endangered species recovery and maintaining or restoring the ecosystems upon which they depend" (77 Fed. Reg. 21215).

Forest plans make conservation decisions and are vehicles to demonstrate compliance with NFMA, as well as the ESA. One key mechanism for implementing the affirmative conservation program is the ESA Section 7(a)(1) conservation review. The conservation review process provides a mechanism to determine compliance with Section 7(a)(1) in that it would compel the Services to make a determination that the forest plan met affirmative recovery obligations. There is an existing process for interagency coordination that should be used to answer the question that the Planning Rule poses: does a forest plan contribute to recovery of listed species? The Consultation Handbook used by the listing agencies describes "proactive conservation reviews" under ESA Section 7(a)(1).[5] According to this Handbook, such reviews are appropriate for major national programs, and they are also "appropriate for Federal agency planning." They would be especially helpful in confirming that the plan has included the ecological conditions necessary for recovery of listed species.[6] We hope the RGNF's recognition of its Section 7(a)(1) responsibilities means that the planning team will

---

[2] 36 C.F.R. § 219.4(a)(1) directs the responsible official to "engage the public—including" … "Federal agencies"… "early and throughout the planning process where feasible and appropriate." Under 219.6(a)(2), the regional forester should coordinate with and provide opportunities for government agencies "to provide existing information for the Assessment."

[3] "Conservation" is defined by the ESA to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."

[4] 36 C.F.R. § 219.9(b)(1) requires that each forest plan include plan components that "provide the ecological conditions necessary to contribute to the recovery of threatened and endangered species …"

[5] Endangered Species Consultation Handbook 1998. U.S. Fish & Wildlife Service and National Marine Fisheries Service, Section 5.1. (https://www.fws.gov/ENDANGERED/esa-library/pdf/esa_section7_handbook.pdf)

[6] The Consultation Handbook also encourages consultation at broader scales such as "ecosystem-based" consultations.

be working with the USFWS to conduct threatened and endangered species' conservation reviews for the RGNF forest plan revision.

We make some specific recommendations regarding the management of threatened and endangered species and their habitats below.

## Black-footed ferret (*Mustela nigripes*)

We recognize that black-footed ferrets do not currently inhabit the RGNF and that the Forest may not have sufficient numbers of Gunnison's prairie dog (*Cynomys gunnisoni*) to support a viable population of this endangered species. Black-footed ferrets are prairie dog obligates; ferret diets consist of around 90 percent prairie dog and the mustelids shelter in prairie dog burrows. The key to recovering the species is to recover prairie dog habitat and boost prairie dog numbers. Black-footed ferrets are currently on "life-support," and their survival in the wild is completely dependent on several reintroduction sites within the range of the four prairie dog species in the United States. Most reintroduction sites require regular supplements of animals from captive-breeding programs.

According to RGNF's Assessment 5 (p. 8), black-footed ferrets have been observed on the Forest, though not since 1930. According to the black-footed ferret habitat map in Assessment 5 (p. 10), suitable habitat exists on the RGNF.

The Forest can take management actions to improve habitat conditions for prairie dogs that would enable colony expansion and increased populations. Actions that could serve as the basis for plan components include: prohibiting prairie dog recreational shooting, prohibiting lethal control of prairie dogs, working with Colorado Parks and Wildlife (CPW) to prevent sylvatic plague epizootics and translocate prairie dogs from places where they are unwanted and lethal control of colonies is imminent.

Refer to the Gunnison's prairie dog section below.

## Canada Lynx (*Lynx canadensis*)

The RGNF is the most important public land unit for recovering Canada lynx in the Southern Rockies. The Forest served as the primary receiving site for lynx reintroduced by CPW. Yet with spruce bark beetle outbreaks continuing to result in significant changes to the spruce component of the spruce-fir ecosystem, the habitat of lynx and their primary prey, snowshoe hare, and their secondary prey, red squirrel, is in flux. Despite the changed and changing forest structural conditions on the RGNF, an ongoing study led by John Squires of the Forest Service's Rocky Mountain Research Station is revealing that lynx are continuing to use and breed in beetle-affected spruce-fir forest (Learn 2016).

Lynx habitat on the RGNF is currently governed by the 2008 Southern Rockies Lynx Amendment (SRLA) to the Forest's management plan and to the plans of other forests in Region 2 of the Forest Service. Under the SRLA, the RGNF is permitted to revisit lynx management direction during management plan revision. Given the beetle-induced changes, we believe now is not the time to radically change management direction and that the SRLA plan components—including all standards and guidelines—should be retained in the revised forest plan. The Forest Service must also determine whether additional provisions may be necessary for the RGNF to maintain ecological

conditions that are contributing to lynx recovery. We raise some questions for consideration and make some recommendations below.

Results from the research project should inform any changes in the lynx direction, and direction may need to be adapted based on the research results. For example, the research is showing that lynx on-the-ground are using habitat that no longer fits the existing policy definition of suitable habitat. We are concerned that forest stands no longer meeting the SRLA definition of suitable habitat may be open to timber activities that could be detrimental to habitat hares and lynx are continuing to use and den in. Without careful consideration, logging projects could disturb den sites, establish roads that fragment habitat, remove important vegetative cover for snowshoe hares, and create clearings with too few trees (dead or alive) that lynx might avoid. We are concerned there may be a disconnect between existing policy and the new science.

More specifically, there has been uncertainty as to whether lynx would use areas transitioning and transitioned out of multi-story, late successional conditions as trees die and fall. This mature forest condition has been considered by experts to be the highest quality winter snowshoe hare habitat, and thus, lynx habitat. Standard VEG S6 was implemented to protect multi-story stands. This state is becoming less prevalent in beetle-affected areas, and significant areas that were once in this state may no longer be meeting the SRLA policy definition for this high-quality habitat. However, rapid regeneration occurring in "formerly" high-quality, suitable habitat may be providing conditions—dense vegetation from re-growth—that are conducive to hare persistence. It is quite possible, but yet unknown, hares thrive under these conditions in the Southern Rockies. A mammal study by Ivan (2015) has found that snowshoe hares are continuing to occupy such areas. But even if they do not provide preferred habitat, it may be that regenerating stands provide sufficient habitat that lynx can adapt to and persist in while trees grow toward maturity. Lynx may need more habitat if it is suboptimal.

In this situation, the Forest Service must carefully consider—along with the USFWS—whether the framework and definitions in SRLA remain conducive to lynx recovery. Definitions may need to be adjusted in the revised plan to reflect the BASI. Stands that have transitioned out of the defined habitat under Standard VEG S6 may require additional provisions to protect habitat. Are exceptions and exemptions to vegetation standards VEG S6 (as well as VEG S1) still appropriate and applicable?

We are concerned that the Forest's proposal to ramp up salvage logging and manage to "aggressively diversify" forest characteristics stated in the Proposed Action may contra-indicated by Objective VEG O1,

> Objective VEG O1. Manage vegetation to mimic or approximate natural succession and disturbance processes while maintaining habitat components necessary for the conservation of lynx.

Why artificially try to manage to mimic natural disturbance and succession when these processes are happening naturally?

If increased salvage logging and other timber and vegetation management are likely to occur under the revised management plan, additional direction may be needed to protect denning habitat and known den sites during the denning period.

We are also concerned about the implications of the beetle kill to how SRLA vegetation standards and guidelines are applied to different types of lynx habitat, especially given existing exceptions and exemptions. We are concerned that baseline conditions have changed since the 2011 habitat and Lynx Analysis Unit (LAU) mapping (Ghormley 2011) to the extent that there is a shaky basis for making judgements about appropriate types and levels of commercial timber harvesting and other vegetation treatments in lynx habitat within the parameters of SRLA. For example, can Forest staff determine when an LAU has reached the 30 percent unsuitable threshold when applying Standard VEG S1 (see below)?

> Standard VEG S1. Unless a broad scale assessment has been completed that substantiates different historic levels of stand initiation structural stages limit disturbance in each LAU as follows: If more than 30 percent of the lynx habitat in an LAU is currently in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects.

Again, application of BASI is key. The Forest Service has indicated that it is planning to remap the LAUs and vegetation. We recommend that this work be conducted in time to inform the plan revision process.

An assessment of whether the connectivity Standard ALL S1 can be met in the changed forest with the current vegetation standards and guidelines should be considered and addressed during plan revision. We recommend the Forest establish protected corridors between LAUs. We also recommend the Forest Service designate the proposed Spruce Hole/Osier/Toltec Landscape Connectivity Zoological Area and Wolf Creek Pass Linkage Landscape Zoological Area to promote lynx habitat connectivity at the landscape scale.

## Gunnison Sage-grouse (*Centrocerus minimus*)

As Assessment 5 points out, Gunnison sage-grouse have had a tenuous existence on the Rio Grande National Forest. The Poncha Pass area is within the species' historic range (see 79 Fed. Reg. 69192: 69194, 2014), though habitat conditions must be improved to support a viable population (79 Fed. Reg. 69313, 2014). Higher elevation sagebrush steppe like Poncha Pass may be key to the species' persistence as climate change continues to affect lower elevation habitat elsewhere (TNC et al. 2011; Coop 2015). Including lands managed by the Bureau of Land Management (48%), the Forest Service (26%), private parties (24%), and the Colorado State Land Board (2%), GSRCS (2005) estimated the range of the population to be 20,400 acres.

A more detailed evaluation of how human uses in the area have affected sagebrush habitat and sage-grouse is warranted. Assessment 5 (pp. 20-21) states, "[t]here is some threat from cumulative physical disturbances associated with recreation in the area." Gunnison sage-grouse are highly sensitive to human disturbance, including those from recreational activities.

We also recommend the following science-based prescriptions for contributing to ecological conditions that will help recover Gunnison sage-grouse on the forest. Federal agencies have long accepted that information on life history and habitat needs for greater sage-grouse is applicable to Gunnison sage-grouse (see, e.g., 79 Fed. Reg. 69193; 75 Fed. Reg. 59805).The measures listed below are considered the minimum required to conserve sage-grouse species. New research may demonstrate that additional measures are needed. Given the difficulty and expense of restoring

Rvsd Plan - 00002433

sagebrush steppe, conservation strategies on public lands should preserve all remaining habitat. This precautionary approach, combined with additional proactive measures to manage public lands and resources, will help support federal, state and local management goals for Gunnison sage-grouse.

Sage-Grouse Essential Habitat:
- Identify and conserve essential sage-grouse habitat (Connelly et al. 2011; Manier et al. 2013; COT 2013; Aldridge et al. 2008).
- Manage or restore essential habitat so that at least 70 percent of the land cover is sagebrush steppe sufficient to support sage-grouse (SGNTT 2011: 6, citing Aldridge et al. 2008, Doherty et al. 2010, Wisdom et al. 2011; also SGNTT 2011: 7; Karl and Sadowski 2005; Doherty 2008; Connelly et al. 2000: 977, Table 3; Knick et al. 2013: 5-6.) with 15 to 40 percent sagebrush canopy cover (Connelly et al. 2000; SGNTT 2011: 26, citing Connelly et al. 2000, Hagen et al. 2007).
- Identify and protect sage-grouse wintering areas (SGNTT 2011: 21; Braun et al. 2005, citing Connelly et al. 2000 and others; Moynahan et al. 2007).
- Identify and protect habitat connectivity corridors to prevent or redress population isolation (SGNTT 2011: 5, 7).

