4. Rationales for not identifying SCC were rarely linked to the best available scientific information
The planning rule requires that the Forest Service use—and document the use of—best available scientific information (BASI) in making SCC determinations.  However, we found that if a rationale was provided for not identifying a SCC, it was rarely explicitly linked to a scientific source that rebuts established concerns about the species' vulnerability that warranted its consideration as a SCC.

5. Inconsistent results for the same species across forests
We did not comprehensively review whether species were treated consistently across regions and among forests. However, there are instances of species being identified as an SCC on one forest and not on an adjacent forest, and without explanation for the distinction. There are also cases where different forests provided different rationales for SCC identification, even where they arrived at the same decision for a given species.

6. Inconsistent application of occurrence criteria
The guidance for SCC is clear that species may only be excluded from SCC consideration if they are "accidental" or "transient," or are "well outside the species' existing range." Forests frequently expanded this concept to include occurrences that are infrequent, occasional or "peripheral". Some required that species must have nesting or breeding habitat or known nest sites on the forest, which effectively excluded some migratory species.

Several forests excluded species based on the length of time since it was last recorded on the forest, even as recently as within the past 10 years.  One forest excluded species because there were "no known surveys." No mention was made of any species "becoming established" in a plan area, as provided in the directives; one species was actually excluded in part because the plan area was at the northern end of the species' range, even though its range could be expected to move northward with climate change.

7. Inconsistent treatment of Forest Service sensitive species and NatureServe rankings; use of plan area information, current or potential management, and other rationales to exclude species
Three forests in three different regions explicitly recognized Forest Service sensitive species as species that they needed to consider as SCC. However, in most or all regions sensitive species on at least some forests were not identified as SCC. In their decisions to exclude species from SCC consideration, none of the forests addressed the original rationale for sensitive species designation.

The forests and regions have also not used NatureServe rankings consistently in making SCC decisions, and have varied in whether and how they have used other authoritative sources listed in the directives.  In many cases, the Forest Service either implicitly disagreed with a NatureServe "vulnerable" ranking (instead finding a species to be "secure" or "stable") without any explanation, or found insufficient information to agree with the existing broader-scale classification. One region's forests used a "vulnerable" ranking by NatureServe as the justification for not identifying a few SCC.

3

In all regions where rationale was provided, the Forest Service frequently used information about a species in the plan area as its entire justification for not identifying SCCs, and it did so without explaining why such a justification could be made in light of broader-scale concerns.  Such justifications were based on lack of information about the species in the plan area, lack of habitat in the plan area, lack of threats to habitat in the plan area, or favorable status or trend in the plan area of populations or habitat.

Current or potential management of the plan area was also considered a factor for excluding SCC (even though that management could be changed by plan revision). The identification of SCC is not dependent on management of the national forest because, by regulation, management of the national forest depends on which species are identified as SCC and the ecological conditions that they require. In three regions, some species were not identified as SCC because planners concluded that the forest plan would mitigate threats to the species in the plan area. In four regions the rationale indicated lack of control over threats (which included climate change in one case).

Two regions determined that a finding of "not warranted" for listing under the Endangered Species Act also meant there is not a substantial concern about persistence, regardless of the species' classification by any other authority (wolverine and bi-state sage grouse, though the latter was subsequently identified after public comment). Three regions believe that designation as a "game species" demonstrates a lack of scientific concern for persistence (gray wolf, band-tailed pigeons and two subspecies of bighorn sheep). Regions took different approaches to considering the effects of other laws on likelihood of persistence, with one relying on the Bald Eagle and Golden Eagle Protection Act requirements as a reason for not identifying a species as SCC.

### Policy for Identifying Species of Conservation Concern

This section provides background and policy information on the SCC identification process, including an interpretation of the identification process as outlined in the directives, and provides the basis for our review.

When the Forest Service adopted its new planning regulations in 2012, the agency included a new approach for meeting its requirement under the National Forest Management Act to "provide for the diversity of plant and animal communities."  It embraced a "complementary ecosystem and species-specific approach."  Ecosystem plan components are expected to provide the ecological conditions for the persistence of most species in the plan area, while species-specific plan components would be developed where ecosystem components are insufficient for some species deemed to be at-risk.  The planning rule requires that the combined ecosystem and species plan components provide "the ecological conditions necessary" for these species.

The Forest Service established what amounts to a two-step process for demonstrating compliance with the requirement for conserving at-risk species.  First, it requires the regional forester to identify the species that must be addressed during the forest planning process.  These include federally listed

Rvsd Plan - 00002469

threatened and endangered species, species proposed for listing and candidate species, determined in accordance with the Endangered Species Act. Plans must also address SCC. SCC are defined as species that are 1) "known to occur in the plan area," and 2) "the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area."

The second step is for the responsible official (normally a forest supervisor) to develop plan components that provide ecological conditions that are necessary for these species. For the ESA-recognized species, the conditions are those necessary to contribute to conservation and recovery of the species. For SCC, the conditions are those necessary to "maintain a viable population" within the plan area (or for some species, "to contribute to maintaining a viable population of the species within its range").

We reviewed how SCC were treated in the assessment and found that there appears to be confusion over the use of "potential" SCC in the SCC identification process, which has implications for which species are considered for SCC, and for who actually makes those decisions. The directives (Section12.52) cite the planning rule 219.6(b)(5), which requires that an assessment discuss "available information relevant to the plan area for…potential species of conservation concern present in the plan area." The directives however state that the planning rule requires the responsible official to actually identify potential SCC. However, the planning rule does not say this; the rule actually says that the responsible official must identify information about potential species that the regional forester has identified.

There is also confusion over which species are considered for SCC, and who is responsible for applying criteria that exclude species from consideration. The directives in Section 12.52b direct responsible officials to use the criteria in Section 12.52d to select the species to consider. This section distinguishes between species that "must" be considered and species that "should" be considered. This is an unnecessary distinction.[1] Since only the regional forester can determine which species are identified as SCC, <u>a forest supervisor cannot determine which species will not be considered</u>.[2] Therefore the responsibility of the responsible official is simply to identify the species in any of the categories listed in the directives because they may meet the criteria for SCC, and to suggest any other species that might meet the criteria. The regional forester must then determine which of these species actually meet the two criteria in the planning rule.

It is worth thinking about what it means to "consider" in this administrative context. It requires that the regional forester document the information that was taken into account, and provide a rationale

[1] There should be no practical difference between species that "must" and "should" be considered as SCC in any case. The Handbook explains the degree of compliance required by the term "should" (Section 05.1): "Action is mandatory, unless a justifiable reason exists for not taking action. Employees must fully consider, but may depart from based on a written finding as applied to specific circumstances that the deviation will enhance program management efficiency or better achieve desired results or other objectives."

[2] "This authority to identify species of conservation concern may not be delegated" (directives Section 21.22a(1)(b))

Rvsd Plan - 00002470

for including or rejecting a species. Moreover, the information must include the "best available scientific information."[3] With regard to SCC, the documentation must explain how the information indicated or did not indicate "substantial concern about the species' capability to persist over the long-term in the plan area." Note that this is referring to scientific concern that has been expressed that is applicable to species persistence in the plan area rather than a subjective perception of concern by the regional forester.

The directives also make an important distinction between species of broader-scale concern and those where there is local conservation concern. All but one of the categories in the directives address the former by encompassing concerns expressed by NatureServe or government agencies about viability of the species at a broader scale than the plan area. The overall approach is to cast a wide net so that the regional forester can consider species where concern about persistence is indicated for either or both of these reasons. Local conditions in a plan area are relevant at the SCC identification stage as a basis for including additional species for which there might not be broader concern; not as a sole basis for rejecting species for which there is a broader concern.

The directives are clear about the approach that should be taken for one category of species. For species with status ranks of G/T1 or G/T2 in the NatureServe ranking system, the directives specify that these species are "expected to be included unless it can be demonstrated and documented that known threats for these species, such as those threats listed for the species by NatureServe, are not currently present or relevant in the plan area." ("Included" means identified or selected as a SCC.) It is important to note that this evaluation is not limited to only those threats present in the plan area, but includes threats from outside of the plan area that are relevant because they affect species in the plan area.

This language establishes a presumption that should be applied to any species that the regional forester considers identifying as a SCC. Species are considered because there is some evidence that they may meet the criteria for SCC. The regional forester is thus obligated to document why the threats suggested by that evidence "are not currently present or relevant in the plan area."

Missing from these directives' categories of broader viability concerns are species identified as sensitive by the Forest Service because of viability concerns in the region. This prior determination by the Forest Service creates a similar obligation to refute the scientific arguments upon which the region based its original decision. Also missing are species considered vulnerable at the state level (S3) by NatureServe. While we recognize that the directives do not explicitly reference them as species to consider when identifying potential SCC, our review notes cases where the Forest Service rejected sensitive and vulnerable species without rebutting the science-based finding that those species are in fact of viability concern within the plan area.

---

[3] A requirement of all aspects of the planning process, but repeated in 36 CFR 219.9(c)). "Such documentation must: Identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered" (36 CFR 219.3).

Rvsd Plan - 00002471

The last category of species to be considered is, "Species for which the best available scientific information indicates there is local conservation concern about the species' capability to persist over the long-term in the plan area …" The directives list possible reasons for the local concern.  This section is clearly intended as an additional reason for inclusion as a SCC, <u>not as a basis for excluding species considered because of broader-scale conservation concerns</u>.

The regional forester is then directed to use the two criteria from the planning rule for identifying SCC.  Here the directives also provide two criteria that could be used to not identify species as SCC.  One is that a species is "secure," and "its long term-persistence in the plan area is not at risk …"[4]  This is simply the reverse of the criterion to include species where persistence is at risk, but it highlights the need for BASI to counter the findings of vulnerability that led to considering the species in the first place.  The other criterion, insufficient scientific information about likelihood of persistence in the plan area, may also be a reason, but that would be a difficult case to make where there is sufficient information at a broader scale to put the species in the categories to consider.  The directives also include two criteria for not identifying SCC in 12.52b(4).[5]  <u>None of these criteria for excluding species suggest that conditions in the plan area alone would be sufficient to exclude species already determined to have broader scale persistence concerns.</u>

Species may also be excluded from consideration if they are not "known to occur" in the plan area.  This may occur if individual occurrences in a plan area are merely "accidental" or "transient," or are "well outside the species' existing range at the time of plan development" (directives Section 12.52c).  A species' range includes all areas where it regularly occurs even where that is seasonal or migratory use.  The directives also acknowledge that a species range may include places where any of these uses are "becoming established."  In the context of the planning rule's acknowledgement of the need to plan for climate change this should be understood to include species predicted to occur in the plan area in the same "long-term" timeframe encompassed by the definition of SCC.  If habitat exists (or is expected to exist) for the species, lack of recent (or any) documented occurrences should not by itself justify not identifying that species as a SCC.

Overall, the process developed by the Forest Service is very expansive and inclusive in identifying SCC.  The actual needs of these species related to management of the national forest may then be determined when plan components are being developed.  Having a large number of SCC does not necessarily lead to pages of plan components if their necessary ecological conditions can be provided by ecosystem plan components.

The assessment is intended to provide information on potential SCC to help determine the "status" of the species in the plan area (directives Section 12.53).  This section does address management

---

[4] The only species found to be "secure" by NatureServe are those with 4 and 5 rankings.

[5] Document the best available scientific information that supports not identifying a species that was considered but not identified as a potential species of conservation concern.  Such rationale may include: a. Knowledge of the species abundance, distribution, lack of threats to persistence, trends in habitat, and responses to management, or b. Lack of sufficient scientific information available about the species status.

Rvsd Plan - 00002472

under the current plan and whether stressors are subject to Forest Service management. This is because the primary value of the assessment of species status is "in identifying the need for change and in developing plan components that provide the ecological conditions necessary to sustain the species." It may also provide the basis for adding SCC based on local concern. It could be used to support not identifying SCC only if the information it includes is "relevant to the plan area," is the BASI, and it indicates there is not "substantial concern about the species' capability to persist over the long-term in the plan area" as explained above.

**Detailed Forest Evaluation**[6]
The evaluation of the SCC identification process is based on a review of various documents from these 14 national forests:

Region 1
      Nez Perce-Clearwater
      Flathead
      Helena-Lewis & Clark
Region 2
      Rio Grande
Region 3
      Cibola
      Carson
      Santa Fe
Region 5
      Inyo
      Sequoia
      Sierra
Region 8
      El Yunque
      Francis Marion
      Nantahala-Pisgah
Region 10
      Chugach

**Review Question: Did the assessment include potential species of conservation concern as required by 219.6(b)(5)?**

Region 1: For the Nez Perce-Clearwater, the regional forester selected 13 terrestrial SCC in September 2013 and these were documented in the assessment in 2014. The assessment also

---

[6] This evaluation is based largely on the reviews of individual forest plan documents by different reviewing organizations, and more in-depth discussion can be found in the comments they have submitted to the Forest Service on these planning documents.

Rvsd Plan - 00002473

includes aquatic and plant potential SCCs. The Flathead assessment includes the "species review process" in Appendix D for species to "recommend" as potential SCC (apparently not yet approved by the regional forester). The Helena-Lewis & Clark assessment includes tables showing all species considered and their recommendations.

Region 2: The Rio Grande included a list of 82 species that "meet the criteria developed in the 2012 Planning Rule" for SCC in its wildlife assessment dated February 22, 2016.

Region 3: The assessments for the three forests identify potential SCC.

Region 5: The assessments for the three forests identify potential SCC.

Region 8: The Francis Marion assessment includes lists of plant, aquatic and terrestrial animals of "potential" conservation concern. These appear to be lists of all species considered. The El Yunque assessment also includes a list of species, but they have already been narrowed from those considered. A 2014 update to the Nantahala-Pisgah assessment identified potential SCC using the Handbook criteria for species that "must be included on the potential list" or may be. The assessment also made "recommendations" for species to be removed from the SCC list based on stated rationale (and sometimes refers to them as "proposed" SCC).

Region 10: The Chugach assessment lists potential SCC (four birds and five plants).

**Review Question: Is it clear that the regional forester considered all species that must or should be considered, and was rationale provided for not doing so (if applicable)? The directives list the criteria the Forest Service must follow when selecting species for SCC consideration.**

Region 1: The Nez Perce-Clearwater assessment describes a process that includes the directives direction as "primary guidance Criteria," for species that were considered. The Flathead frames the SCC question as part of a choice that also included "species of public interest" and focal species. The Flathead assessment stated that it considered NatureServe ranks 1-4 for SCC, but also that "S3 species were considered if there was/is scientific information showing the species is in decline or at risk on Flathead NFS lands." The assessment also considered the Montana wildlife action plan and "a variety of bird assessments." The Helena-Lewis & Clark assessment follows the directives' criteria rigorously (for plants, even stating that all factors listed in the directives "must" be given consideration).

Region 2: The Rio Grande assessment lists the criteria used to determine which species to consider, and these are the criteria from the directives.

Rvsd Plan - 00002474

Region 3:  Several species that appear to meet the criteria for consideration were not addressed or mentioned by the three forests in their assessments, including mountain plover (imperiled in New Mexico according to NatureServe).  Reasons for not considering species were not disclosed.

Region 5: The documentation displays the rationales for evaluating those species that were considered and it results in species that are "proposed SCC."  It does not state that all of the directives' categories have been considered or address any species that were not included in the displays.

Region 8:  The Francis Marion assessment cites the sources for the lists of potential SCC, and they appear to follow the direction within the directives.  The Nantahala-Pisgah also appeared to use the appropriate criteria.  However, it only treated the "must consider" categories as mandatory, and it excluded some G/T3 ranked plant species that "did not meet the criteria for inclusion on the potential SCC list."  The El Yunque assessment includes a list of sources of species that were considered.  It is not clear that they include all of those in the directives that are available (plants were based on a model).

Region 10:  NatureServe G/T 1-2 produced an initial list.  Additional "watch lists" were "evaluated against the SCC evaluation criteria" to eliminate species (which are not identified, but appear to be the criteria for adding local species of concern).

**Review Question: Did the regional forester provide the rationale for identifying or not identifying SCC from among those species considered?  The two regulatory criteria that may be used are 1) "known to occur in the plan area," and 2) "the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area."**

Region 1:  The Nez Perce-Clearwater Notice of Intent soliciting comments on SCC provided only a list of identified SCC and information about these species.  The NOI included no substantive information explaining why other species that were considered were not selected.  When the Flathead solicited comments on SCC, the proposed action did not include a list. No documentation explained the process or criteria by which potential SCC went from being considered (Assessment Appendix D) to recommended/potential (Assessment Table 55) to non-selection (Proposed Action), nor was there any indication of regional forester involvement.  The assessment does include explanations of why nine species received "no special designation."  The Helena-Lewis & Clark assessment included rationale for recommendations to identify or not.  There was no indication of regional forester involvement.

Region 2:  A "basis" is provided for each species "not carried forward for analysis as SCC" that addresses both regulatory criteria for each species.  However, the criteria listed for "determining 'substantial concern'" are only the criteria designated in the directives to be used for species of "local

concern" (directives Section 12.52d(3)(f)).  Thirty-seven species were considered but not carried forward.

Region3:  The forests established criteria to use as a basis for not identifying species as SCC.  Several of these criteria were not included in the directives (some details below).

Region 5:  The forests provided draft lists in July 2015 without accompanying rationale.  They provided rationale several months later consisting of "information we considered in determining whether a species satisfies the criteria that must be met to be considered an SCC."

Region 8:  The Francis Marion DEIS includes a list of SCC. There is no explanation for why the majority of the potential SCC were not carried forward into the DEIS.  (DEIS Appendix E explains the process, but is not species-specific and includes no rationales.) Neither the DEIS nor the assessment contain any information about individual SCCs.  (Documentation of the rationale was received on March 1, but has not been reviewed.)    The regional forester provided a list that "has been identified as 308 SCC"(sic) in a letter to the Nantahala-Pisgah forest supervisor in July 2015. This letter did not include any rationale or any discussion of changes from what the assessment recommended.  The El Yunque documentation does not include rationale for not selecting species as SCC.

Region 10:  The regional forester issued a letter in December 2015 finding that one species met the requirement for SCC on the Chugach.  The regional forester also rejected forest recommendations to include other species, and considered (but rejected) species that the forest did not recommend. Rationale was provided.

**Review Question: Did the regional forester document the use of BASI to support decisions to not identify species as SCC?  The use of BASI is required for all planning actions and explicitly required for determination of SCC.**

Region 1:  No information cited for species on the Nez Perce-Clearwater.  The Flathead assessment includes some scientific information for some species that relates to concern about persistence.  The Helena-Lewis & Clark assessment provides little information about the species not selected.

Region 2:  The rationales in the assessment consist of conclusory statements, with no reference to supporting science.  However, "species overviews" have been prepared for each species considered for SCC (but were not readily available in conjunction with the draft assessment), and they may include the scientific basis for the rationale.

Region 3:  Determining how BASI was used to remove species from consideration was difficult in several cases.  The forests used secondary data sources that did not reveal the specific information used to support the rationale.

Rvsd Plan - 00002476

Region 5: Although the rationale spreadsheets include sources used, clear connections between the rationale and sources used was rarely established.

Region 10:  The regional forester's December 2015 letter includes conclusory statements with no scientific references.

**Review Question: Is the rationale internally consistent on a national forest?**

In most or all regions, the processes used for fish wildlife and plants are not the same.

Region 5: Rationale within invertebrates is not consistent and is also inconsistent between invertebrates and vertebrates.

**Review Question: Is there an explanation of differences among national forests for the same species?**

Region 1:  The Flathead does not mention the species previously selected by the regional forester for the Nez Perce-Clearwater (which is one of the directives' criteria).  While the Helena-Lewis & Clark considered species because they were recommended on the adjacent Flathead, some species are treated differently without adequate explanation.  For example, the Flathead designated the Veery as a potential SCC citing dramatic declines in western Montana whereas the Helena-Lewis & Clark states that information does not indicate regional concern.

Region 3:  "Game species" was used as a criterion for exclusion on two of the three forests, but not on the Santa Fe.  The Cibola used different criteria than the other two forests.  There are ten species where the evaluation and/or conclusion pertaining to SCC differed among the forests for the same species.  These differences were not explained.

Region 5:  The rationales for many species are different across the three national forests, but the final identification is the same, with one exception: The Mt. Pinos sooty grouse is identified as a SCC only on the Sequoia National Forest (based on essentially the same rationale for not identifying it on the other forests).

**Review Question: Did the rationale for not identifying SCC include relevant and appropriate factors?**

We identified the following 16 situations where regional foresters have provided justification for not identifying species as SCC that are not relevant factors, as defined by the two regulatory criteria.

Rvsd Plan - 00002477

1. **Species not known to occur in the plan area because there are no known surveys.** BASI does not require population surveys. The rationale must explain what information was used. (Region 1 and Region 10 did not include a specific discussion of species not "known to occur.")

Region 3: The Cibola excluded species where there were no known surveys.

2. **Species known to occur in the plan area, but on an infrequent basis.** The directives are clear that species may be excluded if they are "accidental" or "transient," or are "well outside the species' existing range. A species' range includes all areas where it regularly occurs even where that is seasonal or migratory use.

Region 2: The basis for several species not being selected is occurrence that is "peripheral," "very few documented," or "very limited."   It is not clear whether these meet the criteria in the directives.

Region 3: Species were not selected if they used the plan area only seasonally ("migrants") or "occasionally" (such as for forging) and did not nest or breed on the national forest.

Region 5: White Mountains copper was not identified as an SCC on the Inyo even though the rationale concluded, "There are less than 5 occurrence records suggesting that on this Forest, this species could be critically imperiled."

3. **Species known to occur in the plan area, but not recently.** Where occurrence records are old, this could substantiate the decline of the species and suggest potential recovery and restoration needs. Age of occurrence records should not be a justification for ignoring a species in the planning process without demonstrating that the likelihood of future occurrence is remote.

Region 1: The Helena-Lewis & Clark excluded the black rosy-finch because of no documented presence in 30 years and because the plan area is at the northern edge of its range (whereas climate change might move its range northward into the plan area).

Region 2: One species was excluded because the most recent occurrence record was 1972.

Region 3: The Cibola excluded a number of species with past observations that ranged from 1963 to 1998, while citing as the rationale "no known surveys."

Region 5: Seven species on the Sequoia were excluded due to the age of occurrence records.

Region 8: Some species were included for the Francis Marion "although they have not been recorded on the FMNF in the last 10 to 15 years." Plants were excluded on both forests by the regional forester if the most recent occurrence records were older than 50 years.

4. **Species included on the regional forester's list of sensitive species.**  If the Forest Service has listed a species as "sensitive," there should be a substantial burden on the Forest Service to explain why the BASI no longer supports a concern for viability.  It must specifically address the prior agency findings regarding viability.

Region 1:  While the Nez Perce-Clearwater assessment points out that 9 of the 13 SCC are currently sensitive species, it does not explain why the other 11 existing sensitive species were not selected. Nine Flathead sensitive animal species and several plant species were not included, without any explanation.  Sensitive species were explicitly considered by the Helena-Lewis & Clark, but seven species of terrestrial wildlife were not selected without rationale being provided.

Region 2:  The existing regional sensitive species list provided the "initial starting point" for species to consider, in addition to the directives' categories.  Many sensitive species were identified as SCC, and one was explicitly not identified because it had been removed from the sensitive species list.

Region 3:  The Carson and Cibola failed to consider two species each that are existing sensitive species.

Region 5:  Seven sensitive species were not identified as SCC.

Region 8:  The Francis Marion considered sensitive species addressed by the existing forest plan. The same appears to be true for the El Yunque, since the need for change documentation states that, "Some old Regional Forester's sensitive species did make the new scc list."  There is no mention of sensitive species in the Nantahala-Pisgah documentation.

Region 10:  The regional sensitive species list was included in the assessment and apparently considered.  Only 1 of the 23 sensitive species was found to have substantial concerns for persistence in the plan area, and no rationale was provided for most of them.

5. **Species identified as vulnerable by NatureServe or others, but no alternative justification provided.**  It is not appropriate to categorically take a position that NatureServe "vulnerable" ranks (level 3) necessarily demonstrate that there is not a substantial concern for persistence in the plan area.

Region 5:  Sierra marten (S3), western pond turtle (G3S3), Sierra ambersnail (G3), three invertebrates (G3G4).

6. **Species identified as vulnerable by NatureServe or others, but considered "secure" by the Forest Service with no justification.**  If a species is "vulnerable" at either the global or state level (G3 or S3), they are not considered "secure".  Statements by the Forest Service

Rvsd Plan - 00002479

dismissing them as SCC because the species is considered "secure" or "stable" (or better) must be supported by BASI that addresses the species' vulnerability and demonstrates security.

Region 5:  This rationale was used for 15 species.

7. **Species identified as vulnerable by NatureServe or others, but insufficient information for the Forest Service.**  If there is sufficient information to find that a species is vulnerable at a global or state level, the Forest Service must demonstrate that the same information is not adequate to show substantial concern for persistence in the plan area.

Region 2:  Uncertainty was part of the rationale for INCLUSION of some species as SCC.

Region 3:  The Cibola excluded 9 species, "for which specific threats have not been identified." The Carson (6) and Santa Fe (1) excluded species where "there is insufficient information to evaluate whether or not the species is at risk for persistence within the plan area."

Region 5: This criterion was used to exclude 5 vertebrate species and 29 invertebrates.

Region 10:  The regional forester cited taxonomic uncertainty.

8. **Species identified as vulnerable by NatureServe or others, but lack of threats in the plan area.**  Infrequent presence or limited habitat in the plan area, and lack of threats from national forest management activities are insufficient to demonstrate that species vulnerable at a broader scale are secure in the plan area.  (Limited habitat might suggest the opposite.)  If a species is "known to occur" in a plan area, the apparent absence of habitat is not a relevant justification. (It may be appropriate to consider when developing plan components.)

Region 1:  Clark's nutcracker was not recommended on the Helena-Lewis & Clark because, "Declines in whitebark pine not as severe in plan area as on other NFs."  Common loon was excluded because of lack of breeding habitat.  Golden eagle was not recommended because, "No clear evidence of decline in plan area, or of impact of forest management activities on population." The trumpeter swan was excluded because of, "lack of established breeding activity, probable lack of suitable breeding and wintering habitat except on two GAs ..."   Wolverine was not recommended in part because, "most forest management activities have little impact on wolverines."

Region 2:  The basis for not including several vulnerable species was "very little suitable habitat on the Rio Grande National Forest." The big free-tailed bat was not selected because there are "no known roosting or breeding areas."

Rvsd Plan - 00002480

Region 3:  Excluded several species that inhabit areas within the plan area not known to be affected by the threats to the species (especially rocky, cliff or talus areas that have not changed from historical reference condition).

Region 5:  This criterion was used for 21 bird species and 2 mammals.

Region 10:  The Aleutian cress was excluded in part because mining is a "hypothetical" threat.

9. **Species identified as vulnerable by NatureServe or others, but favorable population or habitat status or trend in the plan area.**  Localized trends are relevant to adding a SCC that is secure at a broader scale but may be at risk in the plan area (directives Section 12.52d(3)(f)). However, localized trends do not counter broader scale circumstances.

Region 1:  The Flathead did not "recommend" several species as potential SCC "based on Flathead NF observation records and habitat trends."

Region 2:  Using the directives' criteria for including additional species, the Rio Grande excluded species of concern at a broader scale but having stable populations on the forest or because they are "widespread," "common" or had "good viability" on the Forest.

Region 3:  Excluded species having stable or upward habitat trends on the forest.

Region 10:  The rusty blackbird was excluded because "the existing population on the Chugach National Forest ... is stable and growing and there is therefore not currently a viability concern … on National Forest System lands."  Similar rationale was used for Alaska yellow-cedar and Aleutian cress.

10. **Species identified as vulnerable by NatureServe or others, but insufficient information about the species specifically in the plan area.**  If a species has either a global or state ranking as "vulnerable," uncertainty about the status of a population in the plan area should not disqualify such species from SCC designation because it does not address the condition of the larger population.

Region 1:  The Helena-Lewis & Clark did not recommend the Brewer's sparrow as a SCC because there was "not enough information regarding contribution of NFS lands to overall population," and the gray crowned rosy-finch because, "Not enough information regarding presence and distribution in plan area."

Region 2:  The basis for excluding many vulnerable species was "Lack of sufficient information regarding the species status in the general area."

16

Region 5:  This rationale was used for 1 vulnerable vertebrate species and 19 vulnerable invertebrates.

11. **Species identified as vulnerable by NatureServe or others, but current or expected management mitigates any threats in the plan area.**  The existence of current management direction or expectations about the revised forest plan are never relevant to determining SCC status because they may change as a result of the planning process.

Region1:  The regional forester stated that "management actions that would contribute to those threats and stressors" were considered in identifying SCC on the Nez Perce-Clearwater.  On the Flathead, most of the species not recommended for special designation include current forest plan components in the rationale. (Some rely on Amendment 21, which is specifically proposed for change in the revision.)

Region 3:  Species were excluded because they are not affected by management activities under the current Cibola forest plan.  They include bald eagle, ferruginous hawk, golden eagle, northern harrier, osprey, and Wilson's warbler.  Also excluded were three plant species that are found on rocky outcrops or other areas "not suitable for typical forest-management activities such as timber harvest or cattle grazing."  Also excluded were three species where declines that have been associated with "legacy management actions" that are "no longer practiced" by the Cibola.

Region 5:  Northern goshawk, black swift, black-backed woodpecker, Sierra marten

12. **Species identified as vulnerable by NatureServe or others, but no control over threats by the Forest Service.**  The directives specifically recognize climate change as an example of a threat to a species that might warrant identifying it as a SCC even though it is beyond the control of national forest management actions.

Region 1:  The Helena-Lewis & Clark failed to include the Brewer's sparrow because habitats occur "primarily off NFS lands" (though it is known to occur in the plan area).

Region 2:  The sage sparrow was not identified as a SCC because of "very limited ability to influence species through management actions of Rio Grande National Forest."

Region 5:  Mt. Lyell shrew

Region 10:  Aleutian cress was excluded in part because climate change is "outside the control of the agency."  Sessileleaf scurvygrass was excluded in part because its habitat "may be within the regulatory control of the State of Alaska."

Rvsd Plan - 00002482

13. **Species identified as vulnerable by NatureServe or others, but does not contribute to larger population.** This criterion is not included in the directives. Its use appears to confuse the criteria for identifying SCC with requirements for plan components to provide ecological conditions for viable populations.

Region 1: The Helena-Lewis & Clark excludes the white-tailed ptarmigan and fisher for this reason.

14. **Species identified as vulnerable by NatureServe or others, but a not warranted finding under ESA**. The criteria for listing under ESA are more stringent than for SCC, so the failure to list a species under ESA is irrelevant to the SCC determination (risk of extinction is not required of SCC). A previous positive 90-day finding is compelling evidence that there is substantial concern for persistence.

Region 1: Wolverine

Region 5: The bi-state sage grouse was initially not included but apparently added in response to comments.

15. **Species identified as vulnerable by NatureServe or others, but designated as a game species in a state.** The fact that a species is hunted does not provide a scientific justification for lack of concern about persistence.

Region 1: The Helena-Lewis & Clark excluded gray wolf for this reason.

Region 3: Game species was used as a criterion for the Carson (band-tailed pigeon and Rocky Mountain bighorn sheep).

Region 5: Nelson desert bighorn sheep, Mt. Pinos sooty grouse

16. **Existing laws or regulations applicable to the Forest Service cited as alleviating concerns about persistence in the plan are.** Unless these directly address and mitigate all of the threats to a species they do not necessarily affect concerns for persistence in the plan area.

Region 3: The Bald Eagle and Golden Eagle Protection Act requirements were assumed to alleviate a concern for the continued persistence of these species.

Region 8: Bird species protected by the Migratory Bird Treaty Act WERE recommended as SCC by the Nantahala-Pisgah, as well as fish protected by the Clean Water Act and North Carolina Sediment and Pollution Control Act.

18

Rvsd Plan - 00002483

# Appendix B

Rvsd Plan - 00002484

# Antora Meadows recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**
**Saguache Ranger District**      *27,700 acres*



**Map Locator**

### *General Description*

One of Colorado's least-known segments of the Continental Divide runs between the San Juan and Sawatch ranges along the northern rim of the San Luis Valley. The proposed Antora Meadows wilderness contains a large portion of an easy to overlook forested length of the divide and is a primary component of one of Colorado's largest unprotected roadless areas in the Cochetopa Hills. The proposed wilderness would fill one of the largest remaining gaps in the wilderness system in the Southern Rockies, and complete the ecological connection between the large protected wilderness areas of the San Juans to the south and the equally important preserves of the Elk, Sawatch, and Sangre de Cristo ranges to the north and east. The area is generally a refuge for wildlife, including robust deer and elk herds. It is also home to a pure population of the imperiled Rio Grande cutthroat trout.

Antora Meadows lies in the Saguache Creek watershed north of Saguache. The area is bounded on the north by the Continental Divide National Scenic Trail, but the primary access point is the Middle Creek Trailhead on its south side. Fescue grasslands and open ponderosa pine forest are typical in the lowest portions of the area starting at an elevation of 8,800 feet. Large stands of aspen and lodgepole pine forest become more common as one travels deeper into the area towards the Continental Divide at 10,600 feet. The area tops out at 13,269-foot Antora Peak. The area is adjacent to a 3,600-acre wilderness-quality portion of the Starvation Creek roadless area on the Pike-San Isabel NF.

### *Naturalness*

Antora Meadows is a compact shape comprised of several tributary watersheds. It has escaped prior intensive timber management typical of adjacent areas. The PSCO gas pipeline is excluded from the area and forms the western boundary. The boundary cherrystems areas of mineral exploration and development along with the patented mining claims and access road in the Antora Meadows vicinity. It also omits the 5 miles of the Continental Divide National



Scenic Trail open to motorized use along the northern boundary of the unit. Within these boundaries, there is no evidence of significant human imprints.

*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

This large expanse of roadless landscape offers solitude that is hard to find in other mountainous regions of Colorado. Due to its dry environment and lack of large bodies of water, this is a relatively unvisited part of the state. Visitors can readily achieve solitude in any of the several tributary valleys leading to the Continental Divide.

The area's remoteness and lack of roads makes it an ideal refuge for deer and elk, a fact that provides outstanding opportunities for backcountry hunting. The area offers angling opportunities for a pure Rio Grande cutthroat trout population. The area's 20 miles of non-motorized trails in many cases parallel lush riparian zones of willow, blue spruce and aspen that makes it an outstanding destination for horseback riding, hiking and wildlife viewing. The Middle Creek trailhead is popular with backcountry horse users, and the trails are signed as closed to mountain bikes.

*Size and Roadlessness*

Antora Meadows contains 27,700 acres on the Rio Grande National Forest. It is contiguous with 3,600 acres of wilderness quality lands in the adjacent Starvation Creek roadless area on the Pike-San Isabel NF. The area's boundaries are the PSCO gas pipeline on the west and the edge of past timber harvests in the Slaughterhouse Creek watershed to the east, with the national forest boundary and Forest Road 880.2B on the south, and the Continental Divide/national forest boundary to the north.

*Supplemental Values*

While Antora Meadows provides habitat for recovering lynx and potential wolverine populations, perhaps its most important ecological role comes in the form of undisturbed watersheds for core conservation populations of Rio Grande cutthroat trout. The core conservation populations in East Middle Creek and Tuttle Creek are >99% pure, phenotypically true, and representative of the species' historic genome. East Middle Creek is also a Colorado Natural Heritage Program Potential Conservation Area of moderate biodiversity significance because of the trout population.  (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004; CNHP PCA Report, 2015)

Antora Meadows helps fill the largest gap in the wilderness system in the Southern Rockies. The area is part of the ecological connection between the large protected wilderness areas of the San Juans to the south and the equally important preserves of the Elk, Sawatch, and Sangre de Cristo ranges to the north and east.  (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Antora Meadows provides one of the few areas in Colorado where all of the state's major forest types coexist. Ecologists can find an abundance of conifer species here in uncommon proximity, including Douglas fir, white fir, subalpine fir, lodgepole pine, limber pine,

ponderosa pine, Colorado blue spruce and Engelmann spruce. The area is located amidst the only portion of the Rio Grande NF where lodgepole pine naturally occurs.

Antora Meadows contains several ecosystems under-represented among existing wilderness areas on the Rio Grande National Forest. The lowest slopes consist of rolling grasslands at the national forest boundary with adjacent BLM lands, while forests of lodgepole pine and Douglas fir blanket the higher slopes, above meadows and stream valleys banded by aspen groves. By protecting this area, the Rio Grande NF can increase the ecological representation within its wilderness areas of Rocky Mountain Lodgepole Pine Forest, Rocky Mountain Aspen Forest and Woodland, and Southern Rocky Mountain Montane-Subalpine Grassland. (TWS ecosystem representation report, 2016)

*Manageability*

Antora Meadows is a compact unit that is comprised of the Middle Creek watershed and has readily identifiable boundaries on the ground. It is bounded on the north by the motorized Continental Divide National Scenic Trail and on the south by the forest boundary, and by Forest Road 880.2B. The western boundary is readily delineated by the PSCO gas pipeline corridor, and the eastern boundary approximately by Forest Development Road 861 in the Slaughterhouse Creek watershed. The area's eastern boundary, north of Mosquito Lake, is contiguous with several thousand acres of wilderness-quality lands on the Pike-San Isabel NF.

Patented mining claims at Antora Meadows are cherry-stemmed out of the unit boundary along with the access route via FDR 880.2B. These are on top of a ridge and out of sight of wilderness users. A short, dead-end and unmaintained motorized trail (#764) extends two miles north of Antora Meadows (see photo). The 2015 Rio Grande NF TAP ranked this trail as low value and high risk owing to its fords across four headwaters tributaries of East Middle Creek, which are inhabited by Rio Grande cutthroat trout. There are no oil and gas leases within the boundaries.



*Information Resources*

| Item | Data Source |
| --- | --- |
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |

| Recreation | |
|---|---|
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |



Rvsd Plan - 00002489

# Elkhorn Peak recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**                    *15,800 acres*
**Saguache Ranger District**



Map Locator

### General Description

The proposed Elkhorn Peak wilderness serves an important role in landscape connectivity between the Sangre de Cristo range and the Cochetopa Hills of the northern San Juan Mountains. Elkhorn Peak straddles the ridge between Villa Grove and Bonanza south of Poncha Pass. Sweeping vistas of the Sangre de Cristo range are obtained from the summits of Elkhorn and Hayden peaks, enhancing the outstanding sense of isolation in this remote corner of the northern San Luis Valley. Several non-motorized trails provide ready access into the heart of the area, such as the trail that traverses Kelly Creek and Elkhorn Gulch.

Elkhorn Peak extends from grasslands and ponderosa pine characteristic of the uplands of the San Luis Valley to two peaks over 12,000 feet – Elkhorn and Hayden. The elevational gradient creates a continuum of ecosystems through large stands of aspen to lodgepole pine and extensive forests of Engelmann spruce and subalpine fir. Bristlecone pine and limber pine can be found on wind blown dry rocky ridges and slopes.

### Naturalness

Elkhorn Peak is a roughly square area with boundaries defined by the forest boundary and surrounding roads. The boundary excludes past mining impacts and patented mining claims in the vicinity of Bonanza and in the Kerber Creek valley. The resulting area is natural with no substantially noticeable human impacts.



### Outstanding Opportunities for Solitude or Unconfined Primitive Recreation

Outstanding opportunities for solitude and ample vistas are commonplace when exploring Elkhorn Peak. The feeling of seclusion and remoteness is particularly enhanced in the area's western portion, amidst the rugged Elkhorn and Hayden peaks. Visitors can barely ascertain highways and farms more than a half-dozen miles distant in the San Luis Valley. The separation from the sights and sounds of civilization further heightens the sensation of solitude and isolation gained within the unit.

Elkhorn Peak includes approximately ten miles of non-motorized trails. These are popular destinations for horseback riding and hiking, particularly from the Kelley Creek trailhead. Scenic vistas and direct access to the crest of the area combine to create outstanding opportunities for primitive and unconfined recreation. The area's primary drainages contain beaver ponds and trout fisheries, and important deer and elk winter range sustains healthy big game herds that draw fall hunters.

*Size and Roadlessness*

The proposed Elkhorn Peak wilderness is a free-standing unit of 15,800 acres. The area's topography and compact boundary configuration enhances the practicality of managing it for its preservation and use in an unimpaired condition.

*Supplemental Values*

The proposed Elkhorn Peak wilderness contains the entirety of the 2,014-acre Kelly Creek Potential Conservation Area, a Colorado Natural Heritage Program ranked as High Biodiversity Significance. The Kelly Creek PCA includes a wetland complex with a robust montane riparian shrubland where the undergrowth is still dominated by native species, an increasingly rare occurrence. Beaver ponds expand the floodplain habitat and constitute an important component in maintaining this healthy ecosystem. Shrubland associations at lower elevations like this one in Kelly Creek are usually impacted by water diversions, livestock grazing, invasive plant species and agricultural conversion, which makes the PCA all the more unusual. (CNHP PCA Report, 2015)

Elkhorn Peak helps fill the largest gap in the wilderness system in the Southern Rockies and provides connectivity across the landscape between the northern San Juan Mountains and the Sangre de Cristo range. The area is immediately south of the important Poncha Pass lynx linkage area. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Elkhorn Peak contains several ecosystems under-represented among existing wilderness areas on the Rio Grande National Forest. The lowest slopes consist of rolling grasslands and ponderosa pine woodland at the national forest boundary with adjacent BLM lands, while forests of lodgepole pine and Douglas fir blanket the higher slopes. By protecting this area, the Rio Grande NF can substantially increase the ecological representation within its wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, Rocky Mountain Lodgepole Pine Forest, and Rocky Mountain Aspen Forest and Woodland. (TWS ecosystem representation report, 2016)

*Manageability*

Elkhorn Peak can be easily managed to preserve its wilderness character. The area is a compact shape with readily identifiable topographic boundaries. The forest boundary defines the eastern, western and southern boundaries and are largely buffered by adjacent

BLM administered lands. The northern boundary generally consists of forest roads and patented mining claims. The area's lower reaches may be within the WUI boundary for Kelly Creek and Bonanza, which can be easily offset with a boundary cushion. There are no non-federal inholdings as all patented mining claims are excluded from the boundary. There are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |



# Lake Fork addition to La Garita Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**          *3,800 acres*
**Saguache Ranger District**



**Map Locator**

## *General Description*

The Lake Fork addition to the La Garita Wilderness finalizes wilderness protection for the watershed upstream of the remote Middle Fork trailhead on the wilderness area's eastern boundary. The addition is characterized by large aspen stands and mountain-bunchgrass parks, and completes wilderness protection for three miles of the Continental Divide. The wilderness boundary at present follows the center of the Middle Fork of Saguache Creek; this addition creates a topographically sensible wilderness boundary on both sides of the valley that incorporates the entirety of the Middle Fork watershed to the wilderness trailhead.

The added lands provide excellent range for summering elk herds, and enhance habitat protection for documented use by lynx. Machin Lake sits at the headwaters of the Middle Fork and the Middle Fork trail provides direct access to this recreation destination in the La Garita Wilderness.

## *Naturalness*

The proposed wilderness addition applies to the Upper Tier portion of the Lake Fork Colorado Roadless Area, or about 3,800 acres of the larger 10,700-acre roadless area. The addition consists of the Middle Fork valley and adjacent forests and hillsides that are consistent in natural appearance with the adjacent wilderness lands. The aspen and grasslands result from wildfires 100 years prior. There are no vehicle routes or past management activities within the proposed wilderness addition.



## *Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

Rvsd Plan - 00002494

The Middle Fork Trailhead is a remote wilderness access point into the adjacent La Garita Wilderness. It is located at the end of six miles of four-wheel-drive road.  The Middle Fork trail is the gateway to a network of wilderness trails higher in the watershed and terminates in the alpine basin of Machin Lake. Multiple looping wilderness trips extend from the Middle Fork trail, such as those incorporating the Halfmoon Pass and Machin Basin trails. The Middle Fork trail provides outstanding opportunities for backpacking, fishing, horsepacking, and hunting. The remoteness of the trailhead helps guarantee outstanding opportunities for solitude, which is particularly notable along the trail-less portion of the Continental Divide and in the Lake Fork drainage in the addition's northern end.

*Size and Roadlessness*

The proposed Lake Fork addition to the La Garita Wilderness is 3,800 acres out of the larger 10,700-acre Colorado Roadless Area. The northern boundary of this pie-shaped addition is the Lake Fork of Saguache Creek, where the Tarbell Ditch diverts water across the Continental Divide out of the Cochetopa Creek watershed into the Saguache Creek watershed. The remainder of the roadless area boundary is the existing wilderness boundary.

*Supplemental Values*

The proposed wilderness addition includes a portion of the Saguache Creek Potential Conservation Area identified by the Colorado Natural Heritage Program. Saguache Creek is ranked as High Biodiversity Significance owing to its montane and subalpine willow carr associations within the creek's floodplain and valley toe slopes. The Middle Fork of Saguache Creek is noted specifically for a good stand of beaked sedge (*Carex utriculata*) wetland and numerous smaller wetlands in the upper watershed (CNHP PCA Report for Saguache Creek, 2015).

The Middle Fork of Saguache Creek hosts a high purity, recreation population for Rio Grande Cutthroat Trout that extends all the way into the headwaters at Machin Lake. (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004)

The proposed Lake Fork addition enhances the ecological effectiveness of the La Garita Wilderness by expanding the size of the protected area. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas, as are areas with more compact boundaries. The addition increases the wilderness acreage of La Garita while reducing the length of the wilderness boundary, thereby increasing the ratio of acreage to boundary. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

The proposed Lake Fork wilderness addition increases the ecological representation within Rio Grande National Forest wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland, an ecosystem type currently with less than 5% representation of the overall ecosystem acreage on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The Lake Fork addition is readily manageable as wilderness, and increases the compactness of the adjacent La Garita Wilderness by its addition. The only trail within the area is the non-motorized Middle Fork trail leading several miles to the existing wilderness boundary. The transbasin water diversion out of Cochetopa Creek into Saguache Creek is excluded from the proposed wilderness boundary and forms the northern boundary. There are no oil and gas leases or non-federal inholdings.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem Representation | TWS Ecosystem Representation 2016 |



# Wannamaker Creek-Deep Creek addition to La Garita Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**                  *10,900 acres*
**Saguache Ranger District**



Map Locator

## *General Description*

The Wannamaker Creek-Deep Creek addition to the La Garita Wilderness consists of two wild valleys draining north from the 12,000-13,000 foot escarpment of the La Garita Mountains. These two intact roadless watersheds lie adjacent to the wilderness area's eastern boundary, and support primitive recreation on more than 15 miles of backcountry trails. The trails are remote, and in some cases difficult to access, creating an experience of outstanding solitude.

At its lowermost elevations, the addition greatly enhances the ecosystems protected within the existing wilderness by incorporating thousands of acres of grasslands typical of those in expansive Saguache Park. The area provides high quality habitat for elk and deer, and angling opportunities for Rio Grande cutthroat trout. The addition encompasses almost five miles along the South Fork of Saguache Creek.

## *Naturalness*

The proposed wilderness addition applies to the northern half of the Deep Creek-Boot Mountain Colorado Roadless Area. The private inholding and historic mining activity at Sky City is cherrystemmed out of the wilderness boundary, and past timber harvest areas east of Deep Creek are similarly excluded. There are no vehicle routes or past management activities within the proposed wilderness addition, and the area reflects unmodified naturally-occurring ecological conditions.



## *Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

Both Wannamaker Creek and Deep Creek watersheds are remote and lightly visited. The steep northern escarpment of the La Garita Mountains creates a natural topographic barrier at the highest elevations, separating the two drainages from motorized routes

including the La Garita Stock Driveway to the south of the mountain crest. This topographic isolation maintains outstanding opportunities for solitude.

The Sky City inholding blocks public access from the lower end of Wannamaker Creek, but other trails provide several access alternatives into the upper end of Wannamaker Creek. These include the Deep Creek trail from the east, the Coyote Trail coming over the divide from the La Garita Wilderness to the west, and the Wannamaker Creek trail itself from the top of the high escarpment. The alternate access requires more effort and imagination by backcountry users, meaning the Wannamaker Creek watershed retains outstanding solitude and challenging primitive recreation opportunities. Similarly, there is a lightly-used and unobtrusive trail along the length of Deep Creek that begins at its confluence with the South Fork of Saguache Creek.

The trail systems provide access for those seeking remote backcountry hunting experiences in the fall, and Wannamaker Creek supports a hybridized Rio Grande cutthroat trout population for anglers.

*Size and Roadlessness*

The proposed Wannamaker Creek-Deep Creek addition to the La Garita Wilderness is 10,900 acres out of the larger 27,600-acre Colorado Roadless Area. The watershed divide atop the La Garita Mountains escarpment defines the southern boundary, while the northern boundary is the South Fork of Saguache Creek. The area adjoins the La Garita Wilderness to the west, and the Deep Creek watershed divide forms the eastern boundary.

*Supplemental Values*

The proposed Wannamaker Creek-Deep Creek addition includes a portion of the Saguache Creek Potential Conservation Area identified by the Colorado Natural Heritage Program. The Saguache Creek PCA is ranked as High Biodiversity Significance owing to its montane and subalpine willow carr associations within the creek's floodplain and valley toe slopes. According to CNHP, the upper watershed of Saguache Creek supports a broad diversity of aquatic and terrestrial habitats and maintains a largely undisturbed hydrological regime. The headwaters streams provide a valuable refuge for species that have been impacted by land use in the lower watershed, such as the Rio Grande cutthroat trout. (CNHP PCA Report for Saguache Creek, 2015).

Wannamaker Creek hosts a conservation population for Rio Grande Cutthroat Trout. (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004)

The proposed Wannamaker Creek-Deep Creek addition enhances the ecological effectiveness of the La Garita Wilderness by expanding the size of the protected area. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

The proposed Wannamaker Creek-Deep Creek wilderness addition increases by thousands of acres the ecological representation within Rio Grande National Forest wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland, an ecosystem type currently with less than 5% representation of the overall ecosystem acreage on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The Wannamaker Creek-Deep Creek wilderness addition has a clearly defined topographic boundary denoted by watershed divides to the east and south, and by the South Fork of Saguache Creek to the north (the existing wilderness boundary is to the west). This boundary readily excludes incompatible uses such as motorized vehicles. This subset of the larger Deep Creek-Boot Mountain Colorado Roadless Area eliminates the irregularities of shape and also excludes all motorized trails characteristic of the southern half of the roadless area. The Sky City private inholding and its mile-long access road #787 are cherrystemmed out of the lower end of the six-mile long Wannamaker Creek valley. There are no oil and gas leases in the area.

*Information Resources*

| Item | Data Source |
|------|-------------|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
|  | Forest Service inventory pursuant to FSH 1909.12, chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12, chapter 70, section 72 |
|  | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
|  | SLVEC Roadless area description 2002 |
| Supplemental Values |  |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem Representation | TWS Ecosystem Representation 2016 |



Wannamaker Creek - Deep Creek addition La Garita
Recommended Wilderness Boundary

## Wason Park addition to La Garita Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**                    *22,000 acres*
**Divide Ranger District**



### General Description

Wason Park is a large roadless area adjacent to the La Garita Wilderness' western boundary and just outside of Creede. Wason Park adds wilderness protection for up to 8 miles of the Continental Divide on the Rio Grande National Forest, significantly enhancing the presence of the La Garita Wilderness south of the divide. The La Garita Wilderness at present is situated predominately north of the Continental Divide on the neighboring Gunnison National Forest.

Wason Park's addition to the wilderness would greatly expand ecological representation of the La Garita Wilderness by incorporating south-facing slopes dominated by grasslands and ponderosa characteristic of the Rio Grande valley that transition continuously through aspen and spruce-fir to the Continental Divide. The addition spans an elevation range from 8,700 feet in the valley to over 13,000 feet on the Continental Divide. Its western flank consists of the steeply incised valley of East Willow Creek. Several non-motorized trails lead through the area to the adjacent wilderness boundary, including Farmers Trail from the valley floor, the Wason Trail from Creede, and the La Garita Stock Driveway from Phoenix Park.

### Naturalness

Wason Park is a broad, unfragmented area of undisturbed habitat blanketing the western approaches to the La Garita Wilderness. While some mining remnants are visible adjacent to the lower Bachelor Loop Road at its lowest elevations near Creede, Wason Park is otherwise free of any substantial unnatural impacts.



### Outstanding Opportunities for Solitude or Unconfined Primitive Recreation

Wason Park is a large landscape with intact forests and drainages leading to a remote section of the Continental Divide. The Continental Divide National Scenic Trail is located north of the actual divide in this section, thus making the southern flanks of the Divide in Wason Park an area of outstanding isolation and solitude. Upper East Willow Creek is

exceedingly remote and trail-less, and invokes a sense of vastness and impenetrability that further enhances the impression of solitude.

Wason Park contains over a dozen miles of non-motorized trails.  These trails near Creede offer the closest wilderness access into the La Garita Wilderness from any surrounding communities. Several trails traverse the roadless area before reaching the existing wilderness boundary and provide excellent routes for hikers, backpackers, and horse users heading into the adjacent wilderness. These include the Farmers Creek Trail from the valley floor, the Wason Trail from Creede, and the La Garita Stock Driveway from Phoenix Park. The expansive, intact wildlife habitat provides outstanding opportunities for remote backcountry big-game hunting experiences.

*Size and Roadlessness*

Wason Park contains 22,000 acres. It is bounded on the east and north by the existing La Garita Wilderness, and on the south by the forest boundary in the Rio Grande valley. The area's western boundary is generally defined by roads and patented mining claims.

*Supplemental Values*

Wason Park contains outstanding supplemental values for a variety of wildlife species. It is in close proximity to high use lynx areas, contains lynx habitat, and provides an important landscape connectivity link for lynx. Wason Park provides important winter range for elk, deer, and bighorn sheep. Wason Park encompasses a migration route for bighorn sheep from the Bellows Creek herd to the San Luis Peak and Bristol Head herds. Wason Park also is adjacent to priority habitat for moose in West Willow Creek.

The proposed Wason Park wilderness addition enhances the ecological effectiveness of the La Garita Wilderness by expanding the size of the protected area. The Wason Park addition would boost the size of the La Garita Wilderness by 15%. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Wason Park contributes thousands of acres of one of the most under-represented ecosystem types among existing wilderness areas on the Rio Grande National Forest. By protecting this area, the Rio Grande NF can significantly increase the ecological representation within its wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland. (TWS ecosystem representation report, 2016)

Wason Park includes a pair of scenic waterfalls above Phoenix Park that are popular focal points for photographers.

*Manageability*

Wason Park is readily manageable as wilderness. It is characterized by a broad, three-mile-wide belt of forests and streams banding the southern and western boundary of the

existing La Garita Wilderness. Steep topography out of the East Willow Creek drainage precludes ready trespass by motorized vehicles. Adjacent patented mining claims are excluded from the boundary, and access to those private lands is via non-wilderness lands from the west. The primary Creede mineral belt along the famous Amethyst silver vein is situated along West Willow Creek and lies significantly outside the proposed wilderness addition. All of the existing trails are designated non-motorized. There are no oil and gas leases or non-federal inholdings within the area.

*Information Resources*

| Item | Data Source |
| --- | --- |
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |



Rvsd Plan - 00002505

# North Fork Rock Creek recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**            *16,500 acres*
**Divide Ranger District**



Map Locator

## *General Description*

The proposed North Fork Rock Creek wilderness consists of the northeastern portion of the Bennet Mountain Colorado Roadless Area unit. It neatly encompasses the watershed of the North Fork of Rock Creek along with adjacent lands to the north. The area provides coverage of a lower elevation ecological transition in the foothills of the southern San Luis Valley south of Del Norte. In the fall, spectacular displays of colorful aspen foliage dominate the landscape.

Elevation ranges from a low of 8,880 feet at the national forest boundary along Rock Creek to 12,800-feet atop Pintada Mountain. Fescue dominated grasslands are common in the lowest elevations, then transition into pinyon-juniper habitats. Depending on slope aspect and elevation, mixed-conifer habitats of ponderosa pine, Douglas fir can be enjoyed at low to mid elevations. The highest elevations include alpine terrain above timberline. Two non-motorized trails offer abundant opportunities for hiking, angling, hunting, and horseback riding.

## *Naturalness*

North Fork Rock Creek is a subset of a much larger, and more convoluted, roadless area. This smaller component is free of human imprints and displays a substantial level of naturalness throughout the area.

## *Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*



The North Fork of Rock Creek watershed provides an isolated setting shielded from the San Luis Valley. Visitors can readily experience outstanding opportunities for solitude. The area's high points above timberline atop Windy Mountain and Pintada Mountain offer outstanding vistas and similarly impart a sense of isolation amidst a large, undeveloped landscape.

The area is traversed by two non-motorized trails, North Rock Trail #701 and Dry Creek Trail #700.  These trails each offer a half-dozen miles of exploration for hikers, anglers and equestrians. One trail parallels the creek and crosses back and forth multiple times, while the other trail navigates the high slopes above treeline and meanders down through a

range of forest transitions. The area provides important winter range for deer and elk, which translates also into outstanding opportunities for backcountry hunting.

*Size and Roadlessness*

The proposed North Fork Rock Creek wilderness unit is 16,500 acres in size.

*Supplemental Values*

North Fork Rock Creek provides good representation of several ecosystem types under-represented among existing wilderness areas on the Rio Grande National Forest. The area covers the ecological transition from the San Luis Valley to alpine slopes, and at is lowest margins includes grasslands and pinyon-juniper woodlands, as well as ponderosa pine and dry mixed-conifer forests. Recommending this area for wilderness designation will increase the ecological representation on the Rio Grande NF of Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, Rocky Mountain Pinyon-Juniper Woodland, and Southern Rocky Mountain Mesic Montane Mixed-Conifer Forest and Woodland, all of which are currently represented at less than 5% on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

North Fork Rock Creek can be readily managed to preserve its wilderness character.  The boundary is clearly delineated on three sides by easily identifiable topographic features such as ridgelines and streams, and is bounded on the east by the national forest boundary with adjacent undeveloped rural landscapes and BLM administered lands. The western boundary excludes the Middle Frisco Creek trail, which is utilized by mountain bikes.  The area includes no non-federal inholdings and there are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
|  | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
|  | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
|  | SLVEC Roadless area description 2002 |
| Supplemental Values |  |
| High Biodiversity Significance | CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |

| Ecosystem representation | TWS Ecosystem Representation 2016 |



**North Fork Rock Creek**
**Recommended Wilderness Boundary**

## Pole Creek Mountain – Sheep Mountain recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**          *24,800 acres*
**Divide Ranger District**



*General Description*

The Pole Creek Mountain roadless area is an important piece of the puzzle in protecting landscape connectivity across the San Juan Mountains. The area fills a critical gap between the Weminuche Wilderness to the south and La Garita, Uncompahgre, Handies Peak and Red Cloud Peak wildernesses and wilderness study areas to the north. The roadless area incorporates an uncommon triple watershed divide, the high point amidst the Rio Grande, Lake Fork of the Gunnison, and Animas Rivers. The vast, sweeping expanses of upper Pole Creek bring to mind the immensity of Alaskan wilderness. Three distinct landscapes define the area: vertical cliffs rise out of the Lake Fork valley on the north, with numerous waterfalls and grottoes; rolling tundra interspersed with rugged volcanic peaks characterizes the central portion; while the southern end contains several deep, glaciated valleys.

The proposed Pole Creek Mountain and Sheep Mountain wilderness units are along 12 miles of the Continental Divide, from Stony Pass to Cataract Lake. The Colorado Trail and the Continental Divide National Scenic Trail traverse the area, paralleling the divide, and draw numerous hikers and backpackers. Others find Pole Creek equally intriguing for its oddly eroded volcanic formations called beehives and hoodoos.

The proposed wilderness consists of two units. Pole Creek Mountain is the central core of the roadless area, and is defined by the motorized trails along Pole Creek and West Lost Trail Creek, which are excluded. The Sheep Mountain unit is west of Pole Creek, largely within San Juan County, and extends to the Continental Divide.

*Naturalness*

Pole Creek Mountain is a large, primarily alpine roadless area along the Continental Divide. The imprints of human activity are few and substantially unnoticeable. There are a few scattered remnants of historic mining activity at the headwaters of the Rio Grande near Sheep Mountain. The area is generally indistinguishable in natural character from the adjacent Weminuche Wilderness to the south.



Rvsd Plan - 00002509

*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

Pole Creek Mountain and Sheep Mountain form the core of Colorado's largest alpine expanse of tundra. Visitors experience a sensation of vastness and isolation unparalleled amongst existing wilderness areas across the Southern Rockies. From many vantage points, all one can see is undulating tundra ridges retreating into the distance, interrupted here and there by soaring peaks.

The Continental Divide National Scenic Trail/Colorado Trail defines the northern boundary of the proposed wilderness and is a popular with hikers and backpackers. Most long-distance backpackers through this segment are completing the entirety of the Colorado Trail from Denver to Durango. The route of the trail from Stony Pass to Cataract Lake follows a generally moderate grade above tree-line making it one of the most accessible high routes in Colorado. The trail system in Pole Creek Mountain is part of a larger interconnected trail system over the Continental Divide with the non-mechanized trails in Cuba Gulch and Cataract Gulch on the Grand Mesa-Uncompahgre-Gunnison National Forest and nearby lands managed by BLM within the Handies Peak Wilderness Study Area.

*Size and Roadlessness*

The Pole Creek Mountain roadless area is one of the largest freestanding areas on the Rio Grande National Forest. Even with separating the larger roadless area into two units along the motorized Pole Creek trail, the two separate Pole Creek Mountain and Sheep Mountain units are still 16,500 acres and 8,300 acres, respectively. The areas are bounded by the Stony Pass road to the south, the Continental Divide trail to the west and north, and West Lost Trail Creek/Lost Trail Creek to the east.

*Supplemental Values*

Pole Creek Mountain is important for several species of significant conservation concern. It is an area of high use by lynx and provides connections for lynx moving through the heart of the core population of the San Juan Mountains. The area contains one of the few known populations of the Uncompahgre fritillary butterfly, and also the only known global occurrences of the stonecrop gilia. Pole Creek Mountain provides high quality habitat for future wolverine populations.

Pole Creek Mountain includes portions of two Potential Conservation Areas identified by the Colorado Natural Heritage Program. Two globally vulnerable riparian plant communities, Booth's willow (*Salix boothii*)/mesic forbs shrubland and Wolf's willow (*Salix wolfii*)/mesic forbs shrubland, occur within a large subalpine willow carr along the upper reaches of the Pole Creek PCA and are ranked as High Biodiversity Significance. The Sheep Mountain portion includes the entirety of the Sheep Mountain in San Juans PCA, which is ranked as Very High Biodiversity Significance owing to the existence of one of only two known global occurrences of the critically imperiled stonecrop gilia (*Aliciella sedifolia*). The

best known worldwide occurrence of stonecrop gilia is located in the Half Peak PCA along the northern edge of the proposed wilderness (CNHP PCA Report, 2015).

Pole Creek Mountain includes over 20 miles of streams managed for recreation populations of Rio Grande cutthroat trout. Pole Creek, Lost Trail Creek, and West Lost Trail Creek create a large connected population along with adjacent streams in the headwaters of the Rio Grande below Stony Pass. (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004)

The lower slopes of Pole Creek Mountain along the Rio Grande would increase the ecological representation within Rio Grande National Forest wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland, an ecosystem type currently with less than 5% representation of the overall ecosystem acreage on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The proposed Pole Creek Mountain and Sheep Mountain wilderness units are readily manageable as wilderness. The areas have compact boundaries and are situated in perhaps the most remote location in the Rio Grande National Forest, at the very headwaters of the Rio Grande. One cluster of non-federal inholdings in the form of patented mining claims is located in the Sheep Mountain unit near the Continental Divide but is presently under negotiation for federal acquisition. There are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |

| Ecosystem Representation | TWS Ecosystem Representation 2016 |





# Saguache Creek recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**          ***27,100 Acres***
**Saguache Ranger District**



*Map Locator*

## General Description

The proposed Saguache Creek wilderness offers the opportunity to add thousands of acres of high quality wilderness landscapes among grasslands and ponderosa pine woodlands that are poorly represented ecosystem types within the National Wilderness Preservation System. Saguache Creek is an unusual wild landscape – an undeveloped lower elevation stream corridor lacking road access. A Saguache Creek wilderness would fill both a geographic and ecological gap in the system of designated wilderness in the Southern Rocky Mountains. It is a large, intact wild landscape located in one of the largest remaining gaps in the wilderness system in the Southern Rockies.

The proposed Saguache Creek wilderness offers both popular and remote recreation opportunities. Saguache Creek itself is an identified wild and scenic river candidate whose seven-mile canyon is frequented by fly-fishing anglers, while the grasslands and ponderosa forests of lower Fourmile Creek and Luders Creek provide quiet sanctuaries for hikers, horse users, and wildlife watchers. The Colorado Natural Heritage Program ranks the area's high-quality riparian willow-carr and shrublands ecosystems along Saguache Creek and Luders Creek as possessing high biodiversity significance.

## Naturalness

The central feature of the proposed Saguache Creek wilderness is the undeveloped seven-mile long canyon of Saguache Creek immediately below the confluence of its source forks. A several-mile long tributary of California Gulch enters from the south. The grasslands, forests, and riparian zones extending a half-dozen miles north of Saguache Creek are dissected by the lower reaches of Fourmile Creek and Luders Creek. The deep valleys of Saguache Creek and its tributaries are topographically isolated from access



roads above the canyon rims, and the western boundary excludes roads, past timber sales, and grazing developments in the Fourmile Creek and Luders Creek watersheds. The area within the defined boundary appears natural.

Rvsd Plan - 00002515

*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

Saguache Creek is a premier destination for angling with trout fishing a popular recreational activity in the proposed wilderness. Fly fishermen avidly cast the seven-mile length of Saguache Creek for brown and rainbow trout using flies and lures only. Hikers and backpackers enjoy the stream corridor as well, relishing the rugged grandeur of the 1,500-foot deep canyon. Hikers can find complete isolation trekking into the lower reaches of Fourmile Creek and Luders Creek amidst lush riparian zones surrounded by stately ponderosa pines along infrequently maintained trails.

The area's eastern boundary is effectively blocked by private land, so access is restricted to the west via Saguache Park. A network of rugged four-wheel drive routes define the area's western boundary, and these receive light use other than during hunting season. Even in the peak of the summer camping season, just a handful of visitors explore the remote road network and even fewer venture cross-country into the surrounding roadless landscape. The area's topography enhances the sensation of outstanding solitude owing to rocky fin-shaped ridges that separate small meadows and canyons in between.

*Size and Roadlessness*

The proposed Saguache Creek wilderness is 27,100 acres, which places it among the largest stand-alone roadless areas on the forest. The boundary excludes all roads ML2 and above. Even some of these excluded ML2 roads are effectively just ATV trails at this point owing to significant erosion and deterioration such as FDR 736 to Duck Creek.

*Supplemental Values*

The proposed wilderness centered on Saguache Creek, lower Fourmile Creek, and Luders Creek includes significant portions of two Colorado Natural Heritage Program Potential Conservation Areas (PCAs) – Saguache Creek and Luders Creek. The seven miles of Saguache Creek's mainstem comprises the lowest segment of the Saguache Creek PCA. Saguache Creek is ranked as High Biodiversity Significance owing to its montane willow carr associations within the creek's floodplain and valley toe slopes. The lower half of the Luders Creek PCA within the proposed wilderness is also ranked as High Biodiversity Significance because of its montane riparian shrublands, which combined with aspen forests and shrubby cinquefoil shrublands on adjacent terraces creates a structurally and floristically diverse assemblage of riparian and moist toe slope plant communities. (CNHP PCA Reports for Luders Creek, Saguache Creek, 2015).

Saguache Creek through the proposed wilderness was previously determined eligible for Wild and Scenic River designation under the wild classification owing to its outstandingly remarkable scenic, historic, and cultural values. (Rio Grande Forest Plan, 1996)

The proposed Saguache Creek wilderness helps fill the largest geographic gap in the wilderness system in the Southern Rockies. The area is part of the ecological connection between the large protected wilderness areas of the San Juans to the south and the equally

important preserves of the Elk, Sawatch, and Sangre de Cristo ranges to the north and east. The proposed wilderness also provides ecological continuity from the grasslands along lower Saguache Creek extending up through to its headwaters amidst the alpine tundra of the nearby La Garita Wilderness. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

The proposed Saguache Creek wilderness includes the largest expanses of grassland and ponderosa pine forest available for addition to the National Wilderness Preservation System among all of the available candidate areas on the Rio Grande National Forest. These two ecosystem types are critically under-represented among existing wilderness both regionally within the Southern Rockies and at the national level. By protecting this area, the Rio Grande NF can increase the ecological representation within its wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland and Southern Rocky Mountain Ponderosa Pine Woodland from less than 5% of the overall ecosystem acreage on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

Saguache Creek along with its neighboring Fourmile Creek and Luders Creek is a relatively compact unit with one or two cherrystemmed routes penetrating its boundary. The area's eastern boundary is largely inaccessible to public use owing to private lands controlling the valley bottom along Saguache Creek. The boundary along Saguache Creek section is the topographically distinct canyon rim. The western boundary in the Fourmile Creek and Luders Creek watersheds is defined along remote four-wheel-drive routes, primarily Forest Development Road 740. All trails in the proposed wilderness are designated non-motorized. There are no oil and gas leases or non-federal inholdings.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Wild and Scenic River Eligibility | Rio Grande Forest Plan, 1996 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |

| Ecosystem Representation | TWS Ecosystem Representation 2016 |



**Saguache Creek**
**Recommended Wilderness Boundary**

## Blanca Peak addition to Sangre de Cristo Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**          *4,200 acres*
**Conejos Peak Ranger District**



### General Description

The Blanca Peak addition to the Sangre de Cristo Wilderness includes two prominent Colorado fourteeners – 14,345-foot Blanca Peak and its neighboring 14,037-foot Little Bear Peak. The proposed addition abuts a contiguous wilderness addition that is comprised of Lily Lake and the Huerfano River headwaters on the adjacent San Isabel National Forest. Most mountaineers probably assume these rugged peaks are already included within the wilderness, but a comprehensive boundary expansion that incorporates that portion of the Blanca massif on national forest lands would significantly enhance the integrity of existing wilderness.

Blanca Peak is revered by many indigenous cultures in the Southwest, and has been identified as a potential Special Interest Area in recognition of its tribal cultural significance. The addition's landscape consists of sweeping glaciated valleys, soaring granitic peaks, and high alpine lakes. Elevations range from the pinyon-juniper dominated lower slopes of the San Luis Valley through a seamless transition of ecotypes to the rock summits of the high peaks. The challenging jeep trail to Lake Como is excluded from the wilderness addition.

### Naturalness

The proposed Blanca Peak wilderness addition is remote and protected from prior development by its ruggedness, sheer topography and the adjacent private ranch that precluded access from the south. The Lake Como jeep trail forms the northern boundary of the proposed wilderness addition and is excluded from the wilderness. A block of patented mining claims on Little Bear Peak's west shoulder show scant evidence of surface disturbing activity and does not impair the appearance of naturalness across the larger area.



*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

The Blanca Peak addition at its highest point rises almost 7,000 feet above the San Luis Valley. The area's soaring elevation, precipitous alpine ridges, and secluded glacial valleys conspire to create outstanding opportunities for solitude. This is particularly the case for the trail-less valley of Little Bear Lake.

Blanca Peak and Little Bear Peak draw mountaineers hoping to reach the summits and test their mountaineering abilities in highly challenging circumstances. Little Bear Peak ranks among the most technically difficult summits among Colorado's 54 fourteeners, which enhances the outstanding character of this primitive recreational pursuit. An estimated 1,000-3,000 climbers attempt Blanca Peak annually, while less than 1,000 pursue Little Bear's summit (Colorado Fourteeners Initiative, 2015). A half-dozen alpine lakes draw hikers, campers, and photographers keen on experiencing jaw-dropping mountain scenery.

*Size and Roadlessness*

The proposed Blanca Peak wilderness addition is 4,200 acres in size. The area is bounded on the north by the adjacent Sangre de Cristo Wilderness.

*Supplemental Values*

Blanca Peak has outstanding value to native peoples of the Southwest. The Navajo, Ute, and Jicarilla Apache consider the peak sacred, and it is also important within the cultural landscape of the Upper Rio Grande pueblos. The tribes have a strong interest in maintaining the area's pristine nature. The Navajo Nation has proposed designation as a Traditional Cultural Property. (Rio Grande NF tribal assessment, 2015)

The proposed Blanca Peak addition enhances the ecological effectiveness of the Sangre de Cristo Wilderness by expanding the size of the protected area. It specifically interconnects to the Huerfano River headwaters and Lily Lake on Blanca Peak's northern slope, creating overarching protection for the entirety of the Blanca Peak massif when considered in conjunction with the conserved lands on the adjacent Trinchera Ranch to the south. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Ecosystem types along the lower slopes of the proposed addition are poorly represented within the Rio Grande's existing wilderness areas. Wilderness designation of the Blanca Peak addition would increase ecological representation of Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, and Southern Rocky Mountain Pinyon-Juniper Woodland, each of which occur in designated wilderness at less than 5% on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The Blanca Peak addition is comprised of remote and steep ridges and peaks of the Sangre de Cristos, and intervening glaciated valleys. The area is generally bounded on the north by the adjacent Sangre de Cristo Wilderness. The southerly and easterly boundary is the private Trinchera Ranch, which is managed compatibly under a conservation easement. Rural lands administered by BLM abut the area's western boundary. The northeast slopes of Blanca Peak are contiguous with adjacent wilderness-quality lands managed by the Pike-San Isabel National Forest at the headwaters of the Huerfano River. The rugged jeep trail to Lake Como is adjacent to the existing wilderness boundary and forms the northern boundary of the addition, and would be a cherry-stem into the Sangre de Cristo Wilderness boundary once the addition is completed. There are no oil and gas leases in the area. There is a 51.65-acre block of largely inaccessible patented mining claims on the precipitous western ridge of Little Bear Peak for which there is no vehicular access. Is it unlikely these will pose a conflict with wilderness as many similarly situated inholdings have been acquired in wilderness areas throughout Colorado and elsewhere, and historic access has been by foot and horse.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | SLVEC Roadless area description 2002 |
| | Colorado Fourteeners Initiative hiker use estimates, 2015 |
| Supplemental Values | |
| Cultural significance | Rio Grande NF Assessment 12, Areas of Tribal Importance, 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |
| Manageability | |
| Sangre de Cristo Conservation Area | USFWS Sangre de Cristo Conservation Area Land Protection Plan, 2012 |



## Butterfly Creek–Miller Creek addition to Sangre de Cristo Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**               *4,100 acres*
**Saguache Ranger District**



Map Locator

*General Description*

The Butterfly Creek and Miller Creek additions bring the Sangre de Cristo Wilderness boundary to a more logical contour along the range's lower slopes in the northern San Luis Valley. Large undulating alluvial fans characterize the wilderness additions, and a rare oak savanna ecosystem occurs across the lower slopes and riparian corridors of the two areas. It also includes sagebrush habitat for the only population of Gunnison sage grouse in the San Luis Valley.

The additions create a continuous wilderness ecosystem transition from sagebrush, oak and grasslands at the foot of the range through aspen and spruce-fir forests to the crest of the Sangre de Cristo mountains. This is a remote and lightly visited portion of the Sangres, with outstanding sensation of isolation.

*Naturalness*

Butterfly Creek and Miller Creek have intact ecological processes in a setting free of substantially noticeable human imprints. Roads and ways are excluded from the boundary.

*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

The draws and riparian corridors found within Butterfly Creek and Miller Creek create immediate opportunities to experience outstanding solitude and remoteness. For those willing to scale the steeply rising slopes, the elevation quickly establishes a strong sense of separation from the San Luis Valley's rural landscapes and distant Highway 285.

Butterfly Creek and Miller Creek are both free of trails, but two-track vehicle ways provide access through adjacent BLM lands and terminate at



the area's boundary. Visitors take advantage of the area's remote character for high-quality, backcountry hunting opportunities in fall.

*Size and Roadlessness*

The proposed Butterfly Creek and Miller Creek wilderness additions comprise about 4,100 acres and both share extensive boundaries with the adjacent Sangre de Cristo Wilderness. The boundary includes the now closed and revegetating ends of several forest roads. Forest Road #993 along Eaglebrook Creek does not exist on the ground, is marked as closed to motorized use, and there is no evidence that any motorized use has occurred on this route for many years (see photo). The last one-third mile of Forest Road #992 along Butterfly Creek receives no motor vehicle use after it crosses Butterfly Creek, and is being reclaimed by vegetation. The former road (#994) along Raspberry Creek ends on BLM land one-half mile below the national forest boundary.



*Supplemental Values*

The rare oak savanna at the lowest elevations of the Butterfly Creek and Miller Creek additions lies within the Sangres Alluvial Fan Potential Conservation Area, ranked by the Colorado Natural Heritage Program as High Biodiversity Significance. The Sangres Alluvial Fan PCA supports an excellent and large occurrence of an unusual association of Gambel's oak (*Quercus gambelii*) with needle-and-thread grass (*Hesperostipa comata*), the only documented occurrence in the world. In addition, the creeks that run through the savanna from the Sangre de Cristo mountains exhibit unusually high quality occurrences of riparian forest dominated by either aspen or oak. (CNHP PCA Report, 2015)

The lower portion of the Butterfly Creek addition is also within the Decker Creek PCA, which Colorado Natural Heritage Program also ranks as High Biodiversity Significance. This PCA was identified for its value as sagebrush habitat for the small and only population of Gunnison sage grouse in the San Luis Valley. (CNHP PCA Report, 2015)

The proposed Butterfly Creek and Miller Creek additions enhance the ecological effectiveness of the Sangre de Cristo Wilderness by expanding the size of the protected area. In these locations, the current wilderness boundary extends less than one mile down from the crest of the range. With the additions, the boundary would double in width and incorporate a more defensible topographic contour. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Butterfly Creek and Miller Creek are particularly valuable wilderness additions for their contribution of Rocky Mountain Gambel Oak-Mixed Montane Shrubland to the range of ecological representation within Rio Grande National Forest wilderness areas. This is a very poorly represented ecosystem both within the Rio Grande as well as nationally. Wilderness designation of these two additions will bring representation of this oak savanna ecosystem to over 20% on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The Butterfly Creek and Miller Creek additions can be managed to preserve their wilderness characteristics. The additions are bounded on one side by the existing wilderness and on the other by undeveloped lands managed by BLM. There is one patented mining claim in the steep headwaters of South Rock Creek that lacks vehicle access, but the only two other similar inholdings in the Sangres were quickly acquired 20 years ago soon after wilderness designation. There are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |



Butterfly - Miller Creeks additions Sangres
Recommended Wilderness Boundary

## Cotton Creek–Crestone addition to Sangre de Cristo Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**                    *11,000 acres*
**Saguache Ranger District**



**Map Locator**

### General Description

The proposed Cotton Creek–Crestone addition refers to approximately 11,000 acres along the front of the Sangre de Cristo mountains ranging over a dozen miles between Crestone and Valley View Hot Springs. This one or two-mile wide strip extends the wilderness boundary to a more obvious contour at the national forest boundary.

This addition incorporates the lower few miles of six or seven trails leading into the adjacent wilderness from wilderness trailheads at the forest boundary. The addition is extremely rich in biodiversity, encompassing significant portions of a half-dozen conservation areas identified for their biodiversity value by the Colorado Natural Heritage Program largely because of the excellent condition and uncommon quality of the riparian corridors. Not surprisingly, these low elevation lands are dominated by ecosystem types poorly represented within existing wilderness, such as pinyon-juniper woodlands, montane grasslands, and ponderosa pine.

### Naturalness

The Cotton Creek–Crestone addition is characterized by steep slopes and deep canyons with few apparent unnatural impacts. The riparian corridors in these canyons are almost uniformly pristine and in excellent ecological condition. The few areas with more substantial historic mineral prospecting impacts situated nearby clusters of patented mining claims are excluded from the boundary.



### Outstanding Opportunities for Solitude or Unconfined Primitive Recreation

The Cotton Creek–Crestone addition is a region of rugged terrain, with steep mountainsides and plunging valley bottoms. Each of the parallel valleys is topographically isolated from its neighbors, and each provides an outstanding sense of remoteness and solitude.

The Cotton Creek–Crestone wilderness addition abuts a half-dozen wilderness trailheads along the lower flanks of the Sangre de Cristo mountains between Crestone and Valley View Hot Springs. The addition takes in the first mile or two of these wilderness access trails that include Cotton Creek, Wild Cherry Creek, Rito Alto Creek, San Isabel Creek, Major Creek, Garner Creek, and Hot Springs Canyon. Many of these trails lead to high alpine basins and lakes and find great popularity among hikers, anglers, and horsepackers enjoying the outstanding opportunities for primitive recreation pursuits. Most of the high lakes accessed by these trails contain recreational populations of Rio Grande cutthroat trout. The wilderness addition provides key winter range for bighorn sheep, mule deer, and elk and draws backcountry hunters in fall seeking an outstanding primitive hunting experience.

*Size and Roadlessness*

The proposed Cotton Creek–Crestone wilderness addition spans about 11,000 acres and shares over a dozen miles of boundary with the adjacent Sangre de Cristo Wilderness.

*Supplemental Values*

The long length of the proposed Cotton Creek–Crestone wilderness addition spans six Potential Conservation Areas identified by the Colorado Natural Heritage Program. Each of these incorporate several miles of drainages that possess uncommon riparian forest and streamside ecological communities in excellent condition.

- Starting at the northernmost end of the addition, Valley View PCA is a site of High Biodiversity Significance that includes the slopes and stream bottom of Hot Springs Canyon. The site was identified because of the excellent example of bristle cone pine distributed throughout the canyon.
- The Garner Creek PCA supports a dense stand of Douglas-fir with an understory of Rocky Mountain maple. Garner Canyon is wider than most of the other gorges draining the western flank of the Sangre de Cristo Mountains, and the valley bottom is less steep. It is of Moderate Biodiversity Significance.
- The lower end of the Cotton Creek PCA includes a streamside community that is a very diverse collection of aspen, river birch, Rocky Mountain maple, Drummond's willow, and Woods rose. A key feature of the Cotton Creek PCA is its unusually healthy and large stands of river birch occurring in a high-quality montane riparian forest, along with adjacent foothills riparian shrubland. It ranks as a site of High Biodiversity Significance.
- The addition includes the lower segment of the Wild Cherry Creek PCA, where a good example of a quaking aspen and red-osier dogwood community fills the canyon and ranks as Moderate Biodiversity Significance.
- The upper portion of Rito Alto Bosque PCA is located within the wilderness addition and ranks as High Biodiversity Significance. Extensive stands of aspen/western birch and narrow-leaf cottonwood/western birch riparian forests line the riparian corridor that extends along the alluvial fan from the mouth of Rito Alto Canyon.

- The Dimick Gulch PCA is the highest ranked site within the wilderness addition, and is considered of Very High Biodiversity Significance. The entirety of this 1,747-acre conservation area is situated within the proposed wilderness addition. The site contains very uncommon narrowleaf cottonwood and Rocky Mountain juniper dominated riparian areas, and occurs here because of the narrow character of this steep-sided canyon. (CNHP PCA Report, 2015)

Mill Creek is a seventh drainage of biodiversity significance. The lower half of the designated Mill Creek Research Natural Area is located within the proposed wilderness addition. The RNA is notable for its extensive and high quality pinyon-juniper woodlands on gentle alluvial fan slopes as well as adjacent steeper bedrock.

The proposed Cotton Creek–Crestone addition enhances the ecological effectiveness of the Sangre de Cristo Wilderness by expanding the size of the protected area. This addition would create the widest portion of the entire Sangre de Cristo Wilderness, expanding the boundary to a full 10 miles across the range for almost the entire length of this dozen-mile long expansion. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

As to be expected with the abundance of lower elevation slopes along the foot of the Sangre de Cristo mountains, the Cotton Creek–Crestone addition would significantly contribute to several ecosystem types most under-represented within the Rio Grande's existing designated wilderness. The most substantial increases in ecological representation occur for Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, and Southern Rocky Mountain Pinyon-Juniper Woodland. Collectively, the addition would add over 6,000 acres of these poorly represented ecosystem types for which less than 5% of available acreage is presently contained within designated wilderness. (TWS ecosystem representation report, 2016)

*Manageability*

The Cotton Creek–Crestone addition can be readily managed to preserve its wilderness characteristics. The additions are bounded on one side by the existing wilderness and on the valley side either by undeveloped lands managed by BLM or rural agricultural lands. The proposed boundary generally excludes the patented mining claims in North Crestone Creek, but does include the single isolated patented mining claims in Cedar Creek and Wild Cherry Creek. These inholdings lack vehicle access. The Forest Service successfully acquired similar inholdings after the Sangre de Cristo Wilderness was first designated in1993. There are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|------|-------------|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 |

| | |
|---|---|
| | subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
|   High Biodiversity Significance | CNHP PCA Report 2015 |
|   Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
|   Ecosystem representation | TWS Ecosystem Representation 2016 |



## Kit Carson Peak addition to Sangre de Cristo Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**                    *12,300 acres*
**Saguache Ranger District**



**Map Locator**

*General Description*

The proposed Kit Carson Peak wilderness addition is most renowned for the three 14,000-foot summits of the Kit Carson massif, including Challenger Point and Columbia Point. The 12,300-acre addition consists entirely of that portion of the Baca Mountain Tract conveyed into Forest Service jurisdiction by the Great Sand Dunes National Park Act of 2000. The peaks form the backdrop of one of the San Luis Valley's most photogenic settings as the towering crest at the heart of the Sangre de Cristos.

As this was previously part of a private ranch for the prior hundred years, there are no formal forest recreation trails, though the summits of the peaks draw numerous mountaineers. This isolation has helped preserve an area of remarkable biological significance, with the four major drainages all encompassed by one of a half-dozen conservation areas identified for their biodiversity value by the Colorado Natural Heritage Program. Each stream corridor has an excellent condition narrowleaf cottonwood–Rocky Mountain juniper montane riparian forest. A designated Research Natural Area is located immediately adjacent within the existing wilderness.



Photo USDA Forest Service

*Naturalness*

The proposed Kit Carson Peak wilderness addition has been isolated and largely inaccessible to most development activities owing to its private status. The area is characterized by the steep western slopes of the Sangre de Cristo mountains and deep

canyons with few apparent unnatural impacts. The riparian corridors in these valleys are almost uniformly pristine and in excellent ecological condition. The southern end of the area with impacts associated with historic mining activity around Liberty and Duncan is cherry-stemmed out of the proposed wilderness boundary.

*Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

The Kit Carson Peak proposed wilderness addition consists of the rugged west slope of the Sangre de Cristo range south of Crestone. The fault block uplift creates a region of craggy terrain, with steep mountainsides and plunging valley bottoms. The area includes several parallel valleys, each topographically isolated from its neighbors, and each provides an outstanding sense of remoteness and solitude.

The Kit Carson Peak addition has no designated national forest system trails owing to its prior status as part of a private ranch, and thus receives significantly less use than other valleys on the western slope of the Sangres. The Baca Grande subdivision blocks public access from the west, but there are informal routes along several of the valleys, including Cottonwood, Spanish, and Deadman creeks. These routes provide some of the most challenging primitive recreation opportunities for hikers and backpackers in the Sangre de Cristo mountains. Lower Deadman Creek does have public access from the Liberty Road and provides outstanding opportunities for equestrians as well as hikers and backpackers. A substantial number of mountaineers climb the collection of fourteeners  as part of the Kit Carson Peak massif, and while the summits are within the wilderness addition in its far northeast corner, the hiking access routes to the summits such as along Willow Creek are located in the existing wilderness. (Baca Mountain Tract EA, 2009)

*Size and Roadlessness*

The proposed Kit Carson Peak wilderness addition is about 12,300 acres in size, and is bounded on the north and east by the adjacent Sangre de Cristo Wilderness.

*Supplemental Values*

The proposed Kit Carson Peak wilderness addition spans six Potential Conservation Areas identified by the Colorado Natural Heritage Program. These encompass each of the primary drainages that flow west off the crest of the Sangres – Willow Creek, Spanish Creek, Cottonwood Creek, and Deadman Creek. As with the drainages farther north of Crestone, the biodiversity values are associated with healthy riparian corridors.

- The upper portion of the Willow Creek-Western Sangres PCA in Copper Gulch is located within the proposed wilderness addition. The PCA is ranked as High Biodiversity Significance, but primarily for a narrowleaf cottonwood–Rocky Mountain juniper woodland at the lowest elevations below the proposed wilderness. At the elevation of subalpine forest within the potential wilderness unit, the riparian corridor is a mixed conifer and deciduous forest and shrubland that includes Douglas-fir, white fir, blue spruce, Engelmann spruce, aspen, Rocky Mountain maple, and mountain spray.

Rvsd Plan - 00002533

- The Head of Spanish Creek PCA site encompasses the ridge and south-facing open slopes above Spanish Creek and below Challenger Point, and is entirely within the proposed wilderness. This 110-acre site is ranked as High Biodiversity Significance for a globally rare mustard species.
- The entire length of the Spanish Creek drainage comprises the Spanish Creek PCA, most of which is located within the proposed wilderness. This is a site of Very High Biodiversity Significance owing to its narrowleaf cottonwood–Rocky Mountain juniper montane riparian forest. The upstream watershed is included within the site boundary to protect the floodplain and the sources of both surface and groundwater recharge and flow, which are responsible for supplying water to the riparian plant community.
- Cottonwood Creek–Western Sangres is another PCA of Very High Biodiversity Significance, also for its globally imperiled narrowleaf cottonwood–Rocky Mountain juniper montane riparian forest. In addition, the site includes a Douglas fir–water birch community, which is considered globally rare. As with Spanish Creek, the majority of the PCA is within the proposed wilderness, and the upstream watershed is included to protect water sources.
- The central portion of the Deadman Creek–Western Sangres PCA is located within the proposed wilderness. Deadman Creek is ranked as Very High Biodiversity Significance owing to the state's exemplary and largest occurrence of narrowleaf cottonwood–Rocky Mountain juniper montane riparian forest. The PCA also includes an excellent example of aspen–Rocky Mountain maple, a breeding colony of the pale lump-nosed bat and a hybridized Rio Grande cutthroat trout population.
- Cedar Canyon is another PCA with a quality example of narrowleaf cottonwood–Rocky Mountain juniper montane riparian forest. It is also ranked Very High Biodiversity Significance. The creek is a clear stream that runs over the alluvial fan at the canyon's mouth. (CNHP PCA Report, 2015)

Immediately upstream on Deadman Creek is a designated Research Natural Area. The RNA was designated for its good representation of aspen over a wide range of elevations, slopes, and aspects. The RNA includes the riparian corridor and source water for the downstream CNHP Potential Conservation Area.

The higher elevations of the proposed wilderness are bighorn sheep habitat, which is relatively uncommon on the Rio Grande National Forest. Bighorn sheep habitat comprises about one-half of the proposed wilderness addition.

The proposed Kit Carson Peak addition enhances the ecological effectiveness of the Sangre de Cristo Wilderness by expanding the size of the protected area. This addition would complete the wilderness boundary and eliminate the unnatural 90-degree corner boundary of the existing wilderness that is a relic of the Baca Grant.  The addition would also take this portion of the Sangre de Cristo Wilderness to a width of eight miles or more. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

The area's prevalence of lower elevation slopes along the foot of the Sangre de Cristo mountains means the Kit Carson Peak addition would greatly expand several ecosystem types most under-represented within the Rio Grande's existing designated wilderness. Substantial increases would occur in ecological representation for Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, and Southern Rocky Mountain Pinyon-Juniper Woodland. Collectively, the addition would add over 5,000 acres of these poorly represented ecosystem types for which less than 5% of available acreage is presently contained within designated wilderness. (TWS ecosystem representation report, 2016)

*Manageability*

The Kit Carson Peak addition is comprised of remote, steep, and largely inaccessible western slopes of the Sangre de Cristos. The topography creates impediments to incompatible activities, and allows managers to preserve its wilderness characteristics. The area is bounded on north and east by the existing wilderness and on the valley side by Great Sand Dunes National Park and by the agricultural-zoned open space component of the Baca Grande.

The mineral estate beneath the wilderness addition is privately held.  A Mineral Assessment Report completed in 2011 concluded slight likelihood of development of metallic minerals beneath the proposed wilderness, although there could be high potential for occurrence of gold, silver or other metallic minerals. The low prospect of development is predicated on several factors – lack of mining infrastructure, societal resistance as per experience from other large mining operations around the San Luis Valley, and likely removal of high-grade deposits by historic mining operations. Although the current mineral owner drilled several prospecting holes in the early 1990s, there has not been any viable commercial mineral extraction from the Sangre de Cristos since the 1930s. (Rare Earth Science Mineral Assessment Report, 2011)

The National Park Service identified 53,000 acres of adjacent lands as wilderness eligible in Great Sand Dunes National Park with the identical split-estate mineral ownership as the Kit Carson Peak unit. The National Park Service concluded likelihood of mineral extraction was low, and combined with the expected eventual acquisition of the mineral interests, NPS determined its lands wilderness-eligible and formally recommended its lands overlying the private mineral estate for wilderness designation. The NPS recommended wilderness is directly adjacent to the Kit Carson Peak unit south of the Liberty Road. If the Forest Service declines to pursue wilderness designation for the Kit Carson Peak area, it will still be surrounded on three sides by designated and recommended wilderness. (Great Sand Dunes NP GMP/Wilderness Study, 2007)

The Great Sand Dunes National Park Act of 2000 authorized the acquisition of lands and interests therein, such as mineral rights, and transfer to the appropriate agency jurisdiction for management. The Forest Service has the authority, as does the National Park Service, to pursue future acquisition of the split-estate minerals in proposed or potential wilderness.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR xx |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |
| Manageability | |
| Mineral Assessment Report | Rare Earth Science, 2011 |
| NPS Wilderness Recommendation | Great Sand Dunes NP General Management Plan/Wilderness Study, 2007 |
| Wilderness eligibility analysis | Baca Mountain Tract EA, 2009 |



Kit Carson Peak addition Sangres
Recommended Wilderness Boundary

## Sawlog recommended wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**              *17,900 acres*
**Saguache Ranger District**



Map Locator

### *General Description*

The proposed Sawlog wilderness generally encompasses the watershed of the North Fork of Carnero Creek, northwest of La Garita. It extends from the foothills of the San Luis Valley to 10,849-foot Storm King Mountain, spanning ecosystems ranging from grasslands and ponderosa pine woodlands at the lowest elevations to aspen and spruce-fir at highest elevations.

The North Fork of Carnero Creek is a stronghold for Rio Grande cutthroat trout and its headwaters have been identified as one of the premier wetland complexes on the Rio Grande National Forest.  Sawlog provides important big game habitat year-round for elk, deer, and bighorn sheep, and offers excellent backcountry hunting for those willing to invest the effort.

### *Naturalness*

The proposed Sawlog wilderness includes areas with prior two-track vehicle routes made by hunters and wood gatherers that have since been closed and rehabilitated. The boundary is drawn to exclude exterior roads and timber harvest areas.

### *Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

The valley of the North Fork of Carnero Creek and its tributary creeks are isolated by rugged surrounding ridges, creating outstanding opportunities for solitude. The area lacks a well-developed trail system other than the non-motorized trail along the North Fork, a factor that enhances opportunities for solitude in tributaries including Sawlog Creek and Poison Gulch.

Sawlog provides abundant, quality opportunities for primitive backcountry hunting and fishing. The areas of Sawlog Creek and the North Fork of Carnero Creek provide important production habitat for the local bighorn sheep herd. Elk and deer winter on the southern aspects and will move up and down in elevations depending on the winter and are often

discovered during the remainder of the year. The prime habitat draws hunters seeking a more remote and challenging hunting opportunity during fall months.

*Size and Roadlessness*

The proposed Sawlog wilderness is ample size at 17,900 acres. It is bounded on the east and south by the national forest boundary and adjacent BLM lands for the most part. The western boundary is well-delineated by County Road 41G along Carnero Creek's Middle Fork, and the northern boundary is defined by Forest system roads and past areas of timber harvest.

*Supplemental Values*

The proposed Sawlog wilderness includes a portion of the Carnero Creek Potential Conservation Area identified by the Colorado Natural Heritage Program. Carnero Creek is ranked as High Biodiversity Significance owing to its bristlecone pine woodland, a montane grassland, and a Rio Grande cutthroat trout population, all of which are state rare. This population of Rio Grande cutthroat progresses in quality as one continues up the stream. (CNHP PCA Report for Saguache Creek, 2015).

The North Fork of Carnero Creek hosts a high purity, core conservation population for Rio Grande cutthroat trout. (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004)

The proposed Sawlog wilderness addition greatly increases the ecological representation within Rio Grande National Forest wilderness areas of several of the most under-represented ecosystem types on the forest. Sawlog includes thousands of acres of Southern Rocky Mountain Montane-Subalpine Grassland, Southern Rocky Mountain Ponderosa Pine Woodland, and Southern Rocky Mountain Pinyon-Juniper Woodland – all ecosystem types currently with less than 5% representation of the overall ecosystem acreage on the forest. (TWS ecosystem representation report, 2016)

*Manageability*

The proposed Sawlog wilderness is manageable as wilderness. The area is bounded on two sides by adjacent unroaded BLM lands. The western boundary is well-defined by County Road 41G and the steep slopes of Storm King Mountain. Forest system roads and past timber management areas define the northern boundary. There is just one trail within the area, the non-motorized trail along the North Fork of Carnero Creek. One 160-acre private inholding exists in the center of the area, but there is presently no motorized access to it. There are no oil and gas leases.

*Information Resources*

| Item | Data Source |
|------|-------------|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem Representation | TWS Ecosystem Representation 2016 |



Sawlog
Recommended Wilderness Boundary

## Snowshoe Mountain addition to Weminuche Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**          *34,300 acres*
**Divide Ranger District**



Map Locator

### *General Description*

Snowshoe Mountain is the largest roadless area adjacent to the Weminuche Wilderness. Moderate to steep forested slopes rise out of the Rio Grande valley immediately south of Creede, with the mountain bisected by the long undeveloped watershed of Deep Creek. The proposed wilderness addition is split into two units along the Deep Creek trail in order to accommodate mountain bike use of the trail.

This large forested extension north of the Weminuche comprises important and highly utilized habitat for lynx. Snowshoe Mountain also provides valuable habitat for big game and outstanding backcountry recreation opportunities at Creede's doorstep. The mountain offers intriguing geologic interest as a resurgent dome within the Creede caldera bisected by conspicuous graben faults.

### *Naturalness*

Snowshoe Mountain is a compact oval-shaped unit nearly 9 miles across. The Lime Creek Road (FDR #528) accesses areas previously managed for timber harvest at the southern end of the area, but the road and past timber management areas are excluded from the proposed wilderness addition. The area is free of noticeable human improvements and possesses ecologically intact forest and grassland ecosystems.



### *Outstanding Opportunities for Solitude or Unconfined Primitive Recreation*

Snowshoe Mountain consists of steeply forested slopes looming over the Rio Grande valley. The area's size and forbidding slopes create ideal opportunities for outstanding solitude.

Rvsd Plan - 00002542

This large area is bisected by a non-motorized trail along Deep Creek. The Deep Creek Trail is easily accessible from Creede and is popular among hikers, anglers, and horse users. It offers an easy gradient for recreationists to quickly penetrate the area's remote interior. A second trail atop the mountain descends to a dead-end at private property on Pierce Creek. This trail provides access to a very remote and lightly visited portion of the area. Both trails provide access to outstanding opportunities for primitive and unconfined recreation.

*Size and Roadlessness*

The proposed Snowshoe Mountain wilderness addition contains 34,300 acres. It is bounded on the north, west and east by the private lands of the Rio Grande valley. The area is split into two units by the Deep Creek Trail. The Lime Creek Road and associated past timber harvest areas define the remainder of the boundary. The area connects at the south to the adjacent Weminuche Wilderness across a two-mile wide neck of forest and ridges.

*Supplemental Values*

The existence of highly utilized, high-quality lynx habitat comprises a significant supplement wilderness value for Snowshoe Mountain. Important habitat for western boreal toad occurs at the southern end of the area.

Snowshoe Mountain provides geologic features of interest. The mountain is a resurgent volcanic dome formed in the Creede caldera, and the Deep Creek graben is conspicuous at the mountain's crest. (USGS pamphlet Central San Juan Caldera Cluster, 2006)

Snowshoe Mountain includes the entirety of the 417-acre Deep Creek Uplands West PCA, which is a Potential Conservation Area ranked as Very High Biodiversity Significance. This PCA includes one of the best known populations of Smith whitlow-grass, a Colorado endemic and globally imperiled species, as well as a population of globally imperiled black canyon gilia. Snowshoe Mountain includes a portion of the 3,346-acre Spar City Potential Conservation Area identified by the Colorado Natural Heritage Program. Spar City PCA is ranked as Moderate Biodiversity Significance owing to its large and excellent quality occurrence of a state rare bristlecone pine/Thurber fescue (*Pinus aristata/Festuca thurberi*) montane woodland, a plant association limited to the southern Rocky Mountain ecoregion. (CNHP PCA Report, 2015).

Snowshoe Mountain enhances the ecological effectiveness of the Weminuche Wilderness by expanding the size of the protected area by over 30,000 acres. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

Snowshoe Mountain contributes thousands of acres of one of the most under-represented ecosystem types among existing wilderness areas on the Rio Grande National Forest. By protecting this area, the Rio Grande NF can significantly increase the ecological

representation within its wilderness areas of Southern Rocky Mountain Montane-Subalpine Grassland. (TWS ecosystem representation report, 2016)

*Manageability*

Snowshoe Mountain is readily manageable as wilderness owing to its compact configuration. The mountain rises steeply from the surrounding valley floor on the north and east, which offers an imposing topographic delineation. The proposed wilderness addition excludes the Deep Creek Trail in order to avoid conflicts with mountain biking. Identified areas of potential snowmobiling interest in the Seven Parks are excluded along the southern boundary. The area has no geologic potential for oil and gas resources, and there are no oil and gas leases or non-federal inholdings within the area. Portions of Snowshoe Mountain are within a Wildland Urban Interface area along the national forest boundary at Kid Peak Estates and at Wagon Wheel Gap identified within the Mineral County Community Wildfire Protection Plan. These can be buffered out of the wilderness boundary if determined necessary.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Geologic | USGS pamphlet Central San Juan Caldera Cluster, 2006 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |



Snowshoe East addition Weminuche
Recommended Wilderness Boundary



# Adams Fork – Three Forks Addition to South San Juan Wilderness



**Map Locator**

**Proposed Wilderness Designation**
**Rio Grande National Forest**                    *2,700 acres*
**Conejos Peak Ranger District**

## General Description

The proposed Adams Fork–Three Forks addition to the South San Juan Wilderness consists of the slopes surrounding the Three Forks and Adams Fork trailheads at the headwaters of the Conejos River above Platoro Reservoir. The addition incorporates the lowest mile of the Adams Fork trail into the adjacent wilderness and encompasses steep and forested slopes of the Conejos River valley. This addition enhances wilderness protection for the area surrounding these two wilderness trailheads that are popular with anglers, hikers, backpackers and horse users. The additions are part of two larger Colorado Roadless Areas, Gold Creek-Cascade Creek and Tobacco Lakes.

## Naturalness

The proposed Adams Fork–Three Forks wilderness addition is affected primarily by the forces of nature. Much of the unit's mature spruce has succumbed to beetles, similar to surrounding forests. The Adams Fork component consists of the lower mile of the Adams Fork creek corridor. The Three Forks portion includes the steep, forested slopes rising to hanging glacial valleys looming over the Conejos River valley. Topography excludes roads or any other management activities.

## Outstanding Opportunities for Solitude or Unconfined Primitive Recreation

The Adams Fork is a deep, forested stream corridor where visitors immediately encounter a sense of remoteness and solitude upon departing the trailhead. The steep slopes of the Three Forks component is free of trails and consequently receives little to no recreational use, but from the highest points above the Conejos River valley visitors experience an enhanced sense of solitude owing to the separation from the valley floor and expansive vistas.



Rvsd Plan - 00002547

The Adams Fork trail provides outstanding opportunities for primitive and unconfined recreation in the form of wilderness-related activities such as hiking, backpacking, horsepacking, angling, and backcountry hunting. The Three Forks addition enhances the primitive recreation experience by ensuring protection of the wilderness qualities of the landscape that envelops the Three Forks wilderness trailhead.  Both trailheads are easily accessed from Platoro Reservoir.

*Size and Roadlessness*

The Adams Fork-Three Fork wilderness addition is 2,700 acres and is adjacent to the existing South San Juan wilderness to the west and south. The wilderness addition surrounds forest road #247 and effectively creates a short cherry-stem along the road to the Three Forks trailhead.

*Supplemental Values*

The Adams Fork addition is a documented high use area for lynx and was part of one of the initial core areas lynx established after reintroduction. The steep north-facing slopes and drainages of the Adams Fork–Three Forks addition potentially support lynx reproduction and serve as hunting territory. (USDA Forest Service, R2, Profiles of Colorado Roadless Areas, 2008)

The Adams Fork addition includes a portion of the Adams Fork of the Conejos River Potential Conservation Area identified by the Colorado Natural Heritage Program. The PCA is drawn to include the riparian habitat necessary to support the Rio Grande cutthroat trout, and the PCA is ranked as High Biodiversity Significance. The Adams Fork supports a recreation population of Rio Grande cutthroat trout. (Conservation Plan for Rio Grande Cutthroat Trout in Colorado, CDOW, 2004; CNHP PCA Report, 2015)

The proposed Adams Fork–Three Forks wilderness addition enhances the ecological effectiveness of the South San Juan Wilderness by expanding the size of the protected area. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

*Manageability*

The Adams Fork–Three Forks unit adds areas with easily distinguishable boundaries to the adjacent South San Juan Wilderness. The Adams Fork portion extends the existing wilderness boundary about one mile downstream to a new boundary along forest road #247 and effectively results in the entirety of the Adams Fork drainage being included within the wilderness boundary. The Three Forks component lies east of the Conejos River and its steep slopes provide a topographic barrier to incompatible uses. There are no oil and gas leases and no non-federal inholdings within the area.

*Information Resources*

| Item | Data Source |
|---|---|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| High Biodiversity Significance | CNHP PCA Reports 2015 |
| Rio Grande Cutthroat Trout | Conservation Plan for the Rio Grande Cutthroat Trout in Colorado. Colorado Division of Wildlife; CNHP PCA Report 2015 |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem Representation | TWS Ecosystem Representation 2016 |



Adams Fork - Three Forks addition South San Juan
Recommended Wilderness Boundary

# Elk Creek addition to South San Juans Wilderness

**Proposed Wilderness Designation**
**Rio Grande National Forest**        *3,200 acres*
**Conejos Peak Ranger District**



## General Description

The proposed Elk Creek addition to the South San Juan Wilderness adds the lower four miles of the stream valley to the wilderness. The lowermost elevations of Elk Creek at less than 9,000 feet include impressive stands of several-hundred-year-old ponderosa pines, many of which display old-growth characteristics. The low-elevation ponderosa pine-grassland ecosystem adds substantial diversity to the existing wilderness, and the majestic trees offer an appealing contrast to the generally subalpine and alpine character of the wilderness.

Elk Creek is a large tributary of the Conejos River and drains the southern quadrant of the wilderness. The Elk Creek trail is a gentle gradient along a clear tumbling stream that provides a popular wilderness access point for hikers, anglers, and horse users. The proposed wilderness addition creates a topographically defined boundary that incorporates the entirety of the stream valley into the wilderness, as opposed to only a portion of the south half as is currently within the wilderness.

## Naturalness

The Elk Creek addition to the South San Juans is a smaller subset of the Cumbres roadless area. The addition is entirely natural with no evidence of past management activities. The unit's ponderosa pine-grasslands are a particularly good example of a pine forest in the condition expected from a natural fire regime. Other portions of the Cumbres roadless area that might display more evidence of noticeable human activities are excluded from the proposed wilderness addition.



## Outstanding Opportunities for Solitude or Uncor.fined Primitive Recreation

The Elk Creek watershed is a premier destination within the existing South San Juan Wilderness owing to its outstanding opportunities for solitude. The lower Elk Creek addition contributes to that through its topographic isolation as it carves a deep and

narrow valley downstream of the existing wilderness boundary. Soon after departing the Elk Creek trailhead, visitors round into the valley's secluded confines and immediately leave behind civilization's hustle and bustle.

The non-motorized Elk Creek trail traverses the length of the proposed wilderness addition to the wilderness boundary approximately four miles distant from the trailhead. Elk Creek is an easily accessible and popular wilderness access point for both hikers and horse users. Many day-hikers and overnight backpackers enjoy outstanding opportunities for fishing, photography, and wildlife viewing. Horsepackers share the trail and similarly enjoy access to the longest wilderness valley in the South San Juans. The area provides excellent habitat for elk and mule deer, which in turns leads to high-quality backcountry hunting opportunities in the fall.

*Size and Roadlessness*

The proposed Elk Creek addition to the South San Juan Wilderness consists of 3,200 acres adjacent to the existing wilderness. Elk Creek is bounded on the west by the wilderness boundary, and significant topographic features in the form of cliff rims and precipitous ridge tops create boundaries to the north and south.

*Supplemental Values*

Adding lower Elk Creek to the wilderness notably expands the range of ecosystems present within the existing wilderness because of the presence of uncommon stands of robust ponderosa pine at its lower end. These classic stands of stately ponderosa pine intermixed with park-like grasslands create a welcome entrance to the wilderness. This is an ecosystem type noticeably absent within the existing wilderness on the Rio Grande National Forest. (TWS ecosystem representation report, 2016)

The proposed Elk Creek addition enhances the ecological effectiveness of the South San Juan Wilderness by expanding the size of the protected area. Larger protected areas are more likely to provide conditions for species persistence over the long term than smaller areas. (SREP Wildlands Network Vision 2003; Aplet et al Indicators of Wildness 2000.)

*Manageability*

The Elk Creek addition is readily manageable as wilderness and significantly enhances the existing wilderness boundary by bringing the entirety of the Elk Creek valley into the wilderness as compared to the current boundary that protects only the southern half of the valley. The significant topographic barriers of the proposed addition separate the addition from influences on adjacent national forest lands. There are no oil and gas leases or non-federal inholdings.

*Information Resources*

| Item | Data Source |
|------|-------------|
| Roadlessness | Colorado Roadless Rule at 36 CFR 294 subpart D |
| | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 71 |
| Naturalness; Outstanding Opportunities for Solitude or Unconfined Primitive Recreation | Forest Service inventory pursuant to FSH 1909.12,chapter 70, section 72 |
| | USDA Forest Service, R2, Profiles of Colorado Roadless Areas 2008 |
| | SLVEC Roadless area description 2002 |
| Supplemental Values | |
| Connectivity | SREP Wildlands Network 2003, Aplet et al Indicators of Wildness 2000 |
| Ecosystem representation | TWS Ecosystem Representation 2016 |





RARE EARTH SCIENCE

www.rareearthscience.com

August 1, 2011

Christine Canaly
San Luis Valley Ecosystem Council
Post Office Box 223
Alamosa, Colorado 81101

**Re:  Mineral Assessment Report**
**Luis Maria Baca Grant No. 4 Property - Saguache County, Colorado**

Dear Christine:

Rare Earth Science, LLC (Rare Earth) has completed this Mineral Assessment Report (MAR) for the Luis Maria Baca Grant No. 4 (Baca Grant) property located in southeast Saguache County. The purpose of the MAR was to evaluate the mineral-resource and mineral-development potential in those areas of the Baca Grant, and adjoining lands, where Lexam Explorations (USA) Inc. (also known as Lexam VG Gold Inc. [hereafter, "Lexam"]) holds the subsurface mineral rights.

## 1.  Project Overview

The MAR project included a review of documented historical, or currently-permitted and active, mineral mining or drilling operations in Baca Grant vicinity. A general location map for the study area is attached as Figure 1. For this project, Rare Earth reviewed a variety of published geologic, mining and economic mineral-resource data. Available maps, mining-related permit files, and scientific literature were acquired from sources that include the U.S. Geological Survey (USGS);  Bureau of Land Management (BLM); U.S. Forest Service (USFS); U.S. Fish & Wildlife Service (USFWS); National Park Service (NPS); Colorado Division of Reclamation, Mining and Safety (DRMS); Colorado Geological Survey (CGS); Colorado Oil & Gas Conservation Commission (COGCC); San Luis Valley Ecosystem Council and their associates; and Alamosa & Saguache Counties.

This report presents a brief description of the Baca Grant and the local geology, a review of various economic mineral resources (categorized separately as locatable, leasable and saleable minerals), along with a summary of our findings. Rare Earth did not perform a detailed review of land-ownership records or title information for any of the study area; nor was site reconnaissance performed, or sampling & analysis of geologic materials. This MAR is in no way intended to be a mineral appraisal or mineral-examination report. Nor is this report considered to be an opinion on mineral title, mineral valuation or mining-claim validity; or a quantitative analysis of actual mineral resources and/or reserves.

Rvsd Plan - 00002555

## 2. Site Location & Description

The attached Figures 1 & 2 show the boundaries of the Baca Grant, which encompass approximately 100,000 acres (12.5 square miles) in all, or portions of, Townships 41 to 43 North and Ranges 10 to 12 East (New Mexico Principal Meridian). Surface ownership and administration of the Baca Grant includes NPS (Great Sand Dunes National Park), USFWS (Baca National Wildlife Refuge [NWR]), Rio Grande National Forest, and numerous private landowners in the Baca Grande Subdivision adjacent to the town of Crestone.

The Baca Grant is located about 25 miles north-northeast of the City of Alamosa and 4 miles east of Colorado State Highway 17. Adjoining lands to the south-southeast are administered by the NPS, by the USFWS to the south and west, and by the Rio Grande National Forest to the north and east. Smaller tracts of privately-owned land also adjoin the Baca Grant in all directions. The terrain is quite varied and encompasses part of the level San Luis Valley floor, upslope over the mountain front and to the crest of the Sangre de Cristo Range.

USGS topographic maps show the ground surface elevation ranging from a low point of approximately 7,500 feet above mean sea level along the west boundary, to a high point of more than 14,000 feet near the northeast corner of the Baca Grant on Kit Carson Mountain and Challenger Point. Numerous drainages traverse all or part of the Baca Grant in a general northeast-to-southwest direction, including (from north to south): Crestone Creek, Willow Creek, Spanish Creek, Cottonwood Creek, Deadman Creek, Pole Creek and Sand Creek. The Baca Grant area is also located within the San Luis Creek district within a closed basin having no known external drainage.

## 3. Geologic Overview of the Baca Grant Area

The Baca Grant is positioned within the Southern Rocky Mountains physiographic province, with its characteristic rugged, high-elevation peaks and broad intermontane basins. In general, the topography and geology of this area were influenced by several major features including the Sangre de Cristo Range to the east and the San Juan Volcanic Field to the west-southwest. The Baca Grant also lies on the eastern margin of the San Luis Valley and along the western front of the Sangre de Cristo Range. The San Luis Valley coincides with the structural feature called the San Luis Basin, which is a broad, east-dipping half graben that is hinged on the west in the San Juan Mountains and bounded on the east by the Sangre de Cristo Fault at the base of the Sangre de Cristo Range. The San Luis Basin is part of the Rio Grande Rift, a major intracontinental extensional feature from Mexico to central Colorado that originated about 26 to 27 million years ago late during the Oligocene Epoch.

The study area lies on the Baca Half Graben adjacent to the Sangre de Cristo Range to the east. Two major southeast-northwest-trending faults traverse the Baca Grant, in the western part of the property and at the base of the mountains to the east (known as the Sangre de Cristo Fault). Thrust faulting is a common feature in the east-central and northeast corner of the Baca Grant, in those areas east of the Sangre de Cristo Fault.

The *Geologic Map of Saguache County* (CGS Resource Series 44, 2007) was reviewed for an understanding of local surface and subsurface geologic conditions. According to the map, a

RARE EARTH SCIENCE

majority of the Baca Grant is comprised of Quaternary- to Oligocene-age rocks in the Santa Fe Group (Map Unit QTs), described as red sand and conglomerate, volcanic-rich conglomerate, and interbedded basaltic andesite flows in the lower part. Map Unit QTs ranges in thickness from 300 to 11,000 feet. Along the mountain front to the east, there are Holocene & Pleistocene glacial and alluvial surficial deposits (Map Units Qa and Qpt), along with Quaternary eolian deposits ([transverse & parabolic dunes] Map Units Qdt, Qdpf, and Qdpa) in the southeast corner of the Baca Grant in Great Sand Dunes National Park.

Bedrock Paleoproterozoic exposures in the rugged Sangre de Cristo Range along the east boundary and northeast corner of the Baca Grant include a broad area of mafic & felsic gneiss (Map Unit Xgn), and a lesser amount of quartz monzonite of Music Pass (Map Unit Xqm) found between Deadman and Pole Creeks. An overturned bed of Lower Mississippian to Upper Cambrian Leadville Limestone, Chaffee Group, Fremont Dolomite, Harding Quartzite, Manitou Formation and isolated patches of Sawatch Quartzite, undivided (Map Unit MOr) is also exposed at the Deadman Creek thrust fault, which forms an asymmetric east-verging anticline. The northeast corner (and highest reach) of the Baca Grant consists primarily of Middle or Upper Pennsylvanian & Lower Permian Sangre de Cristo Formation (Map Unit PPsc), with a lesser amount of Middle Pennsylvanian Minturn Formation (Map Unit Pm).

### 3.1. *Review of Regional Geology*

Precambrian rocks, also known as basement rocks, underlie the entire Baca Grant. They crop out in the Sangre de Cristo Range and are buried by younger rocks and deposits west of the mountains. Most of the Precambrian rocks are estimated to be around 1.7 billion years old. A thick package of younger rocks overlies these Precambrian rocks at the Baca Grant. A sequence of relatively thin clastic and carbonate rocks were deposited over the Precambrian during the lower and middle Paleozoic throughout much of Colorado, probably including the Baca Grant area. During the Pennsylvanian Period the Ancestral Rocky Mountains rose in a series of uplifted highlands and depositional basins developed between the uplifts. Lower and Middle Paleozoic rocks were stripped off the Ancestral Rocky Mountain highlands, and Pennsylvanian sediments accumulated in the basins.

Much, and perhaps all, of modern San Luis Valley was a highland during the Pennsylvanian Period (known as either the San Luis or San Luis-Uncompahgre highland). The exact eastern margin of the ancestral San Luis Highland is not well constrained. Lower and Middle Paleozoic rocks, as well as Pennsylvanian sediments are preserved in the Sangre de Cristo Range, so these areas were likely in the depositional basin known as the Central Colorado Trough, which lay east of the ancestral San Luis Highland.

During Late Cretaceous time, the Western Interior Seaway transgressed across the region depositing sand along the shoreline that would eventually become sandstone; mud beneath the bottom of the sea that would lithify into shale; and local deposits of limestone. These sediments would later become the source and host of much of the oil & gas in Colorado. More sediment was deposited as the seaway retreated from the area, including thick beds of peat on the landward side of the retreating seaway. The peat beds turned into coal as they were subsequently buried by younger sediment.

Mineral Assessment Report: Baca Grant No. 4 Property (Saguache County, CO)
August 1, 2011
Page 4 of 18

Another major period of mountain-building, the Laramide Orogeny, was initiated around 70 million years ago (mya). Rocks were again eroded off the uplifts, including the Mesozoic rocks, and sediment deposition occurred in adjacent basins. Modern San Luis Valley was again the site of an ancient mountain uplift whose boundaries are also poorly understood. Drill holes scattered across much of the San Luis Valley encountered Precambrian rocks beneath the Tertiary fill, indicating those locations were the site of the Laramide uplifts. However, two small remnants of the Mesozoic rocks reportedly crop out in arroyos cut into the alluvial fans in the vicinity of Deadman Creek on the Baca Grant, and Lexam has reported the existence of Mesozoic rocks in the subsurface beneath the Baca Grant based on their Baca Nos. 1 and 2 drill holes (discussed below in Section 4.2.1.) and geophysical studies, suggesting those areas did not undergo mountain uplift and erosional stripping of the Mesozoic sediment.

These Laramide uplifts formed in response to compressional squeezing of the earth's crust. This led to the development of large, low-angle, thrust faults along the flanks of the uplifts where Precambrian rocks were thrust up and over younger rocks. Scattered igneous intrusions were also emplaced during the Laramide Orogeny, which ended around 45 mya. Starting about 35 mya, widespread volcanism began in the San Juan Mountains west of the San Luis Valley.

Initially the volcanic activity involved andesitic lava flows and volcanic mudflows associated with stratovolcanoes. Rocks from this period of volcanism are commonly called the Conejos Formation; they extended eastward from the San Juan Volcanic Field, perhaps as far east as the Baca Grant. Around 30 mya the volcanism became more silicic and explosive, resulting in the formation of multiple calderas, many of which collapsed when large volumes of ash-flow tuff were violently erupted. Thick sequences of ash-flow tuff filled many of the collapsed calderas, and rapidly moving flows of ash flowed downslope away from the calderas, extending locally at least as far as the modern range front of the Sangre de Cristo Range. Available data suggest ash-flow tuffs may exist in the subsurface beneath the Baca Grant.

Minor precious metal deposits developed in and near the igneous intrusions associated with the Conejos Formation stratovolcanoes, and major precious metal deposits such as those at Creede, Bonanza and Summitville formed in and near the calderas. These types of metal deposits are unlikely to exist at the Baca Grant because neither the Conejos stratovolcanoes nor the calderas associated with the ash-flow tuffs are known to exist in the vicinity of the Baca Grant.

Starting about 27 to 26 mya, the earth's crust began to pull apart in response to east-west-directed extension. A major tear in the earth's crust called the Rio Grande Rift broke open from Mexico at least as far north as central Colorado. San Luis Valley coincides with one of the major structural depressions that formed along the rift, the San Luis Basin. Subsurface sediments and volcanic rocks in the San Luis Basin and beneath the Baca Grant property include Map Unit QTs along with other formations. Attached Figure 3 presents a geologic cross-section (from Brister & Gries, 1994), which depicts the subsurface geology in an east-west alignment just south of the Baca Grant. The cross-section indicates that Oligocene ash-fluffs likely overlie Precambrian rocks beneath much of the Baca Grant, and the western part of the property may have an eastward-thinning wedge of Oligocene Conejos Formation volcanics (mostly andesitic flows and volcaniclastic rocks) between the Precambrian rocks and the ash-flow tuffs. These

RARE EARTH SCIENCE

rocks were deposited in San Luis Basin prior to initiation of rifting; and, rift-related Map Unit QTs overlies the ash-flow tuffs.

## 4.  Evaluation of Mineral Resources

Although Rare Earth did not review land-title records or County assessor's records as part of this project, it is understood that Lexam holds an undivided 75% interest in the subsurface oil & gas rights, and ConocoPhillips owns the remaining 25% oil & gas interests on the 100,000-acre Baca Grant. Lexam also apparently holds 100% of the subsurface rights for all other minerals on the entire Baca Grant. According to Watts, et al (2006), 50% of the hard mineral rights were acquired from Baca Minerals, Inc. in 1987, and the other 50% interest in the hard mineral rights and 50% of the oil & gas rights were purchased from the Newhall Land and Farming Company in 1997. Lexam's additional 25% interest in oil & gas rights were acquired from the Baca Corporation in 1996.

For this project, mineral resources were evaluated on the Baca Grant where Lexam holds a majority interest in subsurface oil & gas rights, and 100% interest in the rights to other minerals. This study also includes a lesser amount of acreage to the west and north of the Baca Grant (in Townships 42 & 43 North, Range 10 East; and Township 43 North, Range 11 East) where Lexam apparently owns mineral rights (ranging from an undivided one-sixth to one-half interest) on a patchwork of Baca NWR and private lands (see attached Figure 2) totaling roughly 5,400 acres.

A number of information sources were reviewed for documented historical, or currently permitted, mining activities at the Baca Grant and adjoining properties, and for determining the likelihood of potential on-site mineral resources. For purposes of this report, "minerals" do not include surface water or groundwater. Mineral resources are typically divided by USGS and other Federal agencies into three distinct categories: locatable, leasable and saleable. Each of these categories is described in detail below in the following Sections 4.1., 4.2. and 4.3.

Examples of the geological & mineral-resource data sources utilized for this project include:

- *Mineral and Surface Management Status Map, Blanca Peak* (BLM, 2010);

- *Great Sand Dunes National Monument, Colorado: A Preliminary Literature Search, Inventory, and Assessment of Mines and Prospects in and near the National Monument with Emphasis on Potential Water Quality Degradation* (Colorado Division of Water Resources [DWR], 1995);

- *Colorado's Hydrothermal Resource Base - An Assessment* (CGS Resource Series 6, 1979);

- *Inventory of Nonmetallic Mining and Processing Operations in Colorado* (CGS Map Series 17, 1981);

- *Location Map and Descriptions of Metal Occurrences in Colorado with Notes on Economic Potential* (CGS Map Series 28, 1994);

RARE EARTH SCIENCE

Rvsd Plan - 00002559

- *Evaluation of Mineral and Mineral Fuel Potential of Saguache County, State Mineral Lands Administered by the Colorado State Land Board* (CGS Open-File Report 00-11, 2000);

- *Oil and Gas Fields Map of Colorado* (CGS Map Series 33, 2002);

- *Radioactive Mineral Occurrences of Colorado* (CGS Bulletin 40, 2005);

- *Coal Resource Maps of Colorado* (CGS Map Series 43, 2006);

- *Geology and Mineral Resources of Saguache County, Colorado* (CGS Resource Series 44, 2007);

- *Critical and Strategic Minerals - Can Colorado Play a Role?* (CGS Information Circular, 2011);

- BLM's National Integrated Land System transaction applications (online at www.geocommunicator.gov/GeoComm/index.shtm) and Land & Mineral Legacy Rehost 2000 System (online at www.blm.gov/lr2000/index.htm);

- DRMS database for active and inactive mines (online at www.mining.state.co.us/GIS%20Data.htm);

- COGCC database for oil & gas wells (online at www.oil-gas.state.co.us/);

- 7.5-minute series *Crestone, Deadman Camp, Deadman Camp Southwest, Hooper East, Medano Ranch, Moffat South, Sand Camp and Sheds Camp, Colorado* topographic maps (USGS, 1967-2010);

- *Mineral Resource Potential of the Sangre de Cristo Wilderness Study Area, South-Central Colorado* (USGS Miscellaneous Field Studies Map MF-1635-A, 1984);

- *An Assessment of the Mineral Resource Potential of the San Isabel National Forest, South-Central Colorado* (USGS Bulletin 1638, 1984);

- *Petroleum Geology and Hydrocarbon Plays of the Albuquerque-San Luis Rift Basin, New Mexico and Colorado* (USGS Open-File Report 87-450-S, 1988);

- *Copper and Uranium in Pennsylvanian and Permian Sedimentary Rocks, Northern Sangre de Cristo Range, Colorado* (USGS Bulletin 2116, 1995);

- *The Principal Rare Earth Element Deposits of the United States - A Summary of Domestic Deposits and a Global Perspective* (USGS Scientific Investigations Report 2010-5220, 2010);

RARE EARTH SCIENCE

Rvsd Plan - 00002560

- *Final Scoping Report - San Luis Valley Geothermal Leasing Analysis, Environmental Assessment and Resource Management Plan Amendment* (BLM San Luis Valley Public Lands Center, November 2010);

- *Environmental Assessment of Proposed Oil and Gas Exploration, Baca National Wildlife Refuge, Saguache County, Colorado* (USFWS, April 2011);

- *Tertiary Stratigraphy and Tectonic Development of the Alamosa Basin (Northern San Luis Valley), Rio Grande Rift, South-Central Colorado* (Brister & Gries [in Geological Society of America Special Paper 291], 1994);

- *General Geology of the Northern San Luis Valley, Colorado* (GEO-HAZ Consulting, 1996);

- *A Summary Review Including A Work Plan And Budget Proposal To Test Oil And Gas Prospects On The San Luis Basin Property, Colorado, USA - For Lexam Explorations Inc.* (Watts, Griffis and McOuat Limited, June 2006); and

- Personal communication with Federal- and State-agency geologists and permitting representatives, along with local geologist Robert Kirkham (GeoLogical Solutions [Alamosa, CO]).

The following sections present an overview of mining and drilling history in the Baca Grant vicinity along with a discussion of known/documented mineral resources, which primarily include precious metals and sand & gravel.

### 4.1. Locatable Minerals

This category includes all minerals for which exploration, production and development are regulated by the Federal General Mining Law of 1872, including most of the metallic minerals (e.g., gold, silver, copper, molybdenum, lead, rare-earth elements, zinc, tungsten, uranium, vanadium, etc.) and some industrial minerals (e.g., high-calcium limestone, gypsum, fluorite, perlite, vermiculite, pegmatite-hosted non-metallics, etc.). Locatable minerals are typically found in lode, vein, disseminated, or placer deposits. The known metallic-mineral deposits in Colorado have been widely studied and are well documented in the literature.

#### 4.1.1. Precious & Base Metals

The Baca Grant is located outside and southeast of the Colorado Mineral Belt, a 10- to 60-mile-wide southwest-northeast-trending zone of hydrothermal mineral deposits that extends roughly from the La Plata Mountains near Durango to the Front Range north of Boulder. However, the eastern part of the Baca Grant falls within two mineralized areas and named mining districts known as Crestone and Liberty (see attached Figure 4). The east-central boundary and northeast corner of the Baca Grant (comprised of both Rio Grande National Forest and privately-owned surface estates) contain both known and geologically-favorable areas for the occurrence of base & precious metal deposits. USGS has assigned a moderate potential for the

occurrence of locatable mineral deposits in this mineralized area following the northwest-trending fault zone on the east side of the Sangre de Cristo Fault.

Archaeological evidence in the Crestone area indicates that oxidized quartz veins containing limonite and pyrite were first worked by Spanish explorers (USGS, 1984). Mining activity peaked during the years 1880 to 1904 from numerous underground and placer mines throughout the surrounding mountainous and outwash areas. The largest mine and primary producer was the Independence Mine (also known as the Independent Mine) situated south of Spanish Creek in the northeast corner of the Baca Grant, about 4 miles southeast of Crestone in the mountain foothills. Between 1890 and 1900, several prospectors began mining operations in the Crestone area and produced precious metals worth approximately 7 to 8 million US dollars (CGS, 2007).

The former townsite of Duncan (approximately 9.5 miles southeast of Crestone on the east-central boundary of the Baca Grant, north of Pole Creek) was another base for mining operations in the area during the 1880's and 1890's. Since it was court-determined that mineral rights were privately owned on the Baca Grant, the trespassing miners were forced to relocate around 1900-1904 to the newly-created Liberty townsite about 1.4 miles southeast of Duncan and immediately east of the Baca Grant boundary. At least five different mining & milling companies operated out of Liberty until about 1915 at the Myrtle K, Aztac [sic], Irena A lode mines and the Revenue placer claim (DWR, 1995). The cyanide process was also used in the 1930's for gold extraction in the Crestone District prior to World War II. According to CGS 1,337 ounces of gold and 533 ounces of silver, plus minor amounts of copper and lead, were produced from the Crestone District between 1932 and 1939.

Mining in the Crestone and Liberty Districts is generally associated with northwest-trending quartz veins and thrust faults commonly found along the west flank of the Sangre de Cristo Range in Proterozoic rocks. The dominant mineral deposits are quartz-hematite and quartz-pyrite-chalcopyrite veins, with some of the veins having grades as high as 5 ounces of gold per ton (CGS, 2007). These polymetallic veins host important base & precious metals such as gold, silver, copper, lead, zinc and iron. Historic placer gold mining is also reported southeast of the Baca Grant in the Great Sand Dunes vicinity along Medano Creek in the 1927-1938 timeframe. The placer mining proved to be unsuccessful on a commercial basis.

Around 1990, Lexam's predecessor ("Challenger Gold Inc."; referred to as Lexam in this report) began prospecting for gold in the Deadman Creek area of the Baca Grant, about 8 miles southeast of Crestone, by drilling and sampling 42 shallow boreholes. Gold mineral deposits at this prospect are related to a low-angle detachment fault similar to that found at the San Luis Gold Mine, which is about 50 miles south in Costilla County (CGS, 2007). The Deadman Creek prospect is located in strongly silicified breccia of feldspar and quartz in a chloritic matrix; the gold is associated with pyrite, and the gold grades are as rich as 0.13 ounces per ton (CGS, 2007). Lexam had apparently obtained a DRMS prospecting permit (No. P1992-002) for this project; however, no information was available in the online DRMS database. Rare Earth also contacted DRMS' Grand Junction office and was told that these prospecting files were confidential and could not be released to the public. Therefore, no actual borehole or assay data were available for review.

Another large, historic mine in the Baca Grant vicinity is the Orient Mine, approximately 15 miles north in Section 25, T46N, R10E. The Orient Mine was the only commercially important iron mine ever developed in Colorado (CGS, 2000). The mine produced about 2 million tons of iron ore (limonite) from an oxidized replacement deposit in a sheared zone in the lower part of the Mississippian Leadville Limestone, just east of the Sangre de Cristo Fault. Colorado Fuel & Iron Company (CF&I) acquired the mine in 1880 and shipped the iron ore to their Pueblo smelter via railroad until 1905, when there was an apparent exhaustion of high-grade ore. The mine was operated intermittently by CF&I and other lessees until 1931. According to USGS, the Orient Mine still contains identified resources estimated at 5 million tons of 43 percent iron.

The most recent mining permit identified in the DRMS database for the surrounding area was issued in 1981 at the Blue Moon Mine, about 10 miles north of the Baca Grant (in the SE ¼ of the NE ¼ of Section 20, T45N, R11E). This was a small gold, silver and copper operation owned by Demure Mining Company, Inc. (Villa Grove, CO) on 9.8 acres of Rio Grande National Forest land. The permit has since been revoked & terminated by DRMS. The nearest active gold & silver mine listed in the DRMS database is Indian Creek Mining Corporation's Profitt Mine, located near the Bonanza District (T47N, R7E in northeastern Saguache County), more than 28 miles northwest of the Baca Grant.

### 4.1.2. Other Locatable Minerals

Historically, Saguache County has been a fairly large uranium-producing county in Colorado, primarily from the Cochetopa, Marshall Pass, and Kerber Creek mining districts. The nearest active uranium mine listed in the DRMS database is Homestake Mining Company's Pitch Project, located in the Marshall Pass Uranium District (T48N, R6E in northern Saguache County & southern Gunnison County), more than 35 miles northwest of the Baca Grant. Open-pit mining at the Pitch Project occurs in the Pennsylvanian Belden Formation on or near the Chester Fault, which displaces Precambrian rocks against remnants of Paleozoic rocks (CGS, 2007).

Other favorable uranium host rocks in Saguache County include the Lower Cretaceous Dakota Sandstone and Jurassic Morrison Formation. There are small USGS-reported occurrences of uranium mapped about 2 miles northeast of Crestone, known as the historic Mercury-Alpine and Venus 1-14 claims (in Section 33, T44N, R12E); and 1.5 miles east of the Baca Grant in Custer County at the King Midas, Damn Fool and Bonanza claims near the east foot of Crestone Needle (in Section 17, T24S, R73W). These uranium occurrences are typically found in bedded carbonaceous sandstone deposits of the Permian Sangre de Cristo Formation. According to CGS, there are no reported uranium occurrences in nearby Alamosa County.

No actively-permitted rare-earth elements (REE) mines were identified in the study area or in Colorado. The geology of this study area in the San Luis Valley and north-central Sangre de Cristo Range does not fit the USGS profile for REE occurrences on a commercially-minable scale. The majority of viable REE deposits in Colorado are found in Fremont, Gunnison and Moffat Counties. USGS classifies the major United States REE deposits as occurring only in four distinct geologic associations:

- Carbonatites & alkaline igneous complexes;

- Veins related to alkaline intrusions;
- Some iron-ore deposits associated with magmatic-hydrothermal processes; and
- Stream and beach deposits (placers) derived from the erosion of alkaline igneous terranes.

Pegmatites (i.e., dike- or vein-like features characterized by coarse grain sizes & interlocking crystal texture with bulk feldspar, high-purity quartz, and several mica minerals) are known to intrude Proterozoic rocks found north-northwest of the Baca Grant in the Crestone District on the west flank of the Sangre de Cristo Range. CGS reports that small amounts of thorium, REE, uranium and vanadium were produced from pits at the Bob Cat Mine pegmatite area, about 4 miles north of the Baca Grant. Accessory minerals in pegmatites can also include beryl, lithium, garnet, and tourmaline. In Colorado, the known REE mineral deposits in pegmatites are found in Chaffee County (Mount Antero) and Jefferson County (South Platte Pegmatite District).

Outcrops of high-purity limestone & dolomite are also known to be present east of Villa Grove and in the Hayden Pass area. However, these resources are probably not economically competitive with larger deposits found close to railroad & highway transportation routes, and commercial markets, near Salida and along the Arkansas River valley to the north.

No currently-permitted locatable mineral operations were identified in the DRMS database for the study area in Saguache County, or nearby lands in Alamosa and Custer Counties. At the time of preparing this mineral assessment report, no plans, permits or proposals were identified for metallic-mineral, REE, uranium or other locatable-mineral mining operations that would impact the Baca Grant.

### 4.2. *Leasable Minerals*

This category includes oil, natural gas, coal, coalbed methane, oil shale, geothermal energy, and several other minerals (e.g., potash, sodium, phosphate, native asphalt, bitumen or bituminous rock, etc.). These minerals are defined as "leasable commodities" by the Mineral Leasing Act of 1920 and the Geothermal Steam Act of 1970.

#### 4.2.1. *Oil & Gas Resources*

According to CGS, Saguache County does not contain any commercial oil & gas resources. A total of 17 oil and gas wells were drilled in the County since the early 1920's, mostly in the San Luis Basin, with total depths ranging from 365 to 12,000 feet. All failed in discovery of producible hydrocarbons and accordingly all these wells were plugged and abandoned. The only productive oil well in the San Luis Basin was the Kirby Jynnifer No. 1, which was drilled in 1985 just south of the Saguache County line in Section 9, T40N, R 5E. This well produced 30 barrels of oil per day from a volcanic sill in the Cretaceous Mancos Shale. (CGS, 2000 & 2007)

No oil & gas fields have been mapped in the area by USGS & CGS or are known to underlie the Baca Grant. A search of the COGCC database revealed two wells that were drilled on the Baca Grant by Lexam in September & October 1995. Both wells are reported as dry & abandoned, meaning they were either "dry holes" (with no hydrocarbons) or unable to produce marketable quantities of oil and/or gas. The wells, known as Baca Nos. 1 & 2, were drilled immediately west

RARE EARTH SCIENCE

of the Deadman Creek area (see attached Figure 2) where Lexam had performed its gold prospecting program that was discussed previously in Section 4.1.1. of this report. During their gold prospecting activities in 1992 & 1993, Lexam apparently encountered biodegraded crude-oil shows in several (either 17, 27 or 28, depending upon the publication) of the 42 shallow boreholes that were drilled in breccia and fractured gneiss.

At the time, Lexam's laboratory analysis claimed that the crude oil was sourced from Cretaceous sediments underlying the thrust-fault zone. Lexam also claimed that they had identified surface outcrops of Jurassic-Cretaceous sediments (i.e., Morrison Formation, Dakota Sandstone, and Mancos Shale) along the west flank of the Sangre de Cristo Range. Portions of these outcrops have apparently been viewed by local geologists and NPS employees.

The Baca Nos. 1 & 2 wells were drilled as wildcats to explore the underlying Cretaceous section on the Deadman Creek block. Both wells encountered a thin, faulted section of Mancos Shale in the hanging wall of the detachment fault, and traces of biodegraded oil were observed in thick intervals (including the Santa Fe Formation, Mancos Shale, and Precambrian gneiss) of both wells. The strongest oil shows were present in a 350-foot interval of the Baca No. 2 well starting at 6,620 feet. (Watts, et al, 2006)

According to the COGCC well-completion reports, the Baca No. 1 was drilled to a total depth of 4,322 feet into Precambrian rock, with 3,566 feet of overlying Santa Fe Formation and 18 feet of Mancos Shale. And, the Baca No. 2 was drilled to a total depth of 6,932 feet into Precambrian rock, with 6,272 feet of Alamosa & Santa Fe Formations and 115 feet of Mancos Shale. The COGCC completion report indicates that the Baca No. 2 was converted to a water well. DWR records show that the well was abandoned by Lexam to a depth of 1,000 feet and converted to a monitoring well for use by Stockman's Water Company.

Lexam continued their evaluation of the Baca Grant though geophysical exploration programs in 1996 and 1998-2004. From this data they delineated the Crestone Prospect, which was further divided into eastern and western fault blocks known as the Crestone East and Crestone West Prospects. Between 2000 and 2009, Lexam filed COGCC Applications for Permit to Drill (APDs) on five single-zone gas wells located generally 6-7 miles northwest of the Baca No. 2 in the newly-created Baca NWR. Baca Nos. 3 & 4 are identified by COGCC as abandoned locations, and Baca Nos. 5-7 all have expired APDs as of May 2010.

The Baca Nos. 5 & 7 wells (see Figure 2) became the subject of the USFWS' April 2011 Environmental Assessment (EA) for proposed oil & gas exploration in the Baca NWR. Lexam's proposal calls for two 14,000-foot-deep vertical wells with the Dakota Sandstone as the objective formation on the Crestone East Prospect. Their 2006 *Work Plan and Budget Proposal* estimated the costs for drilling & completion of one of these wells to be roughly $8.8 million. It should be noted that two of the three authors of the work plan & budget include a former Lexam employee (Tom Watkins) and a Lexam shareholder (Kim Parsons). On April 1, 2011 USFWS issued a Finding of No Significant Impact (FONSI) for Lexam's drilling proposal. A FONSI is issued when the environmental analysis & interagency review find a project proposal to have no significant impacts on the quality of the environment.

RARE EARTH SCIENCE

Mineral Assessment Report: Baca Grant No. 4 Property (Saguache County, CO)
August 1, 2011
Page 12 of 18

The EA's preferred alternative outlines 43 terms & conditions to be imposed upon Lexam by USFWS in addition to those required by COGCC and Saguache County, which ensure the exploration program will not have a significant impact on the natural and human environment. Of particular interest are those measures intended to minimize disturbance to wildlife by restricting the seasons of exploration activity to reduce or eliminate interference with migratory bird breeding and big game calving; minimize the risk of ground and surface water contamination; minimize or eliminate impacts to wetland habitat, sensitive fish populations and plant types; reduce probability of noxious weed infestations; manage fugitive dust; and reduce air, noise and light pollution from exploration activities. Appendix D of the final EA contains a full description of the required protective measures. (USFWS, 2011)

About half of the Baca Grant is mapped as "Sensitive Wildlife Habitat" (SWH) for all species, and the northeast high-elevation corner and Sand Creek drainage corridor are mapped by COGCC as "Restricted Surface Occupancy" (RSO), as defined and regulated by their 1200-Series Rules. These rules require oil & gas operators to consult with the Colorado Division of Wildlife, the surface owner, and the COGCC Director whenever a new oil & gas location is proposed in SWH or RSO areas. The proposed Baca No. 5 well location is included in the SWH area.

According to CGS, Saguache County is considered to have only two hypothetical hydrocarbon plays: the San Luis Valley Biogenic Gas Play, and the San Juan Sag. The gas play covers an elongate area about 70 miles long and 20 miles wide in the east-central part of the San Luis Valley where shallow biogenic gas has been historically produced from the underlying Alamosa Formation. Whether or not a commercial accumulation of gas exists in this play is speculative. The San Juan Sag is located on the west side of the San Luis Valley in hydrocarbon traps found below a thick section of volcanic rocks along the foothills of the San Juan Mountains. The Sag extends from the Del Norte area westward beneath the San Juan volcanic field and connects with the San Juan Basin. The San Juan Sag in Saguache County is considered to have a fair potential for hydrocarbon accumulations (CGS, 2000).

No active Federal oil & gas leases are indicated on adjoining lands with Federal-owned oil & gas rights. As mentioned above, the only reported hydrocarbon production activity in the regional area was the Jynnifer No. 1 well located in the small Del Norte Field, about 33 miles west-southwest of the Baca Grant. Due to sub-economic production, the well was abandoned in July 1998 by Faith Energy Exploration Inc. (Ennis, TX); however, the wellsite has yet to be reclaimed. The nearest oil and/or gas production occurs about 32 miles northeast in the Florence-Cañon City Field in Fremont County, where oil is produced from numerous wells in the Upper Cretaceous Pierre Shale. The Sheep Mountain Field (more than 20 miles southeast in Huerfano County) has also produced more than a trillion cubic feet of carbon dioxide ($CO_2$) since its discovery in 1971.

### 4.2.2. Coal Resources

No on-site or nearby coal mines, coal fields, or coalbed methane operations were identified in the CGS, DRMS, or USGS literature. The Upper Cretaceous Vermejo Formation or Mesaverde Group coal-bearing intervals do not underlie the Baca Grant, nor is coalbed methane known to be present beneath the area. The nearest historic coal mines are located more than 35 miles

RARE EARTH SCIENCE

east-northeast in the Cañon City Coal Field in Fremont County, where coal was produced from more than 175 mines in the lower part of the Vermejo Formation. In 2000, the last underground mine in the field closed, ending 122 years of continuous coal production. The nearest, active coal mining currently occurs more than 60 miles southeast of the Baca Grant at the New Elk Mine located west of Trinidad in Las Animas County (in the Trinidad Coal Field).

### 4.2.3. Other Leasable Minerals

Because the Rio Grande Rift is characterized by high heat flow, there are several geothermal springs identified in the San Luis Valley. The nearest geothermal resource is located about 2.5 miles northeast of Hooper in Section 27, T41N, R10E, known as the Sand Dunes Swimming Pool Hot Water Well. The operation includes public pools, a restaurant, and RV/camping facilities. The hot-water well was originally drilled as an oil & gas test by San Luis Valley Oil & Gas Company in 1924, to a total depth of 4,308 ft in the deepest part of the San Luis Valley where there are 20,000+ feet of valley-fill sediments.

This artesian well flows at a rate of 340 gallons per minute and can be pumped at a rate of 1,480 gallons per minute; the temperature of the water flowing from the well is 111° to 115° F (CGS, 2007). In 1979, CGS estimated that this is a sedimentary reservoir with an areal extent of approximately 1.5 square miles around the well. More than 10 miles north of the Baca Grant (and east of the town of Saguache), Valley View Hot Springs and Mineral Hot Springs are also developed as spa resorts for public use.

The Baca Grant is not currently identified by BLM as a known geothermal leasing area or geothermal lease nomination area. However, BLM and USFS lands in Colorado include about 5.8 million acres that are open to geothermal leasing. And, there are current nominations for geothermal leases in Chafee and Gunnison Counties on both public & private lands with Federal mineral estates. The San Luis Valley Public Lands Center is also currently preparing an EA to consider whether to issue geothermal leases. The EA includes an amendment to BLM's San Luis Resource Management Plan, which is necessary since their 1991 plan did not adequately address geothermal resources.

### 4.3. Saleable Minerals

This category includes both nonmetallic and several industrial minerals (e.g., dimension stone, sand & gravel, clay, petrified wood, volcanic cinders, etc.), falling under the purview of the Materials Act of 1947 and the Multiple Surface Use Mining Act of 1955. None of these commodities has been commercially mined at the Baca Grant according to the CGS, DRMS and USGS literature reviewed for this report, other than possible small historic borrow-pit areas that were utilized for extraction of road-fill material during construction of local ranch roads.

According to DRMS, the nearest active sand & gravel mine (known as the Skoglund Pit) is located about 2 miles north of the Baca Grant in the SE ¼ of Section 34, T44N, R11E, in Pleistocene outwash (Map Unit Qpf) and Holocene/Pleistocene eolian sand (Map Unit Qes) deposits found south of San Isabel Creek. This 30-acre pit is operated by Skoglund Excavating Inc. near Crestone and was permitted by DRMS in 1997 under Permit No. M1996089. Another nearby pit (about 3.5 miles southwest of the Baca Grant near Hooper) is identified as the Curtis

RARE EARTH SCIENCE

Pit in the SE ¼ of Section 33, T41N, R10E. This 9.5-acre pit is operated by the Colorado Department of Transportation near Highway 17 and was permitted by DRMS in 1985 under Permit No. M1985084. The pit appears to be located in similar geologic materials as those found at the Baca Grant (i.e., Map Unit QTs).

Local streams have created large alluvial-fan gravel deposits where they emerge from steep mountain fronts into the San Luis Valley, and there are large deposits of valley-fill alluvium (i.e., common varieties of sand & gravel, with abundant silt & clay in Map Unit QTs). However, all of these resources have only been used to a very small degree due to the remoteness of major population and growth centers to the County (CGS, 2000). Saleable minerals generally have a low unit value (i.e., value per ton), and their exploitation is dependent on easy access to transportation and local markets.

USGS also reports that a small vein near Crestone was historically worked for decorative quartz. Pegmatites and gneiss (and other Precambrian rocks) can be utilized for decorative materials or building stone. No clay, dimension stone, high-purity silica sand (i.e., oil- & gas-field fracking sand) or other saleable mineral mining activities were identified near the Baca Grant.

## 5.  *Conclusion*

Rare Earth prepared this MAR for the Baca Grant property located within southeast Saguache County in south-central Colorado. The project included a review of published documents related to historical and currently-permitted mining and drilling operations for the study area. This report is intended to provide an overview of the various mineral resources and the mineral-development potential for those areas of Lexam's holdings on and near the Baca Grant. Based upon our findings during this MAR process, we conclude the following:

### 5.1. *Oil & Gas Resource Development Potential*

The potential for commercial oil & gas reserves beneath the Baca Grant is reliant on limited data and is the subject of geologic controversy regarding the likelihood of underlying Cretaceous sediments. Unfortunately, the controversy between Lexam's data and the published literature extends beyond the scope and budget of this MAR. The reality is that Lexam's former attempt at locating oil & gas by drilling the Baca Nos. 1 & 2 wells proved unsuccessful, and other geologic studies in the area by CGS and USGS have similarly concluded that there is a low probability of discovering commercial oil & gas reserves at the Baca Grant. In January 2005, BLM prepared a *Mineral Potential Report* as part of a land-exchange program which involved approximately 61,000 acres of State-owned surface and mineral estates located west and south of the Baca Grant, including adjoining lands to the west. BLM stated that the oil & gas resource potential on these lands was low, based upon insufficient data; however, they concluded that "the lands are prospectively valuable for oil and gas."

As owner of the subsurface oil & gas rights on the Baca Grant and other nearby & adjoining lands, Lexam is entitled to make continued use of the surface lands for exploration activities according to Colorado's split-estate laws. Since their failed attempt at locating oil & gas in 1995, Lexam has committed additional resources for acquiring seismic data and preparing well-planning and -permitting documents. In our opinion, this could be viewed as: A) a method of

RARE EARTH SCIENCE

attracting potential investors for funding drilling on the high-risk Crestone East Prospect; B) a way to justify the valuation of underlying mineral rights on the Baca Grant; or, C) a legitimate attempt at locating previously undiscovered oil & gas resources in the San Luis Valley.

Because a majority of the surface estate at the Baca Grant is owned by the Federal government, there are additional protections in place for wildlife and surface usage as prescribed by USFWS, USFS and NPS. Given the high level of concern for protection of wildlife and their habitat on these lands, not to mention protection of water quality & quantity, any future drilling plan at the Baca Grant would be carefully evaluated by those Federal agencies along with COGCC and possibly the Colorado Division of Wildlife.

As evidenced by USFWS' recent EA for the proposed Baca Nos. 5 & 7 wells, this results in increased overall costs for Lexam and longer time frames to complete the necessary site analysis and permitting process; stricter conditions on siting well pads, roads, flow lines and other infrastructure; and stringent mitigation measures. Further complicating the situation and increasing any production costs are the lack of hydrocarbon infrastructure and transportation (i.e., pipelines) options in the San Luis Valley. All of this adds up to an expensive and challenging location for economical recovery of hydrocarbons.

Future oil and/or natural-gas exploration activities are very difficult to project & predict since they are primarily market-driven. Lexam's APDs for the Baca Nos. 5, 6 and 7 wells expired in May 2010. And, as of July 26th, Lexam has filed for COGCC bond release on the Baca Nos. 6 & 7 wells, which are now shown as "abandoned locations." Lexam would need to resubmit an APD to COGCC in order to restart the permitting process for the Baca No. 5 well. The COGCC website and permitting records should be monitored for future oil & gas activities that may adversely affect the Baca Grant and adjoining lands. This also includes the potential for additional geophysical or seismic exploratory programs.

Since ConocoPhilips owns 25% of the oil & gas rights on the Baca Grant, their involvement in the Crestone East Prospect should also be evaluated. Oil & gas operators sometimes have lease agreements and funding mechanisms amongst themselves, which are not recorded or transparent to the public. ConocoPhillips' level of interest or involvement for oil & gas exploration on the Baca Grant is unknown. The Saguache County Assessor's records should also be checked for the status of Lexam's mineral-estate tax assessments.

### 5.2. _Metallic Mineral Resource Development Potential_

There is a moderate to high potential for the occurrence of metallic mineral deposits (predominantly gold & silver, with lesser amounts of copper & lead) along the east-central boundary and northeast corner of the Baca Grant property (primarily in the Rio Grande National Forest [Baca Mountain Tract] and underlying parts of the Baca Grande Subdivision), due to identified resources and nearby historic mining activity in the Crestone and Liberty Districts. The development potential is also moderate to high, based largely on the sustained high market price for gold (currently at $1,630 per ounce). Typically, as market prices rise and fall, so do the levels of exploration & production. Additionally, Lexam has already acquired on-site borehole and assay data from their previous exploration activities in the Deadman Creek area during the early 1990's, and CGS reports gold grades up to 0.13 ounces per ton on the Lexam prospect.

RARE EARTH SCIENCE

The viability of any mineralized area is usually dependent more on economic factors rather than local geology. USGS describes typical impediments to future hard-rock mining that include: A) lack of mining infrastructure, including mills and mining experience; B) fluctuating market prices for metals; and C) societal resistance to mining and fear of environmental pollution from mining. In order for commercial mining of vein deposits to produce a significant tonnage, a large mining & milling operation is mandated.

Because of the mixed surface land status in the Baca Grant area (i.e., Baca NWR, Great Sand Dunes National Park, private lands, nearby Sangre de Cristo Wilderness), a large mining & milling operation would face enormous public resistance and a lengthy permitting process. Modern-day gold-mining operations in the regional area (including Galactic Resources' Summitville mine [to the southwest in Rio Grande County] and the Battle Mountain/Newmont San Luis Project [to the south-southeast in San Luis County]) have all realized severe environmental limitations due to permitting & litigation costs, surface- and groundwater contamination, and mine waste disposal issues.

It is likely that many of the historic mining operations in the Baca Grant area have extracted the highest-grade ores; however, small-scale mining of local pockets of rich ore may be viable, particularly if an operator can find a way to mill and smelt their ore off site. At the time of preparing this MAR, no plans, permits or proposals were identified for metallic-mineral mining operations that would impact the Baca Grant property.

### 5.3. *Aggregate Resource Development Potential*

There is a moderate to high potential for large deposits of aggregate in Map Unit QTs at the Baca Grant property; however, the commercial demand is deemed to be fairly low. It is not known whether these mineral rights for common varieties of sand & gravel are united with the current surface estate (which includes the Federal government and other private landowners), or owned by Lexam. Typically in Colorado, the mineral rights for sand & gravel remain united with the current surface estate unless those rights have been expressly reserved in mineral deeds affecting the Baca Grant. However, a legal opinion would be necessary in order to make that determination.

It is our opinion that commercial sand & gravel mining would not be a permissible or permittable activity at the Baca Grant since an access agreement, lease or easement (i.e., a legal "right-to-enter") must be in place with all affected landowners prior to DRMS issuing a mining permit.

### 5.4. *Geothermal Resource Development Potential*

There is also a moderate potential for private development of geothermal resources beneath the Baca Grant property. Subsurface geothermal fluids are considered to be part of Colorado's groundwater resources, and are therefore administered by the State Engineer. As a result, well drilling for direct-use geothermal projects (e.g., greenhouse heating, warm-water aquaculture, space heating, swimming pools & and spas) is regulated by DWR. However, it is our opinion that private development of geothermal resources for direct-use or electrical power generation would not be a compatible use with the existing surface estates on the Baca Grant.

RARE EARTH SCIENCE

Mineral Assessment Report: Baca Grant No. 4 Property (Saguache County, CO)
August 1, 2011
Page 17 of 18

The Geothermal Steam Act of 1970 also authorizes BLM to lease development rights to the "heat" of the public's mineral estate which could, at some point, potentially affect lands adjoining the Baca Grant with Federal subsurface mineral ownership. SLVEC or other stakeholders should continually monitor the BLM geothermal EA process and their leasing & permitting activities on adjoining lands, which have the potential to adversely affect the surface and subsurface of the Baca Grant.

We appreciate the opportunity to provide SLVEC with these mineral assessment services. Please contact me at 970/241-1762 or jim@rareearthscience.com if you have any questions or need additional information about the content of this report.

Respectfully Submitted,

**Rare Earth Science, LLC**

James C. Armstrong
Principal Geologist

cc:      J. Corzine (TPL)

Attachments

- Preparer's Qualifications
- Figure 1 - Locator Map
- Figure 2 - Lexam Mineral Rights
- Figure 3 - Geologic Cross Section
- Figure 4 - Map Showing Mineralized Areas

RARE EARTH SCIENCE

Rvsd Plan - 00002571

Mineral Assessment Report: Baca Grant No. 4 Property (Saguache County, CO)
August 1, 2011
Page 18 of 18

## *Preparer's Qualifications*

James Armstrong is a professional geologist with 18 years residency in Colorado, and has lived in Grand Junction and Gunnison since 1998. He received a BS in Petroleum Geology from Kansas State University in 1983, and completed additional graduate-level coursework in environmental and natural resource studies at the University of Alaska/Anchorage. Mr. Armstrong spent 7 years working in various private-industry technical positions related to oil and gas exploration & production, geophysical consulting, and petroleum refining & marketing operations in the central U.S., Texas and the Gulf of Mexico.

Since 1990, he has been employed as a consulting geologist and environmental scientist serving oil & gas, mining, private-sector, non-profit, and government-agency clients in Alaska, Hawaii, and the central & western United States. Mr. Armstrong is accomplished in field studies, mineral-reserve evaluations, project management and regulatory compliance, and has prepared numerous mineral assessment reports for conservation-easement and habitat-protection projects. He has completed mineral studies for a diverse client base in south-central Colorado that includes Colorado Division of Wildlife, Colorado Open Lands, Costilla County, Orient Land Trust, Rocky Mountain Elk Foundation, and The Nature Conservancy. Mr. Armstrong is the founder of (and a partner in) Rare Earth Science, LLC.

RARE EARTH SCIENCE

Rvsd Plan - 00002572



Locations of boundaries and
features are approximate.

Base Map Source:
http://services.arcgisonline.com/
World Base Map

**Legend**

□ Luis Maria Baca Grant No. 4
⬚ Additional Lexam Mineral Holdings

**Figure 1: Locator Map**
Baca Grant No. 4

July 25, 2011



N

1:620,000

0            15
⊢━━━━━━┥ Miles

Rare Earth Science, LLC
PO Box 4523
Grand Junction, CO 81502
Phone: 970/241-1762

Rvsd Plan - 00002573



Locations of boundaries and
features are approximate.

Base Map Source:
http://services.arcgisonline.com/
USA Topographic Map

**Figure 2: Lexam Mineral Rights**
Baca Grant No. 4

July 25, 2011

### Legend

| Symbol | Description | Symbol | Description |
|---|---|---|---|
| ⊕ Dry and Abandoned Lexam Wells | | Baca National Wildlife Refuge | |
| ⊙ Proposed Lexam Well Locations | | Great Sand Dunes National Park | |
| Luis Maria Baca Grant No. 4* | | Rio Grande National Forest | |
| Additional Lexam Mineral Holdings** | | TNC Conservation Easement | |

\* Lexam 75% / ConocoPhillips 25% oil & gas rights; Lexam 100% other mineral rights
\*\* Varying percentages of mineral rights



N

1:160,000

0 _____ 4
Miles

Rare Earth Science, LLC
PO Box 4523
Grand Junction, CO 81502
Phone: 970/241-1762



Rvsd Plan - 00002574



Rvsd Plan - 00002575



# Indicators of Wildness: Using Attributes of the Land to Assess the Context of Wilderness

**Gregory Aplet**
**Janice Thomson**
**Mark Wilbert**

**Abstract**—Land can be described in a space defined by two fundamental qualities: naturalness and freedom. The axis of naturalness describes the wholeness of the ecosystem relative to a historical norm, while the axis of freedom describes the degree to which land remains outside of human control. Some land can be natural but not free, and vice versa, but the most natural and free are the most wild — they are the lands we recognize as wilderness. These concepts are illustrated through the mapping of indicators of wildness, derived from readily available data in a Geographic Information System.

The past few years have witnessed considerable attention to conceptions of wilderness. Generally, this attention has taken the form of a "debate" between critics of wilderness as *idea* on one side and defenders of wilderness as *place* on the other (see for example, Callicott and Nelson 1998). Critics contend that white, male, American minds have produced a concept that separates humans from nature, denigrates native peoples, and freezes ecosystems in time. Defenders point out all the myriad values, including wildlife habitat, watershed protection and spiritual healing, provided by the places we call wilderness and conclude that wilderness therefore must be good. Both sides assume they understand what they mean by wilderness; neither states it clearly.

Robert Marshall begins his classic 1930 essay, *The Problem of the Wilderness*, "It is appalling to reflect how much useless energy has been expended in arguments which would have been inconceivable had the terminology been defined." Seventy years after Marshall offered his observations, it appears we are still suffering from the same misunderstandings. The debate over the value of wilderness is being conducted without a common understanding of its meaning. Before any more "useless energy" is expended, it is worthwhile to stop and consider what exactly we mean by wilderness.

One of the first places to look, of course, is the Wilderness Act itself. The Act (Public Law 88-577) defines wilderness straightforwardly enough as:

...an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

But this is a carefully crafted legal definition resulting from years of debate and compromise. Surely, we are not to believe that all the places wild enough to count as wilderness are limited to federal land. And why 5,000 acres? These are legal constraints necessary for the implementation of the Wilderness Act. A general definition of wilderness remains elusive.

In his exploration of the legislative direction provided by the Wilderness Act, ecologist David Cole (1996) notes that wilderness is expected to be both "untrammeled," or uncontrolled and free, and "pristine," or "what would have existed in the absence of post-aboriginal humans." Cole concludes that these two goals provide conflicting direction for managers, as manipulation is often needed to repair damage caused by overuse, exotic species invasions, fire exclusion and other processes that have altered ecosystems away from natural conditions. Cole argues that these goals are "to some extent mutually exclusive" and suggests that we must choose one or the other of these goals to emphasize when managing wilderness.

Alternatively, Aplet (1999) suggests that these two outcomes, freedom and naturalness, rather than providing conflicting direction, actually describe two independent qualities of wilderness. Wilderness is that portion of the land that is most wild, and wildness is a function of both naturalness and freedom from human control. This dualistic nature of wildness can be illustrated with a simple figure (fig. 1) that represents landscapes in the two-dimensional space created by freedom and naturalness. In this conception, wildness increases in two directions: from the controlled to the "self-willed" along a gradient of freedom, and from the artificial to the pristine along a gradient of naturalness. At the most controlled and artificial ends of the continuum are the least wild lands – the built environment of the city. Where freedom and naturalness are highest is the wilderness, regardless of size or ownership. In between, lands can possess any combination of freedom and naturalness, and an intermediate

In: McCool, Stephen F.; Cole, David N.; Borrie, William T.; O'Loughlin, Jennifer, comps. 2000. Wilderness science in a time of change conference—Volume 2: Wilderness within the context of larger systems; 1999 May 23–27; Missoula, MT. Proceedings RMRS-P-15-VOL-2. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Gregory Aplet is Forest Ecologist and Director, Center for Landscape Analysis, The Wilderness Society, 7475 Dakin Street, Suite 410, Denver, CO, 80221 U.S.A. Janice Thomson is Remote Sensing Coordinator and Mark Wilbert is GIS Analyst, Center for Landscape Analysis, The Wilderness Society, 1424 Fourth Ave., Suite 816, Seattle, WA, 98101 U.S.A.

Rvsd Plan - 00002577



**Figure 1**—The "continuum of wildness." Wildness increases as a function of both its naturalness and its freedom from human control.

degree of wildness. All lands fall somewhere within this two-dimensional continuum of wildness.

If wilderness is that portion of the landscape that is most natural and free, it follows that the wilderness manager's job is to maximize *simultaneously* both of these characteristics. This is where the job becomes difficult, and tradeoffs arise. Maintaining freedom may compromise naturalness — for example, where exotic species are allowed to invade from the outside. Likewise, restoring natural conditions often requires bringing the land under tighter control. Just like the parent who simultaneously struggles to instill discipline and independent thought, the key for managers is to strive always toward both goals. When intervention is required, heed Wilderness Watch president Bill Worf's good advice: "Manipulation should generally be limited to those minimum actions that will establish conditions that will allow natural processes to hold sway once again" (Worf 1997).

These qualities of freedom and naturalness help clarify what we mean by wildness, but they themselves are rather vague descriptors that cry out for further explanation. Managers need to know what exactly to pay attention to in order to achieve these twin goals. The remainder of this paper is devoted to exploring the attributes of the land that contribute to its naturalness and freedom from control. Ultimately, we would like to be able to measure these qualities to ensure that we are protecting and sustaining the wildness of wilderness. The measurement of wildness raises the possibility of mapping the wildness of the land, and this paper presents the results of some recent progress toward this goal and discusses how this method differs from other approaches to mapping our precious wild places.

## Indicators of Wildness

Throughout the history of the idea, wilderness has been thought of both as a place *that* is free and as a place *in which* to be free. In other words, wilderness has been thought of both as a real place and as an experience. For example, Nash (1982) notes the value of wilderness to the Romantics of the

19th century as a place to escape the stranglehold of civilization. In contrast, The Wilderness Act speaks of wilderness as "an area where the earth and its community of life are untrammeled by man," suggesting that it is the land itself that is free in wilderness. While wilderness will likely always be highly valued for the experience it provides, it is this second sense, the character of wild land itself, that is the focus of the following discussion.

Though perceptions of wildness vary with each individual, there appears to be a limited set of characteristics that contribute to the freedom and naturalness of a place. Generally, the literature exploring wild land characteristics suggests that the attributes of the land that contribute to its freedom are 1) the degree to which land provides opportunities for solitude, 2) the remoteness of the land from mechanical devices and 3) the degree to which ecological processes remain uncontrolled by human agency. The attributes that contribute to the naturalness of the land are 1) the degree to which it maintains natural composition, 2) the degree to which it remains unaltered by artificial human structure and 3) the degree to which it is unpolluted. Each of these attributes need not exist at an absolute maximum in wilderness, but, collectively, they define the qualities of freedom and naturalness and therefore facilitate the measurement of wildness.

## Solitude

Solitude has been described as "the opportunity to meet the wilderness, or its maker, personally, quietly, on terms only you prescribe" (Whitney 1997). The "outstanding opportunities for solitude" afforded by wilderness have long been recognized as a key part of the "wilderness experience." Thoreau (1862) enjoyed his opportunity to "walk ten, fifteen, twenty, any number of miles, commencing at my own door, without going by any house, without crossing a road except where the fox and mink do." Robert Marshall (1933) required that wilderness have "no permanent inhabitants," and Sigurd Olson (1938) exalted in "the ordinary phenomena of life in the open." Though solitude is clearly an experience of the wild, the ability to provide it is a measurable attribute of the land. That the most wild land must be the least inhabited follows naturally from the notion that, at some population density, people necessarily bring land under control to serve their purposes (such as occupancy, transportation, recreation and hygiene). The degree of human-to-human contact is one of the defining measures of the freedom of the land.

The requirement that wilderness be uninhabited has been interpreted by some as ignoring or even subjugating indigenous people, who occupied (or occupy) the land even as it was (or is) considered wilderness (see Bayet 1994; Birch 1990; Denevan 1992; Gomez-Pompa and Kaus 1992; Nabhan 1995; Plumwood 1998). But it need not be. As the poet Gary Snyder (1990) has pointed out, every landscape has its "fire in the kitchen" and its "place less traveled." Where population density is high, whether in the pre-Columbian or modern era, the ability of the land to afford solitude is diminished. In the "kitchen," the land may still be "natural" (see below), but it will not be as free.

In practice, we may gauge opportunity for solitude by measuring population density. Over large areas, such as states or continents, we are usually limited to looking at

Rvsd Plan - 00002578

where people reside, but how people use the land is also a factor. Over smaller landscapes, we may be able to gauge the opportunity for solitude by examining recreation use patterns. In any case, we look to represent some measure of the probability of encountering others.

## Remoteness

Roadlessness is also widely recognized as a defining characteristic of wilderness. Aldo Leopold (1921) insisted that wilderness be "devoid of roads," while his son Starker's Commission on Wildlife Management in the National Parks considered the roadgrader to be "the most dangerous tool of all" (Leopold and others 1963). Marshall's (1933) definition required wilderness to "possess no means of mechanical conveyance" in order that wilderness remain "free from mechanical sights and sounds and smells." Environmental historian Michael Cohen (1984) believes road construction is the first act of "trammeling" the wilderness. He writes, "I am troubled by the term 'untrammeled'. At what point have we caught and trapped the wilderness? I would presume that a process of capturing or trapping begins when men try to 'open out routes' among the mountains." Thus, the very presence of a road diminishes the freedom of the land, and distance from roads is clearly a time-honored measure of wildness.

The measurement of remoteness is fairly straightforward where we know the location of the road system. Land may be assigned a value depending on the distance from roads of various types, assuming that roads vary in their impact on remoteness. For example, an interstate highway is louder and will bring more people near an area than will a dirt road. Of course, measuring remoteness requires an accurate description of an area's road system, which often is not available for the most remote lands.

## Uncontrolled Processes

The most free land is the least controlled land. With the invasion of new technologies that attended the recent settlement of North America, ancient ecological processes were radically altered in many parts of the country. Where once fires (whether lightning-caused or anthropogenic), floods and migrations marked the passage of the seasons, fire suppression, dams and extermination replaced them. If wilderness is to live up to one of its definitions, "self-willed land" (Turner 1996), its historical ecological processes must be maintained.

The importance of uncontrolled processes to wilderness is amply noted in the literature. Wilderness has been described as a place where "a diversity of beings [flourish] according to their own sorts of order" (Turner 1996) and "where nature prevails or might prevail given the passage of time...so long as active ecological succession, structural diversity, and naturalness are permitted" (Frome 1997). Wilderness pioneer Arthur Carhart (1961) asserts, "[L]ands called 'wild' have retained the attribute of freedom. They have their own integrity intact. They have not been skinned, scraped, dug up, regimented and pounded into shapes and services desired and demanded by 'civilized' man." Even the Wilderness Act itself insists that wilderness "retain its primeval character and *influence*" (emphasis added).

The equation of uncontrolled processes with presettlement influences again raises the question of the role of indigenous people in landscape dynamics. Clearly, indigenous people have had tremendous influence on the character of the land in localized instances and may have altered the nature of ecosystems over broad areas through the use of fire and hunting practices (see, for example, Denevan 1992). Where this influence was intensive, we must view the land as under tight control and not free. However, where influence was extensive, aboriginal fire and hunting joined other sources of ignition and mortality, making it very difficult to distinguish between aboriginal control and "the will of the land." In this case, if only for practical purposes, we should consider extensive aboriginal influences to be part of the processes altered by the invasion of modern technological society.

Alteration of processes is probably the most difficult to measure of the six attributes that contribute to wildness. The science of historical ecology is just beginning to reveal the degree to which disturbance, hydrology, nutrient cycling, long-range migration and other ecological processes have been changed over the past few centuries. And even when we know something about rates of change, it is difficult to ascribe that information to the broader landscape. Nevertheless, progress has been made in mapping altered fire regimes, indices of watershed integrity and other metrics that may allow us to quantify land's freedom from control of ecological processes.

## Natural Composition

Composition, the relative abundance of genes, species, communities and other components of ecosystems, is one of the defining characteristics of ecosystems. An ecosystem that has lost its native species or has been invaded by non-natives has been altered in a fundamental way. In general, we recognize as most natural those ecosystems that have retained their full complement of native species and harbor no exotics.

The protection of intact native ecosystems has long been recognized as a goal of wilderness designation. The Wilderness Act specifically intended to protect "the earth and its community of life..." The protection of species that are easily harmed by, or are harmful to, human contact is a role often relegated to wilderness. Eliminated from much of their historical range, native predators, especially, are considered by many to be a vital part of the wilderness experience. As Turner (1996) says, "Predators are perhaps our most accessible experience of the wild."

The invasion of non-native species also can decrease the naturalness and therefore the wildness of an area. Severe invasions can even alter the structure and function of ecosystems. As wilderness manager Andy Kulla (1998) has said about invasive exotic plants, "Weeds take the wild out of the wilderness." Growing realization of the damage to native ecosystems done by exotic species has led many managers to implement weed control programs, halt stocking of fish, especially non-natives, and to insist on the use of weed-free hay and revegetation mixes.

The measure of natural composition is reasonably straightforward, to a point. Most species are understood to be either native or the result of recent artificial introduction. The species composition of any area, therefore, can be quantified

Rvsd Plan - 00002579          91

in terms of proportion of native species. Determining the degree to which native species composition has changed as a result of human agency is more difficult. Recent developments in historical ecology and (recent) paleobotany are shedding light on changes in species composition.

## Unaltered Structure

Ecosystem structure refers to the spatial arrangement of the components of ecosystems. This can refer to the gross-scale features of geomorphology, the arrangement of vegetation patches or the arrangement and spacing of trees in a forest stand. The degree to which ecosystem components retain their historical arrangement contributes to the naturalness of the system.

The maintenance of unaltered structure has long been a litmus test of wilderness character and is the most familiar criterion for designation. The Wilderness Act requires wilderness to be "without permanent improvements or human habitation...with the imprint of man's work substantially unnoticeable." Bob Marshall's (1933) definition stressed that "all roads, settlements, and power transportation are barred."

Again, the standard against which alteration is to be judged is the condition of the ecosystem prior to the invasion by modern technological society, begun in North American 300-400 years ago. As has been noted, pre-Columbian North America was a network of trails and settlements (Denevan 1992; Snyder 1990). Some structures, such as the earthworks of the Southeast, were large by any standard. These structures were part of the historical ecosystem and should be considered natural. Interestingly, Marshall (1933) recognized historical structures as entirely consistent with his view of wilderness: "Trails and temporary shelters, features such as were common long before the advent of the white race, are entirely permissible."

As with composition, the measurement of alteration of structure is fairly straightforward. Roads, dams, airstrips, mines, stockponds and other built structures diminish naturalness. Also, the substitution of square blocks of perfectly spaced plantations for natural forest, even if they comprise native species, alters ecosystem structure and diminishes naturalness. The science of landscape ecology has developed rapidly in the past few decades and has yielded a number of metrics that can be applied to land to measure its departure from historical structure.

## Pollution

Wilderness carries with it an expectation of purity: clean water, fresh air, clean soil, darkness. When air, streams and the night sky are dirtied with coal exhaust, road dust, bovine feces and distant industrial light, it diminishes the naturalness of the land and the experience it provides. The poet Mark Strand (1996) makes clear the relationship between pollution and wilderness when he writes, "First we pollute the wilderness, then we pollute our minds with the belief that we've done the right thing. Then we pollute the wilderness more because we've lost our ability to see it. Soon the wilderness ceases to exist." Some forms of pollution have direct effects on the ecosystem, such as ozone and nitrogen

deposition; others, such as the influence of city lights, affect mostly the quality of the visitor experience. Even where the effect is only on experience, pollution remains a measurable attribute of the land that affects its wildness.

Because of national laws like the Clean Air Act and the Clean Water Act, pollution is one of the best studied and best documented of the indicators of wildness. Depending on the part of the country, good maps are available for a number of air pollutants and for the quality of surface waters. The Environmental Protection Agency monitors sources of pollution across the country and maintains data in a Geographic Information System. In addition, NASA has used remote sensing to measure from space the light emitted to the night sky. It should be possible to quantify the degree to which any piece of land remains free from pollution.

Each of these attributes contributes to the freedom or the naturalness of a place and therefore to its wildness. But just because they contribute does not mean there will not be cases when they conflict. For example, the maintenance of highly anthropogenic vegetation types (such as indigenous agricultural fields), which would be natural by the above definition, would require such intensive manipulation that it would diminish freedom. Nevertheless, these attributes, when considered in aggregate, should indicate much about the wildness of any given area.

## Mapping Wildness

In this section, we present results of an application of the attributes discussed above to the measurement of relative wildness at one scale – that of the contiguous United States. Though there are no hard and fast rules guiding how to apply these concepts, their application does require the selection of a consistent approach. In this case, our approach was to locate the best spatial data we could find to represent each attribute in a GIS data layer, assign each raster cell of the data layer a value for each attribute and, finally, sum the values to derive the "wildness index" for each cell. To accommodate work at a continental scale, we represented the United States as a matrix of just less than 8 million one-square-kilometer cells for analysis. The analysis was conducted with the GRID module of Arc/Info GIS software. Each attribute was represented with a value ranging between one and five. Some attributes (for example, solitude) were derived from a single data set; others resulted from a combination of several data sets (see below). Although our wildness index suffers from many of the same shortcomings attending other indices (such as the addition of unlike units as though they were commensurate), we feel it represents much of what contributes to the wildness of a place.

## Solitude

Ideally, the spatial representation of opportunity for solitude would display the probability distribution of encountering another person over a landscape. It would account not only for the presence of occupants of the land, but for visitors to popular locations like national parks. Unfortunately, there are no such data sets available for the entire continental United States. However, the U.S. Bureau of the Census keeps track of the distribution of the resident population

Rvsd Plan - 00002580

across the country. Map 1 shows the distribution of census block groups assigned to five classes, where the value 1 (lightest) was assigned to cells with a 1990 population density greater than 1,000 persons/km$^2$, the value 2 was assigned to cells with a population density between 100 and 1,000 persons/km$^2$ and so on to the value 5 (darkest), which was assigned to census block groups with a population density of less than one person/km$^2$. Not surprisingly, the results show high population densities along the Eastern seaboard and very few residents in vast parts of the West. This map represents only where people live; it does not consider the accessibility of the land to visitors. Future renditions of the data may take accessibility into account by representing distance from population centers as well as their location.

## Remoteness

An ideal road data set would include all roads from interstate highways to natural surfaces and include all of the attributes needed to assess their relative influence on remoteness. Unfortunately, such a data set does not exist for the continental United States. Instead, we used a "major highways" (essentially paved intercity routes) data set compiled by the U.S. Geological Survey (USGS). To assign a remoteness value to each cell, we "buffered" the road system at five different distances. Cells within 2 km of a road were assigned a value of 1; between 2 and 5 km a value of 2; 5-10 km a value of 3; 10-25 km a value of 4; and greater than 25 km a value of 5. The results are displayed in map 2. Future

versions may dissolve the five distance classes into one continuous distance "surface."

## Uncontrolled Processes

Ecological processes are inherently difficult to measure, since we rarely are able to measure rates directly; instead, we generally measure states at different times and infer rates. Mapping processes is even more difficult, as it requires tying process measurements to particular places. Such data with national coverage are extremely difficult to obtain. One of the few data sets that suggests process impacts is the national inventory of dams available from the USGS. To account for changes in hydrologic function, we evaluated the number of dams in major hydrologic units (watersheds) and divided the nation into five classes We assigned a value of 5 to cells within watersheds with no dams; a value of 4 to watersheds with 1-6 dams; a value of 3 to watersheds with 7-20 dams; a value of 2 to watersheds with 21-50 dams; and a value of 1 to watersheds with more than 50 dams per watershed.

In future renditions, we plan to build on concepts developed by The Nature Conservancy (1998) to develop a surrogate for terrestrial processes based on patch metrics (area, distance to edge, major axis) for polygons of natural vegetation (see below) delimited by major highways, agricultural lands and urban areas. The approach assumes that ecological processes in larger, well-connected patches are under less human control than in smaller, disconnected patches.



**Map 1**—Opportunity for solitude. Population density by census block group.



**Map 2**—Remoteness. Distance from major highways.

## Natural Composition

There are a number of ways in which ecosystem composition can be measured. Conceptually, one of the most straightforward is species composition. Data sets should provide information on the degree to which ecosystems retain the species typical of the area and the degree to which exotic species have displaced natives. One of the few data sets available with coast-to-coast coverage of species composition is the North American Land Cover Characteristics satellite image classification conducted by the USGS, which assigns surface vegetation to over 200 different classes of natural and anthropogenic vegetation. We combined this data set with the urban classes from a separate USGS Land Use and Land Cover data set. To conduct our analysis, we assigned each one-square-kilometer cell to one of five classes, from unnatural (urban and cropland) to natural vegetation types. Cells exhibiting a mixture of use/cover fell in between. Map 3 illustrates the distribution of natural (darkest) and unnatural (lightest) vegetation across the United States.

## Unaltered Structure

Humans alter ecosystem structure in a number of ways, from the construction of buildings, dams and roads to the leveling of agricultural fields and the clearcutting of forests. An ideal data set would account for all these effects. Unfortunately, available data for the nation as a whole are limited to "built structures." We mapped the location of cities, towns, highways, dams and airstrips across the country. Cells that included built structures were assigned a value of one; all others were assigned a value of five.

## Pollution

Despite the abundance of data on pollution compiled for various locations, there exist very little data describing the distribution of pollution across the entire country in a GIS format. The EPA maintains a "national priority list" in GIS format, recording the locations of all sites they regulate as sources of pollution. In order to assess the influence of light pollution, we evaluated NASA's image of "lights at night" for the U.S. Again, cells were assigned a value from one to five based on a combination of these data sets. As we further refine the map, we intend to bring in data that reflect actual air and water quality, not simply sources.

To construct the map of wildness (map 4), we summed the values of the six attributes into an overall "wildness index" and displayed that index spatially. Beyond the trivial result showing that the West is notably more wild than the East, some results were somewhat surprising. Because the map was generated without regard for ownership or physiography, it bears little resemblance to maps of the distribution of wilderness areas, federal lands, mountain ranges or river basins. Instead, the map exhibits "features," such as the swaths of wild land running from southwestern Arizona to eastern Utah and from Death Valley to southwest Idaho, that have nothing in common but their wildness. Other places, like eastern New Mexico and central Nebraska, jump out as particularly wild, though they are traditionally unheralded. The map also confirms what we already knew about places like the Boundary Waters, northern Maine, Okefenokee and the Everglades: These are very special wild places in an otherwise highly developed landscape.

Rvsd Plan - 00002582



**Map 3**—Natural composition. Natural and artificial land cover.



**Map 4**—Wildness.

Rvsd Plan - 00002583     95

As interesting as this map is, it is important to remember that it is simply one analysis at one scale. Wild land exists in all landscapes at all scales. Aldo Leopold said it best when he wrote, "[W]ilderness exists in all degrees, from the little accidental wild spot at the head of a ravine in a Corn Belt woodlot to vast expanses of virgin country.... Wilderness is a relative condition" (Leopold 1925). Figure 2 illustrates this sentiment by showing that the wild land continuum does not exist only at the scale of large landscapes from city to wilderness. Within the portion of the land that we call rural are land uses ranging from agribusiness to ranch. We may determine that tilled or developed land is not wild, but that a large ranch is. Even on the nonwild farm landscape, land can range from developed homesites to uncultivated pasture and forest. Within this landscape, these uncultivated areas provide a glimpse of the natural and free and are highly prized for their wildness.

The next step in our process will be to repeat this type of analysis at the scale of a region (a state) and a subregion to show that patterns of wildness emerge at all scales. At these scales, new (and hopefully better) data sets will be applied to show that relatively wild land exists all around us. For example, though it appears as a highly developed patch at the scale of the nation, the city of Chicago is home to hundreds of thousands of acres of precious wild places whose protection is being sought by a coalition known as "Chicago Wilderness." The next stage of our analysis will demonstrate that the wildness of places like these can be illustrated through the application of the very same approach to smaller landscapes.

At the same time that we are moving forward with these other analyses, we will be working to improve our analytical approach. Currently, the analysis is plagued by a number of problems. For example, by displaying the data in a one-square-kilometer grid, we have implied a level of precision to the data that is inappropriate for an index based on data collected at a number of scales, some of them quite coarse. We are currently working to identify an appropriate level of precision for display. Also, the current approach has the potential to overemphasize the influence of some factors. For example, roads factor in the estimation of remoteness, uncontrolled processes and unaltered structure. We are working toward a more sophisticated way to combine data sets to account for all six attributes without unduly emphasizing any particular factor.

## Relationship to Other Efforts _____

The approach to mapping wildness described above is based on an understanding that wildness inheres in varying degrees in all lands as a function of the relative freedom and naturalness of the place. This allows the mapping of all lands as possessing some degree of wildness and the production of a continuous surface describing the wildness of any landscape. Such an approach allows us to discern connections across wild landscapes that are not readily apparent in maps based on any one of the attributes (for example, land use/land cover) or on land ownership. As a result, our method represents a new approach to the study of wild lands, complementary to other existing efforts.



**Figure 2**—Wild lands can be found in any landscape at any scale.

Rvsd Plan - 00002584

Generally, efforts to map wild places have been of two sorts: those that focus on biological diversity and those that identify special wild places. Traditionally, mapping efforts have identified special wild places such as nature sanctuaries (Kendeigh and others 1950-51) and wilderness areas (The Wilderness Society 1989), with the implication that lands not identified in the map are not wild. Similarly, a 1997 report by the World Resources Institute characterized the world's forests as either "frontier" or "non-frontier," based on their ability to support a full complement of native species and ecological processes (Bryant and others 1997). Our method allows us to identify lands of particularly high value, while acknowledging the wildness inherent in all lands.

One of the most sophisticated wildland mapping efforts is the National Wilderness Inventory of Australia (Lesslie and Maslen 1995). This effort represents a significant advance over previous efforts because it provides an objective protocol for evaluating the wildness ("Total Wilderness Quality Index") of any particular place based on four indicators: "remoteness from settlement, remoteness from access, apparent naturalness, and biophysical naturalness." The approach described in the Australian National Wilderness Inventory Handbook (Lesslie and Maslen 1995) shares much in common with ours but still must be considered in the traditional mode, as it evaluates the wilderness quality of distinct land units identified as "natural."

The past decade or so has witnessed great progress in the mapping of areas critical to biological diversity. Efforts like the Gap Analysis Project of the USGS Biological Resources Division (Caicco and others 1995, Edwards and others 1995) and similar initiatives, such as that undertaken by the Florida Game and Freshwater Fish Commission (Cox and others 1994), have sought to identify lands of particular conservation value for protecting wildlife in each state. Studies like these improve on traditional conservation mapping initiatives because they acknowledge a continuum or gradient in wildland quality, irrespective of ownership. By including natural composition and uncontrolled processes in our analysis, we, too, recognize biodiversity as critical to wildland quality (although we do not pretend to achieve the level of detail of these other approaches). However, by also recognizing factors like solitude and unaltered structure, we assert that biodiversity is a necessary, but not a sufficient component of wildness.

One particularly noteworthy biodiversity-oriented mapping effort is The Wildlands Project, whose founders believe that "wilderness is absolutely essential to the comprehensive maintenance of biodiversity" (The Wildlands Project 1992). Such a philosophy turns the liabilities of other biodiversity mapping approaches into assets for the mapping of wild places. Because wilderness is essential to biodiversity, protecting wilderness necessarily must result in the protection of nonbiological wilderness values.

Mapping under The Wildlands Project begins with the identification of "core reserves" essential to the conservation of wildlife – often large predators that have been exploited to extinction elsewhere. To these core reserves are added nonwilderness "buffer zones" and "corridors" to connect the core reserves. Core reserves are usually national parks and existing wilderness areas, augmented with roadless areas and places of particular conservation concern. By adding buffer zones, The Wildlands Project begins to address some of the shortcomings of traditional wild land mapping, but because mapping generally begins with existing designated areas and builds out, it is a very "bottom-up" approach in the traditional mode of wild land identification. Our approach, in contrast, is very "top down," representing wildness unanchored by existing land designations. We believe our approach complements the "bottom-up" approach and will bring a new perspective to understanding the context of wilderness.

## Wild Land Mapping: Toward a Blueprint for Wilderness

The identification of quantifiable attributes of wildness makes possible the representation of wildness and the mapping of wildness across the landscape. The mapping of wildness is important for a number of reasons. First, it allows us to point to specific places, places that are important because they are wild, whether those places occur at the scale of a region, as they do in southern Utah, or at the scale of open space in such urban gems as L.A.'s Santa Monica Mountains or Washington, D.C.'s Rock Creek Park. Maps help make places tangible and the subject of action. They can help educate about wilderness, and they can help conservationists visualize the scope of their work. Maps can also serve as a graphic record of our success.

Second, a map of where the wild places are can help us, as conservationists, set priorities for our limited resources. The wildest places are not necessarily the highest priorities for attention, but we should understand the context of the places that we do work to protect. Also, maps that show the relative importance of various wild land tracts can provide convincing arguments for wild land protection. Maps that show a tract or subregion (for example, Okefenokee or the Grand Staircase-Escalante National Monument) to be the "wildest in the land" contribute to the argument for protection.

Third, maps of wild places can be powerful tools of inclusion. Wild land maps can help direct people who wish to contribute to wilderness protection toward high-priority lands. They can also help recruit new voices for wild land protection by showing people who otherwise think of wild lands only in the abstract just how close these places are.

Finally, maps can help illuminate possibility. As The Wildlands Project has shown, dreaming with a map and crayon can motivate people to work toward a future that is better than the present. A wild land map can show not just where the wild lands are, but where they could be. If done well, wild land maps based on the attributes described above can help identify the specific changes necessary to restore wildness to degraded landscapes and begin the job of building a system of wild lands, rather than simply defending an ever-shrinking wild land base.

## Acknowledgments

This paper was originally presented at the Sixth World Wilderness Congress in Bangalore, India, in October 1998 and was greatly improved by the feedback received from Congress delegates.

Rvsd Plan - 00002585

The authors would like to express their gratitude to Susan Balikov, who developed some of the original ideas that made this work possible but who left The Wilderness Society prior to its completion. We miss you.

# References

Aplet, G. H. 1999. On the nature of wildness: exploring what wilderness really protects. Denver University Law Review 76: 347-367.

Bayet, F. 1994. Overturning the doctrine: indigenous people and wilderness – being aboriginal in the environmental movement. Reprinted as pages 314-324 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 p.

Birch, T. H. 1990. The incarceration of wildness: wilderness areas as prisons. Reprinted as pages 443-470 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 p.

Bryant, D.; Nielsen, D.; Tangley, L. 1997. The last frontier forests: ecosystems and economies on the edge. World Resources Institute, Washington, DC.

Caicco, S. L.; Scott, J. M; Butterfield, B.; Csuti, B. 1995. A gap analysis of the management status of the vegetation of Idaho (U.S.A.). Conservation Biology 9:498-511.

Carhart, A. H. 1961. Planning for America's wildlands: a handbook for land-use planners, managers and executives, committee and commission members, conservation leaders, and all who face problems of wildland management. National Audubon Society, National Parks Association, The Wilderness Society, and the Wildlife Management Institute. The Telegraph Press, Harrisburg, PA. 97 pp.

Cohen, M. P. 1984. The pathless way: John Muir and American wilderness. University of Wisconsin Press, Madison. 408 pp.

Cole, D. 1996. Ecological manipulation in wilderness: an emerging management dilemma. International Journal of Wilderness 2(1):15-19.

Cox, J.; Kautz, R.; MacLaughlin, M.; Gilbert, T. 1994. Closing the gaps in Florida's wildlife habitat conservation system. Florida Game and Freshwater Fish Commission, Tallahassee, FL.

Denevan, W. 1992. The pristine myth: the landscape of the Americas in 1492. Reprinted as pages 414-442 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Edwards, T.; Homer, C. G.; Bassett, S. D.; Falconer, A.; Ramsey, R. D.; Wight D. W. 1995. Utah Gap Analysis: an environmental information system.. Final Project Report 95-1, Utah Cooperative Fish and Wildlife Research Unit, Utah State University, Logan.

Frome, M. 1997. Battle for the wilderness, Rev. ed. University of Utah Press. 278 pp. p.12

Gomez-Pompa, A.; Kaus, A. 1992. Taming the wilderness myth. Reprinted as pages 293-313 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Kendeigh, S. C.; Baldwin, H. I.; Cahalane, V. H.; Clarke, C. H. D.; Cottam, C.; Cottam, W. P.; Cowan, I. M.; Dansereau, P.; Davis, Jr., J. H.; Emerson, F. W.; Haig, I. T.; Hayden, A.; Hayward, C. L.; Linsdale, J. M.; Macnab, J. A.; Potzger, J. E. 1950-51. Nature sanctuaries in the United States and Canada, a preliminary inventory. The Living Wilderness 15(35):1-45.

Kulla, A. 1998. Effects of noxious weeds on wilderness, recreation, and tourism. Speech presented April 7, 1998, at the Colorado Weed Summit, Denver, CO (unpublished).

Leopold, A. 1921. The wilderness and its place in forest recreational policy. Journal of Forestry XIX(7):718-721. p. 719

Leopold, A. 1925. Wilderness as a form of land use. Reprinted as pages 75-84 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Leopold, A. S.; Cain, S. A.; Cottam, C. M.; Gabrielson, I. N.; Kimball, T. L. 1963. Wildlife management in the national parks. Reprinted as pages 103-119 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Lesslie, R.; Maslen, M. 1995. National Wilderness Inventory handbook of procedures, content, and usage (Second edition). Australian Heritage Commission. Australian Government Publishing Service, Canberra.

Marshall, R. 1930. The problem of the wilderness. Reprinted as pages 85-96 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Marshall, R. 1933. The people's forests. Harrison Smith, and Robert Haas, New York. pp. 177-178.

Nabhan, G. P. 1995. Cultural parallax in viewing North American habitats. Reprinted as pages 628-641 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Nash, R. 1982. Wilderness and the American mind, 3rd edition. Yale University Press, New Haven, CT. 425 pp.

The Nature Conservancy. 1998. Ecological processes at the ecoregional scale: considerations for portfolio design: guidelines for ecoregional team leaders from the stewardship expert team. Unpublished draft manuscript, August 1998. 19 p.

Olson, S. 1938. Why wilderness? Pages 97-102 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Plumwood, V. 1998. Wilderness skepticism and wilderness dualism. Pages 652-690 in: The great new wilderness debate (J. Baird Callicott and Michael P. Nelson, eds.). University of Georgia Press, Athens. 997 pp.

Snyder, G. 1990. The practice of the wild. North Point Press, New York. 190 pp. p.14.

Strand, M. 1996. Untitled. In: Testimony: writers of the West speak out on behalf of Utah wilderness (S. Trimble and T.T. Williams, comps.). Milkweed Editions, Minneapolis, MN.

Thoreau, H. D. 1862. Walking. Pages 592-630 in: The portable Thoreau (Carl Bode, ed.). Penguin Books, New York. (1982). 698 pp.

Turner, J. 1996. The abstract wild. University of Arizona Press, Tucson.

The Wildlands Project. 1992. The Wildlands Project: plotting a North American wilderness recovery strategy. Wild Earth (Special issue).

The Wilderness Society. 1989. The National Wilderness Preservation System 1964-1989 (map). The Wilderness Society, Washington, DC.

Whitney, S. 1997. Solitude: an endangered value of wilderness. Signpost for Northwest trails. April 1997:33-34.

Worf, B. 1997. Response to "Ecological manipulation in wilderness" by Dr. David Cole. International Journal of Wilderness 3(2): 30-31.

Rvsd Plan - 00002586

# Appendix C

Rvsd Plan - 00002587

**BLANCA PEAK SPECIAL INTEREST AREA (CULTURAL)**

**Proposed Designated Area**
**Rio Grande National Forest**          **4,300 acres**
**Conejos Peak Ranger District**



*Map Locator*

### General Description

Blanca Peak holds tremendous cultural significance for many of the indigenous cultures in southwest Colorado and the upper Rio Grande valley. Navajo, Ute, Jicarilla Apache, and the Upper Rio Grande Pueblos all place great value on maintaining the pristine integrity of Blanca Peak.

The proposed Blanca Peak Special Interest Area comprises that portion of the massif located on the Rio Grande National Forest. The mountain is under overlapping jurisdictions with other portions administered by the Pike-San Isabel National Forest, the Bureau of Land Management, and the private Trinchera Blanca Ranch.

In addition to its cultural significance, Blanca Peak possesses outstanding recreational and scenic values as well. The Blanca Peak SIA includes three well-known Colorado fourteeners – Blanca Peak, Little Bear Peak, and Ellingwood Point – which attract several thousand mountaineers each year. All are drawn in large part by the dramatic alpine scenery of the high glacial basins and rugged granitic peaks.



The Rio Grande National Forest's Assessment of Areas of Tribal Importance provides a thorough and compelling summary of Blanca Peak's cultural significance to regional tribes:

"Mount Blanca, Sierra Blanca or Blanca Peak is sacred to the Navajo, Ute and Jicarilla Tribes. It is also an important anchor point within the cultural landscape of the Upper Rio Grande pueblos, known as *Pintsae'i'i* or "White Mountains" in Tewa. It is of particular significance to the Navajo Tribe, or Dinéh of the American Southwest. To them it is known as *Sisnaajini* or "White Shell Mountain". The peak marks the eastern boundary of the *Dinetah*, or Navajo homeland. The mountain is considered a living breathing entity. The wetlands (Bureau of Land Management, U.S Fish and Wildlife

Service) and the sand dunes (National Park Service) that flank the mountain are revered as critical components of the life force of the mountain.

The Jicarilla Apache call the mountain *Nishnojini,* "Black Belt" Monster Slayer, *Nío nas ga né*, directed Jicarilla and Navajo peoples on where to go from the top of the mountain and it is thought that the clouds retain spirits that bring the water. The mountain is a place of medicine power.

The Kaputa (Capote) Ute consider the mountain a holy place and call it *Peeroradarath*, "the monster's back", "great grandmother serpent" or "dragon's back"; Blanca Peak as the head and the Sangre de Cristo range to the north, the body. Near the mountain was an old lake, *Aripit*, where Ute ancestors hunted the mastodon and the big buffalo, the *Hooche*.

….

The Historic Preservation Department of the Navajo Nation recommends designating *Sisnaajini* as a Traditional Cultural Property to recognize its cultural significance and to maintain its integrity as a critical component of Navajo cosmology and overall well-being of the Navajo people." (Rio Grande NF, Assessment 12, Areas of Tribal Importance, 2015)

## Recreational and Scenic Values

The Blanca Peak Special Interest Area at its highest point rises almost 7,000 feet above the San Luis Valley. The area's soaring elevation, precipitous alpine ridges, and secluded glacial valleys and lakes draw mountaineers, hikers, campers, and photographers keen on experiencing unforgettable mountain scenery.

In particular, Blanca Peak, Little Bear Peak, and Ellingwood Point draw thousands of mountaineers annually hoping to reach the summits, test their mountaineering abilities in highly challenging circumstances and enjoy viewscapes that can extend to points up to 100 miles away. Little Bear Peak ranks among the most exposed routes to the summit among Colorado's 54 fourteeners, which enhances the challenge of this primitive recreational pursuit. An estimated 1,000-3,000 climbers attempt Blanca Peak and Ellingwood Point annually, while less than 1,000 pursue Little Bear's summit (Colorado Fourteeners Initiative, 2015). The Blanca Peak and Ellingwood Point trails from Como Lake were two of only three Fourteener trails in Colorado that received an "A" rating by the Colorado Fourteeners Initiative in 2015.  This was due to work completed on these trails in 2011 and 2012.

## Boundary, Size, and Access

The proposed Blanca Peak Special Interest Area consists of about 4,300 acres that are adjacent to and outside of the existing Sangre de Cristo Wilderness. The SIA boundary could alternatively

be drawn to also incorporate the entirety of the Blanca Peak massif, including that portion within the designated wilderness area. This would not increase protective management to maintain the pristine character of the mountain, but it would better reflect the intact wholeness of the mountain in recognition of its cultural significance and apply a management obligation to the entire cultural area to protect its special character and purpose. The SIA is bounded to the north and northeast by the Pike-San Isabel National Forest, to the south by the private Trinchera Blanca Ranch managed under a conservation easement held by the U.S. Fish and Wildlife Service, and to the west by BLM lands.

A rough four-wheel-drive road (Forest Road #975) provides motorized access to Lake Como in the center of the area. FR 975 is known as one of the roughest and most challenging, if not the most difficult, 4WD roads in Colorado. There are some who value the road for its challenging nature, and prefer to try to drive a vehicle to its end point. However, the tribes have concerns with oil or other automotive fluid spills, littering, and abandoned car parts desecrating the values for which they hold the area sacred. And, many mountaineers and hikers choose to hike the road because it is too rough.

### Proposed Management

Specific management direction is proposed to protect Blanca Peak's unique cultural values, as well as it remarkable recreational and scenic values. These recommendations are based upon desired experiences of visitors wanting to enjoy specific aspects of the SIA (including cultural aspects) that support the stated reasons for the creation of the SIA. These include:

- Make the Blanca Peak SIA administratively unavailable for oil and gas leasing and mineral material sales, and recommend a mineral withdrawal for locatable minerals.

- Management direction must include prohibition on timber harvest and new road construction.

- Restrict motorized and mechanized travel to only the Lake Como access road. Prohibit motorized game retrieval off designated routes. Implement existing travel management designations by installing and enforcing a barrier and signage west of Como Lake to end motorized use at that location.

- Education is recommended for motorized recreationists traveling on the Blanca road to discourage littering, abandonment of broken vehicle parts, and also what type of vehicle and modifications are necessary to safely and responsibly drive on the road. The area should be managed using adaptive management. If monitoring finds more than three examples of oil or other automotive fluid spills, littering, abandoned car parts, or similar left behind each year, additional action will be considered, including permanently closing the road to motor vehicle use.

Rvsd Plan - 00002590

- Do not allow competitive events on the road or trail, or within the SIA.

- Do not allow communication facilities/infrastructure within this area.

- Monitor the natural soundscape to ensure that noise stays under specified decibel limits (the non-standard motorized vehicles that the road attracts may not be designed to meet sound limits). If necessary, establish specific sound limits to protect the natural soundscape.

- Coordinate closely with the Native American tribes when developing specific management direction that protects and interprets the pristine character of the mountain and determines access to the resources of particular cultural significance.

- Develop an interpretive plan in consultation with the Native American tribes that interprets the area's special character and unique values.

***Information Resources***

| Topic | Data Source |
|---|---|
| Cultural | Rio Grande NF Assessment 12, Areas of Tribal Importance, 2015 |
| Recreation | Colorado Fourteeners Initiative hiker use estimates, 2015 |



**CHAMA BASIN WATERSHED PROTECTION AREA**

**Proposed Designated Area**
**Rio Grande National Forest**              **22,900 acres**
**Conejos Peak Ranger District**



### *General Description*

Chama Basin is a large, intact roadless area that encompasses the entirety of the Chama River's headwaters not already included within the South San Juan Wilderness. The Chama River is the largest source of municipal water supply for the majority of New Mexico's urban population. Vast tracts of aspen cover much of the basin, and the Rio Chama at its center is a healthy montane riparian forest of willow, cottonwood, and alder.

Chama Basin has been the focus of prior management actions to enhance its value as an intact and undisturbed headwaters watershed. In 2011, the Rio Grande NF completed acquisition of the mineral rights, consolidating surface and mineral estates under federal jurisdiction and thereby assuring compatible management. Chama Basin has previously been evaluated as possessing high potential for oil and gas resources. Federal ownership of the mineral estate allows complete discretion to the Forest Service about future mineral leasing.

### *Watershed values*

The proposed Chama Basin Watershed Protection Area consists primarily of the 21,600-acre Chama Basin Colorado Roadless Area, which is primarily an Upper Tier area. The area is managed for both non-motorized and motorized recreation, and cattle and sheep grazing occurs. The basin is a compact, confined watershed bounded on three sides by high ridges and escarpments, with only a single road providing access to the southern edge of the basin. (USDA Forest Service Colorado Roadless Rule, 2012)



The uppermost headwaters of the East Fork of the Rio Chama are situated in the adjacent, upstream South San Juan Wilderness. The uppermost headwaters of the West Fork arise within the adjacent, upstream Banded Peak Ranch, which is managed compatibly for watershed protection under a conservation easement.

Over 10 miles of streams within Chama Basin have been determined eligible for inclusion with the Wild and Scenic Rivers System. These include both the East Fork and West Fork of the Rio Chama, as well as 5 miles of Archuleta Creek. The streams were categorized under the Scenic classification, even though the entirety of these segments is inaccessible by road. The 4-5 miles of the Rio Chama mainstem should similarly be recognized as eligible for inclusion as a scenic river. (Rio Grande LRMP FEIS, 1996)

### Wildlife and Botanical Values

The area sees high use by lynx, a threatened species. Boreal owl and goshawk, two sensitive species, have been documented in the area. Bald eagles use the area in the summer.

The Rio Chama Potential Conservation Area identified by Colorado Natural Heritage Program is entirely contained within the proposed watershed protection area. The Rio Chama PCA is a 191-acre site of High Biodiversity Significance identified for its montane riparian forest. The basin's broad floodplain has large amounts of alluvium, abandoned river channels, and downed logs that create a very dynamic, active riparian system. Biodiversity elements of specific interest include mountain willow (*Salix monticola)/*mesic graminoid montane riparian willow carr, and a narrowleaf cottonwood/thinleaf alder (*Populus angustifolia/Alnus incana*) montane riparian forest. (CHNP Potential Conservation Area Report, 2015)

### Boundary, Size, and Access

The proposed Chama Basin Watershed Protection Area is a well-defined and confined watershed. The watershed protection area encompasses 22,900 acres, of which about 21,600 acres is an Upper Tier Colorado Roadless Area. The western rim and eastern rim of the area are the watershed divides. The northern boundary is the national forest boundary or the wilderness boundary, with the uppermost mile or two of the West Fork and East Fork located within adjacent conserved private land (Banded Peak Ranch) or adjacent designated wilderness (South San Juan). The southern boundary is the national forest boundary. Forest Road 121 provides access to the southern, lower reaches of the Rio Chama at the forest boundary. A system of motorized trails (Archuleta Creek and West Fork) and non-motorized trails (Rio Chama and East Fork) provide access to the area's interior.

### Proposed Management

Specific management direction is proposed to ensure primacy of watershed protection as follows:

- The Chama Basin Watershed Protection Area must be found unsuitable for oil and gas leasing and mineral material sales, and made discretionary no lease for watershed protection purposes. The area also needs to be withdrawn from mineral entry.

- Management direction must include prohibition on road construction and limitations on tree removal consistent with Upper Tier management prescribed by the Colorado Roadless Rule, 36 CFR Part 294.43(b), 294.42(b).

- Motorized and mechanized vehicle use can only occur on designated routes that are located and managed to minimize impacts to watershed values. Best management practices are in place on all access routes and monitored regularly to ensure effectiveness.

- Eligible Wild and Scenic Rivers must be managed to preserve their eligibility for designation under the Wild and Scenic Rivers Act. Management direction must include no new roads or expanded motorized access, no water impoundments or diversions, no mineral leasing or extraction, and no new surface disturbing activities.
  - o The classification of the East Fork of the Rio Chama should be changed to Wild to reflect its condition as a primitive watershed inaccessible by motorized access.
  - o The Rio Chama mainstem, from the confluence of the two forks downstream to the national forest boundary, should additionally be identified as an eligible river under the Scenic or Recreational classification.

- Develop an interpretive program for the area that educates visitors on the special character and watershed values of the area.

**Information Resources**

| Topic | Data Source |
|---|---|
| Biodiversity | CHNP PCA Report, 2015 |
| Roadless area | USDA Forest Service Colorado Roadless Rule, 2012 |
| Wild and Scenic Rivers | Rio Grande LRMP Final EIS, 1996 |

Rvsd Plan - 00002595



**SPRUCE HOLE/OSIER/TOLTEC LANDSCAPE CONNECTIVITY ZOOLOGICAL AREA**

**Proposed Designated Special Interest Area**
**Rio Grande National Forest**                    **39,500 acres**
**Conejos Peak Ranger District**



Map Locator

### General Description

Restoring and maintaining wildlife habitat connectivity within and beyond the National Forest is vital for allowing wildlife to migrate, and recover wide-ranging carnivore populations. Connectivity is especially important in the face of climate change because it enables species that are already stressed to move more easily through the landscape. The proposed corridor provides crucial connected habitat for large game species including mule deer, elk, pronghorn, and Rocky Mountain bighorn sheep as well as large carnivores such as Canada lynx, mountain lions, and black bears. The Rocky Mountain bighorn sheep is a Species of Conservation Concern (SCC), and the Canada lynx is protected as threatened under the U.S. Endangered Species Act. The proposed corridor connects to a similar proposal made by New Mexico citizens to the Carson National Forest and the Rio Grande del Norte National Monument. Through an "all lands" approach to coordination, the Forest Service and partners have a unique and inspiring opportunity to establish a landscape-scale linkage that can benefit wildlife on into the future.

### Wildlife Habitat Connectivity Values

The proposed connectivity zoological area is a key movement path for wide-ranging species between southern Colorado and Northern New Mexico. Natural Heritage New Mexico identified this area as the northern reach of the Northern Taos Plateau Wildlife Movement Focal Area that spans through the RGNF, Carson National Forest, and the Rio Grande del Norte National Monument that is managed by the Bureau of Land Management (Muldavin and McCollough 2016). Mule deer and elk migrate through the area, and Rocky Mountain bighorn sheep make seasonal shifts to summering and wintering habitat there.



A newly released Canada lynx explores his new home in the Rio Grande National Forest. © Richard Reading

Protecting remaining intact habitat large enough to allow freedom of movement for these iconic species has never been more important. Habitat loss, deterioration, and fragmentation

have caused Colorado's mule deer population to decline. This is cause for concern, because significant numbers of families, particularly in the local area, rely on the species for food. Disease and habitat loss have put Colorado's bighorn population in jeopardy. Designation of the corridor as Zoological Area would help maintain and restore ecological conditions necessary for bighorn to persist in the Forest and beyond the plan area.

Canada lynx have used this corridor since they were reintroduced by Colorado Parks and Wildlife in 1999. Having an established population of lynx back in Colorado is a source of pride for all wildlife lovers in the state. Protecting linkages for lynx is incredibly important for their long-term viability, and especially now following the large spruce bark beetle outbreak on the forest.  Lynx are stressed by climate change, timber harvesting, roads, and winter recreation. Establishing the corridor will reduce some of these stresses on lynx.

### Additional Biodiversity Values

Managing the Spruce Hole/Osier/Toltec Landscape Connectivity Zoological Area to maintain and restore habitat connectivity would benefit an array of at-risk and special interest species along with those identified above. Several RGNF SCCs are likely to occur in the area including boreal owl, peregrine falcon, Brewer's sparrow, flammulated owl, golden eagle, olive-sided flycatcher, bald eagle, Rio Grande cutthroat trout, Gunnison's prairie dog, among others, Ripley's milkvetch, slender cliffbreak, Plumber's cliff fern, Colorado divide whitlow grass, and many flowered gilia. The area may provide recovery habitat for federally protected species such as Mexican spotted owl, Southwestern willow flycatcher, yellow-billed cuckoo, and New Mexico meadow jumping mouse. Some of the migratory birds that likely use habitats in the area on a seasonal basis include ferruginous hawks (though some are non-migratory), black swifts, sage sparrows, burrowing owls, Cassin's finches, Grace's warblers, Gray vireos, juniper titmouse, Lewis's woodpeckers, loggerhead shrikes, long-billed curlews, mountain plovers, pinyon jays, and Virginia's warblers.

Three Colorado Natural Heritage Program Potential Conservation Areas (PCAs) overlap with proposed connectivity zoological area. These include the Cascade Creek PCA at Osier and Osier Creek PCA, which were identified for Rio Grande cutthroat trout habitat, and the Rito Hondo Creek PCA, identified for its occurrences of Ripley's milkvetch.

The proposed connectivity zoological area overlaps the Spruce Hole – Sheep Creek Upper Tier Roadless Area which contains over 3,000 additional acres of ecosystems types that are not well represented in the Forest's designated protected areas system. Under-represented ecosystems include grasslands and dry mixed conifer forest (The Wilderness Society, 2016).

### Boundary, Size, and Access

The Spruce Hole/Osier/Toltec Landscape Connectivity Zoological Area contains 39,500 acres of the Rio Grande National Forest. It is bounded on the north by the Conejos River as well as Highway 17, which also creates the western boundary. For the purposes here, the southern boundary is the

Colorado-New Mexico state line where the Rio Grande National Forest meets the Carson National Forest. Of course, this political boundary does not demarcate where wildlife movement stops, and a shared management strategy for maintaining and restoring habitat connectivity between the Forests is encouraged.

### Proposed Management

The Spruce Hole/Osier/Toltec Landscape Connectivity Zoological Area is proposed for designation in order to enhance landscape-level habitat connectivity for large game and large carnivores, such as Canada lynx. Specific management direction includes:

- Management actions should be driven by the primary need to ensure continued or enhanced habitat connectivity and viability of the zoological area for wildlife movement.

- Activities currently authorized by the agency in this zoological area shall coexist with wildlife movement, migration and dispersal. Changes to current activities and infrastructure may be required if found incompatible with the area's wildlife values.

- Where possible, augment wildlife values through purchase from willing sellers, exchange, transfer or donation of additional acreage of crucial wildlife habitat for their migration, movement and dispersal. Acquired lands are to be managed consistent with the corridor's standards and guidelines.

- Winter, including over-snow vehicle use, and summer recreation activities should conform to best available scientific knowledge for mitigating impacts to at-risk and other sensitive wildlife species.

- Do not authorize new permanent roads within the corridor in order to maintain unfragmented habitat for wildlife migration and dispersal.

- Establish road and motorized trail density standards within the management area to conform to the best scientific recommendations, generally less than one mile per square mile (Lyon 1979; Van Dyke et al. 1986a, b; Fox 1989; Trombulak and Frissell 2000; Reed et al. 1996; Strittholt and DellaSala 2001; Davidson et al. 1996). Ensure that there will be no net increases in densities above a scientific credible threshold. If these densities do not exist today, the Forest Service will develop a strategy to achieve them.

- All temporary roads are removed and the lands and waters on which they were located are restored to natural conditions within one year of the termination of the purpose for which they were established.

- Decommission and reclaim unauthorized routes and unneeded system roads.

- Establish and implement in a timely manner mitigation standards for existing roads and Highway 17 to facilitate movement of wildlife including a reduction in mortality of wildlife from vehicle collisions (modified from BLM 2012: 2-55). Coordinate with CDOT on planning and projects.

- Limit disturbance footprint resulting from vegetation management activities within the corridor spatially and temporally (e.g., establish maximum width and acres of any one ground disturbance, and limit total acreage of ground disturbance at any one time)

- Minimize fencing for livestock and make all fences wildlife friendly. Coordinate with permittees to identify fencing that is not critical for livestock operations; fencing that is not critical for livestock operations and that is impeding wildlife movement is removed. Any new livestock fencing that is installed should be constructed in a manner that will minimize disruption to wildlife movement, taking into consideration seasonal migration and water resources.

- Preclude the granting of new right-of-ways for energy development that would negatively impact wildlife, their habitat and its connectivity.

- Withdraw the corridor from location and entry under the Mining Law, subject to valid existing rights.

- Access to inholdings must be maintained at no greater than current standards, and reduced or avoided entirely if possible.

- The Connectivity Zoological Area must be discretionary no oil and gas leasing, although there is low likelihood of oil and gas occurrence in this location. It should be withdrawn from mineral entry.

**Information Resources**

| Topic or Data | Data Source |
|---|---|
| wildlife movement and wildlife connectivity opportunity data | Muldavin, E. and R. McCollough. 2016. Wildlife Doorways: Supporting Wildlife Habitat Connectivity Across Borders in the Upper Rio Grande Watershed. Natural Heritage New Mexico and University of New Mexico. March. Center for Native Ecosystems. 2006. Linking Colorado's Landscapes Species Movement Arrows. https://databasin.org/datasets/16d4904566f7446e99768175af07b1e5. |
| Ecosystem representation | The Wilderness Society, 2016. Ecosystem Representation Report. Attached as Appendix 2 to letter submitted by The Wilderness Society et al on September 6, 2016 on the Wilderness evaluation preliminary report. |
| Wildlife, general | Forest Service. 2016. List of Species of Conservation Concern for the Rio Grande National Forest. Rocky Mountain Region. August 17. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia. http://explorer.natureserve.org. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia. http://explorer.natureserve.org. U.S. Fish and Wildlife Service. Information for Planning and Conservation (IPaC). https://ecos.fws.gov/ipac/. |
| CNHP Potential Conservation Areas | Colorado Natural Heritage Program. CNHP Potential Conservation Areas Reports. http://www.cnhp.colostate.edu/download/gis/pca_reports.asp#c. |
| Colorado human population | Svaldi, Aldo. 2015. Colorado's population jumped by 101,000 in 12 months. Denver Post. June 13: http://www.denverpost.com/2015/12/22/colorados-population-jumped-by-101000-in-12-months-2/. |
| mule deer and elk wildlife movement data | Big Game Movement, NM Dept. of Game & Fish |
| | Elk Migration Patterns, CO Parks and Wildlife 2014 |
| | Mule Deer Migration Patterns, CO Parks and Wildlife 2014 |
| | Elk Linkage Modeled Southern, Rockies Ecosystem Project/Center for Native Ecosystems 2009 |
| | Colorado Parks and Wildlife. The Story of Colorado's Mule Deer. https://cpw.state.co.us/Documents/MuleDeer/ColoradosMuleDeerStory.pdf. |
| Rocky Mountain bighorn sheep | Bighorn Overall Range, CO Parks and Wildlife 2014 |
| | Bighorn Severe Winter Range, CO Parks and Wildlife 2014 |
| | Bighorn Summer Concentration Area, CO Parks and Wildlife 2014 |
| pronghorn | Pronghorn Overall Range, CO Parks and Wildlife 2014 |
| Canada lynx | Lynx Denning and Winter Habitats, SW CO U.S. Forest Service |
| | Lynx Habitat Other, SW CO U.S. Forest Service |
| | Lynx Potential Habitat, CO Parks and Wildlife 2014 |
| | Lynx Linkage Modeled, Southern Rockies Ecosystem Project/Center for Native Ecosystems 2009 |
| mountain lion | Mountain Lion Overall Range, CO Parks and Wildlife 2014 |
| black bear | Black Bear Fall Concentration, CO Parks and Wildlife 2014 |
| wolf | All Species Movement Arrows, Southern Rockies Ecosystem Project |
| peregrine falcon nesting | Colorado Natural Heritage Program 2014 |
| | Colorado Oil and Gas Conservation Commission 2008 |
| | Colorado Parks and Wildlife 2014 |
| Gunnison's prairie dog | Gunnison's Prairie Dog Overall Range, CO Parks and Wildlife 2014 |
| Brazilian free-tailed bat | Overall Range, CO Parks and Wildlife 2014 |
| Rio Grande cutthroat trout | Colorado Natural Heritage Program |

| Route density standards | Davidson, Diane W., William D. Newmark, Jack W. Sites, Jr., Dennis K. Shiozawa, Eric A. Rickart, Kimball T. Harper, and Robert B. Keiter. 1996. Selecting Wilderness Areas to Conserve Utah's Biological Diversity. *Great Basin Naturalist* 56(2):95-118. |
|---|---|
| | Forest Service. 2008. Southern Rockies Lynx Management Direction, Final Environmental Impact Statement Volume 1. |
| | Fox, R.A. 1989. Mule Deer (Odocoileus hemionus) Home Range and Habitat Use in an Energy-Impacted Area of the North Dakota Badlands. Masters Thesis, University of North Dakota. Grand Forks, ND. |
| | Lyon, L. J. 1979. "Habitat Effectiveness for Elk as Influenced by Roads and Cover." *Journal of Forestry*, October, 658-660. |
| | Stritthold, J.R., and D.A. DellaSala. 2001. Importance of Roadless Areas in Biodiversity Conservation in Forested Ecosystems: A Case Study—Kalmath-Siskiyou Ecoregion, U.S.A. *Conservation Biology* 15(6):1742-1754. |
| | Trumbulak, S.C., and C.A. Frissell.  2000. Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities. *Conservation Biology* 14(1):18-26. |
| | VanDyke, F. G., Brocke, R. H., Shaw, H. G., Ackerman, B. B., Hemker, T. P., and Lindzey, F. G. (1986b). Reactions of Mountain Lions to Logging and Human Activity. *Journal of Wildlife Management*. 50(1): 95-102. |
| | VanDyke, F. G., Brocke, R. H., and Shaw, H. G. (1986a). Use of Road Track Counts as Indices of Mountain Lion Presence. *Journal of wildlife Management*. 50(1):102-109. |



**SUMMER COON LA VENTANA GEOLOGIC AREA**

**Proposed Designated Area**
**Rio Grande National Forest**　　　　　　　**22,400 acres**
**Divide Ranger District**



Map Locator

### *General Description*

The proposed Summer Coon La Ventana Geologic Area offers a unique opportunity to see well-preserved outcrops representing the earliest evidence of the Rio Grande continental rifting. The proposed area incorporates much of an ancient stratovolcano (a composite layered structure built up from sequential outpourings of eruptive materials), a nearly perfect pattern of radial dikes, and the La Ventana Natural Arch eroded into the center of one of the most prominent dikes. The area includes significant cultural, botanical and ecological values in addition to its notable geological importance.

The Summer Coon La Ventana Geologic Area expands the existing 8,441-acre Elephant Rocks Special Interest Area to incorporate the entirety of the Summer Coon volcanic field, particularly the well-developed radial dikes originating from the area's center. The existing SIA was designated in the prior Forest Plan for a portion of the Summer Coon volcanic features as well as rare botanical features in the form of a Forest Service sensitive species, the rock-loving Neoparrya.

The Natural Arch is a traditional cultural property considered sacred to the Ute and Jicarilla Apache. Extension of the SIA to include the La Ventana Natural Arch expands the represented values to include cultural as well as geologic and ecological values. The expanded boundary encompasses lower elevation 8,880-foot ecosystem types representative of the foothills surrounding the San Luis Valley, with grassland, pinyon-juniper and ponderosa pine woodlands transitioning to higher elevation Douglas-fir and aspen at over 11,000 feet.

### *Geologic and ecological values*

Summer Coon is an eroded Oligocene-aged stratovolcano located in the eastern San Juan Mountains of Colorado, on the western edge of the San Luis Valley. It is noteworthy because it marks the beginning of the Rio Grande rift – about 34 million years ago – when rising magma was threatening to pull the continental plate apart. The volcano is tilted slightly; this probably occurred after eruption as the rift



system grew and lifted. The volcano has well developed radial dikes, but no ring dikes. La Ventana is a natural arch eroded into the long, narrow wall of one of the most prominent dikes. The central intrusive complex appears as a group of low hills running north-northwest in the center of the volcano. The hills are surrounded by an approximately circular alluvium-filled valley about two miles in diameter.  This volcano is part of a larger volcanic complex in the area that erupted from about 31 million years ago to 22 million years ago and is now represented by a series of calderas.

Erosion has uncovered the former stratovolcano down to its base, revealing a complete basal section of the 8-10 mile diameter cone. A geology driving tour along Saguache County Road A32 provides an educational introduction to readily accessible and interesting stops. (Noblett and Loeffler, 1987), and could be expanded into an engaging interpretive tour for forest visitors.

The Summer Coon La Ventana Geologic Area includes a portion of the Elephant Rocks Potential Conservation Area identified by Colorado Natural Heritage Program. This PCA is a complex of volcanic boulders, rock outcrops, and shrublands separating the prairie of the valley floor from the San Juan Mountains and contains both rare plant and animal species, which results in its rank of High Biodiversity Significance. Specific biodiversity elements present include a medium-sized population of the rock-loving Neoparrya – an herb that is restricted to south-central Colorado; a rare milkvetch (*Astragalus cerussatus*) with only 20 known occurrences; and a silky pocket mouse subspecies population found here that is restricted to the San Luis Valley and is rare within its range. (CHNP Potential Conservation Area Report, 2015)

The Eagle Mountain PCA is also located within the proposed Summer Coon La Ventana Geologic Area. The PCA includes the cliffs around Eagle Mountain and Eagle Rock, and is identified as of General Biodiversity Interest because of its nesting habitat for peregrine falcons. (CHNP Potential Conservation Area Report, 2015)

### Cultural Values

The Natural Arch is considered sacred to the Jicarilla Apache and Ute people. The Forest Service presently manages it as a traditional cultural property because of significance to the indigenous peoples. The Rio Grande NF's Assessment of Areas of Tribal Importance describes the arch's significance in cultural ceremonies and as a rendezvous location. (Rio Grande NF Assessment 12, 2015)

### Boundary, Size, and Access

The proposed Summer Coon La Ventana Geologic Area consists of 22,400 acres, which incorporates the entirety of the existing 8,441-acre Elephant Rocks Special Interest Area. The geologic area is contiguous on the east with a portion of BLM's popular Penitente Canyon Special Recreation Management Area. The geologic area is defined by La Garita Creek on the north, by the national forest boundary on the east and south, and generally by Old Woman Creek or private land along the west. Saguache County road A32 provides access directly to the

interior of the area, and Forest Road #659 leads to the La Ventana Natural Arch. The expanded boundary better captures the geologic, ecological, and cultural features than the previous Elephant Rocks Special Interest Area boundary and is more appropriate for conserving this unique landscape.

### Proposed Management

Specific management direction is proposed to protect and interpret the area's scenic character, botanical and geologic features, and cultural and recreational values. These recommendations are based upon desired experiences of visitors wanting to enjoy specific aspects of the Geologic Area (including cultural aspects) that support the stated reasons for the creation of the area. These include:

- The Summer Coon La Ventana Geologic Area must be administratively unavailable for oil and gas leasing and mineral material sales, and a mineral withdrawal needs to be recommended for locatable minerals.

- Management direction must include prohibition on timber harvest and new road construction.

- Motorized and mechanized travel must be restricted to designated routes and motorized game retrieval off designated routes must be prohibited.

- The Forest Service should develop an interpretive program for the area that at a minimum includes and interpretive driving tour that teaches about the area's unique and special qualities.  The Forest Service should consider developing non-motorized interpretive trails as well. Interpretation of cultural values should be done in close cooperation with Native American tribes.

- Prohibit rock climbing on the dike on which the arch is located to protect cultural values.

### Information Resources

| Topic | Data Source |
|---|---|
| Geology | Noblett & Loeffler, Summer Coon Volcano Geology, Colorado College, 1987 |
| Cultural | Rio Grande NF Assessment 12, Areas of Tribal Importance, 2015 |
| Biodiversity | CHNP PCA Reports, 2015 |



Summer Coon La Ventana Geologic Area

**WOLF CREEK PASS LINKAGE LANDSCAPE ZOOLOGICAL AREA**

**Proposed Designated Area**
**Rio Grande National Forest**                           **22,300 acres**
**Divide Ranger District**



Map Locator

### *General Description*

The Wolf Creek Pass Linkage Zoological Area is the most important wildlife linkage zone in the San Juan Mountains. It is situated in the very heart of the San Juan Core Area for lynx, which comprises the core reintroduction area and the most expansive lynx habitat in the Southern Rockies. The Wolf Creek Pass linkage has been frequently utilized by lynx, and presumably may be important for other species such as pine marten, boreal owl, and wolverine in the future.

The proposed Zoological Area includes the most complex management landscape on the Rio Grande National Forest. Much of the area has experienced severe mortality from spruce beetle, and the largest wildfires in the recent history of the San Juan Mountains have occurred in close proximity. The linkage area includes designated wilderness, Colorado Roadless Areas, and the Continental Divide National Scenic Trail, but it also incorporates a permitted ski area, a busy highway corridor, private inholdings, water impoundments, high recreation use both winter and summer, and past and present timber harvests. Moreover, the viability of the linkage area will be tested in the future by rapidly changing habitat conditions. The combination of spruce beetle epidemic, large intense wildfires, and climate change will impose new stresses in this area.

A Zoological Area designation will focus the needed management attention on this crucial landscape for wildlife and landscape connectivity and emphasize the priority of juggling many competing human activities in order to preserve the viability of the linkage. The area was originally identified in the Southern Rockies Lynx Management Direction as a "lynx linkage area," which are "areas of movement opportunity" and "can be maintained or lost by management activities." (Forest Service 2008 at Appendix D)



Rvsd Plan - 00002608

*Linkage values*

The Forest Service has previously succinctly defined the critical significance to lynx of the Wolf Creek Pass linkage:

> Lynx are heavily using the Wolf Creek Pass Lynx Linkage area as a dispersal corridor and the viability of this linkage is important to the recovery of lynx in Colorado. The linkage spans a forested swath over the Continental Divide between large blocks of highly effective subalpine habitat. Lynx denning and established home ranges have been identified to the north and south of the Wolf Creek Pass Lynx Linkage. The linkage is part of the Colorado Division of Wildlife's "Core Research Area" in the San Juan Mountains, recognized as the largest continuous block of high quality lynx habitat in the state and where the CDOW focused their 10-year lynx monitoring and research efforts. (Village at Wolf Creek FEIS, 2014)

Managers concur that maintaining landscape-level habitat connectivity may be paramount to maintaining a viable population because of the patchy, discontinuous distribution of lynx habitat in the Southern Rockies Ecosystem. For that reason, landscape linkages must be available to allow lynx movements between adjacent mountain ranges. Linkage areas are areas of movement opportunities. They exist on the landscape and can be maintained or lost by management activities or developments. (Village at Wolf Creek FEIS 2014; Southern Rockies Lynx Amendment 2008)

The Wolf Creek Pass Linkage Zoological Area includes significant portions of two Colorado Roadless Areas, both managed as Upper Tier. A portion of the Trout Mountain-Elk Mountain roadless area is located immediately north of Highway 160, and the western half of the Fox Mountain roadless area is incorporated within the southern half of the linkage area.

The Continental Divide National Scenic Trail corridor defines the southern border of the linkage area. The trail corridor is managed to provide high-quality scenic, primitive hiking and equestrian opportunities. (Forest Service Manual 2350, 2009)

Two Potential Conservation Areas identified by the Colorado Natural Heritage Program are located largely within the Wolf Creek Pass Landscape Linkage Special Interest Area boundary. The Haven of the Reflected Moonwort PCA is in the subalpine zone near the Continental Divide. It is ranked as High Biodiversity Significance for its occurrences of the moonwort family. The Pass Creek at South Fork Rio Grande PCA is ranked as a Moderate Biodiversity Significance site owing to an historic Rio Grande cutthroat trout population. (CHNP PCA Reports, 2015)

*Boundary, Size, and Access*

The proposed Wolf Creek Pass Linkage Zoological Area is bounded on either side of Highway 160 eastern approach to Wolf Creek Pass by major watershed and topographic divides. It includes about 22,300 acres on the Rio Grande National Forest, and there are additional lands

on the adjacent San Juan National Forest.

**Proposed Management**

The Wolf Creek Pass Linkage Zoological Area is proposed for designation in order to ensure its conservation as a landscape-level habitat connectivity for lynx and other wildlife. Specific management direction includes:

- Management actions must be driven by the primary need to ensure continued or enhanced habitat connectivity and viability of the linkage area for wildlife movement.

- The Wolf Creek Pass Linkage Zoological Area must be discretionary no oil and gas leasing, although there is low likelihood of oil and gas occurrence in this location. It should be withdrawn from mineral entry.

- Management direction must include prohibition on road construction and limitations on tree removal for the two roadless areas consistent with Upper Tier management prescribed by the Colorado Roadless Rule, 36 CFR Part 294 Subpart D.

- Do not authorize new permanent roads within the corridor in order to maintain unfragmented habitat for wildlife migration and dispersal.

- Decommission and reclaim unauthorized routes and unneeded system roads.

- Establish road and motorized trail density standards within the management area to conform to the best scientific recommendations, generally less than one mile per square mile (Lyon 1979; Van Dyke et al. 1986a, b; Fox 1989; Trombulak and Frissell 2000; Reed et al. 1996; Strittholt and DellaSala 2001; Davidson et al. 1996). Ensure that there will be no net increases in densities above a scientific credible threshold. If these densities do not exist today, the Forest Service will develop a strategy to achieve them.

- All temporary roads are removed and the lands and waters on which they were located are restored to natural conditions within one year of the termination of the purpose for which they were established.

- Establish and implement in a timely manner mitigation standards for existing roads and Highway 160 to facilitate movement of wildlife including a reduction in mortality of wildlife from vehicle collisions (modified from BLM 2012:2-55). Coordinate with CDOT on planning and projects.

- Limit disturbance footprint resulting from vegetation management activities within the corridor spatially and temporally (e.g., establish maximum width and acres of any one ground disturbance, and limit total acreage of ground disturbance at any one time)

- Winter and summer recreation activities must conform to best available scientific knowledge for mitigating impacts to lynx and other sensitive wildlife species, and, if necessary be limited spatially and/or temporally.

- Changes in operation or permit boundaries of Wolf Creek Ski Area must be designed to avoid new impacts to use of linkage corridor.

- Access to inholdings and new recreation developments must be maintained at no greater than current standards, and reduced or avoided entirely if possible.

- Coordinate with grazing permittees to identify fencing that is not critical for livestock operations. Fencing that is not critical for livestock operations and that is impeding wildlife movement is removed. Any new livestock fencing that is installed should be constructed in a manner that will minimize disruption to wildlife movement, taking into consideration seasonal migration and water resources.

*Information Resources*

| Topic | Data Source |
|---|---|
| Lynx | Village at Wolf Creek FEIS, 2014 |
| Biodiversity | CHNP PCA Report, 2015 |
| Roadless area | USDA Forest Service Colorado Roadless Rule, 2012 |
| Wildlife crossings | Bureau of Land Management. 2012a [BLM]. Lower Sonoran and Sonoran National Monument Proposed Resource Management Plan and Final Environmental Statement. June 2012. https://www.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=21457. Accessed 04/11/2016. |
| Route density standards | Davidson, Diane W., William D. Newmark, Jack W. Sites, Jr., Dennis K. Shiozawa, Eric A. Rickart, Kimball T. Harper, and Robert B. Keiter. 1996. Selecting Wilderness Areas to Conserve Utah's Biological Diversity. *Great Basin Naturalist* 56(2):95-118. |
| | Forest Service. 2008. Southern Rockies Lynx Management Direction, Final Environmental Impact Statement Volume 1. |
| | Fox, R.A. 1989. Mule Deer (Odocoileus hemionus) Home Range and Habitat Use in an Energy-Impacted Area of the North Dakota Badlands. Masters Thesis, University of North Dakota. Grand Forks, ND. |
| | Lyon, L. J. 1979. "Habitat Effectiveness for Elk as Influenced by Roads and Cover." *Journal of Forestry*, October, 658-660. |
| | Stritthold, J.R., and D.A. DellaSala. 2001. Importance of Roadless Areas in Biodiversity Conservation in Forested Ecosystems: A Case Study—Kalmath-Siskiyou Ecoregion, U.S.A. *Conservation Biology* 15(6):1742-1754. |
| | Trumbulak, S.C., and C.A. Frissell. 2000. Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities. *Conservation Biology* 14(1):18-26. |
| | VanDyke, F. G., Brocke, R. H., Shaw, H. G., Ackerman, B. B., Hemker, T. P., and Lindzey, F. G. (1986b). Reactions of Mountain Lions to Logging and Human Activity. *Journal of Wildlife* |

| | |
|---|---|
| | *Management*. 50(1): 95-102. |
| | VanDyke, F. G., Brocke, R. H., and Shaw, H. G. (1986a). Use of Road Track Counts as Indices of Mountain Lion Presence. *Journal of wildlife Management*. 50(1):102-109. |



# Appendix D

**DECKER CREEK GUNNISON SAGE GROUSE PROTECTION AREA**

**Proposed Designated Area**
**Rio Grande National Forest**            **3980 acres**
**Saguache Ranger District**

---

*General Description*
This area contains currently occupied habitat for the only remaining population of Gunnison Sage Grouse (*Centrocercus minimus*) in the San Luis Valley area.  This species is critically imperiled on a global scale, and was listed as a threatened species by the US Fish and Wildlife Service in November of 2014.

Designation of this area as a Special Interest Area (SIA) would ensure that appropriate and necessary increased management actions would occur in order to protect this species and its known and potential habitat.

*Biodiversity values*
The Gunnison Sage Grouse in this area are one of only seven separate populations of this species.   It is important to maintain these separate populations in order to preserve and develop genetic variability for this species.

Gunnison Sage Grouse were first reintroduced into historic habitat in this area in the early 1970s to augment an existing population.  The small population of grouse in this area initially thrived and remained stable. This population has waxed and waned over the years due to management, mismanagement and unknown factors, but tenuously remains.

Gunnison Sage Grouse are seldom seen.  Accurate population numbers are difficult to determine and are estimates primarily based upon observations at lek sites.

The proposed Decker Creek Special Interest Area includes approximately 3980 acres of non-Wilderness Forest land identified as overall range and historic habitat for Gunnison Sage Grouse, including 2012 acres identified as a part of a grouse production area, according to 2015 Colorado Parks and Wildlife GIS data.  The forest land is adjacent to and contiguous with a much larger area of area of land managed primarily by the Bureau of Land Management, which contains an active grouse lek site and additional habitat for this species.

Sage Grouse are dependent upon sagebrush for nesting, cover and food, and national forest lands in this area contain sagebrush and other known and potential habitat for this species.

*Boundary, Size, and Access*
The proposed Decker Creek Special Interest Area consists of about 3980 acres that are adjacent to and outside of the existing Sangre de Cristo Wilderness. This area is located on the slopes of the Sangre De Cristo Mountains southeast of Poncha Pass.  It is bordered by USFS land to the east, Pike San Isabel National Forest land to the north, and BLM land (with some private land) to the west.

The SIA is split into two units of national forest land which are separated by Sangre de Cristo Wilderness Area lands which extend all the way down to the BLM land boundary to the west near Merkt Creek.

The northern unit of this SIA is about 2550 acres in size.  Most of land within this unit of the SIA is within the Dorsey Creek Roadless Area.  A dead end 1.6 mile long segment of the Forest Road 990 the Dorsey Creek road is within this area.

The southern unit of this SIA is about 1430 acres in size.  Most of the land within this unit is within the Butterfly Roadless Area.   Segments of Forest Road 980 the Rock Creek road and Forest Road 982 the Ditch Road pass through this unit.  In the southern part of this unit there is an unused dead end section of the Butterfly Creek Road #982, and a non-existent and closed on the ground segment of the Eaglebrook Road #980.

North Decker Creek flows through this SIA roughly in the middle of this area.

Both of these units contain land within a Gunnison Sage Grouse Production Area, defined as land within four miles of the known active lek site in this area

### Proposed Management
We propose specific management to protect the population and habitat of Gunnison Sage Grouse in this area.  We believe increased management of this area is necessary in order to mitigate and reverse estimated population declines of grouse here.

Only within the last couple years has the BLM implemented any substantive management actions to protect habitat for grouse in this area, such as implementing seasonal closures of roads. Additional management on adjacent USFS lands would compliment BLM actions and improve conditions for this species in this area.

*Desired conditions*
Populations of Gunnison Sage Grouse in this area are stable or increasing.
Management activities in this area are designed to maintain or enhance biological diversity and to preserve the habitat of all native species of plants and animals, especially threatened species such as Gunnison Sage Grouse.  Management activities maintain or enhance Sage Grouse habitat quality and reproductive success.  For the most part, the landscape appears natural. Insect and disease losses generally are accepted.
Permitted, administrative and public use of this area does not negatively impact Gunnison Sage Grouse or its habitats.
Motorized travel within this area is restricted to a limited number of designated routes.

*Standards*
1. For management activities in sage grouse habitat, retain or enhance existing habitat by:
- Managing for native vegetation,
- Retaining a minimum of five percent of sagebrush over 48 inches in height where site characteristics allow, and

- Maintaining the existing canopy cover of sagebrush.

2. Restrict the use of insecticides in sagebrush habitat to maintain adequate insect populations for grouse.

3. Maintain and manage  to retain a continuous canopy cover of herbaceous plants of the highest average height possible in sage grouse nesting habitat during the sage grouse nesting and early brood-rearing season (generally from April 1 to July 31).

4. Restrict activities that have the potential to impact sage grouse breeding activities from April 1 to July 31 in this area to minimize any negative impacts to reproductive success or survival.

5. New travel routes, temporary routes and facilities are located outside of this SIA to preserve habitat integrity and effectiveness.

6. Off route motorized and mechanized travel is prohibited within this SIA, including travel for game retrieval, firewood gathering, dispersed camping or recreation.  Over snow vehicle use is restricted to designated routes.

7. This SIA is not part of the suitable timber land base.

8. This area will be withdrawn from mineral entry and is not available for oil and gas leasing.

9. New water developments, corrals, or holding pens for livestock are located outside of this SIA.

*Guidelines*
 1. Restrict burning of sagebrush patches to maintain an adequate seed source for sagebrush regeneration.

2. If restoration of habitat in occupied sage grouse habitat is deemed necessary, design treatments to meet the goals as described in current literature on sage grouse habitat.

3. When implementing any vegetation management activities in this SIA:
- Incorporate actions to remove invading conifers in order to maintain and expand the sagebrush cover type.
- Incorporate actions to reduce or eliminate non-native plant species and promote the re-establishment of native plant species.
- Limit the use of herbicides to direct application when necessary for eliminating or reducing non-native plants in sagebrush areas in order to minimize impacts to sagebrush.

4. Limit the installation of new fences, power lines, and other structures in this SIA to reduce possible raptor perches and maintain sagebrush.

5. Manage livestock activity near known or suspected sage grouse nesting areas from April 1 to June 30 to reduce the likelihood of livestock trampling of sage grouse nests. Actions to consider include, but are not limited to:

- Seasonally prohibiting livestock driving and presence in this SIA.
- Using pastures or areas during the nesting season that are not near sage grouse nesting areas.
- Providing livestock mineral supplements and water sources away from sage grouse nesting areas.

6. Manage developments and activities within or adjacent to springs, seeps, and riparian areas that may reduce water availability or soil moisture in order to maintain or improve sage grouse habitat. Actions to consider include but are not limited to:

- Livestock enclosures
- Natural barriers to ungulates
- Limiting or prohibiting water diversions

7. Reduce temporary and permanent modifications to sagebrush cover type, including, but not limited to, roads, and livestock improvement developments

8. Properly implement travel restrictions. Unauthorized and non-system routes are closed and rehabilitated. Coordinate with the BLM and adjacent land owners to help ensure compliance.

9. Remove all unnecessary infrastructure.

10. Restrict and/or prohibit any dispersed recreational activities, such as recreational target shooting, drone use, etc. as necessary in order to protect Sage Grouse and their habitat.


***Information Resources***
Threatened Status for Gunnison Sage-Grouse: Final Rule, Federal Register, 79 Fed Reg 69192 et seq., November 20, 2014.

Colorado Natural Heritage Program Decker Creek Potential Conservation Area



Decker Creek SIA depicted in light blue shading

# Wolverine – Maps, Reports and Publications

Home / The Wolverine – Winter Recreation Research Project / Wolverine – Maps, Reports and...



## Wolverine Study Maps

NDVI Values

Recreation Intensity Classes: Northern 2010-2012

Recreation Intensity Classes: Southern 2010-2012

Recreation Intensity Classes: Northern 2010

Recreation Intensity Classes: Northern 2011

Recreation Intensity Classes: Southern 2012

Rvsd Plan - 00002620

Recreation Intensity Classes: Combined Areas 2010 – 2012

Landfire Existing Veg Type

Distance to groomed snowmobile routes

Ruggedness

Tasseled Cap Brightness Index

## Wolverine Study Reports

Investigating the Relationship Between Winter Recreation and Wolverine Spatial Use in Central Idaho

Idaho Wolverine – Winter Recreation Research Project: Investigating the Interactions Between Wolverines and Winter Recreation. 2011-2012

Investigating the Interactions Between Wolverines and Winter Recreation Use: 2010 Annual Report

Brochure: Winter Recreation and the Wolverine

Wolverine Winter Recreation Project February Update Final

Central Idaho Wolverine and Winter Recreation Research Study – July 2011

Central Idaho Wolverine and Winter Recreation Research Study – November 2011

Central Idaho Wolverine and Winter Recreation Research Study – February 2012

Wolverine and Winter Recreation Research Study – 2013 Progress Report – November 2013

Wolverine-Winter Recreation Project 2014 Progress Report Final

Wolverine-Winter Recreation Project 2015 Progress Report Final

Share this page



## Your Shopping Cart

Your cart is empty.

### News

Efforts to boost
elephant protection
fails at Cites
October 4, 2016

Celebrities Unite to
Save the Yellowstone
Grizzly
August 25, 2016

Save the Yellowstone
Grizzly Campaign
August 25, 2016

Big money,
environmentalists
and the Bears Ears
story
August 5, 2016

### Search

Type and hit er



@round.river
is an ecological research and education
NGO working to conserve wild places.
Student programs in Patagonia, Botswana,
Costa Rica, and Canada.

Rvsd Plan - 00002622

Load More...        © Follow on Instagram



Copyright © 2015 Round River Conservation Studies. All Rights
Reserved. Dream-Theme — truly premium WordPress themes

Where We Work     What We Do
Student Programs     About Us     Contact Us
Round River Store

Rvsd Plan - 00002623

# WOLVERINE – WINTER RECREATION RESEARCH PROJECT:
## *INVESTIGATING THE INTERACTIONS BETWEEN WOLVERINES AND WINTER RECREATION*

## 2015 PROGRESS REPORT



DECEMBER 30, 2015

PREPARED BY

KIMBERLY HEINEMEYER, ROUND RIVER CONSERVATION STUDIES
JOHN SQUIRES, ROCKY MOUNTAIN RESEARCH STATION

Rvsd Plan - 00002624

# WOLVERINE – WINTER RECREATION RESEARCH PROJECT:
## *Investigating the Interactions between Wolverines and Winter Recreation*

### 2015 PROGRESS REPORT

DECEMBER 30, 2015

PREPARED BY:

KIM HEINEMEYER, ROUND RIVER CONSERVATION STUDIES
JOHN SQUIRES, ROCKY MOUNTAIN RESEARCH STATION

WITH THE SUPPORT OF PROJECT PARTNERS AND COLLABORATORS INCLUDING:

BOISE, BRIDGER-TETON, CARIBOU-TARGHEE, PAYETTE AND SAWTOOTH NATIONAL FORESTS
IDAHO DEPARTMENT OF FISH AND GAME
LIZ CLAIBORNE ART ORTENBERG FOUNDATION
UNIVERSITY OF MONTANA
GRAND TETON NATIONAL PARK
WYOMING DEPARTMENT OF GAME AND FISH
US FISH AND WILDLIFE SERVICE
IDAHO STATE SNOWMOBILE ASSOCIATION
BRUNDAGE MOUNTAIN RESORT
GRAND TARGHEE RESORT
JACKSON HOLE MOUNTAIN RESORT
CENTRAL IDAHO RECREATION COALITION
DEFENDERS OF WILDLIFE
THE WOLVERINE FOUNDATION
THE SAWTOOTH SOCIETY
THE WINTER RECREATION COMMUNITIES OF CENTRAL IDAHO AND WESTERN YELLOWSTONE.

To obtain additional project information, see www.roundriver.org/wolverine

1

## ACKNOWLEDGEMENTS

We are grateful to our multiple partners and collaborators who assisted this project in numerous ways. Funding, equipment and logistical support has been contributed by the US Forest Service, Liz Claiborne Art Ortenberg Foundation, Round River Conservation Studies, Idaho Department of Fish and Game, Grand Teton National Park, Wyoming Department of Game and Fish, Idaho State Snowmobile Association, The Wolverine Foundation, Sawtooth Society, and the Nez Perce Tribe. Several additional organizations have assisted with winter recreation monitoring or other aspects of the project: Brundage Mountain Resort, Jackson Hole Mountain Resort, Grand Targhee Resort, Sun Valley Heli Ski, Teton Backcountry Guides and numerous local businesses in Cascade, Driggs, Fairfield, Island Park, McCall, Stanley, Sun Valley and Victor in Idaho and Jackson, Wyoming and surrounding areas.

The project would not have been possible without individuals within our partnering agencies tirelessly assisting the project in numerous ways. In particular, we thank Diane Evans Mack and Rob Cavallaro (IDFG), Tammy Fletcher and Dave Ovard (Caribou-Targhee National Forest), Ana Egnew (Payette NF), Lisa Nutt and Joe Foust (Boise NF), Robin Garwood (Sawtooth NF), Sarah Dewey (Teton National Park), Gary Hanvey, Kerry Murphy and Jason Wilmot (Bridger-Teton NF) and Alyson Courtemanch and Doug Brimeyer (Wyoming Game and Fish) for diligently ensuring the success of the project. We thank Jeff Copeland (The Wolverine Foundation) for the many ways he assists and advises us. We are indebted to Mark Hebblewhite (University of Montana) for his advice and guidance as a member of our science team. We also want to thank Mark Drew, IDFG Veterinarian for his assistance and time in training us and helping us safely anesthetize wolverines as well as Dr. Don Betts of Driggs, Idaho and Dr. Mary Wood (Wyoming Game and Fish). Many others have helped us – we thank you all for your assistance and support.

We have invested a large amount of effort in the processing, management and organization of numerous large and complex spatial data sets generated or needed by the project. Julia Smith, RRCS, has assumed much of this work and we are grateful for her time, skill and diligence. Similarly, our large field crews, spread across many field sites and study areas, could have been a logistical nightmare if it were not for assistance with project and personnel management provided by Kathleen Wilson, RRCS.

The backbone of this research is high quality data collection under often times challenging winter remote backcountry conditions. We are very grateful for the fearless but always impeccably safe flying of Mark Packila along his uncanny ability to find wolverines. We are indebted to our hard-working 2015 field crew, many who have returned to us year after year and always see the project through to the spring-muddy end: Matt Amick, Anne Blackwood, Grace Carpenter, Chris Cole, Zack Farley, Tom Glass, Dylan Hopkins, Lindsay Jones, Matt Kasprzak, Chris Klingler, Tulley Mackey, Cy McCullough, Josh Metten, Nick Miller, Katy Nelson, Carson White and Jarrod Zweigart. The commitment, professionalism and good humor of our field staff have made the project not only successful but also good fun.

We thank the hundreds of recreationists who agreed to carry funny little orange data loggers while out having fun and who took the time to return them to us. Your contribution provides a critical foundation to the project.

Finally, we thank the wolverines, some who also carried funny, little data loggers for us and who have taught us so much.

Rvsd Plan - 00002626

# WOLVERINE – WINTER RECREATION RESEARCH PROJECT
2015 Progress Report

## INTRODUCTION

The potential effects of winter recreation on wolverine reproduction, behavior, habitat use and populations are unknown but of concern (Greater Yellowstone Coordinating Committee 1999, Carroll et al. 2001, May et al. 2006, Copeland et al. 2007, Krebs et al. 2007). In Canada, which could be considered the North American stronghold for the species, wolverine status was changed to 'Special Concern' in May 2014 with increased winter recreation use combined with sensitivity of denning females listed among the primary reasons for this change (www.cosewic.gc.ca).

The goal of the Wolverine – Winter Recreation Study is to robustly identify and evaluate wolverine responses to winter recreation. We have completed the data collection efforts with our 6th winter field season in 2015. Our focus now is on analyzing the complex array of human and animal data to evaluate potential responses of wolverines to different types and intensities of winter recreation. This progress report summarizes the efforts of the last field season.

## 2015 SUMMARY OF EFFORTS

In 2015, we concluded our major field data collection efforts to document wolverine and backcountry winter recreation presence, movements and habitat use.

### 2015 STUDY AREAS

In 2015, we continued the monitoring of wolverines and winter recreations in key study areas in central Idaho (Payette and Boise National Forests) while focusing our core effort on completing the second full year of data collection in the western Yellowstone region of Idaho, Montana and Wyoming.

The western Yellowstone study areas fall across five federal jurisdictions and three states. The 'Island Park' study area includes the Centennial and Henry Mountains straddling the Idaho-Montana state line on the Caribou-Targhee, Custer-Gallatin and Beaverhead-Deerlodge National Forests (NFs). The Teton study area encompasses the Teton Mountains which fall within the Caribou-Targhee and Bridger-Teton NFs and Grand Teton National Park in Idaho and Wyoming (Figure 1).

### WOLVERINE MONITORING

We undertook both live trapping and camera trap-hair collection monitoring in the western Yellowstone study areas and camera trap-hair collections to continue monitoring wolverines in the key study areas in central Idaho.



Figure 1. Idaho Wolverine-Winter Recreation Study Region and Study Areas: Central Idaho study areas on the Payette, Boise and Sawtooth National Forests indicated by blue circles, western Yellowstone study areas indicated by red circles.

Salmon Mountains Study Area. In central Idaho, we completed camera and DNA (hair) collection efforts in the Salmon Mountains near McCall on the Payette and Boise National Forests. This winter represented our 6th year of monitoring wolverines in this popular winter recreation area. Our efforts in 2010 and 2011 identified four reproductively active females and four resident males. Based on our subsequent monitoring through 2015, most of these resident animals are no longer present with the exception of F5 who is tentatively identified in photographs near Warm Lake Summit in March 2015 on a station she has routinely visited in prior years. In 2014, we identified and monitored two new wolverines in the Salmon Mountains (one male M12, one female F10) with apparent resident behaviors (e.g., maintain home ranges) with the female establishing a reproductive den in 2014 (Heinemeyer et al. 2014).

We monitored 10 camera-hair snare stations in the Salmon Mountain study area from January-March 2015 for over 700 nights of effort. We did not confirm F10 in the area during 2015 but did have un-identified wolverines visiting the camera-hair snare sites in or near her 2014 home range; these visits did not result in sufficient hair collection for DNA analyses and photos were inconclusive on individual identification. We initially identified and GPS-collared M12 in the Salmon Mountain study area in 2013-14 documenting his movements within the area previously identified as the home ranges of original M2 and M3, and adjacent to the still resident M1. In 2015, we did not detect M1 but found M12 at baited stations within M1, M2 and M3 original home ranges (Figure 2): M12 was found at 9 of our 10 sample sites. If indeed he maintains this vast area as a territory, it would potentially encompass over 1,100 sq. miles rivaling the largest home range we have documented during the study and well exceeding the 'typical' male home range of 500-800 sq. miles.

Rvsd Plan - 00002628

Based on our camera stations, it appears that the number of wolverines in our Salmon Mountain study area is currently lower than when we initiated the project in 2010. Most notable has been the incremental loss of resident animals without identifying new animals filling these vacant home ranges at densities we initially saw. The probability that we simply did not detect new or resident animals is relatively low given the monitoring effort we invest in the region. Recent analysis suggests that the probability of detecting a wolverine with a baited camera station within its home range over one winter is 86% (Inman et al. 2015). The density of camera – hair snare stations that we deployed and maintained would equate to two or more stations within a typical female home range and more than that within a typical male home range. Additionally, the known resident wolverines readily come into the baited stations and we typically have identified them multiple times over any winter season.



Figure 2. Home ranges of wolverines monitored in the winter of 2014 in the Salmon Mountains near McCall, Idaho. One female F12 was collared on 2014 (location shown), but was never relocated and was likely a transient; another female, F10, denned in late February and her approximate den site is shown. In 2015, M1, F10 and F3 were not detected and are likely no longer present and M12 was identified at baited camera stations in both his 2014 area and the area occupied by M1 in prior years.

Case 1:21-cv-02994-REB Document 24-10 Filed 06/21/22 USDC Colorado Page 163 of 266

Western Yellowstone Study Areas. In our western Yellowstone study areas (Centennials, Henrys, Tetons), we undertook a mix of live trapping and camera-hair snare monitoring to build on efforts started in 2014.

We deployed 5 camera-hair snare stations in the Centennial Mountains at sites that were live traps in 2014. These camera traps were run for a total of 399 trap nights between early January and late March 2015. In this second year of focused effort, we again did not detect a wolverine in the Centennial Mountains (Table 1). We also attempted to undertake an aerial track survey in the Centennials in March 2015 but weather prohibited completing the effort. The Centennials historically were known to support wolverines. Inman (2007) reported five mortalities (3 female, 2 males) between 2001 and 2005 in or near the Centennial Mountains; his work represents the last confirmed observations of wolverines in the mountain range.

In 2014, 2 wolverines (1 male M14, 1 female F11) were captured in the Henry Mountains along the Montana-Idaho border north of the Centennial Mountains. Genetic analysis indicates that F11 is the mother of M14, likely a kit from 2013. She did not den in 2014 and we re-deployed the trap effort in the Henry Mountains in 2015 with the hope of monitoring her through a denning cycle. We did successfully GPS collar her along with a new male M15. We did not detect M14. The female established a reproductive den in late February and we were able to monitor activity at the den through fixed wing flights. Her collar malfunctioned and we were unable to obtain GPS data. This den represents the ninth reproductive den that we have documented. We visited the den site in August after F11 abandoned it, and recorded habitat and structure information. The den was located on the lower slope of a headwall in an area composed of extremely large talus boulders (Figure 3).

We obtained DNA results that show that M15 is also the son of F11 and the sibling of M14. The father is unknown. The male M15 shows movements characteristic of a resident animal and he maintained a home range covering 619 sq. miles including the Henry Mountains and the southern portion of the Madison Range (Figure 4).

We increased our trapping efforts in 2015 in the Tetons after only capturing a single male (M13) in 2014. We established research teams on both sides of the mountain range and undertook a significant trap effort logging 460 total trap nights over the January-March trapping season using both live traps and camera traps. In addition to live traps (239 trap nights), we set up camera-hair snare traps (221 trap nights) for all or part of the winter season (Table 1). The only wolverine detected was again was M13 (nicknamed "Jed"). From DNA analysis, we know he was initially captured in 2002 in another study in the area when he was identified as a subadult at that time. That original capture makes Jed an estimated 14+ years old – well past prime age and it would be expected that he should have been displaced by a younger, prime-age male if one were present. His relatively small home range of 355 sq. miles may be a reflection of his age (Figure 5). We did not identify any females in the Tetons.

We closed trapping in the Tetons in mid-March due to early spring conditions, in late March in the Centennials and by the end of April in the Henry Mountains, prior to grizzly bear emergence. We made a concerted effort through the end of April to recapture F11 to retrieve the malfunctioned collar before it fell off but we were not successful.

All data from the 6 previous years of wolverine tracking efforts were harmonized and compiled into a single geodatabase with final versions of each animal's points, tracks, and calculated home range for each season in which there was sufficient data for analysis (Table 2).

Rvsd Plan - 00002630

Wolverine – Winter Recreation Study, 2015 Progress Report                    December 2015

Table 1. Summary of trapping effort during January-April 2015 within each of the primary mountain ranges or study areas: for each area, the total number of wolverines captured (including recaptures of the same animal) is listed first and the capture success rate is indicated as (captures/100 trap nights).

| Study Area | Total Trap Nights | Live Trap Nights | Wolverines Captured | Camera Trap Nights | Photo Captures |
|---|---|---|---|---|---|
| **Henrys** (2 traps) | 125 | 85 | 4[1] (0.05) | 40 | 6[3] (0.15) |
| **Centennials** (5 traps) | 399 | 0 | 0 | 399 | 0 |
| **Salmons** (10 traps) | 718 | 0 | 0 | 718 | 17[4] (0.02) |
| **Tetons** (10 traps) | 460 | 239 | 3[2] (0.01) | 221 | 3[5] (0.01) |

[1] "M15" (x3), "F11" (1x);  [2] "M13" (3x);  [3] "F11" (3x);  [4] "M12" (5x; maybe 6);  [5] "M13" (1x)





Figure 3. The denning area of F11 is shown in the upper photo – for scale, look in the lower left quadrat for the field technician lying in the grass. In the lower photo, Kim walks below the large boulder that formed the entrance to the den under the snow.

Rvsd Plan - 00002631

Case 1:21-cv-02994-REB   Document 24-10   Filed 06/21/22   USDC Colorado   Page 165 of 266



Figure 4. Home ranges of F11 (from 2014 location data) and M15 (2015 location data) in the Henry Mountains with the relative intensity of snowmobile recreation estimated based on an early spring aerial recreation survey; GPS tracking of winter recreationists was limited to the southern portion of this area.

Rvsd Plan - 00002632

Case 1:21-cv-02994-REB   Document 24-10   Filed 06/21/22   USDC Colorado   Page 166 of 266



Figure 5. The 2015 minimum convex polygon home range of M13 in the Tetons showing the concentration of winter recreation activity (documented through GPS handouts at all major trailheads) is in the southern portions of his territory and to the south of his territory.

Rvsd Plan - 00002633

Table 2. Summary of wolverine location and home range data collected over 6 years of field work; only animals with at least 3 weeks of monitoring are included.

| Sex | N | Years | n | Days | MCP Ave (range) in km² | MCP Ave (range) in mi² |
|-----|---|-------|---|------|------------------------|------------------------|
| F | 10 | 1-3 | 818-2976 | 25-95 | 357 (162-563) | 138 (63-217) |
| M | 9 | 1-4 | 316-3217 | 21-79 | 1138 (440-2365) | 439 (170-1170) |

## RECREATION MONITORING

We continued recreation monitoring in both the Henry and the Teton Mountains including handouts of GPS trackers to backcountry recreationists in the 2015 winter field season. A total of 1,239 GPS tracks were collected from January-March: 83 in the Henrys (82 snowmobile tracks, 1 backcountry ski track) and 1,156 in the Tetons (77 snowmobile tracks, 1,067 ski/snowboard tracks, and 12 mixed recreation tracks; Figure 6). The GPS tracks collected in 2015 combined with the nearly 2,000 collected in the previous winter will provide high quality location data that can be used at multiple spatial and temporal scales to evaluate wolverine responses in the Tetons and Henry Mountains, similar to our central Idaho recreation data collected in prior years. Based on our array of remote trail use counters (19 in the Tetons, 3 in the Henrys), these GPS tracks represents a sample from an estimated 32,500 winter backcountry visits: 29,000 backcountry skier and snowmobiler visits in the Teton Mountain study area and more than 3,500 snowmobiler visits in the Henry Mountain study area.

We also completed an aerial recreation survey on March 20, 2015 in the Henry and southern Madison Range Mountains using methods described in Heinemeyer et al. 2011. This survey documents relative winter recreation levels in the northern part of the home range of M15 that encompasses the southern Madison Mountains where we do not have GPS tracking data from recreationists (Figure 4). Like previous aerial surveys in our other study areas, this survey used a standardized sampling approach to provide an independent estimate of the extent and relative intensity of winter recreation. In addition to filling information gaps, these data will be used when working with the GPS track data to identify any inconsistencies or changing use patterns in areas where GPS monitoring efforts have ended.

Over the summer of 2015, we have completed the validating, compiling and harmonizing of these GPS tracks and combined them with data from all previous years to facilitate analysis and modelling. New recreation intensity grids were calculated and the data are attributed to facilitate the creation of more fine-scale analyses such as daily, weekly or weekend vs weekday spatial layers of recreation intensity.

## BASE DATA ACQUISITION AND PROCESSING

The capture and tracking of wolverine M15 necessitated a redefinition of the West Yellowstone study area boundary and recompilation of base data layers as he covered regions north into the Madison Range. The new West Yellowstone study area now spans four National Forests (Gallatin, Beaverhead-Deerlodge, Caribou-Targhee, and Bridger-Teton) and two National Parks (Grand Teton and Yellowstone). The Central Idaho study area brings in three additional National Forests (Boise, Payette, and Sawtooth) to the overall study area that spans three states (Idaho, Wyoming and Montana). Compiling and harmonizing the best available base data between numerous jurisdictions is a significant and ongoing task. In addition to forest and parks data (roads, trails, winter travel routes, area use restrictions), other base data were recalculated to accommodate the expanded study area, including land cover (vegetation cover, type, seral stage, etc.), vegetation characteristics (e.g., NDVI, brightness and greenness indexes), and terrain variables (elevation, slope, aspect, ruggedness). We acquired and mosaicked high-resolution (1-2 m) NAIP imagery for the entire study area to provide a detailed birds-eye view of cover type (circa 2012) and allow for the calculation of high-resolution visual band indices during peak phenology. We are currently generating a solar insolation covariate as a potential predictor of cooler microclimates that may be important to wolverines for denning and habitat selection.

Wolverine – Winter Recreation Study, 2015 Progress Report                              December 2015



Figure 6. Colored paths are GPS tracks of backcountry recreationists in the Teton Pass area of the southern Tetons; this area is accessible by a paved highway and is a popular backcountry ski destination.



Figure 7. An example of the GPS recreation tracks collected by backcountry skiers in Grand Teton National Park during the winter of 2014; the male wolverine monitored in the Tetons travelled through this area.

Page 11

Rvsd Plan - 00002635

Copeland et al 2007 created a 1-variable wolverine niche model based on the annual presence of snow in mid-May. This model captures 98% of all known wolverine den sites worldwide. As such, it represents a parsimonious model and indicates that spring snow may be an important covariate in more fine-scale habitat modeling efforts such as we will be undertaking. Therefore, we have created a spring snow layer for the years 2009-2015 using 250 m resolution MODIS data based on the methods described in Copeland et al (2007). In addition to providing an updated covariate for analysis in our study area, this spring snow model can also be compared to the Copeland et al. 2007 model which was based on snow data from 2000-2006 to detect changes in spring snow cover.

## OUTREACH AND EDUCATION

Throughout this project, we have attempted to be transparent about the research effort and emerging results of the project. We have completed numerous presentations to public forums across our study region including in McCall, Stanley, Ketchum, Island Park, Idaho Falls, Driggs and Jackson, and have also spent time with elementary, high school and undergraduate college classes over the past 6 years. Presentations have been made at professional or stakeholder conferences including at the Annual Meeting of The Wildlife Society, Society of Conservation Biology, Idaho Wildlife Society Annual Conferences, the Idaho State Snowmobile Association Annual Convention, and the Cross Boundary Wolverine Working Group (BC-Alberta-US group). We have also provided a number of presentations at state and federal agency meetings including to Wyoming Game and Fish, Idaho Fish and Game and to the National Forests where we work.

## NEXT STEPS

The field data collection for the wolverine-winter recreation project is completed. Our focus is now on the analyzing responses of wolverines to winter recreation, associated report and publication preparation and presentation, assisting agencies and stakeholders in interpreting the results of the research and continuing outreach efforts. The majority of the analysis and reporting is expected to be completed by the end of 2016.

## LITERATURE CITED

Carroll, C., R.F. Noss, and P.C. Paquet. 2001. Carnivores as focal species for conservation planning in the Rocky Mountain region. Ecol. Appl. 11: 243-262.

Copeland, J. P. 2009. Investigating the relationship between winter recreation and wolverine spatial use in central Idaho: Phase I completion report. USFS Rocky Mountain Research Station, Missoula, MT. 9 pp.

Copeland, J.P., K.S. McKelvey, K.B. Aubry, A. Landa, J. Persson, R.M. Inman, J. Krebs, E. Lofroth, J.R. Squires, A. Magoun, M.K. Schwartz, J. Wilmot, C.L. Copeland, R.E. Yates, I. Kojola, and R. May. 2010. The bioclimatic envelope of the wolverine (*Gulo gulo*): do climatic constraints limit its geographic distribution? Can. J. Zool. 88:233-246.

Copeland, J. P., J.M. Peek, C.R. Groves, W.E. Melquist, K.S. McKelvey, G.W. McDaniel, C.D. Long, C.E. and Harris. 2007. Seasonal habitat associations of the wolverine in central Idaho. J. Wildl. Manag. 71: 2201–2212.

Department of Interior. 2013. Endangered and threatened wildlife and plants; threatened status for the distinct population segment of the North American wolverine occurring in the contiguous United States. Federal Registry 78(23): FWS-R6-ES-2012-0107. February 4, 2013.

Heinemeyer, K., J. Squires and J.P. Copeland. 2010. Investigating the interactions between wolverines and winter recreation use: 2010 Annual Report. Round River Conservation Studies and the USFS Rocky Mountain Research Station. Available at http://www.roundriver.org/index.php/wolverine

Rvsd Plan - 00002636

Heinemeyer, K. And J. Squires. 2012. Idaho Wolverine – Winter Recreation Research Project: Investigating the interactions between wolverines and winter recreation 2011-2012 Progress Report. Available at http://www.roundriver.org/index.php/wolverine

Heinemeyer, K. 2013. Idaho Wolverine-Winter Recreation Research Project: Investigating the interactions between wolverines and winter recreation, 2013 Report to the Liz Claiborne Art Ortenberg Foundation. Round River Conservation Studies, Salt Lake City, Utah.

Heinemeyer, K. 2014. Idaho Wolverine-Winter Recreation Research Project: Investigating the interactions between wolverines and winter recreation, 2014 Report to the Liz Claiborne Art Ortenberg Foundation. Round River Conservation Studies, Salt Lake City, Utah.

Idaho Department of Fish and Game. 2014. Management plan for the conservation of wolverines in Idaho. Idaho Department of Fish Game, Boise, USA.

Inman, R.M. K.H. Inman, A.J. McCue, M.L. Packila, G.C. White, and B.C. Aber. 2007. Wolverine space use in Greater Yellowstone. Greater Yellowstone Wolverine Program Cumulative Report, May 2007. Wildlife Conservation Society, North America.

Inman, R.M., M. Riley, Z. Walker, B. Lanka and Gary White. 2015. Distribution of female wolverines in Wyoming, Progress Report – August 2015. The Wolverine Initiative, Ennis, Montana. USA.

Inman, R.M., A.J. Magoun, J. Persson and J. Mattisson. 2012. The wolverine's niche: linking reproductive chronology, caching, competition, and climate. J. Mammal. 93(3):634-644.

Krebs, J., E.C. Lofroth, and I. Parfitt. 2007. Multiscale habitat use by wolverines in British Columbia, Canada. J. Wildl. Manag. 71: 2180-2192.

Magoun, A.J., C.D. Long, M.K. Schwartz, K.L. Pilgrim, R.E. Lowell and P. Valkenburg. 2011. Integrating motion-detection cameras and hair snags for wolverine identification. J. Wildl. Manag. 73(3):731-739.

May, R., Landa, A., van Dijk, J., Linnell, J. D. C., and Andersen, R. 2006. Impact of infrastructure on habitat selection of wolverines *Gulo gulo*. Wildlife Biol. 12: 285-295.

McKelvey, K.S., J.P. Copeland, M.K. Scwartz, J.S. Littell, K.B. Aubry, J.R. Squires, S.A. Parks, M.M. Elsner and G.S. Mauger. 2011. Climate change predicted to shift wolverine distributions, connectivity, and dispersal corridors. Ecol. Appl. 21(8):2882-2897.

Rowland, M. M., Wisdom, M. J., Johnson, D. H., Wales, B. C., Copeland, J. P., and Edelmann F. B. 2003. Evaluation of landscape models for wolverines in the interior Northwest, United States of America. J. Mammal. 84: 92-105.

Schwartz, M.K., J.P. Copeland, N.J. Anderson, J.R. Squires, R.M. Inman, K.S. McKelvey, K.L. Pilgrim, L.P. Waits and S.A. Cushman. 2009. Wolverine gene flow across a narrow climatic niche. Ecology 90(11):3222-3232.



# Conservation Economics Institute

Economic solutions for conservation today, a
brighter future tomorrow.

Donate

Research    |    Policy    |    About Us

## Methane Waste Reduction Economics

The U.S. Department of the Interior is revising federal oil and gas rules in
order reduce natural gas waste. Based on our review of the proposed BLM
methane capture rules and the literature we find that the oil and natural gas
industry has much to gain by embracing the rules.  We conducted a case
study of two counties in the San Juan Basin of northwest New Mexico. We
estimate that detecting and repairing leaks at natural gas well pads will
have a positive effect on production and royalties in the San Juan Basin.
Our analysis indicates that capturing the methane currently wasted provides
a win-win scenario for the environment and for industry's bottom line.

Research Repo...           Op-Ed... 



Credit: Ecoflight

## Oil and Gas Royalties on Public Lands

Oil and gas development on public lands is threatening the sustainability of wildlife
and ecosystem service production, and can be detrimental to community
development. To help inform policy on drilling on public lands, CEI recently
submitted extensive economic arguments to the BLM describing how royalty rates
for onshore oil and gas leasing should be calculated and increased. As part of our
service work, we have provided a summary of our economic arguments to the BLM
for the public to use and adapt. If you would like the full set of comments,
please contact us.

Summary of Comments to the BLM... 



## Increasing Royalties for Mitigation

The BLM recently announced a proposed rule investigating "Oil and Gas Leasing;
Royalty on Production, Rental Payments, Minimum Acceptable Bids, Bonding
Requirements, and Civil Penalty Assessments." As part of our comments provided
above, we have taken a closer look at expected revenues in five Western states if
royalty rates were increased.  As of now, collected royalties are woefully inadequate
at covering the costs associated with oil and gas production on public lands.

Increasing Royalties to Mitigate Hazards... 



© 2014

# Technical Support Document: -
# Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis -
# Under Executive Order 12866 -

**Interagency Working Group on Social Cost of Carbon, United States Government**

**With participation by**

Council of Economic Advisers
Council on Environmental Quality
Department of Agriculture
Department of Commerce
Department of Energy
Department of Transportation
Environmental Protection Agency
National Economic Council
Office of Management and Budget
Office of Science and Technology Policy
Department of the Treasury

**May 2013**

Rvsd Plan - 00002639

**Executive Summary**

 Under Executive Order 12866, agencies are required, to the extent permitted by law, "to assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." The purpose of the "social cost of carbon" (SCC) estimates presented here is to allow agencies to incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions. The SCC is an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year. It is intended to include (but is not limited to) changes in net agricultural productivity, human health, property damages from increased flood risk, and the value of ecosystem services due to climate change.

The interagency process that developed the original U.S. government's SCC estimates is described in the 2010 interagency technical support document (TSD) (Interagency Working Group on Social Cost of Carbon 2010).  Through that process the interagency group selected four SCC values for use in regulatory analyses. Three values are based on the average SCC from three integrated assessment models (IAMs), at discount rates of 2.5, 3, and 5 percent. The fourth value, which represents the 95th percentile SCC estimate across all three models at a 3 percent discount rate, is included to represent higher-than-expected impacts from temperature change further out in the tails of the SCC distribution.

While acknowledging the continued limitations of the approach taken by the interagency group in 2010, this document provides an update of the SCC estimates based on new versions of each IAM (DICE, PAGE, and FUND). It does not revisit other interagency modeling decisions (e.g., with regard to the discount rate, reference case socioeconomic and emission scenarios, or equilibrium climate sensitivity). Improvements in the way damages are modeled are confined to those that have been incorporated into the latest versions of the models by the developers themselves in the peer-reviewed literature.

The SCC estimates using the updated versions of the models are higher than those reported in the 2010 TSD.  By way of comparison, the four 2020 SCC estimates reported in the 2010 TSD were $7, $26, $42 and $81 (2007$). The corresponding four updated SCC estimates for 2020 are $12, $43, $65, and $129 (2007$).  The model updates that are relevant to the SCC estimates include: an explicit representation of sea level rise damages in the DICE and PAGE models;  updated adaptation assumptions, revisions to ensure damages are constrained by GDP, updated regional scaling of damages, and a revised treatment of potentially abrupt shifts in climate damages in the PAGE model; an updated carbon cycle in the DICE model; and updated damage functions for sea level rise impacts, the agricultural sector, and reduced space heating requirements, as well as changes to the transient response of temperature to the buildup of GHG concentrations and the inclusion of indirect effects of methane emissions in the FUND model. The SCC estimates vary by year, and the  following table summarizes the revised SCC estimates from 2010 through 2050.

Rvsd Plan - 00002640

**Revised Social Cost of $CO_2$, 2010 − 2050 (in 2007 dollars per metric ton of $CO_2$)**

| Discount Rate Year | 5.0% Avg | 3.0% Avg | 2.5% Avg | 3.0% 95th |
|---|---|---|---|---|
| 2010 | 11 | 33 | 52 | 90 |
| 2015 | 12 | 38 | 58 | 109 |
| 2020 | 12 | 43 | 65 | 129 |
| 2025 | 14 | 48 | 70 | 144 |
| 2030 | 16 | 52 | 76 | 159 |
| 2035 | 19 | 57 | 81 | 176 |
| 2040 | 21 | 62 | 87 | 192 |
| 2045 | 24 | 66 | 92 | 206 |
| 2050 | 27 | 71 | 98 | 221 |

3

Rvsd Plan - 00002641

I.        **Purpose**

The purpose of this document is to update the schedule of social cost of carbon (SCC) estimates from the 2010 interagency technical support document (TSD) (Interagency Working Group on Social Cost of Carbon 2010).[1] E.O. 13563 commits the Administration to regulatory decision making "based on the best available science."[2] Additionally, the interagency group recommended in 2010 that the SCC estimates be revisited on a regular basis or as model updates that reflect the growing body of scientific and economic knowledge become available.[3] New versions of the three integrated assessment models used by the U.S. government to estimate the SCC (DICE, FUND, and PAGE), are now available and have been published in the peer reviewed literature. While acknowledging the continued limitations of the approach taken by the interagency group in 2010 (documented in the original 2010 TSD), this document provides an update of the SCC estimates based on the latest peer-reviewed version of the models, replacing model versions that were developed up to ten years ago in a rapidly evolving field. It does not revisit other assumptions with regard to the discount rate, reference case socioeconomic and emission scenarios, or equilibrium climate sensitivity. Improvements in the way damages are modeled are confined to those that have been incorporated into the latest versions of the models by the developers themselves in the peer-reviewed literature. The agencies participating in the interagency working group continue to investigate potential improvements to the way in which economic damages associated with changes in $CO_2$ emissions are quantified.

Section II summarizes the major updates relevant to SCC estimation that are contained in the new versions of the integrated assessment models released since the 2010 interagency report. Section III presents the updated schedule of SCC estimates for 2010 – 2050 based on these versions of the models. Section IV provides a discussion of other model limitations and research gaps.

II.       **Summary of Model Updates**

This section briefly summarizes changes to the most recent versions of the three integrated assessment models (IAMs) used by the interagency group in 2010. We focus on describing those model updates that are relevant to estimating the social cost of carbon, as summarized in Table 1. For example, both the DICE and PAGE models now include an explicit representation of sea level rise damages. Other revisions to PAGE include: updated adaptation assumptions, revisions to ensure damages are constrained by GDP, updated regional scaling of damages, and a revised treatment of potentially abrupt shifts in climate damages. The DICE model's simple carbon cycle has been updated to be more consistent with a more complex climate model. The FUND model includes updated damage functions for sea level rise impacts, the agricultural sector, and reduced space heating requirements, as well as changes to the transient response of temperature to the buildup of GHG concentrations and the inclusion of indirect effects of

---

[1] In this document, we present all values of the SCC as the cost per metric ton of $CO_2$ emissions. Alternatively, one could report the SCC as the cost per metric ton of carbon emissions. The multiplier for translating between mass of $CO_2$ and the mass of carbon is 3.67 (the molecular weight of $CO_2$ divided by the molecular weight of carbon = 44/12 = 3.67).

[2] http://www.whitehouse.gov/sites/default/files/omb/inforeg/eo12866/eo13563_01182011.pdf

[3] See p. 1, 3, 4, 29, and 33 (Interagency Working Group on Social Cost of Carbon 2010).

4

methane emissions. Changes made to parts of the models that are superseded by the interagency working group's modeling assumptions – regarding equilibrium climate sensitivity, discounting, and socioeconomic variables – are not discussed here but can be found in the references provided in each section below.

**Table 1: Summary of Key Model Revisions Relevant to the Interagency SCC**

| IAM | Version used in 2010 Interagency Analysis | New Version | Key changes relevant to interagency SCC |
|-----|-------------------------------------------|-------------|------------------------------------------|
| DICE | 2007 | 2010 | Updated calibration of the carbon cycle model and explicit representation of sea level rise (SLR) and associated damages. |
| FUND | 3.5 (2009) | 3.8 (2012) | Updated damage functions for space heating, SLR, agricultural impacts, changes to transient response of temperature to buildup of GHG concentrations, and inclusion of indirect climate effects of methane. |
| PAGE | 2002 | 2009 | Explicit representation of SLR damages, revisions to damage function to ensure damages do not exceed 100% of GDP, change in regional scaling of damages, revised treatment of potential abrupt damages, and updated adaptation assumptions. |

### A. DICE

DICE 2010 includes a number of changes over the previous 2007 version used in the 2010 interagency report. The model changes that are relevant for the SCC estimates developed by the interagency working group include: 1) updated parameter values for the carbon cycle model, 2) an explicit representation of sea level dynamics, and 3) a re-calibrated damage function that includes an explicit representation of economic damages from sea level rise. Changes were also made to other parts of the DICE model—including the equilibrium climate sensitivity parameter, the rate of change of total factor productivity, and the elasticity of the marginal utility of consumption—but these components of DICE are superseded by the interagency working group's assumptions and so will not be discussed here. More details on DICE2007 can be found in Nordhaus (2008) and on DICE2010 in Nordhaus (2010).  The DICE2010 model and documentation is also available for download from the homepage of William Nordhaus.

*Carbon Cycle Parameters*

DICE uses a three-box model of carbon stocks and flows to represent the accumulation and transfer of carbon among the atmosphere, the shallow ocean and terrestrial biosphere, and the deep ocean. These parameters are "calibrated to match the carbon cycle in the Model for the Assessment of Greenhouse

Rvsd Plan - 00002643

Gas Induced Climate Change (MAGICC)" (Nordhaus 2008 p 44).[4] Carbon cycle transfer coefficient values in DICE2010 are based on re-calibration of the model to match the newer 2009 version of MAGICC (Nordhaus 2010 p 2). For example, in DICE2010, in each decade, 12 percent of the carbon in the atmosphere is transferred to the shallow ocean, 4.7 percent of the carbon in the shallow ocean is transferred to the atmosphere, 94.8 percent remains in the shallow ocean, and 0.5 percent is transferred to the deep ocean. For comparison, in DICE 2007, 18.9 percent of the carbon in the atmosphere is transferred to the shallow ocean each decade, 9.7 percent of the carbon in the shallow ocean is transferred to the atmosphere, 85.3 percent remains in the shallow ocean, and 5 percent is transferred to the deep ocean.

The implication of these changes for DICE2010 is in general a weakening of the ocean as a carbon sink and therefore a higher concentration of carbon in the atmosphere than in DICE2007, for a given path of emissions. All else equal, these changes will generally increase the level of warming and therefore the SCC estimates in DICE2010 relative to those from DICE2007.

*Sea Level Dynamics*

A new feature of DICE2010 is an explicit representation of the dynamics of the global average sea level anomaly to be used in the updated damage function (discussed below). This section contains a brief description of the sea level rise (SLR) module; a more detailed description can be found on the model developer's website.[5] The average global sea level anomaly is modeled as the sum of four terms that represent contributions from: 1) thermal expansion of the oceans, 2) melting of glaciers and small ice caps, 3) melting of the Greenland ice sheet, and 4) melting of the Antarctic ice sheet.

The parameters of the four components of the SLR module are calibrated to match consensus results from the IPCC's Fourth Assessment Report (AR4).[6] The rise in sea level from thermal expansion in each time period (decade) is 2 percent of the difference between the sea level in the previous period and the long run equilibrium sea level, which is 0.5 meters per degree Celsius (°C) above the average global temperature in 1900. The rise in sea level from the melting of glaciers and small ice caps occurs at a rate of 0.008 meters per decade per °C above the average global temperature in 1900.

The contribution to sea level rise from melting of the Greenland ice sheet is more complex. The equilibrium contribution to SLR is 0 meters for temperature anomalies less than 1 °C and increases linearly from 0 meters to a maximum of 7.3 meters for temperature anomalies between 1 °C and 3.5 °C. The contribution to SLR in each period is proportional to the difference between the previous period's sea level anomaly and the equilibrium sea level anomaly, where the constant of proportionality increases with the temperature anomaly in the current period.

---

[4] MAGICC is a simple climate model initially developed by the U.S. National Center for Atmospheric Research that has been used heavily by the Intergovernmental Panel on Climate Change (IPCC) to emulate projections from more sophisticated state of the art earth system simulation models (Randall et al. 2007).

[5] Documentation on the new sea level rise module of DICE is available on William Nordhaus' website at: http://nordhaus.econ.yale.edu/documents/SLR_021910.pdf.

[6] For a review of post-IPCC AR4 research on sea level rise, see Nicholls et al. (2011) and NAS (2011).

Rvsd Plan - 00002644

The contribution to SLR from the melting of the Antarctic ice sheet is -0.001 meters per decade when the temperature anomaly is below 3 °C and increases linearly between 3 °C and 6 °C to a maximum rate of 0.025 meters per decade at a temperature anomaly of 6 °C.

*Re-calibrated Damage Function*

Economic damages from climate change in the DICE model are represented by a fractional loss of gross economic output in each period. A portion of the remaining economic output in each period (net of climate change damages) is consumed and the remainder is invested in the physical capital stock to support future economic production, so each period's climate damages will reduce consumption in that period and in all future periods due to the lost investment. The fraction of output in each period that is lost due to climate change impacts is represented as one minus a fraction, which is one divided by a quadratic function of the temperature anomaly, producing a sigmoid ("S"-shaped) function.[7] The loss function in DICE2010 has been expanded by adding a quadratic function of SLR to the quadratic function of temperature. In DICE2010 the temperature anomaly coefficients have been recalibrated to avoid double-counting damages from sea level rise that were implicitly included in these parameters in DICE2007.

The aggregate damages in DICE2010 are illustrated by Nordhaus (2010 p 3), who notes that "...damages in the uncontrolled (baseline) [i.e., reference] case ... in 2095 are $12 trillion, or 2.8 percent of global output, for a global temperature increase of 3.4 °C above 1900 levels." This compares to a loss of 3.2 percent of global output at 3.4 °C in DICE2007. However, in DICE2010, annual damages are lower in most of the early periods of the modeling horizon but higher in later periods than would be calculated using the DICE2007 damage function. Specifically, the percent difference between damages in the base run of DICE2010 and those that would be calculated using the DICE2007 damage function starts at +7 percent in 2005, decreases to a low of -14 percent in 2065, then continuously increases to +20 percent by 2300 (the end of the interagency analysis time horizon), and to +160 percent by the end of the model time horizon in 2595. The large increases in the far future years of the time horizon are due to the permanence associated with damages from sea level rise, along with the assumption that the sea level is projected to continue to rise long after the global average temperature begins to decrease. The changes to the loss function generally decrease the interagency working group SCC estimates slightly given that relative increases in damages in later periods are discounted more heavily, all else equal.

### B. FUND

FUND version 3.8 includes a number of changes over the previous version 3.5 (Narita et al. 2010) used in the 2010 interagency report. Documentation supporting FUND and the model's source code for all versions of the model is available from the model authors.[8] Notable changes, due to their impact on the

---

[7] The model and documentation, including formulas, are available on the author's webpage at http://www.econ.yale.edu/~nordhaus/homepage/RICEmodels.htm.

[8] http://www.fund-model.org/. This report uses version 3.8 of the FUND model, which represents a modest update to the most recent version of the model to appear in the literature (version 3.7) (Anthoff and Tol, 2013). For the purpose of computing the SCC, the relevant changes (between 3.7 to 3.8) are associated with improving

7

SCC estimates, are adjustments to the space heating, agriculture, and sea level rise damage functions in addition to changes to the temperature response function and the inclusion of indirect effects from methane emissions.[9] We discuss each of these in turn.

*Space Heating*

In FUND, the damages associated with the change in energy needs for space heating are based on the estimated impact due to one degree of warming. These baseline damages are scaled based on the forecasted temperature anomaly's deviation from the one degree benchmark and adjusted for changes in vulnerability due to economic and energy efficiency growth. In FUND 3.5, the function that scales the base year damages adjusted for vulnerability allows for the possibility that in some simulations the benefits associated with reduced heating needs may be an unbounded convex function of the temperature anomaly. In FUND 3.8, the form of the scaling has been modified to ensure that the function is everywhere concave and that there will exist an upper bound on the benefits a region may receive from reduced space heating needs. The new formulation approaches a value of two in the limit of large temperature anomalies, or in other words, assuming no decrease in vulnerability, the reduced expenditures on space heating at any level of warming will not exceed two times the reductions experienced at one degree of warming. Since the reduced need for space heating represents a benefit of climate change in the model, or a negative damage, this change will increase the estimated SCC. This update accounts for a significant portion of the difference in the expected SCC estimates reported by the two versions of the model when run probabilistically.

*Sea Level Rise and Land Loss*

The FUND model explicitly includes damages associated with the inundation of dry land due to sea level rise. The amount of land lost within a region is dependent upon the proportion of the coastline being protected by adequate sea walls and the amount of sea level rise. In FUND 3.5 the function defining the potential land lost in a given year due to sea level rise is linear in the rate of sea level rise for that year. This assumption implicitly assumes that all regions are well represented by a homogeneous coastline in length and a constant uniform slope moving inland. In FUND 3.8 the function defining the potential land lost has been changed to be a convex function of sea level rise, thereby assuming that the slope of the shore line increases moving inland. The effect of this change is to typically reduce the vulnerability of some regions to sea level rise based land loss, thereby lowering the expected SCC estimate. [10]

*Agriculture*

---

consistency with IPCC AR4 by adjusting the atmospheric lifetimes of CH4 and N2O and incorporating the indirect forcing effects of CH4, along with making minor stability improvements in the sea wall construction algorithm.

[9] The other damage sectors (water resources, space cooling, land loss, migration, ecosystems, human health, and extreme weather) were not significantly updated.

[10] For stability purposes this report also uses an update to the model which assumes that regional coastal protection measures will be built to protect the most valuable land first, such that the marginal benefits of coastal protection is decreasing in the level of protection following Fankhauser (1995).

Rvsd Plan - 00002646

In FUND, the damages associated with the agricultural sector are measured as proportional to the sector's value. The fraction is bounded from above by one and is made up of three additive components that represent the effects from carbon fertilization, the rate of temperature change, and the level of the temperature anomaly. In both FUND 3.5 and FUND 3.8, the fraction of the sector's value lost due to the level of the temperature anomaly is modeled as a quadratic function with an intercept of zero. In FUND 3.5, the coefficients of this loss function are modeled as the ratio of two random normal variables. This specification had the potential for unintended extreme behavior as draws from the parameter in the denominator approached zero or went negative. In FUND 3.8, the coefficients are drawn directly from truncated normal distributions so that they remain in the range $[0,\infty)$ and $(-\infty,0]$, respectively, ensuring the correct sign and eliminating the potential for divide by zero errors.  The means for the new distributions are set equal to the ratio of the means from the normal distributions used in the previous version. In general the impact of this change has been to decrease the range of the distribution while spreading out the distributions' mass over the remaining range relative to the previous version. The net effect of this change on the SCC estimates is difficult to predict.

*Transient Temperature Response*

The temperature response model translates changes in global levels of radiative forcing into the current expected temperature anomaly. In FUND, a given year's increase in the temperature anomaly is based on a mean reverting function where the mean equals the equilibrium temperature anomaly that would eventually be reached if that year's level of radiative forcing were sustained. The rate of mean reversion defines the rate at which the transient temperature approaches the equilibrium. In FUND 3.5, the rate of temperature response is defined as a decreasing linear function of equilibrium climate sensitivity to capture the fact that the progressive heat uptake of the deep ocean causes the rate to slow at higher values of the equilibrium climate sensitivity. In FUND 3.8, the rate of temperature response has been updated to a quadratic function of the equilibrium climate sensitivity. This change reduces the sensitivity of the rate of temperature response to the level of the equilibrium climate sensitivity, a relationship first noted by Hansen et al. (1985) based on the heat uptake of the deep ocean. Therefore in FUND 3.8, the temperature response will typically be faster than in the previous version. The overall effect of this change is likely to increase estimates of the SCC as higher temperatures are reached during the timeframe analyzed and as the same damages experienced in the previous version of the model are now experienced earlier and therefore discounted less.

*Methane*

The IPCC AR4 notes a series of indirect effects of methane emissions, and has developed methods for proxying such effects when computing the global warming potential of methane (Forster et al. 2007). FUND 3.8 now includes the same methods for incorporating the indirect effects of methane emissions. Specifically, the average atmospheric lifetime of methane has been set to 12 years to account for the feedback of methane emissions on its own lifetime. The radiative forcing associated with atmospheric methane has also been increased by 40% to account for its net impact on ozone production and stratospheric water vapor. All else equal, the effect of this increased radiative forcing will be to increase the estimated SCC values, due to greater projected temperature anomaly.

9

## C.   PAGE

PAGE09 (Hope 2013) includes a number of changes from PAGE2002, the version used in the 2010 SCC interagency report. The changes that most directly affect the SCC estimates include: explicitly modeling the impacts from sea level rise, revisions to the damage function to ensure damages are constrained by GDP, a change in the regional scaling of damages, a revised treatment for the probability of a discontinuity within the damage function, and revised assumptions on adaptation. The model also includes revisions to the carbon cycle feedback and the calculation of regional temperatures.[11] More details on PAGE09 can be found in Hope (2011a, 2011b, 2011c). A description of PAGE2002 can be found in Hope (2006).

*Sea Level Rise*

While PAGE2002 aggregates all damages into two categories – economic and non-economic impacts -, PAGE09 adds a third explicit category: damages from sea level rise. In the previous version of the model, damages from sea level rise were subsumed by the other damage categories. In PAGE09 sea level damages increase less than linearly with sea level under the assumption that land, people, and GDP are more concentrated in low-lying shoreline areas. Damages from the economic and non-economic sector were adjusted to account for the introduction of this new category.

*Revised Damage Function to Account for Saturation*

In PAGE09, small initial economic and non-economic benefits (negative damages) are modeled for small temperature increases, but all regions eventually experience economic damages from climate change, where damages are the sum of additively separable polynomial functions of temperature and sea level rise. Damages transition from this polynomial function to a logistic path once they exceed a certain proportion of remaining Gross Domestic Product (GDP) to ensure that damages do not exceed 100 percent of GDP. This differs from PAGE2002, which allowed Eastern Europe to potentially experience large benefits from temperature increases, and which also did not bound the possible damages that could be experienced.

*Regional Scaling Factors*

As in the previous version of PAGE, the PAGE09 model calculates the damages for the European Union (EU) and then, assumes that damages for other regions are proportional based on a given scaling factor. The scaling factor in PAGE09 is based on the length of a region's coastline relative to the EU (Hope 2011b). Because of the long coastline in the EU, other regions are, on average, less vulnerable than the EU for the same sea level and temperature increase, but all regions have a positive scaling factor. PAGE2002 based its scaling factors on four studies reported in the IPCC's third assessment report, and allowed for benefits from temperature increase in Eastern Europe, smaller impacts in developed countries, and higher damages in developing countries.

---

[11] Because several changes in the PAGE model are structural (e.g., the addition of sea level rise and treatment of discontinuity), it is not possible to assess the direct impact of each change on the SCC in isolation as done for the other two models above.

Rvsd Plan - 00002648

*Probability of a Discontinuity*

In PAGE2002, the damages associated with a "discontinuity" (nonlinear extreme event) were modeled as an expected value. Specifically, a stochastic probability of a discontinuity was multiplied by the damages associated with a discontinuity to obtain an expected value, and this was added to the economic and non-economic impacts.  That is, additional damages from an extreme event, such as extreme melting of the Greenland ice sheet, were multiplied by the probability of the event occurring and added to the damage estimate. In PAGE09, the probability of discontinuity is treated as a discrete event for each year in the model. The damages for each model run are estimated either with or without a discontinuity occurring, rather than as an expected value. A large-scale discontinuity becomes possible when the temperature rises beyond some threshold value between 2 and 4°C. The probability that a discontinuity will occur beyond this threshold then increases by between 10 and 30 percent for every 1°C rise in temperature beyond the threshold. If a discontinuity occurs, the EU loses an additional 5 to 25 percent of its GDP (drawn from a triangular distribution with a mean of 15 percent) in addition to other damages, and other regions lose an amount determined by the regional scaling factor. The threshold value for a possible discontinuity is lower than in PAGE2002, while the rate at which the probability of a discontinuity increases with the temperature anomaly and the damages that result from a discontinuity are both higher than in PAGE2002. The model assumes that only one discontinuity can occur and that the impact is phased in over a period of time, but once it occurs, its effect is permanent.

*Adaptation*

As in PAGE2002, adaptation is available to help mitigate any climate change impacts that occur. In PAGE this adaptation is the same regardless of the temperature change or sea level rise and is therefore akin to what is more commonly considered a reduction in vulnerability. It is modeled by reducing the damages by some percentage. PAGE09 assumes a smaller decrease in vulnerability than the previous version of the model and assumes that it will take longer for this change in vulnerability to be realized. In the aggregated economic sector, at the time of full implementation, this adaptation will mitigate all damages up to a temperature increase of 1°C, and for temperature anomalies between 1°C and 2°C, it will reduce damages by 15-30 percent (depending on the region). However, it takes 20 years to fully implement this adaptation. In PAGE2002, adaptation was assumed to reduce economic sector damages up to 2°C by 50-90 percent after 20 years. Beyond 2°C, no adaptation is assumed to be available to mitigate the impacts of climate change. For the non-economic sector, in PAGE09 adaptation is available to reduce 15 percent of the damages due to a temperature increase between 0°C and 2°C and is assumed to take 40 years to fully implement, instead of 25 percent of the damages over 20 years assumed in PAGE2002. Similarly, adaptation is assumed to alleviate 25-50 percent of the damages from the first 0.20 to 0.25 meters of sea level rise but is assumed to be ineffective thereafter. Hope (2011c) estimates that the less optimistic assumptions regarding the ability to offset impacts of temperature and sea level rise via adaptation increase the SCC by approximately 30 percent.

*Other Noteworthy Changes*

Rvsd Plan - 00002649

Two other changes in the model are worth noting. There is a change in the way the model accounts for decreased $CO_2$ absorption on land and in the ocean as temperature rises. PAGE09 introduces a linear feedback from global mean temperature to the percentage gain in the excess concentration of $CO_2$, capped at a maximum level. In PAGE2002, an additional amount was added to the $CO_2$ emissions each period to account for a decrease in ocean absorption and a loss of soil carbon. Also updated is the method by which the average global and annual temperature anomaly is downscaled to determine annual average regional temperature anomalies to be used in the regional damage functions. In PAGE2002, the scaling was determined solely based on regional difference in emissions of sulfate aerosols. In PAGE09, this regional temperature anomaly is further adjusted using an additive factor that is based on the average absolute latitude of a region relative to the area weighted average absolute latitude of the Earth's landmass, to capture relatively greater changes in temperature forecast to be experienced at higher latitudes.

III.     Revised SCC Estimates

The updated versions of the three integrated assessment models were run using the same methodology detailed in the 2010 TSD (Interagency Working Group on Social Cost of Carbon 2010). The approach along with the inputs for the socioeconomic emissions scenarios, equilibrium climate sensitivity distribution, and discount rate remains the same. This includes the five reference scenarios based on the EMF-22 modeling exercise, the Roe and Baker equilibrium climate sensitivity distribution calibrated to the IPCC AR4, and three constant discount rates of 2.5, 3, and 5 percent.

As was previously the case, the use of three models, three discount rates, and five scenarios produces 45 separate distributions for the global SCC. The approach laid out in the 2010 TSD applied equal weight to each model and socioeconomic scenario in order to reduce the dimensionality down to three separate distributions representative of the three discount rates. The interagency group selected four values from these distributions for use in regulatory analysis. Three values are based on the average SCC across models and socio-economic-emissions scenarios at the 2.5, 3, and 5 percent discount rates, respectively. The fourth value was chosen to represent the higher-than-expected economic impacts from climate change further out in the tails of the SCC distribution. For this purpose, the 95th percentile of the SCC estimates at a 3 percent discount rate was chosen. (A detailed set of percentiles by model and scenario combination and additional summary statistics for the 2020 values is available in the Appendix.)  As noted in the 2010 TSD, "the 3 percent discount rate is the central value, and so the central value that emerges is the average SCC across models at the 3 percent discount rate" (Interagency Working Group on Social Cost of Carbon 2010, p. 25). However, for purposes of capturing the uncertainties involved in regulatory impact analysis, the interagency group emphasizes the importance and value of including all four SCC values.

Table 2 shows the four selected SCC estimates in five year increments from 2010 to 2050. Values for 2010, 2020, 2030, 2040, and 2050 are calculated by first combining all outputs (10,000 estimates per

12

model run) from all scenarios and models for a given discount rate. Values for the years in between are calculated using linear interpolation. The full set of revised annual SCC estimates between 2010 and 2050 is reported in the Appendix.

**Table 2: Revised Social Cost of $CO_2$, 2010 – 2050 (in 2007 dollars per metric ton of $CO_2$)**

| Discount Rate Year | 5.0% Avg | 3.0% Avg | 2.5% Avg | 3.0% 95th |
|---|---|---|---|---|
| 2010 | 11 | 33 | 52 | 90 |
| 2015 | 12 | 38 | 58 | 109 |
| 2020 | 12 | 43 | 65 | 129 |
| 2025 | 14 | 48 | 70 | 144 |
| 2030 | 16 | 52 | 76 | 159 |
| 2035 | 19 | 57 | 81 | 176 |
| 2040 | 21 | 62 | 87 | 192 |
| 2045 | 24 | 66 | 92 | 206 |
| 2050 | 27 | 71 | 98 | 221 |

The SCC estimates using the updated versions of the models are higher than those reported in the 2010 TSD due to the changes to the models outlined in the previous section. By way of comparison, the 2020 SCC estimates reported in the original TSD were $7, $26, $42 and $81 (2007$) (Interagency Working Group on Social Cost of Carbon 2010).  Figure 1 illustrates where the four SCC values for 2020 fall within the full distribution for each discount rate based on the combined set of runs for each model and scenario (150,000 estimates in total for each discount rate). In general, the distributions are skewed to the right and have long tails. The Figure also shows that the lower the discount rate, the longer the right tail of the distribution.

**Figure 1: Distribution of SCC Estimates for 2020 (in 2007$ per metric ton $CO_2$)**

Rvsd Plan - 00002651



As was the case in the 2010 TSD, the SCC increases over time because future emissions are expected to produce larger incremental damages as physical and economic systems become more stressed in response to greater climatic change. The approach taken by the interagency group is to compute the cost of a marginal ton emitted in the future by running the models for a set of perturbation years out to 2050. Table 3 illustrates how the growth rate for these four SCC estimates varies over time.

**Table 3: Average Annual Growth Rates of SCC Estimates between 2010 and 2050**

| Average Annual Growth Rate (%) | 5.0% Avg | 3.0% Avg | 2.5% Avg | 3.0% 95th |
|---|---|---|---|---|
| 2010-2020 | 1.2% | 3.2% | 2.4% | 4.3% |
| 2020-2030 | 3.4% | 2.1% | 1.7% | 2.4% |
| 2030-2040 | 3.0% | 1.8% | 1.5% | 2.0% |
| 2040-2050 | 2.6% | 1.6% | 1.3% | 1.5% |

The future monetized value of emission reductions in each year (the SCC in year $t$ multiplied by the change in emissions in year $t$) must be discounted to the present to determine its total net present value for use in regulatory analysis. As previously discussed in the 2010 TSD, damages from future emissions should be discounted at the same rate as that used to calculate the SCC estimates themselves to ensure internal consistency – i.e., future damages from climate change, whether they result from emissions today or emissions in a later year, should be discounted using the same rate.

Under current OMB guidance contained in Circular A-4, analysis of economically significant proposed and final regulations from the domestic perspective is required, while analysis from the international perspective is optional. However, the climate change problem is highly unusual in at least two respects. First, it involves a global externality: emissions of most greenhouse gases contribute to damages around

14

the world even when they are emitted in the United States. Consequently, to address the global nature of the problem, the SCC must incorporate the full (global) damages caused by GHG emissions. Second, climate change presents a problem that the United States alone cannot solve. Even if the United States were to reduce its greenhouse gas emissions to zero, that step would be far from enough to avoid substantial climate change. Other countries would also need to take action to reduce emissions if significant changes in the global climate are to be avoided. Emphasizing the need for a global solution to a global problem, the United States has been actively involved in seeking international agreements to reduce emissions and in encouraging other nations, including emerging major economies, to take significant steps to reduce emissions. When these considerations are taken as a whole, the interagency group concluded that a global measure of the benefits from reducing U.S. emissions is preferable.   For additional discussion, see the 2010 TSD.

## IV.      Other Model Limitations and Research Gaps

The 2010 interagency SCC TSD discusses a number of important limitations for which additional research is needed. In particular, the document highlights the need to improve the quantification of both non-catastrophic and catastrophic damages, the treatment of adaptation and technological change, and the way in which inter-regional and inter-sectoral linkages are modeled. While the new version of the models discussed above offer some improvements in these areas, further work remains warranted. The 2010 TSD also discusses the need to more carefully assess the implications of risk aversion for SCC estimation as well as the inability to perfectly substitute between climate and non-climate goods at higher temperature increases, both of which have implications for the discount rate used. EPA, DOE, and other agencies continue to engage in research on modeling and valuation of climate impacts that can potentially improve SCC estimation in the future.

## References

Anthoff, D. and Tol, R.S.J.  2013. The uncertainty about the social cost of carbon: a decomposition analysis using FUND.  *Climatic Change* 117: 515–530.

Fankhauser, S. 1995. Valuing climate change: The economics of the greenhouse. London, England: Earthscan.

Forster, P., V. Ramaswamy, P. Artaxo, T. Berntsen, R. Betts, D.W. Fahey, J. Haywood, J. Lean, D.C. Lowe, G. Myhre, J. Nganga, R. Prinn, G. Raga, M. Schulz and R. Van Dorland. 2007. Changes in Atmospheric Constituents and in Radiative Forcing. In: *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* [Solomon, S., D. Qin, M. Manning, Z. Chen, M. Marquis, K.B. Averyt, M.Tignor and H.L. Miller (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

Hope, Chris. 2006. "The Marginal Impact of $CO_2$ from PAGE2002: An Integrated Assessment Model Incorporating the IPCC's Five Reasons for Concern." *The Integrated Assessment Journal*. 6(1): 19–56.

Rvsd Plan - 00002653

Hope, Chris. 2011a "The PAGE09 Integrated Assessment Model: A Technical Description" Cambridge Judge Business School Working Paper No. 4/2011 (April). Accessed November 23, 2011: http://www.jbs.cam.ac.uk/research/working_papers/2011/wp1104.pdf.

Hope, Chris. 2011b "The Social Cost of $CO_2$ from the PAGE09 Model" Cambridge Judge Business School Working Paper No. 5/2011 (June). Accessed November 23, 2011: http://www.jbs.cam.ac.uk/research/working_papers/2011/wp1105.pdf.

Hope, Chris. 2011c "New Insights from the PAGE09 Model: The Social Cost of $CO_2$" Cambridge Judge Business School Working Paper No. 8/2011 (July). Accessed November 23, 2011: http://www.jbs.cam.ac.uk/research/working_papers/2011/wp1108.pdf.

Hope, C. 2013. Critical issues for the calculation of the social cost of $CO_2$: why the estimates from PAGE09 are higher than those from PAGE2002. *Climatic Change* 117: 531–543.

Interagency Working Group on Social Cost of Carbon. 2010. Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866. February. United States Government. http://www.whitehouse.gov/sites/default/files/omb/inforeg/for-agencies/Social-Cost-of-Carbon-for-RIA.pdf.

Meehl, G.A., T.F. Stocker, W.D. Collins, P. Friedlingstein, A.T. Gaye, J.M. Gregory, A. Kitoh, R. Knutti, J.M. Murphy, A. Noda, S.C.B. Raper, I.G. Watterson, A.J. Weaver and Z.-C. Zhao. 2007. Global Climate Projections. In: *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* [Solomon, S., D. Qin, M. Manning, Z. Chen, M. Marquis, K.B. Averyt, M. Tignor and H.L. Miller (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

Narita, D., R. S. J. Tol and D. Anthoff. 2010. Economic costs of extratropical storms under climate change: an application of FUND. *Journal of Environmental Planning and Management* 53(3): 371-384.

National Academy of Sciences. 2011. *Climate Stabilization Targets: Emissions, Concentrations, and Impacts over Decades to Millennia*. Washington, DC: National Academies Press, Inc.

Nicholls, R.J., N. Marinova, J.A. Lowe, S. Brown, P. Vellinga, D. de Gusmão, J. Hinkel and R.S.J. Tol. 2011. Sea-level rise and its possible impacts given a 'beyond 4°C world' in the twenty-first century. *Phil. Trans. R. Soc. A* 369(1934): 161-181.

Nordhaus, W. 2010. Economic aspects of global warming in a post-Copenhagen environment. *Proceedings of the National Academy of Sciences* 107(26): 11721-11726.

Nordhaus, W. 2008. A Question of Balance: Weighing the Options on Global Warming Policies. New Haven, CT: Yale University Press.

Randall, D.A., R.A. Wood, S. Bony, R. Colman, T. Fichefet, J. Fyfe, V. Kattsov, A. Pitman, J. Shukla, J. Srinivasan, R.J. Stouffer, A. Sumi and K.E. Taylor. 2007. Climate Models and Their Evaluation. In: *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* [Solomon, S., D. Qin, M. Manning, Z. Chen, M.

16

Rvsd Plan - 00002654

Marquis, K.B. Averyt, M.Tignor and H.L. Miller (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

17

**Appendix**

**Table A1: Annual SCC Values: 2010-2050 (2007$/metric ton $CO_2$)**

| Discount Rate | 5.0% | 3.0% | 2.5% | 3.0% |
| Year | Avg | Avg | Avg | 95th |
|---|---|---|---|---|
| 2010 | 11 | 33 | 52 | 90 |
| 2011 | 11 | 34 | 54 | 94 |
| 2012 | 11 | 35 | 55 | 98 |
| 2013 | 11 | 36 | 56 | 102 |
| 2014 | 11 | 37 | 57 | 106 |
| 2015 | 12 | 38 | 58 | 109 |
| 2016 | 12 | 39 | 60 | 113 |
| 2017 | 12 | 40 | 61 | 117 |
| 2018 | 12 | 41 | 62 | 121 |
| 2019 | 12 | 42 | 63 | 125 |
| 2020 | 12 | 43 | 65 | 129 |
| 2021 | 13 | 44 | 66 | 132 |
| 2022 | 13 | 45 | 67 | 135 |
| 2023 | 13 | 46 | 68 | 138 |
| 2024 | 14 | 47 | 69 | 141 |
| 2025 | 14 | 48 | 70 | 144 |
| 2026 | 15 | 49 | 71 | 147 |
| 2027 | 15 | 49 | 72 | 150 |
| 2028 | 15 | 50 | 73 | 153 |
| 2029 | 16 | 51 | 74 | 156 |
| 2030 | 16 | 52 | 76 | 159 |
| 2031 | 17 | 53 | 77 | 163 |
| 2032 | 17 | 54 | 78 | 166 |
| 2033 | 18 | 55 | 79 | 169 |
| 2034 | 18 | 56 | 80 | 172 |
| 2035 | 19 | 57 | 81 | 176 |
| 2036 | 19 | 58 | 82 | 179 |
| 2037 | 20 | 59 | 84 | 182 |
| 2038 | 20 | 60 | 85 | 185 |
| 2039 | 21 | 61 | 86 | 188 |
| 2040 | 21 | 62 | 87 | 192 |
| 2041 | 22 | 63 | 88 | 195 |
| 2042 | 22 | 64 | 89 | 198 |
| 2043 | 23 | 65 | 90 | 200 |
| 2044 | 23 | 65 | 91 | 203 |
| 2045 | 24 | 66 | 92 | 206 |
| 2046 | 24 | 67 | 94 | 209 |
| 2047 | 25 | 68 | 95 | 212 |
| 2048 | 25 | 69 | 96 | 215 |
| 2049 | 26 | 70 | 97 | 218 |
| 2050 | 27 | 71 | 98 | 221 |

Rvsd Plan - 00002656

**Table A2: 2020 Global SCC Estimates at 2.5 Percent Discount Rate (2007$/metric ton $CO_2$)**

| Percentile | 1st | 5th | 10th | 25th | 50th | Avg | 75th | 90th | 95th | 99th |
|---|---|---|---|---|---|---|---|---|---|---|
| Scenario[12] | | | | | PAGE | | | | | |
| IMAGE | 6 | 11 | 15 | 27 | 58 | 129 | 139 | 327 | 515 | 991 |
| MERGE | 4 | 6 | 9 | 16 | 34 | 78 | 82 | 196 | 317 | 649 |
| MESSAGE | 4 | 8 | 11 | 20 | 42 | 108 | 107 | 278 | 483 | 918 |
| MiniCAM Base | 5 | 9 | 12 | 22 | 47 | 107 | 113 | 266 | 431 | 872 |
| 5th Scenario | 2 | 4 | 6 | 11 | 25 | 85 | 68 | 200 | 387 | 955 |

| Scenario | | | | | DICE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | 25 | 31 | 37 | 47 | 64 | 72 | 92 | 123 | 139 | 161 |
| MERGE | 14 | 18 | 20 | 26 | 36 | 40 | 50 | 65 | 74 | 85 |
| MESSAGE | 20 | 24 | 28 | 37 | 51 | 58 | 71 | 95 | 109 | 221 |
| MiniCAM Base | 20 | 25 | 29 | 38 | 53 | 61 | 76 | 102 | 117 | 135 |
| 5th Scenario | 17 | 22 | 25 | 33 | 45 | 52 | 65 | 91 | 106 | 126 |

| Scenario | | | | | FUND | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | -17 | -1 | 5 | 17 | 34 | 44 | 59 | 90 | 113 | 176 |
| MERGE | -7 | 2 | 7 | 16 | 30 | 35 | 49 | 72 | 91 | 146 |
| MESSAGE | -19 | -4 | 2 | 12 | 27 | 32 | 46 | 70 | 87 | 135 |
| MiniCAM Base | -9 | 1 | 8 | 18 | 35 | 45 | 59 | 87 | 108 | 172 |
| 5th Scenario | -30 | -12 | -5 | 6 | 19 | 24 | 35 | 57 | 72 | 108 |

**Table A3: 2020 Global SCC Estimates at 3 Percent Discount Rate (2007$/metric ton $CO_2$)**

| Percentile | 1st | 5th | 10th | 25th | 50th | Avg | 75th | 90th | 95th | 99th |
|---|---|---|---|---|---|---|---|---|---|---|
| Scenario | | | | | PAGE | | | | | |
| IMAGE | 4 | 7 | 10 | 18 | 38 | 91 | 95 | 238 | 385 | 727 |
| MERGE | 2 | 4 | 6 | 11 | 23 | 56 | 58 | 142 | 232 | 481 |
| MESSAGE | 3 | 5 | 7 | 13 | 29 | 75 | 74 | 197 | 330 | 641 |
| MiniCAM Base | 3 | 5 | 8 | 14 | 30 | 73 | 75 | 184 | 300 | 623 |
| 5th Scenario | 1 | 3 | 4 | 7 | 17 | 58 | 48 | 136 | 264 | 660 |

| Scenario | | | | | DICE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | 16 | 21 | 24 | 32 | 43 | 48 | 60 | 79 | 90 | 102 |
| MERGE | 10 | 13 | 15 | 19 | 25 | 28 | 35 | 44 | 50 | 58 |
| MESSAGE | 14 | 18 | 20 | 26 | 35 | 40 | 49 | 64 | 73 | 83 |
| MiniCAM Base | 13 | 17 | 20 | 26 | 35 | 39 | 49 | 65 | 73 | 85 |
| 5th Scenario | 12 | 15 | 17 | 22 | 30 | 34 | 43 | 58 | 67 | 79 |

| Scenario | | | | | FUND | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | -14 | -3 | 1 | 9 | 20 | 25 | 35 | 54 | 69 | 111 |
| MERGE | -8 | -1 | 3 | 9 | 18 | 22 | 31 | 47 | 60 | 97 |
| MESSAGE | -16 | -5 | -1 | 6 | 16 | 18 | 28 | 43 | 55 | 88 |
| MiniCAM Base | -9 | -1 | 3 | 10 | 21 | 27 | 35 | 53 | 67 | 107 |
| 5th Scenario | -22 | -10 | -5 | 2 | 10 | 13 | 20 | 33 | 42 | 63 |

---

[12] See 2010 TSD for a description of these scenarios.

19

**Table A4: 2020 Global SCC Estimates at 5 Percent Discount Rate (2007$/metric ton $CO_2$)**

| Percentile | 1st | 5th | 10th | 25th | 50th | Avg | 75th | 90th | 95th | 99th |
|---|---|---|---|---|---|---|---|---|---|---|
| Scenario | PAGE | | | | | | | | | |
| IMAGE | 1 | 2 | 2 | 5 | 10 | 28 | 27 | 71 | 123 | 244 |
| MERGE | 1 | 1 | 2 | 3 | 7 | 17 | 17 | 45 | 75 | 153 |
| MESSAGE | 1 | 1 | 2 | 4 | 9 | 24 | 22 | 60 | 106 | 216 |
| MiniCAM Base | 1 | 1 | 2 | 3 | 8 | 21 | 21 | 54 | 94 | 190 |
| 5th Scenario | 0 | 1 | 1 | 2 | 5 | 18 | 14 | 41 | 78 | 208 |

| Scenario | DICE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | 6 | 8 | 9 | 11 | 14 | 15 | 18 | 22 | 25 | 27 |
| MERGE | 4 | 5 | 6 | 7 | 9 | 10 | 12 | 15 | 16 | 18 |
| MESSAGE | 6 | 7 | 8 | 10 | 12 | 13 | 16 | 20 | 22 | 25 |
| MiniCAM Base | 5 | 6 | 7 | 8 | 11 | 12 | 14 | 18 | 20 | 22 |
| 5th Scenario | 5 | 6 | 6 | 8 | 10 | 11 | 14 | 17 | 19 | 21 |

| Scenario | FUND | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IMAGE | -9 | -5 | -3 | -1 | 2 | 3 | 6 | 11 | 15 | 25 |
| MERGE | -6 | -3 | -2 | 0 | 3 | 4 | 7 | 12 | 16 | 27 |
| MESSAGE | -10 | -6 | -4 | -1 | 2 | 2 | 5 | 9 | 13 | 23 |
| MiniCAM Base | -7 | -3 | -2 | 0 | 3 | 4 | 7 | 11 | 15 | 26 |
| 5th Scenario | -11 | -7 | -5 | -2 | 0 | 0 | 3 | 6 | 8 | 14 |

20

Rvsd Plan - 00002658

**Table A5: Additional Summary Statistics of 2020 Global SCC Estimates**

| Discount rate: | 5.0% | | | | 3.0% | | | | 2.5% | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statistic: | Mean | Variance | Skewness | Kurtosis | Mean | Variance | Skewness | Kurtosis | Mean | Variance | Skewness | Kurtosis |
| DICE | 12 | 26 | 2 | 15 | 38 | 409 | 3 | 24 | 57 | 1097 | 3 | 30 |
| PAGE | 22 | 1616 | 5 | 32 | 71 | 14953 | 4 | 22 | 101 | 29312 | 4 | 23 |
| FUND | 3 | 560 | -170 | 35222 | 21 | 22487 | -85 | 18842 | 36 | 68055 | -46 | 13105 |

21

Rvsd Plan - 00002659



# POLICY BRIEF


WORLD RESOURCES INSTITUTE

# MORE THAN MEETS THE EYE
## The Social Cost of Carbon in U.S. Climate Policy, in Plain English

**RUTH GREENSPAN BELL AND DIANNE CALLAN**

## SUMMARY

Presidents since Ronald Reagan have required that significant rules issued by the federal government be accompanied through intra-governmental review by a cost-benefit analysis. In addition, the Obama administration (like the Bush administration before it) has imposed a requirement to assess climate regulation through the lens of a figure (or range of figures) known as the "social cost of carbon" (SCC). The SCC estimates the benefit to be achieved, expressed in monetary value, by avoiding the damage caused by each additional metric ton (tonne) of carbon dioxide ($CO_2$) put into the atmosphere.

The impact of SCC numbers is not theoretical and has consequences for the government regulatory process and therefore for the strength of regulations on climate change that emerge from it. Application of this tool can be problematic to achieving optimum outcomes for society.

A growing literature indicates that developing the SCC requires assumptions that go well beyond the usual boundaries of science or economics. It requires many judgment calls that are hidden in complex economic models and largely invisible to policymakers and stakeholders.

The Obama administration has formulated a standardized approach to estimating the SCC for all new federal rules issued that would regulate greenhouse gases. In the case of climate change, the government calculates the cost imposed on society globally by each additional tonne of carbon dioxide ($CO_2$), the main greenhouse gas. These include health impacts, economic dislocation, agricultural changes, and other effects that climate change can impose on humanity. The benefit to society of avoiding those costs is summed up in the social cost of carbon.

In 2009 an interagency team of U.S. government specialists, tasked to estimate the SCC, reported a range of values from $5 to $65 per tonne of carbon dioxide. The choice of a final figure (or range of figures) is, in itself, a major policy decision, since it sets a likely ceiling for the cost per tonne that any federal regulation could impose on the economy to curb $CO_2$. At $5 a tonne, government could do very little to regulate $CO_2$; at $65, it could do significantly more. Higher SCC numbers, such as the United Kingdom's range of $41–$124 per tonne of $CO_2$ with a central value of $83,[1] would justify, from an economics perspective, even more rigorous regulation.

This paper discusses the limitations that the special nature of climate change imposes on cost-benefit analysis and its constituent parts, primarily focusing on the estimation of the SCC. It explains in plain English the various steps in calculating the SCC, the weaknesses and strengths of those calculations, and how they are used to inform climate policy. The aim is to help policymakers, regulators, civil society, and others judge for themselves the reliability of using the resulting numbers in making policy decisions. Framed as a series of questions and answers, it also allows these stakeholders to understand the current debate within the economics community as to whether climate policy is a special case for which standard cost-benefit and SCC tools of the trade are not adequate to assess policy options.

Environmental Law Institute
2000 L Street, NW, Suite 620
Washington, DC 20036
Tel: (202) 939-3800
www.eli.org

World Resources Institute
10 G Street, NE, Suite 800
Washington, DC 20002
Tel: 202-729-7600
www.wri.org

Copyright 2011 Environmental Law Institute and World Resources Institute.

This work is licensed under the Creative Commons Attribution-NonCommercial-NoDerivative Works 3.0 License.

July 2011

## INTRODUCTION

As the U.S. federal government uses its rulemaking authority to address greenhouse gas emissions, it is important to understand the social cost of carbon (SCC) and its role within the process. When the federal government considers regulation, many values are at play, and the process engages various expertise including law, climate science, engineering, economics, and public policy as well as reaching out to consider the views of stakeholders. SCC provides a dollar figure, or range of dollar figures, that estimate the value of social benefits accrued by acting to reduce climate change. Because of the internal government process for evaluating proposed regulations, the SCC dollar figure, which is a tool devised by economists, can have significant impacts on decisionmakers if they approach regulation from the point of view that the *cost* per tonne to curb $CO_2$ should not be greater than its presumed *effectiveness* in achieving the result. The SCC value can also be misused if the limitations and caveats inherent in its estimation are not considered.

This paper takes no direct position on the merits of using cost-benefit analysis or estimating the social cost of carbon. Instead, it seeks to give non-economists a basic understanding of why and how SCC is calculated and to raise important points about its use, limitations, and assumptions.

### 1. What Is the Social Cost of Carbon?

The SCC is an estimate of the monetized damages associated with an incremental increase in greenhouse gas emissions in a given year. Another way of saying this is that the SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future. As a very simple example, if emissions damage coral reefs, which in turn discourages tourists from visiting Australia, one cost incurred will be lost revenue to the tourist industry. Avoiding that cost is a benefit.

When economists seek to estimate the SCC, they must find a way to estimate the physical and human damages caused by $CO_2$ emissions and the resulting climate change. This enters the realm of scientists researching how growing greenhouse gas emissions are likely to affect the climate system. Climate scientists endeavor to understand a wide variety of harms that can range from more frequent extreme weather events to changes in normal, local climate patterns, to the direct and indirect consequences of ice-free summers in the Arctic.

| Box 1 | Carbon, $CO_2$, or Greenhouse Gases? |
|---|---|

Since many different greenhouse gases of varying strengths contribute to climate change, scientists use the concept of $CO_2$ equivalent ($CO_2$ –eq) to sum their climate change impacts. In calculating the $CO_2$ –eq, scientists also consider timescale because various greenhouses gases differ widely in their persistence in the atmosphere. However, in making the calculation of social cost of carbon, U.S. regulators as of mid-2011 have considered only the effects of regulating $CO_2$, largely because of a lack of data on compound-specific impacts of climate damages (although efforts have been undertaken to expand the scope beyond just $CO_2$).[1,2] $CO_2$ alone accounts for roughly 70% of the climate effects from greenhouse gases.

**Notes**

1. Alex L. Marten and Stephen C. Newbold, *Estimating the Social Cost of Non-CO₂ GHG Emissions: Methane and Nitrous Oxide* (U.S. EPA National Center for Environmental Economics, Working Paper No. 11-01, 2011).

2. U.S. DEPT OF ENERGY, FINAL RULE TECHNICAL SUPPORT DOCUMENT: ENERGY EFFICIENCY PROGRAM FOR COMMERCIAL AND INDUS. EQUIPMENT: SMALL ELECTRIC MOTORS, APPENDIX 15A. SOCIAL COST OF CARBON FOR REGULATORY IMPACT ANALYSIS UNDER EXEC. ORDER 12866 13 (Mar. 9, 2010) [hereinafter IWG Report], *available at* http://www1.eere.energy.gov/buildings/appliance_standards/commercial/sem_finalrule_tsd.html.

Economists do not second-guess the scientists. But they do pick and choose among the latter's many estimates, making judgments about which to include in the economic modeling of damages, and funneling the climate science through their own methods of modeling the world. As explained in more detail in Section 4, SCC estimates are calculated by taking—or trying to take—into consideration learning from climate science about a wide variety of factors such as net agricultural productivity loss, human health effects, and property damage from sea-level rise and changes in ecosystems. Economists fit some subset of these factors into one or more "integrated assessment models" (IAMs), as described later in this paper, to provide a single consistent framework for evaluating a total system response to rising carbon dioxide emissions, including interactions between various component parts of the various dynamic human and environmental subsystems.[2]

Regardless of the modeling approach, a fundamental challenge to this enterprise is uncertainty. Scientists cannot definitely state that certain pollution levels will lead to particular im-

 

Rvsd Plan - 00002661

pacts, which means that the consequences for humans could be much less or much more severe than the median estimate. For example, the loss of a forest to pine-bark-beetle infestation removes those trees from their role in sequestering carbon dioxide and purifying air, but the root system from the same forest might also have been helping to filter and clean water used by downstream human populations, or might have prevented landslides. In addition, the forest might have harbored vegetation used in medicines. The total loss in this example is not simple; a single loss (i.e., the loss of forest) might lead to multiple unexpected effects (i.e., air-quality impacts, loss of clean water, and future landslides), the nature and cost of which we are currently uncertain.

## 2. Why Estimate the Social Cost of Carbon?

Executive Orders since 1981 have required that proposed federal regulations undergo review by the White House's Office of Management and Budget (OMB) prior to being proposed and prior to adoption.[3] For "significant rules", the review must be accompanied by a formal Regulatory Impact Analysis (RIA). One required part of the RIA is a Cost-Benefit Analysis (CBA), which attempts to gauge whether a particular regulation is economically efficient by looking at the benefits (in economics language, the avoided costs) relative to the estimated costs of complying with the regulation.

The Office of Information and Regulatory Affairs (OIRA) within OMB manages the two-stage review process, acting essentially as traffic cop, with the authority to send a regulation back to the agency for revisions or reconsideration when the regulation is deemed not to "comport with the Executive Order's principles and the President's priorities."[4]

Broadly, the SCC informs policymakers from a cost-efficiency point of view how stringent to make regulations, by providing them with a figure that purports to estimate the monetary value of the damages caused by each additional tonne of $CO_2$ put into the atmosphere. In the review of federal regulations involving greenhouse gas emissions, the SCC estimates the benefits side of the cost-benefit equation. From that perspective, to conserve limited resources, society as a whole should not pay any more for these restrictions than is justified by the benefits received from compliance with the regulation. Thus, regulators seek to determine whether greenhouse emission standards for cars, which might cost $10 per tonne of reduced emissions, for example, will bring about benefits from reduced emissions that are worth that cost or more.[5]

Given the importance placed on the economic efficiency of regulatory decisions, the social cost of carbon could have a major impact upon the U.S. government's approach toward combating climate change.

## 3. How Does the SCC Influence U.S. Government Policy Decisions?

The SCC estimates used by the federal government before 2009 were expressed as a range of numbers, and not applied consistently. Different values were used in different rulemakings, even within the same agency.[6] For instance, the Department of Energy in a 2008 regulation of air conditioners and heat pumps estimated that the SCC was in the range of $0 and $20 per tonne but then failed to include this estimate in its cost-benefit analysis, arguing that the proposed regulation passed a cost-benefit test regardless of the SCC.[7]

In 2009, the Obama Administration created an interagency working group (IWG) to standardize the estimate of SCC to be used across federal agencies as they conduct Regulatory Impact Analyses.[8] The working group included the EPA, the Departments of Agriculture, Commerce, Energy, Transportation, and Treasury, and six other federal bodies.[9] Using modeling developed by economists and other analyses and tools described in detail in the following sections, the IWG panel report recommended a range of SCC values—$5, $21, $35, and $65 (in 2007 dollars)—per tonne of carbon dioxide with the intent that these values be used in individual rulemakings across government involving the regulation of $CO_2$.[10] $21 is the "central number" and carries the most weight in analysis.

So far these SCC values have been used in the Regulatory Impact Analysis for DOT/EPA rules imposing miles-per-gallon automobile fleet standards (CAFE) and Department of Energy regulations concerning energy efficiency standards.[11]

The interagency working group produced a range of numbers to reflect the fact that numerous important judgments must be made to calculate the SCC for any given rulemaking. The first three values reflect the use of three different discount rates (as discussed below, the choice of discount rate is controversial; the IWG sidestepped the issue by using three); the fourth shows the cost of worst-case impacts.[12] The IWG does not instruct federal agencies which discount rate to use, suggesting $21 per tonne of $CO_2$ as the "central" value but emphasizing "the importance of considering the full range."[13]

To put the U.S. numbers in perspective, when the U.K. government last calculated the SCC in 2009[14], its analysis yielded a



Rvsd Plan - 00002662

> ### Box 2    The Stern Review
>
> In 2006, the U.K. government released a report from Sir Nicholas Stern, the Head of the Government Economic Service and former World Bank chief economist. The influential report reviewed the potential impacts of climate change and the economics of climate policy. Although its scope was much more wide-ranging than that of U.S. efforts to calculate a social cost of carbon, the report did include an estimated central number social cost of carbon of $85 per tonne of $CO_2$.[1] The reasons for the wide disparity between SCC calculations are discussed in Section 4.e below.
>
> **Note**
> 1. NICHOLAS STERN, THE ECONOMICS OF CLIMATE CHANGE XIV, 287 (2007). $85/tonne is the Stern review number based on business-as-usual projections, year 2000 prices. *Id.*

range of $41–$124 per tonne of $CO_2$ with a central value of $83.[15] The U.K. analysis used very different assumptions, including a much lower discount rate. Their resulting central value supports regulation four times as stringent as the U.S. central value.

In other words, the impact of the IWG's 2009 SCC calculation on federal policy and U.S. climate actions is substantial. With an SCC estimate of $21, only rules that, when implemented, would cost less than $21 per tonne of $CO_2$ reduced would be considered economically efficient. Economists Frank Ackerman and Elizabeth Stanton of the Stockholm Environment Institute point out that the U.S. central SCC number in 2010 translates to roughly 20 cents per gallon of gasoline, in their view "far too small a price incentive to prompt substantive mitigation measures."[16]

## 4. How Is the Social Cost of Carbon Estimated?

The SCC is estimated using complex economic models that seek to mimic or approximate the real-world factors that impose both costs and benefits on society, and thereby to examine the economic processes at play. The basic unit of emissions for the SCC calculation is a metric ton (tonne) of $CO_2$.[17] U.S. residents emitted on average 21 tonnes of $CO_2$ per person in 2005, as shown in Figure 1.[18]

Across the United States, one tonne of $CO_2$ is emitted, *on average*, by:[19]

- a family car every two and half months;
- a household's use of heating and cooking fuel every four months (if energy use were spread equally throughout the year and throughout the country);[20]

> ### Box 3    Optimal Carbon Price or Shadow Price
>
> In an estimation distinct from the SCC, economists may also try to calculate the optimal carbon price to achieve a given policy objective. In the economists' toolbox, this reflects a preference to use price (for example, a tax rather than direct regulation) to reduce society's use of carbon dioxide. The model on which they work is the "rational economic actor"—someone whose actions are predicated on weighing the relative costs and benefits of different options and making a choice entirely based on these values (other relevant values reflecting other perspectives might include ethics, science, or political feasibility). Thus, they ask: what is the optimal price to change behavior—the rate that would cost the economy no more in reduced productivity than the climate damage it would prevent. Estimates of the Optimal Carbon Price are being deployed by U.K. decisionmakers who want to understand how much it will cost to reduce a tonne of carbon dioxide *to the levels their policy requires*. This is a similar exercise to determining the price that carbon should trade at in carbon markets. The United Kingdom has shifted to this approach and away from the SCC because domestically, and as part of the European Union, it is committed to achieving 20% GHG reductions below 1990 levels by 2020.[1]
>
> The United Kingdom has a clear policy objective and is estimating the costs and benefits of carrying it out. In contrast, the United States has no official greenhouse gas emissions reduction requirements (except for the presidential commitment made in Copenhagen to reduce emissions 17% by 2020) and must justify action, regulation by regulation, based on cost-benefit analysis, using the SCC.
>
> **Note**
> 1. The U.K. government pledged in May 2011 to adopt a carbon budget of 50% emissions cut averaged across the years 2023 to 2027, compared with 1990 levels, but this has yet to be enshrined in law.

- a household's use of electricity every six weeks;
- a microwave oven in typical use for seven years or a refrigerator for 15 months.

These are only a small sampling of the vast array of human activities that contribute to GHG emissions. Given their ubiquitous nature, efforts to reduce GHG emissions will impose costs on society, the extent of which is debated. These include the price of new energy technologies and more efficient appliances, vehicles, and heating and cooling systems, as well as the costs of replacing or upgrading existing infrastructure (for example, to replace or retire coal-burning power plants). Some households may face higher electricity bills; drivers may face higher costs of transportation and decide to switch to alternative forms of transport.

 



FIGURE 1 — Percentage Emissions per U.S. Resident, by Sector, 2005

Other: Industry, retail, government 46%

Transportation 33%

Residential Electricity 15%

Home heating and cooling 6%

These changes will also produce benefits (and can be considered investments in energy productivity). As noted earlier, economists define the benefits of reducing GHGs in terms of the avoided damages to be incurred from climate change in the future and estimate the social cost of carbon accordingly.[21]

For non-economists, this can be hard to grasp. Some of the real-world costs avoided are relatively obvious, although perhaps difficult to translate into monetary damages. These include increasingly more intense floods and droughts, which are producing corresponding increases in damage and costs, as recorded by the insurance industry. However, since there have always been floods and droughts, the challenge is to estimate which of these can be connected to a changing climate. Where it gets even harder is to identify and monetize the potential wider, ripple-effect consequences of extreme weather events such as famine, dislocation, mass migrations, civil instability, potential conflicts, and wars. How can one price loss of life, or cultures, such as those of small island states, that might be displaced and possibly made extinct?

As discussed below, economists estimating these numbers must, by necessity, simplify representations of impacts. Often, they must use a proxy, which may not adequately calculate the real harms being inflicted. For example, it is easier to assume

that temperature rises equally around the globe, even though there will be differences geographically; or that there will be a rise in average temperatures, rather than calculating the number of days above a temperature threshold and its potential impact for some major crops.[22]

### a. How do the SCC Models Work?

The particular models used for calculating SCC are called "integrated assessment models" (IAMs). They attempt to incorporate knowledge from a number of fields of study, such as engineering, technology, behavior, and climate science, with the ultimate purpose of deciding whether particular climate change policies are economically efficient in the context of a cost-benefit analysis. The IAM uses mathematical formulas to simulate the relationships between economic activity, measures to control emissions, and the desired environmental outcomes. In so doing, it facilitates the estimation of benefits (the SCC) as well as the comparison of the costs and benefits of emission changes in monetary terms.

The three models most prominently used by mainstream economists and by the U.S. government's interagency working group to estimate social cost of carbon are DICE,[23] PAGE,[24] and FUND.[25] Although there is some overlap between these models, each uses its own methods to import the climate science to make estimations of "climate damage functions." The "climate damage function" is shorthand for estimating the relationship between $CO_2$ emissions and the damage caused, in order to approximate how future damages might be reduced if $CO_2$ emissions fell.

Each modeler selects his or her own method to represent each of the relevant factors. This requires many simplifying assumptions.[26] For example, it is common for models to simply represent global climate change as an increase in global or regional average temperature. The more accurate, but harder to implement, alternative would be to try to capture in the model every detail of expected change in the climate system, and the consequences of those changes. In other cases, modelers make a variety of assumptions about the severity of the damages from changing weather, trying to approximate details of the dynamic process whereby natural systems interact on Earth and the way carbon-cycle feedbacks have been distorted by anthropogenic GHG emissions.

Making such approximations is difficult. The carbon cycle, for example, naturally operates in a relatively balanced state, with seasonal shifts moving carbon from the land to the atmosphere

| Box 4 | IAMs and their Application Explained |
|---|---|

"The user enters a set of economic parameters, including pre-existing baseline projections of economic growth and technological improvements, developed within the standard economic literature. These projections include predictions of future greenhouse gas emissions, which are a function of GDP and a society's 'carbon intensity': the amount of carbon a nation's economy must generate in order to produce wealth.

"From these projected emissions, the climate models predict changes in the concentration of greenhouse gases in the atmosphere. These . . . are in turn used to predict changes in temperature, and the models then project economic harms (in the form of diminished worldwide GDP) from the expected temperature increases . . . .

". . . In order to generate values for the social cost of carbon, the Interagency Group ran the PAGE, DICE and FUND models using standard baseline projections of economic growth and technological development . . . and determined the models' predicted effects of warming on GDP . . . . The Group then re-ran the same models using the same baseline projections, but with *one additional ton of carbon emissions*, in order to determine the marginal effect on global GDP of that additional unit of carbon. . . . [This] is the social cost of carbon: the amount of money saved for every marginal ton of atmospheric carbon that is *not* emitted."[1]

**Note**

1. Jonathan S. Masur & Eric A. Posner, *Climate Regulation and the Limits of Cost-Benefit Analysis* (John M. Olin Law & Econ., Working Paper No. 525, Pub. Law and Legal Theory, Working Paper No. 315, 17 (August 2010), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1662147##.

and then back again. The ocean acts as a buffer, one that can readily take up or release carbon, depending on the circumstances. However, with the rapid rise in $CO_2$ emissions, as a result of human activities, the balance has been significantly disrupted. Ocean and land carbon sinks (also known as reservoirs) cannot absorb all the excess levels of $CO_2$, leading to rising concentrations in the atmosphere. Dynamic carbon-cycle feedbacks can occur naturally or as a result of human influence affecting the flow of carbon between the different reservoirs. For example, because gases are less soluble in warmer liquids, rising ocean temperatures may have the effect of slowing the rate at which the ocean can take up $CO_2$ from the overlying air, leaving more $CO_2$ in the atmosphere, which, in turn, raises air temperatures and heats the ocean further.

Each of the IAMs tries to capture the carbon cycle, but with its own approach to distilling the particular physical phenomena into manageable bites for the model to digest.

DICE assumes fixed rates of flow between major carbon-system reservoirs (ocean, atmosphere, and biosphere) and then totals impact estimates for six sectors into an aggregate global estimate of damages. DICE also tries to account for unpredictable but possible abrupt climate changes. These might include, for example, a shutdown of ocean currents responsible for warming or cooling coastal regions of the continents, large-scale melting of ice sheets leading to dramatic ocean level rise, or the rapid release of methane from arctic permafrost regions, which would further accelerate warming.

PAGE relies on reports from the IPCC. PAGE—and FUND—attempt to capture the uncertainty of the science using a technique called Monte Carlo analysis.[27] Its designers try to build into the model the possibility that climate scientists have either under or overestimated the impacts. They use probability distributions (laypeople might understand this as essentially a Bell curve, although there is theoretical work underway examining whether the Bell curve is an appropriate way to describe the probabilities) as a way of systematically addressing the likelihood of each effect happening. The 2002 version of PAGE assumes a 1% chance of catastrophe, such as the melting of a major ice sheet, should global temperatures rise above 2 degrees C (3.6 degrees F) compared to preindustrial levels. A newer version assumes a 10% chance of catastrophe for the same threshold.[28]

FUND includes sector- and region-specific calculations of damage to agriculture, forestry, water resources, energy consumption, sea-level rise, ecosystems, and health. FUND does not take abrupt, catastrophic changes such as those outlined above into consideration.

It is beyond the scope of this guide to provide detailed comparisons of individual models, the factors they consider, and how each approximates the potential damages from climate change. Moreover, models are constantly updated to increase their sophistication and to supplement the analysis.

However, important factors that all economic modelers should consistently take into account if they are to be faithful to the climate science include:

- the impacts of increased temperature from altering the balance of incoming and outgoing energy in the Earth-



atmosphere system as a result of rising concentrations of greenhouse gases ("radiative forcing")

- possible cooling effects (for example, certain pollutants create a form of haze that reduces the warming impact of the sun although they have harmful impacts on human health)

- regional temperature effects (since, as noted, different parts of the Earth may react in different ways)

- the possibility that changes in the climate system occur in "nonlinear" ways via feedback cycles, tipping points, and/or cascading effects that are irreversible

- economic as well as environmental and social impacts[29]

- the possibility of humans engaging in adaptive measures to buffer or mitigate the impacts of an increasingly hotter world, for example, engineering agriculture to survive in changed environments

In sum, the models used by the federal government to estimate the SCC apply a variety of approaches to estimate the economic harms that might be caused by climate change, with each model adopting a unique approach. These models are not always transparent, may not take into account catastrophic climate change, contain many extrapolations and assumptions, and do not factor in all aspects of climate science.[30]

### b. How Accessible Are the Assumptions Contained in the Models?

A further complication in understanding and comparing models is that in some cases, such as DICE, the authors have made the component parts, and the tools to run the model, publicly accessible, whereas others are proprietary.

Still other models are essentially black boxes because of their complexity and the obscure programming language used. For example, the FUND model, which is growing in acceptance as a standard for evaluation of climate economics, was until recently run only by the model's creator, Richard Tol, and his coauthors. A recent effort by a group of researchers to deconstruct the FUND model revealed many of the unique features that drive its outcomes.

Researchers learned, for example, that FUND assumes that agriculture can tolerate huge temperature changes. In the case of South America, FUND's 95% confidence interval[31] on the ideal temperature for crop production extends to a wide swing of 17 degrees C (30.6 degrees F) above and below historical levels. The model values cumulative damages including sea-level

rise, storm damages, droughts and floods, human deaths and diseases, extinction of species, and forced migration of huge numbers of climate refugees at only $4 per tonne of $CO_2$, with water-supply problems and extinction of species accounting for $2 per tonne of $CO_2$. It excludes catastrophes, which could include the collapse of major ice sheets, accelerated methane releases from melting permafrost, collapse of rainforests, and drastic changes in ocean currents. Reasonable people could and do disagree with these conclusions. In other words, it is as important to understand the assumptions behind a model as it is to understand its final results.[32]

### c. How Do SCC Models Handle Complexity and Uncertainties?

The world that models seek to simulate is highly complex. Consequently, many climate and economic change models are also complex, and many simplifying assumptions are required. Constructing these models is not a mere mechanical exercise. The modeler must make numerous judgments about real-world behavior and how to represent it within the model. The modeler must also distill the various elements down into equations in order to compare one against another[33] and to capture interactions between different component parts.

As the model cannot include every possible factor in either a real-world economy or a real physical world, the modeler must make judgments about appropriate levels of detail, which factors to include, and which to exclude. Likewise, because important aspects of human behavior and the Earth system are dynamic by nature, they are often unpredictable or difficult to represent accurately through the equations that make up models. Among the challenges in any modeling exercise (whether science or economics) is the possibility of surprises and how they interact with other factors. Paul Slovic, a leading researcher of risk perception, noted the difficulties of understanding the indirect consequences of an unexpected event. He analogizes this to a stone dropped in a pond, which causes ripples that expand outward to affect related areas.[34]

The degree of complexity of modeling to estimate the social cost of carbon is further exacerbated by the complexities of climate science, such as the potential for unexpected events (cascading effects, feedback loops, tipping points) that are largely unpredictable based on our current knowledge. Nevertheless, the SCC cannot be reliably calculated without making some attempt to understand the climate system and to estimate the possible impacts that changes to that system could have on human life (including to the "ecosystem services" that serve

and support human development and sustenance and the other forms of life on Earth[35]).

Critics of economic modeling have expressed concern about the way economists filter the significant complexities of Earth and human systems and the inherent uncertainties in them. Scientists MacCracken and Richardson, for example, point to problems "inherent to the complexity of the Earth system," which they think very difficult if not impossible to capture in the context of an IAM.[36] As they summarize, these include:

1. challenges arising from characteristics of the atmospheric, oceanic, cryospheric, and biospheric components of the climate system, including limits in scientific understanding of how to project the future climate

2. challenges arising from the interactions of [people and institutions] with the climate system[37]

Climate science informs what impacts emissions are likely to have on the natural world, and the potential for damage to human society. But climate science is itself a dynamic process. Climate scientists try continually to improve their understanding through research, observations, and models specific to the disciplines that make up climate science.

To point to one example, a warmer atmosphere and ocean are causing the summer Arctic sea ice to melt. Scientists know this is happening (although the evidence for erosion from a warming ocean has been fairly recent).[38] However, because this is an event outside of previous human experience and direct instrumental measurement, scientists cannot know ahead of time the pace at which future melting will occur, much less the impacts on other natural systems that an ice-free Arctic Ocean might cause. Estimates in 2004 were that the Arctic would be ice free in the summer of 2100; current estimates predict this could happen much earlier, some say as early as this decade.[39] And, it remains to be seen what additional changes to the climate system result from associated radiative forcing—for example, the impacts of increasingly larger areas of dark ocean replacing white sea ice, and how this might affect other parts of the climate system.[40]

Another degree of complexity is found in the difficulty of estimating particular damages that are not usually monetized—for example, the loss of endangered species and of certain kinds of vegetation. The defining image in the popular psyche is the polar bear, but other arctic species such as seals are also endangered. And a number of species more directly connected to natural resources that allow humans to grow food are be-

ing disrupted by climate change.[41] The loss of such species is inherent but also connected with other losses that are difficult to quantify.

Another example is the impact of extreme weather—for example, severe flooding in prime agricultural areas that washes out crops and reduces or delays production or shifts it to more climate-tolerant places. There are hundreds of such examples, some of which involve plants and animals, others that involve human lives and communities. Moreover, since humans have always experienced extreme weather events, it is scientifically dubious to attribute any single weather event to a changing climate system. This in itself introduces additional complexities of analysis.

The intellectual puzzle for economists calculating the SCC is how to attach a numeric value to this loss, or to the costs avoided should species survive or even relocate, or should weather cause major changes in the way humans produce food. Even tougher are the methodological challenges associated with monetizing what economists call nonuse environmental benefits. People who may never visit the Himalayas might still be troubled aesthetically or from a geopolitical point of view if glaciers melt. Simply because this is so hard to value, there are benefit categories that get left out in SCC estimates or are valued very conservatively.[42]

None of these are uncertainties about *whether* climate change is happening. Rather, they are uncertainties in calculating the speed of change. Some science projections relating to climate change have been conservative (reflecting the complexity of analysis) and have subsequently been contradicted by experience, such as the swiftly accelerating melt rate for summer Arctic ice.[43]

In truth, human beings have not been very good at predicting either natural or human-made disasters, and therefore have not been prepared for them. The world has recently seen significant examples of miscalculation of risk. In Japan, highly qualified people made calculations of risk of an earthquake, and of a tsunami, but they did not fully understand how the two might work together, and they did not predict a severe enough earthquake or a devastating enough tsunami.

In short, economists who model the SCC must grapple with hugely complex systems and exceptional levels of uncertainty, translating many natural and human variables into monetary values that represent the benefits of acting to control the growth of greenhouse gas emissions. This situation confronts

them with a moving target, as climate scientists are continually learning more about how the natural world is responding to the constantly changing array of human influences. The effort through IAMs to impose order on a rapidly evolving set of observations, facts, and data should not obscure the significance of the uncertainties and assumptions inherent in these calculations, and the monetization in these models should be understood within this context as a wide-ranging estimate of costs.

### d. Why Is the Discount Rate So Important?[44]
A key variable in calculating the social cost of carbon is the "discount rate." Also known as the "rate of time preference," the discount rate reflects the challenge of capturing the time factor in climate policy.

There are three assumptions built into the discount rate: that humans prefer to receive benefits in the present rather than the future; that future generations will be richer and a dollar is worth less to them as a result; and that there are a variety of investment options for any given sum of money. In addressing climate change, it is an unfortunate truth that the costs of reducing greenhouse gas emissions ("mitigation") must typically begin earlier, while the benefits—in the form of catastrophes or costs avoided—accrue many years, decades, and even centuries in the future. Economic analyses sum the costs current generations might impose on themselves to benefit future generations in the form of a discount rate. The IWG selected discount rates of 2.5 to 5% a year.

The discount rate represents the value of a certain future quantity, translated into today's dollars.[45] Because money earns interest, if one assumes a growing economy with a 6% interest rate—a rate that hasn't been seen in quite a long time—and no inflation, one can expect an investment of $100 to have increased to $106 after one year. Thus a cost of $106 next year is equivalent to $100 today. Other ways of expressing this concept are the present value or the time value of money. It makes a big difference to the SCC, and its policy application, which interest rate or discount rate is used. RFF's Burtraw and Sterner provide a vivid example:

> At a discount rate of one percent, the discounted value of $1 million 300 years [from today] is around $50,000 today. But if the discount rate is five percent, the [current]. . . value is less than a mere 50 cents.[46]

This range of discount rates, which span those commonly used in calculating the SCC, leads to differences in net present value after 300 years that vary by a factor of 100,000.

In the calculation of costs, benefits, and the SCC, the choice of discount rate has enormous impact, influencing whether economists recommend to invest today or much later. From the policy perspective of the economists who value this calculation, the higher the discount rate, the less significant future costs become. The choice of discount rate for investments in managing greenhouse gas emissions, following publication of the Stern Review, ignited intense debates in the economics profession.[47] Stern used a low discount rate, approximately 1.4%. By contrast, William Nordhaus, a professor at Yale University, currently uses a discount rate of about 3% in calculating SCC.[48] Three percent values an environmental cost or benefit occurring 25 years in the future at about half as much as the same benefit today.

The school of thought represented by Nordhaus looks at the evidence that successive generations have been increasingly wealthier and questions why current "poorer" people should in effect reduce their own standard of living and consumption patterns to essentially subsidize future generations. They assume that our progeny will be more able to carry the financial burden (and possibly that future generations will invent technology that we cannot currently imagine).

An underlying assumption is a continually growing economy. The higher discount rate that Nordhaus and his followers advocate shifts more of the burden to future generations, supported by the belief that real rates of return indicate that the world in the future will be better able to make climate investments.

Another approach drawn from this perspective argues that current generations should invest money rather than purchase the technology that would today start the process of reducing greenhouse gas emissions. The return on those investments would then be applied in the future to mitigation activities.[49] The difficulty with this argument is that, as climate change science becomes increasingly concerning, it becomes a weaker bet that future generations will be better off.[50] If they are not, lower or negative discount rates are justified.[51] A high discount rate also requires another risky wager, namely that engineers and technicians will know how to roll back challenging impacts of climate change, such as the thawing of the Greenland ice sheets. Even if future generations are richer, they will be stuck with the physical world we bequeath them.

Rvsd Plan - 00002668

Applying a low discount rate represents a judgment not to defer these decisions and their related costs to future generations, despite the general assumption that a dollar is worth more today than a dollar tomorrow. Those in favor of a low discount rate point out the unusual nature of climate change. Thus, they focus on the need to set a ceiling now and then to reduce greenhouse gas emissions to avoid atmospheric concentrations rising to levels that might trigger unpredictable and unsolvable catastrophes farther down the road.

But the choice of discount rates involves myriad social and moral judgments, not simple economic calculations. OMB has acknowledged this in its guidance on using discount rates, which provides that "it may not be appropriate for society to demonstrate a similar [time] preference when deciding between the well-being of current and future generations."[52] Richard Howarth of Dartmouth College explains why we should care about this somewhat arcane discussion among economists and why it is important to make explicit the consequences of using particular discount rates. As he points out, if countries were to use the discount rates advocated by Nordhaus, "[g]reenhouse gas emission [would] be allowed to grow at a robust rate."[53]

Economists wrestling with these issues admit that many of the elements that either are or ought to be considered to rank the desirability of action against climate change, and at what level, require "normative" judgments; one example is how we weigh the welfare of future generations compared to our own. But many of these value judgments are deeply engrained in the approach neoclassic economics[54] takes to analysis. Decisionmakers outside the profession, and indeed the public, if they entered the debate, might make different assumptions about the present generation's responsibility to future generations and their assumed relative wealth. What may make this conversation particularly confusing to people who don't work with these tools on a daily basis is that the analysis results in a mathematical "answer" comparing benefits and costs, potentially masking the large number of judgments made in the estimation process. It is vital that the SCC be understood with these significant limitations and caveats in mind.

### 5. What Roles Should SCC and/or Cost-Benefit Analysis Play in Assessing Climate Policy Options?

The discussion above identifies important caveats about various factors employed in IAMs to estimate the SCC. The objections of various climate scientists, expressed in the literature and also in recent workshops conducted by the U.S. Department of Energy and the Environmental Protec-

tion Agency, have encouraged some economic modelers to undertake efforts to try to improve the ways their models incorporate climate science.[55] It remains to be seen whether these improvements will produce a more reliable set of numbers to inform OMB review.

In addition, a deeper general critique is surfacing of the very use of these models in the context of assessing and making climate-change policy. Three examples follow.

Economist Frank Ackerman and lawyer Lisa Heinzerling have long questioned the use of cost-benefit analysis to inform environmental policymaking in general.[56] More recently, Ackerman critiqued these tools as applied to climate change, including how the basic tools are used to calculate SCC[57]:

> Cost-benefit analysis assumes that costs and benefits can be expressed in monetary terms with a reasonable degree of confidence . . . The benefits of environmental protection, however, are generally more difficult to quantify. In the case of climate change, economists confront a double problem: the benefits of mitigation are both unpredictable and unpriceable.[58]

University of Chicago Law School professors Jonathan S. Masur and Eric A. Posner, in *Climate Regulation and the Limits of Cost-Benefit Analysis,* approach current practices from another angle, criticizing the methods used to calculate the SCC, and examining the relationship between cost-benefit analysis and politics.[59] They conclude that policy responses to climate change—far from being "data driven" decisions—are inherently political questions "involving contested normative issues."[60] Policymakers, they argue, will have to find alternative tools when those questions predominate.[61] They recommend that cost-benefit analysis be reserved for situations that are politically neutral "in the sense of drawing on widely shared intuitions about human well-being."[62]

Finally, Harvard economics professor Martin Weitzman has systematically called into question the adequacy of cost-benefit analysis, including its component, SCC, as a tool to examine climate-policy alternatives. His initial work focused on the so-called "fat tail."[63] In climate science, the fat tail is the right edge of a distribution of, for example, potential temperature variations caused by climate change. Economists often cut off both extreme sides of the curve (5% on each side) for convenience of analysis. But Weitzman says the fat tail is where they should be looking carefully, because it expresses the probability of extreme events.



Standard [cost-benefit] analysis trims off the worst-case outcomes with less than a one in twenty chance of happening . . . but Weitzman tells us that seemingly remote possibility is exactly where we should be looking—because the costs are so high they overwhelm other elements of the cost-benefit analysis.[64]

Thus, Weitzman questions whether standard economic models can provide sound advice on the kinds of decisions that policymakers must make about greenhouse gas emissions. In a 2010 paper, Weitzman appeared to question the very use of cost-benefit analysis for evaluating climate-change policy, arguing for a broader public debate on the subject:

In my opinion, economists need to emphasize more openly to the policy makers, the politicians, and the public that, while formal climate-change [benefit-cost analysis] may be helpful, there is a danger of possible overconfidence from undue reliance on subjective judgments about the probabilities and welfare impacts of extreme events.[65]

## CONCLUSION

U.S. federal agencies are required to conduct a Regulatory Impact Analysis to monetize the anticipated costs and benefits of their proposed actions. In terms of rulemaking related to climate change, the SCC essentially puts a de facto ceiling on the stringency of executive-branch regulation of carbon dioxide. If analyses of specific rules produce SCC figures indicating the rule might impose costs outside the range currently established as acceptable by the federal government interagency working group, namely greater than $65 per tonne of carbon dioxide at the high end, the regulatory agency faces a tough burden of intra-governmental persuasion. In such cases, the choice of SCC can result in weaker control of greenhouse gases, although some advocates for SCC estimates argue that a low positive value is better than zero and can help improve the ambition of a regulation.

The judgments of the IWG—$5, $21, $35, and $65 (in 2007 dollars) per tonne of carbon dioxide—appear on their face to be very concrete. The difficulty with these seemingly rigorous numbers is that they mask a series of choices and value judgments made by the people who run the economic models that produce the final figures.

How these models assess future damages and harms that might occur from climate change is a major issue. Climate scientists research the damage that increasing temperatures and their consequences are imposing on all facets of nature, a uniquely complex undertaking. The economic models essentially selectively filter the climate science, and translate it into numerical representations. An incomplete list of these judgments includes:

- which parts of climate science to factor into the model and at what level of severity
- whether to use a discount rate and what rate to use
- how to account for potentially "catastrophic" climatic events
- how to identify and monetize potential consequences of climate change such as loss of species, mass migrations, spread of disease, and agricultural disruptions and shifts

Perhaps the most important and debated judgment made by modelers is the selection of the discount rate. The IWG selected discount rates of 2.5 to 5% a year. At 3%, a damage that is valued today at $100 in damages shrinks to as little as $5 in a century, suggesting those costs will be less onerous to people in 100 years,[66] and discouraging current regulatory action.

The opacity of the SCC calculation process risks giving policymakers and stakeholders the impression that the numbers are more reliable than they actually are. The assumptions behind the calculation of SCC are not always transparent to policymakers, climate scientists, the public, and sometimes even other economists and economic modelers.

It is a seductive idea that SCC and cost-benefit analysis produce precise numbers backed by hard science. In truth, no single value should be accepted by policymakers unless all the assumptions and choices that underpin the calculation are transparent and well understood. Otherwise the regulatory process risks being held hostage to choices made by unelected experts, rather than grappling with the inherently political and ethical questions posed by climate-change policy.

One way to remedy this problem is through more robust dialogue between economists developing the SCC and climate scientists and others working to understand the damages that climate change is imposing. Climate and social scientists should have a direct role in the SCC calculation process.[67]

## Notes

1. Converted from U.K. pounds to U.S. dollars in 2000.

2. WILLIAM D. NORDHAUS, A QUESTION OF BALANCE: WEIGHING THE OPTIONS ON GLOBAL WARMING POLICIES (2008).

3. Exec. Order No. 12,291, 3 C.F.R. 127 (1982); Exec. Order No. 12,866, 3 C.F.R. 638 (1994).

4. DOMINIC J. MANCINI, OFFICE OF INFORM. & REGULA-TORY AFFAIRS, U.S. OFFICE OF MGMT & BUDGET, THE AM. EXPERIENCE IN REGULATORY REVIEW AND REFORM (2006), *available at http://ec.europa.eu/agriculture/events/simpl fication/mancini.pdf* ("During our review, we examine the RIA and the regulation and make suggestions to improve both the RIA and the rule's cost-effectiveness and to make sure that it comports with the Executive Order's principles and the President's priorities. If the agency refuses to make changes or needs more time to make the changes, we can return the rule to the agency for reconsideration.") James F. Morrall, III, a retired career official at OMB, describes the process and calls the head of the OIRA, the regulatory arm of OMB, the "regulatory Czar." JOHN F. MORRALL, III, U.S. EXPERIENCE WITH REGULATORY OVERSIGHT HISTORY AND USE OF RIA (2010), *available at http://www.gwu.edu/~clai/recent_events/2010/Spring_Regulatory_Program/Speaker%20Presentations/US_Experience_with_Regulatory_Oversight_2010.pdf.*

5. The benefits can be estimated by multiplying the change in GHG emissions in a year by the SCC value appropriate for that year. The net present value (in other words, the value in today's dollars) of the benefits can then be calculated by multiplying each of these future benefits by an appropriate discount factor and summing across all affected years.

6. For example, the National Highway Traffic Safety Administration (NHTSA) used an SCC value ranging on the low end from $2 (a domestic value) to $80 (a global value) in its March 2009 final rule for vehicle fuel economy. Final Rule, Average Fuel Economy Standards, Passenger Cars and Light Trucks, 74 Fed. Reg. 14,196, 14,346 (Mar. 30, 2009). In 2008, NHTSA used an SCC value of $7 in its proposed fuel economy standard. Notice of Proposed Rulemaking, Average Fuel Economy Standards, Passenger Cars and Light Trucks; Model Years 2011–2015, 73 Fed. Reg. 24,352, 24,414 (May 2, 2008).

7. Commercial Standard Sized Packed Terminal Air Conditioners and Packed Terminal Heat Pumps, 73 Fed. Reg. 58,772 (Oct. 7, 2008).

8. The interagency working group states its objective as "making it possible for agencies to incorporate the social benefits from reducing carbon dioxide emissions into cost-benefit analyses of regulatory actions that have small, or 'marginal,' impacts on cumulative global emissions. Most federal regulatory actions can be expected to have marginal impacts on global emissions." U.S. DEPT OF ENERGY, FINAL RULE TECH-NICAL SUPPORT DOCUMENT: ENERGY EFFICIENCY PROGRAM FOR COMMERCIAL AND INDUS. EQUIPMENT: SMALL ELECTRIC MOTORS, APPENDIX 15A. SOCIAL COST OF CARBON FOR REGULA-TORY IMPACT ANALYSIS UNDER EXEC. ORDER 12866 13 (Mar. 9, 2010) [hereinafter IWG Report], *available at* http://www1.eere.energy.gov/buildings/appliance_standards/commercial/sem_final-rule_tsd.html.

9. Council of Economic Advisors, Council on Environmental Quality, National Economic Council, Office of Energy and Climate Change, Office of Management and Budget, and Office of Science and Technology Policy.

10. There was no specific guidance on which value to use in specific rulemakings. This lack of guidance is understandable, given that the differences are mostly related to using a variety of discount rates.

11. Final Rule, Average Fuel Economy Standards, Passenger Cars and Light Trucks, *supra* n. 6; Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324, 25,520 (May 7, 2010); Energy Conservation Program: Energy Conservation Standards for Small Electric Motors, 75 Fed. Reg. 10,874, 10,909 (Mar. 9, 2010); Energy Conservation Program: Energy Conservation Standards for Residential Water Heaters, Direct Heating Equipment, and Pool Heaters, 75 Fed. Reg. 20,112, 20,177 (Apr. 16, 2010).

12. IWG Report, *supra* n. 8, at 40.

13. *Id.* at 34.

14. Climate Change Economics, Dept. of Energy and Climate Change, *Carbon Valuation in UK Policy Appraisal: A Revised Approach* (July 2009), *available at http://www.decc.gov.uk/assets/decc/what%20we%20do/a%20low%20carbon%20uk/carbon%20valuation/1_20090715105804_e_@@_carbonvaluationinukpolicyappraisal.pdf*

 

15. FRANK ACKERMAN & ELIZABETH A. STANTON, THE SOCIAL COST OF CARBON 17 (2010), *available at http:// sei-international.org/mediamanager/documents/Publications/ Climate-mitigation-adaptation/socialcostcfcarbon_sei_20100401. pcf* (citing figures used in Climate Change Economics, *supra* n. 14, at 119). In 2002, the U.K. Government Economic Service (GES) recommended an illustrative estimate for the SCC of £70/tonne of carbon (tC), within a range of £35 to £140/tC (for year 2000 emissions), for use in policy appraisal across government, and that these values should be increased at the rate of £1/tC per year. R. Clarkson and K. Deyes, *Estimating the Social Cost cf Carbon Emissions* 41 (Govt. Econ. Serv. Working Paper 140, Jan. 2002), *available at* http://www.hm-treasury.gov.uk/d/SCC.pdf. The GES also recommended that these values should be subject to periodic review. *Id.* at 42.

16. Ackerman & Stanton, *supra* n. 15, at 1.

17. IWG Report, *supra* n. 8, at 2.

18. Ackerman & Stanton, *supra* n. 15, at 4.

19. This discussion relies heavily on Ackerman & Stanton, *supra* n.15.

20. Because of seasonal differences, the figure is every four years in Hawaii or every six weeks in Maine.

21. Some have pointed out that that this ignores some of the non-climate related co-benefits of reducing $CO_2$, including immediate health benefits. More research is showing those estimates of benefits to be very high. For example, scientists have found that introducing low-emissions cookstoves in India would significantly reduce premature deaths caused by acute lower respiratory infections, ischemic heart disease, and chronic obstructive pulmonary disease. Paul Wilkinson et al., *Public Health Benefits cf Strategies to Reduce Greenhouse-Gas Emissions: Household Energy*, 374 LANCET 1917–29 (2009).

22. FRANK ACKERMAN & CHARLES MUNITZ, CLIMATE DAMAGES IN THE FUND MODEL: A DISAGGREGATED ANALYSIS (2011), *available at http://www.e3network.org/papers/ Climate_Damages_in_FUND_Model_March2011.pcf*.

23. The Dynamic Integrated Climate Change (DICE) model was developed at Yale University by William Nordhaus, David Popp, Zili Yang, Joseph Boyer, and colleagues.

24. The Policy Analysis of Greenhouse Effect (PAGE) model was designed by Dr. Chris Hope, Reader in Policy Modelling at University of Cambridge Judge Business School.

25. The *Climate Framework for Uncertainty, Negotiation and Distribution (FUND) was developed by Richard Tol and David Anthcjf.*

26. This section relies heavily on MICHAEL D. MASTRANDREA, REPRESENTATION OF CLIMATE IMPACTS IN INTEGRATED ASSESSMENT MODELS, WORKSHOP PROCEEDINGS (2010), *available at http://www.pewclimate.org/docUploads/mastrandrea-integrated-assessment-models.pcf*.

27. Monte Carlo analysis is a form of probabilistic testing using computerized mathematical formulas to do repeated random sampling. Doing this allows the modeler to consider a range of possible outcomes and the probabilities they will occur for any choice of action, including extreme possibilities from the most radical to the most conservative decision. This is a technique that was devised by scientists working on the atom bomb, named for the Monaco casino resort mecca.

28. Douglas Fischer & Nicole Heller, *Revised Figures Show Federal Economists Understate the Costs cf Climate Impacts*, CLIMATE CENTRAL (Jan. 26, 2011), http://www. climatecentral.org/news/revised-figures-show-federal-economists-understate-the-cost-of-climate/.

29. For example, although most economists assume that wealth will continue to increase, as it has historically, changing weather might lower economic growth and human wellbeing; future generations could be considerably poorer than current ones (see discussion below concerning discount rate at Section 4.d). Also, extreme weather changes may trigger human migrations from less habitable to more habitable parts of the Earth, a trend that could provoke social conflict.

30. Elizabeth A. Stanton, Frank Ackerman, & Sivan Kartha, *Inside the Integrated Assessment Models: Four Issues in Climate Economics*, 1 CLIMATE AND DEV. 166–84 (2009).

31. A 95% confidence interval means that in the statistical model, the "true" value has a 95% chance of being within the interval.

32. *Ackerman* & Munitz, *supra* n. 22.

33. Frank Ackerman et al., *Limitations cf Integrated Assessment Models cf Climate Change*, 95 CLIMATIC CHANGE 297–315 (2009).

34. Paul Slovic, *Perception cf Risk*, 236 SCIENCE 280–85 (1987).

35. Ecosystems are the systems in the natural world that provide benefits ("services") to human beings. Services can include clean water or the insects that pollinate to allow food to be grown. Rudolf S. de Groot, Matthew A. Wilson, & Roelof M.J. Boumans, *A Typology for the Classcfication, Description and Valuation cf Ecosystem Functions, Goods and Services*, 41 ECOLOGICAL ECON. 393–408 (2002).



36. MICHAEL C. MACCRACKEN & L. JEREMY RICHARDSON, CHALLENGES TO PROVIDING QUANTITATIVE ESTIMATES OF THE ENVIRONMENTAL AND SOCIETAL IMPACTS OF GLOBAL CLIMATE CHANGE (2010), *available at http://www.pewclimate.org/docUploads/maccracken-richardson-challenges-quantitative-estimates.pdf.*

37. *Id.*

38. T.B. Salles, C.M. Griffiths, C.P. Dyt & F. Li, *Australian Shelf Sediment Transport Responses to Climate Change-Driven Ocean Perturbations,* 282 MARINE GEOLOGY 268–74 (2011); E. Rignot et al., *Acceleration of the Contribution of the Greenland and Antarctic Ice Sheets to Sea Level Rise,* 38 GEOPHYSICAL RESEARCH LETTERS L05503 (2011).

39. *Ice-Free Arctic Summers Likely Sooner Than Expected,* NATIONAL OCEANIC AND ATMOSPHERIC ASSOCIATION (Apr. 2, 2009), *http://www.noaanews.noaa.gov/stories2009/20090402_seaice.html.* For the earlier prediction, see, e.g., Richard Black, *New Warning on Arctic Sea Ice Melt,* BBC NEWS (Apr. 7, 2011), *http://www.bbc.co.uk/news/science-environment-13002706;* David Ljunggren, *Arctic Summer Ice Could Vanish by 2013: Expert,* REUTERS (Mar. 5, 2009), *http://www.reuters.com/article/idUSTRE52468B20090305; February Arctic Ice Extent Ties 2005 for Record Low; Extensive Snow Cover Persists,* NATIONAL SNOW AND ICE DATA CENTER (Mar. 2, 2011), *http://nsidc.org/arcticseaicenews/2011/030211.html.*

40. J.E. OVERLAND ET AL., NATIONAL OCEANIC AND ATMOSPHERIC ASSOCIATION, ARCTIC REPORT CARD: UPDATE FOR 2010: ATMOSPHERE (2011), *available at* http://www.arctic.noaa.gov/reportcard/atmosphere.html.

41. *See, e.g.,* Food and Agriculture Organization of the United Nations, Rome, Italy, Feb. 13–14, 2008, *Climate Change and Biodiversity for Food and Agriculture* 2–3 (2008) ("climate change may lead to loss of functional biodiversity and to localized impacts in the delivery of ecosystem services such as lack of pollination, loss of soil biodiversity and capacity for nutrient cycling, or loss of natural biological control leading to potential new pest outbreaks"), *available at ftp:/.ftp.fao.org/docrep.fao/meeting/013/ai784e.pdf;* GLOBAL CLIMATE CHANGE IMPACTS IN THE UNITED STATES 71–78 (Thomas R. Karl, Jerry M. Melillo, & Thomas C. Peterson eds., 2009), *available at http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts.*

42. The methodology economists use to perform this function is called willingness to pay assessments or contingent valuation methodologies. For a critique of such methods, see John Broome, *Valuing Policies in Response to Climate Change: Some Ethical Issues, available at http://webarchive.nationalarchives.gov.uk/+/http://www.hm-treasury.gov.uk/stern_review_supporting_documents.htm.*

43. *See supra* n. 39.

44. This section depends very heavily on Chris Hope & David Newbery, *Calculating the Social Cost of Carbon* (May 3, 2006), *available at http://www.eprg.group.cam.ac.uk/wp-content/uploads/2008/11/eprg0720.pdf,* and Stephen Newbold et al., *The "Social Cost of Carbon" Made Simple* (U.S. EPA National Center for Environmental Economics, Working Paper No. 10-07, 2010).

45. Dallas Burtraw & Thomas Sterner, *Climate Change Abatement: Not 'Stern' Enough?,* RESOURCES FOR THE FUTURE (Apr. 4, 2009), *http://www.rff.org/Publications/WPC/Pages/09_04_06_Climate_Change_Abatement.aspx.*

46. *Id.*

47. The debate and the consequences of the discounting rate are illustrated by economist Hal R. Varian in *Recalculating the Costs of Global Climate Change,* N.Y. TIMES, Dec. 14, 2006, *available at http://www.nytimes.com/2006/12/14/business/14scene.html.*

48. In 1994, Nordhaus advocated for a discount rate of about 6%. WILLIAM D. NORDHAUS, MANAGING THE GLOBAL COMMONS: THE ECONOMICS OF CLIMATE CHANGE (1994).

49. Howarth makes the point that there is not only one rate of return on capital. Richard B. Howarth, *Discounting and Uncertainty in Climate Change Policy Analysis,* 79 LAND ECONOMICS 369–81 (2003).

50. Richard B. Howarth, *Discounting, Uncertainty, and Revealed Time Preference,* 85 LAND ECONOMICS 24–40 (2009).

51. Partha Dasgupta, *Discounting Climate Change,* 37 J. RISK AND UNCERTAINTY 141–69 (2008).

52. OFFICE OF MGMT AND BUDGET, CIRCULAR A-4 (2003), *available at http://www.whitehouse.gov/omb/circulars_a004_a-4/#e.*

53. Howarth, *supra* n. 50, at 1.





WORLD RESOURCES INSTITUTE

Rvsd Plan - 00002673

54. Loosely, neoclassical economics rests on three assumptions: people have rational preferences among outcomes that can be identified and associated with a value; individuals maximize utility and firms maximize profits; and people act independently on the basis of full and relevant information. E. Roy Weintraub, *Neoclassical Economics* in THE CONCISE ENCYCLOPEDIA OF ECONOMICS, *available at* http://www.econlib.org/library/Enc1/NeoclassicalEconomics.html.

55. U.S. EPA, IMPROVING THE ASSESSMENT AND VALUATION OF CLIMATE CHANGE IMPACTS FOR POLICY AND REGULATORY ANALYSIS: MODELING CLIMATE CHANGE IMPACTS AND ASSOCIATED ECONOMIC DAMAGES, *available at* http://yosemite.epa.gov/ee/epa/eerm.nsf/vwRepNumLookup/EE-0564?OpenDocument.

56. FRANK ACKERMAN & LISA HEINZERLING, PRICELESS: ON KNOWING THE PRICE OF EVERYTHING AND THE VALUE OF NOTHING (2005).

57. ACKERMAN ET AL., THE NEED FOR A FRESH APPROACH TO CLIMATE CHANGE ECONOMICS (2010), *available at* http://www.pewclimate.org/docUploads/ackerman-decanio-howarth-sheeran-climate-change-economics.pdf.

58. Social cost of carbon does not calculate the "costs" side of the cost-benefit equation. Ackerman's critique of the larger issues of cost-benefit expresses the difficulty of monetizing essentialities such as clean water and air. A longer discussion of this is found in ACKERMAN & HEINZERLING, PRICELESS, *supra* n. 56.

59. Jonathan S. Masur & Eric A. Posner, *Climate Regulation and the Limits of Cost-Benefit Analysis* (John M. Olin Law & Econ., Working Paper No. 525, Pub. Law and Legal Theory, Working Paper No. 315, 17 (August 2010), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1662147##.

60. *Id.* at 6.

61. *Id.* at 34.

62. *Id.* at 6.

63. Martin L. Weitzman, *On Modeling and Interpreting the Economics of Catastrophic Climate Change*, THE REVIEW OF ECONOMICS AND STATISTICS (Feb. 2009).

64. M. Kimble & L. Tawney, *The Tail of the Fat Tail*, 26 ENVIRONMENTAL FORUM 24 (May/June 2009), *available at* http://www.globalproblems-globalsolutions-files.org/unf_website/PDF/articles/UNF_EC_TaleFatTail_KimbleTawney_0907.pdf.

65. M. Weitzman, *Revising Fat-Tailed Uncertainties in the Economics of Climate Change* (Aug. 23, 2010), *available at* http://www.economics.harvard.edu.faculty/weitzman.files/REEP%2Efinal%2Efat.pdf.

66. Ackerman & Stanton, *supra* n.15.

67. Two workshops on SCC sponsored by the U.S. DOE and EPA in November 2010 and February 2011 represent a welcome step forward in fostering such dialogue.

Rvsd Plan - 00002674

## ABOUT THE WORLD RESOURCES INSTITUTE

The World Resources Institute is a global environmental think tank that goes beyond research to put ideas into action. We work with governments, companies, and civil society to build solutions to urgent environmental challenges. WRI's transformative ideas protect the earth and promote development because sustainability is essential to meeting human needs and fulfilling human aspirations in the future.

WRI spurs progress by providing practical strategies for change and effective tools to implement them. We measure our success in the form of new policies, products, and practices that shift the ways governments work, companies operate, and people act.

We operate globally because today's problems know no boundaries. We are avid communicators because people everywhere are inspired by ideas, empowered by knowledge, and moved to change by greater understanding. We provide innovative paths to a sustainable planet through work that is accurate, fair, and independent.

---

Each World Resources Institute brief represents a timely, scholarly treatment of a subject of public concern. WRI takes responsibility for choosing the study topics and guaranteeing its authors and researchers freedom of inquiry. It also solicits and responds to the guidance of advisory panels and expert reviewers. Unless otherwise stated, however, all the interpretation and findings set forth in WRI publications are those of the authors.

## ABOUT THE ENVIRONMENTAL LAW INSTITUTE

The Environmental Law Institute makes law work for people, places, and the planet. The Institute has played a pivotal role in shaping the fields of environmental law, policy, and management, domestically and abroad. Today, ELI is an internationally recognized independent research and education center known for solving problems and designing fair, creative, and sustainable approaches to implementation.

ELI strengthens environmental protection by improving law and governance worldwide. ELI delivers timely, insightful, impartial analysis to opinion makers, including government officials, environmental and business leaders, academics, members of the environmental bar, and journalists. ELI is a clearinghouse and a town hall, providing common ground for debate on important environmental issues.

The Institute is governed by a board of directors who represent a balanced mix of leaders within the environmental profession. Support for the Institute comes from individuals, foundations, government, corporations, law firms, and other sources.

---

ELI publishes books, research reports, and several periodicals to educate the profession and to stimulate a robust and creative exchange of ideas. ELI Press publishes books by a wide array of authors, whose opinions are not necessarily those of the Institute, its Board of Directors, or funding organizations. ELI welcomes suggestions for book topics and encourages the submission of draft manuscripts and book proposals.

The authors gratefully acknowledge the tutoring, review and editing thoughts of the following people; any mistakes we made after such amazing help were our own: Scott Schang, Kristen Sheeran, James Barrett, Laurie Johnson, Bud Ward, Jake Blumgart, Jeremy Richardson, Kevin Kennedy, Karl Hausker, Frances Irwin, Janet Ranganathan (especially for a great title), Letha Tawney, Micah Ziegler, James Bradbury, Edward Cameron, Mercedes Stickler and one anonymous reviewer, and the patient help of Hyacinth Billings, Rachel Jean-Baptiste, and Maggie Powell in preparing the final document.

 

Rvsd Plan - 00002675

NATURE | COMMENT

# Global warming: Improve economic models of climate change

Richard L. Revesz, Peter H. Howard, Kenneth Arrow, Lawrence H. Goulder, Robert E. Kopp, Michael A. Livermore, Michael Oppenheimer & Thomas Sterner

04 April 2014

Costs of carbon emissions are being underestimated, but current estimates are still valuable for setting mitigation policy, say Richard L. Revesz and colleagues.

Subject terms:    Climate sciences   Economics   Policy



Danny Lawson/PA Wire

Floods brought parts of Britain to a standstill earlier this year.

On 31 March, the Intergovernmental Panel on Climate Change (IPCC) released its latest report on the impacts of climate change on humans and ecosystems (see go.nature.com/ad5v1b). These are real risks that need to be accounted for in planning for adaptation and mitigation. Pricing the risks with integrated models of physics and economics lets their costs be compared to those of limiting climate change or investing in greater resilience.

Rvsd Plan - 00002676

Last year, an interagency working group for the US government used three leading economic models to estimate that a tonne of carbon dioxide emitted now will cause future harms worth US$37 in today's dollars[1]. This 'social cost of carbon' represents the money saved from avoided damage, owing to policies that reduce emissions of carbon dioxide.



## Top picks
from **nature** news

- Stem-cell method carries low risk of tumours
- What cosmologists could still learn from the CMB
- Russia to end Space Station collaboration in 2020

Governments, agencies and companies use such estimates to guide decisions about how much to invest in reducing emissions. In the United States, a previous estimate[2] made in 2010 informed the stricter fuel-economy requirements for new cars. The latest value is motivating President Barack Obama's plan to impose greenhouse-gas limits on coal-fired power plants by next year. Canada, Mexico, the United Kingdom, France, Germany and Norway have used similar numbers to guide regulatory decisions, as has the International Monetary Fund to analyse fossil-fuel subsidies.

Yet the social-cost benchmark is under fire. Industry groups, politicians — including leaders of the energy and commerce committee of the US House of Representatives — and some academics say that uncertainties render the estimate useless.

As legal, climate-science and economics experts, we believe that the current estimate for the social cost of carbon is useful for policy-making, notwithstanding the significant uncertainties. The leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions. In fact, because the models omit some major risks associated with climate change, such as social unrest and disruptions to economic growth, they are probably understating future harms. The alternative — assigning no value to reductions in carbon dioxide emissions — would lead to regulation of greenhouse gases that is even more lax.

Instead, climate-economic models need to be extended to include a wider range of social and economic impacts. Gaps need to be filled, such as the economic responses of developing countries and estimates of damages at extreme temperatures. Today, only a handful of researchers in the United States and Europe specialize in such modelling. A broader programme involving more people exploring more phenomena is needed to better estimate the social cost of carbon and to guide policy-makers. Otherwise policies will become untethered from economic realities.



Nature special: Outlook for Earth

### Social cost

The models in question aim to integrate estimates of the costs of greenhouse-gas emissions and of steps to reduce them. First, they translate scenarios of economic and population growth, and resulting emissions,

into changes in atmospheric composition and global mean temperature. Then the models apply 'damage functions' that approximate the global relationships between temperature changes and the economic costs from impacts such as changes in sea level, cyclone frequency, agricultural productivity and ecosystem function. Finally, the models translate future damages into present monetary value.



SOURCE: A, REF.1 (DICE, FUND, PAGE)/Roson, R. & Mensbrugghe, D. V. D. Int. J. Sus. Econ. 4, 270–285 (2012)
(ENVISAGE)/Ackerman, F., Stanton, E. A. & Bueno, R. Ecol. Econ. 85, 166–176 (2013) (CRED); B, REF.1

Sources of uncertainty are numerous[3]. They include: how the climate responds to carbon dioxide concentrations; positive and negative feedback loops in the climate system; emissions growth rates for various socio-economic scenarios; the completeness and accuracy of damage functions (especially with regard to catastrophic harms, migration and conflict, weather variability and feedbacks on economic growth); the ability of future generations to adapt to climate change; and the economic 'discount rate' used to translate future costs to current dollars.

The 2013 US analysis[1] used the then-most recent vintages of three long-standing models: FUND 3.8, DICE 2010, and PAGE09. Each model applies different climatic and economic functions to simplify the complex picture. Despite the range of approaches and uncertainties, each one predicted sizeable economic damage from greenhouse-gas emissions for warming beyond 2 °C above pre-industrial levels. Two models, ENVISAGE and CRED, published since the US analysis was structured in 2010, have broadly similar projections to these three (see 'Carbon's costly legacy'). The analysis suggested that — depending on assumptions about how future damages are valued in today's money — the expected global cost of one tonne of carbon dioxide emitted in 2020 is between $12 and $64 (with $43 as the central value).

Greater harm

Rvsd Plan - 00002678

The future costs of climate change could be even higher, for four reasons. First, the impacts of historic temperature changes suggest that societies and economies may be more vulnerable than current models predict and that weather variability is more important than average weather in determining impacts, particularly for crop growth and food security. For example, the yields of some crops may decline rapidly above certain temperatures[4].

Second, the models omit damages to labour productivity, to productivity growth, and to the value of the capital stock, including buildings and infrastructure. By lowering the annual growth rate, these damages could have deeper and longer-lasting effects on the global economy than the static losses of annual economic output currently represented in the three main models[5, 6]. A significant decline in human welfare is possible in the medium and long run owing to the compounding effects of lost growth. Also not taken into account are the risks of climate-induced wars, coups or societal collapses and the resulting economic crises[7].

Third, the models assume that the value that people attach to ecosystems will remain constant[8]. Yet as a commodity becomes more scarce, its value increases. In the desert, water is extremely valuable. During a flood, dry land is highly prized. Because the services provided by ecosystems are likely to decline as warming degrades them, the costs of future ecosystem damage from climate change will rise faster than the models predict.

Rvsd Plan - 00002679



ALESSANDRO GAROFALO/Reuters/Corbis

Storms caused chaos on roads in northwestern Italy in 2011.

Fourth, the US analysis assumes a constant discount rate to translate future harms into today's money. However, for impacts that are both highly uncertain and occurring in the distant future, economists have shown[9] that a discount rate that declines over time should be used, with discount rates for the far future

Rvsd Plan - 00002680

significantly below those that were used in the 2013 analysis. This approach would yield a higher present value to the long-term impacts of climate change and thus a higher value for the social cost of carbon.

It is true that future technological developments might better equip society to cope with climate change. And of course overall bias cannot be determined simply by adding biases in each direction. But the bulk of the literature and arguments indicates that social-cost models are underestimating climate-change harms.

### Better models
What now? Modellers, scientists and environmental economists must continue to step outside their silos and work together to identify research gaps and modelling limitations.

Climate hot spots in the developing world are one such gap, because economic responses in these regions cannot be extrapolated simply from estimates made for developed countries. The impacts of extreme temperatures are also uncertain. Current damage estimates are generally calibrated for warming of less than 3 °C (ref. 6). Yet without mitigation, the IPCC projects that we could see warming in excess of 4 °C by the end of the century. Such conditions would be beyond human experience. If warming continues unchecked into the twenty-second century, it could render parts of the planet effectively uninhabitable during the hottest days of the summer, with consequences that would be challenging to monetize[10].

---

### Related stories
- Climate policy: Streamline IPCC reports
- Climate change: The case of the missing heat
- History: Pushing the climate frontier

More related stories

---

The models should be revised more frequently to accommodate scientific developments. Researchers commonly test model sensitivity to new parameters. But the structure and in some cases the calibration of the damage models is stuck in the 1990s, when the original versions were created, owing to a lack of funding.

IPCC reports help to set the research agenda on climate. The release of the Fifth Assessment Report reminds us of the progress so far. It is important to ensure that the sixth assessment takes a substantive step forward. By facilitating efforts to refine estimates of the social cost of carbon, the IPCC will be performing its most important function: informing the global political conversation about how best to address the looming threat of climate change.

Nature 508, 173–175 (10 April 2014)     doi:10.1038/508173a

### References

1. Interagency Working Group on Social Cost of Carbon. Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis (US Government, 2013); available at http://go.nature.com/vzpkkb

Rvsd Plan - 00002681

Show context

2.  Interagency Working Group on Social Cost of Carbon. Social Cost of Carbon for Regulatory Impact
    Analysis (US Government, 2010); available at http://go.nature.com/uqhrgh
    Show context

3.  Kopp, R. E. & Mignone, B. K. Economics 6, 2012–2015 (2012).
    Show context

4.  Schlenker, W. & Roberts, M. J. Proc. Natl Acad. Sci. USA 106, 15594–15598 (2009).
    Show context                                                    Article  PubMed  ChemPort

5.  Fankhauser, S. & Tol, R. S. J. Resour. Energy Econ. 27, 1–17 (2005).
    Show context                                                                    Article

6.  Tol, R. S. J. Annu. Rev. Resour. Econ. 3, 419–443 (2011).
    Show context                                                                    Article

7.  Hsiang, S. M., Burke, M. & Miguel, E. Science 341, 1235367 (2013).
    Show context                                                    Article  PubMed  ChemPort

8.  Sterner, T. & Persson, U. M. Rev. Environ. Econ. Pol. 2, 61–76 (2008).
    Show context                                                                    Article

9.  Weitzman, M. L. Environ. Econ. Mgmt 36, 201–208 (1998).
    Show context                                                                    Article

10. Sherwood, S. C. & Huber, M. Proc. Natl Acad. Sci. USA 107, 9552–9555 (2010).
    Show context                                                    Article  PubMed  ChemPort


## Related stories and links

From nature.com
  - Climate policy: Streamline IPCC reports
    04 April 2014
  - Climate change: The case of the missing heat
    15 January 2014
  - History: Pushing the climate frontier
    18 September 2013
  - Climate change: A patchwork of emissions cuts
    18 September 2013
  - Climate science: Vast costs of Arctic change

Rvsd Plan - 00002682

24 July 2013

- Nature special: Outlook for Earth

### From elsewhere

- Intergovernmental Panel on Climate Change: Fifth Assessment Report
- White House: Social Cost of Carbon (PDF)
- Scientific American: Infrastructure Threatened by Climate Change Poses a National Crisis

## Author information

### Affiliations

Richard L. Revesz is at the New York University School of Law, New York, USA.

Peter H. Howard is at the New York University School of Law, New York, USA.

Kenneth Arrow is in the Department of Economics, Stanford University, Stanford, California, USA.

Lawrence H. Goulder is in the Department of Economics, Stanford University, Stanford, California, USA.

Robert E. Kopp is in the Department of Earth and Planetary Sciences and Rutgers Energy Institute, Rutgers University, New Brunswick, New Jersey, USA.

Michael A. Livermore is at the University of Virginia School of Law, Charlottesville, Virginia, USA.

Michael Oppenheimer is at the Woodrow Wilson School of Public and International Affairs and in the Department of Geosciences, Princeton University, Princeton, New Jersey, USA.

Thomas Sterner is in the Department of Economics, University of Gothenburg, Gothenburg, Sweden.

### Corresponding author
Correspondence to: Richard L. Revesz

For the best commenting experience, please login or register as a user and agree to our Community Guidelines. You will be re-directed back to this page where you will see comments updating in real-time and have the ability to recommend comments to other users.

Comments for this thread are now closed.

3 comments                                                                Subscribe to comments



Geoffry Smith  •  2014-04-06 10:59 PM

http://www.nature.com/nclimate/journal/v3/n9/full/nclimate1972.html?WT.ec_id=NCLIMATE-201309



Wilson Hendal  •  2014-04-08 04:00 AM

Todd, if you have new information this is incredibly important. Please post references for the following information - we don't want people to think you have just made them up: 1. "The total global warming since 1904, yes 1904, is 2/10 of 1 degree F." 2. "There has been absolutely no global warming in over 17 years" Of course, if the earth was due to enter a cooling cycle and we prevented this by heating the earth, then we could still be heating the earth without the temperature actually increasing, right? 3. "There is not one global warming model that can account for how far off all the computer models have been" - (not sure this one makes sense? How can you model a model? Please clarify) 4. "When these alarmists can show us all proof of their assertions, they might regain some credibility" - please clarify what proof you would like (beyond the hundreds of papers already published). Regards, Wilson.



Todd Nelson  •  2014-04-08 02:51 AM

This article is full of ifs, mays, and coulds. There are 2 indisputable truths this article conveniently leaves out. The total global warming since 1904, yes 1904, is 2/10 of 1 degree F. There has been absolutely no global warming in over 17 years. There is not one global warming alarmist computer model that can account for how far off all the computer models have been. When these alarmists can show us all proof of their assertions, they might regain some credibility. But, as this is all being written, there is no proof at all of any of their claims, so there is no credibility in what has been written in this article. Science either is or isn't, there is no belief foundation in any scientific fact, and there are no scientific facts in this article.

See other News & Comment articles from Nature

Nature    ISSN 0028-0836    EISSN 1476-4687

© 2014 Nature Publishing Group, a division of Macmillan Publishers Limited. All Rights Reserved.
partner of AGORA, HINARI, OARE, INASP, CrossRef and COUNTER

Rvsd Plan - 00002684

## REGULATORY IMPACT ANALYSIS:

### Development of Social Cost of Carbon Estimates

GAO-14-663: Published: Jul 24, 2014. Publicly Released: Aug 25, 2014.

### What GAO Found

To develop the 2010 and 2013 social cost of carbon estimates, the Office of Management and Budget (OMB) and Council of Economic Advisers convened and led an informal interagency working group in which four other offices from the Executive Office of the President (EOP) and six federal agencies participated. Participating agencies were the Environmental Protection Agency (EPA) and the Departments of Agriculture, Commerce, Energy, Transportation (DOT), and the Treasury. According to several working group participants, the working group included relevant subject-matter experts and the agencies likely to use the estimates in future rulemakings. According to OMB staff, there is no single approach for convening informal interagency working groups and no requirement that this type of working group should document its activities or proceedings. However, OMB and EPA participants stated that the working group documented all major issues discussed in the Technical Support Document, which is consistent with federal standards for internal control. According to the Technical Support Document and participants GAO interviewed, the working group's processes and methods reflected the following three principles:

- **Used consensus-based decision making.** The working group used a consensus-based approach for making key decisions in developing the 2010 and 2013 estimates. Participants generally stated that they were satisfied that the Technical Support Document addressed individual comments on draft versions and reflected the overall consensus of the working group.

- **Relied on existing academic literature and models.** The working group relied largely on existing academic literature and models to develop its estimates. Specifically, the working group used three prevalent academic models that integrate climate and economic data to estimate future economic effects from climate change. The group agreed on three modeling inputs reflecting the wide uncertainty in the academic literature, including discount rates. Once the group reached agreement, EPA officials—sometimes with the assistance of the model developers—calculated the estimates. All other model assumptions and features were unchanged by the working group, which weighted each model equally to calculate estimates. After the academic models were updated to reflect new scientific information, such as in sea level rise and associated damages, the working group used the updated models to revise its estimates in 2013, resulting in higher estimates.

- **Took steps to disclose limitations and incorporate new information.** The Technical Support Document discloses several limitations of the estimates and areas that the working group identified as being in need of additional research. It also sets a goal of revisiting the estimates when substantially updated models become available. Since 2008, agencies have published dozens of regulatory actions for public comment that use various social cost of carbon estimates in regulatory analyses and, according to working group participants, agencies received many comments on the estimates throughout this process. Several participants told GAO that the working group decided to revise the estimates in 2013 after a number of public comments encouraged revisions because the models used to develop the 2010 estimates had been updated and used in peer-reviewed academic literature.

### Why GAO Did This Study

Executive Order 12866 directs federal agencies to assess the economic effects of their proposed significant regulatory actions, including a determination that a regulation's benefits justify the costs. In 2008, a federal appeals court directed DOT to update a regulatory impact analysis with an estimate of the social cost of carbon—the dollar value of the net effects (damages and benefits) of an increase in emissions of carbon dioxide, a greenhouse gas.

In 2009, the Interagency Working Group on Social Cost of Carbon was convened to develop estimates for use governmentwide, and it issued final estimates in its 2010 Technical Support Document. In 2013, the group issued revised estimates that were about 50 percent higher than the 2010 estimates, which raised public interest.

GAO was asked to review the working group's development of social cost of carbon estimates. This report describes the participating entities and processes and methods they used to develop the 2010 and 2013 estimates. GAO reviewed executive orders, OMB guidance, the Technical Support Document, its 2013 update, and other key documents. GAO interviewed officials who participated in the working group on behalf of the EOP offices and agencies involved. GAO did not evaluate the quality of the working group's approach.

GAO is making no recommendations in this report. Of seven agencies, OMB and Treasury provided written or oral comments and generally agreed with the findings in this report. Other agencies provided technical comments only or had no comments.

For more information, contact J. Alfredo Gómez at (202) 512-3841 or gomezj@gao.gov.

Rvsd Plan - 00002685



# OMITTED DAMAGES:

## What's Missing From the Social Cost of Carbon

March 13, 2014
Peter Howard
© 2014





Institute *for*
Policy Integrity
*new york university school of law*



NRDC
THE EARTH'S BEST DEFENSE

The Cost of Carbon Project is a joint project
of the Environmental Defense Fund, the
Institute for Policy Integrity, and the
Natural Resource Defense Council.

Rvsd Plan - 00002686



COSTOFCARBON.ORG

Rvsd Plan - 00002687

# ABSTRACT

The 2013 Interagency Working Group on the Social Cost of Carbon (IWG) updated the U.S. social cost of carbon (SCC) for 2015 from a central value of $24 to $37 using three integrated assessment models (IAMs): DICE-2010, FUND 3.8, and PAGE09. The SCC is the additional economic damage caused by one ton of carbon dioxide. While some have questioned the increase in the SCC as too high, a thorough examination of the latest scientific and economic research shows that $37 should be viewed as a lower bound. This is because the studies available to estimate the SCC omit many climate impacts—effectively valuing them at zero. Where estimates are available for a given type of impact, they tend to include only a portion of potential harms. This paper represents the first attempt to systematically examine and document these omissions for the latest versions of the three IAMs used by the IWG, as well as earlier versions when they are used in calibrating the updated models.

The table on the following page summarizes hot spot damages including increases in forced migration, social and political conflict, and violence; weather variability and extreme weather events; and declining growth rates. A better accounting of catastrophic damages is also needed, as well as many other impacts.

While there is a downward bias to the U.S. SCC estimates due to these omissions, the Office of Management and Budget (OMB) and other executive branch agencies should move forward to finalize proposed rules with the 2013 IWG's current SCC estimates, as measuring at least some of the costs of carbon dioxide is better than assuming they are zero. At the same time, the OMB should more thoroughly document downward biases of the current U.S. SCC estimates, potentially using this report to list in detail all of the currently omitted damages.

## Missing or Poorly Quantified Damages Needed to Improve SCC Models*

| General Impact | Category | Pages |
|---|---|---|
| Health | Respiratory illness from increased ozone pollution, pollen, and wildfire smoke | 30 |
| | Lyme disease | 30 |
| | Death, injuries, and illnesses from omitted natural disasters and mass migration | 30 |
| | Water, food, sanitation, and shelter | 30 |
| Agriculture | Weeds, pests and pathogens | 20 |
| | Food price spikes | Note 83 |
| | Heat and precipitation extremes | 41 |
| Oceans | Acidification, temperature, and extreme weather impacts on fisheries, species extinction and migration, and coral reefs | 18-20, 41-42 |
| | Storm surge interaction with sea level rise | 37-38 |
| Forests | Ecosystem changes such as pest infestations and pathogens, species invasion and migration, flooding and soil erosion | 20 |
| | Wildfire, including acreage burned, public health impacts from smoke pollution, property losses, and fire management costs (including injuries and deaths) | 20, 30 |
| Ecosystems | Biodiversity**, habitat**, and species extinction** | 29 |
| | Outdoor recreation** and tourism | 23 |
| | Ecosystem services** | 27-28 |
| | Rising value of ecosystems due to increased scarcity | 31-32 |
| | Accelerated decline due to mass migration | 34 |

Rvsd Plan - 00002689

| General Impact | Category | Pages |
|---|---|---|
| Productivity and economic growth | Impacts on labor productivity and supply from extreme heat and weather, and multiple public health impacts across different damage categories | 24-25 |
| | Impacts on infrastructure and capital productivity and supply from damages from extreme weather events and infrastructure and diversion of financial resources toward climate adaptation | 25 |
| | Impact on research and development from diversion of financial resources toward climate adaptation | 25 |
| Water | Availability and competing needs for energy production, sanitation, and other uses | 21, 41 |
| | Flooding | 41 |
| Transportation | Changes in land and ocean transportation | 21-22 |
| Energy | Energy supply disruptions | 21 |
| Catastrophic impacts and tipping points** | Rapid sea level rise** | 8, 36 |
| | Methane releases from permafrost** | 8, 36 |
| | Damages at very high temperatures*** | Note 23 |
| | Unknown catastrophic events | 36-37 |
| Inter- and intra-regional conflict | National security | 39, 41 |
| | Increased violent conflicts from refugee migration from extreme weather, and food, water and land scarcity | 34-35 |

*This table catalogues climate impacts that have been largely unquantified in the economics literature and are therefore largely omitted from SCC models. Quantified impacts represented in the models include: changes in energy (via cooling and heating) demand; changes in agricultural and forestry output from changes in average temperature and precipitation levels, and $CO_2$ fertilization; property lost to sea level rise; coastal storms; heat-related illnesses; and some diseases (e.g. malaria and dengue fever).

** These impacts are represented in a limited way in one or more of the SCC models: 1) they may be Included in some models, and not others; 2) they may be included only partially (e.g., only one or several impacts of many in the category are estimated); 3) they may be estimated using only general terms not specific to any one damage—in these instances, estimated damages are usually very small relative to their potential magnitude, and relative to the impacts explicitly estimated in the models. See complete report for details.

*** While technically represented in SCC models through extrapolations from small temperature changes, there are no available climate damage estimates for large temperature changes, and these may be catastrophic.

# OMITTED DAMAGES:
## What's Missing From the Social Cost of Carbon [+]
## Peter Howard [*]

I n 2008, the United States Court of Appeals for the Ninth Circuit ruled that executive branch agencies must include the climate benefits of a significant regulatory action in federal benefit-cost analyses (BCA) to comply with Executive Order 12,866. In response, an Interagency Working Group on the Social Cost of Carbon was formed in 2010 to develop a consistent and defensible estimate of the social cost of carbon (SCC) using models drawn from the literature (Masur and Posner 2011). The SCC is the global cost to all future generations from one additional unit of carbon pollution in a given time period; forest fires, drought, and disease are just some of the costly consequences of climate change that are ideally included within it.[1] Thus, the SCC captures the benefit of reduced carbon pollution from a policy in terms of expenses avoided.

The SCC is estimated using Integrated Assessment Models (IAMs), which integrate a simplified climate model and a simplified economic model into a cohesive numerical model to capture the feedback effects between the two.[2] Using a methodology specified in the 2010 Technical Support Document (IWG, 2010), the 2010 Interagency Working Group developed a central estimate (corresponding to a constant discount rate of 3 percent) of \$24 for a 2015 emission of carbon using three Integrated Assessment Models (IAMs): DICE-2007 (Nordhaus 2008), FUND 3.5 (Anthoff and Tol 2010), and PAGE2002 (Hope 2006). Using an identical methodology and updated versions of these three models—DICE-2010 (Nordhaus 2010), FUND 3.8 (Anthoff and Tol 2012),[3] and PAGE09 (Hope 2011)— the 2013 IWG re-estimated the central SCC estimate at \$37 in 2015.[4] See Tables 1-3 for a full comparison of the 2010 and 2013 SCC estimates.

With its release by the 2013 Interagency Working Group on the Social Cost of Carbon (IWG), the U.S. government's updated social cost of carbon estimate catapulted into the national political debate. This surge in interest is mostly the result of the approximately 54 percent increase in the federal government's central 2015 SCC estimate from 2010 to 2013. Because the 2013 IWG used the same methodology to estimate the global SCC as the 2010 IWG (IWG 2013),[5] all changes in the SCC estimates are the result of updates to the three IAMs used for estimation. Regardless, considerable debate has ensued due to the significant implication this increase has on current and future U.S. policies.

While some conservative politicians and industry groups question the increase saying it is too high, this report shows more generally that, if anything, these SCC estimates are biased downward, probably significantly so. This downward bias is the result of modeling decisions by the 2010 IWG and modeling decisions by the authors of the current IAMS, including the use of outdated damage estimates and the omission of several climate

*Peter Howard is an Economic Fellow at the Institute for Policy Integrity at the New York University School of Law. This position is jointly funded by Environmental Defense Fund, National Resource Defense Council, and Policy Integrity.

+ Special thanks to Samuel Bird and John Bowman for their invaluable contributions to this work. I would also like to thank Chris Hope, Laurie Johnson, and Gernot Wagner for their feedback. Additional thanks to the staff at the Institute for Policy Integrity, Elizabeth Gatto, Kevin Khuong, Rachael Leven, and Claire Swingle. Finally, I would like to thank the Environmental Defense Fund, the National Resource Defense Council, and Policy Integrity for their support.

Rvsd Plan - 00002691 COSTOFCARBON.ORG

change impacts. This report focuses primarily on omitted damages due to the likelihood that their inclusion would have a significant effect on the SCC.[6] These omissions include climate impacts on the following market sectors: agriculture, forestry, and fisheries (including pests, pathogens, and weeds, erosion, fires, and ocean acidification); ecosystem services (including biodiversity and habitat loss); health impacts (including Lyme disease and respiratory illness from increased ozone pollution, pollen, and wildfire smoke); inter-regional damages (including migration of human and economic capital); inter-sector damages (including the combined surge effects of stronger storms and rising sea levels), exacerbation of existing non-climate stresses (including the combined effect of the over pumping of groundwater and climate-driven reductions in regional water supplies); socially contingent damages (including increases in violence and other social conflict); decreasing growth rates (including decreases in labor productivity and increases in capital depreciation); weather variability (including increased drought and in-land flooding); and catastrophic impacts (including unknown unknowns on the scale of the rapid melting of Arctic permafrost or ice sheets).

Despite these downward biases to federal SCC estimates, this report argues that the Office of Management and Budget (OMB) and other executive branch agencies should move forward to finalize proposed rules with the 2013 IWG's current SCC estimates; they are underestimates, but we should, at a minimum, count the damages we can. At the same time, the OMB should emphasize more strongly the downward bias of the current SCC estimates and commit to addressing this bias in future updates of the estimates.

This report focuses on identifying the important categories of harm from climate change that are omitted from current IAMs. We first review the general categories of climate damages. Second, we describe how the latest versions of the three IAMs (DICE-2013, FUND 3.6, and PAGE09) are calibrated.[7] Third, we discuss a frequent cause of omitting damages: a lack of sound damage estimate(s) in the literature resulting from scientific and economic uncertainty in determining the magnitude of the effect. Fourth, using the previous two sections as a basis, we discuss the important categories of damages that are omitted. Fifth, we discuss the treatment of adaptation in these models, and whether omitted damages are likely to be incurred. Finally, we conclude with a discussion of the findings and what our results imply for the future estimation of climate damages.

# DAMAGES

The rising temperatures and ecological shifts brought on by global climate change are expected to affect myriad aspects of natural ecosystems and human civilization. Though climate change may create benefits in some regions and sectors, the long-term effects of climate change are projected to be overwhelmingly negative. To help policymakers weigh the costs of climate mitigation and adaptation, these impacts are monetized by economists as damages. Damages can be broadly segmented into market damages, which manifest as a loss of gross domestic product (GDP) and non-market damages, which manifest in terms of lost welfare. Damages also include shocks to political stability, massive ecological regime changes (such as tipping points and mass species extinction), and impediments to sustained economic growth, none of which are easily predicted or quantified (U.S. Climate Change Science Program, 2008; Yohe and Tirpak 2008).

## Market Damages

Market damages refer to changes in welfare due to changes in income or the availability, quality, or price of a market commodity or input. Most market damages result from shifts in productivity and a corresponding shift

Rvsd Plan - 00002692

in output and GDP. Market damages can also be the result of the loss or depreciation of capital such as land or infrastructure (Goulder and Pizer 2006; Mendelsohn 2003).[8]

Sectors in which market damages from climate change are forecast include agriculture, due to increased temperatures, $CO_2$ fertilization, changing rainfall patterns, pests, and pathogens; energy demand, largely due to the increased cost of space cooling and the decreased cost of space heating associated with global temperature rise; energy supply, due to changing energy supply costs (such as increasing power plant cooling costs) and extreme weather energy supply interruptions; transportation and communication, due to delays and infrastructure losses from extreme weather events; forestry, due to shifting suitable habitat ranges, pests, pathogens, and fires; fisheries, due to higher water temperatures, invasive species, and ocean acidification; and water resources, due to increased evaporation rates and changing rainfall patterns. Market damages in the form of land, property, and infrastructure loss and degradation are also expected as a result of sea level rise and extreme weather events. While health damages have market (for example, labor availability and increased healthcare costs) and non-market (such as suffering and the value of human life) aspects, the market damages from health are relatively small compared the non-market damages because households place a high value on human life (Tol 2009; Jorgenson et al., 2004).[9]

In some of these market sectors, climate change is projected to create a net benefit in some countries for low-level temperature increases. For example, increased temperature will increase agricultural and forestry productivity in some regions and increased $CO_2$ concentrations can improve the nutritional value of soil (via the $CO_2$ fertilization effect). In some models, the benefits in some sectors are significant enough to result in initial net benefits to the globe from climate change. These sector benefits and the resulting global net benefits, however, are expected to be short-lived as temperatures continue to rise (Warren et al., 2006; Jorgenson et al., 2004). While Tol (2009) finds evidence of net global benefits from climate change up to a 2.2 degrees Celsius increase in temperature, this threshold differs between the three IAMs and even within variants of the same IAM.[10] Some IAMs, such as many of the more recent variants of DICE, find no such evidence of initial benefits.[11]

## Non-market Damages

Non-market damages refer to damages affecting goods or services for which no established market exists, but which still provide value to humans. These non-market goods and services, also referred to as non-market commodities, can generally be thought of as environmental good and services (such as ecosystem services). Environmental goods can be divided into use values, including direct-use values (for example, the pharmaceutical value of biodiversity) and indirect use values (such as the values of ecosystem, recreational, and aesthetic services), and non-use value (including existence, bequest, option, and altruistic values). Another way to subdivide non-market damages is into tangible damages, which by definition can be valued, and intangible damages, which by definition are extremely difficult to value given current methods. While economists have established valuation techniques for tangible damages, the accuracy of these estimates vary by the type of good and service. For example, use values, particularly direct-use values, are more easily quantified than non-use values.[12]

Projected damages to non-market goods from climate change that are included in one or more IAM include the loss of species and habitat, increases in rates of human mortality and morbidity, and changes in amenity values (that is, the direct welfare change from a more or less hospitable climate) (Anthoff and Tol 2012; Warren et al., 2006; Smith et al., 2003). All tangible damages from climate change are not included in IAMs, such as the

Rvsd Plan - 00002693
COSTOFCARBON.ORG

medical value of biodiversity. Intangible benefits, including larger societal implications of climate change, have yet to be meaningfully addressed or incorporated into IAMs (Yohe and Tirpak 2008).

## Socially Contingent Damages

Socially contingent damages are damages that result from changes in social dynamics due to climate change. Warmer temperatures, sea level rise, and changing water availability can affect how societies function. For example, mass migration will become more likely as some regions become more inhospitable. Similarly, interpersonal violence and social and political conflict will rise with increased food, water, and resource scarcity. The values of social dynamics are, in most cases, intangible (that is, unmeasured) given current valuation methods; it is difficult to quantify the social effect, let alone value it. As a consequence, socially contingent damages from climate change are almost completely excluded from IAMs.

## Catastrophic Impacts

One of the most concerning aspects of climate change is the potential for catastrophic damages. Catastrophic damages are characterized as low probability-high damage events. These damages come from

- tipping points (also known as discontinuities)—"an environmental threshold over which small changes in the environmental state can causes rapid, frequently irreversible changes in ecosystem characteristics" (EDF, NRDC, Policy Integrity, and UCS comments, 2013);
- fat tails—uncertainty in the underlying economic and environmental parameters in IAMs that result in underlying "fat-tailed" distributions, which are distributions (often right skewed) characterized by an extended and fat tail on the upper end of the distribution relative to the normal (bell curve) distribution; and
- black swan events—(that is, unknown unknowns) that refer to currently unknown tipping points or parameter distributions.

While tipping points, fat tails, and black swan events are distinct concepts, they are overlapping issues; this is discussed further below. Furthermore, while IAMs often categorize catastrophic damages as a distinct type of damage from the previous three, they should actually be thought of as damages to market goods, non-market goods and services, and society via cataclysmic climate events—often thought of in this case as rapid and/or extreme climate change.

Catastrophic impacts are often cited as a key reason for immediate action on climate change. Using PAGE09, Hope (2013) demonstrates that tipping point damages, the first of these three types of damages, alone can be as important as economic damages in determining the social cost of carbon.

TIPPING POINTS. As mentioned above, an ecological tipping point is broadly defined as a threshold beyond which a small change in conditions causes rapid, often irreversible changes in ecosystem characteristics. Tipping points are generally more common in intricate systems with many interacting parts, such that even small changes in the system can potentially have large impacts through a snowball effect.[13] A simple but illustrative example of an ecological tipping point is the effect of deforestation in tropical rainforests. The large trees in the rainforest depend upon nutrient-rich topsoil to thrive. That topsoil is held in place by the root network of the plants it supports and can take centuries to accumulate. The removal of trees accelerates the rate of



Crowning fire in spruce forest. Photo: Murphy Karen, U.S. Fish and Wildlife Service

topsoil erosion while topsoil erosion impedes tree survival rates. Deforestation, then, creates a chicken-and-egg conundrum as reforestation efforts are doomed by a lack of topsoil and topsoil cannot be sustained without an established root network (Brahic 2009).

Within the context of climate change, a tipping point generally refers to a temperature or $CO_2$ concentration threshold beyond which (even by small perturbations) the future state of Earth's climate system is significantly and irreversibly altered. In other words, a tipping point is an abrupt change in the climate system between stable climate states at the regional scale (at the subcontinental scale or higher) or global scale (Overpeck and Cole 2006). Beyond the temperature or $CO_2$ concentration threshold that causes this abrupt change, ecological changes would be irreversible on human time scales even if temperature could be returned to pre-threshold levels (Overpeck and Cole 2006; Lemoine and Traeger 2011).

A global tipping point would likely be driven by a series of region-specific or system-specific tipping points (that is, tipping elements), which, taken collectively, would dramatically reduce the Earth's natural capacity to withstand climate change. Lenton et al., (2008) identifies the following tipping elements:

- Arctic sea-ice (decreased areal extent),
- Greenland ice sheet (decreased ice volume),
- West Antarctic ice sheet (decreased ice volume),
- Atlantic thermohaline circulation (decreased overturning),
- El Niño-southern oscillation (increased amplitude),
- Indian summer monsoon (decreased rainfall),
- Sahara/Sahel and West African monsoon (increased vegetation fraction),
- Amazon rainforest (decreased tree fraction), and
- boreal forest (decreased tree fraction).[14]

The probability and damages of tipping point scenarios are poorly understood (Weitzman 2011). Due to the considerable uncertainty surrounding these events, some IAMs exclude them altogether. This will be discussed later.

Rvsd Plan - 00002695 COSTOFCARBON.ORG

Tipping point damages can be modeled either explicitly or implicitly. If tipping point damages are modeled explicitly, the damages from the crossing of tipping points are modeled using an additional damage function (for example, Hope 2002; Hope 2009; Nordhaus and Boyer 2000; Nordhaus 2008). If tipping point damages are implicitly modeled, tipping points are modeled in IAMs through the choice of climate parameters, specifically the probability distribution functions that represent them, as in Lemoine and Traeger (2011), Weitzman (2009), and Anthoff and Tol (2013a).[15] In this case, tipping point damages are implicitly captured through assumed increases in market and non-market damages resulting from higher temperature from crossing climate tipping point.

Fat Tails. Fat tails refer to the upper ends (that is, the right sides) of the probability density functions of a range of climate change-related variables. Tail fatness is an indicator of how quickly the probability of an event declines relative to the severity of that event, with fatter tails corresponding to lower rates of decline.[16]

Martin Weitzman has argued that existing climate models fail to adequately account for the extreme risks of climate change. In Weitzman's eyes, prevailing "structural uncertainties" (that is, unknown unknowns) abound in the economics of climate change, and existing benefit-cost analyses (BCAs) and IAMs have yet to deal adequately with these uncertainties. While IAM modelers often choose thin tailed distributions (for example, the uniform distribution) and medium-tailed distributions (for example, the normal distribution) to represent uncertain climate variables, Weitzman argues that fat-tailed distributions (for example, Student-t-distribution) are more appropriate due to these structural uncertainties in climate change (that is, unknown unknowns) and the "unlimited" potential for the scale of damages (Weitzman 2011).[17] Fat tails arise due to the finite amount of information on catastrophic impacts (due to their rarity in historical record keeping) forcing analysts to specify probability distribution functions of probability distribution functions. In other words, Weitzman believes that existing IAMs and BCAs under account for the potential of extreme, irreversible impacts of climate change by assuming thin-tailed and medium-tailed distribution functions,[18] which render the likelihood of extreme damages from climate change small enough to write off (Weitzman 2009; Nordhaus 2012).

Weitzman (2011) identifies multiple sources of structural uncertainty in existing climate modeling literature and models; he emphasizes that these sources are not exhaustive, and more likely exist. The five structural uncertainties that he identifies are: (1) the unprecedented rate and scope of increases in atmospheric greenhouse gas (GHG) concentrations, (2) the uncertainty surrounding the response of global temperatures to this dramatic increase in GHG emissions, (3) the potential for positive feedback mechanisms to accelerate the release of GHGs such as methane, (4) uncertainty of the effects (that is, damages) of extreme climate change,[19] and (5) the proper discounting of the distant future (Weitzman 2011). At each of these steps in the climate model, parameters are highly uncertain and potentially represented by fat tails. As a consequence of the "cascading" uncertainties at each step in the climate model and the potentiality of fat tails at each step, climate impacts are also likely fat tailed. As Weitzman (2011) emphasizes, this is the fat tail that truly matters to climate economics—not the fat tails of the climate sensitivity parameter and the other parameters—for the Dismal Theorem to arise.

As a result of the potential for climate impacts having a fat tail, Weitzman develops a theory now dubbed the Dismal Theorem. According to Weitzman (2009), if IAMs were to model fat-tailed distributions, the expected marginal utility of consumption would "explode." In other words, the "limiting [willingness to pay] to avoid fat-tailed disasters constitutes all of output (Weitzman, 2011)." As a consequence of this result, traditional BCA collapses as the SCC becomes infinite.

While Weitzman (2009) suggests such events can have such large costs as to overwhelm the discount rate,

Nordhaus (2009) finds Weitzman's results are exceptions to the rule. In particular, Nordhaus (2009) find that the Dismal Theory holds, that is, the expected cost of climate change is infinite, only under limited conditions: the tails are "very" fat or society is "very" risk adverse. In other words, "[the probability of a catastrophic event] must not go to zero and [marginal utility of consumption] must be indefinitely large as consumption declines" towards zero (Nordhaus 2012); Nordhaus argues that the former condition may not hold (particularly if there is an upper bound on climate parameters), and the latter condition does not hold. Furthermore, using DICE-2007, Nordhaus (2009) demonstrates that catastrophic outcomes are potentially avoided, even if the climate sensitivity parameter is high and major tipping points exist, if policymakers can learn about the risks of climate change before irreversible, catastrophic damages occur and policymaking works correctly. However, Nordhaus' rebuff of the Dismal Theory (and its implication that BCA does not apply to climate change) should not be construed as a rejection of fat tails—these he believes are important for inclusion in IAMs (Nordhaus 2012).

In response, Weitzman (2011) argues that the infinite number should not become a distraction, but merely emphasize the larger willingness to pay to avoid these structural uncertainties discussed above. To produce a finite SCC for BCA to continue, Weitzman argues for the inclusion of the value of civilization. Like the value of a statistical life, the value of civilization captures the "rate of substitution between consumption and the mortality risk of a catastrophic extinction of civilization or the natural world as we know these concepts (Weitzman 2009)." Crudely calculated, the value of civilization equals the present value of global income in the year that civilization would end divided by the probability that civilization would end in that year (Weitzman 2009; Weitzman 2011).[20]

The empirical work on catastrophic damages, that is, the willingness to pay to avoid structural uncertainty, finds mixed results. On the one hand, Newbold and Daigneault (2009) find large catastrophe risk premiums. In this case, the use of the value of civilization may be essential. On the other hand, Pindyck (2009) finds only a modest risk premium. Similarly, Nordhaus (2009) only finds large catastrophic damages when climate policy fails in the presence of high climate sensitivity and major tipping points. In these cases, the inclusion of a value of civilization may be unnecessary because benefit-cost analysis does not collapse.

Note that there is some overlap between tipping point events and fat tails. If tipping point damages are modeled explicitly, the probability of incurring tipping point damages can be modeled using a fat-tailed distribution if the probability distribution function of the event occurring is unknown. Similarly, the corresponding magnitude of the damages can be modeled using fat-tailed distributions if this probability distribution function (PDF) is also uncertain. If tipping point damages are modeled implicitly, that is, climate parameters are used to model tipping points explicitly, fat-tailed distributions can be used for the corresponding climate parameters' probability distribution functions. However, tipping points do not require fat-tail distributions if they are known unknowns. In other words, the use of fat tails to model the probability of tipping points or their damages is not necessary to the extent that their probability distribution functions are known, and they can be captured by thin- or medium-tailed distributions. Undoubtedly, some tipping points are unknown unknowns and require the use of fat tails in that probability and damages of tipping point scenarios are poorly understood (Weitzman 2011).

BLACK SWAN EVENTS. Black swan events refer to unknown catastrophic impacts, via unknown tipping point events or parameters within unknown probability distribution functions. Currently, black swan events still go unaddressed by IAMs. Along with the view that omitted climate damages likely outweigh omitted climate benefits (Mastrandrea 2009), there exists a general opinion that bad surprises are likely to outweigh good surprises in the case of climate change (Tol 2009b; Mastrandrea 2009).[21]

Rvsd Plan - 00002697 COSTOFCARBON.ORG

Just as tipping points and fat tails are related concepts, so are fat tails and black swan events. Fat tails can be thought of as a general way to capture unknown unknowns in the SCC. However, the choice of fat-tailed distributions, that is, the rate that the tail declines, is unknown. In other words, specifying a fat-tailed distribution is guessing at unknown unknowns. Furthermore, in terms of real practical applications, IAMs that include fat tails may still omit other unknown unknowns. In this sense, the inclusion of fat-tailed distributions into IAM models may not fully capture unknown unknowns.

# CALIBRATION

Through the choice of damage sectors and the choice of calibration estimates, IAM developers determine what damages from climate change are included and excluded in the social cost of carbon.[22] Using damage estimates (measured as a percentage change in GDP) for a specified temperature increase (measured as the degree Celsius increase in regional or global average temperate from the pre-industrial temperature) drawn from the literature,[23] IAM developers calibrate damage functions in three ways: sector-region analysis, survey, or meta-analysis.

First, a sector-regional analysis is when studies are found that provide sector-specific damage estimates by region; extrapolation from observed regional damages to missing regions is often necessary. If an aggregate damage function is utilized, damages are summed across sectors and regions. Earlier versions of DICE (DICE-1999 and DICE-2007) fall within this category, as does FUND.[24] Second, a survey of the literature is when a consensus work, like the IPCC studies, is utilized, or when the author uses his discretion to decide on the level of damages. In either case, though no statistical analysis is performed, the damage estimates are based upon a survey of particular studies. PAGE relies on this methodology combined with uncertainty analysis.[25] Third, a meta-analysis is when a damage curve is fit to various damage estimates that vary in damage magnitude and future temperature level. The most recent version of DICE relies on this method. The latter two methods are problematic in that they make it difficult to determine the actual source behind the damage function, and thus, to determine what particular climate damages are included and excluded from the model.

In the following section, we discuss how each IAM is calibrated by its developer using the default version of each of these models.[26] This is done to reflect the version of the model that each modeler provides to the public and documents most thoroughly. Furthermore, the IWG uses the default versions of these IAMs. In the case of DICE-2013, which has not been utilized by the IWG, the default version is utilized for purposes of consistency.

## Calibration of the DICE damage function

Since 2000, William Nordhaus has released four versions of the DICE model: DICE-99, DICE-2007, DICE-2010, and DICE-2013. Of these four models, DICE-2010 is not considered a major update of the DICE model but rather an aggregation of the RICE-2010 model, a regionalized version of DICE. Across all versions of DICE, William Nordhaus calibrates an aggregated global damage function that is quadratic in temperature.[27] The sources used to calibrate the DICE-RICE damage functions have changed over the various versions of the model. For the quadratic damage functions of the initial models, that is, DICE-99, DICE-2007, and DICE-2010, Nordhaus used damage estimates by sector drawn from specific sources and studies. For the more recent version of the model, that is, DICE-2013, Nordhaus utilizes a meta-analysis approach.

**EARLY VERSIONS OF DICE.** The DICE-99 damage function was calibrated against region-sector damage estimates for a 2.5 degree and 6 degree Celsius increase in global mean surface temperature above the pre-industrial level.[28] The sectors in the DICE-1999 model are: agriculture; other vulnerable markets—forestry, fisheries, water transportation, hotels and other lodging places, outdoor recreation, and energy; coastal—sea level rise and storms; health—malaria, dengue fever, other tropical diseases, and pollution; non-market amenities—the allocation of time to leisure activities; settlements and ecosystems; and catastrophic impacts. Thus, the DICE-1999 model includes market, non-market, and catastrophic damages. See Table 4 for sources of damage estimates and Table 5 for DICE-1999 region-sector specific damage estimates.[29] See forthcoming Appendix A for a full discussion of the calibration of DICE-1999.

Instead of DICE-1999, the 2010 Interagency Working Group utilized DICE-2007 in the estimation of the U.S. Social Cost of Carbon, as documented in the 2010 Technical Support Document. There are no major changes from DICE-1999 to DICE-2007. In particular, as with DICE-1999, Nordhaus uses sector-based damage estimates to calibrate the aggregate DICE-2007 damage function. There is no change in the types of damages.[30] See forthcoming Appendix B.

The 2013 Interagency Working Group utilized DICE-2010 to estimate the U.S. Social Cost of Carbon, as documented in the 2013 Technical Support Document. The actual calibration method is almost identical to DICE-2007. The main difference is that for the 2010 version of the model, Nordhaus explicitly specifies the aggregate damage function as a quadratic function of both sea-level rise and temperature, instead of only temperature (Nordhaus, 2010; Nordhaus and Sztorc, 2013). See forthcoming Appendix C.

Given the similarities between DICE-1999, DICE-2007, and DICE-2010, this paper focuses on the omitted damages from DICE-1999. Of these three versions of DICE, DICE-1999 is chosen because it is used by Hope as one of the calibration sources of the PAGE09 damage function.

**RECENT VERSION OF DICE.** Nordhaus states that DICE-2013 is the first major update of the DICE model since the 2007 version. There are three major updates from 2007 to 2013 in the DICE aggregate damage function. First, Nordhaus updates the sources of his damage estimates used for calibration. Instead of using Nordhaus and Boyer (2000) as the basis of this calibration, he uses the damage estimates in Table 1 of Tol (2009), as seen in Table 7 below and Figure 2 in Nordhaus and Sztorc (2013). Second, he increases these damage estimates by 25 percent to account for omitted non-monetized benefits, such as "several important factors (biodiversity, ocean acidification, and political reactions), extreme events (sea-level rise, changes in ocean circulation, and accelerated climate change), impacts that are inherently difficult to model (catastrophic events and very long-term warming), and uncertainty (of virtually all components from economic growth to damages)." Last, Nordhaus no longer utilizes a sector-region analysis to calibrate DICE's aggregate damage function, but instead switches to the meta-analysis technique; see forthcoming Appendix D.

Determining what damages are included and excluded from the DICE-2013 damage function is difficult. This is because Nordhaus switches from a sector-region analysis to calibrate DICE's aggregate damage function to the meta-analysis technique, which relies on 13 studies cited in Tol (2009); see Table 7. For several reasons, this makes determining the damages included in the DICE-2013 model nearly impossible. First, many of the studies cited in Tol (2009) rely on a multitude of studies to produce their estimates, resulting in the need to go through a large number of papers in detail to decipher what damages are included and excluded from DICE. Second, when these studies do not rely on a multitude of cited papers, they utilize author discretion or statistical techniques to determine damage estimates. Both of these methods make it difficult to determine which sectors are included

Rvsd Plan - 00002699

in the damage estimates, and the latter estimates, which include cross-national regressions, can often suffer from statistical inference problems. Last, it is difficult to determine what damages are included in the damage function because the 13 studies differ in what damages they include and exclude in their analyses. Specifically, what does it mean to have one of 13 studies include catastrophic damages or three out of 13 studies explicitly model the effect of climate change on vector-borne diseases? It seems reasonable to argue that the inclusion of these damages by a minority of studies implies their general exclusion from the DICE-2013 damage function. However, two studies exclude non-market damages and another two studies exclude market damages. Are non-market damages and market damages completely accounted for in DICE-2013? The answer to this question is debatable.

The DICE-2013 damage function was not used by either the 2010 or 2013 Interagency Working Group because the model was not yet peer-reviewed. It is our view that the IWG should be wary of using DICE-2013 in the future, given the inherent difficulty in understanding its foundations. Furthermore, if a meta-analysis is used, it should be conducted at either the sector or region-sector levels where more data are available. This is discussed further in the conclusion.

## Calibration of the FUND 3.6 damage functions

FUND 3.6 is the only model of the three to model damages as functions of physical processes. Specifically, in FUND, Tol calibrates sector-specific damages functions to a 1 degree Celsius increase in temperature, and assumes dynamic equations to extrapolate damage estimates to higher temperature levels and different future states (rate of climate change, $CO_2$ levels, and socio-economic scenarios). These equations depend on various assumptions about physical and economic processes, and also rely on additional parameter calibration. Unlike DICE and PAGE, some sector damages, that is, agriculture and ecosystem services, are functions of the rate of temperature change, in addition to the level of temperature change, sea-level rise, and amount of $CO_2$ in the atmosphere.

FUND includes market and non-market damages, but fails to explicitly model catastrophic damages. The model's damage sectors include: agriculture, energy consumption, forestry, (fresh) water resources, sea level rise, human health, ecosystem degradation, and extreme weather (Anthoff and Tol, 2012). While FUND does not explicitly model catastrophic damages, FUND captures catastrophic damages via uncertain parameters.[31] Of the three IAMs utilized by the IWG, FUND 3.6 is the only one to model a socially contingent response to climate change: migration from sea level rise.

For FUND 3.6, Anthoff and Tol (2012) calibrate multiple damage functions per sector. Tol and Anthoff (2013) calibrate three agricultural damage functions using agricultural damage estimates derived using a general equilibrium approach; the three damage functions model the effect of rate of climate change (the cost of farmer mal-adaptation), level of climate change (effect of temperature level on crop production), and carbon dioxide fertilization on agricultural production (potential increases in agricultural production due to a rise in the atmospheric concentration of $CO_2$), respectively. In energy, Anthoff and Tol include the cost to the energy sector due to increased demand for space cooling and decreased demand for space heating from a rise in temperature. In forestry, Anthoff and Tol (2012) include the cost of climate change impacts on industrial wood manufactured products from changes in mean temperature and atmospheric concentrations of carbon dioxide relative to pre-industrial levels. In water resources, Anthoff and Tol (2012) include the effect of climate change on fresh water resource. For sea level rise, Tol accounts for losses of dry land and wetland, the coastal protection

and migration costs. In health, Tol accounts for the mortality and morbidity costs of diarrhea, vector-borne diseases (malaria, schistosomiasis, and dengue fever), and heat and cold related illnesses (cardiovascular and respiratory disorders) due to a rise in temperature. With respect to ecosystems, Anthoff and Tol (2012) estimate a value for species loss. Finally, with respect to storms, Tol estimates the economic costs of the destruction and the value of life lost from tropical storms (hurricanes, typhoons) and extratropical storms (cyclones).

Due to the extensive use of data sources necessary to calibrate the physical processes, this section does not contain an extensive discussion of data; see forthcoming Appendix E.

## Calibration in the PAGE–2009 damage functions[32]

PAGE09 models damage functions for four generalized impact sectors: market, sea-level rise, non-market, and non-linear (or tipping point) damages. Hope (2011a; 2011b; 2013) specifies a triangular distribution for each of the parameters in the damage function.

The non-catastrophic damage functions in PAGE09 (market, non-market, and sea-level rise) are calibrated using various versions of DICE and FUND. Thus, PAGE09 omits similar damages as do these two models. In PAGE09, Hope calibrates the distribution of economic (that is, market), non-economic (that is, non-market), and sea-level rise damages as a percentage of GDP for a 3 degree temperature increase (corresponding to a 0.5 meter sea-level rise) using a range of damage estimates from Warren et al (2006) and the IPCC 4th Assessment Report (IPCC, 2007). Warren et al (2006) discusses DICE-1999, FUND2.9, PAGE02, and MERGE; PAGE2002 is calibrated based on DICE-1999 and FUND 2.0.[33] Fig 20.3a from AR4 WGII on page 822 (Figure 1 below), which is used to inform the range (the minimum and maximum combined effect) of market and non-market damages (a range between 0.3 percent to 1.8 percent GDP decline for a 2.5 degree Celsius increase), cites Nordhaus and Boyer (2000) – DICE-1999, Tol (2002b) – FUND 2.0, and Mendelsohn et al (2000); this figure is identical to Figure 19.4 in IPCC (2001a, Chapter 19) upon which the PAGE2002 damage estimates were partially based. In other words, the market, non-market, and sea-level damage functions in the PAGE09 model are "highly" dependent on DICE and FUND, though Hope uses his discretion to specify a range of estimates to allow for the possibility that these models have underestimated impacts.



Flooding in downtown Binghamton, New York due to the remnants of Tropical Storm Lee. Photo: National Weather Service, Binghamton

Rvsd Plan - 00002701

Hope (2011) also reduces the magnitude of these damages by including initial climate benefits, which can result in some regions experiencing positive net benefits from climate change at low temperature increases, and by placing a limit on climate damages so that they can be no greater than 100 percent of GDP at high temperature increases. In addition to damages, Hope (2011b) includes an additional term in each of the three non-catastrophic impact sectors based on the findings of Tol (2002) to capture initial climate benefits for lower temperature increases; these initial benefits are set equal to zero for sea-level rise in the default version of the PAGE09 model.[34] These expressions are defined such that these benefits dissipate as temperature increase until they become zero (that is, do not yield any actual benefits) at some temperature threshold, and then they become damages (in addition to the previously discussed calibrated damages) for further temperature increases. Assuming no adaptation, the temperature thresholds for both market and non-market damages are 3 degrees Celsius.[35] Hope (2011) also limits damages to 100 percent of GDP in any given time period. Instead of maintaining polynomial damage functions across all temperature levels, damage functions shift from polynomial functions to logistic functions at certain damage levels to constrain damage to 100 percent of GDP. Following Weitzman (2009), the saturation point (that is, the point where damages as a percentage of consumption starts to become limited) is characterized by a triangular distribution with range 20 percent to 50 percent, a mean of 33.33 percent, and a mode of 30 percent (Hope, 2011a; 2011b). Given the modeling assumption of PAGE09, the initial benefit terms do not yield any actual benefits (that is, are equal to zero) and the damage functions are still polynomial functions for a 3 degree Celsius increase and a 0.5 meter sea-level rise. In other words, non-catastrophic damages equal their calibration value of 2.03 percent of GDP at the calibration temperatures increase of 3 degrees Celsius when there is no adaptation (Hope 2011).

In PAGE09, Hope explicitly models climate tipping points as a singular, discrete event that has a probability of occurring in each time period. This probability increases in temperature. If this event occurs, a decline of 5 percent to 25 percent of GDP occurs; See Table 9 below.[36]

PAGE09 calculates climate damages for the European Union, and then scales these damages to other regions. PAGE09 uses the relative length of coastline to inform the corresponding ranges of scaling factors; Anthoff et al., (2006) is the data source for the weighting factors. While these scaling factors do no differentiate between developed and developing countries, Hope includes equity weights in PAGE09 that account for differences in GDP per capita between European Union and other regions (Hope 2011b). Finally, Hope specifies regional damage functions in PAGE09, which are functions of regional temperature, not global mean surface temperature. Thus, PAGE09 captures some regional differences in climate damages using several mechanisms. See forthcoming Appendix F for further discussion.

## Damages generally included in IAMs

From this discussion about how the three latest IAMs are calibrated, we can make some general statements about what types of damages are accounted for by IAMs. Currently, they cover a number of direct effects of climate change, that is, a rise in global average surface temperature, on economic (that is, market) activity, and to a lesser extent the direct effects of climate change on the environment and human settlements. The three Integrated Assessment Models (IAMs) capture the direct effects of higher temperature levels and higher $CO_2$ levels (via soil fertility) on agriculture and forestry yields (but excluding climate change effects on pests, pathogens, and fires), and the effects of trade through general equilibrium effects. The models only capture the effects of higher temperature on fisheries to a very limited extent, and exclude the effects of habitat loss (particularly mangroves and coral reefs), ocean acidification, and invasive species all together. The models

also capture some effects of climate change on energy demand and fresh water resources, though these are still limited in important ways (see discussions on fisheries, energy supply, ecosystem services, and destabilizers of existing non-climate stressors below). While IAMs capture the effects of heat and cold related illnesses (cardiovascular and respiratory disorders) to different extents, all three capture some effects of climate on vector-borne diseases, including malaria and dengue fever. For example, the direct cost of vector-borne diseases on human life is included, but not the effects of such diseases on labor supply or productivity (as discussed below). To different extents, all three models capture the effects of increased storm strength on coastal property values and sea level rise on preventative expenditures, lost property, and lost ecosystems. To the extent possible with current models, all IAMs consider some effect of climate change on ecosystems and biodiversity—though improved estimates are needed with respect to both of these damage estimates. Finally, there are a variety of damages that are captured by only one or two of the IAMs, but not all three: effects of climate change on morbidity; mortality from storms, pollution, and diarrhea; recreational activities; climate amenities (that is, the willingness to pay to live in a location with more sunny days); and catastrophic damages.

As is discussed more thoroughly in the conclusion of this report, many of the smaller climate damages are not considered by the authors of IAMs because they are considered cancelled out by omitted climate benefits. The views of Tol (2009) and Yohe and Tirpak (2007) are that a better job has to be done with respect to including only major damage categories: catastrophic damages, socially contingent damages, and weather variability. See the conclusion of this paper for more of a discussion.

# CAUSES OF THE OMISSION OF DAMAGES

In general, the more difficult a climate impact is to estimate in the natural sciences (which measure the physical impact) and/or value in economics, the more likely that climate impact  is to be excluded from IAMs (Yohe and Tirpak, 2008); see Figure 2. With respect to the natural sciences, damages corresponding to more certain (that is, known) climate trends (for example, average temperature increases and sea level rise) are included in IAMs; bounded trends, that is, climate change for which a range and/or distribution is specified, such as extreme weather events and weather variability (for example, droughts, floods, storms, and so on), are less likely to be included; and abrupt changes, in general, are the least likely to be included because they are the effects characterized by the greatest uncertainty. With respect to economics, damages that are easier to value are more likely to be included, such that many more market damages are included than non-market damages. Environmental goods and services are more likely to be omitted from IAMs by analysts than market damages because the former does not have observable market prices and instead must be valued by the analysts. While the value of some environmental goods and services can be indirectly observed in market data (for example, housing sales) using revealed preference techniques, other environmental goods and services (for example, biodiversity) can only be valued using stated preference techniques;[37]  this latter group of environmental goods and services are more likely to be omitted. Socially contingent damages (for example, famine, political unrest, migration, and so on), which are often the result of multiple stressors, are usually omitted because they are difficult to quantify, predict, and value (Yohe and Tirpak, 2008). Figure 2 below, taken from Yohe and Tirpak (2008), organizes all types of climate damages into nine categories of damages corresponding to three levels of scientific uncertainty (that is, three rows) and three levels of economics uncertainty (that is, three columns) discussed above.

The nine categories of climate of climate benefits and damages in Figure 2 (and discussed in the previous

paragraph) can be further organized into three groups of damages based on their levels of representation in IAMs:

- Group 1: Included damages—market damages from certain climate trends. Area I in Figure 2.
- Group 2: Partially included damages—bounded and tipping-point market damages and certain and bounded non-market damages. Areas II, III, IV, and V in Figure 2.
- Group 3: Excluded damages—socially-contingent damages and non-market tipping point damages. Areas VI, VII, VIII, and IX in Figure 2.

Group 1 damages, that is, certain market damages, are included, but can still be improved by accounting for geographic variability. Other market damages, for all real purposes, are excluded: fisheries, energy supply, transportation, communication, and recreation and tourism.

Group 2, which includes bounded and tipping-point market damages and certain and bounded non-market damages, has been less successfully included into IAMs. The three IAMs have included certain and bounded non-market damages, but in a less than comprehensive manner due to data and method limitations. In other words, while many of these damages have been included in IAMS (for example, heat stress, loss of wetlands, biodiversity, and loss of life), the included estimates require significant improvement.[38] Similarly, while some IAMs (earlier versions of DICE and PAGE), have explicitly accounted for catastrophic market damages, Yohe and Tirpak (2008) argue that these estimates have been less than comprehensive, and most likely omit non-market and socially contingent consequences of these changes.[39] Furthermore, while IAMs have included market sectors that are affected by climate variability (agriculture, fresh water resources, forestry), little has been done to account for the damages of increased climate variability in these sectors. It is critical to account for increased climate variability because average changes mask extreme events, such as droughts, heavy rains, heat waves, and cold spells.

Group 3, that is, socially contingent damages and non-market tipping point damages, has only recently been investigated (or has not been investigated at all) by impact papers. As a consequence, they are completely omitted from IAMs (Yohe and Tirpak, 2008).

With each generation of IAM, a discussion ensues over whether climate damages are accurately captured. While several studies have identified missing damages in earlier versions of these three IAMs (Warren et al., 2006; Dietz et al., 2007; Yohe and Tirpak, 2008; Tol, 2009), this report is the first to thoroughly identify and discuss the various damages omitted from the most recent versions of these three IAMs (specially the default versions): DICE-2013, FUND 3.6 (which is identical to FUND 3.7 and FUND 3.8 in terms of damage captured), and PAGE09. By analyzing the calibration methods and data sources of the latest version of the three IAMs, as discussed in the previous section, this report is able to provide a comprehensive discussion of which important categories of harm are included and excluded from these IAMs. Please see Appendices A through F for a more thorough discussion of the calibration of each IAM, and which damages are included and excluded from the default version of each of these models.

# OMITTED DAMAGES

Based on the analysis of the three IAMs in the previous two sections, this section will discuss the damages currently omitted from IAMs: market damages—fisheries, pests (IWG, 2010), pathogens (IWG 2010), erosion (Vose et al., 2012), weeds (Rosenzweig et al., 2001), air pollution (Warren et al., 2006; Cline, 1992), fire (Cline, 1992), energy supply (Tol, 2009; IPCC, 2007b), transportation (IPCC, 2007b; Koetse and Rietveld, 2009), communication, ecological dynamics (Gitay et al., 2001; Norby et al., 2005), and decreasing growth rate (Fankhauser and Tol, 2005; Tol, 2009; Dell, Jones, and Olken, 2013; Moyer et al., 2013); non-market damages—recreational value (Tol, 2009), ecosystem services, biodiversity and habitat (IWG 2010; Tol, 2009; Nordhaus and Sztorc, 2013; Freeman and Guzman, 2009), omitted health costs (Tol, 2002a; Warren et al., 2006), and relative prices (IWG, 2010; Sterner and Persson, 2008; Hoel and Sterner, 2007); socially contingent damages— migration, social and political conflict, and violence (Stern, 2007–Chapter 6; Yohe and Tirpak, 2008; Tol, 2009; Dell, Jones, and Olken, 2013); catastrophic impacts (IWG 2010; Yohe and Tirpak, 2008; Tol, 2009); inter-regional damages (IWG 2010); and across sector damages—inter-sector damages (IWG, 2010; Warren et al., 2006), exacerbation of existing non-climate stresses (Free man and Guzman, 2009), ocean acidification (Brander et al., 2009; Cooley and Doney, 2009; Guinotte and Fabry, 2009), and weather variability (Yohe and Tirpak, 2008; IWG, 2010).[40]

Omitted damages can involve omitted damage sectors, such as fisheries, or omitted effects of climate change within and across sectors, such as ocean acidification. This poses a taxonomy problem in that it is hard to classify damages within the simple market, non-market, socially contingent, and catastrophic damage categories that we have laid out earlier. For clarification purposes, we highlight when this is a particular problem with respect to omitted effects of climate change: ocean acidification; wildfires; and pests, pathogens, and weeds.[41] In addition, we add two additional types of omitted damages to the taxonomy: inter-sector damages and cross-sector damages. The former captures the damages that arise due to the interaction of climate change effects between two or more damage sectors, and the latter captures omitted damages that affect multiple sectors. See Table 10 for the taxonomy of omitted damages used in this paper, and Table 11 for an alternative taxonomy based on omitted damage sectors and omitted climate effects.

## Market damages

There exist several market damages that remain unaccounted for in the market damage literature. As mentioned earlier, Yohe and Hope (2013) argue that few updates to market damages will have a significant effect. However, there are several potential additions that should be considered for having potentially large effects: fisheries (and relatedly, including effects of ocean acidification more broadly), market sector disturbances (pests, pathogens, air pollution, erosion, and fires), energy supply, transportation, and economic growth.

FISHERIES. Fisheries are, for the most part, excluded from IAMs. DICE-1999, which is utilized as a damage source in DICE-2010 and PAGE09 (both are used by the 2013 IWG), includes fisheries in a generalized "other market" sector, along with forestry, energy systems, water systems, construction, and outdoor recreation. Citing Cline (1992), Nordhaus (1991), and Mendelsohn and Neumann (1999) damages estimates to these sectors for the United States, Nordhaus and Boyer (2000) argue that damages not related to energy are equal to zero. Implicitly, this assumes that climate damages to fisheries are equal to zero even though the sources he cites do not explicitly discuss damages to fisheries, particularly Cline (1992) and Nordhaus (1991). As a consequence, Nordhaus and Boyer (2000) essentially fail to account for fisheries. In FUND 3.6, freshwater and saltwater fisheries are excluded. Consequently, PAGE09, which heavily relies on early versions of DICE and FUND to calibrate its

Rvsd Plan - 00002705
COSTOFCARBON.ORG

market damage function, excludes fisheries as well. Finally, DICE-2013, at most, partially captures fisheries. Many of the enumerative studies upon which DICE-2013 relies in the calibration of its damage function, exclude fisheries altogether.[42] Similarly, in the statistical studies, the effect on fisheries, particularly offshore salt-water fisheries, may be excluded; see forthcoming Appendix D.[43]

Fisheries support a significant portion of the world's population. Many individuals rely on fishing and aquaculture for employment. Also, many individuals rely on seafood as their primary source of protein. Climate damages to fishery resources will cause particular harm to those regions most reliant on fisheries (WFC, 2007). According to Allison et al., (2009), the most vulnerable fisheries are located in developing nations, which are the most dependent on fisheries in terms of livelihood and nutrition.

Climate change will affect fisheries in several ways. First, rising sea surface temperatures will damage coral reefs, an important habitat for many fisheries, and result in more frequent algae blooms, which negatively affect fish stocks via decreased oxygen availability. Rising temperatures will also positively affect the growing season, winter mortality rates, and growth rates. Second, rising land temperatures will increase the temperatures of fresh water systems, resulting in declined fish stocks through reduced water quality, invasive species and pathogens, and decreased food abundance; again, warmer temperatures in cold waters may have some benefits in terms of increased growth rates. Third, rising sea levels will negatively affect coastal habitats, including mangroves and salt water marshes, and freshwater water habitats via saltwater intrusion; rising sea levels may also benefit shrimp and crab aquaculture. Fourth, increased weather variability and extreme events, including floods and droughts, and decreased water availability in some regions is likely to negatively affect fish stocks, particular fresh water and aquaculture; changing precipitation patterns may affect marine populations via water salinity (WFC 2007). Fifth, changes in ocean chemistry, including ocean acidification, which is discussed more below, and decreased oxygen content from increased algae blooms, which is discussed above, will negatively affect fish stocks, particularly mollusks. Sixth, melting sea ice may increase access to Arctic fisheries. Last, climate change will likely compound the negative effect that human activity, including over fishing, has on future fish stocks.[44] These damages and benefits will vary regionally, particularly as fish shift locations. They are also highly uncertain due to uncertainty over climate change and its effects (particularly on the scale that is relevant to marine life and fisheries – continental shelves), complex aquatic food web and ecosystem dynamics, the ability of species to adapt, and the range of human and environmental impacts fisheries (WFC, 2007; Hollowed et al., 2013; Sumaila et al., 2011).

Adaptation by species and humans may be able to reduce these negative effects. Fish species will be able to adapt to some of these change by moving toward the Poles and into deeper water (Sumaila et al., 2011). However, these changes may still result in habitat loss for some freshwater and saltwater fish, even with this ability to adapt, such that some species will experience declines and extinction (Hollowed et al., 2013). Furthermore, these shifts imply regional effects, such that some regions benefit and others are harmed (Hollowed et al., 2013), and quality effects, as fisherman are forced to switch to new species. Finally, humans may be able to adapt to mitigate losses and meet increased demand by expanding aquaculture to replace decreased wild catch and increasing trade (Brander 2010). However, human adaptation at the local level will come at an increased capital cost, and a loss of capital as some fisherman scrap their vessels (Sumaila et al., 2011).

In addition to climate change affecting fish stocks, climate change will also affect human capital and infrastructure necessary for production. Increased storm strength and frequency will negatively affect infrastructure, particularly aquaculture, located near coastal areas. Coupled with rising sea levels that will negatively affect coastal ecosystems that act as a buffer from coastal storms, storm effects could be significant (WFC, 2007). The

ability of regions to adapt to these events will vary regionally.

There is a lack of estimates for the impacts of climate change on fisheries (Sumaila et al., 2011). This is partially due to the difficulty of estimating the net impacts on production across multiple species and uncertain future environments, which results in highly uncertain estimates. While it is clear that damages will vary regionally—hurting tropical regions and possibly benefiting artic regions—these regional results are uncertain given the large scale effects of climate change on oceans; this includes ocean acidification and higher ocean temperatures—both of which effect phytoplankton (Toseland et al., 2013).[45] Because developing nations are focused predominately in tropical and subtropical subclimates, fishing industries in poor nations are likely to be disproportionately affected. These nations are often already at an open-access equilibria due to overfishing and lack of management, and, as a consequence, are unlikely to experience a significant change in profits due to climate change. However, in developing nations, large portions of the population rely on subsistence fishing for calories and protein. Thus, the effects of climate change on consumer welfare via fisheries are likely to be substantial in developing nations.

### NATURAL DISTURBANCES: PESTS, PATHOGENS, AND WEEDS, EROSION, AIR POLLUTION, AND FIRES.

Pest (weeds and insects) and pathogens (Rosenzweig et al., 2001), erosion (Vose et al., 2012), air pollution (for example, the effects of climate change on increased ozone pollution, which affects crops and public health),[46,47] and fire are natural disturbances that affect agriculture and forestry. While these disturbances are currently being excluded from the agricultural and forestry sectors (Ackerman and Stanton, 2011, Cline 1992), these disturbances are likely to be substantially affected by climate change (IPCC, 2007b, Chapter 5). Climate may expand the geographical extent of pests, pathogens, and weeds (particularly for livestock and forests) and increase the likelihood and severity of pest and pathogen outbreaks due to earlier springs and more extreme events. Forestry may be negatively affected by increased erosion from higher precipitation and other extreme weather events (Vose et al., 2012). Increased ozone exposure will also decrease timber production and crop yields, while increasing crop susceptibility to pest outbreaks. Increased fire risks may decrease forestry production and costs (IPCC, 2007b), and have significant impacts on human health and infrastructure (Fowler, 2003). While each of these natural disturbances may have only modest effects, their interactions (along with drought) and their combined effects are likely to be substantial.

These natural disturbances also affect agricultural and forestry via the fertilization effect, which is the increase in plant growth, and thus production, from an increase of carbon dioxide in the atmosphere. Current estimates of the $CO_2$ fertilization effect are from laboratory experiments where plants are not subject to competition from pests, pathogens, and weeds that may also benefit from $CO_2$ fertilization.[48] More recent estimates, known as Free-Air $CO_2$ Enrichment (FACE) experiments, are field experiments where plants are subject to these pressures; the resulting benefits from increased $CO_2$ are lower under FACE experiments (Hanemann, 2008, IPCC, 2007a). Furthermore, air pollution (ozone), which is completely unaccounted for, may further limit the $CO_2$ fertilization effect (IPCC, 2007b Chapter 5).

Increased pests, pathogens, and weeds, erosion, air pollution, and fires will also affect ecosystems, wildlife, and human settlements. These costs are also currently excluded from the default versions of these IAMs.

### ECOLOGICAL DYNAMICS.

Ecological dynamics are omitted from the analysis despite their significance in timber production. In addition to disease and insects (Gitay et al., 2001; Norby et al., 2005) and wildfires, studies of climate change impacts on ecological dynamics of forests cited by Gitay et al., (2001) include those concerning, seasonality, timing of freeze-thaw patterns, length of growing season, nutrient feedbacks, disturbance, diurnal temperature patterns, local climatic extremes, late and early frost, changes in precipitation, and extreme

Rvsd Plan - 00002707

COSTOFCARBON.ORG

weather events. Climate change will further affect forestry to the extent that these dynamics contribute to forest ecology and will be impacted by climate change.

**ENERGY SUPPLY.** Tol (2009) argues that energy costs may decrease due to climate change relative to a future world without climate change. This is due to decreased costs of supplying renewable energy from wind and wave sources, and the increased availability of oil due to higher temperatures in the Arctic. However, warmer water temperatures will increase the cooling costs of thermal power plants (conventional and nuclear), and decreased water availability in some regions may increase the cost of hydro-electric energy (IPCC, 2007b Chapter 1 and Chapter 7). The increased frequency and intensity of extreme weather events (heat waves, droughts, and storms) have the potential to further disrupt energy supplies, particularly coastal energy and energy transmission infrastructures, while the melting of permafrost is also threatening energy infrastructure in Arctic regions (IPCC, 2007 Chapter 7). It is difficult to determine whether the net effects of climate change on the cost of supply energy will be positive or negative.

**TRANSPORTATION.** Transportation is critical for the movement of populations and goods, including energy resources. However, the effects of climate change on the transportation sector in terms of lost infrastructure, costs, delays, and safety (including fatalities) are rarely emphasized according to Koetse and Rietveld (2009). This may partially be due to the sparse literature in this area and the general ambiguous effects of climate change on transportation due to countervailing effects (Koetse and Rietveld, 2009).

On the one hand, higher temperatures imply fewer transportation delays from snow and ice (Tol 2009, IPCC 2007). While traffic congestion and accidents result from adverse weather conditions (including rain, snow, and poor visibility), less snow overall will result in less traffic congestion and fewer accidents. Furthermore, many areas will experience decreased costs of dealing with these cold weather events, including less salting of roads and plowing equipment. While higher temperatures will also come with some costs, including buckled rails and roads, these costs can likely be overcome gradually with updating of the road and railway systems during their regular maintenance schedule. Higher temperatures also decrease ice cover in rivers, lakes, and oceans, which decreases shipping costs during the winter. In particular, higher Arctic temperatures may make shipping through the Northwest Passage possible at some times during the year; this has the potential to lower overall shipping costs (Koetse and Rietveld, 2009; IPCC, 2007).[49]



The BLM and the U.S. Forest Service work together to manage wildfires. Photo: Bureau of Land Management

On the other hand, greater weather variability and a higher frequency of extreme weather events (droughts, heavy precipitation events, floods, high winds, and storms) will potentially hurt traffic and disrupt transportation. While higher temperatures and less snow decrease some effects of climate change on traffic congestion, delays, and accidents, the overall effects are unclear because increased precipitation variability due to climate change will likely have a countervailing effect, as precipitation following a dry spell significantly increases the number of accidents (Koetse and Rietveld, 2009). Similarly, while decreased ice cover due to higher temperatures reduces shipping costs, extreme weather events significantly disrupt transportation and destroy transportation infrastructure. Flooding is particularly problematic for the transportation systems of coastal communities (and potentially the most costly of the transportation effects), while droughts will be more of a concern for inland waterway transportation.[50] In addition to the inconvenience to travelers, these events could disrupt trade due to the temporarily shutting down of trade routes, road and port closings, and train and airport delays and cancellations. While ports are more affected (in terms of area and numbers effected) by flooding and storm surges than roads, railways, and airports, even small effects to these latter three infrastructures may have significant costs due to network effects.[51] Due to the increase in exposure to extreme weather events, particularly along the coasts, without adaption, the costs from transportation delays and infrastructure losses will undoubtedly be substantial. Furthermore, changing weather patterns may change trade patterns, which may require infrastructure investment, and require that Arctic regions update their transportation infrastructure in response to melting permafrost (Koetse and Rietveld, 2009; IPCC, 2007).

Traffic safety in terms of the frequency of accidents and changes in mortality and injury rates due to accidents is also another important component of transportation costs. While adverse weather increases the likelihood of aircraft accidents, the bulk of deaths related to travel are road traffic related. However, calculating the change in related deaths due to climate change turns out to be complicated because of the complex number of effects: (1) higher temperatures increase the number of accidents due to heat-stress, (2) increased precipitation increases the frequency of accidents, (3) adverse weather decreases the severity of damages due to reduced traffic speed, (4) snowfall causes more accidents than rainfall, and (5) precipitation after a dry spell has a greater effect on accidents and fatal accidents than precipitation alone. Therefore, the effects of climate change on traffic mortalities and injuries are ambiguous, as is the case for traffic safety in general, congestion, and shipping costs. Effects will likely vary regionally (Koetse and Rietveld, 2009).

Adaptation is also likely to reduce some of the costs associated with extreme weather events. In particular, damages due to sea level rise and floods may be preventable through adaptation, including the building of sea walls. As a consequence, many of the current cost estimates available in the literature, which mainly focus on the eastern United States, may be upper bounds.

Current IAMs do not explicitly model climate damages to the transportation sector. DICE-1999 explicitly assumes transportation is negligibly effected by climate change (with the exception of water transportation), though it is possible in early versions of DICE that transportation costs may be captured indirectly through damages to human settlements and sea level rise. Similar to DICE, FUND does not explicitly address transportation costs, though climate damages due to storms and sea level rise may already include some of these costs. Because the market and sea level rise damages in PAGE09 are greatly informed by DICE and FUND, it is unclear the extent to which PAGE09 includes transportation costs. Similar issues arise for DICE-2013.

COMMUNICATION. Communication infrastructure will experience similar disruptions as the energy and transportation infrastructures due to extreme weather. While a possible adaptation is to bury these infrastructures

Rvsd Plan - 00002709

underground, this strategy is costly (IPCC, 2007). Like energy and transportation, these costs are excluded from IAMs. However, Nordhaus and Boyer (2000) categorize damages to the communication sector as insignificant.

RECREATION. The recreation sector will also be affected by climate change, and is omitted from IAMs according to Tol (2009). While there are clearly redistribution effects across regions, its ultimate effect is uncertain according to Tol (2009). Similarly, Bigano et al (2007) find that climate change has unclear, but generally negligible, effects on global tourist expenditures.[52] Alternatively, using a general equilibrium model, Berrittella et al., (2006) find that "climate change will ultimately lead to a non-negligible global loss" in 2050. This estimate includes only the direct impacts of climate change on recreation, and it omits the indirect impacts such as the loss of some beaches and islands due to sea level rise and the loss of particular ecosystems (such as coral reefs) and species (such as polar bears). The inclusion of these indirect impacts will likely further increase the recreational cost of climate change.

CHANGES IN OUTPUT GROWTH. There is evidence that higher temperatures effect labor productivity (Kjellstrom et al., 2009), the growth rate of economic output (Dell, Jones, and Olken, 2009; Dell, Jones, and Olken, 2012; Hsiang, 2010), and the growth rate of exports (Jones and Olken, 2010), and some of these negative effects on growth continue into the medium-run and long-run (Dell, Jones, and Olken, 2009; Dell, Jones, and Olken, 2012). However, as discussed earlier, the popular IAMs are built on enumerative studies that estimate climate damages to a particular economic (or non-economic) sector of a geographical region in a specific time period. These studies, for the most part, omit dynamic considerations with respect to damages. As a consequence, the current IAMs based upon these estimates fail to model the potential effects of climate change on economic growth—a dynamic phenomenon—and instead focus on the effect of climate change on the level of output (Fankhauser and Tol, 2005, Tol, 2009; Moyer et al., 2013).[53]

In their default versions, the popular IAMs (DICE, FUND, and PAGE) all assume the relentless march of output growth. In FUND and PAGE, regional GDP per capita growth rates (and total factor productivity growth) are exogenous inputs into the models that are determined by the economic and population scenarios chosen by the modeler. As a consequence, climate change affects consumption only. In DICE, economic growth (increased GDP due to all factors including changes in inputs—labor and capital—and technological progress) is endogenous and total factor productivity growth (increased GDP due solely to technological progress) is exogenous. As a consequence, climate change potentially affects the growth path by decreasing the marginal production of capital (and as a consequence the optimal savings rate) and decreasing output (and as a consequence decreasing the total amount of investment and capital accumulation) for a given savings rate (Fankhauser and Tol, 2005).[54] However, in DICE, climate change still only has an indirect effect on growth because there are no direct effects of climate change on the inputs of production or total factor productivity. Just as climate change cannot significantly affect the economic trajectory of the global economy in DICE as currently specified, Moyer et al., (2013) shows that climate damage eight to 17-fold higher does not contract economic output by 2300 in DICE. Furthermore, in the U.S. government analysis, the IWG modify DICE to have an exogenous savings rate, such that, like FUND and PAGE, climate change affects only consumption.[55]

The consequence of this unthreatened growth path is that it is not optimal to divert resources for mitigation purposes in the short-run, but rather to continue higher levels of current consumption (and, according to DICE, current investments in capital) (Moyer et al., 2013). In this scenario, the future is always richer than the present due to a growth path of per capita consumption that is rarely overwhelmed by climate change. As a consequence, the discount rate (through the Ramsey equation) almost never declines rapidly, though this prospect is unlikely according to Fankhauser and Tol (2005).[57,58]

While most IAMs provide estimates of declines in output in the present period and do not analyze the implications of climate change for stable, long-term economic growth, climate change may also affect economic growth of economies (Tol, 2009). In general, the risk of climate change creating long-term implications for economic growth are particularly relevant for less developed countries characterized by low reserves of financial capital (Dell, Jones and Olken, 2008; Aziadaris and Stachurski, 2005). In other words, recent research asks whether the exogenous growth assumption is valid, particularly for developing nations. Dell, Jones, and Olken (2012) find a 1.3 percent decline in the economic growth rate of poor countries for a 1 degree Celsius increase in annual average temperature.[59] Hsiang (2010) finds an overall decline of 2.4 percent for a 1 degree Celsius increase in Caribbean and Central American countries resulting from declines in the agricultural and non-agricultural sectors. Even small changes in the growth rate, such as 0.6 percent to 2.9 percent declines in the annual growth rate in poor countries would dominate all other economic damage estimates over the three-century timeline of IAMs (as specified in the IWG analysis). In further support of these findings, Jones and Olken (2009) find that a 1 degree Celsius increase in the temperature of a developing nation reduces exports by 2 percent to 5.7 percent.

There are several mechanisms through which climate change can directly affect economic growth. First, poor regions may suffer from further depleted funds due to climate change and be unable to adapt to rising temperatures and other climatic changes. This could result in a poverty trap (Tol 2009). Second, climate change could affect growth rates via a rise in social conflict (Tol 2009). While social conflict may affect economic growth, particularly political violence (Butkiewicz and Yanikkaya 2005), it is unclear by which mechanism this effect may occur.[60]

Third, there is evidence that climate change will directly affect labor productivity through work capacity limits (that is, a physical and/or mental limit on the amount of time or effort that individual can expend in a given day),[61] irritation, and disease (Lecocq and Shalizi, 2007; Tol, 2009).[62] Dell, Jones, and Olken (2012) summarize much of this literature, including lab experiments and natural experiments, to find that "labor productivity losses ... center around 2 percent per additional 1 degree when baseline temperatures exceed 25 degrees." These studies generally focus on indoor employment when adaptation is possible, but productivity losses are more substantial for outdoor labor, such as agriculture, and labor intensive industries in non-climate-controlled environments where adaptation to higher temperature and/or avoidance of rain is difficult (Hsiang 2010; Dell, Jones, and Olken 2012). Furthermore, decreased output from climate change could also decrease labor productivity via investments in labor productivity and/or human capital (Fankhauser and Tol, 2005).

In recent work that assumes no adaptation (including increased use of air conditioning), Kjellstrom et al., (2009) estimates labor productivity losses from climate change (resulting from work capacity limits and not an increase in the number of sick days) of up to 11.4 percent to 26.9 percent in some developing regions of the world by 2080. These losses are somewhat reduced when accounting for shifts in regional labor forces between the agriculture sector to industry and service sectors. Using regionalized estimates from Kjellstrom et al., (2009), the authors of ENVISAGE, an alternative IAM, find that declines in labor productivity are of paramount importance in terms of economic damages (accounting for at least three-quarters of all damages). Labor productivity accounts for about 84 percent of total global damage in 2050 and 76 percent in 2100, which is equivalent to a 1.5 percent decline in GDP in 2050 and a 3.5 percent decline in GDP in the year 2100 (Roson and van der Mensbrugghe, 2010).

Fourth, labor supply may potentially fall as labor productivity declines. Most IAMS assume an exogenous labor supply equal to population, such that the labor supply grows according to an exogenous path. However, in labor intensive industries, Zivin and Neidell (2010) find a decrease in the labor supply by as much as one hour

Rvsd Plan - 00002711

at temperatures above 85 degrees Fahrenheit.[63] While there is evidence of partial acclimation and the strong potential for adaptation, accounting for adaptation fully may be difficult because it includes: temporal choices (shifting activities to different times of the day and/or different days of the week), activity choice (for example, shifting activities indoors), location choice (for example, moving), and climate neutralizing technologies (for example, using an air conditioner). Furthermore, the labor supply may further decline if a rise in morbidity from climate change forces individuals out of the labor force, or a rise in mortality from climate change decreases the potential labor force (Fankhauser and Tol, 2005).

Fifth, higher temperatures, increased intensity of storms, rising sea-levels, and tipping point events will increase the capital depreciation rate through losses of the capital stock and decreases in the longevity of capital (Hall and Behl, 2006; Fankhauser and Tol, 2005). Losses in capital stock are likely to result from sudden changes, such as from storms and tipping points, rather than slow changes that would allow for adaptation via the movement of capital (Hall and Behl, 2006). For example, Freeman (2000) cites potential capital stock losses of 1 percent, 5 percent, 12 percent, and 31 percent for a one in 10-, 50-, 100-, and 500-year storm, respectively, for Honduras. Another example is Hurricane Andrew and Hurricane Iniki in 1992, which combined to reduce the U.S. capital stock by \$55 billion (Cashell and Labonte, 2005). While the overall economic effect of natural disasters is debated (due to positive effects of reconstruction and remittances), it is clear that storms negatively affect growth through declines in the capital stock and that larger storms (which are more common under climate change) have overall negative effects (Fomby, Ikeda, and Loayza, 2011; Hochrainer, 2009).[64]

Sixth, climate change could also affect economic growth via the capital stock through investment decisions. On the one hand, climate change could influence the relative prices of investment and consumer goods. Climate change is expected to affect a variety of market sectors that produce consumer goods and is generally expected to raise prices and decrease output in these sectors. Higher prices for consumer goods and lower levels of per capita output would lead to lower levels of consumption, while increased future prices could influence investment levels upward (Jorgenson et al., 2004). On the other hand, climate change could lower the amount of output available for investment, which would decrease the amount of capital via capital accumulation. Furthermore, decreases in the labor force and population from climate could decrease the amount of savings available for investment (Fankhauser and Tol, 2005).

Seventh, forward-thinking agents may also change their investment decisions due to the expected effects of climate change. However, it is unclear in which direction. On the one hand, forward-thinking agents may invest more now due to expected declines in future incomes. On the other hand, they may invest less due to lower expected returns on investments (Fankhauser and Tol, 2005; Moyer et al., 2013).

Eighth, increases in temperature may decrease capital productivity if we believe that the electricity grid becomes more unreliable with climate change. Ninth, according to Fankhauser and Tol (2005), Scheraga et al., (1993) argue that climate change could have structural effects on the economy by changing the relative size of sectors. This could have an effect on the composition of GDP. Tenth, the combination of declining tax revenue, due to declines in output, and increased investment in adaptation could decrease non-adaptation investments that grow the economy. In other words, climate change adaptation, particularly in terms of restoring or producing lost ecosystem services, drains capital and labor from research and development (Fankhauser and Tol, 2005; Moyer et al., 2013).

Last, an argument can be made for adding land to the production function. While this is not an input into production in the neoclassical growth model, it is one of the three factors of production in most political-economic work that predates the marginal analysis revolution. This would add additional channels through

which climate change could affect economic growth: declining land due to sea level rise and the loss of ecosystem services. This would allow for the loss of ecosystems to have more than a temporary effect on the economy.

Only DICE can be easily modified to capture these changes in growth. In FUND and PAGE (and DICE in the IWG analysis), it is difficult to model changes in the GDP growth rates due to climate change because economic growth rates are determined by an exogenous socio-economic scenario, as discussed above. In these models, the inclusion of the effects of climate change would require a change in the socio-economic scenario; this would make modeling the marginal effects of an additional unit of $CO_2$ more difficult. However, it is possible.

Modeling the effects of climate change on economic growth in an endogenous growth model, like DICE, is much easier although it requires the specification of a particular mechanism through which climate change may affect growth. As discussed above, DICE, as specified by Nordhaus and not IWG, is the only one of the three IAMs to use an endogenous growth model to estimate climate damages. DICE, as originally intended by Nordhaus, examines climate change using a variation of the Cass-Koopmans model with a single good that can be used for either consumption or saving/investment.[65] However, while DICE does allow for endogenous economic growth, all shocks are to consumption via a general shock to GDP; there are no shocks to labor, capital, or total factor productivity. Thus, modeling the effects of climate change on economic growth via the mechanisms discussed above will require modifications of DICE's structure. As currently specified, the endogenous economic growth structure of the DICE model, which allows for capital investment through an increased savings rate and investment in carbon abatement, allows for some mitigation of climate damages via: (1) increased capital investment that can offset climate damages to output, and (2) substitution of consumption for a reduction in carbon emissions (Nordhaus, 2011; Nordhaus and Sztorc, 2013).[66]

Moyer et al., (2013) modifies DICE-2007 in two different ways to capture the effect of climate change on total factor productivity corresponding to the Cobb-Douglas production function that represents global economic output. First, Moyer et al., (2013) modify DICE such that a portion of climate damages affects the level of total factor productivity. As a consequence, climate damages affect output and economic growth. The authors find that even a small diversion of damages to total factor productivity can produce negative economic growth rates, such that even one-quarter of damages affecting total factor productivity can result a devastatingly high social cost of carbon dioxide of $1,600. Second, they modify DICE such that climate damages reduce the growth rate of total factor productivity. As specified, total factor productivity cannot shrink as to produce economic contractions, and instead is limited to stalling economic growth. While this specification of the damage function does not result in economic collapse from climate change, like the previous specification, it implies an unequivocal increase in the SCC. From these results, Moyer et al., (2013) conclude that modeling the effects of climate change on economic growth can be as important as the discount rate in determining the magnitude of the SCC.

Two alternative IAMs, ENVISAGE and ICES, model the effects of climate change on economic growth (via shocks to labor, capital, and total factor productivity) in a general equilibrium model, GTAP. The authors of ENVISAGE model several damage sectors: agricultural, sea level rise, water, tourism, energy demand, human health and heat-related labor productivity.[67] Unlike DICE, FUND, and PAGE where climate damages affect consumption directly, climate change affects economic output through effects on labor, capital, and land productivity and stock, multi-factor productivity (that is, total factor productivity), and energy and tourist demand (Van der Mensburgghe, 2008). Depending on the damage sector, these shocks to productivity, input availability, and consumer demand can be heterogeneous and homogenous across economic sectors, that is, economic activities (Van der Mensburgghe and Roson, 2010). Using ENVISAGE, Roson and van der Mensbrugghe (2010) estimate damages of 1.8 percent and 4.6 percent of global GDP for increases of 2.3 degrees Celsius and 4.9 degrees Celsius,

Rvsd Plan - 00002713



Gonaïves, Haiti, after the hurricanes. Photo: Roosewelt Pinheiro/ABr

respectively, above 2000 temperatures; as noted earlier, labor productivity accounts for about 84 percent of total global damage in 2050 and 76 percent in 2100  (Roson and van der Mensbrugghe, 2010). The authors of ICES model several damage sectors: agricultural, sea level rise, forestry, floods, tourism, energy demand, and human health.[68] In ICES, damages affect economic activity through supply side shocks to capital and land stocks and capital, labor, and land productivity (Bosello, Eboli, and Pierfederici, 2012). Like ENVISAGE, the authors of ICES also model demand shocks to tourism and energy demand in addition to supply shocks. Bosello et al., (2012) estimate a 0.5 percent decline on global GDP for a 1.9 degrees Celsius increase in global temperatures relative to pre-industrial temperatures.

## Non-market damages

Yohe and Tirpak (2008) and Tol (2009) note that many non-market damages are still missing from current estimates and need further study. Among these are the non-market impacts of ocean acidification (as mentioned earlier), the loss of ecosystem services, the loss of biodiversity, and the omission of some health costs (Tol, 2009). While not an omitted damage per se, the default versions of the IAMs also fail to capture the increase in the value of non-market commodities relative to market goods due to their increase in scarcity. This failure results in a systematic underestimation of non-market damages, particularly biodiversity and ecosystem services, as the value of losses increase.[69]

ECOSYSTEM SERVICES. Natural ecosystems provide a multitude of services that benefit humanity, which are collectively known as ecosystem services. Many of these services are essential for human existence. The United Nations Millennium Ecosystem Assessment groups ecosystem services into four types: (1) provision (food—crops, livestock, fisheries, aquaculture, wild plant and animal products; fiber—timber, cotton, hemp, silk, wood fuel; genetic resources; biochemical, natural medicines, and pharmaceuticals; ornamental resources; fresh water), (2) regulating (air quality regulation; climate regulation—global, regional, and local; water regulation; erosion regulation; water purification and waste treatment; disease regulation; pest regulation; pollination; natural hazard regulation), (3) cultural (cultural diversity; spiritual and religious values; knowledge systems; educational values; inspiration; aesthetic value), and (4) supporting services (soil formation, photosynthesis, primary production, nutrient cycling, and water cycling). The ecosystems that provide these services are known as natural capital; their value equals the present value of all future streams of ecosystem services.

By the end of the century, climate change will be the most important driver of natural capital loss, ecosystem change, and ecosystem service loss. While some regions may experience some initial benefits from climate change in terms of increased ecosystem service provision, overall, the globe will experience negative effects and eventually all regions will experience losses (Millennium Ecosystem Assessment; IPCC, 2007). While not all services are affected by climate change, many of them are. Of these services, only a few are currently included in the IAMs.

Some ecosystem services are already accounted for in the social cost of carbon via other damage sectors. Some of these ecosystem services are explicitly captured by all three IAMs. For example, food and fiber services (particularly crops, livestock, and timber) are explicitly captured via the agricultural, forestry, and "other market" sectors.[70] Some ecosystem services are only captured by some IAMs. For example, only PAGE09 and early versions of DICE explicitly include climate regulation services (particularly globally) in their estimates of the social cost of carbon via their tipping point and catastrophic damage functions, respectively; see the catastrophic damage section below for further discussion.[71] Finally, some ecosystem services are clearly excluded from the default versions of current IAMs, such as pest regulation and pollination as discussed earlier.[72] Some of these omitted services can be thought of as examples of inter-sector services from the non-market sector to the market sector, and will be discussed indirectly in the subsection on the omission of inter-sector damages.

It can be difficult to determine whether ecosystem services are already captured via existing damage functions for two reasons. First, whether an ecosystem service is captured in the damage function(s) is dependent on whether the source of the damage estimate accounted for this service. For example, it could be potentially argued that water purification and water cycling services of ecosystems are already captured in FUND and early versions of DICE (and thus PAGE09, which includes estimates from both other IAMs) via the water sector and the "other market" sectors, respectively. However, this is only true if the water purification and cycling services of ecosystems are directly measured by the underlying studies used to calibrate these models, and this is not the case. In the case of water purification services, forested catchments supply 75 percent of the globes fresh water supplies (Shvidenko et al., 2005; IPCC, 2007 – Chapter 4), and these services could potentially be accounted for in the underlying forestry damages. While the forestry sectors in both models account for the effect of climate change on the value of timber sales, the water sector (within the "other market" sector in DICE-1999) fail to explicitly account for the water purification services of ecosystems. Thus, none of the three IAMs are likely to capture the effect of climate change on the water supply via its effect on forest ecosystems.[73]

Second, some of these omitted services, including water purification and cycling services, may be captured in general attempts by IAMs to capture the value of natural capital. In FUND 3.5 to 3.8, ecosystem damages from climate change are based on a "warm-glow" effect whereby the population's valuations of damages are independent of any real change in ecosystems (Anthoff and Tol, 2012). The warm glow effect is measured by how much people say they are willing to pay for services resulting from habitat preservation services (for example, to preserve wildlife), and Tol (2002) explains that the effect "suggest that people's willingness to pay reflects their desire to contribute to a vaguely described 'good cause,' rather than to a well-defined environmental good or service." However, Anthoff and Tol (2012) calibrate the ecosystem damage function to estimates from Pearce and Moran (1994), who report a mean willingness to pay of $50 per person in OECD nations for habitat. While Pearce and Moran use the $50 value to specifically value loss of habitat services (for example, to preserve species), FUND generalizes this figure to be a warm-glow valuation of people's willingness to contribute to the environment as a societal good. However, this extrapolation is not valid: Tol excludes many of the non-habitat services of ecosystems from FUND because these estimates are based on provision of habitat services

Rvsd Plan - 00002715

COSTOFCARBON.ORG

by ecosystems and not the other tangible and intangible ecosystem outputs.[74] Therefore, FUND likely omits the value of many ecosystem services.

Alternatively, Nordhaus and Boyer (2000) use their own discretion to determine regional economic damages from climate change to ecosystems in DICE-1999 (also one of the sources used to calibrate the default version ofPAGE09); the authors develop their own rough estimates of the loss of natural capital because of the highly speculative nature of estimates. The authors assume that the capital value of the portion of human settlements and ecosystems sensitive to climate change is between 5 percent and 25 percent of regional GDP depending on their size, mobility, and robustness and sensitivity. It is further assumed that a region's annual willingness to pay to prevent climate damages to human settlements and ecosystems equals 1 percent of their capital value, "which is one-fifth of the annualized value at a discount rate on goods of 5 percent per year (Nordhaus and Boyer 2000)." Therefore, the default version of PAGE09 partially captures some of these "omitted" ecosystem services. However, it is impossible to tell to what extent because (1) the PAGE09 default damage functions are also greatly informed by damage estimated from FUND, in addition to DICE-1999, which potentially only captures the value of habitat services (as discussed in previous paragraph), and (2) it is impossible to tell what damages to ecosystem services are omitted from the DICE-1999 climate damage estimates because of the speculative nature of this valuation.

In DICE-2013, the value of natural capital is likely excluded (or at best partially captured) due to a failure of many of the underlying studies to consider them, particularly the studies that only capture market damages.

BIODIVERSITY. The habitat services of ecosystems may or may not include the value of biodiversity in some IAMs. By the end of the century, climate change will be the single most import driver in biodiversity loss (Millennium Ecosystem Assessment). According to the IPCC (2007), "approximately 20-30% of plant and animal species assessed so far are likely to be at increased risk of extinction if increases in global average temperature exceed 1.5-2.5°C." Given the significant species loss that could occur by the end of the century and the likelihood of continued biodiversity loss with even higher temperatures thereafter, accurate estimates of the value of biodiversity loss are essential.

Tol (2009) considers biodiversity loss to be among the largest of the omitted impacts of climate change. Economists not only struggle to place a value on biodiversity, but they also lack the understanding of how climate change will affect intricate systems and processes like nutrient cycles. Furthermore, rather than occurring more gradually as does sea level rise, biodiversity loss is likely to be characterized by a series of system failures and ecological shocks, making it even more difficult to model (Tol 2009). Thus, current default versions of the IAMs may be omitting the value of biodiversity loss. This statement may seem inconsistent with Tol's FUND model given the inclusion of biodiversity loss in FUND 3.6, as a function of species loss (that is, the value of biodiversity increases with the loss of species) and temperature change. However, Tol (2009) is essentially arguing that future work is necessary to improve the accuracy of the estimate of the value of biodiversity, and he will continue to use the warm glow effect (as discussed in the previous section) in FUND until a better estimate becomes available.[75,76]

Like ecosystem services in general, it is unclear how extensively the default versions of the other two IAMs, DICE-2013 and PAGE09, account for biodiversity. These are for the same reasons as discussed in the previous subsection.

OMITTED HEALTH COSTS. According to Tol (2002a), morbidity and mortality can be directly influenced by climate in six ways: (1) high and low temperature (that is, heat and cold stress), (2) vector-borne infectious disease (3) non-vector-borne infectious disease (including, zoonotic and waterborne diseases (NIH 2010) (4) air quality, (5) floods and storms, and (6) inter-sector effects of agriculture and water quality. A seventh path of influence, which is missed by Tol (2002a), is humanity's socially contingent response to climate change, including forced migration, political and civil unrest, and increased violence.

None of the three IAMs discussed by the IWG includes all categories of damages. DICE-1999, which is utilized as a damage source in the default version of PAGE09, focuses on air pollution and the expansion of the geographical distribution of tropical diseases, including vector-borne diseases (malaria, dengue fever, trypanosomiasis, Chagas disease, schistosomiasis, leishmaniasis, lymphatic filariasis, and onchocerciasis) due to higher temperatures (Nordhaus and Boyer, 2000). Second, FUND 3.6, earlier versions of which were also utilized as a damage source in the default version of PAGE09, captures mortality and morbidity from four sources: diarrhea, vector-borne diseases, cardiovascular and respiratory disorders, and storms (Anthoff and Tol, 2012). Within the causes of health damages considered in FUND, however, modeling assumptions omit relevant damages. For example, heat-related cardiovascular mortality and morbidity is limited to urban areas, but we see no reason to ignore these effects within rural populations (Ackerman, 2010). Additionally, "the total change in mortality is restricted to a maximum of 5% of baseline mortality (per cause)" (Anthoff and Tol, 2012); under high levels of warming (for example, 6 degrees Celsius), this may be an unjustifiable restriction that will bias social cost of carbon estimates downward. Last, it is unclear what health damages are included in DICE-2013 because of its meta-analysis structure, and because several studies utilized in the analysis rely on statistical methods that are less explicit in what types of health costs are captured.

Early versions of DICE, upon which the default version of PAGE09 is partially based, and recent versions of FUND are not consistent in what types of health damages are included. On the one hand, DICE-1999 excludes many negative health effects of climate change captured by FUND: diarrhea (fourth and eleventh leading cause of death worldwide in 1990 and 2020, respectively, according to Murray and Lopez [1997]), cardiovascular disorders, respiratory disorders, tropical storms (hurricanes and typhoons), and extra-tropical storms (cyclones). Additionally, DICE fails to account for the cost of morbidity. On the other hand, FUND fails to account for declining air quality due to pollution that results from climate change, some of which DICE-1999 captures.

There are many health effects that DICE or FUND, and thus likely PAGE, omit. This includes: mortality and morbidity from the combined effects of storms and rising sea levels (that is, coastal flooding), flooding more generally (inland flooding from flash floods and the overflow of rivers), mortality, morbidity and air pollution effects from forest fires, non-vector-borne infectious diseases, some vector borne infectious diseases (like Lyme disease), and decreased air quality due to pollination; decreased labor productivity due disease and increased heat (see the subsection above of the effects of climate change on the economic growth rate for further discussion); and indirect health damages from climate change via agriculture and water resources (Ackerman and Munitz, 2012; Hanemann, 2008; IPCC, 2007; Tol, 2002; WMO, 2006). Finally, violence (the 16th and 14th leading cause of death worldwide in 1990 and 2020, respectively, according to Murray and Lopez, 1997) and war injuries (the 20th and 15th leading cause of death worldwide in 1990 and 2020, respectively, according to Murray and Lopez, 1997) may increase if social conflicts arise due to climate change.

There are also general equilibrium effects of health damages that are omitted by the IAMs. Tol (2009) referring to the results of his own paper, Bosello, Rosen, and Tol (2006), states that "the direct costs are biased towards zero for health, that is, direct benefits and costs are smaller in absolute value than benefits and costs estimated by a

general equilibrium model. This is because countries that would see their labor productivity fall (rise) because of climate change would also lose (gain) competitiveness, so that trade effects amplify the initial impact." Therefore, the exclusion of these general equilibrium impacts may further bias the health damages included in IAMs further downwards.

RELATIVE PRICES. Climate change is predicted to affect market and non-market goods produced outdoors (such as agricultural, fisheries, forestry, and environmental goods and services) more than market goods produced indoors; market goods insensitive to climate change account for the majority of GDP (Nordhaus and Boyer, 2000). As a consequence, outdoor produced goods will become relatively scarcer than indoor produced goods over time. Based on the law of scarcity, the value of outdoor produced goods and services will increase relative to indoor produced market goods. However, current damage estimates to climate sensitive goods and services reflect the current ratio of their economic value to climate insensitive goods, which is based on the current ratio of their quantities. By extrapolating these estimates to future time periods without making any explicit adjustment for relative prices, that is, without accounting for relative change in value of outdoor produced goods and services to indoor produced goods over time, the developers of IAMs implicitly assume constant relative prices, and bias the SCC downward.

A methodically sounds way to address this issue is to explicitly model relative prices. However, most IAMs (including DICE, FUND, and PAGE) include only an aggregate consumption good, as measured by per capita consumption, in the social welfare function.[77] On the consumer side of the economy, this assumption implies all goods and services, including market goods and non-market goods, are perfectly substitutable (even in the long-run), and that they have constant relative prices (Gerlagh and van der Zwaan, 2002; Sterner and Persson, 2008). Constant relative prices imply the ratio of the prices of any two goods must remain constant, regardless of the amounts available of either good.[78] As a consequence, the current IAMs fail to capture the increase in value of outdoor produced goods and services relative to other traditional consumption goods produced indoor (Gerlagh and van der Zwaan, 2002; Sterner and Persson, 2008).[79] Therefore, the simplifying assumption of modeling only one generalized consumption good biases the social cost of carbon estimates downward because future damage estimates to climate sensitive goods and services fail to account for the increase in relative value of these goods and services, as discussed in the previous paragraph.

Recent work has looked at the effect of disaggregating per capita consumption into market goods and non-market goods. Developing a simple social welfare function with two sectors (market and non-market) that grow at different rates, Hoel and Sterner (2007) find that increasing consumption of market goods and constant or decreasing consumption of environmental services will increase the relative value of environmental services due to their increasing relative price when the elasticity of substitution is less than one, that is, it is difficult to substitute market goods for non-market goods.[80,81] Hoel and Sterner (2007) demonstrate, as Gerlagh and van der Zwaan (2002) did before them, that the value of market goods will collapse to zero in the long run if these paths continue. After deriving an updated equation for the discount rate (similar to the Ramsey equation) resulting from the new specification, Hoel and Sterner (2007) also find that the combined effect of a newly derived discount rate and the change in relative prices can result in damage estimates that exceed those calculated under traditional discounting.[82] The work in Hoel and Sterner (2007) applies to any two sectors of the economy, not just market and non-market goods.[83]

To capture these effects on the optimal emissions path, Sterner and Persson (2008) modify DICE to restrict substitutability between non-market and market goods. Like Hoel and Sterner (2007) and Neumayer (1999) before them, Sterner and Persson (2008) find that allowing a change in relative prices can increase the costs

of climate change relative to a model assuming constant relative prices. More specifically, the authors find that damages double from 1.05 percent of GDP for a 2.5 degree Celsius increase to 2.1 percent of GDP; this implies that the SCC would also increase with a switch away from constant to relative prices. Using their base parameters, Sterner and Persson (2008) also find that allowing for a change in relative prices achieves a lower optimal emissions path than the Stern Review (Sterner and Persson, 2008; Heal, 2009).[84] In this sense, relative prices can be as important as the discount rate in determining the optimal climate change prevention policy. However, their results are highly dependent on the assumed elasticity of substitution. The lower the actual elasticity of substitution is, that is, the more difficult it is to substitute market goods for lost non-market goods to make society as equally well off under climate change, the more likely the current integrated assessment models are to underestimate the environmental cost of climate change by assuming perfect substitutability.

As is common in these models, we are left with uncertain parameters determining the optimal level of conservation. In this particular case, this is the elasticity of substitution. This recasts the argument about whether or not to act now from a disagreement about the discount rate into a debate of whether poor (strong) sustainability or perfect (weak) sustainability, that is, an elasticity of substitution less than or greater than 1 in the context of the CES utility function, holds in the long run (Gerlagh and van der Zwaan, 2001). Unlike the pure rate of time preference and the elasticity of the marginal utility of consumption, the elasticity of substitution is not an ethical parameter. However, there is still considerable uncertainty about this parameter due to a lack of empirical data (Neumayer, 1999). Sterner and Persson (2008) argue that a lower elasticity of substitution is more likely because some environmental goods are unique and irreplaceable (for example, drinking water), and these goods are likely to dominate the calculation of the elasticity of substitution as environmental goods become more scarce. In a similar argument, Heal (2009) states that market goods and environmental services are complements because some of the services in the former group are irreplaceable and essential to life (Heal, 2009; Dasgupta and Heal, 1979). Heal (2009) points out that this has two implications: some level of environmental services is essential and that the elasticity of substitution is not a constant.[85] Gerlagh and van der Zwaan (2002) demonstrate that even if the substitutability varies with the amount of environmental services, there often exists a level of environmental services below which poor substitutability occurs in the long run. While these arguments support an elasticity of substitution below which it is difficult to substitute consumption goods for environmental goods (elasticity of substitution of less than one), future debate is likely to ensue as current statements are more a matter of belief due to a lack of empirical evidence (Neumayer, 1999).



Greenland ice loss exceeds that of Ice gain. Photo:Christine Zenino, Chicago, US

Rvsd Plan - 00002719

All three IAMs include only an aggregate consumption good in the social welfare function, and so assume constant relative prices and perfect substitutability. While FUND 3.6 does account for the increase in the relative value of habitat services due to the loss of species, this is done in a limited way. Therefore, all three IAMs systematically underestimate climate damages to non-market commodities, possibly by a large margin.

## Socially contingent damages

Many social scientists and economists have argued that the ill-effects of damages to commoditized goods from climate change will extend beyond the calculated loss of value to affect societal dynamics (U.S. Climate Change Science Program, 2008). For example, agricultural damages account for the value of diminished productivity and lost crops, but not for the social repercussions of food insecurity and famine. In many regions, shifting weather patterns, rising sea levels, and increased natural disasters will threaten infrastructure, habitable lands, crop yields, and water resources. Under the resulting intensified resource competition, individuals will have to choose among adapting to resource scarcity, relocating to a region with more abundant resources, or using force to secure a share of the available resources. Each coping pathway has implications for political and social stability (Buhaug, Gleditsch & Theisen, 2009).

The IPCC, which once included social consequences (such as migration) as direct consequences of climate change, has since revised its stance, focusing instead on "human vulnerability," a measure expressing the relative risk of welfare impacts of climate change for individuals and communities (Raleigh & Jordan, 2010; IPCC, 2001). Vulnerability is determined both by physical factors (for example, drought likelihood) and social factors (for example, social status). Highly vulnerable societies are less likely to succeed in their adaptation efforts, and consequently, more likely to resort to conflict and migration. Adaptation strategies used in poorer regions such as removing children from school to provide additional income or subsisting on fewer resources, diminish the welfare of those employing them, and thereby increase the incentives for migration or armed conflict over time. Homer-Dixon (1999) argues that the developing world is more vulnerable to resource scarcity because the "innovation gap"—the difference in capacity between those who are able to innovate solutions to resource scarcity and those who are not—is largely dictated by the financial, physical, and human capital stores and the capacity to mobilize them. As a consequence, developing countries are much more likely to be susceptible to social and political instability from climate change (Homer-Dixon, 1999).

The study of climate change's social impacts is still emerging despite a lack of ability to predict their severity or likelihood. The risks of these broader, complex social responses to climate change are poorly understood and difficult to anticipate, and historical studies are of little use given the unprecedented nature of climate change. In particular, because climate change is a contributing factor and not the direct cause of migration and conflict, isolating the role and corresponding social damages of climate change is especially difficult (Homer-Dixon, 1999; Buhaug, Gleditsch & Theisen, 2008). In addition, the identification strategies of many papers are confounded by various statistical difficulties (Dell, Jones, and Olken, 2013).

Partially as a result of this difficult identification problem, the most recent versions of the three IAMs used by IWG do not address socially contingent damages, such as migration, social and political conflict, and violence. The one exception is FUND, which partially accounts for this social cost indirectly by modeling migration from permanent flooding. However, as discussed under inter-regional damages, FUND ignores most of the costs of migration, including the social conflict caused by an influx of migrants.

MIGRATION. Increases in labor migration and distress migration are likely results of increasing temperatures, reduced rainfall, shorter growing seasons, and sea level rise. Labor migration, generally driven by the "pull" force of economic opportunity, is common in many societies and can play an important role in the adaptation of communities by diversifying income sources and providing supplemental income through remittances. Distress migration, driven by the "push" force of local calamity, tends to be a coping mechanism of last resort. Labor migration is particularly sensitive to climate change-related factors, especially those that are gradual or chronic, which increase the need for income diversification and the allure of economic opportunities elsewhere. Distress migration only increases under sudden shifts, such as natural disasters (for example, severe storms) or irreversible changes (for example, permanent flooding from sea level rise). Distress migration is also more sensitive to social factors than labor migration. The ease of evacuation and availability of relief affect the rates of distress migrations, while community support, economic opportunities, and governmental policies influence resettlement rates. The severity and permanence of damage also play important roles in determining rates of migration and relocation (Raleigh & Jordan, 2010).[86]

It should be noted that mass migration, as predicted by many analysts, may also have significant effects on non-market goods and services. Specifically, mass migration into lesser affected areas may result in damages to environmental goods and services to the incoming nations (Oppenheimer, 2013). This type of damage would qualify as an inter-sector effect, which is discussed in a following section.

CONFLICT. In large scale crises, such as climate change, conflict tends only to occur in societies with histories of armed violence and deep political and social fragmentation. The developing world, which is slated to bear the brunt of climate change due to a lack of adaptive capacity, is considered especially vulnerable to climate-change-related social crises because their economic and political institutions tend to be less stable than those of the developed world (Millner & Dietz, 2011; Buhaug, Gleditsch & Theisen, 2008). Lower availability of financial resources and insurance also tend to increase the rate and permanence of climate change damages in developing countries, making conflict more likely, and intensifying existing conflicts (Millner & Dietz, 2011).

Buhaug, Gleditsch and Theisen (2008) advance four narratives on how climate change can drive conflict by contributing to political instability, economic instability, migration, or inappropriate governmental response. Climate change can exacerbate political instability when weak political institutions fail either to adequately address climate-related catastrophes (droughts, famines, and so on) or to deliver other public goods (such as healthcare, education, and infrastructure) because remediating such catastrophes diverts significant resources. Climate change can contribute to economic instability when decreased availability of a renewable resource drives down household incomes, which can compound existing intergroup inequalities and reduce the governmental funds available to adapt to climate change. [87] Migration driven by natural disasters or sea level rise could cause influxes of climate refugees, increasing environmental, economic, social and political stresses in receiving areas, particularly when the incoming refugees are of a different nationality or ethnic group. Finally, unpopular responses to climate change, such as draconian emission reduction mandates, could result in social uprisings in response. Dell, Jones, and Olken, (2013) also highlights the possibility that weather can directly lead to conflict through "changing the environment" or increasing human aggression.

There is literature studying the effect of weather and social and political conflict that is summarized quite thoroughly in Dell, Jones, and Olken (2013). In particular, there are a variety of cross-country and subnational studies which indicated that higher temperatures and lower-than-average precipitation (including droughts) cause civil conflicts and political instability (for example, coups), particularly via the lower household income mechanism. While there are various studies showing the effect of weather on social and political conflict, there

Rvsd Plan - 00002721

is some ambiguity in the effect because of (1) the low explanatory power of weather of conflict (that is, the noise), (2) a variety of statistical problems, including endogenous controls and spatial correlation, (3) the difficulty of measuring weather, particularly precipitation due to the negative effect of too much (for example, floods) and too little (for example, droughts), and (4) the difficulty of determining if weather changes the timing of conflict or actually causes conflict.

Two important recent papers identifying the connection between climate change and social and political conflict are: Hsiang, Meng, and Crane (2011) and Hsiang, Burke, and Miguel (2013). Hsiang, Meng, and Crane (2011) use more than 50 years of data to show that the probability of conflict doubled in the tropics during El Niño years as compared with La Niña years. Based on their analysis, El Niño contributed to 21 percent of the civil conflicts in the tropics taking place between 1950 and 2004, providing some evidence that warmer temperatures do result in more social conflict. This paper is important in that it provides evidence that weather caused more conflict, and displaced only a portion of conflicts over time.[88]

In another study, Hsiang, Burke, and Miguel (2013) conduct a meta-analysis across 60 multi-disciplinary papers.[89] The authors find that the median effect of a 1-standard-deviation change in climate variables over time causes a 13.6 percent change in the risk of intergroup conflict and a 3.9 percent change in interpersonal violence.[90,91] Similarly, precision-weighted average effects, in which studies were down-weighted based on their precision, are 11.1 percent and 2.3 percent, respectively. Even though the magnitude of this effect is heterogeneous (that is, varies over time and space), given that scientists predict a 2- to 4-standard-deviation change in temperature by 2050, possible increases in conflict as the result of climate change are likely to be significant this century in many areas across the globe. In general, the authors find that all types of conflict increase with temperature and precipitation, regardless of the temporal scale, but intergroup violence is less common in rich countries than poor countries.[92] Furthermore, the evidence indicates that adaptation possibilities are limited in that slow-moving climate change still adversely affects conflict, and these effects will continue into the next century. While the authors note that several avenues are possible to connect climate change to social conflict, more research is necessary to select between competing theories on these linkages.[93] Additionally, it is still unclear whether these mechanisms increase the probability of a conflict occurring or the probability of an existing conflict becoming violent.

**VIOLENCE AND CRIME.** Dell, Jones, and Olken (2013) review the literature studying the effect of weather on violence. In the criminology literature, there is a well-known relationship between higher temperatures and crime, particularly as it relates to aggression. Specifically, many authors find that higher temperatures increase criminal activity, especially as it relates to violent crime. There is an ongoing debate within the literature on whether the cause is neurologically based or a socially contingent response. With respect to precipitation, there is more of a mixed result with some evidence that a lack of precipitation may increase crime and violence through a channel of lower income.

## Catastrophic climate change

There is agreement within the literature on the importance of catastrophic damages. However, there is significant debate within the literature about the extent of their importance; see earlier discussion. Regardless of the side one takes, it is clear that these catastrophic damages should be included in IAMs, and the current failure to do so in some IAMs biases their SCC estimates downward. Given Hope's (2013) finding that tipping-point damages can be as important as the sum of economic damages included in IAMs in determining the social cost of carbon, these biases may be significant.

TIPPING POINTS. The IAMs differ in their treatment of climate tipping points. Earlier versions of DICE, that is, DICE-1999, DICE-2007, and DICE-2010, include certainty equivalent damages of catastrophic events as estimated in a survey of experts in Nordhaus (1994a).[94] For the most recent version of the model, that is, DICE-2013, Nordhaus moved to a meta-analysis based on estimates in Table 1 of Tol (2009). Most of these sources do not include tipping point damages, and it is unclear to the extent that they are included in these newer versions of DICE.[95] While DICE-2013 does include the possibility to explicitly model catastrophic damages, it is excluded from the default version of the model (correspondence with Nordhaus).[96]

PAGE explicitly models tipping points in the default version of his model. From PAGE2002 to PAGE09, Hope moved from modeling discontinuous impacts using certainty equivalence to modeling them as a singular, discrete event that has a probability of occurring in each time period when the realized temperature is above a specified temperature threshold (with a central value of 3 degrees Celsius in the default version of the model), and this probability is increasing in temperature. Of the recent versions of the three models, only PAGE09 fully explicitly models tipping point damages; still a risk premium for aversion to such an event is generally not included in the default versions of IAMs (Kouskey et al., 2011).

While PAGE09 and early versions of DICE explicitly model tipping point damages, an alternative, as represented by Lemoine and Traeger (2011), is to implicitly capture tipping point damages by explicitly modeling tipping points. As stated by the authors, they "directly model the effect of a tipping point on climate dynamics rather than approximating its effects by shifting the damage function." Specifically, Lemoine and Traeger (2011) model two broad types of climate tipping points within DICE: (1) increased climate sensitivity (that is, the increase in global surface temperature from a doubling of the $CO_2$ concentration in the atmosphere) due to increased strength in climate feedback effects beyond current predications, and (2) increased greenhouse gas atmospheric longevity beyond current climate models.[97] It should be noted that this is distinct from modeling fat tails because these modeling changes do not require the use of fat-tailed distributions.

In a similar way, FUND implicitly models tipping points by explicitly modeling the uncertainty of almost 900 parameters in the FUND model.[98] According to Anthoff and Tol (2013a), this captures catastrophic damages more generally by capturing the possibility of catastrophic outcomes, that is, welfare effects. It is unclear to the extent that this method captures tipping points as evidenced by the decision by Hope to jointly model parameter uncertainty and a catastrophic damage function in PAGE09. In other words, FUND may not sufficiently capture catastrophic damages via climate tipping points by simply modeling the uncertainty underlying all parameters in the model.

FAT TAILS. The popular IAMs differ in their ability to capture the catastrophic damages that result from fat tails. However, for the most part, those IAMs fail to model fat tails as suggested by Weitzman. This is because "numerical model(s) cannot fully incorporate a fat-tailed distribution (Hwang, Reynès, and Tol, (2011)."

On the one hand, both FUND and PAGE explicitly model the uncertainty of model parameters by specifying parameter distributions and run Monte Carlos simulations.[99] However, neither model explicitly chooses fat-tailed distributions in its default version. Hope chooses triangular distributions, which explicitly specify minimum and maximums for the probability distribution function, for many of the uncertain parameters in the default version of PAGE; the exception is the climate sensitivity parameter which follows the IPCC (2007) report. In FUND, Tol tends to choose triangular and gamma distributions; the gamma distribution is thin tailed (Weitzman, 2009).[100] However, while Anthoff and Tol (2013a) do not explicitly utilize fat-tail distributions to represent the probability distributions of their 900 uncertain parameters, the distribution of net present welfare

Rvsd Plan - 00002723
COSTOFCARBON.ORG

from a Monte Carlos simulation of 10,000 runs of FUND 3.6 is fat tailed.[101] While fat tails arise in the distribution of welfare in the FUND model, explicitly modeling parameter distributions as fat tailed may further increase the SCC.

On the other hand, the default versions of the DICE models fail to model any parameter uncertainty. As a consequence, the default versions of all DICE models fail to capture catastrophic damages via the fat tails of uncertain parameters. This is particularly significant when parameters have a right-skewed distribution, such as the climate sensitivity parameter and the possible discontinuity outcomes. Therefore, DICE-2013 mostly excludes catastrophic damages via tipping points and fat tails when parameter uncertainty is ignored.

There have been several attempts to include fat-tailed distributions in the popular IAMs. First, Hwang, Reynès, and Tol (2011) found an increase in the optimal carbon tax when accounting for fat tails in DICE; the optimal carbon tax increases in the uncertainty of the climate sensitivity parameter. Similarly, Ackerman, Stanton, and Bueno (2010) find that fat tails over the climate sensitivity parameter increases the economic costs of climate change, and hence the SCC, in DICE, but the magnitude of this increase is highly dependent on the exponent of the DICE damage function. Second, Pycroft et al., (2011) replaces above the 50th percentile of the original triangular distributions for the climate sensitivity parameter and the damage function (sea level rise, market, and non-market) exponents in the PAGE09 model with thin-tailed (specifically, the normal distribution), medium-tailed (specifically, the log-normal), and fat-tailed (specifically, the Pareto) distributions;[102] they switch off the catastrophic damage function when they modify the distributions of the damage function exponents, decreasing the PAGE09 SCC estimate from $102 in the default version of PAGE to $76, because tipping points and fat tails are related concepts, as discussed earlier in this paper. The authors find that the PAGE09 SCC estimate without a catastrophic damage function increases by 44 percent to 115 percent when medium and fat tails are integrated into PAGE09; this corresponds to an increase from $76 to $135 (thin), $147 (medium), and $218 (fat).[103] Larger percentage increases are observed for the 95th and 99th percentile SCC estimate. In other words, the use of fat-tailed distributions is possible and will significantly increase the social cost of carbon. At the same time, because its value is not infinite, as it is using Weitzman's Dismal Theory analysis, the SCC is still useful for benefit-cost analysis.

By explicitly modeling the probability distribution function of the climate sensitivity parameter using the Roe-Baker distribution, the 2013 IWG analysis may partially capture the effects of fat-tailed distributions; the Roe-Baker distribution used in this analysis is fat-tailed (Pindyck, 2013).

BLACK SWAN EVENTS. All three IAMs may exclude black swan events. While it is unclear how these events could be integrated into these models, it is clear that their exclusion biases SCC estimates downward because scientists believe that bad surprises are more likely than good surprises when it comes to climate change. As discussed earlier, these events may be captured by integrating fat-tail distributions for uncertain parameters into IAMs, but the "correct" fat-tailed distribution is still unknown.

## Inter-sector damages

According to both Kopp and Mignone (2012) and the IWG (2010; 2013) IAMs fail to capture inter-sector damages, that is, damages from the interaction of damage sectors. There are a variety of potential inter-sector effects of climate change, and their omission generally tends toward a downward bias. Inter-sector damages include: agriculture and water quality on human health (Tol, 2009; IPCC, 2007); the effects of water supply and quality

on agriculture; the combined effects of increased storm strength and rising sea levels (Yohe and Hope, 2013); the effects of ocean acidification on human settlements; and the effects of ecosystem services on the market sector. As mentioned earlier, many of these inter-sector damages include damages that arise from the interaction of climate change effects between sectors in the market-, non-market-, socially-contingent-, and catastrophic-damage categories.

For the most part, the major integrated assessment models (FUND, PAGE, and DICE) calibrate their damage functions, and as a consequence estimate the social cost of carbon, using sector specific studies, or, at least, rely on studies that utilize sector specific damage estimates, that is, enumerative studies.[104] Implicitly, the authors of the IAMs assume that each sector is an island, independent of all other sectors. Therefore, inter-sector damages are captured by IAMs only if the underlying studies account for these inter-sector damages. For example, agricultural studies that account for the effect of climate change on precipitation and the water supply for irrigation will include the effects of the water supply sector on the agricultural sector. However, most damage studies are incomplete as they omit these inter-sector damages (Yohe and Hope, 2013).[105]

The developers of PAGE and FUND argue that these models capture inter-sector effects. On the one hand, Hope (2006) argues that only inter-sector damages between market and non-market sectors, such as ecosystem services, are excluded. Specifically, he argues that all other inter-sector damages are captured because "PAGE2002 models two damage sectors: economic and non-economic. ... Using highly aggregated damage estimates from the literature allows PAGE2002 to capture interaction effects implicitly." This is something of a tautology – that is, I utilize generalized aggregate damage functions, and because they are general, I capture interactions. As stated above, inter-sector damages can only be captured if the underlying damage estimates account for them, and they do not in the case of the default version of PAGE09. On the other hand, Tol (2009) goes even further by arguing that IAMs, such as FUND, may be double counting inter-sector damages. For example, the effect of water supply on the agricultural sector may be captured by both the water and agricultural sector damages.[106] Again, this can only be the case if the underlying studies explicitly account for these damages, and this is not the case in FUND due to its reliance on enumerative studies that do not account for inter-sector damages.[107]

The latest versions of the three IAMs utilized by IWG omit inter-sector damages. FUND3.6 and DICE-1999 utilize sector-specific damage estimates (from enumerative studies), and by the arguments above omit most, if not all, of the inter-sector damages excluded from the underlying studies. Because PAGE09 is greatly informed by FUND and DICE-1999, it too omits these inter-sector damages even though it relies on aggregate market- and non-market-damage functions. Finally, DICE-2013 also omits most inter-sector damages. Of the 13 studies underlying the DICE-2013 meta-analysis, eight (Nordhaus, 1994a; Fankhauser, 1995; Tol, 1995; Nordhaus and Yang, 1996; Plambeck and Hope, 1996; Nordhaus and Boyer, 2000; Tol, 2002; Hope, 2006) of them rely on sector-specific calibration techniques (that is, rely on enumerative studies), and omit any inter-sector damages excluded from the underlying studies. Four of the remaining five studies (Mendelsohn, Schlesinger, and Williams, 2000; Maddison, 2003; Rehdanz and Maddison, 2005; and Nordhaus, 2006) utilize statistical technique to estimate the damages from climate change. While statistical methods can capture inter-sector effects, all four of these studies omit the damages from the interaction of market and non-market sectors; Maddison (2003) and Rehdanz and Maddison (2005) only include non-market damages, and Mendelsohn, Schlesinger, and Williams (2000) and Nordhaus (2006) include only market damages. Thus, like the other IAMs, DICE-2013 fails to account for many inter-sector damages.

Rvsd Plan - 00002725



Wind erosion is evident on this rangeland during severe drought in Arriba County, New Mexico.
Photo by Jeff Vanuga, USDA Natural Resources Conservation Service.

## Cross–Sector Damages

As discussed earlier, many of the omitted effects of climate change comprise both market- and non-market-damage sectors. This section discusses omitted climate impacts that affect multiple categories of damages (as opposed to inter-sector damages, where multiple impacts interact to contribute to damages in a specific sector): market, non-market, socially contingent, and catastrophic damages. This includes inter-regional damages, destabilizers of existing non-climate stressors, weather variability and climate extremes, and ocean acidification.

INTER-REGIONAL DAMAGES. Inter-regional damages are spillovers from one region to another. For the most part, the major integrated assessment models (FUND, PAGE, and RICE) estimate the social cost of carbon assuming each region of the world is independent of all other regions. There are a variety of potential inter-regional effects of climate change, and their individual omissions may result in an upward or downward bias. While the individual biases are in both directions, Freeman and Guzman (2009) argue that the overall effect very likely leads to an underestimation of the SCC for the United States.

Freeman and Guzman (2009) lay out several international spillover scenarios with respect to the United States. First, there are potential supply shocks to the U.S. economy in terms of decreased availability of imported inputs, intermediary goods, and consumption goods. This includes energy and agricultural goods. Second, there could be demand shocks as affected countries decrease their demand for U.S. imports. Third, there may be financial market effects as international willingness to loan to the United States dries up and the value of U.S. firms decline as foreign markets shrink. Fourth, mass migration from heavily affected areas, such as Latin America, will potentially strain the U.S. economy, and likely lead to increased expenditures on migration prevention. Fifth, increases in infectious diseases are likely due to the combined effects of ecological collapse, the breakdown of public infrastructure in poor nations, and declines in the resources available for prevention; increasing mass migration will intensify the spread of diseases across borders. Last, climate change is likely to exacerbate security threats to the United States, partially through its potential destabilizing effect on politics. As a consequence, climate change is a "threat multiplier" in terms of security. In summary, there are a variety of pathways for the effects of climate change in one region to cause damages in another: trade, capital markets, migration, disease, and social conflict.

There are also several potential positive spillover scenarios currently excluded from the SCC. First, trade has the potential to reduce the SCC by reducing the welfare losses to consumers in particularly hard hit regions (Darwin, 1995).[109] While consumers in exporting nations and producers in importing nations are harmed by trade, this loss is more than offset by gains to consumers in importing nations and producers in exporting nations according to economic theory. For example, low elevation nations will experience a decline in domestic agricultural production, but importing food from higher elevation nations will mitigate some of the consumer welfare loss from domestic production declines (Darwin, 1995). Through this lens, trade can be thought be as a form of human adaptation to climate change whereby humans move tradable market goods between the least- and most-affected regions to satisfy the needs of those with the highest demand.[110] However, trade can also result in general equilibrium costs, which are also currently omitted (Tol, 2009).[111] Second, technology spillovers between nations may reduce the regional costs of mitigation and/or adaptation. Investment by developed nations into mitigation and adaptation technologies may reduce the costs of mitigation and adaptation in developing nations (Löschel, 2002; Buonanno et al., 2003; Rao, 2006).[112]

The inclusion of inter-regional interactions requires integrating the various regional economic models into an international model. This is technically complex and requires many additional assumptions (Freeman and Guzman, 2009). Care must also be taken to avoid double counting of damages. Rather than simply adding inter-regional damages estimates, modelers have to return to the country-specific damage estimates to examine how they were constructed.

In general, all three IAMs exclude inter-regional damages. There are a few exceptions. First, all three IAMs (DICE-2013, FUND 3.6, and PAGE09) capture general equilibrium effects of trade in the agricultural sector. Second, because GDP measurements include net exports, damage estimates at least partially capture trade indirectly through GDP. Last, FUND models migration as it relates to sea level rise.

FUND 3.6 migration cost estimates are relatively ad hoc and omit several types of damages. First, the method of determining the destination of migrants is ad hoc, and this affects the costs of migration because they are dependent on the destination region.[113] Second, the cost of migration to the sending region is three times its regional per capita income per migrant; Tol (2002) describes three as an "arbitrary" parameter. This approach will underestimate costs of migration if per capita income in coastal regions is greater than the regional average, which would be the case if cities with concentrations of economic activity are affected most by sea level rise. Third, in the region that is receiving migrants, costs per migrant equal 40 percent of per capita income of the receiving country (Cline, 1992 from Fankhauser (1995) from Anthoff and Tol, 2012b); Cline (1992; 120) approximates the costs of migration to the United States based on state and local government infrastructure spending (education, roads, police, sanitation) and taxes paid by immigrants. However, this figure from Cline (1992) was simply an illustration of the cost of migration to the United States and was hardly a "guesstimate," as stated by Fankhauser. Furthermore, these migration-cost estimates exclude the costs of social conflict from migration pressures (for example, the effect of Syrian migrants on Bulgaria), the potential stress on the receiving country's social, environmental, and physical infrastructure under cases of mass migration, the psychological cost to migrants of losing their homeland, and the potential physical health costs to refugees (Fankhauser, 1995). Last, FUND sets intra-regional migration costs equal to zero though there is still likely to be stress on the receiving nations (for example, the effect of Syrian migrants on Lebanon and Jordan from the recent Syrian Civil War).[116]

Rvsd Plan - 00002727

DESTABILIZERS OF EXISTING NON–CLIMATE STRESSORS. Climate change is often referred to as a threat multiplier. For example, Freeman and Guzman (2009) state that "the consistent message of [national security] studies is that climate change is a 'threat multiplier' (Freeman and Guzman, 2009)." While Freeman and Guzman (2009) are mainly referring to national security issues worsening due to climate change further weakening already volatile regions and political unstable nations, their arguments can be generalized to other future challenges that the world faces with or without climate change: social and political instability (Freeman and Guzman, 2009); disease, including the flu (Freeman and Guzman, 2009);[117] ecosystem and biodiversity loss (United Nations' Millennium Ecosystem Assessment);[118] decreased water availability.[119] In other words, just as the multiple effects of climate change will interact within different economic sectors, as discussed in the previous section under inter-sector damages, non-climate related economic, societal, and environmental pressures will result in multiple damages across sectors due to their interaction with the effects of climate change.

Like inter-sector damages, the interaction of non-climatic factors and the effects of climate change must be captured in the underlying studies utilized to calibrate the IAM damage functions. In most cases, the studies underlying the calibration of the IAMs' default damage functions do not account for these interactions. Thus, the default versions of the early versions of DICE, DICE-2013, FUND3.6, and PAGE09 by and large omit these damages.

WEATHER VARIABILITY AND CLIMATE EXTREMES. Climate change does not only affect the long-run averages of temperature, precipitation, and sea-level, but also the variability of weather around these changing means. In other words, many more extreme weather events should be expected, including the likelihood of increased: frequency of heat waves, areas experiencing droughts (and some areas experiencing decreased rainfall during monsoons and others experiencing increased aridity), frequency and areas experiencing heavy precipitation events (for example, floods), intensity of tropical cyclones, and extreme high sea level (IPCC, 2007a); see Table 14.

Current IAMs partially capture some of these extremes: tropical storms (hurricanes and typhoons), extra-tropical storms (cyclones), and heat waves. FUND 3.6 explicitly models the economic destruction in terms of lost property and human life (mortality and morbidity) of the increased strength of tropical storms, and the cost to human health (mortality and morbidity) of heat waves, but only to the extent that damages are limited to heat stress. Early versions of DICE, that is, DICE-1999 and DICE-2007, only make an ad hoc account of the loss property, such as human settlements, due to storms in the coastal sector. While both models account for sea-level rise, they fail to account for the interaction between storms and sea level rise, which results in extreme high sea level rise (Yohe and Hope, 2013). As a consequence, the default version of PAGE09 (the damage function of which is greatly informed by FUND and DICE-1999) partially accounts for the cost of the increased intensity of storms and frequency of heat waves. Because most of the underlying studies in DICE-2013 exclude climate extremes, DICE-2013 appears to exclude the economic costs of weather variability (flooding, droughts, and heat waves).

However, these IAMs may implicitly capture some of these extreme events to the extent that these variables are correlated with temperature. Nordhaus (1994a) argues that "in thinking about the impact of climate change we must recognize that the variable focused on in most analyses—globally averaged surface temperature—has little salience for impacts. Rather, variables that accompany or are the result of temperature change—precipitation, water levels, extremes of droughts or freezes, and thresholds like the freezing point or the level of dikes and levees—will drive the socioeconomic impacts. Mean temperature is chosen because it is a useful index of climate change that is highly correlated with or determines the most important variables." Given that these events are not perfectly correlated with temperature, these events are partially omitted from the analysis. As

Tol (1995) states: "only if the relevant climate parameter relates linearly to the global mean temperature, and the relationship is perfectly known, is the temperature an adequate proxy." Therefore, these events are already included in the IAMs to the extent that global average surface temperature is correlated with these extreme events. To the extent that they are not, they are excluded.

OCEAN ACIDIFICATION. None of the most widely adopted IAMs for estimating the SCC (DICE, FUND, and PAGE) address the multiple damages due to ocean acidification. As defined by Shinryokan (2011): "Ocean acidification refers to a reduction in the pH of the ocean over an extended period, typically decades or longer, which is caused primarily by uptake of carbon dioxide from the atmosphere." In terms of market damages, ocean acidification impacts fisheries via its effects on marine ecosystems and organisms, particularly shellfish and crustaceans. In addition to fisheries, ocean acidification will impact ecosystems, biodiversity, and tourism via its effect on coral and also human settlements. While the economic effects of acidification are likely substantial, few economic values of the damages are available because scientists only recently recognized the threat of ocean acidification to marine life (Guinotte and Fabry, 2009) and fisheries, for the most part, are excluded from IAMs; see previous sub-section.

Though fisheries are expected to suffer significant economic damage as a result of ocean acidification, there are few studies of the economic costs of these impacts. Since 2009, economists have completed several impact studies that attempt to more accurately quantify the economic costs of climate change to fisheries. Two such studies, Cooley and Doney (2009) and Narita et al., (2012), estimate these monetary effects with a focus on mollusk production; recent scientific literature finds that acidified ecosystems significantly reduce mollusk populations. Cooley and Doney (2009) conduct a case study of the effect of ocean acidification on U.S. fisheries revenues, with a focus on mollusks. If there were a reduction of 10 percent to 25 percent in the U.S. mollusk harvest from the 2007 level, $75 million to $187 million of direct revenue would be lost each subsequent year;[120] these values correspond to a net present value loss (that is, the sum of annual losses over all futures years in terms of its current dollar value) of $1.7 billion to $10 billion through 2060. Similarly, using a partial-equilibrium model to assess the welfare loss to society from a decline in shellfish supply, Narita et al., (2012) find that the costs of ocean acidification could exceed $100 billion. Because mollusks represent a small fraction of total fisheries, the cumulative economic impact of ocean acidification on fisheries will likely be significantly larger.

In addition to fisheries, ocean acidification will impact tourism associated with the ocean, particularly coral reefs. Coral reefs are expected to be among the worst-affected ecosystems. A study by Brander et al., (2009) considers the economic damages associated with coral reefs and estimates valuation per area. They expect losses in this sector to be at least $50 billion annually by 2050. It should be noted that the overall effects of climate change on tourism are also excluded, but the magnitude and direction of these effects is uncertain (Tol, 2009; Bigano et al., 2007) and potentially negative (Berrittella et al., 2006).

## Adaptation

Some policymakers and analysts may argue that the IAMs need not worry about these omitted damages due to society's ability to adapt. In other words, adaptation implies that these costs will not be incurred. While adaptation must be accounted for when including the above damage estimates, an altogether elimination of these omitted damages (that is, such that they can be ignored) is unlikely. This is particularly the case for non-market, socially contingent, and catastrophic damages, in general, where adaptation is likely be less effective. This is also increasingly the case for market damages as temperatures increase (Hope, 2011). Furthermore,

Rvsd Plan - 00002729

adaptation will be particularly difficult for faster-than-expected temperature increases (Anthoff and Tol, 2012; Hope, 2011). The ability to prevent substantial damages through adaptation is limited as evidenced in current IAM damage estimates.

The current IAMs account for adaptation in different ways. In the early versions of DICE and DICE-2013, adaptation is implicit in the damage estimates.[121] As a consequence, the assumptions about adaptation costs are captured in the underlying damage estimates used to calibrate their damage functions (Warren et al., 2006). While Nordhaus implicitly accounts for adaptation to agriculture, other market, health, coastal, and settlement and ecosystem sectors in the early versions of DICE (DICE-1999, DICE-2007, and DICE-2010)—sometimes in an ad hoc way—he essentially assumes high levels of human adaptation at virtually no cost (IWG, 2010). According to IWG (2010) and Warren et al., (2006), this is particularly evident for the other market sectors. It is less clear the extent to which the DICE-2013 damage function captures these adaptation costs due to the use of a meta-analysis. In all versions of DICE, adaptation is not effective enough to eliminate damages.

In FUND, Tol models adaptation explicitly and implicitly. For adaptation to agriculture, ecosystem, and sea level rise damages, Tol models adaptation explicitly. In the first two of these sectors, Tol captures adaptation by modeling damage costs as a function of the rate of climate change (Anthoff and Tol, 2012); see forthcoming Appendix E. In the case of sea level rise, Tol models the cost of building seawalls. Like in DICE, the assumptions about adaptation costs in the other FUND sectors are captured in the underlying damage estimates used to calibrate these damage functions. Additionally, Tol accounts for adaptation implicitly in the energy and human health sectors by allowing regional sector costs to be a function of regional wealth, such that wealthier societies are better able to adapt (IWG, 2010). According to Warren et al., (2006), FUND assumes perfectly efficient adaptation without accounting for adjustment costs, except in the agriculture and ecosystem sectors. Therefore, Tol may underestimate adaptation costs in some sectors of FUND. While climate change results in net global benefits at low temperature changes, higher temperature increases result in costs that adaptation cannot overcome as evidenced by the negative impacts of climate change on consumption by the late 21st century as predicted by FUND 3.6 (Tol, 2013).

Unlike Nordhaus and Tol, Hope (2011) explicitly models climate adaptation in PAGE09. Hope explicitly models adaptation and the cost of adaptation. For each non-catastrophic damage sector (sea level rise, market, and non-market), he specifies a temperature level up to which adaptation is 100 percent effective, a temperature level up to which adaptation is partially effective, and a level of effectiveness (the percentage of damages not incurred) for temperature increases between these two levels. For catastrophic damages, there is no adaptation. Like DICE and FUND, adaptation is not effective enough to significantly eliminate damages.

Given that included damages are significant despite current adaptation assumptions, adaptation as an argument for ignoring currently omitted damages is not justifiable. Furthermore, the three IAMs used by the IWG are often accused of being overly optimistic in their adaptation assumptions, particularly for the versions used by the 2010 IWG (Dietz et al., 2007; Ackerman, 2010; Warren et al., 2006; Hanemann, 2008; Ackerman et al., 2009; Masur and Posner, 2011). In particular, none of the three IAMs explicitly model mal-adaptation. Therefore, omitted damages are likely to still be significant, and current SCC estimates from DICE-2013, FUND 3.6, and PAGE09 are likely biased downward due to a tendency to be overly optimistic about adaptation (Masur and Posner, 2011).[122]

# CONCLUSION – MOVING FORWARD

The IWG SCC estimates are likely biased downward due to the modeling decisions of EPA scientists and IAM developers, including the use of outdated damage estimates and the omission of a significant number of damage categories. While some of the damage estimates utilized by IAMs are outdated (Ackerman, 2010; Stern Review – Chapter 6; Stern, 2007; Dietz et al., 2007; Warren et al., 2006; Warren et al., 2010; Tol, 2009), updating these estimates is likely to have a minimal effect on the SCC (Yohe and Hope, 2013). Instead, this paper focuses on cataloging the more significant damages omitted from the recent versions of the three IAMs used by the Interagency Working Group (DICE-2010, FUND 3.8, and PAGE09), and the latest version of DICE (DICE-2013).[123] These omissions occur due to the omission of sectors (for example, socially contingent damages), the omission of relationships between regions and sectors (for example, inter-sector and inter-region damages), and the omission of types of climate damages from the underlying studies used for calibration (for example, fires).

The main question is whether the inclusion of these omitted damages matter. Tol (2009) argues that, for the most part, many omitted damages are small (saltwater intrusion in groundwater, increased cost of cooling power plants, adapting urban water management systems, storm frequency, intensity, and range, ocean acidification, and value of firewood),[124] and are balanced out by omitted climate benefits (decreased costs of some traditional and alternative energies—oil, wind, and wave, lower transport costs, lower expenditures on food and clothing due to lower demand from higher temperatures, and fewer transportation and other disruptions from cold-related weather).[125] For others, like tourism, the effects are unknown according to Tol (2009). Instead, Tol (2009) argues that research should primarily focus on estimating and including unknowns that potentially could have large effects, such as biodiversity loss, catastrophic damages, socially contingent damages, and damages at high temperature levels.[126] In other words, Tol (2009) argues that research should focus on tipping point damages and socially contingent damages; see row 3 and column 3 in Figure 2. Yohe and Tirpak (2007) for the most part agree with this assessment, but also include bounded risks (row 2 in Figure 2), which includes the effects of weather variability (droughts, floods, heat waves, and storms); the effects of weather variability are still greatly omitted from many of the included market and non-market damages. Furthermore, black swan events, that is, unexpected effects, related to climate change should further increase the SCC because researchers expect more negative than positive effects (Tol, 2009b). The inclusion of all omitted damages, including these more significant omitted damages, is likely to result in an increase in the SCC (Mastrandrea, 2009; Tol, 2009a). Given the difficulty of deciding *a priori* what damages are likely to be significant, this report advocates that IAMs should work to include all available damage estimates, particularly those discussed in this paper. However, priority for developing new damage estimates should be given to hot spots—regions and damages that are likely to be significant—for which estimates are not currently available.

There is a general consensus that future IAM research must focus on hot spots. The "hot spot" regions are those that are geographically predisposed to climate change (for example, low lying nations and island nations), and those nations with insufficient ability to adapt (for example, developing nations). The "hot spot" sectors are those discussed above: catastrophic damages, weather variability, and socially-contingent damages. While studying these sectors is difficult, analysts need to look at multiple metrics and regions. The current practice is to omit these difficult to estimate damages or to extrapolate damages estimates from developed to developing nations due to limited data availability. To overcome these shortcomings, future work will require the development of reliable datasets in developing nations and advancements in the science of climate variability and tipping points that specify credible scenarios at a regional level (Yohe and Tirpak, 2007). Furthermore, to develop consistent estimates of damages, the current pipeline of damage estimation, whereby scientists

Rvsd Plan - 00002731

estimate potential damages and economists draw on these estimates in their studies independent of input from scientists, must be replaced with collaborative research between the disciplines.[127] This type of research ensures that economists understand the science behind the climate impacts that they are citing, but also ensures that the scientific estimates are developed with the final impact measurement, that is, the dollar impact, in mind.

Alternatively, further attempts to utilize meta-analysis at the aggregate scale (across regions and sectors) as is done in DICE-2013 are ill-advised.[128] There are several reasons to advise against this type of damage-function estimation. First, using meta-analysis makes determining which damages are included and excluded difficult. It requires an analyst to thoroughly study each of the underlying studies to determine which climate impacts on a sector are included and excluded. Furthermore, it is difficult to interpret whether an impact is included if only several studies include the impact. Second, there are too few data points at this scale to properly account for statistical issues: time trends, omitted damage sectors or impacts within sectors, and correlated standard errors between studies that include estimates from the same authors and similar estimation methods. Last, as discussed by Tol (2009), the data points from various studies are not really a time-series, and should not be treated as such. An alternative is to conduct meta-analyses at the sector level where a sufficient number of studies are available. For example, there are a multitude of agricultural studies, and a meta-analysis to estimate a regional-agricultural or global-agricultural damage function would be possible. Another alternative, laid out by Kopp, Hsiang, and Oppenheimer (2013) is to develop an infrastructure that uses statistical (for example, Bayesian) methods to update damage functions as new estimates become available.

Though not discussed in this paper, there are several additional compounding aspects of IAMs that are likely to further bias current SCC estimates downward. In particular, they fail to account for (1) uncertainty in extrapolating damages to higher temperatures given that IAMS assume only moderate temperature increases,[129] (2) a declining discount rate due to uncertainty over future economic growth (Arrow et al., 2013),[130] (3) aggregated and overly simplified spatial and temporal resolution (IWG 2010; Hanemann, 2008; Stern, 2007), and (4) the option value that arises from the irreversibility of $CO_2$ emissions. These shortcomings, by and large, point to a further bias downward of the social cost of carbon.

While there is a downward bias to the federal SCC estimates, this report advocates that the Office of Management and Budget (OMB) and other executive branch agencies should move forward to finalize proposed rules with the 2013 IWG's current SCC estimates, as measuring at least some of the costs is better than assuming there are none. In doing so, the OMB should emphasize more strongly the downward bias of the current U.S. SCC estimates and commit to addressing them in future updates of these estimates. Potentially, OMB can utilize the research provided in this report to list in detail all of the omitted damages in the current U.S. SCC estimates.

## Table 1. 2010 and 2013 SCC Estimates at 3% Discount Rate by Model

| IAM | 2010 Global SCC at 3% Discount Rate (IWG 2010) | 2020 Global SCC at 3% Discount Rate (IWG 2013) | % Change |
|---|---|---|---|
| DICE | $28 | $38 | 34% |
| FUND | $6 | $19 | 222% |
| PAGE | $30 | $73 | 143% |

Source: IWG (2013 Revision)

## Table 2. 2010 SCC Estimates, 2010–2050 (in 2007 dollars per metric ton)

| Discount Rate Year | 5% Avg | 3% Avg | 2.5% Avg | 3% 95th |
|---|---|---|---|---|
| 2010 | 4.7 | 21.4 | 35.1 | 64.9 |
| 2015 | 5.7 | 23.8 | 38.4 | 72.8 |
| 2020 | 6.8 | 26.3 | 41.7 | 80.7 |
| 2025 | 8.2 | 29.6 | 45.9 | 90.4 |
| 2030 | 9.7 | 32.8 | 50.0 | 100.0 |
| 2035 | 11.2 | 36.0 | 54.2 | 109.7 |
| 2040 | 12.7 | 39.2 | 58.4 | 119.3 |
| 2045 | 14.2 | 42.1 | 61.7 | 127.8 |
| 2050 | 15.7 | 44.9 | 65.0 | 136.2 |

Source: IWG (2010)

## Table 3. 2013 SCC Estimates, 2010–2050 (in 2007 dollars per metric ton)

| Discount Rate Year | 5% Avg | 3% Avg | 2.5% Avg | 3% 95th |
|---|---|---|---|---|
| 2010 | 11 | 32 | 51 | 89 |
| 2015 | 11 | 37 | 57 | 109 |
| 2020 | 12 | 43 | 64 | 128 |
| 2025 | 14 | 47 | 69 | 143 |
| 2030 | 16 | 52 | 75 | 159 |
| 2035 | 19 | 56 | 80 | 175 |
| 2040 | 21 | 61 | 86 | 191 |
| 2045 | 24 | 66 | 92 | 206 |
| 2050 | 26 | 71 | 97 | 220 |

Source: IWG (2010)

Rvsd Plan - 00002733 COSTOFCARBON.ORG