Forest Service has no legal right to take away these stipulated protections. In addition, efforts to seek increases in the flow rates of existing rights or additional rights would not produce additional flows within the Forest as there are few to no other water diversions above the Forest boundary. Additionally, the water development within Water Division No. 3 occurred before the reservation of the Forests. This means that most of the large diversions within the Valley (below the Forest Boundary) would be senior to any additional water rights developed by the Forest Service and these senior rights could not be called out to produce more water. Last, as you are no doubt aware, the San Luis Valley as a whole is already fully appropriated and is generally short of surface water to meet all of the already decreed surface water rights and Colorado's obligations under the Rio Grande Compact. The flows of the Rio Grande are managed closely to assure that Colorado neither over- nor under-delivers water to the downstream States, as required by the Compact. Because of this intensive management, any water called down through the Forest will be diverted by water users in the order of their priority, resulting in no appreciable change to stream flow within or outside the Forest boundary.

Finally, attempting to revise the Forest Plan to acquire more than is provided for in the 81CW183 Decree could result in the loss of water rights and water for the Forest. The RGWCD and the water users bargained for, and the Forest Service agreed to, specific reopener provisions if the Forest Service were to attempt to alter the bargain represented by the stipulated Decree:

> This decree may be reopened if the U.S.D.A. Forest Service, in the exercise of its power to grant or deny land use authorizations on National Forest System lands within Water Division No. 3, acts to increase or maintain stream flows, reduce depletions to stream flows, provide favorable conditions of water flow, or provide water for any of the purposes set forth in Paragraphs 14, 15 or 16, above, by: (a) requiring the owner of an Existing Water Right to forego the exercise of all or part of its decreed water right or to relinquish water diverted or stored in priority under its decreed water right, or (b) otherwise taking any action to prevent or interfere with the exercise of all or a part of an Existing Water Right.

81CW183 Decree, ¶ 19. Reopening the 81CW183 Decree will result in the Forest Service having to return to Water Court to "prove its entitlement to and quantity of reserved instream flow water rights for Organic Administration Act purposes within the geographic area subject to reopening." 81CW183 Decree, ¶ 24.a. As you are no doubt aware, the Forest Service has not met with success in courts across the Western United States when required to prove, at trial, its claims for broad Federal Reserved water rights. Therefore, if the Forest Service were to attempt to revise the Forest Plan resulting in a potential injury to the water right of a water user, the Forest Service would not only not gain additional water, but potentially lose what it already has.

You must understand, we negotiated the 81CW183 Decree. We agreed that the Forest Service could have a decree that went far beyond what any Court has recognized as the limitations of the Forest Service's authorities. Should the Forest Service seek to acquire additional water rights, in any way inconsistent with the provisions of 81CW183, we will expect to exercise our right under the reopener provision. Please do not be led into this situation by those who live outside the Valley and care nothing for its people, its society and the agreements you have reached. Integrity is far more important.

4

The District recognizes and appreciates that one of the changes under consideration is incorporating "the negotiated in-stream flow water rights language and decree between the Rio Grande National Forest and the State of Colorado from 2000" into the revised Forest Plan. Needs for Change Document, Table C4. This, of course, is an action that the District would whole-heartedly support. However, we remain concerned that some of the other contemplated revisions, particularly the potential inclusion of 34 stream reaches in the National Wild and Scenic River System, as well as the stated "Forest-wide Goals," if implemented, may result in Forest Service action that is at odds with the terms and conditions in the 81CW183 Decree. It is imperative that the revised Forest Plan honors the negotiated compromise that is embodied in the 81CW183 Decree and respects San Luis Valley water rights and the community as a whole.

In addition to the concerns noted above, we offer the following general comments regarding the Proposed Action and Need for Change topics:

- The District supports revising the current Plan "to include management approaches that consider local economies, markets, and partnership opportunities as tools for meeting desired conditions." Needs for Change Document, Table B4. This approach can be particularly effective in achieving desired conditions in the areas of habitat conservation and the protection of wildlife and plant species, as demonstrated by the San Luis Valley Regional Habitat Conservation Plan and other similar community-based conservation efforts.

- In a similar vein, the District agrees that "opportunities exist to emphasize collaborative stewardship of watersheds and the interrelated biological, economic, and social factors that affect these areas." Proposed Action, p.7. We encourage the Forest Service to develop a Plan that maximizes opportunity for collaboration, voluntary efforts, and community involvement to reach desired goals.

- Lastly, the District opposes the imposition of any new bypass flow requirements, or any conditions or limitations related to privately-held water rights, as a condition of new, renewed, or amended Special Use Permits.

For all of the foregoing reasons, the Rio Grande Water Conservation District requests the Forest Service not revise the Forest Plan in any way that could affect or impact the terms or spirit of the 81CW183 Decree or otherwise impact vested water rights in the San Luis Valley. The District looks forward to continuing to work with the Forest Service within the San Luis Valley for many years to come.

Thank you again for the opportunity to provide the RGWCD's views on this critical issue.

Sincerely,

Cleave Simpson
General Manager
Rio Grande Water Conservation District

Rvsd Plan - 00003479

Rvsd Plan - 00003480

October 28, 2016

To whom it may concern,

The San Juan Back Country Horsemen in Pagosa Springs, and the Trail Wise Back Country Horsemen in Del Norte/SLV, both chapters of Back Country Horsemen of America, would like to be involved in your LMP revision process. We appreciate this opportunity to help develop a new plan that will meet the needs of the Forest Service, its constituents and the land.

We are interested in the Rio Grande National Forest overall, and between our two chapters we work in many of the forest areas. We work, partner and ride on the Divide RD, Conejos RD, and Saguache RD, especially in the Weminuche Wilderness, South San Juan Wilderness, and La Garita Wilderness, and in the Creede/Wheeler areas. Each year we work on facilities and trails in the Thirty Mile area of the Rio Grande River, and we've come to appreciate our FS partnership and the work we get done together there.

In general, we support Wilderness goals and objectives that maintain quality Wilderness lands into the future, and Wilderness access for non-mechanized recreational purposes, including traditional access for stock users. We are interested in all resource aspects of the management of our public lands, including wildlife, noxious weeds, un-roaded areas, Wilderness, and recreation, including trails management.

Our initial thoughts on the current Proposed Action (PA) are:
- Given how important stock use is on the Rio Grande National Forest, including by recreational back country users such as ourselves, by outfitters and guides, hunters, grazing and other permittees, and by FS partners doing trail and other resource work, we hope the RGNF will understand this importance and address it in the LMP revision. The PA, while mentioning general recreational uses earlier in the document (e.g. page 6, para 3), does not appear to list stock use until later in the document (page 25). We realize you cannot mention every activity every time, but hope you will agree that stock use on the RGNF is perhaps as important as picknicking, rock climbing and snowshoeing.
- As important as Wilderness is for back country stock users, and given how recreational uses are specifically mentioned in the Wilderness Act, we would call your attention to the point that recreational uses are not mentioned in the 'Tactical Domain – Management Areas – Proposed Management Area 1.1 – Designated Wilderness' section on page 23, while recreational uses appear to be mentioned in every other management area description on the following pages. We understand that uses are implied in the Wilderness section, but hope you will add more here, as it is our firm belief that recreational users and others help form the strong support base for Wilderness that exists today.
- In the document in general you talk about "horseback riding" as a recreational activity, which is correct, of course, but also possibly misses the point a little, considering the relatively large amount of back country stock and pack stock use that occurs on the RGNF.
- Given the current situation at the Wolf Creek Ski Area regarding the potential construction of a village, we were somewhat surprised to read the management area description on page 33 and not see a mention of maintaining quality wildlife/biological habitat and Wilderness in the surrounding area, especially connected migration corridors and the consideration of the potential connected impact(s) of expanded development effects on surrounding forest management areas and resources, including Wilderness. We realize detailed analysis is coming, and that we are talking about two separate management areas, but as important as this matter is it seems that the PA should mention these things in the ski area management area, similar to how things appear to be addressed or mentioned in other management area descriptions. We do not raise this concern as an 'issue', but suggest such consideration should perhaps be a common core, landscape-level resource management value.

Both the Trail Wise and San Juan chapters of Back Country Horsemen of America appreciate the work you've done with the Proposed Action, and hope you will consider our current and future

Rvsd Plan - 00003481

comments within the context of partnership, and that they are well-meant. We look forward to working with you so the RGNF LMP revision will be a success we can all be proud of and use in the future to manage our valued national forest lands.

Sincerely,

JOHN NELSON, FS Liaison
San Juan Back Country Horsemen
PO Box 3957, Pagosa Springs, CO 81147
928-853-0348, FtValleyPS@aol.com



**Theodore Roosevelt Conservation Partnership Comments on the Proposed Action for the Rio Grande National Forest Land Management Plan**

October 28, 2016

Mr. Dan Dallas – Forest Supervisor, Rio Grande National Forest
Forest Service
1803 W. Highway 160,
Monte Vista, CO 81144
rgnf_forest_plan@fs.fed.us

The Theodore Roosevelt Conservation Partnership (TRCP) appreciates the opportunity to continue working with the US Forest Service (USFS) in the Rio Grande National Forest (RGNF) as it proceeds with a full Land Management Plan (LMP) revision.

Since the RGNF is one of the first forest plans proceeding under the direction of the 2012 Forest Planning Rule, it is especially crucial that the plan results in a balanced approach that represents the interests of those who depend on the forest. Up to this point, we would like to commend the FS for their efforts in instituting this direction, including the opportunity for more public engagement throughout the planning process. The Need for Change and Proposed Action are a good step in the right direction towards developing preliminary alternatives that will benefit hunting, fishing, and fish and wildlife habitat, and could help lead to balanced multiple uses in most of the area analyzed.

There are a diverse number of issues relevant to our sportsman constituents and these comments intend to convey that sentiment in a way consistent with the framework of the planning process. These comments offer what we believe are reasonable changes and/or additions that are backed up by science and generally supported by hunters and anglers. Within the boundaries of the RGNF are a great multitude of resources valued by hunters and anglers, including healthy populations of mule deer, bighorn sheep, elk, Rio Grande cutthroat trout (RGCT), pronghorn, moose, grouse, waterfowl, and a great diversity of habitats that supports these populations cherished by hunters and anglers.

In addition to the inherent value the plants, animals, and their habitats offer to the public, the forest is a significant economic driver that, with proper management, can be maintained indefinitely. Every year, Americans spend $646 billion on outdoor recreation, including gear, vehicles, trips, travel-related expenses, and more. In Colorado, outdoor recreation generates $13.2 billion in consumer spending, 125,000 jobs, $4.2 billion in in wages and salaries, and $994 million in state and local tax revenue.

Rvsd Plan - 00003483

Hunting and fishing in Colorado during 2013 generated $1.3 billion in direct expenditures, supported 18,743 jobs, and generated $306 million in local, state, and federal tax revenue. For perspective, if hunting in the US were a company, the amount spent by sportsmen to support their hunting activities would place it at number 73 on the fortune 500 list. Fishing would come in at number 51.

**2012 Forest Planning Rule**

As mentioned, the RGNF plan revision process is one off the first in the country to proceed under the direction of the 2012 national forest planning rule, and will certainly be used as a model for other forest plan revisions across the country. The TRCP and several sporting organizations from across the country were engaged throughout the 2012 rule-making process and offered significant public comment on the new planning rule. Some key points from the final planning rule, and are relevant here, as follows:

- Guide management so lands are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future. These benefits include clean air and water; habitat for fish, wildlife, and plant communities; and opportunities for recreational, spiritual, educational, and cultural benefits.

- The responsible official shall use the best available scientific information to inform the planning process required by this subpart. In doing so, the responsible official shall determine what information is the most accurate, reliable, and relevant to the issues being considered. The responsible official shall document how the best available scientific information was used to inform the assessment, the plan decision, and the monitoring program as required in §§ 219.6(a)(3) and 219.14(a)(4). Such documentation must: identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered.

- Plans must establish width(s) for riparian management zones around all lakes, perennial and intermittent streams, and open water wetlands, within which the plan components required by paragraph (a)(3)(i) of this section will apply, giving special attention to land and vegetation for approximately 100 feet from the edges of all perennial streams and lakes.

- *Requirements for plan components for a new plan or plan revision*. (1) The plan must include plan components, including standards or guidelines, to provide for:

    (i)    Sustainable recreation; including recreation settings, opportunities, access; and scenic character. Recreation opportunities may include non-motorized, motorized, developed, and dispersed recreation on land, water, and in the air.

2

Rvsd Plan - 00003484

- Timber harvest would be carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and aesthetic resources.

- Coordinate with other federal agencies, States, counties, and local governments, including State fish and wildlife agencies, State foresters and other relevant State agencies. Where appropriate, the responsible official shall encourage States, counties, and other local governments to seek cooperating agency status in the NEPA process for development, amendment, or revision of a plan.

- Habitat conditions, subject to the requirements of § 219.9, for wildlife, fish, and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence, and other activities (in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments).

- Provide multiple-use language for sustainable cultural and historic uses such as hunting, fishing, trapping and horse packing.

In addition to these more specific recommendations, the TRCP and its partners generally agreed with the planning rule's focus on ecological integrity and sustainability of terrestrial and aquatic ecosystems, social and economic sustainability, robust adaptive management, maintaining long-term benefits to habitats for fish and wildlife, and maintaining opportunities for a variety of recreation opportunities, including primitive and semi-primitive hunting and fishing.

Overall, we feel the FS did well incorporating the principles and direction mandated in the 2012 forest planning rule. Below, we discuss some topline issues within the sporting community, as related to the Need for Change and Proposed Actions.

**Habitat Management**

The RGNF holds a number of game species that are enjoyed and used by the public and are important in maintaining economic activity on the forest. Of those, mule deer, bighorn sheep, and RGCT have the highest priority due to their populations being in known decline or very sensitive to changes in their habitats. For this reason we ask that special attention be placed on these three species.

*Mule deer*

Of these three species, only mule deer are not included on the Regional Forester's list of Species of Conservation Concern for the RGNF. We ask that the Regional Forester and Forest Supervisor place mule deer on this list.

Although mule deer populations are relatively stable in the RGNF, their documented decline across many Western states shows the need to get ahead of problems in areas where mule deer populations

Rvsd Plan - 00003485

have been stable, and to take measures to, at the least, maintain population levels, while making an effort to increase populations where wildlife professionals, including Colorado Parks and Wildlife (CPW), feel that an area may be capable of supporting more deer through various management measures.

Numerous studies and reports have documented the decline of Mule deer across their range and we urge the USFS to do a thorough review of studies done by the Western Association of Fish and Wildlife Agencies (WAFWA), CPW, and others when considering the inclusion of Mule deer in the list of Species of Conservation Concern. Included with these comments is a list of recommended literature on Mule deer, although we'd like to highlight the 2003 WAFWA report[1] prepared by their Mule deer working group, and WAFWA's 2016 2016 Range-Wide Status of Mule Deer and Black-Tailed Deer[2] that contain a wealth of information on the justification for including Mule deer on the list of Species of Conservation Concern.

### Bighorn sheep

Bighorn sheep are recognized as Species of Conservation Concern which are well addressed by management zones in the proposed action. In addition to managing these areas for the long-term security of bighorn sheep, buffers between domestic grazing and wild bighorn sheep populations should be established that are based on the best available science and circumstances on the ground.

We recommend using the management direction outlined in the 2009 CPW Bighorn Sheep Management Plan covering management through 2019[3].

### Rio Grande Cutthroat Trout

RGCT are also recognized as a Species of Conservation Concern and are well addressed in the proposed action. It is crucial that as the planning process proceeds, the USFS take into consideration the conservation needs of RGCT.

We recommend following the management direction outlined in the 2013 CPW conservation strategy for RGCT[4].

---

[1] Western Association of Fish and Wildlife Agencies, Mule Deer Working Group. 2003. Mule Deer in the West: Changing Landscapes, Changing Perspectives.

[2] http://www.wafwa.org/Documents%20and%20Settings/37/Site%20Documents/Working%20Groups/Mule%20Deer/Publications2/2016_Mule_Deer_and_BTD_Status_Update_Final.pdf

[3] George, J.L., Kahn, R., Miller, M.W., Watkins, B. 2009. Colorado Bighorn Sheep Management Plan. Colorado Division of Wildlife, Denver, CO.
https://cpw.state.co.us/Documents/WildlifeSpecies/Mammals/ColoradoBighornSheepManagementPlan2009-2019.pdf'

[4] RGCT Conservation Team. 2013. Rio Grande cutthroat trout (Oncorhynchus clarkii virginalis) Conservation Strategy. Colorado Parks and Wildlife, Denver, CO.
https://cpw.state.co.us/Documents/Research/Aquatic/CutthroatTrout/2013RGCTConservationStrategy.pdf

4

Rvsd Plan - 00003486

*Management Areas and Habitat*

As recognized in the management area for deer and elk winter range, these habitats are crucial for maintaining populations commensurate with CPW population objectives. We also recommend that other important habitats recognized by CPW for deer and elk, as well as pronghorn and moose be added to a big game management unit (please see the ungulates section of the referenced and recommended literature section of these comments for numerous studies outlining the importance of these habitats). Habitat delineations that we recommend for inclusion are below:

Elk: migration corridors, migration patterns, production areas, summer concentration areas, and all winter ranges.

Moose: all ranges.

Mule deer: concentration areas, migration corridors, migration patterns, summer ranges, and all winter ranges.

Pronghorn antelope: concentration areas, migration corridors, migration patterns, perennial water sources, and all winter ranges.

*Other Socially and Economically Important Species*

We recommend that other important species that are enjoyed by the public be given a broad-scale management direction with a goal to maintain these populations and their habitat indefinitely. Species include black bear, mountain goats, mountain lions, waterfowl, and wild turkey.

*Fisheries and Aquatic Resources*

Great fishing opportunities exist throughout the forest for a range of species and have a significant impact on local economies. Substantial research[5] shows that the health of most game fish populations is dependent on healthy watersheds, aquatic habitats and sufficient riparian vegetation to maintain a properly functioning ecosystem. In general, fisheries are healthy in the RGNF. We appreciate the goals for maintaining water and aquatic resources in the proposed action, but recommend the inclusion of a goal to maintain high quality wild trout fisheries, with the preference for conserving and maintaining natural fish habitat.

*Coordination with Colorado Parks and Wildlife*

---

[5] Williams, J.E., R.N. Williams, R.F. Thurow, L. Elwell, D.P. Philipp, F.A. Harris, J.L. Kershner, P.J. Martinez, D. Miller, G.H. Reeves, C.A. Frissell, and J.R. Sedell.  2011.  Native Fish Conservation Areas: a vision for large-scale conservation of native fish communities. *Fisheries* 35:267-277.

[6] Dauwalter, D.C., H.M. Neville, and J.E. Williams. 2011 A Landscape-based Protocol to Identify Management Opportunities for Aquatic Habitats and Native Fishes on Public Lands, Phase II: Upper Colorado River Basin. Report to U.S. Bureau of Land Management per Cooperative Agreement PAA-08-0008.  Trout Unlimited, Boise, Idaho.

5

As mentioned, the 2012 national forest planning rule requires the forest to coordinate with state and local wildlife management agencies. Coordination between the USFS and CPW has been sufficient and we encourage continued coordination with CPW on species and habitat management. It is especially important that population objectives set by CPW for species discussed here are honored through coordinated management practices that restore, maintain, and enhance these populations and their habitats.

**Roadless Lands**

The TRCP and several partners were also engaged throughout the Colorado Roadless Rule making process and several of the recommendations submitted by sportsmen were considered and incorporated in the final rule. It is great to see the USFS using these policies directly in the proposed action for the RGNF plan and encourage this in the final plan. Many of the Upper Tier roadless lands are extremely valuable areas for fish, wildlife and hunting and fishing. We strongly support the delineation of roadless geographic areas that includes separate management areas for general and upper tier roadless lands.

**Importance of Access**

Although we are at a point in the planning process that doesn't address travel management, we want to express the importance of retaining access for recreation where agreed upon through a public process. We encourage the USFS to consider reasonable sporting access during future travel management planning during the forest plan implementation process.

We also recommend that the USFS look into ways of improving access to parts of the forest that may be difficult to access or landlocked within private property boundaries. In addition we recommend that the USFS develop priorities for future land and/or easement acquisitions that would facilitate increasing access these hard to reach areas.

**Other Relevant Management Areas**

*Backcountry Management Area*

Backcountry lands in the RGNF offer a unique opportunity for primitive and semi-primitive recreation including hunting and fishing. These lands also provide important habitat security for mule deer and elk. Although backcountry lands often overlap with lands recognized as roadless, or those recognized for their habitat values, this isn't always the case. We appreciate the inclusion of the backcountry management area that focuses on providing these quality hunting and fishing opportunities and is dedicated to maintaining the undisturbed character of these lands.

*Bighorn Sheep Management Area*

Rvsd Plan - 00003488

The bighorn sheep management area is a great way to focus additional management attention to this crucial species. We recommend that the USFS establish a strict buffer between domestic and wild sheep that ensures no physical contact between domestic and wild sheep and prevents overlap within seasonal habitats that could lead to the transmission of disease.

**Timber Management**

As mentioned in the USFS planning documents, timber management in the RGNF is primarily being done with by salvaging beetle kill spruce timber for wood products, and some operations focused on mimicking natural disturbance events. We recommend the prioritization of active restoration to use harvest as management tool in restoring and enhancing fish and wildlife habitat, especially crucial habitats, where appropriate.

We also recommend that the USFS develop vegetation management objectives for roadless areas in a way that is consistent with the Colorado Roadless Rule. The roadless rule allows for vegetation management as long as it maintains the characteristics of roadless areas (see section § 294.42 Prohibition on tree cutting, sale, or removal). We believe that some habitat restoration can occur in roadless areas in a way that is consistent with the rule, such as aspen regeneration projects.

**Wildfire Management**

The most important aspect of wildfire management is the protection of life and property. We fully support the direction of the USFS regarding fire management on the wildland urban interface.

In areas of the forest that are not important for community protection, natural fire process in the RGNF have largely been suppressed and the fuel loads are generally high. As recommended in the USFS planning documents, we recommend following the direction of the fire management zones. As discussed, fire management can often be used as a tool in wildlife management as it can be a great benefit to wildlife pursued by hunters and anglers. As the planning process moves forward we recommend identifying areas where fire can used as a management tool to enhance and restore wildlife habitat values.

**Implementation and Adaptive Management**

In order for the USFS's planning efforts to be successful, significant implementation, monitoring, and adaptive management measures need to be implemented thoroughly and responses need to be as close to real time as possible. If implemented thoroughly, we feel that the general management direction outlined in the need for change and proposed actions (following the direction of the 2012 planning rule) would go a long way in ensuring proper adaptability of the management situation over the life of the plan.

We strongly support efforts to increase funding for actions that will allow for the proper implementation of federal land management plans.

Rvsd Plan - 00003489

Rvsd Plan - 00003490

**Conclusion**

In general, we feel that the USFS is moving in the right direction in efforts to strike a balance between maintaining access to hunting and fishing, providing long-term recreation opportunities, allowing for a wide range of multiple uses, and safeguarding important fish and wildlife habitat. We feel that incorporating the recommendations discussed in these comments would go a long way in helping to achieve this balance and we strongly encourage the USFS to consider them as you move forward in the planning process.

We appreciate the opportunity to provide comments on changes that we feel are appropriate at this stage of the planning process, are supported by science and hunters and anglers, and are realistic given the reality of the management situation on the ground. We look forward to continuing to work with the USFS and other stakeholders to add to these comments and provide any further information that is needed as this process moves forward.

Sincerely,

Nick Payne
Colorado Field Representative
Theodore Roosevelt Conservation Partnership
1440 Williams St. C.
Denver, CO 80218

Please send replies to the address above and:

TRCP
529 14th Street NW, Suite 500
Washington, D.C. 20045

CC:

Erin Minks
eminks@fs.fed.us

Mike Blakeman
mblakeman@fs.fed.us

**Referenced and Recommended Literature**

8

**Attachments**

TRCP. 2013. The economic impact of hunting and fishing in Colorado.

TRCP. 2012. The buck stops here: sportsmen safeguarding our National Forests & Grasslands.

TRCP. 2011. Proposed CO rule sportsmen's solutions.

**Bighorn Sheep**

George, J.L., Kahn, R., Miller, M.W., Watkins, B. 2009. Colorado Bighorn Sheep Management Plan. Colorado Division of Wildlife, Denver, CO.

**Mule Deer and Elk**

Balm, P.H.M. 1999. Stress physiology in animals. CRC Press Inc. Boca Raton, FL. 296 pp.

Barber, J.R., K.R. Crooks, and K.M. Fristup. 2010. The costs of chronic noise exposure for terrestrial organisms. Trends in Ecology & Evolution 25:180-189.

Bartmann, R.M., G.C. White and L.H. Carpenter. 1992. Compensatory mortality in a Colorado mule deer population. Wildlife Monographs 121:1-39.

Berry, C., and R. Overly. 1976. Impacts of roads on big game distribution in portions of the Blue Mountains of Washington. Pages 62-68 in Hieb, S.R. editor. Proceedings of the Elk Logging Roads Symposium. Moscow, Idaho. December 16-17, 1975. Forest, Wildlife and Range Experiment Station, University of Idaho, Moscow. 142 pp.

Farrell, J. E., L. R. Irby, and P. T. McGowen. 2002. Strategies for ungulate-vehicle collision mitigation. Intermountain Journal of Sciences 8:1-18.

Freddy, D. J., W. M. Bronaugh, and M. C. Fowler. 1986. Responses of mule deer to disturbance by persons afoot and snowmobiles. Wildlife Society Bulletin 14:63-68.

Forman, R. T. T., D. Sperling, J. A. Bissonette, A. P. Clevenger, C. D. Cutshall, V. H. Dale, L. Fahrig, R. France, C. R. Goldman, K. Heanue, J. A. Jones, F. J. Swanson, T. Turrentine, and T. C. Winter. 2003. Road Ecology: Science and Solutions. Island Press, Washington, D.C.

Gamo, R. S. and S. H. Anderson. 2002. Use of reclaimed mine lands by pronghorn and mule deer. Interm. J. Sciences. 8:213-222.

Kuck, L., G. Hompland, and E. H. Merrill. 1985. Elk calf response to simulated mine disturbance in southeast Idaho. Journal of Wildlife Management 49:751-757.

Rvsd Plan - 00003491

Lendrum, P. E., C. R. Anderson, Jr., R. A. Long, J. G. Kie, and R. T. Bowyer. 2012. Habitat selection by mule deer during migration: effects of landscape structure and natural-gas development. Ecosphere 3(9):82.

Lutz, D. W., M. Cox, B. F. Wakeling, D. McWhirter, L. H. Carpenter, S. Rosenstock, D. Stroud, L. C. Bender, and A. F. Reeve. 2003. Impacts to changes to mule deer habitat. Pages 13-61 in J. C. DeVos, Jr., M. R. Conover, and N. E. Headrick eds. Mule Deer conservation: issues and management strategies. Berryman Institute Press. Utah State University, Logan, Utah.

Lutz, D. W., J. R. Heffelfinger, S. A. Tessmann, R. S. Gamo, and S. Siegel. 2011. Energy Development Guidelines for Mule Deer. Mule Deer Working Group, Western Association of Fish and Wildlife Agencies, USA.

Medcraft, J. R. and W. R. Clark. 1986. Big game habitat use and diets on a surface mine in northeastern Wyoming. J. Wildl. Manage. 50:135-142.

Merrill, E. H., T. P. Hemker, K., K. P. Woodruff, L. Kuck. 1994. Impacts of mining facilities on fall migration of mule deer. Wildlife Society Bulletin 22:68-73.

New Mexico Department of Game and Fish. 2004. Guidelines for Oil and Gas Development, Santa Fe, New Mexico.

Rost, G. R. and J. A. Bailey. 1979. Distribution of mule deer and in relation to roads. Journal of Wildlife Management 47:634-641.

Riley, T. Z., E. M. Bayne, B. C. Dale, D. E. Naugle, J. A. Rodgers, and S. C. Torbit. 2012. Impacts of crude oil and natural gas developments on wildlife and wildlife habitat in the Rocky Mountain region. The Wildlife Society Technical Review 12-02. The Wildlife Society, Bethesda, Maryland, USA.

Sawyer, H., F. Lindzey, D. McWhirter, and K. Andrews. 2002. Potential Effects of Oil and Gas Development on Mule Deer and Pronghorn Populations in Western Wyoming. Transactions of the 67th North American Wildlife and Natural Resources Conference 67:350-365.

Sawyer, H. R. M. Nielson, F. Lindzey, and L. L. McDonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. J. Wildl. Manage. 70:396-403.

Sawyer, H. M.J. Kaughman, and R.M. Nielson. 2009. Influence of Well Pad Activity on Winter Habitat Selection Patterns of Mule Deer. Journal of Wildlife Management. 73(7): 1052-1061.

Southwick Associates. 2012. Sportsmen for Responsible Energy Development Report – Conserving Lands & Prosperity. Seeking a Proper Balance Between Conservation and Development in the Rocky Mountain West.

Rvsd Plan - 00003492

Southwick Associates. 2012. Sportsmen for Responsible Energy Development Report – Conserving Lands & Prosperity. Seeking a Proper Balance Between Conservation and Development in the Rocky Mountain West. Case study: Cody, Wyoming.

Stalling, David. 2003. Gas and oil development on western public lands; impacts on fish, wildlife, hunting, and angling. Trout Unlimited-Public Lands Initiative.

Tessmann, S., J. Bohne, B. Oakleaf, B. Rudd, S. Smith, V. Stetler, D. Stroud, S. Wolff. 2004. D RAFT: Minimum Recommendations to Sustain Important Wildlife Habitats Affected by Oil and Gas Development: A Strategy for Managing Energy Development Consistently with the FLPMA Principles of Multiple Use and Sustained Yield. Wyoming Game and Fish Department.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology 14:18-30.

Western Association of Fish and Wildlife Agencies, Mule Deer Working Group. 2003. Mule Deer in the West: Changing Landscapes, Changing Perspectives.

Wyoming Game and Fish Department. 2009. Recommendations for Development of Oil and Gas Resources within Important Wildlife Habitats. Cheyenne, WY.

**Rio Grande Cutthroat Trout**

RGCT Conservation Team. 2013. Conservation Agreement for Rio Grande Cutthroat Trout *(Oncorhynchus clarkii virginalis)* in the states of Colorado and New Mexico. Colorado Division of Parks and Wildlife, Denver, CO.

RGCT Conservation Team. 2013. Rio Grande cutthroat trout (*Oncorhynchus clarkii virginalis*) Conservation Strategy. Colorado Parks and Wildlife, Denver, CO.

RGCT Conservation Team. 2013. Rio Grande cutthroat trout (*Oncorhynchus clarkii virginalis*) Range Wide Report. Colorado Parks and Wildlife, Denver, CO.

Rvsd Plan - 00003493



**Sent via email to: rgnf_forest_plan@fs.fed.us**

October 28, 2016

Erin Minks
Forest Planner
Rio Grande National Forest
Forest Plan Revision
1803 US Hwy 150
Monte Vista, CO 81132

### RE: Comments on Rio Grande National Forest Plan Revision Process: Proposed Action

Dear Ms. Minks,

Please accept the following comments from Trout Unlimited (TU) on the Rio Grande National Forest's (RGNF) Proposed Action document. We appreciate the Forest Service's invitation to participate in the planning process and for working with TU and other stakeholders in the assessment phase under the 2012 Planning Rule.

Trout Unlimited is the nation's oldest and largest coldwater conservation non-profit organization with more than 150,000 members nationwide dedicated to conserving, protecting and restoring North America's trout and salmon fisheries and their watersheds. Since 1959, TU staff and volunteers have worked toward the protection of sensitive ecological systems necessary to support robust native and wild trout populations in their respective ranges. We recognize the high value of public lands and the role public lands play in providing habitat to coldwater fisheries, drinking water, and wildlife habitat. Trout Unlimited believes that the actions taken on public lands are ultimately reflected in the quality of fish and wildlife habitat and their populations.

In Colorado, TU plays a critical role in watershed conservation, restoration, and rehabilitation on public lands, particularly our forests. Twenty-four chapters and 10,000 members statewide actively participate in projects with the National Forest, local communities, and private landowners in order to maintain the larger important forest landscape that is so vital to the social and economic community in this area. The San Luis Valley TU chapter has a long term relationship with the Rio Grande National Forest including recent projects such as restoration on the Hidden Mile of the Conejos, and native Rio Grande cutthroat trout reintroduction.

The RGNF is host to the majority of all headwater habitat for a truly unique and native fish – the Rio Grande cutthroat trout (RGCT). Because these fish are only found in specific and limited places,

protection of their watersheds and habitats are especially important. Rio Grande cutthroat trout have adapted to this region for eons; they are a part of our culture and angling heritage. Trout Unlimited has worked on RGCT issues consistently over many years, and we are excited to take advantage of this opportunity in the planning process to ensure even better protections for these fish.

As sportsmen we have considerable stake in the management direction, strategy, and priorities of the RGNF's new planning process. These are the lands on which we fish and hunt, and we feel privileged to participate in the public process that guides the management of those resources. Members of TU believe in multiple uses of the forest but care deeply about the coldwater fisheries, big game habitat, pristine watersheds, and backcountry areas. We look forward to working with the Forest Service throughout the plan revision process.

### The Sportsmen's Vision for the Rio Grande National Forest

Angling and hunting are important uses of National Forest lands. These uses are dependent on high quality waters, outstanding habitat conditions, intact watersheds and appropriate access. Typically these uses are lumped in with other recreational uses such as hiking, skiing, sightseeing and camping and receive no specific management guidance. Frequently there is significant attention to biodiversity, viability and habitat conditions but rarely if ever is there a direct linkage to sportsmen and their use of these public lands for their traditional activities.

The focus on habitat and biological needs of fish and wildlife species is certainly needed and an important component of a well-developed Forest Plan but it often provides little incentive for the sportsmen/women community to become engaged in the Forest Service planning process. Through the use of various management tools, Trout Unlimited (TU) hopes to assist the Forest Service in their planning to the benefit of multiple uses and traditional sporting values.

What follows under the "Sportsmen's Vision" section are geographical areas of concern and some considerations for their management. Discussed elsewhere in this document are possibilities of how these considerations might become reality in a revised forest plan. Please refer to the attached map for more detailed locations of defined areas.

Trout Unlimited realizes that complexity in management designations can be challenging for Forest Service managers to implement. However, we feel that within the new planning framework there are multiple scenarios where layered management directions would be a benefit when it comes to the management of fish and wildlife habitat and their recreational uses, and Trout Unlimited asks them to be considered under an Alternative in the Revised Forest Plan. What is most important, regardless the designation associated with these recommendations and polygons, is the focus on management from a fish and wildlife centric point of view.

### Sportsmen's Emphasis Areas

Generally, a Sportsmen's Emphasis Area (SEA) could be defined as "a geographic area that is managed

with an emphasis on providing quality opportunities for angling and hunting by protecting and restoring fish and wildlife habitat for key species."

*Considerations for management of all Sportsmen's Emphasis Areas:*

- Big Game
    - o Promote backcountry hunting experiences by limiting new road and trail development in existing roadless areas
    - o Develop road and trail density guidelines and alignments that are conducive to intact big game habitat
    - o Seasonal closures to motorized trail travel in roadless areas to coincide with archery season where appropriate
- Fisheries
    - o Prioritize watersheds with wild and native fisheries wherever possible for restoration or improvement
    - o Manage fisheries for high quality and also for recreational use
    - o Maintain or improve riparian health
    - o Manage waterways to retain their outstanding Wild and Scenic values
- Stipulations to future development scenarios to protect fish and big game habitat such as No Surface Occupancy (NSO), No Ground Disturbance (NGD), and Timing Limitations (TL), where appropriate
- Seasonal closures and timing restrictions to permitted industries where beneficial to greater health of fish and wildlife

**Areas to consider as Sportsmen's Emphasis Areas:**

*Saguache Park Area*

Suitability

- Rio Grande cutthroat trout in upper reaches of watershed
- Nearly every big game species represented for hunting
- Connection between high alpine environments to low lying sagebrush and winter range with little to no disturbance
- Geographically isolated from major population centers
- Limited total existing roads and trails
- Low elevation canyon habitat for Big Horn Sheep
- Saguache Creek is Wild and Scenic Eligible
- Potential future RGCT restoration sites

*Divide Peaks Area*

Suitability

Rvsd Plan - 00003496

- Superb big game habitat, home to Game Management Unit 76, one of the most sought after elk units in the state
- Big Horn Sheep production and concentration areas
- Moose priority habitat
- Connections to large areas of existing wilderness and upper tier roadless areas
- Many coldwater fisheries, both streams and stillwater
  - Unique lake run populations

*Silver Peak Area*

Suitability

- Includes largest Elk production area on the RGNF as well provides as severe winter range
- Big Horn Sheep winter and summer habitat concentrations
- Many native trout strongholds including Jim Creek RGCT Focus Area
- Provides watershed protection for Wild and Scenic eligible portion of Conejos River
- Encompasses a large continuous section of upper tier roadless area

*Los Piños Area*

Suitability

- Provides crucial protection for highly important game migration corridor from Carson National Forest to the south
- Harbors many native trout fisheries
- Hosts migration corridors from summer to winter range for local herds
- Connects adjacent public lands and similar management goals with larger landscape of the greater Rio Grande basin

**Rio Grande Cutthroat Trout Focus Areas**

Rio Grande cutthroat trout currently occupy only 12% of their native stream habitat. There has been significant work on this Forest and others to achieve a sustainable population of these remarkable fish across the larger landscape, and the current Forest Plan revision is a chance to assist those efforts and promote the long term success of our native fish. It is a chance for partnering with other organizations and scientific efforts, and probably the best chance we have collectively to meet some of the goals of the 2013 Rio Grande Cutthroat Trout Conservation Strategy[1].

Specially designated locations and areas on the Forest would go a long way in meeting many of these directives as well as overall Forest-wide goals and objectives. The proposed RGCT Focus Areas would protect the legacy fish of this region by facilitating future protections, studies, and reintroduction and

---

[1]RGCT Conservation Team. 2013. Rio Grande cutthroat trout (Oncorhynchus clarkii virginalis) Conservation Strategy. Colorado Parks and Wildlife, Denver, CO.
https://www.fws.gov/southwest/es/newmexico/documents/RGCT_conservation_strategy_final_12-10-13.pdf

protect current populations. Be this designation a Special Wildlife Management Area, or under a Conservation Watershed Network (see comment section below), we feel that the Plan Revision should address this topic in detail in a proposed Alternative.

*Considerations for management of all RGCT Focus Areas:*

- Prioritization of partner projects for restoration and rehabilitation
- Where appropriate recommend designations of recreational populations of RGCT
- Any timber sales need be consistent with the priority purpose of restoration and protection of Rio Grande cutthroat trout
  - o  Additional analysis process for any timber harvest permits to prioritize projects reducing risk of post fire flooding and meet strict standards to protect waterways from potential negative impacts
- No new extractive energy and mineral leases in conservation population watersheds – dependent on future success of maintaining these populations and establishment of new ones
- Strict water quality and riparian health standards, focused on health of RGCT, which are measureable incorporated into the Forest monitoring plan
- Reevaluation of grazing allotments overlapping known RGCT populations and future project areas to encourage mutually beneficial riparian use for fish and permittee

*Sangre De Cristo Area*

Suitability

- Emerging research on existing pure populations
- Unique remoteness and lack of motorized access provides very strong protections
- Habitat is relatively safe from future climate concerns

*Carnero Creek Area*

Suitability

- Recent history of multiple populations across a large watershed
- Potential for a recreation population due to current uses
- Former and ongoing FS/USGS projects to improve habitat - culvert removal

*Jim Creek Area*

Suitability

- Heavy investment from many stakeholders in Jim Creek restoration
- Projects ongoing and approved for future years

**Priority Watersheds**

Rvsd Plan - 00003498

Trout Unlimited acknowledges that the definition of a Priority Watershed in the plan revision process comes with official distinctions. The Watershed Condition Framework is the primary guiding tool for the evaluation of watershed health across the Forest. Ultimately the outcome of the Framework analysis guides management objectives, but it also prioritizes work and funds on the ground. Because the evaluation framework is not open for public comment, and because Trout Unlimited has concerns about the scale of the analysis (level 8 watersheds) we have included here some watersheds to consider for further evaluation of overall health. Please also consider these watershed's potential for having restoration work and resources allocated, and ultimately for their inclusion as priority watersheds with the hopes of meeting forest wide objectives for their improvement over the course of the revised plan's lifespan. Put more plainly, we feel the following places would be good candidates for measureable improvement and TU would like to assist in any such improvement efforts in these watersheds specifically.

*Considerations for management of all Priority Watersheds:*

- Prioritization to protect and restore watershed and riparian conditions
- Reevaluate future threats and past impacts to individual watersheds - mining, energy development, overgrazing, timber harvest etc and create management plan accordingly
- Inventory species of conservation concern within watersheds

*Middle Creek Watershed*

Suitability

- Multiple conservation populations of RGCT
- Severe watershed and riparian degradation in certain areas
- Existing and future projects
- Grazing leases throughout - potential for future partnership

*Kerber Creek Watershed*

Suitability

- The only watershed on the forest listed as in "poor" condition
- Long legacy of mining affects to watershed and aquatic health
- Existing efforts in restoration of mining impacts by Forest Service, State of Colorado, private land owners, and Trout Unlimited

*Upper Saguache Creek Watershed*

Suitability

- Current RGCT populations and high potential for future projects
- Conditions have been degrading in overall watershed health and riparian ecosystem health - now is the chance to reverse this trend for multiple benefit

*West Alder Creek Watershed*

Suitability

- Stronghold conservation population of RGCT

*Lake Fork of the Conejos Watershed*

Suitability

- Upper tier roadless
- Under threat from increased motorcycle use
- RGCT in fluvial and lacustrine populations

*Upper Chama River Watershed*

Suitability

- Only existing priority watershed on the Forest
- Pristine condition in upper reaches but faces multiple threats from human impact

**Protect Big Game Habitat**

Conservation of big game means looking at the big picture. Landscape level movement, high quality waters, outstanding habitat conditions, intact watersheds and appropriate access all play a part. Our vision looks at the big picture view and asks for a practical management strategy on the Rio Grande National Forest.

A combination of Big Game Emphasis Areas and Sportsmen's Emphasis Areas would provide a means for protecting the sustainability of big game herds and habitat while promoting the recreational pursuit of game. This layout includes a balance of backcountry areas for game refuge and quiet hunting opportunities, while recognizing the need and want for other ways of accessing productive hunting grounds.

*Considerations for management of all Big Game Protection Areas:*

- Seasonal closures for motorized trail travel
- Road closures where appropriate
- Area closures in concentrated areas of severe winter range
- Timing restrictions on industrial and permitted use
- Closure to over snow motorized travel off of designated routes

*Cyclone Mountain Area*

Suitability

- Winter Range for Elk and Mule Deer
- Largest concentration of Severe Winter Range for both species on RGNF

- Migration corridors connects from Weminuche and La Garita Wilderness and Saguache Park Sportsmen's Emphasis Area

*The Sportsmen's Vision*

The Sportsmen's Vision for the Rio Grande National Forest would protect and enhance key fish and wildlife habitat while providing opportunities for traditional sporting values. As hunters and anglers we rely on the land in ways that other recreationists don't. As such, our responsibility is to a large landscape and a larger set of parameters.

It is well known that places void of large human influence are of pristine nature and typically provide the best quality fishing, hunting, and backcountry experience. Wilderness and Roadless Areas have been previously identified. Combining and linking these already designated areas with the Geographic and Management Areas of the Sportsmen's Vision shows a landscape that is not only diverse in its possible uses, but also in its protections.

The vision presented here accounts for a large portion of the total forest, but does so in a way that is inclusive of many interests. We feel this vision would create an outstanding future for the users of the Rio Grande National Forest and for the wildlife and habitat they depend on.

**General Comments to the Proposed Action**

*Conservation Watershed Network for Native Fish*

Trout Unlimited would like to bring forward a tool used recently in other Forest Plan revisions for a forest wide analysis, yet watershed based, approach to managing native fish habitat. From Appendix E of the Flathead National Forest's Draft Revised Forest Plan[2]:

> A Conservation Watershed Network is a collection of watersheds where management emphasizes habitat conservation and restoration to support native fish and other aquatic species. The goal of the network is to sustain the integrity of key aquatic habitats to maintain long-term persistence of native aquatic species. Designation of Conservation Watershed Networks, which should include watersheds that are already in good condition or could be restored to good condition, are expected to protect native fish and help maintain healthy watersheds and river systems. Selection criteria for inclusion should help identify those watersheds that have the capability to be more resilient to ecological change and disturbance induced by climate change. For example, watersheds containing unaltered riparian vegetation will tend to protect streambank integrity and moderate the effects of high stream flows. Rivers with high connectivity and access to their flood-plains will experience moderated floods when compared to channelized and disconnected stream systems. Wetlands with intact natural processes slowly release stored water during summer dry periods, whereas impaired wetlands are likely less effective retaining and releasing water over the season. For all of these reasons, Conservation Watershed Networks represent the best long-term conservation strategy for native fishes and their habitats.

Applied to the Rio Grande National Forest, Trout Unlimited feels that this type of multi-scale analysis and corresponding management directives would be an outstanding way to accomplish a host of Forest-

---

[2] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf

wide goals while still allowing flexibility and adaptive management on the ground and at the project level. This Native Fish specific outlook is especially practical on the Rio Grande National Forest because of the nature of the designated protections in the headwaters. The Flathead National Forest's Draft Revised Forest Plan raises the same point:

> Many watersheds on the forest that support the healthiest populations of native trout already have their headwaters protected through lands managed as Congressionally-designated wilderness areas or the Flathead's wild and scenic rivers. These special places are the building blocks of a conservation network as naturally functioning headwaters have a large influence on the function of downstream stream reaches.

Pages 20-21 of the Flathead National Forest's Draft Revised Forest Plan outline Desired Conditions, Objectives, and Standards and Guidelines for the areas considered as a Conservation Watershed Network. TU feels these are good examples, but would like to work with Forest staff to evaluate what might be more applicable to the local landscape and the RGCT specifically.

Following the Forest Wide Directive of Conservation Watershed Network in the Flathead National Forest Draft Revised Forest Plan is the establishment of Riparian Management Zones[3]. These Zones, applied to watersheds without native fish, would complement the Conservation Watershed Network and provide the best possible management parameters towards meeting the Forest-wide goals of this plan revision. Many of the other suggested areas in this document could easily fall under these two categories, and would perhaps better suit the plan revision framework as discussed in the Proposed Action.

The development and incorporation of a Conservation Watershed Network for Native Fish and Riparian Management Zones, or some combination of the two, into the Forest-wide Directives of the preferred Alternative is Trout Unlimited's primary suggestion and contribution in this forest plan revision process. We believe that this could be a giant step in the right direction for the Rio Grande cutthroat trout in the context of the most recent science, and would open the doors for years of future partnerships and on the ground implementation on the Rio Grande National Forest. Trout Unlimited would be excited to participate in the creation of a similar, locally sensitive, framework and to be active in the implementation of those objectives throughout the lifespan of the newly revised Rio Grande National Forest Plan.

*Suction Dredge Mining*

Suction dredge mining is an increasingly important topic of consideration for Trout Unlimited. This type of extraction comes with the possibility of negative impacts to fish and fisheries. At a small or large scale, the basis of operation is set up to be damaging to waterways. The best case scenario in these instances is site specific impact, and the worst case being long lasting and widespread implications. Whether recreational use or otherwise, Trout Unlimited would like to see some directives in this plan revision specifically to address suction dredge mining on the Rio Grande Forest. Trout Unlimited does not stand against all suction dredge mining, but the current free-for-all policy would be potentially problematic and better addressed in the plan revision than a plan amendment. As an organization, TU has worked on this issue from state legislatures down to project level and would be interested in working with the Forest in more detail to craft specific language for suction dredge mining.

---

[3] Flathead National Forest Draft Revised Forest Plan, p 21-23.

**Specific Comments to the Proposed Action**

*Strategic Framework*

> *Table 1.1 Management Area Designations – Management Area Integer*

The topic of Management Area Integers and "Overall Area Emphasis" as seen on page 3 of the Proposed Action should be expanded. As discussed throughout this document, the inclusion of fish and wildlife focused management is lacking, and this is a possible strategy Trout Unlimited would recommend for incorporating some of the proposed "Sportsmen's Vision". We would see the benefit in reorganizing numbers 4 and 5 specifically (PA Table 1.1, p. 3). Also, justification and explanation for these management integers, as well as associated Desired Conditions, monitoring protocol, and Standards and Guidelines is missing.

Without more information it is difficult to comment on these distinctions, however a recreational specific overall area emphasis, represented by the first integer, with a smaller integer to focus on sporting recreation would be advantageous in formulating corresponding resource directions for managing activities on the forest. Trout Unlimited certainly feels as though lumping together of hunting and fishing into other recreation is a far stretch, and should be outstanding from generic recreation as well as "General Forest Management" under integer 4. Not only do these types of recreation require different management approaches, their financial commitment to management and conservation on the forest is second to none. To increase partnership participation and engagement with active management a specific Sportsmen's focus would go a long way.

Here too would be a logical fit for incorporating a Conservation Watershed Network and Riparian Management Zones.

*Forest-wide Goals*

In general, Trout Unlimited applauds the goals as stated and discussed in the Proposed Action. They are well guided and forward thinking. All goals match up well with the mission of Trout Unlimited, and the Sportsmen's Vision for the forest. Especially important, we feel, are the opportunities for collaboration and partnership when specifically applied to watershed and ecosystem health. In the development of the DEIS, we hope to see further explanation of these possibilities. Trout Unlimited would like to be considered partners in these efforts and will continue to remain engaged and active in the plan revision process and into the future implementation of the plan.

To add to an already substantial Goal 3, TU suggests adding language from the original National Forest Reserve Act of 1891 to protect and manage watershed and forest health for the benefit of flood mitigation, water supply and water quality.

**Strategic Domain**

*Forest-wide Desired Conditions*

Rvsd Plan - 00003503

Not noted in the Proposed Action is any need for change from the 1996 Desired Conditions. Trout Unlimited agrees that the language in the majority of the Forest Wide Desired Conditions is good; but we feel that acknowledging the changes since the past plan was originally created need to be a part of the revision process. Changes in local economy, forest based economy, recreation, and science should all be guides for going forward. The new goals are set and desired conditions established for ways of guiding management towards those goals. At the least, some of that language reflected in the Desired Conditions would be a welcome addition.

*Water and Aquatic Resources*

Overall, we believe the generic terms listed as Desired Conditions under the 1996 plan to be mostly satisfactory. Natural fish habitat above manufactured, natural processes for naturally maintaining stream health, and connectivity to natural floodplains are all certainly important desired conditions. We would add that these conditions be used in evaluation of successful watershed management in the new plan's lifespan. Consider too, that overall watershed health is going to change tremendously in response to disturbances in the forest health, and projections of decreased total precipitation input and in more severe but less frequent events. The water and aquatic resource desired conditions could contain more specific language to beetle kill and climate change. One place this could be of importance is a better descriptor of healthy watersheds as a whole, and specifically their headwaters. Resiliency in these systems will be paramount to meeting the Forest's desired conditions, objectives, and goals.

*Minerals*

Trout Unlimited would also like to see historic mining problems corrected and cleaned up. Our involvement in the Kerber Creek drainage has been an example of a success story where collaboration and partnerships can be beneficial to all. Trout Unlimited would like to pursue more mine cleanup projects across the Rio Grande Forest. Additionally, as mentioned elsewhere in this document, TU is concerned with suction dredge mining. Whether this is addressed under mineral extraction or recreation or both, it needs more attention and an update from the previous plan.

*Recreation*

Recreation, we feel has changed significantly since the 1996 plan and updated Desired Conditions should match. Two recommendations to this section would be to monitor and minimize destructive recreational uses, and to reduce recreational user conflict. As stated above, recreational suction dredge mining would be an example of where these issues are played out.

*Objectives*

Objectives specifically for RGCT are missing from the Proposed Action, and from the 1996 plan. Considering the amount of science on the subject since the last plan, Trout Unlimited feels it necessary to update the objectives in the plan revision. These objectives should complement the 2013 Rio Grande Cutthroat Trout Conservation Strategy and the 2014 Species Status Assessment Report for the Rio Grande Cutthroat Trout[4]. Objectives could indicate the number of stream segments recommended for

---

[4] U.S. Fish and Wildlife Service. 2014. Species status assessment report for the Rio Grande cutthroat trout. Albuquerque, NM.

restoration, metrics of improvements to riparian or watershed condition, or recreational populations established.

> OBJ GF3: Take action to maintain, enhance, or improve condition on three to five meadows within 10 years of plan approval.

Trout Unlimited has been partner to wet meadow restoration projects just to the south in the Carson National Forest over several previous years. In that example, wet meadow restoration on the Carson has been sustained at a rate greater than one meadow per year. Using these successes as a guide, a more lofty goal of more meadows should be taken on. We also recommend that a different metric be used for the rubric of these projects since meadow function is complex and varied across the landscape. Acres or estimated water storage might be better numbers to assign to this objective in hopes of doing better and more informed work rather than necessitating inflexibility in the years to come.

> OBJ GF4: Take action to maintain or restore structure, composition, or function of habitat for fisheries and other aquatic species along 3 to 5 miles of stream over a 10-year period.

This goal, although good in intent, is unambitious. Trout Unlimited urges the Forest to do more for the remarkable fisheries and native fish on the forest. We suggest the Forest to use existing partnerships, such as with TU, to set a higher mileage mark for annual fishery improvement. 3 miles per year would be more in line with our goals than 3 miles in 10 years.

> OBJ GF6: Improve condition class on at least one identified priority watershed, as defined by the national Watershed Condition Framework, within 10 years of plan approval.

By defining priority watersheds, they are identified for possible improvement. The goal to improve the class condition of watersheds would be better if applied more broadly than just to a single (based on the 1996 plan) Priority Watershed. Trout Unlimited has identified numerous watersheds on the Forest which would be improved upon if given proper attention and resources. This goal should reflect all watersheds across the forest, not only those listed as "Priority". Because of the potential impacts of the Spruce Bud Worm Epidemic and other factors, it is possible to see some watersheds progress downward in classification. This goal would be better worded to say that across the forest, watersheds listed as poor or at risk should be reduced, and overall classifications of "Good" should increase. Alternatively, the Forest would be well guided to list significantly more watersheds in need of improvement as "Priority" and set the goals for their improvement accordingly.

*Geographic Areas*

Trout Unlimited shares a similar organizational goal as this Forest Plan revision – healthy watersheds. With an eye toward the landscape to guide our participation in this process and these comments to the Proposed Action, we would like to highlight the desire for a closer look at possibilities for large landscape level and watershed scale management. We think that Geographic Areas, Watershed Networks, "Zones", and Management Areas can all play a role in making this happen. As hunters and fishermen, we rely on complete and intact lands as habitat for the fish and wildlife we pursue. By looking at these issues

collectively, we think it provides managers more flexibility to make decisions since each piece of ground need not be so scrutinized, rather cumulative impacts evaluated. Logical confines like specific habitat for indicator species, wildlife migration corridors, and uninterrupted tracts of natural setting would all be useful boundaries in defining the landscapes for evaluation.

Management areas as laid out in in the 1996 plan dissect these areas into pieces which are too small of scale for some of the things we as TU care about. An overlaying "Geographic Area" would help to align some of these values, and we feel, assist the forest in its management of our public resources. Similar to the four proposed geographic areas, these new geographic areas could have limited focus and limited "sideboards", which for the managing personnel, would mean, another table to cross reference, similar to 1.4 of the Proposed Action. The model of the Proposed Action's Fire Management Zones would be an applicable model of how to accomplish these suggestions. There seems to be a missing link between the size of the four Geographic Areas and the Management Areas as included in the Proposed Action. The inclusion of an overlapping middle ground we feel would accomplish some landscape and watershed scale goals of the Proposed Action and the 2012 planning rule, while assisting the on the ground management to focus on important issues while still allowing adaptive management and on the ground flexibility.

As discussed prior, Trout Unlimited has highlighted areas on the Rio Grande Forest we consider to be especially valuable for Sportsmen, we've called them Sportsmen's Emphasis Areas. These areas, we feel, could fit the mold of any number of different designations, but would possibly be best viewed as Geographic Areas. General emphasis and sideboards can be set and through that perspective management areas assigned and projects conducted accordingly.

Another alternative, and TU's preference for inclusion in the Forest's Preferred Alternative, would be the creation of a Conservation Watershed Network and Riparian Management Zones as previously discussed. These could be very similar to the Forest's proposed Fire Management Zones, which overlay both existing Geographic Areas and Management Areas, while still incorporating their own specific tactical, strategic, and monitoring domains.

### Tactical Domain

*Management Areas*

Management Area 3.3, Backcountry, is not included in Table 1.4. Associated allowable activities for these areas should be further discussed and available for public comment. TU cares deeply about backcountry areas and is committed to their management.

From the Sportsmen's Vision discussed above, Rio Grande Cutthroat Trout Focus Areas, and Big Game Priority Areas, we feel, are strong candidates as new Management Areas in the plan revision. Similar to Elk and Deer Winter Range and Bighorn Sheep Special Wildlife Areas, but with a more watershed based focus, these areas would be valuable tools in the site specific on-the-ground management across the forest. Especially when looking at our native trout species, a Special Wildlife Area for RGCT would be

Rvsd Plan - 00003506

an outstanding commitment to the future of the fish.

*Standards and Guidelines*

Components which require standards and guidelines evaluation as listed in the Proposed Action match well with TU's goals and interest in the forest plan revision. Consider adding to the list oil and gas leasing language, mining specific considerations, including recreational mining, and renewable energy development. Although managed by BLM, these resource concerns affect all the other goals and objectives of this plan revision and topical recommendations would be beneficial for partners to know before investing time and resources into the Rio Grande Forest.

Also absent from the list is language specific to Species of Conservation Concern and what standards and guidelines would be applied to the management of specific habitat for specific species. In a similar light, if a Conservation Watershed Network for Native Fish were developed (see previous comments) then standards and guidelines specific to native fish should be compiled.

## Adaptive Management Domain

Public involvement, comment periods, monitoring results reports, and transparency are all extremely valuable to Trout Unlimited for the future of the Rio Grande National Forest. We support the direction of adaptive management in the new plan and ask for similar prioritization and commitment to working towards mutually beneficial partnerships. In the past, concerns about usefulness, metrics, and transparency have been brought to light in TU circles and others. This is an opportunity to spell out in more detail exactly how a partnership might look between a public lands focused group of citizens and the managing agency. Trout Unlimited is committed to assisting towards this end.

## Monitoring Domain

Trout Unlimited applauds the topics of the proposed monitoring program. As an interested party we would like to participate in the public involvement portion of the program, contribute to the science, work collectively to meet plan goals, and collect data. Although we see the inclusion of a monitoring program as a part of the overall plan revision as necessary, we also suggest using the model of flexibility expressed by the planning team in developing that monitoring program. Rather than strictly tie the program to only assessing plan goals, this is an opportunity to further science on a wide scale. It is a way to engage the local communities. It has potential to bring in resource contributions. And, it has the potential to create trust based partnerships. A truly inclusive and extensive monitoring plan could be the strategy of the Forest to meet their plan's goals instead of simply a quantification system.

## Summary

Overall, Trout Unlimited and the Sportsmen and Women we represent are concerned with watershed

Rvsd Plan - 00003507

health and wildlife habitat above all else. We appreciate the work of the Forest Service in managing the Rio Grande Forest we benefit from so greatly and we are thankful for the opportunity to comment on the Plan Revision process. It is our opinion that there is, in this Plan Revision, an opportunity to manage for healthy watersheds and fish and wildlife habitat in new and creative ways, specifically through the creation of a Conservation Watershed Network and Riparian Management Zones. However it is best suited for inclusion in the revision, the places and issues outlined in these comments are extremely important to our members and out organization and we look forward to seeing them incorporated in the Revised Plan's Alternatives.

Sincerely,

Garrett Hanks
SW Colorado Field Organizer
Trout Unlimited
1309 E. 3rd Ave., Suite 109
Durango, CO 81301
970-430-5540
ghanks@tu.org

Mark Seaton
President
San Luis Valley Chapter, Trout Unlimited
P.O Box 503
Alamosa, CO 81101
719-588-7678
slvtroutunlimited@gmail.com

Rvsd Plan - 00003508

Rvsd Plan - 00003509

623 Fourth Street
Alamosa, CO 81101
(719) 589-2230
Heather@slvwcd.org



October 31, 2016

Heather R. Dutton, Manager

Dan Dallas, Forest Supervisor
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

Dear Mr. Dallas

I am writing to provide comments on the Rio Grande National Forest (RGNF) Proposed Action as part of the ongoing Forest Plan Revision. The San Luis Valley Water Conservancy District (SLVWCD) has had staff and Board Members present for every stage of public engagement throughout the revision process.

The SLVWCD has been a technical partner and financial supporter of the Rio Grande Headwaters Restoration Project (RGHRP) for over 15 years. The RGHRP works throughout the Upper Rio Grande Basin to improve the aquatic and riparian habitat, water quality, and resiliency of the Rio Grande. As such, we are pleased to see that Goal 1 of the Proposed Action is to "Protect and restore watershed health, water resources, and the systems that rely on them." Because the RGNF occupies the headwaters of the major rivers and streams of the San Luis Valley, the health of the Forest impacts all water users within the watershed. Therefore, implementation of Goal 1, with the help of local partnerships, will improve the ecological function of the Rio Grande watershed in Colorado and beyond.

The SLVWCD strongly supports the RGNF's intent to "include management approaches that consider local economies, markets, and partnership opportunities as tools for meeting desired conditions" (Need for Change). This goal acknowledges the significant role the RGNF plays in the economies and communities of the San Luis Valley, and the potential for multi-benefit projects to be completed through innovative partnerships.

The SLVWCD also supports the outlined management actions detailed in the "Adaptive Management Domain" (Proposed Action). This section details how the staff can "be more responsive to necessary changes in the Forest Plan content." As the San Luis Valley has collectively recognized, conditions on the ground can change drastically between Forest Plans. As such, the Adaptive Management Domain would afford the RGNF staff the ability to respond more quickly to changes as they arise.

The SLVWCD encourages the RGNF utilize the Wild and Scenic analysis completed for the 1996 Forest Plan. We feel the analysis is complete and do not see a need for change. After review of the eligible Wild and Scenic reaches, the SLVWCD does not believe designation as Wild and Scenic is needed to

maintain the character of the reaches. Therefore, we encourage the RGNF not to recommend any river or stream reaches for Wild and Scenic designation.

The SLVWCD has reviewed the wilderness inventory completed through the Forest Plan Revision process. We appreciate the considerations that were made for existing water and utility infrastructure, as these are substantially noticeable features. We feel the current wilderness designations offer adequate protections of primitive places and abundant opportunities for solitude. Therefore, we encourage the USFS not to recommend any additional wilderness areas. Additional wilderness areas would add to the management directives of the RGNF, which could make it more difficult for managers to respond to changing ecosystems and implement projects to protect watershed health. Further, additional wilderness areas could detrimentally impact nearby communities, which rely on a variety of outdoor recreation, including biking and motorized uses.

Finally, the SLVWCD encourages the RGNF to preserve their existing water rights, without modification. The RGNF has a unique set of Federal Reserved rights, which were negotiated extensively with many local parties in Case No. 81CW183. The Decree notes that the Federal Reserved rights satisfy all purposes of the Forest reservation. Therefore, the SLVWCD requests the RGNF not include any language in the Forest Plan that could impact the 81CW183 decree and the good will with which it was negotiated. The SLVWCD strongly supports the incorporation of the Federal Reserved rights into the forest plan, as discussed in the Need for Change document.

Thank you for the opportunity to comment. The SLVWCD is committed to continuing our participation in the Forest Plan Revision Process. We respectfully request eligible standing for continued involvement in future project activities, and look forward to providing input as appropriate.

Sincerely,

Heather R. Dutton

Heather R. Dutton

Rvsd Plan - 00003511

President:  M. Dee Greeman, Alamosa, CO
Vice-President: Darius Allen, Alamosa, CO; Secretary/Treasurer Marcie Schulz, Alamosa, CO;
Directors: Richard Davie, Del Norte, CO; Charles Griego, Alamosa, CO; Steve Keller, Monte Vista, CO;
Tyler Neely, Del Norte, CO; Randall Palmgren, Center, CO; Karla Shriver, Monte Vista, CO; Tuck Slane, Mosca, CO.



**COLORADO**
**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 3, 2016

Dan Dallas, Forest Supervisor
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

RE: Rio Grande National Forest Plan Revision Formal Scoping Period

Dear Mr. Dallas,

Thank you for the opportunity to submit both scoping comments and comments on the Proposed Action for the Rio Grande National Forest Plan Revision. We appreciate your willingness to collaborate early on in this process and look forward to continued coordination with you.

The Colorado Department of Natural Resources submits the following comment letters prepared by two of our divisions: Colorado Parks and Wildlife and the Division of Water Resources.

Please also note that the Colorado Water Conservation Board (CWCB) has shared shape files for the CWCB instream flow reaches that intersect any part of the Rio Grande National Forest in an earlier response.

If you have any questions, please contact Amy Laughlin, Policy Advisor, at 303-866-3311 or division contacts.

Sincerely,

Robert Randall
Executive Director

Rvsd Plan - 00003512



**COLORADO**
Parks and Wildlife
Department of Natural Resources

Monte Vista Service Center
0722 South Road 1E
Monte Vista, Colorado 81144
Phone (719) 587-6934

October 27, 2016

Dan Dallas, Forest Supervisor
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

RE: Rio Grande National Forest Land Use Management Plan-Proposed Action

Dear Dan:

Colorado Parks and Wildlife (CPW) appreciates the collaborative efforts we have shared to date during the Rio Grande National Forest (RGNF) Forest Plan revision process and the opportunity to comment on the Proposed Action. Our staff has reviewed the documents and maps that you have provided. We applaud your efforts and concur with the vast majority of the goals and desired conditions presented in this Proposed Action. We recommend including a Desired Condition under Ecological Resources that the habitat components and conditions of the Forest are capable of supporting State Wildlife Population Objectives. In addition we have comments on the following topic areas:

- Geographic and Management Areas
- Bighorn Sheep
- Game retrieval

Geographic and Management Areas
It is our understanding that the delineation of Geographic Areas and Management Areas represents different scales of approach. The Geographic and Management Areas provided in the Proposed Action are mapped at a coarse scale, and are small relative to the large area of the forest and we are unable to discern specific areas, habitat types, and land features that are important to wildlife. Therefore, our comments are general in nature. We desire to provide more detail in future commenting opportunities as the plan revision process continues; therefore we request geospatial shape files to aid in our review and analysis of the Forest Planning documents and specific management areas.

RGNF Management Area delineation makes sense for some goals and uses that you are working to manage, e.g., roadless areas. However, wildlife habitat and wildlife related recreational uses are not constrained by the boundaries, definitions, and goals within any specific Geographic or Management Areas. Wildlife use and the relative value of the habitat within the Forest may change seasonally particularly for those species that migrate.

The proposed action identifies Management Area 5.41_Deer and Elk Winter Range and management area 5.42 Special Wildlife Area-Bighorn Sheep. We appreciate the proposed action identifying these areas. We cannot discern from the maps if Management Area 5.41 for deer and elk winter range incorporates the entire mapped habitat that functions as winter range for these species. Shape files would aid in our review and analysis of these areas. We

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp

are also happy to provide CPW's Species Activity Maps (SAM) shape files for your use. We look forward to helping you identifying Standard and Guidelines in these areas to ensure that they continue to function for wildlife.

Bighorn Sheep
Bighorn Sheep are a unique and charismatic species that is highly valuable to the people of Colorado as identified in your planning processes (social, economic and ecological). We are encouraged to see that wild sheep are afforded a specific Management Area category by RGNF in this Proposed Action. Bighorns need a variety of habitat features over large areas of land. We applaud your initial efforts to highlight bighorn areas.   However, it may be more beneficial to designate an overarching classification type that is specific to bighorn sheep. The areas between summer and winter ranges for a single band of sheep can be large and difficult to outline in the fashion that you have developed in the Proposed Action. CPW's bighorn unit boundaries provide one option for designated bighorn habitat and use delineations, allowing the RGNF to evaluate goals and objectives for Management Areas, develop Standard and Guidelines and prioritize proposed uses against the needs of the sheep for each affected Management Area. This would also enhance the ability of CPW and RGNF to coordinate management efforts.

Game Retrieval
We encourage the Forest Service to expand game retrieval as an allowed use on all management areas, except wilderness in the Forest Planning process. Hunting is CPW's primary tool for wildlife management in Colorado. Our wildlife population objectives for big game are achieved through hunter harvest. Hunting is also an important social activity that brings families and friends together to join the pursuit and constitutes as significant driver to local economies in Colorado. The latest economic impact report produced by BBC Research and Consulting in 2008 showed that hunting alone had a $26.1 million impact to the San Luis Valley of Colorado in direct expenditures alone.

CPW sees the use of OHV for game retrieval as a valuable wildlife management tool because, for many hunters, game retrieval by off-road OHV use increases their confidence and harvest success.  OHV use for retrieving game allows hunters who are on foot to penetrate further into areas holding big game during the hunting seasons without the self-imposed limitation of how far they are reasonably willing to go to retrieve an animal off the Forest. Off-road game retrieval, as currently authorized, is highly restricted in time and duration, so impacts are minimal.

CPW recognizes that inappropriate OHV use can adversely affect forest resources. The experience of CPW officers in the field is that most negative impacts have been caused by unauthorized OHV use and few of these problems can be attributed to game retrieval activities.

CPW also recognizes that there are numerous habitat types and physical features where OHV use would not be appropriate; therefore, we look forward to working with the Forest to better define those areas where OHV game retrieval is appropriate and where it is not[1]. CPW is also willing to work with the RGNF in mapping the area in a way that increases our combined abilities to enforce the rule.

CPW appreciates being a part of the planning process and looks forward to working with Forest personnel to address our interests and concerns throughout this and subsequent planning efforts. If you have any questions regarding these comments, please contact Rick Basagoitia at the Monte Vista Office of Colorado Parks and Wildlife.

Sincerely,

Rick Basagoitia
Area Wildlife Manager – San Luis Valley

XC: Dorsey, Magee, SWRO File, Area 17 File

---

[1] Currently, there are many areas where game retrieval use is allowed, but not appropriate. An example of this is the game retrieval polygon just south of the Lake Fork of the Conejos River, where there is significant potential for resource damage. There are also areas where the OHV game retrieval would be appropriate, but is not allowed. An example of that is across the Conejos River near Willow Mountain, where there is little potential for resource damage.



**COLORADO**
Division of Water Resources
Department of Natural Resources

November 3, 2016

The Colorado Division of Water Resources (CDWR) is pleased to have the opportunity to provide comments to the U.S. Forest Service regarding the Rio Grande National Forest Plan revision process. CDWR wishes to express its appreciation to the Rio Grande National Forest Plan revision team for being invited to participate in the planning process as a cooperating agency through the Colorado Department of Natural Resources, and being given the opportunity to comment throughout the process.

In the Rio Grande National Forest Plan Proposed Action, the Forest Service lists multiple streams or segments that are being considered for designation as Wild, Scenic, or Recreational Rivers. These designations may have the potential for the attachment of reserved water rights. However, there are restrictions on the designation of future reserved water rights that the Forest Service should consider. In 1979, the United States of America filed Water Court Case 1979-CW-85 in the Colorado District Court for Water Division No. 3. This case was brought to confirm the reserved water rights of the United States in the Gunnison and Rio Grande National Forests in Colorado Water Division No. 3. The United States filed 88 amendments to Case 1979-CW-85 in various other filings and cases. In 1985, these cases were consolidated into Water Court Case 1981-CW-183. Nearly 50 individuals or entities filed statements of opposition to the original filing or to the subsequent amendments. In 2000, after nearly 21 years of negotiation between the United States and the opposers, a decree was entered in the 1981-CW-183 case. Findings of Fact, Conclusions of Law, and Judgment and Decree, Case No. 81-CW-183 (Dist. Ct., Water Div. No. 3 Mar. 30, 2000) ("Decree"). This Decree confirmed the United States of America's federal reserved water rights on 303 streams in the Rio Grande National Forest and in the portion of the Gunnison National Forest located in Water Division No. 3. To our knowledge these are the only decreed reserved water rights on any National Forest in the nation. The Decree also incorporated limitations on future United States reserved rights claims within this area. The language for the largest of these limitations is found in paragraph 14 of the Decree, which states:

*In settlement and compromise of the claims in this case, the signatories to this decree agree, and it is hereby found, except as provided in Paragraph 28 below, that the quantities of water decreed to the United States herein are fully sufficient to fulfill any and all federal reserved instream flow water rights under existing federal law and all appropriative instream flow water rights that the United States may be entitled to for the Gunnison and Rio Grande National Forests within Colorado Water Division No. 3. Except as provided in Paragraph 28, below, this decree is the final judgment concerning the United States claims for federal reserved water rights under existing federal law and for appropriative instream flow water rights for the Gunnison National Forest and the Rio Grande National Forest within Colorado Water Division No. 3. The United States agrees to dismiss Case No. 94-CW-39, and the signatories to this decree consent to the dismissal. Except as provided in Paragraph 24.d., the United States agrees that, in the future, it will not claim additional appropriative instream flow water rights, in Colorado Water Division No. 3 for National Forest purposes. Except as provided in this paragraph, this agreement does not preclude the United States from acquiring water or water rights by means other than appropriation.*

Paragraph 28 of the Decree states that the Decree "does not address or resolve the nature or extent of the reserved water rights, if any, created under the authority of the Wilderness Act of 1964…" Therefore, it is our opinion that the United States currently has decreed quantities of water sufficient to fulfill any and all federal reserved and appropriative instream flow water rights to which it may be entitled, with a possible exception of

those in Wilderness areas. Any new Wild, Scenic, or Recreational River designated areas in the Rio Grande National Forest must rely solely upon the existing decreed instream flow water rights as decreed in Case 1981-CW-183.

Further, as described in Paragraph 19 of the Decree, any action by the Forest Service in which it *"acts to increase or maintain stream flows, reduce depletions to stream flows, provide favorable conditions of water flow, or provide water for any of the purposes set forth in Paragraphs 14, 15, or 16, above, by: (a) requiring the owner of an Existing Water Right to forego the exercise of all or part of its decreed water right or to relinquish water diverted or stored in priority under its decreed water right, or (b) otherwise taking any action to prevent or interfere with the exercise of all or a part of an Existing Water Right"* may be a basis to reopen the Decree. Paragraph 24.d. further states that the decreed, reserved water rights of the United States may be considered null and void in the event of a reopening of the case. If the case is reopened, the United States must again *"prove its entitlement to and quantity of reserved instream flow water rights for Organic Administration Act purposes within the geographic area subject to reopening,"* pursuant to paragraph 24.a. of the Decree.

The United States Forest Service has a history of close cooperation with the State of Colorado and other water rights holders in the Rio Grande National Forest. It is our sincere hope that this cooperation will continue into the future. Please contact me if you desire more information on the topics of this letter.

Sincerely,

Craig W. Cotten
Division Engineer, Division 3
Division of Water Resources

<u>SLV Fed Agency Scoping Briefing</u>

November 4, 2016

<u>Attendees:</u>  Sharon Vaughn, FWS; Lisa Carrico, NPS; Mike Blakeman, RGNF; Jason Surface, DWM, Saguache; Deborah Blank, BLM; Amy Laughlin, Co DNR; Joe Vieira, BLM-SLV; Melissa Garcia, BLM-Canyon City; Erin Minks, RGNF; Dan Dallas, RGNF; Scott Miller FWS; Judi Perez, RGNF; Chad Lewis, RGNF; Kirby Self, RGNF; Randy Ghormley, RGNF

<u>On phone:</u> Suzanne Sellers, CWCB

Tom opened up.

Dan made opening remarks on planning under new 2012 Rule, moving away from "we're proposing, you're opposing" syndrome, ask that folks realize that we are putting the meat on the bones of an adaptive management framework which was the bulk of the Proposed Action.

We are working on this, revising this, in real time.

Erin gave an update on the project pieces:

Oil and gas

Travel management

Grazing

Wilderness

Wild and Scenic- evaluation in 32 reaches

Connectivity-potential corridor proposals

Off-road game retrieval, synchronize with motor vehicle use maps

Colorado Roadless Rule

Mt Blanca, possible Wilderness/Special Management Area consideration

Lynx- integration of Southern Rockies Lynx Amendment, nexus with habitat/timber suitability

-Melissa, nothing has changed with BLM mapping to coordination needed for any changes

Connectivity- Joe V says to use the Regional Mitigation Strategy

Wild and Scenic- Suzanne had a question about process- when will there be an eligibility and suitability report? Are we prepared to add additional time for public response if it's embedded into the DEIS?

Rvsd Plan - 00003518

Post-lunch:

Dan opened up about the challenge of keeping the public informed in the difference between project level and programmatic planning and decision making.

The end product will be a decision document, DEIS, and plan.

Dan- Re. oil and gas and BLM, there's the overall issue with a disagreement on whether the BLM
"agreed" to our 1996 suitability decision so this planning window might allow for that independent agreement to be decided and documented.  That would allow our forest plan decision upholding the previous leasing availability analysis to stand and allow BLM to concur.

Background, prior to 2008, there was a conflict with the lands set for disposal by BLM in their 1991 RMP at the same time that RG County, Saguache County and Mineral County had approved 100,000 acres plus of subdivisions.  In the meantime, the outstanding BLM parcels had become refugia for wildlife that created an issue.   Later, Colorado Roadless rule direction.

Re. wilderness, our proposed action will likely include recommendations for wilderness (passed around).

Dan also concerned about how recommendations for wilderness might be restricted/limited by a previous Colorado Roadless Rule management direction.

Sharon mentioned FWS are currently evaluating possible wilderness on their acreage.  Also acreage in their CCP.

Lisa mentioned that NPS had a wilderness study done as part of their 2007 plan but waiting on the Medano Ranch acquisition.  Hope to see wilderness crossing boundaries that transcend land management.   Recommends that we coordinate and share presentations before our public.

Sharon chimed in that wilderness on the Baca Refuge isn't meaningful without wilderness adjacent.

Joe reminded RGNF to build in GIS workload issues for BLM staff, or at least anticipate.

Melissa also noted that BLM is working on developing backcountry designated areas.

Randy mentioned importance of considering pack goat restrictions.

Erin asked for folks to share any climate change work that agencies might be done.  Joe said BLM has a climate change model, prism data within one square kilometer grids; Melissa thought of the RG Cutthroat Trout Working Group.

Tom made some closing remarks.

<u>Next steps:</u>

Individual follow up meetings between RGNF staff and:

1. CPW re. bighorn sheep/big game habitat mapping overlay with any revised Management Area boundaries
2. BLM re. oil and gas suitability concurrence with RGNF 1996 Plan
3. CWCB coordination re. overlay with instream flow program and any newly eligible Wild and Scenic  segments
4. Division of Water Resources coordination re. any potential conflict between eligibility for wild and scenic values and implementation of the 2000 decree

<u>Comments For The Rio Grande National Forest Plan Revision</u>

Air and Soil –
- Agree with the principle statement on "protecting water quality, quantity, and timing of flows" as critical to sustaining the ecosystem.  It should be emphasized at every opportunity.
- Identification and tighter management of manmade threats (ATV trails and other vehicle intrusions) to water quality degradation caused by increased sediments should be a higher priority.
- A waiver process for assisting in maintenance of wilderness irrigation structures is acceptable, if tightly regulated and policed.
- Increased forest management in timber harvest and fire management should be a priority outside of wilderness and wilderness study areas.

Carbon – Manage a health forest and nature will take care of the carbon issue.  Don't waste any more time on this.

Cultural and Historical Resources
- Do more to protect and enhance tribal resources.  Increase consideration and involvement of tribal leadership mechanisms to recapture the nature of tribal legacies where reasonable and possible.
- Forest health and adapting to modern threats to protect cultural and historic resources take priority over grazing and logging.

Ecosystem Integrity
- Increase restoration of riparian systems.
- Provide strong regulation and monitoring of activities that are damaging to the ecosystem – OHV use, grazing, logging, and uncontrolled camping.
- Increase enforcement.
- Recognize fire as part of the natural process.
- Increase management of unspoiled areas with wilderness-style practices and protections.

Fish, Wildlife and Rare Species
- Increase protection of unique RG species such as the RG Cutthroat Trout.
- Increase protection on all threatened bird species.
- Consider stronger management of moose populations to protect riparian areas.
- Consider the effect of management practices of the RG Reservoir on the river ecosystem, especially low flows in summer.

Lands and Infrastructure
- We need less motorized and more non-motorized trails and access points.
- More enforcement of motorized uses.  The noise and damage caused by motorized is epidemic. Motorized does not provide a healthy boost to the economy.  We have a treasure in our unspoiled areas that cannot be recreated once the motorized crowd tramples the area.

Rvsd Plan - 00003521

- Tap motorized users as a funding source via use permits. They cause the most damage and issues and should be paying for it more directly.
- Provide more and improved designated camping areas. Reduce or eliminate uncontrolled camping, due to the damage it causes. Especially enforce uncontrolled camping and use near streams and riparian areas.
- Reduce grazing.

Minerals and Energy
- The Mining Act of 1872 has lived way beyond it's intended purpose. It only provides a route for people seeking something for nothing and facilitates damage and harm to the ecosystem, especially our precious water resources.
- Abandoned mines should stay abandoned and be sealed where possible.
- Mining only benefits a few mine owners. It should be eliminated as a possibility in the RGNF.
- Oil and gas exploration and development has no place in our limited forest treasure.

Recreation and Scenic – Less motorized. More non-motorized.

Social, Economic, and Cultural Resources – The comments from the other sections apply here.

Wilderness and Designated Areas
- Allowance of any additional motorized access to designated areas should not be allowed.
- Pole Creek is special destination to many non-motorized users. The current unauthorized use up Pole Creek by motorized should be prevented and use regulations more strictly enforced. No motorized up Pole Creek or Bear Creek due to the damage to the ecosystem and noise. Grazing should be more closely regulated or eliminated in these drainages to protect riparian habitat.
- Deadman's Creek, New Baca Mountain, and Elk Creek trail areas should be designated wilderness to provide consistent management of the contiguous areas.
- Funding issues should not be a driver in whether an area is designated wilderness. The protection of pristine and irreplaceable wild areas should not be about money, which can be shifted from other less worthy budget categories.

Bernie Krystyniak
PO Box 694
Lake City, CO 81235
bklakecity@hotmail.com

I have been a user of RGNF scenic areas since 1975, especially in the RG drainage. Having visited many scenic areas in the nation, I continue to believe the RGNF and this particular area is one of, if not the, finest scenic recreation areas in the country. It is a precious gem that has to be protected.

November 8, 2016

November 10, 2016

Rio Grande National Forest
1803 W Hwy 160
Monte Vista, CO 81144

Eric Burt
Owner/Manager
Kristi Mountain Sports, LLC
3222 Main St
Alamosa, CO 81101
719-589-9759

Re: Forest Plan Revision and Wilderness Evaluation - Comments from a Cyclist's Perspective

Dear Forest Plan Revision Team,

The following is some history, observations, concerns, and ideas to be considered where appropriate during the Forest Plan Revision and Wilderness Evaluation process for the Rio Grande National Forest.

I tried on several occasions to find some quiet time to sit down and develop a comprehensive document to constructively comment on the Forest Plan Revision and Wilderness Evaluation for the RGNF. Between business, family obligations, and unforeseen challenges I wasn't able to comment before the deadlines. I am hopeful this letter will still be of value to the process now and in the future when travel management is reviewed.

I was born and raised in Alamosa and am a fifth generation native of the San Luis Valley. I have a wife and two sons ages 18 and 24. I started working in the ski industry at the end of my 8th grade year at the local ski shop in Alamosa. In 1983 I purchased Kristi Mountain Sports from the original owner's estate after he was killed in a motorcycle collision with a logging truck east of Del Norte Peak while setting up the original Boot Hill Enduro race. My wife and I have operated KMS for the last 30+ years and recently my older son has joined the management team after graduating from MSU with an Industrial Engineering degree. Additionally we opened a second location in Del Norte during the spring of 2016.

My wife and I started selling mountain bikes in 1986, business grew and interest increased exponentially until mountain biking relatively peaked in the late 90s. In 2000 we added outdoor equipment (camping, hiking, climbing, backpacking, etc.) to the mixture of products we sell after the two local sporting goods stores closed down. Around this time I co-promoted the Riders Del Norte mountain bike race for 10 seasons, the last year being 2000. Our best races attracted over 300 riders to the San Luis Valley to ride a 28 mile course in the Limekiln/Nikomodes area on Saturday and an 18+ mile course in the Pinos/Burrow Creek area on Sunday. The riders loved and hated the race in a good way. We quit promoting the race primarily for financial reasons and because many of the other areas like Durango, Gunnison, Crested Butte, and

November 10, 2016

Salida were developing better riding opportunities which made it more difficult for us to attract riders to the area.

During the 90s and early 2000s, we scoured the entire RGNF for mountain biking opportunities, looking for the holy grail of mountain biking; *single-track*. During this time ATVs were becoming more and more popular and in the beginning their trails were quite desirable to ride because they were interesting, flowy and were not on a jeep road.

We were riding Cat Creek (at one time rated a top 10 single-track trail in the state), Schilling Springs, LimeKiln, Burrow Creek, Castle Rock Creek, Shady Creek, Trout Creek, Middle Frisco, Deep Creek, Miners Creek, and West Willow. On the CDT trail we loved to ride Cumbres North (out and back to the wilderness boundary) or Wolf Creek south to Treasure Creek, Silver Creek or all the way to Elwood Pass. We looked real close at areas around Cathedral, Groundhog park, Bowers Peak, Boot Hill, Little La Garita Creek, Tewksbury, Lake Fork, Hunters Lake, Conejos Canyon and all along the Sangre de Cristos from Poncha to Blanca Peak road. In most cases the trails were too steep or too rough for pedaled wheeled traffic without major work on the trails or the routes were already in designated wilderness areas.

We met with the Forest Service on numerous occasions asking for partnerships and consideration for MTB recreation but the land managers at the time appeared to be primarily focused on building ATV trail. ATVs were gaining popularity and their advancing technology allowed them to travel virtually anywhere which started to impact the trails we liked to ride. Sadly the RGNF managers would not or could not act to alleviate the problem. There were many stories or rumors as to why this was the case but it appeared to us personal agendas and bias was at the core of the problem. It was sad and frustrating at the same time because our neighboring regions were developing great mountain bike riding opportunities and realizing the social and economic benefit of those trails systems.

Through a failure of management, signage and compliance, the single-track trails we loved to ride were being ruined and made dangerous by the soil pulverizing effects of the ATV tires. Riding on an ATV trail was like riding on a pile of moving ball bearings with a hump in the middle. We quit riding Trout Creek and many other classics because the ATVs created such a dangerous situation. Even the motorcyclists hated what the ATVs did to the single-track trails they used to ride. Over time we began to look at other areas of the state to ride and started to explore more in the BLM lands of the San Luis Valley for a quality experience, basically giving up on the National Forest trails in our area.

Penitente Canyon was the beginning of a revolution for mountain biking in the San Luis Valley. A nearby guest ranch starting guiding horseback tours through the adjacent canyons which inadvertently created some very interesting single-track trail we could ride on. It was pretty cool what a line of 20 horses walking single file could create on a weekly basis on the native soils in the area. At the same time bicycle suspension was dramatically evolving making these primitive trails quite rideable and more entertaining.

November 10, 2016

In a perfect world, my argument that the Mountain Bike community is one of the most underserved recreation groups in the RGNF would be supported by firm research and data. At this point the best we can provide is the attached infographic (RGNF Mountain Bike Trail Assessment) which overlays geographic mountain bike ride data from MTBProject.com with the RGNF boundary. In a nutshell, each circle represents a trail or ride that is noteworthy enough for users to take the time and effort to share it with other cyclists. When people are traveling or choosing a weekend destination, they will use MTB Project as a resource to find areas to recreate. When I look at this map, I see a significant amount of the forest which has no appeal to the mountain biking community.

My contention might come as a surprise when you consider the thousands of miles of roads, two-track, motorized trails, and multi-use single track that cyclists are legally allowed to ride on the National Forest. From a mountain biker's perspective, there is a big difference between legally "rideable" and "desirable". The reality is, single-track attracts and captivates the cyclist - it makes them want to come back for more. Even though equestrians can legally ride on forest roads, is that the experience that would motivate them to get into a vehicle and travel to some remote location to experience? Generally, it is not - the same can be said about cycling.

On one end of the spectrum you have the mountain bike "tourist" who wants to be hauled up a mountain road in a vehicle so they can coast down for a thrill ride while exerting little effort. Roads, two-track, or trails makes little difference to them as long as gravity is doing most of the work. On the other end of the spectrum is the true mountain bike enthusiast who is drawn to an area to ride over and over again when it has a quality single track network with flowing features, gentle to moderate grades, and multiple routes that connect to create the opportunity for a variety of ride options. The last thing a mountain biker wants to do is ride with ATVs and jeeps on the same tread - no different than a hiker or horseman would not want to hike/ride along a forest road.

In the last three to four years the BLM has made huge strides in designing and building high quality single track trails in the San Luis Valley with bikes in mind - Penitente, Stone Quarry, and now the Pronghorn loop just south of Del Norte. The result has been a surge of interest and increased awareness of our area from a four state region. The trails are equally as good as any other nearby networks and the positive economic impact is just getting started. We invested almost a quarter of a million dollars in our new store in Del Norte because we see the potential is just around the corner. This summer, it was not uncommon for my staff to provide ride recommendations and maps to 10+ tourist groups each day at our Del Norte shop.

After experiencing the local BLM trails we've received customer feedback such as:
- *"I've traveled to Moab every fall for the past 15 years… now I don't need to make that drive anymore"*
- *"We only had time to ride Stone Quarry, we'll be back next year to ride the rest of the networks!"*
- *"I'm from Pagosa (or Salida) and I'm bored with our local trails. Now that I know these rides are just over the hill, I'll definitely be back to explore next summer."*

November 10, 2016

Unfortunately, we rarely mention any of the forest service trails because there is such a gap in quality and quantity between the networks on the BLM and the RGNF.

Not everyone wants to ride in the desert and would prefer a classic tree lined, high alpine riding experience. But the question is where? When you get down to it, the only recommendable trails to the general population in the RGNF are:

- Cat Creek
- Schilling Springs
- Middle Frisco
- LimeKiln / Nicomodes
- Trout Creek
- Deep Creek
- Miners Creek
- CDT Cumbres
- CDT Wolf Creek

I am sure I missed a few others but essentially that is it for a national forest the size of a small state. To my knowledge there has been no new, revised or upgraded mountain bikeable single track trails in the RGNF since the late 80's. One good thing we recently witnessed is the metal structures installed by a motorcycle group around the Cat Creek trail system which blocked the ATVs. Over the last two to three years since the barricades were installed the trail is slowly coming back to life and is worth the trip to ride again. We would love to see more corridors on the forest follow suit.

The current forest plan revision is on the right track to give local managers more control and discretion to make real-time management changes. Based on all the meetings I've attended, I am optimistic for the future. But, the Wilderness Recommendation Process has me concerned for many reasons: one being the increased difficulty and cost to manage and maintain travel corridors, the other is the reality that bikes are not allowed in Wilderness. I spent several hours studying the maps, the Preliminary Evaluation Results and looked at every polygon and associated notes with the area. From a Mountain Biker's perspective, some areas should be Wilderness because of existing terrain characteristics but many areas have Mountain Bike potential if ever pursued.

The entire Sangre De Cristo side of the valley has zero quality single track trails even with the 300,000+ visitors a year to the Great Sand Dunes and the town of Crestone along the boundary and we know visitors to these areas would love to have something interesting to ride on. Poncha pass, North pass, Cochetopa pass has no bikeable single track to our knowledge. The RGNF boundary with the BLM at Penitente Canyon has several trails which would be great to include in the official trails system. Only one trail worth making the 65 mile drive from Alamosa exists in the Conejos region; the CDT Trail north from Cumbres Pass to the Wilderness boundary. The other trails in the area are managed as restricted to mountain bike use even though they are not in Wilderness. Del Norte has one marketable trail, Middle Frisco and South

Rvsd Plan - 00003526

November 10, 2016

Fork has Trout Creek relatively close by. The Creede classic is Deep Creek, but we stand to lose it if a Wilderness recommendation goes forward for the Snowshoe Mountain area.

Going back several years when the last wilderness review was occurring to extend the boundary around the Wheeler Geologic area, I was communicating with forest service personnel about the East Bellows Creek trail into Wheeler. The maps I reviewed at one point in the process showed the trail would not be included in the Wilderness area designation which would have created an amazing cycling route and destination. Somehow I missed something in the process and the next thing we knew the boundary was finalized to eliminate this route as a mountain bikeable option. I could not believe it and the mountain bike residents of Creede were stunned too. This route could have been a local classic and would have attracted mountain bike enthusiast for years to come. Instead the trail is too long to hike in a day (for most people) and overnight trips are a challenge because of the lack of water sources near the monument. As a bikeable trail, the out and back trip would have been a perfect way to visit the monument in a day. I share this story to help illustrate why I get nervous when a Wilderness recommendation process is active - I would hate to see this happen again.

Since the Wilderness Recommendation Analysis ties into the Forest Management areas (polygons), which eventually will tie into the topic of recreation and travel management at some future time, I am going to try to kill three birds with one stone, so to speak, and make comments based on the Wilderness Inventory polygons. I figured the revision team would know which areas I am referring to and can apply the comment or recommendation where appropriate to the Forest Plan Revision process.

A rough assessment of the Preliminary Evaluation results:

- Polygon 1a to 10 - almost all areas have some kind of mountain bike potential. Dream trail could be Blanca Peak road north to Zapata Subdivision along the contour. A trail along the contour north from Crestone to Valley View connecting the various hiking trailheads is theoretically possible.
- Polygon 11 - there was a past effort to construct a reroute of the CDT which should include MTB use.
- Polygon 12, 15, 18, 20a - all have potential
- Polygon 22 - Natural Arch - riding in the area was popular at one time and could be looked at closer again since Penitente is getting more popular.
- Polygon 24 - Wheeler Geologic area - poster child for a poor wilderness area designation.
- Polygon 25a - Wason Park - Creede could be more of a MTB destination if areas like this were developed
- Polygon 26 - Bristol Head - Shuttle ride to Spring Creek to Snow Mesa and down Miners Creek would be an epic ride.
- Polygon 28 and 29 - Pole Mountain - my understanding is the locals have some MTB trails in the area which would be impacted by a wilderness designation.

- Polygon 38a - Snowshoe CRA - Deep Creek trail is one of the few existing single track mountain bike rideable trails in the area.
- Polygon 41 - Trout Creek - Trail was ruined by ATV use but then restricted to single track use in recent years. Now the trail is rehabilitating back to a good ride experience.
- Polygon 43a - Kitty Creek area could be an attraction for MTB activity, especially with all the visitors to the Big Meadows area.
- Polygon 45.a - Tewksberry - trail could be a draw for South Fork visitors if it was rehabilitated.
- Polygon 51 - Bennett Peak area - many opportunities to enhance MTB experience in this area including a shuttled ride starting at Blowout Pass (or South Fork Rock Creek TH), climb over Bennett peak, and descend into Del Norte (see attached map Bennett Peak Epic). Closest Forest access to Del Norte and Monte Vista communities.
- Polygon 53 - Summit Peak - classic high alpine area with good characteristics for a limited MTB experience near the wilderness boundary. The views and terrain would be amazing.
- Polygon 54 - 58 - Summitville and Platoro area - plenty of visitors and recreation in the area but no real MTB trail experience available.
- Polygon 59 - area would be good for MTB due to terrain
- Polygon 63a - Cumbres - The CDT trail in this area is very conducive to MTB use. Views are spectacular, grade tough but not impossible for many riders.
- Polygon 64 - Off and on for years I have heard about an effort to connect Cumbres pass to Magote for an "Epic" ride system.

Consider if past history had been different where prior land managers' priorities and budgets allowed the creation and maintenance of good mountain bike trails similar to adjacent communities (Salida, Gunnison, Durango, etc.), then the management polygons, and the wilderness review would look totally different today because the trails would already be in place and traditional use established precluding any further restrictive designation.

The State of Colorado released a study in October 2016 focused on the statewide Economic and Health Benefits of Bicycling and Walking[1]. It is estimated that 2.25 million out-of-state cyclists visit Colorado each year with bikes in tow. On average they spend 1.5 days cycling which means our state sees 3.38 million user days from out-of-state visitors alone. The economic impact of cycling related tourist traffic is estimated at $448 million annually when considering average trip expenditures for these visitors. While some of these individuals never get off the pavement, a significant number of them are visiting the state specifically to ride our vast networks of high quality single track. I believe there is an incredible opportunity to stimulate our local economy by developing trails that attract and excite this group of individuals.

[1]BBC Research Consulting, Economic and Health Benefits of Bicycling and Walking, State of Colorado http://choosecolorado.com/wp-content/uploads/2016/06/Economic-and-Health-Benefits-of-Bicycling-and-Walking-in-Colorado-4.pdf

November 10, 2016

I support a multi-use forest. I own a RAZR, motorcycles, snowmobiles and occasionally use them to explore the forest. I backpack the CDT trail annually and have climbed all the 14ers in the area numerous times. I thoroughly appreciate extended backpacking trips into Wilderness but one of my strongest passions is still Mountain Biking on single-track trail in the forest.

My overall observation and feeling is that the RGNF should first conduct a comprehensive "Wheeled Travel Single Track Trail Review" to determine if any management area in the forest has the need or unique potential for a quality multi-use single track trail now or in the reasonable future before any permanent mountain bike limiting recommendations are considered. Then after said review, yes of course make the necessary designation where appropriate.

Thank you for your time and consideration.

Sincerely,

Eric Burt

# RGNF Mountain Bike Trail Assessment - 11/8/2016

RGNF Wilderness, Private, etc. - Bikes not permitted by management designation

RGNF - Bikes permitted unless specifically banned from trails

Trail listed on
MTB project
Color = Difficulty



Crested Butte

Colorado Springs

Salida

BLM Trails

Alamosa

Durango

© Kristi Mountain Sports, LLC 11/8/2016

Rvsd Plan - 00003530



**Bennett Peak Epic**

Rvsd Plan - 00003531

 

**NORTHERN ARIZONA UNIVERSITY**
*College of Engineering, Forestry & Natural Sciences*

**W.A. FRANKE** COLLEGE OF
**FORESTRY & CONSERVATION**
UNIVERSITY OF MONTANA

April 18, 2017

Dan Dallas
Forest Supervisor
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144
ddallas@fs.fed.us

James Duran
Forest Supervisor
Carson National Forest
208 Cruz Alta Rd.
Taos, NM 87571
jdduran@fs.fed.us

James Melonas
Forest Supervisor
Santa Fe National Forest
11 Forest Lane
Santa Fe, NM 87508
jmelonas@fs.fed.us

Dear Supervisors Dallas, Duran and Melonas:

Recently, we were fortunate to participate in the *Wildlife Movement Workshop: Connectivity in the Upper Rio Grande Watershed* held by the New Mexico Natural Heritage Program in Taos, NM from December 7-8, 2016. It quickly became apparent that stakeholders in the transboundary region of Colorado and New Mexico were working through the unique opportunities and challenges in integrating ecological connectivity into planning and management efforts. Indeed, connectivity is an important aspect in maintaining the ecological integrity of systems. The presentations and opinions expressed at the workshop were insightful and as a result, we would like to provide comments on the subject.

As background, Andrew is a post-doctoral researcher at the University of Montana where he is investigating the effectiveness of various 'wildlife friendly' fence modifications to sustain wildlife daily and seasonal movements as well as modelling multi-species overlapping seasonal range and migratory pathways to prioritize conservation and management efforts. In 2015, Andrew received his PhD in Environmental Design from the University of Calgary where he assessed GPS location data on 185 female pronghorn across the prairies of Alberta, Saskatchewan and Northern Montana; roughly the area of New Mexico. Andrew modelled migratory pathway selection at two scales in response to anthropogenic factors and environmental gradients and integrated results into a multi-scale prediction map. Andrew used these spatial predictions as a cost-surface to identify seasonal connectivity and prioritize corridors both within and between large habitat patches to design seasonal connectivity networks across this transboundary region.

For 25 years, Paul has specialized in science-based design of wildlife corridors and working with transportation agencies, land managers, and wildlife regulators to conserve corridors on the ground. Paul's 1988-1992 study of cougars documented that young cougars find and use habitat corridors to maintain gene flow among mountain ranges in urbanizing southern California. Paul has authored 4 book chapters and 27 peer-reviewed papers related to wildlife linkage design, plus two statewide maps of wildlife corridors, namely Arizona Wildlife Linkage Assessment (2006) and California Essential Habitat Connectivity (2010). He has also developed 60 detailed linkage designs that are being implemented in Arizona & California. Paul was a lead

1



NORTHERN ARIZONA
UNIVERSITY
*College of Engineering, Forestry & Natural Sciences*

**W.A. FRANKE** COLLEGE OF
**FORESTRY** & **CONSERVATION**
UNIVERSITY OF MONTANA

author of the Wildlife Corridors Initiative, unanimously adopted by the Western Governors
Association in 2008, and of a framework for wildlife corridors for the nation of Bhutan.

Connectivity is a landscape level ecological process that encompasses structural and
functional components (Taylor et al. 2006). Structural connectivity describes the physical
relationships among habitat patches, while functional connectivity describes the degree to which
landscapes increase movement of genetic, organism or population flows throughout the
landscape within a mosaic of habitat types and uses (Chetkiewicz et al. 2006, Hilty et al. 2006).
Connectivity is paramount for wildlife so that they can track spatiotemporal shifts in habitat,
return to or locate new breeding grounds, adapt to anthropogenic influences and, persist in
altered landscapes that may become more suitable for colonization over time (Hilty et al. 2006).
A key tool to promote ecological connectivity is the identification and prioritization of corridors,
defined as swaths of land supporting passage by wildlife species between two or more areas
(Beier et al. 2008). Corridors generally provide benefits to wildlife across both unaltered and
anthropogenic-affected landscapes (Noss 1987). Species may require corridors crossing human-
made barriers or filters to sustain connectivity across fragmented landscapes and are an
important strategy for combating the impacts of climate change on biodiversity (Beier and Noss
1998, Hilty et al. 2006, Heller and Zavaleta 2009). Corridors are also effective in increasing
intra-patch connectivity, which is important in maintaining functional connectivity within large
habitat patches (Beier et al. 2011). Species resource selection within these larger habitat patches
may channel connections to specific locations along the habitat patch edge thus concurrently
influencing connectivity between habitat patches (Beier et al. 2011).

Corridors have been identified and prioritized across continents and ecosystems to assist
in designing regional connectivity planning efforts to sustain healthy wildlife populations (Beier
et al. 2011). Many analytical approaches to identify and prioritize specific corridors to preserve
landscape connectivity have been formulated (e.g., Bunn et al. 2007, Compton et al. 2007,
McRae et al. 2008, Carroll et al. 2011, Jakes 2015) and this area of research continues to grow.
In North America for example, corridors have been identified in Montana's intermountain region
for black bear (Cushman et al. 2009) and lynx (Squires et al. 2013), in the central Great Plains
for multiple species (Cushman et al. 2013), in Ontario, Canada for lynx (Walpole et al. 2012) and
in central Mexico for jaguar (Petracca et al. 2014). Other continental examples include corridor
identification for multiple mammalian species in oceanic Asia (Brodie et al. 2014) and, for
elephants in Africa (Epps et al. 2011, Roever et al. 2013). Efforts to identify corridors to design
regional connectivity plans can mutually benefit both humans and wildlife as typically, planners
must demonstrate that ecologically based approaches provide benefits to humans before policy
decisions and on-the-ground implementation can begin (Opdam et al. 2003). In the United States,
the Forest Service, Bureau of Land Management and other public land managers have begun to
integrate corridor establishment into management planning efforts.  For example, The Bridger-
Teton National Forest amended its Land and Resource Management Plan to protect an important
part of the Pronghorn Migration Corridor (also known as the Path of the Pronghorn) (Hamilton
2008). The amendment designated the Pronghorn Migration Corridor and required that "all



**NORTHERN ARIZONA UNIVERSITY**
*College of Engineering, Forestry & Natural Sciences*

**W.A. FRANKE** COLLEGE OF
**FORESTRY & CONSERVATION**
UNIVERSITY OF MONTANA

projects, activities, and infrastructure authorized in the designated Pronghorn Migration Corridor will be designed, timed and/or located to allow continued successful migration of the pronghorn that summer in Jackson Hole and winter in the Green River basin". Other Forest Service examples include the Gallatin National Forest Travel Plan which established a goal of "providing for wildlife movement and genetic interaction (particularly for grizzly bear and lynx) between mountain ranges" at specific passes and areas and, the White River National Forest which placed emphasis on linking suitable habitat patches with corridors to "provide areas for landscape-scale movement, migration, and dispersal of forest carnivores and other wide-ranging wildlife species; safe travel connections between large blocks of forested landscapes across the Forest; and security from intensive recreational and other human disturbances" (Ament and Meiklejohn 2009).

The U.S. Forest Service's 2012 planning rule provides an exciting opportunity to affirmatively plan and manage for connectivity as a landscape-scale conservation strategy. Indeed, two principle areas of the planning rule require the agency to manage for connectivity: sustainability (36 CFR 219.8) and species diversity (36 CFR 219.9). We believe for forest planning efforts to be most successful, delineating areas that identify and prioritize places that are important for wildlife movement (i.e. corridors) are necessary in providing connectivity. We also believe that plans should engage neighboring stakeholders and account for their requirements throughout this process. Please include this letter in the project record for forest plan revisions and let us know if we can assist planning efforts in any capacity.

Sincerely,

Andrew Jakes
Post-doctoral Researcher
UM School of Forestry & Conservation
406-439-7583
andrew.jakes@mso.umt.edu

Paul Beier
Regents' Professor
NAU School of Forestry
928-523-9341
paul.beier@nau.edu

References

Ament, R. and Meiklejohn, K. 2009. Federal agency planning for wildlife corridors and habitat connectivity language used in completed or draft documents: a compendium. Center for Large Landscape Conservation Unpublished Report. Available at http://largelandscapes.org/media/publications/Federal-agency-planning-for-wildlife1.pdf.

Beier, P., R. Noss. 1998. Do habitat corridors provide connectivity? Conservation Biology, 12(6):1241-1252.

3



Beier, P., D.R. Majka, W.D. Spencer. 2008. Forks in the Road: Choices in procedures for designing wildland linkages. Conservation Biology, 22(4):836-851.

Beier, P., W. Spencer, R.F. Baldwin, B.H. McRae. 2011. Toward best practices for developing regional connectivity maps. Conservation Biology, 25(5):879-892.

Brodie, J.F., Giordano, A.J., Dickson, B., Hebblewhite, M., Bernard, H., Mohd-Azlan, J., Anderson, J., L. Ambu. 2014. Evaluating multispecies landscape connectivity in a threatened tropical mammal community. Conservation Biology, 29(1):122-132.

Bunn, A.G., D.L. Urban, T.H. Keitt. 2000. Landscape connectivity: A conservation application of graph theory. Journal of Environmental Management 59:265-278.

Carroll, C., B.H. McRae, A. Brookes. 2011. Use of linkage mapping and centrality analysis across habitat gradients to conserve connectivity of gray wolf populations in Western North America. Conservation Biology 26:78-87.

Chetkiewicz, C-L.B., C. C. St. Claire, M.S. Boyce. 2006. Corridors for conservation: integrating pattern and process. Annual Review of Ecology, Evolution and Systematics, 37:317-342.

Compton, B.W., K. McGarigal, S.A. Cushman, L.R. Gamble. 2007. A resistant-kernel model of connectivity for amphibians that breed in vernal pools. Conservation Biology 21:788-799.

Cushman, S.A., K.S. McKelvey, M.K. Schwartz. 2009. Use of empirically derived source-destination models to map regional conservation corridors. Conservation Biology, 23(2):368-376.

Cushman, S.A., E.L. Landguth, C.H. Flather. 2013. Evaluating population connectivity for species of conservation concern in the American great plains. Biodiversity and Conservation, 22(11): 2583-2605.

Epps, C.W., Mutoyoba, B.M., Gwin, L., J.S. Brashares. 2011. An empirical evaluation of the African elephant as a focal species for connectivity planning in East Africa. Diversity and Distributions, 17:603-617.

Hamilton, K. 2008. Decision notice & finding of no significant impact: pronghorn migration corridor forest plan amendment. Jackson Hole, WY: USDA Bridger-Teton National Forest.

Heller, N.E. and E.S. Zavaleta. 2009. Biodiversity management in the face of climate change: A review of 22 years of recommendations. Biological Conservation: 142:14-32.

Hilty, J. A., W.Z. Lidicker Jr., A.M. Merenlender. 2006. Corridor ecology: the science and practice of linking landscapes for biodiversity conservation, Island Press. 323 pp.

Jakes, A.F. 2015. Factors influencing seasonal migration of pronghorn across the Northern Sagebrush Steppe. PhD Dissertation. Faculty of Environmental Design, University of Calgary, Calgary, AB. 243 pp.

McRae, B.H., B.G. Dickson, T.H. Keitt, V.B. Shah. 2008. Using circuit theory to model connectivity in ecology, evolution, and conservation. Ecology 89:2712-2724.

Noss, R.F. 1987. Corridors in real landscapes: a reply to Simberloff and Cox. Conservation Biology, 1:159-164.

4



NORTHERN ARIZONA
UNIVERSITY
*College of Engineering, Forestry & Natural Sciences*

**W.A. FRANKE** COLLEGE OF
**FORESTRY** & **CONSERVATION**
UNIVERSITY OF MONTANA

Opdam, P., J. Verboom, R. Pouwels. 2003. Landscape cohesion: an index for the conservation potential of landscapes for biodiversity. Landscape Ecology, 18:113-126.

Petracca, L.S., Ramírez-Bravo, O.E., L. Hernández-Santín. 2014. Occupancy estimation of jaguar *Panthera onca* to assess the value of east-central Mexico as a jaguar corridor. Oryx, 48(1):133-140.

Roever, C.L., van Aarde, R.J., K. Leggett. 2013. Function connectivity within conservation networks: Delineating corridors for African elephants. Biological Conservation, 157:128-135.

Squires, J.R., DeCesare, N.J., Olson, L.E., Kolbe, J.A., M. Hebblewhite. 2013. Combining resource selection and movement behavior to predict corridors for Canada lynx at their southern range periphery. Biological Conservation, 157:187-195.

Taylor, P.D., L. Fahrig, K.A. With. 2006. Landscape connectivity: A return to the basics *In* Connectivity Conservation. K.R. Crooks, M. Sanjayan editors. Cambridge University Press. 29-43 pp.

Walpole, A.A., J. Bowman, D.L. Murray, P.J. Wilson. 2012. Functional connectivity of lynx at their southern range periphery in Ontario, Canada. Landscape Ecology, 27:761-773.

Rvsd Plan - 00003536

Rvsd Plan - 00003537

**Andrew Jakes**
**2809 Mary Jane Blvd.**
**Missoula, MT 59808 USA**
**C (406) 439-7583**
**andrew.jakes@umontana.edu**

**Education**

| Ph.D., Environmental Design | Master of Science, Biology | Bachelor of Science, Biology |
|---|---|---|
| Graduated November 2015 | Graduated May 2001 | Graduated May 1998 |
| University of Calgary | Towson University | James Madison University |
| Calgary, AB T2N 1N4 | Towson, MD 21252 | Harrisonburg, VA 22801 |
| Focus: Movement Ecology | Focus: Landscape Ecology | Minor: Environmental Science |

**Research Experience**

**Post-Doctoral Research (2016-Current): Using Pronghorn to Develop a Multi-Species Approach to Conserve Connectivity in the Northern Great Plains. Employer: Dr. Mark Hebblewhite**

I am leading modelling efforts to investigate multi-species overlap for migratory and seasonal range selection in the Northern Great Plains to prioritize management activities and target opportunities for conservation efforts.  In this regard, we predict that feathered species (i.e. grassland birds, waterfowl, sage-grouse) can be managed under the pronghorn 'umbrella' so as to combine elements into a hierarchically strategic approach at the northern periphery of multiple species range.  We investigate effects from both habitat loss and fragmentation on species habitat use. Results can be used as a decision support tool to provide solutions for public and private landowners.

**Post-Doctoral Research (2015-2016): Restoring Connectivity for Pronghorn across the Northern Sagebrush Steppe. Employer: Dr. Mark Hebblewhite**

I was the principle coordinator and lead analyst for a collaborative interagency large landscape project between University of Montana, Alberta Conservation Association and The Nature Conservancy. The project used a robust approach (Before-After-Control-Impact), and remote cameras traps to assess wildlife-fence interactions and critically evaluate various fence modifications to determine use by pronghorn during daily and seasonal movement while retaining livestock in appropriate pastures on TNC's Matador Ranch. Results can be applied to implement fence standards from a broad scale and can mitigate direct and indirect impacts caused by wildlife-fence interactions, thus improving connectivity throughout the system. Additionally, results will provide private and public stakeholders cost-effective options, guided by the best available science, when modifying barbed-wire fencing across the landscape.

**Ph.D. Research (2008-2015): Factors Influencing Seasonal Migrations of Pronghorn across the Northern Sagebrush Steppe. Supervisor: Dr. Cormack Gates**

I modelled seasonal migratory pathways and designed a connectivity network for my Ph.D., an international, interagency and interdisciplinary endeavor. I worked and communicated continuously with multiple federal, state, provencial, NGO, academic and industry partners. I captured and analyzed data from ~185 pronghorn to first, quantify movement strategies across the northern periphery of pronghorn range. Second, I worked with both state/provincial and federal agencies to develop seamless GIS maps for landcover, topography, roads, natural gas/oil wells and streams. I also created GIS coverages from temporal variables which included forage quality and drilling of wells for modelling purposes. Third, I modeled seasonal migratory pathways across two scales. I then integrated multi-scaled results into one map for conservation use for both spring and fall seasons. Migratory stopover site use was modelled from migratory pathways and in addition, I investigated multi-scale effects from cumulative anthropogenic development on migratory pathway selection. Maps included the northern range of pronghorn (Alberta, Saskatchewan and northern Montana prairies). Finally, I used integrated movement pathway maps as a cost surface to

model connectivity during seasonal migrations across the entire northern range. Results can be applied by wildlife/habitat managers as well as other stakeholders when designing and designating management and mitigation options for pronghorn and potentially other prairie/sagebrush steppe species.

**M.S. Research (1999-2001): A Habitat Preference Model for Beaver *Castor canadensis* on the Southeastern Coastal Plain USA. Supervisor: Dr. Joel Snodgrass**
I modelled beaver habitat preference in blackwater streams of the southeast by creating and using multiple GIS coverages. Local geomorphic variables, including watershed size above each reach, gradient, floodplain width, and presence of road crossings were measured for individual reaches. I used stepwise logistic regression to predict probability of impoundment of reaches based on these local habitat characteristics. The final model included watersheds size above reaches, gradient, and presence of roads. Road crossings increased probabilities of impoundment at each reach, suggesting that beavers utilized culverts created by road crossings to simplify processes of impounding streams. The model should be useful to managers trying to balance and mitigate conflicting demands of protection and management of renewable resources (e.g., timber) and biological diversity associated with beaver impoundment of southeastern streams.

**Research Assistantship (2000): Rutgers University. Supervisor: Dr. Joel Snodgrass**
I collected amphibians to study the effects of heavy metal contamination on developing tadpoles from isolated and damaged wetlands. Addition field collections for other projects included various fish species and alligators.

**B.S. Research (1997-1998): Bioaccumulation of Mercury by Earthworms Living on the Contaminated Flood Plain of the South River and South Fork of the Shenandoah River, VA. Supervisor: Dr. Dean Cocking**
My study investigated mercury contamination in soils and earthworms inhabiting a polluted floodplain. Samples were taken both upstream and downstream from a point source of contamination. Both soils and worms were digested using strong acids, with the resulting solution analyzed for mercury (Hg) levels in soils and tissues. Worms were shown to exhibit bioconcentration and bioaccumulation of Hg from the soil, depending on worm/soil Hg concentration ratios. Results indicated that at low soil Hg concentrations, worms readily uptake Hg from the soil. However, in areas of high soil Hg concentrations, at saturation point worms have the ability to excrete Hg, thus lowering the worm/soil Hg ratios.

## Employment

**Independent Contractor (2006-2014).**
I worked independently and in team situations for a state agency, various NGO's and a private company to provide assistance in literature review, experimental design, field coordination, data collection, analysis and report writing. Contracts ranged from data collection for policy decisions, data collection for habitat mitigation measures, and analytical and field work to improve large scale connectivity. Example contracts include MT Fish, Wildlife & Parks, The Nature Conservancy, Westech, Inc., and Wild Things Unlimited.

**Nonpoint Source Pollution Education & Outreach Coordinator - Montana Department of Environmental Quality (2006-2008). Supervisor: Robert Ray**
I developed and lead the education and outreach components of Montana's Nonpoint Source (NPS) planning document and directed statewide coordination for NPS education, outreach, and public involvement programs, while considering state water wide range of uses, standards and controls. I implemented the education and outreach (E&O) components of the State's NPS Management Plan including preparing campaign ads, brochures, GIS maps, presentations, website development, press releases and other materials regarding water management. I assisted a swath of partners including statewide grassroot voluntary water quality monitoring groups, local watershed groups, conservation districts, and water quality entities in understanding policies and opportunities as set by State NPS Management Plan. I served as the chairman for the interagency

and interdisciplinary Montana Watershed Coordination Council (MWCC) E&O subcommittee, as well as on MWCC Water Activities & Steering Committees. I promoted, awarded and administered all Clean Water Act Section 319 education and outreach contracts for Montana, including multi-funding opportunities for "mini-grant" projects.

**Wildlife Information Specialist - Montana Fish, Wildlife & Parks (2003-2006). Supervisor: T.O. Smith**
As part of an interdisciplinary team, I helped to develop and complete the State Wildlife Grants Program (SWG) Comprehensive Fish & Wildlife Conservation Strategy. The strategy was an interagency endeavor to collect scientific data, which included state and federal agencies, universities, tribes, non-profit organizations and private industry. I performed spatial and temporal analysis using GIS. I assisted in biological and public meetings to prioritize wildlife species and habitat requirements on a regional basis and identifying threats and mitigation opportunities to these priority species and landscapes and multi-scales. I co-lead in researching, compiling and synthesizing data as well as writing and editing both the complete strategy and the executive summary land use plans. Additionally, I lead in all components of a SWG funded project to inventory species diversity of state lands with focus on small mammals, birds, reptiles and amphibians. Duties included writing grant proposal and protocol for inventory, marketing job announcement, interviews and hiring of interns, contract negotiation between universities and FWP for interns, coordination between land owners and crews, managing interns, capture and inventory diverse species, data management and analysis.

**Biological Technician, Mountain Lion Project - Montana Fish, Wildlife & Parks (2002-2003). Supervisor: Rich DeSimone**
I assisted in multiple phases of Garnet Mountains mountain lion project, including data management and analysis, equipment maintenance (computers, GPS, radio collars, cameras, snowmobiles, ATV's, state trucks, pack equipment), telemetry from ground and small aircraft, and tracking and capturing of mountain lions. I lived remotely to survey mountain lions via snowmobiles and ATV's. Lions were tracked, captured and radio collared, utilizing drugs to tranquilize individuals. Public outreach with landowners, hunters, and the general public and other agencies was common.

**Field Organizer - Friends of Max Baucus (2002). Supervisor: Jim Messina**
I independently operated one of nine re-election campaign stations in Montana, for Montana U.S. Senator Max Baucus. I planned, coordinated and managed public events such as parades, fairs, fundraisers, and "Get out the Vote (GOTV) in three counties (Lewis & Clark, Broad water, and Jefferson). I recruited and supervised volunteers while working closely with local candidates, unions, and party members to increase public turnout. I planned and coordinated other large projects such as securing locations for highway signs, yard signs, statewide literature drops, and endorsements for the senator.

**Biological Technician, GS-06 - Lake Clark National Park and Preserve (2001). Supervisor: Dennis Knuckles**
I was a team member in creating a coastal brown bear management program for Lake Clark National Park and Preserve. I was a team member in monitoring study to evaluate cumulative human impacts to brown bear behavior and critical habitat use, population estimation and, assessment of important vegetation usage within critical habitat. I supervised remote field sites of high concentrations of brown bears with or without human conflicts. I contributed to and conducted bear "aversive conditioning" incidents within remote locations following National Park protocols to mitigate human-bear conflicts. I conducted remote field observations of Dall's sheep and moose and recorded hunters within park and preserve territory to maintain hunting regulations and poaching restrictions park-wide.

**Publications**

**18. Jakes, A.**, DeCesare, N.J., Gates, C.C., Jones, P.F., Hebblewhite, M., Kunkel, K. *In Preparation.* Designing seasonal connectivity networks using pronghorn migrations across a transboundary region.

**17. Jakes, A.**, Jones, P.F., Paige, C., Seidler, R., Huijser, M., Ament, R. *In Preparation.* Fence ecology: a new discipline examining wildlife – fence interactions.

**16. Jones, P.F., Jakes, A.**, Eacker, D.R., Hebblewhite, M., Martin, B. *In Preparation.* To cross or not to cross? Evaluating responses to fence modifications by pronghorn across the northern great plains of North America.

**15. Jakes, A.**, DeCesare, N.J., Gates, C.C., Jones, P.F., Hebblewhite, M., Story, S., Olimb, S., Kunkel, K. *In Preparation.* Multi-scale selection of migration pathways by pronghorn in relation to environmental gradients and anthropogenic factors.

**14.** Burkholder, E., **Jakes, A.**, Jones, P.F., Hebblewhite, M., Bishop, C. 2017. To jump or not to jump: Mule deer and white-tailed deer crossing decisions. Wildlife Society Bulletin. *In Review.*

**13. Jakes, A.**, Gates, C.C., DeCesare, N.J., Jones, P.F., Goldberg, J.F., Kunkel, K., Hebblewhite, M. 2017. Classifying the migration behaviors of pronghorn on their northern range. Journal of Wildlife Management. *In Review*.

**12.** Jones, P.F., Hurley, A., Jensen, C., Zimmer, K., **Jakes, A.** 2017. Diel and monthly movement rates by migratory and resident female pronghorn. The Prairie Naturalist. 49(1)

**11.** Poor, E., **Jakes, A.**, Loucks, C., Suitor, M. 2014.  Modeling Fence Location and Density at a Regional Scale for use in Wildlife Management. PLoS One. 9(1): e83912

**10.** Poor, E., Loucks, C., **Jakes, A.**, Urban, D. 2012. Comparing habitat suitability and connectivity modeling methods for conserving pronghorn migrations. PLoS One.7(11): e49390

**9.** Gates, C.C., Jones, P., Suitor, M., **Jakes, A.**, Boyce, M.S., Kunkel, K., Wilson, K. The influence of land use and fences on habitat effectiveness, movements and distribution of pronghorn in grasslands of North America. 2012. *In*: Fencing for Conservation: Restriction of Evolutionary Potential or a Riposte to Threatening Processes? Somers, M.J., Hayward, M. (Eds.). Springer Press, 320 pp.

**8. Jakes, A.**, Poor, E. 2011. Modeling Fence Location and Density at a Landscape Level Scale in Montana. Proceeding of the 24th Biennial Pronghorn Conference, Laramie, WY. 25 pp.

**7. Jakes, A.**, J. W. Snodgrass, J. Burger.  2007.*Castor canadensis* (Beaver) Impoundment Associated with Geomorphology of Southeastern Streams. Southeastern Naturalist. 6(2): 271-282.

**6.** Montana Department of Environmental Quality. 2007. Montana Nonpoint Source Management Plan. Water Quality Planning Bureau, Watershed Protection Section. 136 pp. & app.

**5.** Helena Urban Wildlife Task Force. 2007. City of Helena Urban Deer Management Plan: Findings and Recommendations of the Helena Urban Wildlife Task Force. 57 pp. & app.

**4.** Montana Fish, Wildlife & Parks. 2005.  Montana Comprehensive Fish & Wildlife Conservation Strategy. 658 pp.

**3.** Montana Fish, Wildlife & Parks. 2005. Executive Summary: Montana Comprehensive Fish & Wildlife Conservation Strategy. 91 pp.

**2.** Carson, S., Messer, A., **Jakes, A.**, Rauscher, R. 2005. Small Mammal Inventory Report for First Field Season, Eastern MT. Montana Fish, Wildlife & Parks. 35 pp.

**1.** DeSimone, R., Semmens, B., Chilton, T., Edwards, V., Hedrick, G., Jaffe, R., **Jakes, A.**, Powell, D., Powers, J., Powers, S., and Trapkus, M. 2004. Garnet Mountains Mountain Lion Research. Progress Report January 2003-December 2004. Montana Fish, Wildlife & Parks. 16 pp.

## Presentations

**32.** Factors Influencing Seasonal Migrations of Pronghorn across the Northern Sagebrush Steppe, Webinar co-hosted by GNLCC & PPP LCC, Missoula MT, September 2016.

**31.** Fencing: A Tool or Obstacle for Managing & Conserving Wildlife? Plenary Session Moderator, 27th Biennial Pronghorn Conference, Fairmont Hot Springs MT, August 2016.

**30.** Factors Influencing Seasonal Migration of Pronghorn across the Northern Sagebrush Steppe, 27th Biennial Pronghorn Conference, Fairmont Hot Springs MT, August 2016.

**29.** Evaluating the use of Modified Fence Sites by Pronghorn in the NSS, 27th Biennial Pronghorn Conference, P. Jones – Presenter, Fairmont Hot Springs MT, August 2016.

**28.** Impacts of Severe Winter Weather on Pronghorn Survival in Partially Migratory Populations, 27th Biennial Pronghorn Conference, D. Eacker – Presenter, Fairmont Hot Springs MT, August 2016.

**27.** To Jump or not to Jump: Mule Deer (*Odocoileus hemionus*) and white-tailed deer (*Odocoileus virginianus*) crossing decisions, 27th Biennial Pronghorn Conference, E. Burkholder – Presenter, Fairmont Hot Springs MT, August 2016.

**26.** Connectivity in Wildlife Conservation and Management – Using Pronghorn and Fencing as a Case Study, WBIO 275: Wildlife Conservation Lecture – University of Montana, Missoula MT, April 2016.

**25.** Connectivity in Wildlife Conservation and Management – Using Pronghorn and Fencing as a Case Study, WBIO 370: Wildlife Habitat Conservation & Management Lecture – University of Montana, Missoula MT, April 2016.

**24.** Factors Influencing Seasonal Migration of Pronghorn across the Northern Sagebrush Steppe, The Wildlife Society Meetings – Montana Chapter, Missoula MT, February 2016.

**23.** To Jump or not to Jump: Mule Deer (*Odocoileus hemionus*) and white-tailed deer (*Odocoileus virginianus*) crossing decisions, The Wildlife Society Meetings – MT Chapter, E. Burkholder – Presenter, Missoula MT, February 2016.

**22.** Public Radio International – Living on Earth with Steve Curwood: Man-made Barriers to Pronghorn Migration. Story with Clay Scott aired November 6, 2015.
http://www.loe.org/shows/shows.html?programID=15-P13-00045#feature4

**21.** Use of Remote Cameras to Document Pronghorn Interactions with Fencing, 5th Annual TNC Matador Ranch Science and Land Management Symposium, Zortman MT, June 2015.

**20.** Pronghorn Migration in the Northern Sagebrush Steppe: Managing a Multi-Jurisdictional Species, Helena High School, Helena MT, November 2014.

**19.** Pronghorn Migration in the Northern Sagebrush Steppe: Managing a Multi-Jurisdictional Species, ACA Wildlife in the Wind Series, Lethbridge AB, November 2014.

**18.** Factors Influencing Pronghorn Seasonal Migrations across the Northern Sagebrush Steppe, 4th Annual TNC Matador Ranch Science and Land Management Symposium, Zortman MT, June 2014.

**17.** Factors Influencing Pronghorn Movement, Supportive of a Regional Design across the Northern Sagebrush Steppe, MT FWP Montana Wild series, Helena MT, January 2013.

**16.** Development of a regional fence-density model with implications for wildlife management, The Wildlife Society Meetings (Both MT Chapter and NW Section), Great Falls MT, February 2012.

**15.** Species-specific scaling to define and conserve the Northern Great Plains prairie region, The Wildlife Society Meetings (Both MT Chapter and NW Section), M. Kohl – Presenter, Great Falls MT, February 2012.

**14.** Factors Influencing Pronghorn Movement and Resource Selection, Supportive of a Regional Design across the Northern Sagebrush Steppe, University of Montana: College of Forestry and Conservation Graduate Lecture Series, Missoula MT, September 2011.

**13.** Factors Influencing Pronghorn Movement and Resource Selection, Supportive of a Regional Design across the Northern Sagebrush Steppe, Northern Sagebrush Steppe Initiative Annual Meeting, Havre, MT, February 2011.

**12.** Modeling Fence Location and Density at a Landscape Level Scale in Montana, 24th Biennial Pronghorn Conference, Laramie WY, May 2010.

**11.** Poster: Effects of Fence Type on Pronghorn Movement in North-Central Montana, 24th Biennial Pronghorn Conference, Laramie WY, May 2010.

**10.** Cumulative Effects of Development on Pronghorn Distribution and Movements in the Northern Sagebrush Steppe, 24th Biennial Pronghorn Conference, Laramie WY, May 2010.

**9.** Cumulative Effects of Development on Pronghorn Distribution & Movements in the Northern Sagebrush Steppe, MT FWP Region 6 Citizen Advisory Council Meeting, Malta MT, August 2009.

**8.** Cumulative Effects of Development on Pronghorn Distribution & Movements in the Northern Sagebrush Steppe, Crossing the Medicine Line Annual Meeting, Havre MT, April 2009.

**7.** Cumulative Effects of Development on Pronghorn Distribution & Movements in the Northern Sagebrush Steppe, Northern Sagebrush Steppe Initiative Annual Meeting, Medicine Hat AB, February 2009.

**6.** Poster: Preliminary Findings of the Helena Urban Wildlife Task Force, The Wildlife Society Meetings – Montana Chapter, Bozeman MT, February 2007.

**5.** Poster: Department of Environmental Quality Section 319 Successes in Restoration, Groundwater and Education & Outreach Projects, MWCC Watershed Symposium, Great Falls MT, December 2006.

**4.** A Habitat Preference Model for Beaver *Castor canadensis* on Southeastern Coastal Plains, USA, Montana Fish, Wildlife & Parks Seminar, Helena MT, March 2005.

**3.** State Wildlife Grants Program (SWIG) and the Comprehensive Fish & Wildlife Conservation Plan for Montana, The Wildlife Society Meetings – Montana Chapter, Bozeman MT, February 2004.

**2.** A Habitat Preference Model for Beaver *Castor canadensis* on Southeastern Coastal Plains, USA, American Society of Mammologists, Missoula MT, June 2001.

**1.** A Habitat Preference Model for Beaver *Castor canadensis* on Southeastern Coastal Plains, USA, Towson University Research Expo, Towson MD, April 2001.

## Grants & Scholarships

### Post-Doctoral:
**25.** National Fish and Wildlife Foundation – Alberta Conservation Association, Fall 2016, $156,200
**24.** Sage-Grouse Initiative – University of Montana, Fall 2016, $20,000
**23.** National Fish and Wildlife Foundation – Alberta Conservation Association, Fall 2014, $198,000

### Doctorate:
**22.** EVDS Graduate Student Support Awards - University of Calgary, Fall 2014, $1,025
**21.** EVDS Graduate Student Support Awards - University of Calgary, Summer 2012, $1,025
**20.** Counter Assault, Inc. – Winter 2012, $500
**19.** EVDS Graduate Student Support Awards - University of Calgary, Winter 2012, $2,050
**18.** EVDS Graduate Student Support Awards - University of Calgary, Fall 2011, $2,050
**17.** EVDS Graduate Student Support Awards - University of Calgary, Summer 2011, $2,050
**16.** Saskatchewan Ministry of Environment Fish & Wildlife Development Fund, Spring 2011, $5,000
**15.** EVDS Graduate Student Support Awards - University of Calgary, Summer 2010, $2,000
**14.** Saskatchewan Ministry of Environment Fish & Wildlife Development Fund, Spring 2010, $5,000
**13.** EVDS Graduate Student Support Awards - University of Calgary, Winter 2010, $2,000
**12.** Accelerate Alberta - The Mathematics of Information Technology and Complex Systems Inc. (MITACS), Fall 2009, $15,000
**11.** Agriculture Canada - PFRA, Spring 2009, $20,000
**10.** US Bureau of Land Management Collaborative Project Grant, Spring 2009, $150,000
**9.** Saskatchewan Ministry of Environment Fish & Wildlife Development Fund, Spring 2009, $5,000
**8.** Alberta Sport, Recreation Parks & Wildlife Foundation, Development Initiatives Program, Spring 2009, $5,000
**7.** Research Associate Student Stipend, Montana Fish, Wildlife & Parks, Fall 2008, $30,000
**6.** Alberta Conservation Association (Petro-Canada Sustainable Grasslands Program) Student Stipend, Fall 2008, $30,000
**5.** Glaholt Scholarship Recipient, University of Calgary, Fall 2008, $10,000
**4.** Dean's Entrance Scholarship, University of Calgary, Fall 2008, $6,000
**3.** Living With Wildlife, Helena Urban Wildlife Task Force, Summer 2006, $7,000

### Masters of Science:
**2.** Biology Department, Rutgers University, Summer 2000, $2,300
**1.** Towson University Graduate Student Association, Fall 1999, $300

## Professional Societies:
**1.** The Wildlife Society, Montana Chapter



# Paul Beier

Regents' Professor
Conservation Biology & Wildlife Ecology, School of Forestry, Northern Arizona University, Flagstaff AZ 86011-5018 (May 1992-present)
Phone 928-523-9341. Skype paul.beier. Email paul.beier@nau.edu. Web: http://oak.ucc.nau.edu/pb1/
Ph.D. (Wildland Resource Science), University of California, Berkeley, 1988

## Summary

For 25 years I have specialized in science-based design of **wildlife corridors** and unabashed activism for conserving them on the ground. My 1988-1992 study of cougars documented that young cougars find and use habitat corridors to maintain gene flow among mountain ranges in urbanizing southern California. Recent projects are developing rigorous estimates of landscape resistance to gene flow and movement for various species. ♦ 4 book chapters and 27 peer-reviewed papers related to wildlife linkage design, plus two statewide maps of wildlife corridors, namely Arizona Wildlife Linkage Assessment (2006) and California Essential Habitat Connectivity (2010). ♦ 60 detailed linkage designs in Arizona & California ♦ freely-shared GIS tools for linkage design (www.corridordesign.org) ♦ a lead author of the Wildlife Corridors Initiative, unanimously adopted by the Western Governors Association in 2008 ♦ framework for wildlife corridors for the government of Bhutan ♦ founding member and current president of SC Wildlands (www.scwildlands.org) which specializes in using science and collaboration to connect wildlands

Since 2010, I've developed a second focus on "**conserving nature's stage**" (CNS) – prioritizing sites for conservation on the basis of their topographic and soil traits, in the hope that such sites will interact with any climate (including the wild card climates coming at us) to harbor most species. The world desperately needs a coarse-filter climate-adaptation strategy that does not depend on rococo models in which emission scenarios drive circulation models which drive species envelope models linked to species dispersal models. Sadly, the desperate need for CNS does not guarantee it is a good strategy. I'm working hard to develop and assess CNS strategies so planners can lurch forward armed with an appropriate mix of trepidation and confidence.

Work not related to these 2 themes: ♦ co-production of science by scientists and decision-makers ♦ community-based conservation projects in Ghana ♦ field studies of white-tailed deer, beaver, mountain beaver, northern goshawks, Mexican spotted owls, and forest birds ♦ My students have studied insectivorous birds as top-down regulators, plague dynamics in prairie dogs & fleas assemblages, and lots of other cool stuff. ♦ President of the Society for Conservation Biology (2011-2013) ♦

## Professional Societies

Society for Conservation Biology since 1990, Handling Editor for *Conservation Biology* 2015-present. (See *Related Activities* for more information)

The Wildlife Society (Certified Wildlife Biologist) since 1982; Associate Editor, *Journal of Wildl:fe Management* 2010-2013.

American Society of Mammalogists since 1985

## Peer-Refereed Publications & Book Chapters

Keeley ATH, **Beier P**, Keeley BW, Fagan ME. 2017. Habitat suitability is a poor proxy for landscape connectivity during dispersal and mating movements. *Landscape & Urban Planning*: in press.

Reilly ML, Tobler MW, Sonderegger DL, **Beier P**. 2016. Spatial and temporal response of wildlife to recreational activities in the San Francisco Bay ecoregion. *Biological Conservation*: doi 10.1016/j.biocon.2016.11.003.

**Beier P**, Hansen L, Hellbrecht LJ, Behar D. 2016. A how to guide for co-production of actionable science. *Conservation Letters*: doi: 10.1111/conl.12300.

Albuquerque F, **Beier P**. 2016. Predicted rarity-weighted richness, a new tool to prioritize sites for species representation. *Ecology and Evolution* 8:8107-8114. DOI: 10.1002/ece3.2544

Alsamieh K, Kaboli M, **Beier P**. 2016. Identifying habitat cores and corridors for the Iranian black bear in Iran. *Ursus* 27:18-30. DOI: 10.2192/ursus-d-15-00032.1

Blazquez-Cabrera S, Gastón A, **Beier P**, Garrote G, Simón MA, Saura S. 2016. Influence of separating home range and dispersal movements on characterizing corridors and effective distances. *Landscape Ecology* 31:2355-2366. DOI 10.1007/s10980-016-0407-5

Aycrigg JL, Groves C, Hilty JA, Scott JM, **Beier P**. 2016. Completing the system: new opportunities and challenges for a national habitat conservation system. *BioScience* 66:774-784 doi:10.1093/biosci/biw090

Albuquerque F, **Beier P**. 2016. Downscaling patterns of complementarity to a finer resolution and its implications for conservation prioritization. *Ecology and Evolution* 6:4032-4040, doi: 10.1002/ece3.2190

Keeley ATH, **Beier P**, Gagnon JW. 2016. Estimating landscape resistance from habitat suitability: effects of data source and nonlinearities. *Landscape Ecology* 31:2151-2162. DOI: 10.1007/s10980-016-0387-5

**Beier P**, Albuquerque FS. 2016. Evaluating β diversity as a surrogate for species representation at fine scale. PLoS One: doi: 10.1371/journal.pone.0151048.

Gastón, A, Blázquez-Cabrera S, Garrote G, Mateo-Sánchez MC, **Beier P**, Simón MA, Saura S. 2016. Response to agriculture by a woodland species depends on cover type and behavioural state: insights from resident and dispersing Iberian lynx. *J Applied Ecology* 53:814-824. DOI 10.1111/1365-2664.12629.

Zeller KA, McGarigal K, Cushman SA, **Beier P**, Vickers TW, Boyce WM. 2016. Using step and path selection functions for estimating resistance to movement: pumas as a case study. *Landscape Ecology* 31:1319-1335. DOI 10.1007/s10980-015-0301-6

Albuquerque FS, **Beier P**. 2015. Using abiotic variables to predict importance of sites for species representation. *Conservation Biology* 29:1390-1400. DOI: 10.1111/cobi.12520.

**Beier P**, Albuquerque FS. 2015. Environmental diversity as a surrogate for species representation. *Conservation Biology*: 29:1401-1410. DOI: 10.1111/cobi.12495.

**Beier P**, Hunter ML, Anderson MG. 2015. Conserving nature's stage. *Conservation Biology* 29:613-617.

**Beier P**, Sutcliffe P, Hjort J, Faith DP, Pressey RL, Albuquerque F. 2015. A review of selection-based tests of abiotic surrogates for species representation. *Conservation Biology* 29:668-679. doi: 10.1111/cobi.12509

Anderson MG, Comer PJ, P **Beier P**, Lawler J, Schloss C, Buttrick S, Albano C, Faith D. 2015. Case studies of conservation plans that incorporated geodiversity. *Conservation Biology* 29:680-691.

Albuquerque FS, **Beier P**. 2015. Rarity weighted richness: a simple and reliable alternative to integer programming and heuristic algorithms for minimum set and maximum coverage problems in conservation planning. *PLoS One*: DOI: 10.1371/journal.pone.0119905.

Albuquerque FS, **Beier P**. 2015. Global patterns and environmental correlates of high priority conservation areas for vertebrates. *Journal of Biogeography* 42:1397-1405. doi:10.1111/jbi.12498

Albuquerque FS, Benito B, **Beier P**, Assunção-Albuquerque M, Cayuela L. 2015. Supporting underrepresented forests in Mesoamerica. *Natureza & conservação* 13:152-158

doi:10.1016/j.ncon.2015.02.001

Chornesky E, Ackerly D, **Beier P**, Davis F, Flint L, Lawler J, Moyle P, Moritz M, Scoonover M, Alvarez P, Byrd K, Heller N, Micheli E, Weiss S. 2015. Adapting California's ecosystems to climate change. *BioScience* 65:247-262. 10.1093/biosci/biu233

Schmitz O, Lawler JJ, **Beier P**, Groves C, Knight G, Boyce D, Bulluck J, Johnston KM, Klein ML, Muller K, Pierce DJ, Singleton WR, Strittholt JR, Theobald D, Trombulak S, Trainor A. 2015. Conserving biodiversity: practical guidance about climate change adaptation approaches in support of land-use planning. *Natural Areas Journal* 35:190-203.

Gregory AJ, **Beier P**. 2014. Response variables for evaluation of the effectiveness of conservation corridors. *Conservation Biology* 28:689-695.

Graves T, Chandler R, Royle JA, **Beier P**, Kendall KC. 2014. Estimating landscape resistance to dispersal. *Landscape Ecology* 29:1201-1211.

Zeller KA, McGarigal K, **Beier P**, Cushman SA, Vickers TW, Boyce WM. 2014. Sensitivity of landscape resistance estimates based on point selection functions to scale and behavioral state: pumas as a case study. *Landscape Ecology* 29:541-557.

Graves T, **Beier P**, Royle JA. 2013. Current approaches using genetic distances produce poor estimates of landscape resistance to inter-individual dispersal. *Molecular Ecology* 22:3888-3903.

Schaefer J, **Beier P**. 2013. Going public: an active role for scientists in conservation. *International Journal of Environmental Studies* 70:429-437. doi 10.1080/00207233.2013.800374.

Cushman SA, McRae BH, Adriaensen F, **Beier P**, Shirley M, Zeller K. 2013. Biological corridors. Pages 384-404 *in* DW Macdonald and K Willis, editors. Key Topics in Conservation Biology, volume 2. Wiley-Blackwell, 528pp.

Noss R, Dobson AP, Baldwin R, **Beier P**, Davis CR, DellaSala DA, Francis J, Locke H, Nowak K, Lopez R, Reining C, Schmiegelow FA, Trombulak SC, Tabor G. 2012. Thinking and talking bigger for conservation [editorial]. *Conservation Biology* 26:1-4.

**Beier P**, Gregory A. 2012. Desperately seeking stable 50-year-old landscapes with patches and long, wide corridors. *PLOS Biology* 10:e1001253:4 pages.

**Beier P**, Ingraldi MF. 2012. There is no evidence that the Forest Service's goshawk recommendations improve goshawk nest productivity. *Wildlife Society Bulletin* 36:153-154.

**Beier P**. 2012. Conceptualizing and designing corridors for climate change. *Ecological Restoration* 30:312-319.

Brost BM, **Beier P**. 2012. Comparing linkage designs based on land facets to linkage designs based on focal species. *PLoS One* 7(11): e48965. doi:10.1371/journal.pone.0048965.

Brost BM, **Beier P**. 2012. Use of land facets to design linkages for climate change. *Ecological Applications* 22:87-103. DOI: 10.1111/j.1523-1739.2011.01716.x

Graves T, Royle JA, Kendall K, **Beier P**, Stetz J, McLeod A. 2012. Balancing precision and risk: should multiple detection methods be analyzed separately in N-mixture models? *PLoS One*: http://dx.plos.org/10.1371/journal.pone.0049410.

McRae B, Hall S, **Beier P**, Theobald D. 2012. Where to restore connectivity? Detecting barriers and quantifying restoration benefits. *PLoS One*: 7(12): e52604. doi:10.1371/journal.pone.0052604.

Lopez R, **Beier P**. 2012. Weathered antlers as a source of DNA. *Wildlife Society Bulletin* 36:380-382.

Rudnick D, Ryan S, **Beier P**, Cushman SA, Dieffenbach F, Epps C, Gerber L, Hartter J, Jenness J, Kintsch J, Merenlender A, Perkl A, Preziosi D, Trombulak S. 2012. The role of landscape connectivity in planning and implementing conservation and restoration priorities. *Issues in Ecology* 16:1-19.

Bayless TA, **Beier P**. 2011. Occurrence and habitat characteristics of burrowing owl nests in Gunnison's prairie dog colonies of northeastern Arizona. *J. Arizona-Nevada Academy of Sciences* 42:65-74.

**Beier P**, Spencer WD, Baldwin R, McRae BH. 2011. Toward best practices for developing regional connectivity maps. *Conservation Biology* 25:879-892.

**Beier P**, Brost B. 2010. Use of land facets in planning for climate change: conserving the arenas not the actors. *Conservation Biology* 24:701-710.

Bridgeland WT, **Beier P**, Kolb T, Whitham TG. 2010. A conditional trophic cascade: birds benefit faster-

growing trees with strong links between predators and plants. *Ecology* 91:73-84.

Friggens M, **Beier P**. 2010. Anthropogenic disturbance and the risk of flea-borne disease transmission. *Oecologia* 164:809-820.

**Beier P**, Riley SPD, Sauvajot RM. 2010. Mountain lions. Pages 177-189 in SD Gehrt, SPD Riley, and BL Cypher, eds.  Urban carnivores: ecology, conflict, and conservation. Johns Hopkins University Press, Baltimore, Maryland.

**Beier P**. 2009. Cougars and conservation planning. Pages 177-189  in M. Hornocker and S. Negri, editors, Cougar ecology and conservation. University of Chicago Press.

**Beier P**, Majka DR, Newell SL. 2009. Uncertainty analysis of least-cost modeling for designing wildlife linkages. *Ecological Applications* 19:2067-2077.

Pope TL, Block WM, **Beier P**. 2009. Prescribed fire effects on wintering, bark-foraging birds in northern Arizona. *Journal of Wildlife Management*: 73:695-700.

**Beier P**, Majka D, Spencer WD. 2008. Forks in the road: choices in procedures for designing wildlife linkages. *Conservation Biology* 22:836-851.

**Beier P**, Rogan EC, Ingraldi MF, Rosenstock SS. 2008. Does forest structure affect reproduction of northern goshawks in ponderosa pine forests? *Journal of Applied Ecology* 45:342-350.

McRae BH, **Beier P**. 2008. Circuit theory predicts gene flow in plant and animal populations. *Proceedings National Academy of Sciences* 104:19885-19890.

Rosalino LM, Santos MJ, **Beier P**, Santos-Reis M. 2008. Eurasian badger habitat selection in Mediterranean environments: does scale really matter? *Mammalian Biology* 73:189-198.

Santos MJ, **Beier P**. 2008. Habitat selection by European badgers at multiple spatial scales in Portuguese Mediterranean ecosystems. *Wildlife Research* 35:835-843.

Trapp JR, **Beier P**, Mack C, Parsons DR, Paquet PC. 2008. Wolf, *Canis lupus*, den site selection in the Rocky Mountains. *Canadian Field-Naturalist* 122:49-56.

Dickson BG, **Beier P**. 2007. Quantifying the influence of topographic position on cougar movement in southern California USA. *Journal of Zoology (London)* 271:270-277.

Waskiewicz JD, Fulé PZ, **Beier P**. 2007. Comparing classification systems for ponderosa pine snags in northern Arizona. *Western Journal of Applied Forestry* 22:233-240.

Wightman CS, Germaine SS, **Beier P**. 2007. Landbird community composition varies among seasons in a heterogeneous ponderosa pine forest. *Journal of Field Ornithology* 78(2):184-194.

**Beier P**, AI Tungbani AI. 2006. Nesting with wasps increases nest success of the Red-cheeked Cordon-Bleu. *The Auk* 123:1022-1037.

**Beier P**, Vaughan MR, Conroy MJ, Quigley H. 2006. Evaluating scientific inferences about the Florida Panther. *Journal of Wildlife Management* 70:236-245.

Conroy MJ, **Beier P**, Quigley H, Vaughan MR. 2006. Improving the use of science in conservation: lessons from the Florida panther. *Journal of Wildlife Management* 70:1-7.

**Beier P**, Penrod K, Luke C, Spencer W, Cabañero C. 2006. South Coast Missing Linkages: restoring connectivity to wildlands in the largest metropolitan area in the United States. Pages 555-586 In KR. Crooks and MA Sanjayan, editors, Connectivity conservation, Cambridge University Press.

**Beier P**. 2006. Effects of artificial night lighting on terrestrial mammals. Pages 19-42 *In* C Rich, T Longcore, editors, Ecological consequences of artificial night lighting. Island Press.

Noss RF, **Beier P**, Covington WW, Grumbine RE, Lindenmayer DB, Prather JW, Schmiegelow F, Sisk TD, Vosick DJ. 2006. Recommendations for integrating restoration ecology and conservation biology in ponderosa pine forests of the Southwestern United States. *Ecological Restoration* 14:4-10.

Adjewodah P, Sam MK, Mason JJ. 2005. Elephant crop damage in the Red Volta Valley, northeastern Ghana. *Pachyderm* 38:39-48.

Boyce DA, Kennedy PL, **Beier P**, Ingraldi MF, MacVean SR, Siders MS, Squires JR, Woodbridge B. 2005. When are goshawks not there? Is a single visit enough to infer absence? *Journal of Raptor Research* 39:285-291.

Dickson BG, Jenness JS, **Beier P**. 2005. Influence of vegetation, topography, and roads on cougar movement in southern California. *Journal of Wildlife Management* 69:264-276.

Griffis-Kyle KL, **Beier P**. 2005. Migratory strategy and seasonal patterns of bird diversity in relation to

forest habitat. *American Midland Naturalist* 153:436-443.

McRae BH, **Beier P**, DeWald LW, Huynh LY, Keim P. 2005. Habitat barriers limit gene flow and illuminate historical events in a wide-ranging carnivore. *Molecular Ecology* 14:1965-1977.

Jenness JS, **Beier P**, Ganey JL. 2004. Associations between forest fire and Mexican spotted owls. *Forest Science* 50:765-772.

Czech B, Allen E, Batker D, **Beier P**, Daly H, Erickson J, Garrettson P, Geist V, Gowdy J, Greenwalt L, Hands H, Krausman P, Magee P, Miller C, Novak K, Pullis G, Robinson C, Santa-Barbara J, Teer J, Trauger D, Willer C. 2003. The iron triangle: why The Wildlife Society needs to take a position on economic growth. *Wildlife Society Bulletin* 31:574-577.

Drennan JE, **Beier P**. 2003. Winter foraging habitat of northern goshawks. *Journal of Wildlife Management* 67:177-185.

Griffis-Kyle KL, **Beier P**. 2003. Small isolated aspen stands enrich bird communities in Southwestern ponderosa pine forests. *Biological Conservation* 110:375-385.

Grigione MM, **Beier P**, Hopkins RA, Neal D, Padley WD, Schonewald C, Johnson M. 2003. Ecological and allometric determinants of home-range size for mountain lions (*Puma concolor*). *Animal Conservation* 5:317-324.

**Beier** P, Maschinski J. 2003. Threatened, endangered, and sensitive species. Pages 306-327 In P Friederici, editor. Ecological restoration of southwestern ponderosa pine forests. Island Press.

**Beier P**, van Drielen M, Kankam BO. 2002. Avifaunal collapse in West African forest fragments. *Conservation Biology* 16:1097-1111.

Dickson BG, **Beier P**. 2002. Home range and habitat selection by adult cougars in southern California. *Journal of Wildlife Management* 66:1235-1245.

**Beier P**. 1999. Cougar. Pages 226-228 *In* DE Wilson and S Ruff, editors, Smithsonian Book of North American Mammals. Smithsonian Institution Press, Washington.

Delaney DK, Grubb TG, **Beier P**, Pater LL, Reiser MH. 1999. Activity patterns of nesting Mexican spotted owls. *Condor* 101:42-49.

Delaney DK, Grubb TG, **Beier P**, Pater LL, Reiser MH. 1999. Effects of helicopter noise on Mexican spotted owls. *Journal of Wildlife Management* 63:60-76.

**Beier P**, Noss RF. 1998. Do habitat corridors provide connectivity? *Conservation Biology* 12:1241-1252.

Drennan JE, **Beier P**, Dodd N. 1998. Use of track stations to index abundance of sciurids. *Journal of Mammalogy* 79:352-359.

**Beier P**, Drennan JE. 1997. Vegetation structure and prey abundance in foraging areas of northern goshawks. *Ecological Applications* 7:564-571.

**Beier P**. 1996. Metapopulation modeling, tenacious tracking, and cougar conservation. Pages 293-323 *in* D. R. McCullough, ed., Metapopulations and wildlife management. Island Press.

**Beier P**, Cunningham SC. 1996. Power of track surveys to detect changes in cougar populations. *Wildlife Society Bulletin* 24:540-546.

**Beier P**. 1995. Dispersal of juvenile cougars in fragmented habitat. *J. Wildlife Management* 59:228-237.

**Beier P**, Choate D, Barrett RH. 1995. Activity patterns of cougars during different behaviors. *J. Mammalogy* 76:1056-1070.

**Beier P**. 1993. Determining minimum habitat areas and corridors for cougars. *Conservation Biology* 7:94-108.

**Beier P**. 1993. PUMA: A population simulator. *Wildlife Society Bulletin* 21(1):356-357.

**Beier P**, Loe S. 1992. A checklist for evaluating impacts to wildlife movement corridors. *Wildlife Society Bulletin* 20:434-440.

**Beier P**. 1991. Cougar attacks on humans in the United States and Canada, 1890-1990. *Wildlife Society Bulletin* 19:403-412.

**Beier P**, McCullough DR. 1990. Factors influencing activity patterns and habitat use by white-tailed deer. *Wildlife Monograph* 109: 51pp.

**Beier P**. 1989. Use of habitat by mountain beaver in the Sierra Nevada. *Journal of Wildlife Management* 53:649-654.

**Beier P**, Barrett RH. 1989. Beaver distribution in the Truckee River Basin. *California Fish and Game*

75:171-175.

**Beier P**, McCullough DR. 1988. Motion-sensitive radio collars for estimating white-tailed deer activity. *Journal of Wildlife Management* 52:11-13.

**Beier P.** 1987. Sex differences in quality of white-tailed deer diets. *Journal of Mammalogy* 68:323-329.

**Beier P**, Barrett RH. 1987. Beaver habitat use and impact in the Truckee Basin, California. *Journal of Wildlife Management* 51:794-799.

McCullough DR, **Beier P**. 1986. Upper versus lower molars for cementum annuli age determination of deer. *Journal of Wildlife Management* 59:705-706.

## Other Publications

Beier P, Behar D, Hansen L, Helbrecht L, Arnold J, Duke C, Farooque M, Frumhoff P, Irwin L, Sullivan J, Williams J. (Actionable Science Workgroup of the Advisory Committee on Climate Change and Natural Resource Science [ACCCNRS]). 2015. How-To Guide for co-producing actionable science. ACCCNRS Report to the Secretary of the Interior, Washington, DC. DOI: 10.13140/RG.2.1.2830.0644 http://tinyurl.com/pw4hrae

**Beier P.** 2013. Advocacy, activism, and credible conservation science. In T Thornton, ed. The Endangered Species Act at Forty. Endangered Species Coalition, Washington, DC

Penrod KP, Garding E, Paulman C, **Beier P**, Weiss S, Schaefer N, Branciforte R. 2013. Critical Linkages: Bay Area & Beyond. Produced by Science & Collaboration for Connected Wildlands, Fair Oaks CA, www.scwildlands.org in collaboration with the Conservation Lands Network www.BayAreaLands.org.

Penrod K, **Beier P**, Garding E, Cabañero C. 2012. A Linkage Network for the California Deserts. Produced for the Bureau of Land Management and The Wildlands Conservancy. Produced by Science and Collaboration for Connected Wildlands. Available at www.scwildlands.org.

**Beier P**. 2010. Regulatory Framework for Biological Corridors in Bhutan. Report to WWF-Bhutan & Nature Conservation Division, Department of Forests, Royal Government of Bhutan, Thimphu.

Jones AL, Aumack E, Balsom J, **Beier P**, Belnap J, Catlin J, Fleischner T, Grumbine RE, Mattson D, van Riper, C. 2010. Legacy and future visions of conservation biology on the Colorado Plateau. Pages 1-20 *In* C. van Riper, B. Wakeling, and T. D. Sisk, editors, Colorado Plateau IV: Shaping conservation through science and management. University of Arizona Press

Spencer WD, **Beier P**, Penrod K, Parisi M, Pettler A, Winters K, Strittholt J, Paulman C, Rustigian-Romsos H. 2010. California Essential Habitat Connectivity Project: a strategy for conserving a connected California. Report prepared for California Department of Transportation and California Department of Fish & Game. https://www.wildlife.ca.gov/Conservation/Planning/Connectivity/CEHC

**Beier P**. 2008. Learning like a mountain. *The Wildlife Professional* Winter: 26-29.

**Beier P**, Garding E, Majka D. 2008. Arizona Missing Linkages: Linkage designs (8 reports, namely for Bradshaw Mountains-Agua Fria River, Hualapai Mountains-Cerbat Mountains, Gila Bend Mountains-Sonoran Desert National Monument-Sierra Estrella, Granite Mountain-Black Hills, Patagonia Mountains-Santa Rita Mountains, Tucson Mountains-Tortolita Mountains-Santa Catalina Mountains, Galiuro Mountains-Pinaleno Mountains-dos Cabezas Mountains, and Mount Perkins-Warm Springs); available at www.corridordesign.org.

**Beier P**. 2007. Cougars, connectivity, & missing linkages: two decades of expanding vision & partnerships (keynote address). Transactions of the Western Section of The Wildlife Society 43:1-7.

**Beier P**, Majka D, Bayless T. 2007. Arizona Missing Linkages: Linkage designs (8 reports); available at www.corridordesign.org.

Shaw HG, **Beier P**, Culver M, Grigione M. 2007. Puma field guide. Cougar Network. 129 pp.

Nordhaugen SE, Erlandsen E, **Beier P**, Eilerts BD, Schweinsburg R, Brennan T, Cordery T, Dodd N, Maiefsky M, Przybyl J, Thomas S, Vacariu K, Wells S. 2006. Arizona Wildlife Linkage Assessment. available at http://www.azdot.gov/Highways/OES/AZ_WildLife_Linkages/assessment.asp

Cougar Management Guidelines Working Group. 2005. Cougar Management Guidelines, First Edition. Wild Futures, Bainbridge Island, Washington. 137 pp. (13 authors)

Curriculum Vitae -- Paul Beier 7

**Beier P**. 2005. Being ethical as conservation biologists and as a society. (Invited Editorial). *Conservation Biology* 19:1-2.

Penrod K, Cabañero C, **Beier P**, Luke C, Spencer W, Rubin E. 2003-2006 (11 reports). South Coast Missing Linkages Project: Linkage Designs for 11 connections in southern California, namely San Bernardino-San Jacinto, Palomar-San Jacinto, Peninsular-Borrego, San Bernardino-Granite, San Bernardino-Little San Bernardino, Sierra Madre-Castaic, San Gabriel-Castaic, Tehachapi, Santa Ana-Palomar (C Luke as first author), San Gabriel-San Bernardino (with S. Loe, and K. Meyer as additional coauthors), and Santa Monica-Sierra Madre (with R. Sauvajot, S. Riley, and D. Kamradt as additional coauthors). South Coast Wildlands, www.scwildlands.org.

Adjewodah P, **Beier P**. 2004. Working with traditional authorities to conserve nature in West Africa. African Conservation Telegraph 1 (on-line).

**Beier P**, Vaughan MR, Conroy MJ, Quigley H. 2003. An analysis of scientific literature related to the Florida panther. Report to Florida Fish and Wildlife Conservation Commission and US Fish and Wildlife Service. 211 pages, including an annotated bibliography.

**Beier P**. 2001. [Book review] Model selection and inference, by Burnham and Anderson. *Journal of Wildl.fe Management* 65:.

**Beier P**. 2001. Cougar (Species account in *Encyclopedia Britannica*). Invited contribution.

Despain DG, **Beier P**, Tate C, Durtsche BM, Stephens T. 2000. Modeling fire risk to wildlife habitat. Pages 89-118 In RN Sampson, DA Atkinson, JW Lewis, editors, Mapping Wildfire Hazards and Risks. Haworth Press.

Noss RF, **Beier P**. 2000. Arguing over little things: response to Haddad et al. *Conservation Biology* 14:1546-1648.

## Synergistic Activities

Member, Advisory Committee on Climate Change and Natural Resource Science, appointed by Interior Secretary Sally Jewell, May 2013-May 2018. In this capacity I was lead author of the *How-to guide for co-producing actionable science* (published in peer reviewed form as Beier et al. 2016).

Handling Editor, *Conservation Biology*, 2015-present

Recovery Team Member for the ocelot, *Felis pardalis*, 2003 through 2016.

Recovery Team for the northern jaguar, *Panthera onca*, 2010 to present

Member, IUCN Connectivity Conservation Specialist Group (CCSG), Dec 2016 to present

Member, IUCN World Commission on Protected Areas (WCPA), Dec 2016 to present

Board of Governors, Society for Conservation Biology, 2002-2015 (President 2011-2013). Chaired committee that developed SCB's first Code of Ethics (2004). Chaired committee that made SCB the first professional ecological society to offset its impact on greenhouse gasses (2005-2010). Conservation Chair of Colorado Plateau Chapter (Nov 2001-Sep 2005)

Co-developer of CorridorDesign software (www.corridordesign.org), a set of ArcGIS and ArcMap tools for design of wildlife corridors for multiple focal species; Corridor Evaluation Tools evaluate alternative corridor designs and help decision-makers identify good compromises.

Organizer and editor, workgroup on Conserving Nature's Stage. With support from Doris Duke Charitable Foundation, I convened a 2.5-day working group of 31 scientists from around the globe in July 2013. I served as editor for a special section of 8 papers (plus an editorial) which appeared in print in *Conservation Biology* < 24 months after the workshop.

Core Advisor, Yale Framework for Wildlife Conservation and Climate Change Adaptation, 2010-2012.

Science Advisory Council, Freedom to Roam, 2010-2013.

Science Advisor to US Forest Service: Conserving marten, fisher, red fox, and wolverine in the Sierra Nevada and California Cascades, Sep 2010-present.

Consultant to government of Bhutan. 2010. I developed a Framework for implementing Biological Corridors in Bhutan.

Consultant to California Department of Transportation and California Fish & Game Department. 2008-2010. Our team produced a map and strategic plan for conserving connectivity throughout the state

of California (Spencer et al. 2010, above) on time and on budget.

Lead Author, Science Committee of the Western Governors Association's *Wildl.fe Corridors Initiative*, a multi-state effort to improve management for wildlife corridors and crucial habitat, Sept 2007-Sept 2008. Our science report and the Wildlife Corridors Initiative (http://www.westgov.org/wildlife-corridors-and-crucial-habitat) was unanimously adopted by the western Governors (80% Republican) and led to the creation of the Western Governors Wildlife Council.

Cofounder and Board Member of SCW [Science & Collaboration for Connected Wildlands], 2001-present; President 2008-present. I co-wrote successful proposals totaling >$1.5M for this science based conservation NGO. SCW **co-produced 72 detailed linkage designs** that are being actively implemented in the San Francisco Bay area, coastal southern California, and the deserts of southern California (available at https://www.wildlife.ca.gov/Conservation/Planning/Connectivity and www.scwildlands.org)

Arizona Wildlife Linkage Workgroup, 2004-present. a collaboration among Arizona Game & Fish Department, Arizona Department of Transportation, Federal Highways Administration, US Forest Service, Bureau of Land Management, and others to maintain and restore wildland connectivity in Arizona.

Panelist (1 of 10) to develop climate adaptation strategies for the State of California (2011-2012). This panel was convened by Resources Legacy Fund at the request of the secretaries of the state of California's resource agencies. Our recommendations were later summarized in Chornesky et al. (2015. BioScience).

Mentor, University Mentoring in Environmental Biology. 2008-2010.

Fellow, Aldo Leopold Leadership Program (2005). This programs trains 20 Fellows per year to become effective environmental leaders by developing skills in collaboration, communicating with the media, and developing relationships with members of Congress.

City of Flagstaff Open Space Commission, 2008-2011.

Scientific Review of Habitat Conservation Plan for eastern San Diego County (2005-2007). An independent review of the geographically most extensive Habitat Conservation Plan. I served in the same capacity for the northern San Diego County MSHCP in 2001.

Fulbright Scholar, African Regional Research Program, 1999-2000 (12 months).

Fulbright Scholar, African Regional Research Program, 2006-2007 (5 months).

Science Advisor, Nature Conservation Research Centre, Ghana, 1998-2008. This NGO specializes in community-based conservation activities in Ghana. I was the only scientist on the team that wrote the first Management Plan for the Wechiau Community Hippopotamus Sanctuary (WCHS). As part of this effort I spent > 3 weeks at WCHS each year during 1999-2007 working with traditional authorities, local villages, and NCRC. The WCHS project won the UNDP's *Equator Initiative* top prize for Africa in 2008.

Science Advisory Council, Grand Canyon Trust, 2000-2002. The GCT is the leading conservation NGO in the southwestern US.

Chair, Scientific Review Team, Florida Panther (May 2002-Dec 2003). Commissioned by the US Fish & Wildlife Service and the Florida Wildlife Conservation Commission to evaluate scientific issues related to the endangered Florida panther.

Ecology & Transportation Committee of the Transportation Research Board of The National Academies, October 2009-present.

Member at Large, US National Committee for DIVERSITAS, Nov 2011-Nov 2014.

*Last updated 1 February 2017*

Rvsd Plan - 00003552

# Colorado Native Plant Society

Dan Dallas, Supervisor                                                                                    July 3, 2017
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

Dear Supervisor Dallas:

I am writing today on behalf of the Colorado Native Plant Society to express our strong support for the designation of iconic places on the Rio Grande National Forest in the revised land management plan. In particular we are recommending the inclusion of the whole Elephant Rocks Potential Conservation Area as described by the Colorado Natural Heritage Program as a designated wilderness area. The Colorado Native Plant Society has 6 chapters across the state, with two chapters on the west slope. Our organization is "a non-profit organization dedicated to furthering the knowledge, appreciation and conservation of native plants and habitats of Colorado through education, stewardship and advocacy". As such we are particularly interested in the protection of rare and endangered plants which will be encompassed by your management plan.

We support the 17 areas recommended for wilderness by The San Luis Valley Ecosystem Council, The Wilderness Society, Defenders of Wildlife, Rocky Mountain Wild and others as summarized in the attached handout. We urge you to recommend these areas for wilderness in the revised plan and Record of Decision. Because we have a particular focus on rare and endangered native plant species and habitats, we particularly wish to draw your attention to the Elephant Rocks Potential Conservation Area.

This site lies at the base of the San Juan foothills on the Saguache-Rio Grande County line. It is comprised of a complex of volcanic boulders, rock outcrops, and shrublands separating the prairie of the valley floor from the San Juan Mountains and contains several rare plant species.

The first of these is Slender Spider Flower (*Cleome multicaulis* - G2G3 S2S3) which is restricted to wet meadows and alkaline flats. It is widely distributed in Mexico and probably brought to CO by the early Spanish settlers. With the draining of wetlands it has become quite rare in CO.

The second species is Rock-loving Neoparrya (*Aletes lithophilius* – G3S3) which occurs only in igneous outcrops or sedimentary rock derived from extrusive volcanics, north-facing cliffs and ledges, within pinyon-juniper woodlands. It is endemic to Colorado in Chaffee, Conejos, Fremont, Huerfano, Rio Grande and Saguache counties. This species is only known from ten sites in these counties. Its population has an estimated 2000 individuals.

In addition, *Astragalus cerussatus* a watch-list species (G3G4 S3S4) is a milkvetch which occurs in northern New Mexico and southern Colorado on rocky slopes. Less than 20 occurrences have been located throughout its range.

And finally, another watch-list species, Forked Spleenwort (*Asplenium septentrionale* - G5 S3S4), a grass fern, is found here, representing the southernmost extension of this uncommon fern, and is a new county record for Saguache.

In order to protect these rare native plants, it is critical not to just protect the footprint on which they occur, but also to protect the habitat that surrounds them which are critical to their survival. In designating the boundaries of the conservation area, the Natural Heritage Program provided the following justification:

Rvsd Plan - 00003553

"This boundary encompasses an area in which direct impacts to the elements, such as trampling or other surface disturbance, should be avoided and provides suitable habitat where additional individuals can become established over time. The boundary also encompasses Shaw Springs to ensure the hydrological source necessary for the viability of the slender spiderflower.

The main threat to the rock-loving neoparrya would be physical disturbance of the habitat. The boundary was delineated to include the known extent of the plant population and enough of the adjacent area to incorporate portions of other habitat types. This additional habitat was included based on the assumption that pollinators of the rock-loving neoparrya may also require other types of habitat. The pollinators are unknown, consequently we are uncertain if the amount of adjacent habitat is sufficient to support those species. With more information, these boundaries may change. This boundary is drawn to 1) protect the occurrences from direct impacts such as trampling or other surface disturbances; and 2) provide suitable habitat where additional individuals can become established over time".

In order to protect these important natural resources, we recommend that you not only give them the highest level of protection, but also assure that these areas remain free from any activities that may result in trampling from various forms of recreation.

Sincerely,

Mo Ewing
Chair, Conservation Committee
Colorado Native Plant Society

San Luis Valley Ecosystem Council
Recommended Wilderness Areas
in the Land Management Plan Revision

## Saguache Ranger District

### Antora Meadows (27,700 acres)
- Will significantly increase representation of ecosystems currently under-protected (lodgepole pine, aspen forest/woodland and grassland).
- Will increase conservation of imperiled or at risk species including Rio Grande cutthroat trout conservation population; habitat for lynx, wolverine, and Mexican spotted owl.
- Key piece in landscape connectivity, helping fill the largest gap in protected areas in the Southern Rockies between La Garita Wilderness on south and Collegiates and Sangres to north. Significant portion of Cochetopa Hills roadless complex, one of the largest remaining unprotected roadless areas in Colorado.
- Significant trail system with looping opportunities and connections to CDNST.
- Low conflict with no interior motorized trails other than system trail 764 which is apparently unused and unmaintained.
- Upper Tier Colorado Roadless Area, located in Saguache County.
- Western boundary would be PSCO gas pipeline, eastern boundary extent of inventory area (over to FDR 861 generally).

### Elkhorn (15,800 acres)
- Important landscape connectivity link near Poncha Pass.
- Will significantly increase representation of ecosystems currently under-protected (lodgepole pine, aspen forest/woodland and grassland, ponderosa pine).
- Potential habitat for lynx and wolverine.
- Low conflict with no motorized trails.
- Upper Tier Colorado Roadless Area, located in Saguache County.

### Saguache Creek (Four Mile Creek–Taylor Canyon) (27,100 acres)
- Will significantly increase representation of ecosystems currently under-protected with 15,000 acres of grasslands and ponderosa pine.
- Potential habitat for lynx and Mexican spotted owl.
- Important piece in landscape connectivity, helping fill the largest gap in protected areas in the Southern Rockies between La Garita Wilderness on south and Collegiates and Sangres to north.
- Diverse ecosystem ranging from grasslands/ponderosa to spruce, and 7 miles of Saguache Creek eligible wild river.
- Significant recreation opportunities highlighted by Saguache Creek trail and other non-motorized trails.
- Upper Tier Colorado Roadless Area, located in Saguache County.

### Sangre de Cristo addition Crestone area (Kit Carson Peak, Cotton Creek) (23,300 acres)
- Will significantly increase representation of ecosystems currently under-protected particularly

Rvsd Plan - 00003555

for pinyon-juniper woodland and riparian forests.
- Includes potential extensions of Mill Creek and Deadman Research Natural Areas.
- Provides for topographically continuous boundary along lower slopes of the Sangres by slotting corner of acquired Baca Grant parcel into wilderness.
- Contains well-known primitive recreation destinations such as 14,000-foot Kit Carson Peak and Challenger Point.
- Adjacent to National Park Service recommended wilderness in Great Sand Dunes expansion.
- Low conflict with no motorized trails, in Saguache County.

**Sangre de Cristo addition north end (Butterfly Creek-Miller Creek) (4,100 acres)**
- Will increase representation of currently under-protected ecosystems particularly grasslands and oak shrublands.
- Potential habitat for lynx and Mexican spotted owl, some use by Gunnison sage grouse.
- Vicinity of Poncha Pass lynx linkage area.
- Non-motorized trails, in Saguache County.

**Sawlog (17,900 acres)**
- Will significantly increase representation of currently under-protected ecosystems, particularly grasslands, ponderosa pine, and aspen/woodlands.
- High potential for species conservation with Rio Grande cutthroat trout conservation population; documented used by lynx.
- Low conflict with no interior motorized trails.
- Upper Tier Colorado Roadless Area, located in Saguache County.

**Divide Ranger District**

**La Garita addition west side – Wason Park (22,000 acres)**
- Will significantly increase representation of currently under-protected ecosystems, specifically grasslands.
- Bighorn sheep migration route.
- Expands wilderness to encompass additional 8 miles of Continental Divide, protecting south/east side of the Divide to its crest.
- Increases size of existing wilderness by 15%.
- Provide trailheads nearest to Creede into La Garita Wilderness.
- Non-motorized trails.
- Upper Tier Colorado Roadless Area, in Mineral County.

**La Garita additions east side – Lake Fork, Wannamaker Creek, Deep Creek (14,700 acres)**
- Will significantly increase representation of currently under-protected ecosystems, particularly grasslands.
- Documented lynx use, wolverine habitat, Rio Grande cutthroat trout.
- Expands wilderness to encompass additional 3 miles of Continental Divide, protecting east side of the Divide to its crest (Lake Fork addition).
- Non-motorized trails in Middle Fork, Wannamaker Creek, and Deep Creek that lead to La

Rvsd Plan - 00003556

Garita Wilderness boundary.
- Upper Tier Colorado Roadless Area, in Saguache County.

**Pole Creek Mountain & Sheep Mountain (24,800 acres)**
- Significant landscape connectivity link filling gap amidst encircling protected areas at headwaters of Rio Grande, Lake Fork Gunnison, and Animas rivers. Adjacent to other agency recommended wilderness – GMUG draft 2006 proposed Carson wilderness and BLM proposed Handies Peak wilderness.
- Modest contribution to representation of under-protected ecosystem types, potentially for grasslands.
- High potential for species conservation with one of few known Uncompahgre fritillary populations, high use by lynx, two potential RNAs for only known global occurrences of stonecrop gilia, wolverine habitat.
- Significant backcountry recreation use on CDNST/Colorado Trail, and interconnected trail system over the Divide into non-mechanized trails on the GMUG.
- Can avoid motorized trail conflicts with boundary modification to create distinct Pole Creek Mountain unit and adjacent Sheep Mountain unit to west.
- Upper Tier Colorado Roadless Area, located in Hinsdale and San Juan counties.

**Weminuche addition – Snowshoe Mountain (34,300 acres)**
- Will significantly increase representation of currently under-protected ecosystems particularly, grasslands and dry mixed conifer forest.
- Highest species conservation score with high use by lynx, boreal toads.
- Landscape connectivity link between Weminuche and La Garita wildernesses.
- Largest unprotected roadless area adjacent to Weminuche wilderness.
- Non-motorized trails including Deep Creek just outside Creede, which would create a wilderness trailhead nearest to a surrounding community into the Weminuche Wilderness.
- Upper Tier Colorado Roadless Area, in Mineral County.

**Conejos Peak Ranger District**

**North Fork Rock Creek (16,500 acres)**
- Northeast portion of Bennet Mountain roadless area consists primarily of North Fork Rock Creek.
- Will increase representation of currently under-protected ecosystems, particularly grasslands, ponderosa pine, pinyon-juniper, dry mixed conifer forest.
- Includes potential habitat for lynx, Mexican spotted owl, wolverine.
- Non-motorized trails, and provides for a protected wilderness experience in a landscape otherwise devoted largely to motorized recreation.
- Upper Tier Colorado Roadless Area, in Conejos County.

**Sangre de Cristo addition – Blanca Peak (4,200 acres)**
- Southern end of the Sangre de Cristos, beyond Como Lake.
- Will increase representation of currently under-protected ecosystems, particularly grasslands, ponderosa pine, and pinyon-juniper woodland.

Rvsd Plan - 00003557

Includes two popular fourteeners – Blanca Peak and Little Bear Peak.
- Overlaps Blanca Peak traditional cultural property of significance to native peoples.
- In Alamosa County.

**South San Juan addition – Adams Fork-Three Forks (2,700 acres)**
- High species conservation potential with high use by lynx, wolverine habitat.
- Non-motorized trails leading to wilderness boundary.
- Upper Tier Colorado Roadless Area, in Conejos County.

**South San Juan addition – Elk Creek (3,200 acres)**
- Expands representation of currently under-protected ecosystems by including robust stands of ponderosa pine, grasslands.
- Connectivity enhancement as lynx movement corridor to New Mexico.
- Incorporates first 4 miles of the non-motorized Elk Creek Trail from the trailhead into adjacent wilderness.
- Upper Tier Colorado Roadless Area, in Conejos County.

| | |
|---|---|
| **From:** | Claire Barker |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Forest planning comments |
| **Date:** | Friday, October 14, 2016 7:00:15 PM |

Hi all-

Just a few things.

- I want to extend my support of whatever proposals and suggestions that the **San Luis Valley Ecosystem Council** has set forth. They are well thought out, balance many needs, and deal with water quality issues, soil and air health now and into the future.

- I also want to comment that I *disagree* with expansion of developments-*including* the possible increase of broadband/cell phone towers.              I don't believe those need to be in the forest for esthetic and continual maintenance reasons. (will require a road). I also feel that the future "promise" of cell phone service will make people even less prepared than they are already to go into the back country, and will open up venues for potential law suit-should the "promised" cell service not materialize in certain spots despite advertisement saying it will. So much of the "back country"/dirt road experience is getting away from all this. If it goes badly-well-that is also part of it.

Thank-you for the opportunity to comment.

Claire Barker

4952 N. C.R. 112

Mosca, Colorado 81146

719-378-2024

Rvsd Plan - 00003559

| | |
|---|---|
| **From:** | William Alspach |
| **To:** | FS-RGNF forest plan |
| **Cc:** | Don Riggle |
| **Subject:** | Rio Grande National Forest Plan Revision comment submission |
| **Date:** | Friday, October 14, 2016 11:25:26 AM |
| **Attachments:** | RGNF Forest Plan Comments TPA_COHVCO.pdf |
| | RGNF Forest Plan Executive Summary_TPA_COHVCO.pdf |

Please accept these comments on the Rio Grande National Forest, Forest Plan Revision Project on behalf of the Trails Preservation Alliance ("TPA") and the Colorado Off-Highway Vehicle Coalition ("COHVCO").
Please confirm receipt to williamalspach@gmail.com




October 14, 2016

Attn: Dan Dallas, Forest Supervisor
The Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

**Rio Grand National Forest Plan: Proposed Action**
**Comments**

Dear Supervisor Dallas:

Please accept these comments on the Rio Grande National Forest, Forest Plan Revision Project on behalf of the Trails Preservation Alliance ("TPA") and the Colorado Off-Highway Vehicle Coalition ("COHVCO"). The TPA is a volunteer organization created to be a viable partner to public lands managers, working with the United States Forest Service (USFS) and the Bureau of Land Management (BLM) to preserve the sport of trail riding and multiple-use recreation. The TPA acts as an advocate for the sport and takes the necessary action to insure that the USFS and BLM allocate a fair and equitable percentage of public lands access to diverse trail multiple-use recreational opportunities. COHVCO is a grassroots advocacy organization representing approximately 170,000 registered off-highway vehicle ("OHV"), snowmobile and 4WD users in Colorado seeking to represent, assist, educate, and empower all motorized recreationists in the protection and promotion of multiple-use and off-highway motorized recreation throughout Colorado. COHVCO is an environmental organization that advocates and promotes the responsible use and conservation of our public lands and natural resources to preserve their aesthetic and recreational qualities for future generations. TPA and COHVCO are referred to collectively in this correspondence as "The Organizations." The Organizations generally support the Proposed Action but offer the following comments and concerns regarding this project. We have generally organized our comments relative to the primary areas of proposed change.

These comments do not supplant any of the rights and privileges of our members' and associated clubs to submit comments of their own to retain their individual standing.

Rvsd Plan - 00003561

1. **Fire Management (Re: Forest-Wide Goal 2):**

   a. The Organizations recognize the benefits of fire to the forest and the associated forest resources. However, we have concerns regarding the typical exclusion of public access post fire. We understand the desire for public safety, but too often we feel post fire landscapes have been closed to the public for excessive periods of time. We feel that an appropriate goal of returning public access to post fire zones is one year. <u>That all roads and trails be re-opened to unfettered public access within one year of fire suppression.</u>

   b. Similarly for large-scale beetle kill areas, we recommend that instead of broad closing of these areas and the associated closing of trails and routes within those areas, that public access to these areas remain open. That hazard trees and snags in close proximity to multiple-use trails and routes be felled, thereby reducing and mitigating the hazard. For those routes that are open to OHV recreation, this felling activity could be considered for Colorado State OHV grant funding.

   c. An adequate network of forest roads and trails is necessary to provide access in times of emergency. The USFS is a world-renowned expert on wildland firefighting and knows firsthand the importance of good access, redundant routes and routes in key places and the impact of those routes on the safety of the firefighters, the public and successful wildland firefighting. Demands for reduced road inventory, for reduced route density and increased decommissioning of roads is not collectively and universally in the best interest of neither the forest nor the public. The premise that decommissioning roads will reduce human caused fires is unfounded and unsubstantiated and should not be utilized as a criteria for any decisions regarding the elimination or closure of any multiple-use or motorized route.

   d. With few exceptions, the roads and trails within the Rio Grande National Forest have been in existence and providing public benefits for decades. History has shown that each of these routes provides a level of tangible recreational, economic and/or forest access value. The recent West Fork Complex Fire in 2013 demonstrated firsthand the advantages of having a robust and interconnected network of routes. Continuing to have an adequate network of forest roads and trails will be truly beneficial and necessary in providing sufficient access for future timber management, continuing forest visits and recreation, emergency egress and wildland firefighting efforts.

2. **Sustainable Recreation (Re: Forest-Wide Goal 3):**

   a. The Organizations feel the proposed forest plan lacks emphasis on recreation. We offer that forest recreation needs to be a more prominent focus area when developing

Rvsd Plan - 00003562

alternatives.  <u>Similarly we ask that multiple-use and motorized recreation be specifically addressed in the General Forest Geographic Area.</u>

b.  As the State of Colorado's population has grown, so have the sales of Off-Highway Vehicles (OHV's), bicycles, hiking equipment, camping units and other forms of outdoor recreation increasing the demand for recreation sites within the Rio Grande National Forest.  It is estimated that approximately 8.5% of the households in Colorado participate in OHV recreation and that between 2000 and 2014, resident OHV registrations have increased by 119% with Non-resident permits increasing by over 1,607%![1]   The need and demand for OHV recreational opportunities are growing and will continue to grow, we ask that Forest roads and trails be considered as critical infrastructure for recreation.

c.  We fully recognize that this action proposes to revise and update the Forest Plan for the Rio Grande National Forest and is not a Travel Management decision.  However, the implications for Travel Management into the future are significant and cannot be disregarded or ignored.  Just as the Forest Plan revision made in 1996 resulted in significant reductions in opportunities for multiple-use and motorized recreation, we feel strongly that this new, revised Forest Plan (along with the required *Desired Conditions, Objectives, Standards and Guidelines*) will have implications aimed at, and will "set the stage" for multiple-use and motorized recreation for many years to come.  Each of the Proposed Management Areas on page 14 of the Proposed Action, must be carefully and deliberately analyzed for the impacts to multiple-use and motorized recreation and the affects upon both the existing and future inventory of recreational opportunities available for multiple-use and motorized recreation.  Consequently, <u>"Multiple-use and Motorized Recreation/Travel" should be included into Table 1.4 as an Allowable Activity and the matrix annotated accordingly.</u>

d.  As stated above, Forest Plan revisions regularly have direct, intended and often times unintended consequences on the number of and quality of opportunities available for multiple-use, motorized and OHV recreation.  The Organizations believe that trails and routes within the Rio Grande National Forest have been closed improperly in the past and without proper consideration for NEPA.  Specifically the following lists of routes (listed by Ranger District) were improperly closed during the last forest plan revision and should be reconsidered and re-evaluated for multiple-use access (i.e., re-opened accordingly).  These routes all have a prolonged history of providing multiple-use recreation and have provided access for decades.  Each of these routes traverses very

---

[1] DRAFT Economic Contribution of Off-Highway Vehicle Recreation in Colorado, July 2016.  *This study is nearing completion and will be finalized in the very near future.*

Rvsd Plan - 00003563

remote regions of the Forest, experience very minimal and intermittent use and therefore cause diminutive impacts.   Many of these routes enhance connectivity and looping opportunities for all categories and groups of forest users.  We would offer that several local motorcycle trail rider groups and associations have a desire and willingness to adopt these trails and assist the USFS in the maintenance and management of these routes:

    i.   Saguache Ranger District:

        1.   766.1

        2.   768

        3.   771

        4.   793

    ii.   Divide Ranger District:

        1.   908

        2.   787

        3.   779

        4.   804

        5.   887

        6.   881

e.   The Organizations would encourage and support the Forest's decision to convert most any existing National Forest Service Road (NFSR) to a Full Size Trail or another trail designation (e.g., Trail open to Motorcycles, or open to Vehicles 50" or less in width). We encourage the use of conversion techniques contained in Chapter 17 of the National Off-Highway Vehicle Conservation Council's (NOHVCC) 2015 Great Trails: Providing Quality OHV Trails and Experiences publication[2].  Conversion of roads to multiple-use, motorized trails could make those routes eligible for Colorado Parks and Wildlife OHV grant funds (*which can specifically be used for the construction, reconstruction or maintenance of OHV routes or multiple-use trails that allow for motorized use and other activities*).  These conversions will thereby help reduce the direct financial burden and

---

[2] A copy of this publication has been provided to the Rio Grande National Forest by the TPA/COHVCO.  Additional copies are available upon request.

Rvsd Plan - 00003564

back log to the USFS and can supplement agency funding with user provided funds that were previously unavailable for these routes.  Conversion from roads to trails will also reduce the required maintenance level and reduce the necessary amount and back log of funding.  Likewise by providing an adequate and varied inventory of routes and trails that fulfills the user's spectrum of needs (today and the future) for variety, difficulty, destinations, challenge, terrain and scenic opportunity will lead to improved management and compliance requiring less expenditures on maintenance, signage, enforcement, etc.  We recognize that existing routes all require maintenance; OHV funds have been and will continue to play an important role in meeting USFS operations and maintenance (O&M) costs (*when supporting routes open to OHV recreation*).  These maintenance activities funded by OHV users, in turn benefit all categories of forest/trail users.  **Closing routes to OHV use does not eliminate the need for maintenance, but takes away one of the available funding sources and tools that can be used to provide O&M resources and also eliminates opportunities for user groups, clubs and associations to partner with the Forest to help provide resources, volunteer labor, etc**.  Finally, the lack of fiscal capacity by the USFS should not be criteria for, or lead to closures and reductions in public recreational opportunities, closure of routes or elimination of public access to the National Forest.

f.   In the past there have been unfounded concerns for American elk and mule deer as a reason to close and limit multiple-use and motorized recreation on public lands.  The premise that "large animals, especially deer and elk, are sensitive to traffic and activity along roads" is not supported by published scientific research.  Extensive studies completed as recently as 2005 by the National Park Service (NPS) in Yellowstone Park stated that "Effects of winter disturbances on ungulates from motorized and non-motorized uses more likely accrue at the individual animal level than at the population scale".  Even the biologist performing the research stated that the debate regarding effects on human recreation on wildlife is largely a "social issue" as opposed to a wildlife management issue. This NPS research would certainly seem relevant to wildlife in the Rio Grande National Forest and does not support a premise for closures and reductions in multiple-use recreational opportunities. [3]  Additional research published by Mark Rumble, Lahkdar Benkobi and Scott Gamo in 2005 has also found that hunting invokes a more significant response in elk than other factors in the same habitat area (e.g. roads or trails). [4]  Likewise research by Connor, White and Freddy in 2001 has even

---

[3] Wildlife Response to Motorized Winter Recreation in Yellowstone, 2005 Annual Report, White, Davis & Borkowski
[4] Rumble, Mark A; Benkobi, Lahkdar; Gamo, Scott R; 2005. Elk Responses to Humans in a Densely Roaded Area; Intermountain Journal of Sciences

Rvsd Plan - 00003565

demonstrated that elk population increases on private land in response to hunting activities.[5]  This research again brings into question why multiple-use trail recreation (specifically motorized recreation) might be cited and used as the justification for any closures or modification to public access.

g. Colorado Roadless Rule. The Organizations are also concerned that the Roadless Rule is often used as a lever for the expansion of Wilderness areas. This is a misapplication of the Roadless Rule, as Colorado has developed its own rule that specifically identifies motorized trails as a characteristic of a Colorado Roadless area; 1) While Roadless areas have limitations on road construction and heavy maintenance, trails are entirely outside the scope of the Colorado Roadless Rule, 2) as trail networks may be constructed and expanded in a Colorado Roadless Area.  Page 11 of the Proposed Action lists "Unroaded Areas" as a Desired Condition for Social Resources.  We are unclear as to what this condition is or what it might imply and how it fits with the specified Geographic Areas (i.e. General Forest, Roadless, Wilderness, and Special Designations).

h. Wilderness Areas.  We certainly understand that only Congress can designate Wilderness areas per the Wilderness Act of 1964.  However, we also understand that the Forest staff has the ability to recommend areas for Wilderness designation.  <u>The Organizations do not support any additional Wilderness designated areas within the Rio Grande National Forest</u>.  Any additional Wilderness areas would concentrate use on shrinking multiple-use lands and reduce the ability to remove fuels, fight fires or actively manage the lands to promote forest health. Furthermore additional Wilderness will concentrate use, shrink the future reservoir of lands for multiple-use, increase environmental impacts and reduce user satisfaction. The continued loss of multiple-use lands will reduce the capacity of the land for future generations to use and recreate on, violating the intent of the Planning Rule for sustainability. This concentrated use will decrease user satisfaction and harm tourism, which so many of our rural communities depend upon.

i. For proposed Management Area 5.41 - Deer and Elk Winter Ranges we offer the following comments for considering the use of seasonal closures:

    i. Minimization of the closure period to maximize availability of the routes and areas for recreational uses.

---

[5] Connor, White & Freddy; Elk Movement in response to early-season hunting in Northwest Colorado; The Journal of Wildlife Management; Volume 65, Number 4; October 2001

Rvsd Plan - 00003566

ii. Consistent and uniform closure dates to minimize confusion within the individual Ranger Districts and throughout the Forest.  Multiple dates will likely be more difficult to communicate to Forest visitors and more challenging to enforce.

iii. Natural route closure generally occurs during the winter season due to snow. Coincidence of the required closure periods with the winter season will help minimize impacts to multiple-use of the specified routes. Wherever possible, if the seasonal conditions on the ground are likely to represent an effective barrier to travel, the Forest should avoid implementing seasonal closures that create confusion and create an unnecessary enforcement and financial burden.

iv. Seasonal closures that affect <u>only</u> motorized users are inconsistent with the best available science for protecting habitat[6] and <u>seasonal closures should be made universal to all users</u>.

j. The Organizations recognize that technology is changing with regard to propulsion of vehicles, namely the use of electrically powered devices.  In general we support the use of electrically assisted bicycles wherever bicycles are currently authorized.  And, that electrically powered motorcycles be grouped with other motorized uses and allowed for travel on routes designated for motorized use.

k. The Organizations support motorized cross-country travel, limited to snow machines in the winter within the following Proposed Management Areas:

   i. 3.3 – Backcountry

   ii. 3.5 – Colorado Roadless Area

   iii. 3.6 – Upper Tier Colorado Roadless Area

   iv. 4.3 – Dispersed and Developed Recreation

   v. 5.11 – General Forest and Intermingled Rangelands

   vi. 5.41 – Deer and Elk Winter Range area (with reasonable management)

l. Table 1.4 should be revised such that the Allowable Activity of **"Trail construction/reconstruction"** is allowed in Management Area 4.3 - Dispersed and Developed Recreation.

---

[6] Sime, Carolyn A; 1999. Domestic Dogs in Wildlife Habitats, Effects of Recreation on Rocky Mountain Wildlife,

Rvsd Plan - 00003567

m. OHV recreation should not be cited as a threat for any Species of Conservation. If the analysis chooses to cite OHV trail tread as having negative impacts on species, then the analysis must also disclose that non-motorized trail tread have a identical negative impacts on species. The impacts from non-motorized trail tread will greatly exceed that of the motorized trails, since there are far more miles and therefore more acres of non-motorized trail tread. The analysis should not include OHV Recreation as a threat to species of conservation, since trail tread should be excluded from being considered habitat, and plants do not grow on the trail tread that OHV use is confined to.

3. **Social and Economic support of local communities and connecting citizens to the land (Re: Forest-Wide Goal 3):**

a. The Organizations believe that continued multiple-use access and motorized recreation within the National Forest is vitally important to the preservation and conservation of our public lands and the well being of our citizens. The Organizations acknowledge that as America becomes more urbanized and populations rise, our younger citizens are becoming less connected to and are less likely to identify with the outdoors in their daily lives. Our organizations have worked diligently and continuously to help Coloradans and visitors to our State to be able to access and enjoy our public lands in a safe and responsible manner. We recognize that there is a bona fide correlation between an individual's personal health and their participation in outdoor activities. We continually strive to get youth and families excited about visiting, seeing and experiencing all that our public lands have to offer. We have a history of partnering with the USFS to protect our forest resources while reducing and eliminating barriers that are continuing to make it difficult for Americans to get outside and travel on a multiple-use trail or share a road as part of their outdoor recreational experience. A good example of this is the TPA's annual Trail Awareness Symposium (AKA Colorado 600). An event that each year brings nearly a hundred motorcyclists and enthusiasts to Colorado, the Town of South Fork and the Rio Grande National Forest. <u>The Organizations feel that this project must work diligently to ensure that a balanced spectrum of opportunities are provided in the Rio Grande National Forest to properly serve the diverse cross section of our population and meet their recreational needs</u>.

b. It is well recognized that the average age of our country's population is increasing and the number of persons aged 50 and older is steadily increasing. As the average age grows, so is the number of people still choosing to recreate outdoors but more and more will be less able to use non-motorized methods of travel or participate in high-energy, high-skill sports. As this demographic group grows, so will their needs for access to the Forest by motorized or other assisted methods. If we collectively fail to recognize and plan for this changing demographic, we will be deliberately excluding a significant

8

and growing segment of the population from the opportunities to experience and enjoy the Rio Grande National Forest.  Many of us hope to retain our individual mobility into the "Golden Years", but many will not, and they will need to rely upon some sort of motorized or mechanized assistance to access the places we all enjoy and cherish.

c.   The economic impacts of multiple-use and motorized recreation within the counties and communities encompassed by or adjacent to the Rio Grande National Forest cannot be overlooked.  Many of the visitors that choose to visit the Forest combine their recreational activities and often include using forest routes to access camping sites, setting up a camp and then employing motorized means to travel and explore the surrounding environment.  Significant economic benefits are realized by all of Southern Colorado as the public travels to and from their valued destinations within the Rio Grande National Forest.  As an example, motorized recreational enthusiasts were responsible for approximately $1.6 billion in direct expenditures relating to motorized recreation in Colorado during the 2014-2015 season[7]. As popular as motorized recreation is within the Rio Grande National Forest, the economic benefits to local economies and the nearby communities must not be undervalued.  A copy of this economic report is available upon request and should be used in the revision of this Forest Plan.

d.   Page 11 of the Proposed Action lists "Special Interest Areas" and "Heritage Resources" as Desired Conditions for Social Resources.  Both of these Desired Conditions need to include language to provide for access if their unique benefits are to be realized.  In order to promote "connecting citizens to the land", access to these areas, especially multiple-use access, must be provided, remain a priority and be stated as part of the Desired Conditions.  A similar comment is also made regarding the Desired Condition of "Scenery".

e.   "Desired Recreational Experiences" is subjective and will vary from individual to individual.  A call to decommission roads to return areas into more natural states and enhance recreational experiences is mostly subjective.  Very few will be able to enjoy the forest and all of the resources the forest has to offer if adequate motorized access is not provided.  Multiple-use and motorized recreation is indeed a bona fide form of recreation and not one to be minimized or eliminated on public lands.  Just as it is important to maintain the quality of visitor experiences for non-motorized use, it is equally important to maintain the quality of visitor experiences for motorized use.

---

[7] DRAFT Economic Contribution of Off-Highway Vehicle Recreation in Colorado, July 2016. *This study is nearing completion and will be finalized in the very near future.*

Rvsd Plan - 00003569

f.  The Organizations realize that this Forest Plan revision does not specifically address Travel Management.  However, we feel it is important to spotlight the following principles regarding multiple-use recreation planning and are important considerations when evaluating any modifications to recreational uses on the Forest[8]:

   i.  Generally forest visitors participating in multiple-use activities will use routes that exist and <u>adequately satisfy</u> their needs and desires.

   ii.  Non-system/user created routes should be reviewed on a case-by-case basis to determine if any non-system routes will fulfill a valid need and can be altered to meet recreation and resource considerations.

   iii.  Route networks and multiple-use trail systems should meet local needs, provide the desired recreational opportunities and offer a variety of quality experiences. We are not asking that this be done at the expense of other important concerns, but a system of routes that does not meet user needs will not be used properly and will not be supported by the users.  Occurrences of off-route use, other management issues and enforcement problems will likely increase if the system routes do not provide an appropriate and enjoyable opportunity.

   iv.  Recreational enthusiasts look for variety in their various pursuits.  For multiple-use to include motorized/OHV users, this means looped routes are a priority. An in-and-out route may be satisfactory if the destination is so desirable that it overshadows the fact that forest visitors must use the same route in both directions (e.g., access to dispersed camping sites, overlooks, historic sites, geologic sites, etc.).  However, even in these cases, loop systems will always provide better experiences.

   v.  Adequate legal parking and dispersed camping areas are necessary to fulfill the needs and desires of the recreation community

g.  Adaptive Management Domain.  In general the Organizations support the use of Adaptive Management methods and techniques.  However, we have concerns with the process outlined on page 36.  Specifically we have concerns regarding how an adequate and representative cross section of the public will be notified and an effective dialog conducted.  We are especially concerned about connecting with the forest users that do not reside in the neighboring communities or counties and that travel from locations distant from the Forest to recreate on the Rio Grande National Forest.

h.  The Organizations support maintaining status quo public access to **Mt. Blanca** and the **Natural Arch** areas.

---

[8] Management Guidelines for OHV Recreation, National Off-Highway Vehicle Conservation Council, 2006

Rvsd Plan - 00003570

4. **Mitigating the affects of Climate Change (Re: Forest-Wide Goal 2):**

   a. There has been little actual research quantifying how outdoor, forest based recreation will be affected by climate change and how to mitigate for climate alterations in a meaningful and productive manner. There is little scientific research, and far more opinion, on how climate change should be regarded, planned for and implemented. Some benefits may actually be realized through climate change such as an increased number of recreation days per year, longer growing seasons, etc. The analysis of the effects of climate change, specifically upon forest recreation, and how to properly address effects (if indeed there are any) remains a fledgling science at best, and subject to individual opinions. As a change in climate occurs (as it has in the past) there is no doubt that the forest ecosystems will adapt and our socioeconomic habits and factors will also change and adapt. To restrict or limit accessibility and the recreational use of the Rio Grande National Forest would be impulsive, unjustified, reckless and impossible to enforce. The shear growth of our population, uncertainty about incomes and spending, changes in future building materials, and the demand for forest products (domestic and imported) just to name a few will likely have far more impacts on the forest compared to the effects of climate change. Properly constructed roads and trails within the forest coupled with sensible timber management will all help to mitigate any effects of climate change both on the existing and future road and trail infrastructure. Minor adjustments to USFS design criteria to include values such as Design Storm Frequency, Rainfall Intensity, Runoff Coefficients coupled with appropriate sizing of the supporting drainage infrastructure (e.g. ditch sizing, culvert sizing, rip rap sizing, re-vegetation practices, trail/road alignment, etc.) can all be used to mitigate more extreme weather events and any increased flows that might be attributed to climate change. We feel it is interesting to note that one of the cited effects of climate change is an increase in wildfires; this concern would seem to actually support an argument for an even more extensive and robust transportation network to facilitate emergency response to wildfire. We also feel it is important to point out that trends have already begun to replace internal combustion engines with electric motors in OHV's, a trend we expect to continue and increase and thereby reduce OHV's collective emissions footprint.

5. **Proposed Forest-wide Desired Conditions for OHV Recreation:**

   a. Motorized vehicle use will occur on USFS system roads, trails and areas, except as authorized by permit or for administrative uses. Opportunities exist in appropriate places for responsible motorized recreation with varying experiences for a variety of

Rvsd Plan - 00003571

vehicle classes and types. Forest visitors enjoy semi-primitive motorized recreation and explore the backcountry in OHVs along designated routes. Sound from motorized vehicles is infrequent, away from areas of higher road and motorized route density.

b. A motorized system of routes provides: a variety of route widths and levels of challenge for a diversity of users, scenery and wildlife viewing, a variety of terrain and conditions, and dispersed camping. <u>Multi-use trails are more common than those available for only one class of vehicle or user</u> and may interconnect with roads or other routes to make loops. Motorized routes are easily identified on the ground and the Motor Vehicle Use Map (MVUM). Single-track trails emphasize solitude from other types of motorized vehicles, to the extent practical, and challenge.

c. Adequate signing is provided to advise users of motorized restrictions. Information kiosks are located at main entryways onto the Forest with pertinent OHV recreation information. Information is provided for OHV recreationists and trail users, including maps and signs that provide road and trail information and explain USNF regulations for such activities as OHV travel, camping, and trail opportunities. Orientation information and interpretation is provided at sites that receive high levels of visitation.

d. Resource damage from unauthorized motorized routes is minimal and existing user-created roads and trails are rehabilitated to prevent future access by the public and to mitigate long-term soil and water impacts. Roads and trails are located with minimal impact to cultural sites, soil, water, and wildlife resources. Poorly located routes are redesigned or relocated.

6. **Proposed <u>Objectives, Guidelines and Standards</u> for OHV Recreation:**

a. <u>Objectives</u>

    i. No net decrease in the total existing mileage of roads and multiple-use/motorized system trails during the period/lifetime of the revised plan with two modifications; 1) provide a 15% increase in total trail mileage available for motorized/multiple-use single track, with an emphasis on providing additional opportunities for "novice" single track riders and 2) provide designated recreational opportunities (e.g. loops and routes) for UTV's (AKA side by sides).

    ii. Rehabilitate 10 to 20 miles of user-created routes (including both motorized and non-motorized routes) per year until evidence of non-system trails is minimized Forest-wide.

    iii. Convert existing National Forest Service Roads (NFSR) to Full Size Trails or another trail designation (e.g. Trail open to Motorcycles, or open to Vehicles 50"

12

or less in width) whenever the primary purpose of the road is recreation and the road does not provide a direct access from one area to another. *(Note: Conversion to Full Size Trails will help solve the problem of insufficient funds for road maintenance and make those routes eligible for Colorado Parks and Wildlife OHV grant funds. We also encourage the use of conversion techniques contained in Chapter 17 of the National Off-Highway Vehicle Conservation Council's (NOHVCC) 2015 Great Trails: Providing Quality OHV Trails and Experiences publication[9]).* Complete conversions from NFSRs to trails suitable for motorized recreation within 10 years of plan approval.

    iv. Within the first 5 years of plan approval, consider inclusion and adoption of quality "non-system" routes to help meet the Forest's transportation and recreational needs and demands.

b. Guidelines

    i. Off-route use of any kind (i.e., both non-motorized and motorized) should be limited to prevent loss of vegetative cover and prevent soil erosion.

    ii. Seasonal access restrictions and closures are minimalized in order to maximize the availability of the forest routes and areas for OHV recreational uses. Consistent and uniform closure dates are utilized to minimize confusion within the individual Ranger Districts and throughout the Forest.

c. Standards

    i. Prohibit motor vehicle use beyond the designated system of roads, trails, and areas, as defined on MVUMs, except for those uses authorized by law, permits, and orders in connection with resource management and public safety.

    ii. Discourage off-trail use by all other categories of trail users.

**7. Proposed Management Approaches:**

a. Establish long-term partnerships with motorized recreation organizations to help the Forest maintain motorized trails and foster a low-impact conservation ethic.

b. Establish interpretive messages and programs with the TPA, COHVCO, volunteers and OHV users, including improved signing, information kiosks, and interpretive messaging.

---

[9] A copy of this publication has been provided to the Rio Grande National Forest by the TPA/COHVCO. Additional copies are available upon request.

Rvsd Plan - 00003573

Provide signing and information focused to prevent riders from becoming lost; to show OHV riding and recreational locations; and to identify dangerous and/or closed areas.

8. The Organization's staffs are available and willing to assist the Rio Grande National Forest staff should you have any questions or need additional information. We would like to highlight that our staffs have personnel that are uniquely qualified in the following specialties:

   a. OHV and snowmobile recreation.

   b. The Colorado Roadless Rule.

   c. Forest and timber management.

   d. Civil Engineering to include road and trail design, alignment, construction and maintenance, construction management, stormwater management and drainage.

   e. Water Resources Engineering to include erosion and sediment control, hydraulics, floodplain mapping, fluvial geomorphology, low impact development, watershed studies along with stream restoration methods and techniques, stream bank stabilization, and habitat enhancement.

We thank you for reviewing and considering these comments and suggestions. The Organizations would welcome a discussion of these opportunities at your convenience. Our point of contact for this project will be William Alspach, P.E. at 675 Pembrook Dr., Woodland Park, CO, cell 719-660-1259, e-mail: williamalspach@gmail.com.

Sincerely,

Scott Jones, esq.
COHVCO Co-Chairman
CSA Vice President
508 Ashford Dr.
Longmont, CO 80504
(518) 281-5810
scott.jones46@yahoo.com

D. E. Riggle
Director of Operations
Trails Preservation Alliance
725 Palomar Ln.
Colorado Springs, CO 80906
(719) 338-4104
info@coloradotpa.org

14

 

October 14, 2016

Attn: Dan Dallas, Forest Supervisor
The Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144

### Rio Grand National Forest Plan: Proposed Action
### Comments - EXECUTIVE SUMMARY

Dear Supervisor Dallas:

Please accept these comments on the Rio Grande National Forest, Forest Plan Revision Project on behalf of the Trails Preservation Alliance ("TPA") and the Colorado Off-Highway Vehicle Coalition ("COHVCO"). The TPA is a volunteer organization created to be a viable partner to public lands managers, working with the United States Forest Service (USFS) and the Bureau of Land Management (BLM) to preserve the sport of trail riding and multiple-use recreation. The TPA acts as an advocate for the sport and takes the necessary action to insure that the USFS and BLM allocate a fair and equitable percentage of public lands access to diverse trail multiple-use recreational opportunities. COHVCO is a grassroots advocacy organization representing approximately 170,000 registered off-highway vehicle ("OHV"), snowmobile and 4WD users in Colorado seeking to represent, assist, educate, and empower all motorized recreationists in the protection and promotion of multiple-use and off-highway motorized recreation throughout Colorado. COHVCO is an environmental organization that advocates and promotes the responsible use and conservation of our public lands and natural resources to preserve their aesthetic and recreational qualities for future generations. TPA and COHVCO are referred to collectively in this correspondence as "The Organizations." The Organizations generally support the Proposed Action but offer the following comments and concerns regarding this project. We have generally organized our comments relative to the primary areas of proposed change.

1. **Fire Management (Re: Forest-Wide Goal 2):**

    a. The Organizations recognize the benefits of fire to the forest and the associated forest resources. However, we have concerns regarding the typical exclusion of public access post fire. We feel that an appropriate goal of returning public access to post fire zones is one year. Similarly for large-scale beetle kill areas, we recommend that instead of broad closing of these areas and the associated closing of trails and routes within those areas, that public access to these areas remain open with hazard trees and snags in close proximity to multiple-use trails and routes being felled.

Rvsd Plan - 00003575

2. **Sustainable Recreation (Re: Forest-Wide Goal 3):**

   a. The Organizations feel the proposed forest plan lacks emphasis on recreation.  We offer that forest recreation needs to be a more prominent focus area when developing alternatives and we ask that multiple-use and motorized recreation be specifically addressed in the General Forest Geographic Area.

   b. We fully recognize that this action proposes to revise and update the Forest Plan is not a Travel Management decision.  However, the implications for Travel Management into the future are significant and cannot be disregarded or ignored. "Multiple-use and Motorized Recreation/Travel" should be included into Table 1.4 as an Allowable Activity and the matrix annotated accordingly.

   c. The Organizations believe that trails and routes within the Rio Grande National Forest have been closed improperly in the past and without proper consideration for NEPA. Specifically that there are routes that were improperly closed during the last forest plan revision and should be reconsidered and re-evaluated for multiple-use access (i.e., re-opened accordingly).

   d. The Organizations would encourage and support the Forest's decision to convert most any existing National Forest Service Road (NFSR) to a Full Size Trail or another trail designation (e.g., Trail open to Motorcycles, or open to Vehicles 50" or less in width). Conversion of roads to multiple-use, motorized trails could make those routes eligible for Colorado Parks and Wildlife OHV grant funds.

   e. Wilderness Areas. The Organizations do not support any additional Wilderness designated areas within the Rio Grande National Forest.

   f. The Organizations support motorized cross-country travel, limited to snow machines in the winter within the following Proposed Management Areas:
      i. 3.3 – Backcountry
      ii. 3.5 – Colorado Roadless Area
      iii. 3.6 – Upper Tier Colorado Roadless Area
      iv. 4.3 – Dispersed and Developed Recreation
      v. 5.11 – General Forest and Intermingled Rangelands
      vi. 5.41 – Deer and Elk Winter Range area (with reasonable management)

3. **Social and Economic support of local communities and connecting citizens to the land (Re: Forest-Wide Goal 3):**

   a. The Organizations believe that continued multiple-use access and motorized recreation within the Forest is vitally important to the preservation and conservation of our public lands and the well being of our citizens.

   b. The economic impacts of multiple-use and motorized recreation within the counties and communities encompassed by or adjacent to the Rio Grande National Forest cannot be overlooked. As popular as motorized recreation is within the Rio Grande National Forest, the economic benefits to local economies and the nearby communities must not be undervalued[1].

---

[1] DRAFT Economic Contribution of Off-Highway Vehicle Recreation in Colorado, July 2016.  *This study is nearing completion and will be finalized in the very near future.*

Rvsd Plan - 00003576

4.  **Proposed Forest-wide <u>Desired Conditions</u> for OHV Recreation:**

    a.  Motorized vehicle use will occur on USFS system roads, trails and areas, except as authorized by permit or for administrative uses. Opportunities exist in appropriate places for responsible motorized recreation with varying experiences for a variety of vehicle classes and types. Forest visitors enjoy semi-primitive motorized recreation and explore the backcountry in OHVs along designated routes. Sound from motorized vehicles is infrequent, away from areas of higher road and motorized route density.

    b.  A motorized system of routes provides: a variety of route widths and levels of challenge for a diversity of users, scenery and wildlife viewing, a variety of terrain and conditions, and dispersed camping. <u>Multi-use trails are more common than those available for only one class of vehicle or user</u> and may interconnect with roads or other routes to make loops. Motorized routes are easily identified on the ground and the Motor Vehicle Use Map (MVUM). Single-track trails emphasize solitude from other types of motorized vehicles, to the extent practical, and challenge.

    c.  Adequate signing is provided to advise users of motorized restrictions. Information kiosks are located at main entryways onto the Forest with pertinent OHV recreation information. Information is provided for OHV recreationists and trail users, including maps and signs that provide road and trail information and explain USNF regulations for such activities as OHV travel, camping, and trail opportunities. Orientation information and interpretation is provided at sites that receive high levels of visitation.

    d.  Resource damage from unauthorized motorized routes is minimal and existing user-created roads and trails are rehabilitated to prevent future access by the public and to mitigate long-term soil and water impacts. Roads and trails are located with minimal impact to cultural sites, soil, water, and wildlife resources. Poorly located routes are redesigned or relocated.

5.  **Proposed <u>Objectives, Guidelines and Standards</u> for OHV Recreation:**

    a.  <u>Objectives</u>

        i.  No net decrease in the total existing mileage of roads and multiple-use/motorized system trails during the period/lifetime of the revised plan with two modifications; 1) provide a 15% increase in total trail mileage available for motorized/multiple-use single track, with an emphasis on providing additional opportunities for "novice" single track riders and 2) provide designated recreational opportunities (e.g. loops and routes) for UTV's (AKA side by sides).

        ii.  Rehabilitate 10 to 20 miles of user-created routes (including both motorized and non-motorized routes) per year until evidence of non-system trails is minimized Forest-wide.

        iii.  Convert existing National Forest Service Roads (NFSR) to Full Size Trails or another trail designation (e.g. Trail open to Motorcycles, or open to Vehicles 50" or less in width) whenever the primary purpose of the road is recreation and the road does not provide a direct access from one area to another. *(Note: Conversion to Full Size Trails will help solve the problem of insufficient funds for road maintenance and make those routes eligible for Colorado Parks and Wildlife OHV grant funds. We also encourage the use of conversion techniques contained in Chapter 17 of*

3

Rvsd Plan - 00003577

the National *OJf-Highway Vehicle Conservation Council's (NOHVCC) 2015 Great Trails: Providing Quality OHV Trails and Experiences publication*[2]).  Complete conversions from NFSRs to trails suitable for motorized recreation within 10 years of plan approval.

    iv. Within the first 5 years of plan approval, consider inclusion and adoption of quality "non-system" routes to help meet the Forest's transportation and recreational needs and demands.

  b. <u>Guidelines</u>

    i. Off-route use of any kind (i.e., both non-motorized and motorized) should be limited to prevent loss of vegetative cover and prevent soil erosion.

    ii. Seasonal access restrictions and closures are minimalized in order to maximize the availability of the forest routes and areas for OHV recreational uses. Consistent and uniform closure dates are utilized to minimize confusion within the individual Ranger Districts and throughout the Forest.

  c. <u>Standards</u>

    i. Prohibit motor vehicle use beyond the designated system of roads, trails, and areas, as defined on MVUMs, except for those uses authorized by law, permits, and orders in connection with resource management and public safety.

    ii. Discourage off-trail use by all other categories of trail users.

**6. Proposed Management Approaches:**

  a. Establish long-term partnerships with motorized recreation organizations to help the Forest maintain motorized trails and foster a low-impact conservation ethic.

  b. Establish interpretive messages and programs with the TPA, COHVCO, volunteers and OHV users, including improved signing, information kiosks, and interpretive messaging. Provide signing and information focused to prevent riders from becoming lost; to show OHV riding and recreational locations; and to identify dangerous and/or closed areas.

7. The Organization's staffs are available and willing to assist the Rio Grande National Forest staff should you have any questions or need additional information.  We would like to highlight that our staffs have personnel that are uniquely qualified in the following specialties:
  a. OHV and snowmobile recreation.
  b. The Colorado Roadless Rule.
  c. Forest and timber management.
  d. Civil Engineering to include road and trail design, alignment, construction and maintenance, construction management, stormwater management and drainage.
  e. Water Resources Engineering to include erosion and sediment control, hydraulics, floodplain mapping, fluvial geomorphology, low impact development, watershed studies along with stream restoration methods and techniques, stream bank stabilization, and habitat enhancement.

---

[2] A copy of this publication has been provided to the Rio Grande National Forest by the TPA/COHVCO.  Additional copies are available upon request.

Rvsd Plan - 00003578

We thank you for reviewing and considering these comments and suggestions.  The Organizations would welcome a discussion of these opportunities at your convenience.  Our point of contact for this project will be William Alspach, P.E. at 675 Pembrook Dr., Woodland Park, CO, cell 719-660-1259, e-mail: williamalspach@gmail.com.

Sincerely,

Scott Jones, esq.
COHVCO Co-Chairman
CSA Vice President
508 Ashford Dr.
Longmont, CO 80504
(518) 281-5810
scott.jones46@yahoo.com

Don Riggle

D. E. Riggle
Director of Operations
Trails Preservation Alliance
725 Palomar Ln.
Colorado Springs, CO 80906
(719) 338-4104
info@coloradotpa.org

5

| | |
|---|---|
| **From:** | Nick |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Rio Grande National Forest Winter Travel Management Plan 2017 |
| **Date:** | Tuesday, October 18, 2016 5:24:19 PM |

Hello, and thank you for taking the time to consider my comments regarding the Rio Grande National Forest Winter Travel Management Plan 2017, specifically regarding the shared use of the backcountry by skiers and snowmobiles.

I am a lifelong resident of Colorado and have enjoyed its National Forests since I can remember. For each of the last 11 years I have skied in the backcountry around Wolf Creek Pass; in the last several years I have been encountering snowmobilers on a fairly regular basis.

We all need to share the backcountry, and I accept that snowmobiles have their place. The issue is the "footprint" produced by snowmobiles compared to skiers. The range of a sled, and especially the noise it generates, produces an impact over a large area. With the improvements to sleds and number of them out there now, more snowmobilers are further extending their range by pushing into higher and steeper slopes.

Backcountry skiers have such a small footprint compared the snowmobiles in all possible regards; where snowmobilers have their right to range and noise, skiers should have their right to some solitude - one of the main reasons to be in the backcountry, winter or summer, is to experience the peace that comes with the wilderness experience.

Please help restore a balance by setting aside terrain for non-motorized vehicles around Wolf Creek. I hope you'll support the creation of a no-fly zone to the north the Wolf Creek Ski Area, to the east FS RD 390, Silver Creek to the south, and the Continental Divide to the west.

Thanks again for your consideration in this important matter!

Nick Josephs
2316 S. Leyden St.
Denver, CO 80222

Rvsd Plan - 00003580

| From: | addie greer |
|---|---|
| To: | FS-RGNF forest plan |
| Subject: | Comment on DraftManagmntPlan |
| Date: | Saturday, October 15, 2016 8:07:36 AM |

Regarding a NonMotorized area surrounding the WCPass area yurt above AlbertaLakeRes:

My friends and I enjoy this area year round - in fact I just hiked to yurt (and beyond to CDT)yesterday(!)
It is easy to access Nordic skiing via WC ski area parking lot and once past alpine ski and snowboard folks,lifts and possible ski patrol snowmobile use-skiing across AlbertaLake dam and up to yurt is a special experience in solitude and beauty. I have yet to rent the yurt myself; but having the route skied by users allows me to access it with my small dog and get away from the snowmobiles on many of the other shared areas like EastFork and Toner and 4mileRd.

I have seen ermine, elk and ptarmigan and even bald eagle above Alberta Lake; and always enjoy the honor of their presence.

Snowmobiles can be heard a LONG way in the winter mountains and besides the noise; the smell can bring on an instant headache--I am sensitive to synthetic odors. Additionally, the chemicals from exhaust would have an impact on this area where folks melt snow for drinking and cooking. Finally, the beauty of virgin snow or snow with small width s-curve ski tracks is an enjoyable sight -but the way snowmobiles 'tear up' the snow is not aesthetically pleasing and can make it difficult for wildlife of many species to walk in winter.

I urge you to not allow motorized vehicles in this area for many important reasons.
Adelaide Greer
P.O.Box 1402 P.S,CO 81147


A THOUGHT FOR TODAY:
The most valuable possession you can own is an open heart. The most powerful weapon you can be is an instrument of peace. -Carlos Santana, musician (b. 20 Jul 1947)

| From: | Ben Hendriks |
| To: | FS-RGNF forest plan |
| Subject: | Non-motorized Pass Creek Yurt area |
| Date: | Sunday, October 16, 2016 5:10:07 PM |

I'm a backcountry skier and I would like to ask you kindly to leave the keep the Pass Creek Yurt area for non-motorized use so that we can continue to enjoy the silence and our backcountry experience in this pristine region. Allowing snowmobiles will definitely disturb this region including wildlife. Snowmobiles have their designated areas already mapped out and this covers quite a region already from what it looks like. Is it really necessary to let them expand that even more? Can't we keep a small region to the backcountry skiers, snowshoers, snowboarders and yurt clients? You might propose to have skiers share this area with snowmobiles but you and I know that that doesn't work, it's not safe.

So, once again let's keep this region snowmobile-free please.

Thank you

BH

Sent from my iPad

Rvsd Plan - 00003582

**From:** Justin Armer
**To:** FS-RGNF forest plan
**Subject:** no motorized access
**Date:** Sunday, October 16, 2016 5:28:52 PM

Hi,

I want to submit a comment regarding motorized access of the Pass Creek Yurt area. I understand that everyone has a right to back country access. I use sleds, dirt bikes, jeeps, and other forms of motorized transport to access the back country regularly. That said, on certain days I also like to skin in and leave the engines at home. We should protect the ability to have non motorized access in addition to the motorized methods I and others enjoy.

The problem with shared access between motorized and non motorized users is that it is not a mutually advantageous arrangement. By this I mean that when I sled into an area, it does not bother me or interfere with my activity to have skiers skinning in. This is not true the other way around. When we skin in to an area it is disruptive, unenjoyable, and in some cases dangerous when sleds come ripping through the trail. This is why it is so important to protect the small areas of dedicated non motorized travel.

I am not advocating the restriction of motorized access in places where it already exists. I would just like to voice my vote to maintain certain areas as non motorized access only. There is more than enough area for every form of travel to have dedicated zones. Please keep the Pass Creek Yurt area motor free. Thanks!

--
Justin

**From:** john strand
**To:** FS-RGNF forest plan
**Subject:** Pass Creek Yurt Non Motorized
**Date:** Sunday, October 16, 2016 8:19:08 AM

Hello,

I'd like to thank the USFS for allowing public input on the upcoming Revision of the Rio Grande National Forest. I am writing to urge the USFS to designate the Pass Creek Yurt area as a non-motorized area.

The Pass Creek Yurt area has been a special place for many over the years. The ease of access, the quiet backcountry experience and the pure beauty of the area is under threat to be compromised by the increased use of motorized travelers in the area. As more users continue to go into the backcountry, terrain 'sharing' just does not work. By NOT taking action to make this change, many non-motorized users will be negatively effected. Non-motorized human-powered travelers deserve land set aside for their enjoyment that provides a serene, quiet and safe setting. Silence in the backcountry and on our National Forest is a right. Non-motorized winter travelers with children and/or pets always have to be on the look-out for fast moving vehicles and it creates a safety issue. It's kind of like taking the family out for a hike on a freeway.

By taking action to make this area designated as non-motorized, experience on public lands will be improved for those seeking the serenity and silence that can be found in our National Forest. Non-motorized travelers are only able to travel 5-10 miles in an entire day--whereas motorized travelers can travel well over 50 miles in a day. With the geography and location of the Pass Creek Yurt area, this allows the non-motorized users easy access to get the quiet and safe backcountry experience they have a right to. In addition, motorized users have ample opportunity in the immediate area to access miles and miles of terrain for their enjoyment. The times that I travel in winter on motorized craft, I personally prefer the separate area designated for motorized travel where I don't have to worry about conflict or safety issues with the other users.

Thank you for the consideration and I hope the change can be made to designate the Pass Creek Yurt area as a non-motorized area.

John Strand
Durango, CO
Jstrand@ureach.com
303-489-8849

Get your own "800" number
Voicemail, fax, email, and a lot more
http://www.ureach.com/reg/tag

Rvsd Plan - 00003584

| From: | Mid School Math |
| To: | FS-RGNF forest plan |
| Subject: | Buffer around Pass Creek Yurt |
| Date: | Sunday, October 16, 2016 1:00:16 PM |
| Attachments: | Screen Shot 2016-09-21 at 12.30.59 PM.png |

Hi folks,

I just want to say that for years, I've enjoyed the Pass Creek Yurt.

Snowmobiles would deter me from continuing to visit. The quiet of the location, and connect to the forest is my purpose for visiting.
Thanks for you consideration and keeping the place special.

Scott


Scott Laidlaw, Ed.D. CEO
MidSchoolMath
Phone: 801.657.1035



| From: | Abigail |
| To: | FS-RGNF forest plan |
| Subject: | Non-Motorized buffer around Pass Creek Yurt |
| Date: | Monday, October 17, 2016 8:43:57 AM |

To Whom it May Concern,

As a former USFS Wilderness Ranger and avid backcountry skier, I am writing to ask that the Rio Grande National Forest consider creating a non-motorized buffer in the area of Pass Creek Yurt.

I have spent several overnights at the yurt and find the peaceful experience to be an important rejuvenating winter experience. In addition, I have introduced by eight year old niece to backcountry skiing and USFS lands through the yurt. Being able to reliably assume that there are no snowmobiles in the area gives us peace of mind especially when bringing children into the backcountry. Sharing terrain with motorized users significantly, and negatively impacts the skier experience. I specifically go to Pass Creek Yurt to get away from the noise and number of people that are inherent with motorized use. In addition, snowmobile use increases the possibility of avalanche danger because of their weight and ability to access 50-70 miles of varied terrain. This poses a danger to backcountry skiers.

Please consider these factors as you devise you new draft management plan.

Thank you,
Abigail Sussman

**From:** Michael Rega
**To:** FS-RGNF forest plan
**Subject:** Pass Creek Comments
**Date:** Monday, October 17, 2016 5:12:01 PM

For over a decade we have been exploring the pass creek area by snowshoe and back country skis and feel strongly that there are precious few places as safe and beautiful as Pass Creek to enjoy the serenity of the real wild. Please consider keeping Pass Creek designated motor free, it is well covered by local cell phone towers for any emergency and yet keeps it's true wilderness feel. It is a rare and special area that we do not want to lose to motor sports.

Thank you for the consideration.

**Michael Rega CSP, MSM**
Managing Partner
Ecliptic Consulting Group
Direct 727-692-1911
Office 800-789-ECLIPTIC (3254)
mrega@ecgpc.com
www.ecgpc.com



| | |
|---|---|
| **From:** | David Wilson |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Pass Creek Yurt Non-Motorized Designation |
| **Date:** | Tuesday, October 18, 2016 8:17:05 PM |

To whom it may concern,

I have skied the backcountry throughout the state of colorado for the last 30 years. In days long past I could access the wild places and not see any snow machines. Now they are very high powered and can climb almost anything and do so.

Both motorized and non-motorized users should have the privilege of having a great day in the back country. I like what was done years ago on Rabbit Ears Pass - one side for motorized users and another for non-motorized users. The rules are easy to follow and it seems most folks do so.

I have stayed at the yurt near pass creek perhaps six times over 30 years. While not totally insulated from the trucks on the road it is a nice place to visit and to enjoy the good skiing nearby. I have been there when snow machines have travelled right to the yurt and crushed all the available powder skiing nearby.

They can go anywhere - so please consider limiting their travel to an area that allows non-motorized visitors to enjoy the sound of snow under there skis and pine in the air versus the whine of 150 HP, 2 cycle machine, and the stink of oil in the air.

With respect,

David Wilson
3060 18th St
Boulder, CO 80304

| | |
|---|---|
| **From:** | Howard Cox |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Forest plan revision comments |
| **Date:** | Tuesday, October 18, 2016 11:59:34 AM |

I would like to offer comments as pertains to the upcoming Winter Travel Management Plan updating in 2017. There has been a longstanding issue of snow machine / skier, snowshoe, sledder conflict on the north side of Wolf Creek Pass that is overdue for resolution. As a participant in the original task force that compromised on the voluntary recommendations limiting machines to the Lobo road, I would strongly support reconsideration of that failed policy for all the safety and aesthetic reasons already discussed at length. As a non motorized user of the WC back country for 30 years the problem motorized / non motorized conflict has only gotten worse every year. The vast amount of back country available to machines in the RGNF that skiers cannot ever hope to access pales in comparison to the small amount of prime skier terrain available off the north side of the pass. Machines don't mix with kids and families with sleds, hikers and skiers. I again recomend a common sense, administratively clean separation of the north (non motorized) from the south (no restrictions) sides of WC pass.

The same should be said for the proposed proposed boundaries surrounding the Pass Creek Yurt. Non motorized, winter back country recreation is premised silence, solitude, and high quality (untracked) conditions.

Thank you,
Howard Cox
Del Norte, CO

| | |
|---|---|
| **From:** | Phil Zappone |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Creating a non-motorized buffer around the Pass Creek Yurt in winter |
| **Date:** | Tuesday, October 18, 2016 8:29:38 PM |

As a skier and snowmobiler, please **create ing a non-motorized buffer around the Pass Creek Yurt in winter.**

- Non-motorized users deserve land set aside for their enjoyment
- "Sharing" terrain with motorized users doesn't work
- Silence in the backcountry is a right
- Snowmobiles easily travel 50-70 miles in a day accessing many thousands of acres of backcountry in a day.  Skiers travel 2-10 miles in a day, limiting the acreage to which they have access.

The boundaries requested are: to the north the Wolf Creek Ski Area, to the east FS RD 390, Silver Creek to the south, and the Continental Divide to the west.

Thank you for your hard work and considering this recommendation.


Phi & Tabitha Zappone

30 Limestone Ct

Pagosa Springs, CO

81147

| | |
|---|---|
| **From:** | richard_higashi@yahoo.com |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Non-Motorized Designation for Pass Creek Yurt |
| **Date:** | Tuesday, October 18, 2016 2:21:30 AM |

I support the non-motorized designation for Pass Creek Yurt to preserve the nice and quiet experience for backcountry skiing.

I had an amazing time in that beautiful area and there are very limited backcountry locations. Snowmobiles can easily travel 50-70 miles while Skiers are limited to 2-10 miles.

Sincerely,
Richard
Sent from my iPhone

| | |
|---|---|
| **From:** | TONY HOAG |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Pass Creek Yurt |
| **Date:** | Tuesday, October 18, 2016 4:18:33 PM |

Hello, I am a back country skier that has visited the Pass Creek Yurt many times over the last 20 years. We have enjoyed the wonderful backcountry hard earned relationship we have had with this area. We work hard skiing uphills and down to get to the yurt. Always we are awarded with the wonderful solitude and quietness of this special place. Although it is not a wilderness it sure feels like even though it is only a few miles from a heavily developed mechanized ski area.

We hope you take out feelings into account as you prescribe the uses for this area during the winter. We hope you strongly consider keeping this area as a winter non-motorized area. There must be a balance between motorized and non-motorized ares. As I see it now there is a much greater percentage of the forest in motorized than non-motorized.

Although some people may argue that the two recreation types- non motorized and motorized can exist in the same space.I would strongly argue that they cannot. Back Country skiers experience is largely dependent on being able to leave the mechanized society behind. Snow machines take that experience away.

We understand the multiple use system and support its application throughout the forest system. There are instances though argue for separation- specified bicycle or hiking trails, wood-cutting areas where no recreation is allowed, fencing of areas to maintain separation of animals, and camping areas. All these uses are specific and require areas for use that limit use of others. With that argument in mind we put forth that it is a right to have areas set aside from motorized use- only in winter- in the Pass Creek Yurt Area.

I have enjoyed the Pass Creek Yurt and the solitude and quietness it offers for over 20 years. In terms of winter use there is only a minority of acres of Forest Land to recreate without the encountering mechanized vehicles in a place we seek quietness. Asking for the Pass Creek Yurt Area to be non-motorized in winter as another proscripted use in the multiple-use system is a right to be recognized and valued by the USFS.

Thank You for considering my points in keeping the PAss Creek Yurt non-motorized in winter,

Tony Hoag
17908 Paradox Trail
Montrose, CO 81401
970-249-3564

| | |
|---|---|
| **From:** | Craig Carter |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Non-Motorized Designation for Pass Creek Yurt |
| **Date:** | Thursday, October 20, 2016 11:24:15 AM |

Dear Sir or Madam,

I have been fortunate to use the Pass Creek Yurt during past winters. The approach to the Pass Creek Yurt from the Wolf Creek ski area offers beautiful views. The terrain near the Pass Creek Yurt provides excellent ski descents. However, this experience is often interrupted, both by noise and the tracking out of fresh powder, by snowmobiles.

I appreciate that we want to provide access to and allow enjoyment of our forests by multiple parties and multiple uses. I am writing to simply request that this relatively small area be given a non-motorized designation to allow a wilderness-like experience for its users.

Best regards,

Craig

Professor Craig R. Carter, Ph.D.
Dean's Council of 100 Distinguished Scholar
W.P. Carey School of Business
Arizona State University
Advising Editor and Editor Emeritus, *Journal of Supply Chain Management*
Phone: +1.480.965.6044
Fax: +1.775.201.1754
Email: crcarter@asu.edu
*Journal of Supply Chain Management*:
http://onlinelibrary.wiley.com/journal/10.1111/%28ISSN%291745-493X
Wikipedia: http://en.wikipedia.org/wiki/JSCM
Twitter: http://twitter.com/JSCM_news
LinkedIn: http://www.linkedin.com/pub/craig-carter/12/619/763
*Please consider your environmental responsibility before printing this e-mail*

| | |
|---|---|
| **From:** | Margaret Burkesmith |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Pass Creek Yurt - Pagosa Springs, CO |
| **Date:** | Thursday, October 20, 2016 8:54:24 AM |

To whom it may concern:

I am concerned about the influence that the snowmobiles have in the National Forest.  They are very destructive, loud, disturbing, toxic, and liter our wilderness.

The Pass Creek Yurt (near Wolf Creek Ski Area) is a very sacred, safe, getaway for both us, the animals, and the forest.  One can almost hear the choir of the trees while there.  I personally call it the 'yurt of integration' because it assists us to let down our busy, noisy lives, and come back to our natural state of calm in our mind and bodies.

To be able to connect and commune with nature and the wildlife is vital for our physical, mental, and emotional well being.

For those of you whom are reading this, you know this through and through, and this is most likely the reason you've chosen your vocation.

Please redirect the recreational snowmobiles to a different area - there's so much to choose from - why wouldn't you?

Thank you for your care, concern, and consideration in the matter.  Margaret Burkesmith

Thoreau says it best:

"Live in each season as it passes; breathe the air, drink the drink, taste the fruit, and resign yourself to the influence of the earth."

"We need the tonic of wildness...At the same time that we are earnest to explore and learn all things, we require that all things be mysterious and unexplorable, that land and sea be indefinitely wild, unsurveyed and unfathomed by us because unfathomable. We can never have enough of nature."

― **Henry David Thoreau, Walden: Or, Life in the Woods**

**Margaret Burkesmith**
Phoenix Rising Yoga Therapist
**Yoga Clarity**
970-264-YOGA (9642)
http://www.yogaclaritypagosa.com/pryt.html

Rvsd Plan - 00003594

**From:** La Donna & Travis Ward
**To:** FS-RGNF forest plan
**Subject:** Pass Creek
**Date:** Thursday, October 20, 2016 11:48:31 AM

Dear Forest Plan People,

Please retain the non motorized area around the Pass Creek Yurt (in the Wolf Creek Area). Snowmobilers (and snowbikes etc) already have huge acreages in the area east of Wolf Creek Pass to do their thing. While they are at it they flatten out large tracts of powder snow in a very short time. Non motorized folks (like us) need and deserve an area where they can enjoy some powder in relative peace and quiet. We are forest users too!!

When making your plan for the forest use please make a provision for us quiet users around the Pass Creek Yurt.

Thanks.

Travis and la Donna Ward
1034 5th ave
Durango
Colo
81301

Rvsd Plan - 00003595

**From:** ERIC POLCZYNSKI
**To:** FS-RGNF forest plan
**Subject:** RGNF Forest Plan revision
**Date:** Monday, October 24, 2016 3:48:46 PM

Please consider the following points in the RGNF plan revision,

•Preserve healthy habitats by adding additional areas as Wilderness including Antora Meadows, which would help fill the largest gap in the wilderness system in the Southern Rockies and one of the few areas in Colorado where all of the state's major forest types coexist.
•Other important areas to recommend for Wilderness include North Fork of Rock Creek, Snowshoe Mountain, and Saguache Creek.

•Protect connected landscapes by designating regional and forest-scale wildlife corridors such as the Wolf Creek Pass Landscape Zoological Area, which is one of the most important wildlife linkage zones in the San Juan Mountains and provides the most expansive lynx habitats in the Southern Rockies.
•Also for landscape connectivity please protect the Elkhorn Peak Recommended Wilderness and Spruce Hole/Osier/Toltec Landscape Linkage area.

•Defend key species such as the Canada lynx (ESA threatened) that is recovering in the Rio Grande National Forest, Uncompahgre fritillary butterfly (ESA endangered) that is found only in alpine habitats in the San Juan Mountains, and the Rio Grande cutthroat trout with only about two dozen remaining large gentically pure populations.
•Protect Rio Grande cutthroat trout and important wetland areas by designating Rio Grande Cutthroat Trout Focus Areas including Carnero Creek and Jim Creek.

Thank you for reading. Sincerely, Eric Polczynski, Po Box 3483, Pagosa Springs, CO 81147

**From:** Ralph
**To:** FS-RGNF forest plan
**Subject:** Forest Plan revision
**Date:** Tuesday, October 25, 2016 6:09:52 AM

**A major focus of the plan revision needs to be protecting biodiversity - preserving healthy habitats, connected landscapes, and key species.**

Preserve **healthy habitats** by recommending additional areas as Wilderness including Antora Meadows, which would help fill the largest gap in the wilderness system in the Southern Rockies and one of the few areas in Colorado where all of the state's major forest types coexist.

- Other important areas to recommend for Wilderness include North Fork of Rock Creek, Snowshoe Mountain, and Saguache Creek.

- Protect **connected landscapes** by designating regional and forest-scale wildlife corridors such as the Wolf Creek Pass Landscape Zoological Area, which is one of the most important wildlife linkage zones in the San Juan Mountains and provides the most expansive lynx habitats in the Southern Rockies.
  - Other important areas to protect for landscape connectivity include the Elkhorn Peak Recommended Wilderness and Spruce Hole/Osier/Toltec Landscape Linkage area.

- Defend **species** such as the Canada lynx that is recovering in the Rio Grande National Forest, Uncompahgre fritillary butterfly that is found only in alpine habitats in the San Juan Mountains, and the Rio Grande cutthroat trout with only about two dozen remaining large genetically pure populations.
  - Protect Rio Grande cutthroat trout and important wetland areas by designating Rio Grande Cutthroat Trout Focus Areas including Carnero Creek and Jim Creek.

*Thanks,*

*Ralph Head*

Rvsd Plan - 00003597

| **From:** | Joshua Kuhn |
|---|---|
| **To:** | FS-RGNF forest plan |
| **Subject:** | Scoping Comment |
| **Date:** | Tuesday, October 25, 2016 1:22:43 PM |

Dear Rio Grande National Forest,

Thank you for the opportunity to submit comments toward the Rio Grande National Forest's forest plan revision. **A major focus of the plan revision needs to be protecting biodiversity - preserving healthy habitats, connected landscapes, and key species.**

- Preserve **healthy habitats** by recommending additional areas as Wilderness including Antora Meadows [pictured above], which would help fill the largest gap in the wilderness system in the Southern Rockies and one of the few areas in Colorado where all of the state's major forest types coexist.
    - Other important areas to recommend for Wilderness include North Fork of Rock Creek, Snowshoe Mountain, and Saguache Creek.

- Protect **connected landscapes** by designating regional and forest-scale wildlife corridors such as the Wolf Creek Pass Landscape Zoological Area, which is one of hte most important wildlife linkage zones in the San Juan Mountains and provides the most expansive lynx habitats in the Southern Rockies.
    - Other important areas to protect for landscape connectivity include the Elkhorn Peak Recommended Wilderness and Spruce Hole/Osier/Toltec Landscape Linkage area.

- Defend **key species** such as the Canada lynx (ESA threatened) that is recovering in the Rio Grande National Forest, Uncompahgre fritillary butterfly (ESA endangered) that is found only in alpine habitats in the San Juan Mountains, and the Rio Grande cutthroat trout with only about two dozen remaining large genticely pure populations.
    - Protect Rio Grande cutthroat trout and important wetland areas by designating Rio Grande Cutthroat Trout Focus Areas including Carnero Creek and Jim Creek.

- See our Locator Map for the location of the forest and our Map of Recommended Designated Areas to learn where some of the areas the conservation community is recommending for protections are found.

Thanks,
Josh Kuhn
908 Jasmine Pl
Lafayette, Co

Rvsd Plan - 00003598

**From:** Paula Pluta
**To:** FS-RGNF forest plan
**Subject:** We need your support
**Date:** Tuesday, October 25, 2016 11:03:50 AM

**A major focus of the plan revision needs to be protecting biodiversity - preserving healthy habitats, connected landscapes, and key species. Support Rocky Mountain Wild and our conservation partners by asking the Forest to:**

- Preserve **healthy habitats** by recommending additional areas as Wilderness including Antora Meadows [pictured above], which would help fill the largest gap in the wilderness system in the Southern Rockies and one of the few areas in Colorado where all of the state's major forest types coexist.
    - Other important areas to recommend for Wilderness include North Fork of Rock Creek, Snowshoe Mountain, and Saguache Creek.
- Protect **connected landscapes** by designating regional and forest-scale wildlife corridors such as the Wolf Creek Pass Landscape Zoological Area, which is one of hte most important wildlife linkage zones in the San Juan Mountains and provides the most expansive lynx habitats in the Southern Rockies.
    - Other important areas to protect for landscape connectivity include the Elkhorn Peak Recommended Wilderness and Spruce Hole/Osier/Toltec Landscape Linkage area.
- Defend **key species** such as the Canada lynx (ESA threatened) that is recovering in the Rio Grande National Forest, Uncompahgre fritillary butterfly (ESA endangered) that is found only in alpine habitats in the San Juan Mountains, and the Rio Grande cutthroat trout with only about two dozen remaining large gentically pure populations.
    - Protect Rio Grande cutthroat trout and important wetland areas by designating Rio Grande Cutthroat Trout Focus Areas including Carnero Creek and Jim Creek.

| | |
|---|---|
| **From:** | larry rice |
| **To:** | FS-RGNF forest plan |
| **Subject:** | Rio Grande National Forest future plans ; comments ......... |
| **Date:** | Monday, October 24, 2016 4:35:40 PM |

To whom it may concern;

**A major focus of the plan revision needs to be protecting biodiversity - preserving healthy habitats, connected landscapes, and key species. Support Rocky Mountain Wild and our conservation partners by asking the Forest to:**
• Preserve **healthy habitats** by recommending additional areas as Wilderness including Antora Meadows [pictured above], which would help fill the largest gap in the wilderness system in the Southern Rockies and one of the few areas in Colorado where all of the state's major forest types coexist.

- Other important areas to recommend for Wilderness include North Fork of Rock Creek, Snowshoe Mountain, and Saguache Creek.

• Protect **connected landscapes** by designating regional and forest-scale wildlife corridors such as the Wolf Creek Pass Landscape Zoological Area, which is one of hte most important wildlife linkage zones in the San Juan Mountains and provides the most expansive lynx habitats in the Southern Rockies.

- Other important areas to protect for landscape connectivity include the Elkhorn Peak Recommended Wilderness and Spruce Hole/Osier/Toltec Landscape Linkage area.

• Defend **key species** such as the Canada lynx (ESA threatened) that is recovering in the Rio Grande National Forest, Uncompahgre fritillary butterfly (ESA endangered) that is found only in alpine habitats in the San Juan Mountains, and the Rio Grande cutthroat trout with only about two dozen remaining large gentically pure populations.

- Protect Rio Grande cutthroat trout and important wetland areas by designating Rio Grande Cutthroat Trout Focus Areas including Carnero Creek and Jim Creek.

Please try to incorporate many of these ideas into your ongoing plans for this special area.

Thank you for your time.

Skyward,
 Larry B. Rice

Rvsd Plan - 00003600

1. **Species:** Canada Lynx (*Lynx canadensis*)

2. **Status:**  Table 1 summarizes the current status of this species or subspecies by various ranking entity and defines the meaning of the status.

| Table 1.  Current status of *Lynx canadensis* | | |
|---|---|---|
| Entity | Status | Status Definition |
| NatureServe | G5 | *Species is Secure*<br>At very low risk or extinction or elimination due to a very extensive range, abundant populations or occurrences, and little to no concern from declines or threats. |
| CNHP | S1 | *Species is Critically Imperiled*<br>At very high risk of extinction or elimination due to very restricted range, very few populations or occurrences, very steep declines, very severe threats, or other factors. |
| Colorado State List Status | Endangered; SGCN, Tier 1 | Included in the Colorado Threatened and Endangered Species list. |
| USDA Forest Service | ESA Section 7 | ESA Section 7 consultation requirement for activities that may affect the species. |
| USDI FWS[b] | FT | Federally listed as Threatened |
| USDI FWS Critical Habitat | None | No occurrence of designated critical habitat within the planning area. |
| [a] Colorado Natural Heritage Program.<br>[b] US Department of Interior Fish and Wildlife Service. | | |

The 2012 U.S. Forest Service Planning Rule defines Species of Conservation Concern (SCC) as "a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area" (36 CFR 219.9). This overview was developed to summarize information relating to this species' consideration to be listed as a SCC on the Rio Grande National Forest, and to aid in the development of plan components and monitoring objectives.

3. **Taxonomy**

Genus/species *Lynx canadensis* is accepted as valid.

4. **Distribution, abundance, and population trend on the planning unit [12.53.2,3,4]:**

In 1999, the Colorado Parks and Wildlife initiated a lynx recovery program intended to augment any existing populations in the Southern Rockies with transplants from Canada and Alaska to re-establish a self-sustaining breeding population.  The augmentation program resulted in a total of 218 lynx being transplanted into the San Juan Mountains during 1999-2006.

Lynx reproductive rates in Colorado have varied greatly since kittens were first documented in 2003. After den visits identified 16 kittens in 2003, researchers found 39 kittens in 2004; 50 kittens in 2005; 11 kittens in 2006; 11 kittens in 2009; 14 kittens in 2010. During the 2006, 2009 and 2010 seasons, DOW field crews documented that Colorado-born lynx had successfully produced third-generation Colorado

kittens. In 2010, researchers estimated that between 30 and 40 percent of female lynx bore litters of kittens (Colorado Parks and Wildlife 2010).  Recent kittens produced by two female lynx on the Rio Grande National Forest during the 2015 breeding season represent the first documented reproduction since 2010 (R. Ghormley, pers. comm. 2015).

The RGNF represents a large portion of the core area for lynx reintroduced to Colorado, with approximately 85% of the 218 lynx reintroduced to Colorado from 1999-2007 being released on the planning area. The vast majority of lynx within Colorado remains and reproduces in the high-elevation spruce-fir zone in the southwestern portion of the state, including the RGNF. Currently, lynx continue to utilize and reproduce on the RGNF, and local spruce-fir habitats remain essential to their eventual recovery and delisting (USDA Forest Service 2014).

Lynx habitat within the planning area was most recently modeled and mapped in 2011. Vegetation characteristics provide the criteria for identification of both primary and secondary habitats (Appendix A).Approximately 867,241 acres are classified as lynx primary habitat, 170,847 acres are delineated as secondary habitat (Figure 1), and 6,299 acres are identified as unsuitable habitat (USDA Forest Service 2011). A total of four linkage areas have also been delineated. Lynx habitat on the Rio Grande National Forest extends across administrative boundaries within the greater San Juan Mountains area and includes the San Juan and Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests.  Individual lynx that utilize the Rio Grande National Forest are known to have used all or any one of these units in the greater San Juan Mountains area (Theobald 2011).  Connective habitat between administrative units in the San Juan Mountains and beyond is essential for facilitating movement of Canada lynx across the landscape.

Aerial surveys to detect insect and disease influences indicate widespread mortality in spruce forest and to a lesser extent other forest types within the planning area.  Data from flights conducted from 2010-2014 show that approximately 782,137 acres of suitable lynx habitat were affected by spruce beetle mortality, while about 221 acres were affected by mountain pine beetle mortality (Figure 1). Severity of mortality varies across the landscape, ranging from less than one tree per acre (TPA) to over 100 TPA in some areas.

In 2013, a study was initiated to investigate how lynx respond to forests heavily influenced by spruce bark beetles in the San Juan Mountains of southern Colorado.  The purpose of the study is to address the key management questions associated with the maintenance of suitable habitat for lynx and primary prey species in relationship to natural disturbance processes such as bark beetles and wildfire, and to an expected increase in post-beetle forest management activities, such as timber salvage (USDA Forest Service 2014). Movements and habitat use by 4 radio-collared lynx (2 male, 2 female) for the period February 2014 – July 2015 show that portions of the planning area are currently being used for foraging and denning (with successful production of young). Preliminary results suggest that bark beetle mortality does not appear to be currently influencing lynx distribution or reproduction (R. Ghormley, pers. comm. 2015).

**Table 2. Known Occurrence Frequency within the Planning Area**

| Known Occurrences in the past 20 years | Numerous |
|---|---|
| Year Last Observed | 2015 |

Rvsd Plan - 00003602

5. **Brief description of natural history and key ecological functions [basis for other 12.53 components]:**

Canada lynx habitat in Colorado primarily occurs in the subalpine and upper montane forest zones. Recent analysis of radio-collared reintroduced lynx in Colorado indicates that the majority of the habitat used occurs between 9,900 – 11,620 feet (Theobald and Shenk 2011). Forests in these zones typically contain deep winter snows and are dominated by subalpine fir, Engelmann spruce, aspen, and lodgepole pine. A preference for these forest types, particularly spruce-fir associations, has been documented by radio-telemetry and tracking techniques associated with lynx reintroduced to Colorado (Theobald and Shenk 2011). Other habitats used by reintroduced lynx include spruce-fir/aspen associations and various riparian and riparian-associated areas dominated by dense willow (Shenk 2009).

Throughout North America, the distribution of lynx is closely tied to habitats that support an abundant population of snowshoe hare (Koehler 1990, Aubry et al. 2000). These habitats are generally defined as regenerating stands that contain dense, small-diameter stems that provide both food and horizontal cover (Koehler 1990, Aubry et al. 2000). In Colorado, both small diameter lodgepole stands and mature spruce-fir stands support the highest density of snowshoe hares, although the latter may be of more importance on a year-round basis due to the long-term persistence and distribution of mature spruce-fir stands (Ivan 2011). Reintroduced lynx in Colorado are also utilizing red squirrels, cottontails, and other alternate prey items. Red squirrels are closely associated with mature forest conditions, and would occur sympatrically with snowshoe hare as an important alternate prey species (Buskirk et al. 2000). The increased use of riparian-willow systems by reintroduced lynx during late summer and fall is also considered to be associated with alternate prey sources (Shenk 2009).

Canada lynx breed from March through April in the northern portion of their range, with kittens usually borne in May through June (Mowat et al. 2000). Births by reintroduced lynx in Colorado occurred in late May to mid-June (Shenk 2006). All den sites found in Colorado have occurred within the spruce-fir zone on steep, north-facing slopes and are most often associated with substantial amount of large diameter woody debris (Merrill 2005, Shenk 2009). The average elevation at Colorado den sites is 11,004 feet (Shenk 2009). Disturbances such as insects and disease and windthrow contribute to the downed log component and are therefore important for reproduction and protection for the kittens (Aubry et al. 2000). For denning habitat to be functional, it must be in or adjacent to quality foraging habitat. Because lynx may frequently move their kittens in the first few months, multiple nursery sites are needed that provide kittens with overhead cover and protection from predators and the elements (Ruediger et al. 2000). Downed logs and overhead cover must also be available throughout the home range to provide security when kittens are old enough to travel.

Lynx are known to move long distances, but open areas, whether man-made or natural, may not be used as extensively (Mowat et al. 2000). In north-central Washington, lynx typically avoided openings greater than about 300 feet wide (Koehler and Brittell 1990). However, the Southern Rockies consist of more heterogeneous forest types and their response to natural or created openings may differ (Ruggiero et al. 2000). The habitat use information for lynx in Colorado indicates that canopy closures of at least 40% are important at the site-scale, regardless of the type of cover involved (Shenk 2006). Additional analysis of radio-collared data for reintroduced lynx in Colorado indicates that the average proportion of forest (upper montane) in lynx habitat was 0.65, with the majority occurring in areas with at least 20% forested (upper montane) cover. Habitat use was also associated with distance from large patches (>50 ha, 124 ac.) of forest (upper montane) cover, with the majority of habitat within 3.35 km (2.1 mi.), and the average at 0.36 km (0.2 mi). The average proportion of grasslands was 0.16. There was little association of lynx habitat use areas with other land cover types (Theobald and Shenk 2011). This data indicates that most lynx use in Colorado is associated with larger contiguous blocks of forest that is primarily dominated by spruce-fir forest cover types.

Forested conditions between foraging and denning habitat has also been shown to facilitate movement within the home range, particularly along ridgelines where lynx commonly travel (Ruggiero et al. 1994). Linkage areas may be provided by forest stringers that connect large forested areas, or by low, forested passes that connect subalpine forests on opposite sides of a mountain range (Ruediger et. al. 2000).

Lynx reproductive rates in Colorado have varied greatly since kittens were first documented in 2003. After den visits identified 16 kittens in 2003, researchers found 39 kittens in 2004; 50 kittens in 2005; 11 kittens in 2006; 11 kittens in 2009; 14 kittens in 2010. During the 2006, 2009 and 2010 seasons, DOW field crews documented that Colorado-born lynx had successfully produced third-generation Colorado kittens. In 2010, researchers estimated that between 30 and 40 percent of female lynx bore litters of kittens (Colorado Division of Wildlife 2010).

6. **Overview of ecological conditions for recovery, conservation, and viability [12.53 7, 9?, 10, 11, 12]:**

Specific ecological conditions for recovery, conservation, and viability of Canada lynx on the Rio Grande National Forest are best described in the Southern Rockies Lynx Amendment (SRLA 2008).  All key criteria in the SRLA Management Direction (Objectives, Standards, and Guidelines) should be considered for local conservation and recovery efforts but are too numerous to mention here.  However, some key ecological conditions considered important on the Forest include:

- Recognition that lynx conservation and recovery is a multi-unit landscape-scale issue that involves cross-boundary coordination and consistency.
- A conservation focus on late-successional spruce-fir cover types in combination with aspen and cool-moist mixed conifer stand components represent the majority of the high-quality lynx habitat locally. High-elevation willow-riparian systems also represent high value for summer foraging use.  In the post-spruce beetle environment, a focus on stands that previously were mapped as 4c structural class still contain the structural legacies, green cohorts, and understory components that most likely provide for the key life history requirements of lynx and key prey species.
- High-quality lynx analysis units (LAUs) that are well-connected within and between LAUs. Connectivity attributes that facilitate movement should be further defined and mapped across the Unit and adjoining unit landscapes.
- Recognition of high-value movement and dispersal areas that may require a management focus even when outside of existing LAUs or known occupied reproductive habitat.  A local example is the North Pass area on the Saguache Ranger District that may provide for dispersal and ingress of lynx in and out of the local core area.
- Protection, maintenance, and restoration of dense understory conditions that support primary prey species (snowshoe hare), particularly when associated with late-successional spruce-fir cover types or post-bark beetle conditions in former late-successional green forests.
- In the post spruce-beetle outbreak condition, a refocus on what constitutes high-quality habitat for key prey species, lynx, and reproduction.
- Uncompacted snow conditions and management of over-the-snow vehicle route densities.

## 7.    Threats and Risk Factors

The SRLA (USDA Forest Service 2008b) incorporated and addressed the following risk factors for lynx:

The LCAS [Ruediger et al. 2000] identified several specific management activities and practices termed "risk factors" for the Southern Rockies geographic area. Risk factors affecting lynx productivity included fire exclusion, grazing, and winter recreational uses that create compacted snow conditions.

- Fire exclusion has resulted in a lack of early successional stages of conifers, which provide important snowshoe hare habitat.  Fire exclusion is not considered a factor locally on the Rio Grande National Forest.

- Unmanaged grazing by domestic and wild ungulates in aspen and high elevation willow stands can degrade snowshoe hare habitat.  Grazing influences on riparin willow is not considered a a broadscale factor influencing high-elevation riparian willow habitat on the Rio Grande National Forest; however, it can be a localized issue in certain areas particularly those with a meadow or grassland park interface.

- Road, trail and recreational activities that results in snow compaction may facilitate increased access into lynx habitat and competition for food resources by competitors (primarily coyotes).  Over-the-snow vehicle use is noted as a local concern on the Rio Grande National Forest with use demand on the increase.

- Risk factors affecting lynx mortality include trapping, predator control activities and predation by mountain lions, and being hit by vehicles on major highways and many of the major mountain passes in the Southern Rockies Management Geographic Area.  Illegal trapping methods for legal take species in lynx habitat have been noted as a concern on one occasion on the Rio Grande National Forest.  Although unknown, illegal trapping is not considered a widespread concern locally.  Potential mortality of lynx due to vehicle traffic on highways and/or fragmentation of habitat and impaired genetic exchange due to highways, however, have been identified as a local concern.   Starvation has also been a factor locally in Colorado, especially during the early years of the reintroduction effort (Shenk 2010).

- Risk factors affecting lynx movement include barriers to movements such as major highways and associated development within rights-of-way. Private land development, especially along road corridors in mountain valleys, may also fragment habitat and impede movement of lynx. Urban expansion and development on private land has further fragmented an already patchy distribution of lynx habitat, many times in response to development or expansion of a developed recreational facility on NFS lands within lynx habitats.  Currently, the Rio Grande National Forest supports four key linkage areas that highlight highway crossing and/or movement concerns.  As elsewhere, traffic volume is expected to increase in the future and this concern remains valid locally.  Fragmentation of habitat and additional movement impairment is also a concern locally as evidenced by the approved land exchange and proposed development at Wolf Creek Pass.

The threats and risk factors identified in the SRLA and the management direction to address them remain valid on the Rio Grande National Forest.  However, a focused analysis and reevaluation on the significance of these threats and potential adjustments in management direction is warranted in the post-spruce beetle landscape. Specifically, a reevaluation of what constitutes high-quality habitat in the post-

spruce beetle environment is needed.  Specific threats and risk factors in the post spruce beetle environment include:

- Inability to map suitable habitat across LAUs and adjacent national forest units due to rapid changes from spruce beetle outbreak.
- Uncertainties associated with baseline habitat condition changes due to significant natural events such as spruce beetles, and the relationship of these changes to ongoing management activities that further influence baseline conditions.  Uncertainty in management activity thresholds.
- Uncertainty in what constitutes high-quality habitat in the post spruce beetle landscape, and revised management direction to address these conditions in association with vegetation management.
- A significant increase in over-the-snow vehicles, potential snow compaction and disturbance.


The most recent update to the LCAS provided a full revision, incorporating all prior amendments and clarifications, substantial new scientific information that has emerged since 2000 including related parts of the Lynx Recovery Plan Outline, as well as drawing on experience gained in implementing the 2000 LCAS (Interagency Lynx Biology Team 2013).  Conservation measures were also updated and are similar to, but at times rewritten, to help address the anthropogenic influences mentioned below.

The first tier (most significant) anthropogenic influences noted in the revised LCAS include:

- Climate Change.  Potential threats associated with climate change include 1) shifts in species distribution 2) changes in periodicity of the snowshoe hare cycle 3) reduction in lynx habitat and population size 4) changes in demographic rates and 5) changes in predator-prey relationships.
- Vegetation Management including effects from timber harvest, precommercial thinning, and fuels treatments.
- Fragmentation of Habitat. Primary potential threats involve vegetation patterns (anthropogenic and natural), and highways and road fragmentation.

Second tier anthropogenic influences noted in the revised LCAS include:

- Incidental trapping
- Recreation.  Recreation trend is increasing significantly and the mechanism of effects include 1) habitat loss 2) disturbance 3) changes in competition for snowshoe hare prey (i.e. snow compaction) 4) winter recreation activities 5) snowmobile warming huts and Nordic trail huts, and 6) developed campgrounds.
- Minerals and energy exploration and development.
- Illegal shooting.
- Forest/backcountry roads and trails.
- Grazing by domestic livestock.


Lynx in the contiguous U.S. were listed as threatened under the Endangered Species Act in 2000 primarily because regulations governing forest management activities on Federal lands were deemed inadequate, at that time, to conserve lynx and their habitats. Since listing, most Federal land managers throughout the lynx's range, including National Forests in USFS Region 2 have formally amended management plans to conserve lynx and hare habitats (USDI Fish and Wildlife Service 2013; USDA Forest Service 2008a).

Recent modeling suggests that climate change is likely to impact lynx in the DPS. Although the timing, magnitude, and consequences of climate-related impacts are difficult to predict, lynx habitats and populations in the contiguous U.S. are likely to be smaller and more isolated in the future and, therefore, more vulnerable to other threats (USDI Fish and Wildlife Service 2013).

## 8.  Key literature:

Aubry, K.B., G.M. Koehler and J.R. Squires. 2000.  Ecology of Canada lynx in southern boreal forests. Pp. 373-396 In L.F. Ruggiero, K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires, eds; Ecology and Conservation of Lynx in the United States.  University Press of Colorado, Boulder, CO.

Buskirk, S.W., L.F. Ruggiero, K.B. Aubry, D.E. Pearson, J.R. Squires, and K.S. McKelvey. 2000. Comparative ecology of lynx in North America.  Pp. 397-417 in L.F. Ruggiero, K.B. Aubry, S.W. Buskirk, S.W., G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires, eds; Ecology and Conservation of Lynx in the United States.  University Press of Colorado, Boulder, CO.

Colorado Parks and Wildlife. 2010.  Success of the Colorado Division of Wildlife's Lynx Reintroduction Program.  September 17, 2010.  http://dnr.state.co.us/newsapp/Press.asp?PressId=6650.

Ghormley, R. 2015. RGNF Forest Wildlife Biologist. Personal communication.

Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp.

Koehler, G.M. 1990.  Population and habitat characteristics of lynx and snowshoe hares in north central Washington. Canadian Journal of Zoology. 68:845-851.

Mowat, G., Poole, K.G., O'Donoghue, M., 2000.  Ecology of lynx in northern Canada and Alaska. Pp. 265-306 In: Ruggerio, L.F., Aubry, K.B., Buskirk, S.W., Koehler, G.M., Krebs, C.J., McKelvey, K.S., Squires, J.R. (Eds.), Ecology and Conservation of Lynx in the United States. University of Colorado Press, Boulder, Colorado.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. Canada lynx conservation assessment and strategy (2nd. Edition). USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT.

Shenk, T.M. 2009.  Lynx Update, May 25, 2009.  Colorado Division of Wildlife, Ft. Collins, CO.

Shenk, T.M. 2010. Wildlife research Report:  Post-Release Monitoring of Lynx Released into Colorado. Colorado Division of Wildlife, Fort Collins, CO.  26 pp.

Theobald, D.M. and T.M. Shenk. 2011. Areas of high habitat use from 1999-2010 for radio-collared Canada lynx reintroduced to Colorado. Accessed online 9/12/2012 at: http://wildlife.state.co.us/Research/Mammal/Lynx/Pages/Lynx.aspx.

USDA Forest Service. 2008a. Southern Rockies lynx management direction, record of decision. USDA Forest Service, Rocky Mountain Region. 35 pp. + attachments.

USDA Forest Service. 2008b. Southern Rockies lynx management direction, final environmental impact statement: volume 1. USDA Forest Service, Rocky Mountain Region. 232 pp. + attachments.

USDA Forest Service. 2011. Lynx Habitat Model and Mapping Criteria: San Luis Valley Public Lands Center, Rio Grande National Forest and San Luis Valley BLM. October 7, 2011. 34 pp. + appendices.

USDA Forest Service. 2014. Lynx and Snowshoe Hare Response to Spruce-Beetle Tree Mortality, Wildfire and Timber Salvage in Spruce-Fir Forests of Southern Colorado: Maintaining Suitable Habitat With a Landscape Restoration Focus. Draft Study Proposal, Rio Grande National Forest. J. Squires, J. Ivan, and R. Ghormley, preparers.

USDI Fish and Wildlife Service. 2005. Recovery outline: contiguous United States distinct population segment of the Canada lynx. 21 pp.

USDI Fish and Wildlife Service. 2013. Canada lynx (*Lynx canadensis*) fact sheet. Accessed online at: http://www.fws.gov/mountain-prairie/es/species/mammals/lynx/CandaLynxFactSheet_091613.pdf [07/23/2015].

## 9. Map of Suitable Habitats within the Planning Area

Mapped suitable habitats and linkage areas (described above) as well as insect and wildfire disturbances within the planning area (discussed above) are displayed in Figure 1.



**Figure 1. Canada Lynx Mapped Suitable Habitat, Linkage Areas, and Recent Forest Beetle and Wildfire Disturbances.**

APPENDIX A. RGNF Lynx Habitat Mapping Criteria (USDA Forest Service 2011).

**1.1. Current (FS VEG Spatial) Mapping Criteria** (Note: See "Lynx Habitat Model For FS VEG Spatial" document by the San Juan National Forest (Dan Greene, 12/27/2010) for a detailed description of the model attributes, determinations, and other information).

**Lynx Habitat Model Criteria for San Juan, GMUG, and Rio Grande Forests**

  **A. Primary Lynx Habitat**
1. A. Local Type = Engelmann Spruce / Subalpine Fir or Local Type = Riparian and Regional Cover Type = Engelmann Spruce / Subalpine Fir (spruce/fir classified as a riparian stand)
    B. Stand initiation of same
2. A. Local Type = Aspen with Conifer. In addition,
    There is a total of at least 5% cover of Engelmann spruce + sub-alpine fir in the top 3 dominant tree species.
    There is no ponderosa pine in the top 3 dominant tree species
    There is no Gambel oak in the top 3 majority species
    B. Stand initiation of same
3. A. Local Type = Cool Moist Mixed Conifer or Local Type = Riparian and Regional Cover Type = Douglas-fir, White Fir, or Blue Spruce (in a riparian stand)
    B. Stand initiation of same
4. A. Local Type = Lodgepole. In addition,
    There is a total of at least 5% cover of Engelmann spruce + sub-alpine fir in the top 3 dominant tree species
    B. Stand initiation of same
5. Remove polygons from the selection items (1-4) if
    There is ponderosa pine in the top 3 dominant tree species
    There is Gambel oak in the top 3 majority species
6. Remove from selection if FV_LYNX_HABITAT = N (not habitat)

  **B. Secondary Lynx Habitat (dependant on primary habitat)**
1. Local Type = Aspen without Conifer (pure Aspen). In addition,
    There is no ponderosa pine in the top 3 dominant tree species
    There is no Gambel oak in the top 3 majority species
    The selected stands must be within 300 meters of primary habitat
    Local Type = Aspen with Conifer. In addition,
    There is no ponderosa pine in the top 3 dominant tree species
    There is no Gambel oak in the top 3 majority species
    The percent of spruce/fir is less than 5%
2. Local Type = Riparian and willow is dominant. In addition, selected stands must be within 300 meters of primary habitat
3. Local Type = Alpine but dominated by tall willow (size class M or L). In addition, selected stands must be within 300 meters of primary habitat (handled with the non-riparian module)
4. Local Type = Upland Willow (size class M or L). In addition, selected stands must be within 300 meters of primary habitat
5. Remove from selection if FV_LYNX_HABITAT = N (not habitat)

**Note** –Qualifying stands in "stand initiation" will be identified as lynx habitat but currently not suitable. In addition, qualifying stands regenerating to trees that are not of sufficient height will be identified as lynx habitat but currently not suitable.  Acres of habitat in "stand initiation" or early seral stage will be tracked by LAU in accordance with the SRLA.



Friday,
March 24, 2000

Part V

# Department of the Interior

**Fish and Wildlife Service**

### 50 CFR Part 17
**Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule; Final Rule**

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 17

RIN 1018–AF03

### Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), determine threatened status for the contiguous U.S. Distinct Population Segment of the Canada lynx (*Lynx canadensis*), with a special rule, pursuant to the Endangered Species Act of 1973, as amended. This population segment occurs in forested portions of the States of Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, and Wisconsin. The contiguous U.S. Distinct Population Segment of the lynx is threatened by the inadequacy of existing regulatory mechanisms. Current U.S. Forest Service Land and Resource Management Plans include programs, practices, and activities within the authority and jurisdiction of Federal land management agencies that may threaten lynx or lynx habitat. The lack of protection for lynx in these Plans render them inadequate to protect the species.

**EFFECTIVE DATE:** April 24, 2000.

**ADDRESSES:** The complete file for this rule is available for inspection, by appointment, during normal business hours at the Montana Field Office, U.S. Fish and Wildlife Service, 100 N. Park Avenue, Suite 320, Helena, Montana 59601.

**FOR FURTHER INFORMATION CONTACT:** Kemper McMaster, Field Supervisor, Montana Field Office (see **ADDRESSES** section) (telephone 406/449–5225; facsimile 406/449–5339).

## Background

The Canada lynx, hereafter referred to as lynx, is a medium-sized cat with long legs; large, well-furred paws; long tufts on the ears; and a short, black-tipped tail (McCord and Cardoza 1982). Adult males average 10 kilograms (22 pounds) in weight and 85 centimeters (33.5 inches) in length (head to tail), and females average 8.5 kilograms (19 pounds) and 82 centimeters (32 inches) (Quinn and Parker 1987). The lynx's

long legs and large feet make it highly adapted for hunting in deep snow.

The bobcat (*Lynx rufus*) is a North American relative of the lynx. Compared to the lynx, the bobcat has smaller paws, shorter ear tufts, and a more spotted pelage (coat), and only the top of the tip of the tail is black. The paws of the lynx have twice the surface area as those of the bobcat (Quinn and Parker 1987). The lynx also differs in its body proportions in comparison to the bobcat. Lynx have longer legs, with hind legs that are longer than the front legs, giving the lynx a "stooped" appearance (Quinn and Parker 1987). Bobcats are largely restricted to habitats where deep snows do not accumulate (Koehler and Hornocker 1991). Hybridization (breeding) between lynx and bobcat is not known (Quinn and Parker 1987).

Classification of the Canada lynx (also called the North American lynx) has been subject to revision. In accordance with Wilson and Reeder (1993), we currently recognize the lynx in North America as *Lynx canadensis*. We previously used the latin name *L. lynx canadensis* for the lynx (Jones *et al.* 1992; S. Williams, Texas Tech University, pers. comm. 1994). Other scientific names still in use include *Felis lynx* or *F. lynx canadensis* (Jones *et al.* 1986; Tumlison 1987).

The historical and present range of the lynx north of the contiguous United States includes Alaska and that part of Canada that extends from the Yukon and Northwest Territories south across the United States border and east to New Brunswick and Nova Scotia. In the contiguous United States, lynx historically occurred in the Cascades Range of Washington and Oregon; the Rocky Mountain Range in Montana, Wyoming, Idaho, eastern Washington, eastern Oregon, northern Utah, and Colorado; the western Great Lakes Region; and the northeastern United States region from Maine southwest to New York (McCord and Cardoza 1982; Quinn and Parker 1987) (see "Distribution and Status" section).

In the contiguous United States, the distribution of the lynx is associated with the southern boreal forest, comprising of subalpine coniferous forest in the West and primarily mixed coniferous/deciduous forest in the East (Aubry *et al.* 1999) (see "Distribution and Status" section); whereas in Canada and Alaska, lynx inhabit the classic boreal forest ecosystem known as the taiga (McCord and Cardoza 1982; Quinn and Parker 1987; Agee 1999; McKelvey *et al.* 1999b). Within these general forest types, lynx are most likely to persist in areas that receive deep snow, for which

the lynx is highly adapted (Ruggiero *et al.* 1999b).

We consider lynx in the contiguous United States to be part of a larger metapopulation whose core is located in the northern boreal forest of central Canada; lynx populations emanate from this area (Buskirk *et al.* 1999b; McKelvey *et al.* 1999a, 1999b). The boreal forest extends south into the contiguous United States along the Cascade and Rocky Mountain Ranges in the West, the western Great Lakes Region, and along the Appalachian Mountain Range of the northeastern United States. At its southern margins, the boreal forest becomes naturally fragmented into patches of varying size as it transitions into other vegetation types. These southern boreal forest habitat patches are small relative to the extensive northern boreal forest of Canada and Alaska, which constitutes the majority of the lynx range.

Many of these southern boreal forest habitat patches within the contiguous United States are able to support resident populations of lynx and their primary prey species. It is likely that some of the habitat patches act as sources of lynx (recruitment is greater than mortality) that are able to disperse and potentially colonize other patches (McKelvey *et al.* 1999a). Other habitat patches act as "sinks" where lynx mortality is greater than recruitment and lynx are lost from the overall population. The ability of naturally dynamic habitat to support lynx populations may change as the habitat undergoes natural succession following natural or manmade disturbances (*i.e.*, fire, clearcutting). In addition, fluctuations in the prey populations may cause some habitat patches to change from being sinks to sources and vice versa. Throughout this document, we use the term "resident population" to refer to a group of lynx that has exhibited long-term persistence in an area based on a variety of factors, such as evidence of reproduction, successful recruitment into the breeding cohort, and maintenance of home ranges. We use the word "transient" to refer to a lynx moving from one place to another within suitable habitat. Another word we use throughout the document is "dispersing," which refers to lynx that have left suitable habitat for various reasons, such as competition or lack of food. When dispersing lynx leave suitable habitat and enter habitats that are unlikely to sustain lynx, these individuals are considered lost from the metapopulations unless they return to boreal forest.

Lynx use large woody debris, such as downed logs and windfalls, to provide

Rvsd Plan - 00003613

denning sites with security and thermal cover for kittens (McCord and Cardoza 1982; Koehler 1990; Koehler and Brittell 1990; Squires and Laurion 1999; J. Organ, U.S. Fish and Wildlife Service, *in litt.* 1999). For lynx den sites, the age of the forest stand does not seem as important as the amount of downed, woody debris available (Mowat *et al.* 1999). In Washington, lynx used *Pinus contorta* (lodgepole pine), *Picea* spp. (spruce), and *Abies lasiocarpa* (subalpine fir) forests older than 200 years with an abundance of downed woody debris for denning (Koehler 1990). A den site in Wyoming was located in a mature subalpine fir/ lodgepole pine forest with abundant downed logs and a high amount of horizontal cover (Squires and Laurion 1999). A lynx den site found in Maine in 1999 was located in a forest stand in *Picea rubra* (red spruce) cover type that was logged in 1930 and again in the 1980s (J. Organ, *in litt.* 1999). The site is regenerating into hardwoods and has a dense understory (J. Organ, *in litt.* 1999). The dominant feature of the Maine site was the abundance of dead and downed wood (J. Organ, *in litt.* 1999).

The size of lynx home ranges varies by the animal's gender, abundance of prey, season, and the density of lynx populations (Hatler 1988; Koehler 1990; Poole 1994; Slough and Mowat 1996; Aubry *et al.* 1999; Mowat *et al.* 1999). Documented home ranges vary from 8 to 800 square kilometers (3 to 300 square miles) (Saunders 1963; Brand *et al.* 1976; Mech 1980; Parker *et al.* 1983; Koehler and Aubry 1994; Apps 1999; Mowat *et al.* 1999; Squires and Laurion 1999). Preliminary research supports the hypothesis that lynx home ranges at the southern extent of the species' range are generally large compared to those in the northern portion of the range in Canada (Koehler and Aubry 1994; Apps 1999; Squires and Laurion 1999).

Lynx are highly specialized predators whose primary prey is the snowshoe hare (*Lepus americanus*), which has evolved to survive in areas that receive deep snow (Bittner and Rongstad 1982). Snowshoe hares use forests with dense understories that provide forage, cover to escape from predators, and protection during extreme weather (Wolfe *et al.* 1982; Monthey 1986; Hodges 1999a,1999b). Generally, earlier successional forest stages have greater understory structure than do mature forests and therefore support higher hare densities (Hodges 1999a,1999b). However, mature forests can also provide snowshoe hare habitat as openings develop in the canopy of mature forests when trees succumb to

disease, fire, wind, ice, or insects, and the understory grows (Buskirk *et al.* 1999b). Lynx concentrate their hunting activities in areas where hare activity is relatively high (Koehler *et al.* 1979; Parker 1981; Ward and Krebs 1985; Major 1989; Murray *et al.* 1994; O'Donoghue *et al.* 1997, 1998a).

The association between lynx and snowshoe hare is considered a classic predator-prey relationship (Saunders 1963; van Zyll de Jong 1966; Quinn and Parker 1987). In northern Canada and Alaska, lynx populations fluctuate on approximately 10-year cycles that follow the cycles of hare populations (Elton and Nicholson 1942; Hodges 1999a, 1999b; McKelvey *et al.* 1999b). Generally, researchers believe that when hare populations are at their cyclic high, depletion of food resources exacerbated by predation cause hare populations to decline drastically (Buehler and Keith 1982; Krebs *et al.* 1995; O'Donoghue *et al.* 1997). Snowshoe hare provide the quality prey necessary to support high-density lynx populations (Brand and Keith 1979). Lynx also prey opportunistically on other small mammals and birds, particularly when hare populations decline (Nellis *et al.* 1972; Brand *et al.* 1976; McCord and Cardoza 1982; O'Donoghue 1997, 1998a). Red squirrels (*Tamiasciurus hudsonicus*) are an important alternate prey (O'Donoghue 1997;1998a; Apps 1999; Aubry *et al.* 1999). In the Yukon, lynx shifted to red squirrels when hare numbers began to decline (O'Donoghue 1998a, 1998b). However, a shift to alternate food sources may not compensate for the decrease in hares consumed (Koehler and Aubry 1994). In northern regions, when hare densities decline, the lower quality diet causes sudden decreases in the productivity of adult female lynx and decreased survival of kittens, which causes the numbers of breeding lynx to level off or decrease (Nellis *et al.* 1972; Brand *et al.* 1976; Brand and Keith 1979; Poole 1994; Slough and Mowat 1996; O'Donoghue *et al.* 1997).

Relative densities of snowshoe hares at southern latitudes are generally lower than those in the north, which has led to differing interpretations of the population dynamics of snowshoe hare populations. At southern latitudes hare populations may be—(1) noncyclic, (2) cyclic like northern populations, (3) cyclic with the high and low population numbers closer to the average population numbers, or (4) cyclic with a fluctuating periodicity (length of time between peaks and lows) (Dolbeer and Clark 1975; Wolff 1980; Buehler and Keith 1982; Brittell *et al.* 1989; Koehler 1990; Koehler and Aubry 1994; Hodges

1999b). Hodges (1999b) proposes that northern and southern hare populations have similar cyclic dynamics but that in southern areas both peak and low densities are lower than in the north. Snowshoe hares are generally associated with conifer forest cover types (Hodges 1999b). Relatively low snowshoe hare densities at southern latitudes are likely a result of the naturally patchy, transitional boreal habitat at southern latitudes that prevents hare populations from achieving densities similar to those of the expansive northern boreal forest (Wolff 1980; Buehler and Keith 1982; Koehler 1990; Koehler and Aubry 1994). Additionally, the presence of more predators and competitors of hares at southern latitudes may inhibit the potential for high-density hare populations with extreme cyclic fluctuations (Wolff 1980). If snowshoe hare populations in southern boreal forests do fluctuate (Hodges 1999b), then southern lynx populations also may be expected to fluctuate.

Therefore, lynx densities at the southern part of the range never achieve the high densities that occur in the northern boreal forest (Aubry *et al.* 1999). Comparisons between Canadian and contiguous U.S. lynx harvest returns and snowshoe hare densities over time suggest lynx numbers and snowshoe hare densities for the contiguous United States are substantially lower than those for Canadian provinces (Hodges 1999a, 1999b; McKelvey *et al.* 1999b). We conclude that historic and current lynx densities in the contiguous United States are naturally low relative to lynx densities in the northern boreal forest.

Researchers believe cyclic increases in historic lynx harvest numbers in the contiguous United States were augmented by dispersal of transient animals from Canadian populations (Gunderson 1978; Henderson 1978; Mech 1980; McKelvey *et al.* 1999b). The opinion of some individuals and agencies is that presence of lynx in some regions of the contiguous United States, particularly the Great Lakes, is solely a consequence of dispersal from Canada (G. Meyer, Wisconsin Department of Natural Resources, *in litt.* 1998; R. Sando, Minnesota Department of Natural Resources, *in litt.* 1998). Lynx are capable of dispersing extremely long distances (Mech 1977; Brainerd 1985; Washington Department of Wildlife 1993); for example, a male was documented traveling 616 kilometers (370 miles) (Brainerd 1985). Lynx disperse primarily when snowshoe hare populations decline (Ward and Krebs 1985; Koehler and Aubry 1994;

O'Donoghue *et al.* 1997; Poole 1997). Subadult lynx disperse even when prey is abundant (Poole 1997), presumably as an innate response to establish home ranges. An extreme example of the apparent emigration of lynx from Canada to the contiguous United States is the numerous occurrences of lynx that were frequently documented in atypical habitat, such as in North Dakota, during the early 1960s and 1970s. In these years harvest returns indicated unprecedented cyclic lynx highs for the 20th century in Canada (Adams 1963; Harger 1965; Mech 1973; Gunderson 1978; Thiel 1987; McKelvey *et al.* 1999b). We believe that many of these animals were dispersing and were either lost from the population because they were in areas that are unable to support lynx or they were able to return to suitable habitat.

**Distribution and Status**

The complexities of lynx life-history and population dynamics, combined with a general lack of reliable historic or current lynx data for the contiguous United States, make it difficult for us to ascertain the past or present population status of lynx in the contiguous United States. Lynx population dynamics in the contiguous United States may not be the same as in the northern boreal forests of Canada and Alaska. Regarding lynx in the northern boreal forests of Canada and Alaska, we know the following—northern lynx populations undergo extreme fluctuations in response to snowshoe hare population cycles; lynx disperse when hare populations decline; lynx are capable of dispersing long distances; recruitment of young into the population seems to cease during cyclic lows of snowshoe hare populations; and lynx maintain home ranges (Mowat *et al.* 1999). We do not know the extent to which the northern lynx populations influence lynx occurrence in the contiguous United States. Because of the naturally fragmented habitat and lower density hare populations in the contiguous United States, we expect lynx in the contiguous United States to occur at naturally lower densities than in the north.

Historic lynx data in the contiguous United States are scarce and exist primarily in the form of trapping records. Many States did not differentiate between bobcats and lynx in trapping records, referring to both as "lynxcats." Therefore, long-term lynx trapping data is not available for most States. Surveys designed specifically for lynx were rarely conducted, and many reports (*e.g.*, visual observations, snow tracks) of lynx were collected incidental to other activities. The reliability of

many of these records is unknown; trapping records may have errors, track identification is extremely difficult, and observations may be wrong. Long-term trapping data have been used to understand population trends for various species; however, because trapper effort can change, trapping returns may not accurately reflect population trends. Data showing few lynx trapped could be a result of decreased trapper effort, not necessarily a decreased population. These factors hamper our understanding of lynx population dynamics and status in the contiguous United States and preclude us from drawing definitive conclusions about lynx population trends. Data are too incomplete to infer much beyond simple occurrence (McKelvey *et al.* 1999b) and distribution of lynx in the contiguous United States. However, despite these difficulties, trapping data is the best information available on lynx presence throughout much of its range in the contiguous United States and therefore was relied upon in our analysis.

Data that would help us determine whether resident populations of lynx existed historically or exist currently in many States are generally unavailable. Given the available data and the propensity of lynx to disperse, at this time it is impossible to determine with certainty whether reports of lynx in many States were—(1) merely dispersing animals from northern populations that were effectively lost from the metapopulation because they did not join or establish resident populations, (2) animals that were a part of a resident population that persisted for many generations, or (3) a mixture of both members of resident populations and dispersing animals.

There are several plausible explanations for a lack of lynx records, such as (1) the true absence of lynx, (2) lynx populations are at a cyclic low, (3) lack of adequate surveys, or (4) decreased trapper effort. We suspect that some areas in the contiguous United States naturally act as "sinks" for lynx where mortality is higher than recruitment and lynx are lost from the overall population (McKelvey *et al.* 1999a). Sink habitats are most likely those places on the periphery of the southern boreal forest in the contiguous United States where habitat becomes more fragmented and more distant from larger lynx populations.

In the following discussions, we describe available lynx data, habitat, and other elements that frame our understanding of lynx in the various regions and States where lynx have been

reported within the contiguous United States.

Within the contiguous United States, the lynx range extends into different regions that are separated from each other by ecological barriers consisting of unsuitable lynx habitat. These regions are the Northeast, the Great Lakes, the Northern Rocky Mountains/Cascades, and the Southern Rocky Mountains. In general, lynx in each of these regions are associated with habitats that are southern extensions of the boreal forest (Aubry *et al.* 1999). Differences in local climate, primarily precipitation, and effects of elevation have resulted in climax forest types that differ in the eastern regions compared to the West (Buskirk *et al.* 1999b). The climax forest in the East is primarily deciduous or mixed deciduous/coniferous whereas in the West the climax forest is coniferous (Buskirk *et al.* 1999b). While the four regions of lynx range in the contiguous United States are ecologically unique and discreet, in each of these regions the lynx is associated with the southern boreal forest and, with the exception of the Southern Rockies, they are each geographically connected to the much larger population of lynx in Canada. For a more detailed description of the significance of each region within the overall U.S. population, see the "Distinct Population Segment" section.

*Northeast Region*—Based on an analysis of cover types and elevation zones containing most of the lynx occurrences, McKelvey *et al.* (1999b) determined that, at the broad scale, most lynx occurrence records in the Northeast were found within the "Mixed Forest-Coniferous Forest-Tundra" cover type at elevations ranging from 250 to 750 meters (820 to 2,460 feet). This habitat type in the northeast U.S. occurs along the northern Appalachian Mountain range from southeastern Quebec, western New Brunswick, and western Maine, south through northern New Hampshire. This habitat type becomes naturally more fragmented and begins to diminish to the south and west, with a disjunct segment running north-south through Vermont, an extensive patch of habitat in the Adirondacks of northern New York, and with a few more distant and isolated patches in Pennsylvania (see Figure 8.23 in McKelvey *et al.* 1999b). Within this habitat type, the highest frequency of lynx occurrences were in the *Picea rubens* (red spruce), *Abies balsamea* (balsam fir), *Acer saccharum* (sugar maple), *Betula* spp. (birch), *Fagus grandifolia* (beech) forest (McKelvey *et al.* 1999b).

The entire region south of the St. Lawrence River must be considered in

Rvsd Plan - 00003615

an assessment of lynx in the northeastern United States. Movement of lynx across the St. Lawrence River is believed to occur infrequently (R. Lafond, Quebec Ministry of the Environment, pers. comm. 1999); therefore, emigration from lynx populations of northern Quebec to the region south of the St. Lawrence River is limited. However, northeastern U.S. lynx and snowshoe hare habitat and populations are contiguous with those south of the St. Lawrence River in southeastern Quebec and western New Brunswick and, presumably, together constitute a metapopulation. Lynx should encounter little difficulty moving between southeastern Quebec and Maine and New Hampshire, because habitat is continuous and without barriers. In this region, we conclude the core of lynx habitat historically was found in western Maine, northern New Hampshire, southeastern Quebec, and western New Brunswick.

Harvest records from southeastern Quebec provide evidence that lynx persist in this region. Quebec instituted a lynx management plan requiring that trapping seasons for lynx be closed for 3 years during the lows in the cycles; most recently these seasons were closed during 1995, 1996, and 1997 (Environment et faune Quebec 1995). Outside of these closed seasons, harvest returns in the 1990s ranged from 100 (in 1990 and 1993) to nearly 275 (in 1998) (R. Lafond, *in litt.* 1999). In New Brunswick, the lynx has been listed as endangered since 1982; during 1996 revisions, it was categorized as a "regionally endangered species" (Cumberland *et al.* 1998). Although the lynx harvest season in New Brunswick has been closed, lynx were incidentally caught throughout the 1990s, evidence of the continued occurrence of lynx in New Brunswick (Cumberland *et al.* 1998).

*Maine*—In Maine, lynx accounts are irregular and anecdotal (McKelvey *et al.* 1999b; Maine Department of Inland Fisheries and Wildlife, *in litt.* 1997; R. Joseph, U.S. Fish and Wildlife Service, *in litt.* 1999). Twenty-eight verified records exist for Maine since 1862 (McKelvey *et al.* 1999b). Anecdotal information plus historical and recent records provide evidence of presence, reproduction, and persistence of lynx in several northern and western townships (R. Joseph, *in litt.* 1999), indicating the historical residency of lynx in Maine. Lynx had a bounty placed on them in Maine from 1832 to the closure of hunting and trapping seasons in 1967. Maine classifies lynx as a species of special concern (Matula 1997), and currently

hunting or trapping seasons for lynx are closed.

Although no reliable population estimates exist, in 1994 it was suggested that 200 animals or fewer occur Statewide (Maine Department of Inland Fisheries and Wildlife 1994). Lynx tracks were detected during track surveys in the 1990s (Maine Department of Inland Fisheries and Wildlife, *in litt.* 1997, 1998). In 1999, Maine and Service biologists radio-collared six lynx, three adult males and three adult females, and recorded two sub-adults and two kittens associated with radio-collared adults. This finding established with certainty current reproduction in Maine (J. Organ, *in litt.* 1999) and indicates the existence of a resident population. However, available data are not adequate for determining either population trend (increasing or decreasing) or size.

*New Hampshire*—New Hampshire is the only northeastern State that maintained a record of historic lynx harvest (Orff 1985 *in* McKelvey *et al.* 1999b; see Figure 8.1 in McKelvey *et al.* 1999b). Lynx were intermittently bountied in New Hampshire until 1965. Most of the lynx harvest occurred in the 1930s, ranging from 1 to 20 per year. Between 1940 and 1964, lynx harvests were lower, ranging from 0 to 3 lynx being caught per year. For 11 years, the harvest was zero (McKelvey *et al.* 1999b). The trapping season was closed in 1964 in response to apparent declines in lynx abundance reflected in harvest returns (Siegler 1971; Silver 1974; Litvaitis *et al.* 1991). Since 1980, the lynx has been listed as an endangered species by the New Hampshire Department of Fish and Game. Winter track surveys in 1986 in portions of the White Mountain National Forest did not detect lynx (Litvaitis *et al.* 1991). Litvaitis *et al.* (1991) hypothesized that lynx were extirpated from New Hampshire as increasing agriculture and timber harvesting in the 1970s precluded them from dispersing into the State from southeastern Quebec. Only two reports of lynx in New Hampshire exist for the 1990s (M. Amaral, U.S. Fish and Wildlife Service, *in litt.* 1999). Although lynx reports are scarce, to our knowledge, no lynx surveys have been completed in New Hampshire in recent years. Therefore, we suspect that lynx are present in New Hampshire because habitat remains contiguous with Maine.

*Vermont*—In Vermont, only four verified records of historic lynx occurrence exist (McKelvey *et al.* 1999b). In the mid-1900s, it was reported that Vermont had not had a documented breeding population of lynx for several decades (Osgood 1938 *in* Vermont Department of Fish and

Wildlife 1987). In fact, we have no evidence of a breeding population ever occurring in Vermont. Since 1972, the lynx has been listed by the State as endangered. The last verified occurrence was from 1968, with periodic reports since then. Vermont naturally supports less lynx habitat than we previously presumed, based on analyses by McKelvey *et al.* (1999b). Furthermore, lynx habitat in Vermont is somewhat isolated from that in New Hampshire. The State of Vermont currently considers lynx to be extirpated (A. Elser, Vermont Department of Fish and Wildlife, *in litt.* 1998). Therefore, we conclude that lynx occurrence in Vermont is poorly documented, and, based upon the limited extent and dispersed nature of suitable habitat, lynx were probably never abundant or persistent over time. Currently, lynx are not thought to occur in Vermont.

*New York*—Historically, lynx reportedly occurred in most northern regions of New York, particularly in the Adirondack Mountains and the Catskill Mountains (McKelvey *et al.* 1999b; K. Gustafson, pers. comm. 1994). Miller (1899 *in* Brocke 1982) believed that, by the 1880s, the population was approaching extirpation. McKelvey *et al.* (1999b) found 23 verified lynx occurrences since 1900, primarily from the Adirondack Mountains. The most recent verified record was from 1973 (McKelvey *et al.* 1999b). Historically, the Adirondacks apparently supported lynx habitat, although it was isolated from habitats and lynx populations to the north.

An effort to reintroduce lynx into the Adirondack Mountains occurred during 1988–1990 (Brocke *et al.* 1990; D. Major, U.S. Fish and Wildlife Service, pers. comm. 1998), but the reintroduction is believed to have failed. A collared lynx from the reintroduction effort was found near Ottawa, Ontario, Canada (M. Amaral, U.S. Fish and Wildlife Service, pers. comm. 1997) and another as far away as northern New Jersey (K. Gustafson, New Hampshire Fish and Game Department, pers. comm. 2000). No verified occurrences in New York have been reported recently. In New York, lynx are legally classified as a small game species with a closed season. We conclude the lynx is extirpated from New York.

*Pennsylvania/Massachusetts*—In the proposed rule, Pennsylvania and Massachusetts were considered to be a part of the historic range of lynx. However, the inherent isolation and small sizes of habitat patches both currently and historically, combined with the few accounts of lynx occurrence in these States, led us to

conclude that lynx were merely dispersing animals in these States (J. Belfonti, The Nature Conservancy, *in litt.* 1994). Without the habitat and prey to support lynx, we concluded that these animals were lost from the gene pool and that Pennsylvania and Massachusetts were not within the historic range of lynx.

In summary, we have firm documentation that lynx occur in Maine and that they are reproducing. We conclude that a resident lynx population historically occurred and currently occurs in Maine. Lynx historically occurred in New Hampshire, but recent records of lynx occurrence in New Hampshire are rare. Suitable habitat exists contiguous to Maine. Historically, Vermont and New York have had relatively few records of lynx and none exist from the 1990s, with the exception of animals introduced into New York. It is possible that lynx have been extirpated from New Hampshire, Vermont, and New York. We no longer include Pennsylvania and Massachusetts within the historic range of lynx because these States are isolated from resident populations and lack suitable habitat. Therefore, we concluded that the low number of lynx occurrence records represented dispersing animals that were likely lost from the population.

We conclude, based on documentation of lynx reproduction and individual animals in Maine, the substantive lynx harvest in southeastern Quebec, and the connectivity of boreal forest south of the St. Lawrence River in Quebec, New Brunswick, Maine, and New Hampshire, that in the Northeast a population of lynx continues to exist in the core of the region in the north; however, the range appears to have retracted northward. Connectivity with lynx populations north of the St. Lawrence River in Canada has been reduced from historic levels because of development along the St. Lawrence River and ice breaking to allow year-round shipping.

*Great Lakes Region*—The majority of lynx occurrence records in the Great Lakes Region are associated with the "mixed deciduous-coniferous forest" type (McKelvey *et al.* 1999b). Within this general forest type, the highest frequency of lynx occurrences were in the *Acer saccharum* (sugar maple), *Tilia* spp. (basswood), *Pinus banksiana* (jack pine), *P. strobus* (white pine), and *P. resinosa* (red pine) forest types (McKelvey *et al.* 1999b). These types are found primarily in northeastern Minnesota, northern Wisconsin, and the western portion of Michigan's upper peninsula.

Although the mixed deciduous-coniferous forest covers an extensive area in this region, we consider much of this area to be marginal habitat for lynx because it is a transitional forest type at the edge of the snowshoe hare range. Habitat at the edge of hare range supports lower hare densities (Buehler and Keith 1982) that may not be sufficient to support lynx reproduction. Furthermore, snow depths within appropriate habitat that allow lynx a competitive advantage over other carnivores (*i.e.*, coyotes (*Canis latrans*)) occur only in limited areas in northeastern Minnesota, extreme northern Wisconsin, and Michigan's upper peninsula.

The historic and current status of lynx in the Great Lakes Region is uncertain. Minnesota has a substantial number of lynx reports, primarily trapping records (McKelvey *et al.* 1999b), as expected because of the connectivity of the boreal forest with that of Ontario, Canada, where lynx occur. Wisconsin and Michigan have substantially fewer records of lynx (McKelvey *et al.* 1999b). Researchers have debated whether lynx in this region are simply dispersing lynx emigrating from Canada, are members of a resident population, or are a combination of a resident population and dispersing individuals (McKelvey *et al.* 1999b; R. Sando, Minnesota Department of Natural Resources, *in litt.* 1998). In recent decades, lynx dynamics in the Great Lakes appear to have been driven by immigration because lynx occurrence records did not show a response to local cycles of hare abundance (McKelvey *et al.* 1999b), as would have been expected of a resident lynx population. Available information, does not indicate that resident populations exist, but it does indicate that recent cyclic highs in the Great Lakes lynx data are at least partially Canadian in origin (McKelvey *et al.* 1999b).

*Minnesota*—The majority of lynx occurrence records are from the northeastern portion of the State; however, dispersing lynx have been found throughout Minnesota outside of typical lynx habitat (Gunderson 1978; Mech 1980; McKelvey *et al.* 1999b). Until 1965, lynx had a bounty placed on them in Minnesota. In 1976, the lynx was classified as a game species, and harvest seasons were established (M. DonCarlos, Minnesota Department of Natural Resources, *in litt.* 1994). Harvest and bounty records for Minnesota are available since 1930. Approximate 10-year cycles are apparent in the data, with highs in the lynx cycle in 1940, 1952, 1962, and 1973 (Henderson 1978; McKelvey *et al.* 1999b). During a 47-

year period (1930–1976), the Minnesota lynx harvest was substantial, ranging from 0 to 400 per year (Henderson 1978). These harvest returns for Minnesota are believed to be influenced by influxes from Canada, particularly in recent decades (Henderson 1978; Mech 1980; McKelvey *et al.* 1999b; M. DonCarlos, *in litt.* 1994). When an anticipated lynx cyclic high for the early 1980s did not occur, the harvest season was closed in 1984 (M. DonCarlos, *in litt.* 1994) and remains closed today. Outside of harvest data, 76 verified lynx records exist for Minnesota (McKelvey *et al.* 1999b).

With available data, we cannot verify whether a resident population existed historically in Minnesota. Reproduction and maintenance of home ranges by lynx was documented in the early 1970s (Mech 1973, 1980), which may be evidence of the existence of a resident population. The early 1970s also were a period when the second highest lynx harvest returns in the 20th century occurred throughout Canada. High numbers of lynx trapped in Minnesota during this period were likely due in part to immigrants from Canada (McKelvey *et al.* 1999b). Lynx were consistently trapped over 40 years during cyclic lows, which may indicate that a small resident population occurred historically.

Current information is insufficient to determine whether a resident population of lynx exists in Minnesota and, if so, whether there has been a decline in numbers. In northeastern Minnesota, where deep snow accumulates, suitable lynx and snowshoe hare habitat is likely present. Much of this area is protected as designated wilderness, including the Boundary Waters Canoe Area. Furthermore, these habitats are contiguous with boreal forest in southern Ontario. Trapping records for Ontario districts adjacent to the Minnesota border demonstrate consistent occurrence of lynx in the area over the past 10 years (N. Dawson, Ontario Ministry of Natural Resources, *in litt.* 1999). The only recent verified records of lynx in Minnesota were two lynx in 1992 and one in 1993 (M. DonCarlos, *in litt.* 1994). However, no lynx surveys or research have been conducted in Minnesota to document presence, absence, or population trend. A lynx survey was initiated this year as a joint effort by the Service, the Forest Service and the University of Minnesota. Although habitat and prey conditions appear suitable in the northeastern portion of the State, we have received no information that

substantiates presence of a resident lynx population currently in Minnesota.

*Wisconsin*—Thiel (1987) concluded that, historically, Wisconsin did not support a permanent, self-sustaining lynx population; rather, lynx presence was associated with cyclic lynx population fluctuations in Canada resulting in increased dispersal. Verified reports of lynx in Wisconsin are few (29 records from 1870 to 1992) (McKelvey *et al.* 1999b); over half of these reports are associated with unprecedented cyclic highs that occurred throughout Canada in the early 1960s and 1970s. Between 1948 and 1956, 19 lynx were harvested in the State; annual harvests were low, ranging from 0 (in 1954) to 4 (in 1952) (Wisconsin Department of Natural Resources 1993). In 1992, two lynx mortalities were reported in Wisconsin (Wydeven 1993; C. Pils, *in litt.* 1994). Lynx tracks have been detected during wolf surveys in the 1990s (Wydeven 1998).

A bounty on lynx existed until 1957. Lynx were placed on the protected species list in 1957 and were classified as State endangered in 1972 (C. Pils, *in litt.* 1994). Because of the lack of breeding records, Wisconsin reclassified the lynx as a "protected" species with a closed season (G. Meyer, *in litt.* 1998).

We have no evidence to determine whether a lynx population resided in Wisconsin historically or resides currently; however, Wisconsin Department of Natural Resources suggested that a breeding population may have existed in the State prior to the 1900s (G. Meyer, *in litt.* 1998). Most of northern Wisconsin forests are mixed deciduous-coniferous forest (McKelvey 1999b). We believe this transitional forest type at the edge of the snowshoe hare range may be unable to support hare densities sufficient to sustain a resident lynx population. An exception may be in extreme northern portions of Wisconsin, where more suitable habitat exists and deep snows accumulate.

*Michigan*—In Michigan, historical reports suggest that the Canada lynx was resident and widespread throughout the upper and lower peninsula in the 19th century (Harger 1965). However, records verifying these accounts are scarce; 44 verified records exist from the mid 1800s until 1983 (McKelvey *et al.* 1999b). Lynx were believed extirpated from Michigan's lower peninsula in 1928, and by 1938 they were considered rare or extinct throughout the State (Harger 1965). Lynx persisted on Isle Royale in Lake Superior into the late 1970s (Peterson 1977 *in* Baker 1983; M. Romanski, Isle Royale National Park, *in litt.* 1998). Sixteen of 44 verified lynx records for Michigan are associated with

an extreme cyclic high in Canada in the early 1960s (Harger 1965; McKelvey *et al.* 1999b). Only two verified records of lynx exist for Michigan (from the upper peninsula) since the 1960s (McKelvey *et al.* 1999b; G. Burgoyne, Jr., Michigan Department of Natural Resources, *in litt.* 1998). Michigan listed the lynx as "rare" in 1974; in 1983 it was listed as threatened and in 1987, its status was upgraded to endangered (G. Burgoyne, Jr., *in litt.* 1998). Although suitable habitat and snow depths likely exist in Michigan's upper peninsula, too few records exist to substantiate either the historic or current presence of a resident lynx population in Michigan.

In summary, using the best available information we cannot determine whether resident lynx populations occur currently or historically in the Great Lakes Region. Within this region, we consider northeastern Minnesota to be most likely to support a resident lynx population based on the presence of boreal forest that is contiguous with that of Ontario, where lynx are known to exist, and the number of lynx records from this area. We suspect that there may have been a small resident population historically in northeastern Minnesota; however, we recognize the lack of evidence to clearly support either the past or current existence of a resident population in Minnesota. Because of the paucity of records from Wisconsin and Michigan and the presence of habitat that we think is marginal for lynx, we suspect records of lynx in Wisconsin and Michigan most likely are transient animals that are dispersing, rather than individuals from resident populations. Accurate mapping of lynx habitat in the Great Lakes Region would enable us to define where to expect resident lynx to occur in this region.

*Northern Rocky Mountain/Cascades Region*—In this region, the majority of lynx occurrences are associated at a broad scale with the "Rocky Mountain Conifer Forest"; within this type, most of the occurrences are in moist *Pseudotsuga menziesii* (Douglas fir) and western spruce/fir forests (McKelvey *et al.* 1999b). Most of the lynx occurrences are in the 1,500–2,000 meters (4,920–6,560 feet) elevation class (McKelvey *et al.* 1999b). These habitats are found in the Rocky Mountains of Montana, Idaho, eastern Washington, and Utah and the Cascade Mountains in Washington and Oregon. The majority of verified lynx occurrences in the U.S. and the confirmed presence of resident populations are from this region. The boreal forest of Washington, Montana, and Idaho is contiguous with that in

adjacent British Columbia and Alberta, Canada.

*Washington*—In Washington, resident lynx populations were historically found in the northeast and north-central regions and along the east slope of the Cascade Mountains (Washington Department of Wildlife 1993). Records of lynx exist from the Mount Rainier National Park area in the central Cascades, south in the Cascades nearly to the Oregon border on Mount Adams, and in the Blue Mountains in southeastern Washington (Taylor and Shaw 1927 *in* Koehler and Aubry 1994; Dalquest 1948; Washington Department of Natural Resources 1996a). Washington has a long record of verified lynx occurrences over the past century (McKelvey *et al.* 1999b).

Trapping data kept since 1961 reflect cyclic patterns (McKelvey *et al.* 1999b). The largest harvests were taken in 1969–1970 (31 lynx) and 1976–1977 (39 lynx) (Washington Department of Wildlife 1993). Trapping restrictions were implemented in 1977–1978, and lynx hunting and trapping seasons were closed in 1991 (Washington Department of Wildlife 1993). In the years 1987–1989, immediately prior to the season being closed, harvest increased substantially despite restrictive quotas and shortened seasons (see Figure 8.7 *in* McKelvey *et al.* 1999b). We suspect that this increase in trapped animals may have represented a cyclic increase, as was evident in harvest data from British Columbia during this time frame (see Figure 8.6 *in* McKelvey *et al.* 1999b; M. Badry, British Columbia Ministry of Environment, *in litt.* 1999). Lynx harvest data from British Columbia demonstrate cyclic fluctuations for the past 13 seasons, as well as the continued presence of lynx, in regions contiguous with Washington (M. Badry, *in litt.* 1999).

Established snow track survey routes are conducted to detect the presence of lynx within the six designated "Lynx Management Zones" across the north-central part of Washington (Richardson 1999; Washington Department of Natural Resources 1996a). Results of these surveys show that currently, lynx occupy four of these zones—Okanogan, Kettle Range, Little Pend Oreille, and Salmo Priest—but have not documented lynx presence in the Wedge or Vulcan Mountain, the two smallest zones delineated in Washington (Richardson 1999). Recent preliminary DNA survey results indicate the presence of lynx in the southern and central Cascades in Washington (Weaver and Amato 1999), and recent records of lynx reproduction also exist for Washington in the northern Cascades (Koehler 1990;

Friends of the Loomis Forest, *in litt.* 1999).

Although Washington has the best lynx data in the contiguous U.S., we cannot identify population changes or trend from this data. It is clear that resident lynx populations exist in Washington. The lynx population in Washington has been roughly estimated at 96–191 (Washington Department of Wildlife 1993) and 225 individuals (Brittell *et al.* 1989). However, these population estimates may be high because of assumed similar habitat suitability and lynx densities across the range, which is not the case (Washington Department of Wildlife 1993). Since 1993, the lynx has been listed as a State threatened species (Washington Department of Wildlife 1993). Richardson (1999) recommended retaining the lynx as a threatened species in the State because the status of the lynx had not changed appreciably in Washington.

*Oregon*—Historic lynx records exist from nine counties in Oregon (Bailey 1936; Nellis 1971). McKelvey (1999b) documented 12 verified lynx records for Oregon in the past century. Based on the time frames when collected and locations in atypical habitat, some of these records likely were dispersing transient individuals. Recent observations of lynx have been reported from the Cascades and the Blue Mountains in northeastern Oregon (Csuti *et al.* 1997; R. Anderson, Wallowa-Whitman National Forest, *in litt.* 1998), and preliminary DNA survey results also suggest the presence of lynx in the Cascade Range in Oregon (Weaver and Amato 1999). Lynx have rarely been reported harvested in Oregon, although the season for lynx is essentially open because the State does not regulate lynx harvest, however we do not believe any lynx have been harvested because there are no records of lynx trapping or pelts collected in Oregon (C. Carson, pers. comm., USFWS, Office of Management Authority (OMA), 2000). Based on the limited available information, we cannot substantiate the historic or current presence of a resident lynx population in Oregon.

*Idaho*—According to Rust (1946), lynx were not abundant but were distributed throughout northern Idaho in the early 1940s, occurring in 8 of the 10 northern and north-central counties. McKelvey *et al.* (1999b) located a number of lynx specimen records from Idaho collected during the early 1900s. Harvest records for Idaho are unreliable because no distinction was made between lynx and bobcats until 1982 when Idaho Department of Fish and Game initiated a mandatory pelt tagging program. Anecdotal reports compiled by Lewis and Wenger (1998) indicated the occurrence of lynx in atypical habitats. Based on the time frames when collected, these records likely were dispersing transient individuals. Between 1960 and 1991, 35 verified records exist for Idaho, with 13 of these from 1982 to 1991 (McKelvey *et al.* 1999b). From 1991 until recently, there had been no verified records of lynx from Idaho (McKelvey *et al.* 1999b); however, until the past year, no lynx surveys were conducted in Idaho. Preliminary results from recent DNA surveys suggest the presence of lynx in northern and north-central Idaho (J. Weaver, Wildlife Conservation Society, *in litt.* 1999).

Prior to 1977, the species was considered a predator, subject to unrestricted harvest with no closed season and no bag limit. In 1990, in response to concern over the status of lynx in Idaho, the Idaho Department of Fish and Game instituted a Statewide harvest quota of three lynx per year. In 1997/1998, Idaho closed the lynx trapping/hunting season because no lynx had been captured in several years.

Although records of lynx in Idaho are relatively common and boreal forest habitat is contiguous with adjacent States and Canada where lynx populations are known to exist, we cannot clearly substantiate either the historic or current presence of resident lynx populations in Idaho, nor can we identify population changes or trend with the available information.

*Montana*—In Montana, numerous historic and current lynx records exist throughout the Rocky Mountain Conifer Forest in the western part of the State (McKelvey *et al.* 1999b; P. Graham, Montana Department of Fish, Wildlife, and Parks, *in litt.* 1998). Reproduction has been documented (Brainerd 1985). Many records exist of lynx harvested in eastern Montana's Great Plains Region in the 1960s (Hoffman *et al.* 1969); however, we suspect these were dispersing transient animals associated with cyclic highs in northern lynx populations during the early 1960s.

Since 1950, Montana lynx harvest records exhibit cycles (McKelvey *et al.* 1999b), although accurate harvest records were not kept until 1977 when lynx were classified as a furbearer. The harvest data reflect the extreme highs of the early 1960s and 1970s that were documented throughout Canada. Since 1977, Montana's largest lynx harvest occurred in both 1979 and 1984 when 62 lynx were taken in each season (McKelvey *et al.* 1999b; B. Giddings, Montana Department of Fish, Wildlife, and Parks, *in litt.* 1994). These harvest returns were substantially lower than those recorded in the early 1960s and 1970s, leading to concern that lynx populations in Montana were at or near their lowest levels in the past several decades (Hash 1990; S. Conn, Montana Trappers Association, *in litt.* 1990). The State established quotas that were incrementally decreased from 135 in 1982 down to a Statewide quota of 2 beginning in 1991 (B. Giddings, *in litt.* 1994). In 1999, Montana's lynx harvest season was closed.

Harvest records, winter track surveys conducted since 1990/1991, and trapper logbooks, led Montana Department of Fish, Wildlife, and Parks to conclude that the State's lynx population has recovered and is distributed throughout what it determined to be "predicted lynx habitat" (P. Graham, *in litt.* 1998). Montana Department of Fish, Wildlife, and Parks estimated the lynx population as 1,040 lynx in 1994 (B. Giddings, *in litt.* 1994). This estimate was determined using a habitat area/density index, which is likely inaccurate, given broad assumptions regarding habitat suitability and lynx distribution.

We conclude that a resident population of lynx is distributed throughout its historic range in Montana. However, available data are not sufficient to determine either population trend (increasing or decreasing) or estimates of population size. Furthermore, we now question the interpretations we made in the proposed rule as well as those made by the other sources that harvest returns in the 1980s and 1990s reflected substantially reduced populations (see "Factor B" in the "Summary of Factors" section). We now know that harvest returns in the early 1960s and 1970s represented unprecedented cyclic highs for the 20th century (McKelvey *et al.* 1999b). Therefore, it is possible that lower lynx harvest returns in the 1980s were not unusual compared to harvest returns prior to 1960. Lynx harvest returns for British Columbia and Alberta since 1919 demonstrate the variability of cyclic amplitudes throughout the past century (McKelvey *et al.* 1999b) and lead us to suspect that cycles in Montana were similar.

*Wyoming*—Most historical and recent records of lynx in Wyoming are from the northwestern mountain ranges (Reeve *et al.* 1986; McKelvey *et al.* 1999b). McKelvey *et al.* (1999b) found only 30 verified records Statewide since 1856. Documented reports of lynx in Yellowstone National Park are rare (S. Consolo-Murphy, Yellowstone National Park, pers. comm. 1994); no recent verified records exist from the Greater Yellowstone Ecosystem (McKelvey *et al.*

1999b). However, no lynx surveys have been conducted in this area. Elsewhere, lynx have been reported from the Big Horn Mountains in north-central Wyoming (Reeve *et al.* 1986; McKelvey *et al.* 1999b). Until 1957, lynx had bounties place on them in the State. Since 1973, the lynx has been listed as a protected non-game species and harvest was closed. Because of connectivity with lynx populations and habitat in Montana, we suspect that lynx were historically resident in northwestern Wyoming.

In 1996 the Wyoming Game and Fish Department began a lynx study in west-central Wyoming. Production of kittens was documented in 1998 (Squires and Laurion 1999). This may indicate the presence of a resident population in this local area (Ruggiero *et al.* 1999b). However, using available information we are unable to determine status or trend of lynx throughout Wyoming.

*Utah*—There are few historic reports of lynx in Utah (McKay 1991; McKelvey *et al.* 1999b). Nearly all the reliable lynx reports are from the Uinta Mountain Range along the Wyoming border (McKay 1991). McKelvey *et al.* (1999b) found only 10 verified records of lynx in Utah since 1916; no verified records exist since 1991. However, recent unverified reports of lynx in the Uintas persist (Bates, Utah Department of Wildlife, pers. comm. 1999). The lynx is listed as a State sensitive species with closed harvest seasons. Based on the limited available information we cannot substantiate either the historic or current presence of a resident lynx population in Utah.

In summary, we believe the Northern Rockies/Cascades Region supports the most viable resident lynx populations in the contiguous U.S., while recognizing that, at best, lynx in the contiguous U.S. are naturally rare. Strong evidence exists to support the presence of resident lynx populations distributed throughout much of the forest types considered lynx habitat in Montana and Washington. We expect that resident lynx populations exist in contiguous habitats in Idaho and northwestern Wyoming. We believe that lynx have always occurred intermittently in Oregon and Utah, although we cannot determine the historic or current presence of resident populations in either of these States. Recently initiated DNA surveys in all the States within this region should further refine our understanding of the status of lynx in this region.

**Southern Rockies**

Colorado represents the extreme southern edge of the range of the lynx.

The southern boreal forest of Colorado and southeastern Wyoming is isolated from boreal forest in Utah and northwestern Wyoming by the Green River Valley and the Wyoming basin (Findley and Anderson 1956 in McKelvey *et al.* 1999b). These habitats likely act as a barrier that reduces or precludes opportunities for immigration and emigration from the Northern Rocky Mountains/Cascades Region and Canada, effectively isolating lynx in the southern Rocky Mountains in Colorado and southeastern Wyoming (Halfpenny *et al.* 1982; Koehler and Aubry 1994). A majority of the lynx occurrence records in Colorado and southeastern Wyoming, are associated with the "Rocky Mountain Conifer Forest" type. The occurrences in the Southern Rockies were generally at higher elevations (1,250 to over 3,750 meters (4,100–12,300 feet)) than were all other occurrences in the West (McKelvey *et al.* 1999b).

*Colorado*—The montane and subalpine forest ecosystems in Colorado are naturally highly fragmented (Thompson 1994), which we believe limits the size of lynx populations. A total of 78 lynx reports rated as positive (22) or probable (56) exist in State records since the late 1800s (J. Mumma, Colorado Division of Wildlife, *in litt.* 1998); although McKelvey *et al.* (1999b) considered only 17 of these records "verified." The last verified lynx specimens were taken in 1974 (Halfpenny *et al.* 1982). No verified records of lynx exist since 1974; however, extensive survey efforts have resulted in reports of lynx tracks (Halfpenny and Miller 1981; Thompson and Halfpenny 1989; Anderson 1990; Thompson and Halfpenny 1991; Andrews 1992; Carney 1993; Fitzgerald 1994; Colorado Division of Wildlife *et al.* 1997). The lynx has been listed as a State endangered species since 1976 (Colorado Division of Wildlife *et al.* 1997) and harvest of the species is currently closed.

Few, if any, native lynx continue to exist in Colorado (J. Mumma, *in litt.* 1998). As a result, in 1997, the Colorado Division of Wildlife, in cooperation with numerous government and private entities, began a program to introduce lynx from Canada and Alaska into Colorado in an attempt to reestablish a viable lynx population. Forty-one lynx were released into the wild beginning in early spring 1999. It is too early to predict the success of this effort.

*Wyoming*—"Rocky Mountain Conifer Forest" in southeastern Wyoming is contiguous with that of Colorado. None of the reports of lynx in the Medicine Bow and Laramie Ranges in

southeastern Wyoming have been confirmed (Reeve *et al.* 1986). However, McKelvey *et al.* (1999b) found two specimens collected prior to 1900 in southeastern Wyoming. There is a general lack of information in Wyoming, particularly southeastern Wyoming, that limits our ability to assess historical and current status of the lynx.

In summary, we believe that a resident lynx population historically occurred in the Southern Rockies Region in both Colorado and southeastern Wyoming, based on the records of lynx in Colorado and the persistence of contiguous habitat in southeastern Wyoming with the Colorado habitat. This resident population may now be extirpated.

*Other Reports or Sightings*—Lynx observations in Nevada, North Dakota, South Dakota, Iowa, Nebraska, Indiana, Ohio, and Virginia are considered individuals dispersing subsequent to periods of cyclic high lynx numbers in Canada (Hall and Kelson 1959; Burt 1954 *in* Brocke 1982; McKelvey *et al.* 1999b; S. Johnson, Indiana Department of Natural Resources, *in litt.* 1994; P. Jones, Ohio Department of Natural Resources, *in litt.* 1994; W. Jobman, U.S. Fish and Wildlife Service, *in litt.* 1997; Smithsonian Institute, *in litt.* 1998). During the early 1960s, lynx moved into the Great Plains and the Midwest Region of the U.S. associated with an unprecedented cyclic high in Canada (Gunderson 1978; Mech 1980; DeStefano 1987; South Dakota Natural Heritage Program, *in litt.* 1994). These records are outside of the southern boreal forests where most lynx occurrences are found (McKelvey *et al.* 1999b). We conclude that these unsuitable habitats are unable to sustain lynx and that these records represent dispersing individuals that are lost from the metapopulation unless they return to boreal forest. We do not consider these States to be within the contiguous U.S. range of lynx.

**Distinct Population Segment**

For a species to be listable under the Endangered Species Act (Act), it must be a "species" as defined in the Act. The Act defines "species" as a species, subspecies, or Distinct Population Segment (DPS) of a vertebrate species. On February 7, 1996, the Service and the National Marine Fisheries Service published final policy guidance concerning recognition of Distinct Vertebrate Population Segments for consideration under the Act (61 FR 4722). We follow the Vertebrate Population Policy when considering listing a vertebrate species as endangered or threatened in only a

portion of its range. In developing the proposed rule and final rule for the lynx, we used the Vertebrate Population Policy to evaluate whether the lynx population in the contiguous United States constitutes a DPS under the Act.

Under the Vertebrate Population Policy, two elements, discreteness and significance, must be considered to determine whether a species' population meets the definition of a DPS. If a population is discrete and significant, its status is evaluated using the five listing factors described in section 4(a)(1) of the Act to determine if it meets the definition of either threatened or endangered.

According to the Vertebrate Population Policy, a species' population can be considered discrete from the remainder of the taxon if it satisfies either one of the following conditions—(1) "it is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or (2) "it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist."

We have determined that resident populations of lynx existed historically and currently exist within the contiguous United States (see "Status" section). In Canada, management of forest lands and conservation of wildlife habitat varies depending on Provincial regulations. Canada has no overarching forest practices legislation, such as the United States National Forest Management Act, governing management of national lands and/or providing for consideration of wildlife habitat requirements. Additionally, in Canada, lynx harvest regulations, such as length of season and quotas, vary, being regulated by individual Provinces or, in some cases, individual trapping districts. Therefore, we conclude that the contiguous United States population of the lynx is discrete based on the international boundary between Canada and the contiguous United States due to differences in management of lynx and lynx habitat.

According to the Vertebrate Population Policy, a population segment can be considered significant based on considerations that include, but are not limited to, the following—(1) "Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon," (2) "Evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon," (3) "Evidence that the discrete population segment represents the only surviving

natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range," and (4) "Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics."

Lynx in the contiguous United States may be considered biologically and ecologically significant simply because of the climatic, vegetational, and ecological differences between lynx habitat in the contiguous United States and that in northern latitudes in Canada and Alaska (Buskirk *et al.* 1999b). In the contiguous United States, the distribution of lynx is associated with the mosaic of southern boreal forest and subalpine coniferous forest in the West and southern boreal forest/hardwoods in the East; whereas in Canada and Alaska lynx inhabit the classic boreal forest ecosystem known as the taiga (McCord and Cardoza 1982; Quinn and Parker 1987; Agee 1999; McKelvey *et al.* 1999b) (see "Background" and "Distribution and Status" sections).

Lynx and snowshoe hare population dynamics in portions of the contiguous United States are different from those in northern Canada. We conclude that historic and current lynx and snowshoe hare densities in the contiguous United States are naturally low relative to lynx and hare densities in the northern boreal forest (see "Background" and "Distribution and Status" sections). Because the southern boreal forest in the contiguous United States is naturally highly fragmented and contains more hare predators, it is unable to support the extremely high peak densities of snowshoe hares as in the northern boreal forest of Canada and Alaska (Wolff 1980; Buehler and Keith 1982; Hodges 1999a,1999b; McKelvey 1999a). Therefore, lynx densities at the southern part of the range never achieve the high densities of the northern boreal forest (Aubry 1999).

After review and consideration of lynx status and management in the contiguous United States and Canada, and lynx and snowshoe hare life-history, habitat, and population dynamics, we have determined that the lynx population in the contiguous United States is discrete and significant and, therefore, qualifies as a DPS to be considered for listing under the Act.

Within the contiguous United States population segment, the range of the lynx is divided regionally by ecological barriers of unsuitable lynx habitat. These regions are— (1) the Northeastern Region, including Maine, New Hampshire, Vermont, and New York; (2) the Great Lakes Region, including Michigan, Wisconsin, and Minnesota;

(3) the Northern Rocky Mountain/ Cascades Region, including Washington, Oregon, Idaho, Montana, northwestern Wyoming, and Utah; and (4) the Southern Rocky Mountains Region, including Colorado and southeastern Wyoming.

McKelvey *et al.* (1999b) illustrate lynx population dynamics emanating from central Canada to the periphery. The authors used Canadian and United States lynx trapping and occurrence data to display lagged synchronous cycles (cycles with similar peaks and lows in population size) (McKelvey *et al.* 1999b), providing evidence of the interconnectedness of lynx population dynamics in the contiguous United States with lynx population dynamics in the Canadian boreal forest. All of the different regions that support lynx within the contiguous United States are directly contiguous with lynx habitat or lynx populations in Canada, except the Southern Rockies, although the connectivity of the Northeast Region is largely limited to areas south of the St. Lawrence Seaway: southern Quebec and New Brunswick.

Within the contiguous United States, all four regions are isolated from each other by expanses of unsuitable habitats that limit or preclude lynx movement between these regions. Unsuitable habitat along the southeastern Great Lakes isolates the Northeastern and Great Lakes regions; the Great Plains isolates the eastern regions from the West. Although there may be some limited potential for dispersal between the Southern and Northern Rockies, lynx in the Southern Rockies are considered to be isolated from lynx populations in the Northern Rockies/ Cascades Region by the Green River basin and the Red Desert. We have no expectation that lynx in these individual regions influence the presence or persistence of lynx within another region of the contiguous United States. Therefore, we believe each of these four regions are discrete.

When considering whether a population meets the significance test, policy requires us to evaluate the population as it relates to the entire range of the taxon. In the case of the lynx, the range of the taxon is extensive and exists mainly in Canada and Alaska. When we evaluated the significance of the small discrete regions in the contiguous United States to the entire range of the taxon in North America, we determined that none of these regions individually constitute significantly unique or unusual ecological settings; therefore, they could not be separated from the contiguous U.S. DPS as a whole. Within all four regions of the

contiguous United States, the distribution of the lynx is associated with the southern boreal forest.

We have concluded that none of the four regions, individually, fulfill both the discreteness and significance criteria as provided under the policy. Therefore, we conclude that the listable entity is the contiguous United States DPS of the lynx, consisting of the Northeast, the Great Lakes, the Northern Rockies/Cascades, and the Southern Rockies regions.

Within the contiguous United States, the relative importance of each region to the persistence of the DPS varies. The Northern Rockies/Cascades Region supports the largest amount of lynx habitat and has the strongest evidence of persistent occurrence of resident lynx populations, both historically and currently. In the Northeast (where resident lynx populations continue to persist) and Southern Rockies regions, the amount of lynx habitat is naturally limited and does not contribute substantially to the persistence of the contiguous United States DPS. Much of the habitat in the Great Lakes Region is naturally marginal and may not support prey densities sufficient to sustain lynx populations. As such, the Great Lakes Region does not currently contribute substantially to the persistence of the contiguous United States DPS. Collectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS. We conclude the Northern Rockies/Cascades Region is the primary region necessary to support the continued long-term existence of the contiguous United States DPS. However, the role that each region plays in the long-term conservation of the species will be explored further in recovery planning for the species.

**Previous Federal Action**

The lynx was added to Appendix II of the Convention on International Trade in Endangered Species (CITES) of Wild Flora and Fauna in 1977. The species was classified as a category 2 candidate species in the December 30, 1982, Vertebrate Notice of Review (47 FR 58454), meaning that more information was necessary to determine whether the species' status was declining. In response to a petition received on August 22, 1991, we published a notice of a 90-day petition finding on October 6, 1992, that we did not have substantial information to indicate that listing the North Cascades population of the lynx as endangered may be warranted (57 FR 46007). A lawsuit was filed challenging the October 6, 1992, finding. On July 9, 1993, we published a notice indicating

that we had reviewed the North Cascades 90-day petition after receiving new information and again found that we did not have substantial information to indicate that listing the population may be warranted (58 FR 36924). In a settlement agreement dated November 30, 1993, we agreed to conduct a status review throughout the lower 48 States to determine if the species was threatened or endangered, and to complete the review and publish the finding by November 15, 1994. On February 2, 1994, we published a notice announcing continuation of the status review (59 FR 4887).

On April 27, 1994, we received a petition to list the conterminous U.S. population of "North American" lynx as threatened or endangered. Additionally, the petitioners requested that the Southern Rocky Mountain population of the "North American" lynx in Wyoming and Colorado be emergency-listed. We published a notice on August 26, 1994, that the petition presented substantial information that listing may be warranted, but that we determined emergency listing was not warranted for the Southern Rocky Mountain population (59 FR 44123).

On December 27, 1994, we published a notice (59 FR 66507) of our 12-month finding that listing the lynx in the contiguous United States was not warranted because of the lack of residency in lynx populations in the lower 48 States and our inability to substantiate that threats such as "trapping, hunting, poaching, and present habitat destruction" actually "threaten the continued existence of the lynx in the wild." On January 30, 1996, the Defenders of Wildlife and 14 other plaintiffs filed a lawsuit challenging our finding.

On March 27, 1997, the court issued an opinion and order setting aside the not warranted finding and remanding it back to us for further consideration. We were ordered to publish a 12-month finding on the status of the lynx within 60 days. On May 27, 1997, we published a 12-month finding (62 FR 28653) that the lynx population in the contiguous United States was warranted for listing under the Act but precluded by higher priority listing actions. This warranted-but-precluded finding automatically elevated the lynx to candidate species status.

On September 15, 1997, Defenders of Wildlife *et al.* filed suit in response to our finding that listing the Canada lynx population in the contiguous United States was warranted but precluded. On February 12, 1998, a settlement agreement was reached that called for us to finalize a proposed rule to list the

Lynx in the contiguous United States by June 30, 1998. The proposed rule to list the contiguous United States DPS of the Canada lynx as threatened was published on July 8, 1998 (63 FR 36994).

On July 8, 1999 (64 FR 36836), we extended the listing deadline by 6 months to receive and evaluate comments on new information contained in a report, "The scientific basis for lynx conservation in the contiguous United States" (Science Report), prepared by a team led by the Forest Service's Rocky Mountain Research Station (Ruggiero *et al.* 1999c). As a result, the new listing deadline became January 8, 2000. The Act permits such an extension for the purpose of soliciting additional data when there is substantial disagreement regarding the sufficiency or accuracy of the available data relative to the determination.

The Act requires listing determinations to be made using the best scientific and commercial data available. However, the 1998 settlement agreement allowed only 4 months within which to prepare the proposed rule to list the lynx, much less time than the 9 months allowed by the Act to conduct a status review to make a listing determination. Consequently, we were not able to gather nor consider the best scientific and commercial data available at the time of publication of the proposed rule; instead we relied primarily on data we had gathered during the lynx status review in 1994. Therefore, this final rule treats information available since 1994 as new information; whereas, typically, new information is that information made available subsequent to the proposed rule.

**Summary of Comments and Recommendations**

In the July 8, 1998, proposed rule and associated notifications (63 FR 58910), all interested parties were requested to submit comments or suggestions on the proposed rule, particularly on the following topics—(1) Biological, commercial trade, or other relevant data concerning any threat (or lack thereof) to this species; (2) Additional information concerning the range, distribution, and population size of the species; (3) Current or planned activities in the subject area and their possible impacts on the species; and (4) Additional information pertaining to the promulgation of a special rule to provide States and Tribes the opportunity to maintain the lead role in protection, management, and recovery of the species through the voluntary

**16062**   **Federal Register**/Vol. 65, No. 58/Friday, March 24, 2000/Rules and Regulations

development and implementation of a conservation plan. In the proposed rule, we announced that 10 public hearings on the proposal would be held in various locations throughout the range of the lynx in the contiguous United States. One additional public hearing was announced on August 26, 1998 (63 FR 45445).

Open houses and public hearings, providing an additional forum for public comment on the proposed rule, were held in Colorado, Idaho, Montana, Oregon, Washington, Wyoming, Maine, and Wisconsin. The 60-day comment period on the proposed rule, originally closing on September 30, 1998, was twice extended by request. The first extension was announced on October 2, 1998, and extended the comment period to October 14, 1998 (63 FR 53010). The second extension was announced on October 19, 1998, and extended the comment period on the proposed rule until November 16, 1998 (63 FR 55839).

On July 8, 1999 (64 FR 36836), we extended the listing deadline by 6 months to receive and evaluate comments on new information contained in a report, "The scientific basis for lynx conservation in the contiguous United States" (Science Report), prepared by a team led by the Forest Service's Rocky Mountain Research Station (Ruggiero et al. 1999c). The Act permits such an extension for the purpose of soliciting additional data when there is substantial disagreement regarding the sufficiency or accuracy of the available data relative to the determination. On August 18, 1999, we announced that we had reopened the comment period for an additional 38 days to allow the public to provide additional comment on the proposed rule based on new information contained in the Science Report (64 FR 44883).

Prior to making our final listing determination on the lynx, we held the 11 announced public hearings, and allowed for a total of 140 days of public comment on the proposed rule and Science Report. Appropriate Federal and State agencies, tribal governments, county governments, scientific organizations, and other interested parties were contacted and requested to comment during the initial comment period, notified of the extensions, and were again contacted when the comment period was reopened to allow evaluation of the Science Report. Notices of the reopening of public comment and public hearings were sent to over 1,200 individuals, and public notices were published in 63 newspapers within the contiguous U.S. range of the lynx, including the Spokesman Review,

Spokane, Washington; Wenatchee World, Wenatchee, Washington; The Oregonian, Portland, Oregon; The La Grande Observer, La Grande, Oregon; The News Review, Roseburg, Oregon; The Daily Courier, Grants Pass, Oregon; The Bend Bulletin, Bend, Oregon; The Idaho Statesman, Boise, Idaho; Great Falls Tribune, Great Falls, Montana; Independent Record, Helena, Montana; The Missoulian, Missoula, Montana; The Billings Gazette, Billings, Montana; Bozeman Daily Chronicle, Bozeman, Montana; The Daily Inter Lake, Kalispell, Montana; The Western News, Libby, Montana; Casper Star-Tribune, Natrona County, Wyoming; Wyoming Tribune Eagle, Laramie County, Wyoming; The Cody Enterprise, Cody, Wyoming; The Dubois Frontier, Fremont County, Wyoming; Jackson Hole News, Jackson, Wyoming; Pinedale Roundup, Sublette County, Wyoming; The Riverton Ranger, Fremont County, Wyoming; Thermopolis Independent Record, Thermopolis, Wyoming; Detroit Free Press, Detroit, Michigan; Lansing State Journal, Lansing, Michigan; Daily Mining Gazette, Michigan; Marquette Mining Journal, Marquette, Michigan; Iron Mountain News, Iron Mountain, Michigan; Escanaba Press, Escanaba, Michigan; The Evening News, Michigan; North Country Sun, Michigan; Ontonagon Herald, Ontonagon, Michigan; L'Anse Sentinel, L'Anse, Michigan; The Munsing News, Munsing, Michigan; Manistique Pioneer Tribune, Manistique, Michigan; The Newberry News, Newberry, Michigan; Iron River Reporter, Iron River, Michigan; The Menominee County Journal, Michigan; Minneapolis Star Tribune, Minneapolis, Minnesota; St. Paul Pioneer Press, St. Paul, Minnesota; Duluth News Tribune, Duluth, Minnesota; Ely Echo, Ely, Minnesota; Grand Forks Herald, Grand Forks, Minnesota; Bemidji Pioneer, Bemidji, Minnesota; International Falls Journal, International Falls, Minnesota; Virginia Mesabi News, Minnesota; Cook County News, Minnesota; Grand Rapids Herald Review, Minnesota; Milwaukee Journal Sentinel, Milwaukee, Wisconsin; Wisconsin State Journal, Madison, Wisconsin; Wausau Herald, Wausau, Wisconsin; Florence Mining News, Florence, Wisconsin; Spooner Advocate, Spooner, Wisconsin; Rhinelander News, Rhinelander, Wisconsin; Vilas County News Review, Wisconsin; Superior Daily Telegram, Superior, Wisconsin; Bangor Daily News, Bangor, Maine; Manchester Union Leader, Manchester, New Hampshire; Burlington Free Press, Burlington, Vermont; Albany Times Union, Albany, New York; Rocky

Mountain News, Denver, Colorado; Boulder Daily Camera, Boulder, Colorado; and The Daily Sentinel, Grand Junction, Colorado.

We received a total of 3,548 responses on the proposed rule, 166 oral and 3,382 written comments. Of these comments, 7 were from Federal agencies; 58 were from State, county, city governments or schools; 3,261 were from individuals; 214 were from organizations and industry; 5 were from tribal governments, and 3 were from Canada. Most of these responses were received in the form of a form letter or postcard. Of these commentors, 2,676 supported listing the Canada lynx, 780 opposed listing, and 92 expressed no position.

In response to the reopening of the comment period on August 18, 1999, to receive comment on the Science Report, we received an additional 379 responses. Of these, 239 supported a listing, 115 opposed the listing, and 25 provided comment on the Science Report only. All written and oral statements presented at the public hearings and received during the public comment periods, including comments on the Science Report and peer review comments, are addressed below and within the text of this rule. Comments of a similar nature are grouped into general issues. These issues and our response to each are discussed below.

*Issue 1*—Several commentors believed that there are insufficient and/or inadequate data to support evidence of lynx existence and viable population status within the lower 48 States or at the southern fringes of the range. They believed lynx should be managed in Canada rather than by the Act in the United States. Numerous commentors strongly opposed listing the lynx in Oregon and other individual States, claiming there has never been a self-sustaining breeding population of lynx in a particular State. Several commentors were concerned that much of the information used to develop the range maps for lynx in the United States may represent only dispersing individuals and does not indicate viable populations capable of successful reproduction and recruitment. Similarly, several individuals commented that the distribution maps in the Science Report do not accurately reflect occupied range and that there is no evidence that lynx currently exist in many of the States that the map identifies as occupied.

*Response*—The scientific basis for our findings and conclusions in the proposed rule and those in the Science Report were questioned by many of the affected State wildlife agencies and others that responded during the public

comment period. When making a listing determination, we are required to use the best available scientific and commercial information. To accomplish this, section 4(b)(6)(B) of the Act allows for a 6-month extension of a final determination for the purpose of soliciting additional information if there is substantial disagreement regarding the sufficiency or accuracy of the available data. In the case of the lynx finding, because there was substantial disagreement regarding the sufficiency or accuracy of the available data, we extended for 6 months the deadline for a final listing determination on the proposal to list the contiguous United States DPS (64 FR 36836). The 6-month extension allowed us to receive and evaluate new information contained in the Science Report, a scientific report on lynx prepared by a team of scientist assembled by the Forest Service's Rocky Mountain Research Station in 1998. The Science Report is a comprehensive compilation and assessment of historic and current lynx occurrence records and distribution, scientific literature, lynx and prey ecology, habitat correlations and threats to the continued existence of lynx in the contiguous United States. The Science Report is the only comprehensive assessment of lynx in the contiguous United States and was used, as was the new information obtained during the comment period, in our final listing determination (see "Background," "Distribution and Status," and "Summary of Factors" sections).

Current and best available information, including the Science Report, verified the persistence and presence of lynx in the contiguous United States and recent records of lynx in Oregon (see "Distribution and Status" section). However, with the limited information available on the species, we cannot ascertain whether a resident lynx population exists currently or existed historically in Oregon. We believe that many of the lynx records in the contiguous United States, including Oregon, are of transient animals that dispersed during cyclic population increases (see "Background" and "Distribution and Status" sections). Regardless, the Act, and the Service in administering the Act, do not make a distinction between resident populations, breeding populations, and transient or breeding individuals when considering a species for listing. However animals that are considered "dispersing," and found in unsuitable habitat are considered lost from the metapopulations, because they are unlikely to survive unless they return to

boreal forest. Therefore, dispersing individuals were not considered in this listing. Further, the fact that lynx are managed in Canada does not relieve us from our statutory responsibilities to protect the wildlife of the United States. We have determined that the contiguous United States population of lynx is a DPS under the Act and warrants listing as a threatened species. This determination, therefore, includes all lynx within the contiguous United States, whether they be transient lynx or resident populations.

The lynx distribution maps developed for the Science Report were produced by overlaying lynx occurrence records on maps of primary vegetation types (McKelvey *et al.* 1999b). The authors included all occurrence records made available by State, tribal, and Federal agencies, published and unpublished reports, and museum and harvest records. Furthermore, they considered the reliability of the records. Although there may be errors for some individual data points, these data provide a good basis for us to evaluate lynx occurrence and distribution in the contiguous United States. The maps defined vegetation types for which most lynx occurrences are associated. They are not maps of occupied habitat.

*Issue 2*—Many commentors believed we have insufficient or inadequate data to show that a sufficient prey base historically existed or currently exists in the lower 48 States to support lynx.

*Response*—The Act requires that the Service make listing determinations solely on the basis of the best scientific and commercial data available. Where there is little information available we use our best scientific judgement and that of experts in the field. Available snowshoe hare information as it applies to lynx is summarized by Hodges (1999a, 1999b) in the Science Report. Additionally, we relied on the availability of the primary habitat types used by both snowshoe hares and lynx as an indicator of suitable habitat and likely presence of one or both species (see "Distribution and Status" and "Factor A").

*Issue 3*—Many commentors believed there were insufficient or inadequate data to support a listing and that the decision-making process concerning the proposal to list the lynx was being driven by political pressure and lawsuits. One commentor also believed that the limited quantity of evidence gathered by the Service does not meet the standard of sound science required by the Act and that the proposed rule did not acknowledge the strengths and limitations in the extant body of research related to Canada. For example,

trapper harvest data do not account for trapper effort which may be affected by pelt prices, social change or climatic conditions. Several commentors wanted to know what the effects of trapping on lynx population status and potential recovery were and if the mortality from accidental trapping or animal damage control activities were significant to the overall population. They similarly commented that the Science Report failed to provide quantified data and conclusions justifying additional protection under the Act and believed that additional studies were needed and should be initiated and completed. They suggested that we defer a decision until more information is available.

*Response*—While lawsuits have had an important procedural impact in our listing process, whether the species warrants listing under the Act is a substantive biological determination and has remained our responsibility. We have carefully assessed the best scientific and commercial data available, as required by the Act. We recognize that there are limitations in the extant body of data, including the trapping information, and have taken those limitations into consideration when evaluating the data. As described in "Factor B" in the "Summary of Factors" section, harvest returns are affected by factors that influence trapper effort and success, such as changes in socioeconomic conditions, season length, quotas and trapping restrictions, and ease of access. However, we also recognize the harvest data provided information on the presence and persistence of lynx within the contiguous United States (see "Distribution and Status" section). Furthermore, harvest data for lynx in Canada has similarly provided information about the persistence of lynx in adjacent habitats in Canada and increased our understanding of lynx population dynamics (see "Background," "Distribution and Status," and "Factor B" sections). We have determined that the occurrence of lynx within the contiguous United States is influenced to varying degrees by immigration of lynx from Canada.

We carefully assessed the effects of trapping during our review of the species' status (see "Factor B" and "Factor E" in the "Summary of Factors" section). The effects of trapping on lynx populations are variable depending on factors such as whether lynx taken are a part of a resident population or dispersing individuals that are unlikely to reproduce and contribute to a population, fitness of the lynx population in a given area, connectivity within a larger metapopulation, the

impact of other threats to the population, and the additive nature of these threats. If the population is doing well in an area and there are no threats to its continued existence, trapping mortality would not likely jeopardize the population. However, if other threats to a resident population exist, the additive nature of additional losses to the population may prove to be significant, at least on a local scale. Mortality from accidental trapping or animal damage control activities would be considered incidental and in most cases would not be significant; we have no information to indicate that the loss of such individuals has negatively affected the overall ability of the contiguous United States DPS to persist.

We agree that additional studies of lynx are necessary to better understand the dynamics and requirements of lynx populations in the contiguous United States (see "Distribution and Status" section). However, the Act does not allow us to defer a listing decision based on the need for more research. Most scientists would agree that there is always a need for more research, but listing decisions cannot be postponed based on this premise when known threats to a species are present that may result in a species' trend toward extinction.

*Issue 4*—Several wildlife professionals stated that the effects of overharvesting lynx during the 1970s and 1980s were overstated in our proposed rule and that it does not explain current population levels. If lynx were overharvested in the past, they should have had sufficient time to recover by now. They stated that overutilization is no longer a potential threat nor an additive threat to the continued existence of lynx.

*Response*—We made our determination to propose the species for listing based on the available information at the time. We concluded that low numbers of lynx in the contiguous United States and Canada were the residual effects of substantial overtrapping that occurred in the 1970s and 1980s. We no longer believe that to be true (see "Factor B" in the "Summary of Factors" section). New information explains that the cyclic lynx highs of the early 1960s and 1970s that are reflected in harvest records were unprecedented high levels for the 20th century. Harvest returns that we believed to be abnormally low, were being compared to harvest records during the unprecedented high levels of the 1960s and 1970s rather than to data for cycles over a longer period of time. Comparisons of the recent records to earlier records from the 20th century

indicated comparable harvest records. We conclude that, in the contiguous United States, lynx populations are naturally at low densities; therefore, what seem to be low population levels compared to those of the northern boreal forest in Canada and Alaska likely are normal for lynx at the southern portion of their range where optimal habitat is naturally limited (see "Factor B"of the "Summary of Factors" section).

We recognize the limitations of using harvest data to evaluate the status of a vertebrate population (see "Distribution and Status" section and "Factor B" of the "Summary of Factors" section). There can be numerous reasons for a smaller harvest return one year compared to previous returns, such as trapper effort, weather, or low pelt prices. States in the contiguous United States substantially restricted or closed their lynx harvest seasons by 1990, resulting in less information with which to evaluate the current status of lynx. We now believe that ongoing precautions taken by States and Provinces to restrict lynx trapping since the 1980s possibly prevented the overharvest of resident populations of lynx. We concur with Mowat *et al.* (1999) that it is possible lynx were overharvested in local areas but that in time, particularly with the protection given lynx from trapping closures in the contiguous United States, dispersal by lynx from healthy populations has led and in the absence of significant threats will lead to the repopulation of such areas.

*Issue 5*—Numerous individuals commented that the proposed rule and the Science Report failed to demonstrate that there are significant threats to the survival of the lynx, claiming that there is little evidence in the proposed rule or the Science Report to support claims that current management practices, including timber harvesting and human access, adversely affect lynx; that lynx are old growth obligates; that either bobcat or coyotes are direct competitors for prey with lynx; that lynx habitat throughout the lower 48 States has been fragmented, degraded or reduced by human activity; or that this has resulted in lynx declines. Additionally, these commentors asked how important were localized threats to the overall status of the species and if we knew enough about the threats to assess the cumulative effects to lynx.

*Response*—In the proposed rule, we identified numerous potential threats to the continued existence of lynx based on information available at the time. Since then we have significant new information regarding the magnitude

and imminence of some of the factors identified as threats in the proposed rule. However, there is still a lack of quantifiability information to determine whether some of the possible threats have or would actually result in lynx declines. Both the "Summary of Factors" and "Background" sections discuss the new information we have obtained and how it has been assessed in our decision, particularly regarding habitat (Factor A) and competition issues (Factor E). Because a substantial amount of lynx habitat in the contiguous United States occurs on federally managed lands, particularly in the West, we conclude that the factor threatening lynx in the contiguous United States is the lack of guidance in existing Federal land management plans for conservation of lynx and lynx habitat. Implementation of lynx conservation through revision of Federal land management plans may sufficiently remove threats to the species such that it no longer warrants listing.

*Issue 6*—Many State agencies believed the proposed rule failed to demonstrate that there has been significant extirpation of lynx within the lower 48 States or that a significant range reduction has occurred. There is disagreement on the status and historic range of lynx within some States. Furthermore, they believe that lynx do not occur throughout predicted habitat. They requested information on the basis of our determination of whether a resident or remnant lynx population existed within a State and if the low numbers were the result of poor monitoring, marginal habitat or poor rates of immigration from source populations. They believed the Science Report likewise failed to assess lynx population size, status, and trends.

*Response*—The Act requires us to make listing determinations on the best available scientific and commercial information. Data are often not available to make statistically rigorous inferences about a species' status (*e.g.*, abundance, population trends, and distribution). The extant body of data concerning lynx population status, trends, and historic range is limited. Current information about lynx in the contiguous United States allows us to understand the distribution of lynx. However, the available data for most States do not allow us to assess whether resident populations were historically or are currently present (see "Distribution and Status" section). The scientific community is just beginning to study issues such as specific habitat and prey requirements necessary to support lynx populations, role of dispersing animals in metapopulation dynamics, and lynx

demographics. However, given these uncertainties, we are still charged with determining whether the species warrants listing under the Act. After reviewing the best available information, obtained through a comprehensive effort involving review of historic and current occurrence records, including harvest records for both Canada and the United States; sightings and track records; personal communications with lynx, hare, and forest ecology experts; and a review of all available literature, we have made several conclusions about the status of lynx in the contiguous United States as described in the "Distribution and Status" and "Finding" sections.

In the proposed rule we attempted to identify whether each of the States historically supported or currently support resident populations of lynx. The Act does not make a distinction between protection of resident and migratory or transient species, or between resident populations and those supported by immigration from Canada. Whether a species resides in whole or in part in the United States, it is eligible for protection under the Act. In many instances we cannot be certain whether the lynx was historically resident in a region or was wholly made up of transient animals from Canada or other parts of its range, or a combination of these (see "Background" and "Distribution and Status" sections). However, given the available information from occurrence records, habitat maps, and comparisons of harvest records from the United States and Canada, we concluded that certain areas, such as the Northern Rockies/ Cascades Region, continue to support self-sustaining resident lynx populations, while in other areas or regions we were unable to determine the historic or current presence of a resident lynx population based on available information (see "Distribution and Status" section).

*Issue 7*—Numerous commentors made the following statements: The proposed rule failed to demonstrate that the contiguous United States population represents a DPS and, given the large areas of habitat still directly connected to Canada, evidence of movement across the international border, and the failure to demonstrate that the United States' population is significant, designation of a contiguous United States DPS for lynx is not warranted. The Vertebrate Population Policy does not provide authority for using an international boundary and differences in management programs as a basis for determining discreteness. Likewise, the "significant gap" criterion in the policy

was not intended to be applied to populations on the edge of a species' range. There is no evidence that lynx in the United States are capable of long-term survival if isolated from the larger population in Canada. There is no evidence that lynx populations within the contiguous 48 States were once connected. The idea that semi-isolated subpopulations of lynx separate from each other and from Canada can be supported within the United States is contrary to what is known about lynx ecology. Lynx in the United States are part of a trans-border population and should be managed in cooperation with Canada. Conversely, several commentors believe that lynx in the southern portion of Canada have sharply declined and that we cannot rely on immigration from Canada, nor Canadian management of lynx, to maintain lynx in the United States. Several commentors believe that the lynx deserves protection under the Act based solely on its United States' population.

*Response*—The Service's Vertebrate Population Policy, published in the **Federal Register** on February 7, 1996 (61 FR 4722) specifies that a population segment may be found to be discrete if it satisfies one of two conditions. One of the two conditions states, "It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist." We have determined that lynx occur in both resident populations and as transients in the contiguous United States and conclude that this population satisfies the above requirement for discreteness based on the international boundary between Canada and the contiguous United States and the differences in management of lynx between Canada and the United States (see "Distinct Population Segment" section). While we recognize that portions of the contiguous United States DPS of lynx are part of a trans-border population, when using the international boundary as a criterion for establishing discreteness, the Vertebrate Population Policy does not make a distinction of whether there is movement between the two populations. While we recognize that this movement occurs, and we believe that immigration from Canada may strongly influence the persistent occurrence of lynx in some portions of the United States' population (see "Distribution and Status" section), this does not negate the international boundary for establishing discreteness

between Canadian' and United States' lynx populations under our policy.

Based on the discreteness of a population, our Vertebrate Population Policy requires that we consider the significance of the population to the taxon to which it belongs. We believe there are climatic and vegetational differences in lynx habitat between Canada and the United States, as well as ecological differences between lynx in the contiguous United States and northern populations in Canada and Alaska (see "Distinct Population Segment" section). Therefore, the contiguous United States' population meets the significance criteria for establishment of a DPS.

Additionally, we believe the criterion relating to a "significant gap" in the species' range applies to any discrete unit that exhibits significance regardless of whether it is on the edge of the species' range. For example, there may be situations where populations at the edge of a species range may have unique genetic characteristics or may have adapted to unique or unusual ecological conditions.

Finally, after we established that the United States' population of lynx is discrete and significant, we then applied the listing criteria to the contiguous United States' population of lynx and determined that it meets the definition of a threatened species under the Act (see Factors A-E in the " Summary of Factors" section).

*Issue 8*—Many commentors believed that lynx in different regions of the United States, isolated in island populations and divided regionally by ecological barriers, even State boundaries, are biologically significant and should be considered for listing separately so that each population can be protected and managed according to its needs. They think that, for a wide-ranging species such as lynx, the status of the lynx population in Montana should have no bearing and should not provide a baseline for populations struggling to survive elsewhere in the lower 48 States. In particular, they stated that the Southern Rockies meets the definition of a DPS and that it should be listed as endangered because it is likely on the verge of extirpation, is genetically isolated, faces continued threats, and meets the definition of an unusual or unique ecological setting. These commentors stated that loss of lynx in the Southern Rockies would result in a significant gap in its range. Furthermore, there is scientific consensus that lynx were once viable in Colorado and southern Wyoming. Conversely, some commentors believe lynx at the southern edge of the range

should be excluded from listing. They stated that existing data suggest that lynx exist in the lower 48 States, especially east of Montana, only as a rare and transitory species at the edge of its range, dependent on continued immigration from Canada.

*Response*—We recognize that, within the contiguous United States, the distribution of the lynx is divided into four geographically isolated regions; the Northern Rockies/Cascades, Southern Rockies, Great Lakes and Northeast (see "Distribution and Status" and "Distinct Population Segment" sections). In evaluating whether these qualified as separate DPSs or should be considered one, we analyzed whether lynx in these individual regions qualified as both discrete and significant according to our DPS policy. We concluded that within the United States they were geographically isolated and, therefore, qualified as discrete. When considering whether a population meets the significance test, policy requires that our evaluation take into account the population as it relates to the entire range of the taxon. In the case of the lynx, the range of the taxon is extensive and exists mainly in Canada and Alaska. Only a small portion of the range extends into the United States. The Southern Rockies and Northeast regions account for an extremely small fraction of the entire range of the taxon. We determined that none of the regions individually constitute significantly unique or unusual ecological settings. Within all four regions of the contiguous United States the distribution of lynx is associated with the southern boreal forest. The important element for lynx is forest structure that provides food and cover for snowshoe hares and cover for lynx dens, not the specific vegetation found within the boreal forest. Therefore, the individual regions could not be considered individually significant under our Vertebrate Population Policy and could not be separated from the contiguous United States DPS as a whole. We determined that, individually, none of the four regions fulfill both the discreteness and significance criteria as required under the Vertebrate Population Policy (see "Distinct Population Segment" section). Therefore, we conclude that the listable entity is the contiguous United States DPS of the lynx, consisting of the Northeast, the Great Lakes, the Northern Rockies/Cascades, and the Southern Rockies regions.

Within the contiguous United States, the relative importance of each region to the persistence of the DPS varies. The Northern Rockies/Cascades Region supports the largest amount of lynx

habitat and has the strongest evidence of persistent occurrence of resident lynx populations, both historically and currently. In the Northeast, Great Lakes, and Southern Rockies regions, the amount of lynx habitat is relatively limited and does not contribute substantially to the persistence of the contiguous United States DPS. We conclude the Northern Rockies/ Cascades Region is the primary region necessary to support the continued long-term existence of the contiguous United States DPS.

*Issue 9*—Several individuals believed that we failed to take into account the increased abundance of mountain lions as a threat to lynx and that the rule should acknowledge this concern and discuss this factor as potentially affecting Canada lynx.

*Response*—At the time we wrote the proposed rule to list the lynx as a threatened species, we did not address mountain lion competition with lynx because we had no information that it was a potential threat. Subsequently, the Science Report has identified the potential threat of mountain lion competition (Aubry et al. 1999; Buskirk et al. 1999a). Definitive data on the potential threat of mountain lions on lynx are lacking. However, because known incidents of mountain lions killing lynx are rare, we presume they occupy different ecological niches (particularly in winter), and because they depend on different prey, we conclude that the population-level effect of mountain lions on lynx is minimal (see "Factor E" of the "Summary of Factors" section).

*Issue 10*—Some commentors believed we did not provide for adequate public participation in commenting on the Science Report or in response to the listing proposal.

*Response*—Prior to making our final listing determination on the lynx, we held 11 public hearings and allowed for a total of 140 days of public comment on the proposed rule and Science Report. Our proposed rule to list the lynx as threatened, published in the **Federal Register** on July 8, 1998, opened a 60-day comment period during which we requested comments and materials concerning the proposed rule. At the same time we announced that 10 public hearings on the proposal would be held in various locations throughout the range of the lynx in the contiguous United States. One additional public hearing was announced on August 26, 1998 (63 FR 45445). Open houses and public hearings, providing a forum for verbal comment on the proposed rule, were held in Colorado, Idaho, Montana,

Oregon, Washington, Wyoming, Maine, and Wisconsin. Announcements of the proposed rule and public hearings were made in local newspapers throughout the range of the lynx. The comment period on the proposed rule, originally closing on September 30, 1998, was twice extended by request. From the time a proposed rule is published, the Act allows 12 months in which to make and publish a final determination on a listing action. We extended the 1-year period for the lynx final listing determination for 6 months in a July 8, 1999, **Federal Register** announcement (64 FR 36836), specifically to allow for review, evaluation, and comment on the Science Report because there was substantial disagreement regarding the sufficiency and accuracy of the information. On August 18, 1999, we announced in the **Federal Register** that we were reopening the comment period for an additional 38 days to allow the public to review and comment on the proposed rule based on new information contained in the Science Report, which was placed on the Internet for accessibility. Press releases were issued to ensure the public was aware of the reopened comment period. While we received requests to extend the comment period on the Science Report, we declined to do so because of the time frames the Act allows for completion of a final listing determination, the amount of public notice about the Science Report and rapid availability of the Science Report to interested parties via the Internet.

*Issue 11*—Several individuals believe the lynx should be listed as endangered, not threatened because they believe the lynx is in danger of extinction throughout a significant portion of its range, that it is part of our cultural heritage and should be protected. They stated that in light of the uncertainties about the existing information collected on lynx status and threats, the Service should be cautious and protect existing populations of lynx while additional information is collected. If listed as endangered the lynx would receive the full protection of the Act. Listing would focus more attention on the precarious status of the species and encourage State wildlife agencies to do more educational outreach and encourage conservation on private lands. These commentors also stated that a listing would increase attention given to lynx by Federal land management agencies and would provide the oversight that is needed to ensure conservation and recovery activities are implemented and are effective. Some commentors also believed that failure to list the lynx as

endangered would be contrary to the settlement agreement and other court-ordered stipulations, as well as the Service's listing priority guidance. They stated that the proposed rule to list the lynx as threatened rather than endangered is inconsistent with the prior "warranted" petition finding of May 27, 1997, in which the Service assigned the lynx its highest listing priority number because of the magnitude and imminence of the threats. Conversely, some commentors believed that a listing as threatened was more appropriate and would provide the opportunity and resources to plan a conservation strategy at the landscape scale.

*Response*—When evaluating whether a species, or in this case a DPS, should be listed as threatened or endangered, we first assess the current status of the DPS and then analyze the degree, magnitude and imminence, of the threats to its continued existence. If we conclude that a DPS of a species is likely to go extinct in the foreseeable future, then we must list it as endangered. If we conclude that it is likely to become endangered in the foreseeable future then we must list it as threatened. While we made an extensive effort to find and assess all the available information on the status of lynx in the contiguous United States, the best scientific information available does not provide a clear picture as to the current status of the species (see "Distribution and Status" section). The lack of information on lynx does not allow us to determine with certainty whether the species' population trend is stable, increasing or declining. However, we can make several inferences from the available data. Resident populations continue to exist in the Northern Rockies/Cascades and Northeast regions. Available information provides evidence that within the contiguous United States, lynx continue to occur in most places with historical evidence of persistence except for possible range reductions in the Northeast and Southern Rockies. Given available information on current and historical lynx occurrence and threats, as identified in the "Summary of Factors" section, we conclude that the contiguous United States DPS of the lynx is threatened (see "Finding" section).

In the proposed rule, various threats were identified as potentially affecting lynx populations (see "Summary of Factors" section), including competition, habitat loss and fragmentation, and the inadequacy of existing regulatory mechanisms (in the form of land management plans) to

protect the species. However, there is inconclusive evidence that any of these factors, with the exception of inadequate regulatory mechanisms, may actually adversely affect the contiguous United States' lynx population. At the local level, particularly in the Southern Rockies, habitat loss and fragmentation may negatively affect lynx (see "Factor A" and "Factor E" of the "Summary of Factors" section). However, at the DPS scale, we conclude the factor threatening lynx is the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx and lynx habitat in Federal land management plans (see "Factor D" of the "Summary of Factors" section). A substantial number of the primary areas of lynx occurrence are on Federal lands (see "Factor A" of the "Summary of Factors" section) where programs, practices and activities allowed by current plans may cumulatively impact lynx.

In the settlement agreement dated February 12, 1998, we agreed to publish a proposed rule to list the lynx within the contiguous United States under section 4 of the Act. At the time, we had not determined whether it warranted threatened or endangered status. In the "warranted but precluded" petition finding of May 27, 1997, we assigned the lynx a listing priority number of 3. Guidelines for assigning listing priority numbers, published in the **Federal Register** on September 21, 1983 (48 FR 43098), describe a system for considering three factors in assigning a species a numerical listing priority on a scale of 1–12. The three factors are magnitude of threat (high or moderate to low), immediacy of threat (imminent or non-imminent), and taxonomic distinctiveness (monotypic genus, species or subspecies/population). For a population, such as the contiguous United States' Canada lynx population, listing priority numbers of 3, 6, 9, or 12 are possible. At the time of the "warranted but precluded" finding we concluded that the overall magnitude of threats to lynx was high and that the threats were imminent. Therefore, a priority number of 3 was assigned. New information indicates that threats are at a much lower magnitude than previously believed (see "Summary of Factors" section).

*Issue 12*—Several commentors were concerned that we did not propose a special 4(d) rule for incidental take of lynx along with the proposed listing. They encouraged us to cooperate with the respective States and Tribes in the development of a 4(d) rule and wondered what type of Federal

oversight role would follow the issuance of a special rule.

*Response*—Section 4(d) of the Act provides that whenever a species is listed as threatened, the Secretary of Interior will issue regulations deemed necessary and advisable to provide for the conservation of the species.

We have issued regulations that generally apply to threatened wildlife virtually all the prohibitions that section 9 of the Act establishes with respect to endangered wildlife. These prohibitions, in part, make it illegal for any person subject to the jurisdiction of the United States to "take" any listed wildlife species; to harass, harm pursue, hunt, shoot, wound, kill, trap, or collect any threatened or endangered species or to attempt to engage in any such conduct (16 U.S.C. section 1532 (19)).

Our regulations for endangered wildlife also provide that a "special rule" under section 4(d) of the Act can be tailored to define the section 9 prohibitions for particular threatened species. In that case, the general regulations applying most section 9 prohibitions to threatened species do not apply to that species, and the special rule is to contain the prohibitions (and exemptions) necessary and appropriate to conserve that species.

Such regulations generally are issued and published as special rules in the **Federal Register** along with or following a listing. This final rule includes a special 4(d) rule that addresses the taking and export of captive lynx. To address incidental take of lynx while engaged in otherwise lawful hunting and trapping for bobcat we are currently consulting under section 7 of the Act with the U.S. Fish and Wildlife Service's Office of Management Authority which issues CITES permits for export of bobcat pelts. Additionally, we have worked with State and Tribal agencies and are currently preparing an additional special 4(d) rule to address incidental take of lynx resulting from otherwise lawful hunting and trapping for species other than bobcat (and other than lynx). This proposed amendment to the special rule will describe the Federal oversight that will be required if the rule is implemented. We hope to publish the proposed special rule in the **Federal Register** as soon as possible following this listing rule.

*Issue 13*—One commentor asked what role the Draft Lynx Conservation Assessment and Strategy (LCAS) would play in the long-term conservation of lynx if the species were listed. Another commentor was concerned about conferencing with other Federal agencies to conserve lynx and how we

intended to work with other agencies to identify and implement protective lynx measures. They suggested that a comprehensive review of the Forest Service Forest Management Plans is needed to assess their impacts upon potential lynx habitat and that management plans should be revised to improve snowshoe hare and lynx habitat. Many commentors also stated that Federal agencies should manage and protect public lands in a manner that will increase snowshoe hare habitat.

*Response*—The LCAS was developed to provide a consistent and effective approach to conservation of lynx on Federal lands in the contiguous United States (United States Forest Service *et al.* 1999). It was developed by the Forest Service, Bureau of Land Management (BLM), National Park Service, and the Service. The overall goals of the LCAS were to develop recommended lynx conservation measures, provide a basis for reviewing the adequacy of the Forest Service and BLM Land and Resource Management Plans with regard to lynx conservation, to facilitate section 7 conferencing and consultation under the Act should the lynx be listed (see "Factor D" of the "Summary of Factors" section) and to guide future recovery efforts. The "Draft Biological Assessment of the Effects of National Forest Land and Resource Plans and Bureau of Land Management Land Use Plans on Canada Lynx" (DBA) identified potential effects resulting from 57 Forest Service Land and Resource Management Plans and 56 BLM Land Use Plans within the 16-State area where lynx were proposed for listing (United States Forest Service and Bureau of Land Management 1999).

Section 7(a)(4) of the Act states that Federal agencies shall confer with the Service on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 of the Act or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. Conferencing is a process of early interagency cooperation involving informal or formal discussions between a Federal agency and the Service regarding the likely impact of an action on proposed species or critical habitat. It is designed to help Federal agencies identify and resolve potential conflicts between an action and species conservation early in a project's planning and to develop recommendations to minimize or avoid adverse effects to proposed species or proposed critical habitat. With this final rule to list the lynx within the

contiguous United States as threatened, conferencing is no longer applicable and any agency actions that may affect the lynx will need to be addressed under consultation in accordance with section 7(a)(2) of the Act.

For the lynx, the Forest Service, BLM, National Park Service, and the Service recognized that Federal agencies have a significant role in the conservation of lynx. They established a Lynx Steering Committee in 1998 consisting of representatives from each agency. The Steering Committee provides oversight and guidance to teams established to address various lynx conservation issues on Federal lands. One team developed the LCAS; another team developed the Science Report; a third team prepared a biological assessment to evaluate the effects of Forest Service and BLM Land Management Plans on lynx. All of these efforts are intended to plan and implement sound conservation actions and management decisions for lynx on Federal lands.

*Issue 14*—Numerous commentors were concerned about the economic, social, and cultural effects of listing the lynx. They believed a listing would result in increased burdens on local economies affecting jobs, culture and way of life, and that the cost of implementing a lynx conservation and recovery program is not an efficient allocation of tax dollars.

*Response*—When drafting the Act, Congress found in section 2(a)(1) that, "various species of fish, wildlife and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." In keeping with this finding, listing decisions, other than critical habitat designations, are not subject to economic analyses. The purpose of listing a species is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to conserve the various species facing extinction. In accordance with 16 U.S.C. 1533(b)(1)(A) and 50 CFR 424.11(b), listing decisions are made solely on the basis of the best scientific and commercial data available. In adding the word "solely" to the statutory criteria for listing a species, Congress specifically addressed this issue in the 1982 amendments to the Act. The legislative history of the 1982 amendments states— "The addition of the word 'solely' is intended to remove from the process of the listing or

delisting of species any factor not related to the biological status of the species. The committee strongly believes that economic considerations have no relevance to determinations regarding the status of species * * *," H.R. Rep. No. 567, Part I, 97th Cong., 2d Sess. 20 (1982). Therefore, we have not considered the impacts of listing on economic development in making this listing determination. However, economic impacts will be considered in the designation of critical habitat.

*Issue 15*—We received numerous comments concerning the impact of a listing on the status of introduced lynx in Colorado and requests that these animals be declared a 10(j) "nonessential experimental population."

*Response*—The term "experimental population" as defined in the Act, refers to any population (including any offspring arising solely therefrom) of an endangered species or a threatened species released outside the current range of the species to further its conservation. Experimental populations can only be established when they are wholly separate geographically from nonexperimental populations of the same species. Since there is no clear evidence of the absence of a lynx population within the area prior to reintroduction, establishment of an "experimental population" would not be possible and was not pursued in Colorado. The lynx that were recently introduced into Colorado from Canada and Alaska were released prior to this rule and the resulting placement of the species on the list of threatened and endangered species. Therefore, as of this final rule, they are considered resident lynx and do not qualify as an experimental population. Further, these reintroduced lynx are included as part of the listed entity and placed on the list of threatened and endangered species as of the effective date of this final rule.

*Issue 16*—Several commentors believed that there is a very limited potential, or none at all, for re-establishment, recolonization, and population expansion of historic lynx habitat because of habitat changes, human-induced mortality, and bobcat and mountain lion competition with lynx. They believed the lynx decline is the result of global warming, a natural factor which has allowed the prey generalists, and bobcat and mountain lion, to move into lynx territory and outcompete this less adaptable specialist.

*Response*—We recognize that some historic lynx habitat may no longer be suitable for recolonization of lynx because of habitat changes. However,

we do not agree that global warming or the expansion of the bobcat range has resulted in eliminating historic habitat from recolonization by lynx. There is no evidence that either the bobcat or mountain lion outcompete the lynx for habitat and food resources (see "Factor E" of the "Summary of Factors" section). The lynx, bobcat, and mountain lion co-evolved in similar, yet spatially segregated environments. The lynx is specially adapted for deep snow habitats while the bobcat and mountain lion are not. This special adaptation allows the lynx to outcompete bobcat and mountain lion in deep snow environments. Because we have limited understanding of lynx habitat requirements, it is difficult to determine precisely the amount of habitat available historically or currently. In the majority of the range of lynx in the contiguous United States, suitable habitat remains available (see "Factor A" of the "Summary of Factors" section). There is no evidence to support global warming as a threat to the lynx.

*Issue 17*—Several commentors stated that in lieu of listing, we should pursue candidate conservation mechanisms that eliminate the need to list. Efforts should be focused on landscape planning, developing conservation agreements, forest management plans and lynx conservation criteria in lieu of listing. A multi-species forest planning process, incorporating not only species but special habitats and unique biological communities, would be a better approach, providing more protection to lynx and other wildlife communities, than a single species listing under the Act. They believed that managing for only one species might be detrimental to other species or communities.

Some commentors stated that we failed to take into account the continuing forest fragmentation and increased competition brought on by road construction, excessive timber harvest, off-road back country use and ski area development. They stated that we should implement strong standards to prevent excessive logging, road development, and other human developments in important lynx habitat. Lynx conservation can only be achieved at the landscape scale. They further believed that we failed to take into account the adequacy, inadequacy, political pressures, and limitations of current State and Forest Service programs and questioned the role of these existing programs for lynx as regulatory mechanisms.

*Response*—We fully support candidate conservation mechanisms, landscape planning, and changes in

forest planning as mechanisms to conserve candidate species and species at risk. We are signatories to numerous candidate conservation agreements across the country. The Act requires us to consider conservation efforts by the States and others in listing decisions. However, to conclude that a conservation effort removes the need to list a species, we must determine that the conservation effort is sufficiently certain to be implemented and effective.

In the case of amending forest management plans, we have specifically identified current Federal regulatory mechanisms as a threat to lynx because of the ongoing and potential future actions allowed by current Land and Resource Management Plans. Changes in land management plans to manage these potential threats would result in a significant reduction to the current threats facing the species and, therefore, would strongly factor in future lynx status determinations. In the case of State regulatory and conservation mechanisms, we also have identified that existing State programs will be essential in lynx conservation and recovery (see "Issue 19").

*Issue 18*—Numerous State agencies believe that Federal intervention is not necessary to manage and protect the lynx and that State regulatory protection is adequate. Some States hold that they are already doing everything they can to protect and conserve the lynx. They further believe that States are in a better position to manage the lynx in the future, as they maintain the bulk of the information and management expertise and that we should, as an interim step, assist the respective States and other Federal agencies in gathering biological information and implementing management plans through funding or joint ventures. They questioned how the Act provides for a species' recovery.

*Response*—The role of the Service, as mandated by the Act, is more encompassing than is the role of individual States, or even groups of States. States are responsible for the management of species within their boundaries and to their credit, most if not all States have implemented lynx management measures. The Service, pursuant to the Act, must evaluate the status of a species throughout its entire range and, when determined necessary, provide for its conservation and recovery. In the case of the lynx, this includes 14 separate States. While some States may still harbor resident populations of lynx, the status of lynx in other States is unclear. The Service, as a Federal agency, is responsible for coordinating recovery of a species such as the lynx that crosses State boundaries

and occupies substantial amounts of habitat on Federal lands. Furthermore, we have identified the major threat to lynx as the inadequacy of Federal regulatory mechanisms to provide for the long-term conservation of the species. Listing the lynx under the Act confers substantive protections not otherwise provided by State management.

We agree that the States maintain management expertise and knowledge of lynx within their boundaries, particularly concerning evidence of resident populations or individuals and local snowshoe hare abundance. Much of the available information on lynx status and threats comes from the reports of State wildlife agencies. States have already taken significant steps within their jurisdiction to conserve lynx. With the exception of Oregon, all States within lynx range have closed lynx trapping seasons. In some cases they have been closed for more than 2 decades. New York and Colorado have attempted lynx reintroduction as a means to re-establish viable populations. Long-term conservation of the lynx will not only be dependent on the States continuing their respective conservation programs, but on Federal agencies improving their efforts to conserve lynx and, where necessary, amending regulations, policies and/or practices for the conservation of the species.

When a species is listed under the Act, additional protections and prohibitions are applied. These efforts further conservation in several ways. When a species is listed under the Act as either threatened or endangered, it becomes illegal to "take" the species without a permit or incidental take statement from the Service. The term "take" means to harass, harm, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. "Harm" is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, such as breeding, feeding, or sheltering. "Harass" is defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns, which include but are not limited to breeding, feeding, or sheltering. Federal agencies are required to conserve species listed under the Act and to consult with the Service on any actions that may affect the species. Furthermore, the Act requires that the Service develop and implement a species recovery plan unless such a plan will not promote the recovery of the

species. When a species is considered recovered, it can then be removed from the list of threatened and endangered species.

*Issue 19*—One commentor stated that if the lynx were listed, restrictions imposed, such as limitations on trapping, would interfere with Tribal treaty rights.

*Response*—We have been communicating with Tribal governments regarding development of a special 4(d) rule (see "Issue 12") that would address the incidental take of lynx resulting from otherwise legal trapping and hunting for species other than lynx on Tribal lands. Under Executive Order 13084 "Consultation and Coordination with Indian Tribal Governments" (63 FR 27655, May 14, 1998) we are to inform and receive input from Tribal governments of any actions, such as listings under the Act, that may affect Tribes and to work to resolve any conflicts. However, there are certain circumstances where we cannot resolve issues to everyone's satisfaction. The Act applies to Tribal, as well as all other lands within the United States, and, therefore, the prohibitions brought on by the listing of a species, also apply. There are numerous Tribes within the range of the lynx that might be affected by this listing. On some Tribal lands lynx harvest seasons have already been closed. We will continue to work with Tribal governments to avoid or minimize conflicts should they arise.

*Issue 20*—In response to our reopening of the comment period for review of the Science Report we received numerous specific comments on the adequacy, accuracy and reliability of the Science Report. One commentor believed we should convene a Blue Ribbon panel to review the Science Report and make those deliberations part of the record. The information should be shared with the States and collaborative workshops conducted to ensure that all information is thoroughly evaluated and judged fairly against standards that are supportable.

*Response*—We employed a seldom-used section of the Act, section 4(b)(6)(B), in extending the time frame for issuance of a final listing rule by 6 months. We reopened the comment period on the lynx proposed rule specifically to allow for review, evaluation, and comment on the Science Report because there was substantial disagreement regarding the sufficiency and accuracy of the data relative to the listing determination in the proposed rule. We solicited comments on the Science Report from hundreds of agencies, Tribal governments,

organizations, scientific experts, and individuals. All comments received have been incorporated into the administrative record for this rule and have been reviewed and incorporated into our decision making process.

While we recognize that there are limitations to the Science Report and have attempted to explain these throughout this rule, we also believe that it provides a comprehensive review of the current knowledge concerning the lynx in the contiguous United States. Therefore, we could not ignore it during our review. We have conducted an exhaustive review of the Science Report and all available literature and data on lynx in the United States, as well as the extensive comments we received on the proposed listing. Because of the wide range of the species, sizable list of interested parties and time limitations, it was not possible to convene a workshop of all interested parties specifically to discuss the Science Report. However, we have been in contact with specialists knowledgeable about lynx, hares, forest ecology and management, and potential lynx competitors to discuss various issues about the Science Report. This also is part of the administrative record for this finding.

*Issue 21*—Numerous responses addressed and opposed a proposed reintroduction of lynx into Idaho.

*Response*—We received extensive comment on this particular issue and are addressing it here for clarification purposes. We have not proposed a reintroduction effort for Idaho. At this time, we have not proposed any reintroduction efforts for lynx. Past reintroduction, both in New York and in Colorado, have been initiated and conducted by State wildlife agencies because they believed the lynx had been extirpated or extremely reduced in numbers in specific, historically occupied habitat. In recent years, Idaho Department of Fish and Game considered reintroducing lynx into the State. If during the course of recovery planning for lynx, reintroduction are proposed, we would conduct extensive public outreach, with public hearings and comment periods, to determine the feasibility of such a project.

**Peer Review**

On July 1, 1994, we published a notice in the **Federal Register** announcing our interagency policy to clarify the role of peer review in activities we undertake under authority of the Act (59 FR 34270). This Interagency Cooperative Policy on Peer Review states that it is the policy of the Service to incorporate independent peer

review in listing decisions during the public comment period in the following manner—(1) Solicit the expert opinions of a minimum of three appropriate and independent specialists regarding pertinent scientific and commercial data and assumptions relating to the taxonomy, population models, and supportive biological and ecological information for species under consideration for listing; and (2) Summarize in the final decision document the opinions of all independent peer reviewers received on the species under consideration.

In accordance with this policy, in a letter dated August 21, 1998, we solicited the expert, independent professional opinion of six peer reviewers. We specifically asked the reviewers to address the following questions—(1) Does the information referenced and described in the "Distribution and Status" section of the proposed rule support the Service's conclusions regarding the status of the lynx in the contiguous United States; and (2) Does the information referenced and described in the "Summary of Factors Affecting the Species" section of the proposed rule support the Service's conclusions about threats to the lynx in the contiguous United States? We also requested the reviewers advise us of other available information that would assist us in making a final listing decision.

In response to our solicitation, we received two comment letters. Both commentors stated that they believed the status and threats to the lynx were reliably documented in the proposed rule. The commentors provided some additional information concerning an ongoing survey for lynx populations and the status of lynx in Idaho, Washington, and Wyoming, and also commented that our conclusion that resident populations of lynx historically occurred in Massachusetts, Pennsylvania, and Utah, and possibly Vermont and New Hampshire, was problematic. This information has been incorporated into our discussion of the status of the species. The same response also indicated that the forest practice of precommercial thinning was a greater threat than we had indicated and felt that conservation of lynx across southern Canada was important to conservation of lynx across the northern United States. These comments also have been incorporated into our analyses.

**Summary of Factors Affecting the Species**

Section 4 of the Act and regulations (50 CFR part 424) promulgated to

implement the listing provisions of the Act set forth the procedures for adding species to the Federal lists. A species may be determined to be an endangered or threatened species due to one or more of the five factors described in section 4(a)(1). These factors and their application to the Canada lynx (*Lynx canadensis*) are discussed below.

*Factor A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range*

Factors affecting lynx habitat include human alteration of the distribution and abundance, species composition, successional stages, and connectivity of forests, and the resulting changes in the forest's capacity to sustain lynx populations. People change forests through timber harvest, fire suppression and conversion of forest lands to agriculture. Forest fragmentation may eventually become severe enough to isolate habitat into small patches, thereby reducing the viability of wildlife that are dependent on larger areas of forest habitat (Litvaitis and Harrison 1989).

Since the publication of the proposed rule, we received new information related specifically to lynx—habitat associations (McKelvey *et al.* 1999b; United States Forest Service and Bureau of Land Management 1999), the distribution and ownership of lynx forest types as well as the amount of habitat in specific Federal land allocations (United States Forest Service and Bureau of Land Management 1999), the types and effects of different forest management practices (United States Forest Service *et al.* 1999), the effects of fire suppression (Agee 1999), and some probable implications of forest management practices on lynx forest types (McKelvey *et al.* 1999d).

New information suggests that lynx in the contiguous United States occur at naturally low densities. Lynx are limited to moist, cool boreal forests that support some minimum density of snowshoe hares, where winters are snowy (Ruggerio *et al.* 1999b). Snowshoe hares in the contiguous United States occur at low levels compared to northern reaches of their range in Canada and Alaska (Hodges 1999a, 1999b). Two important human influences on snowshoe hare habitat are timber harvest and fire suppression; however, our knowledge of how lynx populations respond to these specific impacts is limited.

In all regions of the lynx range in the contiguous United States, timber harvest and its related activities are a predominant land use affecting lynx habitat. Timber harvest and associated

forest management can be benign, beneficial, or detrimental to lynx depending on harvest methods, spatial and temporal specifications, and the inherent vegetation potential of the site.

For example, intensive tree harvesting (large-scale clearcutting) can eliminate the mosaic of habitats and mix of forest stand age classes that promote lynx survival, including late successional seral stages that support lynx denning and red squirrel habitat, and early successional snowshoe hare habitat. The response of lynx populations to particular vegetative mosaics is unknown. However, timber harvest can result in reduced cover, unusable forest openings, and large monotypic stands with sparse understories that are unfavorable for lynx and snowshoe hare, the primary lynx prey (Brittell *et al.* 1989; de Vos and Matel 1952; Harger 1965; Hatler 1988; Koehler 1990; K. Gustafson, pers. comm. 1994; J. Lanier, pers. comm. 1994). Some studies indicate that lynx avoid openings such as clear-cut, unforested areas, and grasslands (Koehler *et al.* 1979; Koehler and Brittell 1990; Murray *et al.* 1994). Snowshoe hares also are unlikely to use such areas because of the lack of cover (Koehler *et al.* 1979; Koehler and Aubry 1994; H. Golden, Alaska Department of Fish and Game, pers. comm. 1994). Mechanical thinning of densely stocked young stands to promote vigorous growth of fewer trees can reduce the stem densities required to support high numbers of snowshoe hares (United States Forest Service *et al.* 1999a). Reductions in cone-bearing mature and older forests can result in decreases in habitat for red squirrel, an important alternate lynx prey (Koehler 1990; O'Donoghue 1997; Apps 1999; Mowat *et al.* 1999).

Forestry practices can be beneficial when the resulting understory stem densities and structure meet the forage and cover needs of snowshoe hare (Keith and Surrendi 1971; Fox 1978; Conroy *et al.* 1979; Wolff 1980; Parker *et al.* 1983; Litvaitis *et al.* 1985; Monthey 1986; Bailey *et al.* 1986; Koehler 1990; McKelvey *et al.* 1999d). Hodges (1999a, 1999b) illustrated that snowshoe hare densities are highest in regenerating stands with very high stem densities. Regeneration harvest can be used to create high quality snowshoe hare habitat, especially where natural regeneration would be expected to provide dense young vegetation. Although large openings may initially be underused by snowshoe hare and lynx, regeneration harvest units in appropriate habitat types eventually (in 15 years or more depending on the type of forest) achieve early successional

stages in forests preferred by snowshoe hares (Monthey 1986; Quinn and Parker 1987; Koehler 1990; Koehler and Brittell 1990; Washington Department of Wildlife 1993; McKelvey *et al.* 1999c). Lynx can readily move across landscapes fragmented by commercial forestry (Squires and Laurion 1999). Larger openings can often more closely resemble vegetative patterns that follow natural disturbance events, and decrease amounts of edge favorable to generalist predators (McKelvey *et al.* 1999c).

Natural fire has an important role in forest ecology in some forest types in the United States. During the early 20th century, Federal and State agencies in the contiguous United States enacted a policy of suppressing forest fires. The effects of fire suppression, as well as timber harvest, on lynx habitat vary among the geographic regions (Agee 1999) and will be discussed separately below for western and eastern regions.

McKelvey *et al.* (1999b) used lynx occurrence data to describe lynx distribution patterns and habitat associations. The primary vegetation classes encompassing the majority of lynx occurrences in the West were Rocky Mountain Conifer and Pacific Northwest Conifer, including Douglas-fir and western spruce/fir and fir/hemlock. In the Great Lakes, the primary vegetation class was Mixed Deciduous-Coniferous, and in the Northeast, Mixed Forest-Coniferous Forest-Tundra. These broad vegetation classes include areas that because of elevation or other physical factors are not considered lynx habitat and cannot easily be deleted from the data. Therefore, accurate assessments of the total amount of lynx habitat within these regions is not possible. However, we assume that the areas encompassed within these vegetation classes contain the majority of lynx habitat types in the regions. We also assume that pockets of lynx habitat may occur outside these broad vegetation classes. With these assumptions in mind, where our discussion is based on lynx/habitat associations as reported in McKelvey *et al.* (1999b), we shall refer to the landscapes characterized by these broad vegetation classes as lynx forest types.

**Northern Rockies/Cascades and Southern Rockies**

In the western regions, most lynx forest types occurs on Federal lands. Of all western forest types, the western boreal forests (subalpine fir/spruce forests which provide lynx habitat) have the highest proportion of reserved land, largely because they are primarily in public ownership and are the least productive timberland, making land use

trade-offs between preservation and extraction less controversial than for other public lands (Agee 1999). Human land use that changed areas of forest land, disturbance patterns, and dominant tree species is much less prevalent in the West than in the Great Lakes or Northeast boreal forest (Agee 1999). Broad-scale habitat assessments generally support these conclusions.

Large amounts of lynx forest types occur on Federal lands, within both developmental and nondevelopmental allocations within the western regions. Lands in developmental allocations are managed for multiple uses, such as recreation and timber harvest. Lands within nondevelopmental allocations are to be managed to allow natural ecological processes to dominate (United States Forest Service and Bureau of Land Management 1999). Nondevelopmental lands contain large portions of wilderness or other natural areas (D. Prevedal, United States Forest Service, *in litt.* 1999). Timber harvest and construction of roads typically do not occur or are very limited in lands managed in nondevelopmental allocations. Large proportions of Federal lands in each of the western regions are managed under nondevelopmental allocations. In an assessment of the Columbia River Basin of eastern Washington and Oregon, Idaho, and western Montana, more than 35 percent of cold forest types encompassing subalpine fir/spruce habitats, were in designated wilderness, wilderness study areas, or other administrative natural areas (United States Department of Agriculture and United States Department of the Interior 1997).

Raphael *et al.* (1999) developed a broad-scale landscape model for lynx that assessed conditions across the Columbia River Basin. The model was based on the changes from historic to current amounts of habitat, landscape mosaics, disturbance regimes, vegetation structure, road densities, and human population. The model produced two outcomes, a habitat outcome and a population outcome. We acknowledge that such coarse-scale analyses may not reflect finer-scale environmental requirements that potentially account for a large amount of variation in lynx demographics. Preliminary results of the model suggest that lynx habitat is broadly distributed and of high abundance (relative to historic conditions) across the historic range of the species in the Columbia River Basin, and provides opportunity for intraspecific interactions for the species (Raphael *et al.* 1999). The model's population outcome for lynx suggests that the potential distribution

of lynx in this area is restricted and characterized by patchiness and/or areas of low abundance. There is opportunity for subpopulations in most of the specie's range in this area to interact as a metapopulation; however, some subpopulations are essentially isolated.

At finer scales of analysis, the Forest Service and BLM concluded that many Forest and BLM administrative units have land and resource management plans that may adversely affect lynx due to timber harvest activities (United States Forest Service *et al.* 1999; United States Forest Service and Bureau of Land Management 1999). These plans may affect individual lynx or local lynx populations primarily in the developmental allocation areas of the Northern Rockies/Cascades and Southern Rockies regions, although the assessment did not quantify the level of impact.

Since publication of the proposed rule, we have received information related to past and projected timber harvest levels and precommercial thinning activities on Federal lands in the West. Timber harvest levels on Federal lands in the West have declined consistently and dramatically (approximately 80 percent) over the past decade or longer (R. Gay, United States Forest Service, *in litt.* 1999). Timber harvest in specific lynx forest types also has concurrently declined in the Northern Rockies (B. Ballenbacher, United States Forest Service, *in litt.* 1999; B. Ferguson, United States Forest Service, pers. comm. 1999) and Cascades (Fred Zenson, United States Forest Service, pers. comm. 1999), and the Southern Rockies (B. Short, United States Forest Service, *in litt.* 1999).

The Forest Service's projected need for future precommercial thinning on Forest Service lands over the next decade in the Northern Rockies, Cascades, and Southern Rockies will affect less than approximately 1–4 percent of primary lynx forest types within each of these regions (B. Ballenbacher, United States Forest Service, *in litt.* 1999; B. Ferguson, United States Forest Service, pers. comm. 1999; B. Short, *in litt.* 1999; F. Zenson, United States Forest Service, pers. comm. 1999). Past thinning and timber harvest impacted similarly low proportions of lynx forest types on Federal lands in the Northern Rockies (B. Ballenbacher, *in litt.* 1999; B. Ferguson, pers. comm. 1999), Cascades (F. Zenson, pers. comm. 1999) and the Southern Rockies (B. Short, *in litt.* 1999). Precommercial thinning has occurred in approximately one-fifth (B. Ballenbacher, *in litt.* 1999) to one-half (B. Short, *in litt.* 1999) of the early

successional vegetation created by timber harvest in lynx forest types on western Federal lands over the past decade. This likely reduced snowshoe hare habitat quality at local scales, adversely affecting individual lynx. However, considering the overall proportions of lynx forest types affected, timber harvest and precommercial thinning on Federal lands are not currently conducted, nor are they likely in the projected future to be conducted, at levels likely to impact lynx at the population level.

However, the Northern Rockies encompass more privately owned lynx forest types than elsewhere in the West. Almost one-third of lynx forest types are in private ownership. Although we lack specific information, large portions of this habitat likely occur on privately owned corporate timber lands where timber harvest and thinning occurs. There are no data available on these private lands which would allow us to make a conclusion concerning the quality of lynx and snowshoe hare habitat. However, there is a potential for current and future management of these lands to adversely affect lynx.

Most lynx forest types in the West occur on Federal lands, and large Federal acreage of this habitat in the Northern Rockies/Cascades and Southern Rockies are managed in nondevelopmental status, where timber harvest activities and precommercial thinning generally do not occur. Nondevelopmental allocations on Federal lands require that natural ecological processes play a dominant role in the landscape (United States Forest Service and Bureau of Land Management 1999), as opposed to developmental lands, which are managed for multiple uses, such as recreation and timber harvest.

Large portions of nondevelopmental lands occur in the Northern Rockies and Cascades regions, which encompass most of the lynx forest types in Wyoming, Utah, Montana, Idaho, Oregon, and Washington. We recognize the importance of wildlands and nondevelopmental lands in the Northern Rockies/Cascades Region to provide lynx habitat that is buffered from many human impacts, creating the most likely stronghold for lynx populations in the contiguous U.S.

In the Northern Rockies, nearly 50 percent of the 35 million acres of lynx forest types is in nondevelopmental allocations on Forest Service lands or occurs in National Parks. In the Northern Rockies, 67 percent of the lynx forest types are managed by the Forest Service, 5 percent by the BLM, and 28 percent are in other ownerships (see

"Table 1"). The Forest Service and BLM manage over 24 million acres of lynx forest types. Of federally managed lynx forest types, 57 percent (roughly 14 million acres) lies within areas with nondevelopmental status. Sixty-seven percent of this 14 million acres lie within wilderness or scenic river designations (D. Prevedal, *in litt.* 1999), both of which provide restrictions on land use beneficial to lynx. Additional large tracts of lynx forest types occur in Glacier (735,310 acres) and Yellowstone (1,910,590 acres) National Parks (D. Prevedal, *in litt.* 1999). However, the 43 percent of federally managed lynx forest types that are in developmental status are managed for multiple uses that may, on local scales, conflict with lynx conservation.

TABLE 1.—AMOUNT OF LYNX FOREST TYPES IN GEOGRAPHIC REGIONS IN THE CONTIGUOUS U.S., AMOUNT OF LYNX FOREST TYPES (LFT) ON FOREST SERVICE (FS) AND BUREAU OF LAND MANAGEMENT (BLM) LANDS, AND FEDERAL LAND ALLOCATIONS IN LYNX FOREST TYPES (DATA FROM U.S. FOREST SERVICE AND BUREAU OF LAND MANAGEMENT 1999)

| Geographic region | Total acres LFT, all ownerships | Total acres LFT on FS/BLM | Total acres FS/BLM LFT non-developed allocations | Percent LFT on FS/BLM | Percent FS/BLM LFT in nondevel-oped allo-cations | Percent all LFT in nondevel-oped allo-cations |
|---|---|---|---|---|---|---|
| Cascades | 4.2 M | 4.1 M | 3.6 M | 99 | 87 | 85 |
| Northern Rockies | 34.3 M | 24.8 M | 14.1 M | 72 | 57 | 41 |
| Southern Rockies | 6.5 M | 5.3 M | 1.4 M | 82 | 25 | 23 |

The Cascades and Southern Rockies regions encompass substantively smaller proportions of lynx forest types. In the Cascades Region, 99 percent of lynx forest types are managed by the Forest Service, less than 1 percent by the BLM, and less than 1 percent is in other ownerships (see "Table 1"). The Forest Service and BLM manage approximately 4 million acres of lynx forest types. Of federally managed lynx forest types, 87 percent (3.5 million acres) lies within areas with nondevelopmental allocations and 13 percent occur in areas of developmental status, where multiple use management occurs. Ninety percent of this 3.5 million acres is in wilderness or in key watersheds under the Pacific Northwest Forest Plan, and the remaining 10 percent is in matrix lands including late successional reserves, which allows limited timber harvest such as salvage harvest (D. Prevedal, *in litt.* 1999). In Washington and Oregon, the National Park Service manages an additional 200,000 acres of lynx forest types (D. Prevedal, *in litt.* 1999).

In the Southern Rockies, 76 percent of the lynx forest types are managed by the Forest Service, about 5 percent by the BLM, and 19 percent is in other ownerships (see "Table 1"). Federally managed lynx forest types amount to over 5 million acres. Of the federally managed lynx forest types, only 25 percent (1.4 million acres) lies within areas with nondevelopmental status while the other 75 percent are in developmental status and are managed for multiple uses that may, on local, scales, conflict with lynx conservation.

Considering the Northern Rockies, Cascades and Southern Rockies, a cumulative total of 56 percent of Forest Service and BLM lands is managed in nondevelopmental status, comprising over 40 percent of lynx forest types, allowing for 44 percent to be managed for multiple uses which may conflict with lynx conservation. National Parks in the western regions add several million acres of lynx forest types in more or less undeveloped status.

We conclude that timber harvest activities and precommercial thinning may reduce the quality of snowshoe hare habitat and red squirrel habitat in local areas of the Northern Rockies/Cascades and Southern Rockies, and thus may negatively affect lynx at local scales. Furthermore, the large percentage of Federal lands in developmental status and managed for multiple use may, on local scales, conflict with lynx conservation. However, based on the large proportion of lynx forest types managed in nondevelopmental status compared to the proportion of managed lynx forest types affected, current regional effects of timber harvest and thinning appear to occur at levels that are not likely threatening the Northern Rockies/Cascades and Southern Rockies lynx populations.

Federal land management in developmental allocations often maintains conditions suitable for lynx, and these lands constitute important landscapes providing regional connectivity. Construction of roads, timber harvest, and fire suppression occur in developmental allocations. However, recent studies of lynx have documented lynx presence and reproduction in a variety of managed landscapes (Koehler 1990; Staples 1995; Apps 1999; Squires and Laurion 1999; J. Organ, U.S. Fish and Wildlife Service, pers. comm. 1999). Lynx occurrence records provide evidence that lynx continue to be broadly distributed throughout lynx forest types in the Northern Rockies/Cascades and Southern Rockies (McKelvey *et al.* 1999b), both inside and outside of the nondevelopmental allocation areas within the last decade (U.S. Forest Service and Bureau of Land Management 1999).

Because of the preponderance of lynx forest types on Forest Service, BLM, and National Park system lands, Federal land management assumes the largest single role in the conservation of lynx in western portions of its range. We believe that the large amounts of lynx forest types managed in nondevelopmental allocations, especially in designated wilderness areas, protects lynx in the Northern Rockies/Cascades and Southern Rockies and contributes to the likelihood of persistence of lynx into the future. The forests upon which lynx depend have had less timber harvest, road construction, and have been modified much less than other drier forests (U.S. Forest Service and Bureau of Land Management 1997). In addition, significant portions of these forests are within areas that do not have roads and have habitat that has been classified as wilderness. Natural fires are more likely allowed to burn in wilderness or areas without roads, which helps retain diversity in structural stages and create habitat mosaics in forests for the future. Also, in the Northern Rockies/Cascades Region there are strong habitat connections to lynx populations in

Canada. The Northern Rockies/Cascades Region has the highest potential for maintaining a viable lynx population within the DPS, based upon the large amount of lynx forest types, the large portions of habitat in nondevelopmental management, and strong regional connections to lynx forest types and lynx populations in Canada.

Natural fire has an important role in forest ecology in western mountain ranges of the United States. Some researchers believe that fire suppression during the past 50 years has allowed certain forest types to mature, thereby reducing habitat suitability for snowshoe hares and Canada lynx (Brittell *et al.* 1989; Fox 1978; Koehler 1990; Washington Department of Wildlife 1993; T. Bailey, U.S. Fish and Wildlife Service, *in litt.* 1994; W. Hann, U.S. Forest Service, *in litt.* 1999).

However, others argue that fire suppression is most likely affecting lynx habitat in areas where the historical frequency of fires is shorter than the length of time fires have been suppressed (P. Stickney, U.S. Forest Service, pers. comm. 1994; Agee 1999). Fire suppression in areas with a history of infrequent fire has probably not had much impact (Habeck 1985; Agee 1993). In the western boreal forest zone, long natural fire return intervals (150–300 years) signify that removal of fire has not been as significant as in the West with lower-severity fire regimes and return intervals (30–90 years), even though fire suppression has been in effect for much of this century (Agee 1993, Agee 1998 *in* Agee 1999). More frequent fires of lower intensity do occur in some boreal forest types (W. Hann, *in litt.* 1999), although they typically comprise a small proportion of the total area burned (Agee 1999). In forests with high-severity fire regimes, a number of smaller fires burn a small proportion of the forests, while fewer larger fires account for most of the area burned (McKelvey and Busse 1996 *in* McKelvey *et al.* 1999d; Agee 1999). Lynx forest types in the West include a preponderance of forest types with long natural fire return intervals and high-fire intensity (S. Arno, U.S. Forest Service, *in litt.* 1998; Agee 1999), which suggests that removal of fire in lynx forest types has not been as significant as in the lower-severity fire regimes of the West (Agee 1998 *in* Agee 1999).

In the Northern Rockies, most of the wilderness areas in Montana and Idaho have fire management plans that affect more than 5 million acres that allow naturally caused fires to burn during certain periods and in certain areas (N. Warren, U.S. Forest Service, *in litt.* 1999). In Wyoming and Utah, one-third

of the wilderness areas also have completed similar fire plans, with the remaining plans close to completion (B. Noblit, U.S. Forest Service, *in litt.* 1999). Glacier and Yellowstone National Parks allow natural fires to burn under many conditions. In the Cascades, two of three wilderness areas have fire management plans in place (B. Naney, U.S. Forest Service, Okanogan, pers. comm. 1999). Further, the 1994 Federal Wildland Fire Policy directs the Department of the Interior and the Department of Agriculture to use a full range of potential responses to fire, from full suppression to allowing more fires to burn large areas thereby allowing fires to assume a larger role in maintaining forest health in the future (B. Meuchel, pers. comm. 1999; D. Milburn, pers. comm. 1999). However, natural fire regimes are not necessarily restored because prescriptive criteria to manage these natural wildland fires remain conservative.

Currently, outside large wilderness areas in all western regions, most fires are suppressed. Most fires (98 percent) are successfully extinguished when small and only a small proportion of fires burn large areas (B. Meuchel, U.S. Forest Service, pers. comm. 1999; D. Milburn, U.S. Forest Service, pers. comm. 1999). Fires are extinguished largely due to costs, firefighter safety, local human safety and property concerns. The majority of these fires occur outside lynx forest types at lower elevations in drier forests. However, fires igniting in the lynx forest types outside, and some fires inside, wilderness are suppressed, which can reduce the amount of early seral forests compared to natural conditions and/or change species composition and structural components of forests (W. Hann, *in litt.* 1999). The total area that would have burned had such fires been allowed to burn is likely not substantive when compared to the proportion of the landscape burned by the large, high-intensity fires typical of lynx forest types. However, the resulting pattern of vegetation mosaic and the mix of stand age classes may be altered, as the large fires may burn areas more uniformly due to lack of fire breaks that would have been created by past, smaller fires (D. Milburn, pers. comm. 1999). Other natural processes such as insects, disease, and wind-throw also can play a role in affecting the vegetation mosaics.

Based on available information on fire suppression and upon available habitat assessments, we conclude that at the present time, fire suppression effects are less evident in lynx forest types than in many other forest types in the West. In

the Cascades, fire return intervals in many lynx forest types are very long, 200–500 years (Agee 1999). Mixed-severity fire regimes were not common; therefore, fire suppression is not a factor limiting lynx in the Cascades. In the Northern and Southern Rockies, fire intervals also are long and fire regimes are typically intense (Agee 1999). Where mixed-severity fire regimes occur in the Northern and Southern Rockies, lynx habitat quality may be affected at some local scales, especially outside of wilderness areas, resulting in adverse effects to individual lynx. However, considering a larger scale, the current effects of fire suppression alone are not threatening the Northern Rockies/Cascades and Southern Rockies lynx at the population level at this time.

While recent studies of lynx have documented lynx presence and reproduction in a variety of managed landscapes (Koehler 1990; Staples 1995; Apps 1999; Squires and Laurion 1999; J. Organ, U.S. Fish and Wildlife Service, pers. comm. 1999), we remain concerned about the maintenance of lynx habitat conditions, especially since a large percentage of lands managed by the Forest Service and BLM are in developable status and allow programs, practices and activities that may impact lynx and their primary prey, snowshoe hare. Lynx occur naturally at very low densities in the contiguous United States (see "Background" section). It is imperative that snowshoe hare and alternate prey populations be supported by habitat on Federal lands into the future, to ensure the persistence of lynx in the contiguous United States. Substantive declines in prey species, especially snowshoe hare, may result in a prey base insufficient to support lynx populations. Therefore, amendment of Forest Plans to provide protection for lynx and lynx habitat is needed to conserve habitat for lynx and its prey on Federal forest lands. Without such amendments, the species is threatened.

**Northeast**

In the Northeast Region, softwoods that provided Canada lynx habitat were logged extensively during the late 1800s and early 1900s (Jackson 1961; Barbour *et al.* 1980; Belcher 1980; Irland 1982). Over a short time period, timber extraction during this era resulted in the replacement of late-successional conifer forest with extensive tracts of very early successional habitat, which eliminated cover for lynx and hare (Jackson 1916; Keener 1971). In the Northeast Region, slash, accumulated during logging operations, fueled wildfires that burned vast acreage of softwood forest (Belcher 1980; J. Lanier, pers. comm. 1994). This

sudden alteration of habitat may have resulted in sharp declines in snowshoe hare numbers over large areas, subsequently reducing lynx numbers (Jackson 1961; Keener 1971; K. Gustafson, pers. comm. 1994; J. Lanier, pers. comm. 1994).

The impacts of the logging conducted in the Northeast Region during the late 1800s continue to affect lynx forest types. In Maine, softwood cover and dense sapling growth provided improved snowshoe hare habitat after timber harvest and fires in late successional forests (Monthey 1986). However, in the western sections of the Northeast Region, extensive tracts of predominantly softwood forests that were harvested and burned-over during the late 1800s and early 1900s were subsequently replaced with regenerating hardwoods (D. Degraff, pers. comm. 1994; J. Lanier, pers. comm. 1994). Hardwood forests do not typically supply adequate cover for snowshoe hares (Monthey 1986). For a period of time, this extensive area would have provided the early successional habitat used by snowshoe hare. However, such extensive tracts may not have provided a suitable mosaic of forest habitats and as succession progressed, these large tracts eventually became unsuitable for both snowshoe hare and lynx. Declines in snowshoe hare habitat may have occurred during the 1940s and 1950s as a result of large-scale forest maturation (Litvaitis *et al.* 1991).

In Maine, large tracts of forest (some as large as 36-square mile townships) were harvested in the 1960s to reduce the incidence of spruce budworm. During early successional stages, these forests may provide high quality hare habitat. However, these large tracts create a simplified, monotypic forest over large areas, not a mosaic of forest stands. Passage of the State Forestry Practices Act has required clear-cut size to be substantially reduced. The Maine Department of Conservation recently analyzed Statewide timber production on Maine's 17 million acres of forest land (Gadzik *et al.* 1998). The report indicated 25 percent of the forest was in seedling/sapling stages, which likely includes quality snowshoe hare habitat. However, the report concludes that increasing the number of acres under high-yield silvicultural practices, which will likely include precommercial thinning, to a cumulative total of 9 percent of Maine's forest land by the year 2015 is necessary to sustain the current timber harvest levels into the future. Such high-yield techniques may temporarily reduce snowshoe hare habitat quality, but the long-term effects

on lynx on a landscape scale are not known.

Forested habitat in the Northeast has increased because of land-use changes during the past century (Irland 1982; Litvaitis 1993), including the abandonment of agriculture in many areas. In some areas there may be a gradual upward trend in the coniferous component as spruce and fir regenerate beneath hardwood species (D. Degraff, pers. comm. 1994). Several of the northeastern States support adequate, if not abundant, snowshoe hare populations (C. Grove, Green Mountain National Forest, pers. comm. 1994; F. Hurley, *in litt.* 1994; J. Lanier, pers. comm. 1994).

In 1990, the Forest Service published a report that examined the Northern Forest Lands in New York, Vermont, New Hampshire, and Maine (Harper *et al.* 1990). Eighty-four percent of northern forest lands in the region are currently privately owned and 16 percent are in public ownership. According to another analysis, the Forest Service manages only 7 percent of lynx forest types in the Northeast, of which 23 percent is managed in nondevelopmental status (U.S. Forest Service and Bureau of Land Management 1999). Federal land management will have minimal effect on the persistence of lynx in the Northeast, due to the small amount of lynx forest types managed by the Forest Service.

Commercial forestry continues to be the dominant land use on 60 percent of the private lands in northeastern forests. The rapid pace of subdivision for recreational home sites has been identified as a concern in maintaining the integrity of Northeast forests (Harper *et al.* 1990), though this is not currently posing a significant threat to lynx. At higher elevations and northern latitudes in the Northeast, red spruce and balsam fir are important components of snowshoe hare habitat. Declines in red spruce forests have been documented, and drought, acid deposition, and other human-generated pollutants have been suggested as principal causes (Scott *et al.* 1984). Historic declines in some forest types may have contributed to reducing the quality of lynx habitat in the Northeast. Current lynx research in Maine is contributing to our knowledge about lynx habitat use in the Northeast (J. Organ, pers. comm. 1999).

In Northeast forests, fire return intervals are very long, due to the moist maritime influence (Agee 1999). Thus, fire did not historically play a significant role in creating early successional habitats. Insect infestations and wind were the primary disturbance

events that created early successional habitats. While current fire suppression on public and private lands may have localized effects, it is not likely affecting overall lynx forest types in the Northeast. We conclude that fire suppression in the Northeast does not threaten lynx subpopulations there.

We conclude that most lynx forest types are in private, State, or county ownership in the Northeast. Timber harvest and associated activities exert the most influence on lynx forest types in the Northeast, although the extent of influence of current forest practices on lynx is not known.

### Great Lakes

In the Great Lakes Region, as in the Northeast, softwood forests were logged extensively during the late 1800s and early 1900s (Jackson 1961; Barbour *et al.* 1980; Belcher 1980; Irland 1982) and over a short period resulted in the replacement of late-successional conifer forest with extensive tracts of very early successional habitat, which eliminated cover for lynx and hare (Jackson 1961; Keener 1971). Coniferous forests also were cleared for agriculture during this period in the Great Lakes.

In the Great Lakes Region, the Forest Service manages about 19 percent of the area within which lynx forest types occur, of which 40 percent is managed in nondevelopmental status (U.S. Forest Service and Bureau of Land Management 1999). The remaining 80 percent of the area encompassing lynx forest types in the Great Lakes is in State, county, or Tribal lands, or is privately owned. Public or Tribal ownership accounts for 41 percent of all lynx forest types in the region (J. Wright, *in litt.* 1999 in U.S. Forest Service *et al.* 1999).

Timber harvest levels on Federal lands in the Great Lakes have declined by approximately 20 percent over the past decade (R. Gay, U.S. Forest Service, *in litt.* 1999). While specific information on timber harvest levels or pulpwood production on non-Federal lands in the Great Lakes was not available, timber harvest is generally prevalent on these lands. Past habitat fragmentation likely occurred from forestry management programs, agricultural conversions, residential development and highways. As in the Northeast, regenerating forests now occupy abandoned farmlands in northern portions of the Great Lakes. However, mixed conifer/hardwood stands are often replaced by pure deciduous seral stands, which have been maintained in deciduous stages in recent years because of the importance of aspen as a crop tree (Agee 1999). In the East, hare densities were higher in

coniferous forests than deciduous (Litvaitis et al. 1985; Fuller and Heisey 1986). On managed timber lands in all ownerships, the maintenance of aspen seral components to produce pulpwood precludes the establishment of coniferous forest types, which in turn likely diminishes snowshoe hare habitat quality, adversely impacting lynx.

In the Great Lakes, natural fire regimes are frequent and intense (Agee 1999). Fire suppression in the Great Lakes area has changed the dominant successional pathways, perhaps permanently (Agee 1999). However, in the northeastern portion of Minnesota fires are allowed to burn in the Boundary Waters Canoe Area. This portion of the Great Lakes Region may provide the highest quality lynx habitat, as the largely coniferous forests here more closely resemble the northern boreal forests of Canada than do the transitional coniferous/deciduous forests to the south. On other Federal lands in the Great Lakes, fire suppression policies are such that fire is unlikely to assume its natural role in creating a mosaic of vegetation communities and age classes across the landscape. Escaped fires and other natural processes such as insects, disease, and wind throw maintain natural mosaics to some degree. Lynx foraging habitat is likely to be maintained at levels less than would be provided under natural disturbance regimes. Fire suppression is likely reducing the quality of lynx habitat in the Great Lakes.

Most lynx forest types are in private, State, or county ownership in the Great Lakes and timber harvest is prevalent on these lands. We conclude that timber harvest and fire suppression may be impacting lynx and prey habitat in the Great Lakes Region.

However, we further conclude that timber harvest and fire suppression may have regional or local impacts but do not currently threaten the contiguous United States population. Considering the entire United States distinct population segment, we remain concerned about maintenance of lynx habitat conditions, especially in areas outside nondevelopmental lands in the West. It is imperative that snowshoe hare and alternate prey populations be supported by habitat on Federal lands into the future, to ensure the persistence of lynx in the contiguous United States. We conclude that the single factor threatening the contiguous United States distinct population segment of lynx is the lack of guidance for conservation of lynx and snowshoe hare habitat in National Forest Land and Resource Plans and BLM Land Use

Plans (see "Factor D" of the "Summary of Factors" section). This lack of guidance allows the potential for future degradation of lynx habitat on Federal lands through timber management and other Federal activities (see "Factor D" of the "Summary of Factors" section).

### Factor B. Overutilization for Commercial, Recreational, Scientific, or Education Purposes

One of the primary reasons we proposed to list lynx, based on available information at the time, was our conclusion that the low numbers of lynx in the contiguous United States and southern Canada were the residual effects of overtrapping that was believed to have occurred in the 1970s and 1980s, in response to unprecedented high pelt prices, a concern that was widely shared (Brand and Keith 1979; Todd 1985; Bailey et al. 1986; Hatler 1988; Washington Department of Wildlife 1993).

Since the publication of the proposed rule, we have received substantive new information related to relative numbers of lynx in the northern and southern portions of its range. We now understand that lynx in the contiguous United States always existed at low densities, comparable to lynx populations of the northern boreal forest during cyclic lows (Aubry et al. 1999) (see "Background" and "Distribution and Status" sections). These low densities of lynx do not appear to be the result of declining population trends. Rather, lynx are relatively rare in the contiguous United States because of habitats that are inherently unable to support cyclic, high-density snowshoe hare populations and are thus unable to sustain cyclic, high-density lynx populations.

Trapping records are the best, long-term lynx data available. Harvest returns are generally indicative of, but do not represent, real population changes because of the number of factors that influence trapper effort and success, such as changes in socioeconomic conditions, season length, quotas and trapping restrictions, and ease of access (Hatler 1988; Mowat et al. 1999). Mowat et al. (1999) suggest that fur prices likely affect harvest over the short-term but that it may not be valid to compare and contrast inflation-adjusted prices and harvests that occurred decades apart. Mowat et al. (1999) conclude trapping can reduce lynx numbers and that lower lynx harvest levels in Canada in the first half of the 20th century were possibly a result of overtrapping. However, prior to 1921, harvest data were maintained by the Hudson Bay Company. Lower lynx harvest returns in Canada coincide

with Hudson Bay Company's going out of business and Provinces starting to maintain harvest records; we surmise that the lower harvests are, at least in part, more likely an artifact of changes in recordkeeping.

Human-induced mortality was generally believed to be the most significant source of lynx mortality (Ward and Krebs 1985). Trapping mortality was considered to be entirely additive (i.e., in addition to natural mortality) rather than compensatory (taking the place of natural mortality) (Brand and Keith 1979). However, Canadian researchers determined that natural mortality during the declining phase of the lynx cycle is high; therefore, trapping mortality during some portions of the cyclic decline may compensate for natural mortality (Hatler 1988; Poole 1994; Slough and Mowat 1996; Poole 1997; Mowat et al. 1999). Therefore, we recognize that trapping of lynx can be both additive and compensatory, depending on when it occurs in the cycle.

From the mid-1970s until the late 1980s, prices of lynx pelts were at record highs throughout the United States and Canada (Todd 1985; Hatler 1988; Hash 1990). In Montana, the 1974 average pelt price was $63; by 1978 the average price increased over 500 percent to $348 (B. Giddings, in litt. 1994). Lynx pelt prices peaked in the mid-1980s at nearly $500 per pelt and remained above $200 per pelt for 12 years until 1989 (B. Giddings, in litt. 1994).

In response to declining harvests in the late 1970s and 1980s, Washington, Montana, Minnesota, Alberta, British Columbia, Manitoba, Ontario, Quebec, and Alaska severely restricted or closed their lynx harvest seasons because of concern that lynx populations had been overexploited (Bailey et al. 1986; Hatler 1988; Hash 1990; Washington Department of Wildlife 1993; S. Conn, in litt. 1990; M. DonCarlos, in litt. 1994; B. Giddings, in litt. 1994; R. McFetridge, Alberta Environmental Protection, in litt. 1994; I. McKay, in litt. 1994).

Based on information obtained since the proposed rule, we now recognize that the cyclic peak harvest returns of the early 1960s and 1970s were unprecedented highs for the 20th century (e.g., Figures 8.3 and 8.6 in McKelvey et al. 1999b; Figure 9.4 in Mowat et al. 1999). Wildlife managers may have expected harvest returns during the 1980s and 1990s to be comparable to the anomalous cyclic peaks of the 1960s and 1970s. When harvest returns failed to be as high as anticipated, managers appear to have interpreted the lower returns to be caused by overtrapping when pelt prices

were high (Bailey *et al.* 1986; Hatler 1988; Hash 1990; Washington Department of Wildlife 1993). We compared the lynx harvest returns in the 1980s and early 1990s to harvest data dating back over a longer period of time (i.e., prior to 1960) and found that lynx harvest returns were not unusual nor appreciably lower than those recorded prior to the 1960s.

Trapping data for the contiguous United States during the 1970s and 1980s is available from Minnesota, Montana, and Washington. Only Minnesota has long-term trapping records (Henderson 1978). Minnesota lynx harvest data indicate cycles approximately every 10–12 years (McKelvey *et al.* 1999b). Lynx harvest in Minnesota was relatively high, but also highly variable, ranging from as low as 0 to as high as 400 per year over the 40 years of recordkeeping (Henderson 1978). The Minnesota harvest is believed to have consisted, at least partially, of lynx dispersing from Canada (Henderson 1978; McKelvey 1999b). The amplitude of Minnesota lynx harvest cycles was high and, therefore, the exceptionally high peaks of the early 1960s and 1970s that are evident in all other regions do not appear extraordinary in the Minnesota data. After two seasons in the mid-1970s when no lynx were harvested, a quota of five lynx was established from 1977 through the 1982 season. This quota presumably influenced trapper effort and likely was a factor in the reduced harvests in the late 1970s and early 1980s. However, the quota was always exceeded by at least three times the quota. Although the quota was further reduced to two in 1983, nine lynx were taken, providing evidence of the continued occurrence of lynx in Minnesota. The Minnesota lynx season has been closed since 1984. Given the history of lynx cycles reflected in Minnesota data, a cycle would have been expected to return between 1983 and 1985. However, strict season limits were in place or the season was closed so that evidence of cycles from harvest data is not available after the mid-1980s. During the decade preceding the 1984 closure, over 160 lynx were trapped despite restrictive quotas beginning in 1977. These levels of harvest do not differ substantially from previous cyclic lows considering the effects of restrictive quotas on trapper effort.

Montana has maintained lynx harvest records since 1950 (see Figure 8.5 in McKelvey *et al.* 1999b). The most conspicuous features of the data are the cyclic peaks in the 1960s and 1970s. There is no clearly evident peak in the 1950s. In the mid-1980s, in response to concerns that lynx were being overharvested when returns did not compare to those of the 1960s and 1970s, Montana set lynx trapping quotas. Over successive years, initial annual quotas were set at 135, 120, and 100, but were established without the benefit of long-term harvest data to gauge the range of cyclic highs and lows. These quotas were not filled. However, if returns in the 1950s are a better indication of average long-term harvest, it is possible that these quotas were unrealistically high. Further, despite the quotas, a small cyclic peak is evident in the early 1980s. Since 1991, the quota has been very low, two annually, and has been filled or slightly exceeded every season. The low quota likely affects trapper effort and masks any recent population cycles that could have been reflected in harvest data. Beginning with the 1999 season, all lynx trapping is closed in Montana unless another State is in need of lynx for a reintroduction, in which case five lynx can be taken and translocated to the reintroduction site.

Harvest data for Washington is available only since 1960 (Figure 8.7 in McKelvey *et al.* 1999b). Without harvest information prior to 1960, we cannot know the range of cyclic lows and highs over time in Washington. The 1960s and 1970s cyclic highs are evident in the harvest data, but the data do not clearly track a 10-year cycle. Following the 1970s peak, there were five seasons during which no lynx were harvested. As a result, low quotas were set and seasons were shortened. However, despite the low quotas and restricted seasons, harvest returns increased during the final three seasons of the 1980s and the numbers of lynx harvested were high relative to past records. The final season in 1989 was the fifth highest return ever recorded in Washington. Although the data is limited, the annual number of lynx harvested increased in the late 1980s, perhaps leading to or indicative of a cyclic high. No harvest data are available since a Statewide lynx trapping closure went into effect in 1990.

At the time that Washington, Minnesota, and Montana closed their seasons, lynx were still being trapped, which demonstrates that lynx persisted in these States. We recognize that the States did not have lynx population trend information and so relied on trapping data, deciding to take conservative measures when trapping returns decreased.

Mowat *et al.* (1999) suspected that high harvest pressure during the low phase in the lynx cycle of the mid-1980s or where trapping intensity was severe may have had more of an impact on lynx populations in the southern part of the range (southern Canada and the contiguous U.S.) than on northern lynx populations (Canada and Alaska) (Mowat *et al.* 1999). Mowat *et al.* (1999) also expected that dispersal by lynx from healthy populations will lead and has led to the repopulation of areas where overtrapping had depleted the local lynx population. Mortality of lynx through legal trapping has been virtually eliminated in the contiguous United States, except in locations where Tribal regulations permit the taking of lynx. We now believe that ongoing precautions taken by States and Provinces to restrict lynx trapping since the 1980s possibly prevented the overharvest of resident populations of lynx. However, the lack of available data (trapping or otherwise) for the past 15 years makes it difficult to discern the effect trapping restrictions may have had on resident populations.

We conclude that in the contiguous United States, lynx populations occur at naturally low densities; the rarity of lynx at the southern portion of the range compared to more northern populations is normal. The rarity of lynx is based largely on limited availability of primary prey, snowshoe hares. At southern latitudes, low snowshoe hare densities are likely a result of the naturally patchy, transitional boreal habitat. Such habitat prevents hare populations from achieving high densities similar to those in the extensive northern boreal forest (Wolff 1980; Buehler and Keith 1982; Koehler 1990; Koehler and Aubry 1994; Hodges 1999a, 1999b; McKelvey *et al.* 1999c). Comparatively low numbers of lynx in the contiguous United States occur not as a result of overtrapping, but because lynx and their prey are naturally limited by fragmented habitat, topography, and climate.

Legal trapping activities for bobcat, coyote, wolverine and other furbearers create a potential for incidental capture of lynx. The threat to resident lynx from legal trapping for other species may be limited in many areas because bobcat or coyote trapping generally occurs outside of areas where lynx would be found, although we know that incidental capture occurs (Wydeven 1998; M. DonCarlos *in litt.* 1994; R. Naney, U.S. Forest Service, pers. comm. 1999). Although we are concerned about the loss of lynx that are incidentally captured, we have no information to indicate that the loss of these individuals has negatively affected the overall ability of the contiguous United States DPS to persist. Additionally, we

believe that lynx have been incidentally trapped throughout the past, and still they persist throughout most of their historic range.

In summary, we conclude that past and present overutilization is not a factor threatening lynx.

*Factor C. Disease or Predation.*

Disease and predation are not known to be factors threatening Canada lynx.

*Factor D. Inadequacy of Existing Regulatory Mechanisms*

For the reasons discussed below, existing regulatory mechanisms do not adequately address the needs of the lynx, or reduce the threats to the species or its habitat. Within the contiguous United States range of the lynx, all States, except Oregon, provide the lynx regulatory protection by specifically prohibiting hunting and trapping for lynx. However based on pelt tags records we believe that Oregons trapping programs have not resulted in take of any lynx (Carol Carson, pers. comm. OMA, 2000). Four States classify the lynx as endangered—Vermont (1972), New Hampshire (1980), Michigan (1987), and Colorado (1976). Lynx are classified as "threatened" in Washington (1993), "sensitive" in Utah (1979), and "species of special concern" in Maine (1997), and in Wisconsin as "protected" (1997).

Five States classify lynx as small game or furbearers with closed seasons—Idaho (1997), New York (1967), Minnesota (1984), Wyoming (1973), and Montana (1999). It is legal to harvest lynx in Oregon because the lynx is not protected under Oregon State Law. However based on pelt tags records we believe that Oregons trapping programs have not resulted in take of any lynx (Carol Carson, pers. comm. OMA, 2000). The contiguous United States range of the lynx extends across tribal reservation lands and ceded territories of numerous Tribes. Lynx trapping and hunting are permitted under the regulations of some Tribes, although the Confederated Salish and Kootenai Tribes of the Flathead Nation have prohibited the trapping and taking of lynx since 1986 (M. Pablo, Confederated Salish and Kootenai Tribes Tribal Council, *in litt.* 1998). In the Great Lakes Region, lynx harvest is prohibited on off-reservation ceded lands by the Voigt Intertribal Task Force of the Great Lakes Indian Fish and Wildlife Commission and the 1854 Authority of the Bois Forte and Grand Portage Bands (J. Schlender, Voigt Intertribal Task Force of the Great Lakes Indian Fish and Wildlife Commission, *in litt.* 1998; M. Schrage, Fond du Lac

Resource Management Division, *in litt.* 1998; M. Myers and A. Edwards, 1854 Authority, *in litt.* 1999). We conclude that current hunting and trapping regulations are not threatening the continued existence of the contiguous United States DPS; however, other regulatory mechanisms, as described below, are inadequate.

Most States across the range of lynx have laws and regulations regarding environmental issues. Indirectly, these regulations may promote the conservation of lynx habitat on non-Federal lands; however, few are specific to lynx habitat conservation. Two programs in the Northeast and in Washington may provide some benefit to the species. The majority of lynx forest types in the Northeast occur on private land, ranging from small residential lots to large industrial timber company ownerships (Harper *et al.* 1990). The Northern Forest Lands Council has a charter to maintain traditional patterns of landownership and use in the Northeast; part of this effort includes a forest inventory (Northern Forest Lands Council, *in litt.* 1994). The maintenance of traditional patterns of landownership may prevent the fragmentation and/or development of lynx habitat.

In response to the Washington State Wildlife Commission listing the lynx as threatened, the Washington Forest Practices Board allowed the three primary, non-Federal land managers of Washington lynx habitat to develop "special wildlife management plans" for lynx. Upon approval by Washington Division of Fish and Wildlife, these plans were adopted in lieu of the development of forest practices rules to protect lynx habitat under the State's critical habitat designation. These three land managers had adopted and implemented lynx habitat management plans in Washington—"Lynx Habitat Management Plan for Department of Natural Resources Managed Lands" (Washington Department of Natural Resources 1996a), "North American Lynx Habitat Management Plan for Boise Cascade Corporation" (Whitwill and Roloff 1996), and a plan originally developed by Plum Creek Timber Company and adopted by Stimson Lumber Company "Salmo-Priest and Little Pend Oreille Lynx Management Plan" (Gilbert 1996; Duke Engineering and Services 1998). These plans represent efforts to improve habitat conditions for lynx in Washington, but only on State managed lands and those lands managed by the plan developers.

A substantial amount of the primary areas of lynx occurrence is on National Forest Service lands (Cascades (99

percent), Northern Rockies (67 percent), Southern Rockies (76 percent), Great Lakes (19 percent), Northeast (7 percent)) (U.S. Forest Service and Bureau of Land Management 1999). National Forest Management Act regulations (36 CFR 219.19) provide the following direction to the Forest Service—"Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species." Additionally, the lynx is classified as a sensitive species by all Forest Service regions within the contiguous United States lynx range. There is no regulatory mandate specific to sensitive species; however, the Forest Service Manual (FSM 2670.32) provides the following policy guidance for sensitive species— "avoid or minimize impacts to sensitive species; if impacts cannot be managed to maintain viable populations, a decision must not result in loss of existing native and desired non-native vertebrate species viability or create a significant trend toward Federal listing." At present, Federal land management plans do not adequately address lynx, as described below.

The LCAS was developed to provide a consistent and effective approach to conserving lynx on Federal lands in the contiguous United States (U.S. Forest Service *et al.* 1999). The overall goals of the LCAS were to recommend lynx conservation measures, provide a basis for reviewing the adequacy with regard to lynx conservation of Forest Service and BLM land and resource management plans, and facilitate conferencing and consultation under section 7 of the Act, should the lynx be listed. The LCAS identifies an inclusive list of 17 potential risk factors for lynx that may be addressed under programs, practices, and activities within the authority and jurisdiction of Federal land management agencies. For example, these risk factors include programs or practices that result in: Habitat conversion, fragmentation or obstruction to lynx movement; roads or winter recreation trails that facilitate access to historical lynx habitat by competitors; and fire exclusion, which changes the vegetation mosaic maintained by natural disturbance processes. The risks identified in the LCAS are based on effects to either individual lynx or population segments, or both. Therefore, we do not necessarily consider all of the risks identified in the LCAS to be factors threatening the contiguous United States DPS of lynx. For example, one risk factor identified for the Southern Rockies Region is accidental death to

**Federal Register**/Vol. 65, No. 58/Friday, March 24, 2000/Rules and Regulations **16079**

individual lynx from being hit by a vehicle while crossing roads. While this may result in incidental take of lynx, it is not considered to be a significant threat to the contiguous United States DPS.

The DBA determined that Federal land management plans are likely to adversely affect the lynx (U.S. Forest Service and Bureau of Land Management 1999). The DBA identified potential effects resulting from 57 Forest Service Land and Resource Management Plans (Plans) and 56 BLM Land Use Plans (Plans) within the 16-State area where lynx were proposed for listing. The direction found in the Plans was compared to direction proposed in the LCAS. If it were determined that a Plan may adversely affect either an individual lynx or a population segment through failure to meet any one of the programmatic conservation measures in the LCAS (U.S. Forest Service et al. 1999), then the Plan was deemed overall as likely to adversely affect lynx (U.S. Forest Service and Bureau of Land Management 1999). In other words, a risk was deemed harmful to lynx if the possibility of any adverse effect existed due to Plan direction or if the Plans did not address lynx conservation issues.

The Federal agencies chose a conservative approach in determining whether Plans might result in adverse effects to lynx. The determination was based only on what the Plans directed or allowed, not on a quantitative assessment of the effects to lynx from actual actions as a result of past or current implementation of the Plans. We acknowledge that many activities allowed by Plans, such as timber harvest and road construction, are never carried out for a variety of reasons, such as funding limitations and environmental, wildlife or policy considerations (U.S. Forest Service and Bureau of Land Management 1999).

The DBA identifies 15 criteria that contribute to some level of adverse effects to either an individual lynx or a population segment through failure to meet any one of the programmatic conservation measures in the LCAS. These criteria included, but are not limited to, precommercial thinning, fire management, landscape patterns, winter recreation, and monitoring. Individually, these criteria may not impart substantial impacts on the DPS, however, current Plans do allow actions that cumulatively could result in significant detrimental effects to the DPS. We cannot predict the future levels of impacts to lynx that would result from continued implementation of current Plans. However, the DBA concludes that there is reasonable

potential for adverse effects to lynx as a result of actions directed or allowed by existing Plans. Because the Forest Service and BLM manage a substantial amount of lynx forest types in the contiguous United States, particularly in the West, it is imperative that lynx habitat and habitat for lynx prey be maintained and conserved on Federal lands. Though a large percentage of these lands are in nondevelopmental status, a large proportion remain subject to management under multiple use mandates. Until Plans adequately address risks such as those identified in the LCAS, we conclude that the lack of Plan guidance for conservation of lynx, and the potential for Plans to allow or direct actions that adversely affect lynx (as evidenced by the assessment in the DBA), is a significant threat to the contiguous United States DPS of the lynx. On February 4, 1977, the lynx was included in Appendix II of the CITES. The CITES is an international treaty established to prevent international trade that may be detrimental to the survival of plants and animals. A CITES export permit must be issued by the exporting country before an Appendix II species may be shipped. The CITES permits may not be issued if the export will be detrimental to the survival of the species or if the specimens were not legally acquired; however, CITES does not itself regulate take or domestic trade and therefore does not contribute to protection of the lynx in the United States.

*Factor E. Other Natural or Manmade Factors Affecting Its Continued Existence*

Based on mapping of lynx forest types for the contiguous United States (McKelvey et al. 1999b), we know that the southern boreal forests that support lynx and hares in the contiguous United States are naturally fragmented and disjunct compared with the northern boreal forests in Canada and Alaska (see "Background" section). Connectivity of appropriate habitat types and cover provide travel corridors between habitat patches, thereby increasing the likelihood of successful lynx dispersal. However, we know that lynx can traverse a variety of habitat types and obstacles, including rivers, nonforested habitats, and various types of roads, based on records of lynx occurrences in habitats and locations far from their traditional range and forest habitat types, such as Nebraska, Nevada, Iowa, and South Dakota (Aubry et al. 1999; McKelvey et al. 1999b; Ruggiero et al. 1999b).

For most areas of the contiguous United States, we have no evidence that

human-caused factors have significantly reduced the ability of lynx to disperse or have resulted in the loss of genetic interchange. No information is currently available to identify whether any genetic concerns exist for lynx in the contiguous United States.

In western regions of lynx range, naturally fragmented patches of lynx habitat, typically occurring along mountain ranges, are often connected by a variety of intervening habitats, including shrub steppe, grassland, low-elevation forested or unforested valleys, and in some cases, desert. This natural fragmentation becomes more pronounced in the more southern extremes of lynx range. We have little information to compare these intervening landscapes to the historical condition, nor do we fully understand the environmental or physiological requirements of lynx as they attempt to disperse across them. We do know that much of the intervening landscapes between patches of lynx forest types in the Northern Rockies/Cascades is either used for agriculture or is Federal land; human population centers and other large human developments are limited across the western range of lynx.

In the Northeast, development along the St. Lawrence seaway and ice breaking for winter navigation may reduce the ability of lynx to move between northern Quebec and the area south of the St. Lawrence that includes southern Quebec, New Brunswick, Nova Scotia, and the northeastern United States (R. Lafond, pers. comm. 1999). Historically, lynx populations in the Northeast were periodically supplemented with transient or dispersing individuals from northern Quebec (Litvaitis et al. 1991). South of the St. Lawrence, movement is still possible between southeastern Quebec, western New Brunswick, Maine and New Hampshire, because the habitat is contiguous along the Appalachian Mountains and there are no natural or human-caused barriers to dispersal.

In the Great Lakes Region, winter navigation on the St. Mary's River between Ontario and Michigan's Upper Peninsula may reduce the ability of lynx to migrate across the St. Mary's shipping channel from Ontario to Michigan (Robinson and Fuller 1980).

Lynx movements may be negatively influenced by high traffic volume on roads that bisect suitable lynx habitat. In southern British Columbia, lynx movements and selection of home ranges appear to be influenced by highways (Apps 1999). Apps (1999) surmised that highway influence on lynx varies according to local habitat conditions, roadway width, traffic

volume, and possibly gender and reproductive status of individual lynx. Given the distances and locations where known lynx within the southern boreal forest have moved, we know that lynx successfully cross many types of roads, including unpaved forest roads, secondary paved roads, State and interstate highways (Mech 1980; Smith 1984; Brainerd 1985; Aubry et al. 1999; Squires and Laurion 1999). We suspect that highways with high volumes of traffic and associated suburban developments inhibit lynx home range movement and dispersal, and may contribute to loss of habitat connectivity. Such highways occur in the Southern Rockies Region connecting cities, towns, and ski areas, and also in the Northern Rockies/Cascade Region through the Cascade Range along the Columbia River. However, no information currently exists to determine the level at which traffic volume or roadway design may influence lynx movements or create an impediment to movement.

Although we assume that high-volume, high-speed traffic presents a barrier to dispersal, roads do not appear to be a significant direct cause of lynx mortality (Staples 1995; Ruggiero et al. 1999b). Few records exist of native lynx being killed by vehicles (Wydeven 1998; M. DonCarlos, in litt. 1994). None of the animals tracked by radiotelemetry in various studies throughout the contiguous United States were killed in vehicle accidents (Aubry et al. 1999). The majority of records of lynx mortalities from vehicle accidents are of recently translocated animals, who generally move large distances before settling (Brocke et al. 1991; Brocke et al. 1993; G. Byrne, Colorado Division of Wildlife, pers. comm. 1999). The high incidence of translocated lynx killed by cars is likely not typical of resident lynx populations in southern boreal forests (Aubry et al. 1999).

At the time of the proposed rule, we thought that the existence, density, and human use of unpaved forest roads also negatively impacted resident lynx populations by causing displacement or avoidance by lynx and degradation of lynx habitat. Evidence now available indicates that lynx tolerate some level of human disturbance (Staples 1995; Aubry et al. 1999; Bailey and Staples 1999; Mowat et al. 1999). No evidence exists that human presence displaces lynx. Although information regarding indirect effects of roads on lynx populations is lacking, recent analyses on the Okanogan National Forest in Washington indicate that lynx show no preference or avoidance of forest roads, and that road density does not appear to

affect lynx habitat selection (McKelvey et al. 1999c). Lynx have been documented using some types of roads for hunting and travel (Parker 1981; Koehler and Brittell 1990; Koehler and Aubry 1994). We find no information demonstrating that forest roads negatively impact resident lynx populations.

In the proposed rule, we stated that increasing ease of human access into forests increased the vulnerability of lynx to intentional or unintentional shooting and trapping (Todd 1985; McKay 1991; Washington Department of Wildlife 1993; Koehler and Aubry 1994). We know that lynx are taken during legal trapping and hunting for other species, such as wolverine and bobcat, even when lynx seasons are closed (McKay 1991; Staples 1995; Wydeven 1998; M. DonCarlos in litt. 1994; R. Naney, pers. comm. 1999 ). We do not know how many lynx may be purposefully poached, but are concerned about radio-collared lynx that have been killed but not reported (G. Byrne, pers. comm. 1999; M. Amaral, pers. comm. 1999). No reliable recordkeeping exists to determine how frequently such taking occurs, nor if it has increased because of the increasing accessibility of forests. Further, lynx were likely captured incidentally in the past during regulated and unregulated trapping for other predators, and still they have persisted throughout much of their historic range. We are concerned about the loss of lynx through legal or illegal trapping and shooting; however, we have no information to indicate that the loss of these individuals is negatively affecting the overall ability of the contiguous United States DPS to persist (see "Factor B" of this section).

In the proposed rule, we considered displacement or elimination of lynx when competitors (e.g., bobcat, coyote) expand into lynx range (de Vos and Matel 1952; Parker et al. 1983; Quinn and Parker 1987) to be a significant threat to the contiguous United States DPS of lynx. At this time, there are no data on competition between lynx and other species; therefore, we have only information on behavior of possible competitors from which to gain some inferences about the possibility of competition and its impact on lynx.

Coyote, bobcat, and mountain lion are hypothesized to be potential lynx competitors (Brocke 1982; McCord and Cardoza 1982; Parker et al. 1983; Quinn and Parker 1987; Aubry et al. 1999; Buskirk et al. 1999a; Ruggiero et al. 1999b). In the Northeast and Great Lakes regions of the contiguous United States range of the lynx, bobcat and coyote ranges generally overlap with lynx. In

the Northern Rockies/Cascades and Southern Rockies lynx generally overlap with bobcat, coyote and mountain lion. Lynx are highly evolved for hunting in deep snow: they have a morphological advantage because they are able to walk on snow rather than sink into it as do species with higher foot loads, such as the coyote, bobcat, or mountain lion (Murray and Boutin 1991; Buskirk et al. 1999a). Traditionally, where these species' ranges overlap with that of lynx, snow conditions exclude them from the winter habitats occupied by lynx (McCord and Cardoza 1982; Parker et al. 1983; Quinn and Parker 1987; Buskirk et al. 1999a).

However, today competition may be facilitated through human alteration of forests, creating habitats that may be more suitable to potential lynx competitors (McCord and Cardoza 1982; Quinn and Parker 1987; Buskirk et al. 1999a). The range of the coyote has significantly expanded, snowshoe hares are important prey for both coyotes and bobcats, mountain lion numbers appear to have increased, mountain lions have killed lynx, and snowtrails packed by humans facilitate the movement of potential lynx competitors into the deep snow habitats of the lynx.

Researchers believe the coyote's original range prior to European settlement was the North American Great Plains but over the past century its range has substantially expanded in all directions (Nowak 1979; 1999; Parker 1995). Nearly the entire North American range of the lynx now overlaps with that of the coyote. Coyotes expanded into the far western States in the mid to late 1800s, the western Great Lakes states in the early 1900s, and the Northeast by the 1950s (Nowak 1979, 1999; Parker 1995). Coyotes are generalist predators, feeding on rabbits and hares, rodents, deer, and plants (Parker 1995). In northern latitudes, particularly in winter, where the diversity of food items is limited, snowshoe hares are a primary food item for coyotes (Parker 1995; Staples 1995); the concern regarding competition with lynx stems primarily from diet overlap.

Extirpation of the wolf (Canis lupus) is one factor believed to have enabled the coyote to extend its range (Parker 1995). As wolf populations expand in the Northern Rockies Region in Montana, Idaho, and Wyoming, and the Great Lakes Region in Minnesota, Wisconsin, and Michigan, we expect coyote populations may be reduced (Crabtree and Sheldon 1999). An indirect result may be a reduction in the potential for coyotes to affect lynx in areas of overlap between lynx and wolves.

Rvsd Plan - 00003641

The range of the bobcat overlaps the lynx range within the contiguous United States and southern Canada. Like the coyote, the bobcat is a generalist predator that feeds on a wide variety of prey, including snowshoe hares (McCord and Cardoza 1982; Koehler and Hornocker 1991). Although lynx in the southern boreal forests evolved with bobcats, competition between these species is suspected because of their similar size and appearance (Buskirk et al. 1999a). Bobcats remain restricted to areas with low snow depths (Koehler and Hornocker 1991; Buskirk et al. 1999a). Parker et al. (1983) speculated that bobcats displaced lynx from all areas on Cape Breton Island, Nova Scotia, except high elevations, where snow accumulation limited the bobcat's range. We have no evidence that competition with bobcats has negatively affected the contiguous United States DPS.

Buskirk et al. (1999a) advanced the theory that mountain lions compete with lynx, based on a few records of mountain lions killing lynx and presumed increasing mountain lion populations. Interactions between lynx and lions would most likely occur during snowfree seasons because lions generally do not occupy the same winter habitats as lynx (H. Quigley, Hornocker Wildlife Institute, pers. comm. 1999). It is generally accepted that mountain lion numbers in the West have increased, therefore the rate of encounters between lynx and mountain lions has probably increased (H. Quigley, pers. comm. 1999). Deer (Odocoileus spp.) are the primary prey of mountain lions (Dixon 1982) and are an important food item for coyotes (Parker 1995) and bobcats (McCord and Cardoza 1982; Koehler and Hornocker 1991). In Idaho, mountain lion kills were frequently visited by bobcats and coyotes (Koehler and Hornocker 1991). Lions kill coyotes and bobcats, often in defense of food caches (Boyd and O'Gara 1985; Koehler and Hornocker 1991). Lynx occasionally feed on ungulates or scavenge from carcasses (Brand et al. 1976); we expect interactions between mountain lions and lynx would most likely occur in defense of food caches, as with coyotes and bobcats. Despite numerous mountain lion studies within the western range of the lynx, incidents of lions killing lynx are extremely rare (H. Quigley, pers. comm. 1999). No evidence exists that mountain lions exert a population-level impact on lynx.

Historically, interactions between lynx and potential competitors were limited in winter because most competitors cannot effectively move through the deep snow habitats of the lynx (Buskirk et al. 1999a). Now, ski and snowmobile trails and roads that are maintained for winter recreation and forest management create packed snow corridors that give other species access to lynx winter habitat (Koehler and Aubry 1994; U.S. Forest Service et al. 1999), although significant amounts of habitat remain relatively undisturbed by humans in the interior of large blocks of lynx forest types on Federal lands in the West, especially in designated wilderness and National Parks (U.S. Forest Service and Bureau of Land Management 1999). It appears that bobcats remain restricted to areas with low snow depths (Koehler and Hornock 1991; Buskirk et al. 1999a), and that lynx and lion winter habitats typically do not overlap (H. Quigley, pers. comm. 1999).

Coyotes use packed snowtrails and now occupy the winter habitats of lynx (Murray and Boutin 1991; Murray et al. 1994; Staples 1995; O'Donoghue et al. 1997, 1998a, 1998b) and, therefore, are a concern as a potential lynx competitor in winter. Studies of lynx, coyotes, and hares from the Yukon Territory and Alaska provide some information with which to consider potential for competition between lynx and coyote in winter (Murray and Boutin 1991; Murray et al. 1994; Staples 1995; O'Donoghue et al. 1997, 1998a, 1998b). Coyotes adapted their behavioral patterns for hunting in snow by selecting snow that was shallower and harder; whereas lynx successfully hunted in all habitats where hares were found (Murray and Boutin 1991; Murray et al. 1994; O'Donoghue et al. 1998a). Coyotes and lynx both preferred snowshoe hares over alternate prey during all phases of the hare cycle (O'Donoghue et al. 1998a). During the snowshoe hare decline, lynx switched to hunting red squirrels, whereas coyotes switched to hunting voles (O'Donoghue et al. 1998b). In Alaska, Staples (1995) believes that the 42 percent dietary overlap between lynx and coyote observed during a cyclic low in the hare cycle indicated the potential for competition; however, we are not aware of research or other evidence indicating that coyote competition has negatively affected the lynx populations in Canada. In fact, we expect that the variability of snow conditions and frequency of fresh snows in the winter habitats that support lynx continually reduce or alter the availability of snowtrails and shallow snow depths used by coyotes in lynx habitat, making it more difficult for coyotes to effectively hunt in these areas regularly during the winter. No evidence exists

indicating that coyote competition has negatively affected the contiguous United States lynx DPS (Aubry et al. 1999).

Little is known about lynx habits in snow-free seasons. A greater diversity of prey and habitats available during this time may reduce the negative effects of competition. Furthermore, because lynx have co-evolved with bobcats and mountain lions, and in most areas have coexisted with coyotes for many decades, we suspect some level of segregation of habitat and prey among these species. In summer in Idaho, coyotes, bobcats, and mountain lions used different topographic and habitat features, allowing habitat and prey resources to be partitioned among these species; coyotes used lower elevations than bobcats who used lower elevations than lions (Koehler and Hornocker 1991). All of the elevations used in this study were within the range recorded for lynx occurrences in the West (McKelvey et al. 1999b); however, the data for lynx were not recorded by season. We suspect these data are more representative of elevations lynx use in winter rather than snow-free seasons because much of the lynx data are from trapping records, an activity that occurs during winter.

In summary, we conclude lynx movements may be negatively influenced by high traffic volume on roads that bisect suitable lynx habitat, such as in the Southern Rockies and in some parts of the Northern Rockies/ Cascades Region. We suspect that highways with high volumes of traffic and associated suburban developments inhibit dispersal and movements within home ranges, and may contribute to loss of habitat connectivity. However, roads do not appear to be a significant direct cause of lynx mortality. We find no information demonstrating that forest roads negatively impact resident lynx populations. Packed snowtrails facilitate the movement of coyotes into formerly inaccessible deep snow habitats occupied by lynx; however, we have no evidence that competition with coyotes, mountain lions or bobcats is negatively affecting lynx at a population-level scale.

**Finding**

We conclude that, in the contiguous United States, lynx populations occur at naturally low densities and that the rarity of lynx at the southern portion of their range compared to more northern populations is normal. This rarity is based largely on low densities of snowshoe hares, their primary prey. Low snowshoe hare densities are likely a result of naturally patchy, transitional

boreal habitat at southern latitudes that prevents hare populations from achieving densities similar to those in the extensive northern boreal forest of Canada. Low numbers of lynx reflected in harvest data for the contiguous United States are not a result of overtrapping, but of naturally limiting fragmentation, topography, and climate. Lynx in the contiguous United States are the southernmost extension of a larger metapopulation whose core is in central Canada.

We conclude the single factor threatening the contiguous U.S. DPS of lynx is the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx in National Forest Land and Resource Plans and BLM Land Use Plans as described in Factor D. Until Plans adequately address risks such as those identified in the LCAS, and described generally in Factors A, B and E, we conclude that the lack of Plan guidance for conservation of lynx, as evidenced by the fact that Plans allow or direct actions that cumulatively adversely affect lynx (as indicated by the assessment in the DBA), is a significant threat to the contiguous U.S. DPS of lynx. Therefore, we find that listing the lynx in the contiguous United States as threatened is necessary.

We conclude that Federal land management assumes the largest single role in the conservation of lynx in the contiguous United States because of the preponderance of lynx forest types on Forest Service, BLM, and National Park Service lands, particularly in the western United States. A substantial amount of lynx forest types occur on Forest Service and BLM lands (Northern Rockies-72 percent, Cascades-99 percent, Southern Rockies-82 percent, Great Lakes-19 percent, Northeast-7 percent). We believe that the large amount of lynx forest types properly managed in nondevelopmental allocations, especially in designated wilderness areas, and amendments to existing land use plans, such that management of lynx forest types in developmental areas does not conflict with lynx conservation, will be a substantial benefit to lynx in the Northern Rockies/Cascades and Southern Rockies and will contribute significantly to the likelihood of conserving lynx into the future within the contiguous United States.

It is imperative that snowshoe hare and alternate prey populations be supported by appropriate habitat management on Federal lands into the future to ensure the conservation of lynx in the contiguous United States. Substantive declines in prey species,

especially snowshoe hare, may result in a prey base insufficient to support lynx persistence.

Factors affecting lynx status vary among regions of the contiguous United States. The Northern Rockies/Cascades Region supports the largest amount of lynx habitat and has the strongest evidence of resident lynx populations, both historically and currently. This region has strong habitat connections to lynx populations in Canada, as well as large proportions of lynx habitat in wilderness and other areas with limited human influence. The Northern Rockies/Cascades Region has the highest potential to maintain a viable lynx population within the contiguous United States. Available evidence suggests that lynx populations within this region fluctuate, and we have no information suggesting a declining population trend. The primary factor affecting lynx in this region is the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx in Federal land management plans.

In the Southern Rockies Region, lynx habitat is naturally limited and highly fragmented, which leads us to conclude that lynx were rare historically. We conclude native lynx may now be extirpated from this region. The factors affecting lynx in this region are the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx in Federal land management plans, and loss of habitat connectivity resulting from high-use highways and associated suburban development.

The historic and current status of lynx in the Great Lakes Region is uncertain. We lack information to determine whether lynx in this region are simply dispersing from Canada, are members of a resident population, or are a combination of a resident population and dispersing individuals. Much of this region contains marginal habitat that may not sustain resident lynx populations. The factors affecting lynx in this region include the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx in Federal land management plans, and timber harvest and fire suppression on non-Federal lands.

In the Northeast, lynx reproduction and individual animals have recently been documented in Maine. Recent lynx harvests were substantial in adjacent southeastern Quebec. Therefore, we conclude that a resident population of lynx continues to exist in the core of the region; however, the range may have retracted northward. The main factor

affecting lynx forest types in this region is timber harvest on non-Federal lands, although the extent of influence of current forest practices on lynx is not known.

Within the contiguous United States, the relative importance of each region to the persistence of the DPS varies. The Northern Rockies/Cascades Region supports the largest amount of lynx habitat and has the strongest evidence of persistent occurrence of resident lynx populations, both historically and currently. In the Northeast (where resident lynx populations continue to persist) and Southern Rockies regions, the amount of lynx habitat is naturally limited and does not contribute substantially to the persistence of the contiguous United States DPS. Much of the habitat in the Great Lakes Region is naturally marginal and may not support prey densities sufficient to sustain lynx populations. As such, the Great Lakes Region does not contribute substantially to the persistence of the contiguous United States DPS. Collectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS. We conclude the Northern Rockies/Cascades Region is the primary region necessary to support the continued long-term existence of the contiguous United States DPS. However, the role that each region plays in the long-term conservation of the species will be explored further in recovery planning for the species.

**Critical Habitat**

Critical habitat is defined in section 3(5)(a) of the Act as—(i) the specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) that may require special management considerations or protection and; (ii) specific areas outside the geographical area occupied by a species at the time it is listed, upon a determination that such areas are essential for the conservation of the species. The term "conservation" as defined in section 3(3) of the Act means "to use and the use of all methods and procedures necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," that is, the species is recovered and can be removed from the list of endangered and threatened species.

Section 4(a)(3) of the Act, as amended, and implementing regulations (50 CFR 424.12) require that, to the

maximum extent prudent and determinable, the Secretary designate critical habitat at the time the species is determined to be endangered or threatened. Our regulations (50 CFR 424.12(a)) state that critical habitat is not determinable if information sufficient to perform required analysis of impacts of the designation is lacking or if the biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat. Section 4(b)(2) of the Act requires us to consider economic and other relevant impacts of designating a particular area as critical habitat on the basis of the best scientific data available. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the conservation benefits, unless to do so would result in the extinction of the species.

In the proposed rule, we indicated that designation of critical habitat was not prudent for the Canada lynx because it could increase the vulnerability of lynx to poaching, because the species and its habitat are continually shifting spatially and temporally across the landscape making static designation of specific areas of little benefit to the species, and because designation of broad geographic areas would necessarily include many areas of unsuitable habitat that would not be used by and would not be critical to the species. We also indicated that designation of critical habitat was not prudent because we believed it would not provide any additional benefit beyond that provided through listing as threatened.

In the last few years, a series of court decisions have overturned Service determinations regarding a variety of species that designation of critical habitat would not be prudent. Based on the standards applied in those judicial opinions, we have reexamined the question of whether critical habitat for Canada lynx would be prudent.

The primary regulatory effect of critical habitat is the section 7 requirement that Federal agencies refrain from taking any action that destroys or adversely modifies critical habitat. While a critical habitat designation for habitat currently occupied by this species would not be likely to change the section 7 consultation outcome because an action that destroys or adversely modifies such critical habitat also would be likely to adversely affect the species, there may be instances where section 7 consultation would be triggered only if critical habitat is designated. Examples could include unoccupied habitat or

occupied habitat that may become unoccupied in the future. There also may be some educational or informational benefits to designating critical habitat. Therefore, we find that critical habitat is prudent for Canada lynx.

As explained in detail in our Final Listing Priority Guidance for Fiscal Year 2000 (64 FR 57114), our listing budget is currently insufficient to allow us to immediately complete all of the listing actions required by the Act. Deferral of the critical habitat designation for Canada lynx allows us to concentrate our limited resources on higher priority critical habitat (including court ordered designations) and other listing actions, while allowing us to put in place protections needed for the conservation of Canada lynx without further delay. However, because we have successfully reduced, although not eliminated, the backlog of other listing actions, we anticipate in FY 2000 and beyond giving higher priority to critical habitat designation, including designations deferred pursuant to the Listing Priority Guidance, such as the designation for this species, than we have in recent fiscal years.

We plan to employ a priority system for deciding which outstanding critical habitat designations should be addressed first. We will focus our efforts on those designations that will provide the most conservation benefit, taking into consideration the efficacy of critical habitat designation in addressing the threats to the species, and the magnitude and immediacy of those threats. We will develop a proposal to designate critical habitat for the Canada lynx as soon as feasible, considering our workload priorities. Unfortunately, for the immediate future, most of Region 6's listing budget must be directed to complying with court orders and settlement agreements, as well as due and overdue final listing determinations.

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing results in public awareness and conservation actions by Federal, State, and local agencies, private organizations, and individuals. The Act provides for possible land acquisition and cooperation with the States and requires that recovery actions be carried out for all listed species. The protection required of Federal agencies and the

prohibitions against taking and harm are discussed, in part, below.

Section 7(a) of the Act requires Federal agencies to evaluate their actions with respect to any species that is proposed or listed as endangered or threatened and with respect to its critical habitat, if any is being designated. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR part 402. Section 7(a)(4) requires Federal agencies to confer with the Service on any action that is likely to jeopardize the continued existence of a species proposed for listing or result in destruction or adverse modification of proposed critical habitat. If a species is listed subsequently, section 7(a)(2) requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of the species or destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into formal consultation with us.

The Forest Service and the Fish and Wildlife Service recently signed a Lynx Conservation Agreement (Feb 2000) to promote the conservation of lynx and lynx habitat on Federal lands managed by the Forest Service. It identifies actions the signatories agree to take to reduce or eliminate adverse affects or risks to lynx and lynx habitat. Implementation of these actions within this agreement will provide immediate benefits to lynx.

Section 9 of the Act and implementing regulations set forth a series of general prohibitions and exceptions that apply to all endangered or threatened wildlife. The prohibitions, codified at 50 CFR 17.21 and 17.31, in part, make it illegal for any person subject to the jurisdiction of the United States to take (includes harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt any of these), import or export, ship in interstate commerce in the course of commercial activity, or sell or offer for sale in interstate or foreign commerce any listed species. It also is illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Certain exceptions apply to agents of the Service and State conservation agencies.

Permits may be issued to carry out otherwise prohibited activities involving endangered or threatened wildlife under certain circumstances. Regulations governing permits are codified at 50 CFR 17.22, 17.23, and 17.32. Such permits are available for scientific purposes, to enhance the

**16084**   **Federal Register** / Vol. 65, No. 58 / Friday, March 24, 2000 / Rules and Regulations

propagation or survival of the species, and/or for incidental take in the course of otherwise lawful activities. For threatened species, permits also are available for zoological exhibition, educational purposes, or special purposes consistent with the purposes of the Act.

It is our policy, as published in the **Federal Register** on July 1, 1994, to identify to the maximum extent practicable at the time a species is listed those activities that would or would not constitute a violation of section 9 of the Act (59 FR 34272). The intent of this policy is to increase public awareness of the effect of this listing on proposed and ongoing activities within the species' range. For the contiguous United States population of wild lynx, we believe the following actions would not likely result in a violation of section 9 of the Act:

(1) Actions that may result in take of wild lynx in the contiguous United States that are authorized, funded, or carried out by a Federal agency when the action is conducted in accordance with an incidental take statement issued by us pursuant to section 7 of the Act;

(2) Actions that may result in take of wild lynx in the contiguous United States when the action is conducted in accordance with a permit issued under 50 CFR 17.32 or special rule issued under section 4(d) of the Act. These activities include take for educational purposes, scientific purposes, the enhancement of propagation or survival, zoological exhibition, and other conservation purposes consistent with the Act.

For the contiguous United States population of captive lynx, we believe the following actions would not likely result in a violation of section 9 of the Act:

(1) Take, transport, possess, sell, deliver, and receive of captive lynx and export of captive lynx or their pelts under valid CITES export permits.

For the contiguous United States population of wild lynx, the following actions likely would be considered a violation of section 9 of the Act:

(1) Take of wild lynx (including both purposeful and incidental)

(2) Possessing, selling, delivering, carrying, transporting, or shipping illegally taken lynx;

(3) Export of lynx or lynx parts or products (including pelts) without a permit under section 17.32 (a CITES permit would also be required in order to be in compliance with CITES);

(4) Significant lynx habitat modification or degradation to the point that it results in death or injury by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

For the contiguous United States population of captive lynx, the following would likely constitute a violation of section 9 of the Act:

(1) export of any lynx part or products other than a properly tagged pelt or permitted parts or products;

For lynx that occur outside of the contiguous United States (Alaska and Canada), the Endangered Species Act listing and companion 4(d) have no effect. Lynx in those areas, as well as in the contiguous United States, remain covered by the designation of Appendix II under CITES. Therefore, the import of lynx into the United States and the transportation of lynx from Alaska to the contiguous United States may continue under current procedures established by State law and CITES.

Requests for copies of the regulations regarding listed wildlife and inquiries about prohibitions and permits may be addressed to United States Fish and Wildlife Service, P.O. Box 25486, Denver Federal Center, Denver, Colorado 80225.

**Special Rule**

Section 4(d) also states that the Service may, by regulation, extend to threatened species, prohibitions provided for endangered species under section 9. Our implementing regulations for threatened wildlife (50 CFR 17.31) incorporate the section 9 prohibitions for endangered wildlife, except when a special rule is promulgated pursuant to section 4(d) applies (50 CFR 17.31(c)).

This special rule applies the general take prohibitions for threatened wildlife to the wild population of Canada lynx in the contiguous United States. It also provides for the continuation of the take and export of captive lynx and their pelts under Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) export permits and provides for the transportation of lynx pelts in commerce within the United States. The export of properly tagged (with valid CITES export tag) pelts from lynx documented as captive is not prohibited under the special rule. Properly tagged pelts may be transported in interstate trade without permits otherwise required under 50 CFR 17.32.

CITES is an international treaty for the regulation of international trade in certain animal and plant species. The lynx was included in CITES Appendix II on February 4, 1977, as a part of the listing of all Felidae that were not already included in the appendices. A CITES export permit pursuant to 50 CFR part 23 must be issued by the exporting country before an Appendix II species may be shipped. All Felidae are included in Appendix II to enable better protection of look-alike species that were or could be threatened with extinction without strict regulation of trade. After the lynx (as well as the bobcat and river otter) were included in CITES Appendix II, we worked with the States to develop guidelines for State programs that would provide the information needed to satisfy CITES export requirements. Under the State CITES export programs, all pelts to be exported are required to be tagged with a permanently attached, serially numbered tag that identifies the species, State of origin, and season of taking. The tags are provided to the States and Tribes by the Service. In the past the States that have been approved for export of captive or wild lynx are Alaska, Idaho, Minnesota, Montana, and Washington. In the last few years Idaho, Minnesota and Washington have had zero quotas or closed seasons, and Montana has had a quota of two to three wild lynx trapped per year. Due to the listing all of the States in the contiguous U.S. will no longer be approved for export of wild lynx; Lynx in Alaska are not encompassed by this listing; all existing CITES requirements remain the same for lynx originating in Alaska.

Currently facilities in Idaho, Minnesota, Montana, North Dakota, and Utah raise captive lynx for commercial purposes. At least some of the farms report that their initial stock was obtained from Canada. From 1992 through 1997, Minnesota and Montana reported that a total of 169 lynx pelts were tagged for export under the CITES program and these primarily originated from farmed animals. These captive-bred specimens have neither a positive nor negative effect on the species in the wild.

Current prices for lynx pelts are low so there is little present incentive to trap wild lynx. However, an increase in pelt prices could create a strong incentive to trap wild lynx and export their pelts. Lynx are easy to trap, and the illegal take of lynx would present an enforcement and inspection problem for Service personnel. Since they look the same, captive lynx pelts cannot be effectively differentiated from wild lynx pelts by Service law enforcement and inspection personnel without proper tagging.

This final rule would allow the export from the United States of live captive lynx or their pelts if the pelt is tagged with a CITES export tag and accompanied by a valid CITES export permit. The import of lawfully obtained live lynx or their parts or products

would continue to require the necessary CITES export permits from the exporting country, but no additional permits under 50 CFR 17.32 would be required. CITES permit requirements are found in 50 CFR part 23.

In summary, CITES permits will be required for the export of captive lynx or their parts or products from the United States. No permits under 50 CFR 17.32 will be required for the importation of lynx or their parts or products into the United States or for interstate commerce in pelts that are properly tagged with valid CITES export tags. However, interstate commerce of untagged pelts is prohibited.

## Similarity of Appearance

In the proposed rule we proposed listing the wild population of lynx in the contiguous United States as threatened, and we proposed listing the captive population separately under the similarity of appearance provisions of the Act (section 4(e)). We proposed listing the captive population under the Similarity of Appearance provisions in order to aid law enforcement efforts to protect the wild populations. Upon further review we have determined that separate listings of the wild and captive populations are not necessary. Instead, we have revised the special 4(d) rule accompanying this listing rule to establish prohibitions for the wild and captive populations separately.

## Paperwork Reduction Act for the Listing Rule

This rule does not contain any new collections of information other than those already approved under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*, and assigned Office of Management and Budget clearance number 1018–0094. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information, unless it displays a currently valid control number. For additional information concerning permit and associated requirements for threatened wildlife, see 50 CFR 17.32.

## Required Determinations for the Listing and Special Rule

In accordance with Executive Order 12866, this document is a significant rule and has been reviewed by the Office of Management and Budget, under Executive Order 12866. We completed a Record of Compliance for the 4(d) rule, and published a notice of availability for the Record of Compliance in the **Federal Register** on July 26, 1999 (64 FR 40333). A copy can be obtained by contacting the Montana Field Office (see **ADDRESSES** section).

## National Environmental Policy Act

We have determined that Environmental Assessments and Environmental Impact Statements, as defined in the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to section 4(a) of the Act. A notice outlining our reasons for this determination was published in the **Federal Register** on October 25, 1983 (48 FR 49244).

## References Cited

A complete list of all references cited herein, as well as others, is available upon request from the Montana Field Office (see **ADDRESSES** section).

## Author(s)

The primary authors of this document are Lori Nordstrom and Anne Vandehey, Montana Field Office, Helena, Montana; and Janet Mizzi, Mountain-Prairie Regional Office, Denver, Colorado.

## List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

## Regulation Promulgation

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the U.S. Code of Federal Regulations, as set forth below:

## PART 17—[AMENDED]

1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, Stat. 3500; unless otherwise noted.

2. Section 17.11(h) is amended by adding the following, in alphabetical order under "MAMMALS," to the List of Endangered and Threatened Wildlife:

## § 17.11   Endangered and threatened wildlife.

\* \* \* \* \*

(h) \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| MAMMALS | | | | | | | |
| \* | \* | \* | \* | | \* | | \* |
| Lynx, Canada ............ | *Lynx canadensis* ....... | U.S.A. (AK, CO, ID, ME, MI, MN, MT, NH, NY, OR, UT, VT, WA, WI, WY) Canada. | CO, ID, ME, MI, MN, MT, NH, NY, OR, UT, VT, WA, WI, WY. | T | 692 | NA | 17.40 (k) |
| \* | \* | \* | \* | | \* | | \* |

3. Section 17.40 is amended by adding paragraph (k) to read as follows:

## § 17.40   Special rules—mammals

\* \* \* \* \*

(k) Canada lynx (*Lynx canadensis*).

(1) *What lynx does this special rule apply to?* The regulations in this paragraph (k) apply to all wild and captive lynx in the contiguous United States.

(2) *What activities are prohibited for wild lynx?* All prohibitions and provisions of 50 CFR 17.31 and 17.32 apply to wild lynx found in the contiguous United States.

(3) *What is considered a captive lynx*?

(i) For purposes of this paragraph (k), captive lynx means lynx, whether alive or dead, and any part or product, if the specimen was in captivity at the time of the listing, born in captivity, or lawfully imported or transported into the contiguous United States.

(ii) Lynx that were either born or held in captivity and then released into the wild are considered wild.

(4) *What activities are allowed for captive lynx?*

(i) *Take.* You may take lawfully obtained captive lynx without a permit.

(ii) *Import and export.* You may export captive live lynx, parts or products of captive lynx provided the

specimens are tagged with Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) export tags and/or accompanied by a valid CITES export permit. You may import lawfully obtained lynx that originated outside the United States when you follow the requirements of CITES.

(iii) *Interstate commerce.* You may deliver, receive, carry, transport, ship,

sell, offer to sell, purchase, or offer to purchase in interstate commerce captive lynx and captive lynx parts and products in accordance with State or tribal laws and regulations. In addition, lynx pelts that are properly tagged with valid CITES export tags also qualify for this exemption on interstate commerce.

(5) *Are any activities not allowed or restricted for captive lynx?* You must comply with all applicable State and

tribal laws and regulations. Violation of State or tribal law will also be a violation of the Act.

Dated: March 16, 2000.

**Jamie Rappaport Clark,**

*Director, Fish and Wildlife Service.*

[FR Doc. 00–7145 Filed 3–21–00; 8:45 am]

**BILLING CODE 4310–55–p**

# COLORADO PARKS & WILDLIFE

# Lynx Reintroduction

**JUNE 2014**

## Colorado's Lynx Reintroduction Success

A year before the U.S. Fish and Wildlife Service listed the lynx as a threatened species in 2000, the Colorado Division of Wildlife (now Colorado Parks and Wildlife - CPW) started reintroducing lynx to the state. Over the next seven years, CPW brought 218 lynx to Colorado and established a self-sustaining population.



### Lynx Background

Lynx, (*Lynx canadensis*), are large members of the cat family with short tails and distinctive black ear tufts that are as large as the animal's ear. Often confused with the bobcat (*Lynx rufus*), lynx have large feet and grayish coats without spots. Lynx tails are entirely black while the underside of bobcat tails is white.

Lynx are solitary by nature and inhabit dense high altitude forests or willow-rich mountain stream corridors. The huge feet enable lynx to easily traverse deep winter snowfields in search of their preferred prey - snowshoe hare (*Lepus americas*). Lynx weigh 20-to-30 pounds and have a home range of up to 20 square miles

Lynx are native to North America, historically inhabiting forests in 25 states, including Colorado. Lynx populations dropped steadily in the United States throughout the 1900s due to unregulated trapping, widespread predator poisoning and habitat loss due to logging and other development.

### History of Lynx in Colorado

Lynx were established in Colorado's high elevation forests prior to European settlement. In the early 1800s, commercial trappers sought the thick fur, which sold for premium prices in the international market. The lynx population in Colorado dropped rapidly in the late 1800s and early 1900s. Colorado's last known lynx was illegally trapped near Vail in 1974, a year after the state listed the lynx as endangered.

### Colorado's Lynx Reintroduction Program

The CPW mission includes restoring species that are native to the state. In 1982, the U.S. Fish and Wildlife Service (FWS) started work to list lynx as a threatened species and declared the lynx a protected species under the Endangered Species Act (ESA) in 2000. To be proactive, CPW started work in the mid-1990s on a lynx reintroduction program.

In 1999, CPW brought the first 41 lynx from Canada and Alaska to the San Juan Mountains in southwest Colorado, where river valleys, rugged mountains, and adequate snowshoe hares provided good habitat in the 5.2 million acre core reintroduction area. More than 200 lynx were brought to the area over several years and the reintroduction program established lynx as a self-sustaining population in Colorado.




Rvsd Plan - 00003648

### Highlights of CPW's Lynx Reintroduction Research

All 218 Alaskan and Canadian lynx released in Colorado were fitted with radio and satellite collars, allowing researchers to monitor movement patterns, survival, male and female proximity during breeding season, and female denning and births. A few highlights:

- After the initial 1999 release, four lynx died due to starvation. The next group of wild-caught lynx were held in captivity for a much longer period and released later in the year when more natural food was available. Post-release survival rates improved dramatically.
- CPW released additional wild-caught lynx between 2003 and 2006 to encourage breeding, which had not occurred prior to 2003.
- Once the second set of reintroductions began in 2003, researchers documented the first 16 kittens born to the reintroduced lynx during that year.
- Lynx reproduction varied widely from a high of 50 kittens in 2005 to no reproduction in 2007 and 2008, and back to 10 kittens in 2009 and 2010.
- In 2010, CPW declared that the reintroduction project met all benchmarks of success established prior to the start of the project. The benchmarks included high survival rates after release, successful reproduction in released animals and animals born in the wild, low mortality rates, and reproduction rates that are equal to or that exceed mortality rates over an extended period of time.



Lynx Habitat Use in Colorado (1999-2011)

Low
Medium
High

0  10  20    40    60
Miles

### Additional CPW Lynx Research

- The lessons learned from reintroducing lynx in Colorado aided conservation efforts for the critically endangered Iberian lynx in Spain and may aid in the potential reintroduction of Eurasian lynx to the Scottish Highlands.
- CPW scientists are exploring how to use state-of-the-art non-invasive techniques, such as remote camera surveillance and genetic analysis of lynx fur left in scat, to continue monitoring the status of lynx throughout Colorado.
- CPW is collaborating with the U.S. Forest Service on a project to determine the impacts of winter recreation on lynx.
- For more detailed information, visit the CPW website, www.cpw.state.co.us

### Lynx Reintroduction Funding Partners

Colorado Parks and Wildlife, Great Outdoors Colorado, the Turner Foundation, the U.S. Forest Service, Vail Associates and the Colorado Wildlife Heritage Foundation.

### Lynx Reintroduction Project Partners

U.S. Forest Service, U.S. Fish and Wildlife Service, National Park Service, Colorado State University, the Colorado Natural Heritage Program, wildlife agencies in Washington, Alaska, Montana, Maine, Minnesota, Wyoming, Utah and New Mexico, and the Canadian government and trapping associations.



Rvsd Plan - 00003649



# FEDERAL REGISTER

Vol. 79           Friday,

No. 177          September 12, 2014

Part II

## Department of the Interior

Fish and Wildlife Service

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary; Final Rule

Rvsd Plan - 00003650

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

**[Docket No. FWS–R6–ES–2013–0101; 4500030114]**

**RIN 1018–AZ77**

**Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, are finalizing two actions with this rule: We are designating revised critical habitat for the contiguous United States distinct population segment of the Canada lynx (*Lynx canadensis*) under the Endangered Species Act of 1973, as amended, and we are revising the boundary of the Canada lynx distinct population segment. These revisions fulfill our obligations under two settlement agreements and address issues raised by two courts regarding our previous critical habitat designation. This rule revises critical habitat for the lynx and extends the Endangered Species Act's protections to the species wherever it occurs in the contiguous United States, including New Mexico. The effect of this regulation is to conserve the Canada lynx and its habitats in the contiguous United States under the Endangered Species Act.

**DATES:** This rule becomes effective on October 14, 2014.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* and *http://www.fws.gov/mountain-prairie/species/mammals/lynx/index.htm*. Comments and materials we received, as well as some supporting documentation we used in preparing this final rule, are available for public inspection at *http://www.regulations.gov*. All of the comments, materials, and documentation that we considered in this rulemaking are available by appointment, during normal business hours at: U.S. Fish and Wildlife Service, Montana Ecological Services Field Office, 585 Shepard Way, Suite 1, Helena, MT 59601; telephone 406–449–5225.

The coordinates or plot points or both from which the maps are generated are included in the administrative record for this critical habitat designation and are available at *http://www.regulations.gov* at Docket No. FWS–R6–ES–2013–0101, and at the Montana Ecological Services Field Office (*http://www.fws.gov/montanafieldoffice/* (see **FOR FURTHER INFORMATION CONTACT**). Any additional tools or supporting information that we developed for this critical habitat designation will also be available at the Fish and Wildlife Service Web site and Field Office set out above, and may also be included in the preamble and at *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Jodi Bush, Field Supervisor, U.S. Fish and Wildlife Service, Montana Ecological Services Field Office, 585 Shepard Way, Suite 1, Helena, MT 59601; telephone 406–449–5225. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

*Why we need to publish a rule.* This is a final rule to revise the designation of critical habitat for the contiguous United States distinct population segment (DPS) of the Canada lynx (*Lynx canadensis*). Under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (ESA or Act), any species that is determined to be an endangered or threatened species requires critical habitat to be designated, to the maximum extent prudent and determinable. Designations and revisions of critical habitat can only be completed by issuing a rule. This rule also rescinds the existing State-boundary-based definition of the lynx DPS and replaces it with a definition that extends the Act's protections to lynx "where found" in the contiguous United States. This change ensures that lynx, which are known for their long-distance dispersal capability and tendency to occur in places well outside of typical habitats, receive the Act's protections wherever they occur in the contiguous United States, including (but not limited to) New Mexico.

On March 24, 2000, we, the U.S. Fish and Wildlife Service (Service), listed the contiguous United States DPS of the Canada lynx as threatened in 14 States (65 FR 16052). On September 26, 2013, we published in the **Federal Register** a proposed rule to rescind the State-boundary-based definition of the lynx DPS and to revise the critical habitat designation for the lynx DPS (78 FR 59430). Section 4(b)(2) of the Act states that the Secretary shall designate critical habitat on the basis of the best available scientific data after taking into consideration the economic impact, national security impact, and any other relevant impact of specifying any particular area as critical habitat.

The critical habitat areas we are designating in this rule constitute our current best assessment of the areas that meet the definition of critical habitat for lynx in the contiguous United States. Here we are designating approximately 38,954 square miles (mi$^2$) (100,891 square kilometers (km$^2$)) of critical habitat in five units in the States of Idaho, Maine, Minnesota, Montana, Washington, and Wyoming.

*This rule consists of:* (1) Replacement of the existing State-boundary-based definition of the range of the lynx DPS with a definition that extends the Act's protections to lynx "where found" in the contiguous United States, and (2) a final designation of revised critical habitat for the contiguous United States DPS of the Canada lynx.

*We have prepared an economic analysis of the designation of critical habitat.* To consider economic impacts, we have prepared an analysis of the economic impacts of the critical habitat designations and related factors. We announced the availability of the draft economic analysis (DEA) in the **Federal Register** on June 20, 2014 (79 FR 35303), allowing the public to provide comments on our analysis. In this rule, we have responded to comments we received on the economic analysis (see Summary of Comments and Recommendations section, below).

*We have prepared a National Environmental Policy Act analysis.* Because this rule designates critical habitat in States within the jurisdiction of the U.S. Court of Appeals for the Tenth Circuit, we prepared an analysis in accordance with the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*). We announced the availability of the draft environmental assessment in the **Federal Register** on June 20, 2014 (79 FR 35303), allowing the public to provide comments on our assessment. We have incorporated the comments and have completed the final environmental assessment and finding of no significant impact (FONSI) concurrently with this final determination.

*Peer review and public comment.* We sought comments from appropriate and independent specialists to ensure that our designation is based on scientifically sound data and analyses. We obtained opinions from four knowledgeable individuals with scientific expertise to review our technical assumptions, analysis, and

Rvsd Plan - 00003651

whether or not we had used the best available information. These peer reviewers generally concurred with our methods and conclusions and provided additional information, clarifications, and suggestions to improve this final rule. Information we received from peer review is incorporated in this final revised designation. We also considered all comments and information received from States, Tribes, Federal agencies, and the public during the comment periods.

**Previous Federal Actions**

For more information on previous Federal actions concerning the lynx DPS, refer to the final listing rule published in the **Federal Register** on March 24, 2000 (65 FR 16052), the clarification of findings published in the **Federal Register** on July 3, 2003 (68 FR 40076), the *Recovery Outline for the Contiguous United States DPS of Canada Lynx* (recovery outline; U.S. Fish and Wildlife Service 2005, entire), the final rule designating critical habitat for lynx published in the **Federal Register** on November 9, 2006 (71 FR 66008), the final rule designating revised critical habitat published in the **Federal Register** on February 25, 2009 (74 FR 8616), the 12-month finding on a petition to change the final listing of the DPS of the Canada lynx to include New Mexico published in the **Federal Register** on December 17, 2009 (74 FR 66937), and the proposed rule to revise the designation of critical habitat and the boundary for the lynx DPS published in the **Federal Register** on September 26, 2013 (78 FR 59430). These documents and others addressing the status and conservation of lynx in the contiguous United States may be viewed and downloaded from the Service's Web site: *http://ecos.fws.gov/ speciesProfile/profile/ speciesProfile.action?spcode=A073.*

**Summary of Comments and Recommendations**

We requested written comments from the public on the proposed designation of critical habitat for the lynx DPS during two comment periods. The first (90-day) comment period associated with the publication of the proposed rule (78 FR 59430) opened on September 26, 2013, and closed on December 26, 2013. We also requested comments on the proposed critical habitat designation and associated draft economic analysis and draft environmental assessment during a 30-day comment period that opened June 20, 2014, and closed on July 21, 2014 (79 FR 35303). We held a public hearing in Helena, Montana, on November 25,

2013. We also contacted appropriate Federal, State, Tribal, and local agencies; scientific organizations; and other interested parties and invited them to comment on the proposed rule, the economic analysis, and the draft environmental assessment during these comment periods.

During the first comment period, we received 169 comment letters directly addressing the proposed critical habitat designation (one of which also included approximately 600 identical or nearly identical one-page form letters). During the second comment period, we received 15 comment letters (one of which transmitted 1,999 identical or nearly-identical one-page form letters) addressing the proposed critical habitat designation, the draft economic analysis, and/or the draft environmental assessment. During the November 25, 2013, public hearing, two individuals or organizations made comments on the proposed designation of critical habitat for the lynx DPS. All substantive information provided during comment periods has either been incorporated directly into this final determination or addressed below. Comments received were grouped into 49 general issues specifically relating to the proposed critical habitat designation for the lynx DPS, and are addressed in the following summary and incorporated into the final rule as appropriate.

*Peer Review*

In accordance with our peer review policy published on July 1, 1994 (59 FR 34270), we solicited expert opinions from five appropriate and independent specialists with scientific expertise that included familiarity with the species, the geographic regions in which the species occurs, and conservation biology principles. We received responses from four peer reviewers.

We reviewed all comments received from the peer reviewers for substantive issues and new information regarding critical habitat for the lynx DPS. The peer reviewers generally concurred with our methods, use of available scientific information, application of biological and ecological principles, and conclusions and provided additional information, clarifications, and suggestions to improve the final critical habitat rule. Several peer reviewers noted the challenges, given information gaps and the natural vagaries of lynx and snowshoe hare (*Lepus americanus*) population dynamics and habitats, in developing criteria to delineate critical habitat. Several also suggested that other areas should be considered or included in the designation. Peer reviewer comments are addressed in the

following summary and incorporated into the final rule as appropriate.

*Peer Reviewer Comments*

(1) *Comment:* One peer reviewer suggested that the Primary Constituent Element (PCE) for lynx critical habitat should include a landscape- or home range-scale snowshoe hare density threshold rather than the "presence of snowshoe hares and their preferred habitat conditions" as defined in the proposed rule. The reviewer felt that the proposed rule lacked clarity regarding what constitutes "low" (or "high") hare densities and suggested that the Service develop working definitions of those terms to be applied at the scale of the landscape or home range.

*Our Response:* We appreciate the potential advantages of using landscape-scale hare density as a component of the PCE. However, the available literature does not allow us to determine minimum snowshoe hare densities necessary to maintain lynx populations across the range of the DPS. Additionally, thresholds of hare density needed to support lynx populations likely differ between the western, Great Lakes, and northeastern parts of the DPS range, and the core range of Canada and Alaska, because of significant differences in habitat quality, quantity, and spatial arrangement; climate; magnitude and periodicity of hare cycles; presence, diversity, and density of competing hare predators; and relative connectivity of DPS populations with the core population in Canada. In the proposed rule (78 FR 59440) and in this final rule (Critical Habitat section, below), we present information, where available (Maine and Minnesota), regarding the differences in hare densities between areas that support lynx populations and areas that do not. However, we do not believe it would be appropriate to apply these densities as thresholds elsewhere within the range of the DPS, especially because it appears that lynx populations in some areas (e.g., the Greater Yellowstone Area and the Northern Cascades) persist despite relatively lower hare densities while other areas with higher densities of hares, at least in some places in some years, do not support lynx populations (e.g., the Kettle/Wedge area of northeastern Washington). Therefore, at this time, we do not believe that a scientifically defensible definition of a minimum hare density exists at any scale or that one should be applied as a component of the PCE for lynx critical habitat across the range of the DPS.

(2) *Comment:* Two peer reviewers felt that our analysis of the potential effects of climate change on lynx emphasized

reductions in snowfall but said little about other potential changes. One reviewer suggested that we include more discussion of the potential effects of climate change on spruce-fir forest distribution and provided citations that suggest these forests, particularly in the Northeast, may be susceptible to climate change, and that spruce-fir forests could disappear from New England and much of the upper Great Lakes region due to drought, thermal stress, increased competition from other tree species, decreased regeneration success, and increased susceptibility to pathogens and other forest insects. Given the importance of regenerating spruce-fir forests to snowshoe hares and lynx, this reviewer believed that the climate-induced northward contraction of the range of spruce-fir forests is a threat to the conservation of the lynx DPS. The other peer reviewer felt the climate effects section was too narrow in scope because it did not address the effects of climate change on alternate prey and the behavioral flexibility of lynx to use alternate prey as climate change progresses.

*Our Response:* We agree that climate change is projected to cause a northward contraction of spruce-fir forests within the range of the DPS with potential negative consequences for both lynx and snowshoe hares. We have evaluated the sources provided by the reviewer and added a discussion of potential impacts of climate change on spruce-fir forests to our *Climate Change* section, below (also see our response to comment (18), below). We also agree that climate change could exert pressure on lynx to rely to a greater extent on alternate prey if it reduces future landscape-scale snowshoe hare densities. However, although alternate prey may be relatively more or less important to lynx seasonally and geographically (Aubry *et al.* 2000, p. 373), we are aware of no lynx populations that persist in areas where prey other than snowshoe hares contribute a majority of the biomass of the lynx diet. If climate change results in landscape-scale reductions in hare densities, some areas that currently support lynx populations may become less capable of doing so, and lynx could decline or disappear from these areas regardless of the diversity or abundance of alternate prey species. Such climate-induced impacts to hare habitats and populations could be accompanied by projected reductions in snow quantity, quality, and duration, thereby reducing the competitive advantage lynx have over other hare predators in the areas that currently support lynx populations.

This would further diminish the likelihood that lynx could persist in areas of reduced hare density by switching to alternate prey, and lynx populations are unlikely to persist in areas where such a switch would be necessary over the long term.

(3) *Comment:* One peer reviewer supported our proposed additions of the Van Buren and Herseytown-Staceyville areas to lynx critical habitat in Maine but disagreed with our determination that western Maine (south of the area designated in this final rule) does not contain the physical and biological features necessary to sustain lynx over time and is, therefore, not essential to lynx conservation. This reviewer (a) questioned our general characterization that spruce-fir forest is a lower percentage of the landscape in western than in northern Maine and noted that balsam fir (*Abies balsamea*) volumes are estimated to be higher in some parts of western Maine than in northern Maine areas designated as critical habitat; (b) contends that, although there currently is less high-quality habitat in western than in northern Maine, such habitats (and, therefore, hare densities) are expected to increase in western Maine over the next 25 years while concurrently decreasing in northern Maine; (c) believes that western Maine meets many if not all of the same criteria we used in determining that the Van Buren and Herseytown-Staceyville areas warrant designation as critical habitat; and (d) hypothesizes that western Maine may increase in importance to lynx conservation given the potential for higher elevations to moderate climate change effects on snow accumulation in the Northeast.

*Our Response:* The latest modeling from University of Maine School of Forestry Resources indicates that the composition of Maine's northern forest will be influenced by complicated interactions between spruce budworm outbreaks and their severity, salvage forestry related to budworm outbreaks, other trends in forest management and land ownership, and climate change (Legaard *et al.* 2013 *Unpublished Report,* entire). Some projections predict a transition to a forest of more mixed composition, and especially the expansion of balsam fir (a significant component of hare/lynx habitat) on about 18 percent of the northern Maine forest (Simons-Legaard *et al.* 2013a, p. 12). This prediction is in contrast to broad predictions that spruce and fir will decline because of climate change (Iverson *et al.* 2008, pp. 400, 404). Although a trend toward expanding balsam fir (in area and timber volume) is evident in northern Maine, the

modeling in the papers cited by the peer reviewer does not include western Maine. The same trends may occur there; however, this cannot be inferred from the cited studies.

Although spruce and balsam fir occur in western Maine, the quality of habitat they provide for hare and lynx depends on the size and distribution of the patches and the age of the stands. The information the reviewer cites from McCaskill *et al.* (2011, p. 25) indicates that the average balsam fir volume/acre is greatest in Franklin County (a western Maine county), but much lower in Oxford County next to New Hampshire. However, McCaskill *et al.* (2011) provide information on only the volume/acre and not the age, patchiness, and areal extent of spruce-fir-dominated stands. An alternative explanation for high fir volume in Franklin County is that forests are more mature in western Maine where forest management may be less intense than in northern Maine and a higher proportion of the land is in small woodlot ownership.

Maps of the balsam fir volume in McCaskill *et al.* (2011, p. 25) show a particularly high volume in the Rangeley and Flagstaff Lakes region, where stands may be more mature because land parcels in these areas are typically small and privately owned, or because large areas are in State conservation ownership. Further north, especially along the Maine-Quebec border, stands may be more mature and have higher volume because of forest management practices of Maine Tribes. Balsam fir volume/acre for Somerset and Piscataquis Counties (about 40 percent of the area designated as critical habitat) are third and fourth highest in the State, respectively. However, the only area of high balsam fir volume on the map for the core lynx critical habitat area is in Baxter State Park, where stands are mature due to protection.

Balsam fir volume/acre for Aroostook County (about 50 percent of the area designated as critical habitat) is the second highest in the State, yet no single area stands out on the map as having a particularly high volume, except a thin strip along the Route 11 corridor north of Ashland, where stands may be more mature because land parcels are small and privately owned. Thus, absent the context of areal extent, spatial arrangement, and stand age, and how they relate to hare and lynx habitat quality, we conclude balsam fir volume/acre alone may not be a good surrogate for lynx habitat and does not justify the inclusion of western Maine within this final critical habitat designation.

In the proposed rule and this final rule, we acknowledge the expected decline in hare habitat in northern Maine resulting from the shift in timber harvest practices from clearcutting to partial harvesting and the seral succession of regenerating clearcuts, which currently produce high hare densities, to more mature stands that will support fewer hares. We agree that hare densities may increase in parts of western Maine over the next several decades while they are likely to decrease in parts of northern Maine. However, we are not convinced this change will result in increases in landscape-scale hare densities in western Maine or that western Maine will become essential to the persistence and conservation of lynx populations in Maine. First, if rates of harvest were the same in western as they were in northern Maine in the 1990s and 2000s, the amount of young forest created would be expected to be similar. Second, no information is provided on the extent, size, and type of cuts in western Maine, which are important factors for predicting the quality of future habitat. Third, because partial harvesting was the predominant form of forestry in the 1990s and 2000s, the regenerating young forest would be expected to support lower landscape-scale hare densities in both regions relative to the high hare densities that resulted from the extensive clearcutting of the 1970s and 1980s. And fourth, because the conifer-dominated habitats in western Maine are believed to be patchier and less contiguous than in northern Maine, landscape-scale hare densities in western Maine would be expected to be lower and less able to support lynx populations over time.

Additionally, a study suggesting a possible southwesterly shift in lynx habitat (Simons 2009, pp. 153–163) was conducted in a 2,500-mi² (6,475-km²) area that is in the southwest corner of the designated critical habitat and that extends only as far south as Moosehead Lake. The study did not include western Maine, and the analysis has not been extended to western Maine or to more northern portions of the critical habitat area. Consequently, the study does not address whether the habitat is more fragmented and patchy in western Maine. Simons (2009, pp. 162–163) acknowledges that, although snowshoe hare habitat may shift southward, the potential for lynx densities to increase in western Maine may be constrained by extrinsic factors including higher populations of bobcat (Lynx rufus; a competitor and fisher (Martes pennanti;

a competitor and predator), and less suitable snow conditions.

We agree that, as with western Maine, survey information is inadequate to confirm lynx reproduction in the Van Buren and Herseytown-Staceyville areas where we have designated critical habitat. Although we are not using reproduction as a proxy for presence of the PCE, we believe that our analysis in the proposed rule supporting lynx occurrence in the Van Buren and Herseytown-Staceyville areas (78 FR 59456) also supports the likelihood of lynx reproduction in these areas, which is indicative of the value of the area to the conservation of the species. We also acknowledge the low probabilities of lynx occurrence predicted for both the Van Buren unit (which we have designated) and western Maine (which we have not) by the Hoving et al. (2004) model, and the higher probabilities predicted for both areas by the Hoving et al. (2005) model. However, we do not find either of these models to be definitive in predicting lynx occurrence because they are derived from lynx survey and forest conditions from 1994– 1999, and habitat conditions are constantly changing. Even the more sensitive model (Hoving et al. 2005) does not predict lynx occurrence in several areas currently known to support lynx. We also note that the Hoving et al. (2005) model predicts small, isolated pockets of fragmented, lower quality habitat in western Maine, unlike the more contiguous habitat in northwestern Maine, the Gaspe region of Quebec, and northern New Brunswick.

We agree with the reviewer that lynx occurred in western Maine historically and that lynx have found their way to areas of suitable landscape-scale hare density in western Maine (as well as New Hampshire and Vermont). However, while we recognize that lynx currently occur in western Maine, we believe this area supports lynx only in low numbers because of the patchy distribution of suitable habitat. Lynx occupancy there appears to be in small, isolated pockets of habitat, and lynx do not seem to be occupying the high-elevation spruce-fir stands in western Maine, (although these areas have been poorly surveyed). We question whether the "habitat islands" of conifer habitat at high elevations that may remain in the future will be large enough and close enough to each other to maintain lynx home ranges. Additionally, as snow quantity, quality, and duration will likely decrease due to climate change, bobcats will occur at lower elevations and could shift their home ranges to higher elevations in summer, further reducing the probability that a

lynx population could persist in western Maine.

For the reasons above, we do not agree that western Maine has the physical and biological features essential to lynx in adequate quantity or spatial arrangement to support a lynx population over time or that western Maine is essential to the conservation of the DPS. Therefore, we have not designated critical habitat for lynx in western Maine.

(4) Comment: One peer reviewer felt the Service used reasonable methods in developing the proposed critical habitat designation and that our approach was consistent with conservation biology theory addressing the dynamics of small populations supported by patchy and temporal habitats. The reviewer felt that all the information necessary to understand how we used the available data to inform our designation were contained in the proposed rule, but that it remained difficult to understand how all the information fit together in a larger way to define the distribution of the PCE and derive the proposal for critical habitat. The reviewer suggested that a challenge remains to explain the process more clearly to the public.

Our Response: We agree that it is a challenge to clearly explain the unique and complex relationships between habitat characteristics and lynx and how they influence our efforts to designate critical habitat. Our goal is to distinguish between areas that contain the physical and biological features (PBFs) essential to the conservation of the DPS in adequate quantity and spatial arrangement from other areas that may appear to contain some or all of the PBFs and in which lynx may occur occasionally but which are incapable of supporting lynx populations over time. In this rule, we explain why evidence of a landscape's ability to provide for the conservation of lynx over time is a valid and necessary biological consideration (though not the only criterion we evaluate) and why we believe it is absolutely imperative to rely on verified data and not anecdotal information when assessing the historic record of lynx occurrence and distribution (also see our response to comment (23), below). We also try to explain the limitations in our ability to accurately map lynx and hare habitats across the range of the DPS and to establish range-wide criteria for minimum hare densities; snow depth, quality, and duration; and other habitat variables, and how these limitations prevent a reasonable and accurate range-wide mapping of the individual PBFs essential to conservation of the DPS. Finally, we try to better explain how

designating areas that appear to have some or all of the PBFs in some measure would likely result in the designation of large areas that have never supported lynx other than occasional transient/ dispersing individuals and that are very unlikely to ever support lynx populations regardless of designation and management regime.

(5) *Comment:* One peer reviewer commented that, although our methods for determining lynx habitat requirements and the distribution of habitats containing the PCE were reasonably well explained, we did not provide sufficient detail regarding how we used available and limited information including geographical information system (GIS) coverages of forest and habitat types, snow depth, and topographic information. Other commenters also requested clarification regarding how we used snowfall and topographic considerations when delineating proposed critical habitat.

*Our Response:* To a great extent, the Service relied on lynx habitat data and information compiled by our partner Federal and State agencies, most of which mapped lynx habitats on their management units in accordance with information developed by the Interagency Lynx Biology Team and articulated in the Lynx Conservation Assessment and Strategy (LCAS; Ruediger *et al.* 2000, entire). This information generally consisted of maps depicting cool, moist boreal or subalpine forests that support snowshoe hares and receive deep, powdery and persistent snow across landscapes large enough to support multiple lynx home ranges. We overlaid these areas with the geographic areas occupied by lynx populations at the time of listing based on verified occurrence data. Although snow depth is thought to influence lynx distribution, other factors including snow consistency and persistence are also likely important, and we do not have enough information to support using thresholds for annual snowfall to delineate lynx critical habitat. Therefore, although snow conditions were a consideration, we did not establish or alter critical habitat boundaries based on specific thresholds for average annual snowfall, duration, or consistency. In critical habitat units 3 (Northern Rockies) and 4 (North Cascades), the majority of lynx records and the boreal forest types containing the features essential to lynx generally are found above 4,000 feet (1,219 meters). Therefore we limited critical habitat in these units to areas above this elevation, except in unit 3: (a) East of the Continental Divide, where that elevation encompasses substantial areas

of grasslands that do not contain the PBFs essential to lynx, and (b) in areas where site-specific information indicated that the PBFs occurred and other criteria were met at lower elevations.

(6) *Comment:* One peer reviewer requested that the Service better articulate why denning and matrix habitats, which are not considered limiting for lynx within the DPS at large spatial scales, are considered essential and, therefore, defined as components of the PCE.

*Our Response:* We agree that denning and matrix habitats are not limiting to lynx within the DPS; however, a feature or habitat variable need not be limiting to be considered an essential component of a species' habitat. Both denning and matrix habitats are essential components of landscapes capable of supporting lynx populations in the DPS because without them lynx could not persist in those landscapes. Both habitats fulfill essential lynx natural-history requirements by providing "space for individual and population growth and for normal behavior; sites for breeding, reproduction, and rearing (or development) of offspring; and habitats that are protected from disturbance or are representative of the historic, geographical, and ecological distribution . . ." of lynx in the contiguous United States.

(7) *Comment:* One peer reviewer felt the Service should better clarify the use of jurisdictional (e.g., National Forest) boundaries and highways to delineate critical habitat given that such anthropogenic features seldom fall along natural vegetation (habitat) boundaries.

*Our Response:* As described in our response to comment (6) above, we relied on habitat mapping and information from our partner agencies within the range of the DPS. In some cases, administrative boundaries were used because they encompassed habitats of similar type and extent within an area found to meet the criteria we developed for critical habitat. Roads and other human-made structures were used as boundaries for critical habitat where they clearly delineated areas with confirmed records of lynx and the presence of the PBFs essential to lynx.

After the lynx DPS was listed as threatened under the Act in 2000, Federal land managers mapped potential lynx habitats on their units based on criteria and recommendations developed by the Interagency Lynx Biology Team and articulated in the LCAS (Ruediger *et al.* 2000, entire). As vegetation mapping and habitat modeling have improved, some managers have initiated re-mapping of

lynx habitat to better reflect actual on-the-ground habitat conditions.

In this rule, we have used the information from these habitat mapping refinements/improvements to adjust critical habitat boundaries to better reflect actual habitat conditions. This change has resulted in reduced reliance on administrative or other anthropogenic boundaries where better methods are available (revised mapping has not occurred on all land units within the range of the DPS). In particular, we used improved lynx habitat mapping to adjust critical habitat boundaries in the Idaho Panhandle National Forest and the Flathead National Forest in Unit 3 (U.S. Forest Service 2008a, entire; 2013a, entire); and in the Custer and Gallatin National Forests, Grand Teton National Park, and Bureau of Land Management (BLM) lands in the Pinedale and Kemmerer districts in Unit 5 (U.S. Fish and Wildlife Service 2013a, entire; 2013b, entire; U.S. Forest Service 2013b, entire). In both these units, some areas previously designated or proposed for designation as critical habitat were removed and other areas not previously designated or proposed were added to lynx critical habitat. The adjusted critical habitat boundaries now follow habitat features and not administrative or other anthropogenic features in all places where we had data that allowed such refinements.

(8) *Comment:* One peer reviewer felt that the benefits of critical habitat were presented generally for listed species but not specifically stated for lynx. The reviewer requested clarity regarding (a) the benefit of critical habitat to lynx, especially in the context of consultations under section 7 of the Act; (b) the difference between designated critical habitat and lynx habitat mapped in accordance with guidance in the LCAS, and whether (and if so, why) both are needed to recover lynx in the DPS; and (c) why critical habitat and "mapped" lynx habitat commonly depict different distributions of lynx habitat.

*Our Response:* Compliance with section 4(a)(3) of the Act requires that critical habitat be designated for listed species, if prudent and determinable. Although listed species and the habitats upon which they depend are protected under provisions of the Act whether critical habitat is designated or not, a critical habitat designation identifies lands on which are found the physical and biological features essential to the conservation of the species that may require special management considerations. The identification of these essential areas is important to

guide management and provide for the recovery of the species. The general benefits of critical habitat for listed species also apply to lynx. In the Consideration of Impacts under Section 4(b)(2) of the Act section below we define these benefits for lynx.

The consultation provisions under section 7(a) of the Act constitute the regulatory benefits of critical habitat. Federal agencies must consult with the Service on discretionary actions that may affect a listed species, and in addition, analyze the effects of such actions on critical habitat. The analysis of the effects on critical habitat is a separate and different analysis from that of the effects to the species, and may provide greater regulatory benefits to the recovery of a species than listing alone. In terms of section 7 consultation, for activities with a Federal nexus in areas where lynx "may occur," but which are not designated as critical habitat, the Service's evaluation focuses on the jeopardy standard—i.e., whether a project is likely to jeopardize the continued existence of the DPS. In designated areas, we must additionally evaluate whether a project is likely to result in destruction or adverse modification of critical habitat.

The difference between critical habitat and "mapped" lynx habitat is that critical habitat has been found to contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement on the landscape to support a lynx population or subpopulation over time and, therefore, is essential to the conservation and recovery of the DPS. "Mapped" (or potential) lynx habitat is a tool for determining habitats in which lynx "may be present" (and therefore which may require consultation under section 7), regardless of whether the area is occupied by lynx or has the physical and biological features essential to its conservation. The "may be present" standard for consultation under section 7 is a lower bar than that for critical habitat designation, but it is required to address the possibility of adverse effects or take of lynx in areas not occupied by lynx populations but in which individual lynx may occasionally or intermittently occur as transients or dispersers.

Many areas of "mapped" or potential lynx habitat have no verified records of lynx occurrence, no evidence that they ever supported lynx over time, and are not essential to lynx conservation and recovery. The Service consults on Federal projects in these areas out of recognition that lynx are capable of dispersing long distances from areas that support populations and during such movements have historically occurred intermittently and temporarily in suboptimal, marginal, and unsuitable habitats that do not contain the physical and biological features essential to lynx and cannot, therefore, support lynx over time. Critical habitat is a subset of "mapped" habitat that we have determined is essential to conservation and recovery of the DPS. The remainder of mapped habitat may have some or all of the features lynx need, but not in adequate quantity and/or spatial arrangement to support lynx over time—therefore such areas are not essential to conservation and recovery of the lynx DPS.

(9) *Comment:* One peer reviewer found the structure of the proposed rule confusing because it proposed accomplishing two unrelated objectives: (a) Establishing that lynx will be protected where they occur and not based on State boundaries, and (b) revising the critical habitat designation for lynx in the contiguous United States.

*Our Response:* We have provided clarifying language in the **SUMMARY** and Executive Summary sections above.

(10) *Comment:* One peer reviewer noted that the term "persistent population" is difficult to define in the context of critical habitat and questioned whether the lynx population in Minnesota can be considered truly persistent given that lynx appeared to be absent from the State from about 1973 to 2003. The reviewer noted that the lynx population introduced to Colorado from 1999 through 2006 has persisted until the present, though its long-term persistence remains truly unknown. The reviewer suggested that the long-term persistence of lynx in Minnesota is similarly unknown, and that ". . .the distinction of population persistence between Minnesota and Colorado as articulated in the proposed rule seems arbitrary, especially since there are probably many more lynx in Colorado than Minnesota."

*Our Response:* We agree that defining "persistent" lynx populations in the contiguous United States is a challenge due to the imperfect historical record of lynx occurrence and the absence of reliable long-term monitoring data for most places. Another contributing factor is that most lynx habitat in the range of the DPS is suboptimal, patchy, and supports lower hare densities compared to the core of the lynx range in Canada and Alaska, thus creating the likelihood that there may be times, likely related to inadequate densities of snowshoe hares, when lynx may be absent or at very low numbers even in the best lynx habitat within the range of the DPS with the most compelling evidence of persistent lynx populations.

When we listed the lynx DPS as threatened in 2000, we noted that there were 76 verified records of lynx in Minnesota and 17 in Colorado as of 1999 (McKelvey *et al.* 1999a; 65 FR 16056, 16059). We noted at that time that (a) reproduction and home range maintenance documented in Minnesota in 1972 (Mech 1973, p. 152; 1980, p. 261), (b) consistent trapping records over 40 years (including during cyclic lows in lynx populations) in Minnesota and immediately adjacent habitat in Ontario that was similar and contiguous across the United States-Canada border, and (c) three verified lynx records in Minnesota in 1992–93, all provided some evidence of the existence of a resident population in Minnesota. However, we determined that the available data were insufficient to verify whether a resident lynx population existed in Minnesota historically or at the time of listing (65 FR 16056). In that rule, we also noted that "The montane and subalpine forest ecosystems in Colorado are naturally highly fragmented (Thompson 1994), which we believe limits the size of lynx populations," and that the last verified lynx record was from 1974 (no verified records from 1975 to 1999) despite large-scale snow-tracking efforts (Carney 1993, *unpublished data,* as cited by McKelvey *et al.* 2000a, p. 231). We concluded at that time that there were "few if any" native lynx in Colorado at the time of listing (65 FR 16059).

In our 2003 remanded determination of status for the lynx DPS (68 FR 40076), we noted that, in addition to the evidence (above) suggesting the potential existence of a resident lynx population in Minnesota historically and at the time of listing, there were 62 additional verified lynx records from 2000 to 2003, including 6 that provided evidence of reproduction (68 FR 40088). In that rule, we concluded that, although Minnesota may not always support lynx, ". . . northeastern Minnesota often supports a resident lynx population because there is ample boreal forest habitat directly connected with that in Ontario, there is a high number of historic lynx records, evidence of lynx reproduction and cyclically abundant snowshoe hares" (68 FR 40088). In the same rule, we reemphasized the lack of compelling evidence that Colorado ever naturally supported a persistent, resident lynx population, stating ". . .our original conclusion that the Southern Rocky Mountains supported an isolated resident lynx population may not be correct" (68 FR 40081). We also

suggested that the few verified historic records in Colorado/the Southern Rockies may represent dispersing individual lynx that arrived during extreme highs in lynx populations to the north (68 FR 40081, 40091). We concluded that, if there ever had been a resident population in Colorado, a viable resident population no longer existed there and the loss of a population (if one ever existed) would most likely have been the result of natural processes because the distance and isolation of Colorado and the Southern Rockies from source populations severely reduced, if not entirely precluded the immigration that was likely necessary for a lynx population of this region to sustain itself (68 FR 40091).

We do not find support for the statement that lynx were absent from Minnesota from 1973 through 2003. Mech (1980, entire) reported trapping 37 lynx between 1972 and 1978, including one female that showed evidence of reproduction and nursing, and he also examined the carcasses of 32 other lynx trapped in Minnesota during that time. The continued occurrence of lynx in Minnesota in the late 1970s and early 1980s was supported by State records of 161 lynx harvested in the period 1977–1983 (McKelvey et al. 2000a, p. 223). There were only three verified lynx records in Minnesota from 1984 to 1999, but lynx harvest was closed in 1984 and no surveys or research to document lynx presence, absence, or population trend occurred during this time period (65 FR 16056).

In contrast, there are no verified records of lynx in Colorado between 1937 and 1968; single records in 1969 and 1972; and two records in 1974 (McKelvey et al. 2000a, p. 231), despite the unprecedented "explosions" (irruptions) of lynx into the northern contiguous United States in the early 1960s and again in the early 1970s (McKelvey et al. 2000a, pp. 219, 242). Trapping of lynx was permitted in Colorado until 1970 and would likely have reflected the presence of lynx in the State if they had been there. After 1974, and despite large-scale snow-tracking efforts (Carney 1993, unpublished data, as cited by McKelvey et al. 2000a, p. 231), there are no verified lynx records in Colorado until 1999 (McKelvey et al. 2000a, p. 231), when the State initiated its lynx translocation effort. The 2000 LCAS concurred with McKelvey et al. (2000a, p. 231) that no lynx specimens exist for Colorado from 1974 to 1999 (Ruediger et al. 2000, p. 4–14), but suggested that other records indicate a small number of lynx may have been present during that

time (Ruediger et al. 2000, p. 4–14—4–15). However, the reports upon which Ruediger et al. based their assessment (Halfpenny and Miller 1981; Halfpenny et al. 1982; Thompson and Halfpenny 1989, 1991; Andrews 1992; Carney 1993) were also available to and considered by McKelvey et al. (2000a, pp. 230–231), and the reported lynx occurrences were found to be unverified and, therefore, anecdotal. We consider McKelvey et al. (2000a, entire) the best available information regarding the historical distribution of lynx based on verified occurrence data. We also concur with McKelvey et al. (2008, entire) regarding the imperative need to rely only on verified data when evaluating historical and current ranges of rare and elusive species like lynx. In that peer-reviewed paper, the authors provide case studies of the kinds of errors and conservation consequences that can occur if anecdotal (unverified) data are relied upon for such species. In fact, they provide as an example the potential errors that could occur if bobcats were mistakenly identified anecdotally as lynx only 1 percent of the time (McKelvey et al. 2008, pp. 553–554). Therefore, based on our assessment of the information above, we conclude that there is no reliable evidence that lynx were able to establish and maintain populations in Colorado or elsewhere in the Southern Rockies for much of the past century.

The best available information suggests that northeastern Minnesota has historically supported and currently supports a naturally resident and persistent lynx population, indicating that this area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support a lynx population over time. Therefore, it meets our definition of critical habitat. Conversely, verified evidence suggests that Colorado (as well as southern Wyoming, northeastern Utah, and northern New Mexico) did not historically support a naturally resident lynx population over time. Although this does not prove the absence (or disprove the potential presence) of the PCE from all parts of the Southern Rockies, it is one piece of evidence which suggests that these areas may not contain the physical and biological features essential to the conservation of lynx in adequate quantity and spatial arrangement to support a lynx population over time. As explained in more detail below, as well as in our response to comments (11) and (23), and in the "Application of the Criteria to the Southern Rocky Mountains and Certain

National Forests in Idaho and Montana" section of this final rule, we have determined that the historic record of lynx occurrence and the available information on the quantity and distribution of lynx habitat and hare densities all combine to suggest that the Southern Rockies do not contain the PCE. Therefore, these areas do not meet our definition of critical habitat.

We agree with the reviewer that the future persistence of lynx populations in Minnesota and Colorado is uncertain. However, the extensive boreal forest habitat in northeastern Minnesota, which is directly connected to similar and very extensive habitat and a persistent lynx population in immediately adjacent Ontario, supports our conclusion that future lynx persistence is more likely in Minnesota than in the patchy, marginal, and disjunct habitats in Colorado, which are isolated from other lynx habitats by more than 90 mi (150 km) of unsuitable lower-elevation habitats (McKelvey et al. 2000a, p. 230). We acknowledge that the Colorado population has persisted from its 1999–2006 introduction until the present. We believe that this short-term persistence is not surprising given that the translocation of a large number of healthy lynx from Alaska and Canada over several consecutive years, which were held in captivity and brought into prime health through supplemental feeding prior to their release into Colorado, is much different than the likely intermittent historical arrival of a much smaller number of potentially less-fit lynx in the Southern Rockies that were likely dispersing away from food shortages associated with cyclic hare population crashes to the north. We also concur with the conclusions of Colorado Parks and Wildlife (CPW), which acknowledged that the future persistence of the introduced population is uncertain and hinges on the assumption that patterns of annual reproduction and survival observed as of 2010 repeat themselves during the next 20 or more years (Shenk 2008, p. 16; Shenk 2010, pp. 2, 5–6, 11).

Despite the persistence of the introduced population thus far, we anticipate, based on the historical record and the patchiness and marginal quality of lynx habitat and hare densities, that Colorado and the Southern Rockies, in the absence of additional translocations of lynx from elsewhere, are unlikely to support lynx over the long term. The area's distance from source populations of lynx reduces the likelihood that this area will receive the demographic support, via dispersal and immigration from other populations, thought to be important to

the maintenance of lynx populations in the DPS. Further, climate projections suggest lynx habitat will decline here as elsewhere (Gonzalez *et al.* 2007, pp. 4, 8), making habitats in these areas even more marginal, patchy, and isolated and, therefore, even less capable of supporting lynx populations over time.

Regardless, unlike the long-term presence of naturally resident and persistent populations in northeastern Minnesota and elsewhere within the range of the DPS (despite times when lynx numbers were likely very low in those places), the current presence of the introduced population in the Southern Rockies does not connote that habitats there contain the physical and biological features essential to lynx in quantities and spatial arrangements adequate to support lynx populations over time. It is possible that similar introductions in other places with few historical records and which also have likely not supported naturally resident lynx populations (e.g., northern Vermont, northern Michigan, northern Wisconsin, western and central Minnesota, southwestern Montana, central and southern Idaho, southern Washington and Oregon) would achieve results similar to those observed in Colorado. However, that finding also would not confirm the presence in those places of the essential physical and biological features in adequate quantity and spatial arrangement to support lynx populations over time. We believe it would be inappropriate and speculative to designate critical habitat in such areas that, based on the historical record of verified occurrence and assessment of the available information on habitat quantity and spatial configuration, appear historically and currently incapable of supporting viable lynx populations over time. We find no evidence that such areas can contribute meaningfully (let alone be essential) to the conservation and recovery of the lynx DPS. Therefore, we have not designated critical habitat in Colorado or the Southern Rockies despite the benchmarks achieved by the introduction program there.

(11) *Comment:* One peer reviewer noted that there is scientific evidence that lynx populations in the contiguous United States are connected with those in Canada but that it is unclear (a) if the persistence of southern populations depends on their own productivity or if augmentation from Canada is truly needed, and (b) what role connectivity among southern populations plays in maintaining the overall metapopulation structure. The reviewer felt the proposed rule implied a higher degree of certainty regarding population connectivity than may be the case and contended that we stated, despite the absence of scientific evidence, that lynx use habitat "stepping stones" to connect Montana to the Greater Yellowstone Area (GYA). The reviewer suggested that lynx in the GYA may be maintained by pulses of lynx from populations in Canada rather than movements of animals from Montana populations, and that recognizing this uncertainty is important as it relates to lynx in Colorado. The reviewer felt the proposed rule downplayed the persistence of the Colorado population because it lacked habitat "stepping stones" from northern populations, and that the absence of habitat "stepping stones" did not prevent several lynx from the population introduced into Colorado from dispersing (northward) to the GYA.

*Our Response:* The best available information indicates that lynx populations in the DPS rely on augmentation from populations in Canada. Based on genetic analyses, Schwartz *et al.* (2002, entire) concluded that the persistence of lynx populations in the contiguous United States depends on dispersal from larger populations (also see response to comment (23), below). As we stated in the proposed rule (78 FR 59434), connectivity and interchange with lynx populations in Canada is thought to be essential to the maintenance and persistence of lynx populations in the contiguous United States (McKelvey *et al.* 2000b, p. 33; U.S. Fish and Wildlife Service 2005, p. 2; Interagency Lynx Biology Team 2013, pp. 34, 42, 47, 54, 60, 65; Squires *et al.* 2013, p. 187). Additionally, we are aware of no persistent resident lynx populations in the DPS that are not directly (Maine, Minnesota, northern Montana and northern Idaho, and northern Washington) or indirectly (GYA) connected to lynx populations in Canada via suitable or potentially suitable boreal or subalpine forest habitat.

We used the term "habitat 'stepping stones'" in the Background section of the proposed rule (78 FR 59434) to describe the relative connectivity of populations in the Rockies to larger populations in Canada. We did not state that we are certain lynx use these habitat patches, but rather that patches of habitat potentially conducive to dispersal exist between the GYA and lynx populations to the north and, as noted previously by others (e.g., McKelvey *et al.* 2000a, p. 230; Interagency Lynx biology Team 2013, p. 50), that this is not the case in Colorado, where potential lynx habitat is separate and isolated from other potential lynx habitats and, thus, from northern lynx populations by more than 90 miles (150 km) of unsuitable lower-elevation desert and sagebrush habitats. We do not know to what extent this isolation contributed to the historical inability of lynx to naturally establish and maintain viable resident breeding populations in Colorado and elsewhere in the Southern Rockies, but we believe that it is reasonable to conclude that it is a factor. We also did not state or imply that the GYA lynx population is maintained by movements of animals from Montana populations; rather, we meant that the habitats that support lynx in northwest Montana are part of a potential dispersal corridor that may provide connectivity between lynx in the GYA and populations in Canada (78 FR 59434). We agree that the extent to which lynx use any potential dispersal corridors is uncertain.

Finally, our intent is not to downplay the achievements of the introduction effort in Colorado, but rather to explain what we think the presence of the introduced lynx population does and does not tell us about whether the habitat contains the PCE and is essential to the conservation of the DPS (also see our response to comment (10), above). We acknowledged in the proposed rule that lynx are highly mobile and regularly move long distances (78 FR 59435) and that some lynx from the population introduced into Colorado dispersed widely, including north across the expanse of unsuitable habitat that separates potential lynx habitat in the Southern Rockies from lynx habitats to the north (78 FR 59434, 59448–59449). Clearly lynx from the north also occasionally reached the Southern Rockies historically, as evidenced by the few verified records for Colorado and southern Wyoming. However, we find that the best available information suggests that Colorado and the Southern Rockies do not contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx populations over time, and we have not designated critical habitat in these areas.

(12) *Comment:* One peer reviewer felt that our use of the term "transitional" when describing boreal forests in the range of the DPS implied that lynx habitat used by southern populations is almost "ephemeral," and that our characterization that lynx habitat in the contiguous United States is transitional lacks support and is misleading.

*Our Response:* We use the term "transitional" (78 FR 59433, 59434, 59438) to describe the southern margin of the boreal forest that extends into the northern contiguous United States,

where it "transitions" to other more temperate forest types, which is consistent with its use in Mech (1980, p. 271), Agee (2000, pp. 40, 41, 44), the 2000 listing rule for the lynx DPS (65 FR 16052, 16056, 16081–16082), the 2003 clarification of findings (68 FR 40077), the 2007 "Significant Portion of the Range" clarification (72 FR 1188), the 2009 revised critical habitat rule (74 FR 8616, 8635), the 2009 12-month finding on a petition to include New Mexico in the lynx DPS (74 FR 66939), and the revised Lynx Conservation Assessment and Strategy (LCAS; Interagency Lynx Biology Team 2013, pp. 39, 44, 52). It is important that readers understand that both lynx and snowshoe hares are true boreal forest species, and that most boreal forest habitats in the northern contiguous United States become patchy and marginal for both species as these forests transition to other forest types. The transitional nature of the boreal forest at its southern extent is believed (along with competition from other hare predators) to limit the numbers of both hares and lynx, preventing either from regularly achieving densities in the contiguous United States comparable to those regularly achieved in the classic boreal forests at the centers of their ranges in north-central Canada.

Although some mature multistory forest stands may provide stable lynx and hare habitat over time (Interagency Lynx Biology Team 2013, p. 29), in many parts of the DPS range lynx and hares fare best in areas with large proportions of young regenerating early-successional stands that exist temporarily following disturbance (Aubry et al. 2000, p. 374; Interagency Lynx Biology Team 2013, pp. 28–29). In the absence of additional disturbance, many of these stands will, through natural forest succession, mature into stands with less dense vegetative cover at ground or snow level, providing less food and cover for hares and reducing the quality of foraging habitat for lynx. For example, much of the current higher quality hare and lynx foraging habitat in northern Maine occurs in 15- to 35-year-old dense, regenerating spruce-fir stands that were previously clearcut (78 FR 59456). As these stands continue to mature, and with timber harvest practices and regulations that have shifted away from clear-cut harvest and use of herbicides to promote conifer regeneration, hare and lynx habitats are expected to decline broadly across the area, with the lynx population projected to decline by 55 to 65 percent in the next 20 years (Simons 2009, p. 217). In a sense, then, some lynx habitats truly are "temporary" (Interagency Lynx

Biology Team 2013, p. 29) and ephemeral.

(13) *Comment:* One peer reviewer felt we inappropriately cited a non-peer-reviewed publication (Berg and Inman 2010) to support the statement that ". . . important foraging habitat for lynx is often more limited and fragmented in the contiguous United States than it is in the northern boreal forests of Canada and Alaska" (78 FR 59434).

*Our Response:* We believe that our use of this citation is appropriate given the authors' histories of research and monitoring with regard to lynx, snowshoe hares, and other carnivores and their respective habitats. We also cited in the proposed rule (78 FR 59433) many other published references describing the marked differences between snowshoe hare (i.e., lynx foraging) habitats in the contiguous United States and those in the boreal forest of Canada and Alaska: Wolff 1980, pp. 123–128; Buehler and Keith 1982, pp. 24, 28; Koehler 1990, p. 849; Koehler and Aubry 1994, p. 84; Aubry et al. 2000, pp. 373–375, 382, 394; Interagency Lynx Biology Team 2013, p. 77).

(14) *Comment:* One peer reviewer felt that seasonal and geographic differences in lynx habitat were poorly described in the proposed rule and that clear articulation of how lynx habitat differs across the southern population would be helpful. As an example, the reviewer noted that the habitat used in winter by lynx in the Northern Rockies (mature multistoried forests with dense horizontal cover at ground/snow level; Squires et al. 2010, pp. 1648, 1653, 1656) is almost opposite the habitat used by lynx in Maine year-round (young, regenerating spruce-fir; Vashon et al. 2012, pp. 15–16). The reviewer felt that (a) readers should understand that management actions in Maine may have actually created lynx habitat, (b) it is unclear whether Maine could support lynx without extensive forest management with herbicide treatment, and (c) the role that herbicide treatment of forests in Maine played to create/promote the conifer infill that lynx depend on should be discussed.

*Our Response:* Although our introductory discussion of lynx habitat in the Background section of the proposed rule (78 FR 59434–59435) was general in nature, we provided much more detail on geographic and seasonal differences in lynx habitat in the Critical Habitat, *Physical or Biological Features* section, where we described differences in boreal forests and lynx habitat characteristics for each of the regions within the range of the DPS (78 FR 59437–59442). In that section, we

specifically noted differences in lynx habitat use in winter versus summer (78 FR 59439). Similarly, we discussed in some detail in the *Special Management Considerations or Protection* section (78 FR 59445) and the Proposed Revised Critical Habitat Designation section (78 FR 59456) the influence of industrial timber management and large-scale clearcutting on lynx habitat in Maine. However, we did not discuss the role of herbicides there, so we have added that information to the Critical Habitat, *Boreal Forest Landscapes* section of this final rule, and in our response to comment (19), below, where we provide additional detail regarding historic, recent, and projected future densities of lynx in Maine.

(15) *Comment:* One peer reviewer felt that den habitat in the Northern Rockies was poorly defined and that the proposed rule did not clearly describe how lynx respond to environmental characteristics at dens at various spatial scales.

*Our Response:* Although our discussion of denning habitat in the Background section (78 FR 59435) was general in nature, we included a more detailed and region-specific discussion in the Critical Habitat, *Sites for Breeding, Reproduction, or Rearing (or Development) of Offspring* section (78 FR 59441–59442), where we summarized the available pertinent information regarding lynx den-site selection for each region in the range of the DPS. However, we did not go into detail concerning lynx den selection in response to environmental cues at various spatial scales because we did not think it is germane to the discussion of critical habitat given that denning habitat is not thought to be a limiting factor for lynx anywhere within the range of the DPS.

(16) *Comment:* One peer reviewer suggested that the designation of critical habitat apparently does little to alter Federal responsibilities for the species' management but that it is unclear how designation may affect lynx management and conservation on State and Tribal lands. The reviewer felt readers need to fully understand what the inclusion in or exclusion from a critical habitat designation means to lynx conservation and management on all lands, but especially for State and Tribal lands in Montana that were considered for exclusion in the proposed rule and which we have excluded from designation in this final rule. The reviewer also felt that our rationale and justification for excluding Tribal lands and lands managed in accordance with the Montana Department of Natural Resources and

Conservation (MDNRC) Forested State Trust Lands Habitat Conservation Plan (HCP) should be better articulated and fully explained in the final rule.

*Our Response:* We described the general and specific regulatory benefits of critical habitat to lynx conservation in our response to comment (8), above, and in the Consideration of Impacts under Section 4(b)(2) of the Act section, below. Because a Federal action or "nexus" exists for all activities that may affect lynx on Federally managed lands, the regulatory benefits of consultation in accordance with section 7 of the Act are more likely to occur. Federal agencies must consult with the Service to ensure that no activity they carry out, permit, authorize, or fund will result in the destruction or adverse modification of designated critical habitat.

Activities on State, Tribal, or private lands that involve a Federal nexus must similarly undergo section 7 consultation, though it is the Federal "action agency" that consults with the Service. However, there is no consultation requirement for activities on State, Tribal, or private lands for which a Federal nexus does not exist. With regard to lynx, the activities most likely to impact the species or its habitats involve timber harvest, fire/fuels management, or other vegetation or silvicultural treatments—activities that most often lack a Federal nexus on State, Tribal, or private lands. When evaluating whether to designate critical habitat in such places, we assess the benefits of inclusion versus the benefits of exclusion, and we only exclude areas for which the benefits of exclusion outweigh those of inclusion. In the case of Tribal lands and State or private lands with finalized lynx management plans or habitat conservation plans (HCPs), we have determined that Tribal management, and State and private management in accordance with finalized plans or HCPs, is more beneficial to lynx than a critical habitat designation would be. One component of this analysis is the recognition that many activities that could affect lynx on these lands lack a Federal nexus, thereby precluding opportunity to achieve conservation via section 7 consultation resulting from designation. Therefore, management in accordance with Tribal forest and/or wildlife management plans and HCPs or other formal management plans on State or private lands is more likely to result in conservation of the lynx and its habitats than would be achieved via designation as critical habitat.

With specific regard to lands managed in accordance with the MDNRC HCP (as well as those for other exclusions), we

have in this final rule presented our detailed evaluation of the benefits of including these lands compared to the benefits of excluding them (see Consideration of Impacts under Section 4(b)(2) of the Act, below). We have determined that the benefits of excluding MDNRC lands outweigh the benefits of including them in the lynx critical habitat designation and that doing so will not result in the extinction of the lynx DPS.

With specific regard to Tribal lands, in accordance with Secretarial Order 3206, "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" (June 5, 1997); the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951); Executive Order 13175 "Consultation and Coordination with Indian Tribal Governments;" and the relevant provision of the Departmental Manual of the Department of the Interior (512 DM 2), we believe that fish, wildlife, and other natural resources on Tribal lands are better managed under Tribal authorities, policies, and programs than through Federal regulation wherever possible and practicable. Such designation is often viewed by Tribes as an unwanted intrusion into Tribal self-governance, thus compromising the government-to-government relationship essential to achieving our mutual goals of managing for healthy ecosystems upon which the viability of threatened and endangered species populations depend. We have added details on Tribal management goals and plans, land status, and lynx conservation efforts to our consideration of and rationale for these Tribal lands exclusions. See Exclusions Under Section 4(b)(2) of the Act, below, for a detailed discussion of why these lands have been excluded.

(17) *Comment:* One peer reviewer suggested there is limited anecdotal evidence that lynx in the Greater Yellowstone Area (GYA) are declining, based on the failure to trap any "native" lynx there in 2005–2006 (the only lynx encountered were thought to have been associated with the introduced population in Colorado).

*Our Response:* We do not have evidence of a decline in the GYA lynx population. Although the GYA has a long history of lynx presence and recent evidence of reproduction (Squires and Laurion 2000, entire; Squires *et al.* 2001, entire; Murphy *et al.* 2006, entire), there are relatively few verified records of lynx from Yellowstone National Park and surrounding areas (65 FR 16058, 68 FR 40090). Additionally, lynx habitat in

the GYA is naturally marginal (patchier and composed in many places of drier forest types), less capable of supporting snowshoe hares (Hodges *et al.* 2009, entire), and farther from source populations than most other parts of the DPS range (68 FR 40090). Given the naturally marginal habitat in this largely protected area, we believe it is unlikely that the GYA ever supported more than a handful of lynx home ranges in any given year. We find no evidence that the GYA once supported a larger or more robust lynx population than the small one suggested by verified historic and recent records and survey efforts.

(18) *Comment:* One peer reviewer suggested that lynx habitat in the western United States has contracted significantly in the last decade from fire and insect outbreak, although these changes are fairly recent and thus not addressed in the scientific literature. The reviewer cited the almost complete die-off of Engelmann spruce (*Pica engelmanii*) from 400,000 acres (161,874 hectares) of spruce–fir forests in the San Juan Mountains in Colorado because of spruce budworm infestation, and an increase in fire activity in the Northern Rockies since the mid-1980s at elevations that largely overlap lynx critical habitat.

*Our Response:* Climate change has resulted in warmer and drier conditions that have increased the number and extent of wildfires in the western United States and in boreal forests in Canada, and projected climate changes suggest this trend will continue, with increases likely in the frequency of large, intense forest fires (IPCC 2014a, p. 31; IPCC 2014b, p. 4; Joyce *et al.* 2014, p. 178; Mote *et al.* 2014, p. 495). Climate change is also increasing the vulnerability of western forests to insect and tree-disease outbreaks; large-scale tree die-offs have already occurred and are likely to increase in the future, and the subalpine forests on which lynx in the western contiguous United States depend may be particularly at risk (Joyce *et al.* 2014, p. 177; Mote *et al.* 2014, pp. 495–496). However, the potential consequences of climate change for lynx populations and their habitats remain unquantified. Fire and insects have been important elements of these forests historically, helping to maintain the mosaic of forest successional stages thought to be important to lynx and snowshoe hares. We have no evidence that these factors (fires and insect outbreaks) have thus far altered lynx habitats to the extent that landscapes historically or recently capable of naturally supporting lynx populations can no longer do so, although climate projections suggest

such changes are possible in the future. If lynx habitat has indeed contracted, it may be a temporary effect, and as regeneration and regrowth of these areas progresses, they should return to lynx habitat as long as fire, insect outbreaks, and climate warming and drying have not permanently altered the vegetative capacity and climax forest potential of these sites.

(19) *Comment:* One peer reviewer felt the proposed rule was unclear whether the projected reduction in lynx habitat in Maine was due primarily to a shift in timber harvest away from clearcutting to partial harvest, or if the herbicide use that had helped create conifer-dominated stands of value to lynx and hares has also been greatly curtailed. The reviewer also wondered if the decline would be a return to historical levels of lynx habitat in Maine prior to the extensive habitat fragmentation from earlier clearcutting and herbicide treatment and suggested we clarify this relationship in the final rule.

*Our Response:* The current abundance of snowshoe hare habitat (and, therefore, lynx foraging habitat) in northern Maine was created by large-scale clear-cut timber harvest of about 55 percent of the forestlands in northern Maine in response to a 1973–1985 spruce budworm (*Choristoneura fumiferana*) outbreak (Simons 2009, pp. 64, 218). Some of these clearcuts were treated with herbicide to promote conifer regeneration by reducing competition from deciduous species (Scott 2009, p. 7). From about 15 years to 35 years post-harvest, these regenerating stands provide excellent cover and forage for snowshoe hares (Simons 2009, pp. 217–218), and the prevalence of such stands is credited with the rapid increase in lynx numbers in Maine in the mid-1990s and early 2000s (Simons 2009, pp. 64, 122; Vashon *et al.* 2012, pp. 56–57). As these stands mature beyond about 35 years post-harvest, hare densities begin to decline as cover and forage are reduced due to forest succession (Simons 2009, p. 217). The areal extent of these high-quality hare habitats is believed to have peaked between 2007 and 2010, and lynx numbers in Maine also likely peaked at about that time (Simons 2009, p. 142; Vashon *et al.* 2012, pp. 50, 57). With the reductions in both clearcutting and herbicide application following enactment of the Maine Forest Practices Act of 1989, it is projected that lynx densities will decline by 55 to 65 percent by 2032 (Simons 2009, p. 217). By then, the lynx population, which is thought to have peaked at between 750 and 1,000 adults in 2006, may decline by more than half to perhaps 300 adults,

which is still three times as many lynx as are thought to have inhabited Maine during a population low in the 1970s (Vashon *et al.* 2012, pp. 57–60).

How these numbers compare to historic lynx numbers in Maine is uncertain. Lynx have had a relatively constant presence in Maine since they were first documented in the State in 1833 (Hoving 2001, pp. 6–38). In general, lynx likely occurred at low densities prior to European settlement, when relatively small amounts of the spruce-fir forests in the State are thought to have been composed of young stands (Lorimer 1977, entire; Vashon *et al.* 2012, pp. 45, 56), but they likely responded positively to stand-replacing fires, wind events, and insect outbreaks (Hoving 2001, p. 25). Audubon and Bachman (1852) described lynx as occurring in regenerating forest following fire in Maine, and H.D. Thoreau (1893) noted that lynx were common in the "burnt lands." Lynx may have also responded to timber harvest, which by 1900 had expanded to smaller diameter spruce for a growing paper industry. It is likely, then, that lynx numbers in Maine have fluctuated since European settlement, depending on the size and distribution of natural and human disturbances and the resultant young regenerating forest stands. At times, lynx were considered very common, and in some years in the 1800s, 200–300 lynx were harvested in Maine (Hoving *et al.* 2003, p. 363).

Finally, the extent to which herbicide treatment to favor conifer regeneration contributed to the development of optimal hare habitats in regenerating clearcuts (versus regeneration in untreated stands) is unclear. Herbicide treatment is expensive, and even in the 1980s, when herbicide application was highest, less than 20 percent of clear-cut stands were treated. The areal extent of herbicide application decreased by about 78 percent in 2000–2007 compared to peak application in the late 1980s, which may reduce the amount of conifer-dominated regenerating hare and lynx habitats in the future (Scott 2009, pp. 122–123).

(20) *Comment:* One peer reviewer commented that there was an assumption in the proposed rule that lynx populations within the DPS require demographic rescue periodically from populations in Canada. The reviewer suggested that it is unknown if augmentation from northern populations is sufficient for demographic rescue and that this uncertainty was poorly articulated in the proposed rule. The reviewer also suggested that it is unknown if the lagged synchrony observed in southern

lynx populations resulted from the physical movement of lynx from the north or if southern populations increased due to a related environmental factor (e.g., increased hare abundance), and that this uncertainty also was not communicated in the proposed rule.

*Our Response:* We agree that it is uncertain whether the demographic health of lynx populations in the DPS is reliant on augmentation from Canadian populations and, if so, to what extent, and whether current rates of interchange/immigration are sufficient to provide demographic rescue (also see response to comment (22), below). We recognized and articulated some of these uncertainties at several places in the proposed rule. For example, we stated that lynx in the contiguous United States appear to function as discrete subpopulations connected via dispersal to the larger Canadian metapopulation, that lynx disperse in both directions across the United States-Canada border, and that this interchange is thought to be essential to the maintenance and persistence of lynx populations in the DPS (78 FR 59434). We similarly stated that the degree to which regional lynx populations in the DPS are influenced by local hare population dynamics is unclear, and that lynx presence and population dynamics in the DPS appear to be more influenced by the occurrence of irruptions from Canada than by intrinsically generated hare population cycles within the DPS range (78 FR 59436).

(21) *Comment:* One peer reviewer suggested that the proposed rule assumes that peripheral southern lynx populations (outside proposed critical habitat) failed to persist due to unsuitable habitat conditions but did not mention that no large incursion of lynx has happened in the western United States in the absence of active persecution (i.e., trapping).

*Our Response:* We believe the best available information indicates that we have included within the final critical habitat designation all places in the contiguous United States historically and currently capable of naturally supporting lynx populations and which will provide for the conservation of lynx. We are aware that no large irruptions of lynx from Canada into the contiguous United States have been documented since the DPS was listed and harvest was prohibited throughout its range. However, in the absence of trapping, which provided most of the data upon which the history of past irruptions was constructed, and with limited monitoring of lynx populations

on both sides of the border, there is uncertainty about the number of lynx that may be moving between populations in Canada and those in the contiguous United States.

We have no evidence that lynx were disproportionately persecuted in areas outside those we have designated (secondary or peripheral areas), and lynx populations in designated areas have persisted despite being similarly exposed to hunting and trapping prior to listing. Additionally, other than relatively low levels of reported incidental trapping (with very few resulting in lynx mortality), lynx have not been persecuted in the past 14 years since listing. In that time, populations have persisted in the areas designated as critical habitat, while other areas (with the possible exception of small areas of northern New Hampshire, northern Vermont, and Maine outside the designated area) have failed to attract lynx and support establishment of populations. We interpret this as a strong indication that these secondary and peripheral areas lack one or more of the essential physical or biological features in adequate quantity and/or spatial arrangement, and that it is less likely, given the previously noted dispersal capabilities of lynx, that these areas represent good lynx habitat which lynx have been unable to locate and colonize (but see response to comment (22), below).

(22) Comment: One peer reviewer noted that maintaining connectivity for lynx populations in the contiguous United States may become increasingly difficult in the future due to climate and anthropogenic change, that this added risk was not discussed in the proposed rule, and that a potentially dampened hare/lynx cycle in Canada (e.g., Ims et al. 2008, pp. 81, 85) may cause demographic and genetic impacts to southern lynx populations over time. However, the reviewer noted that lynx from the population introduced to Colorado made documented south-to-north movements, demonstrating that connectivity with the native population in the GYA is possible.

Our Response: Climate change and other anthropogenic change (human-caused habitat degradation/loss/fragmentation) could result in smaller and more isolated lynx populations in the contiguous United States, with reduced connectivity to lynx populations in Canada. We noted in the Future of Lynx Habitat sections of the proposed rule (78 FR 59443) and this final rule (below) that climate change could reduce the amount and quality of lynx habitat in the DPS range, with habitat patches becoming smaller, more

fragmented, and more isolated (Carroll 2007, pp. 1099–1100; Johnston et al. 2012, p. 11), and that lynx populations could become more vulnerable to stochastic environmental and demographic events because of smaller population sizes and increased isolation (Carroll 2007, pp. 1100–1103). However, the level at which reduced connectivity might affect the demographic or genetic health of populations in the DPS is unknown.

Schwartz et al. (2003, entire) documented reduced genetic variation (lower mean number of alleles per population and lower expected heterozygosity) among peripheral lynx populations compared to populations in the core of the lynx geographical range. While recognizing that small changes in genetic variation can lead to large changes in population fitness, the authors noted that the differences between core and peripheral populations in their study were small enough to suggest a lack of significant population subdivision (i.e., no indication of genetic isolation, substantial genetic drift, or potential genetic "bottlenecks" among DPS populations; Schwartz et al. 2003, p. 1814). This finding is consistent with their earlier work, which documented high levels of gene flow (the highest yet documented for any carnivore) between core and peripheral lynx populations despite large separation distances (Schwartz et al. 2002, pp. 520–522). Their results did not suggest that reduced genetic variation among peripheral populations was due to human disturbance (i.e., habitat loss/fragmentation on the southern periphery of the geographic range; Schwartz et al. 2003, p. 1814), but they did imply that the persistence of lynx populations in the contiguous United States depends on dispersal from larger (core) populations (Schwartz et al. 2002, p. 522).

Currently, there is no indication that the levels of connectivity and gene flow between lynx populations in the DPS and those in the core of the lynx's range are inadequate to maintain the genetic health of DPS populations. Given the noted dispersal capabilities of lynx, it appears unlikely that levels of connectivity and gene flow will become inadequate in the foreseeable future. However, because demographic rescue (demographic stability of peripheral populations achieved via immigration from other populations sufficient to offset mortality and emigration in the peripheral population) requires much higher immigration rates than does genetic rescue (McKelvey et al. 2000b, pp. 23–24), reduced connectivity due to

climate change, habitat loss/fragmentation, or a combination of these factors, is more likely to result in demographic rather than genetic impacts to lynx populations in the DPS. But, as with gene flow, the level of diminished connectivity at which DPS populations could suffer demographic impacts is unknown. Finally, how hare and lynx population cycles may be affected by climate change remains unclear (Yan et al. 2013, p. 3264); therefore, estimating the magnitude of potential future demographic and genetic impacts to southern lynx populations remains elusive. If climate change does dampen hare (e.g., Ims et al. 2008, pp. 81, 85) and lynx population cycles, and that dampening alters the periodicity and/or reduces the magnitude of immigration from Canadian to DPS lynx populations (which is poorly understood to begin with), then demographic and genetic impacts are possible.

(23) Comment: Peer reviewers and other commenters presented conflicting views on whether Colorado and other parts of the Southern Rockies (southern Wyoming, northeastern Utah, and northern New Mexico) should be included in the designation. Two peer reviewers agreed with our determination that Colorado and the Southern Rockies do not contain the PCE and are not essential to conservation of the lynx DPS. One peer reviewer questioned the consistency of our logic in not designating critical habitat in Colorado and the Southern Rockies relative to its application to native lynx populations. The reviewer thought we should consider designating critical habitat in Colorado and the Southern Rockies because (a) the introduced population may currently include more lynx than native lynx populations in northwest Wyoming or Minnesota, and (b) the area used by the introduced population in the San Juan Range of Colorado is larger than the area of montane forest that supports lynx in Wyoming. One peer reviewer disagreed with our decision not to designate critical habitat in Colorado or elsewhere in the Southern Rockies and with our determination that evidence is lacking to indicate that these areas historically supported resident lynx populations. The reviewer cited Cary (1911) and Meaney (2002) as evidence that Colorado historically supported a resident lynx population. The reviewer suggested that parts of western Colorado, southern Wyoming, and northern New Mexico contain the physical and biological features essential to lynx in adequate quantity

and spatial arrangement and that high elevations in these areas may become important to lynx conservation if climate change results in upslope movement of lynx and hare habitats, as some models suggest. Many other commenters urged us to designate critical habitat for lynx in Colorado and the Southern Rockies, while others supported our proposal not to designate critical habitat in these areas.

*Our Response:* Neither the presence of the introduced lynx population or the large area it has used demonstrate that habitats in Colorado and other parts of the Southern Rockies contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx populations over time or that this area is essential to the conservation of the lynx DPS. We do not conclude that Cary (1911, pp. 44, 48, 165–167) and Meaney (2002, entire) provide reliable evidence based on verified lynx occurrence data that Colorado historically supported a resident lynx population.

As described above in our responses to comments (10) and (11), the verified evidence suggests that habitats in Colorado and the Southern Rockies have not historically supported viable lynx populations or subpopulations. The importance of using only verified evidence and the need to avoid using anecdotal occurrence data to assess the ranges of rare and elusive species has been amply demonstrated by McKelvey *et al.* (2008, entire; see also our response to comment (10), above). The authors cautioned that this is particularly important when target species may be easily confused with other similar but more common species; using as an example the potential biological and conservation consequences of misidentifying even a small number of bobcats as Canada lynx (McKelvey *et al.* 2008, pp. 553–554). Halfpenny and Miller (1980, p. 8) indicated that Cary's (1911) summary was based largely on (unverified, anecdotal) observations by trappers, and the authors cited Armstrong (1972) who said these ". . . ought to be regarded with a degree of caution." Similarly, Meaney's (2002, entire) unpublished review for the Colorado Department of Transportation of mostly anecdotal lynx records in the State points out many of the vagaries and inconsistencies of the anecdotal data, very unlikely high numbers of lynx reported as trapped in some counties in some years, and misidentification of large, pale bobcats as lynx, but then concludes, questionably in our opinion, that "There is no doubt that established populations of lynx occurred in the northern

mountains of Colorado" (Meaney 2002, p. 5).

Based on our evaluation of the historic record of verified lynx occurrence, we find that, although lynx clearly occurred occasionally in the Southern Rockies, there is no evidence that the Southern Rockies, including southern Wyoming, western Colorado, northeastern Utah, and northern New Mexico, historically supported lynx populations. We conclude that the few verified records from these areas were most likely transient animals dispersing during "irruptions" from northern lynx populations after cyclic hare population declines. As we discuss below, habitat in Colorado and the Southern Rockies is marginal, naturally fragmented, and disjunct, with poor to marginal hare densities. This, combined with its apparent historical inability to naturally supporting lynx populations, suggests that this area does not contain the PCE (see also the "*Application of the Criteria to the Southern Rocky Mountains and Certain National Forests in Idaho and Montana*" section, below).

Also as we described above in our response to comment (10), the persistence, thus far, of the introduced lynx population in Colorado does not demonstrate that habitats there contain the essential physical and biological features in adequate quantity and spatial arrangement to support a lynx population over the long term. Like Colorado and the Southern Rockies, many areas across the northern border of the United States contain some amounts of the essential physical and biological features and have verified records of lynx (in fact, New York, Michigan, Wisconsin, and Idaho all have more verified historic lynx records than Colorado/Southern Rockies; McKelvey *et al.* 2000a, p. 210), but no evidence they have ever supported more than occasional dispersing lynx. The historic inability of these areas to naturally support resident lynx populations indicates either (a) that the quantity and/or spatial arrangement of one or more physical or biological features is inadequate, (b) the area's distance and relative isolation from other lynx habitats and populations prevents the consistent immigration needed to provide the demographic stability that may be necessary to maintain a viable lynx population, or (c) that a combination of these factors has prevented these areas from historically supporting lynx populations over time.

The best available information does not allow us to simply measure and map each of the physical and biological features essential to lynx and thus distinguish areas that contain each in

adequate quantity and spatial arrangement from other areas that do not (see also *Criteria Used to Identify Critical Habitat,* below). Nor does it allow us to determine at what specific distance and relative level of isolation from other lynx habitats and populations a particular area becomes unlikely to receive adequate demographic input (via immigration from other populations) thought to be necessary for population viability and persistence. Regardless, it is informative that Colorado and the Southern Rockies failed to attract lynx and support establishment and maintenance of lynx populations in the wake of two unprecedentedly large irruptions of lynx from Canada into the western United States in the early 1960s and again in the early 1970s (McKelvey *et al.* 2000a, pp. 219, 242). To what degree this failure resulted from the marginal quality of the habitat versus the area's distance and relative isolation is unclear. However, it is clear that, while lynx were unable to establish and maintain populations in Colorado or elsewhere in the Southern Rockies, other lynx populations in the DPS, where we have designated critical habitat, did persist, despite being exposed to similar habitat threats and harvest pressures. That is, we have no indication that habitat loss, degradation, or fragmentation or trapping pressures were greater in the Southern Rockies than in places where lynx populations persisted despite them. In fact, trapping lynx was prohibited in Colorado (1970) and Wyoming (1973) long before it was prohibited in most other States within the range of the DPS (Maine—1967, Minnesota—1984, Washington—1990, Idaho—1996, Montana—2000).

Finally, although recent climate projections suggest that snow water equivalent (the amount of water held in a given amount of snow) may decline less in Colorado than in other areas of the Southwest, it is nonetheless projected to decline by 26 percent by the end of this century (Garfin *et al.* 2014, p. 466). This will likely translate to a reduction in the areas that will continue to have snow conditions that provide a competitive advantage to lynx over bobcats and other hare predators. Additionally, when specifically modeling potential impacts of climate change on lynx, researchers concluded that potential snow and boreal forest habitat refugia were most likely to occur in the Bridger-Teton National Forest in northwestern Wyoming, the Superior National Forest in northeastern Minnesota, and across western Canada, while high-elevation parts of Colorado

are among the areas vulnerable to the loss of potential lynx habitat in the long term (Gonzalez *et al.* 2007, pp. 4, 8). Even if suitable snow conditions persist in Colorado and boreal and subalpine forests move upslope with continued climate warming, the amount of potential lynx habitat, already considered patchy and relatively isolated, will likely decrease, becoming even more patchy and isolated and less capable of supporting lynx populations over time.

For these reasons, we conclude that habitat in Colorado and other parts of the Southern Rockies is marginal, naturally fragmented, and disjunct; that it has not been historically capable of supporting natural resident lynx populations; that it has not been demonstrated to contain all of the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx populations over the long term (i.e., it does not contain the PCE); and that it is not essential to the conservation of the DPS. Therefore, we have not designated critical habitat for lynx in Colorado or elsewhere in the Southern Rocky Mountains.

(24) *Comment:* One peer reviewer, one Federal agency commenter, and several other commenters took exception to our description of the translocation of lynx from Alaska and Canada to Colorado as an ''introduction'' rather than a ''reintroduction.''

*Our Response:* As described above in our responses to comments (10), (11), and (23), we believe the weight of verified evidence suggests that Colorado did not historically support a resident native lynx population, and that the few verified records of lynx prior to the introduction of the current population were likely transient, dispersing animals. Although the translocation of lynx from Alaska and Canada to Colorado has often been referred to as a reintroduction, including in some documents by the Service, we believe it represents the establishment of a lynx population in a place that, based on our evaluation of the best available information, apparently did not support one previously and, therefore, is more accurately described as an introduced population. We have clarified the text throughout this rule to indicate that our use of the term ''introduction'' refers to the establishment of a lynx population in Colorado, as opposed to the reintroduction of individual lynx into an area where individual lynx rarely occurred historically.

*Comments From States*

Section 4(i) of the Act states, ''the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.'' Comments received from States regarding the proposal to designate critical habitat for the lynx DPS are addressed below. Other comments from States pertaining to other issues that may be beyond the scope of this final revised critical habitat designation (e.g., the lynx DPS's listing status under the Act, etc.) will be addressed in separate letters to the States.

(25) *Comment:* The Maine Department of Inland Fisheries and Wildlife supported our determination that the Van Buren and Herseytown-Staceyville areas of Maine, which we proposed to designate and which we have designated as lynx critical habitat in this final rule, contain the PCE and may be essential to lynx conservation. However, the agency provided its opinion that these areas were likely not occupied by lynx at the time of listing and included documentation of standardized lynx surveys conducted in northwestern Maine in 1995–1999 and 2003–2008, and other confirmed lynx occurrences from 1995–2000.

*Our Response:* We reviewed the survey information provided by the agency and determined that the 1995–1999 and 2003–2008 surveys did not adequately cover the Herseytown-Staceyville or Van Buren areas and, therefore, do not sufficiently demonstrate that lynx were absent from these areas at the time of listing. We have reviewed additional lynx record data that indicate lynx have occupied the Herseytown-Staceyville and Van Buren areas historically and since the lynx DPS was listed under the Act, and which demonstrate occupancy at the time of listing in adjacent towns (Hoving 2001, pp. 16, 170–179; Hoving *et al.* 2003, entire; U.S. Fish and Wildlife Service 2013c, entire). For these reasons, we find that the best available information indicates that the newly designated Van Buren and Herseytown-Staceyville areas were likely occupied by lynx at the time of listing and that these areas contain the PCE. Also see our response to comment (3), above, and *Recent Lynx Occurrence and Reproduction in Northern New Hampshire, Northern Vermont, and Eastern and Western Maine,* below).

(26) *Comment:* The Idaho Department of Lands noted that the proposed rule included 26 acres (0.04 mi$^2$ (0.1 km$^2$)) of State Endowment Trust lands in

northern Idaho. The agency provided forest inventory data suggesting that most of the area consists of forest types not considered suitable for lynx and requested that these lands not be designated as critical habitat.

*Our Response:* Although these State Endowment Trust lands do not consist entirely of forest types considered hare and lynx foraging habitat, more than a third of the area is subalpine fir, which is considered foraging habitat. The other portion of this land is consistent with the definition of matrix habitat in the PCE, which is considered an essential feature of lynx critical habitat and is a component of the PCE. Further, while this parcel is at the edge of the designated area, it is surrounded by and contiguous with other similar forest types that also meet the criteria for critical habitat despite being composed of both foraging and non-foraging (i.e., matrix) habitats. We have determined that these State lands contain the physical and biological features (PBFs) essential to the conservation of the lynx DPS and that they are part of the landscape that has supported a resident lynx population over time. Therefore, we have determined that these State Endowment Trust lands contain the PCE, and we have included this area within the final critical habitat designation.

(27) *Comment:* The New Mexico Department of Agriculture requested that the State-boundary-based DPS range remain in place and that New Mexico be specifically excluded from it. The agency believes that a geographical DPS boundary based on the habitat requirements of lynx is more appropriate than the proposed revised ''verbal definition'' of the DPS that would extend the Act's protections to lynx wherever they may occur in the contiguous United States. The agency feels that the proposed change could increase section 7 consultation requirements for actions on Federal lands in northern New Mexico, negatively affecting ranching operations that hold Federal grazing permits on Forest Service or BLM lands, and perhaps precluding or delaying range improvement and watershed restoration projects on these lands.

*Our Response:* Our 2000 listing rule (65 FR 16052) and our 2003 clarification of findings (68 FR 40076) used State boundaries within what we understood to be the range of lynx in the contiguous United States at that time. Subsequently, lynx associated with the introduced population in Colorado were confirmed in northern New Mexico. Revising the existing range of the DPS with this rule addresses that

**54796**    Federal Register / Vol. 79, No. 177 / Friday, September 12, 2014 / Rules and Regulations

inconsistency between the current range of lynx and how the lynx DPS was delineated so that the lynx DPS is now consistent with our DPS policy. Because lynx may be present in northern New Mexico, Federal land managers and agencies that may authorize, fund, or permit activities where lynx may be present should review their actions to determine whether consultation with the Service is necessary to ensure that such activities do not jeopardize the lynx DPS. However, we do not foresee a dramatic increase in section 7 consultations because most of the potential lynx habitat in New Mexico occurs on the Carson and Santa Fe National Forests, and these Federal lands managers already coordinate with the Service to avoid potential impacts to lynx and their habitats. Further, because grazing by domestic livestock is not likely to adversely affect hare or lynx habitats (Interagency Lynx Biology Team 2013, p. 85), we do not anticipate additional regulatory burdens to Federal grazing permit holders. Finally, range improvement and watershed restoration projects can include measures to conserve lynx and hare habitats, and these considerations are unlikely to preclude or substantially delay such projects.

(28) *Comment:* The New Mexico Department of Game and Fish commented that the likelihood of lynx entering and establishing a population in New Mexico remains remote, and the agency is extremely concerned that the extension of ESA protections to individual animals that may enter the State will have significant economic, cultural, and management impacts to currently lawful activities such as hunting, trapping, agency-approved wildlife management activities, and various other activities on public and private lands in northern New Mexico. The agency expressed concern that the level of these impacts may require the Service to conduct at least an environmental assessment and potentially an environmental impact statement to address them.

*Our Response:* We agree that it is unlikely that lynx entering New Mexico from the introduced population in Colorado will establish a self-sustaining population in New Mexico. However, because at least 60 lynx are documented to have traveled into New Mexico after their release in Colorado (Shenk 2007, p. 10; U.S. Forest Service 2009, pp. 9–10), the "may be present" standard for initiating section 7 consultation between the Service and Federal land managers and permitting agencies in northern New Mexico may be met for actions in these areas. Therefore,

Federal land managers and agencies that carry out, fund, or permit activities that may affect lynx or lynx habitats should review their actions to determine whether consultation with the Service is necessary to ensure that these activities do not jeopardize the lynx DPS. We do not anticipate significant restrictions on otherwise lawful activities as a result of these consultations, and we expect little if any impacts to private landowners because activities on private lands would only undergo section 7 consultation if they had a Federal nexus (also see our responses to comments (8) and (16), above). Because the Act does not allow us to consider economic or social impacts when making listing determinations (such as redefining the range or boundaries of a listed species), it is not necessary, and would be inappropriate, to conduct NEPA analysis on the revision to the lynx DPS range.

(29) *Comment:* The Wyoming Game and Fish Department, the county commissions of Lincoln, Park, Sublette, and Teton Counties, the Coalition of Local Governments representing the county commissions and conservation districts for Lincoln, Sweetwater, Uinta, and Sublette Counties, the State of Wyoming Select Committee on Federal Natural Resource Management, and the Wyoming Governor's Office all oppose the designation of lynx critical habitat in Wyoming, and in particular the proposed additions of lands in Grand Teton National Park in Teton County and on BLM, State, and private lands in Sublette and Lincoln Counties. Most of these commenters contend that habitats in Wyoming, including the proposed additions, do not contain the features essential to lynx and that evidence is lacking that they are occupied by lynx or that they currently support or historically supported a resident lynx population. They believe critical habitat designation in Wyoming, including in the additional areas, will have substantial impacts on economic development and management of other resources. Several of these commenters requested that the Service (a) designate lynx in Wyoming as an experimental, nonessential population in accordance with section 10(j) of the Act, and (b) collaborate with State agencies within the range of the DPS to complete a recovery plan for lynx prior to designating critical habitat so that the recovery plan can inform the eventual designation. Several other commenters similarly oppose designation in Wyoming, including the proposed additions, and one specifically opposes designation of any lands within the

Shoshone National Forest. Many other commenters support the proposed additions to critical habitat in the GYA.

*Our Response:* In our previous evaluations of critical habitat for lynx, we determined that habitats in the GYA, including portions of northwest Wyoming in Yellowstone National Park and the Bridger-Teton and Shoshone National Forests, contain the physical and biological features essential to the conservation of lynx, and that the area has a long history of lynx presence (70 FR 68294; 74 FR 8619, 8643–8644). As described in our response to comment (17), above, habitats in the GYA have been demonstrated to contain the essential features in sufficient quantity and spatial arrangement because they (a) have supported a small but persistent lynx population over time, and (b) were occupied by lynx at the time of listing (Squires and Laurion 2000, entire; Squires *et al.* 2001, entire; Murphy *et al.* 2006, entire). Therefore, the GYA meets our criteria for designation as critical habitat.

In northwestern Wyoming and the GYA, lynx are generally associated with the Rocky Mountain Conifer Forest vegetation class, which is dominated by subalpine fir, Engelmann spruce, and lodgepole pine, and which often occurs in a patchy distribution within a mosaic of other vegetation types that do not support snowshoe hares at densities adequate to provide lynx foraging habitat (73 FR 10866). In areas with patchily distributed foraging habitats, like those typical of the GYA, lynx home ranges incorporate extensive areas of non-foraging "matrix" habitats that are used primarily for travel between patches of foraging habitat (74 FR 8644). Therefore, lynx home ranges and designated critical habitat in the GYA may contain substantial areas that do not contain all of the physical and biological features essential to lynx. However, such areas are a necessary component of the landscape that does contain the features. The areas of Grand Teton National Park and the predominantly BLM-managed lands east and south of the Bridger Teton National Forest that we have added to this final critical habitat designation also include matrix habitats, but they are part of the larger landscape that has supported a resident lynx population and, therefore, contains the PCE.

Although habitat information and mapping for the areas we have added to the critical habitat designation in Wyoming were not received in time to evaluate them during the preparation of our previous designation in 2009, it was clear that lynx habitat did not stop at the boundary of the Bridger-Teton

National Forest. However, we designated critical habitat based on the best information available at the time. Since then, additional and refined habitat mapping has become available for these areas, along with recent verified use by lynx and/or information on hare habitats and abundance (U.S. Fish and Wildlife Service 2013a, entire; 2013b, entire). The areas we have added to the designation in Wyoming are natural extensions of adjacent designated lynx habitats and are part of the landscape that supports the GYA's small but persistent lynx population. We have worked closely with both the National Park Service and the BLM in Wyoming to ensure that our designation reflects the most appropriate interpretation of the best available information on lynx occurrence and habitat distribution so that our designation most accurately encompasses the areas that contain the features essential to the conservation of the lynx DPS.

Finally, the Act does not allow us to designate an existing population as a 10(j) experimental, nonessential population. The section 10(j) provision of the Act can be applied only in cases where no population currently exists and is effective only upon release of animals brought from other populations. The best available information indicates that northwestern Wyoming had a small lynx population historically and at the time of listing, and that a small number of lynx currently persist and reproduce in the State. Thus, we cannot designate the Wyoming lynx population as a 10(j) nonessential experimental population because doing so would not conform to the Act.

(30) *Comment:* The Montana Department of Natural Resources and Conservation (MDNRC) requested that we exclude lands covered by the MDNRC Forested State Trust Lands HCP from critical habitat designation in accordance with section 4(b)(2) of the Act, and the Washington State Department of Natural Resources (WDNR) requested that we similarly exclude lands covered by the WDNR Lynx Habitat Management Plan. Several other commenters requested that MDNRC lands not be excluded from designation, either because they felt these lands are essential to the conservation of the lynx DPS or because the MDNRC HCP is the subject of an ongoing court case.

*Our Response:* We have weighed the benefits of designating the lands covered by these plans against the benefits of excluding them, and we have determined that the benefits of excluding them outweigh the benefits of

including them in the final designation. Therefore, we have excluded the lands covered by both these conservation plans from lynx critical habitat. More details regarding our analyses of the benefits to lynx of these plans are presented in the Consideration of Impacts under section 4(b)(2) of the Act section, below (and see our response to comment (16), above). The Service and the MDNRC are currently defending the HCP in a lawsuit that challenges the HCP's adequacy with regard to the conservation of grizzly bears and bull trout. The HCP's adequacy with regard to lynx conservation was not challenged in the lawsuit.

(31) *Comment:* The Washington Department of Fish and Wildlife (WDFW) agreed that the Kettle Range of northeastern Washington did not support a lynx population at the time of listing. Despite this, WDWF suggested that we consider designating the area because it may support lynx movement between larger areas of habitat in the Selkirk and Cascade Mountains, and because a lynx population could become re-established in the future because lynx harvest no longer occurs there and habitat conditions may improve as parts of the area continue to recover from large fires in the 1980s. Conversely, the Board of County Commissioners for Stevens County, Washington, supported our decision not to designate critical habitat in northeastern Washington.

*Our Response:* The Kettle Range in northeastern Washington historically supported a lynx population (Stinson 2001, pp. 13–14), and boreal forest habitat within the Kettle Range appears to contain habitat for lynx; however, there is no evidence that the area was occupied by lynx at the time of listing. The Kettle/Wedge area was included as a core area in the recovery outline despite lacking recent evidence of reproduction and, therefore, did not completely meet the core area criteria in the outline (U.S. Fish and Wildlife Service 2005, pp. 3–5, 21). Moreover, while the Kettle Range contains physical and biological features important to lynx, its spatial configuration and quantity of habitat do not appear to be sufficient to provide for the conservation of lynx. Additionally, we are aware of no evidence that lynx travel between the Northern Rockies and the North Cascades via northeastern Washington. As with other areas that were not occupied at the time of listing (and described in more detail in our response to comment (32), below), we could not designate the Kettle/Wedge area as critical habitat unless we determine that the DPS could only be

conserved and recovered if we were to do so (i.e., that the area is essential to the conservation of the DPS). We have not determined that this area is essential to the conservation and recovery of the DPS and we have not designated critical habitat in the Kettle/Wedge area in this final rule.

*Public Comments*

(32) *Comment:* We received many public comments requesting that we designate additional areas as critical habitat, including the Southern Rocky Mountains (parts of western Colorado, northern New Mexico, northeastern Utah, and south-central Wyoming), the Kettle/Wedge and other areas of northeastern Washington, Oregon, additional areas of northern Idaho and western Montana, parts of central and southeastern Idaho, additional areas in northern Minnesota, and parts of northern New Hampshire and northern Vermont. Some commenters felt we should designate critical habitat in all areas identified as "core areas" in the recovery outline (U.S. Fish and Wildlife Service 2005, entire), while other commenters felt that "secondary" and "peripheral" areas identified in the outline also should be designated.

*Our Response:* Critical habitat is defined in section 3 of the Act as: (1) The specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the Act, on which are found those physical or biological features (a) essential to the conservation of the species and (b) which may require special management considerations or protection; and (2) specific areas outside the geographical area occupied by a species at the time it is listed, upon a determination that such areas are essential for the conservation of the species. Section 3(5)(C) also states that critical habitat "shall not include the entire geographical area which can be occupied by the threatened or endangered species" except when the Secretary determines that the areas are essential for the conservation of the species. The term "conservation" as defined in section 3(3) of the Act means "to use and the use of all methods and procedures which are necessary to bring an endangered species or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary."

With the exception of parts of western Colorado, where a lynx population was introduced just prior to our listing the DPS as threatened, there is no evidence that the places mentioned above were occupied by resident lynx populations at the time of listing and, for most, no

evidence that they are currently occupied by lynx or that they contain the PCE. In order to designate critical habitat in areas not occupied at the time of listing, we must determine that those areas are essential to the conservation and recovery of the DPS (i.e., that the DPS could only be conserved and recovered if we were to designate those areas). To determine what is essential to conservation and recovery, we must look at the threat for which the DPS was listed and determine whether designating unoccupied areas would contribute meaningfully to addressing and ameliorating that threat. The lynx DPS was listed as threatened due to the inadequacy, at the time of listing, of existing regulatory mechanisms and, unlike many species listed under the Act, not to any substantial documented population decline or significant range contraction (65 FR 16071–16082; 68 FR 40084–40101). We have determined that designating areas not occupied by lynx at the time of listing would not meaningfully address or ameliorate the threat for which the DPS was listed and that doing so would not improve the likelihood of recovery (the point at which the protections of the Act are no longer necessary and delisting the DPS would be appropriate). We do not find that the DPS can only be conserved and recovered if we were to designate areas not occupied at the time of listing. Because these areas are not essential to the conservation and recovery of the DPS, designating them would not comply with the Act. Therefore, we have not designated critical habitat in areas that were not occupied by lynx at the time of listing.

Parts of Colorado were occupied by an introduced population of by lynx at the time of listing. However, habitats there apparently did not historically support a resident lynx population, and we have determined that these areas likely do not contain the physical and biological features essential to lynx in adequate quantity and/or spatial arrangement to support a lynx population over time. For additional details regarding our evaluation of the historic record of verified lynx occurrence in Colorado and the Southern Rockies and of the quality of potential lynx habitats there, see our responses to comments (10), (11), and (23), above, and *Application of the Criteria to the Southern Rocky Mountains and Certain National Forests in Idaho and Montana* under the *Criteria Used to Identify Critical Habitat* section, below.

In the recovery outline, we defined six core areas for lynx as those having *both* persistent verified records of lynx occurrence over time *and* recent

evidence of reproduction (U.S. Fish and Wildlife Service 2005, pp. 3–5, 20–21). However, as discussed above in our response to comment (31), the Kettle/Wedge area of northeastern Washington was included as a core area despite lacking recent evidence of reproduction and, therefore, it did not completely meet the core area criteria in the outline. We also defined the Southern Rocky Mountains of Colorado and southern Wyoming as a "provisional" core area because it contained an introduced lynx population that had demonstrated reproduction (U.S. Fish and Wildlife Service 2005, p. 4). Colorado otherwise does not meet the outline's criteria for core areas because prior to the introduced population it lacked persistent verified records of lynx occurrence over time. Southern Wyoming also lacked such records and also had no evidence of recent reproduction. Aside from these two areas (Kettle/Wedge and Southern Rockies), we have designated critical habitat that includes the vast majority of the other areas identified as core areas in the recovery outline.

Regardless, the methodology we used in defining areas for lynx critical habitat did not mirror that used for the lynx recovery outline, although it did reflect the biological concepts considered in the recovery outline. We used the best scientific information available in determining which areas contained the features essential to the conservation of lynx. The areas we determined to be essential for the conservation of lynx do not include all the areas identified in the recovery outline. The criteria we used for determining areas essential to the conservation of lynx for the revised critical habitat designation are based on the critical habitat requirements of the Act, which are more selective than those used for delineating the recovery areas in the outline. The recovery outline more broadly encompasses older records of lynx, and the areas in the recovery outline were mapped conceptually, include substantial areas that do not contain the physical and biological features essential for lynx, or are both unoccupied and not essential for lynx conservation, and, therefore, do not meet the definition of critical habitat. We refined our mapping for the purposes of designating critical habitat in order to meet the statutory requirements associated with critical habitat. As a result, areas determined to be essential to the conservation of lynx for the purposes of critical habitat did not include all the areas delineated in the recovery outline.

(33) *Comment:* One commenter contends that, because we acknowledge

that the best available information does not allow us to simply measure and map all the physical and biological features essential to lynx across the range of the DPS, we have failed to demonstrate that designated areas actually contain all the essential features and, therefore, we should withdraw the designation until we have information adequate to map only those areas that contain all of the essential features. Another commenter argued that, because we concede that the best available information does not allow specific quantification of the essential physical and biological features, it is inappropriate to use "adequate quantity and spatial arrangement" of these features as a prerequisite for critical habitat and we should designate all areas that demonstrate they contain some quantity of the features.

*Our Response:* The Act does not require that we have perfect information before designating critical habitat, only that we make our designations appropriately based on the best available information. Because we lack perfect information and tools adequate for measuring the precise distribution of all the essential features across the broad range of the DPS we must look at the history of verified lynx records, the results of lynx and hare surveys and habitat assessments, and evidence of an area's ability to support lynx over time to evaluate the historic and current distributions of habitats that contain the essential features. We have evaluated the available scientific and commercial information and believe that this critical habitat designation appropriately relies on that information to distinguish between areas that demonstrably contain the essential features in adequate quantity and spatial arrangement to support lynx populations and which, therefore, are essential to the conservation and recovery of the DPS from other areas for which such evidence is lacking.

(34) *Comment:* Several commenters stated that we failed to identify and designate critical habitat in important linkage corridors they believe are essential to the conservation of the DPS. Other commenters believe that we should designate critical habitat in northeastern Washington because it serves as an important linkage between lynx populations in the Northern Rockies of Montana and Idaho and those in the North Cascades of north-central Washington.

*Our Response:* We agree that providing protection for travel and dispersal are important for maintaining lynx populations over time. Critical habitat is designated for the

conservation of the PCE essential to the conservation of the lynx and necessary to support lynx life-history functions. The PCE comprises the essential features of the boreal forest types that provide, for example, prey, reproduction and denning habitat, and snow conditions that give lynx a competitive advantage over other hare predators. Critical habitat for lynx does provide habitat connectivity for travel within home ranges, and exploratory movements and dispersal within critical habitat units. Critical habitat in the final rule was delineated to encompass occupied areas containing features essential to the conservation of the lynx to provide connectivity within the particular regional unit and to maintain direct connectivity with lynx populations in Canada.

Lynx populations in the contiguous United States are believed to be influenced by lynx population dynamics in Canada, and many of these populations in Canada are directly interconnected with U.S. populations. Therefore, retaining connectivity with the larger lynx population in Canada is thought to be important to ensuring long-term persistence of lynx populations in the United States. However, lynx are wide-ranging animals with a well-documented ability to make long journeys across both suitable and unsuitable habitats (68 FR 40079), and there is no evidence that human-caused factors have significantly reduced the ability of lynx to disperse or resulted in the loss of genetic or demographic interchange (65 FR 16079). As we highlighted in our response to comment (22), above, although the level of diminished connectivity at which DPS populations could be affected is unknown, we have no evidence that current levels of connectivity between lynx populations in the DPS and those in the core of the lynx's range are inadequate to maintain the genetic and demographic health of DPS populations or that this situation is likely to change in the foreseeable future. Finally, as stated above in our response to comment (31), we are aware of no evidence that lynx travel between the Northern Rockies and the North Cascades via northeastern Washington.

(35) *Comment:* Some commenters questioned the adequacy of the environmental assessment and other aspects of our compliance with NEPA. They felt that the draft environmental assessment lacked information, did not address recovery, and did not address the full range of alternatives. Some recommended an alternative that includes all core areas identified in the recovery outline. Some felt that we

should prepare an environmental impact statement (EIS) on this action.

*Our Response:* We have complied with the requirements of NEPA for this critical habitat designation for lynx. An EIS is required only in instances where a proposed Federal action is expected to have a significant impact on the human environment. We prepared a draft environmental assessment and a draft economic analysis of the effects of the proposed designation to determine whether designation of critical habitat would have significant impacts. A notice of availability for public review of these documents was published in the **Federal Register** on June 20, 2014 (79 FR 35303). The draft documents have been available since that date on our Web site (*http://www.fws.gov/mountain-prairie/species/mammals/lynx/index.htm*), at *www.regulations.gov,* and by request from the Service's Montana Field Office. We accepted public comment for 30 days after the posting. Following consideration of public comments, we prepared a final environmental assessment and determination that critical habitat designation does not constitute a major Federal action having a significant impact on the human environment. That determination is documented in our Finding of No Significant Impact (FONSI). Both the final environmental assessment and FONSI are available on our Web site and at *www.regulations.gov* (also see **ADDRESSES** section of this rule).

The environmental assessment was prepared for this rule to identify alternatives, identify and analyze significant issues, and determine whether additional analysis was required in an EIS. Two alternatives were considered in the EA: The No Action (Baseline) Alternative and the Proposed Action. Two other alternatives were considered but not brought forward for analysis. The two alternatives not considered further were: (1) Critical habitat designation of all areas within the geographic range of the lynx in the contiguous United States, and (2) designation of all recovery areas (including core areas) as described in the lynx recovery outline. These alternatives were not carried forward because the Act specifies that, except in circumstances determined by the Secretary, critical habitat shall not include the entire geographic area that can be occupied by the species, and the recovery outline was not analyzed as an alternative because it did not meet the criteria for critical habitat defined in the proposed rule.

The designation of critical habitat itself is not a recovery action, but

identifies geographic areas that have the primary biological and physical elements necessary for conservation of lynx and that may require special management. We recognize that designation of critical habitat may not include all of the habitat area that may eventually be determined to be necessary for the recovery of a species. Critical habitat designations made on the basis of the best available information will not control the direction and substance of future recovery plans or planning efforts.

*Comments on the Economic Analysis*

(36) *Comment:* The Small Business Association Office of Advocacy (Advocacy) expressed concern that we improperly certified that the proposed rule would not have a significant impact on a substantial number of small businesses based on the mistaken belief that critical habitat designations only impact Federal agencies. Advocacy asserts that small businesses, especially in the forestry industry, are concerned that we are not considering the impact this designation will have on the industry, and that we should publish an Initial Regulatory Flexibility Analysis (IRFA).

*Our Response:* Our assessment of our responsibilities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), including the need for an IRFA, was provided in the Required Determinations—Amended section of the Notice of Availability published in the **Federal Register** on June 20, 2014 (79 FR 35308) and is reaffirmed in the Required Determinations section of this final rule (below). We evaluated the potential timber-related effects of the critical habitat designation in our environmental assessment (U.S. Fish and Wildlife Service 2014, pp. 35–44, 81–82) and both our 2008 and 2014 economic analyses (IEc, Inc. 2008, 4–1– 4–39; U.S. Fish and Wildlife Service and IEc, Inc. 2014, pp. 6–15). We concluded that critical habitat designation was unlikely to result in significant impacts to timber-related activities because these activities on Federal lands or for which a Federal nexus exists already must undergo consultation, because the additional prohibition on the destruction or adverse modification of designated critical habitat is unlikely to result in additional conservation measures or restrictions, and because these activities on private lands for which there is no Federal nexus typically will not require consultation under section 7 of the Act.

(37) *Comment:* Multiple commenters stated that the economic screening analysis did not comply with ESA

Section 4(b)(2) or the 2010 Wyoming District Court decision, which enjoined the critical habitat designation in Washington State due to inadequacies that the court identified in the Service's 2009 critical habitat rulemaking. The commenter states that based on the Tenth Circuit's decision in *New Mexico Cattle Growers Association* v. *U.S. Fish & Wildlife Service*, 248 F. 3d 1277, 1285 (10th Cir. 2001), the District Court concluded that the Service cannot focus solely on the "quantifiable discounted future incremental costs." One commenter noted that the screening analysis used the baseline model and considered only the incremental effects of the designation of critical habitat. The commenter stated that new Service guidance endorsing the baseline approach does not relieve the Service from the order issued by the District Court in this case. The commenter goes on to state that the approach used in the screening analysis forecloses any possibility that the Service would give meaningful consideration to Washington State Snowmobile Association's (WASSA's) Section 4(b)(2) exclusion request.

*Our Response:* The Service relied on both the economic screening analysis prepared for this revised designation (U.S. Fish and Wildlife Service and IEc, Inc. 2014, entire) and the Economic Analysis prepared for the 2009 designation (IEc, Inc. 2008, entire) to evaluate the potential economic impacts from the critical habitat designation and to give meaningful consideration to the WASSA's exclusion request. The WASSA provided detailed comments about potential economic impacts, which were also considered by the Secretary when she determined whether or not to exclude any areas as a result of economics under section 4(b)(2) of the ESA.

(38) *Comment:* Multiple commenters stated that the economic analysis should consider impacts to all 41,547 square miles proposed for designation. One commenter stated that the **Federal Register** notice accompanying the DEA attempts to limit the analysis to consider just the incremental "administrative costs of the 11 percent of the proposed critical habitat that is not already designated." The commenter stated that the screening analysis must include an analysis of the economic impacts of the entire designation that is being proposed.

*Our Response:* Section 3 of the screening analysis does consider the incremental costs of the proposed rule across all 41,547 square miles proposed as critical habitat for the Canada lynx. In that section, we concluded that

section 7-related costs of designating revised critical habitat for the lynx are likely to be limited to the additional administrative effort required to consider adverse modification based in part on the fact that all areas proposed as critical habitat lands are considered to be currently occupied by the species, which provides the species significant baseline protection under the Act. We then estimated the administrative cost of addressing adverse modification during the section 7 consultation at approximately $320,000 per year based on a future consultation rate of 12 formal consultations, 101 informal consultations, and 48 technical assistances per year. Because this estimate may overstate the consultation rate for some field offices that were unable to limit the consultation history to only those areas proposed as critical habitat, it is likely conservative (i.e., it is more likely to overestimate these costs than it is to underestimate them). Section 4 of the screening analysis discusses other, non-section-7 effects of the proposed designation. These effects are only considered in newly added critical habitat, which consisted of 888 mi$^2$ or two percent of the proposed critical habitat. The analysis of other, non-section-7 costs was limited to newly added areas because these are areas where the revised designation may increase awareness among project proponents of the presence of the lynx and/or the need for lynx conservation. We also note that we carefully considered the Final Economic Analysis prepared for the 2009 designation (IEc, Inc. 2008, entire) when considering areas for exclusion in this final rule under section 4(b)(2) of the ESA.

(39) *Comment:* One commenter stated that the screening analysis fundamentally fails to account for proposed changes to the definition of "destruction or adverse modification" currently under consideration at 79 FR 27060. The commenter stated that the Service's conclusion that there will be no meaningful economic impacts is premised on the overlap between restrictions imposed under the jeopardy standard and the destruction or adverse modification standard. The commenter contended that the Service must analyze whether those assumptions hold true in light of proposed regulatory changes to the Service's definition at 50 CFR 402.02. According to the commenter, these concerns are particularly relevant with respect to fire ecology management on dry forest lands in Washington and Wyoming, as the proposed rule for revising the definition of adverse modification indicates that an activity

could adversely modify critical habitat by preventing successional changes such as stand-replacing fires.

*Our Response:* On May 12, 2014, we and the National Marine Fisheries Service published in the **Federal Register** and invited public comment on a proposed rule to revise the definition of "destruction or adverse modification" of critical habitat (79 FR 27060–27066). In the proposed rule we stated: "In proposing a new definition for 'destruction or adverse modification,' and setting out the accompanying clarifying discussion in this Preamble, the Services are establishing prospective standards only. Nothing in these proposed revised regulations is intended to require (now or at such time as these regulations may become final) that any previously completed biological opinions must be reevaluated on this basis" (79 FR 27062). Similarly, we do not intend to evaluate the proposed revised definition's potential implications for this or other critical habitat designations, or to retroactively apply the eventual final definition to previously completed designations.

Regardless, because section 7 consultations addressing the jeopardy standard for lynx already do, and likely will continue to, focus largely on potential impacts to snowshoe hare (i.e., lynx foraging) habitats, we do not expect the revised definition to appreciably diminish the overlap between restrictions imposed under the jeopardy standard and the destruction or adverse modification standard. Additionally, fire ecology management activities discussed by the commenter are unlikely to be undertaken solely to avoid adverse modification to lynx critical habitat resulting from wildfires, but also to protect other uses of forests in which these activities would be undertaken. Therefore, even without the critical habitat designation, fire ecology management activities are likely to occur in these areas.

(40) *Comment:* Multiple commenters expressed concern about increased litigation-related costs associated with the final critical habitat rule. One commenter states that future claims may be brought against Federal agencies and developers alleging that a given project causes "adverse modification" of critical habitat or asserting a higher analytical burden under the NEPA as a result of a project's location in critical habitat.

*Our Response:* The Service does not consider the costs of litigation surrounding the critical habitat rule when considering the economic impacts of the rule itself. The extent to which litigation specifically regarding critical

habitat may add to the costs of the critical habitat designation is uncertain. While designation of critical habitat may stimulate additional legal actions, data do not exist to reliably estimate such impacts. That is, estimating the number, scope, timing, and costs of potential future legal challenges would require significant speculation.

(41) *Comment:* One commenter stated that the screening analysis fails to account for the economic impact associated with unintentional impacts on forest management practices. The commenter stated that critical habitat designations negatively impact forest management practices by either creating too much "red tape" or by providing litigation angles to stop forest management projects, resulting in a decrease in forest health, an increase in catastrophic wildfires, and an increase in response to those wildfires.

*Our Response:* The only forest management practices that may be impacted by the designation of critical habitat are those that occur on Federal lands or which require Federal funding, authorization, or permits. The Federal agency that manages the land or which funds, authorizes, or permits these activities must consult with the Service to ensure that their actions are not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of their designated critical habitats. This final rule designates critical habitat for lynx only in areas that are currently occupied by lynx and which, therefore, already undergo section 7 consultations for projects that could affect lynx. Because these consultations already focus on impacts to lynx habitats, the additional effort and cost to formally evaluate whether they will destroy or adversely modify designated critical habitat are expected to be minor and thus unlikely to result in unintentional impacts or additional economic or regulatory burdens.

We are aware of no evidence suggesting that the designation of critical habitat will cause a decrease in forest health or an increase in catastrophic wildfires and associated responses, and none was provided by the commenters. Additionally, ecosystem restoration activities intended to reduce the risk of large, stand-replacing fires generally occur outside of lynx habitat in dry and mesic forest types at lower elevations (Interagency Lynx Biology Team 2013, p. 76). Because fire management activities are generally concentrated outside of lynx habitat, we do not expect the critical habitat designation to negatively affect forest management

practices intended to decrease the risk of catastrophic wildfires. Finally, as described in our response to comment (40) above, the extent to which critical habitat designation may result in increased litigation is uncertain and speculative.

(42) *Comment:* One commenter stated that the economic screening analysis should include costs of increased wetland mitigation required by the U.S. Army Corps of Engineers or by the U.S. Environmental Protection Agency in critical habitat areas.

*Our Response:* As stated in Section 2 of the screening analysis, we base our forecast of future consultations on the robust consultation history available for the species as well as supplemental information provided by various Service field offices that consult on lynx. The consultation record does include several consultations for wetland mitigation projects; therefore, the administrative costs related to wetland mitigation activities are included in the estimates of incremental impacts included in the screening analysis. As discussed in Section 3, based on the substantial baseline protections afforded the lynx and the close relationship between adverse modification and jeopardy in occupied habitat, the incremental costs of the critical habitat designation are unlikely to result in any project modifications incremental to (i.e., above and beyond) the baseline.

(43) *Comment:* One commenter stated that economic impacts in Wyoming will be greater than those described in the screening analysis. The commenter stated that, both in perception and reality, the threats of critical habitat designation on multiple-use lands in the expansion area chills activity and will have substantial impacts on economic development and management of other resources. According to the commenter, resource managers in the affected area note that critical habitat creates significant roadblocks for the development of projects that can benefit other wildlife species, recreational opportunities, and local and State economies. The commenter requests that the Service conduct a new economic analysis that considers the real costs of expanding critical habitat in Wyoming.

*Our Response:* As stated in Section 3 of the screening analysis, we expect incremental costs to be limited to administrative costs based in part on the fact that all areas proposed as critical habitat lands are considered to be currently occupied by the species, which provides the species significant baseline protection under the Act. To estimate the magnitude of incremental

costs, we rely on the robust consultation history as well as outreach to relevant Service field offices and other Federal stakeholders. In addition, the screening analysis considers information from publically available sources and public comments submitted in response to the proposed critical habitat rulemaking. Other, non-section-7 incremental costs are considered in Section 4 of the screening analysis. The commenter did not provide additional, actionable data or evidence of the categories of impacts raised in the public comment that could be used to revise the screening analysis.

(44) *Comment:* One commenter stated that the fact that the screening analysis projects only 1 informal consultation per year in Washington and that the Service's Incremental Effects Memorandum (IEM) indicates that there were 195 informal lynx consultations in the State between 2008 and 2014 cannot be reconciled.

*Our Response:* As discussed in Section 3 of the screening analysis, geographic locations of the consultation history presented in the IEM were not readily available. Therefore, we contacted each field office to determine the subset of the consultations presented in the IEM that occur within the proposed critical habitat designation. As discussed in footnote 20 of the screening analysis, based on this follow-up, the Washington field office revised its consultation history to reflect only the subset of consultations for projects that occurred in areas proposed as critical habitat. Specifically, the Washington field office indicated that only 4 of the 195 informal consultations occurred within proposed critical habitat. This level of activity corresponds to approximately one informal consultation per year. According to the Washington field office, the relatively low consultation rate in the State of Washington is a reflection of existing conservation agreements and management plans, which minimize the administrative burden of section 7 consultation by precluding the need for action agencies to consult with the Service on each project individually.

(45) *Comment:* One commenter stated that the total cost column in Exhibit 4 of the screening analysis does not reflect the sum of the previous cost columns, and that these errors artificially deflate the related administrative costs.

*Our Response:* This comment reflects a transcription error. In Exhibit 4 of the screening analysis, the column titled "Biological Assessment" actually refers to the total cost of consultation *without* undertaking a biological assessment. Total costs in the columns titled

"Service", "Federal Agency", and "Third Party" sum to the number in "Biological Assessment." The column titled "Total Costs" refers to the total cost of consultation including a biological assessment. Therefore, the total cost of a biological assessment is the difference between the dollar amounts in "Total Costs" and "Biological Assessment." When calculating total impacts, we use the amounts reported in the "Total Costs" column. The error in the table actually *overestimated* the costs in the "Biological Assessment" column but did not affect the values in the "Total Costs" column. Because we relied on the "Total Costs" column when calculating total economic impacts, there was no artificial deflation of related administrative costs.

(46) *Comment:* Several commenters stated that the screening analysis should have used administrative cost information from the "robust consultation history" rather than a review of consultation records from 2002 adjusted to current dollar values. Another commenter stated that an applicant's participation in a single formal consultation under Section 7 of the Act for an oil and gas project typically costs between $75,000 and $150,000. The commenter stated that, if the cost of addressing critical habitat is approximately 20 to 25 percent of the total cost of consultation, the total incremental administrative costs of consultation would be $18,750 to $37,500, as compared to the per consultation cost of $5,000 used in our analysis. The commenter also stated that the total cost of considering critical habitat in a biological assessment ranges between $10,000 and $50,000.

*Our Response:* The consultation history for the Canada lynx is limited to information on the number of consultations per year, by field office. The Service does not collect or track information on the costs incurred by each party participating in section 7 consultations. Accordingly, the Canada lynx consultation history does not provide any additional insights on the administrative cost of section 7 consultation.

To estimate the administrative costs associated with section 7 consultation, the screening analysis relied on the best information available. As described in Exhibit 4 of the screening analysis, the consultation cost model is based on (a) data gathered from three Service field offices (including a review of consultation records and interviews with field office staff); (b) telephone interviews with action agency staff (e.g., BLM, Forest Service, U.S. Army Corps

of Engineers); and (c) telephone interviews with private consultants who perform section 7 work in support of permittees. In the case of Service and Federal agency contacts, we determined the typical level of effort required to complete several different types of consultations (i.e., hours or days of time), as well as the typical Government Service (GS) level of the staff member performing this work. In the case of private consultants, we interviewed representatives of firms in California and New England to determine the typical cost charged to clients for these efforts (e.g., biological survey, preparation of materials to support a Biological Assessment). The model is periodically updated with new information received in the course of data collection efforts supporting economic analyses and public comment on more recent critical habitat rules. In addition, the GS rates have been updated annually.

Finally, even if the estimated administrative cost of section 7 consultation were adjusted upwards to $87,500 per consultation, the sum of the upper bounds estimates for incremental administrative costs of consultation and biological assessment provided by the commenter, the total incremental impacts ($14 million) still do not approach total costs in excess of $100 million in a given year; therefore it is not considered a "significant regulatory action" under the Unfunded Mandates Reform Act (see *Unfunded Mandates Reform Act,* below).

(47) *Comment:* One commenter stated that the designation of critical habitat creates a regulatory assumption that snowmobiling activity will be further curtailed, thereby discouraging future investment that is needed to support continued viability and further growth of the industry. The commenter cited sworn testimony from two members of the Washington State Snowmobile Association (WASSA), which indicates that, during the brief period that the critical habitat designation was in place in Washington, the snowmobiling industry in Washington experienced measurable economic impacts. The commenter states that the screening analysis notes these concerns but fails to meaningfully address this potential impact.

*Our Response:* Section 4 of the screening analysis discusses potential impacts on snowmobiling in Washington. In this section, we note that in 2001, Washington State University and WASSA conducted a study estimating the annual economic contribution of the entire snowmobiling industry in Washington at

approximately $92.7 million (2001 dollars). In response to the 2009 critical habitat designation, WASSA estimated that snowmobiling accounted for nearly $8.5 million in direct expenditures and $4.1 million in indirect spending in the Methow Valley, an area adjacent to designated critical habitat. As discussed in Section 4, annual data on snowmobiling participation in Washington since 2009 are not readily available. As such, existing data are insufficient to quantify the proportion of the annual economic contribution of the snowmobiling industry that may be affected by the final rule. In addition, stakeholders contacted for the 2014 economic analysis do not anticipate the proposed rule to result in any significant changes to the management of snowmobiling activities in Washington State. We also contacted the Maine and Minnesota Service field offices to determine whether or how snowmobiling activities may have been affected as a result of snowmobiling trails proposed in critical habitat designated there since 2009. According to these discussions, no significant changes in snowmobiling activities have been observed since the 2009 designation of critical habitat in Maine and Minnesota or since the preparation of the Final Economic Analysis of the 2009 designation (IEc, Inc. 2008, entire).

(48) *Comment:* One commenter stated that the screening analysis should include costs resulting from the uncertainty and risk imposed on developers of projects located in proposed critical habitat.

*Our Response:* Section 4 of the screening analysis discusses the possible perceptional effects of the proposed rule on private property values. Specifically, this section discusses comments and concerns submitted in response to previous critical habitat rulemakings that the designation of critical habitat may affect the value of a private property due to the public perception that the Act may preclude, limit, or slow development, or somehow alter the highest and best use of the property. To assess the likelihood of such an outcome, the screening analysis examined data on development activities in areas proposed as critical habitat where the designation of critical habitat increases awareness of the presence of the species or the need for protection of its habitat. Based on the available data, we concluded that, due to low population densities, existing zoning laws, and the distance of proposed critical habitat areas from existing development or public infrastructure (e.g., public roads), the proposed critical habitat designation is

Rvsd Plan - 00003671

unlikely to result in measurable perceptional effects. The commenter did not provide data or information that could be used to revise the screening analysis to consider the potential for project developers to face greater uncertainty or risk due to the proposed rule.

(49) *Comment:* Multiple commenters stated that the screening analysis omits the economic benefits of critical habitat designation. One commenter cited increased recreational use of forests as a result of decreased forest degradation as an example of these benefits. Another commenter states that this one-sided analysis has a distorting effect as readers of the analysis may interpret the results as indicating that lynx protection is "costly" in a net sense. The commenter stated that the screening analysis provides no discussion as to whether any efforts were expended to review the literature regarding the availability of estimates of the benefit of lynx habitat conservation.

*Our Response:* As stated in Section 5 of the screening analysis, the primary intended benefit of critical habitat designation for the Canada lynx is to support the species' long-term conservation. Critical habitat designation may also generate ancillary benefits, which are defined as favorable impacts of a rulemaking that are typically unrelated, or secondary, to the statutory purpose of the rulemaking (U.S. Office of Management and Budget 2003, entire). Critical habitat aids in the conservation of species specifically by protecting the PCEs on which the species depends. To this end, management actions undertaken to conserve a species or habitat may have coincident, positive social welfare implications, such as increased recreational opportunities in a region or improved property values on nearby parcels.

As described in Section 2 of the screening analysis, incremental changes in land management as a result of the designation of critical habitat are unlikely. This finding is based primarily on the fact that all areas proposed as critical habitat are considered occupied by the species and, therefore, receive baseline protection from the listing of the species under the Act. Thus, in this instance, critical habitat designation will likely add minimal conservation benefits to those already provided by baseline conservation efforts (e.g., efforts resulting from the listing of the species under the Act). For the same reason, it follows that the designation will likely add minimal ancillary benefits above those provided in the baseline.

## Summary of Changes From Proposed Rule

In our proposed rule, published September 26, 2013 (78 FR 59430), we proposed to designate 41,547 mi$^2$ (107,607 km$^2$) of critical habitat for the Canada lynx DPS in five units in six States. The proposed critical habitat represented 23,811 mi$^2$ (61,669 km$^2$; 57 percent) on Federal lands, 4,129 mi$^2$ (10,695 km$^2$; 10 percent) on State lands, 13,050 mi$^2$ (33,800 km$^2$; 31 percent) on private lands, 535 mi$^2$ (1,385 km$^2$; 1 percent) on Tribal lands, and 23 mi$^2$ (58 km$^2$; 0.1 percent) on lands owned by local municipalities or in "other" ownership.

We received a number of site-specific comments related to critical habitat for the Canada lynx; completed our analysis of areas considered for exemption under section 4(a)(3)(B)(i) of the Act and for exclusion under section 4(b)(2) of the Act; reviewed the application of our criteria for identifying critical habitat across the range of the lynx DPS to refine our designation; and completed and carefully considered the final economic analysis of the designation as proposed. We fully considered all substantive comments from peer reviewers, States, Tribes, and the public on the proposed critical habitat rule and the associated economic and environmental analyses to develop this final critical habitat designation for the lynx DPS. This final rule incorporates changes to our proposed critical habitat based on the comments we received and to which we have responded in this document; reflects refined lynx habitat mapping provided by Federal and State partners in Idaho, Montana, and Wyoming; and considers completed final management and habitat conservation plans for lynx in Maine, Montana, and Washington.

With this final rule, we designate 38,954 mi$^2$ (100,891 km$^2$) of critical habitat for the Canada lynx DPS in five units in six States. This final designation represents 23,402 mi$^2$ (60,612 km$^2$; 60 percent) on Federal lands, 3,945 mi$^2$ (10,217 km$^2$; 10 percent) on State lands, 11,584 mi$^2$ (30,003 km$^2$; 30 percent) on private lands, and 23 mi$^2$ (59 km$^2$; 0.1 percent) on lands owned by local municipalities or in "other" ownership. Changes from the proposed rule are described below for each critical habitat unit.

Unit 1—We have excluded all Tribal lands, about 96 mi$^2$ (248 km$^2$), from critical habitat in this unit; this area is slightly larger than the area identified in the proposed rule (87 mi$^2$ (225 km$^2$)) due to improved mapping data provided by the Tribes. We have corrected the list

of Tribes whose lands occur within the final critical habitat boundary—only Passamaquoddy Tribe and Penobscot Indian Nation lands are within the boundary, and these lands are excluded from this final designation. We have also excluded about 943 mi$^2$ (2,443 km$^2$) of private lands enrolled in the Natural Resources Conservation Service's Healthy Forest Reserve Program (HFRP). With this final rule, we designate 10,123 mi$^2$ (26,218 km$^2$) of critical habitat in this unit, which represents a 1,039-mi$^2$ (2,691-km$^2$; 9.3-percent) reduction from the proposed designation. See Consideration of Impacts under Section 4(b)(2) of the Act, below, for details regarding lands excluded from designation in this unit.

Unit 2—We have excluded about 78 mi$^2$ (202 km$^2$) of Tribal lands from critical habitat in this unit. With this final rule, we designate 8,069 mi$^2$ (20,899 km$^2$) of critical habitat in this unit, which represents a 78-mi$^2$ (202-km$^2$; 1.0-percent) reduction from the proposed designation. See Consideration of Impacts under Section 4(b)(2) of the Act, below, for details regarding lands excluded from designation in this unit.

Unit 3—We have excluded from critical habitat in this unit about 370 mi$^2$ (958 km$^2$) of Tribal lands as well as 271 mi$^2$ (702 km$^2$) of State lands managed in accordance with the MDNRC Forested State Trust Lands HCP. See Consideration of Impacts under Section 4(b)(2) of the Act, below, for details regarding lands excluded from designation in this unit. We have added about 61 mi$^2$ (158 km$^2$) of Federal land and 39 mi$^2$ (101 km$^2$) of private lands; and we have removed about 73 mi$^2$ (189 km$^2$) of Federal land, 77 mi$^2$ (189 km$^2$) of private land, and 28 mi$^2$ (73 km$^2$) of State Trust land in the vicinity of Flathead National Forest in Montana due to improved lynx habitat mapping on this National Forest (U.S. Forest Service 2013a, entire)—a net reduction of 78 mi$^2$ (202 km$^2$) in this area. However, due to improved ownership data, the final designation represents a net increase of about 136 mi$^2$ (352 km$^2$) of Federal lands in this unit. With this final rule, we designate 9,783 mi$^2$ (25,337 km$^2$) of critical habitat in this unit, which represents a 691-mi$^2$ (1,790-km$^2$; 6.6-percent) reduction from the proposed designation.

Unit 4—We have excluded about 164 mi$^2$ (425 km$^2$) of State lands managed in accordance with the WDNR Lynx Habitat Management Plan. With this final rule, we designate 1,834 mi$^2$ (4,751 km$^2$) of critical habitat in this unit, which represents a 164-mi$^2$ (425-km$^2$, 8.2-percent) reduction from the

proposed designation. See Consideration of Impacts under Section 4(b)(2) of the Act, below, for details regarding lands excluded from designation in this unit.

Unit 5—We have excluded 1.3 mi² (3.4 km²) of State land managed in accordance with the MDNRC HCP. See Consideration of Impacts under Section 4(b)(2) of the Act, below, for details regarding lands excluded from designation in this unit. We have also removed about 543 mi² (1,406 km²) of Federal lands, 6 mi² (16 km²) of State lands, and 71 mi² (184 km²) of private lands on and adjacent to the Gallatin and Custer National Forests in Montana and BLM lands in Wyoming due to improved lynx habitat mapping and information from those agencies (U.S. Fish and Wildlife Service 2013a, entire; 2013b, entire; U.S. Forest Service 2013b, entire). With this final rule, we designate 9,146 mi² (23,687 km²) of critical habitat in this unit, which represents a 620-mi² (1,606-km²; 6.4-percent) reduction from the proposed designation in this unit.

Overall, this final designation represents a reduction on (1) Federal lands of 409 mi² (1,059 km²; 1.7 percent); (2) State lands of 184 mi² (477 km²; 4.5 percent); (3) private lands of 1,466 mi² (3,797 km²; 11.2 percent), and (4) Tribal lands of 535 mi² (1,386 km²; 100 percent) from the area proposed for designation. With this final rule, we designate 38,954 mi² (100,891 km²) of critical habitat for the Canada lynx DPS. This represents a 2,593-mi² (6,716-km²; 6.2-percent) reduction from the area identified in the September 26, 2013, proposed rule (78 FR 59430).

## Revised Definition of the Contiguous United States Distinct Population Segment of the Canada Lynx

In the final listing rule for the Canada lynx, dated March 24, 2000, the Service defined the contiguous United States DPS of lynx based on the international boundary with Canada and State boundaries of all 14 States in the historic and current range of lynx (65 FR 16052; 74 FR 66937). With that definition, New Mexico was not included in the listed area because no lynx occurred there, historic records did not show lynx in the State, and it lacked lynx habitat.

On December 17, 2009, the Service published a 12-month "warranted but precluded" finding in the **Federal Register** on a petition to expand the listing of the Canada lynx to include the State of New Mexico (74 FR 66937). That finding was made in response to an August 8, 2007, petition from a coalition of environmental groups and a 2008 settlement agreement. In the finding, the Service acknowledged that lynx associated with a lynx population introduced into Colorado were "regularly and frequently" crossing the State boundary between Colorado and New Mexico and that, when they did, they were no longer protected by the Act because New Mexico was not included in the listed DPS area. In 2011, as part of a settlement agreement reached in Multi-District litigation, the Service agreed to amend the listing rule to include New Mexico so that lynx entering New Mexico from Colorado would no longer lose Federal protection under the Act upon crossing the State boundary.

We have determined that lynx entering New Mexico, or any other States not currently included in the DPS as described in the 2000 final listing rule, should not lose their protection under the Act upon doing so. Therefore, with this final rule, we have rescinded the State-boundary-based definition of the range of the contiguous United States lynx DPS and replace it in regulation with a definition of the DPS range that extends the Act's protections to lynx "where found within the contiguous United States." This change ensures that all lynx in the contiguous United States receive protection under the Act regardless of where they occur, including (but not limited to) New Mexico.

## Critical Habitat

### Background

Critical habitat is defined in section 3 of the Act as:

(1) The specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the Act, on which are found those physical or biological features

(a) Essential to the conservation of the species, and

(b) Which may require special management considerations or protection; and

(2) Specific areas outside the geographical area occupied by the species at the time it is listed, upon a determination that such areas are essential for the conservation of the species.

Conservation, as defined under section 3 of the Act, means to use and the use of all methods and procedures that are necessary to bring an endangered or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

Critical habitat receives protection under section 7 of the Act through the requirement that Federal agencies ensure, in consultation with the Service, that any action they authorize, fund, or carry out is not likely to result in the destruction or adverse modification of critical habitat. The designation of critical habitat does not affect land ownership or establish a refuge, wilderness, reserve, preserve, or other conservation area. Such designation does not allow the government or public to access private lands. Such designation does not require implementation of restoration, recovery, or enhancement measures by non-Federal landowners. Where a landowner requests Federal agency funding or authorization for an action that may affect a listed species or critical habitat, the consultation requirements of section 7(a)(2) of the Act would apply, but even in the event of a destruction or adverse modification finding, the obligation of the Federal action agency and the landowner is not to restore or recover the species, but to implement reasonable and prudent alternatives to avoid destruction or adverse modification of critical habitat.

Under the first prong of the Act's definition of critical habitat, areas within the geographical area occupied by the species at the time it was listed are included in a critical habitat designation if they contain physical or biological features (1) which are essential to the conservation of the species and (2) which may require special management considerations or protection. For these areas, critical habitat designations identify, to the extent known using the best scientific and commercial data available, those physical or biological features that are essential to the conservation of the species (such as space, food, cover, and protected habitat). In identifying those physical or biological features within an area, we focus on the principal biological or physical constituent elements (primary constituent elements such as roost sites, nesting grounds, seasonal wetlands, water quality, tide, soil type) that are essential to the conservation of the species. Primary constituent elements are those specific elements of the physical or biological

features that provide for a species' life-history processes and are essential to the conservation of the species.

Under the second prong of the Act's definition of critical habitat, we can designate critical habitat in areas outside the geographical area occupied by the species at the time it is listed, upon a determination that such areas are essential for the conservation of the species. For example, an area currently occupied by the species but that was not occupied at the time of listing may be essential to the conservation of the species and may be included in the critical habitat designation. We designate critical habitat in areas outside the geographical area occupied by a species only when a designation limited to its range would be inadequate to ensure the conservation of the species.

Section 4 of the Act requires that we designate critical habitat on the basis of the best scientific and commercial data available. Further, our Policy on Information Standards Under the Endangered Species Act (published in the **Federal Register** on July 1, 1994 (59 FR 34271)), the Information Quality Act (section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L. 106–554; H.R. 5658)), and our associated Information Quality Guidelines provide criteria, establish procedures, and provide guidance to ensure that our decisions are based on the best scientific data available. They require our biologists, to the extent consistent with the Act and with the use of the best scientific data available, to use primary and original sources of information as the basis for recommendations to designate critical habitat.

When we are determining which areas should be designated as critical habitat, our primary source of information is generally the information developed during the listing process for the species. Additional information sources may include the recovery plan or recovery outline for the species (if one has been completed), articles in peer-reviewed journals, conservation plans developed by States and counties, scientific status surveys and studies, biological assessments, other unpublished materials, or experts' opinions or personal knowledge.

Habitat is dynamic, and species may move from one area to another over time. We recognize that critical habitat designated at a particular point in time may not include all of the habitat areas that we may later determine are necessary for the recovery of the species. For these reasons, a critical habitat designation does not signal that

habitat outside the designated area is unimportant or may not be needed for recovery of the species. Areas that are important to the conservation of the species, both inside and outside the critical habitat designation, will continue to be subject to: (1) Conservation actions implemented under section 7(a)(1) of the Act, (2) regulatory protections afforded by the requirement in section 7(a)(2) of the Act for Federal agencies to insure their actions are not likely to jeopardize the continued existence of any endangered or threatened species, and (3) section 9 of the Act's prohibitions on taking any individual of the species, including taking caused by actions that affect habitat. Federally funded or permitted projects affecting listed species outside their designated critical habitat areas may still result in jeopardy findings in some cases. These protections and conservation tools will continue to contribute to recovery of this species. Similarly, critical habitat designations made on the basis of the best available information at the time of designation will not control the direction and substance of future recovery plans, habitat conservation plans (HCPs), or other species conservation planning efforts if new information available at the time of these planning efforts calls for a different outcome.

*Physical or Biological Features*

In accordance with section 3(5)(A)(i) and 4(b)(1)(A) of the Act and regulations at 50 CFR 424.12, in determining which areas within the geographical area occupied by the species at the time of listing to designate as critical habitat, we consider the physical or biological features essential to the conservation of the species and which may require special management considerations or protection. These include, but are not limited to:

(1) Space for individual and population growth and for normal behavior;

(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;

(3) Cover or shelter;

(4) Sites for breeding, reproduction, or rearing (or development) of offspring; and

(5) Habitats that are protected from disturbance or are representative of the historical, geographical, and ecological distributions of a species.

We derive the specific physical or biological features essential for the lynx DPS from studies of this species' habitat, ecology, and life history as described in the Background and Critical Habitat sections of the proposed

rule to designate critical habitat published in the **Federal Register** on September 26, 2013 (78 FR 59430), and in the information presented below. Additional information on the habitat, ecology, and life history of the lynx DPS can be found in the documents listed above under Previous Federal Actions. We have determined that lynx require the following physical or biological features:

Space for Individual and Population Growth and for Normal Behavior

*Boreal Forest Landscapes*

Lynx populations respond to biotic and abiotic factors at different scales. At the regional scale, boreal forests, snow conditions, and competitors (especially bobcat) influence the species' range (Aubry *et al.* 2000, pp. 378–380; McKelvey *et al.* 2000a, pp. 242–253; Hoving *et al.*, 2005 p. 749). At the landscape scale within each region, natural and human-caused disturbance processes (e.g., fire, wind, insect infestations, forest management, and development) may influence the spatial and temporal distribution of lynx populations by affecting the distribution of high-quality habitat for snowshoe hares (Agee 2000, pp. 47–73; Ruediger *et al.* 2000, pp. 1–3, 2–2—2–6, 7–3). At the stand-level (vegetation community) scale, the quality, quantity, and juxtaposition of habitats influence home range location and size, productivity, and survival (Aubry *et al.* 2000, pp. 380–390; Vashon *et al.* 2005a, pp. 9–11). At the smaller substand (within-stand) scale, the spatial distribution and abundance of prey and microclimate likely influence lynx movements, hunting behavior, and den and resting site locations (Organ *et al.* 2008, entire; Squires *et al.* 2008, entire; Moen and Burdett 2009, p. 16; Squires *et al.* 2010, pp. 1648, 1654–1657).

Generally, the physical and biological features of critical habitat for lynx are found within relatively large landscapes (large enough to support multiple lynx home ranges) in what is broadly described as the boreal forest or cold temperate forest (Frelich and Reich 1995, p. 325; Agee 2000, pp. 43–46). That is, no individual small-scale area or site is likely to have all of the physical and biological features lynx need to survive. However, small lynx populations can persist in areas with relatively small areas of boreal forest habitat, as they do in the Garnet Mountains in western Montana and in the Wyoming Range in northwestern Wyoming (Squires 2014, pers. comm.). Lynx in the DPS use very large areas as home ranges that incorporate landscape

features that may be widely separated from one another to satisfy all of their life-history needs. In contrast to the extensive homogenous boreal forest found in the core of lynx range in northern Canada and Alaska, the southern terminus of the boreal forest type that extends into parts of the northern contiguous United States becomes transitional with other forest types—the Acadian forest in the Northeast (Seymour and Hunter 1992, pp. 1, 3), deciduous temperate forest in the Great Lakes, and subalpine forest in the west (Agee 2000, pp. 43–46). In this rule, we use the term ''boreal forest'' because it generally encompasses most of the vegetative descriptions of the transitional forest types that comprise lynx habitat in the contiguous United States (Agee 2000, pp. 40–41).

Because of the transitional nature and patchy distribution of boreal forest in the contiguous United States, species that are specifically adapted to the classic boreal forest farther north, like the lynx, must contend with aspects of their habitat at the southern extent of the boreal forest for which they are not as well-adapted. For example, southern transitional boreal forests often have lower landscape snowshoe hare densities than boreal forests further north (Wolff 1980, pp. 123–128; Buehler and Keith 1982, pp. 24, 28; Koehler 1990, p. 849; Koehler and Aubry 1994, p. 84). This difference requires lynx in the contiguous United States to incorporate more land area into their home ranges than lynx do in the north to acquire adequate food (Mowat et al. 2000, pp. 265, 277–278). At some point, landscape hare densities become too low, making some areas incapable of supporting lynx. Larger home ranges likely require more energy output associated with greater foraging effort (Apps 2000, p. 364) and possibly increased exposure to predation and other mortality factors than lynx face in the core of their range. All of these factors likely lead to lower reproductive output and more tenuous conservation status in many parts of the DPS relative to those in Canada and Alaska (Buskirk et al. 2000a, p. 95).

Throughout the range of the DPS, lynx habitat occurs within boreal forest vegetation types that support relatively high landscape densities of snowshoe hares and have deep snow for extended periods. In eastern North America, lynx are strongly associated with areas of deep snowfall and large (40-mi² (100-km²)) landscapes that have been heavily cut and treated with herbicides and have a high proportion of young regenerating forest (Hoving 2001, pp. 75, 143). Hoving et al. (2004, p. 291)

concluded that the broad geographic distribution of lynx in eastern North America is most influenced by snowfall, but within areas of similarly deep snowfall, measures of forest succession become more important factors in determining lynx distribution. Second-order habitat selection in the Acadian forest region is influenced by hare density (a surrogate for early successional forest) and by mature conifer forest, despite its association with lower hare densities (Simons-Legaard et al. 2013b, pp. 573–574). In the Northern Rocky Mountains, lynx appear to be less tied to early successional forest stages; high lynx use and hare densities, especially in the critical winter season, occur in mature multistoried forest stands where conifer branches reach the snow surface and thereby provide hare forage (Squires et al. 2006a, p. 15; Squires et al. 2010, pp. 1653–1657; Berg et al. 2012, entire).

Boreal forests used by lynx are generally cool, moist, and dominated by conifer tree species, primarily spruce and fir (Agee 2000, pp. 40–46; Aubry et al. 2000, pp. 378–382; Ruediger et al. 2000, pp. 4–3, 4–8—4–11, 4–25—4–26, 4–29—4–30). Boreal forest landscapes used by lynx are heterogeneous mosaics of vegetative cover types and successional forest stages created by natural and human-caused disturbances (McKelvey et al. 2000c, pp. 426–434). In many places, periodic vegetation disturbances stimulate development of dense understory or early successional habitat for snowshoe hares (Ruediger et al. 2000, pp. 1–3—1–4, 7–4—7–5). In Maine, lynx are positively associated with landscapes that were clearcut 15 to 35 years previously (Hoving et al. 2004, p. 291; Simons-Legaard et al. 2013b, pp. 573–574), some of which were also treated with herbicides to promote conifer regeneration (Scott 2009, p. 7). In other places, such as the Northern Rocky Mountains and Greater Yellowstone Area, mature multistoried conifer forests as well as dense regenerating conifer stands provide foraging habitat for lynx (Squires et al. 2010, pp. 1648, 1653–1657; Berg et al. 2012, entire).

The overall quality of the boreal forest landscape and the juxtaposition of stands of high-quality habitat within the landscape are important for both lynx and snowshoe hares in that both can influence connectivity or movements between habitat patches, availability of food and cover, and spatial structuring of populations or subpopulations (Hodges 2000, pp. 184–195; McKelvey et al. 2000c, pp. 431–432; Walker 2005, p. 79). For example, lynx foraging habitat must be near denning habitat to

allow females to adequately provision dependent kittens, especially when the kittens are relatively immobile (Moen et al. 2008a, p. 1507; Vashon et al. 2012, p. 16). In north-central Washington, hare densities are higher in landscapes with an abundance of dense boreal forest interspersed with small patches of open habitat, in contrast to landscapes composed primarily of open forest interspersed with few patches containing dense vegetation (Walker 2005, p. 79; Lewis et al. 2011, p. 565). Similarly, in northwest Montana, connectivity of dense patches within the forest matrix benefits snowshoe hares (Ausband and Baty 2005, p. 209). In mountainous areas, lynx appear to prefer relatively gentle slopes (Apps 2000, p. 361; McKelvey et al. 2000d, p. 333; von Kienast 2003, p. 21, Table 2; Maletzke 2004, pp. 17–18).

Individual lynx require large areas of boreal forest landscapes to support their home ranges and to facilitate dispersal and exploratory travel. The size of lynx home ranges is strongly influenced by the quality of the habitat, particularly the abundance of snowshoe hares, in addition to other factors such as gender, age, season, and density of the lynx population (Aubry et al. 2000, pp. 382–385; Mowat et al. 2000, pp. 276–280). Generally, females with kittens have the smallest home ranges while males have the largest home ranges (Moen et al. 2005, p. 11; Burdett et al. 2007, p. 463). Reported average home range sizes vary greatly from 12 mi² (31 km²) for females and 26 mi² (68 km²) for males in Maine (Vashon et al. 2005a, p. 7), 8 mi² (21 km²) for females and 119 mi² (307 km²) for males in Minnesota (Moen et al. 2005, p. 12), and 34 mi² (88 km²) for females and 83 mi² (216 km²) for males in northwest Montana (Squires et al. 2004a, p. 13). Home range sizes of lynx in the population introduced into Colorado averaged 29 mi² (75 km²) among reproductive females, 40 mi² (103 km²) among attending (reproductive) males, and 252 mi² (654 km²) among all non-reproductive lynx (Shenk 2008, pp. 1, 10). Based on data presented in Shenk (2008, p. 10) and combining reproductive and non-reproductive lynx, home range estimates for lynx in Colorado averaged 181 mi² (470 km²) for females and 106 mi² (273 km²) for males.

## Forest Type Associations in the Contiguous United States

### Maine

Stands of regenerating sapling (15–35 years old) spruce-fir forest that provide dense cover are preferred by both snowshoe hares and lynx in Maine

Federal Register / Vol. 79, No. 177 / Friday, September 12, 2014 / Rules and Regulations **54807**

(Robinson 2006, pp. 26–36; Vashon *et al.* 2012, p. 15). Lynx are more likely to occur in large (40 mi² (100 km²)) landscapes with regenerating forest, and less likely to occur in landscapes with very recent clear-cut or partial harvest (Hoving *et al.* 2004, pp. 291–292). Regenerating stands used by lynx generally develop after forest disturbance and are characterized by dense horizontal structure and high stem density within a meter of the ground. These habitats support high snowshoe hare densities (Homyack 2003, p. 63; Fuller and Harrison 2005, pp. 716, 719; Vashon *et al.* 2005a, pp. 10–11). At the stand scale, lynx in northwestern Maine select older (11- to 26-year-old), tall (15 to 24 feet (ft) (4.6 to 7.3 meters (m)) regenerating clear-cut stands and older (11- to 21-year-old) partially harvested stands (Fuller *et al.* 2007, pp. 1980, 1983–1985). At the home range scale, lynx also select mature conifer forest (Simons-Legaard *et al.* 2013b, pp. 572–573). Lynx may use partial harvested and mature conifer stands associated with low hare densities because of increased ease of travel and prey access along the extensive edges with high-quality (regenerating clear-cut) habitats (Simons-Legaard *et al.* 2013b, p. 574). Most of the high-quality hare and lynx habitat in northern Maine is the result of landscape-scale clear-cut timber harvesting in response to a spruce budworm outbreak in the 1970s–1980s (Simons 2009, pp. 64, 218). Some of these clearcuts were also treated with herbicides to promote conifer regeneration by suppressing deciduous tree species. Both the current amount of high-quality habitat and the lynx population in Maine are likely larger than occurred prior to European settlement, when a relatively smaller proportion of the forest was in an early successional stage (Lorimer 1977, entire; Vashon *et al.* 2012, pp. 45, 56), likely because the natural disturbance regime resulted in smaller frequent disturbances and long intervals between larger disturbances.

Minnesota

In Minnesota, lynx primarily occur in the Northern Superior Uplands Ecological Section of the Laurentian Mixed Forest Province. Historically, this area was dominated by red pine (*Pinus resinosa*) and white pine (*P. strobus*) mixed with aspen (*Populus* spp.), paper birch (*Betula papyrifera*), spruce, balsam fir (*A. balsamifera*) and jack pine (*P. banksiana*) (Minnesota Department of Natural Resources [Minnesota DNR] 2003, p. 2). Lynx habitats in Minnesota are associated with Lowland Conifer,

Upland Conifer, Mixed Conifer, and Regenerating Forest cover types, with lynx selecting the latter because it provides snowshoe hare habitat (Moen *et al.* 2008a, p. 1511; Moen *et al.* 2008b, pp. 18–29). Moen *et al.* (2008b, pp. 23–25) reported that lynx also select for the edges between different cover types, presumably because they can more efficiently capture hares along the edges between stands than in the dense interior understory of regenerating stands.

Northern Rocky Mountains (Idaho, Montana, and Northwestern Wyoming)

In the Northern Rocky Mountains, most lynx occurrences are associated with the Rocky Mountain Conifer Forest or Western Spruce-Fir Forest vegetative class (Küchler 1964, p. 4; McKelvey *et al.* 2000a, p. 246) and most occur above 4,101 ft (1,250 m) elevation (Aubry *et al.* 2000, pp. 378–380; McKelvey *et al.* 2000a, pp. 243–245). The dominant vegetation that constitutes lynx habitat in these areas is subalpine fir (*A. lasiocarpa*), Engelmann spruce, and lodgepole pine (Aubry *et al.* 2000, p. 379; Ruediger *et al.* 2000, pp. 4–8—4–10). Within the boreal forest landscape, lodgepole pine is seral to (i.e., is an earlier successional stage) subalpine fir and Engelmann spruce, which are climax forest habitat types. In winter, lynx preferentially use mature multistoried stands, predominantly spruce-fir, with dense horizontal cover and avoid clearcuts and large forest openings (Squires *et al.* 2010, pp. 1648, 1653–1656). In summer, lynx also select young stands with dense spruce-fir saplings and do not appear to avoid openings (Squires *et al.* 2010, pp. 1648, 1654–1655). Dry forest types (e.g., ponderosa pine (*Pinus ponderosa*), dry Douglas-fir (*Pseudotsuga menziesii*)) do not provide lynx habitat (Berg 2009, p. 20; Squires *et al.* 2010, p. 1655).

Washington

In the North Cascades in Washington, most lynx occur above 4,101 ft (1,250 m) (McKelvey *et al.* 2000a, p. 243, 2000d, p. 321; von Kienast 2003, p. 28, Table 2; Maletzke 2004, p. 17). In this area, lynx select Engelmann spruce—subalpine fir forest cover types in winter (von Kienast 2003, p. 28; Maletzke 2004, pp. 16–17; Koehler *et al.* 2008, p. 1518). As in the Northern Rockies, lodgepole pine is a dominant tree species in the earlier successional stages of these climax cover types. Seral (intermediate stage of ecological succession) lodgepole stands contain dense understories and, therefore, receive high use by snowshoe hares and lynx (Koehler 1990, pp. 847–848; McKelvey *et al.* 2000d, pp. 332–

335). Lynx in this area avoid Douglas-fir and ponderosa pine forests, openings, recent burns, open canopy and understory cover, and steep slopes (Koehler *et al.* 2008, p. 1518).

Southern Rocky Mountains (Western Colorado, Northern New Mexico, Southern Wyoming)

Lynx in the population introduced into Colorado use high-elevation (generally above 9,500 ft (2,900 m)) mature Engelmann spruce/subalpine fir, mixed spruce/fir/aspen, and riparian/mixed riparian habitats in Subalpine and Upper Montane forest zones, and avoid lower elevation Montane forests of Douglas fir and ponderosa pine (Shenk 2006, p. 10; Shenk 2008, pp. 1–2, 12, 15; Devineau *et al.* 2010, p. 525; Ivan 2011a, pp. 21, 27). However, it remains uncertain whether these habitats can sustain a viable lynx population over time (Shenk 2008, p. 16; Shenk 2010, pp. 2, 5–6, 11). Lynx from the population introduced into Colorado also have wandered into mountainous areas of northern New Mexico that contain relatively small and fragmented areas of similar high-elevation spruce/fir and cold mixed-conifer habitats (U.S. Forest Service 2009, pp. 5–10). There is no evidence that lynx occupied these areas historically, no reproduction has been documented among lynx from the population introduced into Colorado that have traveled into northern New Mexico, and habitats in New Mexico are thought to be incapable of supporting a self-sustaining lynx population (U.S. Forest Service 2009, pp. 2, 10, 16–17).

Based on the information above, we identify boreal forest landscapes that support relatively high densities of snowshoe hares, have deep snow for extended periods, and are large enough to support multiple lynx home ranges over time to contain the physical and biological features needed to support and maintain lynx populations over time and which, therefore, are essential for the conservation of the lynx DPS.

Food, Water, Air, Light, Minerals, or Other Nutritional or Physiological Requirements

*Food (Snowshoe Hares)*

Snowshoe hare density is the most important factor explaining the persistence of lynx populations (Steury and Murray 2004, p. 136). Snowshoe hare density differences among areas of boreal forest in the contiguous United States are also thought to explain many lynx distribution patterns historically and at present. While seemingly all of the physical aspects usually associated

with lynx habitat may be present in a landscape, if snowshoe hare densities are inadequate to support reproduction, recruitment, and survival over time, lynx populations will not persist. Minimum snowshoe hare densities necessary to maintain lynx populations across the range of the DPS have not been determined, although Ruggiero et al. (2000, pp. 446–447) suggested that at least 0.2 hares per ac (0.5 hares per ha) may be necessary. Hare densities in areas known to support lynx home ranges in the contiguous United States are 0.26 hares per ac (0.64 hares per ha) in northeast Minnesota (Moen et al. 2012, p. 352) and 0.30 hares per ac (0.74 hares per ha) in northern Maine (Simons-Legaard et al. 2013b, p. 574). Hare density in Voyageurs National Park in northern Minnesota was estimated at 0.14 hares per ac (0.35 hares per ha) and does not support resident breeding lynx (Moen et al. 2012, pp. 352–354). In northern Maine, landscapes with hare densities less than 0.2 hares per ac (0.5 hares per ha) are not occupied by lynx (Simons-Legaard et al. 2013b, pp. 567, 575).

Steury and Murray (2004, entire) modeled lynx and snowshoe hare populations and predicted that a minimum of 0.4 to 0.7 hares per ac (1.1 to 1.8 hares per ha) would be required for persistence of a reintroduced lynx population in the portion of the lynx range in the contiguous United States. In areas used by the introduced lynx population in west-central Colorado, Zahratka and Shenk (2008, pp. 906, 910) reported hare densities ranging from 0.03 to 0.5 hares per ac (0.08 to 1.32 hares per ha) in mature Engelmann spruce-subalpine fir stands and from 0.02 to 0.14 hares per ac (0.06 to 0.34 hares per ha) in mature lodgepole pine stands. In "purportedly good" hare habitat also in west-central Colorado in the area used by the introduced population, Ivan (2011b, pp. iv–v, 71, 92) estimated summer hare densities of 0.08 to 0.27 hares per ac (0.2 to 0.66 hares per ha) in stands of "small" lodgepole, 0.004 to 0.01 hares per ac (0.01 to 0.03 hares per ha) in "medium" lodgepole, and 0.004 to 0.1 hares per ac (0.01 to 0.26 hares per ha) in spruce-fir stands.

The boreal forest landscape is naturally dynamic and usually contains a mosaic of forest stand successional stages. In some areas, particularly in the eastern portion of the DPS, stands that support high densities of snowshoe hares are of a young successional stage and are in a constant state of transition to other more mature stages. Conversely, if the vegetation potential (or climax forest type) of a particular forest stand

is conducive to supporting abundant snowshoe hares, it likely will also go through successional stages that are of lesser value as lynx foraging habitat (i.e., times when snowshoe hare abundance is low) or lynx denning habitat (Agee 2000, pp. 62–72; Buskirk et al. 2000b, pp. 403–408) as part of a natural forest succession process. For example, a boreal forest stand where there has been recent disturbance, such as fire or timber harvest, resulting in little or no understory structure will support fewer snowshoe hares and, therefore, lower quality lynx foraging habitat. However, that temporarily low-quality stand would regenerate into higher quality snowshoe hare (lynx foraging) habitat within 10 to 25 years, depending on local conditions (Ruediger et al. 2000, pp. 1–3—1–4, 2–2—2–5). The continuation of this naturally dynamic pattern of succession exhibited in boreal forests is crucial for lynx survival due to their dependence on intermediate successional stages in many areas. In places where lynx are dependent on mature forest stages, forest stand turnover still occurs, but on a longer time scale requiring the ability to recruit new mature forest stands as others are lost to fire, insect infestation, or human activities.

Forest management techniques that thin the understory may reduce habitat quality for hares and, thus, for lynx (Ruediger et al. 2000, pp. 2–4—3–2; Hoving et al. 2004, pp. 291–292; Homyack et al. 2007, entire), at least temporarily (Griffin and Mills 2007, entire). Stands may continue to provide good snowshoe hare habitat for many years until woody stems in the understory become too sparse, as a result of undisturbed forest succession or management (e.g., clearcutting or thinning) (Griffin and Mills 2007, entire). Thus, if the vegetation potential of the stand is appropriate, a stand that is not currently in a condition that supports abundant snowshoe hares for lynx foraging or coarse woody debris for den sites would improve as habitat for snowshoe hares (and thus lynx foraging) with time. Therefore, we consider lynx habitat to include forested areas with the potential, through natural succession, to produce high-quality snowshoe hare habitat, regardless of their current stage of forest succession.

Snowshoe hares feed on conifers, deciduous trees, and shrubs (Hodges 2000, pp. 181–183), and they prefer boreal forest stands that have a dense horizontal understory to provide food, as well as cover and security from predators. Snowshoe hare density is correlated to understory cover between about 3 and 10 ft (1 to 3 m) above the

ground or snow level (Hodges 2000, p. 184). Snowshoe hares most heavily use stands with shrubs, stands that are densely stocked, and stands at ages where branches provide more lateral cover (Hodges 2000, p. 184; Lewis et al. 2011, pp. 561, 564–565). Generally, earlier successional forest stages provide a greater density of horizontal understory and support more snowshoe hares (Buehler and Keith 1982, p. 24; Wolfe et al. 1982, pp. 668–669; Koehler 1990, pp. 847–848; Hodges 2000, pp. 184–191; Griffin 2004, pp. 84–88). However, snowshoe hares can be abundant in mature forests with dense understories, particularly in the western part of the DPS range (Griffin 2004, pp. 53–54, 88; Hodges et al. 2009, p. 876; Squires et al. 2010, pp. 1648, 1653–1657; Berg et al. 2012, pp. 1484–1488), and such mature forests may be a source of hares for other adjacent forest types (Griffin and Mills 2009, pp. 1492, 1495–1496).

In Maine, snowshoe hare densities are highest in regenerating softwood (spruce and fir) and mixed-wood stands with high conifer stem densities (Homyack 2003, p. 195; Fuller and Harrison 2005, pp. 716, 719; Robinson 2006, p. 69). However, when exploiting high-density hare habitats, lynx focus foraging efforts in stands with intermediate hare densities and structural complexity that occurred at the edges of the highest density habitat, suggesting that lynx balance between hare abundance and accessibility (Fuller and Harrison 2010, pp. 1276–1277; Simons-Legaard et al. 2013b, p. 574). In northeastern Minnesota, lynx use areas with relatively higher proportions of coniferous forest, young (10- to 30-year-old) regenerating forest, and shrubby grassland, and these habitats support the highest hare densities (McCann and Moen 2011, pp. 509, 515).

In montane and subalpine forests in northwest Montana, the highest snowshoe hare densities in summer are generally in younger stands with dense forest structure, but winter hare densities are as high or higher in mature stands with dense understory forest structure (Griffin 2004, p. 53). In Montana in winter, hare and lynx use multistoried stands, often in older-age classes, where the tree boughs touch the snow surface but where the stem density is low (Squires et al. 2006a, p. 15; Griffin and Mills 2009, pp. 1492, 1495–1496; Squires et al. 2010, pp. 1648, 1653–1656). In the North Cascades of north-central Washington, snowshoe hare density was highest in 20-year-old lodgepole pine stands where the average density of trees and shrubs was 15,840 stems per ha (6,415 stems

per ac) (Koehler 1990, pp. 847–848), and hare density was associated with large shrubs and saplings within a stand (Lewis *et al.* 2011, pp. 561, 564–565). In western Wyoming, late-seral multistoried forests support a greater abundance of snowshoe hares than regenerating even-aged forests (Berg *et al.* 2012, p. 1). Similarly, in Yellowstone National Park, where hares were rare and patchily distributed, hare presence and relative abundance are linked to mature forest stands (Hodges *et al.* 2009, p. 876). In western Colorado areas used by the introduced lynx population, Zahratka and Shenk (2008, pp. 906, 910) estimated higher hare densities in spruce-fir stands than in lodgepole pine, but Ivan (2011b, pp. iv, 71, 92) estimated hare densities as highest in stands of small lodgepole pine, intermediate in spruce-fir stands, and lowest in stands of medium lodgepole pine.

Habitats supporting abundant snowshoe hares must be present in a sufficient proportion (though not necessarily the majority) of the landscape to support a viable lynx population. Landscapes with more contiguous hare habitat, or where patches of high-quality habitat occur in a matrix with patches of similar quality, support more hares than fragmented habitats or those in which patches of hare habitat occur within a matrix of poor-quality habitat (Lewis *et al.* 2011, p. 565). Broad-scale snowshoe hare density estimates are not available for all of the areas being designated as lynx critical habitat. Available snowshoe hare density estimates are helpful in determining where snowshoe hares exist, but each estimate is specific to both a location and a point in time. Due to intrinsic, rapid fluctuations often seen in snowshoe hare populations, density estimates cannot be considered definitive for any particular area. If enough data were gathered for a specific area over several years, these data could be used to calculate an average density (with margins of error included). Lynx do not occur everywhere within the range of snowshoe hares in the contiguous United States (Bittner and Rongstad 1982, p. 146; McCord and Cardoza 1982, p. 729). This may be due to inadequate abundance, density, or spatial distribution of hares in some places, to the absence of snow conditions that would allow lynx to express a competitive advantage over other hare predators, or to a combination of these factors.

Based on the information above, we identify relatively high densities of snowshoe hares broadly and consistently distributed across boreal forest landscapes to be a physical or biological feature needed to support and maintain lynx populations over time and which, therefore, is essential to the conservation of the lynx DPS.

*Snow Conditions (Other Physiological Requirements)*

Snow conditions also determine the distribution of lynx and snowshoe hares. Deep, fluffy snow conditions likely restrict potential lynx competitors such as bobcat or coyote from effectively encroaching on or hunting hares in winter lynx habitat. In addition to snow depth, other snow properties, including surface hardness or sinking depth, also influence lynx foraging success and, ultimately may be important factors in the spatial, ecological, and genetic structuring of the species (Stenseth *et al.* 2004, entire). Gonzalez *et al.* (2007, pp. 4, 7) compared 496 lynx locations with snow cover over the period 1966–2005 and concluded that lynx require 4 months (December through March) of continuous winter snow coverage.

In eastern North America, snowfall is the strongest predictor of lynx occurrence at a regional scale (Hoving *et al.* 2005, p. 746, Table 5), and lynx in the northeastern United States are most likely to occur in areas with a 10-year mean annual snowfall greater than 105 in (268 cm) (Hoving 2001, p. 75; Hoving *et al.* 2005, p. 749). The Northern Superior Uplands section of northeast Minnesota, which supports a resident lynx population, receives more of its precipitation as snow than any other part of the State, and has the longest period of snow cover (Minnesota DNR 2003, p. 2). Average annual snowfall from 1971 to 2000 in this area was generally greater than 55 in (149 cm) (University of Minnesota 2013).

Information on average snowfall or snow depths in mountainous areas such as the Cascade and Northern Rocky Mountains is limited because few weather stations in these regions have measured snow fall or snow depth over time. An important consideration in mountainous areas is that topography strongly influences local snow conditions. For example, in the Cascades, annual snowfall averaged 121 in (307 cm) at Mazama, WA (elevation 2,106 ft (642 m)), and 15 in (38 cm) at Omak, WA (elevation 1,299 ft (396 m)) (Western Regional Climate Center 2013). In areas of western Montana that support lynx populations, annual snowfall averaged 90 in (229 cm) in Troy (elevation 1,950 ft (594 m)) and 120 in (305 cm) at Seeley Lake (elevation 4,200 ft (1,280 m)) (Western Regional Climate Center 2013).

Based on the information above, we identify winter conditions that provide and maintain deep, fluffy snow for extended periods in boreal forest landscapes to be a physical or biological feature needed to support and maintain lynx populations over time and which, therefore, are essential to the conservation of the lynx DPS.

Sites for Breeding, Reproduction, or Rearing (or Development) of Offspring

*Denning Habitat*

Lynx den sites are found in mature and younger boreal forest stands that have a large amount of cover and downed, large woody debris. The structural components of lynx den sites are common features in managed (logged) and unmanaged (e.g., insect-damaged, wind-throw) stands. Downed trees provide excellent cover for den sites and kittens and often are associated with dense woody stem growth.

In northern Maine, 12 of 26 natal dens occurred in conifer-dominated sapling stands, and 5 dens were found in mature or mixed multistoried forest stands dominated by conifers (Organ *et al.* 2008, p. 1515). Modeling sub-stand characteristics of these 26 dens, the authors determined that 2 variables, tip-up mounds of blown-down trees and visual obscurity at 16 ft (5 m) from the den, were most useful for predicting lynx den-site selection in managed forests (Organ *et al.* 2008, p. 1514). Lynx essentially select dense cover in a cover-rich area for denning, with blowdown, deadfalls, and root wads providing denning habitat. Coarse woody debris alone is not a useful predictor of lynx den-site selection, despite its abundance, and denning habitat is not considered limiting in northern Maine (Organ *et al.* 2008, p. 1516). Den sites in Maine often occur at the interface of two stands of different ages or in dense regenerating conifer stands, suggesting that females select den sites near prey sources to minimize time spent away from kittens while foraging (Vashon *et al.* 2012, p. 16).

In northern Minnesota, structural components of forests such as blowdown and deadfalls appear to be more important than forest cover type in determining lynx denning habitat (Interagency Lynx Biology Team 2013, p. 46). Most den sites in Minnesota are found in blowdown and are associated with small patches of uplands surrounded by low-lying wetland areas (Moen and Burdett 2009, pp. 5, 11). Although lowland conifer cover types appear to provide the forest structure used most often for denning in northern

Minnesota (Moen *et al.* 2008a, p. 1510), other forest cover types are used if they contained recent blowdowns (Moen and Burdett 2009, p. 16). Very dense horizontal cover in the immediate vicinity of the den site also appears to be a determinant (Moen and Burdett 2009, p. 16). Female lynx forage within approximately 1.2–1.8 mi (2–3 km) of den sites when kittens are at the den, and the landscape composition within the foraging radius around a den site contains more lowland conifer, upland conifer, and regenerating forest than do home ranges (Moen *et al.* 2008a, p. 1507). Denning habitat does not appear to be limiting in northern Minnesota (Moen and Burdett 2009, p. 16).

In northwestern Montana, lynx generally den in mature spruce-fir forests among downed logs or root wads of wind-thrown trees in areas with abundant coarse woody debris and dense understories with high horizontal cover in the immediate areas around dens (Squires *et al.* 2004a, Table 3; Squires *et al.* 2008, pp. 1497, 1501–1505). Few dens are located in young regenerating or thinned stands with discontinuous canopies (Squires *et al.* 2008, p. 1497). Many dens have northeasterly aspects and are farther from forest edges than random expectation (Squires *et al.* 2008, p. 1497).

In the North Cascades, Washington, lynx den in mature (older than 250 years) stands with an overstory of Engelmann spruce, subalpine fir, and lodgepole pine with an abundance of downed woody debris (Koehler 1990, p. 847). In that study, all detected den sites occurred on north-northeast aspects (Koehler 1990, p. 847).

Lynx in the population introduced into Colorado den at higher elevations and on steeper slopes compared to general use areas, with den sites tending to have northerly aspects and dense understories of coarse woody debris (Shenk 2008, p. 2).

Den site availability, although not thought to be limiting for lynx populations in the DPS (Moen *et al.* 2008a, p. 1512; Organ *et al.* 2008, pp. 1514, 1516–1517; Squires *et al.* 2008, p. 1505), is an essential component of the boreal forest landscapes that lynx need to satisfy a key life-history process (reproduction). Therefore, based on the information above, we identify denning habitat to be a physical or biological feature needed to support and maintain lynx populations over time and which, therefore, is essential to the conservation of the lynx DPS.

Habitats Protected From Disturbance or Representative of the Historic Geographical and Ecological Distributions of the Species

*Climate Change*

Our analyses under the Act include consideration of ongoing and projected changes in climate. The terms ''climate'' and ''climate change'' are defined by the Intergovernmental Panel on Climate Change (IPCC). In 2014, the IPCC released its Fifth Assessment Report, which represents the current scientific consensus on global and regional climate change and the best scientific data available in this rapidly changing field. The Fifth Assessment Report largely reaffirms the conclusions of previous reports that the global climate is warming at an accelerating rate and that this warming is largely the result of human activities and the associated release of carbon dioxide and other greenhouse gases into the atmosphere (IPCC 2014a, entire).

''Climate'' refers to the mean and variability of different types of weather conditions over time, with 30 years being a typical period for such measurements, although shorter or longer periods also may be used (IPCC 2007a, p. 78). The term ''climate change'' thus refers to a change in the mean or variability of one or more measures of climate (e.g., temperature or precipitation) that persists for an extended period, typically decades or longer, whether the change is due to natural variability, human activity, or both (IPCC 2007a, p. 78). Various types of changes in climate can have direct or indirect effects on species. These effects may be positive, neutral, or negative and they may change over time, depending on the species and other relevant considerations, such as the effects of interactions of climate with other variables (e.g., habitat fragmentation) (IPCC 2007a, pp. 8–14, 18–19). In our analyses, we weigh relevant information, including uncertainty, in our consideration of various aspects of climate change.

The IPCC's Fifth Assessment Report concludes that the strongest and most comprehensive evidence of the impacts of climate change is in natural systems, where many species have responded by shifting their geographic ranges, seasonal activities, migration patterns, abundances, and species interactions (IPCC 2014a, p. 4). The report also concludes that projected climate change during and beyond the 21st Century will increase extinction risk for many terrestrial and freshwater species (IPCC 2014a, pp. 14–15). In North America, observed impacts attributable to climate change that may affect lynx habitats and distribution include upslope and northward shifts in species distributions across multiple taxa, and increased wildfire activity, fire frequency and duration in boreal and subarctic conifer forests of Canada and the western United States (IPCC 2014a, p. 31).

Previous IPCC assessments concluded that temperatures across the globe have increased by about 1.8 °Fahrenheit (F) (1 °Celsius (C)) over the last century (IPCC 2001, p. 7). The IPCC projection for eastern and western North America within the range of the lynx DPS is climate warming of 1.8 °F (1 °C) to 5.4 °F (3 °C) by the year 2050 (IPCC 2007b, p. 889). The range of warming projected over the next century runs from 3.6 °F (2 °C) to 10.8 °F (6 °C) for North America, with warming higher than this average in areas that are inland, northerly, or mountainous. The IPCC concludes that continued warming in North America, with lower snow accumulation and earlier spring snowmelt, is very likely (IPCC 2007b, p. 887). Climate history and projections from regional climate models for regions within the lynx DPS corroborate global models indicating that both eastern and western North America, including all portions of the lynx DPS, have warmed in the last century and are likely to warm 1.8 °F (1 °C) to 5.4 °F (3 °C) by the year 2050 (IPCC 2007b, p. 889). For example, in the Northern Rocky Mountains at Glacier National Park, mean summer temperatures have increased 3.0 °F (1.66 °C) between 1910 and 1980 (Hall and Fagre 2003, pp. 134–137) resulting in lower snowpack, earlier spring melt, and distributional shifts in vegetation (Hall and Fagre 2003, pp. 138–139; Fagre 2005, pp. 4–9). These changes are predicted to continue and accelerate under future climate scenarios (Hall and Fagre 2003, Fig. 7). An analysis of potential snow cover under a range of IPCC future climate scenarios and modeling of vegetation using a dynamic vegetation model indicates that potential lynx habitat could decrease by as much as two-thirds in the contiguous United States by the end of this century (Gonzalez *et al.* 2007, pp. 4, 7–8, 10, 13–14).

Across their worldwide distribution, lynx are dependent on deep snow that persists for long periods of time. Warmer winter temperatures are reducing snow pack in all portions of the lynx DPS through a combination of a higher proportion of precipitation falling as rain and higher rates of snowmelt during winter (Hamlet and Lettenmaier 1999, p. 1609; Brown 2000, p. 2347; Hoving 2001, pp. 73–75; Mote

2003, p. 3–1; Christensen *et al.* 2004, p. 347; Knowles *et al.* 2006, pp. 4548–4549). This trend is expected to continue with future warming (Hamlet and Lettenmaier 1999, p. 1611; Christensen *et al.* 2004, p. 347; Mote *et al.* 2005, p. 48; IPCC 2007b, p. 850). The IPCC (2007b, p. 850) concludes that "snow season length and snow depth are very likely to decrease in most of North America except in the northernmost part of Canada where maximum snow depth is likely to increase." Shifts in the timing of the initiation of spring runoff toward earlier dates in western North America are also well documented (Hamlet and Lettenmaier 1999, p. 1609; Brown 2000, p. 2347; Cayan *et al.* 2001, pp. 409–410; Christensen *et al.* 2004, p. 347; Mote *et al.* 2005, p. 41; Knowles *et al.* 2006, p. 4554). In addition, a feedback effect causes the loss of snow cover due to the reflective nature of snow and the relative heat-absorbing properties of non-snow-covered ground. This feedback effect leads to the highest magnitude of warming occurring at the interface of snow-covered and exposed areas, increasing the rate at which melting occurs in spring (Groisman *et al.* 1994a, pp. 1637–1648; Groisman *et al.* 1994b, pp. 198–200). This effect has led to the average date of peak snowmelt to shift 3 weeks earlier in spring in the Intermountain West (Fagre 2005, p. 4).

Snow accumulation and duration are expected to decline generally in the geographic areas that contain the central and eastern portion of the lynx DPS (IPCC 2007c, p. 891; Burns *et al.* 2009, p. 31). Due to the importance to lynx of prolonged periods of deep fluffy snow, current habitats that lose this feature would decline in value for lynx (Hoving 2001, p. 73; Carroll 2007, p. 1092; Gonzalez *et al.* 2007, entire). Reduced snow depth and duration may reduce lynx's competitive advantage over bobcats, which have similar ecology to lynx but are not as well-adapted to hunting hares in deep fluffy snow (Hoving 2001, pp. 23–24; Carroll 2007, p. 1102; Interagency Lynx Biology Team 2013, pp. 69, 71).

Changes in temperature and rainfall patterns are expected to shift the distribution of ecosystems northward and up mountain slopes (McDonald and Brown 1992, pp. 411–412; Danby and Hik 2007, pp. 358–359; IPCC 2007c, pp. 230, 232). As climate changes over a landscape, the ecosystems that support lynx are likely to shift, tracking the change of temperature, but with a time lag depending on the ability of individual plant and animal species to migrate (McDonald and Brown 1992, pp. 413–414; Hall and Fagre 2003, p.

138; Peterson 2003, p. 652). In the contiguous United States, researchers expect that lynx in mountainous habitat will, to some extent, track climate changes by using higher elevations on mountain slopes, assuming that vegetation communities supportive of lynx and hare habitats also move upslope (Gonzalez *et al.* 2007, p. 7).

*Future of Lynx Habitat*

In 2003, we determined that climate change was not a threat to lynx within the contiguous United States DPS because the best available science we had at that time (Hoving 2001) was too uncertain in nature (68 FR 40083). Since that time, new information on regional climate changes and potential effects to lynx habitat has been developed (e.g., Knowles *et al.* 2006, pp. 4545–4559; Carroll 2007, pp. 1098–1102; Danby and Hik 2007, pp. 358–359; Gonzalez *et al.* 2007, entire; Iverson *et al.* 2008, pp. 390–400; Beckage *et al.* 2008, entire; Burns *et al.* 2009, p. 31; Johnston *et al.* 2012, pp. 6–13), and much of this new information suggests that climate change is likely to be a significant issue of concern for the future conservation of the lynx DPS. These studies predict lynx and hare habitats—boreal spruce-fir and subalpine forests—and, therefore, lynx distribution, are likely to shift upward in elevation within its currently occupied range and recede northward as temperatures increase (Gonzalez *et al.* 2007, pp. 7, 13–14, 19; Beckage *et al.* 2008, entire; Jacobson *et al.* 2009, pp. 26–27, 30–31; Vashon *et al.* 2012, pp. 60, 64; Interagency Lynx Biology Team 2013, p. 69). The boreal spruce-fir forests that provide habitat for lynx and snowshoe hares is thought to be limited by summer temperatures and drought (Iverson and Prasad 2001, pp. 192–196) and, under a suite of emissions and climate change scenarios, is projected to diminish dramatically or disappear from much of the eastern United States (Iverson and Prasad 2001, p. 196; Iverson *et al.* 2008, pp. 390–400).

Climate modeling suggests that lynx habitat and populations are anticipated to decline accordingly (Carroll 2007, pp. 1098–1102) and may disappear completely from parts of the range of the DPS by the end of this century (Johnston *et al.* 2012, pp. 6–13). Climate change is expected to substantially reduce the amount and quality of lynx habitat in the contiguous United States, with patches of high-quality boreal and subalpine forest habitat becoming smaller, more fragmented, and more isolated (Carroll 2007, pp. 1099–1100; Johnston *et al.* 2012, p. 11). Remaining lynx populations would likely be smaller than at present and, because of

small population size and increased isolation, populations would likely be more vulnerable to stochastic environmental and demographic events (Carroll 2007, pp. 1100–1103).

Aside from predicted elevational and latitudinal shifts in areas currently occupied by lynx, we are aware of no models that predict specific areas not currently of value for lynx that will become so as a result of climate-induced changes (e.g., Johnston *et al.* 2012, p. 11). Therefore, at this time, we find it appropriate to designate critical habitat for the lynx only in areas occupied by the DPS that currently contain the physical and biological features essential to the conservation of the lynx. Although it is not within our authority to designate critical habitat in Canada (in the event that the range of lynx recedes northward out of the contiguous United States), the revised critical habitat units in this final rule include, to the extent practicable and reasonable based on habitat potential, higher elevation habitats within the range of the DPS that would facilitate long-term lynx adaptation to an elevational shift in habitat should one occur. As climate change scenarios and ecosystem responses become more regionally certain, revisions to critical habitat may be necessary to accommodate shifts in the range of the essential physical and biological features and any corresponding shift in the range of lynx in the contiguous United States.

*Primary Constituent Elements for Canada Lynx*

Under the Act and its implementing regulations, we are required to identify the physical or biological features essential to the conservation of lynx in areas occupied at the time of listing, focusing on the features' primary constituent elements (PCEs). Primary constituent elements are those specific elements of the physical or biological features that provide for a species' life-history processes and are essential to the conservation of the species.

Based on our current knowledge of the physical or biological features and habitat characteristics required to sustain the species' life-history processes, we determine, as we did in the 2009 final critical habitat rule and in the 2013 proposed rule, that the PCE specific to lynx in the contiguous United States is:

(1) Boreal forest landscapes supporting a mosaic of differing successional forest stages and containing:

(a) Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of

young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface;

(b) Winter conditions that provide and maintain deep fluffy snow for extended periods of time;

(c) Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and

(d) Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range.

With this final designation of critical habitat, we have identified the physical or biological features essential to the conservation of the species, through the identification of the appropriate quantity and spatial arrangement of the features' PCE sufficient to conserve the species. For lynx, the distinction between areas that may contain *some* of each of the physical and biological features described above and areas that have *all* of the physical and biological features, each in adequate quantities *and* spatial arrangements to support populations (i.e., contains the PCE), is very important for the reasons discussed below.

Many places in the contiguous United States have (1) some amount of boreal forest supporting a mosaic of successional stages, (a) snowshoe hares and their habitats, (b) deep, fluffy snow for extended periods, (c) denning habitat, and (d) other habitat types interspersed among boreal forest patches, but which do not and cannot support lynx populations. That is, not all boreal forest landscapes supporting a mosaic of differing successional forest stages contain the physical and biological features essential to lynx in adequate quantities and spatial arrangements on the landscape to support lynx populations over time. Lynx may occasionally (even regularly, if intermittently) occur temporarily in places that do not contain all of the elements of the PCE, especially during "irruptions" of lynx into the northern contiguous United States following hare population crashes in Canada (as described in the proposed rule (78 FR 59433–59436) and below under *Criteria Used To Identify Critical Habitat*). Other areas may contain all the essential physical and biological features but in quantities and spatial arrangements that are inadequate to support lynx over

time. For example, although evidence of lynx reproduction confirms the presence of the essential physical and biological features, short-term, sporadic, or inconsistent reproduction that is inadequate to maintain a population over time (i.e., where reproduction and recruitment are too low to consistently offset mortality and emigration over the long term) suggests that the quantity or spatial arrangement (or both) of one or more of the essential features is inadequate. These areas do not contain the PCE, are likely population "sinks," and as such do not contribute to lynx conservation or recovery.

*Special Management Considerations or Protection*

When designating critical habitat, we assess whether the specific areas within the geographical area occupied by the species at the time of listing contain features that are essential to the conservation of the species and which may require special management considerations or protection.

In listing the lynx as threatened under the Act due to the inadequacy of existing regulatory mechanisms to ensure the conservation of the DPS, the Service recognized the need for special management considerations or protection for lynx in the contiguous United States. The need for specific management direction and conservation measures for lynx was likewise recognized during development of the interagency Lynx Conservation Assessment and Strategy (LCAS; Ruediger *et al.* 2000, entire). The U.S. Forest Service (USFS), Bureau of Land Management (BLM), National Park Service, and the Service developed the LCAS using the best available science at the time specifically to provide a consistent and effective approach to conserve lynx and lynx habitat on Federal lands. The overall goals of the 2000 LCAS were to recommend lynx conservation measures, to provide a basis for reviewing the adequacy of USFS and BLM land and resource management plans with regard to lynx conservation, and to facilitate conferencing and consultation under section 7 of the Act. The LCAS identified an inclusive list of 17 potential risk factors for lynx or lynx habitat that could be addressed under programs, practices, and activities within the authority and jurisdiction of Federal land management agencies. The risks identified in the LCAS were based on effects to individual lynx, lynx populations, or to lynx habitat.

With the listing of the lynx DPS in 2000, Federal agencies across the contiguous United States range of the

lynx consulted with the Service on actions that may affect lynx. The LCAS assisted Federal agencies in planning activities and projects in ways that benefit lynx or avoid adverse impacts to lynx or lynx habitat. In most cases, if projects were designed that failed to meet the standards in the LCAS, the biologists using the LCAS would arrive at an adverse effect determination for lynx. The 2000 LCAS used the best information available at the time to ensure that the appropriate mosaic of habitat would be provided for lynx conservation on Federal lands. Although the LCAS was written specifically for Federal lands, many of the conservation measures were considered equally applicable to non-Federal lands.

Lynx conservation depends on management that supports boreal forest landscapes of sufficient size to encompass the temporal and spatial changes in habitat and snowshoe hare populations to support interbreeding lynx populations over time. At the time it was written, the LCAS recommended the most appropriate level of management or protection for lynx. The LCAS conservation measures addressed risk factors affecting lynx habitat and lynx productivity and were designed to be implemented at the scale necessary to conserve lynx. This level of management is appropriate for Federal lands because they account for the majority of lynx habitat in the contiguous United States (except in Maine), and also because the inadequacy of regulatory mechanisms to conserve lynx on these lands was the primary reason we listed the lynx as threatened under the Act in 2000.

After the LCAS was written, research on lynx, hares, and their habitats and distributions continued throughout the range of the DPS. The Service and land management agencies recognized that, as new scientific information became available, it should supplement the LCAS and be taken into account by land managers. The USFS considered such new information when it proposed to revise Forest Plans under the Northern (U.S. Forest Service 2007, entire) and Southern (U.S. Forest Service 2008b, entire) Rocky Mountains Lynx Amendments. Some of the LCAS standards were changed to guidelines because the Service determined that some risk factors were not negatively affecting the lynx DPS as a whole. For example, after publication of the LCAS, lynx in the contiguous United States were shown to use a variety of sites and conditions for denning, and den site availability is not believed to be a limiting factor for lynx in the DPS (U.S.

Rvsd Plan - 00003681

Fish and Wildlife Service 2007, pp. 48–49; Interagency Lynx Biology Team 2013, p. 30). Similarly, after evaluating Bunnell *et al.* (2006, entire) and Kolbe *et al.* (2007, entire), the Service determined that the best information available did not indicate that compacted snow routes increased competition from other species to levels that adversely impact lynx populations in the Northern Rocky Mountain Lynx Amendment (NRLA) area (U.S. Fish and Wildlife Service 2007, pp. 53–55). Also since the LCAS was written, new information revealed the importance of multistoried stands for lynx in western areas (Squires *et al.* 2006a, p. 15); based on this, the USFS adopted a standard in the NRLA not identified in the LCAS for conserving such stands.

Federal agencies across most of the range of the DPS have amended or revised land management plans to include specific management direction to conserve lynx and lynx habitat (Interagency Lynx Biology Team 2013, p. 88). This direction was developed in accordance with the National Forest Management Act of 1976 and the regulations that implement the statute (36 CFR 219.22), which requires public review and comment as part of the decisionmaking process. The USFS has completed such amendments or revisions to Land and Resource Management Plans in its Eastern, Northern, Rocky Mountain, and Intermountain regions. In the Pacific Northwest Region, forest plans for national forests with lynx habitat are currently being revised (Interagency Lynx Biology Team 2013, p. 4).

To address the substantial volume of new information on lynx, hares, and their habitats and distributions that has accumulated from more than a decade of continuing research throughout the range of the DPS, the LCAS was revised in 2013 (Interagency Lynx Biology Team 2013, entire). The current revision synthesizes all the available research relevant to lynx, their primary prey, and anthropogenic influences on the conservation of lynx in the contiguous United States. Most USFS Land and Resource Management Plans within the current range of lynx have been formally amended or revised to incorporate lynx and hare conservation standards and guidelines. Standards and guidelines were primarily based on those in the 2000 LCAS, but many Forests used the LCAS to develop goals, objectives, and standards and guidelines formulated or adapted for specific geographic areas or Forest units. Therefore, the Lynx Biology Team deemed it appropriate to abandon the use of prescriptive measures such as those in the 2000

LCAS because they are no longer necessary. Thus, the 2013 revision provides recommended conservation measures to be considered in project planning and implementation and which may help inform future amendments or revisions of USFS forest plans.

The 2013 LCAS revision presents the most current source of such information and will continue to inform the special management considerations necessary for conserving lynx on Federal lands. Notably, the 2013 revision concludes that recent studies in the contiguous United States generally suggest that lynx are rarer and more patchily distributed in the west and in the Great Lakes region, and more abundant in Maine, than previously thought (Interagency Lynx Biology Team 2013, p. 23). It recommends focusing limited conservation resources on those ". . . relatively limited areas that support persistent lynx populations and have evidence of recent reproduction, with less stringent protection and greater flexibility given in areas that only support lynx intermittently" (Interagency Lynx Biology Team 2013, p. 2).

The LCAS was developed to provide a consistent and effective approach to conserve lynx on Federal lands in the conterminous United States. In northern New England, the only place the LCAS would apply is on Federal land in the White Mountain National Forest. However, in northern New England, most lynx habitat is on private commercial timber lands, and lynx populations there occur in extensive boreal forest landscapes where large, contiguous stands of young, regenerating spruce-fir habitat are prevalent (due to past clear-cut timber harvest) and support high densities of snowshoe hares. Although lynx and hare habitats were likely created historically by natural forest disturbances (e.g., fire, insects and disease, and windthrow), the current extensive habitats in northern Maine are the result of large-scale industrial forest management. Maintaining lynx populations there will require forest management practices that produce extensive stands supporting high hare densities into the future. The Service developed Canada Lynx Habitat Management Guidelines for Maine (McCollough 2007, entire), which specify the special management—recommendations on land use, forest conditions, landscape conditions, and silviculture requirements—needed to support lynx populations based on the best available science (see discussion of

Healthy Forest Reserve Program under Exclusions, below, for further details).

Four northern Maine landowners with collective ownership of approximately 8.5 percent of occupied lynx habitat have developed lynx forest management plans through the Natural Resource Conservation Service's Healthy Forest Reserve Program. These landowners commit to employ the Service's lynx habitat management guidelines (McCollough 2007, entire), which include greater use of even-aged silviculture that creates large patches of high-quality hare habitat and landscape hare densities that will continue to support lynx. All other private lands occupied by lynx in Maine currently lack specific forest management plans for lynx, indicating a continuing need for special management considerations there.

*Criteria Used To Identify Critical Habitat*

As required by section 4(b)(2) of the Act, we use the best scientific data available to designate critical habitat. In accordance with the Act and our implementing regulations at 50 CFR 424.12(b), we review available information pertaining to the habitat requirements of the species and identify occupied areas at the time of listing that contain the features essential to the conservation of the species. If, after identifying currently occupied areas, we determine that those areas are inadequate to ensure conservation of the species, in accordance with the Act and our implementing regulations at 50 CFR 424.12(e), we then consider whether additional areas—outside those occupied at the time of listing—are essential for the conservation of the species (i.e., whether the species can only be conserved and recovered via the designation of additional areas). In this final rule, we are designating critical habitat only in areas within the geographical area occupied by the species at the time of listing in 2000 because we have determined that these areas are sufficient for the conservation of the lynx DPS and that designating areas that were not occupied at the time of listing would not address or ameliorate the threat for which the DPS was listed (the inadequacy, at the time of listing, of existing regulatory mechanisms). Because designating areas not occupied at the time of listing would not address the threat for which the lynx DPS was listed, doing so would not improve the likelihood of recovery (the point at which the protections of the Act are no longer necessary and delisting the DPS would be appropriate). Therefore, we have

determined that areas outside those occupied at the time of listing are not essential to the conservation and recovery of the lynx DPS (i.e., we do not find that the DPS could only be conserved and recovered if we were to designate areas not occupied at the time of listing).

To determine those specific areas occupied by the species at the time it was listed on which are found those physical or biological features essential to the conservation of the species, as required by section 3(5)(a)(i) of the Act, we reviewed the approach to the conservation of the lynx provided in the LCAS (Ruediger *et al.* 2000, entire; Interagency Lynx Biology Team 2013, entire); the recovery outline (U.S. Fish and Wildlife Service 2005, entire); information from State, Federal and Tribal agencies; and information from academia and private organizations that have collected scientific data on lynx. We reviewed available information that pertains to the habitat requirements of lynx and its principal prey, the snowshoe hare. This information included data in reports submitted by researchers holding recovery permits under section 10(a)(1)(A) of the Act; research published in peer-reviewed articles or presented in academic theses; agency reports and unpublished data; and various Geographic Information System (GIS) coverages (e.g., land-cover type information, land ownership information, snow depth information, topographic information, locations of lynx obtained from radio- or GPS-collars and locations of lynx confirmed via DNA analysis or other verified records).

In designating critical habitat for the lynx, we used the best scientific data available to identify areas that possess appropriate quantities and spatial arrangements of the physical and biological features essential to the conservation of the DPS and that may require special management considerations or protection. In identifying areas as critical habitat, we first conducted a two-part analysis: (1) We relied on information used during listing of the species, and any available newer information, to delineate the geographic area occupied by the species at the time of listing, and (2) we used the best available scientific information to determine which occupied areas contain the physical and biological features in adequate quantities and spatial arrangements to support lynx populations over time, thus demonstrating that they are essential to the conservation of the lynx.

To delineate critical habitat for lynx, we must be able to distinguish across the extensive range of the species in the contiguous United States, areas that contain all essential physical and biological features in adequate quantity and spatial arrangement to support lynx populations over time (areas with the PCE, as described above under "Primary Constituent Element for Canada Lynx") from other areas that may contain some or all of the features but in inadequate quantities and/or spatial arrangements of one or more feature (and which, therefore, by definition do not contain the PCE). However, the scientific literature does not confer precisely what quantities and spatial arrangements of the physical and biological features are needed to support lynx populations throughout the range of the DPS. We lack range-wide site-specific information or tools that would allow us to analyze boreal forests across much of the range of the DPS and determine which specific areas contain the spatial and temporal mosaic of habitats and hare densities that lynx populations need to persist.

Delineating critical habitat for lynx is complicated by a number of factors related to (1) the animals' biology and population dynamics; (2) the biology and population dynamics of its primary prey, the snowshoe hare; (3) the patchily distributed, temporally and spatially dynamic successional habitat features that shift continually across landscapes, and which drive populations of both lynx and hares at the southern peripheries of both species' ranges; (4) our imperfect understanding of the above factors; and (5) the resulting difficulty in determining with certainty and quantifying which specific habitat features, in what specific amounts and spatial and temporal arrangements, are necessary to provide the boreal forest mosaic essential to lynx conservation. The task is further complicated by an imperfect historical record of lynx occurrence in the contiguous United States. Finally (but importantly), the differences between areas capable of supporting lynx populations over time and other areas that look like they should, but do not, are often subtle and cannot be distinguished over broad areas using traditional vegetation/habitat mapping, remote sensing (aerial photos, satellite data), or available habitat modeling techniques (e.g., see Ivan 2011a, p. 27).

As described in the *Distribution* and *Biology* sections of the proposed rule (78 FR 59433–59436), lynx populations throughout most of their range are irruptive. In central Canada where they inhabit a large, relatively homogenous boreal forest landscape, lynx respond quickly to cyclic fluctuations in hare populations. When hares are abundant, lynx respond with increased productivity and survival and, therefore, increased population sizes (Slough and Mowat 1996, pp. 955–956; Mowat *et al.* 2000, pp. 266, 272). Typically, after hare numbers peak, they begin to decline rapidly and dramatically, forcing large numbers of lynx to disperse—to abandon home ranges in areas with dwindling prey bases no longer capable of supporting the large number of lynx that resulted from the earlier prey abundance (Slough and Mowat 1996, pp. 956–957; Mowat *et al.* 2000, pp. 291–294). These periodic mass dispersal events (irruptions) appear to start at the core of the species' range in Canada and radiate outward (McKelvey *et al.* 2000a, p. 239). At the southern periphery of the lynx's range, these events sometimes result in large numbers of lynx dispersing into a variety of habitats in some areas of the northern contiguous United States in search of adequate food resources (Thiel 1987, entire; McKelvey *et al.* 2000a, pp. 239–242). Some of these dispersing lynx survive and reestablish home ranges elsewhere, but many die en route, often soon after initiating dispersal (Mowat *et al.* 2000, p. 293), and some appear to remain temporarily in areas not capable of supporting all of their life-history needs over time (Thiel 1987, entire).

Canadian populations of lynx have historically been the most reliable source for lynx populations in many areas of the contiguous United States, tending to replenish them within the DPS about every 10 years as the lynx/hare cycle ebbs and flows (McKelvey *et al.* 2000a, entire). These events can be pictured as a "wave" of lynx that occasionally washes over many of the northern tier of States. Over time the wave recedes, leaving remnant lynx populations or "puddles" of lynx in a variety of habitats. These puddles of lynx shrink over time as many lynx perish in inhospitable habitats or disperse elsewhere in search of adequate hare densities. When these waves recede, lynx may disappear abruptly from areas of unsuitable habitat or more gradually from suboptimal or marginal habitats.

In both cases, lynx perish in or leave many of the places where they occurred temporarily because the habitats in such places, due to insufficient prey densities or inadequacy of one or more other physical or biological features, are incapable of supporting them over time. In a few places in the northern contiguous United States, in landscapes with relatively high snowshoe hare densities and adequate quantities and spatial arrangements of other essential physical and biological features, the

puddles tend to persist. It is these remnant "puddle" areas that demonstrate the capacity to support lynx population resiliency—the ability of lynx to persist through lows in their own populations and those of their primary prey—that we have determined are essential to conservation of the contiguous United States lynx DPS.

In terms of lynx conservation, it is important to distinguish between areas that support lynx populations over time (the lasting "puddles") and areas in which lynx may occasionally and temporarily (even if somewhat regularly) occur during and for some time after population irruptions (the temporary or shrinking "puddles"). The former are likely "source" subpopulations within the lynx metapopulation. In addition to their ability to persist through lows in hare and lynx numbers, those areas, during times of hare abundance, produce excess lynx that may either subsequently bolster the local population or disperse into adjacent areas, should habitats and hare numbers in those areas become favorable. The latter areas are likely "sinks"—places where lynx may occasionally occur temporarily but where reproduction and recruitment, if any occur at all, are unlikely to offset mortality. Such areas do not support lynx over time or produce excess lynx and, therefore, do not contribute to the health and stability of the metapopulation.

Lynx are wide-ranging animals that regularly make long-distance movements through both suitable and unsuitable habitats. They also are habitat and prey specialists, inferring natural selection pressures favoring the ability to identify, locate, and occupy habitats conducive to survival and reproduction. The historic record shows that lynx occurred only occasionally in some parts of the southern periphery of its range in the contiguous United States during and for variable lag times after the wave-like population irruptions described above, with long periods of apparently complete absence between irruptions (McKelvey et al. 2000a, entire). This finding suggests that lynx dispersing from areas where hare numbers were declining arrived at many such places looking for but not finding the physical and biological features they needed to survive over the long term (Mowat et al. 2000, p. 293). Additionally, lynx were listed under the Act because regulatory mechanisms at the time were deemed inadequate to conserve lynx habitats in the places they did occur, not because of any documented population decline, range contraction, or large-scale habitat loss in

the contiguous United States (65 FR 16052, 68 FR 40076). For the reasons given above, we conclude it is unlikely that there are areas within the DPS range that contain the PCE (i.e., adequate quantity and spatial arrangement of all essential physical and biological features) that lynx have been unable to locate and occupy. Based on surveys both within and outside of designated critical habitat and in many of the secondary areas defined in the recovery outline, and on responses from peer reviewers and discussions with other lynx researchers, we also conclude that it is very unlikely that there are other resident lynx populations within the range of the DPS that have remained undetected.

Finally, the Act indicates that the function of critical habitat is to provide for the recovery of the species. We designate critical habitat in areas that contain, based on our assessment of the best data available to us, the physical and biological features in the appropriate quantities and spatial arrangements (the PCE), to provide for the conservation of the species. For some species, critical habitat may include unoccupied areas if the currently occupied areas are not sufficient to recover the species. For other species, critical habitat may be a subset of the occupied areas, if the occupied areas have differences in quality that relate to their ability to contribute meaningfully to recovery of the species. The Act does not require that we designate critical habitat in every area that has some components or some amount of the PCE, nor does it require that we demonstrate that all other areas lack the PCE. We make these determinations on a case-by-case basis based upon the best information available as to what the species needs for recovery.

By specifically allowing revisions to critical habitat designations if and when new information becomes available, the Act recognizes the potential limitations of the best available information at any point in time. For lynx, we have determined that not all areas where lynx occasionally occur are necessary for recovery. We believe that lynx recovery in the contiguous United States can be accomplished by conserving high-quality habitat occupied by naturally resident lynx populations across the range of the DPS, and addressing the threats to lynx in those areas.

In summary, lynx have a demonstrated ability to disperse large distances in search of favorable habitats. Further, natural selection theory implies the ability of lynx to locate and occupy areas conducive to their survival and

population viability. Nonetheless, due to inherent swings in densities of their primary prey, lynx regularly occur temporarily in habitats that are not capable of supporting populations over time, usually during irruptions after cyclic hare population crashes in Canada. In designating critical habitat for lynx, it is essential to distinguish between areas capable of supporting populations over time (areas with all essential physical and biological features in adequate quantities and spatial arrangements and which, therefore, demonstrably contain the PCE) and areas that may have some or all of the features but with inadequate quantities and/or spatial arrangements of one or more of them (and which, therefore, do not contain the PCE). Exactly how much of each of the physical and biological features must be present and specifically how each must be spatially arranged within boreal forest landscapes to support lynx populations over time is unknown.

In the absence of site-specific information, we do not have tools or techniques (e.g., remote sensing or vegetation mapping technologies of adequate resolution) that would allow us to distinguish across broad landscapes throughout all of the range of the DPS between those areas that contain the PCE and other areas that contain the physical and biological features but in inadequate quantity and/or spatial arrangement. Nonetheless, we use the best available information to identify where the physical and biological features occur in adequate quantity and spatial arrangement to provide for the conservation of the species. Within this context, we developed the strategy described below for identifying, delineating, and designating critical habitat for the contiguous United States DPS of the Canada lynx.

The focus of our strategy in considering lands for designation as critical habitat is on boreal forest landscapes of sufficient size to encompass the temporal and spatial changes in habitat and snowshoe hare populations to support interbreeding lynx populations over time. These factors are included in the PCE for lynx. As defined in the recovery outline, areas that meet these criteria and have recent evidence of reproduction are considered "core areas" for lynx (U.S. Fish and Wildlife Service 2005, pp. 3–4). However, we do not consider reproduction as a proxy for the PCE in this final rule.

In determining the geographic area occupied by the species at the time of listing, we used data providing verified

evidence of lynx occurrence. We eliminated areas from consideration in two ways: (1) areas outside the known historical range and (2) data older than 1995 were not considered valid to our assessment of areas occupied by lynx populations at the time of listing. We used data on the known historical range of the lynx (e.g., McKelvey *et al.* 2000a, pp. 207–232; Hoving *et al.* 2003, entire) to eliminate areas outside the historical range of the species.

We then focused on records since 1995 to ensure that this critical habitat designation is based on the data that most closely represent the current status of lynx in the contiguous United States and the geographical area known to be occupied by the species at the time of listing. Although the average lifespan of a wild lynx is not known, we assumed that a lynx born in 1995 could have been alive in 2000 or 2003, when the final listing rule and the clarification of findings were published. Data after 1995 were considered a valid indicator of occupancy at the time of listing. Recent verified lynx occurrence records were provided by Federal research entities, State wildlife agencies, academic researchers, Tribes, and private individuals or organizations.

We used only verified lynx records, because we wanted to rely on the best available data to evaluate specific areas and their features for critical habitat designation. The reliability of lynx occurrence reports can be questionable because the bobcat, a common species in much of the range of the lynx DPS, can easily be confused with the lynx. Additionally, many surveys are conducted by snow tracking in which correct identification of tracks can be difficult because of variable conditions affecting the quality of the track and variable expertise of the tracker. Our definition of a verified lynx record is based on McKelvey *et al.* (2000a, p. 209): (1) an animal (live or dead) in hand or observed closely by a person knowledgeable in lynx identification, (2) genetic (DNA) confirmation, (3) snow tracks only when confirmed by genetic analysis (e.g., McKelvey *et al.* 2006, entire), or (4) location data from radio or GPS-collared lynx. Documentation of lynx reproduction consists of lynx kittens in hand, or observed with the mother by someone knowledgeable in lynx identification, or snow tracks demonstrating family groups traveling together, as identified by a person highly knowledgeable in identification of carnivore tracks. However, we made an exception and accepted snow track data from Maine, New Hampshire, and Vermont because of the stringent protocols, the

confirmation of lynx tracks by trained, highly qualified biologists, and the absence of species in the area with tracks that could be easily misidentified as lynx (Maine Dept. of Inland Fisheries and Wildlife 2003, entire).

To define critical habitat according to section 3(5)(A) of the Act, we then delineated, within the geographical area occupied by the species at the time of listing, areas containing physical and biological features essential to the conservation of the lynx. The adequacy of the quantities and spatial arrangements of the physical and biological features (as defined above) essential to the conservation of the DPS is informed by the recovery outline for the species (as discussed below), the nature of the threats in a particular geographic area, and the conservation needs for the species in a particular geographic area.

In the North Cascades and Northern Rockies, the features essential to the conservation of lynx, the majority of lynx records, and the boreal forest types are typically, though not always, found above 4,000 ft (1,219 m) in elevation (McKelvey *et al.* 2000b, pp. 243–245; McAllister *et al.* 2000, entire). Thus, we limited the delineation of critical habitat to lands above this elevation unless we had habitat data indicating that high-quality habitat exists below this elevation. Additionally, in the North Cascades, features essential to the conservation of the lynx and the majority of the lynx records occur east of the crest of the Cascade Mountains.

*Application of the Criteria to the Southern Rocky Mountains and Certain National Forests in Idaho and Montana*

As described above under Previous Federal Actions, the District Court for the District of Montana found several flaws with our 2009 critical habitat designation for lynx. The following section discusses the issues raised by the court.

*Colorado and the Southern Rocky Mountains*

The Montana District Court found, among other things, that we failed in our 2009 designation to determine whether "areas occupied by lynx in Colorado possess the physical and biological features essential to the conservation of the species."

In the recovery outline, we defined six core areas for lynx as those having *both* persistent verified records of lynx occurrence over time *and* recent evidence of reproduction (U.S. Fish and Wildlife Service 2005, pp. 3–5, 20–21). We also defined the Southern Rocky Mountains of Colorado and southern

Wyoming (which both lack persistent verified records of lynx occurrence over time) as a "provisional" core area because it contained an introduced lynx population that had demonstrated reproduction (U.S. Fish and Wildlife Service 2005, p. 4). "Provisional" means: "accepted or adopted tentatively; conditional; or temporary." In our 2009 critical habitat designation, after careful evaluation of the historic record of verified lynx occurrence in Colorado and the Southern Rockies, we determined that there was no compelling evidence that the area had ever supported lynx populations over time and that, therefore, it did not likely contain the PCE and did not meet our criteria for designating critical habitat (74 FR 8641).

For reasons that are described in more detail below (also see our responses to comments (10), (11), and (23), above), the available data do not support that Colorado and the Southern Rockies contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx populations over time, and we provide what evidence is available to determine whether the area, or any parts of it, contain the PCE.

In 1999, just prior to lynx being listed under the Act, the Colorado Division of Wildlife (now Colorado Parks and Wildlife (CPW)) began an intensive effort to establish a lynx population in Colorado, eventually releasing 218 wild-caught Alaskan and Canadian lynx from 1999 to 2006 (Devineau *et al.* 2010, p. 524). At least 122 (56 percent) of the introduced lynx died by June of 2010 (Shenk 2010, pp. 1, 5), but others survived and established home ranges in Colorado, produced kittens in some years, and now are distributed throughout forested areas of western Colorado. Some lynx from this introduced population have also traveled into northern New Mexico, eastern Utah, and southern and western Wyoming, though no reproduction outside of Colorado has been documented by these dispersers.

The CPW has determined the lynx introduction effort to be a success based on attainment of several benchmarks (e.g., high post-release survival, low adult mortality rates, successful reproduction, recruitment equal to or greater than mortality over time; Ivan 2011a, p. 21 and 2011b, p. 11), but acknowledges that the future persistence of the population is uncertain and hinges on the assumption that patterns of annual reproduction and survival observed as of 2010 repeat themselves during the next 20 or more years (Shenk 2008, p. 16; Shenk 2010,

pp. 2, 5–6, 11). However, CPW has discontinued the intensive monitoring necessary to determine if these patterns of reproduction and survival will persist over that time (Colorado Parks and Wildlife 2012, p. 1), instead embarking on a passive monitoring program to detect lynx presence (Ivan 2011c, entire).

Although parts of Colorado and the Southern Rocky Mountains clearly contain some (perhaps all) of the physical and biological features lynx need, available evidence does not indicate that the area, or any parts of it, contain the features in the quantity and spatial arrangement necessary to provide for the conservation of the species. That is, the elements of the PBFs in adequate quantity and spatial arrangement on a landscape scale. Some areas may contain some amounts of all the PBFs, but with one or more in inadequate quantity and/or spatial arrangement and, therefore, does not contain the PCE. The Southern Rocky Mountains (western Colorado, northern New Mexico, and southern Wyoming) are on the southern limit of the species' range and contain marginal lynx habitat (74 FR 8619), are disjunct from lynx habitats in the United States and Canada (McKelvey et al. 2000a, p. 230; 68 FR 40090; Devineau et al. 2010, p. 525; Interagency Lynx Biology Team 2013, pp. 50, 54), and have patchily distributed habitat that limits snowshoe hare abundance (Interagency Lynx Biology team 2013, p. 54). Snowshoe hares and their preferred habitats are described above as part of the PCE. The nearest lynx population occurs in the Greater Yellowstone Area, which supports a small, low-density population also disjunct from other lynx populations and which is unlikely to regularly supply dispersing lynx to the Southern Rockies. We previously determined that the Southern Rockies' distance and isolation from other lynx populations and habitats substantially reduce the potential for lynx from northern populations to naturally augment or colonize the area, that the immigration necessary to maintain a local lynx population is, therefore, naturally precluded, and that the contribution of the Southern Rockies to the persistence of lynx in the contiguous United States is presumably minimal (68 FR 40100–40101).

Dolbeer and Clark (1975, p. 539) estimated 0.30 hares per ac (0.73 hares per ha) on their study area in Summit County in central Colorado. Reed et al. (1999, unpublished, as cited by Hodges (2000, p. 185)) reported hare densities in Colorado ranging from 0.02 to 0.19 hares per ac (0.05 to 0.46 hares per ha). In

areas used by introduced lynx in west-central Colorado, Zahratka and Shenk (2008, pp. 906, 910) reported hare densities that ranged from 0.03 to 0.5 hares per ac (0.08 to 1.32 hares per ha) in mature Engelmann spruce-subalpine fir stands and from 0.02 to 0.14 hares per ac (0.06 to 0.34 hares per ha) in mature lodgepole pine stands. The authors cautioned against comparing their results to other hare density estimates, as their use of the "mean maximum distance moved" method may have underestimated effective area trapped (Zahratka and Shenk 2008, p. 911), potentially resulting in overestimates of hare density.

In "purportedly good" hare habitat also in west-central Colorado in the area used by introduced lynx, Ivan (2011b, pp. iv–v, 71, 92) estimated summer hare densities of 0.08 to 0.27 hares per ac (0.2 to 0.66 hares per ha) in stands of "small" lodgepole pine, 0.004 to 0.01 hares per ac (0.01 to 0.03 hares per ha) in "medium" lodgepole pine, and 0.004 to 0.1 hares per ac (0.01 to 0.26 hares per ha) in spruce-fir stands. The author reported that hare densities were less than 0.4 hares per ac (<1.0 hare per ha) in all stand types and all seasons and, in most cases, were less than 0.12 hares per ac (0.3 hares per ha), and no combination of survival and recruitment estimates from any stand type in any year would result in a self-sustaining hare population, though hare recruitment may have been underestimated (Ivan 2011b, pp. 95, 99).

Ruggiero et al. (2000, pp. 446–447) concluded that a snowshoe hare density greater than 0.2 hares per ac (0.5 hares per ha) may be necessary for lynx persistence. Steury and Murray (2004, pp. 127, 137) modeled lynx and hare populations and determined that a hare density of 0.4–0.7 hares per ac (1.1–1.8 hares per ha) would be needed for persistence of lynx translocated (i.e., introduced or reintroduced) to the southern portion of the species' range. Most hare density estimates for Colorado are well below those thought necessary to support an introduced lynx population over time (Steury and Murray 2004, entire) and many, even from areas considered "good" hare habitat, are lower than the density Ruggiero et al. (2000, pp. 446–447) considered necessary for lynx persistence. The generally low hare densities reported in most cases in what is considered good hare habitat in western Colorado and the very large home ranges (181 mi² (470 km²) for females and 106 mi² (273 km²) for males) reported by Shenk (2008, pp. 1, 10) suggest that even the best potential lynx habitat in the Southern Rocky

Mountains is marginal and unlikely to support lynx populations over time.

Some of the lynx introduced into Colorado have dispersed into mountainous areas of northern New Mexico, which contain relatively small and fragmented areas of similar high-elevation spruce/fir and cold mixed-conifer habitats (U.S. Forest Service 2009, pp. 5–10). No evidence exists that lynx occupied these or any other areas of New Mexico historically, and habitats in New Mexico are thought to be incapable of supporting a self-sustaining lynx population (U.S. Forest Service 2009, pp. 2, 10, 16–17). In addition, the lack of connectivity with northern lynx populations (McKelvey et al. 2000a, p. 230; Devineau et al. 2010, p. 525; Interagency Lynx Biology Team 2013, pp. 50, 54), which is considered necessary for the maintenance and conservation of lynx populations in the contiguous United States (Interagency Lynx Biology Team 2013, pp. 42, 47, 54, 60, 65), further suggests that lynx in the Southern Rockies, in the absence of continued translocations or introductions of lynx, are unlikely to receive the demographic and genetic exchange needed to maintain lynx populations over time.

For these reasons, the Service has determined that the Southern Rocky Mountains likely do not possess the physical and biological features essential to lynx in sufficient quantity and spatial arrangement to sustain lynx populations over time. Therefore, we find that the habitat in Colorado and elsewhere in the Southern Rocky Mountains does not contain the PCE, is not essential for the conservation of the lynx DPS, and we are not designating critical habitat for the lynx DPS in the Southern Rockies.

We acknowledge the efforts by the CPW and recognize that wildlife introductions are, by their nature, experiments whose fates are uncertain. However, it is always our goal for such efforts to be successful and, where possible, contribute to recovery of listed species. If Colorado's introduction effort is successful (i.e., if recruitment equals or exceeds combined mortality and emigration over the next 20 years (Shenk 2010, pp. 2, 5–6, 11)), it could *contribute* to recovery by providing an additional buffer against threats to the DPS. The potential contribution of Colorado to lynx recovery does not mean, however, that the habitat there is essential for the conservation of the DPS. In other words, the lynx population in Colorado is beneficial, but not essential, for recovery.

## National Forests in Idaho and Montana

The Montana District Court ordered the Service to determine specifically whether lands in the Clearwater and Nez Perce National Forests in Idaho, the Bitterroot National Forest in Idaho and Montana, the Beaverhead-Deerlodge National Forest in Montana, and additional parts of the Helena and Lolo National Forests (outside the areas currently designated) in Montana contain the physical and biological features essential for the conservation of the DPS. Although each of these areas clearly contain some (and perhaps all) of the physical and biological features lynx need, for the reasons discussed below, we find no evidence that any of the areas contain the elements in adequate quantity and spatial arrangement to provide for the conservation of lynx. We provide evidence, where available, that these areas were likely not occupied by lynx at the time of listing and are not currently occupied by lynx populations, and we summarize relevant survey results, all of which indicate that lynx do not occupy these areas or that the areas are lacking in either quantity or spatial arrangement (or both) of one or more of the essential features. We have determined that these areas do not contain the PCE, are not essential to the conservation of the lynx, and do not meet the definition of critical habitat. Therefore, based on the information summarized below, we have not included these National Forest lands in this final critical habitat designation.

In the recovery outline, the Service classified these areas (outside the portions of the Helena and Lolo National Forests designated as critical habitat) as "secondary areas" because they lack evidence of lynx reproduction (U.S. Fish and Wildlife Service 2005, pp. 4, 21). As described in detail below, recent surveys for lynx conducted in accordance with established and accepted protocols in many of these areas have failed to detect lynx presence, and the available evidence suggests these areas occasionally may provide temporary habitat for transient lynx dispersing from established lynx populations in the Northern Rocky Mountains of Canada, Idaho, and Montana, but that they likely do not contain all essential physical and biological features in adequate quantity or spatial arrangement to support lynx populations over time.

There is no evidence that the Beaverhead-Deerlodge, Bitterroot, and Nez Perce National Forests were occupied by lynx at the time of listing, or that they are currently occupied by

lynx populations. To date, surveys on these National Forests, which have been conducted according to established protocols, have failed to detect presence of any individual lynx, and they provide no indication of the presence of lynx populations. Surveys described below were conducted according to National Lynx Survey (McKelvey et al. 1999b, entire), and winter snow-tracking survey (Squires et al. 2004b, entire) protocols. Snow-tracking surveys in particular, when conducted strictly according to appropriate protocols by experienced surveyors, which often results in collection of DNA and genetic verification of species identity, are highly effective at detecting lynx, even when only a few animals inhabit the survey area (Ulizio et al. 2007, p. 5; Squires et al. 2012, pp. 215, 219–222).

On the Beaverhead-Deerlodge National Forest, National Lynx Survey efforts in 1999–2001 detected no lynx (U.S. Forest Service 2002a, entire and 2002b, entire). During 2001–2005, in surveys designed to detect presence of lynx and wolverines, 11,220 mi (17,950 km) of winter snow-tracking surveys and trap route checks in the Anaconda-Pintler, Beaverhead, Flint Creek and Pioneer mountain ranges on the Beaverhead-Deerlodge National Forest detected only a single "putative" lynx track, and no verified tracks (Squires et al. 2003, p. 4; Squires et al. 2006b, p. 15). Additional recent snow tracking surveys (Berg 2009, entire) also failed to detect any lynx, and the author concluded that, although some pockets of habitat appeared to support high densities of snowshoe hares, "[m]ost of the [Beaverhead-Deerlodge National Forest] was and appeared to be dry lodgepole pine, which likely is not good lynx habitat . . ." (Berg 2009, p. 20).

During May and June of 2009, hair snares (642 snare-nights) and remote cameras (319 camera-nights) deployed in the Boulder, Flint Creek, and Pioneer mountain ranges also failed to detect any lynx (Porco 2009, entire). Additional hair snare surveys in summer 2012 similarly failed to detect lynx (Pilgrim and Schwartz 2013, entire; U.S. Forest Service 2013c, entire). Snow-tracking surveys designed to detect presence of multiple forest carnivores, including lynx, conducted by the Idaho Department of Fish and Game from 2004 to 2006 detected no lynx in the Beaverhead Mountains Section, just west of the Beaverhead-Deerlodge National Forest (Patton 2006, pp. 20–21, Table 11). We conclude that the rigorous efforts described above collectively provide strong indication that lynx do not occupy the Beaverhead-Deerlodge National Forest, and that the

habitat quality and hare densities appear, based on the best available information, to be inadequate to support lynx. We find no scientific evidence that this area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement. Therefore, it does not contain the PCE and is not essential for the conservation of the lynx DPS.

On the Bitterroot National Forest, National Lynx Survey efforts in 2000–2002 and 2010–2011 detected no lynx (U.S. Forest Service 2000, entire, 2002c, entire, 2003a, entire, 2003b, entire; Pilgrim 2010, entire; Shortsleeve 2013, pers. comm.). Snow-tracking surveys designed to detect presence of multiple forest carnivores, including lynx, conducted by the Idaho Department of Fish and Game from 2004 to 2006 detected no lynx in the Bitterroot Mountains Section (Patton 2006, pp. 20–21, Table 11). Additionally, among 223 vegetation plots sampled in 2010–2012 on the Forest, only 30 (16.1%) met minimum horizontal cover standards for snowshoe hare/lynx habitat (U.S. Forest Service 2012, unpublished data). Based on the information above, we conclude that lynx do not occupy the Bitterroot National Forest, and that the habitat quality and hare densities appear, based on the best available information, to be inadequate to support lynx. We find no scientific evidence that this area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement. Therefore, it does not contain the PCE and is not essential for the conservation of the lynx DPS.

On the Nez Perce National Forest, winter snow-tracking surveys covering 448 mi (721 km) in 2007 did not detect any lynx (Ulizio et al. 2007, entire). The authors concluded that (1) these surveys very likely would have detected the presence of a lynx population if one occurred on the Forest, (2) that the failure to detect lynx suggests that a lynx population does not inhabit the surveyed portion of the Forest, and (3) "[h]istorical sightings . . . may be the result of transient lynx moving through the forest, but the infrequency of such reports suggests lynx are incidental to the area" (Ulizio et al. 2007, p. 5). Neither a partial hare-snare survey conducted in 2008 (though at fewer stations than recommended by the protocol) nor a partial snow-tracking survey conducted in 2009 (also less extensive than protocol) detected presence of lynx on the Forest. Snow-tracking surveys conducted according to established protocols and covering 553 mi (890 km) of forest roads were completed in 2013; these surveys also

Federal Register/Vol. 79, No. 177/Friday, September 12, 2014/Rules and Regulations **54819**

failed to detect presence of any lynx on the Nez Perce National Forest (U.S. Forest Service 2013d, pp. 3–7). Snow-tracking surveys designed to detect presence of multiple forest carnivores, including lynx, conducted by the Idaho Department of Fish and Game from 2004 to 2006 detected no lynx in the Clearwater Region, including parts of the Nez Perce National Forest (Patton 2006, p. 9, Table 2). Based on the information above, we conclude that lynx do not occupy the Nez Perce National Forest, and that the habitat quality and hare densities appear, based on the best available information, to be inadequate to support lynx. We find no scientific evidence that this area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement. Therefore, it does not contain the PCE and is not essential for the conservation of the lynx DPS.

The paucity of verified historical records of lynx occurrence in these three National Forests, and the absence of recent verified records, despite numerous surveys designed to detect lynx presence and described in the preceding paragraphs, suggest these areas may rarely and temporarily support transient dispersing lynx (McKelvey et al. 2000a, pp. 224–227; Ulizio et al. 2007, p. 5). Based on these surveys, historical records of lynx occurrence, the vegetation sampling data described above (U.S. Forest Service 2012, unpublished data), and expert opinion on habitat quality described above (Ulizio et al. 2007, p. 5), the Service has determined that habitats on these three National Forests are not occupied by lynx populations and do not contain the essential physical and biological features in appropriate quantity and spatial arrangement to support lynx over time. We have determined that these areas do not contain the PCE, do not meet the definition of critical habitat, and are not essential to the conservation of the lynx DPS. Therefore, we have not included the Bitterroot, Beaverhead-Deerlodge, and Nez Perce National Forests within this final critical habitat designation.

We recognize that all of the Clearwater and Lolo National Forests, and parts of the Helena National Forest (except for the disjunct Big Belt and Elkhorn mountain ranges) are considered "occupied" by lynx for purposes of consultations under section 7 of the Act. Occupancy in the context of section 7 consultation is intended to inform the "may be present" standard under section 7 and does not imply the presence of lynx populations or that the habitats in these areas contain the

physical and biological features necessary to support a lynx population over time. For section 7 purposes, occupancy is determined on a Forest-wide basis, so that two observations anywhere on a Forest confer permanent "occupied" status to the entire Forest, even in places where lynx have not been documented and where no lynx populations occur.

The Clearwater National Forest is in an area classified in the recovery outline as a secondary area for lynx recovery (U.S. Fish and Wildlife Service 2005, p. 21) because there is no record of consistent lynx presence on the Forest. Snow-tracking surveys designed to detect presence of multiple forest carnivores, including lynx, conducted by the Idaho Department of Fish and Game from 2004 to 2006 detected no lynx in the Clearwater Region, including parts of the Clearwater National Forest (Patton 2006, p. 9, Table 2). Wirsing et al. (2002, entire) studied snowshoe hare demographics on study areas within the Clearwater National Forest. They concluded that hare habitat was fragmented; good hare habitat was rare and occurred as small isolated patches; and hares occurred at extremely low densities (0.04 hares per ac (0.09 per ha)), well below the range of densities typical of other southern hare populations, had low survival rates, and had poor juvenile recruitment (Wirsing et al. 2002, pp. 169–175). The authors identified hare predators including coyotes, raptors, mustelids, and bobcats (Wirsing et al. 2002, p. 172), but identified no predation attributable to lynx. Based on the best available information, summarized above, the habitat quality and hare densities in this area appear to be inadequate to support lynx. We find no scientific evidence that this area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement. We determine that habitats on the Clearwater National Forest do not contain the PCE, are not essential for the conservation of the lynx DPS, and do not meet the definition of critical habitat. As a result we have not designated critical habitat on this national forest.

Portions of the Helena and Lolo National Forests are classified as "core areas" for lynx recovery because they have evidence of consistent lynx occupancy and recent records of reproduction (U.S. Fish and Wildlife Service 2005, pp. 4, 21); these areas are designated as critical habitat. Because of this lynx occupancy, both Forests are designated as "occupied" in their entirety for section 7 purposes, even though the remainders of these two

Forests are considered secondary areas in the recovery outline (U.S. Fish and Wildlife Service 2005, pp. 6, 21) because they lack records of consistent lynx presence. The parts of these two forests that we have not designated continue to lack evidence of lynx occupancy, and surveys (described below) have failed to detect the presence of lynx populations.

On the Helena National Forest, the Big Belt (in 2002, 2003, and 2004) and Elkhorn (in 2003) mountain ranges were surveyed according to the National Lynx Survey protocol (McKelvey et al. 1999b, entire); no lynx were detected in any of these surveys (Pengeroth 2013, pers. comm.). On the Lolo National Forest, no lynx were detected during 941 mi (1,514 km) of snow-tracking surveys targeting lynx in the vicinity of Lolo Pass in January–March 2001 (Squires et al. 2004c, p. 3). More recently, over 2,600 mi (4,184 km) of forest carnivore snow-tracking surveys were conducted according to accepted protocols (Squires et al. 2004b, entire) by highly trained technicians from 2010 to 2013 across much of the Lolo National Forest and on some adjacent lands. These surveys resulted in 199 lynx detections over 4 years, only 1 of which occurred outside the portion of the forest designated as critical habitat in this rule (U.S. Forest Service 2013e, pp. 2–3). The single detection outside the critical habitat boundary was in an area surrounded by critical habitat but at a slightly lower elevation (U.S. Forest Service 2013e, pp. 2, 4). Based on the information summarized above, we conclude that lynx do not occupy the Helena and Lolo National Forests outside the areas we have designated, and that the habitat quality in these areas appears, based on the best available information, to be inadequate to support lynx. We find no scientific evidence that these areas contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement. Therefore, it does not contain the PCE and is not essential for the conservation of the lynx DPS. As a result, we have determined that these areas do not meet the definition of critical habitat, and we have not included these areas in this final critical habitat designation.

Based on historical records and available survey data summarized above (McKelvey et al. 2000a, pp. 224–227; U.S. Forest Service 2000, entire; U.S. Forest Service 2002a, 2002b, and 2002c, entire; Wirsing et al. 2002, entire; Squires et al. 2003, p. 4; U.S. Forest Service 2003a and 2003b, entire; Patton 2006, entire; Squires et al. 2006b, p. 15; Ulizio et al. 2007, entire; Berg 2009, entire; Porco 2009, entire; Pilgrim 2010,

entire; U.S. Forest Service 2012, unpublished data; Pengeroth 2013, pers. comm.; Pilgrim and Schwartz 2013, entire; Shortsleeve 2013, pers. comm.; U.S. Forest Service 2013c, 2013d, 2013e, entire), the Service has determined that habitats on the Beaverhead-Deerlodge, Bitterroot, Clearwater, and Nez Perce National Forests, and on the Helena and Lolo National Forests outside these areas designated as critical habitat, are not occupied by lynx populations and were likely not occupied at the time of listing. These areas may occasionally host transient dispersing lynx, but the best available information indicates that they do not contain the physical and biological features essential to lynx in adequate quantity and/or spatial arrangement to demonstrate that they contain the PCE, and, as a result, do not meet the definition of critical habitat. We have determined these areas are not essential to the conservation of the lynx DPS, and we have not included these areas in this final designation of critical habitat for the lynx DPS.

Recent Lynx Occurrence in Northern New Hampshire, Northern Vermont, and Eastern and Western Maine

*Northern New Hampshire and Northern Vermont*

The historic status of lynx in New Hampshire and Vermont is poorly understood. Lynx occurred historically in central and northern New Hampshire, but there is no evidence that a resident breeding population existed there historically or recently (McKelvey et al. 2000a, pp. 212–214). In 2003, the Service determined that, despite a lack of breeding records, a small resident lynx population likely occurred historically in New Hampshire but no longer existed at the time of listing (68 FR 40077). A bounty program for lynx that persisted in New Hampshire until 1965, along with a lack of dispersing lynx from Quebec, and habitat loss associated with forest management practices may have contributed to the extirpation of lynx from New Hampshire (Litvaitis et al. 1991, pp. 70, 73–74).

Brocke et al. (1993, p. 14) similarly speculated that trapping mortality and the concurrent reduction in habitat resulting from large-scale timber harvest led to the extirpation of lynx from New Hampshire. Surveys conducted in 1986 in high-elevation habitats in the White Mountain region of New Hampshire detected no lynx (Litvaitis et al. 1991, pp. 70, 73). In 1992, an adult lynx killed by a vehicle collision in southern New Hampshire (McKelvey et al. 2000a, p. 213) was classified as a "transient" that

did not belong to a resident population because hare densities where this lynx died are low and habitat conditions are considered unsuitable for home range establishment (Tur 2013, pers. comm.).

The historic record for Vermont is scant, with only five records of lynx occurring from the period 1797 to 1968 and no evidence that a population of lynx ever occurred there (Kart et al. 2005, pp. 101–104). Prior to the listing of the DPS in 2000, the last lynx documented in Vermont was trapped at St. Albans in 1968 (Kart et al. 2005, pp. A4–101). Based on the best available data, summarized above, we conclude that New Hampshire and Vermont were not occupied by lynx at the time of listing.

Although results of surveys to assess the current distribution and status of lynx in New Hampshire and Vermont are not yet complete, surveys to date in New Hampshire suggest that a small number of lynx are sparsely distributed through the northern half of the State, mostly likely as scattered transient animals, and breeding has only recently been documented by a few lynx in very small areas in the northeastern part of the State. Likewise, in Vermont, several lynx have been documented as breeding within a very small area in the northeast corner of the State. Lynx occurrence in northern New Hampshire and Vermont was documented beginning in 2006, and breeding was first documented in 2009. To date, evidence of lynx reproduction in northern New Hampshire was documented in 2010 and 2011, all in the area encompassing the town of Pittsburg (Staats 2013a, pers. comm.). In Vermont, breeding was documented in 2009, 2011, and 2012, all at the Nulhegan National Wildlife Refuge (NWR) (Cliché 2013, pers. comm.).

Historic records suggest that high-elevation habitats in New Hampshire's White Mountains contained lynx (Silver 1957, pp. 302–311; McKelvey et al. 2000a, p. 212); however, surveys conducted during the early 1990s in the White Mountain National Forest did not detect the species (Litvaitis et al. 1991, p. 15; Brocke et al. 1993, p. 14). No lynx have been detected by White Mountain National Forest staff during winter track surveys conducted since 2003 (Prout 2013, pers. comm.). However, in March 2013, New Hampshire Fish and Game Department staff confirmed the presence of lynx tracks in high-elevation habitat located in the area near Franconia Notch. In addition, snow track surveys conducted by the New Hampshire Fish and Game Department in 2012 and 2013 detected lynx near Cambridge and Success, south of the Lake Umbagog NWR (which has lynx in its Maine

portion). Additional records (2006–2013, n=6) occur as far south as Jefferson, NH, at the southern border of the Kilkenny Unit of the White Mountain National Forest. Lynx tracks have also been detected on the Pondicherry NWR, located in Whitefield, NH. Since 2006, New Hampshire has 18 confirmed records, totaling 28 individual animals.

Habitat patches that support lynx in New Hampshire are much smaller than those in northern Maine (Litvaitis and Tash 2005, Fig. 2 and p. A–298; Robinson 2006, Fig. 3.3, p. 99). Hoving estimated roughly 386 mi² (1,000 km²) of lynx habitat in New Hampshire (68 FR 40086–40087). Litvaitis and Tash (2005, p. A–298), analyzing potential lynx habitat in New Hampshire based on the Hoving lynx model, reported an area of 2,000 mi² (5,180 km²) with a greater than 50 percent probability of lynx occurrence. Within this area, "enriched hare habitats" (including high-elevation spruce-fir, clearcuts, and shrub-dominated wetlands) consisted of 342 mi² (886 km²), 17 percent of the total predicted lynx habitat area. The authors concluded that "the modest abundance of high-density hare habitat supports the notion that New Hampshire does not contain sufficient habitat to support a viable, stand-alone population of lynx. Long-term persistence of lynx in New Hampshire is probably dependent on immigrants, and the State likely represents the southern limit of lynx in eastern North America" (Litvaitis and Tash 2005, p. A–298). Similarly, Brocke et al. (1993, pp. 1–14) suggested that the persistence of New Hampshire's lynx population was dependent on receiving dispersing animals. Therefore, persistence of lynx in New Hampshire relies on continuity of habitat through western Maine to the core area of lynx habitat in northern Maine.

Recent modeling to determine lynx habitat connectivity in the Northeast suggests that the Nulhegan River Basin contains Vermont's best lynx habitat (Farrell 2013, pers. comm.). The 205-mi² (530-km²) basin includes 41 mi² (106 km²) managed by the Service, 34 mi² (89 km²) managed by the Vermont Department of Natural Resources, and 131 mi² (340 km²) of private commercial timber lands (with easement). Bobcats occur in the area at moderate densities (Hoving 2001, Fig. 2.5 p. 55). Snow track surveys conducted by State and Service personnel during the winters of 2011 and 2012 (Nulhegan NWR only) and 2012 and 2013 (Nulhegan NWR and Victory Bog State Wildlife Management Area) indicate a small resident lynx population has become established on

the NWR. In areas outside of Nulhegan NWR, the presence of sporadic records indicates lynx have not established home ranges and are considered transient or absent.

Portions of northern New Hampshire and northeastern Vermont contain boreal forest landscapes with a mosaic of habitats of various ages. Although stand-level hare densities in spruce-fir forest in these areas should be similar to densities documented in northern Maine (Litvaitis and Tash 2005, p. A–297), landscape-level hare densities are likely lower because spruce-fir habitat is a lower percentage of the landscape and more fragmented than in core lynx habitat in northern Maine (Hoving 2001, Fig. 2.6, p. 56). The snow regime in northern New Hampshire and northern Vermont also appears adequate for lynx, especially in higher elevation areas, which experience deep, fluffy snow conditions that provide a competitive advantage for lynx, whereas shallower snow in lower elevations may provide competitive advantage to bobcats (Hoving 2001, Fig. 2.2 p. 51). Litvaitis and Tash (2005, p. A–263) modeled bobcat habitat in New Hampshire and concluded that most low-elevation areas that were predicted to have a higher probability of lynx occurrence were also predicted to have moderate-to-high bobcat populations. Conversely, most high-elevation areas that were predicted to have a high probability of lynx occurrence were expected to be avoided by bobcats (at least in the winter). The elevation at which snow benefits lynx versus bobcats in the Northeast is unknown and likely variable.

While historic records indicate that lynx use high-elevation areas in the Northeast, it is unknown if high elevations support high-quality foraging habitat in areas sufficiently large to support breeding individuals. The White Mountain National Forest has the most extensive high-elevation habitat in the Northeast, but only one recent record of lynx occurrence (Staats 2013b, pers. comm.).

Litvaitis and Tash (2005, p. A–298) estimated that New Hampshire contains 342 mi² (888 km²) of potential Canada lynx habitat. There are no comparable lynx habitat estimates for Vermont. Because these areas occur at the southern extreme of the lynx's current distribution, where habitat is interspersed with northern hardwood forests, as well as human-dominated land cover types (e.g., developed areas, roads, agricultural fields, etc.), habitat quality (percent of conifer forest, landscape-level hare density, intensity of forest management) is likely to be lower in New Hampshire and Vermont

than in designated critical habitat in northern Maine. Although potential lynx habitat in New Hampshire and Vermont is fragmented, a recently completed habitat connectivity model demonstrated 100 percent connectivity for lynx movement/dispersal between these areas and the core area of northern Maine (Farrell 2013, pers. comm.). Breeding lynx in New Hampshire and Vermont are not directly connected to Canadian populations, but they are connected to the large population in northern Maine via western Maine.

Due to the uncertainty regarding the long-term persistence of the lynx that now occur in these areas, the relative importance of these areas for conservation of the DPS is unclear. These are peripheral boreal forest areas with higher northern hardwood composition and patchier habitat (Hoving 2001, Fig. 2.6, p. 56), and they represent the southern extent of the lynx range (Litvaitis and Tash 2005, p. A–298). Northern Vermont and New Hampshire do not appear to contain adequate lynx habitat to support lynx populations; nor do lynx in these areas appear to be considered potential source populations (Litvaitis and Tash 2005, p. A–298). Although Brocke *et al.* (1993, pp. 1–14) predicted that, in the absence of trapping, New Hampshire's lynx population would be expected to increase at the very modest rate of 1.65 percent per year, this estimate did not account for other sources of lynx mortality (i.e., interspecific interactions with bobcat or vehicle mortality).

As in Colorado, northern New Hampshire and northern Vermont clearly contain habitats that include some or all of the physical and biological features lynx require (some of the components of the PCE). However, it remains uncertain whether they consistently contain the features (e.g., snow conditions that allow lynx to outcompete bobcats, or landscape-level hare densities) in adequate quantity and spatial arrangement to support lynx over time. Moreover, because neither area was occupied by lynx at the time they were listed, to designate them as critical habitat we would have to determine that they are essential for the conservation of the DPS (i.e., that the DPS could not be recovered unless these areas were designated as critical habitat). We do not believe that is the case, and we do not expect that the current small numbers of breeding lynx in these areas will result in the establishment of permanent lynx populations.

In summary, although lynx were known to occur historically in New Hampshire and Vermont, reliable evidence of the ability of these areas to

support lynx populations over time is lacking. The best available data indicate that New Hampshire and Vermont were not occupied by lynx at the time of listing. If resident lynx occurred in these areas, they may have been extirpated when habitat was modified through forestry practices, a bounty program was in place that increased mortality, and the ability of animals to recolonize the area was compromised by regional-scale influences that suppressed lynx numbers in adjacent populations.

Recently, habitats in these areas have regenerated and source populations of lynx in northern Maine have increased, likely resulting in dispersal of lynx to New Hampshire and Vermont, where small numbers of breeding lynx have been documented in small areas of northern New Hampshire and northern Vermont only over the past few years (since 2009–2010). Their recent arrival and the complex ecological interactions functioning at landscape scales make it difficult to assess the current status of lynx in these areas, as well as their potential contribution to the conservation of the DPS. In addition, potential lynx habitat in these areas is fragmented, landscape-level hare densities are low, and bobcat densities are relatively high. Consequently, these areas are unlikely to support robust lynx populations capable of generating dispersing animals that could occupy other portions of the species' range. The persistence of lynx in New Hampshire is likely reliant upon frequent dispersers from other populations. Because habitats in Vermont are even more localized and fragmented, the same situation most likely exists there. Within these areas, the status of lynx and their habitats may deteriorate further as a result of climate change.

Considering all of the factors above, we believe that northern New Hampshire and northern Vermont do not contain the physical and biological features essential to lynx in adequate quantity and spatial arrangement to support lynx over time. As a result, we have determined these areas do not contain the PCE and do not meet the definition of critical habitat. Further, because neither area was occupied by lynx at the time of listing, to designate these areas as critical habitat we would have to determine they are essential to the conservation of the DPS (i.e., that the DPS could not be recovered unless we designate these areas). We have determined that the small areas in New Hampshire and Vermont recently occupied by a small number of breeding lynx are not essential for the conservation of the lynx DPS, and we have not designated any areas in New

Hampshire or Vermont as critical habitat in this final rule.

*Eastern and Western Maine*

Historically, lynx are believed to have occurred throughout Maine. Hoving *et al.* (2003, entire) assembled historical records dating to 1833 to reconstruct the past distribution of lynx in the State. Prior to 1913, lynx were found throughout the State, with the exception of coastal areas. From 1913 to 1972, records occurred in western and northern Maine. In 1936 and 1939, game wardens described lynx as rare, but present, in most districts except along the coast (Aldous and Medall 1941, as cited *in* Vashon *et al.* 2012, pp. 28, 33). From 1973 to 1999, most records occurred in western and northern Maine, although lynx also occurred in the central and eastern portions of the State. Between 1995 and 1999, the Maine Department of Inland Fisheries and Wildlife conducted snow track surveys for lynx in western and northern Maine (Vashon *et al.* 2012 pp. 34–35) and documented lynx only in northern Maine. Surveys conducted from 2003 to 2008 documented lynx in both western and northern Maine (Vashon *et al.* 2012, pp. 34–35). Snow surveys for lynx have not been conducted in high-elevation habitats in western Maine. Surveys were not conducted in eastern Maine because there was no evidence that lynx occurred there.

Hoving *et al.* (2003, p. 371) documented 39 historic records spanning 135 years of lynx kittens representing a minimum of 21 litters. Most breeding was documented in northern Maine. Prior to listing, the last documented breeding in western Maine was observed in 1995 and in eastern Maine in 1896 (Hoving 2001, p. 173). Since listing, lynx have been documented consistently in western and northern Maine and occasionally in central and eastern parts of the State (Vashon *et al.* 2012, pp. 12, 59). Lynx breeding has been documented in western, northern, and eastern Maine (the latter at a single location in 2010) (Vashon *et al.* 2012, p. 64). Lynx travel widely during dispersal and occasional forays outside of their home ranges (Vashon *et al.* 2012, pp. 22, 59; Maine Department of Inland Fisheries and Wildlife, unpublished data), which may explain occasional occurrences outside of western and northern Maine.

Portions of eastern and western Maine contain boreal forest landscapes with a mosaic of habitats of various ages, but it is uncertain whether these areas contain the PCE (i.e., the physical and biological features essential to lynx in

adequate quantity and spatial arrangement to support lynx populations over time) for the following reasons. Like New Hampshire and Vermont, these areas occur at the southern extreme of the species' current distribution, where habitat is interspersed with northern hardwood forests, as well as human-dominated land cover types (e.g., developed areas, roads, agricultural fields, etc.). Therefore, habitat quality (percent of conifer forest, landscape-level hare density, intensity of forest management) is likely to be lower in eastern and western Maine than in northern Maine. Hoving *et al.* (2004, Fig. 1, p. 290) predicted a low probability of lynx occurrence in western Maine and no lynx occurrence in eastern Maine. Although potential lynx habitat in western Maine is fragmented, it is directly connected to the core area in northern Maine (Farrell 2013, pers. comm.), which we have designated as critical habitat in this rule.

Snowshoe hares were at relatively high densities in northern Maine from 2001 to 2006, but declined by about 50 percent afterward (Scott 2009, pp. 1–44; Vashon *et al.* 2012, p. 14). Lynx populations were believed to have reached the carrying capacity of the habitat in about 2006 (Vashon *et al.* 2012, p. 58). At that time, lynx were likely dispersing at greater rates into western, central, and eastern parts of the State (Vashon *et al.* 2012, Fig. 4.2, p. 59) and were likely the source of lynx in New Hampshire and Vermont.

The snow regime is adequate for lynx in western Maine, especially in higher elevations (Hoving 2001, Fig. 2.2 p. 51), but snow conditions are likely unsuitable for lynx in eastern Maine. Stand-level hare densities also should be similar to those in northern Maine (Litvaitis and Tash 2005, p. A–297), although landscape-level hare densities in western Maine are likely lower because spruce-fir habitat is a lower percentage of the landscape and more fragmented than in core lynx habitat in northern Maine (Hoving 2001, Fig. 2.6, p. 56; Robinson 2006 pp. 81–146). Hare habitat modeling in western Maine indicated patchier and more widely distributed hare habitats compared to northern Maine due to differences in the size and distribution of regenerating clearcuts (Robinson 2006, Fig. 3.3, pp. 99, 181). These areas of western Maine have a higher prevalence of northern hardwoods, which support much lower hare densities.

Carroll (2007, entire) used the Hoving lynx model as a basis to predict lynx distribution in the Northeast under several scenarios affecting forestry,

trapping in Canada, and climate change. A reduced snow model predicted lynx would disappear in all of Maine and persist only in the higher elevation areas of the Adirondacks and White Mountain National Forest. However, Hoving (2001, p. 76) used different snowfall projections and models that predict lynx would continue to occur in northern Maine with reduced snow. Carroll's (2007) climate change model was based on predicted annual snowfall for 2055. Predictions were derived from the output of the Parallel Climate Model, a general circulation model developed by a consortium of researchers in support of the IPCC (Kiehl and Gent 2004, entire). The IPCC climate scenario that was used is in the intermediate to high ranges among the 35 scenarios evaluated by the IPCC. Because these predictions provided only coarse resolutions (~200 km), Carroll interpolated the percent change in annual snowfall predicted and multiplied by finer-scale data for current annual snowfall to produce a "sharpened" estimate of future snowfall patterns. Carroll's modelling included a lake effect and thus differed slightly in output from that used by Hoving *et al.* (2005).

Although climate change models are being refined for the Northeast, additional information is needed to understand what areas may support lynx in the future under a variety of climate change projections and to resolve high levels of uncertainty. In addition to the potentially conflicting climate models that make projecting lynx conservation into the future challenging, the biological response of lynx to climate change at the regional and stand scales is complex and poorly understood at this time. Thus, we believe it is premature at this time to draw any conclusions regarding how much of Maine is likely to remain suitable for lynx in the future as a result of climate change.

Western and eastern Maine have the highest densities of bobcats in the State (Hoving 2001, pp. 54–55). Maine is at the northern edge of the bobcat range, and their populations decline during severe winters (Morris 1986, entire; Parker *et al.* 1983, entire). In 2008 and 2009, Maine experienced two severe winters with deep snow that may have depressed bobcat populations in western and eastern parts of the State at the same time that larger numbers of lynx were dispersing from northern Maine. These conditions may have allowed lynx to establish home ranges in areas formerly inhabited by bobcats. However, whether lynx will persist in these areas as bobcat populations recover is uncertain.

As in New Hampshire and northern Vermont, some habitats in eastern and western Maine clearly contain some or all of the physical and biological features lynx require. However, it remains uncertain whether they contain the PCE. Because neither area was occupied by lynx at the time they were listed, to designate them as critical habitat we would have to determine that they are essential for the conservation of the DPS (i.e., that the DPS could not be recovered unless these areas were designated as critical habitat). We do not believe that is the case, and we do not expect that the area is needed for the conservation of the species.

In summary, although lynx were known to occur historically in eastern and western Maine, reliable evidence of the ability of these areas to support lynx populations over time is lacking. The best available data, summarized above, suggest that eastern Maine was not occupied by lynx at the time of listing. Within these areas, the status of lynx and their habitats may deteriorate further as a result of climate change. Considering all of these factors, we believe that although eastern and western Maine contain physical and biological features important to lynx, we do not find evidence that these areas contain the features in adequate quantity and spatial arrangement to support lynx populations over time. As a result, we have determined these areas do not contain the PCE and do not meet the definition of critical habitat. We have determined that these areas are not essential to the conservation of the lynx DPS, and we have not designated critical habitat in eastern and western Maine in this final rule.

When determining critical habitat boundaries, we made every effort to avoid including developed areas such as lands covered by buildings, pavement, and other structures because such lands lack physical or biological features necessary for lynx. The scale of the maps we prepared under the parameters for publication within the Code of Federal Regulations may not reflect the exclusion of such developed lands. Given the scale of the lynx critical habitat units, it was not feasible to completely avoid inclusion of water bodies, including lakes, reservoirs, and rivers; grasslands; or human-made structures such as buildings, paved and gravel roadbeds, parking lots, and other structures that lack the PCE for the lynx. These areas, including any developed areas and the land on which such structures are located, that exist inside critical habitat boundaries are not intended to be designated as critical habitat. Any such lands inadvertently left inside critical habitat boundaries shown on the maps of this final rule have been excluded by text in this rule. Therefore, a Federal action involving these lands would not trigger section 7 consultation with respect to critical habitat and the requirement of no adverse modification unless the specific action would affect the physical or biological features in the adjacent critical habitat.

The critical habitat designation is defined by the map or maps, as modified by any accompanying regulatory text, presented at the end of this document in the rule portion. We include more detailed information on the boundaries of the critical habitat designation in the preamble of this document. We have made the coordinates or plot points or both on which each map is based available to the public on *http://www.regulations.gov* at Docket No. FWS–R6–ES–2013–0101, on our Internet sites *http://www.fws.gov/montanafieldoffice/*, and at the field office responsible for the designation (see **FOR FURTHER INFORMATION CONTACT**, above).

We are designating as critical habitat areas that we have determined were occupied by lynx populations at the time of listing and which contain the physical and biological features essential to the conservation of the lynx DPS in sufficient quantity and spatial arrangement to support life-history processes essential to the conservation of lynx populations within the DPS. Units were selected for designation because they contain sufficient elements of the physical and biological features essential for supporting lynx life processes and lynx populations over time. All units contain all of the identified elements of physical or biological features in adequate quantity and spatial arrangements on the landscape and support multiple life processes that allow lynx populations to persist over time.

## Final Critical Habitat Designation

We are designating five units as critical habitat for the Canada lynx DPS. The critical habitat areas described below constitute our best assessment at this time of areas that meet the definition of critical habitat. The designated units are: Unit 1 in northern Maine (Aroostook, Franklin, Penobscot, Piscataquis, and Somerset Counties); Unit 2 in northeastern Minnesota (Cook, Koochiching, Lake, and St. Louis Counties); Unit 3 in the Northern Rocky Mountains of northwest Montana (Flathead, Glacier, Granite, Lake, Lewis and Clark, Lincoln, Missoula, Pondera, Powell and Teton Counties) and northeast Idaho (Boundary County); Unit 4 in the North Cascade Mountains of north-central Washington (Chelan and Okanogan Counties); and Unit 5 in the Greater Yellowstone Area of southwest Montana (Carbon, Gallatin, Park, Stillwater, and Sweetgrass Counties) and northwest Wyoming (Fremont, Lincoln, Park, Sublette, and Teton Counties). All units were occupied by lynx populations at the time of listing and are currently occupied by lynx populations. The approximate area and ownership within each critical habitat unit is shown in Table 1, and the area and ownership by State is shown in Table 2.

### TABLE 1—DESIGNATED CRITICAL HABITAT UNITS FOR CANADA LYNX BY OWNERSHIP (MI² (KM²))

[Area estimates reflect all land within designated critical habitat unit boundaries]

| Unit | Federal | State | Private | Other | Total |
|------|---------|-------|---------|-------|-------|
| 1 | 0 (0) | 819 (2,122) | 9,281 (24,039) | 22 (57) | 10,123 (26,218) |
| 2 | 3,863 (10,005) | 2,947 (7,633 ) | 1,259 (3,260) | 0 (0) | 8,069 (20,899) |
| 3 | 8,788 (22,761) | 156 (404) | 839 (2,172) | 0 (0) | 9,783 (25,337) |
| 4 | 1,829 (4,737) | 0 (0) | 5 (14) | 0 (0) | 1,834 (4,751) |
| 5 | 8,922 (23,109) | 23 (60) | 200 (518) | 0.5 (1.3) | 9,146 (23,687) |
| Total | 23,402 (60,612) | 3,945 (10,217) | 11,584 (30,003) | 23 (59) | 38,954 (100,891) |

Note: Area sizes may not sum due to rounding.

TABLE 2—DESIGNATED CRITICAL HABITAT FOR CANADA LYNX BY STATE AND OWNERSHIP (MI²/KM²)

[Area estimates reflect all land within designated critical habitat unit boundaries]

| | Federal | State | Private | Other | Total |
|---|---|---|---|---|---|
| Idaho | 45 (117) | 0.04 (0.1) | 0 (0) | 0 (0) | 45 (117) |
| Maine | 0 (0) | 819 (2,122) | 9,281 (24,039) | 22 (57) | 10,123 (26,218) |
| Minnesota | 3,863 (10,005) | 2,947 (7,633) | 1,259 (3,206) | 0 (0) | 8,069 (20,899) |
| Montana | 10,978 (28,433) | 168 (437) | 979 (2,535) | 0.5 (1.3) | 12,126 (31,405) |
| Washington | 1,829 (4,737) | 0 (0) | 5 (14) | 0 (0) | 1,834 (4,751) |
| Wyoming | 6,688 (17,321) | 10 (26) | 60 (155) | 0 (0) | 6,758 (17,502) |
| Total | 23,402 (60,612) | 3,945 (10,217) | 11,584 (30,003) | 23 (59) | 38,954 (100,891) |

Note: Area sizes may not sum due to rounding.

We present brief descriptions of all units, and reasons why they meet the definition of critical habitat for the lynx DPS, below.

*Unit 1: Northern Maine*

Unit 1 consists of 10,123 mi² (26,218 km²) located in northern Maine in portions of Aroostook, Franklin, Penobscot, Piscataquis, and Somerset Counties. This area was occupied by the lynx at the time of listing and is currently occupied by the species (Hoving *et al.* 2003, entire; Vashon *et al.* 2012, pp. 12–14, 58–60; Interagency Lynx Biology Team 2013, pp. 39–42). This area contains the physical and biological features essential to the conservation of the lynx DPS as it comprises the PCE and its components laid out in the appropriate quantity and spatial arrangement. Lynx in northern Maine have high productivity: 91 percent of available adult females (greater than 2 years) produced litters, and litters averaged 2.83 kittens (Vashon *et al.* 2005b, pp. 4–6; Vashon *et al.* 2012, p. 18). This area is also important for lynx conservation because it is the only area in the northeastern region of the lynx's range within the contiguous United States that currently supports a resident breeding lynx population and likely acts as a source or provides connectivity with Canada for more peripheral portions of the lynx's range in the Northeast.

Timber harvest and management are the dominant land uses within the unit; therefore, special management may be required depending on the silvicultural practices implemented (68 FR 40075). Timber management practices that provide for a dense understory are beneficial for lynx and snowshoe hares. In this area, climate change is predicted to significantly reduce lynx habitat and population size. Carroll (2007, pp. 1100–1103) modeled a 59 percent decline in lynx numbers in the northeastern United States and eastern Canada by 2055 due to climate change, with greater vulnerability among small,

peripheral, low-elevation populations like that in Maine. Under this modeled scenario, populations would have difficulty sustaining themselves, and the lynx distribution would likely contract to the core of the population on the Gaspe Peninsula in Quebec, Canada (Carroll 2007, p. 1102). Gonzalez *et al.* (2007, p. 14) modeled potential climate-induced loss of snow and concluded that snow suitable for lynx may disappear from Maine entirely by the end of this century. Therefore, climate change represents a potential habitat-related threat to lynx in this unit.

Changing forest management practices are also likely to result in reduced hare and lynx habitat in this unit. Much of the lynx and hare habitat in this unit is the result of broad-scale clear-cut timber harvest in the 1970s and 1980s in response to a spruce budworm outbreak and the subsequent treatment of some clearcuts with herbicide to promote conifer regeneration. These clear-cut stands are now at a successional (regrowth) stage (about 35 years postharvest) that features very dense conifer cover and provides optimal hare and lynx habitats, likely supporting many more hares and lynx than occurred historically. The Maine Forest Practices Act (1989) limited the size of clearcuts, resulting in a near complete shift away from clearcuts to partial harvesting. This transition to partial harvest timber management is unlikely to create or maintain the extensive tracts of hare and lynx habitats that currently exist as a result of previous clearcutting. As the clear-cut stands continue to age, their habitat value to hares and lynx is expected to decline. Even in the absence of climate change considerations, forest succession and reduced clearcutting are expected to result in a substantially smaller lynx population in this unit by 2035 (Simons 2009, pp. 153–154, 162–165, 206, 216–220; Vashon *et al.* 2012, pp. 58–60). Therefore, the potential for forest management practices to result in reduced quantity and quality of lynx and hare habitats represents a habitat-

related threat to lynx in this unit. Other potential habitat-related threats to lynx in this unit are habitat loss and fragmentation due to road and highway construction (along with associated increases in traffic volumes and/or speeds) and commercial, recreational, and wind-energy development.

In this final rule, we have not designated critical habitat on Tribal lands in this unit nor on lands managed in accordance with the Natural Resources Conservation Service's Healthy Forest Reserve Program (see Consideration of Impacts under section 4(b)(2) of the Act, below).

*Unit 2: Northeastern Minnesota*

Unit 2 consists of 8,069 mi² (20,899 km²) located in northeastern Minnesota in portions of Cook, Koochiching, Lake, and St. Louis Counties, and Superior National Forest. In 2003, when we formally reviewed the status of the lynx, numerous verified records of lynx existed from northeastern Minnesota (68 FR 40076). The area was occupied at the time of listing and is currently occupied by the species (Moen *et al.* 2008b, pp. 29–32; Moen *et al.* 2010, entire; Catton and Loch 2010, entire; 2011, entire; 2012, entire; Interagency Lynx Biology Team 2013, pp. 44–47). Lynx are currently known to be distributed throughout northeastern Minnesota, as has been confirmed through DNA analysis, radio- and GPS-collared animals, and documentation of reproduction (Moen *et al.* 2008b, entire; Moen *et al.* 2010, entire). This area contains the physical and biological features essential to the conservation of the lynx DPS as it comprises the PCE and its components laid out in the appropriate quantity and spatial arrangement. This area is essential to the conservation of lynx because it is the only area in the Great Lakes Region for which there is evidence of recent lynx reproduction. It likely acts as a source or provides connectivity for more peripheral portions of the lynx's range in the region.

Rvsd Plan - 00003693

Timber harvest and management are dominant land uses (68 FR 40075). Therefore, special management may be required depending on the silvicultural practices implemented. Timber management practices that provide for a dense understory are beneficial for lynx and snowshoe hares. In this area, climate change may affect lynx and their habitats; however, Gonzalez et al. (2007, p. 14) suggested that snow conditions in northern Minnesota should continue to be suitable for lynx through the end of this century. Nonetheless, because climate change may alter vegetation communities and, hence, hare densities, it still represents a potential habitat-related threat to lynx in this unit. Fire suppression or fuels treatment, habitat fragmentation associated with road-building (and associated increases in traffic volumes and/or speeds), and commercial, recreational, and energy/mineral development pose other potential habitat-related threats to lynx in this unit. Incidental capture of lynx in traps set for other species has been documented recently in Minnesota, as have lynx mortalities from vehicle collisions (U.S. Fish and Wildlife Service 2013d, unpubl. database).

In this final rule, we have not designated critical habitat on Tribal lands in this unit (see Consideration of Impacts under section 4(b)(2) of the Act, below).

*Unit 3: Northern Rocky Mountains*

Unit 3 consists of 9,783 mi² (25,337 km²) located in northwestern Montana and a small portion of northeastern Idaho in portions of Boundary County in Idaho and Flathead, Glacier, Granite, Lake, Lewis and Clark, Lincoln, Missoula, Pondera, Powell, and Teton Counties in Montana. It includes National Forest lands and BLM lands in the Garnet Resource Area. This area was occupied by lynx at the time of listing and is currently occupied by the species (Squires et al. 2010, entire; Squires et al. 2012, entire; Squires et al. 2013, entire; Interagency Lynx Biology Team 2013, pp. 57–61). Lynx are known to be widely distributed throughout this unit, and breeding has been documented in multiple locations (Gehman et al. 2004, pp. 24–29; Squires et al. 2004a, pp. 8–10, 2004b, entire, and 2004c, pp. 7–10). This area contains the physical and biological features essential to the conservation of the lynx DPS as it comprises the PCE and its components laid out in the appropriate quantity and spatial arrangement. This area is essential to the conservation of lynx because it appears to support the highest density lynx populations in the Northern Rocky Mountain region of the

lynx's range. It likely acts as a source for lynx and provides connectivity to other portions of the lynx's range in the Rocky Mountains, particularly the Greater Yellowstone Area.

Timber harvest and management are dominant land uses (68 FR 40075); therefore, special management may be required depending on the silvicultural practices implemented. Timber management practices that provide for a dense understory are beneficial for lynx and snowshoe hares. In this area, climate change is expected to result in the potential loss of snow conditions suitable for lynx by the end of this century (Gonzalez et al. 2007, p. 14). Therefore, climate change represents a potential habitat-related threat to lynx in this unit. Fire suppression or fuels treatment, habitat fragmentation associated with road-building (and associated increases in traffic volumes and/or speeds), and commercial, recreational, and energy/mineral development pose other potential habitat-related threats to lynx in this unit.

In this final rule, we have not designated critical habitat on Tribal lands in this unit nor on lands managed in accordance with the MDNRC HCP (see Consideration of Impacts under section 4(b)(2) of the Act, below).

*Unit 4: North Cascades*

Unit 4 consists of 1,834 mi² (4,751 km²) located in north-central Washington in portions of Chelan and Okanogan Counties and includes mostly Okanogan-Wenatchee National Forest lands as well as BLM lands in the Spokane District and Loomis State Forest lands. This area was occupied at the time lynx was listed and is currently occupied by the species (Interagency Lynx Biology Team 2013, pp. 64–65). This area contains the physical and biological features essential to the conservation of the lynx DPS as it comprises the PCE and its components laid out in the appropriate quantity and spatial arrangement. This unit supports the highest densities of lynx in Washington (Stinson 2001, p. 2). Evidence from recent research and DNA analysis shows lynx distributed within this unit, with breeding being documented (von Kienast 2003, p. 36; Koehler et al. 2008, entire; Maletzke et al. 2008, entire). Although researchers have fewer records in the portion of the unit south of Highway 20, few surveys have been conducted there. This area contains boreal forest habitat and the components essential to lynx conservation. Further, it is contiguous with the portion of the unit north of Highway 20, particularly in winter

when deep snows close Highway 20. The northern portion of the unit adjacent to the Canada border also appears to support few recent lynx records; however, it is designated wilderness, so access to survey this area is difficult. This northern portion also contains extensive boreal forest vegetation types and the components essential to lynx conservation. Additionally, lynx populations exist in British Columbia directly north of this unit (Interagency Lynx Biology Team 2013, p. 65). This area is essential to the conservation of the lynx DPS because it is the only area in the Cascades region of the lynx's range that is known to support breeding lynx populations.

Timber harvest and management are dominant land uses; therefore, special management may be required depending on the silvicultural practices implemented. Timber management practices that provide for a dense understory are beneficial for lynx and snowshoe hares. In this area, Federal land management plans are being amended to incorporate lynx conservation. Climate change is expected to reduce lynx habitat and numbers in this unit, with potential loss of snow suitable for lynx (Gonzalez et al. 2007, p. 14) and the potential complete disappearance of lynx from the area by the end of this century (Johnston et al. 2012, pp. 7–11). Therefore, climate change represents a potential habitat-related threat to lynx in this unit. Fire suppression or fuels treatment, habitat fragmentation associated with road-building (and associated increases in traffic volumes and/or speeds), and recreational and energy/mineral development pose other potential habitat-related threats to lynx in this unit.

In this final rule, we have not designated critical habitat in this unit on lands managed in accordance with the WDNR Lynx Habitat Management Plan (see Consideration of Impacts under section 4(b)(2) of the Act, below).

*Unit 5: Greater Yellowstone Area*

Unit 5 consists of 9,146 mi² (23,687 km²) located in Yellowstone National Park and surrounding lands of the Greater Yellowstone Area in southwestern Montana and northwestern Wyoming. Lands in this unit are found in Carbon, Gallatin, Park, Stillwater, and Sweetgrass Counties in Montana; and Fremont, Lincoln, Park, Sublette, and Teton Counties in Wyoming. This area was occupied by lynx at the time of listing and is thought to be currently occupied by a small but persistent lynx population (Squires and Laurion 2000, entire; Squires et al. 2001,

entire; Murphy *et al.* 2006, entire; Interagency Lynx Biology Team 2013, pp. 57–61). This area contains the physical and biological features essential to the conservation of the lynx DPS as it comprises the PCE and its components laid out in the appropriate quantity and spatial arrangement. The Greater Yellowstone Area is naturally marginal lynx habitat with highly fragmented foraging habitat (68 FR 40090; 71 FR 66010, 66029; 74 FR 8624, 8643–8644; Hodges *et al.* 2009, entire). For this reason lynx home ranges in this unit are likely to be larger and incorporate large areas of non-foraging matrix habitat.

Timber harvest and management are dominant land uses on National Forest System lands in this unit; therefore, special management may be required depending on the silvicultural practices implemented. Timber management practices that provide for a dense understory are beneficial for lynx and snowshoe hares. Climate change is expected to reduce lynx habitat and numbers in this unit, with potential loss of snow suitable for lynx over most of the area by the end of this century, though with potential snow refugia in the Wyoming Range Mountains (Gonzalez *et al.* 2007, p. 14). Therefore, climate change represents a potential habitat-related threat to lynx in this unit. Fire suppression or fuels treatment, habitat fragmentation associated with road-building (and associated increases in traffic volumes and/or speeds), and recreational and energy/mineral development pose other potential habitat-related threats to lynx in this unit. Therefore, special management is required depending on the fire suppression and fuels treatment practices conducted and the design of highway and energy development projects.

In this final rule, we have not designated critical habitat in this unit on lands managed in accordance with the MDNRC HCP (see Consideration of Impacts under section 4(b)(2) of the Act, below).

## Effects of Critical Habitat Designation

### Section 7  Consultation

Section 7(a)(2) of the Act requires Federal agencies, including the Service, to ensure that any action they fund, authorize, or carry out is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of designated critical habitat of such species. In addition, section 7(a)(4) of the Act requires Federal agencies to confer with

the Service on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under the Act or result in the destruction or adverse modification of designated critical habitat.

Decisions by the Fifth and Ninth Circuit Courts of Appeals have invalidated our regulatory definition of "destruction or adverse modification" (50 CFR 402.02) (see *Gifford Pinchot Task Force* v. *U.S. Fish and Wildlife Service,* 378 F. 3d 1059 (9th Cir. 2004) and *Sierra Club* v. *U.S. Fish and Wildlife Service et al.,* 245 F.3d 434, 434 (5th Cir. 2001)), and we do not rely on this regulatory definition when analyzing whether an action is likely to destroy or adversely modify critical habitat. Under the provisions of the Act, we determine destruction or adverse modification on the basis of whether, with implementation of the proposed Federal action, the affected critical habitat would continue to serve its intended conservation role for the species.

If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency (action agency) must enter into consultation with us. Examples of actions that are subject to the section 7 consultation process are actions on State, Tribal, local, or private lands that require a Federal permit (such as a permit from the U.S. Army Corps of Engineers under section 404 of the Clean Water Act (33 U.S.C. 1251 *et seq.*) or a permit from the Service under section 10 of the Act) or that involve some other Federal action (such as funding from the Federal Highway Administration, Federal Aviation Administration, or the Federal Emergency Management Agency). Federal actions not affecting listed species or critical habitat, and actions on State, Tribal, local, or private lands that are not federally funded or authorized, do not require section 7 consultation.

As a result of section 7 consultation, we document compliance with the requirements of section 7(a)(2) through our issuance of:

(1) A concurrence letter for Federal actions that may affect, but are not likely to adversely affect, listed species or critical habitat; or

(2) A biological opinion for Federal actions that may affect and are likely to adversely affect, listed species or critical habitat.

When we issue a biological opinion concluding that a project is likely to jeopardize the continued existence of a listed species and/or destroy or adversely modify critical habitat, we provide reasonable and prudent

alternatives to the project, if any are identifiable, that would avoid the likelihood of jeopardy and/or destruction or adverse modification of critical habitat. We define "reasonable and prudent alternatives" (at 50 CFR 402.02) as alternative actions identified during consultation that:

(1) Can be implemented in a manner consistent with the intended purpose of the action,

(2) Can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction,

(3) Are economically and technologically feasible, and

(4) Would, in the Director's opinion, avoid the likelihood of jeopardizing the continued existence of the listed species and/or avoid the likelihood of destroying or adversely modifying critical habitat.

Reasonable and prudent alternatives can vary from slight project modifications to extensive redesign or relocation of the project. Costs associated with implementing a reasonable and prudent alternative are similarly variable.

Regulations at 50 CFR 402.16 require Federal agencies to reinitiate consultation on previously reviewed actions in instances where we have listed a new species or subsequently designated critical habitat that may be affected and the Federal agency has retained discretionary involvement or control over the action (or the agency's discretionary involvement or control is authorized by law). Consequently, Federal agencies sometimes may need to request reinitiation of consultation with us on actions for which formal consultation has been completed, if those actions with discretionary involvement or control may affect subsequently listed species or designated critical habitat.

### Application of the "Adverse Modification" Standard

The key factor related to the adverse modification determination is whether, with implementation of the proposed Federal action, the affected critical habitat would continue to serve its intended conservation role for the species. Activities that may destroy or adversely modify critical habitat are those that alter the physical or biological features to an extent that appreciably reduces the conservation value of critical habitat for the lynx DPS. As discussed above, the role of critical habitat is to support life-history needs of the species and provide for the conservation of the species.

Section 4(b)(8) of the Act requires us to briefly evaluate and describe, in any

proposed or final regulation that designates critical habitat, activities involving a Federal action that may destroy or adversely modify such habitat, or that may be affected by such designation. Activities that may affect critical habitat, when carried out, funded, or authorized by a Federal agency, are required to undergo consultation in accordance with section 7 of the Act to evaluate potential impacts to habitats essential to the conservation of the lynx DPS. These activities include, but are not limited to:

(1) Actions that would reduce or remove understory vegetation within boreal forest stands on a scale proportionate to the large landscape used by lynx. Such activities could include, but are not limited to, forest stand thinning, timber harvest, and fuels treatment of forest stands. These activities could significantly reduce the quality of snowshoe hare habitat such that the landscape's ability to produce adequate densities of snowshoe hares to support lynx populations is at least temporarily diminished.

(2) Actions that would cause permanent loss or conversion of the boreal forest on a scale proportionate to the large landscape used by lynx. Such activities could include, but are not limited to, recreational area developments; certain types of mining activities and associated developments; and road building. Such activities could eliminate and fragment lynx and snowshoe hare habitat.

(3) Actions that would increase traffic volume and speed on roads that divide lynx critical habitat. Such activities could include, but are not limited to, transportation projects to upgrade roads or development of a new tourist destination. These activities could reduce connectivity within the boreal forest landscape for lynx, and could result in increased mortality of lynx within the critical habitat units, because lynx are highly mobile and frequently cross roads during dispersal, exploratory movements, or travel within their home ranges.

In matrix habitat, activities that change vegetation structure or condition would not be considered an adverse effect to lynx critical habitat unless those activities would create a barrier or impede lynx movement between patches of foraging habitat and between foraging and denning habitat within a potential home range, or if they would adversely affect adjacent foraging habitat or denning habitat. For example, a pre-commercial thinning or fuels reduction project in matrix habitat would not adversely affect lynx critical habitat, and would not require consultation. However, a new highway passing through matrix habitat that would impede lynx movement may be an adverse effect to lynx critical habitat, and would require consultation. The scale of any activity should be examined to determine whether direct or indirect alteration of habitat would occur to the extent that the value of critical habitat for the survival and recovery of lynx would be appreciably diminished.

If you have questions regarding whether specific activities may constitute destruction or adverse modification of critical habitat, contact the Supervisor of the appropriate Ecological Services Field Office (see list below).

| State | Address | Phone No. |
|---|---|---|
| Maine ........................................ | 17 Godfrey Drive, Suite 2, Orono, ME 04473 ........................................ | (207) 866–3344 |
| Minnesota ................................ | 4101 American Boulevard East, Bloomington, Minnesota 55425 ...................... | (612) 725–3548 |
| Montana .................................. | 585 Shepard Way, Suite 1, Helena, Montana 59601 ............................... | (406) 449–5225 |
| Idaho and Washington ............................. | 11103 E. Montgomery Drive, Spokane, Washington 99206 ........................... | (509) 893–8015 |
| Wyoming .................................. | 5353 Yellowstone Road, Suite 308A, Cheyenne, Wyoming 82009 .................... | (307) 772–2374 |

## Exemptions

### Application of Section 4(a)(3) of the Act

Section 4(a)(3)(B)(i) of the Act (16 U.S.C. 1533(a)(3)(B)(i)) provides that: "The Secretary shall not designate as critical habitat any lands or other geographic areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan [INRMP] prepared under section 101 of the Sikes Act (16 U.S.C. 670a), if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation." There are no Department of Defense lands with a completed INRMP within this final critical habitat designation.

## Consideration of Impacts Under Section 4(b)(2) of the Act

Section 4(b)(2) of the Act states that the Secretary shall designate and make revisions to critical habitat on the basis of the best available scientific data after taking into consideration the economic impact, national security impact, and any other relevant impact of specifying any particular area as critical habitat. The Secretary may exclude an area from critical habitat upon a determination that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless doing so would, based on the best scientific data available, result in the extinction of the species. In making that determination, the statute on its face, as well as the legislative history are clear that the Secretary has broad discretion regarding which factor(s) to use and how much weight to give to any factor.

When identifying the benefits of inclusion for an area, we consider the additional regulatory benefits that area would receive from the protection from destruction or adverse modification of critical habitat as a result of actions with a Federal nexus; the educational benefits of mapping essential habitat for recovery of the listed species; and any benefits that may result from a designation due to State or Federal laws that may apply to critical habitat.

When identifying the benefits of exclusion, we consider, among other things, whether exclusion of a specific area is likely to result in conservation; the continuation, strengthening, or encouragement of partnerships; or implementation of a management plan that provides conservation benefits equal to or greater than those provided by a critical habitat designation.

In the case of the lynx DPS, the benefits of critical habitat include promotion of public awareness of the presence of the species and the importance of habitat protection, and in cases where a Federal nexus exists, potentially greater habitat protection for lynx due to the protection from destruction or adverse modification of critical habitat.

When we evaluate the benefits of excluding particular areas for which conservation plans have been developed, we consider a variety of factors, including but not limited to, whether the plan is finalized; how it provides for the conservation of the essential physical or biological features; whether there is a reasonable expectation that the conservation management strategies and actions

contained in a management plan will be implemented into the future; whether the conservation strategies in the plan are likely to be effective; and whether the plan contains a monitoring program or adaptive management to ensure that the conservation measures are effective and can be adapted in the future in response to new information.

After identifying the benefits of inclusion and the benefits of exclusion, we carefully weigh the two sides to evaluate whether the benefits of exclusion outweigh those of inclusion. If our analysis indicates that the benefits of exclusion outweigh the benefits of inclusion, we then determine whether exclusion would result in extinction. If exclusion of an area from critical habitat will result in extinction, we cannot exclude it from the designation.

Based on the information provided by entities seeking exclusion, as well as any additional public comments received, we evaluated whether certain lands in the proposed critical habitat were appropriate for exclusion from this final designation pursuant to section 4(b)(2) of the Act. We are excluding the following areas from critical habitat designation for the Canada lynx DPS: (1) Tribal lands, which occur in units 1, 2, and 3; (2) private lands in Maine managed in accordance with the Natural Resources Conservation Service's (NRCS) Healthy Forest Reserve Program (75 FR 6539); (3) State lands in western Montana managed in accordance with the Montana Department of Natural Resources and Conservation (MDNRC) Forested State Trust Lands Habitat

Conservation Plan (HCP) (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010a, entire; 2010b, entire; 2010c, entire); and (4) State lands in northern Washington managed in accordance with the State of Washington Department of Natural Resources (DNR) Lynx Habitat Management Plan for DNR-managed Lands (Washington DNR 2006, entire). Table 3 below provides approximate areas of lands that meet the definition of critical habitat but which we have excluded from the final critical habitat rule under section 4(b)(2) of the Act. For additional details on these plans, see *Exclusions Based on Other Relevant Impacts,* below.

TABLE 3—AREAS EXCLUDED FROM CRITICAL HABITAT DESIGNATION FOR CANADA LYNX BY CRITICAL HABITAT UNIT

| Unit | Specific area | Area in mi² (km²) excluded from final critical habitat designation |
|---|---|---|
| 1. Maine ................................... | Tribal Lands: Passamaquoddy Tribe, Penobscot Indian Nation ............................... | 95.7 (248) |
| 1. Maine ................................... | Maine Healthy Forest Reserve Program ................................................................. | 943.2 (2,443) |
| 2. Minnesota ............................ | Tribal Lands: Grand Portage Reservation, Bois Forte Reservation—Vermillion Lake District. | 77.9 ( 202) |
| 3. Northern Rocky Mountains ................. | Tribal Lands: Confederated Salish and Kootenai Tribes, Flathead Reservation ..... | 369.6 (957) |
| 3. Northern Rocky Mountains ................. | Montana DNRC Multispecies Habitat Conservation Plan ......................................... | 271.4 (703) |
| 4. North Cascade Mountains ................... | Washington DNR Lynx Habitat Management Plan ................................................... | 164.2 (425) |
| 5. Greater Yellowstone Area ................... | Montana DNRC Multispecies Habitat Conservation Plan ......................................... | 1.3 (3) |

**Consideration of Economic Impacts**

Under section 4(b)(2) of the Act, we consider the economic impacts of specifying any particular area as critical habitat. To consider economic impacts, we prepared an incremental effects memorandum (IEM) and screening analysis which, together with our narrative and interpretation of effects, we consider our draft economic analysis (DEA) of the proposed critical habitat designation and related factors (U.S. Fish and Wildlife Service and IEc, Inc. 2014, entire). The analysis, dated June 11, 2014, was made available for public review from June 20, 2014, through July 21, 2014 (79 FR 35303). The DEA addressed potential economic impacts of critical habitat designation for the lynx DPS. Following the close of the comment period, we reviewed and evaluated all information submitted during the comment period that may pertain to our consideration of the probable incremental economic impacts of this critical habitat designation. Based on that evaluation, the probable incremental economic impacts of critical habitat designation for the lynx DPS are summarized below. Additional

information relevant to our evaluation of incremental economic impacts is available in the final economic analysis for the designation of critical habitat for the lynx DPS (U.S. Fish and Wildlife Service and IEc, Inc. 2014, entire), available at *http://www.regulations.gov, and at our Web site: http:// www.fws.gov/mountain-prairie/species/ mammals/lynx/index.htm.*

Revised critical habitat for the lynx DPS is very unlikely to generate incremental economic costs exceeding $100 million in a single year (see additional discussion of this threshold in the *Unfunded Mandates Reform Act* section, below). Data limitations prevent the quantification of benefits. The economic costs of implementing the rule through section 7 of the Act will most likely be limited to the additional administrative effort required to consider adverse modification during section 7 consultations for activities with a Federal nexus. This finding is based on the following factors:

(1) All units are considered currently occupied, providing baseline protection via section 7 consultations addressing the jeopardy standard;

(2) Activities occurring within designated critical habitat with a potential to affect critical habitat are also likely to jeopardize the species, either directly or indirectly;

(3) Project modifications requested to avoid adverse modification are likely to be the same as those needed to avoid jeopardy;

(4) On Federal lands, as well as some private and State lands, ongoing conservation efforts offer additional baseline protection; and

(5) Critical habitat is unlikely to increase the annual consultation rate for two primary reasons:

(a) The existing awareness of the need to consult due to the listing of the species; and

(b) The fact that the 2009 critical habitat designation covered 89 percent of the areas designated as critical habitat in this final rule.

According to a review of consultation records and discussions with multiple Service field offices, the additional administrative cost of addressing adverse modification during the section 7 consultation process ranges from approximately $400 to $5,000 per consultation (2014 dollars). Based on

the historical consultation activity, we forecast an annual consultation rate of approximately 161 per year, resulting in costs ranging from $64,400 to $805,000 annually (2014 dollars). Thus, the incremental administrative burden resulting from the rule is well below the threshold of $100 million in a given year.

The revised designation of critical habitat for the lynx DPS is not expected to trigger additional requirements under State or local regulations. This assumption is based on the array of existing baseline protections for the lynx and the general awareness of State agencies of the presence of the species. The revised designation may cause land managers, landowners, or developers to perceive that private lands will be subject to use restrictions, resulting in costs. However, such impacts, if they occur, are very unlikely to reach $100 million in a given year.

No additional section 7 efforts to conserve the lynx DPS are predicted to result from the revised designation of critical habitat. If, however, public perception of the effect of critical habitat causes changes in future land use, benefits to the species and environmental quality may occur. Due to existing data limitations, we are unable to assess the likely magnitude of such benefits.

The majority of anticipated future consultations are expected to occur in Unit 5 (Greater Yellowstone Area). Costs resulting from public perception of the impact of critical habitat, if they occur, are more likely to occur in Unit 4 (North Cascades) and private lands located in Unit 1 (Northern Maine).

*Exclusions Based on Economic Impacts*

Our 2014 and 2009 economic analyses did not identify any disproportionate costs that are likely to result from the designation. Consequently, the Secretary is not exercising her discretion to exclude any areas from this designation of critical habitat for the lynx DPS based on economic impacts.

Both the current economic analysis (U.S. Fish and Wildlife Service and IEc, Inc. 2014, entire) and the final economic analysis completed for the 2009 critical habitat designation for the lynx DPS (IEc, Inc. 2008, entire) specifically addressed potential economic impacts to the Washington State Snowmobile Association (WASSA) and the groups it represents. Both analyses, incorporated here by reference in their entireties, considered the comments and regional economic assessments provided by the WASSA in response to the 2008 and 2013 proposed designations. In our analyses, we have carefully evaluated

potential impacts to snowmobiling interests throughout the critical habitat designation, and specifically with regard to the concerns of the WASSA and the Wyoming State Snowmobile Association.

Snowmobiling occurs throughout the areas designated as lynx critical habitat, and understanding of the potential effects of snowmobiling on lynx continues to evolve. Concerns about potential negative impacts of snowmobiling are based primarily on the hypothesis that compacted over-the-snow trails could result in increased competition between lynx and other snowshoe hare predators, such as coyotes, in areas where deep snow would otherwise preclude or minimize such competition (Buskirk *et al.* 2000a, pp. 86–95). Research on the relationship between coyotes, lynx, and lynx habitat has provided mixed results regarding this hypothesis, with several studies showing that coyotes use compacted snow trails, but none indicating increased competition or substantial dietary overlap between lynx and coyotes (Interagency Lynx Biology Team 2013, pp. 80–82). In response to this uncertainty, the 2013 revisions to the LCAS provided more flexibility with respect to the management of recreational activities in lynx habitat, and snowmobiling stakeholders have largely expressed approval of the 2013 LCAS revisions (U.S. Fish and Wildlife Service and IEc, Inc. 2014, pp. 11–12].

Between 3,000 and 5,000 miles of trails are available for snowmobiling in Washington, of which about 200 miles (4.0–6.7 percent) occur within the revised critical habitat designation. A 2003 study estimated that the number of people participating in snowmobiling would increase 43 percent by the year 2013 (State of Washington 2003, pp. 4, 41); however, it is not clear whether this level of increase has occurred. In 2001, Washington State University and the WASSA conducted a snowmobile usage study and concluded that the annual economic impact of snowmobiling in Washington was $92.7 million dollars. In response to the 2009 critical habitat designation, WASSA estimated that snowmobiling accounted for nearly $8.5 million in direct expenditures and $4.1 million in indirect spending in Methow Valley, an area adjacent to designated critical habitat.

The WASSA, which represents about 30,000 registered snowmobilers and nearly 100 snowmobile-related businesses, has again expressed concern that critical habitat designation may generate significant economic impacts to the snowmobiling industry. Specifically, the WASSA is concerned

that people will perceive that the designation will limit snowmobiling and in turn will be less likely to invest in snowmobiling equipment, that the designation will prevent an increase in over-the-snow trails thus resulting in congestion, and that the designation will represent an additional regulatory burden for future attempts to expand or increase the number of trails in the area (U.S. Fish and Wildlife Service and IEc, Inc. 2014, p. 13).

Although annual data on snowmobiling participation in Washington since 2009 are not readily available, the critical habitat designation is not anticipated to adversely change snowmobiling in Washington (U.S. Fish and Wildlife Service and IEc, Inc. 2014, p. 13). We evaluated whether and how snowmobiling activities in Maine and Minnesota were affected as a result of the 2009 critical habitat designation, and we found no significant changes in snowmobiling activities have been observed there since the 2009 designation (U.S. Fish and Wildlife Service and IEc, Inc. 2014, p. 13). We have had no reports of significant economic impacts to snowmobiling interests in the other areas designated as critical habitat in 2009 (western Montana, northern Idaho, and northwestern Wyoming).

In response to our 2013 proposed critical habitat designation, the WASSA resubmitted the sector assessment study it previously commissioned on the regional economic impacts of the 2008 proposed critical habitat rule. The WASSA study assumes that lynx conservation efforts will result in an overall loss of winter visitors and tourism spending within the region. The study employs a regional input/output model, estimating the potential cost of the critical habitat designation to be $262,000 to $1,645,000 (2013 dollars) through the year 2025, assuming a seven percent discount rate. This present-value sum translates to approximately $27,000 to $168,500 on an annualized basis, assuming a seven percent discount rate.

Based on both the current economic analysis (U.S. Fish and Wildlife Service and IEc, Inc. 2014, entire) and the final economic analysis completed for the 2009 critical habitat designation for the lynx DPS (IEc, Inc. 2008, entire), we have determined that the designation of critical habitat for the lynx DPS will not result in disproportionate economic impacts to snowmobiling interests anywhere within the designated areas, and specifically with regard to those interests represented by the WASSA and the Wyoming State Snowmobile Association. We have made this

evaluation available to the Secretary for her consideration when determining whether to exercise her discretion to exclude these or other areas based on baseline and incremental economic impacts. Based on her consideration of this evaluation, the Secretary is not exercising her discretion to exclude any areas from this designation of critical habitat for the lynx DPS based on economic impacts.

*Exclusions Based on National Security Impacts or Homeland Security Impacts*

Under section 4(b)(2) of the Act, we consider whether there are lands owned or managed by the Department of Defense where a national security impact might exist. In preparing this final rule, we have determined that no lands within the designation of critical habitat for the lynx DPS are owned or managed by the Department of Defense or Department of Homeland Security, and, therefore, we anticipate no impact on national security or homeland security. Consequently, the Secretary is not exercising her discretion to exclude any areas from this final designation based on impacts on national security or homeland security.

*Exclusions Based on Other Relevant Impacts*

Under section 4(b)(2) of the Act, we also consider any other relevant impacts resulting from the designation of critical habitat. We consider a number of factors, including whether the landowners have developed any HCPs or other management plans for the area, or whether there are conservation partnerships that would be encouraged by designation of, or exclusion from, critical habitat. In addition, we look at any Tribal issues and consider the government-to-government relationship of the United States with Tribal entities. We also consider any social impacts that might occur because of the designation.

Consideration of Land and Resource Management Plans, Conservation Plans, or Agreements Based on Conservation Partnerships

We consider a current land management or conservation plan (HCPs as well as other types) to provide adequate management or protection if it meets the following criteria:

(1) The plan is complete and provides a conservation benefit for the species and its habitat;

(2) There is a reasonable expectation that the conservation management strategies and actions will be implemented for the foreseeable future, based on past practices, written guidance, or regulations; and

(3) The plan provides conservation strategies and measures consistent with currently accepted principles of conservation biology.

We have determined that the following partnerships, program, and plans fulfill the above criteria, and we are, therefore, excluding from critical habitat the areas of non-Federal lands covered by them because they provide for the conservation of the lynx DPS.

Tribal Lands Conservation Partnerships

Tribal lands in Maine, Minnesota, and Montana fall within the boundaries of designated critical habitat in units 1 (Maine), 2 (Minnesota), and 3 (Northern Rocky Mountains). Tribal lands include those of the Passamaquoddy Tribe and the Penobscot Indian Nation in Maine, the Grand Portage Indian Reservation and Bois Forte Indian Reservation—Vermillion Lake District in Minnesota, and the Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation in Montana. The amount of Tribal lands that occur within the final designation is relatively small in size, totaling approximately 543.2 mi² (1,407 km²), which represents 1.4 percent of the total final designation.

In the proposed rule, we requested comments on whether Tribal lands in Maine, Minnesota, and the Northern Rockies should be excluded pursuant to Executive Order 3206. We also contacted a number of Tribes to discuss the proposed designation and, as they had done previously during discussions regarding the 2009 designation, the Tribes again requested that their lands not be designated as critical habitat because of their sovereign rights, in addition to concerns about economic impacts and the effect on their ability to manage natural resources.

*Benefits of Inclusion*

The primary benefit of including Tribal lands in the lynx critical habitat designation would be education that could be exchanged on land management methods that would benefit the species. Potentially, some activities could be authorized, funded, or carried out by a Federal agency, which would require consultation and perhaps action modification to ensure that the physical and biological features essential to lynx are not destroyed or adversely modified.

*Benefits of Exclusion*

Tribal lands are small in size relative to the large landscape required to sustain the lynx populations in these areas. The larger landscape in Maine comprises lands managed for commercial forestry, and in Minnesota

and Montana the larger landscape is managed by the USFS, which revised its forest plans to address the conservation needs of lynx. Therefore, although these Tribal lands support lynx habitat and the PCE, they have a minor role in lynx conservation compared to the extensive commercial forestlands in Maine and National Forest lands in Minnesota and Montana. Due to Tribal natural resource management philosophies, plans, and practices that are designed to avoid adverse effects to lynx and lynx habitat, and that are already in place on Tribal lands, it is highly unlikely that activities approaching the threshold of adverse modification of critical habitat would occur.

Tribal lands of the Passamaquoddy Tribe and the Penobscot Indian Nation fall within lynx critical habitat in Maine. These lands represent only 0.9 percent of the total critical habitat designation in Unit 1. The Environmental Mission of the Passamaquoddy Tribe is: "to protect the environment and conserve natural resources within all Passamaquoddy lands, waters, and the air we share" (Passamaquoddy Tribe 2014, entire). Through Federal grant programs, the Passamaquoddy Tribe is also conducting surveys and developing habitat models for lynx and snowshoe hare, which will likely lead to better understanding and management of lynx and hare habitats on Tribal lands. The mission of the Penobscot Indian Nation's Department of Natural Resources is: ". . . to manage, develop and protect the Penobscot Nation's natural resources in a sustainable manner that protects and enhances the cultural integrity of the Tribe" (Penobscot Indian Nation 2014, entire). Further, the Penobscot Indian Nation's Inland Fish and Game Regulations prohibit the hunting, trapping, or possessing of Canada lynx (Penobscot Indian Nation 2012, p. 15).

Tribal lands of the Grand Portage Indian Reservation and the Bois Forte Indian Reservation—Vermillion Lake District fall within lynx critical habitat in Minnesota. These lands represent only 1 percent of the total critical habitat designation in Unit 2. The Grand Portage Band of Chippewa has been actively working on lynx conservation since 2004. In October 2007, the Band hosted an international conference on lynx research and conservation where more than 50 researchers from the United States and Canada presented results of research on lynx diet, habitat, and management. Additionally, on-reservation timber sales and harvest practices follow an integrated management plan for priority wildlife

Rvsd Plan - 00003699

management, sustainable economic development, and recreational uses. The Band's timber management practices benefit populations of snowshoe hares, the lynx's primary prey (Deschampe 2008, entire).

Tribal lands of the Confederated Salish and Kootenai Tribes, Flathead Indian Reservation fall within lynx critical habitat in Montana. These lands represent only 3.8 percent of the total critical habitat designation in Unit 3. The mission statement of the Tribes' Fish, Wildlife, Recreation and Conservation Division is: "to protect and enhance the fish, wildlife, and wildland resources of the Tribes for continued use by the generations of today and tomorrow" (Confederated Salish and Kootenai Tribes 2014a, entire). An objective of the Tribes' *Tribal Wildlife Management Program Plan* is to ". . . develop and implement habitat management guidelines for Canadian lynx in coordination with the Forestry Department as specified in the Forest Management Plan" (Confederated Salish and Kootenai Tribes. 2014b, p. 5). The Forest Management Plan states that "Standards for lynx management and habitat protection are set forth in the Canada Lynx Conservation Assessment and Strategy. This strategy guides land management activity in lynx foraging and denning habitat. Lynx occurrence and populations will continue to be monitored on the Reservation" (Confederated Salish and Kootenai Tribes. 2000, p. 285). Additionally, most lynx and lynx habitat on the reservation occur in areas with formal protective status, including: (1) The long-designated Mission Mountains and Rattlesnake Tribal Wilderness Areas, which are largely roadless and managed for wilderness qualities; (2) the South Fork/Jocko Primitive Area, which is open to use only by Tribe members and in which commercial timber harvest is prohibited; and (3) the Nine-mile Divide country, which is marginal in terms of lynx habitat, but which is also partly roadless (Courville 2014, pers. comm.).

Because of the protected status of these areas and the prohibition on activities that could impact lynx and their habitats, it is unlikely that additional special management considerations are necessary for these Tribal lands or that additional benefit to lynx would result from designating them as critical habitat.

Secretarial Order 3206, "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" (June 5, 1997) states that, "Critical habitat shall not be designated in such areas unless it is determined essential to conserve a listed species". The President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951); Executive Order 13175 "Consultation and Coordination with Indian Tribal Governments;" and the relevant provision of the Departmental Manual of the Department of the Interior (512 DM 2) also emphasize that Tribal lands should be evaluated to determine whether their inclusion in a critical habitat designation is essential to the species. Therefore, we believe that fish, wildlife, and other natural resources on Tribal lands are better managed under Tribal authorities, policies, and programs than through Federal regulation wherever possible and practicable. Such designation is often viewed by Tribes as an unwanted intrusion into Tribal self-governance, thus compromising the government-to-government relationship essential to achieving our mutual goals of managing for healthy ecosystems upon which the viability of threatened and endangered species populations depend.

*Benefits of Exclusion Outweigh the Benefits of Inclusion*

Exclusion of Tribal lands is warranted because affected Tribes already take actions to avoid negative impacts to lynx and to conserve lynx and hare habitats. Through Federal grant programs, the Passamaquoddy Tribe is conducting surveys and habitat models for lynx and snowshoe hare, the Grand Portage Tribe is assessing lynx habitat on reservation lands, and lynx habitat is protected through a comprehensive conservation plan and non-development land designations on the Flathead Reservation in Montana. Information from these efforts will be used to inform management plans or strategies to promote the conservation of lynx on Tribal lands. Additionally, we received comments from Tribes voicing their commitment to ensuring that lynx remain a viable part of the ecosystem.

We have determined that conservation of lynx can be achieved on Tribal lands within the critical habitat units through the continuation of the cooperative partnerships between the Service and the Tribes, and without designating them as critical habitat. The management plans, activities, and land-use designations being implemented on Tribal lands described above are likely to ensure continued conservation of lynx on Tribal lands. Given the importance of our government-to-government relationship with Tribes, the benefit of maintaining our commitment to the Executive Order by excluding these lands outweighs the benefit of including them in critical habitat. Therefore, pursuant to section 4(b)(2) of the Act, we have not designated critical habitat for the lynx DPS on Tribal lands in Units 1, 2, and 3 in this final rule.

*Exclusion Will Not Result in Extinction of the Species*

We have determined that exclusion of Tribal lands from the designation of critical habitat for the lynx will not result in the extinction of the species because the Passamaquoddy Tribe, Penobscot Indian Nation, Grand Portage Indians, Bois Forte Indians, and Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation implement programs for the conservation of the species, and the physical and biological features essential to it, in occupied areas. The protections afforded to the lynx under the jeopardy standard will remain in place for the areas considered for exclusion from revised critical habitat. Therefore, and in light of Secretarial Order 3206 and Tribal management of lynx and their habitat, 95.7 mi² (248 km²) of Tribal lands in Maine, 77.9 mi² (202 km²) in Minnesota, and 369.6 mi² (957 km²) in Montana have been excluded from lynx critical habitat designation in this final rule.

Maine Healthy Forest Reserve Program (HFRP)

In 2003, Congress passed the Healthy Forest Restoration Act. Title V of this Act designates a Healthy Forest Reserve Program (HFRP) with objectives to: (1) promote the recovery of threatened and endangered species, (2) improve biodiversity, and (3) enhance carbon sequestration. In 2006, Congress provided the first funding for the HFRP, and Maine, Arkansas, and Mississippi were chosen as pilot States to receive funding through their respective Natural Resources Conservation Service (NRCS) State offices. Based on a successful pilot program, in 2008, the HFRP was reauthorized as part of the Farm Bill, and in 2010, NRCS published a final rule in the **Federal Register** (75 FR 6539) amending regulations for the HFRP based on provisions amended by the bill.

In 2006 and 2007, the NRCS offered the HFRP to landowners in the proposed Canada lynx critical habitat unit in Maine to promote development of Canada lynx forest management plans. At that time, five landowners enrolled in the Maine HFRP, and collectively signed contracts (with NRCS) committing to developing lynx forest management plans on 1,069.8 mi² (2,770.7 km²). However, one of the

landowners has since discontinued enrollment in the program. Because of that and other mapping refinements, the amount of land currently managed in accordance with Maine HFRP is 943.2 mi$^2$ (2,443 km$^2$), or 9.3 percent of the total designated critical habitat in Unit 1. Lynx maintain large home ranges; therefore, forest management plans at large landscape scales will provide substantive recovery benefits to lynx.

The NRCS requires that lynx forest management plans must be based on the Service's "Canada Lynx Habitat Management Guidelines for Maine" (McCollough 2007, entire). These guidelines were developed from the best available science on lynx management for Maine and have been revised as new research results became available. The guidelines require maintenance of prescribed hare densities that have resulted in reproducing lynx populations in Maine. The guidelines are:

(1) Avoid upgrading or paving dirt or gravel roads traversing lynx habitat. Avoid construction of new high-speed/high-traffic-volume roads in lynx habitat. Desired outcome: Avoid fragmenting potential lynx habitat with high-traffic/high-speed roads.

(2) Maintain through time at least one lynx habitat unit of 35,000 ac (14,164 ha) (~1.5 townships) or more for every 200,000 ac (80,937 ha) (~9 townships) of ownership. At any time, about 20 percent of the area in a lynx habitat unit should be in the optimal mid-regeneration conditions (see Guideline 3). Desired outcome: Create a landscape that will maintain a continuous presence of a mosaic of successional stages, especially mid-regeneration patches that will support resident lynx.

(3) Employ silvicultural methods that will create regenerating conifer-dominated stands 12–35 ft (3.7–10.7 m) in height with high stem density (7,000–15,000 stems/ac; 2,800–6,000 stems/ha) and horizontal cover above the average snow depth that will support greater than 2.7 hares/ac (1.1 hares/ha). Desired outcome: Employ silvicultural techniques that create, maintain, or prolong use of stands by high populations of snowshoe hares.

(4) Maintain land in forest management. Development and associated activities should be consolidated to minimize direct and indirect impacts. Avoid development projects that occur across large areas, increase lynx mortality, fragment habitat, or result in barriers that affect lynx movements and dispersal. Desired outcome: Maintain the current amount and distribution of commercial forest land in northern Maine. Prevent forest fragmentation and barriers to movements. Avoid development that introduces new sources of lynx mortality.

(5) Encourage coarse woody debris for den sites by maintaining standing dead trees after harvest and leaving patches (at least .75 ac; .30 ha) of windthrow or insect damage. Desired outcome: Retain coarse woody debris for denning sites.

Notably, HFRP forest management plans must provide a net conservation benefit for lynx, which will be achieved by employing the lynx guidelines, identifying baseline habitat conditions, and meeting NRCS standards for forest plans. Plans must meet NRCS HFRP criteria and guidelines and comply with numerous environmental standards. NEPA compliance will be completed for each plan. The NRCS held public informational sessions about the HFRP and advertised the availability of funds. Plans must be reviewed and approved by the NRCS with assistance from the Service. The details of the plans are proprietary and will not be made public per NRCS policy.

Plans must be developed for a forest rotation (70 years) and include a decade-by-decade assessment of the location and anticipated condition of lynx habitat on the ownership. Some landowners are developing plans exclusively for lynx, and others are combining lynx management (umbrella species for young forest) with pine marten (umbrella species for mature forest) and other biodiversity objectives. Broad public benefits will derive from these plans, including benefits to many species of wildlife that share habitat with the lynx. Landowners are writing their own plans. The Nature Conservancy contracted with the University of Maine, Department of Wildlife Ecology to develop a lynx–pine marten plan that serves as a model for lynx/biodiversity forest planning and will be shared with other northern Maine landowners.

Landowners who are enrolled with the NRCS commit to a 10-year contract. Landowners must complete their lynx forest management plans within 2 years of enrollment. Currently, two plans are completed and two are in the final stage of editing. The majority (50 to 60 percent) of HFRP funds are withheld until plans are completed. By year 7, landowners must demonstrate on-the-ground implementation of their plan. The NRCS will monitor and enforce compliance with the 10-year contracts. At the conclusion of the 10-year cost-share contract, we anticipate that Safe Harbor Agreements or other agreements to provide regulatory assurances will be developed by all landowners as an incentive to continue implementing the plans.

We completed a programmatic biological opinion for the HFRP in 2006 that assesses the overall effects of the program on lynx habitat and on individual lynx and provides the required incidental take coverage. Separate biological opinions will be developed under this programmatic opinion for each of the four enrollees. These tiered opinions will document environmental baseline, net conservation benefits, and incidental take for each landowner. If additional HFRP funding is made available to Maine in the future, new enrollees will be tiered under this programmatic opinion. This programmatic opinion will be revised as new information is obtained, or if new rare, threatened, or endangered species are considered for HFRP funding.

Commitments to the HFRP are strengthened by several other conservation efforts. The Nature Conservancy land enrolled in the HFRP is also enrolled in the Forest Stewardship Council (FSC) forest certification program, which requires safeguards for threatened and endangered species. The Forest Society of Maine is under contract to manage a conservation easement held by the State of Maine on the Katahdin Forest Management lands, which is also enrolled in the HFRP. This easement requires that threatened and endangered species be protected and managed. The Forest Society of Maine also holds a conservation easement on the Merriweather LLC—West Branch property, which contains requirements that threatened and endangered species be protected and managed. These lands are also certified under the Sustainable Forestry Initiative and FSC, which require the inclusion of programs for threatened and endangered species. The Passamaquoddy enrolled lands are managed as trust lands by the Bureau of Indian Affairs, and projects occurring on those lands are subject to NEPA review and section 7 consultation.

In the final revised critical habitat designation, published in the **Federal Register** on February 25, 2009 (74 FR 8649–8652), we determined that the benefits of excluding lands managed in accordance with the Maine HFRP outweighed the benefits of including them in the designation, and that doing so would not result in extinction of the species. We affirm that determination based on the analysis below.

*Benefits of Inclusion*

The primary benefit of including an area within a critical habitat designation

is the protection provided by section 7(a)(2) of the Act, which directs Federal agencies to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of a threatened or endangered species and do not result in the destruction or adverse modification of critical habitat. Consultation has already occurred on these lands, and it included consideration of lynx habitat. The regulatory benefit of designating critical habitat on the HFRP lands would be minimal because few Federal actions would trigger the consultation provisions under section 7(a)(2) of the Act. Forestry activities are exempt from the Clean Water Act, and few landowners in Maine obtain Federal funding for projects on their lands. Since the lynx was listed in 2000, few formal consultations on lynx have occurred in Maine; however, no consultations have taken place regarding Federal actions on lands owned by The Nature Conservancy, West Branch Project, Elliotsville Plantation, Inc., and Katahdin Forest Management lands. The Passamaquoddy Tribe, through the Bureau of Indian Affairs, has informally consulted with the Service on several timber sales during this time period, resulting in determinations that the projects were not likely to adversely affect lynx because the harvests would create early successional habitat beneficial to lynx. Consultations in northern Maine have been mostly on small Federal actions (less than 15 ac; 6 ha) that have few consequences to lynx, which require large landscapes of 35,000 ac (14,164 ha) or more; therefore, the results of these informal consultations were that the projects would have no effect on lynx or would not likely adversely affect lynx.

A potential benefit of critical habitat designation would be to signal the importance of these lands to Federal agencies, scientific organizations, State and local governments, and the public to encourage conservation efforts to benefit the lynx and its habitat. By publication of the proposed rule and this final rule, we are educating the public of the location of core lynx habitat and areas most important for the conservation and recovery of the lynx DPS. In addition, designation of critical habitat on HFRP enrollee lands could provide some educational benefit through the rulemaking process.

*Benefits of Exclusion*

A Federal nexus on HFRP lands is rare, and development is unlikely because conservation easements exist on many of these lands. Section 7(a)(2) review will not provide benefits to the physical and biological features essential to the conservation of lynx, because most Federal projects in northern Maine are small and will not benefit habitat at a geographic scale meaningful for lynx conservation. Therefore, the regulatory protection provided through the section 7(a)(2) process for critical habitat would likely be minimal. The HFRP goes beyond the standard of adverse modification to provide a net conservation benefit for lynx. The conservation measures for lynx included in the HFRP plans are affirmative obligations that address the physical and biological features, represent the best available science, and provide a net conservation benefit to the species by ensuring the quality and quantity of unfragmented lynx habitat on the landscape.

Excluding HFRP lands from critical habitat designation would help strengthen partnerships and promote other aspects of recovery for the lynx. Since the lynx was listed in 2000, it has been difficult for us to effectively address lynx conservation across the forest landscape in northern Maine because of the numerous private industrial forest landowners with whom coordination is required. Participation in the HFRP will contribute to the conservation of the physical and biological features essential to lynx conservation in an area representing about 9.3 percent of the designated critical habitat unit. Proactively developing conservation programs for lynx across large ownerships can be a more effective recovery strategy than project-by-project planning in a landscape where consultation under section 7 is rarely applicable. Lynx require large home ranges, and lynx and snowshoe hare habitat occurs in a habitat mosaic across the landscape that changes with time and space as forests age or disturbances occur (e.g., insect outbreaks or timber management). The HFRP plans address landscape-level planning and actions for forestry-related activities within the context of lynx-specific guidelines, which can facilitate lynx recovery. The HFRP contracts operate under a programmatic biological opinion under section 7(a)(2), enabling a coordinated, multi-landowner approach to lynx conservation on private lands.

Contracts committing enrollees to implement the HFRP build on the ongoing partnership between the Service, the NRCS, the Maine Department of Inland Fisheries and Wildlife, and the HFRP enrollees. The contracts provide assurances to the Service that individual landowners will address the habitat requirements of lynx and facilitate the consideration and implementation of lynx conservation needs at a broad landscape scale. Although the HFRP contracts are for 10 years, lynx plans are required to address forest management for the next 70 years. Several incentives encourage enrollees to continue their plans after the conclusion of the 10-year contract:

(1) Enrollees will be offered Safe Harbor Agreements or other mechanisms to extend incidental take coverage and regulatory assurances beyond the 10-year period. Most of the enrollees are in forest certification programs and have conservation easements.

(2) HFRP plans meet the requirements of certification programs and easement requirements to document how they will manage for federally listed species.

(3) Future HFRP funding may be available to promote continued management on these lands.

(4) Landowners may be reimbursed at a graduated rate of up to 100 percent for land put under conservation easements of 30-year and 99-year duration.

Most HFRP enrollees have a long track record of conservation in Maine. The Nature Conservancy has been working with the Service and other conservation partners since the 1970s. The Forest Society of Maine is a conservation easement holder in northern Maine, and has been working with the Service since the late 1990s. We have a long partnership with the Passamaquoddy Tribe that includes consulting on Tribal silvicultural projects, cooperative research, review of forest management plans, and implementation of Service conservation recommendations. Many of the HFRP enrollees contribute as members to the University of Maine Cooperative Forest Research Unit (CFRU). The CFRU has funded numerous lynx and snowshoe hare studies that have advanced our understanding of lynx population dynamics and habitat relationships. Landowners have facilitated research and surveys by allowing access to their lands and logistical support. The positive experiences from HFRP enrollment will promote continued support for funding and continued lynx research.

Some of the enrolled lands could be sold, and it may be argued that new owners may not participate in long-term lynx management. However, new landowners could benefit from the incidental take coverage offered by HFRP or future Safe Harbor Agreements as a result of HFRP plans. Lands under conservation easements would require planning for Federally listed species,

and new landowners would have an incentive to continue to implement plans to meet their easement requirements. Many of the owners have SFI or FSC certifications, which have similar requirements for State and Federally listed species planning. Therefore, substantial incentives exist for a new landowner to honor existing lynx management plans.

Some landowners do not trust that the regulatory effect of critical habitat designation is limited, and they do not want an additional layer of Federal regulation on their private property. They are concerned that additional State regulations or local restrictions may be imposed as a result of the designation of critical habitat. Enrollees in the HFRP are some of the largest landowners in Maine. The cooperation and partnership of these landowners is needed to achieve recovery of lynx in Maine. If designation causes their alienation, it would be counterproductive to designate on their lands.

*Benefits of Exclusion Outweigh the Benefits of Inclusion*

We have determined that there would be minimal benefit in designating lands enrolled in the HFRP as critical habitat for the lynx DPS within Unit 1. We evaluated the exclusion of approximately 943.2 mi$^2$ (2,443 km$^2$) of lands enrolled in the HFRP and determined that inclusion of these lands would result in few benefits; minimal consultation under section 7, and minimal education related to lynx conservation would be realized.

The HFRP lynx management plans will be effective and directly address all of the physical and biological features essential to lynx by incorporating the Service's lynx conservation guidelines. These conservation actions and management for the lynx and the physical and biological features essential to it within large landscapes exceed any conservation value provided as a result of regulatory protections that have been or may be afforded through critical habitat designation. The exclusion of these lands from critical habitat will help preserve partnerships developed with the landowners. Most of the HFRP enrollees have a demonstrated track record of working with the Service and helping to fund lynx research. The HFRP plans will have a high probability of implementation due to the 10-year contract with NRCS and significant incentives (e.g., Safe Harbor, requirements of forest certification and conservation easements, continued funding and possibly additional funds), and could continue for a 70-year period. Funding is assured because

development of lynx forest management plans and initial implementation is being paid for by NRCS. The HFRP plans provide a high degree of public benefit for lynx and other wildlife that share their habitat.

The benefits of excluding HFRP lands from critical habitat outweigh the benefits of retaining these lands as critical habitat. Educational benefits can be realized by critical habitat designation, which informs the public via the rulemaking process. However, education has already been realized through the HFRP. The best scientific information regarding the long-term conservation of lynx is being used and shared with landowners to assist in the development of their plans. We participate in the delivery of this information. We will continue to review Federal actions under Section 7(a)(2) of the Act, although the only likely Federal action we foresee on the lands enrolled in HFRP will be on the consultation required for development of the individual plans. A programmatic biological opinion has already been prepared, and it addresses lynx habitat in detail.

The HFRP provides an opportunity for us to work in partnership with landowners across several landscape scales and ownerships. The HFRP demonstrates that our lynx management guidelines are a flexible, outcome-based approach to addressing lynx recovery in northern Maine that can be adapted to a variety of landowner types and landscapes. The HFRP lynx forest management plans will employ state-of-the-art habitat mapping, apply the best available science, and have a high likelihood of being carried out. We believe that the benefits of excluding lands managed in accordance with the HFRP outweigh the benefits of inclusion, particularly because these landowners have committed to developing long-term lynx habitat plans and on-the-ground management affecting large landscapes. Therefore, in this final rule, we have not designated critical habitat for the lynx DPS on HFRP-enrolled lands.

*Exclusion Will Not Result in Extinction of the Species*

Exclusion of 943.2 mi$^2$ (2,443 km$^2$) from Unit 1 of this final revised critical habitat designation will not result in the extinction of the species, because the HFRP plans provide for the conservation of the species and the physical and biological features essential to it. The jeopardy standard of section 7(a)(2) of the Act and routine implementation of conservation measures through the section 7 process

also provide assurances that the species will not go extinct. The protections afforded the lynx under the jeopardy standard will remain in place for the areas excluded from revised critical habitat. We, therefore, exclude lands managed in accordance with the HFRP from Unit 1 of this final revised designation of critical habitat for the lynx DPS.

State of Washington Department of Natural Resources Lynx Habitat Management Plan for DNR-Managed Lands (WDNR LHMP)

The WDNR LHMP encompasses 197 mi$^2$ (510 km$^2$) of WDNR-managed lands distributed throughout north-central and northeastern Washington in areas delineated as Lynx Management Zones in the Washington State Lynx Recovery Plan (Stinson 2001, p. 39; Washington DNR 2006, pp. 5–13). Of the area covered by the plan, 164.2 mi$^2$ (425 km$^2$) overlaps the area designated as critical habitat. The WDNR LHMP was finalized in 2006, and is a revision of the lynx plan that WDNR had been implementing since 1996. The 1996 plan was developed as a substitute for a species-specific critical habitat designation required by Washington Forest Practices rules in response to the lynx being State-listed as threatened (Washington DNR 2006, p. 5). The 2006 WDNR LHMP provided further provisions to avoid the incidental take of lynx (Washington DNR 2006, p. 6). WDNR is committed to following the LHMP until 2076, or until the lynx is delisted (Washington DNR 2006, p. 6). WDNR requested that lands subject to the plan be excluded from critical habitat.

The WDNR LHMP contains measures to guide WDNR in creating and preserving quality lynx habitat through its forest management activities. The objectives and strategies of the LHMP are developed for multiple planning scales (ecoprovince and ecodivision, Lynx Management Zone, Lynx Analysis Unit (LAU), and ecological community), and include:

(1) Encouraging genetic integrity at the species level by preventing bottlenecks between British Columbia and Washington by limiting size and shape of temporary non-habitat along the border and maintaining major routes of dispersal between British Columbia and Washington;

(2) Maintaining connectivity between subpopulations by maintaining dispersal routes between and within zones and arranging timber harvest activities that result in temporary non-habitat patches among watersheds so

that connectivity is maintained within each zone;

(3) Maintaining the integrity of requisite habitat types within individual home ranges by maintaining connectivity between and integrity within home ranges used by individuals and/or family groups; and

(4) Providing a diversity of successional stages within each LAU and connecting denning sites and foraging sites with forested cover without isolating them with open areas by prolonging the persistence of snowshoe hare habitat and retaining coarse woody debris for denning sites (Washington DNR 2006, p. 29).

The LHMP identifies specific guidelines to achieve the objectives and strategies at each scale; it also describes how WDNR will monitor and evaluate the implementation and effectiveness of the LHMP (Washington DNR 2006, pp. 29–63). WDNR has been managing for lynx for almost two decades, and the Service has concluded that the management strategies implemented are effective.

In the final revised critical habitat designation, published in the **Federal Register** on February 25, 2009 (74 FR 8657–8658), we determined that the benefits of excluding lands managed in accordance with the WDNR LHMP outweighed the benefits of including them in the designation, and that doing so would not result in extinction of the species. We reaffirm that determination based on the analysis below.

*Benefits of Inclusion*

On WDNR State lands, it is uncommon for an action with a Federal nexus that triggers consultation under section 7 of the Act to occur; therefore, little benefit would be realized through section 7 consultation if these lands were included in the designation. Some educational benefits to designating critical habitat for lynx on WDNR-managed lands may exist. However, we believe there is already substantial awareness of the lynx and conservation issues related to the lynx through the species being listed both under the Act and Washington State law; through the public review process for the WDNR LHMP, Washington's Lynx Recovery Plan, and the revision of the Okanogan-Wenatchee National Forest Management Plan; lynx and snowshoe hare research being conducted by the USFS Pacific Northwest Research Station, Washington State University, University of Washington, and the University of Montana; surveys being conducted by Washington Department of Fish and Wildlife and the USFS; and State of Washington Web sites (e.g., *http://*

*wdfw.wa.gov/wlm/diversty/soc/recovery/lynx/lynx.htm, www.dnr.wa.gov/htdocs/amp/sepa/lynx/1_toc.pdf*).

*Benefits of Exclusion*

The WDNR LHMP has provided substantial protection of features essential to the conservation of lynx on WDNR lands, and has provided a greater level of management for the lynx on these State lands than would be achieved with the designation of critical habitat. Because the LHMP provides lynx-specific objectives and strategies for different planning scales, guidelines to meet the objectives, and monitoring to evaluate implementation and effectiveness, the measures contained in the WDNR LHMP exceed any measures that might result from critical habitat designation. As a result, we do not anticipate any actions on these lands that would destroy or adversely modify habitats essential to the conservation of the lynx DPS. The exclusion of WDNR lands from critical habitat would help preserve the partnerships that we have developed with the State of Washington through development and implementation of the 2006 LHMP and the original 1996 lynx plan, both of which provide for long-term lynx conservation.

*Benefits of Exclusion Outweigh the Benefits of Inclusion*

We evaluated the exclusion of approximately 164.2 mi² (425 km²) of lands managed by the WDNR. Including WDNR lands managed in accordance with the LHMP in the final designation would likely not lead to any changes in WDNR management (to further avoid destroying or adversely modifying that habitat), and, therefore, the benefits of inclusion are low. We find that few additional conservation benefits would be realized through section 7 of the Act, because actions on these State lands rarely have a Federal nexus. The habitat conservation measures addressing the features essential to conservation of the lynx are already being implemented on WDNR lands under the WDNR LHMP, have a proven record of effectiveness, will be in place until at least 2076, and are providing for physical and biological features essential to the conservation of the species.

Based on the above considerations, and consistent with the direction provided in section 4(b)(2) of the Act, we find that greater benefits to lynx will be achieved by excluding these WDNR lands from the final designation than would be achieved by including them. Therefore, in this final rule, we have not designated critical habitat for the lynx

DPS on lands managed in accordance with the WDNR LHMP.

*Exclusion Will Not Result in Extinction of the Species*

We have determined that the exclusion of lands managed in accordance with the WDNR LHMP from Unit 4 of this final revised critical habitat designation for the lynx DPS will not result in the extinction of the species because the WDNR plan provides for the conservation of the species and the physical and biological features essential to it. The jeopardy standard of section 7(a)(2) of the Act and routine implementation of conservation measures through the section 7 process also provide assurances that the subspecies will not go extinct. The protections afforded to the lynx under the jeopardy standard will remain in place for the areas excluded from revised critical habitat. We, therefore, exclude 164.2 mi² (425 km²) of lands managed in accordance with the WDNR LHMP from Unit 4 of this final revised lynx critical habitat designation.

Montana Department of Natural Resources and Conservation Forested Trust Lands Habitat Conservation Plan (MDNRC HCP)

The Montana Department of Natural Resources and Conservation (MDNRC) Forested Trust Lands Habitat Conservation Plan (HCP; Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010a, entire; 2010b, entire; 2010c, entire) was permitted in 2011 under section 10(a)(1)(B) of the Act for a period of 50 years (U.S. Fish and Wildlife Service 2011a, entire; 2011b, entire). The HCP covers about 857 mi² (2,220 km²) of forested State trust lands in western Montana. The HCP trust lands occur on both blocked and scattered parcels within three MDNRC land offices, the Northwestern, Central, and Southwestern Land Offices. Blocked lands are primarily three State Forests: Stillwater, Coal Creek, and Swan. Scattered parcels refer to all other HCP project lands outside of blocked lands. About 271.4 mi² (703 km²) of lands managed in accordance with the HCP overlap the designated lynx critical habitat in Unit 3, and about 1.3 mi² (3.3 km²) of HCP-managed lands overlap critical habitat in Unit 5. Of this total, about 73 percent (200 mi² (518 km²)) occurs in high-priority areas for lynx conservation known as Lynx Management Areas (LMAs), with the remainder in scattered blocks (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife

Service 2010a, p. 4–365; 2010b, pp. 2-45–2-61; 2010c, p. D–67; U.S. Fish and Wildlife Service 2011a, pp. III–42–III-45).

The HCP covers activities that are primarily associated with commercial forest management, but includes grazing on forested trust lands. In addition to lynx, the HCP also covers grizzly bears (*Ursus arctos horribilis*) and bull trout (*Salvelinus confluentus*), both listed as threatened under the Act, and two non-listed fish species, the westslope cutthroat trout (*Oncorhynchus clarkii lewisi*) and the Interior (Columbia River) redband trout (*Oncorhynchus mykiss gairdneri*).

The HCP includes a Lynx Conservation Strategy (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010b, pp. 2-45–2-61) consisting of a suite of lynx habitat commitments that apply to all lands in the HCP project area supporting lynx habitat and additional commitments that apply to LMAs. The HCP was finalized in 2011, and MDNRC has been implementing the HCP Lynx Conservation Strategy since the first year of implementation in 2012 (Montana Department of Natural Resources and Conservation 2013a, 2013b, 2013c, entire; 2014a, 2014b, entire). The Lynx Conservation Strategy incorporates many of the existing Administration Rules of Montana (ARMs) for forest management activities, and it describes the additional HCP commitments based on recent information and research. The Lynx Conservation Strategy minimizes impacts of forest management activities on lynx and lynx critical habitat associated with the HCP, while allowing MDNRC to meet its fiduciary and stewardship trust responsibilities. MDNRC requested that lands subject to the HCP be excluded from critical habitat.

The goal of the Lynx Conservation Strategy is to support Federal lynx conservation efforts by managing for habitat elements important to lynx and their prey that contribute to the landscape-scale occurrence of lynx. HCP commitments in the strategy are associated with two types of habitat areas: (1) lynx habitat on lands within the HCP, and (2) lynx habitat on specific LMA subunits of HCP lands where resident lynx are known to occur or likely to occupy the area periodically. The HCP includes specific objectives to achieve this goal:

(1) Minimize potential for disturbance to known den sites;

(2) Map potential lynx winter foraging, summer foraging, and temporarily non-suitable habitats;

(3) Retain coarse woody debris and other denning attributes;

(4) Limit conversion of suitable lynx habitat to temporarily nonsuitable habitat per decade in LMAs;

(5) Ensure adequate amounts of foraging habitat are maintained in LMAs;

(6) Provide for habitat connectivity where vegetation and ownership patterns allow; and

(7) Maintain suitable lynx habitat on MDNRC scattered parcels outside LMAs (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010b, pp. 2-45–2-61).

The Lynx Conservation Strategy through the HCP places additional conservation emphasis on geographic areas most likely to remain high-priority areas to promote lynx conservation into the future (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010b, p. 2-53). These HCP lands occur in primary lynx habitat types, and are thus likely to provide snow depths and vegetation species compositions necessary to provide preferred winter foraging conditions, as well as ensure that the HCP helps support Federal efforts to provide adequate amounts of suitable lynx habitat. It also describes how MDNRC will monitor and evaluate the implementation and effectiveness of the HCP (Montana Department of Natural Resources and Conservation and U.S. Fish and Wildlife Service 2010b, pp. 4-27–4-37). Prior to the HCP, MDNRC had been managing diligently for lynx for over a decade under existing ARMs. The HCP and the ARMS combined will ensure that habitat features important for conservation of lynx will occur on MDNRC's HCP-managed lands in the long term.

*Benefits of Inclusion*

On MDNRC HCP State lands, it is relatively infrequent for an action with a Federal nexus that triggers consultation under section 7 of the Act to occur; therefore, little benefit would be realized through section 7 consultation if these lands were included in the critical habitat designation. Some educational benefits of designating critical habitat for lynx on MDNRC HCP managed lands may exist. However, we believe there is already substantial awareness of the lynx and conservation issues related to the lynx through the species being listed under the Act and addressed by Montana State law; through the public review process for the MDNRC HCP; MDNRC's forest management consistency with the Lynx recovery

outline (U.S. Fish and Wildlife Service 2005, entire); the HCP support of Montana Department of Fish, Wildlife, and Parks' (MFWP) lynx strategy set forth in its Comprehensive Fish and Wildlife Conservation Strategy (Montana Department of Fish, Wildlife, and Parks 2005, pp. 400–402); lynx and snowshoe hare research being conducted by the USFS Rocky Mountain Research Station and the University of Montana; surveys being conducted by MFWP and the USFS; and State of Montana Web sites (e.g., *http://fwp.mt.gov/fishandwildlife/species/threatened/canadaLynx/default.html*, *http://dnrc.mt.gov/HCP/Species.asp*).

*Benefits of Exclusion*

The MDNRC HCP provides substantial protection of features essential to the conservation of lynx on HCP-managed lands and provides a greater level of management for the lynx on these State lands than would be achieved with designation of critical habitat. Because the HCP provides lynx-specific objectives and strategies for different geographic locations, guidelines to meet the objectives, and monitoring to evaluate implementation and effectiveness, the measures contained in the HCP exceed any measures that might result from critical habitat designation. As a result, we do not anticipate any actions on these lands that would reduce the landscape-scale availability of important lynx and hare habitats or otherwise diminish the conservation value of these lands to the lynx DPS.

The exclusion of MDNRC HCP-managed lands from critical habitat would help preserve the partnerships that have developed between the Service and the State through development and implementation of the HCP, the existing ARMs, the Comprehensive Fish and Wildlife Conservation Strategy, and the intent of the State Forest Land Management Plan, all of which provide for long-term lynx conservation. Requiring additional redundant processes of permit applicants/holders who have already undergone an extensive Federal process to apply for a permit also appreciably undermines the benefit of HCPs for cooperators and reduces the certainty otherwise provided by a single clear plan.

*Benefits of Exclusion Outweigh the Benefits of Inclusion*

We have evaluated the exclusion of approximately 272.7 mi² (706 km²) of lands managed by the MDNRC in accordance with the HCP. We have

Rvsd Plan - 00003705

determined that it is unlikely that including these HCP-managed areas in the final designation would lead to any changes in MDNRC management (i.e., no additional conservation measures would be recommended to further avoid impacts to lynx and hare habitats); therefore, the benefits of inclusion are low.

We find that few (if any) additional conservation benefits would be realized through section 7 of the Act, because activities with a Federal nexus are infrequent on these State lands. Additionally, the habitat conservation measures addressing the features essential to conservation of the lynx are already being implemented on MDNRC lands under the MDNRC HCP, have been demonstrated to be effective, will be in place until at least 2061, and are providing for the maintenance and protection of the physical and biological features essential to the conservation of the lynx DPS.

We have, therefore, determined that the benefits of excluding lands managed in accordance with the MDNRC HCP in Unit 3 and Unit 5 outweigh the benefits of including these lands as critical habitat. Based on the above considerations, and consistent with the direction provided in section 4(b)(2) of the Act, we find that greater benefits to lynx are likely to be achieved by excluding MDNRC HCP lands from the final designation than by including them.

*Exclusion Will Not Result in Extinction of the Species*

The MDNRC HCP (1) provides biologically meaningful and quantifiable measures for the long-term conservation of the lynx and the physical and biological features essential to it, (2) includes long-term certainty of implementation, (3) employs rigorous monitoring and reporting requirements, and (4) applies an adaptive management approach. Therefore, it is our determination that the exclusion of MDNRC lands from critical habitat will not result in the extinction of the DPS. We, therefore, exclude 271.4 mi$^2$ (703 km$^2$) of lands managed in accordance with the MDNRC HCP from Unit 3, and 1.3 mi$^2$ (3.3 km$^2$) from Unit 5 of this final revised lynx critical habitat designation.

**Required Determinations**

*Regulatory Planning and Review (Executive Orders 12866 and 13563)*

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) will review all significant rules. The Office of Information and

Regulatory Affairs has determined that this rule is not significant.

Executive Order 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act (5 U.S.C. 601 et seq.)*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA; 5 U.S.C. 801 *et seq.*), whenever an agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. The SBREFA amended the RFA to require Federal agencies to provide a certification statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities.

According to the Small Business Administration, small entities include small organizations such as independent nonprofit organizations; small governmental jurisdictions, including school boards and city and town governments that serve fewer than 50,000 residents; and small businesses (13 CFR 121.201). Small businesses include manufacturing and mining concerns with fewer than 500 employees, wholesale trade entities with fewer than 100 employees, retail and service businesses with less than $5 million in annual sales, general and heavy construction businesses with less than $27.5 million in annual business, special trade contractors doing less than

$11.5 million in annual business, and agricultural businesses with annual sales less than $750,000. To determine if potential economic impacts to these small entities are significant, we considered the types of activities that might trigger regulatory impacts under this designation as well as types of project modifications that may result. In general, the term "significant economic impact" is meant to apply to a typical small business firm's business operations.

The Service's current understanding of the requirements under the RFA, as amended, and following recent court decisions, is that Federal agencies are only required to evaluate the potential incremental impacts of rulemaking on those entities directly regulated by the rulemaking itself, and therefore, not required to evaluate the potential impacts to indirectly regulated entities. The regulatory mechanism through which critical habitat protections are realized is section 7 of the Act, which requires Federal agencies, in consultation with the Service, to ensure that any action authorized, funded, or carried out by the Agency is not likely to destroy or adversely modify critical habitat. Therefore, under section 7 only Federal action agencies are directly subject to the specific regulatory requirement (avoiding destruction and adverse modification) imposed by critical habitat designation. Consequently, it is our position that only Federal action agencies will be directly regulated by this designation. There is no requirement under RFA to evaluate the potential impacts to entities not directly regulated. Moreover, Federal agencies are not small entities. Therefore, because no small entities are directly regulated by this rulemaking, the Service certifies that, if promulgated, the final critical habitat designation will not have a significant economic impact on a substantial number of small entities.

During the development of this final rule we reviewed and evaluated all information submitted during the comment period that may pertain to our consideration of the probable incremental economic impacts of this critical habitat designation. Based on this information, we affirm our certification that this final critical habitat designation will not have a significant economic impact on a substantial number of small entities, and a regulatory flexibility analysis is not required.

*Energy Supply, Distribution, or Use— Executive Order 13211*

Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use) requires agencies to prepare Statements of Energy Effects when undertaking certain actions. OMB has provided guidance for implementing this Executive Order that outlines nine outcomes that may constitute "a significant adverse effect" when compared to not taking the regulatory action under consideration. Our economic analyses of the proposed and final rules found that none of these criteria are relevant to this analysis, and it did not identify any potentially significant effects of lynx critical habitat designation on energy supply, distribution, or use. Thus, based on information in the economic analysis, significant energy-related impacts associated with lynx conservation activities within critical habitat are not expected. As such, the designation of critical habitat is not expected to significantly affect energy supplies, distribution, or use. Therefore, this action is not a significant energy action, and no Statement of Energy Effects is required.

*Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*), we make the following findings:

(1) This rule will not produce a Federal mandate. In general, a Federal mandate is a provision in legislation, statute, or regulation that would impose an enforceable duty upon State, local, or Tribal governments, or the private sector, and includes both "Federal intergovernmental mandates" and "Federal private sector mandates." These terms are defined in 2 U.S.C. 658(5)–(7). "Federal intergovernmental mandate" includes a regulation that "would impose an enforceable duty upon State, local, or Tribal governments" with two exceptions. It excludes "a condition of Federal assistance." It also excludes "a duty arising from participation in a voluntary Federal program," unless the regulation "relates to a then-existing Federal program under which $500,000,000 or more is provided annually to State, local, and Tribal governments under entitlement authority," if the provision would "increase the stringency of conditions of assistance" or "place caps upon, or otherwise decrease, the Federal Government's responsibility to provide funding," and the State, local, or Tribal governments "lack authority" to adjust

accordingly. At the time of enactment, these entitlement programs were: Medicaid; Aid to Families with Dependent Children work programs; Child Nutrition; Food Stamps; Social Services Block Grants; Vocational Rehabilitation State Grants; Foster Care, Adoption Assistance, and Independent Living; Family Support Welfare Services; and Child Support Enforcement. "Federal private sector mandate" includes a regulation that "would impose an enforceable duty upon the private sector, except (i) a condition of Federal assistance or (ii) a duty arising from participation in a voluntary Federal program."

The designation of critical habitat does not impose a legally binding duty on non-Federal Government entities or private parties. Under the Act, the only regulatory effect is that Federal agencies must ensure that their actions do not destroy or adversely modify critical habitat under section 7. While non-Federal entities that receive Federal funding, assistance, or permits, or that otherwise require approval or authorization from a Federal agency for an action, may be indirectly impacted by the designation of critical habitat, the legally binding duty to avoid destruction or adverse modification of critical habitat rests squarely on the Federal agency. Furthermore, to the extent that non-Federal entities are indirectly impacted because they receive Federal assistance or participate in a voluntary Federal aid program, the Unfunded Mandates Reform Act would not apply, nor would critical habitat shift the costs of the large entitlement programs listed above onto State governments.

(2) We do not believe that this rule will significantly or uniquely affect small governments because it would not produce a Federal mandate of $100 million or greater in any year; that is, it is not a "significant regulatory action" under the Unfunded Mandates Reform Act. The FEA concludes incremental impacts may occur due to administrative costs of section 7 consultations; however, these are not expected to significantly affect small governments. Incremental impacts stemming from various species conservation and development control activities are expected to be borne largely by the Federal Government not by any other organizations that could be considered small governments. Consequently, we do not believe that the critical habitat designation would significantly or uniquely affect small government entities. As such, a Small Government Agency Plan is not required.

*Takings—Executive Order 12630*

In accordance with Executive Order 12630 ("Government Actions and Interference with Constitutionally Protected Private Property Rights"), we have analyzed the potential takings implications of designating critical habitat for the lynx DPS in a takings implications assessment. We conducted an economic analysis which determined that (1) the designation of revised critical habitat for the lynx is unlikely to generate costs exceeding $100 million in a single year, (2) the economic costs of implementing the rule through section 7 of the Act will most likely be limited to the additional administrative effort required to consider adverse modification, and (3) the revised designation is not expected to trigger additional requirements under State or local regulations. We also completed a Takings Implication Assessment (TIA) in which we determined that revising the designation of critical habitat for the lynx would not deny anyone economically viable use of their property or result in a direct and immediate interference with property nor in physical occupation of anyone's property. We have concluded, therefore, that this designation is not likely to result in either a regulatory or a physical taking in accordance with the Fifth Amendment of the Constitution. Based on the best available information, the TIA concludes that this designation of critical habitat for the lynx does not pose significant takings implications.

*Federalism—Executive Order 13132*

In accordance with E.O. 13132 (Federalism), this final rule does not have significant Federalism effects. A Federalism assessment is not required. In keeping with Department of the Interior and Department of Commerce policy, we requested information from, and coordinated development of the proposed critical habitat designation with, appropriate State resource agencies in Idaho, Maine, Minnesota, Montana, Washington, and Wyoming. We received comments from Idaho (Office of Species Conservation, Department of Fish and Game, and Department of Lands); Maine (Department of Inland Fisheries and Wildlife); Montana (Department of Natural Resources and Conservation); New Mexico (Department of Agriculture and Department of Game and Fish); Washington (Department of Natural Resources); and Wyoming (Office of the Governor, Legislature's Select Committee on Federal Natural Resource Management, and Game and Fish Department), Fremont, Lincoln, Park,

Rvsd Plan - 00003707

and Sublette Counties Boards of County Commissioners and Shoshone Cooperating Agency Coalition; and the Coalition of Local Governments representing the County Commissions and Conservation Districts for Lincoln, Sweetwater, Uinta, and Sublette Counties) and have addressed them in the Summary of Comments and Recommendations section of the rule. From a federalism perspective, the designation of critical habitat directly affects only the responsibilities of Federal agencies. The Act imposes no other duties with respect to critical habitat, either for States and local governments, or for anyone else. As a result, the rule does not have substantial direct effects either on the States, or on the relationship between the national government and the States, or on the distribution of powers and responsibilities among the various levels of government. The designation may have some benefit to these governments because the areas that contain the features essential to the conservation of the species are more clearly defined, and the physical and biological features of the habitat necessary to the conservation of the species are specifically identified. This information does not alter where and what federally sponsored activities may occur. However, it may assist these local governments in long-range planning (because these local governments no longer have to wait for case-by-case section 7 consultations to occur).

Where State and local governments require approval or authorization from a Federal agency for actions that may affect critical habitat, consultation under section 7(a)(2) would be required. While non-Federal entities that receive Federal funding, assistance, or permits, or that otherwise require approval or authorization from a Federal agency for an action, may be indirectly impacted by the designation of critical habitat, the legally binding duty to avoid destruction or adverse modification of critical habitat rests squarely on the Federal agency.

*Civil Justice Reform—Executive Order 12988*

In accordance with Executive Order 12988 (Civil Justice Reform), the Office of the Solicitor has determined that the rule does not unduly burden the judicial system and that it meets the applicable standards set forth in sections 3(a) and 3(b)(2) of the Order. We are designating critical habitat in accordance with the provisions of the Act. To assist the public in understanding the habitat needs of the species, the rule identifies the elements of physical or biological features essential to the conservation of the lynx DPS. The designated areas of critical habitat are presented on maps, and the rule provides several options for the interested public to obtain more detailed location information, if desired.

*Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.)*

This rule does not contain any new collections of information that require approval by OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). This rule will not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act (42 U.S.C. 4321 et seq.)*

It is our position that, outside the jurisdiction of the U.S. Court of Appeals for the Tenth Circuit, we do not need to prepare environmental analyses pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) in connection with designating critical habitat under the Act. We published a notice outlining our reasons for this determination in the **Federal Register** on October 25, 1983 (48 FR 49244). This position was upheld by the U.S. Court of Appeals for the Ninth Circuit (*Douglas County* v. *Babbitt,* 48 F.3d 1495 (9th Cir. 1995), cert. denied 516 U.S. 1042 (1996)). However, when the range of the species includes States within the Tenth Circuit, such as that of lynx, under the Tenth Circuit ruling in *Catron County Board of Commissioners* v. *U.S. Fish and Wildlife Service,* 75 F.3d 1429 (10th Cir. 1996), we undertake a NEPA analysis for critical habitat designation and notify the public of the availability of the draft environmental assessment for a proposal when it is finished.

We performed the NEPA analysis, and the draft environmental assessment was made available for public comment on June 20, 2014 (79 FR 35303). The final environmental assessment and FONSI has been completed and is available for review with the publication of this final rule. You may obtain a copy of the final environmental assessment and FONSI online at *http://www.regulations.gov*, by mail from the Montana Ecological Services Field Office (see **ADDRESSES**), or by visiting our Web site at *http://www.fws.gov/montanafieldoffice/*.

In our environmental assessment, we concluded that designation of critical habitat would not have any direct effects on the environment, except through the section 7 consultation process. This is because critical habitat designation does not impose broad rules or restrictions on land use, nor does it automatically prohibit any land use activity. We also concluded that, although designation could alter or result in restrictions on some activities, mostly on Federal lands, it is not likely to result in substantial impacts to the physical or human environment. Our analysis did not identify any adverse effects unique to minority or low-income human populations in the affected areas nor the potential to cause irreversible or irretrievable environmental impacts, directly, indirectly, or cumulatively.

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994 (Government-to-Government Relations with Native American Tribal Governments; 59 FR 22951), Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments), and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act), we readily acknowledge our responsibilities to work directly with tribes in developing programs for healthy ecosystems, to acknowledge that Tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to tribes.

Tribal lands in Maine, Minnesota, and Montana fall within the boundaries of this final designation in the Maine (Unit 1), Minnesota (Unit 2), and Northern Rocky Mountains (Unit 3) critical habitat units. Tribal lands that fall within the designation include those of the Passamaquoddy Tribe and the Penobscot Indian Nation in Maine, the Grand Portage Indian Reservation and Bois Forte Indian Reservation–Vermillion Lake District in Minnesota, and the Confederated Salish and Kootenai Tribes, Flathead Indian Reservation in Montana.

During development of the 2009 final rule, we contacted and met with a number of Tribes to discuss the proposed designation, and we also received comments from numerous Tribes requesting that their lands not be designated as critical habitat because of

their sovereign rights, in addition to concerns about economic impacts and the effect on their ability to manage natural resources. During development of the 2013 proposed rule and this final rule, we also contacted the Tribes whose lands were within the proposed revised designation, and they confirmed their continued preference that Tribal lands not be designated as lynx critical habitat. As described above (see *Application of Section 4(b)(2) of the Act*—Exclusions Based on Other Relevant Impacts), we determined in the 2009 final rule and reaffirm in this rule that the benefits of excluding these Tribal lands from the final lynx critical habitat designation outweigh the benefits of including them, and that doing so will not result in extinction of the lynx DPS. Therefore, we are not designating critical habitat for the lynx on Tribal lands.

## References Cited

A complete list of all references cited is available on the Internet at *http:// www.regulations.gov*, *http:// www.fws.gov/mountain-prairie/species/ mammals/lynx/index.htm*, and upon request from the Montana Ecological Services Field Office (see **FOR FURTHER INFORMATION CONTACT**).

## Authors

The primary authors of this rulemaking are the staff members of the Montana Fish and Wildlife Office, the Maine Fish and Wildlife Office, and the New England Fish and Wildlife Office.

## List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

## Regulation Promulgation

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—[AMENDED]

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531– 1544; and 4201–4245, unless otherwise noted.

■ 2. Amend § 17.11(h) by revising the entry for "Lynx, Canada" under "Mammals" in the List of Endangered and Threatened Wildlife to read as follows:

## § 17.11   Endangered and threatened wildlife.

\*      \*      \*      \*      \*

(h) \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| MAMMALS | | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| Lynx, Canada ......... | *Lynx canadensis* .... | U.S.A. (AK, CO, ID, ME, MI, MN, MT, NH, NY, OR, UT, VT, WA, WI, WY), Canada, circumboreal. | Where found within contiguous U.S.A. | T | 692 | 17.95(a) | 17.40(k) |
| \* | \* | \* | \* | \* | | \* | |

■ 3. In § 17.95, amend paragraph (a) by revising the entry for "Canada Lynx *(Lynx canadensis)*" to read as follows:

## § 17.95   Critical habitat—fish and wildlife.

(a) *Mammals.*

\*      \*      \*      \*      \*

Canada Lynx *(Lynx canadensis)*

(1) Critical habitat units are depicted on the maps below for the following States and counties:

(i) Idaho: Boundary County;

(ii) Maine: Aroostook, Franklin, Penobscot, Piscataquis, and Somerset Counties;

(iii) Minnesota: Cook, Koochiching, Lake, and St. Louis Counties;

(iv) Montana: Carbon, Flathead, Gallatin, Glacier, Granite, Lake, Lewis and Clark, Lincoln, Missoula, Park, Pondera, Powell, Stillwater, Sweetgrass, and Teton Counties;

(v) Washington: Chelan and Okanogan Counties; and

(vi) Wyoming: Fremont, Lincoln, Park, Sublette, and Teton Counties.

(2) Within these areas the primary constituent element for the Canada lynx is boreal forest landscapes supporting a mosaic of differing successional forest stages and containing:

(i) Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface;

(ii) Winter conditions that provide and maintain deep fluffy snow for extended periods of time;

(iii) Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and

(iv) Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range.

(3) Critical habitat does not include manmade structures (such as buildings, aqueducts, runways, roads, and other paved areas) and the land on which they are located existing within the legal boundaries on October 14, 2014.

(4) *Critical habitat map units.* Data layers defining map units were created using a USA Contiguous Albers Equal Area Conic projection. The maps in this entry establish the boundaries of the critical habitat designation. The coordinates or plot points or both on which each map is based are available to the public at the Service's internet site, *http://www.fws.gov/ montanafieldoffice/*, at *http:// www.regulations.gov* at Docket No. FWS–R6–ES–2013–0101, and at the field office responsible for this designation. You may obtain field office location information by contacting one of the Service regional offices, the addresses of which are listed at 50 CFR 2.2.

(5) *Note:* Index map follows:
**BILLING CODE 4310–55–P**



Index Map: Critical Habitat for *Lynx canadensis* (Canada Lynx)

Rvsd Plan - 00003710

(6) Unit 1: Maine—Aroostook, Franklin, Penobscot, Piscataquis, and Somerset Counties, ME. Map of Unit 1, Maine, follows:



Critical Habitat for *Lynx canadensis* (Canada Lynx), Unit 1 - Maine

(7) Unit 2: Minnesota—Cook, Koochiching, Lake, and St. Louis Counties, MN.

Map of Unit 2, Minnesota, follows:



(8) Unit 3: Northern Rockies—Boundary County, ID, and Flathead, Glacier, Granite, Lake, Lewis and Clark, Lincoln, Missoula, Pondera, Powell and Teton Counties, MT. Map of Unit 3, Northern Rockies, follows:



Critical Habitat for *Lynx canadensis* (Canada Lynx), Unit 3 - Northern Rockies

(9) Unit 4: North Cascades—Chelan and Okanogan Counties, WA. Map of Unit **4**, North Cascades, follows:



Critical Habitat for *Lynx canadensis* (Canada Lynx), Unit 4 - North Cascades

(10) Unit 5: Greater Yellowstone Area—Carbon, Gallatin, Park, Stillwater, and Sweetgrass Counties, MT, and Fremont, Lincoln, Park, Sublette, and Teton Counties, WY. Map of Unit 5, Greater Yellowstone Area, follows:



*   *   *   *   *

Dated: August 27, 2014.

**Michael J. Bean,**

*Principal Deputy Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2014–21013 Filed 9–11–14; 8:45 am]

**BILLING CODE 4310–55–C**

# Canada Lynx Expert Elicitation Workshop

October 13-15, 2015 - Bloomington, Minnesota



# Final Report
April 18, 2016

## Canada Lynx Species Status Assessment Team:

Heather Bell, U.S. Fish and Wildlife Service, Headquarters
Kurt Broderdorp, U.S. Fish and Wildlife Service, Western Colorado Field Office
Jonathan Cummings, U.S. Geological Survey, Patuxent Wildlife Research Center
Bryon Holt, U.S. Fish and Wildlife Service, Northern Idaho Field Office
Mark McCollough, U.S. Fish and Wildlife Service, Maine Field Office
Mary Parkin, U.S. Fish and Wildlife Service, Northeast Regional Office
Tamara Smith, U.S. Fish and Wildlife Service, Twin Cities Field Office
Jim Zelenak, U.S. Fish and Wildlife Service, Montana Field Office

Rvsd Plan - 00003716

## TABLE OF CONTENTS

*I. EXECUTIVE SUMMARY* _____ *4*

*II. PURPOSE* _____ *4*

*III. BACKGROUND* _____ *5*

*IV. EXPERT ELICITATION* _____ *7*

Workshop Protocol _____ 7

Identifying Experts _____ 8

    Expert Selection Criteria _____ 9

Preparing Experts _____ 9

*V. SUBJECT MATTER PRESENTATIONS* _____ *10*

Canada Lynx Species Status Assessment – Jim Zelenak _____ 10

Historical Distribution of Lynx in the Contiguous U.S. – Dr. Kevin McKelvey ____ 11

Canada Lynx Habitat Regulatory Environment – Scott Jackson _____ 12

Lynx Genetics Considerations – Dr. Michael Schwartz _____ 12

Lynx Distribution, Status, and Management in Southern Canada –
    Dr. Jeff Bowman _____ 13

Seven Ways a Warming Climate Can Kill The Boreal Forest – Dr. Lee Frelich ____ 14

Climate Change and Uncertainty: Implications for Canada Lynx Conservation and
    Management in the Contiguous U.S. – Alexej Siren _____ 14

Projected Climate-Change Impacts on Snow, Vegetation, and Lynx Populations in
    the Western U.S. – Dr. Joshua Lawler and Dr. Chad Wilsey _____ 15

Forest Management and Lynx Habitat Trends – Dr. Erin Simons-Legaard _____ 16

Southern Snowshoe Hares: Updates, Questions, Forecasts - Dr. Karen Hodges ____ 16

*VI. LYNX STATUS UPDATE PRESENTATIONS* _____ *18*

Status of Lynx in Maine - Jennifer Vashon _____ 18

Canada Lynx in Minnesota - Dr. Ron Moen and Susan Catton _____ 19

Current Distribution, Status, and Threats to Canada Lynx in Montana and Wyoming
    - Dr. John Squires _____ 20

Lynx in Washington: Current Status and Potential Threats – Dr. Benjamin Maletzke 21

Status of Lynx in Colorado - Dr. Jake Ivan _____ 22

*VII. EXPERT ELICITATION PROCESS* _____ *23*

*VIII. LYNX STATUS: EXPERT ELICITATION AND RESPONSES* _____ *24*

Expert Responses _____ 25

Rvsd Plan - 00003717

Representation ........................................................................... 25

Redundancy ........................................................................... 26

Resiliency ........................................................................... 34

    Results by Geographic Unit ........................................................................... 36

        Northern Maine ........................................................................... 36

        Northeastern Minnesota ........................................................................... 39

        Northwestern Montana/Northeasern Idaho ........................................................................... 41

        North-central Washington ........................................................................... 43

        Greater Yellowstone Area (GYA) ........................................................................... 45

        Western Colorado ........................................................................... 47

    Summary Across Geographic Units ........................................................................... 49

    Expert Assumptions During Persistence Graphing Excercises ........................... 51

    Conservation Actions to Address Influencing Factors and Increase Probability of Persistence ........................................................................... 52

    Other Considerations ........................................................................... 54

*IX. SYNTHESIS* ........................................................................... *54*

    Representaion ........................................................................... 55

    Redundancy ........................................................................... 56

    Resiliency ........................................................................... 57

*X. CONCLUSION* ........................................................................... *59*

*XI. LITERATURE CITED* ........................................................................... *60*

*XII. APPENDICES* ........................................................................... *64*

Appendix 1.  The Species Status Assessment Framework Fact Sheet

Appendix 2.  Workshop Participants and Roles

Appendix 3.  Final Lynx Species Status Assessment Expert Workshop Notes

Appendix 4.  Lynx Species Status Assessment Expert Workshop Candidates

Appendix 5.  Presentation PDF's

Appendix 6.  Lynx Expert Elicitation Figures

*LIST OF TABLES*

Table 1.  Expert responses regarding natural reestablishment ........................... 30

*LIST OF FIGURES*

Figure 1. Six geographic units with resident Canada lynx ........................... 7

2

Rvsd Plan - 00003718

Figure 2. Individual scores and summary boxplots _____ 29

Figure 3. Years for a geographic unit to become reestablished _____ 32

Figure 4. Years for a geographic unit to become reestablished, adjusted _____ 33

Figure 5. Expected probability of persistence Northern Maine _____ 37

Figure 6. Expected probability of persistence Minnesota _____ 40

Figure 7. Expected probability of persistence Northwestern Montana/Northeastern Idaho _____ 42

Figure 8. Expected probability of persistence North-central Washington _____ 44

Figure 9. Expected probability of persistence Greater Yellowstone Area _____ 46

Figure 10. Expected probability of persistence Western Colorado _____ 48

Figure 11. Summarized probability of persistence of a given number of geographic units _____ 50

Figure 12. Summarized probability of persistence of *at least* a given number of geographic units _____ 51

3

Rvsd Plan - 00003719

# Executive Summary

As part of a species status assessment (SSA) for the contiguous United States distinct population segment (DPS) of the Canada lynx, the U.S. Fish and Wildlife Service (Service) convened an expert elicitation workshop to gather (1) the best available information on the current status of lynx populations within the DPS and (2) the professional judgment and opinions of lynx experts regarding the future viability of the DPS. This report summarizes the results of the workshop regarding the current and likely future condition of lynx populations in six geographic areas within the DPS in terms of representation, redundancy, and resiliency. The Service will incorporate the information gathered at this workshop into the SSA as appropriate, along with the published scientific literature, to inform recovery planning for the DPS and any other determinations the Service is authorized and required to make in accordance with the Endangered Species Act.

# Purpose

The purpose of this report is to convey the results of an expert workshop convened by the U.S. Fish and Wildlife Service (Service) in October 2015 to improve our understanding of the status of the contiguous U.S. distinct population segment (DPS) of Canada lynx (*Lynx canadensis*). This workshop was held in conjunction with a species status assessment (SSA; see Appendix 1 [All appendices are accessible at: http://www.fws.gov/mountain-prairie/es/canadaLynx.php]) for the DPS. The SSA, which will incorporate the best available scientific information on lynx, is needed to inform the Service's response to a June 2014 court order to complete a recovery plan for the DPS by January 2018, or make a formal determination that a recovery plan is not necessary.

The workshop was organized by a Lynx SSA Team consisting of Service and USGS staff who have developed and piloted implementation of the SSA framework, and Service biologists who are working on lynx throughout the range of the DPS. In the interest of collaboration and transparency, this team partnered with State agencies, other Federal agencies, and academic researchers to elicit expert input regarding the current and likely future status of lynx populations within the DPS.

Expert input is needed to complement the published scientific literature and other available information on many aspects of lynx population dynamics in the DPS range. In particular, we were looking for additional information on the status, sizes, and trends of lynx populations and on threats to lynx habitats and those of their primary prey, snowshoe hares (*Lepus americanus*). We therefore designed a process to elicit and capture the knowledge, professional judgments, and opinions of lynx experts to help us assess the current status of, and the nature and magnitude of potential threats to, lynx populations and habitats within the DPS. We also sought expert knowledge to help us evaluate the viability of the DPS (in terms of the "3 Rs" - redundancy, representation, and resiliency; see definitions below) under a range of future

4

threats, habitat conditions, and climate scenarios, and to identify and make explicit areas of uncertainty and potential differences of opinion among experts.

The results of the workshop will contribute to the SSA, which will compile and summarize the best available scientific and commercial data, including empirical data, published literature, and expert input.  This information will then be used by Service decision makers to inform recovery planning direction, classification decisions, and other determinations required by the Endangered Species Act (ESA).

# Background

The Canada lynx is a medium-sized cat with long legs and large, well-furred paws.  Its long, black ear tufts and short, black-tipped tail distinguish the lynx from the similar bobcat (*Lynx rufus*), which is much more common in the contiguous U.S.  The lynx's large feet and long legs make it highly adapted for hunting snowshoe hares in the deep or powdery snow that persists across much of its boreal forest distribution, most of which occurs in Canada and Alaska.  These adaptations provide lynx a competitive advantage over potential competitors, such as bobcats or coyotes (*Canis latrans*), which have much smaller feet and higher foot-loadings that prevent them from hunting efficiently in deep, powdery snow (McCord and Cardoza 1982, p. 748; Buskirk *et al.* 2000, pp. 86–95; Ruediger *et al.* 2000, pp. 1–11; Ruggiero *et al.* 2000, pp. 445, 450).

The southern periphery of the boreal forest extends into parts of the northern contiguous U.S., where it transitions to the Acadian forest in the Northeast (Seymour and Hunter 1992, pp. 1, 3), deciduous temperate forest in the Great Lakes regions, and subalpine forest in the Rocky Mountains and Cascade Mountains in the west (Agee 2000, pp. 40–41).  In the contiguous U.S., these transitional boreal forests become discontinuous and patchy, preventing both lynx and hares from broadly achieving densities similar to those of the northern boreal forests (Wolff 1980, pp. 123–128; Buehler and Keith 1982, pp. 24, 28; Koehler 1990, p. 849; Koehler and Aubry 1994, p. 84; Aubry *et al.* 2000, pp. 373–375, 382, 394).  These forests eventually become too fragmented and isolated in the contiguous United States to support hares at the landscape densities and distributions necessary to support lynx home ranges (Interagency Lynx Biology Team 2013, p. 77) or lynx populations over time.

The Service designated lynx in the contiguous U.S. as a DPS and listed it as threatened under the ESA in 2000 because of the inadequacy, at that time, of existing regulatory mechanisms.  Specifically, at that time the Service believed that most lynx and lynx habitats occurred on national forests, and that the Land and Resource Management Plans that guided management of those forests included "...programs, practices, and activities within the authority and jurisdiction of Federal land management agencies that may threaten lynx or lynx habitat.  The lack of protection for lynx in these Plans render them inadequate to protect the species" (65 FR 16052).  In 2003, in response to a court memorandum opinion on the 2000 listing rule, the Service reaffirmed its determination of the lynx DPS and its status as threatened under the ESA

5

(68 FR 40076). The Service completed a recovery outline in 2005 (U.S. Fish and Wildlife Service 2005, entire), designated critical habitat for the DPS in 2006 (71 FR 66008) and, in 2007, again in response to a court order, clarified its determinations of "significant portion of the range" and that all lynx in the contiguous U.S. constitute a single DPS (72 FR 1186). Also in 2007, the Service initiated a 5-year status review of the DPS (72 FR 19549). The Service revised the critical habitat designation for the DPS in 2009 (74 FR 8616) and 2014 (79 FR 54782) and, concurrent with the latter, rescinded the state-based definition of the DPS boundary to extend ESA protection to lynx "where found" in the contiguous U.S., including New Mexico and other states that were not included in the original DPS range (79 FR 54804).

Although the Service originally identified the DPS as occurring in forested portions of 14 states (Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, Wisconsin, and Wyoming) (65 FR 16052, 16085), it recognized at the time of listing that both lynx and the boreal forests that support them in the Lower 48 States are at the southern margins of their ranges, where habitats naturally become patchy and fragmented and snowshoe hare densities in many places are not consistently high enough to support resident lynx populations (65 FR 16052-59). It also recognized that inherent limitations in historic occurrence information made it difficult to distinguish between areas that consistently supported resident populations; other areas that may have occasionally supported resident, breeding lynx; and yet other areas that intermittently and temporarily contained dispersing or transient lynx but did not support lynx home ranges or reproduction (65 FR 16054-59). Many lynx records in the DPS range seem to have been associated with cyclic "irruptions" of lynx from southern Canada into the northern contiguous U.S. when northern hare populations crashed, as they did historically every 8-11 years (Elton and Nicholson 1942, entire; McKelvey *et al*. 2000, entire; Mowat *et al*. 2000, pp. 281–294; Interagency Lynx Biology Team 2013, p. 33). Lack of reliable information also precluded determination of sizes or trends of lynx populations within the DPS.

Recent research and monitoring have improved our understanding of many aspects of lynx biology, distribution, and potential threats in the DPS. However, we still lack reliable estimates of the sizes and important demographic rates of most populations. Likewise, we would benefit from further understanding of the natural range and causes of variation in lynx and hare numbers; hare densities necessary to support resident lynx populations throughout the DPS; the influence of immigration of lynx from Canada on the demographic and genetic fitness of DPS populations; and the timing, extent, magnitude, and severity of potential threats associated with climate change. The Lynx SSA Team organized this expert elicitation workshop to help fill some of these information gaps with the knowledge, professional judgments, and opinions of lynx experts.

Currently, there are five geographic areas known to support resident lynx populations in the DPS: northern Maine (with occasional/sporadic breeding by small numbers of lynx in northernmost New Hampshire and Vermont); northeastern Minnesota; northwestern Montana and northeastern Idaho; north-central Washington; and western Colorado (Figure 1). After statewide surveys conducted in 1978-1997 suggested the absence of viable resident lynx

Rvsd Plan - 00003722

populations in Colorado, the State, from 1999 to 2006, released 218 lynx captured in Canada and Alaska into southwest Colorado to establish the current resident population.  Additionally, the Greater Yellowstone Area (GYA) of southwestern Montana and northwestern Wyoming is believed historically (and as recently as 2003-04) to have supported a small but relatively persistent lynx population, but it is uncertain whether it currently supports any resident lynx.



Figure 1.  Six geographic units within the range of the contiguous U.S. distinct population segment of Canada lynx (*Lynx canadensis*) that currently support or recently supported (GYA) resident lynx populations.

# Expert Elicitation

## Workshop Protocol

As mentioned under *Purpose*, above, the Lynx SSA Team convened the October 2015 workshop to elicit expert knowledge and opinion on critical uncertainties regarding the current status and future viability of resident lynx populations within the DPS range, and thus the DPS as a whole.  To facilitate this, a 10-member panel of recognized lynx experts from across the DPS range first observed and discussed presentations by subject matter experts summarizing the current state of available information on topics relevant to lynx populations in the DPS (see *Preparing Experts* section below).  After subject matter presentations, members of the lynx expert panel presented updates on lynx populations in each of the six geographic areas

7

described above under *Background*.  The subject matter and update presentations were intended to ensure that all lynx experts had a common baseline of information prior to the elicitation process.

In accordance with the expert elicitation literature (e.g., Burgman 2005, USEPA 2011, Gregory *et al*. 2012, Drescher *et al*. 2013, Morgan 2014), we then used best practices to elicit opinions from the expert panel.  Although invited experts were expected to contribute openly and effectively to group discussions, we did not seek consensus among experts; rather, we probed differences of opinion or interpretation of scientific and technical information.  We also asked experts and other participants to focus on scientific questions and to refrain from discussing or recommending management or policy decisions related to the Service's authorities and responsibilities in implementing the ESA.

In addition to the lynx expert panel and subject matter experts, workshop participants included members of the USFWS/USGS Lynx SSA Team, facilitators, and observers (see Appendix 2 for a full list of attendees and their respective roles).  As a basic ground rule, only members of the expert panel participated in the elicitation process, although panelists were encouraged to confer with the subject matter specialists and SSA Team members as needed.  All workshop participants were welcome to participate in discussions that ensued from review of panel responses to various questions.  Due to time constraints and to minimize interference with the elicitation process, observers were encouraged to write and submit "parking lot" questions, which were collected at the end of the first two days of the workshop and presented to lynx and subject matter experts for responses and discussion the following mornings (see workshop notes, Appendix 3).  The expert elicitation process was facilitated by USFWS and USGS structured decision making practitioners who encouraged open discussion among experts, structured input from both panelists and subject matter experts, and ensured that observers could witness the process without inappropriately influencing it.

## Identifying Experts

SSA Team members reviewed the relevant literature and used their first-hand knowledge to identify experts involved in lynx and hare research or management, boreal forest ecology, and climate modeling.  We then developed *a priori* selection criteria based on professional credentials, positions, areas of expertise, and pertinent experience to develop a list of candidate lynx experts and other subject matter experts.  Selection criteria (below) helped ensure that invitations to participate were made only to scientists with expertise highly relevant to workshop topics and, further, that the selections were transparent, unbiased, and adequately captured the diversity of expertise and professional judgments related to the topics.  Selection was not based on affiliation with a particular organization or interested party; however, States and other partners were asked to review the draft list of workshop invitees and suggest alternate or additional qualified experts.  The SSA Team then invited experts who met the selection criteria and represented lynx expertise throughout the range of the DPS and in adjacent southern

8

Canada. The number of invited experts was necessarily limited to improve the efficiency and effectiveness of the elicitation process, avoid redundancy, maximize scientific discussion among all participants, and maintain an open, comfortable meeting environment.

## Expert Selection Criteria

Expert panelist candidates had to meet all of the following criteria:

1. Candidate must hold a graduate degree in a scientific discipline highly relevant to the workshop topics. Typically this may include advanced degrees in wildlife biology, ecology, zoology, genetics, modeling, or statistical inference.

2. Candidate must hold a research position in government (State, Tribal, or Federal), academia, or in the nonprofit research sector; or participant must hold a governmental management agency position with responsibility for the species' conservation.

3. Candidate must have expertise in the ecology or management of the species or related species, demonstrated by recent (within the past 10 years) peer-reviewed publications or related types of professional scientific expression.

Candidates also had to meet one or more of the following criteria:

4. Candidate is directly engaged in the species' management, monitoring, or analysis of populations or habitat.

5. Candidate is directly engaged in the study of a specific workshop topic.

6. Candidate is a government or academic research scientist with expertise in conservation biology, population or landscape ecology, genetics, or other relevant fields, as demonstrated by recent (within the past 10 years) peer-reviewed publications or related types of professional scientific expression.

Using these criteria, the SSA Team identified 19 candidates for the lynx expert panel who were contacted to determine their interest and ability to attend the workshop (Appendix 4). Among those both interested in and able to attend the workshop, the team extended invitations to 13 candidates, 10 of whom ultimately participated as panelists and who together represent lynx expertise throughout the range of the DPS and in southern Canada. Experts who could not attend this workshop may provide their expertise later in the SSA process as peer review experts.

## Preparing Experts

Before the workshop, the SSA Team contacted all lynx experts and other subject matter experts by email and phone to discuss their roles and, for some, their willingness to prepare and deliver

9

subject matter or lynx population status presentations at the workshop. Correspondence with lynx and subject matter experts and other workshop participants explained the SSA framework and its application to the lynx DPS, the use of expert elicitation in SSAs, and the workshop's purpose, ground rules, and draft agenda.

At the workshop, the Service introduced the Lynx SSA Team, provided a brief overview of the SSA framework and its application to the lynx DPS, and outlined workshop objectives. Prior to elicitation exercises, subject matter experts presented information on the historic and current distribution of lynx in the contiguous U.S., regulatory mechanisms that apply to lynx on Federal lands, genetics considerations, lynx status and management in adjacent southern Canada, potential climate change impacts on boreal forest vegetation and snow conditions important to lynx, effects of forest management and policy on lynx habitat, and snowshoe hare ecology (see *Subject Matter Presentations*, below). After these presentations, lynx expert panelists provided updates on lynx populations and habitats, research efforts, conservation measures, and potential threats to lynx in each of the six geographic areas (Fig. 1). The subject matter and status-update presentations were intended to provide the expert panel with information that could inform their responses to elicitation questions and to ensure that the panelists shared a common understanding of the current status of lynx throughout the DPS. All workshop presentations are included in Appendix 5 and are accessible at the Service's Region 6 Canada lynx web page (http://www.fws.gov/mountain-prairie/es/canadaLynx.php).

# Subject Matter Presentations

Canada Lynx Species Status Assessment, Expert Elicitation Workshop - Jim Zelenak, U.S. Fish and Wildlife Service, Montana Ecological Services Field Office, Helena, Montana

The objectives of this workshop are to (1) gather scientific information from experts on the current status, threats, and future viability of lynx populations in the contiguous U.S.; and (2) where empirical data are lacking, elicit expert knowledge, professional judgment, and opinion on the nature and magnitude of potential threats to DPS populations and the DPS as a whole. We need this information to complete a status assessment for the DPS that will be used by Service decision makers to inform recovery planning and other determinations the Service must make in accordance with the ESA. We have a court order to complete a recovery plan for the DPS by January, 2018, unless we determine that a recovery plan is not necessary (i.e., that the threat for which the DPS was listed has been adequately addressed and ameliorated and no new threats have been identified that pose an immediate or reasonably foreseeable risk of extinction). However, we are not here to make that determination or others regarding the ESA status of the DPS. Rather, we are here to understand the current status of lynx populations and habitats in the DPS and hear from experts on factors influencing the current status and future viability of those populations. The DPS was listed as threatened under the ESA in 2000 because of the inadequacy at that time of regulatory mechanisms in Federal land management plans to protect lynx and their habitats. The Service completed a recovery outline in 2005 and

10

designated critical habitat for the DPS in 2006. In 2007, we clarified our determination of "significant portion of the range" of the DPS and withdrew the 2006 critical habitat designation. We revised critical habitat in 2009 and 2014 and, also in 2014, we received the court order to complete a recovery plan. The results of this workshop will contribute to the SSA, and the expert information gathered here will complement the best available scientific information that will be compiled and summarized in the SSA report. After it is peer-reviewed and finalized, the SSA report will be considered by Service decision makers to inform recovery planning and other determinations required under the ESA.

### Historical Distribution of Lynx in the Contiguous U.S. - Dr. Kevin McKelvey, USDA Forest Service, Rocky Mountain Research Station, Missoula, Montana

Understanding historical range is important because it provides context for modern conservation; however, historical data must be interpreted carefully because they may not be representative, are often unreliable, and their meaning may be unclear. This is especially true for rare animals like lynx, and even more so if they are easily mistaken for another more common animal, as bobcats are mistaken for lynx in the southern portion of lynx range. Because even relatively low identification error rates can lead to significant errors in determining distribution, it is important to rely on verified, and not anecdotal, occurrence records, when attempting to establish historical range. The issue is further complicated by the noted cyclicity in lynx population dynamics associated with snowshoe hare population cycles, which resulted historically in irruptions or pulses of lynx from Canada into the DPS when northern hare populations crashed. This can be described as a wave in which a large number of dispersing lynx intermittently flooded into the northern contiguous U.S. over the course of several years into a variety of potentially suitable and unsuitable habitats. As the irruptions waned (i.e., as the waves receded), lynx disappeared relatively quickly from areas of unsuitable or poor habitat, more slowly from areas of marginal or suboptimal habitat, and persisted (like permanent tide pools) in those areas with habitats and hare densities capable of supporting them over time. This yielded verified records in the contiguous U.S. in places that clearly cannot support lynx populations but, in other places where habitats are or appear to be suitable, it also confounds efforts to distinguish between those that have supported persistent lynx populations, those that may occasionally but not consistently support resident lynx ("winked off" more than "winked on" in a metapopulation sense), and those where dispersing lynx occurred regularly, if intermittently, but could not persist. Given these ambiguities, there remains irresolvable uncertainty about the historic distribution of resident lynx in the DPS. Despite this uncertainty, it appears that resident lynx naturally persist now in most areas that the available reliable data most strongly suggest historically supported resident populations in the contiguous U.S. (Maine, Minnesota, Montana, Idaho, and Washington). Several other areas may have historically supported populations but no longer do (with evidence most compelling for northern New Hampshire and Michigan's Upper Peninsula; less compelling for the Adirondack region of northern New York, northern Wisconsin, and northwestern Wyoming).

11

Rvsd Plan - 00003727

Canada Lynx Habitat Regulatory Environment - Scott Jackson, USDA Forest Service, National Carnivore Program Leader, Missoula, Montana

Before the lynx DPS was listed under the ESA, there was very little information available and little management direction for lynx habitats on national forests or other Federal lands. Given the uncertain status of lynx and lack of information on habitat relationships, an interagency Lynx Steering Committee was chartered almost immediately after the DPS was proposed for listing in 1998. The committee appointed the Lynx Science Team to assemble the available information on lynx and the Interagency Lynx Biology Team to develop a lynx conservation strategy applicable to Federal lands. In 2000, the Science Team published *Ecology and Conservation of Lynx in the United States* (Ruggiero *et al*. 2000), and the Biology Team completed the *Lynx Conservation Assessment and Strategy* (LCAS; Ruediger *et al*. 2000). The committee also directed the completion of the 1999 biological assessment (BA) in which the U.S. Forest Service (USFS) and Bureau of Land Management (BLM) evaluated potential impacts to lynx of management plans for 57 national forests and 56 BLM units and concluded that implementation of existing plans could result in some adverse effects to lynx. The BA recommended amending or revising management plans to incorporate conservation measures that would reduce or eliminate the identified adverse effects to lynx, and to consider the conservation measures identified by the Science Team and Biology Team, once finalized. In March of 2000, the DPS was listed as threatened due to the inadequacy of existing regulatory mechanisms, specifically the lack of guidance for conservation of lynx in national forest Land and Resource Management Plans and BLM Land Use Plans. In October 2000, FWS completed a biological opinion on the 1999 BA, concluding that if forest plans were revised or amended to incorporate the conservation measures in the LCAS, they would reduce or avoid the potential for adverse effects on lynx. Also in 2000, USFS and BLM entered into conservation agreements with FWS to guide management until plans could be amended or revised. By 2004, BLM revised plans in all units with lynx or potential habitat to incorporate LCAS guidance. By 2006, USFS similarly revised plans for national forests in the Northeast and Great Lakes. In 2007 and 2008, USFS formally amended plans for 18 national forests in the Northern Rockies and 8 in the Southern Rockies to address the risk factors identified in the LCAS and adopt management standards and guidelines. Currently, all national forests and BLM units with lynx or potential habitats are governed by plans that have adopted conservation measures identified in the LCAS, subsequent interagency conservations agreements, or by management direction that formally amended or revised land use plans and established standards and guidelines designed to apply the best available scientific information to avoid and minimize potential impacts to lynx. Future challenges include developing effective responses to larger, hotter, and more frequent fires and extensive insect outbreaks, and designing thinning and salvage harvest treatments conducive to creating habitat conditions favorable to lynx and hares.

Lynx Genetics Considerations - Dr. Michael Schwartz, USDA Forest Service, National Genomics Center for Wildlife and Fish Conservation, Missoula, Montana

Review of lynx genetic studies shows, despite some sub-structuring over distance, high gene flow across the continental range of lynx, likely because of high dispersal rates, large dispersal

distances, and few geographic barriers to dispersal.  Some research suggests that the Northern
Rocky Mountains may provide some gene flow restriction in western Canada, as well as an
"invisible barrier" to gene flow in eastern Canada south of James Bay/Hudson's Bay that may be
related to differences in snow conditions driven by large-scale climatic factors (e.g., the Pacific-
North America and North Atlantic Oscillation climatic systems).  North of the DPS, low levels of
genetic substructure have been documented in populations in eastern Canada between
populations north versus south of the St. Lawrence Seaway, and between island (Newfoundland
and Cape Breton islands) and mainland populations.  However, there is evidence of genetic
interaction among even these relatively isolated eastern Canadian populations.  Within the DPS,
minor genetic sub-structuring has been documented among lynx subpopulations in western
Montana.  However, very low $F_{st}$ values (a measure of the proportional reduction in
heterozygosity due to population subdivision, with values near zero indicating high levels of
gene flow and values approaching one indicating poor gene flow) suggest the absence of
significant barriers to genetic interchange throughout much of the lynx range, including the DPS.
Across 17 lynx populations in Alaska, Canada, and the contiguous U.S., $F_{st}$ = 0.033, and the
highest $F_{st}$ for any two populations was 0.070 when lynx from the Kenai Peninsula in Alaska
were compared to those in the Seeley Lake area of Montana.  Lynx-bobcat hybrids have been
documented in Minnesota, Maine, and eastern Canada, but not in the western part of the range.
Hybridization does not seem to be a major issue, nor does it appear to be increasing despite
significant increases in bobcat numbers in some parts of DPS range.  Genomics research (the
genetic mapping and DNA sequencing of sets of genes or complete genomes) on lynx would
increase power and precision of genetic analyses and perhaps identify genes under selection at
the periphery of the range.  The goal for lynx in the DPS should be to conserve the genetic
diversity currently represented in resident populations, recognizing that maintaining connectivity
between DPS and Canadian populations is likely important to achieving that goal.  The genetic
variation at the edge of the range may be of value to future populations, especially as related to
changing climate.

### Lynx Distribution, Status, and Management in Southern Canada - Dr. Jeff Bowman, Ontario Ministry of Natural Resources and Forestry, and Trent University, Ontario

Lynx are managed provincially in Canada, with each province responsible for its own
management program, harvest (trapping) policies, and conservation strategies. Data from
registered trap lines show cyclic decadal peaks in the numbers of lynx harvested, and these
align well with (and lag by one year) cyclic peaks in snowshoe hare indices.  In western
provinces (British Columbia, Alberta, Saskatchewan, Manitoba, Northwest Territories, and the
Yukon), the magnitude of lynx cycles appears to have dampened dramatically after the 1980s-
1990s, while eastern provinces (Ontario, Quebec, and Newfoundland and Labrador) have seen
less dramatic declines in peak lynx numbers trapped. There is some evidence that hare
numbers in the Yukon have not recovered to past levels after declines beginning in about 2000,
and that hare numbers in southern Ontario have been low for the past 5-6 years.  There is also
indication that the range of lynx in eastern Ontario has contracted northward since the 1970s,
and modeling suggests that this contraction is likely influenced by habitat loss perhaps related
to changes in forestry practices and an increase in tolerant hardwoods replacing spruce-fir

13

Rvsd Plan - 00003729

forests resulting from climate warming (Koen *et al*. 2014). This has been accompanied by reduced genetic heterozygosity (allele richness) at this margin of the lynx range. Recent studies also show some differences in functional genetic markers (unique alleles) in lynx south versus north of the St. Lawrence Seaway/River, suggesting the potential for evolutionarily significant differences in lynx in those areas (Koen *et al*. 2015, Prentice *unpubl.*). Research also suggests an "invisible" genetic barrier south of Hudson's Bay likely related to climate-driven differences in snow conditions, which could be amplified in the future with continued climate warming. A few lynx-bobcat hybrids have been documented. Lynx are listed as endangered provincially in New Brunswick and Nova Scotia, which also have by far the highest numbers of bobcats, and where bobcat populations have been increasing since about 1990. Lynx are considered secure in all other provinces.

### Seven Ways a Warming Climate can Kill the Boreal Forest - Dr. Lee Frelich, Director, University of Minnesota Center for Forest Ecology, St. Paul, Minnesota

Northern Minnesota is at the southern edge of the ranges of boreal forest tree species (balsam fir, white spruce, paper birch) and the northern extent of temperate forest species (sugar maple, red maple, red oak). A number of climate-mediated processes are likely to shift these ranges northward, potentially resulting in the complete disappearance of boreal forest from Minnesota before the end of the century. These include projected declines in snow depth, invasion of boreal forests by temperate species and a widening of the mixed forest ecotone, warming summer and winter temperatures, declines in boreal trees under both low- and high-emission climate scenarios, severe wind- and hail-producing thunderstorms (derechos) of greater extent and frequency, large wind-driven fires, heat and drought stress, increased insect infestations due to lack of extreme cold temperatures, and phenological disturbance. These processes, alone or in combination may result in gradual or relatively sudden conversion of boreal forests to temperate forests, savanna, or grassland at the southern edge of the boreal forest range. A mosaic of conversion mechanisms and rates of change will occur at landscape/ecoregion scales. With unmitigated climate change, Minnesota is likely to lose the boreal biome and about one-third of its native species, including lynx, possibly within the next 60-70 years.

### Climate Change and Uncertainty: Implications for Canada Lynx Conservation and Management in the Contiguous U.S. - Alexej Siren, DOI Northeast Climate Science Center and University of Massachusetts Department of Environmental Conservation, Amherst, Massachusetts

Climate models are better at detecting long-term trends in temperature and precipitation than short-term climate variability. Generally, projections of precipitation are less robust compared to temperature, and within the lynx DPS units, projected trends in precipitation are more certain for winter than for summer. Consequently, the resulting model biases may affect climate projections. Global surface temperatures have increased steadily over the 20th century, especially since the 1970s, with an overall increase in winter temperatures in the U.S. These changes are most pronounced from the Northern Rockies to the northeastern U.S., where winter precipitation has also increased. However, the northwestern U.S. has experienced drier

14

Rvsd Plan - 00003730

winters with less snow over the past several decades. Importantly, numerous studies have shown that Canada lynx distribution is related to snowpack characteristics (e.g., snowfall, density, and persistence), which may directly or indirectly affect lynx through 1) increased competition (exploitative and interference) with sympatric carnivores, 2) altering hare and lynx population cycles, and 3) reduced genetic diversity. Therefore, climate projections with a specific emphasis on winter climate are a valuable tool for assessing the long-term viability of lynx in the contiguous U.S. Below are the climate trends for the past several decades and end-of-century model projections for each of the DPS units; projections are multi-model means with the high emissions scenario (A2). In the Northeast, recent trends are toward reductions in snowfall, the number of snow-covered days per season, and the proportion of winter precipitation occurring as snow. Projections include increased winter precipitation, but with a lower proportion occurring as snow, and a decline in snowfall and length of snowpack coverage. In the Great Lakes region, recent trends indicate an increase in lake effect snow and longer snow seasons to the north. Winter precipitation is projected to increase throughout the Midwest, with a lower proportion occurring as snow, except that lake effect snow is projected to increase around Lake Superior and north of the eastern Great Lakes until 2050, and eventually decline towards the end of this century. Overall, models project a decline in snowfall and length of snowpack coverage by 2100 for the Midwestern region. The Northeast and Midwest DPS units are especially vulnerable to snowpack loss due to lack of elevational refugia. In the western DPS units and the Colorado population, recent trends show decreasing spring snowpack at lower elevations, an overall decline in snowpack by the latter half of the 20th century, and a lower proportion of winter precipitation occurring as snow. Projections include decreases in snowfall season and snowfall amount, fewer days with snowfall, and continued reduction in the proportion of winter precipitation occurring as snow. However, projections indicate that snowpack and winter severity may be less impacted in the Northern Rockies compared to other DPS units. In summary, model projections are not favorable for lynx within the DPS units, especially towards the latter half of the 21st century, with less severe winters and diminished snowpack characteristics that favor competing species.

Projected Climate-change Impacts on Snow, Vegetation, and Lynx Populations in the Western U.S. - Dr. Joshua Lawler, University of Washington, School of Environmental and Forest Sciences, Seattle, Washington and Dr. Chad Wilsey, National Audubon Society Science Division, New York, New York

Climate modeling suggests reductions in the amount of precipitation falling as snow and a shift from subalpine forest to temperate evergreen needleleaf forests in a generalized lynx range in the western U.S. Fire is projected to increase in both frequency and fire size, doubling by 2040 and tripling by 2080. Simulated lynx densities were projected for the 2020s, 2050s, and 2090s. Of 25 ecoregions included in the study area, 14 had simulated lynx populations greater than 0.10 individuals/100 $km^2$ across all time points. Of those, and across various Global Circulation Models (GCMs), 3 ecoregions had simulated increasing populations by the 2050s and 11 had declining populations. Populations were projected to continue increasing in the 3 ecoregions by the 2090s, while declines were projected to deepen in 8 of the remaining 11 ecoregions. Growing populations were projected to occur in the sparsely populated Fescue-Mixed Grass

15

Prairie, Middle Rocky-Blue Mountains, and Great Steppe ecoregions, whereas the largest proportional declines were projected to occur in the West Cascades, Pacific Northwest Coast, Northern Cascades, East Cascades – Modoc, and Aspen Parkland ecoregions. The study also looked at the effect of population cycling on projected changes and found that simulated declines differed more due to GCM model used than due to population cycling (i.e., modeling suggested lynx population declines were not strongly influenced by population cycles).

### Forest Management and Lynx Habitat Trends - Dr. Erin Simons-Legaard, University of Maine School of Forest Resources, Orono, Maine

Lynx in Maine occur in the Northern Appalachian/Acadian Ecoregion where their distribution is governed by snowfall and extent of deciduous cover. The eastern spruce budworm (*Choristoneura fumiferana*) is endemic to forests in this region, and extensive outbreaks of this insect pest occurred in northern Maine in the 1970s-80s, resulting in millions of acres of spruce-fir die-offs, despite extensive aerial insecticide applications. For several decades, salvage logging via extensive landscape-scale clear-cutting occurred in impacted forests, until passage in 1989 of the Maine Forest Practices Act, which regulated clear-cut size, configuration, and regeneration. Regenerating clear-cuts became very dense stands supporting high densities of snowshoe hares. Although the Forest Practices Act reduced the amount of clear-cut harvest over the following two decades, overall harvest increased as partial-cut harvesting replaced clear-cutting. At the same time, land ownership patterns in northern Maine were shifting from large blocks of commercial timber interests to smaller blocks and more diverse land management goals, including development and financial investment, as well as some non-development easements (though these do not regulate forest management). The University of Maine modeled lynx habitat occurrence from snow track data, a series of Landsat satellite time-series imagery since 1970, and indices of hare densities for various stand ages post-timber harvest to model past, present, and future lynx occurrence in northern Maine. They found that the proliferation of regenerating partial-cuts produce lower landscape hare densities than regenerating clear-cuts from the 1970s and 1980s. Landscape hare densities will likely decline in the future as the clear-cut-era stands mature into less dense conifer stands, beginning about 35-40 years post-harvest. High-quality stands are being replaced by lower-quality regeneration of partial harvests. High-quality habitat for lynx/hares is currently about 8% of the northern Maine landscape. Model projections indicate it will decline to about 5% of the landscape by 2030, and then level off, and that the prevalence of partial-harvesting will lead to elimination of many areas with concentrated high-quality habitat and a lower future probability of supporting lynx.

### Southern Snowshoe Hares: Updates, Questions, Forecasts - Dr. Karen Hodges, University of British Columbia Okanagan Department of Biology, Kelowna, British Columbia

Northern hare cycles are more variable than commonly portrayed in some literature, with questionable synchrony and variation in peak heights and amplitudes. Some southern hare populations (i.e., within the lynx DPS range) show "cycle-ish" dynamics and high densities, but

16

Rvsd Plan - 00003732

variability in abundances is not obviously linked to forest stand type (thinned, unthinned, mature).  Some areas of high hare density are occupied by bobcats instead of lynx (e.g., the Tally Lake area of the Flathead National Forest in Montana).  Hare densities in the western contiguous U.S. differ substantially across regions and landscapes.  For example, within the GYA, hare densities varied from very low (0.2 hares per hectare) in Yellowstone National Park to very high (0.5 - 1.7 hares/ha) in the Wyoming Range south of the park.  Hare densities also vary in the eastern part of the lynx DPS, with ranges from 0 - 1.8 hares/ha in Maine and, in Minnesota, densities of 0.64 hares/ha in the northeast part of the state (which supports resident lynx) and 0.35 hares/ha in Voyageurs National Park (which does not support resident lynx).  Landscape attributes (e.g., tree densities and moisture gradients) also influence stand quality for hares.  Hare population dynamics (cyclicity, synchrony, amplitude, and peak densities) also vary regionally.  Forest management that reduces stand structure reduces hare abundances.  For example, hares declined after experimental precommercial thinning in Montana, and, in Quebec, hare densities increased with time since commercial thinning, harvest, and fire.  Fire destroys hare habitat temporarily, but hares return to burned areas as soon as favorable habitat conditions return.  Post-fire hare densities also vary regionally; in stands burned by large fires in 1988, hare densities by 2007 were higher in Glacier National Park than in Yellowstone National Park.  Hare densities necessary to support resident lynx remain poorly understood but appear to vary regionally, as do lynx diets and home range sizes.  If southern boreal/montane forests are lost, hares will decline.  Fire, timber harvest, and thinning will result in fewer hares, at least temporarily, and the impacts of post-fire salvage logging are unknown.  Understory cover and browse are very important, but we know little about the influence of shrubs or snow on hares.  Like lynx, hares in the DPS are at the southern extent of their continental range.  Also like lynx, hares show high gene flow across most of the northern range in Canada but lower gene flow (higher genetic structure) in the southern part of the range, with some lineages potentially at risk of genetic drift.  Climate-mediated increases in fires and insect outbreaks and changes in forest regeneration may alter hare habitats and, thus, hare distribution and abundance.  Climate change may also affect hare vulnerability to predation by creating a mismatch between pelage color, which is controlled by photoperiod, and their surroundings (e.g., reduced snow season resulting in white hares on dark forest floors).  It may also alter predator communities, with uncertain impacts on hare populations.  Continued research is needed to better explain regional variation in population dynamics and peak abundances, to predict post-fire recolonization and densities and responses to climate change, and to better understand links between physiology and demography (e.g., predation stress and reproduction).

17

Rvsd Plan - 00003733

# Lynx Status Update Presentations[1]

Status of Lynx in Maine - Jennifer Vashon, Maine Department of Inland Fisheries and Wildlife, Bangor, Maine

Much of the current lynx habitat in Maine was created from extensive harvests to salvage spruce budworm-damaged forests during 1970-1985, and the amount and distribution of high-quality lynx/hare habitat are likely greater now than historic conditions. Many stands were treated with herbicides to create extensive regeneration of spruce and fir. Analysis of Forest Inventory and Analysis (FIA) data indicates that half of the 3 million forested acres of spruce-fir in northern Maine is currently sapling stage that should provide lynx with high quality foraging habitat. Also based on FIA data, the amount of dense spruce-fir (supporting the highest hare densities) increased from 700,000 acres in 2006 to 805,000 acres in 2010. The Maine Department of Inland Fisheries and Wildlife (MDIFW) conducted a telemetry study of lynx from 2000-2011 in a study area with extensive areas of regenerating spruce-fir stands in northwestern Maine and found that lynx had relatively small home ranges. Lynx strongly selected these high-quality hare habitats in former clear-cut areas. Although hare densities declined from 2 hares/hectare to 1 hare/hectare mid-way through the study, lynx did not increase their home range sizes or alter their habitat use. Reproduction declined initially after hare populations declined, but later recovered, with all females producing litters. An average of 65% of females bred each year throughout the study. Litter sizes ranged from 1 to 5 and averaged 2.63 kittens/breeding female. Kitten survival remained high (averaged 78%). Densities of 4.5 adults and 5 to 9 kittens were observed in 100 $km^2$ areas. Based on estimates of occupied habitat and home range information, MDIFW estimated there were between 750 and 1,000 lynx in northern Maine in 2006, and more than 1,000 lynx in 2015 (or at least more animals than 2006). Indices (number incidentally trapped, observed, or killed on roads) have increased, suggesting there are more lynx than in 2006, and the distribution of the population also appears to be expanding. MDIFW initiated a third round of periodic lynx snow track survey in 2015 that support increased populations and expanding range. Additional surveys are planned in 2016 and 2017 to update estimates. Although a model by the University of Maine suggests the effects of the Maine Forest Practices Act could lead to a decrease in lynx habitat, thus far, it does not appear that lynx have declined in response to aging clear-cuts and the prevalence of partial harvests resulting from the Act. A budworm outbreak is expected in the near future that will also impact future amounts of habitat for lynx and snowshoe hare. MDIFW provides landowners with descriptions of lynx-hare habitat for their management plans through published peer-reviewed papers and reports on lynx status and habitat use in Maine and consultation.

---

[1] These are summaries of status updates presented by lynx experts for each of the geographic units in the DPS. Summaries were written by the Lynx SSA Team based on the presentations and notes submitted by expert presenters and on the notes taken at the workshop during presentations. Experts reviewed drafts of these summaries and provided clarifications/ corrections if needed, which were incorporated into the final summaries.

18

Canada Lynx in Minnesota - Dr. Ron Moen, Natural Resources Research Institute, University of Minnesota Biology Department, Duluth, Minnesota, and Susan Catton, USDA Forest Service, Superior National Forest, Duluth, Minnesota

Prior to 1965, lynx in Minnesota were unprotected, had a bounty placed on them, and were overexploited by trapping. From 1930-1977, harvest in Minnesota was twice that of Montana and 40 times that of other states. In 1976, State protection was provided in the spring and summer months, and in 1984 the trapping season was closed. In the 1990s and when listed under the ESA in 2000, it was unknown if lynx in Minnesota were residents or migrants from Canada, but now it is known that the Minnesota lynx population consists of both residents and migrants from Canada. Since then, there have been hair snare and snow-tracking surveys, DNA analyses, and a multi-year telemetry project – none of these monitoring efforts were designed to estimate densities or abundances of the species. However, as of 2015, it is thought that there are somewhere between 50 and 300 lynx in Minnesota (this expert later refined the range as 50 - 200 lynx, as indicated in the summary presentation preceding the graphing exercise below), with the core habitat in the arrowhead region of the state (St. Louis, Lake, and Cook counties), although there have been verified and probable lynx sightings elsewhere in the state. At least 5 of 27 adult lynx radio-collared in Minnesota were later legally trapped in Ontario, and other collared lynx did not return from Canada, therefore their fates are unknown. Telemetry data showed that about half of males radio-marked in Minnesota moved back-and-forth across the border, traveling at all times of the year; that Minnesota females that dispersed into Canada tended not to return to Minnesota; that males had much larger home ranges (267 km$^2$) than females (21 km$^2$); and that females with kittens had the smallest home ranges. About half of the mortality of collared lynx was from vehicle collisions, incidental catch, illegal kills, or unknown causes. Moen *et al*. (2008) documented 10 den sites and showed that denning habitat is not limiting in Minnesota. Since 2000, incidental take of lynx tracked by the USFWS Twin Cities Field Office has ranged from 0-14 per year and included vehicle (car and train) collisions, gunshot, incidental trapping, and unknown causes. Approximately 50% of reported take was of incidentally trapped lynx, about half of which were released alive. Home range analyses showed mean distance to nearest linear feature is approximately 200m, suggesting that lynx do not avoid roads. Bobcat harvest data show a concentration of bobcats adjacent to the core of the lynx range. The IPCC SRES A1B Scenario climate change model (Gonzalez *et al*. 2007, p. 14) shows snow conditions potentially suitable for lynx throughout the northern half of Minnesota to the end of this century; however, the snow and/or biological assumptions in the model need work, because it predicts a range for lynx that is larger than the current suitable range based on snow depth. Other climate modeling (e.g., Morgan, in prep.) suggests that suitable snow-depth range will shrink significantly by 2055, be limited to extreme northeastern Minnesota by 2070, and may be entirely absent from the state by 2095. Since 2000, the Superior National Forest (SNF) and others have identified 268 unique individual lynx (47% Female, 53% Male) from 1,306 DNA samples, primarily from SNF lands. These samples also documented 13 unique individual lynx-bobcat hybrids (5 Female, 8 Male). The DNA analyses also showed persistence of individual lynx in Minnesota of 2 years (N = 27 lynx), 3 years (N = 11), 4 years (N = 5), 5 years (N = 6), and 1 female lynx tracked for over 5 years, who produced 7 kittens in Minnesota. The SNF annually documents 3-5 family groups and is working with

19

North Carolina State University and the Twin Cities Field Office on a study of the distribution of lynx that can be used to inform future study designs aimed at monitoring lynx occupancy and designing more intensive studies to estimate abundance.

Current Distribution, Status, and Threats to Canada Lynx in Montana and Wyoming - Dr. John Squires, USDA Forest Service, Rocky Mountain Research Station, Missoula, Montana

Northwestern Montana - This area is believed to support the largest lynx population in the western U.S., but minimum population size has not been calculated. The Forest Service's Rocky Mountain Research Station in Missoula initiated a lynx research program in 1998 to investigate lynx resource and prey selection, competition, activity patterns, detection and monitoring, and connectivity. From 1998 to 2007, researchers trapped and radio-marked 175 lynx in northwestern Montana and collected nearly 170,000 GPS and over 3,000 VHS telemetry locations documenting lynx movements, resource use, survival, and productivity. From 1999-2007, litter sizes averaged 2.24 kittens/litter (N = 33) in the Seeley Lake area (the central portion of this geographic unit) and from 2003-2007, 2.95 kittens/litter (N = 22) in the Purcell Mountains (the northwestern portion of the unit). In Seeley Lake, 61% of breeding-age females (N = 52) produced kittens; in the Purcells, 83% of females (N = 28) produced kittens. Recent research (Kosterman 2014) suggests kitten production is correlated positively with mature forest connectivity and negatively with fragmentation in female home ranges. Annual survival rates for subadult and adult female lynx were 0.52 and 0.75, respectively, in Seeley Lake, and 0.68 and 0.85, respectively, in the Purcells. There was no evidence of cyclicity in these vital rates, and no indication of irruptions of lynx into this unit from Canada after the 1980s. Starvation, predation by mountain lions, and human-caused deaths each accounted for roughly one-third of documented sources of lynx mortality. Population viability analyses yielded population growth rates of 0.92 for the Seeley Lake area (i.e., declining population trend, 1999-2007) and 1.16 for the Purcells (increasing trend, 2003-2007). The distribution of lynx in this unit appears to have contracted recently; lynx were documented in the Garnet Mountain Range in the southern portion of the unit from at least 1980 into the early 2000s, but in 2010, extensive research trapping efforts yielded only two males, and snow-track and camera-trap surveys in winter 2014-2015 detected no lynx. Genetic analyses revealed fine-scale genetic sub-structuring among the Garnets, Purcells, and Seeley Lake subpopulations, suggesting some level of relative isolation among lynx in those areas. Most lynx habitat in this unit occurs on Federal lands (USFS, BLM, NPS). Recent conservation land purchases substantially increased protection of lynx habitat in the Seeley Lake core area. The extent of fire in this area has increased, with over one million acres burned in 2000-2013. Forest management (timber harvest, silviculture, and fire management) can have negative, neutral, or positive impacts on lynx habitat; current research is investigating lynx response to management actions.

Wyoming/GYA – The long-term persistence of lynx in the GYA is unknown, but early records from Yellowstone National Park documented lynx presence in the 1920s-30s, and more recent (2001-2004) surveys in the park documented several lynx and evidence of reproduction on the east side of Yellowstone Lake. South of the park, lynx were also detected reliably in the late

20

1990s-early 2000s in the Union Pass and Togwotee Pass areas of the Wyoming Range in the Bridger-Teton National Forest. Several lynx released in Colorado (1999-2006) dispersed to the GYA and occupied home ranges (including males and females with overlapping home ranges) in areas of the Wyoming Range previously occupied by "native" resident lynx. Recent (2005-2010) research trapping and survey efforts in the Wyoming Range have detected only Colorado-released lynx, and the current status of lynx in the GYA is uncertain but believed to be at low numbers based on on-going surveys. In addition to fire and forest management (as described above for northwestern Montana), oil and gas exploration and development may pose a potential risk to lynx and habitat in the Wyoming Range.

## Lynx in Washington: Current Status and Potential Threats – Dr. Benjamin Maletzke, Washington Department of Fish and Wildlife, Olympia, Washington

Lynx in Washington were State-listed as threatened in 1993, but with recent large-scale impacts to lynx habitats and likely declines in lynx numbers, upgrading to State-endangered may be justified. The Washington Department of Fish and Wildlife completed a lynx recovery plan in 2001, and the Department of Natural Resources completed a habitat management plan for its lands in 1996, which it revised in 2006. The majority of lynx habitat in Washington occurs on public lands including State Forests and National Forests. Although individual lynx are occasionally documented in the northeastern part of the state, only the Okanogan area (eastern Cascade Mountains abutting the border with Canada) in the north-central part of the state has consistent records and evidence of a resident breeding population. In terms of the ESA's five listing factors, over-utilization, disease/predation, and inadequacy of existing regulatory mechanisms are not issues for lynx in Washington. Lynx trapping was prohibited in 1991, and only live-trapping is allowed for bobcats, so there is little chance for incidental trapping. There is no documented disease and little evidence of predation (though these could occur/increase with climate change). With ESA and State listings, critical habitat designation, and State recovery and State and Federal habitat management plans in place, regulatory mechanisms appear adequate. Recently, much lynx habitat has been lost, at least temporarily, to frequent large-scale fires and insect outbreaks, and climate change may pose additional (or exacerbate existing) threats to lynx and habitats in Washington. From 1990-2002, there were about 2,600 $km^2$ of lynx habitat in the Okanogan (Eastern Cascades) area, and female home ranges were estimated at 38 - 41 $km^2$, suggesting the potential to support roughly 90-115 resident females (home ranges include "matrix" or non-habitat). By 2014, habitat had been reduced by fire to about 1,600 $km^2$, and habitat loss and fragmentation resulted in female home ranges increasing to an estimated 91 $km^2$, with a potential to support roughly 27 resident females. Although areas impacted by fires and insects should regenerate to hare/lynx habitat, it may take 35-40 years or more for that to happen. Climate change will likely reduce snow depth, condition, and persistence, potentially influencing interspecific competition. It also may cause temperature- and precipitation-driven changes in vegetation and increased fire frequency, size, and intensity, resulting in further reduction, fragmentation, and isolation of suitable habitats and impacts to prey abundance. Connectivity between the Okanogan area and lynx populations and habitats in Canada seems adequate; it is more tenuous in the northeastern part of the state, where cross-border populations/habitats in Canada are smaller and potential corridors more constricted. It is

21

also possible that legal trapping in southern British Columbia could limit immigration into Washington's lynx population and be a source of mortality for lynx dispersing from Washington into Canada. Potential management and recovery actions could include resuming surveys and monitoring efforts, reviewing current State, Tribal, and Federal management actions to see if they can be more "lynx-friendly," conducting population viability analyses to estimate probabilities of persistence over various time periods, coordinating with British Columbia on cross-border lynx conservation efforts, evaluating the need and feasibility of augmenting female lynx in the Okanogan and reintroducing lynx to the Kettle Crest, up-listing lynx in Washington to indicate the current status and severity of threats, and seeking collaboration and funding to support the measures above.

## Status of Lynx in Colorado - Dr. Jake Ivan, Colorado Parks and Wildlife, Fort Collins, Colorado

Lynx in Colorado were State-listed as endangered in 1973. Based on statewide surveys conducted in 1978-1997 that found some possible lynx sign (tracks), the State concluded that if lynx were present, too few individuals remained for a viable population and that natural recolonization was unlikely due to geographic isolation. The State initiated a lynx reintroduction program, releasing 218 lynx from source populations in Alaska and Canada from 1999 to 2006. All animals were released into the San Juan Mountains in the southwest part of the state. Many stayed there and used the area heavily; many others established home ranges in the Sawatch Range in the central part of the state, where the bulk of historical records occurred. Although post-release mortality was initially high, it decreased after release protocols were modified and among lynx after they'd been on the ground a year. Mean annual survival was 0.93 for lynx that stayed within the San Juan Mountains core-release area, and 0.82 outside of it. The first den was located in 2003, and 48 dens were subsequently documented in Colorado through 2010, including a third-generation of Colorado-born lynx. The reintroduced population displayed reproduction similar to other areas in the DPS in some regards (e.g., mean litter size was 2.75 kittens), and lower in others (e.g., mean percentage of females that produced kittens was 24% [range = 0% - 46%])[2]. A deterministic model that uses survival estimates and reproduction data from ten years of monitoring reintroduced lynx and assumes that reproductive parameters observed during that time would repeat each decade shows a slightly increasing trajectory through time. Although current population size and survival rates are unknown, photos of females with kittens in 3 sampling units during occupancy monitoring in the San Juan Mountains in 2014-15 and capture of young and unmarked (i.e., "new") lynx during research efforts in 2010-15 provide evidence of continued reproduction. Potential threats to lynx in Colorado include climate change, bark beetle outbreaks, fire, increasing human recreation, and vulnerability to vehicle collisions and disturbance from highways. Climate modeling in 2014, based on the RCP6 (2nd-highest) emissions scenario, suggests that by mid-century temperature will increase by 2°C, precipitation will decrease in the San Juan and other southern mountains, and that spruce-fir habitat will migrate upslope, lagging climate conditions by 50-100

---

[2] These data were provided by the presenter after the workshop but were not part of the original workshop presentation.

years.  Based on this, the overall vulnerability of spruce-fir in the state is considered moderate at mid-century.  As of 2014, over 4 million acres of potential lynx habitat has been impacted by bark beetle outbreaks; however, lynx and hares continued to use impacted areas, even when beetle impacts are severe.  Red squirrel use declined in areas that were heavily impacted by beetles.  Large fires also have impacted lynx habitat, and as elsewhere, fire size, frequency, and intensity are expected to increase with climate change.  A cursory, pre-analysis review of location data suggests that lynx make use of landscapes in which heavy winter recreation occurs.  However, use of developed ski areas is light, and outside of ski areas, heavy lynx use tends to occur in thick timber that is not used by snowmobilers and other backcountry users.  Finally, lynx frequently crossed 2-lane paved highways in home ranges (0.6 crossings/day), more often at dusk and night, coincident with lower traffic volumes, and usually at forested crossings.  Recent results from a new large-scale monitoring program indicated that lynx occupied a similar proportion of the landscape in the San Juan Mountains during winter 2014-15 as they did during winter 2010-11.

# Expert Elicitation Process

All questions posed to the 10 lynx expert panelists were framed in the context of the 3Rs, a driving principle for evaluating viability under the SSA framework.  In questioning, we used a modified Delphi method (e.g., MacMillan and Marshall 2006), which involves eliciting individual responses/scores, exploring response rationale and differences in expert judgment through guided discussions, then allowing experts to reconsider their scores in light of those discussions if they so desire.

In our implementation of the modified Delphi approach, panel members were first asked to respond individually to a particular question and indicate their level of confidence in their response.  We then collated and noted the range of responses, which became the mechanism for follow-up discussion.  In collating responses, we used a simple numeric coding system rather than the experts' names to provide for a reasonable level of anonymity.  We noted where there was high congruence among responses, as well as low congruence and outlying responses.  By asking for experts to voluntarily provide their reasoning for particular responses, we were able to delve into the basis for varying opinions.  After the discussion period, experts were given the opportunity to revise their scores.

In addition to elicited responses to each question, we received substantial feedback from the experts on definitional issues and the validity of the questions themselves; we revised the questions as needed following these discussions.  In the case of a revised question, scores were elicited again following the revision.  The second round of scoring was displayed for experts, with a closing opportunity for comment, discussion, or score revision.

All panel members were encouraged to respond to each question but also given the option of abstaining from responding to a question if they felt it was beyond the bounds of their expertise.  With few exceptions, all 10 expert panelists responded as requested to every question.

23

Instances where experts either chose not to reply or otherwise replied in a manner differing from the expected form of response to the question are noted in the responses below.

# Lynx Status:  Expert Elicitation and Responses

Questions for experts were scripted by the Lynx SSA Team prior to the meeting to facilitate discussion of lynx ecology among the experts, solicit their professional opinions, and to help the Service gather and synthesize biological information for use in the SSA, particularly where empirical data are lacking in the published literature and projecting habitat and population conditions into the future is needed.  Because of the uncertainty of quantifying the population status and other aspects of lynx biology, the Service and facilitators decided to generate a series of discussion questions with quantifiable responses (scores) concerning the redundancy, resilience, and representation (3 Rs) of the DPS.  Although scores provided a starting point for discussion among experts and are quantified, analyzed, and summarized as appropriate in the following sections of this report, the Service also places high value on the content of the discussion among experts.  Therefore, both the analyses of scores and summaries of the discussion content are presented and will be considered during development of the SSA, noting that both were integral to the expert elicitation process.

The types of questions and the format of responses differed based on the information needed to inform the status assessment, and the best way to capture the information relevant to the question being asked.  For example, responses were requested in the form of lists, when a set of influences was desired, in the form of a 4 point elicitation (e.g., the most likely, high, and low end of a range, and confidence that the range contains the true value) when an uncertain quantitative value was desired, in the form of graphed trajectories when probabilities of persistence over time were desired, and other forms as necessary (see questions below).  Experts submitted their scores independently via submission sheets (sticky notes, index cards, graph paper, etc.) with their ID numbers.  Note takers recorded and displayed scores to assist discussion.  Facilitators and other members of the SSA Team then asked directed questions to clarify responses from the panelists as needed.  Following each round of discussion and clarification, the panelists were provided the opportunity to update their response if desired and the second round of responses were collected and recorded.  The final responses are the only responses reported here.  The range of individual responses that we received was not combined (e.g., averaged or otherwise) in any way that would obscure or conceal individual responses, and the final scores for each panelist were recorded if the response was revised.

We present the results of the expert elicitation below under the headings of representation, redundancy, and resilience.  Under each heading, the following is provided:  the definition of the viability category (3 Rs) under consideration, the question(s) asked of the expert panelists, response type (i.e., the form of the response requested of the experts), question clarification (i.e., a narrative description of any additional information provided to the experts by the facilitators for clarification as the questions were asked), expert responses, and notes from the discussion.

24

# Expert Responses

## Representation

Definition - ***Representation*** contributes to the adaptability and evolutionary capacity of a species over time, to accommodate long term issues like climate change. The breadth of genetic ecological, demographic, and behavioral diversity across a species' range may contribute to its capacity to adapt over time. Measures of genetic and life history variability among populations, distribution of populations across a range of ecologically diverse locations or niches, etc., are useful proxies to measure. Consider needs for establishing or reestablishing populations in unoccupied habitat that may be necessary or suitable for species adjustment to climate change or other stressors, including the need to replace former populations in no longer represented ecosystems.

### Representation Questions

**1.  Are any of the geographic units susceptible to genetic drift on a scale that would limit genetic viability?  If yes, which geographic units?**

Response Type:  Experts supplied a written response of "yes" or "no," with a yes answer accompanied by a list of susceptible geographic units.

Expert Responses:  Five experts responded that none of the geographic units are susceptible to meaningful genetic drift, two experts abstained from answering, and three experts responded that there are geographic units that are susceptible to such genetic drift.  Among the latter, one expert responded that the Colorado geographic unit is susceptible over a long period of time, and the other two experts responded that both the Colorado and GYA geographic units are susceptible to genetic drift.

Discussion Points Following Initial Responses:  It wouldn't take many immigrating lynx to provide adequate genetic diversity to prevent genetic drift.  One reproductively successful immigrating lynx every 5 to 10 years per geographic unit is likely sufficient to prevent genetic drift.  Most experts believed there was a low likelihood that even the smaller lynx populations (GYA and Washington) or those in more isolated geographic units (Colorado and GYA) are vulnerable to genetic drift at a scale that would impact viability, though several experts felt that both the GYA and the western Colorado units could experience meaningful drift in the absence of immigration or augmentation.  Overall, most experts felt there is a low risk of genetic drift being a problem for lynx in the DPS.

**2.  Are there locations from a lynx perspective that have unique habitat conditions relative to other areas in the lynx range that are necessary to foster future adaptive capacity of the DPS?  If yes, where?**

25

Response Type: Open discussion. No response forms were submitted, but notes were taken on the discussion that followed.

Question Clarification: The experts required some clarification of terms and the intention of this question to respond. Facilitators read the working definition of representation (above), which previously had been provided to the experts. Experts then discussed representation across the lynx DPS from an adaptive capacity perspective.

Expert Responses: The response was an open discussion captured below.

Discussion Points Following Initial Responses: Maintaining genetic variability is important for adaptive capacity. If uncertain about the capacity for lynx to adapt, then experts encouraged that all populations (and hence the genetic variation within each) be maintained. Experts indicated that it doesn't appear that any U.S. population is more or less important to maintain than the others because of relatively similar ecological settings and the generally low level of genetic differentiation across the DPS. Summary: Experts discussed that maintaining representation in the DPS could best be achieved by retaining current DPS populations, maintaining connectivity between DPS and Canadian lynx populations, conserving the genetic diversity currently represented in DPS, and avoiding impacts that could facilitate or increase the potential for or likelihood of genetic drift.

It was also noted that lynx north of the DPS in some parts of eastern Canada (in New Brunswick and Quebec south of the St. Lawrence Seaway and on Newfoundland Island) have some unique alleles, including at functional genes, and should be preserved. Lynx in these areas are relatively more isolated than lynx elsewhere in Canada. Lynx south of the St. Lawrence are separated from lynx to the north by the seaway itself, which historically froze over during winter but which is now kept open to facilitate maritime shipping, perhaps reducing the level of genetic exchange between lynx on opposite sides. Lynx on Newfoundland Island are separated from lynx in mainland Labrador and Quebec by the 15- to 60-kilometer-wide Strait of Belle Isle. Despite the relative isolation of these populations, genetic evidence indicates some interchange between lynx south and north of the St. Lawrence and between Newfoundland Island and mainland populations. Eastern Canadian populations north of the St. Lawrence may have slightly different genetic composition than lynx in the Maine geographic unit.

## Redundancy

Definition - **Redundancy** contributes to the ability of population types to withstand catastrophic events (hurricanes, wildfires, etc.). The number and distribution of populations of each representative type contribute to the retention of various representative types despite catastrophic events by ensuring that the loss of a population doesn't lead to the loss of representation.

26

Redundancy Questions

## 1. List the factors/catastrophic events that could functionally extirpate an entire geographic unit.

Response Type: Each expert supplied a written list submitted via index card of the factors/catastrophic events.

Question Clarification: Three issues required clarification prior to obtaining responses to this question. First, we initially asked about eliminating a "population" rather than a geographic unit. Because some of the geographic units may support several relatively isolated subpopulations, experts questioned whether we meant individual populations or subpopulations. We clarified that we are evaluating the likely persistence of resident lynx populations in each of the six geographic units that currently support or recently supported them; therefore, we are interested in the likelihood that a catastrophic event could result in the extirpation of resident lynx from the entirety of any of the geographic units. Second, we were asked if extirpation meant the complete loss of all lynx from a unit. We clarified that we wanted to know if lynx could be "functionally extirpated" from any geographic unit, with functional extirpation described as the loss of the unit's ability to support a resident breeding population(s) of lynx. Third, experts were not clear what an "event" entailed. After discussion, it was agreed that an event was defined as a single occurrence of some form, such as a fire, drought, hurricane, etc., that occurs over a relatively brief period of time, rather than a series of smaller cumulative events (e.g., a series of climate change-associated occurrences of fires or insect outbreaks over the course of a decade) causing a cumulative catastrophic result.

Expert Response: Six of the ten experts did not list any catastrophic events that could result in the functional extirpation of lynx from any entire geographic unit. Three of the experts listed multiple catastrophic events they felt could result in at least temporary functional extirpation of lynx in a unit. Among these, two of the experts listed fire, three listed disease, one listed insect outbreak, and one listed a failure of winter conditions due to a combination of heat or drought conditions. One expert listed geographic unit-specific events, namely fire or insect outbreak for the Washington geographic unit, insect outbreak in Maine, and either insect outbreak or fire for one of the Minnesota geographic unit's groupings of individuals, but not all.

Discussion Points Following Initial Responses: Experts were told that climate change was not considered a catastrophic event because it is both a driver of events and influences severity, rather than being an event itself as defined above. Experts discussed the possibility that the Washington geographic unit, because of its relatively smaller size and history of recent extensive fires in lynx habitat, may be at risk of functional extirpation from multiple catastrophic events; disease, fire, and beetle outbreak were all mentioned as possible events. One expert suggested that the Minnesota geographic unit could potentially be eliminated by a very large

27

Rvsd Plan - 00003743

fire, although there was a low probability of this occurring.  Experts expressed some uncertainty whether fire could occur at the severity and scale sufficient to eliminate an entire geographic unit; however, a series of fires over a short time period may have the potential to cause functional extirpation of lynx from a geographic unit or significantly reduce the number of resident lynx it could support, at least temporarily.

**2.  Could any of the catastrophic events listed in response to redundancy question 1 eliminate all 6 geographic units simultaneously?**

Response Type:  Each expert supplied a written response of "yes" or "no."

Expert Response:  All experts answered "no."

**3.  What is the probability (expressed as a percentage) that any single geographic unit could be eliminated by a single catastrophic event in the <u>next 10 years</u>?**

Response Type:  1-point elicitation.  Each expert supplied a written response of X%.

Question Clarification:  In response to the discussion around question #1, which resulted in the inclusion of question 3, this question was modified from its original script to include a 10-year time frame (underlined).

Expert Responses:  All responders gave a relatively low probability ($\leq$ 10%, median of 1%) that any single geographic unit could be eliminated (resident lynx functionally extirpated) by a single catastrophic event in the next 10 years (Figure 2).

**4. What is the percent likelihood that a series of catastrophic events within the next 10 years could cause functional extirpation of one or more lynx geographic units?**

Response Type:  1-point elicitation.  Each expert supplied a written response of X%.

Question Clarification:  This question was developed after discussion of question 3 to capture the possibility of functional extirpation of lynx from geographic units due to a series of catastrophic events over a relatively short time rather than a single event that occurs at one point in time.

Expert Responses:  The percent likelihood ranged from 0.5% to 60%, with a median response of 7.5% (Figure 2).  Expert responses indicated a higher probability <u>of a series of catastrophic events over 10 years</u> resulting in functional extirpation than a single event in the next 10 years, as in question 3.

Rvsd Plan - 00003744



Figure 2. Individual scores and summary boxplots of the percent chance that a geographic unit is eliminated by a single catastrophic event (question #3, left) or a series of catastrophic events (question #4, right) in the next 10 years. Note: This and all subsequent figures below were generated using the statistical software R (Appendix 6).

In Figure 2, individual responses to a single catastrophic event were 0.01%, 0.1%, five responses of 1%, 5%, and two responses of 10%. Individuals responses to a series of catastrophic events were 0.5%, 1.1%, three responses of 5%, 10%, 15%, 20%, 40%, and 60%). Boxplots illustrate response mean values (bold black lines), the 25% and 75% quartiles (upper and lower bounds of boxes), and the highest and lowest values within 1.5 times the quartile range ("whiskers" external to boxes). In this analysis, responses beyond the ends of the whiskers (outside 1.5 times the quartile range) are considered outliers and plotted as points beyond the ends of the whiskers (i.e., experts 3 & 4 in Q3 and experts 3 and 10 in Q4, as indicated by the points plotted between experts 5 and 6). The individual expert responses used to produce the boxplots are indicated by x-marks. Boxplots are provided as a summarizing visualization to aid comprehension of the experts' responses and their range, and the summary values are presented in this context and not intended for use outside of the context of the full set of responses.

Discussion Points Following Initial Responses: One expert noted that the probability of extirpation in any one of the 6 geographic units is greater than the probability of a single specific geographic unit being extirpated. Also, any combination of a series of events over a decade

29

increases the likelihood of extirpation in any one geographic unit relative to the probability of extirpation due to a single event.

Although median probabilities of extirpation were low, experts felt the geographically smallest unit (Washington) and those units believed currently to support the fewest resident lynx (GYA, Washington, and Minnesota) were the most vulnerable geographic units when scoring this exercise.  Fire, drought, and beetle kill were the most frequently mentioned events that were considered by the experts when answering this question.  Some experts felt that these geographic units may be susceptible to such a scenario because of small geographic and/or population sizes and distribution.  In particular, it was noted that this past year there were many fires in lynx habitat, especially in Washington, and another year with similar fire impacts, or a few such fire years in a 10 year period, could lead to extirpation of lynx in the Washington geographic unit.  An expert noted there currently may be as few as 24 remaining females in Washington and that with fewer individuals in this area it would result in a higher probability of at least temporary extirpation.  Experts noted that fire disturbance data are likely available that could be used to model the likelihood of future fire impacts to each geographic unit.

Experts with outlier responses provided their rationales.  Experts having the lowest scores believed that even the smallest geographic units would have only a low probability of extirpation in the next decade - that the time frame under consideration was very short.

### 5.  What length of time would be required for a geographic unit eliminated by a catastrophic event to reestablish naturally?

Response type:  4-point elicitation.  Each expert supplied a written response in years for the longest, shortest, and most plausible time periods for reestablishment of a resident lynx population within a geographic unit following functional extirpation.  They were also asked to indicate their confidence, as a percentage chance, that the true amount of time necessary for reestablishment would fall between the shortest and longest plausible time periods provided.

Expert Responses:  The responses to each of the points elicited are shown below in Table 1. Two experts provided additional information beyond the 4 points elicited when responding.  One presented two scenarios, one in which connectivity is intact and the habitat was damaged by the catastrophic event (e.g., insect outbreak or fire) which would require habitat regrowth first, and the second in which the habitat remained present.  In the case of habitat being present the most likely time period response was less than 10 years.  In the habitat elimination scenario the expert felt given climate changes to habitat that the geographic unit would not re-establish.  The second expert responded by geographic unit, with the exception of the Minnesota geographic unit for which there was no response.  Their responses are summarized in Table 1 using the overall longest and shortest responses as well as the average of the most plausible time (see footnote 3).

30

Table 1.  Expert responses regarding the natural reestablishment time in years for a geographic unit after extirpation by a catastrophic event.

| Expert # | Reestablishment Time in Years | | | Percent Confidence in Range[3] |
|---|---|---|---|---|
| | Shortest Plausible Time | Most Plausible Time | Longest Plausible Time | |
| 1 | 10 | 40 | 100 | 50% |
| 2 | 15 | 100 | 300 | 80% |
| 3 | 15 | 35 | 60 | 5% |
| 4[4] | 1, will not reestablish | <10, will not reestablish | will not reestablish | 100% |
| 5 | 25 | 50 | 100 | 75% |
| 6 | 20 | 30 | 50 | 90% |
| 7 | 15 | 20 | 25 | 90% |
| 8 | 15 | 50 | will not reestablish | 40% |
| 9 | 20 | 30 | 100 | 50% |
| 10[5] | 15 | 55 | 200 | 50% |

Expert responses are also visualized in Figure 3 and Figure 4 below.  The raw responses are visualized in box plot form to aid communication of the results (Figure 3).  Confidence ranges provided in a four point elicitations enable expert responses to be rescaled to produce a common confidence bound across experts using linear extrapolation (e.g., McBride *et al*. 2012). We calculated the 95% confidence interval for the shortest and longest plausible time periods for each expert (Figure 4).  In cases where the linear extrapolation resulted in negative years for the shortest time periods, we adjusted to zero.  This may indicate underconfidence in the responses provided by the experts, or that the use of linear extrapolation for these 4-point elicitation responses fails to distribute expert uncertainty in a manner consistent with the actual uncertainty present in expert responses (i.e., the experts could have been more confident in their shortest plausible time response than their longest plausible time responses, which the linear extrapolation doesn't account for).

---

[3] Expert confidence that the true recovery time would fall between the shortest and longest time periods of their response.
[4] This expert provided a response for two scenarios, first that the catastrophic event does not result in habitat loss, and second that habitat is lost and therefore connectivity to extant populations is lost.
[5] This expert provided separate responses for each geographic unit.  The values in this table are the overall shortest, longest, and average most plausible number of years indicated in the responses across geographic units.

Rvsd Plan - 00003747



Figure 3.  Years for a geographic unit to become reestablished following extirpation due to catastrophic events.

The raw responses for each of the three time periods (longest plausible time to reestablishment, most plausible time, and shortest plausible time period) are displayed in the box plots in Figure 3 above.  Boxplots illustrate response mean values (bold black lines), the 25% and 75% quartiles (upper and lower bounds of boxes), and the highest and lowest values within 1.5 times the quartile range ("whiskers" external to boxes).  In this analysis, responses beyond the ends of the whiskers are considered outliers and plotted as points.  The individual expert responses used to produce the boxplots are indicated by x-marks.  Boxplots are provided as a summarizing visualization to aid comprehension of the experts' responses and their range, and the summary values are presented in this context and not intended for use outside of the context of the full set of responses.

32

Rvsd Plan - 00003748



Figure 4. Years for a geographic unit to become reestablished following extirpation due to catastrophic events, adjusted to provide 95% confidence bounds.

In Figure 4, 95% confidence bounds were produced from the 4-point responses using linear extrapolation. Shortest plausible time period is in blue, most plausible is green, and longest plausible is red. For plotting purposes negative shortest time period values were adjusted to zero, and all zeroes in the plot indicate 95% confidence bounds that extended below zero. Longest time periods beyond 350 years were plotted at 350, with the actual time period noted in text left and below those points. Also note that expert 10 responded by geographic unit, so the figure displays the 95% confidence bound adjusted overall longest, overall shortest, and average most plausible time periods across the six units for expert 10.

Discussion Points Following Initial Responses: Experts discussed the amount of time it takes for habitat to recover after catastrophic events (e.g., fire, insects) when considering timeframes for repopulation. Some experts could picture some geographic units never being recolonized again, and that some could be recolonized immediately, depending on which geographic unit is being evaluated and the level of connectivity to other geographic units and to lynx populations in Canada. Washington is more connected to Canada than the Colorado geographic unit for example. The rate of recolonization was variable for each geographic unit because of the size of each geographic unit, status of adjacent source geographic units, and the level of connectivity. Experts found it hard to generalize across the range of the species for this

33

question. The variances in the geographic units across the range need to be considered. Experts believed GYA and CO would have a long period for recolonization, if ever recolonized, after a potential extirpation event because of the lack of connectivity with Canadian populations. It is likely that those geographic units with connectivity to Canada would recover much sooner than geographic units not connected to Canada.

## Resiliency

Definition - ***Resiliency*** speaks to an individual population's ability to tolerate environmental and demographic stochasticity, such as fluctuations in temperature or genetic drift. It is often measured in terms of population size and growth rate, but in fact is dependent on a number of traits, both demographic and environmental. These include, among others: age or stage class distribution, genetic heterogeneity, birth rates, annual survivorship, sex ratios, etc., and the quality and extent of habitat, the degree of disease, competition, etc. Metapopulation dynamics and distribution can also contribute to population resiliency in some species.

### Resiliency Questions: Probability of Persistence Exercise

**Exercise Summary**

The first two resiliency questions were asked concurrently as part of a probability-of-persistence exercise conducted for each geographic unit. Experts were asked to graphically provide the probability of persistence of resident lynx through time for each geographic unit, as well as the major factors influencing persistence in those geographic units, one geographic unit at a time. Experts were asked to provide persistence probabilities and influencing factors for the near-term (2025), mid-term (2050) and longer-term (2100). Experts were also asked to indicate on each of their graph sheets the emissions scenario (low, moderate, or high/status quo) they were considering in graphing persistence probabilities and listing influencing factors.

We began this exercise with the Northern Maine geographic unit, and the discussion and questions among experts that followed the initial persistence-graphing and factor-listing efforts indicated that a review of the status and major issues confronting lynx in each unit (a quick reminder and summary of the earlier status update presentations) would be helpful. Therefore, prior to expert responses for the remaining units, the expert(s) most familiar with the geographic unit in question gave a 5-10 minute summary of what they viewed as the most relevant information about the current and likely future status of lynx populations and habitats in that unit. They also presented any other conditions or issues they thought could affect the probability of persistence of resident lynx in that unit. All experts then completed their graphs and lists of the factors that influenced the probabilities of persistence they selected for each time frame for the geographic unit in question. For the Maine unit, the discussion following initial responses served the same purpose, and after that discussion, experts were given the opportunity to revise their responses if they felt it necessary.

34

Rvsd Plan - 00003750

After all experts completed their responses, the graphs and influence lists from each expert were posted on the wall, and workshop participants were invited to gather around to view and discuss the range of responses.  Facilitators and SSA Team members then polled the experts about what drove their responses.  These questions were a mix of directed questions about unique responses, the role of particular factors noted in the responses, and open-ended questions to allow experts to describe their thinking.  Experts and team members were also encouraged to ask clarifying questions about the responses.  Experts were encouraged to modify their responses by posting a revised sheet above their first response if they wished to adjust their responses based on the discussions.

**1.  What is the probability of persistence over time (particularly at present, 2025, 2050, and 2100) for each of the 6 major geographic units?**

Response Type:  Graphical 3-point elicitation.  Each expert was provided a blank sheet of graphing paper with a y axis of probability of persistence, and an x axis of time, with 4 time periods bolded (2015, 2025, 2050, and 2100).  For each of those years, experts were asked to add a point to the graph representing the lowest, highest, and most likely probabilities of persistence at that time period.  Experts were also asked to connect the points through time.

Question Clarification:  It was explained that the most likely point should represent the probability of persistence that the expert anticipates to be most likely to occur for that geographic unit at each time period, and that  the points for lowest and highest probability of persistence were intended to capture the expert's uncertainty in the future probability of persistence.  Experts preferred to indicate a most likely probability and to provide a full confidence interval (i.e., upper and lower bounds within which they felt 100% certain the future probability of persistence would fall) rather than indicate a confidence level associated with the lowest and highest probability responses.

Expert Responses:  Responses are by geographic unit and are presented below in conjunction with the responses to question #2 below.

**2.  What are the major drivers/factors (up to 3) reducing probability of persistence for each of the major geographic units?**

Response Type:  Ranked list of top three factors, for each point in time (present, 2025, 2050, and 2100), with % contribution of each factor.

Question Clarification:  Resiliency questions 1 and 2 were asked concurrently.  Experts were provided a sheet of paper for each geographic unit and the area at the bottom of the sheet below the graphing area was used to list the three major factors they expected would most significantly influence the probability of persistence at each time period.  Influencing factors were described as those anthropogenic or naturally-occurring activities, events or factors that

Rvsd Plan - 00003751

could influence the probability that resident lynx populations will persist in a given geographic unit.

Expert Responses: For each geographic unit, an overview of the unit from the area expert are provided, as well a summary of the hand drawn graphs via a figure (Figures 5 - 10), the responses and major factors are summarized via text, and the discussion that the responses generated are presented.

Results by Geographic Unit

Northern Maine

Pre-graphing Overview from Unit Experts: This step was not added to the process until after the probability of persistence exercise for this unit. Because this unit was the first for which experts attempted to graph persistence over time, there were many questions and much discussion about process and intent. It was the discussion following this initial graphing exercise that led the SSA Team to request unit summaries prior to subsequent graphing exercises. The Team felt that overview information similar to that provided prior to graphing persistence for subsequent units (below) came out during the discussion. Further, because experts were encouraged to update their Northern Maine geographic unit responses as necessary following that discussion, the Team felt that the results of the graphing exercise for the Northern Maine geographic unit were valid and comparable to the results generated for the other units.

Expert Responses: All experts indicated an initially high and subsequently declining probability of persistence of resident lynx in Maine through the end of the century, with uncertainty (range between lowest and highest probabilities) also increasing over time. Nearly all experts predicted near-term (year 2025) persistence probability >= 90% and mid-century persistence >= 70%. All experts predicted end-of-century persistence probability >= 50% for this unit, with most predicting a 40% to 60% probability of persistence by 2100 (Figure 5). Near-term drivers that influenced experts' probabilities of persistence for this geographic unit were changes in private forest land ownership, changes in forestry management (timber harvest methods, volumes, and spatial distributions), habitat decline (succession of previous clear-cuts from young, dense regenerating stands to mature stands less conducive to high hare densities), spruce budworm outbreak, climate change-induced loss of spruce-fir habitats, and competition with bobcats due to climate change-induced loss of snow conditions that favor lynx. Longer-term (2050, 2100) drivers similarly included changes in forestry practices, but also climate-driven loss of snow conditions favorable to lynx/competition with bobcats, and loss of spruce-fir forest. As with responses for other geographic units, not all experts provided the factors that influenced their persistence probabilities for each time period, and not all provided the percent contribution of each factor.

36



Figure 5. Expected probability of persistence for the Northern Maine geographic unit at present, 2015, and in 2025, 2050 and 2100.

Note: In Figure 5, above, and figures 6 through 10, below, points for each of the 10 expert responses, for each of the three probability of persistence levels, i.e., highest, most likely, and lowest probabilities of persistence, are represented by the hollow red, filled green, and hollow blue points respectively. The black x mark is the median of the most likely responses across the experts in each response year. The red, green, and blue dashed lines connect the median of the highest, most likely, and lowest probability of persistence responses across the experts in each response year. The edges of the grey area were defined by the extreme responses, i.e., the range from the largest of the highest probability of persistence responses to the smallest of the lowest probability of persistence responses. The median lines and grey area are provided as a summarizing visualization to aid comprehension of the experts' responses and their range, and should not be viewed as a substitute for individual responses or presented outside the context of the accompanying discussion.

Discussion Points Following Initial Responses: One expert expressed confidence that the lynx population in Maine will be stable in the near term; that climate change out to 2050 will primarily affect coastal areas, which support few lynx; and that there will likely still be favorable conditions for lynx in northern Maine where most lynx currently occur. A second expert disagreed, and indicated that a combination of aging of the last of the budworm-era (1970s-80s) clear-cuts, the

37

cumulative effects of the last 25-years of partial harvesting (in accordance with the Maine Forest Practices Act), and the coming spruce budworm outbreak will all substantially reduce the amount of high quality lynx/hare habitat in this unit.  Projecting past 2050, experts generally agreed that climate change will likely create unfavorable conditions (e.g., insufficient snow, loss [northward migration] of spruce-fir forests) in northern Maine's core area for lynx, and the probability of persistence will decline over the longer term.  Although uncertainty increases with time from the present, climate-related loss of favorable snow conditions (amount, consistency, and duration), loss of spruce-fir, and bobcat competition will likely reduce the probability of persistence in this unit beyond 2050.

There was some concern that timber companies would not respond to the pending spruce budworm outbreak like they did in the 1970s (extensive clear-cuts).  Some experts also expressed concerns about the effects of the current clear-cuts aging past conditions that support hares and lynx.  Out to year 2050, changes in snow conditions and loss of spruce-fir associated with climate change will contribute to habitat loss.  Past 2050, diminished snow, successional loss of high-quality habitats, increased competition from bobcats, and spruce-fir decline will make conditions unfavorable for lynx.  Some experts assumed a high-emissions climate change scenario, but others said their predictions would not change under moderate emissions scenarios.  The second expert (above) indicated that current data show spruce-fir habitat is being replaced with a hardwood forest (red maple) system, and that this will continue throughout the century.  This expert indicated hardwood forest invasion isn't being controlled by herbicides as it was in the last budworm outbreak.  The first expert (above) disagreed and said that lynx are resilient and forestry practices will likely sustain spruce-fir habitats in Maine, providing an example of one timber company that has already invested in spruce plantations. The second expert indicated that most of the land base is owned now by Timber Investment Management Organizations and Real Estate Investment Trusts who will not employ intensive or expensive (plantation, herbicide) forms of forestry.  In summary, experts expressed a variety of opinions about how forest management may change in the future in Maine and, in particular, how forest landowners and managers may respond to the pending spruce budworm outbreak, and how these responses may impact resident lynx.

Other factors considered by the experts included budworm outbreaks, the potential for disease in a lynx population (not currently a recognized or documented threat and typically unexpected, but always a possibility), ecosystem change induced by climate change, forest tree species composition changes, competition with other temperate forest animals.  There are many interrelated factors and different stresses and factors that may occur in the future.  It is difficult to anticipate the factors that will affect lynx in the future.

Experts discussed the role of competition between lynx and other carnivores, especially bobcats, throughout the DPS.  One expert remarked that in some parts of Montana there is complete overlap of lynx and bobcat home ranges and little or no evidence of competition effects.  Others indicated relatively narrow regions of overlap and sharp demarcation between areas that support home ranges of the two species that correspond with annual snowfall amounts in Maine and Minnesota.  Experts were unsure whether bobcat-lynx overlap is more a

38

function of snow conditions in these areas or competition between the species (i.e., competition for food or behavioral competition). Although separation of the species has been documented, the nature and causes of the separation are not certain. Bobcats are a more generalist predator than lynx and less reliant upon hares than lynx. Experts expressed varying opinions regarding seasonal differences in overlap among lynx and bobcat diets, the effect and importance of competition between the two species, and whether it is behavioral or resource competition.

Lynx in Maine have not responded to changes in hare abundance exactly as lynx in Canada and Alaska have to hare population cycles. In Maine, the proportion of females that reproduced and average litter size declined during low hare years, as in the north, but home range sizes in Maine did not increase as they did in the north when hare abundance was low. Hare densities do not appear to have dropped below a critical threshold to alter lynx home range size in Maine as in the North.

An SSA Team member asked how hare cycles or fluctuations may affect predictions of persistence in Maine. The first expert (above) said that hare declines documented by University of Maine monitoring is likely due to the aging forest, and that lynx in Maine haven't yet responded biologically to the range of hare densities observed in Maine, as suggested by the lack of change in home range sizes and survival. The second expert (above) disagreed, and cited University of Maine research that showed hare populations declined by ~50% in all stand types sampled starting in 2006, that forests where hares were monitored have not yet progressed to the self-thinning stage, and that the hare decline in Maine is mirrored by hare data from southern Quebec.

### Northeastern Minnesota

Pre-graphing Overview from Unit Experts: There are probably 50-200 resident lynx in Minnesota but there is much uncertainty and survey protocols do not support generation of precise abundance estimates. Lynx occupancy and reproduction both have been consistently documented in the state since it was listed in 2000. Lynx in this geographic unit are interacting with, and possibly depending on, southern Ontario populations. Although females exhibit high reproductive rates, radio-telemetry data suggest low recruitment of Minnesota-born kittens into the breeding population of this geographic unit. Bobcats are a potential future stressor as they are encroaching into lynx areas; fire is a threat in dry years (e.g., there have been 3 fires in last 15 years that have burned approximately 20% of lynx habitat). The forest management industry is tied to softwoods and continued management of softwood tree species is expected in the future.

Expert Responses: As with the previous unit, all expert graphs showed initially high and subsequently declining probability of lynx persistence in Minnesota over time, along with increasing uncertainty through the end of the century. Nearly all experts predicted near-term (year 2025) persistence probability >= 90%, and all experts predicted mid-century persistence at 60% to 90% (median = 80%). Experts predicted end-of-century persistence probabilities of 10% to 60%, with a median of 35%, by 2100 (Figure 6). Near term drivers were reduced snow,

39

Rvsd Plan - 00003755

bobcat competition, disease in lynx (e.g., lungworm, liver fluke, feline leukemia), and forest insects. Long term drivers were reduced snow, competition with bobcat, loss of spruce-fir forests, fires, and climate change.



Figure 6.  Expected probability of persistence for the Minnesota geographic unit at present (2015), and in 2025, 2050 and 2100.

Discussion Points Following Initial Responses:  Some experts expressed uncertainty whether potential climate change impacts will be realized in the short term, but that the cumulative effects of climate-induced changes seem more likely in the longer term.  This uncertainty may be a source of variability in predicted persistence probabilities.   Some experts expressed uncertainty about the accuracy of the rough estimate of the size of the lynx population in this unit because surveys were not designed to provide population estimates.  Some experts wanted clarification on the distribution of lynx in the state, and which areas of the state have the highest use.  The core-use spatial extent was described as a 20-mile-wide strip inland from the north shore of Lake Superior and extending about 60 miles from the northeast tip of the "arrowhead" southwest into the Superior National Forest (SNF).  Lynx occasionally occur further west in the SNF and in other areas such as Voyageurs National Park.  Recent snow-track surveys suggest lynx may be using a larger portion of the arrowhead region, and radio-telemetry data have documented travel to and from southern Ontario.  Lynx also have been documented to use the

40

1-million-acre Boundary Waters Canoe Area Wilderness (BWCAW) that borders Canada for dispersal in both directions across the border. However, because the BWCAW has not been surveyed for lynx, the number of lynx that may use this area is unknown. The SNF does not actively manage the BWCAW. The current connectivity between lynx in this unit and the larger population in Ontario reduces the likelihood of local extirpation in this geographic unit, but the likelihood would increase if connectivity was compromised and cross-border interactions reduced.

Factors considered included potential disease, fire, loss of boreal forest, competition with bobcats and possibly other hare predators. Some experts questioned the validity of disease as an influence in this and other geographic units because although disease has been documented in some felines, it has not been documented as a threat to lynx in any of the DPS populations to date. Some experts speculated that because there is a link between disease and temperature increases in other animals, projected climate warming could contribute to disease in lynx. Therefore, although not a factor for lynx currently, it is not unreasonable that disease could impact lynx populations in the DPS in the future, so we may want to consider disease in future conservation planning. Experts also discussed the possibility that climate warming may facilitate the westward expansion of the spruce budworm outbreak that is projected for Maine and eastern Canada into southern Ontario and the Minnesota geographic unit.

### Northwestern Montana/ Northeastern Idaho

Pre-graphing Overview from Unit Experts: There are likely 200-300 lynx in this unit in several subpopulations (expert stressed that this is a guess and not a true population estimate), and there is currently a connection with lynx in Canada. Climate models project that some boreal forest will persist in this unit and that it will maintain snow into the future. In this unit, lynx primarily occupy public lands, which are actively managed for lynx into the future. In recent decades, fires have occurred on a large scale, with high intensity and increasing frequency. There have been no documented cases of beetle infestations in lynx habitats in this unit.

Expert Responses: As for previous units, all expert graphs showed an initially high and subsequently decreasing probability of persistence for this unit, with increasing uncertainty over time, but a higher probability of persistence at all time frames than other units. All experts predicted near-term (year 2025) persistence probability >= 95%, and all predicted mid-century persistence at 70% to 100% (median = 90%). All experts predicted end-of-century persistence probabilities >= 50%, with a median of 78%, by 2100 (Figure 7).



Figure 7. Expected probability of persistence for the Northwestern Montana/Northeastern Idaho geographic unit at present, 2015, and in 2025, 2050 and 2100.

Discussion Points Following Initial Responses:  Overall, experts assigned a higher probability of persistence in this unit compared to the other two units discussed thus far.  Most lynx habitats in this unit occur on Federal lands that are managed for lynx conservation, but one expert noted that little has been done to document whether lynx are responding to this management.  The recent sale of large tracts of private commercial timberlands in the central part of this unit to The Nature Conservancy has increased protection for lynx via conservation easements managed for lynx.  Habitats in some areas should improve in the near future as previously cut or burned areas mature into dense stands.  Unlike the Maine and Minnesota geographic units (but similar to most other western units), high elevations in this unit could buffer the effects of climate change by providing for the upslope migration of lynx habitats and snow conditions that climate models predict.  However, this would result in even patchier and more isolated islands of habitat in high elevation areas that would be more prone to extirpation due to catastrophic or stochastic events.  Competition from coyotes and bobcats seem to be less of a concern for this unit.

This unit has unimpeded connectivity with Canada, but some experts questioned whether this geographic unit depends on intermittent immigration of lynx from Canada, and whether the historic lynx population cycles in Canada believed to have fueled such immigration are still

42

occurring or will into the future. There doesn't appear to be much demographic input from recent cycles. There is evidence of lynx from this unit moving north into Canada, but little evidence of demographic interactions among the three subpopulations (Purcell Mountains, Seeley Lake, and Garnet Mountains) in this unit. Experts noted that the Garnets Mountains subpopulation at the southern end of this unit may have recently become extirpated.

Discussion among experts indicated that fire was more of a concern for this area. Increased fire extent and severity or other catastrophic events and small subpopulation effects in separated mountain ranges could affect lynx persistence in the future in some parts of this unit. Fire exclusion in this area for the last 100 years likely resulted in the accumulation of fuels; however, this unit may have a reduced probability of a catastrophic fire over time because of recent changes in management and recent fires that may have reduced fuels. Out to 2050 and beyond, some experts felt there may be more pressure on lynx populations in this unit from continued increases in fire extent and severity. Other experts expressed a different opinion of the overall effect of fire in this unit, indicating that it may actually improve habitat over time, and that whether fires improve or degrade habitat depends on the frequency, intensity, size and spatial extent of future fires.

Experts discussed the possibility for increased precipitation and warmer temperatures in this unit because of climate change, and how this might affect lynx habitats. Boreal/subalpine forest may move up in elevation as described above; however, experts expected a shift in forest composition and diminished lynx habitat quality in future with climate change. It is unknown how much the distribution of dry ponderosa pine (non-habitat for lynx) will increase with climate change, but it is likely to happen at some level. One expert reminded that some climate modelers estimated that vegetation will lag about 50 years behind the projected changes in temperature and precipitation. Snow levels in lower elevation areas are already decreasing in some areas, which could lead to smaller areas for lynx to use in winter in future.

### North-central Washington

Pre-graphing Overview from Unit Expert: This geographic unit is thought to currently support roughly 50 resident lynx. There may have been more lynx prior to recent major fires. This unit is currently connected to Canada, and there is no indication that this connection will be disrupted. Some of the best lynx habitat in this unit occurs on plateaus that may be more vulnerable to impacts of climate change because of the absence of higher-elevation areas to which habitats, lynx and hares could migrate in response to warming. In areas that receive maritime climate influences, projected climate-induced changes to snow conditions could be detrimental for lynx. Studies have shown good lynx survival rates in this unit.

Expert Responses: Compared to the previous units, most expert graphs showed a lower probability of persistence for this unit over the short term, and then lower probability of persistence along with increasing uncertainty by 2100, reflecting a more pessimistic outcome for this unit compared to previous units (Figure 8). Experts predicted near-term (year 2025) persistence probabilities of 60% to 90% (median = 80%), and mid-century persistence at 30% to

43

Rvsd Plan - 00003759

80% (median = 70%).  All experts predicted end-of-century persistence probabilities less than
50%, with a median of 38%, by 2100 (Figure 8).  However, one expert predicted an increase in
persistence probability by mid-century as habitats impacted by recent large-scale fires
regenerate into optimal hare-lynx habitat.



Figure 8.  Expected probability of persistence for the North-central Washington geographic unit
at present, 2015, and in 2025, 2050 and 2100.

Discussion Points Following Initial Responses:  The probability of lynx persistence in this unit
could decrease sharply over the next 10-20 years because of extensive recent fires in lynx
habitats and the time needed for these areas to regenerate back to good hare/lynx habitat.
After that, the probability could rebound (or decline more slowly) over the longer term as these
large areas return to prime habitat providing high hare densities.  The current small population is
likely at greater risk of extirpation because of stochastic events, particularly if large fires in lynx
habitat continue to occur in the near future as they have in the recent past.  A small population
also could be more susceptible to disease, though none has been documented among lynx in
this unit.  Experts discussed the extent to which small lynx populations could be reduced before
they would become highly susceptible to stochastic demographic effects.  It was suggested that
15-20 breeding individuals might be the minimum needed to avoid such susceptibility.
Unimpeded connectivity between Canada and the Okanogan area of this unit could allow lynx to

44

repopulate currently-unsuitable areas after the habitat recovers. Lynx in this unit are likely the southern portion of a larger population in Canada, not really a separate, isolated small population. Factors that influenced expert persistence probabilities for this unit included fire, habitat loss, and the future loss of favorable snow conditions predicted by climate change models.

### Greater Yellowstone Area (GYA)

Pre-graphing Overview from Unit Experts: This unit has a long history of lynx presence, but the consistency of occupancy over time is uncertain. Research and surveys since 1997 have detected few lynx in this unit. Lynx are likely spatially limited within the unit because of the patchy distribution of high-quality habitat and the generally low or marginal hare densities in much of the unit. Lynx have large home ranges in this area, an indicator of lower habitat quality. Nevertheless, until recently, this unit appears to have supported a small resident lynx population. The current lynx population in this unit is very small - likely fewer than 10 lynx, and possibly zero. This population may have been somewhat larger in the past; however, there is some uncertainty about this. Recent surveys and trapping efforts have not detected resident lynx, only several that were previously released in Colorado. Several Colorado-released lynx have established home ranges in the GYA unit, and there is evidence of overlapping male and female home ranges. In the late 1800s and early 1900s, there was notable predator control in some parts of this unit. There currently is oil and gas exploration and development activity in parts of this unit, but potential impacts to lynx are uncertain, and projects are attempting to minimize impacts to lynx habitat.

Expert Responses: The expert graphs for this unit were widely variable and had different outcomes and high uncertainty at all time frames. Experts predicted near-term (year 2025) persistence probabilities of 10% to 70% (median = 52%), and mid-century persistence at 15% to 60% (median = 35%). All experts predicted end-of-century persistence probabilities less than 50% for this unit, with a median of 15%, by 2100 (Figure 9). This was the only unit for which most experts believed the present probability of persistence is low (i.e., that it is uncertain whether this area currently supports a resident lynx population). Some experts increased probability of persistence into mid-century as the 1980s-era fires regenerate into hare/lynx habitat, and with the possibility of continued immigration of lynx from Colorado. Other experts project a 10% to 20% probability of persistence by 2100. One reason given for wide variability in responses is because of the uncertainty whether a population currently exists. There were wide confidence intervals around the probabilities for all time periods for this area.

45



Figure 9. Expected probability of persistence for the GYA geographic unit at present, 2015, and in 2025, 2050 and 2100.

Discussion Points Following Initial Responses: Current and future factors expressed by experts as influencing probability of persistence for this unit included small population size, forest disease and insect pests, and fire. Some experts doubt that the GYA unit currently supports a resident breeding population of lynx. Experts indicated that climate models predict that some parts of the GYA unit could provide refuge from climate change impacts because of their high elevations and potential to maintain winter snow levels into the future. Summer conditions in this unit, however, could be drier in the future, resulting in increased fire frequency, extent and intensity, and additional temporary habitat loss. However, regeneration of these areas and the extensive areas that have burned in the recent past may provide good habitat over the next several decades. Lynx immigrating to this unit from Colorado could occupy such improved habitats in the near future. Colorado lynx have made exploratory movements into the GYA in summer months, and analysis of available data could improve our understanding of Colorado lynx movement into and use of the GYA. It is possible that lynx from Colorado are maintaining or could maintain lynx in GYA.

46

Western Colorado

Pre-graphing Overview from Area Expert:  From 1999 to 2006, Colorado Division of Wildlife (CDOW; now Colorado Parks and Wildlife [CPW]) released 218 Canadian and Alaskan lynx into western Colorado.  Survival and litter sizes have been similar to rates observed in other DPS populations.  There are probably 100-250 lynx in Colorado today.  There are currently 5-6 million acres of habitat in this unit thought capable of supporting lynx and where hares are present in sufficient numbers to support persistent reproduction.  Extensive bark beetle infestations have impacted large areas of lynx habitat, but snowshoe hare are still occupying areas with beetle damage.  Three large fires have occurred in recent years, resulting in some lynx habitat burned.  Salvage operations in burned areas could diminish future habitat quality.  This unit is more isolated from Canadian and other DPS lynx populations; separated by a large swath of inhospitable habitat.  Road mortality of released lynx was initially high but it doesn't seem to be a problem now (about 1 per year killed on roads on average since the first year of the reintroduction).  There is no incidental take from trapping because foothold traps are banned in Colorado.  Climate models show CO will maintain habitat over time with anticipated climate changes.  Like other western units, habitat is patchily-distributed across this unit.

Expert Responses:  Similar to most of the other units, most expert graphs indicate an initially high probability of persistence in this unit that will decline gradually with increasing uncertainty through the end of the century.  Experts predicted near-term (year 2025) persistence probabilities of 60% to 100% (median = 90%), and mid-century persistence at 50% to 85% (median = 80%).  Experts predicted end-of-century persistence probabilities of 20% to 70% for this unit, with a median of 50%, by 2100 (Figure 10).

Rvsd Plan - 00003763



Figure 10. Expected probability of persistence for the Western Colorado geographic unit at present, 2015, and in 2025, 2050 and 2100.

Discussion Points Following Initial Responses:  Some experts indicated that beetle kill and fire could potentially create poor habitat conditions in large areas of this unit by mid-century, but that regeneration after these impacts could result in good lynx/hare habitats.  Others expressed uncertainty about whether fire and insect impacts would be temporary or permanent, especially considering climate change and the potential for conversion from boreal/subalpine forests to other forest types.  Although 8 of 10 experts graphed 50% to 70% probability of persistence at 2100, during subsequent discussions, several expressed greater uncertainty about whether resident lynx will persist in the unit at the end of the century.  Higher-quality lynx habitat occurs primarily in two areas and is patchily-distributed.  Lynx in this unit may occur as several smaller, relatively isolated subpopulations, which are likely more vulnerable to stochastic events (similar to MT).  This unit's relative isolation may limit exchange with other lynx populations, increasing the likelihood of genetic drift and reducing the chance of demographic rescue or recolonization if extirpated.  There was discussion about whether ski areas may affect daily movements of lynx, and hares may be declining in ski areas.  Ski areas tend to expand and may, therefore, have larger impacts on lynx in future.  There is some evidence of lynx using ski areas in summer months but avoiding them during the ski season.  It is uncertain whether ski areas may affect genetic connectivity within the Western Colorado geographic unit.  Two-thirds to three-quarters of the lynx in this unit are in the southern portion of the range in the San Juan Mountains.  There

48

is a large area (Weminuche Wilderness) in Colorado that has not been well surveyed for lynx, so it is possible that lynx also could be using that area.

## Summary across Geographic Units

This section extrapolates from the probability of persistence responses for each geographic unit in the section above. In this section we show the combined probabilities of persistence for those geographic units to provide a sense of what the DPS-wide results could be when the results for the individual geographic units are combined. This is shown as a summary of the probability that a given number of geographic units persist into the future (See Figure 11) using the probabilities provided for each individual unit. Note that no additional information was elicited to produce this summary; rather, the probabilities for each geographic unit were treated as independent probabilities of persistence and used to determine the joint probability of persistence for a given number of geographic units in total. Computationally these joint probabilities were computed using a convolution of the Bernoulli probability distribution of persistence for each geographic unit via a custom convolve function executed in the statistical software R (see Appendix 6 for the R code used to produce these and the other summaries and figures presented in the report). The results of this convolution are shown in two forms, first is the probability that a particular number of geographic units persists (Figure 11) and the second is the cumulative probability that at least a given number of geographic units persist (Figure 12).

49



Figure 11. Summarized probability of persistence of a given number of geographic units given the probability of persistence for each individual geographic unit.

The y axis of each grid in Figure 11 is the probability that the specific number of geographic units indicated by the x axis of the grid persist. The probability sums to one in each grid. Moving from top to bottom the grids show the probabilities of a specific number of geographic units persisting by time period (2015, 2025, 2050, and 2100). Moving from left to right the grids show the range of expert responses by selection type and probability response.[6] Therefore looking down a column of grids provides a view of the trend in persistence through time and looking across a row of grids provides a view of the range of uncertainty in persistence experts had for a given time period. The summarized probabilities presented here are provided to aid understanding of the implications of the individual persistence probabilities provided above, and

---

[6] "Median_High" is the probability of persistence generated by selecting the *median* probability of persistence across experts from the *highest* probability response in each geographic unit. "Median_Likely" is the probability of persistence generated by selecting the *median* probability of persistence across experts from the *most likely* probability response in each geographic unit. "Median_Low" is the probability of persistence generated by selecting the *median* probability of persistence across experts from the *lowest* probability response in each geographic unit.

50

are derived directly from those responses and therefore should be presented and considered in conjunction with those figures.



Figure 12. Summarized probability of persistence of at least a given number of geographic units given the probability of persistence for each individual geographic unit.

The y axis of each grid in Figure 12 is the probability that at least the number of geographic units indicated by the x axis of the grid persist. The probability in a bar reaches 1 when there is no probability of fewer geographic units persisting. Moving from top to bottom the grids show the probabilities by time period (2015, 2025, 2050, and 2100). Moving from left to right the grids show the range of expert responses by summary selection type and probability response as in Figure 11. Therefore looking down a column of grids provides a view of the trend in persistence through time and looking across a row of grids provides a view of the range of uncertainty in persistence for a given time period. The summarized probabilities presented here are provided to aid understanding of the implications of the individual persistence probabilities provided above, and are derived directly from those responses and therefore should be presented and considered in conjunction with those figures.

## Expert Assumptions during Persistence Graphing Exercises

Experts were asked to summarize the assumptions that informed their responses to resiliency questions 1 and 2. This was done via open discussion, with facilitators asking both direct questions about particular issues that could impact responses (e.g., climate change conditions), and open ended questions (e.g., what other assumptions were considered?).

51

Rvsd Plan - 00003767

Notes: Climate-change emissions scenarios considered during this exercise differed among experts (and some responses did not indicate an emissions scenario). However, in discussions following the graphing exercise, experts indicated that the confidence intervals around their persistence probabilities were likely to capture the variance associated with different emission scenarios and other climate change uncertainties.

Experts were asked whether regulatory protections influenced their predictions. Some experts assumed the status quo (i.e., continued protections under the ESA and current Federal and State land management policies). Others indicated their persistence probabilities were not influenced by regulatory considerations but that doing so would not have altered their projections. Their focus was on the biology and ecology of the species, not listing status-related impacts or regulatory scenarios in the future, and they felt that factors influencing lynx persistence on the landscape are independent of ESA listing status.

Experts were asked what they meant by "small population size effects." They explained that because small populations are more vulnerable to both demographic and genetic impacts and at increased risk from catastrophic and other stochastic events than are larger populations, they also have a lower likelihood of persistence. Experts indicated that connectivity with other populations reduces the vulnerability of small populations as it does for larger populations.

Experts were asked if their projections were influenced by considerations of whether historical patterns of cyclic irruptions of lynx into the DPS from Canada will continue in the future. Most agreed that the magnitude of irruptions has declined from the historical highs of the 1960s and 1970s, and that irruptions may have ceased in recent decades in some parts of the range, particularly in the West. However, most experts felt that connectivity remains good between Canada and those DPS geographic units that abut the international border, and most assumed some level of regular or intermittent interaction between lynx in those units and Canada, even if full-blown irruptions have not been documented recently. Some experts said that the likelihood of future irruptions had little influence on their persistence graphs, especially for the more isolated units (GYA and Western Colorado), where an influx of lynx from Canada may be less likely.

Conservation Actions to Address Influencing Factors and Increase Probability of Persistence

**3. What conservation actions could be taken that would address the factors impacting the probability of persistence, or would otherwise increase the probability of persistence?**

Response Type: Individual list with rounds responses. Experts were given 5 minutes to write a list of three potential conservation actions that could be taken. Facilitators then asked one expert at a time to provide one item from their list, cycling through the set of experts until all experts had exhausted their lists. Experts were given the opportunity to add items when it was their turn that had not been on their written lists. Experts were not asked if they agreed with

52

conservation actions presented by other experts, thus the following list should not be viewed as consensus among lynx experts.

Expert Responses:  List of potential conservation actions in the order provided.

- Reduce $CO_2$ emissions
- Continue protections associated with Federal and/or State listing
- Adjust forest management to retain spruce and fir, and reduce fire burn rates
- Promote/maintain habitat connectivity with Canadian populations through coordinated cross-border land use planning
- Manage salvage logging associated with fire and insect damage to minimize impacts to and/or facilitate restoration of lynx/hare habitats
- Configure and design lynx-friendly landscapes at appropriate scales; design and maintain a mosaic of lynx/hare habitats
- Manage fuels reduction (fire management) projects while maintaining or enhancing hare/lynx habitat features.
- Augment small populations and reintroduce lynx to former, historic range with suitable habitat  (GYA, Kettle Range in Washington, perhaps other areas); bolster populations before future climate change impacts
- Support additional research to fill knowledge gaps, particularly related to effectiveness of conservation efforts – it remains unclear exactly what is needed for lynx across the range to achieve/maintain viability (e.g., habitat quality/amount/distribution, landscape-level hare densities, forest conditions that support hares, etc.)
- Enhance cross-border cooperation with Canada to increase near-border lynx populations and maintain connectivity
- Consider cumulative impacts of mining, ski areas, oil and gas, etc., in management
- Promote reforestation of heavily fragmented areas (e.g., some parts of the GYA and Minnesota units); reduce fragmentation
- Apply strategic habitat conservation concepts; model and identify key areas and focus on those areas still in need of protection and management (e.g., private forest lands)
- Maximize redundancy of lynx populations throughout the DPS
- Implement fire management Best Management Practices (BMPs)( e.g., allow/encourage burns to occur in a way that creates high- and low-intensity mosaic fire patterns)
- Evaluate whether there is a need for monitoring lynx (and hares) using consistent methods throughout the DPS, perhaps coupled with monitoring of other carnivores; structured occupancy modeling with genetics sampling could be very informative and is cost effective; also known-fate monitoring; monitoring pellet plots is proven and reliable way to monitor hares
- Devote increased funding to lynx conservation - lynx are in worse shape than other mesocarnivore species, but receive less funding than those species that have more secure populations and appear less vulnerable to climate change

Rvsd Plan - 00003769

## Other Considerations

After completing the elicitation exercises and prior to adjourning the workshop, facilitators asked if there were any other considerations the lynx experts or subject matter experts felt are relevant to the SSA.  One subject matter expert indicated that monitoring of prey base (hares, red squirrels) would help inform lynx recovery, and that pellet-based or mark-recapture methods are most reliable.  This expert suggested a need to determine whether areas that we think are going to become poor habitat for a variety of reasons could still hold hares and lynx in the future.  Maybe hares still can use areas we think will be poor habitat, and monitoring these areas could help inform our understanding of how lynx persist at the edge of their range.

# Synthesis

Although uncertainty remains about the historical distribution and sizes of resident lynx populations in the DPS, as well as current population sizes, much more is known now than when the DPS was listed under the ESA in 2000.  Based on research conducted since the DPS was listed, including the summaries of that work provided at this workshop, as well as ongoing research, conservation, and management efforts, we have a much better understanding of the distribution and status of populations throughout the DPS range.  For example, in 2000, it was unclear whether Maine and Minnesota supported resident populations or were only occasionally visited by lynx dispersing from Canada during and after northern hare population crashes.  We now know that both northern Maine and northeastern Minnesota support resident lynx populations, and both are likely larger now than they were historically (Maine), or before they were protected by State and Federal regulations (Minnesota).  In contrast, resident lynx appear to be naturally less abundant and more patchily-distributed in some parts of the DPS than thought at the time of listing, including the West (Interagency Lynx Biology Team 2013, p. 23), where potential lynx habitats also appear to have been initially overestimated.  We also have a better understanding of the habitat features and hare densities that appear necessary to support resident lynx at the southern margin of the species' range, and of the parts of the contiguous U.S. that contain these features.  The presentations in conjunction with expert elicitation responses at this workshop have informed and refined our understanding of key aspects of the status of, and potential threats to, the lynx DPS.

For example, we were provided a thorough history of the evolution of regulatory mechanisms that have been developed and implemented through conservation agreements and formal amendments to Federal agency management plans to address the singular threat for which the DPS was listed under the ESA - the inadequacy of regulatory mechanisms in Federal land management plans prior to listing.  Given our improved understanding of resident lynx populations in Maine and Minnesota (above), where State and private lands constitute much more of the lynx habitat than elsewhere in the DPS (98.9% in Maine; 51.7% in Minnesota), an assessment of the adequacy of regulatory mechanisms on those State and private lands will be a necessary component of the status assessment.  Likewise, our understanding of lynx genetics

54

also has improved, with evidence of continued high levels of gene flow range-wide, despite fine-scale genetic sub-structuring in some populations and additional evidence of lynx hybridization with bobcats.  Bobcats appear to be encroaching at the edge of the lynx range in Minnesota (Appendix 3, p. 9) and their numbers appear to have increased recently in New Hampshire, Vermont, and southern Quebec (Lavoie *et al*. 2009, entire; Roberts and Crimmins 2010, p. 170; Broman *et al*. 2014, p. 230) adjacent to the northern Maine lynx distribution.  Whether this represents a threat to lynx populations in Minnesota and Maine via increased hybridization, behavioral mechanisms, or competition for hares is not documented at this time; however, encroachment of bobcats in the southern periphery of lynx range may result in lynx displacement or niche contraction (Peers *et al*. 2013, entire).

Canadian researchers also provided updated information on lynx status, management (including legal harvest), threats, genetics, and hare population cycles in southern Canada, adjacent to some DPS lynx populations.  Forest ecologists and climate modelers also presented information regarding potential impacts of timber management and climate change on lynx and boreal forest habitats in the contiguous U.S.  Knowledge of lynx and hare responses to various silvicultural treatments continues to improve, although the need for continuing research remains.  Climate models continue to point toward the future northward and upslope migration of lynx and hare habitats and loss of snow conditions favorable to lynx, although uncertainty remains regarding the timing, extent, and biological consequences of such impacts.  Increases in the size, intensity, and frequency of wildfires and insect outbreaks in boreal/subalpine forests may also be related to climate change, but whether these represent temporary or permanent impacts to lynx habitats remains unclear.  Finally, much research has been done on hare population dynamics and habitat relationships at the southern extent of their range, much of which overlaps that of lynx in the contiguous U.S., but questions remain regarding regional variation in hare densities and what landscape-level hare abundances are necessary to support persistent resident lynx populations across the DPS.

Based on the summaries of post-listing research and the status and threat updates provided at this workshop, and on the results of the expert elicitation process, the Service provides the following synthesis of the status and likely viability of the DPS in terms of the 3 Rs.  This information will be considered as appropriate, along with more detailed analysis of the published literature, in the subsequent SSA report for the DPS.  The conclusions below are based on the information provided and the results of expert elicitation conducted at this workshop; they may be complemented or altered by the additional analyses yet to be conducted as part of the SSA process.

## Representation

Expert presentations on lynx genetics in the DPS and in Canada and expert responses and discussion with regard to representation questions suggest few threats to the genetic fitness or adaptive capacity of lynx in the DPS.  High gene flow across the continental lynx range, indicated by very low $F_{st}$ values (see *Subject Matter Presentations*, above), suggests the

55

absence of substantial barriers to genetic interchange, and little evidence or risk of significant genetic drift among DPS populations.  Most experts indicated that none of the six geographic units known or thought to support lynx populations in the DPS is susceptible to meaningful genetic drift, although several experts indicated that the more geographically isolated units (the GYA and Western Colorado units) are likely more susceptible to such drift than the units that are directly connected to lynx populations and habitats in Canada.  Overall, according to both the expert panel and the subject matter presentations, there appears to be a low risk of biologically consequential drift for lynx populations in the DPS.  Likewise, expert responses indicated that the generally low level of genetic differentiation and relatively similar ecological settings across the DPS suggest little life history variability or niche differentiation among DPS populations that would indicate that any are more or less important to maintain than others in terms of representation.  Individual experts indicated that representation can best be maintained by conserving current DPS populations (and hence the genetic variation in each), maintaining connectivity between DPS and Canadian populations, and avoiding impacts that would facilitate or increase the potential for or likelihood of genetic drift.  Our interpretation of this part of the elicitation is that the adaptability and evolutionary capacity of the DPS over time does not appear to have been diminished and is unlikely to become so, independent of threats that may impact the redundancy and persistence of lynx populations.  We will consider this information along with available empirical data and the published literature when evaluating representation in the DPS for the SSA.

## Redundancy

With resident lynx populations and subpopulations in at least five of six large (the smallest is over 2,000 square miles, the others are all over 8,000 square miles), widely-distributed (from Maine to Washington and south along the Rocky Mountains), and relatively discrete geographic areas (see Figure 1), the DPS as a whole appears invulnerable to extirpation from a single catastrophic event.  Expert responses indicated no catastrophic event that could result in the functional extirpation of the entire DPS and, further, no or a very low likelihood of functional extirpation of any of the individual geographic units due to a single catastrophic event.  We interpreted these responses to indicate there is a small chance of decreased redundancy from a single catastrophic event because the probability of any geographic unit being lost to a catastrophic event is low.  Experts indicated that functional extirpation of the geographically smallest unit (Washington) and those supporting the fewest resident lynx (Washington, GYA, and perhaps Minnesota) would be more likely to occur as a result of a series of catastrophic events over a 10-year period than to any single event over the next 10 years (see Figure 2 above).  Experts listed fire, drought, insect outbreaks, loss of favorable winter conditions, and disease as potential events that could lead to functional extirpation in these units.  In Washington in particular, where large fires have impacted nearly 40 percent of the occupied lynx habitat over the past 10-15 years, experts felt that several more successive years of such fires could result in functional extirpation.  However, because fire and insects are likely to cause only temporary (20-40 years) losses of lynx and hare habitats, and because connectivity between the Washington unit and lynx habitats and populations in southern British Columbia

Rvsd Plan - 00003772

remains intact, experts indicated this unit (and others abutting habitats and lynx populations in Canada) would likely be naturally re-colonized relatively quickly by dispersing lynx.  Therefore, extirpation in these units because of catastrophic events (or a series of them over time) would be temporary (likely lasting only one or several decades) unless events permanently altered the habitats.  Experts indicated that if lynx were functionally extirpated in the GYA or western Colorado units, which are not connected to habitats or populations in Canada and are relatively isolated from other DPS populations, natural re-colonization would be less likely, would take longer, or may never occur.

Overall, expert responses indicated that extirpation of the DPS as a whole, or of resident lynx populations in most individual geographic units, because of a catastrophic event is very unlikely.  Because we lack evidence that persistent resident lynx populations occurred historically but have been lost from any other large geographic areas in the contiguous U.S., it also seems that redundancy in the DPS has not been meaningfully diminished from historical levels.  That is, the loss of resident lynx populations in the DPS, to the extent suggested by the historic record, was likely in areas (e.g., northern New Hampshire, Michigan's Upper Peninsula, the Kettle/Wedge area of northeastern Washington, perhaps Isle Royale in Lake Superior) peripheral to the geographic units that currently support resident lynx, and not in discrete geographic units that would have represented greater redundancy in the contiguous U.S.  However, the implications of the potential recent loss of resident lynx in the GYA for the redundancy of the DPS are unclear.  The historic record and recent research show that the GYA has supported resident lynx, but it is unclear whether the area consistently supported a persistent resident population over time or whether it naturally supported resident lynx only some of the time (was "winked on" in a metapopulation sense) when habitat conditions and hare densities were favorable, and at other times, when habitats and hare densities were less favorable, it did not support resident lynx ("winked off" in a metapopulation sense).  Given the protected conservation status of millions of acres in the GYA unit (Yellowstone and Grand Teton National Parks; all or parts of the Absaroka-Beartooth, Bridger, Gros Ventre, Lee Metcalf, Northern Absaroka, Teton, and Washakie Wildernesses), its apparent recent inability to support resident lynx may be a reflection of naturally marginal and patchy habitats and relatively low hare abundance in much of the unit, resulting in only an intermittent ability of this unit to support resident lynx.  If so, its contribution to redundancy within the DPS is questionable.

## Resiliency

Because we lack reliable estimates of the sizes and trends of most lynx populations in the DPS, we are unable to use these parameters to evaluate the resiliency of individual populations or the DPS as a whole.  Efforts to understand resiliency are also confounded by the metapopulation structure thought to govern lynx populations at the southern margin of their continental range (i.e., populations and subpopulations in the DPS), the related uncertainty about the extent to which DPS populations may rely on cyclic immigration of lynx from Canada during population irruptions, and the ambiguity in the historic record that limits our understanding of the relative persistence of lynx in various geographical areas of the contiguous U.S. and, thus, the

Rvsd Plan - 00003773

contribution of those areas to the viability of the DPS. Our evaluation of the resiliency of lynx populations in the DPS is limited, therefore, to a largely qualitative assessment of the current status of populations in each of the six geographic units along with the quantitative summary of expert professional judgment of their likelihood of persistence over time given known or perceived potential threats.

As expected, both expert estimates of probability of persistence and expert confidence in those estimates were higher over the short-term than the long-term. Median probability of persistence (MPOP) at year 2025 was >= 0.90 for all but one of the six geographic areas. The GYA had a MPOP of 0.52, apparently reflecting the uncertainty regarding whether this unit consistently supported a resident lynx population historically and whether it currently supports resident lynx. At year 2025, confidence bounds were smallest (indicating higher expert confidence) for the units with the highest MPOPs (Northern Maine, Northeastern Minnesota, and Northwestern Montana/ Northeastern Idaho), and larger for units with lower MPOPS (North-central Washington, GYA, and Western Colorado). At mid-century, MPOP declined for all units but remained >= 0.70 for all but the GYA (0.35), and confidence bounds increased for estimates for all units but the GYA, where it remained the same as at year 2025. At end-of-century, persistence probabilities declined further, as expected, and only the Northern Maine, Northwestern Montana/ Northeastern Idaho and Western Colorado units had MPOPs >= 0.50. Also as expected, confidence bounds were very large around persistence estimates at year 2100, with the median confidence range extending across more than 50% of the range of possible outcomes for all but the Northwestern Montana/ Northeastern Idaho population, and the extremes of the range nearly covering the full range (0% to 100% probability of persistence) of possible outcomes.

Experts listed a number of factors that influenced their probability of persistence estimates for each unit (see unit summaries above in the *Resiliency* section). Near-term factors varied by unit (e.g., post-harvest forest succession in Maine, where hare abundance is expected to decline as currently dense regenerating clear-cuts mature; continued large-scale fires in lynx habitats in Washington; and insect outbreaks in Maine, Minnesota, and Colorado), but longer term factors seemed to coalesce around anticipated direct and indirect effects of climate change. These included potentially climate-driven increases in the size, frequency, and intensity of fire and insect outbreaks; decreases in snow amount, duration and quality, leading perhaps to increased competition with bobcats and other hare predators; and the projected warming-induced northward and upslope migration of boreal and subalpine forests that would result in the loss and further fragmentation and isolation of lynx and hare habitats in the contiguous U.S. Expert responses and ensuing discussions indicated that continued climate warming and associated direct and indirect effects will likely exert the greatest negative influence on the probability of persistence for lynx populations in the DPS regardless of which climate emissions scenario is used to model future conditions, although the timing, extent, and magnitude of impacts is uncertain and will likely vary by scenario.

58

Rvsd Plan - 00003774

Overall, expert responses to this part of the elicitation indicate that all five of the geographic units known to currently support resident lynx populations have a greater than 70% expectation of doing so by mid-century, but a declining likelihood and greater uncertainty of doing so by the end of the century.  It is uncertain whether the remaining geographic unit (the GYA) currently supports resident lynx, and expert responses indicate a lower probability that it will do so in the future compared to the other units.  Responses also suggest that the overarching threat to the long-term persistence of lynx populations in the DPS is climate change, which is anticipated to result first in loss of snow conditions favorable for lynx and, after an uncertain lag time following continued climate warming, loss (northward and upslope migration) of boreal forest habitats, although the timing and magnitude of such losses are uncertain.

# Conclusion

The Service and the Lynx SSA Team appreciate the willingness of lynx and subject matter experts to attend this workshop and share their knowledge, professional judgments, and opinions.  We have gained considerable insight into the current status of lynx populations throughout the DPS and the factors most likely to influence the DPS's future viability - including information that is not currently available in the peer-reviewed literature.  We will incorporate this information into the SSA as appropriate, along with the published scientific literature, to inform recovery planning for the DPS and any other ESA-related determinations the Service is authorized and required to make.  As we develop the SSA report, we will continue to solicit expert input from workshop panelists and from other lynx and subject matter experts who were unable to attend this workshop, including peer review of the SSA report.

Rvsd Plan - 00003775

# Literature Cited

65 FR 16052. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule. March 24, 2000. http://www.gpo.gov/fdsys/pkg/FR-2000-03-24/pdf/00-7145.pdf

68 FR 40076. Endangered and Threatened Wildlife and Plants; Notice of Remanded Determination of Status for the Contiguous United States Distinct Population Segment of the Canada Lynx. July 3, 2003. http://www.gpo.gov/fdsys/pkg/FR-2003-07-03/pdf/03-16664.pdf

71 FR 66008. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx. November 9, 2006. http://www.gpo.gov/fdsys/pkg/FR-2006-11-09/pdf/06-9090.pdf#page=1

72 FR 1186. Endangered and Threatened Wildlife and Plants; Clarification of Significant Portion of the Range for the Contiguous United States Distinct Population Segment of the Canada Lynx. January 10, 2007. http://www.gpo.gov/fdsys/pkg/FR-2007-01-10/pdf/E6-22633.pdf#page=1

72 FR 19549. Endangered and Threatened Wildlife and Plants; Initiation of 5-Year Reviews of Seven Wildlife Species and Two Plant Species in the Mountain-Prairie Region. April 18, 2007. https://www.gpo.gov/fdsys/pkg/FR-2007-04-18/pdf/E7-7342.pdf#page=1

74 FR 8616. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx; Final Rule. February 25, 2009. http://www.gpo.gov/fdsys/pkg/FR-2009-02-25/pdf/E9-3512.pdf#page=1

79 FR 54782. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx and Revised Distinct Population Segment Boundary. September 12, 2014. https://www.gpo.gov/fdsys/pkg/FR-2014-09-12/pdf/2014-21013.pdf

Agee, J. K. 2000. Disturbance ecology of North American boreal forests and associated northern mixed/subalpine forests. Pages 39-82 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

60

Rvsd Plan - 00003776

Aubry, K. B., G. M. Koehler, and J. R. Squires. 2000. Ecology of Canada lynx in southern boreal forests. Pages 373-396 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

Broman, D. J. A., J. A. Litvaitis, M. Ellingwood, P. Tate, and G. C. Reed. 2014. Modeling bobcat Lynx rufus habitat associations using telemetry locations and citizen-scientist observations: are the results comparable? Wildlife Biology 20: 229-237.

Buehler, D. A. and L. B. Keith. 1982. Snowshoe hare distribution and habitat use in Wisconsin. Canadian Field-Naturalist 96: 19-29.

Burgman, M. 2005. Risks and decisions for conservation and environmental management. Cambridge University Press.

Buskirk, S. W., L. F. Ruggiero, and C. J. Krebs. 2000b. Habitat fragmentation and interspecific competition: implications for lynx conservation. Pages 83-100 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

Drescher, M., A. H. Perera, C. J. Johnson, L. J. Buse, C. A. Drew, and M. A. Burgman. 2013. Toward rigorous use of expert knowledge in ecological research. Ecosphere 4:Article 83. (http://dx.doi.org/10.1890/ES12-00415.1)

Elton, C. and M. Nicholson. 1942. The ten-year cycle in numbers of the lynx in Canada. Journal of Animal Ecology 11: 215-244.

Gonzalez, P., R. P. Neilson, K. S. McKelvey, J. M. Lenihan, and R. J. Drapek. 2007. Potential impacts of climate change on habitat and conservation priority areas for Lynx canadensis (Canada lynx). Report to the Forest Service, U.S. Department of Agriculture, Washington D.C., and NatureServe, Arlington, Virginia. 19 pp.

Gregory, R., L. Failing, M. Harstone, G. Long, T. McDaniels, and D. Ohlson. 2012. Structured decision making: a practical guide to environmental management choices. John Wiley & Sons.

Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-13-19, Missoula, MT. 128 pp.
http://www.fs.fed.us/biology/resources/pubs/wildlife/LCAS_revisedAugust2013.pdf

61

Koehler, G. M. 1990. Population and habitat characteristics of lynx and snowshoe hares in north central Washington. Canadian Journal of Zoology 68: 845-851.

Koehler, G. M. and K. B. Aubry. 1994. Lynx. Pages 74-98 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, L. J. Lyon, and W. J. Zielinski, (eds.). The scientific basis for conserving forest carnivores: American marten, fisher, lynx, and wolverine in the Western United States. USDA Forest Service Gen. Tech. Rep. RM-254.

Kosterman, M. K. 2014. Correlates of Canada Lynx Reproductive Success in Northwestern Montana. M.S. Thesis, University of Montana, Missoula. 69 pp.

Lavoie, M., Collin, P-Y, Lemieux, F., Jolicoeur, H., Canac-Marquis, P., Lariviere, S. 2009. Understanding fluctuations in bobcat harvest at the northern limit of their Range. Journal of Wildlife Management 73: 870-875.

MacMillan, D.C. and K. Marshall. 2006. The Delphi process – an expert-based approach to ecological modelling in data-poor environments. Animal Conservation, 9: 11–19.

McBride, M. F., S. T. Garnett, J. K. Szabo, A. H. Burbidge, S. H. M. Butchart, L. Christidis, G. Dutson, H. A. Ford, R. H. Loyn, D. M. Watson, and M. A. Burgman. 2012. Structured elicitation of expert judgments for threatened species assessment: A case study on a continental scale using email. Methods in Ecology and Evolution 3: 906–920. doi: 10.1111/j.2041-210X.2012.00221.x http://onlinelibrary.wiley.com/doi/10.1111/j.2041-210X.2012.00221.x/full

McCord, C. M. and J. E. Cardoza. 1982. Bobcat and lynx. Pages 728-766 in J. A. Chapman and G. A. Feldhamer (eds.). Wild mammals of North America biology, management and economics. Johns Hopkins University Press, Baltimore, MD.

McKelvey, K. S., K. B. Aubry, and Y. K. Ortega. 2000. History and distribution of lynx in the contiguous United States. Pages 207-264 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

Moen, R., C. L. Burdett, and G. Niemi. 2008. Movement and habitat use of Canada lynx during denning in Minnesota. Journal of Wildlife Management 72: 1507-1513.

Morgan, in prep.

Morgan, M. G. 2014. Use (and abuse) of expert elicitation in support of decision making for public policy. Proceedings of the National Academy of Sciences 111(20):7176-7184.

62

Rvsd Plan - 00003778

Mowat, G., K. G. Poole, and M. O'Donoghue. 2000. Ecology of lynx in northern Canada and Alaska. Pages 265-306 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

Peers M. J. L., D. H. Thornton, and D. L. Murray. 2013. Evidence for large-scale effects of competition: niche displacement in Canada lynx and bobcat. Proceedings of the Royal Society B 280: 1-10. http://dx.doi.org/10.1098/rspb.2013.2495

Roberts, N. M. and S. M. Crimmins. 2010. Bobcat population status and management in North America: Evidence of large-scale population increase. Journal of Fish and Wildlife Management 1: 169-174; e1944-687X. doi: 10.3996/122009-JFWM-026

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williams. 2000. Canada lynx conservation assessment and strategy, second edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT.

Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires. 2000. The scientific basis for lynx conservation: qualified insights. Pages 443-454 in Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey, and J. R. Squires, (eds.). Ecology and conservation of lynx in the contiguous United States. University Press of Colorado, Boulder, Colorado.

Seymour, R. S. and M. L. Hunter, Jr. 1992. New forestry in eastern spruce-fir forests: principles and applications in Maine.  Maine Agricultural and Forest Experiment Station, University of Maine, Miscellaneous Publication 716, Orono, Maine, USA. 36 pp.

U.S. Environmental Protection Agency (USEPA).  2011.  Expert elicitation task force white paper.  Science and Technology Policy Council, USEPA, Washington DC. (http://www.epa.gov/stpc/pdfs/ee-white-paper-final.pdf)

U.S. Fish and Wildlife Service. 2005. Draft recovery outline for the contiguous United States distinct population segment of the Canada lynx. Unpublished draft. U.S. Fish and Wildlife Service, Region 6, Denver, Colorado. 21 pp.

Wolff, J. O. 1980. The role of habitat patchiness in the population dynamics of snowshoe hares. Ecological Monographs 50: 111-130.

Rvsd Plan - 00003779

# Appendices

All appendices are available on the Service's Region 6 Canada lynx webpage (http://www.fws.gov/mountain-prairie/es/canadaLynx.php).

64

# Species Status Assessment

**for the**

## CANADA LYNX *(Lynx canadensis)*

## Contiguous United States Distinct Population Segment



Photo by Keith Williams

Version 1.0 - Final
October 2017

U.S. Fish and Wildlife Service
Regions 1, 3, 5 and 6

Rvsd Plan - 00003781

Recommended Citation

U.S. Fish and Wildlife Service. 2017. Species Status Assessment for the Canada lynx (*Lynx canadensis*) Contiguous United States Distinct Population Segment. Version 1.0, October, 2017. Lakewood, Colorado.

# Credits

This SSA report was produced by the Canada Lynx Species Status Assessment Team (Lynx SSA Team), which consists of a Core Team of Service biologists who work on lynx conservation across the DPS range and an SSA Framework Implementation Team of Service and U.S. Geological Survey staff who have developed and advanced the SSA framework.

U.S. Fish and Wildlife Service Lynx SSA Core Team

Jim Zelenak (Lead), Region 6, Montana Ecological Services Field Office: Chapters/sections - Executive Summary, 1, 2, 3.1, 3.4, 6, and Units 3 and 5
Mark McCollough (Co-lead), Region 5, Maine Ecological Services Field Office: Sections - 3.2, 3.3, 3.5, and Unit 1
Kurt Broderdorp, Region 6, Western Colorado Ecological Services Field Office: Unit 6
Bryon Holt, Region 1, Northern Idaho Ecological Services Field Office: Unit 4
Tamara Smith, Region 3, Minnesota-Wisconsin Ecological Services Field Office: Unit 2

All Core Team members participated in development of conceptual models and reviewed and provided comments/edits on other sections of the SSA report. All members also helped identify and contact lynx expert panelist candidates and other subject matter experts and contributed to expert elicitation and the report of the Expert Elicitation Workshop (see Acknowledgments).

SSA Framework Implementation Team

Heather Bell, USFWS Headquarters, Ecological Services, Division of Restoration and Recovery
Mary Parkin, USFWS Region 5, Endangered Species Recovery Coordinator
Justin Shoemaker, USFWS Region 6, Classification and Recovery Biologist
Jonathan Cummings, USGS - Patuxent Wildlife Research Center, Research Ecologist

The Framework Implementation Team (FIT) developed and facilitated the expert elicitation process. J. Cummings compiled, analyzed, graphed, and summarized the information generated via expert elicitation and created, with Core and FIT input, conceptual models presented in section 1.3. All FIT members contributed to the Executive Summary and sections 1.2 and 1.3, and all provided technical review and editing of other parts of the report.

Administrative and Technical Support: Marigaye Bissell, Barbara Chavez, Kaimy Marks, and Karen Newlon, Montana Ecological Services Field Office.

Rvsd Plan - 00003782

## Acknowledgments

This report relies heavily on the input and professional opinions provided by a panel of 10 recognized lynx experts and captured during a formal Expert Elicitation Workshop held in Bloomington, Minnesota, October 13-15, 2015. Several other recognized lynx experts from Canada and the contiguous United States were invited but unable to participate. The workshop also was supported by and benefitted from the participation and presentations of other recognized experts in the fields of snowshoe hare ecology, lynx genetics, forest ecology, climate change modeling, and Federal lynx habitat management.

### Canada Lynx Expert Panel Members (alphabetically)

Jeff Bowman, Ontario Ministry of Natural Resources and Forestry, University of Trent, Ontario
Susan Catton, USDA Forest Service - Superior National Forest, Duluth, MN
Jake Ivan, Colorado Parks and Wildlife, Department of Natural Resources, Fort Collins, CO
Jay Kolbe, Montana Department of Fish, Wildlife and Parks, White Sulphur Springs, MT
Benjamin Maletzke, Washington Department of Fish and Wildlife, Olympia, WA
Kevin McKelvey, USDA Forest Service - Rocky Mountain Research Station, Missoula, MT
Ron Moen, University of Minnesota, Natural Resources Research Institute, Duluth, MN
Erin Simons-Legaard, University of Maine, School of Forest Resources, Orono, ME
John Squires, USDA Forest Service - Rocky Mountain Research Station, Missoula, MT
Jennifer Vashon, Maine Department of Inland Fisheries and Wildlife, Bangor, ME

### Canada Lynx Expert Elicitation Workshop Presenters (alphabetically)

Lee Frelich, University of Minnesota Center for Forest Ecology, St. Paul, MN
Karen Hodges, University of British Columbia–Okanagan, Kelowna, BC Canada
Scott Jackson, USDA Forest Service - National Carnivore Program Leader, Missoula, MT
Josh Lawler, University of Washington School of Environmental & Forest Sciences, Seattle, WA
Michael Schwartz, USDA Forest Service - National Genomics Center for Wildlife & Fish
        Conservation, Missoula, MT
Alexej Siren, DOI Northeast Climate Science Center, University of Massachusetts, Amherst, MA
Chad Wilsey, National Audubon Society, San Francisco, CA

The Canada Lynx Expert Elicitation Workshop Report can be found here:

https://www.fws.gov/mountain-
prairie/es/species/mammals/lynx/SSA2016/Appendices/2016%2004%2018%20FINAL%20Lynx
%20SSA%20EE%20Workshop%20Report%202%20jzeds.pdf

Report appendices, expert presentations, and other supporting materials can be found under
the "Species Status Assessment (SSA)" tab at:

https://www.fws.gov/mountain-prairie/es/canadaLynx.php

Rvsd Plan - 00003783

This report also relies heavily on the Interagency Lynx Biology Team's *Canada Lynx Conservation Assessment and Strategy*, 3rd Edition, August 2013:

Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp.
http://www.fs.fed.us/biology/resources/pubs/wildlife/LCAS_revisedAugust2013.pdf.

All Lynx SSA Core Team members participated in development and review of the revised LCAS.

iii

# Table of Contents

Credits ...................................................................................................................................i

Acknowledgments...............................................................................................................ii

Table of Contents...............................................................................................................iv

Executive Summary ........................................................................................................... 1

Chapter 1: Introduction......................................................................................................11

1.1 Background ...............................................................................................................11

1.2 SSA Framework and Report.....................................................................................14

1.3 Analytical Approach and Methods ............................................................................16

1.4 Uncertainties and Assumptions ...............................................................................21

Chapter 2: Lynx Ecology ...................................................................................................23

2.1 Species Taxonomy, Description, and Genetics.........................................................23

2.2 Life History and Population Dynamics ......................................................................26

2.2.1 Ecological Requirements of Individuals ...............................................................32

2.2.2 Ecological Requirements of Populations and the DPS ...........................................36

2.3 Historical and Current Lynx Distribution ...................................................................38

2.3.1 Lynx Distribution and Status in Canada and Alaska ................................................38

2.3.2 Lynx Distribution in the Contiguous United States ....................................................39

2.3.2.1 Defining Lynx Distribution at the Periphery of the Range ....................................39

2.3.2.2 Lynx Distribution within the DPS Range...............................................................42

Chapter 3: Factors Influencing Viability of the DPS .......................................................51

3.1 Regulatory Mechanisms ...........................................................................................52

3.1.1 Federal Regulatory Mechanisms.........................................................................52

3.1.2 State Regulations and Tribal Management............................................................58

3.2 Climate Change........................................................................................................66

3.3 Vegetation Management............................................................................................83

3.4 Wildland Fire Management ........................................................................................92

3.5 Habitat Loss and Fragmentation ..............................................................................96

Chapter 4: Current Conditions...........................................................................................105

4.1 Summary of Current Conditions DPS-wide ...............................................................106

4.1.1 Summaries of Current Conditions in Each Geographic Unit ....................................108

4.2 Current Conditions - Detailed Descriptions by Geographic Unit .....................................113

Rvsd Plan - 00003785

4.2.1 Unit 1 - Northern Maine ........................................................................113

4.2.2 Unit 2 - Northeastern Minnesota...........................................................128

4.2.3 Unit 3 - Northwestern Montana/Northeastern Idaho ..............................133

4.2.4 Unit 4 - North-central Washington .........................................................147

4.2.5 Unit 5 - Greater Yellowstone Area .........................................................153

4.2.6 Unit 6 - Western Colorado ....................................................................161

Chapter 5: Future Conditions ..............................................................................166

5.1 Summary of Future Conditions DPS-wide....................................................169

5.1.1 Summaries of Future Conditions in Each Geographic Unit......................173

5.2 Future Conditions - Detailed Descriptions by Geographic Unit......................180

5.2.1 Unit 1 - Northern Maine ........................................................................180

5.2.2 Unit 2 - Northeastern Minnesota............................................................195

5.2.3 Unit 3 - Northwestern Montana/Northeastern Idaho ..............................204

5.2.4 Unit 4 - North-central Washington .........................................................212

5.2.5 Unit 5 - Greater Yellowstone Area .........................................................217

5.2.6 Unit 6 - Western Colorado ....................................................................223

Chapter 6: Synthesis...........................................................................................228

Literature Cited ...................................................................................................238

**FIGURES**

Figure 1. Six geographic units within the range of the contiguous United States distinct population segment of Canada lynx (*Lynx canadensis*)............................................................ 2

Figure 2. Cumulative probabilities that resident lynx populations will persist in at least a given number of geographic units over time (at years 2015 [current at time of expert elicitation], 2025, 2050, and 2100) based on experts' predictions for individual geographic units. Experts' "most likely" probabilities are summarized in the middle column; their highest ("better case") and lowest ("worse case") probabilities, representing uncertainty in their predictions, are summarized in the left and right columns, respectively. See section 5.1 for additional details on graph construction and interpretation. ................................................................................. 6

Figure 3. SSA Framework stages............................................................................15

Figure 4. Conceptual model of the factors thought to influence the 3 Rs as they pertain to lynx viability.....................................................................................................16

Figure 5. Conceptual model of factors thought to influence redundancy within the lynx DPS. ...17

Rvsd Plan - 00003786

Figure 6. Conceptual model of factors thought to influence representation within the lynx DPS. .................................................................................................................................18

Figure 7. Conceptual model of factors thought to influence the resiliency of lynx populations within the DPS. ...............................................................................................................19

Figure 8. Generalized relationship between habitat conditions and hare and lynx population dynamics and their influence on lynx population resiliency.......................................................26

Figure 9. Summary of lynx experts' predictions regarding the probability of persistence of at least a given number of geographic units given the probability of persistence for each individual geographic unit. The y axis of each grid in figure 9 is the probability that at least the number of geographic units indicated by the x axis of the grid persist. The probability in a bar reaches 1 when there is no probability of fewer geographic units persisting. Moving from top to bottom, the grids show the probabilities by time period (2015 [current at time of expert elicitation], 2025, 2050, and 2100). Moving from left to right the grids show the range of expert responses by summary selection type and probability response. Therefore, looking down a column of grids provides a view of the trend in persistence through time and looking across a row of grids provides a view of the range of uncertainty in expert projections of persistence for a given time period............................................................................................................................170

Figure 10. Lynx expert estimates of the probability that the Northern Maine Geographic Unit will continue to support resident lynx in the future (at years 2025, 2050, and 2100). ......................182

Figure 11. Lynx expert estimates of the probability that the Northeastern Minnesota Geographic Unit will continue to support resident lynx in the future (at years 2025, 2050, and 2100).........196

Figure 12. Lynx expert estimates of the probability that the Northwestern Montana/Northeastern Idaho Geographic Unit will continue to support resident lynx in the future (at years 2025, 2050, and 2100)...........................................................................................................................206

Figure 13. Lynx expert estimates of the probability that the North-central Washington Geographic Unit will continue to support resident lynx in the future (at years 2025, 2050, and 2100). ..............................................................................................................................214

Figure 14. Lynx expert estimates of the probability that the Greater Yellowstone Area Geographic Unit will continue to support resident lynx in the future (at years 2025, 2050, and 2100). ..............................................................................................................................218

Figure 15. Expected probability of persistence for the Western Colorado Geographic Unit at present, 2015, and in 2025, 2050 and 2100. ..........................................................................224

Rvsd Plan - 00003787

**TABLES**

Table 1. Summary of expert opinion regarding the likelihood that individual geographic units will continue to support resident lynx populations in the future[1]. ........................................................ 5

Table 2. Lynx SSA Unit Sizes and Percent Ownership. ............................................................ 14

Table 3. Reported annual home range sizes for Canada lynx in the contiguous United States. 34

Table 4. Summary of current conditions in 6 geographic units within the DPS range[1]. ............ 113

Table 5. Expert-predicted future (2025, 2050, and 2100) persistence[1] of resident lynx populations in individual geographic units of the Canada lynx DPS and supporting evidence and uncertainties. ............................................................................................................................ 178

Rvsd Plan - 00003788

# Executive Summary

This report presents the results of a species status assessment (SSA) for the contiguous United States distinct population segment (DPS) of Canada lynx (*Lynx canadensis*). The report represents the U.S. Fish and Wildlife Service's (Service's) evaluation of the best available scientific information, including the formally elicited professional judgments and opinions of recognized lynx experts. Based on this information, we (1) describe the ecological requirements and population dynamics of the species; (2) evaluate the historical and current condition of lynx populations in the DPS and the factors that appear to have influenced them; and (3) assess the DPS's near-term (at year 2025), mid-term (year 2050), and longer-term (year 2100) viability. This final SSA has been revised in response to the reviews, comments, and suggestions of 5 independent peer reviewers, 11 State wildlife and natural resources management agencies, and 3 other Federal agencies.

<u>Background</u>

The Canada lynx is a North American boreal forest carnivore whose populations are strongly tied to its primary prey, the snowshoe hare (*Lepus americanus*). Both species occur primarily in the extensive boreal spruce-fir forests of Canada and Alaskan; however, the southern margins of both their ranges extend into the northern contiguous United States. The Service designated lynx in the Lower 48 States as a DPS because of differences in the management of lynx and lynx habitats across the international boundary with Canada and because of the climatic, vegetative, and ecological differences between lynx habitat at the southern extent of its range in the contiguous United States compared to the northern range in Canada and Alaska. The Service listed the DPS as threatened under the Endangered Species Act (ESA) in 2000 because of the inadequacy, at that time, of regulatory mechanisms on some Federal lands to provide for the conservation of lynx habitats and populations (see section 3.1.1). This SSA does not reconsider the designation of the DPS or its listing status under the ESA, which are Service policy decisions. Instead, it provides the scientific basis for the statutorily required 5-year status review for the DPS and other decisions the Service is required to make in accordance with the ESA.

In this SSA, we evaluate the current and possible future conditions for lynx in 6 geographic units within the DPS range that currently support or recently supported resident lynx. The units are distributed from Maine to Washington and south along the Rocky Mountains to western Colorado (fig. 1). Units 1 (Northern Maine), 2 (Northeastern Minnesota), 3 (Northwestern Montana/Northeastern Idaho), and 4 (North-central Washington) historically supported and currently support resident lynx populations. Based on verified records, it is uncertain whether Units 5 (Greater Yellowstone Area [GYA]) and 6 (Western Colorado) historically supported persistent populations or if they supported resident lynx only ephemerally (see section 2.3.2.2). Combined, the 6 units encompass over 131,000 km$^2$ (about 50,640 mi$^2$) of occupied or potential lynx habitat and represent roughly the southern 2 percent of the species' breeding distribution (98 percent occurs in Canada and Alaska). Land ownership varies among the units, with private

1

lands accounting for most of Unit 1; a mix of Federal, State and private lands in Unit 2; and predominantly Federal lands in the 4 western units (see table 2, chapter 1 for additional details on unit sizes and land ownership).



**Figure 1. Six geographic units within the range of the contiguous United States distinct population segment of Canada lynx (*Lynx canadensis*).**

The lynx is a habitat and prey specialist that requires dense boreal and subalpine forests that support abundant snowshoe hares, which typically constitute greater than 90 percent of the lynx's year-round diet. Lynx and hares are most abundant in areas with long winters and persistent deep, powdery snow. The lynx has evolved morphological adaptions - long legs and exceptionally large paws - which in snowy conditions are thought to confer a competitive advantage over other terrestrial hare predators and allow lynx to occupy habitats that are unavailable, at least seasonally, to some of its potential competitors. The DPS occurs at the southern margin of the species' range, where boreal forest habitats and thus lynx are, in most places, naturally less abundant and generally more patchily-distributed than in the core of the species' range in Canada and Alaska. Maintaining connectivity between the DPS and lynx populations in Canada is thought to be important. However, the extent to which DPS populations may depend on immigration of lynx from Canada remains uncertain.

2

Our understanding of lynx biology has improved substantially since the DPS was proposed for listing in 1998. For example, analysis of historical trapping data indicated that many lynx records in the contiguous United States coincided with the intermittent (roughly decadal) mass dispersal ("irruptions") of lynx from Canada into the northern United States when hare populations in Canada underwent steep cyclic declines. During these events, particularly the unprecedentedly large irruptions of the early 1960s and early 1970s, hundreds to thousands of lynx dispersed south into both suitable and unsuitable habitats in the northern United States. In suitable habitats, immigrants may have contributed to the demographic and genetic health of resident populations; in unsuitable habitats, dispersing lynx occurred only temporarily and disappeared relatively quickly from areas that are not capable of supporting resident populations over the long-term. Research and monitoring conducted by State, Federal, and Tribal agency partners and academic institutions also have refined our understanding of lynx habitat requirements and associations, distributions, demography, and potential stressors throughout the DPS range (see Summary of Findings, below, and chapters 2-4).

SSA Framework

The SSA framework considers a species' life history and ecological requirements to understand how the species maintains itself over time. Therefore, we evaluated the ecological requirements of individual lynx and populations and the current and possible future conditions for resident lynx populations in each geographic unit to assess the viability of the DPS. The SSA uses the conservation biology principles of resiliency, redundancy, and representation (the "3 Rs") as the framework for assessing current and future conditions. Resiliency describes the ability of populations and species to withstand stochastic events, redundancy describes a species' ability to withstand catastrophic events, and representation describes a species' ability to adapt to long-term changes in the environment (see sections 1.2 and 1.3). For lynx, the factors capable of influencing the 3 Rs that we evaluate in this SSA include the adequacy of existing regulatory mechanisms (the factor for which the DPS was listed); climate change, vegetation management, wildland fire management, and habitat loss and fragmentation (the factors considered by the Interagency Lynx Biology Team [ILBT] to have the potential to exert population-level effects on the DPS); and other factors that could influence the continued ability of particular geographic units to support resident lynx.

Uncertainties and Assumptions

Several sources of uncertainty had to be accounted for in our analysis, including limited data on lynx population sizes, trends, and other important demographic parameters in the DPS; the influence of lynx immigration from Canada on the persistence of the DPS; the effectiveness of habitat management efforts; and the potential effects of competition. We similarly lack consistent habitat and demographic information for snowshoe hares throughout much of the DPS range. Given the emerging role of climate change as a stressor, uncertainties about the timing, rate, and magnitude of projected future impacts to hares; boreal, subalpine, and montane forests; and snow quality, depth, and persistence constrain our ability to precisely predict effects on lynx populations and habitats. To account for these uncertainties in our

3

Rvsd Plan - 00003791

analysis, we identified a number of critical assumptions based on the scientific literature and input provided by the lynx experts we consulted (see section 1.4).

As part of our evaluation of the DPS's viability, we asked a panel of 10 lynx experts to provide their opinions on the likelihoods that each geographic unit would support resident lynx populations in the short-term (at year 2025), mid-term (at year 2050) and longer-term (at year 2100). The level of uncertainty regarding the viability of the DPS and each of the factors that may influence it increases the farther into the future we (and the experts we consulted) try to look, and this uncertainty greatly reduces confidence in projections, particularly beyond mid-century. The output from this expert elicitation process (summarized below and presented in detail in chapter 5) remains the experts' best professional judgment, and readers should consider the inherent limitations and substantial uncertainties in expert responses, particularly over longer time periods (see also section 1.4 and chapter 5).

<u>Summary of Findings</u>

Much irresolvable uncertainty remains regarding the historical distributions and sizes of resident lynx populations in the contiguous United States. Several small populations may have been extirpated from some areas within or adjacent or peripheral to the geographic units we assess and a recent fire-driven decline in lynx numbers in Unit 4 seems likely. However, we find no compelling evidence, based on verified historical records, of major range contraction or dramatic declines in the number of resident lynx in the DPS as a whole (see section 2.3.2). In fact, there are currently more resident lynx in some parts of the DPS (Maine and Colorado) than likely occurred historically and, in those areas and in Minnesota, there are more resident lynx now than was suspected when the DPS was listed. Further, some areas suspected to have lost historical lynx populations may have been (and perhaps are now) naturally capable of supporting resident lynx only ephemerally or intermittently, as would be expected in marginal habitats at the southern periphery of the species' range under a metapopulation structure like that thought to govern DPS lynx populations (see sections 2.2 and 4.1).

Lynx conservation measures and habitat management guidance adopted by the U.S. Forest Service (USFS) and the Bureau of Land Management (BLM) via formally amended or revised management plans or conservation agreements with the Service have substantially addressed the singular threat for which the DPS was listed (the inadequacy of regulatory mechanisms when the DPS was listed; see section 3.1). Conservation efforts by State, Tribal, and other Federal agencies; conservation organizations; and some private landowners also have secured protection of lynx habitats and reduced a number of other potential stressors to lynx populations and habitats throughout the DPS range. Nonetheless, we and the experts we consulted expect that resident population sizes and distributions in the DPS will likely decline largely as a result of projected continued climate warming and associated impacts, which are likely to exacerbate the potential adverse effects of other stressors.

Although the timing and extent of climate-mediated impacts are uncertain, continued warming is expected to cause a northward and upslope contraction of the boreal forest, snow conditions,

4

and hare populations that support lynx, along with several other potential impacts (see section 3.2). This, in turn, will likely result in smaller, more fragmented, and increasingly isolated patches of habitat and smaller, more isolated lynx populations in the DPS that would be more vulnerable to stochastic demographic and catastrophic events and genetic drift. It also may improve conditions for other terrestrial hare predators, potentially resulting in increased competition and displacement of lynx from areas that currently support resident populations. Climate-driven increases in the frequency, size, and intensity of wildfires and forest insect outbreaks are also expected to continue, although we do not anticipate that such events alone would cause the permanent loss of breeding lynx populations in any geographic unit. We are aware of no management actions that could be expected to abate the projected long-term retreat of boreal forests, declining hare populations, and diminished snow conditions expected under continued climate warming.

Despite the anticipated long-term effects of climate warming and the effects of other potential stressors (see chapter 3), we and the experts we consulted expect that each of the 5 geographic units that currently supports resident populations (Units 1-4 and 6) individually has a high likelihood (80 to 98 percent based on median "most likely" expert projections; see table 1, below, and section 5.2, figs. 10-13 and 15) of continuing to do so at year 2025. Experts similarly indicated high likelihoods (70 to 90 percent) that those units will continue to support resident populations through 2050, albeit in reduced numbers and distributions. Experts projected that only Unit 3 has a high (78 percent) likelihood of supporting resident lynx by 2100; all other geographic units individually were deemed to have a 50 percent or greater likelihood of functional extirpation (i.e., no longer capable of supporting resident lynx populations) by the end of the century; however, all experts expressed great uncertainty in their projections for that time period (see section 1.4 and the introduction to chapter 5).

**Table 1. Summary of expert opinion regarding the likelihood that individual geographic units will continue to support resident lynx populations in the future[1].**

| Geographic Unit | Year | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2025 | | 2050 | | 2100 | |
| | Probability of Persistence (%)[2] | Range (%)[3] | Probability of Persistence (%) | Range (%) | Probability of Persistence (%) | Range (%) |
| 1 | 96 | 80-100 | 80 | 65-95 | 50 | 40-80 |
| 2 | 96 | 88-100 | 80 | 60-90 | 35 | 10-60 |
| 3 | 98 | 95-100 | 90 | 70-100 | 78 | 50-90 |
| 4 | 80 | 60-95 | 70 | 30-80 | 38 | 5-50 |
| 5 | 52 | 10-70 | 35 | 15-60 | 15 | 5-50 |
| 6 | 90 | 60-100 | 80 | 50-85 | 50 | 20-70 |

[1]We asked 10 recognized lynx experts to provide their estimates of the probability that resident lynx populations or subpopulations would persist in each geographic unit, even if reductions in lynx numbers and distributions were anticipated ( i.e., the probability that resident lynx would *not* be functionally extirpated from the unit).

[2]Median "most likely" probabilities of persistence provided by 10 lynx experts for each geographic unit considering the current status of lynx populations and current and likely future stressors to those populations. Green = 68–100% median probability of persistence; Yellow = 34–67% median probability of persistence; Red = 0–33% median probability of persistence.

[3]The full range of "most likely" probabilities of persistence provided by the 10 lynx experts.

5

Cumulatively, expert median "most likely" responses suggest a high (80 percent) likelihood that resident lynx populations will persist in all 5 units that currently support them at year 2025 and in at least 4 of the 5 units at 2050, and a moderate (just under 50 percent) likelihood that they will persist in all 5 units at 2050 (fig. 2, middle column; also see section 5.1). Over the longer-term, expert responses suggest a high (about 85 percent) likelihood that resident populations will persist in at least 2 of the 5 units at 2100 and a more than 50 percent likelihood they will persist in 3 units, but also a high (> 75 percent) likelihood that resident populations will be functionally extirpated from 2 of the 5 units by the end of the century (fig. 2).



**Figure 2. Cumulative probabilities that resident lynx populations will persist in at least a given number of geographic units over time (at years 2015 [current at time of expert elicitation], 2025, 2050, and 2100) based on experts' predictions for individual geographic units. Experts' "most likely" probabilities are summarized in the middle column; their highest ("better case") and lowest ("worse case") probabilities, representing uncertainty in their predictions, are summarized in the left and right columns, respectively. See section 5.1 for additional details on graph construction and interpretation.**

Below we summarize lynx status in each geographic unit based on our understanding of conditions historically, at the time the DPS was listed, and currently, and considering expert opinions regarding potential population sizes and future persistence. See section 2.3.2 for a detailed assessment of historical and current lynx distribution across the DPS range and chapters 4 and 5, respectively, for detailed evaluations of current and possible future conditions in each geographic unit.

Unit 1 - Currently, northern Maine is thought to support many more resident lynx than likely occurred historically and many more than was known or suspected at the time the DPS was

6

listed, and recent information suggests that resident lynx may be expanding to the south of the core population area. This is due to the large amount and broad distribution of high-quality lynx and hare habitat that currently exists as a result of landscape-level clearcutting on private commercial timber lands in response to a major spruce budworm (*Choristoneura fumiferana*) outbreak in the 1970s and 1980s. These dense regenerating conifer stands are much more extensive than they are thought to have been historically under natural disturbance regimes. The State of Maine suggests that this unit currently may support 750-1,000 or more resident lynx. However, the extent of these high-quality stands probably peaked by 2010, and habitat quality is projected to decline in these stands over the next few decades as they age beyond 35-40 years post-harvest. Because a shift in forest management from clearcutting to partial harvesting that began in 1989 appears unlikely to maintain or recreate this extensive high-quality habitat, we expect lynx habitat and numbers to decline in this unit over the next several decades, perhaps to levels more consistent with likely historical conditions. We concur with the expert panel that the resident lynx population in this unit is very likely to persist at 2025 and at 2050. Over the longer-term (at 2100), we expect continued climate warming to reduce the amount and quality of lynx habitat in this unit and exacerbate other potential stressors (commercial and energy developments, changing forestry practices and land ownership patterns, etc.), further reducing lynx numbers and likely decreasing the population's resilience. Some climate models indicate substantial loss of boreal forest and favorable snow conditions under higher emissions scenarios, and this unit generally lacks potential elevational refugia that would support upslope movement of lynx habitats and populations. Therefore, we suggest that the likelihood that this unit will support a resident lynx population at 2100 may be somewhat lower than expert projections, although the timing and extent of climate-mediated habitat decline is highly uncertain. This geographic unit also may be the source of dispersing lynx that recently recolonized northern New Hampshire as well as several that temporarily established residency in northern Vermont. Some reproduction has been verified recently in both states, although neither was occupied when the DPS was listed, and resident lynx were thought to have been extirpated from New Hampshire.

Unit 2 - Northeastern Minnesota similarly supports many more resident lynx than was suspected when the DPS was listed (when it was unknown whether a resident population occurred there at all), although how the current population compares to historical conditions is uncertain. Trapping records indicate strongly cyclic increases in lynx abundance in this unit in the 1930s through 1970s in association with decadal irruptions of lynx dispersing south from Canada. Currently, Minnesota lynx experts suggest that the population in this unit likely fluctuates from 50 to 200 resident lynx, and we find no evidence that it historically supported a larger resident population or a more extensive distribution of habitat capable of doing so. We concur with the expert panel that the resident lynx population in this unit is very likely to persist at 2025 and at 2050. Over the longer-term (at 2100), we expect continued climate warming to reduce the amount and quality of lynx habitat in this unit, reducing lynx numbers and likely decreasing the population's resilience. Under higher emissions scenarios, some climate models project substantial loss of boreal forest and favorable snow conditions in this unit before the end of the century. Like Maine, this unit also lacks potential elevational refugia that would support upslope movement of lynx habitats and populations. Therefore, we suggest that the likelihood that resident lynx will persist in this

7

unit at 2100 may be somewhat lower than expert projections, although the timing and extent of climate-mediated habitat decline is highly uncertain.

Unit 3 - Recent research, monitoring, and habitat mapping refinements indicate that habitats capable of supporting resident lynx in this and other western geographic units are naturally less abundant and more patchily-distributed than was thought when the DPS was listed. For example, earlier estimates that western Montana supported 1,000 or more lynx were based on broad assumptions regarding habitat suitability and lynx distribution that are not supported by current understanding of lynx habitat requirements (see section 4.2.3). Currently, this unit is thought to be capable of supporting 200-300 resident lynx. How the current population compares to historical conditions is uncertain, but we find no evidence that this unit historically supported a larger resident population or a substantially broader distribution of habitat capable of doing so. Lynx habitats in this unit are naturally patchy and fragmented due to topography and elevational and moisture (aspect) constraints. We concur with the expert panel that resident lynx are very likely to persist in this unit at years 2025 and 2050, and likely to do so at 2100. Over the longer-term, we expect continued climate warming and associated impacts, perhaps especially increased wildfire activity, to reduce the amount and quality of lynx habitat in this unit, reducing lynx numbers and likely decreasing the population's resilience. Although the timing and extent of climate-mediated habitat decline is highly uncertain and fire-driven habitat loss typically would be temporary, wildfire size, frequency, and intensity have increased in this unit over the past few decades, and this pattern is expected to continue with projected climate warming.

Unit 4 - Atypically large, frequent, and intense wildfires over the past few decades have impacted over a third of the lynx habitat in north-central Washington, perhaps substantially more after additional fires in 2017. Because of this, the number of resident lynx in this unit is likely lower than it was historically and when the DPS was listed. Based on estimates of lynx carrying capacity, this unit may have been capable of supporting roughly 50-60 resident lynx prior to large fires beginning in the early 1990s. Recent habitat evaluations suggest it currently may be capable of supporting only about 30-35 lynx, with the decline due to fire-driven habitat losses. Although these losses are expected to be temporary, additional fires in this unit before previously burned areas recover (10-40 years post-burn) would further reduce lynx numbers and make this geographic unit more vulnerable to extirpation. Because of these habitat impacts, limited demographic information, and remaining uncertainties (e.g., immigration/emigration rates, changes in snowpack, disease, lynx population status and impacts of trapping in southern British Columbia, and habitat corridor stability between British Columbia and this unit), the Washington Department of Fish and Wildlife recently submitted, and the State Fish and Wildlife Commission adopted, a proposal to uplist lynx from threatened to endangered within the State. Nonetheless, we concur with the expert panel that the resident lynx population in this unit is very likely to persist at years 2025 and 2050. Over the longer-term (2100), we expect continued climate warming to reduce the amount and quality of lynx habitat in this unit, further reducing lynx numbers and likely decreasing the population's resilience. Therefore, we concur with experts that this unit has a relatively lower likelihood of supporting a resident population at 2100, although the timing and extent of climate-mediated habitat decline is highly uncertain.

8

<u>Unit 5</u> – Based on evaluation of verified historic records, it is uncertain whether this geographic unit historically supported a small but persistent resident population or supported resident lynx only ephemerally. There are very few verified lynx records in the GYA from 1920-1999, but several resident lynx and evidence of reproduction were verified in the late 1990s and early 2000s (around the time the DPS was listed). In addition, at least 9 radio-marked lynx released in Colorado (see below) dispersed northward into or through this unit from 2003-2010, but no lynx have been detected in the GYA since 2010. Most places surveyed in Yellowstone National Park had hare densities clearly too low to support resident lynx. However, parts of the Wyoming Range south of the park, where many historical and most recent occurrences in this unit have been concentrated, had hare densities among the highest documented in the DPS range. No population estimates are available, but expert opinion suggests that this unit may only support 0-10 lynx, and we find no reliable evidence that it once supported a larger or persistent resident population. Therefore, given the uncertainty whether this unit historically or recently supported a persistent resident population and the lack of evidence that it is currently occupied by resident lynx, we concur with experts that it is very unlikely to support a resident population in the future.

<u>Unit 6</u> – There are currently many more resident lynx in this unit than likely occurred historically, and many more than were known or suspected at the time the DPS was listed. There were even fewer verified records in this unit during the last century than in the GYA, and no reliable evidence of a resident breeding population. However, from 1999-2006, 218 Canadian and Alaskan lynx were released into the San Juan Mountains of southwestern Colorado. As a result of the subsequent reproduction of some of the released lynx and some of their offspring over several generations, resident lynx currently occupy this unit. When the DPS was listed in 2000, 27 of 41 lynx released in 1999 were still alive. The State of Colorado has concluded that its efforts have established a viable lynx population, and the State's lynx experts suggest this unit may currently support 100-250 resident lynx. Recent snow-tracking and camera surveys in the San Juan Mountains in the southern part of the unit documented evidence of continued lynx residency and reproduction. We concur with the expert panel that resident lynx in this unit are likely to persist at year 2025. However, given this unit's apparent historical inability to support a persistent resident population, its relative isolation from other lynx populations, its naturally fragmented habitat and generally very low hare densities, and its generally lower proportion of females producing kittens and low kitten survival, we believe it is less likely than expert projections to support a resident population at 2050 or at 2100. It is possible that hare densities will increase over the next several decades as large areas of forest regenerate from recent extensive insect and fire impacts. However, we expect any increase in hares to be temporary and accompanied by a longer-term insect- and fire-driven decrease in red squirrel (*Tamiasciurus hudsonicus*) abundance.

<u>DPS Viability</u>

In this SSA, we describe the current and future viability of the DPS in terms of resiliency, redundancy, and representation. Resident lynx populations persisted historically and continue to persist in 4 geographic units (Units 1-4). It is uncertain whether Unit 5 (the GYA) historically

9

supported a small persistent population or if lynx residency was ephemeral; currently, it appears not to support resident lynx. Available evidence suggests that Unit 6 (Colorado) did not historically support persistent lynx presence; however, a resident population has persisted there for more than a decade since the 1999-2006 releases described above. Considering the available information, we find no reliable evidence that the current distribution and relative abundance of resident lynx in the contiguous United States are substantially reduced from historical conditions. This suggests historical and current resiliency among lynx populations in the DPS.

The current broad distribution of resident lynx in large, geographically discrete areas (redundancy) makes the DPS invulnerable to extirpation caused by a single catastrophic event. Because we lack evidence that formerly persistent lynx populations have been lost from any large areas, it also seems that redundancy in the DPS has not been meaningfully diminished from historical levels. In fact, as a result of the current population in Colorado, redundancy in the DPS is likely greater, at least temporarily, now than it was historically.

Similarly, resident lynx remain broadly distributed across the range of habitats that has supported them historically, suggesting maintenance of the breadth and diversity of ecological settings occupied within the DPS range (representation). Additionally, observed high rates of dispersal and gene flow and, therefore, generally low levels of genetic differentiation across most of the lynx's range, including the DPS, suggest the past and recent genetic health of lynx populations in the DPS (representation; but see section 2.1). Because there are no indications of significant loss of or current stressors to the genetic health or adaptive capacity of lynx populations in the DPS, we find that the current level of representation within the DPS does not appear to indicate a decrease from historical conditions.

We expect lynx populations in each geographic unit to become smaller and more patchily-distributed due largely to projected climate-driven losses in habitat quality and quantity and related factors. However, the timing, rate, and extent of habitat decline due to projected climate warming and corresponding effects to lynx populations is highly uncertain. Despite some reduced resiliency, we conclude that resident lynx populations are very likely to persist in all 5 units that currently support them (Units 1-4 and 6) in the near-term (2025) and in all or most of those units at 2050, with corresponding maintenance of redundancy and representation in the DPS over that time span. We and the experts we consulted have low confidence in predicting the likely conditions of DPS populations beyond 2050. That said, smaller, more isolated populations would be less resilient and more vulnerable to demographic and environmental stochasticity and genetic drift and, therefore, at higher risk of extirpation. Although predictions out to 2100 are highly uncertain, it is possible that resident lynx populations could be functionally extirpated from some units by the end of the century. Should extirpations occur, this would indicate a loss of resiliency, reduced redundancy and representation, and an increased risk of extirpation of the DPS.

Rvsd Plan - 00003798

# Chapter 1: Introduction

The Service designated Canada lynx in the contiguous United States as a DPS because of differences in the management of lynx and lynx habitats across the international boundary with Canada and because of the climatic, vegetative, and ecological differences in lynx habitat compared to the northern parts of the species' range in Canada and Alaska (62 FR 28654-28655). The Service listed the DPS as threatened under the ESA in 2000 because of the inadequacy, at that time, of existing regulatory mechanisms on some Federal lands to provide for the conservation of lynx habitats and populations (65 FR 16052-16086). On May 8, 2014, the United States District Court for the District of Montana ordered the Service to complete recovery planning for the lynx DPS (U.S. District Court MT 2014a, p. 8). On June 25, 2014, the same court ordered the Service to complete a recovery plan by January 15, 2018 "…unless the Service finds that such a plan will not promote the conservation of the [lynx]" (i.e., the DPS is recovered or no longer warrants ESA protections; U.S. District Court MT 2014b, p. 2). We completed this SSA (version 1.0) to summarize the best available scientific information on the current status and likely future viability of the DPS. This SSA will inform a determination by Service decision makers of whether (1) the DPS continues to warrant protection under the ESA and (2) a recovery plan is needed to guide conservation and recovery of the lynx DPS.

## 1.1 Background

The Canada lynx is a North American wild cat that is most strongly associated with northern-latitude boreal forests (taiga) of Canada and Alaska (McCord and Cardoza 1982, p. 729; Agee 2000, pp. 39-41; Aubry *et al.* 2000, pp. 373-374; Mowat *et al.* 2000, p. 272). It is a prey specialist and relies heavily on its primary prey, the snowshoe hare (*Lepus americanus*), to support survival, reproduction, recruitment, and, therefore, population persistence (Ruggiero *et al.* 2000a, p. 110; Mowat *et al.* 2000, p. 270; Steury and Murray 2004, pp. 128, 136-138; USFWS 2005, p. 2; Interagency Lynx Biology Team [ILBT] 2013, pp. 30-34; 79 FR 54808-54809). Lynx distribution and population persistence are also influenced by snow conditions (e.g., Peers *et al.* 2012, pp. 4-9). It is generally restricted to areas that receive deep and persistent unconsolidated ("fluffy") snow, which is thought to allow lynx, with their proportionately longer limbs and very large feet, to outcompete other terrestrial hare predators that are less efficient in such conditions (McCord and Cardoza 1982, pp. 748-749; Quinn and Parker 1987, p. 684; Buskirk *et al.* 2000a, pp. 89-94; Buskirk *et al.* 2000b, pp. 400-401; Ruggiero *et al.* 2000b, pp. 445–449; Hoving 2001, p. 75; Hoving *et al.* 2005, p. 744-749; Carroll 2007, entire; Gonzalez *et al.* 2007, entire; ILBT 2013, pp. 25-26; 79 FR 54809).

The lynx is generally considered secure, widespread, abundant, and distributed throughout most of its historical ranges in Canada and Alaska, which, combined, account for roughly 98 percent of the species' distribution. Lynx are distributed across approximately 5.5 million km$^2$ (2.1 million mi$^2$) in Canada (Environment Canada 2014, p. 2) and 534,454 km$^2$ (206,354 mi$^2$) in Alaska (Univ. of Alaska Center for Conservation Science 2016, entire; Reimer 2016, *pers. comm.*). The southern peripheries of the boreal forest and the distributions of snowshoe hares and lynx extend into the northern contiguous United States (Bittner and Rongstad 1982, p. 146;

11

McCord and Cardoza 1982, p. 729; Agee 2000, pp. 39-41; Aubry *et al.* 2000, pp. 379-382; Hodges 2000a, pp. 163-173; McKelvey *et al.* 2000a, pp. 242-253), where the 6 geographic units evaluated in this SSA represent the other 2 percent of the species' breeding distribution (approximately 131,168 km$^2$ [50,644 mi$^2$]; see fig. 1, above, and table 2, below).

We consider "southern" lynx populations to include all those in the contiguous United States and in the southern parts of the adjacent Canadian provinces of (east to west) Nova Scotia, New Brunswick, Quebec (south of the Saint Lawrence Seaway and River), Ontario (north of the Great Lakes and Minnesota), Manitoba, Saskatchewan, Alberta, and British Columbia (e.g., see Ivan and Shenk 2016, p. 1051, fig. 1). Lynx populations in the DPS and on the margin of the range in adjacent Canadian provinces seem to function as peripheral subpopulations of a larger metapopulation that is broadly distributed across Canada and Alaska (McKelvey *et al.* 2000b, p. 25; 68 FR 40077; also see 2.2 below). The demographic and genetic health and persistence of DPS populations are thought to be influenced by connectivity with, and immigration of lynx from, larger populations in Canada (McKelvey *et al.* 2000b, pp. 21, 33; Schwartz *et al.* 2002, entire; 78 FR 59434, 59447; 79 FR 54815).

Lynx were documented historically in 24 of the Lower 48 States (McKelvey *et al.* 2000a, pp. 207-232), but records in many places are associated with cyclic "irruptions" of large numbers of lynx dispersing from southern Canada during the decline/low phase of snowshoe hare population cycles, roughly every 10 years. Many of these occurrences were in anomalous habitats, and lynx were unable to persist and establish populations in most of these areas (Gunderson 1978, entire; Thiel 1987, entire; McKelvey *et al.* 2000a, pp. 242, 253; Aubry 2006, pp. 1-2; ILBT 2013, p. 23; see also section 2.3.2). Habitats capable of supporting persistent resident lynx populations in the contiguous United States occur over a much smaller geographic area that includes parts of the Northeast (primarily northern Maine), western Great Lakes (northeastern Minnesota), Rocky Mountains (northern Idaho, northwestern Montana; perhaps also parts of northeastern Washington, the Greater Yellowstone Area (GYA) of southwestern Montana and northwestern Wyoming, and parts of western Colorado), and the eastern Cascade Mountains of northern Washington (68 FR 40077-40080; USFWS 2005, p. 3; 79 FR 54806-54807; Lynx SSA Team 2016a, pp. 6-7). Although uncertainty remains regarding the historical distribution of resident lynx in the contiguous United States, and small breeding populations may have been lost from some places, neither broad-scale breeding range contraction nor substantial changes in population status in the contiguous United States has been documented based on verified occurrence data (68 FR 40099; 72 FR 1187; 79 FR 54798, 54815; McKelvey *in* Lynx SSA Team 2016a, p. 11; also see section 2.3.2).

The Service designated lynx in the contiguous United States as a DPS and listed it as threatened under the ESA in 14 states in 2000 because of the inadequacy, at that time, of existing regulatory mechanisms on U.S. Forest Service (USFS) and Bureau of Land Management (BLM) lands in those states (65 FR 16052). In 2003, in response to a court memorandum opinion on the 2000 listing rule, the Service reaffirmed its determination of the lynx DPS and its status as threatened under the ESA (68 FR 40076). The Service completed a recovery outline in 2005 (USFWS 2005, entire), designated critical habitat for the DPS in 2006

12

(71 FR 66008) and, in 2007, again in response to a court order, clarified its determinations of "significant portion of the range" and that all lynx in the contiguous United States constitute a single DPS (72 FR 1186). Also in 2007, the Service announced that it would initiate a 5-year status review of the DPS (72 FR 19549). The Service revised the critical habitat designation for the DPS in 2009 (74 FR 8616) and 2014 (79 FR 54782) and, concurrent with the latter, rescinded the state-based definition of the DPS boundary to formally extend ESA protection to lynx "where found" in the contiguous United States, including New Mexico and other states that were not included in the original DPS range (79 FR 54804). Also in 2014 and as described above, the U.S. District Court for the District of Montana ordered the Service to complete a recovery plan for the lynx DPS by January, 2018, unless it finds that such a plan is not necessary. The Service reinitiated the 5-year status review in 2015 (USFWS 2015a, entire), and that review and potential recovery planning pursuant to it will be informed by this SSA report. On September 7, 2016, the U.S. District Court for the District of Montana remanded the 2014 critical habitat designation to the Service for further consideration (U.S. District Court MT 2016, entire).

The 6 geographic units evaluated in this SSA encompass all areas of the contiguous United States that currently support or are believed to have recently (since the DPS was listed in 2000) supported persistent resident lynx populations (fig. 1, above). Five of the 6 geographic units were designated as "Core Areas" in the Recovery Outline, and western Colorado was designated a "Provisional Core Area" (USFWS 2005, pp. 4-6, 21, 23). With the exception of western Colorado, the SSA units reflect the areas the Service designated as critical habitat in 2014 (79 FR 54782). Some areas adjacent to these geographic units are known or suspected to intermittently support resident lynx and occasional reproduction. Uncertainty remains as to whether resident lynx populations occurred historically in other areas not encompassed by the geographic units evaluated here.

The 6 geographic units include Federal, private, State, and Tribal lands, and proportions vary among the units, with private lands predominating in Maine, a mix of ownerships present in Minnesota, and Federal lands predominating in the western units (table 2).

13

Rvsd Plan - 00003801

**Table 2. Lynx SSA Unit Sizes and Percent Ownership.**

| Unit[1] | Unit Size $(km^2)$ | Percent of SSA Area | Land Ownership/Management (Percent)[2] | | | | | | |
| | | | Federal[3] | | | | | | |
| | | | All Federal | USFS | NPS | BLM | Private | State | Tribal |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 28,909 | 22.0 | 1.2 | 0 | 1.2 | 0 | 90.4 | 7.3 | 0.9 |
| 2 | 21,101 | 16.1 | 47.4 | 44.9 | 2.5 | 0.01 | 15.5 | 36.2 | 1.0 |
| 3 | 26,997 | 20.6 | 84.3 | 69.3 | 13.6 | 1.5 | 8.0 | 4.1 | 3.5 |
| 4 | 5,176 | 3.9 | 91.5 | 84.6 | 6.7 | 0.1 | 0.3 | 8.2 | 0 |
| 5 | 23,687 | 18.1 | 97.6 | 79.7 | 16.7 | 1.1 | 2.2 | 0.3 | 0 |
| 6 | 25,294 | 19.3 | 90.1 | 85.2 | 1.8 | 3.1 | 9.3 | 0.6 | 0 |
| All Units | 131,164 | 100 | 63.8 | 55.6 | 7.1 | 1.1 | 26.3 | 8.8 | 1.1 |

[1] Unit 1 - Northern Maine; Unit 2 - Northeastern Minnesota, Unit 3 - Northwestern Montana/Northeastern Idaho, Unit 4 - North-central Washington, Unit 5 - the Greater Yellowstone Area (Southwestern Montana/Northwestern Wyoming), Unit 6 - Western Colorado.

[2] Unit sizes and ownership for units 1-5 are those calculated for the areas designated in 2014 as lynx critical habitat, including some Tribal, State and private lands that met the criteria for critical habitat but which were excluded from the designation in accordance with section 4(b)(2) of the Endangered Species Act. Unit 6 size and ownership were calculated by the Service's Western Colorado Field Office in coordination with Colorado Parks and Wildlife based on telemetry data from radio-marked lynx.

[3] USFS = U.S. Forest Service; NPS = National Park Service; BLM = Bureau of Land Management.

## 1.2 SSA Framework and Report

The Service is engaged in a number of efforts to improve the implementation of the ESA[1]. As part of this effort, our Endangered Species Program has developed the Species Status Assessment (SSA) Framework to guide how we assess the best scientific and commercial data available when evaluating the biological status of species. The purpose of the SSA Framework is to provide a consistent, integrated, conservation-focused, and scientifically robust approach to assessing a species' biological status such that the information and analysis are useful to all decisions and activities under the ESA. The SSA does not result in a decision document; rather, it provides the biological information and scientific analysis in support of ESA decisions. The SSA Framework entails 3 iterative assessment stages (fig. 3; USFWS 2016a):

---

[1] See: http://www.fws.gov/endangered/improving_ESA/.

Rvsd Plan - 00003802

1. **Species' Needs**. An SSA begins with a compilation of the best available biological information on the species (taxonomy, life history, and habitat) and its ecological needs at the individual, population, and species levels based on how environmental factors are understood to act on the species and its habitat.

2. **Current Species' Condition**. Next, an SSA describes the current condition of the species' habitat and demographics, and the probable explanations for past and ongoing changes in abundance and distribution within the species' ecological settings (i.e., areas representative of the geographic, genetic, or life history variation across the species' range).

**Species Status Assessment Framework**



Figure 3. SSA Framework stages.

3. **Future Species' Condition**. Lastly, an SSA forecasts the species' response to probable future scenarios of environmental conditions and conservation efforts. As a result, the SSA characterizes species' ability to sustain populations in the wild over time (viability) based on the best scientific understanding of current and future abundance and distribution within the species' ecological settings.

Throughout the assessment, the SSA uses the conservation biology principles of resiliency, redundancy, and representation (collectively known as the "3 Rs") as a lens to evaluate the current and future condition of the species. Resiliency describes the ability of the species to withstand stochastic disturbance events, which is associated with population size, growth rate, and habitat quality. Redundancy describes the ability of a species to withstand catastrophic events, which is related to the number, distribution, and resilience of populations. Representation describes the ability of a species to adapt to changing environmental conditions, which is related to distribution within the species' ecological settings. Together, the 3 Rs, and their core autecological parameters of abundance, distribution and diversity, comprise the key characteristics that contribute to a species' ability to sustain populations in the wild over time. When combined across populations, they measure the health of the species as a whole.

The Species Status Assessment Report (SSA Report) is a summary of the information assembled, reviewed, and assessed by the Service and is based on the best scientific and commercial data available at the time of the assessment. Completed SSA Reports and supporting material can be found at the collaborative repository of the National Park Service and the USFWS called "ServCat"[2].

---

[2] http://www.fws.gov/Refuges/NaturalResourcePC/IandM/serviceCatalog.html.

Rvsd Plan - 00003803

## 1.3 Analytical Approach and Methods

We used the SSA Framework described above to evaluate the current status of resident lynx in the contiguous United States as well as the likelihood that the geographic areas supporting resident lynx in the DPS would continue to do so in the near-term and at mid- and end-of-century (years 2025, 2050, and 2100). We framed our evaluation in terms of the 3 Rs using conceptual modeling (figs. 4-7) based on available published literature, other information on the historical and current status of and threats to lynx in the DPS and, where empirical data are lacking, on formally-elicited expert opinion and best professional judgment (Lynx SSA Team 2016a, entire). The conceptual models below are intended to broadly highlight important relationships thought to influence lynx in the DPS in terms of representation, redundancy, and resiliency. They are not meant to capture every nuance of all possible relationships between lynx and their environments or to illustrate all factors potentially capable of affecting individual lynx or populations.



**Figure 4. Conceptual model of the factors thought to influence the 3 Rs as they pertain to lynx viability.**

We applied the definitions from the SSA Framework for the principles of redundancy, representation, and resiliency, provided in section 1.2, to Canada lynx as described below. We evaluated redundancy and representation at the scale of the DPS as a whole, and resiliency at the scale of lynx populations within each of the 6 geographic units and at the scale of the DPS as a whole.

To evaluate **redundancy** for the lynx DPS, we considered the current and likely future geographic distributions of resident breeding populations and whether the DPS is currently vulnerable to extirpation from a catastrophic event or would be vulnerable in the future. We

16

consider catastrophic events to be relatively discrete in both time and geographic extent (e.g., wildfires, storms, floods, volcanic eruptions, etc.) and, therefore, we do not consider anthropogenic climate warming as a catastrophic event (see below). Figure 5 shows examples of relationships among factors that may influence redundancy within the lynx DPS.



**Figure 5. Conceptual model of factors thought to influence redundancy within the lynx DPS.**

To evaluate **representation** for the lynx DPS, we considered measures of genetic diversity and heterozygosity, the current and likely future ecological diversity (breadth) of geographic areas occupied by resident breeding populations, and the documented dispersal capabilities of the species, as shown in figure 6 below.

17



**Figure 6. Conceptual model of factors thought to influence representation within the lynx DPS.**

Because we lack reliable estimates of the sizes and trends of lynx populations in the DPS and existing demographic data are inadequate to construct empirical models to project population sizes, trends, and viability into the future, our evaluation of the **resiliency** of lynx populations in the DPS was based largely on consideration of recent status updates and formally-elicited expert opinion regarding the likelihood that DPS populations will remain viable into the future. The relationships among factors that influence DPS resiliency are shown in figure 7 below.

18



**Figure 7. Conceptual model of factors thought to influence the resiliency of lynx populations within the DPS.**

We elicited expert input on the current status of resident lynx populations in each geographic unit and the likelihood that each unit would continue to support them in the future (i.e., that resident populations would not be functionally extirpated [reduced to the point that a viable breeding population could no longer be sustained]). To assess both current and future conditions for lynx in the DPS, we considered the adequacy of existing regulatory mechanisms (the factor for which the DPS was originally listed) as well as the anthropogenic influences considered by the Interagency Lynx Biology Team (ILBT) to have the potential to exert population-level (3 Rs) effects on the DPS (climate change, vegetation management, wildland fire management, and habitat loss and fragmentation; ILBT 2013, pp. 68-78).

In Chapter 4, we present our assessment of current conditions based on expert input and our evaluation of the available scientific information regarding lynx populations and habitats and the influencing factors described above for each geographic area. In Chapter 5, we present summaries of experts' predictions regarding the probability of lynx persistence in each geographic unit; the factors they thought would most likely influence those probabilities; and the sources of uncertainty that influenced their confidence in their predictions. We then present our evaluation of the scientific literature regarding how certain anthropogenic factors may influence future conditions for resident lynx in each geographic unit. Other factors were also evaluated for some geographic units if the SSA Core Team member most familiar with that unit felt those factors could pose meaningful, even if less likely, risks to the unit's continued ability to support resident lynx. After considering all of the above, we present our conclusions regarding the future conditions for resident lynx in each geographic unit and we discuss the extent to which our conclusions agree with or differ from the projections provided by the lynx expert panel we consulted, and if they differed, why.

19

Implicit in our evaluation of the future for lynx in the contiguous United States is our recognition and consideration of a possible future in which the DPS is not listed under the ESA. However, we do not evaluate the unlikely hypothetical future in which all protections and conservation efforts would disappear if the DPS was not listed given (1) the history of lynx management, research, monitoring, and habitat conservation efforts by State wildlife and natural resource agencies in most states throughout the DPS range; (2) similar efforts by Federal land managers and related formal amendments or revisions to most of their land management plans to address the threat for which the DPS was listed (the inadequacy of previous Federal regulatory mechanisms); (3) Tribal lynx conservation efforts and wildlife management philosophies; and (4) the DPS's listing and consultation history. Rather, we assume that although some protections could be relaxed (e.g., less stringent analyses of Federal project-related impacts, potential for some states to reinstitute limited lynx trapping/hunting harvest, reduced incentives for lynx conservation efforts on some private lands), Federal, State, Tribal and some private land managers would continue efforts to conserve lynx and its habitats and to assure persistence of resident lynx populations in those places that can support them in the DPS range. Our evaluation, therefore, considers the possibility of the future relaxing of some lynx conservation measures and efforts should the DPS be delisted, but not the complete absence of all protections for lynx.

Additionally, we do not define and evaluate specific and explicit climate change or greenhouse gas emissions scenarios or attempt to quantify differences in DPS viability or the persistence of resident lynx populations in individual geographic units based on differences in the rate and extent of potential impacts associated with projected continued climate warming. This is because of the limited resolution and inherent uncertainty of available climate models and the inadequacy of existing demographic data for projecting lynx populations in the DPS over time, including their potential responses to a range of climate-mediated potential future habitat conditions. Therefore, this SSA does not constitute or include a formal climate change vulnerability assessment (Glick *et al*., editors, 2011, entire) for the lynx DPS. Instead, underlying our evaluation in this SSA is the recognition that the lynx, as a boreal forest- and snow-associated specialist predator, is probably broadly exposed and highly sensitive to the projected impacts of continued climate warming and has limited capacity to adapt to it (see sections 1.4 and 3.2 below). Therefore, we (along with the experts we consulted and the ILBT) consider lynx populations in the DPS vulnerable (predisposed to be adversely affected; IPCC 2014a, p. 5) to the projected impacts climate change. While we recognize that the pace and extent of impacts would be expected to differ under specific emissions or modeling scenarios, the limitations described above preclude us from quantifying those differences and their potential influence on the likelihood that resident lynx populations will persist in the DPS or in individual geographic units. Finally, in our analyses we do not consider anthropogenic climate warming a catastrophic effect because it is not temporally- and spatially-discrete; characteristics of events traditionally considered catastrophic (e.g., wildfires, floods, storms, volcanic eruptions, etc.). Rather, we consider climate change as an ongoing, pervasive, and cumulative stressor of lynx and their habitats, particularly at the southern margin of the species' distribution, including all geographic areas of the DPS.

20

## 1.4 Uncertainties and Assumptions

Several sources of uncertainty had to be accounted for in our analysis, including the paucity of empirical data on lynx population sizes, trends, and other important demographic parameters in the DPS; the influence of immigration of lynx from Canada on the persistence of DPS populations; the effectiveness of habitat management efforts; and the effects of competition on lynx populations. We similarly lack demographic information for snowshoe hares throughout much of the DPS range, and consistent methods to monitor hare and lynx habitats and populations have not been implemented throughout most of the range. And importantly, given the emerging role of climate change as a stressor, uncertainties about the rate and extent of projected future impacts to boreal, subalpine, and montane forests and snow quality, depth, and persistence constrain our ability to precisely predict effects on lynx and hare populations and habitats, including to what degree these changes may affect interactions between lynx and their potential competitors.

To account for these uncertainties in our analysis, we identified a number of critical assumptions based on the scientific literature and input provided by the lynx experts we consulted. We treated the following assumptions as constants in the analysis.

- We assume that, in general, habitat quality and contiguity and hare densities are naturally lower at the southern margin of the lynx's range (in both the contiguous United States and the southern portions of adjacent Canadian provinces) compared to the core of the species' range in Canada and Alaska. Hare populations in the DPS range are noncyclic or weakly cyclic and, although they do not exhibit the dramatic cyclic declines of their northern counterparts, they typically occur at densities on the lower end of those in the northern range. Because of this, lynx densities in most of the DPS range are typically similar to those in the north during hare cycle lows.

- We assume that, as a consequence of generally lower habitat quality and hare densities, only some places within the DPS range are capable of supporting persistent resident lynx populations, while others may naturally support resident lynx only ephemerally, and yet other areas are naturally incapable of supporting resident lynx despite boreal-forest-like vegetation, the presence of some hares, and the occasional or intermittent presence of dispersing or transient lynx.

- We assume that the statuses of lynx populations in individual SSA geographic units are largely independent of those in the other geographic units. This is clearly true for Units 1 and 2, and it is probably true of the western geographic units (3 – 6), despite likely historical north-to-south connectivity and dispersal from or through Unit 3 to Unit 5 and possibly Unit 6, and recent evidence of south-to-north connectivity and dispersal from Unit 6 to and through Units 5 and 3. We are aware of no evidence of east-west connectivity or dispersal between Units 3 and 4.

21

Rvsd Plan - 00003809

- We assume that lynx populations in the DPS occur as the southern extensions of larger, cross-border populations or as relatively isolated subpopulations of the larger Canadian populations.

- We assume that lynx exhibit a metapopulation structure in which populations at the southern periphery of the species' range (including all DPS populations and some in southern Canada) receive periodic immigration of lynx dispersing from populations in the core of the Canadian range.

- We assume that connectivity with lynx populations in Canada is important, and that periodic immigration of lynx into the DPS from Canada contributes to the persistence of DPS populations, although the extent to which the demographic and genetic health of DPS populations may depend on immigration remains uncertain.

- We assume that (1) the lynx's morphology confers a competitive advantage in snowy conditions over other terrestrial hare predators, (2) snow conditions (depth, consistency, and persistence) influence the distribution of lynx and its potential terrestrial competitors, and (3) in the absence or loss of these conditions, lynx could be displaced by other terrestrial hare predators.

- We assume that the lynx, as a boreal forest- and snow-associated predator that relies heavily on a single, similarly-specialized prey species, and whose habitats are influenced by climate-mediated disturbance factors (e.g., wildfire, forest insects, wind/ice storms), is highly sensitive and broadly exposed to the impacts of climate warming and has limited adaptive capacity to respond to it. That is, despite some level of behavioral plasticity suggested by differences in snow conditions and specific vegetation communities and stand conditions across the DPS range, we expect that lynx lack the adaptive capacity to shift to non-boreal (e.g., temperate coniferous or deciduous) forests, non-snow-domintated climates, or to persist on alternate prey species where hare densities are or become inadequate. Therefore, we assume lynx populations in the DPS are vulnerable (sensitive, exposed, and with little capacity to adapt; therefore, predisposed to be adversely affected; IPCC 2014a, p. 5) to the projected impacts of continued climate warming.

- We assume that lynx conservation measures and habitat management guidance adopted by the USFS and the BLM via formally amended or revised management plans or conservation agreements with the Service have had a positive influence on DPS lynx populations that occur on Federal lands and will continue to provide benefits as long as those measures and guidance are implemented.

- We assume that the DPS could be delisted in the future and that some of the current protections afforded by the ESA could be lost and/or relaxed. However, we assume that Federal, State, and Tribal agencies and some private landowners would continue to manage for the conservation of resident lynx populations in those places that can support them in the DPS range.

22

For purposes of the SSA, we forecast potential future conditions for lynx in the DPS through the end of this century, and we asked a panel of 10 lynx experts to provide their opinions on the likelihoods that each geographic unit would support resident lynx populations over the short-term (year 2025), mid-term (2050) and longer-term (2100). As expected, the level of uncertainty regarding the viability of the DPS and each of the factors that may influence it increases the farther into the future we (and the lynx experts we consulted) try to look, and this uncertainty greatly reduces confidence in future projections, particularly beyond mid-century. Beyond that time frame, uncertainty regarding the potential impacts of climate change and other potential stressors to lynx populations in the DPS becomes so great that it precludes meaningful analysis or reliable predictions regarding viability.

Finally, although formal elicitation of expert opinion where empirical information is unavailable or inadequate is an appropriate and scientifically supported approach, we remind readers that the output remains the experts' best professional judgment, which is subjective and, therefore, inherently different than experimentally collected data subjected to rigorous statistical analyses. For purposes of useful and meaningful presentation and comparison among geographic units, it was necessary to combine, quantify, graph, and summarize the qualitative information provided by experts. However, we caution that the results we present, graph, and describe in chapter 5 should not be interpreted as precise, statistically robust estimates of the probability that resident lynx will persist in the DPS or in any individual geographic unit in the future, and readers should consider the inherent limitations and substantial uncertainties in expert responses, particularly over longer time periods.

# Chapter 2: Lynx Ecology

In this chapter, we describe the physical characteristics, taxonomy, and genetics of the Canada lynx, its life history and population dynamics, and its taxon-wide and DPS distributions. We rely heavily on recent summaries of this information provided in the revised *Canada Lynx Conservation Assessment and Strategy* (LCAS; ILBT 2013, entire), the Service's recent proposed (2013) and final (2014) rules to revise the designation of critical habitat for the DPS (78 FR 59430-59474; 79 FR 54782-54846), and the results of the October 2015 Canada Lynx Expert Elicitation Workshop (Lynx SSA Team 2016a, entire). We also provide a summary of the pertinent ecological requirements of lynx at the individual, population, and DPS levels. These ecological requirements form the basis of our analyses conducted in Chapters 3 through 5.

## 2.1 Species Taxonomy, Description, and Genetics

The Canada lynx (order Carnivora; family Felidae) is 1 of 4 species within the genus *Lynx* (Kerr 1792), which also includes the bobcat (*L. rufus*, Schreber 1777), the Eurasian lynx (*L. lynx*, Linnaeus 1758), and the Iberian or Spanish lynx (*L. pardinus*, Temminck 1827). There are 3 recognized subspecies of Canada lynx:  *Lynx canadensis canadensis* (Kerr 1792), *L. c. mollipilosus* ("Arctic lynx," Stone 1900), and *L. c. subsolanus* ("Newfoundland lynx," Bangs

Rvsd Plan - 00003811

1897; Integrated Taxonomic Information System online database[3], retrieved April 14, 2016). The Canada lynx is believed to have evolved from the Eurasian lynx in the last 200,000 years in North America as a snowshoe hare specialist (Werdelin 1981, p. 69).

The Canada lynx is a medium-sized cat with long legs and large, well-furred paws. In winter, the lynx's fur is dense and has a grizzled appearance with a grayish-brown mix of buff or pale brown fur on the back, and a grayish-white or buff-white fur on the belly, legs, and feet. In summer, its fur is more reddish to gray-brown (McCord and Cardoza 1982, p. 730). It has long tufts of black hairs extending from the tips of its ears, a short, completely black-tipped tail, and often a distinct dish-like facial ruff of pale hairs tipped black. Lynx generally measure 75 to 90 cm (30 to 35 in) long and weigh 6 to 14 kg (14 to 31 lb; Quinn and Parker 1987, table 1; Moen *et al.* 2010a, fig. 2; MDIFW 2012, *unpubl. data*), and males are 13-25 percent larger than females (Mowat *et al.* 2000, p. 267). The lynx's large feet and long legs make it well-adapted for traversing and hunting in deep, powdery snow, where its low foot-loading (weight per surface area of foot) is thought to provide a competitive advantage (Buskirk *et al.* 2000a, p. 90; 2000b, p. 400; ILBT 2013, pp. 26, 36, 81) over other terrestrial predators of snowshoe hares, the lynx's primary prey. In southern Canada and the northern contiguous United States, where the southern edge of the lynx range overlaps the northern edge of the bobcat range, the 2 species are easily confused because of their similar size and appearance. However, the lynx's longer ear-tufts, larger feet, and black-tipped tail distinguish it from the bobcat, which has shorter ear tufts, small feet, and white on the underside of the tail. Bobcats are much more common, widespread, and abundant than lynx in most of the contiguous United States.

Overall, genetics research suggests high gene flow across most of the continental range of lynx, likely because of high dispersal rates, large dispersal distances, and the absence of significant barriers to genetic interchange throughout much of the lynx range, including the DPS (Schwartz *in* Lynx SSA Team 2016a, pp. 11-12). Genetic evidence also indicates interactions between lynx populations even where physical barriers appear most likely to restrict gene flow. For example, although *L. c. subsolanus* on Newfoundland Island is genetically (Row *et al.* 2012, pp. 1262-1266; Koen *et al.* 2015, p. 528) and morphologically (Khidas *et al.* 2013, pp. 597-601) distinct from mainland lynx (*L. c. canadensis*), there is evidence of genetic exchange between the 2 areas, indicating that some lynx are able to cross the 15-60 km- (9-37 mi-) wide Strait of Belle Isle that separates them (Koen *et al.* 2015, p. 527). Similarly, despite some differences in functional genetic markers (unique alleles) in lynx south versus north of the St. Lawrence Seaway/River in eastern Canada, which suggest the potential for evolutionarily significant differences in those areas (Bowman *in* Lynx SSA Team 2016a, p. 14), recent analyses reveal genetic exchange among lynx on either side, indicating that some lynx successfully navigate this barrier (Koen *et al.* 2015, pp. 524-528; Bowman *in* Lynx SSA Team 2016a, p. 12-13). However, Prentice *et al.* (2017, entire) documented natural selection for unique alleles in relatively isolated island populations of lynx in eastern Canada.

Schwartz *et al.* (2003, entire) documented reduced genetic variation (lower mean number of alleles per population and lower expected heterozygosity) among peripheral lynx populations

---

[3] http://www.itis.gov.

compared to populations in the core of the lynx geographical range in Canada and Alaska. While recognizing that small changes in genetic variation can lead to large changes in population fitness, the authors noted that the differences between core and peripheral populations in their study were small enough to suggest a lack of significant population subdivision (i.e., no indication of genetic isolation, substantial genetic drift, or potential genetic "bottlenecks" among DPS populations; Schwartz *et al.* 2003, p. 1814; 79 FR 54793). This finding is consistent with their earlier work, which documented high levels of gene flow (the highest yet documented for any carnivore) between core and peripheral lynx populations despite large separation distances (Schwartz *et al.* 2002, entire). Their results did not suggest that reduced genetic variation among peripheral populations was because of human disturbance (i.e., habitat loss/fragmentation on the southern periphery of the geographic range; Schwartz *et al.* 2003, p. 1814), but the authors concluded that the persistence of lynx populations in the contiguous United States depends on dispersal from larger (core) populations (Schwartz *et al.* 2002, p. 522).

Within the contiguous United States, minor genetic sub-structuring has been documented among lynx subpopulations in western Montana (Schwartz *in* Lynx SSA Team 2016a, p. 12 and Appendix 5). Genetic diversity may be somewhat greater among lynx in western Colorado than elsewhere in the DPS range because of the broad geographic distribution of the source populations that contributed to the lynx releases in Colorado (45 lynx from Quebec, 4 from Manitoba, 91 from British Columbia, 48 from The Yukon Territory, and 30 from Alaska). Additionally, lynx-bobcat hybridization has been documented in Minnesota, Maine, and New Brunswick (Schwartz *et al.* 2004, entire; Homyack *et al.* 2008, entire), where male bobcats bred with female lynx to produce fertile offspring with lynx-like ear tufts, intermediate foot-size, and bobcat-like fur (ILBT 2013, p. 35). In Minnesota from 2000 to 2015, DNA analyses documented 13 distinct hybrid individuals (Moen and Catton *in* Lynx SSA Team 2016a, pp. 13, 19); hybrids have yet to be documented in the western portion of the lynx's range (Schwartz *in* Lynx SSA Team 2016a, p. 12). At a continental scale, Koen *et al.* (2014b, pp. 111-113) found a low level of bobcat-lynx genetic introgression (i.e., hybridization) but suggested it could increase if bobcat distribution shifts northward in the future as a result of continued climate warming (also see section 3.2 below).

Currently, there is no indication that the levels of connectivity and gene flow between lynx populations in the DPS and those in the core of the lynx's range are inadequate to maintain the genetic health of DPS populations. Given the connectivity of most DPS units with lynx populations and habitats in Canada (particularly Units 1-4, which have the strongest evidence of historically persistent resident lynx populations), the noted dispersal capabilities of lynx, evidence of dispersal in both directions across the Canada-United States border (Aubry *et al.* 2000, pp. 386-387; Squires *et al.* 2006a, p. 38; Moen *et al.* 2010b, pp. ii, 17, 19; Vashon *et al.* 2012, p. 22), and the small number of immigrants thought necessary to maintain genetic variability in peripheral populations (McKelvey *et al.* 2000b, pp. 23-24), genetic isolation, biologically meaningful genetic drift, or potential genetic "bottlenecks" appear unlikely among most DPS populations in the near future (79 FR 54793). However, the potential for genetic drift would be expected to increase at some point in the future if lynx and hare habitats shift

25

northward and upslope, as projected with continued climate warming, resulting in reduced connectivity and gene flow among smaller and more isolated lynx populations at the periphery of the range (Schwartz 2017, pp. 4-5; also see section 3.2).

## 2.2 Life History and Population Dynamics

All aspects of lynx life history are inextricably tied to its primary prey, the snowshoe hare (fig. 8), which comprises most of the lynx diet throughout its range (Nellis *et al.* 1972, pp. 323–325; Brand *et al.* 1976, pp. 422–425; Koehler and Aubry 1994, pp. 75, 85; Apps 2000, pp. 358–359, 363; Aubry *et al.* 2000, pp. 375–378; Mowat *et al.* 2000, pp. 267–268), including the DPS (Koehler 1990a, p. 848; von Kienast 2003, pp. 37–38; Squires *et al.* 2004a, p. 15, table 8; Moen 2009, p. 7; Vashon *et al.* 2012, p. 11; Olson 2015, pp. 60-69; Ivan and Shenk 2016, p. 1053). Lynx are highly specialized hare predators and require landscapes that consistently support relatively high hare densities (McCord and Cardoza 1982, p. 744; Quinn and Parker 1987, pp. 684-685; Aubry *et al.* 2000, pp. 375-378).



**Figure 8. Generalized relationship between habitat conditions and hare and lynx population dynamics and their influence on lynx population resiliency.**

Although lynx take a variety of alternate prey species, especially red squirrels (*Tamiasciurus hudsonicus*), which may be important when hare numbers are low (O'Donoghue *et al.* 1997, pp. 154-155; 1998, pp. 1198-1205; Ivan and Shenk 2016, pp. 1054-1056), hare abundance is the major driver of lynx population dynamics. Lynx denning area selection, pregnancy rates and

26

litter sizes, as well as survival (kitten, subadult, and adult), recruitment, and dispersal rates, and population age structure, home range sizes, density, and distribution are all strongly influenced by hare abundance (Koehler and Aubry 1994, pp. 75-76, 80-83; Apps 2000, entire; Aubry *et al.* 2000, pp. 375-390; Mowat *et al.* 2000, pp. 270-294; Moen *et al.* 2008a, p. 1507; Organ et al. 2008, p. 1516; Vashon *et al.* 2012, p. 16; ILBT 2013, pp. 18, 22-24, 26-34).

Lynx and snowshoe hares are strongly associated with moist boreal forests, where winters are long, cold, and snowy (Bittner and Rongstad 1982, p. 154; McCord and Cardoza 1982, p. 743; Quinn and Parker 1987, p. 684-685; Agee 2000, p. 39-47; Aubry *et al.* 2000, pp. 373-382; Hodges 2000a, pp. 183-191; 2000b, pp. 136-140; McKelvey *et al.* 2000a, pp. 211-232). The predominant vegetation of boreal forest is conifer trees, primarily species of spruce (*Picea* spp.) and fir (*Abies* spp; Elliot-Fisk 1988, pp. 34-35, 37-42). Snowshoe hares feed on conifers, deciduous trees, and shrubs (Hodges 2000a, pp. 181-183) and are most abundant in forests with dense understories that provide forage, cover to escape from predators, and protection during extreme weather (Wolfe *et al.* 1982, pp. 665-669; Litvaitis *et al.* 1985, pp. 869-872; Hodges 2000a, pp. 183-195; 2000b, pp. 136-140). Lynx population dynamics, survival, and reproduction are closely tied to snowshoe hare availability, making snowshoe hare habitat the primary component of lynx habitat. However, lynx do not occur everywhere within the range of snowshoe hares in the contiguous United States (Bittner and Rongstad 1982, p. 146; McCord and Cardoza 1982, p. 729). This may be due to inadequate abundance, density, or spatial distribution of hares in some places, or the absence of snow conditions that would provide lynx a competitive advantage over other terrestrial hare predators (see below), or a combination of these factors (79 FR 54809).

The boreal forest landscapes lynx and hares occupy are naturally dynamic. Forest stands within the landscape may experience abrupt changes after natural or human-caused disturbances such as fire, insect outbreaks, wind, ice, disease, and forest management (e.g., timber harvest or thinning) and more gradual changes as they undergo succession and regenerate after such events (Elliot-Fisk 1988, pp. 47-48; Agee 2000, pp. 47-69). As a result, lynx habitat is a shifting mosaic of forest patches of variable ages and changing quality (68 FR 40077). These stands of differing ages and conditions provide lynx foraging or denning habitat (or may provide these in the future depending on patterns of disturbance and forest succession), and some serve as travel routes for lynx moving between foraging and denning habitats (McKelvey *et al.* 2000c, pp. 427-434; Hoving *et al.* 2004, pp. 290-292).

Over much of the lynx's range, hare densities are higher in regenerating, earlier successional forest stages because they often have greater understory structure (dense horizontal cover) than mature forests (Buehler and Keith 1982, p. 24; Wolfe *et al.* 1982, pp. 665-669; Koehler 1990a, pp. 847-848; Hodges 2000a, pp. 183-195; Homyack 2003, pp. 63, 141; Griffin 2004, pp. 84-88). However, snowshoe hares also can be abundant in mature forests with dense horizontal cover, particularly in the Northern Rocky Mountains (Griffin 2004, pp. 53-54; Griffin and Mills 2009, pp. 1492-1496; Hodges *et al.* 2009, p. 876; Squires *et al.* 2010, pp. 1653-1657; Berg *et al.* 2012, pp. 1483-1487). These mature forests may be a source of hares for other adjacent forest types (Griffin and Mills 2009, pp. 1492, 1495-1496), and they may provide especially important

27

winter foraging habitats (Squires *et al.* 2010, pp. 1655-1657), which may be the most limiting habitat for lynx (Squires *et al.* 2010, pp. 1655-1657; ILBT 2013, pp. 17, 27). They also are more temporally-stable (i.e., they provide high-quality hare habitat for a longer period of time) than regenerating stands, which may foster high hare densities for a variable window of time between stand-initiation and stem-exclusion stages of succession, after which older regenerating stands may persist, in the absence of disturbance, for many years as lower-quality hare habitat (ILBT 2013, pp. 62, 71, 127).

Lynx generally concentrate hunting activities in areas where snowshoe hare densities are high (Koehler *et al.* 1979, p. 442; Ward and Krebs 1985, pp. 2821-2823; Murray *et al.* 1994, p. 1450; O'Donoghue *et al.* 1997, pp. 155, 159-160 and 1998, pp. 178-181), but several studies showed that lynx focused foraging efforts in stands with intermediate hare densities and forest structural complexity that occurred at the edges of the highest density habitat, suggesting that lynx must balance between hare abundance and accessibility (Fuller and Harrison 2010, pp. 1276–1277; Simons-Legaard *et al.* 2013, p. 574). Because understory density within a forest stand changes over time, hare habitat quality and corresponding hare densities also shift over time across boreal forest landscapes.

Hare populations in the core of the lynx range in Canada and Alaska undergo well-documented dramatic 8 to 11 year cycles during which hare numbers may fluctuate 10 to 25 fold or more, with peak densities as high as 23 hares/hectare (ha; 9.3 hares/acre [ac]) and lows of 0.1 hares/ha (0.04 hares/ac; Hodges 2000b, pp. 117-121; Vashon 2015, p. 4). Hare densities are generally lower at the southern periphery of lynx distribution, and hare population cycles are generally much less pronounced or absent entirely among some hare populations in southern Canada and in the contiguous United States (Hodges 2000a, pp. 163–173; Hodges *et al.* 2009, pp. 870, 875–876; Scott 2009, pp. 1–44; Environment Canada 2014, p. 1; Hodges *in* Lynx SSA Team 2016a, pp. 16-17). In the contiguous United States, average stand-level hare densities may exceed 2 hares/ha (0.8 hares/ac; Walker 2005, pp. 20, 85; McCann 2006, p. 15; Robinson 2006, pp. 26-36, 62-75; Homyack *et al.* 2007, pp. 10-11; Griffin and Mills 2009, p. 1492; Vashon *et al.* 2012, p. 14), but in many parts of the DPS, landscape-level densities are lower, ranging from just above to well below the 0.5 hares/ha (0.2 hares/ac) density thought necessary to sustain lynx home ranges and populations (Hodges 2000a, pp. 168-169, 185; Ruggiero *et al.* 2000b, pp. 446–447; Squires and Ruggiero 2007, pp. 313-314; Maletzke *et al.* 2008, pp. 1476-1477; Zahratka and Shenk 2008, pp. 910-911; Hodges *et al.* 2009, pp. 873-877; Ivan 2011a, pp. 91-92, 95-102; Berg *et al.* 2012, p. 1483; ILBT 2013, pp. 24, 26, 90; Ivan *et al.* 2014, entire).

Lynx prey opportunistically on other small mammals and birds, especially red squirrels, grouse (*Bonasa umbellus, Dendragapus* spp., *Falcipennis canadensis*) and ptarmigan (*Lagopus* spp.), but alternate prey species do not sufficiently compensate for low availability of snowshoe hares, and lynx populations likely cannot persist over time in areas with consistently low hare densities (Brand *et al.* 1976, pp. 422–427; Brand and Keith 1979, pp. 833–834; Koehler 1990a, pp. 848–849; Mowat *et al.* 2000, pp. 267–268). Hares constitute the majority of the biomass in lynx diets even in areas with relatively low or marginal hare densities (Koehler and Aubry 1994, p. 85; Apps 2000, pp. 362-363; Aubry *et al.* 2000, pp. 375-378; Roth *et al.* 2007, pp. 2740-2741;

28

Squires and Ruggiero 2007, pp. 310-313; Hanson and Moen 2008, p. 9; Maletzke *et al.* 2008, pp. 1475-1477; Shenk 2009, pp. 13, 16). This remains true in years when hare abundance is low and proportionally more alternate prey items are taken (Brand *et al.* 1976, pp. 424-427; O'Donoghue *et al.* 1998, pp. 1198-1200; Ivan and Shenk 2016, p. 1053). Nonetheless, alternate prey, particularly red squirrels, may contribute to lynx persistence through cyclic hare population lows in the core of the range (O'Donoghue *et al.* 1997, pp. 156-160; 1998, pp.1204-1205) and may be important at the southern periphery of lynx range where hare numbers may be chronically marginal or low and where red squirrels may be less vulnerable than hares to projected impacts of continued climate warming (Roth *et al.* 2007, pp. 2740-2741*; Peers *et* al. 2014, entire; Ivan and Shenk 2016, pp. 1050, 1054-1056).

Lynx typically mate in March and April, and kittens are born from late April to mid-June after a 60- to 70-day gestation period (Koehler and Aubry 1994, p. 81; Mowat *et al.* 2000, p. 285). Female lynx typically reach reproductive maturity in their second year (at 22 months of age); however, when hares are abundant, females may breed at 10 months of age and produce kittens as 1-year-olds (Koehler and Aubry 1994, p. 81; Mowat *et al.* 2000, p. 285). Males do not seem to breed as yearlings, and they do not contribute to rearing of young (ILBT 2013, p. 30). Lynx dens are typically located in areas of dense cover, where coarse woody debris, such as downed logs and windfalls, provides security and thermal cover for lynx kittens (McCord and Cardoza 1982, pp. 743-744; Koehler 1990a, pp. 847-849; Slough 1999, p. 607; Squires and Laurion 2000, pp. 346-347; Organ *et al.* 2008, entire; Squires *et al.* 2008, pp. 1497, 1501-1505; Moen and Burdett 2009, pp. 5-8). Dens have been documented in both mature and younger boreal forest stands (Mowat *et al.* 2000, pp. 274-275; Squires *et al.* 2008, p. 1497; ILBT 2013, pp. 29-30; 78 FR 59441-59442; 79 FR 54809-54810; Organ *et al.* 2008, entire), and the amount of structure (e.g., downed trees; large, woody debris; tip-up mounds) seems to be more important than the age of the forest stand for lynx denning habitat (Mowat *et al.* 2000, pp. 274-275, Organ *et al.* 2008, p. 1516; Moen and Burdett 2009, p. 5). Denning habitat is not thought to be a limiting factor for lynx in the DPS (Moen *et al.* 2008a, p. 1512; Organ *et al.* 2008, pp. 1514, 1516–1517; Squires *et al.* 2008, p. 1505; ILBT 2013, p. 30; 79 FR 54790). Dens must be near foraging habitat to allow females to adequately provision dependent kittens, and females seem to select den sites near prey sources to minimize time spent away from kittens while foraging (Moen *et al.* 2008a, p. 1507; Vashon *et al.* 2012, p. 16; ILBT 2013, p. 29). Females attend kittens at the natal den site and 1 or more (up to 5) alternate or maternal dens until kittens are about 6-10 weeks old (Squires *et al.* 2008, p. 1502; Olson *et al.* 2011, pp. 458-460; Vashon *et al.* 2012, p. 17; ILBT 2013, p. 29).

Thereafter, kittens remain with their mothers through their first winter, apparently learning from her how to hunt and capture prey, initially on a small portion of her home range, but by fall on the larger area the female used before kittens were born (Mowat *et al.* 2000, pp. 269, 278). Juveniles remain closely associated with their mothers until February or March, when family groups begin to break up, with young typically dispersing in April and May (Mowat *et al.* 2000, pp. 278-279) to establish their own home ranges. Female offspring may establish home ranges overlapping or adjacent to their mother's home range and maintain mother-daughter bonds throughout their lives (Mowat *et al.* 2000, pp. 279-280). Male home ranges may slightly overlap

29

adjacent male home ranges. While male home ranges typically overlap 1 to 3 female home ranges, and female home ranges are partially or completely encompassed by a male's home range, core areas within home ranges appear to be exclusive except during the breeding season (Koehler and Aubry 1994, pp. 90-91; Mowat *et al.* 2000, pp. 276-280; Vashon *et al.* 2012, pp. 17, 22-23). Fidelity to home ranges over several years has been documented for both sexes, but shifts and abandonment of home ranges have also been documented (Koehler and Aubry 1994, p. 91; Mowat *et al.* 2000, p. 277). Lynx have been documented to live up to 16 years in the wild (Kolbe and Squires 2006, entire).

Lynx populations in Canada fluctuate in response to the cycling of hare populations (Elton and Nicholson 1942, pp. 241–243; Hodges 2000b, pp. 118–123; Mowat *et al.* 2000, pp. 265–272), with synchronous fluctuations in lynx numbers emanating from the core of the Canadian population and spreading over vast areas, generally lagging hare numbers by 1 year (McKelvey *et al.* 2000a, pp. 232, 239; Mowat *et al.* 2000, pp. 266, 270). When hares are abundant, lynx have higher pregnancy rates and larger litter sizes, higher kitten survival, and lower adult mortality, resulting in rapid population growth during the increase phase of the hare cycle (Slough and Mowat 1996, pp. 955–956; Mowat *et al.* 2000, pp. 266, 270–272, 281–289). When hare populations are low, female lynx produce few or no kittens that survive to independence (Nellis *et al.* 1972, pp. 326–328; Brand *et al.* 1976, pp. 420, 427; Brand and Keith 1979, pp. 837–838, 847; Poole 1994, pp. 612–616; Slough and Mowat 1996, pp. 953–958; O'Donoghue *et al.* 1997, pp. 158–159; Aubry *et al.* 2000, pp. 388–389; Mowat *et al.* 2000, pp. 285–287). When hares decline, lynx mortality rates increase, largely because of starvation, and home range sizes and dispersal/emigration rates also increase (Ward and Krebs 1985, pp. 2821–2823; O'Donoghue *et al.* 1997, pp. 156, 159; Poole 1997, pp. 499–503; Mowat *et al.* 2000, pp. 265–272, 278, 281–294). Lynx numbers decline dramatically during the ''crash'' phase of the hare cycle (Slough and Mowat 1996, p. 956; Mowat *et al.* 2000, pp. 283-285), when many lynx starve and many others abandon home ranges and disperse in search of food, with many dispersers also dying, often soon after initiating dispersal (Mowat *et al.* 2000, p. 293).

In Canada, lynx abundance may be 3 to 17 times higher at the peak versus the low of the hare cycle, with lynx densities reaching 30-45/100 km$^2$ (78-117/100 mi$^2$) in optimal dense regenerating forests 15-40 years post-fire, 8-20/100 km$^2$ (21-52/100 mi$^2$) in older forests or further south, and < 3/100 km$^2$ (< 8/100 mi$^2$) at the hare cycle low (Slough and Mowat 1996, pp. 952, 955; Mowat *et al.* 2000, p. 283; Hatler and Beal 2003, pp. 2, 5; Environment Canada 2014, p. 1). In southern Canada, where hares are less abundant and hare population cycles are muted or absent, lynx populations may be stable at 2-3/100 km$^2$ (5-8/100 mi$^2$; Environment Canada 2014, p. 1). Lynx densities estimated in the contiguous United States have ranged from 9.2-13/100 km$^2$ (24-34/100 mi$^2$), including kittens, in Maine's highest-quality habitat when hares were abundant (Vashon *et al.* 2008a, pp. 1483-1484; Vashon *et al.* 2012, pp. 14-15) to 2.3/100 km$^2$ (6/100 mi$^2$) in Washington when hare abundance was low (Koehler 1990a, pp. 847-850).

Correspondingly, hare abundance may also influence lynx home range size. Ward and Krebs (1985, pp. 2819-2820) documented a 3-fold increase in home range size in southwestern Yukon, from 13 km$^2$ (5 mi$^2$) on average when hares were abundant and increasing to 39 km$^2$ (15

30

mi$^2$) when hare density was low (90 percent MCP method). Poole (1994, pp. 613-614) documented a similar trend in the Northwest Territories, where lynx home range size increased from 17 km$^2$ (7 mi$^2$; males and females combined) when hares were abundant, to 44 km$^2$ (17 mi$^2$) and 62 km$^2$ (24 mi$^2$) for males and females, respectively, when hare numbers declined (95 percent MCP method). In contrast, Breitenmoser *et al.* (1993, p. 552) reported no change in lynx home range size despite a 10-15 fold increase in lynx density as hare abundance increased in the southern Yukon (home range estimation method not provided). Similarly, in Maine, lynx home range size did not increase when hare densities in the best habitats declined by half from 2 hares/ha (0.8 hares/ac) to 1 hare/ha (0.4 hares/ac; Mallett 2014, pp. 53-93; 90 percent fixed kernel method). In general, hare and lynx densities are lower and lynx home ranges larger at the southern periphery of the lynx's range, including most of the DPS range, and lynx densities are similar to those of northern populations during the low phase of the hare population cycle (Koehler and Aubry 1994, p. 93; Aubry *et al.* 2000, pp 382-385; Apps 2000, pp. 362-367; Burdett *et al.* 2007, pp. 463-465).

Although empirical data are lacking and would be difficult to acquire (ILBT 2013, p. 82), the lynx's physical adaptations (described above) are thought to provide lynx a seasonal advantage over potential terrestrial competitors and predators, which generally have higher foot-loading, causing them to sink into the snow more than lynx (McCord and Cardoza 1982, p. 748; Murray and Boutin 1991, entire; Buskirk *et al.* 2000a, pp. 86-95; Ruediger *et al.* 2000, pp. 1-11; Ruggiero *et al.* 2000b, pp. 445, 450). Buskirk *et al.* (2000a, entire) described potential exploitation (for food) and interference (avoidance) competition between lynx and several other terrestrial and avian predators of hares, several of which have also been documented to prey on lynx. Documented lynx predators include cougar (*Puma concolor*; also mountain lion), coyote (*Canis latrans*), wolverine (*Gulo gulo*), gray wolf (*Canis lupus*), fisher (*Pekania pennant*), and other lynx (ILBT 2013, pp. 33, 35). Bobcats are also likely capable of killing lynx in some circumstances. Although lynx have co-evolved with other predators, the influence of predation on lynx populations is unknown (ILBT 2013, pp. 35-36). Coyotes are now more widespread and abundant in the southern periphery of the lynx distribution than they were historically (Gompper 2002, entire), while cougars have been extirpated from the eastern half of the United States (except Florida; USFWS 2011a, entire) but are more abundant and widespread in the western United States now than in the mid-1900s (Buskirk *et al.* 2000a, p. 89).

The species above, along with red fox (*Vulpes vulpes*), American marten (*Martes americana*), mink (*Mustela vison*), as well as a suite of avian predators (e.g., northern goshawk [*Accipiter gentilis*], northern hawk-owl [*Surnia ulula*], great gray owl [*Strix nebulosi*], and great-horned owl [*Bubo virginianus*]) may compete with lynx for hares (Buskirk *et al.* 2000a, pp. 86-95; ILBT 2013, p. 16). Of these, coyotes are the most likely to exert local or regionally important exploitation competition impacts to lynx, and coyotes, bobcats, and cougars are capable of imparting interference competition effects on lynx (Buskirk *et al.* 2000a, p. 89). Interference would be most likely during summer but also during winter in areas lacking deep, unconsolidated snow (ILBT 2013, p. 36). Except for fisher and marten, lynx predators and potential terrestrial competitors all have higher foot-loading, making them less efficient at traveling and hunting in the snow conditions favorable for lynx (Murray and Boutin 1991, entire; Buskirk *et al.* 2000a, pp 86-95;

31

Krohn *et al.* 2005, entire) and, therefore, likely limiting, at least seasonally, interactions between lynx and these species. The fisher has foot-loading similar to lynx, and the marten's is even lower (Buskirk *et al.* 2000a, p. 90), but both species have much shorter legs, which likely limits their mobility in deep, unconsolidated snow compared to lynx. The extent to which predation and competition may influence lynx populations in the DPS remains uncertain.

Lynx populations in the contiguous United States seem to function as subpopulations or southern extensions of larger populations in southern and eastern Canada (McKelvey *et al.* 2000b, pp. 21, 25, 33; 65 FR 16052–16082; 68 FR 40077–40099; 71 FR 66025–66035; 74 FR 8616–8641; Koen *et al.* 2015, pp. 527-528). Populations in the DPS are relatively isolated from one another, though most are directly connected via dispersal to lynx populations in Canada (McKelvey *et al.* 2000b, pp. 25-34; U.S Fish and Wildlife Service 2005, p. 2). DPS populations are at the periphery of the species' range and some, particularly in the West (geographic units 3-6), may behave as islands in a mainland-island metapopulation construct. In such a system, larger islands with higher habitat quality and in closer proximity to the mainland would be more likely to support persistent resident populations and to sometimes act as "sources" that produce surplus animals that may disperse to other islands. Smaller islands with lower habitat quality or at greater distance from the mainland may, in contrast, act as "sinks" that depend on immigration from source populations (McKelvey *et al.* 2000b, p. 30), and which may support resident lynx only occasionally, intermittently, or temporarily.

Although lynx habitats are more contiguous in units 1 and 2 than in the western units, and units 1 and 2 are connected to larger contiguous habitats and lynx populations in Canada, they remain peripheral populations, and a metapopulation structure in which they receive intermittent immigration from the larger population may still exist, even if the mainland-island contruct does not apply. Lynx disperse in both directions across the Canada–United States border (Aubry *et al.* 2000, pp. 386-387; Moen *et al.* 2010b, pp. ii, 17, 19; Vashon *et al.* 2012, p. 22), and this connectivity and interchange with lynx populations in Canada is thought to be important to the conservation of lynx populations in the DPS. (McKelvey *et al.* 2000b, p. 33; Schwartz *et al.* 2002, p. 522; U.S Fish and Wildlife Service 2005, p. 2; ILBT 2013, p. 34, 42, 47, 54, 60, 65; Squires *et al.* 2013, p. 187). However, it remains uncertain whether the demographic and genetic health and persistence of populations in the DPS depend on regular or intermittent immigration of lynx from Canada and if so to what extent (McKelvey *et al.* 2000a, pp. 241-242; 79 FR 54793).

## 2.2.1 Ecological Requirements of Individuals

From birth through recruitment of at least one of it's progeny into the breeding population, the ecological requirements of an individual lynx are met if:

1) its mother occupies a home range containing
   a) secure denning habitat,
   b) adequate prey abundance (especially snowshoe hares) to support lactation during the early kitten stage and later provisioning of the kitten with meat,

Rvsd Plan - 00003820

    c)  habitat (boreal forest and snow) conditions that reduce the likelihood and effect of competition from other hare predators, and

    d)  a low likelihood of encounters with lynx mortality agents (predators, traps, vehicles, etc.);

2)  its mother's home range occurs within a larger landscape that also contains adequate hare abundance and available habitat into which the yearling lynx may disperse and establish its own home range after the period of maternal dependence, with low likelihood of adverse competition or mortality; and

3)  the larger landscape also supports other secure lynx home ranges and ensures the opportunity to encounter a lynx of the opposite sex, breed successfully, and contribute to the recruitment of at least 1 offspring into the breeding population during its lifetime.

In cyclic lynx populations in the core of the species' range (northern Canada and Alaska), there is a strong element of timing that determines whether these individual needs will be met. During the decline and low phases of the hare population cycle, few or no kittens are born, very few survive until their first winter, and recruitment may collapse completely or nearly so for several successive years (Slough and Mowat 1996, entire; Mowat *et al*. 2000, pp. 266, 285-287). Therefore, even in the core of the species' range, a kitten born during a period of declining or low hare abundance is very unlikely to survive to independence, breed successfully, and replace itself within the breeding population in its lifetime. Conversely, a kitten born during the increase or high phase of the hare population cycle is much more likely to survive and, therefore, have an opportunity to breed successfully and replace itself via recruitment of 1 or more of its offspring into the breeding population.

At the southern periphery of the lynx's range (southern Canada and the contiguous United States), hare population cycles are of lower amplitude or absent (Hodges 2000a, pp. 163–173; Hodges *et al*. 2009, pp. 870, 875–876; Scott 2009, pp. 1–44; Environment Canada 2014, p. 1; Hodges *in* Lynx SSA Team 2016a, pp. 16-17), hare densities are typically on the lower end of densities reported for northern populations, and lynx abundances and demographic rates in the south are typically like those of northern lynx populations during hare lows (Koehler and Aubry 1994, p. 93; Aubry *et al*. 2000, pp 382-385; Apps 2000, pp. 362-367). Therefore, in southern populations the likelihood is probably relatively low that an individual lynx will have its ecological requirements met sufficiently to replace itself in the breeding population. Also in the south, there are more diverse assemblages of potential competitors and predators, more natural patchiness and anthropogenic fragmentation of lynx habitat (fewer areas with adequate hare densities and favorable snow conditions distributed broadly across large landscapes), and higher road densities and, thus, greater potential for lynx-vehicle collisions (Wolff 1980, p. 128; Buskirk *et al*. 2000a, entire). These factors probably further reduce the likelihood that an individual lynx in the southern periphery of the range will survive, reproduce successfully, and have 1 or more offspring recruited into the resident breeding population.

Individual lynx require large areas (tens to hundreds of square kilometers) of boreal forest landscapes to support their home ranges, provide hares in adequate abundance to meet their

Rvsd Plan - 00003821

nutritional needs, provide breeding opportunities, and facilitate dispersal and exploratory travel. Female home ranges must also provide secure denning habitat in close proximity to foraging areas with high hare densities to allow females to adequately provide for dependent kittens (Moen *et al.* 2008a, p. 1507; Vashon *et al.* 2012, p. 16; ILBT 2013, p. 29). The size of lynx home ranges is strongly influenced by the quality of the habitat, particularly the abundance of snowshoe hares, in addition to other factors such as gender, age, season, and density of the lynx population (Aubry *et al.* 2000, pp. 382–385; Mowat *et al.* 2000, pp. 276–280). Generally, females with kittens have the smallest home ranges, likely related to their need to stay close to dens and dependent kittens, and males have the largest home ranges (Moen *et al.* 2005, p. 11; Burdett *et al.* 2007, p. 463; ILBT 2013, p. 24).

The increased natural patchiness and fragmentation of high-quality hare habitat where boreal forest conditions transition to temperate forest types require individual lynx in many parts of the DPS to maintain relatively large home ranges that include patches of higher hare densities within a matrix of lower-quality habitats with lower hare densities (ILBT 2013, p. 126; 78 FR 59434; also see 2.3.3). Larger home ranges likely require more energy output associated with greater foraging effort (Apps 2000, p. 364) and possibly increased exposure to predation and other mortality factors than lynx face in the core of their range (78 FR 59438). Annual home range sizes reported for lynx in the contiguous United States (table 3) vary greatly across the DPS but are generally larger in the west than the east; however, differences should be interpreted with caution because different methods, sample sizes, and estimators were used to generate them (ILBT 2013, pp. 23-24; also see footnotes to table 3, below).

**Table 3. Reported annual home range sizes for Canada lynx in the contiguous United States.**

| Geographic Unit | Mean or Median Annual Lynx Home Range Size km$^2$ (Range) | | References (Page Nos.) |
|---|---|---|---|
| | Female | Male | |
| N Maine | 25-33 (14-70) | 39-60 (24-102) | Vashon *et al.* 2008a (1482)[1]; Mallett 2014 (169)[2] |
| NE Minnesota | 17-87 (13-122) | 160-267 (86-439) | Mech 1980 (263-265)[3]; Burdett *et al.* 2007 (460-463)[4]; Moen *et al.* 2008b (17)[4] |
| NW Montana/ NE Idaho | 43-90 (11-157) | 122-220 (29-552) | Brainerd 1985 (20)[5]; Squires and Laurion 2000 (343-344)[3]; Squires *et al.* 2004a (13, table 6)[6] |
| N-C Washington | 37-91 (37-91) | 49-69 (29-99) | Brittell *et al.* 1989 *in* Stinson 2001 (5)[7]; Koehler 1990a (847)[7]; Maletzke *in* Lynx SSA Team 2016a (21)[7] |
| GYA | 50-105 (32-105) | 116-824 (98-2,181) | Squires and Laurion 2000 (343-344)[3]; Squires *et al.* 2003 (12-13)[6] |
| W Colorado | 75-704 (NA) | 103-387 (NA) | Shenk 2008 (10)[2] |

Rvsd Plan - 00003822

[1]85% fixed kernel; [2]90% fixed kernel; [3]95% minimum convex polygon (MCP); [4]95% MCP and 95% fixed kernel; [5]Minimum area method; [6]95% fixed kernel; [7]100% MCP.

Juvenile and adult lynx require about 400 and 600 grams (14 and 21 ounces) of food per day (for adults, 0.4-0.5 hares/day, 170-200 hares/year), respectively, to meet their basic nutritional requirements (Saunders 1963, p. 390; Nellis *et al.* 1972, pp. 324-325). Several sources (Ruggiero *et al.* 2000b, pp. 446-447; ILBT 2013, pp. 26, 125) have suggested that landscape-level hare densities ≥ 0.5 hares/ha (0.2 hares/ac) are necessary to support lynx home ranges and resident breeding populations. Lynx home range abandonment, dispersal, and mortality increase when hare densities are lower, and lynx may be unable to survive where landscape hare densities are below 0.3 hares/ha (0.12 hares/ac; Ward and Krebs 1985, pp. 2819-2822; Slough and Mowat 1996, entire). Recent research in the contiguous United States generally supports the 0.5 hares/ha threshold. For example, in northern Maine, areas with average landscape hare densities of 0.74 hares/ha (0.30 hares/ac) supported resident breeding lynx, but areas with hare densities below 0.5 hares/ha (0.2 hares/ac) were not occupied by lynx (Simons-Legaard *et al.* 2013, pp. 567, 574-575). In northeastern Minnesota, resident lynx maintained home ranges where landscape hare densities were 0.64 hares/ha (0.26 hares/ac), but nearby Voyageurs National Park, where hare density was estimated at 0.35 hares/ha (0.14 hares/ac), did not support resident breeding lynx (Moen *et al.* 2012, pp. 352–354). Similarly, in western Montana, resident lynx used dense young forest stands with mean summer and winter hare densities of 0.64 hares/ha (0.26 hares/ac) and 0.47hares/ha (0.19 hares/ac), respectively, and dense mature multi-story stands in winter when mean hare density was 0.53 hares/ha (0.21 hares/ac), but they did not use more open young or mature stands where hare densities ranged from 0.12 - 0.20 hares/ha (0.05 - 0.08 hares/ac; Squires and Ruggiero 2007, pp. 313-314).

Steury and Murray (2004, p. 137) suggested minimum hare densties of 1.1 - 1.8 hares/ha (0.45 - 0.73 hares/ac) would be necessary to support lynx reintroduction efforts in the southern portion of the range, but Murray *et al.* 2008 (p. 1468) acknowledged that threshold could be overly conservative if southern lynx are less reliant on hares (i.e., more reliant on alternate prey) or if southern hare numbers are more stationary so that resident lynx numbers in the south do not fluctuate as dramatically as is typical in northern populations. Indeed, more than 10 years after translocations of Canadian and Alaskan lynx ceased, resident lynx continue to occupy parts of western Colorado, where hare densities are generally much lower, and lynx there rely heavily on red squirrels, which accounted for 23 ± 6 percent (annual range = 0.1 to 66 percent) of prey items identified over 11 winters (Shenk 2009, pp. 16, 24).

In addition to adequate hare density, individual lynx require landscapes in which they are unlikely to encounter animals that may prey on them or suffer reduced fitness from competition with other hare predators. As described above, the lynx has a much lower foot-loading than most of its potential predators and competitors, and this is believed to provide an advantage in places that receive deep and persistent unconsolidated snow. Although specific snow requirements for lynx (amount/depth, quality, persistence) have not been quantified throughout the DPS range, historical lynx occurrence records in the contiguous United States were correlated with areas that received at least 4 months (December through March) of continuous snow coverage (Gonzalez *et al.* 2007, p. 7). Where snow conditions do not consistently favor

35

lynx, increased potential for predation and competition would be expected (Peers *et al.* 2013, p. 8). Finally, individual lynx are more likely to survive, breed, and replace themselves in the breeding population if they occupy home ranges where trapping is prohibited or trapping pressure is low (Slough and Mowat 1996, entire), high-speed/high-volume roadways are absent (ILBT 2013, pp. 77-78), and other potential anthropogenic causes of lynx mortality are absent or minimal.

In summary, individual lynx require large landscapes with hare densities that maximize their chances of (1) surviving to independence, (2) establishing and maintaining a home range, (3) breeding successfully, and (4) contributing genes to future generations (Breitenmoser *et al.* 1993, p. 552). These landscapes also must provide conditions that allow lynx to compete sufficiently for hares and minimize the likelihood of predation and other sources of lynx mortality. The available science, including recent research in the DPS range, suggests that landscape-level hare densities consistently ≥ 0.5 hares/ha (0.2 hares/ac) and favorable snow depth and conditions for about 4 months are needed to support lynx occupancy, reproduction, and recruitment. At the southern periphery of lynx distribution, some places, including within the range of the DPS, seem to be at minimum thresholds to meet these requirements or do so inconsistently.

## 2.2.2 Ecological Requirements of Populations and the DPS

Lynx populations require essentially the same things that individual lynx do, but on a larger landscape with hare densities and habitat conditions capable of consistently supporting multiple home ranges, breeding and dispersal opportunities, and reproductive and survival rates such that recruitment and immigration will, on average over the long term, equal or exceed mortality and emigration (Pulliam 1988, pp. 652-654). To support persistent lynx populations, such landscapes must provide for the survival of at least some resident lynx even when hares are least abundant and/or other habitat features (e.g., snow conditions) are least favorable so that the lynx population can recover, perhaps aided by immigration, when hare numbers and/or other habitat conditions improve. As with individual lynx, populations are more likely to persist in landscapes where the effects of competition, predation, and human-caused mortality (e.g., trapping, vehicle collisions) are relatively lower.

In a metapopulation structure like that thought to govern lynx population dynamics, the persistence of peripheral populations is determined by colonization and extinction rates (McKelvey *et al.* 2000b, p. 25). Colonization is driven by the number of populations, the distances between them, and the species' dispersal capabilities and timing. Extinction rates are determined by population size and demographic and environmental stochasticity, with extinction more likely in smaller and more isolated populations (McKelvey *et al.* 2000b, pp. 25-31). Formal population viability analyses (PVAs) have not been published for most lynx populations in the DPS and may not be possible for some populations given limited data and natural temporal variation in demographic rates (McKelvey *et al.* 2000b, pp. 22, 30). Although some demographic data are available for most lynx populations in the DPS, most are limited to relatively few, small study areas or relatively short durations. There remains uncertainty about whether, and if so to

36

Rvsd Plan - 00003824

what extent, the demographic health of DPS populations relies on immigration from northern (Canadian) populations; and immigration rates are not known for DPS populations (McKelvey *et al.* 2000b, pp. 24-34). These factors likely preclude development of meaningful DPS-wide or unit-specific empirical population viability models (McKelvey *et al.* 2000b, p. 22).

In the core of the species' range in the southern Yukon, Slough and Mowat (1996, p. 952, table 4) calculated a lynx population growth rate (lambda, λ) = 2.03 (annual doubling) during the 4-year increase-to-peak phase of the hare cycle. This period of rapid growth was followed by a rate of λ = 1.01 (stable) during the first year of a hare decline, and λ = 0.10 and λ = 0.46 (rapid decline) during the first 2 years of the lynx population decline when hares were scarce. However, the natural range in λ that would be expected among peripheral, isolated, or semi-isolated lynx populations where hares are non-cyclic or weakly-cyclic (i.e., in DPS and some southern Canadian populations; Murray 2000, pp. 1210-1215; Murray 2003, pp 152-155), versus those that would signal long-term population decline or instability is unknown. Despite this, and the limitations noted above, Squires (*unpubl. data in* Lynx SSA Team 2016a, p. 20) calculated population growth rates in northwestern Montana of λ = 0.92 for lynx in the Seeley Lake area (i.e., declining population trend, 1999-2007) and λ = 1.16 for lynx in the Purcell Mountains (increasing trend, 2003-2007). Likewise, MDIFW in 2012 calculated an intrinsic rate of growth of 0.05 (λ = 1.05) for Maine's lynx population based on demographic data from a radiotelemetry study collected over a 12-year period (Vashon *et al.* 2012, Appendix VI). Neither the Montana nor Maine estimates incorporated rates of immigration/emigration (i.e., both assumed immigration and emigration rates of zero, which is very unlikely and contradicted by historical and recent evidence of lynx dispersal in both directions across the Canada-Unites States border across the DPS range). Schwartz (2017, p. 4) noted that very low immigration rates (less than 1 female/year on average for a theoretical population of 100 lynx) could provide population stability or even growth, suggesting that the Seeley Lake population and perhaps other DPS populations are probably being bolstered by low levels of immigration, which may go undetected. Other efforts to model lynx population dynamics in the DPS range include those of Lyons *et al.* (2016, entire), who developed spatially-explicit, individual-based population models to estimate reductions in potential lynx carrying capacity in Washington associated with recent large wildfires, and Licht *et al.* (2017, *in press*, entire), who conducted a PVA of a potential lynx reintroduction to Isle Royale in Lake Superior, about 22 km (14 mi) east of Unit 2.

Although minimum viable population sizes have not been derived for lynx populations in the DPS, the Service's Recovery Outline (USFWS 2005, p. 5) suggested landscapes of at least 1,250 km$^2$ (483 mi$^2$) with sufficient boreal/subalpine habitat, hare densities, and snow conditions favorable for lynx. These are the minimum landscape size and habitat conditions thought necessary to support a minimum lynx population of at least 25 adults based on a density of 1 lynx per 50 km$^2$ (USFWS 2005, p. 5). McKelvey *et al.* (2000b, p. 29) noted that extinction (extirpation) risk should decrease with increasing population size, and that extinction resulting from demographic stochasticity is very unlikely even for a population (generally; not specific to lynx) with as few as 20 reproducing females. Kramer-Schadt *et al.* (2005, entire) developed a spatially explicit population model for Eurasian lynx in Germany which they combined with demographic scenarios to evaluate the likely success of potential reintroduction efforts; they

concluded that at least 10 females and 5 males would be required to establish a population with an extinction probability less than 5 percent over 50 years. Rodriguez and Delibes (2003, entire) evaluated extinction among populations of Iberian lynx; they found that extinction occurred only in small populations that occupied habitats of less than 500 km$^2$ and that extinction within 35 years was unlikely among populations occupying areas of at least 500 km$^2$ of adequate habitat quality.

In summary, lynx populations need large (thousands of square kilometers) boreal forest landscapes with hare densities capable of supporting (1) multiple lynx home ranges, (2) reproduction and recruitment most years, and (3) at least some survival even during years when hare numbers are low. These landscapes also must have snow conditions (consistency, depth, and duration) that allow lynx to outcompete other terrestrial hare predators. To persist, lynx populations must exhibit recruitment and immigration rates that exceed mortality and emigration rates on average over the long-term. Immigration may be particularly important to the persistence and stability of lynx populations at the southern periphery of the range, including those within the DPS, where hare densities are generally low and hare populations are either non-cyclic or weakly-cyclic compared to northern populations. Low hare densities reduce the likelihood that lynx recruitment will consistently equal or exceed mortality, and non-cyclic or weakly-cyclic hare populations are unlikely to allow the rapid lynx population recovery observed in northern lynx populations when hare numbers increase dramatically after cyclic population crashes. Conversely, more stable hare populations, even at lower landscape-level densities, likely provide stability (i.e., prevent periodic steep declines) among lynx populations on the periphery of the range in the DPS and in southern Canada. Although immigration rates for DPS populations are unknown, as is the rate and periodicity of immigration needed to provide demographic stability among them, connectivity with and immigration from lynx populations in Canada are believed to be important to the persistence of lynx populations in the DPS (McKelvey *et al.* 2000a, pp. 232-242; 2000b, pp. 32-34; Schwartz *et al.* 2002, entire; USFWS 2005, p. 2; ILBT 2013, pp. 34, 42, 47, 54, 60, 65; Squires *et al.* 2013, p. 187; 79 FR 54789).

## 2.3 Historical and Current Lynx Distribution

### 2.3.1 Lynx Distribution and Status in Canada and Alaska

The Canada lynx is broadly distributed across northern North America from eastern Canada to Alaska (McCord and Cardoza 1982, p. 729; Poole 2003, p. 361; Vashon 2015, p. 4; Univ. of Alaska Center for Conservation Science 2016, p. 1). It is strongly associated with the expansive, continuous boreal forests of those areas, and its range largely overlaps that of its primary prey, the snowshoe hare, also a boreal forest specialist (Bittner and Rongstad 1982, p. 146; Mowat *et al.* 2000, pp. 268-269; Aubry *et al.* 2000, p. 375). In Canada, lynx are thought to occupy about 5.5 million km$^2$ (over 2.1 million mi$^2$), which represents 95 percent of their historical range in that country (Environment Canada 2014, p. 2), and over 89 percent of the species' entire distribution. Nationally in Canada, lynx are classified as secure, widespread, and abundant; they are managed for long-term population stability, with a conservative estimate of 110,000

38

individuals during cyclic lows; and no acute, widespread threats to lynx have been identified (Environment Canada 2014, entire; Vashon 2015, pp. 1-6). Provincially, lynx status is considered secure in British Columbia, Manitoba, Ontario, Quebec, Newfoundland and Labrador, Northwest Territories, and the Yukon; sensitive in Alberta and Saskatchewan; at risk/endangered in New Brunswick and Nova Scotia; and undetermined in Nunavut (Environment Canada 2014, pp. 3-4; Vashon 2015, p. 1). Lynx were extirpated from Prince Edward Island (0.1 percent of lynx range in Canada) by the late 1800s, and on the mainland the southern margin of assumed lynx range has contracted northward in Quebec, southeastern Ontario, Manitoba, Saskatchewan, and Alberta (Poole 2003, p. 361; Bayne *et al.* 2008, pp. 1192-1195; Koen *et al.* 2014a, pp. 757-760).

In Alaska, lynx are distributed across roughly 534,454 km$^2$ (206,354 mi$^2$) of boreal forest (Univ. of Alaska Center for Conservation Science, 2016, entire; Reimer 2016, *pers. comm.*), which represents about 8.7 percent of the species' breeding distribution. Lynx in Alaska are apparently secure, with low to moderate threats, and populations appear stable statewide, although total abundance is unknown (Alaska Natural Heritage Program 2008, pp. 2-4).

In both Alaska and Canada, lynx trapping is managed through regulated seasons and harvest levels, which are adjusted to avoid overexploitation, especially during the low phase of the lynx-hare population cycle (Alaska Natural Heritage Program 2008, pp. 2-6; Vashon 2015, pp. 5-6). Along the Canada-United States border in provinces adjacent to DPS lynx populations, lynx trapping is prohibited in New Brunswick (adjacent to northeastern Maine) but regulated trapping is permitted in Quebec (adjacent to northwestern Maine, northern New Hampshire, and northern Vermont), Ontario (adjacent to northeastern Minnesota), Alberta (adjacent to northwestern Montana), and British Columbia (adjacent to northwestern Montana, northern Idaho, and northern Washington). Because after 2 centuries of being legally harvested for the international fur trade it remains widespread and abundant over most of its range, and because managed harvest in recent decades does not appear to have caused significant range loss or population decline, the lynx has been designated a "species of least concern" in accordance with the IUCN Red List of Threatened Species (Vashon 2015, entire).

## 2.3.2 Lynx Distribution in the Contiguous United States

### 2.3.2.1 Defining Lynx Distribution at the Periphery of the Range

Several aspects of lynx population dynamics and dispersal patterns have resulted in inconsistent approaches and difficulty in defining the range and/or distribution of the species, especially at the margins (74 FR 66942). There also is uncertainty and ambiguity in some historical lynx occurrence records, with early assessments based largely on trapping harvest records of questionable accuracy, particularly where lynx and bobcats overlap, and a reliance on anecdotal or unverified occurrence information (McKelvey *et al.* 2000a, pp. 208-210; 65 FR 16054). These issues confound efforts to accurately portray the species' historical distribution in the contiguous United States and to assess the current distribution relative to historical conditions (McKelvey *et al.* 2008, pp. 553-554; 79 FR 54814-54815; McKelvey *in* Lynx SSA

39

Team 2016a, p.11). This has resulted in inaccurate portrayals of lynx distribution and misperceptions that the historical range of lynx in the contiguous United States was once much more extensive than is ecologically possible (68 FR 40080; 74 FR 66942).

The boreal forest reaches its southern extent in the northern contiguous United States and it becomes naturally patchy and marginal for hares and lynx in places where it transitions to temperate forest types. Many areas of boreal or boreal-like (spruce-fir) forest (e.g., the Appalachian Mountains from New York southward in the East, most of northern Michigan and northern Wisconsin in the Midwest, and the Southern Rocky Mountains and Southern Cascade Mountains in the West) probably never supported persistent native lynx populations despite the presence of snowshoe hares. Hare densities in these areas are generally low and appear insufficient to support resident lynx populations over time. Only a relatively few areas in the contiguous United States historically supported an adequate quantity, quality, and spatial arrangement of habitat to support resident lynx populations continuously over time, and many historical lynx occurrences across a large area of the contiguous United States were likely dispersers. The occurrence of dispersing lynx is unpredictable, and dispersing lynx will probably continue to move periodically and temporarily into areas that cannot support persistent populations (68 FR 40077).

Because the lynx is highly mobile and has, throughout most of its range, cyclic population dynamics that are closely tied to cyclic snowshoe hare populations, numbers of lynx naturally fluctuate and become extremely low during lows in decadal hare cycles. The dramatic, cyclic fluctuations in lynx populations across much of the range as they track cyclic hare populations and the mass synchronous dispersals (irruptions) of large numbers of lynx into the contiguous United States when northern hare populations crashed are well-documented (Elton and Nicholson 1942, entire; Gunderson 1978, entire; Thiel 1987, entire; McKelvey *et al.* 2000a, pp. 219, 232-242; Mowat *et al.* 2000, pp. 281-294; ILBT 2013, p. 33). These events have resulted in records of lynx occurrence, in some cases very rarely, in other cases sometimes in large numbers and with intermittent (cyclic) regularity, in places that otherwise lack evidence of persistent lynx presence or the habitats and hare densities necessary to support a resident lynx population (USFWS 2005, pp. 3-4; 79 FR 54787-54789, 54793-54795, 54812-54823).

Many records of lynx in the contiguous United States appear to be related to such events, including the unprecedented ''explosions'' of lynx observed in the early 1960s and 1970s (Gunderson 1978, entire; McKelvey *et al.* 2000a, pp. 232-242). During these events, many lynx occurred in anomalous habitats, exhibited unusual behavior, suffered high mortality, and numbers declined dramatically within a few years of irruptive peaks (Gunderson 1978, entire; Thiel 1987, entire; McKelvey *et al.* 2000a, p. 242). Because dispersing lynx typically do not persist in these areas of temporary range expansion, disappearing fairly quickly after irruptions, van Zyll de Jong (1971, p. 16) suggested that only areas that support lynx populations throughout both the low and the high phases of the "10-year cycle" (i.e., across the natural range of hare densities) should be considered to constitute the species' range. In its 2003 remanded determination, the Service determined that lynx in the contiguous United States exist either as resident populations or as dispersers, that dispersing lynx are often found repeatedly

40

and for variable amounts of time in habitats that cannot sustain breeding populations over time (though some breeding may occur occasionally in some of these areas), and that such areas probably contribute little (if at all) to the persistence of lynx in the DPS (68 FR 40077, 40079-80). This repeated dispersal into habitats that ultimately cannot support the species ("sink" habitats) often leads to confusion about where lynx populations may be viable (74 FR 66938).

The metapopulation structure thought to govern lynx populations in the DPS (McKelvey *et al.* 2000b, pp. 25-31; see Section 2.2) and the transitional (and, therefore, increasingly fragmented and isolated) and spatially- and temporally-shifting nature of lynx habitat at the southern periphery of the range (Koehler and Aubry 1994, pp. 78-79; McKelvey *et al.* 2000b, pp. 29-30; 74 FR 66940; 79 FR 54814) also present challenges in defining the distribution of lynx. Both factors suggest that some areas may naturally support resident lynx only temporarily or occasionally when habitat conditions (both boreal forest vegetation supporting abundant hares and snow conditions favoring lynx) are adequate and/or when immigration is sufficient to offset the lower productivity and recruitment rates expected among lynx populations in marginal or suboptimal habitats. McKelvey *et al.* (2000b, pp. 21, 29-31) described such habitats as "... source-sink mosaics that shift with disturbance and succession," and the contribution, if any, of these places (especially those that act more often as "sinks" than "sources") to the maintenance and persistence of lynx populations in the DPS remains questionable (74 FR 66938).

Finally, the southern periphery of the lynx's range, where lynx are rare in many places, overlaps with the northern distribution of the much more common bobcat (Peers *et al.* 2012, pp. 4-5). The 2 species are difficult to distinguish in the field, they often were not reliably differentiated in historical trapping records (McKelvey *et al.* 2000a, pp. 208-209), and errors in early accounts of lynx distribution based on anecdotal information seem likely (Halfpenny and Miller 1980, pp. 1, 3-8; Meaney 2002, pp. 3-5, Hoving *et al.* 2003, pp. 366-367). Because of the large effect that relatively few errors in identification can have on assessments of the distribution of rare animals, McKelvey *et al.* (2000a, p. 209; 2008, pp. 553-554) suggest that anecdotal information should be interpreted with caution, and only verified occurrence data should be used to assess historical and current lynx distributions.

These complexities of lynx population dynamics and our incomplete understanding of the limited lynx occurrence data, combined with a naturally dynamic and transitional habitat, make it difficult, if not impossible, to precisely delineate the historical or current distribution of resident lynx populations in the contiguous United States (Koehler and Aubry 1994, p. 79; 68 FR 40084). While recognizing these limitations, we use our best professional judgment of the best scientific and commercial data available to make conclusions about the range of the lynx for the purposes of this SSA. In the following section, we describe the types and distributions of potential lynx habitats in the contiguous United States, and our current understanding of the historical and current distributions of resident lynx populations in the DPS considering the factors discussed above.

41

2.3.2.2 Lynx Distribution within the DPS Range

The southern periphery of boreal forest vegetation extends into parts of the northern contiguous United States, where it transitions to the Acadian forest in the Northeast (Seymour and Hunter 1992, pp. 1, 3), deciduous temperate forest in the Great Lakes region, and subalpine forest in the Rocky Mountains and Cascade Mountains in the west (Agee 2000, pp. 40-41). In much of the DPS range, these boreal forest landscapes become naturally patchy and transitional because they are at the southern edge of the boreal forest range, and they are limited, particularly in the west, by elevation and/or aspect (Ruediger *et al.* 2000, p. 4-16; 68 FR 40090). Non-forested land uses (e.g., agriculture, development) become increasingly prevalent in these areas. These factors generally limit snowshoe hare populations in the contiguous United States from achieving landscape densities similar to those of the expansive northern boreal forest in Alaska and Canada, where hares are generally more evenly distributed across the landscape and more abundant except during cyclic population lows (Wolff 1980, pp. 123-128; Buehler and Keith 1982, pp. 24, 28; Koehler 1990a, p. 849; Koehler and Aubry 1994, p. 84; Aubry *et al.* 2000, pp. 373-375, 382, 394). Consequently, important foraging habitat for lynx is often more limited and fragmented in the contiguous United States than in boreal forests of northern Canada and Alaska (Berg and Inman 2010, p. 6), and overall habitat quality is typically lower.

The habitats that lynx use in the contiguous United States are characterized by patchily-distributed moist forest types with relatively higher hare densities in a matrix of other habitats (e.g., hardwoods, dry forest, non-forest) with lower landscape hare densities (ILBT 2013, p.126; 78 FR 59434). In these areas, lynx incorporate the matrix habitat (non-boreal forest habitat elements) into their home ranges and use it for traveling between patches of boreal forest that support higher hare densities where most lynx foraging occurs. In some areas, patches of habitat containing snowshoe hares become so small and fragmented that the landscape cannot support lynx home ranges (ILBT 2013, p. 77) or populations over time (68 FR 40077). Additionally, the presence of more snowshoe hare predators and potential lynx competitors at southern latitudes may inhibit the potential for high-density hare populations (Wolff 1980, p. 128). Wirsing *et al.* (2002, entire) concluded that high predation rates on hares in fragmented habitats may explain the relative stability (i.e., lack of cyclicity) in southern hare populations. As a result, lynx in the DPS generally occur at relatively low densities compared to lynx in the core of the Canadian and Alaskan range where hares are abundant (Aubry *et al.* 2000, pp. 375, 393-394). Because the lynx is a habitat and prey specialist, its densities in the DPS range are also typically lower than those of the bobcat, which is a habitat and prey generalist (Peers *et al.* 2012, pp. 4-9).

Snow conditions also are thought to influence lynx distribution (Ruggiero *et al.* 2000b, pp. 445-449; Peers *et al.* 2012, pp. 4-9) because they are morphologically and physiologically well-adapted for hunting snowshoe hares and surviving in areas that have cold winters with deep and persistent unconsolidated snow (Murray and Boutin 1991, p. 463). Long-term snow conditions also presumably limit the winter distribution of potential lynx competitors and

42

predators (Buskirk *et al.* 2000a, p. 90; Krohn *et al.* 2005, p. 123; Peers *et al.* 2012, entire; also see section 2.2 above), although behavioral adaptations may offset morphological differences to some degree (e.g., Murray *et al.* 1994, entire; 1995, entire).

Based on verified data, lynx were documented historically in 24 of the contiguous United States (McKelvey *et al.* 2000a, 207-232). More recently, lynx have been documented in 3 other states after some of the lynx released into southwestern Colorado (see below) dispersed into northern New Mexico, Arizona, and Kansas (Colorado Division of Wildlife 2000, p. 3; Devineau *et al.* 2010, p. 526; 74 FR 66938), which had previously lacked verified evidence of lynx occurrence (McKelvey *et* al. 2000a, p. 210; USFS 2009, entire; 74 FR 66940-66943). However, in many states, lynx occurred very rarely as dispersers and often in anomalous habitats – usually (as described above) in association with "irruptions" (mass dispersal events) of lynx from Canada when northern snowshoe hare populations underwent dramatic cyclic declines roughly every decade. Based on our current understanding of lynx and hare habitat requirements, the Service concludes that records in at least 13 states (Arizona, Connecticut, Illinois, Indiana, Iowa, Kansas, Massachusetts, Nebraska, Nevada, New Mexico, North Dakota, Pennsylvania, and South Dakota) represent occasional dispersing lynx that arrived in places with no historical or recent evidence of the habitat quality, quantity, or distribution necessary to support resident lynx (68 FR 40099; 74 FR 66940-66942; 79 FR 54807, 54817). These states are not within the distribution of resident lynx in the DPS, and we conclude that they naturally lack the necessary habitat, hare densities, and snow conditions and that they were not capable historically, and are not capable now, of supporting resident lynx populations over time.

When it listed the DPS under the ESA, the Service defined its range as the forested portions of the remaining 14 states; 4 in the Northeast (Maine, New Hampshire, New York, Vermont), 3 in the Great Lakes Region (Michigan, Minnesota, Wisconsin), and 7 in the West (Colorado, Idaho, Montana, Oregon, Utah, Washington, Wyoming; 65 FR 16052, 16085). Some of these states, and parts of others, are thought to have historically supported only dispersing lynx or to have only occasionally supported resident breeding lynx (68 FR 40099; 74 FR 66940). Such areas were included within the range of the DPS because of the possibility that lynx could establish small, local populations in them and perhaps contribute to the persistence of the DPS, though evidence of this was (and remains) lacking (68 FR 40080; 74 FR 66938).

Based on a comprehensive, peer-reviewed analysis of verified historical lynx records that was published at about the time the DPS was listed (McKelvey *et al.* 2000a, entire) and on research and monitoring that have occurred since then, it seems likely that lynx occurred historically in some states (New York, Vermont, Wisconsin, Oregon, and Utah) only intermittently as dispersers or as small, naturally ephemeral populations; not as persistent resident breeding populations. In other states (New Hampshire, Michigan, Colorado, and Wyoming), it remains uncertain whether resident lynx occurred historically as small but persistent breeding populations or only ephemerally. Parts of the remaining states (Idaho, Maine, Minnesota, Montana, and Washington) show the strongest evidence of historical and recent (at the time of listing and since then) persistent resident populations.

43

In its 2003 remanded determination for the lynx DPS, the Service concluded that (1) potential lynx and hare habitats in Michigan, Oregon, Utah, Vermont, and Wisconsin were relatively small, isolated, and of marginal quality, and that available information suggested that these states did not historically or recently support resident lynx populations; (2) it was uncertain whether Colorado, New York, and Wyoming historically supported resident populations or only occasional dispersers; (3) New Hampshire probably supported a small resident population that had been extirpated; and (4) the remaining states (Idaho, Maine, Minnesota, Montana, and Washington) had the best historical and recent evidence of resident breeding populations (68 FR 40082, 40086-40095, 40097-40101). Below we provide our current understanding of these state groupings and the information available since the 2003 remand that informs this understanding.

_Michigan, Oregon, Utah, Vermont, and Wisconsin_ - Additional information and analyses available since 2003 support the determination that Michigan (except for Isle Royale in Lake Superior) and Oregon did not historically or recently support resident lynx populations (Aubry 2006, pp. 1-2; Linden 2006, pp. 83-90), and no evidence has emerged to suggest that resident populations occurred historically or recently in Utah or Wisconsin (ILBT 2013, pp. 45, 58). Isle Royale, a 535-km$^2$ (206-mi$^2$) island in northwestern Lake Superior that is closer to northeastern Minnesota and southern Ontario than to the rest of Michigan, is thought to have historically supported a small (perhaps 30 lynx) population that was extirpated in the 1930s due to overtrapping (Licht _et al._ 2015, p. 139; 2017, p. 505). The best available information continues to suggest that the rest of Michigan, as well as Oregon, Utah, and Wisconsin, did not historically, and do not currently, support resident lynx populations.  We conclude that (1) habitats in these states are naturally incapable of supporting persistent resident populations; (2) historical and potential future occurrences of lynx in these states most likely represent occasional dispersing lynx; and (3) these states (with the possible except of Isle Royale, MI) have not historically or recently contributed to the persistence and conservation of lynx in the DPS and are unlikely to do so in the future.

In contrast, 9 lynx occurrences were confirmed in the 530-km$^2$ (205-mi$^2$) Nulhegan Basin of northeastern Vermont from 2003 to 2014, and breeding was confirmed in 2012; intensified surveys since then have resulted in only a single photograph of a lynx in 2014 (Bernier 2015, pp. 1-3; Bernier 2016, _pers. comm._). This new information indicates that this small area of northernmost Vermont is at least occasionally capable of supporting a small number of resident breeding lynx. However, assessments of the amount and quality of potential lynx and hare habitat, snow conditions, and the presence and distribution of lynx competitors and predators (Hoving _et al._ 2005, pp. 746-749; Bernier 2015, entire) indicate it is unlikely that northern Vermont can support a persistent resident lynx population (79 FR 54820-54821). We conclude that this small area of Vermont only occasionally supports lynx reproduction when hare abundance and snow conditions are temporarily adequate; that it most likely represents a "sink" rather than a "source" for the regional lynx population; and that this likely represents its natural historical condition.

Rvsd Plan - 00003832

_Colorado, New York, and Wyoming_ - When the Service listed the DPS in 2000, it believed that a resident lynx population occurred historically in the Southern Rocky Mountains of western Colorado and southeastern Wyoming, that lynx were also historically resident in northwestern Wyoming (part of the Northern Rocky Mountains), and that the Adirondack Mountains of northern New York may historically have supported a resident population that was extirpated by the latter half of the 1900s (65 FR 16055-16056; 16058-16059). In the 2003 remand, the Service noted inconsistencies and likely errors in historical lynx reports for the Southern Rockies, questioned its original conclusion that Colorado historically supported an isolated resident population, and concluded that it was uncertain whether a resident population occurred historically in Colorado or if historical records were of periodic dispersing lynx during "extremely high population cycles" and that a resident population never existed in southeastern Wyoming (68 FR 40081, 40091). In that rule, the Service also concluded that, despite evidence of reproduction in northwestern Wyoming (part of the GYA), potential habitat there is naturally marginal (patchier and composed of drier forest types), may be incapable of supporting a resident lynx population, and that lynx in northern Wyoming are most likely dispersers (68 FR 40090). Also in 2003, the Service concluded that it was possible resident lynx occurred in northern New York prior to 1900 but the potential habitat there is small, marginal, isolated and likely has only supported dispersing lynx since then (68 FR 40086-40087).

In Colorado, after the initial release of 96 lynx in 1999 and 2000, none were released in 2001 or 2002 (Shenk 2010, pp. 1, 4; Ivan _in_ Lynx SSA Team 2016a, p. 22). From 2003-2006, another 122 lynx were released, bringing the total to 218 (Devineau _et al._ 2010, p. 526). Reproduction was documented in 2003-2006 and 2009-2010, with 48 dens documented at that time, including a third generation of Colorado-born lynx (Shenk 2010, p. 5; Ivan _in_ Lynx SSA Team 2016a, p. 22). In 2010, CPW determined that all benchmarks for its lynx program had been met and had resulted in the establishment of a viable, self-sustaining lynx population (Ivan 2011b, pp. 11, 12). Intensive monitoring of the population ceased in 2010 and was replaced by an effort to develop a minimally-invasive long-term monitoring program (Ivan 2011b, entire), which used snow-tracking surveys and camera traps to document continued lynx presence in the core release area of the San Juan Mountains in 2010-11, 2014-15, and 2015-16, with evidence of reproduction also documented during that time (Ivan _et al._ 2015, p.1; Odell _et al._ 2016, entire). In its 2014 revised critical habitat designation for the DPS, the Service concluded that the historical record of verified lynx occurrence in Colorado combined with naturally highly-fragmented and isolated potential habitat and generally low snowshoe hare densities suggest that Colorado and the Southern Rockies were unlikely to have historically supported a persistent resident lynx population and that the long-term persistence of the introduced population is uncertain (79 FR 54787-54789, 54793-54795, 54816-54817). The current size of the resident lynx population in Colorado is unknown but thought to number between 100 and 250 (Ivan _in_ Lynx SSA Team 2016a, p. 47). We continue to believe that available information suggests Colorado did not historically support a persistent resident lynx population and that the long-term persistence of the introduced population remains uncertain.

In northern New York, 83 lynx were released into the Adirondack Mountains in 1988-1990 (Brocke et al. 1993, p. 1); however, that effort failed to establish a resident breeding population

45

(65 FR 16055), suggesting that potential habitat there may be (and historically may have been) inadequate to support lynx persistence (68 FR 40086-40087). Information and analyses since the 2003 remand support the conclusion that New York has inadequate habitat quantity and quality (both vegetation and snow conditions) to support a resident lynx population (Hoving *et al.* 2005, pp. 746, 749). We have no information that resident lynx presently occur in New York, and our evaluation of historical records suggests that the timing of most (19; 83 percent) of the 23 verified records in the state after 1900 (McKelvey *et al.* 2000a, p. 216, table 8.2) were consistent with expected decadal irruptions of lynx from the north. The work of Hoving *et al.* (2005, entire), our evaluation of verified records of historical occurrence, and the rapid failure of the 1988-1990 lynx translocations to establish a resident population all suggest that New York has not recently and likely did not historically support a persistent resident lynx population. We conclude that (1) habitat in the Adirondack Mountains is incapable of supporting a resident lynx population, (2) verified historical records were most likely of dispersing lynx, and (3) dispersing lynx may currently and in the future continue to occur rarely and temporarily in northern New York.

In northwestern Wyoming, 18 lynx were reported to have been trapped from a small area in the Wyoming Range in winter 1971-72 (Squires and Laurion 2000, p. 338), and other sources[4] claim that 13 lynx were trapped in the Wyoming Range in winter 1972-73. However, Reeve *et al.* (1986a, Appendix A, pp. 67-69) reported no verified ("certain") records of lynx trapped from 1970-1982 and unverified ("probable") accounts that included no lynx trapped in 1971, 5 trapped in 1972, and 1 trapped in 1973. These conflicting anecdotal reports of lynx occurrence/trapping records illustrate compellingly why only verified records are appropriate for consideration of lynx historical distribution, especially given evidence of historical misidentification of bobcats as lynx (McKelvey *et al.* 2000a, pp. 208-210, 227; 2008, pp. 553-554). Even if some of these anecdotal records were correct, the large numbers of lynx reported in the early 1970s correspond to the second of 2 well-documented and unprecedentedly large irruptions of lynx from Canada into the northern contiguous United States, when dispersing/transient lynx occurred temporarily in many places with little or no evidence of the historical presence of resident lynx (McKelvey *et al.* 2000a, pp. 232-242). It is more plausible that the sudden increase in lynx reportedly trapped in the Wyoming Range suggested by some of these anecdotal records would have reflected a pulse of dispersing lynx associated with that large irruption rather than a previously undocumented resident lynx population that suddenly and simultaneously became vulnerable to trapping in only a handful of winters.

However, verified information available since 2003 has documented continued presence of a small number of lynx in northwestern Wyoming as recently as 2010, including some evidence of reproduction (Squires *et al.* 2003, entire; Squires and Oakleaf 2005, entire; Murphy *et al.* 2006, entire; Endeavor Wildlife Research 2008 and 2009, entire). Additionally, at least 9 radio-marked lynx released in Colorado subsequently moved into or through the area from 1999-2010, with several settling temporarily into parts of the Wyoming Range previously occupied by native lynx (Ivan 2017, entire; see section 4.2.5, below). More recent surveys and research-related trapping

---

[4] http://www.sublettecountyjournal.com/v4n16/v4n16s7.htm.

Rvsd Plan - 00003834

efforts have failed to detect lynx in this area or elsewhere in Wyoming since 2010 (79 FR 54791; Squires *in* Lynx SSA Team 2016a, pp. 20-21, 45).

The historical record and recent evidence of lynx occupancy and reproduction indicate that the GYA of northwestern Wyoming and southwestern Montana at least occasionally supports a small number of resident lynx. However, the consistency of lynx occupancy in the GYA over time remains uncertain (Lynx SSA Team 2016a, pp. 11, 45, 57). Uncertainty about whether this area consistently or only intermittently supported resident lynx historically makes it difficult to interpret their recent apparent absence from the area (Lynx SSA Team 2016a, p. 57). If residency was intermittent historically, the current apparent absence of resident lynx might be a natural condition related to the area's largely marginal or suboptimal habitat conditions - i.e., it may naturally be capable of supporting resident lynx only intermittently when habitat conditions and hare densities are optimal. In that case, future intermittent residency would be expected, but only if lynx dispersing from a source population immigrate to the GYA when habitat conditions and hare densities return to more favorable levels. Conversely, if the GYA always historically supported a small number of resident lynx but no longer does, it may suggest that some factor or factors have acted to shift the quality of the area's habitat from just barely capable of supporting a small resident population to no longer capable of doing so, potentially resulting in extirpation.

We conclude that this uncertainty cannot be resolved based on the available information but, given the protected conservation status of large areas of the GYA unit (Yellowstone and Grand Teton national parks; all or parts of the Absaroka-Beartooth, Bridger, Gros Ventre, Lee Metcalf, Northern Absaroka, Teton, and Washakie wilderness areas), its historical inability to support a robust, persistent resident population and its apparent recent inability to support any resident lynx may be a reflection of naturally marginal and patchy habitats and relatively low hare abundance in much of the unit, resulting in only an intermittent ability of this unit to support resident lynx. We note that some of the best potential habitat and highest hare densities have been documented in areas with developmental land use designations (see 4.2.3 and 4.2.5) outside parks and wilderness (e.g., the Wyoming Range/Union Pass/Togwotee Pass areas; Squires 2017, p. 2). However, most of those areas have been managed by the USFS to conserve lynx and habitats in accordance first with the recommendations in the LCAS (Reudiger *et al*. 2000, entire) and the associated conservation agreement (CA) between the USFS and the Service  (USFS and USFWS 2000, entire) and subsequently with the NRLMD (USFS 2007, entire). Nonetheless, despite active management for lynx conservation and the passage, presumably, of adequate time for some previously impacted areas to regenerate back into higher-quality hare and lynx habitats, lynx apparently have failed to naturally recolonize this unit, and released lynx dispersing from Colorado have failed to maintain long-term home ranges or produce kittens in these areas. We also note, however, that extensive areas of the GYA were burned by the large, intense wildfires of 1988, and that some of those areas may soon (perhaps in the next 5-15 years) regenerate to a stage containing the dense horizontal conifer structure favorable for hares and, therefore, lynx foraging habitat, perhaps increasing the likelihood that the GYA may support resident lynx again in the near future (Lynx SSA Team 2016a, p. 46).

47

In southern Wyoming, all recent lynx records are of Colorado-released lynx that moved into or through the area (Devineau *et al.* 2010, fig. 1, p. 526; Ivan 2017, entire), including 1 female that in 2004 established a den on the west side of the Medicine Bow Mountains and produced 3 kittens that did not survive (Bjornlie 2016, *pers. comm.*; Ivan 2016a, *pers. comm.;* 2017, p. 3). Based on the available information, we conclude that southern Wyoming did not historically or recently support a resident lynx population and is not now capable of doing so.

*New Hampshire* - There were 87 confirmed lynx records in northern New Hampshire from 2006 to 2016 (though these do not represent 87 different individual lynx), with evidence of reproduction in 2010 and 2011 (79 FR 54820; NHFGD 2017, entire). Most of these records were documented during snow-track surveys in 2012-2015, with an additional 30 lynx detections recorded in 2014-2016 by remote cameras (NHFGD 2017, entire). Most records since 2006 are in the vicinity of Pittsburg in the northernmost reaches of the state, though lynx detections in 2015 and 2016 suggest a southern expansion from the area where they had been documented in 2006 through 2014 (Siren 2016a, p. 1; Siren 2016b, *pers. comm.*). Despite recent evidence of lynx residency and reproduction, the Service concluded in the 2014 revised critical habitat designation that, based on modeling of the amount of potentially suitable habitat and favorable snow conditions (Hoving *et al.* 2005, pp. 739, 749; Litvaitis and Tash 2005, p. A-298), it is unlikely that northern New Hampshire will support a resident breeding population over the long-term (79 FR 54820-54821). Siren (2014a, p. 10) suspected that the relatively few lynx detections documented in 2012-2014 may be related to the presence and abundance of bobcat, coyote, and fisher populations in much of northern New Hampshire. We conclude that northern and central New Hampshire likely supported a small resident lynx population historically that was extirpated during the latter half of the 20th century. We are uncertain whether lynx detections in northernmost New Hampshire over the past decade may represent the natural reestablishment of a small resident breeding population in the state or if it is a temporary phenomenon related to an expanding source population in neighboring northern Maine (79 FR 54821). Although bobcat populations have increased and expanded their range in this region in recent decades (Lavoie *et al.* 2009, pp. 873-874), severe winters and deep snow can substantially limit their populations (Reed 2013, pp. 29-33; McCord, 1974, pp. 433-434). Maine's bobcat harvest declined substantially after 2 deep-snow winters in 2008 and 2009 (MDIFW 2015a, p. 37). It is possible that these anomalous deep-snow winters provided a temporary competitive advantage to lynx in northern New Hampshire.

*Idaho, Maine, Minnesota, Montana, and Washington* - These states (along with New Hampshire, above) have the strongest historical evidence of continuous lynx presence and recent evidence of resident lynx populations (McKelvey *et al.* 2000a, pp. 211-228; 68 FR 40086-40095, 40097-40101; McKelvey *in* Lynx SSA Team 2016a, p. 11). Historical lynx records exist for much of Idaho, but many, especially in the central and southern part of the state, occurred in anomalous habitats or were associated with large irruptions of lynx from Canada to the northern contiguous United States in the early 1960s and early 1970s (McKelvey *et al.* 2000a, pp. 225-227). The historical record and recent surveys (summarized at 79 FR 54818-54820) suggest that (1) only dispersing lynx occur throughout most of Idaho, (2) habitats in many parts of the state are drier forest types that support lower densities of hares, and (3) resident lynx seem to

48

be confined to the Purcell, Selkirk, and Cabinet mountain ranges in the State's northern panhandle. The number of individual lynx with home ranges occurring in the northeast corner of the Idaho Panhandle is unknown but small based on the amount of potential habitat and results of recent surveys (Lucid 2016, pp. 7-11; Lucid *et al.* 2016, pp. 158-160, 180), and lynx in Idaho are part of a larger population that occurs primarily in northwestern Montana and southeastern British Columbia. In the Selkirks, a single lynx was detected in 2010 and there were multiple detections in 2015-2016. Over the last several years, radio-collar data and remote camera images have documented a single lynx with a home range in the west Cabinet Mountains and there have been detections of multiple lynx in the Purcell Mountains in or immediately adjacent to designated critical habitat (i.e., within 16 km [10 mi] of the Canada border). Detections in the Purcells in 2015-2016 included a photo of an adult lynx accompanied by juvenile lynx, the only recent evidence of lynx reproduction in Idaho, which otherwise lacks evidence of a long-term, persistent resident population (IDFG 2017a, pp. 2-3).

Maine has a long history of continual lynx presence, with evidence of a persistent resident population in much of the northern half of the state (McKelvey *et al.* 2000a, pp. 211-212; Hoving *et al.* 2003, entire;), which currently is believed to support the largest lynx population in the DPS (Vashon *et al.* 2012, pp. 50-60; 79 FR 54784-54785, 54792, 54822-54824; Vashon *in* Lynx SSA Team 2016a, p. 18). The current amount and distribution of high-quality lynx and hare habitat and the numbers of hares and resident lynx in Maine are all much larger than was suspected at the time of listing or the 2003 remand, and all are probably substantially larger now than under likely typical historical conditions. Based on habitat distribution and lynx home range data, the MDIFW estimated that this geographic unit may have supported roughly 250-320 adult lynx in 1995 and 750-1,000+ by 2003-06 (Vashon *et al.* 2012, p. 58; Vashon *in* Lynx SSA Team 2016a, p. 18]), and recent information suggests that resident lynx may be expanding to the south of the core population area (Vashon 2017, *pers. comm.*). The current lynx population in Maine is supported by the broad distribution of high-quality hare habitat that resulted from extensive, large-scale clearcutting in the 1970s and 1980s in response to a massive spruce budworm (*Choristoneura fumiferana*) outbreak (68 FR 40087; 79 FR 54792; also see section 4.2.1). As these regenerating clearcuts, which currently provide the dense horizontal structure preferred by hares, mature beyond about 35-40 years post-harvest, hare densities are expected to decline as cover and forage are reduced as a result of forest succession (Simons 2009, p. 217; Simons-Legaard *in* Lynx SSA Team 2016a, p. 16). The current lynx population in Maine is probably substantially larger than typically occurred historically under the natural disturbance regime, when relatively small amounts of the spruce-fir forests in the state are thought to have been composed of the dense young stands that provode optimal hare (and, therefore, lynx foraging) habitat (Lorimer 1977, entire; 68 FR 40094; Vashon *et al.* 2012, pp. 45, 56; 79 FR 54792). With the reduction in clearcutting and the proliferation of partial harvesting following enactment of the Maine Forest Practices Act of 1989, lynx densities in Maine are projected to decline by 55 to 65 percent by 2032 (Simons 2009, p. 217; Simons-Legaard *in* Lynx SSA Team 2016a, p. 16), perhaps to levels more consistent with likely historical conditions. Lynx in Maine likely represent the southern periphery of a larger population that occurs in northern New Brunswick and southern Quebec south of the St. Lawrence Seaway/River, which appears to partially isolate lynx in this region, demographically and genetically, from populations in the core of the species'

49

range (Koen *et al.* 2015, entire). Whether lynx persistence in Maine relies on immigration from Canada, and if so to what extent, is unknown.

In Minnesota, research conducted since the 2003 remand has demonstrated the continuous presence of a resident lynx population in the northeastern part of the state that seems to be the southern periphery of a larger population in southwestern Ontario (Moen *et al.* 2008b, entire; Moen *in* Lynx SSA Team 2016a, pp. 19, 39). The number of resident lynx in Minnesota is unknown but believed to be between 50 and 200 (Moen *in* Lynx SSA Team 2016a, pp. 19, 39). Hare densities and snow conditions consistently favorable for lynx appear to be restricted to the northeastern "Arrowhead" region of the state. Lynx are occasionally detected to the south and west of this region; however, those areas are dominated by bobcats. Although there are currently more lynx in Minnesota than was suspected when the DPS was listed, it is unclear whether current numbers and distribution are similar to the historical condition. The extent to which lynx persistence in Minnesota may rely on immigration from Canada is also unknown.

In Montana, research conducted since the DPS was proposed for listing has documented the continued presence and broad distribution of resident lynx in much of the northwestern portion of the state (Squires *in* Lynx SSA Team 2016a, p. 20). The number of resident lynx in northwest Montana is unknown but the area is thought to be capable of supporting between 200 and 300 resident lynx (Squires *in* Lynx SSA Team 2016a, p. 41). In this area, resident lynx occur in 3 subpopulations - the Purcell Mountains, Seeley Lake/Central, and Garnet Mountains (Squires *in* Lynx SSA Team 2016a, p. 20). No lynx were detected in the Garnet Range from 2011 to 2015, prompting concerns about the potential loss of the small resident population (perhaps 7-10 lynx) documented there in the mid-1980s and again recently from 2002 to 2010. However, whether this absence indicates the extirpation of a previously persistent resident population or the temporary loss of an historically ephemeral population is uncertain. A single lynx was verified in the Garnet Range in February 2016, indicating that natural recolonization of the area is possible; however, no other detections of that lynx or other lynx have been verified since then, and there currently remains no evidence of lynx residency in this mountain range (Lieberg 2017, *pers. comm.*). Lynx in northwestern Montana (and northern Idaho) likely represent the southern periphery of a larger population in southwestern Alberta and southeastern British Columbia. The extent to which lynx persistence in this area relies on immigration from Canada is unknown, and trapping harvest data suggest declining immigration after the mid-1980s (McKelvey *et al.* 2000a, p. 225; Squires *in* Lynx SSA Team 2016a, p. 20). In southwest Montana, few lynx and no recent evidence of reproduction have been documented in the Montana portion of the GYA where, as with the northwestern Wyoming part of the GYA (discussed above), uncertainty about whether this area consistently or only intermittently supported resident lynx historically makes it difficult to interpret their recent apparent absence from the area (Lynx SSA Team 2016a, p. 57). As elsewhere in the West, recent research and habitat assessments suggest that habitats capable of supporting resident lynx in Montana are, and historically were, naturally patchier and less-broadly distributed (Squires *et al.* 2006a, pp. 46-47; Squires *et al.* 2013, p. 191), and lynx therefore naturally rarer, than was thought when the DPS was listed (ILBT 2013, p. 23; Jackson *in* Lynx SSA Team 2016a, p. 12).

Rvsd Plan - 00003838

In Washington, research and monitoring conducted since the 2003 remand has continued to document a resident lynx population in the Okanogan region of the eastern Cascade Mountains in the north-central part of the state (von Kienast 2003, entire; Maletzke 2004, entire; Koehler *et al.* 2008, entire; Maletzke *et al.* 2008, entire; Maletzke *in* Lynx SSA 2016, pp. 21-22). Since at least 1985, this is the only area of the state with evidence of a resident breeding population (Koehler and Maletzke 2006, p. 4; Koehler *et al.* 2008, p. 1518; ILBT 2013, p. 58; Maletzke *in* Lynx SSA 2016, p. 21), although the Kettle Mountains in the northeastern part of the state are thought to have historically supported a small breeding population (possibly 10-20 resident lynx), and lynx are detected there occasionally (Stinson 2001, pp. 13–14; Koehler *et al.* 2008, p. 1523; USFWS 2008a, p. 2). Multiple large wildfires in this area over the last 25 years have burned about 34-37 percent of the Okanogan Lynx Management Zone (LMZ), resulting in a more than doubling of estimated female lynx home range size and a commensurate decline in the LMZ's potential lynx carrying capacity (Lewis 2016, pp. 4, 6; Maletzke *in* Lynx SSA 2016, p. 21). Although these areas should regenerate into lynx and hare habitat, it may take 35-40 years (Maletzke *in* Lynx SSA 2016, p. 21), during which time additional fire impacts could further diminish habitat availability and the likelihood that the lynx population will persist (Lynx SSA Team 2016a, p. 44; see also sections 3.4, 4.2.4, and 5.2.4).

In summary, although uncertainty remains regarding the historical distribution of resident lynx in the DPS and small breeding populations may have been lost from some places, neither broad-scale breeding range contraction nor substantial population declines in the contiguous United States from historical conditions until the DPS was listed have been documented based on verified occurrence data (68 FR 40099; 72 FR 1187; 79 FR 54798, 54815; McKelvey *in* Lynx SSA Team 2016a, p. 11). New information summarized above indicates that there are currently many more lynx in Maine and Colorado than likely occurred historically, and many more in those places and in Minnesota than was suspected when the DPS was listed. Likewise, resident lynx and some reproduction have also been documented recently in northern New Hampshire, where lynx were previously thought to have been extirpated, and in northern Vermont, which previously lacked evidence of historical lynx residency. Neither of these areas was occupied by lynx when the DPS was listed, and the expanding population in northern Maine was likely the source of lynx recolonizing northern New Hampshire and colonizing northern Vermont. Conversely, there are naturally fewer lynx and a more limited distribution of suitable habitats in most of the western United States than was previously thought (68 FR 40085, 40091-40092; ILBT 2013, p. 23), and lynx numbers in Washington have likely declined (perhaps temporarily) in response to extensive wildfire impacts to habitats over the past several decades. The geographic units evaluated in this SSA include all areas in the contiguous United States with strong historical or recent evidence of resident lynx populations. Detailed assessments of the current status and future viability of resident lynx populations and habitats in these areas are presented in chapters 4 and 5 below.

# Chapter 3: Factors Influencing Viability of the DPS

In this chapter we discuss factors thought to influence the historical and current distribution and status of lynx populations in the contiguous United States, how these factors would likely

51

influence the future viability of the DPS, and we describe the cause-and-effects pathways of impacts associated with particular factors. We focus on the factor for which the DPS was listed under the ESA (the inadequacy of regulatory mechanisms in Federal land management plans when the DPS was listed) and on the anthropogenic influences identified by the ILBT in the revised LCAS as having the potential to exert population-level impacts on lynx and lynx habitats (ILBT 2013, pp. 68-78). Those anthropogenic influences - climate change, vegetation management, wildland fire management, and habitat loss and fragmentation - are considered the most influential factors in the future viability of the lynx DPS.

# 3.1 Regulatory Mechanisms

A number of activities with the potential to affect lynx habitat suitability, productivity, mortality, and movements via habitat loss or fragmentation, creation of barriers, or that otherwise alter the vegetation mosaics and prey abundances maintained historically by natural disturbance processes may occur in lynx habitats regardless of land ownership and management. The extent to which regulations guide such activities to avoid, reduce, or mitigate impacts to lynx influences the current and future likelihoods that those habitats will provide the ecological requirements to support resident lynx populations. As described in more detail below, the lynx DPS was listed as threatened because of the lack of specific conservation direction and associated regulations on some Federal lands. At that time, the available information indicated that most lynx habitat in the DPS occurred on Federal lands, predominantly in the western United States (65 FR 16061). Since then, research and monitoring have revealed that non-Federal lands contribute more to the conservation of the DPS than was known at the time of listing, particularly in the Northern Maine and Northeastern Minnesota geographic areas. Therefore, in the following sections we describe and compare the Federal regulatory environment for lynx in the DPS at the time of listing and currently, and we describe other regulatory mechanisms as they pertain to lynx on private as well as State and Tribal lands.

## 3.1.1 Federal Regulatory Mechanisms

Since it was listed in 2000, the DPS has been protected by the ESA's prohibition on take (under section 9), which applies to lynx wherever they occur in the DPS, regardless of land ownership. The DPS has also been protected since listing by section 7 of the ESA, which requires Federal agencies to use their authorities to conserve listed species and to consult with the Service for any actions they implement, fund, or permit (i.e., for which a "Federal nexus" exists) and which may affect lynx or lynx habitats within the DPS, again regardless of land ownership. Additionally, section 4 of the ESA requires that critical habitat, defined as the specific geographic areas containing the physical and biological features essential for the conservation of a listed species and that may require special management and protection, be designated for listed species, and section 7 prohibits the destruction or adverse modification of such designated habitats. Critical habitat was designated for the lynx DPS in 2007 and was revised in 2009 and 2014; in accordance with a September, 2016 court order (U.S. District Court MT 2016, entire), it may be revised again in the future. Section 4 of the ESA requires recovery planning for listed species; a

52

recovery plan for the lynx DPS has not yet been completed, but part of the purpose of this SSA is to inform near-term recovery planning direction.

Federal lands make up approximately 64 percent of the lands encompassed by the 6 geographic units evaluated in this SSA. Of those Federal lands, roughly 87 percent is managed by the U.S. Forest Service (USFS), 11 percent by the National Park Service (NPS), and 2 percent by the Bureau of Land Management (BLM). The amount of Federal land varies by unit, ranging from 1 percent in the Northern Maine Unit to over 97 percent in the GYA Unit (see table 2 and Chapter 4 for ownership in each geographic unit). Federal lands management is guided by a number of statutes and associated regulations, policies, standards, guidelines, and best management practices (BMPs) applied by managing agencies to meet legislative mandates and achieve agency missions (for a summary of relevant Acts and associated regulations and guidance, see USFWS 2014, pp. 24-34). Many of these regulatory mechanisms provide some benefits to lynx and protect lynx habitats. For example, the conservation priority in the management of NPS lands in accordance with the National Park Service Organic Act (16 USC 1 *et seq*. as amended), the National Parks and Recreation Act (Public Law 95-625), and the Wilderness Act (16 USC 1131-1136, 78 Stat. 890) likely provides an adequate regulatory framework for the conservation of lynx populations and habitats in the NPS units in which they occur (USFWS 2014, pp. 28-29, 31-33). However, it was the absence of specific management direction and conservation measures for lynx and lynx habitats in USFS and BLM land management plans that led the Service to conclude that the regulatory mechanisms in those plans at the time of listing were inadequate to ensure the conservation of the DPS. Therefore, the evaluation below focuses on the efforts of USFS and BLM, in collaboration with the Service, to address the regulatory inadequacy for which the DPS was listed.

The Service designated lynx in the contiguous United States as a DPS and listed it as threatened under the ESA in 2000 because of the inadequacy, at that time, of existing regulatory mechanisms. Specifically, at that time the Service believed that most lynx populations and potential lynx habitats (broad forest vegetation classes defined as "lynx forest types" [65 FR 16071]) in the contiguous United States occurred on Federal (USFS, NPS, and BLM) lands in the western states, and that the plans that guided management of those lands (particularly USFS and BLM lands) included "...programs, practices, and activities within the authority and jurisdiction of Federal land management agencies that may threaten lynx or lynx habitat. The lack of protection for lynx in these Plans render them inadequate to protect the species" (65 FR 16052, 16082). At that time, the Service found that USFS and BLM management plans did not adequately address risks to lynx and, as identified in the LCAS (Ruediger *et al.* 2000, pp. 2-1 through 6-3), those plans allowed actions that cumulatively could result in significant detrimental effects to lynx in the contiguous United States. As a result, the Service concluded in the final rule that the lack of Federal land management plan guidance for the conservation of lynx and the potential for those plans to allow or direct actions that could adversely affect lynx constituted a significant threat to the DPS (68 FR 40096).

In 1998, in anticipation of the DPS's listing under the ESA, regional and state directors of the Service, USFS, BLM, and NPS approved preparation of the interagency LCAS to provide a

53

consistent and effective approach to conserve lynx and to assist with section 7 consultation on Federal lands. An interagency Steering Committee selected a Science Team to assemble the best available scientific information on lynx and appointed the ILBT to prepare a lynx conservation strategy applicable to Federal land management in the contiguous United States (USFWS 2014, p. 15). The first edition of the LCAS was completed in January, 2000 and revised in August, 2000 (Ruediger *et al.* 2000, entire). The Steering Committee subsequently issued several amendments and clarifications, and the most recent revision of the LCAS was completed in August, 2013 (ILBT 2013, entire). The LCAS initially identified and evaluated 17 risk factors (e.g., timber and fire management, recreation, roads, livestock grazing, trapping, etc.) thought to have the potential to affect lynx habitat suitability, productivity, mortality, and movements and that may be addressed under programs, practices, and activities within the authority and jurisdiction of Federal land management agencies. These risk factors included programs or practices with the potential to result in habitat conversion, habitat fragmentation, or obstruction to lynx movement; roads or winter recreation trails that may facilitate access to historical lynx habitat by competitors; and fire suppression, which changes the vegetation mosaic maintained by natural disturbance processes. The risks identified in the 2000 LCAS were based on potential effects to lynx habitats and to individual lynx, lynx populations, or both; therefore, not all of the risks initially identified in the LCAS were thought to threaten lynx populations in the DPS (68 FR 40096). In the 2013 revised LCAS, risk factors were redefined as "Anthropogenic Influences on Lynx and Lynx Habitat," and grouped into 2 tiers based on the potential magnitude of effects (ILBT 2013, pp. 1, 68). First tier influences (climate change, vegetation management, wildland fire management, and habitat fragmentation - discussed in the remainder of this chapter) are those with potential to negatively affect lynx populations and habitats, while second tier influences are those that may affect individual lynx but are not expected to substantially impact populations or habitats (ILBT 2013, pp. 68-85).

In addition to identifying risks, the LCAS also directed Federal agencies to map potential lynx habitat and identify lynx analysis units (LAUs) to evaluate potential impacts of management actions on lynx and snowshoe hare habitats. Finally, the LCAS developed recommended conservation measures, standards, and guidelines to be applied to lynx habitats on Federal lands that were designed to mimic historical conditions and landscape-scale disturbance patterns and to maintain or improve lynx and hare habitats at both local (project-level) and landscape scales (USFWS 2014, p. 16). After its initial completion in 2000, USFS and BLM managers within the range of the DPS agreed to implement the standards and guidelines identified in the LCAS until management plans could be formally amended to specifically address lynx conservation. In 2000, the Service, USFS, and BLM developed and adopted Canada Lynx Conservation Agreements (CAs; BLM and USFWS 2000, entire; USFS and USFWS 2000, entire) in which the BLM and USFS agreed to coordinate assessment and planning efforts with the Service to assure a comprehensive approach to lynx conservation and to use the LCAS, supporting science, and locally specific information as the basis for the approach and to streamline consultation under section 7 of the ESA. The USFS further committed to deferring any actions not involving third parties that would adversely affect lynx until such time as the Forest Plans were amended or revised to adequately conserve lynx (USFS and USFWS 2000, p. 8; 68 FR 40083).

54

Concurrent with development of the LCAS and interagency CAs, the USFS and BLM in 1999 completed the *Biological Assessment* (BA) *of the Effects of National Forest Land and Resource Management Plans and Bureau of Land Management Land Use Plans on Canada Lynx* (USFS and BLM 1999, entire). The BA identified and evaluated the potential effects on lynx of implementation of 57 USFS Land and Resource Management Plans and 56 BLM Land Use Plans throughout the 14 states in which the lynx DPS was proposed for listing. The BA concluded that the potential for adverse effects to lynx existed on each administrative unit in each geographic area and that, cumulatively, implementation of the existing plans was likely to adversely affect the DPS. It recommended that all of the plans be amended or revised to incorporate conservation measures to reduce or eliminate adverse effects to lynx (USFS and BLM 1999, p. 14). In its 2000 biological opinion on the BA, the Service evaluated the USFS and BLM plans in conjunction with the CAs described above (USFWS 2000, p. 15). The Service concluded that implementation of the existing plans in accordance with the CAs until plans could be formally amended or revised was not likely to jeopardize the DPS, but that amendments or revisions to those plans were needed to further reduce or avoid the potential for adverse effects to lynx (USFWS 2000, pp. 48-50).

In the 2003 remanded rule, the Service similarly determined that adherence to the CAs, the biological opinion, and the LCAS in assessing the impacts of Federal actions on lynx alleviated the potentially-adverse effects of Federal land management activities on lynx, but that amendment of USFS and BLM land management plans to conserve lynx would be the strongest mechanism to ensure long-term conservation of lynx and lynx habitat on Federal lands (68 FR 40096-97). It concluded that although Federal, State, and Tribal regulations and plans had reduced threats to the DPS, the inadequacy of existing regulatory mechanisms still posed a moderate, albeit lower-level threat, and would continue to do so until Federal land management plans were specifically amended to address lynx conservation (68 FR 40097).

Since the 2003 remand, most Forest Service units with lynx forest types (actual and "potential" lynx habitats) have formally amended or revised their land management plans to incorporate the conservation measures, standards, and guidelines identified in the LCAS. Because these amended and revised plans apply to secondary areas and other potential lynx habitats (i.e., all mapped habitat in all LAUs), the USFS had applied the conservation measures to many areas outside the geographic units evaluated in this SSA, including many areas that lack evidence of lynx occupancy and some with no verified lynx records. From 2004-2006, forest plans for 7 national forests with potential lynx habitat in Maine, New Hampshire, Vermont, Michigan, Minnesota, and Wisconsin were revised to include recommendations from the LCAS and the CAs (Jackson 2015, p. 6; USFWS 2014, p. 33). In 2007, the USFS completed the Northern Rockies Lynx Management Direction (NRLMD), which formally amended management plans to include lynx conservation measures, standards, and guidelines for 18 national forests covering over 150,000 km$^2$ (57,915 mi$^2$) in Idaho, Montana, Wyoming and Utah, including over 72,000 km$^2$ (27,800 mi$^2$) of potential lynx habitat (USFS 2007, entire; USFWS 2014, pp. 16-19; 79 FR 54813; Jackson 2015 *in* Lynx SSA Team 2016b, Appendix 3, p. 11). In 2008, the USFS similarly completed the Southern Rockies Lynx Amendment (SRLA), which formally amended forest

55

plans covering about 59,000 km$^2$ (22,780 mi$^2$), including over 30,000 km$^2$ (11,583 mi$^2$) of mapped (potential) lynx habitat on 7 national forests or national forest complexes in western Colorado and southern Wyoming (USFS 2008a, entire; Jackson 2015 *in* Lynx SSA Team 2016b, Appendix 3, p. 11). The management direction adopted in the NRLMD and SRLA was developed in accordance with the National Forest Management Act of 1976 (16 USC 1600) and the regulations that implement the statute (36 CFR 219.22), which requires public review and comment as part of the decision making process. Among national forests within the geographic units evaluated in this SSA, only those in Washington (the Okanogan-Wenatchee and Colville national forests) have not formally amended or revised their land and resource management plans. However, the plan revision process has been initiated for both forests, and both continue to manage for lynx habitats in accordance with the LCAS and the CA. Overall, the USFS manages nearly 56 percent (72,927 km$^2$ [28,157 mi$^2$]) of the lands within the 6 geographic units evaluated in this SSA (see table 2, above), and all USFS lands are managed to support lynx conservation in accordance with formally revised or amended Forest Plans or binding conservation agreements with the Service.

The BLM manages a much smaller proportion of the lands within the SSA geographic units, nearly all of which occur in Colorado, Montana, and Wyoming. In Western Colorado (Unit 6), 10 BLM Field Offices (FOs; Colorado River Valley, Grand Junction, Gunnison, Kremmling, Little Snake, Royal Gorge, San Luis Valley, Tres Rios, Uncompahgre, and White River) contain 784 km$^2$ (303 mi$^2$) of potential lynx habitat. These BLM areas were subject to the 2000 interagency CA; however, that CA expired in 2004 (BLM and USFWS 2000, p. 8) and was not renewed. Since then, BLM Resource Management Plans (RMPs) have been revised for 5 of the 10 FOs (Colorado River Valley, Grand Junction, Kremmling, Little Snake, and Tres Rios). RMPs for the Gunnison, Royal Gorge, San Luis Valley, Uncompahgre, and White River FOs have not been revised and do not contain specific measures for the conservation of lynx; however, these areas constitute a very small proportion of lynx habitat this unit. In western Montana (Unit 3), BLM lands in the Garnet Resource Area include 405 km$^2$ (156 mi$^2$) of designated lynx critical habitat. In western Wyoming (Unit 5), 261 km$^2$ (101 mi$^2$) of BLM lands on the Kemmerer and Pinedale districts are also designated as lynx critical habitat. The RMP for the Garnet area was amended in 2004 to formally adopt the conservation measures of the LCAS (BLM 2004a, 2004b, entire), and the RMPs for the Pinedale and Kemmerer districts were revised in 2008 and 2010, respectively, to adopt conservation measures and BMPs for lynx (BLM 2008, pp. A18-10 - A18-16; BLM 2010, pp. A-9 - A-12). Overall, the BLM manages just over 1 percent (1,443 km$^2$ [557 mi$^2$]) of the lands within the 6 geographic units evaluated in this SSA (see table 2, above), most of which is actively managed to support lynx conservation.

The completion and implementation of the LCAS and its subsequent revisions, the interagency CAs, and the subsequent formal management plan revisions and amendments adopted under the NRLMD and SRLA all were undertaken to address the inadequacy of regulatory mechanisms on USFS and BLM lands for which the DPS was listed. Each incorporated the best available scientific information to develop goals, objectives, conservation measures, standards, and BMPs to guide USFS and BLM management activities at both project- and landscape-level scales to reduce or eliminate the potential for adverse effects to lynx or lynx habitats and thus

56

promote the conservation of the DPS (Ruediger *et al.* 2000, pp. 7-1 - 7-18; BLM and USFWS 2000, entire; USFS and USFWS 2000, entire; USFS 2007, pp. 8-30, USFS 2008a, pp. 6-19, Attachment 1-1 - 1-9). Standards and guidelines developed and implemented in accordance with the NRLMD and the SRLA were designed to promote beneficial effects and limit potentially adverse effects of management activities (vegetation management [e.g., timber harvest, precommercial thinning], wildland fire and fuels management, grazing, recreation, road/access management, energy development, etc.) on important lynx habitats including winter snowshoe hare habitat (high-quality lynx foraging habitat), denning habitat, and linkage/connectivity corridors (USFS 2007, pp. 8-30, USFS 2008a, pp. 6-19, Attachment 1-1 - 1-9). The USFS concluded that the vegetation standards adopted in the NRLMD that limit the total amount and the rate at which lynx habitat can be converted to temporarily unsuitable habitat (stand-initiation seral stage following timber harvest) ensure that the agency's timber management program is beneficial to lynx and will provide sufficient lynx habitat through time at both LAU and landscape-level scales (USFS 2007, p. 35). In its biological opinion on the NRLMD, the Service concluded that its application "...would substantially reduce or eliminate adverse effects to lynx from Forest Service land management activities on at least 94 percent of this area (National Forest System lands in the Northern Rockies), and more likely nearer to 98 percent" (USFWS 2007, p. 76). Similarly, in its 2008 biological opinion on the SRLA, the Service concluded that vegetation management standards in the SRLA would prohibit treatments that could adversely affect essential components of lynx habitat on 95.5 percent of the mapped (potential) lynx habitat in the SRLA area (National Forest System lands in the Southern Rockies; USFWS 2008b, p. 52).

In summary, all USFS and most BLM lands with known or potential lynx habitat within the range of the DPS, including all SSA geographic units that encompass USFS and BLM lands, are currently managed in accordance with the specific conservation measures and considerations identified in the LCAS and implemented via the CAs or formally revised and amended management plans described above. These agreements and revised/amended plans constitute the regulatory framework and specific regulatory mechanisms adopted to conserve lynx habitats and populations on USFS and BLM lands that support or are potentially capable of supporting them. They represent the agencies' efforts, in collaboration with the Service, to address and ameliorate the singular threat for which the lynx DPS was listed under the ESA. Although formal effectiveness monitoring has not been completed, it is clear that implementation of the CAs and revised/amended plans, and the associated programmatic and project-specific consultations between BLM/USFS and the Service in accordance with section 7 of the ESA, have resulted in avoidance/minimization of impacts to important lynx and hare habitats on Federal lands and have reduced the likelihood that management activities on these lands may adversely affect lynx in the contiguous United States. Overall, Federal lands managed by the USFS, BLM, and NPS constitute nearly 64 percent 83,683 km$^2$ [32,310 mi$^2$]) of the area evaluated in this SSA, and all but a tiny fraction of these lands are actively managed for lynx conservation.

Rvsd Plan - 00003845

## 3.1.2 State Regulations and Tribal Management

Private, State, and Tribal lands make up the remaining 36 percent of the lands encompassed by the 6 geographic units evaluated in this SSA, accounting for almost 27 percent, almost 9 percent, and 1 percent of the total, respectively (table 2). The amount of private land varies by unit, ranging from 0.3 percent in the North-central Washington Unit to over 90 percent in the Northern Maine Unit. Likewise, State ownership varies from less than 1 percent in the GYA and Western Colorado units to 36 percent in the Northeastern Minnesota Unit. Tribal lands account for about 4 percent of the Northwestern Montana/Northeastern Idaho Unit and roughly 1 percent of the Northern Maine and Northeastern Minnesota units; there are no Tribal lands in the North-central Washington, GYA, or Western Colorado units. Private, State, and Tribal lands, combined, constitute 99 percent of the lands in the Northern Maine Geographic Unit and over half of those in the Northeastern Minnesota Unit. Because both of these units support larger resident lynx populations than was suspected when the DPS was listed and, therefore, may contribute more substantially to the conservation of the DPS than was understood at the time of listing, we must evaluate the regulatory mechanisms that pertain to lynx on these lands (Lynx SSA Team 2016a, p. 54). Although private, State, and Tribal lands constitute much smaller proportions of the other 4 (western) geographic units (from about 3 percent to 16 percent, combined), important lynx habitats occur on some of those lands, and regulatory mechanisms may influence their contributions to the conservation and persistence of DPS populations or parts of them. Therefore, in this section, we summarize the relevant regulatory frameworks and mechanisms that may affect lynx on private, State, and Tribal lands within the 6 geographic units of the DPS, but with a focus on those units with the greatest proportions of these lands and on activities on these lands with the greatest potential to impact lynx.

State Wildlife Management Regulations - The following information is derived largely from the Service's 2014 Incremental Effects Memorandum prepared in support of the revised designation of critical habitat for the lynx DPS (USFWS 2014, pp. 35-38) and updated as warranted by new information. State furbearer and other wildlife management regulations benefit lynx populations in the states where they occur. In addition to State and private lands, State wildlife regulations govern hunting and trapping activities on many Federal lands where those activities are permitted. Most states within the range of the lynx prohibited trapping and hunting of lynx prior to the Service's 1998 proposal to list the DPS under the ESA, and those activities were prohibited in all states by the time the DPS was listed in 2000. All states within the lynx DPS range that allow legal bobcat harvest (1) manage in accordance with the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) Export Program for Appendix II Furbearer Species (USFWS 2014, pp. 25-26), (2) have distributed information to bobcat trappers and hunters on how to avoid incidental take of lynx, and (3) report all known incidental take of lynx associated with bobcat harvest to the Service's Division of Management Authority to assure that take does not exceed the amount permitted under the intra-agency section 7 consultation for the CITES Export Program (USFWS 2001, entire). Most states have also adopted special regulations in areas where lynx occur to minimize the potential for incidental take (including injury) of lynx during legal trapping of other furbearers. These efforts benefit lynx and are expected to do so in the future with continued implementation and

58

enforcement. Most reported incidentally-trapped lynx are released unharmed (see below), and there is no evidence that incidental trapping has had population-level impacts on lynx in the DPS range.

*Unit 1: Northern Maine* - In 1967, a bounty on lynx in Maine was repealed, and lynx were given complete protection from trapping and hunting. In Wildlife Management Districts where lynx may occur, the Maine Department of Inland Fisheries and Wildlife (MDIFW) has adopted special trapping regulations intended to minimize the incidental capture, injury, and death of lynx. These restrictions have varied over the past two decades, becoming mored restrictive with time following a consent decree in 2008. Some of the requirements developed over time include specification of trap sizes and sets that may be used to legally harvest other furbearers and that are intended to minimize the likelihood of incidentally trapping lynx[5] (MDIFW 2016a, pp. 8, 13). MDIFW has also prohibited the use of visual baits and visual attractants and reqires mandatory reporting of incidental lynx captures. MDIFW also adopted and made available for download on its web page the interagency brochure *How to Avoid Incidental Take of Lynx while Trapping or Hunting Bobcats and other Furbearers*, modified it to be more specific to Maine, and updated it in 2015 (MDIFW 2015b, entire). MDIFW also set-up an incidental lynx capture hotline and has staff on stand-by to help immobilize, evaluate, collect tissue and/or hair samples, and release, if appropriate, any lynx reported to the hotline. From 2000 to 2016, this program has resulted in the release of 106 lynx that were reported incidentally trapped in northern Maine; during this time, 12 lynx died from traps or being illegally shot while in traps (MDIFW 2014, p. 75; MDIFW 2016b, pp. 5-10).

After preparing a habitat conservation plan (Incidental Take Plan), the MDIFW in 2014 obtained an incidental take permit from the Service for lynx trapped incidental to predator management and animal damage control activities, and the recreational furbearer trapping program in Maine. The permit allows incidental trapping of 195 lynx over a 15-year period, including 3 mortalities. After 2 lynx were killed in leaning-pole trap sets in 2014, MDIFW imposed additional trapping restrictions to further reduce mortality and injury of incidentally-trapped lynx, as required by the permit (also see Other Factors in section 4.2.1 below). In addition to prohibiting the type of leaning-pole sets that resulted in the 2 mortalities, the regulations now require exclusion devices on most killer-type traps and multiple swivels on chains, and they prohibit the use of drag sets on foothold traps.

The MDIFW also is responsible for implementing the Maine Endangered Species Act[6] (MDIFW 2009, p. 9). Although the lynx is not State-listed as threatened or endangered because its population is believed to exceed the State's listing threshold, it is considered a species of special concern (MDIFW 2011, p 2). The MDIFW works collaboratively with the Service to conduct research and monitor lynx populations and habitats, and it recommends voluntary forest management activities to promote a sustainable supply of large, connected, and widely-distributed blocks of dense, young spruce-fir stands and to conserve large blocks of unfragmented forestland in northern and western Maine (MDIFW 2011, p. 3).

---

[5] http://www.maine.gov/ifw/hunting_trapping/trapping/avoid_lynx.htm, last accessed 8.08.2016.
[6] http://www.mainelegislature.org/legis/statutes/12/title12sec12803.html.

*Unit 2: Northeastern Minnesota* - Although lynx were unprotected and had a bounty placed on them in Minnesota prior to 1965, lynx trapping and hunting have been prohibited in Minnesota since 1984 (65 FR 16077; Moen *in* Lynx SSA Team 2016a, p. 19). Overlapping the Northeastern Minnesota SSA unit, the Minnesota Department of Natural Resources (MNDNR) has identified a specific "Lynx Management Zone" (LMZ) for which it has promulgated and enforces special trapping regulations for other furbearers in lynx habitat (MNDNR 2016a, p. 53). The MNDNR has modified trapping regulations within the LMZ to minimize the incidental take of lynx during the legal trapping of other furbearers. The regulations address specific trap types and sets, prohibit the use of certain baits and visual attractants, and require reporting of any incidentally trapped lynx to DNR conservation officers within 24 hours (MNDNR 2016a, pp. 53-55). The MNDNR also distributed to trappers the interagency brochure *How to Avoid Incidental Take of Lynx while Trapping or Hunting Bobcats and other Furbearers*. In response to a Federal court order, MDNR developed an incidental take plan designed to minimize the potential for lynx to be incidentally trapped during other legal furbearer trapping; the plan is currently under review by the Service. Like Maine, Minnesota has a State Endangered Species Statute (84.0895) which requires the MNDNR to adopt rules designating species meeting the statutory definitions of endangered, threatened, or species of special concern (State of Minnesota 2016, entire). The Statute also authorizes the MNDNR to adopt rules that regulate treatment of species designated as endangered and threatened. Also like Maine, however, Minnesota has not designated lynx as threatened or endangered under the statute. Instead it has designated the lynx a species of special concern, a designation for species that are extremely uncommon, have unique or highly specific habitat requirements, or occur on the periphery of their range in Minnesota and, therefore, deserve careful monitoring (MNDNR 2013, pp. 1-2). Thus, the MNDNR coordinates with the Service and other agencies to conduct research and monitor lynx populations and habitats.

*Unit 3: Northwestern Montana/Northeastern Idaho* - Lynx are designated as a species of greatest conservation need (S3; "potentially at risk") by the State of Montana (MTFWP 2015, pp. 12, 435) and were previously considered a species of greatest conservation need (S1) by the State of Idaho (ILBT 2013, p. 57). However, in its recently revised State Wildlife Action Plan, Idaho did not retain that designation for lynx because of the lack of evidence of a persistent lynx presence in the state (IDFG 2017a, p. 4). The harvest of lynx was prohibited in Idaho and Montana beginning in 1996 and 1999, respectively. Both States participate in the CITES Export Program for bobcats, and both have promulgated and enforce special regulations for the legal trapping of other furbearers in areas occupied by lynx. In its trapping regulations, Idaho Fish and Game (IDFG) provides information on how to distinguish between bobcats and lynx and provides guidelines to reduce injury and minimize non-target catches, including lynx (IDFG 2017b, pp. 36-37). Guidelines recommend (1) a minimum 8-pound pan tension on foothold traps set for wolves, (2) specific trap types and sets for other furbearers, and (3) bait and habitat considerations when making sets. Trappers are also required to contact IDFG or local sheriff's offices to assist with the safe release of incidentally trapped lynx. Three of 4 lynx incidentally trapped in Idaho recently were released unharmed; the other was illegally shot (IDFG 2017a, p. 3). To minimize and track the incidental capture of lynx, Montana Fish, Wildlife, and Parks

60

(MTFWP) has promulgated an evolving set of trapping regulations and reporting requirements since the DPS was listed (MTFWP 2016, pp. 7-10), including significant changes in 2008 that reduced the reported rate of incidental lynx captures from 1.6 per year in 2000-2007 to 0.4/year in 2008-2015 (MTFWP 2016, p. 5). In 2015, the Federal District Court of Montana approved a settlement agreement reached between the State of Montana and conservation groups aimed at protecting lynx from trapping. The case is now dismissed in accordance with the agreement, under which Montana has implemented a set of restrictions on trapping in lynx habitat. Currently, these regulations identify designated lynx protection zones (LPZs) and define acceptable trapping methods for public lands within them, which (1) prohibit the use of lethal (non-relaxing) snares for bobcats, (2) specifies the types of sets and baits or attractants that may be used for marten, fisher, and other furbearers where lynx occur, (3) requires a minimum 10-pound pan tension on foothold traps set for wolves, and (4) requires that any incidentally trapped lynx must be released unharmed if possible and reported to MTFWP (MTFWP 2016, pp. 7-10).

*Unit 4: North-central Washington* - Lynx harvest has been prohibited in Washington since 1991, and the lynx was listed as a State threatened species in 1993 and uplisted to endangered in 2016 (Lewis 2016, pp. *iii*, 1; WAFWC 2016, p. 3). Under the State's Endangered Species Program, the Washington Department of Fish and Wildlife (WADFW) developed a Lynx Recovery Plan[7] and a Status Report[8], and it prepares annual reports to update population and habitat information for the species. The WADFW also coordinates with the Service and other agencies to conduct research and monitor lynx populations and habitats. Additionally, the use of body-gripping traps (foothold, conibear, snares, etc.) for trapping other furbearers is prohibited in Washington (except for damage control or nuisance wildlife, which requires special permits). This avoids the potential for lynx to be incidentally captured in traps set legally for other animals.

*Unit 5: GYA (Southwestern Montana and Northwestern Wyoming)* - See Unit 3, above, for summary of Montana's special trapping regulations to minimize incidental take of lynx, which apply to the northern part of this unit. Lynx in Wyoming are classified as nongame wildlife, a Species of Greatest Conservation Need, and a Protected Animal by Wyoming State Statute. A classification of "State Protected" status prohibits trapping or any intentional take in the state, and lynx in Wyoming were offered full protection from trapping and hunting beginning in 1973 (ILBT 2013, p. 57). The Wyoming Game and Fish Department (WGFD) also participates in the CITES Export Program for bobcats.

*Unit 6: Western Colorado* - Lynx harvest has been prohibited in Colorado since 1970 and the lynx was listed as endangered in the State in 1973. Colorado participates in the CITES Export Program for bobcats, provides information to trappers and hunters on how to distinguish between lynx and bobcats, and requires immediate release of uninjured incidentally trapped lynx as well as reporting of any (uninjured, injured, or killed) incidentally trapped lynx (CPW 2015, pp. 6-7). Colorado law prohibits the use of foothold or conibear traps and snares for

---

[7] http://wdfw.wa.gov/publications/00394/.
[8] http://wdfw.wa.gov/publications/01521/.

trapping, which avoids the potential for lynx to be incidentally captured in traps set legally for other animals.

State Forest Management Regulations - Timber harvest and other forest management activities on State and private lands are governed by State regulations. Because these activities have the potential for beneficial, benign, or adverse impacts to lynx habitat depending on methods, implementation, and conservation measures, State forestry regulations may influence lynx populations, particularly where substantial amounts of lynx habitat occur on State and private lands. Below, we provide an overview of the forest management regulations in the SSA geographic units and briefly discuss their potential influences on lynx habitat. Additional details on the current and likely future influences of these regulations on lynx populations are provided below in chapters 4 and 5, particularly for the Maine and Minnesota units, where State and private lands constitute the majority of lynx habitats.

*Unit 1: Northern Maine* - State and private lands constitute 7 percent and 90 percent, respectively, of this SSA unit, with the vast majority of private lands managed for commercial timber production. As described above in section 2.3.2.2 and in more detail below in sections 4.2.1 and 5.2.1, the current abundance of lynx in northern Maine is attributable to the landscape-scale clear-cutting that occurred on private timber lands in the 1970s and 1980s in response to an extensive spruce budworm outbreak, which resulted in the recent unnaturally large amount of young (15 to 35 years post-harvest) regenerating forest in prime hare (lynx foraging) habitat condition. The amount and distribution of this post-clear-cut high-quality hare habitat likely peaked in the late 1990s to early 2000s, when 20-25 percent of the forest in Maine was in an early regeneration stage. The amount of young, regenerating forest at that time was 3 to 8 times higher than typical historical conditions under the natural disturbance regime, when only 3 to 7 percent of stands were likely in such condition at any given time (68 FR 40094). Current timber harvest and management on State and private lands in Maine are governed by the Maine Forest Practices Act of 1989 and administered by the Maine Forest Service within the Department of Agriculture, Conservation & Forestry to regulate, among other things, the size, arrangement, regeneration, and management of clearcuts (MEDACF 2014, pp. 42-45). Under the Act, small (up to 101 ha [250 ac]) clear-cuts are still permitted but require special permits and review and have, therefore, been replaced by various forms of partial harvest techniques; many of which are unlikely to maintain the current unnaturally high amount and distribution of high-quality hare and lynx habitat. The consequences of this large-scale shift in forest management on Maine's current lynx population, which is likely much larger than was possible under the natural historical disturbance regime, and on future conditions for lynx in this unit are discussed below in sections 4.2.1 and 5.2.1, respectively, along with other programs and factors that may influence private lands forest management in this unit.

In Maine, most private lands lack long-term management agreements to assure lynx conservation. However, in 2006 and 2007, the Natural Resource Conservation Service (NRCS) provided funds to Maine for a pilot Healthy Forest Reserve Program (HFRP) specifically to manage for Canada lynx and American marten. Under this program, 4 landowners have developed and implemented lynx management plans covering about 652 km$^2$ (252 mi$^2$; 2.3

62

Rvsd Plan - 00003850