Development Impacts:
- Restrict development to one site per section in priority habitat (SGNTT 2011: 21, 24; Holloran 2005; Doherty et al. 2010; Doherty 2008).
- Limit surface disturbance to less than 3 percent per section in priority habitat (SGNTT 2011: 21, 24; Holloran 2005; Doherty et al. 2010; Doherty 2008).
- Prohibit noise levels associated with any anthropogenic activity to not exceed 10 dBA above scientifically established natural ambient noise levels at the periphery of sage grouse mating, foraging, nesting, brood-rearing and winter habitat during each season of use by sage-grouse (Patricelli et al. 2013; Patricelli et al. 2012 (report); SGNTT 2011: 64, citing Patricelli et al. 2010).[7]

Mineral Development:
- Close and recommend for immediate withdrawal lands from location, leasing or sale (including coal) under the mineral laws for the maximum period allowed under law (SGNTT 2011: 22, 24-25, 26).
- Require conditions of approval for existing fluid minerals leases as outlined in the National Technical Team (NTT) report, including 4-mile no-surface-occupancy lek buffers (SGNTT 2011: 22-24). Larger buffers may be required to conserve the species.[8]
- Limit geophysical exploration on existing fluid minerals leases to helicopter-portable methods or vehicles confined to existing roads in priority habitat, and in accordance with seasonal and other applicable restrictions (SGNTT 2011: 21, 22).
- Prohibit surface storage of wastewater generated from fluid minerals development (SGNTT

---

[7] Patricelli et al. (2012) recommend measuring compliance with noise objectives at the edge of areas critical for foraging, nesting and brood-rearing rather than at the edge of the lek.

[8] A 4-mile lek buffer may include an average of 80 percent of nesting females (SGNTT 2011: 21); larger buffers may be recommended to conserve the species (6.2 miles, Aldridge and Boyce 2007; 6.2 miles, Doherty et al. 2010; 5.3 miles, Holloran and Anderson 2005; 4.6 miles, Coates et al. 2013).

Rvsd Plan - 00002434

2011: 64); breach and eliminate existing wastewater reservoirs (SGNTT 2011: 64).

Renewable Energy:
- Exclude renewable energy development (SGNTT 2011: 13).

Rights-of-Way:
- Exclude new rights-of-way (SGNTT 2011: 12).
- Develop valid existing rights-of-way in accordance with NTT report prescriptions (SGNTT 2011: 13).
- Bury existing transmission lines, where possible (SGNTT 2011: 13).

Livestock Grazing:
- Require that grazing strategies maintain at least 7 inches average grass height in nesting and brood-rearing habitat (Connelly et al. 2000).
- Restrict grazing until the completion of sage grouse breeding and nesting period, and seasonally remove livestock from late brood-rearing habitat to allow sufficient regrowth of native grasses to ensure adequate residual height. Limited winter grazing may be appropriate, as long as it leaves sufficient residual grass height prior to the next breeding season (W. Watersheds Project v. Salazar, 843 F.Supp.2d 1105, 1115 (D. Idaho 2012), citing Braun (2006, unpublished); W. Watersheds Project v. Dyer, 2009 WL 484438, at * 21 (D. Idaho 2009)).
- Control grazing to avoid contributing to the spread of cheatgrass in sage-grouse habitat (Reisner et al. 2013; Chambers 2008; Reisner 2010 (dissertation)).
- Manage riparian and wetlands to meet properly functioning condition; manage wet meadows to maintain native species diversity and cover to support sage grouse brood-rearing (Connelly et al. 2000).
- Avoid new structural range and livestock water developments; institute best management practices to prevent or limit and mitigate the potential spread of West Nile virus (SGNTT 2011: 17).

Vegetation Management:
- Prohibit prescribed fire in sagebrush steppe with less than 12 inches annual precipitation (SGNTT 2011: 26, citing Connelly et al. 2000, Hagen et al. 2007, Beck et al. 2009) or areas with moderate or high potential for cheatgrass incursion (Miller et al. 2011).
- Prohibit vegetation treatments that reduce sagebrush canopy cover to less than 15 percent (SGNTT 2011: 26, citing Connelly et al. 2000, Hagen et al. 2007).[9]
- In areas of pinyon/juniper, avoid treating old-growth or persistent woodlands. In areas where sagebrush is prevalent or where cheatgrass is a concern, utilize mechanical methods rather than prescribed fire.
- Restore non-native seedings with native vegetation where it would benefit sage grouse (SGNTT 2011: 16-17).
- Prohibit herbicide application within 1 mile of sage grouse habitats during season of use;

---

[9] Vegetation treatments may not be advised within 2 - 2.7 miles of sage grouse leks (Beck and Mitchell 1997; Heath et al. 1997) or where sagebrush canopy cover is less than 20 percent (Beck and Mitchell 1997) or in sage grouse winter habitat (Connelly et al. 2000; Eng and Schladweiler 1972).

Rvsd Plan - 00002435

prohibit use of insecticides (Blus et al. 1989).

Travel Management and Infrastructure:
- Limit motorized travel to designated routes trails in priority habitat (SGNTT 2011: 11). Implement appropriate seasonal restrictions on motorized travel to avoid disrupting sage grouse during season of use (Holloran 2005; Aldridge et al. 2012.
- Close existing trails and roads to achieve an open road and trail density not greater than 1 km/1km² (.6 mi/.6 mi²) (Knick et al. 2013).
- Where valid existing rights-of-way are developed, restrict road construction within 1.9 miles of sage grouse leks (Holloran 2005).
- Limit the construction of tall facilities and fences to the minimum number and amount needed in essential habitat.
- Install anti-perching devices on transmission poles and towers (SGNTT 2011: 64, citing Lammers and Collopy 2007). Dismantle unnecessary infrastructure.

Habitat Designation:
- The Forest Service should also consider protecting sage-grouse habitat as Zoological Areas (Forest Service Manual 2372) to support long-term conservation of sage-grouse and other sagebrush-dependent species. The agency could apply additional measures to conserve the grouse beyond those prescribed for essential habitat, including prioritizing the areas for land acquisition, habitat restoration, and retirement of lease rights and grazing privileges.

## Mexican Spotted Owl (*Strix occidentalis lucida*)

Assessment 5 states,

> There are no known occurrences within the planning area. The Rio Grande National Forest modeled habitat in 2006 in an attempt to describe potential habitat and focus survey efforts as needed (Figure 4). Based on the query developed, this model identified 14,103 acres of potential Mexican spotted owl habitat. Given the extensive surveys conducted throughout this habitat with no positive Mexican spotted owl occurrences resulting, this model likely substantially over-estimates potential Mexican spotted owl habitat in the planning area.

Though the Forest Service concluded that Mexican spotted owls are not likely to occur on the RGNF, we recommend that the Forest follow the recommendations in the Mexican Spotted Owl Recovery Plan (USFWS 2012). The RGNF is within historic range of the species (USFWS 2012), and some suitable habitat occurs on the Forest.

## Southwestern Willow Flycatcher (*Empidonax traillii extimus*)

The southwestern willow flycatcher is an obligate riparian species that nests in willows, cottonwood and tamarisk vegetation (Stoleson and Finch 2000). Typically, the species builds nests and lays eggs in mid-May to early June and fledges young in mid-July (USFWS 2002).

Assessment 5 states that a Southwestern willow flycatcher was observed on the RGNF in 2008. The Assessment did not evaluate habitat conditions on the Forest but conveyed that 1,762 acres of suitable habitat occurs on the Forest with another 947 acres of potential habitat.

All grazing poses a threat to riparian areas in the region, and in turn, to the habitat of the flycatcher. Removal of livestock grazing pressure from riparian areas has been found to have a positive effect on growth, distribution, and vigor of riparian vegetation (Schulz and Leininger 1991). Grazing poses a current threat to the southwestern willow flycatcher habitat. Plan components should limit grazing effects on vegetation in suitable and potential habitat areas. The Forest Service should be taking actions outlined in the Southwestern Willow Flycatcher Final Recovery Plan (SWFRT 2002).

**Uncompahgre Fritillary Butterfly (*Boloria acrocnema*)**

Assessment 5 provides an account (p. 6-7) of the federally endangered Uncompahgre fritillary butterfly, which is dependent on large snow willow patches for persistence. Assessment 5 account includes a recent history of known Uncompahgre fritillary populations on the forest, including possible extirpated populations, and a summary of threats and risk factors, such as livestock grazing, trampling by humans, and climate change. The Assessment also conveyed the importance of the RGNF to the species; five of 11 known colonies occur on the Forest. Assessments 1 and 3 (Terrestrial) (p. 4) does not evaluate the conditions of snow willow habitat but highlights the threat of climate change to the species:

> We think some ecosystems are particularly susceptible to climate change-related impacts. Plant and animal species in high-elevation alpine ecosystems, such as the Uncompahgre Fritillary Butterfly, may be pushed to extinction if warming temperatures reduce their habitat (Alexander and Keck 2015).

The USFWS Uncompahgre Fritillary Butterfly Recovery Team finalized a recovery plan for the species in 1994 (UBRT 1994). The recovery plan lists a set of responsibilities assigned to the Forest Service for contributing to the species' recovery (UBRT 1994: 16-18). Assigned actions to the Forest Service include (UBRT 1994: 16-18):

- Enforce prohibition on collection
- Determine search locations
- Organize searchers
- Search for colonies
- Monitor population levels
- Determine oviposition sites
- Determine larval life history
- Record snow, rain, and air temp. levels
- Determine soil moist. and temp.
- Determine elev., slope, aspect, of new colony sites
- Monitor morphologic phenology of snow willow
- Monitor phenology of nectar sources
- Conduct recovery team activities
- Contract administration
- Determine disease, parasitism, predation threats
- Determine livestock threats
- Determine recreation threats
- Reintroduce butterflies

- Transplant to other suitable sites
- Erect signs

The Assessment is not clear regarding how the Forest Service is meeting these recovery plan obligations.

We believe these plan components need to change to meet the planning rule requirements. That some colonies on the forest may have been extirpated indicates that standards and guidelines may be inadequate, and if so, should change. Wildlife – Standard 13 (RGNF 1996: III-28) states,

> No ground-disturbing activity shall be allowed in potential Uncompahgre fritillary butterfly habitat unless a survey is conducted to determine the existence of the species. Ground-disturbing activities include trail building, livestock driveways, or domestic sheep bedding grounds. The usual grazing associated with livestock in the area is not considered ground disturbing. Potential habitat definitions and survey protocols are found in the *Uncompahgre Fritillary Butterfly Recovery Plan*.

However if ground disturbing activities are allowed to occur in unoccupied potential habitat, this may precluded the restoration and recolonization of potential habitat and hinder the butterfly's recovery. Wildlife – Standard 14 (RGNF LRMP 1996: III-28) states, "[i]f any new Uncompahgre fritillary butterfly populations are discovered, a "No Butterfly Collecting" regulation shall be imposed on the area." It follows that "ground-disturbing activity" restrictions should apply to the habitat of newly discovered populations not solely collection restrictions.

The USFWS has emphasized a continued need to maintain regulatory mechanisms and recommended the following action: "[d]evelop a management plan with the USFS and BLM to ensure grazing, collecting, recreation, and other on-the-ground threats remain low or are eliminated" (USFWS 2009: 16).

Given the USFWS directive and the vulnerability of the species and the potential for disturbance under the current LRMP, we recommend the following standards:

- Close Uncompahgre fritillary colony sites and potential recovery areas to recreation, including hiking and trail building.
- Close Uncompahgre fritillary colony sites and potential recovery areas to grazing.

We are proposing the designation of the Pole Creek Mountain – Sheep Mountain as recommended wilderness to help protect a population of the Uncompahgre fritillary butterfly.

## Yellow-billed Cuckoo (*Coccyzus americanus*)

The yellow-billed cuckoo is a threatened species and an obligate riparian. Like the flycatcher, the yellow- billed cuckoo would benefit from an increase in suitable riparian habitat in the area. Yellow-billed cuckoo  nest in willow, cottonwood and non-native tamarisk (Seachrist et al. 2013). The preferred habitat of the  yellow-billed cuckoo includes an overstory of native canopy with mixed seral-stage understory comprised  of native vegetation (Seachrist et al. 2013). One recent study found a high concentration of yellow-billed  cuckoo along a long stretch the Middle Rio Grande where there was an absence of anthropogenic activity  (Seachrist et al. 2013). Plan components should

preserve large riparian areas without disturbances to contribute to the recovery of the yellow-billed cuckoo.

USDA research has found that excluding cattle from a landscape for five growing seasons "significantly increased: (1) total vegetative cover, (2) native perennial forb cover, (3) grass stature, (4) grass flowering stem density, and (5) the cover of some shrub species and functional groups" (Kerns et al. 2011). All of these results would benefit the cuckoo and support recovery of this species.

The Forest Service correctly notes that non-native tamarisk have contributed to the decline of the cuckoo's native habitat. However, the cuckoo has been known to nest in these non-native tamarisk (Seachrist et al. 2013). Therefore, before tamarisk is removed under any management strategy, the Forest Service should first complete surveys for cuckoo and assess whether ecological conditions exist to support native riparian vegetation.

### 5.2. Proposed and Candidate Species

Under Planning Rule Section 219.9(b)(1), the revised plan must provide for ecological conditions that will conserve the North American wolverine (*Gulo gulo luscus*), which is proposed for listing under the ESA. Wolverine conservation status in the lower-48 is currently in some flux. In April 2016, a federal judge's decision rejected the 2014 decision by the USFWS to not list the distinct population segment (DPS) of the wolverine under the ESA. As the USFWS reconsiders protections for wolverines, they are now again a 'proposed' species under ESA and may raise questions over how the Forest Service will treat wolverine in ongoing and forthcoming forest plan revisions. Because the wolverine is a proposed species, the RGNF land management plan should provide plan components that will "protect, preserve, manage, or restore natural environments and ecological communities to potentially avoid federally listing" of wolverine (36 CFR 219.19).

In addition, given the uncertainty in the conservation status of wolverines, we believe wolverine should also be treated as a potential SCC, though not eligible for designation—at least not yet. This would ensure that future plan components would be sufficient to meet any applicable regulatory requirements. Furthermore, it is our belief that Planning Rule requirements for federally listed, proposed and candidate species are *in addition* to the baseline requirements for SCC. In other words, the RGNF should identify the ecological conditions necessary for wolverine persistence in the plan area, or those necessary to contribute to wolverine persistence across the species range, so that plan components can be developed for wolverine as a proposed or SCC species.

However, maintaining ecological conditions alone will probably not be sufficient to help ensure wolverine recovery and viability across its range on national forest lands. Therefore, plan components, including standards and guidelines, for wolverine will likely be necessary, as required by 36 CFR 219.9(b)(1). For example, limitations on snowmobile use in some alpine areas where denning could occur may be necessary for protection and recovery of wolverine. Importantly, the RGNF should review and incorporate the preliminary findings, and expected final report, from the

Rvsd Plan - 00002439

Wolverine Winter Recreation Research Project that recently concluded the field study component of the project.[10]

Additionally, because of the uncertainty surrounding the wolverine's listing status and the importance of the species, the RGNF revised plan should include a mechanism whereby wolverine is automatically added to the SCC list in the event that the U.S. Fish and Wildlife Service once again determines that wolverine do not merit listing under the ESA. Given the expected life-span of the revised plan, this is very important to ensure that the plan can anticipate potential actions by other federal agencies in the future, but during the life of the revised plan.

### 5.3. Species of Conservation Concern

#### 5.3.1. Species of Conservation Concern Selection

In previous comments to the RGNF, we pointed out potential problems with the SCC selection process, particularly with the documentation of BASI to support not selecting species under consideration. We have three documents from the Forest Service that pertain to SCC identification and selection justifications; these are Assessment 5, a letter (August 17, 2016) from the Rocky Mountain Region office to the RGNF Forest entitled "List of Species of Conservation Concern for the Rio Grande National Forest," and an Excel spreadsheet with the filename: RGNF_Step2a_RefinedSppList_21July2016. If there are additional documents pertaining to the SCC selection and justification, we ask that these be uploaded to the RGNF or Region 2 website. We will not repeat our comments here in full, but summarize them and ask that the Forest Service consider them as the planning process continues. We also request that the Forest Service reconsider species for which justifications are inadequate for removing them from the SCC list under consideration.

We are concerned that the Forest Service is not using and properly documenting BASI for SCC selection as required by the Planning Rule and directives (36 C.F.R. § 219.3; FSH 1909.12, Ch. 10, 12.53b(3 and 4)). We may agree with the Forest Service's decisions to remove some species from consideration, but cannot do so without reviewing appropriate documentation.

We are not sure if "not documented" on the forest in Assessment 5 (p. 5: 32-34, Table 2) means that documentation exists to support the contention that the species does not occur on the forest or that there is a lack of information about a species occurrence. This applies to the following:

- Monarch butterfly
- Theano alpine
- Colorado blue (butterfly)
- Gold-edge gem moth
- Great Basin silverspot
- Grasshopper sparrow
- Burrowing owl
- Ferruginous hawk

---

[10] All reports and maps are available at: http://www.roundriver.org/wolverine/wolverine-maps-reports-and-publications/.

Rvsd Plan - 00002440

- Mountain plover
- Northern harrier
- Dwarf shrew
- Botta's pocket gopher
- Violet milkvetch
- Missouri milkvetch
- Narrowleaf grapefern
- Winding mariposa lily
- Brandegee's buckwheat
- Manyflowered ipomopsis (or many-flowered gilia, many-flower standing cypress)
- Ice cold buttercup
- Aztec milkvetch
- Lesser tussock sedge
- Lesser yellow lady's-slipper
- Wahatoya Creek larkspur
- Heil's tansy mustard
- Lesser bladderwort

It is not clear if "[n]o known substantial conservation concern on the Rio Grande National Forest" means there is BASI that supports a determination of no substantial concern or if this indicates a lack of information.

- Alberta Arctic
- White-veined Arctic
- Juniper titmouse
- Cassin's finch
- Prairie falcon
- Pinyon jay
- Virginia's warbler
- Brown-capped rosy finch
- American pika
- Little brown bat
- Southern red-backed vole
- Abert's squirrel

The directives make an important distinction between species of broader-scale concern and those where there is local conservation concern. Local conditions in a plan area are relevant at the SCC identification stage as a basis for including additional species for which there might not be broader concern; *not as a sole basis for rejecting species for which there is a broader concern.* In Assessment 5, a "basis" is provided for each species "not carried forward for analysis as SCC" that addresses both regulatory criteria for each species. However, the criteria listed for "determining 'substantial concern" are only the criteria designated in the directives to be used for species of "local concern" (FSH 1909.12 Ch. 10, 12.52d(3)(f)) (See Appendix A: Evaluation of Species of Conservation Concern Identification Process, by Defenders of Wildlife). Thirty-seven species were considered but not carried forward.

Age of occurrence records should not be a justification for ignoring a species in the planning process without demonstrating that the likelihood of future occurrence is remote. Where occurrence records are old, this could substantiate the decline of the species and suggest potential recovery and restoration needs. This applies to:

- Alberta Arctic
- Northern leopard frog
- Veery

Infrequent presence or limited habitat in the plan area, and lack of threats from national forest management activities are insufficient to demonstrate that species vulnerable at a broader scale are secure in the plan area. Limited habitat might suggest the opposite. If a species is "known to occur" in a plan area, the apparent absence of habitat is not a relevant justification. This applies to:

- Sage sparrow
- Pinyon jay
- Loggerhead shrike
- Band-tailed pigeon
- Lewis' woodpecker
- Big free-tailed bat

The directives specifically recognize climate change as an example of a threat to a species that might warrant identifying it as a SCC even though it is beyond the control of national forest management actions (FSH 1909.12 Ch.10, 12.52d). A June 2016 letter from the Deputy Chief to the Regional Foresters further clarified that, "Species should not be eliminated from inclusion as an SCC based upon…threats to persistence beyond the authority of the Agency or not within the capability of the plan area, such as climate change." However, the sage sparrow was not identified as a SCC because of "very limited ability to influence species through management actions of Rio Grande National Forest." The American pika is another species where climate change is a threat. American pikas live among high-elevation talus fields and are vulnerable to warming temperatures (Beever et al. 2003). American pikas are experiencing declines across most of their range (Wilkening et al. 2015). Calkins et al. (2012) predicted that pika habitat will shrink at even slightly warmer temperatures. The species occurs in the RGNF.

### 5.3.1.1.    Response to Additional Recommendations

The Regional Office letter (p. 6) noted that Defenders' had recommended an additional six species for consideration as SCC.

- Silky pocket mouse (*Perognathus flavus*), NatureServe: G5, S1
- Brazilian free-tailed bat (*Tadarida brasiliensis*), NatureServe: G5, S1
- Xanthus Skipper (*Pyrgus xanthus*), NatureServe: G3G4, S3
- Three-toed woodpecker (*Picoides tridactylus*), NatureServe: G3G4, S3S4B (vulnerable)
- Dwarf hawksbeard (*Askellia nana*), NatureServe: G5, S2
- Pale moonwort (*Botychium paltidum*), NatureServe: G3, S2

We see that *Askellia nana* is now on the SCC list under consideration. We assume the other five were rejected. We have not found documentation online or in requests to the Forest Service to understand why these species were not identified as SCC. We provide additional justification as to why we believe the following three species warrant identification as SCCs.

- Brazilian Free-tailed Bat (*Tadarida brasiliensis*). NatureServe (2015) ranks the Brazilian free-tailed bat as critically imperiled in Colorado. The species' range overlaps with the RGNF, and the forest includes several important habitats including caves (or mines), riparian, and mixed conifer forest.

- Silky Pocket Mouse (*Perognathus flavus*). According the NatureServe, the silky pocket mouse is imperiled in Colorado (NatureServe 2015). Based on a Forest Service Region 2 evaluations form, the species is known to occur on the RGNF (Forest Service 2001). Additionally, a small mammal survey conducted by Colorado Natural Heritage Program found occurrences on the RGNF (CNHP 2015). See also CNHP (Rocchio et al. 2000).

- Pale Moonwort (*Botychium pallidum*). Pale moonwort is ranked as imperiled in Colorado by NatureServe (2015). It is a Colorado Rare Plant (CNHP 1997) and Forest Service Region 2 Sensitive Species. It has been found in Rio Grande and/or Conejos counties (Kettler et al. 2000). The Draft Environmental Impact Statement for the RGNF 1996 land and resource management plan indicates the plant occurs on the forest (p. 3-94).

### 5.3.1.2.    Additional request for consideration

We also recommend that the red squirrel (*Tamiasciurus hudsonicus*) be considered as SCCs given recent information about them. Based on a study by Colorado Parks and Wildlife and others (CPW undated), red squirrels may be having a negative response moderate and severe spruce beetle outbreak conditions. The assumption is that the loss of cone crop, a key food resource for the squirrels, is the key factor. They are residents of the RGNF and serve as an important secondary food source for Canada lynx

### 5.3.2. Species of Conservation Concern Recommendations

We make management recommendations and recommend management documents to begin developing species-focused plan components based on BASI for the following faunal SCCs currently under consideration by the Forest Service.

## Boreal Toad (*Anaxyrvs boreas*)

In 2001, the Boreal Toad Recovery Team believed that Boreal Toads occupied less than one percent of their historic breeding areas in the Southern Rocky Mountains (Loeffler 2001). Though the primary cause of Boreal Toad decline is the chytrid fungus (*Batrachoclytrium dendrobatidis*) (Bd), there are several management actions the RGNF could take to improve protection, conditions, and outcomes for the species. The Forest Service's Region 2 Boreal Toad (*Bufo boreas boreas*): A Technical Conservation Assessment (Keinath and McGee 2005: 41-43) recommended the following management actions for managing disease, determining population status, monitoring known populations, delineating important habitat, and protecting suitable habitat.

Disease management:

- If newly evolved environmental stressors (e.g., increased UV radiation, chemical contamination, decreased water quality, human disturbance) facilitate infection, then management should focus on eliminating those stressors from boreal toad habitats, thus enabling the remaining boreal toads to recover and repopulate their former range.
- If certain habitat characteristics (e.g., elevation, water temperature, vegetative cover) mitigate the rate of infection or the mortality rate of those infected, then sites with those characteristics should be given conservation priority. Further, habitat manipulation that promotes those characteristics could be implemented in other sites, especially those that have not already been infected.
- If some toads exhibit natural resistance to infection, then those animals should be the focal point of captive breeding and reintroduction programs.

Monitor known populations:

- Known breeding populations must be monitored to track changes in abundance and behavior and to evaluate impacts of management actions (see "Inventory and monitoring" section).

Delineate important habitat:

- Managers should identify important terrestrial habitats (i.e., foraging areas, over-wintering sites, and movement corridors) and aquatic habitats (i.e., permanent ponds and river and stream habitats within 2.5 km of known breeding ponds). Managers should then assign priorities for protecting and monitoring boreal toad habitats, wherein the healthiest populations receive greater priority.

Protect suitable habitat:

- To insure population persistence, important habitat must be protected from natural and human-caused disturbances that could potentially threaten the survival of boreal toads at the local, population, and/or landscape scale. This includes not only the breeding sites, but also the network of upland habitat and migration corridors. Habitats with BD-free populations should receive high priority for protection.

Keinath, D. and M. McGee (2005: 43-45) recommended a set of tools and practices to guide population and habitat management, summarized below.

Pre-management surveys:

- Habitats that may be suitable for breeding, foraging, over-wintering, or migration by boreal toads should be surveyed prior to any management activity that could impact the toads or their habitat. If the loss or deterioration of boreal toad habitat is inevitable, then mitigation measures should be implemented.

Timber harvest:

- Timber harvests that create uneven-age stands result in fewer disturbances to the understory and ground, which is preferred in boreal toad habitat.
- Fire and heavy equipment use can cause toad mortality, so post-sale treatments (e.g., scarification or fire) should be limited.
- Vehicle use of roads and skid trails in boreal toad habitat should be planned to avoid times of peak boreal toad activity, thus reducing road-kill mortality.
- Boreal toads disperse considerable distances (2.5 km) from breeding to upland forest sites (Bartelt 2000). Therefore, timber harvest within 2.5 km of known breeding sites should be limited during and immediately following the breeding season.
- Timber harvest can alter hydrologic patterns, and thus impact boreal toad breeding sites that may not be within the harvest boundaries. Therefore, managers should plan harvest activities designed to maintain water quality and quantity, and hydrologic functioning in proximate wetlands.

Livestock grazing:

- Maintain riparian areas and wetlands in proper functioning condition by conserving adequate vegetation, landform, or debris to:
    - dissipate energy associated with stream flow, wind, and wave action
    - filter sediment, capture bedload, and aid floodplain development
    - improve flood-water retention and groundwater discharge
    - develop root masses that stabilize stream banks against current action
    - develop diverse pond characteristics to provide habitat, water depth, duration, and temperature to support diverse aquatic life (USDI Bureau of Land Management 1993).
- Maintain water quality and quantity at Clean Water Act standards as a minimum.
- Maintain vegetative cover requirements necessary to meet the recovery needs of boreal toads (see "Habitat" section).
- Locate toad movement corridors and protect them from the impacts of livestock grazing.
- Minimize incidences of trampling by livestock by fencing critical habitat areas.

Fire management:

- In areas where there are known boreal toad breeding sites, burning prescriptions should buffer habitats within 2.5 miles of the site and/or should be restricted to late fall through early spring, when boreal toads are less active. If prescribed fires cannot be avoided at these times and locations, then minimizing the rate of spread may allow toads to escape the flames. The use of fire retardants in or near boreal toad habitats, especially breeding sites or other aquatic habitats, should be avoided.

Pesticides, herbicides, and environmental contaminants:

- Residue from pesticide, herbicide, or fertilizer application can contain compounds detrimental to toads (see "Extrinsic threats" section). Until the lethal and sublethal impacts of these commonly used chemicals are examined for all life history stages of the boreal toads, they should not be applied within at least 100 meters of wetlands.

Rvsd Plan - 00002445

Non-indigenous species:

- To protect boreal toad populations from the other potential threats posed by the presence of non-indigenous species, introductions of native and non-native fish and amphibians into occupied or suitable unoccupied boreal toad breeding habitats should be discouraged
- Managers should keep the potential implications of nonnative species in mind when developing management or conservation strategies for mountain lakes and streams, and consider removal of these species where their presence is deemed detrimental to boreal toad populations or the larger native amphibian community.

Habitat development and fragmentation:

- Water projects. Wetlands in occupied boreal toad habitat and suitable but unoccupied boreal toad habitats should not be drained or filled. If this is unavoidable, lost wetlands should be replaced at a minimum 2:1 ratio (i.e., two hectares of wetland should be created for each hectare lost). Development within at least 300 ft. (100 m) of known occupied and suitable but unoccupied boreal toad habitats should be avoided.
- Roads. Existing roads in occupied boreal toad habitats should be examined to determine whether they are a barrier to toad movement. Roads that represent a barrier to safe movement by toads between essential habitats (e.g., between ponds and uplands, or between neighboring ponds) should be modified, possibly by installing culverts or similar structures that allow toads to pass unhindered. Bridges and seasonal road closures may also be used to provide mitigation. Roads could be moved to avoid impact altogether. New roads should avoid suitable toad habitat and contain appropriate features to eliminate barriers to water flow and toad movement. Roads leading to sensitive wetlands may be seasonally or permanently closed to reduce use of those areas. Interpretive signs explaining modifications of travel should be posted in any area where modifications alter public access.
- Recreation. Campsites in or near occupied breeding ponds should be closed seasonally to protect breeding adults, egg masses, tadpoles, and toadlets. In unrestricted camping areas, fencing and signs should be used to seasonally restrict camping within at least 100 ft. (34 m) of riparian areas. As with roads, interpretive signs explaining changes should be posted to improve the public's acceptance and compliance with these restrictions. The impacts from trail use should be evaluated annually in areas where they cross boreal toad breeding habitat. Trails that lead to or pass near occupied breeding sites should be closed seasonally, or permanently rerouted to avoid these areas. Newly constructed trails should avoid directing users to occupied breeding sites, and a buffer at least 100 ft. (34 m) should be placed between new trails and occupied breeding sites. Off-road vehicle use should be managed to avoid riparian and wetland habitats.

**Western Bumblebee (*Bombus occidentalis*)**

Hatfield et al. (2012) described the following threats to North America bumble bees: habitat fragmentation, livestock grazing, insecticide and herbicide use, loss of genetic diversity, pests and disease, competition with honey bees, and climate change. An additional threat includes fire suppression (Defenders of Wildlife 2015). For a more detailed description of threats to help guide management, see: "A Petition to list the Western Bumble Bee (Bombus occidentalis) as an Endangered, or Alternatively as a Threatened, Species Pursuant to the Endangered Species Act and

for the Designation of Critical Habitat for this Species," by Defenders of Wildlife (2015). The following management recommendations are adapted from the Forest Service's own recommendations in *Conservation and Management of North American Bumble Bees* (Schweitzer et al. 2012) and the Xerces Society's Conserving Bumble Bees: Guidelines for Creating and Managing Habitat for America's Declining Pollinators (Hatfield et al. 2012).

Promote ecological integrity of bumblebee habitat and promote habitat connectivity:

- Provide habitat for nesting and overwintering sites. (Schweitzer et al. 2012: 3)
- When nesting sites are limited, consider providing artificial nest boxes. (Schweitzer et al. 2012: 3)
- Assure continuity of nectar and pollen resources when bumble bees are active from spring to late summer. (Schweitzer et al. 2012: 3)
- Increase abundance and diversity of native wild flowers to improve bee density and diversity. (Schweitzer et al. 2012: 3)
- Ensure that nesting habitat is in close proximity (500-800 m; 0.3-0.5 mi) to foraging habitat. (Schweitzer et al. 2012: 3)

Pesticides and herbicides:

- Minimize exposure to pesticides. (Schweitzer et al. 2012: 3)
- When spraying is necessary, do so under conditions that promote rapid breakdown of toxins and avoid drift. (Schweitzer et al. 2012: 3)
- Use the least toxic and least concentrated application possible. (Hatfield et al. 2012: 15-16)
- Apply when bumble bees are not active: at night and in late fall or winter. (Hatfield et al. 2012: 16)
- Do not apply when plants are in bloom.

Fire:

- Stagger the timing of prescribed burns to enable a continuous food supply. (Schweitzer et al. 2012: 3)
- Only burn a specific area once every 3-6 years. (Hatfield et al. 2012: 13)
- Burn from October through February. (Hatfield et al. 2012: 13)
- No more than one-third of the land area should be burned each year. (Hatfield et al. 2012: 14)
- Avoid high intensity fires. (Hatfield et al. 2012: 14)

Livestock Grazing:

- Grazing on a site should occur for a short period of time, giving an extended period of recovery. (Hatfield et al. 2012: 14)
- Grazing on a site should only occur on approximately one-third of the land each year.

## Rio Grande Chub (*Gila pandora*)

Rvsd Plan - 00002447

- See Rees et al. 2005, Rio Grande Chub:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5200374.pdf

## Rio Grande Cut-throat Trout (*Oncorhynchus clarkia virginalis*)

- See Pritchard et al. 2006, Rio Grande Cutthroat Trout:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5206803.pdf

## Rio Grande Sucker (*Catostomus plebeius*)

- See Rees and Miller 2005, Rio Grande Sucker:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5206797.pdf

## Boreal Owl (*Aegolius funerus*)

In Colorado, Boreal Owls typically occur above 9,500 feet (2,900 meters) (Ryder et al. 1987), largely in spruce-fir forest (Hayward 1994b). They require at least 386 mi² (1,000 km²) of suitable habitat (Hayward 1989; Hayward 1994a), given large home ranges and low populations densities (NatureServe 2015, *Aegolius funereus*). In Colorado, male home ranges have been recorded up to 618 mi² (1,600 km²) (Hayward 1994b, citing Palmer 1986). Given that Boreal Owls are secondary cavity nesters, the presence of primary cavity nesters (particularly woodpeckers) is essential for the owl. In Colorado, Boreal Owls tend to occur in mature, older, multilayered spruce-fir forest with trees of large diameter and high basal area (Hayward 1994a; NatureServe 2015, *Aegolius funereus*). Natural disturbance processes, such as fire and tree mortality due to insects and disease, help create forest heterogeneity preferred by Boreal Owls. A mosaic forest pattern tends to support a diversity of prey, particularly small mammals. Boreal Owls likely assort in a metapopulation structure (Hayward 1994b). While long-distance dispersing juveniles and emigrating adult owls are believed to be nomadic and can travel long distances, environmental changes may threaten species viability if they inhibit linkage between populations and reduce the size of habitat islands (Hayward 1994a).

The RGNF 1996 LRMP contains several plan components that could be modified in accordance with the 2012 planning rule requirements and new BASI. Relevant objectives include Forestwide Objectives: 2, 2.1, 2.2, 2.3, 2.4, 2.7, 2.9, 2.10, and 3.3. Biodiversity Standards 1 and 3 and Guideline 1 should be considered for retention with appropriate modifications. Silviculture Guidelines 1, 4, 5, 6 and 16 should be modified and retained and also be considered as standards. Several experts have recommended the following management practices.

Timber Harvest:

- Silvicultural prescriptions must provide for large diameter trees well dispersed over space and time. The roosting, nesting, and foraging ecology of boreal owls in the western United States also suggests that mature and older forest must be well represented in the landscape to support a productive boreal owl population. (Hayward 1994b)
- Maintain existing habitats and accelerate development of subalpine forest conditions within stands that are currently in mid-seral structural stages. (Wisdom et al. 2000)
- Avoid extensive use of clearcuts, which may reduce habitat quality for 100 to 200 years. Small patch cuts implemented on long rotations may be compatible with maintenance of

habitat quality for boreal owls. Thinning from below may provide for development of nest structures. (Wisdom et al. 2000)

- Retain large-diameter snags in suitable habitat areas and provide for snag replacement over time. (Wisdom et al. 2000)
- Determine potential snag densities for suitable and restoration habitats by conducting surveys. Use these baseline data to determine whether snags are below potential in other areas. Provide measures for snag protection and recruitment in all timber harvest plans. (Wisdom et al. 2000)

Provide for Connectivity:

- Provide or develop linkages among subpopulations. Evaluate linkages among subpopulations and use that information to identify areas that are highest priority for retention and restoration of habitat. This is of particular concern, where reduction in the extent of source habitats has increased the isolation of remaining habitat patches. (Wisdom et al. 2000)

Other:

- Include boreal owl conservation within a larger, ecosystem context that addresses management of primary cavity nesters, small mammals, and forest structural components (Hayward 1994a).

### Brewer's Sparrow (*Spizella breweri*)

- **See** Holmes and Johnson 2005, http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5182051.pdf

### Flammulated Owl (*Otus flamineolus*)

Flammulated owls prefer Ponderosa pine forest. They are secondary cavity nesters and need a high density of large snags. They may prefer snags >25 in dbh, and the low threshold may be 2-8 snags/ac at >13 in dbh (Manley et al. 2004). Nelson et al. (2009) found that a minimum threshold for snag dbh may be 12 in but average at 20 in dbh. Given a decline of large ponderosa pine trees range-wide, available snags may be a limiting factor for flammulated owl persistence and recovery. Post-disturbance salvage logging may not be a management practice that supports sufficient snag retention and density for a variety of snag-dependent species (Hutto 2006; Hutto et al. 2016).

### Northern Goshawk (*Accipter gentiles*)

- See Kennedy 2003: http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5182005.pdf

### Olive-sided Flycatcher (*Contopus cooperi*)

- See Kotliar 2007: http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5182039.pdf

**Peregrine Falcon (*Falco peregrinus anatum*)**

- See Craig and Enderson 2004:
  http://cpw.state.co.us/documents/wildlifespecies/profiles/peregrine.pdf

**Southern White-tailed Ptarmigan (*Lagopus leucerus altipetens*)**

- See Hoffman 2006:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5182070.pdf

**American Marten (*Martes americana*)**

- See Buskirk 2002:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5226875.pdf

**Fringed Myotis (*Myotis thysanodes*)**

- See Keinath 2004:
  http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5181913.pdf

**Gunnison's Prairie Dog (*Cynomys gunnisoni*)**

Stressors and threats to Gunnison's prairie dogs include shooting, poor range condition, energy and mineral development, plague and tularemia, poisoning, poor habitat connectivity, and destruction of habitat through motorized use and other activities (Sheffield 1997; Seglund and Schnurr 2010). Several of these cannot be addressed with coarse-filter, ecosystem plan components. Thus, it is important to incorporate fine-filter plan components to maintain and restore viable populations of prairie dogs and well-distributed prairie dog colonies to promote grassland integrity on the Cibola.

Preservation of prairie dog colonies and associated ecological benefits, however, cannot be limited to merely protection of existing colonies. Studies of population dynamics of prairie dog towns have resulted in the following management recommendation: creation and preservation of "a network of native prairie reserves strategically located across the historical range of this species," which would include "clusters ('complexes') of large towns, as well as large, but isolated prairie dog towns" (Lomolino and Smith 2003). This approach necessitates a landscape-level approach to grassland conservation and habitat, including the elimination of barriers to prairie dog movement and expansion that may exist. Gunnison's prairie dogs are not only indicators of grassland integrity but grassland restoration management tools and should be considered as focal species for monitoring. Burrowing owls can also serve as focal species (Sheffield 1997; Alverson and Dinsmore 2014).

We recommend the following plan components as a starting point (see also Seglund and Schurr 2010).

Desired Conditions:

- At least one desired condition should be developed that is specific to maintaining and restoring occupied prairie dog colonies. It should include, at a minimum, providing for viable populations of prairie dogs and an increasing trend in populations; maintaining and restoring colonies that are well-distributed throughout the Cibola's grasslands; establishing sufficient prairie dog numbers and colonies to enable the persistence of obligate prairie dog

species including burrowing owls, ferruginous hawks, and mountain plovers, with the goal of creating the capacity to support a self-sustaining population of black-footed ferrets; and enabling connectivity between colonies and complexes to maintain genetic diversity. Set a specific goal for increasing occupied acreage on the Forest within this desired condition that will be monitored.

Cooperative Management:

- Work with other public land agencies and stakeholders to identify management emphasis areas where intensive management can focus on landscape scale conservation for the entire prairie dog ecosystem. (adapted from Seglund and Schnurr 2010)
- Work with CPW or other entities to reintroduce and translocate prairie dogs to augment the Forest's populations.

Reduce Target Killing:

- Prohibit recreational shooting of prairie dogs.
- Prohibit lethal control of prairie dogs.

Prevent Disease:

- Prevent plague by implementing a plague management and reduction programs that includes the use of dusting and vaccination. (see Seglund and Schnurr 2010)
- Develop a plague surveillance program to enable immediate management of plague outbreaks (adapted from Seglund and Schnurr 2010)

Habitat Protection:

- Close and obliterate roads and motorized activity in and around prairie dog colonies and re-introduction sites.
- Minimize impacts of energy and/or mineral development on prairie dogs. (adapted from Seglund and Schnurr 2010)

Connectivity:

- Manage grassland ecosystems at the landscape-level, restoring habitat connectivity, both structurally and functionally.
- Eliminate or reduce human pressures on grassland ecosystems, including motorized activity, recreational shooting, and impacts from livestock operations infrastructure.
- Identify and implement feasible and effective techniques to assist in prairie dog population recovery following plague epizootic events. (adapted from Seglund and Schnurr 2010)

Monitoring:

- Designate the Gunnison's prairie dogs as a focal species for grassland integrity.
- Conduct prairie dog population monitoring.

### River Otter (*Lontra canadensis*)

Rvsd Plan - 00002451

- See Boyle 2006:
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5210168.pdf

## Rocky Mountain Bighorn Sheep (*Ovis canadensis canadensis*)

- See Beecham et al. 2007:
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5181936.pdf

## Townsend's big-eared Bat (*Corynorhinus townsendii townsendii*)

Townsend's big-eared bats depend on caves, mines, abandon buildings or the underside of bridges for general roosting, maternal roosting, and hibernation. Species persistence will depend on enabling continued access to caves, mines, and other roosting sites—both known, existing sites and potential habitable sites to promote the species' recovery. The Townsend big-eared bat has specialized habitat requirements that cannot be restored or maintained with ecosystem-focused, coarse-filter components alone. It is essential that management plan components protect roosting sites from human disturbance and minimize other threats and stressors. The RGNF 1996 LRMP includes a wildlife standard regarding the protection of caves and mines,

> Manage human disturbance at caves and abandoned mines where bat populations exist. When closing mines or caves for safety or protection reasons, reduce disturbance of residing bat populations and ensure bat access.

We recommend that this or a similar standard be retained in the revised management plan. The following recommendations have been adapted largely from the Forest Service's Region 2 Townsend's *Big-eared Bat (Co ynorhinus townsendii): A Technical Conservation Assessment* (Gruver and Keinath 2006) and Colorado Parks and Wildlife State Wildlife Action Plan (CPW 2015).

Roost Protection:

- Manage to eliminate or limit disturbance, such as from mining and recreation, of known and potential roost sites, especially to roost sites, maternity colonies, and hibernacula; human activity in and near roosts must be minimized or eliminated, particularly during reproductive and hibernal periods. (Gruver and Keinath 2006; CPW 2015)

- Assess of patterns of roost use and movement to better understand patterns of roost use and fidelity to adequately protect roosting habitat through time and to adequately assess population trends. (Gruver and Keinath 2006)

- Employ appropriate site-specific and/or species-specific techniques for closures and safety enhancements (CPW 2015: 224), such as, by using gates to enable bats access to caves while keeping people out. However, research has shown that gates can negatively affect Townsend's Big-eared Bats but that they may be adaptable in the long-term (Diamond and Diamond 2014). It is important when installing gates that the best available science be used to identify bat-compatible gates.

Prevent Disease Spread:

Rvsd Plan - 00002452

- Manage recreation, research, management, and other human disturbances to control the spread of pathogens (CPW 2015: 224), i.e., to prevent white nose syndrome.

Timber:

- Timber harvest regimes, prescribed burns, and other vegetation management actions should maintain a mosaic of mature forest canopy that can be perpetuated through time. (Gruver and Keinath 2006)

Chemicals:

- Elimination of exposure to toxins by remediating indirect sources of exposure to toxins and eliminate direct exposure will benefit this and other species of wildlife. (Gruver and Keinath 2006)

- Reduce or eliminate herbicide and pesticide use, such as forestry effluents, to prevent the reduction in prey from spraying or runoff. (CPW 2015: 224)

6.   Climate Change

The 2012 Planning Rule adopts an intentional approach to planning for climate change. In fact, the rule was explicitly designed to be a vehicle for adaptation planning and the implementation of strategies to make national forests more resilient to the stresses of climate change (77 Fed. Reg. 21164). The Planning Rule states that the intent of the rule is to allow "the Forest Service to adapt to changing conditions, including climate change…" (36 CFR 219.5(a)).

The Planning Rule establishes adaptation to climate change as a primary consideration within the three phases of planning (assessment, planning and implementation/monitoring).

- The forest plan assessment will identify and evaluate existing information relevant to the forest plan on climate change as a system driver and a stressor, and evaluate information regarding "the ability of terrestrial and aquatic ecosystems on the plan area to adapt to change."
- During the planning phase, the forest plan must develop plan components (i.e. strategies) for ecological sustainability and diversity of plant and animal communities which take climate change into account, based on the best available scientific information, provided in the Assessment.
- The forest plan monitoring program must evaluate the effectiveness of the adaptation strategies and contain one or more monitoring questions and associated indicators on "measurable changes on the plan area related to climate change and other stressors that may be affecting the plan area."

Climate change, including adaptation to climate change effects, does not receive much overt attention in the Proposed Action (it is conceivable that climate considerations can be "built in" plan components, and thus not readily apparent within them. But we do not believe that to be the case in this instance.). There in only one meaningful reference under Goal 2: To aggressively diversify "age classes and structure, seral stage and habitat classes" for the purposes of providing "responsiveness to *anticipated changes in climate*" (emphasis added). It is also suggested in other plan

components for example the desire to maintain habitat, structure, pattern and disturbance frequencies (conditions) *similar to those that result from natural disturbances.* Those natural disturbance conditions used for emulation should be informed by climate change information. Similarly, ecological conditions necessary for at-risk species need to be informed by climate change information. Because there are no actual desired conditions for at-risk species, there are clearly no adaptation strategies for them either.

Whether or not the forest plan can provide for the persistence of species, ecosystems and their key characteristics in the face of climate change depends on how effectively BASI is applied to the planning process, and how effectively climate change was incorporated into the Assessment, which is required to "assess system drivers, stressors, including risks related to climate change" (FSH 1909.12 Ch. 10, 12.3). It is important to note that even if the Assessment fails to consider and document the range of BASI on an important topic such as climate, the BASI should be continuously considered and provided as the planning process proceeds.

Climate change effects are considered a system driver as well as a stressor, when coupled with other processes affected by climate change, such as increases in the spread of invasive species. The Assessment must also come to a status determination for ecological integrity which includes factoring in "the influence of climate change" (12.14c). Not factoring climate into the integrity analysis may result in plan components that do not account for climate trends and will thus be ineffective in providing for integrity; in other words, it will not be possible to provide conditions that *anticipate changes in climate.*

The absence of a climate analysis for planning may also affect at-risk species, both in the failure to provide climate adaptation strategies at the ecosystem-level, but in the absence of climate informed plan components for individual species as well. Climate threats are to be considered when considering species to select as SCC (FSH 1909 Ch. 10, 12.52d), and when determining the status of at-risk species (FSH 1909 Ch. 10, 12.55). This enables the development of adaptation-based plan components for ecological conditions for at-risk species.

It does appear that climate threats were incorporated to some degree into the decisionmaking process for SCC and other at-risk species. For example, the Black swift was included on the SCC list due to susceptibility to "climate related stressors" (at-risk species Assessment p. 37). Specific plan components that address climate threats, coupled with other stressors (e.g. water diversion), will be necessary for this and other species with recognized climate concerns.

The Rio Grande ecosystem Assessment states that the modelling which occurred for NRV and ecosystem integrity "did not specifically include climate change" (Assessments 1 and 3, p. 1). This is worrisome in that it indicates that plan components will not be designed to provide for the conservation of resources in the face of climate change. The Assessment notes that, "The current Rio Grande Forest Plan does not include any guidance related to climate change" (p. 2) but that "We recommend addressing climate change in our revised Forest Plan" (p. 5). How the plan will do this absent climate information is a key question at this stage of the planning process. This is not an insignificant problem, and we are surprised that the Assessment did not use existing climate change adaptation and vulnerability information for resources, lands and waters in Colorado (see below).

Despite these deficiencies, the Assessment does suggest where climate change related plan components may be needed to address vulnerabilities. For instance, plan components will be

Rvsd Plan - 00002454

necessary to reduce manageable stresses on the Uncompahgre Fritillary Butterfly and other numerous climate stressed species dependent on high-elevation alpine ecosystems identified in the at-risk species Assessment. Climate threats are cited in the butterfly's recovery plan, operating in concert with other manageable threats such as habitat trampling caused by "Increasing recreational traffic, including extensive off-trail use (and) domestic livestock grazing…" (At-risk species Assessment, p. 7). In order to "contribute to the recovery" of the butterfly, the forest plan must constrain the manageable threats to the butterfly's recovery. In addition, the plan monitoring plan should include a specific question to evaluate climate impacts on the endangered butterfly, as recommended in the at-risk species Assessment (p. 7). Similarly, the White-tailed ptarmigan is another alpine species threatened by climate change and additionally stressed by grazing, recreational use and mining (at-risk species Assessment p.55). There must be plan components directed at those threats.

The Assessment also notes that, "Research suggests that we should be building off of *the parts of the ecosystems that improve resilience and resistance to climate change*, including unique ecological attributes such as fens, riparian zones (Seavey et al. 2009) and the parts of the spruce fir forest that resisted, or were unaffected by the spruce beetle outbreak" (p. 5, emphasis added). As a general matter these resistant and resilient "parts" of the ecosystem should be selected as key characteristics for planning, management and monitoring, particularly if those "parts" are found to be vulnerable to climate impacts. For example, there should be plan direction to preserve cold water refugia. There should also be specific plan components directed at the protection and restoration of all late successional habitat given the estimated deficits and estimated effects of climate driven changes in disturbance regimes. Specific plan components to conserve these recognized features should be developed. We recommend desired condition statements for each, coupled with any necessary constraints (standards and guidelines) to avoid impacts from additional stressors.

Low elevation riparian areas, seeps and springs should also receive special attention in the plan components and monitoring, based on their climate vulnerabilities noted in the Assessment (p. 5 and 43). The Assessment notes that the effects of grazing, roads and travel management on climate vulnerable low elevation riparian areas are of concern and need to be rigorously evaluated; it even suggests the modification of existing standards and guidelines "to ensure the continued protection of these areas from sedimentation and erosion" and "monitoring and regulation of livestock grazing" (p. 43). Plan components should reflect this strongly stated concern and the effects of the forest plan on these vulnerable resources should be rigorously analyzed within the DEIS. The draft plan should consider an alternative to reintroduce beaver as an adaptation strategy, as suggested by the Assessment (p. 43). In addition, there needs to be strong plan direction for the conservation of wetlands, which are noted in the at-risk species Assessment as providing necessary ecological conditions for several at-risk species (boreal toad, Northern leopard frog, New Mexico meadow jumping mouse) that are threatened by climate change (at-risk species Assessment p 53). Plan components to protect and restore the ecological condition of meadows could be either "coarse" or "fine-filtered", but either way need to provide the necessary condition for these at-risk species, and account for climate driven threats, coupled with others that can be addressed directly by the forest plan (e.g. decreased water quality, water development, timber harvest, livestock grazing, habitat fragmentation, non-native species).

The ecosystem Assessment suggests climate adaptation strategies on p. 43. These should be reflected in the draft plan.

Notably that section of the Assessment calls for the restoration of fire "to its historical role on the forest" (p. 43). To accomplish this the Forest will need to develop desired conditions for wildfire for specific ecosystems associated with frequency and severity and other relevant factors. It is defensible to introduce the concept of "fire management zones" but it will be essential to have clear plan components for fire in these areas so that integrity can be determined for each ecosystem.

There must also be desired conditions and other plan components for rare communities and special habitats, as noted in the Assessment, due to their vulnerability to climate change effects.

Plan components for "heterogeneous conditions at a variety of scales" (p. 43) should also be considered in the draft plan, which will need to clearly describe the desired heterogeneity, features and ecosystems to which the desired condition applies.

The Assessment also notes a significant degree of uncertainty in how climate change effects will manifest on the Forest. The Proposed Action states that, "The intent of the monitoring is to provide the Responsible Official with sufficient information to inform key management decisions about the success of the plan" which is true but the monitoring plan should also test "relevant assumptions", including those surrounding climate change effects on resources governed by the plan. The monitoring plan should be coordinated with the Rocky Mountain Research Station and with the broader-scale monitoring strategy (36 CFR 219.12). Many climate-based questions concerning changes in ecosystem conditions and the effectiveness of adaptation strategies for at-risk species will transcend individual forests. The Assessment calls for monitoring of management practices such as timber harvest, salvage, grazing and others to understand how the possible stress of these effects interact with other climate driven stressors. Seeing pointed monitoring questions to this effect in the monitoring plan is recommended.

Additional information resources:

- The Colorado Climate Change Plan, 2015 (http://cwcb.state.co.us/environment/climate-change/Pages/main.aspx)
- Colorado Wildlife Action Plan Enhancement: Climate Change Vulnerability Assessment (http://www.cnhp.colostate.edu/download/documents/2014/CO_SWAP_Enhancement_CCVA.pdf)
- U.S. Forest Service Rocky Mountain Research Station, Climate Change Vulnerability Assessments and Related Literature for Aquatic Ecosystems (http://www.fs.fed.us/rmrs/climate-change-vulnerability-assessments-and-related-literature-aquatic-ecosystems-colorado)

7. Monitoring

7.1. General Comments

It is important not to think of monitoring as an afterthought to the planning process. In fact, monitoring should be foremost in mind when developing the plan. For example, when drafting a desired condition, it is useful to think: How will we measure this? Most of the plan components in the Proposed Action would not meet this test. For example, how would the monitoring plan address the "status of a select set of the ecological conditions required…to maintain a viable population of

each" SCC. As it stands in the Proposed Action, that monitoring requirement could not be met because the necessary plan direction does not exist.

"Monitoring information should enable the responsible official to determine if a change in plan components" may be needed (36 CFR 219.12(a)). The suggestion that forest plans should be constructed such that they never require amendment undercuts the intention of the rule to use plan components to effectively meet Planning Rule requirements. Monitoring within a planning framework that does not provide for accountability undermines a legitimate adaptive management program. We refer back to our comments on "Responsiveness and Flexibility" earlier support this point.

Much thought should be given to the "select set of ecological conditions." Those ecological conditions that are most heavily dependent on assumptions should be prioritized for monitoring, in that they carry the most risk for at-risk species; cases where that risk of uncertainty is compounded by management effects are highest priority. This question can be answered by asking: "We think the species needs this, but we are not sure…"

We recommend that the Forest refer to "Applying the 2012 Planning Rule to Conserve Species: A Practitioner's Reference" when developing a monitoring approach (and other approaches) to at-risk species (see p. 43). The report correctly points out that monitoring of ecological conditions alone "is less useful when habitat and population dynamics are poorly linked…" (p. 45). Monitoring ecological conditions alone carries some risk for those types of species and thus the authors point out that "the Rule nor the Directives explicitly preclude measuring the occurrence, distribution, abundance, or other population parameters of at-risk species as an indicator of plan effectiveness" (p. 46). The Forest should consider cases where it may be necessary to directly measure population parameters of specific species where collection of ecological condition information alone poses a risk to the conservation of such species. Fiscal realities must be considered as well, and priority for population monitoring should be given to cases of high risk.

## 7.2. Recommended Focal Species

The Planning Rule addresses focal species in conjunction with the plan monitoring program developed by the responsible official (36 CFR § 219.12(a)(5)(iii)). The purposes of focal species are to permit "inference to the integrity of the larger ecological system to which it belongs" and provide "meaningful information regarding the effectiveness of the plan in maintaining or restoring the ecological conditions to maintain the diversity of plant and animal communities in the plan area" (36 CFR. § 219.19). The 2012 rule also includes requirements for focal species. Focal species are employed in the plan monitoring program to evaluate the effectiveness of the forest plan in meeting the diversity requirements (36 C.F.R. § 219.12(a)(5)(iii)). Effective monitoring may require that some SCCs be selected as focal species. The Forest should track the status of focal species throughout the life of the management plan. Species that are either known or hypothesized to be particularly sensitive to climate disruptions should be strongly considered. We recommend the following focal species.

**Beaver (*Castor canadensis*)**

Beavers are considered keystone, or strongly interacting, species. A technical conservation assessment of beavers prepared for the Rocky Mountain Region (Region 2) acknowledged the

Rvsd Plan - 00002457

interactive role of the rodents in riparian systems (Boyle and Owens 2007). Studies have demonstrated the negative consequences of beaver losses as well as the ecosystem services beavers provide through their dam building (Naiman et al. 1994; Gurnell 1998; Wright et al. 2002; Butler and Malanson 2005; Westbrook et al. 2006; Stevens et al. 2007; Bartel et al. 2010; Westbrook et al. 2011). Miller et al. 2003: 188, citing Naiman et al. (1988) and Gurnell (1998), presented a long list of documented ecological impacts of beaver engineering,

> stabilization of stream flows; increased wetted surface area (i.e. benthic habitat); elevation of water tables causing changes in floodplain plant communities; creation of forest openings; creation of conditions favoring wildlife that depend upon ponds, pond edges, dead trees, or other new habitats created by beavers; enhancement or degradation of conditions for various species of fish; replacement of lotic invertebrate taxa (e.g., shredders and scrapers) by lentic forms (e.g., collectors and predators); increased invertebrate biomass; increased plankton productivity; reduced stream turbidity; increased nutrient availability; increased carbon turnover time; increased nitrogen fixation by microbes; increased aerobic respiration; increased methane production; reduced spring and summer oxygen levels in beaver ponds; and increased ecosystem resistance to perturbations.

Additionally, the presence of beaver dams and the functional populations of beaver in suitable habitats contribute to resilience in the face of climate change (Bird et al. 2011).

Beaver ponds provide winter habitat for Rio Grande cutthroat trout (Pritchard and Cowley 2006) and breeding habitat for boreal toads (Keinath and McGee 2005), two Region Two sensitive species that occur in the Forest, and species the RGNF has proposed as species of conservation concern.

## Canada Lynx (*Lynx canadensis*)

The presence and persistence of lynx populations can help indicate the integrity of old growth montane forests and the integrity of movement corridors. Lynx prefer high-elevation habitats characterized by forests at a variety of succession stages that result from natural disturbance regimes, such as fire (Miller et al. 2003). In the Southern Rockies, habitat includes vegetative communities typified by Engelmann spruce (Picea engelmannii), lodgepole pine (Pinus contorta), aspen (Populus tremuloides), and subalpine fir (Abies lasiocarpa) (Koehler and Aubry 1994). Lynx primarily prey primarily on snowshoe hares and red squirrels (Tamiasciurus hudsonicus). Lynx populations need extensive patches of high quality habitat, given their large home ranges. Two lynx require about 40 square miles (McKelvey et al. 1999). Carroll et al. (2001) recommend including carnivores as focal species in "regional-scale monitoring programs" and specifically included Canada lynx in their recommendations.

## Rio Grande Cutthroat Trout (*Oncorhynchus clarkii virginalis*)

Cutthroat trout are indicators of mountain stream quality (Behnke 2002). They require cold, clear streams with stable temperatures and well-vegetated banks (Hickman and Raleigh 1982; Raleigh and Duff 1981; Miller et al. 2003) as well as distinctive habitats for spawning, juvenile rearing, and overwintering. They are vulnerable to threats such as over-fishing; habitat loss and degradation from logging, mining, and livestock grazing; the introduction of non-native fish; disease, and roads. The Rio Grande cutthroat trout was a former a Management Indicator Species for Region 2.

**Brown creeper (*Certhia americana*)**

Brown creepers are indicators of sustainable management of late-seral forests (Aubry and Raley 2002; Hejl et al. 2002; Poulin et al. 2008; Poulin et al. 2010). They inhabit mixed conifer subalpine forests and require snags or dying trees where they nest under peeling bark (Hejl et al. 2002). Scientists commonly employ brown creepers as focal species to study forest disturbance (see Imbeau et al. 2000; Farris et al. 2010; Poulin et al. 2010; Vogeler et al. 2013). Because they have large territories, Poulin et al. (2010) suggested they serve as umbrellas species for other mature old-growth specialists.

**Hairy woodpecker (*Picoides vailosus*)**

Hairy woodpeckers are associated with unlogged burned habitats with high snag densities; they avoid areas with low snag densities (Haggard and Gaines 2001; Saab et al. 2009). Woodpeckers are indicators for snag densities, sizes, and decay rates (Hilty and Merenlender 2000; Haggard and Gaines 2001; Bate et al. 2008; Nappi et al. 2015). Woodpeckers are keystone species in conifer-dominated forests as primary cavity excavators that benefit a range of secondary cavity-using wildlife (Tarbill et al. 2015).

**Northern Goshawk (*Accipiter genulis*)**

Northern goshawks use a variety of forest types, but nest primarily in ponderosa pine and Douglas fir forests (Boyce et al. 2006). They are indicators of the integrity of mature, old growth forest structure and composition and a sufficient forest prey base of small mammals and birds and have been recommended as indicator species in several studies (Hilty and Merenlender 2000). Threats include timber harvesting, in particular, and severe fires as well as fuel treatments. Home range size is estimated to be 2,000-3,000 ha (Boyce et al. 2006). Territories average being within a 1.6 km from nest sites, and they have strong nest site fidelity. Long distance movements should be considered in scale consideration for management (Graham et al. 1999) and the need for large areas of connected habitat. The Forest Service has a monitoring guide for the Northern goshawk (Woodbridge and Hargis 2006). We believe the goshawk makes a particularly good focal species because tracking and monitoring protocols for this species are already well-established.

8.   Designated Area Recommendations

We recommend the attached proposed areas be recommended for Wilderness designation (See Appendix B).

We recommend the attached proposed areas be designated by the Forest Service as special areas (See Appendix C).

We recommend the attached proposed Decker Creek Gunnison Sage Grouse Protection Area be designated as a zoological area by the Forest Service (See Appendix D).

9.   Literature Cited

Aubry, K.B., and C.M. Raley. 2002. The pileated woodpecker as a keystone habitat modifier in the Pacific Northwest. USDA Forest Service General Technical Report PSW-GTR-181, 257-274.

Bartel, R.A., N.M. Haddad, and J.P. Wright. 2010. Ecosystem engineers maintain a rare species of butterfly and increase plant diversity. Oikos. 119: 883-890.

Bate, L.J, M.J. Wisdom, E.O. Garton, and S.C. Clabough. 2008. SnagPRO: snag and tree sampling and analysis methods for wildlife. Gen Tech Rep PNW-GTR-780. Portland, OR: Department of Agriculture, Forest Service, Pacific Northwest Research Station.

Beever, E.A., P.F. Brussard, and J. Berger. 2003. Patterns of apparent extirpation among isolated populations of pikas (Ochotona princeps) in the Great Basin. Journal of Mammalogy. 84: 37-54.

Behnke, R.J. 2002. Trout and salmon of North America. New York: Chanticleer Press, Inc.

Beschta, R.L., Rhodes, J.J., Kauffman, J.B., Gresswell, R.E., Minshall, G.W., Karr, J.R., Perry, D.A., Hauer, F.R., and Frissell, C.A. 2004. Postfire management on forested public lands of the western United States. Conservation Biology 18: 957-967.

Bird, B., M. O'Brien, M. Petersen. 2011. Beaver and Climate Change Adaptation in North America: A Simple, Cost-Effective Strategy. WildEarth Guardians. September.

Boyce Jr, D.A., R.T. Reynolds, and R.T. Graham. 2006. Goshawk status and management: what do we know, what have we done, where are we going? Studies in Avian Biology. 31: 312-325.

Brown, R.T., Agee, J.K., and J.F. Franklin. 2004. Forest restoration and fire: principles in the context of place. Conservation Biology. 18(4): 903-912.

Butler, D.R. and G.P. Malanson. 1995. Sedimentation rates and patterns in beaver ponds in a mountain environment. Geomorphology. 13: 255-269.

Calkins, M.T., E.A. Beever, K.G. Boykin, J.K. Frey, and M.C. Andersen. 2012. Not-so-splendid isolation: modeling climate-mediated range collapse of a montane mammal Ochotona princeps across numerous ecoregions. Ecography. 35(9): 780-791.

Carroll, C., R.F. Noss, and P.C. Paquet. 2001. Carnivores as focal species for conservation planning in the Rocky Mountain Region. Ecological Applications. 11: 961-980.

CNHP (Colorado Natural Heritage Program). 2015. Searching for pocket mice in the San Luis Valley. CNHP Blog, Connecting Conservation and Science. October 22. http://cnhpblog.blogspot.com/2015/10/searchingforpocketmiceinsanluis.html.

CPW (Colorado Parks and Wildlife) et al. Undated. Impact of Bark Beetle Epidemics on Mammals in Colorado. http://sciencegs.weebly.com/uploads/6/0/6/4/60649065/wildlife_effects_spruce_beetle.pdf.

Donato, D.C., Fontaine, J.L. Campbell, W.D. Robinson, J.B. Kauffman, and B.E. Law. 2006. Postwildfire logging hinders regeneration and increases fire risks. Science 313: 615.

Farris, K.L., S. Zack, A.J. Amacher, J.C. Pierson. 2010. Microhabitat selection of bark-foraging birds in response to fire and fire surrogate treatments. Forest Science. 56(1): 100-111.

Rvsd Plan - 00002460

Forest Service. 2001. Region 2 Sensitive Species Evaluation Form, Perognathus flavus / Silky Pocket Mouse. USDA Forest Service, Region 2. July 23.
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5318202.pdf.

Ghormley, R. Lynx Habitat Model and Mapping Criteria, Rio Grande National Forest. U.S. Forest Service, Rio Grande National Forest. October 7.

Graham, R.L., R. Rodriguez, R.L., K.M. Paulin, R.L. Player, A.P. Heap, and R. Williams. 1999. The northern goshawk in Utah: habitat assessment and management recommendations. Gen. Tech. Rep. RMRS-GTR-22. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 48 p.

Gurnell, A.M. 1998. The hydrogeomorphological effects of beaver dam-building activity. Progress in Physical Geography 22(2): 167-189.

Haggard, M., and W.L. Gaines. 2001. Effects of stand-replacement fire and salvage logging on a cavity-nesting bird community in eastern Cascades, Washington.

Hayward, Gregory D.; Flather, Curtis H.; Rowland, Mary M.; Terney, Regis; Mellen-McLean, Kim; Malcolm, Karl D.; McCarthy, Clinton; Boyce, Douglas A. 2016. Applying the 2012 Planning Rule to conserve species: A practitioner's reference. Unpublished paper. Washington, D.C.: U.S. Department of Agriculture, Forest Service. 78 p.

Hejl, S.J., K.R. Newlon, M.E. McFadzen, J.S. Young, and C. K. Ghalambor, 2002. Brown Creeper (Certhia americana). In A. Poole & F. Gill (eds). The Birds of North America, No. 669. Academy of Natural Sciences, Philadelphia, Pennsylvania, and American Ornithologists' Union, Washington, DC.

Hickman, T., and R.F. Raleigh. Habitat suitability index models: Cutthroat trout. USDI Fish and Wildlife Service. FWS/OBS-82/10.5, 1982.

Hilty, J., and A. Merenlender. 2000. Faunal indicator taxa selection for monitoring ecosystem health. Biological conservation 92(2): 185-197.

Imbeau, L., J-P. L. Savard, and R. Gagnon. 2000. Comparing bird assemblages in successional black spruce stands originating from fire and logging. Canadian Journal of Zoology. 77(12): 1850-1860.

Ivan, J. 2015. Wildlife Research Project Summary: Mammal and Breeding Bird response to Bark Beetle Outbreaks in Colorado. Colorado Parks and Wildlife. 5 pp.

Karr, J.R., Rhodes, J.J., Minshall, G.W., Hauer, F.R., Beschta, R.L., Frissell, C.A. and Perry, D.A. 2004. The effects of postfire salvage logging on aquatic ecosystems in the American West. BioScience 54: 1029-1033.

Keinath, D. and M. McGee. 2005. Boreal Toad (Bufo boreas boreas): A Technical Conservation Assessment. Prepared for USDA Forest Service, Rocky Mountain Region. May 25.

Rvsd Plan - 00002461

Kettler, S., J. Rocchio, R. Schorr, and J. Burt. 2000. Biological Inventory of Rio Grande and Conejos Counties, Colorado. Colorado Natural Heritage Program. Fort Collins, Colorado. March 31. http://www.cnhp.colostate.edu/download/documents/2000/rio_grande_and_conejos_counties_v ol1.pdf.

Koehler, G.M. and K.B. Aubry. 1994. Lynx. Pages 74-98 in L. F. Ruggiero, K.B. Aubry, S.W. Buskirk, L.J. Lyon, and W.J. Zielinski, technical editors. The Scientific Basis for Conserving Forest Carnivores: American Marten, Fisher, Lynx, and Wolverine in the Western United States. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. General Technical Report RM-254.

Learn, J.R. 2016. Canada lynx persist in spruce beetle impacted forests, research shows. The Wildlife Society. February 2. http://wildlife.org/canadalynxpersistinsprucebeetleimpactedforestsresearchshows/.

Lindenmayer, D., Burton, P., and Franklin, J. 2008. Salvage Logging and Its Ecological Consequences. Island Press. 227 pgs.

Lindenmayer, D.B, D.R. Foster, J.F. Franklin, M.L. Hunter, R.F. Noss, F.A. Schmiegelow, D. Perry. 2004. Salvage harvesting policies after natural disturbance. Science 303: 1303.

Lindenmayer, D.B., and J.F. Franklin. 2002. Conserving Forest Biodiversity: A Comprehensive Multiscaled Approach. Washington, D.C.: Island Press.

McKelvy K.S., K.B. Aubry, J.K. Agee, S.W. Buskirk, L.F. Ruggiero, and G.M. Koehler. 1999. Lynx conservation in an ecosystem management context. Pages 419-442 in L.R. Ruggiero, K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. Ecology and Conservation of Lynx in the United States. Department of Agriculture, Forest Service, Rocky Mountain Research Station. General Technical Report RMRS-GTR- 30WWW.

Miller, B., D. Foreman, M. Fink, D. Shinneman, J. Smith, M. DeMarco, M. Soule, R. Howard. 2003. Southern Rockies Wildlands Network Vision. Southern Rockies Ecosystem Project. July.

Naiman R.J., C.A. Johnston, J.C. Kelley. 1988. Alteration of North American streams by beaver. BioScience 38: 753-762.

Naiman, R.J., G. Pinay, C.A. Johnston, and J. Pastor. 1994. Beaver Influences on the Long-Term Biogeochemical Characteristics of Boreal Forest Drainage Networks. Ecology. 75(4): 905-921.

Nappi, A., P. Drapeau, and A. Leduc. 2015. How important is dead wood for woodpeckers foraging in eastern North American boreal forests?.Forest Ecology and Management 346: 10-21.

NatureServe. 2015. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia. Available http://explorer.natureserve.org.

Noss, R.F., Franklin, J.F., Baker, W.L., Schoennagel, T., and Moyle, P.B. 2006. Managing fire-prone forests in the western United States. Frontiers in Ecology and Environment 4(9): 481-487.

Rvsd Plan - 00002462

Pritchard, V.L., and D.E. Cowley. 2006. Rio Grande Cutthroat Trout (Oncorhynchus clarkii virginalis): A Technical Conservation Assessment. Prepared for the USDA Forest Service, Rocky Mountain Region, Species Conservation Project. July 28.

Poulin, J.F., M.A. Villard, M. Edman, P.J. Goulet, and A.M. Eriksson. 2008. Thresholds in nesting habitat requirements of an old forest specialist, the Brown Creeper (Certhia americana), as conservation targets. Biological Conservation. 141: 1129-1137.

Poulin, J-F., M.A. Villard, S. Haché. 2010. Short-term demographic response of an old forest specialist to experimental selection harvesting. Ecoscience. 17(1): 20-27.

Raleigh, R.F. and D.A. Duff. 1981. Trout stream habitat improvement; ecology and management. Pages 67-77 in W. King, ed. Proceedings of a Wild Trout Symposium II. Yellowstone National Park, WY. Sept. 24-25, 1979.

Rocchio, J., D. Culver, S. Kettler, and R. Schorr. 2000. Biological Inventory of Rio Grande and Conejos Counties, Colorado Volume II: A Natural Heritage Inventory and Assessment of Wetlands and Riparian Areas in Rio Grande and Conejos Counties. Colorado Natural Heritage Program. Fort Collins, Colorado. March.
http://www.cnhp.colostate.edu/download/documents/2000/Rio_Grande_and_Conejos%20Count y_Inventories_2.pdf.

Shatford, J.P.A., Hibbs, D.E. and Puettmann K.J. 2007. Conifer regeneration after forest fire in the Klamath-Siskiyous: How much? How soon? Journal of Forestry 105(3): 139-146.

Stevens, C.E., C.A. Paszkowski, and A.L. Foote. 2007. Beaver (Castor canadensis) as a surrogate species for conserving anuran amphibians on boreal streams in Alberta, Canada. Biological Conservation. 134: 1-13.

Tarbill, G.L., P.N. Manley, and A.M. White. 2015. Drill, baby, drill: the influence of woodpeckers on post-fire vertebrate communities through cavity excavation. *Journal of Zoology* (2015). Early view, online version.

Thompson, J.R., Spies, T.A., and Ganio L.M. 2007. Reburn severity in managed and unmanaged vegetation in a large wildfire. PNAS 104:25. National Academy of Science. June 2007.

Vogeler, J.C., A.T. Hudak, L.A. Vierling, and K.T. Vierling. 2013. Lidar-derived canopy architecture predicts brown creeper occupancy of two western coniferous forests. The Condor. 115(3): 614-622.

Westbrook, C.J., D.J. Cooper, and B.W. Baker. 2006. Beaver dams and overbank floods influence groundwater—surface water interactions of a Rocky Mountain riparian area. Water Resources Research. 42.

Westbrook, C.J., D.J. Cooper, and B.W. Baker. 2011. Beaver assisted river valley formation. River Research and Applications. 27: 247-256.

Wilkening, J.L., C. Ray, and J. Varner. 2015 Relating sub-surface ice features to physiological stress in a climate sensitive mammal, the American pika (Ochotona princeps). PloS one. 10(3): e0119327.

Rvsd Plan - 00002463

Wright, J.P., C.G. Jones, and A.S. Flecker. 2002. An ecosystem engineer, the beaver, increases species richness at the landscape scale. Oecologia. 132: 96-101.

Woodbridge, B. and C.D. Hargis. 2006. Northern Goshawk Inventory and Monitoring Technical Guide. Gen. Tech. Rep. WO-71. Washington, DC: U.S. Department of Agriculture, Forest Service. 80 p.

Rvsd Plan - 00002464

# Appendix A

## Evaluation of Species of Conservation Concern Identification Process
## Defenders of Wildlife

### Introduction
Defenders of Wildlife is committed to the effective implementation of the 2012 Planning Rule.  In particular we are dedicated to working in good faith with the Forest Service and all forest planning stakeholders to achieve the high conservation standards established under the National Forest Management Act and the 2012 Planning Rule.  Accordingly, we are investing significant organizational capacity into the implementation of the 2012 Planning Rule, through our work on the Planning Rule Federal Advisory Committee, as well as on many of the national forests that have begun revising their land management plans under the new rule.

The Forest Service, the Planning Rule Advisory Committee, and forest planning stakeholders have noted challenges in administering the species of conservation concern planning and management program under the planning rule.  The agency has undertaken an internal review of the SCC program, coupled with an Advisory Committee review effort centered on the observations of stakeholders familiar with implementation of the SCC program.

Consistency in implementation of the planning rule has been an important issue since the formulation of the rule began in 2009; it was addressed as a key issue in the public engagement and NEPA processes, acknowledged in the preamble to the rule, and was central in the formation of the Advisory Committee.  In particular, there was significant interest in the development of a clear and cohesive approach to conserving at-risk species across the National Forest System under the rule. By placing the administration of the SCC program at the regional level, the planning rule acknowledges that the effective conservation of those species requires a consistent approach across national forests.  Consistency in administration of the SCC program is also the aim of the planning rule directives.  The procedures and rationales outlined in the directives for identifying and managing at-risk species should be repeatable in similar circumstances regardless of which national forest or individual is implementing them.

### Summary of SCC Identification Review
In order to contribute to the ongoing discussion and evaluation of the SCC program, for the purposes of improving its implementation and ensuring consistent conservation outcomes across national forests, we reviewed processes for identifying SCC on 14 national forests in six regions that are currently revising their plans under the 2012 Planning Rule.

The review was based on an interpretation of the guidance for SCC found within the planning directives, applied to specific SCC identification processes for individual national forests.  A summary of that interpretation of the directives is provided in the "Policy for Identifying Species of Conservation Concern" section below.

1

Rvsd Plan - 00002466

Our review indicates a wide divergence in SCC identification processes both across and within regions. In addition, the review raises concerns of inconsistent interpretation and application of SCC identification processes found within the planning directives.

Key findings from the review are summarized below.  Detailed documentation of the findings from the various national forests is provided in the "Detailed Forest Evaluation" section below.

*Summary of Key Findings*

**1. Assessments reviewed potential SCC, but ambiguity exists over the interpretation of "potential SCC", and assessments did not always provide rationales for selecting or not selecting species to consider as SCC**
The planning rule requires that the regional forester identify SCC, and that the responsible official, in the assessment for plan revision, "evaluate existing information relative to the plan area for potential species of conservation concern." All of the assessments we reviewed identify potential SCC. However, Forest Service officials have not always interpreted "potential" the same way, and used other terms like "recommended" or "proposed." The assessments also have not always included a rationale for selecting or not selecting species to consider for SCC, and therefore public review of SCC identification at the assessment stage has been limited on some forests.

**2. Forests generally followed guidance on categories of species to consider as SCC, but many did not specify whether all species were considered that met guidance criteria**
All forest planning processes we analyzed have generally followed the directives' guidance concerning SCC, which outlines categories of species to consider when identifying potential species of designation. However, many forests have failed to specify whether they considered all species that meet any of the criteria. In our review, we note species that meet the criteria, but were either considered and not included or evidently not considered for potential SSC designation.

**3. Rationale for excluding SCC have not been available for review and for most forests there is little indication that the regional forester was involved in SCC identification; criteria for identification of SCC were not consistently established**
For many forests, the rationale for excluding SCC have not been available for review when public input could have influenced the assessment and development of a proposed action.  For most forests, there is little indication that the regional forester was involved in SCC identification. We found that the regional forester formally identified SCCs in just three forest planning processes (in three different regions). In two of these cases, identification occurred prior to the assessment, and the regional forester provided accompanying rationale for identifying SCC in one of these cases.

Among all forests, criteria for identification were sometimes explicitly established in advance, in others they may have been developed as species were evaluated. We found instances in every forest planning process where planners cited criteria that may not have been appropriate for rejecting SCC.

Rvsd Plan - 00002467